Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   -------------------------------x

    In re:

5   RESIDENTIAL CAPITAL, LLC.,          Case No.

    et al.,                             12-12020 (MG)

6

                    Debtors.

7   -------------------------------x

8

9                   VIDEOTAPED

10        DEPOSITION OF LEWIS KRUGER

11           New York, New York

12       Wednesday, October 30, 2013

13

14

15       Yellow Highlighting = JSN Designations
16       Pink Highlighting = Plaintiff's Counter-Designations
17       Orange Highlighting = Joint Designations

18

19

20

21

22

23

24   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

25   JOB NO. 67414

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 2 of 165

Page 2

1

2

3

4

5          October 30, 2013

6          10:00 a.m.

7

8

9          Videotaped deposition of LEWIS

10   KRUGER, held at the offices of Morrison &

11   Foerster LLP, 1290 Avenue of the

12   Americas, New York, New York, pursuant to

13   Notice, before Francis X. Frederick, a

14   Certified Shorthand Reporter, Registered

15   Merit Reporter and Notary Public of the

16   States of New York and New Jersey.

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4       MILBANK TWEED HADLEY & McCLOY

5       Attorneys for the Ad Hoc Group of Junior

6       Secured Noteholders

7            1850 K Street, N.W.

8            Washington, D.C. 20006

9       BY:   DAVID COHEN, ESQ.

10           KATHERINE RHODES JANOFSKY, ESQ.

11                                     3

12      MORRISON & FOERSTER

13      Attorneys for the Debtor and the witness

14           1290 Avenue of the Americas

15           New York, New York 10104

16      BY:   CHARLES KERR, ESQ.

17           GARY LEE, ESQ.

18           DAVID ZIEGLER, ESQ.

19           ALEX LAWRENCE, ESQ.

20

21       KRAMER LEVIN NAFTALIS & FRANKEL

22       Attorneys for the Creditors' Committee

23            1177 Avenue of the Americas

24            New York, New York 10036

25      BY:   DOUGLAS MANNAL, ESQ.

Page 4

1

2    A P P E A R A N C E S:  (Cont'd.)

3

4    KIRKLAND & ELLIS

5    Attorneys for Ally

6         655 Fifteenth Street, N.W.

7         Washington, D.C. 20005

8    BY:  RACHEL GOLDSTEIN, ESQ.

9

10   REED SMITH

11   Attorneys for Wells Fargo as

12   Collateral Agent

13        599 Lexington Avenue

14      New York, New York 10022

15   BY:   MARK SILVERSCHOTZ, ESQ.

16

17   CLEARY GOTTLIEB STEEN & HAMILTON

18   Attorneys for Wilmington Trust, N.A. as

19   Indenture Trustee

20        One Liberty Plaza

21        New York, New York  10006-1470

22   BY:  JEREMY OPOLSKY, ESQ.

23

24

25

Page 5

1

2    A P P E A R A N C E S:  (Cont'd)

3

4         SEWARD & KISSELL

5         Attorneys for US Bank

6              One Battery Park Plaza

7              New York, New York  10004

8    BY:   MARK KOTWICK, ESQ.

9

10        CADWALADER WICKERSHAM & TAFT

11        Attorneys for MBIA

12             One World Financial Center

13             New York, New York  10281

14    BY:   JASON JURGENS, ESQ.

15

16        WOLLMUTH MAYER & DEUTSCH

17        Attorneys for Syncora Guarantee Inc.

18             500 Fifth Avenue

19             New York, New York  10110

20    BY:   RANDALL RAINER, ESQ.

21             FLETCHER STRONG, ESQ.

22

23

24

25

Page 6

1

2   A P P E A R A N C E S:    (Cont'd.)

3

4       JONES DAY

5       Attorneys for FGIC

6           222 East 41st Street

7           New York, New York  10017

8       BY:   RICK WYNNE, ESQ. (via telephone)

9

10      KELLEY DRYE

11      Attorneys for UMB Bank

12          101 Park Avenue

13          New York, New York  10178

14      BY:   TIMOTHY MARTIN, ESQ. (via telephone)

15

16

17

18

19   ALSO PRESENT:

20       ROBERT RINKEWICH, Videographer

21

22

23

24

25

1               PROCEEDINGS

2          THE VIDEOGRAPHER:  This is the

3     start of tape labeled number one of the

4     videotaped deposition of Lewis Kruger in

5     the matter of In Re. Residential Capital,

6     et al. in the United State Bankruptcy

7     Court for the Southern District of New

8     York.  This deposition is being held at

9     1290 Avenue of the Americas, New York,

10    New York, on October 30th, 2013 at

11    approximately 10:06 a.m.

12          My name is Robert Rinkewich from

13    TSG Reporting, Incorporated and I am the

14    legal video specialist.  The court

15    reporter its Francis Frederick in

16    association with TSG Reporting.

17          Would counsel state their

18    appearances for the record.

19          MR. COHEN:  This is David Cohen,

20    Milbank, Tweed, Hadley & McCloy, on

21    behalf of the Ad Hoc Group of JSN

22    Noteholders and UMB Bank as Notes Trustee

23    with my colleague, Kate Janofsky.

24          MR. KERR:  Charles Kerr of

25    Morrison & Foerster on behalf of the

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 8 of 165

Page 8

1           PROCEEDINGS

2      Debtors and the witness.

3           MR. LAWRENCE:  Alex Lawrence of

4      Morrison & Foerster on behalf of the

5      Debtors and the witness.

6           MR. SILVERSCHOTZ:  Mark

7      Silverschotz, Reed Smith, for Wells Fargo

8      as collateral agent.

9           MR. JURGENS:  Jason Jurgens from

10     Cadwalader, Wickersham & Taft, LLP, on

11     behalf of MBIA.

12          MR. OPOLSKY:  Jeremy Opolsky,

13     Cleary, Gottlieb, Steen & Hamilton, for

14     Wilmington Trust.

15          MR. KOTWICK:  Mark Kotwick, Seward

16     & Kissell, on behalf of US Bank as

17     Trustee.

18          MR. LIPPS:  Jeff Lipps, Carpenter,

19     Lipps & Leland on behalf of the Debtors.

20          MS. GOLDSTEIN:  Rachel Goldstein

21     on behalf of Kirkland & Ellis on behalf

22     of Ally Financial.

23          MR. ZIEGLER:  David Ziegler,

24     Morrison & Foerster, on behalf of the

25     Debtors and the witness.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 9 of 165

Page 9

1                       L. KRUGER

2              MR. MANNAL:  Doug Mannal, Kramer

3      Levin, on behalf of the Committee.

4              THE VIDEOGRAPHER:  Do we have

5      anybody on the phone?

6              MR. KERR:  Yeah.  The people on

7      the phone, if you could just introduce

8      yourself for the court reporter.

9              MR. WYNNE:  Rick Wynne from Jones

10     Day on behalf of FGIC.

11             MR. MARTIN:  Tim Martin from

12     Kelley Drye on behalf of the UMB Bank.

13             * * *

14     L E W I S   K R U G E R,   called as a

15         witness, having been duly sworn by a

16         Notary Public, was examined and

17     testified as follows:

18     EXAMINATION BY

19     MR. COHEN:

20         Q.    Good morning, Mr. Kruger.

21         A.    Good morning.

22         Q.    I understand you've been deposed

23     before.

24         A.    I have been.

25         Q.    How many times?

Page 10

L. KRUGER

1

2      A.     In this case twice.

3      Q.     How many in your lifetime?

4      A.     Probably half a dozen.

5      Q.     All right.  We'll go over the

6   ground rules very quickly, which I'm sure will

7   be very familiar to you.  You understand that

8   you're under oath?

9      A.     Yes.

10      Q.     That your testimony here is just

11   as though you were giving it in court under

12   penalty of perjury?

13      A.     Yes.

14      Q.     To keep a clean record here I'd

15   like to make sure that we speak one at a time

16   so I'd ask if you'd let me finish my question

17   before you begin your answer and I'll do my

18   best to extend you the same courtesy and let

19   you finish your answer before I begin my next

20   question.

21      A.     Thank you.

22      Q.     If any of my questions are unclear

23   to you or you don't understand my question,

24   let me know, I'll do my best to clear up any

25   ambiguity.  All right?

Page 11

1                      L. KRUGER

2        A.    Yes.

3        Q.    Okay.  All of your answers need to

4    be oral.  A nod is not going to be recorded on

5    the written transcript, okay?

6        A.    Yes.

7        Q.    If you need to consult with your

8    attorney at any time let me know and we can

9    take that up.

10       A.    Okay.

11       Q.    If you'd like to take a break at

12   any time, let me know and I'll do my best to

13   accommodate you, all right?

14       A.    Thank you very much.

15       Q.    What did you do to prepare for

16   this deposition?

17            MR. KERR:  Not to interrupt, but

18       we just had two other folks show up so if

19       we could get them on the record.

20            MR. COHEN:  That's okay.  This is

21       an appropriate time to have people enter

22       their appearances.

23            MR. RAINER:  Randall Rainer,

24       Wollmuth, Maher & Deutsch, for Syncora

25       Guarantee.  This is my colleague,

Page 12

1                    L. KRUGER

2        Fletcher Strong.

3                 MR. KERR:  Sorry.  Sorry.

4                 MR. COHEN:  No problem.

5   BY MR. COHEN:

6        Q.    So, Mr. Kruger, what did you do to

7   prepare for to deposition?

8        A.    Met with my counsel.  Reviewed

9   documents.

10        Q.    When did you meet with your

11   counsel?

12        A.    Over the last few days.

13        Q.    How many days?

14        A.    Probably two or three days.  Parts

15   of those days.

16        Q.    So how many hours in total would

17   you say that you met with your counsel to

18   prepare for this deposition?

19        A.    Ten, 12 hours.

20        Q.    Could you give me an estimate of

21   the volume of documents you looked at in

22   preparation for the deposition.

23        A.    I'm not sure how I can do that.

24   Hundreds of pages of documents.

25        Q.    But was it 15 documents, a hundred

Page 13

L. KRUGER

1  documents?

2  A.   Oh, number of documents?  I don't

3  really recall as I sit here today but my guess

4  is probably a half dozen or so.

5  Q.   Do you recall what those documents

6  were?

7  A.   I do recall  some of them.  I do

8  recall looking at the reorganization plan.

9  Disclosure statement.  Primarily those two.

10  Q.   Any others come to mind?

11  A.   I looked at the White & Case

12  Complaint.  The objection to confirmation I

13  guess is the right words.

14  That's really all that comes to

15  mind.

16  Q.   When you say the objection to

17  confirmation would that be the JSN's plan

18  objection that was filed about a week ago?

19  A.   Yes.  That's what I had in mind.

20  Q.   When you say you met with your

21  counsel are you talking about the lawyers at

22  Morrison & Foerster?

23  A.   That's correct.

24  Q.   Anyone else?

Page 14

1                    L. KRUGER

2         A.    No.

3         Q.    Did you meet with any of the

4    Debtors' financial advisors?

5         A.    I met with them over the course of

6    this entire proceeding from time to time and

7    so I don't know that I met with them

8    specifically to prepare for this but I

9    certainly met with them and talked with them

10   regularly.

11        Q.    Okay.  Let me ask a more specific

12   question.  In preparing for your testimony

13   today, did you schedule sessions to meet with

14   the Debtors' financial advisors?

15        A.    No, I did not.

16        Q.    Did you meet with anybody at the

17   company, any of the officers or management

18   team?

19        A.    I've had discussions with

20   management team over the course of the months

21   that I've been involved and had some

22   discussion with them during the course of the

23   last week.  It's hard to really envision

24   conversations that I had that don't have as

25   their goal either confirmation of the Chapter

Page 15

L. KRUGER

1    11 proceeding, which I assume is part and

2    parcel of this deposition.  So it's hard for

3    me to distinguish between specific general

4    depositions preparation and more generally the

5    confirmation for the proceeding.

6    Q.    Fair enough.

7    Did you with respect to the

8    management team at ResCap schedule any

9    meetings for the purpose of preparing for you

10   deposition?

11   A.    Specifically, no.

12   Q.    All right.

13   Who is your current employer?

14   A.    ResCap.

15   Q.    And what is your title?

16   A.    Chief Restructuring Officer.

17   Q.    When did you become the Chief

18   Restructuring Officer of ResCap?

19   A.    I don't remember the exact date,

20   but sometime in February of this year.  And

21   when I say that they are my employer, I'm also

22   the Chief Restructuring Officer for all of the

23   Debtors in these proceedings.  My appointment

24   was confirmed by the bankruptcy court I

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 16 of 165

Page 16

L. KRUGER

1
2  believe on March 5th of 2013.

3      Q.    How did you come to become the

4  chief restructuring officer of all of the

5  Debtors?

6      A.    I was approached by people I knew

7  at Morrison & Foerster.  They had asked if I

8  would be interested in taking on this role.  I

9  said I might be.  I was then interviewed by

10 the board of directors of the company and they

11 concluded that they'd like to have me serve as

12 chief structuring officer and I agree to do

13 so.

14     Q.    At the time you we met Morrison &

15 Foerster and they approached you about

16 becoming the chief restructuring officer, what

17 did they describe to you as the scope of

18 services that you would be expected to

19 provide?

20     A.    That I would be the chief

21 restructuring officer of the company,

22 participate in the mediation process that was

23 ongoing, and assist them in trying the find a

24 resolution of these contentious Chapter 11

25 proceedings.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 17 of 165

Page 17

L. KRUGER

1

2      Q.    Did they give any more detail on

3  that?

4      A.    I'm not sure what kind of detail

5  you mean.

6      Q.    What specific tasks other than

7  participating in the mediation and trying to

8  find a way to resolve these contentious

9  proceedings?

10      A.    Well, I have an engagement that

11  sets forth all of my -- things that I'm

12  expected to be doing and are doing and have

13  done.  So other than referring to that, I'm

14  not sure that I could give you an offhand

15  list.  That would be the most appropriate

16  place to look for the engagement.

17      Q.    As you sit here right now is there

18  any part of the engagement letter that you

19  feel you did not do?

20      A.    No.

21      Q.    All right.

22           MR. COHEN:  Let's mark as the

23  first exhibit the Notice of Debtors'

24  Motion Pursuant to Section 105(a) and

25  363(b) of the Bankruptcy Code for an

Page 18

1            L. KRUGER

2       Order Authorizing the Debtors to Appoint

3       Lewis Kruger as Chief Restructuring

4       Officer.

5            (Kruger Exhibit 1, Notice of

6       Debtors' Motion Pursuant to Sections

7       105(a) and 363(b) of the Bankruptcy Code

8       for an Order Authorizing the Debtors to

9       Appoint Lewis Kruger as Chief

10      Restructuring Officer, marked for

11      identification as of this date.)

12  BY MR. COHEN:

13       Q.    Mr. Kruger, the reporter has

14  handed you a document marked Kruger Exhibit 1.

15  Would you take a moment to look at this

16  document.

17            (Document review.)

18       A.    Yes.

19       Q.    Have you seen this document

20  before?

21       A.    Yes, I have.

22       Q.    When was the first time you saw

23  this document?

24       A.    During the latter part of February

25  of this year.  Some of it I would guess during

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 19 of 165

Page 19

1                      L. KRUGER

2    the latter part of February of 2013.

3              Q.     All right.  Would you agree with

4    me that this was the motion to formalize your

5    appointment as the CRO of the Debtors?

6              A.     Yes, I would.

7                   MR. KERR:   Objection.   Go ahead

8         you can answer.

9              A.     Yes.

10             Q.     Did you review this document

11   before it was filed?

12             A.     Yes.

13             Q.     Was there anything in this

14   document that you disagreed with that remained

15   in the document when it was filed with the

16   court?

17             A.     Not that I recall sitting here

18   today.

19             Q.     Okay.  Would you turn to page 2 of

20   the document.  And I'd like to focus you on

21   paragraph 3 under the Preliminary Statement.

22   Let me know when you're there.

23                  MR. KERR:   Page 2 of the exhibit

24        or page 2 of the Motion?

25                  MR. COHEN:   Page 2 at the bottom.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 20 of 165

Page 20

1                        L. KRUGER

2          At the top you could do page 6 of 9.

3                    MR. KERR:    Okay.

4          Q.    It's paragraph 3.

5          A.    Actually, just to correct the

6   record, it's page 6 of 19.

7          Q.    Sorry.    I stand corrected.

8                Are you with me at paragraph 3?

9          A.    Yes, I am.

10         Q.    If you look towards the bottom of

11  that paragraph, the fourth line up, the Motion

12  states that, "As such, the CRO will lead the

13  Debtors in plan mediation and assist in the

14  formation of a Chapter 11 plan."

15               Do you see that statement?

16         A.    Dyes.

17         Q.    Do you understand that that was

18  part of the scope of your responsibilities as

19  CRO?

20         A.    Yes.

21         Q.    And did you do that?

22         A.    Yes.

23         Q.    The second task identified here is

24  that you would assist in the resolution of the

25  inter-estate claims.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 21 of 165

Page 21

1          L. KRUGER

2                    Do you see that?

3          A.    Yes.

4          Q.    Did you understand that to be a

5     scope of your responsibility as CRO?

6          A.    Yes.

7          Q.    Did you do that?

8          A.    Yes.

9          Q.    The third item was you were to

10    work with creditors to resolve interdebtor and

11    intercreditor disputes including the

12    allocation of assets among the debtors.

13                    Do you see that?

14         A.    Yes.

15         Q.    Did you do that?

16         A.    Yes.

17         Q.    All right.

18                    Let's flip further back here.

19    We'll use the numbering at the top.  It's page

20    13 of 19.  It's the same Exhibit 1.  I'd like

21    to direct your attention to Section C, Scope

22    of Services.

23         A.    Yes.

24         Q.    The Motion states that the Debtors

25    anticipate that the CRO will assist the

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 22 of 165

Page 22

1                    L. KRUGER

2       remaining members of the Debtors' management

3       team with the following responsibilities.   And

4       among other things, it is participant in

5       negotiations with AFI.

6                    Did you do that?

7            A.    Yes.

8            Q.    The next bullet says you will

9       provide advice regarding the allocation of any

10      AFI settlement.

11                   Did you do that?

12           A.    Yes, I did.

13           Q.    What advice did you provide

14      regarding the allocation of any AFI

15      settlements?

16                   MR. KERR:   And, Mr. Kruger, again,

17           to the extent you're giving advice --

18           well, I just want you to be cautious to

19           not disclose privileged communications.

20           I think you can answer the question that

21           Mr. Cohen has offered, but I just want

22           you to be careful not to disclose

23           privileged communications.   And I want

24           you to be cognizant of, and I know you

25           are, that there is a confidentiality

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 23 of 165

Page 23

1                          L. KRUGER

2              order in place regarding the mediation.

3                    So I want you to also not disclose

4         anything that occurred during the

5         mediation.

6                    But subject to that you're free to

7         respond to Mr. Cohen's questions.

8         A.      When you asked about providing

9    advice, to whom specifically are you asking?

10        Q.      I'm asking for advice that you

11   provided to the Debtors' management team

12   regarding the allocation of the AFI settlement

13   consistent with the Scope of Services in

14   Kruger Exhibit 1.

15        A.      I provided that to the management

16   team.

17        Q.      And what advice did you provide to

18   the management team regarding the allocation

19   of the AFI settlement?

20        A.      After the conclusion of the plan

21   support agreement and the supplemental term

22   sheet, I reviewed with the management the

23   allocation of the Debtors' assets, the Ally

24   contribution.

25        Q.      And what specific advice did you

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 24 of 165

Page 24

1                    L. KRUGER

2       provide to the Debtors' management regarding

3       the allocation of the Debtors' assets and the

4       Ally contribution?

5            A.    I did that in the context of the

6       mediation process.   I'm not sure how to

7       respond to that.

8            Q.    One of your responsibilities was

9       to advise the Debtors on allocating the Ally

10      settlement, correct?

11           A.    Yes.

12           Q.    And you did so?

13           A.    Yes.

14           Q.    And it's your view that you can't

15      discuss that because of a mediation

16      confidentiality?

17           A.    The allocation took place, as I

18      understand it for myself, in the context of

19      the mediation.

20           Q.    What do you mean when you say as

21      you understand it for yourself?

22           A.    In the midst of mediation we

23      discussed the allocation of the proceeds from

24      the Debtor's estates, the proceeds from the

25      Ally contribution if that's what you're

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 25 of 165

Page 25

1                        L. KRUGER

2    referring to.   That was done as part of the

3    mediation.

4         Q.    Well, as you went into the

5    mediation you must have had a view, separate

6    and apart from the mediation, as to where the

7    value from an Ally contribution would be

8    driven, correct?

9               MR. KERR:  Objection to form.

10        A.    No.   I did not.

11        Q.    So when you went into the

12   mediation you had no sense of potential claims

13   against Ally?

14        A.    I knew that there were prospective

15   claims against Ally, yes.

16        Q.    And did you have an understanding

17   as to what those claims were?

18        A.    Yes, I did.

19        Q.    How did you have an understanding

20   as too what those claims were?

21        A.    Through discussions with my

22   counsel, with Creditors Committee's counsel,

23   with my financial advisors, Creditors

24   Committee's financial advisors, and by

25   conversation with virtually all of the members

Page 26

L. KRUGER

1

2 of Creditors Committee with respect to how

3 they proceed the claims that the estate might

4 have against Ally.

5     Q.    Okay.  And when you had those

6 conversations with those constituents, again

7 separate and apart from your own counsel, so

8 negotiations with Creditors Committee and

9 their financial advisors, did they tell you

10 which Debtors they believed held claims again

11 Ally?

12         MR. KERR:  Again, to the extent

13     those conversations occurred during the

14     mediation, Mr. Kruger, I think the

15     confidentiality provision of the

16     mediation apply.  If there's discussions

17     that you recall occurred outside the

18     mediation, you're free to tell Mr. --

19     Q.    And I believe my question is when

20 you went into a mediation room, you must have

21 had some understanding as to what the claims

22 would be.  So it is not in the mediation.

23         MR. KERR:  Well, no.  Mr. Cohen,

24     we can go back and read your question.

25     My direction to the witness is if you had

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 27 of 165

Page 27

L. KRUGER

1

2  discussions -- your question -- and I'll

3  go back and read it -- I think your

4  question was "When you had those

5  conversations with those constituents,

6  again separate and apart from your own

7  counsel, so negotiations with Creditors

8  Committee and their financial advisors,

9  did they tell you which Debtors they

10 believed held claims against Ally?"

11        And my direction to the witness is

12 if you had conversations outside the

13 mediation context on that topic you can

14 tell Mr. Cohen.  If you had conversations

15 within the mediation, however, that's

16 subject to the confidentiality order.

17        MR. COHEN:  Okay.  So let's go

18 back up to an earlier question and reset

19 the stage.

20 BY MR. COHEN:

21    Q.    The first question that I asked

22 you is when you went into the mediation you

23 had no sense of potential claims against Ally.

24 And you said I knew there were prospective

25 claims against Ally, yes.   And the basis for

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 28 of 165

Page 28

1                        L. KRUGER

2    those claims were the conversations that we

3    talked about, amongst others, with your

4    counsel.

5                    So my questions are limited to

6    before you went into the mediation, what was

7    your understanding of the prospective claims

8    against Ally?

9         A.    I need to correct that because it

10   seemed to me when I was engaged in February,

11   the mediation process was under way and all of

12   the conversations I had with various members

13   of the committee, various -- what are now

14   called consenting claimants, counsel,

15   financial advisors, all of that took place in

16   the context of mediation.

17        Q.    What work outside of the mediation

18   context did you personally do to assess

19   positions you were hearing within the

20   mediation?

21               MR. KERR:   Objection.

22        A.    I don't think any.   I think

23   everything that I heard was in the context of

24   the mediation.

25        Q.    And so you listened to what you

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 29 of 165

Page 29

1          L. KRUGER

2    heard in the mediation and outside of

3    mediation you didn't do anything to

4    independently verify the positions that were

5    being taken?

6          A.    When you say outside mediation I'm

7    not quite sure what you mean.

8          Q.    Well, if you go into the mediation

9    and someone says X is the fact, do you go back

10   to your office and determine whether, in fact,

11   X is a fact or not?

12         A.    It seemed to me that if I went

13   back to my office and determined whether X was

14   a fact under those circumstances that would be

15   a part of mediation as I understand it.

16         Q.    Okay.  And you're going to follow

17   an instruction not to testify as to that?

18         A.    Correct.

19         Q.    Did you work with creditors to

20   resolve interdebtor and intercreditor

21   disputes?

22         A.    I certainly did.

23         Q.    All right.  And how were you able

24   to resolve interdebtor and intercreditor

25   disputes?  What specifically did you do?

Page 30

1                           L. KRUGER

2          A.     We had lots of presentations, lots

3    of conversation.    We had lots of documents.

4    Participated in negotiating with the various

5    interested parties.

6          Q.     With respect to the interdebtor

7    review specifically, what did you do to

8    resolve those interdebtor disputes?

9          A.     I looked at the relationships

10   among the various Debtors.    Considered those.

11   Considered the relationship with the parent

12   company, AFI.

13         Q.     And when you looked at those

14   relationships what were you looking for?

15         A.     To better -- to understand the

16   operations of the company and its

17   relationships.

18         Q.     What did you come to understand?

19         A.     The operation of the company and

20   its relationships.

21         Q.     Okay.   And what conclusion did you

22   reach as a result of you looking at the

23   relationships to understand their operations?

24         A.     That I knew a lot more about the

25   company and its operations when I was done

Page 31

1                         L. KRUGER

2    looking than I did when I arrived in February.

3         Q.    And with respect to resolving

4    interdebtor disputes now that you knew more

5    than did you before, what conclusions did you

6    draw?

7         A.    I'm not sure I understand the

8    question.  You don't draw conclusions.  You

9    just -- in terms of resolving issues among the

10   parties.  I don't think they're conclusions.

11   I think there are just results that I

12   understood better of the relationships.

13        Q.    One of your specific

14   responsibilities, you've already agreed with

15   me, was to work with the creditors to resolve

16   intercreditor disputes.

17        A.    Yes.

18        Q.    What result did you achieve?

19        A.    I achieved a result of the global

20   settlement.

21        Q.    And with respect to interdebtor

22   disputes, how was that resolved?

23        A.    That was encompassed within the

24   global settlement agreement.

25        Q.    And how was that resolved within

1                    L. KRUGER

2    the context of the global settlement?

3              MR. KERR:  Objection.  Go ahead.

4         A.    Through negotiation.

5         Q.    And what was the result?

6         A.    The global settlement and the plan

7    of reorganization that's now on file.

8         Q.    And how did that treat interdebtor

9    disputes?

10        A.    It treats the relationship

11   between -- I'm not sure I understand the

12   question but I'm assuming -- I shouldn't

13   assume.  It treats the relationship between

14   ResCap and AFI.

15        Q.     What do you mean when you say it

16   treats the relationship between ResCap and

17   AFI?

18        A.     It settles the relationship

19   between those parties.

20        Q.    Is AFI a debtor?

21        A.    No, it's not.

22        Q.    I'm asking you about the

23   interdebtor disputes.

24        A.    Could you be more specific as to

25   what you're asking precisely now?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 33 of 165

Page 33

L. KRUGER

1

2      Q.    Well, when you understood that you

3  were being appointed as the CRO and one of the

4  things that you were required to do was work

5  with creditors to resolve interdebtor

6  disputes, what did you understand that to

7  mean?

8      A.    I understood that to mean was that

9  creditors had claims against various of the

10  Debtors.  I needed to understand and analyze

11  those claims, understand the relationship of

12  those claims to the various Debtors.

13      Q.    Okay.  Are you familiar with the

14  Ad Hoc Committee of JSN Noteholders?

15      A.    Yes, I am.

16      Q.    You're familiar with the term JSN

17  noteholders more generally?

18      A.    Yes.

19      Q.    What is your understanding of the

20  claims that the JSN noteholders have against

21  the various Debtors?

22      A.    Sitting here today I don't

23  remember all their claims but I believe that

24  they have securities with respect to perhaps

25  some portion of the Debtors.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 34 of 165

Page 34

1                    L. KRUGER

2           Q.    What is your understanding of the

3    security interest that the JSN noteholders

4    have against some portion of the Debtors?

5           A.    Sitting here today I'd have to

6    look at the actual documents so I don't really

7    recall how to answer that question.

8           Q.    You don't know generally?

9           A.    Generally I think they -- as I

10   said, they had some claims against some of the

11   Debtors.

12          Q.    Okay.   Do you know whether the JSN

13   noteholders had claims against the

14   intercompany claims by and amongst the various

15   Debtors?

16                MR. KERR:    Objection.

17                THE WITNESS:    May I answer?

18                MR. KERR:    You can answer.

19          A.    I was aware that they asserted

20   that claim.

21          Q.    Did you do anything to confirm or

22   deny that assertion?

23          A.    Yes, I did.

24          Q.    What did you do?

25          A.    I reviewed those claims, the

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 35 of 165

Page 35

1                     L. KRUGER

2     account intercompany claims with my counsel,

3     with the financial advisors, with other

4     counsel and financial advisors involved in the

5     proceeding.   I settled those claims as part of

6     the global settlement.   And it was always my

7     understanding that there was a serious

8     question as to whether or not JSNs had claims

9     on the intercompany claims, had liens on the

10    intercompany claims.   Because I believe those

11    may be general intangibles and as I understood

12    it, JSNs did not have liens on general

13    intangibles.

14         Q.     Let me make sure I understand what

15    you're saying.   You understood that the JSNs

16    were asserting claims -- liens on the

17    intercompany claims, correct?

18         A.     Yes.

19         Q.     So you investigated those claims.

20    Did you come to a definitive determination

21    that the JSNs did not have a lien on the

22    intercompany claims?

23         A.     That was my conclusion was I did

24    not think they had liens on the intercompany

25    claims.

Page 36

1                    L. KRUGER

2          Q.    What is the basis of that

3    conclusion?

4          A.    Well, I think the -- well, I'll

5    give you a fulsome answer.

6               The intercompany claims -- I think

7    that's what they really are.   I'm not sure

8    that they are actually collectible and had

9    value.   But the intercompany claims are, as I

10   understand the discussions with counsel and

11   others, and forming my own opinion with

12   respect to them, are general intangibles.   My

13   understanding is, and I think the court has

14   confirmed, that the JSNs do not have liens on

15   general intangibles.

16               I don't know how else to respond

17   to that.

18         Q.    Did you have any understanding in

19   your capacity as CRO whether the JSNs asserted

20   that they have a lien on claims against Ally?

21         A.    Yes.   They asserted that as well.

22         Q.    Okay.   Did you do any

23   investigation as to the validity of that

24   claim?

25               MR. KERR:   Objection.   What claim?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 37 of 165

Page 37

L. KRUGER

1

2      The claim that they had liens?

3            MR. COHEN:  The liens against

4      Ally.

5      A.     Liens again the proceeds of the

6  Ally settlement?  Is that the question you're

7  asking me?

8      Q.     Well, let's start with you

9  understand that ResCap asserted that it had

10  claims against Ally, correct?

11      A.     Yes.

12      Q.     And do you understand that the JSN

13  group asserted that they had liens against

14  those claims against Ally?

15      A.     I've heard that assertion.

16      Q.     Okay.  What have you done to

17  confirm or deny that assertion?

18      A.     I reviewed that assertion with my

19  counsel, with counsel for the other creditors

20  in the group, looked at the relationship

21  between the parties, looked at possible claims

22  that might be asserted by the estate causes of

23  action against Ally or AFI.

24            I came to the conclusion, based on

25  those conversations and my own understanding,

Page 38

1              L. KRUGER

2    that they did not have claims against proceeds

3    of the Ally conclusion.

4         Q.    How did you come to that

5    conclusion?

6         A.    I think I just described that.

7         Q.    Well, what information led you to

8    that conclusion?

9         A.    Conversations with counsel looking

10   at underlying security agreements.   Looking at

11   the flow of claims.   And coming to my own

12   conclusion that they were not Ally liens

13   against the AFI proceeds.

14        Q.    When you say looking at the flow

15   of funds, what do you mean?

16        A.    Well, the AFI contribution came

17   into the Debtors' estates.   And I believe the

18   JSNs asserted a claim to those proceeds.   I

19   don't think it's a value claim.

20        Q.    Why don't you believe it's a valid

21   claim?

22        A.    Because I don't think their lien

23   attached to those proceeds.

24        Q.    Why don't you think their lien

25   attached to those proceeds?

Page 39

1                         L. KRUGER

2          A.    My understanding of the lien

3   documents and the transaction as I described

4   was that there were no proceeds that their

5   liens attached to in the lower funds from Ally

6   into the rest of the assets.

7          Q.    What specifically led you to that

8   conclusion?

9          A.    Conversations with counsel.  My

10  own conclusions.  Review of documents.

11         Q.    Okay.  So let's talk about your

12  own conclusions and review of documents.  What

13  were your own conclusions -- what in your own

14  conclusions led you to the belief that the JSN

15  liens did not apply to the Ally contribution?

16         A.    It's just a conclusory statement

17  on my part that they don't apply to those

18  liens.

19         Q.    Okay.  Other than your conclusory

20  statement based on your own analysis separate

21  and apart from your counsel you have no other

22  basis --

23         A.    No, I don't think I --

24         Q.    Let me finish my question, please.

25              MR. KERR:  Lou, let him answer

Page 40

1                              L. KRUGER

2           finish his question and then you can

3           answer it.

4              Q.    Based on -- you said other than

5    your own conclusory statement, based on your

6    own view of it, you had nothing else?

7                   MR. KERR:   Objection.

8              A.    I don't think that was the

9    question that you asked me.

10             Q.    Okay.   Let's go back to the

11   question I asked you.

12                  My question was:   "What were your

13   own conclusions -- what in your own

14   conclusions led you to believe that the JSN

15   liens did not apply to the Ally contribution?

16                  "ANSWER:   It was just a conclusory

17          statement on my part that they don't

18          apply."

19                  So other than your conclusory

20   statement, what is the basis of your belief

21   that the JSN liens don't apply to the Ally

22   contribution?

23                  MR. KERR:   Objection.   Asked and

24          answered.

25             A.    Conversations with my counsel,

Page 41

1                       L. KRUGER

2      with counsel for the parties.   That's what led

3      me to form my conclusion.

4              Q.    Did you do any of your own work to

5      come to that conclusion?

6              A.    I thought that was my own work

7      when I had those conversations with them.

8              Q.    Okay.   With respect to the Ally

9      contribution, do you have an understanding as

10     to whether that's in satisfaction of claims

11     that ResCap may have against Ally?

12             A.    That's not my understanding.

13             Q.    What is your understanding is the

14     basis of the Ally contribution?

15             A.    I mean, I don't know what was in

16     Ally's mind so it's hard for me to say what

17     they were thinking, but my view, if you were

18     to ask me that question, was I believe Ally

19     wanted to arrange to have a clean slate going

20     forward.   So they wanted to make a

21     contribution sufficient but not a penny more

22     than necessary to bring what I would call

23     peace in the valley with respect to these

24     claims.   And the ResCap estates and the ResCap

25     creditors that was interested in this.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 42 of 165

Page 42

1                    L. KRUGER

2          Q.    Was part of obtaining peace in the

3    valley getting ResCap to release its potential

4    claims against Ally?

5              MR. KERR:   Objection.

6          A.    There are general releases

7    provided for in the plan of reorganization.

8          Q.    And those general releases would

9    apply to the various claims that you

10   considered that ResCap would have against

11   Ally, right?

12         A.    Yes.

13         Q.    So it's not your testimony that

14   there is no relationship between the Ally

15   contribution and its desire to have peace in

16   the valley and the release of the potential

17   claims that ResCap has against Ally; is that

18   right?

19              MR. KERR:   Objection to form.

20         A.    I'm not sure what Ally's view, as

21   I said, was, what they thought they were

22   doing.

23              I think from ResCap's perspective,

24   we were trying to have settlement of all the

25   claims including those claims that we might

Plaintiff's
Objection
42:13-43:2:
Objection to
form;
misleading;
confusing

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 43 of 165

Page 43

1                     L. KRUGER

2      have against Ally.

3           Q.      Okay.   And so one of the

4      currencies that you were able to negotiate

5      with Ally was these potential claims that

6      could be asserted against Ally, right?

7           A.      That's not how the negotiations

8      really went.

9           Q.      So there was no discussion of the

10     claims.

11          A.      I had previously seen reviews of

12     claims that might exist provided by the

13     defense for Creditors Committee, by various of

14     the other creditors, my Morrison & Foerster.

15     I saw Ally's responses to those.

16               So I was informed as to what

17     people thought claims might be and what

18     claims -- and what Ally's view of those claims

19     were.

20          Q.    What did the Creditors Committee

21     explain to you about potential claims against

22     Ally?

23               MR. KERR:   Again, if that -- you

24          can answer Mr. Cohen's question as long

25          as you don't disclose any discussions

Page 44

L. KRUGER

1

2    that occurred during the mediation

3    process.

4         A.    That was all provided to me during

5    the context of the mediation.

6         Q.    Okay.  Did you have any

7    discussions with respect to potential claims

8    against Ally that might sound in breach of

9    contract?

10        MR. KERR:  Objection.  Same

11    direction.

12        A.    Those are all -- everything that I

13    discussed or learned about with respect to

14    Ally, claims against Ally, and Ally's defenses

15    to those claims, all took place as part of the

16    mediation process.

17        Q.    All right.  Let's talk about your

18    motivation as CRO.  You testified that you

19    can't know what's in Ally's mind so you don't

20    know why they put $2.1 billion on the table,

21    right?

22        MR. KERR:  Objection.

23        A.    I don't know what their motivation

24    was other than, as I said, I assume they

25    wanted releases.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 45 of 165

Page 45

1                      L. KRUGER

2          Q.    And your motivation was to make

3    that contribution as high as possible, right?

4          A.    Correct.

5          Q.    And so you were prepared to

6    release as many claims as you could to get

7    that pie as big as it could be, right?

8          A.    No.  I don't think that's how it

9    worked.  And this gets, you know -- I'm always

10   uncomfortable because these are all close to

11   mediation kind of questions.

12               I believe that Ally was interested

13   in making the contribution for the general

14   release, not just from the ResCap-related

15   parties, but from third parties as well.  They

16   wanted a clean slate.

17         Q.    How did you determine the

18   sufficiency of the contribution relative to

19   the value of the releases?

20               MR. KERR:  Objection.

21         A.    It was just a negotiation.  I

22   wanted more.  They wouldn't pay more.  The

23   question was what they were prepared to pay be

24   sufficient to get the vast majority of the

25   creditors, including the JSN, a recovery that

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 46 of 165

Page 46

1                          L. KRUGER

2    worked for all parties.  That seemed to be a

3    number that did.

4         Q.    So would you turn to again on

5    Kruger Exhibit 1, the engagement letter, which

6    is at the back of that document.

7               MR. KERR:  Do you know what page

8         it is?  Page -- oh, it's the very last

9         attachment.

10              MR. COHEN:  Yeah, exactly.  It's

11        Exhibit 4 to the Motion.

12        A.    Um-hum.

13        Q.    I'd like to direct your attention

14   to -- you can look at as much or as little of

15   this as you want.  This is your engagement

16   letter that was approved by and incorporated

17   into the court's order.

18              MR. KERR:  Objection.  This -- I

19        think that this engagement letter was

20        amended and that one was approved by the

21        court order.

22              MR. COHEN:  In connection with the

23        March hearing?

24              MR. KERR:  Um-hum.

25              MR. COHEN:  Okay.  I think for our

Page 47

1                    L. KRUGER

2        purposes that won't be relevant.  But

3        we'll see.

4    BY MR. COHEN:

5            Q.     Did there come a time where you

6    sought to have the scope of the services that

7    are listed under paragraph 1(a), Duties, up to

8    (b) changed?

9            A.     No.

10           Q.     So you never sought to be

11   discharged of any of those responsibilities?

12           A.     No.

13           Q.     Okay.

14                  MR. COHEN:  Let's mark this as

15   Kruger 2.

16                  (Kruger Exhibit 2, Notice of

17   Debtors' Motion Pursuant to Sections

18   105(a) and 363(b) of the Bankruptcy Code

19   for an Order Approving Amendment to

20   Engagement Letter with Debtors' Chief

21   Restructuring Officer, Lewis Kruger as

22   Chief Restructuring Officer, marked for

23   identification as of this date.)

24

25   BY MR. COHEN:

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 48 of 165

Page 48

1              L. KRUGER

2        Q.     Mr. Kruger, the reporter has

3   handed you a document that has been marked

4   Kruger Exhibit 2.

5        A.     Yes.

6        Q.     It's entitled Notice of Debtors'

7   Motion Pursuant to Sections 105(a) and 363(b)

8   of the Bankruptcy Code For an Order Approving

9   an Amendment to the Engagement Letter With

10  Debtors Chief Restructuring Officer, Lewis

11  Kruger.

12       A.     Yes.

13       Q.     Have you seen this document

14  before?

15       A.     Yes, I have.

16       Q.     What was the purpose of this

17  document?

18       A.     It was to arrange a possibility of

19  my receiving a "success fee" subject to

20  question and challenge at the conclusion of

21  the proceedings based on an application for

22  allowance at the time.

23       Q.     And this motion was approved?

24       A.     This was approved by the court I

25  believe.

Page 49

1                    L. KRUGER

2          Q.    Is this something that you

3    reviewed before it was submitted to the court?

4          A.    Yes, I had.

5          Q.    And were there any changes that

6    you suggested that were not accepted by the

7    Debtors before it was filed?

8          A.    Not that I recall sitting here.

9          Q.    Do you recall seeing a red line of

10   your engagement letter at the back of this

11   motion?  And it is actually the last two

12   pages.

13         A.    Sitting here today, I don't recall

14   seeing it.

15         Q.    Okay.  So I'd like to focus your

16   attention on the last page of the red line and

17   Romanette vii.

18         A.    Yes.

19         Q.    You can see that the scope of your

20   services there changes from the original

21   engagement letter.

22              MR. KERR:   Objection.

23         Q.    Do you see that?

24              MR. KERR:   Assumes facts not in

25      evidence.

Page 50

1                    L. KRUGER

2                    Answer if you want.

3         A.    The words have changed, yes.

4         Q.    Okay.  Why was that change made?

5         A.    Sitting here today, I don't know

6   why.

7         Q.    Okay.  You know this document was

8   filed with the court about a month ago?

9         A.    Um-hum, yes.

10        Q.    Did you negotiate these changes

11  with anyone?

12        A.    Did I negotiate them, no.

13        Q.    Did anyone discuss them with you

14  before they were presented to the court?

15        A.    I think I read them at the time.

16  But I don't recall a conversation about them.

17        Q.    So you don't recall asking anybody

18  a question as to why the scope of your

19  services was being changed?

20        A.    No.

21        Q.    Okay.  If you'd look at Romanette

22  number ix, your engagement letter used to

23  provide that the CRO shall provide advice

24  regarding the allocation of any AFI settlement

25  proceeds amongst the Debtors' creditors.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 51 of 165

Page 51

1                    L. KRUGER

2                    Do you see that?

3          A.      Yes.

4          Q.      Why was that stricken from your

5    engagement letter?

6                  MR. KERR:   Objection.   Objection -- if

7      you know the answer you can answer.

8          A.      I don't know.

9          Q.      Did anybody discuss that they were

10   taking that away from your scope of services

11   with you?

12                 MR. KERR:   Objection.

13         A.      No.

14         Q.      When you read this did you ask

15   anybody why that was no longer a part of your

16   scope of services?

17                 MR. KERR:   Objection.

18         A.      No.  But I could answer the

19   question if you want to know why it changed.

20         Q.      Certainly.

21         A.      Because the allocation was now

22   present in the reorganization plan.

23         Q.      So you believed your work on that

24   was done.

25         A.      I think the reorganization plan

Page 52

L. KRUGER

stands for itself.    Speaks for itself.

3      Q.    Is there any possibility that that

4  allocation may change?

5      A.    Life is uncertain.    It's always

6  possible.

7      Q.    And as we sit here today, that's

8  no longer within the scope of your services,

9  right?

10      A.    I assume that the extent of my

11  services were -- need to be doing something

12  differently.    If the situation arises that

13  would not apply.

14      Q.    Okay.    Why were they modified to

15  take it away?

16          MR. KERR:  Objection.    Assumes

17      facts not in evidence.

18      Q.    So it would be your expectation

19  that if the issue of allocation came up again

20  you would remain capable and competent of

21  doing that, right?

22      A.    Yes.

23      Q.    And you could have done it in ways

24  different than came out of the mediation,

25  correct?

Plaintiff's
Objection
52:18-53:4: Lack
of personal
knowledge/
speculative (FRE
602)

Page 53

1                          L. KRUGER

2           A.    I guess I could have but why would

3    I?  That's what I thought was a great success

4    and I would not want to change it.

5           Q.    Okay.  And have you read Judge

6    Lyons' expert report in this case?

7           A.    No.

8           Q.    Has anyone discussed it with you?

9           A.    I heard about it.

10          Q.    What have you heard about it?

11          A.    Judge Lyons apparently tries to

12   build a bottom-up view of the Ally

13   contribution by allocating sums of money or

14   some amounts to claims or value to claims in

15   order to utilize and get up to the

16   2.1 billion.

17          Q.    All right.  Is there a reason you

18   have not read that report?

19                MR. KERR:  Objection.

20          A.    No.  I just have a lot of stuff to

21   read and I read as much as I can.

22          Q.    Were you interested in his

23   methodology?

24          A.    Not particularly.

25          Q.    Why not?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 54 of 165

Page 54

1                    L. KRUGER

2          A.    Because with all due respect I

3    don't think that's how we negotiated the Ally

4    contribution.

5          Q.    Is that one of the ways the

6    contribution would have been negotiated?

7                MR. KERR:   Objection.

8          A.    I'm not sure it could have been

9    negotiated that way because I don't think as a

10   practical matter, with all due deference to

11   Judge Lyons, that one can value the individual

12   claims in a meaningful way.   I think the only

13   way to negotiate this is to seek an overall

14   settlement with Ally and then see if that

15   settlement amount was sufficient to create

16   sufficient combination of funds together with

17   the estate's values to satisfy the needs of

18   the creditors.

19         Q.    Well, if that's your view, why did

20   you agree in your original engagement letter

21   that among the services you were going to

22   provide was advice regarding the allocation of

23   proceeds?

24         A.    The allocation of proceeds -- just

25   to be clear, when I say allocation of

Plaintiff's
Objection
54:5-18: Lack of
personal
knowledge/
speculative (FRE
602)

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 55 of 165

Page 55

1                    L. KRUGER

2   proceeds, I'm thinking about the allocation of

3   the $2.1 million -- $2.1 billion from Ally.

4   I'm not thinking of building up from the

5   bottom up a pyramid of various claims and

6   trying to assign values to those claims in

7   order to get to the 2.1.   That never happened.

8        Q.    From the Debtors' side how do they

9   determine where that value would flow?

10       A.    We determined it in several ways.

11  First, we looked at the total sum which was

12  coming from Ally, which was the 2.1.   I

13  recognized that Ally was not going to be more

14  than that for us.

15            We then looked at the values

16  available and respective distributions from

17  the various Debtors' estates.

18            We then looked at the claims from

19  the various Debtors' estates.

20            We then looked at the expectations

21  of the consenting claimants as to what they

22  might receive ultimately from the proceedings.

23            And then we allocated the proceeds

24  together with the Debtors' estates to try to

25  meet those requirements.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 56 of 165

Page 56

1                      L. KRUGER

2          Q.    Was there any effort made to

3    determine which of those estates may have

4    presented -- may have possessed claims that

5    were being released in the Ally settlement?

6          A.    All of the Debtors' were released

7    under the --

8          Q.    I understand that.  But you also

9    understand that there were a wide of variety

10   of claims that could have been asserted

11   against Ally, correct?

12         A.    There were some from the estate

13   causes of action as distinguished from the

14   causes of action perhaps individual creditors

15   might have.

16         Q.    Correct.  I'm talking about

17   individual estate causes of action, that there

18   were a variety of estate causes of action that

19   could have been asserted; is that right?

20         A.    There were some, yes.

21         Q.    Right.  You read Judge Gonzalez's

22   examiner's report?

23         A.    I read it once.

24         Q.    It was a long read I'm sure.

25         A.    It was a very long read.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 57 of 165

Page 57

1                    L. KRUGER

2         Q.    But he identified very specific

3    claims that he thought may or may not be

4    asserted or may or may not be successful,

5    correct?

6              MR. KERR:   Objection.

7         A.    Correct.

8         Q.    And he identified specific debtors

9    who may have causes of action based on certain

10   contracts between certain debtors, correct?

11             MR. KERR:   Objection.

12        A.    He did do that.   I don't

13   necessarily agree with him, but he did do

14   that.

15        Q.    What specifically -- where

16   specifically do you not agree with him?

17        A.    Well, the tax allocation one is a

18   good example of that.   My view of that -- and

19   I was aware of it before we entered into the

20   plan support agreement and the supplemental

21   term sheet.   My view of that was that there

22   was an executed tax allocation agreement

23   between ResCap and AFI.   And that this

24   argument was that somehow or other that ought

25   to be set aside and that an unexecuted

Plaintiff's
Objection
57:2-14:
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

Page 58

1                        L. KRUGER

2    agreement should now become the agreement.

3              I thought that was probably a

4    non-starter, quite frankly.    And that coupled

5    with the fact that from the JSN's perspective

6    I assume that setting aside the executed

7    agreement, the second one, if you will, with

8    an avoidance action, the JSNs did not have

9    liens on the avoidance action.

10             So, as I say, with all due respect

11   to Judge Gonzalez, I disagree with his

12   conclusion.

13        Q.    Did you attempt to put any value

14   on the fact that you had the former Chief

15   Bankruptcy Judge with the Southern District of

16   New York having a view that there may be some

17   merit to that claim?

18        A.    No.

19        Q.    Okay.    So you valued that claim at

20   zero?

21        A.    No, I didn't say I valued it at

22   zero.    I just thought it was a non-starter.

23   I took into consider -- when I participated in

24   seeking the global settlement, I had a lot of

25   information provided me by lots of different

Plaintiff's
Objection
58:13 - 17
Irrelevant (FRE
401, 402)

Page 59

1                         L. KRUGER

2    parties, and lots of different reasons.  Their

3    strengths and weaknesses of their own

4    positions, et cetera.

5                And I also was aware the tax

6    allocation was another thing that I thought

7    about and was part of my thinking.  But I

8    didn't look at it and say, Oh, I ought to

9    ascribe $25 worth of value to that.  That just

10   wasn't how it happened.

11        Q.    Okay.  Were there other specific

12   claims that Judge Gonzalez identified that

13   specific Debtors may hold that you thought he

14   got it right?

15        A.    Well, you know, 2,000 pages, I'm

16   sure there's some in there that if I went back

17   and read again I would find that he got some

18   right.

19        Q.    Okay.

20        A.    The ones that come to -- not that

21   came up that he got right.  I got another one

22   that I think he got wrong.

23        Q.    Okay.  Let's hear which other ones

24   one did he get wrong?

25        A.     I think he got wrong the

Page 60

1                          L. KRUGER

2      bank-to-broker claim.  There was an issue of

3      revenue recognition in the AFI and ResCap

4      family of companies.  And I think it was just

5      done wrong for accounting purposes.  And when

6      they realized they had done it wrong, they

7      reversed it.

8                So I was aware of that.  And I

9      thought people -- you know, people make

10     errors.  When they catch their errors they

11     reverse their errors.  I didn't believe that

12     they rise to the kind of claim that Judge

13     Gonzalez thought it might.

14          Q.     What analysis did you do to come

15     to that conclusion?

16          A.     I read Judge Gonzalez's report.

17     But, as I said, I had already been aware of

18     this issue, so to speak, previous to the plan

19     support agreement and the supplemental term

20     sheet.  And I thought about it, I took it into

21     consideration as I did everything else, and

22     came to the conclusion that it was not -- in

23     my mind I thought that it was not an important

24     issue because I believed that the -- as I

25     said, it was an error, the error was found,

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 61 of 165

Page 61

1                      L. KRUGER

2    corrected, and I thought that was the end of

3    it.

4         Q.    So other than taking it into

5    consideration and thinking about it, did you

6    do anything else to --

7         A.    Well, I --

8         Q.    Let me finish.

9               -- to determine if Judge Gonzalez

10   got it right or wrong?

11              MR. KERR:   Lou, Lou, let him

12    finish his question.   Then you can

13    answer.

14       A.    Okay.

15              I have some comments about that.

16   The first, of course, is that the -- Judge

17   Gonzalez's report came out after the plan

18   support agreement and the supplemental term

19   sheet.   That's first.

20              Second, in all of these

21   discussions I discussed all of these items

22   including the bank-to-broker claim, the tax

23   allocations agreement, with my counsel, with

24   other counsel for the parties in the case,

25   financial advisors and the like.   That's when

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 62 of 165

Page 62

1                          L. KRUGER

2    I formed my opinion and formed my judgment.

3            Q.      Okay.   So in terms of timing, you

4    made the deal on the global settlement and

5    then you got the Gonzalez report, right?

6            A.      Correct.

7            Q.      Okay.   But did you take the time

8    to read the Gonzalez report?

9            A.      Yes, I did.

10           Q.      And when you read the Gonzalez

11   report was there anything that made you

12   rethink whether you should have done things

13   differently in structuring the global

14   settlement for the plan support agreement?

15           A.      Not at all.

16           Q.      Why not?

17           A.      Because I thought that the global

18   settlement was an extraordinary achievement.

19   I thought that when I arrived originally the

20   creditors were at each other's throats, there

21   were intercreditor issues, interdebtor issues,

22   fights with Ally.   All of that was going on.

23   And I was able, together with Judge Peck's

24   invaluable assistance, the Creditor

25   Committee's assistance, various counsel's

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 63 of 165

Page 63

1                     L. KRUGER

2    assistance, create a situation where there was

3    a global settlement that resolved all of the

4    issues among the parties provided for an

5    allocation that they were all, I'm sure not

6    happy with since no one is getting paid in

7    full, but at least comfortable enough with

8    their own recoveries and the recoveries of

9    others, that they were all willing to

10   participate in the global settlement.

11            And in the process of that we also

12   thought about the JSNs.  And even though I

13   personally believe that their secured position

14   was probably some number like 1.7 or

15   $1.8 billion, they nonetheless agreed to pay

16   the JSNs in full on the effective date their

17   allowed claim plus pre-petition interest.

18            So I thought they were also being

19   well treated during this process.

20      Q.    What was the basis for your view

21   that the JSN position was 1.7 or $1.8 billion?

22      A.    Lots of conversation with counsel,

23   financial advisors, both my own and Morrison &

24   Foerster.  Centerview.  Also the Creditors

25   Committee and their counsel, their advisors.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 64 of 165

Page 64

1                           L. KRUGER

2         And then some of the advisors for individual

3    creditors as well.

4              Q.    To what extent in coming up with

5    that conclusion did you undertake to

6    understand the value of the intercompany

7    claims?

8              A.    I looked at the intercompany

9    claims and asked that I be made familiar with

10   them and FTI -- excuse me -- and the company's

11   financial people, I'm not quite sure who, but

12   the company's financial people, looked at

13   intercompany balances.

14                   And, as I understood more and more

15   about them over the passage of time, I

16   realized that the intercompany balances were

17   present for accounting reasons and did not in

18   my mind represent collectible, enforceable

19   debt, that there was a history -- enormous

20   history of debt forgiveness, some $16 billion

21   of debt having been forgiven in the period

22   2007 to 2012; that these intercompany

23   balances, most of them did not have interest

24   rates associated with them, interest paid by

25   them, maturity dates, some little bits of

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 65 of 165

Page 65

1                      L. KRUGER

2   documentation for some of them, but most of

3   them not.

4               So I thought that when I settled

5   those intercompany claims at zero for the

6   purposes of the global settlement that was the

7   reasonable and responsible thing to do.

8         Q.    And you did that on a wholesale

9   basis, correct?

10        A.    Yes.

11        Q.    You did not look at particular

12   intercompany transactions where, for example,

13   there was loan documentation.   That didn't

14   matter to you?

15             MR. KERR:   Objection.

16        A.    I did look at those.   But the

17   reality of it is for myself that I thought

18   that if we went down the road of trying to go

19   back and look at a specific intercompany

20   balance to see what its history was, where it

21   came from, I would then find myself in the

22   position of having to reverse -- or at least

23   creditors would ask to have reversed the

24   $16 billion in forgiveness, put all of that

25   back into the pot.   And I don't think it's

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 66 of 165

Page 66

1                          L. KRUGER

2    possible to isolate one intercompany claim and

3    say, Oh, we're going to focus on this one.

4              I assume once you start down that

5    the road, you then need to do the work to

6    focus on all of them.  That work seemed to

7    me -- I don't want to call it a fool's errand,

8    but it would take years and enormous effort to

9    do.  And I thought that doing that would also

10   interfere with the completion of the global

11   settlement and the confirmation of the plan.

12        Q.     In what way would it interfere

13   with the completion of the global settlement

14   and the confirmation of the plan?

15        A.     Well, the global settlement in my

16   mind -- I describe it two different ways.  I

17   describe it as a mosaic where if you take out

18   one piece of it the mosaic no longer fits.

19              Or, alternatively, I think of it

20   as a Roman arch full of stones.  And if you

21   pull out one stone the arch collapses.

22              I don't think you can start down

23   the road of dealing with one issue without

24   jeopardizing the entire settlement.  So I

25   would assume that if I was now to look at a

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 67 of 165

Page 67

1                L. KRUGER

2    specific intercompany claim and try to find

3    out what its value is, I assume I should be

4    looking at all the intercompany claims.

5    That's a couple years' process at the very

6    least.  Expensive.  And I'm not sure could

7    ever really be resolved because you need to go

8    back and try to find people who are involved

9    in the decisions as to what they -- what they

10   recorded, why they recorded it, and what was

11   done.

12              It seemed to me that all of that

13   would defeat the prospect of having a global

14   settlement now and the Ally contribution and

15   everything would fall apart.

16        Q.    Do you know whether prior to your

17   appointment as CRO the lawyers at Morrison &

18   Foerster and FTI actually did a lot of work on

19   determining the validity of the intercompany

20   claims?

21              MR. KERR:  Objection.

22        A.    I don't know.

23              I should correct myself.  I

24   actually do know that.

25        Q.    Okay.

Plaintiff's Objection 67:16-68:8: Lack of personal knowledge (FRE 602)

Page 68

1                    L. KRUGER

2           A.      They did an investigation, yes.

3           Q.      They did a substantial

4    investigation of that.

5           A.      Right.

6                   MR. KERR:   Objection.

7           A.      They did an investigation.   How

8    substantial, I don't know.

9                   MR. COHEN:   Let's mark this as

10          number 3.

11                  (Kruger Exhibit 3, e-mail dated

12          Monday, 9/17/2012 with attachment bearing

13          production numbers UCC12846 through

14          UCC12852, marked for identification as of

15          this date.)

16   BY MR. COHEN:

17          Q.      Mr. Kruger, did they brief you on

18   that investigation?

19          A.      Well, when I arrived on the scene,

20   one of the things wanted to know about was the

21   intercompany claims and I started to get into

22   the lead, so to speak, and to really

23   understand the issues that were -- confronted

24   the parties.   And so I asked Morrison &

25   Foerster and FTI to review for me and to --

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 69 of 165

Page 69

1                          L. KRUGER

2      and I asked FTI specifically to review the

3      intercompany claims and inform me as to what

4      they found in their investigation.

5                   So I heard about this.  But it was

6      part of bigger effort, if you will, on my own

7      part understanding the claims.

8          Q.     All right.  And what did FTI tell

9      you about their investigation into the

10     intercompany claims?

11                 MR. KERR:   And you can answer that

12         question but be careful again that you do

13         not disclose any confidential --

14         privileged communications you had with

15         counsel.

16         A.     They reviewed with some of the

17     management of the Debtor, I don't know who

18     specifically but people in the finance area of

19     the Debtor's intercompany claims to determine

20     that the source of those claims, understanding

21     of how those claims were recorded, the process

22     of forgiving those claims, as I said, which

23     was the major part of what took place, those

24     claims are forgiven on a regular basis, in

25     billion dollar amounts regularly, and they

Plaintiff's
Objection
69:8-71:4:
Inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 70 of 165

Page 70

1                         L. KRUGER

2    looked at all of that and reported to me.

3         Q.    What did they report to you on the

4    process of forgiving those claims?

5         A.    As part of overall picture of the

6    claims what they reported to me was that the

7    claims are often forgiven in order to meet net

8    worth requirements of individual debtors,

9    individual debtor companies during the course

10   of their business operations.   And that the

11   claims were very difficult to find a history

12   for and very difficult to think about

13   reapplying the previously forgiven claims.

14        Q.    Did they tell you that was true

15   with respect to all of the intercompany claims

16   or just some of them?

17        A.    I don't think we ever -- I don't

18   think I myself ever looked at the individual

19   specific claims in the sense that I looked at

20   all 20,000 or 30,000 or however tens of

21   thousands there are of those claims.   I can

22   say that I was given more detailed information

23   with respect to some of the claims.

24        Q.    Okay.   And with respect to some of

25   the companies did they tell you that the

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 71 of 165

Page 71

1                           L. KRUGER

2       intercompany claims had the indicia of debt

3       and not equity?

4              A.      No.

5              Q.      They never told you that with

6       respect to one intercompany claim.

7              A.      My own view of those claims, as I

8       said, is that I don't believe any of them are

9       debt.   I believe that they're all claims -- I

10      think of debt as being represented in some

11      fashion by maturity dates, interest rates,

12      documentation.   And when you look at the

13      individual claims, as I said, you'd need to go

14      back and put back into the hopper all of the

15      forgiveness over the last several years and

16      then that would lead -- maybe more of an

17      answer than you wanted -- but would lead to

18      falling apart of the global settlement and

19      would lead to litigate everybody with

20      everybody about everything.   Not just about

21      any one specific claim.   I don't think you can

22      look at a claim in isolation.   I think you

23      need to look at all of them.

24              Q.      And you practiced law prior to

25      becoming CRO for 40-plus years?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 72 of 165

Page 72

1                         L. KRUGER

2          A.     Yes.

3          Q.     In your practice you've

4    represented debtors?

5          A.     Yes.

6          Q.     You've represented debtors with

7    centralized cash management systems?

8          A.     Yes.

9          Q.     And you've represented debtors

10   with intercompany claims?

11         A.     I think they must have had

12   intercompany claims.  But sitting here today I

13   don't recall what they were.

14         Q.     Okay.  So you can't recall any

15   case that you've ever worked on where there

16   were intercompany claims?

17         A.     I didn't say that.  I think that

18   the cases that I worked on there probably were

19   cash management systems and intercompany

20   relationships.

21         Q.     Okay.  In your experience, your

22   40-plus years experience that led you to be

23   selected and appointed as CRO, what is your

24   view as to where courts typically come down on

25   centralized cash management systems as debt

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 73 of 165

Page 73

1              L. KRUGER

2  versus equity?

3              MR. KERR:  Objection.

4      A.    Don't know.

5      Q.    You don't know?

6              Did anybody give you any

7  information that reflected Morrison &

8  Foerster's view on that?

9              MR. KERR:  Objection.  Again, you

10     can answer that question yes or no but I

11     don't want you to be revealing any

12     privileged communication.

13     A.    Well, I had conversation with

14  counsel about that, as I said.

15     Q.    Okay.  So I'd like you to take a

16  look at this entire document and let me

17  explain to you the way I understand it to

18  work.

19              On the last page is a chart of the

20  top ten intercompany claims.  At Bates number

21  UCC 12848 there is an analysis that's titled

22  MoFo Draft, Privileged and Confidential For

23  Settlement Discussions Purposes Only, that

24  give their analysis of these intercompany

25  claims.

Page 74

1                     L. KRUGER

2              I'd like you to review this

3      document, please.

4              (Document review.)

5         A.    Well, I've read it through

6      briefly, yes.

7         Q.    Okay.  So do you understand -- the

8      way I think the document works, on the last

9      page it lists out the intercompany and then

10     the numbers tie to the analysis?

11             MR. KERR:  Objection.

12        A.    I see what -- yes, I think I do.

13        Q.    Okay.  So let's look at, for

14     example, on the last page, item number 2,

15     where ResCap is the time borrowing entity,

16     Residential Funding Company is the lending

17     entity.  And then you have the amounts which

18     are, you know, 1.8 billion.

19             Do you see those?

20             And then you go to Bates number

21     UCC 12848.

22        A.    Um-hum.

23        Q.    Which is the MoFo draft.  And you

24     see under Debt MoFo's comments on that

25     particular $1.8 billion intercompany claim.

Page 75

1                          L. KRUGER

2        A.    Right.

3        Q.    And MoFo notes that cash is

4   continuingly being swept upstream for

5   centralized treasury management.

6              In your experience that's a common

7   practice, right?

8              MR. KERR:  Objection.

9        A.    I think it is.

10       Q.    Okay.  And, MoFo notes, that as

11   RFC generates cash that cash gets swept

12   upstream to ResCap.  Also fairly typical in a

13   centralized cash management system, correct?

14       A.    I assume if -- I don't know the

15   answer to that really.

16       Q.    Okay.

17       A.    I'm not an accountant.

18       Q.    Okay.  And then MoFo notes that

19   the cases note that the intercompany claims

20   arising from the operation of the cash

21   management system are enforceable as debt.

22             In your 40-years plus experience

23   as a restructuring lawyer, do you agree with

24   that statement?

25       A.    I'm not sure whether or not

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 76 of 165

Page 76

L. KRUGER

1

2   they're right in saying that -- I did not

3   think of this as debt so it's hard for me to

4   really respond to that.  I didn't think these

5   were enforceable debts.

6        Q.    Okay.  And you'll see the next

7   sentence MoFo notes that claims were

8   identified as receivables and payables on

9   interco books.  Sufficient formality for an

10  intercompany loan.

11            Do you see that?

12       A.    Yes, I do.

13       Q.    Do you share that conclusion?

14       A.    No, I don't.

15       Q.    Why?

16       A.    Because it seems to me that

17  formality is not really the issue.

18            As I look at it, and I looked at

19  it, remember, from a point of view of a

20  settlement of these proceedings, my sense of

21  these claims were that they were on the books

22  and records as intercompany balances, put

23  there because Ally's and AFI's accounting

24  system require them to do so, that they were

25  treated differently by the various

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 77 of 165

Page 77

1                       L. KRUGER

2    subsidiaries of the companies, that they all

3    uniformly go at it the same way.  And the fact

4    that they were intercompany balances to my

5    mind did not necessarily mean that these were

6    collectible and enforceable obligations of the

7    entities, particularly with the kind of

8    history that is present here where there has

9    been massive forgiveness of debt.

10          It's just hard for me to think

11   this is really debt in some real sense of the

12   word.  I think it's basically an accounting

13   issue more than it is an enforceable

14   collectible sum of money.

15       Q.    Okay.  With respect to item number

16   2, which is this $1.8 billion intercompany

17   claim, what did you do to determine whether

18   there was any instrument evidencing the

19   indebtedness?

20          MR. KERR:  What did he do

21      personally?

22          MR. COHEN:  In his capacity as

23      CRO, yeah.

24          MR. KERR:  Okay.

25       A.    I discussed these claims with my

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 78 of 165

Page 78

1                           L. KRUGER

2    counsel, with my financial advisors, with FTI.

3    Beyond that, nothing.

4           Q.    Okay.  Now, let me set the context

5    for this.  You understand that my clients

6    assert that they have a lien on this

7    $1.8 billion intercompany claim and you have

8    determined that it gets wiped out because it's

9    not really debt, right?

10          MR. KERR:   Objection.

11          A.    Oh, I determined that in the

12   context of the global settlement that it was

13   reasonable for me to treat the intercompany

14   claims as -- with no significance because to

15   treat them otherwise would mean that I have to

16   go through the process of trying to understand

17   and deal with each of the intercompany debts,

18   reverse the debt forgiveness over the last

19   several years, leading to the fact that there

20   would not be a global settlement, there would

21   not be an Ally contribution, and I would undue

22   everything that I had worked so hard to

23   accomplish.

24          Q.    But if my clients have a lien on

25   that intercompany claim, how do you have the

Page 79

1                        L. KRUGER

2    power to extinguish that collateral?

3              A.     Well, first of all, I don't

4    believe that your clients -- and I don't

5    accept the premise.  I don't believe your

6    clients have a lien on the intercompany claim,

7    because I believe that those are general

8    intangibles and your clients don't have liens

9    on general intangibles.

10             Q.     Okay.  If they do -- and you

11   understand that's a disputed issue.  The

12   Debtors have one view on it and the JSNs have

13   a different view on it.

14             A.     I understand that that may be

15   true.

16             Q.     Okay.  But you don't propose

17   extinguishing that collateral, the

18   intercompany --

19                  MR. KERR:   Objection.  Go ahead.

20             A.     For the purposes of the global

21   settlement, yes.

22             Q.     Okay.  If my clients actually have

23   a security interest and a lien on that

24   intercompany, how can you extinguish it for

25   purposes of the global settlement?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 80 of 165

Page 80

1                          L. KRUGER

2                    MR. KERR:   Objection.

3           A.     I think it's no different than

4    dealing with any other group of creditor

5    claims.  I've gotten your clients -- as I

6    understand what I've done, I'm paying them in

7    full for their pre-petition -- allowed claim

8    and their pre-petition interest.  I'm not sure

9    they have any more entitlement than that.  If

10   they want to show that they're oversecured

11   somehow, they're free to do so.   If the judge

12   concludes that they are they'll get paid

13   post-petition interest.

14          Q.    And this would be one of the ways

15   to establish, this lien, that they could the

16   establish that they were oversecured, correct?

17          A.    It might be.

18          Q.    Correct.  In determining that you

19   were going to just eliminate all of the

20   intercompany claims, you understand that there

21   are legal tests that you go through when you

22   recharacterize debt as equity?  Do you

23   understand that based on your 40 years of

24   practice?

25          A.    Yes.

Page 81

1                    L. KRUGER

2          Q.    Exactly.  And so there are certain

3   things that courts look at and you have to

4   satisfy those tests before you can do that,

5   correct?

6          A.    Right.  But I'm not assuming that

7   this is debt so I start perhaps from a

8   different premise.

9          Q.    Well --

10         A.    These do -- in my mind, these are

11  intercompany balances on the books and records

12  of the company.  I don't believe that they, in

13  the main, are debt.  And I think that it was

14  reasonable, appropriate and responsible for me

15  to treat them for global settlement purposes

16  as being a bad debt.

17         Q.    Who in your accounting department

18  of your company did you talk to when you

19  determined that this wasn't debt?

20         A.    Lots of people at FTI and Morrison

21  & Foerster.

22         Q.    I'm talking about the employees at

23  the company.  Not the paid consultants.  The

24  people who actually work at the company and

25  booked these entries.  Who did you talk to

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 82 of 165

Page 82

1                       L.  KRUGER

2    when you came to that conclusion?

3          A.    I spoke to many people at the

4    company.  I'm not sure who specifically as I

5    sit here today, but I guess I spoke to Barbara

6    Westman, Tammy Hamzehpour, Jill Horner.

7          Q.    Ms. Dondzilla?

8          A.    I don't know that I ever spoke

9    with her.

10         Q.    Did you review their deposition

11   testimony?  Those three women have been

12   deposed.

13         A.    No, I did not.

14         Q.    Would it surprise you to know that

15   they testified under oath that they thought it

16   was debt?

17            MR. KERR:  Objection.  Misstates

18      the evidence.  That's just -- come on,

19      David.

20         A.    Whatever they called it, I

21   believe, as I said, that this is not debt.

22   For my purposes and for the purposes of the

23   global settlement this was not debt as I

24   understood it.

25         Q.    Why do you qualify it by saying

Plaintiff's
Objection
82:14-16:
Objection to
form;
misleading;
confusing;
unduly
prejudicial

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 83 of 165

Page 83

1                          L. KRUGER

2       for purposes of the global settlement?   I mean

3       it's either debt or equity.

4                    MR. KERR:   Objection.

5            A.       I think of it as intercompany

6       balances, most of which did not have -- I

7       repeat -- I'll say it again.   Most of these

8       obligations or intercompany balances, I guess

9       is the right word, intercompany balances, lack

10      maturity dates, interest rates, interest,

11      documentation, and they're tens of thousands

12      of them.

13                    To try to isolate one or two of

14      them and say, Aha, gottcha because this one

15      looks like it may have some of those

16      characteristics is to me, when I think about

17      it, an invitation and an obligation to look at

18      all of them to see whether or not they all

19      stand the test of time.   All -- God knows how

20      many of them -- 20,000, some number like that

21      I'm told of intercompany balances on the books

22      of the various companies.   I assume that doing

23      that would destroy the prospect of a global

24      settlement because nobody would stand still

25      long enough to allow that to happen.   And

Page 84

1                    L. KRUGER

2    there would be no -- as I said, there would be

3    no Ally contribution, no global settlement.

4    And I think that the global settlement is in

5    the best interest of all the creditors, all of

6    the estates, and quite frankly the JSNs.

7         Q.    Did it ever occur to you to apply

8    a materiality threshold to the intercompany

9    claims?

10        A.    No.

11        Q.    Why not?

12        A.    Some are bigger than others.  Some

13   of the forgivenesses are bigger than others.

14   I didn't apply materiality in either

15   direction.  I just looked at them and thought

16   to myself after discussion that these were not

17   really debt.  I didn't think that they were

18   effectively collectible.

19        Q.    How much time did you spend on

20   that analysis?

21        A.    Many, many hours.

22        Q.    Can you give me an estimate?

23        A.    No.

24        Q.    Can you give me a ballpark?

25        A.    No.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 85 of 165

Page 85

1              L. KRUGER

2        Q.      So you don't know whether it was

3   20 or a hundred?

4        A.      No.   I'm not -- there's no way

5   that I can give you that kind of an estimate.

6   I engaged full time in the endeavor of dealing

7   with these companies and dealing with the

8   reorganization plan, dealing with the

9   creditors and various constituencies, and

10  primarily in recent months dealing with the

11  JSNs.   I've spent a lot of time on the issue

12  of intercompany payments.   Whether that was 20

13  hours or 200 hours, I don't know.   But it's a

14  lot of hours.

15       Q.      Well, if it was your view -- did I

16  understand your testimony that you spent a lot

17  of time on the intercompany claims in

18  connection with the JSNs?

19       A.      Sure.

20       Q.      If it's your view that the JSNs

21  don't have a lien on the intercompany claims

22  why were you worried about them at all in

23  connection with the intercompany claims?

24            MR. KERR:   Objection.

25       A.      Because the JSNs assert claims and

Page 86

L. KRUGER

1

2  liens and I wanted to understand the nature of

3  their claims and go back to why I thought they

4  were not appropriate in the first instance,

5  which is that I don't believe they have liens

6  on the intercompany claims.

7      Q.    But there are two separate issues

8  there.  One is whether they have a lien and

9  the second is whether there is value on the

10 intercompany claims.  If you believe the

11 answer to the first question is no, the JSNs

12 don't have a lien, then why do you care about

13 the second question?

14         MR. KERR:  Objection.

15     A.    I'm not sure that I do.

16     Q.    Then why have you spent

17 significant amount of time on it?

18         MR. KERR:  Objection.

19     A.    Because I'm sitting here today

20 being deposed about it.  I'm also going to be

21 a witness at confirmation so I want to

22 understand every aspect of everything that's

23 going to take place in the confirmation

24 hearing and at this deposition to be able to

25 answer questions like yours.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 87 of 165

Page 87

L. KRUGER

1

2       Q.    Do you understand that the

3   financial advisors and the legal advisors for

4   purposes of their analysis of intercompany

5   claims have focused on the largest of the

6   intercompany claims?

7             MR. KERR:   Objection.

8       A.    I assume they did that because I'm

9   looking at the document that you handed me.

10      Q.    Okay.  Why didn't you follow that

11  path as well?

12      A.    I read these.  I looked at and was

13  aware of the largest of the intercompany

14  claims.  But it didn't change my view which

15  for the purposes of the global settlement, as

16  I've said, if I was going to isolate one or

17  two of these and say, Ah, these look -- on

18  some great continuum from zero to a hundred,

19  these look like they're 5s instead of zeros, I

20  thought I would have to go back and look at --

21  because creditors would all insist upon it,

22  they would all say, Well, what about me under

23  those circumstances, why can't I have blah,

24  blah, blah, I assume I would be going back and

25  looking at all of the claims to understand the

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 88 of 165

Page 88

L. KRUGER

origin of the claims, the impact of the

forgiveness of the indebtedness on those

claims and go back and look at all of them.

           That would defeat, as I said, my

purpose which, as I said, my purpose was

finding a global settlement that was

acceptable, if not embraced, but acceptable,

to the vast majority of the creditors.  And I

take a lot of comfort from the fact that some

6,800 claims filed with the exception of the

JSNs, and perhaps my friends at Syncora, there

really are no major objections to this claim.

It's been approved and endorsed by huge

numbers of consenting claimants.  I must have

done something right.

     Q.   So putting aside the issue of the

validity or not of the JSNs' assertion of a

lien on the intercompany claims, assume some

other creditor had a lien on the intercompany

claims, an uncontested lien, is it your view

that the greater good of the global settlement

justifies the treatment proposed in the plan

of key elimination of the intercompany claims?

           MR. KERR:  Objection.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 89 of 165

Page 89

1                    L. KRUGER

2          A.    I'm not sure I understand your

3     question.

4                    Is the question could they enforce

5     a lien if they had a lien?  Or value the lien

6     if they had a lien?  I would assume that that

7     would be the argument the JSNs make to the

8     court.

9          Q.    And I understand your view that

10    the JSNs don't have a lien and therefore this

11    treatment is appropriate.

12                MR. KERR:  Objection.  Misstates

13    his testimony.

14          Q.    Is that your view?

15          A.    No.  My view is whether they have

16    a lien or not, global settlement and the

17    resolution providing no value and no

18    consideration of the intercompany claims is

19    appropriate both to the fact that it enables

20    us to go forward and have the global

21    settlement and also because the global

22    settlement enables us to pay the JSNs in full

23    their allowed claim plus pre-petition

24    interest.

25          Q.    And if the JSNs have a lien that

Page 90

1                        L. KRUGER

2    would entitle them to the payment of

3    post-petition interest, would they get that

4    under your plan?

5            A.    God bless them.  Yes, they would.

6                 MR. COHEN:  Want to take a break?

7                 MR. KERR:  Sure.  Sure, sure,

8    sure.

9                 THE VIDEOGRAPHER:  The time is

10   11:26 a.m.  This is the end of tape

11   number one.  We're off the record.

12                 (Recess taken.)

13                 THE VIDEOGRAPHER:  The time is

14   11:41 a.m.  This is the start of tape

15   number two.  We are on the record.

16   BY MR. COHEN:

17      Q.    Mr. Kruger, I'm going to hand you

18   a document that has previously been marked as

19   Westman Exhibit 1.  Would you take a moment to

20   look at this document.

21                 (Document review.)

22                 MR. COHEN:  For the record, it's

23   titled the Ad Hoc Group of Junior Secured

24   Noteholders Notice of Rule 30(B)(6)

25   Deposition.

Page 91

L. KRUGER

1

2            (Document review continuing.)

3     A.     I've read it through briefly.

4     Q.     Have you seen Westman Exhibit 1

5  before?

6     A.     No.

7     Q.     Do you understand that you've been

8  designated to testify as a 30(b)(6) witness on

9  certain topics in this deposition today?

10    A.     Yes.

11    Q.     When did you find out you were

12 going to be giving 30(b)(6) testimony in this

13 deposition?

14    A.     In the past couple of weeks.

15    Q.     Other than the preparation that we

16 talked about this morning earlier about

17 getting ready for the deposition, did you do

18 anything in particular to testify as to the

19 topics as to which you've been designated?

20    A.     I looked at those topics and made

21 sure that I could respond to most questions

22 with respect to them.

23    Q.     Okay.  So let's go through and

24 make sure we're in agreement on the topics.

25            If you turn to page 8 of this

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 92 of 165

Page 92

<sup>1</sup>                           L. KRUGER

<sup>2</sup>    document where the deposition topics begin,

<sup>3</sup>    I'll just run these through, can you testify

<sup>4</sup>    truthfully and completely to item 2, Romanette

<sup>5</sup>    (vii), the decision to waive, settle, cancel

<sup>6</sup>    or discharge the intercompany claims?

<sup>7</sup>         A.    No.

<sup>8</sup>         Q.    In your view who is the best

<sup>9</sup>    person at the company who would be able to

<sup>10</sup>   testify as to the decision to waive, settle,

<sup>11</sup>   cancel or discharge the intercompany claims?

<sup>12</sup>        A.    Well, I have waived the

<sup>13</sup>   intercompany claims for global settlement

<sup>14</sup>   purposes so I'm not sure what other approvals,

<sup>15</sup>   policies, procedures -- I'm not sure what all

<sup>16</sup>   of those words mean.

<sup>17</sup>             MR. KERR:  I think there's some

<sup>18</sup>        confusion with the witness.  Lou, if I

<sup>19</sup>        may, what he's focused on is not the

<sup>20</sup>        entire part of 2, but just the very last

<sup>21</sup>        Romanette (vii).

<sup>22</sup>             MR. COHEN:  That's correct.

<sup>23</sup>             THE WITNESS:  Oh, I'm sorry.

<sup>24</sup>             MR. KERR:  That's all right.  So

<sup>25</sup>        that's a mistake.

Page 93

L. KRUGER

1
2      A.    On me.  I'm sorry.

3      Q.    All right.  So --

4      A.    I'm that person.

5      Q.    Okay.  We'll clean up the record.

6            Can you testify truthfully and

7   completely as to the company's decision to

8   waive, settle, cancel or discharge the

9   intercompany claims?

10     A.    For purposes of the global

11  settlement, yes.

12     Q.    Would you look at item 5.  Can you

13  testify truthfully and completely as to all

14  matters relating to analysis concerning and

15  decision to enter into the RMBS trust claim

16  settlement?

17     A.    Yes.

18     Q.    Item number 6, can you testify

19  truthfully and completely to all matters

20  relating to the analysis concerning and

21  decision to enter into the MBIA settlement?

22     A.    Yes.

23     Q.    Item number 7, can you testify

24  truthfully and completely as to all matters

25  relating to analysis concerning and decision

Page 94

L. KRUGER

1

2  to enter into the FGIC settlement?

3      A.    Yes.

4      Q.    Item number 8 on the next page.

5            Can you testify truthfully and

6  completely to all matters relating to the

7  consideration of whether the RMBS trust claim

8  settlement, MBIA settlement, and or FGIC

9  settlement, should be subordinated pursuant to

10 Section 510(b) of the Bankruptcy Code?

11     A.    Yes.

12     Q.    Can you testify truthfully and

13 completely as to all matters relating to the

14 analysis concerning and the decision to enter

15 into the settlement of the allowed claims of

16 the private security claimants?

17     A.    Yes.

18     Q.    Item number 10, can you testify

19 truthfully and completely as to all matters

20 relating to the Debtors' determination to

21 agree to the third party releases in

22 connection with the plan?

23     A.    Yes.

24     Q.    Item number 11, can you testify

25 truthfully and completely as to all matters

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 95 of 165

Page 95

L. KRUGER

1

2 relating to the analysis concerning and the

3 decision to agree to the Ally contribution?

4      A.    Yes.

5      Q.    And item number 12, can you

6 testify truthfully and completely as to all

7 matters relating to the allocation of the Ally

8 contribution on a claim-by-claim basis and the

9 allocation of the Ally contribution set forth

10 on page 41 of the revised disclosure

11 statement?

12      A.    Yes.  So long as the little (i)

13 the circle, the allocation of the Ally

14 contribution on a claim-by-claim basis is not

15 meant to say that I somehow looked at each

16 individual claim against Ally, gave it a

17 value, and then that's how I got to the 2.1

18 billion.  Because that's not the right answer.

19 I did not do that.  I could certainly testify

20 about it, but the way this is written I don't

21 think is correct.

22      Q.    And what is incorrect about

23 paragraph 12, Romanette (i)?

24      A.    I don't think the Ally

25 contribution is being allocated on a

Page 96

1                    L. KRUGER

2    claim-by-claim basis.

3         Q.     Okay.  So the corporate view is

4    that wasn't done and you're the best witness

5    to explain that that wasn't done.

6         A.     That's correct.

7         Q.     And can you explain the reason

8    that wasn't done?

9              MR. KERR:  Objection.  Asked and

10        answered.

11        A.     Because we did not -- in the

12   negotiation with Ally that produced the

13   $2.1 billion contribution from them, it was

14   not done on a bottoms-up basis trying to

15   ascribe a value to each of the prospective

16   claims the parties or the debtor might have

17   against Ally.

18        Q.     Is that work that could have been

19   done?

20              MR. KERR:  Objection.

21        A.     I have no idea whether that

22   actually could have been done.  I don't know

23   whether it's possible to allocate value.  I

24   think you asked me this before.  I don't think

25   it's possible to necessarily allocate value in

Plaintiff's
Objection
96:18-97:5
Lack of
personal
knowledge/
speculative
(FRE 602)

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 97 of 165

Page 97

1                         L. KRUGER

2      a meaningful way to each of the prospective

3      claims that might be asserted against Ally by

4      the various constituencies including the

5      debtor.

6            Q.    And what is the basis of that

7      belief?

8            A.    The basis of my belief comes out

9      of my desire to see the global settlement

10     accomplished because I believe that to do

11     anything other than that would involve a

12     course of conduct that would not lead to a

13     sensible conclusion.    I don't believe, as I

14     said, that you can value individual items

15     individually and that -- everybody would have

16     their own view as to which of the items, what

17     are the values.    I don't think that's

18     sellable.

19           Q.    Who did you consult with in

20     reaching that conclusion?

21                 MR. KERR:   Objection.

22           A.    It's my own conclusion but I

23     consulted with many, many people.    All the

24     various counsel for the parties, all the

25     financial advisors.    And then I came to my own

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 98 of 165

Page 98

1                    L. KRUGER

2    conclusion that that was the right way to go

3    was to negotiate a top-down number with Ally

4    and then see if the number was big enough to

5    make it work for all the creditor

6    constituencies and for the estates.

7         Q.     Did you ask anybody if a

8    bottoms-up approach could be done?

9         A.     It was part of every conversation

10   was are we doing this the right way and there

11   was no doubt in my mind that the only way to

12   do this was as I described which was a

13   top-down view of the world.

14        Q.     My question was different.   Did

15   you ask anybody if a bottoms-up view could be

16   done?

17        A.     I don't think I specifically asked

18   anybody whether they could do that because I

19   just in my own mind gave no credence to that

20   possibility.

21        Q.     Would you look at paragraph 20 on

22   page 11.  All matters related to partial

23   consolidation as set forth in the plan

24   including but not limited to any investigation

25   conducted by the Debtors to ascertain whether,

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 99 of 165

Page 99

1          L. KRUGER

2   Romanette (i), creditors relied on the Debtors

3   collectively or in any combination of subsets

4   as a single entity; Romanette (ii), the

5   Debtors' affairs were hopelessly entangled;

6   and Romanette (iii), the prejudice to

7   creditors of the proposed consolidation would

8   outweigh its benefits.

9          Can you testify truthfully and

10  completely as to those subjects?

11      A.    Yes, I can.

12      Q.    In your 40 years experience as a

13  bankruptcy practitioner, have you been

14  involved in dealing with substantive

15  consolidation issues?

16      A.    Yes.

17          MR. KERR:  Objection.

18      A.    Sorry.  Yes, I have.

19      Q.    Then item 21, All matters related

20  to the treatment of the junior secured

21  noteholders claims under the plan.  Can you

22  testify truthfully and completely as to that?

23      A.    Yes.

24          Hopefully I've been doing so.

25          MR. COHEN:  Mark this as 4.

Page 100

1                    L. KRUGER

2                    (Kruger Exhibit 4, Notice of

3           Filing of Revised Disclosure Statement

4           for Debtors' Revised Plan of

5           Reorganization Pursuant to Chapter 11 of

6           the Bankruptcy Code, marked for

7           identification as of this date.)

8           A.    I have it.

9           Q.    I will not ask you to read Kruger

10    Exhibit 4 which is the Notice of Filing of

11    Revised Disclosure Statement For the Debtors'

12    Revised Plan For Organization Pursuant to

13    Chapter 11 of the Bankruptcy Code from cover

14    to cover.  But you can look at it -- at any

15    section you want to.  I'll direct you to

16    specific pages.

17                    Are you familiar with this

18    document?

19           A.    Yes, I am.

20           Q.    All right.  For ease of reference

21    we're going to use the page numbers at the top

22    of the pages rather than the page numbers at

23    the bottom.

24           A.    Okay.

25           Q.    And so what I'd like you to do is

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 101 of 165

Page 101

1                          L. KRUGER

2      to turn to page 28 of 196 at the top and the

3      sections that we're worry going to be talking

4      about is Article II, the Global Settlement and

5      Implementation of the Plan.

6           A.    Page 28?

7           Q.    28 of 196.

8           A.    Article II?

9           Q.    Yeah.

10          A.    Okay.

11          Q.    And if you would take a look at

12     the two paragraphs at the bottom of that page

13     that carries over to the next page I would

14     appreciate it.

15          A.    Um-hum.

16               (Document review.)

17          A.    Okay.  I've read that.

18          Q.    All right.  Who, to your

19     knowledge, was involved in negotiating the

20     first Ally settlement, the $750 million

21     contribution?

22          A.    I have no idea.

23          Q.    Do you know how that number was

24     arrived at?

25          A.    No.

Page 102

1                    L. KRUGER

2        Q.    Do you know whether the Debtors'

3    attempted to value their claims against Ally

4    before agreeing to a $750 million number?

5        A.    I have no idea.

6        Q.    Do you know whether the Debtors'

7    retained any potential experts to help them

8    determine whether a $750 million contribution

9    from Ally was appropriate?

10       A.    I do know that the Debtors'

11   conducted an investigation of their claims

12   against Ally, but who actually conducted the

13   investigation, whether they were retained

14   experts, I don't know sitting here today.

15       Q.    Okay.  What did you do when you

16   became CRO to bring yourself up to speed as to

17   the move away from 750 million to the

18   mediation?

19             MR. KERR:  Objection.

20       A.    Well, I met with -- in the very

21   first few weeks of my engagement with Judge

22   Peck to understand his view of the mediation,

23   with obviously Morrison & Foerster,

24   Centerview, FTI, the Creditors Committee, its

25   counsel, its financial advisors, to understand

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 103 of 165

Page 103

1                    L. KRUGER

2    where we are and understand each of the

3    creditors' various views of their own claims

4    and their views with respect to other

5    creditors' claims.  And that's what I did.

6          Q.    What is your understanding as to

7    the reason the $750 million contribution was

8    ultimately rejected?

9          A.    I think there was a conclusion by

10   the creditors and the Debtor that that was an

11   insufficient sum when added to the proceeds

12   from the distribution of the Debtors' estates

13   to satisfy the creditors' minimum needs by way

14   of a resolution of the various competing

15   issues in the case that would make them want

16   to enter into a global settlement.

17         Q.    Has there been any attempt by the

18   estate to compute the total value of its

19   claims against Ally?

20         A.    Not that I am aware of.

21         Q.    Why not?

22         A.    As I said before, I don't know

23   that there's any really way to do that.

24   Everybody will have their own view of what the

25   value of each individual claim might be and

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 104 of 165

Page 104

1                      L. KRUGER

2    I'm not sure there's any purpose to be served

3    by it.   We have an opportunity to have a

4    global settlement that I think is in

5    everybody's best interest and I think the

6    settlement that we've achieved is that

7    settlement.   And it's appropriate for us to do

8    it as we did it but just from a top-down

9    basis.

10         Q.     Why isn't the Debtors' view of the

11   value of the claims an important thing to know

12   in determining the reasonableness of the

13   settlement?

14              MR. KERR:   Objection.

15         A.     I'm not sure how you value the

16   claims that the debtor might have against

17   Ally.   What it does say to me is that if we

18   were going to pursue those claims individually

19   we would go back to the litigation state in

20   which the creditors would be suing Ally using

21   the estate causes of action.   Individual

22   creditors would be suing Ally on their own

23   particular causes of action.   The creditors

24   would all be suing each other.   We would have

25   years of chaos and enormous cost to this

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 105 of 165

Page 105

1                    L. KRUGER

2    estate.    None of that made sense to me so

3    that's why the Debtors have not looked at

4    that.    We looked at what do we need to get

5    from Ally by way of a contribution that

6    together with the distributable assets from

7    the Debtors' estate enabled us to compromise

8    all the various competing creditor claims in a

9    way that the creditors are, as I've said, not

10   necessarily happy about but prepared to live

11   with.    That's what we did.

12        Q.    And in your 40 years experience

13   practicing law have you ever done a litigation

14   analysis?

15        A.    Of what a claim is worth?

16        Q.    Yes.

17        A.    I've not done it but I've had

18   presentations to me of claim analysis.

19        Q.    And is that something in your 40

20   years of practice you've typically relied on

21   in going into the settlement negotiations?

22        A.    It would depend on the

23   circumstances, but ordinarily speaking, most

24   of the time lawyers come to me when they give

25   me that kind of stuff and say here's the

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 106 of 165

Page 106

1                    L. KRUGER

2    range.   Well, you know, it's interesting that

3    that's their view of the range.   I didn't

4    think this needed a view of the range.   What

5    this needed was a global settlement.   We

6    achieved that.   I mean, that was the goal and

7    we've done that.

8        Q.       Why didn't you think this needed a

9    view of the range?

10       A.       Because I don't think it would be

11   possible to evaluate in a meaningful way the

12   various claims of the various competing

13   parties, both Debtors' claims and claims of

14   others outside the Debtor.   How would -- you

15   know, there's no way for me to do that.   It

16   would take years.   I mean, in a perfect world

17   if you wanted perfection, every creditor to

18   pursue their claims, the debtor would object

19   to those claims.   Ally would object to those

20   claims to the extent they were being sued.

21   And in four or five years we know precisely

22   what everybody's allowed claim might be and

23   whatever recovery there might be from AFI at

24   that point.   But they were probably an

25   insolvent estate.   And, I recall, for example,

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 107 of 165

Page 107

1                   L. KRUGER

2    the JSN suggesting in one of their pleadings

3    an objection to an extension of exclusivity

4    that the Debtors' estate would become

5    administratively insolvent I think they

6    suggested sometime in the spring of next year.

7              Well, there's no way if we had a

8    litigation scenario that this is going to get

9    done in the spring of next year.  This would

10   go on for years.  That alternative was an

11   unacceptable alternative so for me there

12   wasn't any point in worrying about whether I

13   was building up from the bottom up.  I needed

14   to get a settlement sufficient to work to

15   achieve a global settlement.

16        Q.   Did anyone give you an estimate of

17   how long it would take to do a range of value

18   of the claims the Debtors' --

19        A.   I'm not --

20             MR. KERR:  And just again I don't

21        want you to reveal any communications

22        with counsel, but --

23             MR. COHEN:  And I also want to

24        finish my sentence.

25             MR. KERR:  Oh, I apologize.  I

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 108 of 165

Page 108

1                    L. KRUGER

2        thought you were done.

3                MR. COHEN:  My question.

4                Both you of let me finish my

5        question.

6            Q.    Did anybody give you a range -- or

7    a date estimate as to how long it would take

8    to do a range of value of the Debtors' claims

9    against Ally?

10           A.    No.

11           Q.    Did anybody tell you how much that

12   would cost?

13           A.    No.

14           Q.    Did you ever ask anybody?

15           A.    No.

16           Q.    Why not?

17           A.    Because I didn't think it was

18   meaningful, quite frankly.  As I said, I

19   thought the way to do this was to find the

20   combination of value from Ally and from the

21   various distributable amounts of the Debtors'

22   estates to create a pot of sufficient funds to

23   produce the global settlement.

24           Q.    Let's go to page 49 of Kruger

25   Exhibit 4 which is the chart -- 49 at the top.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 109 of 165

Page 109

1            L. KRUGER

2  I'm sorry.

3        A.    Oh.  I'm sorry.

4        Q.    Which is the allocation chart.

5        A.    Almost.  Ready.

6        Q.    There you are.

7              How was this allocation of money

8  to the Debtors' determined?

9        A.    Well, at the conclusion of -- and

10  I guess -- I get concerned about the mediation

11  part of this.

12            MR. KERR:  Yeah.  Again, if you

13        can answer that question without

14        revealing what happened in the mediation

15        you're free to do so.  But to the extent

16        you would -- we're subject to the

17        mediation confidentiality.

18            MR. COHEN:  I understand.

19            MR. KERR:  And so to the extent

20        you can answer that question in general

21        terms without disclosing what happened in

22        the mediation feel free to do so.  But we

23        need to be very cognizant of that, Lou.

24            MR. COHEN:  And for my purposes

25        I'm not trying to breach the mediation

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 110 of 165

Page 110

1                        L. KRUGER

2          confidentiality.

3                    MR. KERR:  I know that.  I realize

4          that.  We're just trying to navigate

5          around this.

6          A.    Starting with the total number,

7     that represents a combination of available

8     distributable funds out of the estate, ex-cost

9     of administering the estate.  Plus the Ally

10    contribution.

11         Q.    I think you're on the wrong page.

12    I'm on 49.

13         A.    Oh, I'm sorry.  This is just the

14    Ally contribution.

15         Q.    Exactly.

16         A.    I'm looking at the next page.

17    Sorry.

18         Q.    Would you like my question again?

19         A.    No.

20         Q.    Okay.

21         A.    This analysis, and the

22    distribution, came about obviously in the

23    mediation process, but it came about because

24    we looked at first the available distribution

25    of the Debtors' funds and each of the various

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 111 of 165

Page 111

1          L. KRUGER

2  silos that we were creating for the purposes

3  of the reorganization plan and the disclosure

4  statement, ResCap, GMACM and RFC, and what

5  funds were available at each of those entities

6  in the Debtors' estates, what the creditor

7  claims were at each of those Debtors' estates,

8  what the consenting creditors were hoping to

9  achieve by way of recoveries for themselves

10  out of the combination of the assets in the

11  Debtors' estates and the Ally contribution.

12          And so to put all of that into the

13  hopper and came up with an allocation that we

14  believe appropriately represented the

15  recoveries that creditors were seeking to

16  obtain and for me making sure that it was in

17  my mind reasonable, fair and equitable and

18  appropriate for the various creditors who were

19  not a part of the negotiations and at the same

20  time obviously thinking about paying in full

21  the JSNs their pre-petition claim and their

22  pre-petition interest.

23      Q.    Would it be fair to say that this

24  allocation was a negotiated allocation?

25      A.    It was part of -- it was -- I

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 112 of 165

Page 112

1                         L. KRUGER

2    think that's the wrong word.  I don't think it

3    was a negotiated allocation.  I think the

4    negotiations were seeking the compromises

5    among the various creditors with respect to

6    their competing interests and claims and this

7    was a waterfall, if you will, created to

8    satisfy, as I said, not only the requirements

9    of the individual parties, but also to take

10   cognizance of the availability of funds at the

11   various Debtors' estates, the creditor claims

12   at the various Debtors' estates and the like.

13           So I don't think it's necessarily

14   a negotiation.

15       Q.   So let me try and phrase that

16   another way.

17           You determined as part of the

18   global settlement what each of the consenting

19   creditors needed to sign onto the global

20   settlement and then came up with this

21   allocation to make that work?

22           MR. KERR:  Objection.  Misstates

23   his testimony.

24       A.   That's not what I said.  I said

25   that we looked at both what was available

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 113 of 165

Page 113

1                        L. KRUGER

2    under the Debtors' estates.    We looked at what

3    was available -- what the claims were at each

4    of the various Debtors' estates.    We looked at

5    the competing claims of the creditors who had

6    negotiated with the Debtor and among

7    themselves with the benefit of Judge Peck's

8    intervention, and came up with a conclusion

9    that this would be an appropriate allocation

10   of funds in order to both reflect the claims

11   that were present in the various Debtors'

12   estates in these three silos, the assets that

13   were available there, and the distribution of

14   the Ally proceeds that would encompass the

15   results that creditors wanted to see achieved

16   and in my mind was also fair and appropriate

17   and reasonable for those parties who were not

18   part of the mediation and the negotiations.

19        Q.    To be clear, when you said the

20   claims that were variable on the Debtors'

21   silos you're talking about the proofs of

22   claims filed by creditors against the Debtors

23   and not claims that the Debtors held against

24   Ally.

25        A.    That's correct.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 114 of 165

Page 114

1                          L. KRUGER

2          Q.      And this chart on page 49 of

3    Kruger Exhibit 4 does not reflect an analysis

4    to allocate the 2.1 billion based upon which

5    legal entity may hold certain causes of action

6    against Ally, correct?

7          A.      Well, that's too simplistic in my

8    mind to say because, for example, we allocated

9    proceeds to the ResCap Debtors and we did that

10   in part in recognition that some of the

11   creditors had asserted claims against ResCap

12   and against Ally, and aiding and abetting

13   claims, alter-ego claims and the like, and it

14   might not be inappropriate for them to have

15   some benefit in recovery from the Ally

16   contribution at the ResCap level.

17         Q.      How were those determinations

18   made?

19         A.      Which determinations?

20         Q.      The determinations you just talked

21   about; that you recognized that some creditors

22   had asserted claims against ResCap and Ally

23   for the aiding and abetting claims?

24         A.      I looked at those claims.  I

25   discussed those claims.  I had many, many

Page 115

1                   L. KRUGER

2       conversations about those claims.  I

3       participated in the negotiation of the

4       resolution of those claims.  And that's how I

5       did it.

6            Q.    Okay.

7                 (Kruger Exhibit 5, Report of

8            Arthur J. Gonzalez, As Examiner, marked

9            for identification as of this date.)

10      BY MR. COHEN:

11           Q.    So the next exhibit is Kruger

12      Exhibit 5, which are excerpts from the

13      examiner's report.  If you would like to see

14      the whole examiner's report I'm sure we could

15      have someone deliver it.

16            A.    We can go and get it on my desk.

17                 MR. KERR:  And let me just state

18           for the record, if you want to ask

19           questions about this, we object to this.

20           The court has said this is going to be

21           hearsay.  It's not coming in.  But I just

22           want to state my objection to the use of

23           this but you can ask questions if you

24           want.

25                 MR. COHEN:  Well, I don't think I

1              L. KRUGER

2      can move things into evidence in a

3      deposition anyway so --

4           MR. KERR:  I'm not asking -- I

5      realize that.  I just making sure my

6      objection is on the record.

7  BY MR. COHEN:

8      Q.    Would you look at, in Kruger

9  Exhibit 5 -- we can use the page numbers at

10  the top, which is 29 of 47, or at the bottom

11  I-29.  And this goes on to I-33 at the bottom.

12      A.    Yep.

13      Q.    When the Debtors received the

14  examiner's report did they ever try and

15  conduct a similar analysis?

16      A.    No, we did not.

17      Q.    Why not?

18      A.    There's no need to.  We had

19  achieved a global settlement.  What's the

20  point of examining it if everybody is prepared

21  to accept the result?  And it's been accepted

22  now by the overwhelming number of creditors.

23  What's the point of trying to do that?

24      Q.    Was the allocation chart we just

25  looked at in Kruger Exhibit 4 prepared before

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 117 of 165

Page 117

1                    L. KRUGER

2    or after the examiner's report?

3         A.    I think -- I don't recall.  I

4    assume we -- I don't -- I just don't recall

5    sitting here whether it was before or after.

6         Q.    Was it --

7         A.    I take that back.  It was before.

8         Q.    Okay.  And after receiving the

9    examiner's report and having the opportunity

10   to re-examine -- let me rephrase that.

11              There's a lot of "examines" in

12   that question.

13              Having received the examiner's

14   report and having the opportunity to review

15   his findings and his analysis, did you

16   consider going back and changing the

17   allocation table in Kruger Exhibit 4?

18        A.    No, I did not.

19        Q.    Why not?

20        A.    Because with all due deference, as

21   I said, to Judge Gonzalez before, I had

22   different views of what the claims were and I

23   also had a view that the global settlement

24   having been achieved was by itself an

25   accomplishment that we should not hinder and

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 118 of 165

Page 118

1                          L. KRUGER

2    that it was appropriate to go forward just on

3    the allocations that were made and the

4    distribution of funds that we just talked

5    about under the disclosure statement.  And it

6    was not necessary to consider any of the

7    things that Judge Gonzalez had raised.

8          Q.    With respect to the potential

9    impact on the issue of whether the JSNs are

10   oversecured, did you consider the examiner's

11   report in any way as impacting that issue?

12         A.    No, I did not.

13         Q.    Why not?

14         A.    Well, for two reasons.  One is, as

15   I said, in the process of the negotiation with

16   the various competing interests and trying to

17   resolve all of those claims and compromising

18   those claims, we, the Debtor, never lost site,

19   and I don't think others did, of the presence

20   of the JSNs and we provided for them, payment

21   in full of their allowed claim plus

22   pre-petition interest, I thought, quite

23   frankly, that was a real benefit to the JSNs;

24   and that if they were able to demonstrate that

25   they were oversecured to the satisfaction of

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 119 of 165

Page 119

1                    L. KRUGER

2    the court, they would get paid whatever their

3    post-petition interest might be.  But that

4    Judge Gonzalez's report, all hearsay, is not

5    useful in discussing our thinking about that.

6    It may be helpful in giving JSN some roadmap

7    or whatever they think they have claims to but

8    beyond that...

9         Q.    Wouldn't it also give you some

10   roadmap into thinking as to how things may

11   come out?

12             MR. KERR:  Objection.

13        A.    The roadmap that I had was to

14   complete the global settlement and to get a

15   plan confirmed during lives and bean.  I don't

16   mean to be flip about it, but the idea that we

17   were now going to go and look at the various

18   possible claims Ally and sue them on their

19   individual claims and spend the next five

20   years in that litigation, pointless.

21        Q.    And, again, it is your view that

22   it was also pointless to try and value -- once

23   you had the Gonzalez report to be try and

24   value those litigation claims.

25        A.    Correct.  Because if the creditors

1              L. KRUGER

2    were accepting of what had come forward then

3    that seemed to me to be the best evidence that

4    we had an appropriate amount of resolution.

5         Q.    We talked at the beginning of the

6    deposition about the scope of your engagement

7    and I think you recall that one of your

8    responsibilities was to allocate the Ally

9    contribution.  Is it your view that you

10   discharged that duty by the allocation chart

11   in Kruger Exhibit 4?

12        A.    Yes, I believe so.  I assume I

13   should say that it reflects the allocation

14   that I approved.  It wasn't the first time the

15   allocation was present.

16        Q.    Oh, understood.  Understood.  But

17   Kruger Exhibit 4 was an exercise of that duty.

18        A.    Yes.

19        Q.    And when you got the Gonzalez

20   report after Kruger Exhibit 4, the allocation

21   chart that we were talking about, you didn't

22   feel the need, given the scope of your

23   assignment, to revisit that decision.

24        A.    That's correct.

25        Q.    And that was because you had the

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 121 of 165

Page 121

1                    L. KRUGER

2    global settlement, right?

3          A.     Yes.    And, as I said, I also

4    respectfully disagree with some of Judge

5    Gonzalez's conclusions.

6          Q.     Did you raise any of those with

7    Judge Gonzalez?

8          A.     No.

9          Q.     Why not?

10         A.     It seemed to me there was no need

11   to do so since I was busy procuring the global

12   settlement and getting that organization plan

13   confirmed.

14         Q.     Did you have any discussions with

15   the Creditors Committee after the Gonzalez

16   report came out about whether you would need

17   to revisit the allocation in Exhibit 4?

18              MR. KERR:    And, again, Lou, you

19         can answer that question as long as it

20         was not part of any mediation process.

21         A.     We all talked about the Gonzalez

22   report but I don't think anybody saw a need to

23   revisit the allocations.

24         Q.     Had the mediation concluded when

25   the Gonzalez report came out?

Page 122

1                    L. KRUGER

2        A.    The Gonzalez report, if my

3    recollection is correct, came out July 3rd.  I

4    don't remember the date.  I think the

5    mediation, pursuant to court order, was still

6    in place perhaps through July and part of

7    August.  Maybe all of August.

8        Q.    Okay.

9             MR. COHEN:  We're going to go back

10       into intercompany claims.  Do you want to

11       have lunch first?

12            MR. KERR:  Sure.  Why don't we

13       stop and have lunch if you're going to

14       change topics.

15            MR. COHEN:  Exactly.

16            MR. KERR:  Let's go off the

17   record.

18            THE VIDEOGRAPHER:  The time is

19       12:15 p.m.  We're off the record.

20            (Luncheon recess taken at 12:15

21       p.m.)

22

23

24

25

Page 123

1              L. KRUGER

2        A F T E R N O O N   S E S S I O N

3        (Time noted:        12:58 p.m.)

4        THE VIDEOGRAPHER:  The time is

5    12:58 p.m.  We're on the record.

6        * * *

7  L E W I S   K R U G E R,    resumed and

8        testified as follows:

9  EXAMINATION BY (Cont'd.)

10  MR. COHEN:

11        Q.    Mr. Kruger, I'd like to hand you

12  what has been previously marked as Westman

13  Exhibit 13.

14        A.    Oh, okay.

15        Q.    Could you take a moment to review

16  that document.  It's entitled Amended Schedule

17  of Assets and Liabilities For GMAC Residential

18  Holding Company, LLC.

19              (Document review.)

20        A.    Wait just one more minute.

21        Q.    Certainly.

22              (Document review continuing.)

23        A.    Okay.

24        Q.    Earlier, before the lunch break,

25  you were testifying generally about your view

Page 124

1                          L. KRUGER

2    that the intercompany claims do not represent

3    debt.  Do you recall that?

4              A.    Yes.

5              Q.    Is it your view that they

6    represent equity contributions?

7              A.    I think what they rep -- in my own

8    mind I think what they represent are just

9    intercompany balances where sometimes the

10   intercompany balance was forgotten and treated

11   as capital contribution, but I'm not sure that

12   they always necessarily represent equity.

13             Q.    Okay.  If they don't -- did I cut

14   you off?  I'm sorry.

15             A.    No.

16             Q.    If they don't represent a capital

17   contribution and they don't represent equity

18   and they don't represent debt, what else could

19   they represent?

20             A.    I think just accounting

21   information.

22             Q.    So it's your view that they're

23   just journal entries?

24             A.    I think they're just journal

25   entries but I could -- I'm not an accountant

Page 125

1                        L. KRUGER

2          so I could be wrong about that.   Maybe they do

3          represent capital contributions.

4               Q.    And they could also represent debt

5          or equity possibly?

6                     MR. KERR:   Objection.

7               A.    I don't think so.   As I said, I

8          don't think these rise to the level of debt.

9               Q.    Okay.   And over the lunch break

10         have you had time to think about whether there

11         are any other factors that would support the

12         conclusion on your behalf?

13              A.    Nope.

14              Q.    Okay.   In your experience as a

15         bankruptcy practitioner have you had an

16         opportunity to prepare and review schedules of

17         assets and liability for Debtors?

18              A.    Yes, I have.

19              Q.    Have you seen this particular

20         schedule of assets and liabilities for GMAC

21         Residential Holding Company before?

22              A.    No.

23              Q.    Okay.   I'd like to turn your

24         attention to -- we're using the page numbering

25         at the top of the page of Westman Exhibit 13

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 126 of 165

Page 126

1                        L. KRUGER

2        which is page 4 of 13.

3                    What is -- again, more generally,

4        what is the purpose of filing a schedule of

5        assets and liability with the court?

6            A.    To alert creditors as to -- and

7        the court what assets the company believes it

8        may have and what liabilities it may have.

9            Q.    Okay.  And the intent is not to

10       mislead anybody, is it?

11           A.    Certainly not.

12           Q.    So you want this schedule to be as

13       accurate as possible, correct?

14           A.    Certainly the best information the

15       debtor may have at the time.

16           Q.    Okay.  And in your tenure as CRO

17       of ResCap, have you found any evidence that in

18       people preparing bankruptcy filings had an

19       intent to mislead anybody?

20           A.    Certainly not.

21           Q.    Okay.  Are you at page 4 of 13

22       with me?

23           A.    Yes, I am.

24           Q.    Do you see the listing of

25       Creditors Holding Unsecured Claims in the

Page 127

L. KRUGER

1  title line?

3      A.    Yes.

4      Q.    And do you see the creditors'

5  names listed in the left column?

6      A.    I do.

7      Q.    And do you see the column titled

8  Intercompany Payable?  Or the column titled

9  Date Claim Was Incurred and Consideration For

10  Claim?

11          Do you see that?

12      A.    Yes, I do.

13      Q.    And do you see under each of those

14  the description is Intercompany Payable?

15      A.    Yes, I do.

16      Q.    In your experience, what does

17  intercompany payable mean?

18      A.    Well, in this case it's not clear

19  to me what it means because it's not clear to

20  whom it is payable.  The date is not present.

21  I'm not sure what it means other than, as I

22  said, I think it means an intercompany

23  balance.

24      Q.    Okay.  In general, does the term

25  intercompany payable have any meaning to you?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 128 of 165

Page 128

1              L. KRUGER

2         MR. KERR:  Objection.

3         A.    I can't distinguish its meaning

4    outside of the actual case that we're dealing

5    with and in the case that we're dealing with I

6    said I think it represents an intercompany

7    balance.

8         Q.    And you don't know whether this

9    intercompany balance is meant to be a capital

10   contribution, do you?

11        A.    No, I do not.

12        Q.    And you don't know whether it's

13   meant to be a valid and enforceable debt, do

14   you?

15        A.    Not these individual ones but, as

16   I said, I didn't believe that they were

17   enforceable intercompany debts and I reviewed

18   the material that I reviewed and/or had

19   conversation about.

20        Q.    That's right.  But you also

21   testified that you didn't review all of the

22   intercompany obligations, correct?

23        A.    That's correct.

24        Q.    So in the ones that you reviewed,

25   you didn't find any to be valid debt, but you

Page 129

1                         L. KRUGER

2     didn't review them all, right?

3              A.      Well, I think the way to put that

4     is that there are thousands of intercompany

5     balances.   I certainly did not review

6     thousands of intercompany balances.   But my

7     financial advisors who did review a lot of the

8     intercompany balances, and after presentations

9     to me, I came to the conclusion that they were

10    not necessarily enforceable debts in the

11    ordinary course.

12             Q.      Okay.  So when this chart was

13    filed listing Creditors Holding Unsecured

14    Claims to let people know who the creditor's

15    name was and the basis of the claim, whoever

16    prepared the chart wrote intercompany payable

17    in your view they were just wrong?

18             MR. KERR:   Objection.

19             A.    As I said, I'm not sure what these

20    were.  As I looked at them from the

21    perspective of the settlement of the

22    intercompany claims, I thought about them as

23    being, as I said, no more than intercompany

24    balances.  I'm sure the form is correctly

25    filled out.  But I think that these are

Page 130

L. KRUGER

1

2    intercompany balances and that they were

3    certainly appropriate for me to not take into

4    consideration in the global settlement.

5         Q.    Would you look at the page prior

6    to that.  Page 3 of 13.  And do you understand

7    the purpose of the schedule was to state the

8    name, mailing address, including zip code and

9    the last four digits of any account number of

10   all entities holding unsecured claims without

11   priority against the debtor or the property of

12   the debtor as the date of the filing of this

13   petition?

14        A.    Yes, I do.

15        Q.    And so you understand that on the

16   next page that information is intended to

17   fulfill that requirement?

18        A.    Yes.

19        Q.    Do you have any reason to believe

20   that the company was not attempting to be

21   accurate and honest in completing this

22   schedule?

23        A.    None whatever.

24        Q.    But you have a different view as

25   you sit here today as to what that means.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 131 of 165

Page 131

1          L. KRUGER

2          MR. KERR:  Objection.

3      A.    I have a view that for purposes of

4  the global settlement, I look at it from that

5  perspective, intercompany claims were not

6  anything more than intercompany balances

7  reflected on the general journal of the

8  company and that for my purposes seeking to

9  compromise all of the claims of the estate of

10  the various creditors, and based on my view

11  that the intercompany balances were general

12  intangibles in which the JSNs did not have a

13  security interest, my view was was that it was

14  appropriate for me to treat them as being not

15  worthy of consideration for global settlement

16  purposes.

17      Q.    Okay.  Now, if I were to show you

18  a series of other schedules of assets and

19  liabilities that had the same treatment would

20  your view be the same?  We could walk through

21  them but they're generally same.

22      A.    I would have the same position I

23  assume without having seen them.

24      Q.    Okay.  Have you come to the view

25  that the intercompany claims have no value?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 132 of 165

Page 132

1                      L. KRUGER

2          A.     No.   I don't think I've ever said

3    that.

4          Q.     Do you have a view as to whether

5    there is value there?

6          A.     I have no idea whether there is

7    any value there or not.

8          Q.     Have you done anything to test at

9    any level whether there is value there?

10              MR. KERR:   Objection to form.

11              THE WITNESS:   I'm sorry?

12              MR. KERR:   You can answer.   I just

13      objected.

14          A.     Do you want to restate the

15    question?   I'm sorry.

16          Q.     Sure.   Have you done -- I'll give

17    you a different question.

18                 Have you done any analysis at all,

19    without determining what the value was, as to

20    whether there is value there?

21          A.     As I said, I've had many, many

22    meetings with my financial advisors, with my

23    counsel, with other counsel, with other people

24    with respect to the intercompany balances, and

25    it was -- it's been my conclusion that they

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 133 of 165

Page 133

1                          L. KRUGER

2     are not something that I needed to take into

3     consideration in terms of the global

4     settlement.   I did not think that they had

5     enforceable collectible value.

6          Q.     But you have not attempted to

7     analyze any orders of magnitude as to what

8     value may be there.

9          A.     I have not.

10         Q.     And just to be clear, you have not

11    concluded that there is no value there?

12         A.     That's correct.

13         Q.     Is it your view that the

14    intercompany claims are worthless and

15    meritless?

16         A.     My view that for purposes of the

17    global settlement I could treat them in that

18    fashion.   I assume the view ultimately of the

19    judge would be the view that matters.

20         Q.     I understand that for purposes of

21    the settlement you would like to treat them in

22    that manner.   My question is have you come to

23    the conclusion that the intercompany claims

24    are worthless and valueless?

25         A.     Well, I recognize that they are of

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger    Pg 134 of 165

Page 134

1                    L. KRUGER

2      little -- in my own mind, of little or no

3      value because of the prospect of forgiveness

4      of indebtedness by -- both by AFI and a

5      history of forgiveness of these balances over

6      the course of time, I'm not sure that they

7      have any value.

8           Q.     But you're not sure that they

9      don't.

10          A.     Correct.

11          Q.     When you were discharging your

12     duties as CRO within the scope of your

13     engagement, did you allocate any of the Ally

14     contribution to the waiver of the intercompany

15     claims?

16          A.     No, I did not.

17          Q.     Why not?

18          A.     Well, to restate my prior view of

19     the intercompany claims, I perceived them to

20     be of -- not consequential.   I thought that

21     they were not effective, not collectible in

22     the main, that they would have to be examined

23     individually and there are thousands and

24     thousands of them to determine if they had any

25     meaning behind them.   To do that would have

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 135 of 165

Page 135

1                          L. KRUGER

2    defeated the purpose of the global settlement.

3    I simply was not going to do that.  It just

4    made no sense to me.

5         Q.      How would that defeat the purpose

6    of the global settlement?

7         A.      Because the global settlement

8    represents a compromise among many, many

9    participants as to their individual claims and

10   represents a compromise of the claims against

11   Ally held by both individuals as well as by

12   the estates.  And anything that delayed the

13   process I thought would also give rise to the

14   need to -- in the case of the intercompany

15   balances, to review each of the intercompany

16   balances, determine its origination, determine

17   what the offsets were to it, reallocate the

18   $16 billion of forgiveness.  That would delay

19   and defeat the process.

20              And it would certainly not

21   encourage an Ally contribution or anybody else

22   to go forward with their compromises.

23              So for my purposes in looking at

24   the global settlement, I thought it was

25   reasonable and responsible to treat them as

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 136 of 165

Page 136

1                           L. KRUGER

2        not participants.

3            Q.    When was that decision made as a

4    way of disregarding the intercompany claims?

5                 MR. KERR:  Objection.

6            A.    I don't know if there's any

7    specific date that I made that decision, but

8    there's a decision that arose out of the

9    various conversations I had over time since

10   I've been involved in this case up to the time

11   the client support agreement and support

12   agreement.

13           Q.    So it was a decision that was made

14   over time.

15           A.    Yes.

16           Q.     I used the phrase RMBS

17   settlement.  What does that mean to you?

18           A.    The settlement for the RMBS claims

19   in this estate is assume is what we're

20   referring to.

21           Q.    Okay.  And you talked about that

22   you were going to testify and have been

23   designated by the company as the 30(b)(6) on

24   that topic?

25           A.    Yes.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 137 of 165

Page 137

L. KRUGER

1

2      Q.    Can you explain the RMBS suits

3  generally.  What are they about?

4      A.    Reps and breaches of warranty,

5  primarily.  Maybe other causes of action, as

6  well, but primarily that as I understood.

7      Q.    Reps and breaches of warranties

8  with respect to what?

9      A.    With the mortgages that were being

10  insured by the various -- I'm sorry.  By the

11  RMBS creditors.  Pardon me.  RMBS creditors

12  are people who purchased their --

13  institutional investors who purchased their

14  securities from securitization trust.  They

15  would have claims for breaches of reps and

16  warranties which encourage them to bring

17  causes of action against both ResCap and Ally.

18      Q.    And in what form were those claims

19  settled?

20      A.    They were settled as part of the

21  global settlement.

22      Q.    So they were part of the

23  mediation.

24      A.    They were part of the mediation

25  effort.

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 138 of 165

Page 138

L. KRUGER

1
2      Q.    On behalf of ResCap who negotiated
3  that settlement?
4      A.    Combination of myself, my counsel,
5  my advisors, the Judge Peck as mediator, the
6  Creditors Committee, their advisors and all of
7  the competing parties.  And including the RMBS
8  representatives.
9      Q.    Did the Debtors retain a third
10 party to -- an expert, to assess the value of
11 the claims that the RMBS claimants were making
12 against the Debtors?
13         MR. KERR:  Objection.  Just so
14     we're clear, you're talking about prior
15     to reaching the global settlement?
16         MR. COHEN:  Yeah.
17         MR. KERR:  Okay.
18         MR. COHEN:  Well, let me be
19     clearer on what I'm being clear on.
20     Q.    I'm not asking how you came to a
21 number in the mediation.  I'm asking whether
22 you retained an expert just to value the
23 claims.
24         MR. KERR:  But I just want it
25     clear that you're talking about prior to

Page 139

1                      L. KRUGER

2        reaching the global settlement.

3              MR. COHEN:  Correct.

4        A.    Sitting here today, I'm not sure

5   but I know we retained Mr. Lipps who is

6   assisting us in that litigation and in the

7   valuation of the RMBS claims.

8        Q.    Why did you retain someone to

9   assist you in evaluating the RMBS claims?

10             MR. KERR:  Objection.

11       A.    Because I think this was in place

12  before I arrived, quite frankly.  And I assume

13  that it was important to continue on with that

14  document.

15             Maybe you should reask your

16  question.

17       Q.    Sure.  Why did ResCap retain

18  someone to assist it in evaluating the RMBS

19  claims?

20       A.    I assume that -- I don't assume.

21  I don't know the answer to that.

22       Q.    Did you ask anybody?

23       A.    No.

24       Q.    Did you think it was important for

25  ResCap to have an understanding of the

Page 140

1                         L. KRUGER

2    magnitude of those potential claims against

3    it?

4         A.    I thought it was important for me

5    to have an understanding of the potential

6    claims that might be asserted by the RMBS

7    creditors.

8         Q.    Why would that be important for

9    you to know?

10        A.    Because if I was going to achieve

11   a global settlement and seek to compromise

12   everybody's claims I needed to understand the

13   nature of their claim, its strengths and its

14   weaknesses.

15        Q.    But on the flip side of that, you

16   never retained anybody to advise you as to the

17   value of your claims against Ally.    Why not?

18             MR. KERR:    Objection.    Misstates

19   his -- objection.

20        A.    I don't need anybody to help me

21   evaluate the claims against Ally because I

22   don't know that that's really relevant.    I

23   think what is relevant is trying to get a

24   maximum contribution from Ally such that it's

25   sufficient together with the assets of the

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 141 of 165

Page 141

1                         L. KRUGER

2    estates to provide enough funds to achieve a

3    global settlement and the compromise among the

4    various competing interests.

5         Q.     How do you determine what is a

6    fair contribution without any analysis of the

7    value of the potential claims?

8              MR. KERR:   Objection.

9         A.     In my mind, for settlement

10   purposes I'm looking at the global settlement

11   and the compromises that were necessary among

12   all of the competing parties.   If there was a

13   combination of funds that were sufficient to

14   achieve that result, in my mind that was an

15   acceptable result and a responsible result.

16              And so when Ally's contribution

17   got to the $2.1 billion and creditors were

18   able to coalesce around it and say this is

19   sufficient funds together with the funds

20   available from the Debtors' estate to meet our

21   hopes and expectations and desires in the

22   main, I thought that was a sufficient level of

23   contribution.  So there was no need for me to

24   try to evaluate the individual claims.  I

25   never did.

Page 142

1                         L. KRUGER

2        Q.    Do you know what the FGIC

3   settlement involves?

4        A.    Yes.

5        Q.    Could you describe that.

6        A.    We settled -- I'll try to do this

7   from memory.  FGIC filed I think a billion 850

8   million dollar claims against ResCap, RFC,

9   GMACM.  In addition to which they were

10  asserting claims, aiding and abetting claims,

11  against ResCap and Ally.  We settled those

12  claims for a claim of $596 million.  FGIC was

13  going to pay 253 million is my rec -- 273

14  million is my recollection.  253 million to

15  trusts and release for the trusts' claims

16  against them.  And at the same time was going

17  to be receiving $596 million by way of claims

18  in each of the estates.  It looked to me like

19  an appropriate settlement at the time.

20       Q.    How was -- through what process

21  was that settlement achieved?

22       A.    Negotiations with FGIC.

23       Q.    Was that part of the global

24  settlement?

25       A.    It was part of the global

Page 143

1                          L. KRUGER

2      settlement.

3           Q.    Okay.  Why did the amount of the

4      allowed claim differ depending on confirmation

5      of the plan?

6           A.    Because if the plan was to be

7      confirmed, then we wanted to provide a

8      mechanism for FGIC to receive the funds that

9      we thought were the -- so to speak, the

10     compromised amount reached in the

11     negotiations.

12          Q.    So it was just a byproduct of

13     negotiation?

14          A.    A combination of a byproduct of

15     negotiation and a recognition of what was

16     required as part of the overall global

17     settlement to have FGIC participate at a level

18     that was acceptable both to myself as a CRO as

19     well as to the other creditors.

20          Q.    Did the Debtors conduct any

21     analysis as to its potential exposure to FGIC?

22          A.    Yes.

23          Q.    Why?

24          A.    We conducted an -- we -- over the

25     course of the months that I've been involved

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 144 of 165

Page 144

L. KRUGER

1

2   before the final resolution of the plan

3   support agreement, I had many, many

4   conversations with my own counsel, with other

5   counsel, with advisors, financial advisors,

6   and looked at each of the individual

7   creditors' claims so that I would better

8   understand what we thought the debtor, I and

9   myself, their strengths and weaknesses were of

10  those individual claims, not to put

11  necessarily dollar values on them, but to

12  understand where they might stand in the

13  panoply of what was possible.

14           I also heard from each the various

15  competing creditors as to what they thought

16  the strengths and weaknesses were of their own

17  claims.  More emphasis on the strengths, not

18  the weaknesses.  And they were quick to point

19  out to me the weaknesses of other people's

20  claims.

21           That was all part the negotiation

22  process.  That was all part of the mediation.

23      Q.    Are you familiar with the MBIA

24  settlement?

25      A.    Yes, I am.

Page 145

L. KRUGER

1

2     Q.    What is the MBIA settlement?

3     A.    It's a settlement with allowed

4  claims at the three silos that we've created

5  for plan purposes, ResCap -- ResCap, GMACM and

6  RFC.

7     Q.    What are the MBIA claims?

8     A.    Their claims are insurance claims

9  where they insured some of the securitization

10  trusts.  My recollection is that their

11  claims -- something in the neighborhood of 2

12  plus billion dollars.

13     Q.    In what form were those claims

14  resolved?

15     A.    They asserted proofs of -- they

16  say they filed proofs of claims against the

17  various debtors.  They were resolved through

18  negotiation.

19     Q.    And was the negotiation part of

20  the mediation?

21     A.    Yes, it was.

22     Q.    Okay.  Was the subordination of

23  the allowed claims in the RMBS, FGIC and MBIA

24  settlement ever discussed by the Debtors?

25     A.    Yes.

Page 146

L. KRUGER

1

2      Q.    Was subordination of the allowed

3  claims raised during the negotiations?  Was

4  that a negotiated point?

5      A.    Well, I guess I can violate --

6            MR. KERR:  Why don't you just

7       answer that yes or no.

8      A.    Yes.

9      Q.    Why are the Debtors seeking to

10  subordinate the FHFA claims but not the

11  others?

12            MR. KERR:  Objection.

13     A.    I'm sorry.  Do you want to give me

14  that one again?

15     Q.    Sure.  Why are the Debtors seeking

16  to subordinate the FHFA claims but not the

17  others?

18     A.    Because we believe that in the

19  negotiation with the FHFA that was an

20  appropriate thing to be doing.

21     Q.    Why did you think that was an

22  appropriate thing to be doing?

23     A.    I might add parenthetically that

24  claim has been settled and they are now

25  supporting the plan.

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 147 of 165

Page 147

1                    L. KRUGER

2              But at the time it seemed to us to

3    be a way to try to deal with them and help in

4    the negotiations.

5         Q.    Could you describe the private

6    securities claimants' settlement?

7         A.    Yes.  They are receiving, in the

8    form of units in the liquidation trust,

9    ostensibly $235 million which will represent

10   what they, 21 creditors in that category, are

11   going to allocate among themselves in

12   satisfaction of their claims.

13        Q.    And in what forum were those

14   claims --

15        A.    Also as part of the mediation

16   process.

17        Q.    Did the Debtors make any attempt

18   to value its potential exposure to the private

19   securities claimants?

20        A.    Well, as I said, we didn't look at

21   in terms of necessarily dollar amounts

22   although we knew what people were claiming.

23   We looked at it in terms of trying to

24   determine the strengths and weaknesses of

25   their claims so we could understand better how

Page 148

1                    L. KRUGER

2    to compromise those claims and how to

3    participate in a compromise process.    Which

4    was the mediation process.

5         Q.    So with respect to all of the

6    analysis with these various claims we've been

7    discussing, you did a merits analysis on those

8    claims, right?

9         A.    We certainly looked at the merits

10   of those claims and the weaknesses of those

11   claims.

12        Q.    Who were the people who were

13   participating in the mediation?

14        A.    Oh, God.    That is a challenge

15   because at the mediation sessions there were

16   often more than a hundred people present.

17        Q.    Okay.    How about entities instead

18   of people?

19        A.    The members of the Creditors

20   Committee certainly.    Some of the consenting

21   claimants were also present during those

22   mediation sessions.    Counsel for the various

23   parties.    Financial advisors for the various

24   parties.    My own counsel.    My own financial

25   advisors.    And Judge Peck.

Page 149

1              L. KRUGER

2       Q.    When you say consenting claimants,

3   can you identify who those are?

4       A.    Like the New Jersey Carpenters,

5   for example, who are not members of the

6   Creditors Committee but who were present from

7   time to time during the mediation sessions.

8       Q.    Okay.  Any others come to mind?

9       A.    Not sitting here today, no.

10      Q.    Was Paulsen part of the mediation?

11      A.    I don't recall now whether they

12  participated.  I think they did participate

13  but I would not swear to that.

14      Q.    And do you recall what their

15  holdings in unsecured bonds were as part of

16  the mediation?

17      A.    No, I don't.

18      Q.    Let's go to topic 20 which is

19  partial consolidation.

20      A.    Um-hum.

21      Q.    In your 40 years of practice

22  you've dealt with the issue of substantive

23  consolidation before I assume.

24      A.    Yes.

25      Q.    And you're familiar with the

Page 150

                        L. KRUGER

1
2    Second Circuit test for substantive

3    consolidation?

4         A.    I don't know if I'm familiar with

5    it but I have some general sense of what's

6    required for substantive consolidation.

7         Q.    And what is your general sense of

8    what's required for substantive consolidation?

9         A.    Well, you need to be able to

10   demonstrate that the creditors were confused

11   about whom they were dealing with, that there

12   are not books and records, that the companies

13   were sort of closely intermingled.  Things of

14   that sort.

15        Q.    So if I were to say creditor

16   reliance on a single entity and hopeless

17   entanglement?

18        A.    That's certainly some of the

19   standard things that one would look at.

20        Q.    Okay.  Are there other factors

21   that you would look at?

22        A.    Sitting here, I don't know.  I'd

23   have to go back and read the Second Circuit

24   decision.

25        Q.    Okay.  In your 40 years of

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 151 of 165

Page 151

1                    L. KRUGER

2    experience, and your experience more

3    specifically with substantive consolidation,

4    is it your view that that's an extraordinary

5    remedy?

6         A.    It's a remedy.  It's not very

7    frequently found.  I'm not sure what

8    extraordinary means.  But it's not frequent.

9         Q.    Do you have a view as to why it's

10   not frequent?

11        A.    Difficult to prove.  Expensive to

12   prove.  Sometimes not in the interest of

13   creditors to do that.

14        Q.    When you say difficult to prove,

15   what do you mean?

16        A.    Well, it's another form of

17   litigation used to demonstrate all the things

18   you just mentioned as for why there should be

19   substantive consolidation.  I assume that

20   there would be creditors whose views differ

21   from that and then you're off to the races in

22   litigation.

23        Q.    So you'd share my view, though,

24   that substantive consolidation is not the

25   norm, it's a remedy that you have to prove

Page 152

                         L. KRUGER

1

2    entitlement to, right?

3              MR. KERR:   Objection.

4         A.    Well, I would certainly suggest

5    that substantive consolidation is not the

6    norm.   I would agree with that.

7         Q.    All right.  And there are legal

8    tests that you're required to meet in order

9    for the court to impose substantive

10   consolidation, correct?

11        A.    Yes.

12        Q.    And the same is true with respect

13   to partial substantive consolidation; isn't

14   that also true?

15             MR. KERR:   Objection.

16        A.    It depends on what the purpose is.

17   Partial substantive consolidation of the

18   client that we're talking about in the ResCap

19   setting is not substantive consolidation for

20   all purposes.  And I think your prior

21   conversation and your prior questions really

22   related to substantive consolidation for all

23   purposes.

24             The substantive consolidation in

25   the ResCap Chapter 11 proceeding, where you

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 153 of 165

Page 153

1              L. KRUGER

2    create the three silos, was really for

3    efficiency and distribution and it wasn't to

4    suggest that all of the entities, assets and

5    liabilities are now being co-mingled into one

6    entity.  That's not what this is about.

7         Q.   To your knowledge, has ResCap or

8    any of its advisors undertaken an

9    investigation as to whether creditors were

10   confused as to which ResCap entity they were

11   dealing with?

12        A.   I've certainly had those -- I had

13   conversations certainly with my counsel, with

14   the financial advisors, and with others about

15   the substantive consolidation.  But I have

16   personally spoken with the various creditors

17   who are on the Creditors Committee and others

18   outside the Creditors Committee.  No one has

19   ever suggested to me that they were confused

20   about who they were dealing with.  So I didn't

21   see real basis for substantive consolidation.

22        Q.   Okay.  How about with the hopeless

23   entanglement, that the books and records just

24   couldn't be unscrambled did you seek --

25        A.   I don't.

Page 154

L. KRUGER

1

2          Q.    Let me finish.

3          A.    Sorry.

4          Q.    On hopeless entanglement, the

5    books and records couldn't be unscrambled, did

6    you see any evidence that that was the case in

7    ResCap?

8          A.    No, I did not.

9               MR. COHEN:  Let me take about five

10       minutes.  I think we may be done.

11              MR. KERR:  Okay.  Sure, sure,

12       sure.

13              THE VIDEOGRAPHER:  The time is

14       1:28 p.m.  We're going off the record.

15              (Recess taken.)

16              THE VIDEOGRAPHER:  The time is

17       1:36 p.m.  We're on the record.

18   BY MR. COHEN:

19       Q.    Mr. Kruger, did the Debtors

20   consider auctioning the intercompany claims?

21       A.    Auctioning the intercompany

22   claims?

23       Q.    Yeah.

24       A.    No.  We did not.

25       Q.    Why not?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 155 of 165

Page 155

L. KRUGER

1

2      A.    It would seem to me that's another

3  part of the process that would delay the

4  confirmation and would delay the global

5  settlement being implemented.

6      Q.    But wouldn't it have given you a

7  good indication to see if the market put a

8  value on those claims?

9      A.    I'm not sure to what purpose.   I

10 think that you're still entitled -- the JSNs

11 are entitled to make an argument that they

12 think that there's value there.   So I'm not

13 sure how the auction would have made any

14 difference.

15         And, as I said, for my purposes,

16 for the global settlement purposes, I think it

17 was reasonable and responsible and appropriate

18 to treat these as intercompany balances as I

19 think of them as being without value or of

20 little value.

21     Q.    So once that decision was made in

22 the context of the global settlement

23 negotiations, other alternative treatments of

24 the intercompany claims were off the table; is

25 that fair?

12-12020-mg   Doc 5803-10   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Lewis Kruger   Pg 156 of 165

Page 156

L. KRUGER

1

2     A.     Well, we certainly -- I certainly

3  didn't think about auctioning them off at that

4  time and I do not think that would have been a

5  sensible thing to do.

6     Q.     Why not?

7     A.     Because I think, as I said, that,

8  you know, we then get into the process -- I

9  assume in order to auction them off I have to

10  be able to demonstrate that they have

11  something that is worth auctioning off.  And

12  then I get back to where I started from, which

13  is that I'm then in the process of trying to

14  understand and analyze each of the

15  intercompany claims to find out whether or not

16  they have value and if there's something

17  there.

18           None of that made sense to me in

19  the context of the global settlement.  So for

20  global settlement purposes, I thought it was

21  appropriate to just treat them as zero because

22  I had a consenting group of creditors that was

23  quite large with a contribution that was

24  sensible.  And I was at the same time

25  paying -- you know, I come back to it.  I

12-12020-mg    Doc 5803-10    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Lewis Kruger    Pg 157 of 165

Page 157

L. KRUGER

always thought that the JSNs were being well

treated when they got paid their allowed

claims plus pre-petition interest.  So I

didn't think that there was any reason to

think about an auction of the intercompany

claims.

MR. COHEN:  All right.  Thank you.

I have no further questions.

MR. KERR:  Anyone else?

(No response.)

(Continue on next page to include

jurat.)

Page 158

1                         L. KRUGER

2              MR. KERR:  I think we're done.

3        Thank you.

4              THE WITNESS:  Thank you.

5              THE VIDEOGRAPHER:  The time is

6        1:39.  We're off the record.

7              (Time Noted:     1:39 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19                    _____

20                    LEWIS KRUGER

21

22        Subscribed and sworn to before me

23        this ____ day of _____, 2013.

24

25        _____

Page 159

1

2        C E R T I F I C A T E

3   STATE OF NEW YORK       )

4                            : ss.

5   COUNTY OF NEW YORK    )

6            I, FRANCIS X. FREDERICK, a

7   Notary Public within and for the State

8   of New York, do hereby certify:

9            That LEWIS KRUGER, the witness

10  whose deposition is hereinbefore set

11  forth, was duly sworn by me and that

12  such deposition is a true record of

13  the testimony given by the witness.

14           I further certify that I am not

15  related to any of the parties to this

16  action by blood or marriage, and that

17  I am in no way interested in the

18  outcome of this matter.

19           IN WITNESS WHEREOF, I have

20  hereunto set my hand this 30th day of

21  October, 2013.

22

23                    _____

24                    FRANCIS X. FREDERICK

25

Page 160

1

2    ----------------- I N D E X ------------------

3    WITNESS                    EXAMINATION BY          PAGE

4    LEWIS KRUGER          MR. COHEN                 9

5

6

7

8

9    ----------- INFORMATION REQUESTS -------------

10   DIRECTIONS:  NONE

11   RULINGS:  NONE

12   TO BE FURNISHED:  NONE

13   REQUESTS:  NONE

14   MOTIONS:  NONE

15

16

17

18

19

20

21

22

23

24

25

1

2      ------------------ EXHIBITS ------------------

3      KRUGER                                   FOR ID.

4      Exhibit 1

5      Notice of Debtors' Motion

6      Pursuant to Sections 105(a) and

7      363(b) of the Bankruptcy Code

8      for an Order Authorizing the

9      Debtors to Appoint Lewis Kruger

10     as Chief Restructuring Officer.......... 18

11     Exhibit 2

12     Notice of Debtors' Motion Pursuant

13     to Sections 105(a) and 363(b) of

14     the Bankruptcy Code for an Order

15     Approving Amendment to Engagement

16     Letter with Debtors' Chief

17     Restructuring Officer, Lewis Kruger

18     as Chief Restructuring Officer.......... 47

19     Exhibit 3

20     e-mail dated Monday, 9/17/2012

21     with attachment bearing production

22     numbers UCC12846 through UCC12852....... 68

23

24

25

Page 162

1

2      ------------------ EXHIBITS ------------------

3      KRUGER                                    FOR ID.

4      Exhibit 4

5      Notice of Filing of Revised

6      Disclosure Statement for Debtors'

7      Revised Plan of Reorganization

8      Pursuant to Chapter 11 of the

9      Bankruptcy Code........................ 100

10     Exhibit 5

11     Report of Arthur J. Gonzalez,

12     As Examiner............................ 115

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 163

1

2    NAME OF CASE:  In Re Residential Capital LLC

3    DATE OF DEPOSITION:  OCTOBER 30, 2013

4    NAME OF WITNESS:  LEWIS KRUGER

5    Reason codes:
          1.  To clarify the record.
6         2.  To conform to the facts.
          3.  To correct transcription errors.

7    Page _____ Line _____ Reason _____
     From _____ to _____
8
     Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23

                   _____
24
              LEWIS KRUGER
25

**Deposition Errata Sheet**

***In re Residential Capital, LLC, et al.*,**
**Case No. 12-12020(MG)**

Deponent:          Lewis Kruger
Deposition Date:          October 30, 2013

| Citation | Testimony |
|---|---|
| 16:12 | I agree~~d~~ to |
| 16:14 | you ~~we~~ met |
| 20:16 | ~~Dy~~Yes. |
| 38:12 | they were not ~~Ally~~ really liens |
| 38:19 | ~~value~~ valid claim |
| 39:5 | liens attached to in the ~~lower~~ flow of funds from Ally |
| 41:25 | ~~was~~ were |
| 45:23 | The question was would what they were prepared |
| 48:15 | ~~Cathy~~ Kathy Patrick? |
| 49:20 | services there are changes from the original |
| 51:3 | ~~border~~ broader plan issues. |
| 54:6 | contribution could have been negotiated? |
| 58:7 | ~~with~~ was |
| 69:19 | the Debtor's ~~intercompany claims~~ to determine |
| 77:3 | did not uniformly |
| 81:16 | as being ~~bad~~ not a debt |
| 95:25 | allocated ~~on a~~ in |
| 97:18 | ~~sellable~~ sensible |
| 112:18 | settlement ~~what~~ that each |
| 118:18 | ~~site~~ sight |

| Citation | Testimony |
|---|---|
| 119:15 | lives ~~and~~ in be*ing* |
| 119:18 | possible claims *against* Ally |
| 130:23 | None what*so*ever |
| 134:4 | both by AFI *and ResCap* and a |
| 153:3 | efficiency ~~and~~ in distribution |

Date: ___11/15/13___

Signed: ___*Lewis Kruger*___
       Lewis Kruger

2