Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

IN RE:

RESIDENTIAL CAPITAL, LLC, et al.

Civil Action No. 12-12020 (MG)

---------------------------------------X


            ***HIGHLY CONFIDENTIAL***

        VIDEO DEPOSITION OF MARK RENZI

            New York, New York

            November 6, 2013



                R E V I S E D




Reported by:

Rebecca Schaumloffel, RPR, CLR

Job No: 67415


            Yellow Highlighting = JSN Designation
            Pink Highlighting = Plaintiff's Counter-Designation
            Orange Highlighting = Joint Designation

Highly Confidential

Page 2

3      November 6, 2013

4      10:04 a.m.

8          Video deposition of Mark Renzi, held

9    at the offices of MORRISON & FOERSTER, 1290

10   Avenue of the Americas, New York, New York

11   before Rebecca Schaumloffel, a Registered

12   Professional Reporter, Certified Livenote

13   Reporter and Notary Public of the State of

14   New York.

Page 3

1

2    A P P E A R A N C E S:

3

4        MORRISON & FOERSTER
              Attorneys for the Debtors
5             1290 Avenue of the Americas
              New York, New York 10104
6             BY: CHARLES KERR, ESQ.
                  LORENZO MARINUZZI, ESQ.
7                 JENNIFER MARINES, ESQ.

8

9

10       KRAMER LEVIN
              Attorneys for the Creditors
11            Committee
              1177 Avenue of the Americas
12            New York, New York 10036
              BY:  PHILIP KAUFMAN, ESQ.

13

14

15

16       MILBANK TWEED HADLEY & McCLOY
              Attorneys for Junior Secured
17            Lenders
              One Chase Manhattan Plaza
18            New York, New York 10005
              BY:  ATARA MILLER, ESQ.
19                 BENJAMIN SEDRISH, ESQ.

20

21

22        KIRKLAND & ELLIS
              Attorneys for Ally
22            655 Fifteenth Street, N.W.
              Washington, D.C. 20005
23            BY:  RACHEL GOLDSTEIN, ESQ.

24

25

Page 4

1

2

        APPERANCES (continued:)

3

4

5        KELLEY DRYE & WARREN
                Attorneys for UMB Bank
6                101 Park Avenue
                New York, New York 10178
7                BY:  BENJAMIN FEDER, ESQ.
                    (Telephonically)

8

9

10

        CADWALADER WICKERSHAM & TAFT
11                Attorneys for MBIA Insurance Corp.
                One World Financial Center
12                New York, New York 10281
                BY:  JASON JURGENS, ESQ.

13

14

15    ALSO PRESENT:

16

17                Manuel Garcia, videographer
18                Jeffey Lewis, Houligan Lokey
19                Brian Maloney, Esq. (telephonically)
20                Filip Szymik, FTI

21

22            *            *            *

23

24

25

1                         M. RENZI

2                    THE VIDEOGRAPHER:  This is the

3           start of tape label one for the video

4           deposition of Mark Renzi in the matter

5           of In Re Residential Capital, LLC, on

6           November 6, 2013, at approximately

7           10:03 a.m.

8                    My name is Manuel Garcia from

9           TSG Reporting.  I am the legal video

10          specialist.  The Court Reporter is

11          Rebecca Schaumloffel in association

12          with TSG Reporting.  Counsels are

13          noted on the record.

14                   Will the Court Reporter please

15          swear in the witness.

16    M A R K   R E N Z I, called as a witness,

17    having been duly sworn, testified as

18    follows:

19    EXAMINATION BY

20    MS. MILLER:

21          Q.    Good morning, Mr. Renzi.

22          A.    Good morning.

23          Q.    My name is Atara Miller.

24                We are very close.

25          A.    That's all right.  I brushed my

Page 6

M. RENZI

1

2    teeth.

3         Q.    So did I.  My name is

4    Atara Miller.  I am an attorney with the

5    Milbank, Tweed, Hadley & McCoy.  We represent

6    the junior -- the ad hoc group of junior

7    secured note holders in this action.

8              I understand that you have been

9    deposed a number of times in this action

10   already; is that right?

11        A.    That's correct.

12        Q.    So I am assuming that you know

13   the ground rules.  I am going to go over them

14   quickly.  Mainly, I will ask questions.  You

15   answer the questions.  If you can wait for me

16   to finish asking my question before you

17   start, and I will do the same, it will be

18   easier for the Court Reporter to report

19   anything that's being said.

20        A.    Understood.

21        Q.    Also, if you can give verbal

22   answers, that's helpful.  And there may be

23   times during the course of the day that your

24   counsel may object to some questions or

25   anyone else at the table might object to

Page 7

M. RENZI

1
2  certain questions that I ask.  I am going to

3  ask that you answer the question unless you

4  are expressly instructed not to provide an

5  answer.

6      A.    Okay.

7      Q.    Finally, if at any time today you

8  want to take a break, let me know.  Just let

9  me know and we will be -- I will be happy to

10 take a break.  I am going to ask if there is

11 a question that I have already asked that's

12 pending, that you answer that question before

13 we break.

14     A.    Understood.

15     Q.    Okay.  Mr. Renzi, when was FTI

16 first engaged by ResCap in connection with

17 its restructuring?

18     A.    So we have been involved with the

19 company for, I would say, approximately

20 five years.  But in terms of the more recent

21 matter, I believe it was August of, gosh, it

22 seems like awhile, but 2011.

23     Q.    And going back to the pre

24 August -- going back to the period before

25 August 2011, going back to the period

Page 8

1                          M. RENZI

2    August 2011, what kinds of engagements was

3    FTI involved in for ResCap?

4          A.    I am not sure.  I mean, I can

5    speculate.  I think it was liquidity

6    management and other issues that arose.  And

7    questions.  Excuse me, and other projects

8    that the company had us working on.

9          Q.    And do you know if FTI -- do you

10   know if FTI was acting as a consultant to

11   ResCap?

12         A.    I believe so.  But I was not a

13   member of that team.

14         Q.    And do you know if FTI previously

15   did any work for Ally?

16         A.    I don't know.

17         Q.    And when you say "liquidity

18   management," would that have included

19   analysis of compliance with --

20         A.    I don't know.

21         Q.    -- network requirements?

22               You were not personally involved

23   in any engagements before August of 2011 for

24   ResCap?

25         A.    More specifically, before

Page 9

1                        M. RENZI

2   November of 2011.

3        Q.    How did you get involved in the

4   engagement in 2011?

5        A.    Well, I got involved in the

6   engagement in -- the end of 2011 specifically

7   to work with ResCap to understand business,

8   understand some of the issues that were

9   present.  I specialize in financial services

10  firms and have worked with Bill Nolan and

11  others in the firm for over a decade.

12       Q.    And do you understand -- what was

13  the scope of FTI's engagement in August of

14  2011?

15       A.    I believe it was restructuring

16  advice.

17       Q.    And were there particular aspects

18  of ResCap's business that you were engaged to

19  understand or tasked with understanding?

20            MR. KERR:  Just so I am clear,

21       you are talking about Mr. Renzi, when

22       you say "you" or are you talking

23       about FTI?

24            MS. MILLER:  Mr. Renzi

25       specifically.

Page 10

M. RENZI

1

2    Q.    Beginning in November of 2011,

3 were there specific aspects of ResCap's

4 business that you were tasked with

5 understanding?

6    A.    I was tasked with understanding

7 the assets of the business, the types of

8 recoveries the business could get under

9 assets.  As things evolved, I was tasked with

10 developing a waterfall model.  Those would be

11 examples of things I was tasked with.

12    Q.    And was understanding the assets

13 of the business something that you had done

14 for other companies and other engagements?

15    A.    Yes.

16    Q.    Would that be true, also, for the

17 types of recoveries that the company could

18 get on these various assets?

19    A.    Could you be more specific?

20    Q.    What were you referring to when

21 you said you were tasked with understanding

22 the types of recoveries that ResCap could get

23 on certain assets of the business?

24    A.    In order to develop a waterfall

25 model, you have to understand the assets of

Page 11

1                    M. RENZI

2    the business.   Since I specialize in

3    financial services firms, I wanted to make

4    sure I understood the assets that this

5    business, in particular, had along with their

6    operations to make sure that I had a full

7    grasp of the business.

8         Q.    When did you create a waterfall

9    model?

10        A.    I would have said sometime in

11   early 2012.

12        Q.    And in your initial waterfall

13   model, were intercompany balances treated as

14   assets?

15        A.    I can't -- there has been so many

16   iterations, but there were definitely -- we

17   considered intercompany balances in the model

18   and had that functionality from the very

19   beginning.

20        Q.    Were you specifically tasked with

21   understanding the nature of the intercompany

22   balances?

23        A.    I would say not initially.

24        Q.    Did there come a time when you

25   became tasked with understanding the

Page 12

1                    M. RENZI

2    intercompany balances?

3         A.     Well, in order to model them, you

4    had to understand the general nature of the

5    balances.  So as we considered alternative

6    scenarios or scenarios, yes, I think as that

7    evolved, we considered them more and more.

8         Q.     What do you mean by "general

9    nature"?

10        A.     Whether or not the balances are

11   between what debtors and at that point in

12   time, the company hadn't filed, so it was

13   different legal entities.  So that would be

14   an example.

15        Q.     Did you rely on people within the

16   company to provide you information about the

17   intercompany balances?

18        A.     Yes.

19        Q.     Who specifically did you rely on?

20        A.     Cathy Dondzila, Barb Westman.

21   Those are the two examples.

22        Q.     Were there any other people?

23        A.     Or people at their direction.

24        Q.     Was there anyone else at FTI,

25   other than people reporting to you,

Plaintiff's Objections
12:24-13:20

Irrelevant (FRE 401,
402); incomplete

Page 13

1                         M. RENZI

2    responsible for understanding the nature of

3    the intercompany balances?

4         A.    I would think that as we were

5    preparing the SOFA and SOALs, that

6    Mike Talarico, who works -- who indirectly

7    worked for me and was leading that part of

8    the process, had to know what they were to

9    schedule them.

10        Q.    What was your involvement in the

11   SOALs process?

12        A.    I had very limited involvement.

13        Q.    Did you review them before they

14   were filed?

15        A.    Not in detail, but, yes.

16        Q.    Did you review how intercompany

17   balances were reflected?

18              MR. KERR:    Objection.

19        Q.    You can answer.

20        A.    Yes.

21        Q.    Did you provide any comments

22   to -- sorry, let me step back.  Strike that.

23              Was Mike Talarico responsible for

24   preparing the SOFAs and the SOALs?

25        A.    And others at his direction.

Page 14

1                              M. RENZI

2          Q.    Did you provide any comments to

3    Mr. Talarico regarding the treatment of the

4    intercompany balances in the SOALs?

5          A.    No.  Not that I recall.

6          Q.    If you believed they were

7    inaccurately or improperly reflected, would

8    you have told Mr. Talarico before they were

9    filed?

10               MR. KERR:  Objection.

11         A.    The basis for the way

12   Mr. Talarico was reflecting them was

13   consistent with the way we wanted to present

14   the SOFA and SOAL.  I don't remember

15   commenting on it specifically.  I may have

16   said here are some schedules that we have

17   relating to them but that's what I recall.

18         Q.    What do you remember about the

19   way that you wanted to present the SOFAs and

20   the SOALs?

21         A.    I didn't have an opinion as to

22   the way to present them.

23         Q.    Did you have an understanding of

24   how FTI was presenting them?

25               MR. KERR:  Objection.

Page 15

M. RENZI

1

2      A.    I mean generally, yes, but I

3 wasn't focused on that.  I was focused on

4 other things other than that.

5      Q.    What were you focused on during

6 that time -- during this time?

7      A.    Well, we were in ongoing

8 negotiations with a variety of plans

9 regarding a variety of plan support

10 agreements including with the JSNs and the

11 RMBS trusts.  So I was focused on that, I

12 believe, in that timeframe, between January

13 and May.

14      Q.    Were you responsible for valuing

15 potential claims that could be asserted by

16 various creditors against ResCap?

17      A.    I assisted in that.  But there

18 were a number of people working on that.

19      Q.    Who else was working on that?

20      A.    Counsel, MoFo.  I think Carpenter

21 Lipps was also involved.  Those are the ones

22 I recall.

23      Q.    Who is Carpenter Lipps?

24      A.    It is, I think specialty counsel.

25 Counsel that's been involved with the company

Page 16

1                          M. RENZI

2    for a long period of time, and understands

3    rep and warrant type litigation.

4          Q.    Are they specialty counsel

5    specifically with respect to the RMBS

6    litigation?

7          A.    I don't remember specifically.

8          Q.    And --

9          A.    They have been involved -- I know

10    Jeffrey Lipps has been involved for a long

11    time.

12               It all seems like a long time

13    now.

14          Q.    Were you ever asked to value

15    potential claims that ResCap might have

16    against third parties?

17          A.    Not in the context of my

18    reports, no.

19          Q.    What do you mean by "not in the

20    context of my reports"?

21          A.    I wasn't asked to value

22    third-party claims in the context of my

23    reports.

24          Q.    Were you asked to value claims

25    that ResCap might have against other parties

Page 17

1                          M. RENZI

2    in another context?

3         A.    I don't think so.

4         Q.    Have you ever valued potential

5    claims that ResCap might have against other

6    third parties?

7         A.    Can you be more specific?

8         Q.    No.  Have you --

9         A.    I don't think I can answer the

10   question.

11        Q.    Have you ever analyzed the value

12   that a claim that ResCap could assert against

13   a third-party would have?

14             MR. KERR:  Objection.

15        A.    I think that's the same question.

16   Can you be more specific?

17        Q.    Did you --

18        A.    I don't understand what you are

19   getting at.

20        Q.    Did you ever analyze claims that

21   ResCap entities might have against Ally?

22             MR. KERR:  Objection.

23        A.    I don't think so.  I think that's

24   what the examiner did.

25        Q.    Could you have done it if you

Page 18

1                    M. RENZI

2    were asked?

3              MR. KERR:  Objection.

4         A.    I am sure that we could have

5    assembled a team that did the work that the

6    examiner's advisors have done, so yes, I

7    think we could have.  But as we all know, it

8    was a pretty exhaustive and long process.

9         Q.    And you weren't asked to do that

10   work?

11        A.    There was some litigation work

12   that we were asked to do in the beginning,

13   but it wasn't to assess what a settlement

14   with Ally would be.

15        Q.    What litigation work were you

16   asked to do?

17        A.    There was a team at FTI that was

18   asked to look at comparables for ResCap.

19   Also, whether or not the company, in theory,

20   could be insolvent.  Those are the things

21   that I can remember over a period of time

22   historically.

23        Q.    Were you looking at comparables

24   for ResCap to do a solvency analysis?

25              MR. KERR:  Objection.  You are

Page 19

<sup>1</sup>                         M. RENZI

<sup>2</sup>        talking about you, are you talking

<sup>3</sup>        about Mr. Renzi?

<sup>4</sup>             MS. MILLER:  Sorry.

<sup>5</sup>        Q.    Did FTI look at comparables for

<sup>6</sup>   ResCap to do an analysis of insolvency?

<sup>7</sup>             MR. KERR:  Objection.

<sup>8</sup>        A.    So this was in the very -- this

<sup>9</sup>   was in the very beginning.  I would say that

<sup>10</sup>   we were asked to do a number of things for

<sup>11</sup>   counsel to understand the comparables and

<sup>12</sup>   understand whether or not the company could

<sup>13</sup>   be insolvent from a historical basis.

<sup>14</sup>        Q.    What do you mean by

<sup>15</sup>   "comparables"?

<sup>16</sup>        A.    So comparable companies, what

<sup>17</sup>   their -- what the trading multiples and

<sup>18</sup>   comparable companies could be, what public

<sup>19</sup>   information was available for them.  So it is

<sup>20</sup>   what I recall.

<sup>21</sup>        Q.    What was the conclusion of that

<sup>22</sup>   analysis?

<sup>23</sup>             MR. KERR:  Objection.

<sup>24</sup>        A.    I don't think there was a final

<sup>25</sup>   conclusion.

Page 20

1                     M. RENZI

2        Q.    Did FTI conclude that ResCap

3   was -- had been insolvent at any historical

4   time?

5             MR. KERR:  Objection.

6        A.    I believe FTI didn't have a final

7   conclusion.  But there could be a possibility

8   of it.

9        Q.    Did FTI conduct the analysis on a

10  consolidated basis or by each debtor entity?

11       A.    I would have said -- I don't

12  remember specifically.  But I think it would

13  have been a consolidated basis.

14       Q.    Do you know if FTI ever came to a

15  conclusion on whether any particular ResCap

16  subsidiary was insolvent at any time

17  prepetition?

18             MR. KERR:  Objection.

19       A.    I don't think FTI came to a

20  conclusion on the solvency of subsidiaries of

21  ResCap.

22       Q.    Did there come a time when the

23  scope of FTI's engagement changed from the

24  initial engagement in August of 2011?

25       A.    I believe our scope, I would say,

Page 21

1                        M. RENZI

2    expanded as this litigation became more

3    fulsome.

4         Q.    When you say "this litigation,"

5    are you referring specifically to the JSN

6    adversary proceeding or something else?

7         A.    I am referring to the JSN

8    adversary proceeding.

9         Q.    Did FTI's scope of engagement

10   also expand as other litigations became more

11   active?

12             MR. KERR:  Objection.  What

13        other litigations?

14             MS. MILLER:  RMBS litigations,

15        security litigation, Monoline

16        litigation.  There is no shortage of

17        litigations in this bankruptcy.

18        A.    The one that I specifically

19   recall is for the JSN litigation.  As we have

20   been asked -- I have been asked to provide

21   depositions, expert reports, and those I

22   don't think were initially contemplated.  As

23   we were all hoping for a prearranged

24   bankruptcy.

25        Q.    Other than asking to -- other

Page 22

M. RENZI

1    than providing deposition testimony and

2    expert reports, did your personal task list

3    grow as a result of the JSN litigation?

4    A.    Yes.

5    Q.    And what else were you asked to

6    do or required -- what else were you required

7    to do?

8    MR. KERR:  Objection.

9    A.    Well, it expanded from being part

10   of the mediation and then the ongoing

11   negotiations during the pendency of the

12   bankruptcy to when there was an adversary

13   proceeding, it expanded because there are

14   additional analyses that need to be run and

15   some of those analyses have been presented

16   in -- by expert reports.

17   Q.    Are there any additional analyses

18   that you ran that are not presented in your

19   reports?

20   A.    Well, I have been involved with

21   the company for approximately two years.  So

22   we have run thousands.  I would -- hundreds,

23   sorry.  I would say hundreds of analyses.

24   Q.    How did you decide which ones to

Page 23

M. RENZI

1
include in your expert report?

3      A.    The ones that -- sorry, which
4 expert report?

5      Q.    Your, I guess, the second expert
6 report.

7           MR. KERR:  Just so we are clear,
8      Atara, I know there was an expert
9      report that was part of the Phase 1
10      process.

11           MS. MILLER:  Right.

12           MR. KERR:  So if we can focus in
13      on which ones we are talking about.

14      Q.    So I am going to -- when I say
15 "expert report," unless I specifically refer
16 to Phase 1 expert report, I am going to be
17 referring to Phase 2 expert report.  Let me
18 step back.

19           Do you understand the difference
20 between Phase 1 and Phase 2?

21      A.    Yes.

22      Q.    Okay.  I guess as best as any of
23 us can.

24      A.    Right.  But for clarification,
25 there were two in Phase 2.

Page 24

1                    M. RENZI

2        Q.    So I will get to that.

3        A.    So if you're more specific.

4        Q.    When I say "expert report," I

5   will be referring to your opening expert

6   report.  And when I say "rebuttal report," I

7   am going to be referring to your rebuttal

8   report, which is the second expert report

9   that you filed in Phase 2.

10       A.    Okay.

11       Q.    Does that help?

12             MR. KERR:  Just so the record is

13        really clear.  The opening report is

14        the October 18, 2013, report that was

15        filed in connection with Phase 2, and

16        I believe the rebuttal report is

17        November 1st, 2013, rebuttal report

18        filed in connection with Phase 2.

19        Just so we can tie it by date.

20       Q.    Now I forgot the question.

21             How did you decide which analyses

22   to include in your rebuttal report?

23       A.    The rebuttal report, the analyses

24   that were presented were analyses I thought

25   were reasonable and got to the heart of the

Page 25

1                    M. RENZI

2  matter of intercompany balances.

3       Q.    How did you determine that they

4  were reasonable?

5       A.    I worked with counsel.

6       Q.    And what direction did you get

7  from counsel?

8       A.    When working with counsel, we

9  talked about the merits of the variety of

10 scenarios that were run and presented in the

11 expert report and the validity of the

12 intercompany balances and a variety of legal

13 aspects to the intercompany balances that

14 should be considered.

15      Q.    When you said that you "talked

16 about the merits of the variety of scenarios

17 that were run," were you referring to -- what

18 scenarios were you referring to?

19      A.    The four scenarios -- sorry, I

20 guess there are five scenarios presented.

21 Six, sorry.  So for Scenarios 1A through 1B,

22 more specific.

23      Q.    Were there other scenarios that

24 you run that you determined -- sorry.  Let me

25 take that back.

Page 26

1                         M. RENZI

2              After you received Mr. Fazio's

3    expert report on October 18th, did you

4    review it?

5         A.    I did.

6         Q.    And did you run any scenarios,

7    other than the ones included in your rebuttal

8    report, after looking at Mr. Fazio's report?

9         A.    Yes.

10        Q.    And what scenarios did you run?

11        A.    They don't have names.  We just

12   tried to replicate Mr. Fazio's analysis in

13   his scenarios and then ran some additional

14   scenarios that I thought were reasonable.

15        Q.    Did you run any scenarios that

16   reflected a value for the Ally -- for

17   settlement with Ally?

18        A.    Yes.

19        Q.    Did you present any of those in

20   your rebuttal report?

21        A.    No.

22              MS. MILLER:  I would like to

23        mark as Renzi Exhibit 1, the expert

24        report of Mark Renzi dated October 18,

25        2012.

Page 27

M. RENZI

1

2          (Whereupon, Renzi Exhibit 1,

3     Expert Report of Mark Renzi Dated

4     October 18, 2012 was marked for

5     identification as of this date by the

6     Reporter.)

7     Q.    Mr. Renzi, looking at the

8  document that's been marked Renzi Exhibit 1,

9  do you recognize this document?

10     A.    I do.

11     Q.    And is this the expert report

12  that you submitted in Phase 2?

13     A.    Yes.

14          MR. KERR:  This is the first

15     expert report.

16     Q.    I was about to say this is the

17  expert report that we are referring to as

18  "the expert report," not the rebuttal report,

19  right?

20     A.    It says "Expert report of Mark A.

21  Renzi, October 18, 2013."

22     Q.    Okay.  And do you recognize your

23  signature at the end of this document?

24     A.    I do.  Yeah.

25     Q.    Mr. Renzi, you conclude in your

Page 28

1                      M. RENZI

2    summary of opinions that, on page 3 of the

3    expert report, that "The hypothetical

4    liquidation analysis that was attached to the

5    disclosure statement demonstrates that each

6    holder of a claim," reading from about six

7    lines up from the bottom, that "each holder

8    of a claim or interest of each impaired class

9    of claims or interest will likely receive or

10   retain under the plan a recovery that is not

11   less than the amount that such holder would

12   receive or retain if the debtors were

13   liquidated under Chapter 7."

14        A.    I see that.

15        Q.    And is that your opinion today?

16        A.    Yes.

17             MR. KERR:  Objection.  Just you

18        didn't read the whole thing.  So if

19        you want to ask if that's his opinion,

20        that's fine.  But didn't read the

21        whole summary.

22        Q.    You also indicate in the second

23   bullet titled "Limited partial consolidation

24   of the debtors estates that no creditors are

25   harmed by the limited partial consolidation

Page 29

1                      M. RENZI

2    of the debtors estate for distribution

3    purposes."

4            Do you see that?

5        A.    I do.

6        Q.    And does that continue to be your

7    opinion today?

8        A.    Yes.

9        Q.    And can you explain what the

10   "limited partial consolidation" that you are

11   referring to is?

12       A.    The limited partial consolidation

13   consolidates the legal entities into

14   three legal entities, ResCap, GMACM, GMAC

15   Mortgage, and RFC, Residential Finance -- you

16   can just call it RFC.

17       Q.    Mr. Renzi, looking at page 7 of

18   your expert report and, in particular,

19   focusing on footnote 4, you say that "the

20   liquidation analysis and the assumptions upon

21   which it relies are inherently subject to

22   significant economic, competitive and

23   operational uncertainties beyond the control

24   of the debtors.  For example, the liquidation

25   analysis may not include all liabilities that

Page 30

1                        M. RENZI

2    could arise as a result of additional

3    litigation, potential tax assessment and

4    other unanticipated litigation --

5    liabilities.  Further the actual amount of

6    claims against the debtor's estate could vary

7    significantly."

8              Do you see that?

9         A.    I do.

10        Q.    Would the same hold true

11   regarding the value of the assets that you

12   have included in the particular potential

13   claims that ResCap might have against third

14   parties that they can vary significantly from

15   the value reflected in your liquidation

16   analysis?

17        A.    In regards to the liquidation

18   analysis, yes.

19        Q.    Turning to page 8 of your expert

20   report.  You say that "The liquidation

21   analysis assumes that it would likely take a

22   Chapter 7 trustee significant amount of time

23   to investigate, reconcile, negotiate and/or

24   begin to litigate many claims as well as" --

25   sorry.  Then you say, further in paragraph

Page 31

1                          M. RENZI

2    18, "The final resolution of the claims will

3    demand the resolution of such complex issues

4    as the extent and validity of the junior

5    secured note holders liens and claims, the

6    nature and extent of the claims filed by the

7    RMBS trustees, whether the RMBS trustees

8    claims should be subordinated" and on and on.

9    Focusing --

10        A.    Would you like me to -- do I have

11   read the rest?

12        Q.    Did you write the rest?

13        A.    I did.

14        Q.    You can read it to refresh your

15   recollection.  I am going to ask you about

16   certain specific items that you identify in

17   this paragraph.  What are the complex issues

18   regarding intercompany balances that you are

19   referring to?

20        A.    Could you point to me

21   specifically where you are referring to?  Oh,

22   I see it.

23        Q.    Seven lines up from the bottom in

24   paragraph 18.

25        A.    I would just say that we are here

Page 32

M. RENZI

1
2 because of these complex issues.  Meaning
3 whether or not there is liens on these
4 intercompany balances.  Whether or not
5 bankruptcy standstill provisions in some of
6 the documents are applicable.  Whether or not
7 there have been fraudulent conveyances.
8 Those would be examples.
9       Q.    And has FTI concluded whether or
10 not the JSNs have a lien on intercompany
11 balances?
12       A.    I think it's a legal issue that I
13 would refer to MoFo.
14       Q.    Has MoFo instructed you one way
15 or another on that issue?
16       A.    We have discussed it.  But I
17 don't think that they have instructed me.
18       Q.    The next item says "Fraudulent
19 conveyance claims arising out of
20 approximately 16 billion in prepetition debt
21 forgiveness."
22             Have you done anything to analyze
23 the merits of any fraudulent conveyance
24 claims?
25             MR. KERR:  Just so we are clear,

Page 33

M. RENZI

1

2       the legal merits?

3            MS. MILLER:  The legal merits of

4       the fraudulent conveyance claims are

5       based largely on analyses that are

6       most frequently done by consultants

7       like FTI.

8            MR. KERR:  Okay.  I am just

9       making sure we are clear on what the

10      question is, that's all.

11           MS. MILLER:  Yes.

12      A.    We have looked into fraudulent

13 conveyance claims, but I would say from a

14 legal standpoint, we are not -- FTI wouldn't

15 be opining from a legal standpoint.

16      Q.    So I think we already discussed

17 solvency, which is one element.  Has FTI done

18 any analysis of what value the forgiving

19 party may -- sorry, what value the forgiving

20 party may have received in exchange for the

21 debt forgiveness?

22      A.    My understanding is there is very

23 little value exchanged when debt forgiveness

24 occurred.  But that's my recollection.

25      Q.    What's that recollection

Page 34

M. RENZI

1

2  based on?

3      A.    Discussions with the company,

4  reading my colleague's expert report.  Those

5  would be examples.

6      Q.    And what colleague are you

7  referring to or what expert report are you

8  referring to when you say your "colleague's

9  expert report"?

10     A.    Miss Gina Gutzeit.

11     Q.    Did you consider any indirect

12 benefits that the forgiving party may have

13 received?

14     A.    Well, the fact that -- my

15 understanding is that if there was debt

16 forgiveness, it was done for a few reasons.

17 Among them, covenant compliance, certain

18 solvency issues for covenant compliance.

19 Those would be examples.

20     Q.    And did you have an understanding

21 of what would happen if one of the operating

22 subsidiaries was not able to comply with its

23 financial covenants?

24         MR. KERR:  Objection.

25     A.    I think it would have tripped

Page 35

M. RENZI

1
2  certain covenants that would have -- for debt

3  facilities.  That's my understanding.

4      Q.    What would the result of tripping

5  certain covenants have been?

6          MR. KERR:  Objection.

7      A.    I don't know the specific

8  results, but I presume it would have been

9  more difficult for the company or one of the

10  debtor's legal entities to have financing.

11      Q.    Do you have an understanding of

12  whether tripping certain -- tripping

13  covenants in certain debt facilities would

14  cause a process default in other facilities?

15      A.    I would think that that's

16  typical.  These were net worth -- my

17  understanding is these were net worth

18  covenants.

19      Q.    And did you have an understanding

20  of what would happen if any of the ResCap

21  operating subsidiaries was unable to satisfy

22  its network regulatory requirements?

23          MR. KERR:  Objection.

24      A.    I would say it is just not my

25  area of expertise.

Page 36

M. RENZI

1

2    Q.    Did you analyze it in connection

3  with determining what value the forgiving

4  party may have received in connection with

5  the forgiveness?

6         MR. KERR:  Objection.

7    A.    Could you be more specific?

8  Could you give me an example of what you

9  mean?

10    Q.    If, for example -- if, for

11  example, RFC were unable to meet its HUD

12  requirements if ResCap didn't forgive certain

13  debt, what impact would that have had on

14  ResCap?

15         MR. KERR:  Objection.

16    A.    I think I have answered the

17  question.  My understanding is if certain

18  legal entities didn't meet their net worth

19  requirements, and if there wasn't, let's say,

20  debt forgiveness, of which we have already

21  established there is 16 billion, over

22  16 billion of debt forgiveness, that there

23  would be issues with certain financing

24  facilities.

25    Q.    And you didn't look whether there

Page 37

1                    M. RENZI

2   might be issues about certain subsidiaries

3   being able to continue in their ordinary

4   course of operations if they didn't comply

5   with the regulatory requirements?

6        A.    I suspect there would have been

7   problems if they hadn't -- if they didn't

8   meet certain covenants in order to have

9   financing.  I mean, this is a capital

10  intensive business.  They need financing.

11  They were moving -- I mean, you have

12  servicing advances that occur at certain

13  times of the year.  Or month.  For example.

14  And they need the financing to make servicing

15  advances as one of the largest servicers in

16  the country.  So they definitely needed

17  financing.  Or -- and as evidenced by the

18  many different facilities that they did have.

19       Q.    Have you -- outside of your work

20  for ResCap, have you personally ever been

21  involved in the assessment and valuation of a

22  fraudulent conveyance action?

23       A.    I have been working with FTI for

24  over a decade.  So I am sure there have been

25  other instances where I have.  I just can't

Page 38

1                          M. RENZI

2    recall them right now.

3          Q.     Did you consider, when you looked

4    at the debt forgiveness, whether any

5    fraudulent conveyance claims would be barred

6    by the statute of limitations?

7          A.     No.

8          Q.     Do you have an understanding that

9    there is a statute of limitations applicable

10   to fraudulent conveyance transactions?

11         A.     Yes.

12         Q.     What is your understanding based

13   on your experience of how far back you can

14   breach in a fraudulent conveyance action?

15              MR. KERR:   Objection.

16         A.     We were focused when looking at

17   this, we are looking back a year.

18         Q.     When you say "looking back a

19   year," you mean looking back a year from the

20   petition date?

21         A.     Yes.

22         Q.     What was the petition date?

23         A.     I believe it was May 14, 2012;

24   13th, 14th.

25         Q.     Sometime in mid May, 2012?

Page 39

M. RENZI

1

2    A.    I think the 13th was a Sunday.

3 But something like that.  So I keep thinking

4 it was the 14th, a Monday.

5    Q.    So you would not have

6 considered -- sorry, strike that.

7        So you weren't looking at debt

8 forgivenesses that occurred, let's say, in

9 2008, as potential fraudulent conveyances,

10 right?

11        MR. KERR:  Objection.

12    Objection.  Misstates prior testimony.

13    A.    We considered all debt

14 forgiveness, also.

15    Q.    Why did you consider all debt

16 forgiveness when -- why did you consider all

17 debt forgiveness?

18    A.    Well, you can consider all debt

19 forgiveness because in my understanding, is

20 that there wasn't necessarily an arm's length

21 transaction when these debt forgivenesses

22 occurred.  And you can potentially look back

23 further.

24    Q.    How much further did you think

25 you could look back?

Page 40

M. RENZI

1

2    A.    Well, we looked back until 2008.

3    Q.    Any specific time in 2008 or

4    January 1st?

5    A.    I think the date that I recall is

6    January 1st, which reflects the $16 billion

7    in prepetition debt forgiveness that's

8    reflected in this expert report.

9    Q.    Did anyone suggest -- did anyone

10   ever tell you that a claim for fraudulent

11   conveyance -- that a fraudulent conveyance

12   claim could be brought with respect to a

13   transfer that occurred more than four years

14   before the petition date?

15   A.    We had considered -- we had

16   considered a number of things in discussions

17   with counsel.  And whether or not that was

18   the legal theory that could be one of them,

19   but there were others.

20   Q.    What do you mean by other legal

21   theories?

22   A.    Well, taking into consideration

23   that there was debt forgiveness and my

24   understanding wasn't arm's length, that we

25   needed to look back and that's what

Page 41

                    M. RENZI

1
2    Gina Gutzeit did in her report.  Considering
3    the debt forgiveness over the, I guess,
4    through -- 2008 and forward.
5         Q.    Are you looking at the debt
6    forgiveness for a reason -- sorry, strike
7    that.
8              Did you think that debt
9    forgiveness could be unwound for a reason --
10   on a basis other than fraudulent conveyance?
11             MR. KERR:   Objection.
12        A.    I would defer to counsel.
13        Q.    When you speak about the
14   $16 billion in debt forgiveness in your
15   expert report, in paragraph 18, do you
16   indicate any basis other than fraudulent
17   conveyance claims that would result in an
18   unwinding of those transactions?
19        A.    No.
20        Q.    Looking at paragraph --
21   continuing in paragraph 18, the next point
22   that you make is the potential substantive
23   consolidation of the debtors.  Did you do an
24   analysis of whether substantive consolidation
25   would be appropriate here?

Page 42

1                          M. RENZI

2              MR. KERR:   Objection.

3         A.    I am not sure I follow.  What

4    kind of analysis, a legal analysis or a

5    financial analysis?

6         Q.    A financial analysis.

7         A.    At one point in time, we had

8    looked at what a subcon would result in.  But

9    not in the context that you are asking.

10        Q.    When did you do that analysis?

11        A.    I would have said towards the

12   beginning of the case.

13        Q.    And what would the results of

14   subcon have been?

15        A.    It depends.

16        Q.    What does it depend on?

17        A.    The assumptions you are making.

18        Q.    What assumptions would drive the

19   outcome of a scenario that subconned all the

20   ResCap entities?

21        A.    We are going on for a long time

22   about that.  For example, a subcon would not

23   benefit intercompany balances.  I believe,

24   and it's been a very long time, that then the

25   JSNs wouldn't be able to assert multiple

Page 43

M. RENZI

1   deficiencies claims of different legal

2   entities.  Those are P2 examples.  There

3   wouldn't be value from equity pledges if

4   there was a subcon.

5        Q.    Are those results the same in the

6   partial subcon that you discuss in your

7   expert report?

8        A.    No.

9        Q.    Why not?

10       A.    As I have highlighted in my

11   expert report, the partial subcon is done for

12   administrative purposes only.

13       Q.    What does that mean?

14       A.    That means that distributing

15   funds that entities are entitled to or

16   parties are entitled to are done through

17   three main entities for simplicity in the

18   administrative purposes.

19       Q.    So what happens under the limited

20   partial consolidation if the JSNs are

21   determined to have a lien on intercompany

22   balances?

23       A.    I don't think that there is any

24   effect because that will be taken into

Page 44

1                    M. RENZI

2    consideration.  If their intercompany

3    balances are deemed valid and the JSNs indeed

4    do have a lien on them and indeed there is

5    value attributed to them, then I think the

6    plan contemplates allowing that.

7         Q.    Are their liens negatively

8    impacted by partial -- limited partial

9    substantive consolidation?

10        A.    No.

11        Q.    How not?

12             MR. KERR:  Objection.

13        A.    I mean, it is very simple concept

14   to me.  This is just an administrative, a

15   function of administrative simplicity.  If

16   there are, you know, with the value of the

17   equity pledges, for example, is, you know,

18   from what I understand, is recognized.  If

19   there is value attributed to, with the

20   caveats I said before, for intercompany

21   balances, if there is value and the JSNs have

22   liens on certain intercompany balances, then

23   that will be allowed.  Especially in the

24   context of postpetition interest and that's

25   provided for in the plan of reorganization.

Page 45

M. RENZI

1

2      Q.    So looking at footnote 5 on

3  page 10 of your expert report, you state that

4  "Because the recovery analysis and

5  liquidation analysis show that there are

6  estimated to be more assets than claims of

7  the debtor Executive Trustee Services LLC

8  ETS, holders of general unsecured claims at

9  ETS will be entitled to receive the same

10  recovery under the plan that they would be

11  entitled to receive under a hypothetical

12  Chapter 7 liquidation scenario.  ETS is a

13  direct subsidiary of GMACM and therefore,

14  falls within the GMACM debtor group as

15  defined within the plan."

16          Are general unsecured creditors

17  of ETS negatively impacted by the limited

18  substantive consolidation?

19          MR. KERR:  Objection.  That's

20      not --

21          THE WITNESS:  Should I answer?

22          MR. KERR:  If you want to answer

23      that.

24          MS. MILLER:  I can restate it.

25      Q.    Can you tell me what you are

Page 46

1                     M. RENZI

2   saying in footnote 5 about the general

3   unsecured creditors of ETS?

4        A.    ETS is a chapter -- under a

5   Chapter 11 or Chapter 7 ETS, it is the same

6   recovery.  Unsecured creditors.

7        Q.    Is that because they are

8   treated -- they are specifically carved out?

9        A.    Yes, they are specifically

10  addressed in the plan.

11       Q.    And without that specific

12  treatment under the plan, would the ETS

13  general unsecured creditors have been

14  negatively affected by the limited

15  substantive consolidation?

16            MR. KERR:  Objection.

17       A.    Again, the limited substantive

18  consolidation is administrative ease.  I

19  think that it still stands that they would

20  be, on either case, a Chapter 11, Chapter 7,

21  receive 100% recovery for general unsecured

22  creditors at ETS.

23       Q.    You state "There are more assets

24  than claims of ETS."  Is the holder of an

25  equity of a lien on the equity of ETS

Page 47

M. RENZI

1

2    negatively impacted by the limited

3    substantive consolidation?

4            MR. KERR:  Objection.  You keep

5        referring to this limited substantive

6        consolidation.  It is limited partial

7        consolidation.

8            MS. MILLER:  Okay.  Sorry.

9        There are too many made-up terms about

10        partial subcon.  Subcon like I can

11        call it, also, if you would like.

12        Limited partial consolidation.

13            MR. KERR:  Let's call it what

14        it is.

15            MS. MILLER:  I will stick with

16        your terminology.

17            MR. KERR:  Great.

18    Q.    Sorry.  I am happy to --

19    A.    Would you mind repeating it?

20    Q.    I am happy to restate my question

21    or to reask it.

22            You state in footnote 5 that

23    "There are more assets than claims at ETS."

24    Is the holder of an equity lien on the --

25    sorry.

Page 48

M. RENZI

1

2          Is the holder of a lien on the

3   equity of ETS negatively impacted by the

4   limited partial consolidation?

5      A.    No.

6      Q.    How not?

7      A.    The limited partial consolidation

8   is for administrative purposes.  It

9   recognizes that there is value there for the

10  equity pledge, then there is value.

11     Q.    So I just want to understand how

12  this is working.  So under limited partial

13  consolidation, if the JSNs have a lien on the

14  equity of ETS, that a lien continues in spite

15  of the limited partial consolidation?

16     A.    Yes.  That's my understanding.  I

17  don't understand -- I don't understand

18  your -- I think your questions honestly.

19     Q.    Maybe it is that I am unclear by

20  what you mean, that this is being done for

21  administrative purposes only.

22     A.    Yes, that's correct.

23     Q.    So can you explain what you mean

24  by this is being done for administrative

25  purposes only?

Page 49

M. RENZI

1

2    A.    I mean, it might benefit us for

3  me to read 33 and 34.  Paragraph 33 and 34.

4    Q.    Sure.

5    A.    "The plan provides for partial

6  consolidation of the debtors into

7  three debtor groups as described in the

8  disclosure statement for the limited purposes

9  of describing their treatment under the plan,

10  confirmation of the plan and making

11  distributions under the plan.  It is my

12  opinion that no creditors are harmed by the

13  proposed grouping of the debtors.  The vast

14  majority of the assets of the debtor's

15  estates reside at ResCap, GMACM and RFC with

16  the debtor's subsidiaries within each debtor

17  group having little to no assets available

18  for distribution to creditors.

19        "In addition the majority of the

20  claims asserted against the debtors are

21  asserted against ResCap, GMACM, and RFC with,

22  in limit circumstances, de minimus claims

23  asserted against the other debtor's

24  subsidiaries within the debtor group.

25  Therefore, in light of the location of the

Page 50

M. RENZI

1

2  claims and assets, the limited partial

3  consolidation proposed in the plan confers

4  the benefits and convenience and expedience

5  without compromising creditor recoveries at

6  any debtors."

7       Q.    Use smaller words next time.

8       A.    Paragraph 34, "Further, holders

9  of the junior secured notes, in my opinion,

10 are not harmed by the limited partial

11 consolidation, intercompany balances are

12 being compromised and waived as part of the

13 global settlement and not as a result of the

14 limited partial consolidation.  It is my

15 understanding from the debtor's counsel that

16 if the Court determines the holders of the

17 JSNs are entitled to postpetition interest,

18 they will receive payment on an account of

19 that interest under the plan regardless of

20 whether or not the debtor groups are

21 consolidated.  Therefore, it is my opinion

22 that the holders of the JSNs are not harmed

23 by the limited partial consolidation that is

24 contemplated by the plan."

25      Q.    Okay.  Why did you think it was

Page 51

1                         M. RENZI

2      important to note that intercompany balances

3      are being compromised and waived as part of

4      the global settlement and not as a result of

5      the limited partial consolidation?

6           A.    Because that's part of the global

7      settlement.

8           Q.    I understand it is part of the

9      global settlement.  There are a lot of things

10     that are part of the global settlement that

11     are not described in paragraph 33 and 34.

12     Why did you include that fact in

13     paragraph 34?

14          A.    I could have included others.

15          Q.    But you didn't.  Why didn't you?

16          A.    I recognize that intercompany

17     balances are the subject of Phase 2

18     litigation.  I am writing these expert

19     reports in the context of Phase 2 litigation.

20     I recognize that intercompany balances are an

21     issue.  And in my opinion, and from

22     discussions with counsel, if the intercompany

23     balances are indeed valid and the JSNs indeed

24     do have a lien and the balances are

25     appropriate, as stated on the books and

Page 52

1                    M. RENZI

2    records, that under those circumstances, they

3    will receive the benefit of that.

4         Q.    Okay.   What I am trying to

5    understand is, other than from the, you know,

6    distribution of assets perspective, what

7    happens to the intercompany balances under

8    limited partial consolidation if the JSNs are

9    determined to have liens on intercompany

10   balances?

11              MR. KERR:   Objection.

12        A.    I think simply put, if they -- it

13   is deemed, after this Phase 2 -- Phase 1 and

14   Phase 2 litigation are completed, that the

15   JSNs are entitled postpetition interest for

16   whatever variety of reasons are determined

17   they are valid, that they will receive

18   postpetition interest.

19        Q.    So your conclusion that the JSNs

20   are not harmed by limited partial

21   consolidation is because you are saying the

22   JSNs will get paid postpetition inverts if

23   they demonstrated that they have a lien, so

24   it doesn't matter if we -- if the limited

25   partial consolidation then wipes out that

Page 53

1                        M. RENZI

2   value?

3              MR. KERR:  Objection.

4        A.    I wouldn't say it the way you

5   said it.  I would say it the way I said it.

6        Q.    Say it again so I understand.

7        A.    Well, I think there are a number

8   of components that need to be addressed.

9   Number one, if the liens are deemed valid,

10  that's the first thing.

11             Number two, if there is indeed

12  value attributable to the intercompany

13  balances, that's the second thing.  If those

14  two are found to be true and you keep

15  everything else equal, everything else equal

16  in the global settlement and there is value

17  for them, then the JSNs will be entitled to

18  that value as it relates to postpetition

19  interest.  Again, the limited partial

20  consolidation of the debtors is for

21  administrative purposes.

22        Q.    So the JSNs are -- have carve-out

23  treatment sort of like the ETS general

24  unsecured creditors?

25             MR. KERR:  Objection.

Page 54

1                          M. RENZI

2        A.    I wouldn't say it the way you say

3   it.  I would just say that they are -- if

4   they are entitled postpetition interest, it

5   will be provided for.

6        Q.    That's why they are not

7   negatively impacted by limited partial

8   consolidation, which would eliminate

9   intercompany value -- the value of

10  intercompany balances between one of the main

11  three entities and any subsidiary entity?

12             MR. KERR:  Objection.

13       A.    If that was a question, that was

14  a long question.

15       Q.    You're not suggesting that

16  intercompany balances are not negatively

17  impacted by limited partial consolidation,

18  right?

19       A.    I don't think intercompany

20  balances are negatively impacted by limited

21  partial consolidation of the debtors.

22       Q.    If the intercompany balances were

23  deemed to have value, would they be

24  negatively impacted by the limited partial

25  consolidation?

Page 55

1                       M. RENZI

2            MR. KERR:   Objection.   Asked and

3       answered.

4       A.     No.

5       Q.     Why did you make a point of

6  saying that the intercompany balances are

7  being compromised in ways as part of the

8  global settlement and specifically not as a

9  result of the limited partial consolidation?

10           MR. KERR:   Objection.   Asked and

11      answered.

12           You can answer again.

13      A.     I think the point of mentioning

14  intercompany balances in this analysis and

15  this expert report is because that there is

16  so much attention focused on them.

17      Q.     But for the intercompany balances

18  being compromised and waived as a part of the

19  global settlement, would they be negatively

20  impacted by limited partial consolidation?

21           MR. KERR:   Objection.

22      A.     I don't think intercompany

23  balances are negatively impacted by limited

24  partial consolidation.

25      Q.     Even if they are determined to

Page 56

M. RENZI

1  have value?

2       A.    No.  They are not negatively

3  impacted.  There is -- it says here in

4  paragraph 34, it is my understanding from the

5  debtor's counsel that if the court determines

6  the JSN notes are entitled to postpetition

7  interest, they will receive payment on

8  account of that interest under the plan.

9  Whether or not any of the legal theories that

10  the JSNs have asserted are valid.  That your

11  firm has asserted is valid.  If they are

12  valid and the Court rules that way, then

13  there are provisions to deal with it.

14       Q.    Okay.  Are you saying that there

15  could be a difference between the JSNs being

16  negatively impacted and what happens to

17  intercompany balances as a result of the

18  limited partial consolidation?

19       A.    Do you want to elaborate?

20       Q.    Well, every time I ask you if

21  intercompany balances are being essentially

22  wiped out as a result, certain intercompany

23  balances are being wiped out as a result of

24  limited partial consolidation, your response

Page 57

M. RENZI

1  back to me is, the JSNs will get postpetition

2  interest if they prove that there is value

3  there.  I am asking you a simple question

4  separate from JSN recoveries whether

5  intercompany balances, if not compromised and

6  waived as part of the global settlement,

7  would be negatively impacted as a result of

8  limited partial consolidation?

9       MR. KERR:  Objection.

10      A.     I think the heart of the matter

11  is, is whether or not the JSNs are entitled

12  postpetition interest.  If they are entitled

13  postpetition interest, the JSNs have asserted

14  a number of different legal theories that I

15  think are beyond the scope of your

16  questioning.  But nonetheless, if they do

17  have a lien on intercompany balances and

18  there is a value attributed to the

19  intercompany balances such that they would

20  get postpetition interest, everything else

21  equal, then they would be entitled to

22  postpetition interest if the Court does deem

23  that they have enough collateral for a

24  secured recovery greater than par. Greater

Page 58

1                       M. RENZI

2       than the 2223.

3            Q.    So you won't answer my question

4       about whether intercompany balances would be

5       negatively impacted as a result of limited

6       partial consolidation if they were not being

7       compromised and waived as part of the global

8       settlement?

9                 MR. KERR:  Objection.  He has

10           answered your question.  Your question

11           is a hypothetical.  He has tried to

12           answer your question.  Let's move on.

13                MS. MILLER:  I am not going to

14           move on.  I want an answer.

15                MR. KERR:  Objection.

16                MS. MILLER:  I want an answer to

17           the question of -- I have asked the

18           question.

19                MR. KERR:  He has answered your

20           question.

21                MS. MILLER:  In a non-responsive

22           way.  I haven't moved to strike his

23           answer as non-responsive.  But I would

24           like clarity on the fact that you were

25           not giving me a direct -- that you

Highly Confidential

Page 59

1                    M. RENZI

2        will not give me a direct answer to my

3        direct question.

4            MR. KERR:  Objection.  He has

5        given you a direct answer to your

6        direct question.  If you want to ask

7        it to him again, he can give you the

8        answer again.  It's been asked and

9        answered several times now.

10             Your question is a hypothetical.

11       And he has tried to answer your

12       question.  If you want to ask him

13       again, be it, but do not characterize

14       the witness as not being responsive on

15       this record.  Don't do that.

16           MS. MILLER:  The record speaks

17       for itself, so I can characterize as I

18       like.

19   BY MS. MILLER:

20       Q.    If it's determined that the

21   intercompany balances were not appropriately

22   compromised and waived as part of the global

23   settlement, are the intercompany balances

24   negatively impacted as a result of the

25   limited partial consolidation?

Page 60

1                    M. RENZI

2        A.     No.

3        Q.     Okay.  Looking at page 9 of your

4   expert report, you state that the liquidation

5   analysis doesn't attempt to estimate estate

6   recoveries arising from affirmative damages

7   claims against third parties.

8        A.     I am sorry; is that a question?

9        Q.     No, that's not a question.

10  That's a statement.  Why did you -- sorry,

11  why did you not attempt to estimate estate

12  recoveries from affirmative damages claims

13  against third parties?

14       A.     This is for the purposes of the

15  liquidation analysis.  The global

16  settlement -- as opposed to the global

17  settlement.  The global settlement, there is

18  proceeds coming in to the estates of

19  approximately $2.1 billion for -- that is due

20  to broad third-party releases.  I would think

21  that if there is -- if it happens to be not a

22  global settlement, then Ally has been on

23  record, Michael Carpenter is on record saying

24  "I am doing this for global peace."  If it is

25  not global peace and there is not broad

Page 61

M. RENZI

1

2    third-party releases, then there won't be a

3    settlement and we will fight tooth and nail.

4    So I believe that it's very difficult to

5    estimate recoveries from Ally based on those

6    two main issues.

7        Q.    But you're not suggesting that

8    the claims have no value?

9        A.    No, I am not suggesting the

10    claims have no value.

11        Q.    Have you done anything to

12    determine what -- to estimate what the value

13    would be?

14            MR. KERR:   Objection.

15        A.    You mean other than what's

16    presented in the global settlement and what's

17    presented by the examiner?

18        Q.    Right.

19        A.    No.

20        Q.    Have you reviewed the examiner

21    report?

22        A.    I have.  Let me be more clear.

23    It is a very long document.  I would have

24    said it is over a thousand pages because I

25    remember seeing it stacked, but I have read

Page 62

M. RENZI

2  the summary.

3      Q.    Have you read any portions of the

4  discussion in greater detail than in the

5  summary?

6      A.    In -- limited.  Limited.

7      Q.    Do you have an understanding that

8  the examiner concluded that $3.1 billion of

9  claims were more -- were either likely or

10  more likely than not to succeed against Ally?

11          MR. KAUFMAN:  Objection to form.

12          THE WITNESS:  Do I answer?

13          MR. KERR:  Yes, if you have an

14      understanding.

15      Q.    Yes.

16      A.    I have an understanding about it.

17      Q.    And do you also understand that

18  the examiner concluded that there was a total

19  of approximately $5.5 billion of potential

20  claims against Ally?

21      A.    I would have to look at it again.

22  But if you say so, based on the form of your

23  question, I suspect that that's the number.

24      Q.    After reviewing the summary of

25  the examiner -- summary contained in the

Page 63

M. RENZI

1    examiner report, did you consider attributing

2    a value to the claim, certain claims against

3    Ally even in the absence of a global

4    settlement and broad third-party releases?

5        A.    No.  I relied on the testimony

6    from Michael Carpenter and I relied on

7    understanding the fact that the settlement

8    was based on broad third-party releases of

9    which a liquidation would not be broad

10   third-party releases.

11       Q.    Mr. Renzi, have you been involved

12   in other bankruptcy matters that involved

13   substantial litigation?

14       A.    Not as substantial as this one.

15       Q.    Have you ever been involved in

16   cases where there have been multiple

17   plaintiffs and multiple defendants and

18   various -- multiple claims asserted?

19       A.    I have been doing this for quite

20   sometime, so I am sure that I have.

21       Q.    And you understand that sometimes

22   there is a global settlement and sometimes

23   there are piecemeal settlements, right?

24       A.    I do.

Page 64

M. RENZI

1

2      Q.    And sometimes the piecemeal

3   settlements can collectively result in a

4   value higher or lower than a global

5   settlement, right?

6           MR. KERR:  Objection.

7      A.    We are in a hypothetical world

8   right now, right?

9      Q.    A hypothetical world based on

10  your experience in litigations.

11     A.    I suspect it is possible.

12     Q.    And you understand -- and,

13  Mr. Carpenter -- sorry.  Strike that.

14          You understand that if ResCap

15  went out and litigated against Ally, there

16  would be some value attributed to that claim

17  that it could assert against Ally in a

18  litigation, right?

19          MR. KERR:  Objection.

20          MR. MARINUZZI:  Objection.

21     A.    I think ResCap couldn't litigate

22  against Ally but the extent, the time period,

23  you know, whether or not they could be

24  effective over an extended period of time, is

25  speculative to me.  I know there are a number

Page 65

<sub>1</sub>                        M. RENZI

<sub>2</sub>   of different issues involved in litigation

<sub>3</sub>   and this estate without a 2 -- infusion of

<sub>4</sub>   $2.1 billion could theoretically be

<sub>5</sub>   administrative insolvent before it could be

<sub>6</sub>   done with litigation.  So, yes, I understand

<sub>7</sub>   that ResCap could fight extensively in a

<sub>8</sub>   liquidation scenario, could fight extensively

<sub>9</sub>   to the -- limited to the amount of money that

<sub>10</sub>  the estate would have.

<sub>11</sub>       Q.    Do you also understand that there

<sub>12</sub>  are lawyers who work on contingency fees?

<sub>13</sub>       A.    Yes, I understand that.

<sub>14</sub>       Q.    And the likely outcome of Ally --

<sub>15</sub>  sorry, of ResCap litigating -- fighting

<sub>16</sub>  extensively is probably not zero value

<sub>17</sub>  attributed to any claim, right?

<sub>18</sub>            MR. KERR:  Objection.

<sub>19</sub>       A.    I think that there are so many

<sub>20</sub>  different components that go into that

<sub>21</sub>  calculus that it is hard to say.  There could

<sub>22</sub>  be value.  Undeniably, there could be value.

<sub>23</sub>  Whether or not it is unlocked and the net

<sub>24</sub>  value is positive, that's entirely possible.

<sub>25</sub>  But you're talking about a very complex case

Page 66

M. RENZI

1   where you have the entity that's willing

2   under global settlement to provide funds, has

3   gone on record saying we are providing it for

4   global peace, broad third-party releases, and

5   if we don't have those, then we are not going

6   to -- we are going to fight.  So I have no

7   reason to doubt a very senior, Mr. Carpenter

8   on his word.

9        Q.    Did you ever ask Mr. Carpenter

10  whether he would -- what amount he would pay

11  if he didn't get a broad third-party release?

12            MR. KERR:  Has Mr. Renzi ever

13        asked Mr. Carpenter that?

14            MS. MILLER:  Yes, has Mr. Renzi

15        ever asked Mr. Carpenter.

16       A.    Other than reading and reviewing

17  some of his comments, no, I have not directly

18  spoken to Mr. Carpenter.

19       Q.    So did you ever hear

20  Mr. Carpenter -- did Mr. Carpenter ever

21  directly tell you that he would not settle if

22  he didn't have a global settlement or broad

23  third-party releases?

24       A.    I believe that's on record.

Page 67

M. RENZI

1

2      Q.    What do you mean by "on record"?

3      A.    I believe he said it publicly.  I

4 know that with MoFo and others from Kirkland

5 and Ellis that he said it.  So I wasn't

6 directly in the room when he said it.  But I

7 have been working with MoFo for two years.  I

8 implicitly trust them.  If they say that

9 that's what's been said outside of what's

10 been said publicly, I implicitly believe

11 them.  I have absolutely no reason to doubt

12 the truthfulness, and I've worked with them

13 for, you know, two years extensively.

14      Q.    Have you ever seen anything

15 written from Mr. Carpenter stating that he

16 would not settle for any amount without a

17 global settlement and broad third-party

18 releases?

19      A.    I don't recall directly seeing

20 it.  No, I don't recall.  But I have been

21 involved in this case for two years.  Worked

22 with the committee.  I have worked with, you

23 know, the company and it's been said by

24 multiple parties.

25      Q.    Did Ally also insist on

Page 68

1                    M. RENZI

2    settlement and compromise of the intercompany

3    balances of zero?

4              MR. KERR:  Objection.  One thing

5         I want to make clear about, and I

6         don't know to whether your question

7         was talking about during the mediation

8         process.

9              I just want to make sure that if

10        you can answer her question, but it is

11        outside the mediation process,

12        assuming you were involved in the

13        medication process and that issue.  If

14        you can do it outside of the mediation

15        process, do it.  To the extent

16        something came up in the mediation, it

17        is subject to confidentiality order.

18        So subject to that, you can answer her

19        question.

20        A.    Do you mind repeating it?

21        Q.    Sure.  Did Ally insist on

22   settlement and compromise of the intercompany

23   balances at zero as part of the global

24   settlement?

25        A.    I don't know.  I don't know if

Page 69

M. RENZI

1
2    Ally insisted.

3        Q.    Do you know whether there were

4    other parties that insisted on that?

5            MR. KERR:    Same direction.    To

6        the extent you know, you can answer

7        her question, but only from

8        information obtained during the

9        process of the mediation is

10       confidential.    If you can answer her

11       question based on communications or

12       understandings you received outside

13       the mediation, you can answer her

14       question.

15       A.    I think it was all done in

16    mediation.

17       Q.    On page 9 of paragraph 20, you

18    identify a number of reasons why the

19    liquidation analysis doesn't include

20    potential recovery for affirmative damage

21    claims against third-parties including Ally.

22    Do you include the probability of successful

23    judgments, the cost and time required to

24    liquidate the affirmative and any offsetting

25    claims the third-parties and/or Ally may have

Page 70

M. RENZI

1

2  against the debtors.  Are those all true,

3  also, with respect to the RMBS claims?

4      A.    Do you mean to suggest that -- I

5  am not sure I understand what you are

6  suggesting.

7      Q.    Well, let me restate it.  Is the

8  outcome of the RMBS claims absent a global

9  settlement highly speculative and dependent

10 on numerous uncertain variables including the

11 probability of successful judgment and the

12 cost and time required to litigate the

13 affirmative claims?

14     A.    I don't think I can opine on the

15 legal merits of the RMBS claim merits.  If

16 that's what you are asking.  I mean, under

17 liquidation analysis, under a scenario

18 without a global settlement, I think that

19 there would be extensive litigation over

20 claims.  And that's definitely written in the

21 liquidation analysis.  There is -- there are

22 securities claims.  There are the RMBS

23 claims.  I think the RMBS claims initially

24 asserted $44 billion in claims.  So to the

25 extent that, let's say, the estates hopefully

Page 71

M. RENZI

1

2   don't go into liquidation, but if they do,

3   there will be extensive fighting about

4   claims, I am almost certain of that.

5        Q.     Did you include a claim value for

6   the RMBS claims in your liquidation analysis?

7        A.     I believe we provided two.

8        Q.     What were those based on?

9        A.     So it would be helpful to look at

10   the liquidation analysis to answer that or a

11   couple of supplemental documents that I

12   provided.  So I will try to do it from

13   memory.  So in the high scenario, I

14   believe --

15        Q.     If you need to reference --

16   sorry.  Keep going.  If you need to reference

17   something, I think it is attached to your

18   expert report, actually.

19             MR. KERR:  Which is --

20        Q.     Which is Exhibit 1.

21        A.     Well, there is a -- we produced a

22   document that would be helpful to point out

23   more explicitly by constituent.  Jeffrey

24   may -- may know.  There is -- but I can try

25   to do it from here.

Page 72

1                    M. RENZI

2         Q.    Okay.  Sorry to interrupt you.

3    Just wanted to help.

4         A.    Thank you.  So I think under

5    the -- let me just flip back to liquidation

6    analysis.

7         Q.    When you find your spot, just

8    identify what you are looking at for the

9    record before you start to answer.

10        A.    Let me do it from memory instead

11   of flipping around.  So in the high

12   liquidation analysis, my recollection is the

13   RMBS trusts have the similar claim that they

14   would have under the global settlement.

15   Under the low, I believe, there are

16   additional claims asserted against ResCap at

17   a discount, and I don't remember the

18   discount, that are for the purposes of aiding

19   and abetting other Veil Peterson theories,

20   and I remember an additional amount that's

21   greater than the global settlement being

22   asserted against the apparent entity.

23             As -- just to be even more

24   specific, the RMBS trusts under the global

25   settlement have approximately $7 billion

Page 73

M. RENZI

1

2    asserted against RFC and then roughly

3    $300 million asserted against GMACM.

4        Q.    Did you include a claim value for

5    the Monoline claims in your liquidation

6    analysis?

7        A.    I did.  I believe it is sort of a

8    symmetrical adjustment.  It is at the high

9    liquidation analysis reflects the claims

10   under a global settlement.  And then the low,

11   I believe there is also some additional

12   claims.  But I need to look at some

13   additional documents to confirm that.

14       Q.    Is the same true for the

15   securities claims?

16       A.    No, it is not true.

17       Q.    So did you include a claim value

18   for the securities claims in your liquidation

19   analysis?

20       A.    Well, so the question you

21   asked -- the first question I should have

22   said, can you ask me, be more specific.  So I

23   will just -- I will elaborate.

24            The recovery analysis doesn't

25   have claims for securities.  There is the

Page 74

¹                        M. RENZI

²   securities trust.  For the record, I will try

³   to find.

⁴            MR. KERR:  Just trying to help,

⁵        make sure we are talking about the

⁶        liquidation analysis versus the

⁷        recovery analysis.  I think he

⁸        question went to the liquidation

⁹        analysis.

¹⁰            MS. MILLER:  Right.

¹¹        A.    I want to -- there is a

¹²   distinction.  So, for example, on the

¹³   recovery analysis, and I will get to the

¹⁴   liquidation analysis, which is Exhibit A, it

¹⁵   is page 32 of 159, I think, in the approved

¹⁶   disclosure statement.  I mean, it shows that

¹⁷   there are recoveries for the security claims

¹⁸   through a trust, that's Row 22.  The trust

¹⁹   that's established is on Row 4; Row 22 shows

²⁰   the amount of the securities claim against

²¹   the recovery.

²²            So what you will notice is that

²³   on Row 15, the amount of the claim is there

²⁴   is no claim because all of the recoveries are

²⁵   done through a trust.  So in a liquidation

Page 75

1                          M. RENZI

2    analysis, as opposed to the recovery

3    analysis, there are different claims that are

4    asserted for the securities because there is

5    no longer a trust for them.  So -- under the

6    high scenario, I believe that the securities

7    claims are subordinated.  Under the low

8    scenario, the security claims -- securities

9    claims, excuse me, are asserted and my

10   recollection serves me it is almost

11   $12 million across three entities.

12             MS. MILLER:  I think we need to

13        change the tape and now is probably a

14        good time for a break.

15             MR. KERR:  Okay.

16             THE VIDEOGRAPHER:  The time is

17        11:29; we are going off the record.

18             (Whereupon, a recess was held.)

19             THE VIDEOGRAPHER:  The time is

20        11:53; we are back on the record.

21   BY MS. MILLER:

22        Q.   So, Mr. Renzi, I know we

23   mentioned it briefly, sort of in passing on

24   the record, but there are two annexes to your

25   expert report, Annex A and Annex B.  Is that

Page 76

                    M. RENZI

1

2  true?

3         MR. KERR:  I think that's right.

4    Q.    Are these the recovery analysis

5  and liquidation analysis that were included

6  as part of the disclosure statement?

7    A.    The approved disclosure

8  statement.  There are two.

9    Q.    And are these documents that you

10 prepared?

11   A.    Yes.

12   Q.    And looking first at the recovery

13 analysis, in paragraph 8, you discuss the FHA

14 VA mortgage assets.  What are FHA VA mortgage

15 assets?

16   A.    They are loans and servicing

17 advances.

18   Q.    And how does ResCap monetize them

19 in the ordinary course?

20   A.    There are a variety of different

21 ways.  They monetize -- you mean loans or

22 servicing advances?  We can do both.

23   Q.    Sure.

24   A.    The loans, they will try to pool

25 them and put them into Ginny pools that,

Page 77

                        M. RENZI

1

2  where they are modified, sell them into Ginny

3  pools, and those loans are usually loans that

4  they can get to reperform.  That's one way.

5  They can bulk sell them.  That's another way.

6  Those would be two examples.

7       Q.    And does ResCap bulk sell them in

8  the ordinary course?

9       A.    I think if the price is

10  reasonable, yes.  And acceptable to the

11  unsecured creditors, and I would suspect to

12  the JSNs.

13       Q.    Sorry.  Let me go back because

14  maybe I wasn't clear.  Outside of the

15  bankruptcy context, how does ResCap -- how

16  did ResCap monetize FHA VA assets?

17            MR. KERR:  Objection.

18       A.    Recoveries through delivery of

19  modified loans under Ginny securitizations,

20  that's one example.

21       Q.    And did ResCap administer FHA VA

22  loans?

23       A.    I am sorry, I don't understand

24  your question.

25       Q.    What did ResCap -- what did

Page 78

1                        M. RENZI

2      ResCap have to do in order to monetize the

3      FHA VA assets?

4                MR. KERR:  Again, this is

5          prebankruptcy, outside of bankruptcy?

6                MS. MILLER:  Prebankruptcy,

7          outside of bankruptcy.

8          A.    I mean, they would -- collect

9      principle and interest.  And/or they can sell

10     them.  Or resecuritize them.

11         Q.    And you talk about the timing

12     claim recoveries being driven by individual

13     loan status independent on foreclosure

14     status, present of the document deficiencies

15     and geographies?

16         A.    Yes.

17         Q.    What do you mean by loan status?

18         A.    Whether or not a loan is in

19     default or not.  Or if it's 30 days past due,

20     60 days past due, 90 days past due, greater

21     than 90 days past due.  That's one example.

22     If they are in foreclosure.

23         Q.    If the loan is not in default,

24     then the borrower continues to make payments

25     and those payments get collected?

Page 79

M. RENZI

1

2      A.     Is that a question?

3      Q.     That's a question.  Is that how

4   it works?

5           MR. KERR:  Again, are you

6       talking outside of bankruptcy?

7           MS. MILLER:  Outside of

8       bankruptcy.

9           MR. KERR:  So not in the

10       recovery analysis, just generally

11       outside of bankruptcy?

12           MS. MILLER:  Generally outside

13       of bankruptcy.  I am trying to

14       understand the nature of the asset and

15       then the treatment in the recovery

16       analysis and in the liquidation

17       analysis.

18      A.     So yes, the recovery of the

19   principle and interest, those would be

20   examples.

21      Q.     And how does ResCap monetize FHA

22   VA loans that are not sold back to Ginny

23   after a modification?

24      A.     How does ResCap -- could you say

25   that one more time?

Page 80

M. RENZI

1

2      Q.    Yes.   How does ResCap monetize

3  FHA VA loans that are not sold back to Ginny

4  after a modification?

5      A.    There are a variety of different

6  ways.  If a loan is past due, then they have

7  to go through a foreclosure timeline, and as

8  indicated here, you could go through judicial

9  states and that could take a very long period

10 of time.  They sometimes call those, you

11 know, ARs or AR receivables.  Even though

12 they are loans, the company has different

13 ways of sort of describing them in their own

14 vernacular.

15     Q.    And you mentioned that some

16 judicial foreclosure states have an average

17 foreclosure timeline of four years?

18     A.    I do.

19     Q.    Are there some judicial

20 foreclosure states that have a shorter

21 foreclosure timeline?

22     A.    Yes.

23     Q.    Do you know what the average

24 foreclosure timeline is in the states in

25 which ResCap held FHA VA loans?

Page 81

M. RENZI

A.    I think your question is more
relevant towards the ones that remain on
their books, because right now a lot of them
are longer foreclosure timelines because they
are more difficult to monetize.  So it
depends on when you are asking the question.

Q.    What do you mean by longer?

A.    So if a loan has gone past due,
you certainly have to consider how you are
going to recover on that loan.  And you have
to -- there are other things you can do.  You
have to apply for insurance and, in general,
as a lot of companies do, they will take low
hanging fruit.  And the low hanging fruit is
ones that are easier to collect upon, and in
states that have, you know, shorter
foreclosure timelines.  So states like -- I
may have the states mixed up a little bit,
but some of the east coast states like
New Jersey and New York have longer
timelines.

So it depends on when you are
asking the question.  If it's an operating
business, historically, you know, I would say

Highly Confidential

Page 82

1                        M. RENZI

2    it would have an average shorter timeline.

3    But we are left with assets that nobody wants

4    so implicitly, the timeline is likely

5    increased from their -- the historical

6    average because we are left with the ones

7    that are more difficult to monetize.

8         Q.    So the four-year average

9    foreclosure timeline in certain states that

10   you identified in the recovery analysis is

11   the longer of the -- possible judicial

12   foreclosure?

13              MR. KERR:  Objection.

14        A.    I would have to go back and look

15   at -- but just logically, it's definitely --

16   logically, it is likely longer now than it

17   was when they were just functioning as a

18   regular business.  Again, these assets nobody

19   wants.  In the bids, they weren't purchased,

20   it's very difficult to sell them.  So that's

21   why they sell them at prices that are

22   acceptable to all constituents.

23        Q.    And you estimate that if you hold

24   these for -- how long do you assume these

25   assets get held for in the recovery analysis?

Page 83

1                          M. RENZI

2          A.    I think 85% of assets are

3    monetized within the first three years and

4    the rest go for the following four years.

5          Q.    Do you know whether ResCap itself

6    has any administrative responsibilities with

7    regard to its FHA VA assets?

8          A.    In order to collect on insurance,

9    it has to follow very strict procedures to

10   collect on insurance, so, yeah, they have got

11   to service them correctly.  Or the

12   third-parties that are servicing them need to

13   service them correctly, and they are

14   monitored by ResCap.

15         Q.    Do you know -- do you know what

16   percentage of ResCap's FHA VA portfolio is

17   serviced by third-parties?

18         A.    I don't remember.  I know that --

19   I think that -- I don't remember the

20   percentage.

21         Q.    More than 50?

22         A.    I think so.

23         Q.    Do you think it is more than 75%?

24         A.    I don't remember.

25         Q.    But you know it is more than

Page 84

                        M. RENZI

1
2    half?

3              MR. KERR:  Objection.  Asked and

4        answered.

5        A.    I think so.

6              MR. KERR:  I would like to mark

7        as Renzi Exhibit 2.  I would like to

8        mark as Renzi Exhibit 2, a document

9        Bates stamped RCUCCJSN 11241765

10       through '99.

11             (Whereupon, Renzi Exhibit 2,

12       RCUCCJSN 11241765 through '99 was

13       marked for identification as of this

14       date by the Reporter.)

15             MR. KERR:  And at the same time,

16       I would like to mark as Renzi Exhibit

17       3, a document you Bates stamped

18       RCUCCJSN 30047089.

19             (Whereupon, Renzi Exhibit 3,

20       RCUCCJSN 30047089 was marked for

21       identification as of this date by the

22       Reporter.)

23       Q.    Mr. Renzi, I have given you -- I

24   have marked as Renzi Exhibit 2, a document,

25   the first page of which says "withheld as

Page 85

1                          M. RENZI

2    privileged" but behind that, the first page,

3    is what appears to be a working draft of the

4    liquidation analysis; is that correct?

5          A.     It's titled that.

6          Q.     Do you recognize this document?

7          A.     It's similar to the one that's

8    been filed.

9          Q.     Okay.  And if you look, there is

10   a loose slip sheet behind that second

11   document which says "liquidation analysis"

12   which is titled "Recovery Analysis."

13                Do you see that?

14         A.     I see it.

15         Q.     It says "Working draft subject to

16   change," right?

17                And I have marked as Renzi

18   Exhibit 4 -- sorry, as Renzi Exhibit 3, what

19   appears to be a calendar invite attaching a

20   couple of documents, the first of which

21   appears to be a draft of the recovery

22   analysis and the second of which appears to

23   be a draft of the liquidation analysis.  And

24   so I don't think I included the date.  The

25   date of the calendar invite is Monday,

Page 86

                    M. RENZI

1

2    July 1st.  Is that your understanding of what

3    Renzi Exhibit 3 is?

4         A.    It just says -- it says "Let me

5    know if 1:30 works for you regarding the

6    liquidation analysis."

7         Q.    Does it look like a calendar

8    invite?

9              MR. KERR:  Objection.

10        Q.    Do you know whether this was a

11   calendar invitation?

12        A.    It just says -- I mean, it just

13   says the where, when, until, organizer.  So I

14   suspect it is.

15        Q.    That's my suspicion, too.  I want

16   to focus on Exhibit 3, and we will reference

17   Exhibit 2, if you need it.  And if you can

18   turn, in the liquidation analysis, which

19   is --

20        A.    I have 3 in front of me.

21        Q.    Exhibit 3.

22        A.    Okay.

23        Q.    Liquidation analysis which is

24   the --

25              MR. KERR:  You have the right

Page 87

1                    M. RENZI

2       exhibit.  Make sure in the front.

3       There should be an exhibit tab in the

4       front.

5       Q.     Exhibit 3, you have got it.

6  Liquidation analysis, which is in this

7  exhibit, it is the last attachment.  It says,

8  on the bottom, "Printed on 6/30/2013," if

9  that helps us with dates.  If you look at

10 page 5, the discussion of affirmative claims

11 against AFI, it says in bold, need to -- it

12 says in all caps, "Need to discuss additional

13 disclosures and scenarios reaffirmative

14 claims against AFI."

15          Do you know who added that

16 comment?

17      A.     No.

18      Q.     Do you know why that was added?

19      A.     Because we needed to discuss

20 additional disclosure and scenarios regarding

21 affirmative claims against AFI.

22      Q.     Did you believe that the

23 liquidation analysis needed a greater

24 discussion than what you had included in the

25 draft?

Page 88

1                     M. RENZI

2              MR. KERR:  Objection.

3         A.    Well, i would have to compare

4    what's said in page 5 relative to the

5    approved disclosure statement, and I would

6    say what was in the approved disclosure

7    statement is what we needed to add relative

8    to this draft.

9         Q.    You don't know who suggested that

10   additional information needed to be added?

11             MR. KERR:  Objection.

12        A.    I think I -- no, I don't

13   remember.

14        Q.    Do you remember that there was a

15   draft that didn't include any additional

16   information, that included only the

17   information before the capped language?

18        A.    I mean, I am sure there are many

19   drafts of the liquidation analysis.

20        Q.    Well, if you look at Renzi

21   Exhibit 2, page 5 of the first attachment.

22        A.    The first section?

23        Q.    It is confusingly for everybody.

24   It is reversed in this exhibit, where the

25   liquidation analysis is first and then the

Page 89

M. RENZI

1
2    recovery analysis.  So it is the first

3    exhibit -- it is the first attachment to

4    Exhibit 2, the second attachment in

5    Exhibit 3.  Looking towards the bottom of

6    page 5 in the discussion of affirmative

7    claims against AFI.

8         A.    I am there.

9         Q.    Okay.  So do you see that the

10   text is the same in both -- without the

11   comment "Need to discuss additional

12   disclosures and scenarios reaffirmative

13   claims against AFI"?

14        A.    I see there is nothing in all

15   caps.  I can read them both.  But it seems

16   like they are the same.

17        Q.    So there is a draft prior to the

18   one that I marked as Exhibit 2, but did not

19   have that comment in it, right?

20             MR. KERR:  Objection.

21        A.    I am confused as to drafts.  Is

22   there a third draft that you are referring

23   to?  I have three docs.  The approved Draft 1

24   and Draft 2 and Draft 3.  Is there another

25   one that you are referring to?

Page 90

M. RENZI

1

2      Q.      Just these two for now.

3      A.      Got it.

4      Q.      Exhibit 2 has the same textual

5  discussion of affirmative claims against AFI

6  but does not have the all caps comment that

7  says "Need to discuss additional disclosures

8  and scenarios reaffirmative claims against

9  AFI" that is included in Exhibit 3, right?

10     A.      I see that, yes.

11     Q.      Do you recall having any

12  discussions about what "additional

13  disclosures and scenarios about affirmative

14  claims against AFI" to include in the

15  liquidation analysis?

16     A.      Yes, I do.

17     Q.      What was the nature of those

18  discussions?

19     A.      I think that we decided that what

20  was published on page 5 of the affirmative

21  claims against Ally, which is the final one

22  in Exhibit 1, is what we wanted to go with.

23     Q.      What discussions did you have

24  back and forth before you decided what to go

25  with?

Page 91

M. RENZI

1

2      A.     We decided that it was more

3  appropriate to say Ally instead of AFI, and

4  we decided, for example, to reference the

5  examiner's report.

6      Q.     Who suggested referencing the

7  examiner's report?

8      A.     I don't remember specifically.

9      Q.     Did you have any discussions of

10 including an analysis of -- sorry, did you

11 have any discussions about including

12 additional disclosures other than a reference

13 to the examiner's report?

14     A.     I suspect we did.  But I don't

15 remember specifically what other issues we

16 addressed other than that.

17     Q.     Do you remember generally --

18 sorry, do you remember whether -- did you

19 have any discussions about whether to include

20 a scenario that reflected -- in the

21 liquidation analysis, that reflected a claim

22 value for the claims against AFI?

23     A.     I wouldn't say it the way you

24 said it.

25     Q.     How would you say it?

Page 92

M. RENZI

1
2     A.    I would say that we talked about

3  additional scenarios about a recovery from

4  AFI.  But there are so many different

5  components to understanding that, and we

6  didn't know how to value it.

7     Q.    Did anyone ask you to try to

8  value it?

9     A.    No.

10        MS. MILLER:  I would like to

11     mark as Renzi Exhibit 4 a document

12     Bates stamped RCUCCJSN 11874351

13     through '4364.

14        (Whereupon, Renzi Exhibit 4,

15     RCUCCJSN 11874351 through '4364 was

16     marked for identification as of this

17     date by the Reporter.)

18     Q.    Mr. Renzi, I have marked as

19  Exhibit 4, an E-mail from William Nolan to

20  William Tyson and others copying you and to

21  Tanya Meerovich dated July 1st, 2013,

22  forwarding an E-mail from Allan Holtz at

23  AlixPartners to you, among other people.

24        Do you recall receiving comments

25  on the liquidation analysis from

Page 93

1                          M. RENZI

2     AlixPartners?

3          A.    I received many e-mails from

4     them, but now looking at this is E-mail, yes,

5     I see it.

6          Q.    Looking at page 5.

7          A.    Is there a numbered page 5?

8          Q.    Sorry, there is a numbered page 5

9     in the attachment.  Which, sorry -- so the

10    record is clear.  This E-mail attaches --

11    attaches a document titled AP markup dot PDF,

12    which appears to be a draft of the

13    liquidation analysis with handwritten

14    comments.

15              Do you know whose comments

16    these are?

17         A.    I suspect they are Allan Holtz'

18    comments.

19         Q.    Did you review Mr. Holtz'

20    comments on the liquidation analysis?

21         A.    I think so.

22         Q.    Do you see on page 5 of the

23    comments, he writes next to the paragraph

24    regarding affirmative claims against AFI,

25    "does the examiner report change this?"

Page 94

M. RENZI

2      Did you have a discussion with

3  Mr. Holtz or anyone at AlixPartners about the

4  impact that the examiner report had on the

5  inclusion of affirmative claims against AFI

6  in the liquidation analysis?

7          MR. KERR:  Objection.

8          MR. KAUFMAN:   Objection.

9      A.    I don't specifically remember

10  that conversation, but I do remember, now

11  that I look at it, I remember seeing this,

12  and I remember that one of the additions was

13  to put the reference to the examiner's

14  report.  Maybe this is one of the things that

15  was the genesis of putting that comment in

16  the final document.  That's speculation.

17          MR. KERR:  We seem to have both

18      lost our connectivity.

19          THE COURT REPORTER:  Off the

20      record, please.

21          THE VIDEOGRAPHER:  The time is

22      12:19; we are going off the record.

23          (Whereupon, a recess was held.)

24          THE VIDEOGRAPHER:  The time is

25      12:22.  We are back on the record.

Page 95

M. RENZI

1  
2  BY MS. MILLER:

3       Q.    Sir, we don't have the Realtime

4  stream, and I forget where we are.  Can you

5  just read back the last question and answer?

6       A.    We were on page 5.  Five of one

7  of the fives.

8            (Record read.)

9            MR. KERR:  I just saw the

10       witness was making notations on the

11       Exhibits.  Mark, don't make notations

12       on the exhibits.  These are the

13       exhibits that will be used at trial.

14            THE WITNESS:  Okay.

15            MR. KERR:  Maybe you can just

16       specify what you did write on each of

17       these exhibits, just so we are clear

18       on the record?

19            THE WITNESS:  I have four page

20       5s in front of me.  So instead of

21       flipping back to figure out what

22       Exhibit I have, I have written the

23       Exhibit number on each page 5.  So

24       Exhibit 3, on page 5 says "3."

25       Exhibit 2 on page 5 says "2."  On the

Page 96

1                         M. RENZI

2          approved Exhibit 1, which is the

3          approved liquidation analysis, I put

4          "Approved," and on the draft I put

5          "Draft from Alan."

6                   MR. KERR:  I appreciate your

7          effort to try to keep all this

8          straight in front of you.  However,

9          let me ask going forward that we, and

10         I am sure Atara, let's not mark up the

11         Exhibits.  If you need us to get you a

12         pad, a little yellow sticky to stick

13         on there, we can do that for you.

14                   THE WITNESS:  Okay.  Sorry.

15                   MR. KERR:  That's okay.

16                   MS. MILLER:  Made you feel like

17         you are back in second grade.

18                   MR. KERR:  No recess for you.

19         Q.     Did you include any additional

20    scenarios in the liquidation analysis that

21    reflected a value for the affirmative claims

22    against Ally?

23         A.     I don't believe so.

24         Q.     Looking down to the next

25    paragraph, page 5 of Exhibit 4, it states,

Page 97

1                        M. RENZI

2    "Wind-down expenses of $125 million have been

3    allocated to the revolver/JSN collateral as

4    carve-out expenses."

5               If you -- do you know what the

6    actual number of wind-down expenses that you

7    allocated to the revolver and JSN collateral

8    was in the final liquidation analysis?

9         A.    Yes.

10        Q.    What was that value?

11        A.    It says 180 million.

12        Q.    Is it allocated to the same set

13   of collateral?

14        A.    Page 6 of the final liquidation

15   analysis or the approved liquidation

16   analysis, it says or reads, paragraph 30,

17   "The liquidation analysis assumes wind-down

18   expenses of $180 million are allocated to the

19   JSN collateral for the period after April 30,

20   2013, and as such, those costs have been

21   removed from the JSN secured recoveries."

22        Q.    And that's different from the

23   language in the draft on page 5 of Exhibit 4,

24   which says that "$125 million have been

25   allocated to the Revolver/JSN collateral;" is

Page 98

M. RENZI

1

2    that right?

3        A.    Yes.

4        Q.    What's the basis for the

5    $125 million number included in the draft?

6        A.    Which draft?

7        Q.    Sorry, Exhibit 4?

8        A.    The basis was, I believe it was

9    an estimate at that point in time, and as we

10   refined the analysis with the company, the

11   number increased from $125 million to $180

12   million.

13       Q.    What was the estimate based on?

14       A.    I think it was the best

15   information we had at that point in time,

16   whenever the first draft came out.  There are

17   a number of different analyses ongoing at

18   that point in time, and it was labeled

19   "Refined."

20       Q.    Do you know, looking still at

21   page 5 of Exhibit 4, it says in square

22   brackets, "per the [six] cash collateral

23   stipulation - discuss with MoFo."

24           Why was this a discussion point?

25       A.    We were working with MoFo on the

Page 99

M. RENZI

1

2    cash collateral stipulation, and we wanted to

3    make sure that we understood specifically the

4    provisions that are in that cash collateral

5    stipulation, and the amount of expenses that

6    could be charged against the revolver/JSN

7    collateral.

8         Q.    Did you understand that the six

9    cash collateral stipulation allowed these

10   expenses to be charged against the JSN

11   collateral?

12        A.    I think there have been seven

13   cash collateral stipulations.  So

14   differentiating between the sixth and the

15   seventh and the fifth and sixth, I am not

16   sure I can do that, but I think it is just

17   chronology.

18        Q.    So it is your understanding that

19   the cash collateral stipulation would allow

20   these expenses to be charged against the JSN

21   collateral?

22        A.    My understanding is that there is

23   a range that could be charged, and that the

24   one that we analyzed and discussed with the

25   company in MoFo was adjusted from what

Page 100

M. RENZI

1

2    appears in Exhibit 4 to the final liquidation

3    analysis.  And then has, subsequently, been

4    adjusted by a Phase I expert report.

5         Q.    And what's the current number

6    from your Phase I expert report?

7         A.    I think it's $169.8.

8         Q.    Is that almost $170 million

9    number the number that you use in your

10   rebuttal report in Phase II?

11        A.    Yes.

12        Q.    What caused the decline from $180

13   million to $170 million?

14        A.    This -- the $180 million number

15   was accrued, and it was based on estimates

16   provided by various constituents, including

17   the JSN advisors.  And as those estimates

18   became reality over time, we appeared to have

19   accrued $10 million too much.  So I felt it

20   was appropriate to properly adjust the number

21   down to a more refined number.

22        Q.    Do you know how much -- how much

23   had actually been accrued by -- sorry, how

24   much had actually been accrued by the date of

25   your rebuttal report?

Page 101

1                          M. RENZI

2        A.     As of 4/30?

3        Q.     Not as of 4/30.  As of October of

4   -- as of October 13th.

5        A.     Well, we are referring to 4/30

6   balances.  I think that's what you mean by

7   your question.

8        Q.     Sorry, I think I misused the

9   word.  I think I said "accrued" instead of

10  "actually charged."  Do you know how much has

11  actually been charged?

12       A.     $27 million.

13       Q.     So there is a clean record, $27

14  million is the amount that's actually been

15  charged from April 30, 2013, through

16  mid-October, 2013, correct?

17       A.     Yes.  I think the timeline is

18  narrower than you stated, but it is still

19  accurately stated.

20       Q.     I want to put all my page 5's in

21  order.

22       A.     Can I put them away?

23       Q.     You can do the same, yes.

24       A.     Thank you.  Do I give those back

25  to you?

Page 102

1                    M. RENZI

2       Q.    You keep them in a pile.  We

3  might need them again.

4            Mr. Renzi, I am going to hand you

5  a document that's previously been marked as

6  Westman Exhibit 1 in this litigation.  This

7  is a 30 -- this is the ad hoc group of junior

8  secured note holders, noted Rule 30(b)(6)

9  deposition.  And if you look at pages 10 and

10  11 and, in particular, the topics number 18

11  and 19.

12            Do you understand that you have

13  been designated by ResCap as the corporate

14  representative 30(b)(6) witness on all

15  matters relating to the hypothetical

16  liquidation analysis set forth in Exhibit 8

17  of the revised disclosure statement?

18       A.    I see it written here.  If you

19  are saying that I am, I am.

20            MR. KERR:  Just so we are clear,

21       we have designated Mr. Renzi as the

22       30(b)(6) witness on behalf of ResCap

23       for items 18 and 19.

24       Q.    My question is, did you

25  understand that you were the corporate

Page 103

M. RENZI

2 representative for topics 18 and 19, being

3 all matters related to the hypothetical

4 liquidation analysis and recovery analysis,

5 before I asked you a question and showed you

6 this document?

7        A.     Yes.

8        Q.     You did.  And what --

9        A.     The exhibit part threw me off.  I

10 just didn't remember.

11        Q.     And what, in particular, did you

12 do to prepare for your 30(b)(6) testimony?

13        A.     For today?

14        Q.     For today, yes.

15        A.     I discussed with counsel what to

16 anticipate for the deposition today.

17 Predominantly did it just yesterday.

18        Q.     And did you review prior drafts

19 of the hypothetical liquidation analysis?

20        A.     No.

21        Q.     Did you review prior drafts of

22 the recovery analysis?

23        A.     No.

24        Q.     Did you keep any notes of

25 meetings or telephone calls in the ordinary

Page 104

1                            M. RENZI

2      course?

3           A.     Not in respect to -- not in

4      respect to my expert reports or this

5      deposition, no.

6           Q.     Well, in the ordinary course, if

7      you are doing work and analysis, do you write

8      notes either in hand, by hand or

9      electronically about discussions that you had

10     or meetings that you have had?

11          A.     Time detail.

12          Q.     Do you report, in any way, the

13     substance of discussions that you had?

14          A.     I sometimes do, yes.

15          Q.     And did you go back to see if you

16     had any notes relating to the liquidation

17     analysis or the recovery analysis?

18          A.     No.

19          Q.     Did you do anything other than

20     talk to counsel, specifically related to the

21     hypothetical liquidation analysis or the

22     recovery analysis to prepare for your

23     deposition today?

24          A.     Yes.

25          Q.     What did you do?

Page 105

1                    M. RENZI

2        A.    I reviewed the recovery analysis,

3  the liquidation analysis, the first one and

4  the second one.  The first one, I think, was

5  filed in the beginning of July, if I

6  remember, I think it was July 4th.  And I

7  remember reviewing the expert reports that I

8  have written, the three of them.  I reviewed

9  Mr. Fazio's reports.  Those are the things

10  that I remember doing.

11            MS. MILLER:  I would like to

12        mark as Renzi Exhibit 5, the Expert

13        Report of Mark Renzi Intercompany

14        Balances dated 11/1/2013.

15            (Whereupon, Renzi Exhibit 5,

16        Expert Report of Mark Renzi

17        Intercompany Balances dated 11/1/2013

18        was marked for identification as of

19        this date by the Reporter.)

20        A.    Do you want me to -- do I still

21  need this one open?

22        Q.    Yeah, you do.

23        A.    Okay.

24        Q.    Mr. Renzi, is this the rebuttal

25  report that you submitted in Phase II?

Page 106

M. RENZI

1

2        A.      Yes.

3        Q.      I am going to skip your

4   qualifications and look at -- start at page 8

5   of your rebuttal report.  In the third

6   bullet, the last sentence, you say, "The

7   waterfall model and the model relied upon by

8   the JSN, the Fazio model, are largely in

9   agreement with one another."

10               Do you see that?

11       A.      Yes, I do.

12       Q.      And is that still a true

13   statement?

14       A.      I think there are differences,

15   but they are not very large.

16       Q.      And what specific differences

17   have you identified?

18       A.      Well, I haven't requested their

19   models, but I do know that some of the equity

20   pledges are slightly different.  Let me

21   restate.

22               Our final conclusions, we didn't

23   request the model.  Initially we had, but we

24   don't need it.  We think that there are

25   slight differences in the way equity pledges

Page 107

1                      M. RENZI

2      are calculated, and we think that there could

3      be differences in the way intercompany

4      balances could be asserted.  I don't have the

5      details of their presentations, Mr. Fazio's

6      presentation, but I can make good estimated,

7      or good educated guesses as to where they

8      come out.  But that's where I think the

9      majority of the differences are.

10          Q.    Did you have an estimate for the

11     variance between the two models, the degree

12     of variance between the two models?

13               MR. KERR:  Objection.

14     A.    I would say --

15               THE WITNESS:  Can I answer?

16               MR. KERR:  Yes.

17     Q.    You can answer.

18     A.    I would say it is generally

19     within two to three percent.

20          Q.    Looking at page 9 -- let me step

21     back for one second.

22               I know we were talking about a

23     lot of models, and the recovery analysis, and

24     the hypothetical liquidation analysis, and I

25     just want to make sure that we keep

Page 108

1                       M. RENZI

2     everything straight.  Is this report talking

3     about the recovery analysis?

4          A.    No.

5          Q.    Is this report directed to the

6     hypothetical liquidation analysis?

7          A.    No.

8          Q.    What is this report doing?

9          A.    I mean, it's addressing

10    intercompany balances.

11         Q.    Okay.  And is it addressing the

12    treatment of intercompany balances, or the

13    impact of intercompany balances on recoveries

14    under the recovery analysis or under a

15    hypothetical liquidation analysis?

16              MR. KERR:  Objection.

17         A.    Well, it's a compound question.

18    The answer, generally, to both is no.

19         Q.    Okay.  So is it addressing the

20    impact of intercompany balances on JSN

21    recoveries?

22         A.    Yes, it's addressing, under

23    certain scenarios, what the recoveries,

24    secured recovery would be for the JSNs under

25    a variety of scenarios.

Page 109

<sup>1</sup> M. RENZI

<sup>2</sup>    Q.    So looking on page 8, the last

<sup>3</sup> main bullet under "Base Case," it says, "That

<sup>4</sup> waterfall model assumptions are consistent

<sup>5</sup> with the plan's recovery analysis, but the

<sup>6</sup> base case assumes no recovery on account of

<sup>7</sup> an AFI contribution."

<sup>8</sup>    A.    Correct.

<sup>9</sup>    Q.    Is that right?

<sup>10</sup>    Why did you take out "the

<sup>11</sup> recovery on account of an AFI contribution"

<sup>12</sup> from the base case?

<sup>13</sup>    A.    We thought it was -- would be

<sup>14</sup> clearer to show the recoveries on

<sup>15</sup> intercompany balances, if allowed, with

<sup>16</sup> incremental changes regarding the scenarios

<sup>17</sup> that we have presented here.  So we thought

<sup>18</sup> it would be clearer.

<sup>19</sup>    Q.    And did you run the model --

<sup>20</sup> sorry, did you run your three scenarios on

<sup>21</sup> the base case that included the AFI

<sup>22</sup> contributions?

<sup>23</sup>    A.    Did we run --

<sup>24</sup>    Q.    Scenario 1 and Scenario -- sorry,

<sup>25</sup> Scenario 1 and Scenario 2?

Page 110

1                        M. RENZI

2        A.      Not for the expert report.

3        Q.      After you received Mr. Fazio's

4    expert report, did you review that?  Did you

5    run that model?

6              MR. KERR:  Objection.

7        A.      I would have to look at his

8    expert report.  There are a few of them.  And

9    there are many scenarios.  So the answer is,

10   we checked to see if we were close under one

11   or two scenarios, but I didn't try to

12   replicate all of his scenarios.  Again, I

13   didn't have full information for his

14   analysis, but I have nothing -- what I have

15   stated here in my expert report is still

16   consistent with my belief.

17       Q.      What impact would including a

18   recovery on account of AFI -- of an AFI

19   settlement be on the intercompany balances

20   that you have identified?

21             MR. KERR:  Objection.

22       Q.      Sorry, let me restate that.

23       A.      It is broad.

24       Q.      Would the inclusion of an AFI

25   contribution increase the recovery on

Page 111

1                         M. RENZI

2    intercompany balances?

3         A.    It depends.

4         Q.    What does it depend on?

5         A.    If all the intercompany balances

6    were valid.

7         Q.    If all the intercompany balances

8    are valid, would the AFI contribution

9    increase the recovery on the intercompany

10   balances?

11        A.    It depends.

12        Q.    It depends on what?

13        A.    It depends on which

14   intercompanies are valid.

15        Q.    Like I said, if all the

16   intercompany balances are valid, would the

17   AFI contribution increase the recovery on the

18   intercompany balances?

19        A.    Sorry, if all were valid it would

20   increase -- if all intercompany balances are

21   valid, it would increase the value of the

22   intercompany balances.

23        Q.    And do you know by how much?

24        A.    Under what scenario?

25        Q.    Under Scenario 2.

Page 112

M. RENZI

1

2       MR. KERR:  You are talking about

3   Scenario 2 of Mr. Renzi's rebuttal

4   report?

5       Q.     Under Scenario 2 of your rebuttal

6   report, in which you assume that all

7   intercompanies are valid at face value, if

8   you added in the AFI -- an AFI contribution

9   value, what impact would that have on the

10  intercompany balance recovery?

11      A.     Under Scenario 2, I think Mr.

12  Fazio has run this analysis, the JSNs would

13  be -- if there is an AFI contribution, the

14  JSNs would likely be oversecured.

15      Q.     And do you know how much of --

16  how much of a payment by Ally would be needed

17  to render the JSNs oversecured in Scenario 2?

18      A.     I haven't run it incrementally in

19  the way you are asking it.  So you are asking

20  if I -- if I have taken it like Mr. Fazio has

21  done, he's gone from 250 to, I don't

22  remember, 350 to 450, 550, et cetera, et

23  cetera, up to and beyond, I think beyond

24  $3 billion.  I haven't done it the way he has

25  done it.

Page 113

M. RENZI

1

2        So you are asking for a tipping

3   of when we become oversecured, and I know it

4   happens, I just don't remember at what level.

5        Q.    Do you have a general sense of

6   what level?

7        A.    What assumptions do you want me

8   to postulate upon?  Like all --

9        Q.    I want you --

10       A.    Sorry, I would rather have you

11  ask me the question instead of me guessing.

12       Q.    I want you to assume everything

13  that you assume in Scenario 2, with an AFI

14  contribution that runs through the waterfall,

15  that is not subject to a direct lien of the

16  JSNs.

17       A.    So the answer to your question

18  is, I haven't done the analysis in the way

19  Mr. Fazio did it.  It is, like, thousands of

20  lines of a model.  I am good, but I can't do

21  that sitting here.  I would suspect it is

22  slightly less than $2.1 billion, but it

23  depends on where you put the money.

24       Q.    Do you know if it is less than a

25  billion?

Page 114

M. RENZI

1
2        A.    I don't think that there are --
3   the JSNs are oversecured in -- I don't think
4   that they are oversecured.  In less than a
5   billion.  But that's -- if you would like me
6   to run the analysis.  I am sure you would
7   like me to, but --
8        Q.    I am not your lawyer, but you
9   would probably be advised not to offer things
10  like that.
11            Looking at page 9, the fourth
12  sub-bullet under the second bullet of
13  assumptions.  That's the -- is that the
14  $169.8 million administrative expense number
15  that we were discussing earlier?
16       A.    That was the one that we were
17  referring to, the charge against the
18  collateral, yes.
19       Q.    So that's the number that, in
20  this disclosure statement, is reflected at
21  $180 million that has since been revised?
22       A.    Yes.
23       Q.    Looking at page 11, in the second
24  to last bullet on that page, the last
25  sentence says, "The remainder is related to

Page 115

M. RENZI

1   the estimate of accrued and unpaid

3   professional fees as of 7/11/13, plus

4   $25 million."

5          What's the basis for the plus

6   25 million?

7      A.    That was a carve-out amount.

8      Q.    What was that carve-out amount

9   intended to cover?

10     A.    To reflect the additional

11  expenses that could be charged against the

12  JSN collateral.  So it would be the 169 less

13  the 27 -- 169.8 less the 27 million, and you

14  have a remainder of approximately 143 million

15  of which 25 was carve-out.

16     Q.    You are saying carve-out, not

17  carved out, right?

18     A.    Carve-out.

19     Q.    Just making sure.

20     A.    This analysis reflects what we

21  discussed.  It is the -- you can see the

22  adjustments on page 11 that you are referring

23  to, of the two components, the $27 million,

24  which is on row -- under the Fazio model,

25  under row 6, and then, subsequently, when I

Page 116

M. RENZI

1  got it back, on row 8, $143 million.  And you

2  can see that, after that adjustment, we are

3  in agreement.

4      Q.    And what expenses are included in

5  the carve-out amount?

6      A.    Professional fees, things of that

7  sort.

8      Q.    What expenses are included in the

9  143 amount?

10      A.    I believe it is the same.  I

11  don't have the specific document in front of

12  me, but it lists them all out.  But unpaid

13  professional fees is a major portion of it.

14      Q.    Who provided estimates of what

15  the going forward professional fees would be?

16      A.    I actually believe that each of

17  the professional firms, financial advisors,

18  and attorneys have provided estimates of what

19  they think their future expenses are.  So

20  when a budget was pulled together, we

21  consulted with as many -- with as many firms

22  as would provide information.  And we did

23  that in conjunction with the company.

24      Q.    And did those estimates gross up

Page 117

¹                           M. RENZI

²    to $170 million?

³         A.    Initially, we had them estimated

⁴    at -- that would be applied against the JSN

⁵    collateral at $180 million, and it's been

⁶    revised down to $170 million, approximately.

⁷         Q.    Was your initial estimate based

⁸    on the specific estimates that each of the

⁹    firms and FAs and other representatives of

¹⁰   the parties that you discussed gave you?

¹¹        A.    I think it's only a portion.

¹²   What's reflected, what's applied against the

¹³   JSN collateral is just a portion of -- it's a

¹⁴   portion of that.  So the total is certainly

¹⁵   higher.

¹⁶        Q.    Looking at page 12 --

¹⁷        A.    This is page 12.

¹⁸        Q.    It is, that's not my page 12.

¹⁹        A.    Sorry.

²⁰              MR. KERR:  It is a numbered page

²¹        12.

²²        A.    I apologize, the corners are --

²³   got it.

²⁴        Q.    Yours is stapled on the other

²⁵   side.

Page 118

1                       M. RENZI

2        A.     Yes.

3        Q.     I think we are all on page 12 of

4   Exhibit 5, which is the Renzi rebuttal

5   report, which is titled "Overview of

6   Scenarios Global Assumptions."  And on the

7   left-hand column, it says "AFI Contribution."

8               And you state that, "Sensitivity

9   scenarios outlined in this report assume no

10  AFI contribution."  And then you state, "I

11  have also been instructed by counsel not to

12  include any value for purported liens by the

13  JSNs on alleged causes of action by the

14  estates against Ally or its affiliates."

15              Do you know why you were

16  instructed to assume no liens?

17       A.     Because it wasn't -- when I

18  discussed it with counsel, we didn't feel

19  that it was a reasonable assumption.

20       Q.     And what impact would the JSNs

21  having a lien have on the recovery analysis,

22  if it also included some value for the AFI

23  contribution?

24       A.     What assumptions do you want me

25  to make?  I can't answer -- that's, like, too

Page 119

M. RENZI

1  broad of a question.

3      Q.    I want you to assume Scenario 2,

4  where you take all the intercompanies at face

5  value, but assume that there is an AFI

6  contribution and that the junior secured note

7  holders have a lien on that, or at least on

8  some portion of that contribution.

9      A.    And your question is?

10     Q.    What impact does that have on the

11  JSN recovery?

12     A.    It improves their recovery.

13     Q.    Do you know how much of -- what

14  value they, the JSNs, need to have a lien on

15  to render them oversecured?

16     A.    I mean, I just want to back up.

17          We are in this hypothetical world

18  where we assume, like center is powerless,

19  everything else equal, Scenario 2, where

20  nothing else changes.  Meaning claims don't

21  change, that from other constituents, and

22  that there is a settlement, and the JSN

23  intercompany balances are -- the JSNs have a

24  lien on the intercompany balances, and the

25  intercompany balances are valid.

12-12020-mg   Doc 5803-12   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Mark Renzi   Pg 120 of 194
Highly Confidential

Page 120

M. RENZI

1
2        So all of those things, I want to
3  make sure I caveat it, because Scenario 2, I
4  don't necessarily think would be -- if we
5  turn on value for Scenario 2, I think other
6  things will change.  I don't think -- I just
7  want to make sure that -- I don't know that
8  Scenario 2 would exist if you turn on an AFI
9  contribution.
10       Q.    I understand.  We are going to
11  talk about that.
12       A.    Okay.
13       Q.    What I want to know now is, if
14  there is, assume Scenario 2 where
15  intercompanies are on at face value as
16  recorded in the books and records of the
17  debtors, and you assume that there is a
18  payment by Ally, it may be more, it may be
19  less than the -- what is being termed the
20  Ally -- the AFI contribution, there is a
21  payment by Ally and settlement of claims,
22  including some of which the JSNs have a lien
23  on.
24       Do you know what value of -- what
25  value the lien -- the JSN lien on Ally

Page 121

1                    M. RENZI

2  contribution has to be to render them

3  oversecured?

4        A.    I can't answer your question.

5  You didn't tell me where to put the money.

6        Q.    Okay.

7        A.    There is -- there are a number of

8  assumptions you need to make, that you need

9  to tell me where.  It's insufficient

10  information to tell you the answer.

11       Q.    If the JSNs have a lien on

12  certain portions of the recovery, where does

13  that money flow in the waterfall analysis?

14            MR. KERR:  Objection.

15       A.    I don't know.  I have assumed

16  that the JSNs don't have a direct lien on the

17  Ally contribution.  So you are just saying,

18  if they have a direct lien on the

19  contribution?

20       Q.    What if you are wrong in your

21  assumption?  What's the impact on your

22  analysis if you are wrong in this assumption?

23       A.    It depends where the money goes.

24       Q.    So I am asking you, for that

25  portion of the claim related to -- of the

Page 122

1                          M. RENZI

2      settlement payment related to claims that the

3      JSNs are deemed to have a lien -- are

4      determined to have a lien on, where does that

5      money go?

6                MR. KERR:  Objection.

7           A.    You are asking me if they have a

8      lien on it, what legal entity Ally will pay

9      into?  Under --

10                THE WITNESS:  Chad --

11                MR. KERR:  You can answer the

12           question.  Go ahead and answer the

13           question.

14           A.    I don't think -- there is a

15      global settlement.  The global settlement is

16      prescribed in a certain allocation.  That's

17      different than what you are suggesting.  You

18      are suggesting that there is a direct lien on

19      the global -- the amount of contribution of

20      the $2.1 billion, and you are asking me --

21      well, I am not sure I understand your

22      question.  I am not going to try to

23      recharacterize your question.

24           Q.    We will move on, and hopefully we

25      will get into more detail that will help you

Page 123

1                    M. RENZI

2    answer the question.

3                    Turning to page 13 in your

4    rebuttal report?

5                    MR. KERR:  Atara, lunch is

6         outside.  Whenever you want to take an

7         a break.  We can keep going as long as

8         you want.

9                    THE WITNESS:  I am good.

10                   MS. MILLER:  Let's keep going a

11        little bit.

12                   MR. KERR:  That's fine.

13        Q.    You let me know when you are

14   hungry.

15        A.    Sure.

16                   MS. MILLER:  Has someone

17        verified that lunch is outside?

18                   MR. KERR:  I have.  I know you

19        don't trust me.  I apologize for that.

20                   THE WITNESS:  Well done.

21        Q.    Page 13, of the rebuttal report,

22   Scenario 1, can you explain what Scenario

23   1(a) assumes?

24        A.    So Scenario 1 on page 13 says,

25   "There are additional intercompany balances

Page 124

M. RENZI

1

2  that are identified for forgiveness."

3          I think in this example, there

4  is, for the balances that we were analyzing,

5  there is $2.6 billion identified for

6  forgiveness.

7      Q.    What do you mean by "identified

8  for forgiveness"?

9      A.    The company -- but for the

10  bankruptcy filing, the company was going to

11  forgive an additional amount of intercompany

12  balances.  And the ones that are relevant for

13  this analysis, it is approximately

14  $2.6 billion.

15      Q.    Does your recovery analysis

16  assume that the bankruptcy did not happen?

17          MR. KERR:  Objection.

18      A.    No.

19      Q.    In Scenario 2(b), you say that

20  you "reinstate certain balances on account of

21  the avoidance of fraudulent conveyances."

22          How did you decide which balances

23  would be avoided because of fraudulent

24  conveyance actions?

25      A.    So we went back and looked at --

Page 125

M. RENZI

1

2    it is the Scenario 1(b), and we looked at --

3    there are two main --

4        Q.    Are you looking at a different

5    page in your report?

6        A.    I'm looking at page 17.  So we

7    identified two balances, the ResCap to RFC

8    balance of $1.9 billion, and then the GMAC

9    mortgage to PATTI, or passive action

10   transaction balance.  They were identified

11   for fraudulent conveyances.

12       Q.    Were there other intercompany

13   balances between entities that had

14   intercompanies that were avoided -- sorry,

15   that were forgiven?  Let me restate that so

16   that's clear.

17            Did you identify other

18   intercompany balances between entities that

19   had outstanding intercompany balances

20   scheduled on the SOALs, that were forgiven,

21   in addition to the two identified on this

22   page of your report?

23            MR. KERR:  Objection.

24       A.    There were two balances that we

25   identified that were relevant for this

Page 126

1                        M. RENZI

2   analysis for fraudulent conveyance that

3   reduced the balances.  Those were the ones on

4   row 2 and one on row 4, which are the GMAC

5   PATTI and the ResCap RFC balances.

6        Q.    How did you determine that they

7   were relevant for this analysis for

8   fraudulent conveyance?

9        A.    I think I stated in the first --

10  the first bullet, and I am happy to read

11  that.

12            "Certainly the intercompany

13  balances reflected on the debtors' books and

14  records as of the petition date could be

15  reduced if actions were brought against" --

16  "brought to avoid certain instances of the

17  historical forgiveness of intercompany

18  balances.  That is because creditors of the

19  debtor entity that forgave a balance would

20  likely argue the debtor entity did not

21  reasonable equivalent value for the

22  extinguishment of the receivable."

23            And so, that's how.

24       Q.    Did you identify any balances

25  that could be subject to fraudulent

Page 127

1                     M. RENZI

2  conveyance action that increased the

3  intercompany balances?

4       A.    There are, that could increase

5  them, but we didn't think that -- in

6  discussions with counsel and in discussions

7  in terms of who would be bringing those

8  causes of action, we didn't think that, from

9  a legal standpoint, that somebody would be

10  arguing to increase a balance.

11       Q.    Don't you think the JSNs would,

12  if they had a lien on those balances?

13       A.    They could.

14       Q.    But you didn't include that in

15  your analysis?

16       A.    I did not.

17       Q.    Did you run an analysis that

18  avoided, as fraudulent conveyances, all debt

19  forgiveness from 2008 forward?

20       A.    Not from my expert report.

21       Q.    Do you know what the effect of

22  that would be?

23       A.    It's very difficult to do that

24  just looking at this page.

25       Q.    Do you know whether it would have

Page 128

M. RENZI

1
2      less than a $2 billion impact on the net

3      intercompany balances as of May 14, 2012?

4           A.    Would it -- I'm sorry?

5           Q.    Do you know whether it would have

6      less than a $2 billion impact on the net

7      intercompany balances as of May 14, 2012?

8           A.    Are you asking me if the number

9      is lower than the 199 on page 17, third

10     column of numbers?

11          Q.    Yes.

12          A.    Yes, I think it offsets that

13     number.

14          Q.    Do you know by how much?

15          A.    I don't remember.

16          Q.    A billion?

17          A.    I think it is more than a

18     billion.

19          Q.    Looking at Scenario 1(c), what

20     are you doing in Scenario 1(c)?

21          A.    We are adjusting three balances

22     for subordination.  That's the RFC, the home

23     comings balance, the GMAC mortgage to PATTI

24     balance, and the RFC, the RAHI to RFC

25     balance.

1                        M. RENZI

2          Q.     On what basis are you

3    subordinating the claims?

4          A.     I think the basis is that there

5    are, to the extent that these balances are

6    asserted to be valid by the JSNs, that these

7    -- there are documents provided that show

8    bankruptcy standstill provisions, and what

9    those provisions, you can subordinate them.

10         Q.     But it's the debtors' position

11   that these balances didn't accrue pursuant to

12   these agreements, right?

13         A.     It's -- I can speak relative to

14   my analysis here.  My analysis here says that

15   if indeed, under the assumption that the JSNs

16   are asserting that these balances are valid,

17   and that they have a lien on them, then using

18   the same logic that they are asserting it,

19   then if those documents that they are

20   asserting to be valid are applied, then you

21   would have to apply bankruptcy standstill

22   provisions that subordinate these

23   intercompany balances.

24         Q.     You did a detailed analysis of

25   the intercompany balances separate and apart

Page 130

1                    M. RENZI

2   from your rebuttal report, right?

3        A.    I don't know what you mean by

4   "detailed analysis."

5        Q.    You engaged in an analysis over

6   the course of months regarding the

7   intercompany balances, separate and apart

8   from your rebuttal report, right?

9        A.    I have reviewed the documents

10  that I have said I have reviewed in my expert

11  report.

12       Q.    You haven't reviewed any

13  documents other than those identified in your

14  expert report related to intercompany

15  balances?

16            MR. KERR:   Objection.

17       A.    Yes, I have reviewed other

18  documents.

19       Q.    Because you did an analysis of

20  intercompany balances separate and apart from

21  your expert report, right?

22       A.    You just said, "an extensive

23  analysis."  So that's --

24       Q.    I said, "you engaged in an

25  analysis over the course of months regarding

Page 131

M. RENZI

1
2  the intercompany balances separate and apart

3  from your rebuttal reports, right."

4      A.   I have reviewed the impacts, and

5  analyzed what the impacts could be for

6  intercompany balances if the JSNs have a lien

7  on them, and they are indeed valid.

8      Q.   Did you do an analysis of whether

9  the intercompany balances are valid or not?

10         MR. KERR:  Objection.

11     A.   No.  That's a legal analysis.  I

12  didn't do a legal analysis if they are valid

13  or not.

14     Q.   Do you understand that the

15  intercompany balances can be valid even if

16  they are not governed -- even if they don't

17  arise pursuant to the agreements you have

18  identified?

19     A.   I understand, generally, the

20  nature of intercompany balances that are

21  presented here.  I mean, for example, these

22  balances could have arisen out of cash

23  management.  These balances -- most of them

24  didn't have documentation.  I realize that

25  these balances, generally, weren't being --

Page 132

1                        M. RENZI

2    weren't accruing or paying interests.  I

3    realize that these balances, there was debt

4    forgiveness throughout a period of time from

5    2008 forward.

6              So, yes, I think -- yeah.  I

7    recognize the impacts that -- on these

8    balances, and whether or not they are valid

9    or not, I think is more of a legal

10   determination.

11       Q.    Do you understand that the

12   intercompanies can be valid and not governed

13   by the agreements that you have identified

14   and have standstill, bankruptcy standstill

15   provisions?

16             MR. KERR:  Objection.

17       A.    I am not sure I follow the

18   nuance.

19       Q.    Well, the debtors take the

20   position, according to your rebuttal report,

21   "The debtors do not believe that the

22   intercompany balances on the books and

23   records, as of the petition date, accrued

24   pursuant to these agreements;" is that

25   correct?

Page 133

M. RENZI

1

2     A.     That's correct.

3     Q.     Assume the debtors are right,

4 that the intercompany balances didn't accrue

5 pursuant to these agreements.

6     A.     Okay.

7     Q.     And assume that the intercompany

8 balances are still determined to be valid and

9 not re-characterized.

10     A.     Okay.

11     Q.     You understand that that's a

12 possibility, right?

13     A.     I do understand it is a

14 possibility.

15     Q.     Okay.  And so if the balances are

16 valid and did not accrue in accordance with

17 these agreements, then Scenario 1(c) becomes

18 irrelevant, right?

19          MR. KERR:  Objection.

20     A.     I am not sure -- I am not sure if

21 it becomes irrelevant or not.  It becomes a

22 combination of whether or not there is value

23 and whether or not the law says that that's

24 possible.  And I am not here to opine on the

25 legal issue of whether or not this -- whether

Page 134

1                      M. RENZI

2    or not each one of these documents are --

3    could be invalidated, and whether or not that

4    they exist with or without a document.  And I

5    think a lot of them don't exist, or they are

6    on the books and records without a document.

7    That doesn't mean that there is a valid lien.

8    It doesn't mean that there is -- that it's

9    just a function of accounting.

10            So there is a lot of different

11   issues you are asking me to address, and I

12   can probably try to do it in isolation.

13            MR. KAUFMAN:  By the way, no one

14       asked our reporter whether she wanted

15       to take a break for lunch.  And we

16       should have.

17            THE COURT REPORTER:  I am fine.

18            MS. MILLER:  We will take a

19   break soon.

20       Q.    Is there any basis to subordinate

21   certain of the intercompany balances, other

22   than the documents that you have identified

23   in your report?

24            MR. KERR:  Objection.

25       A.    I think there could be, but I

Highly Confidential

Page 135

M. RENZI

1  
2  would need to discuss with counsel what other

3  legal theories that could be -- could apply.

4  We have done, for Scenario 1, we have done

5  four scenarios.

6      Q.    And Scenario 1(c) is predicated

7  on the bankruptcy standstill provisions in

8  the agreements you have identified, right?

9      A.    Yes.

10           MS. MILLER:  Now is good time

11      for a break.

12           THE VIDEOGRAPHER:  The time is

13      1:17.  We are going off the record.

14           (Whereupon, a lunch recess was

15      held.)

16

17

18

19

20

21

22

23

24

25

Page 136

1                        M. RENZI

2               ***AFTERNOON SESSION***

3               THE VIDEOGRAPHER:  The time is

4       2:07; we are back on the record.

5    BY MS. MILLER:

6          Q.    Good afternoon, Mr. Renzi,

7    welcome back.  I am going to hand you what

8    has been previously marked as Westman

9    Exhibit 39.

10         A.    Do you have a magnifying glass?

11         Q.    I am only going to ask you to

12   read one line, so hopefully we can squint

13   through it.  Which is a document Bates

14   stamped RCUCCJSN 00030215 through '215.

15   Apparently a native file.  Titled Residential

16   Capital LLC Debt Forgiveness excludes Ally on

17   less than 20 million, January 1, 2008,

18   through May 13, 2012.  Will you look at the

19   first line.

20         A.    Okay.

21         Q.    I will tell you what I think it

22   says.  We will see if we agree.  It says

23   date, "3-31-2008, description Residential

24   Capital LLC, Residential Funding Co, LLC,"

25   and then it says, "$2 billion intra ResCap

Page 137

1                           M. RENZI

2    debt, reason to meet debt covenants."

3              Is that the debt forgiveness

4    transaction -- sorry, is that the debt

5    forgiveness transaction that you refer to on

6    page 17 of your rebuttal report?

7         A.    I think the numbers -- this is

8    just one, a few entries, I think.  If I can

9    just flip.  Yeah, it is one of them, yes.

10        Q.    What are the other ones?

11        A.    I think if you go back to

12   page 25, there is another -- it is really

13   difficult to read because of the font sizes,

14   I don't know what number that is, but it is a

15   very small number for font size.  But there

16   is another one of 151 million, at least in

17   aggregate for 2009 for that relationship.

18        Q.    So the -- the avoidance of

19   fraudulent conveyances number identified for

20   Residential Capital LLC and Residential

21   Funding Co LLC on page 17 of your slide is

22   comprised in large part by the debt

23   forgiveness that is dated 3-31-2008 on the

24   schedule that was marked Westman Exhibit 39;

25   is that right?

Page 138

1                      M. RENZI

2          A.     Yes, so 17 reflects the reversal

3    of debt forgiveness up to 1.9 -- or avoidance

4    of fraudulent conveyances of 1.955, yes, on

5    my page 6 and generally, corresponds with the

6    first line that we were just discussing on

7    Westman Exhibit 39.

8          Q.     You are going to love me.  I

9    would like to mark as Renzi Exhibit 6 --

10         A.     I don't have to take this

11   anywhere, do I?

12         Q.     You don't.  The Court Reporter

13   does.

14                -- as Renzi Exhibit 6, the

15   corrected disclosure statement with exhibits.

16   That was filed on August 23, 2013.

17                (Whereupon, Renzi Exhibit 6,

18         Corrected Disclosure Statement with

19         Exhibits filed on August 23, 2013 was

20         marked for identification as of this

21         date by the Reporter.)

22         Q.     Mr. Renzi, there is a page in

23   Exhibit 6 that has a flag, a yellow flag on

24   the top of it, which is exhibit -- or should

25   be Exhibit 6 to the Disclosure Statement.

Page 139

1                          M. RENZI

2          A.    I am there.

3                MR. KERR:  Give me a second to

4    get there.

5                THE WITNESS:  I think it says

6    page 19 of 159.

7                MR. KERR:  Page what?

8                THE WITNESS:  It says page 19 of

9    159.

10               MS. MILLER:  Because it is too

11   big to comply with the Court's PDF

12   sizes.  It is about two-thirds of the

13   way through.

14         Q.    Mr. Renzi, do you recognize

15   Exhibit 6 to the disclosure statement?

16         A.    I do.

17         Q.    And is this a document that you

18   were involved in preparing?

19         A.    I believe so.

20         Q.    Okay.  And I want to focus,

21   first, on the page numbered 22 of 159 on the

22   top.  And then, in particular, on

23   intercompany number 6, which is identified as

24   RFC, as the accounts receivable entity and

25   RFC Assets Holding 2 LLC ("RAHI") as the

Highly Confidential

Page 140

1                    M. RENZI

2    accounts payable entity.  Do you see that?

3         A.    I do.

4         Q.    In the comments do you see that

5    it says, "There is no documentation

6    reflecting this intercompany relationship"?

7         A.    I see the comment there, yes.

8         Q.    On page 18 of your rebuttal

9    report?

10        A.    Right.

11        Q.    You see that RAHI intercompany

12   advance agreement is listed as one of the

13   agreements that has a bankruptcy standstill

14   provision.

15        A.    I see what you are referring to.

16   On, excuse me, 18?

17        Q.    On page 18.  Yes.

18             Why does it say that there is no

19   documentation reflecting this intercompany

20   relationship in Exhibit 6 to the disclosure

21   statement if you have you identified an

22   agreement on page -- as reflected on page 18

23   of your rebuttal report?

24        A.    So I think the distinction to be

25   made here is, there isn't something specific

Page 141

1          M. RENZI

2   addressing page 22 of 159, Item 6 between RFC

3   and RAHI.  But 1C is done as part of a

4   rebuttal to Mr. Fazio's report.  And there

5   are a variety of assumptions that are being

6   made in 1C that are different than what is

7   being reflected in the disclosure statement.

8   So the distinction is that the JSNs assert

9   that the intercompany balances are indeed

10  valid and they think that they are valid

11  because a note exists.  The same premise

12  would go that if the note exists somewhere up

13  the chain between RFC and RAHI, that that, I

14  guess, in theory, that note would govern and

15  then, there would be --  a bankruptcy

16  standstill would be applicable.  So this is

17  in rebuttal to Mr. Fazio's assertion that if

18  these balances were indeed true, that the

19  note can cover it.

20      Q.    But it's the debtor's position

21  that none of the intercompany balances

22  identified and discussed on page 18 of your

23  rebuttal report arose, accrued under the

24  agreements you discuss, right?

25      A.    I think that my position is that

Page 142

1                    M. RENZI

2    if the JSNs assert that this intercompany

3    balance is indeed valid, and it is valid by

4    use of the fact that an intercompany

5    agreement existed and I think it is called

6    the RAHI Intercompany Advance Agreement, that

7    if that was applicable, that -- if that

8    agreement makes this balance valid, then in

9    turn, then that would apply against that

10   balance.  Meaning the agreement, the

11   bankruptcy standstill within the agreement

12   would apply.

13       Q.    Is it your position that there is

14   a valid agreement between -- that governs the

15   intercompany balance that -- between Passive

16   Asset Transactions LLC and GMAC Mortgage LLC?

17            MR. KERR:  Objection.  You are

18       talking about Mr. Renzi's position?

19            MS. MILLER:  Well, I asked him

20       before about the debtor's position as

21       he responded to me about what his

22       position is.  So I would like to know

23       now what his position since it is his

24       rebuttal report.

25       A.    The PATTI Intercompany Advance

Page 143

1                          M. RENZI

2    Agreement?

3          Q.    Right.

4          A.    I think the same applies.  Are

5    you referring to page, excuse me, 18 or

6    referring to somewhere else in the Disclosure

7    Statement?

8          Q.    I was asking you about whether it

9    was your position that there is a valid

10   agreement -- whether the intercompany balance

11   between PATTI and GMACM accrued pursuant to

12   a -- an agreement?

13         A.    Well, I will just refer to

14   page 21 of 159, balance number 4.

15         Q.    Sorry.  I am asking you, based on

16   your rebuttal report, not based on the

17   Disclosure Statement exhibit.  I want to know

18   if in the rebuttal report, you are taking the

19   position that the balances that accrued, that

20   the intercompany balance between Passive

21   Asset Transactions LLC and GMAC Mortgage

22   accrued under a valid agreement or not?

23         A.    I can't answer whether the

24   agreement is valid.  I can answer that if the

25   JSNs assert that the agreement is valid, then

Page 144

M. RENZI

1

2 they must take into consideration the

3 bankruptcy standstill provision.

4      Q.    Is it the debtor's position that

5 the intercompany balance did not accrue

6 pursuant to an agreement?

7           MR. KERR:  Objection.

8      A.    I would --

9      Q.    I am going to refer you to the

10 middle of the first bullet on page 18 of your

11 rebuttal report where you say that the

12 debtors do not believe that "The intercompany

13 balances on the debtor's books and records as

14 of the petition date accrued pursuant to

15 these agreements"?

16      A.    Yes, that's correct.  I still

17 believe that.

18      Q.    Okay.  And if you look at --

19      A.    Sorry for --

20      Q.    Being a little confusing?  It is

21 okay.  Okay.

22           If you look at Exhibit 6 to the

23 Disclosure Statement, which we marked as

24 Renzi Exhibit 6, and you look at the

25 discussion in transaction number 4 on page 21

Page 145

1                     M. RENZI

2 of 159, you see there is a discussion of

3 certain documentation that exists regarding a

4 PATTI relationship with a different ResCap

5 entity?

6      A.    It says PATTI and GMAC Mortgage.

7      Q.    Right.  Do you see in the

8 comments --

9      A.    Yes, excuse me.

10      Q.    -- that there is discussion of

11 documentation that exists?

12      A.    Yes, I do see that.  Says

13 "documentation exists reflecting a lending

14 relationship from PATTI to ResCap."

15      Q.    And there is no corresponding

16 discussion in the RFC RAHI comments that we

17 just looked at on page 22 of Exhibit 6 as

18 Exhibit 6?

19      A.    It says "As we discussed before,

20 there is no documentation reflecting this

21 intercompany relationship."

22      Q.    So why, if you explained earlier

23 that you said that there is no documentation

24 because the documentation you identified

25 didn't relate directly to this intercompany

Page 146

1                    M. RENZI

2       relationship, why did you treat it

3       differently for RAHI, which is intercompany

4       balance 6 and for PATTI, which is

5       intercompany balance 4?

6               MR. KERR:  Objection.

7          A.    I think the premise here is a

8       rebuttal to Mr. Fazio.  Mr. Fazio believes

9       that these balances are more valid than not

10      due to these agreements then the same would

11      hold true -- I think the point is that the

12      agreement moves up the stream above RFC.  And

13      thus, if this -- if this is true, that they

14      hold these agreements are valid, then the

15      same would hold for the bankruptcy standstill

16      provisions.

17         Q.    I am asking -- I am asking you

18      now, looking at -- why Exhibit 6 to Exhibit 6

19      has a discussion of the documentation that

20      exists relating to PATTI's intercompany

21      relationships with a different ResCap entity,

22      but in the RAHI intercompany, it simply says

23      "there is no documentation reflecting this

24      intercompany relationship"?

25              MR. KERR:  I am just going to

Page 147

M. RENZI

1

2    put an objection here.  Mr. Renzi can

3    answer.  But he is not here as a

4    30(b)6 witness on -- with respect to

5    Exhibit 6 to the Disclosure Statement.

6    He has explained to you what his

7    expert reports are.  If he has some

8    personal knowledge to answer your

9    question, he can answer it.  But he is

10    not here as 30(b)6 on this Disclosure

11    Statement.  On this aspect of it,

12    okay.

13         MS. MILLER:  Understood.  I

14    think I established that he is

15    personally familiar with Exhibit 6.

16    A.    Yes, we helped pull it together.

17 But Exhibit 6.  But I, you know, by no means

18 am an expert in or a fact witness for each

19 one of these balances.

20    Q.    Did you have any part in drafting

21 Exhibit 6?

22    A.    I think the majority of that was

23 done by the company.  There may have been

24 some formatting done by members of my team.

25         MR. KERR:  Atara, are you done

Page 148

1              M. RENZI

2       with the Disclosure Statement?  Or we

3       can keep it open.

4              MS. MILLER:  Keep it open.

5       Q.     Mr. Renzi, I am handing you a

6   document that was previously marked as

7   Westman Exhibit 19, and it's titled ResCap

8   Intercompany Transactions Draft For Lost

9   Product Purposes Only dated April 4, 2013.

10              Do you recognize this document?

11      A.     I do.

12      Q.     Is this a document that you

13  prepared?

14      A.      It's got FTI formatting but -- so

15  yes, we had some involvement in preparing

16  this.

17      Q.     Referring to page 6 of the

18  exhibit.  Where did FTI get the information

19  about the top seven intercompany balances to

20  include in this dec?

21      A.     The company.

22      Q.     What was this dec used for?

23      A.     Just give me one moment, please.

24      Q.     Sure.

25      A.     So I believe this dec was used

Plaintiff's Objection
148:5-151:19
Irrelevant (FRE 401,
402); incomplete
(FRE 106)

Page 149

1                    M. RENZI

2     for a meeting with the senior unsecured notes

3     is my recollection.

4          Q.    And looking at the second

5     transaction between -- on page 6, between

6     Residential Funding and ResCap, it is that

7     the balance generally arose out of the

8     operation of the company's centralized cash

9     management system.

10         A.    I see that.

11         Q.    Is that consistent with your

12    understanding of that intercompany balance?

13         A.    Yes.

14         Q.    Is it also your understanding

15    that the intercompany balance between

16    Homecoming Financial LLC and RFC listed as

17    number 3 on page 7 generally arose out of the

18    operation of the company's centralized cash

19    management system?

20         A.    Yes.

21         Q.    And is it also your understanding

22    that intercompany transaction number 4

23    between Passive Asset Transactions LLC and

24    GMAC Mortgage LLC generally arose out of

25    intercompany -- out of the operation of the

Page 150

1

M. RENZI

2     company's centralized cash management system?

3          A.     Yes, but I would say you need to

4     read it in the context with the bullets

5     further down.

6          Q.     What is that context?

7          A.     Well, as opposed to -- so, for

8     example, you were referring to PATTI and

9     GMACM.  It says "Documentation exists

10    reflecting lending relationship between PATTI

11    to ResCap."  Whereas, I think -- so, for

12    example, number 3, there is no documentation.

13    Reflecting intercompany relationship.

14    Reflecting -- it reflects documentation

15    exists reflecting the reverse from RFC to

16    Homecoming.  So there are a variety of

17    different items to point out between -- I

18    just wouldn't read it, I guess my point is I

19    wouldn't just read it exclusively one bullet.

20         Q.     I just want to know if the

21    balance generally arose out of the

22    operation -- if it's your understanding that

23    the balance generally arose out of the

24    operation of the company's centralized cash

25    management system?

Page 151

1                      M. RENZI

2          A.     That's my understanding.

3          Q.     Okay.  And is it your

4    understanding with respect to intercompany

5    transaction number 5 between Executive

6    Trustee Services and GMACM, that the balance

7    generally arose out of the operation of the

8    company's centralized cash management system?

9          A.     It's my understanding.

10         Q.     Is that also your understanding

11   with respect to intercompany transaction

12   number 6 between RFC and RFC Asset Holding II

13   LLC that the balance generally arose off the

14   operation of the company's centralized cash

15   management system?

16         A.     Well, the first sentence in a --

17   a paragraph of others.  So, yes, I mean, they

18   all have additional comments.  So it's not

19   exclusive.  But there are others.

20         Q.     Mr. Renzi, do you have experience

21   in other bankruptcy cases dealing with

22   companies that use centralized cash

23   management systems?

24         A.     Yes.

25         Q.     And --

Page 152

M. RENZI

1

2     A.     Or non-bankrupt companies, also.

3     Q.     And is it your experience that

4 centralized cash management -- have you been

5 involved in any company that uses a

6 centralized cash management system to

7 effectuate equity transactions?

8             MR. KAUFMAN:   Objection; form.

9     A.     I have been involved -- so I have

10 been involved with other companies with

11 centralized cash management that deal with

12 intercompany notes.  So -- and there are a

13 variety of different things including the way

14 they handle the intercompany notes.  Not

15 balances, but notes.

16     Q.     Have you ever been involved in --

17 have you ever been involved with a company

18 that used a centralized cash management

19 system where balances that accrued pursuant

20 to the centralized cash management process

21 were recharacterized from debt to equity?

22             MR. KERR:   Objection.

23     A.     I don't think so.

24     Q.     Have you been involved in all of

25 your experience in any case where debt

Plaintiff's
Objection
152:16-23
Irrelevant
(FRE 401,
402); unduly
prejudicial
(FRE 403)

Page 153

1                    M. RENZI

2    transactions have been recharacterized?

3         A.    I think so.  But it's been -- I

4    can't recall any one recently.  I have been

5    involved in this one for two years.

6         Q.    Can you recall any specific

7    example?

8         A.    Not at this moment.

9         Q.    Does ResCap continue to use a

10   centralized cash management system to

11   this day?

12        A.    It does.

13        Q.    And do intercompany balances

14   continue to accrue under the centralized cash

15   management?

16        A.    That's my understanding, yes.

17        Q.    How are postpetition intercompany

18   balances that are generated as a result of

19   the operation of the cash management process

20   being treated in bankruptcy?

21             MR. KERR:   Objection.

22        A.    I think they are being treated as

23   administrative claims.

24        Q.    As debt?

25        A.    No.

Plaintiff's Objection
153:9-23
Irrelevant (FRE 401,
402); lack of
personal knowledge
(FRE 602);
incomplete (FRE
106)

Page 154

1                    M. RENZI

2           MR. KERR:   Objection.

3       A.      Administration claims.

4       Q.    Mr. Renzi, you knew before you

5   started work on ResCap that intercompany

6   balances could -- that there was a

7   possibility that intercompany balances could

8   be recharacterized as equity by the

9   bankruptcy court, right?

10      A.     You are asking me before I

11  started working for ResCap?  Before I started

12  working for ResCap, I dealt with

13  international companies that are non-public.

14  I can't disclose them.  That dealt with

15  intercompany notes that were incredibly well

16  documented.  And had formal agreements where

17  they were formally followed, and they were

18  also -- there was a clearinghouse for every

19  month for those intercompany notes and there

20  was a much more formal process than my

21  experience here.

22      Q.     I think you testified you

23  believed you had worked on an engagement in

24  which debt transactions were recharacterized.

25  Is that your testimony?

Page 155

1          M. RENZI

2          A.     Yeah, I think so.  I can't recall

3     which one it was.

4          Q.     But you think you did?

5          A.     I think I did.  Yes.

6          Q.     So you knew before you came to --

7     before you started working on ResCap that

8     there was a possibility that under bankruptcy

9     rules, certain debt transactions could be

10    recharacterized as equity, right?

11         A.     I believe there -- I believe

12    there are certain instances where things can

13    be recharacterized as equity.

14         Q.     And you knew that before you

15    started working on ResCap, right?

16         A.     Yes.

17         Q.     Okay.  Did you ask the company

18    for information regarding intercompany

19    balances -- let me restate that.

20              When did you start asking the

21    company for information relating to

22    intercompany balances?

23         A.     I would say the spring of 2012.

24    Sometime in that point.  Before the

25    bankruptcy filing.

Plaintiff's
Objection
155:6-25
Irrelevant
(FRE 401,
402);
incomplete
(FRE 106)

Page 156

1            M. RENZI

2      Q.    Is it possible it was in December

3  of 2012?

4      A.    That would be --

5      Q.    That's way after, sorry.  My

6  pages are mixed up.  So spring of 2012?

7      A.    Yeah.

8      Q.    Before the filing, did you

9  understand what factors courts considered to

10 determine whether or not an intercompany

11 balance to be recharacterized?

12     A.    I mean, obviously, this is a

13 subject of great debate because we are here.

14 So -- and in the beginning, we certainly

15 asked many questions and discussed a variety

16 of different issues about the intercompany

17 balances and that's why these documents that

18 are presented before us have been created.

19 My understanding is that things to consider

20 with intercompany balances are whether or not

21 interest was paid, whether or not there are

22 formal documents that govern the balances,

23 whether or not there is principle repayment.

24 There is intent of repayment.  That those are

25 things that should be considered when

JSN Objection
156:8-157-:4
Calls for legal
conclusion;
impermissible lay
opinion (FRE
701, 702)

Page 157

1                M. RENZI

2   evaluating whether or not an intercompany

3   balance is, as you have you said, for

4   example, equity or debt.

5        Q.    You asked the company

6   specifically for information related to

7   factors that you and counsel understood

8   courts consider in doing that analysis before

9   the bankruptcy filing, right?

10             MR. KERR:   Objection.

11        A.    I believe, yes.   I think it was

12   in early spring 2012.

13        Q.    And the company provided as much

14   information as they could to you in the

15   spring 2012 before the bankruptcy filing,

16   right?

17             MR. KERR:   Objection.

18        A.    I believe that's correct.   I know

19   that it evolved because if there are e-mails

20   that were sent to me, I've, obviously,

21   produced all the e-mails, but there are a

22   number of discussions.   So I think there are

23   people in the accounting department that were

24   producing balances and accounting information

25   and not trying to practice law, so to speak.

Plaintiff's Objection
157:5-158:4, Irrelevant
(FRE 401, 402);
incomplete (FRE 106)

Page 158

1                    M. RENZI

2    So they were just trying to be responsive to

3    my questions or others with my direction and

4    questions regarding intercompany balances.

5         Q.    Did you send them a set of ten or

6    more specific questions relating to

7    intercompany -- the factors that courts

8    consider in evaluating intercompany balances?

9              MR. KERR:  Objection.

10        A.    We have discussed -- we have

11   discussed intercompany balances many times

12   with the company.  I don't remember

13   specifically trying to ask them legal factors

14   that govern whether or not -- that govern

15   these balances.  But I have asked numerous

16   times about as much information as we could

17   get.  Some of it prompted by the JSN

18   advisors, for example.

19        Q.    In all instances, did the company

20   endeavor to give you as much information as

21   it had or could provide in response to your

22   questions?

23              MR. KAUFMAN:  Objection.

24              MR. KERR:  Objection.

25        A.    I have no reason to believe

Plaintiff's Objection 158:19-159:2 Irrelevant (FRE 401, 402); incomplete (FRE 106)

12-12020-mg   Doc 5803-12   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Mark Renzi   Pg 159 of 194
Highly Confidential

Page 159

1       M. RENZI

2   otherwise.

3       Q.      Did you ever conclude that the

4   intercompany balances were not debt

5   transactions?

6       A.      By myself, no.

7       Q.      Did FTI ever conclude that the

8   intercompany balances were not debt

9   transactions?

10      A.      We relied on counsel to determine

11  whether or not, but we haven't had a specific

12  task to determine whether or not they are

13  equity or debt.

14      Q.      And is it your understanding that

15  counsel has determined that the intercompany

16  balances are equity?

17          MR. KERR:   Objection.

18      A.      I would let counsel speak for

19  themselves.

20      Q.     You haven't been instructed by

21  them one way or another?

22      A.     I think in terms of running

23  scenarios, we have certainly discussed the

24  scenarios.  In terms of coming up with a

25  global settlement, in which we have done in

Page 160

1                          M. RENZI

2    mediation, I probably can't speak to that.

3          Q.    Were you involved in settlement

4    discussions with the UCC relating to

5    intercompany transactions?

6                MR. KERR:  And with respect to

7          that, you can answer that question.

8          But, again, he, just be -- that in

9          light of the mediation

10         confidentiality, you can't disclose,

11         if you were, you can't disclose the

12         contents of it, but you can answer

13         that question.

14         A.    I was in discussions but the

15   content was under mediation.

16         Q.    And when did discussions with the

17   UCC relate to intercompany transactions

18   start?

19         A.    Well, discussions regarding

20   intercompany transactions and intercompany

21   balances started when they asked questions

22   regarding the documentation that was

23   available for them.  And I suspect that

24   the -- postfiling, because there wasn't an

25   UCC before filing, that they were asking

Page 161

1                      M. RENZI

2    questions about intercompany balances.

3        Q.    And was it your understanding

4    that you and the UCC were taking adverse

5    positions regarding the validity of the

6    intercompany balances?  Sorry, that the

7    debtors and the UCC?

8            MR. KERR:  Again, if you can

9        answer that question without -- I just

10       don't want you to disclose anything

11       that's subject to mediation

12       confidentiality.  And if you can

13       answer that question based on

14       information you received outside the

15       mediation.

16       A.    I think -- my recollection is

17   determining what the intercompany balances

18   were and how to treat them were all done

19   under mediation.  But we have, with -- in

20   terms of talking with the UCC.  In terms of

21   providing information to the UCC, we did and

22   Houlihan, we did that on numerous occasions

23   prior to mediation, with Houlihan, post --

24   pre and postfiling with the UCC, obviously,

25   postfiling.

Page 162

M. RENZI

1

2    Q.    I am going to hand you a document

3 that's been marked Westman Exhibit 15.

4    A.    I have a lot of paper in front of

5 me.  Is there anything I can put away?

6    Q.    You can put it all away.  I can

7 tell you when to take something new out.

8    A.    Okay.

9    Q.    Just to frame my questions, I am

10 not interested in delving into mediation

11 privileged communications.  I am interested

12 in understanding why this document, which was

13 produced by the UCC, is designated for

14 settlement discussions purposes only.

15    A.    I am sorry, which document?

16    Q.    This document, which was

17 previously marked as Westman Exhibit 14,

18 which is an E-mail from you to a number of

19 people.

20        MR. MARINUZZI:  Did you say 14?

21        MS. MILLER:  Exhibit 15, sorry,

22 I misspoke.  15, thank you.

23    Q.    It is an E-mail from you dated

24 September 17, 2012, to a number of people

25 including advisors for the UCC and

Page 163

1                       M. RENZI

2    AlixPartners and others, and it attaches a

3    document, which is labeled Privileged and

4    Confidential For Settlement Discussion

5    Purposes Only.  And I am trying to understand

6    what the basis for that designation is.

7              MR. KERR:  You are asking the

8         witness?

9              MS. MILLER:  Yes.  All I want to

10        know is whether when he sent this

11        E-mail in this document, he was

12        actively involved in settlement

13        discussions with the UCC regarding

14        intercompany balances and whether they

15        were taking adverse positions to one

16        another such that there could be a

17        settlement privilege on this document.

18             MR. KERR:  If you know, Mark.

19        A.   I don't know.  It just says "MoFo

20    draft, 4-24-2012" at the top.

21        Q.    In what context were you

22    providing this document to the UCC's

23    advisors?

24        A.    I think they asked for as much

25    information that we had regarding

Page 164

1                        M. RENZI

2    intercompany balances and the intercompany

3    relationships.  So we were providing what we

4    had.  And it may have been -- it appears to

5    be a draft.

6         Q.   Were you involved in preparing

7    the draft document?

8              MR. KERR:  Just -- objection.

9         You're talking about the draft -- what

10        exactly when you say "the draft

11        document," what are you referring to?

12             MS. MILLER:  Sorry, the first

13        attachment, which is entitled

14        Intercompany Balance Analysis Based on

15        Summary of Top Ten Intercos.

16        A.   I believe I was involved with

17   discussions with MoFo and the company while

18   it was being compiled.  But we talked about

19   this subject many times.  So --

20        Q.   Were you actively engaged in

21   mediation discussions with the UCC in

22   September 2012 relating to intercompany

23   balances?

24        A.   I don't think so.

25        Q.   Were you actively engaged in

Page 165

1                    M. RENZI

2  settlement discussions outside of the context

3  of the mediation with the UCC in September of

4  2012?

5            MR. KERR:  Mr. Renzi personally?

6      Q.    Were you involved?

7            MS. MILLER:  Was Mr. Renzi or

8      FTI involved?

9      A.    Well, it was an evolving process.

10 So was this formal mediation at this point in

11 time?  I don't think Judge Peck was asked to

12 participate at this point in time, but that's

13 my recollection.  But were we discussing

14 information with the UCC about these over a

15 period of time prior to mediation, clearly

16 they were requesting, as this document is

17 evidence, requesting information, all the

18 information that we had, and my belief is we

19 provided substantially similar information

20 through the JSN and JSN advisors.  I don't

21 remember being adverse to them at this point

22 in time.  But that's my recollection.

23     Q.    Mr. Renzi, I am handing you a

24 document that's been previously marked as

25 Dondzila Exhibit 12, and it is an E-mail from

Page 166

1                    M. RENZI

2    Brian McDonald to Barb Westman, copying you

3    and others dated October 25, 2012, regarding

4    intercompany follow-up.

5               Do you see that document?

6         A.    I am on the E-mail, yes.

7         Q.    And you see the very last page of

8    the exhibit has a chart with entity and year

9    running across the top column, the top row.

10              Do you see that?

11        A.    I do.

12        Q.    Do you know what this chart is

13   reflecting?

14        A.    It just says "Legend X in AP,"

15   but I think I would have to go back and

16   understand the context for me to say any more

17   than that.

18        Q.    Okay.   So if you turn back to the

19   document -- the page with the Bates stamp

20   ending in '7038.   There is an E-mail from

21   Dabin Strauss to Brian McDonald and others in

22   which Dabin writes "Pursuant to Mark's E-mail

23   yesterday regarding intercompany

24   transactions, we would also like to analyze

25   financial statements for the 24 entities

Page 167

1                    M. RENZI

2    involved at the petition date."  It says,

3    "Attached is a complete list of the petition

4    date entities which have been marked from

5    those financial statements we have been able

6    to locate in the data room and relativity."

7         A.    This is the first time I have

8    seen this E-mail.  But I see the writing.

9         Q.    Do you understand that certain

10   ResCap subsidiaries filed stand-alone

11   financial statements?

12        A.    I think that they did.  But I --

13   meaning I would have thought GMAC and RFC,

14   since they are the main operating entities,

15   may have.  But I don't recall specifically.

16        Q.    Do you recall whether you

17   reviewed any stand-alone financial statements

18   filed by ResCap's subsidiaries?

19             MR. KAUFMAN:  Objection to form.

20        Just for clarification, when you say

21        "file," what do you mean?  So I

22        understand the question.

23             MS. MILLER:  I am going to

24        restate it because I think it is also

25        not true that they are stand-alones.

Plaintiff's Objection 167:9-15, Incomplete (FRE 106); lack of personal knowledge (FRE 602)

Page 168

                        M. RENZI

1      I think they are consolidated at the

2      subsidiary level.  So let me just

3      restate the question altogether.

4    Q.    Mr. Renzi, did you review any

5  stand-alone financial -- sorry.

6         Mr. Renzi, did you review any

7  financial statements prepared by ResCap's

8  subsidiaries?

9    A.    It's been awhile if I have.  But

10  I suspect that I did.

11   Q.    Do you recall -- do you recall

12  how those subsidiary audited financials

13  reflected intercompany balances?

14         MR. KERR:    Objection.

15   A.    I would say a couple of things.

16  I don't know if the financials were audited,

17  number one, and I don't recall, whether or

18  not, how they were reflected in the

19  intercompany balances.

20   Q.    Do you think if and how

21  intercompany balances are reflected on

22  subsidiary financials would be relevant to

23  your analysis of whether the intercompany

24  balances are valid debt transactions?

Plaintiff's
Objection
168:5-11
Irrelevant (FRE
401, 402); lack of
personal
knowledge (FRE
602); lack of
foundation (FRE
602, 901, 903);
incomplete (FRE
106)

JSN Objection
168:12-20
FRE 611(a) (Non-
responsive)

Page 169

1                    M. RENZI

2            MR. KERR:   Objection.

3       A.     Sorry, do you mind repeating the

4   question?

5       Q.     Do you think whether and how

6   intercompany balances are reflected on

7   subsidiary financials would be relevant to

8   your analysis of whether the intercompany

9   balances are valid debt transactions?

10              MR. KERR:   Objection.

11       A.     If they were presented in their

12   financial statements, it doesn't mean that

13   says that they are value -- valid

14   intercompany balances.   It was a method to

15   record things in the cash movement, for

16   example, as one item on the balance sheets.

17   So whether or not it was debt or not, I don't

18   think I was opining on that.

19       Q.     Mr. Renzi, I would like to show

20   you a document that was previously marked as

21   Westman Exhibit 7.   And looking at the bottom

22   of the first page, it's an E-mail from you to

23   Cathy Dondzila and Barb Westman dated

24   April 20, 2012, and the subject is "Bounce

25   intercompany follow-up."

Plaintiff's Objection
169:5-170:7
Irrelevant (FRE 401,
402); lack of
personal knowledge
(FRE 602); lack of
foundation (FRE
602, 901, 903)

Page 170

1                    M. RENZI

2        A.    Yeah, I see that.

3        Q.    Looking down at number 2, you

4   write, "Were any intercompany balances

5   reported in any public regulatory filings as

6   debt or equity?"

7        A.    I see that.

8        Q.    Why did you want to know that?        JSN Objection
                                                      170:3-12, Hearsay
9        A.    I think this was a compilation of      (FRE 802)

10  questions that we had from a variety of

11  different people, and we thought it was a

12  relevant question.

13       Q.    Why did you think it was a            Plaintiff's Objection
                                                      170:13-171:9
14  relevant question?                               Incomplete (FRE 106)

15       A.    We were trying to assess each one

16  of the intercompany balances and to be as

17  diligent as we possibly could and to provide

18  as much information, not only to ourselves,

19  but to MoFo and then, obviously, to other

20  third-parties that have questions regarding

21  it.  So we were trying to be unbiased as to

22  the way we were asking the questions.  We

23  were trying to just skip to the facts, and

24  that is why Question 2 would be relevant.  In

25  retrospect, I don't think they were in a

Page 171

1                    M. RENZI

2    position necessarily to opine on the legality

3    of that that is implied by that question, but

4    nonetheless, we did ask it.   It is not a bad

5    E-mail.

6        Q.    You have got some good responses

7    with a lot of information, also.

8        A.    You got the timing right, it fits

9    into the spring of 2012.

10              MS. MILLER:  Let's go off the

11         record for a few minutes.  I am close

12         to done.

13              MR. KERR:  Sure.

14              THE VIDEOGRAPHER:  The time is

15         2:56; we are going off the record.

16              (Whereupon, a recess was held.)

17              THE VIDEOGRAPHER:  The time is

18         3:06; we are back on the record.

19    BY MS. MILLER:

20        Q.    Mr. Renzi, in your liquidation

21    analysis, the JSNs would still retain any

22    claims they have against Ally, right?

23        A.    I believe so.

24        Q.    Okay.  And you didn't attribute

25    any value to those claims in the liquidation

Page 172

1                    M. RENZI

2    analysis, right?

3         A.    No.

4         Q.    And in the liquidation analysis,

5    and in the plan, I guess, the FHA VA loans

6    are subordinated?

7         A.    FHFA?

8         Q.    Sorry, yes, the FHFA.

9         A.    Everybody gets it wrong.

10        Q.    Too much FH.  FHFA claims are

11   subordinated, right?

12        A.    It depends.

13        Q.    And what does it depend on?

14        A.    Well, liquidation analysis has

15   two scenarios.  The high scenario they are

16   subordinate with the rest of the securities

17   claims.  The low, they are paired to GUC at

18   certain legal entities.

19        Q.    Did you consider a scenario in

20   the liquidation analysis under which the

21   Monoline claims were subordinated?

22        A.    I don't believe so.

23        Q.    Why not?

24        A.    I mean, the liquidation analysis

25   could have a thousand scenarios or more.  So

Page 173

1                      M. RENZI

2    I thought it was reasonable to present the

3    information in the way it was presented.

4         Q.    And if you had subordinated the

5    Monoline claims or the RMBS claims, that

6    would have resulted in higher recovery to the

7    JSNs under the liquidation analysis, right?

8         A.    No.

9         Q.    No?

10        A.    It depends.

11        Q.    What does it depend on?

12        A.    Well, I mean, if you move

13   one lever, let's say, just for argument's

14   sake, there are 100 levers, 100 meaningful

15   levers, if you move one lever such as if

16   there is an AFI contribution in a liquidation

17   analysis, there would be many other things

18   that will change.  Because -- and there are

19   how long to recover, what the claims of other

20   constituents could be.  I mean, there have

21   been assertions from the RMBS trustees of up

22   to $44 billion in claims.  I am sure under

23   certain scenarios, they would argue and fight

24   to get as big a claim as they possibly could

25   under a liquidation analysis.  But what is

Page 174

M. RENZI

1
2  presented in the liquidation analysis, in my

3  opinion, is reasonable.

4       Q.    Looking at the Disclosure

5  Statement, which is Renzi Exhibit 6.

6       A.    Could I just open one of the

7  smaller ones?

8            MR. KERR:  No, it is in this

9       big one.

10      Q.    Looking at page 51 of 201 on

11  the top.

12      A.    Further back?

13      Q.    No, to the front.  51 in the

14  first count.

15      A.    First count, 51 of 201.  Almost

16  there.

17      Q.    Mr. Renzi, did you review the

18  section of the Disclosure Statement related

19  to -- sorry, the discussion in the Disclosure

20  Statement relating to the compromise of

21  intercompany balances?

22            MR. KERR:  Objection.  Reviewed

23       at any time?

24            MS. MILLER:  Yes.

25      A.    Yes.

Page 175

                    M. RENZI

1

2      Q.    Did you draft this section?

3      A.    No.

4      Q.    Looking at page 40, towards the

5  bottom of the paragraph.

6      A.    40 of the document or 50 of

7  the --

8      Q.    I am confusing.  Yes, page 50 of

9  201 on the top, page 40 of the actual

10  document.

11      A.    Yep.  I am there.

12      Q.    It says that "The debtor's books

13  and records reflect various intercompany

14  payables and receivables amongst various

15  debtor entities as of the petition date."

16          Do you see that?

17      A.    I do.

18      Q.    And then it goes on to say that

19  "These balances were accumulated through tens

20  of thousands separate transactions over a

21  period of years from a course of dealing

22  whereby certain debtors made payments under

23  prepetition loan agreements for the benefit

24  of other debtors or by operation of the

25  debtors centralized cash management system."

Page 176

1                    M. RENZI

2          Do you see that?

3     A.    I do see that.

4     Q.    And do you believe that that's an

5 accurate statement?

6     A.    I think it's a partial

7 description but an accurate statement.

8     Q.    Looking at page 51 of 201 on the

9 top, Page 41 on the bottom, looking at the

10 second full paragraph.

11     A.    Starting with "after"?

12     Q.    Starting with after.  The second

13 sentence says, "While the intercompany

14 balances generally were a result of the

15 debtor's shared cash management system" and

16 then continues, you agree, again, that the

17 intercompany balances generally were a result

18 of the debtor's shared cash management

19 system, right?

20     A.    Well, it says it but that's

21 saying it in whole.  It doesn't mean that

22 one intercompany balance is different than

23 another.

24     Q.    Understood.

25     A.    So, yes, it says that up here in

Page 177

M. RENZI

1
2  that paragraph.

3      Q.    Okay.  And it also says, just

4  before that, it says that "After conducting

5  the analysis, the debtors and creditors

6  committee, based on their independent review

7  and analysis, believe that the intercompany

8  balances reflected in the schedules lack many

9  of the indicia of true debt and likely would

10  not be enforceable intercompany balances."

11      Mr. Renzi, based on your personal

12  review of intercompany balances and the

13  related documentation and information, do you

14  believe that the intercompany balances had

15  any indicia of equity transactions?

16      MR. KERR:  Objection.

17      A.    I believe this statement at the

18  top is correct.  That the top of that

19  paragraph.  So is this is true, I believe

20  that it is one in the same.  I think it is

21  binary.  If it is not debt, then it is not

22  enforceable.  And that's equity would be not

23  enforceable.  Or subordinated.  Which, I

24  think, could be used interchangeably in that

25  sentence.  Yes, so I agree with the sentence

Page 178

M. RENZI

1    at the top of the page.  Excuse me in that --

2    in the paragraph starting "after," excuse me.

3         Q.    Right smack in the middle of the

4    page?

5         A.    In the middle of the page.

6         Q.    Do you believe that the

7    intercompany balances had indicia of equity

8    transactions?

9         A.    I think it's a derivation of that

10   sentence.  So based on that premise, yes.

11        Q.    Did you do an analysis of whether

12   the various counterparties to the

13   intercompany transactions could have engaged

14   in equity transactions when the intercompany

15   balances were accrued?

16        MR. KERR:  Objection.

17        A.    Could you do that again, please?

18        Q.    Yeah.  Did you look, for example,

19   when an intercompany is flowing cash from a

20   subsidiary to a parent, did you analyze and

21   consider whether that subsidiary could make a

22   distribution to its parent?

23        A.    Well, I think your question

24   presupposes that we could analyze every

Page 179

1                          M. RENZI

2    single one of the transactions that occurred

3    between legal entities and, no FTI did not do

4    that.  I don't think anybody, even the

5    debtors, could probably do that.  I think

6    somewhere along here, it says that there were

7    many transactions creating these balances.

8         Q.    Did you do it for any

9    transaction?

10        A.    Tens of thousands of separate

11   transactions over a period of years from a

12   course of dealing.

13        Q.    Did you do that analysis for any

14   intercompany transactions?

15        A.    We answered questions of

16   ourselves that, when discussing with counsel,

17   we felt were relevant to determine whether or

18   not these balances reflected or could be

19   considered debt.  And those criteria would

20   include whether or not principle repayments

21   were being made.  Whether or not there were

22   documentation to support the balance in the

23   proper economics and the right direction of

24   that balance.  Whether or not there was

25   interest being paid and accrued.  Whether or

Page 180

M. RENZI

1
2  not there was a term for the intercompany

3  balances, a formal term for repayment.  And

4  whether or not -- another consideration if

5  there was debt forgiveness, there was an

6  arm's length process in evaluating it.  Those

7  things would be considered.

8      Q.    Mr. Renzi, do you understand that

9  in consideration -- in considering whether a

10 transaction should be recharacterized,

11 really, you are looking at whether the

12 transaction, when it happened, was a debt

13 transaction or an equity transaction?

14      MR. KERR:  Objection.

15     A.    I would defer to counsel for that

16 nuance.  I wouldn't have had an opinion other

17 than discussing it with counsel before we

18 applied financial analysis to that.

19     Q.    So I want to focus not on your

20 analysis or consideration of whether the

21 transaction is debt or not.  I want to focus

22 on what analysis you did to determine whether

23 the transaction was a proper equity

24 transaction or not.

25     MR. KERR:  Objection.  Go ahead.

Page 181

1                M. RENZI

2       A.    I understood.  I understand your

3   question.

4       Q.    So did you consider whether, if

5   the intercompany balances were accrued as a

6   result of equity transactions, whether those

7   transactions would have violated internal

8   ResCap or Ally policies?

9       A.    You keep using a different set of

10  language than I would say what we have done.

11  They may be one in the same.  But the

12  considerations that I listed before are

13  considerations that we took when evaluating

14  intercompany balances.  So whether or not you

15  are saying -- whether or not I was asking

16  myself whether or not they were equity, we

17  were doing the opposite to determine whether

18  or not they were debt and they had indicia of

19  debt.  So could it be a corollary that by

20  determining whether or not their debt is

21  equity, I suppose you can say that.  But I

22  don't think of it in the same context that

23  you are presenting the question.

24      Q.    So did you ever look at it

25  through the lens of is this a valid equity

Plaintiff's
Objection
181:24-182:6
Incomplete (FRE
106)

Page 182

1                        M. RENZI

2    transaction as opposed to is this a proper

3    debt transaction?

4                MR. KERR:    Objection.

5        A.    I looked at it from the

6    perspective of is this debt.

7        Q.    Looking at Page 42?

8        A.    Top or bottom?

9        Q.    Sorry, 52 top, 42 bottom, thank

10   you.  Romanette iii in the bottom paragraph,

11   says "The inability to reach consensual

12   agreement with numerous creditor

13   constituencies absent consensual resolution

14   of the intercompany balances"?

15       A.    I am on -- there is two Romanette

16   iii's, where are we?

17       Q.    Bottom one.  The last paragraph

18   Romanette iii.  On the bottom paragraph.

19       A.    Got it.

20       Q.    Okay.    Inability -- let me start

21   again.  Page 52 of 201 in Renzi Exhibit 6,

22   Romanette iii in the bottom paragraph reads

23   "The inability to reach consensual agreement

24   with numerous creditor constituencies absent

25   consensual resolution of the intercompany

Plaintiff's
Objection
182:20-184:3
Irrelevant (FRE
401, 402); lack of
personal
knowledge (FRE
602); lack of
foundation (FRE
602, 901, 903);
incomplete (FRE
106)

Page 183

1                        M. RENZI

2    balances and inextricably related issues."

3               Which creditor constituencies

4    were insisting on resolution of the

5    intercompany balances?

6               MR. KERR:   Objection.

7        A.    I think that was part of the

8    mediation.

9               MS. MILLER:   There has to be

10       something that supports the statement

11       in the Disclosure Statement.

12              MR. KERR:   There may be.

13       Mr. Renzi is not the 30(b)6.   If you

14       want to ask if he knows of what it

15       does.  He is not the 30(b)6 on this

16       statement in the Disclosure Statement.

17       If you want to ask --

18              Mr. Renzi, I think it is -- I

19       believe what she is asking you is

20       whether or not, if you know, who the

21       creditors that are being referred

22       here, and if you know that, you can

23       tell her.

24       A.    I believe it to be the unsecured

25   creditors committee.   You are asking a

Page 184

1              M. RENZI

2    specific constituent within that, that I

3    think only know that through mediation.

4         Q.    And do you know what the

5    inextricably related issues being referred to

6    in this paragraph are?

7         A.    I just want to read the full

8    paragraph to myself to understand the context

9    a little better.

10        Q.    Sure.

11        A.     I believe that it's referencing

12   that these balances arose over a period of

13   time, and to unwind every single transaction

14   would be incredibly difficult to do.   That's

15   what I think it's getting at.   So to litigate

16   every movement and balance, I think, would

17   be -- there wouldn't be enough funds in the

18   estate to do that.   There are tens -- as it

19   says prior to this, there are tens of

20   thousands of -- let's see what it says.

21   "Tens of thousands of transactions over a

22   period of years."   That would be pretty

23   extensive, in my opinion.

24        Q.    How is that different from

25   Romanette ii which says that the decision to

Page 185

1                         M. RENZI

2  compromise the intercompany balances is

3  reasonable in consideration of --

4  Romanette ii says "the costly and time

5  assuming litigation that would result from

6  any effort to enforce the fugitive of

7  intercompany balances"?

8              MR. KERR:  Again, I object.

9              If -- Mr. Renzi, if you have

10        testimony on that, you can give that,

11        too.

12              But he is not your 30(b)6.  He

13        is not our 30(b)6 on meaning of the

14        Disclosure Statement.

15              Mr. Renzi, if you have personal

16        knowledge, you can answer.

17        A.    I just believe they are

18  corollaries.

19        Q.    Mr. Renzi, was there anyone at

20  FTI more involved than you in the collection

21  and assessment of information related to

22  intercompany balances?

23        A.    I would say Gina Gutzeit wrote an

24  expert report on intercompany balances.  So

25  she may be.  But, yes, in the earlier periods

Page 186

1                          M. RENZI

2   of this case, people at my direction were

3   gathering information for me.   So I say I was

4   heavily involved in that part.   But I would

5   say myself and Gina.

6        Q.      Was Gina involved in the review,

7   collection, review, and analysis of

8   intercompany related materials before she

9   began working on her expert reports submitted

10  in connection with Phase II?

11       A.      I can't speak to how much Gina

12  did in regards to that.

13       Q.      Did you work with Gina on that

14  before she started preparing her expert

15  report?

16       A.      We did separate things.   Gina was

17  doing separate things than I was doing.   So

18  she may have done it in another context.   We

19  didn't specifically work on this together.

20  It seems like I have been writing a few

21  expert reports recently.   So while she was

22  writing hers, we were not working together on

23  hers.   Because I was busy writing the ones

24  that we are reviewing here.

25       Q.      And just so my questions were

Plaintiff's
Objection
186:6-187:11
Irrelevant (FRE
401, 402); lack
of personal
knowledge
(FRE 602);
incomplete
(FRE 106)

Page 187

                        M. RENZI

1

2    clear, in the era before you were drafting

3    expert reports, when you were asking

4    Miss Westman and Ms. Dondzila for information

5    and collecting that and reviewing that

6    related to the intercompany balances, were

7    you working with Gina on those issues?

8         A.    She may have been working on them

9    for separate reasons, but we weren't working

10   on them together at that point in time, that

11   I recall.

12        Q.    Okay.

13        A.    There could have been.  But I

14   don't think so.

15             MS. MILLER:  I don't have

16        anymore questions.  Thank you very

17        much for your time.

18

19

20    (Continued on next page to include

21   jurat.)

22

23

24

25

Page 188

1                         M. RENZI

2

3              MR. KERR:  Anybody else have any

4       questions?  Good, I think we are done.

5              Thank you.

6              THE VIDEOGRAPHER:  The time is

7       3:26; this is the end of the

8       deposition tape labeled 6, November 6,

9       2013.

10             (Whereupon, at 3:26 p.m., the

11       Examination of this Witness was

12       concluded.)

13

14

15       _____

                 MARK RENZI

16

    Subscribed and sworn to before me

17  this _____ day of _____, 2013.

18  _____

         NOTARY PUBLIC

19

20

21

22

23

24

25

Highly Confidential

Page 189

1

2            E X H I B I T S

3

4

5   EXHIBIT      EXHIBIT                    PAGE

6   NUMBER       DESCRIPTION

7   Exhibit 1    Expert Report of Mark        27

8                Renzi Dated

9                October 18, 2012

10  Exhibit 2    RCUCCJSN 11241765            84

11               through '99

12  Exhibit 3    RCUCCJSN 30047089            84

13  Exhibit 4    RCUCCJSN 11874351            92

14               through '4364

15  Exhibit 5    Expert Report of Mark       105

16               Renzi Intercompany

17               Balances dated

18               11/1/2013

19  Exhibit 6    Corrected Disclosure        138

20               Statement with

21               Exhibits filed on

22               August 23, 2013

23

24

25

Page 190

1

2                        I N D E X

3

4    EXAMINATION BY                          PAGE

5    MS. MILLER                                   5

6

7

8

9    INFORMATION AND/OR DOCUMENTS REQUESTED

10   INFORMATION AND/OR DOCUMENTS          PAGE

11                    (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 191

1

2        C E R T I F I C A T E

3

4   STATE OF NEW YORK        )
                            :  SS.:
5   COUNTY OF NASSAU         )

6

7        I, REBECCA SCHAUMLOFFEL, a Notary

8   Public for and within the State of New York,

9   do hereby certify:

10       That the witness whose examination

11  is hereinbefore set forth was duly sworn and

12  that such examination is a true record of the

13  testimony given by that witness.

14       I further certify that I am not

15  related to any of the parties to this action

16  by blood or by marriage and that I am in no

17  way interested in the outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto

19  set my hand this 6th day of November, 2013.

20

        _____

21            REBECCA SCHAUMLOFFEL

22

23

24

25

Page 192

1                           WITNESS ERRATA SHEET

     Witness Name: Mark Renzi
2    Case Name: In Re Residential Capital LLC
3    Date Taken: November 6, 2013
4     Page #_____  Line #_____
5         Should Read:  _____
6         Reason for Change:  _____
7

      Page #_____  Line #_____
8

          Should Read:  _____
9

          Reason for Change:  _____
10

11    Page #_____  Line #_____
12        Should Read:  _____
13        Reason for Change:  _____
14

      Page #_____  Line #_____
15

          Should Read:  _____
16

          Reason for Change:  _____
17

18    Page #_____  Line #_____
19        Should Read:  _____
20   Reason for Change:  _____
21

     Witness Signature:  _____
22

23

24

25

**Deposition Errata Sheet**

*In re Residential Capital, LLC, et al.,*
**Case No. 12-12020(MG)**

Deponent:            Mark Renzi
Deposition Date:     November 6, 2013

| Citation | Testimony |
|----------|-----------|
| 9:7 | to understand its business |
| 9:8 | and understand some |
| 11:15 | there ~~has~~ have been |
| 26:25 | ~~2012~~ 2013 |
| 27:4 | October 18, ~~2012~~ 2013 |
| 43:2 | ~~deficiencies~~ deficiency claims |
| 49:3 | Paragraphs 33 and 34 |
| 57:13 | to postpetition interest |
| 57:14 | to postpetition interest |
| 66:8 | ; |
| 72:19 | ~~Veil Peterson~~ veil piercing |
| 76:13 | FHFA |
| 76:14 | ~~VA~~ mortgage assets.  What are FHFA ~~VA~~ mortgage |
| 77:16 | FHFA ~~VA~~ |
| 77:21 | FHFA ~~VA~~ |
| 78:3 | FHFA ~~VA~~ |
| 79:21 | FHFA |
| 79:22 | ~~VA~~ |
| 80:3 | FHFA ~~VA~~ |

| Citation | Testimony |
|----------|-----------|
| 80:25 | FHFA ~~VA~~ |
| 83:7 | FHFA ~~VA~~ |
| 83:16 | FHFA ~~VA~~ |
| 107:6 | good estimates |
| 125:9 | PAT~~T~~I |
| 126:5 | PAT~~T~~I |
| 128:23 | PAT~~T~~I |
| 142:25 | PAT~~T~~I |
| 143:11 | PAT~~T~~I |
| 145:4 | PAT~~T~~I |
| 145:6 | PAT~~T~~I |
| 145:14 | PAT~~T~~I |
| 146:4 | PAT~~T~~I |
| 146:20 | PAT~~T~~I |
| 150:8 | PAT~~T~~I |
| 150:10 | PAT~~T~~I |
| 148:22 | deck |
| 148:25 | deck |
| 172:5 | FHFA ~~VA~~ |

Date:     18 Nov 2013

Signed:   _Mark Renzi_

ny-1117581