Page 1

```
 1                    J. YOUNG
 2   UNITED STATES BANKRUPTCY COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   -----------------------------x
     In re:                       : Chapter
 4   RESIDENTIAL CAPITAL, LLC,     : Case No. 12-12020(MG)
     et al.,                       : Jointly Administered
 5            Debtors.            :
     -----------------------------x
 6   RESIDENTIAL CAPITAL, LLC,     :
     et al.,                       :
 7            Plaintiffs,         :
          v.                      : Adversary Proceeding
 8   UMB BANK, N.A., as successor  : No. 13-01343(MG)
     indenture trustee under that  :
 9   certain indenture, dated as of:
     June 6, 2008; and WELLS       :
10   FARGO BANK, N.A., third       :
     priority collateral agent and :
11   collateral control agent under:
     that certain Amended and      :
12   Restated Third Priority Pledge:
     and Security Agreement and    :
13   Irrevocable Proxy, dated as of:
     December 30, 2009,            :
14            Defendants.         :
     -----------------------------x
15   OFFICIAL COMMITTEE OF         :
     UNSECURED CREDITORS, on behalf:
16   of the estates of the Debtors,:
          Plaintiff,             :
17          v.                   : Adversary Proceeding
     UMB BANK, N.A., as successor  : No. 13-01277(MG)
18   indenture trustee under that  :
     certain Indenture, dated as of:
19   June 6, 2008; and WELLS       :
     FARGO BANK, N.A. third        :
20   priority collateral agent and :
     collateral control agent under:
21   that certain Amended and      :
     Restated Third Priority Pledge:
22   and Security Agreement and    :
     Irrevocable Proxy, dated as of:
23   December 30, 2009,            :
            Defendants.          :
24   -----------------------------x
     REPORTED BY: KATHY S. KLEPFER
25   JOB NO. 66942
```

**Yellow Highlighting** = JSN Designation
**Pink Highlighting** = Plaintiff's designation
or counter-designation
**Orange Highlighting** = Joint Designation

The Debtors and the Committee object to the JSNs' use of the deposition of Mr. Young on the ground that this deposition may not be used under Bankruptcy Rule 7032 except to the limited extent that Mr. Young was designated as the Debtor's Rule 30(b)(6) witness with respect to the Tax Allocation Agreement.

The Debtors' counter-designations reflected herein are to be admitted, if at all, only upon admission of the JSNs' corresponding affirmative designation.

VIDEOTAPED DEPOSITION

OF

JAMES YOUNG

New York, New York

November 6, 2013

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 2 of 213

Page 2

1                    J. YOUNG

2               November 6, 2013

3                  9:05 a.m.

4           Videotaped deposition of JAMES

5       YOUNG, held at Kirkland & Ellis, LLP,

6       601 Lexington Avenue, New York, New

7       York, before Kathy S. Klepfer, a

8       Registered Professional Reporter,

9       Registered Merit Reporter, Certified

10      Realtime Reporter, Certified Livenote

11      Reporter, and Notary Public of the State

12      of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 3 of 213

Page 3

1                          J. YOUNG

2                     A P P E A R A N C E S:

3    MORRISON & FOERSTER

4    Attorneys for the Debtors

5         1290 Avenue of the Americas

6         New York, New York  10104

7    BY:  DANIEL MATZA-BROWN, ESQ.

8

9    KRAMER LEVIN NAFTALIS & FRANKEL

10   Attorneys for the Committee of Unsecured Creditors

11        1177 Avenue of the Americas

12        New York, New York  10036

13   BY:  NORMAN SIMON, ESQ.

14

15   MILBANK TWEED HADLEY & McCLOY

16   Attorneys for the Ad Hoc Committee of Junior

17   Secured Creditors

18        International Square Building

19        1850 K Street, N.W.

20        Washington, D.C.  20006

21   BY:  DAVID COHEN, ESQ.

22        One Chase Manhattan Plaza

23        New York, New York  10005

24   BY:  NIKKI NIELSON, ESQ.

25

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 4 of 213

Page 4

1                          J. YOUNG

2          A P P E A R A N C E S:  (Cont'd.)

3

4   KIRKLAND & ELLIS

5   Attorneys for Ally Financial, Ally Bank, and the

6   Witness

7          655 Fifteenth Street, N.W.

8          Washington, D.C.   20005

9   BY:  JUDSON BROWN, ESQ.

10          JODI WU, ESQ.

11          - AND -

12   ALLY FINANCIAL

13          200 Renaissance Center

14          Detroit, Michigan   48265

15   BY:  FRANCIS KUPLICKI, ESQ.

16

17   REED SMITH

18   Attorneys for Wells Fargo Bank

19          599 Lexington Avenue

20          New York, New York   10022

21   BY:  ZACHARY GELACEK, ESQ. (By telephone)

22

23

24

25

1                    J. YOUNG

2

3          A P P E A R A N C E S:  (Cont'd.)

4

5   SEWARD & KISSEL

6   Attorneys for US Bank

7        One Battery Park Plaza

8        New York, New York  10004

9   BY:  DALE CHRISTENSEN, JR., ESQ.

10

11  KELLEY DRYE & WARREN

12  Attorneys for UMB Bank

13       101 Park Avenue

14       New York, New York  10178

15  BY:  JASON ADAMS, ESQ. (By telephone)

16

17  ALSO PRESENT:

18       MATTHEW SMITH, Legal Video Specialist

19

20

21

22

23

24

25

1          J. YOUNG

2          THE VIDEOGRAPHER:   This begins tape

3     labeled number 1 of the videotaped

4     deposition of James Young in the matter of

5     In re Residential Capital, LLC, et al., for

6     the United States Bankruptcy Court for the

7     Southern District of New York.

8          This deposition is being held at 601

9     Lexington Avenue in New York, New York, on

10    November 6, 2013 at approximately 9:05 A.M.

11    My name is Matthew Smith for TSG Reporting,

12    Incorporated.  I'm the legal video

13    specialist.  The court reporter is Kathy

14    Klepfer, in association with TSG Reporting.

15         Will counsel please introduce yourself

16    for the record.

17         MR. COHEN:  David Cohen, Milbank Tweed

18    Hadley & McCloy, with my colleague Nicole

19    Nielson, on behalf of the JSN noteholders,

20    the Ad Hoc Group, and the Notes Trustee.

21         MR. BROWN:  Judson Brown, Kirkland &

22    Ellis, on behalf of Ally Financial, Ally

23    Bank, and the witness.

24         MR. SIMON:  Norm Simon of Kramer Levin

25    on behalf of the Committee of Unsecured

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 7 of 213

Page 7

1              J. YOUNG

2    Creditors.

3              MR. CHRISTENSEN:  Dale Christensen of

4    Seward & Kissell on behalf of US Bank.

5              MR. MATZA-BROWN:  Daniel Matza-Brown

6    from Morrison & Foerster LLP on behalf of

7    the debtors.

8              THE VIDEOGRAPHER:  Thank you, and the

9    will court reporter please swear in the

10   witness.

11              * * *

12   J A M E S   Y O U N G, called as a

13        witness, having been duly sworn by a Notary

14        Public, was examined and testified as

15        follows:

16   EXAMINATION BY

17   MR. COHEN:

18        Q.    Good morning, Mr. Young.

19        A.    Good morning.

20        Q.    As you just heard, I'm David Cohen.  I

21   represent the Ad Hoc Group of JSN Noteholders

22   and the Notes Trustee.

23              Have you ever been deposed before?

24        A.    Yes.

25        Q.    How many times?

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 8 of 213

Page 8

<sup>1</sup>                        J. YOUNG

<sup>2</sup>        A.    At least two.

<sup>3</sup>        Q.    When was the last time you were

<sup>4</sup>   deposed?

<sup>5</sup>        A.    During the examiner process for the --

<sup>6</sup>   for the bankruptcy proceeding.

<sup>7</sup>        Q.    How long did that deposition last?

<sup>8</sup>        A.    I don't recall exactly, but probably

<sup>9</sup>   six to seven hours.

<sup>10</sup>        Q.    When did that deposition occur?

<sup>11</sup>        A.    I don't recall the exact date.

<sup>12</sup>        Q.    Do you recall approximately, month and

<sup>13</sup>   year?

<sup>14</sup>        A.    First quarter of this year.

<sup>15</sup>        Q.    Prior to that, when was the -- the

<sup>16</sup>   other time that you were deposed?

<sup>17</sup>        A.    Many, many years ago, ten,

<sup>18</sup>   fifteen-plus years ago for a divorce that was in

<sup>19</sup>   our firm where I was at the time.  Not mine, but

<sup>20</sup>   somebody who reported to me was going through a

<sup>21</sup>   divorce.  I was deposed to give some information

<sup>22</sup>   about their financial status.

<sup>23</sup>        Q.    Okay.  When you were deposed by the

<sup>24</sup>   examiner, did you take an oath like you took

<sup>25</sup>   this morning?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 9 of 213

Page 9

1                           J. YOUNG

2            MR. BROWN:   Objection to form.

3       A.    To the best of my recollection, yes.

4       Q.    Okay.  So you understand that you're

5   testifying under oath just like you would be in

6   a courtroom?

7       A.    Yes.

8       Q.    And that you will be subject to the

9   penalties of perjury if your testimony is not

10  truthful?

11      A.    Yes.

12      Q.    All right.  Cover some ground rules

13  that will hopefully help us speed you along

14  today.

15            It's very important --

16      A.    Actually, I'm sorry, I remember

17  another time I was deposed, if I could.

18      Q.    Okay.

19      A.    It was in a -- an SEC matter related

20  to ResCap, and that would have been

21  approximately a year ago.

22      Q.    And what was that SEC matter?

23      A.    Disclosure on rep and warrant issues.

24      Q.    Can you be more specific?

25      A.    I -- well, all I can say is the

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young     Pg 10 of 213

Page 10

1                          J. YOUNG

2    deposition -- the list of questioning was all

3    about what the disclosures were in the financial

4    statements of ResCap with respect to rep and

5    warrant, representations and warrants for

6    mortgages, the liabilities for mortgages sold by

7    ResCap, and the disclosure of the rep and

8    warrant obligation and those related matters.

9         Q.    During what period of time were the

10   disclosures at issue?

11        A.    I do not recall, but quite a bit in

12   the past, meaning I'm just speaking to the fact

13   that ResCap deregistered from the SEC, you know,

14   quite a while ago, three-plus, four years ago,

15   so it would have been somewhere between the time

16   ResCap was a first a filer, which to the best of

17   my recollection would have been the third

18   quarter of 2005, to when ResCap deregistered,

19   and I can't remember that exact timing, but it

20   was probably '09, '10, somewhere in there.

21        Q.    Did your testimony relate to your

22   responsibilities while you were employed at

23   ResCap?

24        A.    Yes.

25        Q.    Okay.  They did not -- your testimony

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young    Pg 11 of 213

Page 11

J. YOUNG

1
did not relate to your employment with Ally?

3        MR. BROWN:   Objection to form.

4    A.    Correct.

5    Q.    Okay.  So let's go back to some of the
6 ground rules.  The court reporter, although
7 we're taking a videotape, the court reporter is
8 actually making a transcript of everything
9 that's said.  So it's very important that only
10 one of us speak at a time.  So if you would let
11 me finish my question before you begin your
12 answer, and I'll let you finish your answer to
13 the best of my ability before I ask the next
14 question, we'll have a clean transcript, okay?

15    A.    Understood.

16    Q.    If any of my questions are vague,
17 unclear, ambiguous to you, please ask me or let
18 me know that and I'll do my best to clarify,
19 okay?

20    A.    Okay.

21    Q.    If you need to talk to your attorney
22 at any time, let me know and I'll do my best to
23 accommodate that.

24    A.    Okay.

25    Q.    And if you want to take a break, just

Page 12

<sup>1</sup>                              J. YOUNG

<sup>2</sup>  let me know and I'll do my best to accommodate

<sup>3</sup>  that as well.

<sup>4</sup>       A.    Okay.

<sup>5</sup>       Q.    What did you do to prepare for this

<sup>6</sup>  deposition?

<sup>7</sup>       A.    I met with counsel from Ally, Judson

<sup>8</sup>  Brown.  I met with counsel from the Debtors.

<sup>9</sup>       Q.    Okay.  Who from the Debtors did you

<sup>10</sup>  meet with?

<sup>11</sup>       A.    Sorry, the gentleman that is at the

<sup>12</sup>  end of the table here, and I think there were at

<sup>13</sup>  least one or two others in the room.  I don't

<sup>14</sup>  recall their names.

<sup>15</sup>       Q.    From the Debtors?

<sup>16</sup>       A.    Yes.

<sup>17</sup>       Q.    And it was Debtors' outside counsel?

<sup>18</sup>       A.    Yes.

<sup>19</sup>       Q.    How many people from your own law

<sup>20</sup>  firm, from Kirkland & Ellis, were there?

<sup>21</sup>       A.    Three at different times.

<sup>22</sup>       Q.    Okay.  How many times did you meet --

<sup>23</sup>       A.    Sorry.  Also in the room was in-house

<sup>24</sup>  counsel from Ally.

<sup>25</sup>       Q.    Who was that?

Page 13

1                        J. YOUNG

2        A.    Frank Kuplicki, who is at the table.

3        Q.    How many times did you meet with

4    lawyers to prepare for your deposition?

5              MR. BROWN:  Objection to form.

6        A.    Once.

7        Q.    When did that happen?

8        A.    Yesterday.

9        Q.    How long did you spend with them?

10       A.    Total time was approximately 9:30 to 5

11   P.M.  So eight, eight hours.  Eight to eight and

12   a half hours.

13       Q.    During that time, was counsel for the

14   Debtor present the entire time?

15       A.    No.

16       Q.    Of that eight, eight and a half hours,

17   how many hours was counsel for the Debtor there?

18       A.    Approximately two to three.

19       Q.    And was that at the beginning, the

20   end, middle of your prep session?

21       A.    Beginning.

22       Q.    And what did you discuss with counsel

23   when counsel for the Debtors were there?

24             MR. BROWN:  Objection form.  I

25        instruct you not to answer.

Page 14

1                          J. YOUNG

2          MR. COHEN:  On what basis?

3          MR. BROWN:  Privilege.

4          MR. COHEN:  With a third party there?

5          MR. BROWN:  Third party?  Debtors'

6     counsel.  They're not a third party.

7          MR. COHEN:  They're a third party

8     vis-a-vis your client.

9          MR. BROWN:  No, they're not.  We've

10    got a common interest with the Debtors.

11 BY MR. COHEN:

12    Q.    Are you going to answer my question?

13          MR. BROWN:  I instruct you not to

14    answer, Jim.

15    A.    No, I can't answer your question.

16    Q.    Other than meeting with counsel

17 yesterday for eight hours, what did you do to

18 prepare for the deposition?

19          MR. BROWN:  Objection to form.

20    Mischaracterizes testimony.

21    A.    I just met with counsel, reviewed

22 documents yesterday, and that was the extent of

23 my preparation.

24    Q.    Did you review any transcripts of

25 other depositions that have been taken in this

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 15 of 213

Page 15

<sup>1</sup>                          J. YOUNG

<sup>2</sup>   case?

<sup>3</sup>       A.    No.

<sup>4</sup>       Q.    What documents did you review during

<sup>5</sup>   your preparation for this deposition?

<sup>6</sup>       A.    Oh, there were various documents,

<sup>7</sup>   including agreements, e-mails, certain --

<sup>8</sup>   certain sections of the Examiner's Report, those

<sup>9</sup>   types of documents.

<sup>10</sup>       Q.    Okay.  What agreements did you review?

<sup>11</sup>       A.    Well, you say "review."  I would say

<sup>12</sup>   I, you know, I was presented with a document and

<sup>13</sup>   I would look at a particular section.  I

<sup>14</sup>   wouldn't say I reviewed the entire document.

<sup>15</sup>       Q.    Okay.  What agreements did you look

<sup>16</sup>   at?

<sup>17</sup>       A.    The -- we looked at the MMLPSA, which

<sup>18</sup>   I think you're familiar with.

<sup>19</sup>       Q.    I am.

<sup>20</sup>       A.    Certain aspects of the swap

<sup>21</sup>   agreements.  We looked at drafts of tax sharing

<sup>22</sup>   agreements.

<sup>23</sup>       Q.    When you say "drafts of tax sharing

<sup>24</sup>   agreements," what do you mean?

<sup>25</sup>                  MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 16 of 213

Page 16

J. YOUNG

1

2     A.    I mean tax sharing agreements that

3  were not effective.

4     Q.    What do you mean when you say "tax

5  sharing agreements that were not effective"?

6     A.    I mean they weren't -- I'm sorry,

7  would you repeat your question or --

8     Q.    What do you mean when you say "tax

9  sharing agreements that were not effective"?

10    A.    They were not effective.  They were

11 not in place.  They were not operational.

12    Q.    On what basis did you conclude that

13 these drafts were not operational?

14          MR. BROWN:  Objection to form.

15    Mischaracterizes testimony.

16    A.    The -- because they were unexecuted.

17    Q.    Unexecuted by whom?

18    A.    Unexecuted by the parties to the

19 document.

20    Q.    By both parties?

21    A.    To the best of my knowledge, yes.

22    Q.    Did you review any tax sharing

23 agreements that were executed by only one party?

24    A.    I don't recall.

25    Q.    Are you aware of any tax sharing

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 17 of 213

Page 17

1                          J. YOUNG

2    agreements that were executed by only one party?

3         A.    I don't recall.  I don't know.

4         Q.    You don't know if there was a tax

5    sharing agreement that was signed only by Ally

6    but not by ResCap?

7         A.    I don't recall.

8         Q.    Okay.  How many drafts of tax sharing

9    agreements did you look at?  How many different

10   drafts?

11        A.    To the best of my recollection,

12   primarily two.

13        Q.    You looked at two drafts of tax

14   sharing agreements?

15        A.    I looked at two tax sharing

16   agreements.

17        Q.    Okay.  How many drafts of tax sharing

18   agreements did you look at?

19        A.    Well, I would say I looked at one

20   unexecuted agreement.  The second agreement I

21   can't recall right now if it was executed or

22   not.

23        Q.    Do you recall what the difference

24   between the two agreements you reviewed

25   yesterday in preparation for this deposition

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 18 of 213

Page 18

1                          J. YOUNG

2    were?

3        A.      There were I'm sure several

4    differences, not all of which I can recall.

5        Q.      Okay.  Just tell me what you can

6    recall about the differences.

7        A.      There was one key difference, and that

8    key difference being the -- how -- how ResCap

9    would be treated if there were tax losses at

10   ResCap which could not be utilized by ResCap but

11   could be utilized by the parent company.

12            However -- let me rephrase that.  Tax

13   loss attributes that would be allocated to

14   ResCap that would -- could be used by the filer,

15   the actual tax filer, which was the parent.

16       Q.      That unexecuted draft, do you recall

17   ever receiving a copy of that draft during your

18   time at ResCap that had been executed by Ally?

19            MR. BROWN:  Objection to form.

20       A.      I do not recall.

21       Q.      You don't know?

22       A.      I don't -- I don't recall.

23       Q.      Okay.  Do you recall ever executing a

24   tax allocation agreement on behalf of ResCap?

25       A.      I believe I ended up executing a tax

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 19 of 213

Page 19

1                         J. YOUNG

2    agreement on behalf of ResCap eventually, yes.

3        Q.    And did the tax allocation agreement

4    that you ultimately executed on behalf of ResCap

5    have the treatment with respect to losses that

6    you were talking about in the draft?

7            MR. BROWN:  Objection to form.

8        Mischaracterizes testimony.

9        A.    The tax -- the tax attributes that I

10   was referring to being allocated to ResCap, it

11   did not contain that provision.

12       Q.    Why not?

13           MR. BROWN:  Objection to form.  Calls

14       for speculation.

15       A.    Well, we've got -- I mean, depends on

16   how much time you want to talk about it, but

17   there's a lot of reasons.

18       Q.    Okay.  We have seven hours.

19       A.    Okay.  The -- there are -- so tax

20   sharing agreements -- first of all, the tax

21   sharing agreement, the purpose of the tax

22   sharing agreement is to allocate for financial

23   reporting purposes, and nothing else, tax

24   attributes to an entity as a part of a

25   consolidated group.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 20 of 213

Page 20

1                          J. YOUNG

2          Q.      What is the basis for your belief that

3    the purpose of a tax sharing agreement is to

4    allocate for financial reporting purposes and

5    nothing else?

6                  MR. BROWN:   Objection to form.

7        Mischaracterizes testimony.

8          A.    I'll rephrase that.   I will say the

9    primary purpose of the tax allocation agreement

10   is to -- is to allocate the tax attributes of an

11   entity for financial reporting purposes.

12         Q.    So you switched to say it is the

13   primary purpose and not the sole purpose,

14   correct?

15                 MR. BROWN:   Objection to form.

16         A.    That is what I switched, yes.

17         Q.    Okay.   So, in switching from sole

18   purpose to primary purpose, there can be other

19   things in a tax sharing agreement; you would

20   agree with that, right?

21                 MR. BROWN:   Objection to form.

22         A.    There, you know, from my perspective,

23   you know, there could be other reasons for a tax

24   allocation agreement.

25         Q.    What other reasons can you think of?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 21 of 213

Page 21

1                        J. YOUNG

2        A.      I can't think of what they would be,

3    which is primarily why I said for the sole

4    purpose, but primarily there could be other

5    reasons to ensure entities are treated fairly in

6    the tax sharing agreements.

7        Q.      When you say "treated fairly," what do

8    you mean?

9        A.      "Treated fairly," meaning that it's a

10   fair and equitable treatment between the

11   parties.

12       Q.      Who makes that decision?

13               MR. BROWN:   Objection to form.

14       A.      The parties to the agreement.

15       Q.      So when you reviewed the draft

16   yesterday in preparation for your deposition, is

17   that a draft that you had negotiated with Ally

18   in your capacity as the CFO of ResCap?

19               MR. BROWN:   Objection to form.

20       A.      I was involved in the discussions, one

21   of several people from ResCap.

22       Q.      Who else from ResCap was involved in

23   those discussions?

24       A.      Oh, our legal --

25       Q.      Let me finish my question before you

Plaintiff's
Objection
21:15 – 24:9
Inadmissible
hearsay (FRE
802)

Plaintiff's
Objection
21:15-23:3:
irrelevant
(FRE 401,
402)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 22 of 213

Page 22

1                              J. YOUNG

2    start answering.

3              Who else from ResCap was involved in

4    those discussions?

5         A.    Our legal counsel.   Internal legal

6    counsel.

7         Q.    Who was that?

8         A.    Tammy Hamzehpour.

9         Q.    Anyone else?

10        A.    There may have been other individuals

11   in ResCap that I don't recall on the tax side

12   and on the controller group who would have

13   looked at the tax sharing agreement.

14        Q.    Any names come to mind?

15        A.    I can't be sure.   Cathy Dondzila may

16   be one.

17        Q.    Anyone else?

18        A.    John Demro may be another name.

19        Q.    Who is Mr. Demro?

20        A.    At the time, he was the -- he was a

21   Tax person in ResCap.

22        Q.    What was his position within the Tax

23   Department?

24              MR. BROWN:   Objection to form.

25        A.    I don't recall exactly, but he would

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 23 of 213

Page 23

1                        J. YOUNG

2    have been the -- one of the lead ResCap Tax

3    people.

4        Q.    Did there come a time when that draft

5    that you reviewed yesterday in preparation for

6    your deposition was presented to you for

7    signature?

8            MR. BROWN:   Objection to form.

9        A.    I do not recall.

10        Q.    Do you know whether ResCap's board had

11    directed you to sign the draft that you reviewed

12    yesterday in preparation for your deposition?

13            MR. BROWN:   Objection to form.

14        A.    I believe they delegated the authority

15    to me to execute the document when I was ready

16    to do so.

17        Q.    At the time you presented -- did there

18    come a time where you presented the draft that

19    you reviewed yesterday to ResCap's board for

20    approval?

21            MR. BROWN:   Objection to form.

22        A.    There was a time we presented the

23    draft and the -- when you say for approval, it

24    was for the delegation of the authority to

25    complete the transaction when I felt it was

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 24 of 213

Page 24

1                        J. YOUNG

2    necessary and appropriate to do so.

3        Q.    Was the draft that you reviewed

4    yesterday in preparation for your deposition the

5    document that was presented to the board in

6    connection with the request for that approval?

7            MR. BROWN:    Objection to form.

8        Mischaracterizes testimony.

9        A.    I cannot be sure of that.

10       Q.    Okay.  We'll get into this in more

11   detail later.  You said you also reviewed

12   e-mails.  Do you recall specifically any of the

13   e-mails that you reviewed yesterday in

14   preparation for this deposition?

15       A.    Well, yes.

16       Q.    Okay.  Which e-mails did you review?

17       A.    How would you like me to identify

18   them?

19       Q.    Describe them for me.

20       A.    An e-mail from -- there were a lot of

21   e-mails.  E-mail from -- I, actually, I can't

22   remember who exactly they were from.  They could

23   have been from multiple people.  So I really

24   can't say if it's a particular person, but it

25   would have been a combination of people --

Page 25

J. YOUNG

1

2     Q.     Okay.

3     A.     -- perhaps on e-mails, including Bill

4  Marx, Jim Mackey, Tammy Hamzehpour, and the

5  like.  I mean, those are the three that come to

6  mind at this moment.

7     Q.     Okay.  What was the subject matter of

8  the e-mails that you reviewed yesterday in

9  preparation for this deposition?

10          MR. BROWN:  Objection to form.

11    A.     Well, to the best of my recollection,

12  certainly the tax sharing -- e-mails relating to

13  the tax sharing agreement.  At this point in

14  time, the -- those are the ones that are coming

15  to my mind.

16    Q.     So all the e-mails you reviewed

17  yesterday in the eight hours you prepared for

18  this deposition, the only ones you recall

19  related to the tax sharing agreement?

20          MR. BROWN:  Objection to form.

21  Mischaracterizes testimony.

22    A.     No, I'm attempting to recall what they

23  were.

24    Q.     Okay.

25    A.     And I -- I want to make sure I'm

Page 26

J. YOUNG

1
2  accurate, and I can't say exactly if there
3  were -- there were other e-mails, but I can't --
4  I want to be specific on the topics that are in
5  those e-mails and I can't recall the specific
6  topics.
7      Q.    Okay.  So my --
8      A.    Or specifically who they were -- would
9  have been to or from.
10      Q.    Right now we're talking about topics,
11  and I'm asking about e-mails that you reviewed
12  yesterday during your eight-hour prep session
13  for this deposition, and it's your sworn
14  testimony that the only topic you recall as you
15  sit here today from your prep session yesterday
16  relates to the tax sharing agreement?
17      MR. BROWN:  Objection to form.  Asked
18      and answered.
19      A.    Yeah, I am -- I want to be accurate
20  and I'm -- and I'm -- I can't recall exact
21  topics.
22      Q.    Okay.  You said you also reviewed
23  sections of the Examiner's Report.  Which
24  sections did you review?
25      A.    There's only one section that I recall

Plaintiff's
Objection
26:22-33:5
Inadmissible
hearsay and
double
hearsay (FRE
802),
irrelevant
(FRE 401,
402), unduly
prejudicial
(FRE 403),
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602, 901,
903),
incomplete
(FRE 106)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 27 of 213

Page 27

1                           J. YOUNG

2    reviewing was the section on calculating the

3    damages on the -- I believe it was on the tax

4    sharing agreement.    It was a very brief, very

5    brief review, and I did not spend any time

6    understanding that calculation.

7        Q.    What do you mean when you say, "I did

8    not spend any time understanding that

9    calculation"?

10       A.    I looked at it, and through my

11   discussion with counsel basically was counsel,

12   you know, you don't need to understand --

13            MR. BROWN:    Jim, I'm going to instruct

14       you not to reveal privileged communications

15       with counsel.    His question was a little bit

16       different.    If you can answer his question

17       without revealing privileged communication

18       with counsel, you can do so.    Otherwise, do

19       not reveal privileged communications with

20       counsel during your prep session.

21   BY MR. COHEN:

22       Q.    Let me repeat my question.    What do

23   you mean when you say you did not spend any time

24   understanding that calculation, and "that

25   calculation" being damages on the tax sharing

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 28 of 213

Page 28

1                        J. YOUNG

2    agreement in the Examiner's Report?

3              MR. BROWN:  Objection to form.

4       A.    I mean there's a calculation in there

5    with some additions and some subtractions in it

6    and it requires some time to understand it, and

7    I did not take the time to understand it.

8       Q.    Why didn't you take the time to

9    understand it?

10             MR. BROWN:  Objection to form.

11      A.    There was no reason for me to.

12      Q.    Why do you believe that to be the

13   case?

14             MR. BROWN:  Objection to form.

15      A.    I didn't believe there would be a

16   reason for me to understand it.

17      Q.    So it was irrelevant to you?

18             MR. BROWN:  Objection to form.

19      A.    It was not important to me at the

20   time.

21      Q.    And "the time" being yesterday?

22      A.    Correct.

23      Q.    How about before yesterday, was the

24   Examiner's assessment of damages related to the

25   tax sharing agreement ever important to you?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 29 of 213

Page 29

1                          J. YOUNG

2       A.      What do you mean by "important"?

3       Q.      Well, you said yesterday it wasn't

4   important for you to focus on it.   I'm using

5   "important" in the same sense that you did.

6           MR. BROWN:   Objection to form.

7       Mischaracterizes testimony.   Vague.

8       A.      I don't believe their conclusion on

9   that matter was ever important to me personally.

10      Q.      Why not?

11      A.      Well, primarily because I completely

12  disagreed with their premise and conclusion and

13  I've got a daily job to do and I'm doing my

14  daily job.

15      Q.      What aspects of the Examiner's premise

16  did you disagree with?

17      A.      I disagreed with the fundamental

18  premise that there's some view that there's a

19  claim there related to the generation of capital

20  that should be paid attention to.

21      Q.      Why do you disagree with the

22  fundamental premise that there's a claim related

23  to the generation of capital that should be paid

24  attention to?

25      A.      Because the tax sharing agreement has

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 30 of 213

Page  30

1                          J. YOUNG

2    nothing to do with the generation of capital.

3         Q.     What is the basis of that belief?

4         A.     Well, I'd say my 30 years as a

5    financial executive, a lot of it has -- a lot of

6    it has to do with accounting and my experience

7    with tax allocation agreements, generating

8    capital, particularly during the time where

9    we're talking, you know, the time we're

10   referring to.

11              In my 30-plus years of financial

12   experience, including many years of accounting

13   background, not once has a tax sharing agreement

14   been talked about or utilized to generate

15   capital for a company.

16        Q.     Is that true with respect to Ally's

17   other affiliates like its insurance affiliates?

18              MR. BROWN:   Objection to form.

19        A.     I don't know the answer to that.

20        Q.     Did you read the Examiner's Report

21   when it came out?

22              MR. BROWN:   Cover to cover?

23              Objection to form.

24        A.     Well, what do you mean by "read"?

25        Q.     Do you not understand what the word

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 31 of 213

Page 31

1                          J. YOUNG

2    "read" means?

3        A.    Well, I did not read the entire thing

4    cover to cover, no.  I read certain sections of

5    it, certain sections.  I didn't study it

6    in-depth.  I did not read the whole thing cover

7    to cover.  So I did not read it in its entirety.

8        Q.    But you read certain --

9        A.    I read certain sections of it.

10       Q.    How did you decide what sections you

11   wanted to read?

12       A.    It was primarily curiosity at that

13   point.

14       Q.    But you have a 2000-page report.  How

15   did you decide which sections you wanted to

16   read --

17       A.    I reviewed --

18       Q.    Let me finish my question before you

19   answer.

20             You have a 2000-page report.  How did

21   you decide what sections you wanted to read?

22             MR. BROWN:  Asked and answered.

23       A.    I started with the Executive Summary

24   as the natural place to start.

25       Q.    And from there, what did you do?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 32 of 213

Page 32

1                           J. YOUNG

2               MR. BROWN:  Asked and answered.

3          A.    I looked at sections I was curious

4     about.

5          Q.    How did you -- what sections were you

6     curious about?

7          A.    Curious about the sections that I was

8     involved in providing some information on, but

9     not necessarily all of those sections.

10         Q.    So which sections were you interested

11    in where you provided information?

12               MR. BROWN:  Objection to form.

13         A.    I was particularly interested in the

14    tax sharing agreement section because of what I

15    just explained, that my view on that is that it

16    was, you know, an incorrect conclusion by the

17    Examiner.

18         Q.    Were there other sections that you

19    were interested in after reading the Executive

20    Summary?

21         A.    There may have been a couple of other

22    sections that I read.  I don't recall

23    specifically what they were.  Generally

24    speaking, I did not spend a lot of time with the

25    Examiner Report, primarily because I had other

Page 33

1                         J. YOUNG

2    work to do and it was not something that was

3    critical for my day-to-day responsibilities.

4        Q.     Did you search for your name in the

5    Examiner's Report?

6        A.     I did not do any kind of electronic

7    search for my name.

8        Q.     What was --

9            MR. BROWN:   I understand the phone

10   line isn't working.   I know there are people

11   trying to dial in to Mr. Young's --

12           MR. COHEN:   So why don't we take a

13   break and see if we can get that to work.

14           MR. BROWN:   I agree.

15           THE VIDEOGRAPHER:   The time is 9:34

16   A.M.   We're off the record.

17           (Recess.)

18           THE VIDEOGRAPHER:   The time is 9:37

19   A.M.   We're on the record.

20           MR. BROWN:   We have now opened the

21   phone line.   Apologies to those on the line

22   for inadvertently not opening it before.

23           Anyone on the phone line, please

24   identify yourself for the record.

25           MR. ADAMS:   Good morning.   Jason Adams

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 34 of 213

Page 34

1                          J. YOUNG

2        from Kelley Drye.

3              MR. GELACEK:  And Zachary Gelacek,

4        ReedSmith.

5              MR. BROWN:  Anyone else on the line?

6              (No response.)

7              MR. BROWN:  Great.  Thank you.

8    BY MR. COHEN:

9        Q.    So, Mr. Young, before we took the

10   break, you testified that you did not do an

11   electronic search for your name, you just read

12   the Executive Summary and decided which sections

13   you wanted to dig in deeper; is that a fair

14   characterization?

15             MR. BROWN:  Objection to form.

16   Mischaracterizes testimony.

17       A.    That's correct.  I did not do a word

18   search on my name.  I read the Executive

19   Summary, looked at other pieces that I were

20   interested to look at.

21       Q.    And other than the tax sharing

22   agreement, do you recall what other pieces you

23   looked at when the Examiner's Report was

24   released?

25       A.    Not specifically, but I'm sure I would

Plaintiff's
Objection
34:9-36:3
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 35 of 213

Page 35

1                         J. YOUNG

2   have looked at sections around areas that I

3   would have been involved with discussions with

4   the Examiner on.

5        Q.    What areas were those?

6        A.    There were numerous.   Tax allocation

7   agreement, MSR swap, MMLPSA, among others.   The

8   general state of ResCap at the time.   Businesses

9   that were sold.   Transactions that occurred.

10  Actions to raise capital.   Numerous items.

11       Q.    And you looked at all of those

12  sections in the Examiner's Report?

13            MR. BROWN:   Objection to form.

14       A.    I don't recall.

15       Q.    With respect to the tax sharing

16  agreement, were you pleased with the way the

17  examiner characterized your role?

18       A.    No.

19       Q.    Why not?

20       A.    I took personal offense to how I was

21  characterized.

22       Q.    Why?

23       A.    Because it was characterized that

24  there was some -- some measure of breach of

25  fiduciary responsibility, which there was

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 36 of 213

Page 36

1                        J. YOUNG

2   absolutely no basis for and, in my opinion, was

3   completely unfounded.

4        Q.    So when you read that in the report,

5   what did you do about it?

6             MR. BROWN:  Objection to form.

7        A.    I didn't do anything about it other

8   than, you know, let people know who I may have

9   been casually talking to about it within Ally

10  that -- that the Examiner's position on that

11  entire issue is completely without merit.

12       Q.    Who within Ally did you let know that?

13       A.    I don't recall specifically, but I'm

14  sure I would have talked to my immediate manager

15  or boss, the CEO of Ally Bank.

16       Q.    Who was that?

17       A.    Barbara Yastine.

18       Q.    Anyone else?

19       A.    Not that I recall specifically.

20       Q.    How about with respect to the MSR

21  swap, were you pleased with the way the Examiner

22  characterized your role there?

23            MR. BROWN:  Objection to form.

24       A.    No, that's another area where I think

25  he completely misunderstood the fact set and

Plaintiff's
Objection
36:20-37:2
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402), unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 37 of 213

Page 37

1                         J. YOUNG

2    came to an incorrect conclusion.

3        Q.    What did you do about that?

4        A.    I didn't really feel like there was

5    any action I could take, so I didn't do

6    anything.

7        Q.    How about the MMLPSA, were you pleased

8    with the way the Examiner characterized your

9    role in connection with that issue?

10            MR. BROWN:   Objection to form.

11       A.    No, same -- same.   I think there was a

12   misunderstanding, misconstruing the facts and --

13   and -- and the conclusion was without merit.

14       Q.    Is there anything that you read in the

15   Examiner's Report with respect to your role that

16   you thought he got right?

17       A.    I didn't read everything in the

18   Examiner's report with respect to my role.

19       Q.    I'm only asking about the sections

20   that you read.  With respect to the sections in

21   the Examiner's Report that you read, do you

22   think the Examiner got anything right in

23   connection with your role?

24            MR. BROWN:   Objection to form.  Do you

25       mean the conclusions that the Examiner

Plaintiff's
Objection
37:7-13
Inadmissible
hearsay and
double
hearsay (FRE
802),
irrelevant
(FRE 401,
402), unduly
prejudicial
(FRE 403),
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
incomplete
(FRE 106)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 38 of 213

Page 38

1                         J. YOUNG

2         reached on those issues?

3    BY MR. COHEN:

4         Q.    Do you understand my question, Mr.

5    Young?

6              MR. BROWN:  Or do you mean Mr. Young's

7         role with respect to those issues?

8    BY MR. COHEN:

9         Q.    Do you understand my question?

10        A.    Would you repeat it, please?

11        Q.    Sure.  With respect to the sections in

12   the Examiner's Report that you read, do you

13   think the Examiner got anything right in

14   connection with you?

15             MR. BROWN:  Objection to form.  Vague.

16        Unclear.  Ambiguous.  I don't even know what

17        that question means.

18             MR. COHEN:  Well, that's good, because

19        we'll be able to take it up with the judge

20        in a week when these designations go in.  So

21        you can stand by your objections and we'll

22        argue them in court.

23             THE WITNESS:  I don't really recall

24        specifically anything that I read that,

25        yeah, I agree with his position on that

Plaintiff's
Objection
38:11-39:17
Inadmissible
hearsay and
double hearsay
(FRE 802),
irrelevant (FRE
401, 402),
unduly
prejudicial (FRE
403), lack of
personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
incomplete (FRE
106)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 39 of 213

Page 39

1                          J. YOUNG

2        matter.   I would have to refresh my review

3        of the report of the sections that I read to

4        really answer the question, but to the --

5        that's what I can say to the best of my

6        recollection right now.

7    BY MR. COHEN:

8        Q.    So, to the best of your recollection

9    as, in your role in the tax sharing agreement,

10   the MSR swap, and the MMLPSA, he got it all

11   wrong?

12            MR. BROWN:   Objection.

13       Q.    Is that right?

14            MR. BROWN:   Objection to form.

15       A.    I believe that the conclusions reached

16   were -- were not supported by the underlying

17   facts.

18       Q.    He also expressed opinions about your

19   truthfulness in the report; isn't that right?

20            MR. BROWN:   Objection to form.

21       A.    I don't believe so.   There's only one

22   section I thought that he -- he indicated

23   something about my fiduciary responsibility to

24   ResCap.

25       Q.    But did he also express opinions as to

Page 40

J. YOUNG

1

2    whether your version of events was credible?

3         MR. BROWN:  Objection to form.

4    A.   I don't recall.

5    Q.   Where are you currently employed?

6    A.   I'm currently employed with Ally Bank,

7    a subsidiary of Ally Financial Inc.

8    Q.   What is your title?

9    A.   Chief financial officer.

10   Q.   How long have you held that position?

11   A.   I first entered the bank in

12   approximately April or May of 2011.  At that

13   time, the title was chief financial executive.

14   That title recently changed in approximately

15   August of this year to chief financial officer.

16        There's really no practical difference

17   between the two titles, but for the sake of

18   accuracy, you should know that.

19   Q.   Why did the title change?

20   A.   We -- we had an individual who had a

21   CFO title when I first joined the bank, and that

22   person was reporting to me.  So we had that

23   person report to me, and then obviously you

24   can't have two chief financial officers, so I

25   was the chief financial executive.

Plaintiff's
Objection
40:5-18
Inadmissible
hearsay (FRE
802)

Page 41

1                          J. YOUNG

2            That person ended up leaving a short

3    period of time after, but we replaced them with

4    another individual with the title of chief

5    financial officer and controller, and that

6    individual we reassigned to another position in

7    August, and at that time I took the chief

8    financial officer title.

9        Q.    At the time you joined Ally in April

10   or May of 2011, who held the CFO position?

11            MR. BROWN:  Objection to form.

12       A.    I want to make sure I'm clear that I

13   joined Ally Bank.

14       Q.    I'm sorry.  Okay.

15            At the time you joined Ally Bank in

16   April or May of 2011, who held the CFO position?

17       A.    Lisa Gerner.

18       Q.    When did Ms. Gerner leave?

19       A.    To the best of my recollection, in the

20   fourth quarter of 2011.

21       Q.    Why did she leave?

22            MR. BROWN:  Objection to form.

23       A.    I don't know.

24       Q.    Did she quit?

25       A.    Yes.

Page 42

J. YOUNG

1

2      Q.    She wasn't fired?

3      A.    Correct.

4      Q.    Who replaced Ms. Gerner and took the

5  position of CFO-controller at Ally Bank?

6      A.    Larry LaCombe.

7      Q.    And did Mr. LaCombe hold that position

8  until August of this year?

9      A.    Yes.

10     Q.    What is his position now?

11     A.    He is senior director, affiliate

12 governance.

13     Q.    Does that position report to you?

14     A.    Yes.

15     Q.    Who held that position prior to Mr.

16 LaCombe?

17     A.    That's a new position.

18     Q.    What does that position entail?

19     A.    That position is responsible for

20 ensuring our -- that the Ally Bank's

21 transactions with its affiliates are properly

22 structured, documented, and settled in

23 accordance with Federal Reserve Regulation 23a,

24 b.

25     Q.    Who had responsibility for ensuring

Page 43

1                          J. YOUNG

2    that compliance prior to the creation of this

3    position that Mr. LaCombe now holds?

4         A.    It was a shared responsibility across

5    several functions within the bank, including

6    Finance, Legal, the Risk function.

7         Q.    Any other operational units?

8         A.    Well, every function the bank has

9    responsibility to make sure that we're complying

10   with regulations, so I would say that the

11   businesses as well.  Within the bank there's a

12   mortgage business and a deposits business.

13        Q.    So across -- it cuts across both the

14   business lines and the support lines?

15              MR. BROWN:  Objection to form.

16        A.    The responsibility cuts across, yes.

17        Q.    Both business and --

18        A.    Business and financial.

19        Q.    -- and the back office?

20              MR. BROWN:  Objection to form.

21        Q.    Where did you go to college?

22        A.    I went to Luther College in Decorah,

23   Iowa.

24        Q.    What did you study there?

25        A.    A number of things, but I ended up

Page 44

1                          J. YOUNG

2    with an accounting degree.

3        Q.    All right.   What year did you

4    graduate?

5        A.    1981.

6        Q.    And when you graduated, where did you

7    go to work?

8        A.    I went to work for KPMG, a public

9    accounting firm.   At the time, it was referred

10   to as Peat Marwick Mitchell & Co.

11       Q.    That's way back.

12       A.    It's way back.

13       Q.    Where did you work?

14       A.    Minneapolis, Minnesota.

15       Q.    What position did you have?

16       A.    I started as a staff accountant.

17       Q.    How long did you stay at Peat Marwick

18   or KPMG?

19       A.    Approximately 24 years.

20       Q.    So 2005?

21       A.    Yes.

22       Q.    What position did you hold when you

23   left?

24       A.    My position at KPMG?

25       Q.    Yes.

Page 45

J. YOUNG

1

2     A.    I was an audit partner.

3     Q.    Did you have a practice specialty?

4     A.    Yes, I did.

5     Q.    What was that?

6     A.    Banking and financial services.

7     Q.    Are you a CPA?

8     A.    I was a -- I have a CPA certificate.

9  I do not have an active license to be -- to

10 practice CPA.  Since I left KPMG, there was no

11 need to have an active license so I did not

12 renew the license.

13    Q.    What is a CPA certificate?

14    A.    Simply a designation that you have

15 passed the CPA exam and have a certain number of

16 years of experience in accounting.

17    Q.    If you wanted to get your license

18 back, what would that entail?

19    A.    I'm not sure since I haven't tried to

20 do it in nine years, but I would guess it's not

21 much more than send in a fee.

22    Q.    All right.  All right.  Why did you

23 leave Peat Marwick, or KPMG at the time, I

24 guess?

25    A.    I left for what I thought was -- I

Plaintiff's
Objection
45:22-47:16
Inadmissible
hearsay (FRE 802)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 46 of 213

Page 46

1                              J. YOUNG

2    left for a combination of business and personal

3    reasons.

4         Q.    What are the business reasons?

5         A.    The opportunity at Ally -- at GMAC at

6    the time I felt was very attractive

7    intellectually with providing me, you know, a

8    new avenue to -- to experience the business

9    world rather than at KPMG where I was auditing

10   businesses.

11        Q.    Was -- when you say GMAC, what entity

12   are you referring to?

13             MR. BROWN:    Objection to form.

14        A.    General Motors Acceptance Corporation,

15   which was a sub at the time of General Motors,

16   which was the parent company of ResCap.    So when

17   I joined the consolidated group of companies, I

18   did join ResCap, which again was a wholly-owned

19   sub of General Motors Acceptance Corp., which

20   was a wholly-owned sub of General Motors.

21        Q.    Was GMAC a client of yours when you

22   were at KPMG?

23        A.    I was working on -- I was doing some

24   work for GMAC, yes, when I was with KPMG.

25        Q.    What type of work were you doing?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 47 of 213

Page 47

1                          J. YOUNG

2      A.    I was seconded as the chief internal

3   auditor for GMAC.

4      Q.    What were your responsibilities during

5   your secondment?

6      A.    Overall responsibility for the risk

7   assessment of GMAC's businesses, the oversight

8   of the audit program, the oversight of the

9   people on the team, and the execution of the

10  audit plan.

11     Q.    When you say the "oversight of the

12  audit program," what do you mean?

13     A.    I mean managing the audit program to

14  ensure it was adequate, comprehensive, done

15  appropriately in accordance with auditing

16  standards.

17     Q.    When you joined GMAC, what position

18  did you take?

19          MR. BROWN:   Objection to form.

20      Mischaracterizes testimony.   I think he said

21      he joined ResCap.

22          MR. COHEN:   Actually, he didn't,

23      but...

24          MR. BROWN:   We can look at the

25      transcript.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 48 of 213

Page 48

J. YOUNG

1

2       MR. COHEN:  We can, and you'll be

3   proven wrong.

4       THE WITNESS:  Sorry, would you repeat

5   the question?

6   BY MR. COHEN:

7       Q.    Yes.  When you joined GMAC, what

8   position did you take?

9       MR. BROWN:  Object to form.  Misstates

10   the testimony.  I think he said he joined

11   ResCap.

12       A.    I was the chief accounting officer of

13   ResCap.  The controller and chief accounting

14   officer of ResCap, which is a wholly-owned

15   subsidiary of GMAC.

16       Q.    What were your responsibilities as the

17   controller and chief accounting officer of

18   ResCap?

19       A.    Responsibilities were to, at the time,

20   consolidate financial information for the

21   subsidiaries of ResCap; ensure, you know,

22   controls were in place, and related matters.

23       Q.    What do you mean by "related matters"?

24       A.    Well, just making sure that the

25   financial statements were prepared accurately.

Plaintiff's
Objection
48:7-50:12
Inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 49 of 213

Page 49

1                        J. YOUNG

2        Q.    So that was important to you, that the

3   financials were accurate?

4        A.    Yes.

5        Q.    Do you think during your tenure at

6   ResCap the financial statements were accurate?

7        A.    I know during my tenure at ResCap in

8   role as controller, the financial statements

9   were fairly presented in all material respects.

10       Q.    What do you mean by "fairly presented

11   in all material respects"?

12       A.    That's the -- that's the accounting

13   standard for publicly issued financial

14   statements.

15       Q.    Yeah, but what does that standard

16   mean?

17             MR. BROWN:    Objection to form.   Calls

18       for speculation.

19       A.    It means that the financial statements

20   are fairly presented such that if a user of

21   those financial statements were reading those

22   financial statements or using them to make

23   decisions, that those were credible for making

24   those decisions.

25       Q.    Okay.   And so it was your belief

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 50 of 213

Page 50

1                        J. YOUNG

2    during your tenure at ResCap if someone was

3    looking at ResCap's financials or one of its

4    subsidiary's financials, if you looked at the

5    financial statement, they would be able to make

6    credible decisions based on those financials?

7              MR. BROWN:    Objection to form.

8         Mischaracterizes testimony.

9         A.    I would say the consolidated financial

10   statements of ResCap, yes, that is the case.   I

11   was not responsible for all of the subsidiary

12   financial statements.

13        Q.    Who was responsible for the subsidiary

14   financial statements?

15        A.    There would have been hundreds of

16   subsidiaries.  There would have been accounting

17   teams responsible for those subsidiary financial

18   statements.

19        Q.    And to whom did those people report?

20             MR. BROWN:    Objection to form.

21        A.    They would have varied over time.

22   They did not report to me when I first joined

23   ResCap.  At some point in time, I'm sure my

24   tenure at ResCap they would have reported to me,

25   but not when I first joined.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 51 of 213

Page 51

J. YOUNG

1

2    Q.    When do you think they started to

3    report to you?

4    A.    I don't recall exactly.

5    Q.    Okay.  So when you joined ResCap in

6    2005, you were the chief accounting officer and

7    the controller of ResCap, right?

8        MR. BROWN:  Objection to form.

9    A.    Correct.

10    Q.    So if you didn't have responsibility

11    for the subsidiaries' financials, who did?

12        MR. BROWN:  Objection to form.  Asked

13    and answered.

14    A.    There were accounting people within

15    each of the subsidiaries.  ResCap was a very

16    thinly -- very thin group of -- of human

17    resources were designed that way.  You had other

18    operating subsidiaries with full teams of

19    accountants and financial people in them.

20        I don't recall the exact name of those

21    operating entities, but I would commonly refer

22    to them as GMAC Residential, what we used to

23    call Resi, and RFC would have had complete teams

24    of financial people.

25        ResCap was a Holding Company where we

Plaintiff's
Objection
51:5-59:19
Inadmissible
hearsay (FRE
802), irrelevant
(FRE 401, 402)

Page 52

1                           J. YOUNG

2    consolidated those results and issued financial

3    statements for external purposes, including when

4    we registered with the SEC in September of 2005.

5         Q.    But if there was a problem in RFC's or

6    Resi's financials, where did the buck stop

7    within the ResCap group of companies?

8              MR. BROWN:   Objection to form.

9              What time period are you talking

10   about?

11        A.    What kind of problem would you be

12   referring to?

13        Q.    A misstatement in the financials.

14             MR. BROWN:   Objection to form.

15             What time period are you talking

16   about?

17        A.    Material misstatement, when I first

18   joined, I would say it would be a joint

19   responsibility.   Those people did not directly

20   report to me.

21        Q.    A joint responsibility between whom?

22   Who shared that joint responsibility?

23        A.    The financial teams in the

24   subsidiaries, and I would take some

25   responsibility as well to make sure that if I

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 53 of 213

Page 53

1                              J. YOUNG

2    was aware of something, that it would be fixed.

3         Q.    Did there come a time where you did

4    have responsibility for that?  I realize your

5    testimony is when you first joined, you didn't.

6              Did there come a time where the buck

7    stopped with you?

8              MR. BROWN:  Objection to form.

9         A.    I think I did indicate in a previous

10   question that at some point in time those people

11   would have reported to me and the answer would

12   be yes.  I don't recall when that time was.

13        Q.    Do you recall what year it was?

14        A.    Well, I would say two thousand -- at

15   least 2008 when I was named CFO of ResCap.

16        Q.    When in 2008 were you named CFO of

17   ResCap?

18        A.    I believe it was March, March or

19   April.  I believe it was March.

20        Q.    So as of March or April 2008, as CFO

21   of ResCap, it was your responsibility to ensure

22   that not only ResCap but its subsidiaries'

23   financials fairly presented in all material

24   respects its financial statements?

25              MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 54 of 213

Page 54

1                         J. YOUNG

2       A.    Yes.

3       Q.    Did that include the intercompanies

4  that were reflected on those financial

5  statements?

6       A.    To the extent that intercompanies are

7  a part of the consolidated financial statements

8  taken as a whole, yes.

9       Q.    I'm talking about the individual

10  subsidiaries that were now within your

11  responsibility as of March or April 2008.  Did

12  the intercompanies on those subsidiaries'

13  financial statements fall within your purview?

14       A.    Did the intercompanies?

15       Q.    As part of those financial

16  statements --

17            MR. BROWN:   Objection to form.

18       Q.    -- fall within your purview?

19            MR. BROWN:   Objection to form.

20       A.    I need a clarification of the

21  question.   When you say the "intercompanies,"

22  what do you mean?

23       Q.    So if you had an intercompany on a

24  financial statement, a payable or receivable to

25  an affiliate of ResCap, a sister or a parent or

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 55 of 213

Page 55

1                              J. YOUNG

2    a child company that would be reflected on one

3    of the subsidiary's financial statements, was it

4    your responsibility to make sure that that was

5    fairly presented in all material respects?

6              MR. BROWN:   Objection to form.

7         A.    In the context of the consolidated

8    financial statements, yes.

9         Q.    Okay.  We're going beyond the

10   consolidated financial statements.   When you

11   became the CFO of ResCap, did you have

12   responsibility for the subsidiaries' financial

13   statements as well?

14             MR. BROWN:   Objection to form.   Asked

15        and answered.

16        A.    And I'm attempting to make the point

17   that the financial statements are a consolidated

18   group of accounts.   I'm not referring to the

19   consolidated entity.   I would also be referring

20   to GMAC Residential or RFC.

21             There are all kinds of accounts in

22   those financial statements on those legal

23   entity, standalone basis, and to the extent that

24   those -- I was, yes, would have been responsible

25   at that time in March of '08 for the

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 56 of 213

Page 56

1                          J. YOUNG

2    consolidated financial statement of that

3    subsidiary in totality, the consolidated

4    financial statement taken as a whole, fairly

5    presented.

6              Because this comes up in accounting

7    all the time where, you know, this particular

8    account, you know, was off some amount.

9    That's -- that is -- that happens, and but the

10   standard is, and it's a tough standard, the

11   consolidated financial statements are the -- are

12   they fairly presented in all material respects,

13   and yes, I would have been responsible for that.

14        Q.    Okay.  You have used the word

15   "consolidated" financial statements a number of

16   times.  What does "consolidated" mean?

17        A.    "Consolidated" would mean the roll-up

18   of several legal entity subsidiaries under that

19   certain entity.  So, of course, what that means

20   is you could have consolidated financial

21   statements at virtually many, at many levels

22   within the company because there would have been

23   hundreds of subsidiaries.

24              You can have a roll-up at a low level

25   that included a certain number of companies, it

Page 57

1                          J. YOUNG

2    rolls up to another level, it rolls up to

3    another level.

4        Q.    Are you familiar with the phrase

5    "garbage in, garbage out"?

6        A.    I've heard the phrase, yes.

7        Q.    What do you understand that to mean?

8        A.    I would understand that to mean if --

9    if information is wrong going in and somebody

10   does something with the information, doesn't

11   check it, takes it for what it's worth and

12   continues to pass it on, that there's no chance

13   of -- of correcting or catching the garbage, as

14   you say.

15       Q.    Okay.  In your role as CFO with

16   respect -- of ResCap from April or May of 2008

17   or March or April of 2008, what did you do to

18   ensure that you didn't have a garbage in,

19   garbage out situation?

20            MR. BROWN:  Objection to form.

21       A.    Can you give me an example of what you

22   would mean by "garbage in, garbage out" --

23       Q.    Sure?

24       A.    -- in the context of what you're

25   asking?

Page 58

1                           J. YOUNG

2        Q.    Sure.  You're rolling up a number of

3   different legal entities to prepare your

4   consolidated financial statement, right?

5              MR. BROWN:  Objection to form.

6        A.    Yes.

7        Q.    What did you do as CFO of ResCap to

8   ensure that the information you were getting

9   from the different legal entities was accurate

10  and reliable information?

11       A.    We had a system of internal control to

12  ensure, you know, not perfection but a reasoned,

13  you know, a reasoned level of accuracy in

14  financial reporting.

15       Q.    Who was responsible for overseeing

16  that system of internal control ultimately?

17             MR. BROWN:  Objection to form.

18       A.    Ultimately, it would have been the

19  chief financial officer.

20       Q.    And that's you?

21       A.    Correct.

22       Q.    Okay.  So, with respect to each legal

23  entity, at least by the time you became CFO in

24  early 2008, not only did you have responsibility

25  for the consolidated financial statement, you

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 59 of 213

Page 59

1                          J. YOUNG

2    also had ultimate responsibility for each of the

3    individual legal entities' financial statements,

4    right?

5              MR. BROWN:  Objection to form.

6       A.    Ultimately, yes, but there were,

7    again, I would keep in mind hundreds of hundreds

8    of accounting people.  But yes, ultimately yes.

9       Q.    Certainly.  I mean, you didn't do it

10   all yourself.  There were people you relied on,

11   but the ultimate responsibility rested with you,

12   correct?

13             MR. BROWN:  Objection to form.  Asked

14        and answered.

15      A.    There were people I relied upon and

16   systems of control I relied upon, but ultimately

17   as the CFO, yes.

18      Q.    Okay.

19      A.    I was responsible.

20      Q.    When did you leave ResCap and move to

21   Ally?

22             MR. BROWN:  Objection to form.

23        Mischaracterizes testimony.  He's made clear

24        he moved to Ally Bank.

25             MR. COHEN:  Do you want to -- do you

Page 60

1                    J. YOUNG

2      want to take an oath and testify?

3           MR. BROWN:  No.

4           MR. COHEN:  I'd be happy to depose you

5      too.

6           MR. BROWN:  You just mischaracterized

7      him testimony on this point three times now.

8           MR. COHEN:  Object to the form.

9           MR. BROWN:  I did.

10          MR. COHEN:  And just pretend that you

11     know the Rules of Civil Procedure and abide

12     by them.  You can object to the form, but

13     the speaking and coaching objections are

14     ridiculous.

15          If you want to testify, I'm happy --

16          MR. BROWN:  I just want to get you

17     right.

18          MR. COHEN:  I'm happy to put you under

19     oath.  I don't need you to get me right.  We

20     have a transcript.  You can make an

21     objection.  They're going to go into court.

22     If it's mischaracterized, the judge can fix

23     it.

24          Object to the form and abide by the

25     rules.

Page 61

1                        J. YOUNG

2              MR. BROWN:  I did.

3              MR. COHEN:  Do you have my question in

4      mind?

5              MR. BROWN:  Objection to form.

6              THE WITNESS:  Would you repeat the

7      question, please?

8              MR. COHEN:  Certainly.

9              Would you read back my last question?

10             (Record read.)

11             MR. BROWN:  Objection to form.

12     Mischaracterizes testimony.

13             MR. COHEN:  Coaching the witness.

14             THE WITNESS:  I left ResCap and moved

15     to Ally Bank in May of 2011.  I believe it's

16     May, April or May, somewhere in there.

17     BY MR. COHEN:

18       Q.    Under what circumstances did you leave

19     ResCap and move to Ally Bank?

20             MR. BROWN:  Objection to form.

21       A.    I was asked by the company to make the

22     move and I considered the move and I made the

23     move.

24       Q.    When were you asked by the company to

25     make the move?

Plaintiff's
Objection
61:18-64:19
Inadmissibl
e hearsay
(FRE 802),
irrelevant
(FRE 401,
402)

Page 62

1                           J. YOUNG

2       A.    First asked I believe I would say

3   January/December or January -- December of '10

4   or January of '11.

5       Q.    Did they explain why they wanted you

6   to make the move?

7             MR. BROWN:   Objection to form.

8       A.    The discussion was around needing more

9   experience and -- in the bank.

10      Q.    What experience were they looking for

11  in the bank?

12            MR. BROWN:   Objection to form.

13      A.    Heavy accounting experience, financial

14  reporting experience, planning, forecasting,

15  budgeting.   Just senior executive experience for

16  Ally Bank.

17      Q.    Were you replacing someone within Ally

18  Bank?

19      A.    No.   As I think I said before, there

20  was a CFO in Ally Bank and that person

21  reported -- ended up reporting to me after I

22  moved into the bank.

23      Q.    So you took a new position?

24            MR. BROWN:   Objection to form.

25      A.    Correct.

Page 63

1                         J. YOUNG

2        Q.    Did you get a raise?

3        A.    Not that I recall.

4        Q.    Did you get a bonus?

5        A.    For moving?

6        Q.    Yes.

7        A.    Not to my knowledge.

8        Q.    And these discussions started in

9    December of 2010 or January of 2011?

10       A.    Correct.

11       Q.    When was a tax allocation agreement

12   completed between ResCap and Ally?

13            MR. BROWN:   Objection to form.

14       A.    I don't recall specifically.   I could

15   check the record as to when that document was

16   signed, but I don't recall the exact day.

17       Q.    Was it in the same general time

18   period?

19            MR. BROWN:   Objection to form.

20       A.    I don't recall.

21       Q.    Do you recall whether you were

22   negotiating the tax allocation agreement, the

23   second tax allocation agreement, as the Examiner

24   refers to it, at the same time you were talking

25   about leaving ResCap and going to Ally?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 64 of 213

Page 64

1                         J. YOUNG

2                    MR. BROWN:   Objection to form.

3          Mischaracterizes testimony.   Vague.

4          A.    I don't recall that.

5          Q.    But you're sure that the discussions

6     were in December 2010 and January 2011 about you

7     leaving ResCap and going to Ally?

8                    MR. BROWN:   Objection to form.

9          A.    To the best of my recollection, yes.

10         Q.    What are your responsibilities as CFO

11    at Ally Bank?

12         A.    Traditional CFO responsibilities,

13    including accounting, financial reporting,

14    internal control, treasury activities.   In this

15    case, as we've discussed earlier, affiliate

16    governance, which is compliance with Federal

17    Reserve Act 23a and b for affiliated

18    transactions.   Small levels of strategy work and

19    regulatory coordination of examinations.

20         Q.    Anything else come to mind?

21         A.    Not at this time.

22         Q.    When you say "small levels of strategy

23    work," what do you mean?

24         A.    I mean that I have one individual who

25    spends part-time.   The official title is

Page 65

1                          J. YOUNG

2    Strategy.  The reason I say small levels is

3    because Ally Bank is a wholly-owned subsidiary

4    of Ally Financial Inc. and strategy is not

5    something that a subsidiary institution will do

6    on an aggressive, full-time basis.  So it's

7    primarily about thinking about the bank's future

8    in some level of context of what AFI was

9    thinking about in the future.

10        Q.    Is it fair to say that AFI dictates

11   the strategies of the bank?

12           MR. BROWN:  Objection to form.

13        A.    I wouldn't say it's fair.  I don't

14   think it's fair to say they would dictate the

15   strategy, no, but certainly they need to be

16   coordinated.

17        Q.    Well, if the strategy isn't coming

18   from the subsidiary, except in a small way,

19   where is the strategy coming from?

20           MR. BROWN:  Objection to form.

21        A.    Strategy is a coordinated effort

22   between AFI and the bank, but I wouldn't say

23   they dictate it.

24        Q.    Do they suggest it?

25           MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 66 of 213

Page 66

1                          J. YOUNG

2       A.    Well, they certainly lead.

3       Q.    So AFI takes the lead on strategy, is

4  that the right way to characterize that?

5             MR. BROWN:   Objection to form.

6       A.    From my perspective, the AFI

7  leadership and strategy is important for the

8  bank to understand and execute against, yes.

9       Q.    Do you have any position with AFI?

10      A.    I do not have any position with AFI.

11      Q.    So you're not an officer of AFI?

12      A.    Correct.

13      Q.    You're not an employee of AFI?

14      A.    I'm an employee of Ally Bank, which is

15  a wholly-owned subsidiary of AFI, but I'm not an

16  officer of AFI.

17      Q.    My question is, are you an employee

18  also of the legal entity AFI?

19      A.    I am not.

20      Q.    Okay.

21      A.    To my knowledge.

22      Q.    I'm handing you a copy of a document

23  which has previously been marked as Westman

24  Exhibit 1.   Would you take a moment to look at

25  this?

Plaintiff's
Objection
66:22-25
Inadmissible
hearsay (FRE 802),
irrelevant (FRE
401, 402)

Page 67

1                    J. YOUNG

2          MR. CHRISTENSEN:  Do you have extra

3      copies, Mr. Cohen?

4          MR. COHEN:  Yes, we're handing them

5      around.

6   BY MR. COHEN:

7      Q.    Let me know when you're done.

8            This document for the record is titled

9   "The Ad Hoc Group of Junior Secured Noteholders'

10  Notice of Rule 30(b)(6) Deposition," and it's

11  directed to ResCap.

12     A.    Okay.

13     Q.    Have you seen this document before?

14     A.    I believe I was showed this in my

15  meeting with my counsel.

16     Q.    That was the meeting that happened

17  yesterday?

18     A.    Yes.

19     Q.    Before yesterday, had you ever seen a

20  copy of this before?

21     A.    No.

22     Q.    Do you understand that you have been

23  designated to testify on behalf of ResCap as to

24  certain topics in Westman Exhibit 1, this

25  30(b)(6) notice?

Plaintiff's
Objection
67:6-68:17
Inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 68 of 213

Page 68

1                       J. YOUNG

2               MR. BROWN:  Objection to form.

3        A.     I do understand that.

4        Q.     Okay.  You've been designated to

5   testify on behalf of ResCap as to item 14, which

6   is on page 10 of this document.

7               Would you let me know when you're

8   there?

9        A.     I'm there.

10       Q.     Are you able to testify truthfully and

11   completely as to all matters relating to the

12   First 2009 Tax Allocation Agreement and the

13   Second 2009 Tax Allocation Agreement?

14       A.     Yes.

15       Q.     Now I'm handing you a document that

16   has previously been marked as Marx Exhibit 1.

17               Would you hand --

18               MR. BROWN:  Do you have copies for --

19               MR. COHEN:  Yes, the witness is

20   holding them.

21               MR. BROWN:  Oh.  I've just never seen

22   you pass the copies for counsel to the

23   witness.  Sorry.

24               MR. COHEN:  If the reporter were

25   sitting across from me, I would have handed

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 69 of 213

Page 69

1                          J. YOUNG

2          them to her.

3     BY MR. COHEN:

4          Q.    Let me know when you're through with

5     this document, Mr. Young.

6                This document, for the record, is

7     titled "The Ad Hoc Group of Junior Secured

8     Noteholders' Notice of Subpoena to Ally

9     Financial Inc."

10         A.    Okay.

11         Q.    Have you seen a copy of this document

12    before?

13         A.    I believe I saw this yesterday in my

14    session with counsel.

15         Q.    Before yesterday, had you ever seen a

16    copy of this document before?

17         A.    No.

18         Q.    Do you understand that you've been

19    designated to testify on behalf of Ally

20    Financial Inc., AFI, with respect to certain

21    topics in Marx Exhibit 1?

22         A.    Yes.

23         Q.    So let's turn to page 7 of Marx

24    Exhibit 1.   Are you able to testify truthfully

25    and completely as to number 1, "All matters

Plaintiff's
Objection
69:3-72:9
Inadmissible
hearsay (FRE 802),
irrelevant (FRE
401, 402)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 70 of 213

Page 70

1                          J. YOUNG

2   concerning the August 1, 2009 conversion to

3   fair-value accounting and the decision to demand

4   a $51.4 million payment from GMAC Mortgage in

5   relation to the Brokering Consumer Loans Bank

6   project"?

7        A.     Yes.

8        Q.     Would you turn to page 8 of this

9   document.  Let's look at item number 11.  Are

10  you able to testify truthfully and completely as

11  to all matters relating to the MMLPSAs between

12  GMAC Mortgage and Old GMAC Bank and between GMAC

13  Mortgage and Ally Bank?

14       A.     Yes.

15       Q.     Let's look at item number 12.  Are you

16  able to testify truthfully and completely as to

17  all matters relating to the Pipeline Swaps

18  between GMAC Mortgage and Old GMAC Bank and

19  between GMAC Mortgage and Ally Bank?

20       A.     Yes.

21       Q.     Let's look at item 13.  Are you able

22  to testify truthfully and completely as to all

23  matters relating to the 2008 Broker Agreement

24  between GMAC Mortgage and Old GMAC Bank and

25  between GMAC Mortgage and Ally Bank?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 71 of 213

Page 71

1                              J. YOUNG

2        A.      Yes.

3        Q.      All right.   In your capacity as the

4    chief financial officer of ResCap, were you

5    responsible for ensuring compliance with Ally's

6    accounting policies?

7                MR. BROWN:   Objection to form.

8        A.      I would have said I was responsible

9    for the compliance with ResCap's accounting

10   policies.

11       Q.      Did ResCap have separate accounting

12   policies from Ally?

13       A.      To the best of my recollection, at

14   certain periods of time, yes.

15       Q.      During what periods of time did ResCap

16   have separate accounting policies from Ally?

17       A.      I don't recall exactly.

18       Q.      Was it at the beginning of your tenure

19   or the end of your tenure --

20               MR. BROWN:   Objection.

21       Q.      -- as the CFO of ResCap?

22               MR. BROWN:   Objection to form.

23       A.      I can say at the beginning of my

24   tenure at ResCap, as controller and chief

25   accounting officer, not at my time as the CFO

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 72 of 213

Page 72

1                          J. YOUNG

2    because I don't recall at the time I was CFO,

3    but at the time of joining as controller and

4    chief accounting officer, I do believe there

5    were separate accounting policies at that time.

6        Q.     But you don't recall by 2008 whether

7    there were separate accounting policies?

8              MR. BROWN:   Objection to form.

9        A.     Correct.

10       Q.     When you became the CFO of Ally in

11   2011, did Ally have uniform accounting policies

12   that applied to all of its affiliated companies?

13             MR. BROWN:   Objection to form.

14   Mischaracterizes testimony.

15       A.     You keep using the word "Ally," but I

16   was with Ally Bank, and there is a difference

17   between Ally, AFI, and Ally Bank, as you've

18   pointed out before.   So I believe you're asking

19   me about Ally Bank, but perhaps you would

20   rephrase the question?

21       Q.     Sure.   Within the AFI group of

22   companies, which includes Ally Bank and includes

23   ResCap, are there uniform accounting policies as

24   we sit here today?

25             MR. BROWN:   Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 73 of 213

Page 73

J. YOUNG

1

2        A.    I would say there are uniform

3    accounting policies for items that apply to each

4    of those individual companies, yes, and what I

5    mean by that is there could be something that's

6    accounted for in an affiliate group of companies

7    that doesn't exist in the bank and, hence,

8    there's no -- there would be no accounting

9    policy for an insurance product.

10            So, but to the extent that they are

11   policies applying to similar products in similar

12   accounting items, yes.

13        Q.    Well, let's -- let's step back.  Does

14   the Ally group of companies have an accounting

15   policy book that applies to all of the

16   companies, irrespective of whether every item in

17   that manual applies?

18            MR. BROWN:   Objection to form.

19        A.    The Ally group of companies at AFI and

20   the Ally group of companies have accounting

21   policies that apply to everyone.

22        Q.    All right.  And so if in one of the

23   legal entities they don't have a product for

24   which there's a policy, they don't have to apply

25   that policy, right?

Plaintiff's
Objection
73:13-75:18
Inadmissible
hearsay (FRE
802), irrelevant
(FRE 401, 402),
lack of personal
knowledge
(FRE 602)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 74 of 213

Page 74

1                          J. YOUNG

2        A.    That's correct.   In addition, Ally

3   Bank, for instance, does have its own governance

4   over accounting policy, but it is driven by the

5   common policy of the AFI group of companies.

6        Q.    When did those common policies come

7   into effect?

8              MR. BROWN:   Objection to form.

9        A.    I do not recall.

10       Q.    But you do recall when you started in

11  2005 as the controller at ResCap there were not

12  common policies?

13       A.    I think I indicated that there were

14  separate accounting policies at ResCap, and

15  whether they were common from a content

16  perspective, I can't say, but there were

17  separate accounting policies at ResCap at that

18  time.

19       Q.    But and at some point that shifted so

20  that there were common policies for all of the

21  Ally group of companies?

22             MR. BROWN:   Objection to form.

23       A.    Yes.

24       Q.    And by the time you became CFO at

25  ResCap in 2008, those common policies applied?

Page 75

1                    J. YOUNG

2              MR. BROWN:  Objection to form.

3       Mischaracterizes testimony.

4       A.    I don't recall when they -- when the

5  common policies came into play.

6       Q.    In your capacity as the CFO at ResCap

7  and now as the CFO at Ally Bank, the ultimate

8  responsibility for ensuring compliance with

9  those policies rests with you, right?

10             MR. BROWN:  Objection to form.

11      A.    For Ally Bank, yes, and at my time at

12 ResCap when I was CFO for ResCap, yes, for

13 ResCap.

14      Q.    And that would also include the

15 subsidiaries, if any, of Ally Bank and the

16 subsidiaries, if any, of ResCap, right?

17             MR. BROWN:  Objection to form.

18      A.    Yes.

19             MR. COHEN:  You want to take about a

20      five-minute break?

21             MR. BROWN:  Absolutely.

22             THE VIDEOGRAPHER:  The time is

23      10:38 -- I'm sorry, 10:28 A.M.  We're off

24      the record.

25             (Recess.)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 76 of 213

Page 76

J. YOUNG

2      THE VIDEOGRAPHER:  The time is 10:42

3    A.M.  We're on the record.

4  BY MR. COHEN:

5      Q.     Mr. Young, before the break, you went

6  through a list of your responsibilities as CFO

7  of Ally Bank, do you recall that?

8      A.     Yes.

9      Q.     Among your responsibilities you did

10  not include legal advice, did you?

11      A.     I don't recall.  I don't think I did,

12  no.

13      Q.     Do you believe providing legal advice

14  is within your area of responsibility?

15      A.     No.

16      Q.     So it is not within your area of

17  responsibility to interpret contracts, right?

18      A.     Interpreting contracts is different

19  than providing legal advice.  Businesspeople

20  are -- businesspeople are party to contracts all

21  the time and contracts need to be interpreted

22  between the parties.  In fact, I'd go so far to

23  say that the agreement between the parties in a

24  contract is -- is extremely important to

25  businesspeople.

Plaintiff's
Objection
76:5-103:20
Inadmissible
hearsay (FRE
802) (except for
94:24-101:21)

76:5-80:9:
irrelevant (FRE
401, 402), waste of
time (FRE 403)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 77 of 213

Page 77

1                          J. YOUNG

2        Q.    So it is within your area of

3   responsibility to interpret contracts?

4              MR. BROWN:   Objection to form.

5        A.    It's part of our responsibility to

6   come to an agreement with a counterparty from a

7   business perspective with a contract.

8        Q.    Is it within your area of

9   responsibility to interpret contracts?

10             MR. BROWN:   Objection to form.   Asked

11      and answered.

12       A.    Can you give me a specific example of

13  what interpreting a contract may mean to you?

14       Q.    Sure.   Someone hands you a contract

15  and asks you, What are my obligations and rights

16  under this agreement?   Is that something that

17  you would give an opinion on?

18             MR. BROWN:   Objection to form.

19       A.    It depends on the contract and the

20  complexity of the contract, the contract terms.

21  It would depend on a whole host of issues.

22       Q.    So in certain instances you would

23  provide interpretations under contracts in your

24  capacity as the CFO of Ally Bank; is that your

25  testimony?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 78 of 213

Page 78

1                          J. YOUNG

2                  MR. BROWN:  Objection to form.

3        A.    I would not provide a legal

4   interpretation of a contract, no.

5        Q.    And if there was a question as to what

6   Ally Bank's rights and responsibilities were

7   under a contract, would you ask someone with

8   expertise in that area --

9                  MR. BROWN:  Objection.

10       Q.    -- to help you?

11                 MR. BROWN:  Objection to form.

12       Q.    As a general matter?

13                 MR. BROWN:  Objection to form.

14       A.    If I had a question on an Ally Bank

15   contract, I would ask counsel to assist.

16       Q.    And if you needed an opinion as to

17   what the right interpretation of a contract

18   would be, you would typically go to counsel,

19   right?

20                 MR. BROWN:  Objection to form.

21       A.    Well, there are many ways to interpret

22   contracts.  And you know, you used the words

23   "right interpretation."  Sometimes there's not

24   always a right interpretation.  And ultimately a

25   contract is between parties, business parties,

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 79 of 213

Page 79

1                          J. YOUNG

2   not attorneys.  So I'm not sure I can answer

3   your question.

4      Q.    When you became CFO of Ally Bank,

5   there were contracts in place that you had not

6   negotiated, right?

7             MR. BROWN:  Objection to form.  You

8      mean as of August of this year?

9      A.    When I became CFO of Ally Bank in May

10  of 2000 -- April or May of 2011, there would

11  have been contracts in place that I was not a

12  party or not involved in negotiating.

13     Q.    Okay.  And with respect to those

14  contracts where you hadn't negotiated and you

15  didn't have your own sense of what the deal was,

16  if there was a question as to how to interpret

17  the agreement, would you ask a lawyer to help

18  you --

19             MR. BROWN:  Objection.

20     Q.    -- typically?

21             MR. BROWN:  Objection to form.

22     A.    I may ask a lawyer or I may ask a

23  lawyer in addition to businesspeople as well.

24     Q.    But to be clear, you would not take it

25  upon yourself to give legal advice to someone,

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 80 of 213

Page 80

1                          J. YOUNG

2    right?

3          A.    I believe I answered that question.

4          Q.    So the answer is?

5          A.    The answer is I would not; I am not

6    qualified to give legal advice.

7          Q.    And you're not licensed to practice

8    law?

9          A.    I am not licensed to practice law.

10              (Young Exhibit 1, a document bearing

11          Bates Nos. ALLY 242848 through 242866,

12          marked for identification, as of this date.)

13              MR. COHEN:   We marked it Young 1.

14    BY MR. COHEN:

15          Q.    Mr. Young, the reporter has handed you

16    a document which has been marked Young Exhibit

17    1.  It has the Bates number ALLY 242848 through

18    242866.  It's titled Accounting Policy 1075,

19    Related Party.  Would you take a moment to look

20    at this document?

21              (Document review.)

22          A.    Okay.

23          Q.    Have you seen Young Exhibit 1 before?

24          A.    Not that I recall.

25          Q.    Before we took the break, you were

Plaintiff's
Objection
80:10-88:11:
irrelevant (FRE
401, 402), lack of
foundation (FRE
602, 901, 903)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 81 of 213

Page 81

1                         J. YOUNG

2    testifying about accounting policies that

3    applied to the entire Ally group of companies.

4    Is this one of those policies?

5         A.    It would appear to be, although it's

6    dated January 1, 2010.    It says on the front of

7    it, "Distribution:    All Ally," and the scope of

8    the document indicates that it -- well, yeah, I

9    think under the purpose it indicates policy --

10   well, you can read it.    So, yeah, it looks to be

11   the case, yes.

12        Q.    So this is a policy that, as of

13   January 1, 2010, would also have applied to

14   ResCap?

15        A.    Well, I think, as I said before, I do

16   not recall when ResCap would have moved to a

17   common set of policies with AFI.

18        Q.    Well, let's --

19        A.    So I don't know.

20        Q.    Let's look at page -- it's the second

21   page of Young Exhibit 1.    It has the Bates

22   number ALLY 242849, and I'd like to focus your

23   attention on Section 2.0, which is Purpose.

24        A.    Yes.

25        Q.    The document states that, "The purpose

Page 82

1                         J. YOUNG

2   of Accounting Policy 1075, Related Party

3   (Policy) is to establish guidelines for the

4   reporting of related party transactions.  This

5   policy provides a uniform standard for such

6   items and is applicable throughout all Ally

7   Financial Inc. and its direct or indirect

8   subsidiaries, including all Lines of Business

9   (LoBs), Business Units (BUs), and Global

10  Functions (collectively, Ally).  Adherence to

11  this policy is the responsibility for the LoB

12  Controller, or similar role."

13          Do you see that scope of -- of how

14  Ally is defined there?

15          MR. BROWN:  Objection to form.

16      A.   I see it.

17      Q.   Is it your understanding that ResCap

18  and its subsidiaries would fall within that

19  scope?

20      A.   Yes.

21      Q.   Okay.  So if you look at the top of

22  that page, it says that this policy is effective

23  January 1, 2010.  Do you see that?

24      A.   Yes.

25      Q.   And at the time, you were the CFO of

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 83 of 213

Page 83

1                          J. YOUNG

2   ResCap; is that right?

3        A.      That's correct.

4        Q.      And as CFO of ResCap, you had ultimate

5   responsibility for ResCap's consolidated

6   financials and the information that was flowing

7   into those, right?

8                MR. BROWN:   Objection to form.   Asked

9        and answered.

10       A.      Yes, as the CFO of ResCap, I had the

11  responsibility for the consolidated financial

12  statements of ResCap.

13       Q.      Okay.   And was it also your

14  understanding as the CFO of ResCap that you

15  should be abiding by Ally's accounting policies?

16       A.      Again, as I think I've said before, at

17  some point in time, the accounting policies of

18  ResCap and the accounting policies of AFI became

19  one and the same body of accounting policies.   I

20  don't recall exactly when that occurred.

21                ResCap's accounting policies would be

22  in compliance with Generally Accepted Accounting

23  Principles, just as AFI's accounting policies

24  would be in accordance with AFI -- I'm sorry,

25  with Generally Accepted Accounting Principles.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 84 of 213

Page 84

1                      J. YOUNG

2              Whether this particular policy applied

3    to ResCap at the time you're asking and you're

4    inferring that ResCap did not have a similar

5    policy, I don't know the answer to that.

6       Q.    Well, this document you just agreed

7    with me that ResCap fell within the scope as

8    defined in Section 2.0, right?

9              MR. BROWN:   Objection to form.

10      A.    Yes.

11      Q.    And you see at the top of this page

12   where it says "Effective Date:   January 1,

13   2010," do you see that?

14      A.    Yes.

15             MR. BROWN:   Objection to form.

16      Q.    Does that lead you to believe that

17   this policy would apply to ResCap at least as of

18   January 1, 2010?

19             MR. BROWN:   Objection to form.   Asked

20      and answered.

21      A.    The content of this policy would

22   either apply to ResCap or ResCap would have its

23   own policy.   It would have similar GAAP,

24   Generally Accepted Accounting Principle,

25   guidance in it.

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 85 of 213

Page 85

1                          J. YOUNG

2         Q.      Would you look at Section 3.0, which

3    says Scope.    The first sentence says, "This

4    Policy addresses U.S. Generally Accepted

5    Accounting Principles (U.S. GAAP) and reporting

6    requirements related to related party

7    disclosures."  Do you see that?

8         A.      Yes.

9         Q.      Would GAAP be different for Ally as

10   defined in Section 2.0 and ResCap, or is GAAP

11   consistent?

12             MR. BROWN:    Objection to form.

13        A.      GAAP is consistent -- you referred to

14   Section 2.0.   Did you mean 3.0?

15        Q.      Well, 3.0 says that this policy is to

16   implement GAAP.   2.0 you have already agreed

17   would include ResCap.   My question is is GAAP

18   something different for ResCap?

19             MR. BROWN:    Objection to form.

20        A.      No.

21        Q.      Okay.   So if this policy is

22   implementing GAAP, as it says in Section 3.0,

23   and it applies to ResCap in Section 2.0, do you

24   have any reason to believe ResCap would have a

25   different policy as of January 1, 2010?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 86 of 213

Page 86

1                          J. YOUNG

2              MR. BROWN:   Objection to form.

3         A.    I have no reason to believe if they

4    did have a different policy, a separate

5    documented policy, that it would be any

6    different in substance than this policy.

7         Q.    Okay.  Did you have any understanding

8    as the CFO of ResCap in January 2010 when this

9    policy came out that you had discretion not to

10   follow it at ResCap?

11        A.    At ResCap, we followed Generally

12   Accepted Accounting Principles.  So,

13   irrespective of the issuance of a documented

14   policy at what level it came out, meaning AFI,

15   ResCap, or Ally Bank, the entity would follow

16   Generally Accepted Accounting Principles.

17        Q.    Issue respective of this policy?

18        A.    This policy documents Generally

19   Accepted Accounting Principles.

20        Q.    So it would apply at ResCap?

21              MR. BROWN:   Objection to form.   Asked

22   and answered.

23        A.    The content would apply to ResCap,

24   yes.

25        Q.    And did you, as the CFO of ResCap,

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 87 of 213

Page 87

1                         J. YOUNG

2    have the ability to choose not to follow this

3    accounting policy?

4            MR. BROWN:   Objection to form.

5        A.    What I'm trying to say is that you're

6    pointing to this policy, and as I've said

7    before, there may have been a different policy,

8    but it had the same content.   Of course,

9    Generally Accepted Accounting Principles would

10   have to be applied to all entities.   That's not

11   a question.

12            If you're asking about this specific

13   policy, I'm saying is that, yes, ResCap had to

14   follow Generally Accepted Accounting Principles.

15   This policy documents what that would be.   It is

16   possible there was another policy at the ResCap

17   level with substantially the same discussion

18   about Generally Accepted Accounting Principles,

19   because there is no difference in applying

20   Generally Accepted Accounting Principles between

21   the entities.

22            But I can't say that this particular

23   policy on this piece of paper is the one that

24   ResCap was following at the time.

25        Q.    Notwithstanding the fact that ResCap

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 88 of 213

Page 88

1                          J. YOUNG

2    is included within the scope of this policy?

3              MR. BROWN:  Objection to form.

4         A.    Again, I -- again, I -- all I can say

5    is, yes, they are part of the consolidated group

6    of companies.  I'm just trying to make a point

7    that there may have been a separate accounting

8    policy.

9         Q.    But you're not aware of any?

10        A.    I'm not -- I don't recall any right

11   now.

12        Q.    Would you turn to the

13   second-to-the-last page.  It has the Bates

14   number ALLY 242865.  I would like to direct your

15   attention to Section 10.0, which says, "Affected

16   Areas and Exceptions."  That section states,

17   "This Policy applies to all of Ally.  There are

18   no exceptions to this policy."  Do you see that?

19        A.    I do.

20        Q.    Does that refresh your recollection as

21   to whether this policy would apply to ResCap?

22              MR. BROWN:  Objection to form.  He's

23   asked and answered this.

24        A.    No.

25        Q.    Do you have any reason to believe that

Plaintiff's
Objection
88:25-89:5: lack
of personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 89 of 213

Page 89

1                        J. YOUNG

2    Section 10.0, which says, "This Policy applies

3    to all of Ally.   There are no exceptions to this

4    policy," is an untrue statement?

5        A.      No reason to believe that.

6        Q.      What is a related party transaction?

7        A.      The common definition would be a

8    transaction between parties under common

9    control, either direct or indirect, such that --

10   such that the potential exists for the

11   transaction not to be comparable to an arm's

12   length transaction.

13       Q.      What do you mean when you say "the

14   potential exists for the transaction not to be

15   comparable to an arm's length transaction"?

16       A.      I mean it could not -- it would not be

17   comparable to an arm's length, meaning the terms

18   of the transaction between related parties may

19   not be the same terms of a comparable

20   transaction with a non-related party.

21       Q.      Under Ally's accounting policies with

22   respect to related party transactions, is there

23   any presumption as to whether those transactions

24   are arm's length or not?

25              MR. BROWN:   Objection to form.

Plaintiff's
Objection
89:6-90:19: lack
of personal
knowledge (FRE
602), irrelevant
(FRE 401, 402),
improper lay
opinion

Plaintiff's
Objection
89:6-90:19:
lack of
personal
knowledge
(FRE 602),
irrelevant
(FRE 401,
402),
improper lay
opinion, lack
of foundation
(FRE 602,
901, 903)

Page 90

1                    J. YOUNG

2        A.     Would you repeat the question, please?

3        Q.     Sure.   Under Ally's accounting

4   policies with respect to related party

5   transactions, is there any presumption as to

6   whether those transactions are arm's length or

7   not?

8              MR. BROWN:   Objection to form.

9        A.     I would have to read the policy to

10  refresh my recollection of that.

11       Q.     So, as CFO of ResCap from 2008 up

12  through today as CFO of Ally Bank, you don't

13  know what the policy is on that?

14             MR. BROWN:   Objection to form.

15       A.     I understand what Generally Accepted

16  Accounting Principles is with respect to that

17  point, and if there could be transactions

18  that -- with a related party that -- that are

19  not comparable to a third party terms.

20       Q.     Under GAAP is there a presumption with

21  respect to related party transactions as to

22  whether they are arm's length?

23       A.     I would believe under GAAP the

24  presumption is that a related party transaction

25  is not an arm's length.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 91 of 213

Page 91

1                           J. YOUNG

2        Q.    Okay.   Well, let's look at the third

3    page of this document.   It has the Bates number

4    ALLY 242850, which says, "Standards, Practices

5    and Procedures."   Let me know when you're with

6    me.

7        A.    Okay.

8        Q.    The first sentence there says, "There

9    is a general presumption that transactions

10   between related parties cannot be carried out on

11   an arm's length basis."   Do you see that?

12       A.    I do.

13       Q.    And that's in Ally's accounting

14   policy, right?

15            MR. BROWN:   Objection to form.

16       A.    That is in this document, which is

17   Ally's accounting policy, yes.

18       Q.    And we saw in Section 10.0 of Young

19   Exhibit 1 at Bates No. 242865 that that policy

20   applies to all of Ally and there are no

21   exceptions to that policy.   Do you see that?

22            MR. BROWN:   Objection to form.   Asked

23       and answered.

24       A.    Yes.

25       Q.    So, within all of Ally with respect to

Plaintiff's
Designation
91:2-92:10: lack
of personal
knowledge (FRE
602), irrelevant
(FRE 401, 402),
improper lay
opinion, lack of
foundation (FRE
602, 901, 903)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 92 of 213

Page 92

1                         J. YOUNG

2    related party transactions, there is a general

3    presumption that transactions cannot be carried

4    out on an arm's length basis; would you agree

5    with that?

6            MR. BROWN:   Objection to form.

7        A.    I would agree that that presumption is

8    present in Generally Accepted Accounting

9    Principles, so I'm not surprised at all it's in

10   this policy.

11       Q.    Okay.   And as the CFO of ResCap and

12   the chief financial executive and later chief

13   financial officer of Ally Bank, it's your

14   responsibility to enforce these policies, right?

15       A.    My responsibility is to -- to -- with

16   the accounting policy, wherever it exists, at

17   ResCap or Ally Bank, and the recording of

18   related party transactions in accordance with

19   GAAP, yes, it would be my responsibility for

20   recording them and disclosing them.

21       Q.    Do you know what a cash management

22   system is?

23       A.    I would believe there are hundreds of

24   different types of cash management systems.

25       Q.    How about within the Ally group of

Plaintiff's Objection
92:21-93:19: lack of
personal knowledge
(FRE 602)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 93 of 213

Page 93

1                           J. YOUNG

2    companies, have you ever heard the phrase "cash

3    management system" described within the Ally

4    group of companies?

5              MR. BROWN:  Objection to form.

6         A.   Not in any detailed way.

7         Q.   How about at the ResCap group of

8    companies, did it have a cash management system?

9         A.   What do you mean by "cash management

10   system"?

11        Q.   You're not familiar with the phrase?

12             MR. BROWN:  Objection to form.  He's

13        already testified there could be hundreds --

14        A.   I think --

15             MR. BROWN:  -- of different types.

16        A.   Yeah, I said there's hundreds of

17   different types of cash management systems.

18   It's a very generic, broad term.  It could mean

19   virtually anything.

20        Q.   So, within ResCap, if someone says

21   describe ResCap's cash management system, you

22   would say there could be hundreds of different

23   things, I have no idea what you're talking

24   about?

25        A.   No, I could describe the cash

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 94 of 213

Page 94

1                          J. YOUNG

2   management practices of ResCap.

3        Q.     Please do.

4        A.     To the best of my recollection, at the

5   time I was CFO of ResCap, cash management would

6   involvement different things, including cash

7   flow forecasting, monitoring of bank accounts,

8   collateral monitoring, financing sources.  All

9   involve processes and systems for exchanging

10  cash, monitoring cash, and there's likely

11  others, but those would be the main attributes

12  of the system.

13       Q.     When you say "exchanging cash," what

14  do you mean?

15       A.     Just settling cash between parties.

16       Q.     Between which parties?

17       A.     Could be any -- any counterparty that

18  ResCap would have.

19       Q.     Would it also include ResCap's

20  affiliates within the cash management system, as

21  you understand it?

22              MR. BROWN:  Objection to form.

23       A.     Yes, as I understand it.

24       Q.     And did ResCap's application of a cash    94:24-101:21:
                                                          No objection
25  management system create intercompany payables

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 95 of 213

Page 95

1                        J. YOUNG

2    and receivables?

3              MR. BROWN:   Objection to form.

4        A.    There would have been intercompany

5    receivables and payables among the ResCap group

6    of companies as well as intercompany receivables

7    and payables with outside the ResCap group of

8    companies with other AFI affiliates or AFI

9    itself.

10       Q.    Would those, pursuant to GAAP and

11   Ally's accounting policy, have been related

12   party transactions?

13       A.    Yes, I would say they would.

14       Q.    And under GAAP and Ally's accounting

15   policy, they're presumed to not be at arm's

16   length, right?

17             MR. BROWN:   Objection to form.

18       A.    The GAAP assumption for presumed to

19   not be at arm's length is there to drive

20   disclosure of those transactions, but, yes, that

21   presumption exists in GAAP and would have

22   existed throughout the time I was at ResCap when

23   there were intercompany transactions being

24   recorded.

25       Q.    So the answer is yes, intercompany

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 96 of 213

Page 96

1                          J. YOUNG

2    transactions are presumed not to be at arm's

3    length under GAAP and Ally's accounting

4    policies, right?

5              MR. BROWN:   Objection to form.

6         A.    They're presumed to be -- they're

7    presumed not to be arm's length not because they

8    aren't arm's length; it's because they require

9    additional disclosure under GAAP.

10        Q.    Okay.   Let's dig a little bit deeper

11   into Ally's accounting policy, which is

12   reflected in Young Exhibit 1.   Would you turn to

13   the page with the Bates No. ALLY 242854.   I'd

14   like to draw your attention to Section 6.3.1,

15   which is titled Presume Lack of Arm's-Length

16   Basis."   Do you see that?

17        A.    I do.

18        Q.    And it says, "The nature of a

19   transaction may be indicative that the

20   arrangement is not being conducted on an arm's

21   length basis and is a related party transaction.

22   Examples may include..."

23              So these are examples in Ally's

24   accounting policy of what related party

25   transactions may look like; do you agree with

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 97 of 213

Page 97

1                          J. YOUNG

2      that?

3                  MR. BROWN:   Objection to form.

4          A.   I agree.

5          Q.   The first bullet says, "Borrowing or

6      lending on an interest-free basis or at a rate

7      of interest significantly above or below market

8      rates prevailing at the time of the

9      transaction."   Do you see that?

10         A.   I do.

11         Q.   So one of the indicia of a related

12     party transaction is that it's interest-free

13     under Ally's accounting policy and GAAP,

14     correct?

15                 MR. BROWN:   Objection to form.

16         A.   Would you repeat your question,

17     please?

18                 MR. COHEN:   Would the reporter read my

19         question back, please?

20                 (Record read.)

21                 MR. BROWN:   Objection to form.

22                 THE WITNESS:   Read it one more time,

23         please.

24                 COURT REPORTER:   Sure.

25                 (Record read.)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 98 of 213

Page 98

1                          J. YOUNG

2              MR. BROWN:  Objection to form.

3              MR. COHEN:  Can you let the record

4      reflect that the question was read back

5      twice?

6              COURT REPORTER:  Yes.

7              THE WITNESS:  Yeah, I don't think

8      that's right.  I think you're indicating

9      that -- I think your question says that

10     because it's interest-free, it -- well,

11     if -- I'm not sure I understand your

12     question.

13              I mean, just because -- all related

14     transactions are not interest-free, and I

15     think that's what your question is asking.

16   BY MR. COHEN:

17      Q.    I'm not suggesting that all related

18   transactions -- related party transactions are

19   interest-free, but under GAAP and Ally's

20   accounting policy, related party transactions

21   can be interest-free, correct?

22      A.    It is possible, yes.

23      Q.    And that's reflected in Ally's own

24   accounting policy, right?

25      A.    Yes.

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 99 of 213

Page 99

1                          J. YOUNG

2        Q.    Okay.  So let's look at the fourth

3    bullet point.  It says, "Making loans with no

4    scheduled terms for when or how the funds will

5    be repaid."  That's the first sentence.  Do you

6    see that?

7        A.    I do.

8        Q.    So related party transactions under

9    Ally's accounting policy and GAAP can include

10   transactions where there are no scheduled terms

11   for when or how the funds will be repaid, right?

12            MR. BROWN:  Objection to form.

13       A.    This is a list of terms that are

14   indicative that an arrangement may not be at

15   arm's length, and that's it.  So it's

16   indicative -- it's a term that's indicative when

17   you're assessing a transaction and it contains,

18   for example, some of these terms, then it's

19   indicative of something that may not be arm's

20   length and therefore needs to be recorded and

21   reported as a related party transaction.

22       Q.    And that --

23       A.    Potentially.

24       Q.    And that would also include, if you go

25   another three bullet points down, "Loans to

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 100 of 213

Page 100

1                        J. YOUNG

2    parties that do not possess the ability to

3    repay," right?

4        A.    It would apply to everything on this

5    list.

6        Q.    Okay.  But that -- if a related party

7    transaction has those attributes, borrowing on

8    interest-free with no scheduled terms and the

9    loan is to a party that doesn't have the ability

10   to repay, that doesn't impact whether it is a

11   payable or a receivable, does it?

12           MR. BROWN:   Objection to form.

13       A.    Well, I would say it depends on the

14   facts and circumstances of the actual under --

15   under the actual agreements from an accounting

16   perspective.

17       Q.    Well, actually, according to 6.3.1,

18   there may not be an agreement at all.  So what

19   do you do then?

20       A.    Then you have to -- then you have to

21   figure out the facts and circumstances and

22   account for it appropriately, even considering

23   it's a related party transaction, and that could

24   take various forms.

25           So if there's an explicit agreement

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 101 of 213

Page 101

1                              J. YOUNG

2   not to repay, for instance, it could be

3   accounted for as something other than an

4   intercompany payable or receivable.

5        Q.    When would you do that accounting?

6             MR. BROWN:   Objection to form.

7        A.    If the facts and circumstances of a

8   particular transaction are such that it would

9   dictate that there's separate accounting.  So

10  based on facts and circumstances.

11       Q.    But my question is would you determine

12  that when the obligation to pay or the right to

13  receive payment was incurred or would you do it

14  years later?  What does GAAP provide in that

15  regard?

16             MR. BROWN:   Objection to form.

17       A.    GAAP would provide for an assessment

18  at the initiation of the transaction, and then

19  an ongoing assessment if facts or circumstances

20  or terms change, the accounting could be

21  changed.

22       Q.    So if at the time of the transaction

23  the obligation to pay or the right to receive

24  payment was incurred, you would have to

25  determine under GAAP whether it in fact was a

Plaintiff's
Objection
101:22-103:20:
lack of personal
knowledge (FRE
602), irrelevant
(FRE 401, 402),
improper lay
opinion

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 102 of 213

Page 102

1                          J. YOUNG

2    related party transaction and it was a loan or

3    something else, right?

4        A.    At the time of the initiation of the

5    transaction, you would determine whether it

6    was -- how it should be accounted for under

7    GAAP, including considerations of non-arm's

8    length terms if they so exist.

9        Q.    And would you agree with me that one

10   of the overarching principles of GAAP is to

11   fairly reflect the financial statements, the

12   financial condition of the reporting entity?

13       A.    Yes.

14       Q.    So GAAP, if you were recording a -- an

15   asset, a receivable, under GAAP, if you didn't

16   think it was a receivable, you shouldn't record

17   it as a receivable; that's one of the

18   overarching principles of GAAP, right?

19            MR. BROWN:   Objection to form.

20       A.    It's a very general, broad statement,

21   but I would generally agree, yes.

22       Q.    Okay.  So if you had billions of

23   dollars of intercompany payables and receivables

24   on your financial statements under GAAP, if you

25   didn't believe those to be payables and

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 103 of 213

Page 103

1                              J. YOUNG

2      receivables, you wouldn't be recording them as

3      payables and receivables, right?

4                  MR. BROWN:   Objection to form.

5          A.     Are you referring to specific

6      transactions?

7          Q.     I'm referring generally.

8                  MR. BROWN:   Objection to form.

9          Q.     Do you need my question again?

10         A.     Would you re-read it, please?

11                 (Record read.)

12                 MR. BROWN:   Objection to form.

13                 THE WITNESS:   If the facts and

14          circumstances of the receivable or payable

15          were such that the accounting professional

16          had a -- had information available that

17          would indicate that there was no intent to

18          pay or there, you know, then yes, it

19          wouldn't be recorded as a receivable or a

20          payable.

21     BY MR. COHEN:

22         Q.     Okay.  And during your time as CFO at

23     ResCap and later as chief financial executive

24     and CFO at Ally, you prepared your books in

25     accordance with GAAP, right?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 104 of 213

Page 104

1                        J. YOUNG

2            MR. BROWN:  Objection to form.

3       A.    I am not the CFO of Ally.

4       Q.    Bank.  I'm sorry.  Let me reask the

5   question because I think we have a definitional

6   problem.

7            When I said "Ally," I meant Ally Bank,

8   but let me give you the more precise question.

9   I forget I'm deposing an accountant.

10           During your time as CFO at ResCap and

11  later as chief financial executive and CFO at

12  Ally Bank, you prepared your books in accordance

13  with GAAP, right?

14      A.    Yes.

15      Q.    And one of the things you were

16  required to do under GAAP, as you just

17  testified, is look at the payables and

18  receivables and reassess whether they in fact

19  were payables and receivables, right?

20           MR. BROWN:  Objection to form.

21      Q.    GAAP required that, didn't it?

22           MR. BROWN:  Objection to form.

23      A.    GAAP requires an assessment of -- of

24  the intercompany, an assessment of payables and

25  receivables, inclusive of intercompany.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 105 of 213

Page 105

1                          J. YOUNG

2        Q.      And that's an ongoing requirement,

3    right?

4        A.      It's an ongoing requirement, but it's

5    a very complex and detailed analysis.

6        Q.      But it's not something that you can

7    ignore and still be GAAP-compliant, right?

8        A.      You can make your judgment and, you

9    know, you either -- you either make an

10   adjustment or you disclose the transaction.

11   That's part of the reason for the GAAP

12   disclosure requirements is the fact that these

13   could be on non-arm's length basis, and as such,

14   the disclosure is important for the reader to

15   understand, if there is a user of the financial

16   statements.

17       Q.      But under GAAP, it's not okay to book

18   a payable and receivable say in 2009 or 2010,

19   and say, you know what, three years later I'll

20   actually revisit whether that's a payable or a

21   receivable; that's not okay, is it?

22              MR. BROWN:   Objection to form.

23       A.      Now you're introducing the passage of

24   time and you seem to be taking a view that

25   there's facts known at the initiation of the

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 106 of 213

Page 106

1                          J. YOUNG

2    transaction that may not be known.

3         Q.    Well, what I'm saying is you testified

4    that you have an ongoing obligation to look at

5    this.  You can't ignore it for years and then

6    reassess years later.  If something comes up in

7    the interim, you've got to adjust your

8    financials, right?

9         A.    You've got to consider the facts and

10   circumstances and potential adjustment.

11        Q.    On an ongoing basis?

12        A.    On an ongoing basis.

13        Q.    Okay.  And that's required by GAAP

14   irrespective of Ally's policy, right?

15             MR. BROWN:  Objection to form.

16        A.    Yes.

17        Q.    And Ally's policy, as you testified,

18   is an attempt to implement GAAP, right?

19             MR. BROWN:  Objection to form.

20        A.    That would be my opinion, yes.

21        Q.    Okay.  So it should be one and the

22   same, right?

23             MR. BROWN:  Objection to form.

24        A.    Ally's policies follow GAAP.

25        Q.    Okay.  ResCap's policies also follow

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 107 of 213

Page 107

1                   J. YOUNG

2    GAAP, right?

3              MR. BROWN:   Objection to form.

4         A.    ResCap's policies would follow

5    Generally Accepted Accounting Principles, yes.

6         Q.    Okay.   During your time as the CFO at

7    ResCap and then later as the chief financial

8    executive and CFO at Ally Bank, are you aware of

9    anybody trying to mislead people through the

10   financial statements of ResCap or Ally Bank?

11        A.    No.

12        Q.    So you're not aware of people

13   recording things as payables and receivables

14   when they didn't believe them to be payables and

15   receivables?

16        A.    I'm not aware of that.

17        Q.    Okay.   If you were aware of that as

18   the CFO of ResCap and then later the chief

19   financial executive and CFO of Ally Bank, you

20   would have fixed it, right?

21        A.    I certainly would have understood the

22   facts, understood the -- if somebody is raising

23   an issue, why they're raising the issue, and

24   assessed the situation and determined if an

25   adjustment were necessary.

Plaintiff's
Objection
Young Tr. at
107:6-122:18
Inadmissible
hearsay (FRE
802),
irrelevant
(FRE 401,
402), lack of
personal
knowledge
(FRE 602),
improper lay
opinion, lack
of foundation
(FRE 602,
901, 903)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 108 of 213

Page 108

1                              J. YOUNG

2        Q.    So if someone came to you and said

3    there's billions of dollars of payables and

4    receivables, intercompany payables and

5    receivables on these books, but it's not really

6    a payable and receivable, you would have fixed

7    that, right?

8              MR. BROWN:    Objection to form.    Asked

9        and answered.

10       A.    Yeah, I think I did just say that

11   if -- I don't know if you're referring to a

12   specific transaction or not, but the process

13   would involve understanding someone's concern,

14   going through the facts and circumstances,

15   assessing if an adjustment needed to be made,

16   assessing whether disclosure should be made,

17   which maybe hadn't been there for whatever

18   reason, that there's a process that would be

19   followed to make that determination.

20       Q.    Would you turn to -- we're still on

21   Young Exhibit 1.    It's the page with the Bates

22   number ALLY 242857.

23             We're looking at the bottom of the

24   page, which is 6.5.2, titled the "Debt

25   Forgiveness or Extinguishment."    Do you see

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 109 of 213

Page 109

1                              J. YOUNG

2       that?

3            A.      I do.

4            Q.      That section says, "Extinguishment of

5       debt transactions between related entities may

6       be in essence capital transactions.    As such,

7       forgiveness of debt and related interest between

8       related parties and the associated gains or

9       losses generally should not be classified as

10      income statement items but rather as capital

11      transactions."    Do you see that?

12           A.      I do.

13           Q.      Is that consistent with your

14      understanding of GAAP?

15           A.      Yes, when particularly if -- yes.

16      Yes.

17           Q.      Okay.    So if you're going to

18      extinguish or forgive debt rather than treating

19      that as income, you treat it as an equity

20      contribution, right?

21               MR. BROWN:    Objection to form.

22           A.      Could you repeat the question, please?

23               (Record read.)

24               MR. BROWN:    Objection to form.

25           A.      No, it depends on the facts and

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 110 of 213

Page 110

1                          J. YOUNG

2    circumstances of the forgiveness.

3        Q.    Okay.   Under what facts and

4    circumstances would related party extinguishment

5    or forgiveness of debt be treated as an income

6    statement item?

7        A.    When -- when it's, for instance, not

8    a -- that it's a -- not a long series of -- of

9    demonstrated factual history of rotating to

10   debt, forgiveness, debt, forgiveness, debt,

11   forgiveness.

12            If there's a history of a long series

13   of transactions, short-term in nature, that

14   could -- could create a set of facts and

15   circumstances where an accounting professional

16   might say these are capital transactions,

17   they're not debt.   But it's -- but that's one

18   instance.

19            There are obviously other instances

20   where debt forgiveness, even between related

21   parties, is not a capital transaction.   This is

22   not -- I mean, this says "may in essence be" --

23   "may be in essence."   It's not a -- it's not a

24   "at all times."   So there are certainly

25   circumstances where it would be not capital.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 111 of 213

Page 111

1                        J. YOUNG

2       Q.    Well, certainly the first sentence

3   says, "May be in essence capital transactions,"

4   but the second sentence says, "As such,

5   forgiveness of debt and related interest between

6   related parties and the associated gains or

7   losses generally should not be classified as

8   income statement items, but rather as capital

9   transactions."

10            Doesn't that mean that a capital

11  transaction is the default and the income

12  statement item is the exception?

13            MR. BROWN:   Objection to form.

14      A.    I -- I think it's a facts and

15  circumstances assessment.

16      Q.    Where in this policy does it say it's

17  a facts and circumstances?

18      A.    It's clearly embedded in Generally

19  Accepted Accounting Principles and every word of

20  Generally Accepted Accounting Principles is not

21  in that policy.

22      Q.    Okay, but what -- what section of

23  GAAP, what standard should I look to to get

24  backup for your assertion?

25      A.    I don't have chapter and verse to

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 112 of 213

Page 112

1                          J. YOUNG

2    quote to you right now.

3        Q.     Okay.   For purposes of Ally's

4    accounting policy, which we've seen in Section

5    10.0 applies to all of Ally with no exceptions,

6    forgiveness of debt and related interest income

7    between related parties and the associated gains

8    or losses generally should not be classified as

9    income statement items but rather as capital

10   expenditures, that applies to all of Ally;

11   that's its own policy, right?

12           MR. BROWN:   Objection to form.

13       A.     The policy -- you have read -- you

14   read the policy.   That is what the policy says,

15   and I'm indicating that the application of the

16   policy requires an assessment of the facts and

17   circumstances.

18       Q.     And my question is under Ally's own

19   policy, by saying it generally should not be

20   classified as income statement items, the

21   default is it's a capital item, not an income

22   statement item; can you agree with that?

23           MR. BROWN:   Objection to form.

24       A.     Not necessarily.   I mean, default --

25   it's facts and circumstances.

1                              J. YOUNG

2       Q.     Even though the policy says it

3    generally should not be?

4       A.     It's also the first sentence says

5    "entities may be in essence capital

6    transactions."  It's -- it's facts and

7    circumstances based, but it's a -- it's

8    presenting a burden of proof that, you know,

9    it's -- it's, as GAAP would, that there's a

10   certain level of skepticism there, which is

11   appropriate.

12       Q.     Okay.  When you say it's presenting a

13   burden of proof that there's a certain level of

14   skepticism, what do you mean?

15       A.     I mean that -- that the disclosure of

16   intercompany related party transactions is

17   important and in a GAAP concept, and I think

18   we've already discussed the fact that -- that

19   some of the policy, there's a presumption that

20   there's not arm's length, and so that is the

21   presumption going in.

22            It doesn't mean it's the default.

23   It's the presumption going in, which means, of

24   course, you have a burden of proof that

25   transactions are either arm's lengths or, in

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 114 of 213

Page 114

1                           J. YOUNG

2    this particular, very detailed case, accounted

3    for, you know, as the income statement has

4    rather than capital transactions.

5         Q.    So let's back up a little bit.  Just

6    because a transaction is not arm's length, that

7    doesn't mean that it's not a debt transaction,

8    right?  The issue between income statement and

9    capital account only comes up in the forgiveness

10   context, right?

11             MR. BROWN:  Objection to form.

12        A.    No, I mean, you can have a related

13   party transaction where you're providing cash or

14   capital to an affiliate or of a related party in

15   some instance, and if the, you know, if there's

16   an underlying agreement or the terms and

17   conditions -- I'll use a easy example --

18   indicate that there's no repayment requirement,

19   even though the agreement may say it's -- it's

20   a, you know, receivable or a debt agreement, but

21   there's a term in there where it says there's no

22   repayment requirement, that's on the front end,

23   not during your forgiveness period but on the

24   front end of the transaction, you know, just

25   hypothetically, in my view, that would be a

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 115 of 213

Page 115

1                           J. YOUNG

2    capital transaction from day one, not a

3    receivable or payable that was later forgiven.

4        Q.    What about the situation where there

5    is no agreement at all, we looked at the

6    examples in Young Exhibit 1, where you have

7    payables, intercompany payables and receivables

8    where there is no agreement and no stated

9    interest rate, and that still shows up on the

10   books and records prepared in accordance with

11   GAAP as payables and receivables.  That's

12   properly classified, isn't it, even though

13   there's no agreement?

14           MR. BROWN:   Objection to form.

15       A.    Yes.

16       Q.    Okay.   And the only issue with respect

17   to whether it's an income statement item or a

18   capital account item is when you talk about

19   forgiving that payable, isn't that right, or if

20   you come up with other information in your

21   ongoing assessment?

22       A.    Well, again, I would say that, despite

23   the fact that on the initial recording of a

24   receivable and payable that you were describing

25   that may not have, may not have -- I don't know

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 116 of 213

Page 116

1                          J. YOUNG

2    if they do or don't have underlying agreements,

3    but I'll take your assumption that there's no

4    underlying agreement -- if there's a pattern of

5    repayment and settlement, then, you know,

6    that -- that is appropriately classified as an

7    intercompany receivable and payable upfront,

8    without an agreement.

9        Q.    So we've been talking for a while

10   about debt forgiveness.  You're familiar with

11   that phrase, right?

12       A.    Yes.

13       Q.    What does that mean?

14       A.    It means forgiving of debt.

15       Q.    When you say "forgiving," what do you

16   mean?  What does the forgiveness part refer to?

17       A.    If one party owes somebody some money

18   and the other party says, well, you don't need

19   to pay me back, I'm forgiving the debt, that's

20   debt forgiveness.

21       Q.    Okay.  So if it wasn't actually debt,

22   then you wouldn't need to talk in terms of

23   forgiveness, right?

24            MR. BROWN:  Objection to form.

25       A.    If -- if what wasn't debt?  I don't

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 117 of 213

Page 117

1                         J. YOUNG

2    understand.

3        Q.    Without a debt -- you can't forgive

4    debt that isn't owed, do you agree with that?

5        A.    I agree with that.

6        Q.    Okay.  So if you're talking about

7    forgiving debt, there has to be a debt that's

8    owed, right?

9        A.    On the face of it, yes.

10       Q.    All right.

11             (Young Exhibit 2, a memo bearing Bates

12             Nos. RCJSNII0025838 through 258239, marked

13             for identification, as of this date.)

14   BY MR. COHEN:

15       Q.    Mr. Young, the reporter has handed you

16   a copy of a document that's marked Young Exhibit

17   2.  It has the Bates No. RCJSNII0025838 through

18   258239.  Would you take a look at that?

19             MR. COHEN:  This is a document

20             entitled Request for Action by the ResCap

21             Executive Committee, Capital Allocation from

22             ResCap to Residential Funding Company, LLC

23             (RFC), GMAC Residential holdings LLC (Resi),

24             and GMAC Mortgage LLC (GMACM) for Quarter 4

25             TNW Shortfall."

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 118 of 213

Page 118

1                           J. YOUNG

2          A.    Okay.

3          Q.    Have you seen this document before?

4          A.    I don't recall seeing it.  However, I

5    was CC'd on it, so it's certainly possible that

6    I have.

7          Q.    Do you have any reason to believe you

8    didn't get it?

9          A.    No.

10         Q.    Have you seen documents like this

11   before?

12         A.    Well, I -- this document is a request

13   for action by the ResCap Executive Committee.  I

14   would have seen those before.

15         Q.    Have you seen documents requesting the

16   ResCap Executive Committee to forgive debt and

17   convert that debt into a capital contribution?

18         A.    I believe I've seen that before, yes.

19         Q.    What was the purpose of that request?

20               MR. BROWN:   Objection to form.

21         A.    Well, I was not the CFO of ResCap at

22   the time of this memo, so I can -- I wasn't a

23   part of the detailed discussions of this, of

24   this memo.

25         Q.    Does that mean you don't know what the

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 119 of 213

Page 119

1                              J. YOUNG

2   purpose of the request was for?

3        A.     I have a, I would say, general

4   understanding that the purpose was for, as it

5   indicates in the memo, to -- to provide capital

6   for some -- for subsidiaries in order to meet

7   tangible net worth covenants.

8        Q.     Would you look at the second page of

9   the document.   It has the Bates number ending

10  with 839 under the last section of Request.   Do

11  you see that?

12       A.     You said 839?

13       Q.     839.   It's (indicating).

14            MR. BROWN:   It's got two different

15       sets of Bates numbers.

16            MR. COHEN:   Yes, I'm looking at the

17       one at the top.

18            THE WITNESS:   Okay.   Oh, I see.   Thank

19       you.   All right.

20  BY MR. COHEN:

21       Q.     It's the second page of the document.

22            I would like to direct your attention

23  under Request to the second sentence,

24  "Specifically, I request approval of capital

25  contributions in the form of forgiveness of

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 120 of 213

Page 120

1                         J. YOUNG

2    affiliate borrowings from RFC in the amount of

3    $700 million," and then it goes on.   Do you see

4    that?

5         A.    I do.

6         Q.    And as we talked about, because

7    they're requesting forgiveness, there has to be

8    a debt there, otherwise it doesn't make any

9    sense, right?

10        A.    Agreed.

11        Q.    Okay.   You can put that one aside.

12              I'm going to hand you a document which

13   has previously been marked as Hamzehpour No. 3.

14   Would you take a moment to look at this?

15              (Document review.)

16              MR. COHEN:   This has the Bates number

17       RC40006568 through 6570.   It's a memo dated

18       June 25, 2009 from James N. Young, ResCap

19       CFO, to the ResCap Executive Committee,

20       Subject:   Request for action by the ResCap

21       Executive Committee, Capital Allocation from

22       GMAC Residential Holding Company to GMAC

23       Mortgage LLC (GMACM).

24   BY MR. COHEN:

25        Q.    Let me know when you're through that.

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 121 of 213

Page 121

1                        J. YOUNG

2        A.      Okay.

3        Q.      Is this a memo you wrote?

4        A.      I would suspect yes.

5        Q.      Are you James N. Young?

6        A.      I am.

7        Q.      All right.  And in June of 2009, you
8   were the ResCap CFO?

9        A.      Yes.

10       Q.      You were also a member of the ResCap
11   Executive Committee at that time?

12       A.      I believe that's true.

13       Q.      All right.  At the bottom of the first
14   page of Hamzehpour Exhibit 1, you state, "For
15   the above reasons, I request the authority to
16   allocate the capital of ResCap to its subsidiary
17   GMACM by means of debt forgiveness by GMAC
18   Residential Holding Company, LLC for the purpose
19   of," and then it goes on?

20              MR. BROWN:  I think this was
21       Hamzehpour 3, David.

22              MR. COHEN:  Isn't that what I said?

23              MR. BROWN:  No, it's not.

24              MR. COHEN:  Sorry.

25   BY MR. COHEN:

Page 122

1                         J. YOUNG

2        Q.    At the bottom of the first page of

3   Hamzehpour 3 is the language I just read?   Do

4   you see that?

5        A.    Yes.

6        Q.    So what you're asking for is to

7   forgive the debt, and as we talked about,

8   forgiveness doesn't make any sense without debt,

9   right?

10       A.    Yes.

11       Q.    And you not only wrote this memo, if

12   you look at the last page of Hamzehpour 3, which

13   ends in 570, you actually signed approving your

14   request, right?

15       A.    Yes.

16       Q.    So you were in favor of forgiving this

17   debt, right?

18       A.    Yes.

19       Q.    All right.   Thanks.

20            MR. COHEN:   Take about five minutes?

21   I'm going to go into a new topic.

22            MR. BROWN:   Okay.

23            THE VIDEOGRAPHER:   The time is 11:41

24   A.M.   We're off the record.

25            (Recess.)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 123 of 213

Page 123

J. YOUNG

1

2    THE VIDEOGRAPHER:  The time is 11:50

3    A.M.  We're on the record.

4  BY MR. COHEN:

5    Q.    Mr. Young, do you agree that in 2008

6  ResCap was facing severe liquidity issues and at

7  the same time Ally Bank had excess liquidity?

8    MR. BROWN:  Objection to form.

9    A.    In 2008, ResCap, yes, had -- had

10  liquidity issues.  I cannot speak to Ally Bank,

11  as I wasn't part of Ally Bank at that time.

12    Q.    Are you familiar with the Brokering

13  Consumer Loans to Bank project?

14    A.    Yes.

15    Q.    What was that project?

16    A.    Generally speaking, it was a project

17  to have ResCap broker loans to Ally Bank and

18  then Ally Bank -- and then ResCap generally

19  would buy them back under the MMLPSA.

20    Q.    What was the purpose of that

21  arrangement?

22    A.    Well, this was back in two thousand

23  an -- the end of 2008, is that correct?  Do

24  you -- could you refresh my recollection on when

25  the broker arrangement came into play?

Plaintiff's
Objection
123:5-128:20
Inadmissible
hearsay (FRE
802)

Plaintiff's
Objection
123:5-11: lack
of personal
knowledge
(FRE 602)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 124 of 213

Page 124

1                     J. YOUNG

2        Q.    We'll give you a document.

3        A.    Thank you.

4        Q.    I'll give you -- I'll represent to you

5   that the date of the broker agreement is 20

6   November 2008, and maybe at lunch we can make a

7   copy of the document.

8        A.    Okay.  All right.  Yeah, so end of

9   2008, beginning of 2009, the purpose of the

10  agreement was to have ResCap origination

11  production be brokered to Ally Bank and, again,

12  sold to the -- sold to the -- back to ResCap.

13          The advantage to ResCap was the fact

14  that it -- that arrangement would be a mechanism

15  to essentially replace some third-party funding

16  of ResCap's origination pipeline that would have

17  been strained at the time.

18       Q.    In what way did it replace third-party

19  funding of ResCap's origination pipeline?

20       A.    By the way, I want to state for the

21  record that my responsibility as ResCap's CFO

22  did not include Treasury.  The treasury function

23  did not report to me.

24          You had asked me about my

25  responsibility at Ally Bank.  I did have

Page 125

1                         J. YOUNG

2      responsibility for Ally Bank Treasury, but not

3      ResCap Treasury as CFO.

4          Q.    But you also testified earlier that

5      you understood that you have been designated as

6      Ally's corporate representative with respect to

7      all matters relating to the MMLPSAs between GMAC

8      Mortgage and Old GMAC Bank and between GMAC

9      Mortgage and Ally Bank, irrespective of your

10     responsibilities, rights?

11         A.    Yes, I understand that.   I just wanted

12     to state for the record.

13         Q.    Okay.   But you're able to testify

14     as --

15         A.    I am.

16         Q.    -- to these issues?   Okay.

17         A.    And I'm sorry, then repeat the

18     question?

19             (Record read.)

20         A.    Well, it provided for the loan to be

21     brokered to Ally Bank so Ally Bank would fund

22     the loan with the -- with the counterparty and

23     then sell it back to ResCap under the MMLPSA.

24     So that is a -- that is an effective replacement

25     of funding requirements for those loans.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 126 of 213

Page 126

1                          J. YOUNG

2       Q.    Are you familiar with the 250.250

3   exception?

4       A.    Not in a detailed way, but I am

5   familiar with that phrase, yes.

6       Q.    What is your general understanding of

7   that?

8       A.    The -- excuse me, that there is --

9   there is a restriction on the amount of

10  origination activity that the bank is allowed to

11  acquire.  I believe that's what that refers to.

12      Q.    Do you know whether it relates to any

13  Federal Reserve requirements, bank regulatory

14  requirements?

15      A.    Well, I think I just said it's a bank

16  regulatory -- it's a bank limitation on the

17  amount of origination activity it can -- it

18  could take from an affiliate.

19      Q.    Did the Brokering Consumer Loans to

20  Bank project impact that limitation?

21          MR. BROWN:  Objection to form.

22      A.    I don't recall.

23      Q.    So you don't know whether loans

24  brokered to Ally Bank by GMAC Mortgage and then

25  originated by Ally will be subject to that limit

Plaintiff's
Objection
126:2-127:4: lack
of personal
knowledge (FRE
602), improper lay
opinion

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 127 of 213

Page 127

1                         J. YOUNG

2    or not?

3              MR. BROWN:  Objection to form.

4        A.    I don't recall right at this moment.

5        Q.    What was ResCap's agreement with Ally

6    regarding how they would be paid under -- so

7    ResCap would broker the loan, broker it up to

8    Ally, and then buy it back.

9              What were the payment arrangements

10   that existed between the parties?

11             MR. BROWN:  And by "Ally" you mean

12      Ally Bank?

13             MR. COHEN:  I do.

14             THE WITNESS:  The payment arrangements

15      for the repurchase of the loan would have

16      been governed by the MMLPSA.

17   BY MR. COHEN:

18       Q.    And what did the MMLPSA provide with

19   respect to payment?

20             MR. BROWN:  Objection to form.  At

21      what time?

22       A.    That --

23             MR. BROWN:  Objection to form.

24       A.    That the, to the best of my

25   recollection, as of the most recent version of

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 128 of 213

Page 128

J. YOUNG

1

2 the MMLPSA, which I'm most familiar with, it

3 would have involved the repurchase of all the

4 loans that are held for sale by Ally Bank, and

5 the document, of course, has all the terms of

6 that agreement.

7     Q.    Do you have a general understanding of

8 what ResCap was to receive from Ally under the

9 MMLPSA?

10         MR. BROWN:  Objection to form.

11     A.    The MMLPSA is an agreement between

12 ResCap and Ally Bank where Ally Bank is selling

13 the loan.  So the receiver in that situation is

14 Ally Bank.  I think you'd mentioned the other

15 way around.

16     Q.    Uh-huh.

17     A.    But the terms of the transaction again

18 are set forth, but there's specific terms in

19 there in terms of what the purchase price was to

20 be.

21     Q.    As between GMAC Mortgage and Ally

22 Bank, who realized the benefits of points or

23 other origination fees under the MMLPSA?

24         MR. BROWN:  Objection to form.  Which

25     MMLPSA are you talking about?

Page 129

1                       J. YOUNG

2            MR. COHEN:  In 2008.

3            MR. BROWN:  The one that was operative

4       before or after July 1, 2008?

5            MR. COHEN:  The one dated November 20,

6       2008.

7            MR. BROWN:  That's a broker agreement.

8       You just made --

9            MR. COHEN:  I'm sorry.

10           MR. BROWN:  -- that representation.

11           It's dated July 1, 2008.

12           MR. COHEN:  We're going to have to

13      come back to this topic.  We're going to

14      need to make some copies during lunch.

15           MR. BROWN:  Okay.

16           MR. COHEN:  If that's okay.

17           MR. BROWN:  You want to take a moment,

18      I can hand them right now and have copies

19      made of whatever document you need.

20           MR. COHEN:  Yes, let's go off the

21      record.

22           THE VIDEOGRAPHER:  The time is 12 P.M.

23      We're off the record.

24           (Pause in the proceedings.)

25           THE VIDEOGRAPHER:  The time is 12:01

Page 130

1                          J. YOUNG

2          P.M.  We're on the record.

3    BY MR. COHEN:

4          Q.     Earlier today we were talking

5    generally about tax allocation agreements and

6    the Examiner's review of that.  Do you remember

7    that?

8          A.     Yes.

9          Q.     What is a tax allocation agreement?

10         A.     From my perspective, the primary

11   purpose of a tax allocation agreement is to --

12   to provide an understanding of how the tax

13   attributes of a subsidiary that's within a

14   consolidated tax return with -- it files a

15   consolidated tax return with its parent would

16   record tax -- those tax attributes for financial

17   reporting purposes.

18         Q.     Was ResCap party to a tax allocation

19   agreement?

20             MR. BROWN:  Objection to form.  What

21      time period are you talking about?

22         A.     ResCap at a point was -- they had a

23   tax allocation agreement, yes.

24         Q.     At what point in time?

25         A.     I would, to the best of my

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 131 of 213

Page 131

1                           J. YOUNG

2    recollection, if it wasn't the entire period of

3    time that I was at ResCap, there were only small

4    breaks in time, and -- and Generally Accepted

5    Accounting Principles also has a default if

6    there is no tax sharing agreement in place for

7    how you would record the tax attributes on the

8    subsidiaries' books and records.

9        Q.    What is the GAAP default for how you

10   would record the tax attributes on the

11   subsidiaries' books and records?

12       A.    It's referred to as a pure standalone

13   basis, so it would essentially be that the tax

14   attributes would be recorded as if that

15   subsidiary entity was in fact the taxable

16   entity, which of course, it's not, but that's

17   the default under GAAP and the preferred.  The

18   reason it's a default is it's preferred under

19   GAAP.

20       Q.    Why is that preferred under GAAP?

21       A.    Because we've talked before about the

22   users of financial statements being able to make

23   decisions from financial statements, and a

24   standalone tax basis -- the disclosures and

25   recording of an entity's tax attributes using a

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 132 of 213

Page 132

1                          J. YOUNG

2    standalone tax basis is easiest for the reader

3    to understand because it's what any other

4    consolidated tax filer would record.

5        Q.    And is the purpose of a tax allocation

6    agreement to get out of the GAAP default and

7    contract for something else?

8            MR. BROWN:   Objection to form.

9        A.    Not in my opinion.

10       Q.    When ResCap was a party to a tax

11   allocation agreement with Ally, did it report as

12   though it was the consolidated tax filer?

13           MR. BROWN:   Objection to form.   And by

14   "Ally," you mean AFI?

15           MR. COHEN:   I do.

16           THE WITNESS:   There was various points

17   in time where ResCap was treated differently

18   for tax purposes.   I don't recall the exact

19   dates, but at some point in time when I

20   joined the company, ResCap was a -- an LLC

21   or C Corp., and somewhere along the line it

22   moved to a partnership, so at that -- during

23   that point in time, there were no tax

24   attributes recorded as a partnership because

25   of the fact that it was a partnership.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 133 of 213

Page 133

1                      J. YOUNG

2              Then it -- then it moved off of that

3        back to an LLC and -- and then certainly

4        during all those periods of time, except for

5        the partnership years, ResCap was utilizing

6        the GAAP default, preferred, standalone tax

7        attribute reporting method.

8    BY MR. COHEN:

9        Q.    Do you recall in 2009 Mr. Marx

10   negotiating with you over a tax allocation

11   agreement between AFI and ResCap?

12       A.    I recall, yes, some back and forth on

13   tax sharing agreements, yes.

14       Q.    Who was Mr. Marx?

15       A.    He was a tax representative from Ally

16   Financial Inc.

17       Q.    Does he still work for Ally Financial

18   Inc.?

19       A.    I don't know.

20       Q.    When is the last time you talked to

21   him?

22       A.    I can't recall, but it's been quite a

23   while.

24       Q.    On the ResCap side of negotiating the

25   tax sharing agreement, who had responsibility

Plaintiff's
Objection
133:24-134:23
Irrelevant
(FRE 401,
402)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 134 of 213

Page 134

1                          J. YOUNG

2    for that?

3         A.    I think, as we said before, it was

4    a -- it was a combination of Finance, myself,

5    meaning Legal, Tammy Hamzehpour, and I would

6    have had perhaps other people on the Finance and

7    Tax staff look at it.   That's when we -- you

8    asked me for the names and I told you Cathy

9    Dondzila and John Demro.

10        Q.    As between that group of people, who

11   would you say had the lead role?   Who was

12   primarily responsible for negotiating?

13        A.    I would say myself, with Tammy

14   Hamzehpour close behind.

15        Q.    Did you mark up drafts yourself?

16        A.    I don't recall.

17        Q.    Do you recall, as between the team at

18   ResCap, anybody marking up drafts?

19        A.    No, I don't recall.

20        Q.    Who had responsibility for

21   communicating ResCap's position to Mr. Marx?

22        A.    I would say, again, a combination of

23   myself and Tammy Hamzehpour.

24        Q.    Did you consider the tax sharing

25   agreement to be a related party transaction?

1                        J. YOUNG

2            MR. BROWN:  Objection to form.

3       A.    Yes.

4       Q.    Did you consider the negotiation of

5  the tax sharing agreement to be an arm's length

6  negotiation?

7       A.    Yes.

8       Q.    Why?

9       A.    Because it was.

10      Q.    And what aspects of the negotiation

11  lead you to the conclusion that it was an arm's

12  length negotiation?

13      A.    Because there was the discussion back

14  and forth, there was considerations, not in the

15  legal sense but conceptual considerations back

16  and forth, just we -- it was arm's length.

17  There wasn't any -- it was arm's length.

18      Q.    When you say "conceptual

19  considerations back and forth," what do you

20  mean?

21      A.    I mean what is the proper GAAP

22  accounting outcome for a tax allocation

23  agreement or most preferred; what's fair or

24  what's not fair.

25      Q.    What is the most preferred GAAP

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 136 of 213

Page 136

1                            J. YOUNG

2    outcome under a tax sharing agreement?

3        A.    I think I did answer this one, but

4    it's a standalone basis where the tax attributes

5    are accounted for as if the entity were a filer,

6    but of course, it's not.

7        Q.    Who made the determination from

8    ResCap's perspective as to what was fair and not

9    fair?

10           MR. BROWN:  Objection to form.

11       A.    There was a process that ResCap went

12   through to ensure that it was fair.  That

13   process included internal discussions with

14   counsel, meaning Tammy Hamzehpour, discussions

15   with the Executive Committee and the board of

16   ResCap, discussions with the independent

17   directors of ResCap, and ResCap had -- ResCap's

18   independent directors also retained independent

19   outside counsel, which is also, you know, for

20   all those reasons that it was clearly arm's

21   length.

22       Q.    When you were dealing with Mr. Marx in

23   your capacity as CFO of ResCap --

24           You were CFO at the time, right?

25       A.    Yes.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 137 of 213

Page 137

1                         J. YOUNG

2        Q.     Whose interests, which corporate

3   interests were you concerned about?

4        A.     ResCap.

5        Q.     Did you have any concern for Ally

6   Financial's corporate interests while you were

7   undertaking these negotiations?

8        A.     My primary corporate interest was with

9   ResCap.  I -- Ally Financial Inc. at the time

10  was a very important source of funding for

11  ResCap, but my primary fiduciary responsibility

12  was clearly with ResCap.

13       Q.     You say -- what do you mean by your

14  primary corporate interest was with ResCap?

15  What does that mean?

16       A.     It means my -- my corporate interest

17  was with ResCap, pure and simple.

18       Q.     Did you have a secondary corporate

19  interest?

20       A.     I did not have a secondary corporate

21  interest.

22       Q.     During the time that you were

23  negotiating or discussing the tax sharing

24  agreement with Mr. Marx, were you also

25  discussing leaving ResCap and going to Ally

Plaintiff's
Objection
137:22-138:15:
irrelevant (FRE
401, 402)

Page 138

1                        J. YOUNG

2  Bank?

3              MR. BROWN:  Objection to form.

4      A.    No.

5      Q.    Are you sure?

6      A.    I have certainty that they were not

7  connected in any way, and I believe that most of

8  those conversations occurred well before anybody

9  mentioned to me anything about going to Ally

10  Bank, but I -- but it's possible that the

11  signing of the final tax sharing agreement was

12  dated in January of 2011, which was at or about

13  the same time I may have been first asked to

14  move to Ally Bank, but they are in no way

15  connected.

16      Q.    When you say "final tax sharing

17  agreement," what do you mean?

18      A.    I mean the updated version.  There

19  were several tax sharing agreements in place

20  that during the time I first got there, during

21  the time of the partnership, there was a tax

22  sharing agreement in place.  It needed to be

23  updated, and I'm talking about the final,

24  updated, executed version, which I think, you

25  know -- well, yes, the final executed version,

Page 139

1                    J. YOUNG

2   which I believe was signed in January of '11.

3       Q.    Prior to January of '11, did you

4   receive a different version of a tax sharing

5   agreement that had been signed by Ally

6   Financial?

7       A.    I -- I don't recall ever receiving --

8   I don't know.  I don't know.  I don't recall.

9   We certainly talked about the draft, but you're

10  asking me if I ever saw a document signed by

11  somebody from Ally Financial, and I don't

12  recall.

13      Q.    Do you recall whether Ally Financial

14  ever sent you, prior to January of '11, a

15  document with instructions for you to sign?

16            MR. BROWN:  Objection to form.

17      A.    I believe they -- they had prepared

18  something that was to be sent to me.  There

19  was -- and I have seen that.  At some point in

20  time, I'm sure I saw that.

21            (The court reporter has technical

22      issues and there is a pause in the proceedings.)

23            THE VIDEOGRAPHER:  The time is 12:15

24  P.M.  We are off the record.

25            (Recess.)

Page 140

1                          J. YOUNG

2              THE VIDEOGRAPHER:  The time is 12:17

3      P.M.  We're on the record.

4  BY MR. COHEN:

5         Q.     Mr. Young, I'm handing you a document

6  which has been marked as Marx Exhibit 4.  Would

7  you take a moment to look at that, please.

8              I'm also going to hand you a document

9  that has been marked Marx Exhibit 3.  For the

10  record, Marx Exhibit 3 has the Bates Nos.

11  RC40016279 through 16384.  It's titled, Exhibit

12  A, Amended and Restated Agreement for the

13  Allocation of United States Federal Income

14  Taxes.

15              Marx Exhibit 4 has the Bates No.

16  RC00028796 through 28801.  It's also titled

17  Amended and Restated Agreement for the

18  Allocation of United States Federal Income Tax.

19  BY MR. COHEN:

20      Q.     Mr. Young, have you seen these

21  documents before?

22      A.     I have.

23      Q.     What is Marx Exhibit 3?

24      A.     It's Amended and Restated Agreement of

25  the Allocation of the United States Federal

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 141 of 213

Page 141

1                            J. YOUNG

2       Income Tax that is unexecuted.

3            Q.    Is this a document that you negotiated

4       on behalf of ResCap with Mr. Marx, who was

5       negotiating on behalf of AFI?

6            A.    It was never executed.  So it was a

7       topic of conversation, but it was never in

8       force.

9            Q.    Is Marx Exhibit 3 a document that you

10      negotiated on behalf of ResCap with Mr. Marx,

11      who was negotiating on behalf of AFI?

12           A.    I discussed the -- I discussed this

13      tax sharing agreement with him, yes.  It's not a

14      final document, so I think your use of the

15      termed "negotiated" implies that it is.

16           Q.    Why do you believe it's not a final

17      document?

18           A.    Because it was never executed.

19           Q.    Do you know whether it was executed by

20      AFI?

21           A.    I don't recall.

22           Q.    Was Marx Exhibit 3 ever presented to

23      ResCap's board?

24           A.    I believe it was, yes.

25           Q.    Was Marx Exhibit 3 presented to

Page 142

1                           J. YOUNG

2    ResCap's board with a recommendation as to what

3    the board should do with Marx Exhibit 3?

4         A.    Yes.

5         Q.    What was that recommendation?

6         A.    That recommendation was to accept that

7    tax sharing agreement.

8         Q.    Why was that the recommendation to

9    ResCap's Board?

10        A.    Because it met the standard of being

11   fair, plus it was beneficial to ResCap.

12        Q.    In what way did it meet the standard

13   of being fair?

14        A.    It's an alternative for under a tax

15   sharing agreement.   Under GAAP, you know, it's

16   a -- it's an agreement between related parties,

17   which again, in this case, not arm's length.

18   This particular draft was not arm's length, and

19   it had an aspect to it that was -- was

20   beneficial to ResCap, and so, yeah, it was -- it

21   was -- it was -- it was given to the board for

22   and suggested to be approved.

23        Q.    Who made that recommendation to the

24   board?

25        A.    I don't recall exactly, but it was

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 143 of 213

Page 143

1                          J. YOUNG

2    likely to be myself and/or Tammy.

3         Q.    Was it your personal belief as CFO of

4    ResCap that this is a document that ResCap

5    should sign?

6              MR. BROWN:   Objection to form.

7         A.    The -- was there a --

8              Could you repeat the question?

9              (Record read.)

10             MR. BROWN:   Objection to form.

11        A.    I would say it would be an alternative

12   of something that we would have signed, which is

13   why I gave it to the board, yes.

14        Q.    What do you mean it would have been an

15   alternative of something that we would have

16   signed?

17        A.    I mean, there are other alternatives

18   as well that are -- that are -- that continue to

19   be fair and, in the bigger scheme of things,

20   ended up being the one that we signed.   So it

21   was fair for that purpose.   There were

22   alternatives for that purpose.

23        Q.    At the time Marx Exhibit 3 was

24   presented to ResCap's Board of Directors, was it

25   your view that this document should be signed?

Page 144

1                          J. YOUNG

2            MR. BROWN:  Objection to form.

3        A.    Yes.

4        Q.    Why did you believe that to be the

5    case?

6        A.    Because it accomplished the objective

7    under the tax sharing agreement and had an

8    additional benefit to ResCap.

9        Q.    What was that additional benefit to

10   ResCap?

11       A.    That it contained a provision

12   that was -- would allow ResCap to, under the tax

13   sharing agreement, receive some temporary cash

14   and temporary capital that, if offered by AFI,

15   from a ResCap perspective, we were going to

16   take.

17       Q.    What do you mean by "temporary cash or

18   temporary capital"?

19       A.    This is a tax sharing agreement.  A

20   tax sharing agreement is all about recording tax

21   attributes of a subsidiary and exchanging cash

22   with the counterparty to the -- to the

23   agreement, and those cash are two-way cash

24   flows.  But tax is tax and ResCap was not the

25   tax filer.  What we're talking about is ResCap

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 145 of 213

Page 145

1                        J. YOUNG

2  recording taxes as if it were.

3              Everybody knows tax is tax.   You pay

4  tax out.   The only thing about tax is it's

5  complicated and there's timing differences.

6  Sometimes you pay more tax.   And tax is

7  different than financial reporting.   Your

8  taxable income is not the same as your financial

9  reporting income.

10             I'm not talking about ResCap.   I'm

11  talking about the tax filer.   So there are

12  timing differences, but at the end of the day,

13  tax is tax, meaning you pay your tax on what you

14  earned, no more, no less, again, if you're a

15  filer.

16             So, to the extent that there are

17  timing differences, yeah, cash could come in,

18  but it's going to go out because of the timing

19  difference in tax.   The timing differences I'm

20  referring to would be something like the

21  charge-offs of the allowance for loan loss or

22  accelerated depreciation, whereby you don't have

23  to pay the tax to the U.S. Government until at a

24  later point in time.

25             All those complexities are all cash

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 146 of 213

Page 146

1                          J. YOUNG

2    back and forth, and all this provision did was

3    accelerate, and eventually, at least at the

4    time, we didn't know, we couldn't predict the

5    future.  It accelerated something that was

6    going -- you know, it's temporary.  It's not --

7    it's going to go back at some point in time from

8    a tax perspective.  That's what I mean by

9    "temporary."

10         Q.    What do you mean when you say, "At

11   least at the time we didn't know.  We couldn't

12   predict the future"?  What are you trying to

13   caveat there?

14         A.    I'm trying to say that the -- the

15   particular advantage to ResCap at the time we

16   were discussing this agreement with Bill Marx

17   related to the fact that ResCap incurred losses,

18   and under the standalone fair tax sharing

19   agreement that everybody, you know, that most

20   people in the GAAP world use, the -- those

21   losses could not be recorded on ResCap's

22   financial statements because we didn't know what

23   the future Ally holds.

24              And this we could spend a lot of time

25   talking about how taxes are recorded for

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 147 of 213

Page 147

1                         J. YOUNG

2    financial statement purposes, and again, I want

3    to emphasize none of this is real tax at the

4    ResCap level.  This is all just accounting for

5    financial reporting purposes.

6            All the tax attributes are owned by

7    AFI and they are the tax filer.  This is all

8    about recording these entries at the ResCap

9    level, pure and simple.  But the losses of

10   ResCap occurred -- incurred at that time in a

11   standalone method of accounting but would not be

12   benefited because you carry things back, but you

13   can also carry things forward.

14           The accounting -- GAAP doesn't allow

15   you to recognize a carry-forward until it

16   actually occurs, but when it does occur, it

17   occurs, and of course, you can't -- we don't

18   know, you can't predict the future, and that's

19   partially why GAAP indicates you can't recognize

20   the benefit of a carry-forward until it occurs.

21           What this -- what this provision

22   essentially did was create a situation where,

23   for accounting purposes, ResCap would recognize

24   that ahead of time but, otherwise, it wouldn't

25   be able to under GAAP, and so the accounting

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 148 of 213

Page 148

1                        J. YOUNG

2  would result in a capital contribution.

3              But it's temporary because the next

4  year -- and by the way, I think ResCap did in

5  fact make money that would come right back under

6  the tax sharing agreement and be paid back up.

7     Q.     So it was a two-way agreement?

8     A.     It was a two-way agreement.

9     Q.     Now, you said that you recommended to

10  the board and you thought that ResCap should

11  sign Marx Exhibit 3 because it met the standard

12  of both being fair and it was beneficial to

13  ResCap.

14              What is the benefit to ResCap under

15  Marx Exhibit 3?

16              MR. BROWN:   Objection to form.   Asked

17     and answered.

18     A.     Yeah, the benefit is I just explained

19  the fact that there's a term in here that would

20  allow ResCap to record for financial reporting

21  purposes the tax benefits of the loss ahead of

22  when ResCap would otherwise be able to under a

23  tax sharing agreement.

24              This is all accounting.   This is not

25  actual tax filing because that all belongs to

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 149 of 213

Page 149

1                          J. YOUNG

2   AFI, and that would have created an increase in

3   ResCap's capital at that time, a temporary

4   increase in capital at that time.

5              And ResCap, of course -- we had a

6   whole set of stuff going on to get our capital

7   where we needed to get our capital, real

8   capital -- transactions, cash, cash

9   transactions, forgiveness of debt, whatever --

10  to generate real capital within ResCap.

11             So there was a -- there was a benefit

12  there, but it was not significant from my

13  perspective because of what I've said.  One is

14  it's temporary; two, that's not the purpose of

15  the agreement in any, shape or form or in any

16  way, and we had so much going on with our only

17  source of funding, AFI.  That's where the

18  important capital generation activities were

19  coming.

20             I was not going to back-door some --

21  some -- some -- some sort of strange accounting

22  results for the sake of putting ResCap at risk.

23      Q.    What do you mean, "I was not going to

24  back-door some sort of accounting for the sake

25  of putting ResCap at risk"?

Page 150

J. YOUNG

1

2      MR. BROWN:   Objection to form.

3      A.    I'm saying that the -- that provision

4  was -- they call it a little bit of a windfall

5  to ResCap if it would have stayed, a temporary,

6  temporary accounting capital addition if it

7  would have stayed in there, temporary.

8         But, but the real needs of ResCap were

9  being addressed elsewhere with AFI, and real

10  transactions, not -- this is not to generate

11  capital.  This is tax allocation, financial

12  reporting, pure and simple, two-way exchange of

13  cash so that the readers of the financial

14  statements can understand the financial

15  statements of ResCap.

16         So what I'm saying is I -- and you'll

17  get to it, but the Marx piece came out.  We

18  still had a very fair agreement, and in my view,

19  that was the best position to be for ResCap

20  because I did not want to jeopardize the real

21  capital-generation activities that we were

22  dealing with AFI on.

23      Q.    When you said the Marx piece came out,

24  what piece are you referring to?

25      A.    I'm referring to the section that

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 151 of 213

Page 151

1                      J. YOUNG

2    we've been talking about that provides this --

3    this accounting increase to capital ahead of

4    when it otherwise would be.

5        Q.    Why did you refer to that as the Marx

6    piece?

7        A.    Simply because you referred to it as

8    the Marx document.

9        Q.    Oh, because it's Marx Exhibit 3?

10       A.    Yes.

11       Q.    Who originally proposed that provision

12   in Marx Exhibit 3?  Was it AFI or was it ResCap?

13            MR. BROWN:  Objection to form.

14       A.    It was not ResCap.

15       Q.    Was there anybody else involved in the

16   negotiation besides AFI --

17       A.    No, but I --

18       Q.    Let me finish.

19            Was there anybody else involved in the

20   negotiation besides AFI and ResCap?

21       A.    Not to my knowledge.

22       Q.    Okay.  So if it wasn't ResCap, AFI put

23   it in, right?

24       A.    Yes.

25       Q.    All right.  And you understood that to

Plaintiff's
Objection
151:19-24
Lack of
personal
knowledge
(FRE 602)

1                         J. YOUNG

2    be a benefit to ResCap in addition to an

3    otherwise fair agreement, right?

4         A.    I understood it to be a temporary

5    accounting benefit to ResCap in an agreement

6    that is more than fair.

7         Q.    Why do you think it's more than fair?

8         A.    Because it's not arm's length.  There

9    is no way this agreement could exist on an arm's

10   length basis.

11        Q.    Even without this beneficial clause in

12   it?

13             MR. BROWN:  Objection to form.

14        A.    I would have to speculate as to

15   whether a third party would enter into a

16   standalone tax sharing agreement, and I care not

17   to speculate.  But that standalone agreement

18   is -- is the exact same agreement that most

19   every other tax filer would report under.

20             (The court reporter has technical

21         issues and the luncheon recess is taken.)

22             THE VIDEOGRAPHER:  The time is 12:34

23   P.M.  We're off the record.

24             (Luncheon recess.)

25

Page 153

1              J. YOUNG

2           AFTERNOON SESSION

3        THE VIDEOGRAPHER:  The time is 1 P.M.

4    We're on the record.

5  J A M E S   Y O U N G, resumed and

6     testified as follows:

7  EXAMINATION BY (Cont'd.)

8  MR. COHEN:

9     Q.    Mr. Young, before lunch, we were

10  talking about Marx Exhibit 3 and Marx Exhibit 4,

11  and I believe you testified that Marx Exhibit 4

12  was an arm's length agreement but Marx Exhibit 3

13  was not.  Did I get that right?

14     A.    I would, yeah, I would say that Marx

15  Exhibit 3 would not be something that a -- a

16  third party would enter into with ResCap.  I

17  indicated that Marx Exhibit 4 is more akin to

18  what other entities do for reporting of -- of

19  income tax and so more akin to what you could

20  perhaps find in the marketplace, although I'm

21  not aware of any other tax sharing agreement

22  among unrelated entities that has existed in the

23  market.

24     Q.    Was there any other reason other than

25  you couldn't find another counterparty outside

Page 154

1                           J. YOUNG

2    of the Ally group of companies to enter into

3    terms similar to Marx Exhibit 3 that you

4    concluded that it was not arm's length?

5        A.    Marx Exhibit 3, which is the document

6    that has the -- I'm sorry, I just want to make

7    sure we're talking about the same document.

8        Q.    Sure.  Take your time.

9        A.    I'm sorry, could you re-read the

10   question again?

11             (Record read.)

12       A.    I don't believe Exhibit 3 is something

13   that ResCap could obtain from any third party.

14       Q.    But you also recognize that you've

15   never seen a Tax Allocation Agreement between an

16   entity and a third party, right?

17             MR. BROWN:  Objection to form.

18       A.    I've never seen such a thing, that's

19   correct.

20       Q.    So even Marx Exhibit 4, by that

21   definition, would not be arm's length, correct?

22       A.    Potentially, yes.

23       Q.    Now, when you told me earlier that

24   Marx Exhibit 4 was arm's length, you mentioned

25   the process that ResCap went through before it

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 155 of 213

Page 155

1                          J. YOUNG

2    approved Marx Exhibit 4, and you mentioned

3    internal discussions, the Executive Committee,

4    the board, independent directors, independent

5    from directors outside counsel, everybody had

6    reviewed and discussed Marx Exhibit 4; is that

7    correct?

8              MR. BROWN:   Objection to form.

9         A.    At the time, yes, I believe everybody

10   had discussed this, yes.

11        Q.    Was that also true with respect to

12   Marx Exhibit 3?

13             MR. BROWN:   Objection to form.

14        A.    I would suggest that I believe the

15   answer to that would be yes.

16        Q.    Okay.   When -- do you recall when

17   you -- Marx Exhibit 3 was presented to ResCap's

18   board?

19        A.    I believe it was August of 2010 or

20   July or August of 2010, I believe.

21        Q.    Why is Marx Exhibit 3 -- why does the

22   first paragraph say "this amended and restated

23   agreement made as of November 1, 2009" if it

24   wasn't presented to the board until August of

25   2010?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 156 of 213

Page 156

1                          J. YOUNG

2       A.     Because there was an existing tax

3   sharing agreement in place since that point in

4   time and this -- this obviously is an amendment

5   of that agreement.

6       Q.     Did the board approve ResCap's

7   entering into Marx Exhibit 3?

8            MR. BROWN:   Objection to form.   Asked

9       and answered.

10      A.     Yeah, I did answer that question

11   before.   They delegated the authority for me to

12   execute the agreement when I was ready to do so.

13      Q.     Did they delegate to you the authority

14   to negotiate away benefits that ResCap was

15   receiving under Marx Exhibit 3?

16            MR. BROWN:   Objection to form.

17      A.     If there was a material change in the

18   contract, I, irrespective of whether it was

19   delegated or not, I would have gone back to the

20   board and discussed that with them.

21      Q.     Was there a material change in Marx

22   Exhibit 3 before you signed it?

23            MR. BROWN:   Objection to form.

24      Mischaracterizes testimony.

25      A.     I never signed Marx Exhibit 3.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 157 of 213

Page 157

1                          J. YOUNG

2        Q.    Was there a material change in the tax

3   sharing agreement contemplated between ResCap

4   and AFI before you executed the document?

5              MR. BROWN:   Objection to form.

6        A.    There was -- there was a change.   The

7   section that we've been referring to was taken

8   out.

9        Q.    My question is was that change

10  material?

11       A.    It's not material to the fairness of

12  the agreement, but it's a significant enough

13  change to the agreement where I felt it was

14  necessary to take it back to the board.

15       Q.    Why did you feel that was necessary?

16       A.    Well, because it's a, you know, it's a

17  change that was discussed and, I mean, a feature

18  that was discussed previously and -- and it was

19  revised, so I would naturally go back to the

20  board.

21       Q.    What was the board's reaction when you

22  went back to them?

23       A.    I don't recall specifically, but we

24  had a fulsome discussion about the removal of

25  that provision, what it meant from a tax

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 158 of 213

Page 158

1                          J. YOUNG

2    accounting perspective, and had discussion with

3    the independent -- the independent director's

4    counsel on the -- on the new agreement and the

5    change.

6        Q.    What did the independent director's

7    counsel tell you?

8             MR. BROWN:   Objection to form.

9        A.    Well, we just discussed the overall

10   purpose of the agreement, the fairness of the

11   agreement.   They were asking some questions

12   about the provision, a couple of the provisions

13   in the document, including the provision that

14   was ended up being removed, and in addition,

15   they wanted another adjustment made to the

16   agreement that we did sign, and that change was

17   made by -- by AFI.

18       Q.    Did you have an understanding as to

19   whether the board considered Marx Exhibit 4 to

20   be as good of an agreement for ResCap as Marx

21   Exhibit 3?

22             MR. BROWN:   Objection to form.

23       A.    I -- I have a view that, at the end of

24   the day, the board agreed with the

25   recommendation that Marx Exhibit 4 is fair and

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 159 of 213

Page 159

1                          J. YOUNG

2    appropriate for tax reporting purposes for

3    ResCap.

4        Q.    My question was did you have an

5    understanding as to whether the board considered

6    Marx Exhibit 4 to be as good of an agreement for

7    ResCap as Marx Exhibit 3?

8           MR. BROWN:   Objection to form.   Asked

9    and answered.

10       A.    I don't have a view.   I -- I don't

11   recall a particular discussion, but as we've

12   talked before, there was a -- an accounting

13   capital benefit, temporary capital benefit that

14   was removed, and that was discussed.

15       Q.    So at least you recognized that you

16   were giving something away by agreeing to Marx

17   Exhibit 4 as opposed to Marx Exhibit 3, right?

18           MR. BROWN:   Objection to form.

19       A.    There was an adjustment to the

20   agreement, but in the larger context of the

21   purpose of the agreement and other things going

22   on, I agree that -- I acknowledge that it was a

23   give on that to -- to protect -- to come out

24   with an agreement that's fair for this

25   particular purpose and maintain the continued

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 160 of 213

Page 160

1                          J. YOUNG

2    discussions on capital on other fronts not

3    involving this agreement.

4        Q.    Did anyone from AFI suggest to you

5    that if you didn't agree to drop that benefit

6    from the tax sharing agreement, that they

7    wouldn't give you capital?

8        A.    I don't think anyone specifically had

9    that discussion with me, no.

10       Q.    So that was just a concern that you

11   had that you raised internally with yourself?

12       A.    No, I --

13             MR. BROWN:   Objection to form.

14       A.    The -- I certainly had at some point

15   in time understood from AFI that they were very

16   concerned about the provision that we're talking

17   about, and concerned to such a degree that my

18   professional judgment, yeah, it could have had

19   an impact on -- on future transactions or even

20   when we may have been working on it at the time.

21       Q.    Now, you've testified repeatedly that

22   this is just a temporary accounting benefit,

23   right?

24             MR. BROWN:   Objection to form.

25       A.    It -- it is accounting for tax and it

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 161 of 213

Page 161

1                          J. YOUNG

2    depends on future events, but over the course of

3    time in a normal situation, yes, there would be

4    ins and outs, that one year may come in, the

5    next year would go out.

6        Q.    Did you have an understanding, given

7    your view that this was a small accounting

8    benefit, as to why AFI was so concerned about

9    it?

10           MR. BROWN:   Objection to form.

11       A.    Well, my understanding as to why AFI

12   was concerned about it was that it was a -- it

13   would be a mechanism for contributing capital in

14   some form, even if temporary, that was not fully

15   contemplated by AFI or agreed to or -- or could

16   be monitored or in any kind of way.

17       Q.    When you say "contributing capital,"

18   you're talking about cash, right?

19       A.    I'm talking about the accounting under

20   a tax sharing agreement that would have resulted

21   in the accounting for this as capital.   There

22   would have been cash coming through, but as a

23   tax sharing agreement, as I said before, it's

24   not permanent capital.

25       Q.    But AFI certainly wasn't concerned

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 162 of 213

Page 162

1                          J. YOUNG

2    about accounting entries; they were worried

3    about paying cash to ResCap, right?

4              MR. BROWN:    Objection to form.

5        A.      No, I think they would be concerned

6    about accounting entries because the accounting

7    entry would create capital and -- and it, you

8    know, an increase in capital.    Of course, it

9    would take the form of cash.    I'm not saying

10   it's not.    I'm saying it could be temporary,

11   depending on future events, but the point is

12   it's not a contemplated capital transaction.

13   It's not a transaction where -- where we needed

14   capital, our primary provider of capital at the

15   time, our sole provider of capital at the time

16   was AFI.

17              We were in very thoughtful, deep

18   discussions about providing capital above the

19   kind that we needed, permanent capital, not

20   capital that comes through a tax sharing

21   agreement, that had the risk of being returned

22   in the subsequent year, and those -- those

23   discussions were extremely important.

24       Q.      You testified that AFI included this

25   beneficial provision in Marx 3, right?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 163 of 213

Page 163

1                              J. YOUNG

2          A.     Yes.

3          Q.     It wasn't your idea, right?

4          A.     Correct.

5          Q.     And that's the provision that called

6    for AFI to make capital contributions to ResCap,

7    right?

8                 MR. BROWN:   Objection to form.

9          A.     The provision allows for the

10   accounting by ResCap of a -- the benefit of a

11   tax loss prior to the tax loss on paper, because

12   again, as I've said, these are tax attributes,

13   these are not -- these are taxable attributes

14   that are allocated to ResCap; they're owned by

15   AFI.

16                The only reason capital contribution

17   even comes into play is because of Generally

18   Accepted Accounting Principles, and we've

19   actually had this discussion a little bit

20   before.   A related party transaction that is not

21   arm's length could be a capital contribution,

22   and that is -- that is really what we're talking

23   about here, is the -- is the -- is that aspect

24   of the agreement.

25         Q.     But to be clear, this is not about a

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 164 of 213

Page 164

1                              J. YOUNG

2    paper loss and an accounting entry.  That's not

3    why AFI was concerned.  AFI was concerned

4    because they were going to have to give ResCap

5    cash, right?

6             MR. BROWN:  Objection to form.

7        A.    No, I think it was --

8             MR. BROWN:  Asked and answered.

9        A.    No, I think it was because of the --

10   of the manner in which there would have been

11   provided.  We have all kinds of, on the other

12   side of the equation, and proof of history of

13   AFI giving capital to ResCap in various forms --

14   cash, debt forgiveness, loans.  It was the form

15   that it was coming in.

16             This, and again, it's not designed to

17   be a capital contribution.  It's for accounting

18   for tax purposes.  It would have resulted in an

19   entry and the movement of cash, but that was not

20   the reason for the agreement.  It didn't have

21   anything to do with capital.

22       Q.    But AFI put this in.  How could you

23   say that they didn't want it in there?  They

24   gave it to you.

25             MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 165 of 213

Page 165

J. YOUNG

1

2     A.     I can say that they didn't want it in

3 there because they -- they ended up saying, you

4 know, that was something that they hadn't

5 contemplated.

6     Q.     What was something they hadn't

7 contemplated?

8     A.     The provision we're talking about and

9 providing capital through a tax sharing

10 agreement on a -- on an unplanned basis.

11     Q.     Did you ask them why they put it in in

12 the first place?

13     A.     I may have.   I don't recall.

14     Q.     Do you recall what they told you?

15     A.     No.

16     Q.     You said you've looked at portions of

17 the Examiner's Report?

18     A.     Yes.

19     Q.     Did you look at how much the Examiner

20 calculated AFI would have had to pay to ResCap

21 if Marx Exhibit 3 had been signed by you?

22     A.     I looked at it briefly yesterday.

23     Q.     Okay.  Do you know that the Examiner

24 calculated it at $1.77 billion?

25     A.     I believe that's what the piece of

Page 166

J. YOUNG

1

2  paper says.

3      Q.    Okay.  And do you understand that the

4  Examiner was talking about cash transfers?

5          MR. BROWN:  Objection to form.

6      A.    I don't know what the Examiner was

7  talking about.  I haven't studied that section

8  of the -- of the document.

9      Q.    Do you know whether the Examiner in

10  calculating $1.77 billion was using an Ally

11  contribution as part of a settlement of $750

12  million?

13      A.    I don't know.

14      Q.    If the Ally contribution as part of a

15  settlement went up, say, to $2.1 billion, would

16  the damages under Marx Exhibit 3 go up?

17          MR. BROWN:  Objection to form.

18      A.    I don't know.

19          MR. COHEN:  Let's mark this.  This is

20      3.

21          (Young Exhibit 3, a document bearing

22      Bates Nos. ALLY 435003, marked for

23      identification, as of this date.)

24  BY MR. COHEN:

25      Q.    Mr. Young, the reporter has handed you

Plaintiff's
Objection
166:25-167:8:
inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 167 of 213

Page 167

1                          J. YOUNG

2    a document that's been marked Young Exhibit 3.

3    It has the Bates No. ALLY 435003.  Would you

4    take a moment to look at this.

5              (Document review.)

6        A.    Yes.  Okay.

7        Q.    Have you seen this document before?

8        A.    I have seen this, yes.

9        Q.    Did you receive this document on or

10   around September 9, 2010?

11       A.    To the best of my recollection, no.

12       Q.    When do you recall first seeing this

13   document?

14       A.    I do not recall seeing the document

15   when I would have received it, but I'm aware of

16   the fact that there was problems with this

17   binder getting circulated and I'm highly

18   confident I did not receive it around or near

19   September 9.

20       Q.    Do you recall receiving the binder?

21       A.    I don't.

22       Q.    How do you know you didn't receive it

23   on or around September 9?

24       A.    Because I -- I have no reason to sit

25   on things.  I don't sit on things as a matter of

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 168 of 213

Page 168

1                          J. YOUNG

2    course and I -- things just don't sit on my

3    desk, so I couldn't have gotten in it.

4        Q.    When did you -- when do you recall

5    first seeing this document?

6        A.    I mean, my best recollection is

7    yesterday.

8        Q.    On or around September 9, 2010, did

9    you have an understanding whether AFI's view was

10   Marx Exhibit 3 really boiled down to just a

11   handful of signatures each?

12       A.    Will you repeat the question?

13             (Record read.)

14             MR. BROWN:   Objection to form.

15       A.    Do you mean completion of Marx Exhibit

16   3 was solely dependent upon signatures?

17       Q.    Yes.

18       A.    I would have thought that the case

19   that would have been the -- well, there may have

20   been -- actually, I don't know.   There may have

21   been some items that were changed in the

22   documents between the time I had last seen it,

23   but generally speaking, it was, subject to a

24   final review, it was -- it was subject to being

25   signed, to be executed.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 169 of 213

Page 169

1                           J. YOUNG

2        Q.    What do you mean by "subject to a

3   final review"?

4        A.    Well, if I've been delegated authority

5   to approve something, I'm not going to just sign

6   it.  I'm going to take a final look at it and

7   make sure it's in line with what the board had

8   delegated for me to do.

9        Q.    When you presented Marx Exhibit 3 to

10  the board, there weren't items in there that you

11  felt required further negotiation, were there?

12       A.    Not to my recollection.

13       Q.    And looking at Young Exhibit 3, I

14  would like to direct your attention to the last

15  paragraph where Mr. Marx writes, "The package

16  looks daunting, but it really boils down to a

17  handful of signatures each.  We'll be

18  calculating the 2009 tax allocation within the

19  next month or so."

20            Does that refresh your recollection as

21  to whether in September 2010 AFI thought the

22  document was ready to be signed?

23            MR. BROWN:  Objection to form.

24       A.    I really can't speak for AFI.  I was

25  with ResCap at the time.

Plaintiff's
Objection
169:13-25:
inadmissible
hearsay
(FRE 802),
lack of
personal
knowledge
(FRE 602)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 170 of 213

Page 170

1                            J. YOUNG

2       Q.      And your view was, other than doing

3  one last read through it, you were ready to sign

4  it, right?

5             MR. BROWN:   Objection to form.

6       A.      My view was we're doing one final

7  review to make sure everything was in order, I

8  would have signed it.

9       Q.      So if they had walked it over to your

10  office, you would have read it, and if nothing

11  was out of order, if it was consistent with what

12  you presented to the board, you would have

13  signed it, right?

14             MR. BROWN:   Objection to form.

15       A.      Given that hypothetical case, yeah, I

16  would have signed it.

17             (Young Exhibit 4, an e-mail string

18             bearing Bates Nos. ALLY 0245484 through

19             5485, marked for identification, as of this

20             date.)

21  BY MR. COHEN:

22       Q.      Mr. Young, the reporter has handed you

23  a document marked Young Exhibit 4.   It has the

24  Bates No. ALLY 0245484 through 5485, and this is

25  a string of e-mails which I'll represent to you

Plaintiff's Objection 170:2-16: inadmissible hearsay (FRE 802), lack of personal knowledge (FRE 602)

Plaintiff's Objection 170:17-171:6: lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), inadmissible hearsay (FRE 802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 171 of 213

Page 171

1                            J. YOUNG

2    you are not on.

3                Would you take a moment to look at

4    this document.

5                (Document review.)

6        A.    Okay.

7        Q.    Did you have an understanding that in

8    mid October 2010 AFI realized the impact of the

9    provision in Marx Exhibit 3 that we've been

10   discussing?

11               MR. BROWN:   Objection to form.

12       A.    At some point in time, I do believe I

13   was informed about their concern.

14       Q.    What did they tell you?

15       A.    To the best of my recollection, that,

16   you know, they were just realizing that this

17   could result in -- could result in the recording

18   of capital contributions and exchange of cash

19   under a tax sharing agreement that involved

20   two-way payments and changes over time and,

21   accordingly, could result in capital

22   contributions to ResCap that were not

23   contemplated or otherwise formally agreed to in

24   a more -- in a more fulsome, intentioned way.

25       Q.    What do you mean "formally agreed to"?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 172 of 213

Page 172

1                              J. YOUNG

2       A.      Well, as I've said before, a tax

3   sharing agreement is not a mechanism to generate

4   capital; it's a mechanism to account for tax.

5              ResCap needed capital, obviously.  Our

6   sole source of capital was AFI at the time.  It

7   was extremely important that we negotiate with

8   AFI to obtain capital, and again, they were our

9   sole source of capital.

10             And we had many transactions where we

11  formally sat down with them, went over what we

12  needed from a capital perspective, and figured

13  out how to get the capital in a thoughtful,

14  reasoned, intentioned way, and we wanted that to

15  continue.

16      Q.      But they never threatened to take it

17  away, did they?

18             MR. BROWN:  Objection to form.

19      A.      Take what away?

20      Q.      Capital.

21             MR. BROWN:  Objection to form.

22      Q.      They never told you if you didn't sign

23  Marx Exhibit 3, that they wouldn't provide

24  capital, did they?

25             MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 173 of 213

Page 173

1                          J. YOUNG

2        A.      Well, I could -- did they come right

3   up and call me and say no, but I knew that they

4   were concerned about the transaction and -- and

5   it was a tax sharing agreement.

6               We had other mechanisms for obtaining

7   capital.  We didn't have to -- to "gotcha" on

8   this with them in order to not, you know, to get

9   capital in another way from them, and it was a

10  tax sharing agreement.

11       Q.      Well, you testified that ResCap in

12  vetting this agreement took it to the board of

13  directors, took it to the Executive Committee,

14  took it to the independent directors, took it to

15  outside counsel for the independent directors.

16  You had reviewed it.  The Legal Department had

17  reviewed it.  The tax people had reviewed it.

18  The finance people had reviewed it.  It

19  certainly was formally agreed to within ResCap,

20  wasn't it?

21              MR. BROWN:  Objection to form.

22       Mischaracterizes testimony.

23       A.      As a tax sharing agreement, it was

24  formally agreed to, yes.

25       Q.      Every --

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 174 of 213

Page 174

1                              J. YOUNG

2          A.      Within ResCap.

3          Q.      Within ResCap --

4          A.      Within ResCap.

5          Q.      -- every provision of Marx Exhibit 3

6    was formally agreed to, wasn't it?

7               MR. BROWN:    Objection to form.

8          A.      The tax sharing, as a tax sharing

9    agreement, it was, yes, it was agreed to and

10   taken to the board.

11         Q.      Okay.    And on the AFI side, AFI is the

12   one who made the offer in the first place

13   because they put it into Marx Exhibit 3, right?

14              MR. BROWN:    Objection to form.

15         A.      Yes, we didn't ask for it.

16         Q.      Okay.    Let's go back to Young 3.    If

17   you look in the second paragraph after the

18   enumerated items, I'd like to direct your

19   attention to the third sentence, which says,

20   "Anita Bhama advises that no additional

21   governance is required at the Ally Financial

22   Inc. level."    Do you see that?

23         A.      I do.

24         Q.      Do you know who Anita Bhama is?

25         A.      I know who Anita Bhama is.

Plaintiff's
Objection
174:16-175:17:
lack of personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903),
inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 175 of 213

Page 175

1                              J. YOUNG

2          Q.    Who is Anita Bhama?

3          A.    She is on the Legal staff of AFI.

4          Q.    Is she a lawyer?

5          A.    To the best of my knowledge.

6          Q.    Okay.  So AFI proposes the language in

7     Marx Exhibit 3, sends it to you, you negotiate

8     it over a period of months, they understand you

9     take it to the board of directors, who

10    authorizes you to sign it after ResCap fully

11    agrees with it, and AFI's lawyer says, no

12    additional governance is needed.  Do you still

13    think AFI hadn't formally agreed to it?

14              MR. BROWN:  Objection to form.

15         A.    All I can -- all I knew was Anita

16    Bhama was on the piece of paper.  I don't know

17    what Anita Bhama did.

18              MR. COHEN:  Would you read back my

19        question, please?

20              (Record read.)

21              MR. BROWN:  Objection to form.

22              THE WITNESS:  Again, I -- I don't know

23        when I saw this piece of paper because

24        the -- the information was lost.  At some

25        point in time, I was advised that they had

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 176 of 213

Page 176

1                          J. YOUNG

2        not agreed to it prior to me signing.  And I

3        don't let things sit on my desk.

4    BY MR. COHEN:

5        Q.      And you just took them at their word?

6                MR. BROWN:  Objection to form.

7        A.      Took them at their word that they were

8    not agreeing to it?

9        Q.      Yes, that they had not formally agreed

10   to it?

11       A.      I believe I got a communication from

12   the AFI CFO saying that they hadn't vetted it.

13               (Young Exhibit 5, an e-mail string

14       bearing Bates Nos. ALLY 0424657 through

15       4658, marked for identification, as of this

16       date.)

17   BY MR. COHEN:

18       Q.      Would you take a moment to look at the

19   document the reporter has marked as Young

20   Exhibit 5.  It's got the Bates No. ALLY 0424657

21   through 4658.  It's a series of e-mails, and as

22   with Young Exhibit 4, I'll represent to you that

23   you are not copied on these e-mails.

24               (Document review.)

25       A.      Okay.

Plaintiff's
Objection
176:13-25: lack
of personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903),
inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 177 of 213

Page 177

1                    J. YOUNG

2       Q.     Who is Mr. Mackey?

3       A.     He was the I believe interim CFO of

4    Ally Financial Inc. at that time.

5       Q.     Did you have dealings with Mr. Mackey

6    in connection with the tax sharing agreement?

7       A.     I believe, as I just said, I was

8    informed by him via e-mail that they had not yet

9    vetted that around this time, around this period

10   of time.

11      Q.     Did you know that their view was that

12   ResCap thought they were -- that AFI was just

13   finalizing documents?

14             MR. BROWN:   Objection to form.

15      A.     Would you repeat the question, please?

16             (Record read.)

17             MR. BROWN:   Objection to form.

18      A.     I did not know what their view was.

19      Q.     Do you know as we sit here today

20   whether AFI has already used virtually all of

21   its NOLs?

22             MR. BROWN:   Objection to form.

23      A.     I don't know.

24      Q.     Do you know as we sit here today

25   whether AFI has used pretty much all of the

Plaintiff's
Objection
177:11-18:
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602, 901,
903),
inadmissible
hearsay (FRE
802)

Page 178

1                        J. YOUNG

2      capital losses from subsidiaries, its

3      subsidiaries, other than ResCap?

4              MR. BROWN:  Objection to form.

5      A.    I don't know.

6              (Young Exhibit 6, Master Mortgage Loan

7        Purchase and Sale Agreement, Draft, 6/26/08,

8        bearing Bates Nos. ALLY 0201210 through

9        0201225, marked for identification, as of

10       this date.)

11     BY MR. COHEN:

12        Q.    Mr. Young, the reporter has handed you

13     a document marked Young Exhibit 6.  It has the

14     Bates No. ALLY 0201210 through 0201225, and it's

15     titled Master Mortgage Loan Purchase and Sale

16     Agreement, and it says Draft, 6/26/08.

17        A.    Yes.

18        Q.    Have you seen this document before?

19        A.    I have, yes.

20        Q.    What is this document?

21        A.    This is the governing document over

22     loan sales between GMAC Bank and GMAC Mortgage,

23     LLC, which is a wholly-owned subsidiary of

24     ResCap.

25        Q.    Would you look at page 14 of this

Plaintiff's
Objection
178:12-181:8:
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 179 of 213

Page 179

1                           J. YOUNG

2    document.    It has the Bates No. ALLY 0201224.

3         A.      Yes.

4         Q.      Notwithstanding that Young Exhibit 6

5    says "draft" on the cover, do you see your

6    signature on page 14?

7         A.      I do.

8         Q.      Is it your understanding that this is

9    the execution version of this document, that

10   this is the operative MMLPSA?

11              MR. BROWN:   Objection to form.

12              As of July 1, 2008?

13              MR. COHEN:   Yes.

14              THE WITNESS:   As of July 1, 2008, I

15        would say yes.

16   BY MR. COHEN:

17        Q.      How long was this document in effect?

18   During what period of time?

19              MR. BROWN:   Objection to form.

20        A.      I don't recall exactly when it may

21   have been amended, if it were amended,

22   subsequent to this point in time, but this or

23   some amended version was -- would have been in

24   place through, up to or near the filing date of

25   ResCap.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 180 of 213

Page 180

1                              J. YOUNG

2        Q.     Did you have an understanding with

3   respect to the Mortgage Loan Purchase and Sale

4   practices between GMACM and Ally Bank that Ally

5   for a period of time would recognize as revenue

6   only the net interest carry for the period that

7   the loan was on Ally's books?

8             MR. BROWN:    Objection to form.

9        A.     I'm -- it depends on what time you're

10  talking about.    The -- the agreement would

11  have -- the agreement was complicated.    It was

12  complex.    Whether there was a period of time

13  where interest carry only occurred, I can't say.

14  I'm not sure.

15       Q.     What is interest carry only?

16       A.     That would be where you have a

17  mortgage loan on your books and you record

18  interest income on that loan, and that's the --

19  that's the sole piece, meaning the interest

20  carry would be the interest income from the loan

21  on the books.

22       Q.     And you're talking about from Ally

23  Bank's perspective, you don't know whether there

24  was a period of time where that's the only thing

25  it got?

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 181 of 213

Page 181

1                          J. YOUNG

2        A.      Correct.

3        Q.      All right.   So do you know whether

4    there was a period of time where GMAC Mortgage

5    realized the benefit of any points or other

6    origination fees?

7        A.      I -- I can't -- I don't know for sure.

8    It's a complex agreement.

9        Q.      What is your understanding of the

10   economics of Young Exhibit 6?

11              MR. BROWN:   Objection to form.

12       A.      My understanding of the economics of

13   this is that the -- the bank would be in a

14   position to fund these loans and that the bank

15   would then -- and of course, ResCap would

16   originate broker loans to the bank.

17              ResCap would then purchase the loans

18   back from Ally Bank, sell the loans off to the

19   market, Fannie and Freddie, and my high-level

20   understanding of the agreement is that -- that

21   Ally Bank would cover its costs and make a

22   return and that most of the risks and rewards

23   would flow to ResCap in the entire process of

24   loan origination, loan sale and recording and

25   servicing.

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 182 of 213

Page 182

1                        J. YOUNG

2        Q.      When you say Ally Bank would cover it

3    costs and make a return, what do you mean?

4        A.      Well, I mean that Ally Bank is a

5    regulated institution and transactions with

6    affiliates need to be on arm's length from a

7    regulatory perspective.  So you can't have a

8    transaction where the bank is not covering its

9    costs with an affiliate or for any reasonable

10   return.

11            Now, that reasonable return could come

12   in a lot of forms.  It could come in interest

13   carry.  It could come in the form of value gains

14   when the loans are booked.  Origination fees.

15   Of course, there's costs to originate.  There's

16   underwriting costs.  There's broker fees to be

17   paid.

18            It's a complex set of factors, but

19   they are I'd say common in the industry.  But

20   again, the answer to your question, the

21   transaction would need to be arm's length from

22   the sense of covering costs and there to be a

23   reasonable return for Ally Bank or they couldn't

24   enter into the transaction.

25       Q.      Okay.  With respect to Young Exhibit

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 183 of 213

Page 183

1                         J. YOUNG

2    6, what is the economics of the covering of cost

3    and reasonable rate of return that Ally Bank was

4    taking under this agreement?

5              MR. BROWN:   Objection to form.

6       A.    Well, you say "taking."   It was

7    allocated under the agreement, but it was --

8    there was -- it would have changed over time

9    based upon the language of the contract.

10      Q.    What language are you referring to?

11      A.    The purchase price was defined as --

12   as it's net carrying value is defined by

13   Generally Accepted Accounting Principles.   I'm

14   referring to Section 1.9 under Article 1 of

15   Definitions.

16      Q.    And how would that change over time?

17      A.    Well, it could change over time

18   because carrying values could change.   So, for

19   instance, the loans we're talking about are the

20   loans held for sale on the books of Ally Bank,

21   and under Generally Accepted Accounting

22   Principles, depending on what period of time

23   we're talking about, there would have been a

24   couple of different options to in terms of how

25   to record the carrying value of the loan, either

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 184 of 213

Page 184

1                         J. YOUNG

2  on a fair value basis, a lower of cost or market

3  basis, or a fair value basis because you're

4  applying hedge accounting to the portfolio of

5  loans.

6      Q.    Is it your testimony that if Ally

7  changed the way it was accounting for the loans,

8  that the economics under this contract would

9  change?

10         MR. BROWN:   Objection to form.

11     A.    I am suggesting that if the -- the

12 accounting, if the -- if the accounting changed,

13 it could change the -- it could change the

14 economics, yes.

15     Q.    I'm not asking whether it could; I'm

16 asking whether it did?

17         MR. BROWN:   Objection to form.

18     A.    I -- all I can speak to is my time at

19 ResCap, so I really can't speak to the economics

20 that may have been applied, you know, prior

21 to -- prior to my time at the bank.  I can tell

22 you that, through the entire course of the

23 agreement, this contract language was followed

24 and there was a change to fair-value accounting

25 in the bank at some point in time that did --

Plaintiff's
Objection
184:6-185:18:
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 185 of 213

Page 185

1                          J. YOUNG

2    that did create some changes in economics.

3         Q.    You told me earlier, you testified

4    that you understood that you were the 30(b)(6)

5    witness, the corporate representative from Ally,

6    and that you could testify truthfully and

7    completely as to all matters relating to the

8    MMLPSAs between GMAC Mortgage and Old GMAC Bank

9    and between GMAC Mortgage and Ally Bank, do you

10   remember that?

11        A.    Yes.

12        Q.    How did the economics change in Young

13   Exhibit 6 when Ally switched to -- when Ally

14   Bank switched to fair value accounting?

15        A.    Well, the -- it's carry value would

16   have increased on day one.  So the carrying

17   value would have gone to a fair value rather

18   than a lower of cost or market.

19        Q.    And what impact would that have had on

20   Ally Bank and ResCap?

21        A.    Generally speaking, that would -- by

22   the way, I'm sorry, I should also mention that

23   moving to fair-value accounting would not only

24   mean that the loans are recorded at fair value

25   but also any kind of accounting that was

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 186 of 213

Page 186

1                        J. YOUNG

2   connected with lower of cost or market would

3   also be unwound, and one of those accounting

4   conventions is the deferral of fees and costs,

5   commonly referred to as FAS -- FAS91, F-A-S-9-1.

6   That would have been undone as well.

7            So the accounting rules would have

8   been followed and so what would have happened at

9   the time would be that any kind of fees and

10  costs would have been sort of taken out of the

11  deferral equation, taken out of cost basis,

12  taken out of the definition because they're no

13  longer in the carrying value, and then it

14  becomes a mark to market loan.

15           The pure fact of moving to a

16  fair-value accounting does not of itself mean

17  day one there's any kind of dramatic change.

18  What could happen over time, and what did happen

19  over time, is that the fair value of a loan when

20  you originate it could change based on market

21  conditions, and that did happen over time.

22       Q.     And what impact did that have, that

23  change have on the economics of Young Exhibit 6

24  for Ally Bank and ResCap?

25           MR. BROWN:   Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 187 of 213

Page 187

1                          J. YOUNG

2        A.      That change in the market, if that's

3   what you're asking about --

4        Q.      I am.

5        A.      -- occurred?  The change in the market

6   would have had a -- been increased economic

7   impact on the day one value of the loan.  It

8   would have decreased the origination fees that

9   would have been received by the bank.

10             It's a phenomena where a loan is

11  originated -- the customer basically has a

12  choice of here's an amount of origination fee to

13  pay and here's your interest rate.  I think

14  we've all been through it that if you pay a

15  higher fee or a lower origination fee, your

16  right is going to go up or down.

17             So it's the dynamic of those -- of

18  that fact that will drive a lower origination

19  fee and a higher value on the loan in the

20  market, but that's all driven by market

21  conditions.

22        Q.      At the end of the day because of that

23  change in the market, as a result of Ally Bank

24  switching to fair-value accounting and the

25  related changes that came with that, did this

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 188 of 213

Page 188

1                          J. YOUNG

2    contract become more lucrative to Ally Bank and

3    less lucrative to ResCap?

4              MR. BROWN:   Objection to form.

5         A.    I would say it became more lucrative

6    to Ally Bank.   I wouldn't necessarily say it

7    became less lucrative to ResCap because this is

8    a market change and my view is there is more

9    profit overall in the market.   So it's not like

10   the profit in the market was a contained sphere

11   that grew through mortgage rates coming down

12   and -- and then a lot of refinance activity, so

13   there was a lot of economics flowing to both

14   ResCap and the bank.

15        Q.    But on a per-loan basis, if you assume

16   that the market did not grow, you take that

17   phenomenon out, on each loan as a result of

18   those changes, this contract became more

19   advantageous to Ally Bank and less advantageous

20   to ResCap, right?

21             MR. BROWN:   Objection to form.

22        A.    No.   Actually, I'm saying even on a

23   loan-by-loan basis, the profit on that loan

24   could expand.

25        Q.    But as between the profit on the

Plaintiff's
Objection
188:15-189:18:
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 189 of 213

Page 189

1                        J. YOUNG

2   loans, Ally Bank was taking a greater share on

3   each loan and ResCap was taking a smaller share;

4   as between the two of them, the economics

5   changed, correct?

6              MR. BROWN:   Objection to form.

7      Mischaracterizes testimony.   Asked and

8      answered.

9      A.     I'm saying that if you got a finite,

10  you know, and the market grows, I can't tell you

11  if it was, you know, 90/10, 80/20, if it stayed

12  90/10, 80/20.   It may have, but the numbers were

13  bigger for everybody.   I have not done the

14  analysis to know if there was a pro rata

15  detriment to ResCap.

16     Q.     Do you know if anyone at Ally Bank did

17  do that analysis?

18     A.     Not that I'm aware of.

19     Q.     Do you know who Adam Glassner is?

20     A.     I do.

21     Q.     Who is Mr. Glassner?

22     A.     He's an ex-employee of Ally Financial

23  and Ally Bank.

24     Q.     What was his job?

25     A.     I'm sorry, I need to correct that.   I

Plaintiff's
Objection
189:24-190:13:
Inadmissible
hearsay (FRE
802)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 190 of 213

Page 190

1                          J. YOUNG

2  believe he was an ex-employee of Ally Bank.  He

3  was a dual officer of Ally Bank and GMAC

4  Mortgage, I believe.

5              I guess I shouldn't say.  I don't know

6  who actually -- he was in the group of companies

7  of AFI.

8      Q.    Do you know whether he ever raised

9  concerns about the way Ally Bank was

10  interpreting Young Exhibit 6?

11              MR. BROWN:  Objection to form.

12      A.    I am aware of the fact that he raised

13  a -- a question.

14      Q.    What question do you recall him

15  raising?

16      A.    I believe, to the best of my

17  recollection, the substance of his question was

18  that the day-one gains we're talking about here

19  under fair-value accounting, even in an

20  expanding market of profitability, should not

21  have been accruing to Ally Bank.

22      Q.    Did he explain how he came to that

23  view?

24      A.    Not to me.

25      Q.    To anyone at Ally Bank?

Plaintiff's Objection
190:25-191:8: lack of
personal knowledge
(FRE 602), lack of
foundation (FRE 602,
901, 903), inadmissible
hearsay (FRE 802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 191 of 213

Page 191

1                          J. YOUNG

2               MR. BROWN:  Objection to form.

3          A.   To anyone at Ally Bank?  Not that I'm

4     aware of.

5          Q.   Did anyone explain to you his specific

6     concern?

7               MR. BROWN:  Objection to form.

8          A.   Not to my recollection.

9          Q.   Did you do anything when you heard

10    about that concern?

11         A.   Yes.

12         Q.   What did you do?

13         A.   I, first of all, informed my

14    superiors.  I may have first found out about

15    it -- I can't even -- I don't recall who I may

16    have even first found out from about the issue.

17              I would have launched an investigation

18    into the concern, so we embarked upon a process

19    between ResCap, Ally Bank, and AFI to determine

20    whether his concerns had merit.

21         Q.   What conclusion was reached?

22         A.   That the contract was followed at all

23    times on a consistent basis, so no change was

24    made.

25         Q.   Do you know whether Ally Bank actually

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 192 of 213

Page 192

1                        J. YOUNG

2    demanded that -- that ResCap return some money

3    to it for a period of time where Ally contended

4    the contract was not followed?

5         A.    I'm aware of that, yes.

6         Q.    And why did Ally Bank do that?

7         A.    I would have to refresh my

8    recollection of the specific facts, but it had

9    something to do with cash being passed to -- to

10   ResCap by the bank when the bank was under

11   fair-value accounting and, accordingly, then not

12   in accordance with the contract.

13        Q.    Did Ally Bank also demand interest on

14   that money?

15        A.    I believe the answer to that is yes.

16        Q.    Why?

17        A.    Because it is a regulatory requirement

18   that if there is a transaction between

19   affiliates that was considered an error, that

20   the bank is reimbursed for interest.   It's a

21   regulatory requirement.

22        Q.    Do you consider Young Exhibit 6 to be

23   a related-party transaction?

24        A.    Yes.

25        Q.    Would you turn back to Young Exhibit

Plaintiff's
Objection
192:22-197:12:
Lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
inadmissible
hearsay
(FRE 802)

Page 193

1                           J. YOUNG

2      1, please, and I'd like to direct your attention

3      to the page with the Bates No. ALLY 0242856.

4          A.    I'm there.

5          Q.    And I'd like to focus your attention

6      to 6.4.2, which is Transfers of Financial

7      Assets.  Do you see that?

8          A.    I do.

9          Q.    And the first paragraph says,

10     "Transfers of assets between a parent and

11     subsidiary or between entities under common

12     control should generally be accounted for by the

13     receiving entity at the carrying amounts in the

14     accounts of the transferring entity at the date

15     of the transfer (i.e., historical costs)."

16              Do you see that?

17         A.    Uh-huh.

18         Q.    Is that the way Young Exhibit 6 works?

19              MR. BROWN:    Objection to form.

20         A.    I would say yes.

21         Q.    How so?

22         A.    Because this is referring to the

23     carrying amount that's recorded in an entity.

24     So Ally Bank, the carrying amount is fair value

25     and the purchase price is at the net carrying

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 194 of 213

Page 194

1                           J. YOUNG

2    amount, which is fair value.  It's -- there's

3    not -- and it's done according to the agreement

4    45 days later.  There is no separate mark to

5    market that's done when the transaction occurs

6    to up refresh the value from when it was first

7    put on the books of Ally Bank.

8              This is -- this is referring to a

9    transaction, and this would -- this would --

10   this is an example where it's recorded by one

11   entity, and if it's purchased by the related

12   entity, it should be purchased at their carrying

13   value, which is what it says.

14        Q.   Well, it says historical cost?

15        A.   And that is their -- it's -- well,

16   it's the carrying amounts.  I mean, why it says

17   historical costs, it's not always going to be

18   true, so I can't explain why it -- why they put

19   that in there, but it's at the carrying amount.

20              The reason it's in there is because,

21   under Generally Accepted Accounting Principles,

22   it's getting to this view that you don't refresh

23   the value.  It doesn't mean it can't -- it's not

24   a fair value to begin with, but you don't

25   refresh it on the day that you do the

1                          J. YOUNG

2    transaction.

3         Q.    In your view, is fair value the same

4    thing as historical cost?

5         A.    It may or may not be.

6         Q.    What is the difference between fair

7    value and lower of the cost or market?

8         A.    That would -- the primary difference

9    there is that, under fair-value accounting, you

10   would record an asset at a higher or lower value

11   depending on the market.  Lower of cost or

12   market is different in the sense you would only

13   record the downside but not the upside.

14        Q.    When you say "higher or lower value

15   depending on the market," higher or lower than

16   what?

17        A.    Than your -- than your previous value.

18        Q.    Where do you get the previous value

19   from?

20        A.    From your established basis on your

21   books, so...

22        Q.    Would that be historical cost?

23        A.    Well, it may or may not be depending

24   on how the account -- how the account is

25   accounted for.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 196 of 213

Page 196

1                          J. YOUNG

2        Q.    Is fair value the same thing as

3    historical cost?

4              MR. BROWN:  Objection to form.  Asked

5        and answered.

6        A.    Well, I mean, the -- there weren't

7    gains running through Ally Bank's books, if

8    that's what you're asking.

9        Q.    No, I'm asking you whether historical

10   cost is the same thing as fair value?

11             MR. BROWN:  Objection to form.

12       A.    And I would say generally not, but

13   it -- I think it depends on facts and

14   circumstances.  I mean, you could have a

15   purchase of an asset and you're at a cost and

16   that is the fair value.

17       Q.    So it might be, but by definition, it

18   is not?

19             MR. BROWN:  Objection to form.

20       Mischaracterizes testimony.

21       A.    It might be, but by definition, I

22   would say it's trying to get at two different

23   things, yes.

24       Q.    Okay.  And so if you have a contract

25   which is a transfer of financial assets, I take

Page 197

1                    J. YOUNG

2    it you agree that Young Exhibit 6 contemplates

3    transfers of financial assets?

4        A.    Yes.

5        Q.    And it contemplates transfers of

6    financial assets between related parties?

7        A.    Yes.

8        Q.    And so if you have a contract that has

9    transfers of financial assets between related

10   parties for something other than historical

11   cost, it would violate Ally's accounting policy,

12   correct?

13              MR. BROWN:  David, I'm not going to

14       let you do that.  Look at the second

15       paragraph of 6.4.2.

16              MR. COHEN:  You can cross when I'm

17       finished.

18              MR. BROWN:  And I will.

19              MR. COHEN:  Okay.

20              MR. BROWN:  I'm not going to let you

21       mislead the witness on the document.

22              MR. COHEN:  You can cross when I'm

23       done.

24              MR. BROWN:  Believe me --

25              MR. COHEN:  You can object.  That's

Page 198

1                          J. YOUNG

2       what the rules provide.

3               MR. BROWN:  Objection.

4               MR. COHEN:  Do you need a copy?

5               I take that as a no.

6               Would you read back my last question,

7       please.

8               (Record read.)

9               MR. BROWN:  Objection to form.

10          A.    I don't think that's always the case.

11      We were not violating any Ally accounting

12      policy.

13          Q.    How do you know that?

14          A.    Because I've been practicing GAAP for

15      30 years.  I know accounting, and we weren't

16      violating any -- any accounting policy.

17          Q.    Before --

18          A.    It was also audited by external

19      auditors.  It was audited by internal auditors.

20      Many eyes were on it.  We were not violating any

21      accounting policy.

22          Q.    But you didn't do that work yourself,

23      right?

24              MR. BROWN:  Objection to form.

25          A.    Which work?

Plaintiff's
Objection
198:10-199:25:
Inadmissible
hearsay (FRE
802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 199 of 213

Page 199

1                          J. YOUNG

2        Q.     The work of determining whether this

3   contract, Young Exhibit 6, complied with Young

4   Exhibit 1, Ally's accounting policy?

5             MR. BROWN:   Objection to form.

6        A.     I didn't specifically look at it, but

7   I certainly have enough experience to know

8   whether it would have or not.

9        Q.     Okay.  And as of this morning, you

10  testified that until today you had never even

11  seen Young Exhibit 1, right?

12       A.     That's correct.

13       Q.     Okay.  So you certainly, in making

14  your determination in real-time as to whether

15  Mr. Glassner's concerns were founded, you didn't

16  make reference to the policy, did you?

17            MR. BROWN:   Objection to form.

18       A.     I did not make reference to the

19  policy.  I'm not sure I need -- I don't believe

20  I needed to.

21       Q.     When you joined ResCap in 2005, were

22  you involved with ResCap's portfolio of mortgage

23  servicing rights?

24       A.     I would have been involved in the

25  context of accounting for them, yes.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 200 of 213

Page 200

1                        J. YOUNG

2        Q.      Did you have any dealings with respect

3   to entering an arrangement with Ally Bank so

4   that Ally would hold the mortgage servicing

5   rights in order to realize savings, economies of

6   scale?

7        A.      I assume --

8                MR. BROWN:   Objection to form.

9        A.      I assume you're referring to the, what

10  we commonly call the MSR swap agreement.

11       Q.      I am.

12       A.      And I was not a party to the

13  initiation or development of that.   I can't tell

14  you when it first came into play, but I am

15  certainly aware of the agreement.

16       Q.      What is your understanding of what

17  that agreement calls for?

18       A.      My understanding of that agreement is

19  that it is essentially a hedge vehicle such that

20  the Ally Bank is obtaining a hedge of their --

21  of the asset on the books of Ally Bank, and that

22  hedge is in the form of a total return swap,

23  which is essentially what the MSR swap is, a

24  total return swap.

25       Q.      Do you have an understanding as to

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 201 of 213

Page 201

1                          J. YOUNG

2    what happens with increases in the value of Ally

3    Bank's mortgage servicing rights vis-a-vis GMAC

4    Mortgage under the MSR swap?

5              MR. BROWN:  Objection to form.

6       A.    I have an understanding, yes.

7       Q.    What is that understanding?

8       A.    It's a complicated -- it's a very

9    complicated agreement, but the general

10   understanding is that changes in the -- in the

11   value of the MSR that come from market value

12   changes or value creation under the

13   capitalization mortgage servicing rights is

14   swapped to ResCap in exchange for a LIBOR-based

15   return.  And the same is true if the value goes

16   up or the value goes down for those reasons I

17   discussed or indicated.  All that would flow to

18   ResCap.

19              In addition, servicing income,

20   expenses, things of that nature would also flow

21   ResCap.  So it was a total return swap, and Ally

22   Bank would receive a LIBOR-based return and it

23   acts as a very effective hedge of the asset.

24      Q.    Is there anything in the MSR swap that

25   limits the universe of mortgage servicing rights

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 202 of 213

Page 202

1                          J. YOUNG

2    to which it applies?

3              MR. BROWN:  Objection to form.

4        A.    I think that it applies to -- there

5    was a common knowledge among the parties to

6    which the -- how the agreement was to be

7    applied.

8        Q.    And what was that common knowledge?

9        A.    They would act as a total return swap;

10   that -- that increases the day-to-day changes in

11   the value would be swapped back and forth;

12   servicing income and servicing fees would be

13   swapped back and forth; but particularly, the

14   purchase of MSRs from a correspondent loan were

15   not passed back and forth for obvious reasons.

16   It's a purchase of an MSR, it's not the creation

17   of an MSR, but that the creation or the

18   capitalization of an MSR that would come through

19   a -- a non-correspondent loan, that value would

20   be passed to ResCap.

21       Q.    Could you give me the obvious reasons

22   why correspondent loans were excluded in

23   practice?

24             MR. BROWN:  Objection to form.

25       Mischaracterizes testimony.

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 203 of 213

Page 203

1                          J. YOUNG

2        A.    Because they were -- they were

3    purchased by Ally Bank.  There was a cash

4    out-of-pocket to Ally Bank.  It would be

5    completely nonsensical for Ally Bank to pay a

6    third party for that MSR, pass cash to ResCap

7    along with all the economics of the asset,

8    and -- and not -- and not get -- only get it

9    back once from ResCap, potentially.

10            So it's a double purchase of an asset,

11   which is completely nonsensical.

12        Q.    Do you have any understanding as to

13   whether the language in the agreement comports

14   with the parties' practice?

15            MR. BROWN:  Objection to form.  What

16        agreement are we talking about?

17        A.    Which agreement are you referring to?

18        Q.    The MSR swap.

19            MR. BROWN:  Objection to form.

20        A.    Which component of the MSR swap?

21        Q.    Any component.

22            MR. BROWN:  Objection to form.

23        A.    The language is -- is -- the language

24   is -- is not specific to that point.

25        Q.    What does that mean?

Plaintiff's Objection 203:12-204:9: lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), inadmissible hearsay (FRE 802)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 204 of 213

Page 204

1                    J. YOUNG

2        A.     It means it doesn't come right out and

3   say correspondent loans which are purchased by

4   Ally Bank for which a payment is made are -- are

5   removed from the cash flows that go back to

6   ResCap, but that is in what prac- -- that is the

7   practice that was in place, that was the intent

8   of the parties, and it was the logical

9   conclusion to a total return swap.

10       Q.     How do you know that was the intent of

11  the parties?

12       A.     Because the parties were operating

13  under the agreement for years without any

14  question.

15       Q.     And to be clear, there's nothing in

16  the swap that distinguishes among mortgage

17  servicing rights, right?

18            MR. BROWN:    Objection to form.

19       Mischaracterizes testimony.

20       A.     Again, I don't believe the MSR swap --

21  the MSR swap does not specifically talk about

22  correspondent loan MSR versus

23  consumer-originated loan MSR.    It's not in

24  there.    There are things in those agreements

25  that I -- that I view have indications of what

Plaintiff's
Objection
204:15-205:3:
lack of
personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903),
inadmissible
hearsay (FRE
802)

Page 205

J. YOUNG

1

2  the purpose was and why we did what we did, but

3  there's not specific language.

4          MR. COHEN:  Why don't we take a break.

5  I'm going to go through my notes.  We may be

6  wrapping up.

7          MR. BROWN:  Okay.

8          THE VIDEOGRAPHER:  The time is 2:12

9  P.M.  We're off the record.

10          (Recess.)

11          THE VIDEOGRAPHER:  The time is 2:24

12  P.M.  We're on the record.

13  BY MR. COHEN:

14      Q.   Mr. Young, during the break, did you

15  discuss your deposition testimony with anyone?

16      A.   We discussed a few things, yes.

17      Q.   What did you discuss about your

18  deposition testimony?

19      A.   We discussed an item that refreshed my

20  recollection on the question you had about

21  whether the economics changed with respect to

22  the MMLPSA, and I now recall that the bank was

23  always under fair-value accounting from the date

24  of Exhibit 6 that you have through the entire

25  period of the arrangement.

Plaintiff's
Objection
205:17-208:23:
Inadmissible
hearsay (FRE 802)

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 206 of 213

Page 206

1                          J. YOUNG

2              The fair value treatment prior to

3    August of 2009 was a result of an election to

4    use hedge accounting on the HFS portfolio of the

5    bank.  And when you elect hedge accounting, you

6    do -- you have the ability under GAAP to record

7    those -- the asset side on a fair-value basis.

8    And the bank was under fair-value accounting

9    from the entire time of this period.

10             You had asked me about the -- the

11   payment that was made from the -- from the --

12   from ResCap to the bank that was a result of the

13   investigative work we did that I described, and

14   we had all parties at the table, including an

15   outside review by KPMG as an independent party

16   and the interlogger of AFI, by the way, was also

17   involved, and we looked at the accounting in

18   accordance with the agreement, and there was a

19   period of time from January 1 of '09 through

20   July 31 of '09 where we had made an error on the

21   accounting -- I'm sorry, not on the accounting.

22   We made an error in the -- under the MMLPSA

23   because the bank was, under fair-value

24   accounting, the contract requires the purchase

25   price to be at its net carrying value, which was

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 207 of 213

Page 207

1                              J. YOUNG

2    fair value, and the payment came about because

3    the -- that's not what was used under the

4    contract for that period of time January 1, '09

5    through July 31 of '09, and all parties agreed

6    that that was the case, ResCap, Ally Bank, and

7    AFI, and hence, the payment was made from ResCap

8    to Ally Bank with interest as we discussed.

9        Q.    And that payment was a related-party

10   transaction, right?

11       A.    That payment was between related

12   parties.

13       Q.    Was that an arm's length negotiation?

14       A.    I would say absolutely.   It was both

15   sides.   No one coerced anyone to come to the

16   conclusion they came to.

17       Q.    Was legal counsel involved?

18       A.    I believe the answer to that is yes.

19       Q.    Who specifically?

20       A.    I don't know who specifically, but to

21   the best of my recollection, Anne Cummings, who

22   was the chief auditor of AFI, had indicated that

23   either Global Security or Legal was involved.

24       Q.    Who represented ResCap?

25             MR. BROWN:    Objection to form.

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 208 of 213

Page 208

1                            J. YOUNG

2          A.      This would have been in March of 2012,

3    by the timing of this review, and my primary

4    dealings were with Jim Whitlinger, who was the

5    CFO of ResCap at the time.

6          Q.      He's not a lawyer, is he?

7          A.      Not to my knowledge.

8          Q.      Who was legal counsel for ResCap?

9                  MR. BROWN:    Objection to form.

10         A.      I do not recall.

11         Q.      Do you recall whether ResCap had legal

12   counsel?

13         A.      I don't know if ResCap had legal

14   counsel on that matter or not.

15         Q.      Did AFI have legal counsel?

16         A.      I think I just responded that -- that

17   Anne Cummings, the chief auditor, informed me

18   that legal counsel, internal counsel.    I'm not

19   sure if external counsel was involved.

20         Q.      Other than that issue, did you discuss

21   other aspects of your deposition testimony

22   during the break?

23         A.      No.

24         Q.      Could you explain in detail the

25   investigative work that AFI did after hearing

Plaintiff's
Objection
208:24-210:7:
lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
inadmissible
hearsay
(FRE 802)

12-12020-mg    Doc 5803-13    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: James Young    Pg 209 of 213

Page 209

1                          J. YOUNG

2    Mr. Glassner's concerns?

3                MR. BROWN:    Objection to form.

4        A.    I can explain certainly what I was

5    aware of and what I participated in.    It was

6    a -- so I believe Mr. Glassner first let --

7    first came up to Internal Audit, I believe,

8    perhaps, or maybe the Controller's Group at AFI.

9    The AFI Audit Committee was informed, to the

10   best of my knowledge.    The Ally Bank Audit

11   Committee was informed.

12               The detailed work would involve

13   pulling out the agreements, re-reading all

14   sides, re-reading the agreements, and a detailed

15   analysis of the transaction flow during that

16   period of time to see how the -- the cash

17   settlements were occurring during the period of

18   time in question.    And so there was detailed

19   accounting work done by the accounting teams.

20               In addition, as I mentioned, AFI,

21   perhaps even AFI's Audit Committee, engaged KPMG

22   as an independent party.    KPMG came in, reviewed

23   transactions, performed interviews, issued a

24   report on the -- on the matter and -- and of

25   course, that was considered.    And again, in the

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 210 of 213

Page 210

1                        J. YOUNG
2    end, the conclusion was that absent the period
3    of time where the -- from January 1 of '09
4    through August of -- through July of '09 when
5    the $50 million payment was made between ResCap
6    and the bank, that the transactions were
7    accounted for in accordance with the agreement.
8            MR. COHEN:  Pass the witness.
9            MR. BROWN:  Nothing at this time for
10    Mr. Young.
11           MR. CHRISTENSEN:  Nothing here.
12           MR. MATZA-BROWN:  Nothing.
13           MR. COHEN:  Thank you very much for
14    your time.  Appreciate it.
15           THE VIDEOGRAPHER:  This concludes
16    today's deposition.  The time is 2:31 P.M.
17    We're off the record.
18                        oOo
19                    _____

                     JAMES YOUNG
20
21    Subscribed and sworn to
      before me this    day
22    of          2013.
23
      _____
24
25

Page 211

1                          J. YOUNG

2

3                       CERTIFICATE

4      STATE OF NEW YORK )

                               :  ss

5      COUNTY OF NEW YORK)

6           I, Kathy S. Klepfer, a Registered

7      Merit Reporter and Notary Public within and

8      for the State of New York, do hereby

9      certify:

10          That JAMES YOUNG, the witness whose

11     deposition is herein before set forth, was

12     duly sworn by me and that such deposition is

13     a true record of the testimony given by such

14     witness.

15          I further certify that I am not

16     related to any of the parties to this action

17     by blood or marriage and that I am in no way

18     interested in the outcome of this matter.

19          In witness whereof, I have hereunto

20     set my hand this 6th day of November, 2013.

21

22     _____

            KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

Page 212

J. YOUNG

INDEX

TESTIMONY OF J. YOUNG:                              PAGE

Examination by Mr. Cohen                              7


YOUNG EXHIBITS:                                    PAGE

Exhibit 1, a document bearing Bates Nos.            80

ALLY 242848 through 242866

Exhibit 2, a memo bearing Bates Nos.              117

RCJSNII0025838 through 258239

Exhibit 3, a document bearing Bates Nos.          166

ALLY 435003

Exhibit 4, an e-mail string bearing Bates         170

Nos. ALLY 0245484 through 5485

Exhibit 5, an e-mail string bearing Bates         176

Nos. ALLY 0424657 through 4658

Exhibit 6, Master Mortgage Loan Purchase and      178

Sale Agreement, Draft, 6/26/08, bearing Bates

Nos. ALLY 0201210 through 0201225

12-12020-mg   Doc 5803-13   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: James Young   Pg 213 of 213

Page 213

1                       J. YOUNG
2    NAME OF CASE:  In Re Residential Capital LLC
3    DATE OF DEPOSITION:  November 6, 2013
4    NAME OF WITNESS:  James Young
5    Reason Codes:
6         1.  To clarify the record.
          2.  To conform to the facts.
7         3.  To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25                    _____