Page 1

1

2   UNITED STATES BANKRUPTCY COURT

    FOR THE SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------------X

    IN RE:

4   RESIDENTIAL CAPITAL, LLC, et al.

5

    Civil Action No. 12-12020 (MG)

6   ----------------------------------------X

7                ***HIGHLY CONFIDENTIAL***

8            VIDEO DEPOSITION OF AL CELINI

9              Philadelphia, Pennsylvania

10               November 8, 2013

11

12                Yellow Highlighting = JSN Designation

13                Pink Highlighting = Plaintiff's Designation & Counter-Designation

                  Orange Highlighting = Joint Designation

14

15

16

17  Reported by:

18  Rebecca Schaumloffel, RPR, CLR

19  Job No: 66995

20

21

22

23

24

25

Page 2

1

2               November 8, 2013

3               9:03 a.m.

4

5

6

7          Video deposition of Al Celini, held

8     at the WESTIN HOTEL, 99 S. 17th Street,

9     Philadelphia, Pennsylvania, New York before

10    Rebecca Schaumloffel, a Registered

11    Professional Reporter, Certified Livenote

12    Reporter and Notary Public of the State of

13    New York.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4        MORRISON & FOERSTER
             Attorneys for the Debtors
5            1290 Avenue of the Americas
             New York, New York 10104
6            BY:  ROBERT BAEHR, ESQ.

7

8

9

        KRAMER LEVIN NAFTALIS & FRANKEL
10           Attorneys for the Creditors
             Committee
11           1177 Avenue of the Americas
             New York, New York 10036
12           BY:  KURT DENK, ESQ.
                  (Telephonically)

13

14

15

16       MILBANK TWEED, HADLEY & McCLOY
             Attorneys for Junior Secured
17           Lenders
             1 Chase Manhattan Plaza
18           New York, New York 10005
             BY:  ATARA MILLER, ESQ.
19                KELLY PRESSLER, ESQ.

20

21

        KIRKLAND & ELLIS
22           Attorneys for Ally
             655 Fifteenth Street, N.W.
23           Washington, DC 20005
             BY:  JUDSON BROWN, ESQ.
24                JODI WU, ESQ.

25

Page 4

```
 1

 2

 3      APPEARANCES (continued:)

 4

 5      KELLEY DRYE & WARREN
             Attorneys for UMB Bank
 6           101 Park Avenue
             New York, New York 10178
 7           BY:  JASON ADAMS, ESQ.
                (Telephonically)

 8

 9

         MORGAN LEWIS
10           1701 Market Street
             Philadelphia, Pennsylvania 19103
11           BY:  RACHEL JAFFE MAUCERI, ESQ.

12

13

         CADWALADER WICKERSHAM & TAFT
14           Attorneys for MBIA Insurance Corp.
             One World Financial Center
15           New York, New York 10281
             BY:  JARED STANISCI, ESQ.
16              (Telephonically)

17

18      ALSO PRESENT:

19

             Sara Kam, Esq. Reed Smith
20           (telephonically)
21           Gerard Alfe, videographer

22

23

             *          *          *
24

25
```

Page 5

1                    A. CELINI

2               THE VIDEOGRAPHER:  This is the

3          start of tape labeled number one in

4          the deposition of Al Celini taken in

5          the matter In Re Residential Capital,

6          LLC, et al. being held in the United

7          States District Court, Southern

8          District of New York, civil action

9          number 12-12020 (MG).

10               The deposition is being held at

11          the Westin Philadelphia, 99 South 17th

12          Street, Philadelphia, PA 19103.  The

13          date is November 8, 2013.  The time is

14          9:03.

15               Counsel will be appearing on the

16          stenographic record.

17               Please swear in the witness.

18     A L   C E L I N I, called as a witness,

19     having been duly sworn, testified as

20     follows:

21               MS. MILLER:  Before we start, I

22          just want to correct on the record the

23          caption that was put on the record at

24          the beginning of the deposition stated

25          that the case was pending in the

Page 6

1            A. CELINI

2    District Court for the Southern

3    District of New York, and the case and

4    the civ number put on the record is

5    actually related to the case which is

6    this case that's pending in the

7    Bankruptcy Court for the Southern

8    District of New York.

9         MR. BROWN:  Atara, do you want

10   counsel to identify themselves on the

11   record before you begin?

12        MS. MILLER:  I think they are

13   identified on the record already.

14        MR. BROWN:  Let's have everyone

15   on the phone identify themselves.  We

16   had an additional beep there.  I want

17   to make sure everyone on the phone is

18   identified on the record.

19        MR. DENK:  That's Kurt Denk from

20   Kramer Levin on behalf of the

21   Committee.  K-U-R-T, last name

22   D-E-N-K.

23        MR. ADAMS:  Jason Adams from

24   Kelley Drye.

25        MR. STANISCI:  Jared Stanisci

Page 7

                        A. CELINI

1

2        from Cadwalader.

3               MR. BROWN:  Anyone else on the

4        phone?

5               MS. KAM:  Sarah Kam from Reed

6        Smith on behalf of Wells Fargo.

7               MR. BROWN:  Anyone else on the

8        phone?  Okay.

9    BY MS. MILLER:

10        Q.    Good morning, Mr. Celini.  I am

11    Atara Miller from Milbank, Tweed, Hadley and

12    McCloy, and we represent the ad hoc group of

13    junior secured note holders in this action.

14               THE VIDEOGRAPHER:  One moment,

15        please.  I don't know if the witness

16        was sworn in.  I apologize.

17               MS. MILLER:  He was.

18        A.    Okay.

19        Q.    Do you understand that you are

20    under oath here today?

21        A.    Yes, I do.

22        Q.    And you have been sworn in,

23    right?

24        A.    Yes, I have been.

25        Q.    With that, I am going to go over

Page 8

                        A. CELINI

1
2    just a couple of basic ground rules for a

3    deposition.  As you know, today's deposition

4    is both being videotaped, but it's also being

5    recorded by the Court Reporter in a

6    stenographic written record.  She is writing

7    down every word that I say and that you say.

8    So if you could wait for me to finish asking

9    my questions before you start answering, that

10   would be appreciated, and I will do the same.

11   If you could, also, give verbal responses to

12   my questions, no nods of the head, smiles,

13   et cetera.

14        A.    Understood.

15        Q.    And there may be times during the

16   day where your counsel will object to a

17   question that I ask.  I am going to ask to

18   you still answer my question, unless you are

19   specifically instructed by your counsel not

20   to answer that question.

21             Does that work?

22        A.    Understood.

23        Q.    Okay.  If at any time during the

24   day you want to take a break, just let me

25   know.  I would be happy to take a break.  I

12-12020-mg   Doc 5803-14   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Al Celini   Pg 9 of 165
***HIGHLY CONFIDENTIAL***

Page 9

1                    A. CELINI

2     am just going to ask that you answer any

3     question that I have already placed that's

4     pending before you -- before we take a break.

5     Okay?

6          A.    Yes.

7          Q.    Mr. Celini, have you ever been

8     deposed before?

9          A.    No.

10         Q.    Did you sit for interviews with

11    the examiner?

12         A.    Yes.

13         Q.    Were those interviews recorded?

14         A.    Yes, they were.  I believe they

15    were.

16         Q.    Is it your understanding that

17    those were audio recordings?

18         A.    Yes.

19         Q.    And were you under oath when you

20    gave those interviews?

21         A.    No, I was not.

22         Q.    Do you believe that everything

23    that you told the examiner was truthful and

24    accurate?

25         A.    Yes, absolutely.

***HIGHLY CONFIDENTIAL***

Page 10

                        A. CELINI

1

2      Q.     Would it be consistent with the

3  testimony that you would have given had you

4  been under oath?

5      A.     Yes.

6      Q.     Mr. Celini, where do currently

7  work?

8      A.     I'm an executive officer for Sun

9  National Bank based out of Vineland, New

10  Jersey.

11      Q.     How long have you been there?

12      A.     About 11 months.

13      Q.     When did you first start working

14  for Ally?

15          MR. BROWN:  Objection to form.

16      What do you mean by "Ally"?

17          MS. MILLER:  Either Ally or any

18      of its subsidiaries.

19      A.     It was in 2001, I believe,

20  January of 2001.  And at the time, it was

21  GMAC.

22      Q.     And did you work for GMAC?

23      A.     Yes.

24      Q.     What was your position when you

25  first joined in 2001?

***HIGHLY CONFIDENTIAL***

Page 11

1                        A. CELINI

2        A.      I joined as the CFO of GMAC Bank.

3        Q.      How long did you hold that

4   position for?

5        A.      Three years.

6        Q.      And what was your next position?

7        A.      Chief risk officer.

8        Q.      And how long did you hold that

9   position for?

10       A.      Three years.

11       Q.      Did you have any other positions

12  after being chief risk officer?

13       A.      Director of lending development.

14       Q.      And how long did you have that

15  position for?

16       A.      Again, until I departed.  Until I

17  left.

18       Q.      And when did you leave?

19       A.      It was at the -- I believe it was

20  at the end of 2009.

21       Q.      And just so we are clear, did

22  there come a time when GMAC Bank became Ally

23  Bank?

24       A.      Yes.

25       Q.      When was that?

***HIGHLY CONFIDENTIAL***

Page 12

                          A. CELINI

1

2       A.    I forget the actual date that it

3   occurred.  I know there was a rebranding

4   initiative, so I don't recall the exact date.

5   But it was part of my last four years that I

6   was there.

7       Q.    Throughout the time that you

8   described when you were CFO, chief risk

9   officer and then director of lending

10  development, you always worked for GMAC Bank

11  or Ally Bank?

12      A.    Correct, yes.

13      Q.    You have to wait me for to

14  answer -- finish my question.

15      A.    I have to get my --

16      Q.    It's okay.  We will get into a

17  groove.

18      A.    My groove, yes.

19      Q.    So you continuously worked for

20  the entity that was known as either GMAC Bank

21  or Ally Bank as applicable during the

22  relevant period?

23      A.    Yes.

24      Q.    So if I say "Ally" today, unless

25  I am more specific, I will be referring to

Page 13

1                    A. CELINI

2    Ally Bank or GMAC Bank.  Is that understood?

3        A.    Understood.

4            MR. BROWN:  I will object to

5        that.  Just because Ally has been used

6        so differently throughout these cases

7        by different folks.  Ally is sometimes

8        referred to Ally Financial, Inc.  Ally

9        has sometimes referred to Ally

10       Financial, Inc. and its

11       non-debtor Ally subsidiaries.  Ally at

12       times has referred to Ally and all of

13       its subsidiaries.  So if you want to

14       refer to Ally Bank as Ally, that's

15       fine.  But I will have to object to

16       the question because it is just not

17       going to be clear to me what Ally

18       means.

19            MS. MILLER:  Well, I am telling

20       you right now what Ally means.  It

21       means Ally Bank.

22            MR. BROWN:  Fine.  I am telling

23       you unless the question is clear, I am

24       just going to have to object.  Because

25       using Ally to refer to Ally Bank is

Page 14

1                          A. CELINI

2          entirely unclear.

3                    MS. MILLER:   If that's the basis

4          for your objection, you can object and

5          you can defend that to the bank when

6          it's clearly defined a term on the

7          record and the witness has accepted

8          that definition.

9          Q.     So we will go ahead with, if I

10   refer to Ally, I will be referring to Ally

11   Bank, which is the entity that you are

12   familiar with and that you were personally

13   employed by; is that right?

14         A.     Yes.

15         Q.     Okay.   If I refer to "the bank,"

16   you will also understand that I am referring

17   to Ally Bank or GMAC Bank as applicable

18   during the period I'm talking about, right?

19         A.     Yes.

20         Q.     Can you just go through your

21   post-high school education for me?

22         A.     Post high-school --

23         Q.     College and on.

24         A.     The undergraduate degree, Fordham

25   University, major in accounting.   Graduated

12-12020-mg    Doc 5803-14    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Al Celini    Pg 15 of 165
***HIGHLY CONFIDENTIAL***

Page 15

1                     A. CELINI

2    1984.  Sat for the CPA exam a few years

3    later.  Passed the New York State public

4    certified accountant and that's my formal --

5    I have not attended graduate school.  So I

6    have done my professional, all my CPU during

7    that time.

8         Q.     And are you currently a certified

9    public accountant?

10        A.     Yes, I am.

11        Q.     Have you maintained that

12   certification throughout the period from the

13   time you got it until today?

14        A.     Yes.

15        Q.     What were your duties and

16   responsibilities as CFO of GMAC Bank?

17        A.     To oversee all the financial

18   activities, financial reporting and safety

19   and soundness of the bank in its financial

20   matters.

21        Q.     What responsibility, if any, did

22   you have for reviewing financial statements

23   prepared by ResCap subsidiaries, ResCap and

24   its subsidiaries?

25        A.     None.

Page 16

1                          A. CELINI

2          Q.      And what were your duties and

3    responsibilities as the chief risk officer?

4          A.      To establish the risk parameters,

5    risk monitoring activities for credit risk,

6    operational risk, which would include

7    compliance as well as safety and soundness of

8    the depository.

9          Q.      When you say "compliance," are

10   you including compliance with applicable

11   regulations?

12         A.      Yes.

13         Q.      And are you also including

14   compliance with GAAP accounting principles?

15         A.      It's not my responsibility as

16   chief risk officer, it was not.

17         Q.      What else were you ensuring

18   compliance of, regulations and anything else?

19         A.      Regulations.  Obviously,

20   regulations, compliance with the bank's

21   policies.

22         Q.      Were you responsible for

23   reviewing bank policies?

24         A.      Yes.

25         Q.      Were you responsible for

***HIGHLY CONFIDENTIAL***

Page 17

1                    A. CELINI

2    reviewing major transactions to ensure that

3    they complied with the applicable regulations

4    and bank policies?

5              MR. BROWN:   Objection to form.

6         Q.    You can answer.

7         A.    Yes.

8         Q.    What were your duties and

9    responsibilities as director of lending

10   development?

11        A.    They were primarily to work to

12   expand the asset activities of the bank.

13   Working with the various affiliate entities

14   of GMAC.   That would be auto lending,

15   commercial lending, mortgage lending

16   activities.

17        Q.    And what are the asset activities

18   of the bank?

19        A.    The bank was primarily -- had

20   mortgage lending assets, mortgage assets,

21   residential mortgage assets as the primary

22   asset base.   Also did -- at various times had

23   auto financing activities in it, and we did

24   some commercial real estate lending for some

25   auto dealers.

***HIGHLY CONFIDENTIAL***

Page 18

1                    A. CELINI

2        Q.    So was one of your jobs to

3   increase the amount of residential mortgage

4   assets that the bank was --

5        A.    Yes.

6        Q.    --involved with?

7        A.    So the answer is yes.

8        Q.    She is very good.  She got your

9   answer, but you should still wait.

10        A.    I will get with it eventually.

11        Q.    Mr. Celini, can you explain what

12   the 250.250 exemption is?

13        A.    250.250 exemption is a -- sort of

14   an acronym for Reg W 12 CFR, I think it's

15   243 K, I think, I forget the actual citation,

16   but it's -- it was the exemption that was

17   allowed under Reg W to allow a depository to

18   purchase assets from affiliated entities, and

19   it created a series of limitations and

20   restrictions as to how it could be acquired

21   and the types of assets that could be

22   acquired.

23        Q.    And did it also have limitations

24   on the amount of assets that could be

25   acquired?

Plaintiff's Objection
18:11-19:18
Irrelevant (FRE 401,
402)

Page 19

1                    A. CELINI

2        A.      Yes.

3        Q.      What were those limitations?

4                MR. BROWN:   Objection to form.

5        Q.      You can answer.

6        A.      Limitations were no more of 50%

7   of production.

8        Q.      No more than 50% of production

9   could be from assets being acquired by a

10   related entity?

11                MR. BROWN:   Objection to form.

12        A.      So I don't recall the letters and

13   verse of the regulation today.   So there

14   were -- there were restrictions as to who was

15   50% of the production of the affiliate, I

16   believe, that was the requirement there, and

17   no more than 50% of the depository's assets

18   could be from those activities as well.

19        Q.      And what -- does Reg W regulate

20   affiliated entity transactions?

21        A.      Can you clarify that?   I am not

22   sure.

23        Q.      What is Reg W?

24        A.      Reg W is a banking regulation

25   that requires, specifies the terms and

Page 20

1                    A. CELINI

2    conditions by which a bank can do business

3    with a non-banking affiliates.  So prescribes

4    a litany of, you know, items, you know,

5    prohibited covered transactions, low quality

6    asset activities and prohibits the purchases

7    of assets from affiliates and certain

8    conditions subject to exemptions.

9         Q.    Did that apply to Ally -- or GMAC

10   Bank or Ally Bank's transactions with GMAC

11   Mortgage?

12        A.    Can you clarify that?  What

13   type -- so it would apply for a number of

14   transactions.  A lot -- many of its

15   transactions, but the exemptions only applied

16   to certain ones.  So I need clarification.

17        Q.    Let me reask my question.  For

18   purposes of Reg W, was GMAC Bank or Ally Bank

19   considered a banking entity?

20        A.    Yes.

21        Q.    And GMAC Mortgage was a

22   non-banking affiliate, right?

23        A.    Right, it was a 23A affiliate.

24        Q.    Were you responsible for viewing

25   the bank's records to ensure compliance with

12-12020-mg   Doc 5803-14   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Al Celini   Pg 21 of 165
***HIGHLY CONFIDENTIAL***

Page 21

1                    A. CELINI

2      Reg W?

3              MR. BROWN:  Objection to form.

4         At what time period are you talking

5         about?

6              MS. MILLER:  When he was the

7         chief risk officer.

8         A.    Yes.

9         Q.    And did you -- did you have that

10     responsibility at any other time?

11        A.    As CFO, I had responsibility as

12     well.

13        Q.    And so if my calculation is

14     right, that's from about 2001 when you joined

15     the bank through, approximately, 2007?

16        A.    That sounds correct.

17        Q.    Do you know exactly when you

18     transitioned into being the director of

19     lending development?

20        A.    I don't recall the specific date.

21        Q.    Do you recall approximately when

22     in 2007 or 2008 that happened?

23        A.    That's probably --

24              MR. BROWN:  Objection to form.

25        Mischaracterizes testimony.

***HIGHLY CONFIDENTIAL***

Page 22

1                    A. CELINI

2          MS. MILLER:  No speaking

3      objections, please.  You can just

4      object to form.

5          A.    Again, I don't recall a specific

6      date.  It was probably in midway through 2007

7      would be my, you know, best estimate.

8          Q.    And did there come a time --

9      sorry, did the 250.250 exemption limit the

10     amount of expansion in the residential

11     mortgage assets that the bank could acquire?

12              MR. BROWN:  Objection to form.

13         A.    Atara, I think you need to

14     clarify it for me.  In what way?  It

15     limited -- can you be more specific as to

16     what --

17         Q.    Let me ask it differently.  In          Plaintiff's
                                                         Objection
18     reviewing the bank's records, did there come     22:17-23:15
                                                         Irrelevant (FRE
19     a time where you understood that the bank was    401, 402)

20     getting close to the limitations imposed even

21     under the 250.250 exemption?

22              MR. BROWN:  Objection to form.

23         A.    So, yes, there were -- we

24     carefully watched the level of production

25     purchase from the affiliates and carefully

Page 23

1                    A. CELINI

2    monitored it to know when we were coming

3    close or near to the limits and monitored it

4    carefully so we would not exceed.

5         Q.    And did there come a time when

6    you observed that you were coming close to

7    those limits?

8              MR. BROWN:    Objection to form.

9         A.    So various times, so yes.    I

10   mean, you know, we -- we -- it happened

11   several times.    I mean, during -- from the

12   beginning of the bank's existence to when we

13   started using the exemption, through its

14   entire existence.    I mean, again, we watched

15   that level very carefully.

16        Q.    Can you explain, very generally,

17   how mortgages -- mortgage assets were

18   acquired and then either -- how mortgages

19   were acquired by the bank at the time that

20   you joined the bank?

21        A.    Again, you want to be more

22   specific?  Because the bank had several ways

23   to acquire mortgages when I joined the bank.

24              First, when I joined the bank,

25   it -- there was no native origination

***HIGHLY CONFIDENTIAL***

Page 24

1                     A. CELINI

2    capacity of the bank.  It was formed as a de

3    novo.  So we built those functions.  So at

4    inception, its first assets that it was

5    buying were through the 250.250 exemption.

6    So it purchased loans that it had evaluated

7    and underwritten as to meet its criteria, its

8    set credit policy criteria, and it would

9    underwrite and review the loans, and then,

10   after closing, it would buy them as closed

11   loans.

12        Q.     Who would it buy those loans

13   from?

14        A.     It bought loans from GMAC

15   Mortgage.

16        Q.     And did there come a time when

17   the bank started originating loans itself?

18        A.     Yes.

19        Q.     And when was that?

20        A.     I don't recall the specific

21   dates, but soon after the bank was formed,

22   the bank, you know, moved -- acquired the

23   origination capacity, the individuals and

24   systems and platforms of GMAC Mortgage's

25   correspondent lending group and its warehouse

Page 25

1                      A. CELINI

2    lending group.  So even then, you know, as a

3    correspondent, the bank didn't originate it,

4    purchased loans from third-party

5    correspondence.  But it had a small group

6    that it -- a small group within that did

7    broker loans.  So -- but it wasn't its

8    primary activity.  So the bank did very

9    little of its own native origination to

10   purchase closed loans from third-party

11   correspondence.  It purchased loans using the

12   250.250 exemption.

13        Q.    About what timeframe was that?

14             MR. BROWN:  Objection to form.

15        A.    Atara, I don't recall the date.

16   It was generally, probably in the bank's

17   early years.  Maybe 2003.  Sometime.

18        Q.    And did that continue to be the

19   way that the bank acquired loan assets, by

20   purchasing them from GMAC Mortgage under the

21   250.250 exemption, acquiring them under

22   correspondent lending agreements and some

23   small amount of origination through the bank

24   itself until 2000 -- late 2007?

25        A.    So those methods were the primary

Page 26

1                        A. CELINI

2    asset -- acquisition strategies used.  I

3    don't recall the date.  But in -- when we --

4    the financial crisis started, you know,

5    started to bubble in, probably, 2007, late

6    2007, when we -- in my new role as director

7    of lending development, was tasked with the

8    ways to explore, ways to, you know,

9    accelerate or expand our lending beyond the

10   250.250 exemption with our affiliate GMAC

11   Mortgage.

12        Q.    What were the benefits to the        Plaintiff's Objection
                                                     26:12-24:  Irrelevant
13   bank in expanding its lending capacities        (FRE 401, 402)

14   beyond the 250.250 exemption?

15        A.    As a source of the benefits we

16   would accrue from having, you know, greater

17   asset base to earn net interest spread, fees,

18   originations, et cetera.  So just

19   advantageous for it to use, you know, to

20   deploy its liquidity to earn -- to earn, have

21   an interest earning assets.  The bank had

22   ample liquidity and in 2007, there were

23   challenges starting, in some severe

24   challenges, at the affiliate.

25        Q.    And what would the impact have

Page 27

A. CELINI

1

2   been on the bank if GMAC Mortgage didn't have

3   the liquidity to originate loans?

4           MR. BROWN:  Objection to form.

5       Mischaracterizes testimony.  He said

6       GMAC Bank.

7           MS. MILLER:  You said I did?

8           MR. BROWN:  No, I think the

9       witness said GMAC Bank.

10       A.     So can you clarify your question,

11  Atara, are you asking about the bank, the

12  benefits to the bank or the benefits to the

13  affiliate?

14       Q.    My question is, not benefits --

15  you answered benefits.  I appreciated that.

16  My question now is, what would the impact on

17  the bank have been if GMAC Mortgage was

18  unable to acquire -- was unable to originate

19  loans that were then available for

20  acquisition by the bank?

21           MR. BROWN:  Objection to form.

22       A.    I believe I understand the

23  question.  So I will answer.  The -- the

24  affiliate was one of the major sources of

25  earning asset acquisition that we had.  Not

Plaintiff's
Objection
27:14-28:9
Irrelevant (FRE
401, 402)

Page 28

1                          A. CELINI

2       the only.   We had correspondent capability to

3       buy from third parties.   So, you know, if the

4       affiliate wasn't able to originate, we would

5       lose an opportunity to have, you know, make

6       available to us, you know, conforming, you

7       know, Fannie Mae, Freddie agency loans that

8       were, you know, of a favorable risk profile

9       for us.

10          Q.    So if GMAC Mortgage didn't have

11      enough liquidity to be able to originate the

12      loans, the bank would have lost or would have

13      had a significant source of assets negatively

14      impacted, right?

15             MR. BROWN:   Objection to form.

16          A.    Atara, I wouldn't characterize it

17      as "significant."   It would have been one of

18      the ways that, you know, the bank was always

19      able to originate on its own.   We just -- you

20      look to maximize, you know, your acquisition.

21      So if the affiliate was not there, the bank

22      would have been fine.   It would have had more

23      than adequate activities there.   So to

24      sustain itself.   Didn't need the -- the bank

25      never needed the AFI's assets.   It desired

JSN Objection
28:10-29:11
FRE 611(a)
(Non-responsive)

Page 29

1                    A. CELINI

2    them for its own profitability.   And, you

3    know, again, GMAC Mortgage was a service

4    provider to us as well.   Subserviced our

5    loans.   They provided administrative services

6    to us.   So, you know, if our -- if the

7    affiliate was not able to originate, it could

8    have been -- it could have weakened them to a

9    point that they would not have been able to

10   support our activities and we would have had

11   to get them from third-parties.

12       Q.    And would the bank have had to

13   pay more if it had to get those services from

14   third parties?

15            MR. BROWN:  Objection to form.

16       A.    I am not sure, Atara.  I mean Reg

17   W requires that you -- services be, you know,

18   under 23B, be at market rates or better to

19   the bank.  So we would have been able to find

20   those services and been able to sustain

21   ourselves fine.

22       Q.    Reg W doesn't really require that

23   it be market rate, right, you said market

24   rate or better?

25            MR. BROWN:  Objection to form.

Page 30

                        A. CELINI

1

2          THE WITNESS:  I am not quite

3      sure why -- that you are objecting.

4      But whatever you want do, you're fine.

5          Q.    He's just going to object to

6  every question, so you can ignore it and keep

7  on answering.

8          MR. BROWN:  That

9      characterization, Mr. Celini, is

10      incorrect.  As you have already seen,

11      I don't object to every question.  I

12      only object when I don't understand

13      the question or when she

14      mischaracterizes your testimony or any

15      number of things.  Her question that

16      she just asked --

17          MS. MILLER:  Nope.  No speaking

18      objections.

19          MR. BROWN:  -- Mischaracterizes

20      your testimony and was entirely

21      unclear to me.

22          Q.    The basic rule, let's go over it

23  again.  He is going to object.  Unless he

24  specifically says "I instruct the witness not

25  to answer," you can just disregard his

12-12020-mg   Doc 5803-14   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Al Celini   Pg 31 of 165
***HIGHLY CONFIDENTIAL***

Page 31

A. CELINI

1

2    objection.  He is putting it on the record.

3    He will have to justify it before the Court.

4    Unrelated to this deposition.  You just go

5    ahead and answer.

6         A.    My point is, if I don't

7    understand --

8         Q.    Ask for clarification.

9         A.    I'll make sure you clarify.

10        Q.    Thank you.

11        A.    So again, therefore, can you

12   restate your question again?  Sorry.

13        Q.    Yes.  I don't remember it.

14              A transaction would still be

15   consistent with Reg W if it was at a better

16   than market rate for the bank, right?

17              MR. BROWN:  Objection to form.

18        A.    I understand and that's correct.

19   23B requires arm's length terms, market terms

20   or better to the depository.

21        Q.    And Reg W is specifically

22   intended to protect commercial banks, right?

23              MR. BROWN:  Objection to form.

24        A.    In general.  I am not an

25   attorney.  But in general, the requirement of

Page 32

1                          A. CELINI

2        the foundation of Reg W, in my judgment, is

3        it was established to protect insured

4        depositories from, you know, from abuses that

5        could occur from non-banking activities.

6             Q.      In late 2007, do you recall

7        approximately what percentage of the bank's

8        mortgage assets were being acquired from GMAC

9        Mortgage?

10            A.      I don't recall.

11            Q.      Do you remember if it was

12       something north of 40%?

13                 MR. BROWN:   Objection to form.

14            A.      Honestly, I can't answer that.

15       We kept the -- we kept ourselves close to the

16       50% limit but just below it to make sure that

17       we had cushion for any potential coverage

18       transactions that could arise.   So, again, I

19       don't know the exact number, but typically,

20       we would give ourselves some cushion away

21       from the 50% level.   So it would be not 50%,

22       it would have to be some number less

23       than 50%.

24            Q.      So 47% sounds like it might be

25       reasonable?

Plaintiff's
Objection
32:6-23Irrelevant
(FRE 401, 402)

Page 33

A. CELINI

2      MR. BROWN:  Objection to form.

3      A.    You know, I can't answer that.  I

4  don't know.  Again, it could have been that

5  number.  It was monitored on a daily basis.

6      Q.    When you say that you wanted to

7  give yourself some amount of cushion away

8  from 50% level, what percentage of cushion

9  would you have been comfortable with?

10      MR. BROWN:  Objection to form.

11      A.    Any number -- as a general rule,

12  we try to give ourselves a level of cushion

13  based on the amount of transactions we had.

14  So a covered transaction, a violation would

15  occur if we exceeded that.  So the range

16  could vary from time to time.  So, again, I

17  don't feel comfortable giving you, telling

18  you what the cushion was.  I mean, it varied

19  depending on, you know, where we were with

20  the originations.  What was the -- what was

21  our intercompany balance with the affiliate.

22  You had to aggregate many exposures to see

23  where you were with your, you know,

24  transactions with affiliates.  So it varied.

25      Q.    Would 25% have been the number

Page 34

1                    A. CELINI

2    that you were looking at or would that be too

3    much of a cushion?

4              MR. BROWN:  Objection to form.

5         Asked and answered.

6         A.    In general, 20% or did you

7    say 25?

8         Q.    I said 25.

9         A.    25 would probably be too big of a

10   cushion.  But I am sure that -- in any point

11   in time, we may have had a 25% difference

12   from -- away from our 50.  So that would be,

13   generally, would have been viewed as, you

14   know, more than enough cushion, but I am

15   sure, again, it varied up and down.

16        Q.    Would 35% have been viewed as

17   more than enough cushion?

18             MR. BROWN:  Objection to form.

19        A.    I think I answered your question.

20   I don't know -- I think I am -- I have made

21   this clear to you that, you know, there is a

22   50% limit.  We managed it to make sure that

23   we didn't exceed it.  And, you know, some

24   days we were closer to it.  Other days we

25   were off.  Again, it depended on our asset

12-12020-mg    Doc 5803-14    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Al Celini    Pg 35 of 165
***HIGHLY CONFIDENTIAL***

Page 35

1                    A. CELINI

2    sale activities.  You understand that in the

3    banking world you acquire assets and you also

4    sell them.  So at any point in time your

5    asset levels can fluctuate up and down.  So

6    it was not a precise measurement that we had.

7    We knew what our top limit was.  And the

8    bottom limits could vary.

9        Q.    Right.  So I understand all of

10   them.  I am not asking you about what the

11   asset level was.  What I am asking you about

12   is you knew what your top limit was and you

13   said that you observed and monitored to make

14   sure that you had a sufficient cushion, and I

15   am trying to figure out when you say

16   "sufficient cushion," is that 5%, is it 10%,

17   is it 25%?

18              MR. BROWN:  Objection to form.

19       A.    So I think I understand your

20   question, and I am telling you that the

21   amount of cushion depended on the aggregate

22   exposures we had with our affiliates.  And it

23   could change from time to time.  Dependent on

24   what -- if we had asset sales activities,

25   what our other native production levels were.

Page 36

                        A. CELINI

1

2    In other words, if the bank had it was

3    originating -- if it's own native production

4    levels originations came, were lower, that

5    could create an issue with the limit.  So we

6    had to -- so you had to look at the seasonal,

7    cyclicality of originations and the asset

8    sale activity.  So we didn't, you know, it

9    varied.  And I hope you don't have to ask me

10   this again.  You know, we made sure we didn't

11   exceed it.  And, you know, the bottom limit,

12   you know, it depended on.

13        Q.    So you said in about late 2009,

14   when you transitioned to being -- sorry, you

15   said in around late 2009, you were tasked

16   with developing ways to expand the lending

17   capacity of the bank.  What were you

18   referring to?

19              MR. BROWN:  Objection to form.

20        I think he said he left in 2009.

21        Q.    Did I say 2009?

22        A.    Yes.

23        Q.    Sorry.  Let me restate that.  In

24   late 2007, when you were tasked with

25   considering ways to expand the lending assets

Page 37

1                         A. CELINI

2     at the bank, what did you come up with?

3           A.    We had a variety of different

4     strategies that were laid out and one of the

5     major ones that we -- that we were looking to

6     expand was because of the restrictions

7     required under the Reg W 250.250 limits, it

8     was fairly -- it was a difficult task to

9     monitor your levels and limits.   It was a

10    fairly, you know, to stay in compliance.   So

11    one of the activities that I was tasked with

12    was to find a way to have a brokering

13    activity done between the affiliate and the

14    banks so the bank could have more of its own

15    origination capacity under the regular --

16    under the rule.   So those would count as

17    originations so we would not have to -- we

18    would have a bigger portion.   We wouldn't

19    have to watch the 250.250 limit as much.

20          Q.    Can you explain what brokering

21    activity was?

22          A.    Do you want me to explain sort

23    of --

24          Q.    To whom?

25          A.    Do you want to understand what a

***HIGHLY CONFIDENTIAL***

Page 38

1                    A. CELINI

2   mortgage brokering is or this specific

3   transaction?

4        Q.    The specific brokering activity

5   that you -- that was one of the core parts of

6   this initiative.

7             MR. BROWN:   Objection to form.

8        A.    I believe I understand your

9   question.   The brokering -- the brokering

10  strategy that was being evaluated was to have

11  GMAC Mortgage broker loans to GMAC Bank.   Or

12  if it was Ally, at the time.   I don't know if

13  it was at the time.   So -- but the bank.   So

14  to have them broker loans so that the bank

15  would underwrite and fund the loans in the

16  bank's name.

17       Q.    And whose idea was that?

18       A.    A number of people.   We had a

19  task force that was tasked to work on that.

20  It was a fairly large group of people.

21       Q.    And what was your role in that

22  task force?

23       A.    I was the executive -- one of the

24  executive sponsors.   I was the bank's

25  executive sponsor.

Page 39

1                    A. CELINI

2        Q.    What's it meant to be the

3   executive sponsor?

4             MR. BROWN:  Objection to form.

5        A.    I was the executive that was, you

6   know, that oversaw the project, the work

7   streams of the various tasks that were

8   assigned there and the different teams that

9   were working on it.

10       Q.    Do you know who Joe Cortese is?

11       A.    Joe Cortese was the bank's chief

12  accounting officer.

13       Q.    Do you recall whether Mr. Cortese

14  had any involvement in this task force?

15       A.    I don't recall.  I don't recall

16  specifically.  He may have.  But I don't

17  recall -- because he wasn't -- he came to the

18  bank at a different period of time.  So I am

19  not sure if he was directly involved at the

20  project when I was involved with it.

21       Q.    And what about, do you know who

22  Cathy Dondzila is?

23       A.    Yes, I do.

24       Q.    And do you recall whether

25  Cathy Dondzila was involved in this project

Page 40

1                       A. CELINI

2    when you were --

3         A.    Not early on in the project.  But

4    later on.

5         Q.    What was her involvement

6    later on?

7         A.    She was a representative from

8    GMAC Mortgage.  I think she was one of the

9    finance representatives from the affiliate.

10        Q.    And do you recall what her

11   responsibilities were?

12              MR. BROWN:  Objection.

13        Objection to form.

14        A.    Again, she was one of the finance

15   project members from the affiliate.

16        Q.    Do you recall having any

17   discussions with her about the project?

18        A.    Atara, I had multiple discussions

19   with almost -- primarily with the project

20   leads, the work stream leads, but we

21   conversed with many people.  So on lots of

22   topics.  So I am sure I had a conversation

23   with her, or one or two.

24        Q.    Was Cathy Dondzila one of the

25   project leads?

Page 41

1                    A. CELINI

2        A.    I don't recall.  But, again, she

3    was -- she was in the work stream for finance

4    for the affiliate.

5        Q.    So did this idea develop into

6    what became known as the broker consumer

7    loans to bank project?

8        A.    I don't recall what the end

9    project was.  I think we just -- we just

10   called it broker to bank as that was the way

11   I characterized it.  I don't know if it had a

12   formal -- that may be somebody else's

13   characterization.

14       Q.    I will go with broker to bank

15   because materials I have seen have BCL2B,

16   which is very complicated.  Broker to bank is

17   much simpler.

18       A.    It was a large initiative.  There

19   were a number of stakeholders involved.  The

20   project team probably consisted of maybe 30

21   to 40 people at various times based on

22   different -- different approaches.

23       Q.    As the executive sponsor, were

24   you actively involved in discussions relating

25   to the broker-to-bank project?

Page 42

1                      A. CELINI

2              MR. BROWN:    Objection to form.

3         A.      I was actively involved at the

4    high level components.    A lot of the

5    discussion was in the weeds at the functional

6    level, systems, ledgers, accounting.    So I

7    didn't get involved in the day-to-day

8    granular discussions of the work streams.

9    Only at the top level project level.

10        Q.      So were you responsible for

11   developing the major objectives of the

12   project?

13        A.      Yes.

14        Q.      Who else was involved in

15   developing those objectives with you?

16        A.      There was an executive from the

17   affiliate.    I am trying to remember.    There

18   were a couple -- there were a number of

19   executives of the affiliate.    Jim Ferriter

20   was probably the one who ended up being the

21   sponsor on the affiliate side.    Again, there

22   were a number of sponsors that were being

23   considered.    So he probably ended up being

24   the one at the end.

25        Q.      Is there anyone else at the bank

Page 43

1                       A. CELINI

2   who was involved in developing the general --

3   overall objectives of the project?

4         A.    We had many.   We had full input

5   from the executive team, the CFO, chief

6   accounting officer.   You know, we had -- it

7   was -- it was -- my multiple stakeholders at

8   the bank had input into it.

9         Q.    And was part of your job

10  collecting their input and then implementing

11  it as part of the project?

12        A.    Yes.

13        Q.    And what was your understanding

14  of the overall objectives of the project?

15        A.    The goal was to develop a

16  regulatory GAAP compliant -- regulatory and

17  GAAP compliant methodology that would allow

18  for the safe and sound brokering of loans

19  from the affiliate within the bank's credit

20  parameters to fund in the bank.   Close in the

21  bank's name.

22        Q.    And did you have discussions

23  about what the net economic impact of the

24  transaction was supposed to be?

25              MR. BROWN:   Objection to form.

***HIGHLY CONFIDENTIAL***

Page 44

1                    A. CELINI

2        A.      There were numbers of

3   discussions.    The primary objective was to be

4   able to have the bank provide liquidity to

5   fund these -- fund the loans within its

6   credit parameters.

7        Q.      Mr. Celini, you testified earlier

8   that you were interviewed by the examiner in

9   connection with your activities at the bank;

10  is that right?

11       A.      Yes.

12       Q.      Do you understand that the

13  examiner issued a report with respect to his

14  investigation into the bank and ResCap?

15       A.      I understand that they did, but I

16  have not seen it.

17       Q.      Mr. Cortese, I am going to show

18  you a document --

19            MR. BROWN:   Celini.

20       Q.      Sorry, Mr. Celini.  I am reading

21  off the labels.  It's not my fault.

22            Mr. Celini, I am going to show

23  you a document that was previously marked in

24  this matter as Cortese Exhibit 8.

25            Mr. Celini, if you could look

Page 45

1                   A. CELINI

2    back to the document that's Bates stamped on

3    the bottom EXAM0015456.  It is a Power Point

4    presentation titled Brokering Consumer Loans

5    to Bank Project, Legal Entity Revenue Expense

6    and Broker Fee Proposal, dated November 19,

7    2008.

8              MR. BROWN:  I don't want to

9         cause a problem with your deposition.

10        For some reason my document has

11        multiple pages with the Bates stamp

12        ending in '54 and multiple pages with

13        Bates stamp ending in '55.

14             MS. MILLER:  Right.  Those were

15        produced in native form and native

16        files are given a single Bates number

17        that prints on every page of that

18        document.  So those were two native

19        attachments and then there is the

20        document that we are actually looking

21        at, which is the one --

22             MR. BROWN:  56.

23             MS. MILLER:  -- that begins

24        EXAM00015456.

25             MR. BROWN:  Got it.  Thank you.

Page 46

1                     A. CELINI

2        Q.    Mr. Cortese, have you ever seen

3   this document before?

4        A.    I am not Mr. Cortese.

5        Q.    I am going to do that throughout

6   this exhibit.

7              Mr. Celini, have you seen this

8   document before?

9              MR. BROWN:  By "this document,"

10        are you referring to the entire E-mail

11        package that is Cortese Exhibit 8

12        dated February 28, 2012, or just the

13        Page '456?

14             MS. MILLER:  I'm just referring

15        to the Power Point document that I

16        identified on the record, that begins

17        at page EXAM00015456.

18             MR. BROWN:  Does that Power

19        Point go through the end of the

20        document?  Just so I know what

21        document we are talking about.

22             MS. MILLER:  It ends at

23        EXAM00015476.

24             MR. BROWN:  Thank you.

25        A.    Atara, can you restate your

Page 47

1                      A. CELINI

2   question now that we have gotten that squared

3   away.

4        Q.      Yes.   Mr. Celini, have you ever

5   seen the Power Point presentation titled

6   Brokering Consumer Loans to Bank Project

7   dated November 19, 2008?

8        A.      No.

9        Q.      Mr. Cortese, if you can --

10            MR. BROWN:   Celini.

11       Q.      Sorry.  It's going to be a longer

12   day than I thought.

13            Mr. Celini, if you could turn to

14   the page ending in the Bates stamp '459

15   titled Summary.  It says "The GMAC Mortgage

16   broker will have a lending relationship with

17   GMAC Bank."  Is that a true statement under

18   the broker-to-bank project?

19       A.      Well, GMAC Mortgage was to have a

20   brokering relationship to the bank.  So you

21   said lending relationship.  But it would be a

22   brokering relationship as the objective.  So,

23   yes, GMAC Mortgage was to be the broker and

24   the bank was to be the lender.

25            MR. BROWN:   Lines 9 through 10?

Page 48

1                    A. CELINI

2          MS. MILLER:  Yes, I misread it.

3     It is a reading problem on my end.

4     Let me clean that up.  Thank you

5     for --

6          A.    More coffee.  That's what I

7     always tell them.

8          Q.    We might need to take a break.

9          Mr. Celini, looking at the

10    summary on the page ending in Bates stamp

11    '15459, it says "GMAC Mortgage broker will

12    have a brokering relationship with GMAC Bank

13    (lender.)"  Is that an accurate statement

14    under the broker-to-bank project?

15         A.    Yes.

16         Q.    It then says that "GMACM will

17    enter into a broker agreement with GMACB

18    where GMACM will perform origination and

19    processing services and submit loan

20    application packages."

21         Is that also consistent with your

22    understanding of the project?

23         A.    Yes.

24         Q.    So we are clear, GMACM is

25    referring to GMAC Mortgage, right?

Page 49

1                    A. CELINI

2        A.    Yes.

3        Q.    And GMAC B is GMAC Bank?

4        A.    That's correct.

5        Q.    And looking down to bullet number

6   4, it says "GMAC Bank will recognize fee

7   income, net carry, incur broker fees and

8   underwriting expenses."  Is that also

9   consistent with your understanding?

10       A.    It's -- the primary objective of

11  this activity was for the bank to fund loans

12  in a regulatory compliant way through a

13  brokering activity.  So in -- an make sure it

14  recognized all of its income and expenses

15  under GAAP and that it complied with the

16  regulations as it did it.  So fee income

17  would be part of it.  Net carries is

18  something that needs to be defined.  You

19  know, that can have different

20  interpretations.  But it would definitely

21  incur broker fee in underwriting.

22       Q.    Okay.  Mr. Celini, do you have an

23  understanding of what the Cost Basis for GMAC

24  Mortgage's purchases of the loans from the

25  bank was supposed to be?

Page 50

                        A. CELINI

1

2       A.    I have an understanding of what

3   the term Cost Basis professionally.  But I

4   don't -- didn't have privy to all of the, you

5   know, the basis and methodology used by the

6   affiliate.  It wasn't my responsibility to

7   oversee those.

8       Q.    Okay.  Looking at the next page

9   in the Power Point presentation -- before we

10  get there.  Do you understand that --

11          MR. BROWN:  It's a problem with

12      my mic.  It fell off.  You are fine.

13      He is just trying to tell me to put on

14      my mic.

15      Q.    Is there a difference -- sorry.

16  Strike that.

17          Can there be a difference between

18  GAAP accounting entries and a net economic

19  impact of a transaction?

20          MR. BROWN:  Objection to form.

21      A.    I am not sure I understand -- I

22  am not sure I understand where you are going

23  with that.  But, no, I don't quite

24  understand.  So GAAP accounting is the law,

25  right.  We have to -- you would have to

12-12020-mg    Doc 5803-14    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Al Celini    Pg 51 of 165
***HIGHLY CONFIDENTIAL***

Page 51

1                          A. CELINI

2    follow in the situation.  So -- and the other

3    term that you said, I recall, could be again,

4    defined.  It is net economic impact.  I don't

5    know what that would contain, right.

6          Q.    So let me give you an example.

7    If GMAC Bank originates a loan and collects

8    $10 of fees related to that loan and defers

9    the $10 of fees under FAS 91 and then sells

10   that loan to GMAC Mortgage, do you have an

11   understanding of what, from a GAAP accounting

12   perspective, the bank would show as income?

13         A.    So, yes.  In that example, as you

14   explained it, the -- whatever deferrals were

15   booked as, under FAS 91 would need to be

16   reversed when the loan was sold.

17         Q.    Okay.  And what do you mean --

18   how would -- how from a technical accounting

19   and ledger entry perspective would you

20   reverse the FAS 91 deferrals?

21               MR. BROWN:  Objection to form.

22         A.    You actually want me to explain

23   debits and credits here?

24         Q.    I do.

25         A.    So when you defer the $10 fee

Page 52

1                    A. CELINI

2    under FAS 91, you would debit the deferred

3    fee account, and when you sell the loan --

4    and then that deferral would be accreted into

5    income over the duration of the loan asset,

6    and at some point in time, if the loan was

7    sold before that duration had been, you know,

8    between the end of the loan period, loan's

9    life on the balance sheet, you would credit.

10   So reverse out the deferred loan fee and

11   debit, you know, an expense or another

12   revenue account.   In this case it would be a

13   revenue account, as you would credit the

14   asset and debit the revenue account for this.

15   If you want, I can draw T accounts and map

16   that out.

17        Q.    I might give you a piece of

18   paper.

19        A.    Okay.

20        Q.    I am going to hand you a piece of

21   paper, which, when you are done marking it,

22   we will mark it as Celini Exhibit 1.  Can you

23   map out what you were just describing?

24        A.    So I have done -- on this account

25   I have shown T accounts for when the loan is

Page 53

1                           A. CELINI

2     booked or funded, how it is booked, debits,

3     credits, cash, loan and fee.

4          Q.    Can you describe the numbers, the

5     entries and the numbers?

6          A.    Using your example, if the loan

7     was originated at -- for 100 and it had a

8     $10 fee -- fee incurred, that you would book

9     the loan at 100.    You would debit loans at

10    100.    You debit deferred fees for 10 and

11    you'd credit cash for 110, for the amount of

12    the cash outflow.

13              Transaction 2 would be loan sale.

14    So at that time, you would credit the UPB of

15    the loan, whatever it was remaining.    But in

16    your example, 100, okay.    You would

17    reverse -- you credit the loan fee for 10 and

18    you would -- again, depending on the period

19    of whether this occurred.    If it occurred the

20    same day, you'd take the whole amounts out.

21    But if it occurred one month later, it would

22    be whatever, less the deferral would be.    So

23    if you -- in this case, let's make it nine.

24    Make it clear for your example.    You would

25    have -- when you book -- when you book the

Page 54

1                       A. CELINI

2    fee income, so you take off -- you credit one

3    in this example.  Cash would be -- let's just

4    use 109 in the example.  So that's what would

5    come out, 109.  So you would accrete the

6    income of one so 109.

7         Q.    Then in your example -- thank

8    you.  We will mark this as Celini Exhibit 1,

9    please.

10                 (Whereupon, Celini Exhibit 1,

11         Hand drawn T accounts example was

12         marked for identification as of this

13         date by the Reporter.)

14         Q.    In your example, when you are

15    referring to fees, are those fees collected

16    by the bank or paid by the bank?

17         A.    It would be paid by the bank, in

18    this case, as part of the loan.  The loan

19    origination.  The amount of the cash that

20    went out on the first loan would be 110.

21         Q.    So not -- not points collected by

22    the bank from the consumer in connection with

23    the origination?

24         A.    So the accounting for loan

25    acquisition is a complex matter, and what I

Page 55

1                          A. CELINI

2    just did is I just used an example of fees

3    paid by the bank in case of showing the

4    fee -- the cash was going out.  So the

5    accounting for the UPB of origination fees

6    and the various costs associated with, you

7    know, a loan origination is a complex matter.

8    I am not prepared to map out all the entries

9    here to do the activities that would happen.

10   If there were servicing book accreted,

11   there's a fairly complex activity.

12       Q.    Understood.  And you put in your

13   example loan sale at 109.

14       A.    Um-hum.

15       Q.    That was assuming that the loan

16   is being sold at UPB plus the value of any

17   fees that were also outlaid by the bank,

18   right?

19       A.    It's just for illustrative

20   purposes.  I just used an example of 109.

21   Loans can be sold at premiums or discounts.

22       Q.    I am just trying to make sure we

23   clearly understand the example.  So the loan

24   sale, in this example, is 109, which is,

25   basically, equivalent to the UPB and the

Page 56

1                       A. CELINI

2    remaining deferred fee?

3           A.      In this example, I just used a

4    simple example of saying that you would have

5    accreted one of the ten of the deferred fee

6    into income.   That's all.   So it's just an

7    example.   Loans can be sold at premiums or

8    discounts in any activity.   So the amounts

9    could change.   It could have been sold at 115

10   and had a different economic impact.   So I

11   just used as an example for illustrative

12   purposes.   Okay.

13           MS. MILLER:   I would like to

14       mark as Celini Exhibit 2, a document

15       which is excerpts of the report of

16       Arthur J. Gonzalez as examiner in this

17       matter.   But only -- it is a 2,000

18       page report.   Only those portions

19       which reference you.

20           (Whereupon, Celini Exhibit 2,

21       Excerpts of the Report of Arthur J.

22       Gonzalez was marked for identification

23       as of this date by the Reporter.)

24           MR. BROWN:   What have you

25       excerpted here?   Okay.   So you have

Page 57

A. CELINI

1
2  just cherry picked pages, that's what

3  it appears to be?

4      MS. MILLER:  It includes the

5  entirety -- I am going to focus on

6  Section B starting on page V 89 titled

7  GMAC Mortgage Bank Contracts With Ally

8  Bank Government Loan Sales, Brokerage,

9  Servicing and Related Derivative

10  Transactions, and I believe the

11  entirety of that section is included.

12      MR. BROWN:  Atara, I will note

13  for the record that this does not

14  appear to be an excerpt from the

15  examiner's report as the examiner

16  produced his report.  There is maybe

17  highlighting or something in multiple

18  places throughout this document.  And

19  I can assure you when I looked at the

20  examiner's report, there was no

21  highlight in any of those 2200 pages.

22      MS. MILLER:  Right.  If you

23  would stop asking me questions and let

24  me identify --

25      MR. BROWN:  I didn't ask a

***HIGHLY CONFIDENTIAL***

Page 58

                        A. CELINI

1

2    question.  Just made a statement for

3    the record.

4         MS. MILLER:  Right.  So if you

5    would stop making statements on the

6    record and let me properly identify my

7    exhibit, I would explain that.

8         MR. BROWN:  I gave you a couple

9    opportunities.  I didn't hear anything

10   about the highlighting.  I wanted the

11   record to be clear.  If you want to

12   make a statement on the record, go

13   for it.

14   Q.    Mr. Celini, I have given you an

15   excerpt of the examiner's report in which

16   we've highlighted portions where the examiner

17   has referenced specifically statements made

18   by you or in which he has statements in which

19   he supports with references to statements by

20   you.

21        Have you had any discussions with

22   anybody about the examiner's report before

23   today?

24   A.    No.

25   Q.    Do you know what the examiner

Page 59

                        A. CELINI

concluded?

     A.    I have no idea.

     Q.    What topics did the examiner ask
you about?

          MR. BROWN:  Objection to form.

     A.    There was a fairly wide range of
discussions.  I don't recall all of them.  We
talked about affiliate agreements.  We talked
about my background.  My tenure.  So it
covered a very wide range of topics.

     Q.    Did you speak to the examiner
about the broker-to-bank project?

     A.    I believe it was included in the
discussion.

     Q.    Mr. Celini, do you have an
understanding of what revenues the bank was
supposed to retain in the brokering to bank
project?

          MR. BROWN:  Objection to form.

     A.    Just trying to -- let me try to
understand it.  So what do you mean?  Do I
have an understanding of the broad terms?
Can you give more clarification?

     Q.    Do you have an understanding of

Page 60

                        A. CELINI

1

2    the broad terms?

3         A.    Yes.

4               MR. BROWN:   Objection to form.

5         Q.    Overarching principles?

6         A.    Yes.

7         Q.    What were those -- what was that

8    understanding?

9         A.    The brokering activity was to

10   generate, you know, bring assets to the bank

11   for us to originate in our name with our

12   funding.  And that we would follow GAAP in

13   the recordation of those -- that funding

14   activity.  You know, as prescribed by our

15   chief accounting officer.  And that it would

16   be Reg W compliant.  It was a sourcing

17   activity.  A way -- you know, to get loans

18   recognized.  So loans should have been funded

19   by the bank in order for us to, you know, to

20   get those assets and utilize our liquidity.

21              MS. MILLER:   Let's take a quick

22         break.

23              THE VIDEOGRAPHER:   We are now

24         going off the video record.  That

25         concludes tape number one.  The time

Page 61

A. CELINI

1    is 10:12.

2              (Whereupon, a recess was held.)

3              THE VIDEOGRAPHER:  We are now

4    back on the video record.  This

5    commences tape number 2, November 8,

6    2013.  The time is 10:29.

7              Please continue.

8    BY MS. MILLER:

9        Q.    Good morning, Mr. Celini.  So I

10   handed you, before we broke, a document that

11   we have marked as Celini Exhibit 2, which is

12   certain excerpts of the examiner's report in

13   this matter with portions that are

14   specifically referencing you highlighted.

15             I would like you to turn, if you

16   could, to page V 124, which is also page 124

17   of 175 on the top.  And there is a section

18   here that's titled Genesis of the Brokering

19   and Consumer Loans to Bank Project.  And in

20   this report, starting after footnote 629, the

21   second highlighted portion, it says "The

22   250.250 program sales to the bank were

23   reaching this limit in the summer and fall of

24   2008 and in at least one instance the limit

Page 62

A. CELINI

1

2   was exceeded."

3             Is that the same 250.250 limit

4   that we were discussing earlier today?

5             MR. BROWN:  Objection to form.

6        A.    Yes.

7        Q.    And then it goes on to say,

8   "However, loans brokered to the bank by GMAC

9   Mortgage and then originated by the bank in

10  its own names would not be subject to this

11  limit."

12            That's consistent with your

13  testimony earlier this morning, right?

14       A.    That's correct.

15       Q.    And then it says, "Further,

16  switching to a broker model not only offered

17  the prospect of increase in the number of

18  loans which could be funded through the bank,

19  but the projected savings to the GMAC

20  Mortgage of 10 to 21 basis points over loans

21  originated by GMAC Mortgage but would

22  increase the volume of MSRs that could be

23  retained by the bank."

24            Is that also an accurate

25  statement?

Page 63

1                    A. CELINI

2          MR. BROWN:  Objection to form.

3      He has already testified he hasn't

4      seen the document or the report, for

5      that matter.

6          MS. MILLER:  I am asking him

7      whether that statement is accurate

8      based on his knowledge, understanding

9      and personal involvement in the

10     broker-to-bank project.

11         MR. BROWN:  Objection to form.

12     A.     So, again, I have only seen this

13 now.  I remember we talked at the, you know,

14 the examiner's discussion, we talked about a

15 lot of things.  So these -- these terms that

16 you show me so far are consistent with what

17 I -- we talked about with the examiner.

18     Q.     Okay.  And then it says,

19 "S. Celini," and I think that's referring to

20 you, "the sponsor of the broker-to-bank

21 project for the bank noted, quote, 'There was

22 very widespread knowledge that the affiliate

23 had high cost liquidity and no liquidity and

24 that if we didn't do this -- if we didn't

25 find a way to do this, that there would be a

Page 64

1                    A. CELINI

2    bad outcome on the other side.'"

3              Do you see that?

4         A.    I see that in the report.

5         Q.    Do you recall making that

6    statement to the examiner?

7         A.    I don't recall the specific

8    wording.  We talked about a lot of things in

9    the context, so we talked about a lot of

10   things.  I don't recall making that specific

11   statement.  But if it's here, obviously, it

12   was recorded as such.

13        Q.    Sitting here today, do you

14   believe that statement to be true?

15        A.    Be true -- I mean, yeah, this was

16   2007.  The market was in turmoil and in 2008,

17   Lehman -- we all know what happened.  So the

18   affiliate was definitely facing a liquidity

19   crunch.

20        Q.    And then it continues, "The

21   project was made a priority."  Do you believe

22   that the project was -- the broker-to-bank

23   project was a priority at this time in late

24   2007?

25        A.    Yes, it was.  Like I said, there

Page 65

1                    A. CELINI

2    was large project teams, multi-functions, all

3    working on it as a priority.

4         Q.    And then the examiner says that

5    there was an -- that "There was a project

6    team assembled under the direction of

7    project -- of bank project leader and Celini

8    subordinate Debra Scott."

9              Who is Debra Scott?

10        A.    She was a project manager who

11   worked for me at GMAC Bank.

12        Q.    What was her specific involvement

13   in the broker-to-bank project?

14        A.    She was the project manager for

15   the bank on the initiative.

16        Q.    And would you say that she was

17   the person at the bank most familiar with all

18   aspects of the broker-to-bank project?

19        A.    No, I wouldn't say that.  She was

20   the project manager managing the work streams

21   that had a lot of technical inputs.  So the

22   project manager trying to keep people on task

23   and organized is her primary role.

24        Q.    So she had an understanding of

25   what everybody was supposed to be doing and

Page 66

                        A. CELINI

1
2    was actually doing in the project, right?

3              MR. BROWN:  Objection to form.

4         A.    I think I answered that one.  She

5    is the project manager.  I am trying to be as

6    explicit -- I mean, doesn't -- not an expert

7    in anything other than keeping people on

8    track and focused.

9         Q.    And a requisite of being able to

10   keep people on task and focused is having an

11   understanding of what people are supposed to

12   be doing, right?

13             MR. BROWN:  Objection to form.

14        A.    There are defined work stream

15   tasks.  Whether they be finance, treasury,

16   accounting, systems.  You know, this was a

17   huge endeavor.  So she knew that what the

18   work streams were as we defined them in the

19   project.  She doesn't know everything that's

20   happening with IT.  She isn't an expert in IT

21   or accounting or anything like that.  So she

22   knew the work streams and their deliverables.

23   I answered that a few times.

24        Q.    Turning now to page B 126 in the

25   report.  I am going to also hand you a

***HIGHLY CONFIDENTIAL***

Page 67

                        A. CELINI

1

2    document that was previously marked as

3    Cortese Exhibit 4.  I am going to try not to

4    call you Mr. Cortese throughout this portion

5    of the examination.

6              Mr. Celini, I have handed you a

7    document that was previously marked as

8    Cortese Exhibit 4, which the upper portion of

9    the exhibit is an E-mail chain from 2012 that

10   you were not involved in.  But if you look

11   down to the fourth E-mail down from the top

12   in the chain at the bottom of the page marked

13   EXAM00003975, it is an E-mail from

14   Jill Horner to you and Mr. Whitehead copying

15   Debra Scott and Elizabeth Manafie (phonetic)

16   from September 3rd, 2008.

17             Do you see that?

18        A.   I see that E-mail, yes.

19        Q.   And the next E-mail down, so

20   going back chronologically in that chain is

21   an E-mail from you to Mr. Whitehead copying a

22   number of people from September 2008.  Do you

23   see that?

24        A.   Yes.

25        Q.   And in it, in that E-mail, you

Page 68

                          A. CELINI

1

2    say "Matt, see my comments in red below."

3               Do you understand that to mean

4    that you provided interlineated comments in

5    response to Mr. Whitehead's E-mail that's the

6    first E-mail in the chain, also from

7    September 2, 2008?

8         A.    Yes.

9         Q.    I searched the documents that

10   were produced to us in this matter, and we

11   were not provided with a color copy of this

12   E-mail, which makes it somewhat less helpful

13   to follow exactly what you've added in

14   response to Mr. Whitehead's questions and

15   what was Mr. Whitehead's text.

16              But if you look at the examiner

17   report, I believe he has italicized those

18   portions -- well, maybe not.  I guess we have

19   to see if we can figure out what you added in

20   response to Mr. Whitehead's comments.  Just

21   looking at Cortese Exhibit 4, and looking at

22   the first E-mail in the chain -- sorry, the

23   bottom E-mail in the chain, first

24   chronologically, last in the document, from

25   Mr. Whitehead to you dated September 2, 2008,

Page 69

A. CELINI

1   but which includes your comments.  It says

2   "Al, based on our conversation on Friday, I

3   wanted to confirm that only revenue the bank

4   is going to recognize is the net carry, i.e.,

5   interest income/expense.  All of the other

6   income/fees, i.e., origination fee, loan

7   discount fee, income (points, rate lock fee,

8   overage/shortage/subsidies, underwriting fee,

9   other ancillary fees) will be payable to the

10  bank (lender) from the borrower and not the

11  mortgage company and will be capitalized

12  within the Cost Basis of the loan and

13  essentially sold to mortgage at the Cost

14  Basis as the purchase price."

15          Is it your understanding that you

16  responded "CORRECT" to that inquiry in all

17  caps immediately after the portion that I

18  read into the record?

19      A.   Just give me sometime to read

20  here.  Reading this E-mail as it has been

21  laid out, the capitalized term is correct.

22  Looks like my response is to these

23  statements, yes.

24      Q.   And then the E-mail continues and

Page 70

                    A. CELINI

1

2    says, "All the traditional rev/EXP

3    reimbursement items that normally be

4    recognized by the originator be borne by GMAC

5    B and capitalized into the loan basis

6    accordance with GAAP.  These items will not

7    reside on the bank's P&L, deferred onto B/S

8    and will be recognized on the mortgage P&L

9    once the loan is sold to GSEs."

10           Do you know whether that's part

11   of your response?

12        A.    No, that's not part of my

13   response.

14        Q.    Okay.

15        A.    I believe my response is only to

16   the capitalized activity to that -- in that

17   statement.  I believe the rest of this was

18   Matt Whitehead's commentary.

19        Q.    Okay.  So Matt Whitehead

20   continues three lines down and says "This

21   would effectively make the bank P&L neutral

22   to the way it currently conducts business and

23   would act essentially as a funder of loans

24   and not impacted by any market or interest

25   rate movement."  And then it says "correct"

Page 71

A. CELINI

1

2    in square brackets after that.

3              Is it your understanding that the

4    "correct" in brackets is also your response

5    to Mr. Whitehead's comment?

6         A.    Give me a moment to read so I can

7    read the context of it.  It is complex.

8         Q.    Sure.

9         A.    I believe the bracketed term is,

10   yes, my response, correct.

11        Q.    Sitting here today, do you

12   believe those are accurate statements and

13   responses?

14              MR. BROWN:  Objection to form.

15        A.    I need you to clarify that.

16        Q.    Do you have any reason, sitting

17   here today, to believe that your response

18   "correct" was inaccurate?

19        A.    It is really important to

20   understand this was a large project, had

21   multiple scenarios and this E-mail, as

22   presented here, could have been one of the

23   scenarios that was presented that was being

24   discussed through the -- through the project

25   team.  So we had several scenarios being

Page 72

1                          A. CELINI

2    worked through.    So this may have been my --

3    this document -- my statements here as to

4    correct were in the context of this document

5    and the scenario that we probably were

6    working through here.    So the ultimate

7    resolution, this may or may not have been

8    what the project ended up implementing.

9          Q.     Any reason to believe that this

10   is not what the project ended up being

11   implemented?

12         A.     I don't believe this is what the

13   end up -- I mean, let me try to -- do I have

14   any reason to believe this is not, I do

15   believe there were at least five or six other

16   scenarios that we worked through.    And also

17   have to understand that some of this was for

18   management reporting, not necessarily legal

19   entity reporting comments.    So GAAP rules,

20   you know, for the legal entities, are the

21   prevailing activity.    So a lot of these

22   commentaries were -- here were talking about

23   different management reporting treatments.

24         Q.     So if I understand what you are

25   saying is that the management reporting

***HIGHLY CONFIDENTIAL***

Page 73

                           A. CELINI

1    treatment might view a transaction as not

2    having an impact on the bank's income

3    statement even though there are GAAP entries

4    on the bank's income statement; is that

5    right?

6               MR. BROWN:  Objection to form.

7        A.    You need to clarify that.  Try

8    that one more time.

9        Q.    If the bank collects income

10   related to a loan originated but that income

11   is then offset by a reduction in the purchase

12   price -- in the sale price of the mortgage,

13   from a management perspective, that's a no

14   gain no loss from the bank; is that right?

15               MR. BROWN:  Objection to form.

16       A.    I think you need to be -- first

17   off, GAAP is the prevailing activity that

18   needs to be recognized on the legal entities.

19   Management -- management reporting for

20   segment -- for segment reporting for in a

21   business unit evaluations can look at a lot

22   of components.  So -- and again, this is, you

23   are pointing to me one E-mail in probably

24   what was several thousands that were

Plaintiffs' Objection
73:10-74:4

Lack of foundation
(FRE 602, 901), lack of
personal knowledge/
speculative (FRE 602)

Page 74

1                    A. CELINI

2    exchanged on several scenarios.   So, I mean,

3    that could -- that could have been one of the

4    context.   But I can't tell you for certain.

5          Q.    Outside of the context of what

6    did or didn't happen.   As a general

7    management and accounting matter, if a

8    bank -- if the bank originates a loan with a

9    $100 UPB, and the bank collects $10 in points

10   from the consumer, and the bank then sells

11   that loan to GMAC Mortgage for $90 dollars,

12   would the bank's balance sheet -- sorry,

13   would the bank's P&L recognize $10 of income

14   collected from the consumer?

15                MR. BROWN:   Objection to form.

16         A.    You know, you are talking about a

17   hypothetical situation?

18         Q.    Right.

19         A.    I don't want to proffer -- you

20   know, in that example, I don't see how it is

21   relevant to what we are talking about here.

22         Q.    Based on your -- okay.   What's

23   your understanding of how the bank actually

24   accounted for -- sorry.   Let me step back.

25                When the bank originated a loan,

Page 75

A. CELINI

2  what fees, costs and expenses were associated

3  with it?

4           MR. BROWN:  Objection to form.

5      A.    I answered you before.  First

6  off, the accounting for mortgage loan

7  activities is a complex and, you know,

8  complex activity governed by multiple

9  statements underneath GAAP and underneath

10  various scenarios.  Depends whether something

11  is originated at a discount, premium, whether

12  you have fees deferred, non-deferred.

13  Whether there is a servicing asset that's

14  created or not.  So it is a complex activity.

15  I am not prepared to give you a recitation of

16  the GAAP accounting activities that are going

17  to need to be recognized in this scenario.

18      Q.    I don't think I asked you about

19  GAAP accounting.  Let me step back, if I used

20  a term that you are saying is a technical

21  term.

22           What fees would the bank have

23  associated with originating a loan?

24           MR. BROWN:  Objection to form.

25      A.    So in general, they can be

***HIGHLY CONFIDENTIAL***

Page 76

A. CELINI

1

2  numerous types.  There can be origination

3  fees.  There can be processing fees.  There

4  can be appraisal fees.  There is a long list

5  of fees that are out there and their

6  treatments for recognition are complex and

7  vary depending on what they are.  They can be

8  a premium, a discount.  I believe I answered

9  this question just before in terms of what

10  fees and types of activities could be there.

11      Q.    You said there are a lot.  I am

12  asking you do you have a list of them?

13          MR. BROWN:  Objection to form.

14      Are you asking for expenses to the

15      bank, too, or just fees that a

16      borrower pays to the bank?  I'm just

17      not clear, sorry.

18          MS. MILLER:  I am going to ask

19      all of them.

20          So right now, I am looking

21      specifically for fees that are paid to

22      the bank.

23          MR. BROWN:  Objection to form.

24      A.    I am trying to understand context

25  of fees.  You have discount points.  And, you

Page 77

A. CELINI

1  know, again, premium -- premium or discount

2  that could come.  Again, I am not prepared to

3  give you a complete recitation of all those

4  activities.

5      Q.    And what expenses would the bank

6  have related to the origination of a loan?

7           MR. BROWN:  Objection to form.

8      A.    Expenses, typically -- typically

9  that would be incurred would be the cost for,

10  you know, underwriting evaluation, cost for

11  any direct expenses incurred in the

12  origination, and those could be many, right.

13  So those are the typical types of things you

14  would do.  Appraisals.  You know, credit

15  reports.  People to check.  You know, make

16  sure the fees have been validated.  So there

17  is many fees that would be expenses that

18  would be incurred in originating a loan.

19      Q.    Mr. Celini, what did you do to

20  prepare for your deposition today?

21      A.    I arrived here and showed up to

22  talk to you about my recollections and

23  knowledge from this time back in several

24  years ago.  So I have not -- I mean, I

Page 78

A. CELINI

1    prepared by -- the only thing I did was I can

2    say is for the examiner report that, you

3    know, when I was here to testify in front of

4    the examiners.  That's the only time I have

5    thought about, today and that examiner

6    report, is the last time I have talked or

7    thought about these activities.

8        Q.    So you haven't spoken with any

9    counsel for Ally or the debtors in connection

10   with your deposition today?

11       A.    No.

12            MR. BROWN:  If you want to take

13       a short break, I will tell Mr. Celini

14       about what he can and cannot reveal in

15       light of the privilege.  I think he is

16       slightly confused by your question.

17       A.    Yeah, I mean, can --

18       Q.    Did you meet with --

19       A.    Clarify, please.

20       Q.    Did you meet with any lawyers to

21   prepare for your deposition today?

22            MR. BROWN:  Like I said, I am

23       willing to take a very short break,

24       talk to Mr. Celini and tell him what

Page 79

A. CELINI

1

2    he can and cannot reveal pursuant to

3    the privilege.

4        THE WITNESS:  I would like to

5    take a break, please, that way I can

6    have that discussion.

7        MS. MILLER:  I have a question

8    pending, and I will instruct you that

9    unless you are being directed by your

10   lawyers not to answer my question, you

11   can answer my question whether or not

12   you met with lawyers to prepare for

13   your deposition today.

14       MR. BROWN:  I think what he is

15   telling you is he needs to inquire

16   about what he can reveal and not

17   reveal subject to the privilege.

18       MS. MILLER:  Are you instructing

19   him not answer the question?

20       MR. BROWN:  No, I am not.

21       MS. MILLER:  So he can answer

22   the question.  It is a yes or no

23   question.  He can answer it.

24       MR. BROWN:  If he doesn't know

25   whether he can answer affirmatively or

Page 80

1                    A. CELINI

2      not without revealing privileged

3      information, he has already asked and

4      you said --

5              THE WITNESS:  I would like to

6      take a break.

7              MS. MILLER:  I am telling you --

8      you should instruct him to answer the

9      question.  That's the appropriate

10     response here.  It is not to take a

11     break to direct your witness and to

12     coach him.

13             MR. BROWN:  I am not going to

14     coach him.  I'm going to tell him the

15     extent of the privilege.

16             MS. MILLER:  You can tell it to

17     him right here on the record.

18             MR. BROWN:  I will tell him that

19     off the record.

20             MS. MILLER:  I don't understand.

21     Q.    I have asked you a question.  Are

22 you refusing to answer my question?

23     A.    My answer is I would like to take

24 a break so I can fully understand the context

25 for with input from my counsel.

Page 81

                         A. CELINI

1

2       Q.     I have asked you a yes or no

3   question --

4       A.     No.

5       Q.     -- about whether you met with

6   your lawyers.  No?

7       A.     I am answering that I would like

8   to take a break so I can get clarity here as

9   to what my, you know, the appropriate, you

10  know, privileged requirements are.  I just

11  don't understand your question and I want

12  clarity.

13          MR. BROWN:  Mr. Celini, so she

14          can get the record she wants, you can

15          answer that question, whether you met

16          with counsel with a yes or a no.  And

17          then you can take a break and we can

18          discuss the scope of anything else

19          that she can ask you and what you

20          should be able to reveal in response

21          to those questions.  But you can

22          answer the existing question whether

23          you met with counsel or not with a yes

24          or a no.

25      Q.     I am going to ask it again.

Page 82

1                    A. CELINI

2    Mr. Celini, did you meet with counsel to

3    prepare for your deposition today?

4         A.    Yes.

5         Q.    And how long did you meet with

6    counsel for?

7         A.    A couple of hours.

8         Q.    Okay.

9              MS. MILLER:  We can go off the

10             record and take a break.

11             THE VIDEOGRAPHER:  Off video,

12             10:53.

13             (Whereupon, a recess was held.)

14             THE VIDEOGRAPHER:  Back on,

15             10:55.

16   BY MS. MILLER:

17        Q.    Mr. Celini, are you represented

18   by counsel here today?

19        A.    Yes.

20        Q.    And who is your lawyer?

21        A.    Counsel who is to my right,

22   Judson.

23        Q.    Did you sign an engagement letter

24   with them?

25        A.    No.

***HIGHLY CONFIDENTIAL***

Page 83

                         A. CELINI

1

2        Q.    Did they ask you if you would

3   like to retain them as your lawyers?

4        A.    No.

5              MR. BROWN:  I'll give you a

6        representation on the record that, as

7        a former employee of Ally Bank,

8        Mr. Celini does have an agreement with

9        Ally.  Not specifically with Kirkland.

10       I will represent that to you on the

11       record.

12       Q.    Mr. Celini, are you paying your

13  own legal fees and expenses related to this

14  deposition?

15       A.    Yes.

16       Q.    So you are paying Kirkland and

17  Ellis?

18       A.    Let me clarify.  I am paying for

19  my own expenses.  I am not paying fees for --

20  to any attorneys.

21       Q.    And do you have an understanding

22  of who is paying those fees?

23       A.    My former employer, that would be

24  Ally.

25       Q.    And how many times did you meet

Page 84

1                          A. CELINI

2    with attorneys from Kirkland in connection

3    with your deposition here today?

4         A.    Once.

5         Q.    Did you have telephonic

6    conversations in addition to that meeting?

7         A.    One phone call.

8         Q.    And how long was the phone call?

9         A.    Very brief.  Just to setup an

10   appointment.

11        Q.    And did you meet in person?

12        A.    Yes.

13        Q.    And when did you meet?

14        A.    Yesterday.

15        Q.    And did you review documents?

16        A.    We talked about many things.  We

17   had --

18             MR. BROWN:  Mr. Celini, don't

19        reveal the subject matter of our

20        conversation.  You can answer her

21        question whether you reviewed

22        documents or not with a yes or a no.

23        A.    Yes.

24        Q.    And did you discuss any prior

25   testimony that's been given in this action?

Page 85

                          A. CELINI

1

2      A.      Thinking about it yesterday, no.

3      Q.      Do you understand that

4   Mr. Cortese was deposed in this matter?

5      A.      I am not aware of anybody else

6   who has been involved in this.

7      Q.      And did you discuss -- did you

8   discuss the examiner's report with counsel

9   yesterday?

10     A.      No.

11     Q.      Okay.  How many documents did you

12  review with counsel?

13          MR. BROWN:  You can answer that

14      with a number as best you can recall.

15     A.      Two or three.

16     Q.      And did any of the documents that

17  you reviewed specifically refresh your

18  recollection about anything?

19     A.      I mean, they refreshed it since,

20  you know, since the time of my report to the

21  examiner.  That's all.

22     Q.      And what documents did you look

23  at that refreshed your recollection?

24     A.      Gosh, what did we look at?  We

25  looked at a bunch of them, like I said.  So

Page 86

                        A. CELINI

1    probably the one that comes to mind is the

2    Master Mortgage Loan Purchase and Sale

3    Agreement.

4         Q.    What specifically were you

5    refreshed by in looking at the MMLPSA?

6              MR. BROWN:  Objection to form.

7         A.    Just we -- it's been a number of

8    years, counselor, since I have dealt with

9    these things.  So just reviewed it to

10   remember what, you know, looked at what the

11   terms and conditions were.

12        Q.    And was the document -- this

13   E-mail chain that I marked as Cortese Exhibit

14   4, a document that you reviewed that

15   refreshed your recollection?

16        A.    No, I don't recall, no.  I don't

17   recall seeing this document.

18        Q.    And what about the Power Point

19   that had previously been marked as Cortese

20   Exhibit 8, is that a document that you

21   reviewed that refreshed your recollection?

22        A.    Let me see which one that is.

23             MR. BROWN:  The one at page EXAM

24   '15456; is that right?

Page 87

                           A. CELINI

1

2          MS. MILLER:  Yes.

3     A.     So, this document was shown to me

4  yesterday.

5     Q.     Did it refresh your recollection

6  about anything?

7     A.     No.  I am sorry, I had my -- so,

8  no, I gave the same answer that I --

9          MR. BROWN:  Mr. Celini, don't

10         reveal privileged communications.  She

11         is not asking for that.  She is simply

12         asking whether this refreshed your

13         recollection.  You can answer that

14         with a yes or a no.

15    A.     No.

16    Q.     What other documents did you look

17  at other than the MMLPSA that refreshed your

18  recollection?

19    A.     I don't recall.  We looked at a

20  bunch.

21    Q.     Did you review affiliate

22  transaction memos that refreshed your

23  recollection?

24    A.     I believe there was one in there,

25  so yes.

Page 88

A. CELINI

1

2      Q.      And do you recall which ones

3  specifically?

4      A.      No.

5      Q.      Were there any e-mails that you

6  reviewed that refreshed your recollection?

7      A.      No.

8      Q.      Any other documents or types of

9  documents that you reviewed that refreshed

10  your recollection?

11          MR. BROWN:   Objection.   Asked

12      and answered.

13      A.      No.

14      Q.      Did you review the MSR swap

15  agreements?

16      A.      That could have been inside

17  there.   Again, we met -- it wasn't

18  extensively.   So we looked at that -- that

19  may have been in there.   I don't recall.   Let

20  me answer your question, I don't recall if

21  that was in there.

22      Q.      Mr. Celini, do you recall which

23  MMLPSA you reviewed that refreshed your

24  recollection?

25      A.      No.

Page 89

1                    A. CELINI

2        Q.    Do you recall whether it was the

3   MMLPSA that was amended and restated as of

4   July 1st, 2008?

5        A.    No, I don't recall if that was

6   the specific document.

7        Q.    I am going to hand you a document

8   that's previously been marked as Cortese

9   Exhibit 2.  It's the Master Mortgage Loan

10  Purchase and Sale Agreement between GMAC Bank

11  and GMAC Mortgage LLC amended and restated as

12  of July 1, 2008.  Bates numbered ALLY_0201210

13  through '1225.

14            Mr. Celini, was anyone other than

15  Mr. Brown in attendance at the meeting either

16  in person or by telephone yesterday?

17       A.    Yes.

18       Q.    Who was that?

19       A.    (Indicating.)

20            MR. BROWN:   Jodi.

21       Q.    Anyone else?

22       A.    No, sorry.

23       Q.    Mr. Celini, I have handed you

24  what has been marked as Cortese Exhibit 2.

25  Does this refresh your recollection about

Page 90

A. CELINI

1

2   whether it is the July 1, 2008, MMLPSA that

3   you reviewed yesterday?

4       A.    So, this may have -- this may

5   have been one that I looked at yesterday.  I

6   mean, we looked, like I said -- so, no.  Wait

7   a minute.  Can I get clarification?  Let me

8   step back here.

9           So we had a number of documents.

10  So this document, as you are presenting it to

11  me here, refreshes my recollection of this

12  document.

13      Q.    Does it remind you whether you

14  saw this document yesterday or not?

15      A.    I answered that question to you

16  already.

17      Q.    And you answered it no?

18      A.    No.

19      Q.    Mr. Celini, do you see that this

20  document has a draft header on the top of the

21  first page?

22      A.    I see it.

23      Q.    And the dates are bracketed both

24  on the front page Bates ending '1210 as well

25  as in the first recital -- sorry, the first

Page 91

1                    A. CELINI

2    paragraph above the recitals in '1211?

3         A.    Yes.

4         Q.    Do you understand this to be the

5    final executed version of the July 2008

6    amendment and restatement to the MMLPSA?

7         A.    Based on the fact that it is

8    executed by all the parties, yes.

9         Q.    Just to be clear, you were an

10   attesting witness to Mr. Groody's signature;

11   is that right?

12        A.    Yes.

13        Q.    And that's on page ALLY_0201224.

14   Did you review drafts of this agreement

15   before it was executed?

16        A.    The answer is probably, yes.  I

17   mean, the fact these typically go through

18   multiple drafts before they are finalized, so

19   I am sure I did.

20        Q.    Do you have an understanding why

21   the MMLPSA was amended and restated in July

22   of 2008?

23        A.    So these agreements change from

24   time to time based on a number of inputs.  So

25   I don't recall specifically why July 1st one

12-12020-mg    Doc 5803-14    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Al Celini    Pg 92 of 165
***HIGHLY CONFIDENTIAL***

Page 92

1                    A. CELINI

2    could have been done.   It could have been as

3    a result of a regulatory examination, inputs,

4    comments.   It could have been for a number of

5    reasons.

6          Q.     Do you recall whether it was

7    amended in connection with the broker-to-bank

8    project?

9          A.     No.   They are separate.   They are

10   not related activities.

11         Q.     Does the MMLPSA -- does the

12   MMLPSA have any relationship to the

13   broker-to-bank project?

14         A.     I think I just answered that.

15   No, they are separate.   One was for an inflow

16   activity.   Discovering the sale of loans,

17   outflow activity.

18         Q.     And the bank and GMAC Mortgage

19   had an MMLPSA long before the broker-to-bank

20   project, right?

21               MR. BROWN:   Objection to form.

22         A.     Yes.

23         Q.     Okay.   And when GMAC Mortgage was

24   originating loans, the flow of loans, as I

25   understand it, and you tell me if I am right,

Page 93

1                        A. CELINI

2    is that GMAC Mortgage would originate, GMAC

3    Mortgage would then sell the loans to the

4    bank and the bank would then sell the loans

5    back to GMAC Mortgage pursuant to the MMLPSA,

6    whichever MMLPSA version was applicable at

7    the relevant time, and then GMAC Mortgage

8    would then sell the loans to GSEs or other

9    third-parties, is that the general flow?

10                MR. BROWN:   Objection to form.

11          A.     You need to be more specific.   So

12    when?   So at different times the flow may

13    have varied.

14          Q.     In early 2006; sorry, in early

15    2007.

16          A.     So that -- at that time period,

17    yes, it would have been the general flow.   So

18    we used the -- the bank was purchased

19    underneath the exemption.   In general that

20    was before the brokering activity started or

21    purchased from correspondence, as I explained

22    to you earlier, and would generally hold, you

23    know, would warehouse the loans prior to

24    their ultimate delivery offered to the GSEs

25    or ultimate investors.

Page 94

                    A. CELINI

1

2        Q.    And under that scenario, for

3   loans that GMAC Mortgage was originating, who

4   retained any fees paid by consumers?

5              MR. BROWN:  Objection to form.

6        A.    I am not sure.  I mean, you

7   know -- so if it was originated -- I am not

8   sure.  You'd have to clarify who retained

9   what -- what fees?  What type of fees?

10       Q.    So if points are paid by a

11  consumer and GMAC Mortgage originated the

12  loan and then sold that loan to the bank, did

13  GMAC Mortgage pass that -- those fees --

14  sorry, those origination points onto the

15  bank?

16       A.    Thank you for the clarification.

17  Yes, they would have.  We purchased a closed

18  loan.  So it was -- whatever, you know, fees,

19  origination fees or in a capitalizable

20  activity, whether it be premiums or

21  discounts, were in there.

22       Q.    What was the cost that GMAC

23  Mortgage paid for those loans when it

24  acquired them from the bank under the MMLPSA?

25             MR. BROWN:  Objection to form.

Page 95

1              A. CELINI

2       Which MMLPSA are you talking about?

3       Q.    In early 2008.  Sorry, early

4  2007.

5            MR. BROWN:  So before Cortese 2?

6            MS. MILLER:  Before Cortese 2.

7       A.    I need to see what that agreement

8  looked like at that time.  So whatever the --

9  whatever -- would be governed by whatever the

10  MMLPSA terms and conditions were in effect at

11  that time.

12      Q.    Do you have an understanding,

13  sitting here today, of what those terms and

14  conditions were?

15      A.    I don't have a recall -- I don't

16  have a recollection specifically as to the

17  terms and conditions at that time.  I would

18  have to see the document.

19      Q.    Do you have a general

20  recollection of what they were?

21      A.    No.

22      Q.    After the broker-to-bank project

23  was implemented, GMAC Mortgage would make

24  initial contact with the customer as the

25  broker and would then refer that customer to

Page 96

1                          A. CELINI

2        the bank and the bank would then originate

3        the loan and then sell that loan to GMAC

4        Mortgage under the MMLPSA and then GMAC

5        Mortgage would then sell those loans to GSEs

6        or other third-parties; is that right?

7             A.    So the sales would govern

8        whatever the terms of the MMLPSA were at that

9        time.  As a general flow, that's how the

10       overall transactions were.

11            Q.    Okay.  So looking at Cortese

12       Exhibit 2, which is the document Bates

13       stamped ALLY_0201210, which is the amended

14       and restated MMLPSA dated July 1, 2008.

15       Could you turn to Section 1.24 on page 3,

16       which is titled Purchase Price.  You see that

17       the purchase price with respect to first lien

18       mortgage loans means the Cost Basis plus

19       reserves associated with the loans?

20            A.    I see that section.

21            Q.    And is that -- do you have any

22       reason to believe that that was not the

23       purchase price under this agreement?

24            A.    No, I have no reason not to

25       believe.

Page 97

1                     A. CELINI

2        Q.    Okay.   Looking at the definition   *

3   of Cost Basis in Section 1.9 on page 2, Cost

4   Basis, it says "Means, with respect to a

5   mortgage loan, its net carrying value as

6   defined by the accounting principles

7   generally accepted in the United States of

8   America as amended to include without

9   limitation the unpaid principle balance of

10  such mortgage loan plus or minus any premium

11  or discount paid, net deferral fees or costs,

12  accrued interest and basis adjustments from

13  derivative loan commitments, hedge accounting

14  or lower of cost or market adjustments."

15            Do you see that?

16        A.    I see it.

17        Q.    What do you understand that to

18  mean in your own words?

19        A.    My understanding Cost Basis is

20  GAAP.   So it is as defined here.   The Cost

21  Basis of the loan as originated with -- under

22  GAAP.

23        Q.    And what is "plus or minus any

24  premium or discount paid, net deferral fees

25  or cost accrued interest and basis

JSN Objection
97:17-22:
FRE 611(a) (Non-
responsive)

Page 98

                           A. CELINI

1

2    adjustments from derivative loan commitments,

3    hedge accounting or lower of cost or market

4    adjustments" mean?

5              MR. BROWN:   Objection to form.

6         A.    So what does that mean?

7         Q.    Yes.

8         A.    I mean, these are, again, the

9    GAAP terms that are typically associated

10   with, you know, the Cost Basis of a loan.

11   It's fair value accounting.

12        Q.    This is fair value accounting?

13        A.    Because it includes basis from

14   derivative loan commitments, hedge accounting

15   a lower to cost market adjustments.  So it is

16   GAAP.

17        Q.    You understand that to be fair

18   value of accounting?

19        A.    Yes.

20        Q.    Do you understand that there is a

21   difference between fair value accounting and

22   lower of cost or market accounting?

23        A.    Yes, I understand them and I

24   understand them both to be GAAP depending on

25   what was being applied at the time.  What our

Page 99

1                      A. CELINI

2     overall principles that were being used.

3           Q.     And you understand that this Cost

4     Basis is referring to fair value accounting?

5           A.     I answered that, yes.

6           Q.     Do you understand what accounting

7     the bank was using in July of 2008?

8           A.     Should be fair value accounting,

9     if that's the way it was defined here.   I

10    wasn't the CFO at the time so --

11          Q.     And if it wasn't fair value

12    accounting, what would you understand this

13    provision to mean?

14               MR. BROWN:   Objection to form.

15          A.     GAAP.   I answered you already.

16    So, again, it is generally accepted

17    accounting principles.   GAAP.   Whatever GAAP

18    was being followed at the time.

19          Q.     So I am trying to understand in

20    plain English if the bank were using lower of

21    cost or market accounting, what would GMAC

22    Mortgage pay GMAC Bank for a loan?

23               MR. BROWN:   Objection to form.

24          A.     I believe I have answered that

25    to you.

Page 100

1                     A. CELINI

2        Q.    I would like you to answer it

3   again.

4              MR. BROWN:  Objection to form.

5        A.    You know, I don't know where you

6   are going with it.  So I believe I have

7   answered it to you.  Here, as defined

8   underneath the MMLPSA, it is Cost Basis as

9   defined as GAAP.  So I can't opine as to what

10  the affiliate's accounting was.  I can only

11  opine as to what I generally know was the

12  bank's accounting.  And if the bank was using

13  GAAP, that's what it should be.  I mean the

14  bank is using GAAP it is going to be whatever

15  its GAAP accounting is at the time.

16       Q.    You keep saying GAAP?

17       A.    Yes.

18       Q.    And you are including GAAP to

19  mean either fair value or lower of cost or

20  market, right?

21       A.    Yes.

22       Q.    Whatever was being used by the

23  bank at the time?

24       A.    Yes.  Because either or -- either

25  of those two is GAAP.

***HIGHLY CONFIDENTIAL***

Page 101

A. CELINI

1

2      Q.     Either of those two is GAAP, and

3   do you have an understanding -- I guess you

4   already said.  Do you know -- were you

5   involved in any discussions in July of 2008

6   about transitioning the bank's accounting to

7   fair value accounting?

8      A.     No, that's chief risk

9   officer, no.

10     Q.     Who was responsible for putting

11  together this amended and restated MMLPSA?

12            MR. BROWN:  Objection to form.

13     A.     The parties that were here.  The

14  signatories, I would assume.

15     Q.     Is it your understanding that

16  Mr. Groody drafted this agreement?

17            MR. BROWN:  Objection to form.

18     A.     So as a signatory, I would assume

19  that he was the drafter.  I am sure he had

20  inputs from counsel as well.  So both

21  parties.

22     Q.     Okay.  Were you involved in

23  negotiating this agreement with GMAC

24  Mortgage?

25     A.     I can't recall.  I was involved

***HIGHLY CONFIDENTIAL***

Page 102

A. CELINI

1  in reviewing.  As an attester, I was involved

2  in reviewing these documents but I didn't

3  negotiate.

4     Q.     Were you involved either as an

5  active participant or as an observer in any

6  discussions with GMAC Mortgage related to

7  this agreement?

8     A.     As an observer, yes.

9     Q.     Did you participate in meetings

10  as an observer related to this agreement with

11  GMAC Mortgage?

12     A.     I don't recall, honestly.  I

13  mean, we -- I reviewed almost -- I had to

14  review almost all of these things.  So I

15  would review them.  I don't know if I -- I

16  don't recall if I participated in any

17  specific meetings on this.

18     Q.     Were you -- do you know if there

19  was any -- strike that.

20        In the discussions that you were

21  a part of between GMAC Bank and GMAC Mortgage

22  related to the MMLPSA, did the bank ever tell

23  GMAC Mortgage that it was intending to

24  transition to fair value accounting?

Page 103

                        A. CELINI

1                    A. CELINI

2          MR. BROWN:  Objection to form.

3      A.    I have no idea.  I don't -- no.

4  Again, I didn't -- I answered your question

5  already.  I'm an attester.  I was a reviewer.

6  I didn't negotiate the terms of this.

7      Q.    Right.  But you said that you

8  participated in discussions as an observer.

9  I want to know, any discussions that you ever

10  heard about this agreement between GMAC Bank

11  and GMAC Mortgage, did GMAC Bank represent to

12  GMAC Mortgage that it was intending to

13  transition to fair value accounting?

14          MR. BROWN:  Objection to form.

15      A.    Let me make sure -- as my role as

16  an observer in these meetings, were those

17  statements -- I can answer I am not aware of

18  any of those discussions during my

19  participation as an observer.

20      Q.    Do you know when the bank

21  transitioned from lower of cost or market

22  accounting to fair value accounting?

23      A.    No.

24      Q.    Do you know whether under this

25  definition of Cost Basis there had been a

***HIGHLY CONFIDENTIAL***

Page 104

1                   A. CELINI

2    material impact on the transaction if,

3    depending on whether Ally Bank were using

4    fair value or lower of cost or marketing

5    accounting?

6              MR. BROWN:  Objection to form.

7         A.    I don't understand.  What

8    transaction?

9         Q.    Would the cost -- would the

10   definition of Cost Basis, under the MMLPSA,

11   be different if the bank were using fair

12   value or lower of cost or market accounting?

13             MR. BROWN:  Objection to form.

14        A.    I am not too sure.  You are

15   asking me do I know if the transactions

16   were -- been different?  I mean they would

17   be.  One would be under fair value and one

18   would be under low COM.  So yes, they would

19   be different.

20        Q.    And would the purchase price be

21   different?

22        A.    Yes, they would be different

23   because they would be under two different

24   basis.  Different basis, right.  So it is

25   obvious, right, they would.

Plaintiff's Objection
104:9-25, Lack of
personal knowledge/
speculative (FRE 602);
calls for legal
conclusion

Page 105

1                    A. CELINI

2        Q.    And do you think that the

3   purchase price is a core term of the MMLPSA?

4              MR. BROWN:   Objection to form.

5        A.    It's here.   It is in the

6   document.   So it is -- all terms are

7   important.

8        Q.    Mr. Celini, looking back at the

9   E-mail chain that was previously marked as

10  Cortese Exhibit 4.   I believe you stated

11  earlier that there were a number of scenarios

12  being discussed and you're not sure one way

13  or another whether this E-mail is talking

14  about the final scenario; is that right?

15  Sorry, so the record is clear, the E-mail

16  exchange between yourself and Mr. Whitehead

17  that appears on EXAM '0003976.

18        A.    Yes, I answered you.   I already

19  answered you.   There were -- I'm not certain

20  that this was the final version as to the way

21  the project.   But like I said, there were

22  multiple versions, extensive discussions with

23  the team and a number of scenarios which some

24  of them never came to fruition.

25        Q.    Can you tell me how the

Page 106

1                      A. CELINI

2    discussion in this E-mail chain differs from

3    the final scenario that was implemented?

4         A.    No, I --

5               MR. BROWN:    Objection to form.

6         A.    No.

7         Q.    It might not differ at all,

8    right?

9         A.    I don't -- I don't know.    I

10   mean -- so I don't know.    I don't know how

11   it -- I have to see what the final broker

12   agreement and the final MMLPSA.    Those are

13   the driving documents.    So these e-mails may

14   have been one of thousands, like I said,

15   various scenarios.    So I can't tell by

16   looking at these e-mails.

17        Q.    So you said that the broker

18   agreement and the MMLPSA were the driving

19   agreements.    What were they the driving

20   agreements of?

21        A.    The brokering activity and the

22   sales activities.

23        Q.    So sitting here, based on your

24   recollection and understanding of the

25   agreement -- of the agreements as they were

Page 107

1                    A. CELINI

2    finalized, there is nothing in this E-mail

3    that you can identify as being inconsistent

4    with the final scenario that was implemented

5    in the project, right?

6              MR. BROWN:  Objection to form.

7         A.    Yeah, that I don't get.  So my

8    view of this -- my looking at these e-mails

9    tells me what?  Can you clarify?

10        Q.    I am asking you if, sitting here

11   today, you can tell me if there is anything

12   in this E-mail that is inconsistent with your

13   understanding of the end result of the

14   broker-to-bank project?

15             MR. BROWN:  Without showing him

16        the documents he just referenced?

17        A.    I can't tell.

18             MS. MILLER:  Yes, without

19        showing him the documents?

20             MR. BROWN:  Objection to form.

21        Q.    Based on your recollection of the

22   project.

23        A.    I can't answer that question.  I

24   can't answer it looking at this E-mail

25   without looking at -- again, these e-mails

Page 108

                         A. CELINI

1  were not the driving, you know, end result of

2  the documents.  I have already answered that.

3  So I can't answer that just by looking at

4  this E-mail.

5      Q.    Do you have an understanding of

6  what the final agreements reflected?

7          MR. BROWN:  Objection to form.

8      A.    I had an understanding.  I don't

9  recall them, the nuances of all of them.  I

10 would have to look at the agreements to

11 have -- to refresh my understanding of those.

12     Q.    Mr. Cortese, during the time that

13 the -- sorry, Mr. Celini, during the time --

14 Mr. Celini, during the time that the

15 broker-to-bank project was ongoing, about how

16 much time of yours did it occupy?

17     A.    This is in the middle of the debt

18 crisis.  It was madness.  It was all hands on

19 deck.  So who knows.  I mean, it was -- we

20 were working extensively.  So, I mean, how

21 much percentage of my time, I don't recall

22 how much.  It was a lot.  And it was a large

23 project.  No small task.

24     Q.    So did you spend multiple hours

Page 109

A. CELINI

1

2  every day working on the broker-to-bank

3  project?

4          MR. BROWN:  Objection to form.

5      A.    I mean, yes.

6      Q.    And how long did the project

7  last for?

8      A.    Several months.  I don't recall

9  how long.  Several months.

10      Q.    Were you consistently involved

11  from beginning to end?

12      A.    Yes.

13      Q.    And during that time, did you

14  feel like you had a strong understanding of

15  the project and its components?

16      A.    Yes.

17      Q.    From the time that you left Ally

18  Bank until you were interviewed by the

19  examiner, have you thought much about the

20  broker-to-bank project?

21      A.    Have I thought much about it?

22      Q.    Yeah.

23      A.    No, not much.  But I thought that

24  project, basically, let GMAC Mortgage and

25  ResCap live for another couple of years.  It

Page 110

1                      A. CELINI

2    wasn't on my mind every day.  But it was a

3    Herculean effort that allowed them to live.

4         Q.    So you didn't sit around at night

5    and review all of the details of the

6    agreement?

7         A.    No.  No.

8         Q.    When were you interviewed by the

9    examiner?

10        A.    Honestly, I don't recall the

11   date.

12        Q.    Does February 2013 sound right?

13        A.    Sounds about right.  It was cold.

14        Q.    It was cold outside?

15        A.    It was cold outside.  It was here

16   in Philadelphia.  No offense, I don't

17   remember what I ate for dinner last night.

18   My assistant keeps track of my calendar.  So

19   whatever my calendar says.  If that's what

20   the examiner says, that's the date it was.

21        Q.    Does she calendar what you eat

22   for dinner?

23        A.    No, she doesn't.

24        Q.    Mr. Cortese, looking at --

25   Mr. Celini, I will stop.

Page 111

                        A. CELINI

1

2       A.      It is actually comical.

3       Q.      You do laugh every time, and I

4    want wait to ask you when we are off the

5    record what's so funny about being thought of

6    as Mr. Cortese.  I thought he was a lovely

7    gentleman.

8               MR. BROWN:  I don't think it is

9          anything thought of Mr. Cortese.  The

10         fact that you consistently do it.  I

11         think he knows it is inadvertent.

12              THE WITNESS:  Yes.

13      Q.      It is much more meaningful after

14   you are a real person.

15      A.      Just a second.  Let me put my

16   microphone back on.  It fell off.  Okay.  I

17   am back.

18      Q.      Mr. Celini, looking at page V 134

19   in the examiner report.

20              MR. BROWN:  Sorry, where are we?

21              MS. MILLER:  Sorry, we are in

22         Celini 2.

23              MR. BROWN:  Okay.  What page?

24              MS. MILLER:  Page V 134.

25      Q.      It says, beginning in the second

1                    A. CELINI

2    sentence of the first full paragraph, it says

3    "Celini explained that the contemplated

4    allocation of revenues and expenses generally

5    was the same as that under the existing

6    contractual agreements."

7              Do you agree with that?

8         A.    For what context?  I mean, what

9    are we speaking of?  Just looking here.  I am

10   reading the page.

11        Q.    Sorry, let me just reorient you

12   in where we are.  We are in the section of

13   the examiner's report that's discussing the

14   genesis of the brokering consumer loans to

15   bank project and its objectives.

16        A.    So again, I have never seen the

17   examiner's report, so I am just reading it

18   the way I can understand context.

19        Q.    Sitting here today, do you think

20   that's -- that it is accurate -- an accurate

21   statement to say that the contemplated

22   allocation of revenues and expenses generally

23   was the same as that under the existing

24   contractual agreements?

25        A.    Again, what are existing

***HIGHLY CONFIDENTIAL***

Page 113

1                     A. CELINI

2    contractual relationships, arrangements, what

3    does that mean?

4         Q.    So if you look at footnote 673,

5    which is what that statement is referencing,

6    it has a citation to your interview and it

7    says, "For prebroker agreement, bank

8    originated loans, the affiliate, GMAC

9    Mortgage, received the P&L impact of

10   origination income and expenses, quote, 'We

11   were not recognizing gains and losses on

12   these activities.'"

13             Do you see that?

14        A.    Okay.  I see the footnote and I

15   am trying to get myself oriented to this

16   context here.  So explain the contemplated

17   allocation -- generally was the same under

18   the existing contractual agreements.  Okay.

19   I am just looking at the remainder of the

20   paragraph to get context here.  So in

21   particular for the agreement.  Okay, so now

22   once I have read this, can you restate your

23   question?  You want to know if the sentence,

24   the second sentence there --

25        Q.    Right.

1            A. CELINI

2       A.      That "Celini explained that the

3  contemplated allocations of revenue and

4  expenses generally was the same as under the

5  existing contractual arrangements."  So when

6  I read this, I don't recall the context of my

7  comment here.  But this would tell me that,

8  when I look at this, is that the -- the

9  allocation of revenue expenses was -- is

10  under existing -- was underneath the existing

11  MMLPSA, is that what it is inferring?  I am

12  not sure.  It is not clear what it is

13  inferring to me.  Contractual arrangements

14  seems to imply affiliate agreements.  Doesn't

15  say which one.  The one that drives revenues

16  and expenses probably would have been the

17  MMLPSA.  Because that would have governed the

18  terms of what the sale of our loans was from.

19  So, again, where are we going with this?  I

20  am confused.

21       Q.      Okay.  Was the bank recognizing

22  gains and losses on its purchase and sale of

23  loans from GMAC Mortgage and back to GMAC

24  Mortgage before the broker agreement?

25            MR. BROWN:  Objection to form.

***HIGHLY CONFIDENTIAL***

1                    A. CELINI

2        What time period?  I don't know what

3        this is.

4        A.    Which one?  Again that's

5    prebrokers so that would be what, what month?

6    Again, the answer is the same thing.

7    Whatever the MMLPSA that was enforce, in

8    place at that time would have been the way

9    that we were generated revenues, and

10    honestly, I don't recall the exact terms and

11    the dates that they were in place, so

12    whatever the documents said.

13        Q.    Do you have any reason to dispute

14    that, under the MMLPSA, that was governing

15    immediately prior to the broker agreement

16    being entered into, that the bank was not

17    recognizing gains or losses on those

18    activities?

19            MR. BROWN:  Objection to form.

20        A.    So I need to see the specific

21    document before I can make any assertion as

22    to whether -- what was happening.  Because I

23    just don't recall.  Again, it is not

24    committed to memory as to what was -- what

25    the basis for accounting was being done at

***HIGHLY CONFIDENTIAL***

Page 116

                    A. CELINI

1

2    that time.

3        Q.    You don't dispute you said that

4    to the examiner, right?

5            MR. BROWN:  Objection to form.

6        A.    It is here.  I made many

7    statements to the examiner.  It is hard to

8    really understand the context of this one

9    within the overall.  If it's here, it is

10   probably accurate that I did say it.  But I

11   can't really make out the context from it,

12   Counselor.  It is hard to understand just by

13   reading these paragraphs -- this specific

14   paragraph here.

15       Q.    Did you review any documents with

16   the examiner during the examination?

17       A.    Yes, several.

18       Q.    And did you review several

19   versions of the MMLPSA -- sorry, I won't say

20   "versions" -- several different MMLPSAs?

21       A.    Yes, I did.

22       Q.    And did you review the brokering

23   agreement with the examiner?

24       A.    I don't recall.  I know we looked

25   at several MMLPSAs.  I don't know if we

Page 117

                        A. CELINI

1
2    looked at the broker agreement.  We may have.

3        Q.    The last -- very last sentence in

4    that paragraph --

5            MR. BROWN:  Are we on the same

6        page, sorry?

7        Q.    The same page.  Last sentence in

8    that paragraph which starts the last four

9    words on the page says "The cost based

10   pricing for loans purchased effectuated under

11   the 2008 MMLPSA in July 2008 pipeline swap as

12   implemented would have captured the effect of

13   the FAS 91 deferrals."

14            Do you know what that means?

15            MR. BROWN:  Objection to form.

16       Q.    Sorry let me reask.  Do you know

17   what the effect of the FAS 91 deferrals

18   would be?

19            MR. BROWN:  Object to form.

20       A.    No, not in this context.

21       Q.    Under lower of cost or market

22   accounting, what effect would five -- FAS 91

23   deferrals have on the purchase price under

24   the July 1, 2008, amended and restated

25   MMLPSA, which was marked Cortese Exhibit 2?

Page 118

1                    A. CELINI

2              MR. BROWN:  Cortese 2?

3        A.    So in what section of -- in this

4    document?  So FAS 91 deferrals are part of

5    the Cost Basis of the loan.

6        Q.    And what effect do they have on

7    the Cost Basis of the loan?

8              MR. BROWN:  Objection to form.

9        A.    What effect do they have?

10       Q.    Yes.

11       A.    Typically would increase the Cost

12   Basis.

13       Q.    And if the bank were collecting

14   fees from the consumer, what effect would

15   those fees, if deferred under FAS 91, have on

16   the Cost Basis of the loan?

17             MR. BROWN:  Objection to form.

18       A.    I just answered that.  So any fee

19   that is deferred is -- I answered that.  So

20   it increases the Cost Basis of the loan.

21       Q.    Okay.  So if a customer pays $10

22   in points to the bank, the bank defers those

23   $10, the Cost Basis, on the loan with the UPB

24   of $100, the Cost Basis of the loan is what?

25             MR. BROWN:  Objection to form.

***HIGHLY CONFIDENTIAL***

Page 119

1                    A. CELINI

2          At what time?

3          Q.      Under this agreement, lower of

4    cost of market accounting.

5                  MR. BROWN:   Objection to form.

6          A.      So first off, you are mixing

7    here.   So points are not FAS 91 deferral

8    fees, okay.   So points are part of the

9    premium or discount that is paid when you

10   originate a loan.   So the answer to your

11   question is the same.   Fees collected that

12   are deferrable under FAS 91 are part of the

13   Cost Basis of the loan.   Answer.   Asked.

14   Answer.

15                  Points collected are not part of

16   FAS 91 deferral.   They're part of the UPB or

17   premium or discount, which is different from

18   a FAS 91 adjustment.

19         Q.      So when you say fees collected,

20   they increase the Cost Basis -- when you say

21   fees collected by the consumer, you're

22   talking about origination fees, processing

23   fees?

24                  MR. BROWN:   Objection.

25         Q.      Appraisal fees and the like,

Page 120

1                    A. CELINI

2  right?

3            MR. BROWN:  Objection.  I think

4        you misspoke.  You said fees collected

5        by the consumer.

6        Q.    Sorry.  When you say fees

7  collected from the consumer, you are

8  referring to origination fees, processing

9  fees, appraisal fees and the like, right?

10           MR. BROWN:  Objection to form.

11       A.    I answered that before.

12       Q.    What was your answer?

13           MR. BROWN:  Objection to the

14       form.

15       A.    You can look at the tape.  There

16  are various ones.  So there is a laundry

17  list.  You can look down a HUD 1 and see what

18  the fees that are there, and those fees that

19  are shown on the HUD 1, some of them are

20  capitalizable and deferrable and others are

21  not.  So, again, there is a long list of

22  them.  So application fees, origination fees.

23  Those are just examples of them.  You have

24  asked them and I have answered those.  I

25  cannot recite the whole list off of the

Page 121

1                    A. CELINI

2    HUD 1.

3         Q.    I am not asking you to recite the

4    list.  You don't like going with my

5    hypothetical of a simple single fee that you

6    collect.  I am okay with that.  But what I

7    want to understand is, if the bank is

8    collecting money from the consumer, whether

9    that's increasing or decreasing the Cost

10   Basis under lower of cost -- if the bank is

11   using lower of cost or market accounting

12   under the definition of Cost Basis in

13   Section 119 of the July 1, 2008, MMLPSA?

14                MR. BROWN:   I think you mean

15        1.9.

16                MS. MILLER:   1.9.

17                MR. BROWN:   Objection to form.

18        A.     In principal, any fee that is not

19   a pass through, in other words, an appraisal

20   fee is collected from a consumer but is paid

21   out through to an appraisal, third-party

22   person.  So any fee that's not paid out as

23   part of a pass through would become part of

24   the basis of a loan.

25        Q.     And I want to know if it

Page 122

                        A. CELINI

2    increases or decreases the Cost Basis?

3              MR. BROWN:  Objection to form.

4         A.    I answered this before.  It would

5    increase the Cost Basis of a loan.  Just by

6    its nature of the deferral.  Deferral, debit,

7    equals increase the basis.

8              MS. MILLER:  I think we have to

9         go off the record because we are at

10        the end of the tape.

11             THE VIDEOGRAPHER:  We are now

12        going off the video record.  That

13        concludes tape number 2.  The time is

14        11:47.

15             (Whereupon, a recess was held.)

16             THE VIDEOGRAPHER:  We are now

17        back on the video record.  This

18        commences tape number 3, November 8,

19        2013.  The time 11:59.

20             Please continue.

21   BY MS. MILLER:

22        Q.    Mr. Celini, why did you leave the

23   bank?

24        A.    I was left -- I was terminated

25   based on the reorganization as an executive

Plaintiff's
Objection
122:22-123:25
Irrelevant (FRE
401, 402)

Page 123

1                    A. CELINI

2    changeover.

3         Q.    What is an executive changeover?

4         A.    Folks from another institution

5    show up with a CEO and one by one replace the

6    executive team of the previous organization.

7    So a number of my colleagues, Mr. Groody, our

8    chief risk officer, every one of them, most

9    of the executive team was relieved with the

10   arrival of a new CEO and chairman.   So

11   reorganization.

12        Q.    And when was -- when did that

13   happen?

14             MR. BROWN:   Objection to form.

15        Q.    When was the executive

16   changeover?

17        A.    The dates of my employment should

18   be on the record.   You guys should know that.

19   So that happened in 2009.   November of 2009.

20        Q.    Was the timing around the same

21   for your executive colleagues that you just

22   mentioned?

23        A.    On or about.   Over plus or minus

24   months.   I was one of the last ones to be

25   around.

Page 124

1                        A. CELINI

2        Q.    And Mr. Celini, do you know

3   that -- do you know who Mr. Glassner is,

4   Adam Glassner?

5        A.    Yes.

6        Q.    Who is Mr. Glassner?

7        A.    Adam Glassner was head of capital

8   markets for -- he ran correspondent lending

9   and capital markets for us at ResCap and he

10  had a role in the bank.  He oversaw the

11  correspondent lending group for a small time,

12  for a short period of time.

13       Q.    And did Mr. Glassner have any

14  involvement in the broker-to-bank project?

15       A.    Not that I recall.  A lot of

16  people came in and out of it so --

17       Q.    And did the MMLPSA govern the

18  purchase by GMAC Mortgage of correspondent

19  loans that the bank held?

20            MR. BROWN:  Objection to form.

21       A.    I answered that earlier this

22  morning, right.  The bank originated -- the

23  bank had various asset acquisition

24  activities, so the correspondent activities

25  those loans were in the bank.  Or purchased

***HIGHLY CONFIDENTIAL***

1          A. CELINI

2     by the bank.

3          Q.     So my question is, whether GMAC

4     Mortgage bought those assets from the bank

5     under the MMLPSA?

6          A.     Yes.

7          Q.     So the MMLPSA, stated

8     differently, the MMLPSA did not only cover

9     those mortgages that were either originated

10    by GMAC Mortgage or by the bank depending on

11    the period?

12         A.     We covered all mortgages.

13         Q.     Okay.  Are you aware that there

14    was an investigation conducted into certain

15    accounting under the MMLPSA after your

16    departure?

17         A.     No, not specifically.

18         Q.     Do you know generally?

19         A.     No.

20         Q.     Do you know that Mr. Glassner

21    raised concerns about how the bank was --

22    what revenues the bank was retaining under

23    the MMLPSA agreement?

24         A.     No.

25         Q.     I am going to represent to you

***HIGHLY CONFIDENTIAL***

Page 126

1                      A. CELINI

2    that at the time the July 1, 2008, Master

3    Mortgage Loan Purchase and Sale Agreement was

4    signed and became effective, which is marked

5    as Cortese Exhibit 2, was signed and became

6    effective, the bank was using lower cost or

7    market accounting for its mortgage assets,

8    okay?

9                 MR. BROWN:  For all mortgage

10        assets?  You can represent what you

11        want to represent.  But I will tell

12        you that representation isn't correct.

13        Q.    Mr. Cortese -- sorry, Mr. Celini,

14    did you have an understanding of what

15    accounting the bank was using for mortgages

16    acquired by -- sorry, that it was acquiring

17    from GMAC Mortgage?

18                 MR. BROWN:  Objection to form.

19        A.    What period of time?  When?

20        Q.    In July of 2008.

21                 MR. BROWN:  Objection to form.

22        A.    I don't recall specifically.  It

23    would be GAAP whatever it was.  I don't

24    recall the specific basis that was being

25    used.

***HIGHLY CONFIDENTIAL***

Page 127

                          A. CELINI

1

2        Q.      Under GAAP, you could choose

3    different accounting methods, right?

4        A.      Sure, yes.

5        Q.      And they can all be GAAP

6    compliant, right?

7        A.      Yes.

8        Q.      And one of them would be lower of

9    cost or market, right?

10        A.      Yes, that's correct.

11        Q.      And another one would be fair

12    value, right?

13        A.      That's correct as well.

14        Q.      And those are not the same,

15    right?

16        A.      That is correct.

17        Q.      And I am asking you, if you know,

18    whether July 1, 2008, the bank was using

19    lower of cost or market accounting?

20        A.      Honestly, I don't recall.

21             MR. BROWN:  Objection.

22             THE WITNESS:  Sorry.

23        A.      I don't recall.  Honestly, I

24    don't recall.

25        Q.      Okay.

***HIGHLY CONFIDENTIAL***

Page 128

1                         A. CELINI

2        A.     It's a long time ago.

3        Q.     When you were the CFO of GMAC

4    Bank, what accounting was the bank using for

5    mortgage loans acquired from GMAC Mortgage?

6        A.     That would have been in 2001

7    through 2003, approximately, correct?

8        Q.     Right.  I think you said 2004,

9    but yeah.

10       A.     So we were in during in that

11   time.  It was a long time ago.  Probably

12   using low COM at the time and again, that

13   applies to -- we may have used some fair

14   value assumptions on certain parts of our

15   portfolio, but for our held for investment

16   portfolio, it would have been one way.  We

17   could have had another basis for our held for

18   sale.  All portfolios are not accounted for

19   in the same way.

20       Q.     And did you have an understanding

21   or do you recall whether there was a

22   different accounting basis used for the held

23   for income portfolio?  Held for investment

24   portfolio?

25               MR. BROWN:  Objection to form.

Page 129

1                    A. CELINI

2        At what time?

3        Q.    When you were CFO of GMAC Bank.

4        A.    The portfolio would have been on

5   a low COM basis.

6        Q.    Would that have been the same for

7   the held for sale portfolio?

8        A.    It's been awhile back.  So I

9   think -- it probably was at the beginning and

10  then we moved it to, you know, a fair value

11  over a period of time.  But I don't recall

12  when that happened.  It slips my mind.

13       Q.    Do you know whether it happened

14  while you were the CFO of GMAC Bank?

15       A.    I honestly don't recall when it

16  cut over.

17       Q.    Is it possible that it didn't

18  happen until the end of 2008?

19            MR. BROWN:  Objection to form.

20       A.    Again, I wasn't CFO at the time.

21  It is possible.  So, again, this was a long

22  time ago.  I don't recall.  Could have

23  happened then.

24       Q.    I will represent to you that it

25  happened in late 2008, okay?

Page 130

1                    A. CELINI

2       A.    Okay.

3             MR. BROWN:  Again, you can

4       represent what you want to represent.

5       I will tell that your representation

6       is incorrect.

7             MS. MILLER:  Okay.

8       Q.    Looking at Cortese Exhibit 2,

9  which is the July 1, 2008, MMLPSA.  Can you

10 tell me whether points collected by GMAC

11 Mortgage on loans brokered by GMAC Mortgage

12 to the bank were retained by GMAC Mortgage or

13 the bank?

14            MR. BROWN:  Objection to form.

15      Sorry, I think you might have

16      misspoken.  You said points collected

17      by GMAC Mortgage.

18      Q.    Looking at the Cortese Exhibit 2,

19 which is the July 1, 2008, MMLPSA, can you

20 tell me whether points collected by the bank

21 on mortgages -- on loans brokered by GMAC

22 Mortgage to the bank were retained by GMAC

23 Mortgage or the bank?

24            MR. BROWN:  Objection to form.

25      A.    So were retained by the mortgage

Plaintiff's
Objection
130:18-133:23
Lack of personal
knowledge/
speculative (FRE
602)

Page 131

1                        A. CELINI

2    company or retained by the bank?

3         Q.    That's what I want to know.

4         A.    So your question was retained by

5    the mortgage or the bank?  So let me think

6    through here.  So points collected would be

7    part of the basis of the loan.  It would be

8    part of the UPB and those, again, would have

9    been part of the description as covered here

10   for Cost Basis on the MMLPSA.  So points

11   collected, discount points collected by the

12   bank at its origination would have been

13   included in the Cost Basis of the loan when

14   sold.

15        Q.    Okay.  At the end of the entire

16   transaction, at the end of the sale, I want

17   to know who has the net economic benefit from

18   the points collected, if it's held by the

19   bank, who benefits from it, the bank or GMAC

20   Mortgage?

21              MR. BROWN:  Objection to form.

22        A.    So we answered that.  The

23   accounting that's prescribed here is --

24   that's where -- that's how the benefit -- the

25   GAAP benefit is derived here.  So as

***HIGHLY CONFIDENTIAL***

Page 132

1                    A. CELINI

2    described in this MMLPSA or when -- whatever

3    one was in place, that's where the economic

4    benefits were ascribed to.  It is ascribed

5    here in the agreement.

6         Q.     I am asking you, based on your

7    familiarity with these agreements, what the

8    benefit was.  That's what I am asking you.

9              MR. BROWN:   Objection to form.

10        A.     So what the benefit was?  Okay,

11   so there is a number of benefits.  So it

12   describes -- they are described here.  Sorry

13   not trying to be argumentative.  The bank

14   would earn interest carry.  It would have --

15   when it sold the loans, it would get whatever

16   the gains and losses are described in the

17   MMLPSA at that point in time.

18        Q.     Okay.  Can you detail for me the

19   gains and losses that were described in the

20   MMLPSA?

21        A.     In this document?

22        Q.     In this document with the

23   assumption that the bank was using low COM

24   accounting.

25              MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-14   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Al Celini   Pg 133 of 165
***HIGHLY CONFIDENTIAL***

Page 133

1                    A. CELINI

2        A.    I have to study the agreement to

3   make sure I understand the pieces at the

4   time.

5        Q.    Take as much time as you need.

6        A.    Okay.  So as described in this

7   document here, the bank would accrue, and you

8   were asking me for the benefits derived by

9   the bank, correct?

10       Q.    Right.

11       A.    The bank would accrue the income

12  for its holding period.  And upon its sale,

13  it would be relieved at its Cost Basis plus

14  or minus any of its, you know, derivative

15  loan or hedge accounting, low COM

16  adjustments.  So that would take the bank out

17  at no gain or loss.  So its benefit would be

18  the coupon interest that it earned during the

19  period.

20       Q.    And what benefits would be

21  derived from the bank -- by the bank if the

22  bank were using fair value accounting?

23       A.    The same.

24       Q.    And is your testimony based on

25  your review today of the MMLPSA consistent

Page 134

                        A. CELINI

1

2    with your recollection of the agreement from

3    the time that you were at Ally Bank?

4                MR. BROWN:   Objection to form.

5        A.      These statements are made based

6    on review of the agreement that's here.

7    That's all I can -- I mean, I don't recall.

8    Assuming that these were executed, that means

9    they were in place.   So that's what was

10   happening at the time.   So, again, I was not

11   the CFO.   I was an attester to this

12   agreement.   So it is an inference, but that's

13   what was in place.

14       Q.      And if the parties wanted to

15   modify that, to provide gain for the bank

16   under this agreement, would they have to

17   amend the agreement?

18                MR. BROWN:   Objection to form.

19       A.      So, yes, they would have to.

20                MS. MILLER:  We can take a quick

21   break.  I might be done.

22                THE VIDEOGRAPHER:  We are now

23   going off the video record.  The time

24   is 12:16.

25                (Whereupon, a recess was held.)

Plaintiff's Objection
134:14-19 Lack of
personal knowledge/
speculative (FRE 602);
calls for legal
conclusion

Page 135

1                    A. CELINI

2          THE VIDEOGRAPHER:  Back on,

3     12:25.

4  BY MS. MILLER:

5      Q.    Mr. Celini, I would like to mark

6  as Celini Exhibit 3, a document Bates stamped

7  RC '0030534 through '550, and it is the

8  Broker Agreement dated November 20, 2008,

9  between GMAC Mortgage -- sorry, between GMAC

10  Bank, GMAC Mortgage and Ditech LLC.

11          (Whereupon, Celini Exhibit 3, RC

12     '0030534 through '550 was marked for

13     identification as of this date by the

14     Reporter.)

15      Q.    Mr. Celini, do you recognize this

16  document?

17      A.    Yes, I do.

18      Q.    And were you involved in the

19  preparation of this document?

20      A.    Yes, I was.

21      Q.    And did you -- were you involved

22  in the negotiation of the terms of this

23  agreement?

24      A.    Yes, I was.

25      Q.    And were you involved in the

***HIGHLY CONFIDENTIAL***

Page 136

1                          A. CELINI

2    drafting of this agreement?

3         A.    Yes, with counsel.

4         Q.    Did you sign this agreement?

5         A.    Yes, I did.

6         Q.    And you executed the agreement on

7    behalf of the bank, right?

8         A.    Yes.

9         Q.    And, Mr. Celini, why were you the

10   bank representative who was designated to

11   execute this agreement?

12              MR. BROWN:  Objection to form.

13        A.    I am an officer of the bank.  The

14   two parties here were the executive sponsors.

15        Q.    The executive sponsors --

16        A.    Yes.

17        Q.    -- for the broker-to-bank project

18   that we have been talking about?

19        A.    Yes.

20        Q.    Is this agreement the culmination

21   of that project?

22        A.    It is obvious, yes.

23        Q.    Nothing is obvious unless it is

24   on the record.  I will ask that again.  Is

25   the Broker Agreement the culmination of the

***HIGHLY CONFIDENTIAL***

Page 137

1                    A. CELINI

2    broker-to-bank project?

3              MR. BROWN:  Objection to form.

4        A.    Yes.

5        Q.    Does this refresh your

6    recollection that it ended in around late

7    November 2008?

8        A.    Yes.

9        Q.    And can you describe, generally,

10   what the Broker Agreement provided?

11             MR. BROWN:  Objection to form.

12       A.    The terms and conditions by which

13   the affiliate would broker loans to the bank,

14   you know, in accordance with regulatory

15   requirements and generally accepted

16   accounting principles.

17       Q.    And did the -- sorry, did GMAC

18   Mortgage receive a brokering fee in

19   connection with its services provided under

20   the Broker Agreement?

21       A.    Yes.

22       Q.    And how are those brokering fees

23   established?

24       A.    Generally, through a 23 B

25   compliant process of serving what market

Page 138

1                    A. CELINI

2    prices are for broker fees in the

3    marketplace.  Similar types of transactions.

4        Q.    And do you recall whether, under

5    the MMLPSA, GMAC Mortgage would effectively

6    reimburse the bank for any broker fees that

7    it was paid?

8              MR. BROWN:  Objection to form.

9        Q.    Because they would be considered

10   a cost to the bank and therefore, increase

11   the Cost Basis of the loans being purchased?

12       A.    I believe we've already answered

13   questions from the MMLPSA.  This is a

14   separate document that governs the sale of

15   loans.  Nothing to do with the brokering

16   activity.

17       Q.    If the bank paid a brokering fee

18   in connection with the loan, would that

19   increase or decrease the Cost Basis under the

20   MMLPSA?

21       A.    It would be an expense.  So would

22   it increase the basis of the loan?  I have to

23   think.  It would be an expense to the bank

24   for the cost incurred by the affiliate to

25   source the loan.  I believe under GAAP that

***HIGHLY CONFIDENTIAL***

1                    A. CELINI

2    would have been included in the basis of the

3    loan.

4         Q.    Okay.  So from GMAC Mortgage's

5    perspective, it was collecting a broker fee

6    but that was then also increasing the Cost

7    Basis that it had to pay for the loans when

8    it acquired them in the next step under the

9    MMLPSA?

10              MR. BROWN:  Objection to form.

11        A.    I need clarification on that.

12   Walkthrough that.

13        Q.    Okay.  So in Step 1, GMAC

14   Mortgage makes a contact with a customer and

15   brokers that customer to the bank and the

16   bank pays GMAC Mortgage a broker fee in

17   connection with that activity and that

18   happens -- that's governed by the Broker

19   Agreement, right?

20        A.    That's correct.

21        Q.    The bank then has a loan, which

22   GMAC Mortgage is going to purchase from the

23   bank under the MMLPSA, right?

24        A.    That's correct.

25        Q.    And under the MMLPSA, the

***HIGHLY CONFIDENTIAL***

1                    A. CELINI

2    purchase price is the Cost Basis of the bank,

3    right?

4              MR. BROWN:  Objection to form.

5         A.    Whatever the MMLPSA is in effect

6    at that time, right, yes.

7         Q.    And under the July 1, 2008,

8    MMLPSA, the Cost Basis would be increased by

9    the broker fee that was paid to GMAC

10   Mortgage, right?

11        A.    Yes.

12             MR. BROWN:  Objection to form.

13        A.    So yes, the Cost Basis would be

14   increased.  GMAC Mortgage would recognize the

15   broker fee in income right away.  That's for

16   their activities.  So it is a deferrable cost

17   into the Cost Basis of the loan for the bank

18   for the affiliate's income.

19        Q.    Right.  Then when GMAC Mortgage

20   buys the loan from GMAC Bank, it is

21   purchasing it at the Cost Basis, which has

22   been increased by the broker fee, paid to

23   GMAC Mortgage under the Broker Agreement,

24   right?

25             MR. BROWN:  Objection to form.

Page 141

                        A. CELINI

1

2        A.     As defined under Section 1.9, it

3   would be in there.  And you would need to

4   reverse out the income that it recognized

5   upfront.  So you can't book revenue twice.

6   You'd have to reverse out the revenue it

7   recognized at origination and then when it

8   purchased the loan.

9        Q.     So under that scenario, GMAC --

10  it doesn't matter to GMAC Mortgage whether

11  the brokering fee is $1 or $100, right?

12            MR. BROWN:  Objection to form.

13       A.     You know, again, I can't speak

14  for the affiliate on their -- when the bank's

15  requirements are that it be compliant

16  with 23B.

17       Q.     23B requires that it only be at

18  market or better for the bank, right?

19       A.     That's the general

20  requirements, yes.

21            MS. MILLER:  I would like to

22            mark as Celini Exhibit 4, a document

23            Bates stamped ALLY_0017869

24            through '877.

25            (Whereupon, Celini Exhibit 4,

Page 142

1                         A. CELINI

2            ALLY_0017869 through '877 was marked

3            for identification as of this date by

4            the Reporter.)

5            Q.     Mr. Celini, I have marked as

6      Celini Exhibit 4, a document entitled

7      Affiliate Transaction Memo, which is from you

8      to file regarding the Master Mortgage Loan

9      Purchase and Sale Agreement amended and

10     restated 6-1-07 with a date June 6, 2007,

11     revised 10-31-2007.  Do you recognize this

12     document?

13           A.     Yes, I do.

14           Q.     Is it a document that you

15     prepared?

16           A.     Yes, it is.

17           Q.     And did you draft it?

18           A.     Yes.

19           Q.     Do you recall why you revised

20     this memo in late October of 2007?

21           A.     I don't know.  It was a long time

22     ago.  When I look at the change here, it

23     could have been a number of reasons.  In this

24     case, it could have been in response to a

25     regulatory examination finding or -- at the

Page 143

                        A. CELINI

1

2    time.  I don't recall specifically, but it

3    could have been -- it may have been because

4    of a finding from the FTIC.

5         Q.    Do you recall if there were any

6    findings from the FTIC in or around October

7    of 2007 that you may have been responding to?

8         A.    My memory is fuzzy back to the

9    specifics of the report of the examination at

10   the time.  I do know that the FTIC did have

11   some concerns about the terms and conditions.

12   So at various times.

13        Q.    And when you say "terms and

14   conditions," you mean specifically the terms

15   and conditions of the MMLPSA?

16        A.    Yes.  And the marketing pricing.

17   There was discussion.  They felt comfortable

18   with market pricing.

19        Q.    And turning to page 2 of the --

20   sorry, is this a document that you reviewed

21   yesterday that refreshed your recollection?

22        A.    I am sorry, can you repeat?

23        Q.    Did you review this document with

24   counsel yesterday and did it refresh your

25   recollection?

Page 144

1                    A. CELINI

2        A.    No.

3        Q.    Sorry, looking at page 2 of

4   Celini Exhibit 4, and looking under the

5   bullet that says "23B compliant pricing

6   source for first lien loan sales is arrived

7   at through the following constructs."  Do you

8   see that right in the middle of the page?

9        A.    Yes.

10       Q.    Then it says, "1, loan sales to

11  affiliate occur at the actual market value

12  price paid by GMACB to acquire such loan from

13  affiliated or third-party correspondence."

14             Do you see that?

15       A.    Yes.

16       Q.    Then it says "Plus/minus accrued

17  interest discount and premium."  Do you see

18  that?

19       A.    That's correct.  I see it, yes.

20       Q.    Is that consistent with how you

21  read the MMLPSA, the July 1, 2008, amended

22  and restated MMLPSA that we were just

23  looking at?

24             MR. BROWN:  Objection to form.

25       This document is from 2007.

Page 145

1                         A. CELINI

2          A.      You are talking about

3    two separate documents.

4          Q.      Sorry.

5          A.      This is for 2007.  The other one

6    was 2008.

7          Q.      Thank you.

8               MS. MILLER:  Mr. Celini, I would

9          like to mark as Celini Exhibit 5, the

10         a document Bates stamped ALLY_0018275

11         through '290, which is the Master

12         Mortgage Loan Purchase and Sale

13         Agreement between GMAC Bank and GMAC

14         Mortgage LLC amended and restated

15         June 1, 2007.

16              (Whereupon, Celini Exhibit 5,

17         ALLY_0018275 through '290 was marked

18         for identification as of this date by

19         the Reporter.)

20         Q.      Mr. Celini, looking at the

21    definition of Cost Basis on page '18277 of

22    Celini Exhibit 5.  Can you explain how, if at

23    all, it differs from the definition of Cost

24    Basis in the July 1, 2008, MMLPSA which was

25    previously marked as Cortese Exhibit 2?

1                    A. CELINI

2          A.      The two terms from Section 1.9 of

3     each agreement varying that the one from 2008

4     reflects fair value accounting basis.    Net

5     carrying value.

6          Q.    What does the Cost Basis in

7     Celini Exhibit 5 for 2007 MMLPSA reflect?

8          A.      It is GAAP as defined under Cost

9     Basis.  So that would probably be a low COM

10    type of basis.

11         Q.      What do you understand the

12    reference low COM to mean in the definition

13    of Cost Basis in Cortese Exhibit 2?

14                 MR. BROWN:  Objection to form.

15         A.      We answered that before.

16         Q.      Can you tell me what the

17    answer was?

18                 MR. BROWN:  Objection to form.

19         A.      I will repeat.  Fair value

20    accounting concept for the Cost Basis as

21    defined -- as it defines it shows adjustments

22    from derivative loan commitments, hedge

23    accounting, lower cost of market adjustments.

24         Q.    Comparing the 2007 and 2008

25    MMLPSAs does the purchase price to be paid by

Page 147

1                    A. CELINI

2  GMAC Mortgage differ?

3            MR. BROWN:  Objection to form.

4       A.    Haven't we answered this before?

5       Q.    I don't think we have looked at

6  the 2007 MMLPSA before, no.

7       A.    The 2007 document refers to

8  purchase prices.  There is a difference

9  between market value and Cost Basis of the

10  mortgage loan at the cutoff date.  And the

11  Cost Basis.  So this is a -- in 2007 version

12  reflects, so the way a market value for

13  purchase.  So the difference between

14  market -- the difference between market value

15  and cost plus the Cost Basis of the mortgage.

16  So this indicates that the purchase price

17  would be at market from the affiliate.

18       Q.    Under the 2008 MMLPSA, the

19  purchase price was at Cost Basis?

20            MR. BROWN:  Objection to form.

21       Q.    Right?

22            MR. BROWN:  Objection to form.

23       A.    Yes, that's what the document

24  says.  Let me clarify.  In the 2008 document,

25  the document states first liens was at Cost

Page 148

1                        A. CELINI

2    Basis.   Second liens was at market value.

3              Q.     And what was the net benefit

4    retained by the bank under the 2007 MMLPSA?

5              A.     Net benefit underneath the 2007?

6              Q.     Right.

7              A.     As described by, in the affiliate

8    transaction memo, which is your Exhibit 4.

9    It is described in there.

10             Q.     So looking at the page 3 of

11   Celini Exhibit 4, the last sentence of the

12   indented paragraph says "The agreement allows

13   the bank to participate in transactions in

14   which it enjoys the benefits of interest

15   spread and market securitization activity

16   generating gains and liquidity at the direct

17   cost of legal investment bank underwriting

18   and upper costs normally associated in these

19   types of transactions."

20             A.     Correct.   In this case the bank

21   earns a carry during the period for first

22   mortgage assets.   And has a forward

23   commitment for sale, so it doesn't take any

24   price risk.   No gain or losses on sale, on

25   the sale or disposition of the assets.

Page 149

1                 A. CELINI

2    Allows the bank to manage its liquidity asset

3    appropriately.

4              MS. MILLER:  I have no further

5       questions.  Thank you.

6              MR. BROWN:  Mr. Celini, before

7       we go off the record I have some

8       questions for you, but if you need a

9       break --

10              THE WITNESS:  No, that's fine.

11       Proceed.

12    EXAMINATION BY

13    MR. BROWN:

14       Q.     Mr. Celini, let's go to Cortese

15    Exhibit 2.  Do you have that?

16       A.     Yes.

17       Q.     This is the July 1, 2008, MMLPSA

18    you were discussing earlier, correct?

19       A.     Yes.

20       Q.     Let's turn to page 2, definition

21    of Cost Basis on 1.9 or at 1.9.  Do you see

22    that?

23       A.     Yes.

24       Q.     The MMLPSA provides a definition

25    for Cost Basis, right?

***HIGHLY CONFIDENTIAL***

Page 150

1                         A. CELINI

2           A.      Yes.

3           Q.      Cost Basis is a defined term in

4    the agreement?

5           A.      That is correct.

6           Q.      Do you see where it says "Net

7    carrying value as defined by accounting

8    principles generally accepted in the United

9    States of America"?

10          A.      Yes.

11          Q.      As a CPA and finance executive,

12   do you understand that net carrying value has

13   a particular meaning under GAAP?

14          A.      Yes.

15          Q.      Do you also understand that the

16   phrase "accounting principles generally

17   accepted in the United States of America"

18   refers to U.S. GAAP?

19          A.      Yes.

20          Q.      If the bank's accounting

21   methodology is lower of cost or market, what

22   is its net carrying value as defined by GAAP?

23          A.      Under low COM, the carrying

24   value -- the Cost Basis would be the UPB of

25   the loan plus or minus any discount, premium

Page 151

                         A. CELINI

1

2    or discount purchased.   So that's points paid

3    at a discount at origination.   Plus any fees

4    that would be appropriate to be deferred

5    under FAS 91.

6         Q.      And in your answer, you just used

7    the phrase Cost Basis.   Were you referring to

8    the defined term Cost Basis as it exists in

9    the MMLPSA?

10        A.      No, I was referring to it in

11   GAAP.

12        Q.      Okay.   So if the -- if the bank's

13   accounting methodology were lower of cost or

14   market, was its net carrying value, as

15   defined by GAAP, Cost Basis?

16        A.      It would be the lower of that

17   cost or market price.

18        Q.      And you provided the definition

19   of what the Cost Basis would be in your

20   previous answer?

21        A.      Yes.

22        Q.      If the bank were using fair value

23   accounting methodology, what would its net

24   carrying value be as defined by U.S. GAAP?

25        A.      What would its net carrying

Page 152

1                    A. CELINI

2      value, is that the term used or did you say

3      fair value?

4           Q.     Sorry.  So let's go back.  You

5      understand that net carrying value has a

6      particular meaning in U.S. GAAP, right?

7           A.     Yeah.

8           Q.     Is that correct?

9           A.     Yes.

10          Q.     If the bank is using a fair value

11     accounting methodology, what is its net

12     carrying value as defined by GAAP?

13          A.     Net carrying value would be the

14     UPB of the loan plus or minus any premium or

15     discount plus any deferred fees that would

16     be, you know, capitalizable under FAS 91 plus

17     or minus any hedge gains or derivative gains

18     that would be used to hedge the specific

19     asset.

20          Q.     If the bank were using fair value

21     accounting, would its net carrying value as

22     defined by GAAP be the fair value of the

23     asset?

24              MS. MILLER:  Objection; leading.

25          A.     Yes, it would be the fair value.

Page 153

1                   A. CELINI

2    It reflects the net of all those adjustments.

3        Q.     If the bank -- strike that.

4               Are you familiar with hedge

5    accounting?

6        A.     Yes.

7        Q.     What is hedge accounting?

8        A.     It's a nomenclature -- it's

9    another name for a fair value accounting.   It

10   reflects the hedge gains.   Hedge accounting

11   reflects the impact of the specific hedges

12   identifiable against a loan or a pool of

13   loans to be net against its activity.

14       Q.     Is hedge accounting similar to

15   fair value accounting?

16       A.     Yes.

17       Q.     If the bank were using hedge

18   accounting, what would its net carrying value

19   as defined by GAAP be for a particular asset?

20       A.     Again, it is a technical term.

21   The GAAP is explicit but it would be the fair

22   value.   Net.   That's the net -- that would be

23   the fair value of the loans.

24       Q.     What is the difference between

25   the fair value of an asset and the assets or

Page 154

1                    A. CELINI

2    the Cost Basis of an asset?

3         A.    So let me be careful here.

4    Because the GAAP is extensive.  It is the

5    volatileness that describes it -- the fair

6    value generally reflects the net impact to

7    the cost of a loan, the basis of a loan at

8    origination.  The cost of originating a loan

9    less the mark-to-market adjustments of any

10   derivatives or hedges that you have on

11   that -- on specifically, identified against

12   that asset.  So it brings it to its market or

13   fair value, essentially.

14        Q.    So the fair value is the fair          JSN Objection

15   value under GAAP, right?                          154:14-18:
                                                       FRE 611(c) (Leading)
16              MS. MILLER:  Objection.

17        A.    I thought I answered that,

18   but yes.

19        Q.    Mr. Celini, when the bank would

20   enter into an MMLPSA or any other affiliate

21   agreement, would it seek board approval?

22        A.    Yes, that was a requisite under

23   policy.

24        Q.    What do you mean by that?

25        A.    We had -- the bank had an

Page 155

1                         A. CELINI

2    affiliate bank transaction that required all

3    transactions with affiliates to be subject to

4    formal agreements, in compliance with Reg W.

5    They would be documented by -- accompanied by

6    an affiliate transaction memo which would go

7    through the requirements to say, state its

8    compliance therewith to the various

9    provisions of Reg W that would have to be

10   presented to the board for -- as part of its

11   approval of the agreement.

12              (Whereupon, Celini Exhibit 6,

13        ALLY_PEO_'8380 through '8741 was

14        marked for identification as of this

15        date by the Reporter.)

16        Q.    Mr. Celini the Court Reporter has

17   handed you Celini Exhibit 6.  Do you have

18   that?

19        A.    Yes.

20        Q.    It is a document Bates stamped

21   ALLY_PEO_'8380 through '8741.  Do you have

22   that?

23        A.    Yes.

24        Q.    This is a set of materials for a

25   July 2, 2008, Ally Bank board meeting.  Do

Page 156

1                         A. CELINI

2    you see that?

3                MS. MILLER:  Objection.

4         A.    Yes.

5                MS. MILLER:  It says GMAC Bank.

6         Q.    Celini Exhibit 6 is a set of

7    materials for a July 2, 2008, GMAC Bank board

8    meeting.  Do you see that?

9                MS. MILLER:  Objection.

10        Q.    Do you see that, Mr. Celini?

11        A.    I see that.

12        Q.    Do you see there are a list of

13   board of directors right in the middle of the

14   page?

15        A.    Yes.

16        Q.    Do you recognize those to be the

17   board of directors of GMAC Bank on or around

18   July 2008?

19        A.    Those were the directors at that

20   time.

21        Q.    Do you see at the bottom of the

22   first page, there are a list of cc's.

23        A.    Yes.

24        Q.    Were you one of those?

25        A.    Yes, I am.

Page 157

1                      A. CELINI

2        Q.      Would you have received this set

3    of board materials?

4        A.      Yes, I would have.

5        Q.      Would have you reviewed the set

6    of materials?

7        A.      Yes.

8        Q.      Let's turn to the page ending in

9    '8442.

10       A.      I have it.

11       Q.      What is this page, Mr. Celini?

12       A.      It's a resolution for the board.

13   This -- the first page, '8442, is a summary

14   of the resolution describing the action

15   required of the board to amend the MMLPSA and

16   some other agreements, the ISDA and other

17   client agreement, right.

18       Q.      Does this page contain a summary

19   of your revisions to the MMLPSA and of your

20   agreements?

21       A.      Yes, it does.

22       Q.      Do you see in the middle of the

23   page, there is a bullet point says "Major

24   points."  Do you see that?

25       A.      Yes.

Page 158

1                          A. CELINI

2        Q.        Right below that --

3                  MS. MILLER:   Hold on.

4        Q.        -- says "Amended and restated

5    Master Mortgage Loan and Sale Agreement

6    between GMAC Bank and GMAC Mortgage LLC."

7                  Do you see that?

8        A.        Yes, I do.

9        Q.        Take a minute and review the

10   bullets underneath that heading and let me

11   know when you are finished.

12       A.        Okay, I have read them.

13       Q.        Mr. Celini, does that refresh

14   your recollection why the MMLPSA was amended

15   and restated in July 2008?

16       A.        Yes, it does.

17       Q.        Why was the MMLPSA amended and

18   restated in July 2008?

19       A.        Basically, it was a FDIC request

20   and probably part of a report of examination

21   or earlier in that year.

22       Q.        What was changed in the July 2008

23   MMLPSA in response to an FDIC request?

24       A.        The resolution requires the

25   clarification of the term purchase price, I

Page 159

                         A. CELINI

 1

 2    think was the defined term.

 3         Q.     What do you mean by that?

 4         A.     Well, going through this

 5    refreshes my memory basically requires us to

 6    change the Cost Basis to take -- to change

 7    the Cost Basis to reflect the net carrying

 8    value under GAAP.   And it made some other

 9    refinements to the agreement to clarify

10    take out.

11         Q.    And by that, you mean that the

12    FDIC requested that the purchase price be

13    revised to --

14         A.    The net carrying value.   The fair

15    value.

16         MS. MILLER:   Wait.   He has to

17         finish his question because I am

18         waiting to object to it.

19         THE WITNESS:   I apologize.

20         Getting anxious.

21         Q.     Did the FDIC request that the          JSN Objection
                                                         159:21-25
22    purchase price be revised to reflect net          FRE 602, 802 (Lacks
                                                         personal knowledge;
23    carrying value under GAAP?                         calls for hearsay)

24         MS. MILLER:   Objection.

25         A.     Yes.

Page 160

1                    A. CELINI

2        Q.      Was the July 2008 amendment --          JSN Objection
                                                          160:2-10 FRE 611(c)
3   MMLPSA amended to reflect GMAC Mortgage's            (Leading)

4   purchase price to be net carrying value under

5   GAAP?

6              MS. MILLER:  Objection; leading.

7        A.      Give me a moment, I will check

8   the actual document.

9        Q.      It is Cortese Exhibit 2.

10       A.      Exhibit 2, right.  Yes.

11       Q.      Did GMAC Bank or Ally Bank ever

12  use hedge accounting for its held for sale

13  portfolio?

14             MS. MILLER:  Objection.

15       A.      Honestly, I don't recall.

16             MR. BROWN:  Nothing further at

17        this time.

18

19

20     (Continued on next page to include

21  jurat.)

22

23

24

25

Page 161

1                    A. CELINI

2          MS. MILLER:  Anyone else?

3          We are done.  Thank you for your

4     time.

5          THE VIDEOGRAPHER:  That now

6     concludes this video deposition and

7     tape number 3.  The time is 1307.

8          (Whereupon, at 1:07 p.m., the

9     Examination of this Witness was

10    concluded.)

11

12

13    _____

         AL CELINI

14

      Subscribed and sworn to before me

15    this _____ day of _____, 2013.

16    _____

         NOTARY PUBLIC

17

18

19

20

21

22

23

24

25

Page 162

1

2          E X H I B I T S

3

4

5    EXHIBIT        EXHIBIT                      PAGE

6    NUMBER         DESCRIPTION

7    Exhibit 1     Hand drawn T accounts        54

8                  example

9    Exhibit 2     Excerpts of the Report       56

10                 of Arthur J. Gonzalez

11   Exhibit 3     RC '0030534 through          135

12                 '550

13   Exhibit 4     ALLY_0017869 through         142

14                 '877

15   Exhibit 5     ALLY_0018275 through         145

16                 '290

17   Exhibit 6     ALLY_PEO_'8380 through       155

18                 '8741

19

20

21

22

23

24

25

1

2                          I N D E X

3

4    EXAMINATION BY                          PAGE

5    MS. MILLER                                   7

6    MR. BROWN                                  149

7

8

9

10     INFORMATION AND/OR DOCUMENTS REQUESTED

11     INFORMATION AND/OR DOCUMENTS        PAGE

12                  (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25

***HIGHLY CONFIDENTIAL***

Page 164

1

2        C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

                  :  SS.:

5    COUNTY OF NASSAU        )

6

7            I, REBECCA SCHAUMLOFFEL, a Notary

8    Public for and within the State of New York,

9    do hereby certify:

10           That the witness whose examination

11   is hereinbefore set forth was duly sworn and

12   that such examination is a true record of the

13   testimony given by that witness.

14           I further certify that I am not

15   related to any of the parties to this action

16   by blood or by marriage and that I am in no

17   way interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19   set my hand this 8th day of November, 2013.

20       _____

21               REBECCA SCHAUMLOFFEL

22

23

24

25

Page 165

1                        WITNESS ERRATA SHEET

     Witness Name: Al Celini
2    Case Name: In Re:  Residential Capital
3    Date Taken: November 8, 2013
4     Page #_____  Line #_____
5         Should Read:  _____
6         Reason for Change:  _____
7

      Page #_____  Line #_____
8

         Should Read:  _____
9

         Reason for Change:  _____
10

11    Page #_____  Line #_____
12        Should Read:  _____
13        Reason for Change:  _____
14

      Page #_____  Line #_____
15

         Should Read:  _____
16

         Reason for Change:  _____
17

18    Page #_____  Line #_____
19        Should Read:  _____
20   Reason for Change:  _____
21

     Witness Signature:  _____
22

23

24

25