Page 1

```
 1                        T. Marano
 2         UNITED STATES BANKRUPTCY DISTRICT COURT
 3          FOR THE SOUTHERN DISTRICT OF NEW YORK
 4      -------------------------------x
        In re:                    Case No. 12-12020
 5      RESIDENTIAL CAPITAL, LLC, et al.,      (MG)
                          Debtors,    Jointly Administered
 6      -------------------------------x
        RESIDENTIAL CAPITAL, LLC, et al.,
 7                        Plaintiffs,
 8           vs.              Adversary Proceeding
 9      UMB BANK, N.A., as successor   No. 13-01343 (MG)
        indenture trustee under that
10      Certain Indenture, dated as of
        June 6, 2008; and WELLS FARGO BANK,
11      N.A., Third Priority Collateral
        Agent under that Certain Amended
12      and Restated Third Priority Pledge
        and Security Agreement and
13      Irrevocable Proxy, dated as of
        December 30, 2009,
14                        Defendants.
        -------------------------------x
15      (CAPTION CONTINUED ON NEXT PAGE)
16
17
18         VIDEOTAPED DEPOSITION OF TOM MARANO
19              New York, New York
20            Monday, November 11, 2013
21
22                          Yellow Highlighting = JSN Designation
                            Pink Highlighting = Plaintiff's Counter-Designation
23      Reported by:        Orange Highlighting = Joint Designation
24      THOMAS A. FERNICOLA, RPR
25      JOB NO. 67837
```

```
 1                      T. Marano
 2    (Caption Continued as follows:)
      ------------------------------x
 3    OFFICIAL COMMITTEE OF UNSECURED
      CREDITORS, on behalf of the
 4    estates of the Debtors,
                     Plaintiff,   Adversary Proceeding
 5      vs.                       No. 13-01277 (MG)
 6    UMB BANK, N.A., as successor
      Indenture Trustee under that
 7    Certain Indenture, dated as of
      June 6, 2008; and WELLS FARGO BANK,
 8    N.A., Third Priority Collateral
      Agent and Collateral Control Agent
 9    under that Certain Amended
      and Restated Third Priority Pledge
10    and Security Agreement and
      Irrevocable Proxy, dated as of
11    December 30, 2009,
                     Defendants.
12    ------------------------------x
13
14              November 11, 2013
15                 2:00 p.m.
16
17         Videotaped Deposition of TOM MARANO,
18    held at the law offices of Morrison & Foerster,
19    LLP, 1290 Avenue of the Americas, New York, New
20    York, before Thomas A. Fernicola, a Registered
21    Professional Reporter and Notary Public of the
22    State of New York.
23
24
25
```

Page 3

1                       T. Marano

2    A P P E A R A N C E S:

3

4              CARPENTER LIPPS & LELAND

5              Attorneys for Debtors and the Witness

6                   280 Plaza

7                   280 North High Street

8                   Columbus, Ohio  43215

9              BY:  JEFFREY LIPPS, ESQ.

10

11

12             KIRKLAND & ELLIS

13             Attorneys for Ally

14                  655 Fifteenth Street, N.W.

15                  Washington, D.C.  20005

16             BY:  DANIEL DONOVAN, ESQ.

17

18

19             ALSTON & BIRD

20             Attorneys for Wells Fargo Bank, N.A.

21             as Trustee

22             90 Park Avenue

23             New York, New York  10016

24             BY:  MICHAEL JOHNSON, ESQ.

25

Page 4

1                        T. Marano

2    A P P E A R A N C E S   (Continued):

3

4              MORRISON & FOERSTER

5              Attorneys for Debtors

6                   1290 Avenue of the Americas

7                   New York, New York  10104

8         BY:   DANIEL MATZA-BROWN, ESQ.

9

10

11             MILBANK TWEED HADLEY & MCCLOY

12             Attorneys for the Ad Hoc Group of

13                Junior Secured Noteholders

14                  One Chase Manhattan Plaza

15                  New York, New York  10005

16        BY:   RACHEL PENSKI FISSELL, ESQ.

17                HAILEY DEKRAKER, ESQ.

18                JONATHAN OSTRZEGA, ESQ.

19

20

21

22

23

24

25

Page 5

1                        T. Marano

2     A P P E A R A N C E S (Continued):

3

4             KELLEY DRYE & WARREN

5             Attorneys for UMB Bank

6                101 Park Avenue

7                New York, New York  10178

8             BY:  BENJAMIN FEDER, ESQ.

9             (Telephonically)

10

11

12

13    ALSO PRESENT:

14             MICHELLE MAMAN,

15                Cadwalader Wickersham & Taft

16                (Telephonically)

17             LEM LATTIMER, Videographer.

18

19

20

21

22

23

24

25

1              T. Marano

2         THE VIDEOGRAPHER:  This is the

3    videotaped labeled No. 1 of the videotaped

4    deposition of Tom Marano, in the matter of

5    In Re: Residential Capital, LLC.

6         We are now going on the record.  The

7    time is 2:00.

8         Will counsel please state your

9    appearances for the record.

10        MR. LIPPS:  Jeffrey Lipps, Carpenter

11   Lipps & Leland, representing the Debtors

12   and the witness.

13        MR. MATZA-BROWN:  Daniel

14   Matza-Brown, Morrison & Foerster, on

15   behalf of the Debtors.

16        MS. FISSELL:  Rachel Penski Fissell,

17   on behalf of the ad hoc group of Junior

18   Secured Noteholders.

19        MS. DeKRAKER:  Hailey DeKraker,

20   Milbank Tweed Hadley & McCoy, for the

21   same.

22        MR. OSTRZEGA:  Jonathan Ostrzega,

23   also for the ad hoc group of Junior

24   Secured Noteholders.

25        THE VIDEOGRAPHER:  Thank you.

Page 7

1                          T. Marano

2              Will the court reporter please swear

3         the witness in.

4              MR. FEDER:  Benjamin Feder, Kelley

5         Drye & Warren, on behalf of UMB Bank.

6              (A Discussion was Held off the

7         Record.)

8

9    T O M    M A R A N O,

10        called as a witness, having been duly sworn

11        by a Notary Public, was examined and

12        testified as follows:

13   BY THE REPORTER:

14        Q.    Please state your full name and

15     address for the record.

16        A.    Tom Marano, 111 Oxford Drive,

17     Tenafly, New Jersey  07670.

18

19   EXAMINATION BY MS. FISSELL:

20        Q.    Good afternoon, Mr. Marano.

21        A.    Good afternoon.

22        Q.    So I understand that you've been

23     deposed a few times before.

24        A.    Yes.

25        Q.    Okay.

1          T. Marano

2          So I won't go over the ground rules.

3   I'll just say if you don't understand any of

4   my questions, please let me know.

5          A.    Okay.

6          Q.    So before we get started, I just

7   want to go over some definitions to make sure

8   we're on the same page.

9              When I refer to the JSNs, I'll be

10  referring to anyone holding a Junior Secured

11  Noteholders issued by ResCap, LLC in 2008.

12             Okay?

13         A.    Okay.

14         Q.    The ad hoc group will refer to the

15  JSNs who have formed the group that has hired

16  White & Case, and Milbank and Houlihan Lokey.

17         A.    Okay.

18         Q.    And the Debtors, we'll refer to each

19  of the ResCap entities that are subject to the

20  bankruptcy proceeding in the SDNY, including

21  officers, directors, professionals, employees.

22         A.    Okay.

23         Q.    What did you do to prepare for

24  today's deposition?

25         A.    I met with the gentleman here for

Page 9

T. Marano

1

2  four or five hours on Thursday or Friday of

3  last week, and I met with him for about 45

4  minutes today.

5      Q.    And did you review any documents in

6  advance of today's deposition?

7      A.    I did review a few documents, yes.

8      Q.    What documents were those?

9      A.    There were a couple of e-mails.  I

10  think that was mostly it, just e-mails.

11      Q.    And what is your current role with

12  the Debtors?

13      A.    I am currently the chairman of

14  ResCap.

15      Q.    When did you become chairman?

16      A.    I was the nonexecutive chairman back

17  in 2 -- in spring of 2008.  I became chairman

18  and CEO in the summer of 2008.  And I resigned

19  as CEO in May of 2013, but retained the title

20  as chairman.

21      Q.    And do you hold any other jobs at

22  this time?

23      A.    No.

24      Q.    What are your responsibilities as

25  chairman?

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 10 of 112

Page 10

T. Marano

1

2      A.    I host regular board meetings of the

3  ResCap board of directors, I will occasionally

4  assist Tammy Hamzehpour, Lew Kruger, other

5  members of the company in market-related

6  questions and activities.

7      Q.    And so while you were CEO of ResCap,

8  you also served as chief capital markets

9  officer and chief mortgage officer of AFI?

10      A.    That's correct.

11      Q.    You served in that dual role between

12  May 2009 and May 2012?

13      A.    That time period is approximately

14  correct.

15      Q.    Can you be more specific?

16      A.    I'm not sure if it was April of 2009

17  or May 2009, but it's within a month, and it

18  ended -- the dual role ended on May of 2012.

19      Q.    With the filing of the petition?

20      A.    Correct.

21      Q.    How were you compensated when you

22  had the dual role?

23      A.    I'm not sure I understand the

24  question.

25      Q.    What were the components of your

Page 11

1                       T. Marano

2       compensation while you held the dual role at

3       AFI and ResCap?

4                  MR. LIPPS:  Do you want to know for

5          each position?

6     BY MS. FISSELL:

7          Q.    Were you compensated separately for

8       each position?

9          A.    No.

10         Q.    So what was your compensation?  Was

11      it a combination of stock and cash and --

12         A.    Oh, okay.

13                Yes.  It was a combination of cash

14      and deferred stock.

15         Q.    Deferred stock in AFI?

16         A.    Yes.

17         Q.    So, broadly, if AFI did well, you

18      did well compensation wise?

19                MR. LIPPS:  Objection to form.

20                Go ahead.

21         A.    It -- the decision of what to pay me

22      was a function of how ResCap did, how AFI did,

23      and how the capital markets in the area did.

24      They looked at multiple components.

25         Q.    Right.

1          T. Marano

2          But because part of your

3    compensation was AFI stock, your compensation

4    was tied, to the extent it was made up of AFI

5    stock, to the performance of AFI?

6          MR. LIPPS:  Objection.  Asked and

7       answered.

8       A.    I already answered it.  It all rolls

9    together and was -- it's not like AFI had a

10   public stock.  It's a phantom stock.  It's,

11   you know, it's nothing you can really point

12   to.

13       Q.    You were deposed in November 2012;

14   correct?

15       A.    Yes.

16       Q.    And at that deposition you gave

17   truthful answers?

18       A.    Yes.

19          MS. FISSELL:  I'd like to mark this

20       as Marano 1, the transcript of the

21       deposition of Thomas Marano, dated

22       November 12, 2012.

23   BY MS. FISSELL:

24       Q.    And if I could just turn your

25   attention to page 19.  And if you look at

Plaintiff's
Objection
12:19-22:
Inadmissible
hearsay
(FRE 802)

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 13 of 112

Page 13

1                           T. Marano

2      line 16, are you saying that your compensation

3      bears -- the question posed to you was, "Are

4      you saying that your compensation bears no

5      relationship to AFI's financial performance?

6           "Answer:   Broadly, if AFI does well,

7      I'll do well, but AFI has a very large number

8      of components that affect their

9      profitability."

10          Is that answer true?

11     A.   That answer is true.

12          MR. DONOVAN:   I'll object to the

13     form.

14 BY MS. FISSELL:

15     Q.   Were there other ResCap employees

16     that were also employed at either AFI or Ally

17     and had a dual role similar to the way you

18     did?

19     A.   Yes.

20     Q.   Who were those employees?

21     A.   I actually can't recall the names at

22     this point in time, but there were several

23     people who had a dual role.

24     Q.   By several, you mean more than 10?

25          MR. LIPPS:   Objection to form.

Plaintiff's
Objection
13:15-23:
Irrelevant
(FRE 401,
402), lack of
personal
knowledge
(FRE 602)

Page 14

                    T. Marano

1

2              Go ahead.

3         A.    It might be less than 10.

4         Q.    Was James Aretakis one of those

5    employees?

6         A.    I'm sorry, I don't recall who James

7    Aretakis is.

8         Q.    What about Albert Celini?

9         A.    Al Celini, I think, worked for Ally

10   Bank.  I don't know if he worked for ResCap.

11        Q.    Joseph Cortez?

12        A.    I'm not familiar.

13        Q.    Cathy Dondzila?

14        A.    Cathy Dondzila, I believe, worked --

15   well, she did the accounting work for us at

16   ResCap.  I don't recall if she was a dual

17   employee or not.

18        Q.    What about Tammy Hamzehpour?

19        A.    For a period of time Tammy worked

20   for Ally, and then I think for another period

21   of time she -- I know for another period of

22   time she worked for ResCap.

23              I don't know if she had -- no, Tammy

24   probably had dual responsibilities.

25        Q.    What about William Marx?

Plaintiff's
Objection
14:18-24
Lack of
personal
knowledge
(FRE 602)

Page 15

1                           T. Marano

2       A.      Who?

3       Q.      William Marx?

4       A.      I don't recall who William Marx is.

5       Q.      Barbara Westman?

6       A.      I know who Barbara is, I don't know

7  if she had a dual role.

8       Q.      James Young?

9       A.      I'm not -- again, Jim moved around

10  from ResCap to Ally Bank.  I don't know if he

11  was ever an Ally employee.

12      Q.      Is there anyone who you recall

13  having the dual role?

14      A.      I don't recall with 100 percent

15  certainty.  There was a couple other people

16  that you could look into, but...

17      Q.      Who are those people?

18      A.      I think maybe Lou Neese may have had

19  a dual role.  And who else.

20              Lou is the only one that comes to

21  mind.

22      Q.      How was it determined which entity

23  an employee would work for?

24              MR. LIPPS:  Objection.  Calls for

25         speculation, but go ahead, if you know.

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 16 of 112

Page 16

T. Marano

1

2     A.     It would depend upon the nature of

3     their qualifications and when they were hired.

4     For instance, some people could bring value to

5     both parts of the firm or multiple parts of

6     the firm and other people's skill set was more

7     narrowly focused.

8          Like I said, in the context of a

9     dual employee, I don't think there were a lot,

10    meaning someone who did two jobs at the same

11    time.

12         There were plenty of employees that

13    moved between the organization, but very few

14    did two jobs at the same time.

15    Q.     And for employees that did have dual

16    roles, are you aware of how the costs for that

17    employee were allocated?

18    A.     There was, for those types of

19    employees, there was a cost allocation model.

20    I couldn't take you -- I don't recall the

21    specifics of it, but there was a model or, you

22    know, a process.

23    Q.     So, for instance, for your salary,

24    the cost of your salary was split between

25    ResCap and Ally?

Plaintiff's
Objection
16:15-17:8
Lack of
personal
knowledge
(FRE 602)

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano    Pg 17 of 112

Page 17

1                       T. Marano

2        A.    In the context of my case, I

3   actually don't know how they did it.  I really

4   don't know how they did it.  I know we made a

5   lot of money at the parent and we also, you

6   know, had some years where we made a lot of

7   money at ResCap, but I don't know how it was

8   done.

9        Q.    Was there any system in place for

10  monitoring which employees were working for

11  which entity?

12       A.    I didn't do that work, so I

13  couldn't -- I couldn't tell you how it was

14  done.  I'm sure there was a process, as I

15  said.  You know, that would be more in the

16  H.R. or the accounting area.

17       Q.    Are you familiar with what's been

18  termed the Phase II disputes between the

19  debtors and the ad hoc group?

20            MR. LIPPS:  Objection to form, but

21       go ahead.

22       A.    You'd have to get a little more

23  granular on that for me.  I'm sorry.  The

24  way -- I sort of know what it is, but you have

25  to -- if you give me specifics, I could help.

Page 18

1                          T. Marano

2        Q.    Okay.

3              So are you aware that there's a

4    dispute over the claims relating to

5    intercompany balances between debtor entities?

6        A.    Yes.

7        Q.    And are you aware that there's a

8    dispute over certain claims that the debtors

9    have against Ally?

10             MR. LIPPS:  Objection to form, but

11       go ahead.

12             MR. DONOVAN:  Objection to form.

13       A.    Can you just rephrase it?

14       Q.    Sure.

15             So, you're aware that there is as

16   part of the plan certain claims that the

17   debtors have against Ally are being settled?

18       A.    That's correct, yes.

19       Q.    And are you aware that the JSNs

20   claim that they have a lien over some of those

21   claims?

22       A.    Yes, I am.

23       Q.    Okay.

24             Do you know which of those claims

25   the JSNs are asserting they have a lien over?

Page 19

T. Marano

2    MR. LIPPS:  Objection to form.

3    A.    I really don't know the specifics of

4    their claim.

5    Q.    Okay.

6         Are you aware that the JSNs are

7    asserting they have a lien relating for -- a

8    breach of contract claim relating to --

9    relating to the first 2009 tax allocation

10   agreement?

11   A.    I know that scenario where they --

12   where they have a dispute, yes.

13   Q.    And also relating to the brokering

14   and consumer loans project?

15   A.    I'm aware they have an issue with

16   that, as well, yes.

17   Q.    And the failure to make swap

18   payments based on the value of the entire MSR

19   portfolio?

20   A.    I know they have an issue with the

21   swap arrangement, but I don't understand it

22   the way you've described it.

23   Q.    Okay.

24        And what about the 2006 bank

25   restructuring?

Page 20

T. Marano

1

2      A.    I know they have an issue with that,

3   as well.

4      Q.    And will you be spending any written

5   direct testimony -- sorry, let me back up.

6          You're going to be submitting

7   written direct testimony to the court

8   tomorrow; correct?

9      A.    Yes.

10      Q.    And have you reviewed that

11   testimony?

12      A.    That's something we have worked

13   on --

14          MR. LIPPS:  I don't want you to talk

15      about conversations that you've had.

16          THE WITNESS:  Lawyers.

17          MR. LIPPS:  It hasn't been

18      submitted, so it's not ready for his

19      review.

20          MS. FISSELL:  Okay.  So you're --

21      okay.

22   BY MS. FISSELL:

23      Q.    Do you know the substance of what

24   you'll be testifying about?

25      A.    Yes.

Page 21

T. Marano

1

2      Q.     Okay.

3             Unless your attorney directs you not

4      to answer a question, you have to answer the

5      question that I ask.

6             MR. LIPPS:  He's been answering your

7         questions.

8             MS. FISSELL:  Okay.

9             MR. LIPPS:  Just ask the question.

10            MS. FISSELL:  I'll ask it when I'm

11        ready to ask it.

12            So I don't think it's

13        privileged whether -- were you directing

14        him not to answer whether he has reviewed

15        the testimony?  I think those are two

16        questions ago.

17            MR. LIPPS:  Yes.

18            MS. FISSELL:  So you're saying he

19        can -- you're directing him not to answer

20        whether he's actually reviewed the direct

21        testimony.

22            MR. LIPPS:  I'm not going to allow

23        him to testify about conversations we had

24        with respect to the preparation of the

25        written direct testimony.  It's not due to

Page 22

T. Marano

2   be submitted until tomorrow, so I'm not

3   sure what you're trying to accomplish with

4   the question.

5       But why don't you ask it and I'll

6   either direct him not to answer or I'll

7   allow him to answer.

8       MS. FISSELL:  Okay.  Well, we'll see

9   how far we get.  We might just have to

10   adjourn his testimony until after his

11   direct testimony is admitted if you're not

12   going to allow him to speak about the

13   substance of it.

14       MR. LIPPS:  No, he can speak about

15   the substance of his direct testimony.

16       MS. FISSELL:  Okay.

17       MR. LIPPS:  He just said he knows

18   generally what he's going to testify

19   about.

20       MS. FISSELL:  Okay.

21   BY MS. FISSELL:

22       Q.   So are you -- is the subject of your

23   direct testimony going to cover any of the

24   areas that we just went over that the JSNs or

25   the ad hoc group and the debtors are

Page 23

1                        T. Marano

2   disputing?

3          MR. LIPPS:  And I'll allow him to

4   answer it.  I just want to understand.

5   You're talking about the intercompany

6   balances and then the four claims that you

7   walked through?

8          MS. FISSELL:  Yes.

9          THE WITNESS:  Can we take a second?

10         MR. LIPPS:  Sure.

11         MS. FISSELL:  Well, you can't take a

12   second while a question is pending.

13         MR. LIPPS:  If he wants to consult

14   with me on whether he's disclosing

15   privilege or not, I think he can do that.

16         MS. FISSELL:  I mean, you're not

17   supposed to have a conference while a

18   question is pending.

19         Are you directing him not to answer

20   the question?

21         MR. LIPPS:  No.  I want to help my

22   client make sure he doesn't close

23   privileged information.

24         MS. FISSELL:  Okay.

25         It's completely inappropriate to

Page 24

T. Marano

1    talk to counsel while a question remains

2    pending.

3         A.    Okay.   Rephrase your question or ask

4    me again.

5         Q.    Is the substance of your testimony

6    going to cover any of the topics that we just

7    went over, the intercompany balances, the four

8    claims that the debtors have against Ally?

9         A.    I can't answer that question.

10             MR. LIPPS:   Without talking to me?

11             THE WITNESS:   Yes, without speaking

12        to him.

13             MR. LIPPS:   Will you give me the

14        courtesy of speaking to him?

15             MS. FISSELL:   Why don't we do this.

16        We'll go back to that if we have to.

17    BY MS. FISSELL:

18         Q.    Why don't you tell me what the

19    substance of your direct testimony is going to

20    be about.

21         A.    The majority --

22             THE WITNESS:   Can I do that?

23             MR. LIPPS:   You can talk about

24        generally what you understand.   Obviously,

Page 25

1                         T. Marano

2         you haven't --

3                 THE WITNESS:  Yes.  We haven't

4         finished it.

5                 MR. LIPPS:  -- it's not submitted,

6         so...

7         A.    We haven't finished it.

8         Q.    Okay.

9         A.    Generally, the deposition is about

10    the --

11                MR. LIPPS:  The direct testimony.

12        A.    Pardon me, the direct testimony is

13    about the value that we achieved through the

14    process of our actions that led ResCap to a

15    soft landing in bankruptcy.

16                And there obviously is -- there are

17    some actions we took that I describe in there

18    that may touch on the areas of the dispute

19    you've raised; but in the specific way you've

20    raised them, I can't say that they are a

21    hundred percent addressed at this time.

22        Q.    Okay.

23                So how does your direct testimony

24    touch upon the areas of dispute?

25                MR. LIPPS:  Objection to form.  I

Page 26

1                          T. Marano

2      don't see how he can answer that.  He

3      hasn't given his direct testimony yet, but

4      go ahead.

5           MS. FISSELL:  I mean, the whole

6      purpose of this deposition is to prevent

7      having us do trial by ambush.  And so we

8      are entitled to question what he is going

9      to be testifying about.

10           If you're not going to let me do

11     that, then we can just adjourn this

12     deposition until Wednesday and cover

13     what's actually in his direct testimony

14     submitted to the court.

15           MR. MATZA-BROWN:  That's not the

16     schedule you've agreed to.

17           MR. LIPPS:  You knew the direct

18     testimony --

19           MS. FISSELL:  Well, this is the

20     subject of his -- of the deposition is

21     what he's going to be testifying about and

22     we're going to explore.

23           If you want me to go through

24     every -- every issue and every document

25     that he has ever touched, we can spend it

Page 27

1                     T. Marano

2      but we're going to be here until

3      9:00 tonight.

4            MR. LIPPS:  You never --

5            MS. FISSELL:  If you want to --

6            MR. MATZA-BROWN:  -- a long time

7      ago.

8            MS. FISSELL:  If you want to go --

9      I'm entitled to explore with him what he's

10     going to be testifying about.  And if

11     you're not going to let me do that, we

12     will adjourn the deposition.

13           MR. LIPPS:  No, he has answered to

14     the best he can.  The problem is you're

15     framing your questions in terms of direct

16     testimony that will not be submitted until

17     tomorrow.

18           You knew that was the date it was

19     going to be submitted.  He's here for the

20     period of time that we have agreed upon.

21     You can ask him --

22           MS. FISSELL:  There's no period of

23     time we have agreed upon.  I have seven

24     hours.

25           MR. LIPPS:  Seven hours.  Seven

Page 28

                        T. Marano

1   hours is what you have.

2         MS. FISSELL:  Okay.

3         MR. LIPPS:  So if you want to show

4   him document after document for seven

5   hours, you can; but if you have specific

6   questions, ask him a specific question and

7   he'll be able to answer it.

8         But to frame it around direct

9   testimony that's not even due until

10  tomorrow, I mean, that's what

11  cross-examination --

12        MS. FISSELL:  It's due tomorrow.  He

13  should know what he's testifying about

14  tomorrow.  You know, and --

15        MR. MATZA-BROWN:  Just ask the

16  question.  In that way -- I mean, that was

17  the objection.  You're talking about

18  something that doesn't actually really

19  exist yet.  I think that we can do this.

20  BY MS. FISSELL:

21        Q.   What are you planning to testify

22  about in your direct testimony?  You said

23  you're going to be touching upon areas that

24  relate to the disputes between the ad hoc

Page 29

1                      T. Marano

2     group and the debtors.

3               MR. LIPPS:   Objection.

4     BY MS. FISSELL:

5          Q.    What are those areas?

6               MR. LIPPS:   Objection.

7     Mischaracterizes.   But go ahead.

8          A.    The deposition largely talks --

9               MR. LIPPS:   Direct testimony.

10         A.    Pardon me.   The direct testimony

11    largely talks about the actions that the

12    ResCap board of directors and management team

13    took as we approached bankruptcy to provide

14    for a soft landing.

15              It talks a bit about the settlement

16    process with Ally, the first, you know, the

17    first round settlement.   It talks a little

18    bit -- it addresses a little bit the issues

19    surrounding the value that was achieved

20    through having delivered a soft landing.

21         Q.    Anything else?

22         A.    At the moment, that's all that I can

23    really say I, you know, am on the topic.

24         Q.    Is there anything else that you

25    think you should -- you would like to testify

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 30 of 112

Page 30

1                         T. Marano

2    about?

3              MR. LIPPS:   Objection to form.

4        A.    I prefer to testify about nothing.

5    Unfortunately, I'm here.

6        Q.    All right.

7              So you said, you've mentioned soft

8    landing a few times.

9              What are you referring to by the

10   soft landing?

11       A.    There was a risk that ResCap could

12   have gone into a free-fall bankruptcy.

13       Q.    Uh-huh.

14       A.    And we tried to evaluate the impact

15   of a soft landing bankruptcy versus a

16   free-fall bankruptcy on the value of the

17   assets as we're approaching possible

18   consideration of a filing.

19             So we did a number of things to

20   ensure that we provided as soft a landing as

21   possible, meaning a very large DIP,

22   cooperation with government agencies,

23   cooperation with regulators, retention

24   bonuses, that sort of thing, and consistency

25   of management team.

Page 31

1                        T. Marano

2          So we focused heavily on that

3    because we felt that that would ensure that

4    when the assets were liquidated, we would

5    achieve the highest value possible for those

6    assets.

7        Q.    What were the actions that the board

8    took to achieve that?

9        A.    The board encouraged us, myself in

10   particular, to meet with each of the GSEs and

11   the FHFA, HUD.  The board encouraged the firm

12   to get settlement with DOJ and the Attorney

13   Generals.

14          A subcommittee of the board worked

15   on developing a settlement with Ally.  The

16   board had a compensation committee and the

17   compensation committee approved the necessary

18   bonuses that we brought forth to the judge for

19   retention.  Those sorts of things.

20       Q.    Anything else?

21       A.    That's all I can recall.

22       Q.    You said that you achieved the soft

23   landing by having a large debt, cooperating

24   with the government, retention bonuses, and

25   ensuring consistency of management?

Page 32

T. Marano

1

2     A.     As well as coordinating with the

3  GSEs, Fannie, Freddie, and ultimately Ginnie

4  Mae, yes.

5     Q.     Anything else?

6     A.     We actually increased certain

7  staffing levels and brought vendors in to

8  provide support to make sure that the

9  delinquencies on the pool did not spike in the

10  confusion surrounding the filing of ResCap.

11          Confusion on the part of borrowers,

12  in other words, as to whether or not they

13  needed to make their payments.

14     Q.     And -- okay.

15          One of the other areas that you said

16  you will be testifying about is the settlement

17  process with Ally?

18     A.     Yes.

19     Q.     So what do you plan to testify about

20  with respect to the settlement process with

21  Ally?

22     A.     Again, it's not finished yet, but I

23  will mention the fact that we, you know, got a

24  $750,000,000 settlement from Ally.  That was

25  worked on by John Mack and John Ilany.

Page 33

1                         T. Marano

2        Q.     Were you involved in achieving the

3     $750 million settlement?

4        A.     No, that was not negotiated by me.

5        Q.     Did you provide any input to

6     Mr. Mack or Mr. Ilany?

7        A.     No.

8        Q.     Other than the fact that Mr. Mack

9     and Mr. Ilany achieved a $750 million

10    settlement with Ally, is there anything else

11    you plan to discuss with respect to that?

12       A.     No.

13       Q.     And you're aware that that

14    settlement ultimately was not agreed to?

15       A.     Correct.

16              It was ultimately replaced with a

17    second settlement.

18       Q.     So you didn't have any negotiations

19    with Ally with respect to the $750 million

20    settlement?

21              MR. LIPPS:  Objection.  Asked and

22        answered.

23       A.     Again, the folks who negotiated that

24    settlement were Ilany, Mack, Carpenter.  I'm

25    not sure who else from Carpenter, from Ally's

Page 34

1                        T. Marano

2     side.

3         Q.    You said in addition to testifying

4     about the actions that the board took and

5     providing a soft landing, the settlement

6     process with Ally -- well, you said the

7     settlement process, but what you're saying to

8     me now you didn't mean the settlement process,

9     you just mean the fact that there was a

10    one-time $750 million agreed-to settlement

11    between AFI and the debtors?

12             MR. LIPPS:  Objection to form.

13        Argumentative.  Also asked and answered.

14             Go ahead.

15        A.    My testimony does not describe the

16    settlement process in, you know, any level of

17    detail.  Because it's written and we refer to

18    it, I think it's, you know, it's the process.

19        Q.    What do you mean by "the process,"

20    it, the process?

21        A.    The board had meetings.  Information

22    was shared with the board from Mr. Ilany and

23    Mr. Mack and, you know, they did the

24    day-to-day negotiation with Ally, and we

25    ultimately came to -- or they ultimately came

Page 35

1                      T. Marano

2     to a $750 million number, and the board

3     ultimately approved that.  That's the kind of

4     process.

5          Q.    What was -- you said information was

6     shared with the board from Mr. Ilany and

7     Mr. Mack.

8                What was that information?

9          A.    They would -- they would on occasion

10    come back after a meeting with the folks from

11    Ally and say, we're making progress, we're not

12    making progress, these are -- you know, there

13    are some sticking points.

14                You know, they had a view as to

15    whether or not they could get more or less

16    money from time to time out of Ally.  So they

17    shared their thoughts with us.  But,

18    ultimately, they worked out the best deal that

19    they could get at that point in time.

20          Q.    Do you recall anything else about

21    those discussions with them?

22          A.    Not really, no.

23          Q.    I believe you said there was a third

24    issue that you'd be covering in your planned

25    direct testimony.  And you said about, I

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 36 of 112

Page 36

T. Marano

1  believe it was issues achieved post petition?

2  I'm not sure if I'm recalling correctly what

3  you said.

4  A.    Again, I don't recall, you know,

5  where you're going with that, but I know that

6  we did do things post petition.  There were

7  specific requirements we needed to meet by --

8  in the DOJ, AG and Fed settlement, and we

9  brought sufficient resources forward to get

10  those milestones met so we could get the

11  cooperation of the Attorney Generals to allow

12  us to continue to operate in their states

13  while we were in bankruptcy.

14          You know, those would include the

15  loan modifications, working to complete HARP

16  loan modifications, collecting the Ginnie Mae

17  insurance or collecting the HUD insurance on

18  the Ginnie Mae loans.

19          So we really, post bankruptcy,

20  shifted a lot of our effort to getting

21  those -- those requirements by the government

22  and the regulators and the GSEs to work

23  smoothly to maximize the value of the assets.

24  Q.    Okay.

Page 37

1                          T. Marano

2              Other than the actions that the

3    board took to provide a soft landing and the,

4    what you've termed the settlement process with

5    Ally relating to the $750 million settlement,

6    what else do you plan to testify about?

7              MR. LIPPS:  Objection to form.

8        A.    At this point in time, I've given

9    you the, you know, from what I have completed

10   so far, a majority of what I plan to talk

11   about.

12       Q.    Well, I do not want the majority.  I

13   want all of it.  So --

14             MR. LIPPS:  Well, you'll get it on

15        the 12th.

16       A.    I can't give you --

17             MS. FISSELL:  We'll go back.

18             MR. LIPPS:  Are you going to waive

19        your right to cross-examine at trial?  I

20        mean, you get the right to cross-examine?

21        You'll get his testimony when --

22             MS. FISSELL:  I mean --

23             MR. LIPPS:  -- it's scheduled to be

24        provided.

25             MS. FISSELL:  Right.  So you want to

Page 38

T. Marano

1

2      do trial by ambush.  That's fine.

3            MR. LIPPS:  Direct testimony with

4      cross is not trial by ambush.  I've been

5      doing it for 32 years.  That's the way we

6      operate in the courtroom.

7            The witness swears under oath,

8      stands up, does direct testimony, and then

9      the lawyer on the other side

10     cross-examines.  Your deposition is where

11     you can ask questions about specific

12     topics, not trying to somehow preview what

13     he's going to testify about at trial.

14  BY MS. FISSELL:

15     Q.   You said you going to talk about a

16  little bit about the issues surrounding the

17  value that was achieved through having

18  determined a soft landing.

19          What was the value that was achieved

20  through having delivered a soft landing?

21     A.   I can name a few things.  For

22  instance, we had a large portfolio of Ginnie

23  Mae buyout loans.  These were loans that did

24  have government insurance; however, there were

25  significant document deficiencies in the loan

Page 39

T. Marano

1  files.  The documents existed, but they,

2  because of the acquisitions over the year,

3  years, most of the documents were in a place

4  called Iron Mountain, some of the documents

5  were not in the actual loan files, some of the

6  documents were of a nature that we could not

7  find -- pardon me -- some of the document

8  deficiencies were of a nature that we could

9  not find any counterparty to finance them.

10      And, in fact, the only counterparty

11  we found that would finance them was Ally.

12  Ally provided a line for these Ginnie Mae

13  documents.  I'll be describing that.  That

14  allowed us to continue to buy Ginnie Mae loans

15  or loans out of Ginnie Mae pools, modify those

16  borrowers, take those loans that would have

17  traded at 70 cents or 60 cents on the dollar,

18  cure them, get the borrower back on track and

19  redeliver them at 100 cents on the dollar.

20      Also, by having the line from Ally,

21  we were afforded time to maintain our Ginnie

22  Mae delivery status.  We actually got an

23  extension.  We negotiated an extension after

24  we were in bankruptcy.  That allowed us to

Page 40

T. Marano

1   collect the insurance for a longer period of

2   time, and, again, deliver loans to Ginnie Mae

3   for a longer period of time, all of which

4   caused us to get value for loans that, you

5   know, might have sold for 50 to 70 cents on

6   the dollar, got us up to a point where we

7   could get close to par on those loans.

8           The extra runway we got from Ally

9   and from Barclays through their DIP has put us

10  in a position where we today continue to make

11  progress on curing the document deficiencies.

12     Q.    Other than what we discussed, is

13  there anything else that you will be

14  testifying about?

15          MR. LIPPS:  Objection.  Asked and

16      answered.

17          Go ahead.

18     A.    There will be some -- there will be

19  some testimony about the role and challenges

20  of working with the regulators in that.  I

21  think I mention that already, though.

22     Q.    That's okay.  You can repeat.

23          You said some of what you might be

24  testifying about might touch upon areas

Page 41

1                         T. Marano

2    related to what we discussed earlier as

3    Phase II issues?

4         A.    Yes.

5         Q.    So how does what we've just gone

6    through touch upon the Phase II issues?

7         A.    I think -- again, my recollection on

8    some of the Phase II issues are whether or not

9    the efforts we've put forth have created value

10   that belongs to the JSNs or someone else.

11             And I believe -- I would assume --

12   actually, could you go back over the

13   Phase II --

14        Q.    Sure.  Sure.

15        A.    -- issues again.  That will be

16   easier for me.

17        Q.    All right.

18             We'll do it more specifically.

19             So will anything you will be

20   testifying about touch upon the intercompany

21   balances between debtor entities?

22             MR. LIPPS:  Objection to form.

23        A.    I don't think I'm going to be -- I

24   don't think there's going to be any, you know,

25   extreme detail there.  I know we had

Page 42

1                          T. Marano

2      intercompany balances, but not -- we had

3      intercompany balances, I know that, but I'm

4      not going to be dwelling on that in the

5      testimony, no.

6          Q.    I understand you might not dwell on

7      it, but are you touching upon it in any way,

8      the intercompany balances?

9              MR. LIPPS:  Just note my objection

10         to form.

11             Go ahead.

12         A.    Just we're not finished yet, so, I

13     can't tell you, you know, I don't know.

14         Q.    At this point are you aware of

15     touching upon it in any way?

16         A.    Again, I think that I acknowledge it

17     from, you know, what I've seen so far, but

18     it's not particularly detailed.

19         Q.    So what do you --

20             MR. LIPPS:  Just note my objection

21         to form.

22     BY MS. FISSELL:

23         Q.    What do you acknowledge?

24         A.    Intercompany balances existed.

25         Q.    Okay.

Page 43

1                          T. Marano

2              And they no longer exist?

3         A.    I'm not -- that's not in my

4    deposition.

5         Q.    Well, you used the past tense.

6    That's why I asked.

7         A.    Intercompany balances existed

8    from -- there may be intercompany balances

9    today.  I'm not an accountant.  I haven't

10   looked at the books.

11        Q.    Will you be testifying at all about

12   the first or second 2009 tax allocation

13   agreements?

14        A.    No, I don't think so.

15        Q.    What about the 2006 bank

16   restructuring?

17        A.    I don't think so.  I wasn't

18   involved.

19        Q.    The brokering consumer loans

20   project?

21              MR. LIPPS:  Objection to form.

22        A.    I just, you know, I don't know, but

23   I don't think so.

24        Q.    The failure to make certain swap

25   payments based on the value of the entire MSR

Page 44

1                        T. Marano

2    portfolio?

3              MR. LIPPS:  Objection to form.

4         A.    Again, I believe I do touch on swap,

5    but not in the way you've described it.

6         Q.    What do you touch upon with respect

7    to the swap?

8         A.    There was swap.  That was all part

9    of the relationship between Ally and ResCap.

10        Q.    And what about just the fact that a

11   swap existed between Ally and ResCap?

12        A.    Yes.

13        Q.    Anything else?

14        A.    No.

15        Q.    Will your testimony discuss debt

16   forgiveness related to the intercompany

17   balances between debtors?

18              MR. LIPPS:  Objection to form.  Also

19        asked and answered.

20        A.    I don't recall that I had anything

21   in there about that.

22        Q.    Do you recall that there was debt

23   forgiveness related to intercompany balances?

24        A.    There was forgiveness of their

25   company balances, yes.

1                        T. Marano

2        Q.     Will you be testifying about

3   subordination under Rule 510(b) of the

4   Bankruptcy Code?

5                MR. LIPPS:   Objection to form.

6        A.     No, I don't think so.

7        Q.     Will you be testifying about the

8   appropriate allocation of the Ally

9   contribution?

10               MR. LIPPS:   Objection to form.

11       A.     I believe I describe the Ally

12   contribution, but how it's allocated, we never

13   really thought about the allocation, you know,

14   how that would be allocated.  Ally's view, the

15   only way we could get a settlement is if we

16   got everybody on board.

17       Q.     How do you describe the Ally

18   contribution?

19               MR. LIPPS:   Objection to form.

20       A.     Ally contributed $750 million for

21   the settlement.  Ally provided a DIP of a few

22   hundred million dollars.  Ally provided shared

23   services which allowed us to function in a

24   compliant manner.  That's, you know, generally

25   how I would describe it or how I do describe

Page 46

1                           T. Marano

2      it.

3           Q.    So when I say Ally contribution, you

4      answered referring to the $750 million

5      settlement.

6                MR. LIPPS:  Objection to form.  It's

7           argumentative.

8           A.    Ally, the way I look at it is Ally

9      provided a lot of stuff.  They provided

10     billions of dollars over, you know, many, many

11     years.  They provided a $750 million

12     settlement, which they ultimately raised to

13     north of 2 billion.

14                They provided infrastructure

15     support, system support, technology support

16     and they provided a DIP, as well as some other

17     funding, assets, other funding functions

18     within the DIP.

19          Q.    Will you be discussing the $2.1

20     billion Ally contribution or --

21          A.    I don't -- I don't believe I have

22     that number in my testimony.

23                MR. LIPPS:  Just note my objection

24          to form.

25

Page 47

1                              T. Marano

2   BY MS. FISSELL:

3        Q.    Will you be testifying about whether

4   the JSNs are entitled to out-of-court

5   protection?

6             MR. LIPPS:  Objection to form.

7        A.    I'm not a lawyer.  I'm not going to

8   decide a legal matter or opine on it.  I'm

9   just trying to share the information I have.

10  That's it.

11       Q.    Okay.

12            So were you involved in the

13  settlement discussions prepetition with the

14  debtors, Ally and the JSNs?

15            MR. LIPPS:  Objection.  Asked and

16       answered.

17            Go ahead.

18       A.    I was at a meeting but did not sit

19  in at the meeting where that was discussed

20  before we filed, yes.  I was brought -- I

21  forget what law firm hosted it.  I was there,

22  but I was not involved in most of that

23  discussion.

24       Q.    Are you aware that the JSNs, AFI and

25  ResCap agreed to a confidentiality agreement

Page 48

                              T. Marano

1

2    as part of the post settlement discussions?

3         A.    I don't recall if they did or not.

4    I just don't recall.

5              MS. FISSELL:    We're going to mark as      Plaintiff's
                                                           Objection
6         Marano 2 an agreement between Residential        48:5-8
                                                           Inadmissible
7         Capital, LLC, Ally Financial, Inc. and           hearsay (FRE
                                                           802), lack of
8         Davidson Kempner Capital Management LLC.         personal
                                                           knowledge
9              (A Discussion was Held off the              (FRE 602),
                                                           lack of
10        Record.)                                         foundation
                                                           (FRE 602,
11             (Marano's Exhibit 1, Transcript of          901, 903)

12        the deposition of Thomas Marano dated

13        November 12, 2012, was marked for

14        identification.)

15             (Marano's Exhibit 2, Agreement

16        between Residential Capital, LLC, Ally

17        Financial, Inc. and Davidson Kempner

18        Capital Management, LLC, was marked for

19        identification.)

20   BY MS. FISSELL:

21        Q.    So does this refresh your

22   recollection that there was a confidentiality

23   agreement between certain JSNs, ResCap and

24   Ally or AFI?

25        A.    It really doesn't.  It's clearly,

Page 49

T. Marano

1

2    it's executed by the general counsel of

3    ResCap, but I just don't recall the document.

4         Q.    Are you aware that the agreement

5    required disclosure of any material nonpublic

6    information by the petition date?

7              MR. DONOVAN:  Objection to form.

8              MR. LIPPS:  Are you asking as to

9         this document, Marano Exhibit 2?

10              MS. FISSELL:  Uh-huh.

11              MR. LIPPS:  Well, just note my

12         objection.  He said he doesn't remember

13         the document.  So the document will speak

14         for itself.

15              But go ahead and answer if you can.

16         A.    I -- if you can show me where it

17    says that, I can --

18         Q.    Sure.

19              If you'll turn to page 4.          Plaintiff's Objection
                                                    49:19-51:14
20         A.    Okay.                               Lack of personal
                                                    knowledge (FRE 602), lack
21         Q.    The second full paragraph.          of foundation (FRE 602,
                                                    901, 903), inadmissible lay
22         A.    Yes.    The --                       opinion

23              MR. LIPPS:  Wait a minute.  I think

24         she needs to ask a question first.

25              THE WITNESS:  Sorry.

Page 50

1                      T. Marano

2              MR. LIPPS:   She pointed you to it.

3              What's the question?

4    BY MS. FISSELL:

5        Q.    Do you read this as requiring Ally

6    or the debtors to disclose any material

7    nonpublic information by May 18, 2012?

8              MR. DONOVAN:   Objection to form.

9              MR. LIPPS:   Objection to form.   Also

10   calls for -- potentially calls for a legal

11   conclusion.

12             Go ahead.

13             MS. FISSELL:   I'll strike that

14   question.

15   BY MS. FISSELL:

16       Q.    What do you understand this

17   paragraph to be about?

18       A.    I -- so I understand that I've seen

19   this before.   This is sort of like a sunlight

20   provision.   When you're -- again, I'm assuming

21   this is Ally's document.

22             But essentially what they're saying

23   to an investor is, we're giving you material

24   nonpublic information.   You should not be

25   trading on this information or sharing this

12-12020-mg    Doc 5803-15    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tom Marano    Pg 51 of 112

Page 51

1                            T. Marano

2    information to others who may trade.

3              And here it says no later than

4    May 18th, Ally will either disclose the

5    information, and if they don't, then the

6    people who are on the other side of this

7    document can disclose the information and then

8    can trade.

9         Q.    You understand that it's important

10   for funds that manage money in a fiduciary

11   capacity to be able to trade in and out of

12   their positions?

13             MR. LIPPS:   Objection to form.

14        A.    At times, yes.

15        Q.    Okay.

16             You're aware that the parties later

17   engaged in a second mediation?

18        A.    By "parties," can you give us --

19        Q.    Oaky.   It's not clear.   I appreciate

20   you asking for a clarification.

21             So that the debtors and Ally and the

22   creditors committee engaged in a second

23   mediation.

24        A.    Yes.

25        Q.    And do you agree that the JSNs

Plaintiff's Objection 51:9-14: objection to form; vague and ambiguous

12-12020-mg    Doc 5803-15    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tom Marano    Pg 52 of 112

Page 52

1                          T. Marano

2    wanted to participate in that mediation?

3              MR. DONOVAN:  Objection to form.

4              MR. LIPPS:  Objection to form and

5        assumptions.

6        A.    I don't know what the JSNs wanted to

7    do.  I know that the JSNs, if we're talking

8    about the same mediation, they were present.

9        Q.    What mediation are we talking about

10   or do you think that I'm talking about?

11             MR. LIPPS:  Objection to form.

12       A.    The one that was held at 1177 Sixth

13   Avenue.  I think the JSNs were there.  Maybe

14   they weren't.  I don't know.

15       Q.    Is that the mediation that resulted

16   in the global settlement --

17       A.    Yes.

18       Q.    -- embodied in the plan?

19       A.    Yes.

20       Q.    Do you know whether the debtors

21   offered to enter into an agreement similar to

22   what was marked as Marano Exhibit 2 with the

23   JSNs in the second mediation?

24       A.    I don't recall.  I recall there were

25   some parties who, no matter what, would not

Page 53

1                        T. Marano

2    sign a document like this.  But I don't recall

3    if this was offered up as part of the second,

4    I just can't remember.

5        Q.    Who were the parties who would not

6    sign this no matter what?

7        A.    There was -- I think Aurelius was

8    one fund that never wanted to sign these

9    documents.  That's kind of what I recall.

10       Q.    Do you know whether AFI was willing

11   to sign this document?

12           MR. DONOVAN:  Objection to form.

13   Foundation.

14       A.    I really don't.

15           MR. LIPPS:  Do you want to take a

16   break?

17           THE WITNESS:  We're at 3:00.

18           MS. FISSELL:  Do you want to take a

19   break?

20           THE WITNESS:  Yes.  Now, or at 3:00.

21           MS. FISSELL:  Can we just finish up

22   this, then we can take a break.

23           THE WITNESS:  Sure.

24           (A Discussion was Held off the

25   Record.)

Page 54

1                          T. Marano

2              MS. FISSELL:  So I'd like to mark as

3         Marano Exhibit 3 a document that's been

4         stamped AHG20002731.

5              (Marano's Exhibit 3, Document,

6         Bates No. AHG20002731, was marked for

7         identification.)

8    BY MS. FISSELL:

9         Q.    Do you know who Dan Gropper is?

10        A.    Based upon the bottom of the e-mail,

11    he's from Aurelius.

12             (A Discussion was Held off the

13        Record.)

14        Q.    He's our client, so I'd better be

15    able to say it.

16        A.    Yes.

17             I do not know him, though.

18        Q.    I'll focus your attention on the

19    second or the second e-mail from the bottom

20    that says -- do you know who Ken Eckstein is?

21        A.    Yes, I do.

22        Q.    Who is --

23        A.    He's the lawyer for the Creditors'

24    Committee.

25        Q.    And he says, "Did you hear my

Page 55

1                          T. Marano

2    comment."  He's writing to Dan Gropper.  "Did

3    you hear my comment?  Judge was receptive to

4    say the settlement discussions are not MNPI."

5              Do you understand what MNPI refers

6    to?

7        A.    No.

8        Q.    What if I said it's Material

9    Nonpublic Information?

10       A.    That I mean --

11       Q.    Would that make sense?

12       A.    That makes sense.

13       Q.    And you see that Gropper responds,

14   "I did hear.  Thank you.  We will come up with

15   the language that will address both business

16   information and negotiations.  The attached

17   motion order which you are familiar with

18   should provide insight."

19             So this is from -- the attachment is

20   from a proceeding from the bankruptcy court in

21   Texas?

22       A.    Okay.

23             MR. LIPPS:  Are you asking him to

24       acknowledge that?

25             MS. FISSELL:  Yes.

Page 56

T. Marano

1

2      A.    Yes.  U.S. Bankruptcy Court Order,

3    Northern District of Texas.  That's what it

4    says.

5      Q.    And it's an order in aid of

6    settlement discussions?

7            MR. LIPPS:  Objection to form.

8      A.    Again, yes, that's what it says.

9      Q.    Okay.

10           This e-mail is dated December 20,

11    2012; correct?

12            MR. LIPPS:  Objection.

13    BY MS. FISSELL:

14      Q.    Sorry.

15            If you turn back to the first

16    page --

17      A.    Okay.

18      Q.    -- from Dan Gropper to Ken Eckstein,

19    December 20, 2012?

20      A.    Yes.

21      Q.    And at this time was the mediation

22    that led to the global settlement commencing?

23      A.    I don't recall the exact date that

24    we got Judge Peck involved as the mediator.

25    We had obviously wanted to try and mediate

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 57 of 112

Page 57

                           T. Marano

1

2      with all the creditors early on.

3             But whenever Judge Peck got involved

4      and when you Lew Kruger got involved, it --

5      you know, the whole process picked up steam.

6      I can't remember the dates, though, if that

7      was December 20th.  I just don't recall.

8          Q.   Okay.

9             MR. LIPPS:  Is this a good point for

10     a break?

11            MS. FISSELL:  Let me just do two

12     minutes.

13            I'm going to mark as Marano

14     Exhibit 4 a document that's Bates stamped

15     AHG20002759.

16            (Marano's Exhibit 4, Document,

17     Bates No. AHG20002759, was marked for

18     identification.)

19  BY MS. FISSELL:

20         Q.   Let me know when you're ready.

21         A.   (Document Review.)

22            Okay.

23         Q.   You see that this e-mail is dated

24     January 8, 2013?

25         A.   Yes.

Plaintiff's Objection 57:13-60:15 Inadmissible hearsay (FRE 802), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), inadmissible lay opinion

Page 58

1                     T. Marano

2          Q.     And that Dan Gropper is attaching a

3     proposed order in aid of mediation?

4                MR. LIPPS:   Are you asking him to

5          look and acknowledge on the document,

6          because he's not on the e-mail chain.

7                MS. FISSELL:   I'm asking him to

8          acknowledge this.

9                MR. LIPPS:   Well, the document

10         speaks for itself.   So I'll just object,

11         but go ahead.

12    BY MS. FISSELL:

13         Q.     And you know that Mr. Gropper says

14    that he wants to get this in the hands of the

15    debtors, in the e-mails --

16         A.     Yes.

17         Q.     -- that you guys had for almost a

18    week.

19                And if you'll turn to Proposed Order

20    in Aid of Settlement, and if you'll look at

21    paragraph 8 on page 2, paragraph 8A, sub

22    little i?

23                MR. LIPPS:   Is that the one that

24         ends 2761?

25                MS. FISSELL:   Yes.

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 59 of 112

Page 59

1                           T. Marano

2          A.      Okay.   Do you want me to read all of

3     8?

4          Q.      I want you to focus on paragraph sub

5     little I.

6          A.      (Document review.)

7                  Okay.

8          Q.      So would you characterize this

9     provision here, as -- I believe you

10    characterized the provision we looked at in

11    the other confidentiality agreement as a

12    sunlight provision.

13                 Do you agree that this paragraph is

14    a similar sunlight type provision?

15                 MR. LIPPS:   Objection to form.

16         A.      It's a little different because,

17    again, I'm not a lawyer, but the way I read

18    this is, we could selectively disclose

19    information to various parties to the

20    mediation which would obviously put certain

21    parties at a disadvantage.

22                 There is an opportunity to disclose

23    at some later point.   But if we are

24    selectively disclosing, then some parties

25    would be trading on a lack of information.

Page 60

T. Marano

 2    So I sort of understand the concept

 3    that at some point there's a sunlight

 4    provision, but it looks like the way this is

 5    written is one party has an advantage versus

 6    the other.

 7        Q.    But you agree that some part of this

 8    does contain a sunlight provision?

 9            MR. LIPPS:    Objection.

10    Argumentative.

11            Go ahead.

12        A.    I think somewhere down near the

13    bottom there is a request to disclose by

14    February 28th.    So that would give you the

15    sunlight, yes.

16        Q.    I'm going to show you one more

17    document.

18            MS. FISSELL:    I'll mark as Marano 5

19    a document Bates stamped AHG20002748.

20            (Marano's Exhibit 5, Document,

21    Bates No. AHG20002748, was marked for

22    identification.)

23    BY MS. FISSELL:

24        Q.    I'll ask you to flip to the second

25    page of the document stamped 2749.    And that's

Page 61

1                              T. Marano

2       the same e-mail that we looked on Marano

3       Exhibit 4?

4               MR. LIPPS:  Objection.  The document

5           speaks for itself.  He's not even on the

6           chain.

7               But go ahead.

8       A.    (Document review.)

9               Okay.  What was your question?

10      Q.    I just -- you see that that's the

11      same --

12              MR. LIPPS:  She wants you to compare

13          two e-mails.

14      BY MS. FISSELL:

15      Q.    That's the same e-mail that I showed

16      you as Marano Exhibit 5.

17      A.    Yes.  Yes, it appears to be.

18      Q.    And that on January 11th,

19      Mr. Gropper sent Mr. Eckstein an e-mail

20      saying, "Just following up to our conversation

21      of yesterday.  Any thoughts?"

22              MR. LIPPS:  Objection.  The document

23          speaks for itself.

24              Go ahead.

25      A.    I see that it's written there, yes.

Page 62

1                          T. Marano

2          Q.     And then he followed up again on

3     January 15th, the e-mail at the top of the

4     chain?

5                 MR. LIPPS:   Same objection.

6          A.     Yes.

7          Q.     And have you ever seen these e-mails

8     before today?

9          A.     No.

10         Q.     Were you ever made aware of these       Plaintiff's

11    communications between Mr. Gropper and            Objection
                                                        62:10-63:12
12    Mr. Eckstein?                                     Irrelevant (FRE
                                                        401, 402)
13                MR. LIPPS:   You can answer that, but

14    I want to caution you I don't want you

15    disclosing any conversations that you may

16    have had with your counsel.

17                So you can go ahead and answer the

18    question, but I want to make sure you

19    don't inadvertently talk about

20    conversations that you had.

21         A.     No, I understand.

22                Mr. Eckstein was not my counsel and

23    I had very limited involvement with him and

24    always I had counsel present.   I don't know --

25    I don't know anything about what Mr. Eckstein

Page 63

1                        T. Marano

2      received or didn't receive.  I just don't

3      know.

4           Q.    Were you aware that Aurelius made

5      requests to the committee to participate in

6      the mediation?

7           A.    I knew Aurelius -- and this is only

8      through my counsel.

9                 MR. LIPPS:  Well, I don't want you

10      disclosing anything that you talked about

11      with counsel.

12           A.    I can't -- I can't comment.

13                 MS. FISSELL:  Well, I mean, the fact

14      that he -- whether he knew about a

15      particular fact is not confidential

16      information.

17      BY MS. FISSELL:

18           Q.    I'm not asking you to disclose any

19      conversations you had about that fact with

20      counsel, but whether you are aware of the

21      underlying fact that Mr. Gropper or Aurelius

22      was reaching out to the committee about

23      participating in the mediation.  That's a fact

24      that you can testify to.

25                 MR. LIPPS:  Not if he's had

Page 64

                              T. Marano

1       conversations with counsel.  I'm not going

2       to have him talking about counsel.

3            You can ask the committee if they

4       communicated it to him or whatever.

5            MS. FISSELL:  I can ask the

6       committee if they communicated to him.  I

7       can ask if he was -- if it was

8       communicated by the committee to him.

9            MR. LIPPS:  You can ask him if the

10      committee communicated to him, as well,

11      but you can't ask him what he learned

12      through his counsel.  It's just not going

13      to happen.

14           MS. FISSELL:  I can --

15  BY MS. FISSELL:

16      Q.    Okay.

17            Was there ever a time where you were

18  aware that Aurelius had asked to participate

19  in the mediation?

20      A.    Yeah.  I can answer that.

21            MR. LIPPS:  You can answer that.

22      A.    I was aware that Aurelius wanted to

23  be part of the mediation process.  I was also

24  aware that there were dialogues to try and get

Page 65

1                      T. Marano
2    a document that anyone else had signed to make
3    them comfortable.
4              Why they never signed it, if they
5    ever, indeed, never signed it, I don't know.
6         Q.    Okay.
7              MS. FISSELL:   Okay.   We can take a
8    break now.
9              THE VIDEOGRAPHER:   The time is
10   3:09 p.m.   We're going off the record.
11             (Recess taken from 3:09 p.m. to
12   3:26 p.m.)
13             THE VIDEOGRAPHER:   The time is
14   3:26 p.m.   We're going back on the record.
15   BY MS. FISSELL:
16        Q.    You discussed earlier the
17   $750 million settlement with Ally.   And were
18   you aware that there was a planned support
19   agreement drafted related to that settlement?
20        A.    Yes.
21        Q.    And do you recall how intercompany
22   claims between debtors, not between debtors
23   and Ally, but between debtors were treated in
24   that first PSA?
25        A.    I don't -- I don't recall the

Page 66

```
1                        T. Marano
2      specifics of it, no.
3                MS. FISSELL:  I'd like to mark as
4      Marano 6 the term sheet for Joint Chapter
5      11 Plan of Reorganization, which is
6      document No. 6-8.
7                (Marano's Exhibit 6, Joint Chapter
8      11 Plan of Reorganization, was marked for
9      identification.)
10               (A Discussion was Held off the
11     Record.)
12   BY MS. FISSELL:
13       Q.    If you'll turn to page 7, the top
14     box on that page says Intercompany Claims.
15               Do you want to read that box.
16               MR. LIPPS:  You want him to read it
17     to himself or into the record or --
18               MS. FISSELL:  He can read it to
19     himself.
20               MR. LIPPS:  Okay.
21       A.    (Document Review.)
22               Okay.
23       Q.    Does that refresh your recollection
24     as to how intercompany claims were treated
25     under the first PSA?
```

Page 67

T. Marano

2    A.    Again, I recall the issue was

3    discussed and addressed.  I'm struggling just

4    with the way this is written.  I don't

5    understand the impaired and the semicolons.

6    They're like a paragraph before the word

7    "impaired" or should have been just a colon.

8          I'm just not sure how to read this

9    the way it's written.

10    Q.    Okay.

11    A.    You know, I'm not used to the

12    legalese of a lawyer.  You see what I'm

13    saying; right?  Like normally I would have

14    written impaired, colon.  Why is there a

15    semicolon there?

16    Q.    I'm not here to answer your

17    questions.

18    A.    I don't know how to read this.

19    Q.    My question -- I think you said,

20    though, you do remember how this was

21    refreshing your recollection as to how

22    intercompany claims were treated?

23          MR. LIPPS:  No, he does not say

24    that.

25    A.    No.  I recall there was an issue

Page 68

T. Marano

1

2     surrounding intercompany claims.  Okay?  You

3     know, at -- I am aware of that.

4          Q.    What was the issue?

5          A.    We tended to forgive intercompany

6     claims on a regular basis.  And I believe, you

7     know, that in essence we didn't deem them as

8     having any particular value.

9          Q.    And when you say "we," you mean the

10    debtors?

11         A.    The debtors, yes.

12         Q.    So we can ignore, if you will --

13    bear with me for a minute and just ignore that

14    first sentence, which --

15         A.    Okay.

16         Q.    -- I agree is a bit confusing.

17               And -- but if you start with the

18    second sentence, which reads, "Unless the

19    Junior Secured claims have been paid in full

20    based upon their secured claims, allowed

21    intercompany claims shall receive in full

22    satisfaction of such allowed intercompany

23    claims an amount equal to its pro rata share

24    of ResCap unsecured claims pool."

25               Do you understand what that's

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 69 of 112

Page 69

1                      T. Marano

2     saying?

3              MR. LIPPS:  Objection.

4        A.    This, no.  This is like the most

5     poorly written sentence I've seen in quite

6     some time.  I can't decipher that.  I'm

7     totally serious, that is really poorly

8     written.

9        Q.    Do you understand this to be saying

10    that the intercompany claims are being waived

11    and settled at zero?

12       A.    I can't say that.  This is -- like,

13    I have not read this in ages, and this is like

14    the worst sentence I've ever seen.  I honestly

15    don't know what this sentence says.

16       Q.    Okay.  Fair enough.

17             Do you recall any discussions with

18    Ally about the treatment of intercompany

19    claims in the initial PSA?

20             MR. LIPPS:  By the initial PSA,

21        you're talking about discussions prior to

22        this agreement?

23    BY MS. FISSELL:

24        Q.    I just -- when I'm referring to the

25    initial PSA, I'm referring to the PSA that is

Plaintiff's
Objection
69:24-71:13
Irrelevant
(FRE 401,
402)

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 70 of 112

Page 70

```
 1                    T. Marano
 2    embodied by the term -- this term sheet that
 3    we're looking at here.
 4         A.    The original plan support agreement.
 5              MR. LIPPS:  I just want to make sure
 6    we're not getting into the mediation.
 7              MS. FISSELL:  No.
 8              MR. LIPPS:  This is prior to --
 9              MS. FISSELL:  The prepetition PSA.
10              MR. LIPPS:  Thank you.
11         A.    So your question, do I recall a
12    conversation.  I don't recall having any
13    conversations with anyone in Ally about this.
14         Q.    Do you recall anyone telling you
15    that they discussed intercompany claims with
16    Ally in these negotiations?
17         A.    I know --
18              MR. LIPPS:  Well, I'll let you
19    answer; but, again, I don't want you to
20    disclose any specific conversations that
21    you had with counsel in connection with
22    the negotiation of PSA.
23         A.    Again, I know that I discussed with
24    my chief financial officer the topic of
25    intercompany claims, how we did them, how they
```

Page 71

                    T. Marano

1

2    worked at the time all this was coming

3    together.  So I can disclose that because he's

4    not my lawyer.

5        Q.    You discussed with the ResCap CFO?

6        A.    That's correct.

7        Q.    But you did not have any discussions

8    with Ally about intercompany claims?

9            MR. LIPPS:  Objection.  Asked and

10    answered.

11            Go ahead.

12        A.    I don't recall any conversation with

13    Ally on this.

14        Q.    And you don't recall Mack or Mr.

15    Mack or Mr. Ilany reporting back to the board

16    that they had discussed intercompany balances

17    with Ally?

18        A.    I don't recall.  They may have.  I

19    don't recall.  The only conversations I recall

20    were with my CFO.

21        Q.    And what were those conversations?

22        A.    What exactly was the nature of the

23    intercompany claims.  He explained to me how

24    money moved between the various subsidiaries,

25    how periodically we would forgive an

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 72 of 112

Page 72

1                           T. Marano

2      intercompany balance.

3                  I remember discussing the nature by

4      which we forgave them.  You know, he reminded

5      me of documents we signed and approved where

6      we would forgive a balance.

7          Q.    And you discussed this with him

8      while -- at the same time that the

9      negotiations for the initial PSA were going

10     on?

11         A.    Around -- around the same period of

12     time, yes.

13         Q.    And what was the purpose of those

14     discussions with your CFO?

15         A.    My CFO and I occasionally talked

16     about documents that were getting created that

17     related to ResCap.  We read the documents.

18     That sort of thing.

19                You know, I can't remember why this

20     was of particular note to him, but we -- I do

21     recall having a conversation.

22         Q.    And who was your CFO at the time?

23         A.    Jim Whitlinger.

24         Q.    Did you discuss with him how

25     intercompany balances would be treated in the

Page 73

1                          T. Marano

2    first day filings?

3        A.    I don't recall in the context of how

4    they would be treated in the first day

5    filings.

6        Q.    Did you play any role in how they

7    would be treated in the first day filings?

8        A.    No, I didn't do the first day

9    filings.

10       Q.    Other than mentioning the existence

11   of intercompany balances in your planned

12   testimony, is there anything else that you

13   will be discussing with respect to

14   intercompany balances?

15           MR. LIPPS:  Objection.  That's been

16       asked and answered.  I also object to the

17       form.

18       A.    I don't recall any detail of

19   intercompany balances as to what I'm going to

20   be saying in my deposition -- direct

21   testimony.  Sorry.

22       Q.    Well, just use the word "deposition"

23   for your direct testimony.  We all know what

24   you're talking about.

25       A.    Clearly, I'm not a lawyer.

Page 74

1                         T. Marano

2             MS. FISSELL:  I will mark as Marano

3        Exhibit 7, the Notice of Filing of

4        Corrected Solicitation Version of the

5        Disclosure Statement and Joint Chapter 11

6        Plan, which is Docket No. 4819.

7             (Marano's Exhibit 7, Notice of

8        Filing of Corrected Solicitation Version

9        of the Disclosure Statement and Joint

10       Chapter 11 Plan, was marked for

11       identification.)

12   BY MS. FISSELL:

13        Q.   If you'll turn to page -- you'll

14   have to unrubber band that -- to page 20.

15             MR. LIPPS:  What's the number up

16       top?

17             MS. FISSELL:  You can try page 3201.

18       A.   Yes.

19        Q.   If you look at the second row, the

20   class of claims is intercompany balances.  The

21   treatment of claim reads, "On the effective

22   date, as part of the overall compromised body

23   in the plan, intercompany balances shall be

24   waived, canceled and discharged.  Holders of

25   intercompany balances shall receive no

Page 75

1                        T. Marano

2    recovery on account of their claims."

3               Do you see that?

4        A.    Yes, I do.

5        Q.    And would you agree that that

6    treatment of intercompany balances is

7    different than the treatment of intercompany

8    balances that we looked at in the term sheet

9    marked as Marano Exhibit 6?

10              MR. LIPPS:  Note my objection to

11         form.  I think he said he didn't -- he

12         wasn't sure he could understand what

13         Exhibit 6 was saying, but go ahead.

14              MS. FISSELL:  You can make an

15         objection to form.  Stop testifying on the

16         record.

17              MR. LIPPS:  And I'm not testifying,

18         and I appreciate that.  But you also have

19         a good faith responsibility to really ask

20         him a question that's grounded in what

21         he's testified to.

22              But go ahead.

23         A.    Again, based upon the poorly written

24    sentence, I did not understand the other

25    document; but it's clear to me that in this

12-12020-mg    Doc 5803-15    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tom Marano    Pg 76 of 112

Page 76

1                          T. Marano

2      one that there's -- that there's no value

3      ascribed to the intercompany claims.

4           Q.    And you have no position on whether

5      it's different from the original PSA?

6           A.    Because I can't understand the way

7      that was written, I just can't draw that

8      conclusion.

9                 (A Discussion was Held off the

10      Record.)

11      BY MS. FISSELL:

12           Q.    Do you recall a time where you and

13      your team began brainstorming a range of

14      possible claims against AFI?

15           A.    Yes, I do.

16           Q.    Do you recall when that was?

17           A.    Probably summer of 2011, maybe.

18           Q.    And was the focus of those claims on

19      claims between the debtors against AFI or

20      Ally?

21           A.    Yes.

22           Q.    And you asked Morrison Foerster to

23      look into certain areas?

24           A.    Yes.  We asked them to do an

25      investigation.

12-12020-mg    Doc 5803-15    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tom Marano    Pg 77 of 112

Page 77

1                          T. Marano

2         Q.       Why did you ask them to do an

3     investigation?

4         A.       We needed someone to.    We weren't

5     sure at that point in time if we were going to

6     file.    We were, you know, in the interest of

7     being prudent, we wanted to have our bases

8     covered if we had to file.

9              So we reached out to Morrison

10    Foerster because of their long relationship

11    with the firm, frankly, not a particularly

12    warm relationship between Morrison Foerster

13    and Ally, and in the interest of not spooking

14    the market or creating the impression we going

15    to file if we didn't know we were going to

16    file, we hired them to do the work.

17        Q.       And at that time do you believe

18    there were certain claims that the debtors

19    might have against Ally?

20        A.       We were told by Morrison Foerster --

21              MR. LIPPS:    I don't want you to talk

22    about legal advice that you received.

23        A.       Repeat your question.    Let's see if

24    I can answer it.

25        Q.       Okay.

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 78 of 112

Page 78

1                        T. Marano

2              At that time, did you believe that

3      there were certain claims that the debtors

4      might have against Ally?

5              MR. LIPPS:  And I'll allow you to

6         answer, but I am going to instruct you not

7         to disclose any information that you

8         received from counsel.

9              THE WITNESS:  I understand.

10             MR. LIPPS:  If you can't answer it,

11        you can't answer it.

12             But go ahead if you can.

13      A.     At the time we hired Morrison

14      Foerster, I actually didn't know.

15      Q.     You also set up a special review

16      committee, as well?

17      A.     For the claims?

18      Q.     Yes.

19      A.     I actually don't recall if we had a

20      committee to review the claims.  We definitely

21      talked about it at board meetings.  I don't

22      know if there was a committee.

23             Or -- no, at that point in time, I

24      don't think we had a committee in the summer

25      of '11.

Page 79

T. Marano

1

2    Q.    Did -- by December 2011 had the

3    ResCap board established a special review

4    committee?

5    A.    I think we had a negotiating team.

6    Yes, we did, for -- I think that was John Mack

7    and Jonathan Ilany.

8    Q.    And was one of the things that they

9    were tasked with was implementing a process

10   and procedure for the review and assessment of

11   potential claims arising in relation to

12   transactions with AFI?

13       MR. LIPPS:  Objection to form, but

14       go ahead.

15   A.    I know we had a committee.  I don't

16   know, you know, if there was a committee, we

17   would have had rules and guidance for the

18   committee.  I just don't know what we had.

19   Q.    Okay.

20       MS. FISSELL:  We'll mark as Marano

21       Exhibit 8, an excerpt from the examiner's

22       report.  It's pages Roman Numeral III-244

23       through Roman numeral III-245.

24       MR. LIPPS:  Just note my objection

25       on the record for the use of it.  I think

Page 80

                          T. Marano

1

2        even the judge has characterized it as

3        hearsay, but you may proceed.

4             MS. FISSELL:  You are aware that

5        you're allowed to use hearsay in

6        depositions.

7             MR. LIPPS:  I'm not stopping you.

8        I'm just objecting.

9             THE WITNESS:  Do you want to number

10       this?

11            (A Discussion was Held off the

12       Record.)

13            (Marano's Exhibit 8, Excerpt from

14       Examiner's Report, was marked for

15       identification.)

16   BY MS. FISSELL:

17       Q.   So you'll turn to page III-246,

18    Roman Numeral III-246.

19            MR. JOHNSON:  Can you repeat that

20       page, please.

21            MS. FISSELL:  It's 246.

22            MR. JOHNSON:  Okay.

23   BY MS. FISSELL:

24       Q.   Does this -- if you look at the

25    paragraph in the middle of the page, it says,

Page 81

1                        T. Marano

2      "Effective December 5, 2011, the ResCap board

3      established the special review committee."

4          A.    Yes.

5          Q.    And then for the purpose of -- and

6      I'll let you read that paragraph to yourself.

7          A.    (Document Review.)

8                Okay.   I've read it.

9          Q.    Does that refresh your recollection

10     of whether the special review committee was

11     also tasked with implementing a process and

12     procedure for the review and assessment of

13     potential claims arising in relation to

14     transactions and interrelationships between

15     the debtors and AFI?

16         A.    Yes.

17         Q.    It does refresh your recollection?

18         A.    It does.

19         Q.    Okay.

20               And who did they hire to assist them

21     with that analysis?

22               MR. LIPPS:  Objection to form.

23         A.    I'm not sure -- you're talking about

24     their counsel?

25         Q.    Did Ilany and Mack hire anyone to

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 82 of 112

Page 82

1                         T. Marano

2    assist them?

3         A.    I have no idea.  They would have had

4    access to Morrison & Cohen, but I don't know

5    if they hired anyone else.  I don't recall.

6         Q.    And who is Morrison & Cohen?

7         A.    Those would -- Morrison & Cohen is

8    counsel to the independent committee

9    members -- board members.

10        Q.    Do you know whether Morrison

11   Foerster or -- do you know whether Morrison

12   Foerster ever made a presentation to the

13   ResCap board regarding their analysis of

14   potential claims against Ally?

15              MR. LIPPS:  And I will allow you to

16        respond to the fact of whether or not

17        there was a presentation, but I don't want

18        you to disclose any legal advice or

19        information that you received from counsel

20        as a result of their analysis.

21              Go ahead.

22        A.    We did.  The board did receive a

23   presentation, yes.

24              MS. FISSELL:  The substance of the

25   presentation was disclosed in the

1                    T. Marano

2    examiner's report.  So you're taking the

3    position now that the presentation,

4    although the parts, at least, of the

5    presentation are disclosed in the

6    examiner's reports, which has been

7    publicly disclosed, are --

8         MR. LIPPS:  There was a

9    confidentiality order and strict

10   restrictions on information that the

11   examiner was to receive.  And it was never

12   our understanding nor intention to waive

13   any privilege that we have with respect to

14   communications that the lawyers for the

15   debtors provided to the board.

16        So I'm not going to allow him to

17   discuss legal advice that the board

18   received.

19        MS. FISSELL:  I just want to make

20   sure the record is clear, so if I -- I'll

21   just ask the question and if you want to

22   make the objection --

23        MR. LIPPS:  I'll instruct as

24   appropriate and let him answer as

25   appropriate.

Page 84

1                    T. Marano

2              MS. FISSELL:  Okay.

3  BY MS. FISSELL:

4        Q.    What -- what analysis -- strike

5     that.

6              Did MoFo identify any breach of          Plaintiff's

7     contract claims that the debtors may have         Objection
                                                        84:6-19
8     against Ally?                                     Lack of personal

9              MR. LIPPS:   And I'll allow you to       knowledge (FRE
                                                        602)
10     answer to the extent you can answer

11     without revealing advice that you received

12     from Morrison Foerster.  And if you can't,

13     then indicate that you'll follow my

14     instruction.

15        A.    I was present at a slide show where

16     they put a list of claims up there.  I don't

17     recall one way or the other if a breach of

18     contract claim was there.  I just don't

19     recall.

20        Q.    Was one of the claims that they had

21     on that slide presentation a claim related to

22     the tax allocation agreements?

23              MR. LIPPS:  And, again, I'll

24     instruct you not to answer to the extent

25     you would reveal legal advice that you

Page 85

1                        T. Marano

2          received from the company.

3          A.    We would have -- you know, I can't

4     answer it then.

5                    MR. LIPPS:  Then you can't answer

6          it.  I'll instruct him not to answer it.

7     BY MS. FISSELL:

8          Q.    Do you recall any of the specific

9     claims that were disclosed in that

10    presentation?

11                   MR. LIPPS:  I'll let you answer

12        "yes" or "no" to that.

13         A.    Yes.

14         Q.    What were they?

15                   MR. LIPPS:  I'm going to instruct

16        him not to answer to the extent it

17        requires you to reveal information and

18        legal advice that you received from

19        Morrison Foerster.

20         A.    I can't answer it then.

21         Q.    Do you know whether there was a

22    presentation also made to the Ally board

23    relating to claims that the debtors have

24    against Ally?

25         A.    Yes.

12-12020-mg    Doc 5803-15    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Tom Marano    Pg 86 of 112

Page 86

1                          T. Marano

2          Q.      Who made that presentation?

3          A.      Actually, I take that back.   There

4     was a presentation to Michael Carpenter.   I

5     actually don't know if the Ally board was part

6     of the presentation.   I don't recall.

7          Q.      Okay.

8                  So there was a presentation to

9     Michael Carpenter about --

10         A.      That's right.   And I don't recall if

11    the board received a presentation -- the Ally

12    board received a presentation.

13         Q.      Do you see a copy of the

14    presentation?

15         A.      I don't think so, no.

16         Q.      Were you at the presentation?

17         A.      No, I don't recall being there, no.

18         Q.      Do you know who made the

19    presentation?

20         A.      My recollection is that -- I can't

21    recall which lawyers, but some lawyers from

22    Morrison Foerster were there and some lawyers

23    from Ally's firm were there.

24                  My recollection -- yes, that's it.

25    That's all I know.   They had a meeting.

Page 87

1              T. Marano

2       Q.    And do you know whether the

3  presentation made to the Ally board was in any

4  way different than the presentation -- I'm

5  sorry.  The presentation that was made to

6  Michael Carpenter was in any way different

7  than the presentation made to the ResCap

8  board?

9       A.    I don't --

10       MR. LIPPS:  Objection.  Calls for

11  speculation.  Go ahead.

12       A.    I have no idea.

13       Q.    Did you have any conversations with

14  anyone at Ally regarding potential claims that

15  the debtors might have against Ally?

16       A.    Yes.

17       Q.    Who?

18       A.    Michael Carpenter.

19       Q.    Anyone else?

20       A.    That's all I recall.

21       Q.    What did you discuss with Michael

22  Carpenter?

23       A.    Michael Carpenter told me that he

24  didn't think Ally owed ResCap anything.

25       Q.    What did you tell him?

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 88 of 112

Page 88

1                         T. Marano

2        A.    I said whether you owe us something

3    or not it's going to cost you, you know, some

4    money.  And that's it.

5        Q.    That was your entire conversation?

6        A.    Yes.

7        Q.    When was the conversation?

8        A.    It would be towards the end of

9    ResCap being around, you know, probably

10   May 2012, maybe shortly thereafter.

11       Q.    How long did you talk to him for?

12       A.    A brief conversation.

13       Q.    What do you mean by "brief"?

14       A.    Minutes.

15       Q.    So minutes can mean -- are you

16   saying anything less than 60 minutes?

17       A.    Substantially --

18             MR. LIPPS:  Objection.

19       A.    A few minutes at a time.  We did

20   not -- once, you know, in this time period we

21   weren't having lengthy meetings.  A few

22   minutes.

23       Q.    So that was your only conversation

24   with Michael Carpenter regarding the claims

25   that the debtors might have against Ally?

Page 89

1                        T. Marano

2      A.      That's all I recall, yes.

3      Q.      Do you recall anything else about

4  the conversation other than what you just

5  discussed?

6      A.      No.   That it was going to cost them

7  some real money.

8      Q.      If you could turn to page Roman

9  Numeral III-252, to the second paragraph.

10     A.      "In addition"?

11     Q.      Yes.

12             The first sentence reads, "In

13  addition, the Morrison & Foerster presentation

14  noted that is arguable that ResCap and AFI

15  acted," quote, "as a single integrated

16  operation in certain respects during the post

17  TARP period."

18             Do you agree with that statement?

19             MR. LIPPS:  Objection to form.

20             MR. DONOVAN:  Objection to form.

21     A.      I can't answer it because it would

22  be based upon, you know, advice we got from

23  counsel.

24     Q.      You were the CEO of ResCap --

25     A.      Yes.

Page 90

1                        T. Marano

2        Q.    -- for a number of years.  And in

3    your experience as CEO of ResCap, would you

4    agree that ResCap and AFI acted as a single

5    integrated operations in certain respects

6    during the post TARP period?

7        A.    Not necessarily, actually.

8        Q.    Why not?

9        A.    While we may have shared certain

10   resources, we acted as separate and

11   independent companies.  The organization was

12   extremely siloed.  It was challenging to get

13   various members of different teams or

14   divisions to work together on anything.

15            So I wouldn't consider it to have

16   been an integrated organization.  Not at all.

17       Q.    Do you believe that $2.1 billion

18   contribution from Ally to the estate

19   constitutes substantial consideration?

20            MR. LIPPS:  Note my objection to

21       form.

22       A.    I think it's a lot of money.  I

23   don't know what "substantial consideration"

24   means.  It's a lot of money.

25       Q.    Will you be including in your

Page 91

1                          T. Marano

2     planned direct testimony anything about the

3     amount of Ally's contribution to the estate?

4         A.    Yes.

5         Q.    Will you be commenting on whether

6     it's substantial?

7                MR. LIPPS:  Note my objection to

8         form.

9         A.    Again, we haven't finished it, so I

10    don't know if that particular word -- but I'm

11    telling you here today, 2.1 billion is a lot

12    of money, and I would testify to that if I was

13    asked.

14        Q.    Right now is your testimony planning

15    to include that?

16               MR. LIPPS:  Objection.  It's been

17        asked and answered.

18               Go ahead.

19        A.    Again, I know that $2.1 billion

20    number is in there.  I don't recall if the

21    word "substantial" or some other fancy legal

22    term is in there, you know, but I maintain

23    that's a lot of money.

24        Q.    In your planned direct testimony?

25               MR. LIPPS:  Objection.

Page 92

1                         T. Marano

2        A.    I maintain -- I'm telling you that

3    2.1 billion is in there.  The adjectives in

4    front of it, I don't recall.

5        Q.    Have you done anything to evaluate

6    Ally's $2.1 billion contribution net of tax

7    benefits to Ally?

8        A.    No.

9        Q.    Did you review the examiner's

10   report?

11       A.    Yes.

12       Q.    Do you recall reviewing

13   Footnote 1812 in the examiner's report?

14       A.    I would have to see that footnote.

15   I'm sorry.

16       Q.    Okay.

17            MR. LIPPS:  I'm disappointed.

18       A.    Is it in here?

19       Q.    Some footnotes we know by heart.

20            MR. LIPPS:  I'm disappointed, you

21   don't remember that footnote without

22   looking.

23            (A Discussion was Held off the

24   Record.)

25

Page 93

1                              T. Marano

2    BY MS. FISSELL:

3          Q.    I'm going to show you what's been

4    previously marked as Aretakis Exhibit 3.

5                MR. LIPPS:  While he's looking at

6          that, I'll just make the same notation on

7          the record.  This has been indicated by

8          the judge as being hearsay, and I'll

9          object to it.

10   BY MS. FISSELL:

11         Q.    If you'll turn to the last page,

12   you'll find Footnote 1812.

13         A.    Okay.

14         Q.    Do you recall reviewing this

15   footnote?

16         A.    Yes.  Yes.  I recall this section.

17         Q.    And do you recall in particular the

18   calculations in Footnote 1812?

19         A.    Yes.

20         Q.    Did you do anything after you

21   reviewed this calculation?

22         A.    Did I do anything?

23         Q.    Did you ask any professionals about

24   it?

25               MR. LIPPS:  Well, I don't want you

Page 94

1                    T. Marano

2      disclosing any --

3                MS. FISSELL:  I didn't ask for the

4      substance.  I asked whether he --

5                MR. LIPPS:  Let me just finish my

6      objection.

7                I don't want you to disclose any

8      substance of conversations with counsel.

9      I will allow you to answer fact of

10     consultation, if it did occur.

11     A.     Okay.

12              I talked to my CFO about this, about

13     all the tax -- pardon me -- about these tax

14     issues raised here.

15     Q.     And what did you discuss with him?

16     A.     We discussed the fact that since

17     ResCap is not a tax-paying entity and the fact

18     that you can't transfer these NOLs to a third

19     party, that, yes, essentially ResCap was a

20     disregarded entity and it was bankrupt, so the

21     benefit of these NOLs would not follow.

22              I struggle to understand how the

23     examiner thought there was value here, again,

24     especially since ResCap was not a tax-paying

25     entity.

Page 95

T. Marano

1

2      Q.    Did you discuss with -- when you

3   refer to your CFO, you're referring to

4   Mr. Whitlinger?

5      A.    Yes.

6      Q.    Did you discuss with Mr. Whitlinger

7   that this calculation shows that Ally will get

8   a tax benefit from the -- its contribution to

9   the estate?

10         MR. LIPPS:   Objection to form.

11         Go ahead.

12      A.    That I did not discuss.

13      Q.    If you'll look at the line that

14   reads, "Less assumed contribution by the AFI

15   to creditor's recovery."  And that it's

16   750 million that at that time was the amount

17   of Ally's proposed contribution.

18         MR. LIPPS:   What's the question?

19   BY MS. FISSELL:

20      Q.    I asked if he saw that on here.

21      A.    Yes.

22      Q.    You see that.

23         And did you discuss that with

24   your -- Mr. Whitlinger?

25      A.    No, I just discussed whether or not

Page 96

1                            T. Marano

2        the tax losses had any value whatsoever to a

3        third party.

4              Q.    To a third party other than AFI?

5                    MR. JOHNSON:  I object to the form.

6        A.    Yes.  To a nonaffiliated entity.

7              Q.    Did you discuss anything else with

8        Mr. Whitlinger?

9        A.    No.

10                   MR. LIPPS:  On that topic or related

11             to that?

12                   MS. FISSELL:  Related to

13             Footnote 1812.

14       A.    No.

15             Q.    Did you discuss Footnote 1812 with

16       anyone else?

17             A.    I don't recall anyone else.

18             Q.    And you see that the examiner says

19       at the end of the footnote, "Any additional

20       amount that AFI contributes towards the

21       recovery would produce cancellation of

22       debt-to-income on a dollar-for-dollar basis"?

23                   MR. LIPPS:  Objection to form.

24       BY MS. FISSELL:

25             Q.    At the very bottom.

Page 97

1                          T. Marano

2        A.      Yes, I see what it says.

3        Q.      And did you discuss that with

4   anyone?

5        A.      No.

6        Q.      Are you aware that the ad hoc group

7   filed an objection to the disclosure statement

8   filed by the plan proponents?

9        A.      The ad hoc group being the JSNs?

10       Q.      Yes.

11       A.      I am aware they filed an objection.

12       Q.      Okay.

13               I want to show you a document marked

14   as Aretakis 10.

15       A.      Are there multiple copies here or --

16       Q.      Yes.  If you'll turn to, I think

17   it's the fourth to last page of the document.

18               You see that this is --

19       A.      Can I just get the page number on

20   the bottom because it's --

21       Q.      Yes.  It's page 2.  It's a different

22   page 2.  Yes.  Exhibit --

23       A.      C?

24       Q.      -- D.  Exhibit D, page 2.

25       A.      Got it.  Okay.

Plaintiff's
Objection
97:12-99:7
Inadmissible
hearsay (FRE
802), lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602, 901,
903)

Page 98

1                          T. Marano

2        Q.      Do you recall reviewing this table?

3        A.      No, I don't recall this page.

4        Q.      Do you see that this shows the same

5    table that was in Footnote 1812 in the

6    examiner's report?

7                MR. LIPPS:    Objection to form.

8        A.      And the layout's a little different,

9    but it's similar.    I see what you're doing

10   because it has more fields.

11       Q.      Right.

12               And that there's been a comment --

13   sorry, a column added, and under the row "Less

14   Assumed Contribution by AFI to Creditor's

15   Recovery," it shows the examiner's report

16   number of 750, and then it shows the

17   2.1 billion.

18       A.      Right.    There's two columns added to

19   this report, yes.

20       Q.      Right.

21               And you'll see that the last row,

22   the examiner had estimated tax benefits to --

23   the value of tax benefits to AFI at

24   1.77 billion; right?

25       A.      Yes.

12-12020-mg   Doc 5803-15   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Tom Marano   Pg 99 of 112

Page 99

1                    T. Marano

2      Q.    And that using the $2.1 billion

3   number, it's -- the value of the tax benefit

4   to AFI are 2.2 billion?

5            MR. LIPPS:  Objection to form.

6      A.    According to the chart, I see it's

7   2.2, yes.

8      Q.    Hypothetically, if Ally received tax

9   benefits greater its $2.1 billion payment,

10  would that affect your conclusion that

11  Ally's -- I think your words were "paying a

12  lot of money"?

13           MR. LIPPS:  Objection to form and

14    assumptions.

15           MR. JOHNSON:  Objection to form.

16    Hypothetical.

17      A.    I never factored in -- as to what

18  Ally should pay, I never factored in whether

19  there was, you know, a benefit to writing a

20  big check or not.

21            So I'm not an accountant.  I'm not a

22  tax accountant.  I just never even considered

23  the tax issue in the context of the way you're

24  presenting it.

25      Q.    But, hypothetically, if they

Plaintiff's
Objection
99:8-100:17
Lack of
personal
knowledge
(FRE 602),
inadmissible
lay opinion

Page 100

1                        T. Marano

2      received benefits greater than their actual

3      payment, would that affect your conclusion?

4                  MR. LIPPS:   Objection.   Asked and

5           answered.   Also without foundation.

6                  Go ahead.

7                  MR. JOHNSON:   Objection.

8           A.     All I know is it costs them billions

9      and billion dollars of dollars to get -- to

10     settle this process.   I can't come to the

11     conclusion.   I don't know.

12          Q.     So your answer is you don't know

13     whether it would change your analysis?

14                 MR. LIPPS:   Objection.

15          Mischaracterizes.

16          A.     Not at all.   I don't know.   I just

17     don't know.   I'm not a tax person.

18          Q.     So you feel you need to be a tax

19     person to assess whether if Ally received tax

20     benefits greater than 2.1 billion, whether

21     that would affect your conclusion regarding

22     whether Ally's contribution was significant?

23                 MR. LIPPS:   Objection to form.

24          Mischaracterizes.

25                 Go ahead.

Page 101

1                        T. Marano

2        A.    Again, I think Ally contributed an

3    enormous amount of money.   I don't know

4    whether or not they're getting tax benefits

5    for this or not.   I'm not a tax person.   I

6    don't know.   I can't draw that conclusion.

7        Q.    Right.

8             I understand that you don't know as

9    a matter of course.   I'm just saying,

10   hypothetically, if you were to learn that they

11   were getting a tax benefit greater than the

12   actual payment amount, would that affect your

13   conclusion that they are making an enormous

14   payment?

15             MR. JOHNSON:   Objection to form.

16             MR. LIPPS:   Objection to form and

17   assumptions.

18       A.    No, it wouldn't alter my opinion

19   either way, they had to write a big check, no.

20       Q.    I believe you testified earlier

21   you're not familiar with who James Aretakis

22   is?

23       A.    No.

24             MR. LIPPS:   Objection.   Asked and

25   answered.

Page 102

1                    T. Marano

2        A.    Yes.  I don't recall who he is.

3              MS. FISSELL:  I'm going to mark as

4    Marano Exhibit 9 the transcript of the

5    deposition of James Aretakis from

6    November 6, 2013.

7              (Marano's Exhibit 9, Transcript of

8    Deposition of James Aretakis dated

9    November 6, 2013, was marked for

10   identification.)

11   BY MS. FISSELL:

12        Q.    If you'll turn to page 9 of the

13   transcript.

14        A.    On the transcript --

15        Q.    Yes.  Page 9 of the transcript, not

16   of the document.  If you'll look at line 6.

17              "Question:  What's your position at

18   Ally?

19              "Answer:  General tax counsel."

20              Do you see that question was asked

21   and that answer was given?

22        A.    Yes.

23        Q.    Okay.

24              If you'll turn to page 53 --

25              MR. DONOVAN:  Objection to form.

Plaintiff's
Objection
102:3-103:20:
Inadmissible
hearsay (FRE
802), lack of
personal
knowledge
(FRE 602),
inadmissible
lay opinion,
irrelevant (FRE
401, 402)

Page 103

1                           T. Marano

2           Q.    -- of the transcript.

3           A.    I'm sorry, what page?

4           Q.    53 of the transcript.  It's page 14

5     of the document.  Look at line -- page 53,

6     line 13.

7                 "Question:  At the end of the day,

8     if one's liabilities are known and there is a

9     taxable event in the bankruptcy, is it

10    possible that Ally will receive a tax benefit

11    in excess of $2.1 billion?

12                "Mr. McCain:  Objection to form.

13    Vague, overbroad, calls for speculation.

14                "Answer:  Is it possible?  Yes, it's

15    possible."

16                You see that Mr. Aretakis gave that

17    testimony?

18          A.    Yes.

19                MR. LIPPS:  Note my objection to

20      form.

21    BY MS. FISSELL:

22          Q.    Does that change your opinion that

23    Ally's contributing an enormous amount of

24    money to the estate?

25                MR. LIPPS:  Objection.

Page 104

1                    T. Marano

2        A.     No.    They wrote a check.    They're

3    contributing money.    The money would not be in

4    the estate if Ally didn't write the check.

5                MS. FISSELL:   I think we're done,

6         but we're going to take a five-minute

7         break.

8                THE VIDEOGRAPHER:   The time is

9         4:15 p.m.  We're coming off the record.

10                (Recess taken from 4:15 p.m. to

11         4:28 p.m.)

12                THE VIDEOGRAPHER:   The time is

13         4:28 p.m.  We're going back on the record.

14    BY MS. FISSELL:

15        Q.     Are you aware that Berkshire

16    Hathaway holds JSN bonds?

17        A.     I'm not aware of their current

18    position.  I don't know.

19        Q.     Are you aware that they had a

20    position at the time of the signing of the

21    initial PSA?

22        A.     I know they held JSNs at one point

23    in time.  I don't remember when they traded

24    out of them, or if they traded out of them.

25        Q.     Are you aware that they never signed

Page 105

1                     T. Marano

2     the initial PSA?

3         A.    No, I don't recall that they did or

4     didn't.

5         Q.    And you have no -- do you know

6     whether Berkshire Hathaway held more than the

7     aggregate number of -- held more bonds than

8     the aggregate number of JSNs that signed the

9     PSA?

10        A.    Again, I don't recall how many they

11    held.  I know they held juniors and they held

12    the senior unsecureds.  I just don't recall

13    how many they held.

14        Q.    Did you -- were you aware that they

15    held a significant number of JSNs?

16        A.    I believe -- I knew they held a lot

17    of our bonds in all the categories, like, you

18    know, hundreds -- hundreds and hundreds of

19    millions.  Maybe over a billion.

20        Q.    And are you aware that the examiner

21    was appointed at their request?

22        A.    Yes.

23            MS. FISSELL:  No further questions.

24            MR. LIPPS:  Anybody else have any

25    questions?

Page 106

1                    T. Marano

2          MR. DONOVAN:  No questions.

3          MR. MATZA-BROWN:  No questions.

4          MR. LIPPS:  Going, going, gone.

5     Thank you.

6          THE VIDEOGRAPHER:  The time is

7     4:30 p.m.

8          We're going off the record.

9          (The deposition was concluded at

10    4:30 p.m.)

11         (The exhibits were retained by the

12    court reporter to be attached to the

13    transcript.)

14

15

16

17

18         _____

19              TOM MARANO

20

21    Subscribed and sworn to before me

22    this    day of          2013.

23

24    _____

25

Page 107

1                    T. Marano

2

3          C E R T I F I C A T E

4

5   STATE OF NEW YORK   )

6                      ) ss.:

7   COUNTY OF NEW YORK )

8

9       I, THOMAS A. FERNICOLA, Registered

10   Reporter and Notary Public within and for

11   the State of New York, do hereby certify

12   that the within is a true and accurate

13   transcript of the proceedings held on

14   November 11, 2013.

15       That I am not related to any of the

16   parties to this action by blood or

17   marriage; and that I am in no way

18   interested in the outcome of this matter.

19       IN WITNESS WHEREOF, I have hereunto

20   set my hand this 11th day of November,

21   2013.

22

23          _____

24          THOMAS A. FERNICOLA, RPR

25

1                      T. Marano

2    ----------------------- INDEX --------------------

3    ATTORNEY                                         PAGE

4    Ms. Fissell                                        7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 109

1                        T. Marano

2      ----------------------- EXHIBITS -----------------

3   MARANO'S

4   DESCRIPTION                              PAGE    LINE

5    Exhibit 1 Transcript of the            48       9

6   deposition of Thomas Marano dated

7   November 12, 2012,

8    Exhibit 2 Agreement between            48      13

9   Residential Capital, LLC, Ally

10  Financial, Inc. and Davidson

11  Kempner Capital Management, LLC,

12   Exhibit 3 Document, Bates No.          54       3

13  AHG20002731,

14   Exhibit 4 Document, Bates No.          57      14

15  AHG20002759,

16   Exhibit 5 Document, Bates No.          60      18

17  AHG20002748,

18   Exhibit 6 Joint Chapter 11 Plan of     66       5

19  Reorganization,

20   Exhibit 7 Notice of Filing of          74       5

21  Corrected Solicitation Version of

22  the Disclosure Statement and Joint

23  Chapter 11 Plan,

24

25

Page 110

1                        T. Marano

2    ---------------- EXHIBITS (Cont'd)------------------

3    MARANO's

4    DESCRIPTION                          PAGE   LINE

5     Exhibit 8 Excerpt from Examiner's    80      11

6    Report,

7     Exhibit 9 Transcript of Deposition   102      5

8    of James Aretakis dated November 6,

9    2013,

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 111

1                          T. Marano

2            ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:  In Re:  Residential Capital, LLC

4   Dep. Date:  November 11, 2013

5   Deponent:   TOM MARANO

6   Reason codes:

7        1. To clarify the record.

         2. To conform to the facts.

8        3. To correct transcription errors.

9   Page _____ Line _____ Reason _____

10  From _____ to _____

11  Page _____ Line _____ Reason _____

12  From _____ to _____

13  Page _____ Line _____ Reason _____

14  From _____ to _____

15  Page _____ Line _____ Reason _____

16  From _____ to _____

17  Page _____ Line _____ Reason _____

18  From _____ to _____

19

20                            _____

21                            TOM MARANO

22

23        Subscribed and sworn to before me

24        this    day of                    2013.

25        _____

## Deposition Errata Sheet

### *In re Residential Capital, LLC, et al.,*
### Case No. 12-12020(MG)

| Deponent: | Thomas Marano |
| Deposition Date: | November 11, 2013 |

| Citation | Testimony |
|----------|-----------|
| 31:12 | to get a settlement with DOJ and the Attorney |
| 57:4 | and when ~~you~~ Lew Kruger got involved, it -- |
| 65:2 | a document that ~~anyone~~ everyone else had signed to make |
| 65:18 | you aware that there was a ~~planned~~ support |
| 77:14 | the market or creating the impression we were going |
| 101:19 | either way~~,~~. They~~they~~ had to write a big check~~,~~. No.~~no.~~ |

Date:  _11/15/13_

Signed:  _Thomas Maran_

Thomas Marano