Page 1

```
 1              M. Carpenter
 2      UNITED STATES BANKRUPTCY DISTRICT COURT
 3      FOR THE SOUTHERN DISTRICT OF NEW YORK
 4   -------------------------------x
     In re:                    Case No. 12-12020
 5   RESIDENTIAL CAPITAL, LLC, et al.,     (MG)
                 Debtors,    Jointly Administered
 6   -------------------------------x
     RESIDENTIAL CAPITAL, LLC, et al.,
 7                   Plaintiffs,
 8          vs.           Adversary Proceeding
 9   UMB BANK, N.A., as successor   No. 13-01343 (MG)
     indenture trustee under that
10   Certain Indenture, dated as of
     June 6, 2008; and WELLS FARGO BANK,
11   N.A., Third Priority Collateral
     Agent under that Certain Amended
12   and Restated Third Priority Pledge
     and Security Agreement and
13   Irrevocable Proxy, dated as of
     December 30, 2009,
14                   Defendants.
     -------------------------------x
15   (CAPTION CONTINUED ON NEXT PAGE)
16
17
18      VIDEOTAPED DEPOSITION OF MICHAEL CARPENTER
19             New York, New York
20          Tuesday, November 12, 2013
21
22
23   Reported by:        Yellow Highlighting = JSN Designation
24   THOMAS A. FERNICOLA, RPR   Pink Highlighting = Plaintiff's Counter-Designation
25   JOB NO. 67416        Orange Highlighting = Joint Designation
```

**The Debtors and Committee object to the JSNs' use of the deposition of Mr. Carpenter on the ground that this deposition may not be used under Bankruptcy Rule 7032.**

1            M. Carpenter

2  (Caption Continued as follows:)

   -----------------------------x

3  OFFICIAL COMMITTEE OF UNSECURED

   CREDITORS, on behalf of the

4  estates of the Debtors,

            Plaintiff,    Adversary Proceeding

5    vs.                   No. 13-01277 (MG)

6  UMB BANK, N.A., as successor

   Indenture Trustee under that

7  Certain Indenture, dated as of

   June 6, 2008; and WELLS FARGO BANK,

8  N.A., Third Priority Collateral

   Agent and Collateral Control Agent

9  under that Certain Amended

   and Restated Third Priority Pledge

10 and Security Agreement and

   Irrevocable Proxy, dated as of

11 December 30, 2009,

            Defendants.

12 -----------------------------x

13

14            November 12, 2013

15               2:14 p.m.

16

17      Videotaped Deposition of MICHAEL

18  CARPENTER, held at the law offices of

19  Kirkland & Ellis, LLP, 601 Lexington Avenue, New

20  York, New York, before Thomas A. Fernicola, a

21  Registered Professional Reporter and Notary

22  Public of the State of New York.

23

24

25

1              M. Carpenter

2    A P P E A R A N C E S:

3

4            KIRKLAND & ELLIS

5            Attorneys for Ally

6                655 Fifteenth Street, N.W.

7                Washington, D.C. 20005

8            BY:  DANIEL DONOVAN, ESQ.

9                  - and -

10

11           KIRKLAND & ELLIS

12               300 North LaSalle

13               Chicago, Illinois 60654

14           BY:  RAY SCHROCK, ESQ

15  .

16

17           ALSTON & BIRD

18           Attorneys for Wells Fargo Bank, N.A.

19             as Trustee

20           90 Park Avenue

21           New York, New York 10016

22           BY:  WILLIAM HAO, ESQ.

23               (Telephonically)

24

25

Page 4

1                    M. Carpenter

2     A P P E A R A N C E S  (Continued):

3

4          MORRISON & FOERSTER

5          Attorneys for Debtors

6               1290 Avenue of the Americas

7               New York, New York 10104

8          BY:  KAYVAN SADEGHI, ESQ.

9

10

11          MILBANK TWEED HADLEY & MCCLOY

12          Attorneys for the Ad Hoc Group of

13             Junior Secured Noteholders

14               1 Chase Manhattan Plaza

15               New York, New York 10005

16          BY:  ATARA MILLER, ESQ.

17               ATESSH CHANDA, ESQ.

18

19

20          KELLEY DRYE & WARREN

21          Attorneys for UMB Bank

22               101 Park Avenue

23               New York, New York 10178

24          BY:  TIMOTHY MARTIN, ESQ.

25               (Telephonically)

Page 5

1                    M. Carpenter

2  A P P E A R A N C E S  (Continued):

3

4            REED SMITH

5            Attorneys for Wells Fargo

6                 Reed Smith Centre

7                 225 Fifth Avenue

8                 Pittsburgh, Pennsylvania 15222

9       BY:  ZACHARY GELACEK, ESQ.

10                (Telephonically)

11

12

13           CADWALADER WICKERSHAM & TAFT

14           Attorneys for MBIA

15                One World Financial Center

16                New York, New York 10281

17      BY:  JASON JURGENS, ESQ.

18

19

20

21

22  ALSO PRESENT:

23           CARLOS LOPEZ, Videographer.

24

25

Page 6

M. Carpenter

1

2        THE VIDEOGRAPHER:  This is the start

3    of tape labeled No. 1 of the deposition of

4    Michael Carpenter in the matter, In Re:

5    Residential Capital, LLC.

6        This deposition is being held at 601

7    Lexington Avenue, New York, New York, on

8    November 12, 2013 at approximately

9    2:14 p.m.

10        My name is Carlos Lopez.  I am the

11    legal video specialist from TSG Reporting,

12    Inc.

13        The court reporter is Tom Fernicola,

14    in association with TSG Reporting.

15        Appearances are noted.

16        Will the court reporter please swear

17    in the witness.

18

19   M I C H A E L   C A R P E N T E R,

20        called as a witness, having been duly sworn

21    by a Notary Public, was examined and

22    testified as follows:

23   BY THE REPORTER:

24        Q.    Please state your full name and

25    address for the record.

1           M. Carpenter

2      A.    Michael Alan Carpenter,

3   C-A-R-P-E-N-T-E-R.  Alan is one L.  134 Otter,

4   O-T-T-E-R, Rock, R-O-C-K, Drive, Greenwich,

5   Connecticut 06830.

6

7   EXAMINATION BY MS. MILLER:

8      Q.    Good afternoon, Mr. Carpenter.  My

9   name is Atara Miller, and I'm at Milbank Tweed

10  Hadley & McCloy, and we represent the Junior

11  Secured Noteholders in this action.  I'm going

12  to go over a couple of the basic ground rules

13  for this afternoon.

14          The first is I'm going to ask

15  questions, you'll give me answers, and it

16  would help the court reporter if you wait for

17  me to finish asking a question before you give

18  a response, and I'll try to do the same.

19          I also got a special request from

20  the court reporter for you to give clear and

21  audible answers so he can take it down.  The

22  setup is a little bit difficult for him.

23          There may be times throughout the

24  afternoon where your counsel may object to a

25  question that I ask.  I'm going to ask that

1                         M. Carpenter

2    you still answer the question unless your

3    counsel instructs you specifically not to

4    answer the question.  If at any time a

5    question that I ask you is unclear or you need

6    clarification, just ask.

7              Okay?

8        A.    Understood.

9        Q.    Also, if you could give audible

10   answers instead of nods of the heads or other

11   nonverbal gestures or acknowledgments, that

12   would be good.

13             Okay?

14       A.    Yes.

15       Q.    Also, if you need a break, just let

16   me know; but if there's a question pending,

17   I'm going to ask that you answer the question

18   that I've asked before we take a break.

19       A.    Sure.

20       Q.    Mr. Carpenter, could you tell me

21   what your current position is?

22       A.    I'm the Chief Executive Officer of

23   Ally Financial.

24       Q.    And when did you assume that

25   position?

Page 9

M. Carpenter

1

2      A.      The middle of November 2009.

3      Q.      And when did you first start working

4   for Ally?

5      A.      I joined the board of directors in

6   May 2009.

7      Q.      And what was your employment before

8   you joined Ally?

9      A.      Immediately prior to that I had my

10   own firm called Southgate Holdings.  Previous

11   to that I was -- '06 to '09.

12           And then from '95 to 2006, I had

13   various jobs at Travelers, which subsequently

14   merged into Citi, with Citibank to form

15   Citigroup, and I had a variety of senior

16   management responsibilities in both of those.

17           I was at GE for 10 years prior to

18   that, and I was in the Boston Consulting Group

19   for nine years prior to that.

20      Q.      And are you currently a member of

21   the board of Ally Financial?

22      A.      Yes.

23      Q.      And have you been a member of the

24   board of Ally Financial throughout the period

25   from when you started in May 2009?

Page 10

M. Carpenter

1

2      A.     Yes.

3      Q.     Mr. Carpenter, I'd like to show you

4   a document that was previously marked as Marx

5   Exhibit 1, which is the ad hoc group of Junior

6   Secured Noteholders Notice of Subpoena to Ally

7   Financial, Inc.  And if you look at page 7 of

8   the document, there are a number of deposition

9   topics listed.

10        Do you understand that you've been

11  identified as the 30(b)(6) corporate

12  representative on behalf of AFI with respect

13  to deposition Topics 2, 3 and 4 listed on

14  page 7?

15     A.     Yes.

16     Q.     And what did you do to prepare for

17  your deposition today?

18     A.     I reviewed with counsel a number of

19  documents on various topics.

20     Q.     And did any of the documents you

21  reviewed with counsel refresh your

22  recollection in any way?

23     A.     Yes.

24     Q.     And which documents did you review

25  that refreshed your recollection?

1                          M. Carpenter

2          A.    I don't remember which documents.  I

3      looked at 20 or 30 documents which

4      collectively refreshed my recollection, which

5      was pretty good anyway.

6          Q.    And do you recall which topics the

7      documents you looked at refreshed your

8      recollection about?

9          A.    I think some of the details of the

10     events that occurred and the dates that

11     occurred and some of the public statements

12     that we made would be the things that would

13     come to mind.

14              THE WITNESS:  Am I speaking clearly

15        enough for you?

16              THE COURT REPORTER:  Yes, thank you.

17     BY MS. MILLER:

18         Q.    And did you review internal e-mails?

19         A.    I don't recall seeing any internal

20     e-mails.

21         Q.    Did you review public filings by

22     Ally Financial?

23         A.    Yes.

24         Q.    And did you review any PowerPoint

25     presentations that were made to the board of

Page 12

1                    M. Carpenter

2   directors of Ally Financial?

3        A.    I don't believe I did, no.

4        Q.    Did you review any other board

5   materials that were submitted to the Ally

6   Financial board?

7             MR. DONOVAN:  Other than the SEC

8        filings he talks about?

9             MS. MILLER:  Right, yes.

10       A.    Not that I recall.

11       Q.    How long did you meet with counsel?

12       A.    A couple of hours.

13       Q.    And, Mr. Carpenter, do you believe

14   that you're the person most knowledgeable at

15   Ally Financial, Inc. and are competent to

16   testify about the matters identified in

17   Topics 2, 3 and 4, specifically the analysis

18   of claims settled as part of the Ally

19   settlement, all matters concerning the

20   analysis of, including the decision to enter

21   into the Ally settlement, and all matters

22   concerning any analysis of alternatives to the

23   Ally settlement?

24       A.    I believe I am, yes.

25             MR. DONOVAN:  Mark objection to

Page 13

M. Carpenter

1  
2      form.

3  BY MS. MILLER:

4      Q.    Mr. Carpenter, do you anticipate

5  submitting direct testimony in this case?

6      A.    Yes.

7      Q.    On what topics do you expect to

8  cover in your direct testimony?

9          MR. DONOVAN:  And before you go,

10      Mr. Carpenter, I'm going to let him answer

11      this but, obviously, it's not done yet or

12      submitted; so, I just want to make sure he

13      can answer what he believes it's going to

14      be, based on his work to date.

15      A.    Among other topics, it will address

16  the magnitude of the support that Ally

17  provided to ResCap prior to its filing for

18  bankruptcy.  It will address the tremendous

19  support that Ally provided to ResCap during

20  the bankruptcy process which allowed the

21  estate to be able to sell the assets for

22  $4-1/2 billion, and without that help that

23  would not have been possible.

24          We -- I also talk about the

25  settlement that we reached with the board of

1                     M. Carpenter

2     directors and the company prior to or around

3     the time of its filing.  I address

4     specifically in several cases the fact that we

5     would not have entered into any settlement

6     whatsoever if it were not for complete and

7     total releases from the estate and from all

8     third parties.

9               And that I would like to underline

10    that point.  I addressed the mediation process

11    that led to Ally increasing the amount of cash

12    that it put on the table as part of the

13    overall settlement and how we got to that.

14    And that Ally's expectations with regard to

15    the future are, obviously, if the plan is

16    confirmed, we'll be happy to write the check,

17    and if the plan is not confirmed, that, in

18    particular, the third-party releases are not

19    granted, then we will withdraw our $2.1

20    billion support.

21               I'm sure there are other things, but

22    those are the ones that come to mind.

23       Q.    And do you know that those direct

24    witness statements are being submitted today?

25       A.    Yes.  Well, I don't know --

Page 15

M. Carpenter

1

2          MR. DONOVAN:  It probably all

3     depends on how long you keep us here today

4     when it will be filed tonight.

5          MS. MILLER:  I guess so.  I think

6     there's a deadline, but...

7  BY MS. MILLER:

8     Q.    You understand that the deadline for

9  submitting witness statements is

10 November 13th?

11    A.    I'm sure my counsel understands

12 that.  I don't.

13    Q.    What about the mediation process do

14 you intend to testify about?

15    A.    Well, as I understand it, the

16 mediation process itself is privileged; and,

17 so, therefore, I'm unable to discuss the

18 details of the process itself, simply to say

19 that we entered into a process that, as you

20 know, was supervised by Judge Peck.

21          We entered into an arm's length

22 negotiation.  We listened to his advice and we

23 ended up at a much higher number than I

24 thought was -- would ever be possible and

25 certainly way beyond what I ever thought was

1                         M. Carpenter

2      justified.

3                      But in terms of the mechanics of

4      what took place in that room, that I'm not

5      prepared to discuss, unless counsel tells me

6      otherwise.

7                      MR. DONOVAN:  No.  That's right.

8   BY MS. MILLER:

9          Q.    Mr. Carpenter, have you ever

10     characterized the $2.1 billion settlement

11     payment as a hostage payment?

12         A.    I don't know that I characterized it

13     as hostage payment, but I certainly have used

14     language like that in different situations.

15         Q.    And what language have you used?

16         A.    I may have used the term "hostage

17     payment."  Certainly when I talk to the

18     analytical community, I have used terminology

19     like that.  Whether I used it in the context

20     of that payment, I'm not going to say because

21     I don't remember.

22                      But let me simply say that my view

23     of the merits of the case against us and, in

24     particular, as it related to veil piercing and

25     as it related to fraudulent conveyance, was

1                     M. Carpenter

2    that there was absolutely no merit whatsoever.

3              And I would say there's nothing --

4    nothing has transpired, including the

5    examiner's report, that would cause me to have

6    a different view of that conclusion; that as

7    of today, I don't think the accusations

8    leveled against us had any merit whatsoever.

9              And, therefore, the characterization

10   of hostage payment, which I may or may not

11   have made, would not be inaccurate.

12       Q.    And what does "hostage payment" mean

13   to you?

14       A.    What it means to me is simply

15   writing a check that is not in proportion to

16   the merits.  Now, we did it voluntarily and we

17   did it for sound business reasons.

18       Q.    Mr. Carpenter, will you be available

19   to testify live at trial?

20       A.    Yes.

21       Q.    Were you interviewed by the examiner

22   in connection with your role at Ally?

23       A.    Not by the examiner personally.  I

24   was interviewed by the law firm that was

25   representing the examiner.

1                    M. Carpenter

2        Q.    And was that Chadbourne & Parke?

3        A.    I believe it was.

4        Q.    And how many days were you

5    interviewed for?

6        A.    It was a matter of, I think about

7    three hours.

8        Q.    And was your testimony recorded?

9        A.    I don't recall.

10       Q.    Did you review the examiner report?

11       A.    Yes.

12             Let me be more accurate.

13       Q.    Okay.

14       A.    If I told you --

15       Q.    I was going to be amazed.

16       A.    If I had told you I read that many

17   pages, you would wonder if I was being

18   truthful.

19             I read the executive summary of the

20   examiner's report.

21       Q.    And beyond reading the executive

22   summary, were there any specific sections that

23   you read more in depth?

24       A.    I didn't read any of the sections.

25       Q.    Did you do a word search for your

1                         M. Carpenter

2    name?

3         A.      No, I did not.

4         Q.      Did anyone point out to you where

5    you were referenced and discussed in the

6    examiner's report?

7         A.      I don't believe they did, no.

8         Q.      And was there anything in the

9    executive summary of the examiner report that

10   surprised you when you read it?

11             MR. DONOVAN:  And, Mr. Carpenter,

12        before you expand on the area, obviously,

13        you get legal advice, you shouldn't

14        disclose any legal advice or discussion

15        you had.  To the extent you had

16        discussions with nonlawyers or your own

17        review it, that's fine, you can testify

18        about that.

19   BY MS. MILLER:

20        Q.      I'd say -- so let me restate my

21   question because I didn't read that into it,

22   so let me just be clear.

23             Is that anything that when you were

24   reading the examiner report surprised you?

25             MR. DONOVAN:  Same instruction.

Plaintiff's
Objection
19:20-21:18
Irrelevant (FRE
401, 402)

Plaintiff's
Objection
19:20-21:7
Inadmissible
hearsay (FRE
802)

1                     M. Carpenter

2          A.        Fine.

3                    I was not surprised by the complete

4    vindication on piercing of the veil and

5    fraudulent conveyance.  I was quite surprised

6    at some of the other things that were

7    mentioned and quantified in the report, which,

8    in my own judgment, have no merit whatsoever.

9          Q.        And what were those other things

10   that were mentioned and quantified in the

11   report that you believe have no merit?

12         A.        I don't remember the details of it

13   because I haven't looked at it in a long time.

14                   There was some crazy notion about

15   taxes which made absolutely no sense to me

16   whatsoever.  There was some other crazy notion

17   associated with Minnesota which made no sense

18   to me whatsoever.  And big numbers were

19   attached to these things.

20                   The only thing in there that I

21   thought you could at least have a debate on

22   was the transfer pricing associated with

23   mortgages from the bank to ResCap, and did the

24   bank take more of a markup than it should

25   have.

Page 21

1                      M. Carpenter

2           Now I personally don't think they

3    did and we certainly had an accounting firm

4    take a look at it.  But it was the only thing

5    that I thought you could even have an

6    intelligent conversation around it.  The rest

7    of it, frankly, I thought was garbage.

8        Q.    And when you're talking about the

9    debate about the transfer pricing and the

10   associated with mortgages from the bank to

11   ResCap and whether the bank took more of a

12   markup than it should, are you referring to

13   the discussion about the brokering agreement

14   and the MMLPSA?

15       A.    Yes.  What I would refer to as the

16   Glassner question.  I'm not sure exactly which

17   agreements, but that was a very small number

18   in the scheme of things.

19       Q.    Mr. Carpenter, do you believe that

20   there were any other claims for which Ally is

21   being released that had merit?

22       A.    No.  I mean, remember, I haven't

23   looked at the document in many months at this

24   point; but my recollection of looking at that

25   document was that there were none of those

1                        M. Carpenter

2    complaints that had any logic to them

3    whatsoever, or any merit.

4         Q.    I'm going to ask you to put the

5    examiner to the side of your mind right now --

6         A.    Uh-huh.

7         Q.    -- and I'm asking generally whether

8    there were any claims for which Ally is being

9    released as part of the global settlement that

10   you believe have merit?

11              MR. DONOVAN:  And, again,

12         Mr. Carpenter, again, this is a very broad

13         question.  So I think it's really just

14         your general reaction, because it can't

15         be -- you're not asking I know for legal

16         advice or counsel of that sort.

17              MS. MILLER:  No.

18         A.    To be honest with you, I don't

19   really know how to answer that question.  I

20   mean, the only thing I can tell you is that I

21   did not believe that any of the things that

22   were mentioned in the examiner's report --

23   many of the things that came out of the

24   examiner's report I'd never heard of before.

25   They were completely out of the blue.

M. Carpenter

1

2          Obviously, I made the point of

3     trying to understand them to form a judgment

4     as to their merits.  I concluded, based on

5     professional work with my staff, that, in

6     fact, these new-found theories had no merit

7     whatsoever.  And so, I can only really react

8     to the things that are contained in the

9     examiner's report.

10         Q.    Mr. Carpenter, would Ally be willing

11    to go forward with the global settlement if it

12    included a carve-out for the claims related to

13    the Glassner issue, as you characterized it?

14         A.    No.   Absolutely not.

15              Let me say something very, very

16    simple.  All right.

17              The very first negotiation with the

18    debtors, with the board of directors at

19    ResCap, the very first conversation, the whole

20    premise was complete and total releases;

21    otherwise, there was no deal.

22              And when we went into the mediation,

23    we made it clear, complete and total releases,

24    otherwise, there was no deal.  And as of

25    today, complete and total releases, otherwise,

1                          M. Carpenter

2       there was no deal.

3                   And if I go back in history, when I

4       first met Mr. Buffett and Mr. Buffett proposed

5       he was one of the person you're representing,

6       when proposed buying ResCap for pennies on the

7       dollar, I said we could have a conversation

8       provided we are completely released from all

9       of these kinds of obligations.

10                  And they made a series of proposals,

11      none of which came to pass because they were

12      unable to cross or unwilling to cross that

13      bridge.  So, for two years now, the answer is

14      no deal without complete releases, and that is

15      where we are right now.

16                  And, by the way, I would say the

17      examiner's report, if this whole deal falls

18      apart, I have a lot more confidence with the

19      examiner's report on where it will end up than

20      I did before the report came out.

21          Q.    Because of the examiner report --

22      sorry, because of the examiner's treatment of

23      the veil piercing and fraudulently conveyance

24      action?

25          A.    Because those really are the two key

1                    M. Carpenter

2      issues.  Everything else is garbage.

3      Technical term.

4              MR. DONOVAN:  That was legal advice;

5          correct?

6      BY MS. MILLER:

7          Q.    So I take it, then, that Ally would

8      not be willing to go forward with the global

9      settlement if there was a carve-out for claims

10     related to breach of the tax allocation

11     agreement; right?

12         A.    We are not willing to go forward

13     with any carve-outs for anything.  This deal

14     has been negotiated with Judge Peck as the

15     mediator.  There is no more room for

16     negotiation from start, end of story.

17         Q.    Do you think it was important to

18     have the settlement finalized before the

19     examiner's report was made public?

20             MR. DONOVAN:  Objection to form.

21             Again, Mr. Carpenter, you can give

22         your own personal reactions, but any legal

23         advice should not be disclosed.

24         A.    I don't know the answer to that, to

25     be honest.  I mean, I -- I would say -- I

Page 26

M. Carpenter

1    would say to you this.

3         I would say to you the cost of
4    putting this behind us became so high that
5    I was very much considering whether just to
6    kick the can down the road and see what
7    happened with the report.

8         And if I look in the rear-view
9    mirror, I almost wish I had.

10   Q.    Mr. Carpenter, do you believe that
11   there was merit to third-party claims that
12   could be asserted against Ally?

13   A.    I have no idea, I mean -- you'd have
14   to define your terms.  I don't know what that
15   means.  Okay.

16   Q.    Did you think that Ally had material
17   exposure on rep and warranty claims?

18         MR. DONOVAN:  To the extent your
19         knowledge comes from legal advice either
20         way, you should not disclose that.

21         And your question is seeking legal
22         advice.

23   BY MS. MILLER:

24   Q.    When you were negotiating the global
25   settlement, did you consider a value that

1                        M. Carpenter

2       third-party claims against Ally might have?

3            A.       You mean a numerical value?

4            Q.       Numerical value.

5            A.       No.

6            Q.       What analysis did you do of

7       potential claims that could be asserted by

8       ResCap against Ally?

9                  MR. DONOVAN:  Again, you can answer

10           from the business perspective, but don't

11           disclose any legal advice.

12                  Can you reask your question?  I just

13           think it's getting into -- that kind of

14           question is pretty in the sweet spot of

15           legal advice.

16                  MR. JURGENS:  Well, I'm asking

17           Mr. Carpenter what analysis he did of

18           potential claims that could be asserted by

19           ResCap against Ally.

20           A.       The answer is I commissioned

21       extensive legal analysis of all the claims

22       that could be asserted against Ally by ResCap

23       well in advance of ResCap's decision to file

24       for bankruptcy.

25           Q.       And did your counsel present you

1                    M. Carpenter

2    with a complete -- sorry, strike that.

3            Did you ask any business people

4    within Ally Financial to do an analysis of

5    potential litigation risk exposure?

6        A.    No.

7            MR. DONOVAN:  And, again -- that's

8        fine.

9        A.    This was -- this was all done by

10   outside counsel.

11       Q.    Okay.

12            And what did you do to assess

13   potential claims that third parties could

14   assert against Ally?

15       A.    Again, we commissioned a major and

16   very thorough review by outside counsel of

17   every conceivable exposure that we could have

18   that would be derived from the actions of

19   ResCap over many previous years.

20            And to give you a specific, let's

21   take rep and warrant.  Okay.  It is very, very

22   clear that the rep and warrant exposure is

23   ResCap's.  It is contractually ResCap's

24   obligation; but, nevertheless, it's entirely

25   appropriate for me, as the chief executive, to

M. Carpenter

1   ask the question, even though that is ResCap's

2   obligation clearly by contract and their

3   contract is with the investors, their contract

4   is with the GSCs, is there any way that the

5   parent would have liability for that exposure

6   of ResCap's.

7           It's a completely legitimate

8   question for me to ask and bears directly on

9   the issue of piercing of the corporate veil

10  that we talked about before, that I was

11  pleased that the examiner found was not the

12  case.

13          So I'll give you that as an example.

14          MS. MILLER:  I'd like to mark as

15      Carpenter Exhibit 1 a document Bates

16      stamped Ally_0255144 through 162.

17          (A Discussion was Held off the

18      Record.)

19          (Carpenter's Exhibit 1, Transcript

20      of Conference Call dated November 2,

21      2011, Bates Nos. Ally_0255144 through

22      162, was marked for identification.)

23  BY MS. MILLER:

24          Q.    Mr. Carpenter, I've marked as

1                    M. Carpenter

2        Carpenter Exhibit 1 a final transcript from

3        Thomson StreetEvents of a conference call, the

4        Q3 2011 Ally Financial, Inc. earnings

5        conference call from November 2nd, 2011 at

6        1:00 p.m.

7              Do you see that?

8        A.     Sure.

9        Q.     This is a document you've seen

10   before?

11       A.     I haven't seen this document before,

12   no; but we do take transcripts of our calls.

13       Q.     Mr. Carpenter, when did you first

14   start considering a global settlement with

15   ResCap?

16              MR. DONOVAN:   Objection to the form.

17              You can answer.

18       A.     I don't know what that means.

19       Q.     When did you first start settlement

20   discussions with ResCap that would have

21   included a broad release of all debtor and

22   third-party claims?

23       A.     Some time in the time frame when

24   ResCap's board of directors was considering

25   filing for bankruptcy.

M. Carpenter

1     Q.    Do you recall approximately when

that was?

     A.    That would be some time

presumably -- well, I don't, you know, I

didn't go to the ResCap board meetings, so I

don't know exactly when.  But I would have

guessed it would have been in the early part

of 2012.  That would have been my guess.

     Q.    And by "early," is January probably

a safe assumption?

     A.    I don't know.  Early to me is

anytime between January and April.

     Q.    Okay.

     Well, I'll show you documents that

can hopefully --

     A.    Sure.

     Q.    -- orient us in time.

     Mr. Carpenter, if you would turn to

the page in Carpenter Exhibit 1 with the Bates

ending in 151.

     A.    Yes.

     Q.    Do you see there's a section that

begins toward the top of the page that says,

"Michael Carpenter, Ally Financial, Inc.'s

1              M. Carpenter

2    CEO," and then there's a lot of writing.

3         Do you have an understanding of what

4    this is?

5    A.    Yes.  This is the -- without reading

6    the whole document, I'm presuming this is a

7    transcript of our earnings call.

8    Q.    And is it correct that the comments

9    under the heading, "Michael Carpenter, Ally

10   Financial, Inc.'s CEO," are comments that you

11   made on the earnings call?

12   A.    Well, I haven't read them, okay, so

13   I would like -- what I will, first of all, say

14   is my experience in reading these things is

15   they frequently make a lot of mistakes.

16   Q.    Okay.

17   A.    So, I mean, I'm happy to read it and

18   then comment on anything in particular.

19   Q.    Okay.

20   A.    But I just caveat that they make a

21   lot of mistakes.

22   Q.    Okay.

23        So I'm going to ask you to read

24   those portions of this transcript that you

25   believe are comments that you made or that are

Page 33

1                    M. Carpenter

2     identified as comments that you made.

3              MR. DONOVAN:  So you want him to

4         read both pages, it appears, 151 and 152?

5              MS. MILLER:  If he feels like he

6         needs to review all of the comments he

7         made to tell me if he thinks it's accurate

8         or not, I'd like him to review all the

9         comments that are identified as comments

10        made by Michael Carpenter on the

11        transcript.

12        A.    (Document Review.)

13              Fine.  Yes, okay.

14        Q.    Mr. Carpenter, is it your

15    understanding that the text under the heading,

16    "Michael Carpenter, Ally Financial, Inc.'s

17    CEO," are comments that you made during the

18    investor -- during the November 2nd, 2011

19    investor call?

20        A.    Generally speaking, yes.  Not

21    necessarily word for word, but generally

22    speaking, yes.

23        Q.    Okay.

24              And looking on the page with the

25    Bates ending 151, starting about six

Plaintiff's
Objection
33:14-22
Inadmissible
hearsay (FRE
802)

1                        M. Carpenter

2     paragraphs up from the bottom, there's a

3     discussion about the AG, claims that could be

4     brought by the AG and settlement with the AGs.

5              And you said at the very end in the

6     last sentence of paragraph -- of the fifth

7     paragraph from the bottom, "We see our

8     exposure as a small fraction of that number,

9     referring to the applied market share

10    settlement number that had been bandied about

11    adjusted for Ally's applied market share in

12    the area of 1 billion to 1.5 billion" -- and,

13    sorry, let me restate that.

14         A.    Go ahead.

15         Q.    Do you see that in discussing the

16    potential settlement with the AG, you indicate

17    that numbers have been thrown around in the

18    marketplace of a $5 billion number which,

19    based on Ally's market share, would have been

20    a settlement in the area of 1 to $1.5 billion?

21         A.    Yes.

22              MR. DONOVAN:   Objection to form.

23    BY MS. MILLER:

24         Q.    And it was your position on the call

25    that Ally's exposure was a small fraction of

Page 35

1                     M. Carpenter

2    that number and that Ally simply would not

3    settle for those kind of numbers; right?

4        A.    You realize this is about

5    robo-signing.  It has nothing to do with this

6    case at all; right?

7        Q.    I understand.

8        A.    Okay.

9        Q.    And in the next paragraph you have a

10   discussion of securities law claims.  And,

11   again, with respect to those you say that

12   you're confident in the legal defenses related

13   to the claims.

14           And then you say with respect to the

15   FHFA claims, you see them as being tactical

16   and completely without merit?

17       A.    Yes.

18       Q.    And on rep and warranty claims in

19   the last paragraph on that page, and carrying

20   over to the top of the page ending in 152, you

21   say that "ResCap currently has 825 --

22   29 million of reference for rep and warranties

23   and we believe that's adequate based on the

24   claims and issues."

25           Do you see that?

1                            M. Carpenter

2        A.      Yes.

3        Q.      And then seven paragraphs down,

4    right in the middle of the page, you say,

5    "Finally, to be clear," and then you stress,

6    "and this is very important, all of these

7    contingent exposures we have been discussing

8    would, if they emerge, be obligations of

9    ResCap and its entity, which include GMAC

10   Mortgage."

11               Then you state, "While Ally owns

12   100 percent of ResCap, ResCap has operated as

13   a clearly separate legal entity."

14               Do you see that?

15       A.      Yes.

16       Q.      And why was that important to say on

17   this call?

18       A.      I think it, you know, it bears

19   directly on the findings of the examiner's

20   report, which is we essentially said that we

21   ran ResCap very much as a separate company.

22   It had its own board of directors, it had an

23   operating agreement, filed its own S1 with the

24   SEC, entered into its own contracts without

25   the endorsement of the parent.

Plaintiff's
Objection
36:3-37:12
Inadmissible
hearsay (FRE 802)

Page 37

1                    M. Carpenter

2              And all of those things were

3        evidence that the obligations of ResCap were

4        not the obligations of the parent, as borne

5        out by the examiner's report.

6          Q.     And so you were saying that --

7          A.     That's all I was saying there.

8          Q.     So you were saying that Ally's

9        exposure on these potential claims didn't

10       exist because the claims were being asserted

11       against ResCap, which is a separate legal

12       entity; is that right?

13              MR. DONOVAN:   Objection to the form.

14              You can answer.

15       A.     I was simply saying that these,

16       whatever the merits of these claims, and we

17       thought many of them were weak, that those

18       claims would be against ResCap, the legal

19       entity, and did not necessarily transfer, did

20       not, in our view at all, transfer to being

21       obligations of the parent.

Plaintiff's
Objection
37:15-21
Inadmissible
hearsay (FRE
802)

22          Q.     Were there any third-party claims

23       that were being negotiated and settled as part

24       of the global settlement in this case that you

25       believe Ally had direct exposure for?

Page 38

M. Carpenter

1

2        MR. DONOVAN:  Again, Mr. Carpenter,

3    you can answer to the extent it's not

4    legal advice.

5        A.    I have no idea how to answer that

6    question.  You'd have to give me and list of

7    claims and say what about that one.

8        I can't -- I can't answer these

9    things in sweeping generalities like that.

10       Q.    So when you were sitting and

11   negotiating or thinking about what Ally's

12   position --

13       A.    What time frame are we -- this is

14   2011.

15       Q.    Right.

16       A.    Right?

17       What time frame are you on?

18       Q.    Let's start with January and

19   February of 2012, when you first start having

20   discussions with ResCap about a settlement

21   that would include a broad release, including

22   a broad third-party release.

23       A.    Let's call it -- let's call it the

24   spring of 2012.  I don't want to be pinned

25   down to even months, but go ahead, what was

1                        M. Carpenter

2      the question?

3          Q.    Can we include February in the

4      spring?

5          A.    Sure.  January, February, March,

6      April.

7                Some of us --

8          Q.    The rosiest outlook for January and

9      February.

10         A.    Let's say the first four months of

11     the year.

12         Q.    Okay.

13               So can we call it -- all right.  Q1

14     into Q2.  Okay.

15               In the January to April 2012 time

16     period when you're negotiating with ResCap,

17     were you considering the value that a third

18     party -- that a release from third-party

19     claims had to Ally in connection with that

20     settlement?

21         A.    I think I testified to this already.

22     We simply took the point of view that we're

23     not entering into it.  We are not entering

24     into a negotiation unless it is understood by

25     all parties that complete releases from the

1                          M. Carpenter

2       debtors, from the estate, and from third

3       parties, was a precondition to any

4       negotiation.

5                   And the answer to the ResCap board

6       was, if you don't accept that as a

7       precondition, then there is no negotiation.

8       And then if I complete my logic, if there is

9       no negotiation, there is no support agreement

10      and there's no $4-1/2 billion from asset

11      sales.

12                  So, just to complete the story,

13      without -- without a complete and total

14      understanding on day one that we would get

15      full releases from third party and the estate,

16      then the estate would not have achieved a

17      fraction of $4-1/2 billion of proceeds from

18      asset sales.

19                  It was a precondition,

20      non-negotiable, and never at any time in the

21      process ever reconsidered.

22          Q.    How did you --

23          A.    I don't know how to be more

24      definitive.  We can do this for hours if you

25      want, but that is the simple answer.

Page 41

1                           M. Carpenter

2         Q.      Okay.

3         A.      All right?

4         Q.      How did you decide -- how did Ally

5    decide what amount to put on the table in its

6    negotiation with ResCap in the spring of 2012?

7         A.      Well, we started from the point of

8    view that we actually did not have any

9    obligation at all.  And we entered into an

10   arm's length negotiation with the independent

11   members of the ResCap board of directors.

12           And the ResCap board of directors

13   with whatever, you know, advice they had, took

14   the position that there needed to be a

15   meaningful financial contribution, in addition

16   to all the support that we were going to

17   provide.  All right.

18           We had a very -- we had over a

19   period of several weeks an intensive

20   discussion.  We certainly didn't proffer

21   350 -- $750 million.  We weren't even close.

22   And so that was -- it was simply a case of an

23   arm's length negotiation ending up with a

24   result that both sides, probably neither one

25   was happy with, but we could live with.

Page 42

1                        M. Carpenter

2        Q.      So was the --

3        A.      I should point out something.   All

4    right?

5              ResCap already knew that there was

6    no piercing of the veil and there was no

7    fraudulent conveyance.   They knew that.   They

8    knew that they didn't have much to work with.

9              By the way, I'm speculating.   I

10    never asked them.   Okay.

11        Q.      Did you -- do you know whether

12    ResCap's advisors made presentations to your

13    counsel about claims that they had that could

14    be asserted by ResCap against Ally?

15              MR. DONOVAN:   And that's "yes" or

16        "no," Mike.   Start there.

17        A.      Yes.

18        Q.      Okay.

19              And did you see any of the

20    presentation materials?

21        A.      Yes.   It was a joke.

22        Q.      And what makes you say it was a

23    joke?

24              MR. DONOVAN:  Again, it's your

25        reaction, Mike, not legal counsel's.

1                    M. Carpenter

2        A.    Correct.  Yes, that's true.

3              MR. DONOVAN:  Although I may agree

4        with you.

5        A.    It was fantasy.  It was in the

6    wildest dreams, what kind of garbage could you

7    conjure up.

8        Q.    Would they have been better off

9    sticking to the breach of contract claims?

10       A.    What breach of contract claims are

11   you talking about?

12       Q.    The Glassner issue that the examiner

13   identified.

14       A.    I'm not -- I'm not -- I'm not going

15   to comment on that.

16       Q.    So how did you -- strike that.

17             Was the settlement -- were the

18   settlement negotiations, from your

19   perspective, just a question of, you know,

20   seeing how much could be squeezed out of a

21   lemon?

22             MR. DONOVAN:  Objection to form and

23   time frame.

24       A.    I don't understand that form at all.

25             Who was the lemon?

1      M. Carpenter

2      Q.    It would have been you in the

3   analogy.  Sorry.

4           MR. DONOVAN:  And which time frame?

5      Are you talking about leading up to this

6      $750 million?

7           MS. MILLER:  I'm still focusing on

8      the spring of 2012 negotiation.

9      A.    I can't -- I can't speak for what

10   the ResCap board's motivation was.  You know,

11   I happen to think they are responsible people

12   and they were trying to come up with something

13   they thought was fair.

14           And, you know, we started out very

15   far apart and we ended up where we ended up.

16      Q.    So from your perspective was the

17   $750 million number just a number for all of

18   the value of the releases in Ally's mind

19   without any consideration of the underlying

20   claims?

21      A.    I would describe it this way.  I

22   would say the combination of the value that we

23   were providing in the support of the ResCap

24   bankruptcy, which probably is a much bigger

25   number than the 750, okay, plus the 750, was

Page 45

M. Carpenter

1

2    a -- a value package that we were prepared to

3    pay for peace in the near term.

4              Our expectation of that time is this

5    would all have been over by December 2012.

6    Okay?  Our expectation going in, was we would

7    get the full support of the debtor for the --

8    the settlement and a quick proposal of the

9    plan going forward.

10             That didn't happen.  So it was -- it

11   was not some mechanical process of valuing X,

12   Y and Z.  It was a total package with a set of

13   expectations on both sides, and I would say

14   those expectations were met on the Ally side

15   and were not met on the ResCap side.

16        Q.    Moving forward now to the $2.1

17   billion settlement.  I'm going to refer to

18   that as it's been referred to for months in

19   this case as the global settlement.

20             Will you understand what I'm

21   referring to?

22        A.    Uh-huh.

23        Q.    Okay.

24             How did you decide on the $2.1

25   billion value to provide a settlement in the

JSN Objection
45:16-46:5
Irrelevant (FRE
401, 402), lack of
foundation (FRE
602, 901, 903)

1                    M. Carpenter

2   global settlement?

3        A.      I would say I didn't decide on it.

4   It was a result of a very, very, very

5   difficult mediation process.

6        Q.      And in the context of the mediation,

7   did you consider the potential claims and the

8   value of the claims that could be asserted

9   against Ally?

10       A.      I really don't think that was much

11  of an issue at that point.

12               Let me answer the question a little

13  differently.

14               When that negotiation began, the

15  merits were really not a subject of

16  conversation.

17       Q.      And why not?

18       A.      Because -- because Judge Peck was

19  focused on trying to get a deal done.  And the

20  uncertainty associated with the examiner's

21  report was the leverage that he had to bring

22  both sides to the table.  It's as simple as

23  that.

24       Q.      Who was holding you hostage?

25               MR. DONOVAN:  Objection to form.

Page 47

M. Carpenter

1

2       A.    What do you mean by that?

3       Q.    Well, if the global settlement

4   payment is, and you said that you very well

5   may have used the language hostage payment,

6   and I could take out a document showing you

7   that it's attributed to you --

8       A.    I actually don't think I said that

9   once we had reached a settlement.  But I

10  could -- it doesn't matter.  Let's not argue

11  about it.  It doesn't matter.

12          MR. DONOVAN:  I also think -- I'm

13      just concerned you're getting into the

14      mediation process.  If you want to ask him

15      why he entered, that's fine; but to the

16      extent you're asking him why he did

17      certain things from Judge Peck, I'm just

18      getting concerned that we are getting into

19      an area that is confidential precluded by

20      the judge.

21          MS. MILLER:  Well, I don't want to

22      know -- I'm sensitive to that.

23  BY MS. MILLER:

24      Q.    I'm certainly not asking you about

25  discussions with Judge Peck or otherwise.  But

Page 48

M. Carpenter

1

2     to the extent that you're on the public record

3     characterizing a payment as a hostage payment,

4     I just want to know what your mindset was in

5     saying it and who Ally felt it was being held

6     hostage.

7              MR. DONOVAN:  Can we see the

8          document, because I'd like to see the time

9          frame and everything.

10             MS. MILLER:  Yes.

11             We'll come back to it after a break.

12         I don't want to take time on the record

13         right now.

14    BY MS. MILLER:

15         Q.    Are you okay, you don't need a

16    break?

17         A.    Yes, I'm fine.

18         Q.    Okay.  So let's keep going.

19             Mr. Carpenter, did you insist on the

20    settlement of the intra ResCap debtor,

21    intercompany claims as part of the global

22    settlement?

23         A.    I don't even understand the

24    question.  I'm sorry.

25         Q.    So do you understand that certain

Plaintiff's
Objection
48:25-49:18
Irrelevant (FRE
401, 402), lack of
personal
knowledge (FRE
602)

1                    M. Carpenter

2      ResCap debtors, that there are intercompany

3      claims between certain ResCap debtors?

4          A.    I do understand that, yes.

5          Q.    And was a condition of Ally making a

6      payment under the global settlement, the

7      settlement of all of those intra ResCap

8      intercompany claims?

9          A.    I don't -- I wasn't part of that.  I

10     mean, I can't imagine how we could write a

11     check unless there was an agreement among the

12     various ResCap entities.  I can't imagine how

13     you do that.  But I did not lay down that as a

14     condition.

15         Q.    So from your perspective, would Ally

16     have been comfortable writing a check and

17     then, you know, letting the kids fight over

18     who gets what?

19             MR. DONOVAN:  Objection to form.

20             Can you ask a little --

21             MS. MILLER:  Sorry.

22             MR. DONOVAN:  I'm just worried --

23             actually, I'm not sure even what we're

24             talking about.  I think I know it's a

25             legal dispute.  I'm not sure the way you

Plaintiff's
Objection
49:15-18
Objection to
form:  vague
and
ambiguous

JSN Objection
49:19-50:4
Irrelevant (FRE
401, 402),
Inadmissible
hearsay (FRE
802)

Page 50

M. Carpenter

2    described it is what Mr. Carpenter is

3    referring to; so, I'm worried that there's

4    some confusion here.

5              MS. MILLER:  Okay.

6              MR. DONOVAN:  Because he was talking

7        about ResCap entities.  You're talking

8        with inter-creditor claims, I believe.  So

9        that's why --

10             MS. MILLER:  No.

11             MR. DONOVAN:  Sorry.  If you could

12        just go ahead.  I am worried his answer

13        differed from your question.

14    BY MS. MILLER:

15        Q.    Okay.

16              You know what I'm talking about, so

17    I'm going to ask a more clear question so we

18    can all be on the same page here.

19        A.    Okay.

20        Q.    Would Ally have been prepared to

21    write a check to ResCap and then allow ResCap

22    to figure out and the various ResCap

23    subsidiaries fight about where the settlement

24    payment should be allocated?

25        A.    Well, it's a very hypothetical

Plaintiff's
Objection
50:20-51:10
Irrelevant
(FRE 401,
402)

1                    M. Carpenter

2    question; right?  Which, you know, I would,

3    frankly, defer to counsel for an answer on.

4              But I would say -- I would put it in

5    these terms.  If we were writing a check and

6    we knew we were getting everything we asked

7    for, including all of the various releases

8    that I just described, how the creditors

9    divide up the spoils is a matter of

10   indifference to me.

11              MS. MILLER:  I'd like to mark as

12        Carpenter Exhibit 2 a document Bates

13        stamped Ally_0003585 through 3759.

14              (Carpenter's Exhibit 2, Set of

15        Board Material of GMAC Financial Service,

16        dated June 1, 2009, Bates Nos.

17        Ally_0003585 through 3759, was marked for

18        identification.)

19   BY MS. MILLER:

20        Q.    I've marked as Carpenter Exhibit 2 a

21   set of board materials of GMAC Financial

22   Services from the Special Informational GMAC

23   Board of Directors Meeting, dated on Monday,

24   June 1, 2009.  And you're listed as -- on the

25   top of the page.

1                        M. Carpenter

2          A.    Yes.

3          Q.    Mr. Carpenter, have you seen these

4     documents before?

5          A.    I mean, I'd have to look through the

6     document to answer that, but it's not

7     unfamiliar in terms of the kind of documents

8     that were produced.

9          Q.    And is this right around the -- is

10    this document from right around the time that

11    you joined the Ally board?

12         A.    Yes.

13         Q.    Sorry, just so the record is clear,

14    was Ally Financial at this time known as GMAC

15    Financial Services?

16         A.    Yes.

17         Q.    So these are board materials

18    relating to what we've been referring to today

19    as the Ally Financial board; right?

20         A.    They would appear to be, yes.

21         Q.    Okay.

22               Do you know whether this would have

23    been your first board meeting?

24         A.    I don't recall.  We have 36 board

25    meetings from the time I joined the board

Page 53

M. Carpenter

1     until the time I took over as CEO.

3           So I wouldn't swear that this was

4     the first.

5     Q.     I think you got paid for each one;

6     right?

7     A.     I actually don't think we did.

8     Q.     I think there was a chart somewhere

9     that shows that you did.

10          But, Mr. Carpenter, when you joined

11    the Ally board or -- sorry -- let me restate

12    that.

13          When you -- after you joined the

14    Ally board, did you have an understanding of

15    whether ResCap was insolvent?

16          MR. DONOVAN:  Objection to form.

17    A.     The board was certainly not informed

18    that ResCap was insolvent.  Nobody had

19    suggested that ResCap was insolvent.

20    Q.     Do you recall considering filing

21    ResCap for bankruptcy protection at the time

22    that you joined the board?

23    A.     What I recall -- the reason we had

24    36 board meetings is because ResCap and the

25    mortgage business, in general, was a huge

1                       M. Carpenter

2    problem for the company.  It had absorbed a

3    tremendous amount of capital.  As you know,

4    the government put $17 billion into the

5    company.  I think pretty much all of that went

6    to support the mortgage business one way or

7    another.

8            The company did not have access to

9    the capital markets because the market wasn't

10   comfortable with a mortgage business; and, so,

11   for that and many other reasons, the board of

12   directors was very, very concerned about what

13   the future strategy should be for the mortgage

14   business and ResCap, in particular.

15           And that was the topic of many of

16   those board meetings.  And we did, in fact,

17   hire financial advisors to look at every

18   conceivable alternative, and certainly

19   bankruptcy was one of the alternatives that

20   was evaluated in that time frame.

21           That is not what happened.  What

22   happened, when I took over as CEO, is with the

23   help of the U.S. Government, we made a huge

24   multi-billion-dollar infusion into ResCap

25   to -- to allow it to be recapitalized and go

Page 55

1                    M. Carpenter

2   forward.  But was it considered as an

3   alternative, yes, it was.

4       Q.    And did any of your advisors tell

5   you whether -- sorry, let me make it clear so

6   as not to draw an objection.

7            Did any of your financial advisors

8   tell you whether ResCap was insolvent from a

9   balance sheet perspective?

10      A.    No, they did not.

11      Q.    And do you know whether ResCap would

12  have been able to pay its obligations as they

13  came due if Ally did not continue to support

14  and make capital infusions into ResCap in

15  2009?

16           MR. DONOVAN:  I object to the form.

17  It's a hypothetical.

18           But go ahead.

19      A.    I don't remember what the financial

20  projects were back then.  I mean, I do

21  remember, as I said, in the -- in December of

22  '09, we wrote down the questionable mortgages

23  in ResCap.  We infused ResCap with additional

24  capital to the tune of, I think $2-1/2

25  billion, something of that order of magnitude.

Page 56

M. Carpenter

1

2        And we were comfortable when we did

3    that, that the company had the wherewithal

4    based on its business plan to go forward and

5    to thrive.

6        Q.    And in 2009, after you joined the

7    board, did you understand that -- or, sorry.

8        Did you consider whether ResCap

9    would be able to continue to pay its

10   obligations as they came due without ResCap --

11   without Ally's support?

12       MR. DONOVAN:  Objection.  Asked and

13       answered.

14       A.    Yes.  We were mostly focused on in

15   '09 what are the strategic alternatives for

16   ResCap and what direction do we go.

17       The question, there was no member of

18   management, no member of the board, no

19   member -- no advisor that I remember

20   suggesting solvency issues.

21       Q.    And was one of the alternatives that

22   the board considered cutting off further

23   support to ResCap and preparing for a ResCap

24   bankruptcy filing?

25       A.    It was one of half a dozen

Page 57

M. Carpenter

1 alternatives that were considered --

3     Q.    And on what --

4     A.    -- but it was not implemented.

5     Q.    Understood.

6     And on what basis would ResCap be

7 filing for bankruptcy?

8     MR. DONOVAN:  Again, two things,

9     Mr. Carpenter.  At that point you were the

10     board member, but still to the extent the

11     board got legal advice, that shouldn't be

12     disclosed.  To the extent --

13     A.    The board obviously made a decision

14 to support ResCap, to recapitalize it, and

15 during the time I was on the board we had

16 repeatedly put in cash and we had repeatedly

17 forgiven debt to support ResCap's financial

18 needs.

19     And the actions that were taken in

20 December of '09 were in order of magnitude

21 greater than the actions that had been taken

22 previously.  So what alternatives were

23 considered were numerous.  We looked at

24 spinoffs, we looked at all kinds of things.

25     But, in the end, the board decided

Page 58

M. Carpenter

1

2    to support the company and did so in a major,

3    major way.

4        Q.    And is it your testimony that you

5    don't know whether ResCap would have been

6    forced into bankruptcy if Ally -- if the Ally

7    board had decided instead not to provide

8    further financial support to ResCap?

9            MR. DONOVAN:  Objection to form.

10       A.    As I sit here now, I can't answer

11   that question.  I don't remember the

12   financials.

13       Q.    So you think that it's possible that

14   ResCap could have continued as a going concern

15   even without any financial support from Ally?

16           MR. DONOVAN:  Objection to form.

17       A.    It's possible, but I simply don't

18   remember the analysis back then.  You know, I

19   have to keep saying:  We looked at the

20   strategic alternatives.  We decided to commit

21   to the business in -- with a huge amount of

22   money.  And we did that because the U.S --

23   because we were able to draw $3-1/2 billion

24   from the U.S. Treasury.

25           It's no more complicated than that.

Page 59

M. Carpenter

1
2      Q.     And you did it --

3      A.     Everything else is hypothetical.

4      Q.     And you did it because you knew that

5    if Ally didn't support ResCap, ResCap would be

6    forced into bankruptcy?

7      A.     Not at all.  We did it because we

8    thought that ResCap could -- ResCap and the

9    mortgage business could be a good business,

10   could earn money and could justify the

11   shareholders's investment.

12            It wasn't for negative defensive

13   reasons.  We thought that was the best course

14   of action for the shareholders.  We were

15   wrong, but that was the decision.

16     Q.     Mr. Carpenter, do you understand

17   that ResCap had total net worth covenants that

18   it had to comply with?

19     A.     Yes.

20     Q.     And --

21            MR. DONOVAN:  Can you just give time

22         frames, because it changed over time, just

23         as you go forward, the net worth

24         covenants?

25            MS. MILLER:  Okay.

1                          M. Carpenter

2     BY MS. MILLER:

3          Q.     I'm going to talk about the entire

4     period from 2009 through the bankruptcy

5     filing.

6               Do you understand that ResCap had

7     total net worth covenants that it had to

8     comply with?

9          A.    Yes.    But it differed at different

10    times, and it was less restrictive as time

11    went on.

12         Q.     Okay.

13              And do you understand that the total

14    net worth covenants that ResCap had to comply

15    with throughout this period included total net

16    worth covenants in financial, in third-party

17    financing agreements?

18              MR. DONOVAN:    Objection to form.

19         A.     I don't recall that as I'm sitting

20    here.

21         Q.     Do you recall that ResCap had total

22    net worth covenants in bank lending

23    facilities?

24         A.     The constraint that I recall is the

25    one that we had with either Fannie or Freddie.

M. Carpenter

1

2    There may have been others, but that happens

3    to be the one I remember.

4        Q.      And if ResCap failed to satisfy the

5    net worth covenant with Fannie or Freddie, do

6    you know what the results would have been?

7        A.      No.   It would have been -- it would

8    have been complicated because, in the end,

9    Fannie and Freddie have the right to seize

10   from ResCap the mortgage servicing rights,

11   which are a substantial asset on the balance

12   sheet of the company.

13            They have the right to do that.

14   They don't have to prove anything to anybody.

15   They have to -- they have the right to do

16   that.   And that, by the way, in the bankruptcy

17   was one of the things that ResCap was most

18   concerned about, which was that that if they

19   did not get the support of Ally to continue to

20   function as a going concern and meet the needs

21   of the GSCs, that $1.1 billion of MSR value

22   that the investors -- that the creditors

23   benefited from would have not been available

24   because the GSCs could have essentially taken

25   the mortgage servicing rights away.

Plaintiff's Objection 61:4-62:5 Lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), inadmissible lay opinion

Page 62

1                    M. Carpenter

2            And so that -- whether they would

3    have done in '09, '10, you know, I don't know,

4    but that was always the concern, which was

5    what would the reaction be.

6        Q.    And what would the effect have been

7    on the bank if --

8        A.    On the bank?

9        Q.    Can I just finish my question?

10       A.    Yes.   Sorry.

11       Q.    What would the effect have been on

12   Ally if the GSCs had pulled the servicing

13   rights from ResCap?

14            MR. DONOVAN:   And let's be clear.

15       You're talking about the MSRs on ResCap's

16       books, because there are different ones

17       and that is where I think the confusion

18       is.

19       A.    You used the term "Ally Bank."   You

20   used the term "bank."   So we have three

21   entities we're talking about.   We're talking

22   about Ally Bank, we're talking about Ally

23   Financial and ResCap.

24            The first and the third have an MSR

25   asset; the second, the parent, does not.

Page 63

1                        M. Carpenter

2        Q.    What would -- what would the effect

3    have been on Ally and all of its non-debtor

4    subsidiaries if the GSCs had pulled the

5    mortgage servicing right from ResCap?

6        A.    Ally and its non-debtor -- well,

7    what would have happened is ResCap -- I mean,

8    I suppose what would have happened, I'm

9    speculating, all right, so what would have

10   happened is the billion dollars of value that

11   ResCap would have shown on its books would

12   have gone to zero.

13            And in that scenario, I guess ResCap

14   would have been bankrupt.  And then the

15   implication on the parent beyond a reduction

16   in ResCap's net worth, nothing directly, but

17   it would, obviously, indirectly it wouldn't

18   have been good.

19            MS. MILLER:  I'd like to mark as

20   Carpenter Exhibit 3 a document Bates

21   stamped Ally_0359385.

22            (A Discussion was Held off the

23   Record.)

24

25

Page 64

1                    M. Carpenter

2              (Carpenter's Exhibit 3, E-Mail from

3          Lara Hall to Michael Carpenter dated

4          September 26, 2011, Bates No.

5          Ally_0359385, was marked for

6          identification.)

7    BY MS. MILLER:

8         Q.    Mr. Carpenter, I've marked as

9    Carpenter Exhibit 3 a document -- sorry, an

10   e-mail from Lara Hall to you, copying a number

11   of people, dated September 26, 2011, with the

12   subject, "Request for Modification to BOD

13   Resolution Re: ResCap's 9/30 TNW."

14              Do you see that?

15        A.    Yes.

16        Q.    Is this a document that you

17   received?

18        A.    Yes.  Okay.

19        Q.    Do you have an understanding of what

20   TNW is?

21        A.    I think I think they mean Total Net

22   Worth.

23        Q.    And in this e-mail is Ms. Hall

24   recommending that Ally move the cap on what it

25   will contribute to ResCap up from $250 million

1                    M. Carpenter

2    to $1 billion?

3        A.    Let me pause for a minute here and

4    say, I don't recall this document.  All right?

5              My just reading it, what I believe

6    that it relates to is that we were approaching

7    a settlement or ResCap was approaching a

8    settlement with the Department of Justice and

9    the Attorney General on the robo-signing

10   settlement, which we talked about earlier on.

11             And that it was unclear to us what

12   the amount of money is, or was, but that,

13   given ResCap's at that time net worth of

14   316 million, it was likely that ResCap would

15   fall below its net worth covenants, because

16   the charge from the Department of Justice was

17   going to be in the hundreds of millions of

18   dollars.

19             And so, therefore, ResCap would have

20   fallen below its net worth covenants, and

21   something would have had to be done to fix it.

22   And what I think Lara was trying to do here is

23   to get ahead of it, is to essentially to say

24   rather than find out we have negative net

25   worth and we violated the covenants, let's fix

1                          M. Carpenter

2        it ahead of time.

3                I remember the issue.  I don't

4        remember what we did about it.

5            Q.    And Ms. Hall, in the second

6        paragraph of this e-mail, says that "The

7        primary reason why we recommend this path is

8        because if ResCap were to breach its covenant

9        as of 9/30, even if driven by a subsequent

10       event, it is an immediate event of default

11       with no cure period."

12           A.    Right.

13           Q.    And then she lists a number of

14       things, including one, the five external bank

15       facilities.

16                 Do you see that?

17           A.    Yes.

18           Q.    Does that refresh your recollection

19       that ResCap had total net worth requirements

20       in its external bank facilities?

21           A.    Yes.

22           Q.    And the FNMA facility.

23                 Do you see that?

24           A.    Yes.

25           Q.    Do you know what the FNMA --

1                          M. Carpenter

2        A.      The Fannie Mae.

3        Q.      The Fannie Mae?

4        A.      Yes.

5        Q.      And so we discussed that.  And then

6    three with the GSCs, which I guess includes

7    Fannie and Freddie?

8        A.      Yes.

9        Q.      Do you understand that a breach of

10   the total net worth covenant would result in

11   an immediate event of default with no cure

12   period for ResCap?

13       A.      Well, I didn't know the details of

14   it, but that's what this memo says.

15       Q.      Do you have any reason to believe

16   this isn't true?

17       A.      No.

18       Q.      And then she explains that all of

19   the banking parties will have the ability to

20   accelerate and the GSCs will have the right to

21   pull servicing?

22       A.      Correct.

23       Q.      And so we discussed the servicing.

24   And what does it mean if the banking party has

25   the ability to accelerate a bank facility?

Plaintiff's Objection
67:9-22
Lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), inadmissible lay opinion

Page 68

M. Carpenter

1

2     A.    It means they can call the loans

3    and, obviously, if the company doesn't have

4    enough cash on hand to pay the loans, they're

5    in default.

6     Q.    And then she says one sentence

7    later, "It is also likely a disclosable event

8    for Ally, given the size of lending facilities

9    and the materiality overall."

10     A.    Yes.

11     Q.    Is it your understanding that if

12    ResCap had an event of default on its five

13    external bank facilities with Fannie and with

14    Freddie, that ResCap -- that Ally would have

15    to disclose that?

16     A.    I wouldn't doubt it.

17     Q.    And then it says, "In other words,

18    we could be facing an immediate liquidity

19    event."

20          Do you see that?

21    A.    Yes.

22    Q.    And do you what -- do you know who

23    the "we" is?

24          MR. DONOVAN:  Objection.  Calls for

25    speculation.

Plaintiff's
Objection
68:6-16
Lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602, 901,
903),
inadmissible
lay opinion

M. Carpenter

2   A.      Whereabouts are you?

3   Q.      The second to last sentence in the
4   second paragraph.   It says, "In other words,
5   we could be facing an immediate liquidity
6   event."

7   A.      Well, I think, you know, I could
8   speculate.   I think what she's trying to do
9   here is say, Ally has to step up to fix the
10  net worth and liquidity problem that this
11  event creates.

12          And that's what we did.

13  Q.      Because it would have bad
14  consequences for Ally?

15  A.      Bad consequences for ResCap.   It
16  would have put ResCap out of business,
17  immediately.

18  Q.      And bad consequences for Ally?

19  A.      Oh, absolutely.

20  Q.      And in connection with ensuring that
21  ResCap remained in compliance with its total
22  net worth, did Ally occasionally forgive
23  certain intercompany debt?

24          MR. DONOVAN:   Objection to form.

25          MS. MILLER:   Sorry.   Let me restate

Plaintiff's
Objection
69:3-19
Lack of
personal
knowledge
(FRE 602), lack
of foundation
(FRE 602, 901,
903),
inadmissible lay
opinion

Page 70

M. Carpenter

2    that.

3  BY MS. MILLER:

4    Q.    Did Ally ever forgive intercompany

5  debt that was owed to it by ResCap in order to

6  ensure that ResCap would remain in compliance

7  with its total net worth covenants?

8    A.    It did, in, as I recall, though my

9  memory is not perfect, it did so in 2009.  It

10 did not do so until 2011 after that, which I

11 think relates to this.

12          And I don't remember how many other

13 times, not that it was infrequent, let's put

14 it that way, but it did happen.

15   Q.    I don't know that that's just a

16 realtime thing, but I just want to make sure

17 that the record in the last question says did

18 Ally ever forgive, as written.  It's a real

19 word, but it's makes no sense.

20          What does it mean to forgive a debt?

21          MR. DONOVAN:  Objection to form.

22   A.    You owe me $100.  I tell you don't

23 need to repay it.

24   Q.    And if I never owed you $100, would

25 you have to forgive my debt?

Plaintiff's Objection 70:20-25 Irrelevant (FRE 401, 402), lack of personal knowledge (FRE 602), lack of foundation (FRE 602, 901, 903), inadmissible lay opinion

M. Carpenter

2          MR. DONOVAN:    Objection to form.

3      He's a fact witness.    You can't ask

4      hypotheticals.

5      A.    If you didn't borrow $100 from me, I

6  wouldn't have to -- you wouldn't have to repay

7  me, no.

8          Q.    So when the Ally board -- did the

9  Ally board have to approve debt forgiveness?

10         A.    Depending on the amount, the answer

11  is yes.

12         Q.    Let me clarify that.

13              Did the Ally board have to approve

14  debt forgiveness between -- did the Ally board

15  have to forgive -- I'm going to strike that.

16              Let's take a break because we have

17  two minutes and I'll come back to it and

18  hopefully be able to say a clear question.

19              THE VIDEOGRAPHER:   The time is

20  3:36 p.m.   We're going off the record.

21              (Recess taken from 3:36 p.m. to

22  3:57 p.m.)

23              THE VIDEOGRAPHER:   The time is

24  3:57 p.m.   We're back on the record, video

25  No. 2.

Plaintiff's
Objection
71:5-7
Irrelevant
(FRE 401,
402), lack of
personal
knowledge
(FRE 602),
lack of
foundation
(FRE 602,
901, 903),
inadmissible
lay opinion

Page 72

1                    M. Carpenter

2   BY MS. MILLER:

3        Q.    Good afternoon, Mr. Carpenter.

4             MS. MILLER:  I'd like to mark as

5        Carpenter Exhibit 4 a document Bates

6        stamped RCUCCJSM10615535 through 5547.

7             (Carpenter's Exhibit 4, Series of

8        E-Mails, Bates Nos. RCUCCJSM10615535

9        through 5547, was marked for

10       identification.)

11            MR. DONOVAN:  Just for the record,

12       it appears to be missing a page, at least

13       Bates number wise.

14            MS. MILLER:  Right.  So I believe

15       what it's missing is the identifier

16       identifying that there's another -- that

17       there's an attachment; but, yes, I see

18       that.

19   BY MS. MILLER:

20       Q.    Mr. Carpenter, I've marked as

21   Carpenter Exhibit 4 an e-mail chain, but

22   really I'd like you to focus on -- turn to the

23   document after the blue slip sheet, which is

24   RCUCCJSN10615538, which is titled, a document

25   titled "Unanimous Consent to Action," and it's

Page 73

1                    M. Carpenter

2    dated December 30, 2009.

3           Do you see that?

4    A.    Yes.

5    Q.    Mr. Carpenter, do you recognize this

6    document?

7    A.    No.

8    Q.    Looking at the page ending in 15542,

9    do you recognize your signature on that page?

10   A.    That's my signature.

11   Q.    Do you understand that you signed

12   this document in your capacity as a member of

13   the board of directors?

14   A.    Yes.

15   Q.    Mr. Carpenter, did the Ally board

16   have to approve debt forgiveness by Ally to

17   ResCap in amounts greater than $50 million?

18           MR. DONOVAN:  Objection to form.

19           Go ahead, Mr. Carpenter.

20   A.    They had to approve any capital

21   infusion in excess of 50 million, which I

22   presume would include debt forgiveness.

23   Q.    And was the same true with respect

24   to debt forgiveness between ResCap and its

25   subsidiaries?

1                        M. Carpenter

2        A.    I think debt forgiveness between

3   ResCap and its subsidiaries was -- I don't

4   know the answer to that.

5              I would imagine that it's the

6   purview of the ResCap board, without the

7   approval of the parent board, but I don't know

8   that as a fact.

9        Q.    Okay.

10             So looking at the page ending in

11  10615539, the very top "whereas" paragraph.

12       A.    Right.

13       Q.    It says, "Whereas under the

14  reservation of authorities of the board, the

15  board must approve GMAC's capital contribution

16  to ResCap and ResCap's contribution to RFC, to

17  the extent each contribution is $50 million or

18  more."

19       A.    Yes.

20       Q.    I'm going to skip the parenthetical,

21  but do you see that?

22       A.    Yes.

23       Q.    Do you understand that ResCap's

24  contribution to RFC is relating to a debt

25  forgiveness between ResCap and one of its

Page 75

1                         M. Carpenter

2    subsidiaries?

3                    MR. DONOVAN:  Objection to form.

4         A.    I'm not arguing about it.  I just

5    don't remember it.  I'm just reading it as if

6    for the first time.

7         Q.    Is that your understanding based on

8    reading it?

9         A.    It's not something I would have paid

10   any attention to it, frankly.

11        Q.    Do you recall whether, as a member

12   of the Ally board, you periodically approved

13   debt forgivenesses between ResCap and certain

14   of its subsidiaries?

15        A.    I don't remember that.

16        Q.    Looking back at the page with the

17   Bates ending 15538, toward the middle of the

18   page, the second bullet states, reads,

19   "Forgiveness of outstanding indebtedness of

20   ResCap to GMAC under the following agreements,

21   as may be amended from time to time, such that

22   the aggregate amount of the indebtedness

23   forgiven will be deemed paid in full and

24   completely extinguished and ResCap will have

25   no further obligation for the forgiven

1                         M. Carpenter

2     indebtedness."

3                 And it lists under the third dash,

4     the loan agreement dated November 20, 2009, by

5     and among RFC Asset Holdings II, LLC, and

6     Passive Asset Transactions, LLC.

7                 Sorry, my misreading.  Strike the

8     question.

9                 Mr. Carpenter, when you consider the

10    forgiveness of debt that ResCap owed to Ally,

11    did you consider -- were you considering it

12    from the perspective of -- strike that.

13                I tried to take a break.

14                Mr. Carpenter, if ResCap didn't owe

15    Ally money under an intercompany debt, would

16    Ally have had to forgive that debt?

17                MR. DONOVAN:  Objection to form.

18         A.    I don't understand the question.  If

19    ResCap didn't owe Ally money, then would Ally

20    have not had to forgive the debt?

21         Q.    Right.

22         A.    I don't understand the question.

23         Q.    So let me say it differently.

24         A.    Okay.

25         Q.    If Ally gave ResCap money as an

Page 77

1                    M. Carpenter

2    equity contribution, and ResCap was not

3    repaying that money, would Ally have had to

4    take any action to forgive an obligation of

5    ResCap's?

6              MR. DONOVAN:  Objection to form.

7         Hypothetical.

8         A.    I mean, I think the answer is very

9    simple, which is in order to preserve an

10   appropriate capital, you know, an appropriate

11   capital level in ResCap, this is the

12   recapitalization that I was describing at the

13   end of '09, which had a whole series of

14   aspects to it, one of which was writing down a

15   whole bunch of loans in ResCap, contributing

16   loans from Ally Bank as capital.

17              So I would say there are many

18   different ways you can contribute capital.

19   You can contribute equity.  You can forgive

20   debt.  You can contribute mortgage loans,

21   which we did here to the tune of several

22   billion dollars.  All of those things can be

23   used and, you know, I rely on my financial

24   people and my legal people to tell me which is

25   the best solution at this particular point in

1                    M. Carpenter

2      time.

3           But, you know, you had half a dozen

4      different things you could do to accomplish

5      the same objective.

6           Q.    Did Ally have an expectation that

7      ResCap would repay the debts that it were owed

8      if they hadn't been forgiven?

9           A.    Our -- our loans to ResCap were

10     throughout this period heavily secured by

11     assets, and there was every reason to believe

12     there was adequate collateral to repay those

13     loans.

14          Q.    You don't recall ever considering

15     and approving debt forgiveness between ResCap

16     and one of its subsidiaries?

17          A.    I don't recall that, no; but the

18     phrase you read earlier on suggests that the

19     board did have certain responsibilities in

20     that regard.  I just don't recall that as I'm

21     sitting here.

22          Q.    Do you know if the Ally board would

23     have had to approve capital contributions that

24     were not in the form of debt forgiveness?

25          A.    They would have had to approve any

Page 79

1                          M. Carpenter

2      capital contribution above $50 million, to the

3      best of my knowledge.

4          Q.     Including capital contributions

5      between ResCap and its affiliates?

6          A.     I didn't say that.  You asked me

7      about from Ally to ResCap, and I answered you

8      on Ally to ResCap.

9                  What exactly was required for an

10     inter-subsidiary transaction within ResCap or

11     a transaction between ResCap and its

12     subsidiaries, I don't have the expertise,

13     sitting here now, to comment on.

14         Q.     If the issue were presented to the

15     board for approval, do you believe you would

16     have been informed before making a decision on

17     it?

18                 MR. DONOVAN:  Objection to form.

19         A.     I would, obviously, as CEO, have

20     been knowledgeable about all of the elements

21     of a unanimous consent that was presented to

22     the board of directors.  But, you know, having

23     said that, I rely on my internal counsel to

24     get this stuff right.  I don't know the legal

25     entity structure of the company to that lowly

Page 80

1          M. Carpenter

2    detail.

3          Q.    Mr. Carpenter, when you were

4    negotiating the settlement with ResCap, going

5    back to the spring of 2012, did you consider

6    the tax benefits that Ally would get as a

7    result of any settlement payment made to

8    ResCap?

9          A.    I'm not aware there were any tax

10   benefits.  And I've heard lots about tax

11   benefits since then, and I haven't found a tax

12   person yet that tells me there is any

13   legitimacy to that argument.

14         Q.    So, do --

15         A.    There are some creative minds.

16         Q.    What do creative minds do?

17         A.    What?

18         Q.    What have creative minds been doing?

19         A.    Imagine tax laws that don't exist.

20         Q.    So is it your position that --

21   well -- sorry, strike that.

22         A.    Let me be clear.  In the $2.1

23   billion settlement, Ally does not expect to

24   receive any tax benefits.

25         Q.    What do you mean by in the $2.1

Page 81

                        M. Carpenter

1

2     billion settlement?

3         A.    We don't expect to receive any tax

4     benefits.

5         Q.    Does Ally expect to receive tax

6     benefits as a result of ResCap's

7     restructuring -- ResCap's bankruptcy and its

8     contribution of $2.1 billion to ResCap?

9         A.    Not to my knowledge.   I've heard the

10    allegation made, but my professionals tell me

11    it's fantasy.

12        Q.    I'd like to show you what's been

13    previously marked as Aretakis 9.

14              THE VIDEOGRAPHER:   The time is

15    4:12 p.m.  We're going off the record.

16              (A Discussion was Held off the

17    Record.)

18              THE VIDEOGRAPHER:   The time is

19    4:13 p.m.  We're back on the record.

20    BY MS. MILLER:

21        Q.    Mr. Carpenter, I've handed you

22    what's been marked as Aretakis Exhibit 9,

23    which is the July 31, 2013 Form 8K of Ally

24    Financial, Inc.

25              Do you see that?

                          M. Carpenter

1

2      A.    Yes.

3      Q.    Is this a document that you reviewed

4   with counsel that refreshed your recollection?

5      A.    I don't remember.

6      Q.    Turning to the -- page 3 in the

7   document?

8      A.    Yes.  I mean, I reviewed several of

9   our SEC filings.  I don't remember whether I

10  reviewed this one or not.

11     Q.    Looking at Note 4 or No. 4 on

12  page 3.

13     A.    Yes.

14     Q.    It says, "Includes approximately

15  $1.6 billion charge resulting from Ally's

16  comprehensive settlement agreement in the

17  ResCap Chapter 11 bankruptcy case."

18     A.    Right.

19     Q.    "This was partially offset by

20  approximately $600 million in tax benefits

21  related to the settlement charge on the sale

22  of Ally's international business."

23            What's your understanding of what

24  the tax benefits related to the settlement

25  charge are?

Plaintiff's Objection
82:14-83:5
Lack of personal
knowledge (FRE
602), lack of
foundation (FRE
602, 901, 903),
inadmissible lay
opinion

Page 83

1                      M. Carpenter

2        A.      I'm not a tax expert, and so, I'm

3    not going to go into the details of that tax

4    return.  I can't do it sitting here.  So I'm

5    really not familiar with the details.

6        Q.      But you don't challenge that there

7    are tax benefits related to the settlement

8    charge?

9             MR. DONOVAN:  Well, objection.  I

10            think you're mixing terms here.  So if he

11            doesn't have a foundation, he's not the

12            right witness for it.

13        A.      I mean, it says here -- I can read

14    what it says.  That's all I know.

15        Q.      And did you read --

16        A.      You just separated out, by the way,

17    settlement charges from sale of Ally's

18    businesses.

19             MR. DONOVAN:  And I think you're

20            also -- it shows a net loss that it's a

21            footnote to.  So I'm not sure what the

22            benefit is to lose 1 or $2 billion there,

23            so...

24             MS. MILLER:  Well, it's a billion

25            dollars; right?

1                    M. Carpenter

2              MR. DONOVAN:  It's a loss.

3              MS. MILLER:  Right.  If you lose 2

4        and you only lose 1, that's a benefit of 1

5        because of the losses being offset -- we

6        don't have to discuss tax issues right

7        now.

8              MR. DONOVAN:  I think the witness

9        issue here is you have a foundational

10       problem.

11             MS. MILLER:  Okay.  I'm going to ask

12       you a question.

13    BY MS. MILLER:

14        Q.     Mr. Carpenter, in your capacity as

15    CEO of Ally, did you review Ally's public

16    filings?

17        A.     Yes.

18        Q.     Did you review this 8K?

19        A.     Yes.

20        Q.     And if you -- would you confirm with

21    all of the people who report to you and who

22    are responsible for the various sections that

23    the information that they've included is

24    complete and accurate?

25        A.     Yes.

Page 85

1                   M. Carpenter

2         Q.      And you wouldn't sign off on an Ally

3    public filing without doing that; right?

4         A.      Correct.

5         Q.      And so, to the best of your

6    understanding, every statement in this public

7    filing is true and complete; right?

8         A.      Right.

9         Q.      And -- so in connection with

10   settlement negotiations, you never

11   asked any -- sorry.

12             Did you have any discussions with

13   any members of your staff about the net tax

14   impact that ResCap restructuring and a

15   settlement payment to ResCap would have for

16   Ally?

17        A.      None whatsoever.

18        Q.      And after the examiner report came

19   out, did you have any discussions with your

20   tax advisors about the tax benefits identified

21   by the examiner?

22             MR. DONOVAN:  And, again, to the

23        extent it's legal advice, you can't

24        disclose that, Mr. Carpenter.  But if it's

25        business, you can.  I just don't want you

Page 86

1                    M. Carpenter

2        to --

3        A.      I mean, I had conversations with our

4    financial people who basically explained to me

5    why they thought there was absolutely no merit

6    in that suggestion.

7        Q.      Did you have an understanding that

8    Ally will receive essentially a 35 percent

9    increase -- 35 cents on the dollar increase in

10   tax benefits for any additional dollar it

11   contributes in settlement to --

12       A.      I think I just said to you that my

13   tax people basically explained to me that

14   there was not a tax benefit as a result of the

15   settlement.   I just explained that.

16       Q.      What did your tax people tell you,

17   other than that there wasn't a benefit about

18   the tax effect of the settlement?

19       A.      I don't remember the details.   It's

20   a long time ago.

21       Q.      When did you have those discussions?

22       A.      After the examiner's report came

23   out.  The first time I talked to them about

24   taxes was when that report came out.   And

25   their response to me was it doesn't make any

JSN Objection
86:7-87:7
Inadmissible
hearsay (FRE
802)

1                    M. Carpenter

2      sense.

3          Q.      And did you have any subsequent

4      discussions with them?

5          A.      I didn't need to.   They told me it

6      didn't make any sense.   That's all I needed to

7      know.

8          Q.      Who were your tax people who you

9      spoke to after the examiner report came out?

10         A.      Well, I talked to our chief

11     financial officer.   And he, in turn, spoke

12     with Jim Aretakis and other folks in our Tax

13     Department.

14         Q.      And did you ever speak directly to

15     Mr. Aretakis?

16         A.      No.

17             MS. MILLER:   I have no further

18     questions.   Thank you.   Thank you very

19     much.

20             MR. DONOVAN:   Thank you very much.

21             Off the record.

22             THE VIDEOGRAPHER:   The time is

23     //

24     //

25     CONTINUED ON THE NEXT PAGE TO INCLUDE JURAT.

Page 88

M. Carpenter

1

2      4:19 p.m.  We're going off the record.                    9

3           (The deposition was concluded at

4      4:19 p.m.)

5           (The exhibits were retained by the

6      court reporter to be attached to the

7      transcript.)

8

9

10

11

12

13

14                    _____

15                    MICHAEL CARPENTER

16

17      Subscribed and sworn to before me

18      this    day of              2013.

19

20      _____

21

22

23

24

25

1          M. Carpenter

2

3          C E R T I F I C A T E

4

5    STATE OF NEW YORK    )

6                          ) ss.:

7    COUNTY OF NEW YORK )

8

9          I, THOMAS A. FERNICOLA, Registered

10   Reporter and Notary Public within and for

11   the State of New York, do hereby certify

12   that the within is a true and accurate

13   transcript of the proceedings held on

14   November 12, 2013.

15          That I am not related to any of the

16   parties to this action by blood or

17   marriage; and that I am in no way

18   interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto

20   set my hand this 12th day of November,

21   2013.

22

23          _____

24          THOMAS A. FERNICOLA, RPR

25

Page 90

1                          M. Carpenter

2     ----------------------- INDEX --------------------

3     ATTORNEY                                        PAGE

4     Ms. Miller                                        7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           M. Carpenter

2    ---------------------- EXHIBITS -----------------

3    CARPENTER'S

4    DESCRIPTION                              PAGE   LINE

5    Exhibit 1 - Transcript of Conference     29     18

6    Call dated November 2, 2011, Bates

7    Nos. Ally_0255144 through 162,

8    Exhibit 2 - Set of Board Material of     51     12

9    GMAC Financial Service, dated June

10   1, 2009, Bates Nos. Ally_0003585

11   through 3759,

12   Exhibit 3 - E-Mail from Lara Hall to     63     22

13   Michael Carpenter dated September

14   26, 2011, Bates No. Ally_0359385,

15   Exhibit 4 - Series of E-Mails, Bates     72     3

16   Nos. RCUCCJSM10615535 through 5547,

17

18

19

20

21

22

23

24

25

Page 92

1          M. Carpenter

2       ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:  In Re: Residential Capital, LLC

4   Dep. Date:  November 12, 2013

5   Deponent:   MICHAEL CARPENTER

6   Reason codes:

7       1. To clarify the record.

        2. To conform to the facts.

8       3. To correct transcription errors.

9   Page ____ Line ____ Reason _____

10  From _____ to _____

11  Page ____ Line ____ Reason _____

12  From _____ to _____

13  Page ____ Line ____ Reason _____

14  From _____ to _____

15  Page ____ Line ____ Reason _____

16  From _____ to _____

17  Page ____ Line ____ Reason _____

18  From _____ to _____

19

20                      _____

21                      MICHAEL CARPENTER

22

23      Subscribed and sworn to before me

24      this    day of            2013.

25      _____