Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                    Chapter 11

RESIDENTIAL CAPITAL, LLC,
et al.,                                  Case No. 12-12020
                                                 (MG)

          Debtors.

_____

                    Yellow Highlighting = JSN Designation
                    Pink Highlighting = Plaintiffs' Counter-Designation
                    Orange Highlighting = Joint Designation

          The Debtors' and Committee's counter-designations reflected
          herein are to be admitted, if at all, only upon admission of the
          JSNs' corresponding affirmative designations.

          VIDEOTAPED DEPOSITION OF ADAM GLASSNER

     (Taken by UMB as Bank Trustee & Adhoc Group of JSM)

              Charlotte, North Carolina

              Wednesday, November 13, 2013

          Reported in Stenotype by April Reid

                    Job #66947

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 2 of 106

Page 2

1          ADAM GLASSNER

2          ANNOUNCEMENT PAGE

3

4    Wednesday, November 13, 2013

5             9:07 a.m.

6       201 East Trade Street

7         The Ritz-Carlton

8          Charlotte, NC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 3 of 106

Page 3

```
 1   APPEARANCES

 2   MILBANK TWEED HADLEY & McCLOY

 3   On behalf of UMB as bank trustee

 4   and the Adhoc Group of JSM

 5   1850 K Street, N.W.

 6   Washington, D.C. 20006
     BY:  DAVID COHEN, ESQUIRE
 7   BY:  JACOB JOU, ESQUIRE

 8

 9   MORRISON & FOERSTER
     On behalf of the debtors
10   1290 Avenue of the Americas
     New York, NY  10104
11   BY:  ROBERT BAEHR, ESQUIRE

12

13   KRAMER LEVIN NAFTALIS & FRANKEL
     On behalf of the committee
14   1177 Avenues of the Americas
     New York, NY  10036
15   BY:  NORMAN SIMON, ESQUIRE

16

17   KIRKLAND & ELLIS,
     On behalf of Ally
18   655 Fifteenth Street, N.W.
     Washington, D.C. 20005
19   BY:  JUDSON BROWN, ESQUIRE

20

21   BRUNE & RICHARD
     On behalf of the deponent
22   One Battery Park Plaza
     New York, NY  10004
23   BY:  DAVID ELBAUM, ESQUIRE

24

25   ///
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner    Pg 4 of 106

Page 4

 1   DECHERT

 2   On behalf of the Bank of New York Mellon

 3   & Bank of New York Mellon Trust Company

 4   1290 160 Queen Victoria Street

 5   London, EC 4V4QQ

 6   BY:  MIKHAELLE SCHIAPPACASSE, ESQUIRE

 7   (Via Telephone)

 8

 9   CADWALADER WICKERSHAM & TAFT

10   On behalf of MBNA

11   One World Financial Center

12   New York, NY 10281

13   BY:  JARED STANISCI, ESQUIRE

14   (Via Telephone)

15

     KELLEY DRYE & WARREN
16   On behalf of UNC Bank
     101 Park Avenue
17   New York, NY 10178
     BY:  JASON ADAMS, ESQUIRE
18   (Via Telephone)

19

20   SEAN LOWTHER, Legal Video Specialist

21

22      *   *   *   *   *

23

24

25

```
 1                     ADAM GLASSNER

 2

 3                   I N D E X

 4   THE WITNESS                    ADAM GLASSNER

 5                                  EXAMINATION

 6

 7   By Mr. Cohen                        9

 8   By Mr. Brown                        87

 9

10

11                 *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

1                    ADAM GLASSNER

2                    E X H I B I T S

3                      (Attached)

4

5    NO.                  DESCRIPTION                PAGE

6    Glassner 1    Brokering Consumer Loans          74

7                  to Bank project (BCL2B)

8                  November 19, 2008

9

10

11                     *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    ADAM GLASSNER

2          (THEREUPON, the following proceedings

3          were had).

4          THE VIDEOGRAPHER:  This is the beginning

5   of tape number one in the deposition of Adam

6   Glassner in the matter of Residential Capital,

7   LLC, et al, Debtors, in the Court of the United

8   States Bankruptcy Court, Southern District of

9   New York, Case No. 12-12020 (MG).

10          This deposition is being held at the

11  Ritz-Carlton at 201 East Trade Street in

12  Charlotte, North Carolina.  The date is

13  November 13th, 2013.  The time on the monitor

14  is approximately 9:07 a.m.

15          My name is Sean Lowther, the Legal Video

16  Specialist, and the court reporter is April

17  Reid and we're representing TSG Reporting, Inc.

18  headquartered at 747 Third Avenue, New York,

19  New York.

20          Will counsel please introduce themselves

21  starting with attorney Cohen, and who you're

22  representing, after which the court reporter

23  will swear in the witness.

24          MR. COHEN:  David Cohen with Jacob Jou,

25  Milbank, Tweed, Hardley & McClory on behalf of

Page 8

1                    ADAM GLASSNER

2    UMB as bank trustee and the Adhoc Group of JSM

3    holders.

4            MR. ELBAUM:  David Elbaum, Brune &

5    Richard, for Mr. Glassner.

6            MR. BROWN:  Judson Brown, Kirkland &

7    Ellis, on behalf of Ally.

8            MR. SIMON:  Norm Simon, Kramer Levin, on

9    behalf of the committee.

10           MR. BAEHR:  Robert Baehr, Morrison &

11   Foerster, on behalf of the debtors.

12           MR. COHEN:  Would the people on the

13   phone please identify yourselves and the

14   parties you represent.

15           MR. ADAMS:  Oh.  Jason Adams, Kelley

16   Drye, on behalf of UNC Bank.

17           MR. STANISCI:  Jared Stanisci from

18   Cadwalder Wickersham & Taft, on behalf of MBNA.

19           MR. COHEN:  Anyone else?

20           Dechert?

21           Are you still on?

22           MS. SCHIAPPACASSE:  Yes, I'm still on.

23           MR. COHEN:  Can you identify yourself

24   for the record, please.

25           MS. SCHIAPPACASSE:  This is Mikki

Page 9

1                    ADAM GLASSNER

2        Schiappacasse from Dechert on behalf of Bank of

3        New York Mellon and Bank of New York Mellon

4        Trust Company of North America.

5    Thereupon,

6                    ADAM GLASSNER

7    was called for examination and after having been

8    first duly sworn to tell the truth, was examined and

9    testified as follows:

10                     EXAMINATION

11   BY MR. COHEN:

12       Q.     Good morning, Mr. Glassner.

13       A.     Good morning.

14       Q.     You understand that you're under oath?

15       A.     I do.

16       Q.     Have you been deposed before?

17       A.     I have.

18       Q.     How many times?

19       A.     Approximately, four or five.

20       Q.     And in what circumstances were you

21   previously deposed?

22       A.     A variety of cases involving

23   mortgage-backed securities and personal -- personnel

24   matters at previous employers.

25       Q.     Did any of those depositions involve

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 10 of 106

Page 10

1                    ADAM GLASSNER

2   your time either at Ally Financial, Ally Bank or

3   ResCap?

4        A.     No.

5        Q.     Okay.  Let's go over some ground rules

6   that hopefully will speed us along this morning.

7               You see the reporter sitting between us,

8   she's trying to take down a record of everything

9   that's said here so it's very important that only

10  one of us speak at a time.  I'd ask you to let me

11  finish my question before you begin answering and I

12  will do my best to let you finish your answer before

13  I begin my next question.  Okay?

14       A.     Yes.

15       Q.     It's also very important that all of

16  your answers be verbal.  The record won't reflect a

17  nod of the hat -- a nod of the head or a gesture of

18  the hand; is that okay?

19       A.     Yes.

20       Q.     If any of my questions aren't clear to

21  you, let me know, I will do my best to clarify that.

22  Okay?

23       A.     Yes.

24       Q.     If you need to speak with your attorney

25  at any time let me know and we'll do our best to

Page 11

1                    ADAM GLASSNER

2   accommodate that.   Okay?

3        A.     Yes.

4        Q.     And if you'd like to take a break at any

5   time let me know and I'll do my best to accommodate

6   that as well.   Okay?

7        A.     Yes.

8        Q.     Are you represented by counsel here          Plaintiff's
                                                             Objection
9   today?                                                   11:8-18
                                                             Irrelevant (FRE
10       A.     I am.                                         401, 402)

11       Q.     Who is your counsel?

12       A.     David Elbaum.

13       Q.     How did Mr. Elbaum come to be your

14  counsel?

15       A.     I selected him amongst several choices

16  provided to me.

17       Q.     Who provided you with those choices?

18       A.     I believe it was Ally Financial.

19       Q.     Were there lawyers from Ally Financial

20  who provided you with those choices?

21       A.     I don't specifically recall whom it came

22  from.

23       Q.     Did Ally Financial offer to represent

24  you with their own lawyers?

25              MR. ELBAUM:   Let me just caution the

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 12 of 106

Page 12

```
 1                        ADAM GLASSNER

 2           witness not to discuss conversations he had

 3           with any lawyers for Ally Financial that might

 4           be covered by the attorney-client privilege.

 5                   THE WITNESS:   I don't recall the

 6           specific circumstances in regard to the

 7           engagement of my counsel.

 8      BY MR. COHEN:

 9           Q.      Okay.   When did you engage Mr. Elbaum?

10           A.      Approximately, 20 to 24 months ago.

11           Q.      Were you interviewed by the examiner in

12      this case?

13           A.      Yes.

14           Q.      Did you have legal representation in

15      connection with your interview with the examiner?

16           A.      Yes.

17           Q.      Who was your counsel in connection with

18      that interview?

19           A.      David Elbaum.

20           Q.      Were you interviewed by lawyers for

21      ResCap in this case?

22           A.      I do not specifically recall.

23           Q.      You don't recall meeting with lawyers

24      from the Morrison & Foerster law firm separate and

25      apart from your meeting with the examiner?
```

Plaintiffs' Objection 12:9-19 Irrelevant (FRE 401, 402)

Page 13

1                          ADAM GLASSNER

2                 MR. BROWN:  Objection to form.

3                 THE WITNESS:  I do not recall.

4    BY MR. COHEN:

5         Q.      What did you do to prepare for this

6    deposition?

7         A.      I met with my attorneys and got a good

8    night sleep.

9         Q.      All right.  When did you meet with your

10   attorneys?

11        A.      I believe it was Wednesday of last week.

12        Q.      How long did you spend with your

13   attorneys during that meeting?

14        A.      Several hours.

15        Q.      Can you be more specific?

16        A.      Approximately, three hours.

17        Q.      All right.  Other than that meeting, did

18   you do anything else to prepare for the deposition?

19        A.      I did not.

20        Q.      Did you meet with lawyers from ResCap?

21        A.      I did not.

22        Q.      Did you meet with lawyers from any of

23   the Ally companies?

24        A.      I did not.

25        Q.      Did you have discussions with lawyers

Page 14

ADAM GLASSNER

1

2  from ResCap in connection with this deposition?

3      A.     Not that I recall.

4      Q.     Did you have discussions with any of the

5  lawyers from the Ally Financial companies in

6  connection with this deposition?

7      A.     Not that I recall.

8      Q.     Beginning with college, can you describe

9  your educational background?

10     A.     I received a BS/BA in finance from Miami

11 University at Oxford, Ohio in May of 1996.

12     Q.     Did you have any further college

13 education other than your BS/BA?

14     A.     That is the extent of my formal

15 education.

16     Q.     Okay.  Beginning with your graduation

17 from college, would you describe your employment

18 history?

19     A.     I worked for Carolina Advisors, Inc. in

20 Cincinnati, Ohio from approximately July of 1996

21 through April of 1999.

22     Q.     What was your position with Carolina

23 Advisors?

24     A.     I was an asset-backed and

25 mortgage-backed securities investment analyst.

Plaintiff's Objection 14:8-17:12 Irrelevant (FRE 401, 402)

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 15 of 106

Page 15

1                              ADAM GLASSNER

2          Q.      During that entire period?

3          A.      Correct.

4          Q.      What were your responsibilities?

5          A.      To analyze mortgage backs and

6    asset-backed securities for investment purposes.

7          Q.      Why did you leave Carolina Advisors in

8    1999?

9          A.      I was offered a new opportunity to come

10   work for NationsBank Montgomery Securities in

11   Charlotte, North Carolina.

12         Q.      What position were you offered with

13   NationsBank Montgomery Securities?

14         A.      An associate in their investment banking

15   area focused on mortgage-backed securities.

16         Q.      What were your responsibilities as an

17   associate in their investment banking area?

18         A.      Origination structuring and client

19   management within the mortgage backed and mortgage

20   origination sector.

21         Q.      And how long did you hold that position?

22         A.      I worked in the investment bank for --

23   at Bank of America -- well, it became Banc of

24   America Securities for nine years, all in the

25   mortgage finance area.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 16 of 106

Page 16

1                              ADAM GLASSNER

2          Q.        So that would take you up to about 2008?

3          A.        That's correct.

4          Q.        And why did you leave NationsBank/Bank

5    of America in 2008?

6          A.        I moved from the investment bank to Bank

7    of America's investment portfolio as part of the

8    growth of the investment portfolio in mortgages.

9          Q.        What position did you hold in the

10   investment portfolio group?

11         A.        Managing director of the retained loan

12   portfolio.

13         Q.        What were your responsibilities as the

14   managing director of the retained loan portfolio?

15         A.        I managed all the loans that were

16   originated and held at Bank of America for

17   investment purposes.

18         Q.        What were your responsibilities in

19   connection with managing all of the loans that were

20   retained and held?

21         A.        All aspects of the origination and

22   acquisition, valuation and ultimate buy or hold

23   decisions.

24         Q.        You took that position in 2008?

25         A.        That's correct.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 17 of 106

Page 17

1                    ADAM GLASSNER

2          Q.      How long did you hold that position?

3          A.      Approximately, nine months.

4          Q.      Do you know what month in -- in 2008 or

5    2009 you left that position?

6          A.      Would have been approximately March

7    2009.

8          Q.      Why did you leave that position in March

9    2009?

10         A.      I was extended an offer from Ally Bank

11   to come manage the correspondent and warehouse

12   division.

13         Q.      Were you looking for a new job or did

14   that job find you?

15         A.      That job found me.

16         Q.      And what were your responsibilities

17   managing the correspondent and warehouse division of

18   Ally Bank?

19         A.      I was responsible for all client

20   selection, product lending, pricing, origination and

21   disposition of any of the activity associated with

22   the correspondent vision along with the lending

23   terms and client selection program for the warehouse

24   division.

25         Q.      When you say "client selection" what do

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 18 of 106

Page 18

```
 1                        ADAM GLASSNER
 2     you mean?
 3          A.      Who we did business with.
 4          Q.      At that time was Ally Bank doing
 5     business with GMAC Mortgage?
 6          A.      Not in that capacity.
 7          Q.      In what capacity was Ally Bank doing
 8     business with GMAC Mortgage when you joined Ally
 9     Bank?
10          A.      Ally Bank sold its origination activity
11     to GMAC Mortgage who ultimately disposed of those
12     loans in the capital markets either via sale or
13     securitization.
14          Q.      Did you have any responsibility for the
15     pricing of those sales?
16                  MR. ELBAUM:  Objection to form.
17                  THE WITNESS:  At that point in time I
18          did not.
19     BY MR. COHEN:
20          Q.      Did there come a point in time where you
21     had responsibility for the pricing of the sales of
22     Ally Bank's loans to GMAC Mortgage?
23                  MR. BROWN:  Objection to form.
24                  THE WITNESS:  Indirectly in September I
25          be -- I took over the Capital Markets Division
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 19 of 106

Page 19

1                    ADAM GLASSNER

2          which was in GMAC Mortgage.

3    BY MR. COHEN:

4          Q.      What do you mean when you say you "took

5    over the Capital Markets Division which was in GMAC

6    Mortgage"?

7          A.      The capital markets division is a group

8    that is responsible for the disposition of all the

9    originating activity for Ally Financial's

10   origination business at that time, in September the

11   gentleman who was my manager and had run that

12   division previously retired and I took his position.

13         Q.      What was his name?

14         A.      Tom Neery.

15         Q.      So you were an employee of Ally Bank in

16   September of 2009?

17         A.      Yes.

18         Q.      Were you also an employee of GMAC

19   Mortgage in September of 2009?

20         A.      No.

21         Q.      Did you have managerial responsibility

22   within GMAC Mortgage in September of 2009?

23         A.      Yes.

24         Q.      Did it strike you as odd that you had

25   managerial responsibility in GMAC Mortgage

1                    ADAM GLASSNER

2    notwithstanding the fact that you were not an

3    employee of GMAC Mortgage?

4               MR. ELBAUM:  Objection to form.

5               THE WITNESS:  It did not.

6    BY MR. COHEN:

7         Q.    Why not?

8         A.    It's a common structure within a bank

9    holding company.

10        Q.    What do you mean when you say "it's a

11   common structure within a bank holding company"?

12        A.    Within a bank holding company, where

13   there are multiple subsidiaries, generally speaking

14   it is very common for employees to be officers or

15   have responsibilities of separate divisions.

16        Q.    Okay.  So when you took over the Capital

17   Markets Division within GMAC Mortgage you were also

18   -- you also had your responsibilities as managing

19   the correspondent warehouse activities at Ally Bank,

20   correct?

21        A.    Can you rephrase the question?

22        Q.    Certainly.

23               In September of 2009 when you took over

24   the Capital Markets Division at GMAC Mortgage did

25   you also continue to have responsibilities at Ally

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 21 of 106

Page 21

```
 1                    ADAM GLASSNER

 2  Bank?

 3       A.      Yes.

 4       Q.      What were the responsibilities that you

 5  had at Ally Bank when you took over the Capital

 6  Markets Division at GMAC Mortgage?

 7       A.      The same that were given to me when I

 8  was hired in March or April of 2009.

 9       Q.      Okay.  So in September 2009 you still

10  had responsibility at Ally Bank for the pricing of

11  mortgages when you were selling them, correct?

12       A.      That's correct.

13                MR. BROWN:  Objection to form.

14  BY MR. COHEN:

15       Q.      And in September of 2009 when you took

16  over the Capital Markets Division at GMAC Mortgage

17  you had responsibility for pricing when they were

18  buying mortgages, correct?

19                MR. BROWN:  Objection to form.

20                THE WITNESS:  No, that's not correct.

21  BY MR. COHEN:

22       Q.      What were your responsibilities

23  vis-a-vis mortgage purchases at GMAC Mortgage when

24  you took over the Capital Markets Division in

25  September 2009?
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 22 of 106

Page 22

1                    ADAM GLASSNER

2              MR. BROWN:  Objection to form;

3        mischaracterizes his testimony.

4              THE WITNESS:  The Capital Markets

5        Division was responsible for disposing of

6        assets that were originated for distribution

7        into capital markets.  I was responsible for

8        managing that division on behalf of the

9        company.

10   BY MR. COHEN:

11        Q.      Where was GMAC Mortgage obtaining the

12   assets that it was distributing to the capital

13   markets?

14        A.      In many cases, Ally Bank.

15        Q.      Okay.  Did you have any responsibility       JSN Objection
                                                              22:15-23:10
16   for obtaining assets at GMAC Mortgage that it would      Irrelevant (FRE
                                                              401, 402)
17   then distribute to the capital markets?

18        A.      I don't understand the question.

19        Q.      Well, you were responsible for selling

20   GMAC Mortgage's assets into the capital markets,

21   right?

22        A.      Correct.

23        Q.      Did you have any responsibility for

24   obtaining assets on behalf of GMAC Mortgage that it

25   could then distribute into the capital markets?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 23 of 106

Page 23

```
1                    ADAM GLASSNER

2         A.      I did not.

3         Q.      Who had that responsibility?

4         A.      The relationship that -- the way that

5    the GMAC Mortgage acquired assets was done in a

6    variety of agreements between GMAC Mortgage and Ally

7    Bank that pre-existed my arrival at Ally Bank.

8         Q.      Okay.  But who had responsibility for

9    monitoring compliance with those agreements?

10        A.      I don't know.

11        Q.      How do you know that that was not

12   something you were expected to do?

13               MR. ELBAUM:  Objection; form.

14               THE WITNESS:  I don't understand the

15        question.

16   BY MR. COHEN:

17        Q.      Well, you say that obtaining assets for

18   GMAC Mortgage to then distribute into the capital

19   markets was not one of your responsibilities, right?

20        A.      That's correct.

21        Q.      How do you know that?

22        A.      I don't understand the question.

23               MR. ELBAUM:  Same objection.

24   BY MR. COHEN:

25        Q.      Why?
```

Page 24

1              ADAM GLASSNER

2         MR. ELBAUM:  He's told you what his

3    responsibilities are/were at the time.

4         MR. COHEN:  Okay.  You can object to the

5    form.

6         MR. ELBAUM:  Okay.

7         MR. COHEN:  You can't coach the witness

8    in a speaking objection.

9         MR. ELBAUM:  I am not coaching the

10   witness.

11        MR. COHEN:  This deposition is covered

12   by the Federal Rules of Banking Procedure.

13        MR. ELBAUM:  I am well aware of the

14   rules.

15        MR. COHEN:  Then follow them.

16        MR. ELBAUM:  He's told you twice he

17   doesn't understand the question.

18        MR. COHEN:  That's not an objection.

19        MR. ELBAUM:  You have asked him the same

20   question.

21        MR. COHEN:  That's not an objection,

22   that's a speech.  If you are going to make

23   speeches we're going to be here for a very,

24   very, very long time.

25        MR. ELBAUM:  If he says he doesn't

Page 25

 1                    ADAM GLASSNER

 2   understand the question you shouldn't just ask

 3   the same question, the same words.

 4        MR. COHEN:  I don't need your help in

 5   how to take a deposition.

 6        MR. ELBAUM:  Okay.  Well, then I will

 7   just object.

 8        MR. COHEN:  Okay.  Then just object.

 9   That's what you're allowed to do under the

10   rules, period.

11        MR. ELBAUM:  And I did and you didn't

12   change a single word of it.

13        So pose a different question that will

14   perhaps be clearer to the witness.

15        MR. COHEN:  I don't need your help.

16        MR. ELBAUM:  I am not offering you help.

17        MR. COHEN:  You can object.  You can

18   object to the form.

19        You are very circumscribed.

20        MR. ELBAUM:  I'm well aware of the

21   federal rules.

22        MR. COHEN:  We're going to be -- then --

23   then follow them.

24        MR. ELBAUM:  I have been.

25        MR. COHEN:  You have not.

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 26 of 106

Page 26

```
 1                    ADAM GLASSNER

 2              MR. ELBAUM:  I have been.

 3              Go right ahead.

 4              This is a third-party question.

 5              Go, ask another question please.

 6   BY MR. COHEN:

 7         Q.     Who explained your responsibilities to

 8   you when you became -- when you took your position

 9   in September of 2009 at GMAC Mortgage Capital

10   Markets?

11         A.     I don't specifically recall.

12         Q.     Did somebody do that?

13         A.     I do not recall a formal meeting

14   describing my responsibilities.

15         Q.     How did you come to understand what your

16   responsibilities were?

17         A.     I was familiar with the general activity

18   that the Capital Markets Division had taken, I spent

19   some time with my previous manager who was exiting

20   on any open issues, and I asked questions of

21   existing management and control partners to

22   understand what was the expectations.

23         Q.     What was your understanding of the

24   general activities that the Capital Markets Division

25   was undertaking when you took responsibility for
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 27 of 106

Page 27

```
 1                    ADAM GLASSNER
 2   that group in September 2009?
 3        A.      The Capital Markets Division was
 4   responsible for distributing loans originated by the
 5   franchise for ultimate disposition into the capital
 6   markets, either through hold on sales or
 7   securitizations.
 8        Q.      You said you spent time with your
 9   predecessor and discussed open issues.  What open
10   issues did you discuss?
11        A.      I do not recall --
12        Q.      And --
13        A.      -- any of the specifics.
14        Q.      Do you recall generally what you
15   discussed?
16        A.      I do not.
17        Q.      You said you spent time with your team
18   to -- to discuss the issues in the group.  Do you
19   recall any of the specifics of that discussion?
20        A.      I actually did not testify that I spent
21   time with my team.  I said I spent time with my
22   manager, management of the company and the control
23   partners.
24        Q.      Okay.  In connection with spending time
25   with the management of the company and the control
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 28 of 106

Page 28

1                      ADAM GLASSNER

2    partners, what did you discuss?

3         A.     I don't specifically recall.

4         Q.     Did there come a time when you left your

5    positions at Ally Bank and GMAC Mortgage?

6         A.     I don't think that's a complete

7    question.  I don't understand it.

8         Q.     Are you still employed with Ally Bank?

9         A.     I am not.

10        Q.     Do you still have responsibilities for

11   GMAC Mortgage?

12        A.     I do not.

13        Q.     When did you leave Ally Bank?

14        A.     January 2012.

15        Q.     Why did you leave Ally Bank in January

16   of 2012?

17        A.     To pursue a new opportunity with Fannie

18   Mae.

19        Q.     What was that opportunity?

20        A.     It was SVP responsible for pricing.

21        Q.     Do you still hold that position?

22        A.     I do not.

23        Q.     How long did you hold that position?

24        A.     Till approximately May of 2013.

25        Q.     Why did you leave that position in May

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 29 of 106

Page 29

1                    ADAM GLASSNER

2    of 2013?

3         A.       To pursue a new opportunity with Baby

4    Loan servicing hedge fund originations.

5         Q.       Do you still hold that position today?

6         A.       I do.

7         Q.       When you were with Fannie were you

8    located in Washington, D.C.?

9         A.       I commuted from Charlotte to D.C.

10        Q.       From September 2009 till January 2012

11   when you left your position at Ally Bank did you

12   have responsibility during that entire period for

13   the Capital Markets Group at GMAC Mortgage?

14        A.       No.

15        Q.       When did you stop having responsibility

16   for the Capital Markets Group at GMAC Mortgage?

17        A.       Upon my departure in January of 2012.

18        Q.       From September 2009 up to January 2012

19   did your responsibilities for managing the Capital

20   Markets Group at GMAC Mortgage change?

21        A.       No.

22        Q.       You testified that you were interviewed

23   by the examiner in this case?

24        A.       Yes.

25        Q.       When did that happen?

Plaintiff's
Objection
29:22-31:24
Irrelevant
(FRE 401,
402)

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 30 of 106

Page 30

1                          ADAM GLASSNER

2          A.      I don't specifically recall.

3          Q.      Do you recall generally?

4          A.      I actually do not recall generally.

5          Q.      Do you remember how long that interview

6    lasted?

7          A.      A full day.

8          Q.      What did you do to prepare for that

9    interview?

10         A.      I met with my attorneys and got a good

11   night sleep.

12         Q.      All right.   When you say your attorneys,

13   are you talking about your attorney here today?

14         A.      And other associates with his firm, yes.

15         Q.      Did you meet with any of the lawyers

16   representing either Ally or ResCap to prepare for

17   your interview with the examiner?

18         A.      Yes.

19         Q.      Who did you meet with from ResCap or

20   Ally in preparation for your meeting with the

21   examiner?

22         A.      Ally's counsel represented here today.

23         Q.      Mr. Brown?

24         A.      That's correct.

25         Q.      For what purpose did you meet with Mr.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 31 of 106

Page 31

1                          ADAM GLASSNER

2    Brown?

3          A.     I don't understand the question.

4          Q.     Why did you meet with Mr. Brown in

5    preparation for your interview with the examiner?

6          A.     He was present during my discussions

7    with my counsel.   I'm not exactly sure why he was

8    present.

9          Q.     You didn't ask him to be there?

10         A.     I don't believe I did.

11         Q.     Okay.   And you're not sure why he was

12   there?

13         A.     I'm not a lawyer.

14         Q.     I understand that, but -- but my

15   question is, when you go to a meeting to prepare for

16   the interview you had no understanding as to why Mr.

17   Brown was there with you?

18         A.     Much like I'm not sure why all the other

19   people are in the room here today, I did not

20   understand or did not ask why.

21         Q.     Okay.   Were you relying on him to

22   provide you with legal advice during that

23   preparation?

24         A.     I was not.

25         Q.     Are you familiar during your time at

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 32 of 106

Page 32

1                        ADAM GLASSNER

2    Ally Bank and at GMAC Mortgage with -- with a

3    program called the Brokering Consumer Loans to Bank?

4                   MR. BROWN:  Objection to form.

5                   THE WITNESS:  At a high level, yes.

6    BY MR. COHEN:

7         Q.     What is your understanding at a high

8    level of the brokering consumer loans to bank

9    project?

10        A.     It was a program put in place prior to

11   my arrival, where the consumer direct division that

12   is housed within GMAC Mortgage would broker loans

13   originated directly from consumers to Ally Bank.

14        Q.     Do you know what the purpose of that

15   program was?

16        A.     I do not know specifically, I did not

17   set it up.

18        Q.     Do you know generally what the purpose

19   of that program was?

20        A.     Generally, it was there so that GMAC

21   Mortgage could broker loans to Ally Bank.

22        Q.     Do you know what the business purpose of

23   that program was?

24                   MR. BROWN:  Objection to form.

25                   THE WITNESS:  I do not.

JSN
Objection
32:22-33:21
Irrelevant
(FRE 401,
402)

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 33 of 106

Page 33

```
1                    ADAM GLASSNER
2    BY MR. COHEN:
3         Q.      Do you know why there was a desire to
4    have GMAC Mortgage broker loans to Ally Bank?
5         A.      As a --
6                 MR. ELBAUM:  Objection to form.
7                 You can answer.
8                 THE WITNESS:  As it was set up prior to
9         my arrival and by parties that I was not
10        involved with, I cannot answer that question.
11   BY MR. COHEN:
12        Q.      So even though it was in place when you
13   took over responsibility for the Capital Markets
14   Group at GMAC Mortgage you had no understanding of
15   why that program was put in place?
16                MR. BROWN:  Objection to form.
17                MR. ELBAUM:  Misstates the record.
18                THE WITNESS:  That was not part of the
19        capital markets activities.  That was a
20        consumer division activity which I was not
21        responsible for.
22   BY MR. COHEN:
23        Q.      In -- in your capacity at -- at Ally
24   Bank did you have under -- any understanding as to
25   why that program was put in place?
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 34 of 106

Page 34

```
 1                     ADAM GLASSNER

 2              MR. BROWN:  Objection to form.

 3              THE WITNESS:  As I previously testified,

 4        it was set up prior to my arrival at Ally Bank

 5        by executives that were in charge of that area,

 6        not me.

 7   BY MR. COHEN:

 8        Q.    I understand that, but even though the

 9   program was put in place before you got there once

10   you got there did you have any understanding as to

11   why that program had been put in place previously?

12              MR. BROWN:  Objection to form; asked and

13        answered.

14              THE WITNESS:  I do not.

15   BY MR. COHEN:

16        Q.    Do you have any understanding of what

17   happened once the loans were brokered from GMAC

18   Mortgage to Ally Bank, what Ally Bank then did with

19   those loans?

20        A.    Yes.

21        Q.    What did Ally Bank do with those loans?

22        A.    It held them for a period of time until

23   they were sold to GMAC Mortgage which were then

24   subsequently sold to the capital markets.

25        Q.    Why would Ally Bank hold the loans
```

JSN Objection
34:25-36:3
Irrelevant (FRE 401,
402); incomplete
question and answer

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 35 of 106

Page 35

```
 1                    ADAM GLASSNER
 2   brokered by GMAC Mortgage and then just sell them
 3   back?
 4        A.    I don't understand the question.
 5        Q.    What was the business purpose of
 6   brokering loans to Ally Bank just to have them sell
 7   them back to GMAC Mortgage?
 8             MR. BROWN:  Objection to form; asked and
 9        answered.
10             THE WITNESS:  As I previously testified,
11        that relationship existed prior to my arrival
12        at Ally Bank so I cannot tell you the business
13        purpose for the reason that those people set
14        that up.
15   BY MR. COHEN:
16        Q.    In your capacity holding positions both
17   at Ally Bank and GMAC Mortgage you had no
18   understanding as to why that relationship was on
19   going?
20             MR. BROWN:  Objection.
21             MR. SIMON:  Objection to form.
22             THE WITNESS:  I had a high level
23        understanding of the way that the relationship
24        worked and operated.  As I wasn't involved in
25        the development of that or the documentation of
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 36 of 106

Page 36

```
1                    ADAM GLASSNER

2        that, I don't know the business purpose for the

3        reasons those people put that in place.

4   BY MR. COHEN:

5        Q.      So while you have -- held positions at

6   both Ally Bank and GMAC Mortgage you -- your -- you

7   had no sense of why that relationship was ongoing?

8                MR. BROWN:  Objection to form; asked and

9        answered, mischaracterizes his testimony.

10               THE WITNESS:  As I previously testified,

11       that relationship predated my arrival.  I

12       reviewed the documentation to understand the

13       agreements, but I was not involved in the

14       development of the program or the documents so

15       I cannot say why those people developed it and

16       why it existed.

17  BY MR. COHEN:

18       Q.      When you say you reviewed the

19  documentation to understand the agreements what

20  specifically did you do?

21       A.      I reviewed the broker agreement and I

22  spent time with the people who developed the program

23  to understand how it was supposed to work.

24       Q.      Which specific people are you referring

25  to when you say you "spent time with the people who
```

Page 37

1                    ADAM GLASSNER

2   developed the program"?

3         A.      I believe it was Al Celini, Bob Groody

4   and Mark Hales.

5         Q.      Other than the broker agreement, were

6   there other documents that you looked at?

7         A.      Yes.

8         Q.      What other documents did you look at?

9         A.      There was a pipeline swap and an MSR

10  swap that I also reviewed.

11        Q.      Anything else?

12        A.      Not that I recall.

13        Q.      Did -- did you review a document titled

14  the Master Mortgage Loan Purchase & Sale Agreement,

15  MMP -- MMLPSA?

16        A.      I have reviewed that document.  I do not

17  believe it happened at that time.

18        Q.      Okay.  Why did you talk to the people

19  who developed the program?

20        A.      I wanted to understood -- understand how

21  the program worked.

22        Q.      And what did you come to understand as

23  to how the program worked?

24        A.      That GMAC Mortgage brokered

25  consumer-direct origination loans to Ally Bank, Ally

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 38 of 106

Page 38

1                    ADAM GLASSNER

2    Bank sold those loans back to GMAC Mortgage and

3    retained mortgage servicing rights for its own

4    balance sheet, and GMAC Mortgage sold those loans to

5    the capital markets.

6         Q.       And in those discussions did you talk

7    about the economics of that relationship?

8         A.       I do not believe at that point we did.

9         Q.       Did there come a point when you did have

10   discussions about the economics of that

11   relationship?

12        A.       Yes.

13        Q.       When did that happen?

14        A.       I don't specifically recall.  It

15   happened on multiple occasions, as I tried to

16   understand their aggregate relationship and the

17   various agreements and swaps and how they

18   interplayed with each other.

19        Q.       When you say "multiple occasions" how

20   many times are you talking about?

21        A.       I don't specifically recall.

22        Q.       Why did you want to understand the

23   aggregate relationships and the various agreements

24   and how they interplayed with each other?

25        A.       It was to better understand the business

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 39 of 106

Page 39

1                      ADAM GLASSNER

2    activities of Ally Bank and how the mortgage

3    origination business impacted Ally Bank in its

4    financials.

5         Q.      Were you able to better understand the

6    business activities of Ally Bank and how the

7    mortgage origination business impacted Ally Bank as

8    a result of these discussions?

9         A.      Generically, yes.

10        Q.      And what was that understanding that --

11   that you came to generically have?

12        A.      I came to understand that GMAC Mortgage

13   brokered loans to Ally Bank which were subsequently

14   sold to the capital markets via GMAC Mortgage, the

15   MSRs were covered under a total return swap where

16   Ally Bank received a fixed -- or a floating payment

17   in return for exchange of market value risk

18   associated with those assets and any asset changes

19   of the loans while they were held at Ally Bank were

20   swapped to GMAC Mortgage.

21        Q.      Did you come to have an understanding as

22   to what GMAC Mortgage was expected to pay in this

23   relationship when it acquired the loans back from

24   Ally Bank?

25        A.      During what period of time?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 40 of 106

Page 40

1                    ADAM GLASSNER

2        Q.      During any period of time.

3        A.      Yes.

4        Q.      What was your understanding as to what

5    GMAC Mortgage was required to pay Ally Bank when it

6    acquired those mortgages back from Ally Bank?

7        A.      It was my understanding that the

8    agreements were written to cover cost basis.

9        Q.      When you say "cost basis" what do you

10   mean?

11       A.      The cost that the loan or -- the cost of

12   the loan to originate.

13       Q.      How was that determined?

14               MR. BROWN:  Objection; form.

15               THE WITNESS:  I do not know.

16   BY MR. COHEN:

17       Q.      You never asked?

18       A.      I did ask.

19       Q.      What were you told?

20       A.      I never got a definitive answer prior to

21   my departure.

22       Q.      What kind of answers did you get if they

23   weren't definitive?

24       A.      That investigation was ongoing.

25       Q.      What was being investigated?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 41 of 106

Page 41

1                    ADAM GLASSNER

2         A.      I don't understand the question.

3         Q.      Well, they told you an investigation was

4   ongoing, what did you take that to mean?

5         A.      That they were looking into it.

6         Q.      How long had the relationship been in

7   place when you left Ally Bank in January of 2012?

8              MR. BROWN:   Objection to form.

9              THE WITNESS:   I don't specifically

10      recall.

11  BY MR. COHEN:

12        Q.      Well, was it in place when you joined in

13  2009?

14             MR. BROWN:   Objection to form.

15             THE WITNESS:   As I previously testified,

16      all of the agreements were in place prior to my

17      arrival.

18  BY MR. COHEN:

19        Q.      Okay.   So it was at least two or three

20  years, right?

21        A.      It was prior to my arrival.

22        Q.      And you were there for two or three

23  years, right?

24        A.      I started in approximately April of 2009

25  and left in January of 2012.

Plaintiffs'
Objection
41:6-42:12
Lack of
personal
knowledge/
speculative
(FRE 602), lack
of foundation
(FRE 602, 901)

Page 42

1                    ADAM GLASSNER

2        Q.      Okay.  So two-and-a-half years, right?

3        A.      That sounds about right.

4        Q.      Okay.  So the program was in place for

5    two-and-a-half years at least, right?

6                MR. ELBAUM:  When he left?  The time

7        periods are confusing here.

8                MR. COHEN:  Yes.

9                MR. ELBAUM:  Okay.

10               THE WITNESS:  It was in place prior to

11       my arrival and I believe it was still in place

12       when I left, yes.

13   BY MR. COHEN:

14       Q.      And you were there two-and-a-half years,

15   right?

16               MR. BROWN:  Objection to form.

17               THE WITNESS:  I started in approximately

18       May of 2009 and left in January of 2012.

19   BY MR. COHEN:

20       Q.      And you would agree that that's

21   approximately two-and-a-half years, right?

22               MR. ELBAUM:  I think that's been asked

23       and answered.

24               THE WITNESS:  I testified that I arrived

25       at Ally Bank in approximately May of 2009.

Page 43

1                    ADAM GLASSNER

2    BY MR. COHEN:

3         Q.    You don't --

4         A.    And --

5         Q.    -- know whether that's approximately

6    two-and-a-half years?

7               You can't answer that question?

8         A.    I don't know what "approximately" means.

9               MR. BROWN:  He's already answered it.

10              MR. ELBAUM:  It has been asked already.

11   BY MR. COHEN:

12        Q.    You don't know what approximately means?

13              MR. ELBAUM:  Objection; argumentative

14        and abusive.

15              Why don't you ask a subsequent question.

16        The calendar is what the calendar is.

17              THE WITNESS:  As I previously testified,

18        I arrived in May of 2009, if you would like to

19        characterize that as approximately

20        two-and-a-half years you are more than welcome

21        to.

22   BY MR. COHEN:

23        Q.    The last question I asked you was, your

24   sworn testimony is you don't know what the word

25   approximately means?

Page 44

1                    ADAM GLASSNER

2    A.      I don't --

3            MR. ELBAUM:  That's abusive.

4            THE WITNESS:  I don't --

5            MR. ELBAUM:  Just focus on the substance

6    here.

7            MR. COHEN:  You can object to the form.

8            MR. ELBAUM:  I have.

9            MR. BROWN:  Objection to form.

10           MR. COHEN:  Thank you.

11           Would you read back my last question?

12           (THEREUPON, the above-referred to

13           portion of the Record was read back by

14           the Court Reporter).

15           THE WITNESS:  I don't know if you

16   believe -- if you and I have the same

17   definition of what approximately means.

18           As I testified, I gave you my

19   approximate arrival date and my approximate

20   departure date, if you believe that is

21   approximately two-and-a-half years that is your

22   opinion.

23           I'd have to go back to my employment

24   records to determine the exact date of my

25   arrival and the exact date of my departure and

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 45 of 106

Page 45

1                    ADAM GLASSNER

2          then determine how many days and how many years

3          that is.

4    BY MR. COHEN:

5          Q.      Did it strike you as odd when you asked

6    about what GMAC Mortgage was required to pay Ally

7    Bank --

8          A.      Uh-huh.

9          Q.      -- to purchase the loans that it

10   brokered that you weren't able to get a definitive

11   answer on that?

12                 MR. SIMON:  Objection to form.

13                 THE WITNESS:  I had a high level

14          understanding during my tenure of the way these

15          agreements worked.

16                 When I inquired in late 2009 about

17          various activities going on, to understand how

18          they were being -- being administered I went to

19          the finance departments of both companies to

20          inquire and have them investigate, their

21          investigation was ongoing upon my departure in

22          2012.

23   BY MR. COHEN:

24          Q.      So you initiated your inquiry as to how

25   these agreements were being administered in late

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 46 of 106

Page 46

1                    ADAM GLASSNER

2    2009?

3         A.      I'm sorry.   Late 2011.

4         Q.      Okay.

5         A.      I...

6         Q.      You understood that there were contracts

7    in place that govern these relationships, right?

8         A.      As I previously testified, I reviewed

9    several of those contracts post my discussions with

10   the executives that drafted them.

11        Q.      So the answer is yes, there were

12   contracts in place?

13        A.      Yes.

14        Q.      Okay.  Did it strike you as odd when you

15   asked in late 2011 how these agreements were being

16   administered that you weren't able to get a

17   definitive answer?

18                MR. BROWN:   Objection to form.

19                THE WITNESS:   It did not.

20   BY MR. COHEN:

21        Q.      Why not?

22        A.      I did not have an in-depth understanding

23   of the agreements.  I went to the parties that -- to

24   understand with questions, under question -- to

25   understand questions that I had and they

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 47 of 106

Page 47

1                          ADAM GLASSNER

2    investigated.   I did not strike that as odd -- that

3    did not strike as odd to me.

4         Q.      What questions did you have?

5         A.      It was my high level understanding of

6    the agreements that certain economics would go to

7    certain entities and when I saw a financial summary

8    of both legal entities side-by-side at a high level

9    it did not strike me to be congruent with my

10   understanding of the agreements.

11        Q.      What was your understanding of the

12   agreements as to which economics would go to which

13   party?

14        A.      It was my understanding that GMAC

15   Mortgage would get gain on sale and Ally Bank would

16   earn points and fees and interest earned during the

17   holding period.

18        Q.      When you say "points and fees and

19   interest earned during the holding period" what do

20   you mean?

21        A.      Points and fees paid by the consumer at

22   the origination of the residential loan and the

23   interest spread over the -- the interest earned over

24   its cost of funds on the mortgage loan while it is

25   held by Ally Bank.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 48 of 106

Page 48

1                          ADAM GLASSNER

2        Q.      How did you come to have that

3    understanding of the agreements?

4        A.      It was explained to me by the executives

5    that put the agreements in place.

6        Q.      Did there come a time where you came to

7    believe that the agreements were not being

8    administered that way?

9        A.      In late 2011 when I saw the financials

10   of both entities next to each other, at a glance

11   they did not appear to be incongruent with the high

12   level understanding I had of the agreements.

13       Q.      In what way were they not congruent with

14   your high level understanding of the agreements?

15       A.      It appeared that more of the economics

16   involved with the origination activity were being

17   kept at Ally Bank than I would have suspected with

18   those agreements.

19       Q.      Did you have an understanding of what

20   aspects of the economics were being retained at Ally

21   Bank that was inconsistent with your understanding

22   of the agreements?

23       A.      I did not.

24       Q.      Did there come a time where you gained

25   an understanding of that?

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 49 of 106

Page 49

```
1                      ADAM GLASSNER
2          A.    I did not.
3          Q.    Who did you ask to clarify the
4    administration of these agreements once you
5    discovered that it was inconsistent with your
6    understanding of the way the agreements were meant
7    to operate?
8          A.    I believe it was several people within
9    Ally Bank's finance department along with ResCap or
10   GMAC Mortgage's finance department.
11         Q.    Okay.  Let's start with ResCap.  Who at
12   ResCap did you raise the issue with?
13         A.    I believe I had a conversation with Jim
14   Whitlinger.
15         Q.    What was Mr. Whitlinger's position
16   within ResCap?
17         A.    I believe at that point he was the CFO
18   of ResCap.
19         Q.    Did you raise the issue with anyone else
20   at ResCap?
21         A.    I believe I made Tom Morano aware -- who
22   was CEO aware.
23         Q.    You made Mr. Morano aware of what?
24         A.    That at a high level the economic splits
25   did not appear to be consistent with my
```

12-12020-mg  Doc 5803-17  Filed 11/18/13  Entered 11/18/13 11:51:57  Exhibit
Deposition Designations: Adam Glassner  Pg 50 of 106

Page 50

```
 1                    ADAM GLASSNER
 2   understanding of the agreements.
 3       Q.    How often did you interact with Mr.
 4   Morano in general?
 5       A.    Frequently.
 6       Q.    When you say "frequently" what do you
 7   mean?
 8       A.    Quite often.
 9       Q.    How many times a week?
10       A.    Multiple.
11       Q.    More than five?
12       A.    I likely interacted with Mr. Morano, if
13   averaged out over a month, more than one time a day.
14       Q.    Okay.  And how often did you interact
15   with Mr. Whitlinger?
16       A.    Frequently, but less so than Mr. Morano.
17       Q.    All right.  Who at Ally did you raise
18   this issue with?
19             MR. BROWN:  Objection to form.
20             Do you mean Ally Bank?
21   BY MR. COHEN:
22       Q.    Who at any of the Ally-named entities,
23   AFI, Ally Bank, any -- any entity that was called
24   Ally did you raise the issue?
25             MR. BROWN:  Objection to form.
```

Plaintiff's
Objection
50:22-15
Objection to
form: vague,
ambiguous

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 51 of 106

Page 51

1                     ADAM GLASSNER

2              THE WITNESS:  I raised it to Jim Young

3        who was the CFO.

4    BY MR. COHEN:

5        Q.     Anyone else?

6        A.     I believe I raised it to Ann Cummings

7    who was the head auditor.

8        Q.     Anyone else?

9        A.     I'm sure there were other people within

10   -- within Jim Young's organization, Joe Cortez and

11   others that I can't specifically recall having

12   conversations with.

13       Q.     Why did you raise the issue with so many

14   people?

15              MR. SIMON:  Objection to form.

16              MR. BROWN:  Objection.

17              THE WITNESS:  It was inconsistent with

18       my understanding of the agreements.

19   BY MR. COHEN:

20       Q.     Why didn't you just find one person and

21   say this is inconsistent, can you explain it?

22              Why didn't you do that?

23       A.     I don't recall.

24       Q.     Did you think it was a big issue?

25              MR. BROWN:  Objection to form.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 52 of 106

Page 52

1                    ADAM GLASSNER

2              THE WITNESS:   It had the potential

3        implication given the size of the activity that

4        had gone down -- that had taken place between

5        the two entities to potentially have material

6        intact -- impact to both entities.

7    BY MR. COHEN:

8        Q.      When you say it could potentially have

9    material impact to both entities what do you mean?

10       A.      If the accounting of that -- of those

11   agreements was done incorrectly it would not have

12   been an insignificant amount of money to both

13   entities as it relates to that activity.

14       Q.      And if the accounting had been done

15   incorrectly it would have meant -- start over.

16              If the accounting had been done

17   consistent with your understanding of the way the

18   agreements were meant to operate based on your

19   conversations with the people who put the agreements

20   in place it would have meant more money to ResCap

21   and less money to Ally, right?

22              MR. BROWN:   Objection.

23              MR. SIMON:   Objection; form.

24              THE WITNESS:   Yes.

25   BY MR. COHEN:

Plaintiff's
Objection
52:14-24
Lack of personal
knowledge/
speculative (FRE
602), lack of
foundation (FRE
602, 901);
impermissible lay
opinion

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 53 of 106

Page 53

1              ADAM GLASSNER

2        Q.      And it would have been a material

3   amount, correct?

4        A.      Yes.

5        Q.      Do you have a sense of whether if the

6   accounting had been done consistently with the way

7   you understood the agreements to operate based on

8   your conversations with the people who put the

9   agreements in place it would have required Ally

10  Financial to restate its financials?

11            MR. BROWN:   Objection.

12            MR. SIMON:   Objection to the form.

13            THE WITNESS:   I'm not an accountant, but

14      it was my uninformed and unprofessional opinion

15      that the material -- the amount could be

16      material enough that we would have to restate

17      Ally financial -- Ally Bank's financial

18      statements, yes.

19  BY MR. COHEN:

20        Q.      When you talked to the four or five

21  people that you raised this issue with, did you tell

22  them that?

23            MR. BROWN:   Objection to form.

24            THE WITNESS:   I believe I did.

25  BY MR. COHEN:

Plaintiffs'
Objection
53:5-18
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901);
impermissible
lay opinion

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 54 of 106

Page 54

ADAM GLASSNER

1

2        Q.       What reaction did you get?

3        A.       I don't specifically recall.

4        Q.       Do you generally recall?

5        A.       I generally recall all of the parties

6    engaging their staffs and other available resources

7    to them to investigate the issue that I raised and

8    come to a conclusion.

9        Q.       Were you still employed at Ally Bank

10   when they came to the conclusion?

11       A.       I was not.

12       Q.       Did you play any role in their

13   investigation of the issue?

14       A.       Previous to my departure I would have

15   been involved in several conference calls to discuss

16   the matter.

17       Q.       What was discussed during those

18   conference calls?

19       A.       I don't specifically recall.

20       Q.       Do you generally recall?

21       A.       I generally recall discussing my

22   understanding of the agreements and how the

23   agreements were written and outside of that I do

24   not.

25       Q.       Were the people who put the agreements

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 55 of 106

Page 55

1                    ADAM GLASSNER

2    in place, who explained the agreements to you which

3    formed the basis of your understanding of the

4    agreements, also part of those conference calls?

5         A.    I believe they were all departed from

6    the company by that point.

7         Q.    Can you remind me specifically who those

8    people were who put the agreements in place and

9    explained them to you and gave you your

10   understanding of the way the agreements were meant

11   to operate?

12              MR. BROWN:  Objection to form.

13              MR. SIMON:  Objection to form.

14              THE WITNESS:  Bob Groody, Al Celini,

15        Mark Hales.

16   BY MR. COHEN:

17        Q.    And they were all gone by the time you

18   raised this issue?

19        A.    I believe that is the case.

20        Q.    In your mind, is there a possibility

21   that you were confused as to what they told you

22   about how the agreements were meant to operate?

23        A.    I don't believe so.

24        Q.    So you were pretty clear that they told

25   you, these people who put the agreements in place,

Plaintiffs'
Objection
55:7-15
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901)

Plaintiffs'
Objection
55:24-56:7
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901)

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 56 of 106

Page 56

```
 1                    ADAM GLASSNER

 2    that this is the way it was supposed to work?

 3              MR. SIMON:  Objection to form.

 4              THE WITNESS:  I did not come out of my

 5        meeting -- my meetings with them with any

 6        confusion of their interpretation of the way

 7        the agreements were supposed to work.

 8    BY MR. COHEN:

 9        Q.    And, again, these were the people who

10    put the agreements in place?

11              MR. SIMON:  Objection to form.

12    BY MR. COHEN:

13        Q.    You went to the source, right?

14              MR. SIMON:  Objection to form.

15              MR. BROWN:  Objection to form.

16              THE WITNESS:  That is correct.

17    BY MR. COHEN:

18        Q.    During these conference calls that --

19    that you participated in while you were still at the

20    company as part of the investigation did anybody

21    tell you that your understanding of the agreement

22    was wrong?

23        A.    I don't specifically recall that

24    discussion.

25        Q.    How about separately from the conference
```

Plaintiff's
Objection
56:9-16
Lack of personal
knowledge/
speculative (FRE
602), lack of
foundation (FRE
602, 901)

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 57 of 106

Page 57

1                    ADAM GLASSNER

2    calls, did anybody come into your office or pull you

3    aside and say that that's not what the agreements

4    provide for?

5          A.    I do not recall that happening.

6          Q.    After you left the company did anybody

7    call you and ask for your input as part of the

8    company's investigation?

9                MR. BROWN:  Objection to form.

10               THE WITNESS:  Yes.

11   BY MR. COHEN:

12         Q.    Who?

13         A.    I believe I had a call with a general

14   auditor and an outside audit firm that they engaged

15   to do an investigation.

16         Q.    When you say "general auditor" who do

17   you mean?

18         A.    I don't remember the name of the firm.

19               Oh.  Sorry.  Ann Cummings was the

20   general auditor.

21         Q.    And then there was an outside accounting

22   firm that was also involved?

23         A.    That's correct.

24         Q.    And you don't recall which firm that

25   was?

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 58 of 106

Page 58

1                        ADAM GLASSNER

2          A.        It was either KPMG or PWC, but...

3          Q.        Okay.    What did you discuss with

4    Ms. Cummings as part of the investigation after you

5    left the company?

6          A.        Other than that call we have -- did not

7    have any discussions.

8          Q.        Okay.    During that call.    I'm sorry.

9    During the call -- let me ask a complete question.

10                   During the call with Ms. Cummings after

11   you left the company what was discussed?

12         A.        From what I recall, they wanted to

13   understand my understanding of the agreements and

14   why I raised the issue.

15         Q.        What did you tell her?

16         A.        I believe I told her that it was my

17   understanding that GMAC Mortgage got the gain on

18   sale, Ally Bank received interest spread during the

19   period it was held on loans and points and fees paid

20   in the consumer transaction, along with the market

21   value risk associated with the pipeline which is

22   loans held in the books for ultimate sale, and the

23   MSR was swapped to GMAC Mortgage in return for a

24   floating rate return based on LIBOR.

25         Q.        And that's a conversation you had with

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 59 of 106

Page 59

                          ADAM GLASSNER

1    Ms. Cummings after you left Ally Bank, right?

2         A.      I believe that was during the interview

3    as part of their investigation with their outside

4    auditor.

5         Q.      All right.   And you had left the bank by

6    that point in time, right?

7         A.      That is correct.

8         Q.      But hadn't you already told Ms. Cummings

9    that in December of 2011 when you were still with

10   the bank, when you raised the issue with her?

11                MR. BROWN:   Objection to form.

12                THE WITNESS:   As I previously testified,

13        I raised this issue to multiple people of which

14        Ann Cummings was one of them, yes.

15   BY MR. COHEN:

16        Q.      So she was essentially asking you to

17   explain what you had already told her?

18        A.      The call involved her and outside -- an

19   outside auditing firm.   It was my interpretation

20   that that team was trying to do an independent

21   review and an independent investigation and this was

22   in an effort to do that.

23        Q.      Oh, okay.   So it was one call with both

24   her and the outside firm?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 60 of 106

Page 60

1                        ADAM GLASSNER

2         A.      That is correct.

3         Q.      All right.  It wasn't a call with her

4    and then a separate call with the outside firm?

5         A.      No.  That is correct.

6         Q.      Okay.  Other than that call with

7    Ms. Cummings and the outside auditing firm, after

8    you left Ally Bank did anyone else reach out to you

9    as part of their investigation?

10        A.      Not that I recall.

11        Q.      Before Ally Bank and GMAC Mortgage

12   reached a conclusion to their investigation as a

13   result of their investigation did anybody run that

14   conclusion by you?

15        A.      I'm not aware of a conclusion being made

16   prior to my departure at Ally Bank in January of

17   2012.

18        Q.      Okay.  How about after you left Ally

19   Bank in January of 2012?

20                I believe your testimony was that when

21   you left the investigation was ongoing, right?

22        A.      That's correct.

23        Q.      So after you left the bank did anybody

24   call you and say this is what we think the

25   conclusion is, what's your reaction to it?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 61 of 106

Page 61

```
 1                        ADAM GLASSNER
 2         A.      No.
 3         Q.      Okay.  So other than that one call with
 4    Ms. Cummings and the firm once you left the bank
 5    that was only -- your only involvement in this
 6    issue, right?
 7         A.      Outside of the bank -- the examiner's
 8    deposition, yes.
 9         Q.      Okay.  Okay.  Do you know whether as
10    part of its investigation the bank went back to
11    Mr. Groody, Mr. Celini and Mr. Hales to talk to them
12    about their understanding of the agreements they put
13    in place?
14         A.      I believe I read within the examiner's
15    report, which I was provided a copy of, at least
16    some of those individuals having been interviewed,
17    but I don't know if the bank had separate interviews
18    or not.
19         Q.      Okay.  And did -- who provided you a
20    copy of the examiner's report?
21         A.      I believe it was my counsel.
22         Q.      When were you provided a copy of the
23    examiner's report?
24         A.      Some time subsequent to its issuance.
25         Q.      Was it over the summer?
```

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 62 of 106

Page 62

                          ADAM GLASSNER

1

2        A.      I don't specifically recall, but I'm

3    sure it was within several weeks of the examiner's

4    report being finalized.  I don't remember when that

5    was finalized.

6        Q.      All right.  Did you read it?

7        A.      Portions.

8        Q.      You didn't read it cover-to-cover?

9        A.      I did not.

10        Q.      Did you search for your name in it?

11        A.      Yes.

12        Q.      Did you read the sections where you were

13    referenced?

14        A.      At a high level, yes.

15        Q.      When you say "at a high level" what do

16    you mean?

17        A.      I didn't read it with the desire of

18    attention to detail that I would a document that I

19    wanted to have specific recollection or

20    understanding of because it didn't -- I didn't

21    believe it had any relevance to me.

22        Q.      Was there anything that you read in the

23    examiner's report where he made reference to you

24    that -- that you disagreed with?

25        A.      I don't specifically -- I don't believe

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 63 of 106

Page 63

1                    ADAM GLASSNER

2   so.

3        Q.      Okay.  So where he recapped things that

4   you told him during your interview in general he got

5   it right; is that a fair assessment?

6        A.      In general, I don't recall any material

7   missummaries or misstatements in the portions that I

8   reviewed.

9        Q.      Okay.  Would you agree that in your Ally

10  Bank capacity you were responsible for warehouse and

11  correspondent lending and also became the point of

12  contact for Ally Bank's mortgage businesses with

13  both the FDIC and the Utah Department of Financial

14  Institutions?

15       A.      Yes.

16       Q.      Would you agree that in your capital

17  markets function, and this is at ResCap or at GMAC

18  Mortgage, your responsibilities included pricing for

19  each of the bank and ResCap loan channels?

20       A.      Yes.

21       Q.      What were your responsibilities for

22  pricing each of the bank and ResCap loan channels?

23       A.      We established the -- both base pricing

24  which was sourced from information available to the

25  capital markets and the targeted mark -- origination

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 64 of 106

Page 64

1                    ADAM GLASSNER

2    margin that would be achieved upon the sale of the

3    asset.

4         Q.      When you say "base pricing" what do you

5    mean?

6         A.      The price that the market values the

7    asset at origination.   Excuse me.

8         Q.      I think you used the phrase origination

9    margin?

10        A.      Yes.

11        Q.      What is that?

12        A.      That is the expected profit margin,

13   gross profit margin at origination on any one given

14   loan that you expect to make when your originator

15   purchased that loan.

16        Q.      So you were responsible within GMAC

17   Mortgage for a profit margin that it expected to

18   make when it purchased the loan from Ally Bank?

19             MR. ELBAUM:   Objection; form.

20             THE WITNESS:   We set profit margins not

21        at the legal entity level, but at the channel

22        origination level, so correspondent wholesale

23        division that Ally Bank also had, along with

24        the consumer direct, would have had price

25        expected origination margins set at the

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 65 of 106

Page 65

ADAM GLASSNER

2    origination or acquisition of those loans.

3    That was not done at a legal entity level, that

4    was done by a channel perspective.

5  BY MR. COHEN:

6    Q.    So from a channel perspective the profit

7  margin was done on -- was targeted on a consolidated

8  basis?

9    A.    It was done in a channel-specific level.

10  So correspondent would have had its own origination

11  targeted margin by customer, by product, by coupon,

12  consumer would have had its own origination by

13  target margin by the same variables, and the

14  wholesale would have had its own origination target

15  margin at -- by those same variables.

16    Q.    Okay.  And on the consumer channel how

17  was it determined how that profit margin would be

18  divided as between Ally Bank and GMAC Mortgage?

19        MR. SIMON:  Objection to form.

20        MR. BROWN:  Objection to form.

21        THE WITNESS:  That would have been done

22        under finance's interpretation of the various

23        agreements in place.

24  BY MR. COHEN:

25    Q.    And those are the agreements we've been

Plaintiff's
Objection
65:25-66:15
Lack of
personal
knowledge/
speculative
(FRE 602), lack
of foundation
(FRE 602, 901);
impermissible
lay opinion

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 66 of 106

Page 66

ADAM GLASSNER

2  talking about this morning?

3       A.    That is correct.

4       Q.    And it was your understanding that the

5  division of that profit on the consumer channel was

6  being done incorrectly as of the time you left the

7  company, right?

8              MR. BROWN:   Objection to form.

9              THE WITNESS:   At the time I left the

10      company I had raised an issue that the

11      financials as I saw them on a legal entity

12      basis were inconsistent with my understanding

13      of the agreements and that I asked the finance

14      departments of both to investigate that and to

15      ensure that it was accurate.

16  BY MR. COHEN:

17      Q.    From the time that you raised the issue

18  until your last day at the company, approximately

19  how many weeks passed?

20      A.    Somewhere between 10 and 16.

21      Q.    And in that 10 and 16 weeks, to your

22  understanding, neither ResCap nor Ally Bank were

23  able to answer the question as to how the profits in

24  the consumer loan channel were to be divided between

25  those entities?

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 67 of 106

Page 67

1                     ADAM GLASSNER

2              MR. SIMON:  Objection to form.

3              THE WITNESS:  I was unaware at the point

4      of my departure if they had come to a

5      definitive answer in regard to the questions

6      that I raised.

7  BY MR. COHEN:

8      Q.      Did that strike you as odd?

9              MR. BROWN:  Objection to form.

10             THE WITNESS:  It did not.

11  BY MR. COHEN:

12     Q.      Why not?

13     A.      It's a fairly complex issue, involving a

14  variety of legal documents that were drafted by

15  people who were no longer at the company and

16  administered by people that didn't draft them, I

17  believe they were doing a thorough analysis and

18  given the holiday periods that we covered here,

19  including Thanksgiving and Christmas and New Year's,

20  it didn't surprise me that upon my departure they

21  had not come to a definitive conclusion.

22     Q.      Do you agree that you resigned on

23  January 3rd, 2012 but were asked to stay on until

24  January 26th, 2012?

25     A.      Yes.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 68 of 106

Page 68

1                          ADAM GLASSNER

2          Q.      Do you have an understanding as to why

3    you were asked to stay until January 26th, 2012?

4          A.      Barbie Gaston, who was the president and

5    CEO of Ally Bank, asked me to stay on for -- for an

6    extended transition period and out of respect for

7    her I obligated or I fulfilled her request.

8          Q.      So the idea was to give someone time to

9    come up-to-speed in your responsibilities?

10         A.      That is correct.

11         Q.      Okay.

12                 MR. COHEN:   Take about a five-minute

13         break.

14                 MR. BROWN:   Sure.

15                 MR. ELBAUM:   Sure.

16                 THE VIDEOGRAPHER:   The time on the

17         monitor is approximately 10:11 and this is the

18         end of tape number one and we're off the

19         record.

20                 (Recess in Proceedings).

21                 THE VIDEOGRAPHER:   This is the beginning

22         of tape number two in the deposition of Adam

23         Glassner.   The time on the monitor is

24         approximately 10:31 a.m. and we're back on the

25         record.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 69 of 106

Page 69

```
 1                    ADAM GLASSNER

 2   BY MR. COHEN:

 3        Q.     Mr. Glassner, before the break I believe

 4   you testified that it was your understanding of the

 5   way the profits for consumer mortgages were to be

 6   split between GMAC Mortgage and the bank was that

 7   GMAC Mortgage was to receive the gain on sale; is

 8   that correct?

 9        A.     That's correct.

10        Q.     What do you mean by "gain on sale"?

11        A.     It was my understanding that the gain

12   associated with the sale of the loan into the

13   capital markets over the acquired cost of the loan

14   would go to GMAC Mortgage.

15        Q.     How would the acquired cost of the loan

16   be calculated?

17        A.     The finance team would have been

18   responsible for that.

19        Q.     Do you have a general understanding of

20   what went into that calculation?

21        A.     Yes.

22        Q.     Could you explain that, please?

23        A.     It would include, in the case of a

24   correspondent loan, the price paid for that

25   residential loan and any associated costs that were
```

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 70 of 106

Page 70

                          ADAM GLASSNER

1   included in the accounting treatment of that asset

2   and any consumer loan transaction or broker

3   transaction, any direct costs associated with the

4   origination of that loan.

5        Q.      And when you say "direct costs" what do

6   you mean?

7        A.      Any costs that were specific to that

8   transaction that you came out-of-pocket for which

9   could include certain things like title and flood

10  and other consumer-related activities.

11       Q.      So those costs are actual cash

12  expenditures?

13       A.      I believe that's true, yes.

14       Q.      Okay.   And when you say "price paid for

15  the loan," how would the price paid for the loan be

16  determined?

17       A.      It would be the price associated that

18  Ally Bank in its correspondent division agreed to

19  pay the seller of that loan at the point of trade.

20       Q.      Okay.   And that's an actual

21  out-of-pocket as well?

22       A.      That is correct.

23       Q.      Okay.   Was one of the concerns you

24  raised when you talked to the people at ResCap and

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 71 of 106

Page 71

                           ADAM GLASSNER

1

2    Ally in December of 2011 that not only would -- was

3    there the potential that the bank had overstated its

4    earnings, were you also concerned that the bank, if

5    it had overstated its earnings, also was -- reported

6    -- reported inflating capital?

7         A.      Yes, those would go hand-in-hand with

8    each other.  Yes.

9         Q.      Why would they go hand-in-hand with each

10   other?

11        A.      If you have earnings that you decide to

12   retain those retained earnings would go into the

13   equity capital of your institution.

14               It's my understanding that in that case

15   if you had earnings that were higher than should

16   have been you would have also had higher capital and

17   you would have reported that to your various

18   regulators.

19        Q.      At the time you raised these concerns in

20   December of 2011 was capital an issue at Ally Bank?

21               MR. BROWN:  Objection to form.

22               THE WITNESS:  I don't completely

23   understand the question.

24   BY MR. COHEN:

25        Q.      In December of 2011 -- well, let's back

Plaintiffs'
Objection
71:19-72:13
Irrelevant
(FRE 401,
402), lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901)

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 72 of 106

Page 72

1                         ADAM GLASSNER

2    up.

3                   Was Ally Bank a recipient of TARP funds?

4        A.    No.

5        Q.    It did not receive any TARP funds?

6        A.    Ally Bank did not receive TARP funds.

7        Q.    Did AFI receive TARP funds?

8        A.    Yes.

9        Q.    Were certain of those TARP funds used to

10   support the capital at Ally Bank?

11                   MR. BROWN:  Objection to form.

12                   THE WITNESS:  I do not believe so, but I

13       do not know for certain.

14   BY MR. COHEN:

15       Q.    Okay.  If your interpretation of the

16   contract, based on the understanding you obtained

17   from the people who put the contract in place were

18   correct, would that have had a material impact on

19   the reported capital at Ally Bank?

20                   MR. BROWN:  Objection to form.

21                   THE WITNESS:  It was my opinion that the

22       potential -- if it was being accounted for

23       incorrectly that could happen, yes.

24   BY MR. COHEN:

25       Q.    So it could have had a material impact

Plaintiffs'
Objection
72:15-73:6
Lack of personal
knowledge/
speculative (FRE
602), lack of
foundation (FRE
602, 901);
impermissible lay
opinion

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 73 of 106

Page 73

1                   ADAM GLASSNER

2    on reported capital of the bank?

3         A.     Yes.

4         Q.     And that's an issue that they would have

5    had to take up with the regulators, correct?

6         A.     Yes.

7         Q.     Other than raising the issue with the

8    people that you identified before the break in

9    December of 2011, did you do any investigation of

10   your concern yourself?

11        A.     Yes.

12        Q.     What did you do?

13        A.     I re-read the various agreements,

14   attempted to look at the financials on a historical

15   basis and had accidentally come across a working

16   document that had been created prior to my arrival

17   and reviewed that.

18        Q.     What was that working document, do you

19   recall?

20        A.     It was a hard copy of a PowerPoint

21   presentation done some time prior to that that was

22   in a folder by a person next to me who was throwing

23   papers away.

24        Q.     Who was the person next to you throwing

25   papers away?

Page 74

1                    ADAM GLASSNER

2          A.      I believe it was Martha Tate.

3          Q.      Okay.  Give me a second here.  I think

4    we have a document we can show you.

5          A.      No problem.

6                  MR. COHEN:  Would you mark that as

7    Glassner 1.

8                  (THEREUPON, Glassner Exhibit 1 was

9                  marked for identification).

10   BY MR. COHEN:

11         Q.      Mr. Glassner, the reporter has handed

12   you a document which has been marked Glassner 1.

13   It's titled Brokering Consumer Loans to Bank

14   Project, (BCL2B), dated November 19th, 2008 and it

15   has the Bates number EXAM 75395 through 75495.

16   Would you take a moment to review this document.

17         A.      Okay.

18         Q.      Is Glassner Exhibit 1 the Brokering

19   Consumer Loans to Bank Project PowerPoint the

20   PowerPoint you were just testifying about?

21         A.      I believe it is.

22         Q.      And after reviewing this PowerPoint as

23   part of your own investigation in December 2011 did

24   you reach a conclusion as to whether this was

25   consistent or inconsistent with your view of the

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 75 of 106

Page 75

                        ADAM GLASSNER

1  contract?

3       A.      I believe this PowerPoint was consistent

4  with my high level understanding of the various

5  agreements and how they work, yes.

6       Q.      And, to be clear, this is a PowerPoint

7  that was created before you joined the bank, right?

8       A.      That is correct.

9       Q.      And at the time you joined the bank the

10 contract was already in place, right?

11      A.      That is correct.

12      Q.      And at the time you joined the bank the

13 people who put the contract in place explained to

14 you their understanding of how the contract was

15 supposed to work which was consistent with this

16 PowerPoint, Glassner Exhibit 1, right?

17      A.      That is correct.

18      Q.      Okay.   In January of 2012 when you were

19 leaving the company did someone ask you to sign a

20 Sarbanes-Oxley certification?

21      A.      I was asked to sign a sub certification

22 regarding the CFO's Sarbanes-Oxley statement for

23 Ally Bank on a frequent basis and I believe that did

24 happen as a request in November of 2011.

25      Q.      What were you being asked to sub

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 76 of 106

Page 76

1                        ADAM GLASSNER

2    certify?

3          A.      That the business activities that I was

4    responsible for within Ally Bank were correct.

5          Q.      What do you mean "the business

6    activities were correct"?

7          A.      I don't remember the specific list of

8    items that were in the sub certification provided to

9    the CFO, but they were there to provide comfort to

10   the CFO that the business activities that all of the

11   business leaders were responsible for, that they

12   were unaware of any errors.

13         Q.      Did you sign that sub certification?

14         A.      I did not.

15         Q.      Why not?

16         A.      I departed before it was due; I didn't

17   feel appropriate given the open issue that I had

18   raised that had not been resolved.

19         Q.      Okay.  When was it due?

20         A.      I don't specifically recall, but it was

21   due after my resignation date.

22         Q.      When -- are you familiar with the term

23   fair value accounting?

24         A.      Yes.

25         Q.      What is your understanding of what fair

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 77 of 106

Page 77

1                        ADAM GLASSNER

2    value accounting is?

3           A.      It's my basic understanding that fair

4    value accounting attempts to carry assets at the

5    fair market value associated with that asset.

6           Q.      Are you familiar with the term lower of

7    cost or market?

8           A.      Yes.

9           Q.      What is your understanding of lower of

10   cost or market?

11          A.      It would be the carrying value of an

12   asset that would be held at the lesser of the costs

13   associated with acquiring that asset or the current

14   market value.

15          Q.      At the time you left the bank in January

16   of 2012 did you have a view as to whether the

17   agreements called for the division of profits in the

18   consumer loan channel to be allocated on the basis

19   of fair value accounting?

20             MR. ELBAUM:   Objection.

21             MR. BROWN:   Objection to form.

22             THE WITNESS:   It's my high level

23       understanding that the agreements don't address

24       the accounting of those instruments and simply

25       address defined terms within the agreement.

Plaintiffs'
Objection
77:15-78:17
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901);
impermissi
ble lay
opinion

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 78 of 106

Page 78

1                           ADAM GLASSNER

2                   I do not recall a specific reference to

3           the accounting treatment of the loans.

4    BY MR. COHEN:

5           Q.      Is it your view that the -- the division

6    of profits under the agreements could be something

7    different than the way they were accounted for on

8    the books and records of ResCap and Ally Bank?

9                   MR. ELBAUM:   Objection to form.

10                  THE WITNESS:   My high level

11          understanding of the agreements, when I saw the

12          division of profits between the two entities of

13          the origination business caused me to inquire

14          to our finance departments to investigate that

15          because it was -- it appeared to be

16          inconsistent with my high level understanding

17          of those agreements.

18   BY MR. COHEN:

19          Q.      And your high level understanding of

20   those agreements came from your own review of the

21   agreements and your conversations with the people

22   who put those agreements in place, correct?

23          A.      That is correct.

24                  MR. BROWN:   Objection to form.

25                  THE WITNESS:   That is correct.

Plaintiffs'
Objection
78:19-23
Lack of personal
knowledge/
speculative (FRE
602), lack of
foundation (FRE
602, 901)

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 79 of 106

Page 79

1                    ADAM GLASSNER

2    BY MR. COHEN:

3         Q.     With respect to the mortgages that were

4    brokered from GMAC Mortgage to Ally Bank, did the

5    bank have hedge risk on those mortgages?

6              MR. BROWN:    Objection to form.

7              THE WITNESS:    It did not.

8    BY MR. COHEN:

9         Q.     What do you understand hedge risk to be?

10        A.     Hedge risk is associated with the value

11   of an interest rate rock -- lock for a loan held for

12   the ultimate disposition into capital markets that

13   can be impacted by market changes or consumer

14   behavior changes in those loans or interest rate

15   locks.

16        Q.     As between GMAC Mortgage and Ally Bank

17   who bore the hedge risk?

18        A.     It's my understanding that GMAC Mortgage

19   bet -- bore that risk via the pipeline swap.

20        Q.     Is it your understanding with respect to

21   the mortgages that were brokered by GMAC Mortgage to

22   Ally Bank that the bank had eligibility risk?

23        A.     Can you state that again?

24        Q.     Sure.

25              Is it your understanding that with

Plaintiffs'
Objection
79:2-7
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602, 901)

Plaintiffs'
Objection
79:16-80:9
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602, 901)

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 80 of 106

Page 80

1                    ADAM GLASSNER

2    respect to the mortgages that were brokered by GMAC

3    Mortgage to Ally Bank that were subject to the

4    agreements we've been talking about that the bank

5    bore eligible -- eligibility risk?

6               MR. BROWN:  Objection to form.

7               THE WITNESS:  No, I don't -- I don't

8        believe it's my understanding that the bank

9        bore eligibility -- eligibility risk.

10   BY MR. COHEN:

11       Q.    What is eligibility risk?

12       A.    Eligibility risk would be loans that are

13   originated that are subsequently deemed ineligible

14   for sale or securitization to capital markets

15   investors.

16       Q.    With respect to the loans that were

17   brokered by GMAC Mortgage to Ally Bank, who bore

18   eligibility risk?

19       A.    It was my understanding that that was

20   GMAC Mortgage.

21       Q.    With respect to the loans that were

22   brokered by GMAC Mortgage to Ally Bank, is it your

23   understanding that the bank bore default risk?

24       A.    No.

25       Q.    With respect to those loans who did bear

Plaintiffs'
Objection
80:16-20
Lack of personal
knowledge/
speculative (FRE
602), lack of
foundation (FRE
602, 901)

Plaintiffs'
Objection
80:25-81:3
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602, 901)

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 81 of 106

Page 81

                          ADAM GLASSNER

2  the default risk?

3      A.      GMAC Mortgage.

4      Q.      Did the fact that the bank didn't have

5  hedge risk, eligibility risk or default risk impact

6  your opinion on who should be obtaining as between

7  Ally Bank and GMAC Mortgage the gain on sale for

8  premium pricing income?

9              MR. BROWN:   Objection.

10             MR. ELBAUM:   Objection to form.

11             MR. BROWN:   Objection to form.

12             THE WITNESS:   Those factors were

13     consistent with how I understood the agreements

14     to work as provided to me upon my hire at the

15     company and they fell consistent with what I

16     understood the agreements executed.

17  BY MR. COHEN:

18     Q.      When you say they "were consistent with

19  how I understood the agreements to work" what do you

20  mean?

21     A.      It was my understanding that those risks

22  were associated with the various aspects of the

23  agreements that we've discussed previously covered

24  which was transferred to GMAC Mortgage.

25     Q.      And to what extent, if any, did that

Plaintiffs'
Objection
81:4-16
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901);
impermissible
lay opinion

Plaintiffs'
Objection
81:25-82:7
Lack of
personal
knowledge/
speculative
(FRE 602),
lack of
foundation
(FRE 602,
901);
impermissible
lay opinion

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 82 of 106

Page 82

ADAM GLASSNER

1

2  impact your opinion on who should be obtaining the

3  gain on sale or premium pricing income?

4          MR. BROWN:  Objection to form.

5          THE WITNESS:  It was my understanding at

6      a high level that the agreements laid out that

7      GMAC Mortgage received the gain on sale.

8  BY MR. COHEN:

9      Q.      During your time at Ally Bank and in the

10 Capital Markets Group at GMAC Mortgage did you have

11 any responsibility for overseeing compliance with

12 Regulation W?

13     A.      I did not.

14     Q.      Do you know what Regulation W is?

15     A.      I do.

16     Q.      What is Regulation W?

17     A.      It's a bank holding company law and it

18 involves affiliated transactions within bank holding

19 companies.

20     Q.      And in general can you tell me what

21 Regulation W provides for?

22          MR. BROWN:  Objection to form.

23          THE WITNESS:  In general, it provides

24     the rules that affiliates may transact under

25     and in certain circumstances where they cannot

Plaintiffs'
Objection
82:20-83:21
Lack of
personal
knowledge/
speculative
(FRE 602), lack
of foundation
(FRE 602, 901);
impermissible
lay opinion

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 83 of 106

Page 83

                        ADAM GLASSNER

    1
    2        transact.
    3   BY MR. COHEN:
    4        Q.      Did you have a view as to whether your
    5   understanding of the brokering agreements that we've
    6   been talking about were compliant with Regulation W?
    7              MR. ELBAUM:   Objection to form.
    8              THE WITNESS:   It was my understanding
    9        from discussions with the people who were
   10        responsible for analysis of that that these
   11        agreements were consistent with Reg W and
   12        compliant.
   13   BY MR. COHEN:
   14        Q.      Did you have your own view, given your
   15   roles above Ally Bank and GMAC Mortgage, as to
   16   whether your understanding of the agreement was
   17   fair?
   18              MR. BROWN:   Objection to form.
   19              THE WITNESS:   It was my opinion that --
   20        as I understood the agreements, that they were
   21        fair.
   22   BY MR. COHEN:
   23        Q.      Did you have an opinion as to whether --
   24   once you discovered the way these agreements were
   25   being accounted for, did you have an opinion as to

```
 1                    ADAM GLASSNER

 2   whether that interpretation of the agreement was

 3   fair?

 4              MR. ELBAUM:  Objection.

 5              MR. BROWN:  Objection to form.

 6              THE WITNESS:  I don't specifically

 7        recall doing an assessment that if they were

 8        accounted for inconsistently with my

 9        understanding of that, if that was true, that

10        if that was fair.  I don't recall doing any

11        specific analysis in that matter.

12   BY MR. COHEN:

13        Q.    So you never formed an opinion in that

14   matter?

15        A.    I believe that's correct.

16        Q.    Did you have a view as to whether the

17   broker fees that Ally Bank was -- was paying to GMAC

18   Mortgage were at or below market?

19        A.    I don't specifically recall forming an

20   opinion of that.

21        Q.    During the time the -- I think you said

22   it was 10 to 16 weeks when you first raised your

23   concerns regarding the way the profits from the

24   consumer loans were being divided as between GMAC

25   Mortgage and Ally Bank, to the time you left, did
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner    Pg 85 of 106

Page 85

1                        ADAM GLASSNER

2    anybody show you any documents that would have

3    supported the way the bank was accounting for these

4    transactions?

5              MR. BROWN:  Objection to form.

6              THE WITNESS:  I do not recall any

7        specific documentation that would have support

8        either side of that so the only documents that

9        I recall reviewing would have been the

10       agreements and the PowerPoint labeled Exhibit 1

11       that had been provided to me.

12   BY MR. COHEN:

13       Q.    And -- and you testified that the

14   PowerPoint, Glassner Exhibit 1, was consistent with

15   your understanding of the document?

16             MR. BROWN:  Objection to form.

17   BY MR. COHEN:

18       Q.    Of the agreements, correct?

19       A.    That is correct.

20       Q.    Did anybody show you any documents that

21   was consistent with the interpretation that was

22   being applied at the bank during that 10 to 16-week

23   period?

24             MR. BROWN:  Objection to form; asked and

25       answered, vague.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 86 of 106

Page 86

ADAM GLASSNER

1

2        THE WITNESS:   As I testified, I don't

3     recall during that 10 to 16-week period any new

4     documents being provided to me in regard to

5     interpretation on either side.

6  BY MR. COHEN:

7     Q.     Okay.  During that 10 to 16-week period,

8  did anybody who was responsible for putting the

9  agreements in place come to you and say your

10 understanding of the way these agreements are meant

11 to operate is wrong, I put them in place and this is

12 the way they're supposed to work?

13        MR. BROWN:  Objection to form.

14        THE WITNESS:  I do not recall that

15     conver -- anything of that.

16        MR. COHEN:  Okay.  We'll pass the

17     witness.

18        MR. BROWN:  Could we take a short break?

19        MR. COHEN:  Sure.

20        THE VIDEOGRAPHER:  The time on the

21     monitor is approximately 10:55 a.m. and we're

22     off the record.

23        (Recess in Proceedings).

24        THE VIDEOGRAPHER:  The time on the

25     monitor is approximately 11:07 a.m. and we're

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 87 of 106

Page 87

```
 1                    ADAM GLASSNER

 2        back on the record.

 3                    EXAMINATION

 4   BY MR. BROWN:

 5        Q.    Mr. Glassner, good morning.  My name is

 6   Judson Brown, I'm an attorney with Kirkland & Ellis

 7   representing Ally in this matter.

 8                I'm going to be asking you a few more

 9   questions.  Okay?

10        A.    Yes.

11        Q.    Mr. Glassner, earlier today you

12   testified that you were retained or that you

13   retained Mr. Elbaum approximately 20 to 24 months

14   ago.  Do you recall that testimony?

15        A.    I do recall stating approximately 20 to

16   24 months ago, yes.

17        Q.    Now, Mr. Glassner, approximately 20 to

18   24 months ago you were still an employee of Ally

19   Bank at that time, correct?  In late 2011.

20        A.    That's correct.

21        Q.    Did you retain Mr. Elbaum while you were

22   an employee of Ally Bank?

23        A.    I did not.

24        Q.    Do you recall approximately when you

25   retained Mr. Elbaum?
```

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 88 of 106

Page 88

1                     ADAM GLASSNER

2         A.        It would have been some time after my

3    departure at -- from Ally Bank, but I do not recall.

4         Q.        Why is it that you retained Mr. Elbaum?

5         A.        I believe it was in regard to the ResCap

6    examiner's investigation.

7         Q.        Mr. Glassner, you testified that you

8    joined the bank in approximately March or April of

9    2009; is that correct?

10        A.        That is correct.

11        Q.        At the time that you joined Ally Bank

12   what agreements were in place between Ally Bank and

13   GMAC Mortgage?

14        MR. COHEN:        Objection; vague and

15        overbroad.

16             THE WITNESS:        I am aware there were a

17        whole bunch of agreements, I am aware of at

18        least three.

19   BY MR. BROWN:

20        Q.        What are those three?

21        A.        A broker agreement, the HFS or pipeline

22   swap, and the MSR swap.

23        Q.        Mr. Cohen asked you about an MMLPSA.  Do

24   you recall that?

25        A.        I do.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 89 of 106

Page 89

                              ADAM GLASSNER

1

2        Q.       Was there an MMLPSA in place between the

3   bank and GMAC Mortgage at the time you joined the

4   bank?

5        A.       I believe there was.

6        Q.       Were you involved in negotiating the

7   broker agreement, Mr. Glassner?

8        A.       I do not believe I was.

9        Q.       Were you involved in drafting the broker

10  agreement?

11       A.       I do not believe I was.

12       Q.       Were you involved in negotiating the

13  pipeline swap, Mr. Glassner?

14       A.       I do not believe I was.

15       Q.       Were you involved in drafting the terms

16  of the pipeline swap?

17       A.       I do not believe I was.

18       Q.       Were you involved in negotiating the MSR

19  swap?

20       A.       Only to the extent of the request of the

21  FDIC that we review the current pricing in context

22  of concerns that they had raised on affiliate

23  transactions.

24       Q.       When was that?

25       A.       Some time during the second half of my

Page 90

                         ADAM GLASSNER

1

2   tenure.  I don't recall the specific dates.

3        Q.    What was the specific issue that the

4   FDIC raised?

5        A.    The FDIC was concerned that the

6   transaction was not at market or better and an

7   extensive analysis was done and third parties were

8   engaged to provide them comfort that we believe that

9   it was.

10        Q.    What do you mean by that, that the

11   transaction was not at market or better?

12        A.    For any affiliated -- it's my

13   understanding within Reg W for any affiliated

14   transactions to be compliant they need to be at

15   market or better for the bank.

16        Q.    So what was the FDIC's concern with

17   respect to the MSR swap?

18        A.    From what I recall, they were concerned

19   that it was not compliant with Reg W in the sense

20   that it was not at market or better.

21        Q.    Meaning, the bank had below market

22   terms?

23        A.    Yes.

24        Q.    By that do you mean that the bank was

25   receiving a rate under the MSR swap that was below

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 91 of 106

Page 91

1                    ADAM GLASSNER

2    market terms for an entity in the bank's position?

3         A.     That was the FDIC's concerns.

4         Q.     In other words, that GMAC Mortgage was

5    paying a below market rate to the bank?

6         A.     That is what the FDIC voiced in their

7    concerns, yes.

8         Q.     Other than being involved in the

9    negotiations concerning the pricing under the MSR

10   swap, were you involved in any other negotiations of

11   the MSR swap?

12        A.     I was not.

13        Q.     Were you involved in drafting any

14   language of the MSR swap?

15        A.     I was not.

16        Q.     Were you involved in negotiating the

17   MMLPSA that was in place when you joined the bank?

18        A.     I was not.

19        Q.     Were you ever involved in negotiating an

20   MMLPSA between the bank and GMAC Mortgage?

21        A.     Not that I recall.

22        Q.     Were you involved in drafting an MMLPSA

23   that was -- strike that.

24              Were you ever involved in drafting the

25   terms of an MMLPSA in place between the bank and

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 92 of 106

Page 92

1                    ADAM GLASSNER

2    GMAC Mortgage?

3         A.      Not that I recall.

4         Q.      You do not know -- strike that.

5                 Mr. Glassner, do you know based on

6    firsthand knowledge the parties' intent with respect

7    to the MMLPSA?

8         A.      I had an operating understanding of the

9    way the agreements were intended to work from the

10   three previous parties that I've testified to.

11        Q.      And who were those three parties?

12        A.      Bob Groody, Al Celini and Mark Hales.

13        Q.      You don't have an understanding of the

14   intent of the parties based on your involvement in

15   negotiating any of those agreements, correct?

16                MR. COHEN:   Object to the form.

17                THE WITNESS:   The only understanding I

18        had was what they explained to me and I took

19        away from is the -- the way -- what the

20        agreements -- functionally each party was

21        desired to have a result of.

22   BY MR. BROWN:

23        Q.      Mr. Glassner, which agreement between

24   Ally Bank and GMAC Mortgage sets or includes the

25   terms that set the price GMAC Mortgage would pay to

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 93 of 106

Page 93

                          ADAM GLASSNER

1

2    Ally Bank when it purchased a loan from Ally Bank?

3              MR. COHEN:  Object to the form.

4              THE WITNESS:  I don't -- do not recall

5        which specific document that is referenced.

6    BY MR. BROWN:

7        Q.    Do you recall which agreement that is

8    referenced in?

9        A.    I do not.

10       Q.    So you're not offering an interpretation

11   of that contract here today, are you?

12       A.    I don't recall which agreement houses

13   the various definitions from a -- from a operating

14   perspective.  I understood at a high level the way

15   that the three agreements interacted in its totality

16   along with the explanations provided to me by people

17   who were involved with drafting them prior to my

18   arrival.

19       Q.    And those three agreements were the

20   broker agreement, the pipeline swap and the MSR

21   swap?

22       A.    That's correct.

23       Q.    And the agreements you discussed that

24   were with Mr. Celini, Mr. Groody and Mr. Hales?

25       A.    That's correct.

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 94 of 106

Page 94

1                          ADAM GLASSNER

2          Q.      Now, Mr. Glassner, you are not a lawyer,

3    are you?

4          A.      I am not.

5          Q.      You are not an accountant also, are you?

6          A.      I am also not an accountant.

7          Q.      Are you familiar with FAS 91 accounting,

8    Mr. Glassner?

9          A.      At a very high level, yes.

10         Q.      Would it be correct, Mr. Glassner, that

11   you have no knowledge -- strike that.

12                 What is your high level understanding of

13   FAS 91?

14         A.      It's a -- an announcement of accounting

15   standards that applies to the way origination costs

16   and loans are held on balance sheet.

17         Q.      What do you mean by that?

18         A.      It's a statement that describes from the

19   Federal Accounting Standards Board, also know as

20   FASB, that attempts to clarify the way from my

21   understanding of loan origination expenses are

22   treated into regards of the value of the loan and

23   the way that that loan is carried on balance sheet.

24         Q.      Do you know the details that FAS 91 sets

25   forth concerning those accounting entries?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 95 of 106

Page 95

1                          ADAM GLASSNER

2          A.      I do not.

3          Q.      Other than that high level

4    understanding, is it correct that your knowledge of

5    FAS 91 is effectively zero?

6          A.      Yes.

7                  MR. COHEN:   Object to the form.

8    BY MR. BROWN:

9          Q.      Mr. Glassner, are you familiar with the

10   typical revenues that an originator receives when

11   originating a loan?

12         A.      Yes.

13         Q.      What are those?

14         A.      Origination fees, points charged to the

15   consumer, gain on sale and interest rate carry --

16   and interest rate carry.

17         Q.      Points charged to the consumer,

18   origination fees, interest rate carry and gain on

19   sale; is that correct?

20         A.      That is correct.

21         Q.      What do you mean by "gain on sale" in

22   that context?

23         A.      The amount associated that recognized

24   upon the sale of a loan that was either originated

25   or purchased.

Page 96

                        ADAM GLASSNER

1

2        Q.      So I'm talking about the typical

3    revenues of an originator right now, I want to

4    understand what those typical revenues are so how --

5    what is the gain on sale that you're referring to in

6    that context?

7        A.      It would be the revenue associated with

8    the sale of the loan upon sale.

9        Q.      Or securitization?

10       A.      Securitization is a form of a sale, yes.

11       Q.      Okay.  Are you familiar with

12   origination-related income?

13       A.      I don't understand the question.

14       Q.      Okay.  You're not familiar with

15   origination-related income?

16       A.      I don't understand what origination

17   income means in the context of your question.

18       Q.      Okay.  Are you familiar with fee income?

19       A.      I have an interpretation of what fee

20   income is, yes.

21       Q.      What's your interpretation of fee

22   income?

23       A.      Fee income would be income received as

24   part of a transaction that is not at risk, it's paid

25   as a fee.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 97 of 106

Page 97

1                    ADAM GLASSNER

2          Q.      With respect to origination of mortgage

3    loans what would that fee income include?

4          A.      One potential example of a fee income

5    might be an origination fee charged to a consumer.

6          Q.      Would fee income include any other

7    income?

8          A.      It could include a variety of other

9    income associated with the transaction.

10         Q.      Such as what?

11         A.      I think there's a pretty extensive list,

12   but any fee charged to -- to a consumer that is more

13   than the cost associated with that tran -- with that

14   service would be considered as fee income.

15         Q.      Okay.  Can you give me some examples?

16         A.      Origination fee, appraisal fee, title

17   search, Fed Ex fee, doc prep fee, underwriting fee.

18   And I am certain there are others.

19         Q.      Okay.  You just can't think of them now?

20         A.      In a mortgage transaction you're allowed

21   to charge fees associated with a whole variety of

22   activities as long as they are disclosed.

23         Q.      Are you also familiar with the typical

24   expenses of an originator?

25         A.      Yes.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 98 of 106

Page 98

```
1                    ADAM GLASSNER

2         Q.       What are those?

3         A.       Commission income, underwriting

4    expenses, processing expenses, funding expenses,

5    fixed overhead.   And I am sure there are other

6    expenses associated with that, but those would be

7    the main ones.

8         Q.       Do you understand when the broker

9    arrangement between the bank and GMAC Mortgage was

10   implemented?

11               MR. COHEN:   Object to the form; vague.

12   BY MR. BROWN:

13        Q.       Strike that.

14               Mr. Glassner, do you understand when

15   GMAC Mortgage began brokering loans into the bank?

16               MR. COHEN:   Object to the form.

17               THE WITNESS:   The only thing I could say

18   for certain, it was prior to my arrival at Ally

19   Bank.

20   BY MR. BROWN:

21        Q.       Do you know whether GMAC Mortgage ever

22   originated and funded loans itself?

23        A.       I believe it did.

24        Q.       Okay.   When GMAC Mortgage would

25   originate and fund a loan who would bear the
```

12-12020-mg    Doc 5803-17    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Adam Glassner    Pg 99 of 106

Page 99

1                        ADAM GLASSNER

2    expenses related to origination you just identified?

3         A.      As I wasn't present at the company

4    during that time of activity and wasn't responsible

5    for it because I wasn't there I couldn't answer that

6    definitively.

7         Q.      After GMAC Mortgage began brokering

8    loans to the bank which party bore the expenses

9    related to originating loans?

10        A.      It's my understanding on the loans that

11   were brokered to the bank from -- by GMAC Mortgage

12   GMAC Mortgage would have borne -- would have borne

13   the expenses associated with origination of those

14   loans.

15        Q.      Who bore the underwriting expenses?

16        A.      I believe it was GMAC Mortgage.

17        Q.      And what's that understanding based on?

18        A.      My high level understanding of the way

19   that the consumer division was run out of ResCap.

20        Q.      You discussed two different accounting

21   methodologies earlier in your testimony, fair value

22   and lower of cost or market.   Do you remember that?

23        A.      I do.

24        Q.      I am going to ask you about another one.

25   Are you familiar with hedge accounting?

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 100 of 106

Page 100

ADAM GLASSNER

1

2        A.        At a high level, yes.

3        Q.        What's your understanding?

4        A.        Hedge accounting would involve an asset

5  that is on your books and the hedge associated with

6  that and that the way the pricing changes and

7  resulting accounting entries would result -- would

8  occur on those two instruments on a combined basis.

9        Q.        What do you mean by that?

10       A.        Hedge accounting in my understanding

11  treats the hedge associated with an asset and the

12  change in value of that hedge and the change in

13  value of that asset in a combined transaction to

14  result a net result and there are certain accounting

15  thresholds necessary for hedge accounting to be

16  permitted.

17       Q.        I want to take a minute and look at

18  Glassner Exhibit 1.   Do you have that, Mr. Glassner?

19       A.        I do.

20       Q.        This is the banker and consumer loans

21  that you reviewed in late 2011; is that correct?

22       A.        That is correct.

23       Q.        Were you involved in preparing this

24  presentation, Mr. Glassner?

25       A.        I was not.

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 101 of 106

Page 101

1                      ADAM GLASSNER

2        Q.      Do you know who was?

3        A.      I do not know.

4        Q.      When was the first time you reviewed

5    this presentation, Mr. Glassner?

6        A.      Late 2011.

7        Q.      The presentation is dated November 19th,

8    2008.  Do you see that?

9        A.      I do.

10       Q.      Did you review this presentation on or

11   around November 19th, 2008?

12       A.      I was not employed by Ally Bank at that

13   point.

14       Q.      Do you know who did review this

15   presentation on or around November 19th, 2008?

16       A.      I do not.

17       Q.      Do you know whether this presentation

18   reflects the final terms of the agreement between

19   Ally Bank and GMAC Mortgage with respect to the

20   brokering project?

21       A.      I do not.

22       Q.      Let's turn to page 4, it's entitled

23   Summary.  Let me know when you're there.

24       A.      I am there.

25       Q.      At the top it says, "GMAC Mortgage

Page 102

```
1                      ADAM GLASSNER

2    broker will have a brokering relationship with GMAC

3    bank lender."

4              Do you see that?

5         A.   I do.

6         Q.   And there are certain points summarized

7    below that.  Do you see that?

8         A.   I do.

9         Q.   Are those items consistent with your

10   high level understanding of the parties

11   relationship?

12        A.   Generally, yes.

13        Q.   What do you mean "generally"?

14        A.   It was my high level understanding that

15   the underwriting expenses described in 4 and in 5

16   were borne by GMAC Mortgage.

17        Q.   This document reflects otherwise; is

18   that correct?

19        A.   Bullet point 4 would appear to indicate

20   that the underwriting expenses would be borne by

21   GMAC Mortgage or by GMAC Bank, excuse me.

22        Q.   With respect to the revenues received by

23   GMAC Bank, is this document consistent with your

24   high level understanding of those revenues?

25        A.   It is.
```

Page 103

```
 1                    ADAM GLASSNER

 2        Q.        And that understanding is that Ally Bank

 3   would receive points, fees and net interest carry?

 4        A.        Along with the broker fee.

 5                  I'm sorry, would expense the broker fee,

 6   yes.

 7        Q.        So the revenues would be points, fees

 8   and net interest carry?

 9        A.        That is correct.

10             MR. BROWN:  I don't have anything

11   further at this time.

12             MR. SIMON:  I don't have anything.

13             MR. COHEN:  Anybody on the phone have

14   questions?

15             I guess we're done.

16             THE VIDEOGRAPHER:  That's the end of

17   tape number two and the deposition of Adam

18   Glassner.  The time on the monitor is

19   approximately 11:29 a.m. and we're off the

20   record.

21             (THEREUPON, the videotaped deposition

22             was concluded at 11:29 a.m.)

23

24

25
```

Page 104

1

2

3    STATE OF NORTH CAROLINA

4    COUNTY OF MECKLENBURG

5            I, April Reid, Court Reporter and Notary

6    Public in and for the State of North Carolina, do

7    hereby certify that there came before me on

8    Wednesday, November 13, 2013, the person hereinfore

9    named, who was by me duly sworn to testify to the

10   turth and nothing but the truth of knowledge

11   concerning the matters at controversy in this cause;

12   that the witness was thereupon examined under oath,

13   the examination reduced to typewriting under my

14   direction, and the deposition is a true record of

15   the testimony given by the witness.

16            I further certify that I am neither

17   attorney or counsel for, nor related to or employed

18   by, any attorney or counsel employed by the parties

19   hereto or financially interested in this action.

20            This, the 13th day of November, 2013.

21

22            _____

23            APRIL REID, Court Reporter

24            Notary Public #2003237014

25

Page 105

1                    J U R A T

2

3   I,              , do hereby certify under

4   penalty of perjury that I have read the foregoing

5   transcript of my deposition taken on              ;

6   that I have made such corrections as appear noted

7   herein in ink, initialed by me; that my testimony as

8   contained herein, as corrected, is true and correct.

9

10  DATED this _____ day of _____, 20  ,

11  at _____,         .

12

13

14

15

16

17  _____

18  SIGNATURE OF WITNESS

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-17   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Adam Glassner   Pg 106 of 106

Page 106

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5          1.   To clarify the record.

6          2.   To conform to the facts.

7          3.   To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____