Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3          FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                        ) Chapter 11
     RESIDENTIAL CAPITAL, LLC,      ) Case No. 12-12020(MG)
6    et al.,                        ) Jointly Administered
                      Debtors.      )
7    ----------------------------)
     RESIDENTIAL CAPITAL, LLC,      )
8    et al.,                        )
                                    ) Adversary Proceeding
9              Plaintiffs,          ) No. 13-01343(MG)
                                    )
10              vs.                 )
                                    )
11   UMB BANK, N.A., as successor   )
     indenture trustee under that  )
12   certain indenture, dated as    )
     of June 6, 2008; and WELLS     )
13   FARGO BANK, N.A., third        )
     priority collateral agent and)
14   collateral control agent       )
     under that certain Amended     )
15   and Restated Third Priority    )
     Pledge and Security Agreement)
16   and Irrevocable Proxy, dated   )
     as of December 30, 2009,       )
17                                  )
                      Defendants.   )
18   ----------------------------)
19

20      VIDEOTAPED DEPOSITION OF SUSHEEL KIRPALANI
21              New York, New York
22          Thursday, November 14, 2013
23

24   Reported by:
     KRISTIN KOCH, RPR, RMR, CRR, CLR
25   JOB NO. 68030

Yellow Highlighting = JSN Designation
Pink Highlighting = Plaintiffs' Counter-Designation
Orange Highlighting = Joint Designation

The Debtors and Committee object to the
JSNs' use of the deposition of Mr. Kirpalani
on the ground that this deposition may
not be used under Bankruptcy Rule 7032.
The Debtors' and Committee's counter-
designations reflected herein are to be
admitted, if at all, only upon admission of
the JSNs' corresponding affirmative
designations.

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 2 of 46

Page 2

```
 1
 2            UNITED STATES BANKRUPTCY COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
     OFFICIAL COMMITTEE OF        )
 4   UNSECURED CREDITORS, on      )
     behalf of the estates of the )
 5   Debtors,                     ) Adversary Proceeding
                     Plaintiff,   ) No. 13-01277(MG)
 6                                )
 7                vs.             )
                                  )
 8   UMB BANK, N.A., as successor )
     indenture trustee under that )
     certain indenture, dated as  )
 9   of June 6, 2008; and WELLS   )
     FARGO BANK, N.A., third      )
10   priority collateral agent and)
     collateral control agent     )
11   under that certain Amended    )
     and Restated Third Priority  )
12   Pledge and Security Agreement )
     and Irrevocable Proxy, dated )
13   as of December 30, 2009,     )
                                  )
14                  Defendants.   )
     ----------------------------)
15
16             November 14, 2013
                   4:08 p.m.
17
18        Videotaped Deposition of SUSHEEL
19   KIRPALANI, held at the offices of Kramer
20   Levin Naftalis & Frankel LLP, 1177 Avenue
21   of the Americas, New York, New York, before
22   Kristin Koch, a Registered Professional
23   Reporter, Registered Merit Reporter,
24   Certified Realtime Reporter and Notary
25   Public of the State of New York.
```

Page 3

1

2     A P P E A R A N C E S:

3

4

5        KRAMER LEVIN NAFTALIS & FRANKEL

6        Attorneys for Committee of Unsecured

7        Creditors

8             1177 Avenue of the Americas

9             New York, New York 10036

10    BY:    P. BRADLEY O'NEILL, ESQ.

11             KENNETH ECKSTEIN, ESQ.

12             DOUGLAS MANNAL, ESQ.

13

14

15       MILBANK TWEED HADLEY & McCLOY

16       Attorneys for Ad Hoc Committee of Junior

17       Secured Creditors

18             One Chase Manhattan Plaza

19             New York, New York 10005

20    BY:    ALAN STONE, ESQ.

21             KELLY PRESSLER, ESQ.

22

23

24

25

Page 4

1

2    A P P E A R A N C E S:  (Continued)

3

4

5        QUINN EMANUEL URQUHART & SULLIVAN

6        Attorney for Susheel Kirpalani

7            51 Madison Avenue

8            New York, New York 10010

9        BY:   SCOTT SHELLEY, ESQ.

10

11

12        JONES DAY

13        Attorneys for FGIC

14            555 South Flower Street

15            Los Angeles, California 90071

16        BY:   RICHARD WYNNE, ESQ., Via telephone

17

18

19        ALSTON & BIRD

20        Attorney for Wells Fargo

21            90 Park Avenue

22            New York, New York 10016

23        BY:   WILLIAM HAO, ESQ., Via telephone

24

25

1

2      A P P E A R A N C E S:   (Continued)

3

4

5          KELLEY DRYE & WARREN

6          Attorneys for UMB Bank, N.A.

7               101 Park Avenue

8               New York, New York 10178

9      BY:   TIMOTHY MARTIN, ESQ., Via telephone

10

11

12     ALSO PRESENT:

13

14               CARLOS LOPEZ, Legal Video Specialist

15

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 6 of 46

Page 6

1

2          (Kirpalani Exhibit 1, Declaration of

3     Susheel Kirpalani, marked for

4     identification.)

5              *     *     *

6          THE VIDEOGRAPHER:   This is the

7     start of the tape labeled number 1 of the

8     videotaped deposition of Susheel Kirpalani

9     in the matter of In Re:   Residential

10    Capital LLC.

11         This deposition is being held at

12    1177 Avenue of the Americas, New York,

13    New York on November 14, 2013 at

14    approximately 4:08 p.m.

15         My name is Carlos Lopez.  I am the

16    legal video specialist from TSG Reporting

17    Inc.  The court reporter is Kristin Koch in

18    association with TSG Reporting.

19         Appearances are noted.

20         Will the court reporter please swear

21    in the witness.

22 S U S H E E L   K I R P A L A N I,

23    called as a witness, having been duly sworn

24    by a Notary Public, was examined and

25    testified as follows:

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 7 of 46

Page 7

1

2    EXAMINATION BY

3    MR. STONE:

4        Q.    Mr. Kirpalani, good afternoon.  My

5    name is Alan Stone.  I am with Milbank Tweed.

6    We are here on behalf of the Notes Trustee and

7    Ad-Hoc Committee of Junior Secured Noteholders.

8    We are here to take your deposition.  We only

9    have a couple hours, so I am going to dispense

10   with the preliminaries and get right into it.

11            I am handing you what's been marked

12   as Exhibit 1 for purposes of your deposition

13   today.

14            MR. STONE:  And for those on the

15       phone, this is the Declaration of Susheel

16       Kirpalani.

17       Q.    Mr. Kirpalani, do you recognize this

18   document?

19       A.    Yes.

20       Q.    What is it?

21       A.    It's the declaration that I prepared

22   and submitted on November 12th.

23       Q.    Okay.  And for what purpose did you

24   submit this declaration?

25       A.    I submitted it in support of

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 8 of 46

Page 8

<sup></sup>                          Kirpalani

1

2    confirmation of ResCap's and the Creditors

3    Committee of ResCap's Chapter 11 plan.

4         Q.    Okay.  Am I correct that this plan

5    calls for a contribution of a certain amount of

6    money by Ally?

7         A.    Yes.

8         Q.    And how much money is that?

9         A.    $2.1 billion.

10             MR. WYNNE:  We can't hear

11        Mr. Kirpalani on the phone.  I don't know

12        if the mike is not working or what.

13             MR. STONE:  You just need to keep

14        your voice up.  I think that will work.

15             THE WITNESS:  Maybe I will try and

16        talk more into the microphone.

17             MR. O'NEILL:  Is that better, Rick?

18             MR. WYNNE:  Yes.  Thank you.

19        Q.    Am I also correct that Ally was only

20    willing to make that contribution if they could

21    get a third-party release as a part of the

22    plan?

23        A.    You would have to ask Ally, but

24    that's my understanding.

25        Q.    I am just asking for your

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 9 of 46

Page 9

1                       Kirpalani

2    understanding.   Okay.

3                   You represent certain private

4    securities claimants?

5           A.    Yes.

6           Q.    Okay.   And what type of claims did

7    or do those private securities claimants have

8    against ResCap and Ally?

9           A.    What do you mean by what type of

10   claim?

11          Q.    What's the nature of those claims?

12          A.    It depends.   Some clients have

13   claims for common law fraud, some clients have

14   statutory claims for rescission, some clients

15   have consumer protection statute-type claims,

16   but I would say that they are all claims that

17   parties misrepresented certain facts in

18   connection with their purchase of certificates

19   that were issued by various RMBS trusts.

20          Q.    So you would agree with me that

21   these claims generally involve the purchase or

22   sale of securities?

23          A.    Yes.

24          Q.    From your clients' standpoint, they

25   were unwilling to support the plan and the

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 10 of 46

Page 10

Kirpalani

1

2 third-party release unless they got an actual

3 distribution in the bankruptcy; is that right?

4      A.    Can you repeat or rephrase the

5 question.  I didn't quite get it.

6      Q.    Sure.  So from your clients'

7 standpoint, they were willing to settle their

8 securities claims against ResCap and Ally as

9 long as they could get an actual general

10 unsecured claim in the bankruptcy plan?

11      A.    I'm not sure that to the clients the

12 actual plumbing or mechanics were that

13 important, but they certainly -- if they were

14 being asked to give up a right of theirs to be

15 paid something, they would want to get paid

16 something.

17           (Mr. Mannal enters.)

18      Q.    Let me ask it this way:  Would your

19 clients have been willing to settle had they

20 been asked to take a subordinated claim?

21           MR. O'NEILL:  Objection.

22      A.    I think -- I think there are some

23 missing parts of that question.  The answer --

24 if that's the only -- if those are the things

25 that I have to assume for purposes of the

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 11 of 46

Page 11

1                     Kirpalani

2    question, would they settle in exchange for a

3    subordinated claim against ResCap and nothing

4    else, I would be pretty confident the answer

5    would be no.

6         Q.    Okay.  What parts were missing from

7    the question?

8         A.    Well, I don't know -- when you are

9    saying would they be willing to settle, who are

10   they settling with?  If in your hypothetical

11   they were settling with a third-party and that

12   third-party was providing enough money to them

13   that they feel they were justly compensated for

14   their losses, it's quite possible that they

15   would have agreed to a different structure, but

16   that was not -- that was never presented as an

17   offer, but --

18        Q.    Okay.  Well, let me ask it this way

19   then:  Had the deal that was -- I'm sorry.  Let

20   me try again.

21              If ResCap and Ally had offered your

22   clients precisely the same settlement that you

23   arrived at now with the only exception being

24   that they weren't getting a general unsecured

25   claim, but instead they were going to get a

Plaintiffs'
Objection
11:21-12:4
Lack of
personal
knowledge/
speculative
(FRE 602)

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 12 of 46

Page 12

Kirpalani

2  subordinated claim, would they have settled?

3          MR. O'NEILL:  Objection.

4      A.   I have no idea.

5          MR. O'NEILL:  Calls for speculation.

6      A.   I have no idea.

7      Q.   You have no idea.  Okay.

8          (Mr. Eckstein enters.)

9      Q.   In paragraph 14 of your declaration

10 one of the statements that you declare is that

11 "the settlement of Private Securities Claims

12 set forth in the PSA and the Allocation

13 Agreement was conducted at arm's length."  What

14 did you mean by that?

15     A.   That the settlement of the Private

16 Securities Claims was conducted at arm's

17 length, what do I mean by that?

18     Q.   Yes.

19     A.   I mean that it was a negotiation

20 that took place among parties that were not

21 affiliated with each other, with robust energy

22 and views for the various litigation risks that

23 each side were taking, and that there was no

24 collusion involved and that it was in good

25 faith.

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 13 of 46

Page 13

1                          Kirpalani

2        Q.     Okay.  How did the settlement come

3   about?

4               MR. O'NEILL:  I will caution the

5        witness not to discuss the particulars of

6        the mediation.

7        A.     Can you be more specific?

8        Q.     Well, your counsel mentioned there

9   was a mediation.  Is that right, there was a

10  mediation of these claims?

11       A.     Yes.  That's talked about in my

12  declaration.  It's a matter of public

13  knowledge.

14       Q.     Right.  Who was involved in the

15  mediation?

16       A.     Me.

17       Q.     You were the only one?

18       A.     No.  There were about -- the Kramer

19  Levin security guards would know better, but I

20  think at some point there were over a hundred

21  people.

22       Q.     Who was represented at the -- which

23  parties were represented at that mediation?

24       A.     My clients.

25       Q.     Okay.  I understand that.  And who

12-12020-mg    Doc 5803-18    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Susheel Kirpalani    Pg 14 of 46

Page 14

1                           Kirpalani

2    else?

3          A.      The Debtors.    They were -- they had

4    representation there.    Do you want me to just

5    keep going?

6          Q.      Yes.

7          A.      The Creditors Committee had advisors

8    here.    Judge Peck was the mediator.    He had two

9    clerks with him.    I know FGIC was here.    I know

10   MBIA was here.    I know they had

11   representatives.    I know Junior Secured

12   Noteholders, I believe are your clients, they

13   had principals as well as professionals here.

14   There were Senior Unsecured Noteholders that

15   were here.    FHFA was here through counsel.    I

16   don't believe the New Jersey Carpenters Class

17   was here, except for maybe one piece of it, and

18   maybe telephonically.    I just don't remember.

19   No, that's not true.    They did have a

20   bankruptcy counsel that was here in person for

21   some time.    I mentioned MBIA.    I mentioned

22   FGIC.    The notes -- the RMBS trust had just an

23   army of people here, and there was the named --

24   the class representative of a class action of

25   borrowers, they were here.    At least they had

12-12020-mg    Doc 5803-18    Filed 11/18/13    Entered 11/18/13 11:51:57    Exhibit
Deposition Designations: Susheel Kirpalani    Pg 15 of 46

Page 15

1                    Kirpalani

2    representatives here.   If you gave me a list of

3    all of the major parties of interest in this

4    case, I would venture to say that they were all

5    here.

6        Q.    Okay.   Now, with respect to

7    the resolution --

8        A.    Oh, I'm sorry.   Ally was here.

9        Q.    With respect to the mediation or

10   resolution of the Private Securities Claims,

11   was there a separate portion of the mediation

12   where there was a subgroup of parties that

13   discussed those claims?

14       A.    I'm not sure what you mean when you

15   say was there a separate portion of the

16   mediation.

17       Q.    In other words, did Judge Peck get a

18   subset of the various parties who were present

19   for the mediation together to discuss the

20   Private Securities Claims?

21       A.    I don't think I should be disclosing

22   how a mediator conducted his mediation, so I am

23   not going to answer that.

24       Q.    Okay.   I am not asking for any

25   substance or positions people took or anything

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 16 of 46

Page 16

1                        Kirpalani

2    else.  I am just asking about the procedure.

3        A.    I understand, but that's kind of

4    the -- that's a trick of the trade, that's a

5    craft, and that's up to Judge Peck to decide if

6    he wants to disclose how he goes about doing

7    shuttle diplomacy or not doing shuttle

8    diplomacy.  You know, I wouldn't talk about the

9    way I mediated the Dynegy case and I don't

10   think I would like it if people talked about

11   that either.

12       Q.    Okay.  Well, let me try it this way

13   then.  Did all of the major constituencies in

14   this bankruptcy have input into the settlement

15   of those Private Securities Claims?

16       A.    I would -- I would think so.  My

17   understanding is that they had input.

18       Q.    Did you or other representatives of

19   Private Securities Claimants ever get in a room

20   with Ally and ResCap and negotiate these -- the

21   resolution of these claims?

22            MR. O'NEILL:  Objection.

23       A.    One room with Ally and ResCap?

24       Q.    Uh-huh.

25       A.    No.

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 17 of 46

Page 17

1                        Kirpalani

2        Q.      Did you ever get in a room with

3   Ally?

4        A.      Many times.

5        Q.      Did you ever get in a room with

6   ResCap?

7        A.      Yes.

8        Q.      You distinguished between -- in your

9   declaration between Settling Private Securities

10  Claimants and other Private Securities

11  Claimants.

12            In the deal that ultimately was

13  reached in the Plan Support Agreement are all

14  of the Private Securities Claims being

15  resolved?

16       A.      I'm sorry.  Can you -- you can have

17  it read back, but I lost my train of thought in

18  the middle of your question.

19       Q.      Okay.  No problem.  Maybe I'll ask a

20  simpler question.

21            What's the difference between the

22  Settling Private Securities Claimants and the

23  other Private Securities Claimants that you

24  note in your declaration?

25       A.      I think I know the answer.  I just

Page 18

1                        Kirpalani

2    want to look back to the plan term --

3         Q.    Sure.  Take your time.

4         A.    -- because I don't want to mess up

5    your record, so let me look.

6         Q.    So the first paragraph you will see

7    the Settling Private Securities Claimants.

8         A.    Okay.  So the Settling Private

9    Securities Claimants are my clients.  We were,

10   for lack of a better word, the anchor tenants

11   of the settlement that would later be rolled

12   out to what I defined as the -- I think it's

13   Additional Private Securities Claimants.  So

14   that's the way I would characterize us, is we

15   were the anchors.

16        Q.    And once you rolled out that

17   settlement to the Additional Private Securities

18   Claimants, did they agree to go along with the

19   settlement?

20        A.    It was a process.

21        Q.    But ultimately they agreed?

22        A.    Ultimately they agreed.  I'm happy

23   to say, ultimately I have unanimous accepting

24   class of creditors in a situation that,

25   frankly, I never thought it could be achieved.

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 19 of 46

Page 19

1                    Kirpalani

2        Q.     In paragraph 14, at least in the

3    version of your declaration that I have, it

4    says -- there is a clause, at least, and this

5    is right before paragraph 15, that says:

6    "Based on the uncertainty surrounding treatment

7    and priority of more than $20 billion of claims

8    against the Debtors' estates."

9                What does that $20 billion of claims

10   refer to?

11       A.     When you said at least the version

12   you have, you gave me a copy of this exhibit,

13   so --

14       Q.     Yes.  It should be the same as the

15   one I have.

16       A.     Okay.  What is the $20 billion?

17       Q.     Yes.

18       A.     That is an estimate of the potential

19   claims for losses suffered by creditors that

20   are either the Settling Private Securities

21   Claimants, the Additional Private Securities

22   Claimants, or other holders of claims that

23   assert similar theories.

24       Q.     Okay.  The amount of $235 million

25   that represents the amount of the general

Page 20

1                        Kirpalani

2    unsecured claim, in resolution of the Private

3    Securities Claims does that also include the

4    other claims -- does that correspond to the

5    $20 billion worth of claims?

6             MR. O'NEILL:  Object to form.

7        A.    I just don't agree with the premise

8    of your question that there is a $235 million

9    general unsecured claim.

10       Q.    Okay.  Maybe I got it wrong.  Maybe

11   you can tell me what -- I guess I can be more

12   precise about it as well.

13            Am I correct that in resolution of

14   the Private Securities Claims there was

15   agreement to set up a Private Securities fund

16   of $235 million?

17       A.    That's a projected amount, but

18   subject to increase or decrease based on things

19   beyond the Creditors' control, yes, 235 million

20   was the projected amount to satisfy the claims

21   of Private Securities Claimants.

22       Q.    Okay.  Now, when you told me what

23   the $20 million -- or $20 billion worth of

24   claims represents, you mentioned the Settling

25   Private Securities Claimants, the Additional

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 21 of 46

Page 21

<sub>1</sub>                          Kirpalani

<sub>2</sub>   Private Securities Claimants and then persons

<sub>3</sub>   who held other similar claims.

<sub>4</sub>        A.    I didn't say "other similar claims."

<sub>5</sub>   I said other claims asserting similar theories

<sub>6</sub>   of liability.

<sub>7</sub>        Q.    Okay.   Thanks for that correction.

<sub>8</sub>              Those persons who are asserting

<sub>9</sub>   other claims with similar liability theories,

<sub>10</sub>   are they going to be able to take from the PSC

<sub>11</sub>   fund as well?

<sub>12</sub>        A.    No.

<sub>13</sub>        Q.    No.   Okay.

<sub>14</sub>              So they are still left out there?

<sub>15</sub>        A.    They are not left out there.   They

<sub>16</sub>   were resolved separately.

<sub>17</sub>        Q.    Okay.   If you look at paragraph 13,

<sub>18</sub>   there are some numbers there relating to the

<sub>19</sub>   aggregate estimated amounts for the Private

<sub>20</sub>   Securities Claims against Ally and against the

<sub>21</sub>   Debtors and AFI?

<sub>22</sub>        A.    Right.

<sub>23</sub>        Q.    Are those the estimated amounts of

<sub>24</sub>   liability that the Private Securities Claimants

<sub>25</sub>   would be seeking in their lawsuits?

Page 22

1              Kirpalani

2      A.    Yes.

3      Q.    So that totals, by my math, some

4  $3.8 billion.  Why did you settle for

5  $235 million?

6           MR. O'NEILL:  Objection.

7      A.    Couldn't get 3.8.

8      Q.    Why couldn't you get 3.8?

9           MR. O'NEILL:  Caution the witness

10      not to discuss anything that occurred in

11      the mediation.

12      A.    Because to get 3.8 somebody would

13  have to pay me that and nobody was willing to

14  pay that.

15      Q.    Okay.  Do you think that amount is

16  fair?

17           MR. O'NEILL:  3.8?

18           MR. STONE:   No.  235 million.

19      A.    If I didn't think it was fair, I

20  wouldn't have let my clients sign onto it, so

21  yes, I do think it's fair.

22      Q.    So it's fair to your clients?

23      A.    I think it's fair to both sides.

24      Q.    It's fair to both sides.  Is it fair

25  to all constituencies?

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 23 of 46

Page 23

1                       Kirpalani

2        A.    I think something is either fair or

3    it's not fair.  So it's fair.

4        Q.    It's fair to everyone?

5        A.    Yes.

6        Q.    Okay.  In determining whether

7    $235 million is fair, did you account for the

8    general litigation risk associated with those

9    claims?

10        A.    Yes.

11        Q.    How did you do that?

12        A.    Well, which litigation risk are you

13    referring to?

14        Q.    Well, I am putting aside any risk of

15    subordination.  I am just talking about the

16    typical risk that you have in the types of

17    claims that you brought.

18        A.    Then the answer is yes.

19        Q.    Okay.  And how did you account for

20    that?

21        A.    How did I account for it?

22        Q.    Yes.

23        A.    $235 million is a fraction of the

24    actual losses.  The difference between the

25    amount received and the amount of losses

Page 24

Kirpalani

1

2    represents a judgment about the risk of

3    collection, that goes to why it's not

4    3.8 billion, as well as the risk of winning.  I

5    don't think there is any precise way to slice

6    and dice between 235 million and your number,

7    3.8 billion, to know how much relates to the

8    risk of collection, how much relates to the

9    risk of potentially losing on the merits, but I

10   think that clients and their representatives

11   made a judgment that that was a fair

12   resolution.

13       Q.   Did you do any kind of risk analysis

14   with respect to the litigation, a formal risk

15   analysis?

16       A.   I don't know what your formal risk

17   analysis looks like.  We certainly analyzed our

18   clients' claims, if that's what you are asking.

19       Q.   Okay.  Let's talk about a simple

20   one.  You just simply take the maximum

21   potential amount of recovery and apply some

22   factor based on your assessment of the risk.

23   Did you do that?

24            MR. O'NEILL:  You are asking for his

25       work product at this point.

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 25 of 46

Page 25

1                         Kirpalani

2           MR. STONE:  Are you instructing him

3      not to answer?

4           MR. O'NEILL:  I mean, it's not my

5      privilege, but you are asking for him to

6      reveal his clients' privilege.

7      A.      Can you read back or ask the

8  question again.  If it's a yes/no question,

9  which I think you were asking me, I probably

10  could answer it.

11      Q.      Okay.  Did you simply take the

12  maximum potential amount of recovery and apply

13  a factor based on your assessment of the risk?

14      A.      No.

15      Q.      Did you account -- in determining

16  that the $235 million is fair, did you account

17  for the risk that the claims could be

18  subordinated?

19      A.      When you say "the claims," can you

20  be more precise?  There are some claims that

21  have absolutely zero risk of being

22  subordinated, zero.

23      Q.      Let's say then some claims could be

24  subordinated.  Did you take that into account?

25           MR. O'NEILL:  Objection.

Page 26

Kirpalani

1

2      A.      That some of those claims could be

3   subject to a risk of subordination?

4      Q.      Yes.

5      A.      Yes.

6      Q.      How did you take that into account?

7              MR. O'NEILL:  Objection.

8      A.      By making a judgment call that

9   $235 million appropriately reflected the risks

10   of collection and litigation and I would lump

11   subordination into the litigation pillar.

12      Q.      Okay.  In determining that the

13   $235 million is fair, did you take into account

14   how money was to be distributed in the plan?

15      A.      Did I take into account how money

16   was to be distributed?  I'm not sure I

17   understand.

18      Q.      Well, did you account for the

19   interests of others, put it that way, other

20   constituencies?

21              MR. O'NEILL:  Objection.

22      A.      Again, I still -- it's vague.  I

23   don't understand what you mean, did I account

24   for the interests of others.

25      Q.      Well, you agree with me that the

Page 27

1              Kirpalani

2  issue of 510(b) subordination is an issue that

3  had been briefed before the court; is that

4  right?

5       A.     Yes, among others.

6       Q.     Right.  And it was in dispute?

7       A.     Yes.

8       Q.     And if your clients lost on that,

9  some of their claims would have been

10 subordinated?

11      A.     Lost where?  In the bankruptcy court

12 or in the district court or the supreme court?

13      Q.     Well, ultimately -- if they

14 ultimately lost, there was a risk that they

15 would be subordinated?

16      A.     That some claims --

17      Q.     Right.

18      A.     -- of my clients would be

19 subordinated if the Debtors were to have

20 prevailed and gotten that order appealed all

21 the way up?  Yes, there is a risk.

22      Q.     And if those claims had been

23 subordinated, the likely outcome as to those

24 claims is your clients would have gotten

25 nothing at the end of the day?

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 28 of 46

Page 28

Kirpalani

1

2        A.     If they would have been

3    subordinated, subject to my earlier comment

4    about it being a final order no longer subject

5    to appeal, then yes, they wouldn't be receiving

6    a distribution based on subordinated claims.

7        Q.     And you agree with me that one of

8    the benefits of settling for your clients was

9    that those claims as to which there was a risk

10   of subordination were now general unsecured

11   claims -- well, let me correct that -- were now

12   going to take from the PSC fund?

13            MR. O'NEILL:  Objection.  Object to

14       form.

15       A.     I would agree that it's a benefit to

16   both sides to get that issue resolved.

17       Q.     Okay.  Is it a benefit to General

18   Unsecured Creditors for your clients to get a

19   distribution on claims as to which there was a

20   risk of subordination?

21       A.     I think so.

22       Q.     Why is that?

23       A.     Because if I would have won my

24   summary judgment motion or trial, then my

25   clients and others asserting similar legal

Page 29

Kirpalani

1

2  theories would have flooded the general

3  unsecured claims base with $20 billion.  That's

4  the number we have talked about before.

5       Q.    Essentially you are saying there was

6  risk on both sides?

7       A.    I'll take that bet any day.  There

8  was a lot more risk to the Estate than there

9  was to us.

10      Q.    Why do you say that?

11      A.    Because I think our briefs were

12  better and I think we would have prevailed.  In

13  fact, it was hard to convince my clients to

14  settle, because they knew how strongly I

15  believed in them.

16      Q.    Okay.  Now, would you agree with me

17  that subordinated securities claims cannot be

18  transformed into a general unsecured claim by

19  agreement of the Debtor and the Securities

20  Claimants?

21           MR. O'NEILL:  Objection.

22      A.    Explain what constitutes a

23  subordinated securities claim.

24      Q.    One where we -- you and I both agree

25  that these are claims that need -- that should

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 30 of 46

Page 30

1                        Kirpalani

2      be subordinated, they are securities claims

3      that under 510(b) should be subordinated.

4           A.     Whether we agree doesn't make any

5      difference, so I don't think that's correct.

6           Q.     Okay.  Let's say that a court of law

7      would find that under 510(b) they should be

8      subordinated.

9           A.     And has that decision become final

10     and no longer subject to appeal?

11          Q.     Sure.

12          A.     And then what's the question?

13          Q.     The question is would you agree with

14     me that those claims couldn't be transformed

15     into general unsecured claims by agreement of

16     the Debtor and the Securities Claimants?

17               MR. O'NEILL:  Objection.

18          A.     Yeah, I would agree with that.

19          Q.     What about a securities claim that

20     has only a very small chance of surviving a

21     challenge based on subordination?

22               MR. O'NEILL:  I am going to object

23          to all this on the grounds that it requires

24          him to speculate and to give legal

25          conclusions.  I have a standing objection

Page 31

1                    Kirpalani

2      to this line of questioning.

3      A.    What was the question?

4      Q.    So if you had a securities claim as

5  to which there was almost no question that it

6  would be subordinated under 510(b), could the

7  Debtor and the Claimant on that security agree

8  that it would be treated as a general unsecured

9  claim?

10     A.    Are we talking about some

11 hypothetical case, not this case?

12     Q.    Yes.

13     A.    I'd say if it's in the range of

14 reasonableness, then yes.

15     Q.    If it's in the range of

16 reasonableness yes what?

17     A.    Yes, parties can settle unresolved

18 issues if there is a small risk of litigation,

19 a large risk of litigation, sure.

20     Q.    Okay.  In determining that the

21 $235 million was fair, did you take into

22 account the risk that an appeals court or the

23 U.S. Supreme Court might not agree that

24 securities claims as to which the 510(b)

25 subordination issue is disputed can be settled?

1          Kirpalani

2          MR. SHELLEY:  I am going to object.

3     We are getting into work product again.

4          A.    What was the -- did I consider --

5     ask me the question again.

6          Q.    Yes.  In determining whether the

7     $235 million is fair, did you take into account

8     the risk that the Second Circuit or the U.S.

9     Supreme Court might hold that securities claims

10    as to which there is a dispute about whether

11    they should be subordinated under the 510(b)

12    can be settled?

13         A.    I don't think I did, no.  I'm not

14    sure I understand why that would be the case,

15    but I guess you will educate the court about

16    why I'm wrong, but no, I don't think so.

17         Q.    Okay.  So your working assumption is

18    that disputed claims can be settled and there

19    is no reason to think that that would ever be

20    overturned?

21         MR. O'NEILL:  Objection.

22         A.    Well, that's a different question,

23    but -- are you asking me that question?

24         Q.    Yes.

25         A.    I think there are risks that

1              Kirpalani

2    disputed claim settlements can be overturned in

3    many different circumstances.  So of course

4    that could happen.

5         Q.    Did you take that into account?

6         A.    You asked me that already.  Here in

7    this context --

8         Q.    In this context.

9         A.    -- did I take into account that the

10   510(b) settlement that's inextricably

11   intertwined with the global resolution of the

12   Private Securities Claimants' claims, did I

13   take into account whether an appeals court

14   would say that could not be resolved by

15   settlement?  I answered that before.  The

16   answer is no, I didn't take that into account.

17   I think -- I don't agree with the premise.  I

18   actually thought that an appeals court would

19   applaud the result as opposed to potentially

20   overturn it.  It's unprecedented.

21        Q.    Would you agree with me that a

22   Debtor cannot pick out one or more members of a

23   particular class and give them different

24   consideration?

25              MR. O'NEILL:  Objection.  Calls for

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 34 of 46

Page 34

1                       Kirpalani

2       a legal conclusion.

3       A.    I'd prefer to stick to the facts of

4   this case and that's the reason I'm here.  I'm

5   happy over a drink to talk about the law with

6   you, but not -- I am not going to be deposed on

7   my ability to be a lawyer.

8       Q.    Okay.  You are not going to answer

9   the question?

10      A.    No.

11      Q.    Okay.  If a court had ruled that

12  your clients' claims were to be subordinated

13  under 510(b), would your clients still be

14  supportive of a third-party release for Ally?

15          MR. O'NEILL:  Objection.  Calls for

16      speculation.

17      A.    You say a court.  You have to be

18  more clear.  If a court -- I hear that as the

19  bankruptcy court.  If Judge Glenn would have

20  said the Debtors win on summary judgment and my

21  clients' claims are subject to subordination, I

22  have every belief in the world that I would

23  have prevailed on appeal.  So I don't know if

24  they would have wanted to settle.  Maybe they

25  would have doubled down and said now we will

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 35 of 46

Page 35

Kirpalani

1  just go for blood and try to get a hundred

2  cents on the dollar.  I don't know.

3  

4      Q.    Okay.  What if you appealed that

5  claim as far as you could and the answer was

6  not in favor of your clients, do you think they

7  would be supportive of a third-party release

8  for Ally?

9          MR. O'NEILL:  Same objection.

10     A.    I really -- again, it's leaving out

11  issues that need to be included for that

12  question to make sense to me.  If that's all

13  there is, then no, they wouldn't be releasing

14  anybody.  They wouldn't release the Debtor,

15  they wouldn't release Ally.  Why would they?

16     Q.    Taking a look at paragraph 14 of

17  your declaration, and I am focusing on the

18  sentence that's sort of in the middle of the

19  paragraph -- you don't have page numbers here,

20  so I can't tell you what page it's -- yes, it's

21  page 8, I guess.

22          It says:  "The consensual resolution

23  of billions of dollars of securities claims

24  avoids the substantial time, expense and risks

25  associated with litigating such claims, in

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 36 of 46

Page 36

Kirpalani

<sup>1</sup> courts all over the country, and permits the

<sup>2</sup> expeditious completion of the Debtors' Chapter

<sup>3</sup> 11 cases."

<sup>4</sup>          So, first of all, the avoidance of

<sup>5</sup> substantial time, expense and risk associated

<sup>6</sup> with litigating such claims in courts all over

<sup>7</sup> the country, why is that beneficial to ResCap?

<sup>8</sup>          MR. O'NEILL:  Objection.

<sup>9</sup>     A.    It seems self-evident.

<sup>10</sup>     Q.    Well, let me ask it this way:

<sup>11</sup> The -- at least in terms of the exposure as

<sup>12</sup> noted in paragraph 13 -- I'm sorry.

<sup>13</sup>          So anyway, part of the claims up to

<sup>14</sup> $1.4 billion are against Ally Securities.

<sup>15</sup>          Why would it benefit ResCap to avoid

<sup>16</sup> the substantial time, expense and risk

<sup>17</sup> associated with litigating those claims?

<sup>18</sup>     A.    Well, the Debtors acknowledged very

<sup>19</sup> early in the case that claims against its

<sup>20</sup> parent would detract from management's time and

<sup>21</sup> energy needed to reorganize, so they actually

<sup>22</sup> sought an injunction to prevent those actions

<sup>23</sup> from going forward.  So putting aside its own

<sup>24</sup> exposure, which I will come back to, I think

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 37 of 46

Page 37

<sup></sup>

Kirpalani

1   there is a high degree of distraction of time

2   and attention that would be better used

3   elsewhere, such as maximizing the value of

4   their assets in figuring out a way to stop

5   burning so much money in administrative

6   expenses to come out of Chapter 11 and they

7   wouldn't be focusing on those, they would be

8   trying to defend themselves in these other

9   actions, and that may not make sense to you,

10  but what you don't -- may not know is that

11  there is an overlap of claims against the

12  debtors and Ally, so although in paragraph 13 I

13  said $1.4 billion are asserted against Ally and

14  $2.4 billion are asserted against the Debtors

15  and Ally, the 1.4 is subsumed within the 2.4,

16  so there is overlap.  So I would assume that

17  the Debtors want to defend 1.4 billion in

18  claims the same that they want to defend the

19  2.4 billion in claims.  They might try to do

20  that in the bankruptcy court.  Venue over that

21  was going to be another hotly-contested issue.

22  I know my clients felt very strongly about

23  having their cases tried where they were

24  commenced, and I think after Stern v. Marshall,

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani    Pg 38 of 46

Page 38

Kirpalani

1

2   that they would have a good shot at getting

3   that.

4       Q.    Now, focusing on the second part of

5   the sentence, it "permits the expeditious

6   completion of the Debtors' Chapter 11 cases."

7   How did it do that?

8       A.    How did it permit the expeditious

9   completion?  I guess we will find out next

10  week.

11      Q.    What do you mean by that?

12      A.    There is a confirmation hearing next

13  week.  I don't believe there would be a

14  confirmation hearing next week if these claims

15  were not resolved.

16      Q.    Well, could the company have

17  converted to Chapter 7 and done a liquidating

18  plan?

19      A.    Don't know.

20            MR. O'NEILL:  Objection.

21      A.    If you are asking me could legally,

22  we will have that drink and we can talk about

23  it.  Never thought about it here.

24      Q.    Okay.  In the next sentence you say:

25  "In addition, this settlement resolves

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 39 of 46

Page 39

Kirpalani

1

2  uncertain litigation over whether the Private

3  Securities Claims may be subordinated under

4  Bankruptcy Code section 510."

5          Had you lost that issue, do you

6  still believe that a global resolution would

7  have been difficult?

8          MR. SHELLEY:  Objection to form.

9          MR. O'NEILL:  Objection.

10     A.    If I had lost that issue in the

11  bankruptcy court?

12     Q.    Uh-huh.

13     A.    Yes, I think it still would have

14  been very difficult.

15     Q.    Why is that?

16     A.    Because I would have appealed.

17          MR. STONE:  Why don't we go off the

18     record.

19          THE VIDEOGRAPHER:  The time is

20     4:51 p.m.  We are going off the record.

21          (Recess was taken from 4:51 to 4:53.)

22          THE VIDEOGRAPHER:  The time is

23     4:53 p.m.  We are back on the record.

24  BY MR. STONE:

25     Q.    Just a couple more questions.

12-12020-mg   Doc 5803-18   Filed 11/18/13   Entered 11/18/13 11:51:57   Exhibit
Deposition Designations: Susheel Kirpalani   Pg 40 of 46

Page 40

1                         Kirpalani

2              Focusing on paragraph 13 of your

3     declaration, looking at the second sentence, it

4     says:  "It is my understanding, based upon my

5     review of publicly available information and

6     discussions with representatives of the

7     additional PS Claimants that the recovery rates

8     represented by this settlement are generally

9     consistent with other settlements of claims

10    based on the purchase and sale of RMBS

11    certificates, although the specific recovery

12    rates for RMBS claims vary based on the

13    particular characteristics of such claims,

14    including, for example, whether the claims have

15    survived a motion to dismiss, or whether the

16    claims are based on statutes with less

17    stringent elements of proof, such as state blue

18    sky claims or claims under the Securities Act

19    of 1933."

20         A.    Uh-huh, yes.

21         Q.    What did you look at specifically?

22         A.    I had one of my associates pull

23    together information of settlements that have

24    been announced since the financial crisis and

25    they fed me a bunch of that data when I was

1                    Kirpalani

2    going into this mediation, and obviously I read

3    in the newspaper what these types of claims

4    settle for in the class action context.

5    Getting that type of data is very hard on the

6    private litigation side, because almost all of

7    them are subject to confidentiality agreements,

8    which you probably know, but I was able to get

9    some based on information that my firm

10   maintained in confidence so I could advise my

11   clients properly.

12        Q.    Okay.  With respect to the data that

13   you were fed by your associate in connection

14   with the mediation, do you still have that

15   data?

16        A.    I don't think so.

17        Q.    Have you looked?

18        A.    No, nobody asked me to look.  I

19   would note when I read Lucy Allen's expert

20   report, all of the information that she did

21   include there was consistent with what my

22   understanding was from the work that my firm

23   had done for me.

24   RQ        MR. STONE:  Okay.  Well, I would ask

25        you that you go back and look at your files

Page 42

                        Kirpalani

1

2      and see if you can find it.

3              And I'm sure you will take that under

4      advisement.

5              MR. O'NEILL:  Yes.

6      Q.    With respect to discussions with

7  representatives of the additional PS Claimants,

8  who did you talk to?

9      A.    I'm sorry.  Ask the question again.

10 You looked like you were reading and then I was

11 looking to see what you were reading, but I'm

12 not sure --

13     Q.    Paragraph 13 again.  Same sentence.

14 It says "and discussions with representatives

15 of the Additional PS Claimants" at the bottom

16 of page 7.

17     A.    Yes.

18     Q.    Who did you speak to?

19     A.    There were -- there are 17 other

20 claimants in the -- what we call the AF 21,

21 Ally Financial 21, and we represent 4.  The

22 other 17 all have different counsel.  So I

23 don't remember the names of them, but I was on

24 calls with some of them, and then my team,

25 combined bankruptcy and RMBS litigators, did a

1                    Kirpalani

2   lot of the discussions with them about the

3   nature of their clients' claims.

4            MR. STONE:  I don't have any further

5        questions.

6            MR. O'NEILL:  Nothing.

7            THE VIDEOGRAPHER:  The time is

8        4:57 p.m.  We are going off the record.

9            (Time noted:  4:57 p.m.)

10

11

12            _____

13            SUSHEEL KIRPALANI

14

15   Subscribed and sworn to before me

16   this       day of              20  .

17

18   _____

19

20

21

22

23

24

25

Page 44

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                         ) ss.:

6    COUNTY OF NASSAU     )

7

8         I, KRISTIN KOCH, a Notary Public

9    within and for the State of New York, do

10   hereby certify:

11        That SUSHEEL KIRPALANI, the witness

12   whose deposition is hereinbefore set forth,

13   was duly sworn by me and that such

14   deposition is a true record of the

15   testimony given by such witness.

16        I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage; and that I am

19   in no way interested in the outcome of this

20   matter.

21        IN WITNESS WHEREOF, I have hereunto

22   set my hand this 14th day of November,

23   2013.

24        _____

25        KRISTIN KOCH, RPR, RMR, CRR, CLR

Page 45

1

2    --------------------I N D E X-------------------

3

     WITNESS                 EXAMINATION BY        PAGE

4

5    SUSHEEL KIRPALANI      MR. STONE               7

6

     --------------------EXHIBITS-------------------

7

8    KIRPALANI                          PAGE LINE

9

     Exhibit 1

10   Declaration of Susheel Kirpalani..... 6    2

11

     REQUESTS:  41

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 46

1

2          ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:     In Re Residential Capital LLC

     Dep. Date:     November 14, 2013

4    Deponent:      Susheel Kirpalani

5                   CORRECTIONS:

6    Pg. Ln.   Now Reads        Should Read        Reason

7    ____ ____ _____  _____  _____

8    ____ ____ _____  _____  _____

9    ____ ____ _____  _____  _____

10   ____ ____ _____  _____  _____

11   ____ ____ _____  _____  _____

12   ____ ____ _____  _____  _____

13   ____ ____ _____  _____  _____

14   ____ ____ _____  _____  _____

15   ____ ____ _____  _____  _____

16   ____ ____ _____  _____  _____

17   ____ ____ _____  _____  _____

18

19                            _____

20                            Signature of Deponent

21   SUBSCRIBED AND SWORN BEFORE ME

22   THIS_____DAY OF_____, 2013.

23

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____