**Hearing Date: December 17, 2013 at 10:00 a.m. (ET)**
**Objection Deadline: December 9, 2013 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Erica J. Richards
Meryl L. Rothchild

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Chapter 11 |
| Debtors. | Jointly Administered |
---------------------------------------------------------------

**COVERSHEET FOR FOURTH INTERIM APPLICATION OF**
**MORRISON & FOERSTER LLP AS BANKRUPTCY**
**COUNSEL FOR THE DEBTORS FOR COMPENSATION AND**
**REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD**
<u>**MAY 1, 2013 THROUGH AUGUST 31, 2013**</u>

This is a(n):    ___ monthly    _x_ interim    ___ final application.

| | |
|---|---|
| Name of Applicant: | Morrison & Foerster LLP ("**Applicant**") |
| Authorized to Provide Professional Services to: | Residential Capital, LLC, *et al*. (collectively, the "**Debtors**") |
| Date of Retention: | Order entered on July 16, 2012 retaining Applicant *nunc pro tunc* to May 14, 2012 |
| Period for which Compensation and Reimbursement is sought: | May 1, 2013 through August 31, 2013 (the "**Application Period**") |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $21,653,139.30 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $551,388.56 |

ii

## Summary of Monthly Applications for Application Period:

| Date Submitted | Compensation Period | Requested Fees (80%) | Requested Expenses | Fees Paid | Expenses Paid | 20% Holdback |
|---|---|---|---|---|---|---|
| 10/1/2013 | 5/1/2013 – 5/31/2013 | $4,619,591.40 | $52,159.08 | $0.00 | $0.00 | $1,154,897.85 |
| 10/25/2013 | 6/1/2013 – 6/30/2013 | $3,758,557.60 | $392,883.64 | $0.00 | $0.00 | $939,639.40 |
| 11/6/2013 | 7/1/2013 – 7/31/2013 | $4,228,838.72 | $47,909.48 | $0.00 | $0.00 | $1,057,209.68 |
| 11/14/2013 | 8/1/2013 – 8/31/2013 | $4,729,619.52 | $58,436.36 | $0.00 | $0.00 | $1,182,404.88 |
| **TOTAL** | | **$17,336,607.24** | **$551,388.56** | **$0.00** | **$0.00** | **$4,316,532.06**[1] |

---

[1]    This figure has been reduced to reflect additional deductions by Applicant in the amounts of (i) $5,621.25 for travel within New York City, and (ii) $11,998.50 for minimal hours worked by Applicant's associates.

**Summary of Previous Interim Applications:**

| Date and Docket Number of Application | Period Covered by Application | Date of Order on Application | Interim Fees Requested | Interim Fees Allowed | Interim Fees Paid | Interim Expenses Requested | Interim Expenses Allowed | Interim Expenses Paid |
|---|---|---|---|---|---|---|---|---|
| 10/11/2012 (Dkt. No. 1885) | 5/14/2012-8/31/2012 | 12/28/2012 (Dkt. No. 2530) | $14,667,747.50 | $14,273,523.50 | $14,273,523.50 | $598,549.72 | $587,369.72 | $587,369.72 |
| 3/14/2013 (Dkt. No. 3200) | 9/1/2012 – 12/31/2012 | 4/29/2013 (Dkt. No. 3556) | $20,712,177.25 | $20,622,177.25 | $20,622,177.25 | $418,544.90 | $418,544.90 | $418,544.90 |
| 8/7/2013 (Dkt. No. 4551) | 1/1/2013 – 4/30/2013 | 9/25/2013 (Dkt. No. 5205] | $22,790,342.60 | $22,750,816.10 | $22,750,816.10 | $350,910.44 | $299,176.32 | $299,176.32 |
| **TOTAL** | | | **$58,170,267.35** | **$57,646,516.85** | **$57,646,516.85** | **$1,368,005.06** | **$1,305,090.94** | **$1,305,090.94** |

iv

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Erica J. Richards
Meryl L. Rothchild

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------ ) | |
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ------------------------------------------------------------ ) | |

**FOURTH INTERIM APPLICATION OF**
**MORRISON & FOERSTER LLP AS BANKRUPTCY**
**COUNSEL FOR THE DEBTORS FOR COMPENSATION AND**
**REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD**
**MAY 1, 2013 THROUGH AUGUST 31, 2013**

For its Fourth Interim Application for compensation and reimbursement of

expenses (the "**Application**") for the period May 1, 2013 through August 31, 2013 (the

"**Application Period**"), Morrison & Foerster LLP ("**Applicant**"), bankruptcy counsel to

Residential Capital, LLC., *et al.*, as debtors and debtors in possession (collectively, the

"**Debtors**"), respectfully represents as follows:

## <u>JURISDICTION, VENUE AND STATUTORY PREDICATES</u>

1.        This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        The statutory bases for the relief requested herein are sections 330, 331, and 1103 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"). This Application has been prepared in accordance with General Order M-447, *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, effective as of January 29, 2013 (the "**Local Guidelines**"), and the *United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330* effective January 30, 1996 (the "**UST Guidelines**" and, together with the Local Guidelines, the "**Guidelines**").  Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as <u>Exhibit A</u>.

## <u>BACKGROUND</u>

A.        <u>The Chapter 11 Cases</u>

3.        On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy

2

Rule 1015(b). No trustee has been appointed in these Chapter 11 cases (the "**Chapter 11 Cases**").

4.       On May 16, 2012, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed a nine member official committee of unsecured creditors (the "**Creditors' Committee**").

5.       On June 20, 2012, the Court directed that an examiner be appointed, and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "**Examiner**") [Docket Nos. 454, 674]. On July 27, 2012, the Court entered an *Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner* [Docket No. 925], including the issuance of a report (the "**Examiner's Report**"). On May 13, 2013, the Examiner filed the Examiner's Report under seal [Docket Nos. 3677, 3697]. On June 26, 2013, the Examiner's Report was unsealed and made available to the public [Docket No. 4099].

6.       On October 23, 2012 and October 24, 2012, the Debtors successfully conducted an auction for the sale of the servicing and origination platform (the "**Platform Sale**") to Ocwen Loan Servicing, LLC ("**Ocwen**") for $3 billion. On October 25, 2012, the Debtors conducted an auction for the sale of their whole loan portfolio assets (the "**Whole Loan Sale**") to Berkshire Hathaway Inc. ("**Berkshire**") for $1.5 billion.

7.       At a hearing held on November 19, 2012, the Court approved the Sale Motion[1] on the record. On November 21, 2012, the Court entered orders approving the Platform Sale

---

[1]     *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123 and Fed R. Bankr. P. 2002, 6004, 6006 and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Hearing and Sale Deadline; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "**Sale Motion**") [Docket No. 61].

ny-1115071

(which incorporated the sale and assignment of certain of the servicing and original platform assets to Walter Investment Management Corporation ("**Walter**")) and the Whole Loan Sale (collectively, the "**Asset Sales**") [Docket Nos. 2246 and 2247]. The transactions comprising the Debtors' Platform Sale closed in two parts: a sale to Walter that closed on January 31, 2013, and a sale to Ocwen that closed on February 15, 2013. The Debtors' Whole Loan Sale to Berkshire closed on February 5, 2013.

8.        On December 26, 2012, the Court entered an order approving the appointment of the Honorable Judge James M. Peck as mediator (the "**Mediator**") to assist the plan negotiations process for an initial term through and including February 28, 2013 [Docket No. 2519]. Mediation commenced shortly after the Mediator was appointed. On March 5, 2013, the Court *sua sponte* extended the appointment of the Mediator through and including May 31, 2013 [Docket No. 3101], and on June 4, 2013, the Court further extended such appointment until October 31, 2013 [Docket No. 3877]. On April 22 and 23, 2013, parties in interest attended an initial mediation "summit" with the Mediator, the Debtors' CRO (defined below) and advisors and/or business level leaders of each of the Debtors' major claimant constituencies to provide a structure in which these parties could resolve complex legal issues and develop a consensual plan of reorganization.

9.        Following the Court's orders extending and further extending the Debtors' exclusive period to file a chapter 11 plan [Docket Nos. 1413, 2489], on February 22, 2013, the Court entered a bridge order to continue the extension of the Debtors' exclusive period [Docket No. 3007]. The Court subsequently entered orders during the Application Period further extending the Debtors' exclusive period to file a plan [Docket Nos. 3102, 3440, 3634, 3919, 3958], extending this period through and including August 21, 2013. Pursuant to the Court's

4

latest order, the Plan Proponents (defined below) had the exclusive right to solicit votes on the Plan through and including October 21, 2013.

10.     On March 5, 2013, the Court entered an *Order Granting Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 3103], pursuant to which Lewis Kruger was appointed as the Debtors' Chief Restructuring Officer ("**CRO**").

11.     On June 26, 2013, the Court entered an order authorizing the Debtors to enter into and perform under a plan support agreement (the "**PSA**") by and among the Debtors, Ally, the Creditors' Committee, and certain consenting claimants [Docket No. 4098].

12.     On July 3, 2013, the Debtors and the Creditors' Committee (together, the "**Plan Proponents**") filed the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] (as amended, the "**Plan**") and the *Disclosure Statement for the Joint Chapter 11 Plan of Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4157] (as amended, the "**Disclosure Statement**"). On August 23, 2013, the Court entered an order approving, *inter alia*, the Disclosure Statement, as amended, and authorizing the Plan Proponents to solicit acceptances of the Plan [Docket No. 4809].

13.     On October 11, 2013, the Plan Proponents filed Exhibit 2 through Exhibit 21 comprising the plan supplement to the Plan (the "**Plan Supplement**"). On October 29, 2013, the Plan Proponents filed the schedule of certain contracts and unexpired leases, the "Assumption Schedule," as Exhibit 1 comprising the Plan Supplement. Pursuant to the Plan, the Plan Proponents have since amended and/or supplemented certain Exhibits of the Plan Supplement.

14.     Commencing on October 15, 2013, the Court presided over a trial during which the Debtors and the Creditors' Committee litigated certain "Phase I" issues raised in their respective adversary proceeding complaints (the "**JSN Adversary Proceedings**") against holders of junior secured notes (the "**JSNs**").  The trial was substantially complete by October 25, 2013, subject to post-trial briefing due on November 1, 2013 and closing arguments presented on November 6, 2013.  On November 15, 2013, the Court entered the *Memorandum Opinion, and Findings of Fact and Conclusions of Law, After Phase I Trial* [Docket No. 5772].

15.     All quarterly fees have been paid to the U.S. Trustee and all required monthly operating reports have been filed.

16.     As of the date of this Application, the Debtors have approximately $1,484,694,968.00 in cash on hand or on deposit, of which approximately $429,174,721.00 is unencumbered.  The Debtors estimate that as of October 31, 2013, the date of the most recent closing of the Debtors' monthly financial statements, the estates have accrued approximately $325,400,000.00 in unpaid administrative expenses on account of operating expenses, employee liabilities (including compensation), professional fees, and other miscellaneous liabilities.

**B.     Applicant's Retention and Interim Compensation**

17.     On July 16, 2012, the Court entered the *Order Authorizing the Retention and Employment of Morrison & Foerster LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 786], approving Applicant's retention.

18.     On July 17, 2012, the Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 797] (the "**Interim Compensation Order**").  Pursuant to the terms of the Interim Compensation Order, Applicant, among others, is authorized to submit monthly invoices to the Debtors, counsel for

6

the Creditors' Committee, counsel for Ally Financial Inc., counsel for Barclays Bank PLC, and the U.S. Trustee (collectively, the "**Notice Parties**").

19.      On October 11, 2012, Applicant filed its first interim fee application covering the period from May 14, 2012 through August 31, 2012 (the "**First Interim Fee Application**"). The First Interim Fee Application was granted pursuant to, and to the extent set forth in, the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 2530], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.

20.      On March 14, 2013, Applicant filed its second interim fee application covering the period from September 1, 2012 through December 31, 2012 (the "**Second Interim Fee Application**").  The Second Interim Fee Application was granted pursuant to, and to the extent set forth in, the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 3556], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.

21.      On August 7, 2013, Applicant filed its third interim fee application covering the period from January 1, 2013 through April 30, 2013 (the "**Third Interim Fee Application**"). The Third Interim Fee Application was granted, pursuant to, and to the extent set forth in, the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 5205], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.  The Court also approved the payment of the remaining 10% holdbacks for each the First Interim Fee Application and Second Interim Fee Application.

ny-1115071

22.     On October 1, 2013, Applicant served its monthly invoice covering the period from May 1, 2013 through May 31, 2013 (the "**May Invoice**") on the Notice Parties.   On October 25, 2013, Applicant served its monthly invoice covering the period from June 1, 2013 through June 30, 2013 (the "**June Invoice**") on the Notice Parties.   On November 6, 2013, Applicant served its monthly invoice covering the period from July 1, 2013 through July 31, 2013 (the "**July Invoice**") on the Notice Parties.   On November 14, 2013, Applicant served its monthly invoice covering the period from August 1, 2013 through August 31, 2013 (the "**August Invoice**" and together with the May Invoice, the June Invoice, and the July Invoice, the "**Monthly Invoices**") on the Notice Parties.   As of the date hereof, Applicant had not received any objection to the Monthly Invoices.[2]

23.     For the convenience of this Court and all parties in interest, attached hereto as Exhibit B is a schedule of the total amount of fees incurred under each of Applicant's internal task codes during the Application Period.

24.     Applicant has not yet received any payments for fees and expenses on account of the Monthly Invoices as of the date hereof.[3]   The Monthly Invoices reflect voluntary aggregate deductions of $190,297.25 in fees during the Application Period, comprising a 50% reduction for non-working travel ($6,131.25) and a 100% reduction for Applicant's review of the Monthly Invoices for privilege and compliance with compensation guidelines ($184,166.00).   In addition, this Application reflects the deduction of fees for time billed by associates who billed less than

---

[2]     The objection periods for the July Invoice and August Invoice expire on November 26, 2013 and December 4, 2013, respectively.

[3]     In the event no timely objections to the July Invoice and August Invoice are received, Applicant will request, and expects to receive prior to the hearing on this Application, payment of 80% of fees and 100% of expenses for the applicable compensation periods, which will bring the total fees paid for the Application Period to $17,336,607.24 and total expenses paid for the Application Period to $551,388.56, bringing the aggregate amount of payments received by Applicant for the Application Period to $17,887,995.80.

ny-1115071

five hours total during the Application Period ($11,998.50), as well as for time billed to travel within New York City ($5,621.25).

25.    Applicant maintains computerized records of the time expended in the rendering of the professional services required by the Debtors.  These records are maintained in the ordinary course of Applicant's practice.  For the convenience of this Court and all parties in interest, attached hereto as Exhibit C is a billing summary for the Application Period, setting forth the name of each attorney and paraprofessional who rendered services during the Application Period, each attorney's year of bar admission and area of practice concentration, the aggregate time expended by each attorney and each paraprofessional, the hourly billing rate for each attorney and each paraprofessional at Applicant's current billing rates, and the individual amounts requested for each professional.  The compensation requested by Applicant is based on the customary compensation charged by comparably skilled practitioners in other similar cases under the Bankruptcy Code.

26.    Applicant also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursements are sought is attached hereto as Exhibit D.[4] The Monthly Invoices reflect aggregate deductions of $82,317.73 in expenses incurred during the Application Period.  Additionally, as an accommodation to the Debtors made in accordance with prepetition practices, Applicant does not charge the Debtors for expenses incurred by

---

[4]    To the extent that the descriptions of expenses for travel and transportation to and/or from the Court, either after 8:00 a.m. or before 8:00 p.m., do not state the purpose for the use of a cab or car, Applicant submits that such expenses were incurred by the Applicant's professionals for the purpose of transporting voluminous hearing materials to and/or from Court.

ny-1115071

Applicant for Lexis or Westlaw research, overtime meals, in-house document preparation fees, or secretarial overtime.  These expenses are in addition to the deductions described above.

27.     Copies of Applicant's computerized records of fees and expenses in the format specified by the Guidelines have been served on the Notice Parties with each of the Monthly Invoices and are attached hereto collectively as <u>Exhibit E</u>.

28.     There is no agreement or understanding between Applicant and any other person, other than partners of the firm, for the sharing of compensation to be received for services rendered in the Chapter 11 Cases.

29.     The Monthly Invoices submitted by Applicant are subject to a 20% holdback (as is customary in this District) imposed by the Court on the allowance of fees.  The aggregate amount of Applicant's holdback during the Application Period is $4,316,532.06.[5]  In light of the significant progress made in these Chapter 11 Cases to date, Applicant respectfully requests, in connection with the relief requested herein, that the Court allow this holdback amount on an interim basis pursuant to sections 330 and 331 of the Bankruptcy Code and authorize the Debtors to satisfy such amounts.  Applicant further requests that the Court allow the remaining 10% holdback with respect to the Third Interim Fee Application on an interim basis pursuant to sections 330 and 331 of the Bankruptcy Code and authorize the Debtors to satisfy such amounts.

### DESCRIPTION OF SERVICES AND
### EXPENSES AND RELIEF REQUESTED

30.     In general, Applicant has represented the Debtors in connection with the following aspects of the Chapter 11 Cases:

---

[5]   This figure has been reduced from $4,334,151.81 to reflect additional deductions by Applicant in the amounts of (i) $5,621.25 for travel within New York City, and (ii) $11,998.50 for minimal hours worked by Applicant's associates.

(a)     advising the Debtors with respect to their powers and duties as debtors in possession in the continued management and operation of their businesses and properties;

(b)     attending meetings and negotiating with creditors and parties in interest;

(c)     advising the Debtors in connection with any sale of assets in these Chapter 11 Cases;

(d)     taking all necessary action to protect and preserve the Debtors' estates, including prosecuting actions on the Debtors' behalf, defending any action commenced against the Debtors, and representing the Debtors' interests in negotiations concerning all litigation in which the Debtors are involved, including, but not limited to, objections to claims filed against the Debtors or their estates;

(e)     preparing all motions, applications, answers, orders, reports, and papers necessary to the administration of the Chapter 11 Cases;

(f)     taking any necessary action on behalf of the Debtors to obtain approval of solicitation procedures, a disclosure statement and confirmation of a Chapter 11 plan, including engaging in plan mediation under the direction of the Mediator;

(g)     providing U.S. tax advice to the Debtors regarding restructuring matters;

(h)     appearing before this Court, any appellate courts, and the United States Trustee to protect the interests of the Debtors' estates before such Courts and the United States Trustee;

(i)     performing other necessary legal services for the Debtors in connection with the Chapter 11 Cases, including (i) analyzing the Debtors' leases and executory contracts and the assumption or assignment thereof, (ii) analyzing the validity of liens against the Debtors, and (iii) advising on corporate, litigation, and other legal matters;

(j)     facilitating and cooperating with the Examiner's investigation, including preparing written submissions in response to Examiner inquiries and responding to voluminous discovery requests; and

(k)     taking all steps necessary and appropriate to bring the Chapter 11 Cases to conclusion.

31.     To provide an orderly and meaningful summary of the services rendered by Applicant on behalf of the Debtors during the Application Period, Applicant established, in accordance with the Guidelines and its internal billing procedures, separate task codes in

11

ny-1115071

connection with the Chapter 11 Cases. The following is a summary of the most significant professional services rendered by Applicant during the Application Period organized in accordance with Applicant's internal system of task codes:

(a)    **Asset Analysis and Recovery – 001.**

**Fees:** $17,191.00**; Total Hours:** 23.7

32.    This category includes time spent by Applicant's professionals reviewing and analyzing materials regarding the Debtors' assets and liabilities, including: analysis of the repurchase recovery protocol and pending settlements in connection with certain repurchase recovery claims, and discussions with the Creditors' Committee and its advisors regarding the same; analysis of repurchase recovery thresholds and settlement parameters with FTI; and research and analysis of issues related to potential avoidance action recoveries.

(b)    **Asset Dispositions/Sales – 002.**

**Fees:** $454,465.00**; Total Hours:** 660.1

33.    This category includes time devoted by the Applicant to all matters related to the post-closings of the Asset Sales by and between the Debtors and Ocwen, Walter, and Berkshire, respectively, which generated an aggregate of approximately $4.5 billion in sale proceeds for the Debtors' estates, as well as matters concerning various *de minimis* asset sales. This category includes time billed to: preparing for and participating in numerous meetings and calls with the various parties in interest regarding pending sale-related and/or cure claim issues involving, among others, Impac Funding Corporation ("**Impac**"), Syncora Guarantee Inc. (**Syncora**), Financial Guaranty Insurance Company ("**FGIC**"), Ambac, and DB Structured Products, Inc. ("**DB**"), including meetings and calls between the Debtors, Ocwen, various third parties, the Creditors' Committee, AFI and Ally Bank; researching and reviewing transactions, deal level information and related documents to analyze servicing assets, servicing, master servicing,

12

and/or SBO servicing issues, loan status, and assignment issues so as to diligence asserted claims and/or assignment of loan agreements involving such counterparties; researching, negotiating, and drafting certain settlements, stipulations, and motions relating to the same; and negotiating and drafting a scheduling order and amendments thereto to allow Applicant to draft a stipulation letter agreement between the Debtors, Ocwen, and FGIC in connection with resolving FGIC's outstanding cure claim and to document the transfer of certain FGIC agreements to Ocwen.

34.    In addition, Applicant devoted time to: the analysis of Ocwen's obligation to pay the purchase price for charged off loans; review pooling and servicing agreements in connection with parties' post-closing obligations and continue to review servicing-related agreements in connection with Asset Sales reconciliation efforts and true-up calculations; preparing comments to a Ginnie Mae PIIT[6] extension letter agreement in connection with PIIT servicing transfers; analysis of purchase price schedules and adjustments, various non-disclosure agreements with certain third parties; and analysis of FHA loans and potential sale of same; review and analyze amendments and modifications to the AFI Shared Services Agreement and Transition Services Agreements between the Debtors and Ocwen and Walter, respectively; and participation in numerous meetings and calls with Debtors' other professional advisors, the Creditors' Committee and its professional advisors in connection with the aforementioned activities.

(c)    **Business Operations and Advice – 003.**

**Fees:**  $367,660.00; **Total Hours:**  391.3

35.    This category includes matters related to advising the Debtors with respect to their business operations, in connection with both day-to-day matters and long-term strategic

---

[6]    PIIT is a term used by Ginnie Mae to designate an ability to effectuate an immediate pool transfer upon issuance.

ny-1115071

planning relating to the Debtors' business and management generally, including:  preparation for and participation in board meetings and periodic estate presentations, and providing advice to the Debtors' directors regarding, among other things, strategy regarding the trajectory of the Chapter 11 Cases, negotiated settlements with key stakeholders, the JSN Adversary Proceedings and pending litigation, governance issues, estate budget and wind-down activities and cost analyses, and estate management issues to ensure the efficient use of estate resources, directors' fiduciary duties, estate operations, board composition, and director indemnification post-closing of the Asset Sales.

36.    Specifically, Applicant's professionals invested significant time in the following: providing the Debtors' management and board with updates and analyses as to the status of the Chapter 11 Cases and negotiations with various creditor constituencies; including advising the Debtors on term sheet discussions and the progress of mediation relating to Disclosure Statement and Plan negotiations and status of same; discussing the scope of the CRO's duties and inclusion of a success fee in connection with the CRO's compensation for work accomplished in the Chapter 11 Cases; advising on the need for a chief liquidation officer and the process for selecting and retaining the same; advising the Debtors as to the run rates, fee limits, and quarterly reporting for ordinary course professionals retained by the Debtors; assisting the Debtors with resolving various operational issues including those related to the preparation of monthly operating reports; and management of numerous press inquiries regarding the status and developments of the Chapter 11 Cases.

### (d)    Case Administration – 004.

**Fees:**  $189,037.50; **Total Hours:**  345.6

37.    This category includes matters related to the administration of the Debtors' cases, including:  reviewing and monitoring the main Chapter 11 Cases docket and related dockets;

14

managing task lists, and tracking deadlines; assisting the Debtors with preparing expense reports and tracking and payment of invoices for retained professionals, ordinary course professionals, expert witnesses, RMBS trustees and their counsel, and contract attorneys; preparation of weekly update memoranda to distribute to the board to inform on case status and strategy; managing the costs of document production, including the approval of contract attorney time sheets and payment of vendor production invoices; coordination and delivery of hearing materials to Court; and preparation for and participation in various working group meetings to discuss case strategy and status, upcoming hearing matters, and allocation and coordination of tasks.    Applicant's professionals, in accordance with past practice, participate in a weekly call in which the attorneys bearing material responsibility for every workstream in the Chapter 11 Cases engage in discussions addressing a wide range of topics, such as Plan negotiations and settlement discussions with various creditor constituencies, mediation efforts, the claims reconciliation process, and estate planning efforts, among others.    Such discussions, which address many confidential matters, directly assist Applicant's professionals in understanding the impact of issues arising in one workstream on various other workstreams, and are necessary for the coordination of overall case strategy and planning to progress the Debtors' Chapter 11 Cases.

38.    Furthermore, Applicant devoted time to reviewing and analyzing certain motions filed by the JSNs and other filings relating thereto, including the JSNs' motion to disqualify Applicant from participation in these Chapter 11 Cases, or alternatively, requiring neutrality of Applicant in the context of inter-Debtor disputes.    Applicant conducted numerous internal meetings and engaged in correspondence internally and with the Creditors' Committee and other parties to determine the appropriate response thereto.

15

(e)    **Claims Administration and Objections – 005.**

**Fees:** $4,590,123.50**; Total Hours:** 6,836.3

39.    This category includes time spent by Applicant's professionals in connection with the ongoing review and analysis of claims to work towards identifying and categorizing an accurate universe of claims asserted against the Debtors, including: drafting and preparing omnibus claims objections to certain claims on a variety of bases, as well as related declarations and proposed orders, and filing a total of thirty-two (32) omnibus claims objections; researching, drafting, and revising replies to certain responses filed in connection with the omnibus claims objections, and preparing stipulations with certain third parties as required; researching and analyzing issues and general claims reconciliation strategy with the Debtors' claims management and reconciliation team ("**CM&R**") and engaging in periodic meetings and conferences to discuss the status of the same; discuss claims reconciliation issues and progress with CM&R, the Creditors' Committee and its advisors, including SilvermanAcampora LLP, special borrowers' counsel to the Creditors' Committee ("**SilvermanAcampora**"), and other Debtors' professionals and special and ordinary course counsel in connection with certain class action claims, large general unsecured claims, and the administration and treatment of borrower claims to manage the Debtors' claims register; researching and analyzing issues related to various class action claims and class certification, and filing certain objections and stipulations of settlement in connection with certain asserted class action claims; and preparing for and participating in meetings with Debtors' personnel regarding claim reconciliation process and strategy.

40.    In addition, Applicant expended significant efforts in pursuing the Debtors' strategy in the treatment of certain classes of claims in the Chapter 11 Cases, including: researching and analyzing issues surrounding individual objections to large borrower claims and preparing to litigate the same, objecting to certain securities claims, and engaging in settlement

16

negotiations in connection with the same.  Further, Applicant devoted a great amount of time throughout this Application Period to analyzing the underlying bases and value of certain monoline claims, including those claims asserted by FGIC, and working with the Debtors' other advisors, as well as the Creditors' Committee and certain trustees towards a settlement agreement to resolve the treatment of such claims (the "**FGIC 9019 Settlement**").  In connection with the FGIC 9019 Settlement, Applicant spent time: researching, drafting, revising, and discussing the motion in support of the FGIC 9019 Settlement; analyzing, researching, and preparing responses to the objections filed in connection with the same; analyzing the Debtors' expert reports and drafting, revising, and finalizing expert and witness testimonies in support of the FGIC 9019 Settlement; analyzing objectors' expert reports and drafting, revising, and finalizing rebuttals to same; once determining that the FGIC 9019 Settlement would need to be heard before the Court at an evidentiary hearing, Applicant devoted time to researching and analyzing issues relating to motions in limine, and preparing motions in limine to prevent certain of the objectors' expert testimony from being introduced at that hearing, as well as responding to motions in limine filed to by certain objectors in connection with certain of the Debtors' expert testimony; and discussing strategy relating to the aforementioned activities, with the goal of receiving Court approval of the FGIC 9019 Settlement, with Applicant's professionals and the Debtors' other advisors, trustees, the Creditors' Committee and its advisors.

41.    Lastly, Applicant spent time continuing to research and analyze equitable subordination issues and preparing briefs in connection with the subordination of certain classes of claims; reviewing and analyzing issues concerning the classification of securities claims, the estimation of such claims and asserted damages, related indemnification agreements in connection therewith, and related strategy; researching and analyzing certain indemnification

claims, and intercompany transactions, debt forgiveness and balance issues, and the impact of the same on the Debtors' estates.

### (f)    Executory Contracts – 006.

**Fees:** $119,216.50**; Total Hours:** 181.9

42.    This category includes time spent by Applicant's professionals related to the review, analysis and assumption/rejection of executory contracts and unexpired leases prior to and after the closing of the Asset Sales, including:  researching and analyzing issues relating to the treatment of certain servicing agreements and agreements relating to home equity lines of credit ("**HELOCs**"), and preparing notices of rejection in connection with the same; negotiating and preparing stipulations in connection with the assumption and assignment of certain agreements and resolution of related cure issues, including, but not limited to Ambac, DB, and Impac; preparation of notices of assumption and assignment of certain executory contracts and unexpired leases; drafting motions to assume and assign servicing agreements with respect to Impac and Syncora, as well as drafting reply briefs and negotiations concerning consensual resolution of the same; and engaging in numerous meetings and correspondence regarding the aforementioned activities.

### (g)    Fee/Employment Applications – 007.

**Fees:** $151,678.50**; Total Hours:** 278.6

43.    This category includes matters related to the review, analysis and preparation of fee and retention applications and associated exhibits, affidavits, and conflicts reports filed by various retained professionals in the Chapter 11 Cases, and providing advice and assistance to the Debtors and the Debtors' other professionals retained in connection with their retention in these cases, including, but not limited to, Perkins Coie, PWC, FTI, and various ordinary course professionals utilized by the Debtors.  In addition, the Applicant devoted time to negotiating

engagement letters and drafting retention applications for KPMG, ARC Excess, New Oak Capital Advisors, and Tilghman and Co. Finally, Applicant devoted time to preparing and filing the CRO's fee reports for submission to the Court.

> ### (h)    Fee/Employment Objections – 008.

> **Fees:** $1,273.50**; Total Hours:** 1.8

44.    This category includes time spent by Applicant's professionals in connection with the review, analysis, response to, and resolution of objections to fee and retention applications. This category includes time spent assisting and advising various retained professionals regarding the logistics and process for resolving objections to fee applications in advance of the hearing on the third interim fee applications. Pursuant to the Court's directive, activities billed under this task code do not include time spent by Applicant's professionals in responding to or resolving the U.S. Trustee's objection to Applicant's Third Interim Fee Application.

> ### (i)    Financing – 009.

> **Fees:** $201,302.50**; Total Hours:** 295.5

45.    This category includes matters related to the Debtors' financing arrangements, including: drafting the Debtors' cash collateral motion and discussing the same with the Debtors' financial advisors; reviewing and analyzing objections thereto and preparing a reply and proposed order to the same; analyzing related discovery issues, including preparing certain witnesses for depositions, in connection with the Debtors' use of cash collateral, and correspondence and discussions with parties in interest regarding the strategy of same. In addition, Applicant engaged in: the analysis of and correspondence with the Debtors' financial advisors and other parties in interest to discuss the use of cash collateral and adequate protection lien issues, review cost allocation methodology and analyses and related issues; analysis of issues relating to the paydown of AFI as part of the paydown of JSN debt, and drafting the

19

Debtors' reply in support of the motion for the paydown of such debt; discussions and preparation of drafts of a debt payment stipulation, and correspondence with the Debtors' advisors, the Creditors' Committee, JSNs, and AFI regarding the same; and discussions with the United States Trustee regarding Chase deposits and cash collateralization.

46.     Applicant also devoted time to:  researching, discussing, and preparing certain lien UCC-3 continuation filing statements, and researching on UCC-9 security interest filings and lien perfection and release issues; and drafting, revising, and preparing to file a stipulation for the continued use of cash collateral and related documentation in connection with the same.

### (j)     Plan, Disclosure Statement and Confirmation Matters – 010.

**Fees:  $3,377,269.00; Total Hours:**  4,688.6

47.     This category includes time spent by Applicant's professionals in connection with the preparation, review, analysis, negotiation, documentation, and finalization of the plan term sheet, the supplemental term sheet, the RMBS trust settlement and monoline settlement agreements, and the PSA that formed the foundation of the Plan Proponents' Disclosure Statement, the Plan, and related exhibits.  These documents required that Applicant consult with the Debtors' other professionals and advisors, as well as the Creditors' Committee, and devote a significant enormous amount of time to engage in meetings, calls, and conferences with key parties in interest to identify and address open points, including, but not limited to, the establishment of certain trusts, claims treatment, and coordination and finalization of the consensual terms of these key documents and agreements; discussions with the Creditors' Committee and JSNs, among others.  In addition, Applicant also prepared, revised, and filed the related joint defense and common interest agreement among the PSA parties, and the motion to approve the PSA and related term sheets.  Applicant analyzed the objections, statements, and reservations of rights filed in connection with the motion to approve the PSA, prepared a reply to

ny-1115071

such objections and discussed strategy in connection therewith.  Further, Applicant drafted

Debtors' reply in support of the final motion to extend exclusivity, the supplemental declaration

of Lewis Kruger (CRO) in support thereof and related bridge order to permit the Plan Proponents

to file a joint Disclosure Statement and Plan within the exclusive period, and additional

exclusivity extension motions as needed for such purpose.  Additionally, Applicant spent time

drafting and revising the Debtors' Bankruptcy Rule 3016 motion to prepare for circumstances

requiring the Plan Proponents to file the Plan without the Disclosure Statement.

48.    In connection with the Disclosure Statement, Applicant devoted significant time

and effort to conducting research for appropriate precedent and provisions to include therein,

including, but not limited to, descriptions of liquidating trusts, tax issues, and other relevant

sections; coordinate research and drafting responsibilities amongst various team members and

specialists; preparation of issues lists relating to tracking issues raised in connection with

drafting and multiple revisions to the Disclosure Statement; continuous around the clock

discussions and negotiations with the Creditors' Committee and various key stakeholders to

address the structure of the Disclosure Statement, disclosure issues, and certain other topics of

interest raised by these parties in connection therewith; researching and analyzing, among other

things, solicitation issues, ballot and voting matters, tax disclosures, liquidating trust description,

and working with Debtors' financial advisors and management in connection with the

preparation of recovery and liquidation analyses and updates of same to include as an exhibit to

the Disclosure Statement; coordination with Applicant's team and Debtors' other professionals

to provide summaries of certain descriptions of various litigation settlement history,

negotiations, and outcomes, pending and resolved litigation, and updated information to include

in the Disclosure Statement; analyzing, drafting, and revising the risk factors to include therein.

49.    Further, Applicant spent significant time on: drafting, revising, negotiating, and finalizing the motion to approve the Disclosure Statement, as well as ballots to be distributed to voting claimants and notices relating to the same; numerous internal discussions, as well as with the Creditors' Committee and the United States Trustee, regarding the same; attending to filing the Disclosure Statement and motion in support of approval of the same, as well as the Plan and related exhibits; addressing and negotiating certain requested revisions to the Disclosure Statement post-filing, and negotiating key provisions and revising the Disclosure Statement and Plan, where appropriate, to reflect resolutions of the same; draft, revise, and prepare for filing the reply in support of the sufficiency of the Disclosure Statement, as well as the chart detailing the objections to the same and eventual resolutions and/or settlement of objections; revise ballots and notices to address the Court's and the United States Trustee's concerns;

50.    In connection with the Plan, Applicant participated in numerous discussions, calls, and meetings to determine appropriate Plan structure, mechanics, conformity with the plan term sheets and PSA, and Plan construct and treatment of various classes of claims; drafted and revised several iterations of the Plan, including but not limited to a "no settlement" version, to track the progress of Plan negotiations.  Applicant engaged in discussions with the CRO and the Debtors' financial advisors in analyzing and negotiating various plan waterfall structures, recovery scenarios, and wind-down budgets in connection with proposed Plan structure and mechanics, explored, negotiated, and finalized certain settlement agreements (*e.g.*, NJ Carpenters Class Action) to be incorporated into the Plan structure and recovery assumptions; discuss numerous Plan-related issues, including the allocation of the AFI Contribution, Plan process, claims estimation and reserves, the impact of Plan mechanics on certain classes of claims, judgment reduction provision set forth in the Plan and related issues; the scope of third

party releases and potential carve outs of the same for certain parties, impairment issues for plan voting purposes, trust-related issues.

51.    Furthermore, Applicant conducted extensive research regarding various Plan matters including, but not limited to, the debtor's releases, D&O releases, consensual and non-consensual third party releases and related opt-out language, and claims subordination.    In addition, Applicant devoted substantial time in negotiating with the Creditors' Committee and the Debtors' major creditor constituencies, reviewing proposed draft plan term sheets proposed by certain creditor constituencies, and analyzing the same with the Debtors' CRO.    Applicant prepared, revised, and filed solicitation version of the Disclosure Statement and Plan and related exhibits.

**(k)    Plan Supplement Documents**

**Fees:  $19,276.00; Total Hours:  29.6**

50.    This category includes time spent by Applicant's professionals in connection with the discussion, research, analysis, and preparation of certain Plan Supplement documents, including the liquidating trust agreement to be established pursuant to the Plan.    Applicant devoted time to researching trust law, the requirements of the formation of a trust and appointment of a trustee thereof, tax considerations and related issues of liquidating trusts, and drafting and revising the liquidating trust agreement to be filed as part of the Plan Supplement.

**(l)    Relief from Stay Proceedings – 012.**

**Fees:  $450,759.50; Total Hours:  749.6**

51.    This category includes time spent by Applicant's professionals in connection with the review and analysis of dozens of motions for stay relief filed in the Chapter 11 Cases, including, but not limited to, junior and senior lienholders', borrowers', and third parties'

requests for relief from stay.    Applicant also continuously engaged in discussions and correspondence with the Debtors and outside counsel in connection with such motions, and preparation of responses to such motions, including objections to requested relief and stipulations granting such relief, in whole or in part.

52.    In addition, Applicant devoted significant time to: analyzing issues and appellate filings in connection with FHFA's motion to seek relief from the automatic stay to secure certain of the Debtors' loan files; preparing for oral argument before the Circuit Court for the Second Circuit regarding the same; drafting and revising a letter brief to Judge Cote in connection with the FHFA appeal matter and remand from the Second Circuit, and analyzing Judge Cote's decision regarding the same; discussing the FHFA stay matter with the Creditors' Committee, AFI, and their professionals to determine strategy relating to the same.    This category also includes time spent: having discussions with the Debtors and Carpenter Lipps & Leland LLP ("**CLL**") to strategize the Debtors' response to the motion by U.S. Bank for limited relief seeking discovery from the Debtors to use in a pending state court action; negotiating with certain movants regarding FDIC and Assured extend stay matters, stipulated stay relief, discussions with counsel for the Creditors' Committee regarding the same; and appeals of decisions regarding motions for stay relief in the FHFA dispute.

**(m)    Hearings – 013.**

**Fees: $872,739.00; Total Hours:** 1,448.7

53.    This category includes all matters related to preparation for and attendance at hearings in the Chapter 11 Cases, including:    preparation of agendas, scripts, binders and outlines; meetings with potential witnesses to prepare for hearings and correspondence with various of the Debtors' retained professionals in advance of hearings; coordination with chambers, the Creditors' Committee, and other parties in regarding scheduling issues; attendance

24

at twenty (20) hearings and Court conferences held on May 7, 2013, May 13, 2013, May 14, 2013, June 12, 2013, June 17, 2013, June 26, 2013, July 3, 2013, July 10, 2013, July 15, 2013, July 22, 2013, July 25, 2013, July 26, 2013, July 30, 2013, August 14, 2013, August 16, 2013, August 19, 2013, August 21, 2013, August 22, 2013, August 28, 2013 and August 29, 2013.

54.    In accordance with the Court's billing guidelines, where multiple attorneys attended omnibus hearings, no more than three of Applicant's professionals billed for the entire length of the hearing.  In further recognition of this Court's directive, Applicant's professionals who spent time arguing or appearing, or specifically supporting work on particular matters heard at the omnibus hearings, billed for their time in connection with only those matters.

### (n)    Tax Matters – 014.

**Fees:** $337,268.00; **Total Hours:**  464.8

55.    This category includes time spent by Applicant's professionals in connection with analyzing various tax issues related to the Chapter 11 Cases, the Debtors' operations, and wind-down activities, including: analysis of the Debtors' ownership and schedules of certain REMIC residuals, as well as related interest calculations, and the tax implications of the assignment of such interests under the standard pooling and servicing agreement; research and analysis of tax issues and disclosures and revisions thereto in connection with the Disclosure Statement and the Plan, including the research and analysis of the various tax implications of Plan structures and tax considerations in connection with potential settlements between the Debtors and key stakeholders; research and analysis of the federal law and the law of certain taxing authorities on liquidating trusts, assignments to the liquidating trusts as well as the assets to be held by such trusts, and tax considerations relating to the same; research and analysis of NERDS (non-economic residual interest) assessments and the opportunities to assign the same; discussion and analysis of potential post-confirmation tax issues; analysis of certain de minimis sales tax issues.

25

56.     Applicant also expended efforts in: reviewing and analyzing the findings of Ernst & Young ("**E&Y**") on various tax issues, and participating in frequent meetings with E&Y and FTI to discuss the same.  Applicant spent time analyzing the tax considerations raised in the JSN Adversary Proceedings, and reviewing and analyzing relevant case law and arguments relating to the same, including those regarding the tax allocation agreement claims and issues relating thereto.

(o)     **PLS Litigation – 017.**

**Fees:  $1,957,870.50; Total Hours:**  3,233.5

57.     This category includes time spent by Applicant's professionals in connection with their assisting and advising the Debtors in preparing for trial regarding Debtors' Bankruptcy Rule 9019 motion seeking approval of the RMBS settlements, including: extensive analysis relating to and discussions with Applicant's professionals and counsel for AFI, the Creditors' Committee, insurers, and the trustees for the respective RMBS trusts to prepare extensive pre-trial briefing and other litigation-related activities in support of the proposed amended RMBS 9019 settlement and in preparation for the 9019 trial on the RMBS settlement; research, analysis, and preparation of issues in response to motions to preclude certain evidence at issue in the RMBS 9019 trial, and drafting certain Daubert motions to preclude certain expert testimony as inadmissible, including research for and preparation of motions in limine to exclude certain allegedly irrelevant evidence; continue to draft and revise numerous witness statements and direct testimony for certain fact and expert witnesses of the Debtors in support of the RMBS 9019 settlement, and briefs in support of same; creation, multiple revisions, and finalization of RMBS 9019-related exhibits to be used at the evidentiary hearing, as well as assign designations. Ultimately, trial did not end up going forward, as these matters were resolved in the PSA.

26

(p)    **Litigation (Other) – 018.**

**Fees:** $2,026,701.50; **Total Hours:** 2,975.4

58.    This category includes time spent by Applicant's professionals in connection with: participation in various adversary proceedings and associated appeals, including engaging with counterparties, including borrowers, through the application of the Debtors' supplemental case management procedures for adversary proceedings, participation in pre-trial status conferences and settlement discussions in connection with resolving such proceedings, and preparing case status reports to submit to the Court to track the status and progress of such cases; research and analysis of issues in connection with the Debtors' pending litigation in other jurisdictions; and correspondence and periodic conferences with the Debtors' in-house legal department, outside counsel, and the Creditors' Committee regarding the same.

59.    In addition, Applicant expended significant time in connection with litigation activity involving the JSN Adversary Proceedings, and in particular, the Debtors' adversary proceeding complaint against the JSNs, including: researching and analyzing certain lien and security interest issues; revising and amending the Debtors' complaint, and engaging in numerous strategy sessions with Applicant's professionals and the Debtors' other advisors in connection with the same; drafting, revising, and preparing a motion to dismiss the JSNs' counterclaims, and conducting extensive research regarding the issues raised therein; drafting and revising an opposition to the JSN' motion to dismiss the complaint, drafting and revising a discovery plan and scheduling orders, and discussions with other parties in interest regarding the same. Applicant's professionals devoted time to analyzing, preparing, drafting, and revising the Debtors' witness statements and direct testimony in support of the Debtors' complaint against the JSNs and position on issues raised therein, meeting and strategizing with witnesses to discuss the same, as well as participating in numerous internal strategy sessions to discuss the same. In

27

preparation for the trial for Phase I of the JSN Adversary Proceedings, Applicant spent time preparing witnesses for depositions ahead of trial, analyzing key documents and research in connection with Debtors' as well as the Creditors' Committee's positions in connection with the respective complaints against the JSNs; and numerous meetings, discussions, and conference calls in connection with the strategy relating to the aforementioned activities.

### (q)    Government/Regulatory – 019.

**Fees:** $467,357.00**; Total Hours:** 708.4

60.    This category includes time spent by Applicant's professionals with respect to matters related to the Debtors' interactions with various state and federal governmental or regulatory bodies, including, but not limited to:  discussions with the Creditors' Committee and its professionals, the Federal Reserve Board ("**FRB**"), the Department of Justice ("**DOJ**") and various state attorneys general and other regulators regarding the Debtors' continued compliance with the FRB and DOJ consent orders; extensive negotiations to discuss proposed settlement with the FRB in connection with the foreclosure review and analyze and revise related proposed term sheets to document the same; analyzing related research in connection with FRB settlement options and structures and costs associated with such options; discussions with the aforementioned parties relating to the same, and drafting a stipulation of settlement with the FRB, motions to classify FRB obligations and amend the FRB Consent Order, as well as declarations and proposed orders in support of the same; discussions, review and analysis of establishment of an escrow agreement for a qualified settlement fund in connection with settlement payments made to the FRB, and drafted and revised the same as well as a proposed order permitting the Debtors to escrow FRB settlement funds.

61.    In addition, Applicant engaged in: discussions with the DOJ and other parties regarding the treatment of the DOJ and related settlement obligations in the Plan and post-

Effective Date obligations; review and analysis of issues and strategies in connection with the pending investigations being conducted and certain subpoenas issued by governmental agencies; continued negotiations related to the employment of third party professionals and payment of costs in connection with the foreclosure review being conducted in connection with the FRB consent order, and preparation of interim orders for the employment on an interim basis of these professionals associated with the foreclosure review.  Lastly, Applicant finalized a stipulation and order to permit such parties to file a joint Rule 60(a) motion in the District Court for the District of Columbia to enable parties to correct a clerical error to the FRB Consent Order.

**(r)    Customer and Vendor Matters – 020.**

**Fees:  $7,663.50; Total Hours:**  8.7

62.    This category includes Applicant's time spent on analyzing the rights of certain borrowers in connection with lien releases related to certain HELOCs, and discussions with SilvermanAcampora and the Creditors' Committee regarding the disposition of zero-balance HELOCs.

**(s)    Insurance Matters – 021.**

**Fees:  $49,814.00; Total Hours:**  60.4

63.    This category includes time spent by Applicant's professionals in connection with matters related to insurance benefits and coverage, including: correspondence with Perkins Coie, the Debtors' insurance coverage special counsel, and the Creditors' Committee's professionals to analyze the potential scope and availability of insurance coverage for pending litigation, including, but not limited to, settlements relating to certain class action claims, and participation in negotiations regarding insurance issues relating to the same; the scope of D&O and E&O insurance claims and policies, as well as related shared insurance issues between the Debtors and AFI;  analyzing  and  presenting  to  the  Creditors'  Committee  and  other  parties  in  interest

29

information relating to insurance available to the Debtors and the use of insurance proceeds; and reviewing and analyzing the potential use of available insurance proceeds with AFI and the Creditors' Committee's professionals.

**(t)      Communication with Creditors – 022.**

**Fees:** $39,829.00**; Total Hours:** 64.0

64.      This category includes time spent by Applicant's professionals communicating with Creditors' Committee members, general unsecured creditors and other parties in interest regarding: the status of the Debtors' bankruptcy proceedings, including providing updates to the Creditors' Committee and claimants regarding operations, the claims reconciliation process and claims objections, borrower-related issues, settlement discussions with the FRB and DOJ in connection with the foreclosure review, and various case issues; providing notices and updates to claimants relating to the filed Plan and Disclosure Statement; and the negotiation and preparation of confidentiality agreements with creditors.

**(u)      Meetings of Creditors – 023.**

**Fees:** $13,620.50**; Total Hours:** 17.4

65.      This category includes time spent by Applicant's professionals preparing for and participating in meetings with the Creditors' Committee and/or its professionals to discuss the status of the case, estate wind-down and claims reconciliation and analysis issues, new developments relating to Plan negotiations and proposed revisions to the same, estate management and governance issues, insurance issues, and other matters of significance to general unsecured creditors.    Applicant also spent time preparing materials for such presentations for the Creditors' Committee professionals, as well as preparing for and participating in meetings with other creditor constituents including counsel for senior unsecured

ny-1115071

noteholders, JSNs, and Consenting Claimants to discuss Plan negotiations, waterfall analyses, and secured creditor positions.

### (v)    Employee Matters – 024.

**Fees:  $52,107.50; Total Hours:  65.7**

66.     This category includes time spent by Applicant addressing issues related to employee matters, including: research, analysis, and preparation of certain executive non-compete agreements and separation agreements for certain officers; drafting, revision, and preparation of Debtors' employee severance motion and proposed order for filing, as well as a motion to seal exhibits to same from the public record; analysis and discussion of director and officer indemnification issues, and key employee lists and related incentive and other employee programs, including related severance payment issues; research and analysis of CRO success fees as a component of compensation metrics and discussion of same with the Debtors' management and the Creditors' Committee; analysis and discussion of pension plan and employee benefits matters, as well as other PBGC-related matters; discussion of potential PBGC-related Disclosure Statement revisions, Plan release language and fiduciary liability issues with Debtors' professionals, AFI, and the PBGC representatives; analysis of TARP restrictions on executive compensation and director compensation alternatives; review and analysis of employment agreements with the Debtors' key executives; preparation and revision of an employee reimbursement protocol motion and annual incentive plan motion and correspondence with U.S. Trustee and Creditors' Committee regarding same; and review and analysis of potential estate severance and indemnification obligations.

31

(w)    **Discovery or Rule 2004 Requests – 025.**

**Fees:** $4,003,373.80; **Total Hours:** 7,047.7

67.    This category includes the very significant time spent by Applicant analyzing and responding to numerous document and information requests involving several litigated issues and discovery requests, including: discovery requested from the Examiner in connection with the use of certain "professional eyes only" and privileged information in the Examiner's Report; the Debtors' and other key stakeholders' entry into the PSA; the Debtors' motion for continued use of cash collateral and related issues; discovery projects involving the JSN Adversary Proceedings and related lien challenges and intercompany balance and debt forgiveness issues; and discovery activities in connection with the FGIC 9019 Settlement.  For each of the aforementioned matters, the Applicant engaged in reviewing, analyzing, preparing and compiling responsive documents and other materials, reviewing responsive materials for relevance, confidentiality, and privilege, as well as preparing privilege logs, transmitting materials, and negotiating non-disclosure agreements with parties seeking discovery or access to confidential materials.  Furthermore, Applicant devoted significant amounts of time in drafting and responding to certain interrogatories, as well as strategizing and preparing the Debtors' witnesses for deposition and defending these witnesses in deposition, and preparing to take depositions of fact and expert witnesses in connection with the aforementioned matters. Applicant's professionals engaged in discussions and correspondence to review, analyze, and update strategy relating to the same.

68.    In connection with the production of such documents to the JSNs during Phase I discovery, within the Application Period, Applicant produced (i) 314,379 emails from all JSN-identified custodians, consisting of 1,989,294 pages, and (ii) 9,733 non-custodial large financial documents, consisting of 50,391 pages, all of which included time-consuming document

32

restoration and preparations for creating and updating privilege logs.  In addition, Applicant

analyzed and discussed with the Debtors' other professionals, including CLL and Curtis, Mallet-

Prevost, Colt & Mosle LLP, and counsel to the JSNs document review, data collection issues,

document restoration and retention issues, discovery scope, confidentiality and production issues

relating to the same.  In connection with preparation for the FGIC 9019 Settlement hearing,

Applicant similarly discussed document production issues and coordination of same with

counsel to the RMBS trustees, and other parties in interest, respectively, concerning the

scheduling orders related to the same.

69.    Applicant also spent time managing and analyzing certain discovery requests

arising from certain adversary proceedings and motions for relief from stay, including analyzing

and responding to document and information requests from governmental agencies.  In addition,

Applicant devoted time to researching, discussing, and preparing a motion, set of procedures,

proposed order, and related documents in connection with establishing a discovery protocol

relating to plan confirmation.

### (x)    Schedules and Statements – 026.

**Fees:** $1,077.00**; Total Hours:** 1.6

70.    This category includes time spent by Applicant's professionals advising the

Debtors and working with the Debtors' employees and other professionals to amend and finalize

the Debtors' schedules and statements of financial affairs.

### (y)    Other Motions and Applications – 028.

**Fees:** $449,328.00**; Total Hours:** 652.6

71.    This category includes matters related to the review, analysis, research, and

preparation of motions, applications and objections filed in these Chapter 11 Cases to the extent

not addressed specifically under other task codes (*i.e.*, fee and employment applications (007,

008), motions for stay relief (012) and other general litigation (018)) with respect to the Debtors' cases, including: among others, the Debtors' responses to the Creditors' Committee's and other parties' motions and statements in connection with the request for standing to prosecute claims against the JSNs in the JSN Adversary Proceedings, and review and analysis of related filings thereto; continue drafting Debtors' motion to abandon DOA property to Durbin Crossing; further revise the Debtors' joinder brief in connection with AFI's motion to enforce the automatic stay in connection with the Rothstein litigation and to enforce the automatic stay in the Knutson matter; draft and revise the Debtors' Bankruptcy Rule 9019 motions, and related declarations, to approve a settlement agreement with Flick, a settlement with GVC, and a settlement with Regions Bank; drafting motion seeking approval to make settlement payments to NJ Carpenters plaintiffs and advance notice costs, and related motions to file same under seal; motion in connection with the establishment of an escrow account for the Kessler class action settlement; and analyze and draft the Debtors' objection to the JSN's motion to disqualify Applicant, or in the alternative, require Applicant's neutrality in these Chapter 11 Cases.

### (z)    Non-Working Travel – 029.

**Fees:** **$12,262.50**; **Total Hours:** 19.3

72.    This category includes time spent by Applicant's professionals in non-working travel while representing the Debtors, excluding time spent by attorneys traveling within New York City.[7]  Applicant billed one-half of the total time that such professionals spent on non-working travel.

---

[7]    Applicant has taken additional reductions totaling $5,621.25 on account of time incurred in connection with non-working travel within New York City that was initially included in the May Invoice.

### (aa)    Monthly Fee Statements – 030.

**Fees:** $184,166.00**; Total Hours:** 309.4

73.    This category includes all time spent by Applicant's professionals reviewing Applicant's monthly invoices to ensure that the time detail and expenses complied with applicable compensation guidelines, as well as to ensure that no privileged or confidential information was disclosed therein.  In accordance with the Court's billing guidelines, Applicant has deducted 100% of the time within this task code.

### (bb)    Examiner – 033.

**Fees:** $630,538.00**; Total Hours:** 1,095.5

74.    This category contains time spent by Applicant's professionals related to the Debtors' cooperation with the Examiner's investigation, including: review, research, and analysis of the Examiner's requests for: additional briefing and submissions on Minnesota law issues, and preparation of submissions to same; consideration of the Examiner's proposed use of "professional eyes only" documents in the Examiner's Report and impact of same.  Debtors also devoted significant time to drafting, revising, and submitting an emergency motion to seal the Examiner's Report, as well as responding to certain parties' motions to unseal the same.

75.    In addition, Applicant devoted significant time to reviewing and analyzing the Examiner's Report itself, along with all parties' submissions to the Examiner, and drafting the Debtors' response and reply submissions in connection with the filed Examiner's Report.  Applicant also prepared detailed summaries and internal memoranda to document the numerous Examiner interviews and briefing issues covered to date, as well as a summary of the Examiner's conclusions.

ny-1115071

(cc)    **Minimal Hours Associates – 035.**
**Fees:** $11,998.50; **Total Hours:** 22.0

This category includes time spent by Applicant's associates that billed less than five hours in total during the Application Period.  In accordance with the U.S. Trustee Guidelines, Applicant has deducted 100% of the time within this task code.

(dd)    **Mediation Issues– 037.**

**Fees:** $816,088.00; **Total Hours:** 978.1

76.    This category includes time spent by Applicant's professionals in connection with the Plan mediation, including: preparation for and participation in mediation sessions with the Mediator and with the CRO to analyze plan waterfall scenarios and the positions of creditor constituencies in connection with participation in mediation to discuss plan distribution scenarios; discuss disclosures and proposed confidentiality agreements for parties participating in mediation; extensive preparation for and participation in mediation discussions whereby the Debtors, AFI, the Creditors' Committee, and certain major creditor constituencies engaged in discussions and negotiations concerning numerous recovery scenarios based on varying AFI settlement contributions to the Debtors' estates, in an effort to form the foundation for a consensual Chapter 11 plan of reorganization.

77.    In addition, Applicant devoted time to: discussions with the Debtors and the Mediator in connection with supplemental mediation matters, including, but not limited to, NJ Carpenters settlement as well as possible mediation of disputes with the FHFA and JSNs; drafting, revising, and finalizing the order in aid of mediation and confidentiality agreement with the JSNs to address the sharing of information in connection with the same; and engaging in numerous discussions with parties in interest regarding the same.

ny-1115071

78.     The foregoing descriptions of services rendered by Applicant in specific areas are not intended to be exhaustive of the scope of Applicant's activities in the Chapter 11 Cases.  The time records attached hereto as <u>Exhibit E</u> present more completely the work performed by Applicant in each billing category during the Application Period.

## **CONCLUSION**

79.     Applicant believes that the services rendered during the Application Period on behalf of the Debtors were reasonable and necessary within the meaning of Bankruptcy Code section 330.  Further, the expenses requested were actual and necessary to the performance of Applicant's services.

80.     Applicant therefore requests an order (i) approving interim compensation in the amount of $21,653,139.30 and interim reimbursement of expenses in the amount of $551,388.56,[8] (ii) directing payment of all compensation held back in connection with the Monthly Invoices, (iii) directing payment of all compensation held back in connection with allowed fees under the Third Interim Fee Application, and (iv) granting such other and further relief as may be just and proper.

---

[8]     The rates charged for such expenses are (i) equivalent to what Applicant normally bills to its non-bankruptcy clients and (ii) calculated to compensate Applicant for only the actual costs of the expenses.

ny-1115071

Dated:  November 18, 2013
        New York, New York

/s/ Lorenzo Marinuzzi
Gary S. Lee
Lorenzo Marinuzzi
Erica J. Richards
Meryl L. Rothchild
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*