# MILBANK, TWEED, HADLEY & McCLOY LLP

**1 CHASE MANHATTAN PLAZA
NEW YORK, NY 10005**

_____

212-530-5000

FAX: 212-530-5219

Atara Miller
Partner
212-530-5421
E-MAIL: amiller@milbank.com

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**WASHINGTON, D.C.**
202-835-7500
FAX: 202-835-7586

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-(0)69-71914-3400
FAX: 49-(0)69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

November 25, 2013

<u>**VIA ECF**</u>

Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

      Re:    *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG)

Dear Judge Glenn:

      Pursuant to the Court's direction during trial (*see* Transcript of Adversary Proceeding ("<u>Tr.</u>") at 52:01-06, Phase II Trial, No. 13-01343, Nov. 21, 2013), we submit this letter brief on behalf of the Ad Hoc Group of Junior Secured Noteholders (the "<u>JSNs</u>") and UMB Bank, N.A., as successor Notes Trustee ("Notes Trustee"), in support of their motion made on the record to strike paragraphs 5, 6, and 28 through 32 of the Direct Testimony of Mark A. Renzi [Dkt No. 5702] ("<u>Direct Testimony</u>").  Those paragraphs in the Direct Testimony contain expert opinions that were not previously disclosed, as required by Federal Rule of Bankruptcy Procedure 7026(a)(2)(B)(i) and should be excluded pursuant to Rule 7037(c)(1).

      Rule 7026(a)(2)(B) requires, *inter alia*, that written expert reports contain, among other things "a complete statement of all opinions the witness will express and the basis and reasons for them."  As the Committee Note on the corresponding section in the Federal Rules of Civil Procedure makes clear, the expert report must "stat[e] the testimony the witness is expected to present during direct examination, together with the reasons therefor."  Fed. R. Civ. P. 26 Committee Note (1993).  This expert disclosure must contain a complete statement of all opinions, including any opinions rebutting another expert's opinions in the same proceeding.

Milbank, Tweed, Hadley & McCloy LLP

Judge Martin Glenn
November 25, 2013
Page 2

*See Complaint of Kreta Shipping, S.A.*, 181 F.R.D. 273, 276 (S.D.N.Y. 1998) (finding expert's witness statement violated Rule 26(a)(2)(B) where it contained criticism of another expert's report "not previously disclosed in the form of a rebuttal expert report"). As the District Court aptly noted, "if expert testimony contradicting another expert's analysis were exempt from Rule 26(a)(2)(B)'s stringent disclosure requirements, in many cases parties would have no incentive to file rebuttal reports." *Id.* at 276. Rule 7026(a) also makes clear that the disclosure must include a complete statement of the basis and the reasons for the opinions expressed.

Expert testimony that fails to comply with Rule 26(a) should be excluded. *See Hunt v. CNH America*, 857 F. Supp. 2d 320, 339 (W.D.N.Y. 2012) ("[N]ew information, that exceeds the scope of [the expert's] written report and deposition testimony, as opposed to merely restating [the expert's] earlier opinions, the Court agrees that it violates FRCP 26(a)(2)(B), and is subject to exclusion pursuant to FRCP 37(c)(1)."), *aff'd* 511 F. App'x 43, 46 (2d Cir. 2013). Rule 37(c)(1), made applicable by Bankruptcy Rule 7037, provides that, where a party fails to provide information as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 37(c)(1) is designed to "prevent the practice of 'sandbagging' an opposing party with new evidence." *Hunt*, 857 F. Supp. 2d at 339. In determining whether to exclude previously undisclosed expert testimony, the Court may consider "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.* (internal citation omitted). As detailed below, there can be no justification for the Debtors not properly disclosing all of Mr. Renzi's expert opinions. Mr. Renzi submitted two expert reports in this Phase of the proceedings. He should not be allowed to further supplement his opinions through direct trial testimony.

Section 10 of the Amended Order Establishing a Discovery Protocol in Connection With Discovery Relating to Plan Confirmation [Docket No. 4974] (the "Discovery Protocol") required affirmative testifying experts to submit written reports by October 18, 2013. Rebuttal reports were to be exchanged no later than November 1, 2013.

Mr. Renzi was retained by the Debtors and identified as an expert witness on whose testimony they intend to rely in support of Plan Confirmation and Phase II. (*See* Expert Report of Mark A. Renzi, dated October 18, 2013 ("Renzi Report") ¶ 1 attached hereto as Ex. A.) The Debtors timely served the Renzi Report on October 18. On November 1, Mr. Renzi submitted a rebuttal report titled "Expert Report of Mark A. Renzi – Intercompany Balances" ("Renzi Rebuttal Report") in accordance with Section 10(b) of the Discovery Protocol. (*See* Renzi Rebuttal Report attached hereto as Ex. B.) The Renzi Rebuttal Report was submitted in response to the Expert Report of Michael Fazio – Recovery Analysis, an expert report prepared at the request of the JSNs and the Notes Trustee ("Opening Fazio Report").

Milbank, Tweed, Hadley & M<u>c</u>Cloy LLP

Judge Martin Glenn
November 25, 2013
Page 3

Despite submitting a written report rebutting the Opening Fazio Report, Mr. Renzi presented numerous new opinions about Mr. Fazio's analysis for the first time in his direct trial testimony. These opinions should be excluded. Specifically, Mr. Renzi's Direct Testimony opines, in paragraphs 5, 6 and 28 through 32, that the Fazio Report contains flawed and incorrect assumptions and provides a detailed discussion of such purported deficiencies. As Mr. Renzi admitted during cross examination, none of the opinions contained in the section of his Direct Testimony titled "Rebuttal to Fazio Opening Report – Summary of Mr. Fazio's Assumptions" was disclosed in the Renzi Rebuttal Report. There is no reason why it could not have been.

In paragraph 5 of his Direct Testimony, Mr. Renzi states that it is his "opinion that the various scenarios Mr. Fazio ran through his model (the "<u>Fazio Model</u>") as 'sensitivity outputs' in that report are premised on unreasonable assumptions in light of the Global Settlement." (Direct Testimony ¶ 5.) This is repeated in paragraph 28 which states that "Mr. Fazio runs his model to reflect certain assumptions that I believe are unreasonable on a combined basis." (*Id*. ¶ 28.) The Renzi Rebuttal Report contains no discussion of whether Mr. Fazio's assumptions are reasonable. At trial, Mr. Renzi conceded that the substance of these paragraphs was not explicitly disclosed in his rebuttal report.

> Q. Mr. Renzi, can you show me where in your rebuttal report you talk about any errors or deficiencies in Mr. Fazio's analysis or assumptions?
>
> A. I think that it's -- **I would say that it's implicit but not explicit**.
>
> Q. And so none of the five paragraphs of explicit deficiencies, incorrect assumptions, and other mistakes made by Mr. Fazio that you detail at length in over two pages in your expert -- in your direct testimony are expressly included in your rebuttal report; is that right?
>
> A. Well, just to be clear, my rebuttal to Opening Fazio Report is what's stated, so I'm a little confused by the way you're using the terminology. **My expert report doesn't explicitly say it**, but I do believe that Mr. Fazio is creating a simplistic world when he's running some of his scenarios and that I needed to address that in my direct testimony. . . .

(Tr. 230:23-231:13, Nov. 20, 2013 (emphasis added).)

Milbank, Tweed, Hadley & M<u>c</u>Cloy LLP

Judge Martin Glenn
November 25, 2013
Page 4

Paragraphs 29 through 32 expand on the new opinion presented in paragraphs 5 and 28, and articulate four different assumptions that Mr. Renzi opines are unreasonable. These opinions are not contained in his Rebuttal Report. For example, at paragraphs 29 and 30, Mr. Renzi criticizes Mr. Fazio's model based on conclusions presented in Mr. Bingham and Ms. Gutzeit's expert reports. The Renzi Rebuttal Report does not even mention Mr. Bingham or Ms. Gutzeit. At trial, Mr. Renzi could not identify where any of these opinions were disclosed:

> Q. Expert Report of Mark A Renzi, Intercompany Balances, dated November 1, 2013. **Mr. Renzi, can you show me where in this rebuttal report you include the statements and opinions that are included in paragraph 30 of your expert -- of your direct testimony?**
>
> **A. Well, I'm not sure -- I mean, I'm not sure I can find it.**
>
> **Q. Is it possible that it's not in here?**
>
> **A. It's possible**.
>
> Q. And Mr. Renzi, is it possible that none of the opinions that you express in paragraphs 28 through 32 in the section titled "Summary of Mr. Fazio's Assumptions, Rebuttal to Opening Fazio Report" are included anywhere in the rebuttal report that you submitted in this case?
>
> A. I'm not exactly sure what you're getting at, honestly.

(*Id*. at 229:13-230:01 (emphasis added).)

Moreover, in paragraph 6, Mr. Renzi opines on the reasonableness of certain assumptions contained in the alternative scenarios presented in Mr. Fazio's rebuttal report. Under Rule 7026(a)(2)(D), this opinion needed to be disclosed as set forth in the Court-ordered Discovery Protocol. The Discovery Protocol clearly established the process to be followed in expert disclosures, and did not allow for rebuttal of rebuttal opinions. Both the opening and rebuttal expert reports were to be exchanged simultaneously. If the Debtors wanted to have an opportunity to rebut any rebuttal opinions presented by the JSNs' experts, they could have proposed a staggered expert disclosure schedule. Having not done so, they cannot be permitted to submit further rebuttal opinions at trial through direct testimony.

Mr. Renzi made clear that the opinions being offered in paragraphs 28 through 32 of his Direct Testimony are expert opinions, subject to disclosure under Rule 7026(a).

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Judge Martin Glenn
November 25, 2013
Page 5

> Q. And are those your expert opinions about the deficiencies and the assumptions of Mr. Fazio?
>
> A. Yes. Mr. Fazio has been involved in this case just during litigation, has not been involved very long. I've been involved in this case for almost two years. **So I would say yes, that is my expert opinion**.

(*Id*. at 231:18-23 (emphasis added).)

Debtors offer no explanation why Mr. Renzi did not include the opinions expressed in the "Rebuttal to Opening Fazio Report" section of his Direct Testimony in his rebuttal report. Debtors did not seek to reopen expert discovery or to file a supplemental report; instead they had Mr. Renzi present new opinions at trial. The JSNs and the Notes Trustee are harmed by the Debtors' failure to disclose Mr. Renzi's opinions because they were unable to effectively cross-examine Mr. Renzi on these new opinions or determine whether supplemental expert discovery would have been necessary. These opinions were also not disclosed or examined during Mr. Renzi's deposition. In fact, Mr. Renzi provided testimony at his deposition that is directly contrary to the new opinions being offer in his Direct Testimony. For example, Mr. Renzi testified during his deposition that unwinding all of the inter-debtor debt forgivenesses since 2008 would net against the reduction in intercompany claim amount that he identified in his rebuttal report. (*See* Renzi Dep. 127:11-128:18, an excerpt of which is attached hereto as Ex. C.) His new opinion, however, appears to be that there would be no netting because the JSNs would not have a lien on such reinstated balances. (*See* Direct Testimony ¶¶ 5, 30.) The JSNs and the Notes Trustee were not able to explore with Mr. Renzi the application of his new opinion on his other analyses, including how he could offset a reinstated general unsecured liability against a secured asset. Because none of Mr. Renzi's expert opinions contained in these paragraphs of his direct testimony were disclosed in either of his expert reports, this testimony violates Rule 7026(a)(2)(B) and should be excluded.

Accordingly, the JSNs and the Notes Trustee respectfully request that the Court strike paragraphs 5, 6, and 28 through 32 of the Mr. Renzi's Direct Testimony.

Respectfully submitted,

/s/ Atara Miller

Atara Miller

# **<u>Exhibit A</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

<u>**EXPERT REPORT OF MARK A. RENZI**</u>

**October 18, 2013**

1.      I am a Senior Managing Director in the Corporate Finance/Restructuring practice at FTI Consulting, Inc. ("FTI").  FTI is one of the financial advisors to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").  I submit this report (the "Report") in support of confirmation of the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153], as may be amended from time to time (the "Plan"), filed in connection with the above-captioned chapter 11 cases (the "Chapter 11 Cases").[1]  Specifically, I submit this Report to set forth summaries of my conclusions that:  (a) the Plan is in the best interest of creditors and satisfies the requirements of Section 1129(a)(7)(A)(ii) of the Bankruptcy Code, and (b) the limited partial consolidation of the Debtors' estates (for description and distribution purposes only) under the Plan is reasonable and appropriate and does not harm creditors.

2.      I have read and am familiar with the terms and provisions of the Plan and the Disclosure Statement, as amended.  Except as otherwise noted, the facts and analyses presented in this Report are based upon my personal knowledge, my review of various documents and information, my discussions with the Debtors and their other advisors, information prepared and provided by the Debtors, my familiarity with the Debtors' business, operations and financial condition, and my experience, which I describe below.  In preparing this Report, I have been assisted by other professionals working at my direction and under my supervision.  In those instances where tasks were performed by my colleagues, I reviewed their work and determined that it was appropriate to rely upon that work.

3.      My opinions and analyses are based on currently available information.  My work that forms the basis for this Report is ongoing and I plan to analyze any new relevant information

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

that is identified, becomes available, or is presented by objectors to the Plan, their experts and

other parties in interest.  If necessary, I will modify this Report.  My Report may be

supplemented by deposition or actual testimony.[2]

## Summary of Opinions

4.      Based on the results of the material and data I have reviewed and analyzed as well

as assumptions relied upon as more fully described below, combined with my specific

experience in providing restructuring advice, it is my opinion that:

- *"Best Interest of Creditors" Test:*  The hypothetical liquidation analysis attached as Exhibit 8 to the Disclosure Statement ("Liquidation Analysis") contains reasonable assumptions regarding: (a) the proceeds that could be obtained from a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code, (b) the costs associated with a wind-down of the Debtors' Estates under Chapter 7, and (c) the claims that have been or may be asserted against the Debtors, including the complexity of certain of such claims.  Based upon the assumptions set forth in the Liquidation Analysis, as of the Effective Date of the Plan, each holder of a claim or interest of each impaired class of claims or interests will likely receive or retain under the Plan a recovery that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7.  Therefore, the Plan satisfies the "best interest of creditors" test in Section 1129(a)(7)(A)(ii) of the Bankruptcy Code with respect to each Debtor.

- *Limited Partial Consolidation of the Debtors' Estates*:  No creditors are harmed by the limited partial consolidation of the Debtors' Estates for distribution purposes only.

## Background

5.      FTI is one of the Debtors' financial advisors.  From and after April 2007, the

Debtors periodically engaged FTI to provide financial advisory services.  In the summer of 2011,

the Debtors retained FTI to perform financial advisory services as it prepared to seek Chapter 11

bankruptcy protection.  On July 25, 2012, this Court approved the initial retention of FTI as a

financial advisor to the Debtors in these Chapter 11 Cases [Docket No. 902].  This retention has

---

[2]      In connection with the Confirmation Hearing, I may present selected pages of the documents and information I have relied upon.  In addition, I may prepare graphical or illustrative exhibits based on the contents of this Report, the documents and information considered, and my analysis of the documents and information.

since been amended or supplemented from time to time pursuant to further orders of the Court

[Docket Nos. 902, 3104, 3308, 3971, and 4417].

6.      During the course of this retention, the Debtors asked FTI to assist with, among

other things, the preparation of financial related disclosures, claims management and claims

resolution, advising the Debtors on accounting matters related to the bankruptcy filing, the

preparation of financial information for distribution to creditors and others, and assist with the

preparation of information and analysis necessary for confirmation of a plan of reorganization.

FTI has also provided and continues to provide additional support and analysis to the Debtors as

part of these cases.

7.      I have led a team of FTI professionals that performed a variety of financial

analyses for the Debtors during the course of FTI's retention.  Specifically, my team and I

worked with the Debtors and their investment bankers and legal advisors in connection with the

preparation of the Plan, the recovery analysis (the "Recovery Analysis") and the Liquidation

Analysis.  I have attached to this Report as Annex A and Annex B copies of the Recovery

Analysis and the Liquidation Analysis, respectively.

8.      Under the terms of its retention by the Debtors, FTI is entitled to seek to be

compensated on an hourly basis, based upon FTI's customary hourly rates, plus reimbursement

of actual and necessary expenses incurred by FTI, subject to certain monthly caps on such

compensation.  FTI is also entitled to seek compensation in excess of the monthly caps with

respect to certain litigation support services, including in connection with providing services as a

testifying expert or as a consulting expert, and is also entitled under certain circumstances to seek

an award of a completion fee [Docket Nos. 902, 3104, 3308, 3971, and 4417].  Compensation

payable to FTI in connection with the preparation of this Report is not contingent on the nature of my findings.

## **Experience**

9.       I received my Bachelor of Arts degree in economics from Washington College and a Master's degree in finance from Boston College.  I also attended the Scuola di Administrazione Aziendale at the University of Turin, School of Business.  Before joining PricewaterhouseCoopers (the predecessor firm to FTI) in 2001, I worked at a boutique money management firm in New York evaluating and trading derivative portfolios.

10.       I am currently employed as a senior managing director in the FTI Consulting Corporate Finance/Restructuring practice, and I am a member of FTI's Financial Institutions industry group.  While at FTI, I have held various positions in which I was responsible for analyzing and preparing financial analysis and planning and business plan development.  During my nearly 20 years of business experience and more than twelve years of financial consulting experience, I have practiced in a broad range of industries, including, among others, financial services, retail, manufacturing, distribution, derivative portfolio management, healthcare, consumer credit, and telecommunications.

11.       I have provided restructuring services on more than 25 engagements in both out-of-court workout situations and in Chapter 11 proceedings, including many large and high profile national and international engagements, such as (but not limited to): CIT, Inc., Credit-Based Asset Servicing and Securitization (C-BASS), The Education Resources Institute, American Business Financial Services, Thaxton Financial, Oakwood Homes Corporation, a $4 billion international chemical company, and a $2 billion international recreational products company.

12.       My experience includes a wide range of assignments, including liquidity and capital structure assessment, debt and equity restructuring advice, identification of reorganization

5

alternatives, and day-to-day management activities, including the development of pro forma

financials, cash flow management, and the identification of liquidity enhancing activities.  In

addition, I have assisted companies in Chapter 11 cases in the preparation of complex recovery

and liquidation analyses, examining compliance with the "best interest" test, and in evaluating

distributions and recoveries among creditors.   Among the clients for whom I have provided these

analyses are Oakwood Homes Corporation, CIT, Inc., and The Education Resources Institute.   In

addition, I have prepared complicated recovery and liquidation analyses in non-bankruptcy

matters in cases including C-BASS as well as other cases which are confidential in nature.

13.     I am a member of several professional organizations, including the Association of

Insolvency and Restructuring Advisors and the Turnaround Management Association.   I have

provided testimony in The Education Resources Institute bankruptcy matter and expert testimony

in these Chapter 11 Cases in connection with the JSN Adversary Proceeding.

### Supporting Material

14.     Attached hereto as Annex C is a list of the documents I have considered in

forming the opinions herein.  Attached hereto as Annex D is my curriculum vitae.

### The Plan Satisfies the "Best Interest of Creditors" Test

### A.  Liquidation Analysis Generally

15.     The Liquidation Analysis contained in the Disclosure Statement provides an

estimation of recoveries that would be generated from the liquidation of the Debtors' assets and

properties in the context of a proceeding under Chapter 7 of the Bankruptcy Code, as well as a

projection of costs associated with Chapter 7 liquidation.  (Liquidation Analysis ¶ 1.)  In both

cases, the Liquidation Analysis assumes a conversion to Chapter 7 utilizing a commencement

date of April 30, 2013.   (Liquidation Analysis ¶ 2.)   The Liquidation Analysis also examines

how a hypothetical Chapter 7 scenario might impact the recoveries of holders of Claims and

Equity Interests in the Debtors.

16.     I have supervised FTI's work to assist the Debtors in the preparation of the

Liquidation Analysis demonstrating the estimated recoveries that holders of Claims and Equity

Interests in each of the Debtors that have creditors would receive if each Debtor were liquidated

under Chapter 7.[3]  I, along with other FTI professionals under my supervision, reviewed various

financial analyses prepared by employees and management of the Debtors and participated in

numerous discussions with management of the Debtors and other Debtor professionals to prepare

the Liquidation Analysis.

17.     In preparing the Liquidation Analysis, my team and I worked with the Debtors'

employees and management, investment bankers, and the Debtors' counsel to make certain

assumptions[4] regarding the estimated proceeds expected to be received from the accelerated

disposition of the Debtors' assets.  Those assumptions are set forth in the Liquidation Analysis

attached to the Disclosure Statement and are reasonable.  Given the complexity of the Debtors'

assets, if the Debtors' cases were converted to Chapter 7, it is reasonable to estimate that it

would take a Chapter 7 trustee approximately twelve months following the appointment to assess

and monetize the Debtors' assets.  (Liquidation Analysis ¶ 2.)  Many of the Debtors' assets are

complex mortgage assets, including FHA/VA loans, whole loans, claims from various

governmental agencies, MSRs and associated servicer advances, other securitized HELOCs,

---

[3]     The Liquidation Analysis only analyzes potential recoveries for creditors at Debtors that have assets
available for distribution.  Debtors that do not have assets are listed on the "Summary of Unscheduled Entities."
(Liquidation Analysis at 24.)

[4]     The Liquidation Analysis and the assumptions upon which it relies are inherently subject to significant
economic, competitive, and operational uncertainties beyond the control of the Debtors.  For example, the
Liquidation Analysis may not include all liabilities that could arise as a result of additional litigation, potential tax
assessments, or other unanticipated liabilities.  Further, the actual amount of Claims against the Debtors' Estates
could vary significantly.

REO properties, trading securities, and derivative assets that would take substantial time and

expertise to accurately review and value.  (Id. ¶¶ 18-26.)

18.    The Liquidation Analysis also assumes that it would likely take a Chapter 7

trustee a significant amount of time to investigate, reconcile, negotiate and/or begin to litigate the

approximately 4,700 Claims remaining on the Debtors' claims register.  (Id. ¶ 35.)  As set forth

in the Liquidation Analysis, stakeholders have filed many extremely large, complex, and

competing claims.  Final resolution of these claims will demand the resolution of such complex

issues as the extent and validity of the Junior Secured Noteholders' liens and claims, the nature

and extent of the Claims filed by the RMBS Trustees, whether the RMBS Trustee's claims

should be subordinated to the claims of other general unsecured creditors, subordination,

validity, and amount of the Claims filed by various monoline insurers, issues relating to

subordination, validity, and amount of the Claims filed by securities claimants, the validity and

amount of the Borrower Claims asserted against the Debtors, and complex issues regarding

intercompany balances, fraudulent conveyance claims arising out of approximately $16 billion in

pre-petition debt forgiveness, and the potential substantive consolidation of the Debtors.  (See

generally Disclosure Statement at 2-4.)  In light of the time it would take a Chapter 7 trustee to

review, resolve, or litigate these claims, it is reasonable to assume that winding down the

Debtors' estates in a Chapter 7 scenario would last for a period of three years and possibly

significantly longer.  (Liquidation Analysis ¶ 3.)

19.    In light of the complexities of these Chapter 11 Cases and the inherently

conflicting claims that have been or could have been asserted against the Debtors absent the

Global Settlement contained in the Plan, the Liquidation Analysis reasonably assumes that costs

and expenses under the Chapter 7 scenario will be higher than expenses under the Plan.  (Id. ¶

8

34.)  This is assumed because (i) payments must be made to a Chapter 7 Trustee, and (ii) restructuring professional fees and ordinary course professional fees are estimated to be higher due primarily to potentially extensive third party litigation that the Estates would most likely need to defend and pursue for purposes of settling claim amounts and monetizing assets.

20.     The Liquidation Analysis does not attempt to estimate Estate recoveries arising from affirmative damage claims against third parties (including avoidance actions and potential claims against Ally and its non-Debtor affiliates) and does not assume any additional expenses associated with pursuing such claims.  The Liquidation Analysis does not include any such potential recoveries because, as with other litigation claims, the outcome of such actions would be highly speculative and dependent on numerous uncertain variables including: (i) the probability of successful judgments; (ii) the cost and time required to litigate the affirmative claims; and (iii) any offsetting claims third parties and/or Ally may have against the Debtors.

21.     The Liquidation Analysis assumes the $2.1 billion Ally Contribution provided for under the Plan would not be available in a liquidation.  The Ally Contribution is specifically conditioned on Ally obtaining broad third-party releases. Because third-party releases are not available in a Chapter 7 liquidation, the Liquidation Analysis assumes the Ally Contribution would not be made and the Global Settlement would not be consummated.  In the absence of the Global Settlement, third parties would continue to pursue significant claims and causes of action against Ally and its affiliates.  It is my understanding based on discussions with Debtors' counsel that litigation by third parties against Ally could trigger indemnity claims from Ally against the Debtors' Estates.  In addition to the costs that could be associated with defending against such claims, if those claims were successful and were not disallowed as contingent or equitably subordinated, they could offset any potential recoveries on account of estate claims against Ally.

9

22.    Additionally, for purposes of the Liquidation Analysis, it is assumed that the

Junior Secured Noteholders are significantly undersecured.  Currently, the Debtors and the

Committee are engaged in extensive litigation with the Junior Secured Noteholders regarding the

scope of the Junior Secured Noteholders' liens and the amount and validity of the Junior Secured

Notes Claims.  It is my understanding that the Junior Secured Noteholders assert that they are

significantly oversecured and have valid liens on substantially more of the Debtors' assets than

was assumed in this Liquidation Analysis.  The Liquidation Analysis assumes that the Debtors

and the Committee prevail on each of their arguments with respect to the scope of the Junior

Secured Noteholders' liens in the JSN Adversary Proceeding, and the Bankruptcy Court finds

that, among other things, the Junior Secured Noteholders are undersecured.  To the extent the

Junior Secured Noteholders are ultimately successful in the JSN Adversary Proceeding, the

assets available for distribution to unsecured creditors (and the unsecured creditors'

corresponding recoveries) in the Liquidation Analysis would decrease.

23.    Based upon the assumptions set forth in the Liquidation Analysis, each holder of a

claim or interest of each impaired class of claims or interests will likely receive or retain under

the Plan a recovery of a value, as of the Effective Date of the Plan, that is not less than the

amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7.

Because of the $2.1 billion contribution that Ally is making to fund creditor recoveries and the

settlements embodied in the Plan, confirmation of the Plan will result in meaningfully higher

recoveries for creditors than such creditors would likely receive in a hypothetical Chapter 7

scenario.[5]  Accordingly, the Plan meets the requirements of Section 1129(a)(7)(A)(ii) and is in

---

[5]    As discussed below, because the Recovery Analysis and the Liquidation Analysis show that there are
estimated to be more assets than claims at Debtor Executive Trustee Services, LLC ("ETS"), holders of General
Unsecured Claims at ETS will be entitled to receive the same recovery under the Plan as they would be entitled to

the best interest of all holders of Claims and Equity Interests in all classes of the Plan of each of
the Debtors.

**B.  Plan Treatment of Creditors of ETS**

24.    With respect to those Unsecured Claims asserted against ETS (a subsidiary of
GMACM that would have otherwise been a member of the GMACM Debtors), the Plan provides
that holders of Allowed ETS Unsecured Claims will receive their pro rata share of cash equal to
the value of assets available at the ETS Estate after payment of all allowed claims senior in
priority.  As a result of a review and analysis by FTI and the Debtors' management of each
Debtor's assets and the estimated Allowed Claims against each Debtor's estate, it became
apparent that the unencumbered assets available at ETS would give holders of ETS Unsecured
Claims a greater recovery in a Chapter 7 liquidation than they would receive as a holder of a
General Unsecured Claim against the GMACM Debtor Group under the Plan.  Accordingly, the
Plan properly provides for separate classification and treatment of the ETS Unsecured Claims,
and ensures that holders of Allowed ETS Unsecured Claims will receive the same recovery in
both a hypothetical Chapter 7 scenario and under the Plan.  Section 1129(a)(7)(A)(ii) is therefore
satisfied as to holders of ETS Unsecured Claims.[6]

**C.  Plan Treatment of the FHFA Claims**

25.    FHFA filed claims against ResCap, RFC, and four entities with no assets.  The
FHFA Claims have been classified under the Plan as Class R-11 against the ResCap Debtors and

---

receive under a hypothetical Chapter 7 liquidation scenario.  ETS is a direct subsidiary of GMACM and, therefore
falls within the GMACM Debtor Group, as defined in the Plan.

[6]      The Debtors and FTI have not yet completed the claims reconciliation process at ditech, LLC ("ditech").
To the extent that holders of General Unsecured Claims at Debtor ditech vote to reject the Plan and the pre-
confirmation claims reconciliation process reveals that there are Allowed General Unsecured Claims at ditech that
would receive less under the Plan than under a liquidation scenario, it is my understanding that the Plan Proponents
would have to amend the Plan to provide creditors with payment in full of such Allowed Claims.  (See Disclosure
Statement at 40 ("To the extent the Plan of a particular Debtor does not meet the 'best interest of creditors' test,
distributions under the Plan may be modified, as needed, to satisfy this test, with the consent of the Consenting
Claimants, which consent shall not be unreasonably withheld.").)

Class RS-11 against the RFC Debtors.  The Plan contemplates that the estates will seek to

subordinate the FHFA Claims pursuant to section 510(b) of the Bankruptcy Code (in which case

those claims would not be entitled to a recovery), but provides alternate treatment to the extent

the Bankruptcy Court finds that such claims are not subject to subordination.  To the extent the

FHFA Claims are not subordinated under section 510(b) of the Bankruptcy Code, the Plan

provides that they will receive a distribution in excess of the estimated recovery they would

receive in a Chapter 7 liquidation, accounting for the fact that no holder of an FHFA Claim is

subject to the Third Party Releases.  A full description of the treatment of the FHFA Claims is

contained in Article III.D of the Plan.

26.    Specifically, with respect to the FHFA Claims asserted against the ResCap

Debtors, the Plan currently provides that holders of FHFA Claims in Class R-11 shall receive no

recovery on account of such Claims, unless the Bankruptcy Court determines that the FHFA

Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, in which

case each holder of an Allowed ResCap FHFA Claim shall receive a distribution in Cash equal to

0.001% of such holder's Allowed ResCap FHFA Claims.  Upon a further review of the

Liquidation Analysis and its claims assumptions, and the FHFA Claims asserted against ResCap,

I understand from Debtors' counsel that the Plan Proponents will be amending the Plan to

provide that FHFA Claims in Class R-11 will receive a distribution in Cash in a percentage

greater than 0.0587% of its Allowed ResCap FHFA Claim at ResCap to the extent that the Court

determines that the FHFA Claims are not subject to subordination under section 510(b) of the

Bankruptcy Code.  The analysis of the FHFA Claims against ResCap assumes that the Plan will

be amended to provide such modified treatment.

27.     The Liquidation Analysis projects that holders of General Unsecured Claims against ResCap will receive a recovery of 0.1% on the low end and 0.2% on the high end in a Chapter 7 liquidation.  As an initial matter, the low and high recoveries of 0.1% and 0.2% were rounded for purposes of consistency in the Liquidation Analysis.  A more precise calculation reveals that General Unsecured Creditors would receive approximately 0.0587% in a low scenario and 0.1899% in a high scenario.  Based on the current assumptions contained in the Liquidation Analysis, I believe the "best interests" test is satisfied as to FHFA at ResCap for the reasons stated below.

28.     The high recovery in the ResCap Liquidation Analysis (estimated at 0.1899%) assumes that all securities claims, including those asserted by FHFA, are subordinated or disallowed on the merits.  Accordingly, this scenario is not applicable to FHFA because it assumes that all securities claims, including those asserted by FHFA, are subordinated or disallowed on the merits and therefore not be entitled to receive any recovery.  Likewise, the low scenario, where creditors would receive a hypothetical recovery of 0.0587% of their claims, reflects the assumption that the securities claims at ResCap, even if not subordinated, are allowed at approximately 16% of the asserted amount based upon discussions with the Debtors' counsel that it is unlikely that securities claimants would succeed on a claim against ResCap based upon alter ego, veil piercing, aiding and abetting or similar theories.  It is my understanding from discussions with the Debtors' counsel that other holders of securities claims assert substantially the same legal arguments in support of their claims as those asserted by FHFA, and therefore to the extent that FHFA's claims were to be allowed at 100% in a liquidation scenario, it would be reasonable to assume that other securities claims would also be allowed at 100%.  As a result, FHFA's percentage recovery would be diluted by increased recoveries to other similar claimants.

13

In addition, to the extent that FHFA is successful on a claim against ResCap based upon alter

ego, veil piercing, aiding and abetting or similar theories, other claimants with similar theories of

recovery at ResCap are equally likely to be able to recover on account of their claims against

ResCap on similar bases, which would further reduce FHFA's percentage recovery in the low

scenario.  Finally, additional expenses would have to be incurred by ResCap to reconcile and

defend claims against the estate, further reducing recoveries to creditors.  Thus, based on the

assumptions in the Liquidation Analysis, and for the reasons discussed above, it is reasonable to

conclude that FHFA will not recover more than 0.0587% of its allowed claims in a hypothetical

liquidation.

29.    Accordingly, based upon the foregoing, including the assumptions contained in

the Liquidation Analysis and the amendments to be incorporated in the Plan, I believe the "best

interests" test is satisfied at ResCap as it is unlikely that FHFA could recover more than .0587%

of its allowed claims in a Chapter 7 liquidation in either the low or high liquidation scenarios.

30.    With respect to the FHFA Claims asserted against the RFC Debtors, the Plan

provides that holders of FHFA Claims in Class RS-11 shall receive no recovery on account of

such Claims, unless the Bankruptcy Court determines that the FHFA Claims are not subject to

subordination under section 510(b) of the Bankruptcy Code, in which case each holder of an

Allowed FHFA Claim against the ResCap Debtors shall receive a distribution in Cash equal to

2.0% of such holder's Allowed FHFA Claim as soon as practicable after the later of the Effective

Date or the allowance of such Claim.

31.    The Liquidation Analysis assumes that holders of General Unsecured Claims

against RFC will receive a recovery of 1.9% on the low end and 3.6% on the high end.  At RFC,

the high scenario (with a recovery estimated at 3.6%) assumes that all securities claims,

14

including those asserted by FHFA, are subordinated or disallowed on the merits.  Accordingly, in

the high end scenario of the Liquidation Analysis, FHFA will not receive a recovery on its

claims.  Likewise, the low end scenario, where creditors would receive a hypothetical recovery

of 1.9% of their claims, reflects the assumption that the securities claims at RFC are allowed at

50% of their asserted amounts to reflect litigation risk.  To the extent that FHFA asserts that its

claim should be allowed at 100% in a liquidation scenario, it would be reasonable to assume that

other securities claims, which, to my understanding after discussions with the Debtors' counsel,

make substantially the same legal arguments as FHFA in support of their claims, would also be

allowed at 100%.  As a result, FHFA's percentage recovery would be diluted by increased

recoveries to other similar securities claimants.  Thus, based on the assumptions in the

Liquidation Analysis, and for the reasons discussed above, it is reasonable to conclude that

FHFA will not recover more than 2.0% of its claims in a hypothetical liquidation.

32.    The foregoing description of the recovery scenarios for FHFA at ResCap and

RFC under the Liquidation Analysis are reflected in the chart below:

| ($ millions) | | Liquidation Analysis | | | | |
| | | Liquidation - Low | | Liquidation - High | | |
| Legal Entity | Estimated Allowed Claims | GUC | Securities Claims | GUC | Securities Claims | Proposed Plan (FHFA) |
|---|---|---|---|---|---|---|
| Residential Capital, LLC | $ 330 | 0.0587% | 0.0587% | 0.1899% | 0.0000% | > 0.0587% |
| Residential Funding Company, LLC | $ 1,000 | 1.9293% | 1.9293% | 3.6205% | 0.0000% | 2.0000% |

**Notes**

Securities claims asserted at Residential Capital, LLC include claims asserted by the Private Securities Claimants, NJ Carpenters and FHFA. Securities claims asserted at Residential Funding Company, LLC include claims asserted by the Private Securities Claimants, NJ Carpenters, FHFA, and the National Credit Union Administration Board.

As set forth above, in the high liquidation scenario, securities claims are presumed to be subordinated to General Unsecured Claims or disallowed on the merits, and accordingly, under such circumstances, such claims will not be entitled to receive any recovery on account Proposed recovery of FHFA at Residential Capital, LLC will be greater than 0.0587%.

## The Limited Partial Consolidation of the Debtors

33.     The Plan provides for partial consolidation of the Debtors into three (3) Debtor Groups, as described in the Disclosure Statement, for the limited purposes of describing their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan. It is my opinion that no creditors are harmed by the proposed grouping of the Debtors. The vast majority of the assets of the Debtors' estates reside at ResCap, GMACM, and RFC, with the Debtor subsidiaries within each Debtor Group having little to no assets available for distribution to creditors. In addition, the majority of Claims asserted against the Debtors are asserted against ResCap, GMACM, and RFC, with, in limited circumstances, *de minimis* Claims asserted against the other Debtor subsidiaries within a Debtor Group. Therefore, in light of the location of the Claims and assets, the limited partial consolidation proposed in the Plan confers the benefits of convenience and expedience without compromising creditor recoveries at any Debtor.[7]

34.     Further, holders of the Junior Secured Notes, in my opinion, are not harmed by the limited partial consolidation. Intercompany Balances are being compromised and waived as part of the Global Settlement and not as a result of the limited partial consolidation. It is my understanding from Debtors' counsel that if the Court determines that the holders of Junior Secured Notes are entitled to post-petition interest, they will receive payment on account of that interest under the Plan, regardless of whether or not the Debtor Groups are consolidated. Therefore, it is my opinion that holders of Junior Secured Notes are not harmed by the limited partial consolidation that is contemplated by the Plan.

---

[7]     As described above, there are two entities that posed a potential issue when partially consolidating the Debtors' Estates for description and distribution purposes, ETS and ditech. With respect to ETS, the treatment of ETS Unsecured Claims has been isolated in the Plan, and creditors of ETS will receive what they would be entitled to in a liquidation scenario. With respect to ditech, the Debtors and FTI are continuing to conduct the claims resolution process and, to the extent necessary, the Plan would have to be modified to provide creditors of ditech the recoveries they would be entitled to in a liquidation scenario.

35.     Finally, the Plan satisfies the "best interest of creditors" test at each individual

Debtor entity (including as to ETS, as described above) and the proposed structure of the partial

consolidation proposed in the Plan will not give a class of creditors a higher potential recovery in

a hypothetical Chapter 7 scenario than under the Plan.  Accordingly, it is my opinion that the

limited partial consolidation is appropriate under the circumstances.

_____
Mark A. Renzi
October 18, 2013

# ANNEX A

# RECOVERY ANALYSIS

# RESIDENTIAL CAPITAL, LLC

1.      The Recovery Analysis[1] is based on the planned orderly wind-down of the assets remaining in the Estates as of April 30, 2013.  The recovery from these assets, along with cash on hand as of April 30, 2013 and the proceeds from the settlement with Ally Financial, Inc. (the "Ally Contribution"), are then distributed to; i) holders of secured claims, ii) administrative and priority expenses, and iii) general unsecured claims.

2.      Estimates were made of the cash proceeds which might be realized from the orderly liquidation of the Debtors' assets.  The liquidation is based on asset balances as of April 30, 2013 with certain proforma adjustments[2] used to estimate recoveries. Recoveries to creditors are presented on an undiscounted basis and are assumed to occur over the course of 7 years with over 85% of recoveries occurring over the first 3 years.  There can be no assurance that the recoveries assigned to the assets will in fact be realized.

### Estimate of Costs

3.      The Recovery Analysis assumes the wind-down of the Estates lasts for a period of approximately 3 years for the settlement of claims, although certain asset realization costs will continue through 7 years. During this time the Debtors will incur administrative expenses for operating expenses, restructuring professional fees, foreclosure file review costs, and other items. There can be no assurance that the administrative expenses will not exceed the estimates included in this analysis.

4.      THE DEBTORS' RECOVERY ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF THE ORDERLY LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Recovery Analysis are a number of estimates and material assumptions that are inherently subject to significant economic, competitive, operational uncertainties and contingencies beyond the control of the Debtors.  In addition, various decisions upon which certain assumptions are based are subject to change.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the recovery values of the assets will result in an accurate estimate of the proceeds that will be realized.  In addition, amounts of Claims against the Estates could vary significantly from the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[2] The pro-forma adjustments were made to exclude certain assets that are either non-economic or securitized (i.e. assets with offsetting liabilities recorded on the balance sheet).  The asset balances also exclude certain accounting adjustments related to pre-paid expenses and accounts receivable, as well as entries recorded to estimate true-up payments for the asset sale transactions with Ocwen and Walter.

12-12020-mg   Doc 5948-1   Filed 11/25/13   Entered 11/25/13 15:49:34   Exhibit A
Pg 26 of 159

estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors
could vary materially from the estimates provided herein.

5.      THE RECOVERY ANALYSIS SET FORTH HEREIN WAS BASED ON THE
VALUES OF THE DEBTORS' ASSETS AS OF APRIL 30, 2013 WITH CERTAIN
PROFORMA ADJUSTMENTS.  TO THE EXTENT THAT OPERATIONS THROUGH SUCH
DATE WERE DIFFERENT THAN ESTIMATED, THE ASSET VALUES MAY CHANGE.
DELOITTE TOUCHE TOHMATSU LLP, THE INDEPENDENT REGISTERED PUBLIC
ACCOUNTING FIRM FOR RESCAP, HAS NOT EXAMINED, COMPILED OR
OTHERWISE APPLIED PROCEDURES TO THESE VALUES AND, CONSEQUENTLY,
DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH
RESPECT TO THE VALUES IN THE RECOVERY ANALYSIS.

## ASSET RECOVERY ASSUMPTIONS

### *Cash and Cash Equivalents*

6.      Cash and cash equivalents include cash in the Debtors' domestic bank accounts and other
cash equivalents.  The estimated recovery for this category of assets is 100%.

### *Restricted Cash*

7.      Restricted cash primarily consists of cash held at Ally Bank, escrow funds for GNMA
pooling agreements and other amounts held in escrow related to the Ocwen APA and Walter
Assignment, and other parties.  Outstanding amounts are estimated to be fully recovered in the
Recovery Analysis scenarios.

### *FHA/VA Mortgage Assets*

8.      Federal Housing Administration and Department of Veterans Affairs ("FHA/VA")
mortgage assets consist of mortgage loans, servicer advances, and accrued interest.  These assets
constitute the bulk of the Estates' remaining assets. The FHA/VA recovery calculation assumes
two primary resolution strategies, including: 1) recoveries through delivery of modified loans
into GNMA securitizations, and 2) recovery of loan principal, interest and advances through
FHA/VA insurance claims. The timing of claim recoveries is driven by the individual loan status
and is dependent on foreclosure status, presence of documentation deficiencies and geography.
Geography has become particularly important, as some judicial foreclosure states have an
average foreclosure timeline of 4 years.

9.      FHA/VA loans are assumed to have a blended net recovery rate of approximately 93% of
book value in the Recovery Analysis.

### *Non FHA/VA Mortgage Assets*

10.     The Estates' Non FHA/VA mortgage assets consist primarily of mortgage loans, servicer
advances and accrued interest on loans removed from Fannie Mae ("FNMA") and Freddie Mac
("FHLMC") securitizations, loans rejected from the Berkshire Hathaway asset purchase
agreement and other loans deemed to be non-marketable. These assets are not guaranteed by any
government agency.

11.     The Recovery Analysis assumes approximately 15% of the loan portfolio will be resolved through foreclosure or real estate owned ("REO") sales. The analysis further assumes a bulk sale of the remaining portfolio by the end of 2013. The Estates are currently preparing to market this portfolio. The blended recovery rate is assumed to be approximately 73% in the Recovery Analysis.

### *MSRs and Associated Servicer Advances*

12.     Mortgage servicing rights ("MSRs") and the associated servicer advances consist of assets excluded from the asset purchase agreements with Ocwen and Walter, due to various counterparty objections. The Estates are currently negotiating with the counterparties to resolve the objections and intends to sell these MSRs and servicer advances once settlements have been achieved. The blended recovery rate is assumed to be 103% of book value in the Recovery Analysis.

### *Other Debtors' Assets*

13.     Other Debtors' Assets consist primarily of securitized Home Equity Lines of Credit ("HELOCs"), REO properties, trading securities and derivative assets.

14.     The securitized HELOCs are comprised of current paying home equity lines which are projected to run off over the next 15 months.

15.     REO properties are assumed to be sold in the ordinary course.

16.     The GMAC 2010-01 securitization asset is assumed to continue paying off at historical rates over the first 2 years of the Estates. After the first 2 years, the securitization will be unwound through a cleanup call and the resulting whole loans will be sold at prices consistent with on-balance sheet FHA/VA loans.

17.     Derivative collateral is expected to be collected upon the completion of the delivery of modified loans into GNMA securitizations.

18.     The Other Debtors' Assets are expected to recover at a blended average rate of approximately 61% of book value in the Recovery Analysis.

### *Non-Debtors' Assets*

19.     Non-Debtors' Assets are comprised primarily of equity interests in the Debtors' foreign affiliates. These affiliates are working to liquidate assets and to resolve claims and litigation. The Debtors assume in the Recovery Analysis that they will be able to recover $24 million from non-Debtor affiliates.

### *Other Recoveries*

20.    Additional incremental recoveries are expected to materialize from client recoveries and broker fees from the wind-down of the originations pipeline, however, these fees are expected to be offset by incremental costs for the Berkshire loan repurchase true-up[3]. In total, incremental recoveries are estimated to generate approximately $0 net recovery.

### Ally Contribution

21.    The Ally Contribution is assumed to result in an additional contribution to the Estates of $2.1 billion in the Recovery Analysis. The Ally Contribution is comprised of $1.95 billion in cash to be paid on the Effective Date and $150 million on account of certain insurance claims. The Recovery Analysis assumes that $783 million of the AFI Contribution will be allocated to ResCap Debtors, $462 million will be allocated to GMACM Debtors, $462 million will be allocated to RFC Debtors and $393 million will be allocated to the Private Securities Claims Trust, Borrowers Claims Trust, and NJ Carpenters Claims Trust based on the plan term sheet.

## ADMINISTRATIVE EXPENSES

22.    Administrative expenses include payments for operating expenses, asset management costs, interest expense, professional fees, foreclosure file review related expenses, and post-petition accounts payable and accrued expenses.  Post-petition intercompany claims, which are subject to administrative priority status, are reflected in the April 30, 2013 cash balances by legal entity. The assumed total administrative expenses in the Recovery Analysis are $1.086 billion.

### Operating Expenses and Compensation and Benefits

23.    Operating expenses consist of a number of costs necessary to administer the Estates after April 30, 13. These costs are primarily related to compensation and benefits, document storage and destruction costs, transition service agreement expenses, ordinary course professional fees and other operating expenses and are assumed to be $379 million in the Recovery Analysis.

24.    The estimation for compensation and benefits assumes an initial headcount of 257 as of April 30, 2013 which winds down over the forecast period. By the expected Confirmation Date of October 31, 2013, headcount is anticipated to decline to approximately 135.  Compensation and benefits includes severance, retention, and incentive payments.

25.    Document storage and destruction costs include expenses relating to the physical retention and destruction of documents. The Recovery Analysis assumes that all document destruction occurs at the end of the three years.

26.    Transition service agreement ("TSA") costs reflect the current TSA agreements between the Estates and Ocwen, AFI, and Walter. The Recovery Analysis reflects all extensions, modifications, and terminations as currently known and the most recent pricing available.

---

[3] Excludes any adjustments related to Walter and Ocwen sale true-ups.

27.     Ordinary course (non-reorganization) professional fees are projected based on the analysis of historical costs of closed cases, discounted for a reduction in litigation costs due to the AFI Contribution.

28.     Other operating expenses consist primarily of overhead costs necessary to run the Estates. This category includes costs related to facilities, insurance, information technology, and taxes[4], as well as other miscellaneous expenses.

### *Direct Asset Management Costs*

29.     Direct asset management costs primarily consist of servicing and subservicing fees to Ocwen and custodial fees.

30.     Servicing and subservicing costs are a function of the delinquency status of the individual loans being serviced. Servicing and subservicing costs reflect fees for the full asset disposition period (i.e. 7 years). The Recovery Analysis includes $47 million of direct asset management costs.

### *Interest Expense*

31.     Interest expense consists of post-petition interest payments made on the senior secured AFI Revolver and AFI LOC facilities. As of the date of the Disclosure Statement, both the AFI Revolver and the AFI LOC have been paid in full and no additional interest expense is assumed in the forecast. Total interest included in the Recovery Analysis is $8 million.

### *Foreclosure File Review and Remediation Expenses*

32.     Foreclosure file review and remediation costs consist of (i) expenses related to the Debtors' pending final settlement with the Board of Governors of the Federal Reserve of the independent foreclosure review ("IFR") under the Consent Order, as well as (ii) expenses related to ongoing compliance with the DOJ/AG Settlement entered into by the Debtors with the Department of Justice and 49 state attorneys general. These include costs related to the pending IFR settlement, third party professional fee expenses, costs and related to the SCRA file review component of the DOJ/AG Settlement, and a pro-rata share of the ongoing fees and expenses of the Office of Mortgage Settlement Oversight during the DOJ/AG Settlement enforcement period. The $230 million IFR settlement was agreed in June 2013 and bankruptcy court approval will be sought during July 2013. Total foreclosure review and remediation costs are assumed to be $328 million in the Recovery Analysis.

### *Restructuring Professional Fee Expenses*

33.     Restructuring Professional Fee Expenses include those fees paid to professionals engaged by the Debtors, the Unsecured Creditors Committee ("UCC"), the Junior Secured Noteholders, the Residential Mortgage Backed Securities ("RMBS") trustees, the Examiner, the US Trustee,

---

[4] The Estates have retained advisors for tax matters. The tax estimate is presented based upon preliminary guidance the Estates have received from their tax advisors.  It should be noted that the tax analysis has not been completed, and accordingly the guidance may change and those changes may be material.

and the Chief Restructuring Office ("CRO"). Where applicable, forecasted fees are based on third party vendor forecast submissions. Restructuring professional expenses are assumed to be approximately $310 million in the Recovery Analysis.

**Claims**

*Ally Secured Claims*

34.    Secured claims are given priority under the Bankruptcy Code and are entitled to payment prior to any payment on unsecured claims.  Secured claims from secured facilities include the claims related to the Ally Revolver and the Ally LOC facilities.

*Junior Secured Notes*

35.    The JSNs' claim of $2.223 billion ($2.121 billion of principal plus $102 million of pre-petition interest) is assumed to be satisfied in full in the Recovery Analysis by the residual value of AFI Revolver collateral and pledged equity after the satisfaction of the AFI Revolver.

36.    The allocation of the JSN recoveries among the Debtors is listed below.  The Plan also contemplates that the JSN claims will be paid in full on the Effective Date.

| | |
|---|---|
| ResCap Debtors | 9% |
| GMACM Debtors | 60% |
| RFC Debtors | 31% |

*General Unsecured Claims*

37.    General Unsecured Claims include:

(1)    RMBS Trust Claims;

(2)    Monoline Claims;

(3)    Other General Unsecured Claims;

(4)    Borrower Claims; and

(5)    Senior Unsecured Notes

38.    The treatment of many of these claims in the Recovery Analysis is assumed to be subject to the settlement terms agreed upon by the Consenting Claimants.

39.    Per the terms of the settlement, the Monoline Claims held by MBIA Inc. ("MBIA") are assumed to be fully and finally allowed as non-subordinated unsecured claims of $719 million against the ResCap Debtors, $1.450 billion against the GMACM Debtors, and $1.450 billion against the RFC Debtors.  Pursuant to the FGIC Settlement Agreement, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, as of the Effective Date, the Allowed amounts of the General Unsecured

Claims held by FGIC shall be: $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors. On account of such Allowed General Unsecured Claims, FGIC shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, RFC Debtors Unit Distribution and ResCap Debtors Unit Distribution, as applicable. The Monoline Claims held by all other Monolines are assumed to be treated under the Plan as unsecured claims of the ResCap Debtors, the RFC Debtors or the GMACM Debtors, as applicable, or as otherwise approved by the Plan Proponents and the Consenting Claimants.

40.     Per the terms of the settlement, the plan incorporates a settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims through approval of the Debtors' prior agreement with the Institutional Investors, which covered 392 RMBS Trusts. The RMBS Settlement shall provide that all RMBS Trust Claims of the Original Settling Trusts and the Additional Settling Trusts shall be fully and finally allowed as non-subordinated unsecured claims in the aggregate amount of $7.051 billion for the Original Settling Trusts and in the aggregate amount of $250 million for the Additional Settling Trusts. The $7.301 billion of claims is allocated $210 million to the GMACM Debtors and $7.091 billion to the RFC Debtors; provided, however, the allowance and allocation of such claims shall not affect the distributions to be made in accordance with the RMBS Trust Allocation Protocol.

41.     Senior Unsecured Claims of $1.003 billion is assumed to be asserted against Residential Capital LLC and is assumed to recover pari passu with the general unsecured creditors at Residential Capital LLC.

42.     Other General Unsecured Claims are comprised of trade claims, lease rejections, and other unsecured claims and are assumed to be $92 million.

43.     Borrower Claims will be addressed through the establishment of a Borrower Claims Trust for the benefit of the holders of Borrower Claims at each of the Debtors and shall be funded in an amount of $57.6 million, subject to the Adjustments as defined in the Supplemental Term Sheet.

### Additional Securities Claims

44.     Per the terms of the settlement, the recoveries for Securities Claims have been fixed. These include the NJ Carpenters Claims totaling $100 million and Private Securities Claims totaling $226 million, plus a pro-rata share of incremental recoveries beyond amounts contemplated in the Term Sheet.

12-12020-mg   Doc 4819-4   Filed 08/23/13   Entered 08/23/13 16:49:39   Exhibit A
Pg 32 of 159

| Residential Capital, LLC and Subsidiaries |
| --- |
| Recovery Analysis |
| ($ Millions) |

| | | **Book Value** | | | |
| --- | --- | --- | --- | --- | --- |
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 1 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 2 | FHA/VA Mortgage Assets | - | 945.3 | - | 945.3 |
| 3 | Non FHA/VA Mortgage Assets | - | 39.4 | 7.3 | 46.7 |
| 4 | MSRs and Associated Servicer Advances | - | 189.2 | 21.8 | 211.0 |
| 5 | Other Debtors' Assets | 0.1 | 85.3 | 9.7 | 95.1 |
| 6 | Non-Debtor Assets (5) | - | - | - | - |
| 7 | Other Recoveries | - | - | - | - |
| 8 | **Total** | **$ 28.0** | **$ 1,298.3** | **$ 38.9** | **$ 1,365.2** |

| | | **Recoveries ($)** | | | |
| --- | --- | --- | --- | --- | --- |
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 9 | Restricted Cash | $ 27.9 | $ 39.2 | $ - | $ 67.1 |
| 10 | FHA/VA Mortgage Assets | - | 878.3 | - | 878.3 |
| 11 | Non FHA/VA Mortgage Assets | - | 27.6 | 6.4 | 34.0 |
| 12 | MSRs and Associated Servicer Advances | - | 189.5 | 28.4 | 217.9 |
| 13 | Other Debtors' Assets | - | 50.9 | 6.6 | 57.5 |
| 14 | Non-Debtor Assets | - | - | 24.2 | 24.2 |
| 15 | Other Recoveries | - | 5.5 | (6.8) | (1.3) |
| 16 | **Total** | **$ 27.9** | **$ 1,191.0** | **$ 58.8** | **$ 1,277.6** |

| | | **Recoveries (%)** | | | |
| --- | --- | --- | --- | --- | --- |
| | | ResCap Debtors | GMACM Debtors | RFC Debtors | Total |
| 17 | Restricted Cash | 100.0% | 100.0% | n/a | 100.0% |
| 18 | FHA/VA Mortgage Assets | n/a | 92.9% | n/a | 92.9% |
| 19 | Non FHA/VA Mortgage Assets | n/a | 70.1% | 87.1% | 72.8% |
| 20 | MSRs and Associated Servicer Advances | n/a | 100.2% | 130.3% | 103.3% |
| 21 | Other Debtors' Assets | 0.0% | 59.7% | 67.9% | 60.4% |
| 22 | Non-Debtor Assets | n/a | n/a | n/a | n/a |
| 23 | Other Recoveries | n/a | n/a | n/a | n/a |

---

[5] Book values for the recoveries of the non-debtor assets are not shown as these assets for Debtors' represent equity claims.

| | ResCap Debtors | GMACM Debtors | RFC Debtors | Settlement Payment | Total |
|---|---|---|---|---|---|
| **Residential Capital, GMACM and RFC** Recovery Analysis ($ Millions) | | | | | |
| **Distributable Value** | | | | | |
| 1  Cash | $ 143.5 | $ 2,037.8 | $ 1,496.9 | $ - | $ 3,678.3 |
| 2  Remaining Assets | 27.9 | 1,191.0 | 58.8 | - | 1,277.6 |
| 3  AFI Contribution | 782.7 | 462.3 | 462.3 | - | 1,707.4 |
| 4  Trust Contribution | - | - | - | 392.6 | 392.6 |
| 5  **Total Distributable Value** | **$ 954.1** | **$ 3,691.1** | **$ 2,018.0** | **$ 392.6** | **$ 7,055.9** |
| **Paydown of Sec. Debt and JSN** | | | | | |
| 6  Ally Revolver and Ally Line of Credit | $ - | $ (854.4) | $ (272.7) | $ - | $ (1,127.1) |
| 7  Total JSN Paydown | (205.3) | (1,334.5) | (683.1) | - | (2,223.0) |
| 8  **Total Paydown** | **$ (205.3)** | **$ (2,188.9)** | **$ (955.8)** | **$ -** | **$ (3,350.1)** |
| **Priority/Wind-Down** | | | | | |
| 9  Priority/Wind-Down | $ - | $ (836.3) | $ (249.8) | $ - | $ (1,086.2) |
| **Value Available to GUC** | | | | | |
| 10  Total Value Available to GUC | $ 748.8 | $ 665.9 | $ 812.4 | $ 392.6 | $ 2,619.6 |
| **GUC Claims** | | | | | |
| 11  Monolines | $ 1,056.5 | $ 1,939.0 | $ 1,945.8 | $ - | $ 4,941.3 |
| 12  RMBS Trusts | - | 209.8 | 7,091.2 | - | 7,301.0 |
| 13  Senior Unsecured Notes | 1,003.3 | - | - | - | 1,003.3 |
| 14  Other GUCs | 0.9 | 63.7 | 27.5 | - | 92.1 |
| 15  Securities Claimants | - | - | - | - | - |
| 16  Borrower Claimants | - | - | - | - | - |
| 17  **Total GUC Claims** | **$ 2,060.7** | **$ 2,212.5** | **$ 9,064.5** | **$ -** | **$ 13,337.7** |
| **GUC Recoveries ($)** | | | | | |
| 18  Monolines | $ 383.9 | $ 583.6 | $ 174.4 | $ - | $ 1,141.8 |
| 19  RMBS Trusts | - | 63.1 | 635.5 | - | 698.7 |
| 20  Senior Unsecured Notes | 364.6 | - | - | - | 364.6 |
| 21  Other GUCs | 0.3 | 19.2 | 2.5 | - | 22.0 |
| 22  Securities Claimants | - | - | - | 335.0 | 335.0 |
| 23  Borrower Claimants | - | - | - | 57.6 | 57.6 |
| 24  **Total GUC Recoveries ($)** | **$ 748.8** | **$ 665.9** | **$ 812.4** | **$ 392.6** | **$ 2,619.6** |
| **GUC Recoveries (%)** | | | | | |
| 25  Monolines | 36.3% | 30.1% | 9.0% | n/a | 23.1% |
| 26  RMBS Trusts | n/a | 30.1% | 9.0% | n/a | 9.6% |
| 27  Senior Unsecured Notes | 36.3% | n/a | n/a | n/a | 36.3% |
| 28  Other GUCs | 36.3% | 30.1% | 9.0% | n/a | 23.8% |
| 29  Securities Claimants | n/a | n/a | n/a | n/a | n/a |
| 30  Borrower Claimants | n/a | n/a | n/a | n/a | n/a |
| 31  **Total GUC Recoveries (%)** | **36.3%** | **30.1%** | **9.0%** | **n/a** | **19.6%** |

# ANNEX B

# HYPOTHETICAL LIQUIDATION ANALYSIS

# RESIDENTIAL CAPITAL, LLC

1.　　　The Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Chapter 11 Plan or (b) receive or retain property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if Residential Capital, LLC and its debtor subsidiaries/affiliates (collectively "ResCap", the "Debtors", or the "Estates") were liquidated under Chapter 7 of the Bankruptcy Code.  The first step in determining whether this test has been met is to determine the estimated amount that would be generated from the liquidation of the Debtors' assets and properties in the context of the Chapter 7 liquidation case.  The gross amount of cash available to the holders of Impaired Claims or Interests would be the sum of the proceeds from the disposition of the Debtors' assets through the liquidation proceedings and the cash held by the Debtors at the time of the commencement of the Chapter 7 case.  This gross amount of cash available is reduced by the amount of any claims secured by the Estates' assets, the costs and expenses of the liquidation, and additional administrative expenses that may result from the termination of the Debtors' businesses and the use of Chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.  For purposes of this liquidation analysis[1], which was prepared by Management with the assistance of the Debtors' advisors (Morrison & Foerster and FTI), it is assumed that the assets of Residential Capital, LLC and its Debtor subsidiaries are liquidated for the benefit of ResCap's creditors.  Additionally, only entities with assets that will generate recoveries for their creditors are considered relevant for this analysis (see "Summary of Unscheduled Entities" on page 24).  A general summary of the assumptions used by ResCap's Management in preparing this liquidation analysis follows.

### *Estimate of Net Proceeds*

2.　　　Estimates were made of the cash proceeds which might be realized from the liquidation of the Debtors' assets.  The Chapter 7 liquidation period is assumed to commence on April 30, 2013, and the monetization of assets is assumed to last 12 months following the appointment of a Chapter 7 trustee.  Recoveries to creditors are presented on an undiscounted basis.  For purposes of this analysis, recoveries were estimated based on estimated book asset balances as of April 30, 2013 with certain proforma adjustments[2].  There can be no assurance that the liquidation would be completed within this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under Section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the Estates as expeditiously (generally at distressed prices) as is compatible with the best interests of the parties-in-interest.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[2] The pro-forma adjustments were made to exclude certain assets that are either non-economic or securitized (i.e. assets with offsetting liabilities recorded on the balance sheet).  The asset balances also exclude certain accounting adjustments related to pre-paid expenses and accounts receivable, as well as entries recorded to estimate true-up payments for the asset sale transactions with Ocwen and Walter.

1

*Estimate of Costs*

3.      The Liquidation Analysis assumes the wind-down of the Estates lasts for a period of approximately 3 years for pending litigation and the settlement of claims.  The Debtors' cost of liquidation under Chapter 7 would include fees payable to a Chapter 7 trustee, as well as those which might be payable to attorneys and other professionals that a trustee may engage, as well as other internal and overhead costs.  Further, costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors until conclusion of the Chapter 7 case.

4.      Additional Claims would arise by reason of the breach or rejection of obligations incurred under executory contracts, or leases entered into by the Debtors.  It is possible that in a Chapter 7 case, the wind-down expenses may be materially different than the estimated amount.  Such expenses are in part dependent on the duration of the liquidation.

*Distribution of Net Proceeds under Absolute Priority*

5.      The costs, expenses, fees and such other Claims that may arise and constitute necessary costs and expenses in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to General Unsecured Creditors.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full.

6.      This analysis considers the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and professional advisors to such trustee and (ii) an erosion in the value of assets in the Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the forced sales atmosphere that would likely prevail. THE DEBTORS HAVE DETERMINED, AS SUMMARIZED ON THE FOLLOWING PAGES, THAT CONFIRMATION OF THE CHAPTER 11 PLAN WILL PROVIDE SUBSTANTIALLY MORE VALUE TO THE DEBTORS' ESTATES THAN WOULD BE RECEIVED PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

7.      THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, and contingencies beyond the control of the Debtors or a Chapter 7 trustee.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation.  The actual amounts of Claims against the Estates could vary significantly from the estimate set forth herein, depending on the Claims asserted during the pendency of the Chapter 7 case.  Moreover, this liquidation analysis may not include all liabilities that may arise as a result of additional litigation, potential tax assessments, or other potential Claims.  Neither this analysis, nor the Recovery Analysis, include potential recoveries from avoidance actions or intangible assets, and includes no incremental costs for the pursuit of

2

such recoveries.  No value was assigned to additional proceeds that might result from the sale of certain items with intangible value.  Therefore, the actual liquidation value of the Debtors' assets could vary materially from the estimates provided herein.

8.      THE LIQUIDATION ANALYSIS SET FORTH HEREIN WAS BASED ON THE ESTIMATED BOOK VALUES OF THE DEBTORS' ASSETS ON APRIL 30, 2013 WITH CERTAIN PROFORMA ADJUSTMENTS.  TO THE EXTENT THAT OPERATIONS THROUGH SUCH DATE WERE DIFFERENT THAN ESTIMATED, THE ASSET VALUES MAY CHANGE.  DELOITTE TOUCHE TOHMATSU LLP, THE INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR RESCAP, HAS NOT EXAMINED, COMPILED OR OTHERWISE APPLIED PROCEDURES TO THESE VALUES AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE VALUES IN THE LIQUIDATION ANALYSIS.

9.      Estimated net proceeds may be realized from the liquidation of ResCap's subsidiaries.  The method of liquidation may vary greatly from subsidiary to subsidiary depending on the jurisdiction or country in which it resides or was formed.  The obligations are assumed to be satisfied at the individual entity level, with excess proceeds flowing upward to the next ownership level and ultimately to Residential Capital, LLC, to the extent available.

## ASSET RECOVERY ASSUMPTIONS

10.     All recoveries cited in the asset recovery assumptions below are presented on a consolidated basis and are presented as a blended average percentage of book value.  The mix of assets may vary between Debtors, and as such, recovery percentages may vary on an unconsolidated basis.

### *Cash and Cash Equivalents*

11.     Cash and cash equivalents include cash in the Debtors' domestic bank accounts and other cash equivalents.  The estimated recovery for this category of assets is 100%.

### *Restricted Cash*

12.     Restricted cash primarily consists of cash held at Ally Bank, escrow funds for GNMA pooling agreements and other amounts held in escrow related to the Ocwen APA and Walter Assignment, and other parties.  Outstanding amounts are estimated to be fully recovered in the Chapter 7 liquidation scenarios.

### *FHA/VA Mortgage Assets*

13.     FHA/VA mortgage assets consist of mortgage loans, servicer advances, and accrued interest, which are guaranteed by the Federal Housing Administration's ("FHA") mortgage insurance program or the US Department of  Veterans' Affairs ("VA"), and constitute the bulk of the Estates' remaining assets.  The total blended recovery for FHA/VA mortgage assets is 57% - 71% in the lower and higher Chapter 7 scenarios, respectively.

14.     The Chapter 7 liquidation scenarios assume that the Debtors will continue to liquidate mortgage loans through the ongoing retail liquidation process for the nine months immediately

following April 30, 2013, immediately followed by a bulk sale of all remaining mortgage loans. Loans are assumed to be sold on an "as is, where is" basis, without representations and warranties from the Estates and without kickout provisions, resulting in steep discounts to pricing. The blended average recovery under these assumptions is estimated to be between 61% - 74% in the lower and higher Chapter 7 liquidation scenarios, respectively.

15.     The servicing advances are comprised of advances on Estates' FHA/VA loan portfolio and aged expense claims. As such, it is assumed likely that existing loan advances would likely trade at prices similar to the underlying loan, while there would be minimal to no value on the aged advances. FHA/VA servicer advances are estimated to recover between 30% - 50% in the lower and higher Chapter 7 scenarios, respectively.

### Non FHA/VA Mortgage Assets

16.     The Estates' Non FHA/VA mortgage assets consist primarily of mortgage loans, servicer advances and accrued interest on loans removed from government insured deals, loans rejected from the Berkshire APA and other loans deemed to be non-marketable. They are assumed to be sold in a bulk sale during the 1-year asset disposition period.

17.     Non FHA/VA mortgage assets are assumed to generate between 28% - 54% in the lower and higher Chapter 7 scenarios, due to the assumed quick liquidation, certain documentation deficiencies, the absence of representations and warranties from the Estates, and other material risks.

### MSRs and Associated Servicer Advances

18.     MSRs and associated servicer advances consist of assets excluded from the asset purchase agreements with Ocwen and Walter, due to various counterparty objections. The Estates are currently negotiating with the counterparties to resolve the objections and intend to sell these MSRs and servicer advances once settlements have been achieved, however, the Liquidation Analysis assumes that negotiations will not be successful after the conversion to a Chapter 7 liquidation. The blended average recovery rate is assumed to be 65% and 75% in the lower and higher liquidation scenarios, respectively.

19.     MSRs are assumed to recover a de minimis amount due to the termination of counterparty settlement negotiations under the Chapter 7 liquidation scenarios.

20.     Based on a scenario assuming bulk asset sales without resolution of pending cures, excluded servicer advances are assumed to generate between 72% – 83% recoveries in the lower and higher Chapter 7 liquidation scenarios, respectively.

### Other Debtors' Assets

21.     Other Debtors' Assets consist primarily of securitized HELOCs, REO properties, trading securities and derivative assets, which are expected to recover at a blended average rate ranging from 30% - 39% in the lower and higher Chapter 7 liquidation scenarios, respectively. Non-economic assets are assumed to generate zero recovery value.

4

22.    Securitized HELOCs are assumed to recover between 40% - 60% in the lower and higher Chapter 7 liquidation scenarios, as these assets are expected to sell at a significant discount in an accelerated bulk sale scenario.

23.    REO properties are assumed to recover between 40% - 60% in the lower and higher Chapter 7 liquidation scenarios, as REO assets are expected to sell at a significant discount in an accelerated bulk sale scenario.

24.    Under the Chapter 7 liquidation scenarios, the GMAC 2010-01 securitization asset is assumed to be liquidated as a single asset (rather than as whole loans), and to sell at a significant discount from the Recovery Analysis.  Recoveries on this asset are estimated to be between 35% - 50% in the lower and higher Chapter 7 liquidation scenarios, respectively.

25.    Chapter 7 liquidation scenarios assume 100% recovery on derivative assets and associated collateral, the majority of which has already been collected as of the date of this Disclosure Statement.

26.    There are a number of other Debtor-owned assets including accounts receivable and other assets, which are assumed to provide zero recovery to the Estates.

### Non-Debtors' Assets

27.    Non-Debtors' Assets are comprised primarily of equity interests in the Debtors' foreign affiliates. These affiliates are working to liquidate assets and to resolve claims and litigation. The Debtors assume in the Recovery Analysis that they will be able to recover $24 million from non-Debtor affiliates.

### Other Recoveries

28.    Additional incremental recoveries are expected to materialize from client recoveries and broker fees from the wind-down of the originations pipeline, however, these fees are expected to be offset by incremental costs for the Berkshire loan repurchase true-up[3]. In total, incremental recoveries are estimated to generate approximately $0 net recovery.

### Affirmative Claims Against Ally

29.    No estimate is included in the Liquidation Analysis for recoveries relating to potential affirmative damage claims against Ally. The Debtors believe that an estimate of the ultimate recoveries from such claims is highly subjective and dependent on numerous variables, including (i) the probabilities of successful judgments; (ii) the cost and time required to litigate the affirmative claims; (iii) any offsetting claims Ally may have against the Debtors; and (iv) the collectability of amounts significant enough to alter the outcome of the Liquidation Analysis.  The Examiner's Report [Docket No. 3698] includes an assessment of potential claims against Ally.

---

[3] Excludes any adjustments related to Walter and Ocwen sale true-ups.

**Chapter 7 Wind-Down Costs and Administrative Claims**

30.     For the purposes of the Chapter 7 liquidation scenarios, Chapter 11 administrative claims and Chapter 7 wind-down costs are shown as combined for administrative ease.  The Liquidation Analysis assumes wind-down expenses of $180 million are allocated to the JSN collateral for the period after April 30, 2013, and as such those costs have been removed from JSN secured recoveries.  All other wind-down and administrative costs are shown in the wind-down and administrative cost line of the Liquidation Analysis.

31.     Chapter 7 wind-down costs are allocated to legal entities based on total value available after repayment of the AFI LOC, the AFI Revolver, and the secured portion of the JSNs.

32.     Post-petition intercompany claims, which are subject to administrative priority status, are reflected in the April 30, 2013 cash balances by legal entity and, as such, are not shown in the Liquidation Analysis.

*Trustee Fees*

33.     Trustee fees include all fees that would be paid to the Chapter 7 trustee by each Debtor, consistent with Bankruptcy Code requirements.  Chapter 7 trustee fees are estimated to be 3% of gross distributions in both the higher and lower Chapter 7 liquidation scenarios, which are included in wind-down administrative costs.

*Professional Fees*

34.     Restructuring professional fees and ordinary course professional fees are estimated to be higher under the Chapter 7 liquidation scenarios than in the Recovery Analysis.  This is due primarily to potentially extensive third party litigation that the Estates will most likely need to defend and pursue for purposes of settling claim amounts and monetizing assets.

35.     Because the Chapter 7 Trustee and, to the extent applicable, the Chapter 7 Trustee's professionals must familiarize themselves with the Estates, including their assets and liabilities, it is anticipated that additional professional fees will be incurred in a Chapter 7 liquidation.  Restructuring professional and ordinary course professional fees are expected to be approximately $175 million higher in the Chapter 7 liquidation scenarios than in the Recovery Analysis (exclusive of Chapter 7 trustee fees).  No professional fees are assumed for pursuing litigation against Ally, as no amounts received from litigation pursued against Ally are contemplated in the Liquidation Analysis (see paragraph 29.)

*Chapter 7 Wind-Down Costs*

36.     Estimated costs under the Chapter 7 liquidation scenarios are consistent with total estimated costs under the Recovery Analysis.  Any savings achieved in the accelerated wind-down of the asset portfolio would be insignificant for the purposes of this analysis, and would likely be offset by higher internal costs required to pursue and defend litigation.  As such, these costs are assumed to be the same under both the Recovery Analysis and the Liquidation Analysis scenarios.

6

37.     The remaining costs are assumed to be unaffected by the hypothetical Chapter 7 filing. Costs related to facilities, insurance, IT, accounts payable, document storage and destruction, tax[4], post-petition representation and warranty liabilities, and the various TSAs are assumed to remain constant, as the Estates will need to maintain certain personnel, documentation and other overhead capabilities in order to pursue or fight litigation and to maintain legal documents and systems until all legal proceedings are resolved.

**Claims**

*AFI Secured Claims*

38.     As of April 30, 2013, the Estates had pre-petition debt and accrued interest obligations under both the AFI Revolver and the AFI LOC.  The estimated recovery for AFI Secured Claims is 100%.

*Junior Secured Notes*

39.     The JSNs' claim of $2.223 billion ($2.121 billion of principal plus $102 million of interest) of principal and prepetition accrued interest is satisfied by the AFI Revolver collateral, on which the JSNs hold a second lien. To the extent the JSN claim is not satisfied by AFI Revolver collateral, a deficiency claim is asserted against the borrower and the guarantor entities. These deficiency claims recover pari passu with the General Unsecured Creditors ("GUC") at each entity. Under the Chapter 7 liquidation scenarios, the recovery of the JSNs reflects the remaining JSN collateral.  Secured recoveries are limited by the remaining value of the JSN collateral package and pledged equity at each Debtor entity after payment of the Revolver.  The estimated recovery for the JSNs, including recoveries from deficiency claims, is estimated between 70% and 77% under the Chapter 7 liquidation scenarios.

*General Unsecured Claims*

40.     General Unsecured Claims is by far the largest claims category under the Chapter 7 liquidation scenarios, and includes:

(1) RMBS Trust Claims;

(2) Monoline Claims;

(3) Borrower Claims;

(4) Senior Unsecured Notes Claims; and

(5) Other General Unsecured Claims

---

[4] The Estates have retained advisors for tax matters. The tax estimate is presented based upon preliminary guidance the Estates have received from their tax advisors.  It should be noted that the tax analysis has not been completed, and accordingly the guidance may change and those changes may be material.

41.     The Liquidation Analysis assumes that the Debtors litigate all Claims asserted against the Debtors, significantly increasing the assumed cost of litigation in the Liquidation Analysis.  As a result of the additional litigation and incremental expenditures, it is assumed that, with the exception of Borrower Claims and Private Securities Claims, allowed Claims in the Liquidation Analysis are consistent with claims estimates in the Recovery Analysis.

42.     In the Chapter 7 liquidation scenarios, Borrower Claims are assumed to recover pari passu with other General Unsecured Claims.  In the Recovery Analysis, Borrower Claims are subject to settlement, and as such, no Borrower Claim amount is estimated for the Recovery Analysis.  However, for purposes of the Liquidation Analysis in the higher Chapter 7 scenario, Borrower Claims are estimated to be approximately $422 million and $557 million in the higher and lower Chapter 7 scenarios, respectively.

### Securities Claims

43.     Securities litigation claims, including the Private Securities Claims, the NJ Carpenters Claims, claims of the Federal Housing Finance Agency and the National Credit Union Administration Board, and other securities claims are assumed to be $11.7 billion for the purposes of the lower scenario in the Liquidation Analysis. The claim amount is based on the Debtors' estimate of the claim asserted by each claimant discounted by 50% to reflect litigation risk.  These claims are assumed to be pari passu with GUC in the lower scenario, and are assumed to be subordinated or disallowed on the merits in the higher scenario.  Although these claims are estimated to be approximately $11.7 billion, there is no assurance that the allowed claim amount will not be materially different from this estimate.

### Claims Against Residential Capital, LLC

44.     Various parties, including the RMBS Trusts, the Monolines and certain Private Securities Claims, have also asserted claims against Residential Capital, LLC based on alter ego, veil piercing, aiding and abetting or similar theories.   For purposes of the lower scenario in the Liquidation Analysis, these claims are assumed to be allowed against Residential Capital, LLC discounted by approximately 68% from the claims projected against the operating entities in the lower scenario.  In the higher scenario, these claims are assumed to be disallowed in their entirety, with the only remaining claims against Residential Capital, LLC being the Senior Unsecured Notes and a de minimis amount of General Unsecured Claims.

**Residential Capital, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| Liquidation of Remaining Assets | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| 1  Restricted Cash | $ 27.9 | $ 27.9 | 100.0% | $ 27.9 | 100.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | 0.1 | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ 28.0** | **$ 27.9** | | **$ 27.9** | |

| Distribution of Values | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | Lower (1) | Higher (1) | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 143.5 | | $ 143.5 | |
| 10  Remaining Assets | | | 27.9 | | 27.9 | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 171.4** | | **$ 171.4** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (157.0) | | (157.0) | |
| 15  **Total Paydown** | | | **$ (157.0)** | | **$ (157.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (8.9) | | $ (8.6) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ 2,066.0 | $ 2,066.0 | $ 1.2 | 0.1% | $ 3.9 | 0.2% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 7,341.1 | $ 1,004.2 | $ 4.3 | 0.1% | $ 1.9 | 0.2% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ 2,871.0 | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 0.1% | 0.2% | 36.3% |

(1)  For purposes of the Liquidation Analysis, the "Lower" scenario assumes higher claims and thus lower recovery rates for unsecured creditors.
Conversely, the "Higher" scenario assumes lower claims and thus higher recovery rates for unsecured creditors.

| | GMAC Mortgage, LLC<br>Chapter 7 Liquidation Analysis<br>($ Millions) | | | | |

| | | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| | **Liquidation of Remaining Assets** | | | | | |
| 1 | Restricted Cash | $ 39.2 | $ 39.2 | 100.0% | $ 39.2 | 100.0% |
| 2 | FHA/VA Mortgage Assets | 945.3 | 542.5 | 57.4% | 673.5 | 71.2% |
| 3 | Non FHA/VA Mortgage Assets | 39.4 | 10.4 | 26.4% | 20.3 | 51.6% |
| 4 | MSRs and Associated Servicer Advances (1) | 189.2 | 125.1 | 66.1% | 144.5 | 76.4% |
| 5 | Other Debtors' Assets | 56.4 | 16.3 | 28.8% | 19.2 | 34.0% |
| 6 | Non-Debtors' Assets (2) | - | - | 0.0% | - | 0.0% |
| 7 | Other Recoveries (1) | - | 5.3 | 0.0% | 5.3 | 0.0% |
| 8 | **Total Remaining Assets** | **$ 1,269.4** | **$ 738.8** | | **$ 902.0** | |

| | **Distribution of Values** | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|---|
| | | Lower (3) | Higher (3) | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| | **Distributable Value** | | | | | | |
| 9 | Cash | | | $ 1,977.7 | | $ 1,977.7 | |
| 10 | Remaining Assets | | | 738.8 | | 902.0 | |
| 11 | AFI Claims Recovery | | | - | | - | |
| 12 | **Total Distributable Value** | | | **$ 2,716.5** | | **$ 2,879.7** | |
| | **Paydown of Secured Debt** | | | | | | |
| 13 | Ally Revolver and Ally Line of Credit | | | $ (854.4) | | $ (854.4) | |
| 14 | JSN Secured Claims | | | (1,177.8) | | (1,267.6) | |
| 15 | **Total Paydown** | | | **$ (2,032.2)** | | **$ (2,122.0)** | |
| | **Admin/Wind-Down Costs** | | | | | | |
| 16 | Admin/Wind-Down Costs | | | $ (466.0) | | $ (495.8) | |
| | **JSN Deficiency Claim** | | | | | | |
| 17 | JSN Deficiency Claim | $ 1,045.2 | $ 955.4 | $ 65.5 | 6.3% | $ 77.0 | 8.1% |
| | **General Unsecured Claims** | | | | | | |
| 18 | General Unsecured Claims | $ 2,441.5 | $ 2,296.2 | $ 152.9 | 6.3% | $ 185.0 | 8.1% |
| | **Subordinated Claims** | | | | | | |
| 19 | Subordinated Claims | $ - | $ 34.5 | $ - | 0.0% | $ - | 0.0% |

| | | Chapter 7 Liquidation Recovery | | Ch. 11<br>Recovery |
|---|---|---|---|---|
| | | Low (%) | High (%) | Recovery % |
| 20 | **GUC Recovery in Chapter 7 vs. Chapter 11** | 6.3% | 8.1% | 30.1% |

(1) Includes assets of GMACM Borrower.
(2) Book values for the recoveries of the non-debtor assets are not shown as these assets represent the Debtors' equity claims.
(3) For purposes of the Liquidation Analysis, the "Lower" scenario assumes higher claims and thus lower recovery rates for unsecured creditors.
   Conversely, the "Higher" scenario assumes lower claims and thus higher recovery rates for unsecured creditors.

| | | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |

**Passive Asset Transactions, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | **Liquidation of Remaining Assets** | | | | | |
|---|---|---|---|---|---|---|
| 1 | Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 | FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 | Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 | MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 | Other Debtors' Assets | 28.7 | 9.2 | 32.2% | 13.2 | 46.0% |
| 6 | Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 | Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 | **Total Remaining Assets** | **$ 28.7** | **$ 9.2** | | **$ 13.2** | |

| | **Distribution of Values** | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|---|
| | | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| | **Distributable Value** | | | | | | |
| 9 | Cash | | | $ 27.8 | | $ 27.8 | |
| 10 | Remaining Assets | | | 9.2 | | 13.2 | |
| 11 | AFI Claims Recovery | | | - | | - | |
| 12 | **Total Distributable Value** | | | **$ 37.0** | | **$ 40.9** | |
| | **Paydown of Secured Debt** | | | | | | |
| 13 | Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 | JSN Secured Claims (1) | | | (37.0) | | (40.9) | |
| 15 | **Total Paydown** | | | **$ (37.0)** | | **$ (40.9)** | |
| | **Admin/Wind-Down Costs** | | | | | | |
| 16 | Admin/Wind-Down Costs | | | $ - | | $ - | |
| | **JSN Deficiency Claim** | | | | | | |
| 17 | JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| | **General Unsecured Claims** | | | | | | |
| 18 | General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| | **Subordinated Claims** | | | | | | |
| 19 | Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|---|
| | | Low (%) | High (%) | Recovery % |
| 20 | **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 30.1% |

(1)  JSN secured claim amount represents distribution of equity from Passive Asset Transactions, LLC which is pledged to the JSNs.

11

**Executive Trustee Services, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| Liquidation of Remaining Assets | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | 0.2 | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | 0.3 | 0.0% | 0.3 | 0.0% |
| 8 **Total Remaining Assets** | **$ 0.2** | **$ 0.3** | | **$ 0.3** | |

| Distribution of Values | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 30.8 | | $ 30.8 | |
| 10 Remaining Assets | | | 0.3 | | 0.3 | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 31.1** | | **$ 31.1** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims (1) | | | (6.9) | | (7.7) | |
| 15 **Total Paydown** | | | **$ (6.9)** | | **$ (7.7)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (19.2) | | $ (18.5) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ 5.0 | $ 4.8 | $ 5.0 | 100.0% | $ 4.8 | 100.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | 100.0% | 100.0% | 100.0% |

(1) JSN secured claim amount represents distribution of equity from Executive Trustee Services, LLC which is pledged to the JSNs.

**Ditech, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | $ - | $ - | | $ - | |

| Distribution of Values | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9   Cash | | | $ 0.9 | | $ 0.9 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | $ 0.9 | | $ 0.9 | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.7) | | (0.7) | |
| 15  **Total Paydown** | | | $ (0.7) | | $ (0.7) | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.2) | | $ (0.2) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 0.0 | $ 0.0 | $ 0.0 | 100.0% | $ 0.0 | 100.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 100.0% | 100.0% | 30.1% |

**Residential Consumer Services, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | 0.0 | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ 0.0** | **$ -** | | **$ -** | |

| Distribution of Values | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.2 | | $ 0.2 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.2** | | **$ 0.2** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.1) | | (0.1) | |
| 15  **Total Paydown** | | | **$ (0.1)** | | **$ (0.1)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.1) | | $ (0.1) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 30.1% |

12-12020-mg    Doc 4819    Filed 08/23/13    Entered 08/23/13 16:49:36    Exhibit A
Pg 48 of 159

**GMAC Mortgage USA Corporation**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | $ - | $ - | | $ - | |

| | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.5 | | $ 0.5 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.5** | | **$ 0.5** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.2) | | (0.2) | |
| 15  **Total Paydown** | | | **$ (0.2)** | | **$ (0.2)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.3) | | $ (0.3) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 30.1% |

15

| | | | | | | |
|---|---|---|---|---|---|---|
| **Residential Funding Company, LLC** | | | | | | |
| **Chapter 7 Liquidation Analysis** | | | | | | |
| **($ Millions)** | | | | | | |

| | **Book Value** | **Chapter 7 Liquidation Recovery** | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets (1) | 7.3 | 2.6 | 35.0% | 4.8 | 65.0% |
| 4  MSRs and Associated Servicer Advances (1) | 21.8 | 12.2 | 56.0% | 14.1 | 64.6% |
| 5  Other Debtors' Assets (1) | 9.1 | 3.0 | 32.6% | 4.5 | 49.0% |
| 6  Non-Debtors' Assets (2) | - | 24.2 | 0.0% | 24.2 | 0.0% |
| 7  Other Recoveries (1) | - | (6.8) | 0.0% | (6.8) | 0.0% |
| 8  **Total Remaining Assets** | **$ 38.3** | **$ 35.1** | | **$ 40.7** | |

| | **Claims** | **Claims** | **Recovery Ranges** | | | |
|---|---|---|---|---|---|---|
| | Lower (3) | Higher (3) | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distribution of Values** | | | | | | |
| **Distributable Value** | | | | | | |
| 9   Cash | | | $ 1,469.0 | | $ 1,469.0 | |
| 10  Remaining Assets | | | 35.1 | | 40.7 | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 1,504.1** | | **$ 1,509.7** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ (272.7) | | $ (272.7) | |
| 14  JSN Secured Claims | | | (46.9) | | (50.6) | |
| 15  **Total Paydown** | | | **$ (319.6)** | | **$ (323.3)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (791.3) | | $ (768.1) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ 2,176.1 | $ 2,172.4 | $ 42.0 | 1.9% | $ 78.7 | 3.6% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 18,200.0 | $ 9,379.5 | $ 351.1 | 1.9% | $ 339.6 | 3.6% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ 8,812.0 | $ - | 0.0% | $ - | 0.0% |

| | **Chapter 7 Liquidation Recovery** | | **Ch. 11 Recovery** |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 1.9% | 3.6% | 9.0% |

(1)  Includes assets of RFC Borrower.
(2)  Book values for the recoveries of the non-debtor assets are not shown as these assets represent the Debtors' equity claims.
(3)  For purposes of the Liquidation Analysis, the "Lower" scenario assumes higher claims and thus lower recovery rates for unsecured creditors.
     Conversely, the "Higher" scenario assumes lower claims and thus higher recovery rates for unsecured creditors.

**RFC Asset Holdings II, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | 0.6 | 0.0 | 1.6% | 0.0 | 2.4% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | **$ 0.6** | **$ 0.0** | | **$ 0.0** | |

| Distribution of Values | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 27.6 | | $ 27.6 | |
| 10 Remaining Assets | | | 0.0 | | 0.0 | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | **$ 27.6** | | **$ 27.6** | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims (1) | | | (27.6) | | (27.6) | |
| 15 **Total Paydown** | | | **$ (27.6)** | | **$ (27.6)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ - | | $ - | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

(1) JSN secured claim amount represents distribution of equity from RFC Asset Holdings II, LLC which is pledged to the JSNs.

17

| | | | | | |
|---|---|---|---|---|---|
| **Homecomings Financial, LLC** | | | | | |
| **Chapter 7 Liquidation Analysis** | | | | | |
| **($ Millions)** | | | | | |

| | **Book Value** | **Chapter 7 Liquidation Recovery** | | | |
|---|---|---|---|---|---|
| **Liquidation of Remaining Assets** | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | **$ -** | **$ -** | | **$ -** | |

| | **Claims** | **Claims** | **Recovery Ranges** | | | |
|---|---|---|---|---|---|---|
| **Distribution of Values** | Lower (1) | Higher (1) | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.3 | | $ 0.3 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.3** | | **$ 0.3** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | - | | - | |
| 15  **Total Paydown** | | | **$ -** | | **$ -** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.2) | | $ (0.2) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ 2,223.0 | $ 2,223.0 | $ 0.1 | 0.0% | $ 0.1 | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ 33.9 | $ 17.8 | $ 0.0 | 0.0% | $ 0.0 | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | **Chapter 7 Liquidation Recovery** | | **Ch. 11 Recovery** |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | 0.0% | 0.0% | 9.0% |

(1)  For purposes of the Liquidation Analysis, the "Lower" scenario assumes higher claims and thus lower recovery rates for unsecured creditors.
Conversely, the "Higher" scenario assumes lower claims and thus higher recovery rates for unsecured creditors.

**Residential Funding Mortgage Exchange, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

|  | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| **Liquidation of Remaining Assets** |  | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| 1   Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2   FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3   Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4   MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5   Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6   Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7   Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8   **Total Remaining Assets** | $ - | $ - |  | $ - |  |

| **Distribution of Values** | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
|  |  |  | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** |  |  |  |  |  |  |
| 9    Cash |  |  | $ 0.0 |  | $ 0.0 |  |
| 10   Remaining Assets |  |  | - |  | - |  |
| 11   AFI Claims Recovery |  |  | - |  | - |  |
| 12   **Total Distributable Value** |  |  | $ 0.0 |  | $ 0.0 |  |
| **Paydown of Secured Debt** |  |  |  |  |  |  |
| 13   Ally Revolver and Ally Line of Credit |  |  | $ - |  | $ - |  |
| 14   JSN Secured Claims |  |  | (0.0) |  | (0.0) |  |
| 15   **Total Paydown** |  |  | $ (0.0) |  | $ (0.0) |  |
| **Admin/Wind-Down Costs** |  |  |  |  |  |  |
| 16   Admin/Wind-Down Costs |  |  | $ (0.0) |  | $ (0.0) |  |
| **JSN Deficiency Claim** |  |  |  |  |  |  |
| 17   JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** |  |  |  |  |  |  |
| 18   General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** |  |  |  |  |  |  |
| 19   Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20   **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**DOA Holding Properties, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1  Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2  FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3  Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4  MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5  Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6  Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7  Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8  **Total Remaining Assets** | $ - | $ - | | $ - | |

| Distribution of Values | Claims | Claims | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** | | | | | | |
| 9  Cash | | | $ 0.0 | | $ 0.0 | |
| 10  Remaining Assets | | | - | | - | |
| 11  AFI Claims Recovery | | | - | | - | |
| 12  **Total Distributable Value** | | | **$ 0.0** | | **$ 0.0** | |
| **Paydown of Secured Debt** | | | | | | |
| 13  Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14  JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15  **Total Paydown** | | | **$ (0.0)** | | **$ (0.0)** | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16  Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| **JSN Deficiency Claim** | | | | | | |
| 17  JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18  General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19  Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20  **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

**RFC Asset Management, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
| | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** | | | | | |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | $ - | $ - | | $ - | |

| | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distribution of Values** | | | | | | |
| **Distributable Value** | | | | | | |
| 9 Cash | | | $ 0.0 | | $ 0.0 | |
| 10 Remaining Assets | | | - | | - | |
| 11 AFI Claims Recovery | | | - | | - | |
| 12 **Total Distributable Value** | | | $ 0.0 | | $ 0.0 | |
| **Paydown of Secured Debt** | | | | | | |
| 13 Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15 **Total Paydown** | | | $ (0.0) | | $ (0.0) | |
| **Admin/Wind-Down Costs** | | | | | | |
| 16 Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| **JSN Deficiency Claim** | | | | | | |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** | | | | | | |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** | | | | | | |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
| | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

21

**RFC SFJV-2002, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

| | | Book Value | Chapter 7 Liquidation Recovery | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| | **Liquidation of Remaining Assets** | | | | | |
| 1 | Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 | FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 | Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 | MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 | Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 | Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 | Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 | **Total Remaining Assets** | $ - | $ - | | $ - | |

| | | Claims | Claims | Recovery Ranges | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Lower | Higher | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| | **Distributable Value** | | | | | | |
| 9 | Cash | | | $ 0.0 | | $ 0.0 | |
| 10 | Remaining Assets | | | - | | - | |
| 11 | AFI Claims Recovery | | | - | | - | |
| 12 | **Total Distributable Value** | | | $ 0.0 | | $ 0.0 | |
| | **Paydown of Secured Debt** | | | | | | |
| 13 | Ally Revolver and Ally Line of Credit | | | $ - | | $ - | |
| 14 | JSN Secured Claims | | | (0.0) | | (0.0) | |
| 15 | **Total Paydown** | | | $ (0.0) | | $ (0.0) | |
| | **Admin/Wind-Down Costs** | | | | | | |
| 16 | Admin/Wind-Down Costs | | | $ (0.0) | | $ (0.0) | |
| | **JSN Deficiency Claim** | | | | | | |
| 17 | JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| | **General Unsecured Claims** | | | | | | |
| 18 | General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| | **Subordinated Claims** | | | | | | |
| 19 | Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

| | | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
| --- | --- | --- | --- | --- |
| | | Low (%) | High (%) | Recovery % |
| 20 | **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

22

12-12020-mg    Doc 4819-1    Filed 08/23/13    Entered 08/23/13 16:49:39    Exhibit A
Pg 57 of 159

**RCSFJV2004, LLC**
**Chapter 7 Liquidation Analysis**
**($ Millions)**

|  | Book Value | Chapter 7 Liquidation Recovery | | | |
|---|---|---|---|---|---|
|  |  | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Liquidation of Remaining Assets** |  |  |  |  |  |
| 1 Restricted Cash | $ - | $ - | 0.0% | $ - | 0.0% |
| 2 FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 3 Non FHA/VA Mortgage Assets | - | - | 0.0% | - | 0.0% |
| 4 MSRs and Associated Servicer Advances | - | - | 0.0% | - | 0.0% |
| 5 Other Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 6 Non-Debtors' Assets | - | - | 0.0% | - | 0.0% |
| 7 Other Recoveries | - | - | 0.0% | - | 0.0% |
| 8 **Total Remaining Assets** | $ - | $ - |  | $ - |  |

| **Distribution of Values** | Claims Lower | Claims Higher | Recovery Ranges | | | |
|---|---|---|---|---|---|---|
|  |  |  | Lower ($) | Lower (%) | Higher ($) | Higher (%) |
| **Distributable Value** |  |  |  |  |  |  |
| 9 Cash |  |  | $ 0.0 |  | $ 0.0 |  |
| 10 Remaining Assets |  |  | - |  | - |  |
| 11 AFI Claims Recovery |  |  | - |  | - |  |
| 12 **Total Distributable Value** |  |  | $ 0.0 |  | $ 0.0 |  |
| **Paydown of Secured Debt** |  |  |  |  |  |  |
| 13 Ally Revolver and Ally Line of Credit |  |  | $ - |  | $ - |  |
| 14 JSN Secured Claims |  |  | (0.0) |  | (0.0) |  |
| 15 **Total Paydown** |  |  | $ (0.0) |  | $ (0.0) |  |
| **Admin/Wind-Down Costs** |  |  |  |  |  |  |
| 16 Admin/Wind-Down Costs |  |  | $ (0.0) |  | $ (0.0) |  |
| **JSN Deficiency Claim** |  |  |  |  |  |  |
| 17 JSN Deficiency Claim | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **General Unsecured Claims** |  |  |  |  |  |  |
| 18 General Unsecured Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |
| **Subordinated Claims** |  |  |  |  |  |  |
| 19 Subordinated Claims | $ - | $ - | $ - | 0.0% | $ - | 0.0% |

|  | Chapter 7 Liquidation Recovery | | Ch. 11 Recovery |
|---|---|---|---|
|  | Low (%) | High (%) | Recovery % |
| 20 **GUC Recovery in Chapter 7 vs. Chapter 11** | n/a | n/a | 9.0% |

| **Residential Capital, LLC** |
| :---: |
| **Summary of Unscheduled Entities** |

| | Entity Name | Total Assets (1) |
| --- | --- | ---: |
| 1 | DOA Properties IX (Lots-Other), LLC | $ - |
| 2 | EPRE LLC | - |
| 3 | Equity Investments I, LLC | - |
| 4 | ETS of Virginia, Inc. | - |
| 5 | ETS of Washington, Inc | - |
| 6 | GMAC Model Home Finance I, LLC | - |
| 7 | GMAC Residential Holding Company, LLC | - |
| 8 | GMAC RH Settlement Service, LLC | - |
| 9 | GMACM REO LLC | - |
| 10 | GMACR Mortgage Products, LLC | - |
| 11 | GMAC-RFC Holding Company, LLC | - |
| 12 | HFN REO Sub II, LLC | - |
| 13 | Home Connects Lending Services, LLC | - |
| 14 | Homecomings Financial Real Estate Holdings, LLC | - |
| 15 | Ladue Associates, Inc. | - |
| 16 | PATI A, LLC | - |
| 17 | PATI B, LLC | - |
| 18 | PATI Real Estate Holdings, LLC | - |
| 19 | RAHI A, LLC | - |
| 20 | RAHI B, LLC | - |
| 21 | RAHI Real Estate Holdings, LLC | - |
| 22 | Residential Accredit Loans, Inc. | - |
| 23 | Residential Asset Mortgage Products, Inc. | - |
| 24 | Residential Asset Securities Corporation | - |
| 25 | Residential Consumer Services of Alabama, LLC | - |
| 26 | Residential Consumer Services of Ohio, LLC | - |
| 27 | Residential Consumer Services of Texas, LLC | - |
| 28 | Residential Funding Mortgage Securities I, Inc. | - |
| 29 | Residential Funding Mortgage Securities II, Inc. | - |
| 30 | Residential Funding Real Estate Holdings, LLC | - |
| 31 | Residential Mortgage Real Estate Holdings, LLC | - |
| 32 | RFC – GSAP Servicer Advance, LLC | - |
| 33 | RFC Construction Funding, LLC | - |
| 34 | RFC REO LLC | - |
| | **Total Assets** | **$ -** |

(1) Total assets exclude certain non-economic assets recognized by the Company in accordance with generally accepted accounting principles, investment in subsidiaries and intercompany balances.

# ANNEX C

## Annex C
Documents Considered by Mark Renzi

| Document Title | Document Date |
| --- | --- |

**Legal Pleadings**

*Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Disclosure Statement") [Docket No. 4819-1]    August 23, 2013

*Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4819-2]    August 23, 2013

Exhibit 7 to the Disclosure Statement, titled "Recovery Analysis" [Docket No. 4819-3]    August 23, 2013

Exhibit 8 to the Disclosure Statement, titled "Hypothetical Liquidation Analysis" [Docket No. 4819-3]    August 23, 2013

**Other Documents**

Illustrative Waterfall Analysis Asset and Liabilities Input, Preliminary Draft – Defendant's Exhibit DXAIF, in the JSN Adversary Proceeding    As of April 30, 2013

Professional Fee Budget in Chapter 7 Liquidation

Schedule of Assumed Recoveries on Assets in Chapter 7 Liquidation

Schedule of Assumed Securities Claims

# ANNEX D

# MARK A. RENZI

• 200 STATE ST, BOSTON, MA 01929 •

• MARK.RENZI@FTICONSULTING.COM • 617.897.1528 •

---

## FINANCIAL CONSULTING & RESTRUCTURING

---

### CORE COMPETENCIES

| | | |
|---|---|---|
| • Financial Restructurings | • PMO & Team Leadership | • Business Plan Development |
| • Operational Restructurings | • Financial, Planning & Analysis | • Asset Dispositions |
| • Interim Management | • Capital Solutions | • Transaction Advisory Services |
| • Liquidity Management | • Cost Rationalization | • Valuation |

---

## PROFESSIONAL EXPERIENCE

---

### FTI Consulting • Boston, MA • 2001 – Present
### Senior Managing Director • Corporate Finance – Restructuring

- Participated in the refinancing / raising of $10 billion plus of capital for over 25 companies; capital includes DIP loans, revolvers, B loans, private equity, cash flow loans, secured and unsecured debt. Worked directly with investment banks on divestitures of non-core assets / divisions and other creative recapitalizations.

- Provide interim-management services to mid cap and large cap portfolio companies of private equity investors.

- Lead and manage engagements by directing FTI staff and corporate management in financial and operational turnarounds. Lead multiple PMOs for liquidity forecasting, foreign currency exposure, FP&A, among others.

- Develop solutions to complex problems and propose insightful recommendations to management of Fortune 1,000 companies. Work closely with senior management to develop strategies for resolution of contentious issues.

- Identify cost reduction opportunities and implement cost savings in excess of $500 million.

- Provide real-time responses to meet the needs of money center banks, investment banks, finance companies, and equity investors seeking assurance regarding business issues, particularly as it may affect their collateral interest.

- Knowledge of: valuing businesses; liquidity management and implementation; cost rationalization and benchmarking; creating projections for securing new financing; budgeting for future cash need; creating LBO models; creating and negotiating term sheets; running the due diligence process; and performing market reports.

- Knowledge of finance companies, student loans, securitizations, whole loan sales, and other related assets. Participated in the restructuring of assets in excess of $100 billion.

---

## SUMMARY OF EARLIER EXPERIENCE

---

### Monadnock Associates, Inc. • Boston, MA • July 2000 – April 2001
### Director of Finance

*Direct all financial analysis of required cash flows for e-business companies, corporate spin-offs, and strategic business alternatives for developed companies. Assisted in sourcing capital for four clients including: angel funds, mezzanine financing, and venture financing. Total capital raised was $6 million; total financing in progress was $17 million. Directed consulting team for eight clients; provided in-depth financial and market analysis on business models, existing revenue models, and cash flows. Acted as interim CFO for publishing corporation. Responsible for all cash flow evaluations, payments, and presentations for venture capitalists. Led all valuation and financial analysis of clients and prospective business alternatives.*

*…continued…*

# MARK A. RENZI
PAGE 2

**PricewaterhouseCoopers L.L.P.  •  Philadelphia, PA  •  January 1998 – July 2000**
**Senior Associate  •  Corporate Value Consulting**

*Analyzed and assisted clients in mergers, divestments, and acquisitions in deals with assets exceeding $2.5 billion in value. Valued intangible properties, such as trade names, trademarks, licenses, and technology in excess of $50 million. Assisted in buy-side advisory work for $3 billion plus firms. Evaluated alternatives for improving and realizing shareholder value for Internet companies in excess of $250 million. Assisted in creation of LBO and cash flow models for clients' future acquisition needs up to $500 million. Involved in valuation of firms applying the Real Option Valuations for decisions that lead to multi-million dollar decisions. Created multiple cross platform transfer pricing and valuation models for streamlined comparable valuations. Developed strategic and operational models for Internet startup companies to assist in obtaining additional rounds of venture capital financing in excess of $80 million. Managed a group of associates in implementation of strategic financial alternatives for clients. Involved in all aspects of project management.*

**Managed Risk Trading L.P.  •  New York, NY  •  1995 – 1997**
**Risk Manager and Trader**

*The firm utilized a private investment pool of money using index and equity option trading strategies. Traded and made markets in the technology, telecommunications, chemical, and metals industries. Trained associate traders in risk management and derivative portfolio management. Managed derivative portfolio risk.*

**Timber Hill, Inc.  •  Philadelphia, PA; New York, NY  •  1993 – 1995**
**Equity and Index Options Trader**

*The firm is a hedge fund that uses a private investment pool of capital to invest in sophisticated derivative trading strategies internationally. Traded and made markets in the technology, telecommunications, chemical, and metals industries. Trained associate traders in risk management and derivative portfolio management.*

---

# EDUCATION

---

*Masters of Science in Finance, Beta Gamma Sigma*
Boston College, Chestnut Hill, Massachusetts.
*B.A., Economics (Departmental honors); Minor, Business Management*.
Washington College, Chestertown, Maryland.
Harvard University, School of Continuing Education
Boston Language Institute, Advanced Italian.
New York University, Import/Export Financing.
Scuola di Administrazione Aziendale, University of Turin School of Business, Italy.
Boston College, Creative Writing.

Member of the Turnaround Management Association

# **<u>Exhibit B</u>**

# Residential Capital, LLC
## Expert Report of Mark A. Renzi – Intercompany Balances

**11/1/2013**

# Table of Contents

| | | |
|---|---|---|
| I. | Executive Summary | 3 |
| II. | Introduction | 7 |
| III. | Overview of Hypothetical Sensitivity Scenarios | 10 |
| IV. | Appendix | 21 |



Executive Summary

# Disclaimer

This report ("Report") was prepared pursuant to the engagement of FTI Consulting, Inc. ("FTI") by Residential Capital, LLC and its debtor affiliates (collectively, "ResCap" or the "Debtors"). Mr. Renzi will explain how, under certain hypothetical scenarios, the allowance of intercompany balances reflected on the Debtors' books and records as of the Petition Date impacts the secured recovery of the JSN (as defined below)

FTI was last retained by the Debtors on 8/25/11 as its financial advisor to provide the Debtors with general restructuring and financial advisory services as more fully described in FTI's engagement letter, as amended, with the Debtors. The information contained herein is based upon information supplied by the Debtors and publicly available information, and portions of the information contained herein are based upon statements, estimates, allocations and forecasts provided by the Debtors

Mr. Renzi and FTI professionals at his direction have relied upon the accuracy and completeness of the foregoing information, including statements, estimates, allocations and forecasts, have not assumed any responsibility for any independent verification of such information and have assumed that such information has been reasonably prepared on bases reflecting the best estimates and judgments of the management of the Debtors

The analysis in this presentation is complex and is not necessarily susceptible to a partial analysis or summary description. Furthermore, selecting any portion of Mr. Renzi's analysis, without considering the analysis as a whole, would create an incomplete view of the process underlying the analysis

Mr. Renzi will not be responsible for and has not provided any tax, accounting, actuarial, legal or other specialist advice in this Report

4



# Mark A. Renzi – Qualifications

### Education

- B.A. in Economics, Washington College
- M.S. in Finance, Boston College
- Scuola di Administrazione Aziendale, University of Turin School of Business

### Qualifications

- Mark Renzi is a senior managing director in the FTI Consulting Corporate Finance/Restructuring practice and is based in Boston. Mr. Renzi has nearly 20 years of business experience and more than twelve years of financial consulting experience, including liquidity and capital structure assessment, debt and equity restructuring advice and identification of reorganization alternatives. He has experience across a broad range of industries, including retail, manufacturing, distribution, derivative portfolio management, healthcare, financial services, consumer credit and telecommunications, among others

- Mr. Renzi has provided restructuring services on more than 25 engagements in both out-of-court workout situations and in Chapter 11 proceedings. Further, he has assisted distressed companies with day-to-day management activities, including development of pro forma financials, cash flow management and identification of liquidity enhancing activities. Mr. Renzi has also provided restructuring advice to portfolio companies of private equity firms

- Mr. Renzi is experienced in analyzing and implementing strategic and operational change, including the development of business plans and redeployment of capital to address changing industry conditions, as well as stabilizing and fixing noncore operations through plant, product and customer rationalization initiatives. He has developed options and solutions through detailed financial and operational analyses, while collaborating closely with management and other stakeholders. In addition to operational turnarounds, Mr. Renzi has assisted in financial restructurings, including refinancings, recapitalizations, debt-for-equity swaps and strategic mergers and acquisitions

- Mr. Renzi has been involved with many large and high profile national and international engagements, including: CIT; Residential Capital; Credit-Based Asset Servicing and Securitization (C-BASS), a large RMBS investor and loan servicer; The Education Resources Institute, the nation's largest guarantor of private loans for education; American Business Financial Services, an originator and servicer of home mortgage loans; Thaxton Financial; Oakwood Homes Financial Corporation; a $4 billion international chemical company and a $2 billion international recreational products company. Two of Mr. Renzi's engagements were selected as the turnaround of the year by various industry organizations

5

# Mark A. Renzi – Qualifications

- Prior to joining FTI Consulting, Mr. Renzi worked at a boutique money management firm in New York evaluating derivative portfolios. He has also held various positions in financial analysis and planning and business plan development

- Mr. Renzi is a member of several professional organizations, including the Association of Insolvency & Restructuring Advisors and the Turnaround Management Association

- Mr. Renzi has provided testimony in The Education Resources Institute bankruptcy matter and has previously provided testimony in this matter

- In connection with the preparation of this Report, FTI is being compensated based on the time incurred providing such services, multiplied by FTI's standard hourly rates.  FTI is also reimbursed for reasonable direct expenses incurred in connection with the rendition of FTI's services.  Compensation payable to FTI is not contingent on the nature of Mr. Renzi's findings or on the outcome of this case



# Introduction



# Introduction

- The Report has been prepared at the request of counsel. Mr. Renzi will explain how, under certain hypothetical scenarios, the allowance of intercompany balances as reflected in the Debtors' books and records as of the Petition Date impacts the secured recovery of the JSN

- The JSN collateral recovery calculations contained herein are based on information available to and analysis conducted by Mr. Renzi and other FTI professionals at his direction as of the date of this Report

- FTI has developed a recovery model (the "Waterfall Model") in order to determine the distributable value of intercompany balances and resulting total recovery for the JSN based on scenarios provided by counsel. The Waterfall Model was developed by Mr. Renzi and FTI professionals at his direction during the pre-petition period and has since been maintained and refined as additional information becomes available and additional or different assumptions become relevant. The Waterfall Model and the model relied upon by the JSN (the "Fazio Model") are largely in agreement with one another

- In this Report, Mr. Renzi assumes in certain cases that the intercompany balances are either directly or indirectly part of the JSN collateral. Mr. Renzi does not opine on whether the JSN have valid and perfected liens on the intercompany balances

- FTI has been asked by counsel to provide sensitivity outputs for the following scenarios:
  - **Base Case** – Waterfall Model assumptions (e.g., claims and administrative expense allocation) are consistent with the Plan's recovery analysis, but the Base Case assumes no recovery on account of an AFI contribution. It also reflects, consistent with the Waterfall Model, that the intercompany balances are receiving no distribution, that the JSN do not have enforceable liens on the intercompany balances, that to the extent the JSN do have liens on the intercompany balances such liens have no value, and that the JSN will be unable to demonstrate an entitlement to adequate protection on account of the Plan's treatment of intercompany balances. The JSN will be undersecured and not be paid in full
  - **Scenario 1** – Waterfall Model assumptions are consistent with the Plan's recovery analysis, but without the AFI contribution and with allowed intercompany balances adjusted to reflect the impact of:
    - Avoidance of certain intercompany balances on account of the identified forgiveness of such balances as of the Petition Date
    - Reinstatement of balances on account of the avoidance of fraudulent conveyances related to the historical forgiveness of intercompany balances, which such avoidance actions the Court has determined are not subject to the JSN liens
    - Subordination of certain intercompany balances
  - **Scenario 2** – Waterfall Model assumptions are consistent with the Plan's recovery analysis and recognizes the intercompany balances at face value, but without the AFI contribution. This scenario is solely for illustrative purposes. Any scenario with an AFI contribution and intercompany balances allowed at face value would result in significant changes to other assumptions contained in the Plan's recovery analysis

---

1. The "Revolver" means that certain loan agreement by and among Debtors RFC and GMACM, as borrowers, various Debtor affiliates, as guarantors, and AFI, as agent and lender, dated as of December 30, 2009. The "JSN" mean the 9.625% Junior Secured Guaranteed Notes due 2015

8



# Introduction (cont.)

■ The Waterfall Model calculates the recovery for JSN at each legal entity and factors in the impact of allowance/disallowance of certain intercompany balances, equity pledges and deficiency claims

■ The Waterfall Model also assumes the following:

- Recoveries from certain international entities and CapRe are excluded, as any recoveries from these entities that might flow into the estate are speculative due to potential and ongoing litigation
- Ally Revolver (including blanket lien) collateral and equity in DIP are used to pay the JSN secured claim before the General Unsecured Creditors ("GUC")
- JSN deficiency claims are asserted against the borrower and guarantor entities, including ResCap, and are pari passu with the GUC
- Approximately $169.8M of projected administrative expenses are to be paid from the JSN cash collateral after 4/30/13

■ Mr. Renzi has assumed the following when evaluating the results of the Waterfall Model:

- The Debtors' tracking and allocation of the Revolver/JSN collateral is reliable and accurate
- The Debtors' assumptions as to the recoverability of assets remaining in the estate, which were included in the Disclosure Statement approved on 8/23/13, are reasonable
- The Debtors' assumptions as to the wind-down costs of the estate and the allocation of expenses on a debtor-by-debtor basis are reasonable and consistent with the Global Settlement
- The potential impact of the UCC's lien challenge on the JSN collateral is not considered in this analysis
- Intercompany receivables between two Debtor entities can be offset with intercompany payables between those same two entities, and vice versa. Thus, the intercompany balances in this Report are presented on a net basis

9

# Overview of Hypothetical Sensitivity Scenarios

# JSN Secured Recovery

■ As reflected below, the models utilized by FTI and the JSN are consistent and largely in agreement with one another[1]

■ The schedule below reflects $1.745B in secured recovery for the JSN calculated based on the recovery value of the JSN collateral and equity pledges

■ The analysis also reflects $169.8M for projected administrative expenses to be applied against the JSN collateral after 4/30/13

  ■ Of the $169.8M[2], approximately $27M[3] was actually paid from the JSN cash collateral under the terms of various stipulations for use of cash collateral between 5/1/13 and 8/31/13[4].  The remainder is related to the estimate of accrued and unpaid professional fees as of 7/11/13 plus $25M

■ Based on the Ocwen sale true-up analysis, a favorable purchase price adjustment resulted in an additional $51M in recoveries allocated to the JSN collateral

($ millions)

| | JSN Secured Recovery | | |
|---|---|---|---|
| | **Fazio Model** | **FTI Model** | **Variance** |
| 1 Cash and Remaining Assets | $      2,512 | $      2,513 | $      (1) |
| 2 Equity Pledges | 100 | 99 | 1 |
| 3 Pledged Intercompany Claims | - | - | - |
| 4 Impact of Ocwen True-Up | 51 | 51 | - |
| 5 Revolver Pay-Down | (747) | (747) | - |
| 6 Additional Expense Allocation | (27) | (170) | 143 |
| 7 **Total Secured Recovery** | $      1,888 | $      1,745 | $      143 |
| 8 *Additional Expenses* | *(143)* | *n/a* | *(143)* |
| 9 **Total Secured Recovery** | $      1,745 | $      1,745 | $      (0) |

1. FTI reserves the right to adjust this statement once the JSN model is produced
2. As noted above, the calculation of actual and projected expense allocation of $169.8M was based on estimated accrued and unpaid expenses. As such, it is subject to modification based on actual results
3. $27M was actually charged to the JSN collateral during the period from 5/1/13 to 8/31/13. Of this amount, $3.7M relates to pre 5/1 expenses paid prior to 5/1 but reimbursed by the JSN collateral post 5/1/13. $1.2M was charged in August 2013 following the expiration of the Cash Collateral Stipulation on 7/11/13 solely for the reimbursement of JSN professional fees
4. Additional amounts may have been charged against the JSN collateral since 8/31/13 pursuant to the limited authority granted in the cash collateral stipulation

# Overview of Scenarios – Global Assumptions

■ The table below provides an overview of the global assumptions FTI applied in each of the hypothetical scenarios included in this Report

| Assumption | Comments |
|---|---|
| **Waterfall Model Mechanics** | ■ Illustrative waterfall analysis based on the Debtors' trial balances as of 4/30/13 adjusted to reflect the Ocwen true-up and claims consistent with the provisions of the Plan<br><br>■ Obligations are satisfied at each subsidiary by the assets at the subsidiary. Remaining equity, if any, would flow up to the next ownership level<br><br>■ Key considerations include co-borrowing relationships, guarantees, and equity ownership structure<br><br>■ With the exception of the Base Case scenario, pre-petition intercompany balances are allowed and then adjusted for various hypothetical scenarios that could occur in light of the intercompany balances being asserted; hypothetical scenarios are discussed below<br><br>■ Consistent with the cash management order, post-petition intercompany balances are unwound and reflected in the 4/30/13 balances<br><br>■ Any value attributable to certain international entities and CapRe is excluded as any recoveries from these entities that might flow into the estate are speculative due to potential and ongoing litigation |
| **Asset Recovery** | ■ The asset recovery estimates are as of April 30, 2013, with certain limited adjustments based on:<br>　■ Cash proceeds that might be realized from the orderly liquidation of the Debtors' remaining assets<br>　■ Presented on an undiscounted basis<br>　■ Assumed to occur over the course of up to seven years, with approximately 85% of the recoveries occurring over the first three years<br>　■ Assumed to include $68M in additional proceeds from the Ocwen true-up; $51M is attributed to the JSN collateral |
| **AFI Contribution** | ■ Sensitivity scenarios outlined in this Report assume no AFI contribution. I have also been instructed by counsel not to include any value for purported liens by the JSN on alleged causes of action by the estates against Ally or its affiliates. |
| **Wind-down Costs** | ■ $826M allocated to the GMACM and approximately $10M allocated to ETS<br><br>■ $250M allocated to RFC |
| **GUC** | ■ Amount and allocation of the GUC is consistent with the Disclosure Statement and includes Monoline Claims, RMBS Claims, Senior Unsecured Claims, Other GUC, and the JSN Deficiency Claims<br><br>■ The JSN Deficiency Claims are asserted against the borrower and guarantor entities, including ResCap, and are pari passu with GUC |

12



# Overview of Scenarios – Sensitivity Assumptions

**Base Case**

- Projected and allowed claims in the Base Case scenario are consistent with the Plan's Waterfall Model, but the distributions to the JSN are not supplemented by the AFI contribution
- Assuming no AFI contribution and disallowance of intercompany balances, the JSN recover approximately $1,745M in secured recovery calculated based on the recovery value of the JSN collateral and equity pledges
- By asserting deficiency claims, the JSN recover an additional $217M
- Combined JSN recovery in the Base Case scenario is $1,963M (88% of the total JSN asserted claim of $2,223M)

**Scenario 1**

- Scenario 1 utilizes assumptions from the Base Case scenario. In addition, it is assumed that the intercompany balances are allowed and adjusted to reflect the impact of:

  **A** Intercompany balances identified for forgiveness
  - The impact of reducing the total intercompany balances on the Debtors' books and records as of the Petition Date by the amount of those balances that were identified to be forgiven as of the Petition Date reduces the total intercompany balance by approximately $2.6B (from $8.2B to $5.6B). As a result of allowing these adjusted intercompany balances, the JSN secured recovery in scenario 1A is $1,757M (79% of the total JSN asserted claim of $2,223M)

  **B** Reinstatement of balances on account of avoidance of fraudulent conveyances
  - Reinstatement of certain balances on account of the avoidance of fraudulent conveyances reduces the total intercompany balance by approximately $2.0B (from $8.2B to $6.2B). As a result of allowing these adjusted intercompany balances, the JSN secured recovery in scenario 1B is $1,870M (84% of the total JSN asserted claim of $2,223M)

  **C** Subordination of certain intercompany balances
  - The impact of subordinating certain intercompany balances to GUC reduces the total intercompany balance by approximately $2.2B (from $8.2B to $6.0B). As a result of allowing these adjusted intercompany balances, the JSN secured recovery in scenario 1C is $1,768M (80% of the total JSN asserted claim of $2,223M)

  **D** The Aggregation of 1A, 1B, and 1C
  - Assuming no AFI contribution and the aggregation of intercompany balance adjustments highlighted in 1A, 1B, and 1C, the JSN secured recovery in scenario 1D is $1,751M (79% of the total JSN asserted claim of $2,223M)

13



# Overview of Scenarios – Sensitivity Assumptions (cont.)

**Scenario 2**

- Scenario 2 utilizes assumptions from the Base Case scenario. In addition, it is assumed that the intercompany balances on the Debtors' books and records as of the Petition Date are allowed at their face value

- The allowance of pre-petition intercompany balances on the Debtors' books and records as of the Petition Date improves the JSN secured recovery by approximately $130M over the Base Case scenario

- Without the AFI contribution, the JSN will not recover their asserted claim of $2,223M even if the intercompany balances are allowed at face value. Nonetheless, as a result of allowing the aforementioned intercompany balances the JSN secured recovery in Scenario 2 is $1,876M (84% of the total JSN asserted claim of $2,223M)

- Scenario 2, however, still reflects various assumptions from the Plan recovery analysis that would otherwise be unavailable absent the Global Settlement, for example, multiple settled claims levels.  Absent the Global Settlement, claims would be significantly higher, further reducing the JSN recovery.  Therefore, Scenario 2 is purely for illustrative purposes and does not reflect a likely outcome

14

# Overview of Scenarios – Results

■ The table below shows the recovery available to the JSN under the scenarios discussed herein

| ($ millions) | Base Case | Scenario 1 | | | | Scenario 2 |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| 1 | JSN Secured Recovery | $ 1,745 | $ 1,745 | $ 1,745 | $ 1,745 | $ 1,745 | $ 1,745 |
| 2 | Total Improvement in JSN Recovery | - | 12 | 125 | 22 | 6 | 130 |
| 3 | Total Secured Recovery | 1,745 | 1,757 | 1,870 | 1,768 | 1,751 | 1,876 |
| 4 | % of Total Claim ($2,223M) | 79% | 79% | 84% | 80% | 79% | 84% |
| 5 | Unsecured Recovery | 217 | 211 | 189 | 210 | 216 | 186 |
| 6 | Total Recovery | $ 1,963 | $ 1,969 | $ 2,060 | $ 1,977 | $ 1,967 | $ 2,062 |
| 7 | % of Total Claim ($2,223M) | 88% | 89% | 93% | 89% | 88% | 93% |

A  Intercompany balances identified for forgiveness
B  Reinstatement of balances on account of avoidance of fraudulent conveyances
C  Subordination of certain intercompany balances
D  The aggregation of 1A, 1B, and 1C

15

# Scenario 1 **A** – Impact of Intercompany Balances Identified for Forgiveness

■ Historically, the Debtors forgave intercompany balances in the normal course of business. On occasions including when the existence of an intercompany payable on a Debtor's balance sheet threatened certain solvency and net worth thresholds under external financing agreements and/or federal or state regulations, the intercompany balance was forgiven.  Additionally, intercompany balances were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities

■ The Debtors forgave approximately $16.6B of intercompany balances between the 2008 and the Petition Date

■ In addition to the $16.6B of balances forgiven prior to the Petition Date, an additional $2.6B of intercompany balances that were on the Debtors' books and records as of the Petition Date were identified for forgiveness in the first half of 2012.  But for the bankruptcy filing, it is appropriate to assume these balances would have been forgiven in the ordinary course of business

■ The schedule below provides a summary of intercompany balances that the Debtors had identified for forgiveness in the first half of 2012

| Impact of Intercompany Balances Identified for Forgiveness | | | | | |
|---|---|---|---|---|---|
| ($ millions) | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012 (1) | Anticipated Intercompany Balance Forgiveness | Adjusted Net Interco Balances |
| | Paying Entity | Receiving Entity | | | |
| 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 |
| 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | - | 1,955 |
| 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | (1,249) | 3 |
| 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (652) | 45 |
| 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | (265) | 0 |
| 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | (214) | 18 |
| 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 |
| 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | (55) | - |
| 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co., LLC | 51 | - | 51 |
| 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | (50) | - |
| 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | (46) | - |
| 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | (36) | - |
| 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | (17) | 0 |
| 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | (12) | - |
| 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | (10) | - |
| 16 | Other | Other | 41 | (17) | 24 |
| 17 | **Total** | | $ 8,192 | $ (2,623) | $ 5,569 |

Impact of Intercompany Balances Identified for Forgiveness

1.   Excludes the intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC

16

# Scenario 1 B - Impact of Reinstatement of Intercompany Balances on Account of Fraudulent Conveyances

- Certain of the intercompany balances reflected on the Debtors' books and records as of the Petition Date could be reduced if actions were brought to avoid certain instances of the historical forgiveness of intercompany balances. That is because creditors of a Debtor entity that forgave a balance would likely argue that the Debtor entity did not receive reasonably equivalent value for the extinguishment of the receivable
- The schedule below reflects the impact of reinstating the balances that were forgiven that offset the intercompany balances on the Debtors' books and records as of the Petition Date

## Impact of Reinstatement of Balances on Account of Avoidance of Fraudulent Conveyances (1)

($ millions)

| | | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012 (2) | Avoidance of Fraudulent Conveyances | Adjusted Net Interco Balances |
|---|---|---|---|---|---|---|
| | | Paying Entity | Receiving Entity | | | |
| Impact of Reinstatement of Balances on Account of Avoidance of Fraudulent Conveyances | 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 |
| | 2 | Residential Capital, LLC (3) | Residential Funding Co., LLC (3) | 1,955 | (1,955) | - |
| | 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | - | 1,252 |
| | 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (44) | 653 |
| | 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | - | 265 |
| | 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | - | 232 |
| | 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 |
| | 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | - | 55 |
| | 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co. LLC | 51 | - | 51 |
| | 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | - | 50 |
| | 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | - | 46 |
| | 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | - | 36 |
| | 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | - | 17 |
| | 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | - | 12 |
| | 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | - | 10 |
| | 16 | Other | Other | 41 | - | 41 |
| | 17 | **Total** | | $ 8,192 | $ (1,999) | $ 6,193 |

1. For illustrative purposes, the impact of avoidance of fraudulent conveyance has been applied to intercompany balances higher than $10M
2. Excludes the intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC

17

# Scenario 1 C – Impact of Subordination of Certain Intercompany Balances

■ Certain of the intercompany agreements identified by the Debtors contain bankruptcy standstill provisions that subordinate balances accrued under these agreements to GUC (see Homecomings Intercompany Advance Agreement, PATI Intercompany Advance Agreement, and RAHI Intercompany Advance Agreement). The Debtors do not believe that the intercompany balances on the Debtors' books and records as of the Petition Date accrued pursuant to these agreements; however, to the extent the holders of JSN seek to argue that these agreements govern the intercompany balances, the bankruptcy standstill provisions contained in these agreements would similarly apply

■ The schedule below reflects the impact of subordination pursuant to bankruptcy standstill provisions on certain intercompany balances

| Impact of Subordination of Certain Intercompany Balances | | | | | |
|---|---|---|---|---|---|
| ($ millions) | Top Intercompany Balances | | Net Interco Balance as of May 14, 2012 (1) | Subordinated Intercompany Balances | Adjusted Net Interco Balances |
| | Paying Entity | Receiving Entity | | | |
| 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $ 3,334 | $ - | $ 3,334 |
| 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | - | 1,955 |
| 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | (1,252) | - |
| 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (697) | - |
| 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | - | 265 |
| 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | (232) | - |
| 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 |
| 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | - | 55 |
| 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co., LLC | 51 | - | 51 |
| 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | - | 50 |
| 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | - | 46 |
| 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | - | 36 |
| 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | - | 17 |
| 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | - | 12 |
| 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | - | 10 |
| 16 | Other | Other | 41 | - | 41 |
| 17 | **Total** | | $ 8,192 | $ (2,180) | $ 6,012 |

*Impact of Subordination of Intercompany Balances*

1. Excludes the intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC

# Scenario 1 D – Aggregate Adjusted Intercompany Balances

■ Aggregating scenarios 1A, 1B, and 1C, results in a decrease to the total amount of intercompany balances of $4.6B. Adjustments are indicated on the right hand side of the chart and indicate whether the adjustment was due to intercompany balances identified for forgiveness, reinstatement of balances on account of avoidance of fraudulent conveyances or subordination of certain intercompany balances

### Impact of Adjustments to the Intercompany Balances

($ millions)

| | Paying Entity | Receiving Entity | Net Interco Balance as of May 14, 2012 (1) | Aggregate Adjustments | Adjusted Net Interco Balances | Adjustments |
|---|---|---|---|---|---|---|
| 1 | GMAC Residential Holding Co., LLC | Residential Capital, LLC | $   3,334 | $   - | $   3,334 | |
| 2 | Residential Capital, LLC | Residential Funding Co., LLC | 1,955 | (1,955) | - | B |
| 3 | Residential Funding Co., LLC | Homecomings Financial, LLC | 1,252 | (1,252) | - | A      C |
| 4 | GMAC Mortgage, LLC | Passive Asset Transactions, LLC | 697 | (697) | - | A  B  C |
| 5 | GMAC Mortgage, LLC | Executive Trustee Services, LLC | 265 | (265) | 0 | A |
| 6 | RFC Asset Holdings II, LLC | Residential Funding Co., LLC | 232 | (232) | - | A      C |
| 7 | GMAC Mortgage, LLC | Residential Funding Co., LLC | 140 | - | 140 | |
| 8 | GMAC Residential Holding Co., LLC | Home Connects Lending Serv., LLC | 55 | (55) | - | A |
| 9 | GMAC Mortgage, LLC | GMAC Residential Holding Co., LLC | 51 | - | 51 | |
| 10 | Home Connects Lending Serv., LLC | GMACRH Settlement Services, LLC | 50 | (50) | - | A |
| 11 | Residential Funding Co., LLC | RFC Asset Management, LLC | 46 | (46) | - | A |
| 12 | RFC Asset Management, LLC | RFC SFJV-2002, LLC Pre | 36 | (36) | - | A |
| 13 | Residential Funding Co., LLC | RCSFJV2004, LLC | 17 | (17) | 0 | A |
| 14 | RFC Asset Holdings II, LLC | Homecomings Financial, LLC | 12 | (12) | - | A |
| 15 | GMACRH Settlement Services, LLC | GMAC Mortgage, LLC | 10 | (10) | - | A |
| 16 | Other | Other | 41 | (17) | 24 | A |
| 17 | **Total** | | $   8,192 | $   (4,643) | $   3,549 | |

A  Intercompany balances identified for forgiveness
B  Reinstatement of balances on account of avoidance of fraudulent conveyances
C  Subordination of certain intercompany balances
D  The Aggregation of 1A, 1B, and 1C

1.  Excludes the intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC

19

# Impact of Intercompany Balances on the JSN Recovery

■ The schedule below provides a detailed breakdown of the JSN recoveries from allowed intercompany balances in each sensitivity scenario

| ($ millions) | | | | | | Scenario 1 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Interco Relationships** | | **Net Interco Balance** | **Base Case** | **A** | **B** | **C** | **D** | **Scenario 2** |
| | **Receiving Entity** | **Paying Entity** | | | | | | | |
| 1 | ResCap | GMAC Resi Holdings | $ 3,334 | $    - | $    - | $    - | $    - | $    - | $    - |
| 2 | RFC | ResCap | 1,955 | - | 5 | - | 5 | - | 5 |
| 3 | Homecomings | RFC | 1,252 | - | 0 | 95 | - | - | 95 |
| 4 | PATI | GMACM | 697 | - | 1 | 14 | - | - | 15 |
| 5 | ETS | GMACM | 265 | - | 0 | 6 | 7 | 0 | 6 |
| 6 | RFC (1) | RAHI (1) | 232 | - | - | - | - | - | - |
| 7 | RFC | GMACM | 140 | - | 4 | 3 | 4 | 4 | 3 |
| 8 | Other | Other | 318 | - | 2 | 7 | 7 | 2 | 7 |
| 9 | **Subtotal** | | $ 8,192 | $    - | $   12 | $  125 | $   22 | $    6 | $  130 |
| 10 | JSN Secured Recovery - Base Case (2) | | | 1,745 | 1,745 | 1,745 | 1,745 | 1,745 | 1,745 |
| 11 | Total Secured Recovery | | | $ 1,745 | $ 1,757 | $ 1,870 | $ 1,768 | $ 1,751 | $ 1,876 |
| 12 | % of Total Claim ($2,223M) | | | 79% | 79% | 84% | 80% | 79% | 84% |
| 13 | Unsecured Recovery | | | 217 | 211 | 189 | 210 | 216 | 186 |
| 14 | Total Recovery | | | $ 1,963 | $ 1,969 | $ 2,060 | $ 1,977 | $ 1,967 | $ 2,062 |
| 15 | % of Total Claim ($2,223M) | | | 88% | 89% | 93% | 89% | 88% | 93% |

Impact of Intercompany Balances

JSN Recovery

A  Intercompany balances identified for forgiveness
B  Reinstatement of balances on account of avoidance of fraudulent conveyances
C  Subordination of certain intercompany balances
D  The aggregation of 1A, 1B, and 1C

1.  For illustrative purposes, recoveries from the RAHI intercompany balances are included in the equity pledge portion of the JSN secured recovery
2.  For comparative purposes the $1,745M is reflected on a consistent basis. The JSN secured recovery varies between scenarios based on assumptions applied to the intercompany balances

20



Appendix

# Pre-Petition Intercompany Balances[1]

*($ in millions)*

| | Paying Entity | | | Receiving Entity | | | Net Payable Balance |
|---|---|---|---|---|---|---|---|
| | LE | Name | D/ND | LE | Name | D/ND | |
| 1 | SS033 | GMAC Residential Holding Co LL | Debtor | 50000 | Residential Capital, LLC | Debtor | $ 3,334 |
| 2 | 50000 | Residential Capital, LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 1,955 |
| 3 | 10010 | Residential Funding Co., LLC | Debtor | 10011 | Homecomings Financial, LLC | Debtor | 1,252 |
| 4 | SS001 | GMAC Mortgage LLC | Debtor | SS095 | Passive Asset Transactions LLC | Debtor | 697 |
| 5 | SS001 | GMAC Mortgage LLC | Debtor | SS002 | Executive Trustee Services LLC | Debtor | 265 |
| 6 | 10015 | RFC Asset Holdings II, LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 232 |
| 7 | SS001 | GMAC Mortgage LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 140 |
| 8 | SS033 | GMAC Residential Holding Co LL | Debtor | SS067 | Home Connects Lending Serv LLC | Debtor | 55 |
| 9 | SS001 | GMAC Mortgage LLC | Debtor | SS033 | GMAC Residential Holding Co LL | Debtor | 51 |
| 10 | SS067 | Home Connects Lending Serv LLC | Debtor | SS066 | GMACRH Settlement Services LLC | Debtor | 50 |
| 11 | 10010 | Residential Funding Co., LLC | Debtor | 10300 | RFC Asset Management, LLC | Debtor | 46 |
| 12 | 10300 | RFC Asset Management, LLC | Debtor | 10301 | RFC SFJV-2002, LLC Pre | Debtor | 36 |
| 13 | 10010 | Residential Funding Co., LLC | Debtor | 10302 | RCSFJV2004, LLC | Debtor | 17 |
| 14 | 10015 | RFC Asset Holdings II, LLC | Debtor | 10011 | Homecomings Financial, LLC | Debtor | 12 |
| 15 | SS066 | GMACRH Settlement Services LLC | Debtor | SS001 | GMAC Mortgage LLC | Debtor | 10 |
| 16 | 10301 | RFC SFJV-2002, LLC Pre | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 6 |
| 17 | 10302 | RCSFJV2004, LLC | Debtor | 10300 | RFC Asset Management, LLC | Debtor | 6 |
| 18 | 10022 | Equity Investment I, LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 5 |
| 19 | 16220 | DOA Holding Properties, LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 4 |
| 20 | SS067 | Home Connects Lending Serv LLC | Debtor | SS001 | GMAC Mortgage LLC | Debtor | 3 |

1.  Excludes the intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC

# Pre-Petition Intercompany Balances (cont.) [1]

*($ in millions)*

| | LE | Paying Entity — Name | D/ND | LE | Receiving Entity — Name | D/ND | Net Payable Balance |
|---|---|---|---|---|---|---|---|
| 21 | 10011 | Homecomings Financial, LLC | Debtor | SS001 | GMAC Mortgage LLC | Debtor | 3 |
| 22 | SS001 | GMAC Mortgage LLC | Debtor | 50000 | Residential Capital, LLC | Debtor | 3 |
| 23 | 10302 | RCSFJV2004, LLC | Debtor | 10301 | RFC SFJV-2002, LLC Pre | Debtor | 3 |
| 24 | SS001 | GMAC Mortgage LLC | Debtor | SS026 | Ditech.com LLC | Debtor | 3 |
| 25 | 10010 | Residential Funding Co., LLC | Debtor | 10550 | GMAC Model Home I, LLC | Debtor | 2 |
| 26 | 10015 | RFC Asset Holdings II, LLC | Debtor | 50000 | Residential Capital, LLC | Debtor | 2 |
| 27 | SS002 | Executive Trustee Services LLC | Debtor | SS019 | ETS of Virginia, Inc. | | 1 |
| 28 | SS001 | GMAC Mortgage LLC | Debtor | SS009 | GMAC Mortgage USA Corporation | Debtor | 1 |
| 29 | SS001 | GMAC Mortgage LLC | Debtor | SS007 | Residential Consumer Serv LLC | | 0 |
| 30 | 10010 | Residential Funding Co., LLC | Debtor | 30003 | RFC Construction Funding LLC | | 0 |
| 31 | 10010 | Residential Funding Co., LLC | Debtor | SS002 | Executive Trustee Services LLC | Debtor | 0 |
| 32 | SS095 | Passive Asset Transactions LLC | Debtor | 10015 | RFC Asset Holdings II, LLC | Debtor | 0 |
| 33 | 16269 | DOA Properties IX, LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 0 |
| 34 | SS018 | ETS of Washington Inc | Debtor | SS001 | GMAC Mortgage LLC | Debtor | 0 |
| 35 | SS001 | GMAC Mortgage LLC | Debtor | SS019 | ETS of Virginia, Inc. | | 0 |
| 36 | SS018 | ETS of Washington Inc | Debtor | SS002 | Executive Trustee Services LLC | Debtor | 0 |
| 37 | SS067 | Home Connects Lending Serv LLC | Debtor | 10010 | Residential Funding Co., LLC | Debtor | 0 |
| 38 | 10300 | RFC Asset Management, LLC | Debtor | 10011 | Homecomings Financial, LLC | Debtor | 0 |
| 39 | 10011 | Homecomings Financial, LLC | Debtor | 10301 | RFC SFJV-2002, LLC Pre | Debtor | 0 |
| 40 | **Total** | | | | | | **$ 8,192** |

1. Excludes the intercompany balance between GMAC Res Fund of Canada (Non-debtor) and Residential Funding Co., LLC

23

# Balance of Pending Forgiveness

*($ millions)*

| Forgiven By | In Favor Of | Amount of Pending Balance Forgiveness |
|---|---|---|
| **Homecomings Financial, LLC** | Residential Funding Co., LLC | $ 1,249 |
| | RFC Asset Holdings II, LLC | 12 |
| | **Subtotal** | **$ 1,261** |
| **Passive Asset Transactions, LLC** | GMAC Mortgage LLC | $ 652 |
| **Executive Trustee Services, LLC** | GMAC Mortgage LLC | $ 265 |
| **Residential Funding Co., LLC** | RFC Asset Holdings II, LLC | $ 214 |
| | RFC SFJV-2002, LLC Pre | 6 |
| | **Subtotal** | **$ 220** |
| **Home Connects Lending Serv., LLC** | GMAC Residential Holding Co LLC | $ 55 |
| **RFC Asset Management, LLC** | Residential Funding Co., LLC | $ 46 |
| | RCSFJV2004, LLC | 6 |
| | **Subtotal** | **$ 52** |
| **GMACRH Settlement Services, LLC** | Home Connects Lending Serv LLC | $ 50 |
| **RFC SFJV-2002, LLC Pre** | RFC Asset Management, LLC | $ 36 |
| | RCSFJV2004, LLC | 3 |
| | **Subtotal** | **$ 39** |
| **RCSFJV2004, LLC** | Residential Funding Co., LLC | $ 17 |
| **GMAC Mortgage, LLC** | GMACRH Settlement Services LLC | $ 10 |
| | Home Connects Lending Serv LLC | 3 |
| | **Subtotal** | **$ 13** |
| **Grand Total** | | **$ 2,623** |

24

# Actual Balance Forgiveness

($ in millions)

| Forgiven By | In Favor Of | Entity Status | 2008 | 2009 | 2010 | 2011 | 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| | | | **Year** | | | | | |
| Residential Capital, LLC | Residential Funding Co., LLC | Debtor | $ 2,000 | $ 151 | $ - | $ - | $ - | $ 2,151 |
| | GMAC RFC Europe Limited | Non Debtor/Active | 1,800 | - | - | - | - | 1,800 |
| | GMAC - RFC (UK) Limited | Sold 9/30/2010 | 725 | 371 | 80 | - | - | 1,176 |
| | GMAC RFC Investment B.V. | Sold 10/01/2010 | 154 | 435 | - | - | - | 589 |
| | Investments BV GX1 | SPE/Active | - | 165 | 285 | 3 | - | 452 |
| | RFC UK Ltd Viaduct | SPE/Active | 15 | 175 | 231 | - | - | 420 |
| | GMAC Res Fund of Canada | Non Debtor/Active | 154 | 5 | - | - | - | 159 |
| | Australia GMAC RFC | Sold 7/02/2009 | 23 | 122 | - | - | - | 145 |
| | Viaduct (no.7) | SPE/Active | - | - | - | - | 134 | 134 |
| | Financiera Auritec, S.A. | Non Debtor/Active | - | 39 | - | - | - | 39 |
| | GMAC-RFC Property Finance Ltd | Non Debtor/Active | - | 33 | - | - | - | 33 |
| | PREEMAC 2 NL NETH B.V. | SPE/Active | - | - | 19 | 3 | - | 22 |
| | **Subtotal** | | **4,871** | **1,495** | **615** | **5** | **134** | **7,120** |
| GMAC Residential Holding Co LLC | GMAC Mortgage LLC | Debtor | - | 2,520 | - | - | - | 2,520 |
| Residential Funding Co., LLC | RFC Asset Holdings II, LLC | Debtor | 1,228 | - | - | - | - | 1,228 |
| | GMAC Model Home Finance, LLC | Sold 6/2008 | 481 | - | - | - | - | 481 |
| | Equity Investment I, LLC | Debtor | 392 | - | - | - | - | 392 |
| | RC Properties I, LLC | Dissolved 12/30/2011 | - | 88 | - | - | - | 88 |
| | CMH Holdings, LLC | Non Debtor/Active | 48 | - | - | - | - | 48 |
| | DOA Properties IX, LLC | Debtor | - | - | - | 45 | - | 45 |
| | DOA Holding Properties, LLC | Debtor | 43 | 0 | - | - | - | 43 |
| | DOA Properties I, LLC | Dissolved 8/09/2011 | 31 | - | - | - | - | 31 |
| | Equity Investment IV | Dissolved 8/09/2011 | - | 21 | - | - | - | 21 |
| | KBOne, LLC | Sold 6/2008 | 18 | - | - | 1 | - | 18 |
| | DOA Properties II, LLC | Dissolved 8/09/2011 | 14 | - | - | - | - | 14 |
| | RFC-GSAP Servicer Advance, LLC | Debtor | 7 | - | - | - | - | 7 |
| | DOA Properties IV, LLC | Dissolved 12/30/2011 | - | - | - | 7 | - | 7 |
| | Developers of Hidden Springs | Dissolved 12/30/2011 | 6 | - | - | - | - | 6 |
| | DOA Holdings NoteCo, LLC | Dissolved 4/12/2012 | - | - | - | 5 | - | 5 |
| | REG-PFH, LLC | Dissolved 12/30/2001 | 5 | - | - | - | - | 5 |
| | LenOne, LLC | Sold 6/2008 | 4 | - | - | 0 | - | 4 |
| | RFC Construction Funding LLC | Debtor | - | - | - | 2 | - | 2 |

25

# Actual Balance Forgiveness (cont.)

($ in millions)

| Forgiven By | In Favor Of | Entity Status | 2008 | 2009 | 2010 | 2011 | 2012 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | Year | | | |
| **Residential Funding Co., LLC** | Hidden Springs Sewer Company | Sold 9/23/2009 | 2 | - | - | - | - | 2 |
| | GMAC Model Home I, LLC | Debtor | - | 1 | - | - | - | 1 |
| | Ameriland LLC | Dissolved 12/30/2011 | 1 | - | - | - | - | 1 |
| | GMCMTH, LLC | Sold 6/2008 | 0 | - | - | 0 | - | 1 |
| | DOA Properties IIIB, LLC | Sold 9/30/2008 | - | - | - | 0 | - | 0 |
| | DOA Properties V, LLC | Dissolved 12/30/2011 | 0 | - | - | - | - | 0 |
| | DOA Properties VIII, LLC | Cancelled 6/06/2008 | - | 0 | - | - | - | 0 |
| | RFC Resort Funding LLC | Sold 7/23/2008 | - | - | - | 0 | - | 0 |
| | DOA Properties VII, LLC | Dissolved 8/09/2011 | 0 | - | - | - | - | 0 |
| | **Subtotal** | | **2,280** | **111** | **-** | **61** | **-** | **2,452** |
| **Passive Asset Transactions LLC** | Flume (no.8) | SPE/Active | - | - | 351 | - | 53 | 404 |
| | GX CE Funding II B.V. | SPE/Active | - | - | 311 | - | - | 311 |
| | **Subtotal** | | **-** | **-** | **662** | **-** | **53** | **715** |
| **RFC Asset Holdings II, LLC** | GMAC Model Home Finance, LLC | Sold to CMH 6/2008 | **-** | **-** | **-** | **209** | **-** | **209** |
| **GMAC Mortgage LLC (1)** | PATI, LLC (1) | Debtor | **44** | **-** | **-** | **-** | **-** | **44** |
| **GMACRH Settlement Services LLC** | Home Connects Lending Serv LLC | Debtor | **5** | **-** | **-** | **-** | **-** | **5** |
| **Homecomings Financial, LLC** | GMAC Model Home Finance, LLC | Sold 6/2008 | - | - | - | 0 | - | 0 |
| | DOA Properties IIIB, LLC | Sold 9/30/2008 | - | - | - | 0 | - | 0 |
| | KBOne, LLC | Sold 6/2008 | - | - | - | 0 | - | 0 |
| | LenOne, LLC | Sold 6/2008 | - | - | - | 0 | - | 0 |
| | **Subtotal** | | **-** | **-** | **-** | **0** | **-** | **0** |
| | **Subtotal of Top Interco Notes** | | **7,199** | **4,126** | **1,277** | **275** | **187** | **13,064** |
| **GMAC Model Home Finance, LLC** | Various | | 636 | - | - | 503 | - | 1,139 |
| **CMH Holdings, LLC** | Various | | - | - | - | 457 | - | 457 |
| **Flume (no.8)** | Various | | - | - | 351 | - | 53 | 404 |
| **GX CE Funding II B.V.** | Various | | - | - | 311 | - | - | 311 |
| **DOA Holding Properties, LLC** | Various | | - | - | - | 268 | - | 268 |
| **Remaining** | Various | | 84 | - | - | 773 | 134 | 992 |
| | **Total** | | **$ 7,920** | **$ 4,126** | **$ 1,938** | **$ 2,276** | **$ 374** | **$ 16,633** |

1.  The Fazio Report referenced the debt forgiveness schedule produced by the Debtors. Since the production, the debt forgiveness schedule has been updated to reflect an additional balance of $44M between GMAC Mortgage, LLC and PATI, LLC

26

## Source Documents

- April 30, 2013 Trial Balances (RENZI0000001)
- Estimated Recovery On Remaining Assets (RENZI00000002)
- Ocwen True-Up Summary (RENZI00000003)
- ResCap – Intercompany Transactions Presentation Dated April 4, 2013 (EXAM00345894)
- Post-Petition Intercompany Claims (RCUCCJSN00012496)
- Forgiven Intercompany Claim Balances (RCUCCJSN11270924)
- Intercompany Balances Identified for Forgiveness (RCJSNII00003625)
- Expert Report of Michael Fazio – Recovery Analysis Dated October 18, 2013
- Debtors' SOALs (ECF #s 548-595)
- Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan (ECF # 4819)
- Homecomings Intercompany Advance Agreement (EXAM00107030-EXAM00107035)
- PATI Intercompany Advance Agreement (EXAM00107300-EXAM00107307)
- RAHI Intercompany Advance Agreement (EXAM00107022-EXAM00107029)

27



## Signature Page

I reserve the right to update or modify this Report for additional information that may come to my attention, including information that was unavailable to me as of the date of this Report.  I declare under penalty of perjury that foregoing is true and correct to the best of my knowledge and belief as of the date of this Report

Dated: November 1, 2013

_____

Mark A. Renzi

Senior Managing Director

FTI Consulting Inc.

# **Exhibit C**

Page 1

1

2

UNITED STATES BANKRUPTCY COURT

3   FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

4   IN RE:

RESIDENTIAL CAPITAL, LLC, et al.

5

6   Civil Action No. 12-12020 (MG)

----------------------------------------X

7

8           ***HIGHLY CONFIDENTIAL***

9       VIDEO DEPOSITION OF MARK RENZI

10          New York, New York

11          November 6, 2013

12

13

14           R E V I S E D

15

16

17

18   Reported by:

19   Rebecca Schaumloffel, RPR, CLR

20   Job No: 67415

21

22

23

24

25

Highly Confidential

Page 125

M. RENZI

1    it is the Scenario 1(b), and we looked at --

2    there are two main --

3    Q.    Are you looking at a different

4    page in your report?

5    A.    I'm looking at page 17.  So we

6    identified two balances, the ResCap to RFC

7    balance of $1.9 billion, and then the GMAC

8    mortgage to PATTI, or passive action

9    transaction balance.  They were identified

10   for fraudulent conveyances.

11   Q.    Were there other intercompany

12   balances between entities that had

13   intercompanies that were avoided -- sorry,

14   that were forgiven?  Let me restate that so

15   that's clear.

16          Did you identify other

17   intercompany balances between entities that

18   had outstanding intercompany balances

19   scheduled on the SOALs, that were forgiven,

20   in addition to the two identified on this

21   page of your report?

22   MR. KERR:  Objection.

23   A.    There were two balances that we

24   identified that were relevant for this

Highly Confidential

Page 126

M. RENZI

1

2   analysis for fraudulent conveyance that

3   reduced the balances.  Those were the ones on

4   row 2 and one on row 4, which are the GMAC

5   PATTI and the ResCap RFC balances.

6        Q.    How did you determine that they

7   were relevant for this analysis for

8   fraudulent conveyance?

9        A.    I think I stated in the first --

10  the first bullet, and I am happy to read

11  that.

12        "Certainly the intercompany

13  balances reflected on the debtors' books and

14  records as of the petition date could be

15  reduced if actions were brought against" --

16  "brought to avoid certain instances of the

17  historical forgiveness of intercompany

18  balances.  That is because creditors of the

19  debtor entity that forgave a balance would

20  likely argue the debtor entity did not

21  reasonable equivalent value for the

22  extinguishment of the receivable."

23        And so, that's how.

24        Q.    Did you identify any balances

25  that could be subject to fraudulent

Highly Confidential

Page 127

1                       M. RENZI

2    conveyance action that increased the

3    intercompany balances?

4         A.     There are, that could increase

5    them, but we didn't think that -- in

6    discussions with counsel and in discussions

7    in terms of who would be bringing those

8    causes of action, we didn't think that, from

9    a legal standpoint, that somebody would be

10   arguing to increase a balance.

11        Q.     Don't you think the JSNs would,

12   if they had a lien on those balances?

13        A.     They could.

14        Q.     But you didn't include that in

15   your analysis?

16        A.     I did not.

17        Q.     Did you run an analysis that

18   avoided, as fraudulent conveyances, all debt

19   forgiveness from 2008 forward?

20        A.     Not from my expert report.

21        Q.     Do you know what the effect of

22   that would be?

23        A.     It's very difficult to do that

24   just looking at this page.

25        Q.     Do you know whether it would have

Highly Confidential

1                    M. RENZI

2    less than a $2 billion impact on the net

3    intercompany balances as of May 14, 2012?

4         A.    Would it -- I'm sorry?

5         Q.    Do you know whether it would have

6    less than a $2 billion impact on the net

7    intercompany balances as of May 14, 2012?

8         A.    Are you asking me if the number

9    is lower than the 199 on page 17, third

10   column of numbers?

11        Q.    Yes.

12        A.    Yes, I think it offsets that

13   number.

14        Q.    Do you know by how much?

15        A.    I don't remember.

16        Q.    A billion?

17        A.    I think it is more than a

18   billion.

19        Q.    Looking at Scenario 1(c), what

20   are you doing in Scenario 1(c)?

21        A.    We are adjusting three balances

22   for subordination.  That's the RFC, the home

23   comings balance, the GMAC mortgage to PATTI

24   balance, and the RFC, the RAHI to RFC

25   balance.