# <u>Exhibit 2</u>

## Proofs of Claim and Responses

## Bath Proof of Claim

Claim #1138  Date Filed: 10/10/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: **Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Brian Edmond Bath

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

**Brian Edmond Bath**
**8547 East Arapahoe Road, J - 129**
**Greenwood Village CO 80112**

Telephone number: 303.517.1360                 email: bbath2012@aol.com

**Court Claim Number:** _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:                              email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $_____
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. **Basis for Claim:** Mortgage Note _____
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: ____3948____ | 3a. Debtor may have scheduled account as: a transferred claim *(See instruction #3a)* | 3b. Uniform Claim Identifier (optional): ████████4619 *(See instruction #3b)* |
|---|---|---|

4. **Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
Nature of property or right of setoff: ☑ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $ 75,000    Annual Interest Rate 8.0 % ☑ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____              Basis for perfection: _____

Amount of Secured Claim: $ 75,000.00 ____    Amount Unsecured: $_____

**RECEIVED**
OCT 1 0 2012
**KURTZMAN CARSON CONSULTANTS**

6. **Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.      $ 75,000.00 ____  (See instruction #6)

7. **Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. **Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. **Signature:** (See instruction #9) Check the appropriate box.
☑ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or   ☐ I am a guarantor, surety,
                        (Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
                                                                    (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Brian Edmond Bath _____
Title: _____                    *Brian bath* (Signature)    10.3.12 (Date)
Company: _____
Address and telephone number (if different from notice address above):
_____
_____

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

Telephone number:                Email:

COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprison*

12120201210100000000000030



**Experian**
A world of insight

Prepared for:  **BRIAN BATH**
Date: **September 11, 2012**
Report number: **1808-3757-58**

Page 6 of 24

Your accounts that may be considered negative (continued)

▶ The original amount of this account was $73,400

**GMAC MORTGAGE**
PO BOX 4622
WATERLOO IA 50704
**Phone number**
(800) 766 4622
**Partial account number**
3644
**Address identification number**
3644
**Mortgage Identification Number**
4619

**Payment history**
2008 2007
JAN DEC NOV OCT
CLS CLS NO CO

| **Date opened** | **Type** | **Credit limit or** | **Recent balance** | **Responsibility** |
|---|---|---|---|---|
| Jul 2004 | Home Equity | original amount | Not reported | Individual |
| **First reported** | **Terms** | $75,000 | | **Status** |
| Oct 2007 | Not reported | **High balance** | | Transferred,closed, $0 written off. |
| **Date of status** | **Monthly** | $75,000 | | **Creditor's statement** |
| Jan 2008 | **payment** | | | "Account transferred to another lender." |
| | Not reported | | | This item was updated from our processing of your dispute in Jun 2012. |

**HOMEWARD RESIDENTIAL**
PO BOX 631730
IRVING TX 75063
**Phone number**
(877) 304 3100
**Partial account number**
3644
**Address identification number**
3644

**Payment history**
2008
SEP
F

| **Date opened** | **Type** | **Credit limit or** | **Recent balance** | **Responsibility** |
|---|---|---|---|---|
| Jun 2006 | Mortgage | original amount | $0 as of Sep 2008 | Individual |
| **First reported** | **Terms** | Not reported | | **Status** |
| Sep 2008 | 40 Years | **High balance** | | Foreclosed. |
| **Date of status** | **Monthly** | Not reported | | This account is scheduled to continue on record until May 2013. |
| Sep 2008 | **payment** | | | This item was updated from our processing of your dispute in Jun 2012. |
| | Not reported | | | |

0029429279

## **Bath Response**

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

In re:                                          )          Chapter 11
                                                )
RESIDENTIAL CAPITAL, LLC, et al.,               )          Case No. 12-12020 (MG)
_____                )            Jointly Administered
                                                )
                                                )
                                                )          Claim 1138
Debtor                                          )

---

## CREDITOR'S NOTICE FOR VOLUNTARY DISMISSAL

---

BRIAN EDMOND BATH'S RESPONSE AND OBJECTION TO DEBTOR'S MOTION TO
DISALLOW AND EXPUNGE FOR FAILURE TO SHOW SUPPORTING
DOCUMENTATION

Brian Edmond Bath humbly prays to the Court to deny debtors claim

to disallow and expunge my claim.

### A. INTRODUCTION

1. Creditor is Brian Edmond Bath; debtor is RESIDENTIAL CAPITAL, LLC.

2. Creditor files a claim against debtor for a report on Brian Edmond Bath's

Experian credit report for $ 75,000.00 under a GMAC Mortgage account.

3. Debtor filed a motion to dismiss Creditor, Brian Edmond Bath claim for

failure to show sufficient documentation

4. Creditor, Brian Edmond Bath files this response asking the Court to

deny debtor's motion.

5. In its claim, debtor alleged an insufficient claim for lack of documentation,

prior to filing petition for bankruptcy; creditor can produce 2 years of correspondence

with GMAC, subsidiary of RESIDENTIAL CAPITAL, LLC. (See Exhibit A & B)

RECEIVED
AUG - 1 2013
U.S. BANKRUPTCY COURT, SDNY

## B. ARGUMENT

6. When considering the debtor's motion to dismiss, a court must construe the factual allegations in the complaint in the light most favorable to the creditor.

See *Barker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

If the complaint provides fair notice of the claim and the factual allegations are sufficient to show that the right to relief is plausible, a court should deny the defendant's motion.

See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555-56; *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). {*See O'Connor's Federal Rules, "Standard," ch. 3-F, §5.1, p. 203.*}

7. In the motion, debtor alleged a claim for insufficient documentation, and the elements are what law states that a creditor must show documentation outside of discovery. The motion does not provide creditor with fair notice of the claim.

See *Brooks*, 578 F.3d at 581.

8. In support of *his* claim for sufficient, Brian Edmond Bath made the following factual allegations for each element: claim for 75,000.00. This factual allegations show a right to relief that is plausible. That is, when the factual allegations are assumed to be true, they show a right to relief that is more than mere speculation.

See *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009); *see Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-56; *Brooks*, 578 F.3d at 581

## C. CONCLUSION

9. Because Brian Edmond Bath stated a claim on which relief can be granted, the Court should deny debtor's motion and retain the claim on the Court's docket.

Respectfully Submitted

Dated: July 28, 2013

All Rights Reserved

Brian Edmond Bath, Creditor
UCC 1 - 308

New Address: 2614 Tamiami Trail North, # 633
Naples, Florida [34103]

9227 East Lincoln Avenue
Suite 200 – 425
Lone Tree, Colorado 80124

Exhibit A

September 28, 2011

Experian
P O Box 9701
Allen, Texas 75013

Attn: Legal Department

I am disputing the following items:

  1.  GMAC MORTGAGE / ACCOUNT # 739176****

Please provide me with a description of the reinvestigation procedure for all items.

Please provide me with the source of information for all items.

Please send me all information in my consumer file.

Please send me an updated copy of my credit report.

Thank you for your cooperation in advance.


Sincerely,


Brian Edmond Bath
████3948


P.S.  Please find enclosed a copy of my Passport and Social Security card to verify identity.


Enc.

**Office of Brian Edmond Bath**
**8547 East Arapahoe Road**
**Suite J - 129**
**Greenwood Village, Colorado**
**thetwomisifts@gmail.com**

April 12, 2013,                          2nd Constructive Notice
                                         Certified Mail: 7011 2000 0001 2340 0632

GMAC Mortgage
PO BOX 4622
WATERLOO, IA 50704

Re: Experian Credit Report Accounts: 739176....

## NOTICE OF PENDING LAWSUIT

Legal Department,

This is being sent prior to filing suit an opportunity to amicably cure GMAC Mortgage violations of the Fair Credit Reporting Act (FCRA) 15 U.S.C. § 1681b, Fair Debt Collection Practices Act (FDCPA)15 U.S.C. § 1692c(a)(1) and the Florida Consumer Collection Practices Act (FCCPA).

I have repeatedly mail you written request to you requesting an lawful response. You have not done so. I also demand that you pay me $ 75,000.00 as settlement for your violations of law at my expense and delete all records of your account with all 4 credit bureaus.

I am willing to settle these matters amicably without having to file suit and am giving you five days from receipt of this letter to take the opportunity to do so.

If GMAC Mortgage chooses not to settle the matters at hand then I will have no choice but to file suit and seek my remedy in small claims court.

Please also cease all communications with me by phone. All future communications with me must be done in writing or email and sent to the address noted in this letter.

Respectfully,

_____
Brian Edmond Bath
thetwomisifts@gmail.com

Exhibit B

## Scott Proof of Claim

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor and Case Number:**
Residential Capital, LLC, Case No. 12-12020

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

**Name of Creditor (the person or other entity to whom the debtor owes money or property):**
FREDDIE M. SCOTT

**Name and address where notices should be sent:**
FREDDIE M. SCOTT & TIMOTHY W. SCOTT
14450 E. 50TH. AVE.
DENVER,COLORADO 80239

Telephone number: 303-371-8274     email: seamf52@msn.com

**Name and address where payment should be sent (if different from above):**

Telephone number:     email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
*(If known)*

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ 208,250.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** MORTGAGE NOTE
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 1234

**3a. Debtor may have scheduled account as:** Alison Tearnen
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☒Real Estate ☐Motor Vehicle ☐Other
**Describe:**

**Value of Property:** $ 208,250.00     **Annual Interest Rate** 5 % ☐Fixed ☒Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:** $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____     **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ 208,250.00 (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature: (See instruction #9)** Check the appropriate box.
☒ I am the creditor.     ☐ I am the creditor's authorized agent.     ☐ I am the trustee, or the debtor, or     ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)     their authorized agent.     indorser, or other codebtor.
(See Bankruptcy Rule 3004.)     (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Freddie M. Scott
Title:
Company:     (Signature) Freddie M. Scott     (Date) 11-6-12
Address and telephone number (if different from notice address above):

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☒ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(9).

**Amount entitled to priority:**
$ 208,250.00

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

RECEIVED
NOV 0 8 2012
KURTZMAN CARSON CONSULTANTS

Telephone number: 303-371-8274     Email: seamf52@msn.com

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 1°*

1212020121108000000000105

# STONECREEK FUNDING
### MORTGAGE       BANKERS

---

# ATTN:    TITLE CLOSER

Please return the Original Note and a copy of the Deed of Trust with the attached Transfer and Allonge packet WITHIN 24 HOURS to:

> The Provident Bank (PCFS)
> Attn: Donna Futscher
> 309 Vine Street
> Cincinnati, Ohio 45202
> Mail Sop 227-D

Please also ensure that Stonecreek receives a copy of the Note and the Deed, along with THE REST OF OUR ORIGINAL DOCUMENTS to be returned as soon as possible to:

> Stonecreek Funding
> Attn: Wendi Giezentanner
> 36 Steele Street, Suite 210
> Denver, CO  80206

Thank you for your assistance in this matter, and please feel free to call me at (303) 355-1304 with any questions.

Sincerely,


Wendi Giezentanner
Stonecreek Funding

# AFFIDAVIT

## STATE OF COLORADO

## COUNTY OF DENVER

The undersigned, being duly sworn, deposes and says:

1.  We are over the age of eighteen years.

2.  We have reasonable knowledge of Account number ████0131.

3.  We did not knowingly or willingly sign any agreement obligating us to repay our own monies to **DEUTSCHE BANK TRUST COMPANY AMERICAS, RESIDENTIAL FUNDING CORPORATION or STONECREEK FUNDING CORPORATION.**

4.  We have not knowingly or willingly refused to pay **DEUTSCHE BANK TRUST COMPANY AMERICAS** through **HOMECOMING FINANCIAL** any monies belonging to it that it advance to us.

5.  The monies advanced to us by **STONECREEK FUNDING CORPORATION** and assigned/sold to **RESIDENTIAL FUNDING CORPORATION** and assigned/sold to **DEUTSCHE BANK TRUST COMPANY AMERICAS**, *fka* **BANKERS TRUST COMPANY** belonged to us.

6.  **DEUTSCHE BANK TRUST COMPANY AMERICAS, RESIDENTIAL FUNDING CORPORATION, and STONECREEK FUNDING CORPORATION** did not lend us any lawful money.

7.  **DEUTSCHE BANK TRUST COMPANY AMERICAS, RESIDENTIAL FUNDING CORPORATION, and STONECREEK FUNDING CORPORATION** used deceit and Fraud in the Factum and Fraud in the Inducement of the agreement.

Date: 01-28-08

_____          _____
Signature of Affiant               Signature of Affiant

Freddie Mae Scott                  Timothy Wayne Scott
Printed Name of Affiant            Printed Name of Affiant

I HEREBY CERTIFY that on _____, before me, the subscriber, a Notary Public in and for the City & County aforesaid, personally appeared the above stated affiants, and made Oath in due form of law.

MIA B.
BALLENTINE
STATE OF COLORADO

_____
Notary
My Commission Expires: May 28 2011

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.250 %** or less than **8.250 %**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE AND 000/1000** percentage points ( **1.000 %**) from the rate of interest I have been paying for the preceding **6** month(s). My interest rate will never be greater than **14.250 %**. My interest rate will never be less than 8.250%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Rider.**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayment without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3 (A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE** 

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_Freddie M. Scott_ _____ (Seal)       _____ (Seal)
FREDDIE M. SCOTT                          Borrower                                                    Borrower

_____ (Seal)       _____ (Seal)
                                                   Borrower                                                    Borrower

_____ (Seal)       _____ (Seal)
                                                   Borrower                                                    Borrower

Document Systems, Inc.                          Page 3 of 3          Adjustable Rate Note (LIBOR Index-Rate Caps)
                                                                    GMAC Residential Funding Form 1555 (10/91)

Borrower Initials: _____  _____     _____  _____

N15553 LSR

Freddie M. Udit
14450 E. 50th. AVE.
Denver Colorado 80239





**MAIL COVER SHEET**

Please attach a separate
Mail Cover Sheet to each group of
Documents and mail to:
PCFS
309 VINE STREET
CINCINNATI, OH 45202
MAIL STOP 227 D

## ENCLOSED IN THIS PACKAGE: (Circle One)

Please deliver this package to:
(Check One and Circle Subheading)

| | |
|---|---|
| **WAREHOUSE/INVESTOR SETUP** | Charles Hunt |
| Warehouse Transmittal Packages | Fax: 1-888-222-7988 |
| Complete Final Package Submissions | Ph:  1-800-838-9727 ext. 15451# |
| Credit Grades | |
| New Closed Loan Submissions | |
| | |
| **COLLATERAL/NOTES FOR PURCHASE** | Rhonda Jacobs |
| | |
| **PURCHASING CONDITIONS** | Bill Kiefer |
| Closing Packages | Regional Buyer Name |
| Pre-funding Conditions | Fax: 1-888-513-8125 |
| Clear to close conditions | Ph:  1-800-838-9727 ext. 11292# |
| | |
| **WAREHOUSE AGED LOANS** | Steve Ahlers |

For PCFS to maintain our service level commitment to you this cover sheet is to be
completed and attached to all correspondence sent to PCFS.

Failure to use this form and to fill it out completely may cause delays in processing
your request.

This instrument was prepared by
And should be returned to:

# TRANSFER and ASSIGNMENT of MORTGAGE

This Transfer and Assignment is made this 26th day of October , 2001 by and between Stonecreek Funding , whose address is 36 Steele Street, Suite 210, Denver, a corporation organized and existing under the laws of the State of Colorado (herein referred to as "Assignor") and THE PROVIDENT BANK, doing business as _____ _____ whose address is One East Fourth Street, Cincinnati, Ohio 45202, a corporation organized and existing under the laws of the State of Ohio (hereinafter referred to as "Assignee").

For and in consideration of the sum of one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby transfers and assigns unto Assignee it interest in and to that certain Mortgage, Deed of Trust, or Security Deed ("The Mortgage") which is more fully described as follows:

MORTGAGER(s): Freddie Scott

PRINCIPAL AMOUNT: $ 208,250.00

DATE OF EXECUTION: 10-26-01

LEGAL DESCRIPTION: See attached Exhibit "A"

PARCEL IDENTIFICATION#:

DATE OF RECORDING:

BOOK:                    PAGE:

MICROFICHE or INSTRUMENT#:

COUNTY:                 STATE:

Together with the rights of Assignor under the note or notes, any and all loan agreements, security agreements, and all other documents executed in conjunction with the loan transaction including the indebtedness, without recourse.

Evidenced by the Note and secured by the Mortgage conveying the property and all rights, privileges and powers of Assignor in, to or under the Note and the Mortgage.

IN WITNESS WHEREOF, Assignor has caused the Assignment to be executed by its duly authorized officer(s) and has caused its corporate seal to be affixed hereto on the date first above written.

Stonecreek Funding
"Assignor"

By: _____

Printed Name:   Scott Brooks

Its:   President

Witness

Witness

By: _____

Printed Name: _____

Its: _____

Witness

Witness

STATE OF    COLORADO

COUNTY OF    DENVER

The Foregoing instrument was acknowledged before me, a Notary Public, This 26th day of October , 2001 by  Scott Brooks  its  President  and by _____ on behalf of the corporation. He/she/they is/are personally known to me or has produced satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument.

My commission expires:

June 8, 2005

Notary Public

Printed Name    Wendi Giezentanner

Jurisdiction _____

NOTARY PUBLIC
WENDI
GIEZENTANNER
STATE OF COLORADO

# ALLONGE TO PROMISSORY NOTE

Without recourse pay to the order of
**RESIDENTIAL FUNDING CORPORATION**

By: _____

Name:        Scott Brooks
Title:       President
Company:     Stonecreek Funding
             36 Steele St., Suite 210
             Denver, CO 80206

Loan Information

Borrower:    Freddie Scott

Address:     14450 E. 50th Ave
             Denver, CO 80239

Loan Amount: $ 208,250.00

Loan Date:   10-26-01

PAY TO THE ORDER OF
Bankers Trust Company as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

By _____

Judy Faber, Vice President

---

**ALLONGE TO PROMISSORY NOTE**

**FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE**

---

**POOL: 4559**          **LOAN ID:** ███8124    

**NOTE DATE: 10/26/2001**    **LOAN AMOUNT: $208250.00**

**BORROWER NAME: FREDDIE SCOTT**

**PROPERTY ADDRESS: 14450 EAST 50TH AVE, DENVER, CO 80239**

---

PAY TO THE ORDER OF

**RESIDENTIAL FUNDING COMPANY, LLC**

WITHOUT RECOURSE

Deutsche Bank Trust Company Americas as Trustee, f/k/a Bankers Trust Company as Trustee,
Residential Funding Corporation as Attorney in Fact

By: _____
John Hagebock, Vice President
Residential Funding Corporation

PAY TO THE ORDER OF
LaSalle Bank, N.A. as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

By: _Judy Faber_
Judy Faber, Vice President

Recorded at _____ o'clock _____ M.,
Reception No. _____
Recorder

## ASSIGNMENT OF DEED OF TRUST OR MORTGAGE DEED

OCTOBER 26, 2001 _____ Date of Assignment
_____ Assignee
_____ Address

STONECREEK FUNDING
CORPORATION _____ Assignor
36 STEELE ST. #210 _____ Address
DENVER, COLORADO 80206

OCTOBER 26, 2001 _____ Date of Deed of Trust
DENVER _____ Recording date of Deed of Trust
_____ County of Recording
Book No. _____ Page No. _____ Loan Number: ████0109        812 ¢
Form No. _____ Reception No. _____

KNOW ALL MEN BY THESE PRESENTS THAT FREDDIE M. SCOTT AND TIMOTHY W. SCOTT did grant, bargain, sell and convey the property described in the Deed of Trust or Mortgage Deed herein referred to as Deed of Trust, to the Public Trustee*

In the County in which said Deed of Trust was recorded, to be held in trust to secure the payment of a Promissory Note for the original principal sum of $ 208,250.00 together with interest.

NOW THEREFORE, In consideration of the sum of TWO HUNDRED EIGHT THOUSAND TWO HUNDRED FIFTY AND 00/100 dollars, paid to the assignor, the receipt and sufficiency of which is hereby acknowledged, the said assignor hereby assigns unto the said assignee, the said Deed of Trust and Note secured thereby, together with all monies now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and promises therein contained, and the said assignor hereby grants and conveys unto the said assignee, the following described property, situated in the CITY AND ** County of DENVER State of Colorado, to wit:

LOT 5, BLOCK 12, GATEWAY VILLAGE FILING NO. 3, CITY AND COUNTY OF DENVER, STATE OF COLORADO.
A.P.N. #: 660318712005000

BANKERS TRUST COMPANY AS TRUSTEE
3 Park Plaza, Sixteenth Floor, Irvine, California 92714
recorded 11-13-2001 #2001191782 Denver County, CO.
also known by street and number as:

14450 EAST 50TH AVENUE, DENVER, COLORADO 80239

TO HAVE AND TO HOLD the said Deed of Trust and Note, and also the said property unto the said assignee forever, subject to the terms contained in said Deed of Trust and Note.

And the said assignor hereby covenants with the assignee that the said Deed of Trust and Note hereby assigned is a good and valid security and that the sum of TWO HUNDRED EIGHT THOUSAND TWO HUNDRED FIFTY AND 00/100 dollars remains unpaid on the said Note and that the said assignor has not done or permitted any act, matter or thing whereby the said Deed of Trust has been released or discharged, either partly or in entirety and has the right to assign said Deed of Trust and Note will upon request, do, perform and execute every act necessary to enforce the full performance of the covenants and agreements therein contained and that this assignment and the covenants herein shall inure to the benefit and extent to be binding upon the heirs, personal representatives, successors and assigns of the respective parties hereto.

IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written.

State of COLORADO
County of DENVER

STONECREEK FUNDING CORPORATION, A COLORADO CORPORATION

SEAL

Scott Brooks

The foregoing instrument was acknowledged before me in DENVER County, State of COLORADO
10-26-0 (date) by
Scott Brooks President

10-8-2005 Date Commission Expires

_____
Notary Address

NOTARY PUBLIC
WENDI GIEZENTANNER
STATE OF COLOR.

Witness my hand and seal,
_____
Notary Public

*If a Mortgage, have delete reference to Public Trustee and complete as applicable.
**If Denver, insert "City and."

After Recording Return To:

PEELLE MANAGEMENT CORPORATION
ASSIGNMENT JOB #90788
P.O. BOX 1710
CAMPBELL, CA 95009-1710
1-408-866-8868

STONECREEK FUNDING CORPORATION
36 STEELE ST. #210
DENVER, COLORADO 80206

CORPCO.AOD

2002075496 2002/04/23 15:22:00 1/ 2 ASN
DENVER COUNTY CLERK AND RECORDER  10.00       .00 JCZ
*****

After Recording Return To:

**PEELLE MANAGEMENT CORPORATION**
ASSIGNMENT JOB #90788
P.O. BOX 1710
CAMPBELL, CA 95009-1710
1-408-866-6868

RATION

RFC Loan Number: ███ 8124    05-031

**CORPORATION ASSIGNMENT of MORTGAGE/DEED OF TRUST**

## NOTICE OF ELECTION AND DEMAND
## FOR SALE BY PUBLIC TRUSTEE
### Colorado
Public Trustee Sale No. 3556

**TO THE PUBLIC TRUSTEE FOR THE COUNTY OF DENVER, COLORADO:**

Pursuant to the terms of the Deed of Trust executed by Freddie M. Scott and Timothy W. Scott, Grantor(s), dated October 26, 2001 and recorded on November 13, 2001 in the County of Denver as reference number(s) Reception No. 2001191782 indicating Stonecreek Funding Corporation as the Original Beneficiary, of which Deutsche Bank Trust Company Americas, fka Bankers Trust Company As Trustee is the Current Owner of the Evidence of Debt, you are hereby notified that the undersigned, as attorney for the owner of the Evidence of Debt secured by the Deed of Trust described above, the original principal amount of which was $208,250.00, with a present outstanding principal balance due and owing of $204,953.35, declares a violation of the covenants of said Deed of Trust by the default in the payment of principal and interest payments and other payments required by said Deed of Trust.

The following described property is all of the property presently encumbered by said Deed of Trust:

> Lot 5, Block 12, Gateway Village Filing No. 3, City and County of Denver, State of Colorado.
> Purported Street Address:    14450 East 56th Avenue
> Denver, CO 80239

### THE LIEN BEING FORECLOSED MAY NOT BE A FIRST LIEN

The undersigned, as the attorney and agent for the current owner of the Evidence of Debt secured by said Deed of Trust, elects to advertise the property therein described for sale, and hereby demands that you as Public Trustee named in said Deed of Trust give Notice, advertise for sale and sell said property for the purpose of paying the Evidence of Debt thereby secured by the above described Deed of Trust, and the expenses of making such sale, all as provided by law and the terms of said deed of trust.

THE LAW FIRM OF FRASCONA, JOINER, GOODMAN AND GREENSTEIN, P.C. ACTS AS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Date:    February 13, 2004

Deutsche Bank Trust Company Americas, fka Bankers Trust Company As Trustee
Current Owner of the Evidence of Debt

By:    Frascona, Joiner, Goodman and Greenstein, P.C.
Oliver E. Frascona, Esq.        Reg. No. 5748
Janeen R. Hill, Esq.        Reg. No. 33680
Attorney and Agent for the Current Owner of the Evidence of Debt
4750 Table Mesa Drive Boulder, CO 80305-5575
Telephone: (303) 494-3000 Facsimile: (303) 494-6309

2004056882
City & County Of Denver    NEG

# ADJUSTABLE RATE NOTE   Loan Number ████0109
## (LIBOR Index - Rate Caps)

### 3558

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

OCTOBER 26 , 2001 ,        DENVER                              COLORADO
                           [City]                              [State]

### 14450 EAST 50TH AVENUE, DENVER, COLORADO 80239
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $208,250.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is STONECREEK FUNDING CORPORATION, A COLORADO CORPORATION
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of   8.250   %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.
I will make my monthly payments on the       1st       day of each month beginning on DECEMBER   1
,2001      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on   NOVEMBER   1      ,2031      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at 36 STEELE ST. #210, DENVER, COLORADO 80206

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,564.51      . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of NOVEMBER   1      , 2004      , and on that day every   6th      month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar deposits in the London market based on quotations of major banks, as published in The Wall Street Journal. The rate published in The Wall Street Journal on the date 45 days before each Change Date as being the London interbank offered rate on the preceding business day is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SEVEN AND 030/1000                percentage points (   7.030   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Document Systems, Inc.                                              Adjustable Rate Note (LIBOR Index-Rate Caps)
                                                                   GMAC Residential Funding Form 1555 (10/91)
                                        Page 1 of 3

Borrower Initials: L.M.S.

N1555I.LSR

Identifier: ███ 2020-mg   Doc 5962-2   Filed 11/26/13   Entered 11/26/13 21:38:30   Exhibit 2 -
Proofs of Claim and Responses   Pg 26 of 143

2/4

## ADJUSTABLE RATE NOTE · Loan Number ████0109
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

OCTOBER   26   , 2001 ,           DENVER                COLORADO
                                    [City]                [State]

        14450 EAST 50TH AVENUE, DENVER, COLORADO 80239
                        [Property Address]

**1. BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $208,250.00  (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is STONECREEK FUNDING CORPORATION, A COLORADO CORPORATION
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
    Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of   8.250   %. The interest rate I will pay will change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
    **(A) Time and Place of Payments**
    I will pay principal and interest by making payments every month.
    I will make my monthly payments on the   1st   day of each month beginning on DECEMBER   1 , 2001  . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on NOVEMBER 1 , 2031  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."
    I will make my monthly payments at 36 STEELE ST. #210, DENVER, COLORADO 80206

                                or at a different place if required by the Note Holder.

    **(B) Amount of My Initial Monthly Payments**
    Each of my initial monthly payments will be in the amount of U.S. $1,564.51  . This amount may change.

    **(C) Monthly Payment Changes**
    Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the first day of NOVEMBER   1 , 2004  , and on that day every   6th   month thereafter. Each date on which my interest rate could change is called a "Change Date."

    **(B) The Index**
    Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar deposits in the London market based on quotations of major banks, as published in The Wall Street Journal. The rate published in The Wall Street Journal on the date 45 days before each Change Date as being the London interbank offered rate on the preceding business day is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

    **(C) Calculation of Changes**
    Before each Change Date, the Note Holder will calculate my new interest rate by adding SEVEN AND 030/1000           percentage points (  7.030   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
    The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Document Systems, Inc.                    Page 1 of 3          Adjustable Rate Note (LIBOR Index-Rate Caps)
                                                              GMAC Residential Funding Form 1555 (10/91)

                        Borrower Initials: _____  _____      _____  _____  _____  _____
413551.LSR

Identifier: ███ 12020-mg   Doc 5962-2   Filed 11/26/13   Entered 11/26/13 21:38:30   Exhibit 2 -
Proofs of Claim and Responses   Pg 27 of 143

3/4

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than   11.250 % or less than   8.250   %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   ONE AND 000/1000   percentage points ( 1.000   %) from the rate of interest I have been paying for the preceding   6   month(s). My interest rate will never be greater than   14.250   %. My interest rate will never be less than 8.250%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Rider.**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3 (A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Document Systems, Inc.                    Page 2 of 3                    Adjustable Rate Note (LIBOR Index-Rate Caps)
                                                                        GMAC Residential Funding Form 1555 (10/91)

Borrower Initials: ___  ___  ___    ___  ___  ___

N1555 LSR

**11. UNIFORM SECURED NOTE**

. This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_Freddie Mae Scott_ _____ (Seal)    _____ (Seal)
Freddie Mae Scott            Settlor    Borrower            Borrower
EIN# 545904509              Prepaid

_____ (Seal)    _____ (Seal)
                          Borrower            Borrower

_____ (Seal)    _____ (Seal)
                          Borrower            Borrower

ACKNOWLEDGMENT

As a Notary Public for the City and County of Denver, State of Colorado, I do hereby certify that on this _27th_ day of _November_ , 2007 the above mentioned appeared before me and executed the foregoing. Witness my hand and seal: Notary Public _____

(Notary seal)
NOTARY PUBLIC
CLAUDIA
SANCHEZ
STATE OF COLORADO

my comm. expires
June 14, 2010

**FILE COPY**

(handwritten, left margin, vertical) THIS APPLICATION PROVIDED THE INFORMATION FOR THE APPLICATION WHICH WAS FALSIFIED AND CHANGED

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower" as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ▢ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ▢ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ V.A.  ☐ FHA  ☒ Conventional  ☐ FmHA  ☐ Other: | Agency Case Number | Lender Case Number ▓▓0082 |
|---|---|---|---|

| Amount $ 160,316.00 | Interest Rate 8.250 % | No. of Months 300 | Amortization Type: ☒ Fixed Rate  ☐ GPM  ☐ Other (explain):  ☐ ARM (type): | 0 |
|---|---|---|---|---|

## PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) | No. of Units |
|---|---|
| 14450 50TH AVENUE DENVER COLORADO 80239 | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| LOT 5, BLK 12, GATEWAY SUBDIVISION | 2000 |

Purpose of Loan: ☒ Purchase  ☐ Construction  ☐ Other (explain):  ☐ Refinance  ☐ Construction-Permanent

Property will be: ☒ Primary Residence  ☐ Secondary Residence  ☐ Investment

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made   Cost $ |
|---|---|---|---|---|

| Title will be held in what Name(s) TIMOTHY W. SCOTT AND FREDDIE M. SCOTT | Manner in which Title will be held JOINT TENANCY | Estate will be held in: ☒ Fee Simple  ☐ Leasehold (show expiration date) |
|---|---|---|

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

Checking/Savings

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) TIMOTHY W. SCOTT | Co-Borrower's Name (include Jr. or Sr. if applicable) FREDDIE M. SCOTT |

| Social Security Number ▓-2026 | Home Phone (incl. area code) 303-371-8274 | Age 48 | Yrs. School 15 | Social Security Number ▓4509 | Home Phone (incl. area code) 303-371-8274 | Age 46 | Yrs. School 14 |
|---|---|---|---|---|---|---|---|

| ☒ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no.   ages | ☐ Married  ☒ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no.   ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  7 No. Yrs. mos. | Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  7 No. Yrs. mos. |
|---|---|
| 5490 CRYSTAL ST.  DENVER, COLORADO 80239 | 5490 CRYSTAL ST.  DENVER, COLORADO 80239 |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. mos. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. mos. |
|---|---|

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. mos. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. mos. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Name & Address of Employer  ☐ Self Employed  Yrs. on this job 2/ | Name & Address of Employer  ☐ Self Employed  Yrs. on this job 8/9 |
| DISABLED VETERAN | TURNER PROFESSIONAL SERVICES  26 OAKLAND ST. #7  AURORA, CO 80014 |
|  Yrs. employed in this line of work/profession | Yrs. employed in this line of work/profession 8 |

| Position/Title/Type of Business / | Business Phone (incl. area code) | Position/Title/Type of Business OFFICE MANAGER/APPRAISAL SERVI | Business Phone (incl. area code) 303-695-0587 |
|---|---|---|---|
| | 303-695-0587 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer  ☐ Self Employed  Dates (from - to)   Monthly Income | Name & Address of Employer  ☐ Self Employed  Dates (from - to)   Monthly Income |
|---|---|
| Position/Title/Type of Business / | Business Phone (incl. area code) | Position/Title/Type of Business / | Business Phone (incl. area code) |

| Name & Address of Employer  ☐ Self Employed  Dates (from - to)   Monthly Income | Name & Address of Employer  ☐ Self Employed  Dates (from - to)   Monthly Income |
|---|---|
| Position/Title/Type of Business / | Business Phone (incl. area code) | Position/Title/Type of Business / | Business Phone (incl. area code) |

| Borrower's Signature X | Date | Freddie Mac Form 65 10/92  Fannie Mae Form 1003 10/92 |
|---|---|---|
| Co-Borrower's Signature X | Date | |

Page 1 of 4

FILE COPY

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ | 2,975.00 | 2,975.00 | Rent | | |
| Overtime | | | | First Mortgage (P&I) | 663.00 | 1,264.02 |
| Bonuses | | | | Other Financing (P&I) | | 38.25 |
| Commissions | | | | Hazard Insurance | | 162.50 |
| Dividends/Interest | | | | Real Estate Taxes | | 28.06 |
| Net Rental Income | 162.00 | | 162.00 | Mortgage Insurance | | 4.58 |
| Other (before completing, see the notice in "describe other income" below) | 2,988.85 | | 2,988.85 | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | 3,150.85 | 2,975.00 | 6,125.85 | Total | 663.00 | 1,497.41 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| B | VA DISABILITY/DISBILITY | 2,419.60 |
| B | SOCIAL SECURITY/Social Securit | 569.25 |

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [X] Jointly [ ] Not Jointly

## ASSETS

Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property.

| Description | ASSETS | Cash or Market Value | | LIABILITIES | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|---|
| Cash deposit toward purchase held by: MEADON HOMES | | < 2,000.00> | Name and address of Company | | | 28,895.00 |
| | | | | CHRYS CRED | 600.00/48 | |
| List checking and savings accounts below | | | | | | |
| Name and address of Bank, S&L, or Credit Union CITYWIDE BANK OF DENVER | | | Acct. no. _____9210 | | $ Pmt./Mos. | 5,269.00 |
| | | 10,890.68 | Name and address of Company | | | |
| US BANK | | | | CAPITAL ONE BANK | 299.00/18 | |
| | | 3,063.76 | | | | |
| Acct. no. | | | Acct. no. _____5692 | | $ Pmt./Mos. | 4,873.00 |
| Name and address of Bank, S&L, or Credit Union FITSIMMONS FEDERAL C.U. | | | Name and address of Company | | | |
| | | 30,401.29 | | AURORA NATIONAL BANK | 198.00/25 | |
| Acct. no. | | | Acct. no. _____5961 | | $ Pmt./Mos. | 3,178.00 |
| Name and address of Bank, S&L, or Credit Union | | | Name and address of Company | | | |
| | | | | US BANK | 188.00/17 | |
| Acct. no. | | | Acct. no. _____0801 | | $ Pmt./Mos. | 2,568.00 |
| Name and address of Bank, S&L, or Credit Union | | | Name and address of Company | | | |
| | | | | FCNB-SPIEGEL | 175.00/15 | |
| Acct. no. | | | Acct. no. _____1737 | | $ Pmt./Mos. | 2,063.00 |
| Stocks & Bonds (Company name/number & description) | | | Name and address of Company | | | |
| | | | | HFC | 44.00/47 | |
| Life insurance net cash value | | | Acct. no. _____9422 | | $ Pmt./Mos. | 1,744.00 |
| Face amount: $ | | | Name and address of Company | | | |
| Subtotal Liquid Assets | | 44,355.73 | | CROSS COUNTRY BANK | 50.00/35 | |
| Real estate owned (enter market value from schedule of real estate owned) | | 139,000.00 | | | | |
| Vested interest in retirement fund | | | Acct. no. _____8492 | | $ Pmt./Mos. | |
| Net worth of business(es) owned (attach financial statement) | | | Alimony/Child Support/Separate Maintenance Payments Owed to: | | $ | |
| Automobiles owned (make and year) 1990 DODGE DURANGO | | 30,000.00 | | | | |
| Other Assets (itemize) Furniture | | 30,000.00 | Job Related Expense (child care, union dues, etc.) | | $ | |
| | | | | Total Monthly Payments | | $ 1,746.00 |
| Total Assets a. | | 243,355.73 | | Net Worth (a minus b) ► $ 105,013.73 | Total Liabilities b. | 138,342.00 |

Borrower's Signature: X _____  Date _____    Co-Borrower's Signature: X _____  Date _____

Fannie Mae Form 1003 10/92

**FILE COPY**

## Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| SEE SCHEDULE OF REAL ESTATE OWNED | | $ | $ | $ | $ | $ | $ |
| | Totals | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|

---

### DETAILS OF TRANSACTION

| | | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|
| | | | Yes | No | Yes | No |
| a. Purchase price | 191,304.00 | a. Are there any outstanding judgments against you? | | X | | X |
| b. Alterations, improvements, repairs | | b. Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. Land (if acquired separately) | | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. Refinance (incl. debts to be paid off) | 939.75 | d. Are you a party to a lawsuit? | | X | | X |
| e. Estimated prepaid items | 2,111.75 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | X |
| f. Estimated closing costs | | | | | | |
| g. PMI, MIP, Funding Fee | | | | | | |
| h. Discount (if Borrower will pay) | | | | | | |
| i. Total costs (add items a through h) | 194,355.50 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | X |
| j. Subordinate financing | | g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| k. Borrower's closing costs paid by Seller | | h. Is any part of the down payment borrowed? | | X | | X |
| l. Other Credits (explain) Earnest Money | 2,000.00 | i. Are you a co-maker or endorser on a note? | | X | | X |
| | | j. Are you a U.S. citizen? | X | | X | |
| | | k. Are you a permanent resident alien? | | X | | X |
| | | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | X | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 160,316.00 | m. Have you had an ownership interest in a property in the last three years? | | X | | X |
| n. PMI, MIP, Funding Fee financed | 160,316.00 | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| o. Loan amount (add m & n) | | (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 32,039.50 | | | | | |

---

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns, will rely on the information contained in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to a successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property. Certification: I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

---

### X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may neither discriminate on the basis of this information, nor on whether you choose to furnish it. However, if you choose not to furnish it, under Federal regulations this Lender is required to note race and sex on the basis of visual observation or surname. If you do not wish to furnish the above information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER Race/National Origin: | | CO-BORROWER Race/National Origin: | |
|---|---|---|---|
| ☐ I do not wish to furnish this information | | ☐ I do not wish to furnish this information | |
| ☐ American Indian or Alaskan Native | ☐ Asian or Pacific Islander | ☐ American Indian or Alaskan Native | ☐ Asian or Pacific Islander |
| ☐ White, not of Hispanic origin | | ☐ White, not of Hispanic origin | |
| X Black, not of Hispanic origin | ☐ Hispanic | X Black, not of Hispanic origin | ☐ Hispanic |
| ☐ Other (specify) | | ☐ Other (specify) | |
| Sex: ☐ Female   X Male | | Sex: X Female   ☐ Male | |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | BILL FIRMIN | CTX MORTGAGE COMPANY |
| ☐ face-to-face interview | Interviewer's Signature          Date | 5600 SOUTH QUEBEC STREET, STE 100D |
| X by mail | Interviewer's Phone Number (incl. area code) | GREENWOOD VILLAGE, CO 80111 |
| ☐ by telephone | 303/741-1241 | |

| Freddie Mac Form 65 10/92 | Page 3 of 4 | Fannie Mae Form 1009 10/92 |
|---|---|---|

# Uniform Residential Loan Application

**FILE COPY**

This application is designed to be completed by the applicant(s) with the lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA. | ☑ Conventional | ☐ Other: | | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|---|
| | ☐ FHA | ☐ FmHA | | | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☑ Fixed Rate | ☐ Other (explain): |
|---|---|---|---|---|---|
| 208,150 | 8.250 % | 360/360 | | ☐ GPM | ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) | No. of Units |
|---|---|
| 4450 EAST 50TH AVE , Denver, CO 80239 County: Denver | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| | |

| Purpose of Loan | ☐ Purchase ☐ Construction ☐ Other (explain): | Property will be: |
|---|---|---|
| | ☐ Refinance ☐ Construction-Permanent | ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| 000 | 191,000 | $ 158,300 | Cash-Out/Debt Consolidation | Cost: $ |

| Title will be held in what Name(s) FREDDIE M. SCOTT ✓ | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| | Joint tenants | ☑ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
| FREDDIE SCOTT | |

| Social Security Number | Home Phone (incl. area code) | Age | Yrs. School | Social Security Number | Home Phone (incl. area code) | Age | Yrs. School |
|---|---|---|---|---|---|---|---|
| 4509 | 303-371-8274 | 48 | 14 | | | | |

| ☑ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no. ages | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Borrower) no. ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) ☑ Own ☐ Rent 1.5 No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|
| 4450 EAST 50TH AVE. Denver, CO 8023 | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) ☑ Own ☐ Rent 10 Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|
| 990 CRYSTAL STREET DENVER, CO 8023 9 | |

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Name and Address of Employer ☐ Self Employed | Name and Address of Employer ☐ Self Employed |
| RESIDENTIAL APPRAISAL SPECIALIST 45 OAK STREET WHEATRIDGE, CO 80033 | |

| Yrs. on this job 2 | Yrs. on this job |
|---|---|
| Yrs. employed in this line of work/profession 13 | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| APPRAISER | 303-432-0809 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name and Address of Employer ☐ Self Employed | Dates (from-to) | Name and Address of Employer ☐ Self Employed | Dates (from-to) |
|---|---|---|---|

✗  FALSIFIED APPLICATION



**FILE COPY**

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 10,000.00 | $ | $ 10,000.00 | Rent | $ | $ |
| Overtime | | | | First Mortgage (P&I) | 1,291.00 | 1,564.51 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | 46.00 | 39.83 |
| Dividends/Interest | | | | Real Estate Taxes | 170.00 | 134.92 |
| Net Rental Income | | | | Mortgage Insurance | | 100.00 |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other | | |
| Total | $ 10,000.00 | $ | $ 10,000.00 | Total | $ 1,507.00 | $ 1,839.26 |

*Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| | Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower(B) or Co-Borrower(C) does not choose to have it considered for repaying this loan. | | |
|---|---|---|---|---|
| B/C | | | | Monthly Amount |
| | | | | $ |
| | | | | |
| | | | | |

## VI. ASSETS AND LIABILITIES

This statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☑ Jointly ☐ Not Jointly

| ASSETS | | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|
| Description | | | LIABILITIES | $ Payt./Mos. | $ |
| Cash deposit toward purchase held by: | | $ | Name and address of Company | | |
| | | | WASHINGTON MUTUAL HOME | | |
| List checking and savings accounts below | | | 324 W. EVANS STREET | | |
| Name and address of Bank, S&L, or Credit Union | | | FLORENCE, SC 29501 | | |
| FITZSIMMONS FEDERAL CREDIT UNION | | | | | |
| 13529 E. 17TH PL | | | | | |
| AURORA, CO 80010 | | | Acct. no. ████6764 | * (1,480) /300 | 157,157 |
| | | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. ████4110 | | $ 500 | HOMESIDE LENDING INC. | | |
| Name and address of Bank, S&L, or Credit Union | | | 9601 MCALLISTER FWY | | |
| CITYWIDE BANKS | | | SAN ANTONIO, TX 78216 | | |
| P.O. BOX 128 | | | (RENTAL PROPERTY) | | |
| AURORA, CO 80040-0128 | | | Acct. no. ████0000 | (675) /360 | 84,912 |
| | | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. ████7835 | | $ 1,000 | US BANK | | |
| Name and address of Bank, S&L, or Credit Union | | | 332 MINNESOTA ST. | | |
| | | | SAINT PAUL, MN 55101 | | |
| | | | (RENTAL PROPERTY) | | |
| | | | Acct. no. ████0001 | (385) /180 | 32,906 |
| Acct. no. | | $ | Name and address of Company | $ Payt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | | CHRYS CRED | | |
| | | | 6025 S. QUEBEC STREET, SUITE 350 | | |
| | | | ENGLEWOOD, CO 80111 | | |
| | | | Acct. no. ████3210 | 608 /072 | 19,958 |
| Acct. no. | | $ | Name and address of Company | $ Payt./Mos. | $ |
| Stocks & Bonds (Company name/ number & description) | | $ | FFCU | | |
| | | | P.O. BOX 6248 | | |
| | | | AURORA, CO 80045 | | |
| | | | Acct. no. ████0144 | 276 /72 | 12,355 |
| | | | Name and address of Company | $ Payt./Mos. | $ |
| Life insurance net cash value | | | DIRECT MERCHANTS BANK | | |
| Face amount: $ | | $ | 17600 N PERIMETER DR. | | |
| Subtotal Liquid Assets | | $ 1,500 | SCOTTSDALE, AZ 85255 | | |
| Real estate owned (enter market value from schedule of real estate owned) | | $ 400,000 | Acct. no. ████9269 | 220 /(8) | |
| Vested interest in retirement fund | | | | | |

FILE COPY

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 14450 EAST 50TH AVE. Denver, CO 80239 | SFR | $ 230,000 | $ 157,200 | $ | $ 1,291 | $ 216 | $ |
| 5480 CRYSTAL STREET DENVER, CO    R | SFR | 170,000 | 118,382 | 1,100 | 1,030 | | (205) |
| Totals | $ | 400,000 | 275,582 | $ 1,100 | $ 2,321 | $ 216 | $ (205) |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 194,535.00 |
| e. Estimated prepaid items | 1,533.19 |
| f. Estimated closing costs | 5,577.00 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | 2,070.00 |
| i. Total costs (add items a through h) | 203,715.19 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 208,250.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 208,250.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | (4,534.81) |

## VIII. DECLARATIONS

If you answer "yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | ☑ | | |
| b. Have you been declared bankrupt within the past 7 years? | | ☑ | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | ☑ | | |
| d. Are you a party to a lawsuit? | | ☑ | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | ☑ | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | ☑ | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | ☑ | | |
| h. Is any part of the down payment borrowed? | | ☑ | | |
| i. Are you a co-maker or endorser on a note? | | ☑ | | |
| j. Are you a U. S. citizen? | ☑ | | | |
| k. Are you a permanent resident alien? | | ☑ | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☑ | | | |
| m. Have you had an ownership interest in a property in the last three years? | ☑ | | | |
| (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | | | PR | |
| (2) How did you hold title to the home—solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | SP | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information contained in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

Certification: I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may neither discriminate on the basis of this information, nor on whether you choose to furnish it. However, if you choose not to furnish it, under Federal regulations this Lender is required to note race and sex on the basis of visual observation or surname. If you do not wish to furnish the above information, please check the box below. (Lender must review the above material to assure that the disclosure satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

**FILE COPY**

## Continuation Sheet/Residential Loan Application

| | |
|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: **FREDDIE SCOTT** |
| | Co-Borrower: |
| | Agency Case Number: |
| | Lender Case Number: |

### VI. ASSETS AND LIABILITIES

| ASSETS — Name and address of Bank, S&L, or Credit Union | Cash or Market Value | LIABILITIES — Name and address of Company | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| | | PROVIDIAN BP<br>P.O. BOX 9007<br>PLEASANTON, CA 94556 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████9963 | 31/(R) | 1,041 |
| Name and address of Bank, S&L, or Credit Union | | MBGA/JC PENEY<br>P.O. BOX 27510<br>ALBUQUERQUE, NM 87125 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████5299 | * 67/(R) | 1,349 |
| Name and address of Bank, S&L, or Credit Union | | LOWES/MBGA<br>P.O. BOX 103080<br>ROSWELL, GA 30076 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████3000 | 46/(R) | 1,629 |
| Name and address of Bank, S&L, or Credit Union | | AMEX<br>P.O. BOX 7871<br>FORT LAUDERDALE, FL 33329 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████3100 | 91/001 | 3,020 |
| Name and address of Bank, S&L, or Credit Union | | SEARS<br>13200 SMITH ROAD<br>CLEVELAND, OH 44130 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████2271 | * 29/(R) | 981 |
| Name and address of Bank, S&L, or Credit Union | | GECCCC/LENSCRAFTERS<br>P.O. BOX 276<br>DAYTON, OHN 45401 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████5858 | * 15/(R) | 711 |
| Name and address of Bank, S&L, or Credit Union | | NORDSTROM FSB<br>P.O. BOX 6555<br>ENGLEWOOD, CO 80155 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████1051 | * 11/(R) | 370 |
| Name and address of Bank, S&L, or Credit Union | | WAL-MART/MBGA<br>P.O. BOX 103027<br>ROSWELL, GA 30076 | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. ████4660 | * 34/(R) | 813 |
| Name and address of Bank, S&L, or Credit Union | | DILLARDS DEPT STORE<br>P.O. BOX 52005<br>PHOENIX, AZ 85072 | $ Payt./Mos. | $ |

**FILE COPY**

## Continuation Sheet/Residential Loan Application

| | | |
|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: **FREDDIE SCOTT** | Agency Case Number: |
| | Co-Borrower: | Lender Case Number: |

### VI. ASSETS AND LIABILITIES

| ASSETS Name and address of Bank, S&L, or Credit Union | Cash or Market Value | LIABILITIES Name and address of Company | Monthly Payt. & Mos. Left to Pay $ Payt./Mos. | Unpaid Balance $ |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union | | MBNA AMERICA BANK NA | $ Payt./Mos. $ | $ |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮6429 CITIBANK MASTER CARD | 86 $ | 5,262 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮4527 CROSS COUNTRY BANK | 97/(R) $ | 4,690 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮8492 LOEWS | 57/(R) $ | 1,896 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮0917 CITYWIDE BANKS | 46/(R) $ | 1,629 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮5961 CHASE NA | 168 $ | 1,143 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮9822 HHLD BANK | 26 $ | 1,302 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮9215 NEXTCARD | 21 $ | 824 |
| Acct. no. Name and address of Bank, S&L, or Credit Union | $ | Acct. No. ▮0871 DISCOVER FINANCIAL | 15/(R) $ | 363 |

**FILE COPY**

## Continuation Sheet/Residential Loan Application

| | |
|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: **FREDDIE SCOTT** |
| | Co-Borrower: |
| | Agency Case Number: |
| | Lender Case Number: |

### VI. ASSETS AND LIABILITIES

| ASSETS — Name and address of Bank, S&L, or Credit Union | Cash or Market Value | LIABILITIES — Name and address of Company | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| | | **WEISFIELD** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| | | **FAIR FINANCE** | $ Payt./Mos. | $ 1,484 |
| Acct. no. | $ | Acct. No. | | |
| | | **HRSI** | 72   $ Payt./Mos. | $ 1,297 |
| Acct. no. | $ | Acct. No. | | |
| | | **GORDON** | 20   $ Payt./Mos. | 792 |
| Acct. no. | $ | Acct. No. | | |
| | | **TARGET** | $ Payt./Mos. | 630 |
| Acct. no. | $ | Acct. No. | | |
| | | **EDDIE BAUER** | 32/(R)   $ Payt./Mos. | 628 |
| Acct. no. | $ | Acct. No. | | |
| | | **FOLEYS** | 20/(R)   $ Payt./Mos. | 556 |
| Acct. no. | $ | Acct. No. | * | |
| | | **FIRST PREMIER** | 65/(R)   $ Payt./Mos. | 546 |
| Acct. no. | $ | Acct. No. | | |
| | | **SPIEGEL** | 20/(R)   $ Payt./Mos. | 443 |

FILE COPY

## Continuation Sheet/Residential Loan Application

| | |
|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:  FREDDIE SCOTT |
| | Co-Borrower: |

Agency Case Number:

Lender Case Number:

### VI. ASSETS AND LIABILITIES

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company PROVIDIAN | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | * | 1,768 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company LOWES | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | * | 1,044 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |

FILE COPY

**<u>Scott Response</u>**



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re:                                          )          Case No. 12-12020 (MG)
                                                )
**RESIDENTIAL CAPITAL, LLC, et al.,**   )
                                                )
                            Debtors.    )
                                                )

### NOTICE OF OBJECTION TO PROPOSED DISALLOWANCE OR
### EXPUNGEMENT OF CLAIM

Freddie M. Scott

                        Claimant                                September 14, 2013

### BASIS OF CLAIM

### PREDATORY LENDING through SUB-PRIME MORTGAGE SECURITIZATIONS

The above named Debtors through their family of affiliates, agents and representatives and associated companies have committed various **Tort Acts** against Claimant(s) in a **SCHEME OR ARTIFICE TO DEFRAUD** myself, family and others in their participation in the **SECURITIZATION OF MORTGAGES.** This created an environment which encouraged and supported the fabrication and FALSIFICATION of documents to support an ongoing pattern in which  to maximize profits and benefits with no regard for the law.. The desire for huge profits led to plans and courses of action intended to deceive us,  and to obtain, by false or fraudulent pretenses, representations, or promises, monies or property from persons so deceived as my husband and myself. All of this is in RE: Loan #(s) ▉▉▉▉0131/▉▉▉▉0131 Loan period: October 26, 2001 until **FULL RECONVEYANCE** in which Beneficiary has consented. (see attached **NOTICE OF RECONVEYANCE**) dated November 29, 2007.

### STATEMENT OF FACTS

1. On October 26, 2001, We attended what we assumed would be Loan closing based on fully documented information supplied to the agents, representatives of **ALLY/GMAC/RFC** for a 30 year FIXED RATE MORTGAGE because of the FACT one of the co-borrowers was DISABLED VETERAN on a fixed income. The proper information was supplied, however the agent(s) and or representatives of **ALLY/GMAC/RFC (hereafter GMAC/RFC)** chose to **FALSIFY** the Application with the approval of the herein named DEBTORS to the detriment of claimant and family. We have attempted through the many years since October 26, 2001 to have his situation rectified. We later found that the agents and representatives of **GMAC** and

**RESIDENTIAL FUNDING** having **FALSIFIED t**he application (**END OF STORY**) to show
inaccurate and false income ($10,000) per month for Freddie M. Scott, when it was documented
on the application to be only about $2,750.00 - $2,900.00 per month. This along with the
DISABILITY INCOME OF VETERAN Timothy W. Scott of $2.988.00 constituted the income
which qualified us for a fixed rate mortgage "only". We didn't know at the time that this was the
type of situation in which Predatory Lending thrived. We now know we were targeted as
(African Americans) considered to not be sophisticated enough to understand what was going
on. The PREDATORY aspects of these type of loans have now been very well documented and
verified. In the pursuit of the SECURITIZATION of MORTAGES and the immense PROFITS
to be attained and then obtained, left individuals like us with very little recourse for reparations.
We didn't have the note at closing along with other documents which were not provided until
later. The application which we later learned had been falsified and the promissory note was not
available we were instructed to sign documents as of the Closing date of October 26, 2001. At
the closing we were told that Timothy W. Scott's income was not needed and that he would take
title only.

2. GMAC/RFC and affiliates sold adjustable rate mortgages without income verification and the
falsification of applications. With advanced knowledge of prospective borrowers such as
ourselves and the information provided manipulated that information to obtain a result most
assuredly favorable to GMAC/RFC the intended contracted mortgage loan would absolutely be
unserviceable by us because of the nature of ADJUSTABLE RATE MORTGAGES resetting for
additional profit(s).

3. We were never informed that I (**Freddie M. Scott**) had in fact entered into an undisclosed
investment contract and not a loan. Which was then and now a violation of TILA and the SEC.
Without my knowledge I was converted from a borrower to a securities issuer.

4. On October 26, 2001 your agent(s) took my promissory note and monetized it by stamping on
an **ALLONGE TO PROMISSORY NOTE**, without recourse to pay to the order of
**RESIDENTIAL FUNDING CORPORATION**, By Scott Brooks, President of Stone Creek
Funding Corp. Which was  deposited as cash into a deposit account at a bank such as in the
**ALLY/GMAC/RFC** affiliate family of companies in order to facilitate the securitization of
assets. An **Act of CONVERSION** . **NOTE had not been signed**. The ALLONGE indicates a
pay to the order of Scott Brooks without recourse on 10/26/01, but we didn't get the promissory
note until OCTOBER 30, 2001 @ 10:27 AM {**FRAUD IN THE FACTUM**}

5. THE NOTE WAS ALTERED, VOIDING IT.

6. THE NOTE WAS POOLED WITH OTHERS AND SECURITIZED

7. THE NOTE HAD (CASH) VALUE BECAUSE OF MY SIGNATURE

8. THE NOTE HAS BEEN MULTI-FUNDED AND SOLD MULTIPLE TIMES

9. THE TRANSACTION ACCOUNT FOR THE CASH VALUE OF THE NOTE BELONGS TO
**Freddie M. Scott and Timothy W. Scott**

10. THE NOTE, THEREFORE THE LOAN, HAS BEEN PAID AND SATISFIED

11. I (WE) FUNDED OUR OWN LOAN THROUGH MY SIGNATURE.

12. MY NOTE WAS THE BASIS OF THE ENTIRE TRANSACTION THROUGH
SECURITIZATIONS. THE NOTE IS NULL AND VOID (ab initio)

13. THE NOTE BECAUSE IT WAS SECURITIZED, WAS INSURED THROUGH THE **PSA**
AND OTHER VARIOUS MEANS SUCH AS CREDIT DEFAULT SWAPS AND OTHER
INSURANCE. THE PSA WAS THE INSURANCE EXISTING TO PROTECT THE BANKS
FROM DEFAULT.

14. THE NOTE HAS BEEN PAID AND THEREFORE; SATISIFED UNDER THE TERMS OF
THE PSA.

15. THE NOTE AND DEED OF TRUST WERE NOT LEGALLY AND VALIDLY
TRANSFERRED TO THE SECURITIZED TRUST, WHICH HELD THIS BUNDLED
SECURITY.

16. THE RULES THAT GOVERN ANY TRANSFERS ARE DICTATED BY THE POOLING
AND SERVCING AGREEMENT WHICH WE REQUESTED YEARS AGO. THE
PROMISSORY NOTE AND SECURITY INSTRUMENT UNDER STATE LAW HAD TO BE
TRANFERRED BY PROPER INDORSEMENT. THIS NOTE AND DEED OF TRUST WAS
TRANSFERRED AND INDORSED AND ASSIGNED AT LEAST TWICE TO DIFFERENT
ENTITIES ON THE SAME DAY (OCTOBER 26, 2001). THE ORIGINAL NOTE IS NOT
AVALIABLE AND WAS NOT AVAILABE UNTIL AT LEAST OCTOBER 30, 2001 AND
APPEARS TO HAVE BEEN BACKDRAFTED TO ACCOMMODATE SECURITIZATION
PURPOSES

17. DEBTORS ROUTINELY AND SYSTEMATICALLY HAVE FAILED TO COMPLY WITH
APPLICABLE STATE AND FEDERAL LAWS AND THE POOLING AND SERVICING
AGREEMENTS FOR THE VALID TRANSFEROF NOTES AND SECURITY
INSTRUMENTS

18. DEBTORS HAVING BEEN INVOLVED IN "ROBO-SIGNING AND THE
FALSIFICATIONOF SIGNATURES ASSIGNING MORTGAGES BACK TO SECURITIZED
TRUSTS ALLEGEDLY THAT OWNED THEM.

19. THE SCHEME BASED ON FRAUD DID NOT WORK

20. THE FRAUDULENT, PREDATORY, SUB-PRIME LOANS WERE PACKAGED, BUNDLED
AND SOLD OVER AND OVER AGAIN WITH **NO UNDERLYING RISKS** TO GMA/RFC
BECAUSE OF INSURANCE AND CREDIT DEFAULT SWAPS

21. THE NOT SO "MORTAGE BACKED SECURITIES BECAME TOXIC AND WE ARE
WHERE WE ARE TODAY. THE BASIS FOR OUR CLAIM, DUE TO THE FACT
INSTITUTIONAL INVESTORS HAVE REFUSED TO CONTINUE TO PURCHASE THE
BONDS.

22. CLAIMANT(S) IS/ARE THE INJURED PARTY IN THIS MATTER

23. FREDDIE MAE SCOTT HAS NOT FAILED TO STATE A CLAIM UPON WHICH RELIEF
CAN BE GRANTED AS EVIDENCED ON THE COMMERCIAL REGISTRY AT THE
COLORADO SECRETARY OF STATE'S OFFICE, UCC-1 FINANCING STATEMENT

24. THERE WAS A LACK OF POSSESSION OF THE ORIGINAL NOTE DEMONSTRATING
THE PROPER CHAIN OF TITLE AND ANY LEGAL RIGHT TO INITIATE AND OR
FORECLOSE WHICH WAS ATTEMPTED IN 2004 AND 2008 AND SHOULD BE NOTED
AS EVIDENCE OF FRAUD, THAT COUPLED WITH MISSING ASSIGNMENTS AND OR
MULTIPLE ASSIGNMENTS IS FURTHER EVIDENCE OF THE EXISTENCE OF FRAUD.

25. FOR A VALID LOAN TO EXIST, BOTH PARTIES INVOLVED MUST INCUR A RISK. IF
ONE PARTY HAS NO RISK, THERE IS NO EQUAL PROTECTION UNDER LAW.

## PREDATORY LENDNG CLAIMS

- Truth in lending Violations
- Original failure to give Notice of Right to Cancel
- Falsification of Uniform Residential Loan Application
- RESPA VIOLATIONS
- Equal Credit Opportunity Act violations

## RECONVEYANCE

1. The Deed of trust or security instrument and the Promissory Note are Paid-Off due to the nature
of the securitization process and the multiple pay outs of defaults in the loan (see page A 17. @
line 23).  **Release.** *Upon payment of all sums secured by this Security Instrument, Lender shall
request that Trustee release this Security Instrument and shall produce for Trustee, duly
canceled, all notes evidencing debts secured by this instrument. Trustee shall release this
Security Instrument without further inquiry or liability. Borrower shall pay any recordation
costs and the statutory Trustee's fees.*

## CLAIMANT RELIEF CLAIMS

1. UNDER "Civil RICO" Federal Racketeering laws (18 U.S.C. 1964) GMAC/RFC as the
"lender" may have established a "pattern of racketeering activity" by using the U.S. Mail more

than twice to attempt to collect an unlawful debt and GMAC/RFC and affiliates may be in violation of 18 U.S.C. 1341,1343, 1961 and 1962.

2. In the federal courts, it has been established that a National bank (ALLY) has no power to lend its credit to another by becoming surety, indorser, or guarantor for him. *"Farmers and Miners Bank v. Bluefield National bank, 11 F 2d 83, 271 U.S. 669.*

3. *"A national bank has no power to lend its credit to any person or corporation..."* *Bowen v. Needles National Bank 94 F 925, 36 CCA 553, certiorari denied in 20 S.ct 1024, 176 US 682, 44 LED 637.*

4. A bank may not lend its credit to another, even though such transactions (securitizations) turns out to have been of benefit to the bank (Ally and family of affiliates) *Norton Grocery Co. v Peoples National Bank, 144 SE 505, 151 Va 195.*

5. Any false representation of material facts with knowledge of falsity (falsified application) and with intent that it would be acted on by another in entering into contract, and which is so acted upon, constitutes "fraud", and entitles party deceived to avoid contract or recover damages." *Barnsdall Refining Corn. V Birnam wood Oil Co. 92 F 2d 817.*

6. "It is not necessary for recision of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently , to retain the fruits of a bargain induced by such representations" *Whipp v Iverson, 43 Wis 2d 166.*

## THROUGH THE LOOKING GLASS

The Banks and all surrounding and supporting entities, associates ,affiliates and subsidiaries, ALLY, RESCORP, RESIDENTIAL FUNDING CORPORATION, GMAC MORTGAGE and any and all that have fed at the trough of so-called mortgage backed securitizations. The scheme has allowed you to steal the identity of investors and the REMIC trusts by issuing bonds into a "street name" but showing end of month statements to investors that they owned bonds and loans. After selling these loans multiple times and receiving insurance protection through credit default swaps and such  to reduce any so-called losses these loans became worthless and now represented a liability to return all the money back because the so-called underlying loans were fraudulent and defective and the so-called profits generated were in actuality the proceeds of theft. This scheme and artifice to defraud and deceive was reliant on the continued purchase of what has turned out to be fraudulent and bogus mortgage bonds. With us caught in the middle of the great big "PONZI SCHEME" Read your own PSA's for the facts of the matter.

The files indicate the fraud and deception,  the so-called allonges that have shown up in this case were never part of the transaction. You cannot sell a note apart from the mortgage (DOT) multiple times to different entities and ever have a proper chain of title evidenced.

Our Claim is valid and should not be denied,expunged or what ever else the legal mine field has laid out to deceive.  This was part of a fraud that ultimately brought this nation to its knees in 2008. It is time out for all of this crap you people do to circumvent the law and justice and righteousness. We were placed into an adjusted rate mortgage fraudulently , it exploded it has caused on going financial damage and emotional distress. We did the right thing and followed the rules and should no longer have to suffer the consequences of the actions of the RESCORP/GMAC family of deceivers.

Return Addresses:

14450 E. 50th. Ave.
Denver, Colorado 80239


Ultimate authority to reconcile, settle, or otherwise resolve the claim on my behalf can be sent
to :

    Timothy W. Scott
    14450 E. 50th. Ave.
    Denver, Colorado 80239
    303.371.8274



Freddie M. Scott

# 5

# SUBPRIME LENDING

### CONTENTS

*Mortgage securitization: "This stuff is so complicated how is
    anybody going to know?"* .......................................................................68
*Greater access to lending: "A business where we can make some money"*.............72
*Subprime lenders in turmoil: "Adverse market conditions"*...................................74
*The regulators: "Oh, I see"* ....................................................................................75

In the early 1980s, subprime lenders such as Household Finance Corp. and thrifts such as Long Beach Savings and Loan made home equity loans, often second mortgages, to borrowers who had yet to establish credit histories or had troubled financial histories, sometimes reflecting setbacks such as unemployment, divorce, medical emergencies, and the like. Banks might have been unwilling to lend to these borrowers, but a subprime lender would if the borrower paid a higher interest rate to offset the extra risk. "No one can debate the need for legitimate non-prime (subprime) lending products," Gail Burks, president of the Nevada Fair Housing Center, Inc., testified to the FCIC.[1]

Interest rates on subprime mortgages, with substantial collateral—the house—weren't as high as those for car loans, and were much less than credit cards. The advantages of a mortgage over other forms of debt were solidified in 1986 with the Tax Reform Act, which barred deducting interest payments on consumer loans but kept the deduction for mortgage interest payments.

In the 1980s and into the early 1990s, before computerized "credit scoring"—a statistical technique used to measure a borrower's creditworthiness—automated the assessment of risk, mortgage lenders (including subprime lenders) relied on other factors when underwriting mortgages. As Tom Putnam, a Sacramento-based mortgage banker, told the Commission, they traditionally lent based on the four C's: credit (quantity, quality, and duration of the borrower's credit obligations), capacity (amount and stability of income), capital (sufficient liquid funds to cover down payments, closing costs, and reserves), and collateral (value and condition of the property).[2] Their decisions depended on judgments about how strength in one area, such as collateral, might offset weaknesses in others, such as credit. They underwrote borrowers one at a time, out of local offices.

In a few cases, such as CitiFinancial, subprime lending firms were part of a bank holding company, but most—including Household, Beneficial Finance, The Money Store, and Champion Mortgage—were independent consumer finance companies. Without access to deposits, they generally funded themselves with short-term lines of credit, or "warehouse lines," from commercial or investment banks. In many cases, the finance companies did not keep the mortgages. Some sold the loans to the same banks extending the warehouse lines. The banks would securitize and sell the loans to investors or keep them on their balance sheets. In other cases, the finance company itself packaged and sold the loans—often partnering with the banks extending the warehouse lines. Meanwhile, the S&Ls that originated subprime loans generally financed their own mortgage operations and kept the loans on their balance sheets.

## MORTGAGE SECURITIZATION: "THIS STUFF IS SO COMPLICATED HOW IS ANYBODY GOING TO KNOW?"

Debt outstanding in U.S. credit markets tripled during the 1980s, reaching $13.8 trillion in 1990; 11% was securitized mortgages and GSE debt. Later, mortgage securities made up 18% of the debt markets, overtaking government Treasuries as the single largest component—a position they maintained through the financial crisis.[3]

In the 1990s mortgage companies, banks, and Wall Street securities firms began securitizing mortgages (see figure 5.1). And more of them were subprime. Salomon Brothers, Merrill Lynch, and other Wall Street firms started packaging and selling "non-agency" mortgages—that is, loans that did not conform to Fannie's and Freddie's standards. Selling these required investors to adjust expectations. With securitizations handled by Fannie and Freddie, the question was not "will you get the money back" but "when," former Salomon Brothers trader and CEO of PentAlpha Jim Callahan told the FCIC.[4] With these new non-agency securities, investors had to worry about getting paid back, and that created an opportunity for S&P and Moody's. As Lewis Ranieri, a pioneer in the market, told the Commission, when he presented the concept of non-agency securitization to policy makers, they asked, "'This stuff is so complicated how is anybody going to know? How are the buyers going to buy?'" Ranieri said, "One of the solutions was, it had to have a rating. And that put the rating services in the business."[5]

Non-agency securitizations were only a few years old when they received a powerful stimulus from an unlikely source: the federal government. The savings and loan crisis had left Uncle Sam with $402 billion in loans and real estate from failed thrifts and banks. Congress established the Resolution Trust Corporation (RTC) in 1989 to offload mortgages and real estate, and sometimes the failed thrifts themselves, now owned by the government. While the RTC was able to sell $6.1 billion of these mortgages to Fannie and Freddie, most did not meet the GSEs' standards. Some were what might be called subprime today, but others had outright documentation errors or servicing problems, not unlike the low-documentation loans that later became popular.[6]

SUBPRIME LENDING                                69

## Funding for Mortgages

*The sources of funds for mortgages changed over the decades.*

IN PERCENT, BY SOURCE



SOURCE: Federal Reserve Flow of Funds Report

*Figure 5.1*

RTC officials soon concluded that they had neither the time nor the resources to sell off the assets in their portfolio one by one and thrift by thrift. They turned to the private sector, contracting with real estate and financial professionals to securitize some of the assets. By the time the RTC concluded its work, it had securitized $25 billion in residential mortgages.[7] The RTC in effect helped expand the securitization of mortgages ineligible for GSE guarantees.[8] In the early 1990s, as investors became

## Subprime Mortgage Originations

*In 2006, $600 billion of subprime loans were originated, most of which were securitized. That year, subprime lending accounted for 23.5% of all mortgage originations.*

IN BILLIONS OF DOLLARS



NOTE: Percent securitized is defined as subprime securities issued divided by originations in a given year. In 2007, securities issued exceeded originations.

SOURCE: Inside Mortgage Finance

*Figure 5.2*

more familiar with the securitization of these assets, mortgage specialists and Wall Street bankers got in on the action. Securitization and subprime originations grew hand in hand. As figure 5.2 shows, subprime originations increased from $70 billion in 1996 to $100 billion in 2000. The proportion securitized in the late 1990s peaked at 56%, and subprime mortgage originations' share of all originations hovered around 10%.

Securitizations by the RTC and by Wall Street were similar to the Fannie and Freddie securitizations. The first step was to get principal and interest payments from a group of mortgages to flow into a single pool. But in "private-label" securities (that is, securitizations not done by Fannie or Freddie), the payments were then "tranched" in a way to protect some investors from losses. Investors in the tranches received different streams of principal and interest in different orders.

Most of the earliest private-label deals, in the late 1980s and early 1990s, used a rudimentary form of tranching. There were typically two tranches in each deal. The

less risky tranche received principal and interest payments first and was usually guaranteed by an insurance company. The more risky tranche received payments second, was not guaranteed, and was usually kept by the company that originated the mortgages.

Within a decade, securitizations had become much more complex: they had more tranches, each with different payment streams and different risks, which were tailored to meet investors' demands. The entire private-label mortgage securitization market—those who created, sold, and bought the investments—would become highly dependent on this slice-and-dice process, and regulators and market participants alike took for granted that it efficiently allocated risk to those best able and willing to bear that risk.

To demonstrate how this process worked, we'll describe a typical deal, named CMLTI 2006-NC2, involving $947 million in mortgage-backed bonds.[9] In 2006, New Century Financial, a California-based lender, originated and sold 4,499 subprime mortgages to Citigroup, which sold them to a separate legal entity that Citigroup sponsored that would own the mortgages and issue the tranches. The entity purchased the loans with cash it had raised by selling the securities these loans would back. The entity had been created as a separate legal structure so that the assets would sit off Citigroup's balance sheet, an arrangement with tax and regulatory benefits.

The 4,499 mortgages carried the rights to the borrowers' monthly payments, which the Citigroup entity divided into 19 tranches of mortgage-backed securities; each tranche gave investors a different priority claim on the flow of payments from the borrowers, and a different interest rate and repayment schedule. The credit rating agencies assigned ratings to most of these tranches for investors, who—as securitization became increasingly complicated—came to rely more heavily on these ratings. Tranches were assigned letter ratings by the rating agencies based on their riskiness. In this report, ratings are generally presented in S&P's classification system, which assigns ratings such as "AAA" (the highest rating for the safest investments, referred to here as triple-A), "AA" (less safe than AAA), "A," "BBB," and "BB," and further distinguishes ratings with "+" and "−." Anything rated below "BBB-" is considered "junk." Moody's uses a similar system in which "Aaa" is highest, followed by "Aa," "A," "Baa," "Ba," and so forth. For example, an S&P rating of BBB would correspond to a Moody's rating of Baa. In this Citigroup deal, the four senior tranches—the safest—were rated triple-A by the agencies.

Below the senior tranches and next in line for payments were eleven "mezzanine" tranches—so named because they sat between the riskiest and the safest tranches. These were riskier than the senior tranches and, because they paid off more slowly, carried a higher risk that an increase in interest rates would make the locked-in interest payments less valuable. As a result, they paid a correspondingly higher interest rate. Three of these tranches in the Citigroup deal were rated AA, three were A, three were BBB (the lowest investment-grade rating), and two were BB, or junk.

The last to be paid was the most junior tranche, called the "equity," "residual," or "first-loss" tranche, set up to receive whatever cash flow was left over after all the other investors had been paid. This tranche would suffer the first losses from any

defaults of the mortgages in the pool. Commensurate with this high risk, it provided
the highest yields (see figure 5.3). In the Citigroup deal, as was common, this piece of
the deal was not rated at all. Citigroup and a hedge fund each held half the equity
tranche.[10]

While investors in the lower-rated tranches received higher interest rates because
they knew there was a risk of loss, investors in the triple-A tranches did not expect
payments from the mortgages to stop. This expectation of safety was important, so
the firms structuring securities focused on achieving high ratings. In the structure of
this Citigroup deal, which was typical, $737 million, or 78%, was rated triple-A.

### GREATER ACCESS TO LENDING:
### "A BUSINESS WHERE WE CAN MAKE SOME MONEY"

As private-label securitization began to take hold, new computer and modeling tech-
nologies were reshaping the mortgage market. In the mid-1990s, standardized data
with loan-level information on mortgage performance became more widely avail-
able. Lenders underwrote mortgages using credit scores, such as the FICO score, de-
veloped by Fair Isaac Corporation. In 1994, Freddie Mac rolled out Loan Prospector,
an automated system for mortgage underwriting for use by lenders, and Fannie Mae
released its own system, Desktop Underwriter, two months later. The days of labori-
ous, slow, and manual underwriting of individual mortgage applicants were over,
lowering cost and broadening access to mortgages.

This new process was based on quantitative expectations: Given the borrower, the
home, and the mortgage characteristics, what was the probability payments would be
on time? What was the probability that borrowers would prepay their loans, either
because they sold their homes or refinanced at lower interest rates?

In the 1990s, technology also affected implementation of the Community Rein-
vestment Act (CRA). Congress enacted the CRA in 1977 to ensure that banks and
thrifts served their communities, in response to concerns that banks and thrifts were
refusing to lend in certain neighborhoods without regard to the creditworthiness of
individuals and businesses in those neighborhoods (a practice known as redlining).[11]

The CRA called on banks and thrifts to invest, lend, and service areas where they
took in deposits, so long as these activities didn't impair their own financial safety
and soundness. It directed regulators to consider CRA performance whenever a bank
or thrift applied for regulatory approval for mergers, to open new branches, or to en-
gage in new businesses.[12]

The CRA encouraged banks to lend to borrowers to whom they may have previ-
ously denied credit. While these borrowers often had lower-than-average income, a
1997 study indicated that loans made under the CRA performed consistently with
the rest of the banks' portfolios, suggesting CRA lending was not riskier than the
banks' other lending.[13] "There is little or no evidence that banks' safety and sound-
ness have been compromised by such lending, and bankers often report sound busi-
ness opportunities," Federal Reserve Chairman Alan Greenspan said of CRA lending
in 1998.[14]

## Residential Mortgage-Backed Securities

*Financial institutions packaged subprime, Alt-A and other mortgages into securities. As long as the housing market continued to boom, these securities would perform. But when the economy faltered and the mortgages defaulted, lower-rated tranches were left worthless.*



**1 Originate**

Lenders extend mortgages, including subprime and Alt-A loans.

**2 Pool**

Securities firms purchase these loans and pool them.

**3 Tranche**

Residential mortgage-backed securities are sold to investors, giving them the right to the principal and interest from the mortgages. These securities are sold in tranches, or slices. The flow of cash determines the rating of the securities, with AAA tranches getting the first cut of principal and interest payments, then AA, then A, and so on.

**Pool of Mortgages**

**RMBS**
TRANCHES
Low risk, low yield

*First claim to cash flow from principal & interest payments...*

AAA — **SENIOR TRANCHES**

*next claim...*

AA — **MEZZANINE TRANCHES**

*These tranches were often purchased by CDOs. See page 128 for an explanation.*

*next... etc.*

A
BBB
BB
**EQUITY TRANCHES**

High risk, high yield

**Collateralized Debt Obligation**

*Figure 5.3*

In 1993, President Bill Clinton asked regulators to improve banks' CRA perform-
ance while responding to industry complaints that the regulatory review process for
compliance was too burdensome and too subjective. In 1995, the Fed, Office of Thrift
Supervision (OTS), Office of the Comptroller of the Currency (OCC), and Federal
Deposit Insurance Corporation (FDIC) issued regulations that shifted the regulatory
focus from the efforts that banks made to comply with the CRA to their actual re-
sults. Regulators and community advocates could now point to objective, observable
numbers that measured banks' compliance with the law.

Former comptroller John Dugan told FCIC staff that the impact of the CRA had
been lasting, because it encouraged banks to lend to people who in the past might not
have had access to credit. He said, "There is a tremendous amount of investment that
goes on in inner cities and other places to build things that are quite impressive. . . .
And the bankers conversely say, 'This is proven to be a business where we can make
some money; not a lot, but when you factor that in plus the good will that we get
from it, it kind of works.'"[15]

Lawrence Lindsey, a former Fed governor who was responsible for the Fed's Divi-
sion of Consumer and Community Affairs, which oversees CRA enforcement, told
the FCIC that improved enforcement had given the banks an incentive to invest in
technology that would make lending to lower-income borrowers profitable by such
means as creating credit scoring models customized to the market. Shadow banks
not covered by the CRA would use these same credit scoring models, which could
draw on now more substantial historical lending data for their estimates, to under-
write loans. "We basically got a cycle going which particularly the shadow banking
industry could, using recent historic data, show the default rates on this type of lend-
ing were very, very low," he said.[16] Indeed, default rates were low during the prosper-
ous 1990s, and regulators, bankers, and lenders in the shadow banking system took
note of this success.

## SUBPRIME LENDERS IN TURMOIL:
## "ADVERSE MARKET CONDITIONS"

Among nonbank mortgage originators, the late 1990s were a turning point. During
the market disruption caused by the Russian debt crisis and the Long-Term Capital
Management collapse, the markets saw a "flight to quality"—that is, a steep fall in de-
mand among investors for risky assets, including subprime securitizations. The rate
of subprime mortgage securitization dropped from 55.1% in 1998 to 37.4% in 1999.
Meanwhile, subprime originators saw the interest rate at which they could borrow in
credit markets skyrocket. They were caught in a squeeze: borrowing costs increased
at the very moment that their revenue stream dried up.[17] And some were caught
holding tranches of subprime securities that turned out to be worth far less than the
value they had been assigned.

Mortgage lenders that depended on liquidity and short-term funding had imme-
diate problems. For example, Southern Pacific Funding (SFC), an Oregon-based sub-
prime lender that securitized its loans, reported relatively positive second-quarter

results in August 1998. Then, in September, SFC notified investors about "recent ad-verse market conditions" in the securities markets and expressed concern about "the continued viability of securitization in the foreseeable future."[18] A week later, SFC filed for bankruptcy protection. Several other nonbank subprime lenders that were also dependent on short-term financing from the capital markets also filed for bank-ruptcy in 1998 and 1999. In the two years following the Russian default crisis, 8 of the top 10 subprime lenders declared bankruptcy, ceased operations, or sold out to stronger firms.[19]

When these firms were sold, their buyers would frequently absorb large losses. First Union, a large regional bank headquartered in North Carolina, incurred charges of almost $1.7 billion after it bought The Money Store. First Union eventually shut down or sold off most of The Money Store's operations.

Conseco, a leading insurance company, purchased Green Tree Financial, another subprime lender. Disruptions in the securitization markets, as well as unexpected mortgage defaults, eventually drove Conseco into bankruptcy in December 2002. At the time, this was the third-largest bankruptcy in U.S. history (after WorldCom and Enron).

Accounting misrepresentations would also bring down subprime lenders. Key-stone, a small national bank in West Virginia that made and securitized subprime mortgage loans, failed in 1999. In the securitization process—as was common prac-tice in the 1990s—Keystone retained the riskiest "first-loss" residual tranches for its own account. These holdings far exceeded the bank's capital. But Keystone assigned them grossly inflated values. The OCC closed the bank in September 1999, after dis-covering "fraud committed by the bank management," as executives had overstated the value of the residual tranches and other bank assets.[20] Perhaps the most signifi-cant failure occurred at Superior Bank, one of the most aggressive subprime mort-gage lenders. Like Keystone, it too failed after having kept and overvalued the first-loss tranches on its balance sheet.

Many of the lenders that survived or were bought in the 1990s reemerged in other forms. Long Beach was the ancestor of Ameriquest and Long Beach Mortgage (which was in turn purchased by Washington Mutual), two of the more aggressive lenders during the first decade of the new century. Associates First was sold to Citi-group, and Household bought Beneficial Mortgage before it was itself acquired by HSBC in 2003.

With the subprime market disrupted, subprime originations totaled $100 billion in 2000, down from $135 billion two years earlier.[21] Over the next few years, however, subprime lending and securitization would more than rebound.


## THE REGULATORS: "OH, I SEE"

During the 1990s, various federal agencies had taken increasing notice of abusive subprime lending practices. But the regulatory system was not well equipped to re-spond consistently—and on a national basis—to protect borrowers. State regulators, as well as either the Fed or the FDIC, supervised the mortgage practices of state

76          FINANCIAL CRISIS INQUIRY COMMISSION REPORT

banks. The OCC supervised the national banks. The OTS or state regulators were responsible for the thrifts. Some state regulators also licensed mortgage brokers, a growing portion of the market, but did not supervise them.[22]

Despite this diffusion of authority, one entity was unquestionably authorized by Congress to write strong and consistent rules regulating mortgages for all types of lenders: the Federal Reserve, through the Truth in Lending Act of 1968. In 1969, the Fed adopted Regulation Z for the purpose of implementing the act. But while Regulation Z applied to all lenders, its enforcement was divided among America's many financial regulators.

One sticking point was the supervision of nonbank subsidiaries such as subprime lenders. The Fed had the legal mandate to supervise bank holding companies, including the authority to supervise their nonbank subsidiaries. The Federal Trade Commission was given explicit authority by Congress to enforce the consumer protections embodied in the Truth in Lending Act with respect to these nonbank lenders. Although the FTC brought some enforcement actions against mortgage companies, Henry Cisneros, a former secretary of the Department of Housing and Urban Development (HUD), worried that its budget and staff were not commensurate with its mandate to supervise these lenders. "We could have had the FTC oversee mortgage contracts," Cisneros told the Commission. "But the FTC is up to their neck in work today with what they've got. They don't have the staff to go out and search out mortgage problems."[23]

Glenn Loney, deputy director of the Fed's Consumer and Community Affairs Division from 1998 to 2010, told the FCIC that ever since he joined the agency in 1975, Fed officials had been debating whether they—in addition to the FTC—should enforce rules for nonbank lenders. But they worried about whether the Fed would be stepping on congressional prerogatives by assuming enforcement responsibilities that legislation had delegated to the FTC. "A number of governors came in and said, 'You mean to say we don't look at these?'" Loney said. "And then we tried to explain it to them, and they'd say, 'Oh, I see.'"[24] The Federal Reserve would not exert its authority in this area, nor others that came under its purview in 1994, with any real force until after the housing bubble burst.

The 1994 legislation that gave the Fed new responsibilities was the Home Ownership and Equity Protection Act (HOEPA), passed by Congress and signed by President Clinton to address growing concerns about abusive and predatory mortgage lending practices that especially affected low-income borrowers. HOEPA specifically noted that certain communities were "being victimized . . . by second mortgage lenders, home improvement contractors, and finance companies who peddle high-rate, high-fee home equity loans to cash-poor homeowners."[25] For example, a Senate report highlighted the case of a 72-year-old homeowner, who testified at a hearing that she paid more than $23,000 in upfront finance charges on a $150,000 second mortgage. In addition, the monthly payments on the mortgage exceeded her income.[26]

HOEPA prohibited abusive practices relating to certain high-cost refinance mortgage loans, including prepayment penalties, negative amortization, and balloon pay-

ments with a term of less than five years. The legislation also prohibited lenders from making high-cost refinance loans based on the collateral value of the property alone and "without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment."[27] However, only a small percentage of mortgages were initially subject to the HOEPA restrictions, because the interest rate and fee levels for triggering HOEPA's coverage were set too high to catch most subprime loans.[28] Even so, HOEPA specifically directed the Fed to act more broadly to "prohibit acts or practices in connection with [mortgage loans] that [the Board] finds to be unfair, deceptive or designed to evade the provisions of this [act]."[29]

In June 1997, two years after HOEPA took effect, the Fed held the first set of public hearings required under the act. The venues were Los Angeles, Atlanta, and Washington, D.C. Consumer advocates reported abuses by home equity lenders. A report summarizing the hearings, jointly issued with the Department of Housing and Urban Development and released in July 1998, said that mortgage lenders acknowledged that some abuses existed, blamed some of these on mortgage brokers, and suggested that the increasing securitization of subprime mortgages was likely to limit the opportunity for widespread abuses. The report stated, "Creditors that package and securitize their home equity loans must comply with a series of representations and warranties. These include creditors' representations that they have complied with strict underwriting guidelines concerning the borrower's ability to repay the loan."[30] But in the years to come, these representations and warranties would prove to be inaccurate.

Still, the Fed continued not to press its prerogatives. In January 1998, it formalized its long-standing policy of "not routinely conducting consumer compliance examinations of nonbank subsidiaries of bank holding companies,"[31] a decision that would be criticized by a November 1999 General Accounting Office report for creating a "lack of regulatory oversight."[32] The July 1998 report also made recommendations on mortgage reform.[33] While preparing draft recommendations for the report, Fed staff wrote to the Fed's Committee on Consumer and Community Affairs that "given the Board's traditional reluctance to support substantive limitations on market behavior, the draft report discusses various options but does not advocate any particular approach to addressing these problems."[34]

In the end, although the two agencies did not agree on the full set of recommendations addressing predatory lending, both the Fed and HUD supported legislative bans on balloon payments and advance collection of lump-sum insurance premiums, stronger enforcement of current laws, and nonregulatory strategies such as community outreach efforts and consumer education and counseling. But Congress did not act on these recommendations.

The Fed-Lite provisions under the Gramm-Leach-Bliley Act affirmed the Fed's hands-off approach to the regulation of mortgage lending. Even so, the shakeup in the subprime industry in the late 1990s had drawn regulators' attention to at least some of the risks associated with this lending. For that reason, the Federal Reserve, FDIC, OCC, and OTS jointly issued subprime lending guidance on March 1, 1999.

This guidance applied only to regulated banks and thrifts, and even for them it would not be binding but merely laid out the criteria underlying regulators' bank examinations. It explained that "recent turmoil in the equity and asset-backed securities market has caused some non-bank subprime specialists to exit the market, thus creating increased opportunities for financial institutions to enter, or expand their participation in, the subprime lending business."[35]

The agencies then identified key features of subprime lending programs and the need for increased capital, risk management, and board and senior management oversight. They further noted concerns about various accounting issues, notably the valuation of any residual tranches held by the securitizing firm. The guidance went on to warn, "Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations. Higher fees and interest rates combined with compensation incentives can foster predatory pricing. . . . An adequate compliance management program must identify, monitor and control the consumer protection hazards associated with subprime lending."[36]

In spring 2000, in response to growing complaints about lending practices, and at the urging of members of Congress, HUD Secretary Andrew Cuomo and Treasury Secretary Lawrence Summers convened the joint National Predatory Lending Task Force. It included members of consumer advocacy groups; industry trade associations representing mortgage lenders, brokers, and appraisers; local and state officials; and academics. As the Fed had done three years earlier, this new entity took to the field, conducting hearings in Atlanta, Los Angeles, New York, Baltimore, and Chicago. The task force found "patterns" of abusive practices, reporting "substantial evidence of too-frequent abuses in the subprime lending market." Questionable practices included loan flipping (repeated refinancing of borrowers' loans in a short time), high fees and prepayment penalties that resulted in borrowers' losing the equity in their homes, and outright fraud and abuse involving deceptive or high-pressure sales tactics. The report cited testimony regarding incidents of forged signatures, falsification of incomes and appraisals, illegitimate fees, and bait-and-switch tactics. The investigation confirmed that subprime lenders often preyed on the elderly, minorities, and borrowers with lower incomes and less education, frequently targeting individuals who had "limited access to the mainstream financial sector"—meaning the banks, thrifts, and credit unions, which it viewed as subject to more extensive government oversight.[37]

Consumer protection groups took the same message to public officials. In interviews with and testimony to the FCIC, representatives of the National Consumer Law Center (NCLC), Nevada Fair Housing Center, Inc., and California Reinvestment Coalition each said they had contacted Congress and the four bank regulatory agencies multiple times about their concerns over unfair and deceptive lending practices.[38] "It was apparent on the ground as early as '96 or '98 . . . that the market for low-income consumers was being flooded with inappropriate products," Diane Thompson of the NCLC told the Commission.[39]

The HUD-Treasury task force recommended a set of reforms aimed at protecting

borrowers from the most egregious practices in the mortgage market, including bet-
ter disclosure, improved financial literacy, strengthened enforcement, and new leg-
islative protections. However, the report also recognized the downside of restricting
the lending practices that offered many borrowers with less-than-prime credit a
chance at homeownership. It was a dilemma. Gary Gensler, who worked on the re-
port as a senior Treasury official and is currently the chairman of the Commodity Fu-
tures Trading Commission, told the FCIC that the report's recommendations "lasted
on Capitol Hill a very short time. . . . There wasn't much appetite or mood to take
these recommendations."[40]

But problems persisted, and others would take up the cause. Through the early
years of the new decade, "the really poorly underwritten loans, the payment shock
loans" continued to proliferate outside the traditional banking sector, said FDIC
Chairman Sheila Bair, who served at Treasury as the assistant secretary for financial
institutions from 2001 to 2002. In testimony to the Commission, she observed that
these poor-quality loans pulled market share from traditional banks and "created
negative competitive pressure for the banks and thrifts to start following suit." She
added,

> [Subprime lending] was started and the lion's share of it occurred in the
> nonbank sector, but it clearly created competitive pressures on
> banks. . . . I think nipping this in the bud in 2000 and 2001 with some
> strong consumer rules applying across the board that just simply said
> you've got to document a customer's income to make sure they can re-
> pay the loan, you've got to make sure the income is sufficient to pay the
> loans when the interest rate resets, just simple rules like that . . . could
> have done a lot to stop this.[41]

After Bair was nominated to her position at Treasury, and when she was making
the rounds on Capitol Hill, Senator Paul Sarbanes, chairman of the Committee on
Banking, Housing, and Urban Affairs, told her about lending problems in Baltimore,
where foreclosures were on the rise. He asked Bair to read the HUD-Treasury report
on predatory lending, and she became interested in the issue. Sarbanes introduced
legislation to remedy the problem, but it faced significant resistance from the mort-
gage industry and within Congress, Bair told the Commission. Bair decided to try to
get the industry to adopt a set of "best practices" that would include a voluntary ban
on mortgages that strip borrowers of their equity, and would offer borrowers the op-
portunity to avoid prepayment penalties by agreeing instead to pay a higher interest
rate. She reached out to Edward Gramlich, a governor at the Fed who shared her con-
cerns, to enlist his help in getting companies to abide by these rules. Bair said that
Gramlich didn't talk out of school but made it clear to her that the Fed avenue wasn't
going to happen.[42] Similarly, Sandra Braunstein, the director of the Division of Con-
sumer and Community Affairs at the Fed, said that Gramlich told the staff that
Greenspan was not interested in increased regulation.[43]

When Bair and Gramlich approached a number of lenders about the voluntary

FINANCIAL CRISIS INQUIRY COMMISSION REPORT

program, Bair said some originators appeared willing to participate. But the Wall Street firms that securitized the loans resisted, saying that they were concerned about possible liability if they did not adhere to the proposed best practices, she recalled. The effort died.[44]

Of course, even as these initiatives went nowhere, the market did not stand still. Subprime mortgages were proliferating rapidly, becoming mainstream products. Originations were increasing, and products were changing. By 1999, three of every four subprime mortgages was a first mortgage, and of those 82% were used for refinancing rather than a home purchase. Fifty-nine percent of those refinancings were cash-outs,[45] helping to fuel consumer spending while whittling away homeowners' equity.



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**Current Report**
**Pursuant to Section 13 or 15 (d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): July 1, 2013**

---

# OCWEN FINANCIAL CORPORATION

**(Exact name of registrant as specified in its charter)**

---

| **Florida** | **1-13219** | **65-0039856** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2002 Summit Boulevard, Sixth Floor**
**Atlanta, Georgia 30319**
**(Address of principal executive offices)**

**Registrant's telephone number, including area code: (561) 682-8000**

**Not applicable.**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

¨  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 2.01 Completion of Acquisition or Disposition of Assets.

On July 1, 2013, Ocwen Loan Servicing, LLC ("OLS"), a wholly-owned subsidiary of Ocwen Mortgage Servicing, Inc., and an indirect wholly-owned subsidiary of Ocwen Financial Corporation ("Ocwen"), completed a sale to HLSS Holdings, LLC ("HLSS Holdings") and Home Loan Servicing Solutions, Ltd. (together with HLSS Holdings, "HLSS") of rights to receive servicing fees ("Rights to MSRs") and related servicing advances for a servicing portfolio of subprime and Alt-A residential mortgage loans (the "Transaction").

The Transaction resulted in the sale of Rights to MSRs with approximately $83.6 billion in unpaid principal balance of mortgage loans ("UPB") as of June 30, 2013. The purchase price for the Transaction was approximately $2.670 billion, including $2.429 billion for servicing advances and $241 million for the associated Rights to MSRs. Within 90 days of the closing, the purchase price may be adjusted to reflect any adjustments in the calculation of the UPB of the underlying mortgage loans or servicing advance balances acquired in the Transaction.

The mortgage servicing assets were sold to HLSS pursuant to a Sale Supplement to the Master Servicing Rights Purchase Agreement previously entered into by OLS and HLSS Holdings. In addition to the sale of OLS' right, title and interest to the Rights to MSRs and the associated servicing advances, HLSS Holdings also committed to purchase servicing advances that arise under the related pooling and servicing agreements after the closing date. In return, OLS continues to subservice the related mortgage loans, receives a monthly base fee equal to 12% of the servicing fees collected in any given month and retains any ancillary income payable to the servicer (excluding investment income earned on any custodial accounts) pursuant to the related pooling and servicing agreements. OLS also earns a monthly performance based incentive fee based on the servicing fees collected. If the targeted advance ratio in any month exceeds the predetermined level for that month set forth in the Sale Supplement and the Subservicing Supplement for the Transaction, any performance based incentive fee payable for such month will be reduced by an amount equal to 3.00% per annum of the amount of any such excess servicing advances. The Subservicing Supplement for the Transaction is governed by the Master Subservicing Agreement previously entered into by OLS and HLSS Holdings.

These descriptions of the Sale Supplement and the Subservicing Supplement are not complete and are qualified in their entirety by reference to those supplements, copies of which are attached hereto as Exhibit 10.1 and 10.2 and which are incorporated herein by reference.

## Item 9.01. Financial Statements and Exhibits.

(d) Exhibits.

| Number | Description |
| --- | --- |
| 10.1 | Sale Supplement, dated July 1, 2013, between Ocwen Loan Servicing, LLC, HLSS Holdings, LLC and Home Loan Servicing Solutions, Ltd. |
| 10.2 | Subservicing Supplement, dated July 1, 2013, between Ocwen Loan Servicing, LLC and HLSS Holdings, LLC. |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

OCWEN FINANCIAL CORPORATION
(Registrant)

By: /s/ John V. Britti

John V. Britti
Executive Vice President & Chief Financial Officer
(On behalf of the Registrant and as its principal financial officer)

Date: July 5, 2013

Exhibit 10.1

## SALE SUPPLEMENT

### dated as of July 1, 2013

### between

### OCWEN LOAN SERVICING, LLC, as Seller,

### HLSS HOLDINGS, LLC, as Purchaser

### and

### HOME LOAN SERVICING SOLUTIONS, LTD., as Purchaser

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS; REFERENCE TO MASTER SERVICING RIGHTS PURCHASE AGREEMENT | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Reference to the Master Servicing Rights Purchase Agreement | 7 |
| ARTICLE 2 | PURCHASE AND SALE OF SERVICING RIGHTS AND RIGHTS TO MSRS; ASSUMED LIABILITIES | 7 |
| 2.1 | Assignment and Conveyance of Rights to MSRs | 7 |
| 2.2 | Automatic Assignment and Conveyance of Servicing Rights | 8 |
| 2.3 | MSR Purchase Price | 8 |
| 2.4 | Assumed Liabilities and Excluded Liabilities | 9 |
| 2.5 | Remittance of Excess Servicing Fees, Servicing Advance Receivables Fees and Related Amounts | 10 |
| 2.6 | Payment of Estimated Purchase Price | 10 |
| ARTICLE 3 | PURCHASE AND SALE OF SERVICING ADVANCE RECEIVABLES | 11 |
| 3.1 | Assignment and Conveyance of Servicing Advance Receivables | 11 |
| 3.2 | Servicing Advance Receivables Purchase Price | 11 |
| 3.3 | Servicing Advances | 12 |
| 3.4 | Reimbursement of Servicing Advances | 12 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF SELLER | 12 |
| 4.1 | General Representations | 12 |
| 4.2 | Title to Transferred Assets | 12 |
| 4.3 | Right to receive Servicing Fees | 13 |
| 4.4 | Servicing Agreements and Underlying Documents | 13 |
| 4.5 | Mortgage Pool Information, Related Matters | 13 |
| 4.6 | Enforceability of Servicing Agreements | 13 |
| 4.7 | Compliance With Servicing Agreements | 14 |
| 4.8 | No Recourse | 14 |
| 4.9 | The Mortgage Loans | 15 |
| 4.10 | Servicing Advance Receivables | 16 |
| 4.11 | Servicing Agreement Consents and Other Third Party Approvals | 17 |

-i-

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| 4.12 | Servicing Advance Financing Agreements | 17 |
| 4.13 | Anti-Money Laundering Laws | 17 |
| 4.14 | Servicer Ratings | 17 |
| 4.15 | Eligible Servicer | 17 |
| 4.16 | HAMP | 18 |
| ARTICLE 5 | CONDITIONS PRECEDENT | 18 |
| 5.1 | Conditions to the Purchase of the Rights to MSRs and the Advance SPEs | 18 |
| ARTICLE 6 | SERVICING MATTERS | 18 |
| 6.1 | Seller as Servicer | 18 |
| 6.2 | Servicing | 19 |
| 6.3 | Collections from Obligors and Remittances | 19 |
| 6.4 | Servicing Practices | 19 |
| 6.5 | Servicing Reports | 20 |
| 6.6 | Escrow Accounts | 20 |
| 6.7 | Notices and Financial Information | 20 |
| 6.8 | Defaults under Deferred Servicing Agreements | 20 |
| 6.9 | Continuity of Business | 20 |
| 6.10 | Optional Termination or Clean Up Calls | 20 |
| 6.11 | Amendments to Deferred Servicing Agreements; Transfer of Servicing Rights | 21 |
| 6.12 | Assumption of Servicing Duties; Transfer of Rights to MSRs and Servicing Rights | 21 |
| 6.13 | Termination Event | 21 |
| 6.14 | Servicing Transfer | 21 |
| 6.15 | Incorporation of Provisions from Subservicing Agreement | 21 |
| ARTICLE 7 | SELLER SERVICING FEES; COSTS AND EXPENSES | 22 |
| 7.1 | Seller Monthly Servicing Fee | 22 |
| 7.2 | Performance Fee | 22 |
| 7.3 | Costs and Expenses | 23 |
| 7.4 | Ancillary Income | 23 |
| 7.5 | Calculation and Payment | 23 |

-ii-

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 7.6 | No Offset | 23 |
| 7.7 | Servicing Fee Reset Date | 23 |
| ARTICLE 8 | INDEMNIFICATION | 24 |
| 8.1 | Seller Indemnification of Purchasers | 24 |
| 8.2 | Purchasers Indemnification of Seller | 24 |
| 8.3 | Indemnification Procedures | 24 |
| 8.4 | Tax Treatment | 25 |
| 8.5 | Survival | 25 |
| 8.6 | Additional Indemnification | 26 |
| 8.7 | Specific Performance | 26 |
| ARTICLE 9 | GRANT OF SECURITY INTEREST | 26 |
| 9.1 | Granting Clause | 26 |
| ARTICLE 10 | MISCELLANEOUS PROVISIONS | 27 |
| 10.1 | Further Assurances | 27 |
| 10.2 | Compliance with Applicable Laws; Licenses | 27 |
| 10.3 | Merger, Consolidation, Etc. | 27 |
| 10.4 | Annual Officer's Certificate | 28 |
| 10.5 | Accounting Treatment | 28 |
| 10.6 | Incorporation | 28 |
| Exhibit A | Form of Monthly Remittance Report |  |
| Schedule I | Servicing Agreements |  |
| Schedule II | Underlying Documents |  |
| Schedule III | Retained Servicing Fee Percentage |  |
| Schedule IV | Target Ratio |  |
| Schedule V | Valuation Percentage |  |
| Schedule VI | Amortization Percentage |  |

-iii-

## SALE SUPPLEMENT

This Sale Supplement, dated as of July 1, 2013 (this "<u>Sale Supplement</u>"), is between Ocwen Loan Servicing, LLC, a Delaware limited liability company ("<u>Seller</u>"), HLSS Holdings, LLC, a Delaware limited liability company ("<u>Holdings</u>") and Home Loan Servicing Solutions, Ltd. ("<u>HLSS</u>" and, together with Holdings, the "<u>Purchasers</u>"):

## <u>WITNESSETH:</u>

WHEREAS, Seller and Purchasers are parties to that certain Master Servicing Rights Purchase Agreement, dated as of February 10, 2012 (as amended, supplemented and modified from time to time), and that certain Master Servicing Rights Purchase Agreement, dated as of October 1, 2012 (as amended, supplemented and modified from time to time, the "<u>Agreement</u>"), in each case with respect to the sale by Seller and the purchase by Purchasers of the Servicing Rights and other assets; and

WHEREAS, Seller and Purchasers desire to enter into the transactions described in the Agreement as supplemented by this Sale Supplement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

## ARTICLE 1

## DEFINITIONS; REFERENCE TO MASTER SERVICING RIGHTS PURCHASE AGREEMENT

1.1 <u>Definitions</u>. (a) For purposes of this Sale Supplement, the following capitalized terms shall have the respective meanings set forth or referenced below:

"Additional Servicing Advance Receivable": As defined in <u>Section 3.1</u>.

"Advance SPEs": Each of HLSS Servicer Advance Facility Transferor, LLC and HLSS Servicer Advance Facility Transferor II, LLC, Delaware limited liability companies, and HLSS Servicer Advance Receivables Trust and HLSS Servicer Advance Receivables Trust II, Delaware statutory trusts.

"Amortization Percentage": For each calendar month following the Closing Date, the percentage set forth on <u>Schedule VI</u> to this Sale Supplement for such calendar month.

"Assumed Liabilities": As defined in <u>Section 2.4</u>.

"Book Value" means, with respect to the Rights to MSRs related to any Deferred Servicing Agreement, as of a specified date, an amount equal to the amortized book value of such Rights to MSRs on HLSS's financial statements as of such date.

-1-

"Closing Date": July 1, 2013; provided that, with respect to <u>Section 5.3</u> of the Agreement, the Closing Date shall be the related Servicing Transfer Date.

"Closing Statement": The statement delivered by Seller to Purchasers on the Closing Statement Delivery Date setting forth the good faith calculation of the Estimated Purchase Price.

"Closing Statement Delivery Date": The Closing Date, unless otherwise agreed by Seller and Purchasers.

"Consent Period": For each Deferred Servicing Agreement and each related Deferred Servicing Right, the period, if any, from and including the Closing Date to and including the related Servicing Transfer Date.

"Cut-off Date": June 30, 2013, or such other date as is agreed by Seller and Purchasers.

"Deferred Mortgage Loan": A mortgage loan subject to a Deferred Servicing Agreement.

"Deferred Servicing Agreement": As of any date of determination, each Servicing Agreement that is not a Transferred Servicing Agreement on such date. For avoidance of doubt, on the Closing Date each Servicing Agreement is a Deferred Servicing Agreement.

"Deferred Servicing Right": As of any date of determination, each Servicing Right arising under a Servicing Agreement that is a Deferred Servicing Agreement on such date.

"Excess Servicing Advances": For any calendar month, the amount, if any, by which the outstanding Servicer Advances with respect to the Servicing Agreements as of the last day of such calendar month exceeds an amount equal to (a) the Target Ratio for such calendar month multiplied by (b) the unpaid principal balance of the Mortgage Loans subject to the Servicing Agreements as of the last day of such calendar month.

"Excess Servicing Fees": For any calendar month, an amount equal to the product of (i) 9.0 annualized basis points and (ii) the aggregate unpaid principal balance of the Mortgage Loans underlying the Rights to MSRs as of the close of business on the last Business Day of the prior calendar month.

"Excluded Liabilities": As defined in <u>Section 2.4(c)</u>.

"Fannie Mae": As defined in the Subservicing Agreement.

"Indemnified Person": A Purchaser Indemnified Party or a Seller Indemnified Party, as the case may be.

"Indemnifying Person": The Seller pursuant to <u>Section 8.1</u> or the Purchasers pursuant to <u>Section 8.2</u>, as the case may be.

"Initial Servicing Advance Receivable": As defined in <u>Section 3.1</u>.

-2-

"Investor": With respect to any Securitization Transaction, any holder or other beneficial owner of any securities issued by the related Trust.

"Liability": As defined in <u>Section 8.1</u>.

"Monthly Remittance Report": With respect to each Deferred Servicing Agreement, a report substantially in the form attached as <u>Exhibit A</u> to this Sale Supplement or in such other form as may be agreed to by Seller and Purchasers from time to time.

"Monthly Servicing Fee": For each calendar month, the Base Subservicing Fee (as defined in the Subservicing Supplement) for such calendar month together with the Seller Monthly Servicing Fee for such calendar month.

"Monthly Servicing Oversight Report": A report with respect to all of the Deferred Servicing Agreements and related Mortgage Loans in such form as may be agreed to by Seller and Purchasers from time to time.

"MSR Purchase Price": For each Servicing Agreement, an amount equal to the product of (i) the Valuation Percentage for such Servicing Agreement and (ii) the aggregate unpaid principal balance of the Mortgage Loans subject to such Servicing Agreement as of the Closing Date.

"P&I Advance": As defined in the Subservicing Agreement.

"Performance Fee": As defined in <u>Section 7.2</u>.

"Purchaser Indemnified Party": As defined in <u>Section 8.2</u>.

"Purchase Price": The sum of (a) the aggregate MSR Purchase Price for all of the Servicing Agreements and (b) the aggregate Servicing Advance Receivables Purchase Price for any Initial Servicing Advance Receivables.

"Retained Servicing Fee": For any calendar month, an amount equal to the sum of (a) the product of the Retained Servicing Fee Percentage for such calendar month and the average unpaid principal balance of all Mortgage Loans subject to the Deferred Servicing Agreements and the Transferred Servicing Agreements during such calendar month and (b) the Retained Servicing Fee Shortfall, if any, for the immediately prior calendar month.

"Retained Servicing Fee Percentage": For any calendar month, the percentage set forth on <u>Schedule III</u> to this Sale Supplement.

"Retained Servicing Fee Shortfall": For any calendar month, beginning in July 2013, an amount equal to the excess, if any, of (a) the Retained Servicing Fee for such calendar month over (b) the excess, if any, of (x) the aggregate Servicing Advance Receivables Fees actually received by Holdings with respect to the Deferred Servicing Agreements and pursuant to the Transferred Servicing Agreements during such calendar month (whether directly pursuant to such Transferred Servicing Agreements or pursuant to this Sale Supplement) over (y) the Monthly Servicing Fee for such calendar month.

-3-

"Rights to MSRs": For each Servicing Agreement, each of the following assets:

(a) all Servicing Fees payable to Seller as of or after the Closing Date under such Servicing Agreement and the right to receive all Servicing Fees accruing and payable as of or after the Closing Date under such Servicing Agreement;

(b) the right to receive any investment income earned on amounts on deposit in any Custodial Account or Escrow Account related to such Servicing Agreements as of or after the Closing Date;

(c) the right to purchase the Servicing Rights pursuant to Section 2.2 of this Sale Supplement; and

(d) any proceeds of any of the foregoing.

"Sale Date": For each Servicing Advance Receivable, the date on which such Servicing Advance Receivable is transferred to Holdings pursuant to Section 3.1.

"Seller Indemnified Party": As defined in Section 8.1.

"Seller Monthly Servicing Fee": As defined in Section 7.1.

"Servicing Advance Financing Agreements": Each of:

(i) that certain Third Amended and Restated Indenture, dated as of May 21, 2013, among HLSS Servicer Advance Receivables Trust, as issuer, Deutsche Bank National Trust Company, as indenture trustee, calculation agent, paying agent and securities intermediary, Holdings, as administrator and servicer, Seller, as servicer and as a subservicer, and Barclays Bank PLC, Wells Fargo Securities, LLC and Credit Suisse AG, New York Branch, as administrative agents, and each other "Transaction Document" as such term is defined therein, in each case as the same may be amended from time to time; and

(ii) that certain Indenture, dated as of July 1, 2013, among HLSS Servicer Advance Receivables Trust II, as issuer, Deutsche Bank National Trust Company, as indenture trustee, calculation agent, paying agent and securities intermediary, Holdings, as administrator and servicer, Seller, as servicer and as a subservicer, and Barclays Bank PLC, as administrative agent, and each other "Transaction Document" as such term is defined therein, in each case as the same may be amended from time to time.

"Servicing Advance Payment Date": (a) For any Initial Servicing Advance Receivable, the Closing Date and (b) for any Additional Servicing Advance Receivable, the Funding Date (as defined in the Servicing Advance Financing Agreement) for such Additional Servicing Advance Receivable.

"Servicing Advance Receivable": For each Servicer Advance, the right to receive reimbursement for such Servicer Advance under the Servicing Agreement pursuant to which such Servicer Advance was made.

"Servicing Advance Receivables Fees": For any calendar month, an amount equal to the excess of the aggregate amount of Servicing Fees paid to Seller for such calendar month under each Servicing Agreement over the Excess Servicing Fees for such calendar month.

-4-

"Servicing Advance Receivable Purchase Price": With respect to each Servicing Advance Payment Date, for each Servicing Advance Receivable, the outstanding amount that is reimbursable under the related Servicing Agreement with respect to such Servicing Advance Receivable as of such Servicing Advance Payment Date.

"Servicing Agreement": Each of the servicing agreements described on Schedule I and each of the Underlying Documents described on Schedule II governing the rights, duties and obligations of Seller as servicer under such agreements.

"Servicing Fee Reset Date": The date which is six (6) years after the Closing Date.

"Servicing Rights Assets": As defined in Section 2.2.

"Servicing Transfer Date": With respect to each Servicing Agreement, the date on which all of the Third Party Consents related to such Servicing Agreement necessary to transfer the related Servicing Rights to Purchasers are received or such later date mutually agreed to by Seller and Purchasers.

"Special Damages": As defined in Section 8.3(d).

"Subservicing Agreement": That certain Master Subservicing Agreement, dated as of October 1, 2012, between the Seller, as subservicer, and Holdings, as servicer, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Subservicing Supplement": That certain Subservicing Supplement, dated as of July 1, 2013, between the Seller, as subservicer, and Holdings, as servicer, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Summary Schedule": As defined in Section 4.5(a).

"Target Ratio" for each calendar month shall mean the amount specified in Schedule IV with respect to such month.

"Termination Event" means the occurrence of any one or more of the following events (whatever the reason for the occurrence of such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) Seller fails to remit any payment required to be made under the terms of this Sale Supplement (to the extent not resulting solely from Holdings failing to purchase a Servicing Advance Receivable required to be purchased by Holdings under this Sale Supplement), which continues unremedied for a period of one (1) Business Day after the date on which written notice of such failure shall have been given by Holdings to Seller;

(b) Seller fails to deliver any required information or report that is complete in all material respects as required pursuant to this Sale Supplement in the manner and time frame set forth herein, which failure continues unremedied for a period of two (2) Business Days after the date on which written notice of such failure shall have been given to Seller by Holdings;

-5-

(c) Seller fails to observe or perform in any material respect any other covenant or agreement of Seller set forth in the Agreement or this Sale Supplement, which failure continues unremedied for a period of thirty (30) days after the date on which written notice of such failure shall have been given to Seller by Holdings; provided however, in the event that any such default is incurable by its own terms, a Termination Event shall be deemed to occur immediately hereunder without regard to the thirty (30) day cure period set forth above;

(d) a material breach by Seller of any representation and warranty made by it in the Agreement or this Sale Supplement, which breach continues unremedied for a period of thirty (30) days after the date on which written notice of such failure shall have been given to Seller by Holdings; provided, however, in the event that any such default is incurable by its own terms, a Termination Event shall be deemed to occur immediately hereunder without regard to the thirty (30) day cure period set forth above;

(e) Seller fails to maintain residential primary servicer ratings for subprime loans of at least "Average" by Standard & Poor's Rating Services, a division of Standards & Poor's Financial Services LLC (or its successor in interest), "SQ3" by Moody's Investors Service, Inc. (or its successor in interest) and "RPS4+" and "RSS4+" by Fitch Ratings (or its successor in interest);

(f) Seller ceases to be a Fannie Mae, Freddie Mac or FHA approved servicer;

(g) the occurrence of a Material Adverse Event;

(h) any of the conditions specified in the applicable "Servicer Default", "Servicer Event of Default," "Event of Default," "Servicing Default" or "Servicer Event of Termination" or similar sections of any Deferred Servicing Agreement or any related Underlying Document shall have occurred with respect to Seller for any reason not caused by Purchasers (other than as a result of any delinquency or loss trigger which was already triggered as of the Closing Date with respect to such Deferred Servicing Agreement); provided that Seller shall be entitled to any applicable cure period set forth in such Deferred Servicing Agreement or Underlying Document;

(i) a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against Seller and such decree or order shall have remained in force undischarged or unstayed for a period of thirty (30) days;

(j) Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to Seller or of or relating to all or substantially all of its property; or

-6-

(k) Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations.

"Third-Party Claim": As defined in Section 8.3(b).

"Transferred Assets": The Rights to MSRs and the Transferred Servicing Rights.

"Transferred Receivables Assets": As defined in Section 3.1.

"Transferred Servicing Agreement": As of any date of determination, a Servicing Agreement with respect to which the related Servicing Rights have been transferred to Purchasers pursuant to Section 2.2 of this Sale Supplement or to its designee in accordance with the terms of this Sale Supplement on or prior to such date. For the avoidance of doubt, on the Closing Date no Servicing Agreement is a Transferred Servicing Agreement.

"Transferred Servicing Rights": As of any date of determination, any Servicing Rights that have been transferred to HLSS pursuant to Section 2.2 of this Sale Supplement on or prior to such date.

"UCC": As defined in Section 3.1.

"Valuation Percentage": For each Servicing Agreement, the valuation percentage for such Servicing Agreement as set forth in Schedule V hereto.

(b) Any capitalized term used but not defined in this Sale Supplement shall have the meaning assigned to such term in the Agreement.

1.2 Reference to the Master Servicing Rights Purchase Agreement. Each of Seller and Purchasers agrees that (a) this Sale Supplement is a "Sale Supplement" executed pursuant to Section 2.1 of the Agreement, (b) the terms of this Sale Supplement are hereby incorporated into the Agreement with respect to the Servicing Agreements and the related Mortgage Loans to the extent set forth therein and herein, and (c) the terms of this Sale Supplement apply to the Servicing Agreements specified herein and not to any other "Servicing Agreement" as that term is used in the Agreement. In the event of any conflict between the provisions of this Sale Supplement and the Agreement, the terms of this Sale Supplement shall prevail.

## ARTICLE 2

## PURCHASE AND SALE OF SERVICING RIGHTS AND RIGHTS TO MSRS; ASSUMED LIABILITIES

2.1 Assignment and Conveyance of Rights to MSRs.

(a) As of the Closing Date, subject to the terms and conditions set forth in the Agreement and this Sale Supplement, Seller does hereby sell, convey, assign and transfer, in each case, without recourse except as provided herein, free and clear of any Liens, (i) to HLSS

-7-

all of its right, title and interest in and to all of the Excess Servicing Fees for each of the Servicing Agreements, and (ii) to Holdings, any and all other right, title and interest in and to all of the Rights to MSRs for each of the Servicing Agreements.

(b) On and after the Closing Date, Holdings shall be obligated to maintain a complete and accurate list of Servicing Agreements that are Deferred Servicing Agreements and Transferred Servicing Agreements, as the same shall be amended and modified from time to time in connection with Deferred Servicing Agreements becoming Transferred Servicing Agreements as contemplated by the terms and provisions of this Sale Supplement. The list of Deferred Servicing Agreements and Transferred Servicing Agreements maintained by Purchasers under this Section 2.1(b) shall be (x) available for inspection by Seller at any time during normal business hours and (y) presumed to be accurate absent manifest error on the part of Purchaser.

2.2 Automatic Assignment and Conveyance of Servicing Rights. As of the Servicing Transfer Date with respect to each Servicing Agreement, Seller does hereby sell, convey, assign and transfer to Holdings, without recourse except as provided herein, free and clear of any Liens, without further action by any Person, all of its right, title and interest in and to the following assets (the "Servicing Rights Assets"):

(a) the Servicing Rights in respect of all of the Mortgage Loans and REO Properties related to such Servicing Agreement, in each case together with all related security, collections and payments thereon and proceeds of the conversion, voluntary or involuntary of the foregoing, other than the Excess Servicing Fees previously conveyed to HLSS pursuant to Section 2.1;

(b) all Ancillary Income and Prepayment Interest Excess received as of or after the related Servicing Transfer Date under such Servicing Agreements and any rights to exercise any optional termination or clean-up call provisions under such Servicing Agreements;

(c) all Custodial Accounts and Escrow Accounts related to such Servicing Agreement and amounts on deposit therein;

(d) all files and records in Seller's possession or control, including the related Database, relating to the Servicing Rights Assets specified in clauses (a), (b) and (c);

(e) all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or claims of any nature, whether arising by way of counterclaim or otherwise, available to or being pursued by Seller to the extent related exclusively to such Servicing Rights Assets and/or the Assumed Liabilities; and

(f) any proceeds of any of the foregoing.

2.3 MSR Purchase Price. Subject to the conditions set forth in this Sale Supplement and the Agreement, as consideration for the purchase of the Rights to MSRs and the Servicing Rights Assets, HLSS shall pay the portion of the MSR Purchase Price attributable to the value of the Excess Servicing Fees for each Servicing Agreement, and Holdings shall pay the portion of the MSR Purchase Price attributable to the value of the remainder of the Rights to MSRs and the Servicing Rights Assets, in each case for each Servicing Agreement, to Seller.

-8-

2.4 Assumed Liabilities and Excluded Liabilities.

(a) Upon the terms and subject to the conditions set forth herein and in the Agreement, Holdings shall assume, (i) prior to the Servicer Transfer Date for each Servicing Agreement, and solely as between Holdings and Seller, all of the duties, obligations and liabilities of Seller (other than the Excluded Liabilities), as servicer but subject to such Servicing Agreements, and provided that Seller will continue to act as the servicer as set forth herein and in no event shall Holdings be a subservicer, subcontractor or servicer within the meaning of a Servicing Agreement prior to the related Servicing Transfer Date and (ii) as of or after the Servicing Transfer Date for each Servicing Agreement, all of the duties, obligations, and liabilities of Seller (other than the Excluded Liabilities) as servicer accrued and pertaining solely to the period from and after such Servicing Transfer Date relating to the Servicing Rights that are subject to such Servicing Agreement (the "Assumed Liabilities").

(b) Holdings hereby agrees to act as servicer under each Servicing Agreement following the related Servicing Transfer Date and assumes responsibility for the due and punctual performance and observance of each covenant and condition to be performed or observed by the servicer under the applicable Servicing Agreement, including the obligation to service each Mortgage Loan in accordance with the terms of the related Servicing Agreement and to pay any Excess Servicing Fees to HLSS on and after such Servicing Transfer Date; provided, however, that the parties hereto acknowledge and agree that neither Purchaser nor any successor servicer assumes any liabilities of Seller, or any obligations of Seller relating to any period of time prior to the applicable Servicing Transfer Date. Seller hereby acknowledges that neither this Sale Supplement nor the Agreement limits or otherwise releases it from its liabilities for its acts or omissions as the servicer under the Servicing Agreements prior to the related Servicing Transfer Date. Holdings hereby acknowledges that Seller shall have no further obligation as servicer under any of the Servicing Agreements on and after the related Servicing Transfer Date, except to the extent set forth in this Sale Supplement, the Agreement, the Subservicing Agreement and the Subservicing Supplement.

(c) Notwithstanding anything to the contrary contained herein, Purchasers do not assume any duties, obligations or liabilities of any kind, whether known, unknown, contingent or otherwise, (i) not relating to the Transferred Servicing Rights or the Assumed Liabilities, (ii) attributable to any acts or omissions to act taken or omitted to be taken by Seller (or any of its Affiliates, agents, contractors or representatives, including, without limitation, any subservicer of the Mortgage Loans) prior to the applicable Servicing Transfer Date, (iii) attributable to any actions, causes of action, claims, suits or proceedings or violations of law or regulation attributable to any acts or omissions to act taken or omitted to be taken by Seller (or any of its Affiliates, agents, contractors or representatives, including, without limitation, any subservicer of the Mortgage Loans) prior to the applicable Servicing Transfer Date or (iv) relating to any representation and warranty made by Seller or any of its Affiliates with respect to the related Mortgage Loans or the Transferred Assets (the "Excluded Liabilities"). Without limiting the generality of the foregoing, it is not the intention that the assumption by Purchasers of the Assumed Liabilities shall in any way enlarge the rights of any third parties relating thereto. Nothing contained in the Agreement or this Sale Supplement shall prevent any party hereto from contesting matters relating to the Assumed Liabilities with any third party obligee.

-9-

(d) From and after the related Servicing Transfer Date, except as otherwise provided for in <u>Section 8.3</u> of this Sale Supplement, (i) Holdings shall have complete control over the payment, settlement or other disposition of the Assumed Liabilities and the right to commence, control and conduct all negotiations and proceedings with respect thereto, subject to the terms of the related Servicing Agreements and (ii) Seller shall have complete control over the payment, settlement or other disposition of the Excluded Liabilities and the right to commence, control and conduct all negotiations and proceedings with respect thereto. Except as otherwise provided in this Sale Supplement, (i) Seller shall promptly notify Holdings of any claim made against Seller with respect to the Assumed Liabilities or the Transferred Assets and shall not voluntarily make any payment of, settle or offer to settle, or consent or compromise or admit liability with respect to, any Assumed Liabilities or Transferred Assets without the prior written consent of Holdings and (ii) Holdings shall promptly notify Seller of any claim made against Purchasers with respect to the Excluded Liabilities and shall not voluntarily make any payment of, settle or offer to settle, or consent or compromise or admit liability with respect to, any Excluded Liabilities without the prior written consent of Seller.

2.5 <u>Remittance of Excess Servicing Fees, Servicing Advance Receivables Fees and Related Amounts</u>.

(a) Seller shall, to the extent permitted under any Deferred Servicing Agreement cause (i) any Excess Servicing Fees to be deposited directly into HLSS's account in accordance with HLSS's written directions and (ii) any Servicing Advance Receivables Fees, any investment income earned on any amounts or deposit in any Custodial Accounts and Escrow Accounts that are payable to Seller on or after the Closing Date under such Deferred Servicing Agreement, to be deposited directly into Holdings' account in accordance with Holdings' written directions. In any case, Seller shall within one (1) Business Day of the receipt thereof, remit to the related Purchaser any such amounts and, to the extent Seller is permitted to retain such amounts under the related Servicing Agreement, any investment income earned on any amounts or deposit in any Custodial Accounts and Escrow Accounts that are received by Seller under any Deferred Servicing Agreement after the Closing Date. Any such amounts shall be remitted in accordance with such Purchaser's written directions.

(b) Seller shall exercise any rights under any Deferred Servicing Agreement to direct the investment of amounts in any Custodial Account or Escrow Account in accordance with Holdings' directions and the terms of the related Deferred Servicing Agreement, the related Mortgage Loan Documents and Applicable Law.

2.6 <u>Payment of Estimated Purchase Price</u>. Subject to the conditions set forth in this Sale Supplement and the Agreement, HLSS and Holdings shall pay the Estimated Purchase Price to Seller at the Closing. The Estimated Purchase Price shall be reconciled to the final Purchase Price in accordance with <u>Section 2.5</u> of the Agreement.

-10-

## ARTICLE 3

## PURCHASE AND SALE OF SERVICING ADVANCE RECEIVABLES

3.1 <u>Assignment and Conveyance of Servicing Advance Receivables</u>. Commencing on the Closing Date, and continuing until the close of business on the earlier of the related Servicing Transfer Date or date of Seller's termination as servicer pursuant to such Servicing Agreement, subject to the terms and conditions set forth in the Agreement and this Sale Supplement, Seller hereby sells, conveys, assigns and transfers to Holdings, and Holdings acquires from Seller, without recourse except as provided herein, free and clear of any Liens, all of Seller's right, title and interest, whether now owned or hereafter acquired, in, to and under each Servicing Advance Receivable (i) in existence on the Closing Date that arose under the Servicing Agreements and is owned by Seller as of the Closing Date, if any (the "<u>Initial Servicing Advance Receivables</u>"), (ii) in existence on any Business Day on or after the Closing Date that arises under any Servicing Agreement prior to the earlier of the related Servicing Transfer Date or date of Seller's termination as servicer pursuant to such Servicing Agreement ("<u>Additional Servicing Advance Receivables</u>"), and (iii) in the case of both Initial Servicing Advance Receivables and Additional Servicing Advance Receivables, all monies due or to become due and all amounts received or receivable with respect thereto and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect in all applicable jurisdictions (the "<u>UCC</u>")), together with all rights of Seller to enforce such Initial Servicing Advance Receivables and Additional Servicing Advance Receivables (collectively, the "<u>Transferred Receivables Assets</u>"). Until the related Servicing Transfer Date, Seller shall, automatically and without any further action on its part, sell, assign, transfer and convey to Holdings, on each Business Day, each Additional Servicing Advance Receivable not previously transferred to Holdings and Holdings shall purchase each such Additional Servicing Advance Receivable. The parties acknowledge and agree that so long as the Servicing Advance Receivables with respect to a Servicing Agreement are being sold by Holdings to the Advance SPEs pursuant to the Servicing Advance Financing Agreements, the sale of such Servicing Advance Receivables by Seller to Holdings shall be made pursuant to and in accordance with the provisions of the Servicing Advance Financing Agreements, and Seller covenants and agrees to comply with the provisions of such Servicing Advance Financing Agreements with respect to such Servicing Advance Receivables.

3.2 <u>Servicing Advance Receivables Purchase Price</u>. In consideration of the sale, assignment, transfer and conveyance to Holdings of the Servicing Advance Receivables and related Transferred Receivables Assets, on the terms and subject to the conditions set forth in this Sale Supplement, Holdings shall, on each related Servicing Advance Payment Date, pay and deliver to Seller, in immediately available funds, a purchase price equal to the Servicing Advance Receivables Purchase Price for such Servicing Advance Receivables sold on such date; provided that Seller shall have complied with the terms of <u>Section 3.1</u> and <u>Section 3.3</u> with respect to the related Servicing Advance Receivable. Subject to the proviso of the immediately preceding sentence, to the extent any P&I Advances are required to be made under the terms of the Deferred Servicing Agreements, as determined by Seller and set forth in the applicable Monthly Remittance Report, Holdings shall, on the date the related P&I Advance is required to be made under the related Deferred Servicing Agreement, deposit the Servicing Advance Receivable Purchase Price for such P&I Advances into either the applicable Custodial Account

-11-

or other applicable account held by the related trustee, master servicer, securities administrator, or trust administrator, as the case may be, in accordance with the requirements of the related Deferred Servicing Agreement (which may be done directly by Holdings or though an account established in connection with the Servicing Advance Facility Agreements) in consideration for such P&I Advance.

3.3 Servicing Advances. Seller covenants and agrees that each Servicer Advance made by Seller under the Servicing Agreements prior to the related Servicing Transfer Date shall (a) be required to be made pursuant to the terms of the related Deferred Servicing Agreement and comply with the terms of such Deferred Servicing Agreement and Applicable Law, (b) comply with Seller's advance policies and stop advance policies and procedures and not constitute a nonrecoverable Servicer Advance as of the date Seller made such Servicer Advance and (c) be supported by customary backup documentation. Seller agrees to provide prompt notice to Holdings of any Servicer Advance made by Seller under the Deferred Servicing Agreements and deliver to Holdings such customary backup documentation relating to any Servicer Advance promptly upon request by Holdings. In the event Seller cannot provide, or cause to be provided to Holdings any customary backup documentation, and Holdings is unable to be reimbursed for such Servicer Advance solely as a result of such failure, Seller shall reimburse Holdings for the amount of such unreimbursed Servicer Advances within five (5) Business Days of Holdings' written request, to the extent Holdings paid Seller for such amounts.

3.4 Reimbursement of Servicing Advances. Seller shall, to the extent permitted under any Deferred Servicing Agreement cause the reimbursement of any Servicer Advances under the Deferred Servicing Agreements to be made directly into Holdings' account in accordance with Holdings' written directions. In any case, Seller shall within one (1) Business Day of the receipt thereof, remit to Holdings any amounts that are received by Seller under any Deferred Servicing Agreement after the Closing Date as reimbursement of any Servicer Advance. Any such amounts shall be remitted in accordance with Holdings' written directions.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes the following representations and warranties to Purchasers as of (a) each of the Closing Date and each Sale Date or (b) as of such other dates specified below:

4.1 General Representations. Each of the representations and warranties set forth in Article 3 of the Agreement are true and correct.

4.2 Title to Transferred Assets. From and including the Closing Date until such Servicing Rights Assets are transferred to Holdings under Section 2.2, Seller shall be the sole holder and owner of such Servicing Rights Assets and shall have good and marketable title to the Servicing Rights Assets, free and clear of any Liens. Upon the sale of such Servicing Rights Assets pursuant to Section 2.2, Seller will transfer to Holdings good and marketable title to the Servicing Rights Assets free and clear of any Liens. Seller is the sole holder and owner of the Rights to MSRs and the sale and delivery to Purchasers of the Rights to MSRs pursuant to the provisions of this Sale Supplement will transfer to Purchasers good and marketable title to the Rights to MSRs free and clear of any Liens.

-12-

4.3 <u>Right to Receive Servicing Fees</u>. Seller is entitled to receive Servicing Fees, Ancillary Income and Prepayment Interest Excess as servicer under each Servicing Agreement, and the New York Uniform Commercial Code permits the Seller to transfer the Excess Servicing Fees to HLSS and the remainder of the Rights to MSRs to Holdings under the Agreement and this Sales Supplement without violation of any applicable Servicing Agreement.

4.4 <u>Servicing Agreements and Underlying Documents</u>. <u>Schedule I</u> hereto contains a list of all Servicing Agreements (other than the Underlying Documents) related to the Servicing Rights that are subject to this Sale Supplement and <u>Schedule II</u> hereto contains a list of all Underlying Documents related to such Servicing Agreement, in each case with all amendments and modifications thereto, or supplements thereto with respect to such Servicing Rights.

4.5 <u>Mortgage Pool Information, Related Matters</u>.

(a) Seller has delivered to Purchasers one or more summary schedules which set forth information with respect to each Mortgage Pool relating to the Servicing Rights (the "<u>Summary Schedules</u>"). Seller acknowledges that Purchasers have relied on such Summary Schedules to determine the Purchase Price it was willing to pay for the Transferred Assets.

(b) The Summary Schedules, the Mortgage Loan Schedule and the Database are true, accurate and complete in all material respects as of the related Cut-off Date or such other date specified thereon.

(c) The Mortgage Loan Schedule indicates, by code reference, which of the Mortgage Loans have been converted into REO Properties as of the Cut-off Date.

4.6 <u>Enforceability of Servicing Agreements</u>.

(a) Seller has delivered to Purchasers, on or prior to the related Closing Date, true and complete copies of all Servicing Agreements listed on <u>Schedule I</u> hereto and all amendment thereto and all Underlying Documents listed on <u>Schedule II hereto and all amendments thereto</u>. There are no other written or oral agreements binding upon Seller or Purchasers that modify, supplement or amend any such Servicing Agreement or Underlying Document.

(b) Seller has not received written notice of any pending or threatened cancellation or partial termination of any Servicing Agreement or Underlying Document or any written notice of any pending or threatened termination of Seller as servicer of any of the Mortgage Loans.

(c) On and prior to the related Servicing Transfer Date, each Servicing Agreement and each of the Underlying Documents is or was a valid and binding obligation of Seller, is or was in full force and effect and enforceable against Seller in accordance with its terms, except as such enforceability may be affected by bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors rights generally and general principles of equity (regardless of whether considered in a proceeding of law or in equity).

-13-

4.7 Compliance With Servicing Agreements.

(a) Seller has serviced the Mortgage Loans subject to the Servicing Agreements and has kept and maintained complete and accurate books and records in connection therewith, all in accordance with Applicable Requirements, has made all remittances required to be made by it under each Servicing Agreement and is otherwise in compliance in all material respects with all Servicing Agreements and the Applicable Requirements.

(b) (i) No early amortization event, servicer default, servicer termination event, event of default or other default or breach has occurred under any Servicing Agreement or any Underlying Document (except with respect to the delinquency or loss performance triggers identified in the Summary Schedules), and (ii) no event has occurred, which with the passage of time or the giving of notice or both would: (A) constitute a material default or breach by Seller under any Servicing Agreement, Underlying Document or under any Applicable Requirement; (B) permit termination, modification or amendment of any such Servicing Agreement or Underlying Document by a third party without the consent of Seller; (C) enable any third party to demand that Seller or either Purchaser incur any repurchase obligations pursuant to a Servicing Agreement or an Underlying Document or provide indemnification for any amount of losses relating to a breach of a loan representation or warranty; (D) impose on Seller or either Purchaser sanctions or penalties in respect of any Servicing Agreement or Underlying Document; or (E) rescind any insurance policy or reduce insurance benefits in respect of any Servicing Agreement or Underlying Document which would result in a material breach or trigger a default of any obligation of Seller under any Servicing Agreement or Underlying Document.

(c) There are no agreements currently in place with any subservicers to perform any of Seller's duties under the Servicing Agreements.

(d) Each report and officer's certification prepared by Seller as servicer pursuant to a Servicing Agreement is true and correct in all material respects. Seller has previously made available to Purchasers a correct and complete description of the policies and procedures used by Seller in connection with servicing the Mortgage Loans related to the Servicing Agreements.

(e) In the preceding twelve (12) month period, no Governmental Authority, Investor, Insurer, rating agency, trustee, master servicer or any other party to a Servicing Agreement has provided written notice to Seller claiming or stating that Seller has violated, breached or not complied with any Applicable Requirements in connection with the servicing of the related Mortgage Loans which has not been resolved by Seller.

(f) All Custodial Accounts and Escrow Accounts have been established and continuously maintained in accordance with Applicable Requirements. All Custodial Account and Escrow Account balances required by the Mortgage Loans and paid for the account of the Mortgagors under the related Mortgage Loans have been credited properly to the appropriate account and have been retained in and disbursed from the appropriate account in accordance with Applicable Requirements.

4.8 No Recourse. None of the Servicing Agreements or other contracts to be assumed by Purchasers hereunder provide for Recourse to Seller.

-14-

4.9 The Mortgage Loans.

(a) Each of the Mortgage Loans and REO Properties related to each Servicing Agreement has been serviced in accordance with Applicable Requirements in all material respects.

(b) Except as disclosed on the Mortgage Loan Schedule, in the related Database and in the related Loan File and consistent with the requirements of the related Servicing Agreement, Seller has not waived any default, breach, violation or event of acceleration under any Mortgage Loan, except to the extent that any such waiver is permitted under the related Servicing Agreement and reflected in the Mortgage Loan Schedule, the related Database and the related Loan File and the disclosure relating to such waiver is reflected consistently in all material respects among the related Mortgage Loan Schedule, the related Database and the related Loan File. The Mortgage related to each Mortgage Loan related to the Servicing Agreements has not been satisfied, cancelled or subordinated, in whole or in part, and except as permitted under the related Servicing Agreement, the related Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, or subordination.

(c) There is in force with respect to each Mortgaged Property and REO Property related to a Servicing Agreement a hazard insurance policy (including any policy in effect under a forced place insurance policy) and, if applicable, a flood insurance policy that provides, at a minimum, for the coverage as required by the applicable Servicing Agreement. Seller and any prior servicer or subservicer under the Servicing Agreements has taken all necessary steps to maintain any hazard insurance policy, flood insurance policy, primary mortgage insurance policy, and title insurance policy as required under the Servicing Agreements.

(d) Seller is not aware of any repurchase requests or demands being made or threatened to be made with respect to any Mortgage Loans related to the Servicing Agreements in excess of $10 million with respect to any Servicing Agreement.

(e) Except as disclosed in the related Database, Seller has not received notice from any Mortgagor with respect to the Mortgage Loans related to the Servicing Agreements of a request for relief pursuant to or invoking any of the provisions of the Servicemembers Civil Relief Act or any similar law which would have the effect of suspending or reducing the Mortgagor's payment obligations under a Mortgage Loan or which would prevent such loan from going into foreclosure.

(f) With respect to each adjustable rate Mortgage Loan, Seller and each prior servicer has complied in all material respects with all Applicable Requirements regarding interest rate and payment adjustments.

(g) Each first lien Mortgage Loan is covered by a valid and freely assignable, life of loan, tax service contract, and flood tracking services contract, in full force and effect. All flood zone determination information provided to Purchasers is true and correct in all material respects.

-15-

(h) There are no actions, claims, litigation or governmental investigations pending or, to the knowledge of Seller, threatened, against Seller, or with respect to any Servicing Agreement or any Mortgage Loan, which relate to or affect Seller's rights with respect to the Servicing Rights or Seller's right to sell, assign and transfer the Servicing Rights or the Rights to MSRs or to receive any Servicing Fee, which could reasonably be expected to have a Material Adverse Effect individually or in the aggregate.

(i) Payments received by Seller with respect to any Mortgage Loans related to the Servicing Agreements have been remitted and properly accounted for as required by Applicable Requirements in all material respects. All funds received by Seller in connection with the satisfaction of Mortgage Loans, including foreclosure proceeds and insurance proceeds from hazard losses, have been deposited in the appropriate Custodial Account or Escrow Account and all such funds have been applied to pay accrued interest on the Mortgage Loans, to reduce the principal balance of the Mortgage Loans in question, or for reimbursement of repairs to the Mortgaged Property or as otherwise required by Applicable Requirements or are on deposit in the appropriate Custodial Account or Escrow Account.

(j) Seller is not aware of any Person that has issued any notice or written intention to exercise the optional call or optional redemption provisions under any of the related Servicing Agreements.

(k) No fraudulent action has taken place on the part of Seller in connection with its servicing of any Mortgage Loan related to the Servicing Agreement.

(l) Except with respect to partial releases, actions required by a divorce decree, assumptions, or as otherwise permitted under Applicable Requirements and documented in the Loan File and the Database, (i) the terms of each Mortgage Note and Mortgage have not been modified by Seller or any prior servicer, (ii) no party thereto has been released in whole or in part by Seller or any prior servicer and (iii) no part of the Mortgaged Property has been released by Seller or any prior servicer.

4.10 Servicing Advance Receivables.

(a) From and including the Closing Date until such Servicing Advance Receivable is transferred to Holdings under Section 3.1, Seller is the sole holder and owner of each Servicing Advance Receivable and has good and marketable title to such Servicing Advance Receivable. Seller has not previously assigned, transferred or encumbered the Servicing Advance Receivables other than pursuant to the Agreement, this Sale Supplement and the Servicing Advance Financing Agreements. The sale and delivery to Holdings of the Servicing Advance Receivables pursuant to the provisions of this Sale Supplement will transfer to Holdings good and marketable title to the Servicing Advance Receivables free and clear of any Liens (other than the Liens created pursuant to the Servicing Advance Financing Agreements).

(b) Each Servicing Advance Receivable transferred to Holdings under Section 3.1, is at the time of such transfer a valid and existing account owing to Seller and is carried on the books of Seller at or less than the amount actually advanced or accrued net of any charge-offs or other adjustments by Seller. Seller has not received any notice from a master servicer, securities

-16-

administrator, trustee, Insurer, Investor or any other Person, which disputes or denies a claim by Seller for reimbursement in connection with any such Servicing Advance Receivable. Each Servicer Advance made by Seller (and each trailing invoice received by Holdings on or after the related Servicing Transfer Date for services rendered prior to such Servicing Transfer Date) that is reimbursed or paid by Holdings to Seller or a third party service provider is fully reimbursable to Holdings as a Servicer Advance under the terms of the related Servicing Agreement.

(c) Each Servicer Advance made by Seller was made in accordance with Applicable Requirements and Seller's advance policies and stop advance policies and procedures in all material respects, and is not subject to any set-off or claim that could be asserted against Holdings. No Servicer Advance made by Seller or any prior servicer under a Servicing Agreement and not reimbursed or paid to Seller prior to the related Sale Date is a Non-Qualified Servicer Advance. Seller has not received any written notice from any Person in which such Person disputes or denies a claim by Seller for reimbursement in connection with a specifically identified Servicer Advance.

4.11 Servicing Agreement Consents and Other Third Party Approvals. None of the execution, delivery and performance of the Agreement and this Sale Supplement by Seller, the transfers of Servicing Rights under Section 2.2, the transfer of Rights to MSRs under Section 2.1, the transfers of Servicing Advance Receivables under Section 3.1 and the other transactions contemplated hereby require any consent, approval, waiver, authorization, penalties, notice or filing to be obtained by Seller or Purchasers from, or to be given by Seller or Purchasers to, or made by Seller or Purchasers with, any Person, except for, with respect to the Servicing Rights Assets, the Third Party Consents.

4.12 Servicing Advance Financing Agreements.

(a) Except as otherwise disclosed to the Purchasers, all of the Servicing Agreements are "Facility Eligible Servicing Agreements," and each Servicer Advance to be owned by an Advance SPE is a "Facility Eligible Receivable," each as defined under the Servicing Advance Financing Agreements.

(b) All of the representations and warranties of Seller in the Servicing Advance Financing Agreements are true and correct, and no early amortization event, default, event of default or similar event has occurred under the Servicing Advance Financing Agreements.

(c) Each of Seller and its Affiliates have complied in all material respects with the terms of the existing Servicing Advance Financing Agreements.

4.13 Anti-Money Laundering Laws. Seller has complied with all applicable anti-money laundering laws and regulations.

4.14 Servicer Ratings. Seller has a residential primary servicer rating for the servicing of subprime residential mortgage loans issued by S&P, Fitch or Moody's at or above "Above Average," "RPS3" and "SQ2-", respectively.

4.15 Eligible Servicer. Seller meets the eligibility requirements of a servicer and a subservicer under the terms of each Servicing Agreement and Underlying Document.

-17-

4.16 <u>HAMP</u>. Seller has entered into a Commitment to Purchase Financial Instrument and Servicer Participation Agreement with Fannie Mae, as financial agent of the United States, which agreement is in full force and effect.

## ARTICLE 5

## CONDITIONS PRECEDENT

5.1 <u>Conditions to the Purchase of Certain Servicing Advance Receivables</u>. Holdings' obligations to purchase any Servicing Advance Receivable pursuant to Section 3.1 and to pay the related Servicing Advance Receivables Purchase Price pursuant to Section 3.2 are subject to the satisfaction of Holdings' waiver of the condition that, on the date of the financing of such Servicing Advance Receivable pursuant to the Servicing Advance Financing Agreements, any required written confirmation from a national statistical rating organization that the rating of the related notes will not be reduced, withdrawn or downgraded shall have been obtained.

5.2 <u>Conditions to the Purchase of the Rights to MSRs</u>. Purchasers' obligations to make their respective purchases pursuant to <u>Section 2.1</u>, Holdings' obligations to purchase the Servicing Rights pursuant to <u>Section 2.2</u>, and Purchasers' obligations to pay the Purchase Price (and the Estimated Purchase Price) pursuant to <u>Section 2.3</u> and <u>Section 2.6</u> are subject to the satisfaction or Purchasers' waiver of each of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.3</u> of the Agreement (except the requirement to deliver the Third Party Consents necessary to transfer the Servicing Rights pursuant to <u>Section 2.2</u>) with respect to each of the Servicing Agreements and each of the Servicing Rights, as applicable, on the Closing Date and the satisfaction of each of the following conditions:

(a) Seller shall have obtained all consents or approvals required to be obtained to consummate the transfers to Purchasers pursuant to <u>Section 2.1</u>;

(b) The Servicing Advance Facility Agreements shall have been executed and delivered by each of the parties thereto and all of the conditions precedent to the effectiveness of the Servicing Advance Facility Agreements set forth therein have been satisfied; and

(c) The Subservicing Agreement and the Subservicing Supplement shall have been executed and delivered by each of the parties thereto and all of the conditions precedent to the effectiveness of the Subservicing Agreement and the Subservicing Supplement set forth therein have been satisfied.

## ARTICLE 6

## SERVICING MATTERS

6.1 <u>Seller as Servicer</u>. Except as expressly set forth in this Sale Supplement, Seller shall perform all of its duties and obligations of under each Servicing Agreement until the related Servicing Transfer Date and shall at all times until the related Servicing Transfer Date meet any standards and fulfill any requirements applicable to Seller under each Servicing Agreement.

-18-

6.2 <u>Servicing</u>. Except as otherwise specifically provided in this Sale Supplement, Seller covenants and agrees to service and administer each Mortgage Loan related to a Servicing Agreement from and after the Closing Date until the related Servicing Transfer Date in accordance with Applicable Law, the terms of the related Mortgage Loan Documents and any applicable private mortgage insurance or pool insurance, the standards, requirements, guidelines, procedures, restrictions and provisions of the related Servicing Agreement and Underlying Documents governing the duties of Seller thereunder, this Sale Supplement and any other Applicable Requirements. Without limiting the foregoing, Seller covenants and agrees that it shall perform its obligations pursuant to this Sale Supplement in a manner that will not cause the termination of Seller as servicer under any Deferred Servicing Agreement, including any termination based on Seller's management of delinquency or loss performance with respect to Mortgage Loans related to such Deferred Servicing Agreement. The parties acknowledge and agree that any termination of Seller as servicer with respect to a Servicing Agreement pursuant to a delinquency or loss performance trigger or for any other reason, other than as a result of a failure by Holdings to purchase Servicing Advance Receivables pursuant to <u>Section 3.1</u>, shall be deemed to be the result of a breach by Seller of its obligations under this Sale Supplement and the Agreement. In the event of a conflict between a Servicing Agreement and this <u>Article 6</u>, the Servicing Agreement shall control.

6.3 <u>Collections from Obligors and Remittances</u>. Seller shall direct the obligors on the Deferred Mortgage Loans to remit payment on the Deferred Mortgage Loans to the Clearing Account (as defined in the Servicing Agreement) and shall within one (1) Business Day of receipt promptly deposit any amounts Seller receives with respect to the Deferred Mortgage Loans in the Clearing Account. Seller shall promptly remit all amounts received by Seller with respect to the Mortgage Loans to the applicable Custodial Account or Escrow Account, but no later than the earlier of two (2) Business Days after receipt thereof or the date required pursuant to the applicable Deferred Servicing Agreement; <u>provided</u>, that Seller shall, subject to the terms of the related Servicing Agreement, remit any such amounts that constitute recovery of a Servicer Advance to the applicable account, if any, specified by Holdings pursuant to <u>Section 3.4</u> within one (1) Business Day of receipt thereof; <u>provided</u>, further, that Seller shall, subject to the terms of the related Servicing Agreement, remit any such amounts that constitute Servicing Fee to the applicable account, if any, specified by Holdings pursuant to <u>Section 2.5</u> within one (1) Business Day of receipt thereof. Seller shall also making any compensating interest payments or prepayment interest shortfall payments required to be made by Seller with respect to the Mortgage Loans under the Deferred Servicing Agreements, and shall remit any such payments to the applicable Custodial Account no less than one (1) Business Day prior to the applicable remittance date for such Servicing Agreement.

6.4 <u>Servicing Practices</u>. Seller shall not make any material change to its servicing practices with respect to the Deferred Mortgage Loans after the date hereof, including, any material changes to its cash collection and sweep processes or its advance policies or stop advance policies, without Holdings' prior written consent, which consent shall not be unreasonably withheld or delayed. Holdings shall have the right to direct Seller to implement reasonable changes to Seller's servicing practices applicable with respect to all or a portion of the Mortgage Loans, including any changes necessary to ensure compliance with any Applicable Laws or governmental programs or directions received pursuant to the applicable Servicing Agreements.

-19-

6.5 <u>Servicing Reports</u>. Seller shall simultaneously deliver a copy of any reports delivered by Seller to any Person pursuant to the Deferred Servicing Agreements to Holdings.

6.6 <u>Escrow Accounts</u>. Subject to the terms of the related Deferred Servicing Agreement, Seller shall be entitled to withdraw funds from any Escrow Account related to a Deferred Servicing Agreement only for the purposes permitted in the applicable Servicing Agreement.

6.7 <u>Notices and Financial Information</u>. Until the last Servicing Transfer Date, Seller will furnish, or will cause to be furnished, to Purchasers:

(a) within two (2) Business Days after the occurrence of a breach by Seller of the Agreement or this Sale Supplement or any Termination Event or other event that would give HLSS the right to direct Seller to transfer the Servicing Rights with respect to any Deferred Servicing Agreement, notice of such event;

(b) any information required to be delivered by Seller pursuant to <u>Section 5.10</u> of the Subservicing Agreement, which information shall be delivered at such times as specified in <u>Section 5.10</u> of the Subservicing Agreement, provided that any reference to a "Subject Servicing Agreement" in <u>Section 5.10</u> of the Subservicing Agreement shall be deemed to be a reference to a "Deferred Servicing Agreement," for the purposes of this <u>Section 6.7</u>; and

(c) such other information regarding the condition or operations, financial or otherwise, of Seller or any of its subsidiaries as HLSS may from time to time reasonably request.

6.8 <u>Defaults under Deferred Servicing Agreements</u>. Seller covenants and agrees to use its reasonable best efforts to cure any breach, default or notice of default with respect to its obligations under any Deferred Servicing Agreement within the timeframe for cure set forth in such Deferred Servicing Agreement.

6.9 <u>Continuity of Business</u>. (a) Seller will maintain a disaster recovery plan in support of the services it performs pursuant to this Sale Supplement and each Deferred Servicing Agreement. Seller's disaster recovery plan shall include, at a minimum, procedures for back-up/restoration of operating and loan administration computer systems; procedures and third-party agreements for replacement equipment (e.g. computer equipment), and procedures and third-party agreements for off-site production facilities. Seller will provide Holdings information regarding its disaster recovery plan upon reasonable request. Seller agrees to annually test its disaster recovery plan to ensure compliance with this <u>Section 6.9</u>. If such test results identify a material failure, Seller shall advise Holdings of the steps Seller will be taking to remedy such failure and shall notify Holdings when Seller has remedied such failure and retested. Seller will notify Holdings anytime Seller's disaster recovery plan is activated. In the event of an activation of the disaster recovery plan, Seller shall use best efforts to provide redundancy capabilities for a majority of the critical systems within 48 hours in at least one of Seller's other servicing facilities unaffected by the disaster to ensure servicing of the Mortgage Loans will be re-established within such 48 hours.

6.10 <u>Optional Termination or Clean Up Calls</u>. Seller may exercise its rights under any optional termination or clean up call provision pursuant to a Deferred Servicing Agreement prior

-20-

to the related Servicing Transfer Date; provided that simultaneously or prior to such exercise, (i) Seller or its designee agrees to purchase, and purchases, the Mortgage Loans that are subject to such Deferred Servicing Agreement at a purchase price that is at least equal to the applicable purchase price pursuant to such Deferred Servicing Agreement, (ii) all unreimbursed Servicer Advances and other amounts owed to Holdings under the Sale Supplement or otherwise are paid to Holdings, (iii) Seller shall have paid to HLSS a redemption fee with respect to such Deferred Servicing Agreement equal to the Book Value of the Rights to MSRs related to such Deferred Servicing Agreement on HLSS's financial statements as of the date of such optional termination or clean up call and (iv) Seller shall provide at least ten (10) Business Days prior written notice to Purchasers of such exercise.

6.11 Amendments to Deferred Servicing Agreements; Transfer of Servicing Rights. Seller hereby covenants and agrees not to amend the Servicing Agreements without Purchasers' prior written consent. Seller shall not sell or otherwise voluntarily transfer servicing under any of the Deferred Servicing Agreement during the Consent Period except as expressly provided in this Sale Supplement or take any other actions inconsistent with Purchasers' right to acquire ownership of Servicing Rights with respect to a Servicing Agreement upon receipt of the required Third Party Consents.

6.12 Assumption of Servicing Duties; Transfer of Rights to MSRs and Servicing Rights. Holdings may from time to time designate any of Seller's servicing obligations under a Deferred Servicing Agreement and assume the performance of such obligations so long as such assumption is permitted pursuant to such Deferred Servicing Agreement and does not limit Seller's right to receive the Servicing Fees pursuant to such Deferred Servicing Agreement. Notwithstanding anything in the Agreement or this Sale Supplement to the contrary, HLSS may transfer the Rights to MSRs to any third party and/or may direct Seller to transfer the Servicing Rights to a third party that can obtain the required Third Party Consents, subject to the right of the Seller to receive the Seller Monthly Servicing Fee, the Performance Fee, the Ancillary Income and, if applicable, the Prepayment Interest Excess owed to Seller with respect to such Deferred Servicing Agreement pursuant to Article 7. For the avoidance of doubt, HLSS shall be entitled to receive all proceeds of such transfer.

6.13 Termination Event. In the case that any Termination Event occurs with respect to any Servicing Agreement during the Consent Period, Seller shall, upon HLSS's written direction to such effect, use commercially reasonable efforts to transfer the Servicing Rights relating to any affected Servicing Agreement to a third party servicer identified by HLSS with respect to which all required Third Party Consents with respect to such Servicing Agreement can be obtained. HLSS shall be entitled to receive all proceeds of such transfer.

6.14 Servicing Transfer. Seller and Purchasers shall, prior to the Servicing Transfer Date with respect to each Servicing Agreement, work in good faith to determine and agree upon applicable servicing transfer procedures with respect to such Servicing Agreement.

6.15 Incorporation of Provisions from Subservicing Agreement. The provisions of each of Sections 5.3, 5.4, 5.5, 5.6, 5.7, 5.8 (excluding the first sentence thereof), 5.17 and 5.18, and Exhibit A of the Subservicing Agreement are hereby incorporated into this Sale Supplement by reference, *mutatis mutandis*, as if its provisions were fully set forth herein; provided that any

-21-

reference therein to the defined terms "Ocwen," "Servicer," "Mortgage Loan," "Subject Servicing Agreement" and "Agreement," shall be deemed for purposes of this Sale Supplement to be references to the terms "Seller," "Holdings," "Deferred Mortgage Loan," "Deferred Servicing Agreement" and "Sale Supplement," respectively and any reference therein to the phrase "during the term of this Agreement" shall be deemed for purposes of this Sale Supplement to be references to the phrase "until the last Servicing Transfer Date."

## ARTICLE 7

## SELLER SERVICING FEES; COSTS AND EXPENSES

7.1 Seller Monthly Servicing Fee. As consideration for Seller servicing the Mortgage Loans pursuant to the Deferred Servicing Agreements during the applicable Consent Period but prior to the earlier of the date on which the Servicing Rights are transferred from Seller with respect to a Deferred Servicing Agreement or Servicing Fee Reset Date, Holdings shall pay to Seller a monthly base servicing fee for each calendar month during such period during which Seller is servicing Mortgage Loans with respect to Deferred Servicing Agreements pursuant to this Sale Supplement equal to 12% of the aggregate Servicing Fees actually received by Purchasers under this Sale Supplement during such calendar month with respect the Deferred Servicing Agreements (the "Seller Monthly Servicing Fee").

7.2 Performance Fee. In addition to the Seller Monthly Servicing Fee, Holdings shall pay to Seller for each calendar month during which Holdings is servicing Mortgage Loans with respect to Deferred Servicing Agreements pursuant to this Sale Supplement a performance fee ("Performance Fee") equal to the greater of (a) zero and (b) (x) the excess, if any, of the aggregate of all Servicing Fees actually received by Purchasers with respect to the Deferred Servicing Agreements and pursuant to the Transferred Servicing Agreements (whether directly pursuant to such Transferred Servicing Agreements or pursuant to this Sale Supplement) during such calendar month over the sum of (i) the Monthly Servicing Fee for such calendar month and (ii) the Retained Servicing Fee for such calendar month multiplied by (y) a fraction, (i) the numerator of which is the average unpaid principal balance of all Mortgage Loans subject to the Deferred Servicing Agreements during such calendar month and (ii) the denominator of which is equal to the sum of the average unpaid principal balance of all Mortgage Loans subject to the Deferred Servicing Agreements during such calendar month and the average unpaid principal balance of all Mortgage Loans subject to the Transferred Servicing Agreements during such calendar month, or such other allocation percentage which is agreed by Seller and Holdings (the "Allocation Percentage"). The Performance Fee, if any, for any calendar month will be reduced by an amount equal to (y) 3.00% per annum (i.e., 0.25% per month) of the Excess Servicing Advances, if any, for such month multiplied by the Allocation Percentage, and the amount of any such reduction in the Performance Fee shall be retained by Holdings. If the Closing Date does not occur on the first day of a calendar month, the Performance Fee for the period from the Closing Date to the last of the calendar month in which the Closing Date occurs shall be calculated in a pro rata manner based on the number of days in such period. Notwithstanding any provision in this Sale Supplement to the contrary, in the event Holdings has failed to pay Seller any Seller Monthly Servicing Fee or Performance Fees that are past due after ten (10)

-22-

Business Days of Holdings receiving notice of such failure, Seller shall not be required to continue to act as subservicer until such time as Holdings has fully paid such past due Seller Monthly Servicing Fee or Performance Fee; provided that Holdings shall not have notified Seller that it disputes the occurrence or amount of such past due Seller Monthly Servicing Fee or Performance Fee.

7.3 Costs and Expenses. Except as otherwise expressly provided in the Agreement or this Sale Supplement, each party hereto shall be responsible for its own costs and expenses incurred in connection with the negotiation and execution of the Agreement, this Sale Supplement and all documents relating thereto. Seller shall be required to pay all expenses incurred by it in connection with its obligations hereunder to the extent such expenses do not constitute Servicer Advances and shall not be entitled to reimbursement therefor except as specifically provided for herein or in the applicable Deferred Servicing Agreement. Seller shall reimburse Purchasers for any reasonable out-of-pocket costs, including legal fees, incurred by Purchasers in connection with obtaining any required Third Party Consents; provided, however, that neither Purchaser shall incur such costs without the prior written approval of Seller.

7.4 Ancillary Income. Seller shall be entitled to retain as additional compensation any Ancillary Income and any Prepayment Interest Excess received by Seller with respect to the Deferred Mortgage Loans, to the extent such Ancillary Income or Prepayment Interest Excess is permitted to be retained by Seller pursuant to the related Deferred Servicing Agreement.

7.5 Calculation and Payment. No later than the second Business Day following the receipt by Purchasers of the Monthly Servicing Oversight Report for a calendar month, Holdings will remit to Seller in immediately available funds the Seller Monthly Servicing Fee and Performance Fees payable by Holdings to Seller for the related calendar month, along with a report showing in reasonable detail the calculation of such Seller Monthly Servicing Fees and Performance Fees.

7.6 No Offset. Neither party shall have any right to offset against any amount payable hereunder or other agreement to the other party, or otherwise reduce any amount payable hereunder as a result of, any amount owing by the other party or any of its Affiliates to such party or any of its Affiliates.

7.7 Servicing Fee Reset Date. The servicing fees payable to Seller after the Servicing Fee Reset Date shall be subject to negotiation between Seller and Holdings. If Seller and Holdings are unable to agree to such servicing fee prior to the Servicing Fee Reset Date, Seller shall, upon Holdings' written direction to such effect, transfer the Servicing Rights relating to all of the Deferred Servicing Agreements to a third party servicer identified by Holdings with respect to which all required Third Party Consents with respect to the Deferred Servicing Agreements can be obtained. Holdings shall be entitled to receive all proceeds related to such transfer.

-23-

## ARTICLE 8

### INDEMNIFICATION

8.1 <u>Seller Indemnification of Purchasers</u>. Seller agrees to indemnify and hold harmless each Purchaser and each officer, director, agent, employee or Affiliate of each Purchaser (each, a "<u>Seller Indemnified Party</u>") from and against any and all claims, losses, damages, liabilities, judgments, penalties, fines, forfeitures, legal fees and expenses, and any and all related costs and/or expenses of litigation, administrative and/or regulatory agency proceedings, and any other costs, fees and expenses (each, a "<u>Liability</u>") suffered or incurred by a Purchaser or any such other Person (whether or not resulting from a third party claim) arising directly or indirectly out of or resulting from (a) any event relating to Transferred Assets occurring prior to the related Servicing Transfer Date, (b) a breach of any of Seller's representations and warranties contained in the Agreement, this Sale Supplement or any other Related Agreement or Seller's failure to observe and perform any of Seller's duties, obligations, covenants or agreements contained in the Agreement, this Sale Supplement or any other Related Agreement, (c) acts or omissions of Seller, any other servicer of any Mortgage Loans, or any subservicer, contractor or agent engaged by Seller or any other servicer, in each case prior to the related Servicing Transfer Date, relating to the Transferred Assets, including any failure by Seller, any other servicer or any subservicer, contractor or agent engaged by Seller or any other servicer prior to the related Servicing Transfer Date to comply with the Applicable Requirements, (d) the Excluded Liabilities or (e) any acts or omissions by Seller or its employees or agents in performance of its duties or obligations pursuant to this Sale Supplement.

8.2 <u>Purchasers Indemnification of Seller</u>. Purchasers agree, jointly and severally, to indemnify and hold harmless Seller and each officer, director, agent, employee or Affiliate of Seller (each, a "<u>Purchaser Indemnified Party</u>") from and against any and all Liability suffered or incurred by Seller or any such other Person arising out of or resulting from (a) a breach of any of Purchasers' representations and warranties or covenants contained in the Agreement, the Sale Supplement or any other Related Agreement or (b) acts or omissions of a Purchaser or any subservicer, contractor or agent (other than Seller or any of Seller's Affiliates) engaged by Purchasers, in each case after the related Servicing Transfer Date, relating to the Transferred Assets.

8.3 <u>Indemnification Procedures</u>.

(a) As promptly as is reasonably practicable after becoming aware of a claim for indemnification under the Agreement or this Sale Supplement not involving a Third-Party Claim, but in any event no later than fifteen (15) Business Days after first becoming aware of such claim, the Indemnified Person shall give notice to the Indemnifying Person of such claim, which notice shall specify the facts alleged to constitute the basis for such claim and the amount that the Indemnified Person seeks hereunder from the Indemnifying Person; <u>provided</u>, <u>however</u>, that the failure of the Indemnified Person to give such notice shall not relieve the Indemnifying Person of its obligations under this <u>Section 8.3</u> except to the extent (if any) that the Indemnifying Person shall have been prejudiced thereby.

(b) The Indemnified Person shall give notice as promptly as is reasonably practicable, but in any event no later than ten (10) Business Days after receiving notice thereof, to the Indemnifying Person of the assertion of any claim, or the commencement of any action, suit, claim or proceeding, by any unaffiliated third Person (a "<u>Third-Party Claim</u>") in respect of which indemnity may be sought under the Agreement or this Sale Supplement (which notice shall

-24-

specify in reasonable detail the nature and amount of such claim); provided, however, that the failure of the Indemnified Person to give such notice shall not relieve the Indemnifying Person of its obligations under this Section 8.3 except to the extent (if any) that the Indemnifying Person shall have been prejudiced thereby. The Indemnifying Person may, at its own expense, (i) participate in the defense of any such Third-Party Claim, and (ii) upon notice to the Indemnified Person, at any time during the course of any such Third-Party Claim, assume the defense thereof with counsel of its own choice and, in the event of such assumption, shall have the exclusive right, subject to clause (i) in the proviso in Section 8.3(c), to settle or compromise such Third-Party Claim. If the Indemnifying Person assumes such defense, the Indemnified Person shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Person. Whether or not the Indemnifying Person chooses to defend or prosecute any such Third-Party Claim, all of the parties hereto shall cooperate in the defense or prosecution thereof.

(c) Any settlement or compromise made or caused to be made by the Indemnified Person (unless the Indemnifying Person has the exclusive right to settle or compromise under clause (ii) of Section 8.3(b) or the Indemnifying Person, as the case may be), of any such Third-Party Claim shall also be binding upon the Indemnifying Person or the Indemnified Person, as the case may be, in the same manner as if a final judgment had been entered by a court of competent jurisdiction in the amount of such settlement or compromise; provided, however, that (i) no obligation, restriction, loss or admission of guilt or wrongdoing shall be imposed on the Indemnified Person as a result of such settlement or compromise without its prior written consent and (ii) the Indemnified Person will not compromise or settle any Third Party Claim without the prior written consent of the Indemnifying Person.

(d) Except as specifically provided for in the Agreement or this Sale Supplement, no claim may be made by an Indemnified Person for any special, indirect, punitive or consequential damages ("Special Damages") in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of, or in any way related to the transactions contemplated, or relationship established, by this Agreement or any Sale Supplement, or any act, omission or event occurring in connection herewith or therewith, and to the fullest extent permitted by law, Seller and each Purchaser hereby waives, releases and agrees not to sue upon any such claim for Special Damages, whether or not accrued or whether or not known or suspected to exist in its favor.

8.4 Tax Treatment. (a) Seller and Purchasers agree that all payments made by any of them to or for the benefit of the other under this Article 8, under other indemnity provisions of the Agreement or this Sale Supplement and for any misrepresentations or breaches of warranties or covenants, shall be treated as adjustments to the Purchaser Price for tax purposes and that such treatment shall govern for purposes hereof except to the extent that the Applicable Laws of a particular jurisdiction provide otherwise.

(b) All payments made pursuant to this Agreement shall be made free and clear and without deductions of any kind for taxes.

8.5 Survival. The parties' obligations under this Article 8 shall survive any termination of the Agreement and/or this Sale Supplement.

-25-

8.6 <u>Additional Indemnification</u>. (a) Without limiting Seller's obligations under <u>Article 8</u> of this Sale Supplement, it is agreed by the parties that if Seller is terminated as servicer under any Deferred Servicing Agreement as a result of any action described in <u>clauses (a) through (e)</u> of <u>Section 8.1</u> above, Seller shall also pay to Purchasers, as reasonable and just compensation for such termination, an amount equal to the product of (i) the Purchase Price for such Deferred Servicing Agreement and (ii) the Amortization Percentage for the calendar month in which Seller received notice of such termination, and Purchasers shall accept such sum as liquidated damages, and not as penalty, in the event of such a termination.

8.7 <u>Specific Performance</u>. Notwithstanding any other provision of the Agreement or this Sale Supplement, (i) it is understood and agreed that the remedy of indemnity payments pursuant to this <u>Article 8</u> and other remedies at law would be inadequate in the case of any actual or threatened breach of the Agreement or this Sale Supplement by Seller and (ii) Purchasers shall be entitled, without limiting its other remedies and without the necessity of proving actual damages or posting any bond, to equitable relief, including the remedy of specific performance or injunction, with respect to any breach or threatened breach of such covenants. Such relief shall be in addition to, and not in lieu of, all other remedies available at law or in equity to such party under the Agreement and this Sale Supplement.

## ARTICLE 9

## GRANT OF SECURITY INTEREST

9.1 <u>Granting Clause</u>. To secure its performance of its obligations under the Agreement and this Sale Supplement, Seller hereby grants to Purchasers a security interest in all of its right, title and interest in an to the following, whether now owned or hereafter acquired, and all monies "securities," "instruments," "accounts," "general intangibles," "payment intangibles," "payment intangibles," "goods," "letter of credit rights," "chattel paper," "financial assets," "investment property," (each as defined in the applicable UCC) and other property consisting of, arising from or relating to any of the following:

(a) the Servicing Rights in respect of all of the Mortgage Loans and REO Properties related to the Deferred Servicing Agreements, in each case together with all related security, collections and payments thereon and proceeds of the conversion, voluntary or involuntary of the foregoing;

(b) the Rights to MSRs with respect to each Servicing Agreement;

(c) all Servicing Fees, Ancillary Income and Prepayment Interest Excess received under the Deferred Servicing Agreements and subject to <u>Section 6.10</u> of this Sale Supplement any rights to exercise any optional termination or clean-up call provisions under the Deferred Servicing Agreements;

(d) all income from amounts on deposit in Custodial Accounts and Related Escrow Accounts related to the Deferred Servicing Agreements;

(e) all files and records in Seller's possession or control, including the related Database, relating to the assets specified in clauses (a) through (c);

-26-

(f) all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or claims of any nature, whether arising by way of counterclaim or otherwise, available to or being pursued by Seller to the extent related exclusively to any of the foregoing and/or the Assumed Liabilities; and

(g) any proceeds of any of the foregoing (collectively, the "Collateral").

This Sale Supplement shall constitute a security agreement under applicable law. Seller agrees that from time to time it shall promptly execute and deliver all additional instruments and documents and take all additional action that Purchasers may reasonably request in order to perfect the interests of Purchasers in, to and under, or to protect, the Collateral or to enable Purchasers to exercise or enforce any of its rights or remedies hereunder. To the fullest extent permitted by applicable law, Seller hereby authorizes Purchasers to file financing statements and amendments thereto in connection with the grant of a security interest pursuant to this Section 9.1. Seller covenants and agrees to take all necessary action to prevent the creation or imposition of any Lien upon any of the Collateral, and to maintain the Collateral free and clear of all Liens, other than the Lien securing the obligations of Seller arising under this Sale Supplement.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

10.1 Further Assurances. Without limiting Section 5.7 of the Agreement, each party hereto shall execute and deliver in a reasonable timeframe such reasonable and appropriate additional documents, instruments or agreements and take such reasonable actions as may be necessary or appropriate to effectuate the purposes of this Sale Supplement at the request of the other party. Without limiting the foregoing, the Seller agrees that it will promptly at Purchasers' request execute and deliver an one or more assignment and assumption agreements, in form mutually agreed to by the parties, one or more equity interest assignments, in form mutually agreed to by the parties, or such other documents, instruments or agreements as Purchasers may reasonably request to evidence the transfers of Rights to MSRs pursuant to Section 2.1, Servicing Rights pursuant to Section 2.2 and Transferred Receivables Assets pursuant to Section 3.1.

10.2 Compliance with Applicable Laws; Licenses. Seller will comply with all Applicable Laws in connection with the performance of its obligations under the Agreement and this Sale Supplement. Seller shall maintain all necessary licenses and approvals in each jurisdiction where the failure to do so would materially and adversely affect the ability of Seller to perform its obligations under the Agreement and this Sale Supplement.

10.3 Merger, Consolidation, Etc.. Seller will keep in full effect its existence, rights and franchises as a limited liability company, and will obtain and preserve its qualification to do business as a foreign organization in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of the Agreement, this Sale Supplement, each Deferred Servicing Agreement or any of the Deferred Mortgage Loans, or to perform its duties under the Agreement or this Sale Supplement. Seller may be merged or consolidated with or into any Person, or transfer all or substantially all of its assets to any Person, in which case any

-27-

Person resulting from any merger or consolidation to which Seller shall be a party or acquiring all or substantially all of the assets of Seller, or any Person succeeding to the business of Seller shall be the successor of Seller hereunder and under the Agreement, without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided, however, that the successor or surviving Person shall be an institution whose deposits are insured by FDIC or a company whose business includes the servicing of mortgage loans and shall have a tangible net worth not less than $25,000,000.

10.4 <u>Annual Officer's Certificate.</u> Not later than March 15th of each calendar year commencing in 2014, Seller shall deliver to Purchasers an Officer's Certificate stating, as to each signatory thereof, that (i) a review of the activities of Seller during the preceding year and of performance under the Agreement and this Sale Supplement has been made under such officers' supervision and (ii) to the best of such officer's knowledge, based on such review, Seller has fulfilled all of its obligations under the Agreement and this Sale Supplement in all material respects throughout such year, or, if there has been a default in the fulfillment of any such obligation in any material respect, specifying each such default known to such officer and the nature and status thereof.

10.5 <u>Accounting Treatment</u>. Notwithstanding <u>Section 8.14</u> of the Agreement, the parties acknowledge that until such time as the Third Party Consents with respect to a Servicing Agreement are obtained, the parties shall treat the transaction hereunder with respect to such Servicing Agreement as a financing for accounting purposes.

10.6 <u>Incorporation</u>. The provisions of <u>Article 8</u> of the Agreement are hereby incorporated into this Sale Supplement by reference, *mutatis mutandis*, as if its provisions were fully set forth herein.

10.7 <u>Third Party Beneficiaries</u>. Seller and each Purchaser acknowledge and agree that the indenture trustee, on behalf of the holders of related notes, with respect to any Servicing Advance Financing Agreements pursuant to which Purchaser has transferred Servicer Advances made pursuant to a Deferred Servicing Agreement is an express third party beneficiary of this Sale Supplement and the Agreement solely with respect to the Deferred Servicing Agreements related to such Servicing Advance Financing Agreement.

[Signature Page Follows]

-28-

9/13/2013 9:52 PM

IN WITNESS WHEREOF, the parties hereto have caused this Sale Supplement to be executed and delivered by its respective officer thereunto duly authorized as of the date above written.

**OCWEN LOAN SERVICING, LLC**

By:    Ocwen Mortgage Servicing, Inc., as its sole member

By:    /s/ Nikhil Malik

Name: Nikhil Malik

Title:  CFO and Treasurer

**HLSS HOLDINGS, LLC**

By:    /s/ James E. Lauter

Name: James Lauter

Title:  Senior Vice President and CFO

**HOME LOAN SERVICING SOLUTIONS, LTD.**

By:    /s/ William C. Erbey

Name: William C. Erbey

Title:  Chairman



Ocwen is upgrading its systems to better serve your loan. As part of this upgrade, you may now register a new username and password at www.ocwencustomers.com for your active and future account management needs. This includes management of your online payment needs as well as payoff requests and other web functionality to which you are accustomed. Please note that some options may have changed. You may continue to log in at http://ocwen.mortgagebanksite.com for access to historical account information.

Go to ocwencustomers.com

**\*Borrowers with more than one account:** We may not have moved all of your loans to the new system, so you may not be able to access all of your accounts at www.ocwencustomers.com. We are working quickly to move all accounts. Until that time, you will continue to have access to manage the accounts that have not moved at http://ocwen.mortgagebanksite.com.

If you have questions, you may call our Customer Care Center at (800) 74-OCWEN / (800-746-2936).

# Closed

# 14450 EAST 50TH AVE

DENVER, CO 80239
30 year ARM Loan
I want to...
Select One ...
**This loan is closed.**
Account Number:
⬛0131
Close Date:
00/00/00
You can still view details about this loan—just select an option from the "I want to" menu on the right.

. Hide loan details
# Help for Homeowners Center

Find out if you qualify for a loan modification program or check the status of your request.

continue

About homeowner assistance programs »



Ocwen is upgrading its systems to better serve your loan. As part of this upgrade, you may now register a new username and password at www.ocwencustomers.com for your active and future account management needs. This includes management of your online payment needs as well as payoff requests and other web functionality to which you are accustomed. Please note that some options may have changed. You may continue to log in at http://ocwen.mortgagebanksite.com for access to historical account information.

Go to ocwencustomers.com

**\*Borrowers with more than one account:** We may not have moved all of your loans to the new system, so you may not be able to access all of your accounts at www.ocwencustomers.com. We are working quickly to move all accounts. Until that time, you will continue to have access to manage the accounts that have not moved at http://ocwen.mortgagebanksite.com.

If you have questions, you may call our Customer Care Center at (800) 74-OCWEN / (800-746-2936).

# Closed

# 14450 EAST 50TH AVE

DENVER, CO 80239
30 year ARM Loan
I want to...
Select One ...
Account Number:
▮▮▮▮▮0131

## Account History

Original Loan Date:
10/26/2001
Original Loan Amount:
$208,250
Balance as of 09/14/2013:
$0.00
To search your account history, please specify the date range.

03/14/2013 through 09/14/2013.

From mm/dd/yyyy 03/14/2013          To mm/dd/yyyy 09/14/2013
Print

Save a copy as
Microsoft Excel

Comma-separated values

Adobe PDF

Self Service 12-12020-mg Doc 5962-2 Filed 11/26/13 Entered 11/26/13 21:39:30 Account details / transactionhisto...
Proof of Claim and Responses Pg 97 of 143
Servicing Mortgage Customers

how to save and/or print your account history

| Date | Description | Monthly Payment | Applied to Principal | Applied to Interest | Applied to Escrow | Late Charges | Other |
|---|---|---|---|---|---|---|---|
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Service Released | $0.00 | $191,519.53 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/09/2013 | Payment | $1,496.61 | $534.84 | $800.23 | $161.54 | $0.00 | $0.00 |

**1**, 2 next »

CO Residents - View Associated Fees

# Help for Homeowners Center

Find out if you qualify for a loan modification program or check the status of your request.

continue

About homeowner assistance programs »

NMLS #1852 - NMLS Consumer Access Page

© Copyright 2013 Ocwen Financial Corporation. All rights reserved.

# Ocwen Loan Servicing®
## Mortgage Customers

**OCWEN**

| Date | Description | Monthly Payment | Applied to Principal | Applied to Interest | Applied to Escrow | Late Charges | Other |
|------|-------------|-----------------|---------------------|--------------------|--------------------|--------------|-------|
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Fee Waived | ($20.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($20.00) |
| 09/02/2013 | Service Released | $0.00 | $191,519.53 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/09/2013 | Payment | $1,496.61 | $534.84 | $800.23 | $161.54 | $0.00 | $0.00 |
| 07/09/2013 | Payment | $1,496.61 | $532.62 | $802.45 | $161.54 | $0.00 | $0.00 |
| 06/10/2013 | Payment | $1,496.61 | $530.41 | $804.66 | $161.54 | $0.00 | $0.00 |
| 05/15/2013 | County Tax Paid | ($835.81) | $0.00 | $0.00 | ($835.81) | $0.00 | $0.00 |
| 05/09/2013 | Payment | $1,461.56 | $528.21 | $806.86 | $126.49 | $0.00 | $0.00 |
| 04/09/2013 | Payment | $1,461.56 | $526.02 | $809.05 | $126.49 | $0.00 | $0.00 |
| 03/11/2013 | Payment | $1,461.56 | $523.84 | $811.23 | $126.49 | $0.00 | $0.00 |
| 02/11/2013 | Payment | $1,461.56 | $521.67 | $813.40 | $126.49 | $0.00 | $0.00 |
| 01/29/2013 | County Tax Paid | ($835.82) | $0.00 | $0.00 | ($835.82) | $0.00 | $0.00 |
| 01/10/2013 | Fee Paid | $7.50 | $0.00 | $0.00 | $0.00 | $0.00 | $7.50 |
| 01/10/2013 | Fee Assessed | $7.50 | $0.00 | $0.00 | $0.00 | $0.00 | $7.50 |
| 01/10/2013 | Payment | $1,461.56 | $519.50 | $815.57 | $126.49 | $0.00 | $0.00 |
| 12/10/2012 | Payment | $1,461.56 | $517.35 | $817.72 | $126.49 | $0.00 | $0.00 |
| 11/09/2012 | Payment | $1,461.56 | $515.20 | $819.87 | $126.49 | $0.00 | $0.00 |
| 10/09/2012 | Fee Paid | $7.50 | $0.00 | $0.00 | $0.00 | $0.00 | $7.50 |
| 10/09/2012 | Fee Assessed | $7.50 | $0.00 | $0.00 | $0.00 | $0.00 | $7.50 |
| 10/09/2012 | Payment | $1,461.56 | $513.06 | $822.01 | $126.49 | $0.00 | $0.00 |
| 09/10/2012 | Fee Paid | $7.50 | $0.00 | $0.00 | $0.00 | $0.00 | $7.50 |
| 09/10/2012 | Fee Assessed | $7.50 | $0.00 | $0.00 | $0.00 | $0.00 | $7.50 |
| 09/10/2012 | Payment | $1,461.56 | $510.93 | $824.14 | $126.49 | $0.00 | $0.00 |

## Title 18 USC § 474

<u>Whoever, with intent to defraud, makes, executes, acquires, scans, captures, records, receives, transmits, reproduces, sells, or has in such person's control, custody, or possession, an analog, digital, or electronic image of any obligation or other security of the United States is guilty of a class B felony.</u>

"Fraud vitiates the most solemn Contracts, documents and even judgments" [<u>U.S. vs. Throckmorton</u>, 98 US 61, at pg. 65].

"It is not necessary for rescission of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations." [<u>Whipp v. Iverson</u>, 43 Wis 2d 166].

"Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages." <u>Barnsdall Refining Corn. v. Birnam Wood Oil Co.</u> 92 F 26 817.

### ResCap Completes Sale Of Servicing Platform Assets To Ocwen Loan Servicing, LLC

**February 15, 2013 – NEW YORK** – Residential Capital, LLC (ResCap) has completed the sale of the servicing platform assets to Ocwen Loan Servicing, LLC, the mortgage servicing arm of Ocwen Financial Corporation. The United States Bankruptcy Court, Southern District of Manhattan had approved the sale of the assets last November.

"Today marks an important step in what has been a successful sale process for ResCap," said ResCap Chief Executive Officer Thomas Marano. "Since the Court's approval of the deal, our focus has been to ensure a smooth transition for homeowners and preserve value for our creditors."

The sale of ResCap's originations and capital markets platform to Walter Investment Management Corp., and the sale of a whole loan portfolio to Berkshire Hathaway were recently completed. The three sale transactions, in the aggregate, generated more than $4 billion in proceeds for the benefit of ResCap's creditors and preserved more than 3,800 U.S. jobs.

"This complex transaction was settled in three components with three distinct purchasers, in cooperation with eight government agencies or regulatory authorities - all while keeping the business operating as a going concern," Marano said. "This successful outcome is a direct result of the hard work our employees, leadership and advisors have dedicated over the last year."

Centerview Partners LLC and FTI Consulting are acting as financial advisors to ResCap. Morrison & Foerster LLP is acting as legal advisor to ResCap. Morrison Cohen LLP is advising ResCap's independent directors.

#### *About Residential Capital (ResCap)*
Residential Capital, LLC was one of the largest originators, sellers and servicers of residential mortgage loans in the United States, conducting its mortgage operations in recent years through GMAC Mortgage, a wholly owned subsidiary that is not affiliated with General Motors. ResCap was the first mortgage servicer to complete and exceeded the consumer relief obligations as part of the National Mortgage Settlement, providing $257.4 million in credited relief to borrowers across the nation. ResCap's executive offices are located in New York City, and most of its retained operations are in Fort Washington, Pennsylvania and Minneapolis, Minnesota.

**Contacts**
Susan Fitzpatrick
Director of Communications
(215) 734-4400
susan.fitzpatrick@gmacrescap.com



1212020130215000000000010



**Homecomings Financial Receives Moody's Highest Primary Servicer Designation; Rating Reflects Ability to Service a Wide Range of Non-Conforming Mortgages**

# GMAC RFC

**GMAC-RFC LOGO**
GMAC-RFC (Residential Funding Corporation) logo. GMAC-RFC, a wholly owned subsidiary of General Motors Acceptance Corporation, is America's largest private-label issuer of mortgage-backed securities and a leading warehouse lender. The company leverages its strengths in securitization, lending and investment to offer a broad portfolio of innovative capital solutions. The company is headquartered in Minneapolis and operates in the United States, Europe, Latin America and Japan. Contact: http://www.rfc.com. (PRNewsFoto)[TK]
MINNEAPOLIS, MN USA 04/26/2002

MINNEAPOLIS, May 20 /PRNewswire/ -- Homecomings Financial(SM), a wholly owned subsidiary of Residential Funding Corporation (GMAC-RFC), today announced it has received top servicing designations from Moody's Investor Services.

(Photo: http://www.newscom.com/cgi-bin/prnh/20000324/MNF002 )

Moody's assigned Homecomings Financial its highest rating, SQ1, as a primary servicer of residential prime, subprime and second-lien mortgage loans. Homecomings Financial also received Moody's SQ2 rating as a special servicer of residential mortgage loans.

"Moody's designations are attributed to our strength in payment collections, above average foreclosure timeline management and overall stability," said Chris Gilson, president and managing director of Homecomings Financial. "We strive to provide top-quality service for our borrowers by investing in the best associates and technology and by remaining adaptable to market conditions."

Moody's SQ ratings provide an independent view of a loan servicer's ability to prevent or mitigate mortgage pool losses across changing markets. The rating scale ranges from SQ1 (strong) to SQ5 (weak).

Moody's ratings were also based on Homecomings Financial's experienced leadership team, well-trained staff, extensive technology resources and performance in servicing special loan products, such as second liens, high-loan-to-value (HLTV), home-equity line-of-credit (HELOC) and home equity CES. The ratings were also attributed to Homecomings Financial's stability based on access to capital and liquidity from parent company GMAC-RFC.

In the last year, Homecomings Financial has also been given top servicer ratings by rating agency Fitch and top master servicing designations by rating agency Standard & Poor's (S&P).

Moody's servicer ratings are differentiated in the marketplace by focusing on performance measurement. Every rating incorporates an assessment of delinquency transition rates, foreclosure timeline management, loan cure rates, recoveries, loan resolution outcomes and REO management -- all critical indicators of a servicer's ability to get maximum returns from mortgage portfolios.

"Homecomings Financial is very strong in payment collections, an area of particular importance for primary servicers," said Thomas Crowe, an analyst at Moody's. "In addition, as a special servicer, Homecomings Financial has above-average foreclosure timeline management and the ability to minimize losses on defaults that do occur."

Moody's servicer ratings also consider the company's ability to maintain its focus on high-quality servicing in an economic downturn. Servicing operations can be stressed by increasing the number of delinquent loans while at the same time increasing the need for liquidity. Ratings are assigned with

the understanding that a servicer's effectiveness can have a strong positive
or negative impact on credit enhancement levels, particularly within
lower-rated securities.  For this reason, servicer ratings remain valid for a
maximum of one year.

    ABOUT HOMECOMINGS FINANCIAL
    Homecomings Financial, the loan servicing unit of GMAC-RFC, services over
540,000 loans and is comprised of three fully integrated servicing sites
(Dallas, Texas; San Diego, Calif.; and Blue Bell, Pa.), with the Dallas office
serving as platform headquarters.

    ABOUT GMAC-RFC
    GMAC-RFC, a wholly owned subsidiary of GMAC Financial Services, is a
leading private issuer of mortgage-backed securities and home equity loan
asset-backed securities, and the No. 1 warehouse lender in the United States.
The company leverages its strengths in securitization, lending and investment
to offer a broad portfolio of innovative capital solutions.  The company is
headquartered in Minneapolis and operates in the United States, Europe and
Latin America.   http://www.gmacrfc.com


SOURCE GMAC Residential Funding Corporation
Web Site: http://www.gmacrfc.com
Photo Notes: NewsCom:
http://www.newscom.com/cgi-bin/prnh/20000324/MNF002 AP Archive:
http://photoarchive.ap.org PRN Photo Desk, 888-776-6555 or
212-782-2840
Company News On Call: Company News On-Call:
http://www.prnewswire.com/comp/138832.html

Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the
content.

More news from PR Newswire...
Copyright © 1996-2002 PR Newswire Association LLC. All Rights Reserved.
A United Business Media company.

**<u>Sulit Proof of Claim</u>**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
RESIDENTIAL CAPITAL, LLC, et al., CASE NO. 12-12020 (MG)

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
GMAC MORTGAGE

Name and address where notices should be sent:
GMAC MORTGAGE
3451 HAMMOND AVE.
P.O. BOX 780
WATERLOO, IA 50704-0780

Telephone number:                          email:

☐ Check this box if this claim amends a previously filed claim.

Court Claim
Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):
LEILANI R. SULIT
3415 N. ODELL AVE,
CHICAGO, IL 60634
Telephone number: 773-836-9306          email: lsulit@mail.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ _____

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** MORTGAGE / STATEMENT
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**
6691

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☒Real Estate ☐Motor Vehicle ☐Other
**Describe:**

Value of Property: $ 280,000   Annual Interest Rate 3.5 % ☐Fixed ☒Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $ 407,804.00   Basis for perfection: _____

Amount of Secured Claim: $ _____   Amount Unsecured: $ _____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$ _____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ _____   (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are *redacted* copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and *redacted* copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain: PROMISSORY NOTE NOT AVAILABLE AT THIS TIME

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**9. Signature:** (See instruction #9) Check the appropriate box.

☐ I am the creditor.   ☐ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)

☒ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)

☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: LEILAN SULIT
Title: MRS.
Company: ABBEY ST. CLARE
Address and telephone number (if different from notice address above):
3315 N. OAK PARK AVE, CHICAGO, IL 60634

(Signature) _____   10-14-2012 (Date)

Telephone number: 773-836-9306   Email: lsulit@gmail.com

**RECEIVED**
**OCT 1 8 2012**
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*



# GMAC Mortgage

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

09/18/12

511881-006635

LEILANI I SULIT

3415 N ODELL AVE

CHICAGO IL 60634-0000

|..||..||....||....||..||.||..||.|..||.||.||||....||.||.||.||.||

RE:    Account Number        ███████4337
       Property Address    3415 NORTH ODELL AVE

                           CHICAGO IL 60634-0000

Dear LEILANI I SULIT

        **IMPORTANT NOTICE REGARDING INTEREST RATE CHANGE**

The interest rate on your loan is scheduled to adjust on 10/01/12
and will be effective with the 11/01/12 payment.

Projected principal balance after 10/01/12 payment $    407804.46

| Previous index value | 0.14750% | New index value | 0.15330% |
|---|---|---|---|
| Current interest rate | 3.50000% | New interest rate | 3.50000% |
| Current P&I payment  $ | 2090.76 | Margin | 3.29000% |

Rate Next Change Date                    11/01/12
Principal and Interest Next Change       12/01/12

Your new interest rate is calculated by adding the margin to the
new index value as defined in your loan documents. The result of
this addition is subject to rounding and rate cap limitations
according to the terms of your loan documents.

| | | New Principal and Interest payment |
|---|---|---|
| Minimum Required | $ | 2090.76 |
| Interest Only | $ | 1189.42 |
| Fully Amortizng | $ | 2090.31 |
| 15 Year | $ | 4372.90 |

*INTEREST ONLY and FULLY AMORTIZING amounts subject to change if
any payment received after the date of this notice are other than
MINIMUM REQUIRED payment amount.

The MINIMUM REQUIRED payment is the minimum monthly payment you
must make as stipulated by your loan documents.



09/18/12
Account Number ▮▮▮▮4337
Page Two

The INTEREST ONLY payment is the minimum amount necessary to pay
all accrued interest amounts due for the month. If this amount
is less than the minimum required payment, you must still make
the minimum required payment.

The FULLY AMORTIZING payment is the principal and interest (P&I)
amount required to pay your loan in full over the remaining loan
term based on the new interest rate stated above. If this amount
is less than the minimum required payment, you must still make
the minimum required payment.

When the minimum required payment is less than the interest only
or fully amortizing payments, your loan may experience negative
amortization. Negative amortization occurs when the monthly P&I
payment is less than the full amount of interest for the month.
Whenever this occurs, the difference between the two figures is
added to the outstanding principal balance of your loan. Your
interest for the next month is then accrued based on the higher
unpaid balance.

Your unpaid principal balance can never exceed a maximum amount
equal to  115.0000% of the principal amount originally borrowed.
Should your unpaid principal balance reach the maximum amount,
you will be required to begin paying the full payment amount.

If your payments are made through our automatic payment program,
unless we are notified otherwise, your required payment amount
will be deducted on your scheduled draft date. If you wish to
have additional principal deducted at the same time, please
contact us at the number below to assist you with this process.

IF YOU ARE IN DEFAULT AT THE TIME THIS NOTICE IS DELIVERED TO
YOU, GMAC Mortgage, LLC                    WILL CONTINUE WITH THE
DEFAULT PROCESS EVEN THOUGH THE INTEREST RATE AND PAYMENT AMOUNT
ARE BEING ADJUSTED.

Notice Regarding Bankruptcy:  If you have filed for bankruptcy
and your case is still active and/or if you have received a
discharge, please be advised that this notice is for
informational purposes only and is not an attempt to collect a
pre-petition or discharged debt.  If you are currently in
bankruptcy under Chapter 13, you should continue to make
payments in accordance with your Chapter 13 Plan. If you have
surrendered the property during your bankruptcy case, you may
disregard this notice.

If you have any questions, please call 800-766-4622.


Customer Care
Loan Servicing
4015

4

### 3.    WHEN AND WHERE TO FILE

Except as provided for herein, all proofs of claim must be filed so as to be actually received **on or before November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time), or solely as to governmental units on or before November 30, 2012 at 5:00 p.m. (Prevailing Eastern Time),** at:

mailed 10-14-20x

---

**(i) If by mail or overnight courier**:

**ResCap Claims Processing Center, c/o KCC
PO Box 5004
Hawthorne, CA 90250**

---

(ii) if by hand delivery:

United States Bankruptcy Court for the Southern District of New York
One Bowling Green, Room 534
New York, New York 10004

or

ResCap Claims Processing Center, c/o KCC
2335 Alaska Ave
El Segundo, CA 90245

Proofs of claim will be deemed timely filed only if **actually received** at the ResCap Claims Processing Center or hand delivered to the U.S. Bankruptcy Court on or before 5:00 p.m. (Prevailing Eastern Time) on the applicable Bar Date. Proofs of claim **may not** be delivered by facsimile, or electronic mail.

### 4.    WHO NEED NOT FILE A PROOF OF CLAIM

You do not need to file a proof of claim on or before the General Bar Date if you are:

(a)    Any person or entity that has **already** properly filed a proof of claim against the applicable Debtor or Debtors with the Clerk of the Bankruptcy Court for the Southern District of New York in a form substantially similar to the Proof of Claim Form;

(b)    Any person or entity whose claim is listed on the Debtors' schedules of assets and liabilities and/or schedules of executory contracts and unexpired leases (collectively, the "Schedules"), **provided that**: (i) the claim is **not** scheduled as "disputed," "contingent" or "unliquidated"; **and** (ii) the claimant agrees with the amount, nature and priority of the claim as set forth in the Schedules; **and** (iii) the claimant agrees that the claim is an obligation of the specific Debtor against which the claim is listed on the Schedules;

001KC0001_52271-21_DOMESTIC_4296/070658/353289

**<u>Sulit Response</u>**

July 11, 2013

3415 N. Odell ave.
Chicago, Il 60634

Honorable Martin Glenn.
One Bowling Green
New York, New York 10004

ATTN: Gary S. Lee, ESQ.

Gentlemen:

This is with reference to the Case#12-12020 (MG) (See attached). Our claim to this case
should not de disallowed. All my signature to the bank United Mortgage note was forged,
I was not present when the Bank United statement was made.

The Bank United Mortgate was taken over or either transferred to GMAC.

Claimant Name: 1) Patricio sulit, 3415 N. Odell ave., Chicago, Il 60634. Tel#773-
836-9306, and fax#773-836-9307

2)Debtor Name –
Bank United and or GMAC

Respectfully,

PATRICIO SULIT


RECEIVED
JUL 1 7 2013
U.S. BANKRUPTCY COURT, SDNY

*THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN**
**PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

---

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

Alexandra Steinberg Barrage
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone: (202) 887-1500

*Counsel to the Debtors and
Debtors in Possession*
Dated:    July [3], 2013
New York, New York

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of
Unsecured Creditors*



---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE DEADLINE TO VOTE ON THE PLAN IS   [              ], 2013, AT 5:00 P.M.
EASTERN TIME.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY
RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING
DEADLINE AS DESCRIBED HEREIN.

PLEASE BE ADVISED THAT ARTICLE V OF THE PLAN CONTAINS
RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD
REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR
RIGHTS MAY BE AFFECTED THEREUNDER.

The Plan Proponents (defined herein) are providing the information in this
Disclosure Statement (defined herein) to holders of Claims and Equity Interests entitled to
vote on the Plan for the purpose of soliciting votes to accept the Plan. <u>Nothing in this
Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

This Disclosure Statement may not be deemed as providing any legal, financial,
securities, tax, or business advice. The Plan Proponents urge any holder of a Claim or
Equity Interest to consult with its own advisors with respect to any such legal, financial,
securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each
of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of
the adequacy of disclosures contained in this Disclosure Statement does not constitute the
Bankruptcy Court's approval of the merits of the Plan or a guarantee of the accuracy or
completeness of the information contained herein. The Plan Proponents have not
authorized any entity to give any information about or concerning the Plan other than that
which is contained in this Disclosure Statement. The Debtors have not authorized any
representations concerning the value of their property other than as set forth in this
Disclosure Statement. Any information, representations, or inducements made to obtain
acceptance of the Plan, which are other than or inconsistent with the information contained
in this Disclosure Statement, in the Plan, or in the Plan Supplement should not be relied
upon by any holder of a Claim or Equity Interest entitled to vote to accept or reject the
Plan.

The Plan Proponents urge every holder of a Claim or Equity Interest entitled to vote
on the Plan to (1) read the entire Disclosure Statement and the Plan carefully, (2) consider
all of the information in this Disclosure Statement, including, importantly, the risk factors
described in Article [●] of this Disclosure Statement, and (3) consult with its own advisors
with respect to reviewing this Disclosure Statement, the Plan, all documents annexed hereto
or filed in connection herewith, and the proposed transactions contemplated under the
Plan <u>before</u> deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory
provisions, events in the Debtors' Chapter 11 Cases, and certain documents related to the
Plan. In the event of any inconsistency or discrepancy between a description in this

Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Plan Proponents do not represent or warrant that the information contained herein or annexed hereto is without any material inaccuracy or omission.

Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise. The Plan Proponents are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver. No reliance should be placed on the fact that a particular Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponents may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents annexed hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' notice and claims agent by: (i) visiting http://www.KCCllc.net/rescap; (ii) writing to Residential Capital, LLC c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave, El Segundo, CA, 90245; or (iii) calling (888) 251-2914.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION AND PLAN SUMMARY ........................................................ 1

    A.    Introduction and Overview ...................................................................... 1

    B.    General Information................................................................................. 4

    C.    Overview of Chapter 11 .......................................................................... 5

    D.    Summary of Classification and Voting Rights of Allowed Claims and
    Equity Interests ...................................................................................... 6

    E.    Summary of Solicitation Package and Voting Instructions ................................. 13

    F.    Summary of Treatment of Allowed Claims and Equity Interests........................ 14

    G.    Implementation of the Plan ..................................................................... 17

    H.    Confirming and Consummating the Plan..................................................... 20

ARTICLE II. THE GLOBAL SETTLEMENT ..................................................................... 21

    B.    The Plan Includes a Settlement of RMBS Trust Claims .................................... 27

    C.    The Plan Settles the Claims of FGIC and MBIA................................................ 28

    D.    The Plan Resolves Certain Securities Claims Against the Debtors and Ally ...... 31

    E.    The Plan Resolves the Claims of NJ Carpenters ................................................ 31

    F.    The Plan Resolves the Claims in the Kessler Class Action ............................ 32

    G.    The Plan Provides a Trust to Allow for Payment in Cash to Holders of
    Borrower Claims.................................................................................... 32

    H.    The Plan Provides Junior Secured Noteholders with Payment in Full ............... 33

    I.    The Plan Resolves Claims of the Senior Unsecured Noteholders and the
    Senior Unsecured Noteholder Trustee .................................................... 33

    J.    The Plan Resolves Issues Relating to Substantive Consolidation of the
    Debtors' Estates .................................................................................... 33

    K.    The Plan Contains a Compromise of Intercompany Balances and Resolves
    Subrogation and Other Disputed Intercompany Issues......................... 34

    L.    The Plan Allocates the Estate Assets and Administrative Expenses among
    Debtor Groups and Creditor Constituencies ...................................... 36

ARTICLE III. BACKGROUND ....................................................................................... 38

    A.    The Debtors' Businesses and Operations ........................................................ 38

    B.    The Debtors' Organizational Structure............................................................. 41

-i-

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| C. | The Debtors' Assets and Capital Structure | 41 |
| D. | Events Leading to the Filing of the Chapter 11 Cases | 46 |

ARTICLE IV. THE CHAPTER 11 CASES .................................................................................... 56

| A. | Commencement of the Chapter 11 Cases | 56 |

ARTICLE V. OTHER PLAN PROVISIONS ................................................................................ 96

| A. | Unclassified Claims | 96 |
| B. | Classification, Treatment, and Voting of Claims and Equity Interests | 99 |
| C. | Establishment of Trusts and Provisions Governing Issuance of Units and Distributions | 99 |
| D. | Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests | 107 |
| E. | Senior Unsecured Notes; Fees and Expenses | 108 |
| F. | Corporate Action | 109 |
| G. | Dissolution of the Debtors | 110 |
| H. | Exemption from Certain Taxes and Fees | 110 |
| I. | Preservation of Causes of Action | 111 |
| J. | Nonconsensual Confirmation | 112 |
| K. | Treatment of Executory Contracts and Unexpired Leases | 112 |
| L. | Surrender of Existing Publicly Traded Securities | 115 |
| M. | Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations | 116 |
| N. | Undeliverable Distributions and Unclaimed Property | 117 |
| O. | Compliance with Tax Requirements | 117 |
| P. | Setoffs and Recoupment | 118 |
| Q. | Interest on Claims | 118 |
| R. | Claims Paid or Payable by Third Parties | 118 |
| S. | Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable | 119 |
| T. | Distributions Free and Clear | 119 |
| U. | Procedures for Resolving Disputed Claims | 120 |

# TABLE OF CONTENTS
(continued)

**Page**

V.    Claims Estimation; Allowance ................................................................. 120

W.    Settlement, Release, Injunction, and Related Provisions.................................. 122

X.    Conditions Precedent to Confirmation and Consummation of the Plan ........... 126

Y.    Modification, Revocation, or Withdrawal of the Plan ....................................... 129

Z.    Retention of Jurisdiction ................................................................. 130

AA.   Miscellaneous Plan Provisions ................................................................. 130

BB.   Plan Supplement ................................................................. 133

ARTICLE VI. VOTING PROCEDURES ................................................................. 134

A.    Voting Deadline................................................................. 134

B.    Holders of Claims or Interests Entitled to Vote.................................................. 135

D.    Vote Required for Acceptance by a Class ......................................................... 136

E.    Returning Your Ballot................................................................. 137

ARTICLE VII. RECOVERY ANALYSIS ................................................................. 138

ARTICLE VIII. CONFIRMATION OF THE PLAN ................................................. 139

A.    Confirmation Hearing ................................................................. 139

B.    Deadline to Object to Confirmation................................................................. 139

C.    Confirmation Standards ................................................................. 140

D.    Persons to Contact for More Information ......................................................... 145

E.    Disclaimer................................................................. 145

ARTICLE IX. PLAN-RELATED RISK FACTORS AND  ALTERNATIVES TO
CONFIRMING THE PLAN ................................................................. 146

A.    General................................................................. 146

B.    Certain Bankruptcy Law Considerations ......................................................... 146

C.    Disclosure Statement Disclaimer................................................................. 149

D.    Additional Factors to Be Considered ............................................................... 150

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ................................................................. 152

A.    Certain U.S. Federal Income Tax Consequences to the Debtors....................... 153

ny-1097924

# TABLE OF CONTENTS
(continued)

<strong>Page</strong>

B.  Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims .................................................................................................. 154

C.  Tax Treatment of the Liquidating and Holders of Beneficial Interests ............. 158

D.  Treatment of the Disputed Claims Reserve ....................................................... 160

E.  Tax Treatment of the Private Securities Claims Trust and the Borrowers Claims Trust ....................................................................................................... 160

ARTICLE XI. SECURITIES LAW MATTERS ...................................................... 161

ARTICLE XII. RULES OF INTERPRETATION ................................................... 163

A.  Rules of Construction ......................................................................................... 163

B.  Computation of Time .......................................................................................... 164

C.  Governing Law ................................................................................................... 164

ARTICLE XIII. CONCLUSION AND RECOMMENDATION ............................. 164

ny-1097924

Cook County #21762

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - CHANCERY DIVISION

GMAC Mortgage, LLC

　　　　　　　　PLAINTIFF

　　　　Vs.

Leilani I. Sulit a/k/a Leilani Sulit; Patricio I. Sulit a/k/a
Patricio Sulit; Wiczer & Associates, LLC; Unknown
Owners and Nonrecord Claimants

　　　　　　　　DEFENDANTS

No.

**10CH04211**

## **COMPLAINT TO FORECLOSE MORTGAGE**

NOW COMES the Plaintiff, GMAC MORTGAGE, LLC, by and through its attorneys, CODILIS
& ASSOCIATES, P.C., complaining of the defendants herein and, pursuant to 735 ILCS 5/15-
1101, states as follows:

1. Plaintiff files this Complaint to Foreclose the mortgage, trust deed or other conveyance in the
nature of a mortgage (hereinafter called "Mortgage") hereinafter described, and names the persons
identified in the above caption as "Defendants", as parties hereto.

2. Attached as "EXHIBIT A" is a copy of the Mortgage.  Attached as "EXHIBIT B" is a copy of
the Note.

3. Information concerning said Mortgage:

　　　(A)  Nature of the instrument:  Mortgage.

　　　(B)  Date of the Mortgage: 10/17/2006

　　　(C)  Name of mortgagor(s):

　　　　　Leilani I. Sulit a/k/a Leilani Sulit
　　　　　Patricio I. Sulit a/k/a Patricio Sulit

　　　(D)  Name of the mortgagee:

　　　　　BankUnited, FSB

　　　(E)  Date and Place of Recording or Registering:

　　　　　11/01/2005
　　　　　Office of the Recorder of Deeds of Cook County Illinois

　　　(F)  Identification of Recording: Document No.  0630549130

　　　(G)  Interest subject to the mortgage:  Fee Simple.

(H)  Amount of original indebtedness:

    (1) Original Indebtedness:  $424,000.00

(I)  Both the legal description of the mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty:

LOT 70 (EXCEPT THE NORTH 82 FEET THEREOF) IN COLLINS AND GAUNTLETT'S FIRST GARDENS SUBDIVISION IN THE EAST 1/2 OF FRACTIONAL SECTION 24, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**COMMONLY KNOWN AS:**    3415 N. Odell Avenue
    Chicago, IL 60634

**TAX PARCEL NUMBER:** 12-24-413-038

(J)  Statement as to defaults:  Mortgagors have not paid the monthly installments of principal, taxes, interest and insurance for 10/01/2009,  through the present; the principal balance due on the Note and the Mortgage is $430,207.21, plus interest, costs, advances and fees. Interest accrues pursuant to the note.

(K)  Name of present owner(s) of said premises:
    Leilani I. Sulit a/k/a Leilani Sulit
    Patricio I. Sulit a/k/a Patricio Sulit

(L)  Names of other persons who are joined as defendants and whose interest in or lien on the mortgaged real estate is sought to be terminated and alleged to be subordinate and inferior to the mortgage of the Plaintiff:

Wiczer & Associates, LLC, by virtue of a Memorandum of Judgment against Leilani Sulit, rendered in Case No. 2007M2 001236, in the Circuit Court of Cook County, Illinois, and filed in the office of the Recorder/Registrar of Deeds of Cook County, Illinois on 11/12/09 as Document No. 0931650003 in the sum of $8,849.18 plus $150 costs.  The interest of this Defendant is subordinate to that of Plaintiff.

(M)  Names of persons who executed the Note, Assumption Agreement(s), or Personal Guarantee:
    Leilani I. Sulit a/k/a Leilani Sulit
Please note that no personal deficiency will be sought against any party who has received a Chapter 7 discharge or who are personally protected by the automatic stay at sale confirmation.

(N)  Capacity in which Plaintiff brings this foreclosure: Plaintiff is the Mortgagee under 735 ILCS 5/15-1208.



## A. SETTLEMENT STATEMENT
**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1 __ FHA  2 __ RHS  3 _X_Conv Unins | | 6 File Number | 7 Loan Number | 8 Mortgage Insurance Case Number | |
| 4 __ VA  5 __ Conv Ins | | 06-1480 | █████5590-0 | | |

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked (P.O.C.) were paid outside the closing, they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| LEILANI I. SULIT | | BANK UNITED, FSB |
| 3415 N. ODELL AVE. | | 7815 NW 148 STREET |
| CHICAGO, IL 60634 | | NIAMI LAKES, FL 33016 |

| G. Property Location | H. Settlement Agent | |
|---|---|---|
| 3415 N. ODELL AVE. | CAMBRIDGE TITLE COMPANY | |
| CHICAGO, IL 60634 | Place of Settlement | I. Settlement Date |
| | 400 CENTRAL AVENUE | 10/17/06 |
| | NORTHFIELD, IL 60093 | DD: 10/23/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 8,456.74 | 403. | |
| 104. PAYOFF WELLS FARGO HOME MORTGAGE | 244,033.36 | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411 | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 252,490.10 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. Amounts Paid By or in Behalf of Borrower** | | **500. Reductions in Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 424,000.00 | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219 | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 424,000.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. Cash At Settlement From or To Borrower** | | **600. Cash At Settlement To or From Seller** | |
| 301. Gross amount due from borrower (line 120) | 252,490.10 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 424,000.00 | 602. Less reduction amount due seller (line 520) | |
| 303. CASH    TO    BORROWER | 171,509.90 | 603. CASH    TO    SELLER | 0.00 |

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT     **SETTLEMENT STATEMENT**     PAGE 2

| L. SETTLEMENT CHARGES: | FILE #: 06-1480 | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $ | 0 @ 0 | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | **P.O.C.** | | |
| 801. Loan Origination Fee    % | | | |
| 802. Loan Discount    % | | | |
| 803. Appraisal Fee    to | FIRST CHICAGO | 225.00 | |
| 804. Credit Report    to | | | |
| 805. Lender's Inspection Fee    to | | | |
| 806. Mtg Ins Application Fee    to | | | |
| 807.    to | | | |
| 808. UNDERWRITING FEE | BANK UNITED, FSB | 288.00 | |
| 809. PROCESSING FEE | FIRST CHICAGO | 720.00 | |
| 810. YSP PAID BY BANKUNITED, FSB | $14840 POC TO FIRST CHICAGO | | |
| 811. MORTGAGE BROKER FEE | FIRST CHICAGO | 4,240.00 | |
| 812. DOCUMENT PREPARATION | BANK UNITED, FSB | 250.00 | |
| 813. FLOOD CERTIFICATION | FIRST AMERICAN FLOOD DATA SERVICES | 14.00 | |
| 814. TAX SERVICE FEE | FCIS | 62.00 | |
| 815. WIRE FEE | BANK UNITED, FSB | 30.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest from 10/23/06 to 11/01/06 @$ 94.2222 /day 9 Days | | 848.00 | |
| 902. Mortgage Insurance Premium for    to | | | |
| 903. Hazard Insurance Premium for    yrs to $864.34 POC TO ALLSTATE | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001. Hazard Insurance   5 mo.@$ 72.03 /mo. | | 360.15 | |
| 1002. Mortgage Insurance   mo.@$ /mo. | | | |
| 1003. City property taxes   mo.@$ /mo. | | | |
| 1004. County property taxes   4 mo.@$ 232.91 /mo. | | 931.64 | |
| 1005. Annual Assessments   mo.@$ /mo. | | | |
| 1006.   mo.@$ /mo. | | | |
| 1007.   mo.@$ /mo. | | | |
| 1008. AGGREGATE ADJUSTMENT | | -72.05 | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee    to | | | |
| 1102. Abstract or title search    to | | | |
| 1103. Title examination    to | | | |
| 1104. Title insurance binder    to | | | |
| 1105. Document preparation    to | | | |
| 1106. Notary fees    to | | | |
| 1107. Attorney's fees    to | | | |
| (includes above items No:      ) | | | |
| 1108. Title Insurance    to | CAMBRIDGE TITLE COMPANY | 550.00 | |
| (includes above items No:      ) | | | |
| 1109. Lender's coverage $ 487,600.00 ---- 550.00 | | | |
| 1110. Owner's coverage $ | | | |
| 1111. EPA ENDORSEMENT | | | |
| 1112. 6.2 NEG ARM ENDORSEMENT | | | |
| 1113. ALTA 8.1 & ALTA 9 ENDORSEMENT | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording fees   Deed $   Mortgage $   Release $ 0.00 | | | |
| 1202. City/county/stamps   Deed $   Mortgage $ | | | |
| 1203. State tax/stamps   Deed $   Mortgage $ | | | |
| 1204. | | | |
| 1205. ASSIGNMENT OF MORTGAGE RECORDING FEE | | | |
| **1600. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey    to | | | |
| 1302. Pest Inspection    to | | | |
| 1303. RENTAL HOUSING SURCHARGE   COOK COUNTY RECORDER | | 10.00 | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103 and 502, Sections J and K) | | 8,456.74 | 0.00 |

_[Signature]_   10/17/06        _____
LEONA BUOY    Buyer/Borrower            Seller

_[Signature] Anna C. Rasho_      10-17-06     _____
CAMBRIDGE TITLE COMPANY       Date           Seller

RESPA, HB 4305.2 -- REV. HUD-1 (3/86)



# BankUnited

Exhibit: __B__

## Adjustable Rate Note

**(1 Year MTA Index – Initial Discounted Monthly Payment –
Payment Caps and Maximum Rate)
(1 Month MTA ARM)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND MY PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THIS NOTE. THE PRINCIPAL BALANCE OF THIS NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

| October 17, 2006 | NORTHFIELD | Illinois |
|---|---|---|
| [Date] | [City] | [State] |

3415 NORTH ODELL AVENUE
CHICAGO, IL 60634

[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 424,000.00 plus any amounts added in accordance with Section 3(E) of this Note (this amount is collectively called "Principal"), plus interest, to the order of Lender. Lender is   BankUnited, FSB

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.   INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   8.0000   %. The interest rate I will pay will change as provided in this Section 2.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the first day of   December 2006 and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".

**(C) Interest Rate Limits**

My interest rate will never be greater than   10.9500   %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rate (H.15)." The Twelve-onth Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding Three and 2900/10000   percentage points ( 3.2900   %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.

In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

**3.   PAYMENTS**

**(A) Time and Place of Payments**

I will make my monthly payments on the first day of every month, beginning on   December 2006 . I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on November 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

Multistate Adjustable Rate Note – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate – Monthly Rate Change

MFCD5063

Page 1 of 4

Initials: 



I will make monthly payments at
7815 NW 148 ST., MIAMI LAKES, FL 33018

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payment**

My initial monthly payment will be in the amount of U.S. $ 1,403.05          . My initial monthly
payment was calculated using a rate of 1.2000       %, the original Principal, and the Maturity Date. This
rate is lower than the initial interest rate stated in Section 2(A) above.

The amount of my initial monthly payment will change as provided in this Section 3.

**(C) Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the due date of
my thirteenth (13ᵗʰ) payment, which is due on December 1, 2007
and on that same day every twelfth (12ᵗʰ) month thereafter. Each of these dates is called a "Payment
Change Date." My monthly payment will also change as provided under Section 3(F) below.

I will pay the amount of my new monthly payment each month beginning on each Payment
Change Date until the next Payment Change Date, unless my monthly payments are changed earlier as
provided in Section 3(F) below.

**(D) Calculation of Monthly Payment Changes; Limitations**

On each Payment Change Date, my monthly payment will change to the amount that would be
sufficient to repay the Principal that I am expected to owe at the Payment Change Date, together with
interest at the rate in effect during the preceding month, in full in substantially equal monthly installments
through the Maturity Date. However, unless Section 3(F) or Section 3(G) below apply, the amount of my
new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no
more than 7 1/2% greater than the amount I am required to pay under this Note immediately prior to that
Payment Change Date. The Note Holder's monthly billing statement may disclose other payment options
that I may have, if I should wish to pay a monthly payment that is larger than this amount.

**(E) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will
accrue under this Note at the initial interest rate stated in Section 2(A) of this Note, and may be lesser or
greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates
that thereafter are in effect under this Note. In addition, since my monthly payment amount changes less
frequently than the interest rate and since the monthly payment is subject to the payment limitations
described in Section 3(D) above, my subsequent monthly payments could be lesser or greater than the
amount sufficient to pay the interest that will accrue under this Note at the interest rates that are in effect
under this Note from time to time. For each month that my monthly payment is less than the interest that
accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the
accrued interest and will add the difference to my unpaid Principal, and interest will accrue on the amount
of this difference at the interest rate that is in effect under the Note from time to time. For each month
that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will
apply the excess towards a Principal reduction of this Note.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount
originally borrowed. In the event my unpaid Principal would otherwise exceed that 115% limitation on a
monthly payment due date, I will begin paying a new monthly payment on that due date, and will continue
to make this payment each month until the next Payment Change Date, subject at all times to a further
increase in my monthly payment under this Section 3(F) if my unpaid Principal would again otherwise
exceed the 115% limitation. The new monthly payment will be the amount that would be sufficient to
repay my then unpaid Principal, together with interest at the rate in effect during the month prior to the
payment due date, in full in substantially equal monthly installments through the Maturity Date. The new
monthly payment will be determined without applying the 7 1/2% payment limitation described in Section
3(D) of this Note.

**(G) Required Full Monthly Payment**

On the 5ᵗʰ Payment Change Date, on each succeeding 5ᵗʰ Payment Change Date thereafter, and
on the final Payment Change Date, the monthly payment will be determined without regard to the 7 1/2%
payment limitation described in Section 3(D) of this Note.

**4.    NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly
payment before the effective date of any change. The notice will include information required by law to be
given to me, and also the title and telephone number of a person who will answer any question I may
have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of
Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in
writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the
monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The
Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.
However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the
Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note. If I
make a partial Prepayment, there will be no changes in the due date of my monthly payments unless the
Note Holder agrees in writing to those changes.

My partial Prepayment may reduce the amount of my monthly payments after the first Interest
Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment
may be offset by an interest rate increase or other factors.

Multistate Adjustable Rate Note – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate –
Monthly Rate Change

MFCD6063                                    Page 2 of 4                         Initials: _____

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of     15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      6.0000      % of such monthly payment due. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least thirty (30) days after the date on which the notice is delivered or mailed to me.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

"Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial Interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that

Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

Borrower has executed and acknowledges receipt of pages 1 through 4 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Leilani Sulit_ _____ (Seal) _____    _____ (Seal)
LEILANI I. SULIT                 -Borrower                        -Borrower

_____ (Seal) _____    _____ (Seal)
                -Borrower                        -Borrower

_____ (Seal) _____    _____ (Seal)
                -Borrower                        -Borrower

[Sign Original Only]

MFCD6063                                                    580-0

Multistate Adjustable Rate Note – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate –
Monthly Rate Change
                            Page 4 of 4                            Initials: _____

# 🦅BankUnited

## Adjustable Rate Rider
### (1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate)
### (1 Month MTA ARM)

THIS ADJUSTABLE RATE RIDER is made this **17th** day of **October 2006**

and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note, as modified or amended (the "Note") to **BankUnited, FSB**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**3415 NORTH ODELL AVENUE
CHICAGO, IL  60634**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND THE PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THE NOTE. THE PRINCIPAL BALANCE OF THE NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**"2.    INTEREST**
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.0000** %. The interest rate I will pay will change as provided in this Section 2.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
**(B) Interest Change Dates**
The interest rate I will pay may change on the first day of **December 2006** and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".
**(C) Interest Rate Limits**
My interest rate will never be greater than **10.9500** %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.
**(D) Index**
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rate (H.15)." The Twelve-onth Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."
If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.
**(E) Calculation of Interest Rate Changes**
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 2900/10000** percentage points ( **3.2900** %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.
In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

Multistate Adjustable Rate Rider – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate Monthly Rate Change

MFCD5084                                            8580-0                    Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)         _____ (Seal)
LEILANI I. SULIT                  -Borrower                                        -Borrower

_____ (Seal)         _____ (Seal)
PATRICIO T. SULIT                 -Borrower                                        -Borrower

_____ (Seal)         _____ (Seal)
                                  -Borrower                                        -Borrower

Witness:                                        Witness:

_____                 _____

State of Illinois  ILLINOIS
County of  COOK

This instrument was acknowledged before me on  October , 19th, 2006
                                                                                    (date) by

LEILANI I SULIT
PATRICIO T SULIT
                                                                                    (name[s] of person[s]),

_____
                                                                                    Notary Public

<ILLEGIBLE notary seal stamp>

ILLINOIS—Single Family— Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
ITEM 1876L17 (0011)                          (Page 11 of 11 pages)        Form 3014 1/01
                                                                          GREATLAND ■
                                                            To Order Call: 1-800-530-9393  Fax: 616-791-1131
MFIL3112                                                                  5560-0

NOTE: Not my Signature

This instrument was prepared by:

Name: **KIM C. NIEKRASZ**

Address:

**BANKUNITED, FSB
1900 E. GOLF ROAD, SUITE 1200,
SCHAUMBURG, IL 60173**

After Recording Return To:
**BANKUNITED, FSB
ATTN: POST CLOSING
7815 NW 148 STREET
MIAMI LAKES, FL 33016**

**Exhibit:** A

Doc#: 0630549130 Fee: $52.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 11/01/2006 01:21 PM Pg: 1 of 15

06 -1480

[Space Above This Line For Recording Data]

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated **October 17, 2006**                , together with all Riders to this document.

(B) "**Borrower**" is **PATRICIO I. SULIT AND LEILANI I SULIT, HUSBAND AND WIFE**

Borrower is the mortgagor under this Security Instrument.

(C) "**Lender**" is **BankUnited, FSB**

Lender is a **CORPORATION**                                            organized and existing under
the laws of **UNITED STATES OF AMERICA**                                            . Lender's address is
**7815 NW 148 STREET, MIAMI LAKES, Florida 33016**

Lender is the mortgagee under this Security Instrument.

(D) "**Note**" means the promissory note signed by Borrower and dated **October 17, 2006**                . The Note states that Borrower owes Lender **Four Hundred Twenty Four Thousand and no/100**

Dollars (U.S. $ **424,000.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **November 01, 2036**.

(E) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider    [ ] Second Home Rider

[ ] Balloon Rider    [ ] Planned Unit Development Rider    [X] Other(s) [specify] LEGAL DESCRIPTION

[ ] 1-4 Family Rider    [ ] Biweekly Payment Rider

15X

(H) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

ILLINOIS—Single Family · Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L1 (0011)                (Page 1 of 11 pages)                Form 3014 1/01

MFIL3112

GREATLAND ■
To Order Call 1-800-530-9393 □ Fax: 616-791-1131

9580-D

CAMBRIDGE TITLE COMPANY
400 Central Avenue
Northfield, IL 60093

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument."

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns the following described property located in the              COUNTY              of              COOK
                                 [Type of Recording Jurisdiction]                            [Name of Recording Jurisdiction]

## SEE ATTACHED LEGAL DESCRIPTION MADE A PART HERETO.

**PIN#12-24-413-038-0000**

which currently has the address of              **3415 NORTH ODELL AVENUE**
                                           [Street]

**CHICAGO**              , Illinois              **60634**                    ("Property Address"):
  [City]                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014 1/01
ITEM 1876L2 (0011)               (Page 2 of 11 pages)                GREATLAND ■
                                           To Order Call 1-800-530-9393 :Fax 616-791-1131

MFIL3112


S580-0

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L3 (0011)

(Page 3 of 11 pages)

Form 3014 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

MFIL3112

6580-0

fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was

ILLINOIS—Single Family– Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3014 1/01

ITEM 1876L4 (0011)    (Page 4 of 11 pages)    GREATLAND ■
To Order Call 1-800-530-9393    □ Fax 616-791-1131

MFIL3112    8580-0

previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
ITEM 1876L1 (0011)                                 (Page 5 of 11 pages)

MFIL3112

Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131
6980-0

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.    **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance. Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)    Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                    Form 3014 1/01
ITEM 1876L6 (0011)                                          (Page 6 of 11 pages)                    GREATLAND ■
                                                                                To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

MFIL3112

580-0

29

(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3014 1/01
ITEM 1876L7 (0011)                                   (Page 7 of 11 pages)                    GREATLAND ■
                                                                             To Order Call 1-800-530-6393  Fax 616-791-1131
MFIL3112

580-0

30

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest In Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require

ILLINOIS—Single Family —Fannie Mac/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L8 (0011)                    (Page 8 of 11 pages)

MFIL3112

Form 3014 1/01
GREATLAND ■
To Order Call 1-800-530-9393 □Fax: 616-791-1131

6580-0

31

immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.   **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.   **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.   **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

ILLINOIS—Single Family —Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L9 (0011)

*(Page 9 of 11 pages)*

Form 3014 1/01
GREAT LAND ■
To Order Call : 800-530-9393 ☐ Fax: 616-791-1131

MFIL3112

6330-0

32

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23.  Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L10 (0011)

MFIL3112

(Page 10 of 11 pages)

Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393  Fax: 616-791-1131

0680-D

33

Commitment No.: 06-1480                    **EXHIBIT A**

**LEGAL DESCRIPTION**

LOT 70 (EXCEPT THE NORTH 82 FEET THEREOF) IN COLLINS AND GAUNLETT'S FIRST GARDENS
SUBDIVISION IN THE EAST 1/2 OF FRACTIONAL SECTION 24, TOWNSHIP 40 NORTH, RANGE 12, EAST OF
THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Commonly known as: 3415 N. ODELL AVE., CHICAGO, IL 60634

Permanent Index No.: 12-24-413-038-0000

# ⊷BankUnited

## Adjustable Rate Rider
(1 Year MTA Index – Initial Discounted Monthly Payment –
Payment Caps and Maximum Rate)
(1 Month MTA ARM)

THIS ADJUSTABLE RATE RIDER is made this      17th      day of      October 2006

and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note, as modified or amended (the "Note") to  BankUnited, FSB

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

3415 NORTH ODELL AVENUE
CHICAGO, IL  60634

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND THE PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THE NOTE. THE PRINCIPAL BALANCE OF THE NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

"2.    INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      8.0000      %. The interest rate I will pay will change as provided in this Section 2.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
(B) Interest Change Dates
The interest rate I will pay may change on the first day of      December 2006
and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".
(C) Interest Rate Limits
My interest rate will never be greater than      10.9500      %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.
(D) Index
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rate (H.15)." The Twelve-onth Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."
If the Index, or any substitute Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.
(E) Calculation of Interest Rate Changes
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding Three and 2900/10000      percentage points (      3.2900      %)
(the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.
In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

Adjustable Adjustable Rate Rider – 1 Year MTA Index – Initial Discounted Monthly Payment  Payment Caps and Maximum Rate – Monthly Rate Change

Page 1 of 3

**(A) Time and Place of Payments**

I will make my monthly payments on the first day of every month, beginning on    December 2006
. I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on November 1, 2036
, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make monthly payments at  7815 NW 148 ST., MIAMI LAKES, FL  33016

or at a different place if required by this Note Holder.

**(B) Amount of My Initial Monthly Payment**

My initial monthly payment will be in the amount of U.S. $ 1,403.00    My initial
monthly payment was calculated using a rate of 1.2900    %, the original Principal, and the Maturity Date. This rate is lower than the initial interest rate stated in Section 2(A) above.
The amount of my initial monthly payment will change as provided in this Section 3.

**(C) Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the due date of my thirteenth (13th) payment, which is due on: December  1, 2007
and on that same day every twelfth (12th) month thereafter.  Each of these dates is called a "Payment Change Date." My monthly payment will also change as provided under Section 3(F) below.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date until the next Payment Change Date, unless my monthly payments are changed earlier as provided in Section 3(F) below.

**(D) Calculation of Monthly Payment Changes; Limitations**

On each Payment Change Date, my monthly payment will change to the amount that would be sufficient to repay the Principal that I am expected to owe at the Payment Change Date, together with interest at the rate in effect during the preceding month, in full in substantially equal monthly installments through the Maturity Date. However, unless Section 3(F) or Section 3(G) below apply, the amount of my new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no more than 7 1/2% greater than the amount I am required to pay under this Note immediately prior to that Payment Change Date. The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than this amount.

**(E) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will accrue under this Note at the initial interest rate stated in Section 2(A) of this Note, and may be easier or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that thereafter are in effect under this Note. In addition, since my monthly payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 3(D) above, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that are in effect under this Note from time to time. For each month that my monthly payment is less than the interest that accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the accrued interest and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate that is in effect under this Note from time to time. For each month that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will apply the excess towards a Principal reduction of this Note.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that 115% limitation on a monthly payment due date, I will begin paying a new monthly payment on that due date, and will continue to make this payment each month until the next Payment Change Date, subject at all times to a further increase in my monthly payment under this Section 3(F) if my unpaid Principal would again otherwise exceed the 115% limitation. The new monthly payment will be the amount that would be sufficient to repay my then unpaid Principal, together with interest at the rate in effect during the month prior to the payment due date, in full in substantially equal monthly installments through the Maturity Date. The new monthly payment will be determined without applying the 7 1/2% payment limitation described in Section 3(D) of this Note.

**(G) Required Full Monthly Payment**

On the 5th Payment Change Date, and on each succeeding 5th Payment Change Date thereafter, and on the final Payment Change Date, the monthly payment will be determined without regard to the 7 1/2% payment limitation described in Section 3(D) of this Note.

**4.    NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice."

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read, in its entirety, as follows:

"Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed,

Adj/CD5054
Multistate Adjustable Rate Note Index - 1 Year MTA Index - Initial Discounted Monthly Payment - Payment Caps and Maximum Rate - Monthly Rate Change

Page 2 of 3

37

contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Adjustable Rate Rider.

_Leilani Sulit_ _____ (Seal) _____ (Seal)
LEILANI L SULIT                        -Borrower                                                    -Borrower


✗ _Patricio Sulit_ _____ (Seal) _____ (Seal)
PATRICIO T. SULIT                      -Borrower                                                    -Borrower


_____ (Seal) _____ (Seal)
                                        -Borrower                                                    -Borrower

[Sign Original Only]

NOTE

✗ THIS WAS NOT MY SIGNATURE
MY SIGNATURE WAS FORGED

38

**THIS IS A NOTICE REGARDING YOUR CLAIM.  YOU MUST READ IT AND TAKE ACTION IF YOU DISAGREE WITH THE OBJECTION.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**NOTICE OF HEARING ON TWENTIETH OMNIBUS OBJECTION TO CLAIMS (BORROWER CLAIMS WITH INSUFFICIENT DOCUMENTATION)**

**Leilani R. Sulit**

| Proposed Claim(s) to be Disallowed and Expunged | | | | Reason for Disallowance |
|---|---|---|---|---|
| Claim No(s); Date Filed | Debtor | Classification | Amount | |
| 1397<br><br>10/18/12 | Residential Capital, LLC | Administrative Priority | N/A | Claimant does not include sufficient supporting documents |
| | | Administrative Secured | N/A | |
| | | Secured | $280,000.00 | |
| | | Priority | N/A | |
| | | General Unsecured | N/A | |

PLEASE TAKE NOTICE that, on July 3, 2013, Residential Capital, LLC and certain of its affiliates (collectively, the "**Debtors**") filed their Twentieth Omnibus Objection to Claims (Borrower Claims with Insufficient Documentation) (the "**Objection**") with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[1] The category of claim objection applicable to you is identified in the table above in the column entitled "**Reason for Disallowance**".

The Objection requests that the Bankruptcy Court expunge, and/or disallow one or more of your claims listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED on the ground that the claim(s) does not contain sufficient documentation to substantiate the claim.  **Any claim that the Bankruptcy Court expunges and disallows will be treated as if it had not been filed and you will not be entitled to any distribution on account thereof.**

---

[1]    A list of the Debtors, along with the last four digits of each Debtor's federal tax identification number, is available on the Debtors' website at http://www.kccllc.net/rescap.

If you do NOT oppose the expungement, and/or disallowance of your claim(s) listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED, then you do NOT need to file a written response to the Objection and you do NOT need to appear at the hearing.

If you DO oppose the expungement, and/or disallowance of your claim(s) listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED, then you MUST file with the Bankruptcy Court and serve on the parties listed below a written response to the Objection that is received on or before 4:00 p.m. Prevailing Eastern Time on August 5, 2013 (the "**Response Deadline**").

Your response, if any, must contain at a minimum the following: (i) a caption setting forth the name of the Bankruptcy Court, the names of the Debtors, the case number and the title of the Objection to which the response is directed; (ii) the name of the claimant and description of the basis for the amount of the claim; (iii) a concise statement setting forth the reasons why the claim should not be disallowed, and/or expunged for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which you will rely in opposing the Objection; (iv) all documentation or other evidence of the claim, to the extent not included with the proof of claim previously filed with the Bankruptcy Court, upon which you will rely in opposing the Objection; (v) the address(es) to which the Debtors must return any reply to your response, if different from that presented in the proof of claim; and (vi) the name, address, and telephone number of the person (which may be you or your legal representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the claim on your behalf.

The Bankruptcy Court will consider a response only if the response is timely filed, served, and received. A response will be deemed timely filed, served, and received only if the original response is actually received on or before the Response Deadline by (i) the chambers of the Honorable Martin Glenn, One Bowling Green, New York, New York 10004, Courtroom 501; (ii) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Gary S. Lee, Esq., Norman S. Rosenbaum, Esq. and Jordan A. Wishnew, Esq., attorneys for the Debtors; and (iii) Kramer Levin Naftalis & Frankel LLP, 1117 Avenue of the Americas, New York, NY 10036, Attn: Kenneth H. Eckstein, Esq. and Douglas H. Mannal, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases.

A hearing will be held on August 21, 2013 to consider the Objection. The hearing will be held at 10:00 a.m. Prevailing Eastern Time in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom 501. If you file a written response to the Objection, you should plan to appear at the hearing. The Debtors, however, reserve the right to continue the hearing on the Objection with respect to your claim(s). If the Debtors do continue the hearing with respect to your claim(s), then the hearing will be held at a later date. If the Debtors do not continue the hearing with respect to your claim(s), then a hearing on the Objection will be conducted on the above date.

Whether or not the Bankruptcy Court disallows, and/or expunges your claim(s) listed above under PROPOSED CLAIM(S) TO BE DISALLOWED AND EXPUNGED, the Debtors have the right to object on other grounds to the claim(s) (or to any other claims you may

have filed, including any SURVIVING CLAIM(S) listed above) at a later date. You will receive a separate notice of any such objections.

You may participate in a hearing telephonically provided that you comply with the Bankruptcy Court's instructions, which can be found on the Bankruptcy Court's website at www.nysb.uscourts.gov.

If you wish to view the complete Objection, you can do so on the Bankruptcy Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the internet at www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov), or for free at http://www.kccllc.net/rescap. If you have any questions about this notice or the Objection, or if you would like to request a complete copy of the Objection at the Debtors' expense, please contact the Debtors' approved claims agent Kurtzman Carson Consultants, LLC at (888) 926-3479. CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO DISCUSS THE MERITS OF THEIR CLAIMS.

DATED:      July 5, 2013
            New York, New York

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION