1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matters of:

6  RESIDENTIAL CAPITAL, LLC, et al.,          Case No. 12-12020-mg

7                  Debtors.

8  - - - - - - - - - - - - - - - - - - - - -x

9  RESIDENTIAL CAPITAL, LLC, et al.,

10                  Plaintiffs,                Adv. No. 13-01343-mg

11          - against -

12  UMB BANK, N.A., in its Capacity as Trustee

13  INDENTURE TRUSTEE,

14                  Defendant.

15   - - - - - - - - - - - - - - - - - - - -x

16  OFFICIAL COMMITTEE OF UNSECURED

17  CREDITORS, et al.,

18                  Plaintiffs,                Adv. No. 13-01277-mg

19          - against -

20  UMB BANK, N.A., et al.,

21                  Defendants.

22   - - - - - - - - - - - - - - - - - - - -x

23

24

25

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    United States Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    November 19, 2013

19                    9:07 AM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

1

2  Adversary proceeding: 13-01277-mg    Official Committee of

3  Unsecured Creditors et al v. UMB Bank, N.A. et al.

4  PHASE II TRIAL

5

6  Adversary proceeding: 13-01343-mg Residential Capital, LLC et

7  al. v. UMB Bank, N.A., in its Capacity as Indenture Trustee

8  PHASE II TRIAL

9

10  12-12020-mg    Residential Capital, LLC

11  Fairness Hearing RE: Kessler Settlement Class.

12

13  CONFIRMATION HEARING.

14

15  (CC: Doc# 5535, 5536, 5537) Debtors Motion for Approval of the

16  Settlement Agreement Between the Debtors and the National

17  Credit Union Administration Board as Liquidating Agent for

18  Western Corporate Federal Credit Union and U.S. Central Federal

19  Credit Union.

20

21  Doc# 5598 Motion to Allow and Memorandum of Law in Support of

22  Class Counsels Motion and Application for Award of Attorneys

23  Fees and Litigation Costs and Expenses

24

25

1

2 Doc# 5597 Motion to Allow and Memorandum of Law in Support of

3 Application for Incentive Awards to Named Plaintiffs

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20 Transcribed by:  Penina Wolicki

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   GARY S. LEE, ESQ.

9        CHARLES L. KERR, ESQ.

10       LORENZO MARINUZZI, ESQ.

11       JOSEPH ALEXANDER LAWRENCE, ESQ.

12

13

14  MORRISON & FOERSTER LLP

15       Attorneys for Debtors

16       755 Page Mill Road

17       Palo Alto, CA 94304

18

19  BY:   DARRYL P. RAINS, ESQ.

20

21

22

23

24

25

```
 1   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

 2          Conflicts Counsel to Debtors

 3          101 Park Avenue

 4          New York, NY 10178

 5

 6   BY:   THERESA A. FOUDY, ESQ.

 7

 8

 9   UNITED STATES DEPARTMENT OF JUSTICE

10          Office of the United States Trustee

11          U.S. Federal Office Building

12          201 Varick Street

13          Suite 1006

14          New York, NY 10014

15

16   BY:   BRIAN S. MASUMOTO, ESQ.

17

18

19   SILVERMANACAMPORA LLP

20          Special Counsel to Creditors' Committee

21          100 Jericho Quadrangle

22          Suite 300

23          Jericho, NY 11753

24

25   BY:   RONALD J. FRIEDMAN, ESQ.
```

1

2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

3        Attorneys for Official Creditors' Committee

4        1177 Avenue of the Americas

5        New York, NY 10036

6

7   BY:   KENNETH H. ECKSTEIN, ESQ.

8        PHILIP S. KAUFMAN, ESQ.

9        DOUGLAS MANNAL, ESQ.

10       STEPHEN ZIDE, ESQ.

11       P. BRADLEY, O'NEILL, ESQ.

12       JOSEPH A. SHIFER, ESQ.

13

14

15  U.S. DEPARTMENT OF JUSTICE

16       U.S. Attorney's Office

17       86 Chambers Street

18       3rd Floor

19       New York, NY 10007

20

21  BY:   JOSEPH N. CORDARO, ESQ.

22

23

24

25

8

1

2   KIRKLAND & ELLIS LLP

3          Attorneys for Ally Bank and Ally Financial, Inc.

4          153 East 53rd Street

5          New York, NY 10022

6

7   BY:   RAY C. SCHROCK, ESQ.

8

9

10  KIRKLAND & ELLIS LLP

11         Attorneys for Ally Bank and Ally Financial, Inc.

12         655 Fifteenth Street, N.W.

13         Washington, DC 20005

14

15  BY:   DANIEL T. DONOVAN, ESQ.

16

17

18  MILBANK, TWEED, HADLEY & MCCLOY LLP

19         Attorneys for Ad Hoc Group of Junior Secured Notes

20         One Chase Manhattan Plaza

21         New York, NY 10005

22

23  BY:   GERARD UZZI, ESQ.

24         DANIEL M. PERRY, ESQ.

25         ATARA MILLER, ESQ.

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for Ad Hoc Group of Junior Secured Notes

4         1850 K Street, NW

5         Washington DC 20005

6

7    BY:   DAVID S. COHEN, ESQ.

8

9

10    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

11         Attorneys for Ad Hoc Group of Junior Secured Notes

12         1633 Broadway

13         New York, NY 10019

14

15    BY:   DANIEL A. FLIMAN, ESQ.

16

17

18    REED SMITH LLP

19         Attorneys for Wells Fargo Bank, N.A.

20         599 Lexington Avenue

21         New York, NY 10022

22

23    BY:   ERIC A. SCHAFFER, ESQ.

24         MARK D. SILVERSCHOTZ, ESQ.

25

1

2  MORGAN, LEWIS & BOCKIUS LLP

3          Attorneys for Bank of New York Mellon

4          101 Park Avenue

5          New York, NY 10178

6

7  BY:   GLENN E. SIEGEL, ESQ.

8

9

10  JONES DAY

11          Attorneys for FGIC

12          222 East 41st Street

13          New York, NY 10017

14

15  BY:   RICHARD L. WYNNE, ESQ.

16          LANCE E. MILLER, ESQ.

17

18

19  LOWENSTEIN SANDLER LLP

20          Attorneys for N.J. Carpenters

21          65 Livingston Avenue

22          Roseland, NJ 07068

23

24  BY:   MICHAEL S. ETKIN, ESQ.

25

1

2   WINSTON & STRAWN LLP

3         Attorneys for WFBNA - Wachovia

4         200 Park Avenue

5         New York, NY 10166

6

7   BY:   JAMES DONNELL, ESQ.

8         NATHAN LEBIODA, ESQ.

9

10

11  ROPES & GRAY LLP

12        Attorneys for Institutional Investor Steering Committee

13        800 Boylston Street

14        Boston, MA 02199

15

16  BY:   D. ROSS MARTIN, ESQ.

17        ANDREW G. DEVORE, ESQ.

18

19

20  ALLEN & OVERY LLP

21        Attorneys for HSBC Bank USA, N.A. as Trustee

22        1221 Avenue of the Americas

23        New York, NY 10020

24

25  BY:   JOHN KIBLER, ESQ.

```
 1   SEWARD & KISSEL LLP

 2        Attorneys for US Bank as RMBS Trustee

 3        One Battery Park Plaza

 4        New York, NY 10004

 5

 6   BY:   MARK D. KOTWICK, ESQ.

 7        THOMAS ROSS HOOPER, ESQ.

 8        ARLEN R. ALVES, ESQ.

 9        DALE C. CHRISTENSEN, JR., ESQ.

10

11

12   MORRISON COHEN LLP

13        Attorneys for Independent Directors.

14        909 Third Avenue

15        New York, NY 10022

16

17   BY:   JOSEPH T. MOLDOVAN, ESQ.

18

19

20   CLEARY GOTTLIEB STEEN & HAMILTON LLP

21        Attorneys for Wilmington Trust

22        One Liberty Plaza

23        New York, NY 10006

24

25   BY:   MARK A. LIGHTNER, ESQ.
```

1

2  POLSINELLI PC

3        Attorneys for Kessler Settlement Class

4        900 Third Avenue

5        21st Floor

6        New York, NY 10022

7

8  BY:   DAN FLANIGAN, ESQ.

9

10

11  PENSION BENEFIT GUARANTY CORPORATION

12        Office of the Chief Counsel

13        1200 K Street, N.W.

14        Washington, DC 20005

15

16  BY:   VICENTE MATIAS MURRELL, ESQ.

17

18

19  SCHULTE ROTH & ZABEL, LLP

20        Attorneys for Serberse Capital Management

21        919 Third Avenue

22        New York, NY 10022

23

24  BY:   HOWARD O. GODNICK, ESQ. (TELEPHONICALLY)

25

1

2   ACCESS LEGAL SERVICES

3           Attorneys for Caren Wilson

4           310 Fourth Avenue South

5           Suite 5010

6           Minneapolis, MN 55415

7

8   BY:   WENDY ALISON NORA, ESQ. (TELEPHONICALLY)

9

10

11   ROMERO LAW FIRM

12           Attorneys for County of San Bernardino

13           BMR Professional Building

14           Whittier, CA 90601

15

16   BY:   MARTHA E. ROMERO, ESQ. (TELEPHONICALLY)

17

18

19   RICHARD RODE

20           Appearing Pro Se

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  All right.  Please be seated.

3          All right.  We're here in Residential Capital, which

4    is number 12-12020 and in the two adversary proceedings 13-

5    01343 and 13-01277.

6          Mr. Lee.

7          MR. LEE:  Good morning, Your Honor.  Gary Lee from

8    Morrison & Foerster for the debtors.

9          Your Honor, before I start my opening, I'd like to

10   thank, on behalf of myself and everybody here, for the grace

11   and patience that you've shown in what has been an incredibly

12   difficult case and an even more difficult schedule.  I also

13   want to extend our thanks to the court staff for their

14   graciousness, as well, in facilitating the hearing today.

15         Your Honor, I have a slide presentation for today,

16   which I could hand up to Your Honor.  I've attached to it an

17   exhibit summarizing the debtors' witnesses and an updated

18   objections chart as well.

19         THE COURT:  And while you're doing that, the parties

20   had submitted a joint pre-trial order and amendment to joint

21   pre-trial order and second amendment to joint pre-trial order.

22   Does the second amendment replace the first amendment, Mr.

23   Kerr?

24         MR. KERR:  It does not, Your Honor.  Charles Kerr of

25   Morrison & Foerster.

1        Your Honor what we were trying to do is just to update

2   the exhibit list and the list of witnesses.  That's it.

3        THE COURT:  I'm going to enter all three.  I don't

4   know if I have it on disk or not, but all three are so ordered.

5        MR. KERR:  Okay, great.  Thank you, Your Honor.

6        THE COURT:  Sorry, Mr. Lee, go ahead.

7        I'm not sure there is going to be room for many more

8   binders.  But we'll deal with it.  Okay.

9        MR. LEE:  Your Honor, I'm obviously delighted to be

10  standing before you on behalf of the debtors seeking

11  confirmation of the joint Chapter 11 plan, a plan that has

12  overwhelming stakeholder support.  In fact, of the classes that

13  had the opportunity to vote, the only classes that did not

14  accept are the junior noteholders and one subclass that I think

15  I addressed at the status conference on November the 14th.

16       That translates to the support of creditors holding

17  over 100 billion dollars in claims, and that's something that I

18  at least thought was inconceivable just a few months ago.

19       We believe that the creditors have spoken, and given

20  that no one is going to be able to demonstrate a single

21  sustainable legal infirmity in the plan, we believe that the

22  plan should be approved.

23       If I may, Your Honor, I'm going to preview the topics

24  that I'm going to cover in my opening.  First, in the interests

25  of guiding the Court through the mountains of paper that are to

1   your left, I'm going to walk through --

2           THE COURT:  I think yours are mostly on this side.

3   But --

4           MR. LEE:  Okay.  Left and right and behind.

5           THE COURT:  And there's stuff under the table and

6   there's -- okay.

7           MR. LEE:  I think if it would be helpful, what I want

8   to do is first walk through the evidence that we're going to

9   put on in support of the confirmation, so effectively collapse

10  all of the direct --

11          THE COURT:  Before you go on, there is on overflow

12  room.  People are not going to stand here for four days, or

13  five days, or six days or however many days.  So find a seat or

14  go to the overflow room.

15          Go ahead, Mr. Lee.

16          MR. LEE:  So the second thing that I'm going to cover,

17  because I think it's critical to understanding the plan and why

18  the plan and the releases should be approved, are the events

19  that led to the formulation of the plan and the global

20  settlement.  Then I'm going to do a very brief overview of the

21  structure of the plan.

22          We can, if Your Honor wants, address the immaterial

23  modifications that have been made to the plan following

24  solicitation.  And then really, which is the meat of the

25  presentation, I'm going to address the relevant requirements

1    under Section 1129; and with respect to each of the settlements
2    that are embodied in the plan I'll address the 9019 standards.
3             Then I'm going to address the relatively few remaining
4    objections to the requirements that we have.
5             Then sometime tomorrow I'm going to turn the podium
6    over to Mr. Eckstein who is going to be addressing the global
7    settlement from the perspective of the unsecured creditors
8    together with a detailed discussion of the objections from the
9    junior secured noteholders and the phase 2 issues.
10            So let me start with a summary of the evidence that we
11   are putting on.  The plan proponents and other supporting
12   parties are putting on a total of twenty-seven witnesses
13   through direct testimony.  And for Your Honor's convenience
14   we've attached a summary of the witness testimony to the slide
15   deck.  For the convenience of the Court, what I'd like to do is
16   discuss the order in which we anticipate calling the witnesses,
17   describe their testimony generally and why it's integral to the
18   findings that we're seeking in relation to the plan.
19            So the first five witnesses will be providing evidence
20   supporting the conformability of the plan.  The first witness
21   is Joe Morrow from KCC.  KCC are the debtors' solicitation and
22   tabulation agent.  Mr. Morrow will describe how KCC implemented
23   the solicitation procedures that the Court approved at the
24   disclosure statement, the contents of the notices that were
25   sent, and who received them.  The contents of the notices in

1   this case, obviously are very important with respect to the

2   third-party releases that we're seeking here.  He's also going

3   to testify about the tabulation of the votes, which as I said,

4   establishes the near universal acceptance of the plan.

5          The second witness is Mr. Lipps who the Court has

6   heard from before.  He's going to testify about the various

7   claims asserted against both the debtors and against Ally that

8   are being settled under the plan including those of the private

9   securities claimants, the monolines, the RMBS trustees, the

10  nondebtor Ally entities, and the debtors' directors and

11  officers.

12         He's going to provide evidence regarding the enormous

13  litigation costs that would be incurred if the settlements are

14  not approved.  That testimony obviously is based not just on

15  the debtors' pre-petition experience, but Your Honor has seen

16  some evidence of that during the course of the last year and a

17  half in front of you just with respect to the RMBS trial alone.

18         Mr. Lipps will also testify about the complete absence

19  of any latent claims that could be asserted against the debtors

20  in connection with their RMBS.

21         Next, Mr. Marano, the chief executive officer --

22  sorry, the former chief executive officer of ResCap, now the

23  current chairman of the board, will testify.  And after him Mr.

24  Carpenter, the current CEO of AFI.

25         They're going to testify regarding the substantial

1   contributions that have been made by the third-party releases

2   and by the exculpated parties under the plan.

3           Mr. Marano will testify, and you obviously heard that

4   in connection with the phase 1 adversary proceeding, how the

5   contributions that were made by AFI during the period prior to

6   and through the petition -- sorry, and through this case,

7   enabled the debtors to maximize the value of their assets at

8   the auction for the benefit of creditors.

9           Mr. Carpenter will testify that AFI would not have

10  settled without a third-party release.

11          The fourth witness is Mr. Dubel.  Mr. Dubel is the co-

12  chair of the creditors' committee.  He is going to testify

13  about the role of the creditors' committee in the mediation and

14  formulation of the plan, including the factors that informed

15  the determination of the creditors' committee that the global

16  settlement was found reasonable and the plan is in the best

17  interests of the debtors' creditors and their estates.

18          Mr. Dubel will also testify about the investigation

19  that was performed by the creditors' committee regarding not

20  just the AFI claims, but also about the various claims that are

21  being settled under the plan.  Finally ,Mr. Dubel will testify

22  why it is that the plan proponents could not and indeed should

23  not be required to perform any additional allocation of the AFI

24  contribution.

25          Then we plan to proffer the testimony of Lewis Kruger,

1   the debtors' CRO.  Mr. Kruger will testify that the plan

2   satisfies each of the Section 1129 factors and that the global

3   settlement is procedurally and substantively fair.  He will

4   also testify as to why the settlements are fair, reasonable,

5   and in the best interests of the debtors' estate and why they

6   represent a reasonable exercise of the debtors' business

7   judgment.

8           Next, Your Honor, we're going to be proffering the

9   testimony of seventeen fact and expert witnesses who are going

10  to discuss specific parts of the settlements that make up the

11  plan.

12          First we will call Frank Sillman from Fortis.  I think

13  you recall Mr. Forits' (sic) testimony in connection with the

14  initial RMBS settlement.  He's going to provide an expert

15  opinion regarding the likely amounts of losses that will be

16  incurred by each of the RMBS trusts as well as by the monolines

17  that are settling parties, that's Ambac, Assured, FGIC and

18  MBIA, as well as the estimated amount of damages those entities

19  are likely to be able to recover with respect to those losses

20  in the absence of a settlement.

21          Then the debtors are going to present the testimony of

22  ten witnesses who will testify in connection with the RMBS

23  claims settlement.  Six of those witnesses will be testifying

24  on behalf of the settling RMBS trustees.  I've listed the names

25  on the chart.

RESIDENTIAL CAPITAL, LLC, ET AL.                        22

1           Then Allen Pfeiffer of Duff & Phelps will provide an
2    expert opinion that the claims of the RMBS trusts, the
3    distributions thereon are all fairly allocated under the plan.
4           Jose Fraga from Garden City Group will testify
5    regarding the settlement negotiations that were sent out to the
6    RMBS certificate holders.
7           THE COURT:  Say that one again?
8           MR. LEE:  Sorry, Jose Fraga from Garden City is going
9    to testify regarding the settlement negotiations -- sorry, the
10   settlement notifications --
11          THE COURT:  You misspoke, that's why.
12          MR. LEE:  Pardon me.
13          Two witness are going to provide testimony regarding
14   the reasonableness of the 5.7 percent allowed fee claim payable
15   to the two law firms who represented holders of notes,
16   securities or certificates of the RMBS trusts.
17          The first is a fact witness Nancy Mueller-Handal of
18   MetLife Insurance company who was a member -- sorry, who is a
19   member of the RMBS steering committee.  And then Ralph Mabey,
20   of Stutman Treister & Glatt, is going to provide an expert
21   report.
22          The plan proponents will then submit the testimony of
23   two witnesses in connection with the private securities claims
24   settlements under the plan.  The first is Lucy Allen of NERA,
25   N-E-R-A, who is going to provide an expert opinion that the

1   235-million-dollar settlement of the private securities claims

2   and the 100-million-dollar settlement of the New Jersey

3   Carpenters' class action are consistent with and within the

4   range of other RMBS related securities litigation settlements.

5        Susheel Kirpalani of Quinn Emanuel will then testify.

6   He's counsel to the settling private securities claimants.

7   He's going to testify regarding the negotiations and

8   discussions that led to the settlement of the private

9   securities claims and the establishment of the private

10  securities trust.

11       The next two witnesses relate to the borrower claims.

12  First will be Bill Thompson, who is the general counsel of

13  ResCap.  And then the second is Ron Friedman from

14  SilvermanAcamapora, who is special borrowers' counsel.  They're

15  going to testify regarding the treatment of borrower claims

16  under the plan and the adequacy of the funding of the borrower

17  trust as well as the debtors' treatment of borrowers during

18  these cases more generally.

19       Mr. Thompson will also testify about the benefits that

20  borrowers have received during these Chapter 11 cases in

21  connection with the debtors' continued compliance with the FRB

22  consent order and the DOJ order as well.

23       Then we'll have -- and this relates, Your Honor, to

24  the jurisdictional issues for third party releases -- Martin

25  Blumentritt from AFI.  He's going to testify about AFI's shared

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1    insurance policies with the debtors and why the proceeds of

2    those policies, which are estate assets, would be depleted, if

3    debtor related claims asserted in litigation currently pending

4    against Ally are not released under the plan.

5         Next Mark Renzi of FTI will testify regarding his

6    expert opinion that the plan satisfies the best interests test

7    under Section 1129(a)(7), and that the limited partial

8    consolidation of the debtors' estates that's embodied in the

9    plan is reasonable, appropriate and doesn't harm any creditor.

10   Mr. Renzi will also testify about the plan proponents'

11   liquidation analysis.

12        Following that we're going to introduce evidence

13   that's relevant to some of the specific factual issues

14   concerning the debtors as they relate not just to the plan

15   objections, but also to the phase 2 adversary proceeding.  That

16   evidence is going to come from four individuals, Barbara

17   Westman, Tammy Hamzehpour, Jim Young and Gina Gutzeit.

18        Ms. Westman is going to testify about how, consistent

19   with the debtors' past practice, the intercompany balances are

20   being waived under the plan; why any litigation that would

21   attempt to adjudicate the intercompany balances on a

22   transaction-by-transaction basis would be extremely difficult,

23   time consuming and expensive, if not impossible.

24        Ms. Hamzehpour who is the chief business officer of

25   ResCap, will testify that the claims being released under the

1    plan's third-party release would impact the debtors' estates if

2    they are not released by virtue of claims for contractual

3    indemnification against the debtors' claims to insurance

4    policies, and so on.

5         Ms. Hamzehpour will also testify that by agreeing to

6    forego insurance coverage under D&O and E&O insurance policies,

7    the debtors, officers and directors have provided a substantial

8    contribution to the debtors' estates, warranting their

9    inclusion in the third-party release under the plan.

10        Ms. Hamzehpour will also testify about the debtors'

11   regular business practice of forgiving intercompany balances

12   and her role in that process.

13        Mr. Young, who is employed by Ally Bank, will testify

14   about three alleged contract claims to which the JSNs assert

15   that their liens attach.

16        Specifically he will discuss the mortgage servicing

17   rights swap agreement between Ally Bank and GMAC Mortgage and

18   why the JSNs' claims with respect to that agreement do not

19   comport with either the documents or the parties' intent with

20   respect to those transactions.

21        Now, he's also going to testify about the revenue that

22   Ally Bank received for loans it sold to GMAC Mortgage under

23   what's called the MML PSA between those two entities and the

24   draft tax allocation agreement between AFI and ResCap.  And he

25   will testify why the JSNs' claims with respect to both of those

1    are not valid.

2            Finally, Ms. Gutzeit will provide an expert opinion

3    rebutting the expert report prepared by Robert Bingham of

4    Houlihan which was submitted by the JSNs regarding the debtors'

5    intercompany balances.  Ms. Gutzeit will testify that Mr.

6    Bingham's conclusion that the intercompany balances reflect

7    true debt is incorrect and that the treatment of those balances

8    pre-petition was indicative of the allocation of capital and

9    transfers of equity.

10           Your Honor, we believe that the factual evidence

11   supporting plan confirmation is extraordinary.  The only

12   contrary testimony that we're going to hear over the next four,

13   five, or six days, is opinion provided by experts hired by the

14   JSNs regarding why certain aspects of the global settlement are

15   not reasonable, or pieces of cross-examination on issues that

16   go to the quest, the quest for post-petition interest, the holy

17   grail for the junior secured noteholders throughout this case.

18           Now, none of those opinions and none of that testimony

19   is going to undermine three critical facts.  First, the debtors

20   are and were faced with a crippling array of actual and

21   potential litigation.

22           Second, through a mediation that was procedurally fair

23   in every conceivable aspect, which took place under the

24   guidance of a federal bankruptcy judge, the parties were able

25   to reach universal consensus among constituencies with wildly

1    diverging interests.

2            And third, they developed a plan that resolves over a

3    hundred billion dollars in claims, and they do so in full

4    compliance with the Bankruptcy Code.

5            I think it's just important, Your Honor, for us to

6    step back and see how we got here from our pre-pack filing in

7    May of last year.  Hope springs eternal.

8            On the day that ResCap filed for bankruptcy, we had

9    four objectives.  They're the same four objectives that we

10   effectively have now.  First, which was to continue to run and

11   operate and then sell one of the country's largest mortgage

12   servicing companies; and we wanted to do that in bankruptcy and

13   without interruption to our operations.

14           Second, in doing so preserve thousands of jobs in an

15   industry, which is quite clearly battered, under siege, not

16   just from regulators, but through litigation.

17           Third, and we said this at the very first day and in

18   several hearings subsequent to that, that we intended to abide

19   by the agreements and obligations that ResCap owed to the U.S.

20   government, the States Attorney General, the Federal Reserve

21   Board and others, and at the same time make sure, to the extent

22   that we could, that the borrowers and homeowners, the mortgages

23   that we were servicing, would not be adversely affected by the

24   Chapter 11.

25           And fourth, which is what we're here for today,

1   resolve the tens of billions of dollars of claims arising out

2   of extraordinarily complex actual and pending litigation.  Not

3   a small task to start the case with.

4       We believe that we've successfully accomplished the

5   first three objectives; and today we stand on the cusp of

6   achieving the fourth, resolution of billions of dollars of

7   complex claims through a 2.1-billion-dollar settlement.  It's a

8   historic amount.  And that settlement arose from mediation led

9   by Judge Peck.  And as to that fourth objective, we believe

10  that we have near universal consensus from our stakeholders.

11      And in order to understand why we think that that

12  result is exceptional and warrants the provisions that we're

13  seeking in the plan, including the third-party releases, I

14  think it's worth noting that each of our objectives are

15  interconnected.

16      As Your Honor noted in connection with the phase 1

17  trial, ResCap basically had potentially very valuable assets

18  that could only be sold in a bankruptcy that successfully

19  resolved a morass of litigation claims.  But the work that was

20  done to obtain the support that the debtors needed to continue

21  to operate pre-bankruptcy started well before these cases was

22  ever commenced and continued through the closing of the asset

23  sales.

24      By the time that we had filed for bankruptcy, we,

25  together with AFI, had negotiated settlement agreements with

1   the Fed, the DOJ, the States Attorney General, and various plan

2   support agreements, one with AFI, one with an ad hoc group of

3   noteholders, and the third with a group -- sorry two groups of

4   institutional investors representing the RMBS holders.  Now, as

5   we all know the agreement with the ad hoc group fell by the

6   wayside and after that scorched earth litigation followed.

7           I will concede that the agreements with AFI and the

8   RMBS investors did not culminate in the plan as originally

9   proposed.  But what we do believe is that the foundation that

10  enabled the debtors to operate and then sell a live mortgage

11  business while in bankruptcy for 4.5 billion dollars, is

12  reflective of the effort that was put in prior to the

13  bankruptcy and through the time of the sale.

14          We believe, Your Honor, that those contributions are

15  significant.  Not only did they allow us to save jobs, not only

16  did they allow us to sell the business, not only did they allow

17  us to continue to comply with our obligations to the

18  government, but they effectively are what allows us to be here

19  today to try and achieve the fourth objective.

20          Now, I recall -- and this may have been the first or

21  second day of the JSN adversary proceeding, or it may have been

22  at the closing -- that there was an attempt by the noteholders

23  to downplay the significance of those accomplishments.  And

24  what they said is, and I think this is a quote, risk is part

25  and parcel in the sale of any business.

1        But the fact is, Your Honor, what we did here, running

2    and operating a financial services business in a bankruptcy and

3    selling it as a going concern has never happened before.  It

4    was unprecedented, and the reason it was unprecedented was

5    because it required an enormous amount of coordination before

6    we filed for bankruptcy and an enormous amount of support from

7    our parent company during the course of the case.

8        Now the nature of that support is set forth as to AFI

9    in detail in the testimony of Thomas Marano and Michael

10   Carpenter.  And it consisted -- and I think Your Honor is

11   familiar with all of these things, with the DIP financing that

12   was provided, the stalking-horse bid for the sale loan

13   portfolio, the shared services that we needed to run the

14   business, the ability to continue to service Ally Bank's loans

15   and MSRs instead of through a third-party service provider, and

16   the ability to continue to originate mortgages by funding

17   mortgages on market terms.  That's from AFI.

18       Testimony from Mr. Marano will show that a significant

19   portion of the RMBS investors represented by Kathy Patrick and

20   Talcott Franklin also provided support in the form of the

21   original RMBS settlement, which not only potentially resolved

22   billions of dollars of claims, but it did so in a way that

23   ensured that we were able to sell our MSRs and associated

24   advances without depletion.

25       The debtors' cooperative relationship with the

1   governmental entities in these cases also provided a direct

2   benefit to borrowers outside of the plan.  Your Honor will

3   recall that in June of this year, ResCap, GMAC Mortgage, and

4   the Federal Reserve all agreed to an amendment of the original

5   April 22nd, 2011 consent order.  And what that allowed us to

6   do, Your Honor, was to put 230 million dollars into the hands

7   of borrowers.  The borrowers received expedited remediation

8   payments, and the debtors obviously avoided the hundreds of

9   millions of dollars of costs associated with the foreclosure

10  review.

11          But we wouldn't have been able to enter into that

12  settlement but for the fact that in May we signed the plan

13  support agreement, and by that time a significant amount of

14  trust and confidence had been engendered between AFI, the

15  consenting claimants, and the debtors.  and we believe that

16  that's another example of why the circumstances of this case

17  are unique.

18          So we think that the evidence will show a very clear

19  link between the pre- and post-petition support provided to the

20  debtors, and we believe that the evidence shows that that is

21  what enabled us to achieve the first three objectives that we

22  set out to achieve.  And that, we think, is a major key to

23  understanding why this is that truly exceptional case that's

24  described in Metromedia, one that justifies the third-party

25  releases and exculpation provisions that we're seeking.

RESIDENTIAL CAPITAL, LLC, ET AL.                    32

1        So once the asset sales closed, Your Honor, we
2   obviously all devoted our time to the resolution of the claims
3   and disputes with the various parties, although that work had
4   begun in December of last year really -- really picked up speed
5   I think in February of this year.
6        And the debtors' view is, and this is why we thought
7   that mediation was so critical, we were faced with a number of
8   intractable disputes, intractable disputes between creditors,
9   intra-debtor disputes as well.  I think I've laid those out on
10  the next slide.  Those were part and parcel, I think, Your
11  Honor, of what we set out when we made the motion to appoint
12  Judge Peck as the mediator.
13       Probably could have done another ten or eleven slides
14  of other intractable disputes we've had in this case that we
15  asked Judge Peck to try and resolve, and he appears to have
16  been successful, except with respect to one.  But hope springs
17  eternal.
18       THE COURT:  Hope springs eternal, I was just going to
19  say that.  It's never too late.
20       MR. LEE:  Now talking of intractability, and I'm going
21  to quote Mr. Shore here, speaking on behalf of the junior
22  secured noteholders at the hearing on the debtors' third motion
23  for exclusivity in December, he expressed significant
24  skepticism to that a settlement of these issues could be
25  reached and suggested that perhaps the cases should instead be

1　　converted to Chapter 7.  And I believe that in the papers that

2　　the JSNs filed at that time they make much the same point.

3　　　　　　　But we recognized that trying to achieve a global

4　　settlement was a relatively daunting task, but we believed that

5　　the alternative and the alternative presented here is actually

6　　far, far worse; absent the global settlement none of those

7　　gating issues were going to be resolved.

8　　　　　　　And I think I've quoted Your Honor now five times

9　　before, but I believe what you said was the alternative, the

10　　available alternatives here are a global settlement or

11　　litigation that amounts to nuclear war.  And I was going to

12　　have a slide with a nuclear bomb, but we didn't think that was

13　　appropriate.  So --

14　　　　　　　So we think, Your Honor, that the decision to enter

15　　into mediation, the decision to actually recognize that these

16　　disputes were surmountable and the resolution that Judge Peck

17　　has reached suggests that that decision has paid off.  Enough

18　　of the key parties, we think, have taken this Court's

19　　admonitions to heart, that it's appropriate to settle, that

20　　there is nothing to be gained by literally burning through

21　　tens, potentially even hundreds of millions of dollars in

22　　litigation.

23　　　　　　　And I think as I reported to Your Honor on November

24　　the 4th and then again on November the 14th, there is a high

25　　degree of consensus with respect to the plan, and as I said,

RESIDENTIAL CAPITAL, LLC, ET AL.                              34

1    what we're left with are the JSNs and I believe two other

2    creditors raising relatively narrow issues.  So putting those

3    things aside, we believe that the plan has broad and

4    functionally unanimous support.

5           I think actually at this point, Your Honor it's

6    probably worth bringing to the Court's attention that there

7    have been some additional resolutions since we were here last

8    week.  There have been four that I can report on.

9           The first is Deutsche Bank had a limited objection to

10   confirmation, that was docket number 5459.  That was withdrawn

11   either last night or this morning, I think I saw it on the

12   docket.

13          The second is the objection from Universal Restoration

14   Services, that was docket 5506.  That's also been resolved.

15          The next one is going to make Your Honor happy, it was

16   the objection of Impac, that's docket 5401, and that's also

17   been resolved and that objection will be withdrawn, if it

18   hasn't already.

19          And finally, and I think this is probably absolutely

20   critical, the U.S. Trustee is withdrawing the objection which

21   is at 5412.  And why that's critical, Your Honor, is we

22   obviously have now no objections to the exculpation provisions

23   in the plan.

24          MS. ROMERO:  Your Honor, this is Martha Romero from

25   California.

1          THE COURT:  Please don't interrupt.  This is the

2     proponents' opening statement.

3          MS. ROMERO:  Well, but there's on more --

4          THE COURT:  No.  Please do not interrupt or you will

5     be cut off.

6          Go ahead, Mr. Lee.

7          MR. LEE:  Just so beyond -- Your Honor, I said the

8     junior secured noteholders, I believe it's Wachovia, Wells, but

9     Wells' objection really derives from the JSNs' objections, and

10    the parties that joined Ms. Nora's objection, but Ms. Nora's

11    objection has been resolved -- so I think that we are down to

12    three plus the entities that joined in Ms. Nora's objection.

13         So, Your Honor, we think that we're left with a fairly

14    simple choice, do we litigate each and every claim, and --

15    or -- and this is the path that the consenting claimants would

16    like to go down -- do we move forward on a consensual basis?

17         The vote in every case is extremely important.  But

18    Your Honor, we suggest that the vote here is even more

19    important because of the interdebtor and intercreditor disputes

20    that would otherwise be left unresolved if this plan isn't

21    confirmed.

22         As I said, in nearly every class but one, and the

23    junior secured noteholders, they voted in favor of what Your

24    Honor is aware is not just a very heavily negotiated

25    settlement, but a settlement by which the parties agreed to

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1    release Ally in exchange for the substantial contribution

2    they're making now and they've made throughout the case.  And

3    the parties have not only voted in favor of the settlement, but

4    they've also voted in favor of the methodology by which the

5    values under that settlement are allocated.

6            So, Your Honor, Mr. Morrow will testify and his

7    testimony will be that the vote took place exactly as it should

8    have.  It was done consistent with the solicitation and

9    tabulation procedures that were endorsed by Your Honor with

10   respect to the disclosure statement.  Solicitation of the

11   materials took place within the time frame set out within the

12   order, including the mailing of not just 4,000 ballots, but

13   over 2 million notices.

14           As required by the disclosure statement order, each

15   and every notice that went out included a prominent legend that

16   advised recipients of the release, exculpation, and injunction

17   provisions contained in the plan.  That notice was sent not

18   just to known creditors or known holders of pre-petition claims

19   against the debtors, but also parties that are in litigation

20   with Ally relating to the debtors' businesses as well as

21   individual borrowers whose loans were serviced by the debtors

22   as of September the 20th, 2012; and that was regardless of

23   whether they were entitled to vote on the plan or not.

24           In addition, on September the 3rd, KCC caused

25   confirmation hearing notice, including the legend with respect

1  to the releases, exculpation, and injunction provisions, to be

2  published in the Wall Street Journal National Edition and USA

3  Today.

4           In short, Your Honor, we believe that the plan

5  proponents did everything they could to put the world on notice

6  of the releases that were being sought in connection with this

7  plan and to let parties know that if they had an objection,

8  they should speak now or forever hold their peace.

9           Now, as the testimony of Mr. Morrow will show, the

10  methodology applied in tabulating the votes was consistent with

11  the Court's order, including the tabulation of the RMBS trustee

12  votes well.  That tabulation also took into account a number of

13  stipulations that the debtor had entered into both before and

14  after the bar date, including the stipulation with UMB Bank as

15  trustee for the junior secured note claims.

16           With respect to the requirements for acceptance of the

17  plan, which is set forth in Section 1126, the debtors will

18  again proffer the testimony of Mr. Morrow, and that will show

19  that 153 of the 183 subclasses eligible to vote accepted the

20  plan.

21           If you eliminate the 23 subclasses of junior secured

22  notes that obviously rejected the plan, we carried 159 of the

23  160 subclasses.  I think Your Honor will be aware that the FHFA

24  has entered into a settlement and it has changed its vote to

25  accept the plan.  159 out of 160 reflects near unanimity, which

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1    quite frankly is truly remarkable given where we were at the
2    beginning of this year.
3            As we set forth in the confirmation brief, 1,368 of
4    1,432 creditors voting on the plan, holding over a hundred-
5    billion-dollars'-worth of claims, have accepted the plan and
6    consented to the releases.
7            Now, just turning to the single subclass that did not
8    vote to accept the plan, that was the borrower class at debtor
9    Residential Funding Real Estate Holdings LLC.  I think I
10   referred to that, Your Honor, in connection with the status
11   conference on November the 14th.  There we received precisely
12   one vote in favor of the plan and one vote from an individual
13   named Duncan Robertson, again, something that I think I
14   mentioned that we'd gone back to do some research, and what we
15   had determined, in fact Mr. Robertson wasn't a borrower.  He
16   is, in fact, a creditor, if he has a claim at all. And if he
17   has a claim, it's not against that entity, which is a holding
18   company, it's against ResCap or Homecomings, where we carried
19   the classes.
20           So what stands in the way of a fully consensual plan?
21   The twenty-three subclasses.  And what do the twenty-three
22   subclasses want?  They want post-petition interest.
23           What stands in the way of the plan isn't facts, it
24   isn't law, it's not the equities of the case, it's not a
25   Constitutional argument.  It's a tactic.

1          Mr. Eckstein is going to address the JSN objection in

2     detail.  So I'm not going to duplicate what he says.  I do want

3     to make a couple of points, because we've been the subject of

4     some of those tactics.

5          When we refer to the junior noteholders, what we're

6     really talking about is an ad hoc committee of noteholders that

7     on day one of this case was prepared to support a plan that

8     provided them with lower recoveries than they will receive

9     under this plan.

10         They have the same counsel and they have the same

11    financial advisors they do today, and they thought that that

12    deal was fair and advised their clients to accept it.  And Your

13    Honor noted that in connection with the phase 1 hearing.

14         The evidence in phase 1 was that they were going to

15    receive a ninety-three percent recovery on their secured claims

16    under that agreement, and that was only after the benefit of

17    the subordination agreement with AFI.  And under a liquidation

18    scenario, under a Chapter 7, they get between seventy and

19    seventy-seven percent.

20         The plan gives them more, and more quickly, than both

21    of those scenarios.  It pays them in full.

22         I think the best analogy I can think of is like a dog

23    that chases a car.  I'm not exactly sure why they'd even want

24    to catch it in this case.  Seventy to seventy-seven percent and

25    par seems like a fairly obvious choice.

1        So what's driving the scorched earth approach?  It's

2   option in value, it's deep pockets, it's a precedential

3   appetite for litigation that we've seen in other cases.  More

4   importantly, a large number of junior secured notes changed

5   hands post-petition.  I think that's a fact that we've drawn to

6   the Court's attention before.  And they changed hands to

7   holders who were looking to use litigation tactically to hold

8   up the process and enhance their own recoveries.  And Your

9   Honor obviously has recognized in the past that this is a very

10   tactical driven approach.

11        Your Honor, the debtors believe that it is just

12   inconsistent with the primary goal of a bankruptcy, which is

13   the expedited resolution of an insolvent estate in a manner

14   that ensures fair and equitable treatment to all creditors, to

15   allow a single party to exploit the protections built into the

16   Code and hold everyone else hostage, and that's what's

17   happening this week.

18        So that, Your Honor, brings me to the plan itself,

19   which has the support of nearly all of the debtors' key

20   constituencies.  And although the plan itself is premised on

21   the interrelated settlements that comprise the global

22   settlement agreement that I will discuss, the plan also

23   contains specific features worth bring to go the Court's

24   attention.

25        Now as I mentioned, the plan provides for the

1   consensual partial consolidation of the debtors for purposes

2   solely of voting and distribution.  And it does so in three

3   groups.  There's the ResCap group, the GMAC group, and the RFC

4   group.

5           The ResCap group is made up of the parent and its two

6   immediate subsidiaries, which are both holding companies.  The

7   GMAC group consists of GMAC Mortgage and its twenty debtor

8   subsidiaries.  The RFC group consists of Residential Funding

9   and its twenty-six debtor subsidiaries.

10          This division was intended to capture where the assets

11  and liabilities of the debtors actually lay within the

12  corporate structure of the debtors; and the recoveries for

13  unsecured creditors under the plan vary based on the different

14  debtor groups.

15          At ResCap debtors, creditors are estimated to receive

16  at least 31.5 percent.  At the GMAC debtors, creditors are

17  estimated to receive at least 26 percent.  And at the RFC

18  debtors, creditors are estimated to receive at least 7.8

19  percent.

20          Now importantly, and this is going to be established

21  through the testimony of Mark Renzi, this consolidation doesn't

22  affect any creditors.  It's simply being done to facilitate and

23  expedite distributions to creditors.  It mirrors the company's

24  operational structure.  We don't believe that this structure

25  and this provision of the plan is or should be controversial.

1          In fact, no single creditor has objected to the

2    partial consolidation except the JSNs who object solely on the

3    basis that it impacts their recoveries.  But given that they

4    are being paid in full, it's not entirely clear to me that that

5    is a sustainable objection.

6          The other noteworthy feature of the plan is that it

7    establishes various trusts to effectuate distributions to

8    creditors.  The main liquidating trust will liquidate the

9    debtors' remaining assets following the effective date and make

10   distribution to creditors in the form of trust units, and that

11   will be followed up by cash distributions based on those units.

12         Distributions to borrowers, New Jersey Carpenters, the

13   private securities claims and the RMBS trust claims will be

14   administered through their own separate trusts; and I'll go

15   into details as to why that is the case when I describe the

16   individual settlements that are embodied in the plan.

17         Your Honor, we provided the Court with updates

18   regarding the resolution of confirmation objections; we did so

19   on the 4th of November, the 14th of November.  So I don't plan

20   to repeat them here unless Your Honor would like me to do so.

21   We've attached an updated chart to the binder that I've

22   provided to Your Honor.

23         THE COURT:  I see it.  Okay, Exhibit C to tab 1.

24         MR. LEE:  Yes, Your Honor.

25      (Pause)

1          MR. LEE:  Okay.  Next, Your Honor, I want to briefly

2    turn to the modifications we've made to the plan pursuant to

3    Section 1127 since we mailed out the -- mailed it out to the

4    creditors with the disclosure statement.

5          The changes are immaterial, cleanup changes, or they

6    were revisions that resolved objections that were filed in

7    connection with confirmation.  They only affect the parties

8    whose objections are being resolved.  Your Honor, I've marked a

9    copy of the plan showing the changes, which is I think the last

10   tab in the binder.

11         THE COURT:  Next to the last?  The last is your

12   confirmation order.

13         MR. LEE:  Yes.

14         THE COURT:  The one before that is the --

15         MR. LEE:  My apologies.

16         THE COURT:  It's okay.

17         MR. LEE:  It's tab 2, yes.

18         THE COURT:  So this is red-lined against what?

19         MR. LEE:  The solicitation.

20         Now, Your Honor, I'm not necessarily planning to go

21   through them now unless you have questions, as I said, they're

22   immaterial changes, I can address them or not.

23         THE COURT:  I think now is not the best time to

24   address them.  So --

25         MR. LEE:  So, Your Honor, I'm going to turn now to

1  Section 1129, if I may.

2          In large part the plan's compliance with Section 1129

3  is uncontested and we believe that the direct evidence that's

4  submitted isn't controversial.

5          So unless Your Honor would like me to address each of

6  the requirements, what I'd like to do is just skip to what I

7  think are the unresolved objections.

8          THE COURT:  Okay.

9          MR. LEE:  Basically, Your Honor, I think the

10  unresolved objections, unless Your Honor wants me to address

11  the joinders that were made in connection with Ms. Nora --

12          THE COURT:  No.

13          MR. LEE:  -- the unresolved pieces, Your Honor, are

14  1129(a)(7), which is the best interest test and 1129(b), which

15  is cramdown.

16          Sorry, in connection with 1129(a)(7) we're going to

17  proffer the testimony of Mark Renzi of FTI.  FTI is the

18  debtors' financial advisor.  We're also going to proffer the

19  liquidation analysis prepared by FTI, which will show the best

20  interest test is satisfied under the plan.

21          There were, I think, two objections to this:  The JSNs

22  and Wells Fargo Bank NA as successor to Wachovia.  With respect

23  to the JSNs, their allowed claims are being paid in full under

24  the plan.  Given that it's impossible for them to receive a

25  higher distribution in connection with a Chapter 7, and again,

1    that evidence came in connection with phase 1 and will come in

2    in connection with this hearing, we think that that objection

3    should be overruled.

4           And then in connection with Wachovia, they've actually

5    yet to articulate a claim against the debtors, ever.  I think

6    Your Honor asked that question of counsel to the debtor -- to

7    Wachovia perhaps more than once.  So given that we don't

8    understand they have a claim against the debtors, we think that

9    that objection should also be overruled as well.

10          So the other objection, Your Honor, was 1129(b),

11   cramdown.  The voting affidavit will establish that the

12   impaired rejecting classes are the JSN claims, the subclass at

13   Residential Fundings Real Estate, which I already described,

14   holders of intercompany balances, and the fourth is equity and

15   trusts.

16          The JSNs -- I'll address their objection as opposed to

17   Ms. Nora's -- the JSNs argue that the plan is not fair and

18   equitable both with respect to the treatment of their own

19   claims as well as to the treatment of the intercompany

20   balances.

21          Again, the objection with respect to their own claims

22   fails because they're being paid in full.  So we don't think

23   that's a sustainable objection.  What they do argue, though,

24   Your Honor, is that they should still be entitled to full

25   payment on account of their deficiency claims plus post-

1    petition interest because various claims should be --

2              THE COURT:  Plus sixty million dollars in fees.

3              MR. LEE:  I've noted that, Your Honor.  That's the so-

4    called 510(b) argument that they ran in connection with the

5    FGIC trial as well.

6              So the first and perhaps the most obvious point is

7    that the Bankruptcy Code and case law are very clear that an

8    undersecured creditor is not entitled to post-petition

9    interest.  So I'm not entirely sure that it makes much

10   difference.

11             Your Honor, as I said, did address the subordination

12   issue in connection with the FGIC settlement.  And given that

13   the case law in this circuit is that it's permissible to settle

14   claims that could potentially be subject to subordination, it's

15   a bit of a stretch to figure out how the very payment of a

16   settled claim could then violate the absolute priority rule.

17             Turning next to the intercompany claims.  I think as

18   Your Honor has noted on more than one occasion, the junior

19   secured noteholders are not actually the holders of the

20   intercompany balances.  They just assert that they are

21   creditors of those holders.  And obviously a party cannot

22   prevent the confirmation of a plan by raising the rights of

23   third parties who do not object to confirmation.

24             So we believe that the noteholders lack standing to

25   argue that the treatment of intercompany balances under the

1    plan is unfair to the holders of those intercompany balances,

2    in other words, the debtors.  Stated a bit differently, the

3    noteholders shouldn't be able to argue under the plan that it

4    shouldn't be confirmed, because other parties who haven't

5    objected should be unhappy with their treatment.

6          Mr. Kruger will testify that the decision was made on

7    behalf of each of the debtors with respect to this treatment

8    and that it was reasonable and appropriate in the context of

9    the global settlement.

10          Finally, Your Honor, there are no classes junior to

11    the rejecting classes of Residential Funding Real Estate

12    Holdings LLC and holders of intercompany balances and equity in

13    trust that are receiving or retaining any property under the

14    plan.

15          So we believe that the evidence will show that we've

16    satisfied 1129(b).  The plan doesn't unfairly discriminate.

17    It's fair and equitable.  And with respect to each of the

18    rejecting classes it's fair and equitable.

19          So that, Your Honor, will now take me to 1123(b)(3)(A)

20    and to the plan settlements.

21          So I'm obviously not going to rehearse (sic)

22    1123(b)(3)(A) or 9019 or any of those things, but I think that

23    the most important point that I'd like to make in connection

24    with the settlements under the plan, Your Honor, is that the

25    entire plan is premised on a global settlement, and that

1   includes all of the settlements that I'm going to describe.

2         We believe that taken individually and taken

3   collectively, both the global settlement and its constituent

4   parts are fair and equitable and in the best interests of the

5   estate, and clearly the debtors' business judgment in that

6   regard should be deferred to.

7         Critically, not a single party has raised a single

8   objection to the reasonableness or amount of any of the

9   individual creditor settlements, and that includes the JSNs.

10  As I understand it from their confirmation objections, they

11  object to the priority of the creditor settlements, but not the

12  actual amount by which they're settled.  And indeed, but for

13  that, there is unanimous support for each of the constituent

14  individual creditor settlements that are embodied in the plan.

15        So, Your Honor, I'm not going to rehearse the Iridium

16  factors.  What I do want to say is that there is a --

17        THE COURT:  I mean, they do object to the securities

18  settlements.  They say that they should be subordinated under

19  510(b).

20        MR. LEE:  Right.  They're not objecting, Your Honor,

21  as I understand it, to the amount by which the claim is

22  settled, so in other words -- but you're correct, Your Honor,

23  with respect to both the RMBS trusts, the monoline claims, the

24  securities claims, they object to the priority under 510(b).

25        THE COURT:  Right.

1          MR. LEE:  And thankfully they haven't objected to the

2    borrower claims, so I think we can assume those are general

3    unsecured claims.

4          But the common theme, Your Honor, as we go through the

5    Iridium factors is that the claims that we're setting are

6    massive.  The litigation of each of the individual claims would

7    be complex, time consuming, and would likely cost tens if not

8    more millions of dollars.

9          Your Honor had firsthand, and I'm sure, a very

10   pleasant experience with that in connection with the RMBS

11   trial, and I think that you could imagine what that looks like

12   private securities claimants at large.

13         So while I'm going to discuss the individual

14   compromises, I think that it's important to remember that the

15   settlements are interconnected and the reasonableness of the

16   overall settlement should be evaluated holistically.  And in

17   fact, and all testimony will show this, but for that holistic

18   approach there would be no settlement at all here today.

19         And that's an approach that's been used by courts in

20   other mega-cases, including by Judge Gerber in Adelphia, by

21   Judge Walrath in Washington Mutual, and by Judge Gonzalez in

22   Enron.

23         So, Your Honor, we think that the evidence will show

24   that each of the settlements is in the best interests of the

25   creditors.

1          All of the testimony in connection with the settlement

2    negotiations will come from those who participated.  And what

3    they will unequivocally confirm is that the negotiations were

4    conducted in good faith and at arm's length.  And I think there

5    was some suggestion in one of the briefs that I saw from the

6    JSNs, that they questioned that.  But our premise is it

7    couldn't be otherwise.

8          The negotiations were conducted exclusively as part of

9    a mediation by a sitting federal court bankruptcy judge, by

10   Judge Peck.  The debtors were represented by their CRO, Mr.

11   Kruger, an experienced professional with more than fifty years

12   in the field with an entirely untarnished reputation for

13   honesty and integrity.

14         And even with that adult supervision in place, it

15   would still be an understatement to describe the negotiations

16   between the parties as anything other than difficult,

17   aggressive, and sometimes bitter.  Everybody had leverage, and

18   all the parties were represented by sophisticated and

19   experienced advisors.

20         So with that, Your Honor, if I may, I'd like to turn

21   to the individual settlements under 9019.

22         So the first settlement, Your Honor, that I'd like to

23   talk about is the RMBS trust settlement.  The plan provides for

24   the settlement of the claims asserted by the RMBS trustees

25   arising from 1,100 RMBS trusts holding interests in more than

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1   one million loans, with a combined original principal balance

2   of over a quarter of a trillion dollars.

3        The RMBS trusts' claims include their rep and warranty

4   contract claims, their administrative cure claims, as well as

5   their servicing cure claims which have all been asserted in the

6   hundreds or billions of dollars.  The RMBS claims are

7   unliquidated.

8        The testimony with respect to the settlement will

9   first come from Mr. Sillman from Fortis who will testify that

10   based on the analysis that he performed -- and Your Honor will

11   recall he had performed an analysis last year as well, so this

12   was an extension of that work -- and what he will testify to is

13   that the RMBS trusts will incur aggregate lifetime losses of

14   between 42.4 billion dollars and 43.2 billion dollars on

15   account of which the trusts would likely be able to recover

16   between 7.4 and 8.7 billion dollars.

17        Under the settlement, the RMBS trusts will be

18   receiving allowed claims in the aggregate amount of 7.3 billion

19   dollars on account of which they will receive a pro rata

20   distribution of units from the liquidating trust.  And those

21   will, in turn, be reallocated to the RMBS trusts.

22        As Your Honor will recall, the dispute regarding the

23   RMBS 9019 motion spanned the entirety of this case, and a trial

24   on the merits of those claims, if it ever took place, would

25   involve numerous complex novel issues of law, would likely take

1    days or weeks and consume millions of dollars of estates' cash.

2          The evidence will show that the outcome of litigation

3    regarding the RMBS trust claims was uncertain, and the plan

4    resolves each of those issues, saving significant time and

5    costs.  That evidence will be introduced in the form of

6    testimony from Mr. Lipps who will describe the claims.

7          In addition, Mr. Dubel will testify regarding the very

8    exhaustive investigation of the RMBS claims that was performed

9    by the committee, which informed the committee's determination

10   that as part of a global holistic settlement, the RMBS

11   settlement under the plan is reasonable.  Mr. Kruger will also

12   testify regarding the basis for his conclusion that was

13   reasonable too.

14         Again, Your Honor, the only objection to the RMBS

15   settlement is the one raised by the JSNs relating to 510, and

16   I'll address that collectively when I get to -- after I've

17   spoken about the monolines and the securities claims.

18         The plan also resolves claims filed by FGIC, MBIA,

19   Assured, Ambac and now Syncora, for a fraction of the billions

20   of dollars asserted in the aggregate by those parties.  Those

21   resolve all monoline claims.

22         The plan proponents will again introduce the expert

23   testimony of Mr. Sillman, and his testimony would establish

24   that the settlements fall within the estimated range of actual

25   damages that the monolines would likely incur.

RESIDENTIAL CAPITAL, LLC, ET AL.                          53

1          Mr. Kruger, Mr. Dubel, and Mr. Lipps will testify that

2     based on the extensive work that's been done in this case and

3     prior to this case, everybody understood that the litigation of

4     the monoline claims would involve factual and legal complexity,

5     rivaling if not exceeding that of the RMBS trust claims.

6          In addition, the parties in the negotiations were well

7     aware of several recent legal decisions that had broken in

8     favor of monolines, and that was one of the things that weighed

9     obviously in settling those claims.

10         Mr. Lipps will testify about the pre-petition

11    litigation that MBIA filed against RFC in 2008.  That case is

12    the poster child for just how bad it is to have to litigate

13    these claims to completion and just how bad it will be for the

14    estate to have to do so.  That case involved 5 securitizations,

15    not over 1,000.

16         RFC produced more than a million pages of documents

17    and over 63,000 loan files.  Combined, each side took over 130

18    days of deposition.  And the discovery was still ongoing when

19    the debtors filed for bankruptcy.

20         If you multiply that burden, gross it up to 1,100

21    trusts, and you add in the practical difficulties that the

22    debtor now has, including the fact that most of the debtors'

23    employees and witnesses are no longer employed by the debtor,

24    it becomes clear that the actual process of just simply taking

25    discovery in those cases is a burden that the debtors cannot

1  sustain, let alone litigate, even.

2        So, Your Honor, we think that the evidence will easily

3  support a finding that the settlement of the monoline claims is

4  reasonable.

5        And again, no one is challenging the actual amount of

6  the settlement, just the JSNs, and again, as I understand it,

7  just with respect to the priority of those claims.

8        Next the plan also addresses more than fifty billion

9  dollars in securities claims against the debtors and nondebtor

10  affiliates arising from the issuance of a residential mortgage-

11  backed securities.  First, the plan resolves litigation with

12  twenty institutional private securities claimants over

13  subordination and classification of their claims.  The

14  aggregate amount of those claims, and that's the group that is

15  in part represented by Mr. Kirpalani, has an aggregate face

16  amount of 2.4 billion dollars.

17        The plan contemplates that that group of twenty will

18  receive their recoveries through the private securities claims

19  trust.  The private securities claims trust will receive 235

20  million units -- sorry, 235 billion dollars'-worth of units

21  from the liquidating trust, and they will be responsible for

22  allocating that.

23        Mr. Kruger, Mr. Dubel, Mr. Lipps, and Mr. Kirpalani

24  will testify that the litigation of those claims in courts

25  around the country would involve substantial time, expense and

1  risk.  For example, Mr. Lipps will testify that the

2  defendants -- sorry, the debtors were defendants in seventeen

3  different private securities lawsuits, twelve of which had

4  asserted claims against Ally as well.  A number of those cases

5  had been litigated for several years and survived motions to

6  dismiss.

7        Ms. Allen of NERA will testify that the proposed

8  private securities settlement is within the range of other

9  settlements of RMBS-related securities litigation around the

10  country.

11        Staying with securities claims, the plan also settles

12  the New Jersey class action.  In that case, the claimants have

13  asserted claims of securities law violations relating to RMBS,

14  and they claimed losses in excess of thirteen billion dollars.

15        The class has been certified in the district court and

16  the case survived a motion to dismiss.  So accordingly, the New

17  Jersey Carpenters' claims represented one of the largest

18  exposures that the debtors faced in these cases.

19        We believe, Your Honor, that the terms, settling this

20  for a hundred million dollars in the face of a thirteen-

21  billion-dollar exposure, while avoiding the obviously costly

22  litigation that would ensue with respect to that, demonstrates

23  that the settlement is fair and reasonable.

24        The New Jersey class claimants will receive cash

25  distributions from the trust totaling a hundred million

1    dollars.  And again, Ms. Allen will testify that that is well

2    within the range of reasonableness.

3            Your Honor, there are three additional settlements

4    that either are or will be before the Court that are

5    conditioned on the plan being confirmed, and I've been asked to

6    raise each of those three.  Obviously approval is being sought

7    outside of the plan.  That relates to the FHFA, NCUAB, and the

8    Kessler settlements.  The motions to approve --

9            THE COURT:  I'm sorry, which was the third?

10           MR. LEE:  Kessler.

11           THE COURT:  Yes.  I just didn't hear you clearly.

12           MR. LEE:  The motions to approve those settlements, I

13   think, is going to be scheduled for the conclusion of the

14   confirmation hearing.  But the claims are -- the claims are

15   very significant so I think they're worth noting.

16           Your Honor, the debtors' settlement regarding

17   securities claims brought by FHFA as conservator for Freddie

18   Mac resolves claims against the debtors in connection with

19   eight billion dollars of the debtors' RMBS.  Pursuant to the

20   settlement, FHFA is receiving a two percent recovery on account

21   of its 1.2-billion-dollar allowed claim against RFC.

22           The settlement with NCUAB, which I think the motion

23   was filed on October the 28th, resolves close to 300-million-

24   dollars'-worth of securities claims against debtor and several

25   hundred million dollars'-worth of securities claims against

1    Ally affiliates.  Those claims arise out of the pre-petition

2    RMBS actions.

3          Under that settlement, NCUAB is receiving an allowed

4    general unsecured claim against two debtors in the RFC group

5    for an amount totaling seventy-eight million dollars.

6          And finally, the plan proponents will be seeking final

7    approval of the Kessler class action settlement.  The Kessler

8    settlement resolves 1.8-billion-dollars'-worth of class action

9    borrower claims involving 44,500 second mortgage loans held by

10    the debtors, and those claims arise out of allegations of TILA,

11    T-I-L-A, RESPA, HOEPA and RICO violations.

12          Pursuant to that settlement and subject to

13    confirmation of the plan, the class proofs of claim are to be

14    allowed at the RFC debtors in the amount of 300 million

15    dollars.  It's going to be allowed as an allowed borrower

16    claim, and it's not subject to subordination.  And it will

17    be -- distributions will occur through the borrower trust.

18          The settlement agreement also confers additional

19    potential benefits upon class members through potential

20    insurance recoveries.  And with respect to those insurance

21    recoveries one of the resolutions, Your Honor, that I think is

22    noted in the objection chart is that of the GM insurers, and

23    that's resolved through the addition of insurance neutrality

24    language in the plan.

25          Your Honor approved, preliminarily, the settlement

1   agreement on August the 22nd.  Since that time, in accordance

2   with Your Honor's order, the putative class was furnished

3   notice of the settlement.  And as I understand it, only one

4   class member filed an objection.

5            In addition, only a handful of class members opted out

6   of the class.  PNC Bank, a co-defendant in the MDL litigation,

7   filed a limited objection to the motion, and the parties have

8   briefed that, and I guess that's going to be addressed when

9   this matter is heard.

10           So that leaves me, Your Honor, with the only objection

11  to the settlements, the issue of priority of the RMBS claims,

12  the monoline claims and the private securities claims.  And

13  again, that objection is from the JSNs who argue for a second

14  time that the debtors can't settle claims that are potentially

15  subject to subordination.

16           Your Honor, I think that the objection is most easily

17  dealt with by the fact that Your Honor has already ruled on

18  this precise same issue when you found that it was permissible

19  for a debtor to settle claims that could potentially be subject

20  to subordination.

21           We think that the law of the case, the doctrine of

22  collateral estoppel effectively undermines that agreement.

23           However, to the extent further effort needs to be

24  given to dealing with another point, I could make four

25  observations as to why we thought it was appropriate to settle

RESIDENTIAL CAPITAL, LLC, ET AL.                          59

1    those claims on an unsubordinated basis.

2            First, the monoline claims arise from insurance and

3    indemnity agreements.  They don't arise from an agreement to

4    purchase securities.

5            Second, the RMBS trust claims arise out of the sale of

6    mortgage loans, not securities.  They don't arise from the

7    issuance of trust certificates, but rather from the contractual

8    rep and warrantees made in connection with the deposit of

9    mortgage loans into the trust.

10           Third, with respect to the fifty-five billion dollars

11   in securities claims which are being settled for less than 400

12   million dollars -- that's a good risk reward there -- there is

13   no point -- sorry, there's no ruling on this point in this

14   circuit.  And the only ruling that I'm aware of in relation to

15   this is from Judge Walrath in Washington Mutual.  So we're

16   clearly faced with some difficult law.  Furthermore,

17   subordination of the securities claims against the debtors

18   doesn't really help, because it doesn't apply to the third-

19   party claims that are brought against Ally.  So these claims

20   needed to be addressed as part and parcel of a settlement in

21   any event.

22           And fourth and perhaps most amazingly, any settlement

23   regarding the subordination of these claims doesn't impact the

24   JSNs at all because they're being paid in full, in cash, on the

25   effective date.

1       The next settlement that's embodied in the plan is the

2   settlement of the senior unsecured notes claims.  The plan

3   resolves and settles claims that the senior unsecured notes

4   indenture trustees brought on behalf of the senior noteholders.

5   They've also asserted claims against the Ally released parties

6   and the debtors relating to various breaches of the indenture

7   and other causes of action that they have.

8       Litigation of those claims -- and they really, Your

9   Honor, relate to subrogation, to substantive consolidation, to

10  potentially a sixteen-billion- dollar fraudulent conveyance

11  claim -- those all raise very significant issues.  They raise

12  the prospect of significant costs.

13      So, again, Mr. Kruger and Mr. Dubel will testify that

14  these claims and the associated disputes that arose from these

15  claims were complex, fact-specific, and that it made sense to

16  settle those in light of potential litigation.

17      I want to turn now, Your Honor, to the borrower

18  claims.  The plan establishes a borrower claims trust which

19  will be funded with 57.6 million dollars in cash.  And that's

20  going to make direct cash distributions to borrowers with

21  allowed claims.

22      The purpose of that trust, Your Honor, is twofold.

23  The parties thought that it was very important to insulate

24  borrower recoveries from potential disruptions due to asset

25  values, to general unsecured claims amounts, or to the likely

1   post-confirmation litigation that we may be facing.

2          Second, and equally importantly, the objective was to

3   streamline the procedures for borrowers to receive

4   distributions by giving them cash rather than liquidating trust

5   units.

6          And third, the purpose of the trust was to enable the

7   borrower trustee to adopt procedures specifically tailored to

8   quickly and efficiently resolve the remaining borrower claims

9   through a process -- through a different process, Your Honor,

10  not through, obviously, having to come to court as a pro se

11  plaintiff and having to wind their way through the difficulties

12  of bankruptcy litigation.

13         In the disclosure statement, Your Honor, we said that

14  the treatment of borrowers under the plan was going to be fair

15  and reasonable, and we think that we will prove that through

16  the testimony of Mr. Kruger, Mr. Thompson who is the debtors'

17  general counsel, and through Mr. Friedman who is the special

18  borrowers' counsel.  And that testimony will show that we, in

19  consultation with the committee and special counsel, developed

20  a process to estimate the amount of remaining unliquidated and

21  unreconciled borrower claims.

22         And based on that analysis, the plan proponents

23  believe the amount of funding required to the borrower claims

24  trust is more than adequate to ensure that those creditors will

25  receive as much, if not more, than general unsecured creditors,

1    and that no further borrower true-up is required.

2              In addition, Your Honor, Ms. Hamzehpour will testify

3    that throughout the debtors' cases, they've worked with the DOJ

4    and FRB to ensure ongoing compliance with the governmental

5    consent orders.

6              And as Your Honor knows, obviously, we successfully

7    amended that consent order in June of this year, and 230

8    million dollars should now, if they didn't lose the checks in

9    the mail again, be in the hands of borrowers.

10             Next settlement in the plan, Your Honor, is

11   substantive consolidation.  Given the debtors' capital

12   structure and given the allegations that have been made in this

13   case about alter ego and veil piercing and the like, it's been

14   clear that some parties would be incentivized to seek

15   substantive consolidation of debtors' estates and obviously

16   other parties are incentivized to oppose it.

17             Mr. Kruger will testify that the debtors considered

18   various factors weighing both in favor of and against

19   substantive consolidation and concluded that that would just

20   simply be complex, time-consuming and expensive.

21             As part of the global settlement the parties agreed

22   that the estates would not be substantively consolidated.  That

23   resolution like the other settlements under the plan was

24   reached through the mediation process.

25             The next, and certainly the one that has generated the

1   most paper in this case, is the resolution and settlement of

2   intercompany balances among the debtors' estates, as well as

3   any subrogation claims and fraudulent conveyance claims related

4   to the debtors' forgiveness of sixteen billion dollars of

5   intercompany balances prior to the petition date.

6           The plan proponents will proffer the testimony of

7   Barbara Westman who is the debtors' controller regarding the

8   facts and records behind the intercompany balances.  The plan

9   proponents will also proffer the testimony of Mr. Kruger, Mr.

10  Dubel and Gina Gutzeit of FTI.  That testimony establishes that

11  the debtors and committee performed an extensive analysis of

12  the intercompany balances.  That's an analysis that goes back

13  to prior to the inception of this case, Your Honor.  And they

14  considered, among other things, whether these claims should be

15  treated as allowed claims, subordinated to other claims,

16  setoff, or treated as equity distributions or dividends.

17          The debtors' analysis which was shared with the

18  committee establishes that the intercompany balances lack many

19  indicia of true debt.  Ms. Gutzeit will testify that the

20  intercompany balances accumulated over the course of several

21  years and they are the results of tens of thousands of separate

22  book entries.  Most of the largest balances are not supported

23  by intercompany agreements, and the ones that were did not have

24  fixed maturity dates, interest rates, or repayment schedules.

25          THE COURT:  So let me just stop you there, because the

1   JSNs make strong arguments that at all times:  before the

2   filing of the petitions, after the filing of the petitions,

3   when the schedules were filed, that the debtors supported the

4   validity of all of the intercompany balances and that it was --

5   this is the position the JSNs have taken -- that it was the

6   committee refusing to engage in any plan that did not settle

7   intercompany claims.

8           You said affirmatively that the debtors -- it's been

9   the debtors' position that the intercompany claims are not

10  enforceable.  Could you just address that briefly now?  I'm

11  sure we're going to hear a lot of evidence and argument about

12  it, but I stop you here because you, at least in your opening,

13  make it sound as if the debtors have always questioned the

14  intercompany balances.

15          MR. LEE:  Your Honor, the evidence during the course

16  of this trial will be that we have, in fact, conveyed the

17  belief that I've described to the JSNs.  In fact, we conveyed

18  it to them pre-petition.  And Mr. Eckstein is going to get into

19  this --

20          THE COURT:  Okay.

21          MR. LEE:  -- in significantly more detail than I am.

22          THE COURT:  I'm trying not to interrupt you very much,

23  but on this point, because they spent so much time in their

24  section of the joint pre-trial order going through this in

25  great detail, that's why I wanted you to address it.

1           MR. LEE:  Your Honor, I think you'll see at least, and

2    this -- there was a very preliminary draft analysis that was

3    put together prior to the bankruptcy petition in which we were

4    meandering through the intercompany balances.  I mean, there

5    was an exercise taking place.  And it's certainly true that as

6    of that date, we thought that there were lots of reasons why

7    one could reach the conclusion that the intercompany balances

8    are enforceable, are not enforceable, lack indicia of debt,

9    don't lack indicia of debt.

10          But we think that when you take that together with the

11   company's pattern of pre-petition forgiveness of debt and the

12   fact that the entities in question simply lack the capacity to

13   repay that debt, those are factors.  So I think we were very

14   careful about our choice of words.  We've never taken the

15   position that the intercompany balances have no value.  What we

16   have said consistently is in connection with the global

17   settlement, given those infirmities, given the offsetting

18   claims that come through, it makes perfectly good sense to

19   resolve them.

20          That's part of the glue that holds the global

21   settlement together.

22          THE COURT:  You tell me when you're going to reach a

23   convenient time for a break.  I'll let you go on if you prefer.

24   I don't want to stop you at --

25          MR. LEE:  No, no; this is a perfect time to take a

RESIDENTIAL CAPITAL, LLC, ET AL.                            66

 1  break because I'm now going to turn to Ally.

 2          THE COURT:  Okay.  So let's take a 15-minute recess.

 3          MR. LEE:  Okay, thank you, Your Honor.

 4          THE COURT:  Thank you very much.

 5      (Recess from 10:28 a.m. until 10:52 a.m.)

 6          THE COURT:  Everybody be seated.

 7          Okay, Mr. Lee.

 8          MR. LEE:  Sorry.  Still good morning.  Gary Lee from

 9  Morrison & Foerster for the debtors.  Your Honor, I've just

10  been asked to make one housekeeping announcement.

11          San Bernardino taxing authority's  counsel asked us to

12  note on the record that -- this is docket number 5408, was

13  resolved by stipulation so she can be excused.

14          THE COURT:  Absolutely.

15          MR. LEE:  So just turning to the next plan settlement,

16  Your Honor, the next one is the allocation of the Ally

17  contribution.

18          The plan allocates the Ally contribution among the

19  debtor groups in various trusts established under the plan.

20  There it is on the screen.

21          The testimony with respect to the fairness and

22  reasonableness of that allocation is going to come from Mr.

23  Kruger and Mr. Dubel.  What that testimony is going to show,

24  Your Honor, is that each estate held multiple, complex, and

25  uncertain litigation claims against Ally; and the potential

1    recoveries could not be estimated easily.  The same holds true

2    for the dozens of third-party claims against Ally that were

3    pending in various courts throughout the country or that were

4    otherwise subject to tolling agreements.

5         And the testimony will also show that that really

6    isn't the end of the story.  What it will show is that any

7    attempt to allocate the AFI contribution to specific claims

8    would lead to endless interdebtor and intercreditor litigation.

9    Indeed the testimony will be that that is in one way what

10   doomed the original RMBS settlement from the start.

11        The evidence is going to show that the principals that

12   negotiated the global settlement took each of these facts into

13   account, determined it would be not just counterproductive but

14   entirely destructive to try to perform a bottoms-up valuation

15   of individual claims and allocate settlement amounts on that

16   basis.

17        THE COURT:  So you can allocate among debtor groups

18   but not among claims?

19        MR. LEE:  That's correct, Your Honor.

20        We believed that it wasn't feasible to allocate the

21   settlement on the basis of individual claims.  We're talking

22   about dozens, if not hundreds of claims, pending around this

23   country.

24        And we think, Your Honor, that it would have been

25   impossible not only to do a ground-up allocation -- sorry,

1   ground-up analysis of each of the individual claims, but that

2   in and of itself would have then trigger another round of

3   interdebtor and intercreditor disputes, fundamentally the same

4   issue that arose with respect to the RMBS settlement, the first

5   RMBS settlement, and the litigation that effectively flowed

6   from that.

7          I'm going to -- Mr. Eckstein is going to, I think,

8   discuss this point in greater detail during his opening.

9          The plan also allocates projected administrative

10  claims among the debtors groups, and that's on the slide.  Any

11  variation in actual expenses above or below the 1.086 billion

12  will be allocated to the liquidating trust.

13         Mr. Kruger and Mr. Dubel will testify that this

14  allocation is fair and reasonable.  Mr. Dubel's testimony will

15  be the principal testimony with respect to this issue.  What he

16  will testify to is that the allocation was the subject of very

17  significant negotiation and debate within the committee whose

18  members plainly had very divergent interests regarding where

19  the expenses would fall.

20         And the plan proponents will demonstrate that the

21  allocation that was ultimately agreed upon was the result of an

22  arm's-length negotiation.

23         So now we turn to --

24         THE COURT:  Before you turn to -- so what happens if I

25  conclude that the 2.1 billion Ally contribution has to be

1   allocated among claims?  The JSNs argue, cite various case

2   authority in support of it, that as difficult as it is in

3   certain circumstances, the court has to do it.  I'm not saying

4   that this is one of those circumstances; that remains for

5   decision.  But if I were to conclude that I did have to

6   allocate it, they say there are cases that analogize it to an

7   estimation proceeding.

8           What's the proponents' position as to what the

9   Court -- if the Court were to decide that the claim -- that the

10  contribution had to be allocated as to how it should be done?

11  And if Mr. Eckstein is going to address that, I'll wait.

12          MR. LEE:  Mr. Eckstein will address that.

13          THE COURT:  All right.

14          MR. LEE:  But the reality is, Your Honor, you can

15  confirm the plan.  The question, and it's effectively a phase 2

16  question of allocation, arises in the context of phase 2, you

17  can make a determination that the JSNs have a lien or have an

18  adequate protection claim and that definitely goes to the

19  question of whether they're oversecured or not.

20          It's not, in our view, Your Honor, it should not be a

21  plan confirmation issue.

22          THE COURT:  The plan can be confirmed with -- as with

23  the contribution just the way it is, broken up in three silos,

24  and if the JSNs are correct it would fall into an adequate

25  protection claim.  If that would make them oversecured, it will

1  make them oversecured.  Is that what you're telling me?

2          MR. LEE:  That's correct, Your Honor.  And obviously

3  there's an insurmountable hurdle to demonstrating that there's

4  an adequate protection claim at all.  But Mr. Eckstein's going

5  to address that.

6          THE COURT:  We'll deal with that separately.  And I'll

7  hear what Mr. Eckstein has to say.

8          MR. LEE:  That is absolutely the debtors' position,

9  Your Honor.

10          THE COURT:  Okay.

11          MR. LEE:  Your Honor, let me just move on now to,

12  sorry, the third-party claims against Ally, which obviously is

13  a central part of the story.

14          In addition to resolving all of the complex

15  interdebtor intercreditor disputes, the plan also resolves

16  estate and third-party claims against Ally, claims that people

17  have spent hundreds or thousands potentially of hours

18  analyzing.

19          And after months of hard-fought negotiations in front

20  of Judge Peck, Ally agreed to contribute 2.1 billion dollars

21  into the estate.  The testimony --

22          THE COURT:  That covers not only third-party claims,

23  but debtors' claims.

24          MR. LEE:  That's correct, Your Honor.

25          The testimony, obviously, Your Honor, is -- and

1   leaving aside the issue of releases and exculpation, there's

2   nobody that's actually objected to the sufficiency of the Ally

3   contribution as it relates to the release of the estate claims

4   or the allowance of the consenting claimants' claims and

5   amount.  It simply goes to either the allocation or the

6   priority with which those claims are treated.

7           Obviously, Your Honor, the testimony from Mr. Kruger,

8   from Mr. Dubel, from Mr. Renzi and others is going to establish

9   that the proposed Ally contribution will materially enhance, by

10  multiples, the over consideration that's being provided to the

11  debtors' creditors.

12          And obviously, without the Ally settlement, the

13  ensuing Ally litigation, the resulting indemnification claims

14  that Ally has against the estates, will take -- and this is a

15  certainty, years to conclude and cost hundreds of millions of

16  dollars.  And again, we'll be left with intercreditor issues to

17  resolve on top of that.

18          So, Your Honor, if I may now just turn to the

19  releases.  I'd like to address first the debtor release.

20  Approval of the debtor release is governed by the best interest

21  of the estate standard.  And as far as I'm aware, nobody is

22  challenging the debtors' releases under the plan, which are

23  standard in a case like this one.

24          The testimony in support of the debtor release will

25  come from Mr. Carpenter, Mr. Kruger and Mr. Dubel, and they

1   will establish the debtor release of Ally and its affiliates is

2   a key part of the Ally settlement under the plan, and in fact,

3   it's a cornerstone of the plan.

4           The evidence will show that the release in favor of

5   the consenting claimants is a fair concession made in order to

6   resolve the interdebtor and intercreditor disputes under the

7   plan.

8           And then, finally, Mr. Kruger and Ms. Hamzehpour will

9   establish that the release in favor of the directors, officers

10  and employees of the debtors is reasonable in light of their

11  agreement to forego not just their rights to indemnification,

12  but also to the insurance proceeds.

13          So that, Your Honor, takes us to the third-party

14  release.  And objections to the third-party release are being

15  pressed by three parties:  the JSNs, Wachovia, and Wells Fargo

16  and as collateral agent.

17          There are two principal bases for those objections,

18  the first being that the Court lacks jurisdiction to grant the

19  third-party release.

20          I think that's probably the easiest one to deal with,

21  Your Honor.  Under Manville, under Quigley, and as this Court

22  held in Trinsum this year, if ever there were a case in which

23  the Court has subject-matter jurisdiction to grant third-party

24  releases, this will be it.

25          Ms. Hamzehpour from the debtors and Mr. Blumentritt

1    from Ally will testify that the claims covered by the third-

2    party release most definitely affect the bankruptcy estate in

3    several ways.

4         In addition, there is an identity of interest with

5    respect to the claims that are subject to the third-party

6    release.  That's reflected by the fact that AFI has filed, I

7    believe, it's ninety-six proofs of claim against the debtors

8    that assert indemnification claims.

9         So the evidence will show six things.  First, that the

10   debtors have indemnification obligations to Ally and its

11   affiliates under the operating agreement.  Second, that the

12   debtors' current and former officers and directors are entitled

13   to indemnification from ResCap for a broad variety of claims.

14        Third, the debtors have indemnification obligations to

15   Ally securities pursuant to various underwriting agreements.

16   Fourth, Ally Bank has indemnity rights against GMAC Mortgage

17   under various custodial agreements.

18        Fifth, the debtors' current and former officers and

19   directors are entitled indemnification from Ally under AFI's

20   certificate of incorporation.  So to the extent that Ally

21   incurs costs with respect to the liabilities arising from the

22   operations and businesses of the debtors, then they're going to

23   turn back around and seek indemnification under the operating

24   agreement.

25        And sixth --

1        THE COURT:  And they filed proofs of claim for all of

2   that?

3        MR. LEE:  That's correct, Your Honor.

4        And sixth, Your Honor, Ally and the debtors share

5   insurance policies which provide coverage for the claims

6   subject to the third-party releases.  Those proceeds,

7   obviously, Your Honor, are estate assess.  And allowing third-

8   party claims to continue against Ally will diminish that asset.

9   And as I've mentioned, as part of the global settlement, the

10  directors and officers have agreed to waive their right to

11  insurance proceeds and to contractual indemnification.

12       So taken together, those factors, we think, clearly

13  indicate that the claims that are subject to the third-party

14  releases will impact the rest of the debtors' estate and as a

15  result the Court has jurisdiction.

16       So that, Your Honor, really takes us to the Metromedia

17  factors, the nonjurisdictional objection to the -- by the three

18  objecting parties.

19       I'm not going to address Metromedia.  But let me just

20  address the factors and why the evidence will show that each of

21  those factors have been met.

22       I think it's incontrovertible, Your Honor, that the

23  first factor, substantial consideration, has been provided by

24  Ally in these cases.  I think as Your Honor noted in connection

25  with the phase 1 trial, that may have been during the closing

RESIDENTIAL CAPITAL, LLC, ET AL.                         75

1    arguments, the debtors were in a very precarious position on

2    the petition date.  And our ability to maintain, much less

3    maximize the value of our assets, depended on our ability to

4    maintain the trust and support of the GSEs, the DOJ and the AGs

5    and the Fed.  And it's quite clear that but for the fact that

6    substantial contributions were made by AFI as we entered into

7    the case, we wouldn't have been able to maintain those

8    relationships and agreements.

9            So we believe that the evidence shows that the

10   contributions include much more than the 2.1 billion dollars in

11   funding that a nondebtor is giving here to settle claims.

12           THE COURT:  But they made those earlier contributions

13   without any assurance whatsoever that they were going to get a

14   third party nondebtor release.

15           MR. LEE:  That's absolutely correct, Your Honor.  We

16   were quite careful to tie the provision of those contributions

17   away from the obligation to effectively execute on the PSA.  It

18   was certainly understood between the parties that was something

19   that the debtors were going to be looking to do.  But at the

20   end of the day when that PSA expired, Ally had provided all of

21   those contributions.

22           But I would remark, Your Honor, that 2.1 billion

23   dollars will go very, very far here.  The settlement --

24           THE COURT:  My only question is whether any prior

25   contributions count toward the Metromedia standard.

1          MR. LEE:  Well, Your Honor the --

2          THE COURT:  Because those were made without any

3    assurance that they'd get a third-party release.

4          MR. LEE:  The second point, Your Honor, I accept that

5    it was made without that.  It was certainly made with the

6    expectation, it was certainly made with the hope that they

7    would get a third-party release.

8          But I think that the substantial consideration test

9    looks at the consideration provided by the party during the

10   course of the case.  So we can, in my view, look not just to

11   the settlement consideration, but the fact that but for that

12   consideration, during the life of the case, we wouldn't be

13   where we are --

14         THE COURT:  At an appropriate time you'll provide me

15   with some authority that supports that.

16         MR. LEE:  I will, Your Honor.

17         We don't think that the second Metromedia factor is

18   relevant here.  Under the plan, the vast majority of the claims

19   are being settled and the JSNs are being paid in full.

20         We are not aware of any viable claims against Ally

21   that are being released under the -- that are not being

22   released under the plan.  Because there are no claims of

23   identifiable value that are being released without payment,

24   there is nothing to channel.

25         I think I can skip the third part of the task.

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1          Regarding the fourth part of the Metromedia factors

2    with respect to an overwhelming majority of the creditors, the

3    third-party claims have been settled and they're effectively

4    being paid through the plan.  So in effect they're being paid

5    in respect of those claims.

6          And now finally, though, with respect to the final

7    Metromedia factor, the third-party releases are now almost

8    entirely consensual.  Indeed it's hard to figure out what's

9    left with respect to the third-party release apart from the

10   JSNs, which Mr. Eckstein will address in some detail, and two

11   other parties, neither of whom, by the way have identified any

12   valid concrete claims.  So we think that that factor weighs in

13   favor of the third-party release.

14         So what's left?  As I said, Mr. Eckstein will address

15   the junior secured notes, so I will address the other two

16   objections.

17         The first is the objection by Wells Fargo as

18   collateral agent for the junior secured noteholders.  I think

19   that I've made this point before, Your Honor.  It's an

20   objection that effectively arises from the JSN objection.  It's

21   an objection that arises from the findings in relation to --

22   potentially arising in connection with phase 1.

23         What Wells argues is that the JSNs might choose to sue

24   them, and in that event Wells Fargo might have some claims as

25   yet to be identified.  And that they have those claims, if they

1    have them at all, against the directors and officers of the

2    debtors who delivered the officers certificates and the

3    debtors' counsel who delivered the opinions upon which Wells

4    Fargo relied in releasing the collateral.

5            In its objection Wells goes into great detail as to

6    the many reasons why this hypothetical lawsuit will, could and

7    should not ever take place, including the fact that the

8    governing agreements waive any holders' rights to sue Wells,

9    and Wells is explicitly entitled under the documents to rely on

10   the officers certificates and the opinions of counsel.

11           In fact, despite pursuing scorched earth litigation

12   against the debtors and the plan, I don't believe that the JSNs

13   have actually ever asserted they could have claims.

14           THE COURT:  I thought they did.

15           MR. LEE:  Maybe.  Is that correct?

16           I've not understood that to be the case, but perhaps

17   they have -- believe they have that claim, too.

18           We don't see the possibility of a claim being asserted

19   against Wells.  And even if there was a lawsuit brought against

20   Wells, Wells' contractual indemnity claims, if they have any,

21   rest against the debtors under the documents.  There's no right

22   to seek an indemnity from the debtors' officers and directors

23   or counsel.  And in fact they don't articulate a single basis

24   for a claim that they have against those individuals.

25           So given that they can't identify a single contractual

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1   provision or theory upon which they could hold the debtors'

2   officers and directors liable, it seems to me that the best way

3   to address this, if there is an indemnity claim against the

4   debtors, as opposed to the directors and officers, is that

5   those claims could be estimated --

6          THE COURT:  I was just going to ask that.  I mean,

7   isn't this -- sort of it's an unliquidated claim --

8          MR. LEE:  Correct.

9          THE COURT:  -- and if it needs to be estimated, it may

10  be estimated at zero, but it needs to be estimated.

11         MR. LEE:  Well, Your Honor, we believe that the claims

12  are invalid and either it should be estimated at zero or

13  disallowed under 502(e).  We will take the position that we

14  don't believe a reserve is appropriate, at least as of today.

15         That, Your Honor, leads us to what in a relatively

16  strange case is perhaps the single strangest objection we've

17  had in this case, and that's the objection from Wachovia as

18  successor to Wells Fargo.  This is what we call the dog who

19  barked in the night objection, which is the reference to the

20  Sherlock Holmes story in which the curious incident that Holmes

21  observed was in fact that no incident had ever occurred.

22         As far as I can remember, Your Honor, we closed our

23  Wachovia accounts one month after the petition date with no

24  amounts owed to Wachovia.  I understand that Wachovia's counsel

25  has incurred 850,000 dollars in legal fees, which the debtors

1  have no obligation to reimburse, in an attempt to argue for

2  adequate protection for a closed account.

3          I also understood that Wells -- sorry, Wachovia, has

4  collected 472,000 dollars from AFI for those fees by sweeping

5  one account, and is opposing the third-party release because it

6  could be read to discharge the claims against AFI for the

7  remaining fees.

8          The fact that Wachovia has incurred additional

9  unjustified legal fees in this case --

10          THE COURT:  Who are their counsel?

11          MR. LEE:  What's that?

12          THE COURT:  Who are their counsel?

13          MR. LEE:  Winston & Strawn, Your Honor.

14          I'm not going to gild the lily, Your Honor, but I'd

15  also note that Wachovia is going to compound its folly.  It's

16  noticed its intent to cross-examine eight witnesses.

17          I'm just going to move on.

18          So the last point, Your Honor, obviously with respect

19  to the third-party release plan, to say that the third-party

20  release is important to the plan is an understatement.  AFI has

21  been steadfast that if it's going to make a contribution in

22  terms of cash, it's contingent on receiving a third-party

23  release, and that evidence will come from Mr. Carpenter, who

24  will be here to testify.

25          The evidence will be that the releases are integral to

1   the plan because, quite frankly, nobody is going to provide

2   billions of dollars to fund settlements of Chapter 11 debtor

3   without a broad release.

4           We believe that the combination of unprecedented

5   claims and exceptional contributions yields the unusual

6   circumstances that the Second Circuit requires under

7   Metromedia.

8           Your Honor, I was going to address the exculpation

9   provisions of the plan.  Your Honor, no party is pressing an

10  objection to of the plan exculpation provisions as amended, and

11  that includes the U.S. Trustee's Office, most importantly, and

12  the Department of Justice.

13          So unless Your Honor has any questions, we now have

14  consensual exculpation provisions in the plan.

15          THE COURT:  If you need to address it in closing

16  argument, you will.

17          MR. LEE:  I will, Your Honor.  I'm obviously happy to

18  do it now.

19          THE COURT:  I know.

20          MR. LEE:  Your Honor, the only other provision that

21  I'd like to refer you to is Article 9(k) of the plan, which is

22  the judgment reduction provision.

23          The only observation I'd like to make is that that

24  language was negotiated by the institutional defendants in the

25  investor related securities litigation and numerous plaintiffs

1    on the other hand.  It's consistent with language in other

2    plans, and also language has now been added to the plan to

3    resolve the Deutsche Bank objection.  So that is now entirely

4    consensual.

5            So in closing, Your Honor, we obviously would have

6    preferred to come to you with a hundred percent consensual

7    plan.

8            Given at least the JSNs' strategy of contesting

9    everything and conceding nothing, we've known for some time

10   that we were going to be needed -- that we would need today to

11   justify and defend every single component of this plan.  And I

12   won't say that I've been grateful for the experience or the

13   waste of time or the expenditure.  But I am confident that over

14   the next several days we will present a case that will allow

15   Your Honor to conclude that this plan, which has near universal

16   support from our creditors, is confirmable in every single

17   respect.

18           Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Lee.

20           Mr. Eckstein?

21           MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

22   Eckstein of Kramer Levin.  Counsel for the official committee

23   of unsecured creditors.

24           First I guess I should observe I now have the sense of

25   how Mr. Horowitz felt at the end of the phase 1 opening.

1    Hopefully I'll have adequate time to go through what I think

2    are some important issues that need to be covered in connection

3    with the confirmation hearing and the phase 2 issues.  I'll try

4    to --

5              THE COURT:  I'm mindful of the time, but I didn't set

6    the same limits that we had in phase 1.  So go ahead.

7              MR. ECKSTEIN:  I appreciate that, Your Honor.

8              Let me begin, Your Honor, again, I also would like to

9    thank the Court and the court staff and also acknowledge Mr.

10   Lee and the Morrison & Foerster team and Mr. Kruger and the

11   extensive degree of cooperation and coordinated effort that has

12   gone into trying to present to the Court and to the entire case

13   what now I'm very pleased to say is, with the exception of some

14   important issues that we'll deal with with the JSNs,

15   essentially a fully consensual plan, and that is something that

16   I personally feel pride in being able to participate in and I

17   think it's worthy of acknowledging the whole array of

18   participants who've gotten us this far.

19             Your Honor, Mr. Lee has described and I endorse the

20   remarkable achievements that are reflected in the plan.  Mr.

21   Lee described the provisions of the plan and how it satisfies

22   the Bankruptcy Code's requirement for confirmation, and we are

23   fully in agreement with the fact that once Your Honor hears the

24   evidence over the next several days, that Your Honor will, in

25   fact, be satisfied and be comfortable that this plan fully

1   satisfies all of the provisions of the Bankruptcy Code and all

2   the requirements of 1129 and the relevant case law and the

3   applicable legal standards that are necessary for the Court to

4   confirm the plan as proposed.

5          Mr. Lee has also described the global settlement and

6   why viewing it as a whole or viewing each of the elements in

7   the global settlement, the Court will determine that the global

8   settlement and its elements are well within the bounds of

9   reasonableness and can be approved by the bankruptcy Court both

10  under the 1129 standards and under 9019.

11         Your Honor has heard the painstaking arm's-length

12  negotiation process that led to overwhelming creditor support

13  for the plan, support that is as close to unanimity as one

14  could hope for in a case of this size and complexity.

15         And Your Honor has heard Mr. Lee address the handful

16  of remaining objections to limited aspects of the plan, and we

17  concur with the view that those objections, to the extent they

18  still exist, should be overruled.

19         What remains and what I intend to focus on this

20  morning are the objections to confirmation brought by the JSNs,

21  the latest effort in a campaign to try to obtain post-petition

22  interest, even though based on the Court's rulings to date it's

23  clear to us that the JSNs are substantially undersecured, not

24  entitled to an adequate protection claim, and thus not entitled

25  to more than is provided for in the plan that is on file.

1        The Court has described this campaign, I think with

2   elegant understatement, as unfortunate, and to understand I

3   think where that comes from, it is worth spending a few

4   moments, I think, reviewing the context that we find ourselves

5   in.

6        These cases, as Your Honor I think knows full well,

7   presented virtually unprecedented challenges, combining a

8   complex financial bankruptcy with a mortgage industry mass

9   tort, in some respects a perfect storm of a financial and

10  litigation chaos.  Before the cases began, the debtors, as Your

11  Honor heard, spent months pursuing settlements to narrow the

12  areas of dispute and ease their transition into Chapter 11.

13       But the pre-petition settlements the debtors achieved,

14  were anything but global.  They reflected relatively little

15  consensus among the major creditor groups and left massive

16  issues open to be addressed through the bankruptcy process.

17       The majority of creditors actually opposed the 750-

18  million-dollar pre-petition settlement with AFI.  The majority

19  of creditors did not support the RMBS settlement, which

20  addressed only a portion of RMBS liabilities and was being

21  prosecuted outside of the context of an overall resolution and

22  consensual plan.

23       The pre-negotiated plan did nothing to resolve

24  billions of dollars of monoline claims.  It did nothing to

25  resolve the RMBS securities claims, including more than 2.4

1   billion in private securities claims, more than 13 billion in

2   class action claims, several billion dollars in claims asserted

3   by the FHFA and others.

4           It did not have the support of the holders of more

5   than a billion dollars in ResCap's senior unsecured notes.  It

6   did not address millions of dollars in individual and class

7   action borrower claims.  It did not address liabilities arising

8   from various investigations and enforcement actions by

9   government regulators, such as the Department of Justice

10  settlement and the FRB consent order.

11          And the pre-negotiated plan would have left a de

12  minimis recovery for unsecured creditors, and even that

13  recovery would have been received only after dramatic expense

14  and delay litigating the open issues.

15          Now what was unique to this case was that every major

16  constituency of unsecured creditors held or relied on

17  contingent litigation claims.

18          In addition, each creditor constituency was pursuing

19  claims directly against AFI, and therefore was going to be

20  opposed to the attempt to receive a third-party release.

21          Many of the issues had already been the subject of

22  years of litigation without resolution, others had been

23  simmering but were certain to break-out before these cases

24  could conclude.  All told, years of well-funded wide-scale

25  court battles in jurisdictions around the country seemed

1    inevitable when these cases were filed and before we could get

2    to a resolution.

3            In short, as Your Honor has observed, as Mr. Lee has

4    observed, the debtors were near the precipice of an abyss of

5    litigation that would have taken years to resolve, cost

6    hundreds of millions of dollars, destroyed value that could

7    have been achieved for constituents of the debtors' estates.

8            The experience teaches us that litigation-driven cases

9    like this one, with this kind of complexity, cases like Dow

10   Corning or Owens Corning or W.R. Grace or ADelphia, have each

11   taken years and years and hundreds of millions of dollars to

12   resolve.

13           Ironically, the debtors' pre-petition agreements had

14   the support of the only creditor group that in fact is now

15   objecting to the plan, the JSN ad hoc committee, which had

16   agreed pre-petition to accept payment of the face amount of its

17   claims payable over several years, waive post-petition

18   interest, waive any interest --

19           THE COURT:  December 2012.

20           MR. ECKSTEIN:  That was premised upon December 2012,

21   that is correct -- waive any interest in intercompany balances,

22   as long as its secured claim was being paid, and supporting a

23   750-million-dollar settlement with AFI.

24           Remarkably, the global settlement in the plan, which

25   was achieved as Your Honor knows only twelve months after this

1    case began, avoids the litigation meltdown.  It relies on a

2    2.1-billion-dollar settlement from AFI and the unique powers of

3    the Bankruptcy Code and the bankruptcy court to cut through the

4    litigation morass, bring all parties together, resolve

5    consensually under one umbrella a remarkable array of

6    overlapping, conflicting, and competing claims.

7            And by resolving all these claims now, with almost

8    unanimous consensus, the plan delivers markedly improved

9    treatment for every constituency over what would have been

10   available under the earlier settlement or what would be

11   available in the alternative after years of litigation delay,

12   if this plan were not confirmed.

13           The centerpiece of those resolutions and indeed the

14   plan itself is the comprehensive global release for Ally of

15   potential liabilities to the estates and related liabilities to

16   third-parties in exchange for a 2.1-billion-dollar plan

17   contribution.

18           Your Honor will hear directly from Mr. Michael

19   Carpenter, AFI's CEO, that global resolution or closure to the

20   ResCap related litigation was always AFI's goal and their

21   requirement for a settlement.  AFI simply was not willing to

22   settle individual estate claims in the absence of global peace.

23           Mr. Kruger, the debtors' CRO, will testify that

24   closure for Ally was in the debtors' interest as well. Because

25   the myriad claims against Ally and against the estates are

1    inextricably intertwined with judgments against one party

2    potentially leading to indemnification or competing insurance

3    claims against others.  As a result, a global resolution

4    benefits all stakeholders.

5            Your Honor will also hear testimony that confirms that

6    Chapter 11 was the only viable avenue for achieving this global

7    resolution.  This Court was and is the indispensable forum for

8    this resolution.

9            As with most mass torts, global consensus resolving

10   the litigation from the mortgage meltdown simply could not have

11   been achieved through the unmanaged civil litigation carried

12   out in numerous state and federal courts throughout the

13   country.  But that didn't mean that it was going to be easy or

14   simple to achieve consensus in bankruptcy either.

15           Your Honor made clear from the beginning of this case

16   that any attempt to obtain complete closure through third-party

17   releases was going to face close scrutiny, applying the tough

18   Metromedia standard for non-debtor releases in the Second

19   Circuit.  Your Honor addressed this precise point in several of

20   the earliest hearings in this case, and Your Honor's

21   admonitions have guided our efforts as we developed the plan

22   and approached confirmation, and motivated the overwhelming

23   consent that is now subject to this confirmation hearing.

24           The committee believed that the pre-petition

25   settlements did not meet the high standards applicable to

1   either an estate or third-party release, and that a third-party

2   release would be appropriate only when there was a

3   comprehensive settlement that provided a material recovery to

4   creditors and garnered near unanimous creditor support.  As Mr.

5   Lee acknowledged, the original settlement didn't accomplish

6   that.  This one does.

7           By this time, the Court is familiar with how this

8   global resolution was achieved.  Mr. Lee has described in great

9   detail the process from the debtors' perspective.  I'd like to

10  briefly supplement Mr. Lee's comments with a description of

11  some of the evidence the Court will hear regarding how the

12  consensus was achieved from the vantage point of the committee

13  and the consenting claimants.

14          The comprehensive record in this case will provide an

15  ample basis for approving the plan and the global settlement.

16          Your Honor will hear from Mr. John Dubel, the CEO and

17  chairman of the board of FGIC and co-chair of the creditors'

18  committee.  Mr. Dubel will describe the unique role played by

19  the committee in every aspect of this case.

20          Mr. Dubel explains that each of the major unsecured

21  creditor constituencies was represented on the creditors

22  committee:  the RMBS trustees, two monolines, two securities

23  claimants, the trustee for the HoldCo bonds, and a

24  representative of borrowers.

25          Each committee member had its own claims against the

1  debtors and AFI, and their constituencies were all naturally

2  competing with each other over the amount and priority of

3  claims.  Each committee member was well armed with its own

4  experienced counsel and in some cases its own financial

5  advisor.

6          And while the committee room provided the source for a

7  great deal of potential creditor in-fighting, it also provided

8  a unique forum for the type of consensus that only a bankruptcy

9  case can achieve.  The committee's approach to this case would

10  have an important impact on its direction and timing.

11          Mr. Dubel will testify that following the conclusion

12  of the debtors' asset sales, the committee saw a window of

13  opportunity to pursue a consensual resolution at a relatively

14  early stage of the case before the cases devolved into what

15  appeared to be inevitable endless litigation.

16          The RMBS trust settlement which had already been

17  subject to extensive discovery and was heading to a contested

18  hearing would have only been the beginning.  Litigation

19  involving every category of creditor claim and multiple

20  intercreditor and interdebtor issues seemed inevitable.

21          Recognizing this risk, the debtors and the committee

22  took steps to defer the litigation, at least for a short time,

23  in hopes of reaching a consensual resolution, agreeing, among

24  other things, to the appointment of a mediator, to the

25  appointment of a chief restructuring officer and to

1   appropriately limited extensions of exclusivity.

2          And Your Honor recalls that the Court reluctantly

3   agreed to adjourn the RMBS trial one further time into the

4   spring to see whether or not a resolution possibly could be

5   achieved.

6          Mr. Dubel will testify regarding the complex dynamics

7   the committee faced.  Broad creditor support for a

8   comprehensive settlement was not attainable without a

9   substantial increase in Ally's contribution to settle both

10  estate and third-party claims.  But it was recognized that the

11  best way to maximize Ally's contribution was for the committee

12  to build consensus and to be able to offer Ally a reliable

13  global resolution of all estate and third-party claims, a

14  result that had been unachievable prior to the bankruptcy and

15  impossible during the case without creditors coalescing and

16  delivering broad creditor support.  The committee's challenge

17  was to figure out how to break that circle.

18         Mr. Dubel will describe how to break the logjam, the

19  committee sought to inform itself and its members regarding

20  each category of claims and issues in this case so the parties

21  would have a sophisticated understanding of the upside and

22  risks of each of their positions.

23         Mr. Dubel will also testify about the thousands of

24  hours the committee and its professionals devoted to

25  investigating the claims against Ally in a parallel path with

1    the examiner and how these efforts provided the foundation that

2    enabled the committee to actively engage with Ally beginning

3    with a formal exchange of legal and factual positions in early

4    2013.

5            Those exchanges were very important, were very

6    substantive, and provided a real substantive platform for the

7    mediation that followed.

8            Ultimately, as the Court is aware, the global

9    settlement was achieved through the confidential mediation

10   process skillfully led by Judge Peck.  Mr. Lee has already

11   spoken at length about the reasonableness of the global

12   settlement and the plan that embodies it.  And the results do

13   truly speak for themselves.

14           First, the broad support embodied in the PSA, and now

15   the overwhelming consensus evident from the voting results.

16   This near unanimity by itself is powerful evidence that almost

17   by definition the global settlement is fair and within the

18   range of reasonableness.

19           No group is completely happy and consensus remains

20   fragile.  That's the hallmark of most good settlements.  Every

21   party did make significant concessions in this case.  Everyone

22   agreed to forego their litigation rights, which they all felt

23   strongly about that might have helped maximize their own

24   individual recoveries or their own defenses, but what

25   ultimately deprived of a global consensus.

1        The upshot is that representatives, almost every

2    creditor constituency, and practically all the debtors'

3    individual creditors agreed to resolve their claims as part of

4    the global settlement, with the exception of the JSNs.  And

5    it's in this context that the JSNs' remaining objections will

6    be evaluated.

7        So let me turn, Your Honor, if I may, to the JSN

8    treatment and to their objections.  The JSNs did not join in

9    the global settlement.  Nonetheless, in a practical attempt to

10   address their secured claim and their unsecured deficiency

11   claims, the consenting claimants agreed to provide the JSNs

12   plan treatment that was better than the treatment they agreed

13   to in their pre-petition PSA and designed to avoid a major

14   dispute by paying them their full pre-petition claims in cash

15   on the effective date.

16       The plan provides that the JSNs would receive post-

17   petition interest on their claims if and to the extent the

18   Court determines that the JSNs are oversecured.

19       The recent phase 1 ruling has confirmed, as Your Honor

20   well knows, as the plan proponents believed when the plan was

21   formulated, that the JSNs are significantly undersecured.

22       In the phase 1 trial the Court held that the JSNs'

23   allowed claim is 2.22 billion dollars, but that the effective

24   date value of their collateral, subject to any potential

25   adjustment in phase 2 is 1.904 billion.

1        The Court also found that the JSNs had failed to meet

2    their burden of proving either the value of their collateral on

3    the petition date, or an overall aggregate diminution of value

4    during the cases, and thus were not entitled to an adequate

5    protection claim based on phase 1.

6        Therefore, under the plan, the JSNs will receive 1.904

7    billion dollars, less the payments that have been made to the

8    JSNs during the case, in respect of their secured claim, and

9    318 million dollars in the aggregate from the several

10   deficiency claims allocated between ResCap, RFC and GMAC.

11       It's important to recognize what this treatment means.

12   The JSN secured claim will be paid in full in cash on the

13   effective date.  That's despite the fact that more than 500

14   million dollars of JSN collateral will still need to be

15   liquidated by the liquidating trust post-effective date.

16       The debtors' estate and the liquidating trust is

17   fronting 500 million dollars to cash out the JSNs, again

18   originally in the hope that that was going to yield a

19   consensus.

20       Furthermore, unlike other unsecured creditors in this

21   case, the JSNs are receiving full payment of their deficiency

22   claims in cash on the effective date rather than a percentage

23   of their claim through trust units.  The accelerated payment of

24   the secured claim and the deficiency claims are being funded

25   almost entirely out of the proceeds of the AFI settlement.

1    To suggest that the JSNs are not benefiting directly

2  and significantly from the AFI settlement is disingenuous and

3  blind to the facts of this case.  Even if the Court concludes

4  that the JSNs are entitled to some additional secured recovery

5  as a result of phase 2, the JSN collateral value and secured

6  claim would have to increase by more than 318 million dollars

7  before their recovery would change from what they're being

8  provided under the plan.

9    The plan proponents, Your Honor -- this is an

10  important point -- the plan proponents anticipate that the JSNs

11  were substantially undersecured and the resolutions that are

12  built into the global settlement were done in contemplation of

13  the fact that even if we were off by ten, twenty, thirty,

14  forty, fifty million dollars, those adjustments would not

15  ultimately change the conclusion that the JSNs are

16  undersecured, and therefore the treatment in the plan was

17  better than what they would have received as unsecured

18  creditors and paid them in full.

19    THE COURT:  Are you going to address their argument

20  that they're entitled to sixty million dollars in fees even if

21  they're under secured?

22    MR. ECKSTEIN:  I will address that argument later,

23  Your Honor.

24    THE COURT:  And they also say they can reduce their

25  claims against some debtors so that they're oversecured there

RESIDENTIAL CAPITAL, LLC, ET AL.                              97

1    and get post-petition interest that applies -- I must say I

2    hadn't seen this argument before I read their papers, but --

3            MR. ECKSTEIN:  Your Honor, that's a new argument for

4    me as well.  The fees, Your Honor, the position we take in our

5    papers is that unless they are oversecured, they're not

6    entitled to fees.  And in any event the fees are subject to

7    reasonableness.  And on both bases, we don't believe --

8            THE COURT:  Okay.

9            MR. ECKSTEIN: -- that fees in connection with the JSN

10   phase 1 or phase 2 litigation should be allowed in this case.

11   And certainly if they're undersecured, they're not entitled to

12   it as a matter of law.

13           In terms of the second argument that you can be

14   oversecured by being undersecured, which I think Mr. Lee

15   addressed, we believe that's inconsistent with the Bankruptcy

16   Code and it's inconsistent with Timbers.  We address it in the

17   briefs and I think we can address it more fully.

18           THE COURT:  Okay.

19           MR. ECKSTEIN:  But it's an issue that we frankly think

20   is without any Bankruptcy Code or case law support.

21           Let me talk about the objections that we have tried to

22   grapple with and that we've taken very seriously.  And I think

23   Your Honor appreciates that at great expense to everybody, all

24   the parties and the Court have taken the JSN objections with

25   the utmost seriousness.

1          Rather than accepting the favorable treatment built

2    into the plan, the JSNs have used the certainty of their plan

3    treatment unfortunately as a platform for a barrage of no holds

4    barred litigation designed to come up with some theory, and

5    there are many theories, to support the claim that they are

6    over secured.

7          Having exhausted their claims in phase 1, they now

8    present variations ever these themes in phase 2, advancing a

9    multitude of legal theories in their 49-page plan objection and

10   119 pages of pre-trial contentions.

11         But despite their efforts to complicate the analysis,

12   the JSNs' opposition really boils down to two relatively

13   discrete arguments, relating to the plan's treatment of inter-

14   company balances and the AFI contribution.

15         In addition, because the JSNs have never dreamed up an

16   issue they don't love, they advance an assortment of minor

17   arguments, the two Your Honor just mentioned -- for example,

18   they argue best interest, even though they're being paid in

19   full, they make an indubitable equivalent argument, and they

20   raise the argument that somehow the debtor is precluded as a

21   matter of law from settling claims that might be subject to

22   subordination under 510(b).

23         Mr. Lee has addressed those.  Since I may not want to

24   come back to it later, the notion -- the notion that this

25   estate is confronted with many, many billions of dollars of

1    potential securities claims, where Your Honor was about to hear

2    a summary judgment motion hotly contested, on whether these

3    claims were going to be subordinated or allowed as general

4    unsecured claims, the debtor rather than litigate and frankly

5    expose this estate to twenty billion dollars of additional

6    unsecured claims that would have overwhelmed the unsecured

7    claim pool, the debtor as has resolved the securities claims in

8    an eminently reasonable fashion.  And as Mr. Lee points out,

9    the third-party claims against AFI have nothing to do with

10   subordination, and the consideration that's being paid clearly

11   was being paid substantially in respect of third-party claims.

12        The suggestion that this debtor is precluded from

13   compromising and reasonably settling claims that might be

14   subject to subordination, we believe, is frivolous, in addition

15   to the fact that we think Your Honor has already ruled on that

16   in connection with the FGIC trial.

17        Now, the two main issues raised by the JSNs are -- and

18   I think I may have actually a couple of slides, because I

19   didn't want to be left out -- the two main issues are, one,

20   whether waiver of the intercompany balances as part of the

21   global settlement was reasonable and triggers any claim for

22   adequate protection to compensate the JSNs for the loss of any

23   purported collateral.  That's the intercompany balances claim.

24        Two, whether the Court can approve of the global

25   settlement without allocating the Ally contribution to a

1    particular debtor and third-party claims against Ally.  If the

2    Court determines that it is required to or needs to allocate,

3    the Court has to determine whether the JSNs, in fact, have a

4    lien on any portion of the Ally contribution -- a very

5    important step -- then whether the lien has any value, and

6    whether the JSNs are entitled to any compensation for the

7    release of the lien, in addition to what they are receiving

8    under the plan.

9           I think that captures the issues that we have to deal

10   with and I will address those.

11          Let's turn to the intercompany balances.

12          Over the next several days, the plan proponents will

13   demonstrate, number one, that the waiver of the intercompany

14   balances as part of the global settlement was eminently

15   reasonable.  Number two, that the JSNs failed to meet their

16   burden of showing either that they have a lien on the

17   intercompany balances or the value of any such lien.  And

18   number three, the JSNs have failed in their burden to establish

19   that the waiver of the balances resulted in an aggregate

20   diminution in value of the JSNs' collateral for purposes of

21   adequate protection.  And I know Your Honor is very familiar

22   with the burden in the adequate protection issues.

23          I think it's worth spending a few minutes to put this

24   intercompany balance issue into context.

25          The evidence will show that intercompany balances have

1   never been viewed by any constituency in this case as real

2   enforceable claims that any party expected would be paid.

3   Rather, the evidence will show that they were bookkeeping or

4   general ledger entries maintained in compliance with GAAP by

5   the debtors in order to track cash and noncash assets as they

6   moved throughout the ResCap system.  There were virtually no

7   documents memorializing tens of thousands of entries and

8   billions and billions of dollars of transfers, sometimes

9   several billion dollars moving up and down from one subsidiary

10  to another in a matter of hours.

11         The evidence will confirm intercompany balances were

12  routinely forgiven by the debtors in massive amounts prior to

13  the petition date.  Sixteen billion dollars of forgiveness took

14  place in the four years prior to the filing.

15         The evidence will confirm that it was the ordinary

16  course of the debtors' business pre-petition to forgive or

17  waive the intercompany balances and treat the forgiveness as a

18  contribution to capital.  The evidence also shows that the JSNs

19  were fully aware of the real nature of the intercompany

20  balances prior to the petition date, and their candid view of

21  the balances was clearly articulated.

22         The JSNs agreed pre-petition to disregard the balances

23  in their pre-petition plan support agreement as long as their

24  secured claim was paid.  And the JSNs assigned zero value to

25  the balances in their own collateral value and recovery

RESIDENTIAL CAPITAL, LLC, ET AL.                              102

1    analysis that was disseminated to the public by the financial

2    advisors for the JSNs in connection with the original AFI

3    settlement, and that was an exhibit Your Honor saw at the phase

4    1 trial

5             THE COURT:  That's the May 14th --

6             MR. ECKSTEIN:  That's correct.

7             THE COURT:  -- Houlihan.

8             MR. ECKSTEIN:  And if the JSNs thought that the

9    intercompany balances were real collateral, they would not have

10   agreed to let the debtor release them in the original plan

11   support agreement, and they would have been noted in these

12   valuations that they disseminated to the public.  That's the

13   candid view of how everybody believed the intercompany balance

14   issue would be treated.  It's only now -- it's only now that

15   there is a new view as to how the intercompany claims are being

16   treated.

17            Now I know the contention is -- there is a suggestion

18   that somehow the committee came up with some nefarious strategy

19   to insist that the debtors disallow the intercompany claims.

20   That's not true.  That's not the facts.  And you're not going

21   to hear a single fact to support that suggestion.

22            And in fact, the JSNs chose to put into evidence

23   correspondence from me to Morrison and Foerster, and when Your

24   Honor has an opportunity to see that correspondence, Your Honor

25   will realize the debtors take the position that they have

1    never -- they have never digressed from their basic position

2    that these intercompany claims are likely invalid.  That has

3    always been the position that the debtors took.  That has

4    always been the position that the committee understood.  And

5    that was always the position that the JSNs understood during

6    the pre-petition period when they came into this case.  And the

7    suggestion to the contrary -- there is no support for that

8    suggestion in the record.

9            The plan proponents' witnesses at trial who will

10   testify with respect to the intercompany balances are the three

11   that Mr. Lee described.  Barbara Westman, a senior director and

12   controller of ResCap whose responsibilities included the

13   development and management of ResCap's general ledger,

14   operations, and who oversaw the monthly closing of the general

15   ledger in the preparation of trial balances.  Ms. Westman will

16   describe for Your Honor the genuine -- the reality surrounding

17   this intercompany balance process.

18           Tammy Hamzehpour, the chief business officer at ResCap

19   and former general counsel of ResCap who was involved in the

20   regular forgiveness of the intercompany balances leading up to

21   the petition date, will testify about the debtors' pre-petition

22   course of conduct to regularly release the intercompany

23   balances.

24           I want to point out, because I may not have mentioned

25   it -- it's also noteworthy -- the debtors didn't require

1    consent, the debtors didn't require notice.  These intercompany

2    balances were truly --

3            THE COURT:  I thought the board had to approve every

4    one of them.

5            MR. ECKSTEIN:  Internally, yes, but no, they didn't

6    require the consent or notice from the JSNs or other secured

7    creditors.  It was truly something that the debtor did in the

8    ordinary course of its own business.

9            And Ms. Gutzeit, a senior managing director of -- in

10   FTI Consulting's corporate finance group and an expert witness

11   who, based on her analysis of the debtor balances, will opine,

12   among other things, that the balances are not indicative of

13   valid and collectable obligations.

14           Your Honor will hear each of these witnesses.

15           The witnesses will lay out the following notable

16   characteristics of the intercompany balances, all of which cut

17   against their being viewed as enforceable debt obligations.

18           Again, Your Honor, let me just point out, we're not

19   having a trial on the intercompany balances, and at the end of

20   the day, if the plan is not confirmed, the JSNs or some trustee

21   will have the privilege of going out and trying to enforce

22   these intercompany balances.  So we're not having a trial on

23   the intercompany balances.  This is about the reasonableness of

24   the waiver of the intercompany balances as part of the global

25   settlement.

1           But nonetheless, in order to support the ultimate
2    determination that it was reasonable to waive the intercompany
3    balances in connection with the global settlement, the evidence
4    will show none of the intercompany balances are governed by
5    written agreements.  Where agreements exist, they either long
6    ago expired or reflect a lending relationship that is opposite
7    of the intercompany balance reflected on the books and records.
8           None of the intercompany balances have a maturity
9    date, interest rate, repayment schedule, security or sinking
10   fund associated with the balances.  With a single exception, no
11   interest was ever paid on the intercompany balances, and in
12   fact, interest was rarely even accrued.  The balances were
13   generally not settled for cash.  The balances reflect tens of
14   thousands of numerical bookkeeping entries prepared pursuant to
15   AFI's accounting policies and in accordance with GAAP, and
16   nobody has suggested that they weren't prepared in accordance
17   with GAAP.  But they were prepared in order to keep track of
18   intercompany activity among the various entities within the
19   enterprise.  Each of these entities happen to be guarantors of
20   the JSNs, and so it's not as if these entities were escaping
21   the JSN's guarantees.  But the bookkeeping entries contain no
22   notes or explanation as to why they were made.  Therefore,
23   there is no ability to link any particular type of transaction
24   to a balance.
25          Practical matter, what Your Honor will hear is that

1    even if the JSNs wanted to, and even if the debtors wanted to,

2    they can't determine how these transactions arose, why they

3    arose, why the balances were there.  It was merely a constant

4    reflection of thousands and thousands of movements of cash and

5    noncash assets and liabilities throughout the enterprise

6    system.

7            The evidence will also show that the intercompany

8    balances were routinely forgiven by the company on a massive

9    scale in the years before bankruptcy without the consent of the

10   JSNs, including well over sixteen billion in forgiveness from

11   2008 through the petition date, without the requirement of any

12   notice to or consent from the JSNs.

13           The intercompany balances, the evidence will show,

14   arose between entities that shared common control and were not

15   prepared at arm's length.  Notably, and in contrast to that,

16   the evidence will show that these characteristics of the

17   intercompany balances are starkly different from the debtors'

18   intercompany lending arrangements with AFI.  The AFI revolver

19   and the AFI LOC, for instance, were thoroughly documented,

20   secured, regularly repaid with interest, even though they were

21   lending relationships between related parties.  When these

22   entities wanted to create collectable intercompany debt, they

23   knew precisely how to do so, and these intercompany balances

24   were not part of those transactions.

25           With this context, Mr. Kruger will testify that in his

1  opinion, as the chief restructuring officer for the debtors, it

2  was reasonable to waive the intercompany balances both

3  independently and as part of the global settlement based upon a

4  series of considerations.

5          First, the decision to waive the balances was made

6  only after both the debtors and the committee analyzed the

7  facts I just mentioned surrounding the intercompany balances.

8  The analysis showed that the lack -- that they lacked many

9  indicia of true debt and would likely be unenforceable.

10         Second, contrary to what the JSNs would have you

11  believe, the intercompany balances were not solely a JSN issue.

12  Due to their potential ability to shift value among the debtor

13  entities, a number of parties were focused on the intercompany

14  balances during the case and have taken various positions on

15  their enforceability.

16         The settlement was also not limited to the waiver of

17  the current intercompany balances.  The settlement included the

18  resolution of other inter-debtor issues, such as the waiver of

19  claims for subrogation among debtor entities, allocation of

20  administrative expenses among debtor entities, fraudulent

21  conveyance claims related to forgiveness of more than sixteen

22  billion of inter-company balances.  Mr. Kruger recognized that

23  all of these issues would have been implicated if the

24  intercompany balances had to be litigated.

25         A good example of some of the issues that were

1  resolved can be found by reading the statement in support of

2  the plan by Wilmington as the indenture trustee for the senior

3  unsecured notes.  In it, the note trustees point out that they

4  had identified nine-and-a-half billion dollars in fraudulent

5  transfer claims that they were threatening ResCap was going to

6  assert against RFC and GMAC.  This was just an example of the

7  kinds of litigation sort of threats that were being created

8  essentially around the intercompany balances.

9       Third, the plan proponents determined that anything

10  other than settling the treatment of the intercompany balances

11  would lead to large-scale litigation which would have a

12  substantial detrimental impact on all creditors.  As we've seen

13  in these hearings, fraudulent conveyance, substantive

14  consolidation, recharacterization and similar issues are highly

15  complex, fact-intensive, require extensive discovery and expert

16  testimony, addressing insolvency, valuation, contemporaneous

17  exchange of value, arm's length terms, accounting practices,

18  allocation and other issues, and absent the resolution of the

19  intercompany claims each of those issues would have had to be

20  litigated to conclusion.

21       Last, the waiver of the balances and the decision not

22  to revisit subrogation and prior forgiveness was supported by

23  substantially all the debtors' creditors, with the exception,

24  we understand, of the JSNs.  Now, the JSNs' overall objection

25  to the waiver of intercompany balances can be broken into two

1    components.

2           Number one, they assert that the waiver of the

3    intercompany balances is unreasonable because they are valid

4    debt obligations.

5           Number two, they say that the waiver compromises their

6    collateral without their consent and entitles them to adequate

7    protection.

8           Let me address each of those.

9           With respect to the reasonableness of the settlement,

10   the JSNs' objection relies on the testimony of one witness,

11   their expert Robert Bingham.  Mr. Bingham's opinion that the

12   intercompany balances were treated as valid and collectable

13   obligations is based almost entirely on the limited fact that

14   the debtors generally recorded intercompany activity on their

15   general ledgers as payables and receivables in accordance with

16   GAAP and in accordance with AFI's accounting policies and

17   disclosed them in certain very limited public filings.  Now, we

18   believe this opinion will ultimately be entitled to very little

19   weight for several reasons.

20          First, as the proponent's rebuttal expert, Ms. Gutzeit

21   will explain, this recording methodology was followed primarily

22   for GAAP accounting purposes pursuant to AFI's accounting

23   policies which required the debtors' books and records be

24   maintained in order so that AFI could track its subsidiaries'

25   intercompany balances and eliminate them -- and eliminate them

RESIDENTIAL CAPITAL, LLC, ET AL.                    110

1   in preparing and filing consolidated GAAP-compliant financial

2   statements.  Nowhere on the consolidated statements will

3   anybody find the intercompany balances.  They were eliminated.

4   They were merely something that was required by GAAP.

5           Second, Mr. Bingham conceded at his deposition that a

6   prudent outside lender in an arm's length transaction, what we

7   would normally expect to be a creditor in a case, would never

8   have loaned the debtor the amounts at issue in the intercompany

9   balance without written agreement, stated interest, maturity

10  dates, payment schedules, or collateral.

11          Third, Mr. Bingham agreed at deposition that merely

12  because a balance is treated as a receivable for GAAP purposes,

13  does not necessarily mean it's going to be collected or

14  establish any actual expectation of repayment.

15          And finally, Mr. Bingham acknowledged at deposition

16  that he has no opinion concerning the value of the intercompany

17  balances or the reasonableness of the debtors' decision to

18  settle those balances as part of the global settlement in the

19  plan.

20          So in addition, while the JSNs do not support the

21  waiver, the global settlement with its numerous settlements and

22  the 2.1 billion dollar AFI contribution substantially benefits

23  the JSNs; the reasonableness of the waiver, therefore, must be

24  evaluated in the context of the overall mosaic of the inter-

25  related compromises contained in the global settlement, and the

RESIDENTIAL CAPITAL, LLC, ET AL.                    111

1  benefits which would have been unavailable absent this

2  resolution.

3          As counsel to the ad hoc group conceded in a July 30

4  hearing, and I've put that quote up on the screen, counsel

5  acknowledged that without the benefit of the global settlement,

6  the intercompany balances would have had little value.  If Your

7  Honor takes a look at the quote, it says before the Ally

8  settlement occurred, as Your Honor may recall, there was a

9  question as to whether unsecured creditors were going to get

10 anything in the context of this case, or whether these cases

11 were going to be administratively insolvent, in which case the

12 intercompany claims don't matter.  It was recognized that

13 absent the global settlement, absent the AFI contribution, the

14 intercompany claims either didn't matter or had no value,

15 certainly no value of consequence in this case.  The JSNs would

16 simply not be receiving the par recovery they are getting under

17 the plan without the global settlement, that includes the

18 waiver of the intercompany balances.  Thus, all creditors

19 including the JSNs, receive a higher recovery under the global

20 settlement with the intercompany balances waived than in pre-

21 global settlement world where there was no AFI contribution.

22         Taking all these factors into consideration, the

23 determination by each of the debtors' estates to waive the

24 intercompany balances as part of the global settlement was

25 clearly reasonable and in the best interests of the estate and

1  should be approved.

2          The JSNs' argument that the waiver compromises their

3  collateral without their consent is unavailing.  In making this

4  argument, the JSNs gloss over a number of important facts.

5          One, the JSNs persist in referring to the entries as

6  intercompany claims.  It's their burden to show that a ledger

7  entry is a claim, meaning an enforceable debt obligation that

8  would qualify as a general intangible under the Uniform

9  Commercial Code.  They will be unable to do so either through

10 the company witness or through Mr. Bingham.  There will be no

11 proof in the record that these are enforceable debt obligations

12 that might even possibly be treated as general intangibles

13 within their collateral basket.

14         Second, any liens the JSNs have on the balances are

15 completely illusory.  Under the notes indenture, the

16 intercreditor agreement and related documents, both the debtors

17 and AFI were permitted to dispose of and waive the intercompany

18 balances without JSN consent.

19         The right to release the liens was not theoretical --

20         THE COURT:  Let me ask -- this may show a

21 misunderstanding on my part, but if the JSNs had a lien on

22 intercompany balances as intangibles, the AFI revolver would

23 have had the same lien, wouldn't it?

24         MR. ECKSTEIN:  Correct.

25         THE COURT:  And did the company ever record

1    intercompany claims as collateral under the revolver?

2            MR. ECKSTEIN:  I don't believe the company ever

3    recorded intercompany balances as debt or receivables for any

4    purpose.  They were bookkeeping entries for GAAP that were

5    treated --

6            THE COURT:  But I am right, if the JSNs had a lien on

7    it, the AFI revolver gave AFI a lien on them, as well?

8            MR. ECKSTEIN:  That's certainly my understanding, Your

9    Honor.

10           THE COURT:  Okay.

11           MR. ECKSTEIN:  And there was no different treatment of

12   the intercompany balances for AFI versus the JSNs.

13           Now, the right to this lien was not theoretical.  As I

14   mentioned, the debtors, in fact, routinely released billions --

15   millions of dollars in intercompany balances in the years

16   before the petition date.  Here, AFI and the debtors have

17   agreed to the waiver of any and all intercompany balances under

18   the plan support agreement.  This waiver was permissible under

19   the operative documents and AFI and the debtors respective

20   consent is binding on the JSNs and automatically releases the

21   JSNs' liens, if any, on the intercompany balances.  The Court

22   should enforce the intercreditor agreement and should enforce

23   the release that was implemented by both AFI and the debtors.

24           THE COURT:  Is there a specific release that you argue

25   had the effect of releasing any liens on intercompany claims?

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1          MR. ECKSTEIN:  It was embodied in the global

2   settlement --

3          THE COURT:  Okay.  All right.

4          MR. ECKSTEIN:  -- and the plan support agreement, so

5   it specifically contemplated the waiver of the intercompany

6   balances as part of the global settlement.

7          THE COURT:  Okay.

8          MR. ECKSTEIN:  Third, while the JSNs claim to have a

9   lien on general intangibles, they do not, in fact, have a lien

10  on all general intangibles, as Your Honor knows, because their

11  lien was released in part.

12         As shown at the phase 1 trial, as a result of

13  collateral releases, general intangibles associated with

14  certain servicing rights and mortgage loans pledged to the AFI

15  LOC were released.  The JSNs will fail to demonstrate that even

16  if some intercompany balances may be claims that the general

17  intangibles at issue were not on loan; it was released.

18         And that's not a gotcha.  It's because nobody could

19  even figure it out from these documents.  The JSNs will not be

20  able to demonstrate that the intercompany balances that they're

21  pointing to were not, in fact, part of their release

22  collateral.  Because neither the debtors nor the JSNs can

23  identify with precision the sources of the intercompany

24  balances based on the information shown on the debtors' books

25  and records, the JSNs simply can't demonstrate whether a

RESIDENTIAL CAPITAL, LLC, ET AL.                                    115

1    particular balance is covered by a collateral release or not.

2    Yet another failure of proof and yet another reason why the

3    waiver and resolution in the global settlement is reasonable.

4          Fourth, with respect to some of the balances, PATI and

5    ETS, for example, the JSNs do not even argue that they have a

6    lien on those balances.  Instead, they refer to liens on the

7    equity of those insolvent entities and they want the debtors to

8    go enforce those obligations, even though creditors of those

9    estates have been paid in full.

10         And as we'll show in trial, some of the balances would

11   receive no material distribution, even if deemed to be debt,

12   because the obligor entities have no assets.  So the treatment

13   under the plan with respect to two of the particular balances

14   that you'll hear about from the JSNs are completely irrelevant

15   to the JSNs because there would be no recovery.

16         All of the factors, Your Honor, that we think you will

17   hear, amply support the conclusion that the decision under the

18   context of the global settlement to waive the intercompany

19   claims were reasonable.

20         That would then shift us to whether or not the JSNs

21   should be entitled to adequate protection.  I'm not going to

22   belabor this issue because I know Your Honor appreciates this,

23   but the JSNs will have a complete failure of proof with respect

24   to the petition date value of the intercompany balances.

25         While the plan proponents are obligated to establish

1    the reasonableness of the decision to release and waive the

2    balances as part of the global settlement, a burden that I

3    believe it will amply meet, as the Court made clear in the

4    phase 1 decision, the JSNs bear the burden of proof with

5    respect to an adequate protection claim, a burden that includes

6    whether they have a lien on the balances, which they do not

7    have any evidence to support; the petition date value of that

8    lien, which there will be no evidence to support; and whether

9    the waiver of the intercompany balances under the plan entitles

10   the JSNs to adequate protection claims.

11          Your Honor, we don't believe any of the evidence that

12   you will hear from the JSNs will allow them to satisfy any of

13   those burdens.  We do not believe that Mr. Fazio's testimony

14   will, again, in this instance, be credible because it's based

15   upon assumptions that are fundamentally at odds with the global

16   settlement --

17          THE COURT:  I assume your position is that having --

18   this was a bifurcated trial; I heard the evidence, made my --

19   rendered my decision, findings of fact, they failed to prove

20   the petition date value of their collateral.  They don't get a

21   do-over now.

22          MR. ECKSTEIN:  That is correct, Your Honor.  And we

23   believe that's important and we believe that was understood by

24   both sides.  And we believe that's significant today because

25   there will not be an ample record that the JSNs have --

1          THE COURT:  And I said in my decision that anything I

2    decided in that decision, that was my final ruling on it, even

3    though there's no orders entered, so that was certainly my view

4    when issues were bifurcated.  I tried them.  I tried them once.

5    I made my findings.  We're not doing it over.

6          MR. ECKSTEIN:  And I think -- as I said, I think all

7    parties expected that was the process that we were following,

8    and I think everybody understood that with the burden falling

9    on the secured creditor, there is going to be a failure of

10   proof with respect to the value of the claims or whether or not

11   there has been an aggregate diminution in value as of the

12   petition date.

13         And I think for all of the reasons that I've gone

14   through already, we don't believe there is going to be any

15   evidence that will support the conclusion that as of the

16   petition date, these claims had any value; and whether it's

17   looking at the JSNs' statements as of the petition date or the

18   acknowledgements at the July 30 hearing, we think the JSNs also

19   recognize that as of the petition date, without the benefit of

20   the AFI settlement, there was no value to these intercompany

21   balances even if they were enforceable debt.  And they're not.

22         Your Honor, let me shift to the AFI contribution

23   issue.  There is a lot of briefing on the issues and I just --

24   I don't want to belabor the points.

25         The second argument that the JSNs raise is that we're

1    duty bound to allocate the AFI contribution to individual state

2    and third-party claims and they have developed a very complex

3    theory, which I'll walk through as to how they have a lien on

4    some portion of the AFI contribution and somehow it magically

5    translates into fifty percent of the AFI contribution.

6              THE COURT:  I don't have any evidence of that anymore.

7              MR. ECKSTEIN:  That's correct, Your Honor, but

8    nonetheless, let me walk through this.

9              We have three points.  It was reasonable and

10   appropriate for the parties not to allocate the AFI

11   contribution to specific claims.

12             Two, the JSNs do not have a lien on any portion of the

13   AFI contribution.  And even if the JSNs potentially could have

14   a lien on some portion of the AFI contribution, no value should

15   be allocated to the JSNs on account of these three claims that

16   they've identified either as direct collateral or through

17   adequate protection.

18             Some brief background to appreciate the AFI

19   contribution allocation issue.  AFI and the debtors, as we

20   know, face crippling litigation from the debtors' businesses.

21   The Court will hear Jeffrey Lipps testify as to the staggering

22   number and magnitude of claims arising from the debtors'

23   business, individual and class action borrower claims,

24   financial creditor claims, an array of government claims,

25   private and class-action securities claims, monoline insurer

1   claims, RMBS trustee and institutional investor claims, FHFA,

2   FDIC, NCUAB claims, among others.

3          These claims amounted to multiple suits in more than a

4   dozen different states and federal courts.  The claims

5   collectively involve more than 1,000 securitizations, more than

6   1 million loans, an aggregate original principal balance of

7   over 225 billion of mortgages, over 5,000 proofs of claim, 26

8   unaffiliated co-defendants with the ability to assert indemnity

9   or contribution claims, claimed losses totaling over 50 billion

10  dollars.  The JSNs would like you to allocate amongst all those

11  claims.

12         On top of that, AFI and its nondebtor affiliates were

13  named as defendants or threatened in many of these suits for

14  alter ego, control group or underwriter liability, as well as

15  for direct claims sounding in fraud, breach of fiduciary duty,

16  aiding and abetting, and other claims that potentially had the

17  risk of holding AFI responsible for potentially all of ResCap's

18  debts.  That was the landscape we were dealing with when we got

19  to the settlement.  This lead AFI --

20         THE COURT:  I think that was probably the position of

21  the committee when the case started.

22         MR. ECKSTEIN:  That's correct, and it was the position

23  of all of the parties that were not supporting the plan as of

24  petition date.  This led AFI's CEO, Michael Carpenter, to

25  describe ResCap as a millstone around AFI's neck..

1        In addition, ResCap and its subsidiaries had a wide
2    array of potential claims that could be asserted against its
3    parent company, AFI, once ResCap was a debtor-in-possession in
4    bankruptcy.

5        Now, against this backdrop, the evidence will show
6    that by the time ResCap filed for bankruptcy in May 2012, the
7    parties could not have resolved litigation of this volume and
8    complexity without a holistic approach to reaching a global
9    resolution predicated on a satisfactory settlement contribution
10   by AFI in exchange for a full release for AFI of all ResCap-
11   related claims.  The evidence will demonstrate unequivocally
12   that a piecemeal settlement of individual claims would not be
13   the basis for a solution.

14       For example, John Dubel, the committee's co-chair,
15   will testify that an attempt to allocate the Ally contribution
16   would have prevented the global settlement from being achieved.
17   He will also testify that no individual component of the global
18   settlement can be fairly considered in isolation because the
19   goal was a holistic and comprehensive settlement; a claim-by-
20   claim or issue-by-issue approach would have been counter-
21   productive for multiple reasons.

22       Similarly, Mr. Kruger, the debtors' chief
23   restructuring officer, will confirm that the AFI contribution
24   could not be allocated without threatening the global
25   settlement as a whole.  The reasons a claim-by-claim approach

1   wouldn't work and would threaten the global settlement are

2   simple.

          It would have increased, rather than avoided, in-

3   fighting amongst the creditors, each one pursuing and believing

4   in the strength of its own claims.  Your Honor correctly points

5   out, the global settlement allocated the recoveries amongst the

6   three estates and amongst various creditor groups.  That was

7   done.  That was a monumental undertaking.  The global

8   settlements specifically did not try to wrestle to the ground

9   which claim might have more or less strength, because everybody

10  thought that its claim was the best claim, and nobody was ever

11  willing to step back and concede that their claims might be

12  weak.  And if the parties committed to try to allocate the

13  claim -- the settlement to each individual claim, the witnesses

14  will testify, this process simply would have broken down.

15        It was not -- it had nothing to do, Your Honor, with

16  whether it was contract claims, or tort claims, or avoidance

17  action, or third-party claims -- and frankly, at the time, Your

18  Honor, nobody knew whether the JSNs had liens on one or the

19  other, and in fact, if Your Honor recalls, until a ruling this

20  summer, JSNs were absolutely confident they had liens on tort

21  claims and they had liens on avoidance actions.  And so from

22  the JSNs' perspective in April, all the estate claims were part

23  of their collateral.

24        So the decision not to allocate had nothing to do with

25  the JSNs, because as far as the estate was concerned, the

1   third-party claims were not their collateral, the estate

2   claims, they were taking the position, were their collateral.

3            So the decision to allocate was a pragmatic decision

4   that was made in order to get to a settlement.  It was not some

5   strategic effort to deprive the JSNs of maybe a lien on some

6   contract claim.  The suggestion of that is frankly not

7   consistent with the evidence in this case, and frankly, it's

8   just rhetoric.

9            THE COURT:  So they marshal authority, which they

10  say -- I'm not saying that's what the cases stand for -- but

11  they marshal authority, which they say -- or courts have said

12  if someone is not a party to, but is adversely affected by the

13  settlement, the court may have this extremely difficult task of

14  allocating a settlement.

15           That wouldn't -- here, that wouldn't necessarily

16  affect the settlement for purposes of plan confirmation, but

17  could impact whether -- whether it's in the form of an adequate

18  protection payment or in some other form -- I mean, sometimes

19  the difficulty of doing something is not a legal defense having

20  to do it.

21           MR. ECKSTEIN:  Your Honor, that's absolutely true, and

22  I'm --

23           THE COURT:  So my question is -- there will be time to

24  deal with this, but that -- they marshal authority to support

25  that position and at an appropriate time you're going to have

 1   to respond so that legal authority.

 2              MR. ECKSTEIN:  Let me briefly just explain to the

 3   Court what I believe are the compelling answers to that point.

 4   I understand the point.

 5              First of all, as to the specific cases, the cases that

 6   are cited -- and we'll deal with it in our closing brief --

 7              THE COURT:  Yeah.

 8              MR. ECKSTEIN:  -- but the cases that are cited are all

 9   cases that involve allocating settlements among co-defendants

10   in order to apportion responsibility, which is very different

11   from whether or not a bankruptcy court in the context of a

12   global settlement in a Chapter 11 plan has to allocate

13   claims -- a settlement to individual potential causes of

14   action.
                There are no cases that they've pointed to that

15   address the facts of this case.  And the cases they cite are

16   inapposite and really are not binding to whether or not in this

17   case.

18              But that's not the important answer.  It's an

19   interesting and important issue, but there is an important

20   answer, Your Honor, and I'm going to skip to it because I

21   think -- in some respects I think the AFI contribution issue

22   really should end on what I think is a relatively simple

23   proposition.

24              The JSNs are not harmed by the treatment of the AFI

25   contribution in the plan because the JSNs don't have a lien on

 1   any portion of the AFI contribution.  That is a simple

 2   proposition that I believe is fundamentally supported by the

 3   law.  And I believe we ultimately are going to ask Your Honor

 4   to rule at the appropriate time that the JSNs do not have a

 5   lien on any portion of the AFI contribution.

 6            Let me explain that briefly, because I think in some

 7   respects -- we will go through this trial, we'll present the

 8   evidence about all these claims and the strengths and the

 9   weaknesses in the claims -- the contract claims, tort claims --

10   Your Honor, respectfully, it doesn't matter.  They don't have a

11   lien.  Very simply, the AFI contribution is a new asset created

12   in a bankruptcy case.

13            THE COURT:  You cite a magistrate judge's decision as

14   the support for that argument.

15            MR. ECKSTEIN:  Your Honor --

16            THE COURT:  I respect magistrate judges, don't

17   misunderstand me, but I think that was the only authority you

18   had for that proposition that this is a new asset.

19            MR. ECKSTEIN:  I hope Your Honor will not take

20   offense, but I'm going to cite Your Honor's decision in the

21   phase 1 trial on page 96 and 97.

22            THE COURT:  I said something on 96?

23            MR. ECKSTEIN:  Your Honor, I'm not being facetious,

24   because we've all spent a lot of time on this and this is -- in

25   our view, Your Honor, this is the answer to this question.

RESIDENTIAL CAPITAL, LLC, ET AL.                    125

1          As of the petition date, and I think it's important to

2   walk through this and understand it and at least understand

3   what we're going to be doing with this issue.

4          THE COURT:  You're going to tell me what I said and

5   then what I meant?

6          MR. ECKSTEIN:  I will.  As of the petition date, I

7   think we all recognize -- let me just back up.

8          The JSNs claim to have a lien on some portion of the

9   AFI contribution through their lien on general intangibles --

10  that's the way they -- this general intangible seems to be the

11  source for all liens -- general intangibles, which they claim

12  includes a lien on contract claims.

13         Now, the Court has already ruled, the JSN lien does

14  not include commercial tort claims, it doesn't include

15  avoidance actions, which as a practical matter would eliminate

16  almost any claim that I would think that a subsidiary in a

17  Chapter 11 case would be bringing against the parent -- breach

18  of fiduciary duty, aiding and abetting, alter ego, fraudulent

19  conveyance.  The JSNs also, I think, acknowledge that they

20  don't have a lien on any third-party claims.  So the bulk of

21  the potential causes of action, I think everybody agrees they

22  don't have liens on, so we're left with, do they have a lien on

23  the contract portion of the settlement.

24         So as of the petition date, I think we would all

25  agree, any contract claim in this case was, at best, inchoate.

RESIDENTIAL CAPITAL, LLC, ET AL.                    126

1    There was no judgment for any contract claim, there was no

2    pending lawsuit, there was no demand; there wasn't even a

3    threatened lawsuit by ResCap against its parent.

4            Let's keep in mind, this was a company run by AFI.

5    AFI employees, or former employees, were the senior executives

6    of ResCap; of course ResCap wasn't suing AFI pre-petition.  So

7    there was no such thing as a contract claim between ResCap and

8    AFI pre-petition.

9            Now, the absence of any choate contract claim could

10   provide an independent basis for the Court to conclude that the

11   claims identified by the JSNs are not subject to a pre-

12   petition lien.

13           THE COURT:  I thought their argument is that that may

14   have been true under an earlier version of the UCC, but after

15   amendments to the UCC, the issue about inchoate versus choate

16   claims sort of disappears.

17           MR. ECKSTEIN:  That's why I'm not going to argue it.

18           THE COURT:  Okay.

19           MR. ECKSTEIN:  So even if the Court were not going to

20   go down that path -- and we can debate whether it is or

21   isn't true --

22           THE COURT:  I haven't decided anything about it yet.

23   I've read everything, okay?

24           MR. ECKSTEIN:  But it doesn't change the conclusion

25   that the AFI contribution does not qualify as proceeds of pre-

RESIDENTIAL CAPITAL, LLC, ET AL.                    127

1   petition collateral covered by Bankruptcy Code Section 552(b).
2   And that's the standard.  That's the test.  It's not
3   inchoate -- not inchoate -- it's does the AFI contribution
4   represent proceeds of pre-petition collateral covered by
5   Bankruptcy Code Section 552(b).
6          Now, what Your Honor held in the phase 1 opinion, page
7   96, 97, is that "Section 552(b) is intended to cover after-
8   acquired property that is directly attributable to pre-petition
9   collateral, without addition of estate resources," citing
10  Collier's.  And the Court held that because the debtors used
11  state resources to enhance the value of the goodwill during the
12  case, the JSNs could not satisfy their burden of establishing a
13  lien on goodwill generated pre-petition.
14         THE COURT:  I actually remember saying that, yes.
15         MR. ECKSTEIN:  So the Court's holding, as applied in
16  goodwill, frankly, as I'll explain, is much more compelling
17  when dealing with this global settlement in this bankruptcy
18  case.  And it's not just because we spent some money.  It goes
19  well beyond just spending money.
20         The AFI contribution is undoubtedly and
21  unquestionably -- and the record, I think, will confirm -- a
22  new asset that resulted entirely and uniquely from this
23  bankruptcy case.
24         It certainly is not directly attributable to the JSNs'
25  pre-petition collateral -- and that's the standard, directly

RESIDENTIAL CAPITAL, LLC, ET AL.                    128

1    attributable.  And it certainly required both substantial

2    estate resources and the bankruptcy process to be realized.

3            Now, as we already described, AFI was not willing to

4    contribute 2.1 billion dollars in exchange for a global

5    settlement releasing all estate statement claims without a

6    global release.  I think we've all confirmed ourselves ad

7    nauseam, that release could not be achieved outside of

8    bankruptcy.  And Your Honor can take judicial notices of that

9    from the beginning of the case until today.

10           Number two, the AFI contribution would not have been

11   achieved without the court-ordered mediation under the

12   supervision of Judge Peck.

13           Number three, the AFI contribution could not have been

14   created unless there had been an official creditors' committee

15   that had been appointed that consisted of all of the dissenting

16   creditors who were charged to investigate the estate causes of

17   action and consolidate the unsecured creditors' joint interests

18   in a settlement negotiation.

19           Through the bankruptcy process, the Court appointed an

20   examiner to investigate the estate and third-party claims at

21   substantial expense, and the deadline for the examiner report

22   was an important catalyst to achieve the settlement.

23           It was only through bankruptcy that an independent

24   estate representative, Lewis Kruger, the CRO, could be

25   appointed to have responsibility over the debtors' subsidiaries

1  and actually negotiate a comprehensive settlement of estate and

2  third-party claims that was going to be fair.  That process

3  can't happen outside of bankruptcy where you're going to have

4  an independent person essentially take responsibility for a

5  negotiated settlement between a debtor subsidiary and its

6  parent.  That is a bankruptcy event.

7          The Court can take judicial notice of the fact that

8  the pre-petition negotiations, which the JSNs participated in,

9  were not successful in achieving a global consensus, and that a

10  viable global settlement could only have been achieved with the

11  benefits of the bankruptcy process.  And only through the

12  Chapter 11 process and the unique opportunity to support a

13  third-party release, using the Metromedia standards in 1129,

14  and all of the provisions that Mr. Lee described, can the

15  global settlement and the release of claims against AFI be

16  achieved.  None of these features could have been accomplished

17  outside of an organized Chapter 11 case.  The cost of the

18  process was certainly substantial, and the results were

19  significant.

20          The global settlement in the AFI contribution that is

21  an essential feature of the settlement is a unique new asset,

22  was created through the bankruptcy, and cannot and should not

23  be treated as proceeds of the JSNs' pre-petition lien.

24          Your Honor, I would submit that the AFI contribution

25  issue should rest on this issue, and I believe, as a matter of

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1   law, the Court can and should determine that the JSNs simply

2   don't have a lien on the AFI contribution.

3          Avoiding the need to frankly get involved with all of

4   the interesting complexities about whether or not these

5   contract claims are or are not subject to their lien and do

6   they have value and can they show adequate protection and can

7   they satisfy the burden -- we'll spend many days.  They are

8   interesting.  As a matter of law, the AFI contribution is not

9   part of their lien.

10         I can go on, Your Honor, with all the other points,

11  but I sincerely believe this is the right conclusion and I

12  believe it's consistent with the Court's decision in phase 1

13  and I believe it reflects the law of 552(b).

14         Let me briefly, Your Honor, sort of look at some of

15  the alternative arguments.

16         I think I already explained why we don't believe the

17  Court is obligated to allocate.  This is a fairly unique case.

18  I know they've pointed to cases where you had to allocate among

19  co-defendants.  That makes sense that you have to allocate

20  among co-defendants when one is settling and one is not

21  settling; the one who is not settling wants to know what his

22  remaining liability is.

23         It's very different from a case when in a bankruptcy

24  case, you're agreeing to a global settlement.  You're resolving

25  mass tort claims.  If you analogize -- and I think Your Honor

1  raised the question, what about the obligation to estimate in a

2  mass tort case.  I think Your Honor appreciates that when a

3  mass tort case is finally negotiated to a consensual

4  resolution, you avoid the estimation.  You don't have to

5  estimate.  If the tort claimants, in an asbestos case --

6          THE COURT:  If only you had completely consensual

7  resolution, I wouldn't have to deal with that.

8          MR. ECKSTEIN:  But, Your Honor, in this case, we do

9  have -- we do have overwhelming consent.  We have an objection,

10  but the issue is not whether the Court has to estimate.  The

11  issue is whether the global settlement is reasonable and then

12  whether or not they're entitled to an adequate protection

13  claim.  It's not whether or not the Court is duty-bound in

14  every case to allocate.

15          THE COURT:  You agree that if this was not mutually

16  exclusive, I could find that the global settlement is

17  appropriate in amount, but they could still have an adequate

18  protection claim.

19          MR. ECKSTEIN:  Yes, we do -- we absolutely recognize

20  that, Your Honor.  And I think when I laid out the points, that

21  was --

22          THE COURT:  Okay.

23          MR. ECKSTEIN:  One of the alternatives was if Your

24  Honor determines they do have a lien on some portion of the AFI

25  contribution, we're then to have to get to the question of,

RESIDENTIAL CAPITAL, LLC, ET AL.                    132

1  well, all right, is it -- do they ever a perfected lien in the

2  contract claims, then what is the value of those claims --

3          THE COURT:  I'm just curious, in your STN motion you

4  didn't seek authority to bring contract claims; you did tort

5  claims.  So they see focus some of their argument that the

6  stronger claims were the contract claims, but there would be a

7  fraudulent conveyance claim to set aside the second tax

8  agreement -- and you were seeking to assert the avoidance

9  claims.  So if you settle the avoidance claims, does the

10 contract claim have to be -- so relating to -- specifically as

11 to the two tax agreements --

12         MR. ECKSTEIN:  Right.

13         THE COURT:  -- okay, if you settle it as a fraudulent

14 conveyance claim, does any further analysis have to be made

15 whether somehow it should have been brought as a contract

16 claim?

17         MR. ECKSTEIN:  Your Honor, our view is that for

18 purposes of the estate's claims, it can only be realized as an

19 avoidance action, whether ultimately --

20         THE COURT:  Well, they say the only thing you can do

21 in avoidance action is set aside the second tax sharing

22 agreement.

23         MR. ECKSTEIN:  But no value can come -- even begin to

24 come into the estate --

25         THE COURT:  Until you do that.

1        MR. ECKSTEIN:  -- unless we can prevail on an

2  avoidance action, which will be difficult.  It's not an easy

3  claim.

4        THE COURT:  Right.

5        MR. ECKSTEIN:  But our view is that the claim -- the

6  claim of the estate is an avoidance action.

7        THE COURT:  Maybe if you litigated it, the result

8  would be avoiding the agreement, but that doesn't mean you

9  can't settle it for dollars.

10        MR. ECKSTEIN:  You can settle -- you can settle the

11  tax claim for dollars.  We believe that whatever it would be

12  settled for would be an avoidance action, not subject to their

13  lien.  They want to argue with the contract claim.

14        But as Your Honor points out, and we noted this, the

15  STN motion, we think, is telling.  At the time the committee

16  was trying to bring what we thought were the strongest claims.

17  Again, we were not being strategic about trying to identify

18  contract claim versus tort claims or avoidance action, as Your

19  Honor will note --

20        THE COURT:  Had you identified the tax-sharing

21  agreements as among the claims that the committee could assert

22  as either avoidance claims or contract claims?

23        MR. ECKSTEIN:  The committee had identified tax

24  issues, but I think, if Your Honor recalls, the specific tax-

25  sharing claim that was suggested was only identified as a

1   result of interviews that were conducted by the examiner that

2   we were not privy to --

3           THE COURT:  That's fine.

4           MR. ECKSTEIN:  -- and so the specific issues that had

5   been pointed to in the examiner report were not something that

6   the committee was privy to at the time.  But the committee had

7   looked at the tax issues, the debtor had looked at the tax

8   issues, and it was not an issue that we had identified as being

9   what we thought were our lead arguments, if we were going to

10  litigate issues against AFI.

11          And Your Honor, I think it's telling, the STN motion

12  that the committee filed, the STN motion that Wilmington Trust

13  on behalf of SUNs filed, a lot of claims were articulated.  And

14  coincidentally, at the time, there were no contract claim.

15          So if Your Honor wants to get into how much should I

16  allocate to contract claims, to the extent Your Honor is going

17  to look at what was in the minds of the committee and the SUNs,

18  at least in April, contract claims were certainly not a

19  prominent part of what was being examined or what we thought we

20  would prosecute, absent a settlement.

21          Certainly, I think Your Honor can infer -- without

22  getting into the mediation privilege -- Your Honor can infer

23  that if those were the claims that were being articulated in

24  the public filings, that the claims that were in the filing

25  were the ones that were the subject of the debate with AFI, and

1   that the contract claims were in fact not the hidden gems that

2   were yielding the big 2.1 settlement.

3              THE COURT:  The Minnesota preference claim.

4              MR. ECKSTEIN:  The Minnesota preference claim.

5              Your Honor, I think that if we go down the path of

6   what these claims are worth, I think we're going to have to,

7   again, shift the burden to the JSNs.  They have a lot of

8   burdens here.  And we don't believe they're going to be able to

9   satisfy any of these burdens.  They have no direct evidence

10  supporting any of the claims in which they purport to have a

11  lien or damages on any of these claims.  They have no evidence

12  of the value of the estate and third-party claims.  They gloss

13  over the fact that this settlement was not being accomplished

14  without a third-party release.  How much was AFI paying in

15  respect of the third-party release?  Honestly, we chose not to

16  answer that question, because nobody wanted to have to put a

17  thumb on the scale in that issue.

18             But the reality is, and I think the testimony that

19  Your Honor will hear from Mr. Carpenter and Mr. Kruger and Mr.

20  Dubel, was unless all of the parties who were asserting third-

21  party claims were willing to consent to the release, the third-

22  party release was not something that this Court was going to

23  approve and AFI was not going to agree to the contribution.

24             And so I think it is -- and this goes back to Mr.

25  Lee's original comment -- it makes it impossible to determine

RESIDENTIAL CAPITAL, LLC, ET AL.                    136

1  with any kind of certainty how much you would allocate to an
2  individual contract claim.
3          I guess, Your Honor, you'll ask Mr. Carpenter how much
4  would he have paid to release the MML PSA claim, whether -- the
5  MSR swap claim.  As a standalone claim --
6          THE COURT:  I won't, if it calls for speculation,
7  but --
8          MR. ECKSTEIN:  I know Your Honor once in a while will
9  ask a question like that.  But the -- I say it rhetorically.
10         THE COURT:  You can object.
11         MR. ECKSTEIN:  The testimony is that as a standalone
12 matter, AFI says they would have rather paid Kirkland & Ellis
13 rather than paying the estate to release one of these claims.
14         THE COURT:  That I can't believe, but anyway.
15         MR. ECKSTEIN:  I'm just an advertisement for Kirkland
16 & Ellis.
17         The fact of the matter was there was no willingness to
18 settle individual claims.  There was only a willingness to do a
19 global settlement, and to try to -- after the fact contrive how
20 much maybe I think they would have paid to settle this one
21 contract claim, I think it's speculative and frankly
22 impossible.  But the reality is the burden is on the JSNs to
23 demonstrate to Your Honor, this is how much these specific
24 claims that they claim to have liens on should be worth in the
25 context of a 2.1 billion dollar global settlement.

RESIDENTIAL CAPITAL, LLC, ET AL.                    137

1        We don't believe that they can begin to satisfy that

2   burden, and for that reason, independent of the other

3   arguments, we believe a request for adequate protection or a

4   request for independent compensation for effective date

5   collateral both fail.

6        Your Honor knows that they don't have any direct

7   evidence of the value of the claims as of the petition date.

8   These claims weren't asserted as of the petition date; they

9   weren't pending as of the petition date.  The JSNs certainly

10  weren't banging the drum to bring them as of the petition date.

11  There is no evidence that these claims were perceived to have

12  any value as of the petition date.

13       Only now, once there is a global settlement as part of

14  a Chapter 11 plan, is there value.  And again, I go back to the

15  fact that it's not part of their lien under 552(b).

16       We're left, then, with -- Your Honor is going to hear

17  evidence about these three individual claims.  Again, I don't

18  want to minimize the claims, I don't want to overly denigrate

19  the claims, but we do think that two of the claims are not

20  contract claims.  We think the tax claim is an avoidance

21  action, we think the MML PSA claim -- they haven't even

22  identified a provision in the contract that they think was

23  breached.  And in fact, in Your Honor looks at the STN motion,

24  you'll see that the committee raised the MML PSA claim, but it

25  raised it as an avoidance action, not as contract claim,

1  because we thought the avoidance action had greater prospects

2  for success.  And the MSR swap claim which was the last claim,

3  aside from the fact that you'll hear from Jim Young, who used

4  to be ResCap's CFO, and now is the, I think, CEO -- or the CFO

5  of Ally bank, he'll testify as to what he believes are the

6  infirmities to that claim.  But more fundamentally, because of

7  the release of liens on the MSRs, these claims travel with the

8  MSRs, and we don't believe the JSNs can demonstrate that even

9  if this claim were valid, this is a claim that runs with the

10 MSRs that were released.  And therefore, even if it has some

11 validity as a contract claim, it was a release claim that would

12 not be subject to their liens.  Because the MSR contract claim

13 runs with the MSRs, and if they don't have a lien on the MSRs,

14 we don't think they have a lien on the claim.

15         So while the proponents don't have the burden of proof

16 on the value of the claims or the value of the other claims, or

17 the value of the claim as of the petition date, or the value of

18 the claim now as taken as part of the mosaic of claims that are

19 being released, Your Honor will hear testimony from Mr. Young

20 who will testify that in his view, none of these three claims

21 are likely to have real value because they are subject to

22 numerous strong defenses.  And Your Honor, if you wanted to

23 ascribe some value, we believe you're going to have to take

24 real account of the testimony from the witnesses who will say

25 that these are extremely tenuous claims and were not likely to

RESIDENTIAL CAPITAL, LLC, ET AL.                    139

1   have real value in litigation.

2            You'll hear Mr. Carpenter's testimony that AFI never

3   would have paid anything to settle these claims outside of a

4   global settlement.  And Mr. Kruger will testify that the debtor

5   reviewed these claims and thought they were serious hurdles to

6   successfully prosecuting these claims against AFI and they

7   should be ascribed little or no value.  And Mr. Dubel will

8   testify that the committee identified what it determined to be

9   estate claims likely to yield the greatest value for all the

10  estate's creditors.  And the committee identified those claims

11  in the STN motion filed in April of 2013, and none of the JSN

12  contract claims that they're putting their emphasis were on

13  included in that motion.

14           So the global settlement without allocation is more

15  than reasonable.  And in any case, the AFI contribution, we

16  believe, is a new, post-petition asset created as a result of

17  the bankruptcy case and is not proceeds of the JSNs' pre-

18  petition lien and is therefore not proceeds of the JSN pre-

19  petition collateral.  Therefore, we think the Court should find

20  that the JSNs have no lien on any portion of the Ally

21  contribution.  Even if the Court decides to allocate the Ally

22  contribution, the Court should find that no value ultimately

23  should be allocated to the JSNs on account of the claims they

24  identified and that the JSNs will be unable to meet their

25  burden on this last issue.

1          Your Honor, I think I've probably spent enough time

2     and I think I've covered what I believe are the remaining

3     objections.  If I can, let me just go through my notes and

4     see -- the JSNs do have a variety of other objections.  They do

5     argue that -- they argue best interest, they argue indubitable

6     equivalent.  I think those issues can be easily dealt with

7     through the presentations in the brief and from Mr. Lee.  As

8     Your Honor has heard many times, the JSNs are being paid in

9     full and are receiving the indubitable equivalent of their

10    claims, likewise, by being paid in full.  They could recover no

11    more in Chapter 7, and thus the best interest test is

12    satisfied.

13         They argue that we don't have the authority to settle

14    the intercompany balances without their consent, but here their

15    consent is not required because we are not selling assets under

16    363(f), and even if we were, for the reasons we described in

17    our brief, we believe we meet four separate subparts of 363(f)

18    that would allow a free and clear sale, if we were selling the

19    assets, which we're not.  At any rate, it's only AFI's consent

20    that is required under the intercreditor agreement, and they

21    have consented.

22         The JSNs have also, as I indicated, reprised their

23    argument regarding 510(b) and the fact that the debtor is

24    prohibited from settling claims that might be subject to

25    subordination.  We don't believe that that issue deserves any

1  more serious attention, and we believe should be rejected as

2  being an issue that the Court has already ruled on and having

3  no credible basis for serious consideration or argument.

4          And finally, the JSNs make the argument that I think

5  Your Honor pointed out, that even if they are undersecured,

6  they should get post-petition interest by aggregating their

7  deficiency claims; that they're oversecured because they're

8  undersecured, essentially.  This argument is contrary to

9  502(b)(2) of the Bankruptcy Code and it's contrary to the

10 Supreme Court's decision in Timbers and numerous other

11 decisions addressing the disallowance of interest to unsecured

12 creditors, which is a fundamental principle of bankruptcy law.

13 And if Your Honor needs more briefing on that, we obviously can

14 provide it.

15         In sum, for all the foregoing reasons and as the

16 evidence will demonstrate at trial, we submit that the JSNs are

17 undersecured; that the settlements in the plan, including the

18 settlements, the waiver of the intercompany balances and the

19 resolution of the AFI contribution, are proper and appropriate;

20 that the Court should reject the objections and confirm the

21 plan.

22         THE COURT:  All right.  Thank you, Mr. Eckstein.

23         Let me ask, who else is going to make short openings

24 in support of confirmation?  I'm not sure; don't start yet,

25 okay?  I'm just trying to understand --

RESIDENTIAL CAPITAL, LLC, ET AL.                    142

1           MR. SCHROCK:  I am, Your Honor.  Ray Schrock of

2   Kirkland & Ellis.

3           THE COURT:  Is anybody else, other than Mr. Schrock?

4           How long do you anticipate being, Mr. Schrock?

5           MR. SCHROCK:  Fifteen minutes, Your Honor.

6           THE COURT:  Would you prefer to do it now or after

7   lunch?

8           MR. SCHROCK:  After lunch would be great.

9           THE COURT:  2 o'clock, then.  Okay?

10          MR. SCHROCK:  Okay.  Very good.  Thank you.

11          THE COURT:  We're adjourned until -- we're in recess

12  until 2 o'clock.

13      (Recess from 12:38 p.m. until  2:02 p.m.)

14          THE COURT:  Please be seated.

15          Mr. Schrock.

16          MR. SCHROCK:  Good afternoon, Your Honor.  Ray Schrock

17  of Kirkland & Ellis on behalf of Ally Financial Inc. and its

18  nondebtor subsidiaries.

19          THE COURT:  You want to quiet down back there?

20          Go ahead.

21          MR. SCHROCK:  Thanks, Your Honor.  Your Honor, thank

22  you for the opportunity to give a brief opening statement.

23          I'll try not to repeat what has been said, although I

24  admit there are many words spoken this morning, so it may be

25  difficult.

RESIDENTIAL CAPITAL, LLC, ET AL.                143

1          I'm going to cover four points in this presentation.

2     I did leave a copy of it up front.

3          First, I'd like to cover putting Ally's support in

4     perspective; second, the plan and its process; why and how the

5     property of the bankruptcy estate is affected by the claims

6     being released; and finally, Your Honor, just a few brief words

7     on the plan support and the JSNs' objections.

8          So, Your Honor, first putting Ally's support in

9     perspective, we've heard a lot this morning about what's

10    happened during the case.  I'd like to take a step back for

11    just a moment and talk about what's happened pre-petition.  It

12    is covered in Mr. Carpenter's testimony, but I think it's

13    really important to realize and it goes to just how truly

14    unique these cases are.

15         Ally first began supporting ResCap with capital

16    infusions in 2007.  And if you look on the timeline of what was

17    happening during that time, you start to see the first cracks

18    in the mortgage crisis.  April 2007, New Century files for

19    bankruptcy, American Home filed in 2007, Countrywide secured an

20    eleven-billion-dollar emergency loan; and during this period

21    Ally supported ResCap to the tune of 2.763 billion dollars.

22    This is in addition to all of the credit facilities, ongoing

23    business support that it was lending to ResCap during this

24    time.

25         In 2008 Bear Stearn fails.  IndyMac is seized in July

1    2008.  It was during this time that Kirkland & Ellis first

2    became involved with Ally Financial.  ResCap already had

3    restructuring counsel in place.  And then in the fall of 2008,

4    Lehman Brothers filed for bankruptcy, kept Judge Peck very busy

5    for a long period of time --

6          THE COURT:  Until you all got to him.

7          MR. SCHROCK:  Until we got to him.  Fannie Mae and

8    Freddie Mac were placed in conservatorship.  Washington Mutual

9    was seized.  TARP was passed.

10          And, Your Honor, this was a very critical time for

11   Ally as well.  Ally faced its own set of issues.  It injected

12   more than 1.2 billion dollars into ResCap during this time.

13   And I still recall during the presidential election, the

14   automotive -- the OEMs, General Motors was having its own set

15   of issues.  GMAC, then Ally, its predecessor, was having its

16   own set of issues.

17          And it was through TARP and, the Troubled Asset Relief

18   Program, a really monumental effort that culminated in Ally

19   becoming a U.S. Bank holding company.  And that's a very key

20   point, and I think an important perspective for what's happened

21   here.

22          The view was that in order to save General Motors, you

23   had to save the finance company associated with it.  Ally was

24   providing the majority of the financing for dealers, for

25   numerous parties, like every other financial institution it was

1    under siege at the time.  It received TARP funds upon becoming

2    a bank holding company, a very substantial injection.  And

3    during 2009, it injected more than four billion dollars into

4    ResCap.  It did so because it was the right thing to do.  They

5    wanted to save the company.  They didn't want to see anybody

6    fail.  As a U.S. Bank holding company, the thought of a U.S.

7    Bank holding company's subsidiary filing for bankruptcy at that

8    time was not on the radar, it was unthinkable.

9           The Fed begins purchasing MBS guaranteed by Fannie Mae

10   Freddie Mac; and in the fall of 2009 you had 14.41 percent of

11   mortgage loans are delinquent or in foreclosure, according to

12   various news articles.  It was obviously a very troubling time.

13   But ResCap rallied in 2010, thanks to those injections.  And it

14   wasn't really until you saw the onslaught of mortgage

15   litigation that I think that a lot of these issues that we're

16   dealing with now first came into the fold.

17          But, you know, this is at a time where now Ally is

18   seventy-four percent owned by the United States taxpayers.  It

19   has received and still is the holder -- or still owes more than

20   any other TARP recipient.  And repaying the United States

21   taxpayers for their trust in Ally is foremost on their mind as

22   they're dealing with all of these issues.  They want to do the

23   right thing.  They have done the right thing.

24          So in 2011, they put in further capital injections and

25   it culminated in 2012 with a lot of negotiations leading up to

1    these cases.  Now leading into these cases, and Your Honor hit

2    onto this a little earlier, we think there are many things that

3    happened here that were essential to the success of the plan

4    that's in front of you.  And we do think that is the legal

5    standard under Metromedia.

6           You don't have to have linked contingent support

7    that's contingent on the plan; it just has to be essential to

8    the success of the plan.  Your Honor, I'd look at -- we cited

9    in our brief I think in footnote 4, Adelphia, where Judge

10   Gerber talks about the fact that there are many contributions

11   made during the course of the case that were key to the success

12   of the plan and in a 363 sale.

13          And I also think it's -- when you think about the

14   policy considerations of having every piece of consideration

15   linked to a plan support agreement or contingent upon a plan

16   that that has perverse incentives, that could be harmful to

17   debtors.  But we think the state of the law is, it just has to

18   be essential to the plan.  But during this process and leading

19   up to the case, Ally certainly provided support that no one

20   else could.  It was unique and substantial.

21          They refinanced a billion-dollar GSAP financing

22   facility from Goldman Sachs in December 2012.  They

23   participated in the plan support agreements with the RMBS

24   claimants, the third lien bondholders, the debtors.  They

25   supported the sale process and the DIP financing process

1   leading into the case through their employees and advisors.

2           That support was substantial and unique in these

3   Chapter 11 cases.  Having a U.S. Bank holding company support a

4   debtor, a financial enterprise, through a bankruptcy filing to

5   save the jobs, maximize value, was unprecedented.  It's the

6   paradigm, when we think about it, for what a substantial

7   contribution is.  And without this support, I don't think there

8   will be any testimony to the contrary, that there would be no

9   sale of a going concern.  There wouldn't be 4.5 billion dollars

10  in sale proceeds that provides the base for distributions in

11  addition to the Ally contribution.

12          The continued origination from Ally Bank to support

13  the servicing platform was absolutely critical to the sale

14  process.  Without it, there is no servicing platform.  The

15  ability to originate loans -- and I think Mr. Marano's

16  testimony will certainly support this -- was absolutely key.

17          Dealing with the GSEs, Fannie, Freddie, GNMA, the

18  regulators who obviously as a regulated entity have a

19  significant role in Ally's business and ResCap's business,

20  having Ally there as a source of support was the key to making

21  this happen.

22          We provided DIP financing when no one else would

23  provide it, 200 million dollars.  We served as the stalking-

24  horse bidder on the debtors' portfolio of held for sale loans.

25  We did this at the debtors' request.  I know we were criticized

RESIDENTIAL CAPITAL, LLC, ET AL.                148

1    in some of the pleadings during this case, which we let pass.

2    But we did this because we provided a higher bid than anybody

3    else.  The debtor wanted Fortress to be able to focus its

4    capital on -- the available capital on the servicing platform.

5            I'm sure that that generated a higher value ultimately

6    in the case, and it ultimately resulted, which we were fine

7    with, in Berkshire Hathaway purchasing those assets with little

8    due diligence, instead relying on what Ally had done.

9            The subservicing of Ally Bank's loans is a major piece

10   of the debtors' former servicing platform.  It is certainly a

11   key aspect of there being something to further support.

12           We also assumed pension obligations, we had shared

13   services that were provided to the debtors, and we'll support

14   all of this.  We also have the FHFA settlement that came in at

15   the end of this case.  FHFA insisted that Ally effectively

16   underwrite recoveries in the case.  Without it, there would be

17   an objection, there would be a process that would be a huge

18   impediment, we think, to getting the plan to where it is today.

19           Now on slide 5, we talked a little bit about the plan

20   and its process, which we think are truly unique.  It's the

21   paradigm for the product of a good and fair resolution for the

22   estates after good-faith negotiating and very difficult

23   negotiating.  And without breaching the mediation privilege, I

24   can really say this is a grand bargain for everyone involved.

25   It's a testament to this Court, to the Chapter 11 process, that

1   this was able to even come together to where we are today.  In

2   no other forum could this occur.  What Judge Peck was able to

3   do with 150 people in mediation is truly remarkable.

4           And it goes to the unique aspect of this case.  This

5   process spanned many months, dozens of meetings and the sheer

6   number of parties, some of which are listed on this page, and

7   not all of them, is truly mind numbing at times.  We didn't

8   think that it would happen at times, but we had faith, and I

9   will say that we were steadfast in insisting that there was

10  going to be no deal unless there was a global resolution.

11          Now given the make-up of the consenting creditor body

12  and the dollar amounts of claims at stake, we think the plan

13  represents the best chance to avoid years of protracted

14  litigation that would deplete the estate's assets.

15          Ally, we have our own views certainly on the

16  litigation.  We feel very strongly about our position in it.

17  We would vigorously defend ourselves in any litigation.  We

18  would prosecute our claims, as anybody would.

19          But to be sure, there was never any discussion, Your

20  Honor, from Ally's perspective about allocation.  And Mr.

21  Carpenter will certainly support that, that in this process we

22  said there is going to be a deal, a global resolution, or there

23  is not going to be any kind of deal.  We think that was

24  supported by the parties, by the mediator.  Everybody

25  understood that it had to be a global resolution.  And this

1    monetary and non-monetary contribution is unprecedented.

2             Your Honor asked a few questions earlier about

3    allocation, and certainly when I look at the allocation in this

4    case, I really think about it that it has to be a global deal.

5             Now I actually spent a good deal of time in another

6    case, Charter Communications, litigating with Mr. Uzzi about

7    the allocation between third-party releases and debtor

8    releases.  There was a great deal of time spent in that case

9    where we said, as the debtors, listen, this is one deal, where

10   it is not separable between third-party claims and debtor

11   claims.  Judge Peck ultimately found that it was a global

12   resolution and that we didn't have to allocate between the

13   third-party claims and the debtor claims.

14            I think the same can be said here, that Your Honor can

15   look at the total settlement to see whether or not it's

16   reasonable.  You don't have to allocate, I think, on a claim-

17   by-claim basis, but that's certainly something we can deal with

18   in further briefing.

19            Now Ally had its own reasons for agreeing to the

20   settlement, faces its own set of issues.  Repaying the United

21   States taxpayers for the support that has been loaned to Ally

22   is of paramount concern.  Moving on, having its own set of

23   regulatory issues; and it would not have agreed, again, unless

24   there was this very unique set of facts and circumstances.

25            And Your Honor, I think it's also a testament to the

1   parties and the sophisticated nature of the process that the

2   settlement --  and we believe the evidence will bear this out -

3   - that the examiner report actually supports the settlement.

4   It is hearsay, but I know of few other settlements that undergo

5   an eighty-million-dollar cost of examination, the most

6   extensive examination that I'm aware of in a Chapter 11, and

7   come out of the other end of it where the parties actually have

8   a settlement that is supported by the evidence.

9           Now in slide 7, I just want to talk briefly about the

10  property of the estates being affected by the claims being

11  released under the plan.

12          Now the claims at the heart of the proposed third-

13  party release directly affect the rest of the bankruptcy

14  estate, we think, under established law.  We have filed ninety-

15  eight timely proofs of claim.  And the debtors owe broad

16  indemnification rights to Ally, pursuant to, among other

17  things, an amended operating agreement, an operating agreement

18  that was put in place, ironically, to protect ResCap from the

19  perceived risks of General Motors.

20          So under that operating agreement -- we've got the

21  relevant provisions here -- the deal basically was that ResCap

22  would indemnify what was then GM, later became Ally, for

23  liabilities that Ally would face related to ResCap's business;

24  and the opposite was also true, that Ally would indemnify

25  ResCap for liabilities related to Ally's business that ResCap

1  faced.

2           We think it is plain that under the terms of the

3  operating agreement, the debtors are contractually obligated to

4  indemnify Ally for losses and claims that are subject to the

5  third-party release.

6           We also would note that in our proof of claim -- and

7  the documents clearly bear this out -- under the line of

8  credit, those claims are secured.  And that's not something

9  that's highlighted often, but it certainly is asserted in our

10  proofs of claim.

11          We also have the shared insurance coverage.  The

12  shared insurance coverage is a key aspect of the settlement and

13  also is effective -- the claims would also significantly affect

14  that shared insurance.  There is substantial E&O insurance

15  coverage; Martin Blumentritt of Ally will testify as to this.

16  And the global settlement contemplates that the first 150

17  million dollars of insurance proceeds from Ally's insurance

18  claims will be distributed to the debtors' estates.

19          I think the first of those settlements will be

20  presented to the court in short order.  We've been working with

21  the insurance companies to try and see if we can get those in

22  sooner than next year, but I expect that we'll be in front of

23  the Court soon pressing that forward.

24          Now let's talk just briefly here about the remaining

25  objections.  You've heard a lot about the overwhelming support

1    from the JSNs, and I will note, of course, that the JSNs

2    received over 800 million dollars in interest while Ally was

3    supporting ResCap in the years leading up to these cases.  And

4    they did sign a plan support agreement.  Things have changed.

5    They're now objecting.  But, Your Honor, I want to focus you on

6    just a couple of things.  And I think this is important.

7          They're objecting in their capacity as secured

8    creditors, not unsecured creditors.  When you are objecting in

9    your capacity as a secured creditor, you have to look at the

10   intercreditor agreement.

11         Whether they're oversecured or undersecured, it

12   doesn't affect the conformability of the plan.  But when you

13   look at the intercreditor agreement, and I question whether or

14   not they'd even have a lien on anything at this point, but

15   saying for a moment that they do, when you look at the

16   intercreditor agreement, the JSNs agreed Ally gets paid first.

17   Ally gets paid first means that no matter what happens inside

18   of this court, it gets its default interest, it gets all of its

19   rights, and the JSNs agreed -- that's the purpose of an inter-

20   creditor -- you, Ally are going to get paid first, we will get

21   paid next.

22         And what has always troubled me about the arguments

23   that are being placed here by subordinated creditors in their

24   capacity as secured parties -- not unsecured -- where they have

25   reserved rights under the intercreditor to just act in their

1    capacities in the bankruptcy court -- but to say here we as a

2    secured party have a claim against the senior creditor -- and I

3    think that flies in the face, the very purpose of an

4    intercreditor.  They have collateral that forms the basis and

5    has a claim against Ally.

6            My view and the view of Ally is that once we pay a

7    dollar to the JSNs, that comes right back to us until we're

8    paid in full.  That's the way the intercreditor works.  If it

9    were otherwise, you'd have situations where junior creditors

10   could effectively subvert the provisions of an intercreditor by

11   prosecuting claims against the senior creditors.

12           Now I'm not aware of any other case or circumstance

13   where subordinated creditors are taking this position that's

14   being taken by the JSNs in this case.  But we think under the

15   plain and unambiguous language, the intercreditor agreement

16   should be enforced.  I'll be happy to address that further, if

17   Your Honor would like.

18           Your Honor, I want to talk just for a second about the

19   WFNBA objection.  This one bothers me because I've never had

20   any idea what this party is objecting to.

21           We dealt with them pre-petition.  They wanted a set of

22   demands that the debtor thought was unacceptable, so they moved

23   to close the accounts.  They wanted to reserve rights, but to

24   what end, I'm not sure.

25           But what's happened here is we have a situation where

1   their counsel has created exposure, even though the accounts

2   were closed in June of 2012 -- and I have a colloquy on the

3   slide here that talks about how those accounts were closed,

4   there was nothing to even have adequate protection for.  This

5   is in June 20, 2012.

6          But for some reason there is now a million dollars of

7   fees that have been racked up in this case for monitoring that

8   are related to the debtors' business.  And I don't understand

9   why if we have closed -- the debtors closed the accounts.  Ally

10  had money that it subsequently took out of Wells Fargo.  But

11  there is nothing to protect.  It's creating issues where there

12  are none.

13         Now the last thing I want is for this to take up more

14  time in this case, and if Your Honor wants to hear the

15  applicability of the third-party release to Wells Fargo so that

16  we don't have to go through, take up the Court's time during

17  this confirmation trial, if you want to reserve that for after

18  the confirmation hearing, Ally will do that.  We'll put it

19  aside and we'll say we'll argue the applicability of a third-

20  party release should the Court approve it post-confirmation.

21  If Wells Fargo wants to take up the dozens of lawyers' time in

22  this hearing and trial to argue about whether or not the third-

23  party release can even be granted, well then we'll have to hear

24  the issue now.

25         But I would hope that given the limited scope of what

1  we're dealing with --

2         THE COURT:  Let me ask you this.  Have you sought to

3  work out a stipulation with Wells Fargo -- I mean I'm hearing

4  this for the first time and my reaction is I'll decide whatever

5  issues I have to decide.  If you can reach an agreement with

6  Wells Fargo, reach a stipulation with Wells Fargo.

7         MR. SCHROCK:  Okay.  We'll try and work out something

8  like that, Judge, and see if we can.  I discussed it with my

9  client at lunch and I said we have to be able to --

10        THE COURT:  Sounds like I'm hearing it for the first

11 time and so are they, so --

12        MR. SCHROCK:  Exactly.

13        THE COURT:  Okay.

14        MR. SCHROCK:  So, Your Honor, for all the reasons

15 that -- and I join in the comments of Mr. Eckstein and Mr. Lee,

16 but we'd ask the Court after hearing the evidence and closing

17 arguments to please confirm the plan.  We think that what Ally,

18 the debtors, the committee have put together here is truly

19 unique.  There are no do-overs.  This is a fragile peace that

20 has been worked out among all of the parties.  And we think

21 that the evidence and the law support granting the relief

22 that's been requested.

23        THE COURT:  The only question I have is you pointed a

24 footnote 4 in your brief and I don't remember what was there.

25        What is the authority you rely on that the support

1   that Ally provided to the debtors before it agreed to make the
2   2.1-billion-dollar contribution as part of the plan should be
3   considered in connection with the Metromedia standard?  Is
4   there a case that you're relying on?
5          MR. SCHROCK:  Well, Aldephia -- certainly we cited
6   Aldephia.  I think there are other --
7          THE COURT:  And what is it that Judge Gerber decided
8   in Adelphia --
9          MR. SCHROCK:  I think that he referenced that --
10         THE COURT:  You -- I haven't heard evidence on this
11  point, but I've heard about it enough during the case, about
12  all of the assistance, essential assistance that AFI provided
13  that allowed the debtors to get to this point.  So I'm not
14  questioning that for now.  There may be evidence to the
15  contrary, but so, I'm not -- let's assume the evidence supports
16  that statement.
17         MR. SCHROCK:  Yes.
18         THE COURT:  Okay.  What I'm looking for is the
19  support -- I mean 2.1 billion is nothing to, you know, sneeze
20  at.
21         MR. SCHROCK:  Right, it the most significant
22  contribution ever.
23         THE COURT:  But you're arguing beyond that.
24         MR. SCHROCK:  Yes.
25         THE COURT:  That everything that AFI did before

1   agreeing to the 2.1 billion is appropriately considered in

2   deciding whether the Metromedia standard is satisfied.

3          MR. SCHROCK:  Yes.  So, Judge, I think if you look at

4   Aldephia, we don't think the law is -- I'll put it this way,

5   Judge, and we can certainly provide further briefing to the

6   extent that you thought it was necessary -- but we don't think

7   the law predicates a finding of a substantial contribution upon

8   the timing of the consideration or its nexus that it has to

9   only be coming in upon the plan being confirmed.

10         Now we cite Aldephia for that proposition where they

11  found that both financial and non-financial consideration given

12  in the past was substantial, noting the nondebtors had already

13  "put in 17.5 billion into the estate and agreed to rework their

14  agreements to take the debtors' assets in the Section 363

15  sale."

16         THE COURT:  Okay.  We'll do this later.  I understand

17  your point.

18         MR. SCHROCK:  Judge, and just to finally hit that --

19  so I think that if -- all of the support that was provided

20  really provides the basis for why we're here today.  And I just

21  want to bring it back to the evidence, that without that

22  support, without the sale getting to a baseline where we could

23  have the agreement that we have here, it was essential to the

24  success of the plan, and I think the witnesses and the evidence

25  will support that.

1              THE COURT:  Okay, thanks, Mr. Schrock.

2              MR. SCHROCK:  Thank you.

3              THE COURT:  All right.  Is there anyone else who

4      intended to give an opening in support of plan confirmation?

5              All right.  Sure com on up.  So we'll hear those

6      opposed.

7              Mr. Uzzi, I guess you're going to open?

8              MR. UZZI:  Good afternoon, Your Honor.  Gerard Uzzi of

9      Milbank Tweed Hadley & McCloy on behalf of UMB Bank and the ad

10     hoc group.

11             Your Honor I was tempted to come up from the back row

12     and start.  I've handed up a deck, Your Honor.

13             THE COURT:  It's unusual to see Mr. Shore sitting in

14     the back and you up front.

15             MR. UZZI:  He's dying to come up here too, Your Honor,

16     I can tell you that.

17             I handed up a deck, Your Honor.  I'll work from a few

18     slides, but I'm not very good at PowerPoint.  So hopefully we

19     match up with what's on the screen.

20             Your Honor, obviously we appreciate all the Court's

21     time and your staff's time.  We know that this has been

22     difficult.

23             You know, typically, in this process, you never want

24     to be the last man standing, but I actually think for the

25     purposes of what Your Honor has to deal with, hopefully it will

1    make this more efficient than what people thought it was going

2    to be even just a -- even just a few weeks ago.

3            We're here both on confirmation issues and issues

4    related to adversary proceeding both as they affect the JSNs'

5    entitlements.  And although there are a lot of complex issues

6    that factor into making the determination, when you cut through

7    it, Your Honor, there are two basic things that are in dispute,

8    what are the JSNs rights and entitlements and what are the

9    debtors' rights and entitlements with respect to first

10   intercompany claims, and second, claims against Ally upon which

11   the JSNs have a lien.  Ultimately, it's whether those rights

12   and entitlements require the plan proponents to pay the JSNs

13   post-petition interest under the plan.

14           So what does that really mean and what are we really

15   fighting over?

16           Well, specifically, Your Honor, as of December 15th --

17   and this is on slide 2, Your Honor -- $342 million of post-

18   petition interest.  And as the court recognized in the phase 1

19   decision, that is a large sum of money.  Your Honor, as a

20   consequence of your phase 1 decision, you determined that the

21   JSNs are under secured by $318 million.  Thus, for us to start

22   earning post-petition interest, excluding fees, the Court needs

23   to determine that we have at least an additional $318 million

24   of collateral securing our claims at issue, the collateral

25   issue in this adversary proceeding.

1      And for us to receive our full contractual

2  entitlements, the Court needs to determine there's an

3  additional $660 million assuming, again, a December 15th date.

4  And as my partner, Mr. Cohen, will go through with you in a

5  moment, we believe that the evidence will demonstrate that the

6  value of the remaining collateral well exceeds our full

7  contractual remaining entitlements.

8      Another consequence of the phase 1 decision is that it

9  confirms that given the amount of collateral we have and the

10 size of our deficiency claims, that multiple asset-rich debtors

11 were entitled to recover a full par claim including accrued

12 pre-petition interest under all circumstances, even if we're

13 under secured.  Said another way, Your Honor, the plan pays us

14 our minimum, no more than that.

15      THE COURT:  I rejected the OID argument, and so you've

16 got the full par amount in your claim.

17      MR. UZZI:  Yes, Your Honor.  I mean, the plan always

18 contemplated that we would get our full pre-petition claim.

19 And if you had not rejected the OID argument, that just would

20 have reduced what the claim was.

21      I think there's been some confusion as to, you know,

22 the debtors -- the terms of being generous to us in the plan.

23 Under the plan, we were always, regardless of --

24      THE COURT:  Whether you're undersecured or not, you

25 were going to get --

RESIDENTIAL CAPITAL, LLC, ET AL.                    162

1        MR. UZZI:  There's enough value there for us to get --

2        THE COURT:  Right.

3        MR. UZZI:  -- to the full par claim.

4        THE COURT:  It just might be coming from different

5   pots, but it was --

6        MR. UZZI:  Correct, Your Honor.

7        Your Honor, I'm going to skip over slide 3.  I decided

8   to consolidate my argument a little bit and just go to slide 4.

9        And I'd like to talk about the pre-petition PSA just

10  for a moment.  And I don't believe the pre-petition PSA should

11  really have too much significance here, Your Honor, but you've

12  heard about it --

13       THE COURT:  I agree with you on that.

14       MR. UZZI:  -- quite a bit.  Well, Your Honor, I need

15  to address it and I'd ask you to bear with me for just about

16  two minutes.

17       And, yes, a group of holders of JSNs negotiated with

18  the debtors and Ally and entered into an agreement on the eve

19  of the petition date to support a plan process.  And yes, it's

20  true, Your Honor, I was the lead counsel who negotiated that

21  agreement with respect to that PSA for those GSNs -- JSNs, I

22  should say.  And with any agreement, Your Honor, it had its

23  gives and gets.  And the JSN's gets were accelerated

24  distributions.  And how was that?  It was through, among other

25  things, but most importantly, a material modification to the

1   intercreditor agreement that would permit the JSNs to receive

2   their distributions much more quickly and ahead of Ally.

3        And it wasn't just the subordination of $125 million,

4   as what you've heard.  What was going to happen was Ally was

5   going to receive the first $400 million, the JSNs would receive

6   the next billion, and then the JSNs would receive 81 cents of

7   every next dollar until payment in full.

8        And the JSN's gives were to support the plan process

9   and the sale process and limit a highly conditional waiver of

10  six and a half months of interest.  And why structure the deal

11  that way?  Well, I think it's plain on its face.  It's simple.

12  Post-petition interest was always going to be the issue for the

13  JSNs from the start of the case.  And one of the ways to make

14  the issue go away is to prevent the accrual of the interest in

15  the first place.  And accelerated distributions, while not

16  making the issue go away completely, would have substantially

17  minimized the issues in this case relative to the JSNs, and

18  that's why that deal was cut.

19       Well, what happened, Your Honor?  As the Court

20  recognized in its phase 1 decision, first, the deal never got

21  traction with the broader group of JSN holders.  Only thirty-

22  seven percent ever signed up for the deal.

23       Second, the deal became illusory.  In fact, one of the

24  termination events in the PSA was the filing of the committee's

25  lien challenge.  Given the delays of the case and the breadth

1   of that lien challenge, it became clear the deal was not

2   executable for reasons beyond the JSN's control.  But the

3   committee never tried to embrace that deal either, Your Honor.

4   The committee chose a litigation path by seeking to challenge

5   the liens and to let interest accrue.  And that's part of the

6   reason why we're here today, Your Honor.

7         It's important to note that the JSNs, as JSNs, didn't

8   agree to anything.  A small number of holders of JSNs signed

9   PSAs that were designed to help move the process forward and

10  did, in fact, move the process forward.  The deal ultimately

11  stalled, but that small number of PSA's -- I'm sorry -- small

12  number of holders signing PSAs in their individual capacities

13  had no ability to and did not purport to bind JSNs as JSNs to

14  anything.  They didn't have the legal authority to do so.  The

15  PSA, Your Honor, I believe has little significance, but if it

16  does, all it does is confirm that post-petition interest was

17  always an issue for the JSNs in this case.

18        Your Honor, I'm, just to keep up, moving onto slide 6,

19  the more substantive matters.  What's in dispute?

20        Your Honor, we use a shorthand in our papers, the

21  subject collateral, and what does that mean?  It's the

22  collateral that is comprised of intercompany claims that the

23  JSNs have direct liens on.  It is claims against Ally,

24  specifically claims other than commercial tort claims and

25  avoidance actions -- the debtors' claims, I should say, to be

1  clear, and equity pledges of entities that are beneficiaries of

2  intercompany claims where we concede we don't have a direct

3  lien on the intercompany claim.

4          Pursuant to the cash collateral order --

5          THE COURT:  So the debtors as to which you didn't

6  have -- you don't have a lien on intercompany claims -- I mean,

7  where's the restriction on their governance rights?  Where's

8  the restriction on their ability to settle and resolve

9  intercompany claims on the basis that they think is

10  appropriate?  You're complaining about it, but you don't have a

11  lien on it.

12          MR. UZZI:  No, but I do have a lien on the equity of

13  that entity, Your Honor.

14          THE COURT:  Yes, you do, but that doesn't restrict

15  governance rights, the ability of a company to resolve disputed

16  matters.

17          MR. UZZI:  Well, Your Honor --

18          THE COURT:  You don't get to step in in place of their

19  management when you have -- you've got an equity pledge, but

20  you know, some day you'll find out what the equity is worth.

21          MR. UZZI:  Well, Your Honor, there are no material

22  creditors, if any creditors, at these entities.  So through the

23  equity pledge --

24          THE COURT:  So are you saying -- tell me this.  Are

25  you saying that management of a debtor is prohibited from

RESIDENTIAL CAPITAL, LLC, ET AL.                    166

1    exercising its management authority because you have an equity

2    pledge?  And do you have some authority for that proposition?

3                MR. UZZI:  Your Honor, what I'm saying is, is that I

4    have a lien on the equity pursuant to the security agreement.

5                THE COURT:  No.  Could you answer my question, and

6    then I'll let you go on?  Do you have any authority that

7    management of an entity as to which you have an equity pledge

8    is restricted or limited in exercising its management authority

9    and control, specifically with respect to settling claims.

10               MR. UZZI:  Yes, Your Honor.  I mean, general corporate

11   governance requires management to act in its fiduciary

12   capacity for the equity holder.

13               THE COURT:  So you think you got a breach of -- have

14   you asserted a breach of fiduciary duty claim against

15   management for going ahead and entering into a global

16   settlement that resolves intercompany claims?

17               MR. UZZI:  Your Honor, I've tried to make my case the

18   best I can.  I mean -- Your Honor, I mean --

19               THE COURT:  Yeah, you've raised -- you know, the JSNs

20   have raised more issues than I think I've seen in my whole

21   career, okay.  And in phase 1, I went through every one of the

22   issues you raised, and I decided every one of the issues you

23   raised and I'll do it now if I have to as well, but you're

24   acknowledging you don't have liens directly on intercompany

25   claims.

RESIDENTIAL CAPITAL, LLC, ET AL.                    167

1          MR. UZZI:  Yes, Your Honor.

2          THE COURT:  And what I want to know is what is the

3   basis for your argument with no liens on intercompany claims

4   that management is limited or restricted or prohibited from

5   exercising its business judgment and resolving disputed

6   matters, do you have any authority that says that?  I didn't

7   see it -- you know, I've read all the pretrial papers

8   carefully.  And you'll answer my question, and then you can go

9   on with your argument.

10          MR. UZZI:  No, Your Honor, I do not have authority for

11  the direct question.  A couple of issues, Your Honor.

12          First, all we've asked for, and what they've said no

13  to, is to the extent the intercompany claims have value, we

14  should get them as part of our secured claim, whether it's

15  adequate protection or otherwise.  They have taken the position

16  that, no, we're entitled to settle them at zero, and that

17  value, that zero, dictates what you're entitled to as a matter

18  of adequate protection.  I have no choice in the face of that

19  argument to say then, then you shouldn't be able to settle them

20  because you're not taking into accounted my economic interests.

21          Under the security agreement, but for the automatic

22  stay, I would have the right to foreclose on --

23          THE COURT:  Not to foreclose on intercompany claims.

24          MR. UZZI:  I would have the right --

25          THE COURT:  You don't have any lien on intercompany

1     claims.

2            MR. UZZI:  Well, I do have liens on certificate

3     intercompany claims, Your Honor.  I don't have liens -- I have

4     liens on equity pledges, and as a consequence of foreclosing on

5     the equity pledge, I could take control of that entity.  It's

6     the automatic stay which requires adequate protection.

7            Your Honor, I just want my economic rights preserved,

8     the global --

9            THE COURT:  I know what you want.  You wanted a lot of

10    money.

11           MR. UZZI:  Yes.

12           THE COURT:  But what I'm having -- what I'm struggling

13    with is finding what the legal basis for your argument that

14    you're entitled to any of it.

15           MR. UZZI:  And I'm struggling for the legal basis of

16    settling intercompany claims at zero, Your Honor.

17           Your Honor, would you -- I --

18           THE COURT:  Go ahead.  I'm sorry.  I'm going to let

19    you go on.

20           MR. UZZI:  Okay.  Pursuant to the cash collateral

21    order, Your Honor, the debtors stipulated to the liens on the

22    subject collateral, as we've defined them, as we narrowly

23    defined them, and the committee did not challenge those liens,

24    so those stipulations are binding.

25           Pursuant to the security agreement, Your Honor, we

RESIDENTIAL CAPITAL, LLC, ET AL.                    169

1    have a lien on general intangibles.  It's more in our papers.

2    I don't want to burden you with it.  But we have a lien on

3    general intangibles that generally includes things in actions,

4    including contract claims.

5            THE COURT:  And the AFI revolver would have a lien on

6    those same matters?

7            MR. UZZI:  They do, and we don't dispute that, Your

8    Honor, and I will get to the issue of the intercreditor

9    agreement in a moment.

10           In fact, I think we'll probably move to slide 8, and I

11   can address the issues on the intercreditor agreement.

12           Now, notwithstanding the cash collateral stipulations,

13   Your Honor, the plan proponents now suggest that we don't have

14   a lien on intercompany claims, of course, either the

15   intercompany company claims are not enforceable obligations or,

16   two, because we don't have what they call a protectable

17   interest in the intercompany claims.

18           With respect to the first argument, that simply goes

19   to the value of the interest.  If it's enforceable, we have a

20   lien on it and we get that value.

21           With respect to the second issue regarding a

22   protectable interest, the plan proponents rely on the indenture

23   in the intercreditor agreement to say that we have no

24   protectable interest because pre-petition and, very

25   importantly, pre-default the debtors had the -- this is what

RESIDENTIAL CAPITAL, LLC, ET AL.                    170

1  they say -- unfettered right to compromise the intercompany
2  claims without our consent, and that was our bargain and all we
3  are entitled to is the benefit of our bargain.  But what they
4  ignore is that we are no longer pre-petition and we are no
5  longer pre-default.  Our bargain was to be paid our full
6  contractual entitlements.

7          Once there is a default and an absence of being paid
8  such full contractual entitlements, the benefit of our bargain
9  is to be able to look to our collateral which includes the
10  intercompany claims to satisfy ourselves.  Those claims exist
11  today and but for the automatic stay, as we set forth in our
12  plan objection, Your Honor, under our security agreement we
13  would have the right to control the intercompany claims.  They
14  are in material default of the indenture and they're not
15  permitted to rely on those provisions.

16          THE COURT:  I'm sorry.  Which is the -- you've got
17  highlighted language.  Is some of this --

18          MR. UZZI:  Actually what I just said isn't in the
19  slide.  I'm going to turn to that in a second, Your Honor, I'm
20  sorry, but it is in our plan objection.

21          Second, Your Honor, they're in bankruptcy.  They're
22  required to preserve and protect the collateral and to provide
23  adequate protection upon its disposition.  And nothing in the
24  indenture obviates the need to adequately protect our
25  collateral.

RESIDENTIAL CAPITAL, LLC, ET AL.                    171

1            Now, getting to the slide, Your Honor, you know,

2    the -- interestingly, this is the plan proponents, but not Ally

3    claiming that Ally had the unfettered right to release liens or

4    otherwise dispose of collateral under the intercreditor

5    agreement; that is legally and factually incorrect.

6            First, the intercreditor agreement -- and now I'm on

7    slide 8, Your Honor.

8            THE COURT:  Yes.

9            MR. UZZI:  The intercreditor agreement, once there is

10   a bankruptcy, Section 6.1(c) controls and permits the JSNs to

11   withhold what is otherwise a deemed consent to any lien release

12   and, even if there were a deemed consent, requires that the

13   liens attached to the proceeds of any disposition of

14   collateral.

15           Moving on, Your Honor, to the next slide.  The proviso

16   in Section 3.1(a) of the intercreditor agreement also clearly

17   establishes the JSN's rights in bankruptcy.  The JSNs may take

18   any action to establish, preserve or perfect its rights in

19   collateral or to file any pleadings in response to any person

20   seeking to disallow a claim secured by collateral.

21           Additionally and probably most importantly, 3.1(d)(3)

22   makes it clear there is no unfettered right to dispose of

23   collateral.  It expressly requires the first lien agent to act

24   in a commercially reasonable manner within the meaning of any

25   applicable UCC.

1          Finally, Your Honor, what the plan proponents rely on

2    is Section 5.1A, 5.1(a) is misplaced -- first, the lien release

3    in 5.1(a) is not an automatic lien release.  It requires

4    conditions to its satisfaction.  First, it contemplates an

5    affirmative release by Ally, and nowhere in Ally's pleading,

6    nor in the evidence, have we seen does Ally purport to actually

7    have released any lien.

8          And Your Honor, we don't dispute -- I don't dispute --

9    I don't like that Mr. Ray brings up charter -- Mr. Ray, I'm

10   sorry -- Mr. Schrock brings up charter which, just as an aside,

11   I think has nothing to do with the issue that Mr. Schrock

12   raised.  But I don't disagree that they come in front of us.

13   They've been paid down already, Your Honor.  They don't have an

14   economic interest in this collateral, except for maybe some de

15   minimis fees, but there's 800 million dollars of other

16   collateral sitting there to satisfy them.

17         So, Your Honor, 5.1(a) by its terms is inapplicable.

18   6.1(c) is the operative provision under the intercreditor

19   agreement, and that provision fully protects the JSNs.

20         Your Honor, why are we objecting to the global

21   settlement?  Your Honor, I don't want to be objecting to the

22   global settlement, but if its terms are going to be used to

23   determine our substantive rights, I have no choice.

24         We don't take issue, first of all, with the concept

25   that general unsecured creditors are free to decide how to

1  divide up the residual value as they wish.  The key is the

2  residual value.  And we've seen -- we've said this in our

3  papers.  We see no reason why our rights shouldn't be

4  determined independent of the global settlement, and then just

5  let the global settlement stand for the distribution residual

6  value.

7           I think you kind of heard that today.  I think you've

8  kind of heard, well, if we establish adequate protection, then

9  it just comes off the top and then the global settlement

10 stands.

11          THE COURT:  Do you agree with that or disagree?

12          MR. UZZI:  I think that's the way it should be, Your

13 Honor.  I think --

14          THE COURT:  That was really my question earlier this

15 morning because, quite honestly, it is not clear to me -- you

16 framed your arguments in the alternative.  That's certainly

17 fine; I have no problem with that.  But to the extent that

18 you're saying that alternatively we get an adequate protection

19 claim if what is our collateral is being used to satisfy the

20 global settlement.  That's when I asked the question this

21 morning is, can this plan be confirmed with the global

22 settlement, and your rights rise or fall as to whether you've

23 got an adequate protection claim.

24          MR. UZZI:  I think it can.  I think it should.  That's

25 what I fought long and hard for, Your Honor, with getting the

RESIDENTIAL CAPITAL, LLC, ET AL.                                174

1    representation that we got at the disclosure statement hearing.

2    I fear that there's always kind of somewhat of a retreat on

3    that.  That doesn't -- only they can answer the question as to

4    whether their plan is confirmable under a certain ruling by

5    you, Your Honor.  Our submission --

6            THE COURT:  Well, I made clear earlier in the case I

7    wasn't even going to go forward with a plan that allowed any of

8    the creditors to blow up the plan if I determined that you were

9    oversecured and entitled to whatever you get as a result.

10           MR. UZZI:  And we appreciate that, Your Honor, and I

11   think that's the right answer.

12           THE COURT:  And that -- I think the answer was given

13   pretty clearly that, yes, if you determine that the JSNs are

14   oversecured, they get their post-petition interest.  It doesn't

15   permit others to say, no, the plan can't be -- you know, that's

16   not a condition to confirming the plan that you're

17   undersecured.

18           MR. UZZI:  Yes, Your Honor.  And in our plan

19   objection, in a footnote, you'll see that that wasn't always

20   the case, notwithstanding you were saying that and

21   notwithstanding the fact that I was coming before you asking

22   for that determination.  There was a time when the plan

23   proponents were taking the position that --

24           THE COURT:  That got resolved.

25           MR. UZZI:  That did get resolved, Your Honor.

1            THE COURT:  Are you satisfied with those answers?

2            MR. UZZI:  No, I am satisfied with that, Your Honor.

3            What I struggle with, Your Honor, and which I think is

4    causing unnecessary friction, is just how far does that go.

5    There is a gray area now.  For instance, I don't take issue

6    with the general concept of them saying intercompany claims

7    should be disregarded for the purposes of distributions among

8    the general unsecured creditors.  But if they have value, I

9    should get it.  And then we could just talk about what the

10   value is.  Instead --

11           THE COURT:  The value may be zero.

12           MR. UZZI:  The value may be zero, Your Honor, but not

13   because they settled --

14           THE COURT:  Well, maybe because they settled them.

15   That comes back to the point, Mr. Uzzi, that -- I mean, they

16   have to satisfy -- I'm not ruling by my comment, but, you know,

17   at an absolute minimum they have to satisfy the 1919 standard

18   with respect to the settlement.  I understand that's

19   controversial; you dispute it. But if I find they satisfied the

20   1919 standard, you know, settlements often make some people

21   unhappy.  But when they satisfy the required standard, when

22   they're settling disputed claims, when you go to prove the 1919

23   standards -- if it gets approved, it gets approved.

24           MR. UZZI:  And I understand that, Your Honor, but if

25   they're going to -- if they're taking the position, which they

RESIDENTIAL CAPITAL, LLC, ET AL.                    176

1   are, that they can settle them at zero and that settlement

2   dictates my value, then I have to object to settling them at

3   zero.  I would just prefer that let's just talk about what

4   they're worth and maybe work something out that way.

5        THE COURT:  I understand you're objecting to it at

6   zero and I'll have to hear that, okay, and I'll decide it the

7   way I think it should be decided.

8        MR. UZZI:  And Your Honor, respectfully, I'm just

9   trying to address, you know, your comments --

10       THE COURT:  No, because look, I'll tell you -- and I

11  mean, I think this has been helpful to me.  The reason I asked

12  the question this morning is because it still wasn't clear to

13  me whether your objections to the plan with respect to the

14  global settlement, whether that precludes -- if you're right,

15  does it preclude confirmation of the plan?  Why does it

16  preclude confirmation of the plan?  How is it -- you know, I

17  have to decide -- I'm not questioning it -- I'll have to decide

18  whether do you have property rights that have been taken away

19  from you realize.

20       But look, I mean, if you had a lien on a personal

21  injury action, are you telling me that means that the parties

22  to the dispute can't settle it?  And if the issue in the

23  dispute is whether a million dollars of damages or 100,000

24  dollars of damages, the parties come to an agreement to settle

25  it for 200,000 dollars -- you're saying because you have a lien

1  on it you can control whether the parties to the actual dispute

2  can settle it, unless you have a written agreement that says

3  precisely that?  And I've seen that.

4          MR. UZZI:  Well, Your Honor, if I don't have that

5  written agreement, then I'm not sure I can.

6          All right.  But I do have that agreement here.  I have

7  a security agreement.

8          THE COURT:  Do you?

9          MR. UZZI:  Yeah.

10         THE COURT:  You know, insurance contracts, don't let

11 the insureds settle a claim without the approval of the

12 insurance company, okay.  The person who ran somebody over

13 can't say, okay, I have ten million dollars of insurance, I'll

14 settle it for twenty-nine million whether the insurance company

15 likes it or not.  The insurance company policy is written

16 exactly to prevent that.  The security agreement isn't written

17 to do that.

18         MR. UZZI:  Let me be precise.  I don't want to

19 misstate the position.  Until an event of default, they have --

20 the debtor has the ability and the authority to settle, you

21 know, a payment receivable, the intercompany claim.

22         Upon an event of default, in absence of the automatic

23 stay, the secured party under both the security agreement and

24 under the UCC has the absolute right to deliver notice to the

25 counterparty that says I have a lien on this and I am now

RESIDENTIAL CAPITAL, LLC, ET AL.                    178

1    attorney in fact with respect to that claim.

2              THE COURT:  Which is the language that you're pointing

3    to on here?

4              MR. UZZI:  I'm sorry.  It's in our plan objection.

5    I'm going to ask one of my colleagues to look for it.

6              THE COURT:  Go ahead.

7              MR. UZZI:  So, Your Honor, you know, -- so again, we

8    don't have an issue with the global settlement as it affects

9    everybody else, only as it affects us.  And we believe the

10   evidence will show that the plan proponents designed the global

11   settlement in a manner that is prejudicial to the rights of the

12   JSNs.  And if we look -- and this is hopefully the last time

13   we'll look at the pre-petition PSA.  If we look at my pre-

14   petition PSA -- and this is slide 12 -- Your Honor, we see what

15   the treatment of intercompany claims was under that PSA.

16             There has been suggestions, but no evidence, that the

17   intercompany claims were being waived in the pre-petition PSA

18   or that we were leasing liens on the pre-petition PSA.  That's

19   not what the pre-petition PSA says.  The pre-petition PSA, it

20   preserves the value of the intercompany claims for us as our

21   collateral.

22             Now, to be clear, Your Honor, pre-petition, I'm not

23   meaning to suggest that anybody was in agreement that there was

24   value there, how much value there was --

25             THE COURT:  I mean, this isn't like your argument

RESIDENTIAL CAPITAL, LLC, ET AL.                    179

1   about 5G, the cash collateral order that revised liens on the

2   billion dollars in collateral --

3           MR. UZZI:  No, Your Honor.  But what it is --

4           THE COURT:  Whatever you had, you had.

5           MR. UZZI:  Yes, and whatever we had, we'd get.  And

6   that's fair.

7           Now we look at the treatment in the -- what I'll call

8   the consenting creditors -- well, actually this is from the

9   plan, Your Honor.  They just waived, cancelled, discharged --

10  nothing.  That's notwithstanding that they have admitted

11  through this, since we started talking about this, that these

12  intercompany claims do have value.  We don't know how much yet.

13  But they say that we get nothing, and because of the waiver,

14  we're not entitled to that value.

15          I'd also like to look at for a second, Your Honor, a

16  little bit more closely how the global settlement came

17  together.  If you look on slide 13, on the left we see the

18  original agreement that was reached on May 13th.  At that

19  point, there was no -- what was called a plan term sheet and

20  there was certainly no suggestion of any type of allocation of

21  the Ally contribution among the debtors' estates.

22          Instead, there was a different allocation.  Each

23  consenting creditors negotiated for a specific monetary

24  distribution, a specific piece of the pie, and that was the

25  condition of them getting on board, getting not that I remember

RESIDENTIAL CAPITAL, LLC, ET AL.                    180

1   satisfying piece of the pie.

2           You can see MDIA (sic) negotiated for nearly 800

3   million dollars, FGIC negotiated for nearly 200 million

4   dollars, and so on.  And then they came up with the percentage

5   allocations.  That's what's the original deal on May 13th -- it

6   wasn't until May 23rd that there was a supplemental plan term

7   sheet that was agreed to, and that's where the waiver of

8   intercompany claims was first introduced.  And it wasn't until

9   the filing of the disclosure statement, which was six weeks

10  later, Your Honor, and that's on the right-hand side, where you

11  see that they are trying to allocate the Ally distributions

12  among debtors' estates.  But that was simply the reverse

13  engineer of the waterfall to get back to what was originally

14  agreed to on May 13th.

15          And what did they do in doing that?  They waived the

16  intercompany claims.  And why not?  It's our collateral.

17          THE COURT:  Maybe.

18          MR. UZZI:  Well, Your Honor, I think because of the

19  cash collateral stipulation, it is our collateral -- whether or

20  not that's valid -- I mean, Your Honor, the stipulation is

21  clear that we have liens on general intangibles.  General

22  intangibles include payment intangibles.  They don't even in

23  their pleadings suggest that they're not payment intangibles.

24  What they suggest is that if they're not valid -- well, okay,

25  if they're not valid, they're not valid, they have no valid.

1    But I don't think there is a question that we actually have
2    liens on these claims.
3              What's interesting, Your Honor, and to me a little bit
4    troubling all at once, is that the waiver of intercompany
5    claims -- and Mr. Eckstein, I believe it was, actually raised
6    this -- is subject that the global, the approval of the global
7    settlement as a whole.
8              The consenting creditors are not endorsing a wholesale
9    waiver of intercompany claims under any circumstance.  That's
10   because they need to know exactly what they're getting before
11   they waive the intercompany claims.  Because if the
12   intercompany claims aren't waived and if this wasn't approved,
13   there will be winners and losers if we just did a natural
14   waterfall.
15             THE COURT:  That's why we're doing this in phase 2 in
16   the confirmation hearing and not during phase 1, because many
17   parties in interest have a very important stake in this issue.
18   That's why I bifurcated it and this this as part of
19   confirmation.
20             MR. UZZI:  And I think, Your Honor, fortunately for
21   both of us, it's now us that have the vested interest in this
22   given support for the (indiscernible) -- but and I think this
23   goes back to you can confirm this plan, approve the global
24   settlement, just independently determine what our rights may be
25   with respect to --

1              THE COURT:  Want to enter into a stipulation with the

2    other parties to that effect?

3              MR. UZZI:  We've tried to, Your Honor.

4              Can I have a moment, Your Honor?

5              THE COURT:  You're going to negotiate it now?  I'm

6    sorry, go ahead.

7              MR. UZZI:  I think Mr. Eckstein still owes me lunch,

8    Your Honor.

9              THE COURT:  Do you want to take it now or wait?

10             MR. UZZI:  Maybe we'll have a drink this afternoon,

11   Your Honor.

12             Your Honor, I'd like to frame what I think is a couple

13   of fundamental principles.  Some of this goes to the burden

14   issues.

15             What I'd like you to keep in mind when you're

16   listening to the evidence, and I don't intend to do legal

17   argument now, Your Honor, I'll wait until the closing, but

18   there is a lot in the papers about the 1919 standards and

19   what's necessary to approve the global settlement.

20             As it relates to the JSNs, there is also a plan.

21   We've voted against the plan.  Therefore, they need to cram us

22   down under the plan.  And under their theory of the case, they

23   concede that they must provide the JSNs with the indubitable

24   equivalent.

25             THE COURT:  We can thank THA*PBG for that term.

1        MR. UZZI:  Yes, and I've been practicing its

2   pronunciation the last couple of days, Your Honor.

3        I'd like to focus on those words, Your Honor, for a

4   moment because they were' important.

5        In indubitable means without doubt, without doubt the

6   equivalent. It doesn't mean more likely than not. It doesn't

7   mean we're pretty sure.  It doesn't mean we're reasonably

8   certain and it doesn't mean what we want to do is really good

9   for everybody else so we just should be able to do it.

10       To confirm their plan they must establish that they're

11  giving the JSNs without doubt the equivalent of what they have

12  now.

13       So what do we have now, Your Honor?  Well, we believe

14  we have liens on certain assets, specifically the intercompany

15  claims, and certain claims against Ally, all of unliquidated

16  and disputed value, but all of enough potential value to pay us

17  multiples of our full remaining contractual entitlements.

18       And instead of turning that collateral over to us so

19  that we can seek to monetize it ourselves to see if we could

20  pull fill those contractual entitlements, which is what the

21  typical indubitable equivalent treatment is, they seek to

22  compromise that collateral over our objection.

23       Now, what do they want to give news return for that

24  collateral?  Again, absolutely nothing.  They want to ascribe

25  no value to the collateral, and that's what they were claiming

1    is the indubitable equivalent.

2            Now, what they are attempting to do here is to

3    compromise our collateral at a value that we disagree with and

4    while paying us our contractual entitlements.  Putting aside

5    that they want to pay us zero, Your Honor, I think there is a

6    fair question as to whether it's appropriate for a debtor to

7    compromise a cause of action that a creditor that they say is

8    undersecured has a lien on when the undersecured creditors says

9    I don't like the value --

10           THE COURT:  That's when I ask you whether you've

11   got -- that's where I'm looking for some legal authority, Mr.

12   Uzzi.

13           MR. UZZI:  Okay.  The answer may depend, Your Honor --

14   again, there are different types of collateral.  There's what

15   we call the direct lien intercompany claims, there are claims

16   against Ally, and then there are what we call the indirect

17   claims.

18           Your Honor, you know, on this question, when I first

19   read the plan and I first saw what they were doing, I had a

20   visceral reaction to say wait a second, that's my collateral,

21   you can't just compromise it.  And I tasked people to go find

22   authority, go find authority that says they can't do this.

23   Well, you know what, we couldn't find a single example of a

24   debtor ever trying to do this.

25           There are examples where a debtor will compromise the

1    collateral of an oversecured creditor and there is a finding

2    that there is an equity cushion and all the rest, but there is

3    not a single example that we could find and they don't quite to

4    a single one in their papers that says they can compromise the

5    collateral of a creditor over their -- a specifically a cause

6    of action, Your Honor.

7            And so in trying to build up and think about why is

8    that, I start fundamentally with the Fifth Amendment, and it is

9    well established, as Your Honor knows, that the protections

10   afforded secured in bankruptcy stem from the Fifth Amendment.

11   And we see that in several provisions of the Bankruptcy Code,

12   we have section 362, section 363, 1129(b)(21), just to name a

13   few.

14           And I'd like you to think about a couple of these

15   things, Your Honor, in this particular context where they're

16   taking our collateral, we're having dispute over the value of

17   it, it's a liquidating plan, they're seeking to dispose of it

18   and we don't like what they're giving us.

19           Section 362(d)(2) I think is interesting, Your Honor.

20   It permits relief from the automatic stay when the debtor

21   doesn't have equity in the property and the property is not

22   necessary to an effected reorganization.  That is so that the

23   secured creditor can go and maximize the value of the

24   collateral itself.  Here, the debtors claim they don't have

25   equity in any of the subject collateral otherwise we wouldn't

1   be here.  And this type of intangible collateral, claims and

2   causes of action, has never been determined to be necessary to

3   an effective reorganization.

4              Section 363(f) does not allow the sale of collateral

5   of an undersecured creditor over their objection unless the

6   debtor has established the enumerated rated elements.  And the

7   interesting thing about section 363(f), Your Honor, it applies

8   even if you market test the asset.  1129(b)(2)(A)(2) requires a

9   credit bid.  And the reason for the credit bid is to allow the

10  secured creditor to protect itself against what it thinks

11  subjectively is an undervaluation --

12             THE COURT:  Your view is that those sections taken

13  together mean that where there are disputes as to the existence

14  of what you claim is your collateral, or disputes -- yeah,

15  disputes as to existence that a debtor is prohibited from

16  settling disputes?

17             MR. UZZI:  I think when you look at those and you look

18  at the indubitable equivalent, I think that, yes, I think that

19  when they're seeking to compromise -- and remember what they're

20  doing here, they're compromising our collateral.  The

21  collateral has potentially more value.  It may have more, it

22  may have less at the end of the day, but whatever the part that

23  is our collateral, and just assuming, Your Honor, for argument

24  that we have defined collateral, whatever it is, if they're not

25  discharging my lien contractually, then why should they be able

1    to take my collateral and compromise it?

2         What they want to do is use it for currency for

3    something else, which is okay only if they discharge my lien,

4    because that means it has value, it has value beyond my lien.

5    But otherwise they have to satisfy me as the secured creditor

6    or they have to give me the collateral, they have to do

7    something else.

8         And, Your Honor, that's why we said in our papers -- I

9    truly belief, Your Honor, that the whole valuation issue is

10   somewhat of a red herring.  To the extent I have liens on this

11   collateral, they have a simple legal question.  They can

12   discharge my liens through the full contractual entitlements or

13   turn the collateral over to me.  And the question comes as to

14   what is the cost and benefit.  If the benefits of just

15   discharging me outweigh the costs, then they discharge me.

16        Here, clearly the benefits outweigh the cost because

17   they've always contemplated that they might have to pay me

18   post-petition interest, and because of those very important

19   acknowledgements that we received at the disclosure statement

20   hearing, we heard today that you can find for any reason we're

21   entitled to post-petition interest, the plan still gets

22   confirmed, the plan still gets confirmed.

23        I think as an element of the global settlement, they

24   decided to structure it this way for benefits for them.  It

25   comes with a cost, and the cost is discharging me.

1          THE COURT:  Both sides are putting on evidence whether

2    the intercompany claims had value, right?  You're putting on

3    evidence to that effect, right?

4          MR. UZZI:  Yes, Your Honor.

5          THE COURT:  And they're putting on evidence as well.

6          And so if I determine that you have a lien and the

7    value of the lien is 100 dollars, you say you're entitled -- if

8    they want to use it elsewhere, they've got to pay you the 100

9    dollars, right, but I've got to determine what the value of

10   that collateral is?

11         MR. UZZI:  You know, Your Honor, it's an interesting

12   question that I've been struggling with because this all goes

13   to -- well, how do you go about valuing it and whose value

14   should dictate.  And again --

15         THE COURT:  Mine.

16         MR. UZZI:  -- as an -- well, Your Honor, as an

17   undersecured -- well, let me give you an example, Your Honor.

18   Under 1129(b)(2)(A)(ii) -- all right.  So if they were selling

19   the collateral, they could market test it.  You could find a

20   value of it and you can't force the sale at that value.  The

21   undersecured creditor has the absolute right -- I mean, subject

22   to cause -- to credit bid, and that's what the Supreme Court

23   has said.  The Supreme Court said you can't just cash them out

24   under the indubitable equivalent standard.

25         So I think when you think about these things, it's an

1   oversimplification to just say, well, it has zero value,

2   therefore they get nothing, or it has 100 dollars, they get

3   nothing.  There's a real question about --

4           THE COURT:  They're not selling it.

5           MR. UZZI:  Well, they're disposing of it, Your Honor.

6           THE COURT:  Well, no, they're asking me -- you're

7   asking me to value the intercompany claims.  You say it has

8   value and they say it doesn't, and you're both putting on

9   evidence, and you're putting on an expert who's going to

10  testify these were valid intercompany debts and they're

11  enforceable, et cetera, and they're putting on an expert who's

12  saying just the opposite.  They're putting on company officers

13  who are going to testify as to the historical treatment of it

14  and whether it had value.  And if I determine they're right, I

15  guess I include there were no enforceable intercompany claims

16  and you don't have a lien on it.  And if I decide it your way,

17  no, they do, these were properly recorded in the books and

18  records, they reported it in financial statements, they did

19  this, they did that, all of the indicia of a true obligation,

20  then I guess I find your way.

21          MR. UZZI:  I think it goes to two issues, Your Honor.

22  Again, I would submit, for the reason I just said, and I won't

23  belabor it, that --

24          THE COURT:  No, belabor it because I want to be sure I

25  understand your position.  Don't be afraid to say it again,

1    okay?

2            MR. UZZI:  All right.  So I think fundamentally, when

3    I think about this, when they're trying to compromise my

4    collateral over my objection that it is -- they have an option

5    to either discharge my lien or turn over the collateral to me.

6            THE COURT:  What does discharge your lien mean?

7            MR. UZZI:  By payoff of my full contractual

8    entitlements, then my lien is discharged and they go on their

9    way.

10           What I would say otherwise, Your Honor, if you don't

11   accept that proposition, then this goes to the burden of proof,

12   as to I have a lien on collateral that I will put on a case

13   that says, well, you know, this is the collateral, this is my

14   lien, I think it has a lot of value.  They want to say it

15   doesn't have value.  I think it's their burden and I think

16   there are cases that say that when a party is trying to

17   establish that a creditor is undersecured, it's their burden to

18   establish that I'm undersecured.

19           So I think this goes not only to -- well, first, a

20   legal proposition, but the burdens in this case as to with

21   respect to the collateral we have here -- keep in mind, Your

22   Honor, this is not the situation under the cash collateral

23   order where we're thinking about compensation for past use of

24   cash.  They're disposing of this collateral, whether it's a

25   sale or otherwise, today.  The collateral exists today in

1  whatever form it is -- I mean, again, presuming my liens are

2  valid -- and they're disposing of it today.

3          It's their burden to -- not only to establish adequate

4  protection, but it's their burden to establish the indubitable

5  equivalent also.  And I think that all goes to where the burden

6  goes, if you don't accept my prior legal proposition.

7          THE COURT:  Okay.  Go ahead.

8          MR. UZZI:  Very quickly on the global settlement, Your

9  Honor, we've tried to keep this -- and it is intended to be

10 focused on the issues that specifically affect our economics,

11 Your Honor.  So, again, the settlement of the intercompany

12 claims at zero, the failure to attribute any portion of the

13 Ally contribution to liens against the Ally claims, the failure

14 to recognize the impact of 510(b).  And on the 510(b)

15 arguments, Your Honor, I just want to make clear, it's solely

16 as they affect the value or potential value of the intercompany

17 claims.  We're not saying that the plan's not confirmable

18 because of --

19          THE COURT:  Gee, I read your papers as suggesting that

20 the plan is unconfirmable as a matter of law, and it appeared

21 to me you were arguing other people's rights rather than your

22 own.

23          MR. UZZI:  No, we're just trying -- Your Honor, if --

24          THE COURT:  I must say, that's the way I read your

25 papers.

1          MR. UZZI:  -- that was poor drafting -- that's poor

2     drafting on my part then, Your Honor.  The intention is to

3     focus on the value of the intercompany claims.

4          Your Honor, the other issue we raised, substantive

5     consolidation, I think I've heard at the beginning here that

6     what they're not doing is substantive consolidation.  We don't

7     have an objection to consolidation for administrative

8     convenience, and I've had some conversations with Mr. Eckstein.

9     I think this is probably something we can stipulate before the

10    end is --

11         THE COURT:  Sooner rather than later would be helpful.

12         MR. UZZI:  We will.  When he buys me the drink

13    tonight, Your Honor.

14         And Your Honor -- and then, of course, we're objecting

15    to the third-party release, again, as it relates to us.  We

16    don't believe it's proper that a third-party release of Ally

17    should be imposed upon us.

18         THE COURT:  You're willing to take it for 750 million

19    contribution but not for a 2.1 billion contribution?

20         MR. UZZI:  Well, Your Honor, again, the "you" is the

21    pronoun "you" that we need to be careful of.  Thirty --

22         THE COURT:  Your clients have changed.

23         MR. UZZI:  Thirty-seven percent have -- well, yeah,

24    but even when my clients were -- hadn't changed --

25         THE COURT:  They changed their mind.

RESIDENTIAL CAPITAL, LLC, ET AL.                    193

1           MR. UZZI:  No, Your Honor, no.  It was only thirty-

2   seven percent ever agreed.  But also keep in mind, Your Honor,

3   we had our own settlement with Ally in there.  We jiggered the

4   contractual waterfall --

5           THE COURT:  What are your claims against AFI?

6           MR. UZZI:  Well, Your Honor, I think it's under the

7   intercreditor agreement, as to whether --

8           THE COURT:  Spell it out for me.  I'd like to know

9   what are the JSNs' claims against AFI?

10          MR. UZZI:  Your Honor, you heard a lot in phase 1

11  about the movement of collateral from the revolver to the LOC

12  and, you know, whether or not, you know, Ally engaged in self-

13  dealing or otherwise breached their obligations to us under the

14  intercreditor agreement --

15          THE COURT:  When they moved collateral from the

16  revolver to the AFI/LOC, that breached your rights?

17          MR. UZZI:  Yes, they breached our rights, Your Honor.

18          THE COURT:  And you raised that for the first time

19  when?  When, over the years, billions of dollars of collateral

20  got moved from the revolver to the AFI/LOC, you didn't know

21  anything about that?

22          MR. UZZI:  No, I don't think the market knew about it,

23  Your Honor.  We found it in the UCC-3's.  There were no public

24  disclosures of it, but it is in the record with respect to the

25  phase 1 trial that that's the reason why we agreed with Ally to

RESIDENTIAL CAPITAL, LLC, ET AL.                          194

1    change the waterfall.  That was our settlement with Ally.  They

2    had harmed us.

3              THE COURT:  So that any other claims that you believe

4    you have against AFI?

5              MR. UZZI:  Well, if they purport to be releasing the

6    liens under the intercreditor agreement now, then we would have

7    a significant claim, I think, for acting

8    commercially unreasonable.

9              THE COURT:  Okay.  Any other claims that you believe

10   the JSNs have against AFI?

11             MR. UZZI:  Not that I have diligenced, Your Honor.

12             THE COURT:  All right.

13             MR. UZZI:  Your Honor, two other things and then I

14   just have a small closing.

15             THE COURT:  But let me just -- and I'm going to give

16   you whatever time you need, so don't worry about it, Mr. Uzzi.

17             Everything you've identified for me, at least at this

18   point, as the claim that the JSNs have against AFI all relates

19   to AFI's conduct with respect to the debtors and collateral

20   held by the debtors.  In other words, I think in Manville, in

21   one of the opinions I give the example about, you know, this is

22   not an issue that somebody from AFI ran over an employee of one

23   of the junior secured noteholders and they'd be claiming that's

24   released.  Everything relates to -- there is a nexus --

25             MR. UZZI:  Yes.

1           THE COURT:  -- there's a strong nexus between all of

2    the conduct that you say they give rise to a claim against AFI

3    and the debtors in this case, correct?

4           MR. UZZI:  Yes, but I would also add that there is a

5    contract that I'm in direct privy with in with Ally --

6           THE COURT:  The intercreditor agreement?

7           MR. UZZI:  The intercreditor agreement, yes -- so yes,

8    Your Honor.

9           THE COURT:  Okay.  So the intercreditor agreement is

10   at the core of what you identify as the JSNs' claims against

11   AFI.  Is that a fair statement?

12          MR. UZZI:  Yes, Your Honor.  I mean, we're not --

13   we're, again, trying to say as focused as we can.

14          THE COURT:  Okay.  I'm trying to make sure I

15   understand what your arguments are.

16          MR. UZZI:  Although I think Mr. Schrock owes me a

17   drink too.

18          THE COURT:  Mr. Schrock, take him for a drink, and

19   then you can take Mr. Eckstein too.  Maybe the three of you

20   will talk.

21          MR. UZZI:  Your Honor, you know, it came up, it will

22   come up at the closing, the issue of Ogle and the Second

23   Circuit, 586 F.3d 143.  We think it's controlling case law that

24   under existing contract post-petition fees, if it's owing under

25   the existing contract as part of the pre-petition claim, we

RESIDENTIAL CAPITAL, LLC, ET AL.                    196

1    understand that it's subject to -- it's still a reasonableness

2    determination by Your Honor.

3          We also discussed -- they made some -- the plan

4    proponents made some technical amendments regarding our

5    treatment.  We may misunderstand them, so we agreed that we

6    would discuss that with them and I'm just going to reserve for

7    closing on that.

8          Your Honor, before I -- and I really appreciate the

9    time, Your Honor, and before I turn the podium over to my

10   partner, David Cohen, to address the evidence with you, I'd

11   like to address just a few things that have been weighing on

12   me, Your Honor.

13         I'd like to just go back to a time before -- right

14   before the consenting creditors breached their deal.  And they

15   came to you and they asked you to delay publication of the

16   examiner's report.  And when they did that, Your Honor, I knew

17   we were being left out of the deal and I believe I told you I

18   knew we were being left out of the deal.  And I think, at least

19   it was my perception at that conference, that it was a

20   difficult decision for Your Honor to make to delay the

21   examiner's report at that point.  And I stood up and I asked

22   you to delay the publication of the examiner's report, even

23   though I knew we were being left out of the deal.  And I did it

24   then because I thought it was the right thing to do, and I

25   still think it was the right thing to do.

1          And Your Honor, we didn't object to approval of the

2    PSA.  In fact, in your decision approving the PSA, Your Honor,

3    you recognized that we offered to fully support the plan if

4    they would simply reserve our legal and economic rights,

5    meaning -- meaning -- and this is what you said, I think you

6    quoted our papers -- that an adjudication of our entitlement,

7    such as a finding that intercompany claims are valid debt

8    claims, without having a win for us constitute a loss for the

9    global settlement.  That's what we were looking for.

10         And we resolved our objections to the disclosure

11   statement.  And I think it's important to remember, Your Honor,

12   we're still having confusion over, you know, what you -- what

13   the Court can appropriately do under the global settlement in

14   finding that we're entitled to post-petition interest and still

15   approve the global settlement, and it was finally at that

16   hearing that you asked Mr. Eckstein, do you agree, and Mr. -- I

17   think it was Marinuzzi, do you agree, and we got that.

18         And I know I took a lot of the court's time in trying

19   to get that, but it was important for us and it was important

20   because, as the deposition testimony now confirms, that wasn't

21   true.  What they were telling us privately wasn't what was

22   represented on the record there.  So at least that's part of

23   the record now.

24         And, Your Honor, in our plan objection, we offered,

25   again, to try and stipulate and narrow the issues.  We offered

1    to not object to the settlement of intercompany claims at zero

2    if that settlement isn't being used to determine our value.

3    That offer still stands, Your Honor.

4           And, Your Honor, we're not telling you that the Ally

5    contribution is not sufficient to justify the debtor releases.

6    We're not telling you not to approve the settlement of the

7    allowed claims of the disputed contingent claimants of the RMBS

8    claimants, the monolines, and others.  We're not here telling

9    you that this plan is wholesale.

10          THE COURT:  Well, you are because you're saying --

11   you're objecting to the priority that they've been given, so

12   you're objecting to the settlement of their claims.  Part of

13   the settlement of their claims is they don't get subordinated,

14   and you objected to that.

15          MR. UZZI:  Only as it relates to the value of the

16   intercompany claims, Your Honor, though.  We're not trying to

17   say the plan is wholesale unconfirmable.

18          THE COURT:  You're putting a different -- a slant on

19   your written positions that I didn't get when I read it, okay?

20          MR. UZZI:  Well, Your Honor, and that's what I'm -- I

21   mean, what I'm trying to tell you is, is that the positions --

22   I can't stipulate with myself, I can't settle with myself, and

23   in absence of that settlement, the positions we take are a

24   function of the positions taken by the other side.  And you

25   know, we --

1          THE COURT:  I don't understand what you've just said,

2     because I read your papers carefully to say you object to the

3     settlement with the security claimants, you object to the

4     settlement with the monolines, you object to the settlement

5     with the RMBS trustees because you believe all of their claims

6     have to be subordinated.

7          MR. UZZI:  We objected --

8          THE COURT:  That's what you did.

9          MR. UZZI:  We objected to -- it's in the section that

10    deals with the treatment of the intercompany claims and the

11    valuation of the inter-condition claims, Your Honor.  And all

12    I'm trying to say to Your Honor is I'm trying to address some

13    of your comments that -- what we're trying to do here is

14    present our case, Your Honor, and the positions that we take

15    are necessarily informed by the position taken by the other

16    side.

17         THE COURT:  So, look, if you have a protectable

18    property interest in intercompany claims, because you had a

19    lien, it had value, all of that, then how does it affect you at

20    all whether the monolines and the RMBS are subordinated or not?

21         MR. UZZI:  Well, keep in mind, Your Honor, the

22    intercompany claims are -- participate pari passu in value with

23    the other parties.  I mean, if you were to go back --

24         THE COURT:  If you prevailed in your position that you

25    have a lien, that there was value, that they've given it away

1   for nothing and you're entitled to an adequate protection claim

2   because they gave away your property without compensation, how

3   does the issue of subordination of any of those other RMBS,

4   securities, monolines -- why does that make any difference

5   whatsoever?  So I read you as trying to below everything up,

6   just sort of like the position that the JSNs have taken

7   throughout this case, is blow everything up, stop everything in

8   its tracks, that's what I read your paper as saying.

9          Now you -- but to be specific, if you have a lien on

10  the intercompany claims, if you have a lien on causes of action

11  of value, why does it make any difference whatsoever whether

12  the subordination that's been agreed to as part of the global

13  settlement is valid or not?

14         MR. UZZI:  Well, if I may, Your Honor, if you have two

15  claims, intercompany claim and call it, you know, potential

16  subordinated claim, and those are the only two claims of the

17  debtor.  If the potentially subordinated claim is subordinated,

18  the intercompany claim is worth more.  If the potentially

19  subordinated claim is pari passu --

20         THE COURT:  Look, if it's your collateral, you've got

21  to secure -- you know, look, they're either subordinated to

22  general unsecured claims or treated pari passu, okay?

23         MR. UZZI:  Yes.

24         THE COURT:  All right.  You claim to have a security

25  interest.  If you have a security interest, you take ahead of

RESIDENTIAL CAPITAL, LLC, ET AL.                    201

1    all of those, whether they're subordinated or unsecured.

2             MR. UZZI:  No, I don't --

3             THE COURT:  What am I missing?

4             MR. UZZI:  What you're missing, Your Honor, is -- this

5    is where I like to draw pictures.  It's -- remember, the

6    intercompany claim is a claim against the debtor estate.  I

7    have a lien on that claim, but that claim isn't secured into

8    the debtor estate.  That claim is an unsecured claim into the

9    debtor estate.  And so its pro rata share of the rest --

10            THE COURT:  Coming from --

11            MR. UZZI:  Yes.

12            THE COURT:  -- RFC to whoever they owe the money to?

13            MR. UZZI:  Yes, and that's what could potentially --

14   now, Your Honor, if -- I think the way the intercompany claims

15   of value work, hopefully this actually isn't an issue that

16   won't factor insignificantly into the intercompany claims, but

17   that will be dependent upon where we wind up.

18            Your Honor, I greatly appreciate all the time you've

19   given me.  Unless you have questions for me --

20            THE COURT:  I don't.

21            Let's take a 15-minute recess, and then I'll hear from

22   Mr. Cohen.

23            MR. UZZI:  Your Honor, can I just, right before you --

24   I just want to give you this, the -- you know what, this is not

25   the right thing, I'm sorry.  The question you asked me earlier

1 on where it says in the security agreement.  Thank you, Your

2 Honor.

3    THE COURT:  Thank you.

4    All right.  We're taking fifteen minutes.

5   (Recess from 3:35 p.m. until 3:53 p.m.)

6    THE CLERK:  All rise.

7    THE COURT:  Please be seated.

8    Mr. Cohen.

9    MR. COHEN:  Good afternoon, Your Honor.  David Cohen,

10 Milbank Tweed Hadley & McCoy, on behalf of the ad hoc group of

11 junior secured noteholders and the notes trustee.

12    Before we took the break, we were talking about the

13 issues that need to be decided both in connection with phase 2

14 and with plan confirmation.  What I'd like to do with my time

15 is focus on the evidence that we're going to hear in phase 2,

16 and as everyone has noted, there is some bleed-over into the

17 confirmation issues, which is why this is a consolidated

18 proceeding.

19    I think the first place for us to start is with the

20 plaintiffs' contentions.  The first issue in phase 2 that I'd

21 like to talk about is whether the JSNs have a valid enforceable

22 and valuable lien on the intercompany balances.

23    One of the things the Court said just before the break

24 is that it was the Court's expectation that the JSNs were going

25 to prove that -- attempt to prove that the intercompanies were

1    valuable and that the debtors and the plaintiffs would attempt

2    to prove that they had a no value.  And I think it's a little

3    bit different than that.  I think we're going to try to prove

4    the value, and they're going to try to prove that it looks more

5    like equity than debt.  They've repeated several times they're

6    not putting on a value case.  Mr. Lee said it this morning.  So

7    at the end of it, though, what the plaintiffs also propose to

8    do is compromise those claims at zero.  And so we're really

9    talking about adequate protection.

10           In particular in 44 -- this is from the joint pretrial

11   order of the plaintiffs' contention.  What they say is if the

12   plan is confirmed and the global settlement approved and each

13   debtor is found to hold a claim under the intercompany -- that

14   each debtor that is found to hold a claim under the

15   intercompany balances will receive no distribution on account

16   of that claim.  Thus, even if the JSNs prove they have a lien

17   on the intercompany balances and leaving aside the issue of

18   adequate protection discussed below, confirmation will render

19   that lien valueless.

20           So it's an adequate protection issue, and I think the

21   way I have understood it is that is the interplay with the

22   global settlement and the plan with protecting the JSNs'

23   rights.

24           And then with respect to the Ally contribution, what

25   they say is if the plan is confirmed and the global settlement

1   is approved, there will be no allocation of the AFI

2   contribution among the causes of action.  As a result, no value

3   adheres to any lien on the purported contract claims for the

4   AFI contribution.  Neither the parties nor the Court is

5   required to allocate the AFI contribution because it's simply

6   not allocable.

7           And I have a couple of observations from the argument

8   you heard this morning.  As the Court observed, just because it

9   may be difficult, a difficult thing to do, doesn't mean it

10  can't be done.

11          The other thing that you asked Mr. Eckstein about was

12  the one case that he cited -- or that the plaintiffs cited in

13  their briefs which was the magistrate decision, National

14  Communications Association v. National Telecommunications

15  Association.  And if you look at that case, particularly at the

16  end, what the case actually dealt with was a tax lien that had

17  priority over a state law lien, and the court never got to the

18  issue of allocation.  And at the end, it pointed to a

19  bankruptcy case that did involve the issue of allocation and

20  described that allocation is, in fact, required.

21          So even though it's a magistrate case that they're

22  citing, I think when you read, it's actually going to end up on

23  our side of the column.

24          Let me go -- so, again, in the plaintiff's

25  contentions, if you look at the bottom, thus assuming the plan

RESIDENTIAL CAPITAL, LLC, ET AL.                     205

1    is confirmed, the only open phase 2 issue, and this is the

2    plaintiff's view of the world, relating to intercompany

3    balances and the AFI contribution is adequate protection, i.e.,

4    whether the plan's treatment of those issues has resulted in a

5    diminution of the aggregate value of the JSNs' collateral.

6            So I do think --

7            THE COURT:  Do you agree with that or not?

8            MR. COHEN:  Well, I think from the position date to

9    the effective date of the plan, I think we'll have legal

10   argument on the data in which you're doing that.  But I do

11   think, and I agree with my partner, Mr. Uzzi, and the everybody

12   here, that the issue of whether the plan is confirmable, even

13   if there is value, that must be distributed to the JSN

14   noteholders, that the plan is confirmable and the global

15   settlement can be implemented, as long as --

16           THE COURT:  That was the question I asked this morning

17   because I was -- and I won't say struggled, but when I read

18   both sides' contentions, I was left a little unclear, you know.

19   So when I entered an order yesterday granting a motion in

20   limine, I had a parenthetical about whether it was adequate

21   protection or that you were entitled to some distribution

22   because of claims that had to be allocated.

23           MR. COHEN:  And I come to my conclusion in a number of

24   different ways.  We've taken a number of depositions.  We've

25   deposed Mr. Kruger, the CRO.  We've deposed some of the Ally

1  people.  And --

2          THE COURT:  Hang on just a second.

3          Somebody is on the phone.  I'm picking up background

4  noise.  You need to put your phone on mute or you're going to

5  get cut off.

6          Go ahead, Mr. Cohen.

7          MR. COHEN:  So in talking, taking the depositions of

8  the witnesses, and then looking at the joint pretrial order, I

9  think it is fair to say that that finding value to the liens

10  both on the intercompany claims and on the Ally claims

11  ascribing value to those and finding a way to fund to make sure

12  that the JSNs are made whole will not result in the plan

13  blowing up and the global settlement blowing up.  I think

14  everybody has agreed that that is not the result here.

15          Now, whether adequate -- whether you're looking at it

16  from the effective date of the plan or the petition date and

17  the diminution in value in terms of protecting us, I think

18  that's an issue that we'll have to brief, and we understand the

19  Court's decision in phase 1, but we think it's presented in a

20  different context here for reasons that Mr. Uzzi described.

21          At the end of the trial, what we think is the Court

22  will conclude that there are valuable liens on the intercompany

23  claims, that the intercompany claims should be treated in the

24  same manner the debtors have always treated them.  That's the

25  evidence that I'm going to walk you through.  We think that the

1  proposed treatment as part of the global settlement and the
2  plan is a wholesale departure from the way the debtors actually
3  operated their business.  They treated them as real payables
4  and receivables, not as capital contributions and equity
5  transactions.  And on that basis alone, if the Court finds only
6  with respect to the intercompanies, I think you'll find that
7  the JSNs are oversecured.  I have a demonstrative to that
8  effect.

9        If you look at column A, what you'll see is, if it is
10 only intercompany claims and one of the comments made this
11 morning was that Mr. Bingham did not value the intercompany
12 claims, well, that's true, it's a little misleading with
13 respect to the record, because Mr. Fazio did, and this is his
14 valuation.

15       So if you look at that, the intercompany claims alone,
16 the value, if you recognize them in the way that the debtors
17 always recognized them, we believe that there is an incremental
18 value there of 740 million, and that's on top of the collateral
19 that the Court found in phase 1.  And if you add that to the
20 value that the Court found in phase 1, the collateral package
21 securing the JSN notes is approximately 2.6 billion.  But we
22 also think that the Court will find that a portion of the Ally
23 contribution must be allocated to the JSNs, and after a fair
24 and equitable allocation of that, we think you'll find that the
25 JSNs are oversecured.

1          And with respect to that piece alone, so it's just the

2     Ally contribution, the incremental value there is 1.2 billion.

3          THE COURT:  Where are you getting that number from?

4          MR. COHEN:  That is in column B.

5          THE COURT:  But where are you getting the number from?

6          MR. COHEN:  We are getting the number from a

7     reasonable allocation, and we understand, given the Court's

8     ruling yesterday, that that's now going to be the subject of

9     legal argument and witness testimony, so we're going to have to

10    make that case at trial.  Okay?  And that's where the 1.2

11    billion dollars comes.

12         And then if you add them both together from column C,

13    it's a little counterintuitive because you would think you

14    would just add A and B to get C, and it comes up to a number

15    less -- that's by virtue of the waterfall -- it is an

16    incremental value of 1.6 billion for a total collateral package

17    of 3.5 billion.

18         Now, what's interesting about this model is, as in

19    phase 1 where is the JSNs and the debtors largely agreed at the

20    starting point of 1.88, I think the testimony here from the

21    debtors' experts and from Mr. Fazio will be that the waterfall

22    model is really not disputed between the parties.  Some of the

23    assumptions as to what goes into it may be the subject of

24    dispute, but I think you'll find the testimony will demonstrate

25    that the model is largely consensual.

1           Why do we believe that the outcome of phase 2 is going
2   to lead to the conclusion that we're oversecured both as a
3   result of the intercompanies and the Ally contribution?  That's
4   really simply the evidence.  I'd like to start with the
5   intercompany claims.
6           For the reasons that Mr. Uzzi explained, as a matter
7   of law we believe we do have a lien on the intercompany claims,
8   and the arguments to the contrary are wrong.  Those are legal
9   arguments.  We'll deal with that in the post-trial briefing to
10  the extent that they weren't covered in the pre-trial briefing.
11          If you look at the plaintiffs' contentions, this is
12  the way they have framed the issue with respect to the
13  intercompany balances.  What they say is even if the JSNs had
14  liens on intercompany balances or some portion of the AFI
15  contribution, the liens were valueless.  The debtors' waived
16  the intercompany balances under the plan because, among other
17  things, they were comprised of bookkeeping entries kept for
18  GAAP purposes and were routinely forgiven before the petition
19  date.  The same reasons prevent the JSNs from proving the lien
20  on intercompany balances or that any such lien has value, which
21  is essentially the factors that I think Mr. Eckstein walked
22  through.  He pointed out a number of factors which led the
23  committee in its investigation and the debtors in its
24  investigation to conclude that this looked more like a debt in
25  equity.

RESIDENTIAL CAPITAL, LLC, ET AL.                    210

1        There's going to be no evidence, though, in this case

2   of what the committee's investigation was and what they looked

3   at and what they considered and what they didn't consider.  And

4   there's going to be no evidence of the debtors' investigation

5   because they haven't produced it in discovery.

6        What you will get is Ms. Gutzeit's testimony on her

7   investigation of this, and what she's going to tell you is in

8   her estimated thirty or forty hours of work that she did

9   considering the hundred plus items listed on her report as the

10  materials considered, the interviews she did, her writing and

11  editing, her forty-four-page report.  In thirty or forty hours,

12  she was able to conclude that these looked more like that debt

13  than equity, but she is not offering an opinion -- and this is

14  important -- that it satisfies the tests for

15  recharacterization.

16        But we also, in the weeks leading up to this trial,

17  did a fair amount of fact discovery in this case.  We took

18  depositions of Mr. Young, who was ResCap's CFO, who is now

19  Ally's CFO.  We took depositions of key accounting people at

20  ResCap, and we talked to them about what the books and records

21  meant, what GAAP meant, what they were trying to do.  And what

22  I'd like to do is, you know, point to one of the things that

23  Mr. Eckstein said this morning.

24        He said nowhere on the consolidated financial

25  statements will anyone find the intercompany balances.  They

1  were eliminated.  They were merely something that was required

2  by GAAP.  And that's consistent with what Ms. Gutzeit says.

3  But the fact that these accounting entries were compliant with

4  GAAP doesn't go to the question.  We're going to explain what

5  the witnesses have to say about why they complied with GAAP and

6  what it meant to comply with GAAP.

7            The idea that GAAP means it's just bookkeeping entry

8  and therefore has no value into the determination as to whether

9  the company thought these were payables and receivables versus

10 capital accounts is really just a red herring.

11           THE COURT:  I understand that in a consolidated

12 financial statement you eliminate the intercompany entries.

13 I'm just -- did the debtors prepare consolidating financial

14 statements?

15           MR. COHEN:  They did, and --

16           THE COURT:  What do they show?

17           MR. COHEN:  In some of the SEC filings, what the

18 consolidating schedules show is not on a subsidiary-by-

19 subsidiary basis.  They show them -- the payables on an

20 aggregate basis.  And when they prepared individual financial

21 statements for certain regulators, in some instances they were

22 counting both the assets and liabilities.  In other instances,

23 for example, the Department of Housing and Urban Development

24 would not count the receivable as an asset, but they did count

25 the payable as a liability because they had concerns perhaps

1   about the quality of asset or, you know, other policies.

2           But the testimony is also going to show you, and we'll

3   get to this in a minute, when the company was determining for

4   its own purposes solvency, which is one of the reasons that led

5   to the process which was a very formalized process of debt

6   forgiveness, they counted the payables and receivables as

7   assets and liabilities.

8           So the idea and the suggestion in opening statements

9   that these were just bookkeeping entries and nobody really

10  treated them as such, it's totally inconsistent with the fact

11  testimony you're going to hear from the people who were

12  responsible for creating and maintaining the books.

13          The other thing that Mr. Eckstein said, it was

14  ordinary course of business for these debtors to routinely

15  forgive the intercompany balances.  And the number that has

16  been thrown about in a couple of these hearings that I've been

17  to is 149 instances and 16 billion dollars.  But actually, when

18  you look at the debtor-to-debtor forgiveness in the relevant

19  period, it's a four-year lookback, it's ten instances and it's

20  6.4 billion dollars.

21          And in each of those instances, the evidence will show

22  there was a legitimate business reason to do it.  It had to do

23  with capital, liquidity and covenant requirements, which are

24  legitimate business reasons to do it.  There were formal

25  processes that it went through, as the Court noted this

1   morning.  Board approval was required.  And the policy said and

2   the policy that was followed is we will forgive as little as

3   possible to accomplish our corporate goal.  So the idea that

4   there was some sort of indifference between payables and

5   receivables and capital transactions, there is no evidence

6   that's going to support that.

7          The other thing on the elimination point, as the Court

8   said, you recognized the things eliminating consolidation.  One

9   of the things Ms. Gutzeit points to is, well, you know, the

10  payables and receivables we'll eliminate in consolidation.

11  Well, even if the company intended these to be capital

12  transactions, those would eliminate in consolidation too.  It

13  goes nothing -- it speaks not at all to the company's intent as

14  to whether we view this as debt in equity or receivable

15  payable, or capital investment and capital out.

16         It's really -- when you look at the intercompany debt

17  forgiveness, to me it's very much a leap to say that in the ten

18  instances over four years for legitimate business purposes that

19  went through corporate formality, then went up through the

20  board, that was the minimum necessary to accomplish a

21  legitimate corporate interest, that you should then say all of

22  the intercompany balances that didn't go through this process

23  are subject to the same treatment.

24         I think that the fact that they followed a process,

25  they followed a formality, they had a reason to do it and they

1    did do it, does not suggest the pieces of the intercompanies

2    which are still payables and receivables, which have not been

3    forgiven should be forgiven.

4              They also, in the opening and in the papers, make much

5    of the fact that these are not arm's-length transactions.  And

6    they point out a couple of factors.  What they'll identify is

7    on some of the loans no interest was charged.  Some of the

8    loans there was no indication of scheduled terms or how the

9    funds would be repaid.  In some instances with the

10   intercompanies, there didn't even seem to be an ability to

11   repay.  And there were some loans where advances were made

12   where they were no longer collectable.

13             The plaintiffs would have you believe that all of

14   those things lead to the conclusion that this is more like

15   equity than debt.

16             Finally, what they argue --

17             THE COURT:  Did their auditors do an impairment

18   analysis?

19             MR. COHEN:  I don't know whether the auditors did, but

20   one of the documents I'm going to show you is Ms. Westman,

21   who's going to be a witness here, did impairment analysis and

22   the company continually looked at it for impairment purposes.

23   And in instances where they felt it was impaired, they took an

24   impairment.  In instances where they felt they had the ability

25   to repay the debt, they did not take an impairment.  Again, in

1   my mind, that goes to the fact that the company was really

2   looking at this as to whether it's payable or receivable and

3   not capital contribution.

4           And the last factor I think they point out is that all

5   of this arose out of the operation of the cash management

6   system, and therefore that doesn't tell you anything.  Well, I

7   think that argument is actually one of the biggest stretches

8   that they make, so I'll take that one on first.

9           First of all, there are cases that say that the

10   transactions, the payables and receivables that come out of the

11   cash management system, are presumptively valid, and we can

12   cite those cases to you.

13          Secondly, if you look at what's going on in this case

14   itself, the waiver and the elimination of all of the

15   intercompany balances only applies to the pre-petition claims.

16   On the post-petition claims, which arose out of these same cash

17   management system in the same way and for the same reasons that

18   they arose pre-petition, they're being treated as

19   administrative expense priority claims and being paid in full.

20   And the idea that you can draw some sort of intent out of a

21   cash management system that's operating the day before Chapter

22   11 and the day after and say what's happening before all

23   evidence is an intent to treat this as equity and not debt, but

24   the day after all of these get paid in full, I think blows the

25   argument out of the water.

1          THE COURT:  So your contentions, both sides, where you

2     looked at the top ten intercompany balances, and maybe it was

3     there and I just didn't -- I read it too quickly and didn't

4     follow it, which ones do you need to get to your point?

5     Because you've got -- if three of them -- three of the big ones

6     are valid, does that get you to the point where you need to be?

7          MR. COHEN:  You know, I think that we would rather

8     do -- you can't really look at them that way because of assets

9     and liabilities and the way that they are collectible.  So it

10    is not the case that all of these factors apply to every one of

11    them.  And so what the debtors have done, plaintiffs have done,

12    and what Ms. Gutzeit has done and, frankly, what Mr. Kruger did

13    is they looked at all of these together and they drew the same

14    conclusion, even though some of these factors were present in

15    some, some of them are in others.

16         What I'm trying to do today is to introduce the

17    testimony as to what the company's intent was, why the factors

18    don't give the plaintiffs the silver bullet they think they

19    have here, and then when Mr. Bingham takes the stand, we're

20    going to walk you through each one of them.

21         THE COURT:  Okay.

22         MR. COHEN:  Okay.

23         MR. COHEN:  Okay.  So one of the things -- this is

24    from Mr. Young, who I mentioned was ResCap's CFO, now Ally's

25    CFO -- one of the things that we talked about at his deposition

1    was if you book these transactions in 2008 and 2009, and at the

2    time you believe it to be debtor equity, can you wait three

3    years or four years or until you've hatched a global settlement

4    to then decide, you know what, this really isn't payable and

5    receivable; this is really more like capital.

6            And his answer is pretty clear.  What he says is that,

7    "If you discover something different, you have an obligation to

8    go back and look."

9            And what I said to him is, "You've got to consider the

10   facts and circumstances and potential adjustment on an ongoing

11   basis?"  And he says, "On an ongoing basis."  And I ask him,

12   "And that's required by GAAP irrespective of the accounting

13   policy?"  Mr. Brown objects.  He says, "Yes."  And I said, "In

14   Ally's policy, which you've testified is an attempt to

15   implement GAAP, right?"  Mr. Brown objects.  He says that would

16   be his opinion.

17           The company, in addition to the impairment analysis

18   that I just told you Ms. Westman was doing, the CFO understood

19   that they were under an obligation to revisit these things and

20   look at them.  And up until May of this year when the global

21   settlement was not only hatched on May 13th, but not until ten

22   days later did the conclusion come, you know what, this is

23   really more like equity than debt and we're just going to

24   wholesale take care of it.

25           I think it's entirely inconsistent with the way the

1  company ran both pre- and post-petition.

2          This is another important point in Mr. Young's

3  testimony, because he was very convinced and he agreed that one

4  of the purposes of GAAP is to have accurate financial

5  statements that show the true financial condition of the

6  company.

7          So I asked him, "During your time as CFO at ResCap and

8  later as the chief financial executive and CFO at Ally Bank,

9  are you aware of anybody trying to mislead people through the

10 financial statements?"

11         "No."

12         "So you're not aware of people reporting things as

13 payables and receivables when they didn't believe them to be

14 payables and receivables."

15         Answer:  "I'm not aware of that."

16         You couple that with the fact that he understood that

17 you had to go back and continue to look at it and Ms. Westman

18 was running an impairment, it will give you a sense as to

19 whether the plaintiffs are going to be able to meet the promise

20 they made to you this morning that these are just bookkeeping

21 entries and that nobody at the company really cared about it.

22 These are the officers responsible for it and they took pride

23 in the fact that they had accurate books and records, that the

24 books and records complied with GAAP, that the general ledger

25 and the accounting systems were accurate and appropriate.  No

1    one in this case is going to testify otherwise.

2              So I went through the factors that they pointed to.

3    This is -- I just pulled up the Westman memo.  And if you look

4    at the conclusion, the re: line is the intercompany receivable.

5    This is something she's looking at March 12th, a month before

6    the bankruptcy.

7              She looks at the conclusion, due to these

8    circumstances, management concludes and ResCap maintains the

9    ability to support its intercompany obligations with RFC and

10   therefore, no impairment of this receivable is warranted for

11   the RFC's standalone financial statements.

12             They were doing this regularly.  They understood the

13   importance of it.  They were documenting it.  And what they're

14   asking you to do right now under the global settlement and the

15   plan, and it may make sense in the context of a 9019, but

16   they're asking you to extrapolate that value of zero to our

17   collateral.  And we think there is not a factual basis to do

18   that.

19             This is Ally's accounting policy.  And this really is

20   one of the key documents that I think undercuts virtually all

21   of their arguments as to why this is more like equity than

22   debt.

23             This is an accounting policy.  The testimony will make

24   clear to you that what it's intended to do is implement GAAP,

25   because they wanted their books to comply with GAAP.  And they

1   wanted their books to comply with GAAP, even the books that

2   weren't audited because that's the gold standard of accounting.

3           So let's look at what GAAP says about arms'-length

4   transactions.  And this is implemented in Ally's policy.  It's

5   more convenient to do it this way.  By the way, the Ally

6   policy, by definition, applied to all of its affiliates and

7   subsidiaries, so this would be the operative policy that

8   applied to ResCap.

9           There is a general presumption that transactions

10  between related parties cannot be carried out on arms'-length.

11  That's true of every corporation that follows GAAP.  So the

12  idea that these affiliate intercompany balances were not at

13  arms' length isn't shocking.  It's GAAP and it's appropriate

14  GAAP.

15          Presumed lack of an arms'-length basis.  So one of the

16  things that their policy does and GAAP does is give you a list

17  of things to look at so you can confirm it's not an arms'-

18  length transaction.

19          First, borrowing or lending on an interest-free basis

20  or a rate of interest above or below market rates.  It's one of

21  the factors we see here in some of the intercompanies that

22  we'll be discussing at trial.

23          Two, making loans with no scheduled terms for when or

24  how the funds will be repaid.  Another one of the factors that

25  they're pointing to.  So another one of GAAP factors that you

RESIDENTIAL CAPITAL, LLC, ET AL.                    221

1    can confirm a related party transaction is not arm's length.

2          Three, loans to parties that don't possess the ability

3    to repay.  Now, when we get into the list of top ten and we go

4    to the valuation issues, that's one of the things that we'll

5    discuss and that's why it's not so easy to say if you find the

6    first three, you can ignore the last seven.

7          And the last one, loans advanced ostensibly for a

8    valid business purpose and later written off as uncollectable.

9    The list as the same as the one you heard this morning.  What

10   they didn't tell you is that this is the way GAAP requires you

11   to determine whether a related party transaction is, in fact,

12   not arms'-length.

13         So what do you do when you forgive debt on a related

14   party transaction that's not arms' length? GAAP and AFI's

15   accounting policy addresses that, as well.

16         What it says is extinguishment of debt transactions

17   between related entities may, in essence, be capital

18   transactions.  As such, forgiveness of debt and related

19   interest between related parties and associated gains or losses

20   generally should not be classified as income statement, but

21   rather as capital transactions.

22         So GAAP required in these forgiveness transactions

23   that we've talked about, which were for valid business

24   purposes, and/or be indicia of not being arms' length as they

25   were presumed to be, had to be accounted for as capital

1    transactions.

2           What the plaintiffs would have you do, though, is take

3    the jump and say, because when they actually forgave, they

4    treat it as a capital transaction -- everything else is equity,

5    too.  There's no support for that.

6           THE COURT:  Well, I want to be sure I understand.  So

7    there is a presumption that none of the ten transactions that

8    were forgiven were arms'-length transactions?

9           MR. COHEN:  Correct.

10          THE COURT:  And so what does GAAP say as to whether

11   you record it as debt or as equity?

12          MR. COHEN:  You record it as a payable or receivable

13   until you no longer believe it should be a payable or

14   receivable.

15          The fact that it's arms' length or lack of arms'

16   length under GAAP has nothing to do with it.  Nothing at all

17   anymore than the fact that it eliminates and consolidation has

18   anything to do with it.  So all of the labels that you've seen

19   in the papers and you've heard people talk about, sound

20   compelling -- there's no interest rate; of course it can't be a

21   loan.  Well, that's not what GAAP says.

22          What GAAP says is you've got to look at what the

23   intent is, and that's what the accounting people did, whether

24   it's payable or not.  Did you do an impairment analysis?

25   That's what the people were doing.  These were not arms'-length

 1    transactions.  They had all of the indicia under GAAP that we

 2    talked about that were arms' length, but they were still

 3    properly accounted for.  They were still being treated as

 4    assets and liabilities for purposes of determining solvency,

 5    they were still being reported to regulators, they were still

 6    in the SEC filings.

 7            The conclusion that the plaintiffs want you to reach

 8    is it's okay to just make all of this go away because it's just

 9    bookkeeping anyway -- totally unsupported by the evidence.  And

10    the only witness you're going to hear testify that she has a

11    different view spent thirty or forty hours looking at it.

12            Let me jump ahead.  We do appreciate your indulgence

13    on time.

14            THE COURT:  Just tell me what page you're going to.

15            MR. COHEN:  Yeah, I'm going to.  Okay, so one of the

16    other questions that we asked the witness, because everybody

17    has talked about this in terms of debt forgiveness, and to me

18    it didn't make sense to talk about debt forgiveness when people

19    were saying these are really equity transactions.

20            So we talked to Mr. Young, and I said to him, "You're

21    familiar with the phrase debt forgiveness?"

22            "Yes."

23            "What does that mean?"

24            "It means forgiving debt."

25            "Well, what about the forgiving part?"

1           And what he says is, "If one party owes somebody some

2    money and the other party says well you don't need to pay me

3    back, I'm forgiving the debt.  That's debt forgiveness."

4           Now, it's significant that its' Mr. Young who is

5    saying this, because for a period of time, Mr. Young served on

6    ResCap's executive board, so he was not only writing the memos

7    to get approval for debt forgiveness, he was signing as one of

8    the three members on the executive committee approving debt

9    forgiveness.  And I asked him, "Well, if there wasn't a valid

10   debt underneath, why would you be forgiving it?  It wouldn't

11   make any sense."  His answer is, "You're right, it wouldn't."

12          "Without a debt, you can't forgive a debt that isn't

13   owed.  Do you agree with that?"

14          "I agree with that."

15          "Okay.  So when you're talking about forgiving debt,

16   there has to be a debt that's owed?"

17          "On the face of it, yes."  This is ResCap's CFO.

18          Ms. Dondzila, I told you that she was looking at these

19   issues for purposes of solvency.  She couldn't be more clear in

20   her deposition:  "They would have formed assets or liabilities

21   of the entities as recorded and so they would have been

22   considered.  There were no special adjustments for them, but

23   they would have been considered as assets or liabilities of the

24   respective companies."

25          So when the lawyers tell you these were just

1    bookkeeping entries and nobody treated them like assets and

2    liabilities, squarely at odds with the evidence.  No one in the

3    accounting department is going to tell you that.

4           This is Mr. Young writing to himself as a member of

5    the executive committee.  "In order to ensure that it meets the

6    required net worth level until it requires additional capital,

7    it requires additional capital that can be provided through the

8    forgiveness of 500 million in affiliate borrowings."  A formal

9    request.

10          This process was followed for all debt forgiveness

11   over fifty million dollars, and there were designated levels

12   beneath it.  But the idea that the company can just, on a

13   whim --

14          THE COURT:  Okay.  Whoever is on the phone, I'm

15   picking up feedback from somebody.  You're going to get cut

16   off.  I don't know whether somebody is bringing a cell phone or

17   a BlackBerry next to the phone receiver.

18          Is CourtCall operator on the line?

19          COURTCALL OPERATOR:  Yes, Your Honor.

20          THE COURT:  Can you tell where I'm getting this

21   feedback from?

22          COURTCALL OPERATOR:  Yes, Your Honor, it was on the

23   line of Wendy Alison Nora.

24          THE COURT:  Ms. Nora, if I continue to have feedback

25   or noise coming, you're going to be cut off from the line.  If

1   you have a cell phone or a BlackBerry near the phone, you need

2   to turn it off.  Court call operator, the next time it happens,

3   disconnect the line.

4           COURTCALL OPERATOR:  Yes, Your Honor.

5           MS. NORA:  Your Honor, I have the court on mute.  I

6   don't know how that could be happening.

7           THE COURT:  Well, you're not on mute.  You're speaking

8   to me now.  The CourtCall operator identified your line as the

9   culprit.

10          Go ahead, Mr. Cohen.

11          MR. COHEN:  So what we're looking at is one of the

12  memos that were formally used to formally document the process

13  of capital forgiveness -- or, debt forgiveness, capital

14  contribution, and the reasons for it, the amounts for it, they

15  all had to be explained, they all had to be approved.  This was

16  not something that could be done thoughtlessly.

17          And Mr. Eckstein said this morning that -- he was

18  making an analogy between the intercompany balances and the

19  lending relationship between Ally or AFI and ResCap, and he

20  said if they wanted it to be a loan, they knew how to document

21  it or something to that effect.

22          Certainly if ResCap wanted to convert its payables and

23  receivables into capital contributions, they knew how to do it,

24  they did it when they needed to, and when they didn't need to,

25  they didn't.  It was a very, very formal process.

1           And we've already touched on the cash management

2     system.

3           If you look at -- and this I also think is very

4     important -- these are the statements of assets and liabilities

5     that were filed in the main case, and they list the top of the

6     intercompany receivables.  They don't list them as contingent.

7     They don't list them as disputed.  They list them as valid

8     debts.

9           Now, there's also a reservation of rights that goes

10    with it, and I think that's important to look at, too, because

11    while the debtors reserve the right to go back and

12    recharacterize -- I think, first of all, they have to have the

13    right to do that, and to have the right to do that, you have to

14    make certain tests under the law -- you have to pass certain

15    thresholds under the law.  Those are largely intent-based tests

16    and I think that the witnesses, the fact witnesses of the

17    company are all going to tell you that their intent was to

18    properly book these as payables and receivables, to move them

19    into capital when they felt it was appropriate, and that they

20    were on top of the situation.

21          The expert witness, Ms. Gutzeit, is going to tell you

22    she did no investigation into intent.  So I don't think she

23    really helps in that regard.

24          But even in connection with the reservation of rights,

25    what the debtors said in their statements of assets and

1   liabilities filed in this case, after they had done an

2   investigation, after Mr. Renzi at FTI had spent a lot of time

3   looking at it, is they said they made every reasonable effort

4   to ensure that the schedules and statements are as accurate and

5   complete as possible based on the information that was

6   available to them at the time of preparation.

7           There is no suggestion -- and we heard from Ally's

8   lawyer, the restructuring professionals came on the scene in

9   2008; this case filed in 2012 -- there is no suggestion that

10  this information as to how these payables and receivables were

11  being recorded was not available to management.  Management

12  knew exactly how they were doing it.

13          And then if you look at the section that speaks to

14  intercompany transactions, again what the debtors say, and with

15  the benefit of restructuring professionals on the scene for

16  four years, that the debtors have made every attempt to

17  properly characterize, prioritize and classify all intercompany

18  transaction.

19          Then -- this is a key piece -- each debtor reserves

20  the right to recharacterize and reprioritize and reclassify

21  claims against -- and debts owed to other debtors and nondebtor

22  affiliates.

23          What they also recognize is the point that I've talked

24  to you about is among the biggest ones, there may be different

25  issues and they're dealing with it on a debtor-by-debtor basis,

1  not the wholesale treatment contemplated by the global

2  settlement in the plan.

3          I'd like to touch base on the Ally contribution as

4  well.  And the debtors have conceded, and I think everyone in

5  this courtroom would concede that the Ally contribution of 2.1

6  billion is the cornerstone of the plan.

7          But the debtors and the plaintiffs here argue that

8  none of the Ally contributions should be allocated to those

9  causes of action on which the JSNs hold liens.

10         And they reach that conclusion, if I follow their

11  logic, by saying that when the settlement was agreed to in

12  March 2013, the committee, a month before, had filed an STN

13  motion and identified certain causes of action that it intended

14  to bring.  And none of those causes of action sounded in

15  contract and they were avoidance actions under the Bankruptcy

16  Code, alter ego, things that were not contract actions that

17  will be subject to our lien.

18         As a result of that, when the 2.1 billion came on the

19  table a month later, no one was thinking about the contract

20  actions, and the examiner's report was under seal.  So no one

21  knew what the examiner was doing really.  So how could you then

22  take the examiner's report, look at what he spent a year and

23  eighty million dollars doing and try to ascribe any value of

24  the causes of action that he identified to this settlement.

25         As best as I can understand the argument, that's it.

RESIDENTIAL CAPITAL, LLC, ET AL.                          230

1        But I think it's important to go back and look at the

2   history in this case of how the examiner came to be.

3        And there was a hearing on the appointment of the

4   examiner, and Mr. Shore was actually concerned that the

5   appointment of the examiner was somehow going to slow down

6   settlement discussions that were going on between the JSNs and

7   the debtors and the committee at the time.

8        And this was your observations.  What you said to Mr.

9   Shore is, "You keep talking about not interfering with the

10  settlement, but it's very important that any investigation

11  yield enough facts.  I mean the 9019 standard for this Court to

12  approve any settlement requires me to have a fundamental

13  understanding of the facts and the arguments in support.  You

14  don't try issues in deciding whether to approve a settlement,

15  but I need all of that before me and an examiner may be in a

16  better position than the parties to the settlement to make sure

17  I have all those facts."

18       And so what the Court recognized at the time is that

19  even if there was going to be a quick settlement, the examiner

20  brought value to the table.

21       The Court then entered an -- issued an opinion

22  appointing the examiner.  And one of the things that you

23  observed is the debtors' hope to exit these cases quickly with

24  third-party nondebtor releases in favor of Ally and others.

25  "It's important that the investigation be conducted

1   expeditiously, but until an independent evaluation has been

2   completed, any potential claims that would be released under a

3   proposed plan, the Court will be unable to conclude whether the

4   debtors will be permitted to solicit votes in support of such a

5   plan."  That was the Court's thinking when it appointed the

6   examiner.

7           And as to the idea that nobody knew what the examiner

8   was looking at, the Court also entered an order where you

9   approved the scope of Judge Gonzalez's examination and you

10  adopted his preliminary statement regarding the scope and

11  timing of his examination.

12          Two of the things that I think are very relevant here,

13  is Judge Gonzalez as looking at all material pre-petition

14  transactions and all material verbal or written agreements or

15  contracts between and among the debtors on the one hand and any

16  one or more of Ally financial, formerly known as GMAC, LLC, and

17  then it goes on on the other.

18          And then you also told him that you were looking at

19  the officers and directors of the boards with respect to those

20  transactions.

21          The idea that after the examiner had gathered nine

22  million pages of documents had conducted eighty-nine

23  interviews, twelve depositions, that these people who were

24  sitting as part of the global settlement while the examiner's

25  report was completed and under seal didn't have a sense of what

1    he was looking at --

2             THE COURT:  Well, they didn't -- the examiner report

3    was under seal but, correct me if I'm wrong, I thought the

4    committee had access to the examiner's documents; not only the

5    committee, others did, too.  So the committee -- I was

6    concerned, and I think rightly so, in light of the costs

7    involved, I was concerned that there was going to be

8    duplicative efforts.

9             MR. COHEN:  Right.

10            THE COURT:  But I acknowledged and I think everybody

11   acknowledged that the committee was going to go on with its

12   investigation.

13            Mr. Eckstein, didn't you have you, didn't the

14   committee have access to the documents that the examiner was

15   collecting?  I thought that that was what o--

16            MR. ECKSTEIN:  Yes, Your Honor, the committee did have

17   access to all of the documents that the examiner was

18   collecting.  The only thing the committee did not have access

19   to was the witness interviews.

20            THE COURT:  Right.  So Mr. Cohen, I mean, it's not

21   like the committee was operating totally in the dark and

22   negotiated a 2.1 billion dollar settlement. The committee

23   didn't have access to the interviews that Judge Gonzalez had

24   taken, but it did whatever interviews it thought was

25   appropriate; it had access to nine million pages of documents.

1          MR. COHEN:  I agree with that.  My point is --

2          THE COURT:  So it's not like a bunch of people with

3   blindfolds on went out to negotiate and came back with a 2.1

4   billion dollar settlement and then, lo and behold, once the

5   Court approves it and releases Judge Gonzalez's report

6   everybody suddenly sees claims.  The committee and Wilmington

7   Trust had both made motions for standing.

8          MR. COHEN:  I agree.  And my point is actually not

9   that the committee didn't not know there were contract claims,

10  and one of the witnesses will testify, Mr. Marks, who

11  negotiated and was responsible on the tax allocation agreement

12  on the Ally side of it.  When I deposed him, I said when the

13  examiner's report came out and you read it, were you surprised?

14  He said no.  Why weren't you surprised?  He said it was very

15  clear where the examiner was going in his investigation and

16  what conclusion was he going to reach.  I said, well, how did

17  he make that clear to you?  Obviously, this isn't the

18  testimony; I'm paraphrasing.  How did he make that clear to

19  you?  He said by his demeanor and the questions.

20         So I'm sure that the committee and the debtors had the

21  documents and knew where the examiner was going with this, but

22  having represented a lot of committees, the claims that I

23  choose to pursue are the avoidance actions that go to the

24  committees and perhaps not the contract claims that are subject

25  to liens.

RESIDENTIAL CAPITAL, LLC, ET AL.                    234

1          So my only point in this argument is you can't say

2    that while the examiner's investigation was done and the report

3    was under seal that no one was thinking about potential

4    contract claims.  And that's the basis of the argument is, we

5    weren't thinking about contract claims.  Therefore, even if you

6    have a lien on contract claims, you don't get any value; see

7    our STN motion.  So that's my argument on that point.

8          THE COURT:  Okay.

9          MR. COHEN:  Now, there's been some discussion also

10   about for what purposes the examiner's report can be used, and

11   the Court has made it abundantly clear that it's hearsay, and I

12   think the fact --

13         THE COURT:  Nobody agreed with that.  You disagree

14   with it?

15         MR. COHEN:  I don't disagree with it.

16         THE COURT:  Okay.

17         MR. COHEN:  And one of the things we did a lot of work

18   on in depositions is try to get the witnesses, to the extent we

19   could with -- we obviously didn't have eighty million dollars

20   and a year to conduct discovery with --

21         THE COURT:  No, but you have his report now and --

22         MR. COHEN:  We do, and so --

23         THE COURT:  -- and you have nine million pages of

24   paper that were produced.

25         MR. COHEN:  We do, and we deposed the witnesses and

1    with many of the witnesses we just read the statement from the

2    examiner's report and said do you agree with it.

3            And on the factual assertions, I think we've overcome

4    a lot of the hearsay because you're going to hear live

5    testimony in the court that is going to back up the key facts

6    that the examiner relied on and then the Court in its function

7    of deciding the law is going to decide whether it's a

8    meritorious contract claim, and how it should be valued for

9    purposes of the settlement, if so.  So that's the exercise that

10   given the Court's ruling on the Lyon's (ph.) declaration or the

11   Lyon's opinion that we're going to go through at trial.  But I

12   think we have been able to clear out a lot of the hearsay.

13           But one of the things that you did do that I think is

14   very important, and again this is a conversation that you had

15   with Mr. Shore, is you did agree that the examiner's report was

16   not hearsay for purposes of identifying the claims.

17           So where he says it's a contract claim, breach of this

18   agreement, you agreed that that was not a hearsay purpose.  And

19   that is from the August 28th hearing; those are the pages that

20   I've put up in front of you now.

21           And so with that, when you look at the damages that

22   the examiner has identified in his report in the different

23   claims, you've got a breach of contract from misallocation of

24   net revenues on the brokerage agreement --

25           THE COURT:  I swore, the examiner did not term

 1   damages, okay?  I've read all 2,235 pages of the report.  I

 2   know what the examiner did.  He identified potential claims and

 3   amounts, and what he thought was likely, but that's not a

 4   determination of damages.

 5          MR. COHEN:  I understand, and we've labeled it

 6   "potential damages".

 7          THE COURT:  Okay.

 8          MR. COHEN:  It is consistent with the way he labeled

 9   it in his report.  And I certainly --

10          THE COURT:  You're not using his report, Mr. Cohen.

11   I'm just telling you right now, you're not using his report.

12          MR. COHEN:  I understand.  And I also under --

13          THE COURT:  That should have been clear.  You tried.

14          MR. COHEN:  I also understand that the reasonable

15   value of those claims, because they're not litigated, they

16   haven't gone to a final judgment, there hasn't been discovery,

17   that the value of potential damages that the examiner has

18   identified is not the value that we're going to ask you to --

19          THE COURT:  I have a blinder in front of me.  What's

20   in the examiner report is not evidence, is not coming in.  If

21   you're able to produce competent evidence to support your

22   argument, that's fine.  But what you tried to do and what I

23   would not allow to be done, you tried to do it through the

24   guise of an expert testifying about both fact and law who

25   didn't conduct much of an investigation of his own; he relied

1   on an examiner report that's 2,235 pages long that can't come

2   into evidence.  So --

3          MR. COHEN:  Well, on our --

4          THE COURT:  -- as a demonstrative that you want to use

5   now, fine.  But it is not evidence and it won't be considered

6   as evidence.

7          MR. COHEN:  I understand, but let me go back to, then,

8   the August 28th hearing, because it's important for me to

9   understand for what purpose, if any, I can use the report,

10  because as I --

11         THE COURT:  Well, when you offer it, you'll find out.

12  Let's go on with your argument.

13         MR. COHEN:  Well, let me ask you, because --

14         THE COURT:  I'm not making a hypothetical ruling at

15  this point.

16         MR. COHEN:  It's not hypothetical.

17         THE COURT:  It is for me.

18         MR. COHEN:  Okay.  What I understood the road rule to

19  be is that the examiner's report was not hearsay for the

20  purposes of identifying the claims.

21         THE COURT:  Well, I'll go back and I'll review the

22  whole transcript.  I'm not sure I ruled on anything at that

23  time, so go on with your argument.

24         MR. COHEN:  Okay.  This is the contention piece that

25  we were just talking about; notwithstanding the claims that

1    were identified, the witnesses' testimony and understanding of

2    the claims, it's the plaintiff's contention that it's apparent

3    at the time of the negotiation, while the creditors' committee

4    had sought authority to pursue claims based on certain of the

5    conduct underlying the contract claims now championed by the

6    JSN, it views such claims as either commercial torts or

7    avoidance actions and it ascribed no value.

8            But let's see this one -- unfortunately, we can't read

9    it on the screen -- Mr. Carpenter, who is Ally's CEO had to say

10   about the claims identified by the committee and the debtors.

11   And this is on page --

12           THE COURT:  Slide 45?

13           MR. COHEN:  45, yes.

14           So Mr. Carpenter had to be given a presentation by

15   ResCap's lawyers about potential claims and these were the

16   alter ego claims.

17           And the question was, "Did you see any of the

18   presentation materials?

19           Mr. Carpenter, Ally's CEO's answer was, "It was a

20   joke."

21           "And what makes you say it was a joke?"

22           There is an objection by his counsel, to discuss his

23   own view and not legal counsel's.  Mr. Carpenter's view of the

24   alter ego theories that were being championed by the debtors

25   and the committee in the STN motion was that "It's a fantasy,

1  it was in the wildest dreams, what kind of garbage could you

2  conjure up."

3          THE COURT:  How did he really feel about it?

4          MR. COHEN:  Yeah, exactly.  Exactly.  But he also had

5  a view, because we then asked him, as we did with all of the

6  witnesses what he felt about the examiner's report.  And he had

7  some strong words about the examiner's report as well.

8          THE COURT:  I don't think that's competent evidence.

9  The examiner's report is hearsay.  What Mr. Carpenter thought

10 about the examiner's report is not competent evidence, Mr.

11 Cohen.

12         MR. COHEN:  Well, what Mr. Carpenter thought about

13 claims that could be asserted against Ally, that is what the

14 testimony goes to.  Because what is in his state of mind when

15 he's sitting in a room negotiating a 2.1 billion dollar

16 release -- or payment, rather, for a global release, and what

17 he's thinking about is, if you look at the middle of the page,

18 "The only thing in the examiner report that I thought you could

19 at least have a debate on was the transfer pricing associated

20 with the mortgages from the bank to ResCap, and did the bank

21 take more of a mark-up than it should have.  Now, I personally

22 think that they did and we certainly had an accounting firm

23 take a look at it, but it was only the thing that I thought you

24 could even have an intelligent conversation around."  And I

25 think the CEO of a company who has paid 2.1 billion dollars in

RESIDENTIAL CAPITAL, LLC, ET AL.                    240

1   to this bankruptcy for global release, his view on claims that

2   could be asserted is highly relevant.

3          With respect to Mr. Carpenter's view as to what claims

4   he was settling, essentially, and I think this is consistent

5   with what we've heard this morning, his view was he was putting

6   in 2.1 billion dollars for a global release and was indifferent

7   as to how the money was split up among the creditors.

8          Similarly, his testimony, and we're going to highlight

9   it in here, is that the issue of the waiver of intercompany

10  claims in settling them out at zero, couldn't care less, it was

11  not one of his demands.  So that was not a contingency that

12  brought in the Ally payment.

13         I will skip slide 48 for the reasons that we've talked

14  about with the earlier slide.

15         Now I want to go to -- there's been a suggestion and

16  we heard it in depositions and we've heard it in papers and

17  have seen it in papers and have heard this theme in the court,

18  that somehow the JSNs decided to boycott the mediation.  And I

19  want to walk you through some of the evidence you're going to

20  see.  It shows up in a couple of the witness statements.  I

21  think Mr. Kruger makes the statement that the JSNs made a

22  tactical decision not to come.

23         So the mediator was appointed in December 2012.

24  Immediately after the New Year's one of the noteholders is

25  sending out an e-mail to Mr. Eckstein trying to get a comfort

1 order so that they could participate in the mediation without

2 being subject to allegations of insider trading.

3           One of the JSN noteholders was deposed in this case,

4 and he was asked specifically -- this is at page 450 of the

5 deck -- "Were you individually involved in the decision not to

6 participate in the mediation initially?"

7           Answer:  "I don't think we, as an ad hoc group, would

8 not object to participating in the mediation.  We wanted to

9 participate in the mediation and our advisors did participate

10 in the mediation.  We tried very hard to get an NDA signed in

11 substantially the identical form to the NDA, the NDA that was

12 agreed upon to get us to the PSA, which was the first PSA, but

13 the debtor was not willing to provide us with that form of NDA.

14 As a result, it was impossible for the principals of the ad hoc

15 group to participate in the mediation."

16          And what they essentially were looking for were

17 comfort orders.  And Judge Peck has described comfort orders

18 and the comfort order ultimately that was entered in this case

19 on July 29th as the gold standard for comfort orders of this

20 type.

21          And Judge Peck also recognized that are these are now

22 becoming industry standard in these cases.

23          But there are other witnesses here, for example Mr.

24 Dubel, in his witness statement, will make it clear that at

25 least one of the noteholders, the Berkshire Hathaway noteholder

RESIDENTIAL CAPITAL, LLC, ET AL.                                242

1   represented by Munger Tolles, and my partner and the ad hoc's

2   financial advisors attended the mediation; Mr. Marano will tell

3   you the same thing, that the JSNs through their advisors

4   participated in the mediation, as well Mr. Kirpalani.

5   Unfortunately, it wasn't until the end of July when the comfort

6   order was signed and the principals could participate.  And

7   they did.

8           Now, we know because we're standing here today that a

9   solution wasn't reached, and because of mediation

10  confidentiality, we're never going to know why a solution

11  wasn't reached.  It could be that the bid and ask were too far

12  apart, which is typically the reason.  It could be that after

13  this deal was cut in May, when the principals still could not

14  participate, there wasn't enough consideration left.  It could

15  be that it was by design.  There is not going to be any

16  evidence as to why, once the principals got into the mediation,

17  a settlement wasn't reached.

18          But we're here to have a fair trial.  We think the

19  issues are clear.  We agree with you that there is a lot of

20  money at stake, but we think the evidence on all of these

21  issues cuts in our favor and that you'll find at the end of the

22  trial that with respect to either of the intercompany claims or

23  the lien on the Ally contribution, we're oversecured and

24  entitled to post-petition interest.

25          THE COURT:  Thank you.

1             MR. COHEN:  Thank you.

2             THE COURT:  All right.  Is anyone else intending to

3    make an opening in opposition to confirmation of the plan?

4             MR. DONNELL:  Yes, Your Honor.  Wachovia, Jim Donnell.

5             THE COURT:  Come on up.

6             MR. DONNELL:  Jim Donnell, Winston & Strawn --

7             THE COURT:  I'm sorry; I still didn't hear your last

8    name.

9             MR. DONNELL:  Donnell, D-O-N-N-E-L-L --

10            THE COURT:  Okay.

11            MR. DONNELL:  -- on behalf of Wachovia, WFBNA.  And --

12            THE COURT:  Go ahead.

13            MR. DONNELL:  -- I can be very brief.

14            THE COURT:  Yeah, go ahead.

15            MR. DONNELL:  So I would like to explain -- it's been

16   characterized as --

17            THE COURT:  Let me -- sorry.

18            MR. DONNELL:  I will be brief and you can cut me off.

19            THE COURT:  No, I'm going to let you do what you need

20   to do, but we have to stop at 5 o'clock.

21            MR. DONNELL:  Sure.

22            THE COURT:  If you're not done, we're going to resume

23   in the morning but, okay --

24            MR. DONNELL:  That's fine.

25            THE COURT:  -- we have to stop at 5.

RESIDENTIAL CAPITAL, LLC, ET AL.                          244

1          MR. DONNELL:  Understand.

2          THE COURT:  Thank Congress for that.  Sequestration

3   is --

4          MR. DONNELL:  So I would like to explain the strangest

5   objection of all, as Mr. Lee characterized it.  And recognizing

6   that we are a very small claim compared to everybody else here,

7   I will keep this very brief.

8          But first, I would like to clear up what we view as

9   three mischaracterizations of our position that were set forth,

10  and I'll be brief.

11         One is of the challenge to jurisdiction.  We do not

12  contest this Court's jurisdiction to generally grant a release

13  of third-party creditors.  In fact, we agree with the debtor

14  that of the Second Circuit Quigley decision even goes so far as

15  to say that even nonderivative claims are subject to

16  jurisdiction.

17         So we only contest jurisdiction for our specific

18  claims to the extent that this Court agrees that there is no

19  underlying right of indemnity in favor of AFI that would give

20  rise to jurisdiction, whether that's because of the fact that

21  the claim is related to AFI's accounts as opposed to the

22  debtors' accounts, or whether because there is a specific

23  waiver of indemnity rights in our deposit agreement.  So it's

24  issues limited to us.

25         Similarly, the second statement, we do not contest the

1   best-interests test, generally, with respect to creditors as a

2   whole.  And instead, we are only contesting it with respect to

3   our particular claims under the deposit agreement because those

4   claims we have directly against AFI, and we would receive a

5   hundred percent recovery on those claims from AFI.

6            So in fact, we think it is amazing the support that

7   the plan has garnered and it clearly does appear to be in the

8   best interests of most creditors.

9            THE COURT:  Do you really run up 800,000 dollars in

10  fees after the account was closed?

11           MR. DONNELL:  No, that's incorrect.  I will go through

12  the history of our disputes in just a moment.

13           THE COURT:  You ran up anything you're trying to

14  charge them after the account was closed?

15           MR. DONNELL:  Our dispute is with AFI.  And AFI's

16  accounts were open as of a month and a half ago.

17           THE COURT:  Okay.

18           MR. DONNELL:  So our dispute is not with the debtor,

19  per se.

20           We seek no leverage in this case.  In fact, we would

21  waive any existing fee claim against the debtor.  All we are

22  looking for is a preservation of our indemnity rights against

23  AFI, both for any obligations associated with the AFI deposit

24  accounts or the other nondebtor AFI affiliates, including Ally

25  Bank.  And then the other type of indemnity rights we have

RESIDENTIAL CAPITAL, LLC, ET AL.                    246

1   against AFI includes what we view as an enforceable guarantee

2   by AFI of whatever rights arise out of the ResCap accounts.

3           THE COURT:  Well, that would be indemnifiable, right?

4   I mean if you're claiming rights because of debtors' accounts,

5   that specifically goes back to the race as to which you're

6   conceding there is jurisdiction to grant a release, correct?

7           MR. DONNELL:  Ordinarily it would except for the same

8   instrument that gives us the guarantee rights also waives their

9   indemnity rights.  AFI waives its indemnity rights against

10  ResCap for our particular claims.  So --

11          THE COURT:  Okay.

12          MR. DONNELL:  -- if you don't agree with that, then

13  yes, you're right.

14          THE COURT:  Go ahead.

15          MR. DONNELL:  So to get to our claim, so -- or, the

16  question, why are we barking.  We're barking because we've had

17  a very long-running dispute, number of disputes with AFI that

18  began over a year and a half ago before the bankruptcy

19  occurred.  So we demanded additional collateral and guarantees

20  from AFI as the parent corporation.  And the end result of that

21  was the imposition of an amendment to the deposit agreement

22  that provided for a guarantee by the parent company AFI.

23          THE COURT:  Deposit agreement with whom?

24          MR. DONNELL:  With AFI.  There's one deposit agreement

25  signed by AFI and signed by ResCap debtors.  But they each had

RESIDENTIAL CAPITAL, LLC, ET AL.                     247

1    their own accounts.  So AFI had its own accounts with Wachovia.

2         THE COURT:  So your dispute relate only to AFI's

3    accounts with Wachovia or with respect to ResCap's accounts

4    with Wachovia?

5         MR. DONNELL:  We would like to preserve all of our

6    indemnity rights against both -- well, we know what's going to

7    happen to our indemnity rights against the debtor; they're

8    going to get, effectively, wiped out.  But we'd like to reserve

9    our indemnity rights against AFI.

10         So, but the disputes that we've had include first

11    that --

12         THE COURT:  Do you know whether -- has AFI filed a

13    proof of claim for indemnification for claims arising from

14    Wachovia -- whatever it may be in your deposit agreement --

15         MR. DONNELL:  Right.

16         THE COURT:  -- has AFI filed a proof of claim that

17    would seek to recover from ResCap any claim that Wachovia

18    recovers relating to a ResCap account?

19         MR. DONNELL:  I assume they have or that they would.

20    So I would concede that.

21         THE COURT:  And if they've done that, you think I

22    still don't have jurisdiction?

23         MR. DONNELL:  I think that's up to you, I think if you

24    read the deposit agreement, it says they waive those claims.

25    If you think that's effective, then there is no indemnity

RESIDENTIAL CAPITAL, LLC, ET AL.                    248

1  claim, even if they filed a proof of claim.

2          THE COURT:  Okay.

3          MR. DONNELL:  So our next dispute with AFI arose in

4  connection with the bankruptcy.  We tried to work out an

5  acceptable cash management order and get protections under the

6  financing agreement.  We had a disagreement.  We never reached

7  resolution.  We objected to those initial financing motions and

8  ultimately, in court, we were able to reserve our rights.

9          The next dispute arose in connection with the original

10 proposal to sell assets to AFI, because that had a sale free-

11 and-clear provision that we viewed as giving AFI an effective

12 release of all claims related to ResCap.

13         So again, we objected to that, we participated in

14 that, and we ultimately were successful in reserving our

15 rights.

16         The next AFI attempted release that we faced came in

17 the form of a motion to assume and assign our contract to

18 someone else.  That was eventually withdrawn by the debtor and

19 AFI.

20         Next, we basically, as AFI has asserted, we, our bank,

21 had a setoff of amounts held in an AFI account to reimburse

22 itself for the unpaid fees.  And then AFI now asserts that that

23 was a conversion and that they have the right to sue Wachovia

24 for that.  So again, we would claim, well, we're going to have

25 an indemnity right back against you, AFI.  We would like to

1    preserve that.

2              And now this, the plan is the final attempt to get an

3    AFI release of our claims.

4              So we have indemnity claims against AFI for fees of

5    approximately 375,000 dollars.  We have continuing indemnity

6    claims against AFI for whatever we're going to incur in

7    fighting their conversion action.  And we're going to have

8    continuing indemnity claims against AFI for whatever comes up

9    in the future, which we don't know about; maybe it's a U.S.

10   Government audit of AFI to which we have to respond with

11   records.  I don't know; it's unknown.  It's a contention.

12             So that brings me to the point of, our view is so what

13   if it's contention; it's still a claim.  If you look at the

14   deposit agreement, it specifically provides that even when the

15   accounts are closed and the agreement's terminated, the

16   indemnity obligations survive.

17             And again, the accounts of AFI were open until a

18   couple of months ago.  And we cited in our -- excuse me; I'm

19   losing my voice here.

20             But we think the fact that our claims, in large part,

21   are contingent doesn't mean that they're not valid.  We cited

22   in our objection to Your Honor's own ruling in the FGIC opinion

23   that we believe that supports a proposition that even if a

24   claim is contingent, it's still valid, at least in the first

25   instance.

RESIDENTIAL CAPITAL, LLC, ET AL.                    250

1          So finally, brings me to our limited objection, which
2     I think is fully addressed in our papers.  I won't repeat all
3     that.  We claim waiver; we claim insubordination rights
4     independent of any release that they should exist.  We agree
5     with AFI that the intercreditor rights should be preserved.
6          We think the best-interests test is not satisfied if
7     we have to give up a claim against AFI that we would get a
8     hundred percent recovery on.  And we think Judge Bernstein's
9     opinion in Quigley clearly supports us on that.
10         We're very aware of the Court's time and our
11    relatively small size, so we're going to be extremely brief.
12    We reserve for five minutes for several of the AFI and debtor
13    witnesses.  Hopefully we can get that even shorter with a
14    stipulation that we're working on.  But that's it.
15         THE COURT:  Thank you.
16         MR. DONNELL:  Thank you.
17         THE COURT:  All right.  Let me ask, who else is
18    intending to make an opening?
19         And who are you, sir?
20         MR. RODE:  Richard Rode.
21         THE COURT:  And how long do you intend to take Mr.
22    Rode?
23         MR. RODE:  More than five minutes.
24         THE COURT:  Well, we're a not going to do it today,
25    but I'm asking you for an estimate of how long you're going to

1  be.

2           MR. RODE:  Fifteen minutes.

3           THE COURT:  I'm sorry?

4           MR. RODE:  Fifteen minutes.

5           THE COURT:  Anybody else?

6           MR. SCHAFFER:  Your Honor, Eric Schaffer for Wells

7  Fargo as collateral agent.  No opening.

8           THE COURT:  Okay.  Anybody else?

9           We will beginning tomorrow morning at 9 with no more

10 than fifteen minutes with Mr. Rode, and then we'll proceed with

11 the witnesses.  Okay?

12          See everybody in the morning.

13          IN UNISON:  Thank you, Your Honor.

14      (Whereupon these proceedings were concluded at 5:02 PM)

15

16

17

18

19

20

21

22

23

24

25

1

2                                    I N D E X

3

4                                    RULINGS

5                                                    Page        Line

6   Joint pre-trial order, Amended pre-trial        16            5

7   order, 2nd Amended pre-trial order, are all

8   entered.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4   I, Penina Wolicki, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8                    _Penina Wolicki_

9

10  _____

11  PENINA WOLICKI

12  AAERT Certified Electronic Transcriber CET**D-569

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:   November 20, 2013

19

20

21

22

23

24

25