1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

In the Matters of:

RESIDENTIAL CAPITAL, LLC, et al.,          Case No. 12-12020-mg

             Debtors.

- - - - - - - - - - - - - - - - - - - -x

RESIDENTIAL CAPITAL, LLC, et al.,

             Plaintiffs,                Adv. No. 13-01343-mg

      - against -

UMB BANK, N.A., in its Capacity as Trustee

INDENTURE TRUSTEE,

             Defendant.

- - - - - - - - - - - - - - - - - - - -x

OFFICIAL COMMITTEE OF UNSECURED

CREDITORS, et al.,

             Plaintiffs,                Adv. No. 13-01277-mg

      - against -

UMB BANK, N.A., et al.,

             Defendants.

- - - - - - - - - - - - - - - - - - - -x

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 20, 2013

19              9:05 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

Adversary proceeding: 13-01277-mg   Official Committee of

Unsecured Creditors et al v. UMB Bank, N.A., et al.

PHASE II TRIAL


Adversary proceeding: 13-01343-mg Residential Capital, LLC et

al. v. UMB Bank, N.A., in its Capacity as Indenture Trustee

PHASE II TRIAL


12-12020-mg   Residential Capital, LLC

CONFIRMATION HEARING.


Fairness Hearing RE: Kessler Settlement Class.


Transcribed by:  Penina Wolicki

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

4

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:   GARY S. LEE, ESQ.

9        CHARLES L. KERR, ESQ.

10       LORENZO MARINUZZI, ESQ.

11       JOSEPH ALEXANDER LAWRENCE, ESQ.

12

13

14  MORRISON & FOERSTER LLP

15       Attorneys for Debtors

16       755 Page Mill Road

17       Palo Alto, CA 94304

18

19  BY:   DARRYL P. RAINS, ESQ.

20

21

22

23

24

25

5

1  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

2        Conflicts Counsel to Debtors

3        101 Park Avenue

4        New York, NY 10178

5

6  BY:   THERESA A. FOUDY, ESQ.

7

8

9  UNITED STATES DEPARTMENT OF JUSTICE

10        Office of the United States Trustee

11        U.S. Federal Office Building

12        201 Varick Street

13        Suite 1006

14        New York, NY 10014

15

16  BY:   BRIAN S. MASUMOTO, ESQ.

17

18

19  SILVERMANACAMPORA LLP

20        Special Counsel to Creditors' Committee

21        100 Jericho Quadrangle

22        Suite 300

23        Jericho, NY 11753

24

25  BY:   RONALD J. FRIEDMAN, ESQ.

6

1

2  KRAMER LEVIN NAFTALIS & FRANKEL LLP

3       Attorneys for Official Creditors' Committee

4       1177 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   KENNETH H. ECKSTEIN, ESQ.

8        PHILIP S. KAUFMAN, ESQ.

9        DOUGLAS MANNAL, ESQ.

10       STEPHEN ZIDE, ESQ.

11       P. BRADLEY, O'NEILL, ESQ.

12       JOSEPH A. SHIFER, ESQ.

13

14

15  U.S. DEPARTMENT OF JUSTICE

16       U.S. Attorney's Office

17       86 Chambers Street

18       3rd Floor

19       New York, NY 10007

20

21  BY:   JOSEPH N. CORDARO, ESQ.

22

23

24

25

7

1

2  KIRKLAND & ELLIS LLP

3       Attorneys for Ally Bank and Ally Financial, Inc.

4       153 East 53rd Street

5       New York, NY 10022

6

7  BY:   RAY C. SCHROCK, ESQ.

8

9

10  KIRKLAND & ELLIS LLP

11       Attorneys for Ally Bank and Ally Financial, Inc.

12       655 Fifteenth Street, N.W.

13       Washington, DC 20005

14

15  BY:   DANIEL T. DONOVAN, ESQ.

16

17

18  MILBANK, TWEED, HADLEY & MCCLOY LLP

19       Attorneys for Ad Hoc Group of Junior Secured Notes

20       One Chase Manhattan Plaza

21       New York, NY 10005

22

23  BY:   GERARD UZZI, ESQ.

24       DANIEL M. PERRY, ESQ.

25       ATARA MILLER, ESQ.

 1

 2  MILBANK, TWEED, HADLEY & MCCLOY LLP

 3          Attorneys for Ad Hoc Group of Junior Secured Notes

 4          1850 K Street, NW

 5          Washington DC 20005

 6

 7  BY:   DAVID S. COHEN, ESQ.

 8

 9

10  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

11          Attorneys for Ad Hoc Group of Junior Secured Notes

12          1633 Broadway

13          New York, NY 10019

14

15  BY:   DANIEL A. FLIMAN, ESQ.

16

17

18  REED SMITH LLP

19          Attorneys for Wells Fargo Bank, N.A.

20          599 Lexington Avenue

21          New York, NY 10022

22

23  BY:   ERIC A. SCHAFFER, ESQ.

24          MARK D. SILVERSCHOTZ, ESQ.

25

**9**

1   ALSTON & BIRD LLP

2          Attorneys for Wells Fargo Bank, N.A.

3          90 Park Avenue

4          15th Floor

5          New York, NY 10016

6

7   BY:   MICHAEL E. JOHNSON, ESQ.

8

9

10   DECHERT LLP

11          Attorneys for Bank of New York Mellon

12          1095 Avenue of the Americas

13          New York, NY 10036

14

15   BY:   MAURICIO A. ESPANA, ESQ.

16

17

18   MORGAN, LEWIS & BOCKIUS LLP

19          Attorneys for Bank of New York Mellon

20          101 Park Avenue

21          New York, NY 10178

22

23   BY:   GLENN E. SIEGEL, ESQ.

24          JAMES L. GARRITY, JR., ESQ.

25

10

1    JONES DAY

2            Attorneys for FGIC

3            222 East 41st Street

4            New York, NY 10017

5

6    BY:    RICHARD L. WYNNE, ESQ.

7            LANCE E. MILLER, ESQ.

8

9

10   LOWENSTEIN SANDLER LLP

11           Attorneys for N.J. Carpenters

12           65 Livingston Avenue

13           Roseland, NJ 07068

14

15   BY:    MICHAEL S. ETKIN, ESQ.

16

17

18   WINSTON & STRAWN LLP

19           Attorneys for WFBNA - Wachovia

20           200 Park Avenue

21           New York, NY 10166

22

23   BY:    JAMES DONNELL, ESQ.

24           NATHAN LEBIODA, ESQ.

25

1

2   ROPES & GRAY LLP

3        Attorneys for Institutional Investor Steering Committee

4        800 Boylston Street

5        Boston, MA 02199

6

7   BY:   D. ROSS MARTIN, ESQ.

8        ANDREW G. DEVORE, ESQ.

9

10

11  ALLEN & OVERY LLP

12        Attorneys for HSBC Bank USA, N.A. as Trustee

13        1221 Avenue of the Americas

14        New York, NY 10020

15

16  BY:   JOHN KIBLER, ESQ.

17

18

19  MORRISON COHEN LLP

20        Attorneys for Independent Directors.

21        909 Third Avenue

22        New York, NY 10022

23

24  BY:   JOSEPH T. MOLDOVAN, ESQ.

25

12

1

2  SEWARD & KISSEL LLP

3        Attorneys for US Bank as RMBS Trustee

4        One Battery Park Plaza

5        New York, NY 10004

6

7  BY:   MARK D. KOTWICK, ESQ.

8        THOMAS ROSS HOOPER, ESQ.

9        ARLENE R. ALVES, ESQ.

10       DALE C. CHRISTENSEN, JR., ESQ.

11

12

13  CLEARY GOTTLIEB STEEN & HAMILTON LLP

14        Attorneys for Wilmington Trust

15        One Liberty Plaza

16        New York, NY 10006

17

18  BY:   MARK A. LIGHTNER, ESQ.

19

20

21

22

23

24

25

13

1

2  POLSINELLI PC

3        Attorneys for Kessler Settlement Class

4        900 Third Avenue

5        21st Floor

6        New York, NY 10022

7

8  BY:    DAN FLANIGAN, ESQ.

9

10

11  PENSION BENEFIT GUARANTY CORPORATION

12        Office of the Chief Counsel

13        1200 K Street, N.W.

14        Washington, DC 20005

15

16  BY:    VICENTE MATIAS MURRELL, ESQ.

17

18

19  SCHULTE ROTH & ZABEL, LLP

20        Attorneys for Serberse Capital Management

21        919 Third Avenue

22        New York, NY 10022

23

24  BY:    HOWARD O. GODNICK, ESQ. (TELEPHONICALLY)

25

14

1

2  MUNGER, TOLLES & OLSON LLP

3        Attorneys for Berkshire Hathaway, Inc.

4        355 South Grand Avenue

5        35th Floor

6        Los Angeles, CA 90071

7

8  BY:    THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11  RICHARD RODE

12        Appearing Pro Se

13

14

15

16

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          All right.  We're here in Residential Capital number

4   12-12020.

5          We're going to continue with, I think, the last

6   opening statement.

7          Mr. Rode, you wanted to make an opening statement?

8   Come on up.

9          MR. RODE:  Thank you, Your Honor.

10         THE COURT:  If you would identify yourself on the

11  record.

12         MR. RODE:  Yes, sir.  My name is Richard Rode.  I

13  reside in Deer Park, Texas, where I live and built my home.  I

14  am an unsecured creditor in debtors' bankruptcy case, and I

15  would like to thank Your Honor for this opportunity to present

16  my opening statement.

17         I'm not an attorney, although I am surrounded by some,

18  and I have never --

19         THE COURT:  There are probably some non-attorneys in

20  here as well, so you're not entirely alone.

21         MR. RODE:  I don't know.

22         THE COURT:  But don't let that stop you anyway.  Okay?

23         MR. RODE:  Okay.  And I'm not very adverse (sic) in

24  bankruptcy law.  This public appearance in front of the

25  attendees in this courtroom is very overwhelming for me, and so

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1    I apologize up front for my informal presentation.

2         I am a homeowner and borrower.  Along with everyone

3    else involved in this case I do feel that my case is just as

4    important and deserve full compensation as explained yesterday

5    by everybody else.  I did agree with that.

6         I also concede that not everybody is going to be happy

7    or a hundred percent satisfied, although it sure would be nice.

8         I personally appreciate and recognize the burden of

9    this Court to sort through all the litigation, provide a fair

10   and amicable solution to these complex situations.

11        My position is not to disrupt or create delays in

12   these proceedings, but to represent myself in person at my own

13   expense, to get answers to a small part -- I'm sorry, to my

14   personal experiences related to the -- related to the Court, my

15   reasons for objecting to the plan.  I understand, I am a small

16   part of the proceedings, but the importance of losing my

17   investment in property in proportion is just as great as those

18   that are senior, junior and affiliates of ResCap.

19        My pre-petition suit seems to be valued now at less

20   than one percent, and with senior noteholders being

21   conservatively compensated and I'm assuming that it could be

22   anywhere from ninety to whatever -- and I'm just

23   guesstimating -- I did hear a lot about junior holders

24   yesterday and it seems like they have a good case.  They may be

25   around zero to 120 percent, I don't know.  And I understand

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1    that AFI will be contributing 2.1 billion dollars, which is

2    wonderful, but it doesn't compensate or help me as a homeowner

3    in regards to the same amount of money that I have at stake, in

4    proportion.

5           My case was stayed and yet allowed debtors and

6    affiliates to continue business as usual and provide them

7    breathing space as by bankruptcy law.

8           Debtors are aware and were allowed to resolve their

9    borrower claims, including being overseen by the DOJ and CFPB

10    and other agencies.  My experience is that they chose not to do

11    anything in my case, and yet are now being rewarded unjustly by

12    continuing their same practices.  And to allow AFI to be

13    released from, in my case, the post-petition is not reasonable

14    based on the amount of the borrowers' accounts, service and

15    property retained by AFI, all the time not disclosing the

16    securities and loan accounting as required by state and federal

17    law.  That's my personal opinion and I'd like to thank the

18    Court for this time.

19           THE COURT:  Can I ask you just a few questions?

20           MR. RODE:  Yes, sir.

21           THE COURT:  Where was your lawsuit pending?

22           MR. RODE:  It was in federal court in Houston, Texas.

23           THE COURT:  And without getting into the legal

24    technicalities of it, what was the -- what gave rise to your

25    lawsuit?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1             MR. RODE:  Um --

2             THE COURT:  Did you have a mortgage from GMAC?

3             MR. RODE:  I had a mortgage from Homecomings --

4             THE COURT:  Okay.

5             MR. RODE:  -- and then GMAC.

6             THE COURT:  And do you still have your home or was it

7    foreclosed?

8             MR. RODE:  I am in my home now.

9             THE COURT:  Okay.  And what is the status of your

10   loan?

11            MR. RODE:  That's one of the answers I'd like to have

12   answered.

13            THE COURT:  Okay.

14            MR. RODE:  And I'm being serious.

15            THE COURT:  And did you file a proof of claim in this

16   case?

17            MR. RODE:  Yes, I did.

18            THE COURT:  Okay.  I've had a lot of borrowers who

19   have either moved to lift the stay to permit their state or

20   federal court actions to go forward.  Quite honestly, I don't

21   remember, having had you or your case before me before.

22            MR. RODE:  Very understandable.

23            THE COURT:  Did you file anything beyond the claim in

24   the case.

25            MR. RODE:  I was pretty devastated, no.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

19

1          THE COURT:  Okay.

2          MR. RODE:  I got my denial.

3          THE COURT:  When you say you got your denial, I

4   just --

5          MR. RODE:  I was telephonically connected.

6          THE COURT:  Okay.

7          MR. RODE:  And my case never did get heard and I was

8   then told when I called back into the Court that I had missed

9   my time --

10          THE COURT:  Okay.

11          MR. RODE: -- even though I was on the line for two and

12   a half hours, and that it was -- the next day I was -- Ms.

13   Richards let me know that it was denied.  And then I received

14   the paperwork a week later from the Court documents that it had

15   been denied.

16          THE COURT:  All right.  I'm going to have to check.  I

17   want to make sure and find out happened.  I mean, when I have a

18   hearing -- and I do permit borrowers to appear by telephone --

19          MR. RODE:  Yes.

20          THE COURT:  -- you've obviously come a long way from

21   Texas to be here for this hearing, I do typically allow

22   borrowers to appear by telephone.  I call the calendar and if

23   people aren't on the phone, there is nothing I can do about

24   that.

25          MR. RODE:  I understand.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1      THE COURT:  But Mr. Lee, if -- before the end of the

2  day, if you could advise me what the issue was with Mr. Rode

3  that came before the Court and what the Court's position was.

4      MR. LEE:  I could do it now, Your Honor.

5      THE COURT:  Okay, if you would.  Stay right there, Mr.

6  Rode.  Okay?

7      MR. LEE:  Yes.  Good morning, Your Honor.  Gary Lee,

8  from Morrison & Foerster.  My understanding was that there was

9  a motion for relief from the stay.  I'm not sure whether the

10  debtors were or weren't -- what the opposition was at the time.

11      My understanding was that when the Court called the

12  case, there was no appearance on behalf of Mr. Rode, who was

13  represented by counsel, I think, with respect to at least some

14  part of this matter, and as a result the Court disposed of the

15  matter because there was --

16      THE COURT:  And it was a lift stay motion?

17      MR. LEE:  That's correct, Your Honor.

18      THE COURT:  But Mr. Rode has filed a proof of claim

19  and that remains.  That's hasn't been -- has there been a claim

20  objection with respect to Mr. Rode's claim?

21      MR. LEE:  No, Your Honor Mr. Rode filed a proof of

22  claim for five million dollars..  There has been no objection

23  to that claim.

24      THE COURT:  Okay.  All right.  So that remains at some

25  point to be dealt with one way or the other.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1        MR. LEE:  Absolutely.  And hopefully either, I'm not

2   sure if it's a general unsecured claim or a borrower claim.  If

3   it's a borrower claim, obviously hopefully, through the

4   borrower trust.

5        THE COURT:  Okay.

6        MR. LEE:  I'm not sure whether anybody has explained

7   this to Mr. Rode, but the general unsecured recoveries are the

8   same for borrowers, it's about thirty-four percent.  I'm more

9   than happy to take him through the --

10        THE COURT:  Perhaps somebody can -- are you going to

11   be staying for the hearing today, Mr. Rode?

12        MR. RODE:  Yes, I am.

13        THE COURT:  Okay, maybe during one of the recesses one

14   of the debtors' counsel or one of the creditors counsel can

15   talk to you -- because you're not represented by a lawyer?

16        MR. RODE:  Correct.

17        THE COURT:  Okay.  Then they can talk to you directly.

18   If you were represented by a lawyer, they couldn't talk to you

19   without --

20        MR. RODE:  I understand.

21        THE COURT:  Okay.  So during one of the recesses,

22   hopefully somebody can talk to you.

23        MR. RODE:  Thank you very much.

24        THE COURT:   Thank you very much Mr. Rode.

25        Okay.  Are we ready for the first witness?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1          MR. KERR:  Your Honor, Charles Kerr, Morrison &

2    Foerster on behalf of the debtors.  Two things I'd like to

3    raise before we put on our first witness, Your Honor.

4          As I mentioned yesterday, we're trying to make this

5    process go as smoothly as possible.  We may take some witness

6    who I don't think are going to be cross-examined, take them out

7    of order, and I will try to work with counsel to make that

8    work, just so they can get in here and get out.

9          THE COURT:  Okay.

10          MR. KERR:  The second thing, Your Honor, is on Monday

11    Your Honor entered an order granting the plan proponents'

12    motion to exclude the proposed expert testimony of Raymond

13    Lyons.  The number is docket number 5800.

14          The exclusion of Mr. Lyons' testimony necessarily

15    affects the testimony of Michael Fazio, who is another expert

16    that the JSNs are putting on.  Portions of Mr. Fazio's

17    testimony is based on and incorporates Judge Lyons' testimony.

18          We were going to wait to raise this issue until Mr. --

19          THE COURT:  Wait to raise it.  Both sides agreed

20    there'd only be one motion in limine, and that's --

21          MR. KERR:  I understand that, Your Honor, but

22    yesterday during their opening they put up a demonstrative --

23          THE COURT:  Yes, and I raised an issue about it too.

24          So openings are not evidence and when I come to

25    consider evidence and closing arg -- when I come to consider

**RESIDENTIAL CAPITAL, LLC, ET AL.**

23

1  disposition and closing argument, only those things that are in

2  evidence will be considered by the Court.

3          I mean, I raised with Mr. Cohen yesterday, it seemed

4  pretty clear to me that some of the demonstratives that he

5  showed included information that was derived from Mr. Lyons'

6  report, which his testimony or report have been excluded from

7  evidence, so.

8          MR. KERR:  And that's fine, Your Honor.  And we didn't

9  raise it yesterday because of that.  but all I want to alert

10  Your Honor to is that there are certain portions of Mr. Fazio's

11  testimony we think should be in or out, and I can provide --

12          THE COURT:  See if you can work it out with Mr.

13  Cohen --

14          MR. KERR:  Fine.

15          THE COURT:  -- and we may obviate the need for -- you

16  know, obviously I ruled on the admissibility of Mr. Lyons'

17  expert testimony and report.  Another witness cant -- well, I'm

18  going to leave it in the first instance to see whether --

19          MR. KERR:  Right.

20          THE COURT:  -- you can resolve -- if there remains any

21  issues, I'll deal with it at the time.  See if you and Mr.

22  Cohen can work out the issue, okay.

23          MR. KERR:  We'll try to do that, Your Honor.

24          THE COURT:  Thank you very much, Mr. Kerr.

25          MR. KERR:  Okay.  Our first witness will be Joe

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1   Morrow.

2          THE COURT:  Okay.

3          MR. KERR:  Your Honor, again, we have -- well, we have

4   binders for Mr. Morrow and we can bring them up.  I'm not sure

5   Mr. Morrow is going to be cross-examined.  But --

6          THE COURT:  Well, let me ask, is anybody intending to

7   cross-examine Mr. Morrow?

8          MR. COHEN:  Your Honor, David Cohen on behalf the

9   JSNs.

10         We've reached a stipulation with the plan proponents,

11  with respect to his testimony that I'd like to read into the

12  record; and that would obviate the need for cross.

13         MR. KERR:  Mr. Morris was going to do that anyways,

14  but either way.  But --

15         MR. COHEN:  You can read it.

16         THE COURT:  Well, I think, let's get his direct --

17  offer his direct.

18         MR. LAWRENCE:  Okay, yes, Your Honor.

19         THE COURT:  Why don't you hang tight.  We'll see

20  whether you -- why don't you be sworn in any event?  Okay.

21  Just raise your right hand and you'll be sworn.

22      (Witness sworn)

23         THE COURT:  All right. Please have a seat.  We'll see

24  how long you're up there.  Okay?

25         MR. LAWRENCE:  Good morning, Your Honor.  Alex

**RESIDENTIAL CAPITAL, LLC, ET AL.**

25

1    Lawrence on behalf of the debtors.

2            In support of the joint Chapter 11 plan proposed by

3    the debtors and the official committee of unsecured creditors,

4    the debtors offer the affidavit of Joseph Morrow, dated

5    November 12, 2013 which was filed as docket entry number 5699

6    and which is also marked as Plan Proponents' Exhibit 929.

7            If Mr. Morrow were called to testify, he would testify

8    as to what is in his written affidavit.  We therefore offer his

9    affidavit as direct testimony in factual support of plan

10   confirmation.

11           THE COURT:  All right.  Are there any objections to

12   the admission into evidence of Mr. Morrow's affidavit, which is

13   Exhibit 929?

14           All right, hearing no objection, it is in evidence.

15   (Affidavit of Joseph Morrow in lieu of direct testimony was

16   hereby received into evidence as Plan Proponents' Exhibit 929,

17   as of this date.)

18           THE COURT:  Mr. Cohen, did you want to read your --

19   you have a -- it's a stipulation?  Is that --

20           MR. COHEN:  It is, Your Honor.

21           MR. LAWRENCE:  David, come on up and you can have the

22   honor.

23           MR. COHEN:  The stipulation that we have agreed to

24   with the plan proponents is that for the avoidance of doubt

25   nothing in the affidavit of P. Joseph Morrow, IV, certifying

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1    the tabulation of votes on the joint Chapter 11 plan proposed

2    by Residential Capital LLC, et al. and the official committee

3    of unsecured creditors at docket number 5699 establishes that a

4    particular claim for which a ballot was cast is an allowed

5    claim entitled to distribution under the plan.

6              THE COURT:  Is that agreed?

7              MR. LAWRENCE:  Yes, that is agreed, Your Honor.

8              THE COURT:  All right.

9              MR. COHEN:  Thank you.

10             THE COURT:  That's fine.  May I just ask this --

11             MR. KERR:  Your Honor --

12             THE COURT:  Where there isn't going to be cross-

13   examination, I don't want all of the exhibits that somebody --

14   I do want a copy of the witness statement, because I've got so

15   many -- it's hard for me to find materials.  So I want to at

16   least on those where there is no objection, just the witness

17   statement.

18             MR. KERR:  May approach?

19             THE COURT:  Thank you.  Mr. Kerr, thank you very much.

20   All right, I've been handed a notebook that has a copy of the

21   affidavit of P. Joseph Morrow, IV. It's ECF docket 5699 in the

22   main case.  All right.

23             MR. LAWRENCE:  Your Honor, also in connection with Mr.

24   Morrow's --

25             THE COURT:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

27

1          MR. LAWRENCE:  -- direct testimony, we'd like to offer

2     a number of exhibits --

3          THE COURT:  Okay.

4          MR. LAWRENCE:  -- which are referenced in his direct

5     testimony.

6          THE COURT:  All right.

7          MR. LAWRENCE:  They're all either orders of the Court

8     or court filings related to --

9          THE COURT:  Offer them; we'll see whether there's any

10    objections, okay.

11         MR. LAWRENCE:  Yes, Your Honor.  We offer Plan

12    Proponents' Exhibit numbers 865, 868, 905, 908, 909, 910, 911,

13    912, 913, 914, 915, 916, 917, 918, 919, 920 --

14         THE COURT:  Hold on.  Slow down.  I keep notes of --

15         MR. LAWRENCE:  I apologize, Your Honor --

16         THE COURT:  -- just to keep track of what's -- all

17    right, 919.  What's after 919?

18         MR. LAWRENCE:  920, 921, 922, 923, 932 and 933.

19         THE COURT:  All right.  Are there any objections to

20    any of those exhibits that have just been identified?

21         All right.  Each of those exhibits 965, 968, 905 --

22    excuse me, strike that.  Okay, 865, 868, 905, 908, 909, 910,

23    911, 912, 913, 914, 915, 916, 917, 918, 919, 920, 921, 922,

24    923, 932 and 933 are all admitted in evidence.

25    (Exhibits regarding Mr. Morrow's testimony were hereby received

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  into evidence as Plan Proponents' Exhibits 865, 868, 905, 908,

2  909, 910, 911, 912, 913, 914, 915, 916, 917, 918, 919, 920,

3  921, 922, 923, 932 and 933, as of this date.)

4          MR. LAWRENCE:  With that, Your Honor hopefully Mr.

5  Morrow can be excused.

6          THE COURT:  All right, Mr. Morrow you can be excused.

7          THE WITNESS:  Thank you.

8          MR. LAWRENCE:  Thank you, Your Honor.

9          THE COURT:  Thank you very much.

10         Thank you for your brief appearance, Mr. Morrow.

11         THE WITNESS:  You're welcome.

12         THE COURT:  It should all go that quickly.

13         Mr. Rains?

14         MR. RAINS:  Good morning, Your Honor.  We'll hope this

15  next one will go just as quickly.

16         THE COURT:  You have to identify yourself.

17         MR. RAINS:  Yeah, Darryl Rains of Morrison & Foerster

18  on behalf of the debtors.

19         Our next witness in support of plan confirmation is

20  Jeffrey Lipps.

21         THE COURT:  Mr. Lipps, come on up.  I think you had a

22  brief appearance at the last trial.

23         MR. LIPPS:  Very brief.

24         THE COURT:  Very brief.  Come on up.  You'll be sworn.

25     (Witness sworn)

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1            THE COURT:  Please have a seat.

2            All right, Mr. Rains.

3            MR. RAINS:  Thank you, Your Honor.

4            The direct testimony of Mr. Lipps was filed on

5    November 12 as docket entry 5701 and the debtors now move Mr.

6    Lipps' direct testimony into evidence.

7            THE COURT:  All right.

8            Any objections to Mr. Lipps' direct testimony which is

9    ECF docket number 5701?

10           Hearing no objection, the direct testimony of Mr.

11   Lipps, Jeffrey A. Lipps, ECF docket 5701 is in evidence.

12   (Direct testimony of Jeffrey Lipps was hereby received into

13   evidence as Plan Proponents' Exhibit, as of this date.)

14           MR. RAINS:  Your Honor, there are a large number of

15   exhibits associated with Mr. Lipps' testimony.  With your

16   permission I'd like to offer them into evidence in groups.

17           THE COURT:  Okay.

18           MR. RAINS:  The first group consists of proof of

19   claims.

20           THE COURT:  How large is the group?

21           MR. RAINS:  About 500 exhibits, Your Honor.

22           THE COURT:  Oh.  Do you have a piece of paper with all

23   the numbers on it?  Here's what I would like.  Rather than -- I

24   don't want to have to go through and read 500 exhibit numbers,

25   but to spare me that task, you have to give me and give other

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1    counsel a list of all of the exhibits by number that you're

2    offering.  Have you shown them the list before?

3         MR. RAINS:  We have; and I should say that they're all

4    being offered for a limited purpose, and with that caveat,

5    there are no objections.

6         THE COURT:  Is that correct?  Any other counsel

7    involved?

8         MR. RAINS:  They're not offered for the proof.

9         THE COURT:  Right.  Mr. Cohen?

10        MR. COHEN:  We have no objection to having them

11   entered for a limited purpose.

12        THE COURT:  So I can hold off on that, but again, I do

13   need -- so what you ought to do, file it as a separate ECF

14   docket number.  It should, it doesn't need -- you know, it's

15   the list of exhibits offered and admitted in evidence without

16   objection through the testimony of Jeffrey A. Lipps, and just

17   have the exhibit number for each of those exhibits.  Make sure

18   that counsel have an opportunity to review the list and confirm

19   that that's accurate, and it will spare us all the exercise of

20   going through and me -- because I really do try -- and let me

21   say this now, okay.

22        So when we close all the evidence, what I'm going to

23   ask is, is that you all confer and with my law clerks to make

24   sure that I have a complete, accurate and agreed list of all

25   exhibits that have been introduced into evidence.  Any that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1  have been marked for identification but not -- and identified

2  in court, but not introduced, and any that have been admitted

3  in evidence.

4          So we won't take more time now with it, but what we've

5  done at it each of the other ResCap trials, make sure I get

6  that list, and if there are any disagreements we'll sort it

7  out.

8          Is that okay, Mr. Cohen?

9          MR. COHEN:  Yeah.  That would be fine, Your Honor.

10          THE COURT:  Okay.  Because it works both ways.  So --

11          MR. RAINS:  We'll do that; we'll make that filing,

12  Your Honor.

13          I will say for the proof of claims, fortunately

14  they're all in sequence, so it's 951 through 1429.

15          THE COURT:  Yeah.  I just -- I want to make sure that

16  there is a list that has them all so that later on there's no

17  issue about what exhibits were admitted into evidence during

18  the trial.

19          MR. RAINS:  We'll do a filing later today of his

20  exhibits and of course we'll check the list later.

21          THE COURT:  Thank you.

22          MR. COHEN:  And that procedure makes great sense to

23  us.

24          THE COURT:  Okay.  Thank you.  I appreciate it.

25          MR. RAINS:  Your Honor, we do have other groups

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    through them.  They're not as numerous.  Would you like me to

2    offer them now or follow the same procedure?

3            THE COURT:  Have you worked out with Mr. Cohen, are

4    the other exhibits agreed or not?

5            MR. RAINS:  I think they are.  Let me say that the

6    next group are pleadings in underlying securities and monoline

7    actions.  They also are offered for a limited purpose, not

8    offered for the truth of the matter asserted, and I believe

9    with that caveat you guys are okay with it.

10           MR. COHEN:  We'd like to see the list, but I think we

11   will be okay, so let's follow the same procedure.

12           THE COURT:  Okay.  Let's follow the same procedure.

13           MR. RAINS:  Okay.

14           THE COURT:  If there are -- so I'm reserving.  If

15   there are issues you raise, Mr. Cohen, about any of the ones

16   we'll deal with it accordingly.

17           How many in this group?

18           MR. RAINS:  Oh, about maybe twenty or twenty-five.

19           THE COURT:  Okay.  That's fine.

20           MR. COHEN:  That will be fine, Your Honor.  Thank you.

21           THE COURT:  Now there are other parties-in-interest

22   who are here, and this is the combined phase 2 trial in the

23   adversary proceeding, but also the confirmation hearing.

24           So if there are other parties-in-interest who aren't

25   in agreement with what's being said, you need to stand and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1    indicate it.  I'm going to take the silence of any other

2    counsel or pro se parties-in-interest as agreement with what

3    Mr. Cohen and his colleagues are saying, okay, just to make

4    that clear.

5            So I don't want to hear about it later.  They're being

6    offered now.  We'll go through the same procedure of having a

7    typed list, the document will be filed on ECF, counsel will

8    have an opportunity to review it.  But if there are objections

9    I need to hear about it now, okay.

10            MR. RAINS:  Great.  Thank you, Your Honor.

11            THE COURT:  All right.

12            MR. RAINS:  I have about ten more exhibits.

13            THE COURT:  Okay.

14            MR. RAINS:  There are eight sample agreements from the

15   debtors' securitizations, these are RMBS securitization

16   agreements, Exhibits 640 through 647 and 737.  We offer those

17   in evidence.

18            THE COURT:  Mr. Cohen?

19            MR. COHEN:  We'll look at all of these exhibits once

20   the list gets filed.

21            THE COURT:  Okay.

22            MR. RAINS:  So then the last --

23            THE COURT:  Mr. Rain, you can put them all on a single

24   list.

25            MR. RAINS:  Will do, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1          THE COURT:  Okay.  But if you want to -- so I'm not

2     ruling now.  640 to 647 and 737 were the additional ones you

3     just identified now?

4          MR. RAINS:  Right, and then the last two are prior

5     pleadings in this action, those are exhibits 639 and 675, but

6     we'll put them on the list and file it today on ECF.

7          THE COURT:  Okay.  See if you can work that out.

8          MR. COHEN:  That's right, and we'll get back to you on

9     the entire list.

10          THE COURT:  That's fine.  That's the most efficient

11     procedure.

12          MR. RAINS:  Your Honor, with that --

13          THE COURT:  Do you have any cross-examination, Mr.

14     Cohen?

15          MR. COHEN:  We do not.

16          THE COURT:  Okay.  Anybody else wish to cross-examine

17     Mr. Lipps?

18          Mr. Lipps, you're excused.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  You're two for two on short appearances.

21          MR. KERR:  Your Honor, may I?

22          THE COURT:  Yes, please.

23          MR. KERR:  Okay.  Your Honor, Charles Kerr from

24     Morrison & Foerster.  For our next witness, it will be Mr.

25     Thomas Marano.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1          Your Honor in support of the Chapter 11 plan proposed

2     by the debtors and the official committee of unsecured

3     creditors, the debtors offer the direct testimony of Thomas

4     Marano dated November 12, 2013, which is filed as docket entry

5     number 5705.

6          If Mr. Marano was called to testify he would testify

7     as to what's in his written testimony.  We therefore offer his

8     written direct in factual support of the consolidated

9     proceedings and plan confirmation.

10          THE COURT:  All right.

11          If you would just raise your right hand and be sworn,

12     Mr. Marano.

13      (Witness sworn)

14          THE COURT:  Please have a seat.

15          MR. KERR:  Your Honor, we expect that there will be

16     some cross-examination --

17          THE COURT:  Okay.

18          MR. KERR:  -- so we think it makes sense to hand up

19     the binders, if that's okay.

20          THE COURT:  Please, yes.  You mean boxes?

21      (Pause)

22          MR. KERR:  And Your Honor, just so -- Your Honor, I

23     can see, is scrutinizing what is all this stuff.  Let me just

24     be very clear.  What we've put in the binders --

25          THE COURT:  I can speed-read, but not that quickly.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1              MR. KERR:  I realize that, Your Honor.

2              What we put in the binders are all the exhibits that

3    are referenced in his direct testimony.  That actually includes

4    exhibits that were introduced in phase 1, are actually already

5    in evidence, but they're in the binders so if the witness needs

6    to refer to them or Your Honor wants to refer to it, they're in

7    there.

8              THE COURT:  So let me just -- you picked up the

9    numbering of your exhibits for this trial with what number?

10             MR. KERR:  What we did, Your Honor, is we started -- I

11   believe the phase 1 exhibits were 1 through 500, so we started

12   from 500 on.

13             THE COURT:  Okay.  That's what I --

14             MR. KERR:  Yes.

15             THE COURT:  -- I had quickly looked through the boxes.

16             MR. KERR:  And if we have not done this, this is my

17   failure, Your Honor.  I know we were going to bring in and give

18   to your clerks and to Your Honor an exhibit list with

19   everything on it with the numbers, and I don't know if we've

20   done that yet.  If we did not, I apologize.  It was filed on

21   ECF, as the second amended pre-trial order.

22             THE COURT:  And actually I printed it and have it.

23             MR. KERR:  Okay.  So you'll see in there, Your Honor,

24   that in the -- at least plan proponents' exhibit list, it lists

25   all of the exhibits starting from 1 through I think about, the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1   range of 1 through 500 was phase 1.  And to the extent they're

2   on the list they're the ones we're referring to and they're all

3   in evidence.

4           THE COURT:  So what I got was the second amendment to

5   the joint pre-trial order --

6           MR. KERR:  Correct, Your Honor.

7           THE COURT:  -- which I said yesterday was being

8   entered.  It had attached to it as Exhibit A all of the

9   plaintiffs' or the plan proponents' --

10          MR. KERR:  Plan proponents.

11          THE COURT:  - plan proponents' exhibits.

12          MR. KERR:  Right.

13          THE COURT:  And as attached as Exhibit B were --

14          MR. KERR:  I think Exhibit B, Your Honor, is the JSNs'

15  exhibit list.  And Exhibit C, I believe, is Wells Fargo's

16  separate exhibit list.  I don't have the document in front of

17  me, but I believe that to be the case, Your Honor.

18          THE COURT:  I do.  And -- let me just see something.

19  Okay.

20          MR. KERR:  So, Your Honor, again we -- one second.

21          So, Your Honor, just so we're clear, we've provided

22  Your Honor with a set of the exhibits that are referenced in

23  Mr. Marano's testimony, we've given one to counsel, there is a

24  set in front of Mr. Marano, okay?

25          THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1          MR. KERR:  With that, Your Honor, we therefore

2     offer -- one final thing, I apologize, Your Honor.  I believe

3     in the first volume there is actually a copy of his written

4     direct as well.

5          THE COURT:  I see that right in the beginning of the

6     binder.

7          MR. KERR:  So that'll be at the beginning of this --

8          THE COURT:  Yes, I have that.

9          MR. KERR:  So with that, Your Honor, we offer his

10    written direct in factual support of the consolidated

11    proceedings and plan confirmation.

12         THE COURT:  Any objections?

13         MR. PERRY:  No objections, Your Honor.

14         THE COURT:  You have to identify yourself for the

15    record.

16         MR. PERRY:  Dan Perry from Milbank Tweed on behalf of

17    the JSNs.

18         THE COURT:  Thank you, Mr. Perry.

19         MR. KERR:  Now, Your Honor, even though we've given

20    you a large group of documents in front of you --

21         THE COURT:  Let me rule.  The direct testimony of

22    Thomas Marano, which was ECF number 5705 is in evidence.

23    (Direct testimony of Thomas Marano was hereby received into

24    evidence as Plan Proponents' Exhibit, as of this date.)

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1          THE COURT:  Go ahead, Mr. Kerr.

2          MR. KERR:  And, Your Honor, even though we put a large

3  number of binders, there is only a small number of items we'll

4  actually be moving into evidence with this, so let me list

5  those if I can.

6          THE COURT:  Okay, if you would.

7          MR. KERR:  Those would be documents -- Plan Proponent

8  Exhibits 603, 669, 810, 820, 822, 832, 835, 848, 849, 855, 856,

9  857 and 868.  And of those, Your Honor, four of them are not

10  being offered for the truth.

11          THE COURT:  Which ones?

12          MR. KERR:  810, 820, 822 and 832 are not being offered

13  for the truth.

14          THE COURT:  All right.  Are there any objections to

15  the exhibits which Mr. Kerr has just offered into evidence?

16          Hearing no objection, Exhibits 603, 669, 835, 848,

17  849, 855, 856, 857, 868 are admit in evidence for all purposes.

18  810, 820, 822 and 832 are admitted for limited purposes.

19  (Exhibits regarding Mr. Marano's testimony were hereby received

20  into evidence as Plan Proponents' Exhibits 603, 669, 810, 820,

21  822, 832, 835, 848, 849, 855, 856, 857 and 868, as of this

22  date.)

23          MR. KERR:  Thank you, Your Honor.  With that Mr.

24  Marano is available to be cross-examined.

25          THE COURT:  All right.  And I've just been handed by

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1    one of my law clerks the cross-examination binder for Mr.

2    Marano.

3            Mr. Marano, do you have water, as well?

4            THE WITNESS:  No, I don't.  I'm all right, right now.,

5    though

6            THE COURT:  Well, let somebody bring it up to you,

7    just in case.

8            THE WITNESS:  Thank you.

9            THE COURT:  If my courtroom deputy is listening, you

10    can bring in the pitcher of water as well.  There are some

11    bottles, but we can bring the pitcher in for the witness stand.

12            Okay.

13            MR. PERRY:  For the record Dan Perry from Milbank

14    Tweed on behalf of the junior secured noteholders.

15    CROSS-EXAMINATION

16    BY MR. PERRY:

17    Q.   Good morning, Mr. Marano.

18         You became chairman and CEO of ResCap in the summer of

19    2008, correct?

20    A.   I was non-executive chairman, I believe, in April of 2008,

21    and then I became chairman and CEO in August.

22    Q.   And you resigned as CEO in May of 2013, correct?

23    A.   Correct.

24    Q.   But you retain the title of chairman to this day, correct?

25    A.   Correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1  Q.   And you were also -- you were also the chief capital

2  markets officer and the chief mortgage officer of AFI between

3  May of 2005 and May of 2012, correct?

4  A.   I believe you said 2005?

5  Q.   Yes.

6  A.   No.

7  Q.   May of -- is it May of 2009?

8  A.   2009, yes.

9  Q.   So just to be clear, you were the chief capital markets

10  officer and the chief mortgage officer of AFI between May 2009

11  and May 2012, correct?

12  A.   Correct.

13  Q.   Now, you understand that Ally is proposing to make a 2.1-

14  billion-dollar contribution to broadly resolve all of the

15  claims against it involving ResCap, right?

16  A.   Yes.

17  Q.   And you never really thought about how the Ally

18  contribution would be allocated among creditors of ResCap,

19  correct?

20  A.   Correct.

21  Q.   And Ally's view, at least your perspective of Ally's view,

22  is that the only way you could get a settlement is if you got

23  all the creditors on board, correct?

24          MR. KERR:  Objection.

25          THE COURT:  Overruled.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    A.    I don't really know what Ally's view was.  I know that

2    from my perspective it was important to get as many creditors

3    on board as possible.

4    Q.    Why don't you take a look at DX-BBZ in your binder?

5    A.    Sorry, DX-B?

6    Q.    B, as in boy, B as in boy, Z as in Zorro.

7    A.    Got it.

8    Q.    This is, for the record, a confidentiality letter on the

9    letterhead of Residential Capital, LLC and Ally Financial,

10   Inc..  It's addressed to Ms. Sarah Tirschwell of the Davidson

11   Kempner Capital Management, LLC fund.

12         Can you identify this document, sir?

13   A.    I'm not familiar with this particular item, but it looks

14   like a form of confidentiality agreement that might restrict

15   trading associated with one of the ResCap positions.

16   Q.    And this is a document that we reviewed in your

17   deposition, right?

18   A.    Again, I don't recall if you handed this to me in the

19   deposition.  I just don't, I'm not familiar.  You handed me a

20   lot of stuff.

21   Q.    Okay.  Why don't you look at page 6 of the letter?

22   A.    Yes.

23   Q.    The letter, there is a -- and I'm looking at the

24   Residential Capital LLC signature line.  Can you identify the

25   signature on the signature page that's executed purportedly on

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1  behalf of Residential Capital?

2  A.    Yes, that's Tammy Hamzehpour.

3  Q.    And Ms. Hamzehpour was the general counsel of Residential

4  Capital, LLC, at the time?

5  A.    That's correct.

6  Q.    And she was authorized to execute things like

7  confidentiality agreements on behalf of Residential Capital,

8  LLC, correct?

9  A.    Yes, she would have been, yes.

10  Q.    Now, certain of the junior secured noteholders

11  participated in a negotiation that led to a pre-petition

12  agreement by Ally to pay 750 million dollars to resolve certain

13  claims involving the debtors, correct?

14  A.    That's correct.

15  Q.    And there was a confidentiality agreement put in place to

16  facilitate their participation in the pre-petition negotiation,

17  correct?

18  A.    That's correct.

19  Q.    And if you turn to page 4 of the agreement -- I'm focusing

20  on the first full paragraph.

21  A.    Yes.

22  Q.    You understand here that the agreement is telling the

23  investor that they will be provided with material nonpublic

24  information, right?

25  A.    Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   And your understanding is that this letter is advising the

2   investor that they should not be trading on the information or

3   sharing it with others, correct?

4   A.   Correct.

5   Q.   And then if you go down to the next paragraph, this is

6   what you would call a sunlight provision, correct?

7   A.   That's correct.

8   Q.   And you understood that the agreement provided that no

9   later than May 18, 2012, Ally or ResCap would either disclose

10  the material nonpublic information provided to the investor, or

11  failing that, authorize the investor to disclose the

12  information itself, correct?

13  A.   Yes.

14  Q.   And you understood that this sunlight provision would

15  enable the investor to then trade after May 18, 2012, correct?

16  A.   Correct.

17  Q.   You're a former Cerberus employee, right?

18  A.   Correct.

19  Q.   And you understand that it's important for funds that

20  manage money in a fiduciary capacity to be able to trade in and

21  out of their positions on occasion, correct?

22  A.   Correct.

23  Q.   And Exhibit BBZ at least allowed the funds that signed the

24  agreement to have the ability to trade after May 18th, 2012,

25  notwithstanding their participation in the settlement

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1  negotiations, correct?

2  A.    As long as the material was disclosed, they could trade.

3  Q.    Now there was a second mediation, right?

4  A.    Yes.

5  Q.    And that mediation began in December of 2012, right?

6  A.    I believe you're referring to the efforts for mediation

7  after filing?

8  Q.    This is -- well, let me ask you this.  There came a point

9  in time when Judge Peck was appointed as a mediator to assist

10  the parties in this proceeding in mediating their disputes,

11  correct?

12  A.    That's correct.

13  Q.    And that happened in or around December 2012, correct?

14  A.    That's correct.

15  Q.    And you would agree with me that the JSNs were present at

16  the mediation sessions that you attended, correct?

17  A.    I believe their counsel was present.

18  Q.    And by your recollection, the JSNs' counsel participated

19  in the mediation that resulted in a global settlement, correct?

20  A.    The only part I recall was -- of their involvement was

21  down -- there was a lower level building where Judge Peck

22  started the process.  I couldn't tell you if all of the JSNs

23  were present upstairs; but I do recall they were downstairs in

24  the basement of the building.

25  Q.    Okay.  And you don't recall one way or another whether the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

46

1  debtors offered to enter into an agreement similar to what's

2  been marked as DX-BBZ to the JSNs in connection with the second

3  mediation, right?

4  A.    My recollection is that throughout the bankruptcy process

5  and the mediation process, there were individuals who -- pardon

6  me, firms, that looked to get material nonpublic information,

7  and if that was part of the mediation, they were required to

8  sign this type of agreement.

9  Q.    And when you say this type of agreement, you mean DX-BBZ?

10  A.    Yes, so documents similar to this, which would restrict

11  their trading and provide a sunlight provision.

12  Q.    So is it your testimony that the debtors offered JSNs the

13  ability to sign a confidentiality agreement substantially in

14  the form of DX-BBZ in connection with the second mediation

15  before Judge Peck?

16  A.    I know from conversation with counsel that -- and I know

17  from letters that came into ResCap, that there were parties

18  that wanted to obtain material nonpublic information and I

19  directed those conversations or letters -- pardon me, I

20  directed those letters to counsel, and counsel dealt with them.

21  Q.    But you don't know personally, and I'm just focused on

22  your personal knowledge, whether the debtors offered parties

23  that wanted to participate in the mediation a confidentiality

24  agreement substantially in the form of DX-BBZ, correct?

25  A.    I don't know if the document, this type of document was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

47

1  specifically offered to a specific individual, but if they

2  chose to sign our form of document, they had the opportunity to

3  do so.

4  Q.   And you don't know whether your form of document was

5  substantially in the form of DX-BBZ or had different sorts of

6  provisions, correct?

7  A.   I'm not sure.  I don't know.

8  Q.   Okay.  And you don't know what conditions Ally placed on

9  confidentiality arrangements in connection with the second

10  mediation, correct?

11       MR. KERR:  Objection.

12  A.   I have no idea what Ally --

13       THE COURT:  Overruled.

14  A.   I have no idea what Ally was doing at that point in time.

15  Q.   Okay.  Why don't we --

16       THE COURT:  Mr. Marano, if there are objections, just

17  wait until I rule before you go ahead and answer, okay?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  Go ahead, Mr. Perry.

20  Q.   Why don't we go to DX-BCG.  This is an e-mail exchange

21  between Mr. Groper and Kenneth Eckstein.  You understand Mr.

22  Groper to be somebody affiliated with the Aurelius Fund, right?

23  A.   Yes.

24  Q.   And you understand that Mr. Eckstein is one of the

25  committee's lawyers, right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.   Yes.

2  Q.   And you'd agree with me that this appears to be a request

3  by the Aurelius firm to the committee's attorneys for an order

4  that would permit them to participate in the mediation before

5  Judge Peck, right?

6  A.   Just repeat that one more time.

7  Q.   You would agree with me that this appears to be a request

8  from the Aurelius firm for an order that would permit them to

9  participate in the second mediation before Judge Peck, right?

10 A.   Yes, that's what the e-mail exchange between Mr. Groper

11 and Eckstein appear to say.

12 Q.   And when you were asked at deposition whether you were

13 aware of the Aurelius fund's request to the committee to

14 participate in mediation you declined to answer on privilege

15 grounds, right?

16        MR. KERR:  Objection, Your Honor.

17        THE COURT:  This just calls for a yes or no.

18 A.   The answer is yes.

19 Q.   Nevertheless, you were aware that the Aurelius firm wanted

20 to participate in the mediation process, right?

21 A.   Yes.

22 Q.   And you were aware that there were discussions to try and

23 get a document that they were comfortable signing, right?

24 A.   Yes.

25 Q.   And you don't know what the resolution of those

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**49**

1   discussions were, right?

2   A.   I know the lawyers worked on it.  I don't know whether or

3   not they -- I don't know the reasons why they couldn't come to

4   terms.

5   Q.   And you don't know, for example, why the debtors did not

6   simply provide the form of confidentiality agreement set forth

7   in Exhibit BBZ to folks that wanted to participate in the

8   second mediation, right?

9           THE COURT:  You want to enlighten me, Mr. Perry, why I

10  really care about any of this?

11          MR. PERRY:  It is --

12          THE COURT:  In other words, why is relevant?

13          MR. PERRY:  We are -- okay, on relevance we are

14  reacting --

15          THE COURT:  To what?

16          MR. PERRY:  -- to decisions that you've written,

17  including your phase 1 decision.

18          I think the participation of my clients in the

19  mediation is something that Mr. Kruger raised directly in his

20  witness statement in connection with the -- in connection with

21  this phase 2 proceeding.  And so the suggestion from the other

22  side appears to be that there was some tactical decision not to

23  participate.

24          It's not true.  And that's what I'm establishing with

25  this witness, and we're going to go through it with some other

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1  witnesses as well.  So that's the proffer.

2           THE COURT:  I'll let you do it once.  I'm not going to

3  let you -- because I think that the relevance of this is at

4  best -- at best, marginal.  So decide which witness you want to

5  do it with.  You're not going to do it multiple times.  Okay?

6  That's your call.

7           MR. PERRY:  Okay.  Well, let me move on then.

8           THE COURT:  As best I can tell, Mr. Perry, the issues

9  I'm being asked to decide in confirmation or in phase 2 don't

10 require and elaborate history of negotiations of

11 confidentiality agreements.  The first one that I actually saw,

12 I would not sign, and there ultimately was one that I did sign.

13          But you know, I'm not sure, I don't think that has any

14 bearing on the specific issues I'm being asked to decide.  But

15 I'm going to let you do it once.  But you're going to decide

16 with whom.

17          MR. PERRY:  Understood, Your Honor.  Again, we're just

18 reacting to what --

19          THE COURT:  Just ask your next question.

20 BY MR. PERRY:

21 Q.   Why don't you go to DX-BCA.  Can you identify this

22 document, Mr. Marano?

23 A.   Yeah.  It's the term sheet for the proposed Chapter 11

24 plan of reorganization.

25 Q.   This is the pre-petition term sheet, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1  A.    Yes.

2  Q.    And why don't you look at page 7?  And I'm looking

3  specifically at Class R8.

4       Are you with me?

5  A.    Yeah, I'm there.  I'm reading it.

6  Q.    Okay.  Let me just read it.  The box Class R8 is entitled

7  intercompany claims.  It states "impaired deemed to reject the

8  plan pursuant to Section 1126(g) of the Bankruptcy Code.

9  Unless the junior secured claims have been paid in full based

10  on their secured claims, allowed intercompany claims shall

11  receive in full satisfaction of such allowed intercompany

12  claims an amount equal to its pro rata share of ResCap

13  unsecured claims pool."

14       Do you see that?

15  A.    Yes.

16  Q.    And that, in your view, is a poorly written sentence,

17  right?

18  A.    Yeah.  I struggled with the syntax and the use of certain

19  grammar.

20  Q.    Your testimony is that you can't decipher the intent of

21  this provision, correct?

22  A.    Just from the way it was written, yes.  I'm not a lawyer,

23  so I would have relied on counsel just because of, again, the

24  way the sentence is structured.

25  Q.    Okay.  And you'd agree with me that it appears to relate

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**52**

1    to intercompany claims, right?

2    A.    That's correct.

3    Q.    Okay.   And you don't recall in connection with the pre-

4    petition plan negotiations, Ally insisting that the ResCap

5    intercompany claims be resolved in any particular way, correct?

6    A.    At the time, no.   There were many things going on.   That

7    particular aspect, I just don't recall.

8    Q.    Now you do recall discussing the topic of inter-company

9    claims with your chief financial officer Mr. Whitlinger at some

10    point in time, correct?

11    A.    That's correct, I believe after the examiner's report and

12    probably before as well.   But I definitely recall after the

13    examiner's report.

14    Q.    And you discussed with Mr. Whitlinger how the company

15    treated intercompany claims, correct?

16    A.    That's correct.

17    Q.    And, well let me -- let's take a look at DX-BDD.

18    A.    BDB?

19    Q.    BDD.

20    A.    DD?

21    A.    So, B, as in boy, D as in Dan, D as in Dan.

22       This is an e-mail from Mr. Renzi of the FTI firm to Mr.

23    Whitlinger, correct, the first page?

24    A.    Yes.

25    Q.    And it's dated July 5, 2012, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1    A.    Yes.

2    Q.    It appears to attach a letter addressed to the ad hoc

3    group of ResCap's junior secured noteholders from the Aurelius

4    Capital firm, correct?

5    A.    Correct.

6    Q.    And Mr. Whitlinger, in July of 2012 was the ResCap CFO,

7    correct?

8    A.    Correct.

9    Q.    And do you see on the -- well, just focusing on the

10   Aurelius letter, is this a letter that you saw in or around

11   July of 2012 when Mr. Renzi sent it to Mr. Whitlinger?

12   A.    I actually don't recall this letter.

13   Q.    And do you see on the second page of Mr. Brodsky's (sic)

14   letter, there is some text relating to intercompany claims.  Do

15   you see that?

16   A.    Yes, I do.

17   Q.    Okay.  And your testimony is, I take it, you don't recall

18   focusing on this particular text in or around July of 2012,

19   correct?

20         MR. KERR:  Objection, Your Honor.

21         THE COURT:  Sustained.

22   A.    I don't recall --

23         THE COURT:  No.

24         THE WITNESS:  Oh, sorry.

25         THE COURT:  When I sustain an objection --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**54**

1          THE WITNESS:  Sorry.

2          THE COURT:  -- you don't answer the question.

3          THE WITNESS:  I'm sorry.

4     Q.    Okay.  Regardless of the letter, you became aware, did you

5     not, that at some point in time the JSNs began taking the

6     position that the intercompany claims formed part of their

7     collateral, right?

8     A.    Yes.

9     Q.    And they were taking that position because they believed

10    they had a lien on intercompany claims, correct?

11          MR. KERR:  Objection, Your Honor.

12          THE COURT:  Sustained.

13    Q.    Your understanding is that they were taking that position

14    because they believed they had a lien on intercompany claims,

15    correct?

16    A.    I have to be honest with you, I don't know why they took

17    the position.  I'm not familiar with these words in this

18    section.  I knew they were trying to get it, but I don't know

19    what the reasoning was.

20    Q.    Okay.  And that was certainly something you understood by

21    the time the parties began their mediation process with Judge

22    Peck, correct?

23          MR. KERR:  Objection, Your Honor.

24          THE COURT:  Sustained.

25    Q.    Did you understand that the JSNs were taking the position

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1    that the allowance of intercompany claims improved their -- the

2    value of their collateral by the time the mediation with Judge

3    Peck commenced?

4    A.    No.  It wasn't a focus of mine.

5    Q.    Okay.  And did there come a time ever when it became a

6    focus of yours?

7    A.    I would say at some point through the lengthy mediation

8    process I became aware this may be an issue, but I didn't delve

9    into it.

10    Q.    Why don't you go to DX-AZA.  This is a portion of the

11    examiner's report.  I'm going to have some questions about

12    footnote 1812 --

13              THE COURT:  I don't see that in the binder.  ACA?

14              MR. PERRY:  A, Z as in Zorro, A.

15              THE COURT:  Hold on.

16              MR. PERRY:  It should be the last tab in your binder,

17    Your Honor.

18              THE COURT:  Okay, I have it.

19              MR. KERR:  Your Honor, just let me note my objection

20    to the use of this.

21              THE COURT:  Well, let me hear a question first; and

22    you can frequently use a lot of things that don't come into the

23    evidence.  So we'll have to take it one at a time.

24    Q.    I'm focused on what should be the last page of the excerpt

25    contained at DX-AZA, and specifically footnote 1812.  Are you

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1    with me?

2    A.    Yes, I am.

3    Q.    You recall focusing on footnote 1812 at some point after

4    the examiner report came out, correct?

5    A.    I did see it in the report and I did look at the math.

6    Q.    Okay.  And, in fact, you talked to your CFO about the tax

7    issues raised in the examiner report, correct?

8    A.    Correct.

9    Q.    And prior to the examiner report coming out, you had not

10   focused on the potential tax benefits that Ally could receive

11   in connection with the ResCap bankruptcy, correct?

12   A.    Correct.

13   Q.    And whether or not Ally receives a tax benefit in excess

14   of its 2.1-billion-dollar payment to ResCap, you believe that

15   the 2.1-billion-dollar contribution is sufficient, correct?

16   A.    I -- as I said in my testimony and in my deposition, I

17   believe that Ally contributed an enormous amount of money and I

18   think it was a good deal.

19   Q.    Okay.  And just to put a fine point on it, you as chairman

20   of Residential Capital never factored in what potential

21   benefits Ally was receiving as a result of the settlement

22   contribution, correct?

23   A.    I factored in a lot of benefits Ally would receive, but

24   the tax code is the tax code.  Ally was making a payment to

25   receive certain relief from litigation, and that's how I viewed

**RESIDENTIAL CAPITAL, LLC, ET AL.**

57

1  it.

2       You know, we all pay taxes and we all get the benefit of

3  the tax code.   I never thought about the tax code.

4  Q.   Okay.  So the answer to my question is that, no, you did

5  not factor in what potential benefits Ally was receiving as a

6  result of the settlement, correct?

7  A.   I did not factor in the tax benefits.

8            MR. PERRY:  I have no further questions, Your Honor.

9            THE COURT:  Thank you very much, Mr. Perry.

10           Any further cross-examination?

11           Any redirect examination?

12           MR. KERR:  No redirect, Your Honor.

13           MR. O'NEILL:  Your Honor, may I ask one question?

14           THE COURT:  Yes, go ahead.

15           MR. O'NEILL:  Mr. Marano, Brad O'Neill on behalf the

16  creditors committee.

17  REDIRECT EXAMINATION

18  BY MR. O'NEILL:

19  Q.   Mr. Perry asked you some questions about DX-BCA.

20           THE COURT:  Let me find it.

21  Q.   Do you recall those?

22  A.   I'm at DX-BCA.

23  Q.   And in particular he asked you some questions about the

24  box intercompany claims at the top of page 7.  Do you recall

25  that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1    A.    Yes.

2    Q.    Can you flip to page 12 of DX-BCA?

3    A.    Yes.

4    Q.    And looking down about three-quarters of the way on that

5    page, do you see a box "intercompany claims"?

6    A.    Yes.

7    Q.    What does that say?

8    A.    Impaired, deemed to reject the plan pursuant to Section

9    1126(g) of the Bankruptcy Code, holders of intercompany claims

10   shall receive no recovery on account of such claims.

11             MR. O'NEILL:  Thank you, Mr. Marano.

12             THE COURT:  Thank you Mr. O'Neill.

13             Any further examination?  Any redirect, Mr. Kerr?

14             MR. KERR:  Your Honor, Charles L. Kerr for the

15   debtors.  No redirect.

16             THE COURT:  All right.  You're excused.  Thank you,

17   Mr. Marano.

18             THE WITNESS:  Thank you, sir.

19             THE COURT:  Maybe somebody could come up and grab his

20   binders while -- unless you're going to use them.

21             MR. KERR:  And Your Honor, if I may, this is a good

22   time for us to try to fit some witnesses in.  So I just need to

23   do a little adjustment of making sure I have the right folders

24   and binders where I need them to be.

25             THE COURT:  Okay.  And I do too.  So I want to move

**RESIDENTIAL CAPITAL, LLC, ET AL.**

59

1  and make room for the next group of binders.

2      (Pause)

3          MR. KERR:  Your Honor, if you will indulge me.  I'm

4  going to put on the trustee witnesses.  They're upstairs.

5          THE COURT:  Okay.

6          MR. KERR:  I've got to bring them down.  They're here,

7  but I just --

8          THE COURT:  Well, look, let's take a ten-minute

9  recess.

10          MR. KERR:  Thank you, Your Honor.  I appreciate it.

11  Thank you very much.

12          THE COURT:  Ten minutes.

13      (Recess from 10:06 a.m. until 10:20 a.m.)

14          THE COURT:  Please be seated.

15          Mr. Kerr.

16          MR. KERR:  Your Honor, Charles Kerr, Morrison &

17  Foerster.

18          Your Honor, we have done some rearranging of boxes.

19  What I would like to do now is to go through a series of the

20  witnesses for the trustees -- the RMBS trustees.  I believe

21  there is a stipulation between the JSNs and the trustees that

22  they will not be crossed subject to the terms of the

23  stipulation.

24          MR. COHEN:  That's correct. And I believe that was

25  filed on the docket.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1           MR. KERR:  It was filed at number 5872.

2           THE COURT:  So I didn't see it.  Just give me the gist

3   of it.

4           You can either read it or just tell me what

5           MR. COHEN:  What the gist of it is, is if we were to

6   cross-examine the trustees, they would either invoke mediation

7   confidentiality, attorney-client privilege or lack of

8   knowledge.

9           THE COURT:  Okay.  That's fine.

10          MR. COHEN:  Thank you.

11          THE COURT:  Okay.

12          MR. KERR:  So in light of that stipulation, I

13  understand they're not going to cross the trustees.  But we

14  want to offer up their -- is that correct?

15          MR. COHEN:  That's correct.

16          THE COURT:  Okay.

17          MR. KERR:  Okay.  So with that, Your Honor, I'm going

18  to go through a series of trustees.  I'll do them one at a

19  time.

20          THE COURT:  Okay.

21          MR. KERR:  Your Honor, the first one is Mamta Scott.

22          And let me just say, in support of the joint Chapter

23  11 plan proposed by the debtors the unofficial committee -- the

24  official committee of unsecured creditors, debtors offer the

25  direct testimony of Mamta K. Scott, dated November 12, 2013,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

61

1    which was filed as docket number 5683.

2          If Ms. Scott was called to testify, she would testify

3    to what is in her direct written testimony.

4          THE COURT:  Okay.

5          When you finish all of them, I don't know what

6    exhibits are being offered with them but --

7          MR. KERR:  What we're going to do, Your Honor, I'm

8    going to do it one at a time and I'll offer the exhibits one at

9    a time.

10          THE COURT:  That's fine.

11          MR. KERR:  So we'll do it that way.

12          THE COURT:  All right.

13          MR. KERR:  So we therefore offer Ms. Scott's direct

14    testimony in factual support of the plan confirmation.

15          THE COURT:  Any objections?

16          Hearing no objections, the direct testimony of Mamta

17    Scott, 5683 is admitted in evidence.

18    (Direct testimony of Mamta Scott was hereby received into

19    evidence as Plan Proponents' Exhibit 1500, as of this date.)

20          MR. KERR:  And, Your Honor, just to -- again, for

21    logistics -- we have a binder.  And as I understand it, direct

22    written testimony that was actually filed, attached the

23    exhibits to it that were referenced in there.  So I'm going to

24    read the exhibits by exhibit number.

25          THE COURT:  Here is what I would like.  Since I've got

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    copies of all of the exhibits, all right -- so for those who

2    are not being cross-examined, I don't need it right at this

3    minute, but I would like to get just the direct testimony.  It

4    references exhibit numbers.  But so that I don't have to go --

5    I've read some of the direct testimony, not all of the direct

6    testimony at this point -- and so that I don't have to have

7    duplication of all the exhibits -- yes, I know the direct

8    testimony is here as well.  But so I don't need it right now,

9    but either the end of the day today or tomorrow morning, if I

10   could just be given just a copy of the witness statement --

11   direct testimony statements of the witnesses, that would be

12   helpful.

13          MR. KERR:  And we'll make that happen, Your Honor.

14          THE COURT:  That's fine.

15          MR. KERR:  But, however, I would like to, for the

16   record --

17          THE COURT:  Yeah, I do want to make sure the exhibits

18   get identified.

19          MR. KERR:  So in connection with Ms. Scott's direct

20   testimony, we also offer the following exhibits, all of which

21   have been previously identified on the trial exhibit list, and

22   they are -- first off, actually her direct testimony is Exhibit

23   1500, but the additional exhibits we're going to be offering in

24   through Ms. Scott are 1501, 1502, 1503, 1504, 1505, 1506, 1507,

25   1508, 1509, 1510, 1511, 1512 and 1513, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1          THE COURT:  Are there any objections to the exhibits

2     that Mr. Kerr has just identified?

3          MR. COHEN:  We have no objections, Your Honor.

4          THE COURT:  All right.  Hearing no objections from

5     anyone, Exhibits 1501, 1502, 1503, 1504, 1505, 1506, 1507,

6     1508, 1509, 1510, 1511, 1512, and 1513 are all admitted in

7     evidence.

8     (Exhibits regarding Ms. Scott's testimony were hereby received

9     into evidence as Plan Proponents' Exhibits 1501, 1502, 1503,

10    1504, 1505, 1506, 1507, 1508, 1509, 1510, 1511, 1512, and 1513,

11    as of this date.)

12         MR. KERR:  Thank you, Your Honor.

13         For the next direct testimony in support of the joint

14    Chapter 11 plan proposed by the debtors and the official

15    committee of unsecured creditors, the debtors offer the direct

16    testimony of Robert H. Major dated November 12, 2013 which was

17    filed as docket entry number 5677.

18         If Mr. Major were called to testify, he would testify

19    as to what is in his written direct testimony.  We therefore

20    offer his written direct testimony in factual support of the

21    consolidated proceedings and the plan confirmation.

22         THE COURT:  Does that have an exhibit number as well?

23         MR. KERR:  It is Exhibit 1515, Your Honor.

24         THE COURT:  All right.  Any objections?

25         Hearing none, the direct testimony of Robert H. Major,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

64

1  which is Exhibit 1515, and is on ECF as 5677, is in evidence.

2  (Direct testimony of Robert Major was hereby received into

3  evidence as Plan Proponents' Exhibit 1515, as of this date.)

4         MR. KERR:  And in connection with Mr. Major's direct

5  testimony, Your Honor, we also offer the following exhibits,

6  all of which were previously identified on the plan proponents'

7  trial exhibit list.  They are Exhibit 1516, 1517, 1518, 1519,

8  1520, 1521, 1522, 1523, and 1524.

9         THE COURT:  All right.  Are there any objections to

10  the exhibits that Mr. Kerr just identified?

11         MR. COHEN:  We have no objection to the admission of

12  the exhibits for the limited purpose, they're hearsay but

13  they're notice letters.

14         THE COURT:  Is that correct, Mr. Kerr?

15         MR. ESPANA:  One clarification.

16         THE COURT:  You just have to identify yourself,

17  please.

18         MR. ESPANA: Mauricio Espana, Dechert, on behalf of

19  Bank of New York Mellon entities.

20         Most of the exhibits are notices or governing

21  agreements except for three of them which is 1515, 1518 and

22  1522, which are Mr. Major's declarations submitted here and in

23  the prior proceedings, and those were submitted --

24         THE COURT:  1515 is already admitted in evidence.

25  What was the other?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1          MR. ESPANA:  1518 and 1522.

2          THE COURT:  Okay.

3          MR. ESPANA:  Those were the other additional two.

4    Those are Mr. Major's prior declarations submitted in the FGIC

5    9019.

6          MR. COHEN:  That's' fine.  No objection as to those.

7          THE COURT:  All right.  So exhibits 1516, 1517,

8    1518 -- let me leave 1518 -- 1516, 1517, 1519, 1520, 1521, 1523

9    and 1524 are all admitted for the limit purpose as notices.

10          Exhibits 1518 and 1522, which are Mr. Major's prior

11    testimony, is admitted in evidence without the same

12    restriction.

13    (Exhibits regarding Mr. Major's testimony were hereby received

14    into evidence as Plan Proponents' Exhibits 1516, 1517, 1518,

15    1519, 1520, 1521, 1522, 1523, and 1524, as of this date.)

16          MR. COHEN:  Correct.  Thank you, Your Honor.

17          THE COURT:  Thank you very much.

18          MR. KERR:  Your Honor, Charles Kerr.

19          The next one; in support of the joint Chapter 11 plan

20    proposed by the debtors and the official committee of unsecured

21    creditors, the debtors offer the direct testimony of Brendan

22    Meyer, M-E-Y-E-R, dated November 12, 2013, which was filed as

23    docket number 5690.  It was also listed as Exhibit 1530 in the

24    list of exhibits, Your Honor.

25          If Mr. Meyer was called to testify, he would testify

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  to what is in his written direct testimony.  We therefore offer

2  his written direct testimony, in factual support of the

3  consolidated proceedings and the plan confirmation.

4  THE COURT:  Are there any objections?

5  All right.  Mr. Meyer's -- I don't know if he

6  pronounces it [May-er] or [My-er], but his testimony is

7  admitted.  It's Exhibit PX-1530 and it's on ECF as 5690.

8  That's in evidence.

9  (Direct testimony of Brendan Meyer was hereby received into

10  evidence as Plan Proponents' Exhibit 1530, as of this date.)

11  MR. KERR:  In connection with Mr. Meyer's testimony,

12  Your Honor, we also offer the following exhibits, all of which

13  were previously identified on our exhibit list and marked for

14  identification.  They are Exhibits 1531, 1532, 1533, 1534 and

15  1535.

16  THE COURT:  All right.  Are there any objections to

17  those exhibits?

18  MR. COHEN:  Your Honor, not as to 1533, but with

19  respect to the others, we have no objection if they're offered

20  for a limited purpose.

21  THE COURT:  Not hearing -- Mr. Garrity, are you coming

22  up?

23  MR. GARRITY:  Yes, Your Honor.

24  THE COURT:  Okay.  Just take your time.

25  MR. GARRITY:  Good morning, Your Honor.  Jim Garrity

**RESIDENTIAL CAPITAL, LLC, ET AL.**

67

1  from Morgan Lewis on behalf of Deutsche Bank and counsel to Mr.

2  Meyer.  We agree to the limitation as set forth.

3         THE COURT:  All right.  1533, I take it, doesn't have

4  the same limitations, Mr. Cohen?

5         MR. COHEN:  That's correct.  It's a declaration.

6         THE COURT:  All right.  So Exhibits 1531, 1532, 1534

7  and 1535 are admitted for the limited purpose, and 1533

8  admitted without restriction.  Thank you.

9  (Exhibits regarding Mr. Meyer's testimony were hereby received

10  into evidence as Plan Proponents' Exhibits 1531, 1532, 1533,

11  1534 and 1535, as of this date.)

12         MR. COHEN:  Thank you, Your Honor.

13         MR. KERR:  Next, Your Honor, in support of the joint

14  Chapter 11 plan proposed by the debtors and the official

15  committee of unsecured creditors, debtors offer the direct

16  testimony of Mary Sohlberg, dated November 12, 2013, which was

17  filed as docket number 5680.  It was also listed as Exhibit

18  1545 on the plan proponents' exhibit list.

19         THE COURT:  All right.  Any objections?

20         MR. COHEN:  No objection.

21         THE COURT:  All right.  The direct testimony of Mary

22  Sohlberg, Exhibit 1545, also on ECF as 5680 is in evidence.

23  (Direct testimony of Mary Sohlberg was hereby received into

24  evidence as Plan Proponents' Exhibit 1545, as of this date.)

25         MR. KERR:  Your Honor, in connection with Ms.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1    Sohlberg's direct testimony, we also offer the following

2    exhibits, all of which were previously identified on the plan

3    proponents' trial exhibit list, and they are Exhibit number

4    1546, 1547, 1548, 1549, 1550, 1551, 1552, 1553, 1554, 1555,

5    1556, 1557.

6            THE COURT:  Are there any objections?

7            MR. COHEN:  Your Honor, we have no objection to 1554,

8    which is a declaration.  With respect to the other exhibits

9    identified by Mr. Kerr, we would have no objection, if they are

10   introduced into evidence for a limited purpose.

11           MR. KERR:  Your Honor, I would just note --

12           MR. COHEN:  No objection on 1555.

13           THE COURT:  Let me hear from the sponsors.

14           MR. JOHNSON:  Good morning, Your Honor, Michael

15   Johnson from Alston & Bird on behalf of Wells Fargo Bank as

16   trustee.

17           THE COURT:  Good morning.

18           MR. JOHNSON:  We agree to the limitation in respect of

19   the exhibits that Mr. Kerr just read off except for the

20   declaration, which is Exhibit number 1554.

21           THE COURT:  Okay.  So Exhibits 1546, 1547, 1548, 1549,

22   1550, 1551, 1552, 1553, 1555, 1556 and 1557 are admitted for

23   the limited purpose, and 1554 is admitted without limitation.

24           MR. COHEN:  Correct, Your Honor, thank you.

25   (Exhibits regarding Ms. Sohlberg's testimony were hereby

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**69**

1  received into evidence as Plan Proponents' Exhibits 1546, 1547,

2  1548, 1549, 1550, 1551, 1552, 1553, 1554, 1555, 1556, 1557, as

3  of this date.)

4         THE COURT:  Thank you very much.

5         MR. KERR:  The next thing I'd like to do, Your Honor,

6  in support of the joint Chapter 11 plan proposed by the debtors

7  and the official committee of unsecured creditors, the debtors

8  offer the direct testimony of Thomas Musarra, dated November

9  12, 2013.

10        THE COURT:  Just spell the last name for me.

11        MR. KERR:  It's M-U-S-A-R-R-A.  I apologize if I

12  didn't pronounce it correctly.

13        THE COURT:  I wouldn't know, so.

14        MR. KERR:  But it was filed as docket entry 5675.  It

15  was actually listed on our exhibit list as Exhibit 1560.

16        THE COURT:  All right.  Any objections to Mr.

17  Musarra's direct testimony?

18        Hearing none, the direct testimony of Thomas Musarra,

19  which is on ECF as 1575 and marked as PX-1560 is admitted in

20  evidence.

21  (Direct testimony of Thomas Musarra was hereby received into

22  evidence as Plan Proponents' Exhibit 1560, as of this date.)

23        MR. KERR:  Next, Your Honor, in support --

24        THE COURT:  No exhibits?

25        MR. KERR:  No exhibits to that one, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Okay.

2          MR. KERR:  In support of the joint Chapter 11 plan

3    proposed by the debtors and the official committee of unsecured

4    creditors, the debtors offer the affidavit regarding

5    dissemination of notices and information to RMBS trust

6    certificate holders of Mr. Fraga.  And I don't have Mr. Fraga's

7    first name.  I apologize.

8          Jose Fraga.  And that was dated November 12, 2013, and

9    it was filed with ECF as docket number 5687, and it is listed

10   as Exhibit 1580 on our exhibit list, Your Honor.

11         If Mr. Fraga was here -- if Mr. Fraga was called to

12   testify, he would testify as to what is in his affidavit.

13         THE COURT:  All right.  Any objections?

14         MR. COHEN:  No objection.

15         THE COURT:  All right.  The direct testimony of Jose

16   Fraga on ECF as 5687 and marked as Proponents' Exhibit 1580 is

17   in evidence.

18   (Testimony of Jose Fraga was hereby received into evidence as

19   Plan Proponents' Exhibit 1580, as of this date.)

20         MR. KERR:  Your Honor, in connection with Mr. Fraga's

21   direct testimony, we also offer the following exhibits, all of

22   which were previously identified on the plan proponents' trial

23   exhibit list.  They are Exhibits 1581, 1582, 1583, 1584, 1585,

24   1586, 1587, 1588, 1589 and 1590.

25         THE COURT:  Are there any objections to these

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
Pg 71 of 300
**RESIDENTIAL CAPITAL, LLC, ET AL.**

71

1    exhibits?

2    MR. COHEN:  Your Honor, with respect to Exhibit 1582,

3    we have no objection.  With respect to the other exhibits

4    identified by Mr. Kerr, we have no objection provided they're

5    admitted for the limited purpose of establishing notice.

6    THE COURT:  All right, may I hear the sponsor's

7    counsel?

8    MR. KOTWICK:  Good morning, Your Honor, Mark Kotwick

9    of Seward & Kissel on behalf of U.S. Bank, as well as speaking

10   for Garden City Group who employs Mr. Fraga.  We have no

11   problem with the limitations.

12   THE COURT:  All right.

13   So Exhibit 1582 is admitted for all purposes.  And

14   then exhibits 1581, 1583, 1584, 1585, 1586, 1587, 1588, 1589

15   and 1590 are all admitted in evidence for the limited purpose.

16   (Exhibits regarding Mr. Fraga were hereby received into

17   evidence as Plan Proponents' Exhibit 1581, 1582, 1583, 1584,

18   1585, 1586, 1587, 1588, 1589 and 1590, as of this date.)

19   MR. KERR:  Next, Your Honor, in support of the joint

20   Chapter 11 plan proposed by the debtors and the official

21   committee of unsecured creditors, the debtors offer the direct

22   testimony of Allen M. Pfeiffer dated November 12, 2013 which

23   was filed as docket number 5682 and was listed as Exhibit 1600

24   on our exhibit list.

25   If Mr. Pfeiffer was called to testify, he would

**RESIDENTIAL CAPITAL, LLC, ET AL.**

72

1  testify to what is in his written direct testimony.

2          THE COURT:  Are there any objections to Mr. Pfeiffer's

3  direct testimony?

4          MR. COHEN:  No objection, Your Honor.

5          THE COURT:  All right.  The direct testimony of Allen

6  Pfeiffer on ECF as 5682 and marked as Plaintiff's (sic) Exhibit

7  1600 is in evidence.

8  (Direct testimony of Allen Pfeiffer was hereby received into

9  evidence as Plan Proponents' Exhibit 1600, as of this date.)

10         MR. KERR:  And, Your Honor, in connection with Mr.

11 Pfeiffer's direct testimony, we also offer the following

12 exhibits, all of which were previously identified on the plan

13 proponents' trial exhibit list, those are Exhibits 1600-1,

14 1600-2 and 1600-3.

15         THE COURT:  Mr. Cohen?

16         MR. COHEN:  We have no objection to the admission of

17 those three exhibits into evidence for a limited purpose.

18         THE COURT:  Mr. Johnson?

19         MR. JOHNSON:  Michael Johnson.  We agree to the

20 limitation.

21         THE COURT:  All right.  Exhibits PX-1600-1, 1600-2 and

22 1600-3 are admitted into evidence for a limited purpose.

23 (Exhibits regarding Mr. Pfeiffer's testimony was hereby marked

24 for identification as Plan Proponents' Exhibit 1600-1, 1600-2,

25 1600-3, as of this date.)

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1          MR. KERR:  Your Honor, we're just going to shift here.

2     I'm going to ask Mr. Rains come up to do the next two witness

3     who I believe should not be subject to cross-examination.

4          THE COURT:  So you're letting Mr. Rains do it?

5          MR. KERR:  You know, he just sits there.  He's anxious

6     to do something.

7          MR. RAINS:  Your Honor, with our witness, Mr. Lipps,

8     I --

9          THE COURT:  Just identify yourself again.  I'm sorry,

10    Mr. Rains.

11         MR. RAINS:  I'm sorry.  Darryl Rains of Morrison &

12    Foerster for the debtors.

13         THE COURT:  Let's let -- there are some people who are

14    excusing themselves, which is quite all right.  But let's just

15    wait until they clear, okay?

16         MR. RAINS:  Your Honor, I wanted to note that I had

17    one job with Mr. Lipps and that was to get his exhibits into

18    evidence and we weren't able to do that.  I'm going to try

19    again this time and maybe -- these witnesses don't have any

20    exhibits, so I think we might have a better chance of getting

21    this done.

22         Your Honor, our next witness in support of plan

23    confirmation is Frank Sillman.  Mr. Sillman is an expert

24    witness from Fortis.  His direct testimony was filed previously

25    on ECF on November 12th, it's docket number 5703.  The debtors

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    now offer into evidence Mr. Sillman's direct testimony.

2              THE COURT:  Is it marked as an exhibit as well.

3              MR. RAINS:  It is not, Your Honor we didn't do that

4    for our direct testimony.

5              THE COURT:  That's fine.  That's fine.  Are there any

6    objections to Mr. Sillman's direct testimony?

7              MR. COHEN:  No objection.

8              THE COURT:  All right.  The direct testimony of Frank

9    Sillman, which is on ECF as 5703 is admitted into evidence.

10   (Direct testimony of Frank Sillman was hereby received into

11   evidence as Plan Proponents' Exhibit, as of this date.)

12             MR. RAINS:  Your Honor, we'll hand that up to you at

13   this time. Mr. Sillman is here.  He's available for cross-

14   examination, if that's needed.

15             THE COURT:  Does anybody wish to cross-examine Mr.

16   Sillman?

17             MR. COHEN:  The JSNs do not, Your Honor.

18             THE COURT:  Anyone else?

19             Mr. Sillman, it was an easy day for you.

20             Very good, Mr. Rains.

21             MR. RAINS:  Thank you.  Court reporter, would you

22   please mark that as part of the transcript?

23             THE COURT:  If that's what it takes to make your day.

24             MR. RAINS:  Your Honor, our next witness, also an

25   expert witness, is Ms. Lucy Allen from NERA.  And her testimony

12-12020-mg Doc 5972 Filed 11/21/13 Entered 11/27/13 14:12:35 Main Document
Pg 75 of 300
**RESIDENTIAL CAPITAL, LLC, ET AL.**

75

1    was filed on November 12 as docket number 5706.

2           Now yesterday Ms. Allen discovered a small error in

3    her work.  Basically her work is taking the securities

4    settlement and the New Jersey Carpenters settlement and

5    comparing them to twelve other recent settlements.

6           She found that one of the data items for one of the

7    other settlements was erroneous.  She's redone her testimony.

8    It moves the placement of that settlement which was the WaMu

9    settlement up and down in their tables, it does not change any

10   of the text or any of her conclusions.

11          THE COURT:  Have you shared that information with

12   opposing counsel?

13          MR. RAINS:  We have.  We filed it last night on ECF as

14   well.  The new number for the corrected testimony is 5879.

15          So what we'd like to do is offer her corrected

16   testimony into evidence, 5879, at this time.

17          THE COURT:  Mr. Cohen?

18          MR. COHEN:  No objection.

19          THE COURT:  All right.  Any --

20          MR. RAINS:  She's got no exhibits and she's available

21   to be cross-examined.

22          THE COURT:  The direct testimony of Lucy Allen, the

23   corrected direct testimony of Lucy Allen, which is on ECF as

24   5879, is admitted in evidence.

25   (Corrected direct testimony of Lucy Allen was hereby received

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    into evidence as Plan Proponents' Exhibit, as of this date.)

2         THE COURT:  Does anybody wish to cross-examine Ms.

3    Allen?

4         MR. COHEN:  The JSNs do not, Your Honor.

5         THE COURT:  All right.

6         MR. RAINS:  Thank you, Your Honor.

7         THE COURT:  Very good again, Mr. Rains.

8         MR. O'NEILL:  Your Honor, Brad O'Neill for the

9    unofficial (sic) creditors committee.

10        The committee would like to offer the direct testimony

11   of Ronald J Friedman in support of confirmation and

12   consolidated adversary proceedings.  The direct testimony is at

13   docket number 5710.  If called to testify Mr. Friedman would

14   testify to the contents of his direct testimony.

15        THE COURT:  Any objections?

16        MR. COHEN:  No, Your Honor.

17        THE COURT:  All right. Mr. Friedman's direct testimony

18   5710 on ECF is in evidence.

19   (Direct testimony of Ronald Friedman was hereby received into

20   evidence as Plan Proponents' Exhibit, as of this date.)

21        MR. O'NEILL:  There are no exhibits, Your Honor.

22        THE COURT:  All right.  Does anybody wish to cross-

23   examine, Mr. Friedman?

24        MR. COHEN:  We do not, Your Honor.

25        THE COURT:  You know, I might like to, but I'll spare

**RESIDENTIAL CAPITAL, LLC, ET AL.**

77

1  Mr. Friedman from that.  Okay.  All right, so Mr. Friedman's

2  testimony is in evidence.

3         Just for those who don't know, Mr. Friedman appears in

4  this court in other matters with some frequency, so.  I'll give

5  him a hard time in those cases rather than this one.

6         Okay, Mr. Kerr?

7         MR. KERR:  One second, Your Honor.  I'm just getting

8  something out.

9         THE COURT:  Sure.

10         MR. KERR:  I need to adjust my glasses, Your Honor.

11  Just one second.  Your Honor, on behalf of the debtors and the

12  official committee of unsecured creditors, we'd like to offer

13  the written direct testimony at this time of Michael Carpenter,

14  which was filed as docket number 5695.

15         Mr. Carpenter, if he was asked to testify as to what

16  is in his direct, he would testify on the stand.  He is

17  available here to be cross-examined.

18         THE COURT:  Does anybody anticipate cross-examining

19  Mr. Carpenter?

20         MS. MILLER:  Yes, Your Honor.  Atara Miller of

21  Milbank, Tweed, Hadley & McCloy on behalf --

22         THE COURT:  Okay, come on up, Mr. Carpenter, and be

23  sworn.

24         Any objections to the direct testimony?

25         MS. MILLER:  No, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  All right. So the direct testimony of Mr.

2    Carpenter is admitted into evidence.

3    (Direct testimony of Michael Carpenter was hereby received into

4    evidence as Plan Proponents' Exhibit, as of this date.)

5          THE COURT:  Mr. Carpenter, if you'd raise your right

6    hand and be sworn.

7       (Witness sworn)

8          THE COURT:  All right.  Please have a seat.

9          Tell me your name again, I'm sorry.

10          MS. MILLER:  Atara Miller, Milbank, Tweed, Hadley &

11   McCloy, on behalf of the JSNs.

12          THE COURT:  Thank you, Ms. Miller.

13   CROSS-EXAMINATION

14   BY MS. MILLER:

15   Q.   Good morning, Mr. Carpenter.

16   A.   Good morning.

17   Q.   I think it's still morning.  Mr. Carpenter, you joined the

18   board of directors of Ally Financial in May 2009, right?

19   A.   Correct.

20   Q.   And you've been the CEO of Ally since November of 2009,

21   right?

22   A.   Correct.

23   Q.   And since you joined the Ally board in May 2009, you've

24   monitored ResCap's financial condition, correct?

25   A.   Correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

79

1   Q.   And as CEO of Ally, you knew from the time that you

2   assumed that position that ResCap had net worth covenants that

3   it had to comply with, right?

4   A.   Correct.

5   Q.   And you understood that government sponsored entities,

6   which I'm going to refer to as GSEs, like Fannie and Freddie

7   imposed net worth covenants on ResCap, right?

8   A.   Correct.

9   Q.   And you knew also that there would be serious consequences

10  if ResCap didn't meet its net worth covenants with the GSEs,

11  right?

12  A.   Correct.

13  Q.   The GSEs could seize ResCap's mortgage servicing rights,

14  for example?

15  A.   Correct.

16  Q.   And the mortgage servicing rights were a substantial asset

17  on ResCap's balance sheet, right?

18  A.   Correct.

19  Q.   ResCap had about 1.1 billion dollars in MSR assets, right?

20  A.   Correct.

21  Q.   And the GSEs could seize the MSRs as of right without

22  having to prove anything to anybody, right?

23  A.   I believe that's true.

24  Q.   And you also knew from the time that you joined the Ally

25  board that ResCap also had to satisfy net worth covenants in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

80

1  its banking facilities, right?

2  A.    Correct.

3  Q.    And --

4         THE COURT:  I missed the last part of your question,

5  what facilities?

6         MS. MILLER:  Banking.

7         THE COURT:  Okay.  I just didn't hear you.  Thank you

8  very much.

9  Q.    And ResCap had five separate bank facilities, right?

10  A.    I have no idea.

11  Q.    Okay.  And if ResCap blew a covenant in one of the bank

12  facilities, there would be an immediate event of default with

13  no cure period, right?

14  A.    Possibly.  I'm not the treasurer of the company.  So I

15  would have to -- I would consult the treasurer of the company

16  and say what would the implications be.  But I -- that's

17  probably true.

18  Q.    And if that did happen that ResCap failed to comply with

19  one of the covenants in its bank facilities and there was an

20  immediate event of default with no cure period, the banks would

21  have the right to immediately call the loans, right?

22         MR. KERR:  Objection.

23         THE COURT:  Sustained.

24  Q.    Mr. Carpenter, I'd like you to look at a document in your

25  binder DX-BAR, which is an e-mail from Lara Hall to you, dated

**RESIDENTIAL CAPITAL, LLC, ET AL.**

81

1    Monday, September 26, 2011?

2    A.   DB --

3            THE COURT:  I think there's a problem, and they just

4    got put in out of order.  In the binder I was handed, DX-BAR is

5    actually behind the tab for DX-BAQ, but they just got switched.

6    I have it, go ahead.

7            Do you have the right exhibit, Mr. Carpenter?

8            THE WITNESS:  Yes, I do.

9            THE COURT:  Go ahead, it just got switched in the

10   binder.

11           MS. MILLER:  It is --

12           THE COURT:  I have it.  It's marked --

13           MS. MILLER: -- in the reverse alphabetical order.

14           THE COURT:  No, the tab is incorrect, but that's okay.

15           MS. MILLER:  Apologies.

16           THE COURT:  It just got switched.  I have it.

17           MS. MILLER:  Good.

18   BY MS. MILLER:

19   Q.   Mr. Carpenter, is this an e-mail that you've seen before?

20   A.   Yes, because you showed it to me the other day.

21   Q.   I did show it to you the other day.

22        And do you recall testifying about this document?

23   A.   Yes.

24   Q.   And do you recall testifying that, in fact --

25           THE COURT:  Just ask him questions.  If what you're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    trying is impeachment, it's improper; and so just ask him

2    questions, and then if you want to use the deposition, you can.

3    But -- okay?

4                MS. MILLER:  Okay.

5    Q.    Mr. Carpenter, do you believe that you received this

6    e-mail in September of 2011?

7    A.    I have no reason to believe I didn't.

8    Q.    Okay.  And do you know what this e-mail is referring to?

9    A.    Yes.

10   Q.    And what's it talking about?

11   A.    This is a period of time you may all remember, robo-

12   signing, in which the mortgage industry was slapped with a

13   twenty-five-billion-dollar fine by the government, by the DOJ

14   and the Attorneys General.  We were in of the middle of

15   negotiating -- ResCap was in the middle of negotiating what its

16   share of that settlement might be.  It was in a very wide

17   range.  And depending on the size of that settlement, it could

18   potentially cause ResCap to violate some of the covenants that

19   you just discussed.

20   Q.    And who's Ms. Hall?

21   A.    Lara Hall is one of our senior financial people, spends a

22   lot of time on our capital markets activity.

23   Q.    And in the second paragraph of this document Ms. Hall

24   writes on the third line, "All of the banking parties will have

25   the ability to accelerate and the GSEs will have the right to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

83

1   full servicing."

2        Does that refresh your recollection that, in fact, if

3   ResCap defaulted on one of its net worth covenants in its

4   banking facilities, the banks would have the ability to

5   accelerate the loans?

6   A.   I knew it wasn't a good thing.

7   Q.   Because if ResCap didn't have the cash to repay the loans,

8   it would have been in default, right?

9   A.   Yes, continuing that logic train, yes.

10  Q.   And that would have put ResCap out of business continuing

11  that logic train one step further, right?

12  A.   Yes, theoretically.

13  Q.   And ResCap reaching its net worth covenants would have

14  also had bad consequences for Ally, right?

15  A.   To the ex -- depending on what happened, conceivably, yes.

16  Q.   If ResCap breached its covenants, that would have been a

17  disclosable event for Ally, right?

18  A.   Yes.

19  Q.   And Ally wouldn't want to have to disclose a bad material

20  event, right?

21        MR. KERR:  Objection.

22        THE COURT:  Sustained.

23  Q.   As CEO of Ally, you negotiated the settlement of potential

24  claims with ResCap before the bankruptcy filing, right?

25  A.   We negotiated a global settlement with ResCap before the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  bank -- with the ResCap board on an arm's-length basis to cover

2  the support that we would provide, the financial settlement

3  that we would agree to enter into, and under the condition that

4  all claims, third-party and estate claims, would be released.

5  Q.   And you continued to lead the negotiations for Ally

6  throughout the mediation with Judge Peck, right?

7  A.   Correct.

8  Q.   And throughout all of the negotiations, both pre-petition

9  and the more recent mediation, the one thing that Ally really

10 cared about was getting a full release from the debtors and all

11 third parties, right?

12 A.   It's not the only thing we cared about.   It was a sine qua

13 non.

14 Q.   And as long as Ally gets its release, Ally is willing to

15 write a check for the 2.1-billion-dollar settlement amount,

16 right?

17 A.   Correct.

18 Q.   And Ally is not conditioning its payment of the settlement

19 on the settlement of intercompany claims, for example?

20 A.   I'd have to defer to my lawyers, but I don't believe so.

21 Q.   And, in fact, Ally is indifferent about how ResCap's

22 creditors divide up the contribution, right?

23 A.   That's what I said the other day.   That's what I'd say

24 today.

25 Q.   I think you said it more colorfully then.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

85

1    A.    Okay.  Well, I've got a bigger audience today.  And a

2    prestigious judge, so I have to be very careful.

3              MS. MILLER:   We broadcast from the deposition.

4    Q.    And as part of the mediation process, Mr. Carpenter, you

5    didn't consider the value of the claims that could be asserted

6    against Ally, right?

7    A.    The way I would describe it is, we had done a detailed

8    analysis of all the potential allegations and claims that could

9    be made against us before we entered into a negotiation, and we

10   had concluded that there was no material claims that could be

11   asserted that would be, in our judgment, of value or upheld.

12   Q.    Okay.  So focusing on the mediation, and I'm going to go

13   back to the pre-petition negotiation.  But focusing first on

14   the mediation before Judge Peck, the merits of the causes of

15   action weren't really part of the conversation at mediation,

16   right?

17             MR. KERR:   Objection, Your Honor.

18             THE COURT:   Sustained.

19             Ms. Miller you haven't been before me before, but

20   there is a long history about anyone inquiring about the

21   substance of what was discussed in the mediation.

22             I've been absolutely consistent in my rulings, which

23   is that the mediation privilege applies to whatever was

24   discussed during the mediation.  I'm not going to permit -- you

25   can ask your questions, they're going to wind up with

**RESIDENTIAL CAPITAL, LLC, ET AL.**

86

1    objections and they're going to wind up with me sustaining it.

2          MS. MILLER:  Your Honor, understood.

3          THE COURT:  Go ahead, ask your questions.

4          MS. MILLER:  Okay.  I will say that there were --

5          THE COURT:  Ask your questions.

6          MS. MILLER:  The answers were solicited and there was

7    no objection put on the record at the deposition.

8          THE COURT:  Well, there was now, and I sustained the

9    objection.

10          MS. MILLER:  Okay.  Understood.

11   Q.   Mr. Carpenter, you're the person at Ally most

12   knowledgeable about the claims that are being settled as part

13   of the global settlement, right?

14   A.   I wouldn't say that, no.

15   Q.   Do you know that you were identified in this case as the

16   30(b)(6) witness on behalf of Ally, specifically on the topic

17   of the claims settled as part of the global settlement?

18   A.   Let me define my terms here, okay?  Which is, can I debate

19   with anybody individual claims against Ally, no.  Am I

20   knowledgeable about what Ally's position was vis-a-vis the

21   claims collectively and in general; the answer to that is yes

22   Q.   And going back even pre-petition, you understood that

23   ResCap believed that it had claims that could be asserted

24   against Ally, right?

25   A.   You mean around the time -- clarify your time frame.  You

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  mean around the time of the filing, is that what you're talking

2  about?

3  Q.    I think what I would classify as winter, January, February

4  time period.  I think you might characterize that as spring.

5  But the January through pre-petition period, January through

6  May of 2012?

7  A.    Was I aware that ResCap had studied what it thought its

8  claims were against Ally?  Yes.

9  Q.    And ResCap's lawyers made a presentation to Ally about

10  those claims, right?

11  A.    They made a presentation to Ally's counsel about these

12  claims --

13  Q.    And --

14  A.    -- not to me.

15  Q.    Sorry.  And you reviewed that presentation, right?

16  A.    I did.

17  Q.    And do you recall what claims were the focus of that

18  presentation?

19  A.    I don't remember all of them.  It's so long ago.

20  Q.    Do you remember that it focused on alter ego and veil

21  piercing and fraudulent conveyance claims?

22  A.    I mean, obviously I was aware that those claims would be

23  included in that document, yes.

24  Q.    And you thought that the presentation was a joke, right?

25  A.    Correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

88

1    Q.    And in fact, I think you described it to me as fantasy,

2    what in the wildest dreams, what kind of garbage you could

3    conjure up, right?

4    A.    Well, I mean, they were paid to come up with an argument

5    for a big number, and that's what they did.  And they did a

6    good job.  I think the examiner's report made it very clear

7    that piercing of the veil claims and fraudulent conveyance

8    claims didn't exist.

9    Q.    And you believed even in the pre-petition negotiation

10   period that those claims against -- as asserted against Ally

11   had no merit, right?

12   A.    Correct.

13   Q.    And it's your position that the settlement payment bears

14   no relation to the merits of the claims against Ally, right?

15   A.    Correct.

16   Q.    And in particular, you believe that about the veil

17   piercing and the alter ego theories, right?

18   A.    I believe that about all the claims.

19   Q.    And you also believe that the third-party claims against

20   Ally have no merit, right?

21   A.    We think they're very weak.

22   Q.    And that's because you know that there is a clear --

23   sorry -- that's because you know that with respect to the rep

24   and warranty claims you think that there is a clear contractual

25   determination that that is ResCap's.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MS. MILLER:  Well, let me restate that.

2     Q.   With respect to the rep and warranty claims, it's your

3     position that it's very clear that that is ResCap's contractual

4     obligation, right?

5     A.   The ResCap claims are contractual obligations.  ResCap was

6     an S-1 filer.  ResCap disclosed everything it needed to

7     disclose.  They were clearly contractual obligations of ResCap,

8     not obligations of the parent.

9     Q.   And you've been public about that position going back to

10    November of 2011, right?

11    A.   Correct.

12    Q.   Mr. Carpenter, you reviewed the executive summary of the

13    examiner report, right?

14    A.   Correct.

15    Q.   And your reaction, which I think you already touched on,

16    was that Ally's position with respect to veil piercing and

17    alter ego was vindicated?

18    A.   Correct.

19          MR. KERR:  Objection, Your Honor.

20          THE COURT:  He answered already.  So --

21    Q.   And you felt the same way about the fraudulent conveyance

22    claims, right?

23          MR. KERR:  Objection.

24          THE COURT:  Sustained.

25    A.   Our negotiation --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

90

1       THE COURT:  No.

2   Q.   No, you can't answer.

3   A.   Sorry.

4       THE COURT:  Wait for another question.  I mean if you're

5   absolutely insistent on speaking.

6       THE WITNESS:  No, no, it's okay.  It's okay.  I know when

7   I'm not to.

8   Q.   Did you agree with the examiner about the fraudulent

9   transfer claims?

10       MR. KERR:  Objection.

11       THE COURT:  Sustained.

12   Q.   Mr. Carpenter, you've seen a lot of claims against -- a

13   lot of potential claims against Ally presented to you, right?

14   A.   I've seen the same ones you have.

15   Q.   And what was your reaction to those claims?

16   A.   That's a very sweeping question.  We did an enormous

17   amount of due diligence of a legal nature before we decided to

18   withdraw support from ResCap, knowing that would cause ResCap's

19   filing.  And the results of that analysis were to give us a

20   great deal of confidence in our legal position vis-a-vis the

21   claims that might be asserted.

22       And all of that had nothing to do with the settlement.

23   Q.   Mr. Carpenter, did you believe that there could be a

24   debate about a claim related to the transfer pricing associated

25   with mortgages from the bank to ResCap?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

91

1  A.   I did say that --

2        MR. KERR:  Objection, Your Honor.

3        THE COURT:  Sustained.

4  Q.   Mr. Carpenter, what was your reaction when you read the

5  examiner report?

6        MR. KERR:  Objection, Your Honor.

7        THE COURT:  Sustained.

8  Q.   Mr. Carpenter, did you understand that there was an issue

9  concerning whether Ally took more of a mark-up than it should

10 have under the brokering agreement and the MML PSA?

11 A.   That was -- yes.  It was an issue that was raised by an

12 employee as he was leaving the company as a possible question.

13 It was looked into by our finance staff.  It was looked into by

14 our audit staff.  It was looked into independently by Ernst &

15 Young, all of whom concluded the approach that had been taken

16 was, in fact, perfectly legitimate and appropriate.

17 Q.   But you still believed that you could have an intelligent

18 conversation about whether that was a valid claim or not,

19 right?

20 A.   I believed it was the only thing that you could at least

21 have a conversation about that made any sense.

22 Q.   All the other claims you had seen leading up to ResCap's

23 filing and afterwards you consider to be garbage, right?

24 A.   Maybe a more polite -- I thought they were grasping for

25 straws, and that's what I thought.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MS. MILLER:  Thank you.  No further cross.

2          THE COURT:  Thank you.  Any further examination?  Come

3    on up.

4          MR. SCHAFFER:  I have a some questions, Your Honor.

5          THE COURT:  Sure, please.  Come on up.

6    CROSS-EXAMINATION

7    BY MR. SCHAFFER:

8    Q.   Mr. Carpenter, I'm Eric Schaffer from Reed Smith.  I'm

9    here for Wells Fargo in its capacity as collateral agent.

10         Are you familiar with Wells Fargo's collateral agency

11   agreement that it acted as collateral agent in connection with

12   the AFI revolver?

13   A.   No, I'm not.

14   Q.   Are you aware that the same collateral that secured the

15   revolver also secured the junior secured notes?

16   A.   No, I'm not.

17   Q.   Are you familiar at all with Wells Fargo's objection?

18   A.   No.

19   Q.   You're making this too easy.

20         Are you aware --

21   A.   I'm only telling you the truth.

22   Q.   Are you aware that from time to time collateral would be

23   released at the direction of Ally?

24   A.   I'm not familiar with the details.

25   Q.   But generally you're aware that collateral would be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   released at Ally's direction?

2   A.   I'm going to say no.

3   Q.   In your witness statement and in your testimony today,

4   you've advocated for a full release of Ally in connection with

5   the plan, is that correct?

6   A.   Correct.

7   Q.   And I think you've said one of the reasons you think it's

8   appropriate is that Ally would defeat any claims that might be

9   asserted by the debtors or anyone else against Ally, is that

10   correct?

11   A.   I would say it a different way.  I would say that from the

12   very first conversation that we had with Warren Buffett when he

13   wanted to buy ResCap way back when, to the negotiation with the

14   board of directors of ResCap, to the mediation by Judge Peck,

15   we've simply said our condition that is totally nonnegotiable,

16   is full releases from everybody.  That's all.

17   Q.   And would that include any claims that Wells Fargo might

18   have as collateral agent?

19   A.   Everybody.

20   Q.   Okay.  Have you ever given any consideration to any claims

21   Wells Fargo might have?

22   A.   No, not separate from all the other claims.

23   Q.   Okay.  But you are seeking as part of this plan to get a

24   release that would extend to any claims of Wells Fargo?

25   A.   All participants.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   Would you agree that to the extent Ally directed Wells

2  Fargo as collateral agent to release liens, that the collateral

3  agent should have a right of indemnification against Ally?

4          THE COURT:  Sustained.

5          MR. KERR:  Objection, Your Honor.

6  Q.   Do you know whether Ally has any contractual claims for

7  indemnification against the debtor based on the revolver?

8  A.   No.

9  Q.   You don't know --

10 A.   I mean, I'm sitting here, you're asking me legal

11 questions.  I have an honorary doctorate in law, but I haven't

12 started to practice yet.

13 Q.   It's not too late.

14 A.   I think it probably is.

15 Q.   Well, if I tell that you Ally has filed proofs of claim in

16 which it asserts that it has a right -- a contractual right to

17 indemnification against the debtors, would you disagree?

18 A.   No, I --

19          MR. KERR:  Objection, Your Honor.

20          THE COURT:  Sustained.

21 Q.   Do you think that any indemnification rights Ally has

22 against the debtors have any value?

23          MR. KERR:  Objection, Your Honor.

24          THE COURT:  Sustained.

25          MR. SCHAFFER:  I have nothing further, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Thank you.

2          Any other cross-examination?

3          Any redirect examination?

4          MR. LEBIODA:  One question, Your Honor.

5          THE COURT:  Is it -- there are a couple people that

6     seem to want to cross.  Are you cross examining?

7          MR. LEBIODA:  Yeah.  Cross-examination, Your Honor.

8          THE COURT:  Go ahead.  Your name is?

9          MR. LEBIODA:  Nathan Lebioda, Winston & Strawn on

10    behalf of Wells Fargo Bank --

11         THE COURT:  I apologize.

12         MR. LEBIODA: -- successor to Wachovia Bank.

13         THE COURT:  Tell me your -- just tell me your last

14    name again, I'm sorry.

15         MR. LEBIODA:  Nathan Lebioda.

16         THE COURT:  Okay.

17    CROSS-EXAMINATION

18    BY MR. LEBIODA:

19    Q.   Just two questions, Mr. Carpenter.

20         It's your understanding that Ally is able to currently pay

21    its obligations as they come due in full in cash?

22    A.   Yes.

23    Q.   And it's also your understanding that Ally is currently

24    solvent?

25    A.   Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

96

1          MR. LEBIODA:  Thank you.  No further questions.

2          THE COURT:  All right.  Further cross-examination from

3     anyone? Mr. Rode?

4          THE WITNESS:  It better be, because we paid the government

5     six billion dollars.  We just paid them six billion dollars --

6     the taxpayer, I should say.

7          THE COURT:  Just identify yourself for the record.

8          MR. RODE:  My name is Richard Rode, R-O-D-E.

9     CROSS-EXAMINATION

10    BY MR. RODE:

11    Q.   Good morning, Mr. Carpenter.

12         One question, as I think the only homeowner left, would it

13    be a problem paying 2.15 to settle mine?

14              THE COURT:  2.15 what?

15              MR. RODE:  Billion.

16              UNIDENTIFIED SPEAKER:  Objection, Your Honor.

17              THE COURT:  Sustained.

18              MR. RODE:  Just thought I'd ask.

19              THE WITNESS:  No harm in asking.

20              THE COURT:  Good try.

21              Any other cross-examination?

22              Any redirect examination.

23              UNIDENTIFIED SPEAKER:  No, sir.

24              THE COURT:  All right.  You're excused, Mr. Carpenter.

25    Thank you for your testimony.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE WITNESS:  Thank you very much.

2      (Pause)

3          THE COURT:  Is somebody going to tell me what's

4  happening next?

5          MR. O'NEILL:  I'm sorry, Your Honor.

6          THE COURT:  Mr. O'Neill?

7          MR. O'NEILL:  Your Honor, in support of the joint

8  Chapter 11 plan proposed by the debtors and the official

9  committee of unsecured creditors, the debtors offer the

10 testimony John Dubel dated November 12, 2013 which was filed at

11 docket number 5697.

12         If Mr. Dubel was called to testify, he would testify

13 as to what is in his written direct testimony.  We would

14 therefore offer his written direct in factual support of the

15 consolidated proceedings.

16         THE COURT:  I assume it's being offered -- you said on

17 behalf of the debtor.  I assume the committee --

18         MR. O'NEILL:  I'm sorry, the committee -- the co-

19 proponents.

20         THE COURT:  The co-proponents --

21         MR. O'NEILL:  Yes.

22         THE COURT:  -- are offering the testimony of Mr.

23 Dubel.

24         All right.  I assume there is going to be cross-

25 examination?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

98

1          MR. COHEN:  Yes, Your Honor.

2          THE COURT:  Are you offering any exhibits?

3          MR. O'NEILL:  Yeah, there will be exhibits.  Mr.

4    Wynne's going to offer a second declaration.

5          THE COURT:  Okay, Mr. Wynne.

6          MR. WYNNE:  Good morning, Your Honor, Richard Wynne of

7    Jones Day on behalf of FGIC.

8          We are offering Mr. Dubel's declaration, which was

9    docket number 5692 as well, and Mr. Dubel would testify --

10         THE COURT:  Is this a different declaration?

11         MR. WYNNE:  Yes.

12         THE COURT:  Okay.

13         MR. WYNNE:  There's one with respect to the FGIC

14   claims and then there's the one with respect to the plan.

15         THE COURT:  Okay.  You have exhibits?

16         MR. WYNNE:  We do, Your Honor.  I just was informed

17   that there are some objections, although I thought there

18   weren't.  Do you want to us deal with that now or after the

19   cross?

20         THE COURT:  Why don't you at least identify the

21   exhibits you're offering.  And we'll see where we go.

22         MR. WYNNE:  We've offered exhibits 719, 720, 721, 722,

23   723, 724, 725, 726, 727, 728, 729 --

24         THE COURT:  Hang on just a second -- okay.

25         MR. WYNNE:  730.  Then 887, 889, 890, 951, 952 and

1    953, which I think there may be no objection as long as we're

2    offering them for a limited purpose, but the JSNs counsel will

3    have to speak to that, because I just heard that there might be

4    objections.

5         And we're also offering exhibits 892 and 893, which

6    are effectively compilations of the appellate record from the

7    FGIC 9019 trial.

8         We do believe, Your Honor, that collateral estoppel

9    should apply to your prior ruling, that we put in effectively

10   was admitted in the FGIC trial in those two exhibits.

11        THE COURT:  All right.  Let's deal with the first

12   thing.  Are there objections to the direct testimony of Mr.

13   Dubel, offered in two declaration, the first is 5697 -- any

14   objections to that?

15        MR. PERRY:  Dan Perry from Milbank Tweed, Your Honor.

16   I want to reserve on that.  I think the answer is no, but given

17   some of the objections on mediation confidentiality, there is

18   at least portions of his declaration that touch on that

19   subject.  And so if I'm not going to be allowed to inquire

20   about paragraphs in his declaration, we'd move to strike.  But

21   subject to that qualification there is no objection.

22        THE COURT:  And what about with respect to the

23   declaration which is 5692 on ECF?

24        MR. PERRY:  With the same reservation, Your Honor, no

25   objection.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

100

1       THE COURT:  And tell me what your position is with

2    respect to the exhibits that Mr. Wynne has identified.

3       MR. PERRY:  We have no objection subject to the

4    qualification on independent legal significance.  We don't --

5       THE COURT:  You're going to have to spell that out for

6    me.  I don't know what these exhibits are.  So --

7       MR. PERRY:  Certain of the exhibits, as we understand

8    it, are hearsay exhibits that are being offered subject to an

9    understanding that they're coming in only for their legal

10   significance being transmitted or filed.

11      THE COURT:  Is that correct, Mr. Wynne?

12      MR. WYNNE:  That's correct, Your Honor.

13      THE COURT:  With that limitation, you don't have any

14   objection, I take it?

15      MR. PERRY:  Correct, Your Honor.

16      MR. WYNNE:  Your Honor, I believe that there are

17   objections to a few exhibits, Exhibit 750, 751, 752 --

18      THE COURT:  Hold on, hold on.

19      MR. WYNNE:  Oh, sorry.

20      THE COURT:  I wrote down every exhibit you identified

21   and now these were not among them.

22      MR. WYNNE:  Yes.  Your Honor, I had two lists, one was

23   the list that we thought there were no objections, which we

24   covered --

25      THE COURT:  Well, let's deal with this list first.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1         So in light of what Mr. Perry said, Exhibit 719, 720,

2  721, 722, 723, 724, 725, 726, 727, 728, 729, 730, 887, 889,

3  890, 951, 952, 953, 892 and 893 are admitted into evidence, as

4  to those appropriate with respect to independent legal

5  significance, not necessarily for the truth of the matters

6  asserted.

7  (Exhibits regarding Mr. Dubel's testimony were hereby received

8  into evidence as Plan Proponents' Exhibits 719, 720, 721, 722,

9  723, 724, 725, 726, 727, 728, 729, 730, 887, 889, 890, 951,

10  952, 953, 892 and 893, as of this date.)

11         THE COURT:  So what are the additional exhibits?

12         MR. WYNNE:  Exhibit 750.

13         THE COURT:  Just give me the numbers, and then

14  we'll --

15         MR. WYNNE:  750, 751, 752, 753 and 754.

16         THE COURT:  Mr. Perry?

17         MR. PERRY:  We're not going to press any of the

18  objections.

19         THE COURT:  I'm sorry?  You're not pressing the

20  objections?  Okay.

21         MR. PERRY:  Correct, Your Honor.

22         THE COURT:  All right.  So anybody else have any

23  objections?

24         All right.  So Exhibit 750, 751, 752, 753 and 754 are

25  also admitted in evidence.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    (Exhibits regarding Mr. Dubel's testimony were hereby received

2    into evidence as Plan Proponents' Exhibits 750, 751, 752, 753

3    and 754, as of this date.)

4            MR. PERRY:  Thank you, Your Honor.

5            THE COURT:  So we have -- I'll permit Mr. Perry to

6    reserve with respect to specific paragraphs of Mr. Dubel's

7    declarations.  We'll see, let's make sure before he finishes

8    the witness that his testimony is in, out, whatever.

9            MR. O'NEILL:  I have some more exhibits.

10           THE COURT:  Okay.

11           MR. O'NEILL:  They are 810, 814, 820, 822, 835, 845,

12   852, 853 --

13           THE COURT:  Hold on, slow down.

14           MR. O'NEILL:  Sorry.

15           THE COURT:  Okay, go ahead.

16           MR. O'NEILL:  853, 855 and 857.

17           Of those, all are admitted for a limited purpose,

18   except for 835 and 857, which are admitted for all purposes.

19           THE COURT:  Mr. Perry?

20           MR. PERRY:  No objection, Your Honor.

21           THE COURT:  All right.  Exhibits 810, 814, 820, 822,

22   845, 852, 853 and 855 are admitted for a limited purpose, and

23   835 and 857 are admitted for all purposes.

24   (Exhibits regarding Mr. Dubel's testimony were hereby received

25   into evidence as Plan Proponents' Exhibits 810, 814, 820, 822,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

103

1   845, 852, 853, 855, 835 and 857, as of this date.)

2          THE COURT:  Does that deal with all the exhibits?

3          MR. O'NEILL:  Yes, Your Honor.

4          THE COURT:  All right.  Mr. Perry you're going to

5   cross-examine.  And I need the witness statement.  Here we go.

6   I've got --

7          Yes, the you should be sworn.  Thank you, Mr. Dubel.

8       (Witness sworn)

9          THE COURT:  All right.  Just give me one other second,

10  Mr. Perry.  I just want to move some more things out of the

11  way.

12         All right, maybe you've got -- yeah, let's get his

13  cross-examination material in front of him.

14      (Pause)

15         THE COURT:  Anytime you're ready, Mr. Perry, is fine.

16  If you're still moving documents around, that's okay.

17         MR. PERRY:  We're still distributing documents.

18         THE COURT:  That's okay.  I'll wait.

19         Mr. Perry?

20  CROSS-EXAMINATION

21  BY MR. PERRY:

22  Q.   Good morning, Mr. Dubel.

23  A.   Good morning.

24  Q.   I'm an attorney for the junior secured noteholders.  We've

25  never met, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

104

1  A.  I don't believe we have, no.

2  Q.  And you've been deposed roughly twenty or thirty times,

3  correct?

4  A.  Not in this case, but in my career.

5  Q.  And roughly how many times in your career have you given

6  in-court testimony?

7  A.  Maybe ten times or so.  I don't recall exactly.

8  Q.  You work for Dubel & Associates, right?

9  A.  That's correct.

10  Q.  And Dubel & Associates provides services to FGIC, correct?

11  A.  That's correct.

12  Q.  They provide the temporary services of John Dubel, that's

13  you, as CEO of FGIC, correct?

14  A.  CEO and chairman of the board.

15  Q.  Okay.  And you've been providing services to FGIC in

16  various capacities since January of 2008, correct?

17  A.  That's correct.

18  Q.  And you became CEO of FGIC in December of 2008, correct?

19  A.  That's correct.

20  Q.  And you have responsibility for overseeing all the

21  operations of FGIC, correct?

22  A.  That is correct.

23  Q.  And with respect to the ResCap bankruptcy, you served as

24  FGIC's representative on the official committee of unsecured

25  creditors, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

105

1  A.   That is correct.

2  Q.   And you have the title of co-chair of the committee,

3  correct?

4  A.   Co-chair of the official unsecured creditors' committee,

5  yes.

6  Q.   Now, at some point in time certain of the constituencies

7  in this case agreed to a term sheet for a pre-petition plan

8  support agreement, correct?

9       THE COURT:  Well, it wasn't during the case, it may

10  have been before the case.

11  Q.   With that qualification, prior to the case, certain

12  parties agreed to a pre-petition plan support agreement term

13  sheet, correct?

14  A.   That is what I understand.

15  Q.   Okay.  FGIC was not a party to that pre-petition

16  agreement, right?

17  A.   It was not.

18  Q.   And at the outset of these cases, the committee did not

19  support the pre-petition plan support agreement, correct?

20  A.   Well, at the outset of the cases, the committee didn't

21  have a position, because it needed to understand it and get a

22  better understanding of what the whole pre-petition plan

23  support agreement meant.  And so we didn't have is a position

24  at the outset.

25  Q.   You didn't support, you didn't oppose, you didn't have a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  position at the outset; that's your testimony, right?

2  A.   We asked our advisors to review it and report back to us

3  on various issues so we could take a position.  But at the

4  outset we had no position until we had the opportunity to

5  review the plan support agreement.

6  Q.   Why don't you take a look at DX-BDD in your binder?

7  A.   I'm sorry, B, D as in David, D as in David?

8  Q.   Yes.

9        THE COURT:  You better tell me again.

10       MR. PERRY:  BX, D as in Dan, D as in Dan.

11  Q.   And if you could flip to the second page, this, just for

12  the record this is an e-mail from Mr. Renzi -- you understand

13  Mr. Renzi is someone employed by the FTI firm, correct?

14  A.   I do understand that.

15  Q.   And the FTI firm provides financial advisory services to

16  the debtors, correct?

17  A.   That's my understanding, yes.

18  Q.   And if you flip to the second page, this is a letter on

19  the Aurelius firm's letterhead.  You understand that the

20  Aurelius firm is one of the junior secured noteholders, sir?

21  A.   I understand that to be the case.

22       THE COURT:  You know, maybe I'm not understanding you

23  clearly which exhibit, because I'm not finding it.  Tell me one

24  more time, okay?

25       MR. PERRY:  DX-BDD, Boy, David, David.  It should be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

107

1  the third exhibit in your binder, Your Honor.  And it's a

2  covering e-mail.  May I approach?

3         THE COURT:  BDB?  Is this it?  Okay. Thank you very

4  much.  I have BDD in front of me now.  Thank you for your help,

5  Mr. Perry.

6  Q.   We were focused on the letter from Aurelius to the ad hoc

7  group which is the second page of DX-BDD.

8       My question to you, sir, is have you ever seen that letter

9  before?

10  A.   I heard reference to in the earlier testimony, I think, of

11  Mr. Marano, but I've never seen this -- never seen this letter

12  before.

13  Q.   Okay.  Now in July of 2012, the debtors filed schedules of

14  assets and liabilities on behalf of the individual debtors,

15  correct?

16  A.   I'm sorry, what date was that?

17  Q.   I said in July of 2012 -- in June or July of 2012, the

18  debtors filed schedules of assets and liabilities on behalf of

19  the individual debtors in the ResCap bankruptcy, correct.

20  A.   It's my understanding they were done at the very end of

21  June of 2012.

22  Q.   And why don't you take a look at DX-AUT --

23  A.   Okay, you have to help me --

24  Q.   -- which should be the next exhibit --

25  A.   Oh, got it.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   -- in your binder after the Aurelius letter we were just

2  looking at.

3  A.   Thank you.

4  Q.   And I'm specifically interested in the text on page 5.

5  It's a paragraph labeled "intercompany transactions".

6       My question, sir, is did the committee focus on the

7  debtors' treatment of intercompany claims in their schedules of

8  assets and liabilities in or around the time those schedules

9  were filed?

10 A.   I'm sorry, are you asking me to read that paragraph or

11 just --

12 Q.   I'm just asking you -- so my question is -- take the

13 paragraph out -- did the committee focus on the treatment of

14 intercompany claims in the schedules of assets and liabilities

15 in or around June or July of 2012 when they were filed?

16 A.   I don't believe it was in or around June or July.  The

17 committee had a tremendous amount of work in front of it,

18 including dealing with the sales of the major assets of the

19 company and reviewing DIP motions and the likes of such.  But

20 sometime in the fall or late summer, the committee would have

21 focused on the various different claims that were being

22 asserted against the debtors by all the various parties,

23 including what might have been included in the document here.

24 Q.   Sure.  Why don't you take a look at DX-AYQ.  And I'm

25 specifically interested in the second page.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

109

1          Mr. Eckstein is your lawyer from Kramer Levin, correct, or

2     the committee's lawyer from Kramer Levin, correct?

3     A.    That's correct.

4     Q.    Okay.  And he's writing in this e-mail to Mr. Lee -- you

5     understand Mr. Lee to be the lawyer for the debtors, correct?

6     A.    I do, yes.

7     Q.    And about halfway down, let me just read, Mr. Eckstein

8     writes to Mr. Lee, "The plan annexed to the exclusivity motion

9     appears to separately classify intercompany claims and says

10    they will be allowed as general unsecured claims in the case.

11    This is at odds with the company's position" --

12              THE COURT:  It says "that is at odds".

13              MR. PERRY:  What's that?

14              THE COURT:  You just misread it.  It's "that is at

15    odds".

16              MR. PERRY:   That is -- thank you, Your Honor.

17    Q.    -- "that is at odds with the company's position that

18    intercompany claims were not being recognized and would not be

19    allowed.  You and our waterfall analysis" --

20         THE COURT:  It's "your and our waterfall analysis".

21    Q.    -- "your and our waterfall analysis reflects this

22    assumption.  This is potentially a major issue."

23         Is it fair to say that by early September 2012, the

24    committee had identified the treatment of intercompany claims

25    as potentially a major issue in the ResCap case?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

110

1    A.    One of the many issues that the committee was looking at

2    was all of the various claims, including intercompany claims.

3    Q.    And part of the reason that the committee was looking into

4    intercompany claims was because there was a recognition on the

5    part of the committee that if the JSNs had a lien on

6    intercompany claims, it could render the JSNs oversecured,

7    right?

8            MR. O'NEILL:  Objection, Your Honor.

9            THE COURT:  Overruled.  If that's your recollection.

10   A.    I'm sorry, could you repeat the question?

11   Q.    Isn't it the case, sir, that there was a recognition on

12   the part of the committee that if the JSNs had a lien on the

13   intercompany claims, those claims could render the JSNs --

14   recognition of those claims could render the JSNs over secured?

15   A.    Well, I think at that point in time, what we were trying

16   to focus on is all of the various different claims that could

17   be presented to the estates which would have an impact on

18   trying to negotiate a global plan of reorganization, because by

19   that point in time it was clear that there was not a lot of

20   support for the plan that was being proposed.

21       So we needed to understand the impact of intercompany

22   balances as it interrelated with all of the other various

23   claims that were being presented against the estates.

24   Q.    And part of the reason that the committee needed to

25   understand the interrelation of the intercompany claims was a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

111

1   recognition on the committee's part that if the intercompany

2   claims were recognized and the JSNs had a lien on intercompany

3   claims, it could render them oversecured, right?

4   A.   At this time I don't recall that to be something that we

5   were focused on.  We were focused on trying to understand all

6   of the issues around these intercompany balances and other

7   claims that were being presented.

8   Q.   Okay.  And -- but there did come a time where the

9   committee focused on the possibility that if the JSNs had a

10  lien on intercompany claims, a recognition of the claims could

11  render them oversecured, right?

12  A.   I think there came a time when as we were reviewing the

13  security agreements, because there was a time frame in which we

14  had to -- the committee had to raise objections to the security

15  agreements, the collateral and the likes, that counsel did

16  start to look at the issues of intercompany liens or

17  intercompany balances and whether there were liens or not.

18  Q.   And going into -- you understand there was a mediation

19  with Judge Peck that started in late December of 2012, correct?

20  A.   That's correct.

21  Q.   And isn't it true, sir, that going into that mediation,

22  the committee had at least recognized the possibility that if

23  the JSNs had a lien on intercompany claims, the recognition of

24  those claims could render the JSNs oversecured?

25  A.   No, that was not our understanding.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Let's take a look at DX-ANH.

2            MR. KERR:  Your Honor --

3            THE COURT:  Mr. Kerr?

4            MR. KERR:  I have an objection to the use of this

5   exhibit.  This exhibit is 408 material.

6            THE COURT:  You're going to have to go over to the

7   microphone.  I'm sorry.  I just want to make sure we have a

8   clear record.

9            MR. KERR:  Your Honor, Charles Kerr from Morrison &

10   Foerster.  We have an objection to the use of this exhibit,

11   even though it's not in evidence, it's 408 material --

12            THE COURT:  It's what?

13            MR. KERR:  It's material prepared for purposes of

14   settlement under Federal Rules of Evidence 408. The cover's an

15   e-mail, I believe from Mr. Renzi, but attached to it was a

16   document that was prepared for settlement purposes.

17            THE COURT:  Mr. Perry, you want to respond to that?

18            MR. PERRY:  Sure.  Two things, Your Honor.  First, Mr.

19   Lee referenced this exhibit in his opening.  I believe he

20   referred to it as one of the preliminary documents that was

21   prepared.  So that's one.

22            THE COURT:  Do you have a transcript to show me, to

23   read to me where he did that.

24            MR. PERRY:  I can certainly take it out.  I don't have

25   it.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

113

1          THE COURT:  You're going to have to find it.

2     Otherwise I'm not going to let you use it.  It clearly says for

3     settlement discussion purposes only.

4          MR. PERRY:  Let me -- just a second, Your Honor.  The

5     second point.

6          THE COURT:  Yes.

7          MR. PERRY:  We have, I believe, preserved an

8     objection -- 408 applies to settlement discussions between

9     potential claimants, and this is a discussion about the

10    intercompany claims.  The settlement of those claims are

11    literally interdebtor, intercompany claimant to intercompany

12    claimant.

13         This is not discussing a settlement with the

14    committee, it's literally discussing a settlement between one

15    of Morrison & Foerster's clients another of Morrison &

16    Foerster's clients.

17         So we would take the position that 408 does not apply

18    to a communication with the committee about a potential

19    resolution of interdebtor claims.

20         THE COURT:  Mr. Kerr?

21         MR. KERR:  If I may, Your Honor.  Charles Kerr.  The

22    exhibit that Mr. Perry showed the witness just previously to

23    this includes within -- that's Exhibit DX-AYQ -- there is an e-

24    mail on the second page of that exhibit from Mr. Eckstein to

25    Mr. Lee, which I think Mr. Perry read, about Mr. Eckstein

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   raising a question about the treatment of intercompany balances

2   in light of the fact that there had been an exclusivity motion,

3   I think, prepared and filed in August, several weeks before.

4   And attached to that, I believe, and I understand, there was a

5   copy of a proposed plan.

6          And this communication, which is DX-ANH, was in

7   connection with trying to resolve those issues with the

8   committee.

9          So Mr. Perry is incorrect in my -- I suggest Mr. Perry

10  is incorrect.  This was being part of the settlement

11  discussions with the committee over a potential plan at that

12  point in time.  We were passing information back on that basis.

13         THE COURT:  Okay.  Do you have a reference to the

14  opening statement, Mr. Perry?  Because I sure don't remember

15  it.

16         MR. PERRY:  So it -- I'm being told -- we're doing

17  this on the fly --

18         THE COURT:  Well, we have a transcript.  So it's not

19  on the fly.  I'm not asking the impossible here.

20         MR. PERRY:  Okay.  So it's page 84 --

21         THE COURT:  Half your crew has computers -- go ahead.

22         MR. PERRY:  Page 84 of the rough draft that was

23  circulated by the reporting agency last night, Mr. Lee

24  commented, "Your Honor, there was a very preliminary draft

25  analysis that was put together prior to the bankruptcy petition

**RESIDENTIAL CAPITAL, LLC, ET AL.**

115

1    in which we were meandering through the intercompany balances."

2              And he goes on.  That's a reference to this document.

3              THE COURT:  I don't know whether it was or not.

4    Objection sustained.

5    BY MR. PERRY:

6    Q.    Mr. Dubel, the committee retained AlixPartners as one of

7    its financial advisors, correct?

8    A.    That's correct.

9    Q.    And one of the tasks of the AlixPartners firm was to audit

10   and review the intercompany claims, correct?

11   A.    No, that's not correct.

12   Q.    One of the tasks of the AlixPartners firm was to review

13   the debtors' intercompany claims, correct?

14   A.    AlixPartners was working under the direction of the

15   committee counsel to assist the committee counsel in its review

16   of a myriad of different claims.  I believe that reviewing the

17   intercompany balances was one of the things that the committee

18   counsel had directed and asked them to assist counsel on.

19   Q.    And AlixPartners commenced that review as early as

20   September of 2012, correct?

21   A.    I don't remember the exact time frame.

22   Q.    Okay.  Well, if -- let me just ask the question.

23              MR. PERRY:  I wasn't clear, Your Honor, whether the

24   full Exhibit DX-ANH, whether the objection was sustained.

25              THE COURT:  Sustained.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

116

1           MR. PERRY;  Okay.

2   Q.   AS to the --

3           THE COURT:  I'll deal with questions one at a time.

4   You want to ask another question?

5   Q.   So directing your attention back to DX-ANH I just want to

6   ask you about --

7           THE COURT:  No, you're not going to do that.  I've

8   sustained the objection with regard to ANH.  You may not refer

9   to ANH.  It was for settlement purposes.  The objection is

10  sustained.

11  Q.   Why don't you look at DX-BDB?

12  A.   B as in boy, D as in David, B as in boy?

13  Q.   D as as in Dan, B as in Boy, D as in David.

14  A.   DBD, okay sorry.

15       I'm sorry, could you repeat that again.  I don't see a

16  DBD.

17  Q.   It should be the next exhibit --

18           THE COURT:  B as in boy, D as in David, B as in Boy?

19           MR. PERRY:  Yeah.

20           THE COURT:  BDB?

21           THE WITNESS:  Okay, I'm sorry, I thought he said the

22  opposite.

23           THE COURT:  Yeah, I'm having trouble too, but I think,

24  BDB?  The next one?

25           MR. PERRY:  Yes, BDB.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

117

1        THE COURT:  Got it.  Mr. Dubel, you've got it.

2        THE WITNESS:  I'm all set.

3        THE COURT:  I've got it.  Go ahead.

4        THE WITNESS:  Thank you.

5        MR. KERR:  Your Honor.

6        THE COURT:  Mr. Kerr?

7        MR. KERR:  Again, there is at least a portion of this

8   document, starting I think on the --

9        THE COURT:  You're going to have to go to the

10  microphone.

11        MR. KERR:  I apologize, Your Honor.

12        THE COURT:  This isn't just privileged, this is highly

13  privileged and confidential.

14        MR. KERR:  And it's really important.

15        Your Honor, again, attached to Exhibit DX-BDB, there

16  is a document, it looks like slides, that are marked subject to

17  408, and I'd make the same objection.  And I believe the entire

18  attachment is marked subject to 408.  And I think it's the

19  same --

20        THE COURT:  Lots of stuff gets marked.  But --

21        MR. KERR:  But this, Your Honor, this again, I

22  believe, is part of those discussions.

23        THE COURT:  Well, here is what you're going to have to

24  do.  If you want to take the witness on voir dire to establish

25  those facts that this was part of a settlement discussion, I'm

**RESIDENTIAL CAPITAL, LLC, ET AL.**

118

1    going to permit to you do that.  I want to make sure I have a

2    sufficient evidentiary record on which to sustain or overrule

3    the objection.

4         Do you wish to take the witness -- first of all, has

5    he seen it before?

6         Have you seen this exhibit before, Mr. Dubel?

7         THE WITNESS:  No, Your Honor.

8         THE COURT:  Okay.  All right.  Represent to the

9    Court -- since he hasn't seen it, he can't lay a foundation for

10   it, Mr. Perry.

11        Okay.  So the objection is sustained.  I'm not going

12   to permit this witness to be examined on a document that has

13   not -- where no foundation has been laid.

14        The legend beginning on the second --

15        MR. KERR:  I think it's Bates number --

16        THE COURT:  It's got a long Bates number.  577 are the

17   last digits of the Bates stamp, I think.

18        I'm going to sustain the objection for now.  If there

19   is a witness that can authenticate it and establishes whether

20   there's privilege or not, I'm just not going to permit this

21   witness who has never seen the document to be examined with a

22   witness that at least on the face of it appears to relate to

23   the same subject matter as the prior exhibit and is legended --

24   clearly legend subject to FRE 408 with highly privileged and

25   confidential.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

119

1          MR. KERR:  Your Honor, and that's fine.  I just want

2     to be -- just to be very clear for Your Honor, I was raising

3     the 408 issue, not the privilege issue.  But I take that and I

4     will --

5          THE COURT:  Yes, 408.  It was exchanged between --

6          MR. KERR:  Correct, Your Honor.

7          THE COURT:  -- between parties.  And your

8     representation was it was for settlement purposes.

9          MR. KERR:  But I will confirm that, Your Honor.  If it

10    comes up again and if that's the case, I will object at that

11    time.  If not, I'll let it go.

12         THE COURT:  Okay.  All right.

13         MR. KERR:  Thank you.

14         THE COURT:  Confer with Mr. Perry and make sure -- he

15    may disagree, but at least he knows what your position is on

16    it.

17         So for now I'm sustaining the objection to the use of

18    Exhibit D as in David -- no, excuse me -- B as in boy, D as in

19    David, B as in boy.

20    BY MR. PERRY:

21    Q.   As of November of 2012, there was no formal mediation

22    process that the committee was engaged in, correct?

23    A.   That's correct.

24    Q.   And the committee's professionals at Moelis would from

25    time to time run sensitivity scenarios based on various

**RESIDENTIAL CAPITAL, LLC, ET AL.**

120

1   potential outcomes in the case that calibrated the unsecureds'

2   recovery, correct?

3   A.   At the direction of the committee, we asked committee

4   counsel to work with Moelis and AlixPartners to develop the

5   various different analyses.  So Moelis might have present --

6   would have presented various information along with committee

7   counsel.

8   Q.   And at least focusing on the Moelis analysis, one of the

9   sensitivities that they ran prior to the commencement of the

10  mediation was whether the intercompany balances were recognized

11  or not, correct?

12  A.   Committee counsel and its advisors presented a tremendous

13  amount of information to the committee.  I don't recall the

14  specifics of each individual presentation at this time.  We

15  were meeting with counsel weekly on a variety of different

16  issues.

17  Q.   Okay.  I understand you don't recall the specifics.  My

18  question relates precisely to the issue of intercompanies and

19  whether the committee was presented with a sensitivity analysis

20  of the intercompany claims issue prior to the commencement of

21  the mediation.

22  A.   Intercompany sensitivity, is that what you're asking me?

23  Q.   A sensitivity that compared the committee's recoveries

24  either with the intercompany balances recognized and not

25  recognized?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

121

1   A.   I don't recall if there was one presented or not.  I just

2   don't recall as I sit here right now.

3        (Pause)

4   Q.   Well, why don't you go to page -- do you have your direct

5   examination?  Up there was a --

6   A.   I do not -- don't know if it's in this binder or not.

7   Q.   I think we did put it in --

8        THE COURT:  It is.  There is a tab 5692, direct

9   testimony.

10       MR. PERRY:  There is actually two tabs, Your Honor.

11   I'm going to refer to 5697.

12       THE COURT:  Okay, it's in there too.

13   A.   5692?

14   Q.   97.

15       THE COURT:  No, 97.  It's the second of your --

16       THE WITNESS:  Yes, thank you.  I see it.

17       THE COURT:  Okay.

18   Q.   And if you could go to page 14 of your direct?

19       Let's go back; why don't we start with page 12 and

20   paragraph 28.

21       It's fair to say, is it not, sir, that in the fall of 2012

22   the committee began to focus in earnest on strategies that

23   might avoid prolonged conflict and destructive litigation,

24   correct?

25   A.   That's correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

122

1    Q.    And one of the things the committee did was analyze

2    creditor claims, correct?

3    A.    One of the many things, yes.

4    Q.    And paragraph 31 identifies the various types of creditor

5    claims that the committee considered, correct?

6    A.    Yeah, that's correct.

7    Q.    And one of the types of creditor claims that the committee

8    considered were the intercompany balances, correct?

9    A.    Well, I would classify them as intercompany balances, not

10    necessarily creditor claims.

11    Q.    Okay.  Well, you'd agree with me that you include the

12    bullet labeled intercompany balances in paragraph 31, which

13    starts with the text "The committee's consideration of creditor

14    claims included the following, among others," that's what your

15    declaration says, correct?

16    A.    That's correct.

17    Q.    And the review of intercompany balances was something that

18    was commenced in the fall of 2012, right?

19    A.    In the fall of 2012 or possibly a little bit earlier, in

20    the late summer.  I don't recall exactly when it commenced.

21    Q.    And at least with respect to intercompany balances, the

22    committee considered whether they were enforceable,

23    subordinated, subject to set-off, or subject to

24    recharacterization, correct?

25    A.    That's correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

123

1   Q.   And if you go down to paragraph 32, there's -- the third

2   sentence reads: "Furthermore, late in 2012, committee members

3   began to hold discussions among themselves concerning these

4   matters."

5        Do you see that?

6   A.   I do.

7   Q.   And it's true, is it not, that late in 2012, committee

8   members began to hold discussions among themselves about the

9   intercompany balances, correct?

10  A.   That sentence is referring to all of the various different

11  items that were laid out in paragraph 31.  We would have had

12  discussions at committee meetings concerning all of the various

13  different claims, including reports from counsel on their

14  review of the intercompany balances.

15  Q.   And that analysis occurred in late 2012, correct?

16  A.   Well, the analysis commenced when we asked the committee

17  advisors to start the review of all of these various different

18  claims, which would have been for a lot of these claims we

19  started looking at them in the summer and would have gone

20  through the latter part of 2012 and continued on through 2013,

21  midpoint in 2013.

22  Q.   Sure.  But at least by the time of the commencement of the

23  mediation before Judge Peck, the committee had commenced its

24  evaluation of the intercompany balances, correct?

25  A.   That's correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    And by the time that the mediation before Judge Peck was

2    commenced, the committee understood, did it not, that treating

3    intercompany claims as enforceable had the potential to render

4    the JSNs oversecured?

5    A.    No, I don't believe that's correct.

6    Q.    Once you accounted -- the committee accounted for an

7    influx of funds from a prospective Ally settlement agreement,

8    the committee recognized the possibility, prior to mediating

9    with Judge Peck, that there was the potential that the

10   intercompany claims, to the extent they were enforceable, would

11   render the JSNs oversecured, isn't that right?

12   A.    I don't believe that's correct.

13   Q.    Now you had two roles in the mediation, right?

14           THE COURT:   You want to spell it out?

15   Q.    One was as a member of the creditors' committee and the

16   other was as FGIC's representative in the mediation sessions,

17   right?

18   A.    That's correct, yes.

19   Q.    And there were a hundred or so people involved in the

20   mediation process by your observation, right?

21   A.    Yes, there were a hundred and -- I want to say 150 round

22   number -- 150 people involved in the mediation process.

23   Q.    And by your observation, there were ten to fifteen major

24   creditor groups involved, right?

25   A.    I believe that's correct, yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

125

1  Q.    And from your perspective all of the major creditor

2  constituencies participated in the mediation, right?

3  A.    Yes, that's correct.

4  Q.    Ally participated in the mediation, right?

5  A.    Ally Financial, yes.

6  Q.    The debtors participated in the mediation, right?

7  A.    Yes, they did.

8  Q.    The monolines participate understand the mediation,

9  correct?

10  A.    Two of the monolines, FGIC and MBIA who held the most

11  significant claims.

12  Q.    Okay.  And MBIA had actually commenced litigation against

13  certain of the debtors, right?

14       THE COURT:  Pre-petition you're talking about?

15       MR. PERRY:  Pre-petition.

16  A.    Yes, I believe that's correct.

17  Q.    And do you know which debtors MBIA had sued?

18  A.    I've never seen their lawsuits.  I know they were going on

19  for four years or so.

20  Q.    Do you know one way or another whether they had sued

21  ResCap as opposed to RFC or GMACM?

22  A.    I believe they were suing multiple debtors, including

23  ResCap, but I don't recall -- you know, I don't know the

24  lawsuit.

25  Q.    Now the borrower claimants, certain of the borrower

**RESIDENTIAL CAPITAL, LLC, ET AL.**

126

1    claimants participated in the mediation, right?

2    A.    Yes, representatives of the borrowers' claimants, yes.

3    Q.    And the private securitization claimants participated in

4    the mediation, right?

5    A.    Several of them directly and their counsel.

6    Q.    Okay.  The New Jersey Carpenters Union participated in the

7    mediation, right?

8    A.    I believe it was counsel.  I'm not sure if there was

9    actual representatives, but counsel who had authority to act on

10   their behalf, from what was represented to us.

11   Q.    And the senior unsecured noteholders participated in the

12   mediation, correct?

13   A.    Certain holders of the senior unsecured notes, plus the

14   trustee for the senior unsecured notes participated, yes.

15   Q.    And the junior secured noteholders participated in the

16   mediation, correct?

17   A.    As I understand, certain representatives of the -- of

18   various junior secured noteholders did participate in the

19   mediation sessions.

20   Q.    That would include representatives on behalf of Berkshire

21   Hathaway, right?

22   A.    I believe it was just one representative on behalf of

23   Berkshire Hathaway.

24   Q.    And representatives on behalf of the ad hoc group of

25   junior secured noteholders, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.    That's correct.

2   Q.    And with respect to those representatives, they were

3   involved in many of the global sessions that you participated

4   in, correct?

5   A.    That's correct.

6   Q.    And you don't recall any point in time in which the JSNs'

7   representatives were excluded from the mediation, process,

8   correct?

9   A.    I don't recall any time that they were excluded.

10  Q.    And from your perspective as co-chair of the committee,

11  they attended and participated in the mediation process,

12  correct?

13  A.    Representatives of them; not actual principals.

14  Q.    And when you say representatives, that's folks from

15  Milbank Tweed, right?

16  A.    That's correct.

17  Q.    Folks from White & Case, right?

18  A.    That's correct.

19  Q.    Folks from the Houlihan Lokey firm, correct?

20  A.    That's correct.

21  Q.    And with respect to the representative from Berkshire, you

22  understood that he had settlement authority at the mediation,

23  is that right?

24  A.    I had no understanding of what authority he may or may not

25  have had.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Okay.   Now you understand that in this proceeding the JSNs

2   contend that they have liens on certain inter-company balances

3   among the debtors, correct?

4   A.   When you say "this proceeding", are you talking about the

5   ResCap bankruptcy proceeding?

6   Q.   The ResCap bankruptcy proceeding, the plan confirmation

7   proceeding, and phase 2 trial that we're all here on?

8   A.   I understand that they have alleged liens on intercompany

9   balances.

10   Q.   And with respect to -- you also understand that the JSNs

11   contend that they have liens on breach of contract claims that

12   the debtors might have against Ally, right?

13   A.   I understand that they have alleged they have liens on

14   those issues.

15   Q.   And your testimony -- well, and it's true that you've

16   never had discussions with any representatives from the JSNs

17   about the extent and nature of their liens outside the context

18   of a mediation, correct?

19   A.   I don't believe I've had any conversations with any

20   representatives of the JSNs outside of the mediation sessions.

21   Q.   Why don't you go to DX-AZW?   A as in Allen, Z as in Zorro,

22   W as in Wendy.

23   A.   Yes, I see it.

24   Q.   Mr. Eckstein was authorized on behalf of the committee to

25   negotiate confidentiality agreements with participants in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

129

1  mediation, correct?

2  A.   Well, the committee wanted to have as many principals

3  sitting at the mediation table as possible.  We had a

4  tremendous number of principals:  principals from MBIA,

5  principals from FGIC, AIG, Allstate.  We had actual principals

6  from hedge funds such as Paulson sitting at the table.  And we

7  wanted to have principals negotiating this so that all the

8  parties could get together and come to an agreement.  So we

9  sought to have as many participants as possible at the

10  principal level participate.

11  Q.   Sure.  And you understand that Mr. Groper is somebody

12  associated with the Aurelius fund, correct?

13  A.   I do.

14  Q.   And he is one of the principals that you as co-chair of

15  the committee wanted to have at the mediation, correct?

16  A.   One of the principals, one of many principals we would

17  have loved to have had.

18  Q.   And you would agree with me that this appears to be an

19  e-mail at least where Mr. Eckstein is responding to Mr. Groper

20  in connection with a request concerning Aurelius' participation

21  in the mediation, correct?

22  A.   Well, I believe this is the same document that was given

23  to me -- was this the same document that was given to me at my

24  deposition?

25  Q.   Yes, I believe so.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   I have not seen this document before.  I don't -- I'm not

2   sure this was a document that was given to me at my deposition,

3   but if it was, I testified I had not seen this document before.

4   Q.   Okay.  Well, just referring your attention to the third

5   page of the document, there is an order in aid of settlement

6   discussions entered in the Vitro case.

7        You understand that -- is it your understanding that

8   members of the JSN group were seeking an order that would allow

9   them to participate in the mediation as early as December 20th,

10  2012?

11  A.   I don't recall the date.  I do know that after the

12  mediation order was entered, I think it was December 26th of

13  2012, there were any number of parties who were willing to

14  abide by the mediation order.  It's my understanding that

15  Aurelius chose not to abide by the mediation order and was

16  seeking to have a modification of it.

17  Q.   And ultimately the committee agreed to a modification of

18  the mediation order to permit the Aurelius firm, among others,

19  to participate, right?

20  A.   We did.

21  Q.   And you don't know why that modification didn't occur in

22  late December or early January of 2013, correct?

23  A.   Well, as I just stated, I believe that the mediation order

24  was entered in December, on December 26th of 2012.  So it

25  really probably would have been in January that we would have

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    had, you know, the initial discussions that I recall about, you

2    know, enabling other parties to participate, but not have to

3    abide by the mediation order.  Because most of the other

4    parties, almost all the other parties were willing to abide by

5    the mediation order.

6    Q.   Why don't you take a look at DX-AZY.  This is an e-mail

7    from Mr. -- e-mail chain from Mr. Groper to Mr. Eckstein

8    beginning on January 8, 2013.  He sends follow-ups on January

9    11th and January 15th.

10       My question to you, sir, is are you aware of any response

11   from Mr. Eckstein to Mr. Groper's e-mails set forth at DX-AZY?

12   A.   I have never seen this e-mail before.

13           THE COURT:  Mr. Perry, my patience is running out.

14           MR. PERRY:  I'll move on then, Your Honor.

15           THE COURT:  I didn't do this as a timed trial, but I

16   may.

17   Q.   Now in terms of -- you understand that the debtors had

18   asserted as part of --

19           MR. PERRY:  Strike that.

20   Q.   You understand that the debtors have potential claims

21   against Ally in this bankruptcy case, correct?

22   A.   Yes, the debtors have claims -- the estate, I should say,

23   has claims against Ally that have all been, you know, settled

24   as part of the global resolution.

25   Q.   And focusing on the claims that the debtors have against

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Ally, going into the mediation, the committee attempted to

2  understand the value of those various claims, correct?

3  A.    Well, prior to any thought of even a mediation, really in

4  the early summer, probably late May time frame, shortly after

5  the committee was formed, while there was a lot of things that

6  the committee had on its plate, including looking at the sale

7  process and the likes and such, the committee recognized that

8  because the debtor had entered into a plan support agreement in

9  which they were releasing all of those claims and all of the

10  nonconsensual third-party releases, that the committee felt it

11  was appropriate to have counsel commence an investigation of

12  the various different claims that the estate might have against

13  Ally.  And that commenced in the summer, including with a

14  request for 2004 examinations.

15  Q.    And the committee did that so that it could work through

16  the mediation process and come up with a fair allocation of all

17  the funds and value that would be available to all of the

18  creditors as a result of any potential settlement, right?

19  A.    That's not correct.

20  Q.    Why don't you -- Mr. Dubel, you recall you gave a

21  deposition in this case, correct?

22  A.    I've given a couple of depositions, yes.

23  Q.    Do you recall you gave a deposition on Thursday, November

24  7th; Mr. Sedrish asked you questions.  Do you recall that?

25  A.    I don't recall the exact date, but if you have the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

133

1    transcript, I'm sure I can --

2         THE COURT:  There is a transcript in the binder from

3    November 1st.  Is that the one you're talking about?.  It just

4    says -- the tab says deposition transcript.  There is another

5    transcript behind it.  It's near the back of the binder.  Is

6    that the one you're talking about?

7         THE WITNESS:  I don't believe that's my deposition.

8         THE COURT:  Oh, you're right.  It's not.  It's

9    somebody else's deposition.

10        Thank you.  All right.  I've been handed a copy of the

11   deposition transcript of Mr. Dubel from Thursday, November 7th,

12   2013.

13   Q.   Mr. Dubel, directing your attention to page 37, line 3 to

14   37, line 15, I'd like to play a clip of the question and answer

15   that is --

16   A.   I'm sorry?  Could

17   Q.   Page 37 --

18   A.   Yes.

19   Q.   -- line 3 to page -- to line 15, clip 19.

20        MR. ECKSTEIN:  Your Honor, is he trying to impeach

21   with this?  This doesn't relate to the question he just asked.

22        THE COURT:  Let me just look at it first.

23        Sustained.

24   Q.   Isn't it true, sir, that prior to the mediation, the

25   committee attempted to understand what the values of various

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   claims were prior to the mediation so that it could work

2   through the mediation process, and prior to that work through

3   the process of coming up with a fair allocation of all the

4   funds and value that would be available to all of the various

5   different creditors?

6   A.   I'm sorry, could you repeat it?  I just want to make sure

7   I answer the question properly.  Could you repeat the question?

8   Q.   Isn't it true, sir, that the committee attempted to

9   understand what the values of the various claims were prior to

10  the mediation so that it could work through the mediation

11  process, and prior to that, work through the process of coming

12  up with a fair allocation of all the funds and value that would

13  be available to all of the various different creditors?

14          MR. ECKSTEIN:  Objection.

15          THE COURT:  Overruled.

16  A.   I'm trying to understand -- I'm trying to answer your

17  question properly.

18          THE COURT:  Mr. Dubel, look at page 37 of your

19  transcript.  Let's just do it the easy way, okay.

20          Look at page 37.

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  Your answer at lines 8 through 15, Mr.

23  Perry essentially asked you a question reading almost verbatim,

24  and he wants to know if that is accurate, okay?

25          THE WITNESS:  I understand, Your Honor.  I think that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

135

1   response was in relation to a question that I -- as I

2   understood the question, was more developed around the

3   mediation process.

4        We absolutely reviewed all of the various claims, as I

5   said earlier, that started in the summer of 2012, because we

6   wanted to understand what the magnitude of the claims that

7   could be presented to the debtors' estates -- I'm sorry, by the

8   estates against Ally.

9        THE COURT:  Did you also want to come up with what you

10   thought was a fair allocation of all the funds and value that

11   would be available to all of the various different creditors?

12   That's what the sentence in the deposition --

13        THE WITNESS:  We wanted to see if we could determine

14   that.  We were looking at the variety of different claims --

15   and when I say values here, what I'm referring to is really the

16   fact that it could be zero to any number, and that's what we

17   were trying to understand, what could be the magnitude of the

18   claims that we could present to them.

19        THE COURT:  Go ahead Mr. Perry with your examination.

20   I'm not precluding you from going over this again.  You can ask

21   your next question.

22        MR. PERRY:  Okay.

23   BY MR. PERRY:

24   Q.   Well, let me do it this way:  At your deposition were you

25   asked the following question and did you give the following

**RESIDENTIAL CAPITAL, LLC, ET AL.**

136

1   answer?  Question --

2            THE COURT:  Just, you could read it to yourself.  You

3   were asked the question: did you give the answer that's on page

4   37, lines 3 through 19?

5            THE WITNESS:  Yes, Your Honor.

6            THE COURT:  Okay.  He's answered that.  Let's move

7   along.

8   Q.   You would agree --

9            MR. PERRY:  What's that?

10           THE COURT:  Let's move along.

11  Q.   You would agree with me that in attempting to negotiate

12  with Ally, it would be helpful to know the value of the

13  potential claims the ResCap debtors had against Ally, right?

14  A.   We wanted to understand the magnitude of the claim so we

15  could present a case to -- and I don't mean a legal case, but

16  just a presentation to Ally on what the magnitude of those

17  claims would be to get what I'll call the best leverage against

18  Ally in trying to negotiate a settlement with them.

19  Q.   Sure.  And that was work that was done in advance of the

20  mediation, correct?

21  A.   As I've testified earlier, we commenced that in the

22  summer, well before there was even a thought of mediation.

23  Q.   Now, you were here for Mr. Eckstein's opening statement

24  yesterday, correct?

25  A.   I was.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

137

1  Q.    And you heard Mr. Eckstein talk about how the committee

2  had not focused on the breach of contract claims identified in

3  the examiner report, correct?

4  A.    I don't recall exactly.  I was in the back, unfortunately

5  busy on other work at the same time.  I have a company to run.

6          THE COURT:  It was a wonderful opening, I assure you.

7          THE WITNESS:  And no offense to Mr. Eckstein, please.

8          THE COURT:  Do you want to know whether he listened to

9  Mr. Uzzi's opening as well, or Mr. Cohen's?

10  Q.    So let me ask it this way.  The committee at a certain

11  point in time in these cases filed an STN motion seeking leave

12  to pursue claims against Ally on behalf of the debtors, right?

13  A.    That's correct.

14  Q.    And is it your understanding that the committee sought

15  leave to pursue breach of contract claims against the

16  debtors -- against Ally on behalf of the debtors?

17  A.    The committee wanted to bring -- sought the opportunity to

18  bring any and all claims that could be presented against Ally.

19  Q.    And that would include breach of contract claims, I take

20  it, correct?

21  A.    It would include any and all claims that could be

22  generated and presented.

23  Q.    And just so we're clear, if the debtors had breach of

24  contract claims against Ally that could generate value for the

25  general unsecured claims, your view is that those claims ought

**RESIDENTIAL CAPITAL, LLC, ET AL.**

138

1  to be brought, right?

2  A.   If there were valid claims of any type, whether they were

3  breach of contract claims or otherwise, we would have wanted to

4  present them to Ally either in a negotiation or in a litigation

5  if it came to that to try and create the best value for the

6  estate.

7  Q.   Okay.  And at least with respect to --

8       MR. PERRY:  Well, strike that.

9  Q.   The examiner completed his report prior to the conclusion

10 of the mediation with Ally, correct?

11      THE COURT:  No.

12      MR. ECKSTEIN:  Objection.

13      THE COURT:  Sustained.  Do you have some foundation

14 for that?

15 BY MR. PERRY:

16 Q.   Well, let me ask you this:  Do you have any understanding

17 of whether the parties sought to delay publication of the

18 examiner -- release of the examiner report prior to the

19 conclusion of the mediation?

20 A.   There were many things that we sought to delay as part of

21 the mediation, because we didn't want to have any number of

22 issues that were popping up kind of get in the way of what was

23 starting to coalesce around a successful mediation process.

24      We had, as I recall, the STN motion had been presented --

25 I don't think Your Honor had ruled on it -- we had that.  We

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   had sought to delay the RMBS trial.  And yes, we had sought to

2   delay the publication of the examiner's report, to the extent

3   that it was even finished by that.  I don't remember exactly

4   when they were going to be finished.

5           THE COURT:  How much longer are you going to be on

6   your cross-examination?

7           MR. PERRY:  Twenty or thirty minutes?

8           THE COURT:  Keep going.

9   Q.   Now ultimately the committee adopted what you described as

10  a holistic approach to settlement, right?

11  A.   The committee on all the parties did.

12  Q.   Okay.  And having said that, there was an allocation that

13  was done in connection with the settlement, right?

14  A.   There was an allocation of the amount to the various

15  different participating -- various different parties and the

16  debtors' estates, three debtor groupings I guess I should refer

17  to it as.

18  Q.   And as I understand your direct testimony --

19          MR. PERRY:  Strike that.

20  Q.   Let's go to paragraph 70 of your direct testimony -- 75,

21  I'm sorry, sir, paragraph 75 of your direct testimony?

22  A.   On page 30?

23  Q.   Yeah.  One of the items that the committee sought to

24  resolve in connection with the global settlement was the

25  treatment of intercompany balances, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    That's correct.

2    Q.    And under the plan, intercompany balances, as well as any

3    subrogation claims and fraudulent conveyance claims related to

4    the debtors' forgiveness of more than sixteen billion of

5    intercompany debt prior to the petition date will be waived,

6    canceled and discharged on the effective date.  Do you see

7    that?

8    A.    I do.

9    Q.    Okay.  And did the committee do any investigation with

10   respect to the waiver of sixteen billion dollars of claims

11   related to the debtors' forgiveness of intercompany debt before

12   the petition date?

13   A.    As I testified earlier, we asked the committee counsel to

14   review the issues around the intercompany balances, and I

15   believe that that was part of the work that had been done.

16   Q.    And from your perspective as the chair of the committee,

17   did the --

18   A.    I'm sorry, co-chair.

19   Q.    Co-chair of the committee, my apologies, did the claims

20   related to the debtors' forgiveness of more than sixteen

21   billion of intercompany debt prior to the petition date have

22   any value?

23   A.    I'm sorry, could you restate that question?  Just repeat

24   it, I'm sorry.

25   Q.    Did the fraudulent conveyance claims related to the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  debtors' forgiveness of more than sixteen billion of

2  intercompany debt, prior to the petition date, have any value?

3  A.    No.

4  Q.    And you'd agree with me that certain of those claims

5  related to the forgiveness of debt with nondebtors, correct?

6  A.    It's my understanding -- well, there is multiple different

7  intercompany transactions and balances.  There were the

8  intercompany transactions between Ally and the ResCap entities,

9  and those are separate, you know, I'll call it a separate

10  grouping.  They had security agreements, payments, interest, et

11  cetera.

12      And then there was a separate grouping of intercompany

13  balances and transactions that related to the ResCap entities.

14  Obviously, those were -- references were related to the ones

15  that were prior to the petition date, so they weren't debtor

16  entities at the time, they were ResCap entities.

17  Q.    Okay.

18  A.    And many of those entities were subsequently sold or never

19  went into Chapter 11, but all fell under the -- what I'll call

20  under the ResCap umbrella.

21  Q.    Okay.  And I just want to focus on the forgiveness, pre-

22  petition forgiveness, of intercompany claims with respect to

23  entities that are not currently debtors before this Court.

24      Do you know one way or another whether that is included in

25  the sixteen-billion-dollar figure that is set forth in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    paragraph 75 of your declaration?

2    A.    I believe they were all part of the, what I referred to

3    earlier as the ResCap entities, some of which subsequently

4    filed Chapter 11, some of which didn't, some of which were sold

5    off, and so hence would never have been part of the Chapter 11

6    process, some of which might be regulated entities that

7    couldn't file a Chapter 11.

8    Q.    Okay.  So let's just focus on forgiveness that is not

9    current debtor-to-debtor pre-petition forgiveness.  Can we just

10   focus on that category of forgiveness?  Okay, you understand

11   what I'm talking about?

12   A.    I do, yes, sir.

13   Q.    And do you know what percentage of the sixteen billion

14   relates to forgivenesses by debtors to entities that are not

15   debtors in this proceeding?

16   A.    Well, we looked at it, again, as ResCap entities and any

17   of the ResCap subsidiaries.  So I don't have -- I never kind of

18   looked at it as what was eventually debtor versus nondebtor.

19   It was all part of the ResCap entities and never saw the

20   distinction or the need to have a distinction on that.

21   Q.    Well, that's what I'm driving at, sir.  If there is a

22   forgiveness of debt pre-petition and then a fraudulent transfer

23   claim relating to that pre-petition forgiveness, which as I

24   understand it is the subject of paragraph 75, is that right?

25   A.    That's correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

143

1   Q.   Okay.  If the forgiveness in question was extended to an

2   entity that's not a debtor, what impact does that have on these

3   cases?

4   A.   I'm not sure if you're asking me a legal question or not,

5   but I don't see any impact based upon the work that we had done

6   on this.

7   Q.   To the extent that those were good claims, you'd agree

8   with me that they'd actually be bringing money back into the

9   estate, right?

10  A.   You're asking me a hypothetical question.  If they were

11  good claims, they might.  If they weren't good claims, they

12  wouldn't.  But I think you're asking for a legal conclusion,

13  and I can't give that.

14  Q.   Why don't we look at -- have you reviewed any of Mr.

15  Renzi's expert reports submitted in connection with this

16  proceeding?

17  A.   I have not.

18  Q.   And with respect to claims that potential debtors may have

19  against nondebtors for pre-petition forgivenesses of

20  intercompany debt, those are all being released for zero as

21  part of the global settlement, right?

22  A.   All of the issues surrounding the intercompany balances

23  are effectively be waived or released.

24  Q.   Okay.  But, for example, if prior to the petition date

25  there was a debt forgiveness accomplished with respect to a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    nondebtor entity for a billion dollars, the global settlement

2    would compromise that claim at zero, right?

3    A.    Well, as I look at it, there was no -- these weren't

4    really debt instruments, these were effectively equity

5    transactions, movements of cash.  From what I have seen, the

6    facts that I've heard, they weren't debt, they didn't have any

7    indicia of debt, they weren't treated like debt.  And clearly,

8    the Ally entities, which included ResCap, knew how to treat

9    intercompany balances as debt, when they felt it was important

10    to do that as evidenced by, as I said earlier, the fact that

11    there were transactions between Ally and ResCap entities, which

12    had all of the typical things:  loan agreements, payment

13    schedules, et cetera.

14    Q.    And so --

15    A.    These entities transactions didn't have any of that, so.

16    Q.    So just to be clear, the committee didn't consider

17    bringing claims with respect to pre-petition forgivenesses of

18    debt to nondebtor entities, right?

19    A.    The committee looked at all of the opportunities and as

20    part of the global resolution of this case we determined it was

21    appropriate to waive all of the intercompany balance issues and

22    not bring any actions.  It was going to be a fruitful (sic)

23    exercise, it would have cost us just a tremendous amount of

24    money and possibly would have just blown up the mediation

25    process.  And we were looking to get a resolution.  And that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

145

1   was all part of the holistic approach that I have testified to.

2   Q.   I guess that's why I'm focusing on waivers --

3          THE COURT:  I don't care whether you guess that's why

4   you're focusing or not.

5          MR. PERRY:  Okay.

6          THE COURT:  Ask questions.  Let's get this done.  Move

7   along.

8   Q.   How would the settlement of claims against nondebtors,

9   intercompany claims against nondebtors for zero value

10  facilitate the global settlement?

11  A.   Well, we didn't think there was any value in them.  So

12  trying to get, you know, all of the parties together and agree,

13  which would include, you know, granting releases to AFI,

14  getting the debtors to do their releases amongst themselves,

15  was something that was important as part of the process.

16         THE WITNESS:  And I apologize, Your Honor, I need to

17  be careful that I'm not going too far in terms of the mediation

18  discussion, so.

19  Q.   Let's talk about the settlement.  In paragraph 51 of your

20  witness statement, there is a reference to a global -- a

21  mediation yielding a global compromise on or about May 13,

22  2013.  Do you see that testimony?

23  A.   I do.

24  Q.   And just so I get the sequencing right, on or about May

25  13, 2013, Ally agreed to make a contribution of 2.1 billion

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    dollars, correct?

2    A.   Yes, subject to the finalization of the supplemental plan

3    term sheet, I think was the technical title of it.

4    Q.   Okay.  And the supplemental plan term sheet that you just

5    referenced is set forth in your testimony and discussed at

6    paragraph 52, correct?

7    A.   That's correct.

8    Q.   Okay.  And the supplemental plan term sheet was not

9    finalized until roughly ten days later, correct?

10   A.   That's correct.

11   Q.   So on May 13th, Ally agreed to pay 2.1 billion dollars,

12   but it wasn't until May 23rd that the various creditors

13   subscribing to the settlement agreed how to allocate their

14   recoveries, correct?

15   A.   Well, I don't think it was just the various creditors.

16   The debtors were involved in that, and I believe AFI had some

17   involvement, I don't think they really cared too much about

18   that.  But it was the debtors and all of the consenting

19   claimants and the committee were all involved in that process.

20   Q.   In other words, the debtors didn't care how the creditors

21   and the debtors -- the creditors of ResCap and the debtors, the

22   claimants, split up the 2.1-billion-dollar contribution,

23   correct?

24            MR. KERR:  Objection.

25            THE COURT:  Sustained.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Well, let me ask you this --

2         THE COURT:  We're going to take our lunch recess.  You

3   have ten minutes left on your cross-examination.  During lunch

4   you can refine it.  We will resume at 2 o'clock, you will have

5   ten minutes and that will be the end.

6         I'd like to see lead counsel at the bench.

7         You're excused.

8         THE WITNESS:   May I step down?  Thank you, Your

9   Honor.  Can I leave my stuff?

10        THE COURT:  Yeah, you can.

11      (Recess from 12:35 p.m. until 2:02 p.m.)

12        THE COURT:  Please be seated.

13        Mr. Perry?

14        Mr. Dubel, you know you're still under oath.

15        THE WITNESS:  Yes, Your Honor.

16  BY MR. PERRY:

17  Q.   Mr. Dubel, directing your attention to PX-90 in your

18  binder.

19  A.   PX-90?

20  Q.   PX-90.

21  A.   Thank you.

22  Q.   This is a lengthy document, Mr. Dubel.  In order to

23  facilitate use of the document, we've put in PX-90A and 90B

24  tabs.  I'd ask you to flip to PX-90A.

25  A.   Yes, sir.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

148

1   Q.   This is a copy of the term sheet for the proposed Chapter

2   11 plan, correct?

3   A.   It appears to be that, yes.

4   Q.   And I believe your testimony was this PX-90A was finalized

5   on or about May 13, 2013, correct?

6   A.   I don't recall saying that, but --

7          THE COURT:  It's in your witness statement.

8   A.   -- it's in my direct.  Yes, I'm sorry.  Yes.  It was on or

9   about that date, yes.

10  Q.   Okay.  And directing your attention to page 99 of 145 on

11  the bottom of the document, it's page 3?

12  A.   Yes.

13  Q.   Under the text entitled plan and disclosure statement,

14  directing your attention to the third paragraph, it reads,

15  "Each of the consenting creditors has agreed to an allocation

16  of estate assets in the Ally contribution that will be set

17  forth in the supplemental term sheet."  And that was the

18  supplemental term sheet that was not completed until some ten

19  days later, correct?

20  A.   That's correct.

21  Q.   Okay.  And then it goes on, and it says, "On or before May

22  13th, 2013 the creditors' committee shall disclose to Ally in

23  writing such allocation which Ally will keep strictly

24  confidential subject to the confidentiality provision described

25  below and which shall not be changed in the supplemental term

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    sheet absent obtaining consent from the parties for such

2    changes."

3        Do you see that text?

4    A.    I do.

5    Q.    And the disclosure that was made by the creditors'

6    committee on or before May 13, 2013 was the bottom line

7    recoveries negotiated by each of the consenting creditors,

8    correct?

9    A.    When you say bottom line recoveries, it was the recoveries

10   that all of the creditors had agreed to, but it was subject to,

11   obviously, whatever the end results would be of the wind-down

12   of the ResCap estates.

13   Q.    Sure.  And just to put a point on it, go to 90B, and I'm

14   specifically interested in the document or the annex set forth

15   at page 132 of 145.

16   A.    Yes, sir.

17   Q.    Are you with me?

18   A.    Yes.

19   Q.    And these are, when I'm talking about bottom line

20   recoveries, at least for FGIC there was a recovery of 206.5

21   million that was negotiated, correct?

22   A.    Again, subject to whatever the final results would be of

23   the liquidating trust certificate values.

24   Q.    And with that same qualification, the 206.5 million dollar

25   recovery for FGIC was something that was agreed to on or before

**RESIDENTIAL CAPITAL, LLC, ET AL.**

150

1    May 13th, correct?

2    A.    That's correct.

3    Q.    Okay.  And then in the supplemental term sheet on page 120

4    of 145, directing your attention to the portion of the table

5    entitled monoline settlement.  Are you with me?  It's at the

6    bottom of page 120 of 145?

7    A.    I am, yes.

8    Q.    Okay.  And specifically with respect to FGIC, this

9    document lays out the agreed claims at three debtor entities,

10   correct?

11   A.    That's correct.

12   Q.    And, again, subject to the qualification you gave earlier,

13   the intent of this document is that when those claims are run

14   through the bankruptcy process, it will yield a 206.5-million-

15   dollar recovery for FGIC, correct?

16   A.    Subject to the qualification, yes, that's correct.

17   Q.    Okay.  And this allocation of claims was one of the items

18   that was done in the ten days between May 13th and May 23rd,

19   2013, correct?

20          THE WITNESS:  Your Honor, I think I can answer that

21   without violating the mediation --

22          THE COURT:  Okay, go ahead.

23   A.    The answer is yes.  I just don't want to go too far.

24          THE COURT:  I understand.

25          MR. PERRY:  Okay.  No further questions.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

151

1          THE COURT:  Thank you. Redirect -- oh, any other

2    cross?  Go ahead.

3    CROSS-EXAMINATION

4    BY MR. SCHAFFER:

5    Q.   Mr. Dubel, Eric Schaffer from Reed Smith.  I'm here on

6    behalf of Wells Fargo as collateral agent.

7          Are you familiar with Wells Fargo's role as collateral

8    agent in connection with the AFI revolver or the junior secured

9    notes?

10   A.   I am not.

11   Q.   All right.

12         Do you have any understanding as to whether Wells Fargo's

13   got a secured claim in this case?

14   A.   I have no understanding.

15   Q.   Do you have any understanding as to whether Wells Fargo as

16   collateral agent released liens on collateral during the course

17   of its serving as collateral agent?

18   A.   I have no understanding.

19   Q.   Okay.  Are you familiar with the objection to confirmation

20   that Wells Fargo filed?

21   A.   I apologize, I have not read it, no.

22   Q.   Now you're shortening things.

23         Did the committee ever discuss a reserve for any Wells

24   Fargo indemnification claim?

25   A.   I don't recall any discussions along those lines.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

152

1  Q.   Have you seen -- have you heard that the JSNs might assert

2  a claim against Wells Fargo in connection with its conduct as

3  collateral agent?

4  A.   I have not.

5  Q.   Did the committee conduct any investigation of claims that

6  might be asserted by the JSNs against Wells Fargo?

7  A.   I don't recall any discussion along those lines.

8  Q.   Does the committee have any basis for believing that the

9  JSNs will or will not sue Wells Fargo?

10         MR. KERR:  Objection.

11         THE COURT:  Sustained.

12  Q.   So in fact, you don't know whether they might sue Wells

13  Fargo or not?

14         MR. KERR:  Objection.

15         THE COURT:  Sustained.

16  Q.   Do you have any understanding as to whether the debtors

17  are obligated to pay any fees or expenses of Wells Fargo as

18  collateral agent?

19  A.   I don't have any understanding.

20  Q.   Am I correct, the plan proponents agreed to seek

21  confirmation of a plan regardless of whether or not the JSNs

22  won or lost in the phase 1 litigation?

23         THE COURT:  I really don't understand your question.

24         MR. SCHAFFER:  Let me try it again, Your Honor.

25  Q.   Am I correct that under the plan, the JSNs are to be paid

**RESIDENTIAL CAPITAL, LLC, ET AL.**

153

1   whatever they are owed.  If they are oversecured, they will

2   collect post-petition interest; if they're undersecured, they

3   won't?

4          MR. O'NEILL:  Objection, Your Honor.

5          THE COURT:  Sustained.  It's a legal issue.  I think

6   in openings it was agreed.  And certainly it was something that

7   I said I wasn't going forward with confirmation unless that was

8   the case.

9   Q.   One last question for you.

10       Do you know of any reason why Wells Fargo would not be

11   included as a released party in the plan?

12  A.   I don't know what Wells Fargo's position is, so I wouldn't

13  have an opinion on whether they are or they're not.

14         MR. SCHAEFFER:  That's it.

15         THE COURT:  All right.  Who else?  Any other cross-

16  examination?

17         MR. PERRY:  Your Honor, I just before -- I had one

18  housekeeping matter.

19         THE COURT:  Go ahead.

20         MR. PERRY:  I had asked Mr. Dubel a series of

21  questions about his deposition transcript and the witness read

22  it to himself, but it didn't appear in the record.  It's

23  just --

24         THE COURT:  I thought I called it out by page and line

25  number.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

154

1           MR. PERRY:  As long as we can have a stipulation --

2           THE COURT:  Somebody else -- I mean, there's a

3   transcript.

4           MR. COHEN:  Whatever is in the record is in the

5   record.  What's in his transcript doesn't come in.

6           THE COURT:  You want to call out page and line number.

7   Look, I think I did, but go ahead -- you want to -- refer to

8   the page and line number in the deposition.  I know I did it

9   before.

10          MR. PERRY:  Okay.  So, I know you referred to the page

11  and line number --

12          THE COURT:  Just do it.  Let's just do it.

13          MR. PERRY:  It's page 37, line 3 to 15, and we would

14  move that testimony in.

15          THE COURT:  Well, you don't move it in, you can't move

16  it into evidence.  You can -- you asked a question based on it.

17          MR. PERRY:  Okay.  So can I read it into the record.

18          MR. COHEN:  I object.

19          THE COURT:  Just do it.  Let's just get it over with.

20          MR. PERRY:  The question was --

21          THE COURT:  Waste of time.

22          MR. PERRY:  -- "Did the committee's approach to

23  mediation which was developed before the mediation attempt --

24  attempt or not attempt to allocate value or quantify claims

25  held by individual creditors or debtors as a part, as part of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

155

1    achieving a global settlement?

2            "Answer:  Well, the committee attempted to understand

3    what the values of the various claims were prior to the

4    mediation, so it could, you know, work through the mediation

5    process, and prior to that work through the process of coming

6    up with a fair allocation of all the funds and value that would

7    be available to all the various different creditors."

8            THE COURT:  That's probably the second or third time

9    that's now appeared in the record.

10           Mr. O'Neill, do you have questions?

11           MR. O'NEILL:  Before I begin, Your Honor, I'd like to

12   offer the declaration into evidence.  I think Mr. Perry had a

13   reservation and I don't think his -- or his questions were not

14   were answered in any way.

15           THE COURT:  Mr. Perry?

16           MR. PERRY:  No objection, Your Honor.

17           THE COURT:  All right, let me just find my notes here.

18   The direct witness testimony of John Dubel, and there are two

19   declarations, one is ECF 5697, the other is ECF 5692, and both

20   are in evidence.

21   (Direct testimony of John Dubel - two declarations was hereby

22   received into evidence as Plan Proponents' Exhibit, as of this

23   date.)

24   REDIRECT EXAMINATION

25   BY MR. O'NEILL:

**RESIDENTIAL CAPITAL, LLC, ET AL.**

156

1  Q.   Mr. Dubel, would you turn to Exhibit AYQ?

2        THE COURT:  Where is that in the binder?

3        MR. O'NEILL:  It's towards the front.

4        THE COURT:  Okay.

5        MR. O'NEILL:  It's one inch into eight inches of

6  documents.

7        THE COURT:  That's fine.

8  A.   So you said AYQ?

9  Q.   AYQ.

10  A.   Yes, I have it.

11  Q.   Mr. Perry asked you a series of questions --

12        MR. O'NEILL:  Strike.

13  Q.   This appears to be an e-mail chain and Mr. Perry asked you

14  a series of questions about the last e-mail in the chain.  Do

15  you recall that?

16  A.   I do.

17  Q.   Would you turn to the first page and look at the next

18  e-mail up in the chain?

19  A.   The one at the bottom of the first page?

20  Q.   Yes.  Would you read the second paragraph of that -- who

21  is that e-mail from and who is it to?

22  A.   It appears to be from Mr. Todd Goren to Kenneth Eckstein,

23  Gary Lee, with copies to Douglas Mannal and Lorenzo Marinuzzi.

24  Q.   And would you read the second paragraph of that e-mail?

25        MR. PERRY:  Objection, Your Honor.  Hearsay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1              THE COURT:  Overruled.

2   A.    "Our position remains the same, that most, if not all of

3   the intercompany claims are likely invalid.  What we've put in

4   the plan is essentially a placeholder.  To the extent we cannot

5   reach a consensus with the various parties as to the treatment

6   of those claims under the plan, we would expect to file

7   something to tee the issue up before the court.

8              THE COURT:  Just to be clear I've permitted that to be

9   read into evidence based on the rule of completeness, since Mr.

10  Perry dealt with other aspects of Exhibit AYQ.

11  Q.    Mr. Dubel, do you have an understanding as to the position

12  the debtors have taken with respect to the validity or

13  invalidity of intercompany claims during the course of this

14  case?

15  A.    Yes.  It's my understanding the intercompany balances they

16  viewed as not being valid, not have any debt-like validity.

17  Q.    And to what extent, if any, has the debtors' position

18  changed concerning that matter during the course of the case?

19  A.    To my understanding it hasn't changed since the very

20  beginning when I first understood this in the early summer of

21  2012.

22  Q.    Thank you, Mr. Dubel.

23             MR. O'NEILL:  I have nothing else Your Honor.

24             THE COURT:  Any further examination from any party?

25             You're excused, Mr. Dubel.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

158

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you.

3          THE WITNESS:  Your Honor, what --

4          THE COURT:  Somebody will come up and get it.  You

5    don't have to lug your documents.  Okay.  Thank you.

6        (Pause)

7          MR. KERR:  Your Honor, Charles Kerr of Morrison &

8    Foerster, on behalf of the debtors.

9          In support of the joint Chapter 11 plan proposed by

10   the debtors and the official committee of unsecured creditors,

11   debtors offer the direct testimony of Lewis Kruger dated

12   November 12, 2013, which was filed as docket entry number 5709.

13         If Mr. Kruger was called to testify, he would testify

14   to what is in his written direct testimony.  We therefore offer

15   his written direct testimony in factual support of the

16   consolidated proceedings and the plan confirmation.

17         THE COURT:  Mr. Cohen?

18         MR. COHEN:  Your Honor, we have an objection to one

19   paragraph in Mr. Kruger's testimony that we'll cross-examine

20   him ,and then I think we can deal with the objection

21   afterwards.

22         THE COURT:  Okay.  But I need a copy of his -- are

23   there exhibits as well?

24         MR. KERR:  Yes

25         THE COURT:  All right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

159

1          MR. KERR:  But Your Honor, just so you know for this,

2   because he is -- we'll bring the exhibits up to you right now.

3          THE COURT:  Okay.

4          MR. KERR:  Give us a second, Your Honor.  It's heavy.

5   I think, Your Honor, the direct testimony is in volume one.

6          THE COURT:  It is.  Okay.

7          MR. KERR:  I believe.

8          THE COURT:  All right.  How are you going to deal with

9   the exhibits?  Are you going to wait?  Is that what --

10          MR. KERR:  Your Honor --

11          THE COURT:  It's okay with me.

12          MR. KERR:  -- I was going to read them off and

13   introduce them.

14          THE COURT:  Well, why don't you read them off.  How

15   many new exhibits are there?

16          MR. KERR:  Probably about twenty, I think, Your Honor.

17          THE COURT:  All right.  Why don't you read them off?

18          MR. KERR:  May I do one thing just very quick?

19          So, Your Honor, again, first I've offered Mr. Kruger's

20   testimony --

21          THE COURT:  Yeah, I'm going to withhold, I'm going to

22   reserve ruling until cross-examination

23          MR. KERR:  Okay.

24          MR. COHEN:  Thank you, Your Honor..

25          MR. KERR:  And in connection with Mr. Kruger's direct

**RESIDENTIAL CAPITAL, LLC, ET AL.**

160

1    testimony, we also offer the following exhibits, all of which

2    have been previously identified in the plan proponents' trial

3    exhibit list..

4         Your Honor, I've broken them into two groups, some are

5    being offered not for the truth, and let me list those first.

6         THE COURT:  Okay.

7         MR. KERR:  Those would be Exhibits 801, 802, 803, 804,

8    808, 809, 811, 812, 819, 821, 823, 824, 834, 836, 838, 839,

9    841, 842, 843, 844, 847, 850, 861, 870, 894 and 934.

10        It was a little more than I expected, Your Honor, but

11   those are the ones we're offering, not for the truth, but to

12   show the type of information Mr. Kruger reviewed in his role as

13   CRO.

14        THE COURT:  Okay.

15        MR. COHEN:  No objection, Your Honor.

16        THE COURT:  All right.  Exhibits 801, 802, 804, 808,

17   809, 811, 812, 819, 821, 823, 824, 834, 836, 838, 839, 841,

18   842, 843, 844, 847, 850, 861, 870, 894 and 934 are all

19   introduced in evidence not for the truth of the matters

20   asserted.

21   (Exhibits regarding Mr. Kruger's testimony were hereby received

22   into evidence as Plan Proponents' Exhibits 801, 802, 804, 808,

23   809, 811, 812, 819, 821, 823, 824, 834, 836, 838, 839, 841,

24   842, 843, 844, 847, 850, 861, 870, 894 and 934 , as of this

25   date.)

**RESIDENTIAL CAPITAL, LLC, ET AL.**

161

1          MR. KERR:  And Your Honor, I have a few more exhibits

2     that make up, they're either previous orders of the Court or

3     materials that were submitted by the debtors, like the plan or

4     the disclosure statement.  Let me just run those for you.

5          859, 860, 862, 863, 864, 866, 872, 875, 876 and 877.

6          MR. COHEN:  And for what purpose are these being

7     offered?

8          MR. KERR:  They are prior orders of the Court, which

9     Mr. Kruger is aware of and refers to in his testimony.  They're

10    also, Your Honor, the original versions of the plan and

11    disclosure statement, the amended plan and disclosure

12    statement.  I'm just putting in the record, so I can --

13          THE COURT:  To the extent you're hearsay, you're not

14    offering them for the truth of the matter asserted.

15          MR. KERR:  I'm not offering them for the truth, but I

16    think the orders speak for themselves.

17          MR. COHEN:  No objection, Your Honor.

18          THE COURT:  The orders would have independent legal

19    significance.  So --

20          MR. KERR:  Yeah.

21          THE COURT:  No objection, Your Honor.

22          THE COURT:  All right.  So Exhibits 859, 860, 862,

23    863, 864, 866, 872, 875, 876 and 877 are in evidence.

24    (Exhibits regarding Mr. Kruger's testimony were hereby received

25    into evidence as Plan Proponents' Exhibits 859, 860, 862, 863,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

162

1    864, 866, 872, 875, 876 and 877, as of this date.)

2         MR. KERR:  And there is only one more document, Your

3    Honor, and that would be Exhibit 846 --

4         THE COURT:  I'm sorry, E-46?

5         MR. KERR:  846.

6         THE COURT:  846.

7         MR. KERR:  And this is a copy of Mr. Kruger's

8    engagement letter as amended and as approved by the Court on

9    March 1, 2013.

10         THE COURT:  Mr. Cohen?

11         MR. COHEN:  No objection.

12         THE COURT:  All right.  Exhibit 846 is in evidence as

13    well.

14    (Engagement Letter was hereby received into evidence as Plan

15    Proponents' Exhibit 846, as of this date.)

16         MR. KERR:  With that, Your Honor, Mr. Kruger is

17    available to be cross-examined.

18         THE COURT:  Okay.  Before you start your cross-

19    examination, and I may do this from time to time during the

20    trial, and it may shape witness examinations.  It's not ruling

21    on anything, but primarily based on reviewing both the joint

22    pre-trial order and reviewing the briefs on confirmation, there

23    are a number of issues on my mind that I hope that the evidence

24    and arguments later will address.  Some of these I've seen in

25    briefs and things like that, but I just thought it would be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

163

1    useful for me to tell you some of the things I'm interested in.

2    I may do this from time to time during the trial.

3            While I'm not ruling on it, it seemed to me that the

4    request for adequate protection from the JSNs here does not

5    arise out of the cash collateral order, but rather from Section

6    363 in the use, sale, or disposition of the JSNs' collateral --

7    assuming it is collateral.  And what's not clear to me is

8    whether the security agreement was intended to give the JSNs

9    liens on intercompany claims.

10            If the JSNs have a lien on intercompany claims, so

11    does AFI.  It was the issue I raised yesterday about the

12    revolver.  And one question I had was did the issue ever arise

13    whether AFI has a lien on the intercompany claims.  Were

14    intercompany claims ever recorded by AFI as its collateral?

15    Were any books and records entries ever made by the debtors or

16    AFI showing a release of collateral when intercompany debts

17    were forgiven?

18            There's already been testimony about 16.6 billion

19    dollars of intercompany claims being forgiven.

20            The intercompany claims may have been enforceable

21    debts, treated as such by the debtors and AFI, recorded in the

22    books and records, and tested for impairment, but this may not

23    be sufficient to sweep the debts within the security interests

24    of either AFI or the JSNs.  Are there any facts establishing

25    the intent of the parties whether such debts were subject to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**164**

1    the liens of AFI or the JSNs?

2           It seemed to me that there are at least three steps in

3    the necessary analysis.  First, were there valid intercompany

4    debts at issue that's disputed?  Second, did the JSNs have a

5    lien on such debts?  And third, were those debts properly

6    released under the applicable loan security and intercreditor

7    agreements.

8           If the first or second inquiries result in a

9    conclusion that the JSNs have no lien, it would seem to me the

10   inquiry ends.  If the JSNs had a lien the third question may

11   then be determinative.  If the liens had value and were not

12   permissibly released, the JSNs arguably would be entitled to

13   compensation for the disposition of their property either

14   through an adequate protection claim or direct recovery.

15          I'll stop there.  Those are just -- I mean after

16   listening to the openings and as you get into the meat of the

17   testimony, those are some of the things that are on my mind,

18   having read the briefs and listening to the openings.

19          I may do this from time to time when there are other

20   things on my mind.

21          MR. COHEN:  Thank you, Your Honor.

22          THE COURT:  I'm not trying to hide the ball about what

23   I'm thinking about.

24          MR. COHEN:  I think that's very helpful and I think

25   Mr. Kruger may testify as to some of those issues.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  That's why I did it now.

2          MR. COHEN:  Yeah, and it will certainly help us going

3     forward.

4          THE COURT:  Okay.  All right.

5          MR. KERR:  I'm going to ask Mr. Kruger to come up.

6          THE COURT:  Yes, please.

7          If you would raise your right hand and be sworn, Mr.

8     Kruger.

9        (Witness sworn)

10          THE COURT:  Thank you very much.  I think somebody has

11    put up a bottle of water for you if you need that.

12          THE WITNESS:  Thank you.

13          THE COURT:  And Mr. Cohen is going to bring you a

14    binder.  I don't know whether you can take some of the other

15    binders away or have some of your colleagues come up.

16          But does he need those?

17          MR. COHEN:  These six are the debtors'.

18          THE COURT:  Those are his.  Okay.  That's fine.

19          MR. COHEN:  So I can move them over here.

20          THE COURT:  No, just leave them here.

21          MR. COHEN:  The JSNs have a very small compact binder.

22          THE COURT:  Yeah, I see that.  I'm appreciative

23          THE WITNESS:  I think I need to be taller.

24    CROSS-EXAMINATION

25    BY MR. COHEN:

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Good afternoon, Mr. Kruger.  As you know, I'm David Cohen

2   with Milbank, Tweed, Hadley & McCloy, representing the JSN ad

3   hoc group and the notes trustee.

4   A.   Good afternoon.

5   Q.   It's nice to see you.

6        Mr. Kruger, you understand that the debtors designated you

7   as their corporate representative with respect to ResCap's

8   decision to waive, settle, cancel or discharge the intercompany

9   claims, right?

10  A.   Yes.

11  Q.   And you're able to testify as to that, aren't you?

12  A.   Yes, I am.

13  Q.   And the debtors also designated you as their corporate

14  rep --

15        THE COURT:  Just pull the microphone a little closer

16  to you, Mr. Kruger.  Okay.  Thank you.

17  Q.   The debtors also designated you as their corporate

18  representative with respect to all matters related to the

19  treatment of the JSN claims under the plan, right?

20  A.   That's correct.

21  Q.   And you're able to testify as to that, correct?

22  A.   Yes.

23  Q.   Finally, the debtors designated you as their corporate

24  representative to testify with respect to all matters relating

25  to the allocation of the Ally contribution on a claim-by-claim

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  basis and the allocation of the Ally contribution as set forth

2  in the disclosure statement?

3  A.   Well, I think I'm designated to respond to the first half

4  of that.  I can allocate for the proceeds of the AFI

5  contribution, but I don't think I ever did them in terms of the

6  individual claims or the individual creditors --

7  Q.   And we'll get --

8  A.   -- or the causes of action against Ally and the like.

9  Q.   And we'll get into that in more detail, but you do

10  understand that with respect to that category, the debtors have

11  designated you as the representative?

12  A.   Yes.

13  Q.   And you can testify as to that, right?

14  A.   I can.

15  Q.   Now, when up became the CRO of ResCap, which I believe you

16  started working at the end of February and the order was

17  entered March 5th, is that right?

18  A.   That's correct.

19  Q.   Okay.  When you started working as the CRO of ResCap, you

20  understood that the JSNs were asserting a lien on the

21  intercompany claims, didn't you?

22  A.   Not when I started, but it took me a while to get involved

23  with the factual background, and then I learned that the JSNs

24  were asserting that claim.

25  Q.   And you learned that fairly early in your tenure as CRO,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   right?

2   A.   Well, I became involved as a CRO probably during mid

3   February and probably learned about the JSNs views during the

4   course of the following two or three weeks.

5   Q.   Okay.  All right.  In your mind, you reached the

6   conclusion that the JSNs did not have a lien on the

7   intercompany balances, didn't you?

8   A.   I don't know that I ever reached a conclusion with respect

9   to the lien.  I had lots of presentations by my counsel, my

10  financial advisors, the creditors' committee, their counsel,

11  their advisors, others among the creditor community, all of

12  which took the view, or many of which took the view that the

13  question of whether or not the JSNs had a lien on the

14  intercompany claims was certainly subject to doubt, and in my

15  own review of those, I came to the conclusion that I did not

16  think they had a lien on them because I thought they were

17  general intangibles and not the subject of a JSN lien.  But

18  that's not my decision, so to speak.

19  Q.   Okay.  So it was your view, the conclusion you reached

20  after all of these presentations was that the intercompany

21  balances were a general intangible and the JSNs did not have a

22  lien on general intangibles; that was your conclusion, right?

23  A.   That was my conclusion, but that was not the only reason

24  why I thought it was appropriate if I'm being asked to waive

25  those claims as part of the global settlement.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

169

1    Q.    We'll get to that.  We'll get to that.

2          Now you don't intend to waive privileged communications

3    you had with the lawyers of Morrison & Foerster?

4    A.    Certainly -- certainly not.

5    Q.    So if I asked you what did your lawyers tell you, you

6    would tell me I'm not answering, correct?

7    A.    Correct.

8    Q.    All right.  And did you believe you had a common interest

9    with the creditors' committee with respect to this issue?

10          MR. KERR:  Objection, Your Honor.

11          THE COURT:  Sustained.

12   A.    I'm not sure exactly --

13          THE COURT:  No, stop, stop.  Sustained.

14   Q.    When you were having conversations with lawyers for the

15   creditors' committee, regarding whether the JSNs had a lien on

16   the intercompany balances, did you believe that those were

17   privileged conversations?

18   A.    I believed that they are part of the mediation process,

19   and I thought about them in that context.

20   Q.    Okay.  And you don't intend to waive mediation

21   confidentiality, do you?

22   A.    No, I do not.

23   Q.    So if I asked you what you thought about, in terms of your

24   conversations with the creditors' committee, in connection with

25   the mediation, you'd refuse to answer.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

170

1       THE COURT:  Mr. Kerr would rise and object and I would

2   sustain the objection.

3       MR. COHEN:  All right, terrific.

4   Q.   So I'm not going to ask you what happened at the

5   mediation.

6       What did you do to come to have an understanding as to

7   whether there was value in the intercompany balances at ResCap?

8   A.   Well, as I said, I had many conversations with my counsel,

9   with my financial advisors, with other counsel for the other

10  interested parties with respect to the intercompany claims, and

11  I thought that the intercompany claims were intercompany

12  balances recorded on the books of the debtor, but it did not

13  seem to me that they had the indicia that are usually thought

14  about in connection with actual debt, enforceable collectable

15  debt.  They lacked, in most cases, documentation, they lacked

16  maturity dates, they lacked interest rates, they lacked

17  security.  They did not look to me like debt, and so I did not

18  think that they were of great value, if any.

19  Q.   Did you discuss the intercompany balances with members of

20  the debtors' accounting staff?

21  A.   Yes.

22  Q.   Specifically, who did you have those discussions with?

23  A.   I think I've testified in my deposition that I think I had

24  them with Barbara Westman, with Tammy Hamzehpour, with Jim

25  Whitlinger, at one point.  There may be others as well, but I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

171

1    don't recall offhand, sitting here today.

2    Q.    During those conversations, did you ask those individuals,

3    that you just identified, whether they viewed the intercompany

4    balances as legitimate debt?

5    A.    Well, we discussed it, but I really came to my own

6    conclusion based on what I saw of the debt or the intercompany

7    balances, as they were described to me.

8    Q.    Did any of those four people, that you identified, tell

9    you that they didn't view the intercompany balances as

10    legitimate payables or receivables?

11        MR. KERR:    Objection.

12        THE COURT:    Overruled.

13    A.    I think that they had the view that part of their

14    engagement was to record properly the intercompany balances and

15    the intercompany transactions on the books and records of the

16    debtor, but not -- not, so to speak, binding upon me as to

17    whether or not they thought they were debt or not.

18    Q.    When you say not binding upon you as to whether they

19    thought it was debt or not, what do you mean?

20    A.    Well, I think whatever they may have thought about them, I

21    had my own view with respect to them.

22    Q.    What I'm asking you is did they tell you that they didn't

23    view them as payables and receivables as they were booked on

24    the books and records of ResCap?

25    A.    I had a lot of conversations with them.  I don't recall

**RESIDENTIAL CAPITAL, LLC, ET AL.**

172

1   what they said about them other than that they recorded them.

2   Q.   Okay.  Do you think those four individuals were competent

3   at their jobs?

4   A.   Oh, yes, I'm sure they are.

5   Q.   Did you have any reason or do you have any reason, in the

6   time that you've been the CRO of the debtors, to believe that

7   they were intending to mislead anybody through the debtors'

8   books and records?

9   A.   No.

10  Q.   Have you seen any evidence at all that the debtors' books

11  and records were anything but accurate and well kept?

12  A.   I assume they're accurate and well kept.

13  Q.   And you have no evidence to suggest otherwise, right?

14  A.   Correct.

15  Q.   Okay.  When you undertook your investigation as to the

16  value of the intercompany balances, did you look at any

17  particular balances or did you look at them all together?

18  A.   I looked at them primarily all together, because in my

19  mind, if I were to look at them individually, then I would get

20  into the whole issue of whether or not you select one out of

21  the many, many tens of thousands of recorded intercompany

22  balances to see if there's one that maybe fits some of the

23  characteristics of looking like debt.

24       Once you do that, if I then seek to assert an intercompany

25  debt against a counterparty, I assume that they would then seek

**RESIDENTIAL CAPITAL, LLC, ET AL.**

173

1   to assert their claims against other counterparties.  I would

2   then invite all of the contestants, who are so rife in this

3   case, to participate, and I would never have gotten around to

4   the global settlement.  So in my own mind, I did not value

5   intercompany claims as being significant.

6   Q.   All right.  Do you know whether, if you just looked at the

7   top ten intercompany balances at ResCap, whether that covered

8   ninety-six percent of all of the intercompany balances?

9   A.   Well, it depends what you mean by that, in the sense

10  that -- I'll give you the answer that I think is correct.  Once

11  you start down that road, you also have to look at, in my mind,

12  the sixteen billion dollars of forgiveness during the prior

13  four years before the commencement of the case, roll those into

14  the case, and then look and see what really are the ten

15  largest, and which ones are meaningful and which ones are not,

16  if any of them are meaningful.  When you look at debt as it's

17  alleged between two related companies, that always, in my mind,

18  raises a question as to the validity and the meaningfulness of

19  that relationship.  So I'm not sure if that's an answer to your

20  question, but it's as close as I can come to it.

21  Q.   Well, why would you have to look at the sixteen billion

22  dollars of forgiveness?  Why is that relevant to your

23  determination as to the value of the intercompany balances that

24  existed on the debtors' books when you became the CRO?

25  A.   Because I don't think you can do it in a vacuum.  I think

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  you need to -- I assumed that I would be in fraudulent transfer

2  litigation, I would be in litigation with respect to the

3  interdebtor issues, and that would give rise to issues among

4  the creditors again because various of the creditors would have

5  and did have their own views as to what the intercompany claims

6  meant, what they might have meant for their own individual

7  claims.  So it's sort of like taking out the one brick from the

8  middle of the Roman arch and then you start everything going.

9  So in my mind you needed to look at all of it.

10 Q.  What was your understanding of the circumstances under

11 which intercompany debt was forgiven at ResCap in the four

12 years before you came the CRO?

13 A.  I understand that it was forgiven for -- to find net worth

14 covenants, to liquidity issues and the like, and for a variety

15 of different reasons, over the course of time, and that was a

16 history that went back more than just the four years before the

17 filing of the commencement of the proceeding.

18     I looked at the fifth year and that also had significant

19 debt forgiveness, which again, in my mind, if you look at a

20 company that for gives three or four billion dollars of

21 intercompany balances every year, it would give me some pause

22 as beginning to think is this really real.  It gives me pause

23 to think that perhaps it's not really an intercompany balance

24 that works as debt.

25 Q.  And that was your own conclusion?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    Correct.

2    Q.    Do you know Ms. Gina Gutzeit?

3    A.    I've heard her name, yes.

4    Q.    Have you ever met her?

5    A.    No.

6    Q.    Did you help her in preparing her expert report in this

7    case?

8    A.    No, I did not.

9    Q.    Have you read her expert report in this case?

10    A.    No, I have not.

11    Q.    So I take it you don't have an opinion as to whether she's

12    right or wrong with respect to her opinions?

13    A.    I certainly hope she's right with respect to her opinions,

14    but I have not read her report.

15    Q.    All right.  She didn't call you and try to get your input

16    on her opinions?

17    A.    No, she did not.

18    Q.    All right.  Now you testified that you thought that

19    looking at the intercompany balances on a one-by-one basis

20    would make it, I think you said impossible to get to the global

21    settlement; is that your testimony?

22    A.    I think it has several aspects to it.  I think one is that

23    in order to really examine the intercompany claims -- and as I

24    said, I understand that there are tens of thousands of them --

25    one would have to go back and try to understand how they

**RESIDENTIAL CAPITAL, LLC, ET AL.**

176

1   originated, why they originated, what the relationships were at

2   the time that they originated, what you do with the forgiveness

3   over the course of time.  So that's sort of one aspect of it.

4        The second aspect of it was that I was concerned that if I

5   started to the go down that road, I would also then be opening

6   the floodgates, if you will, to litigation from other creditor

7   communities with respect to the intercompanies and then back to

8   litigating with each other, litigating with AFI and would

9   defeat the purposes of trying to achieve the global settlement,

10  which was my goal, if you will, with respect to these

11  proceedings.

12  Q.   The fact that you believed the JSNs didn't have a lien on

13  the intercompanies influenced your view as to whether you

14  should investigate further the value of the intercompanies,

15  though, didn't it?

16  A.   Well, it was one of the subjects I took into

17  consideration.  But if they did indeed have a lien on the

18  intercompany claims and if the intercompany claims had value --

19  and I don't know whether they do or don't -- nonetheless, I

20  would still have taken the view that they should be waived for

21  the purposes of achieving the global settlement, because I

22  thought that if I did not do that, then the parties to the

23  global settlement would not be able to come to a conclusion

24  with respect to the global settlement and we'd be back into the

25  litigation mode.  So I certainly thought about the lien, but it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  wasn't a controlling factor.

2  Q.   But you also understand, and I believe you testified to

3  this in your deposition, that if the JSNs are able to prove a

4  lien, then they are able to prove that the intercompanies are

5  valuable, to the extent they're over secured they'll get their

6  post-petition interest, right?

7  A.   As I said, God bless them.

8  Q.   Would you look at, in your binder, the second to the last

9  tab?  And it has the label DX-AMJ.

10 A.   Got it.

11 Q.   And this is a document entitled "Amended Schedules of

12 Assets and Liabilities for GMAC Residential Holding Company,

13 LLC".

14 A.   Um-hum.

15 Q.   Have you seen this document before?

16 A.   I think you showed it to me at my deposition.

17 Q.   Okay.  Do you know what it is?

18 A.   I think it's what it says it is, the "Amended Schedule of

19 Assets and Liabilities for GMAC Residential Holding".

20 Q.   All right.  And given your fifty years as a bankruptcy

21 practitioner, what do you understand this document -- the

22 purpose of this document to be?

23 A.   It's to provide a schedule, for the benefit of the Court

24 and other parties, of assets and liabilities of the debtor.

25 Q.   You're not aware of anyone putting false information on

**RESIDENTIAL CAPITAL, LLC, ET AL.**

178

1   the debtors' schedules of assets and liabilities, are you?

2   A.   No, I'm not.

3   Q.   And it would be your belief that the debtors would do

4   everything they can to make sure this is as accurate as

5   possible, right?

6   A.   Yes.

7   Q.   So if you look at the actual schedule, it is the fourth

8   page in the document, and it says page 1 of 1 at the bottom?

9           THE COURT:  Every one of them says 1 of 1.

10          MR. COHEN:  Yes, it has blue bar at the top.  Yeah,

11   unfortunately they all say 1 of 1.  There's a blue bar at the

12   top and then it has four items listed, the first being GM --

13          THE WITNESS:  I have --

14          THE COURT:  We have black bars, but --

15          THE WITNESS:  I have black bars, but --

16          MR. COHEN:   Oh, I'm sorry.

17          THE WITNESS:  I have one that says --

18   Q.   It says page 4 of 13 at the top.

19   A.   Yes, I have that.

20   Q.   All right.

21          THE COURT:  I'm with you too.

22   Q.   And about a third of the way in from the right, there is a

23   column that says, "Date claim was incurred and consideration

24   for claim".  And you see for those four balances, which total

25   about 3.4 billion, it's listed as intercompany payable.  Do you

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    see that?

2    A.    Yes, I do.

3    Q.    What is your understanding of what a payable is?

4    A.    It's an obligation from one entity to another.

5    Q.    Okay.  And you also believe that when the ResCap employees

6    put this together and caused it to be filed with the bankruptcy

7    Court, they intended it to be an accurate assessment, correct?

8            MR. KERR:  Objection, Your Honor.

9            THE COURT:  Overruled.

10   A.    I think that is correct, but I recognize that this is the

11   amended schedule of assets and liabilities, and I believe that

12   in the original asset and liability schedule, with respect to

13   this schedule, there was a reservation of rights by the debtor

14   indicating that although these were listed, they were not

15   necessarily to be considered to be valid intercompany payables.

16   Q.    Okay.  At what point in this bankruptcy case did the

17   debtors first publicly take the position -- and by publicly I

18   mean it's something filed on the docket in this Court -- that

19   the intercompany payables, which were the payables and the

20   receivables, were not really liabilities and assets, they were

21   more like equity?  When was the first time that happened?

22           MR. KERR:  Objection, Your Honor.

23   A.    I have no idea.

24   Q.    Do you know whether it happened before the results of the

25   mediation and the global settlement were announced?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

180

1    A.    Well, I think, as I said, in the original schedule, of

2    which this is an amendment, I believe there was a reservation

3    of rights with respect to intercompany payables.  So I'm not

4    sure I can do anything earlier than that.  That, as I said, was

5    before my coming on board in mid February.  But I believe that

6    that is correct.

7    Q.    Well, certainly there was the reservation of rights.  My

8    question is when did the debtors first invoke that reservation

9    of rights to treat -- in a public way on the docket in this

10   case, treat these intercompany payables and receivables as

11   something other than intercompany payables and receivables?

12            MR. KERR:  Objection.

13            THE COURT:  Sustained.

14   Q.    When did ResCap, the company of which you are the CRO,

15   first make a public statement that they did not consider the

16   intercompany payables and receivables to be true debt?

17   A.    I thought --

18            MR. KERR:  Objection, Your Honor.

19            THE COURT:  Overruled.

20   A.    I thought they did that when they filed their original

21   schedules with the reservation of rights with respect to the

22   intercompany payables.  Am I missing something?

23            THE COURT:  I think Mr. Cohen's question really is

24   different.  It's one thing to reserve your rights, and then

25   it's another thing to take the position with -- I think his

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  question fairly addresses, do you know when the debtors took

2  the position that the intercompany debts were not valid debts?

3  Is that a fair --

4        MR. COHEN:  That is a more articulate form --

5        THE COURT:  No, it's not.  It's just --

6        MR. COHEN:  -- of my question; thank you.

7        THE COURT:  I think that was really the question.

8  A.   The answer is I don't know.

9        THE COURT:  Okay.

10  Q.   Okay.

11       Now, let's talk about the Ally contribution.

12       Do you agree that the 2.1 billion dollar contribution is

13  really the keystone of the global settlement and the plan?

14  A.   It is certainly an important aspect of it.

15  Q.   All right.  And you understand, at the time you became CRO

16  and you were participating in mediation, Ally believed it had

17  claims against -- sorry, ResCap believed it had claims against

18  Ally, right?

19  A.   Yes.

20  Q.   All right.  But you, as CRO, never undertook an effort to

21  either identify specific claims or quantify the value of those

22  claims, right?

23  A.   I certainly took an effort to identify the claims.  I had

24  many, many presentations about the nature of the claims that

25  might be asserted by the debtor against Ally, by the creditors'

**RESIDENTIAL CAPITAL, LLC, ET AL.**

182

1    committee against Ally, but I did not seek to ever value the

2    individual claims.

3    Q.    What type of claims were identified to you?

4    A.    Well, ranging from alter ego, piercing the corporate veil,

5    aiding and abetting, domination and control, those kinds of

6    claims.

7    Q.    Did anybody identify contract claims to you?

8    A.    I think -- I'm not sure what contract claims you have in

9    mind, but I certainly had presentations made about other kind

10   of claims that might be thought about.

11   Q.    Did the presentations also include potential breaches of

12   contract by Ally vis-a-vis ResCap?

13   A.    Well, I'm not sure how to answer that question.  But, for

14   example, I know that the JSNs alleged that there is some value

15   to the tax allocation agreement and that that's a contract

16   claim.  I had presentations about that to me as well.

17        So I think I encompassed just the ones I mentioned.  But I

18   think all of the things that anybody thought, at least on the

19   debtors' side and the creditors' committee side, might be

20   claims against Ally.

21   Q.    All right.  So you were knowledgeable about the potential

22   claims when you went into the mediation, right?

23   A.    Yes, I was.

24   Q.    And you understand now that one of the things that Ally

25   wants, as a result of the mediation and as part of the bargain

**RESIDENTIAL CAPITAL, LLC, ET AL.**

183

1   for its 2.1 billion dollar payment, is a release on all claims

2   ResCap has against Ally, right?

3   A.   Correct.

4   Q.   And among those, they also want a release on contract

5   claims within that broad definition?

6   A.   I'm -- I'm sure they do.

7   Q.   All right.  And you're prepared to give them that, right?

8   A.   Correct.

9   Q.   But you didn't make any attempt to value what alter ego

10  claims or tort claims or any other claims would look like,

11  right?

12  A.   Correct.

13  Q.   Why not?

14  A.   Because I thought that it would be really speculative to

15  try to do that, and I think the kind of the claims that are

16  available, not just the debtors' claims, the claims of third

17  parties, which may have individual claims against Ally, in some

18  fashion, as a result of something to do with ResCap, are also

19  being released to try to look at all of those.  And I assume --

20  I don't know -- I assume there must be hundreds of them all

21  over the -- all over the United States, to try to get a handle

22  on those.  I assume, even if I took the time and had the

23  ability and skill set to put values on all of those, I'm not

24  sure everybody, who was part of the participating creditors or

25  others, would agree with my values, and I think we'd be back

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    here in Court fighting over my values instead of looking at the

2    confirmation of a Chapter 11 plan.

3    Q.    Well, let's be clear.  When you say you put a value on it,

4    you certainly would have relied on your team of lawyers at

5    Morrison & Foerster, right?

6    A.    Well, I certainly have a lot of confidence and faith in

7    Morrison & Foerster, but I've had a lot of experience looking

8    at claims over the course of those fifty years.  I've had lots

9    of presentations from lawyers as to what the range of recovery

10   likely was, and what the range of value for the claim really

11   was.  And it's all very interesting, but it's not the same as

12   getting a global settlement or really coming to a firm

13   conclusion.

14       I mean, you can come to a conclusion about all of this, we

15   could have litigated, and it was sort of a binary decision for

16   me early on.  We could have litigated all -- every creditor

17   could have been litigated with to find out what the size of

18   their claim was.  Ally could have been sued by the creditors'

19   committee under their standing motion.  Ally would have

20   defended those actions, private security claims would have

21   sued, everybody would be litigating.  We might take four or

22   five years, and at the end of that time we might have

23   perfection, in the sense that we would know what all the

24   allowed claims are and what our recovery is from AFI.

25       The problem, of course, is that the debtor would like to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

185

become administratively insolvent during that process and there
would be no distribution to creditors for years to come.  It
seemed to me to be not an intelligent way to go forward,
because I think -- and I'm comforted by the fact that the
creditors, in large measure, have overwhelmingly voted in favor
of this plan, tells me what we did was the right thing to do.

Q.   So to back up, you determined, at the beginning, that
having an estimate of claims prepared by your lawyers and
financial advisors was not going to be something helpful to
you, going into the mediation?

A.   That's correct, because I don't think that Ally was
thinking about it in those terms and I don't think that we
were.  I think my goal was to get as much money as possible
from Ally, because obviously the more money you have, the
easier to it is for people to coalesce around that.

     Ally's goal was to pay as little as humanly possible, but
to pay an amount just big enough, to the last dollar, that
would be sufficient to get all of the creditors to look at that
sum of money, look at what was available under -- from
distribution on the debtors' estates and say that that
combination of dollars was enough for them to satisfy their own
individual claims and to not feel too badly about seeing other
creditors receive some debt benefits as well.

Q.   And to be clear, when you were doing that calculus, it was
your understanding that the JSNs did not have a lien on any

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    portion of the Ally contribution, right?

2    A.    Well, that -- that was my own view of the world, but of

3    course that's not binding upon the JSNs and we're here,

4    obviously, because you assert a different position.  And I

5    thought that we did well in thinking about all of this, in the

6    sense that we provided for the JSNs a full recovery with

7    pre-petition interest and provided a mechanism for the JSNs to

8    assert their claims for post-petition interest.

9    Q.    So when you were negotiating the settlement and you were

10   looking out for all of the creditors, it was your thinking that

11   the JSNs did not have a lien on the Ally contribution, right?

12   A.    That was my thought, yes.

13   Q.    Okay.  And you also thought that if, in this phase two

14   trial, the JSNs proved that there is a value to the lien and

15   the Court does an allocation, to the extent that they are

16   oversecured, they'd be entitled to their interest that way,

17   right?

18   A.    Yes.

19   Q.    Okay.  So you would agree with me that the claims that

20   ResCap hold -- held -- holds, until the release is entered,

21   against Ally are assets of ResCap, right?

22   A.    Yes.

23   Q.    On the liability side of ResCap, people who participated

24   in the mediation were parties who had claims against both

25   ResCap and Ally, right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   Some did; not all.

2   Q.   Okay.  With respect to the people who had claims against

3  ResCap, did you have your lawyers do a litigation analysis on

4  the liability side?

5   A.   I'm not quite sure what --

6        THE COURT:  I don't understand your question.  Would

7  you just --

8        MR. COHEN:  Sure.

9   Q.   For example, the private securities plaintiffs asserted

10  claims against ResCap and Ally, right?

11   A.   Yes.

12   Q.   Did you have your lawyers do a litigation analysis to tell

13  you what the strength of those claims were and what the

14  magnitude of the damages may be?

15   A.   Oh, yes.  I had full presentations, basically, both from

16  my counsel, creditors' committee counsel, sometimes counsel for

17  the individual creditors themselves, and analyzing each other

18  person's claims, the strengths and weaknesses of their claims,

19  and from the debtors' perspective what our affirmative defenses

20  would be and affirmative actions would be with respect to every

21  creditors' claim.

22   Q.   So on the liability side, you actually did undertake to do

23  a litigation and exposure analysis, right?

24   A.   Well, when you're talking about that, what I learned about

25  was what the strengths and weaknesses were of our case, but I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

188

1    don't know that anybody ever said the strengths and weaknesses

2    bring us to X dollars as a result of that.  That's not what we

3    did.  I learned the strengths and weaknesses of people -- of

4    parties' positions and of creditors' claims, but we never put

5    dollar amounts on them.

6    Q.    And the dollar amounts were a subject of negotiation in

7    the context of mediation, right?

8    A.    Correct.

9    Q.    Okay.  Would you turn to your witness statement, which is

10    the first document in your binder?  And I'd like to direct your

11    attention to paragraph 132 on page 50, please.  And let me know

12    when you are there.

13    A.    I'm sorry, what paragraph again?

14    Q.    Paragraph 132 on page 50, please.

15    A.    Yes.

16    Q.    All right.  In that paragraph you say, "The junior secured

17    noteholders' counsel and advisors attended the mediation, but

18    the principals of the junior secured noteholders made a

19    strategic decision not to participate in the mediation, which

20    resulted in the plan support agreement and thus did not enter

21    into the plan support agreement."  Do you see that?

22    A.    Yes, I do.

23    Q.    You don't have personal knowledge as to why the principals

24    of the junior secured noteholders did or did not attend a

25    mediation, do you?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    Well, let me -- let me tell you what I know.  Judge Peck

2    was the host of the mediation, and he invited to the mediation

3    those whom he invited.  I think he would have invited all of

4    the JSN secured noteholders, but I don't think that he was

5    comfortable with the kind of disclosure documents that they

6    wanted, so he chose not to invite them.

7    Q.    So it's your testimony that they were not invited to the

8    mediation?

9    A.    I think they were invited, but they were invited, as

10   everybody else was, who agreed to maintain the confidentiality

11   of the mediation process and not participate in the trading of

12   debt as a result of that mediation process.  I think, as I

13   said, that Judge Peck was not comfortable with the requirements

14   for participation from members of the ad hoc committee, or at

15   least some of them.

16   Q.    Did Judge Peck tell you that?

17   A.    Yes.

18   Q.    And did Judge Peck tell you that the junior secured

19   noteholder principals made a strategic decision not to attend

20   the mediation?

21   A.    That's my own conclusion.

22   Q.    And that conclusion is based on the conversation with

23   Judge Peck?

24   A.    That's correct.

25   Q.    Do you know -- have personal knowledge as to why the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

190

1   principals of the junior secured noteholders did not enter into

2   the plan support agreement?

3   A.    No, I do not know why they did not enter into the plan

4   support agreement.

5   Q.    They didn't call you and tell you, and you didn't call

6   them and ask them?

7   A.    No, and quite frankly, I was surprised and disappointed

8   that they did not, because I thought that for them to get a

9   meaningful recovery we needed to have a confirmation of a

10  Chapter 11 plan.  Absent a confirmation of this plan, and the

11  litigation that might ensue as a result of not confirming a

12  plan, I assumed there would be distri -- there would be no

13  effective date, no Ally contribution, the JSNs would be

14  fortunate to recover the full amount of their pre-petition

15  allowed claim at some future date, let alone what they're

16  getting out of this claim.  So as I said, I was disappointed

17  that they did not sign up for this plan.

18             MR. COHEN:  Thank you.  I have no further questions.

19             THE COURT:  Thank you, Mr. Cohen.

20             Any other cross-examination?

21  CROSS-EXAMINATION

22  BY MR. SCHAFFER:

23  Q.    Mr. Kruger, I think you've heard I'm Eric Schaffer, here

24  for Wells Fargo as collateral agent.

25  A.    I have.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

191

1    Q.    I'll try and move through this as expeditiously as I can.

2    Are you familiar with Wells Fargo's role as collateral agent

3    with regard to the AFI revolver and the junior secured notes?

4    A.    I've been informed that that's your role.

5    Q.    Yes.  Thank you for the approbation.

6         Are you aware that in connection with the AFI revolver,

7    Wells Fargo has a first priority lien?

8    A.    I am not familiar with that.

9    Q.    Okay.  Do you know whether Wells Fargo is a secured

10   creditor?

11   A.    No, I do not know anything about that.

12   Q.    Do you have an understanding that, from time to time,

13   Wells Fargo released liens on certain collateral?

14   A.    I've heard about that.

15   Q.    Okay.  Do you understand that for purposes of such

16   releases, the various documents, the revolver, the security

17   agreement, the intercreditor, all provided the rules of the

18   road for when and how things should be released?

19   A.    I'm not familiar with that.

20   Q.    Do you know whether Wells Fargo received officer

21   certificates or opinions of counsel with regard to any of the

22   lien releases?

23   A.    I have no idea.

24         THE COURT:  This is all very interesting.  Do you

25   really think you're going to get any competent evidence from --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  go ahead.

2          MR. SCHAFFER:  Your Honor, I promise to move as

3  quickly as I can.

4          THE COURT:  You've been asking a handful of questions

5  but I -- you know.

6          MR. SCHAFFER:  Well, I appreciate the Court permitting

7  me to ask a few more.

8          THE COURT:  Go ahead.  Just go ahead.

9  Q.   Are you aware that Wells Fargo has noted in its objection

10 that it's been threatened with suit by the JSNs?

11 A.   I've heard about that as well.

12 Q.   And you understand that that would be somehow connected to

13 the release of liens in connection with the junior secured

14 notes?

15         THE COURT:  I'm going to sustain my own objection to

16 this, okay?  This is not -- look, let's move on, okay?  If you

17 have questions about what this witness knows, about what ResCap

18 did with respect to Wells Fargo as collateral agent, go ahead

19 and ask him.  Otherwise stop wasting my time.

20 Q.   Mr. Kruger, Mr. Lee, in his opening, said he did not

21 believe the JSNs could have any kind of legitimate claim

22 against Wells Fargo, so there should be ultimately no

23 indemnification claim against the debtors.  Do you have any

24 knowledge about that?

25 A.   No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Have the debtors made any investigation of claims that

2   might be asserted by the JSNs against Wells Fargo?

3   A.   No, not that I know of.

4   Q.   Do you have any basis to believe that they wouldn't sue

5   Wells Fargo?

6        MR. KERR:  Objection, Your Honor.

7        THE COURT:  Sustained.

8   Q.   How do you evaluate Wells Fargo's indemnification claim

9   against the debtors?

10  A.   I have not done so.

11  Q.   Do you know if anyone has done so for the debtors?

12  A.   Not that I'm aware of.

13  Q.   Are the debtors prepared to reserve an amount sufficient

14  to ensure that whatever indemnification claim Wells Fargo might

15  have, it will be paid?

16       MR. KERR:  Objection.

17       THE COURT:  Sustained.

18  Q.   Are you familiar with the releases that are granted under

19  the plan?

20  A.   Yes.

21  Q.   Is it your understanding that the releases would extend to

22  any claims that Wells Fargo might have against directors and

23  officers of ResCap?

24  A.   It's probably a lawyer's answer, but I believe that that's

25  correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

194

1   Q.   Do you know whether the proposed releases would also

2   extend to any claims that Wells Fargo might have against Ally

3   for indemnification?

4         THE COURT:  You know, you can get a legal -- you know,

5   at some point a legal issue may be relevant, but not from this

6   witness.  He's not testifying as an expert.  He's testifying --

7   well, he's testifying as a CRO.  He may be very expert in what

8   he does, but I'm going to preclude your further questions about

9   what the legal effect of the release in the plan is.

10        MR. SCHAFFER:  I understand, Your Honor.

11  Q.   Mr. Kruger, is there any kind of insurance, D&O insurance

12  or otherwise, that would be available to Wells Fargo under the

13  plan?

14  A.   I have no -- I have no idea.

15  Q.   I think you testified earlier that the debtors agreed to

16  seek confirmation of the plan, regardless of the outcome of the

17  phase one litigation?

18  A.   That's correct.

19  Q.   So if the JSNs prove to be unsecured, you'd have no

20  problem --

21        THE COURT:  Undersecured, you mean?

22        MR. SCHAFFER:  Thank you, Your Honor.

23  Q.   If they prove to be oversecured, you would have no problem

24  with them getting paid in full with post-petition interest?

25  A.   Whatever the amount of their oversecured position was, as

**RESIDENTIAL CAPITAL, LLC, ET AL.**

195

1   I said, God bless them.

2   Q.    Do you understand that if they don't recover all of that

3   and they sue us, that Wells Fargo ends up with --

4           THE COURT:  Okay, your examination is over.  Go sit

5   down.  You're not heeding the directions that I've given, okay?

6   I made it clear before lunch, when I had counsel at the bench,

7   that I intend to keep a tight rein on the time and the

8   questions and cross-examination that's asked of witnesses.  I

9   tried to make it clear.  I've given you some leeway in your

10  examination.  I believe you're abusing it, and your examination

11  is over.

12          Anybody else wish to examine -- any redirect of Mr.

13  Kruger?

14          MR. KERR:  Your Honor, we have no redirect.

15          THE COURT:  All right.  Thank you you're excused, Mr.

16  Kruger.

17          THE WITNESS:  Thank you.

18          THE COURT:  We have to deal with this witness

19  statement.

20          THE WITNESS:  I'm not quite sure what to do with the

21  binders.

22          THE COURT:  Just leave them.

23          Go ahead, Mr. --

24          MR. COHEN:  Your Honor, we object to the introduction

25  of paragraph 132 of Mr. Kruger's witness statement into

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    evidence.  We think it is a lack of personal knowledge, hearsay

2    and given the Court's earlier comments about participation at

3    the mediation, we would also object on relevance.

4            THE COURT:  Sustained.  That's the only paragraph you

5    have a problem with?

6            MR. COHEN:  That is the only paragraph.

7            MR. KERR:  Sorry, Your Honor.  I'm just unclear --

8            THE COURT:  You can leave it there.  It's just I'm

9    sustaining the objection to it.

10           MR. KERR:  Right, but subject to that, Mr. Kruger's

11   testimony has been admitted?

12           THE COURT:  Oh, absolutely.

13           MR. KERR:  Okay, great.

14           THE COURT:  Absolutely.

15           MR. KERR:  Thanks.

16           MR. COHEN:  Thank you, Your Honor.

17           THE COURT:  It's just one paragraph of the direct --

18           MR. COHEN:  Correct --

19           THE COURT:  -- testimony.

20           MR. COHEN:  Correct.

21           THE COURT:  All right.  So --

22           MR. KERR:  Your Honor, do you need us to refile it

23   with the delete --

24           THE COURT:  Mr. Cohen, it's not -- I know I'm

25   sustaining the objection to the paragraph.  I mean, you read a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

197

1    transcript, somebody asks a question, and an objection is

2    raised and I sustain an objection, it's still in the

3    transcript.

4            MR. COHEN:  That's fine, Your Honor.

5            THE COURT:  Okay.  So --

6            MR. COHEN:  We don't need a redacted version.

7            THE COURT:  Okay.  All right.

8            MR. COHEN:  You have enough paper.

9            THE COURT:  So, all right.  The direct testimony of

10   Lewis Kruger, which has been identified at ECF docket number

11   5709, is in evidence, except for paragraph 132, as to which

12   I've sustained the objection.

13   (Direct testimony of Lewis Kruger, except for paragraph 132,

14   was hereby received into evidence as Plan Proponents' Exhibit,

15   as of this date.)

16           MR. KERR:  Thank you, Your Honor.

17           THE COURT:  Thank you very much.

18           MR. COHEN:  Your Honor, could we take a short break

19   before the next witness?

20           THE COURT:  Absolutely.

21           MR. COHEN:  Thank you.

22           THE COURT:  So let's -- we'll take this as our

23   afternoon recession.  We'll take a fifteen-minute recess.

24   Okay?

25           MR. COHEN:  Thank you, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

198

1           THE COURT:  All right.  Thank you very much.

2           Who is the next witness?

3           MR. KERR:  Your Honor, Mr. Thompson is the next

4  witness.  I will tell you that we worked very, very, very hard

5  to get our witnesses here and lined up.  However, we were given

6  cross-examination times of three hours for Mr. Kruger --

7           THE COURT:  Be thankful that it wasn't three hours.

8           MR. KERR:  I am, Your Honor, but I'm just telling Your

9  Honor that I may run out of witnesses --

10          THE COURT:  Blame Mr. Cohen.

11          MR. KERR:  Yeah, well --

12          MR. COHEN:  We gave our estimates before the bench

13  conference before lunch.

14          MR. KERR:  So Your Honor, I'm doing my best to have

15  everybody here, but I'm --

16          THE COURT:  I'm glad people got the message then.

17          MR. COHEN:  It was delivered.

18          THE COURT:  All right.  Fifteen-minute recess.  If you

19  run out of witnesses, everybody will get a little extra time.

20  Okay?

21       (Recess from 3:09 p.m. until 3:31 p.m.)

22          THE CLERK:  All rise.

23          THE COURT:  Please be seated.

24          MR. LAWRENCE:  Good afternoon, Your Honor; Alex

25  Lawrence on behalf the debtors.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

199

1           Your honor, in support of the joint Chapter 11 plan

2     proposed by the debtors and the official committee of unsecured

3     creditors, the debtors offer the direct testimony of William

4     Thompson, dated November 12, 2013, which was filed as docket

5     entry number 5713.

6            If Mr. Thompson was called to testify, he would

7     testify to what is in his written direct testimony.

8            We therefore offer his written direct testimony in

9     factual support of the plan confirmation in these consolidated

10    proceedings.

11            THE COURT:  Mr. Cohen?

12            MR. COHEN:  No objection, Your Honor.

13            THE COURT:  All right.  The direct testimony of

14    William Thompson, which is ECF number 5713 is in evidence.

15    (Direct testimony of William Thompson was hereby received into

16    evidence as Plan Proponents' Exhibit as of this date.)

17            THE COURT:  Are you going to cross-examine?

18            MR. COHEN:  We are not, Your Honor.

19            THE COURT:  Okay.  Does anybody wish to cross-examine

20    Mr. Thompson?

21            Are there any exhibits that you wish to offer?

22            MR. LAWRENCE:  There are a handful, Your Honor.

23            THE COURT:  All right.  Give me those.

24            MR. LAWRENCE:  They are -- we offer as plan

25    proponents' exhibits, Exhibit numbers 648, 649, 650, 651, 678,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    851, 924, 925 and 926.

2           THE COURT:  Are there any objections to those

3    exhibits?

4           MR. COHEN:  Your Honor, if I may have a minute.

5           THE COURT:  Yes, absolutely, sure.

6        (Pause)

7           MR. COHEN:  No objection, Your Honor.

8           THE COURT:  All right.  Exhibit 648, 649, 650, 651,

9    678, 851, 924, 925 and 926 are admitted in evidence.

10   (Exhibits regarding Mr. Thompson's testimony were hereby

11   received into evidence as Plan Proponents' Exhibits 648, 649,

12   650, 651, 678, 851, 924, 925 and 926, as of this date.)

13          MR. LAWRENCE:  Thank you, Your Honor.

14          THE COURT:  Thank you very much.

15          MR. KERR:  Your Honor, we'll get you a copy of his

16   direct in a moment.

17          THE COURT:  That's fine.

18          MR. KERR:  Okay, thank you.

19          THE COURT:  Okay.

20          MR. KERR:  One moment, Your Honor.

21          THE COURT:  Absolutely.

22          MR. KERR:  Your Honor, Charles Kerr on behalf of

23   debtors.  On behalf of the debtors and official committee of

24   unsecured creditors, we'd like to offer the direct testimony of

25   Martin Blumentritt.  It was filed in ECF as 5698.  It's dated

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    November 12, 2013.

2              If Mr. Blumentritt was asked these questions on the

3    stand, he would testify as set forth in his written testimony.

4              THE COURT:  Any objections?

5              MR. COHEN:  No objection, and we do not intend to

6    cross.

7              THE COURT:  All right.

8    (Direct testimony of Martin Blumentritt was hereby received

9    into evidence as Plan Proponents' Exhibit as of this date.)

10             THE COURT:  Any exhibits, Mr. Kerr?

11             MR. KERR:  Your Honor, we do have exhibits.  However,

12   there is a long series of insurance policies, and what I would

13   suggest is that we do what we're doing with Mr. Lipps, prepare

14   a list, I'll make sure Mr. Cohen gets it tonight, we'll go

15   through it, and I have them here if you'd like to have them,

16   Your Honor.

17             THE COURT:  Oh, I think I could probably live without

18   them for now.

19             MR. COHEN:  That's fine with us.

20             MR. KERR:  We'll take care of that housekeeping --

21             THE COURT:  Okay.

22             MR. KERR:  -- Your Honor.

23             THE COURT:  All right.  I think that's a good way to

24   proceed.  You'll prepare a written list and get -- see if you

25   can get agreement on it and --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

202

1          MR. KERR:  Right.

2          THE COURT:  -- I'll deal with any problems.  Thank you

3    very much.

4          MR. KERR:  No problem.  Let me just move these out of

5    the way.

6          THE COURT:  Okay.

7          MR. KERR:  One moment, Your Honor.

8          THE COURT:  Yes, that's fine.  I keep checking them

9    off your list.  We've got a lot of people.

10          Mr. Cohen, do I have your order of witnesses yet?

11          MR. COHEN:  Yes.  We served it -- yeah, it was filed

12    before noon today.

13          THE COURT:  Okay.  That's -- I wouldn't have seen it.

14    Okay.

15          MR. COHEN:  Sorry, Your Honor, it was exchanged.  It

16    was exchanged.

17          THE COURT:  So if you file it tonight on ECF --

18          MR. COHEN:  We'll be happy to.

19          THE COURT:  -- I would appreciate it.  And then if I

20    don't see it there, you'll tell me what the number is and I'll

21    print it out, because I've been trying to keep track of

22    witnesses.

23          MR. COHEN:  That'll be fine.  We will file those

24    tonight.

25          THE COURT:  That's fine.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          Go ahead, Mr. Kerr.

2          MR. KERR:  Your Honor, Charles Kerr on behalf of the

3   debtors.

4          In support of the joint Chapter 11 plan proposed by

5   the debtors and the official committee of unsecured creditors,

6   the debtors offer the direct testimony of Mark A. Renzi, dated

7   November 12, 2013, which was filed as docket entry number 5709.

8          If Mr. Renzi was called to testify, he would testify

9   to what is in his direct written testimony.  We offer his

10  direct written testimony in support of the consolidated

11  proceedings and plan confirmation.

12          THE COURT:  All right.  Mr. Cohen?

13          MR. COHEN:  Ms. Miller will be handling --

14          THE COURT:  Ms. Miller?

15          MR. COHEN:  -- this witness.

16          MS. MILLER:  We have no objections.

17          THE COURT:  All right.  So the direct testimony of

18  Mark A. Renzi, which is at ECF number 5709, is in evidence.

19  (Direct testimony of Mark A. Renzi was hereby received into

20  evidence as Plan Proponents' Exhibit as of this date.)

21          THE COURT:  I assume you're cross-examining Mr. Renzi?

22          MS. MILLER:  I am.

23          THE COURT:  Okay.  All right.

24          MR. KERR:  And we have no exhibits to offer with Mr.

25  Renzi.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Okay.  All right.

2          MR. KERR:  So I'm going to bring up a copy of his

3    direct.

4          THE COURT:  Thank you.

5          Mr. Renzi, if you would come up and be sworn.

6          If you would just go up and raise your right hand,

7    you'll be sworn.  Okay?

8      (Witness sworn)

9          THE COURT:  Okay.  Please have a seat.  Does somebody

10   have some water for Mr. Renzi?  You have your water.

11         THE WITNESS:  Thank you.

12         THE COURT:  All right.  Yes, that's good.

13   CROSS-EXAMINATION

14   BY MS. MILLER:

15   Q.   For the record, Tara Miller of Milbank, Tweed, Hadley &

16   McCloy, on behalf of the JSNs.  Good afternoon, Mr. Renzi.

17   A.   Good afternoon.

18   Q.   Mr. Renzi, you became actively engaged in the ResCap

19   matter in November 2011, right?

20   A.   That's correct.

21   Q.   And was sometime in early 2012 you were tasked with

22   understanding the nature of ResCap's intercompany balances,

23   right?

24   A.   Among other things, correct.

25   Q.   And you were heavily involved in the process, at FTI, of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    understanding really what was behind the intercompany balances,

2    right?

3    A.    I would say the focus of the -- my work was not

4    intercompany balances.  It was other things, but that was one

5    of the issues that was being addressed.

6    Q.    And you knew, based on your prior experience, that

7    intercompany debt transactions could be recharacterized in a

8    bankruptcy proceeding, right?

9    A.    That's my understanding.

10   Q.    And you understood also, based on discussions that you

11   had, the factors that would be relevant in a review of

12   intercompanies, right?

13   A.    I had an understanding, along with advice from counsel.

14        THE COURT:  I'm sorry, I didn't hear the last part.

15        THE WITNESS:  Along with advice from counsel.

16        THE COURT:  All right.

17   Q.    I'd like you, Mr. Renzi, to look at Exhibit DX-AXK.

18   A.    Is it only on screen or is it in a --

19   Q.    No, it's in the binder --

20        THE COURT:  It's on the second tab in the binder,

21   yeah.

22   Q.    -- in front of you.

23   A.    Thank you very much.

24        THE COURT:  Second tab.

25        MS. MILLER:  DX-AXK.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        THE COURT:  Oh, it's not the second tab.  I'm sorry.

2    It's midway through the binder.

3        MS. MILLER:  Yeah, it's after the disclosure

4    statement --

5        THE COURT:  Yeah, I got it.

6        MS. MILLER:  --  which is the very large one.

7    A.    I'm there.

8    Q.    Okay.  And Mr. Renzi, looking down in this exhibit past

9    the top e-mail, which you're not on, the second e-mail in the

10   chain is an e-mail from you to Barbara Westman and Cathy

11   Donzilla, copying a number of other people, dated April 20,

12   2012, right?

13   A.    Yes, that's correct.

14   Q.    And in this e-mail you indicate that you collected

15   questions from MoFo, K&E, Evercore and Ally, and that you

16   listed them in a pretty extensive e-mail that you sent over to

17   Ms. Westman and to Ms. Donzilla, right?

18   A.    Yes.

19   Q.    And these questions were specifically targeted toward the

20   factors that you and counsel thought were relevant to the

21   recharacterization analysis, right?

22        MR. KERR:  Objection, Your Honor.

23        THE COURT:  Overruled.

24   A.    We thought that this e-mail was an extensive and diligent

25   request list for information regarding intercompany balances.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

207

1    Q.    And you thought you were being as diligent as you possibly

2    could be in collecting, in your collection of information

3    related to the intercompany balances before the petition date,

4    right?

5    A.    Yes, we took this task very seriously.

6    Q.    And you wanted to make sure that both you and MoFo had as

7    much information as possible, right?

8    A.    Correct.

9    Q.    And you relied on ResCap's employees to provide you

10   accurate information about the intercompanies, right?

11   A.    I did.

12   Q.    And specifically you relied on Ms. Westman and Ms.

13   Donzilla and people who were working at their direction at

14   ResCap, right?

15   A.    Yes.

16   Q.    And it's your belief that the company gave you as much

17   information as it had in response to your requests, right?

18   A.    That's my belief.

19   Q.    And you also believed that the information that they gave

20   you was accurate, right?

21   A.    I believe to the extent that they could answer it, yes, I

22   believe it's accurate.

23   Q.    And Mr. Renzi, you had a very limited involvement in the

24   debtors' preparation of the SOALs, right?

25   A.    Correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

208

1   Q.    But you did review specifically how the intercompany

2   claims were reflected on the SOALs, isn't that right?

3   A.    I looked at some of the schedules along with the

4   intercompany schedules.  So it wasn't just that schedule.

5   There were other things, but I wasn't primarily focused on the

6   SOFA and SOALs.

7   Q.    But you did specifically look at the schedule that listed

8   the intercompany balances?

9   A.    Correct.

10  Q.    And you mentioned that you weren't primarily responsible,

11  your colleague Mr. Talrico (ph.) was taking the primary

12  responsibility in putting together the schedules, right?

13  A.    That's correct.

14  Q.    And after you reviewed the schedules on which the

15  intercompany balances appeared, you didn't give Mr. Talrico any

16  comments, right?

17  A.    I don't recall.

18  Q.    Was it your belief that the intercompany balances were

19  being reflected on the SOALs the way the company wanted them to

20  be reflected?

21          MR. KERR:  Objection.

22          THE COURT:  Overruled.

23  A.    It is my belief; I think that the company signed off on

24  the way they were reflected in the SOFA and SOALs.

25  Q.    You don't recall providing Mr. Talrico with any specific

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  comments, right?

2          THE COURT:  Asked and answered.

3  Q.   If you thought that they were misrepresented, you would

4  have told Mr. Talrico, right?

5  A.   Yes.

6  Q.   Mr. Renzi, I'd like you to turn now to document, in your

7  binder, DX-APA.

8  A.   Is it further back?

9  Q.   No, it's very close to the beginning, probably four tabs

10  in.  It is the third tab in.

11     Mr. Renzi, is this a document you've seen before?

12  A.   Yes.

13  Q.   And this is a presentation that FTI put together regarding

14  the ResCap intercompany transactions, right?

15  A.   And others, correct.

16  Q.   And this presentation is dated April 4, 2013, right?

17  A.   It is dated April 4, 2013.

18  Q.   And if you turn to page 6 of the deck, looking at the

19  first intercompany balance, the intercompany between ResCap LLC

20  and GMAC Residential Holding in the net claim amount of 3.334

21  million dollars, the first bullet states that the balance

22  generally arose from borrowing under loan agreements, do you

23  see that?

24  A.   Ms. Miller, I think it's 3,334 million, not 3 point --

25          THE COURT:  3.334 billion dollars?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

210

1          MS. MILLER:  Right, yes.

2          THE WITNESS:  Correct, Your Honor.

3   Q.   I keep my charts in billions, but you're right.  This one

4   is misleadingly in millions.

5          THE COURT:  It's not misleading.  It's what it is, but

6   it's billions.

7          MS. MILLER:  It's misleading only in my brain.

8   Q.   It is 3,334 million dollars is the net claim amount,

9   right?

10  A.   Correct.

11  Q.   And do you know who actually put together this PowerPoint?

12  A.   It was a combination of FTI, the company,

13  discussions with the company, and discussions with counsel.

14  Q.   And do you know who did the actual drafting penmanship?

15  A.   I would say it's a collective effort.

16  Q.   Do you know who attributed the labels to various columns?

17  A.   I can't remember specifically, but I know it was one of

18  the three groups.  This was obviously something that we wanted

19  to present publicly or out to a broader group, and we made sure

20  that we presented things as accurately as we possibly could.

21  Q.   Okay.  And the first bullet under transaction number 1

22  says that the balance generally arose from borrowings under a

23  loan agreement between ResCap and Res Holdings.  Do you see

24  that?

25  A.   I do.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.   And if you look down to intercompany two, which is the

2    intercompany between Residential Funding Company, RFC, and

3    ResCap, in the amount of -- in the claim amount of 1,955

4    million dollars, the first bullet says that "The balance

5    generally arose out of the operation of the company's

6    centralized cash management system as RFC generated cash.  That

7    cash would be swept upstream to ResCap.  Balance changed

8    frequently."  Do you see that?

9    A.   I do.

10   Q.   Do you believe that's an accurate description of how

11   intercompany balance number 2 arose?

12   A.   I do.

13   Q.   And you believe also that intercompany balance number 3,

14   which is the intercompany between Homecomings Financial, LLC

15   and RFC, in the amount of 1,252 million dollars also generally

16   arose out of the operation of the company's centralized cash

17   management system, right?

18   A.   Yes, I do.

19   Q.   And looking at intercompany balance number 4, which is the

20   intercompany balance between a Passive Asset Transactions, LLC

21   and GMAC Mortgage LLC in the amount of 697 million dollars,

22   that balance also generally arose out of the operation of the

23   company's centralized cash management system, right?

24   A.   I think the answer to this one is also yes, but I think in

25   the context of these balances they were continuously created,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   and to the extent that monies was being swept around the system

2   and going from A to B to C, there may be -- the balances kept

3   getting inflated, in my understanding.

4         So yes, one of the predominant reasons is a centralized

5   cash management system, but I also think that there is some

6   context that needs to be, you know, presented in terms of why

7   these balances were at the level that they are.

8   Q.   When you say inflated, you mean that the balances

9   increased as a result of cash moving throughout the system,

10  right?

11  A.   Yes, cash did move.  But to the extent that cash was

12  ultimately going to one debtor versus another debtor, the --

13  you may have multiple balances being created that were not I

14  would call, cleaned up.

15        So, for example, if A wanted to lend money to C, it may

16  have lent it from A to B to C, and then subsequent balances

17  were being created when the intent was really just to get money

18  from A to C, so --

19  Q.   Is that a hypothetical, or are you describing something

20  real at ResCap?

21  A.   That's my understanding.

22  Q.   And what is that understanding based on?

23  A.   Discussions with management.

24  Q.   Can you give me an example of intercompany balances that

25  you're describing that are reflected on the intercompany

**RESIDENTIAL CAPITAL, LLC, ET AL.**

213

1   balance chart?

2   A.   I think that's what's been represented in my direct

3   testimony, is that these are a combination of tens of thousands

4   of transactions.  So I probably could not isolate that without

5   doing a tremendous amount of personal diligence in terms of

6   seeing a specific example for you.

7   Q.   And you never personally diligenced any of the

8   transactions underlying these balances, right?

9   A.   No.

10  Q.   And that's something that the company would have done,

11  right?

12          MR. KERR:  Objection, Your Honor.

13          THE COURT:  Sustained.

14  A.   I believe the company --

15          THE COURT:  Stop.

16  Q.   You can't answer.

17  A.   Sorry.

18  Q.   So looking at all of the intercompany balances that are

19  listed in this exhibit, you can't give me one specific example

20  of the type of movement that you're discussing?

21  A.   Not here, no.

22  Q.   Well, looking down to intercompany balance number 5, the

23  intercompany balance between Executive Trustee Services LLC and

24  GMACM, in a net claim amount of 265 million dollars, you agree

25  also that that balance generally arose out of the operation of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  the company's centralized cash management system, right?

2  A.   Correct.

3  Q.   And the same would be true also for intercompany balance

4  number 6 on page 8 of the deck between RFC and RFC Asset

5  Holdings II, LLC, in the net claim amount of 232 million

6  dollars, right?

7  A.   It also goes on to say "Balance primarily attributed to

8  settlement of taxes under the tax sharing agreement".

9  Q.   And do you see that as contradicting the first sentence

10  which says that the balance generally arose out of the

11  operation of the company's centralized cash management system,

12  or giving more information about that?

13  A.   I can't tell which one of the two sentences to weigh more.

14  Q.   And Mr. Renzi, you have experience with other debtors with

15  cash management systems, right?

16  A.   I do.

17  Q.   And you've never been involved in a case where an

18  intercompany balance generated by a cash management system has

19  been recharacterized as equity, right?

20  A.   I don't think that the situations were comparable, the way

21  you're stating it.

22  Q.   But you've never seen intercompany balances that were

23  generated as a result of the functioning of the centralized

24  cash management system recharacterized as equity, right?

25  A.   I don't think -- I'm not trying to be argumentative; I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

215

1  just don't think they're comparable, because in prior examples

2  intercompany balances weren't intercompany balances; they were

3  formal documents that were intercompany notes that had maturity

4  dates, interest payments, interest rates, et cetera.

5  Q.   Mr. Renzi, have you ever been involved in a Chapter 11

6  proceeding where an intercompany balance that arose out of the

7  functioning of a centralized cash management system was

8  recharacterized as equity?

9  A.   I can't recall.  I don't think so.

10  Q.   Looking back at page 8, at intercompany balance number 6

11  in Exhibit DX-APA, and looking the a the last sentence that you

12  mentioned, which states that the balance -- the last sentence

13  of the first bullet, which states that the balance primarily

14  attributable to settlement of taxes under the tax sharing

15  agreement -- does that sentence impute debt or equity to you?

16        MR. KERR:  Objection.

17        THE COURT:  I don't understand your question, Ms.

18  Miller.

19  Q.   Does that sound like -- let me restate it.

20        Mr. Renzi, does the settlement of taxes under a tax

21  sharing agreement sound like it would be a debt transaction or

22  an equity transaction?

23        MR. KERR:  Objection, Your Honor.

24        THE COURT:  I'm going to overrule it.  If you can

25  answer it --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

216

1  A.    I don't know the answer to that question.

2  Q.    I'd like you to turn now to Exhibit DX-AWR, which is the

3  notice of filing of the corrected solicitation version of the

4  disclosure statement in the joint Chapter 11 plan, attaching

5  the disclosure statement and all exhibits.

6      Mr. Renzi, have you seen this document before?

7  A.    Yes, I have.

8  Q.    If you could turn to page 52 of 201 on the top, or page 42

9  on the bottom of the document.  Looking down to the last

10 paragraph, Romanette iii states that "the inability to reach

11 consensual agreement with numerous creditor constituencies

12 absent consensual resolution of the intercompany balances and

13 inextricably related issues".  Do you know which creditor

14 constituency insisted on settlement of the intercompany claims

15 at zero?

16         THE WITNESS:  Your Honor, I think a lot of this was

17 under mediation, but --

18         THE COURT:  Don't --

19         MR. KERR:  I would object, Your Honor.  It calls for

20 disclosed stuff that happened in the mediation.

21         THE COURT:  If it calls for the disclosure of what was

22 discussed in the mediation, I will sustain that.

23         MS. MILLER:  I believe at Mr. Renzi's deposition --

24         THE COURT:  I don't care what he said at his

25 deposition.  What I care about is when it was discussed, okay?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

217

1   I'm not precluding you from questioning on the issue.  All I'm

2   going to say is if the discussion occurred as part of the

3   mediation and an objection is made, I'll sustain it.  Maybe you

4   could inquire in another fashion to get to the same point.  I'm

5   not closing out this line of questioning, because the statement

6   is in a public document, the disclosure statement.

7   Q.   Mr. Renzi, it's your understanding that it was the

8   unsecured creditors' committee then insisted on the settlement

9   of the intercompany claims at zero in this case, right?

10  A.   I think that this is a consensual plan and that when we

11  reached a global settlement for which essentially is global

12  peace, that that was one of the components of the plan.

13         THE COURT:  Outside of the mediation, did anyone tell

14  you, in words or in substance, that the creditors' committee

15  insisted on setting the intercompany balance issue at zero?

16         THE WITNESS:  I think it was discussed.  I mean, one

17  of the items that we've considered in the diligent process

18  we've gone through is --

19         THE COURT:  But my question is specific, but I'm

20  excluding what was discussed during the mediation, all right --

21  excluding what happened in the mediation, did anyone tell you,

22  in words or in substance, that the creditors' committee

23  insisted on settling the intercompany balance issue at zero?

24         THE WITNESS:  I think they believed it was reasonable.

25  So I'm not sure the word insisted, I don't think -- I can't

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   remember if they insisted, but I think they thought it was

2   reasonable.

3          THE COURT:  Go ahead, Ms. Miller.

4   Q.   When you say "they", you're referring to the unsecured

5   creditors' committee, correct?

6   A.   Correct.

7   Q.   Mr. Renzi, you never valued potential claims that ResCap

8   had against Ally, right?

9   A.   Correct.

10  Q.   And that's because you were never asked to do that

11  analysis, right?

12  A.   I was not asked to do that analysis.

13  Q.   And it's not because you couldn't have done the analysis,

14  right?

15  A.   FTI is a very large firm.  I'm sure, if need be, we could

16  have.  And --

17  Q.   And you weren't asked to -- you weren't asked to do a

18  valuation of claims pre-petition, right?

19         THE COURT:  I'm sorry; I don't understand your

20  question.

21         MS. MILLER:  Sorry.

22  Q.   You weren't asked to do a valuation of potential claims

23  that ResCap could assert against Ally or that third parties

24  could assert against ResCap pre-petition, right?

25  A.   Correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

219

1  Q.   And you also weren't asked to do a valuation during the

2  mediation, right?

3        MR. KERR:  Objection.

4

5

6  **start 1:37:10**

7        THE COURT:  I'm going to let him answer this one yes

8  or no.

9        MR. KERR:  Okay.

10       THE COURT:  Can you answer that yes or no.

11       THE WITNESS:  Do you mind just one more time?

12  BY MS. MILLER:

13  Q.   Yeah.  You weren't asked to do a valuation of potential

14  claims that ResCap could assert against Ally or the third

15  parties could assert against Ally during the mediation, right?

16  A.   That's correct.

17  Q.   And you also weren't asked to do a valuation or an

18  allocation after the global settlement was struck, right?

19  A.   I was not asked to redo the global settlement, no,

20  correct.  I was not asked to redo the global settlement.

21       THE COURT:  That wasn't the question.  Listen

22  carefully again, okay?

23       THE WITNESS:  I'm sorry.

24  BY MS. MILLER:

25  Q.   You weren't asked to do an allocation of the global

**RESIDENTIAL CAPITAL, LLC, ET AL.**

220

1    settlement amount --

2    A.    I'm sorry.  That --

3    Q.    -- among claims after the global settlement was struck,

4    right?

5    A.    That's correct.

6    Q.    And the plan allocates a settlement among certain debtors,

7    right?

8    A.    Yes.

9    Q.    Sorry.  I think I misspoke, but if you understood.

10   A.    Maybe if you could clarify it, that would be great.

11   Q.    Okay.  Under the plan, the Ally contribution is allocated

12   among certain debtors, right?

13   A.    Correct.

14   Q.    And were you involved in developing that allocation?

15   A.    That allocation occurred during the mediation.

16   Q.    And the plan also -- in addition to allocating the

17   settlement, also contemplates where certain creditors' claims

18   will be allowed; is that right?

19   A.    That's correct.

20   Q.    But at no time did you try to allocate the global

21   settlement payment by claim?

22   A.    No.

23   Q.    Mr. Renzi, you prepared the debtors' liquidation analysis,

24   right?

25   A.    I did, and others at my direction.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   And you've been designated as the debtors' corporate

2  representative on the liquidation analysis, right?

3  A.   Correct.

4  Q.   And in the debtors' liquidation analysis, which is exhibit

5  8 to Exhibit DX-AWR --

6           THE COURT:  At the top, there are page number of --

7           MS. MILLER:  We flagged the exhibits that I thought

8  might be used.

9           THE WITNESS:  Oh, got it.  You said Exhibit 8?

10           MS. MILLER:  It's Exhibit 8.  It's --

11           THE COURT:  All right.  I got it.

12           MS. MILLER:  -- page 33 of 159, probably in the second

13  or third run-through, the numbers in the filing.

14           THE COURT:  I see the flags.

15           THE WITNESS:  That makes it easier than the

16  deposition.

17  BY MS. MILLER:

18  Q.   Yes, it does.  I learned.

19       And in the debtors' liquidation analysis, you didn't

20  include any value for claims against Ally, right?

21  A.   No, I did not.

22  Q.   But you're not suggesting that those claims have no value,

23  right?

24  A.   No, I'm not suggesting that.

25  Q.   And you're not giving an opinion here today on the value

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    of any claim against Ally, right?

2    A.   I am -- in the liquidation analysis, no.

3    Q.   And you didn't include a value for the Ally claims because

4    you believed that it was clear that Ally would not settle

5    without a broad release from the debtors and the third parties,

6    right?

7    A.   Well, the assumption was used in the context of a

8    liquidation analysis, and what I believed to be the case is to

9    come up with a new number that was different than what was part

10    of the global settlement.  It would be very difficult given the

11    context of what Mr. Carpenter has testified to and what Mr.

12    Kruger has testified to, that it would be very difficult to

13    come up with what that amount would be given the extent of

14    litigation that I thought would occur and the amount of

15    additional claims that may be asserted, so that is correct.

16    Q.   And in fact, in the liquidation analysis itself, you state

17    that the outcome of any litigation against Ally would be highly

18    speculative and dependent on uncertain variables, right?

19    A.   Yes, correct.

20    Q.   If the RMBS claims weren't settled, recovery on those

21    claims would also be speculative and subject to uncertain

22    variables, right?

23    A.   Well, my understanding is that the RMBS claims were

24    asserted at a much larger amount than what was presented in the

25    global settlement so --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  I don't understand your answer.

2          MS. MILLER:  Right.  Let me reask my question,

3    maybe --

4          THE COURT:  Go ahead.

5    BY MS. MILLER:

6    Q.    In the absence of a settlement of the RMBS claims, it

7    would be speculative and those claims would also be speculative

8    and subject to uncertain variables, right?

9    A.    Yes.

10   Q.    You included a value for the RMBS claims in the

11   liquidation analysis, right?

12   A.    I did.

13   Q.    And in fact, in the high recovery scenario, you valued

14   them at their global settlement value, right?

15   A.    For ease of comparison, that's correct.

16   Q.    And you believe that was a reasonable assumption, right?

17   A.    I did.

18   Q.    And Mr. Renzi, in a liquidation analysis, the RMBS

19   claimants would keep their claims against Ally, right?

20   A.    That is my understanding, yes, correct.

21   Q.    Because Ally can't get a third-party release in a

22   liquidation analysis, right?

23   A.    Correct.

24   Q.    And Mr. Renzi, in the absence of a global settlement, the

25   monoline claims would also be speculative and subject to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

224

1    uncertain variables, right?

2    A.    I wouldn't say it like that, but yes, they would be

3    subject to certain variables, and I think they would try to

4    assert a larger claim that was presented in the global

5    settlement.

6    Q.    And you included a value for the monoline claims also in

7    your liquidation analysis, didn't you?

8    A.    Yes, that's correct.

9    Q.    And you thought that that was also a perfectly reasonable

10    thing to do, right?

11    A.    Well, we did a range, so we thought that the range was

12    helpful for the purposes of the liquidation analysis.

13    Q.    And in the high recovery scenario, the monolines are

14    valued at their global settlement value, right?

15    A.    Correct.

16    Q.    And in the low recovery scenario, they're actually given a

17    higher value than under the global settlement, right?

18    A.    I would say a higher claim, not higher value, but that's

19    fine.

20    Q.    And you believe that both of those were reasonable, right?

21    A.    I did.

22    Q.    And in a liquidation analysis, the monolines would also be

23    keeping their claims against Ally, right?

24    A.    That's correct.

25    Q.    And under your liquidation analysis, Ally is not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    contributing anything?

2    A.    That is correct, Ally is not contributing.  The 2.1

3    billion dollar settlement, my understanding is for global

4    peace, in the context of this case.  It's broader than that.

5    Q.    Two billion dollars would be a bargain for that.

6    A.    That would be very cheap for the world, but --

7    Q.    Right.  And Mr. Renzi, while you were drafting the

8    liquidation analysis, you talked about including additional

9    scenarios that would include a recovery from Ally, right?

10    A.    We did.

11    Q.    And you even ran some of those scenarios, right?

12    A.    Well, I think the context of doing the liquidation

13    analysis is important.  One of the things that we're dealing

14    with is in a liquidation where it's absent, broad, third-party

15    releases, the global settlement, it's difficult to figure out

16    because Ally and Mr. Carpenter said, and I think they've been

17    on record, that they would fight -- for an extended period of

18    time, there would be extended litigation over claims, over --

19    and that could go on for an extended period of time.  And in my

20    opinion, the company would become administratively insolvent at

21    some point.  To litigate this would be very difficult, to

22    litigate every claim.

23        So when we were considering whether or not to add a lower

24    amount than what was agreed to in the global settlement, it was

25    very difficult to do.  So that's why -- one of the reasons why

**RESIDENTIAL CAPITAL, LLC, ET AL.**

226

1  we left it out.

2  Q.    I'm not sure I followed your answer, but I'm not sure it

3  was responsive to my question either.

4          THE COURT:    Well, let's leave the commentary out.    If

5  you've got another question, ask your question.

6  BY MS. MILLER:

7  Q.    You thought that it was important to include in your

8  liquidation analysis a discussion of affirmative claims that

9  could be asserted against Ally, right?

10 A.    Correct.

11 Q.    And you had some discussions with the committee's advisors

12 about what information should be included in that disclosure,

13 right?

14 A.    That's correct.

15 Q.    And you decided that instead of adding more descriptive or

16 running another -- adding another scenario that reflected an

17 Ally contribution, you would add the sentence that appears at

18 the end of paragraph 29 on page 5 of the liquidation analysis,

19 which states that the examiner's report includes an assessment

20 of potential claims against Ally, right?

21 A.    I see it and it is there, that last sentence.

22 Q.    And that is the debtors' disclosure about affirmative

23 claims against Ally, right?

24 A.    One of them, yes.

25 Q.    And Mr. Renzi, in a liquidation analysis, the JSNs would

**RESIDENTIAL CAPITAL, LLC, ET AL.**

227

1   also retain any claims that they have against Ally, right?

2   A.   Correct.

3   Q.   You didn't consider the value of that in your liquidation

4   analysis, did you?

5   A.   No, I did not.

6   Q.   Mr. Renzi, in addition to testifying here as the debtors'

7   corporate representative on the liquidation analysis, you've

8   also submitted two expert reports in this case; is that

9   correct?

10   A.   For phase 2, it's three in total.

11   Q.   Right.  Sorry.  I'm phase 2 centered now -- on phase 2.

12   And you submitted direct testimony which goes primarily to your

13   expert testimony; is that right?

14   A.   Correct -- excuse me, and my rebuttal to Mr. Fazio.

15   Q.   When you say your rebuttal to Mr. Fazio, what are you

16   referring to?

17   A.   Well, there are two reports, Your Honor.  One was for

18   liquidation analysis and one was for also the analysis that Mr.

19   Fazio presented on intercompany balances.

20   Q.   And so you're referring to your rebuttal report that you

21   submitted in phase 2?

22   A.   I am.

23   Q.   You're not referring to any additional rebuttal to

24   analyses by Mr. Fazio that were not included in your rebuttal

25   report, are you?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      THE COURT:  There's a section in his direct witness

2  testimony called "Summary of My Rebuttal Report".  It begins at

3  page 16.  If you mean something different -- I'm confused.  I

4  mean, his witness direct testimony includes what it includes,

5  but one of the things it includes is a rebuttal, Summary of My

6  Rebuttal Report, relating to Mr. Fazio.

7      MS. MILLER:  Right.

8  BY MS. MILLER:

9  Q.   And the court, I believe, is looking at page 16 of your

10  direct testimony, and turning back two pages to page 14 of your

11  testimony, there is actually a section called "Rebuttal to

12  Opening Fazio Report".

13  A.   I'm sorry.  Just which tab?

14  Q.   I'm sorry.  It is titled "Direct Testimony of Mark Renzi".

15  It's towards the back.  It may be easier if you take it out of

16  the binder, but I'll defer.

17  A.   Sure.

18  Q.   Mr. Renzi, in paragraph 30 of your direct testimony, the

19  second to last sentence starts "Mr. Fazio incorrectly assumes

20  that to the extent the reinstatement of forgiven balances would

21  increase the amount of an intercompany balance or create a

22  balance where none existed as of the petition date, the junior

23  secured noteholders would be entitled to obtain value on

24  account of the increase or newly created balance through their

25  security interest; however, the Court has already determined in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

229

1   phase 1 that the junior secured noteholders do not have liens

2   on avoidance actions or the proceeds of avoidance actions."

3       Do you see that?

4   A.    I do.

5   Q.    And that's in the section that's your Rebuttal to the

6   Opening Fazio Report, right?

7   A.    It is.

8   Q.    And Mr. Renzi, can you turn to the Rebuttal Report of Mark

9   Renzi, Phase 2, in your binder?

10  A.    Sure.   Should I leave this paragraph open?

11  Q.    Sure.

12  A.    Okay.   Expert Report of Mark Renzi, Phase 2?   That tab?

13  Q.    Expert Report of Mark A Renzi, Intercompany Balances,

14  dated November 1, 2013.

15      Mr. Renzi, can you show me where in this rebuttal report

16  you include the statements and opinions that are included in

17  paragraph 30 of your expert -- of your direct testimony?

18  A.    Well, I'm not sure -- I mean, I'm not sure I can find it.

19  Q.    Is it possible that it's not in here?

20  A.    It's possible.

21  Q.    And Mr. Renzi, is it possible that none of the opinions

22  that you express in paragraphs 28 through 32 in the section

23  titled "Summary of Mr. Fazio's Assumptions, Rebuttal to Opening

24  Fazio Report" are included anywhere in the rebuttal report that

25  you submitted in this case?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

230

1    A.    I'm not exactly sure what you're getting at, honestly.

2    Q.    I'm asking you if you're expressing opinions in your

3    direct testimony that you submitted to this Court on November

4    12th that are rebuttal to the opening report of Mr. Fazio that

5    were not included in the rebuttal report that you submitted in

6    this matter.

7    A.    I think that my direct testimony clarifies anything that

8    may not have been highlighted in my expert report that I

9    thought was important to highlight for the Court.  So to the

10   extent that there is something not -- the chronology isn't, I

11   think, important, and this is November 1st.  I believe this

12   direct testimony is -- I don't remember, but I think it's after

13   that.  And so I think that, to the extent that I need to

14   highlight anything, that it was done in the context of the

15   rebuttal that I've written from paragraph 28 forward.  I hope

16   that was responsive.

17   Q.    So you don't think that there are any opinions expressed

18   in your direct testimony that were not addressed in your

19   rebuttal report; is that right?

20   A.    I think they work together in conjunction with each other,

21   to the extent that I missed stating something clearly, that I

22   did it in my direct testimony.

23   Q.    Mr. Renzi, can you show me where in your rebuttal report

24   you talk about any errors or deficiencies in Mr. Fazio's

25   analysis or assumptions?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.    I think that it's -- I would say that it's implicit but

2  not explicit.

3  Q.    And so none of the five paragraphs of explicit

4  deficiencies, incorrect assumptions, and other mistakes made by

5  Mr. Fazio that you detail at length in over two pages in your

6  expert -- in your direct testimony are expressly included in

7  your rebuttal report; is that right?

8  A.    Well, just to be clear, my rebuttal to Opening Fazio

9  Report is what's stated, so I'm a little confused by the way

10  you're using the terminology.  My expert report doesn't

11  explicitly say it, but I do believe that Mr. Fazio is creating

12  a simplistic world when he's running some of his scenarios and

13  that I needed to address that in my direct testimony.  To the

14  extent that it's not in my expert -- I'm sorry.  Let me state

15  it by the way it's titled, Expert Report of Mark A. Renzi,

16  Intercompany Balances.  I think that my direct testimony

17  clarifies it.

18  Q.    And are those your expert opinions about the deficiencies

19  and the assumptions of Mr. Fazio?

20  A.    Yes.  Mr. Fazio has been involved in this case just during

21  litigation, has not been involved very long.  I've been

22  involved in this case for almost two years.  So I would say

23  yes, that is my expert opinion.

24        THE COURT:  Ms. Miller, you're getting to the point of

25  diminishing returns on this point.  I understand what you're --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

232

1   the point you're trying to make.  I'm not sure that going

2   further with it is going to enhance the point.

3          MS. MILLER:  I am moving on, Your Honor.

4          THE COURT:  Okay.

5          MS. MILLER:  I was with you.

6   BY MS. MILLER:

7   Q.   Mr. Renzi, I'd like to focus now not on your rebuttal --

8   not on the section titled "Rebuttal to Opening Fazio Report"

9   but in the section of your direct testimony titled "Summary of

10  My Rebuttal Report which is --

11  A.   Can I put this -- do I still need to have this part open?

12  I'm sorry.  Do I still need to have the binder open at my

13  expert report or -- it's just -- I don't want things to fall

14  off of here.

15  Q.   I like the slides better in your expert report, but it's

16  all in your direct testimony.

17  A.   Okay.

18  Q.   So no, you do not need to keep it open.

19  A.   Okay.  I like the slides better too.

20  Q.   Mr. Renzi, I'd like to turn your attention first to

21  paragraph 36 and actually to the chart that's on page 19 of

22  your direct testimony.  Do you see that?

23  A.   I'm at paragraph 36 of my direct testimony, yes,

24  "Reconciliation of FTI Model and Fazio Model".

25  Q.   Right.  And in the chart, you lay out the Fazio model and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  the FTI model and you note the variance between the two models.

2  And with the exception of the additional expense allocation,

3  which Mr. Fazio included at twenty-seven million dollars, and

4  you include it at 170 million dollars, the Fazio model and the

5  FTI model are virtually the same, right?

6  A.   Correct, or stating the amount of secured recovery which

7  obviously has been updated by Your Honor, but this is -- at

8  that point in time, this was accurate.

9  Q.   So you understand that this amount has been updated or

10  would need to be updated as a result of the Court's rulings in

11  phase 1 of this case, right?

12  A.   Yes.  My understanding is the 1745 goes to approximately

13  1.9 billion.  The 1 -- 17 --

14       THE COURT:  It's the 143 million dollars of the

15  additional expenses, line 8 --

16       THE WITNESS:  Correct.

17       THE COURT:  -- as to which I ruled.

18       THE WITNESS:  Correct.  And I think there was, like,

19  twelve million more or roughly a little bit more.

20  BY MS. MILLER:

21  Q.   Right.  And so if you look at the Fazio model and the FTI

22  model, the base of both of those models, the Fazio model is now

23  actually a lot closer to the actual base case in this -- that's

24  operative in this adversary, right?

25  A.   Correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

234

1   Q.   Just because of mathematics, not for -- for no other

2   reason, right?  And because the base case is now off, that

3   means that the numbers in the recovery models throughout your

4   report would need to be adjusted slightly upward to reflect

5   that change, right?

6   A.   That's correct.

7   Q.   And so even if all of your assumptions are right, the

8   numbers are now going to be somewhat misstated on the low end

9   because of that inclusion, right?

10           MR. KERR:  Objection, Your Honor.

11           THE COURT:  Sustained.

12   BY MS. MILLER:

13   Q.   Mr. Renzi --

14           THE COURT:  Once again, I really do understand your

15   point, but be my guest.

16   BY MS. MILLER:

17   Q.   In your direct testimony, you present scenarios which show

18   the impact of the intercompany claims on JSN secured

19   recoveries, right?

20   A.   Yes, the intercompany balances, correct.

21   Q.   And each of the -- I think it's five scenarios that you

22   run, 1A through D and 2, assume that there is no Ally

23   contribution, right?

24   A.   There's six scenarios, but -- base plus four, plus one.

25   Q.   Got it.  And in all six of those models, you assume that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

235

1    there is no Ally contribution, right?

2    A.    That's correct.

3    Q.    Mr. Renzi, you ran scenarios that included a recovery on

4    the intercompany balances and also included a value for the

5    settlement with Ally, right?

6    A.    In the context of the expert report, no.  But in order to

7    understand whether or not FTI and Houlihan had consistent or

8    reasonably consistent outcomes, we thought that it was one

9    thing that we wanted to do.  So yes, we checked to make sure

10   that they were doing things properly.

11   Q.    And so you know that if you assume that all of the

12   intercompany claims are valid, adding in an Ally contribution

13   increases the recovery on those intercompany claims, right?

14            THE WITNESS:  Your Honor, I would just say that

15   keeping everything else equal that that's an accurate

16   statement, but when I think about it, Ms. Miller is referring

17   to scenario 2 and then putting it in settlement.  What I do

18   believe what would happen is a number of other variables would

19   change.

20            So to the extent that you're implying that everything

21   else equal for scenario 2 and putting in the settlement, that's

22   one thing, but I do believe -- and my belief is that a number

23   of other things would change; for example, the claim amounts

24   would change for all other constituents if intercompany

25   balances were added.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

236

1    BY MS. MILLER:

2    Q.    Understanding your position, if you kept all of the

3    intercompanies as valid debt and flowed the Ally contribution

4    through the waterfall, the JSNs would be oversecured, right?

5    A.    My understanding is that if -- that they would be

6    oversecured.

7    Q.    And that's without the JSNs having a lien on any portion

8    of the Ally contribution, right?

9    A.    Just -- correct.  And just to clarify my prior answers, I

10   want to highlight that you have to keep a number of other

11   assumptions constant for that to be accurate.  So the context

12   is very important because there are a number of assumptions

13   that could change, and I believe they would change.

14         THE COURT:  How did you run that analysis to reach

15   that result?

16         THE WITNESS:  Well, Mr. Fazio ran the analysis.

17   Effectively, it's scenario 2, Your Honor, in my report.  In

18   scenario 2, he just assumed that if you allow the intercompany

19   balances and you allow the Ally settlement and then you change

20   nothing else, that indeed you become oversecured.  And again, I

21   think I ran it in that context, because I felt that it was

22   important to say whether or not there was reasonably similar

23   outcomes.  And that was the only context in which I did it.

24         When I think about the analysis that Mr. Fazio did, I

25   believe -- as I said in my direct testimony, I believe a number

**RESIDENTIAL CAPITAL, LLC, ET AL.**

237

1   of additional claims would be asserted because I just don't

2   think that leaving them the same is reasonable.

3           THE COURT:  And why is that?

4           THE WITNESS:  Because having the intercompany balances

5   being asserted was not part of the global settlement.  I think

6   that the global settlement contemplated paying the junior

7   secured notes in full, and that did not have intercompany

8   balances.  There was a waiver of intercompany balances.  So to

9   the extent that they're stated, I believe that it changes the

10  calculus of a number of constituents here and --

11          THE COURT:  If they get the benefit of intercompany

12  balances, others are going to want to do the same thing.

13          THE WITNESS:  Exactly.  And they would be, in my

14  opinion, significantly diluted if that happened.  And then I

15  think Mr. Fazio's report doesn't take that into account.

16  BY MS. MILLER:

17  Q.   Mr. Renzi, the JSNs would also be over secured with a much

18  smaller Ally contribution if the intercompany balances are

19  treated as debt, right?

20  A.   I can't answer that question here.  It depends.  It

21  depends on a number of variables.  I think if you're changing

22  the amount of the settlement, I believe it will drastically

23  change a number of additional assumptions such as where the

24  money is put.  So to the extent that, when you're looking on

25  these intercompany balances, it depends on the legal entity,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

238

1  because if you put it a different amount in GMACM and RFC,

2  there are a lot of claims, for example, at RFC.  So if you put

3  more money at RFC, it depends on whether or not that portion

4  that the intercompanies would get is much smaller than it would

5  be if it was all at ResCap, because there are not a lot of

6  claims at ResCap.

7       So I can't answer that here.  As I stated before in my

8  deposition, I mean these models are unfortunately complex, but

9  there are complex issues and there are thousands of lines, and

10  I like to say I'm pretty good at this, but I don't think I can

11  do it right here.

12  Q.   Well, maybe I can help you.  I'd like you to turn to

13  DX-BDE which is a December 4, 2012, presentation by FTI and

14  ResCap titled "ResCap Discussion Materials".

15            THE COURT:  You have to wait for me to find it.

16            MS. MILLER:  Sorry.

17            MR. KERR:  Your Honor, may I have a moment?

18            THE COURT:  Just repeat for me, Ms. Miller, which

19  exhibit you said.

20            MS. MILLER:  DX-BDE.

21            THE COURT:  Okay.  I have it.

22            MR. KERR:  I'm there, DX-BDE.

23            MS. MILLER:  I think counsel has asked for a minute.

24            MR. KERR:  Your Honor, we're fine.

25            THE COURT:  Go ahead, Ms. Miller.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  BY MS. MILLER:

2  Q.    Mr. Renzi, is this a document that you recognize?

3  A.    I do.

4  Q.    And were you involved in the preparation of this document?

5  A.    I was.

6  Q.    If you look at page 5, it lists the waterfall key

7  assumptions for the base case.  Do you see that?

8  A.    I do, I do see that.

9  Q.    And the third row down, it says "Ally settlement", and it

10  assumes an Ally settlement at 750 million dollars in cash.  Do

11  you see that?

12  A.    Third row, third bullet or --

13  Q.    First bullet -- sorry, the third -- the row titled "Ally

14  settlement" --

15  A.    Oh, I'm sorry.

16  Q.    -- about a third of the way down.

17  A.    I see it.

18  Q.    Do you see it?

19  A.    I do.

20  Q.    Okay.  And the first bullet says, "Assume Ally settlement

21  at 750 million dollars in cash"?

22  A.    I do see that.

23  Q.    You see that, okay.  And if you turn to pages 8 and 9 in

24  the deck, on page 9 it says, "Scenario 3, pre-petition

25  interco's are valid."  Do you see that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

240

1              THE COURT:  Just say that again?

2              MS. MILLER:  On --

3              THE COURT:  I'm on that page, but I was looking at --

4    BY MS. MILLER:

5    Q.   On slide 9 of the deck, there are a number of scenarios

6    laid out, and scenario 3 is pre-petition interco's are valid.

7    Do you see that, Mr. Renzi?

8    A.   I do, yup.

9    Q.   And the first bullet under that scenario says, "JSB

10   secured recovery increases to approximately 100 percent."  Do

11   you see that?

12             THE COURT:  You didn't read it exactly correct, but

13   it's close enough.

14             THE WITNESS:  I do see that.

15             MS. MILLER:  Right.  It says increased to

16   approximately 100 percent, I apologize.

17   BY MS. MILLER:

18   Q.   And if you look at the illustrative recoveries on slide 8,

19   you see that, in fact, under scenario 3 the JSN secured

20   recovery is at 2228 million -- billion.

21   A.   It doesn't say that.  It just says recovery, junior

22   secured bonds, junior secured bonds recovery.  It doesn't say

23   secured recovery there.  I see that -- I'm sorry.  I don't mean

24   to be argumentative.  I see the 2228.  It doesn't say secured

25   recovery though.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      THE COURT:  This is the point that they will get that

2  amount, although some of it is a result of a deficiency claim

3  that comes from other debtors.

4      THE WITNESS:  That's correct.

5  BY MS. MILLER:

6  Q.   Yeah, you --

7  A.   I mean, I think the context of this -- I certainly

8  understand where you're going.  This is an older presentation

9  from December with a number of assumptions that have already

10  actually have played out, which are much different than what's

11  presented here.

12      THE COURT:  You have to keep your voice up.

13      THE WITNESS:  I'm sorry.

14      THE COURT:  I heard you.

15      THE WITNESS:  Okay.

16      THE COURT:  I want to be sure we have a clear

17  transcript, okay?

18      THE WITNESS:  Okay.

19  BY MS. MILLER:

20  Q.   Sorry.  I was actually -- I just flagged the wrong page.

21  If you look at slide 11 in the deck, it's of the JSB recoveries

22  by source, and if you look under scenario 3 on this slide, you

23  see that under scenario 3 with the interco's on, the secured

24  recoveries are 2228 with no recoveries from deficiency claims.

25  Do you see that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    I do see that.

2    Q.    Okay.  And looking back at slide 9 and the sort of

3    pictogram that is next to scenario 3 indicating whether various

4    creditor groups have improved static or declined positions

5    under that scenario, do you see that the JSN secured recovery

6    is improved under scenario 3 where the intercompanies are on,

7    right?

8    A.    Yes, I see that.

9    Q.    And with respect to the unsecured creditors, it's kind of

10   a mixed bag, right?  The SUNs stay static, the rafts (ph.)

11   decrease, the nonrafts increase, and the other general

12   unsecureds also decrease, right?

13   A.    Yes, I do see that.

14   Q.    So it was known certainly by December 2012, that the

15   validity of the intercompany balances would have a material --

16   would significantly improve the JSN recoveries, right?

17   A.    Again, in the context of, I think it's very important to

18   answer that question that we look back at the assumptions --

19   Your Honor, I mean, a number of these assumptions -- so the

20   answer is simply yes, they do improve, but we are making a

21   number of assumptions that we now know the actual truth here,

22   meaning time is --

23              THE COURT:  What page are you on?

24              THE WITNESS:  I'm just on page 5.

25              The reason why I highlight it is these models are

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    incredibly complex.  Changing one or two levers results in many

2    different things.  As you can see, we have many scenarios here,

3    and obviously all constituents want to see what happens under

4    multiple scenarios, and that's why we're here under phase 2, to

5    see all these different scenarios.  But as we know, this says,

6    "Illustrative waterfall analysis using projected assets and

7    claims as of 1/31/13."  So the global settlement is based on

8    430.  Almost all of the claims in the amounts of where they've

9    been asserted have changed relative to this presentation.

10           So yes, from this presentation I certainly believe

11   that my math was correct.  But to the extent that you want me

12   to extrapolate to 430, I don't think that I could do that,

13   just --

14   BY MS. MILLER:

15   Q.    And Mr. Renzi, just focusing on this document and the

16   specific time in which you made it, you believed at the time

17   that the assumptions that you were making were reasonable,

18   right?

19   A.    I believe that this document was helpful to understand the

20   sensitivity of changing certain assumptions at that point in

21   time, so correct.

22   Q.    And so this document also is an accurate reflection based

23   on your waterfall model and the math that comes out of that or

24   goes into it of what the value of the intercompany claims were

25   as of this date, right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

244

1          MR. KERR:  Objection, Your Honor.

2          THE COURT:  Sustained.  You haven't been listening to

3   him.  You haven't been listening to what he said.

4          Ask your next question.

5   BY MS. MILLER:

6   Q.   Mr. Renzi, I understand that things have changed since

7   December of 2012.  Was this an accurate reflection of

8   assumptions that you thought were reasonable as of that date?

9   A.   As of this date, yes, I thought these assumption -- well,

10  I thought that it displayed outcomes.  I'm not necessarily

11  opining on all the assumptions.  There are eight scenarios as

12  illustrated on page 7.  When I ran these scenarios, I didn't

13  necessarily opine like I would in an expert report whether or

14  not I thought they were all reasonable.  I was just asked by

15  counsel that it would be helpful for people to understand the

16  mathematics behind it.  And I personally, as I look back at it,

17  I like the way I presented things.  I think it's helpful,

18  because it is complex, and there are -- I mean, as you can see,

19  Your Honor, I had to create a table on page 7 to see -- to keep

20  things straight because there are just so many different

21  assumptions that you can change to see what happens to the

22  outcomes.

23          So I'm not sure I would say -- I'm not going to say that I

24  think all these assumptions are reasonable.  I don't -- I think

25  that it's mathematically accurate and helpful to understand

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  what happens when you change different levers, and that goes

2  back to my prior testimony of how sensitive certain assumptions

3  are.

4  Q.   And Mr. Renzi, looking at slide 11 again, based on the

5  assumptions as of this date and putting ourselves back in

6  December 2012 with these assumptions and the various models

7  that you ran, the JSNs would have a total recovery of 100

8  percent in all but one model, whether based on a secured

9  recovery alone or a combination of a secured recovery and a

10  deficiency claim, right?

11  A.   I think you're referring to row 26, and as you've

12  highlighted, scenario 4 on row 26 says 94 percent, and

13  absent --

14  Q.   Mr. Renzi, turning now to paragraph 40 of your direct

15  testimony, to scenario 1A --

16  A.   Just for sake of organization, can I --

17  Q.   Sorry.

18  A.   -- can I put this to the side, or do I need this open,

19  too?  Something may fall.

20  Q.   You can put it to the side --

21  A.   Okay.

22  Q.   -- at least for now.

23  A.   You said paragraph 40?

24  Q.   Paragraph 40.

25  A.   Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

246

1   Q.   Mr. Renzi, in scenario 1A presented in your direct

2   testimony, you effectuate debt forgivenesses that didn't

3   actually happen pre-petition, is that right?

4   A.   That is correct.  That is what scenario 1A is.

5   Q.   Okay.  And you say at the end of paragraph 40 on page 21

6   that it is appropriate to assume that these balances -- that

7   "but for the bankruptcy filing, it is appropriate to assume

8   these balances would have been forgiven in the ordinary course

9   of business."  Do you see that?

10  A.   Yes, I see it and I still believe that's consistent with

11  my belief.

12  Q.   The debt forgivenesses that you're talking about here had

13  not been approved by the Ally board, right?

14  A.   Just one area of distinction.  I would say anticipated

15  intercompany balance forgiveness.  I don't call it debt

16  forgiveness.

17          THE COURT:  Had it been approved by the Ally board

18  yet?

19          THE WITNESS:  Right.

20          THE COURT:  Had it been approved by the Ally board

21  yet?

22          THE WITNESS:  I'm sorry.  You mean the anticipated?  I

23  can't answer that.  I don't -- I don't know the answer, if the

24  Ally board had approved it.  I know that it had been

25  anticipated and identified.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

247

1  BY MS. MILLER:

2  Q.   So it's your testimony that you didn't know that the

3  scheduled, at least certain of the scheduled debt forgivenesses

4  hadn't even ever been submitted to the Ally board?

5  A.   I can't testify as to whether it had been submitted.   I

6  know that it had been identified and highlighted and presented

7  to all constituents, as far as I can tell.

8  Q.   When you say "all constituents", who are you referring to?

9  A.   Meaning that in production we presented -- we produced

10  these documents that said these are the balances that were

11  identified for forgiveness.

12          THE COURT:  When did that occur?

13          THE WITNESS:  Your Honor, I can't remember.  I think

14  it happened during the examiner -- when the examiner was doing

15  their diligence.  I can't remember the specific date.

16          THE COURT:  So they were presented for forgiveness

17  post-petition?

18          THE WITNESS:  They were, I -- I think the

19  chronology --

20          THE COURT:  Because the examiner is long after the

21  case filed.

22          THE WITNESS:  Right.  I meant -- I meant the

23  documentation was presented, meaning to third parties.  But the

24  company had identified it, I think, earlier in the year, pri --

25          THE COURT:  That's not -- my question is, when had the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

248

1    company identified items for debt forgiveness?

2         THE WITNESS:  I think it was prior to the bankruptcy

3    filing.

4         THE COURT:  Were you on board at that time?

5         THE WITNESS:  I can't remember.  If I was on board,

6    I'm not sure it was highlighted to me at that point in time.

7         THE COURT:  Go ahead, Ms. Miller.

8    BY MS. MILLER:

9    Q.   And Mr. Renzi, did you ever look into what documentation

10   existed within the company about the reported schedules or

11   anticipated debt forgiveness?

12   A.   I looked at some of the documents that were produced by

13   the company for the anticipated intercompany balance

14   forgiveness.

15   Q.   And I'd like to turn your attention to Exhibit DX-ANK.

16        (Pause)

17   A.   Is this towards the front?

18   Q.   It is forwards the front.  It's the --

19   A.   Got it.

20   Q.   -- second document.

21   A.   I'm there, thank you.

22   Q.   And Mr. Renzi, this is an e-mail from Barbara Westman to

23   you and Brian McDonald, copying Jake Bizella (ph.) and Jill

24   Horner, dated March 3, 2013.  Do you see that?

25   A.   I see the e-mail, yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  May I ask you a question, Ms. Miller?

2          MS. MILLER:  Sure.

3          THE COURT:  On the first page, the bold heading, "Re:

4    Intercompany and OID discussion", was that part of an original

5    document, or was that added to the exhibit?

6          MS. MILLER:  That is the Re: line from the e-mail.

7    This is -- you're testing me -- it is I'm assuming a pre-

8    Outlook platform that prints like this.

9          MR. KERR:  Your Honor, that's how we found the

10   documents, how it was produced.

11         THE COURT:  Okay.  That's what I --

12         MR. KERR:  So it came from our files like that.

13         THE COURT:  That's what I wanted to understand.  Okay.

14   Thank you, Mr. Kerr.

15         Go ahead.

16         MS. MILLER:  It does look a lot like our Bates

17   stamping of the exhibit number --

18         THE COURT:  I know; that's why I asked the question.

19         MS. MILLER:  -- but I didn't title the document.

20         THE COURT:  Okay.  I wasn't accusing you.

21         MS. MILLER:  Could've come up with something better.

22   Q.   And as the Court points out, Mr. Renzi, this e-mail, the

23   Re: line of this e-mail appears to be "Intercompany and

24   OID discussion."

25         THE COURT:  I'm not sure it's the Re: line of the e-

**RESIDENTIAL CAPITAL, LLC, ET AL.**

250

1  mail.  I mean, at some point, Mr. Kerr has represented that's

2  how they found the document.

3          MR. KERR:  Your Honor -- and this is Mr. Kerr -- I

4  have no idea why this -- this is on a number of documents.  I

5  have absolutely no idea.

6          THE COURT:  Just go ahead.

7          MS. MILLER:  Okay.

8  Q.   Mr. --

9  A.   I'm sure the font size wasn't that big.

10          THE COURT:  I've never seen an e-mail this font size,

11  or bold.

12          THE WITNESS:  There's times that I've wanted to make

13  it that big.

14  Q.   If you look at Ms. Westman's e-mail, she says to you,

15  starting -- it's hard to see the first line of what appears to

16  be the text; it's kind of smushed right up against the

17  attachment titles -- but it says, "Here are two responses to

18  the UCC questions in the attached document, "intercompany

19  questions", 2 underscore 25 underscore 13.

20      And she says, "In response to relationship number 3C, see

21  document labeled 'Intercompany Relationships 02-29-12v.1', the

22  document attached was an internal working document and contains

23  much more detailed information than we have provided in the

24  past."

25      And then in bold, "I am not sure we want to share this

**RESIDENTIAL CAPITAL, LLC, ET AL.**

251

1    level of detail.  However, we have no other documentation to

2    support the statement that we plan to do debt forgiveness on

3    these balances."

4        Do you see that?

5    A.    I do.  I do.

6    Q.    Appeared you don't doubt that you got this e-mail in March

7    of 2013, do you?

8    A.    I'm sure -- it looks like I did.

9    Q.    And Ms. Westman continues, "I do have a statement with an

10   internal status update document that indicates we were

11   targeting to bring this request to an April 4th Ally board

12   meeting as the debt forgiveness would have required Ally board

13   of approval, but we never moved forward after the bankruptcy

14   process was underway."  Do you see that?

15   A.    They were tumultuous times.  I think that right around

16   2/29/12 is just prior to filing, and I think that's what she's

17   getting at, that it was pretty busy for such a large company to

18   file bankruptcy.  So I think that they had focused on other

19   things other than that -- the items she's referring to.

20   Q.    Right.  So Ms. Westman is saying that the company did not

21   have formal documentation other than the spreadsheet and

22   they've never presented the request to the Ally board for

23   approval, right?

24        MR. KERR:  Objection, Your Honor.

25        THE COURT:  Overruled.  The document says what it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

252

1    says.  I think it was a fair summary of the document.

2    A.    I see that written here.

3    Q.    And turning to about three pages in the document, I'm

4    going to read out the long Bates number, document --

5              THE COURT:  Just read the last three digits.

6              MS. MILLER:   Okay.

7    Q.    Last three digits, 763.

8              THE COURT:  We'd be here until the 5 o'clock stop time

9    if we had to get to the --

10             MS. MILLER:  I'm sorry.

11             THE COURT:  -- the full Bates.

12   A.    I'm there, 763.

13   Q.    And if you see, it says relationship three -- sorry, at

14   the top of the page, it says debtor net payable balances as of

15   5/13/2012, and it has seven relationships listed.

16   A.    I do see that.

17   Q.    And one of the relationships is number 3, Homecomings

18   Financial, LLC to Residential Funding Co., LLC in the amount of

19   1,251,521,437 dollars.  Do you see that?

20   A.    I do.  I do; sorry.

21   Q.    And is it your understanding that it's the forgiveness of

22   that intercompany balance that Ms. Westman is discussing on the

23   first page of this exhibit?

24   A.    That is my understanding, and it's also reflected, I

25   think, in the schedule that we were referring to before in my

**RESIDENTIAL CAPITAL, LLC, ET AL.**

253

1   direct testimony.

2   Q.   That was my next question, that that balance is one of the

3   ones that you schedule as forgiven -- has scheduled to be

4   forgiven and include as though it had been forgiven in your

5   analysis, right?

6   A.   I think that's correct.

7   Q.   And Mr. Renzi, in running scenario 1A, you didn't consider

8   whether effectuating these forgivenesses on the eve of

9   bankruptcy would have subjected them to avoidance as preference

10  or fraudulent conveyances, did you?

11  A.   Are you talking about at this point in time, or in the

12  time of my expert report?

13  Q.   I'm talking about in scenario 1A in your direct testimony.

14  A.   I considered under the assumptions that I've laid out that

15  if the company hadn't filed, that they would have gone through

16  with the identified intercompany balances that they wanted to

17  forgive and, I presume, that they would have forgiven, but for

18  the bankruptcy.

19  Q.   I think we'd all be very surprised to learn that ResCap

20  never filed for bankruptcy.  You're not suggesting that, right?

21  A.   No.

22          THE COURT:  I think his testimony was clear.

23          Ask your next question.

24  Q.   Mr. Renzi -- I'm going to do a short one because we're

25  short on time here -- skipping over scenario 1B and turning now

**RESIDENTIAL CAPITAL, LLC, ET AL.**

254

1   to scenario 1C, which is on page 23 of your direct testimony,

2   in this scenario you subordinate certain intercompany balances

3   based on bankruptcy standstill provisions that you believe

4   would apply in certain intercompany agreements that you

5   identified, right?

6   A.   That's correct.

7   Q.   But it's the debtors' position that these contracts don't

8   relate to the current intercompany balances at all, right?

9   A.   I think that you would consider them tangential.  They're

10  within the org structure, up and down the org structure, but

11  not specifically to those balances.

12       I think, if I may, that what we're trying to do is say

13  that to the extent that Mr. Fazio believes that these balances

14  are governed by those notes and that they are indeed valid,

15  that if they're indeed valid because of those notes, even

16  though they're not specific to those balances, then it's

17  reasonable to assume that the bankruptcy standstill provision

18  would apply.  But I'm not saying that these notes govern.  I

19  don't think these notes govern, and I discussed that with

20  counsel.

21       But to the extent -- I'm sorry.

22  Q.   And in paragraph 46 of your direct testimony, you say the

23  debtors do not believe that the intercompany balances on the

24  debtors' books and records, as of the petition date, accrued

25  pursuant to these agreements, right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    Correct.

2    Q.    And you also understand that the debtors can be right that

3    the intercompany balances did not accrue pursuant to these

4    agreements and the intercompany balances may still be valid

5    debt, right?

6              MR. KERR:  Objection.

7              THE COURT:  Overruled.

8    A.    It's possible.

9    Q.    And you don't identify any other basis to subordinate

10   these intercompany balances other than the particular

11   agreements that you've identified in your expert testimony,

12   right?

13   A.    That's correct, for scenario 1C.

14             THE COURT:  You've got three more minutes.

15             MS. MILLER:  Right.  I'm talking --

16             THE COURT:  We're going to use all of our time.

17             MS. MILLER:  Okay.

18   Q.    Mr. Renzi, could you turn to DX-AUC?

19   A.    I'm there.

20             MS. MILLER:  Your Honor, I'll make the same

21   representation, that this is how the document was produced.

22             THE COURT:  I -- but now I got the picture of it --

23             MS. MILLER:  Okay.

24             THE COURT:  -- so okay.

25   Q.    Mr. Renzi, looking at this document, which is an e-mail,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

256

1    the first document at the top of the chain is an e-mail from

2    Brian McDonald to T. Talasso (ph.) at AlixPartners with a CC to

3    a number of people, including yourself, dated January 17th,

4    2013; do you see that?

5    A.    I do.

6    Q.    And if you look -- well, and the text of that e-mail says

7    "Todd, per Mark's request, I'm sending the attached

8    information."  Do you see that?

9    A.    I do.

10   Q.    And is it your understanding that you're the Mark that's

11   being referred to here?

12   A.    With a K, yes.

13   Q.    So turning -- scrolling down to the next e-mail in the

14   chain, which is an e-mail from you to Marc Landy --

15             THE COURT:  With a C.

16             MS. MILLER:  With a C.

17   Q.    -- Brian McDonald and William Nolan, dated December 21,

18   2012, you write, "Marc," with a C, "Please find the additional

19   intercompany information that we discussed.  Regards, Mark."

20   Okay.

21             THE COURT:  As much as I want to hear it, we have to

22   stop now for the day.  We'll resume at 9.

23             How much longer do you anticipate with your cross-

24   examination?

25             MS. MILLER:  Half an hour.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Okay.

2          Is there going to be redirect, Mr. Kerr?

3          MR. KERR:  There could be.

4          THE COURT:  Okay.  All right.  See, we didn't run out

5     of witnesses.

6          MR. KERR:  We did our best, Your Honor.

7          THE COURT:  I know.

8          MR. KERR:  If Mr. Rains had gotten his exhibits in,

9     we'd be still waiting, so.

10          THE COURT:  Mr. Lee, you had something you wanted to

11     say?

12          MR. LEE:  Yes, sorry.

13          MS. MILLER:  Sorry.

14          MR. LEE:  It's Gary Lee from Morrison Foerster for the

15     debtors, here.  Your Honor, I think you asked us this morning

16     to follow up with Mr. Rode?

17          THE COURT:  What's that?  I couldn't hear you.

18          MR. LEE:  With Mr. Rode.  We've done so.  There have

19     been several discussions with him and SilvermanAcampora and

20     counsel for the debtors, but the two statements that I made on

21     the record this morning were both correct.  There had been a

22     motion for relief from the stay; there were no appearance; Your

23     Honor took the matter under advisement based on the papers and

24     denied the motion.  And there has been no objection to his

25     claim; that discussion is ongoing.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

258

1          THE COURT:  Okay.

2          MR. LEE:  Okay.  And he's not --

3          THE COURT:  I noticed Mr. Nosek sitting with him in

4    the back earlier.  Keep talking to him, okay?

5          MR. LEE:  Thank you, Your Honor.

6          THE COURT:  Okay, thank you.

7          All right, see you all in the morning at 9 o'clock.

8          Do the proponents -- do you anticipate you're going to

9    conclude your case tomorrow?

10          MR. KERR:  Yeah, Your Honor, there is one witness who

11   I believe is not available until Friday, a very short witness.

12          THE COURT:  I've already said you'll work it out and

13   we -- I'm perfectly amenable to taking witnesses out of order.

14          MR. KERR:  And frankly, Your Honor, he witnesses

15   tomorrow we expect there will be cross-examination, so it just

16   depends how long they cross them.

17          THE COURT:  Okay, all right.  See you all in the

18   morning.  Thank you very much.

19          MR. KERR:  Thank you.

20       (Whereupon these proceedings were concluded at 5:02 PM)

21

22

23

24

25

259

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Mr. Marano | Mr. Perry | 40 |
| Mr. Marano | Mr. O'Neill | 57 |
| Mr. Carpenter | Ms. Miller | 78 |
| Mr. Carpenter | Mr. Schaffer | 92 |
| Mr. Carpenter | Mr. Lebioda | 95 |
| Mr. Carpenter | Mr. Rode | 96 |
| Mr. Dubel | Mr. Perry | 103 |
| Mr. Dubel | Mr. Schaffer | 151 |
| Mr. Dubel | Mr. O'Neill | 155 |
| Mr. Kruger | Mr. Cohen | 165 |
| Mr. Kruger | Mr. Schaffer | 190 |
| Mr. Renzi | Ms. Miller | 204 |

E X H I B I T S

| PLAN PROPONENTS' | DESCRIPTION | PAGE |
|------------------|-------------|------|
| 929 | Affidavit of | 25 |
| | Joseph Morrow in | |
| | lieu of direct | |
| | testimony | |
| 865, 868, 905, | Exhibits regarding | 27 |

| | | |
|---|---|---|
| 1 | 908, 909, 910, | Mr. Morrow's |
| 2 | 911, 912, 913, | testimony |
| 3 | 914, 915, 916, | |
| 4 | 917, 918, 919, | |
| 5 | 920, 921, 922, | |
| 6 | 923, 932 and 933 | |
| 7 | -- | Direct testimony    29 |
| 8 | | of Jeffrey Lipps |
| 9 | -- | Direct testimony    35 |
| 10 | | of Thomas Marano |
| 11 | -- | Direct testimony    38 |
| 12 | | of Thomas Marano |
| 13 | 603, 669, 810, | Exhibits regarding   39 |
| 14 | 820, 822, 832, | Mr. Marano's |
| 15 | 835, 848, 849, | testimony |
| 16 | 855, 856, 857 and | |
| 17 | 868 | |
| 18 | -- | Direct testimony    61 |
| 19 | | of Mamta Scott |
| 20 | 1501, 1502, 1503, | Exhibits regarding   63 |
| 21 | 1504, 1505, 1506, | Ms. Scott's |
| 22 | 1507, 1508, 1509, | testimony |
| 23 | 1510, 1511, 1512, | |
| 24 | and 1513 | |
| 25 | 1515 | Direct testimony    64 |

| | | |
|---|---|---|
| 1 | | of Robert Major |
| 2 | 1516, 1517, 1518, | Exhibits regarding    65 |
| 3 | 1519, 1520, 1521, | Mr. Major's |
| 4 | 1522, 1523, and | testimony |
| 5 | 1524 | |
| 6 | 1530 | Direct testimony    66 |
| 7 | | of Brendan Meyer |
| 8 | 1531, 1532, 1533, | Exhibits regarding    67 |
| 9 | 1534 and 1535 | Mr. Meyer's |
| 10 | | testimony |
| 11 | 1545 | Direct testimony    67 |
| 12 | | of Mary Sohlberg |
| 13 | 1546, 1547, 1548, | Exhibits regarding    68 |
| 14 | 1549, 1550, 1551, | Ms. Sohlberg's |
| 15 | 1552, 1553, 1554, | testimony |
| 16 | 1555, 1556, 1557 | |
| 17 | 1560 | Direct testimony    69 |
| 18 | | of Thomas Musarra |
| 19 | 1580 | Testimony of Jose    70 |
| 20 | | Fraga |
| 21 | 1581, 1582, 1583, | Exhibits regarding    71 |
| 22 | 1584, 1585, 1586, | Mr. Fraga |
| 23 | 1587, 1588, 1589 | |
| 24 | and 1590 | |
| 25 | 1600 | Direct testimony    72 |

| | | |
|---|---|---|
| 1 | | of Allen Pfeiffer |
| 2 | 1600-1, 1600-2, | Exhibits regarding   72 |
| 3 | 1600-3 | Mr. Pfeiffer's |
| 4 | | testimony |
| 5 | -- | Direct testimony   74 |
| 6 | | of Frank Sillman |
| 7 | -- | Corrected direct   75 |
| 8 | | testimony of Lucy |
| 9 | | Allen |
| 10 | -- | Direct testimony   76 |
| 11 | | of Ronald Friedman |
| 12 | -- | Direct testimony   78 |
| 13 | | of Michael |
| 14 | | Carpenter |
| 15 | 719, 720, 721, | Exhibits regarding   101 |
| 16 | 722, 723, 724, | Mr. Dubel's |
| 17 | 725, 726, 727, | testimony |
| 18 | 728, 729, 730, | |
| 19 | 887, 889, 890, | |
| 20 | 951, 952, 953, 892 | |
| 21 | and 893 | |
| 22 | 750, 751, 752, 753 | Exhibits regarding   102 |
| 23 | and 754 | Mr. Dubel's |
| 24 | | testimony |
| 25 | 810, 814, 820, | Exhibits regarding   102 |

| | | |
|---|---|---|
| 1 | 822, 845, 852, | Mr. Dubel's |
| 2 | 853, 855, 835 and | testimony |
| 3 | 857 | |
| 4 | -- | Direct testimony 155 |
| 5 | | of John Dubel - |
| 6 | | two declarations |
| 7 | 801, 802, 804, | Exhibits regarding 160 |
| 8 | 808, 809, 811, | Mr. Kruger's |
| 9 | 812, 819, 821, | testimony |
| 10 | 823, 824, 834, | |
| 11 | 836, 838, 839, | |
| 12 | 841, 842, 843, | |
| 13 | 844, 847, 850, | |
| 14 | 861, 870, 894 and | |
| 15 | 934 | |
| 16 | 859, 860, 862, | Exhibits regarding 161 |
| 17 | 863, 864, 866, | Mr. Kruger's |
| 18 | 872, 875, 876 and | testimony |
| 19 | 877 | |
| 20 | 846 | Engagement Letter 162 |
| 21 | -- | Direct testimony 197 |
| 22 | | of Lewis Kruger, |
| 23 | | except for |
| 24 | | paragraph 132 |
| 25 | -- | Direct testimony 199 |

1                          of William Thompson
2  648, 649, 650,       Exhibits regarding   200
3  651, 678, 851,       Mr. Thompson's
4  924, 925, and 926    testimony
5  --                   Direct testimony    201
6                          of Martin Blumentritt
7  --                   Direct testimony    203
8                          of Mark A. Renzi

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

265

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:   November 21, 2013

**#**

**#607 (1)**
3:22

**\***

**\*\*start (1)**
219:6

**[**

**[May-er] (1)**
66:6
**[My-er] (1)**
66:6

**A**

**abetting (1)**
182:5
**abide (4)**
130:14,15;131:3,4
**ability (5)**
44:24;46:13;82:25;
83:4;183:23
**able (8)**
44:20;73:18;95:20;
166:11,21;176:23;
177:3,4
**absence (2)**
223:6,24
**absent (5)**
149:1;190:10;
216:12;225:14;
245:13
**Absolutely (10)**
21:1;85:22;90:5;
135:4;196:12,14;
197:20;200:5,21;
250:5
**abusing (1)**
195:10
**ACA (1)**
55:13
**accelerate (2)**
82:25;83:5
**accomplished (1)**
143:25
**accordingly (1)**
32:16
**account (3)**
58:10;228:24;
237:15
**accounted (2)**
124:6,6
**accounting (2)**
17:16;170:20
**accounts (1)**
17:14
**accrue (1)**
255:3

**accrued (1)**
254:24
**accurate (17)**
30:19,24;134:24;
172:11,12;178:4;
179:7;207:10,20,22;
211:10;233:8;
235:15;236:11;
243:22;244:7,25
**accurately (1)**
210:20
**accusing (1)**
249:20
**achieve (1)**
176:9
**achieving (2)**
155:1;176:21
**act (1)**
126:9
**acted (1)**
92:11
**action (3)**
34:5;85:15;167:8
**actions (7)**
18:20;32:7;144:22;
184:20;187:20;
229:2,2
**actively (1)**
204:18
**activity (1)**
82:22
**actual (8)**
126:9;127:13;
129:5;170:14;178:7;
210:14;233:23;
242:21
**actually (23)**
36:3,4,22;38:3;
39:4;50:11;53:12;
61:22;62:22;69:15;
81:5;121:10;125:12;
143:8;187:22;
210:11;224:16;
228:11;232:21;
233:23;241:10,20;
246:3
**Ad (8)**
7:19;8:3,11;53:2;
107:6;126:24;166:2;
189:14
**add (2)**
225:23;226:17
**added (2)**
235:25;249:5
**adding (3)**
226:15,16;235:12
**addition (2)**
220:16;227:6
**additional (12)**
34:2;62:23;65:3;
101:11;222:15;
225:8;227:23;233:2,
15;237:1,23;256:18

**address (2)**
162:24;231:13
**addressed (4)**
42:10;53:2;205:5;
230:18
**addresses (1)**
181:1
**adequate (2)**
163:4;164:14
**adjust (1)**
77:10
**adjusted (1)**
234:4
**adjustment (1)**
58:23
**administratively (2)**
185:1;225:20
**admissibility (1)**
23:16
**admission (3)**
25:12;64:11;72:16
**admit (1)**
39:17
**admitted (32)**
27:24;30:15;31:2,
17;39:18;61:17;63:6;
64:24;65:9,11;66:7;
67:7,8;68:22,23;
69:19;71:5,13,15;
72:22;74:9;75:24;
78:2;99:10;101:3,25;
102:17,18,22,23;
196:11;200:9
**adopted (1)**
139:9
**advance (1)**
136:19
**Adversary (5)**
3:2,6;32:23;76:12;
233:24
**adverse (1)**
15:23
**advice (2)**
205:13,15
**advise (1)**
20:2
**advisement (1)**
257:23
**advising (1)**
44:1
**advisors (10)**
106:2;115:7;
120:12;123:17;
168:10,11;170:9;
185:9;188:17;226:11
**advisory (1)**
106:15
**advocated (1)**
93:4
**affects (1)**
22:15
**affidavit (9)**
25:4,8,9,12,15,25;

26:21;70:4,12
**affiliated (1)**
47:22
**affiliates (2)**
16:18;17:6
**affirmative (4)**
187:19,20;226:8,
22
**AFI (21)**
17:1,12,15;41:2,
10;92:12;145:13;
146:16;151:8;
163:11,13,14,16,21,
24;164:1;167:4;
176:8;184:24;191:3,
6
**afternoon (6)**
166:1,4;197:23;
198:24;204:16,17
**afterwards (2)**
91:23;158:21
**again (33)**
24:3;30:12;37:20;
42:18;50:17;51:23;
61:20;73:9,19;76:7;
78:9;95:14;106:9;
116:15;117:7,15,21;
119:10;135:20;
142:16;149:22;
150:12;152:24;
159:19;174:4,19;
188:13;219:22;
234:14;236:20;
240:1;242:17;245:4
**against (73)**
41:15;85:6,9;
86:19,24;87:8;88:10,
10,14,19;90:12,13;
93:9;94:3,7,17,22;
108:22;110:23;
125:12;128:12;
131:21,23,25;132:12;
135:8;136:13,17;
137:12,15,16,18,24;
143:19;145:8,9;
152:2,6;167:8;
172:25;173:1;
181:17,17,25;182:1,
20;183:2,17;186:21,
24;187:2,10;192:22,
23;193:2,9,21;194:2;
218:8,23,24;219:14,
15;221:20;222:1,17;
223:19;224:23;
226:9,20,23;227:1;
250:16
**agencies (1)**
17:10
**agency (2)**
92:10;114:23
**agent (14)**
92:9,11;93:18;
94:2,3;151:6,8,16,17;

152:3,18;190:24;
191:2;192:18
**ago (1)**
87:19
**agree (22)**
16:5;45:15;48:2,7;
51:25;67:2;68:18;
72:19;84:3;90:8;
94:1;122:11;129:18;
136:8,11;141:4;
143:7;145:12;
181:12;183:25;
186:19;213:24
**agreed (21)**
22:19;25:23;26:6,
7;30:24;32:4;105:7,
12;130:17;145:25;
146:11,13;148:15;
149:10,25;150:9;
152:20;153:6;
189:10;194:15;
225:24
**agreement (39)**
32:25;33:2;42:14;
43:12,15,19,22;44:8,
24;46:1,8,9,13,24;
49:6;91:10;92:11;
105:8,12,16,19,23;
106:5;124:7;129:8;
132:8;163:8;182:15;
188:20,21;190:2,4;
191:17;201:25;
210:23;214:8;
215:15,21;216:11
**agreements (16)**
33:14,16;43:7;
50:11;64:21;111:13,
15;128:25;141:10;
144:12;164:7;
209:22;254:4,25;
255:4,11
**ahead (28)**
39:1;47:17,19;
57:14;81:6,9;86:3;
95:8;102:15;114:21;
117:3;135:19;
150:22;151:2;
153:19;154:7;192:1,
8,8,18;195:23;203:11;
218:3;223:4;238:25;
248:7;249:15;250:6
**aid (1)**
130:5
**aiding (1)**
182:5
**AIG (1)**
129:5
**al (4)**
3:3,3,7;26:2
**alert (1)**
23:9
**Alex (2)**
24:25;198:24

**AlixPartners (7)**
115:6,9,12,14,19;
120:4;256:2

**allegations (1)**
85:8

**alleged (4)**
128:8,13;173:17;
182:14

**ALLEN (11)**
11:11;71:22;72:5,
8;74:25;75:2,22,23,
25;76:3;128:21

**allocate (4)**
146:13;154:24;
167:4;220:20

**allocated (2)**
41:18;220:11

**allocates (1)**
220:6

**allocating (1)**
220:16

**allocation (19)**
132:16;134:3,12;
135:10;139:12,14;
148:15,23;150:17;
155:6;166:25;167:1;
182:15;186:15;
219:18,25;220:14,15;
233:2

**allow (5)**
17:12;19:21;130:8;
236:18,19

**allowance (1)**
55:1

**allowed (12)**
17:5,8;26:4;44:23;
51:10,11;99:19;
109:10,19;184:24;
190:15;220:18

**Allstate (1)**
129:5

**Ally (152)**
7:3,3,11,11;41:13,
17;42:9;43:12;44:9;
47:8,12,14;52:4;
56:10,13,17,21,23,
24;57:5;78:18,20,23;
79:1,24;83:14,17,19,
23;84:5,9,14,14,18,
21;85:6;86:11,16,19,
24;87:8,9;88:10,14,
20;90:13;91:9;92:23;
93:4,8,9;94:1,3,6,15,
21;95:20,23;124:7;
125:4,5;128:12;
131:21,23;132:1,13;
135:8;136:12,13,16,
18;137:12,16,18,24;
138:4,10;141:8;
144:8,11;145:25;
146:11;148:16,22,23;
166:25;167:1,8;
181:11,16,18,25;

182:1,12,20,24;
183:2,17;184:18,19;
185:11,14;186:1,11,
21,25;187:10;
190:13;194:2;
206:15;218:8,23;
219:14,15;220:11;
221:20;222:1,3,4,17;
223:19,21;224:23,25;
225:2,9,16;226:9,17,
20,23;227:1;234:22;
235:1,5,12;236:3,8,
19;237:18;239:9,10,
13,20;246:13,17,20,
24;247:4;251:11,12,
22

**Ally's (8)**
41:21,21;42:1;
86:20;87:11;89:16;
93:1;185:16

**almost (4)**
131:4;134:23;
231:22;243:8

**alone (3)**
15:20;190:15;
245:9

**Along (10)**
16:2;120:6;136:7,
10;145:7;151:25;
152:7;205:13,15;
208:3

**alphabetical (1)**
81:13

**ALSTON (2)**
9:1;68:15

**alter (5)**
87:20;88:17;89:17;
182:4;183:9

**although (5)**
15:17;16:7;98:17;
179:14;241:2

**ALVES (1)**
12:9

**always (1)**
173:17

**amenable (1)**
258:13

**amended (6)**
36:21;161:11;
162:8;177:11,18;
179:11

**amendment (2)**
37:4;180:2

**Americas (3)**
6:4;9:12;11:13

**amicable (1)**
16:10

**among (14)**
41:18;100:21;
122:14;123:3,8;
128:3;130:18;
168:11;174:3;183:4;
204:24;220:3,6,12

**amongst (1)**
145:14

**amount (35)**
17:3,14;51:12;
56:17;84:15;90:17;
108:17;120:13;
139:14;144:23;
185:17;190:14;
193:13;194:25;
209:20;210:8;211:3,
3,15,21;213:5,24;
214:5;220:1;222:13,
14,24;225:24;
228:21;233:6,9;
237:22;238:1;241:2;
252:18

**amounts (4)**
188:5,6;235:23;
243:8

**analyses (2)**
120:5;227:24

**analysis (47)**
85:8;90:19;109:19,
20,21;114:25;120:8,
19;123:15,16;164:3;
187:3,12,23;206:21;
218:11,12,13;220:23;
221:2,4,19;222:2,8,
16;223:11,18,22;
224:7,12,22,25;
225:8,13;226:8,18,
25;227:4,7,18,18;
230:25;236:14,16,24;
243:6;253:5

**analyze (1)**
122:1

**analyzing (1)**
187:17

**ANDREW (1)**
11:8

**Angeles (1)**
14:6

**ANH (2)**
116:8,9

**annex (1)**
149:14

**annexed (1)**
109:8

**announced (1)**
179:25

**answered (5)**
18:12;89:20;136:6;
155:14;209:2

**anticipate (3)**
77:18;256:23;
258:8

**anticipated (5)**
246:14,22,25;
248:11,13

**anxious (1)**
73:5

**anyways (1)**
24:13

**Apologies (2)**
81:15;140:19

**apologize (11)**
16:1;27:15;36:20;
38:2;69:11;70:7;
95:11;117:11;
145:16;151:21;
240:16

**appear (4)**
19:18,22;48:11;
153:22

**appearance (5)**
15:24;20:12;28:10,
22;257:22

**appearances (1)**
34:20

**appeared (3)**
155:9;208:15;
251:6

**Appearing (1)**
14:12

**appears (15)**
48:2,7;49:22;
51:25;53:2;77:3;
109:9;118:22;
129:18;148:3;
156:13,22;226:17;
249:23;250:15

**appellate (1)**
99:6

**applicable (1)**
164:6

**applies (2)**
85:23;113:8

**apply (4)**
99:9;113:17;254:4,
18

**appointed (1)**
45:9

**appreciate (5)**
16:8;31:24;59:10;
192:6;202:19

**appreciative (1)**
165:22

**approach (6)**
26:18;91:15;107:2;
139:10;145:1;154:22

**approbation (1)**
191:5

**appropriate (8)**
91:16;93:8;101:4;
132:11;144:21;
168:24;246:6,7

**approval (2)**
251:13,23

**approved (5)**
162:8;246:13,17,
20,24

**approximately (3)**
233:12;240:10,16

**April (5)**
40:20;206:11;
209:16,17;251:11

**arch (1)**
174:8

**area (1)**
246:14

**arg (1)**
22:25

**arguably (1)**
164:12

**argument (2)**
23:1;88:4

**argumentative (2)**
214:25;240:24

**arguments (1)**
162:24

**arise (2)**
163:5,12

**ARLENE (1)**
12:9

**arm's-length (1)**
84:1

**arose (9)**
209:22;210:22;
211:5,11,16,22;
213:25;214:10;215:6

**around (18)**
16:25;45:13;53:10,
18;86:25;87:1;
103:16;108:8,15,16;
111:6;135:2;138:23;
140:14;173:3;
185:15;212:1;251:15

**arrangements (1)**
47:9

**articulate (1)**
181:4

**aspect (4)**
52:7;176:3,4;
181:14

**aspects (2)**
157:10;175:22

**assert (15)**
152:1;172:24;
173:1;186:4,8;
218:23,24;219:14,15;
224:4

**asserted (22)**
32:8;85:5,11;
86:23;88:10;90:21;
93:9;101:6;108:22;
131:18;152:6;
160:20;161:14;
181:25;187:9;193:2;
222:15,24;226:9;
237:1,5;243:9

**asserting (2)**
167:20,24

**asserts (1)**
94:16

**assessment (2)**
179:7;226:19

**asset (4)**
79:16;179:12;
211:20;214:4

**assets (15)**
79:19;107:14,18;
108:8,14,18;148:16;
177:12,19,24;178:1;
179:11,20;186:21;
243:6
**assist (3)**
45:9;115:15,18
**associated (4)**
29:15;42:15;90:24;
129:12
**Associates (2)**
104:8,10
**assume (16)**
97:16,17,24;
172:12,25;183:19,20,
22;203:21;234:22,
25;235:11;239:20;
246:6,7;254:17
**assumed (4)**
79:2;174:1;190:12;
236:18
**assumes (2)**
228:19;239:10
**assuming (3)**
16:21;163:7;249:7
**assumption (4)**
109:22;222:7;
223:16;244:9
**Assumptions (23)**
229:23;230:25;
231:4,19;234:7;
236:11,12;237:23;
239:7;241:9;242:18,
19,21;243:17,20;
244:8,11,21,24;
245:2,5,6;253:14
**assure (1)**
137:6
**ATARA (3)**
7:25;77:20;78:10
**attach (1)**
53:2
**attached (9)**
37:8,13;61:22;
112:15;114:4;
117:15;250:18,22;
256:7
**attaching (1)**
216:4
**attachment (2)**
117:18;250:17
**attempt (4)**
154:23,24,24;
183:9
**attempted (4)**
132:1;133:25;
134:8;155:2
**attempting (1)**
136:11
**attend (2)**
188:24;189:19
**attended (3)**

45:16;127:11;
188:17
**attendees (1)**
15:25
**attention (10)**
116:5;130:4;
133:13;147:17;
148:10,14;150:4;
188:11;232:20;
248:15
**attorney (2)**
15:17;103:24
**attorney-client (1)**
60:7
**Attorneys (23)**
6:3;7:3,11,19;8:3,
11,19;9:2,11,19;10:2,
11,19;11:3,12,20;
12:3,14;13:3,20;
14:3;48:3;82:14
**Attorney's (1)**
6:16
**attributable (1)**
215:14
**attributed (2)**
210:16;214:7
**audience (1)**
85:1
**audit (2)**
91:14;115:9
**August (2)**
40:21;114:3
**Aurelius (14)**
47:22;48:3,8,13,
19;53:3,10;106:19,
20;107:6;108:1;
129:12;130:15,18
**Aurelius' (1)**
129:20
**authenticate (1)**
118:19
**authority (3)**
126:9;127:22,24
**authorize (1)**
44:11
**authorized (2)**
43:6;128:24
**available (14)**
39:24;74:13;75:20;
77:17;132:17;134:4,
13;135:11;155:7;
162:17;183:16;
185:19;194:12;
258:11
**Avenue (13)**
5:3;6:4;8:20;9:3,
12,20;10:12,20;
11:13,21;13:4,21;
14:4
**avoid (1)**
121:23
**avoidance (4)**
25:24;229:2,2;

253:9
**aware (18)**
17:8;48:13,19,22;
54:4;55:8;87:7,22;
92:14,20,22,25;
131:10;161:9;
177:25;191:6;192:9;
193:12
**away (1)**
165:15
**AYQ (4)**
156:1,8,9;157:10

**B**

**back (29)**
19:8;34:8;85:13;
86:22;89:9;93:13;
106:2;114:12;116:5;
121:19;133:5;137:4;
143:8;174:16;
175:25;176:7,24;
183:25;185:7;209:8;
215:10;228:10,15;
242:2,18;244:16;
245:2,5;258:4
**background (1)**
167:23
**bad (2)**
83:14,19
**badly (1)**
185:22
**bag (1)**
242:10
**balance (34)**
79:17;144:21;
174:23;209:19,21;
210:22;211:4,7,11,
13,19,20,22;213:1,
22,23,25;214:3,7,10,
18;215:6,10,12,13;
217:15,23;228:21,22,
24;246:15;248:13;
252:22;253:2
**balances (96)**
110:22;111:6,17;
114:1;115:1,17;
120:10,24;122:8,9,
12,17,21;123:9,14,
24;128:2,9;139:25;
140:2,14;141:7,13;
143:22;144:9;
157:15;168:7,21;
169:16;170:7,12,19;
171:4,7,9,14;172:16,
17,22;173:7,8,23;
174:21;175:19;
178:24;204:22;
205:1,4;206:25;
207:3;208:8,15,18;
211:25;212:2,7,8,13,
16,24;213:8,18;
214:22;215:2,2,

216:12;227:19;
228:20;229:13;
231:16;234:20;
235:4,25;236:19;
237:4,8,8,12,18,25;
242:15;246:6,8;
247:10;251:3;
252:14;253:16;
254:2,8,11,13,16,23;
255:3,4,10
**ball (1)**
164:22
**ballot (1)**
26:4
**Bank (21)**
3:3,7;7:3,11;8:19;
9:2,11,19;11:11,12;
12:3;64:19;67:1;
68:15;71:9;80:9,11,
19;84:1;90:25;95:10,
12
**banking (4)**
80:1,6;82:24;83:4
**Bankruptcy (30)**
2:14,23;15:14,24;
17:7;46:4;51:8;
56:11;58:9;83:24;
104:23;107:19;
114:25;118:5,6;
131:21;150:14;
177:20;179:6,16;
205:8;246:7;248:2;
251:13,18;253:9,18,
20;254:3,17
**banks (2)**
80:20;83:4
**bar (2)**
178:10,11
**Barbara (3)**
170:24;206:10;
248:22
**bargain (2)**
182:25;225:5
**bars (2)**
178:14,15
**base (5)**
233:22,23;234:2,
24;239:7
**based (20)**
17:14;22:17;51:9;
94:7;119:25;143:5;
154:16;157:9;
162:21;171:6;
189:22;205:6,10;
212:22;243:7,22;
245:4,8;254:3;
257:23
**basement (1)**
45:24
**Basically (2)**
75:3;187:15
**basis (7)**
84:1;114:12;152:8;

167:1;175:19;193:4;
255:9
**Bates (6)**
118:15,16,17;
249:16;252:4,11
**Battery (1)**
12:4
**BBZ (2)**
44:23;49:7
**BDB (5)**
52:18;107:3;
116:20,24,25
**BDD (2)**
52:19;107:4
**bearing (1)**
50:14
**bears (1)**
88:13
**became (11)**
40:18,21;54:4;
55:5,8;104:18;
167:15;168:2;
173:24;181:15;
204:18
**become (3)**
185:1;225:20;
236:20
**began (6)**
45:5;54:5,21;
121:22;123:3,8
**begin (1)**
155:11
**beginning (8)**
38:5,7;118:14;
131:8;157:20;
174:22;185:7;209:9
**begins (1)**
228:2
**behalf (37)**
20:12;22:2;24:8;
25:1;28:18;38:16;
40:14;43:1,7;57:15;
64:18;67:1;68:15;
71:9;77:11,21;78:11;
86:16;95:10;97:17;
98:7;107:14,18;
126:10,20,22,24;
128:24;137:12,16;
151:6;158:8;198:25;
200:22,23;203:2;
204:16
**behind (4)**
81:5;133:5;205:1;
244:16
**belief (7)**
178:3;207:16,18;
208:18,23;235:22;
246:11
**believes (1)**
254:13
**believing (1)**
152:8
**below (1)**

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
Case No. 12-12020-mg            Pg 269 of 300                November 20, 2013

148:25
**bench (3)**
147:6;195:6;
198:12
**BENEFIT (5)**
13:11;56:13;57:2;
177:23;237:11
**benefits (6)**
56:10,21,23;57:5,
7;185:23
**BENSON (1)**
8:10
**Berkshire (4)**
14:3;126:20,23;
127:21
**best (7)**
50:4,4,8;136:17;
138:5;198:14;257:6
**better (7)**
73:20;96:4;105:22;
106:9;232:15,19;
249:21
**beyond (1)**
18:23
**big (4)**
88:5;185:17;250:9,
13
**bigger (1)**
85:1
**billion (25)**
17:1;79:19;96:5,5,
15;140:4,10,21;
141:1;142:13;144:1;
145:25;146:11;
163:18;173:12,21;
174:20;178:25;
181:12;183:1;
209:25;225:3,5;
233:13;240:20
**billion-dollar (1)**
41:14
**billions (2)**
210:3,6
**binary (1)**
184:15
**binder (28)**
38:6;40:1;42:4;
55:13,16;61:21;
80:25;81:4,10;106:6;
107:1;108:1;121:6;
133:2,5;147:18;
156:2;165:14,21;
177:8;188:10;
205:19,20;206:2;
209:7;228:16;229:9;
232:12
**binders (11)**
24:4;35:19,24;
36:2,5;39:3;58:20,
24;59:1;165:15;
195:21
**binding (3)**
171:16,18;186:3

**BIRD (2)**
9:1;68:15
**bit (2)**
122:19;233:19
**Bizella (1)**
248:23
**black (2)**
178:14,15
**Blame (1)**
198:10
**bless (2)**
177:7;195:1
**blew (1)**
80:11
**blown (1)**
144:24
**blue (2)**
178:10,11
**Blumentritt (3)**
200:25;201:2,8
**board (19)**
41:23;42:3;78:18,
23;79:25;84:1;93:14;
104:14;180:5;
246:13,17,20,24;
247:4;248:4,5;
251:11,12,22
**BOCKIUS (1)**
9:18
**bold (3)**
249:3;250:11,25
**bonds (2)**
240:22,22
**booked (1)**
171:23
**books (9)**
163:15,22;170:12;
171:15,24;172:8,10;
173:24;254:24
**borrower (7)**
16:2;17:9;21:2,3,4;
125:25,25
**borrowers (4)**
18:18;19:18,22;
21:8
**borrowers' (2)**
17:14;126:2
**borrowing (1)**
209:22
**borrowings (1)**
210:22
**Boston (1)**
11:5
**Both (11)**
22:19;31:10;84:8;
155:19;162:21;
186:24;187:15;
207:6;224:20;
233:22;257:21
**bottle (1)**
165:11
**bottles (1)**
40:11

**bottom (8)**
148:11;149:6,9,19;
150:6;156:19;178:8;
216:9
**Bowling (1)**
2:15
**box (3)**
51:6;57:24;58:5
**boxes (3)**
35:20;36:15;59:18
**boy (11)**
42:6,6;52:21;
106:25;116:12,12,13,
18,18;119:18,19
**Boylston (1)**
11:4
**Brad (2)**
57:15;76:8
**BRADLEY (1)**
6:11
**brain (1)**
210:7
**breach (6)**
128:11;137:2,15,
19,23;138:3
**breached (1)**
83:16
**breaches (1)**
182:11
**break (1)**
197:18
**breathing (1)**
17:7
**Brendan (2)**
65:21;66:9
**BRIAN (4)**
5:16;248:23;256:2,
17
**brick (1)**
174:7
**brief (4)**
28:10,22,23,24
**briefs (3)**
162:22,25;164:18
**bring (14)**
24:4;36:17;40:6,
10,11;59:6;137:17,
18;144:22;159:2;
165:13;188:2;204:2;
251:11
**bringing (2)**
143:8;144:17
**broad (3)**
183:5;222:5;
225:14
**broadcast (1)**
85:3
**broader (2)**
210:19;225:4
**broadly (1)**
41:14
**Broadway (1)**
8:12

**Brodsky's (1)**
53:13
**broken (1)**
160:4
**brokering (1)**
91:10
**brought (1)**
138:1
**Buffett (1)**
93:12
**Building (3)**
5:11;45:21,24
**built (1)**
15:13
**bullet (9)**
122:12;209:21;
210:21;211:4;
215:13;239:12,13,20;
240:9
**burden (1)**
16:8
**business (3)**
17:6;83:10;246:9
**busy (2)**
137:5;251:17
**buy (1)**
93:13
**BX (1)**
106:10

## C

**CA (1)**
14:6
**calculus (2)**
185:24;237:10
**calendar (1)**
19:22
**calibrated (1)**
120:1
**call (23)**
19:22;44:6;50:6;
80:21;136:17;141:9,
19;154:6;175:15;
190:5,5;212:14;
246:15
**called (17)**
19:8;20:11;25:7;
35:6;61:2;63:18;
65:25;70:11;71:25;
76:13;97:12;153:24;
158:13;199:6;203:8;
228:2,11
**calls (3)**
48:17;216:19,21
**came (10)**
20:3;45:8;46:17;
56:4;111:12;138:5;
168:15;171:5;
174:12;249:12
**Can (81)**
17:19;19:23;21:10,
14,17,22;22:8;23:11,

12,20,22;24:4,15;
25:21;28:5,6;30:12;
33:23;34:7;35:23,25;
39:5;40:10,11;42:12,
24;50:8,21;55:22;
58:2;60:4;82:2;
85:25;86:18;112:24;
118:19;133:1;
135:20;142:9;147:4,
9,10;150:20;154:1,
16,17;158:20;
161:12;165:14,19;
167:4,13,14;173:20,
25;178:4;180:4;
184:14;191:1;192:3;
194:4;196:8;201:25;
212:24;215:24;
219:10;229:8,15,18;
230:23;232:11;
238:10,12;243:2;
244:18,21;245:16,18,
20;247:7;255:2
**cancel (1)**
166:8
**canceled (1)**
140:6
**cant (1)**
23:17
**capacities (1)**
104:16
**Capacity (3)**
3:7;44:20;92:9
**Capital (16)**
3:6,10;13:20;15:3;
26:2;41:1,9;42:9,11,
24;43:1,4,7;53:4;
56:20;82:22
**care (6)**
49:10;145:3;
146:20;201:20;
216:24,25
**cared (3)**
84:10,12;146:17
**career (2)**
104:4,5
**careful (2)**
85:2;145:17
**carefully (1)**
219:22
**Carpenter (26)**
77:13,15,19,22;
78:2,3,5,15,17;80:24;
81:7,19;82:5;85:4;
86:11;89:12;90:12,
23;91:4,8;92:8;
95:19;96:11,24;
222:11;225:16
**Carpenters (3)**
10:11;75:4;126:6
**case (60)**
15:14;16:3,3,24;
17:5,11,13;18:16,21,
24;19:7;20:12;26:22;

37:17;40:7;86:15;
104:4;105:7,9,10,11;
106:21;109:10,25;
110:11;119:10;
120:1;127:17;130:6;
131:21;132:21;
136:15,15;144:20;
151:13;153:8;
157:14,18;173:3,13,
14;175:7,9;179:16;
180:10;187:25;
214:17;217:9;222:8;
225:4;227:8;229:25;
231:20,22;233:11,23;
234:2;239:7;247:21;
258:9
**cases (6)**
77:5;105:18,20;
137:11;143:3;170:15
**cash (21)**
83:7;95:21;144:5;
163:5;211:6,6,7,16,
23;212:5,9,11,11;
214:1,11,15,18,24;
215:7;239:10,21
**cast (1)**
26:4
**category (2)**
142:10;167:10
**Cathy (1)**
206:10
**cause (2)**
82:18;90:18
**caused (1)**
179:6
**causes (2)**
85:14;167:8
**caveat (2)**
30:4;32:9
**CC (1)**
256:2
**centered (1)**
227:11
**centralized (8)**
211:6,16,23;212:4;
214:1,11,23;215:7
**CEO (9)**
40:18,21,22;78:20;
79:1;83:23;104:13,
14,18
**Cerberus (1)**
44:17
**certain (25)**
23:10;43:10,12;
51:18;56:25;100:7;
105:6,11;125:13,25;
126:13,17;128:2;
137:10;141:4;
191:13;220:6,12,17;
224:3;243:20;245:2;
247:3;254:2,4
**certainly (18)**
54:20;112:24;

153:6;165:2;168:14;
169:4,4;175:13;
176:25;180:7;
181:14,23;182:9;
184:4,6;241:7;
242:14;243:10
**certificate (2)**
70:6;149:23
**certificates (1)**
191:21
**certifying (1)**
25:25
**cetera (3)**
141:11;144:13;
215:4
**CFO (2)**
53:6;56:6
**CFPB (1)**
17:9
**chain (7)**
131:7;156:13,14,
18;206:10;256:1,14
**chair (1)**
140:16
**chairman (6)**
40:18,20,21,24;
56:19;104:14
**Chambers (1)**
6:17
**chance (1)**
73:20
**change (11)**
75:9;234:5;235:19,
23,24;236:13,13,19;
237:23;244:21;245:1
**changed (6)**
148:25;157:18,19;
211:7;243:9;244:6
**changes (2)**
149:2;237:9
**changing (3)**
237:21;243:1,20
**Chapter (24)**
25:2;26:1;35:1;
50:23;60:22;63:14;
65:19;67:14;69:6;
70:2;71:20;97:8;
141:19;142:4,5,7;
148:1;158:9;184:2;
190:10;199:1;203:4;
215:5;216:4
**characteristics (1)**
172:23
**characterize (1)**
87:4
**Charles (10)**
22:1;34:23;58:14;
59:16;65:18;112:9;
113:21;158:7;
200:22;203:2
**chart (3)**
213:1;232:21,25
**charts (1)**

210:3
**Chase (1)**
7:20
**cheap (1)**
225:6
**check (3)**
19:16;31:20;84:15
**checked (1)**
235:9
**checking (1)**
202:8
**Chief (6)**
13:12;41:1,2,9,10;
52:9
**chose (4)**
17:10;47:2;130:15;
189:6
**CHRISTENSEN (1)**
12:10
**chronology (2)**
230:10;247:19
**circulated (1)**
114:23
**circumstances (1)**
174:10
**City (1)**
71:10
**claim (49)**
18:15,23;20:18,19,
20,22,23;21:2,2,3;
26:4,5;90:24;91:18;
94:15;136:14;
142:23;144:2;
151:13,24;152:2;
164:14;167:24;
178:23,24;182:16;
184:10,18;187:21;
190:15,16;192:21,23;
193:8,14;209:20;
210:8;211:3;213:24;
214:5;220:21;222:1;
224:4,18;225:22;
235:23;241:2;
245:10;257:25
**claimant (2)**
113:11,12
**claimants (8)**
113:9;125:25;
126:1,2,3;146:19,22;
223:19
**claim-by-claim (1)**
166:25
**claims (256)**
17:9;29:19;31:13;
41:15;43:13;51:7,9,
10,10,12,13;52:1,5,9,
15;53:14;54:6,10,14;
55:1;57:24;58:5,9,
10;83:24;84:4,4,19;
85:5,8,10;86:12,17,
19,21,23;87:8,10,10,
17,21,22;88:7,8,10,
14,18,19,24;89:2,5,

22;90:9,12,13,15,21;
91:22;93:8,17,20,22,
24;94:6;98:14;108:7,
14,21;109:9,10,18,
24;110:2,2,4,6,13,13,
14,16,23,25;111:2,3,
7,10,10,23,24;
113:10,10,19;115:10,
13,16;120:20;122:2,
5,7,10,14;123:13,18,
18;124:3,10;125:11;
128:11;131:20,22,23,
25;132:2,9,12;134:1,
9;135:4,6,14,18;
136:13,17;137:2,12,
15,18,19,21,24,25,25;
138:2,3;140:3,3,10,
19,25;141:4,22;
143:7,11,11,18;
144:17;145:8,9;
150:9,13,17;152:5;
154:24;155:3;157:3,
6,13;163:9,10,13,14,
19,20;166:9,19;
167:6,21;168:14,25;
170:10,11;173:1,5;
174:5,7;175:23;
176:18,18;181:17,17,
21,22,23,24;182:2,3,
6,7,8,10,20,22;183:1,
5,10,10,10,15,16,16,
17;184:8,20,24;
185:8,22;186:8,19,
24;187:2,10,13,18,
18;188:4;193:1,22;
194:2;208:2;216:14;
217:9;218:7,18,22;
219:14;220:3,17;
221:20,22;222:3,15,
20,21,23;223:6,7,10,
19,25;224:6,23;
225:18;226:8,20,23;
227:1;234:18;
235:12,13;237:1;
238:2,6;241:24;
243:7,8,24
**clarification (1)**
64:15
**clarifies (2)**
230:7;231:17
**clarify (3)**
86:25;220:10;
236:9
**Class (4)**
3:13;13:3;51:3,6
**classify (3)**
87:3;109:9;122:9
**cleaned (1)**
212:14
**clear (26)**
23:4;33:4;35:24;
37:21;41:9;73:15;
88:6,22,24;89:3;

110:19;112:8;
115:23;119:2;
137:23;144:16;
157:8;163:7;184:3;
185:24;195:6,9;
222:4;231:8;241:16;
253:22
**clearly (6)**
89:7;106:23;113:2;
118:24;144:7;230:21
**CLEARY (1)**
12:13
**CLERK (1)**
198:22
**clerks (3)**
30:23;36:18;40:1
**clients (3)**
49:18;113:15,16
**clip (2)**
133:14,19
**close (4)**
30:22;173:20;
209:9;240:13
**closer (2)**
166:15;233:23
**closing (3)**
22:25;23:1;217:5
**Co (1)**
252:18
**co- (1)**
97:18
**coalesce (2)**
138:23;185:15
**co-chair (6)**
105:2,4;127:10;
129:14;140:18,19
**Code (6)**
51:8;56:24,24;
57:3,3;58:9
**COHEN (114)**
8:7;11:19;23:3,13,
22;24:8,8,15;25:18,
20,23;26:9;30:9,10;
31:8,9,22;32:3,10,15,
20;33:3,18,19;34:8,
14,15;59:24;60:5,10,
15;63:3;64:11;65:6,
16;66:18;67:4,5,12,
20;68:7,12,24;70:14;
71:2;72:4,15,16;74:7,
17;75:17,18;76:4,16,
24;98:1;154:4,18;
158:17,18;159:24;
160:15;161:6,17;
162:10,11;164:21,24;
165:2,13,17,19,21,
25;166:1;170:3;
178:10,16;181:4,6;
187:8;190:18,19;
195:24;196:6,16,18,
20,24;197:4,6,8,18,
21,25;198:10,12,17;
199:11,12,18;200:4,

7;201:5,14,19;
202:10,11,15,18,23;
203:12,13,15
**Cohen's (2)**
137:9;180:23
**collateral (29)**
54:7;55:2;92:9,10,
11,14,22,25;93:18;
94:2,2;99:8;111:15;
151:6,7,16,16,17;
152:3,18;163:5,6,7,
14,16;190:24;191:2,
13;192:18
**colleague (1)**
208:11
**colleagues (2)**
33:3;165:15
**collect (1)**
153:2
**collectable (1)**
170:14
**collected (1)**
206:14
**collecting (1)**
207:2
**collection (1)**
207:2
**collective (1)**
210:15
**collectively (1)**
86:21
**colorfully (1)**
84:25
**COLT (1)**
5:1
**column (1)**
178:23
**columns (1)**
210:16
**combination (4)**
185:21;210:12;
213:3;245:9
**combined (1)**
32:22
**comfortable (3)**
48:23;189:5,13
**comforted (1)**
185:4
**coming (8)**
56:9;66:21;100:9;
134:3,11;155:5;
180:5;184:12
**commence (1)**
132:11
**commenced (10)**
55:3;115:19;
122:18,20;123:16,23;
124:2;125:12;
132:13;136:21
**commencement (5)**
120:9,20;123:22;
173:13;174:17
**commentary (1)**

226:4
**commented (1)**
114:24
**comments (3)**
196:2;208:16;
209:1
**Committee (120)**
3:2;5:20;6:3;11:3;
25:3;26:2;35:2;
48:13;57:16;60:23,
24;63:15;65:20;
67:15;69:7;70:3;
71:21;76:9,10;77:12;
97:9,17,18;104:24;
105:2,4,18,20;108:6,
13,17,20;109:24;
110:1,3,5,12,24;
111:9,14,22;113:14,
18;114:8,11;115:6,
15,15,17;119:22;
120:3,3,6,12,13,19;
121:22;122:1,5,7,22;
123:2,7,12,16,23;
124:2,6,8,15;127:10;
128:24;129:2,15;
130:17;132:1,5,6,7,
10,15;133:25;134:8;
137:1,10,14,17;
139:9,11,23;140:9,
13,16,19;144:16,19;
146:19;148:22;
149:6;151:23;152:5,
8;155:2;158:10;
168:10;169:9,15,24;
182:1,19;184:19;
187:16;189:14;
199:2;200:23;203:5;
217:8,14,22;218:5
**committee's (9)**
47:25;48:3;109:2;
111:1;119:24;
120:23;122:13;
154:22;226:11
**common (1)**
169:8
**communication (2)**
113:18;114:6
**communications (1)**
169:2
**communities (1)**
176:7
**community (1)**
168:11
**compact (1)**
165:21
**companies (1)**
173:17
**company (25)**
52:14;80:14,15;
91:12;108:19;137:5;
174:20;177:12;
180:14;207:16;
208:19,23;210:12,13;

211:2;213:10,14;
225:20;247:24;
248:1,10,13;251:17,
20;253:15
**company's (7)**
109:11,17;211:5,
16,23;214:1,11
**comparable (2)**
214:20;215:1
**compared (1)**
120:23
**comparing (1)**
75:5
**comparison (1)**
223:15
**compensate (1)**
17:2
**compensated (1)**
16:21
**compensation (2)**
16:4;164:13
**competent (2)**
172:2;191:25
**compilations (1)**
99:6
**complete (1)**
30:24
**completed (2)**
138:9;148:18
**completeness (1)**
157:9
**complex (5)**
16:10;238:8,9;
243:1;244:18
**comply (2)**
79:3;80:18
**components (1)**
217:12
**compromise (2)**
144:2;145:21
**computers (1)**
114:21
**concede (1)**
16:6
**conceivably (1)**
83:15
**concerned (1)**
176:4
**concerning (5)**
91:9;123:3,12;
129:20;157:18
**conclude (1)**
258:9
**concluded (3)**
85:10;91:15;
258:20
**conclusion (17)**
138:9,19;143:12;
164:9;168:6,8,15,19,
22,23;171:6;174:25;
176:23;184:13,14;
189:21,22
**conclusions (1)**

75:10
**condition (3)**
78:24;84:3;93:15
**conditioning (1)**
84:18
**conditions (1)**
47:8
**conduct (2)**
152:2,5
**confer (2)**
30:23;119:14
**conference (1)**
198:13
**confidence (2)**
90:20;184:6
**confidential (3)**
117:13;118:25;
148:24
**confidentiality (15)**
42:8,14;43:7,15;
46:13,23;47:9;49:6;
50:11;60:7;99:17;
128:25;148:24;
169:21;189:10
**confirm (2)**
30:18;119:9
**CONFIRMATION (24)**
3:11;25:10;28:19;
32:23;35:9;38:11;
50:9;61:14;63:21;
66:3;73:23;76:11;
128:6;151:19;
152:21;153:7;
158:16;162:22;
184:2;190:9,10;
194:16;199:9;203:11
**confirming (1)**
190:11
**conflict (1)**
121:23
**Conflicts (1)**
5:2
**confused (2)**
228:3;231:9
**conjunction (1)**
230:20
**conjure (1)**
88:3
**connected (2)**
19:5;192:12
**connection (28)**
26:23;46:2,14;
47:9;49:20,20;52:3;
56:11;62:19;64:4;
66:11;67:25;70:20;
72:10;92:11;93:4;
114:7;129:20;
139:13,24;143:15;
151:8;152:2;159:25;
169:24;170:14;
191:6;192:13
**consensual (3)**
216:11,12;217:10

**consensus (1)**
157:5
**consent (1)**
149:1
**consenting (3)**
146:18;148:15;
149:7
**consequences (2)**
79:9;83:14
**conservatively (1)**
16:21
**consider (9)**
22:25,25;85:5;
91:23;144:16;
180:15;227:3;253:7;
254:9
**consideration (4)**
93:20;122:13;
176:17;178:23
**considered (7)**
23:2;122:5,8,22;
179:15;217:17;
253:14
**considering (1)**
225:23
**consistent (4)**
85:22;235:7,8;
246:10
**consists (1)**
29:18
**consolidated (9)**
35:8;38:10;63:21;
66:3;76:12;97:15;
158:16;199:9;203:10
**constant (1)**
236:11
**constituencies (3)**
105:6;125:2;
216:11
**constituency (1)**
216:14
**constituents (5)**
235:24;237:10;
243:3;247:7,8
**consult (1)**
80:15
**contained (1)**
55:25
**contains (1)**
250:22
**contemplated (1)**
237:6
**contemplates (1)**
220:17
**contend (2)**
128:2,11
**contents (1)**
76:14
**contestants (1)**
173:2
**context (16)**
128:17;169:19;
188:7;211:25;212:6;

222:7,11;225:4,12;
230:14;235:6;
236:11,21,23;241:7;
242:17
**continue (2)**
15:5;17:6
**continued (2)**
84:5;123:20
**continues (1)**
251:9
**continuing (3)**
17:12;83:9,10
**continuously (1)**
211:25
**contract (11)**
128:11;137:2,15,
19,24;138:3;182:7,8,
12,15;183:4
**contracts (1)**
254:7
**contractual (6)**
88:24;89:3,5,7;
94:6,16
**contradicting (1)**
214:9
**contributed (1)**
56:17
**contributing (3)**
17:1;225:1,2
**contribution (24)**
41:14,18;56:15,22;
84:22;145:25;
146:22;148:16;
166:25;167:1,5;
181:11,12;186:1,11;
190:13;220:11;
226:17;234:23;
235:1,12;236:3,8;
237:18
**control (1)**
182:5
**controlling (1)**
177:1
**conversation (6)**
46:16;85:15;91:18,
21;93:12;189:22
**conversations (8)**
46:19;128:19;
169:14,17,24;170:8;
171:2,25
**conveyance (5)**
87:21;88:7;89:21;
140:3,25
**conveyances (1)**
253:10
**copies (1)**
62:1;156:23
**co-proponents (1)**
97:20
**copy (11)**
26:14,20;38:3;
62:10;114:5;133:10;
148:1;158:22;162:7;

200:15;204:2
**copying (2)**
206:11;248:23
**CORDARO (1)**
6:21
**corporate (7)**
166:7,13,17,23;
182:4;221:1;227:7
**CORPORATION (1)**
13:11
**corrected (5)**
75:14,15,23,25;
216:3
**correctly (1)**
69:12
**cost (1)**
144:23
**Counsel (59)**
5:2,20;13:12;
20:13;21:14,14;22:7;
30:1,6,18;33:2,7;
37:23;43:3;45:17,18;
46:16,20,20;51:23;
67:1;71:7;75:12;
87:11;99:2;111:15;
115:15,15,18,18;
120:4,7,12,15;
123:13;126:5,8,9;
132:11;140:13;
147:6;168:9,10;
170:8,9;187:16,16,
16;188:17;191:21;
195:6;205:13,15;
206:20;210:13;
238:23;244:15;
254:20;257:20
**counterparties (1)**
173:1
**counterparty (1)**
172:25
**couple (2)**
95:5;132:22
**course (11)**
31:20;151:16;
157:13,18;168:4;
174:15;176:3;184:8,
25;186:3;246:8
**Court (645)**
2:14;15:2,10,19,
22;16:9,14;17:18,19,
21,22,23;18:2,4,6,9,
13,15,18,20,23;19:1,
3,6,8,10,14,16,20;
20:1,3,5,11,14,16,18,
24;21:5,10,13,17,21,
24;22:9,19,23;23:2,
12,15,20,24;24:2,6,
16,19,23;25:11,18;
26:6,8,10,12,19,25;
27:3,6,7,8,9,14,16,19;
28:6,9,12,16,21,24;
29:1,7,17,20,22;30:6,
9,12;31:2,10,15,21,

24;32:3,12,14,19,21;
33:11,13,18,21,23;
34:1,7,10,13,16,20,
22;35:10,14,17,20,
25;36:8,13,15,22;
37:4,7,11,13,18,25;
38:5,8,12,14,18,21;
39:1,6,11,14,25;40:6,
9;41:25;47:13,16,19;
48:17;49:9,12,15;
50:2,8,19;53:21,23,
25;54:2,12,24;55:13,
15,18,21;57:9,14,20;
58:12,16,19,25;59:5,
8,12,14;60:2,9,11,16,
20;61:4,10,12,15,25;
62:14,17;63:1,4,22,
24;64:9,14,16,24;
65:2,7,17;66:4,16,21,
24;67:3,6,19,21;68:6,
13,17,21;69:4,10,13,
16,24;70:1,13,15,25;
71:6,12;72:2,5,15,18,
21;73:4,9,13;74:2,5,
8,15,18,21,23;75:11,
17,19,22;76:2,5,7,15,
17,22,25;77:4,9,18,
22;78:1,5,8,12;80:4,
7,23;81:3,9,12,14,16,
25;83:22;85:18;86:3,
5,8;89:20,24;90:1,4,
11;91:3,7;92:2,5;
94:4,20,24;95:1,5,8,
11,13,16;96:2,7,14,
17,20,24;97:3,6,16,
20,22;98:2,5,10,12,
15,20,24;99:11,22;
100:1,5,11,13,18,20,
25;101:11,13,16,19,
22;102:5,10,13,15,
19,21;103:2,4,9,15,
18;105:9;106:9,22;
107:3;109:12,14,20;
110:9;112:3,6,12,17,
22;113:1,6,20;
114:13,18,21;115:3,
25;116:3,7,18,20,23;
117:1,3,6,9,12,20,23;
119:5,7,
12,14;121:8,12,15,
17;124:14;125:14;
131:13,15;133:2,8,
22;134:15,18,22;
135:9,19;136:2,6,10;
137:6,8;138:11,13;
139:5,8;141:23;
145:3,6;146:25;
147:2,10,12;148:7;
150:22,24;151:1;
152:11,15,23;153:5,
15,19,24;154:2,6,12,
15,19,21;155:8,15,
17;156:2,4,7;157:1,7,

8,24;158:2,4,17,22,
25;159:3,6,8,11,14,
17,21;160:6,14,16;
161:2,8,13,18,21,22;
162:4,6,8,10,12,18;
164:22;165:1,4,6,10,
13,18,20,22;166:15;
169:11,13;170:1;
171:12;177:23;
178:9,14,21;179:7,9,
18;180:13,19,23;
181:5,7,9;184:1;
186:15;187:6;
190:19;191:24;
192:4,6,8,15;193:7,
17;194:4,21;195:4,
15,18,22;196:4,8,12,
14,17,19,21,24;
197:5,7,9,17,20,22;
198:1,7,10,16,18,23;
199:11,13,17,19,23;
200:2,5,8,14,17,19,
21;201:4,7,10,17,21,
23;202:2,6,8,13,17,
19,25;203:12,14,17,
21,23;204:1,4,9,12;
205:14,16,20,24;
206:1,5,23;208:22;
209:2,25;210:5;
213:13,15;215:17,24;
216:18,21,24;217:13,
19;218:3,19;219:7,
10,21;221:6,11,14;
223:1,4;226:4;228:1,
9,25;230:3,9;231:24;
232:4;233:14,17;
234:11,14;236:14;
237:3,11;238:15,18,
21,25;240:1,3,12;
241:1,12,14,16;
242:23;244:2;
246:17,20;247:12,16,
20,25;248:4,7;249:1,
3,11,13,18,20,22,25;
250:6,10;251:25;
252:5,8,11;253:22;
255:7,14,16,22,24;
256:15,21;257:1,4,7,
10,17;258:1,3,6,12,
17
**courtroom (2)**
15:25;40:9
**Court's (3)**
20:3;196:2;233:10
**covenant (1)**
80:11
**covenants (10)**
79:2,7,10,25;
80:19;82:18;83:3,13,
16;174:14
**cover (1)**
84:1
**covered (2)**

100:24;173:7
**covering (1)**
107:2
**cover's (1)**
112:14
**create (4)**
16:11;138:5;
228:21;244:19
**created (4)**
211:25;212:13,17;
228:24
**creating (1)**
231:11
**creditor (15)**
15:14;122:2,4,7,10,
13;124:24;125:1;
168:11;176:6;
184:16;191:10;
216:11,13;242:4
**Creditors (49)**
3:3;21:14;25:3;
26:3;35:3;41:18,23;
42:2;57:16;60:24;
63:15;65:21;67:15;
69:7;70:4;71:21;
76:9;77:12;84:22;
97:9;104:25;132:18;
134:5,13;135:11;
146:12,15,20,21;
148:15;149:7,10;
154:25;155:7;
158:10;167:6;174:4,
4;183:24;185:2,5,18,
23;186:10;187:17;
199:3;200:24;203:5;
242:9
**Creditors' (21)**
5:20;6:3;105:4;
124:15;148:22;
149:5;168:10;169:9,
15,24;181:25;
182:19;184:18;
187:16,21;188:4;
217:8,14,22;218:5;
220:17
**crew (1)**
114:21
**CRO (12)**
160:13;167:15,19,
25;168:2;172:6;
173:24;174:12;
180:14;181:15,20;
194:7
**cross (9)**
24:12;60:13;92:1;
95:6,6;98:19;151:2;
201:6;258:16
**cross- (7)**
26:12;74:13;76:22;
97:24;153:15;
162:18;256:23
**crossed (1)**
59:22

**cross-examination (27)**
34:13;35:16;40:1,
15;57:10;73:3;78:13;
92:6;95:2,7,17;96:2,
9,21;103:13,20;
139:6;147:3;151:3;
159:22;165:24;
190:20,21;195:8;
198:6;204:13;258:15
**cross-examine (9)**
24:7;34:16;60:6;
74:15;76:2;103:5;
158:19;199:17,19
**cross-examined (7)**
22:6;24:5;39:24;
62:2;75:21;77:17;
162:17
**cross-examining (2)**
77:18;203:21
**cure (2)**
80:13,20
**current (2)**
142:9;254:8
**currently (3)**
95:20,23;141:23
**CURTIS (1)**
5:1

**D**

**D&O (1)**
194:11
**DALE (1)**
12:10
**damages (1)**
187:14
**DAN (9)**
13:8;38:16;40:13;
52:21,21;99:15;
106:10,10;116:13
**DANIEL (3)**
7:15,24;8:15
**Darryl (2)**
28:17;73:11
**data (1)**
75:6
**date (56)**
25:17;28:3;29:13;
38:24;39:22;61:19;
63:11;64:3;65:15;
66:10;67:11,24;69:3,
22;70:19;71:18;72:9,
25;74:11;76:1,20;
78:4;101:10;102:3;
103:1;107:16;
130:11;132:25;
140:5,6,12,21;141:2,
15;143:24;148:9;
155:23;160:25;
162:1,15;178:23;
190:13,15;197:15;
199:16;200:12;
201:9;203:20;207:3;

228:22;243:25;
244:8,9;245:5;
247:15;254:24
**dated (23)**
25:4;35:4;52:25;
60:25;63:16;65:22;
67:16;69:8;70:8;
71:22;80:25;97:10;
158:11;199:4;
200:25;203:6;
206:11;209:16,17;
229:14;248:24;
256:3,17
**dates (2)**
170:16;215:4
**DAVID (13)**
8:7;24:8;25:21;
106:7,7,25,25;
116:12,13,18;119:18,
19;166:1
**Davidson (1)**
42:10
**DAY (12)**
10:1;19:12;20:2;
40:24;62:9;74:19,23;
81:20,21;84:23;98:7;
256:22
**days (3)**
146:9;148:19;
150:18
**DB (1)**
81:2
**DBD (2)**
116:14,16
**DC (3)**
7:13;8:5;13:14
**DD (1)**
52:20
**deal (13)**
23:21;32:16;56:18;
90:20;98:18;99:11;
100:25;103:2;116:3;
158:20;159:8;
195:18;202:2
**dealing (2)**
108:18;225:13
**dealt (3)**
20:25;46:20;
157:10
**debate (2)**
86:18;90:24
**debt (44)**
140:5,11,21;141:2,
5;142:22;143:20,25;
144:4,6,7,7,9,18;
170:14,15,17;171:4,
6,17,19;172:23,25;
173:16;174:11,19,24;
180:16;185:23;
189:12;205:7;
215:15,21;236:3;
237:19;246:2,12,15;
247:3;248:1,11;

251:2,12;255:5
**debt-like (1)**
157:16
**debtor (17)**
94:7;97:17;132:8;
139:16;141:15;
142:18;143:2;150:9;
170:12;171:16;
177:24;179:13;
181:25;184:25;
212:12,12;252:14
**Debtors (115)**
5:2;17:5,8;20:10;
22:2;25:1,3,4;28:18;
29:5;35:2,3;43:13;
46:1,12,22;49:5;
58:15;60:23,24;
63:14,15;65:20,21;
67:14,15;69:6,7;70:3,
4;71:20,21;73:12,25;
77:11;84:10;93:9;
94:17,22;97:8,9;
106:16;107:13,14,18,
19;108:22;109:5;
125:6,13,17,22;
128:3,12;131:17,20,
22,25;136:13;137:12,
16,16,23;141:23;
142:14,15;143:18;
145:14;146:16,18,20,
21,21;152:16;
154:25;157:12;
158:8,10,11;161:3;
163:15,21;166:6,13,
17,23;167:10;172:6;
178:3;179:17;180:8;
181:1;192:23;193:1,
9,11,13;194:15;
198:25;199:2,3;
200:23,23;203:3,5,6;
214:14;220:6,12;
222:5;241:3;254:23;
255:2;257:15,20
**debtors' (31)**
15:14;21:14;33:15;
108:7;115:13;135:7;
139:16;140:4,11,20;
141:1;157:17;
165:17;170:20;
172:7,10;173:24;
178:1;182:19;
183:16;185:20;
187:19;207:24;
226:22;227:6;254:7,
24
**debtor-to-debtor (1)**
142:9
**debts (9)**
163:16,21,23,25;
164:4,5,5;181:2,2
**December (15)**
45:5,13;104:18;

111:19;130:9,12,22,
24,24;238:13;241:9;
242:14;244:7;245:6;
256:17
**DECHERT (2)**
9:10;64:18
**decide (4)**
50:4,9,14,15
**decided (2)**
90:17;226:15
**decipher (1)**
51:20
**decision (7)**
49:17,22;166:8;
168:18;184:15;
188:19;189:19
**decisions (1)**
49:16
**deck (5)**
209:18;214:4;
239:24;240:5;241:21
**declaration (13)**
67:5;68:8,20;98:4,
8,10;99:13,18,20,23;
122:15;142:1;155:12
**declarations (5)**
64:22;65:4;102:7;
155:19,21
**declined (2)**
48:14;242:4
**decrease (2)**
242:11,12
**deemed (2)**
51:7;58:8
**Deer (1)**
15:13
**default (3)**
80:12,20;83:8
**defaulted (1)**
83:3
**defeat (2)**
93:8;176:9
**defended (1)**
184:20
**defenses (1)**
187:19
**defer (2)**
84:20;228:16
**deficiencies (3)**
230:24;231:4,18
**deficiency (3)**
241:2,24;245:10
**define (1)**
86:18
**definitely (1)**
52:12
**definition (1)**
183:5
**delay (4)**
138:17,20;139:1,2
**delays (1)**
16:11
**delete (1)**

196:23
**delivered (1)**
198:17
**delve (1)**
55:8
**demonstrative (1)**
22:22
**demonstratives (1)**
23:4
**denial (2)**
19:2,3
**denied (3)**
19:13,15;257:24
**DEPARTMENT (2)**
5:9;6:15
**dependent (1)**
222:18
**depending (2)**
82:17;83:15
**depends (6)**
173:9;237:20,21,
25;238:3;258:16
**deposed (1)**
104:2
**deposition (26)**
42:17,19;48:12;
56:16;82:2;85:3;
86:7;129:24;130:2;
132:21,23;133:4,7,9,
11;135:12,24;
153:21;154:8;
170:23;177:3,16;
216:23,25;221:16;
238:8
**depositions (1)**
132:22
**deputy (1)**
40:9
**derived (1)**
23:5
**describe (1)**
85:7
**described (4)**
88:1;139:9;148:24;
171:7
**describing (2)**
212:19,25
**description (1)**
211:10
**descriptive (1)**
226:15
**deserve (1)**
16:4
**designated (7)**
166:6,13,17,23;
167:3,11;221:1
**destructive (1)**
121:23
**detail (3)**
167:9;231:5;251:1
**detailed (2)**
85:7;250:23
**details (1)**

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
Case No. 12-12020-mg                Pg 274 of 300                November 20, 2013

92:24
**determination (2)**
88:25;173:23
**determinative (1)**
164:11
**determine (1)**
135:13
**determined (3)**
144:20;185:7;
228:25
**Deutsche (1)**
67:1
**devastated (1)**
18:25
**develop (1)**
120:4
**developed (2)**
135:2;154:23
**developing (1)**
220:14
**DEVORE (1)**
11:8
**different (31)**
47:5;93:11;98:10;
108:21;110:16;
115:16;120:5,15;
123:10,13,17;132:12;
134:5,13;135:11,14;
139:15,15;141:6;
155:7;174:15;
180:24;186:4;222:9;
228:3;238:1;241:10;
243:2,5;244:20;
245:1
**difficult (5)**
222:10,12;225:15,
21,25
**digits (3)**
118:17;252:5,7
**diligence (3)**
90:17;213:5;
247:15
**diligenced (1)**
213:7
**diligent (3)**
206:24;207:1;
217:17
**diluted (1)**
237:14
**diminishing (1)**
231:25
**DIP (1)**
108:19
**dire (1)**
117:24
**direct (141)**
24:16,17;25:9,15;
27:1,4;29:4,6,8,10,
12;35:3,8;36:3;38:4,
10,21,23;60:25;61:3,
13,16,18,21;62:3,5,5,
7,11,19,22;63:13,15,
19,20,25;64:2,4;

65:21;66:1,2,9;67:15,
21,23;68:1;69:8,17,
18,21;70:15,21;
71:21;72:1,3,5,8,11;
73:24;74:1,4,6,8,10;
75:22,23,25;76:10,
12,14,17,19;77:13,
16,24;78:1,3;97:13,
14;99:12;121:4,8,18;
139:18,20,21;148:8;
155:18,21;158:11,14,
15;159:5,25;164:14;
188:10;196:17;
197:9,13;199:3,7,8,
13,15;200:16,24;
201:8;203:6,9,10,17,
19;204:3;213:2;
227:12;228:1,4,10,
14,18;229:17;230:3,
7,12,18,22;231:6,13,
16;232:9,16,22,23;
234:17;236:25;
245:14;246:1;253:1,
13;254:1,22
**directed (4)**
46:19,20;94:1;
115:18
**directing (6)**
116:5;133:13;
147:17;148:10,14;
150:4
**direction (6)**
92:23;93:1;115:14;
120:3;207:13;220:25
**directions (1)**
195:5
**directly (3)**
21:17;49:19;126:5
**Directors (4)**
11:20;78:18;93:14;
193:22
**disagree (2)**
94:17;119:15
**disagreements (1)**
31:6
**disappointed (2)**
190:7,16
**discharge (1)**
166:8
**discharged (1)**
140:6
**disclosable (1)**
83:17
**disclose (5)**
44:9,11;83:19;
89:7;148:22
**disclosed (3)**
45:2;89:6;216:20
**disclosing (1)**
17:15
**disclosure (14)**
148:13;149:5;
161:4,11,11;167:2;

189:5;206:3;216:4,5,
21;217:6;226:12,22
**discovered (1)**
75:2
**discuss (2)**
151:23;170:19
**discussed (12)**
52:14;82:19;85:21,
24;146:5;171:5;
216:22,25;217:16,20;
254:19;256:19
**discussing (5)**
52:8;113:13,14;
213:20;252:22
**discussion (11)**
113:3,9;117:25;
145:18;152:7;217:2;
226:8;238:14;249:4,
24;257:25
**discussions (19)**
48:22;49:1;113:8;
114:11;117:22;
123:3,8,12;128:16;
130:6;131:1;151:25;
170:22;205:10;
210:13,13;212:23;
226:11;257:19
**displayed (1)**
244:10
**disposed (1)**
20:14
**disposition (3)**
23:1;163:6;164:13
**disputed (1)**
164:4
**disputes (1)**
45:10
**disrupt (1)**
16:11
**dissemination (1)**
70:5
**distinction (3)**
142:20,20;246:14
**distri (1)**
190:12
**distributing (1)**
103:17
**distribution (3)**
26:5;185:2,20
**divide (1)**
84:22
**docket (29)**
22:13;25:5;26:3,
21;29:5,9,11;30:14;
35:4;59:25;61:1;
63:17;65:23;67:17;
69:14;70:9;71:23;
73:25;75:1;76:13;
77:14;97:11;98:9;
158:12;179:18;
180:9;197:10;199:4;
203:7
**doctorate (1)**

94:11
**document (66)**
33:7;37:16;42:12,
16;46:25,25;47:2,4;
48:23;50:22;80:24;
81:22;82:23;87:23;
108:23;112:16;
115:2;117:8,16;
118:12,21;129:22,23;
130:1,2,3,5;147:22,
23;148:11;149:14;
150:9,13;162:2;
177:11,15,21,22;
178:8;188:10;209:6,
11;216:6,9;217:6;
239:2,4;243:15,19,
22;248:20;249:5,19;
250:2,18,21,22,22;
251:10,25;252:1,3,4;
255:21,25;256:1
**documentation (5)**
170:15;247:23;
248:9;251:1,21
**documents (16)**
19:14;38:20;39:7;
46:10;103:16,17;
112:20;156:6;158:5;
189:5;191:16;215:3;
247:10;248:12;
249:10;250:4
**DOJ (2)**
17:9;82:13
**dollar (8)**
149:24;150:15;
181:12;183:1;
185:17;188:5,6;
225:3
**dollars (31)**
17:1;20:22;43:12;
79:19;96:5,5;140:10;
144:1;146:1,11;
163:19;173:12,22;
174:20;185:21;
188:2;209:21,25;
210:8;211:4,15,21;
213:24;214:6;225:5;
233:3,4,14;239:10,
21;252:19
**domination (1)**
182:5
**done (19)**
31:5;36:16,20;
59:18;73:21;85:7;
107:20;136:19;
139:13;140:15;
143:5;145:6;150:18;
193:10,11;213:10;
218:13;230:14;
257:18
**DONNELL (1)**
10:23
**DONOVAN (1)**
7:15

**Donzilla (3)**
206:11,17;207:13
**doubt (3)**
25:24;168:14;
251:6
**DOUGLAS (2)**
6:9;156:23
**down (22)**
27:14;44:5;45:21;
58:4;59:6;75:9;
100:20;102:13;
109:7;123:1;147:8;
173:11;176:5;195:5;
206:8;211:1;213:22;
216:9;239:9,16;
254:10;256:13
**downstairs (1)**
45:23
**draft (2)**
114:22,24
**drafting (2)**
210:14;225:7
**drastically (1)**
237:22
**dreams (1)**
88:2
**driving (1)**
142:21
**Dubel (28)**
97:10,12,23;98:9;
99:13;103:7,22;
104:8,10,12;115:6;
117:1;118:6;132:20;
133:11,13;134:18;
147:14,17,22;151:5;
153:20;155:18,21;
156:1;157:11,22,25
**Dubel's (5)**
98:8;101:7;102:1,
6,24
**due (2)**
90:17;95:21
**duplication (1)**
62:7
**during (23)**
21:13,21;22:22;
31:17;85:24;105:9;
147:3;151:16;
157:13,18;162:19;
163:2;168:2,3;171:2;
173:12;185:1;
217:20;219:1,15;
220:15;231:20;
247:14
**DX-AMJ (1)**
177:9
**DX-ANH (4)**
112:1;114:6;
115:24;116:5
**DX-ANK (1)**
248:15
**DX-APA (2)**
209:7;215:11

**DX-AUC (1)**
255:18
**DX-AUT (1)**
107:22
**DX-AWR (2)**
216:2;221:5
**DX-AXK (2)**
205:17,25
**DX-AYQ (2)**
108:24;113:23
**DX-AZA (2)**
55:10,25
**DX-AZW (1)**
128:21
**DX-AZY (2)**
131:6,11
**DX-B (1)**
42:5
**DX-BAQ (1)**
81:5
**DX-BAR (2)**
80:25;81:4
**DX-BBZ (6)**
42:4;46:2,9,14,24;
47:5
**DX-BCA (4)**
50:21;57:19,22;
58:2
**DX-BCG (1)**
47:20
**DX-BDB (2)**
116:11;117:15
**DX-BDD (2)**
52:17;106:6,25;
107:7
**DX-BDE (2)**
238:13,20,22

**E**

**e- (2)**
113:23;249:25
**E-46 (1)**
162:4
**earlier (13)**
107:10;122:19;
135:5;136:21;
140:13;142:3;
144:10;150:12;
180:4;194:15;196:2;
247:24;258:4
**early (9)**
109:23;115:19;
130:9,22;132:4;
157:20;167:25;
184:16;204:21
**earnest (1)**
121:22
**ease (1)**
223:15
**easier (3)**
185:15;221:15;
228:15

**East (2)**
7:4;10:3
**easy (2)**
74:19;92:19;
134:19
**ECF (28)**
26:21;29:9,11;
30:13;33:7;34:6;
36:21;38:22;64:1;
66:7;67:22;69:19;
70:9,16;72:6;73:25;
74:9;75:13,23;76:18;
99:23;155:19,19;
197:10;199:14;
200:25;202:17;
203:18
**ECKSTEIN (18)**
6:7;47:21,24;
48:11;109:1,7;
113:24,25;128:24;
129:19;131:7,11;
133:20;134:14;
137:1,7;138:12;
156:22
**Eckstein's (1)**
136:23
**effect (1)**
194:9
**effective (2)**
140:6;190:13
**effectively (5)**
99:6,9;143:23;
144:4;236:17
**effectuate (1)**
246:2
**effectuating (1)**
253:8
**efficient (1)**
34:10
**effort (3)**
181:20,23;210:15
**efforts (1)**
45:6
**ego (5)**
87:20;88:17;89:17;
182:4;183:9
**eight (3)**
33:14;156:5;
244:11
**either (15)**
18:19;21:1;24:14;
27:7;44:9;60:4,6;
62:9;120:24;138:4;
161:2;163:24;
164:13;181:21;226:3
**elaborate (1)**
50:10
**ELLIS (2)**
7:2,10
**else (14)**
16:3,5;34:16;
74:18;93:9;101:22;
153:15;154:2;

**East (2)**
157:23;189:10;
195:12;235:15,21;
236:20
**else's (1)**
133:9
**e-mail (39)**
47:20;48:10;52:22;
80:25;81:19;82:6,8;
106:12;107:2;109:4;
112:15;129:19;
131:6,7,12;156:13,
14,18,21,24;206:9,9,
10,14,16,24;248:22,
25;249:6,22,23;
250:10,14;251:6;
255:25;256:1,6,13,14
**e-mails (1)**
131:11
**employed (1)**
106:13
**employee (2)**
44:17;91:12
**employees (2)**
179:5;207:9
**employs (1)**
71:10
**enable (1)**
44:15
**enabling (1)**
131:2
**encompassed (1)**
182:17
**end (10)**
20:1;62:9;107:20;
147:5;149:11;
167:16;184:22;
226:18;234:8;246:5
**ends (2)**
164:10;195:3
**enforceable (5)**
122:22;124:3,10;
163:20;170:14
**engaged (2)**
119:22;204:18
**engagement (3)**
162:8,14;171:14
**enhance (1)**
232:2
**enlighten (1)**
49:9
**enormous (2)**
56:17;90:16
**enough (4)**
185:17,21;197:8;
240:13
**ensue (1)**
190:11
**ensure (1)**
193:14
**enter (5)**
46:1;84:3;188:20;
190:1,3
**entered (10)**

22:11;30:11;37:8;
85:9;130:6,12,24;
132:8;167:17;186:20
**entire (2)**
34:9;117:17
**entirely (1)**
15:20
**entities (18)**
64:19;79:5;141:8,
13,16,16,18,23;
142:3,6,14,16,19;
144:8,11,15,18;150:9
**entitled (8)**
26:5;51:6;148:13;
150:5;164:12;
177:11;186:16;
228:23
**entity (4)**
143:2;144:1;179:4;
237:25
**entries (1)**
163:15
**entry (8)**
25:5;29:5;35:4;
63:17;69:14;158:12;
199:5;203:7
**equal (3)**
51:12;235:15,21
**equity (7)**
144:4;179:21;
214:19,24;215:8,15,
22
**ERIC (4)**
8:23;92:8;151:5;
190:23
**Ernst (1)**
91:14
**erroneous (1)**
75:7
**error (1)**
75:2
**errors (1)**
230:24
**eScribers (1)**
3:21
**ESPANA (6)**
9:15;64:15,18,18;
65:1,3
**ESQ (41)**
5:6,16,25;6:7,8,9,
10,11,12,21;7:7,15,
23,24,25;8:7,15,23,
24;9:7,15,23,24;10:6,
7,15,23,24;11:7,8,16,
24;12:7,8,9,10,18;
13:8,16,24;14:8
**essentially (3)**
134:23;157:4;
217:11
**establish (1)**
117:24
**establishes (2)**
26:3;118:19

**establishing (3)**
49:24;71:5;163:24
**estate (6)**
84:4;131:22;
132:12;138:6;143:9;
148:16
**estates (7)**
110:17,23;135:7,8;
139:16;149:12;
185:20
**estimate (1)**
185:8
**estimates (1)**
198:12
**estoppel (1)**
99:8
**et (7)**
3:3,3,6;26:2;
141:10;144:13;215:4
**ETKIN (1)**
10:15
**evaluate (1)**
193:8
**evaluation (1)**
123:24
**eve (1)**
253:8
**even (14)**
19:11;38:19;39:2;
86:22;88:9;112:11;
132:3;136:22;139:3;
183:22;225:11;
234:7;247:4;254:15
**event (5)**
24:20;80:12,20;
83:17,20
**eventually (1)**
142:18
**Evercore (1)**
206:15
**everybody (9)**
16:5,6;93:16,19;
183:24;184:21;
189:10;198:15,19
**everyone (1)**
16:2
**evidence (98)**
22:24,25;23:2,7;
25:12,14,16;27:24;
28:1;29:6,11,13,16;
30:15,22,25;31:3,17;
33:17;36:5;37:3;
38:22,24;39:4,15,17,
20;55:23;61:17,19;
63:7,9;64:1,3,24;
65:11,14;66:8;67:6;
67:10,22,24;68:10;
69:1,20,22;70:17,18;
71:15,17;72:7,9,17,
22;73:18;74:1,9,11;
75:16,24;76:1,18,20;
77:2;78:2,4;101:3,8,
25;102:2,25;112:11,

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                                    Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
Case No. 12-12020-mg                      Pg 276 of 300                          November 20, 2013

14;154:16;155:12,20,
22;157:9;160:19,22;
161:23,25;162:12,14,
23;172:10,13;
191:25;196:1;
197:11,14;199:14,16;
200:9,11;201:9;
203:18,20
**evidenced (1)**
144:10
**evidentiary (1)**
118:2
**ex (1)**
83:15
**exact (2)**
115:21;132:25
**exactly (8)**
104:7;122:20;
137:4;139:3;169:12;
230:1;237:13;240:12
**examination (19)**
26:13;57:11,17;
58:13;74:14;92:2;
95:3;96:22;97:25;
121:5;135:19;
153:16;155:24;
157:24;162:19;
195:4,10,10;256:24
**examinations (2)**
132:14;162:20
**examine (3)**
76:23;175:23;
195:12
**examined (2)**
118:12,21
**examiner (13)**
56:4,7,9;89:13;
90:8;91:5;137:3;
138:9,18,18;247:14,
14,20
**examiner's (6)**
52:11,13;55:11;
88:6;139:2;226:19
**examining (1)**
95:6
**example (12)**
49:5;79:14;84:19;
143:24;182:14;
187:9;212:15,24;
213:6,19;235:23;
238:2
**examples (1)**
215:1
**except (5)**
64:21;68:19;
102:18;197:11,13
**exception (1)**
233:2
**excerpt (1)**
55:24
**excess (1)**
56:13
**exchange (2)**

47:20;48:10
**exchanged (3)**
119:5;202:15,16
**exclude (1)**
22:12
**excluded (3)**
23:6;127:7,9
**excluding (1)**
217:20,21
**exclusion (1)**
22:14
**exclusivity (2)**
109:8;114:2
**excuse (3)**
27:22;119:18;
227:14
**excused (8)**
28:5,6;34:18;
58:16;96:24;147:7;
157:25;195:15
**excusing (1)**
73:14
**execute (1)**
43:6
**executed (1)**
42:25
**executive (2)**
89:12;213:23
**exercise (2)**
30:19;144:23
**Exhibit (111)**
25:6,13,16;27:12;
29:13,24;30:17;
36:18,24;37:8,13,14,
15,15,16;38:24;
44:23;49:7;61:19,24;
62:4,21,22;63:22,23;
64:1,3,7,7;65:23;
66:7,10,13;67:17,18,
22,24;68:3,3,20;
69:15,15,22;70:10,
10,16,19,23;71:2,13,
17,23,24;72:6,9,13,
24;74:2,11;76:1,20;
78:4;81:7;100:17,20;
101:1,12,24;106:23;
107:1,24;112:5,5,10,
19;113:22,23,24;
115:24;116:17;
117:15;118:6,23;
119:18;155:22;
156:1;157:10;160:3;
162:3,12,15;197:14;
199:16,25;200:8;
201:9;203:20;
205:17;206:8;
213:19;215:11;
216:2;221:4,5,9,10;
238:19;248:15;
249:5,17;252:23
**exhibits (128)**
26:13;27:2,20,21,
25;28:1;29:15,21;

30:1,15,17,25;31:17,
20;32:4;33:12,16,19;
34:5;36:2,4,9,11,25;
37:11,22;39:8,15,16,
19,20;61:6,8,23,24;
62:1,7,17,20,23;63:1,
5,8,9;64:5,10,12,20;
65:7,10,13,14,24;
66:12,14,17;67:6,9,
10;68:2,8,19,21,25;
69:1,24,25;70:21,23;
71:1,3,14,16;72:12,
13,17,21,23;73:17,
20;75:20;76:21;98:2,
3,15,21,22;99:5,10;
100:2,6,7,8,17;101:7,
8,11;102:1,2,9,21,24,
25;103:2;158:23;
159:2,9,15;160:1,7,
16,21,22;161:1,22,
24,25;199:21,25;
200:3,10,11;201:10,
11;203:24;216:5;
221:7;257:8
**exist (1)**
88:8
**existed (3)**
173:24;228:22;
248:10
**expect (3)**
35:15;157:6;
258:15
**expected (1)**
160:10
**expeditiously (1)**
191:1
**expense (2)**
16:13;233:2
**expenses (2)**
152:17;233:15
**experience (4)**
17:10;184:7;205:6;
214:14
**experiences (1)**
16:14
**expert (28)**
22:12,15;23:17;
73:23;74:25;143:15;
175:6,9;194:6,7;
227:8,13;229:12,13,
17;230:8;231:6,10,
14,15,18,23;232:13,
15;235:6;244:13;
253:12;255:11
**explained (2)**
16:4;21:6
**explicit (2)**
231:2,3
**explicitly (1)**
231:11
**exposure (1)**
187:23
**express (1)**

229:22
**expressed (1)**
230:17
**expressing (1)**
230:2
**expressly (1)**
231:6
**extend (3)**
93:24;193:21;
194:2
**extended (4)**
143:1;225:17,18,
19
**extensive (2)**
206:16,24
**extent (26)**
37:1;94:1;124:10;
128:17;139:2;143:7;
157:4,17;161:13;
177:5;186:15;
207:21;212:1,11;
222:13;228:20;
230:10,13,21;231:14;
235:20;237:9,24;
243:11;254:13,21
**extra (1)**
198:19
**extrapolate (1)**
243:12

## F

**face (1)**
118:22
**facilitate (3)**
43:16;145:10;
147:23
**facilities (6)**
80:1,5,9,12,19;83:4
**fact (15)**
56:6;81:24;83:2;
84:21;88:1;91:16;
114:2;135:16;
144:10;152:12;
176:12;185:4;
222:16;223:13;
240:19
**factor (3)**
57:5,7;177:1
**factored (2)**
56:20,23
**factors (2)**
205:11;206:20
**facts (3)**
117:25;144:6;
163:24
**factual (10)**
25:9;35:8;38:10;
61:14;63:20;66:2;
97:14;158:15;
167:23;199:9
**failed (1)**
80:18

**failing (1)**
44:11
**failure (1)**
36:17
**fair (10)**
16:9;109:23;
121:21;132:16;
134:3,12;135:10;
155:6;181:3;252:1
**fairly (2)**
167:25;181:1
**Fairness (1)**
3:13
**faith (1)**
184:6
**fall (6)**
108:20;121:21;
122:18,19;232:13;
245:19
**false (1)**
177:25
**familiar (12)**
42:13,19;54:17;
92:10,17,24;151:7,
19;191:2,8,19;193:18
**Fannie (1)**
79:6
**fantasy (1)**
88:1
**far (3)**
145:17;150:23;
247:7
**Fargo (34)**
8:19;9:2;68:15;
92:9;93:17,21,24;
94:2;95:10;151:6,15,
20,24;152:2,6,9,13,
17;153:10;190:24;
191:7,9,13,20;192:9,
18,22;193:2,5,14,22;
194:2,12;195:3
**Fargo's (8)**
37:15;92:10,17;
151:7,12;153:12;
191:2;193:8
**fashion (2)**
183:18;217:4
**favor (1)**
185:5
**Fazio (26)**
22:15;227:14,15,
19,24;228:6,12,19;
229:6,24;230:4;
231:5,8,11,19,20;
232:8,24,25;233:3,4,
21,22;236:16,24;
254:13
**Fazio's (5)**
22:16;23:10;
229:23;230:24;
237:15
**February (4)**
87:3;167:16;168:3;

180:5

**Federal (5)**
5:11;17:16,22;
18:20;112:14

**feel (2)**
16:3;185:22

**fees (1)**
152:17

**fell (1)**
141:19

**felt (4)**
89:21;132:10;
144:9;236:21

**few (4)**
17:19;100:17;
161:1;192:7

**FGIC (18)**
10:2;65:4;98:7,13;
99:7,10;104:10,13,
15,18,21;105:15;
125:10;129:5;
149:20,25;150:8,15

**FGIC's (2)**
104:24;124:16

**fiduciary (1)**
44:20

**fifteen (1)**
124:23

**fifteen-minute (2)**
197:23;198:18

**Fifteenth (1)**
7:12

**fifth (1)**
174:18

**fifty (2)**
177:20;184:8

**fight (1)**
225:17

**fighting (1)**
184:1

**figure (2)**
141:25;225:15

**file (9)**
18:15,23;30:13;
34:6;142:7;157:6;
202:17,23;251:18

**filed (44)**
20:18,21;25:5;
29:4;33:7,20;35:4;
36:20;59:25;60:1;
61:1,22;63:17;65:22;
67:17;69:14;70:9;
71:23;73:24;75:1,13;
77:14;94:15;97:10;
100:10;107:13,18;
108:9,15;114:3;
137:11;142:4;
151:20;158:12;
179:6,18;180:20;
199:4;200:25;
202:11;203:7;
247:21;253:15,20

**filer (1)**

89:6

**files (1)**
249:12

**filing (13)**
31:11,19;45:7;
83:24;87:1;90:19;
91:23;174:17;216:3;
221:13;246:7;248:3;
251:16

**filings (1)**
27:8

**final (2)**
38:2;149:22

**finalization (1)**
146:2

**finalized (2)**
146:9;148:4

**Finally (1)**
166:23

**finance (1)**
91:13

**Financial (16)**
7:3,11;42:9;52:9;
78:18,24;82:21;84:2;
106:15;115:7;125:5;
168:10;170:9;185:9;
211:14;252:18

**find (10)**
19:17;26:15;57:20;
113:1;155:17;
174:13;184:17;
229:18;238:15;
256:18

**finding (1)**
106:23

**fine (27)**
23:8,14;26:10;
31:9;32:19,20;34:10;
56:19;60:9;61:10;
62:14;65:6;74:5,5;
82:13;103:15;119:1;
156:7;165:18;197:4;
200:17;201:19;
202:8,23,25;224:19;
238:24

**finish (1)**
61:5

**finished (2)**
139:3,4

**finishes (1)**
102:7

**firm (14)**
48:3,8,19;52:22;
53:4;106:13,15,20;
115:9,12;127:19;
130:18;184:12;
218:15

**firms (1)**
46:6

**firm's (1)**
106:19

**first (50)**
21:25;22:3;23:18,

25;29:18;38:3;43:20;
50:11;52:23;55:21;
60:21;62:22;70:7;
85:13;93:12;99:11,
13;100:25;112:18;
118:4;133:22;
156:17,19;157:20;
159:19;160:5;164:3,
8;167:3;178:12;
179:17,21;180:8,15;
188:10;191:7;
209:19,21;210:21;
211:4;214:9;215:13;
232:20;239:13,20;
240:9;249:3;250:15;
252:23;256:1

**fit (1)**
58:22

**fits (1)**
172:22

**five (5)**
20:22;80:9;184:22;
231:3;234:21

**flagged (2)**
221:7;241:20

**flags (1)**
221:14

**FLANIGAN (1)**
13:8

**FLIMAN (1)**
8:15

**flip (4)**
58:2;106:11,18;
147:24

**floodgates (1)**
176:6

**Floor (4)**
6:18;9:4;13:5;14:5

**flowed (1)**
236:3

**fly (2)**
114:17,19

**focus (12)**
55:4,6;87:17;
108:6,13;110:16;
121:22;141:21;
142:8,10;205:3;
232:7

**focused (12)**
46:21;55:24;56:10;
87:20;107:6;108:21;
111:5,5,9;137:2;
208:5;251:18

**focusing (11)**
43:19;53:9,18;
56:3;85:12,13;120:8;
131:25;145:2,4;
243:15

**Foerster (12)**
20:8;22:2;28:17;
34:24;59:17;73:12;
112:10;158:8;169:3;
184:5,7;257:14

**Foerster's (2)**
113:15,16

**folders (1)**
58:23

**folks (4)**
49:7;127:14,17,19

**follow (4)**
32:2,11,12;257:16

**followed (1)**
226:2

**following (11)**
62:20;64:5;66:12;
68:1;70:21;72:11;
122:14;135:25,25;
160:1;168:4

**follow-ups (1)**
131:8

**font (2)**
250:9,10

**footnote (3)**
55:12,25;56:3

**foreclosed (1)**
18:7

**forgive (1)**
253:17

**forgiven (10)**
163:17,19;174:11,
13;228:20;246:8;
253:3,4,4,17

**forgiveness (28)**
140:4,11,20;141:1,
5,21,22;142:8,9,10,
22,23;143:1,25;
173:12,22;174:19;
176:2;246:15,16;
247:11,16;248:1,11,
14;251:2,12;252:21

**forgivenesses (7)**
142:14;143:19;
144:17;246:2,12;
247:3;253:8

**form (8)**
42:14;46:14,24;
47:2,4,5;49:6;181:4

**formal (3)**
119:21;215:3;
251:21

**formed (2)**
54:6;132:5

**former (1)**
44:17

**forth (9)**
49:6;67:2;131:11;
141:25;146:5;
148:17;149:14;
167:1;201:3

**Fortis (1)**
73:24

**fortunate (1)**
190:14

**fortunately (1)**
31:13

**forward (6)**

18:20;153:7;165:3;
185:3;230:15;251:13

**forwards (1)**
248:18

**FOUDY (1)**
5:6

**found (3)**
75:6;249:9;250:2

**foundation (3)**
118:9,13;138:13

**four (3)**
39:9;125:19;171:8;
172:2;173:13;
174:11,16,20;178:12,
24;184:21;209:9;
234:24

**fourth (1)**
178:7

**Fraga (8)**
70:6,8,11,11,16,18;
71:10,16

**Fraga's (2)**
70:6,20

**frame (4)**
86:25;111:13;
115:21;132:4

**Frank (3)**
73:23;74:8,10

**FRANKEL (1)**
6:2

**frankly (2)**
190:7;258:14

**fraudulent (9)**
87:21;88:7;89:21;
90:8;140:3,25;
122:42;174:1;253:10

**FRE (1)**
118:24

**Freddie (1)**
79:6

**frequency (1)**
77:4

**frequently (2)**
55:22;211:8

**Friday (1)**
258:11

**FRIEDMAN (8)**
5:25;8:10;76:11,
13,19,23;77:1,3

**Friedman's (2)**
76:17;77:1

**front (12)**
15:24;16:1;37:16,
24;38:20;103:13;
107:4;108:17;156:3;
205:22;248:17,18

**fruitful (1)**
144:22

**FTI (13)**
52:22;106:13,15;
204:25;209:13;
210:12;218:15;
232:24;233:1,5,21;

235:7;238:13

**full (16)**
16:4;43:20;51:9,
11;83:1;84:10;93:4,
16;95:21;115:24;
186:6;187:15;
190:14;194:24;
237:7;252:11
**functioning (2)**
214:23;215:7
**fund (3)**
42:11;47:22;
129:12
**Funding (2)**
211:2;252:18
**funds (9)**
44:19,23;124:7;
129:6;132:17;134:4,
12;135:10;155:6
**fund's (1)**
48:13
**further (16)**
57:8,10;58:13;
83:11;92:1,2;94:25;
96:1,2;150:25;
157:24;176:14;
190:18;194:8;209:8;
232:2
**Furthermore (1)**
123:2
**future (1)**
190:15

## G

**garbage (2)**
88:2;91:23
**Garden (1)**
71:10
**GARRITY (5)**
9:24;66:21,23,25,
25
**Gary (3)**
20:7;156:23;
257:14
**gave (7)**
17:24;132:20,23;
150:12;198:12;
207:16,19
**general (11)**
21:2,7;43:3;82:14;
86:21;109:10;
137:25;168:17,21,22;
242:11
**generally (8)**
92:25;209:22;
210:22;211:5,15,22;
213:25;214:10
**generate (1)**
137:24
**generated (4)**
137:22;211:6;
214:18,23

**GERARD (1)**
7:23
**gets (4)**
33:20;84:14;
117:20;201:14
**Gina (1)**
175:2
**gist (2)**
60:2,5
**given (18)**
37:23;38:19;62:10;
93:20;99:16;104:5;
129:22,23;130:2;
132:22;177:20;
195:5,9;196:2;198:5;
222:10,13;224:16
**gives (2)**
174:20,22
**giving (2)**
214:12;221:25
**glad (1)**
198:16
**glasses (1)**
77:10
**GLENN (2)**
2:22;9:23
**global (46)**
45:19;83:25;86:13,
17;110:18;127:3;
131:24;139:24;
143:21;144:1,20;
145:10,20,21;155:1;
168:25;173:4;
175:20;176:9,21,23,
24;179:25;181:13;
184:12;217:11,11;
219:18,19,20,25;
220:3,20;222:10,25;
223:14,24;224:4,14,
17;225:3,15,24;
237:5,6;243:7
**GM (1)**
178:12
**GMAC (6)**
18:2,5;177:12,19;
209:20;211:21
**GMACM (3)**
125:21;213:24;
238:1
**goal (1)**
176:10;185:13,16
**God (2)**
177:7;195:1
**GODNICK (1)**
13:24
**goes (7)**
115:2;148:21;
214:7;227:12;
233:12;243:24;245:1
**good (34)**
16:24;20:7;24:25;
28:14;40:17;56:18;
58:21;66:25;68:14,

17;71:8;74:20;76:7;
78:15,16;81:17;83:6;
88:6;96:11,20;98:6;
103:22,23;143:7,11,
11;166:1,4;198:24;
201:23;204:12,16,17;
238:10
**Goren (1)**
156:22
**GOTTLIEB (1)**
12:13
**govern (2)**
254:18,19
**governed (1)**
254:14
**governing (1)**
64:20
**government (3)**
79:5;82:13;96:4
**grab (1)**
58:19
**grammar (1)**
51:19
**Grand (1)**
14:4
**granted (1)**
193:18
**granting (2)**
22:11;145:13
**grasping (1)**
91:24
**GRAY (1)**
11:2
**great (7)**
16:17;31:22;33:10;
90:20;170:18;
196:13;220:10
**Green (1)**
2:15
**Groper (6)**
47:21,22;48:10;
129:11,19;131:7
**Groper's (1)**
131:11
**grounds (1)**
48:15
**Group (16)**
7:19;8:3,11;29:18,
20;32:6,17;38:20;
53:3;59:1;71:10;
107:7;126:24;130:8;
166:3;210:19
**grouping (2)**
141:10,12
**groupings (1)**
139:16
**groups (6)**
29:16;31:25;
124:24;160:4;
210:18;242:4
**GSEs (5)**
79:6,10,13,21;
82:25

**GUARANTY (1)**
13:11
**guess (3)**
139:16;145:2,3
**guesstimating (1)**
16:23
**guest (1)**
234:15
**Gutzeit (1)**
175:2
**guys (1)**
32:9

## H

**HADLEY (6)**
7:18;8:2;77:21;
78:10;166:2;204:15
**half (4)**
19:12;114:21;
167:3;256:25
**halfway (1)**
109:7
**Hall (3)**
80:25;82:20,21,23
**HAMILTON (1)**
12:13
**Hamzehpour (3)**
43:2,3;170:24
**hand (7)**
24:21;35:11,18;
74:12;78:6;165:7;
204:6
**handed (6)**
26:20;39:25;42:18,
19;81:4;133:10
**handful (2)**
192:4;199:22
**handle (1)**
183:21
**handling (1)**
203:13
**hang (2)**
24:19;98:24
**happen (4)**
62:13;80:18;
235:18;246:3
**happened (10)**
19:17;45:13;83:15;
170:4;179:21,24;
216:20;217:7;
237:14;247:14
**happening (1)**
97:4
**happens (3)**
243:3;244:21;
245:1
**happy (3)**
16:6;21:9;202:18
**hard (4)**
26:15;77:5;198:4;
250:15
**harm (1)**

96:19
**Hathaway (3)**
14:3;126:21,23
**heading (1)**
249:3
**hear (10)**
16:23;33:5,9;
55:21;68:13;71:6;
80:7;205:14;256:21;
257:17
**heard (11)**
19:7;99:3;107:10;
137:1;144:6;152:1;
175:3;190:23;
191:14;192:11;
241:14
**HEARING (14)**
3:11,13;19:18,21;
21:11;25:14;29:10;
32:23;39:16;61:16;
63:4,25;66:21;69:18
**hearsay (5)**
64:12;100:8;
156:25;161:13;196:1
**heavily (1)**
204:25
**heavy (1)**
159:4
**hedge (1)**
129:6
**heeding (1)**
195:5
**held (3)**
125:10;154:25;
186:20
**help (6)**
17:2;107:4,23;
165:2;175:6;238:12
**helpful (9)**
62:12;136:12;
164:24;185:9;
224:12;243:19;
244:15,17,25
**hence (1)**
142:5
**hereby (34)**
25:16;27:25;29:12;
38:23;39:19;61:18;
63:8;64:2;65:13;
66:9;67:9,23;68:25;
69:21;70:18;71:16;
72:8,23;74:10;75:25;
76:19;78:3;101:7;
102:1,24;155:21;
160:21;161:24;
162:14;197:14;
199:15;200:10;
201:8;203:19
**Here's (1)**
29:23
**hide (1)**
164:22
**high (2)**

223:13;224:13
**higher (3)**
  224:17,18,18
**highlight (4)**
  230:9,14;236:10;
  242:25
**highlighted (4)**
  230:8;245:12;
  247:6;248:6
**highly (3)**
  117:12;118:24;
  222:17
**himself (1)**
  153:22
**history (3)**
  50:10;85:20;
  174:16
**Hoc (8)**
  7:19;8:3,11;53:2;
  107:6;126:24;166:3;
  189:14
**Hold (9)**
  27:14;30:12;55:15;
  100:18,18;102:13;
  123:3,8;186:20
**holders (4)**
  16:23;58:9;70:6;
  126:13
**Holding (3)**
  177:12,19;209:20
**Holdings (2)**
  210:23;214:5
**holds (1)**
  186:20
**holistic (2)**
  139:10;145:1
**home (3)**
  15:13;18:6,8
**Homecomings (3)**
  18:3;211:14;
  252:17
**homeowner (3)**
  16:2;17:2;96:12
**HON (1)**
  2:22
**honest (1)**
  54:16
**honestly (2)**
  18:20;230:1
**Honor (286)**
  15:9,15;20:4,7,17,
  21;22:1,3,10,11,21;
  23:8,10,23;24:3,8,18,
  25;25:20,22;26:7,11,
  23;27:11,15;28:4,8,
  14;29:3,14,21;31:9,
  12,25;32:20;33:10,
  25;34:12,19,21,23;
  35:1,15,22,22;36:1,6,
  10,17,18,23;37:6,14,
  17,20,21,22;38:1,2,9,
  13,19;39:2,9,23;
  48:16;50:17;53:20;

54:11,23;55:17,19;
57:8,12,13;58:14,21;
59:3,10,16,18;60:17,
21;61:7,20;62:13,25;
63:3,12,23;64:5;
65:16,18,24;66:12,
18,23,25;67:12,13,
25;68:7,11,14,24;
69:5,23,25;70:10,20;
71:2,8,19;72:4,10;
73:1,7,16,22;74:3,12,
17,24;76:4,6,8,16,21,
24;77:7,10,11,20,25;
85:17;86:2;89:19;
91:2,6;92:4;94:5,19,
23,25;95:4,7;96:16;
97:5,7;98:1,6,16;
99:8,15,24;100:12,
15,16,22;101:21;
102:4,20;103:3;
107:1;109:16;110:8;
112:2,9,18;113:4,21;
114:24;115:23;
117:5,11,15,21;
118:7;119:1,2,6,9;
121:10;131:14;
133:20;134:21,25;
136:5;138:25;
145:16;147:9,15;
150:20;152:24;
153:4,17;155:11,16;
156:25;157:23;
158:3,7,18;159:1,4,5,
10,16,19,24;160:4,
10,15;161:1,10,17,
21;162:3,16;164:21;
169:10;179:8,22;
180:18;192:2;193:6;
194:10,22;195:14,24;
196:7,16,22;197:4,
16,18,25;198:3,8,9,
14,24;199:1,12,18,
22;200:4,7,13,15,20,
22;201:11,16,22;
202:7,15;203:2;
206:22;210:2;
213:12;215:23;
216:16,19;227:17;
232:3;233:7;234:10;
235:14;236:17;
238:17,24;242:19;
244:1,19;247:13;
249:9;250:3;251:24;
255:20;257:6,15,23;
258:5,10,14
**honorary (1)**
  94:11
**HOOPER (1)**
  12:8
**hope (4)**
  28:14;162:23;
  175:13;230:15
**hopefully (4)**

21:1,3,22;28:4
**Horner (1)**
  248:24
**host (1)**
  189:2
**Houlihan (2)**
  127:19;235:7
**hour (1)**
  256:25
**hours (3)**
  19:12;198:6,7
**housekeeping (2)**
  153:18;201:20
**Houston (1)**
  17:22
**HOWARD (1)**
  13:24
**HSBC (1)**
  11:12
**humanly (1)**
  185:16
**hundred (3)**
  16:7;124:19,21
**hundreds (1)**
  183:20
**hypothetical (2)**
  143:10;212:19

## I

**idea (8)**
  47:12,14;80:10;
  179:23;191:23;
  194:14;250:4,5
**identification (3)**
  31:1;66:14;72:24
**identified (32)**
  27:20;31:1;34:3;
  62:18,21;63:2;64:6,
  10;66:13;68:2,9;
  70:22;71:4;72:12;
  86:15;100:2,20;
  109:24;137:2;160:2;
  171:3,8;182:3;
  197:10;246:25;
  247:6,11,24;248:1;
  253:16;254:5;255:11
**identifies (1)**
  122:4
**identify (14)**
  15:10;28:16;38:14;
  42:12,24;50:21;
  64:16;73:9;96:7;
  98:20;181:21,23;
  182:7;255:9
**II (3)**
  3:4,8;214:5
**iii (1)**
  216:10
**illustrated (1)**
  244:12
**illustrative (2)**
  240:18;243:6

**immediate (2)**
  80:12,20
**immediately (1)**
  80:21
**impact (5)**
  110:17,21;143:2,5;
  234:18
**impaired (2)**
  51:7;58:8
**impairment (1)**
  163:22
**impeach (1)**
  133:20
**impeachment (1)**
  82:1
**implications (1)**
  80:16
**implicit (1)**
  231:1
**implying (1)**
  235:20
**importance (1)**
  16:16
**important (14)**
  16:4;42:2;44:19;
  117:14;144:9;
  145:15;181:14;
  225:13;226:7;230:9,
  11;236:12,22;242:17
**imposed (1)**
  79:7
**impossible (2)**
  114:19;175:20
**improper (1)**
  82:1
**improve (1)**
  242:16,20
**improved (3)**
  55:1;242:4,6
**impute (1)**
  215:15
**inability (1)**
  216:10
**Inc (4)**
  7:3,11;14:3;42:10
**inch (1)**
  156:5
**inches (1)**
  156:5
**include (14)**
  93:17;122:11;
  126:20;137:19,21;
  145:13;182:11;
  221:20;222:3;225:9;
  226:7;229:16;233:4;
  253:4
**included (18)**
  23:5;87:23;108:23;
  122:14;141:24;
  144:8;153:11;
  223:10;224:6;
  226:12;227:24;
  229:16,24;230:5;

231:6;233:3;235:3,4
**includes (6)**
  36:3;113:23;
  226:19;228:4,4,5
**including (11)**
  17:9;49:17;108:18,
  23;110:2;123:13;
  125:22;132:6,13;
  225:8;256:3
**inclusion (1)**
  234:9
**incorporates (1)**
  22:17
**incorrect (4)**
  81:14;114:9,10;
  231:4
**incorrectly (1)**
  228:19
**in-court (1)**
  104:6
**increase (2)**
  228:21,24;242:11
**increased (2)**
  212:9;240:15
**increases (2)**
  235:13;240:10
**incredibly (1)**
  243:1
**incurred (1)**
  178:23
**indeed (4)**
  176:17;236:20;
  254:14,15
**indemnification (9)**
  94:3,7,17,21;
  151:24;192:23;
  193:8,14;194:3
**Indenture (1)**
  3:7
**Independent (4)**
  11:20;100:4;101:4;
  161:18
**independently (1)**
  91:14
**indicate (2)**
  33:1;206:14
**indicates (1)**
  251:10
**indicating (2)**
  179:14;242:3
**indicia (2)**
  144:7;170:13
**indifferent (1)**
  84:21
**individual (13)**
  47:1;86:19;107:14,
  19;120:14;154:25;
  167:6,6;174:6;182:2;
  183:17;185:22;
  187:17
**individually (1)**
  172:19
**individuals (3)**

46:5;171:2;172:2
**indulge (1)**
59:3
**industry (1)**
82:12
**inextricably (1)**
216:13
**inflated (2)**
212:3,8
**influenced (1)**
176:13
**influx (1)**
124:7
**informal (1)**
16:1
**information (25)**
23:5;43:24;44:2,
10,12;46:6,18;70:5;
75:11;114:12;120:6,
13;160:12;177:25;
206:25;207:2,7,10,
17,19;214:12;
226:12;250:23;
256:8,19
**informed (2)**
98:16;191:4
**initial (1)**
131:1
**input (1)**
175:15
**inquire (2)**
99:19;217:4
**inquiries (1)**
164:8
**inquiring (1)**
85:20
**inquiry (1)**
164:10
**insisted (6)**
216:14;217:8,15,
23,25;218:1
**insistent (1)**
90:5
**insisting (1)**
52:4
**insolvent (2)**
185:1;225:20
**instance (1)**
23:18
**instead (2)**
184:1;226:15
**Institutional (1)**
11:3
**instruments (1)**
144:4
**insurance (3)**
194:11,11;201:12
**intangible (1)**
168:21
**intangibles (2)**
168:17,22
**intelligent (2)**
91:17;185:3

**intend (4)**
169:2,20;195:7;
201:5
**intended (2)**
163:8;179:7
**intending (2)**
24:6;172:7
**intent (4)**
51:20;150:13;
163:25;212:17
**intercompanies (10)**
120:18;176:7,13,
14;177:4;205:12;
207:10;236:3;238:4;
242:6
**intercompany (198)**
51:7,10,11;52:1,5,
15;53:14;54:6,10,14;
55:1;57:24;58:5,9;
84:19;108:5,7,14;
109:9,18,24;110:2,4,
6,13,21,25;111:1,2,6,
10,16,17,23;113:10,
11,11;114:1;115:1,
10,13,17;120:10,20,
22,24;122:8,9,12,17,
21;123:9,14,24;
124:3,10;128:8;
139:25;140:2,5,11,
14,21;141:2,7,8,12,
22;143:20,22;144:9,
21;145:9;157:3,13,
15;163:9,10,13,14,
16,19,20;164:3;
166:8;167:21;168:7,
14,20;169:16;170:7,
10,11,11,19;171:3,6,
9,14,15;172:16,21,
24;173:5,7,8,23;
174:5,11,21,23;
175:19,23;176:18,18;
178:25;179:15,19;
180:3,10,11,16,22;
181:2;204:22;205:1,
4,7;206:25;207:3;
208:1,4,8,15,18;
209:14,19,19;211:1,
2,11,13,14,19,20;
212:24,25;213:18,22,
23;214:3,18,22;
215:2,2,3,6,10;
216:12,14;217:9,15,
23;227:19;228:21;
229:13;231:16;
234:18,20;235:4,12,
13,24;236:18;237:4,
7,8,11,18,25;242:15;
243:24;246:15;
248:13;249:4,23;
250:18,21;252:22;
253:16;254:2,4,8,23;
255:3,4,10;256:19
**inter-company (2)**

52:8;128:2
**interco's (3)**
239:25;240:6;
241:23
**intercreditor (2)**
164:6;191:17
**interdebtor (3)**
113:11,19;174:3
**interest (12)**
141:10;153:2;
169:8;170:16;177:6;
186:7,8,16;194:24;
215:4,4;228:25
**interested (5)**
108:4,25;149:14;
163:1;170:10
**interesting (2)**
184:11;191:24
**interests (1)**
163:23
**internal (2)**
250:22;251:10
**interrelated (1)**
110:22
**interrelation (1)**
110:25
**into (89)**
17:23;19:8;24:11;
25:12,16;28:1;29:6,
12,16;30:25;31:17;
38:23;39:4,15,20;
46:1,17;55:9,22;
61:18;63:9;64:2;
65:14;66:9;67:10,23;
68:10;69:1,21;70:18;
71:16;72:8,17,22;
73:17;74:1,9,10;
75:16;76:1,19;78:2,
3;84:3;85:9;91:13,
13,14;101:3,8;102:2,
25;110:3;111:18,21;
132:1,8;141:19;
143:8;154:16,17;
155:12,22;156:5;
157:9;160:4,22;
161:25;162:14;
164:16;167:9;
172:20;173:13;
176:16,24;182:22;
185:10;188:21;
190:1,3;195:25;
197:14;199:15;
200:11;201:9;
203:19;237:15;
243:24;248:9
**introduce (1)**
159:13
**introduced (5)**
30:25;31:2;36:4;
68:10;160:19
**introduction (1)**
195:24
**invalid (1)**

157:3
**invalidity (1)**
157:13
**investigate (1)**
176:14
**investigation (5)**
132:11;140:9;
152:5;172:15;193:1
**investment (1)**
16:17
**Investor (6)**
11:3;43:23;44:2,
10,11,15
**invite (2)**
173:2;189:6
**invited (6)**
189:2,3,3,7,9,9
**invoke (2)**
60:6;180:8
**involved (18)**
16:3;30:7;124:19,
22,24;127:3;146:16,
19;167:22;168:2;
204:25;214:17;
215:5;220:14;
231:20,21,22;239:4
**involvement (3)**
45:20;146:17;
207:23
**involving (2)**
41:15;43:13
**isolate (1)**
213:4
**issue (25)**
20:2;22:18,23;
23:22;31:17;55:8;
91:8,11;109:22,25;
119:3,3;120:18,20;
153:5;157:7;163:11,
12;164:4;169:9;
172:20;194:5;217:1,
15,23
**issues (24)**
23:21;32:15;50:8,
14;56:7;106:3;110:1;
111:6,16;114:7;
120:16;128:14;
138:22;140:14;
143:22;144:21;
162:23;164:25;
174:3,3,14;205:5;
216:13;238:9
**item (1)**
42:13
**items (9)**
39:3;75:6;123:11;
139:23;150:17;
178:12;217:17;
248:1;251:19
**IV (2)**
25:25;26:21

157:3
**J**

**Jake (1)**
248:23
**JAMES (2)**
9:24;10:23
**January (10)**
87:3,5,5;104:16;
130:22,25;131:8,8,9;
256:3
**Jeffrey (4)**
28:20;29:11,12;
30:16
**Jericho (2)**
5:21,23
**Jersey (2)**
75:4;126:6
**Jill (1)**
248:23
**Jim (2)**
66:25;170:24
**job (2)**
73:17;88:6
**jobs (1)**
172:3
**Joe (1)**
23:25
**JOHN (5)**
11:16;97:10;
104:12;155:18,21
**JOHNSON (7)**
9:7;68:14,15,18;
72:18,19,19
**joined (3)**
78:17,23;79:24
**joint (16)**
25:2;26:1;37:5;
60:22;63:13;65:19;
67:13;69:6;70:2;
71:19;97:7;158:9;
162:21;199:1;203:4;
216:4
**joke (1)**
87:24
**JONES (2)**
10:1;98:7
**Jose (3)**
70:8,15,18
**JOSEPH (7)**
6:12,21;11:24;
25:4,15,25;26:21
**JR (2)**
9:24;12:10
**JSB (2)**
240:9;241:21
**JSN (9)**
130:8;166:2,19;
168:17;189:4;
234:18;240:19;
242:5,16
**JSNs (71)**
22:16;24:9;38:17;

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document

RESIDENTIAL CAPITAL, LLC, et al.                Pg 281 of 300                Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
Case No. 12-12020-mg                                                         November 20, 2013

45:15,22;46:2,12;
54:5,25;59:21;74:17;
76:4;78:11;99:2;
110:5,6,12,13,14;
111:2,9,23,24;124:4,
11;128:1,10,16,20;
152:1,6,9,21,25;
163:4,8,10,24;164:1,
4,9,10,12;165:21;
167:20,23;168:3,6,
13,21;169:15;
176:12;177:3;
182:14;185:25;
186:3,6,7,11,14;
190:13;192:10,21;
193:2;194:19;
204:16;226:25;
236:4,7;237:17;
245:7

**JSNs' (4)**
37:14;45:18;127:6;
163:6

**JUDGE (22)**
2:23;22:17;45:9,
21;46:15;48:5,9;
54:21;55:2;84:6;
85:2,14;93:14;
111:19;123:23;
124:1,9;189:1,13,16,
18,23

**judgment (1)**
85:11

**July (9)**
52:25;53:6,11,18;
107:13,17,17;108:15,
16

**June (4)**
107:17,21;108:15,
16

**Junior (28)**
7:19;8:3,11;16:18,
23;40:14;43:10;51:9;
53:3;92:15;103:24;
106:20;126:15,18,25;
151:8;188:16,18,24;
189:18;190:1;191:3;
192:13;228:22;
229:1;237:6;240:21,
22

**JUSTICE (2)**
5:9;6:15

## K

**K&E (1)**
206:15

**KASOWITZ (1)**
8:10

**KAUFMAN (1)**
6:8

**keep (14)**
27:14,16;139:8;
148:23;195:7;202:8,

21;210:3;223:19;
232:18;236:10;
241:12;244:19;258:4

**keeping (2)**
224:23;235:15

**Kempner (1)**
42:11

**KENNETH (3)**
6:7;47:21;156:22

**kept (4)**
172:11,12;212:2;
236:2

**Kerr (220)**
22:1,1,10,21;23:8,
14,19,23,24,25;24:3,
13;26:11,18,19;
34:21,23,23;35:15,
18,22;36:1,10,14,16,
23;37:6,10,12,14,20;
38:1,7,9,19;39:1,2,7,
12,15,23;41:24;
47:11;48:16;53:20;
54:11,23;55:19;
57:12;58:13,14,14,
21;59:3,6,10,15,16,
16;60:1,12,17,21;
61:7,11,13,20;62:13,
15,19;63:2,12,23;
64:4,10,14;65:18,18;
66:11;67:13,25;68:9,
11,19;69:5,11,14,23,
25;70:2,20;71:4,19;
72:10;73:1,5;77:6,7,
10;80:22;83:21;
85:17;89:19,23;
90:10;91:2,6;94:5,19,
23;112:2,3,4,9,9,13;
113:20,21,21;117:5,
6,7,11,14,21;118:15;
119:1,6,9,13;146:24;
152:10,14;158:7,7,
24;159:1,4,7,10,12,
16,18,23,25;160:7;
161:1,8,15,20;162:2,
5,7,16;165:5;169:10;
170:1;171:11;179:8,
22;180:12,18;193:6,
16;195:14;196:7,10,
13,15,22;197:16;
198:3,8,11,14;
200:15,18,20,22,22;
201:10,11,20,22;
202:1,4,7;203:1,2,2,
24;204:2;206:22;
208:21;213:12;
215:16,23;216:19;
219:3,9;234:10;
238:17,22,24;244:1;
249:9,12,14;250:1,3,
3;251:24;255:6;
257:2,3,6,8;258:10,
14,19

**Kessler (2)**

3:13;13:3

**key (1)**
239:6

**keystone (1)**
181:13

**KIBLER (1)**
11:16

**kind (20)**
88:2;138:22;
142:17;182:9;
183:15;189:5;
192:21;194:11;
242:9;250:16

**kinds (1)**
182:5

**KIRKLAND (2)**
7:2,10

**KISSEL (2)**
12:2;71:9

**knew (5)**
54:18;79:1,9,24;
83:6;144:8;205:6

**knowing (1)**
90:18

**knowledge (6)**
46:22;60:8;188:23;
189:25;192:24;196:1

**knowledgeable (3)**
86:12,20;182:21

**known (1)**
242:14

**knows (2)**
119:15;192:17

**KOTWICK (3)**
12:7;71:8,8

**KRAMER (3)**
6:2;109:1,2

**Kruger (21)**
49:19;158:11,13;
160:12;161:9;
162:16;164:25;
165:8;166:1,6,16;
190:23;192:20;
194:11;195:13,16;
197:10,13;198:6;
222:12

**Kruger's (8)**
158:19;159:19,25;
160:21;161:24;
162:7;195:25;196:10

## L

**label (1)**
177:9

**labeled (3)**
108:5;122:12;
250:21

**labels (1)**
210:16

**lack (2)**
60:7;196:1

**lacked (4)**

170:15,15,16,16

**laid (4)**
118:13;123:11;
240:6;253:14

**LANCE (1)**
10:7

**Landy (1)**
256:14

**Lara (2)**
80:25;82:21

**large (8)**
29:14,20;38:20;
39:2;185:5;206:6;
218:15;251:17

**larger (2)**
222:24;224:4

**largest (1)**
173:15

**last (24)**
15:5;28:22;33:22;
34:4;55:16,24;69:10;
75:13;80:4;95:13;
114:23;118:17;
153:9;156:14;177:8;
185:17;205:14;
215:11,12;216:9;
226:21;228:19;
252:5,7

**late (9)**
94:13;108:20;
111:19;122:20;
123:2,7,15;130:22;
132:4

**later (9)**
19:14;31:16,19,20;
33:5;44:9;146:9;
148:19;162:24

**latter (1)**
123:20

**law (6)**
15:24;17:7,17;
30:23;40:1;94:11

**LAWRENCE (19)**
24:18,25;25:1,21;
26:7,23;27:1,4,7,11,
15,18;28:4,8;198:24,
25;199:22,24;200:13

**lawsuit (3)**
17:21,25;125:24

**lawsuits (1)**
125:18

**lawyer (6)**
21:15,18;51:22;
109:1,2,5

**lawyers (12)**
47:25;49:2;84:20;
87:9;169:3,5,14;
184:4,9;185:8;187:3,
12

**lawyer's (1)**
193:24

**lay (2)**
118:9;232:25

**lays (1)**
150:9

**lead (2)**
84:5;147:6

**leading (1)**
91:22

**learn (1)**
253:19

**learned (6)**
167:23,25;168:3;
187:24;188:3;221:18

**least (23)**
20:13;26:16;36:24;
41:21;44:23;91:20;
98:20;99:18;111:22;
117:7;118:22;
119:15;120:8;
122:21;123:22;
129:19;138:7;
149:20;164:2;
182:18;189:15;
245:22;247:3

**leave (10)**
23:18;65:8;137:11,
15;147:9;165:20;
195:22;196:8;226:4;
229:10

**leaving (2)**
91:12;237:2

**LEBIODA (10)**
10:24;95:4,7,9,9,
12,15,15,18;96:1

**led (1)**
43:11

**Lee (23)**
20:1,4,7,7,17,21;
21:1,6;109:4,5,8;
112:19;113:25;
114:23;156:23;
192:20;257:10,12,14,
14,18;258:2,5

**leeway (1)**
195:9

**left (3)**
96:12;147:3;226:1

**legal (16)**
17:23;90:17,20;
94:10;100:4,9;101:4;
136:15;143:4,12;
153:5;161:18;194:4,
5,9;237:25

**legend (2)**
118:14,24

**legended (1)**
118:23

**legitimate (4)**
91:16;171:4,10;
192:21

**lend (1)**
212:15

**length (1)**
231:5

**lengthy (2)**

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 282 of 300
Case No. 12-12020-mg    Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
November 20, 2013

55:7;147:22

**lent (1)**
212:16
**less (1)**
16:19
**letter (17)**
42:8,21,23;44:1;
53:2,10,10,12,14;
54:4;106:18;107:6,8,
11;108:1;162:8,14
**letterhead (2)**
42:9;106:19
**letters (4)**
46:17,19,20;64:13
**letting (1)**
73:4
**level (4)**
45:21;129:10;
212:7;251:1
**leverage (1)**
136:17
**levers (2)**
243:1;245:1
**LEVIN (3)**
6:2;109:1,2
**LEWIS (5)**
9:18;67:1;158:11;
197:10,13
**Lexington (1)**
8:20
**liabilities (10)**
107:14,18;108:8,
14;177:12,19,24;
178:1;179:11,20
**liability (4)**
179:12;186:23;
187:4,22
**Liberty (1)**
12:15
**lien (30)**
54:10,14;110:5,12;
111:2,10,23;163:10,
13;164:5,9,10;
167:20;168:6,9,13,
16,17,22;169:15;
176:12,17,25;177:4;
185:25;186:11,14;
191:7,22;236:7
**liens (15)**
94:2;111:16,17;
128:2,8,11,13,17;
151:16;163:9;164:1,
11;191:13;192:13;
229:1
**lieu (1)**
25:15
**lift (2)**
18:19;20:16
**light (3)**
60:12;101:1;114:2
**LIGHTNER (1)**
12:18
**likely (2)**

157:3;184:10

**likes (3)**
108:19;111:15;
132:7
**limine (1)**
22:20
**limit (1)**
65:9
**limitation (5)**
67:2;68:18,23;
72:20;100:13
**limitations (2)**
67:4;71:11
**limited (17)**
30:4,11;32:7;
39:18;64:12;66:20;
67:7;68:10,23;71:5,
15;72:17,22;99:2;
102:17,22;207:23
**line (21)**
19:11;42:24;82:24;
133:13,14,19,19;
149:6,9,19;153:24;
154:6,8,11,13;217:5;
233:15;249:6,23,25;
250:15
**lined (1)**
198:5
**lines (5)**
134:22;136:4;
151:25;152:7;238:9
**Lipps (13)**
28:20,21,23;29:4,
11,11,12;30:16;
34:17,18;73:7,17;
201:13
**Lipps' (3)**
29:6,8,15
**liquidating (1)**
149:23
**liquidation (23)**
220:23;221:2,4,19;
222:2,8,16;223:11,
18,22;224:7,12,22,
25;225:8,12,14;
226:8,18,25;227:3,7,
18
**liquidity (1)**
174:14
**list (39)**
30:1,2,15,18,24;
31:6,16,20;32:10;
33:7,20,24;34:6,9;
36:18,24;37:2,15,16;
39:4;62:21;64:7;
65:24;66:13;67:18;
68:3;69:15;70:10,23;
71:24;72:13;100:23,
25;160:3,5;201:14,
24;202:9;206:25
**listed (12)**
65:23;67:17;69:15;
70:9;71:23;178:12,

25;179:14;206:16;
208:7;213:19;252:15
**Listen (1)**
219:21
**listened (1)**
137:8
**listening (5)**
40:9;164:16,18;
244:2,3
**lists (3)**
36:24;100:22;
239:6
**literally (2)**
113:11,14
**litigate (2)**
225:21,22
**litigated (3)**
184:15,16,17
**litigating (3)**
176:8,8;184:21
**litigation (19)**
16:9;56:25;121:23;
125:12;138:4;
152:22;174:2,2;
176:6,25;187:3,12,
23;190:11;194:17;
222:14,17;225:18;
231:21
**little (8)**
58:23;122:19;
160:10;166:15;
185:16;198:19;
231:9;233:19
**live (2)**
15:13;201:17
**Livingston (1)**
10:12
**LLC (18)**
3:6,10,21;26:2;
42:9,11,24;43:4,8;
177:13;209:19;
211:14,20,21;213:23;
214:5;252:18,18
**LLP (21)**
5:1,19;6:2;7:2,10,
18;8:2,10,18;9:1,10,
18;10:10,18;11:2,11,
19;12:2,13;13:19;
14:2
**loan (6)**
17:16;18:10;
144:12;164:6;
209:22;210:23
**loans (3)**
80:21;83:5,7
**logic (2)**
83:9,11
**logistics (1)**
61:21
**Lokey (1)**
127:19
**long (14)**
19:20;24:24;45:2;

84:14;85:20;87:19;
99:1;118:16;154:1;
201:12;231:21;
247:20;252:4;258:16
**longer (2)**
139:5;256:23
**look (53)**
33:19;42:4,21;
51:2;52:17;56:5;
59:8;80:24;106:6;
107:22;108:24;
111:16;112:1;
116:11;131:6;
133:22;134:18,20;
143:14;144:3;154:7;
156:17;170:17;
172:16,17,19;173:11,
14,16,21;174:9,19;
177:8;178:7;183:10,
19;185:18,19;
192:16;205:17;
208:7;211:1;233:21;
239:6;240:18;
241:21,22;242:18;
244:16;248:9;
249:16;250:14;256:6
**looked (13)**
36:15;46:6;91:13,
13,14;142:16,18;
144:19;172:18;
173:6;174:18;208:3;
248:12
**looking (29)**
42:23;51:2;58:4;
108:2;110:1,3;
123:19;132:6;
135:14;144:25;
172:23;175:19;
184:1,7;186:10;
206:8;209:18;
211:19;213:18,22;
215:10,11;216:9;
228:9;237:24;240:3;
242:2;245:4;255:25
**looks (3)**
42:13;117:16;
251:8
**Lorenzo (1)**
156:23
**Los (1)**
14:6
**losing (1)**
16:16
**lost (1)**
152:22
**lot (20)**
16:23;18:18;42:20;
55:22;56:23;82:22;
90:12,13;110:19;
123:18;132:5;
171:25;184:6,7;
202:9;216:16;
233:23;238:2,5;

249:16
**Lots (3)**
117:20;168:9;
184:8
**loved (1)**
129:17
**low (2)**
224:16;234:8
**LOWENSTEIN (1)**
10:10
**lower (2)**
45:21;225:23
**Lucy (4)**
74:25;75:22,23,25
**lug (1)**
158:5
**lunch (4)**
147:2,3;195:6;
198:13
**Lyons (1)**
22:13
**Lyons' (4)**
22:14,17;23:5,16

**M**

**MA (1)**
11:5
**magnitude (5)**
135:6,17;136:14,
16;187:14
**mail (2)**
113:24;250:1
**main (1)**
26:22
**maintain (1)**
189:10
**Major (9)**
63:16,18,25;64:2;
108:18;109:22,25;
124:23;125:1
**Major's (5)**
64:4,22;65:4,10,13
**makes (5)**
31:22;35:18;
221:15
**making (5)**
56:24;58:23;92:19;
242:20;243:17
**MALLET-PREVOST (1)**
5:1
**Mamta (4)**
60:21,25;61:16,18
**manage (1)**
44:20
**Management (13)**
13:20;42:11;211:6,
17,23;212:5,23;
214:1,11,15,18,24;
215:7
**Manhattan (1)**
7:20
**MANNAL (2)**

6:9;156:23

**many (23)**
26:15;32:17;42:2;
52:6;104:5;110:1;
122:3;127:3;129:2,9,
16;138:20;141:18;
159:15;168:12;
170:8;172:21,21;
181:24,24;243:1,2;
244:20

**Marano (17)**
34:25;35:4,6,12;
37:24;38:22,23;
39:24;40:2,3,17;
47:16;50:22;57:15;
58:11,17;107:11

**Marano's (2)**
37:23;39:19

**Marc (2)**
256:14,18

**March (4)**
162:9;167:17;
248:24;251:6

**marginal (1)**
50:4

**Marinuzzi (1)**
156:23

**MARK (15)**
8:24;12:7,18;71:8;
74:22;203:6,18,19;
228:14;229:8,12,13;
231:15;256:10,19

**marked (13)**
25:6;31:1;46:2;
66:13;69:19;70:16;
72:6,23;74:2;81:12;
117:16,18,20

**markets (3)**
41:2,9;82:22

**Mark's (1)**
256:7

**mark-up (1)**
91:9

**MARTIN (4)**
2:22;11:7;200:25;
201:8

**Mary (3)**
67:16,21,23

**MASUMOTO (1)**
5:16

**material (12)**
43:23;44:10;45:2;
46:6,18;83:19;85:10;
103:13;112:5,11,13;
242:15

**materials (3)**
26:15;161:3;
238:14

**math (3)**
56:5;243:11,23

**mathematically (1)**
244:25

**mathematics (2)**

234:1;244:16

**MATIAS (1)**
13:16

**matter (10)**
20:14,15;32:8;
118:23;153:18;
157:18;161:14;
204:19;230:6;257:23

**matters (6)**
77:4;101:5;123:4;
160:19;166:18,24

**maturity (2)**
170:16;215:3

**MAURICIO (2)**
9:15;64:18

**may (74)**
16:24;22:5;23:15;
26:10,18;34:21;
40:22;41:3,3,7,7,10,
11;44:9,15,24;55:8;
57:13;58:21;71:6;
78:18,23;82:11;87:6;
99:1;105:9;107:2;
113:21;116:8;
119:15;127:24,24;
131:16;132:4;
143:18;145:21,24;
146:11,12;147:8;
148:5,21;149:6;
150:1,18,18;159:18;
162:19,20;163:2,20,
22;164:10,19,25;
170:25;171:20;
183:17;187:14;
194:5,7;198:9;200:4;
212:2,13,15;222:15;
228:15;230:8;
238:17;245:19;
249:1;254:12;255:4

**maybe (13)**
21:13;32:18;58:19;
73:19;91:24;103:12;
104:7;106:22;
172:22;217:3;
220:10;223:3;238:12

**MBIA (4)**
125:10,12,17;
129:4

**MCCLOY (6)**
7:18;8:2;77:21;
78:11;166:2;204:16

**McDonald (3)**
248:23;256:2,17

**mean (31)**
19:17;23:3;35:20;
46:9;86:25;87:1,22;
88:4;90:4;94:10;
136:15;154:2;
164:15;171:19;
173:9;179:18;
184:14;194:21;
196:25;212:8;
217:16;228:3,4;

229:18;238:8;
240:23;241:7;
242:19;244:18;
246:22;250:1

**meandering (1)**
115:1

**meaning (3)**
242:22;247:9,23

**meaningful (3)**
173:15,16;190:9

**meaningfulness (1)**
173:18

**means (1)**
234:3

**meant (5)**
105:23;174:6,6;
247:22,22

**measure (1)**
185:5

**meat (1)**
164:16

**mechanism (1)**
186:7

**mediating (2)**
45:10;124:8

**mediation (124)**
45:3,5,6,16,19;
46:3,5,7,14,23;47:10;
48:4,9,14,20;49:8,19;
54:21;55:2,7;60:6;
84:6,9;85:4,12,14,15,
21,23,24;93:14;
99:17;111:18,21;
119:21;120:10,21;
123:23;124:1,13,16,
20,22;125:2,4,6,8;
126:1,4,7,12,16,19;
127:7,11,22;128:18,
20;129:1,3,15,21;
130:9,12,14,15,18,
23;131:3,5;132:1,3,
16;133:24;134:1,2,
10,10;135:3;136:20,
22;138:10,19,21,23;
144:24;145:17,21;
150:21;154:23,23;
155:4,4;169:18,20,
25;170:5;179:25;
181:16;182:22,25;
185:10;186:24;
188:7,17,19,25;
189:2,2,8,11,12,20;
196:3;216:17,20,22;
217:3,13,20,21;
219:2,15;220:15

**mediator (1)**
45:9

**meet (1)**
79:10

**meeting (2)**
120:15;251:12

**meetings (1)**
123:12

**Mellon (3)**
9:11,19;64:19

**member (1)**
124:15

**members (5)**
123:2,8;130:8;
170:19;189:14

**mentioned (4)**
22:4;182:17;
208:10;215:12

**merit (2)**
88:11,20

**merits (2)**
85:14;88:14

**message (1)**
198:16

**met (2)**
103:25;175:4

**Meyer (4)**
65:22,25;66:9;67:2

**M-E-Y-E-R (1)**
65:22

**Meyer's (3)**
66:5,11;67:9

**MICHAEL (7)**
9:7;10:15;22:15;
68:14;72:19;77:13;
78:3

**microphone (3)**
112:7;117:10;
166:15

**mid (2)**
168:2;180:5

**middle (3)**
82:14,15;174:8

**midpoint (1)**
123:21

**midway (1)**
206:2

**might (32)**
42:14;73:20;76:25;
82:16;87:4;90:21;
93:8,17,21;99:3;
108:23;120:5;
121:23;128:12;
132:12;142:6;
143:11;152:1,6,12;
174:6;181:25;
182:10,19;184:21,22;
190:11;193:2,14,22;
194:2;221:8

**MILBANK (10)**
7:18;8:2;38:16;
40:13;77:21;78:10;
99:15;127:15;166:2;
204:15

**MILLER (94)**
7:25;10:7;77:20,
20,25;78:10,10,12,
14;80:6;81:11,13,15,
17,18;82:4;85:3,19;
86:2,4,6,10;89:1;
92:1;203:13,14,16,

22;204:14,15;
205:25;206:3,6;
209:24;210:1,7;
215:18;216:23;
218:3,21;219:12,24;
221:7,10,12,17;
223:2,5;226:6;228:7,
8;231:24;232:3,5,6;
233:20;234:12,16;
235:16;236:1;
237:16;238:16,18,20,
23,25;239:1;240:2,4,
15,17;241:5,19;
243:14;244:5;247:1;
248:7,8;249:1,2,6,16,
19,21;250:7;252:6,
10;255:15,17,20,23;
256:16,25;257:13

**million (19)**
20:22;43:12;
149:21,24;209:21,24;
210:8;211:4,15,21;
213:24;214:5;233:3,
4,14,19;239:10,21;
240:20

**millions (1)**
210:4

**mind (12)**
162:23;164:17,20;
168:5;172:19;173:4,
11,17;174:9,19;
182:9;219:11

**mine (2)**
55:4;96:13

**minute (3)**
62:3;200:4;238:23

**minutes (5)**
59:12;139:7;147:3,
5;255:14

**mislead (1)**
172:7

**misleading (2)**
210:5,7

**misleadingly (1)**
210:4

**misread (1)**
109:14

**misrepresented (1)**
209:3

**missed (3)**
19:8;80:4;230:21

**missing (1)**
180:22

**misspoke (1)**
220:9

**misstated (1)**
234:8

**mistakes (1)**
231:4

**mixed (1)**
242:10

**MML (1)**
91:10

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                                    Pg 284 of 300
Case No. 12-12020-mg                                               Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
                                                                            November 20, 2013

**mode (1)**
176:25
**Model (11)**
232:24,24,25;
233:1,4,5,21,22,22;
243:23;245:8
**models (7)**
233:1,22;234:3,25;
238:8;242:25;245:6
**modification (3)**
130:16,17,21
**Moelis (4)**
119:24;120:4,5,8
**MoFo (2)**
206:15;207:6
**MOLDOVAN (1)**
11:24
**moment (4)**
200:16,20;202:7;
238:17
**Monday (2)**
22:10;81:1
**money (12)**
17:3;44:20;56:17;
143:8;144:24;
185:13,14,19;212:15,
17;237:24;238:3
**monies (1)**
212:1
**monitored (1)**
78:24
**monoline (4)**
32:6;150:5;223:25;
224:6
**monolines (4)**
125:8,10;224:13,
22
**more (33)**
21:8;31:4;33:12;
48:6;84:9,25;91:9,
24;102:9;103:10;
106:24;135:2;140:4,
20;141:1;160:10;
161:1;162:2;167:9;
174:16;179:21;
181:4;185:14;192:7;
214:12,13;219:11;
226:15;233:19,19;
238:3;250:23;255:14
**MORGAN (2)**
9:18;67:1
**morning (20)**
20:7;24:25;28:14;
40:17;62:9;66:25;
68:14,17;71:8;78:15,
16,17;96:11;98:6;
103:22,23;257:15,21;
258:7,18
**Morris (1)**
24:13
**MORRISON (15)**
11:19;20:8;22:1;
28:17;34:24;59:16;

73:11;112:9;113:15,
15;158:7;169:3;
184:5,7;257:14
**Morrow (12)**
24:1,4,5,7;25:4,7,
15,25;26:21;28:5,6,
10
**Morrow's (3)**
25:12;26:24;27:25
**mortgage (8)**
18:2,3;41:2,10;
79:13,16;82:12;
211:21
**mortgages (1)**
90:25
**MOSLE (1)**
5:1
**most (7)**
34:10;64:20;86:11;
125:10;131:3;157:2;
170:15
**motion (11)**
20:9,16;22:12,20;
109:8;114:2;137:11;
138:24;184:19;
257:22,24
**motions (1)**
108:19
**move (18)**
29:5;50:7;58:25;
99:20;103:10;
131:14;136:6,10;
145:6;154:14,15,15;
165:19;191:1;192:2,
16;202:4;212:11
**moved (2)**
18:19;251:13
**movement (1)**
213:20
**movements (1)**
144:5
**moves (1)**
75:8
**moving (4)**
39:4;103:16;212:9;
232:3
**MSR (1)**
79:19
**MSRs (1)**
79:21
**much (31)**
21:23,24;23:24;
26:19;28:9;57:9;
59:11;65:17;69:4;
80:8;97:1;107:4;
139:5;146:17;
165:10;185:13;
197:17;198:1;
200:14;202:3;
205:23;207:7,16;
222:24;237:17;
238:4;241:10;
250:23;256:21,23;

258:18
**multiple (5)**
50:5;125:22;141:6;
212:13;243:4
**MUNGER (1)**
14:2
**MURRELL (1)**
13:16
**Musarra (3)**
69:8,18,21
**M-U-S-A-R-R-A (1)**
69:11
**Musarra's (1)**
69:17
**must (1)**
183:20
**myriad (1)**
115:16
**myself (1)**
16:12

## N

**NA (5)**
3:3,7;8:19;9:2;
11:12
**NAFTALIS (1)**
6:2
**name (8)**
15:12;69:10;70:7;
78:9;95:8,14;96:8;
175:3
**NATHAN (3)**
10:24;95:9,15
**nature (4)**
90:17;128:17;
181:24;204:22
**near (1)**
133:5
**necessarily (6)**
22:14;101:5;
122:10;179:15;
244:10,13
**necessary (1)**
164:3
**need (29)**
23:15;24:12;30:13,
14;32:25;33:9;58:22,
24;62:2,8;77:10;
103:5;142:20;
145:16;158:22;
165:11,16,23;174:1;
196:22;197:6;
218:15;230:13;
232:11,12,18;233:10;
234:4;245:18
**needed (8)**
74:14;89:6;105:21;
110:21,24;174:9;
190:9;231:13
**needs (2)**
36:5;212:6
**negotiate (4)**

110:18;128:25;
136:11,18
**negotiated (4)**
83:23,25;149:7,21
**negotiating (4)**
82:15,15;129:7;
186:9
**negotiation (9)**
43:11,16;85:9,13;
88:9;89:25;93:13;
138:4;188:6
**negotiations (5)**
45:1;50:10;52:4;
84:5,8
**NERA (1)**
74:25
**net (12)**
79:2,7,10,25;83:3,
13;174:13;209:20;
210:8;213:24;214:5;
252:14
**Nevertheless (1)**
48:19
**New (30)**
2:16,16;3:23;5:4,
14;6:5,19;7:5,21;
8:13,21;9:5,11,13,19,
21;10:4,21;11:14,22;
12:5,16;13:6,22;
64:19;75:4,14;126:6;
159:15;222:9
**newly (1)**
228:24
**next (31)**
19:12;28:15,19;
32:6;34:24;44:5;
50:19;59:1;63:13;
65:19;67:13;69:5,23;
71:19;73:2,22;74:24;
97:4;107:24;116:17,
24;135:21;156:17;
197:19;198:2,3;
242:3;244:4;253:2,
23;256:13
**nice (2)**
16:7;166:5
**night (2)**
75:13;114:23
**ninety (1)**
16:22
**ninety-six (1)**
173:8
**NJ (2)**
10:11,13
**Nolan (1)**
256:17
**non (1)**
84:13
**non-attorneys (1)**
15:19
**nonconsensual (1)**
132:10
**nondebtor (3)**

142:18;144:1,18
**nondebtors (4)**
141:5;143:19;
145:8,9
**none (5)**
63:25;69:18;
228:22;229:21;231:3
**nonetheless (1)**
176:19
**non-executive (1)**
40:20
**nonnegotiable (1)**
93:15
**nonpublic (4)**
43:23;44:10;46:6,
18
**nonrafts (1)**
242:11
**noon (1)**
202:12
**Nosek (1)**
258:3
**note (4)**
55:19;68:11;73:16;
233:1
**notebook (1)**
26:20
**noted (1)**
192:9
**noteholder (1)**
189:19
**noteholders (16)**
16:20;40:14;43:10;
53:3;103:24;106:20;
126:11,15,18,25;
188:18,24;189:4;
190:1;228:23;229:1
**noteholders' (1)**
188:17
**Notes (18)**
7:19;8:3,11;27:14;
92:15;126:13,14;
151:9;155:17;166:3;
191:3;192:14;215:3;
237:7;254:14,15,18,
19
**notice (3)**
64:13;71:5;216:3
**noticed (1)**
258:3
**notices (3)**
64:20;65:9;70:5
**notwithstanding (1)**
44:25
**November (28)**
2:18;25:5;29:5;
35:4;60:25;63:16;
65:22;67:16;69:8;
70:8;71:22;73:25;
75:1;78:20;89:10;
97:10;119:21;
132:23;133:3,11;
158:12;199:4;201:1;

203:7;204:19;
229:14;230:3,11
**number (82)**
15:3;22:13,13;
25:5;26:3;27:2;29:9,
14;30:1,14,17;35:5;
36:9;38:22;39:3,3;
60:1;61:1,24;63:17,
22;65:23;67:17;68:3,
20;70:9;71:23;73:25;
75:1,14;76:13;77:14;
88:5;97:11;98:9;
118:15,16;124:22;
129:4;130:13;
135:16;138:21;
153:25;154:6,8,11;
158:12;162:23;
197:10;199:5,14;
202:20;203:7,18;
206:11;210:21;
211:11,13,19;213:22;
214:4;215:10;221:6;
222:9;235:18,22;
236:10,12,25;237:10,
21,23;240:5;241:9;
242:19,21;249:17;
250:4,20;252:4,17;
256:3
**numbering (1)**
36:9
**numbers (10)**
27:12;29:23,24;
36:19;62:4;101:13;
199:25;221:13;
234:3,8
**numerous (2)**
32:1;216:11
**NW (3)**
7:12;8:4;13:13
**NY (21)**
3:23;5:4,14,23;6:5,
19;7:5,21;8:13,21;
9:5,13,21;10:4,21;
11:14,22;12:5,16;
13:6,22

**O**

**oath (1)**
147:14
**object (6)**
119:10;154:18;
170:1;195:24;196:3;
216:19
**objecting (1)**
16:15
**objection (110)**
20:20,22;25:14;
26:16;29:10;30:10,
16;39:16;41:24;
47:11;48:16;53:20,
25;54:11,23;55:19;
64:11;65:6;66:19;

67:20;68:7,9,12;
70:14;71:3,4;72:4,
16;74:7;75:18;80:22;
83:21;85:17;86:7,9;
89:19,23;90:10;91:2,
6;92:17;94:5,19,23;
96:16;99:1,21,25;
100:3,14;102:20;
110:8;112:4,10;
113:8;115:4,24;
116:8,9;117:17;
118:3,11,18;119:17;
134:14;138:12;
146:24;151:19;
152:10,14;153:4;
155:16;156:25;
158:18,20;160:15;
161:17,21;162:11;
169:10;170:2;
171:11;179:8,22;
180:12,18;192:9,15;
193:6,16;196:9,25;
197:1,2,12;199:12;
200:7;201:5;206:22;
208:21;213:12;
215:16,23;217:3;
219:3;234:10;244:1;
251:24;255:6;257:24
**objections (43)**
25:11;27:10,19;
29:8;30:5;33:8;
38:12,13;39:14;
47:16;61:15,16;63:1,
3,4,24;64:9;66:4,16;
67:19;68:6;69:16;
70:13,25;72:2;74:6;
76:15;77:24;86:1;
98:17;99:4,12,14,17;
100:17,23;101:18,20,
23;111:14;200:2;
204:13;206:16
**obligated (1)**
152:17
**obligation (2)**
89:4;179:4
**obligations (4)**
89:5,7,8;95:21
**observation (2)**
124:20,23
**obtain (2)**
46:18;228:23
**obtaining (1)**
149:1
**obviate (2)**
23:15;24:12
**obviously (11)**
19:20;21:3;23:16;
87:22;141:14;
149:11;185:14;
186:4;210:18;233:7;
243:3
**occasion (1)**
44:21

**occur (3)**
130:21;222:14;
247:12
**occurred (3)**
123:15;217:2;
220:15
**o'clock (3)**
147:4;252:8;258:7
**odds (4)**
109:11,12,15,17
**off (11)**
30:12;62:22;68:19;
142:5;159:12,14,17;
202:9;208:23;
232:14;234:2
**offense (1)**
137:7
**offer (50)**
24:17;25:4,8;27:1,
9,11;29:16;32:2;
33:16;35:3,7;38:2,9;
60:14,24;61:8,13;
62:20;63:15,20;64:5;
65:21;66:1,12;67:15;
68:1;69:8;70:4,21;
71:21;72:11;74:1;
75:15;76:10;77:12;
97:9,14;98:4;155:12;
158:11,14;160:1;
199:3,8,21,24;
200:24;203:6,9,24
**offered (22)**
30:4,8,15;32:7,8;
33:6;39:10,12,15;
46:1,12,22;47:1;
61:6;66:19;97:16;
98:22;99:13;100:8;
159:19;160:5;161:7
**offering (11)**
30:2;62:23;97:22;
98:2,8,21;99:2,5;
160:11;161:14,15
**offhand (1)**
171:1
**Office (4)**
5:10,11;6:16;13:12
**officer (6)**
41:2,2,10,10;52:9;
191:20
**officers (1)**
193:23
**Official (20)**
3:2;6:3;25:3;26:2;
35:2;60:24;63:14;
65:20;67:14;69:7;
70:3;71:20;77:12;
97:8;104:24;105:4;
158:10;199:2;
200:23;203:5
**OID (2)**
249:4,24
**older (1)**
241:8

**OLSON (1)**
14:2
**once (7)**
33:19;50:2,15;
124:6;172:24;
173:10;234:14
**One (135)**
2:15;7:20;12:4,15;
16:20;18:11;20:25;
21:13,13,14,21;
22:20;28:15;37:20,
23;38:2;40:1;42:15;
45:25;47:24;48:6;
50:11,12;55:23;
57:13;60:18,21;61:8,
8;64:15;65:19;69:25;
73:17;75:6,6;77:5,7,
11;80:11,19;82:21;
83:3,11;84:9;93:7;
95:4;96:12;98:13,14;
100:22;103:9;
106:20,23;110:1;
112:20,21;113:14;
115:6,9,12,17;116:3,
24;120:8;121:1;
122:1,3,7;124:15;
125:20;126:22;
129:14,16,16;133:3,
6;139:23;141:24;
150:17;153:9,17;
155:19;156:5,19;
158:18;159:5,18;
162:2;163:12;
170:25;172:20,22;
174:7;175:22,25;
176:3,16;178:9,17;
179:4;180:24;
182:24;194:17;
196:17;200:20;
202:7;205:4;206:6;
210:3,17;211:24;
212:4,12;213:19;
214:13;217:12,16;
219:7,11;225:13,25;
226:24;227:17,18;
228:5;234:24;235:8,
22;243:1;245:8;
246:14;252:17;
253:2,24;258:10
**one-by-one (1)**
175:19
**O'NEILL (30)**
6:11;57:13,15,15,
18;58:11,12;76:8,8,
21;97:5,6,7,18,21;
98:3;102:9,11,14,16;
103:3;110:8;153:4;
155:10,11,25;156:3,
5,12;157:23
**ones (11)**
32:15;34:2;37:2;
39:11;90:14;141:14;
160:11;173:15,15;

182:17;253:3
**ongoing (1)**
257:25
**only (18)**
22:20;23:1;39:3;
41:22;45:20;84:12;
91:20;92:21;96:12;
100:9;113:3;162:2;
168:23;196:4,6;
205:18;210:7;236:23
**open (5)**
229:10;232:11,12,
18;245:18
**opening (17)**
15:6,7,16;22:22;
112:19;114:14;
136:23;137:6,9;
176:5;192:20;
228:12;229:6,23;
230:4;231:8;232:8
**openings (4)**
22:24;153:6;
164:16,18
**operation (5)**
211:5,16,22;
213:25;214:11
**operations (1)**
104:21
**operations@escribersnet (1)**
3:25
**operative (1)**
233:24
**opine (1)**
244:13
**opining (1)**
244:11
**opinion (7)**
17:17;153:13;
175:11;221:25;
225:20;231:23;
237:14
**opinions (9)**
175:12,13,16;
191:21;229:16,21;
230:2,17;231:18
**opportunities (1)**
144:19
**opportunity (6)**
15:15;30:18;33:8;
47:2;106:4;137:17
**oppose (1)**
105:25
**opposed (1)**
125:21
**opposing (1)**
75:12
**opposite (1)**
116:22
**opposition (1)**
20:10
**order (25)**
22:7,11;36:21;
37:5;48:3,8;81:4,13;

130:5,8,12,14,15,18,
23;131:3,5;147:22;
162:22;163:5;
167:16;175:23;
202:10;235:6;258:13
**orders (5)**
27:7;161:2,8,16,18
**ordinary (1)**
246:8
**org (2)**
254:10,10
**organization (1)**
245:16
**original (5)**
161:10;179:12;
180:1,20;249:4
**originated (3)**
176:1,1,2
**others (10)**
44:3;66:19;122:14;
130:18;168:11;
170:25;183:25;
209:15;220:25;
237:12
**Otherwise (5)**
113:2;138:3;
172:13;192:19;
194:12
**ought (2)**
30:13;137:25
**ourselves (1)**
245:5
**out (58)**
19:17;22:6,8;
23:11,12,22;31:7;
32:3;34:7;44:21;
56:4,9;77:8;81:4;
83:10;100:5;102:8;
103:10;108:13;
112:24;123:11;
124:14;131:13;
150:9;153:24;154:6;
163:5;172:20;174:7;
184:17;186:10;
190:16;198:9,19;
202:4,21;210:19;
211:5,16,22;213:25;
214:10;215:6;217:5;
225:15;226:1,4;
228:15;232:25;
240:6;241:10;
243:23;249:22;
252:4;253:14;257:4;
258:12,13
**outcome (2)**
194:16;222:17
**outcomes (5)**
120:1;235:8;
236:23;244:10,22
**Outlook (1)**
249:8
**outset (5)**
105:18,20,24;

106:1,4
**outside (3)**
128:17,20;217:13
**over (21)**
110:14;112:6;
114:11;135:20;
154:19;165:19;
174:15;176:3;177:5;
183:21,21;184:1,8;
195:4,11;206:16;
225:18,18;231:5;
237:17;253:25
**overrule (1)**
118:2;215:24
**Overruled (12)**
41:25;47:13;110:9;
134:15;157:1;
171:12;179:9;
180:19;206:23;
208:22;251:25;255:7
**oversecured (13)**
110:6;111:3,11,24;
124:4,11;153:1;
186:16;194:23,25;
236:4,6,20
**overseeing (1)**
104:20
**overseen (1)**
17:9
**overwhelming (1)**
15:25
**overwhelmingly (1)**
185:5
**OVERY (1)**
11:11
**owed (1)**
153:1
**own (12)**
16:12;168:15;
171:5,21;173:4;
174:5,6,25;185:21;
186:2;189:21;192:15

**P**

**page (71)**
42:21,25;43:19;
51:2;52:23;53:13;
55:24;57:24;58:2,5;
106:11,18;107:7;
108:4,25;113:24;
114:20,22;121:4,18,
19;130:5;133:13,17,
19;134:18,20;136:3;
139:22;148:10,11;
149:15;150:3,6;
153:24;154:6,8,10,
13;156:17,19;178:8,
8,18;188:11,14;
209:18;214:4;
215:10;216:8,8;
221:6,12;226:18;
228:3,9,10;232:21;

239:6,24;240:3;
241:20;242:23,24;
244:12,19;246:5;
249:3;252:14,23;
254:1
**pages (4)**
228:10;231:5;
239:23;252:3
**paid (7)**
51:9;88:4;96:4,5;
152:25;193:15;
194:24
**paper (2)**
29:22;197:8
**papers (1)**
257:23
**paperwork (1)**
19:14
**paragraph (45)**
43:20;44:5;82:23;
108:5,10,13;121:20;
122:4,12;123:1,11;
139:20,21;142:1,24;
145:19;146:6;
148:14;156:20,24;
158:19;188:11,13,14,
16;195:25;196:4,6,
17,25;197:11,13;
216:10;226:18;
228:18;229:10,17;
230:15;232:21,23;
245:14,23,24;246:5;
254:22
**paragraphs (4)**
99:20;102:6;
229:22;231:3
**pardon (2)**
46:5,19
**parent (1)**
89:8
**Park (6)**
5:3;9:3,20;10:20;
12:4;15:13
**part (46)**
16:13,16;20:14;
45:20;46:7;54:6;
74:22;80:4;85:4,15;
86:12,17;93:23;
110:3,5,12,24;111:1;
114:10;117:22,25;
123:20;131:18,24;
138:20;140:15;
142:2,5,19;143:21;
144:20;145:1,15;
154:25,25;168:25;
169:18;171:13;
182:25;183:24;
205:14;217:2;222:9;
232:11;237:5;249:4
**participants (3)**
93:25;128:25;
129:9
**participate (16)**

46:23;48:4,9,14,
20;49:7,23;125:8;
126:18;129:10;
130:9,19;131:2;
173:3;188:19;189:11
**participated (14)**
43:11;45:18;125:2,
4,6;126:1,3,6,11,14,
15;127:3,11;186:23
**participating (3)**
139:15;181:16;
183:24
**participation (6)**
43:16;44:25;49:18;
129:20;189:14;196:2
**particular (9)**
26:4;42:13;52:5,7;
53:18;57:23;88:16;
172:17;255:10
**parties (30)**
45:10;46:17,22;
54:21;82:24;84:11;
105:12;108:22;
119:7;129:8;130:13;
131:2,4,4;138:17;
139:11,15;145:12;
149:1;157:5;163:25;
170:10;176:22;
177:24;183:17;
186:24;218:23;
219:15;222:5;247:23
**parties' (1)**
188:4
**parties-in-interest (3)**
32:21,24;33:2
**party (3)**
105:15;153:11;
157:24
**passing (1)**
114:12
**Passive (1)**
211:20
**past (2)**
206:8;250:24
**patience (1)**
131:13
**Paulson (1)**
129:6
**Pause (10)**
35:21;59:2;97:2;
103:14;121:3;158:6;
174:21,22;200:6;
248:16
**pay (7)**
43:12;57:2;95:20;
146:11;152:17;
185:16,17
**payable (3)**
178:25;179:3;
252:14
**payables (10)**
171:10,23;179:15,
19,19;180:3,10,11,

16,22
**paying (2)**
96:13;237:6
**payment (7)**
56:14,24;84:18;
88:13;144:12;183:1;
220:21
**payments (2)**
141:10;215:4
**PC (1)**
13:2
**peace (2)**
217:12;225:4
**Peck (19)**
45:9,21;46:15;
48:5,9;54:22;55:3;
84:6;85:14;93:14;
111:19;123:23;
124:1,9;189:1,13,16,
18,23
**pending (1)**
17:21
**Penina (1)**
3:20
**penmanship (1)**
210:14
**PENSION (1)**
13:11
**people (17)**
19:23;73:13;82:21;
95:5;124:19,22;
171:8;185:15;
186:23;187:2;188:3;
198:16;202:9;
206:11;207:13;
244:15;256:3
**per (1)**
256:7
**percent (9)**
16:7,20,25;21:8;
173:8;240:10,16;
245:8,12
**percentage (1)**
142:13
**perfection (1)**
184:23
**perfectly (3)**
91:16;224:9;
258:13
**Perhaps (2)**
21:10;174:23
**period (8)**
80:13,20;82:11;
87:4,5;88:10;225:17,
19
**permissibly (1)**
164:12
**permission (1)**
29:16
**permit (10)**
18:19;19:18;48:4,
8;85:24;102:5;118:1,
12,20;130:18

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document

RESIDENTIAL CAPITAL, LLC, et al.                    Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
Case No. 12-12020-mg                 Pg 287 of 300                        November 20, 2013

**permitted (1)**
157:8

**permitting (1)**
192:6

**PERRY (101)**
7:24;38:13,16,16,
18;40:13,13,16;
47:19;49:9,11,13,16;
50:7,8,17,20;55:14,
16;57:8,9,19;99:15,
15,24;100:3,7,15;
101:1,16,17,21;
102:4,5,19,20;103:4,
10,15,17,19,21;
106:10,25;107:5;
109:13,16;112:17,18,
24;113:4,7,22,25;
114:9,9,14,16,20,22;
115:5,23;116:1,19,
25;118:10;119:14,
20;121:10;125:15;
131:13,14,19;134:23;
135:19,22,23;136:9;
138:8,15;139:7,19;
145:5;147:13,16;
150:25;153:17,20;
154:1,10,13,17,20,
22;155:12,15,16;
156:11,13,25;157:10

**person (2)**
16:12;86:11

**personal (7)**
16:14;17:17;46:22;
188:23;189:25;
196:1;213:5

**personally (4)**
16:8;46:21;213:7;
244:16

**person's (1)**
187:18

**perspective (6)**
41:21;42:2;125:1;
127:10;140:16;
187:19

**petition (12)**
52:4;114:25;140:5,
12,21;141:2,15,22;
143:24;207:3;
228:22;254:24

**Pfeiffer (4)**
71:22,25;72:6,8

**Pfeiffer's (3)**
72:2,11,23

**ph (4)**
208:11;242:10;
248:23;256:2

**PHASE (22)**
3:4,8;32:22;36:4,
11;37:1;49:17,21;
50:9;128:7;152:22;
186:13;194:17;
227:10,11,11,21;
229:1,9,12;233:11;

243:4

**PHILIP (1)**
6:8

**phone (1)**
19:23

**picked (1)**
36:8

**pictogram (1)**
242:3

**picture (1)**
255:22

**piece (1)**
29:22

**piercing (5)**
87:21;88:7,17;
89:16;182:4

**pitcher (2)**
40:10,11

**place (1)**
43:15

**placed (1)**
47:8

**placeholder (1)**
157:4

**placement (1)**
75:8

**plaintiffs (1)**
187:9

**plaintiffs' (1)**
37:9

**Plaintiff's (1)**
72:6

**plan (135)**
16:15;22:11;24:10;
25:2,6,9,16,24;26:1,
5;27:11;28:1,19;
29:13;35:1,9;36:24;
37:9,10,11;38:11,24;
39:7,20;50:24;51:8;
52:4;58:8;60:23;
61:14,19;63:9,14,21;
64:3,6;65:14,19;66:3,
10;67:10,14,18,24;
68:2;69:1,6,22;70:2,
19,22;71:17,20;72:9,
12,24;73:22;74:11;
76:1,20;78:4;93:5,
23;97:8;98:14;101:8;
102:2,25;105:7,12,
19,22;106:5;109:8;
110:18,20;114:5,11;
128:6;132:8;140:2;
146:2,4,8;148:2,13;
152:20,21,25;153:11;
155:22;157:4,6;
158:9,16;160:2,22;
161:3,10,11,25;
162:14;166:19;
181:13;184:2;185:6;
188:20,21;190:2,3,
10,10,12,17;193:19;
194:9,13,16;197:14;
199:1,9,16,24;

200:11;201:9;203:4,
11,20;216:4;217:10,
12;220:6,11,16;251:2

**plate (1)**
132:6

**platform (1)**
249:8

**play (1)**
133:14

**played (1)**
241:10

**Plaza (3)**
7:20;12:4,15

**pleadings (2)**
32:6;34:5

**Please (19)**
15:2;24:23;29:1;
34:22;35:14,20;
59:14;64:17;74:22;
78:8;92:5;137:7;
147:12;165:6;
188:11,14;198:23;
204:9;256:18

**plus (3)**
126:13;234:24,24

**pm (5)**
147:11,11;198:21,
21;258:20

**point (34)**
20:25;45:8;47:14;
52:10;54:5;55:7;
56:3,19;62:6;105:6;
110:15,19;113:5;
114:12;127:6;
137:11;149:13;
170:25;179:16;
194:5;209:24;217:4;
225:21;231:24,25;
232:1,2;233:8;
234:15;241:1;
243:20;248:6;250:1;
253:11

**points (1)**
249:22

**policies (1)**
201:12

**polite (1)**
91:24

**POLSINELLI (1)**
13:2

**pool (1)**
51:13

**poorly (1)**
51:16

**popping (1)**
138:22

**portion (6)**
55:10;117:7;150:4;
186:1;236:7;238:3

**Portions (3)**
22:16;23:10;99:18

**position (35)**
16:11;20:3;54:6,9,

13,17,25;79:2;86:20;
88:13;89:3,9,16;
90:20;100:1;105:21,
23;106:1,3,4;109:11,
17;113:17;119:15;
153:12;157:2,11,17;
179:17;180:25;
181:2;186:4;194:25;
236:2;254:7

**positions (4)**
42:15;44:21;188:4;
242:4

**possibility (3)**
111:9,22;124:8

**possible (13)**
22:5;42:3;91:12;
129:3,9;178:5;
185:13,16;207:7;
229:19,20,21;255:8

**Possibly (5)**
80:14;122:19;
144:24;207:1;210:20

**post-petition (6)**
17:13;153:2;177:6;
186:8;194:24;247:17

**potential (22)**
56:10,20;57:5;
83:23;85:8;90:13;
113:9,18;114:11;
120:1;124:3,9;
131:20;132:18;
136:13;143:18;
182:11,21;218:7,22;
219:13;226:20

**potentially (3)**
82:18;109:22,25

**PowerPoint (1)**
210:11

**practice (1)**
94:12

**practices (1)**
17:12

**practitioner (1)**
177:21

**pre- (3)**
52:3;141:21;249:7

**precisely (1)**
120:18

**preclude (1)**
194:8

**precluding (2)**
135:20;217:1

**predominant (1)**
212:4

**preference (1)**
253:9

**preliminary (2)**
112:20;114:24

**preparation (2)**
207:24;239:4

**prepare (2)**
201:13,24

**prepared (8)**

112:13,16,21;
114:3;183:7;185:8;
193:13;220:23

**preparing (1)**
175:6

**pre-petition (28)**
16:19;43:11,16;
50:25;84:8;85:13;
86:22;87:5;88:9;
105:7,12,15,19,22;
125:14,15;142:9,22,
23;143:19;144:17;
186:7;190:14;
218:18,24;239:24;
240:6;246:3

**present (9)**
15:15;45:15,17,23;
120:5;135:18;
136:15;138:4;
210:19;234:17

**presentation (14)**
16:1;87:9,11,15,18,
24;120:14;136:16;
209:13,16;238:13;
241:8;243:9,10

**presentations (8)**
168:9,20;181:24;
182:9,11,16;184:9;
187:15

**presented (25)**
90:13;110:17,23;
111:7;120:6,12,19;
121:1;135:7;137:18,
22;138:24;210:20;
212:6;222:24;224:4;
227:19;241:11;
244:17;246:1;247:6,
9,16,23;251:22

**preserved (1)**
113:7

**press (1)**
101:17

**pressing (1)**
101:19

**prestigious (1)**
85:2

**presume (1)**
253:17

**pre-trial (3)**
36:21;37:5;162:22

**pretty (5)**
18:25;23:4;206:16;
238:10;251:17

**previous (1)**
161:2

**previously (9)**
62:21;64:6;66:13;
68:2;70:22;72:12;
73:24;113:22;160:2

**pri (1)**
247:24

**pricing (1)**
90:24

**primarily (7)**
162:21;172:18;
208:5,10;214:7;
215:13;227:12
**primary (1)**
208:11
**principal (1)**
129:10
**principals (14)**
127:13;129:2,4,4,5,
5,7,14,16,16;188:18,
23;189:19;190:1
**print (1)**
202:21
**printed (1)**
36:22
**prints (1)**
249:8
**prior (35)**
34:4;56:9;64:23;
65:4,10;99:9;105:11;
114:25;118:23;
120:9,20;124:8;
132:3;133:24;134:1,
2,9,11;138:9,18;
140:5,21;141:2,15;
143:24;155:3,5;
161:8;173:12;205:6;
215:1;236:9;245:2;
248:2;251:16
**priority (1)**
191:7
**private (3)**
126:3;184:20;
187:9
**privilege (5)**
48:14;60:7;85:23;
118:20;119:3
**privileged (5)**
117:12,13;118:24;
169:2,17
**Pro (3)**
14:12;33:2;51:12
**probably (15)**
15:19;52:12;80:17;
94:14;130:25;132:4;
155:8;159:16;168:2,
3;193:24;201:17;
209:9;213:4;221:12
**problem (8)**
71:11;81:3;96:13;
184:25;194:20,23;
196:5;202:4
**problems (1)**
202:2
**procedure (6)**
31:22;32:2,11,12;
33:6;34:11
**proceed (1)**
201:24
**proceeding (15)**
3:2,6;32:23;45:10;
49:21;128:1,4,5,6,7;

142:15;143:16;
174:17;205:8;215:6
**proceedings (14)**
16:12,16;35:9;
38:11;63:21;64:23;
66:3;76:12;97:15;
158:16;176:11;
199:10;203:11;
258:20
**proceeds (2)**
167:4;229:2
**process (35)**
22:5;45:22;46:4,5;
48:20;54:21;55:8;
85:4;119:22;124:20,
22;127:7,11;132:7,
16;134:2,3,11,11;
135:3;138:23;142:6;
144:25;145:15;
146:19;150:14;
155:5,5;169:18;
185:1;189:11,12;
204:25;217:17;
251:14
**produced (4)**
247:9;248:12;
249:10;255:21
**production (1)**
247:9
**professionals (1)**
119:24
**proffer (1)**
50:1
**projected (1)**
243:6
**prolonged (1)**
121:23
**promise (1)**
192:2
**pronounce (1)**
69:12
**pronounces (1)**
66:6
**proof (6)**
18:15;20:18,21;
29:18;30:8;31:13
**proofs (1)**
94:15
**properly (5)**
134:7,17;164:5;
171:14;235:10
**property (3)**
16:17;17:15;
164:13
**Proponent (1)**
39:7
**proponents (6)**
24:10;25:24;37:10;
97:19;152:20;258:8
**proponents' (48)**
22:11;25:6,16;
27:12;28:1;29:13;
36:24;37:9,11;38:24;

39:20;61:19;63:9;
64:3,6;65:14;66:10;
67:10,18,24;68:3;
69:1,22;70:16,19,22;
71:17;72:9,13,24;
74:11;76:1,20;78:4;
101:8;102:2,25;
155:22;160:2,22;
161:25;162:15;
197:14;199:16,25;
200:11;201:9;203:20
**proportion (2)**
16:17;17:4
**proposed (20)**
22:12;25:2;26:1;
35:1;50:23;60:23;
63:14;65:20;67:14;
69:6;70:3;71:20;
97:8;110:20;114:5;
148:1;158:9;194:1;
199:2;203:4
**proposing (1)**
41:13
**prospective (1)**
124:7
**protection (2)**
163:4;164:14
**prove (5)**
79:22;177:3,4;
194:19,23
**proved (1)**
186:14
**provide (9)**
16:9;17:6;23:11;
46:11;49:6;84:2;
104:12;177:23;207:9
**provided (9)**
37:21;43:23;44:8,
10;71:4;186:6,7;
191:17;250:23
**provides (2)**
104:10;106:15
**providing (2)**
104:15;208:25
**provision (6)**
44:6,14;46:11;
51:21;148:24;254:17
**provisions (2)**
47:6;254:3
**PSA (1)**
91:10
**public (5)**
15:24;89:9;180:9,
15;217:6
**publication (2)**
138:17;139:2
**publicly (3)**
179:17,17;210:19
**pull (1)**
166:15
**purportedly (1)**
42:25
**purpose (18)**

30:4,11;32:7;
64:12;65:9;66:20;
67:7;68:10,23;71:5,
15;72:17,22;99:2;
102:17,22;161:6;
177:22
**purposes (14)**
39:17,18;71:13;
102:18,23;112:13,16;
113:3;116:9;119:8;
176:9,21;191:15;
224:12
**pursuant (4)**
51:8;58:8;254:25;
255:3
**pursue (2)**
137:12,15
**put (32)**
22:3,22;33:23;
34:6;35:24;36:2;
39:2;43:15;56:19;
59:4;81:4;83:10;
86:7;99:9;114:25;
121:7;147:23;
149:13;157:3;
165:11;179:6;
183:23;184:3;188:4;
209:13;210:11;
232:11;237:24;
238:1,2;245:18,20
**putting (7)**
22:16;161:12;
177:25;208:12;
235:17,21;245:5
**PX-1530 (1)**
66:7
**PX-1560 (1)**
69:19
**PX-1600-1 (1)**
72:21
**PX-90 (3)**
147:17,19,20
**PX-90A (3)**
147:23,24;148:4

**Q**

**qua (1)**
84:12
**Quadrangle (1)**
5:21
**qualification (6)**
99:21;100:4;
105:11;149:24;
150:12,16
**quantify (2)**
154:24;181:21
**quick (1)**
159:18
**quickly (5)**
28:12,15;35:25;
36:15;192:3
**Quite (5)**

18:20;73:14;187:5;
190:7;195:20

**R**

**R8 (2)**
51:3,6
**rafts (1)**
242:10
**Rain (1)**
33:23
**Rains (41)**
28:13,14,17,17;
29:2,3,14,18,21;30:3,
8;31:11,19,25;32:5,
13,18;33:10,12,14,
22,25;34:4,12;73:2,4,
7,10,11,11,16;74:3,
12,20,21,24;75:13,
20;76:6,7;257:8
**raise (31)**
22:3,18,19;23:9;
24:21;32:15;35:11;
78:5;111:14;165:7;
204:6
**raised (7)**
22:23;23:3;49:19;
56:7;91:11;163:11;
197:2
**raises (1)**
173:18
**raising (2)**
114:1;119:2
**ran (7)**
120:9;225:11;
235:3;236:16,21;
244:12;245:7
**range (6)**
37:1;82:17;184:9,
10;224:11,11
**ranging (1)**
182:4
**rata (1)**
51:12
**rates (2)**
170:16;215:4
**Rather (3)**
29:23;77:5;163:5
**RAY (1)**
7:7
**Raymond (1)**
22:12
**RE (5)**
3:13;249:3,6,23,25
**reach (3)**
157:5;216:10;
236:14
**reached (5)**
24:10;168:5,8,19;
217:11
**reaching (1)**
83:13
**reacting (2)**

49:14;50:18

**reaction (3)**
89:15;90:15;91:4

**read (31)**
24:11,15;25:18;
29:24;51:6;60:4;
61:24;62:5;68:19;
91:4;108:10;109:7;
112:23;113:25;
136:2;151:21;
153:21;154:17;
156:20,24;157:9;
159:12,14,17;164:18;
175:9,14;196:25;
240:12;252:4,5

**reading (2)**
51:5;134:23

**reads (2)**
123:2;148:14

**ready (2)**
21:25;103:15

**real (2)**
174:22;212:20

**realize (1)**
36:1

**really (29)**
30:20;41:17;42:1;
49:10;84:9;85:15;
117:14;130:25;
132:3;135:15;144:4;
146:17;152:23;
171:5;173:14;
174:22,23;175:23;
179:20;180:23;
181:7,13;183:14;
184:10,12;191:25;
205:1;212:17;234:14

**rearranging (1)**
59:18

**reask (1)**
223:2

**reason (9)**
82:7;110:3,24;
153:10;168:23;
172:5,5;234:2;
242:25

**reasonable (12)**
17:13;217:24;
218:2;223:16;224:9,
20;237:2;243:17;
244:8,14,24;254:17

**reasonably (2)**
235:8;236:22

**reasoning (1)**
54:19

**reasons (6)**
16:15;49:3;93:7;
174:15;212:4;225:25

**rebuttal (24)**
227:14,15,20,23,
24;228:2,5,6,11;
229:5,8,15,23,24;
230:4,5,15,19,23;

231:7,8;232:7,8,10

**recall (44)**
42:18;45:20,23,25;
52:3,7,8,12;53:12,17,
22;56:3;57:21,24;
81:22,24;87:17;
104:7;111:4;120:13,
17;121:1,2;122:20;
125:23;127:6,9;
130:11;131:1;
132:20,23,24,25;
137:4;138:24;148:6;
151:25;152:7;
156:15;171:1,25;
208:17,25;215:9

**receivables (6)**
171:10,23;179:20;
180:10,11,16

**receive (6)**
51:11;56:10,23,25;
58:10;185:23

**received (36)**
19:13;25:16;27:25;
29:12;38:23;39:19;
61:18;63:8;64:2;
65:13;66:9;67:9,23;
69:1,21;70:18;71:16;
72:8;74:10;75:25;
76:19;78:3;82:5;
101:7;102:1,24;
155:22;160:21;
161:24;162:14;
191:20;197:14;
199:15;200:11;
201:8;203:19

**receives (1)**
56:13

**receiving (2)**
56:21;57:5

**recent (2)**
75:5;84:9

**recess (7)**
59:9,13;147:2,11;
197:23;198:18,21

**recesses (2)**
21:13,21

**recession (1)**
197:23

**recharacterization (2)**
122:24;206:21

**recharacterized (4)**
205:7;214:19,24;
215:8

**recognition (6)**
110:4,11,14;111:1,
10,23

**recognize (3)**
16:8;179:10;239:2

**recognized (8)**
109:18;111:2,22;
120:10,24,25;124:8;
132:7

**recollection (4)**

45:18;46:4;83:2;
110:9

**Reconciliation (1)**
232:24

**record (22)**
15:11;24:12;38:15;
40:13;42:8;62:16;
86:7;96:7;99:6;
106:12;112:8;118:2;
153:22;154:4,5,17;
155:9;161:12;
171:14;204:15;
225:17;257:21

**recorded (5)**
163:14,21;170:12;
172:1,21

**records (7)**
163:15,22;171:15,
24;172:8,11;254:24

**recover (2)**
190:14;195:2

**recoveries (13)**
21:7;120:23;
146:14;149:7,9,9,20;
234:19;240:18;
241:21,24,24;242:16

**recovery (29)**
58:10;120:2;
149:20,25;150:15;
164:14;184:9,24;
186:6;190:9;222:20;
223:13;224:13,16;
225:9;233:6;234:3;
235:3,13;240:10,20,
21,22,23,25;242:5;
245:7,9,9

**redacted (1)**
197:6

**redirect (12)**
57:11,12,17;58:13,
15;95:3;96:22;151:1;
155:24;195:12,14;
257:2

**redo (2)**
219:19,20

**redone (1)**
75:7

**REED (3)**
8:18;92:8;151:5

**refer (7)**
36:6,6;79:6;116:8;
121:11;139:16;154:7

**reference (4)**
107:10;114:13;
115:2;145:20

**referenced (6)**
27:4;36:3;37:22;
61:23;112:19;146:5

**references (2)**
62:4;141:14

**referred (4)**
112:20;142:2;
154:10;256:11

**referring (15)**
37:2;45:6;82:8;
123:10;130:4;
135:15;218:4;
227:16,20,23;235:16;
245:11;247:8;
251:19;252:25

**refers (1)**
161:9

**refile (1)**
196:22

**refine (1)**
147:4

**reflect (1)**
234:4

**reflected (7)**
208:2,19,20,24;
212:25;226:16;
252:24

**reflection (2)**
243:22;244:7

**reflects (1)**
109:21

**refresh (1)**
83:2

**refuse (1)**
169:25

**regard (3)**
116:8;191:3,21

**regarding (18)**
27:25;39:19;63:8;
65:13;67:9;68:25;
70:4;71:16;72:23;
101:7;102:1,24;
160:21;161:24;
169:15;200:10;
206:25;209:13

**Regardless (3)**
54:4;152:21;
194:16

**regards (2)**
17:3;256:19

**regulated (1)**
142:6

**rein (1)**
195:7

**reinstatement (1)**
228:20

**reject (2)**
51:7;58:8

**relate (4)**
51:25;118:22;
133:21;254:8

**related (15)**
16:14,14;27:8;
90:24;140:3,11,20,
25;141:5,13,14;
166:18;173:17;
207:3;216:13

**relates (2)**
120:18;142:14

**relating (4)**
53:14;142:23;

166:24;228:6

**relation (2)**
88:14;135:1

**relationship (3)**
173:19;250:20;
252:13

**relationships (4)**
176:1;250:21;
252:15,17

**relative (1)**
243:9

**release (14)**
84:10,14;93:4,24;
94:2;138:18;163:16;
183:1,4;186:20;
192:13;194:9;222:5;
223:21

**released (14)**
17:13;84:4;92:23;
93:1;143:20,23;
151:16;153:11;
164:6,12;183:19;
191:13,18

**releases (10)**
93:16;132:10;
145:13,14;191:16,22;
193:18,21;194:1;
225:15

**releasing (1)**
132:9

**relevance (3)**
49:13;50:3;196:3

**relevant (5)**
49:12;173:22;
194:5;205:11;206:20

**relied (2)**
51:23;184:4;207:9,
12

**relief (3)**
20:9;56:25;257:22

**remains (4)**
20:19,24;23:20;
157:2

**remember (13)**
18:21;82:11;87:19,
20;114:14;115:21;
139:3;210:17;218:1;
230:12;247:13,15;
248:5

**render (8)**
110:6,13,14;111:3,
11,24;124:3,11

**Renzi (61)**
52:22;53:11;
106:12,13;112:15;
203:6,8,18,19,21,25;
204:5,10,16,18;
205:17;206:8;
207:23;209:6,11;
214:14;215:5,20;
216:6;217:7;218:7;
220:23;223:18,24;
225:7;226:25;227:6;

228:14,18;229:8,9,
12,13,15,21;230:23;
231:15;232:7,20;
234:13;235:3;
237:17;239:2;240:7;
243:15;244:6;245:4,
14;246:1;248:9,22;
249:22;253:7,24;
255:18,25
**Renzi's (2)**
143:15;216:23
**reorganization (2)**
50:24;110:18
**rep (3)**
88:23;89:2;166:14
**repay (1)**
83:7
**repeat (7)**
48:6;110:10;
116:15;134:6,7;
140:23;238:18
**report (53)**
23:6,6,17;52:11,
13;55:11;56:4,5,7,9;
88:6;89:13;91:5;
106:2;137:3;138:9,
18;139:2;175:6,9,14;
226:19;227:20,25;
228:2,6,12;229:6,8,
12,13,15,24,24;
230:4,5,8,19,23;
231:7,9,10,15;232:8,
10,13,15;234:4;
235:6;236:17;
237:15;244:13;
253:12
**reported (1)**
248:10
**reporter (1)**
74:21
**reporting (1)**
114:23
**reports (4)**
123:13;143:15;
227:8,17
**represent (2)**
16:12;118:8
**representation (2)**
119:8;255:21
**representative (10)**
104:24;124:16;
126:22;127:21;
166:7,18,24;167:11;
221:2;227:7
**representatives (11)**
126:2,9,17,20,24;
127:2,7,13,14;
128:16,20
**represented (6)**
20:13;21:15,18;
126:10;213:2;250:1
**representing (1)**
166:2

**request (10)**
48:2,7,13;129:20;
132:14;163:4;
206:25;251:11,22;
256:7
**requests (1)**
207:17
**require (1)**
50:10
**required (3)**
17:16;46:7;251:12
**requirements (1)**
189:13
**Res (1)**
210:23
**ResCap (98)**
16:18;31:5;40:18;
41:15,18;42:15;44:9;
46:17;51:12;52:4;
53:6;56:11,14;79:2,7,
10,19,25;80:9,11,18;
82:15,18;83:3,7,10,
13,16,24,25;84:1;
86:23;87:7;89:5,5,6,
7;90:18,25;93:13,14;
104:23;107:19;
109:25;125:21,23;
128:5,6;136:13;
141:8,13,16,20;
142:3,16,17,19;
144:8,11;146:21;
149:12;167:15,19;
170:7;171:24;173:7;
174:11;179:5;
180:14;181:17;
182:12;183:2,18;
186:20,21,23,25;
187:3,10;192:17;
193:23;204:18;
207:14;209:14,19;
210:23;211:3,7;
212:20;218:7,23,24;
219:14;238:5,6,14,
14;253:19
**ResCap's (13)**
53:3;78:24;79:13,
17;84:21;87:9;88:25;
89:3;90:18;91:22;
166:7;204:22;207:9
**reservation (7)**
99:24;155:13;
179:13;180:2,7,8,21
**reserve (6)**
99:16;102:6;
151:23;159:22;
180:24;193:13
**reserving (1)**
32:14
**reside (1)**
15:13
**Residential (15)**
3:6,10;15:3;26:2;
42:9,24;43:1,3,7;

56:20;177:12,19;
209:20;211:2;252:18
**resigned (1)**
40:22
**resolution (6)**
48:25;113:19;
131:24;144:20,25;
216:12
**resolve (6)**
17:8;23:20;41:14;
43:12;114:7;139:24
**resolved (1)**
52:5
**respect (51)**
20:13,20;24:11;
66:19;68:8,18;71:2,
3;88:23;89:2,16;
98:13,14;99:22;
100:2;101:4;102:6;
104:23;122:21;
127:2,21;128:10;
138:7;140:10;
141:22;143:18,25;
144:17;150:8;
157:12;166:7,18,24;
167:10;168:8;169:9;
170:10;171:21;
174:2;175:12,13;
176:7,10,24;179:12;
180:3,21;187:2,20;
192:18;242:9
**respond (2)**
112:17;167:3
**responding (1)**
129:19
**response (4)**
131:10;135:1;
207:17;250:20
**responses (1)**
250:17
**responsibility (2)**
104:20;208:12
**responsible (1)**
208:10
**responsive (2)**
226:3;230:16
**restate (3)**
89:1;140:23;
215:19
**restrict (2)**
42:14;46:10
**restriction (2)**
65:12;67:8
**result (15)**
20:14;56:21;57:6;
132:18;164:8;
182:25;183:18;
188:2;189:12;
190:11;212:9;
214:23;233:10;
236:15;241:2
**resulted (2)**
45:19;188:20

**results (5)**
90:19;149:11,22;
179:24;243:1
**resume (2)**
147:4;256:22
**retain (2)**
40:24;227:1
**retained (2)**
17:15;115:6
**returns (1)**
231:25
**reverse (1)**
81:13
**review (15)**
30:18;33:8;106:2,
5;115:10,12,15,19;
122:17;123:14,17;
140:14;168:15;
205:11;208:1
**reviewed (7)**
42:16;87:15;89:12;
135:4;143:14;
160:12;208:14
**reviewing (5)**
108:19;111:12;
115:16;162:21,22
**revolver (8)**
92:12,15;94:7;
151:8;163:12;191:3,
6,16
**rewarded (1)**
17:11
**RFC (9)**
125:21;211:2,6,15;
214:4,4;238:1,2,3
**RICHARD (5)**
10:6;14:11;15:12;
96:8;98:6
**Richards (1)**
19:13
**rife (1)**
173:2
**right (387)**
15:3;19:16;20:5,
24;23:19;24:21,23;
25:11,14;26:8,20,22;
27:6,17,19,21;28:6;
29:2,7;30:9;33:11;
34:4,8;35:10,11;
37:12;38:5;39:14,25;
40:4,4;41:15;42:17;
43:24;44:17;45:3,5;
46:3;47:22,25;48:5,9,
15,20,23;49:1,8;
51:17;52:1;54:7;
58:16,23;61:12;62:1,
2,8;63:4,24;64:9;
65:7;66:5,16;67:3,6,
19,21;69:16;70:13,
15;71:6,12;72:5,21;
73:14;74:8;75:19;
76:5,17,22;77:1;78:1,
5,8,18,21;79:3,7,11,

17,19,21,22;80:9,
13,21,21;81:7;82:25;
83:8,11,14,17,20,24;
84:6,11,16,22;85:6,
16;86:13,24;87:10,
15,24;88:3,11,14,17,
20;89:4,10,13,22;
90:13;91:19,23;94:3,
16,16;96:2,24;97:24;
99:11;101:22,24;
102:21;103:4,9,12;
104:8;105:16;106:1;
110:7;111:3,11;
118:8;119:12;121:2;
122:18;124:11,13,17,
20,24;125:2,4,6,13;
126:1,4,7,21;127:15,
17,23;128:12;
130:19;132:18;
133:8,10;136:13;
137:12;138:1;
139:10,13;142:24;
143:9,21;144:2,18;
145:24;151:11;
153:15;155:17;
158:25;159:2,8,17;
160:16;161:22;
162:12;165:4,7;
166:9,19;167:13,17;
168:1,5,22;169:8;
170:3;172:13;173:6;
175:12,13,15,18;
177:6,20;178:5,20,
22;181:15,18,20,22;
182:21,22;183:2,7,7,
11;184:5;185:6;
186:1,11,17,21,25;
187:10,23;188:7,16;
195:15;196:10,21;
197:7,9;198:1,18;
199:13,23;200:8;
201:7,23;202:1;
203:12,17,23;204:1,
6,12,19,23;205:2,8,
12,16;206:12,17,21;
207:4,7,10,14,17,20,
24;208:2,12,16;
209:1,4,14,16;210:1,
3,9;211:17,23;
212:10;213:8,11;
214:1,6,15,19,24;
217:9,20;218:8,11,
14,18,24;219:2,15,
18;220:4,7,12,18,24;
221:2,11,20,23;
222:1,6,18,22;223:2,
8,11,14,16,19,22;
224:1,10,14,17,20,
23;225:7,9,11;226:9,
13,20,23;227:1,11,
13;228:7;229:6;
230:19;231:7;
232:25;233:5,11,21,

24;234:2,5,7,9,19,23;
235:1,5,13;236:4,8;
237:19;238:11;
240:15;242:7,10,12,
16;243:18,25;
245:10;246:3,13,19;
247:22;250:16;
251:15,20,23;253:5,
20;254:5,8,25;255:2,
5,12,15;257:4;258:7,
17

**rights (9)**
79:13,16;94:21;
179:13;180:3,7,9,21,
24

**rise (4)**
17:24;170:1;174:3;
198:22

**RMBS (10)**
12:3;33:15;59:20;
70:5;139:1;222:20,
23;223:6,10,18

**road (3)**
173:11;176:5;
191:18

**Robert (3)**
63:16,25;64:2

**robo- (1)**
82:11

**RODE (44)**
14:11;15:7,9,12,12,
21,23;17:20,22;18:1,
3,5,8,11,14,17,22,25;
19:2,5,7,11,19,25;
20:2,6,12,18,21;21:7,
11,12,16,20,23,24;
96:3,8,8,10,15,18;
257:16,18

**R-O-D-E (1)**
96:8

**Rode's (1)**
20:20

**role (4)**
151:7;160:12;
191:2,4

**roles (1)**
124:13

**roll (1)**
173:13

**Roman (1)**
174:8

**Romanette (1)**
216:10

**RONALD (3)**
5:25;76:11,19

**room (1)**
59:1

**ROPES (1)**
11:2

**Roseland (1)**
10:13

**ROSS (2)**
11:7;12:8

**ROTH (1)**
13:19

**rough (1)**
114:22

**roughly (4)**
104:2,5;146:9;
233:19

**round (1)**
124:21

**row (5)**
239:9,12,13;
245:11,12

**rule (3)**
38:21;47:17;157:9

**ruled (3)**
23:16;138:25;
233:17

**Rules (2)**
112:14;191:17

**ruling (5)**
34:2;99:9;159:22;
162:20;163:3

**rulings (2)**
85:22;233:10

**run (9)**
119:25;137:5;
150:13;161:4;198:9,
19;234:22;236:14;
257:4

**running (4)**
131:13;226:16;
231:12;253:7

**run-through (1)**
221:13

## S

**S-1 (1)**
89:6

**sake (1)**
245:16

**sale (2)**
132:6;163:6

**sales (1)**
108:18

**same (28)**
17:3,12;21:8;32:2,
11,12;33:6;65:11;
67:4;89:21;90:14;
92:14;99:24;117:17,
19;118:23;129:22,
23;137:5;149:24;
157:2;184:11;214:3;
217:4;233:5;237:2,
12;255:20

**sample (1)**
33:14

**SANDLER (1)**
10:10

**Sarah (1)**
42:10

**satisfaction (1)**
51:11

**satisfied (1)**
16:7

**satisfy (2)**
79:25;185:21

**saw (4)**
50:11;53:10;
142:19;171:6

**saying (4)**
33:3;148:6;251:20;
254:18

**scenario (27)**
223:13;224:13,16;
226:16;235:17,21;
236:17,18;239:24;
240:6,9,19;241:22,
23;242:3,5,6;245:12,
15;246:1,4;253:7,13,
25;254:1,2;255:13

**scenarios (14)**
119:25;225:9,11;
231:12;234:17,21,24;
235:3;240:5;243:2,4,
5;244:11,12

**SCHAEFFER (1)**
153:14

**SCHAFFER (14)**
8:23;92:4,7,8;
94:25;151:4,5;
152:24;190:22,23;
192:2,6;194:10,22

**Schedule (11)**
177:18,23;178:7;
179:11,12,13;180:1;
208:4,7;252:25;
253:3

**scheduled (3)**
247:3,3;253:3

**schedules (14)**
107:13,18;108:7,8,
14;144:13;177:11;
178:1;180:21;208:3,
4,12,14;248:10

**SCHROCK (1)**
7:7

**SCHULTE (1)**
13:19

**Scott (6)**
60:21,25;61:2,17,
18;62:24

**Scott's (3)**
61:13;62:19;63:8

**screen (1)**
205:18

**scrolling (1)**
256:13

**scrutinizing (1)**
35:23

**Se (2)**
14:12;33:2

**seat (5)**
24:23;29:1;35:14;
78:8;204:9

**seated (4)**

15:2;59:14;147:12;
198:23

**second (41)**
22:10;36:21;37:4,
20;45:3;46:2,14;
47:9;48:9;49:8;
53:13;77:7,11;82:23;
98:4,24;103:9;
106:11,18;107:7;
108:25;113:4,5,24;
118:14;121:15;
155:8;156:20,24;
159:4;164:4,8;176:4;
177:8;205:20,24;
206:1,9;221:12;
228:19;248:20

**Section (10)**
51:8;54:18;58:8;
163:5;228:1,11;
229:5,22;232:8,9

**Secured (45)**
7:19;8:3,11;40:14;
43:10;51:9,10;53:3;
92:14,15,15;103:24;
106:20;110:14;
126:15,18,25;151:8,
13;177:5;188:16,18,
24;189:4,18;190:1;
191:3,9;192:13;
228:23;229:1;233:6;
234:18;237:7,17;
240:10,19,22,22,23,
24;241:23;242:5;
245:8,9

**securities (4)**
17:16;32:6;75:3;
187:9

**securitization (2)**
33:15;126:3

**securitizations (1)**
33:15

**security (10)**
111:13,14;141:10;
163:8,23;164:6;
170:17;184:20;
191:16;228:25

**Sedrish (1)**
132:24

**seeing (2)**
185:22;213:6

**seek (3)**
152:20;172:24,25;
182:1;194:16

**seeking (4)**
93:23;130:8,16;
137:11

**seem (3)**
95:6;164:9;170:13

**seemed (4)**
23:3;163:3;164:2;
185:3

**seems (2)**
16:19,24

**seize (2)**
79:13,21

**select (1)**
172:20

**sending (1)**
256:7

**sends (1)**
131:8

**senior (6)**
16:18,20;82:21;
126:11,13,14

**sense (6)**
31:22;35:18;91:21;
173:9;184:23;186:6

**sensitive (1)**
245:2

**sensitivities (1)**
120:9

**sensitivity (5)**
119:25;120:19,22,
23;243:20

**sent (2)**
53:11;206:16

**sentence (12)**
51:16,24;123:2,10;
135:12;214:9;
215:11,12,15;226:17,
21;228:19

**sentences (1)**
214:13

**separate (7)**
30:13;37:16;80:9;
93:22;141:9,9,12

**separately (1)**
109:9

**September (4)**
81:1;82:6;109:23;
115:20

**sequence (1)**
31:14

**sequencing (1)**
145:24

**Serberse (1)**
13:20

**series (6)**
59:19;60:18;
153:20;156:11,14;
201:12

**serious (2)**
18:14;79:9

**seriously (1)**
207:5

**served (2)**
104:23;202:11

**service (1)**
17:14

**services (5)**
104:10,12,15;
106:15;213:23

**servicing (3)**
79:13,16;83:1

**serving (1)**
151:17

12-12020-mg    Doc 5972    Filed 11/21/13    Entered 11/27/13 14:12:35    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
Case No. 12-12020-mg                    Pg 292 of 300                    November 20, 2013

**sessions (5)**
  45:16;124:16;
  126:19;127:3;128:20
**set (13)**
  37:22,24;49:6;
  67:2;117:2;131:11;
  141:25;146:5;
  148:16;149:14;
  167:1;183:23;201:3
**set-off (1)**
  122:23
**setting (1)**
  217:15
**settle (3)**
  96:13;166:8;222:4
**settled (4)**
  86:12,17;131:23;
  222:20
**Settlement (98)**
  3:13;13:3;41:22;
  44:25;45:19;56:21;
  57:6;75:4,4,8,9;
  82:16,17;83:23,25;
  84:2,15,18,19;86:13,
  17;88:13;90:22;
  112:14,16;113:3,8,
  10,13,14;114:10;
  116:9;117:25;119:8;
  124:7;127:22;130:5;
  132:18;136:18;
  139:10,13,24;143:21;
  144:1;145:8,10,19;
  146:13;150:5;155:1;
  168:25;173:4;
  175:21;176:9,21,23,
  24;179:25;181:13;
  184:12;186:9;214:8;
  215:14,20;216:14;
  217:8,11;219:18,19,
  20;220:1,3,6,17,21;
  222:10,25;223:6,14,
  24;224:5,14,17;
  225:3,15,24;235:5,
  17,21;236:19;237:5,
  6,22;239:9,10,14,20;
  243:7
**settlements (2)**
  75:5,7
**settling (1)**
  217:23
**seven (1)**
  252:15
**several (4)**
  114:3;126:5;
  175:22;257:19
**SEWARD (2)**
  12:2;71:9
**shall (4)**
  51:10;58:10;
  148:22,25
**shape (1)**
  162:20
**share (3)**

  51:12;82:16;
  250:25
**shared (1)**
  75:11
**sharing (4)**
  44:3;214:8;215:14,
  21
**sheet (13)**
  50:23,25;79:17;
  105:7,13;146:3,4,8;
  148:1,17,18;149:1;
  150:3
**SHIFER (1)**
  6:12
**shift (1)**
  73:1
**short (5)**
  34:20;197:18;
  253:24,25;258:11
**shortening (1)**
  151:22
**shortly (1)**
  132:4
**show (6)**
  81:21;112:22;
  160:12;229:15;
  230:23;234:17
**showed (4)**
  23:5;81:20;113:22;
  177:16
**showing (1)**
  163:16
**shown (1)**
  30:2
**sic (5)**
  15:23;53:13;72:6;
  76:9;144:22
**side (8)**
  49:22;182:19,19;
  186:23;187:4,22;
  245:18,20
**sides (1)**
  22:19
**SIEGEL (1)**
  9:23
**sign (6)**
  46:8,13;47:2;
  50:12,12;190:17
**signature (3)**
  42:24,25,25
**signed (2)**
  44:23;208:23
**significance (4)**
  100:4,10;101:5;
  161:19
**significant (3)**
  125:11;173:5;
  174:18
**significantly (2)**
  237:14;242:16
**signing (2)**
  48:23;82:12
**silence (1)**

  33:1
**Sillman (7)**
  73:23,23;74:9,10,
  13,16,19
**Sillman's (2)**
  74:1,6
**SILVERMANACAMPORA (2)**
  5:19;257:19
**SILVERSCHOTZ (1)**
  8:24
**similar (3)**
  46:1,10;236:22
**simplistic (1)**
  231:12
**simply (3)**
  49:6;93:15;242:20
**sine (1)**
  84:12
**single (1)**
  33:23
**sit (2)**
  121:2;195:4
**sits (1)**
  73:5
**sitting (5)**
  94:10;129:3,6;
  171:1;258:3
**situations (2)**
  16:10;214:20
**six (5)**
  96:5,5;165:17;
  234:24,25
**sixteen (7)**
  140:4,10,20;141:1;
  142:13;173:12,21
**sixteen-billion-dollar (1)**
  141:25
**size (4)**
  82:17;184:17;
  250:9,10
**skill (1)**
  183:23
**skipping (1)**
  253:25
**slapped (1)**
  82:12
**slide (6)**
  240:5,18;241:21,
  22;242:2;245:4
**slides (3)**
  117:16;232:15,19
**slightly (1)**
  234:4
**Slow (2)**
  27:14;102:13
**small (5)**
  16:13,15;39:3;
  75:2;165:21
**smaller (2)**
  237:18;238:4
**SMITH (3)**
  8:18;92:8;151:5
**smoothly (1)**

  22:5
**smushed (1)**
  250:16
**SOALs (5)**
  207:24;208:2,6,19,
  24
**SOFA (2)**
  208:6,24
**Sohlberg (3)**
  67:16,22,23
**Sohlberg's (2)**
  68:1,25
**sold (2)**
  141:18;142:4
**solicitation (1)**
  216:3
**solicited (1)**
  86:6
**solution (1)**
  16:10
**solvent (1)**
  95:24
**somebody (14)**
  21:10,22;26:13;
  40:6;47:22;58:19;
  97:3;129:11;133:9;
  154:2;158:4;165:10;
  197:1;204:9
**somehow (1)**
  192:12
**someone (1)**
  106:13
**sometime (2)**
  108:20;204:21
**sometimes (1)**
  187:16
**somewhat (1)**
  234:8
**sorry (66)**
  16:13;42:5;53:24;
  54:1,3;73:9,11;78:9;
  87:15;88:23;90:3;
  95:14;97:5,18;
  100:19;101:19;
  102:14;106:7;
  107:16;108:10;
  110:10;112:7;
  116:14,15,21;133:16;
  134:6;135:7;139:21;
  140:18,23,24;148:8;
  162:4;178:16;
  181:17;188:13;
  196:7;202:15;
  205:14;206:1;
  213:17;218:19,21;
  219:23;220:2,9;
  227:11;228:13,14;
  231:14;232:12;
  238:16;239:13,15;
  240:23;241:13,20;
  245:17;246:22;
  252:10,13,20;254:21;
  257:12,13

**sort (9)**
  16:9;31:6;174:7;
  176:3;184:15;242:2
**sorts (1)**
  47:5
**sought (8)**
  129:9;137:14,17;
  138:17,20;139:1,1,23
**sound (2)**
  215:19,21
**source (1)**
  241:22
**South (1)**
  14:4
**space (1)**
  17:7
**spare (3)**
  29:25;30:19;76:25
**speak (4)**
  99:3;161:16;
  168:18;171:16
**SPEAKER (2)**
  96:16,23
**speaking (2)**
  71:9;90:5
**Special (1)**
  5:20
**specific (11)**
  47:1;50:14;102:6;
  181:21;208:25;
  213:6,19;217:19;
  243:16;247:15;
  254:16
**specifically (15)**
  47:1;51:3;55:25;
  86:16;108:4,25;
  149:14;150:8;
  170:22;206:19;
  207:12;208:1,7;
  210:17;254:11
**specifics (2)**
  120:14,17
**speculative (6)**
  183:14;222:18,21;
  223:7,7,25
**speed-read (1)**
  35:25
**spell (3)**
  69:10;100:5;
  124:14
**spends (1)**
  82:21
**split (1)**
  146:22
**sponsored (1)**
  79:5
**sponsors (1)**
  68:13
**sponsor's (1)**
  71:6
**spreadsheet (1)**
  251:21
**spring (1)**

87:4
**staff (3)**
91:13,14;170:20
**stake (1)**
17:3
**stamp (1)**
118:17
**stamping (1)**
249:17
**stand (4)**
32:25;40:11;77:16;
201:3
**standing (1)**
184:19
**standstill (2)**
254:3,17
**start (6)**
111:16;121:19;
123:17;162:18;
173:11;174:8
**started (11)**
36:10,11;45:22;
94:12;111:19;
123:19;135:5;
167:16,19,22;176:5
**starting (4)**
36:25;117:8;
138:23;250:15
**starts (2)**
122:13;228:19
**state (4)**
17:16;18:19;
222:16;231:14
**stated (4)**
130:23;231:9;
237:9;238:7
**statement (30)**
15:6,7,16;26:14,
17;49:20;62:10;93:3;
103:5;114:14;
136:23;145:20;
148:7,13;161:4,11,
12;167:2;180:15;
188:9;195:19,25;
206:4;216:4,5;217:5,
6;235:16;251:2,9
**statements (3)**
62:11;229:16;
257:20
**States (10)**
2:14;5:9,10;51:7;
183:21;209:21;
215:12,13;216:10;
226:19
**static (2)**
242:4,10
**stating (3)**
214:21;230:21;
233:6
**status (2)**
18:9;251:10
**stay (6)**
18:19;20:5,9,16;

242:10;257:22
**stayed (1)**
17:5
**staying (1)**
21:11
**STEEN (1)**
12:13
**Steering (1)**
11:3
**step (2)**
83:11;147:8
**STEPHEN (1)**
6:10
**steps (1)**
164:2
**still (13)**
18:6;78:17;91:17;
103:16,17;147:14;
176:20;197:2;
232:11,12;246:10;
255:4;257:9
**stipulation (7)**
24:10;25:19,23;
59:21,23;60:12;
154:1
**STN (2)**
137:11;138:24
**stop (8)**
15:22;164:15;
169:13,13;192:19;
213:15;252:8;256:22
**straight (1)**
244:20
**strategic (2)**
188:19;189:19
**strategies (1)**
121:22
**STRAWN (2)**
10:18;95:9
**straws (1)**
91:25
**Street (9)**
3:22;5:12;6:17;7:4,
12;8:4;10:3;11:4;
13:13
**strength (1)**
187:13
**strengths (4)**
187:18,25;188:1,3
**strictly (1)**
148:23
**strike (6)**
27:22;99:20;
131:19;138:8;
139:19;156:12
**struck (2)**
219:18;220:3
**structure (2)**
254:10,10
**structured (1)**
51:24
**struggled (1)**
51:18

**studied (1)**
87:7
**stuff (5)**
35:23;42:20;
117:20;147:9;216:20
**subject (28)**
59:22;73:3;99:19,
21;100:3,8;117:16,
18;118:23,24;122:23,
23;142:24;146:2;
148:24;149:10,22;
150:12,16;163:25;
168:14,17;188:6;
196:10;222:21;
223:8,25;224:3
**subjected (1)**
253:9
**subjects (1)**
176:16
**submitted (13)**
64:22,23;65:4;
143:15;161:3;227:8,
12,21;229:25;230:3,
5;247:4,5
**subordinate (2)**
254:2;255:9
**subordinated (1)**
122:23
**subrogation (1)**
140:3
**subscribing (1)**
146:13
**subsequent (1)**
212:16
**subsequently (2)**
141:18;142:3
**subsidiaries (1)**
142:17
**substance (3)**
85:21;217:14,22
**substantial (1)**
79:16
**substantially (3)**
46:13,24;47:5
**successful (1)**
138:23
**successor (1)**
95:12
**sue (4)**
152:9,12;193:4;
195:3
**sued (4)**
125:17,20;184:18,
21
**sufficient (5)**
56:15;118:2;
163:23;185:18;
193:13
**suggest (3)**
114:9;172:13;
201:13
**suggesting (3)**
221:22,24;253:20

**suggestion (1)**
49:21
**suing (1)**
125:22
**suit (2)**
16:19;192:10
**Suite (3)**
3:22;5:13,22
**sum (1)**
185:19
**summary (6)**
89:12;228:2,5;
229:23;232:9;252:1
**summer (9)**
40:18;108:20;
122:20;123:19;
132:4,13;135:5;
136:22;157:20
**sunlight (3)**
44:6,14;46:11
**SUNs (1)**
242:10
**supplemental (7)**
146:2,4,8;148:17,
18,25;150:3
**support (43)**
25:2,9;28:19;35:1,
8;38:10;60:22;61:14;
63:13,20;65:19;66:2;
67:13;69:6,23;70:2;
71:19;73:22;76:11;
84:2;90:18;97:7,14;
105:8,12,19,19,23,
25;106:5;110:20;
132:8;158:9,15;
188:20,21;190:2,4;
199:1,9;203:4,10;
251:2
**sure (68)**
16:7;19:17;20:9;
21:2,6;24:4;30:17,
24;31:5,15;47:7;
50:13;58:23;62:17;
77:9;92:5;102:7;
108:24;112:7,18;
114:14;118:1;
119:14;123:22;
126:8;129:11;130:2;
133:1;134:6;136:19;
143:4;149:13;
169:12;172:4;
173:19;178:4;180:4;
182:8,13;183:6,24;
187:5,8;195:20;
200:5;201:14;207:6;
210:19;217:25;
218:15;226:2,2;
228:17;229:10,11,18,
18;230:1;232:1;
235:9;241:16;
244:23;248:6;249:2,
25;250:9,25;251:8
**surprised (2)**

190:7;253:19
**surrounded (1)**
15:17
**surrounding (1)**
143:22
**sustain (8)**
53:25;118:2,18;
170:2;192:15;197:2;
216:22;217:3
**Sustained (37)**
53:21;54:12,24;
80:23;83:22;85:18;
86:8;89:24;90:11;
91:3,7;94:4,20,24;
96:17;115:4,24,25;
116:8,10;118:11;
133:23;138:13;
146:25;152:11,15;
153:5;169:11,13;
180:13;193:7,17;
196:4;197:12;
213:13;234:11;244:2
**sustaining (4)**
86:1;119:17;196:9,
25
**sweep (1)**
163:23
**sweeping (1)**
90:16
**swept (2)**
211:7;212:1
**switched (3)**
81:5,9,16
**sworn (9)**
24:20,21,22;28:24,
25;35:11,13;77:23;
78:6,7;103:7,8;165:7,
9;204:5,7,8
**syntax (1)**
51:18
**system (11)**
211:6,17,23;212:1,
5,9;214:1,11,18,24;
215:7
**systems (1)**
214:15

**T**

**tab (12)**
55:16;81:5,14;
121:8;133:4;177:9;
205:20,24;206:1;
209:10;228:13;
229:12
**table (4)**
129:3,6;150:4;
244:19
**tables (1)**
75:9
**tabs (3)**
121:10;147:24;
209:9

**tabulation (1)**
26:1
**tactical (1)**
49:22
**Talasso (1)**
256:2
**talk (8)**
21:15,17,18,22;
137:1;145:19;
181:11;230:24
**talked (2)**
56:6;225:8
**talking (14)**
82:10;87:1;125:14;
128:4;133:3,6;
142:11;149:19;
187:24;246:12;
253:11,13;255:15;
258:4
**taller (1)**
165:23
**Talrico (4)**
208:11,15,25;
209:4
**Tammy (2)**
43:2;170:24
**tangential (1)**
254:9
**Tara (1)**
204:15
**targeted (1)**
206:19
**targeting (1)**
251:11
**task (2)**
29:25;207:5
**tasked (1)**
204:21
**tasks (2)**
115:9,12
**tax (12)**
56:6,10,13,24,24;
57:3,3,7;182:15;
214:8;215:14,20
**taxes (4)**
57:2;214:8;215:14,
20
**taxpayer (1)**
96:6
**team (1)**
184:4
**technical (1)**
146:3
**technicalities (1)**
17:24
**tee (1)**
157:7
**telephone (2)**
19:18,22
**TELEPHONICALLY (3)**
13:24;14:8;19:5
**telling (3)**
43:22;92:21;198:8

**tells (1)**
185:6
**temporary (1)**
104:12
**ten (11)**
33:12;59:12;104:7;
124:23;146:9;147:3,
5;148:18;150:18;
173:7,14
**ten-minute (1)**
59:8
**tens (3)**
172:21;175:24;
213:3
**tenure (1)**
167:25
**term (12)**
50:23,25;105:7,12;
146:3,4,8;148:1,17,
18,25;150:3
**terminology (1)**
231:10
**terms (10)**
49:4;59:22;86:18;
131:17;145:17;
167:5;169:23;
185:12;212:6;213:5
**terrific (1)**
170:3
**tested (1)**
163:22
**testified (10)**
130:3;136:21;
140:13;145:1;
170:23;175:18;
177:2;194:15;
222:11,12
**testify (34)**
25:7,7;35:6,6;61:2,
2;63:18,18;65:25,25;
70:12,12;71:25;72:1;
76:13,14;77:15,16;
97:12,12;98:9;
158:13,13;164:25;
166:11,21,24;167:13;
199:6,7;201:3;203:8,
8;247:5
**testifying (6)**
81:22,24;194:6,6,
7;227:6
**testimony (194)**
22:12,14,15,17,17;
23:6,11,17;24:11;
25:9,15;27:1,5,25;
29:4,6,8,10,12,15;
30:16;35:3,7;36:3;
37:23;38:21,23;
39:19;46:12;51:20;
53:17;56:16;60:25;
61:3,14,16,18,22;
62:3,5,6,8,11,20,22;
63:8,13,16,19,20,25;
64:2,5;65:11,13,21;

66:1,2,6,9,11;67:9,
16,21,23;68:1,25;
69:8,17,18,21;70:15,
18,21;71:22;72:1,3,5,
8,11,23;73:24;74:1,4,
6,8,10,25;75:7,14,16,
22,23,25;76:10,12,
14,17,19;77:2,13,24;
78:1,3;93:3;96:25;
97:10,13,22;99:12;
101:7;102:1,8,24;
104:6;106:1;107:10;
121:9;128:15;
139:18,20,21;145:22;
146:5;148:4;154:14;
155:18,21;158:11,14,
15,19;159:5,20;
160:1,21;161:9,24;
163:18;164:17;
175:21;189:7;
196:11,19;197:9,13;
199:3,7,8,13,15;
200:10,24;201:3,8;
203:6,9,10,17,19;
213:3;227:12,13;
228:2,4,10,11,14,18;
229:17;230:3,7,12,
18,22;231:6,13,16;
232:9,16,22,23;
234:17;236:25;
245:2,15;246:2;
247:2;253:1,13,22;
254:1,22;255:11
**testing (1)**
249:7
**Texas (3)**
15:13;17:22;19:21
**thankful (1)**
198:7
**Thanks (1)**
196:15
**that'll (2)**
38:7;202:23
**That's' (1)**
65:6
**theoretically (1)**
83:12
**theories (1)**
88:17
**there'd (1)**
22:20
**therefore (9)**
25:8;35:7;38:1;
61:13;63:19;66:1;
97:14;158:14;199:8
**THERESA (1)**
5:6
**thinking (4)**
164:23;185:12;
186:5,10
**Third (25)**
11:21;13:4,21;
82:24;84:11;107:1;

123:1;130:4;148:14;
155:8;164:5,10;
178:22;183:16;
209:10;218:23;
219:14;221:13;
222:5;239:9,12,12,
13,16;247:23
**third-party (5)**
84:4;88:19;132:10;
223:21;225:14
**thirty (2)**
104:2;139:7
**thirty-four (1)**
21:8
**THOMAS (9)**
12:8;14:8;34:25;
35:3;38:22,23;69:8,
18,21
**Thompson (6)**
198:3;199:4,6,14,
15,20
**Thompson's (1)**
200:10
**though (9)**
19:11;38:19;39:2;
40:5;112:11;176:15;
240:25;253:4;254:16
**thought (52)**
41:17;57:3;87:7,
24;91:24,25;96:18;
98:17;100:23;
116:21;132:3;
135:10;136:22;
153:24;162:25;
168:16,24;169:19,23;
170:11,13;171:17,19,
20;175:18;176:22,
25;180:17,20;182:10,
18;183:14;186:5,12,
13;190:8;206:20,24;
207:1;209:3;218:1;
221:7;222:14;224:9,
11;226:7;230:9;
235:8;244:8,9,10,14
**thousands (4)**
172:21;175:24;
213:3;238:9
**threatened (1)**
192:10
**three (16)**
64:21;72:17;
139:16;150:9;164:2;
168:4;174:20;198:6,
7;210:18;227:10;
252:3,5,7,13;255:14
**three-quarters (1)**
58:4
**throughout (5)**
46:4;84:6,8;212:9;
234:3
**Thursday (2)**
132:23;133:11
**thus (1)**

188:20
**tight (2)**
24:19;195:7
**timed (1)**
131:15
**times (7)**
50:5;104:2,5,7;
198:6;250:12;251:15
**Tirschwell (1)**
42:10
**title (4)**
40:24;105:2;146:3;
249:19
**titled (7)**
228:14;229:23;
231:15;232:8,9;
238:14;239:13
**titles (1)**
250:17
**today (10)**
21:11;31:19;34:6;
62:9;84:24;85:1;
93:3;171:1;202:12;
221:25
**Todd (2)**
156:22;256:7
**together (10)**
114:25;129:8;
145:12;172:17,18;
179:6;208:12;
209:13;210:11;
230:20
**told (3)**
19:8;114:16;209:4
**TOLLES (1)**
14:2
**tomorrow (3)**
62:9;258:9,15
**tonight (3)**
201:14;202:17,24
**took (12)**
54:16;91:9;167:22;
168:12,12;176:16;
181:1,23;183:22;
207:5;257:23
**top (10)**
57:24;173:7;
178:10,12,18;206:9;
216:8;221:6;252:14;
256:1
**topic (2)**
52:8;86:16
**TORRES (1)**
8:10
**tort (1)**
183:10
**total (3)**
178:24;227:10;
245:7
**totally (1)**
93:15
**touch (1)**
99:18

**touched (1)**
89:15
**toward (1)**
206:19
**towards (3)**
156:3;228:15;
248:17
**track (2)**
27:16;202:21
**trade (4)**
44:15,20,24;45:2
**trading (4)**
42:15;44:2;46:11;
189:11
**train (2)**
83:9,11
**transaction (3)**
210:21;215:21,22
**transactions (13)**
108:5;141:7,8,13;
144:5,11,15;171:15;
205:7;209:14;
211:20;213:4,8
**Transcribed (1)**
3:20
**transcript (15)**
74:22;112:22;
114:18;133:1,2,4,5,
11;134:19;153:21;
154:3,5;197:1,3;
241:17
**transfer (4)**
90:9,24;142:22;
174:1
**transmitted (1)**
100:10
**treasurer (2)**
80:14,15
**treat (3)**
144:8;180:9,10
**treated (4)**
52:15;144:7;
163:21;237:19
**treating (1)**
124:2
**treatment (7)**
108:7,13;109:24;
114:1;139:25;157:5;
166:19
**tremendous (5)**
108:17;120:12;
129:4;144:23;213:5
**TRIAL (20)**
3:4,8;28:22;31:18;
32:22;36:9;62:21;
64:7;68:3;70:22;
72:13;99:7,10;128:7;
131:15;139:1;160:2;
162:20;163:2;186:14
**trials (1)**
31:5
**tried (1)**
195:9

**trouble (1)**
116:23
**true (10)**
49:24;79:23;80:17;
111:21;123:7;
128:15;133:24;
134:8;180:16;214:3
**Trust (2)**
12:14;21:4;70:5;
149:23
**Trustee (9)**
3:7;5:10;11:12;
12:3;59:4;68:16;
126:14;166:3;213:23
**trustees (6)**
59:20,20,21;60:6,
13,18
**truth (11)**
32:8;39:10,13;
92:21;101:5;160:5,
11,19;161:14,15;
242:21
**try (17)**
22:7;23:23;30:20;
48:22;58:22;73:18;
96:20;138:5;152:24;
175:15,25;183:15,19,
21;191:1;220:20;
224:3
**trying (19)**
22:4;54:18;82:1;
110:15,18;111:5;
114:7;133:20;
134:16,16;135:17;
136:18;145:12;
164:22;176:9;
202:21;214:25;
232:1;254:12
**tumultuous (1)**
251:15
**turn (14)**
43:19;156:1,17;
188:9;209:6,18;
216:2,8;229:8;
232:20;238:12;
239:23;248:15;
255:18
**turning (5)**
228:10;245:14;
252:3;253:25;256:13
**TWEED (10)**
7:18;8:2;38:16;
40:14;77:21;78:10;
99:15;127:15;166:2;
204:15
**twelve (2)**
75:5;233:19
**twenty (4)**
32:18;104:2;139:7;
159:16
**twenty-five (1)**
32:18
**twenty-five-billion-dollar (1)**

82:13
**twenty-seven (1)**
233:3
**two (33)**
19:11;22:2;34:4,
20,20;65:3;73:2;
95:19;99:10,13;
100:22;112:18;
121:10;124:13;
125:10;155:18,21;
160:4;168:4;173:17;
186:13;211:1;
214:13;225:5;227:8,
17;228:10;231:5,22;
233:1;243:1;250:17;
257:20
**type (7)**
46:8,9,25;138:2;
160:12;182:3;213:20
**typed (1)**
33:7
**types (2)**
122:4,7
**typical (1)**
144:12
**typically (1)**
19:21

## U

**UCC (1)**
250:18
**ultimately (5)**
50:12;130:17;
139:9;192:22;212:12
**Um (1)**
18:1
**UMB (2)**
3:3,7
**umbrella (1)**
141:20
**Um-hum (1)**
177:14
**uncertain (4)**
222:18,21;223:8;
224:1
**unclear (1)**
196:7
**under (39)**
26:5;84:3;91:10;
112:14;115:14;
140:2;141:19,20;
147:14;148:13;
152:25;157:6;164:6;
166:19;174:10;
184:19;185:19;
193:18;194:12;
209:22;210:21,22;
214:8;215:14,20;
216:17;220:11;
224:17,25;240:9,19;
241:22,23;242:5,6;
243:3,4;253:14;

257:23
**underlying (2)**
32:6;213:8
**underscore (2)**
250:19,19
**undersecured (2)**
153:2;194:21
**understandable (1)**
18:22
**understood (15)**
44:8,14;50:17;
54:20;79:5;86:2,10,
22;124:2;127:22;
135:2;157:20;
167:20;205:10;220:9
**undertake (1)**
187:22
**undertook (2)**
172:15;181:20
**underway (1)**
251:14
**unfortunately (3)**
137:4;178:11;
238:8
**UNIDENTIFIED (2)**
96:16,23
**Union (1)**
126:6
**United (4)**
2:14;5:9,10;183:21
**unjustly (1)**
17:11
**Unless (3)**
51:9;58:20;153:7
**unofficial (2)**
60:23;76:9
**Unsecured (32)**
3:3;15:14;21:2,7;
25:3;26:3;35:2;
51:13;60:24;63:15;
65:20;67:15;69:7;
70:3;71:21;77:12;
97:9;104:24;105:4;
109:10;126:11,13,14;
137:25;158:10;
194:19;199:2;
200:24;203:5;217:8;
218:4;242:9
**unsecureds (1)**
242:12
**unsecureds' (1)**
120:1
**up (60)**
15:8;16:1;22:22;
24:4,24;25:21;28:21,
24;35:18;36:8;40:6;
58:19;60:14;66:22;
73:2;74:12;75:9;
77:22;84:22;85:25;
86:1;88:3,4;91:22;
92:3,5;119:10;121:5;
132:16;134:3,12;
135:9;138:22;

144:24;146:22;
155:6;156:18;157:7;
158:4;159:2;161:2;
165:5,11,15;167:15;
185:7;190:17;195:3;
198:5;204:2,5,6;
212:14;222:9,13;
241:12;249:21;
250:16;254:10;
257:16
**update (1)**
251:10
**updated (3)**
233:7,9,10
**upheld (1)**
85:11
**upon (4)**
143:5;171:16,18;
186:3
**upstairs (2)**
45:23;59:4
**upstream (1)**
211:7
**upward (1)**
234:4
**USA (1)**
11:12
**use (12)**
51:18;55:20,22;
58:20;82:2;112:4,10;
113:2;119:17;
147:23;163:6;255:16
**used (2)**
221:8;222:7
**useful (1)**
163:1
**using (2)**
231:10;243:6
**usual (1)**
17:6
**usually (1)**
170:13
**UZZI (1)**
7:23
**Uzzi's (1)**
137:9

## V

**vacuum (1)**
173:25
**valid (13)**
91:18;138:2;
157:16;164:3;
179:15;181:2;
235:12;236:3;
239:25;240:6;
254:14,15;255:4
**validity (4)**
157:12,16;173:18;
242:15
**valuable (1)**
177:5

**valuation (5)**
218:18,22;219:1,
13,17
**value (47)**
55:2;85:5,11;
94:22;132:2,17;
134:4,12;135:10;
136:12;137:24;
138:5;140:22;141:2;
145:9,11;154:24;
155:6;164:11;170:7,
18;172:16;173:4,23;
176:14,18;181:21;
182:1,14;183:9;
184:3,10;186:14;
221:20,22,25;222:3;
223:10,14;224:6,14,
17,18;227:3;228:23;
235:4;243:24
**valued (4)**
16:19;218:7;
223:13;224:14
**values (8)**
133:25;134:9;
135:15;149:23;
155:3;183:23,25;
184:1
**variables (7)**
222:18,22;223:8;
224:1,3;235:18;
237:21
**variance (1)**
233:1
**Varick (1)**
5:12
**variety (3)**
120:15;135:14;
174:14
**various (35)**
104:16;106:3;
108:21,22;110:2,16,
22;119:25;120:5,6;
122:4;123:10,12,17;
126:18;132:2,12;
133:25;134:4,9,13;
135:4,11;139:14,15;
146:12,15;155:3,7;
157:5;174:4;191:16;
210:16;242:3;245:6
**veil (5)**
87:20;88:7,16;
89:16;182:4
**verbatim (1)**
134:23
**version (2)**
197:6;216:3
**versions (1)**
161:10
**versus (2)**
142:18;212:12
**VICENTE (1)**
13:16
**view (15)**

41:21,21;42:1;
51:16;137:25;
168:12,12,19;171:9,
13,21,23;176:13,20;
186:2
**viewed (3)**
56:25;157:16;
171:3
**views (2)**
168:3;174:5
**vindicated (1)**
89:17
**violate (1)**
82:18
**violating (1)**
150:21
**virtually (1)**
233:5
**vis-a-vis (3)**
86:20;90:20;
182:12
**Vitro (1)**
130:6
**voice (1)**
241:12
**voir (1)**
117:24
**volume (2)**
38:3;159:5
**voted (1)**
185:5
**votes (1)**
26:1

## W

**Wachovia (2)**
10:19;95:12
**wait (8)**
22:18,19;47:17;
73:15;90:4;103:18;
159:9;238:15
**waiting (1)**
257:9
**waive (5)**
144:21;166:8;
168:24;169:2,20
**waived (3)**
140:5;143:23;
176:20
**waiver (2)**
140:10;237:8
**waivers (1)**
145:2
**WALPER (1)**
14:8
**WaMu (1)**
75:8
**wants (3)**
36:6;134:24;
182:25
**warranty (2)**
88:24;89:2

**Warren (1)**
93:12
**Washington (3)**
7:13;8:5;13:14
**Waste (1)**
154:21
**wasting (1)**
192:19
**water (5)**
40:3,10;165:11;
204:10,10
**waterfall (7)**
109:19,20,21;
236:4;239:6;243:6,
23
**way (35)**
19:20;20:25;24:14;
41:22;45:25;51:22,
24;52:5;58:4;61:11;
85:7;89:21;93:11,13;
103:11;125:20;
134:19;135:24;
137:10;138:22;
141:24;155:14;
178:22;180:9;185:3;
186:16;201:23;
202:5;208:19,24;
214:20;231:9,15;
239:16;244:17
**ways (1)**
31:10
**weak (1)**
88:21
**weaknesses (4)**
187:18,25;188:1,3
**week (1)**
19:14
**weekly (1)**
120:15
**weeks (2)**
114:3;168:4
**weigh (1)**
214:13
**welcome (1)**
28:11
**Wells (42)**
8:19;9:2;37:15;
68:15;92:9,10,17;
93:17,21,24;94:1;
95:10;151:6,7,12,15,
20,23;152:2,6,9,12,
17;153:10,12;
190:24;191:2,7,9,13,
20;192:9,18,22;
193:2,5,8,14,22;
194:2,12;195:3
**Wendy (1)**
128:22
**weren't (19)**
20:10;73:18;85:15;
98:18;141:15;
143:11;144:3,6,7;
208:10;215:2;

218:17,17,22;219:1,
13,17,25;222:20
**West (1)**
3:22
**Westman (8)**
170:24;206:10,17;
207:12;248:22;
251:9,20;252:22
**Westman's (1)**
250:14
**WFBNA (1)**
10:19
**what's (15)**
27:16,17;32:25;
35:7;46:1;82:10;
97:3;109:13;136:9;
154:5;163:7;213:2;
231:9;241:10;257:17
**Whereupon (1)**
258:20
**White (1)**
127:17
**Whitlinger (6)**
52:9,14,23;53:6,
11;170:25
**whole (2)**
105:22;172:20
**who's (1)**
82:20
**wide (1)**
82:16
**wildest (1)**
88:2
**William (4)**
199:3,14,15;
256:17
**willing (3)**
84:14;130:13;
131:4
**Wilmington (1)**
12:14
**wind (2)**
85:25;86:1
**wind-down (1)**
149:11
**WINSTON (2)**
10:18;95:9
**winter (1)**
87:3
**wish (8)**
34:16;74:15;76:2,
22;118:4;195:12;
199:19,21
**withdraw (1)**
90:18
**withhold (1)**
159:21
**within (5)**
113:23;163:23;
183:5;248:10;254:10
**without (12)**
17:23;21:19;30:15;
65:11;67:8;68:23;

79:21;150:21;
201:17;213:4;222:5;
236:7
**witness (126)**
21:25;22:3,5;
23:17,25;24:22;
26:14,16;28:7,11,19,
25;34:19,24;35:13;
36:5;40:4,8,11;
47:18;49:20,25;50:4;
53:24;54:1,3;58:18;
62:10;73:2,7,22,24;
74:24,25;78:7;81:8;
86:16;90:6;93:3;
96:4,19;97:1;102:8;
103:5,8;113:22;
116:21;117:2,4,24;
118:4,7,12,19,21,22;
121:16;133:7;
134:21,25;135:13;
136:5;137:7;145:16,
20;147:8,15;148:7;
150:20;153:21;
155:18;158:1,3;
162:20;165:9,12,23;
178:13,15,17;188:9;
192:17;194:6;
195:17,18,20,25;
197:19;198:2,4;
203:15;204:8,11;
205:15;210:2;
216:16;217:16,24;
219:11,23;221:9,15;
228:1,4;233:16,18;
235:14;236:16;
237:4,13;240:14;
241:4,13,15,18;
242:24;246:19,22;
247:13,18,22;248:2,
5;250:12;258:10,11
**witnesses (15)**
50:1;58:22;59:4,
20;62:11;73:19;
195:8;198:5,9,19;
202:10,22;257:5;
258:13,14
**Wolicki (1)**
3:20
**won (1)**
152:22
**wonderful (2)**
17:2;137:6
**word (1)**
217:25
**words (5)**
49:12;54:17;
146:20;217:14,22
**work (24)**
22:7,8;23:12,22;
34:7;75:3,3;104:8;
108:17;120:4;
132:15;134:1,2,10,
11;136:19;137:5;

140:15;143:5;155:4,
5;205:3;230:20;
258:12
**worked (3)**
32:3;49:2;198:4
**working (5)**
115:14;167:16,19;
207:13;250:22
**works (2)**
31:10;174:24
**world (3)**
186:2;225:6;
231:12
**worth (7)**
79:2,7,10,25;83:3,
13;174:13
**write (2)**
84:15;256:18
**writes (2)**
82:24;109:8
**writing (2)**
109:4;148:23
**written (28)**
25:8;35:7,8;38:3,
10;49:16;51:16,22;
61:3,22;63:19,20;
66:1,2;72:1;77:13;
97:13,14;158:14,15;
199:7,8;201:3,24;
203:9,10;230:15;
252:2
**wrong (2)**
175:12;241:20
**wrote (1)**
100:20
**WYNNE (17)**
10:6;98:5,6,6,11,
13,16,22,25;100:2,
11,12,16,19,22;
101:12,15
**Wynne's (1)**
98:4

**Y**

**year (3)**
174:18,21;247:24
**years (9)**
125:19;173:13;
174:12,16;177:20;
184:8,22;185:2;
231:22
**yesterday (10)**
16:4,24;22:4,22;
23:3,9;37:7;75:2;
136:24;163:11
**yield (1)**
150:14
**yielding (1)**
145:21
**York (25)**
2:16,16;3:23;5:4,
14;6:5,19;7:5,21;

8:13,21;9:5,11,13,19,
21;10:4,21;11:14,22;
12:5,16;13:6,22;
64:19
**Young (1)**
91:15
**yup (1)**
240:8

**Z**

**ZABEL (1)**
13:19
**zero (9)**
16:25;135:16;
143:20;144:2;145:9;
216:15;217:9,15,23
**ZIDE (1)**
6:10
**Zorro (3)**
42:6;55:14;128:21

**0**

**02199 (1)**
11:5
**02-29-12v1' (1)**
250:21
**07068 (1)**
10:13

**1**

**1 (20)**
36:4,11,11,25;37:1,
1;49:17;152:22;
162:9;178:8,8,9,9,11,
11;210:21;229:1,14;
233:11,13
**1,251,521,437 (1)**
252:19
**1,252 (1)**
211:15
**1,955 (1)**
211:3
**1.1 (1)**
79:19
**1.9 (1)**
233:13
**1/31/13 (1)**
243:7
**1:37:10** (1)**
219:6
**10:06 (1)**
59:13
**10:20 (1)**
59:13
**100 (4)**
5:21;240:10,16;
245:7
**10004 (1)**
12:5
**10005 (1)**

7:21
**10006 (1)**
12:16
**10007 (1)**
6:19
**10014 (1)**
5:14
**10016 (1)**
9:5
**10017 (1)**
10:4
**10019 (1)**
8:13
**10020 (1)**
11:14
**10022 (5)**
7:5;8:21;11:22;
13:6,22
**10036 (2)**
6:5;9:13
**10040 (1)**
3:23
**1006 (1)**
5:13
**101 (2)**
5:3;9:20
**10166 (1)**
10:21
**10178 (2)**
5:4;9:21
**1095 (1)**
9:12
**11 (26)**
25:2;26:1;35:1;
50:23;60:23;63:14;
65:19;67:14;69:6;
70:2;71:20;97:8;
141:19;142:4,5,7;
148:2;158:9;184:2;
190:10;199:1;203:4;
215:5;216:4;241:21;
245:4
**1126g (2)**
51:8;58:9
**11753 (1)**
5:23
**1177 (1)**
6:4
**11th (1)**
131:9
**12 (18)**
25:5;29:5;35:4;
58:2;60:25;63:16;
65:22;67:16;69:9;
70:8;71:22;75:1;
97:10;121:19;
158:12;199:4;201:1;
203:7
**12:35 (1)**
147:11
**120 (3)**
16:25;150:3,6
**1200 (1)**

13:13
**12-12020 (1)**
15:4
**12-12020-mg (1)**
3:10
**1221 (1)**
11:13
**12th (2)**
73:25;230:4
**13 (6)**
145:21,25;148:5;
149:6;178:18;250:19
**13-01277-mg (1)**
3:2
**13-01343-mg (1)**
3:6
**132 (6)**
149:15;188:11,14;
195:25;197:11,13
**13th (4)**
146:11;148:22;
150:1,18
**14 (2)**
121:18;228:10
**1429 (1)**
31:14
**143 (1)**
233:14
**145 (4)**
148:10;149:15;
150:4,6
**15 (4)**
133:14,19;134:22;
154:13
**150 (2)**
124:21,22
**1500 (2)**
61:19;62:23
**1501 (3)**
62:24;63:5,9
**1502 (3)**
62:24;63:5,9
**1503 (3)**
62:24;63:5,9
**1504 (3)**
62:24;63:5,10
**1505 (3)**
62:24;63:5,10
**1506 (3)**
62:24;63:5,10
**1507 (3)**
62:24;63:5,10
**1508 (3)**
62:25;63:6,10
**1509 (3)**
62:25;63:6,10
**1510 (3)**
62:25;63:6,10
**1511 (3)**
62:25;63:6,10
**1512 (3)**
62:25;63:6,10
**1513 (3)**

62:25;63:6,10
**1515 (5)**
63:23;64:1,3,21,24
**1516 (4)**
64:7;65:7,8,14
**1517 (4)**
64:7;65:7,8,14
**1518 (7)**
64:7,21;65:1,8,8,
10,14
**1519 (3)**
64:7;65:8,15
**1520 (3)**
64:8;65:8,15
**1521 (3)**
64:8;65:8,15
**1522 (5)**
64:8,22;65:1,10,15
**1523 (3)**
64:8;65:8,15
**1524 (3)**
64:8;65:9,15
**153 (1)**
7:4
**1530 (2)**
65:23;66:10
**1531 (3)**
66:14;67:6,10
**1532 (3)**
66:14;67:6,10
**1533 (5)**
66:14,18;67:3,7,10
**1534 (3)**
66:14;67:6,11
**1535 (3)**
66:15;67:7,11
**1545 (3)**
67:18,22,24
**1546 (3)**
68:4,21;69:1
**1547 (3)**
68:4,21;69:1
**1548 (3)**
68:4,21;69:2
**1549 (3)**
68:4,21;69:2
**1550 (3)**
68:4,22;69:2
**1551 (3)**
68:4,22;69:2
**1552 (3)**
68:4,22;69:2
**1553 (3)**
68:4,22;69:2
**1554 (5)**
68:4,7,20,23;69:2
**1555 (4)**
68:4,12,22;69:2
**1556 (3)**
68:5,22;69:2
**1557 (3)**
68:5,22;69:2
**1560 (2)**

69:15,22
**1575 (1)**
69:19
**1580 (3)**
70:10,16,19
**1581 (3)**
70:23;71:14,17
**1582 (4)**
70:23;71:2,13,17
**1583 (3)**
70:23;71:14,17
**1584 (3)**
70:23;71:14,17
**1585 (3)**
70:23;71:14,18
**1586 (3)**
70:24;71:14,18
**1587 (3)**
70:24;71:14,18
**1588 (3)**
70:24;71:14,18
**1589 (3)**
70:24;71:14,18
**159 (1)**
221:12
**1590 (3)**
70:24;71:15,18
**15th (2)**
9:4;131:9
**16 (2)**
228:3,9
**16.6 (1)**
163:18
**1600 (3)**
71:23;72:7,9
**1600-1 (2)**
72:13,24
**1600-2 (3)**
72:14,21,24
**1600-3 (3)**
72:14,22,25
**1633 (1)**
8:12
**17 (1)**
233:13
**170 (1)**
233:4
**1745 (1)**
233:12
**17th (1)**
256:3
**18 (2)**
44:9,15
**1812 (3)**
55:12,25;56:3
**1850 (1)**
8:4
**18th (1)**
44:24
**19 (3)**
133:19;136:4;
232:21
**192nd (1)**

3:22
**1A (6)**
234:22;245:15;
246:1,4;253:7,13
**1B (1)**
253:25
**1C (2)**
254:1;255:13
**1st (2)**
133:3;230:11

**2**

**2 (19)**
32:22;49:21;50:9;
128:7;147:4;211:11;
227:10,11,11,21;
229:9,12;234:22;
235:17,21;236:17,18;
243:4;250:19
**2.1 (6)**
17:1;145:25;
146:11;181:12;
183:1;225:2
**2.1- (1)**
41:13
**2.15 (2)**
96:13,14
**2.1-billion-dollar (4)**
56:14,15;84:15;
146:22
**2/29/12 (1)**
251:16
**2:02 (1)**
147:11
**20 (2)**
2:18;206:11
**200 (1)**
10:20
**20005 (3)**
7:13;8:5;13:14
**2004 (1)**
132:14
**2005 (2)**
41:3,4
**2008 (4)**
40:19,20;104:16,
18
**2009 (6)**
41:7,8,10;78:18,20,
23
**201 (2)**
5:12;216:8
**2011 (4)**
81:1;82:6;89:10;
204:19
**2012 (40)**
41:3,11;44:9,15,
24;45:5,13;52:25;
53:6,11,18;87:6;
107:13,17,17,21;
108:15;109:23;
111:19;115:20;

119:21;121:21;
122:18,19;123:2,7,
15,20;130:10,13,24;
135:5;157:21;
204:21;206:12;
238:13;242:14;
244:7;245:6;256:18
**2013 (34)**
2:18;25:5;35:4;
40:22;60:25;63:16;
65:22;67:16;69:9;
70:8;71:22;97:10;
123:20,21;130:22;
131:8;133:12;
145:22,25;148:5,22;
149:6;150:19;
158:12;162:9;199:4;
201:1;203:7;209:16,
17;229:14;248:24;
251:7;256:4
**206.5 (2)**
149:20,24
**206.5-million- (1)**
150:14
**20th (1)**
130:9
**21 (2)**
246:5;256:17
**21st (1)**
13:5
**222 (1)**
10:3
**2228 (3)**
240:20,24;241:24
**23 (1)**
254:1
**232 (1)**
214:5
**23rd (2)**
146:12;150:18
**25 (1)**
250:19
**26 (3)**
81:1;245:11,12
**265 (1)**
213:24
**26th (2)**
130:12,24
**28 (3)**
121:20;229:22;
230:15
**29 (1)**
226:18

**3**

**3 (16)**
133:13,19;136:4;
148:11;154:13;
209:24;211:13;
239:24;240:6,19;
241:22,23;242:3,6;
248:24;252:17

**3,334 (2)**
209:24;210:8
**3.334 (2)**
209:20,25
**3.4 (1)**
178:25
**3:09 (1)**
198:21
**3:31 (1)**
198:21
**30 (3)**
139:22;228:18;
229:17
**300 (1)**
5:22
**30b6 (1)**
86:16
**31 (3)**
122:4,12;123:11
**32 (2)**
123:1;229:22
**33 (1)**
221:12
**355 (1)**
14:4
**35th (1)**
14:5
**36 (2)**
232:21,23
**363 (1)**
163:6
**37 (7)**
133:13,14,17;
134:18,20;136:4;
154:13
**3C (1)**
250:20
**3rd (1)**
6:18

**4**

**4 (7)**
43:19;178:18;
209:16,17;211:19;
238:13;245:12
**40 (4)**
245:14,23,24;
246:5
**408 (10)**
112:5,11,14;113:8,
17;117:17,18;
118:24;119:3,5
**41st (1)**
10:3
**42 (1)**
216:8
**430 (2)**
243:8,12
**46 (1)**
254:22
**4th (1)**
251:11

**5**

**5 (7)**
52:25;108:4;
213:22;226:18;
239:6;242:24;252:8
**5/13/2012 (1)**
252:15
**5:02 (1)**
258:20
**50 (2)**
188:11,14
**500 (5)**
29:21,24;36:11,12;
37:1
**51 (1)**
145:19
**52 (2)**
146:6;216:8
**53rd (1)**
7:4
**5675 (1)**
69:14
**5677 (2)**
63:17;64:1
**5680 (2)**
67:17,22
**5682 (2)**
71:23;72:6
**5683 (2)**
61:1,17
**5687 (2)**
70:9,16
**5690 (2)**
65:23;66:7
**5692 (5)**
98:9;99:23;121:8,
13;155:19
**5695 (1)**
77:14
**5697 (4)**
97:11;99:13;
121:11;155:19
**5698 (1)**
200:25
**5699 (3)**
25:5;26:3,21
**5701 (3)**
29:5,9,11
**5703 (2)**
73:25;74:9
**5705 (2)**
35:5;38:22
**5706 (1)**
75:1
**5709 (4)**
158:12;197:11;
203:7,18
**5710 (2)**
76:13,18
**5713 (2)**
199:5,14

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
November 20, 2013

**577 (1)**
118:16
**5800 (1)**
22:13
**5872 (1)**
60:1
**5879 (3)**
75:14,16,24
**599 (1)**
8:20
**5th (1)**
167:17

---

**6**

**6 (4)**
42:21;209:18;
214:4;215:10
**603 (3)**
39:8,16,20
**639 (1)**
34:5
**640 (2)**
33:16;34:2
**647 (2)**
33:16;34:2
**648 (3)**
199:25;200:8,11
**649 (3)**
199:25;200:8,11
**65 (1)**
10:12
**650 (3)**
199:25;200:8,12
**651 (3)**
199:25;200:8,12
**655 (1)**
7:12
**669 (3)**
39:8,16,20
**675 (1)**
34:5
**678 (3)**
199:25;200:9,12
**697 (1)**
211:21

---

**7**

**7 (4)**
51:2;57:24;244:12,
19
**70 (1)**
139:20
**700 (1)**
3:22
**719 (3)**
98:22;101:1,8
**720 (3)**
98:22;101:1,8
**721 (3)**
98:22;101:2,8
**722 (3)**

98:22;101:2,8
**723 (3)**
98:23;101:2,9
**724 (3)**
98:23;101:2,9
**725 (3)**
98:23;101:2,9
**726 (3)**
98:23;101:2,9
**727 (3)**
98:23;101:2,9
**728 (3)**
98:23;101:2,9
**729 (3)**
98:23;101:2,9
**730 (3)**
98:25;101:2,9
**737 (2)**
33:16;34:2
**75 (4)**
139:20,21;142:1,
24
**750 (8)**
43:12;100:17;
101:12,15,24;102:2;
239:10,21
**751 (4)**
100:17;101:15,24;
102:2
**752 (4)**
100:17;101:15,24;
102:2
**753 (3)**
101:15,24;102:2
**754 (3)**
101:15,24;102:3
**763 (2)**
252:7,12
**7th (2)**
132:24;133:11

---

**8**

**8 (10)**
131:8;134:22;
214:4;215:10;221:5,
9,10;233:15;239:23;
240:18
**800 (1)**
11:4
**801 (3)**
160:7,16,22
**802 (3)**
160:7,16,22
**803 (1)**
160:7
**804 (3)**
160:7,16,22
**808 (3)**
160:8,16,22
**809 (3)**
160:8,17,23
**810 (7)**

39:8,12,18,20;
102:11,21,25
**811 (3)**
160:8,17,23
**812 (3)**
160:8,17,23
**814 (3)**
102:11,21,25
**819 (3)**
160:8,17,23
**820 (7)**
39:8,12,18,20;
102:11,21,25
**821 (3)**
160:8,17,23
**822 (7)**
39:8,12,18,21;
102:11,21,25
**823 (3)**
160:8,17,23
**824 (3)**
160:8,17,23
**832 (4)**
39:8,12,18,21
**834 (3)**
160:8,17,23
**835 (7)**
39:8,16,21;102:11,
18,23;103:1
**836 (3)**
160:8,17,23
**838 (3)**
160:8,17,23
**839 (3)**
160:8,17,23
**84 (2)**
114:20,22
**841 (3)**
160:9,17,23
**842 (3)**
160:9,18,24
**843 (3)**
160:9,18,24
**844 (3)**
160:9,18,24
**845 (3)**
102:11,22;103:1
**846 (5)**
162:3,5,6,12,15
**847 (3)**
160:9,18,24
**848 (3)**
39:8,16,21
**849 (3)**
39:8,17,21
**850 (3)**
160:9,18,24
**851 (3)**
200:1,9,12
**852 (3)**
102:12,22;103:1
**853 (4)**
102:12,16,22;

103:1
**855 (6)**
39:8,17,21;102:16,
22;103:1
**856 (3)**
39:8,17,21
**857 (7)**
39:9,17,21;102:16,
18,23;103:1
**859 (3)**
161:5,22,25
**86 (1)**
6:17
**860 (3)**
161:5,22,25
**861 (3)**
160:9,18,24
**862 (3)**
161:5,22,25
**863 (3)**
161:5,23,25
**864 (3)**
161:5,23;162:1
**865 (3)**
27:12,22;28:1
**866 (3)**
161:5,23;162:1
**868 (6)**
27:12,22;28:1;
39:9,17,21
**870 (3)**
160:9,18,24
**872 (3)**
161:5,23;162:1
**875 (3)**
161:5,23;162:1
**876 (3)**
161:5,23;162:1
**877 (3)**
161:5,23;162:1
**887 (3)**
98:25;101:2,9
**889 (3)**
98:25;101:2,9
**890 (3)**
98:25;101:3,9
**892 (3)**
99:5;101:3,10
**893 (3)**
99:5;101:3,10
**894 (3)**
160:9,18,24

---

**9**

**9 (6)**
239:23,24;240:5;
242:2;256:22;258:7
**9:05 (1)**
2:19
**90 (1)**
9:3
**900 (1)**

13:4
**90071 (1)**
14:6
**9019 (2)**
65:5;99:7
**905 (4)**
27:12,21,22;28:1
**908 (3)**
27:12,22;28:1
**909 (4)**
11:21;27:12,22;
28:2
**90B (2)**
147:23;149:13
**910 (3)**
27:12,22;28:2
**911 (3)**
27:12,23;28:2
**912 (3)**
27:13,23;28:2
**913 (3)**
27:13,23;28:2
**914 (3)**
27:13,23;28:2
**915 (3)**
27:13,23;28:2
**916 (3)**
27:13,23;28:2
**917 (3)**
27:13,23;28:2
**918 (3)**
27:13,23;28:2
**919 (6)**
13:21;27:13,17,17,
23;28:2
**920 (4)**
27:13,18,23;28:2
**921 (3)**
27:18,23;28:3
**922 (3)**
27:18,23;28:3
**923 (3)**
27:18,24;28:3
**924 (3)**
200:1,9,12
**925 (3)**
200:1,9,12
**926 (3)**
200:1,9,12
**929 (3)**
25:6,13,16
**932 (3)**
27:18,24;28:3
**933 (3)**
27:18,24;28:3
**934 (3)**
160:9,18,24
**94 (1)**
245:12
**951 (4)**
31:14;98:25;101:3,
9
**952 (3)**

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg
Adv. No. 13-01343-mg; Adv. No. 13-01277-mg
November 20, 2013

98:25;101:3,10
**953 (3)**
  99:1;101:3,10
**965 (1)**
  27:21
**968 (1)**
  27:21
**97 (2)**
  121:14,15
**973406-2250 (1)**
  3:24
**99 (1)**
  148:10