1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 - - - - - - - - - - - - - - - - - - - -x

5 In the Matters of:

6 RESIDENTIAL CAPITAL, LLC, et al.,        Case No. 12-12020-mg

7           Debtors.

8 - - - - - - - - - - - - - - - - - - - -x

9 RESIDENTIAL CAPITAL, LLC, et al.,

10           Plaintiffs,              Adv. No. 13-01343-mg

11       - against -

12 UMB BANK, N.A., in its Capacity as

13 INDENTURE TRUSTEE,

14           Defendant.

15  - - - - - - - - - - - - - - - - - - - -x

16 OFFICIAL COMMITTEE OF UNSECURED

17 CREDITORS, et al.,

18           Plaintiffs,              Adv. No. 13-01277-mg

19       - against -

20 UMB BANK, N.A., et al.,

21           Defendants.

22  - - - - - - - - - - - - - - - - - - - -x

23

24

25

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 21, 2013

19              9:03 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   12-12020-mg   Residential Capital, LLC

3   PHASE II TRIAL

4

5   Adversary proceeding: 13-01277-mg   Official Committee of

6   Unsecured Creditors et al v. UMB Bank, N.A., et al.

7   PHASE II TRIAL

8

9   Adversary proceeding: 13-01343-mg Residential Capital, LLC et

10  al. v. UMB Bank, N.A., in its Capacity as Indenture Trustee

11  PHASE II TRIAL

12

13  12-12020-mg   Residential Capital, LLC

14  CONFIRMATION HEARING.

15

16  Fairness Hearing RE: Kessler Settlement Class.

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

**4**

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for Debtors
 5        1290 Avenue of the Americas
 6        New York, NY 10104
 7
 8   BY:   GARY S. LEE, ESQ.
 9         CHARLES L. KERR, ESQ.
10         LORENZO MARINUZZI, ESQ.
11         JOSEPH ALEXANDER LAWRENCE, ESQ.
12
13
14   MORRISON & FOERSTER LLP
15        Attorneys for Debtors
16        755 Page Mill Road
17        Palo Alto, CA 94304
18
19   BY:   DARRYL P. RAINS, ESQ.
20
21
22
23
24
25
```

1

2    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3          Conflicts Counsel to Debtors

4          101 Park Avenue

5          New York, NY 10178

6

7    BY:   THERESA A. FOUDY, ESQ.

8

9

10   SILVERMANACAMPORA LLP

11         Special Counsel to Creditors' Committee

12         100 Jericho Quadrangle

13         Suite 300

14         Jericho, NY 11753

15

16   BY:   RONALD J. FRIEDMAN, ESQ.

17

18

19   KIRKLAND & ELLIS LLP

20         Attorneys for Ally Bank and Ally Financial, Inc.

21         601 Lexington Avenue

22         New York, NY 10022

23

24   BY:   RAY C. SCHROCK, P.C.

25

1

2  KIRKLAND & ELLIS LLP

3       Attorneys for Ally Bank and Ally Financial, Inc.

4       655 Fifteenth Street, N.W.

5       Washington, DC 20005

6

7  BY:   DANIEL T. DONOVAN, ESQ.

8        JUDSON D. BROWN, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12       Attorneys for Official Creditors' Committee

13       1177 Avenue of the Americas

14       New York, NY 10036

15

16  BY:   KENNETH H. ECKSTEIN, ESQ.

17        PHILIP S. KAUFMAN, ESQ.

18        DOUGLAS MANNAL, ESQ.

19        STEPHEN ZIDE, ESQ.

20        P. BRADLEY O'NEILL, ESQ.

21        JOSEPH A. SHIFER, ESQ.

22

23

24

25

7

 1

 2  U.S. DEPARTMENT OF JUSTICE

 3          U.S. Attorney's Office

 4          86 Chambers Street

 5          3rd Floor

 6          New York, NY 10007

 7

 8  BY:   JOSEPH N. CORDARO, ESQ.

 9

10

11  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

12          Attorneys for Ad Hoc Group of Junior Secured Notes

13          1633 Broadway

14          New York, NY 10019

15

16  BY:   DANIEL A. FLIMAN, ESQ.

17

18

19  MILBANK, TWEED, HADLEY & MCCLOY LLP

20          Attorneys for Ad Hoc Group of Junior Secured Notes

21          1850 K Street, NW

22          Washington, DC 20005

23

24  BY:   DAVID S. COHEN, ESQ.

25

8

1

2  MILBANK, TWEED, HADLEY & MCCLOY LLP

3       Attorneys for Ad Hoc Group of Junior Secured Notes

4       One Chase Manhattan Plaza

5       New York, NY 10005

6

7  BY:   GERARD UZZI, ESQ.

8       DANIEL M. PERRY, ESQ.

9       ATARA MILLER, ESQ.

10

11

12  MORGAN, LEWIS & BOCKIUS LLP

13       Attorneys for Deutsche Bank, Bank of NY Mellon

14       101 Park Avenue

15       New York, NY 10178

16

17  BY:   GLENN E. SIEGEL, ESQ.

18       JAMES L. GARRITY, JR., ESQ.

19

20

21

22

23

24

25

1

2   JONES DAY

3         Attorneys for FGIC

4         222 East 41st Street

5         New York, NY 10017

6

7   BY:   LANCE E. MILLER, ESQ.

8

9

10  JONES DAY

11        Attorneys for FGIC

12        555 South Flower Street

13        Fiftieth Floor

14        Los Angeles, CA 90071

15

16  BY:   RICHARD L. WYNNE, ESQ.

17

18

19  WINSTON & STRAWN LLP

20        Attorneys for WFBNA - Wachovia

21        200 Park Avenue

22        New York, NY 10166

23

24  BY:   JAMES DONNELL, ESQ.

25        NATHAN P. LEBIODA, ESQ.

1

2  ROPES & GRAY LLP

3       Attorneys for Institutional Investor Steering Committee

4       800 Boylston Street

5       Boston, MA 02199

6

7  BY:  D. ROSS MARTIN, ESQ.

8       ANDREW G. DEVORE, ESQ.

9

10

11  ALLEN & OVERY LLP

12       Attorneys for HSBC Bank USA, N.A. as Trustee

13       1221 Avenue of the Americas

14       New York, NY 10020

15

16  BY:  JOHN KIBLER, ESQ.

17

18

19  MORRISON COHEN LLP

20       Attorneys for Independent Directors

21       909 Third Avenue

22       New York, NY 10022

23

24  BY:  JOSEPH T. MOLDOVAN, ESQ.

25

1

2   SEWARD & KISSEL LLP

3          Attorneys for US Bank as RMBS Trustee

4          One Battery Park Plaza

5          New York, NY 10004

6

7   BY:   MARK D. KOTWICK, ESQ.

8          THOMAS ROSS HOOPER, ESQ.

9          ARLENE R. ALVES, ESQ.

10          DALE C. CHRISTENSEN, JR., ESQ.

11

12

13   CLEARY GOTTLIEB STEEN & HAMILTON LLP

14          Attorneys for Wilmington Trust

15          One Liberty Plaza

16          New York, NY 10006

17

18   BY:   MARK A. LIGHTNER, ESQ.

19          JEREMY R. OPOLSKY, ESQ.

20

21

22

23

24

25

1

2    POLSINELLI PC

3            Attorneys for Kessler Settlement Class

4            900 Third Avenue

5            21st Floor

6            New York, NY 10022

7

8    BY:    DAN FLANIGAN, ESQ.

9

10

11    PENSION BENEFIT GUARANTY CORPORATION

12            Office of the Chief Counsel

13            1200 K Street, N.W.

14            Washington, DC 20005

15

16    BY:    VICENTE MATIAS MURRELL, ESQ.

17

18

19    SCHULTE ROTH & ZABEL, LLP

20            Attorneys for Cerberus Capital Management

21            919 Third Avenue

22            New York, NY 10022

23

24    BY:    HOWARD O. GODNICK, ESQ. (TELEPHONICALLY)

25

1

2   MUNGER, TOLLES & OLSON LLP

3        Attorneys for Berkshire Hathaway, Inc.

4        355 South Grand Avenue

5        35th Floor

6        Los Angeles, CA 90071

7

8   BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11  QUINN EMANUEL URQUHART & SULLIVAN, LLP

12        Attorneys for AIG, Allstate, Prudential, and Mass Mutual

13        51 Madison Avenue

14        22nd Floor

15        New York, NY 10010

16

17  BY:   SCOTT C. SHELLEY, ESQ.

18

19

20  ALSO PRESENT:

21        RICHARD RODE, Party Pro Se

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    14

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  We're here in Residential Capital, number

4    12-12020 and also in the two adversary proceedings 13-01343 and

5    13-01277.  We'll continue with the cross-examination of Mr.

6    Renzi.

7              Come on up, Mr. Renzi.

8              Before we start, I also wanted to announce we're going

9    to end early tomorrow at 3 o'clock.  So I think we're making

10   good progress and I'm not concerned about finishing within the

11   allotted time.  So we're going to end tomorrow at 3 o'clock.

12             Mr. Renzi come on up, if you can.  Maneuvering between

13   boxes and lawyers --

14             All right, you know you're still under oath, Mr.

15   Renzi.

16             THE COURT:  Ms. Miller?

17   RESUMED CROSS-EXAMINATION

18   BY MS. MILLER:

19   Q.   Good morning, Mr. Renzi.

20   A.   Good morning.

21   Q.   I'm going to check -- I just want to confirm that you

22   still have all of the materials that you left on the table

23   yesterday.

24   A.   It's a big binder.

25   Q.   Good, okay.  Mr. Renzi, before we broke yesterday we were

1  in the middle of talking about document DC-AUC.  Do you recall

2  that?

3         THE COURT:  I don't.  What was the exhibit again, I'm

4  sorry, Ms. Miller?

5         MS. MILLER:  Sorry DX-AUC.

6         THE WITNESS:  That's towards the front.

7         MS. MILLER:  Right.

8         THE COURT:  Okay.

9  Q.    And Mr. Renzi, if you could turn in that document to the

10  page with the Bates ending in 112?

11  A.    I'm there.

12  Q.    Do you recognize this attachment to the e-mail chain?

13  A.    I recognize the information.  I'm not sure if I recognize

14  the specific e-mail; but, yes.

15  Q.    And where does the information come from?

16  A.    My recollection is the company's books and records.

17  Q.    And are you referring both to the information in the sort

18  of chart-like section at the very top of 112 and the

19  information that follows after the sentence at the bottom of

20  the page that said "Following is information the company was

21  able to find/identify based upon a review of the accounting

22  records" --

23  A.    Yes, I --

24  Q.    -- on page 114?

25  A.    On page 114?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    16

1    Q.   The information that follows that sentence on page 113

2    through 114.

3         Let me ask you a more clear question.

4         Mr. Renzi, the information in the chart you testified, I

5    think, that you believe that came from the debtors' books and

6    records, is that right?

7    A.   That's correct.

8    Q.   And did the information following the sentence at the

9    bottom of page 112 also come from the company's books and

10   records?

11   A.   I believe so, or clarifications made by the company.

12   Q.   Okay.  Mr. Renzi, you testified yesterday about the cash

13   management system.  Is it your understanding that the cash

14   management system continues to operate post-petition?

15   A.   Yes.

16   Q.   And intercompany balances continue to accrue as a result

17   of the operation of the cash management system post-petition,

18   right?

19   A.   Correct.

20   Q.   And those intercompa -- those post-petition intercompany

21   balances are being treated as administrative priority claims

22   under the plan, right?

23   A.   That is my understanding.

24   Q.   Mr. Renzi, in the recovery analysis -- you're also the

25   debtors' corporate representative on the recovery analysis, is

1    that right?

2    A.    Correct.

3    Q.    And that is Exhibit 7 to DX-AWR, the disclosure statement,

4    right?

5    A.    Should I flip there?

6    Q.    Well, you can just answer me if the recovery -- yes, flip

7    there, but my question is, is Exhibit 7 to the disclosure

8    statement the recovery analysis on which you are testifying as

9    the corporate representative?

10   A.    Yes, Exhibit 7 is the recovery analysis in this binder.

11   Q.    And in the recovery analysis, in paragraph 3, you assume

12   that the wind-down take place over a period of approximately --

13           THE COURT:  Can you just tell me --

14           MS. MILLER:  Sorry.

15           THE COURT:  -- in the disclosure statement page what

16   of 254 are you looking at?

17           MS. MILLER:  So, I'm looking at Exhibit 7 which is

18   tabbed --

19           THE COURT:  Yes, but if you look at the top, there

20   is --

21           MS. MILLER:  It runs through.

22           THE COURT:  Just give me the starting page.

23           MS. MILLER:  It's 24 of 159.  The numbering restarts.

24           THE COURT:  Okay just give me a second.

25           MS. MILLER:  Sure.

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1          THE COURT:  All right, I'm there, go ahead.

2    BY MS. MILLER:

3    Q.    In paragraph 3 of the recovery analysis you assume that

4    the wind down of assets takes place over a period of three

5    years and seven years for certain assets, is that right?

6    A.    Yes, that's what paragraph 3 says.

7    Q.    And Mr. Eckstein, in his opening statement, said that the

8    JSNs were getting favorable treatment under the plan because

9    they'll be paid full in cash on the effective date despite the

10   fact that more than 400 million dollars of JSN collateral will

11   be liquidated post-effective date.

12         Was he referring to liquidation of the --

13         MS. MILLER:  Sorry, strike that.

14   Q.    Is it your understanding that there is approximately 500

15   million dollars of debtors' assets that will be rolled off over

16   a period of three to five years under the recovery analysis?

17         THE COURT:  Can I just -- I'm sorry, just give me -- I

18   want to hear the question again.  I didn't understand it.

19         MS. MILLER:  Sorry.

20   Q.    Is it your understanding that the debtors have

21   approximately 500 million dollars of assets that will roll off

22   over a three- to seven-year period under the recovery analysis?

23   A.    I think the number is greater than 500 million, but --

24   Q.    And is it the debtors' present intention to continue to

25   hold those assets and roll them off consistent with your

1  assumptions in the recovery analysis?

2  A.    I believe it will take up to seven years.  As illustrated

3  in paragraph 2, recoveries to creditors are presented on a

4  discounted base and are assumed to occur over the course of

5  seven years with over eighty-five percent of recoveries

6  occurring in the first three years.

7  Q.    And so do you know if the debtors have received any

8  expressions of interest to purchase their assets in bulk after

9  the effective date?

10  A.    I know that there were attempts to sell certain assets in

11  bulk, but they were in my understanding, unacceptable to the

12  UCC and the debtors.

13  Q.    Mr. Renzi, turning now to your witness statement which is

14  contained in the binder -- you may have taken it out of the

15  binder -- you testified beginning on paragraph 25 on page 13

16  about the limited partial consolidation of the debtors.  Do you

17  see that?

18  A.    Yes, paragraph 25?

19        MS. MILLER:  Sorry, just for the record I think I may

20  have referred to this as your witness statement.  It is the

21  direct testimony of Mark Renzi that I'm referring to.

22        THE COURT:  ECF 5702.

23  Q.    And in paragraph 26 you state that the junior secured

24  noteholders are not harmed by the limited partial

25  consolidation, right?

1   A.    Yes.

2   Q.    And is it your understanding that despite the limited

3   partial consolidation, the JSNs are getting the benefit of any

4   equity pledges that they have in lower tier subsidiaries?

5   A.    Yes, that's my understanding.

6   Q.    And your recovery analysis assumes that certain -- that at

7   certain of those debtors there are no other creditors other

8   than Ally and the JSNs, is that right?

9   A.    Could you be more specific?  I mean certain debtors don't

10  have creditors, correct; but I'm not sure I understand the

11  question.

12  Q.    Are there certain debtors where the JSNs are getting the

13  benefit of an equity pledge that have no other creditors other

14  than Ally and JSNs?

15  A.    That's my understanding, yes.

16  Q.    And Mr. Renzi, is it your understanding that at certain of

17  those entities the JSNs are being treated as unimpaired?

18  A.    I'm not sure I -- I'm not sure I follow.

19  Q.    Do you know whether -- do you know what the JSNs'

20  treatment is at those debtors where only the JSNs and Ally are

21  creditors?

22  A.    If you're referring to a specific entity, there are

23  certain entities where there is an equity pledge that there

24  aren't unsecured creditors.  I think that's what you're

25  referring to.

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1    Q.   And do you know if the JSNs are being treated as

2    unimpaired at those entities?

3    A.   If that means the same thing that I just stated, I assume

4    that's correct.  But I would say it the way I said it.

5             THE COURT:  If you don't understand the question --

6             MS. MILLER:  Right, I'll --

7             THE COURT:  -- just tell her you don't understand.

8    A.   I don't understand the question.

9    Q.   I'll move on.

10        Mr. Renzi, turning now, in your direct testimony to

11   paragraph 43 -- the section beginning with paragraph 43 on page

12   21 where you discuss scenario 1B of your -- 1B in your rebuttal

13   scenarios.  Do you see that?

14   A.   I'm there.

15   Q.   And in scenario 1B, you -- Mr. Renzi, despite all of the

16   talk throughout this case of 16.6 billion dollars and 149

17   transactions of pre-petition debt forgiveness, which you detail

18   on page 25 of your rebuttal report, in scenario 1B, you assume

19   that only three transactions, three forgiveness transactions,

20   are avoided as a result of fraudulent conveyance actions, is

21   that right?

22   A.   The chart on page 22 shows two.

23   Q.   Well, is it your understanding that the net avoidance

24   that's shown in line 2 is the result of the avoidance of two

25   fraudulent conveyances?

1  A.   Can I -- would you like me to flip back just to confirm?

2  Or --

3           THE COURT:  Yeah, I would like you to.

4           THE WITNESS:  Okay.

5           THE COURT:  And just tell us what you're looking at --

6           THE WITNESS:  Sure.

7           THE COURT:  -- to confirm your testimony.

8  Q.   Mr. Renzi if you have  --

9           THE COURT:  Can you give him a chance?

10          MS. MILLER:  I'm sorry, I was going to help direct

11 him, but if he knows where it is --

12          THE COURT:  Okay, go --

13          THE WITNESS:  Your Honor it says the rebuttal -- it's

14 under a tab for me saying rebuttal report of Mark Renzi phase

15 2.

16          THE COURT:  All right.

17          THE WITNESS:  I think its way towards the back.

18          THE COURT:  Yes, I still have the tab, okay.  And what

19 page are you looking at?

20          THE WITNESS:  I'm just going back to actual balance

21 forgiveness.

22          THE COURT:  But is there a specific page of the report

23 that you're looking at?

24          THE WITNESS:  It's page --

25          MS. MILLER:  25.

1              THE WITNESS:  -- 25.

2              THE COURT:  Okay, I'm on 25.

3              THE WITNESS:  I'm there.  So I see the -- so, Your

4    Honor, unfortunately the rows are not labeled, but on page 25,

5    I'm just looking at the top row.  And I believe Ms. Miller is

6    referring to the two-billion-dollar number, which appears the

7    number two thousand --

8              THE COURT:  For 2008?

9              THE WITNESS:  Yeah, exactly; for 2008.  And then for

10   2009 it's the --

11             THE COURT:  151 million?

12             THE WITNESS:  Exactly.

13             THE COURT:  And tell me what that reflects?

14             THE WITNESS:  Well, so we're just -- I have both -- I

15   have my direct testimony out of my binder.  And I think Ms.

16   Miller is just asking me to confirm whether or not in row 2 on

17   page 22, which there are a lot of numbers, but in paragraph --

18             THE COURT:  Paragraph 45, the schedule that appears in

19   your direct testimony --

20             THE WITNESS:  Exactly.

21             THE COURT:   -- that has Residential Capital as the

22   paying entity and Residential Funding as the receiving entity?

23             THE WITNESS:  Exactly.

24             THE COURT:  All right.  And so these numbers are not

25   the same as in the chart on page 25 of your rebuttal report?

1          THE WITNESS:  Correct.

2          THE COURT:  So what is that?

3          THE WITNESS:  I think what I did was I wanted to use

4    the avoidance of fraudulent conveyances up to the amount of the

5    net intercompany balance, because my understanding is --

6          THE COURT:  The total intercompany balance is the

7    2,151,000,000?

8          THE WITNESS:  Well, Your Honor, that's the debt

9    forgiveness --

10          THE COURT:  Okay.  All right.

11          THE WITNESS:  -- excuse me, the balance forgiveness.

12          THE COURT:  All right.

13          THE WITNESS:  So I limited it to the amount of the

14    balance, which was 1955, or 1.955.

15          THE COURT:  So you're saying the balance at petition

16    date was the 1955?

17          THE WITNESS:  Correct, Your Honor.

18          THE COURT:  Okay.  And what do I derive from page 25

19    of your rebuttal report?  The 2151 was the total amount of

20    balance forgiveness?

21          THE WITNESS:  Correct.

22          THE COURT:  All right.

23          THE WITNESS:  I think the question to me was, was

24    there two debt forgivenesses.  And in summary it looks like

25    two, but I presume that underlying these two years that there

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1  could be --

2          THE COURT:  And you say two because you've got on page

3  25 of the rebuttal report, you have the two billion figure

4  under the 2008 and the 151 million in the 2009?

5          THE WITNESS:  Correct.

6          THE COURT:  That's why you're saying two balance

7  forgivenesses?

8          THE WITNESS:  I think that's why Ms. Miller is

9  interpreting it as two balance forgivenesses.

10         THE COURT:  And what do you interpret it as?

11         THE WITNESS:  Well I think it's a summary of 2008 and

12  2009.  So there may be --

13         THE COURT:  There may have been a lot of items that

14  fit into each of those years?

15         THE WITNESS:  Yes, Your Honor.

16         THE COURT:  Go ahead, Ms. Miller.  I just wanted to be

17  sure I understand what he was saying.  Go ahead with your

18  examination.

19         MS. MILLER:  Right.

20  BY MS. MILLER:

21  Q.   So let me just follow up, because I'm not sure I'm

22  following.

23      On your chart on page 25 that follows through to 26 --

24         THE COURT:  25 of the rebuttal report?

25  Q.   Sorry, 25 of the rebuttal report following through to 26

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1  of the rebuttal report, if you look at the very bottom row on

2  26 there is the 16.6 billion dollar in total debt forgiveness

3  that people like to talk about, right?

4  A.    There is.

5  Q.    Okay.  And on page 25, my under -- is it true that each

6  entry in each row -- sorry, in each column for each year in

7  this chart on page 25 and 26 reflects one debt forgiveness, or

8  can it be multiple debt forgivenesses?

9  A.    I believe that there is additional detail underlying the

10 schedule.  This is a summary.

11 Q.    Okay.

12        THE COURT:  So you can't tell -- I can't tell from

13 looking at your schedule whether there were separate balance

14 forgivenesses that aggregated two billion dollars in 2008 or

15 not, right?

16        THE WITNESS:  Correct, Your Honor.  I believe that all

17 the underlying detail has been provided.

18        THE COURT:  To whom?

19        THE WITNESS:  To Houlihan.

20        THE COURT:  Okay.

21 Q.    And Mr. Renzi, that two billion dollars in debt

22 forgiveness in 2008 was, in fact, a single debt forgiveness in

23 March of 2008, right?

24 A.    I can't tell that from this chart, but if I had the

25 additional detail, I can confirm that.  But I --

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1  Q.   I'll show it to you.  But do you remember -- do you know

2  that without looking at this chart?

3            THE COURT:  Does he know what?

4  Q.   Do you know that the two billion -- that there was a

5  forgiveness of two billion dollars in debt between RFC and

6  ResCap in March of 2008 that is reflected on your chart on page

7  25?

8  A.   I see this in summary -- excuse me.  I see what you're

9  referring to in summary and that's all that I have in terms of

10 information in front of me.  If there is an additional schedule

11 that will help me refresh my memory, that would be great to

12 confirm what you've asked.

13 Q.   But what you can tell, looking back at your direct

14 testimony on page 22, is that of the 16 billion dollars in

15 debt -- 16.6 billion dollars in debt forgiveness that you

16 identify in your rebuttal report, you are avoiding, as a result

17 of fraudulent conveyances, 1.999 billion, is that right?

18 A.   Yes, that's correct.  That's on row 17.

19 Q.   And that's because you only avoided intercompany debt

20 forgivenesses that reduced the intercompany balances, right?

21 A.   I believe that this schedule properly reflects --

22           THE COURT:  "This schedule" meaning --

23           THE WITNESS:  Excuse me --

24           THE COURT:  -- paragraph 45 of your direct testimony?

25           THE WITNESS:  Correct, Your Honor.

1           THE COURT:  Go ahead.

2   A.    I believe that it properly reflects avoidance actions,

3   because my understanding is that the JSNs do not have a lien

4   on -- excuse me, on avoidance actions, that increased the

5   balances.

6           So if you reverse the debt, that it would increase and

7   create a new balance that they don't have a lien on that, and

8   that was ruled upon before, it's my --

9           THE COURT:  You're going to have to -- your voice

10  trailed off, so I missed the last part of your answer.

11  A.    My understanding is that if you reverse the debt

12  forgiveness -- excuse me, the balance forgiveness such that it

13  creates a new note, that there is -- that the JSNs don't have a

14  lien on that avoidance action.

15  Q.    And so it's your testimony that if we unwound all of the

16  16.6 billion dollars in debt forgiveness, it wouldn't offset

17  the 199 number in your rebuttal report, right?

18  A.    Well --

19          THE COURT:  199?  I think -- are you referring --

20          MS. MILLER:  Sorry, the 1.999-billion-dollar number in

21  paragraph 45 of your direct testimony.

22          THE COURT:  Line 17?

23          MS. MILLER:  Line 17, right.

24  A.    Well, I don't think that you can draw such a straight

25  conclusion, because lines 1 through 17 may not match up to all

1    of the debt forgiveness that are shown here.  For example, when

2    you look at pages 25 and 26 of my rebuttal report, there are

3    some entities that might have been sold, are nondebtor, et

4    cetera, and I think that designation you can see in the entity

5    status column.

6         So I'm not sure that -- I can probably spend time to do

7    that, but --

8    Q.   Mr. Renzi, is it your testimony that if we unwound all of

9    the debt forgiveness between 2008 and 2012, the 1,999,000,000

10   dollar number reflected in line 17 would not be netted?

11        THE COURT:  I don't understand your question.

12   Q.   Well, Mr. Renzi --

13   A.   I don't either.

14   Q.   -- there are inter -- in reviewing your intercompany -- in

15   reviewing the intercompany balances and the forgiveness of

16   intercompany debt, you identified certain intercompany balances

17   that if avoided, certain -- sorry.

18        Mr. Renzi, in your review of the debt forgiveness, you

19   identified certain debt forgivenesses that if avoided would

20   have increased the intercompany balances, right?

21   A.   Yes, I did.

22   Q.   Is it your testimony that the number that you represent in

23   scenario 1B on line 17 of paragraph 45 of your direct testimony

24   would not be netted as a result of the avoidance of all of

25   those debt forgivenesses?

1          THE COURT:  I still don't understand.  I'm sorry,

2    maybe I'm being thick, but I don't -- this is important.

3          MS. MILLER:  Yeah.

4          THE COURT:  I want to be sure I understand what you're

5    asking.

6          MS. MILLER:  Okay.

7          THE COURT:  I just don't understand.

8          MS. MILLER:  Let me take it in pieces.

9    Q.   Mr. Renzi, there are debt forgivenesses that if avoided

10   would increase intercompany balances, right?

11   A.   From a mathematical standpoint, yes.

12   Q.   What I'm asking you is in paragraph 45, this chart says

13   "impact of reinstatement balances on account of avoidance of

14   fraudulent conveyance," right?

15   A.   Yes, that's what the schedule on page 22, paragraph 45,

16   says.

17   Q.   And, Mr. Renzi, when the Court was asking you about line 2

18   and the disparity between the number that you reflect in the

19   chart in paragraph 45 and the number reflected on page 25 of

20   your rebuttal report, you explained that you were testifying in

21   this paragraph only as to the net impact.  And so there is a

22   difference in value, but because there isn't a corresponding

23   net intercompany that you're offsetting, you didn't reflect it

24   in this chart, is that right?

25         MR. KERR:  I'm going to object to that question.

1          THE COURT:  I'm going to sustain it.

2          MS. MILLER:  Okay.

3          THE COURT:  I'm sorry, Ms. Miller.

4          Explain to me in paragraph 45 of your direct testimony

5   what it is you're trying to communicate to me with respect to

6   the impact of avoidable fraudulent conveyances with respect to

7   intercompany balances?  And when I get down you're going to

8   explain to me particularly the adjusted net intercompany

9   balances ,and when you get down to the number of 6 billion and

10  93, explain that to me, and then Ms. Miller can cross-examine

11  you further.  But I want to understand this chart; and I want

12  to understand how you get to these numbers.

13         THE WITNESS:  Sure, Your Honor.  So the objective here

14  was to say if you avoided certain fraudulent conveyances on

15  intercompany balance forgiveness, that I limited the amount of

16  that avoidance to the amount of the balance that's reflected.

17         So as we were going through the math before on page 25

18  of my --

19         THE COURT:  Rebuttal report.

20         THE WITNESS:  -- rebuttal report, the number could

21  have been, just from a math standpoint, 2151.  And I limited

22  the adjustment to the amount of the balance.

23         My understanding is the JSNs didn't have a lien on

24  avoidance actions, so I didn't think that it made sense to

25  create a new balance because of that avoidance of fraudulent

1  conveyances.  So that's what I did.

2         And the same thing goes for row 4, paragraph -- excuse

3  me, paragraph 45, row 4, for the forty-four million.

4         THE COURT:  The GMAC PAT, passive asset transactions,

5  that's the row 4, and you show forty-four-million-dollar

6  avoidance.

7         THE WITNESS:  Correct.  The math happens to be

8  simpler.  Because as -- Your Honor, if you look at page 26,

9  it's limited to forty-four, so.

10         THE COURT:  Right.  You're looking at, page 26,

11  forgiven by GMAC Mortgage LLC and in favor of PAT; and your

12  chart for 2008 shows the forty-four million and that's in the

13  grand total column.

14         THE WITNESS:  Right.  It doesn't -- we don't have the

15  same issue, so it's not as, I'll say, complicated.  I think --

16         THE COURT:  Why did you assume, or why did you -- was

17  it an assumption or a conclusion, had you been asked to make

18  the assumption -- going back to your testimony on page 22,

19  paragraph 45 -- that for Residential Funding -- excuse me

20  Residential Capital the 1955 was avoidable, and for GMAC

21  Mortgage with PAT, that the 44 million was avoidable?

22         THE WITNESS:  Yes, under the assumptions under --

23         THE COURT:  You were asked to make those assumptions?

24         THE WITNESS:  I was asked to make those assumptions,

25  and what I did was I looked back for the four years to

1   understand fraudulent conveyances.  And these were two

2   examples, which I've shown on row 2 and row 4 on the

3   schedule --

4         THE COURT:  You weren't independently concluding that

5   those transactions were avoidable.  Those were assumptions that

6   you were asked to make in your analysis, correct?

7         THE WITNESS:  Those are -- yes, Your Honor, they're

8   assumptions.  And I also discussed with counsel whether or not

9   it was reasonable.  After discussions, I felt that it was a

10  reasonable assumption, and that's why I presented it in this

11  schedule.

12        THE COURT:  Go ahead, Ms. Miller.

13        MS. MILLER:  I'm just going to follow up.  Thank you,

14  Your Honor.  I'm going to follow up on that line.

15        THE COURT:  I didn't -- I really -- I'm reluctant to

16  interfere in your cross-examination, but I really wanted to

17  understand what's here.

18        MS. MILLER:  Understood.

19  BY MS. MILLER:

20  Q.   Mr. Renzi, following up on the judge's last line of

21  questioning, FTI never determined whether any ResCap subsidiary

22  was insolvent at any time, right, pre-petition?

23  A.   Not that I recall.

24  Q.   And you also know that debt forgiveness was often done to

25  ensure compliance with net worth covenants, right?

1  A.   Yes.

2  Q.   And there would have been significant problems for ResCap

3  if one of the reporting entities failed to comply with one of

4  the covenants, right?

5  A.   Yes, that's my understanding.

6  Q.   It would have prevented them from getting further

7  financing, for example, right?

8  A.   Among others, but correct.

9  Q.   And ResCap was a capital-intensive business, right?

10  A.   Yes, ResCap is capital intensive.

11  Q.   So it definitely needed the financing, right?

12  A.   I think ResCap needed financing along the way, yes.

13  Q.   But you didn't do any valuation of those benefits that the

14  forgiving entity would get -- any benefits that the forgiving

15  entity would receive as a result of the forgiveness, right?

16  A.   Are you asking me if this is an arm's-length transaction?

17  Q.   No.  I'm asking you if you did a valuation of any

18  benefits, indirect benefits that the forgiving entity received

19  as a result of the debt forgiveness?

20  A.   Do you mind doing that one more time?

21  Q.   Yeah.  Did you do a valuation of any indirect benefits

22  that the forgiving entity received as a result of the

23  forgiveness?

24  A.   I did not do a valuation, a historical valuation of, I

25  think, what you're referring to.

RESIDENTIAL CAPITAL, LLC, ET AL.                          35

1  Q.   Mr. Renzi, I just want to turn -- in your binder you have

2  your, there is a tab called deposition testimony of Mark Renzi?

3           THE COURT:  It's the November 6th deposition?

4           MS. MILLER:  The November 6th deposition.

5  A.   I'm there.

6  Q.   Okay.  And on page 127, line 17 through 128, line 13 --

7           THE COURT:  Let me just get there, okay?

8           MS. MILLER:  Sure.

9           THE COURT:  All right, I'm there.

10 A.   I'm at page 127.

11 Q.   Did you say you're at one page?

12 A.   Excuse me, I'm at page 127 of my deposition.

13 Q.   Okay.  And do you recall that I asked you whether you ran

14 an analysis that avoided all fraudulent conveyances, all debt

15 forgivenesses from 2008 forward?

16 A.   I believe you're referring to the question on row 17, and

17 on row 20 I said "not for my expert report".

18 Q.   Right.  And then I asked you whether you knew what the

19 effect would be, right?  And you said it's very difficult to do

20 that just looking at the page, right?

21           MR. O'NEILL:  Objection, Your Honor.  Is she

22 impeaching?  I don't understand what she's doing.

23           THE COURT:  I'm going to let her do this.  Overruled.

24           Go ahead.

25 Q.   And then I asked you "Do you know whether it would have

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1   been less than a two-billion-dollar impact on the net

2   intercompany balance as of May 14, 2012." And you said I'm

3   sorry. And I restated the question. I said, "Do you know

4   whether it would have had less than a two-billion-dollar impact

5   on the net intercompany balances as of May 14, 2012?

6       And you asked me very specifically, "Are you asking me if

7   the number is lower than the 199 on page 17, third column of

8   numbers", which is the same 199 that's on page 45 of your

9   direct testimony. And I said yes. And you said -- your

10  testimony was "Yes, I think it offsets that number."

11      Do you recall that being your testimony?

12  A.   Just a couple of corrections. The 199 should be 1999.

13          THE COURT: I think we understand -- understand that

14  that's what --

15  A.   I think this is similar to what I just testified to, that

16  the number of 1955 is actually higher. It could be, if I was

17  to reverse the debt for -- excuse me, the balance forgiveness,

18  it was in excess of a two-billion-dollar number. So if that's

19  what you're referring to, I understand the math.

20  Q.   Is it your testimony here today that if you unwound all of

21  the debt forgivenesses, because you now say that the JSNs don't

22  have a lien, that there would not be an impact on -- that the

23  199 number in row 17 would not be offset as a result of those

24  avoidances?

25          THE COURT: Do you understand the question, Mr. Renzi?

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1          THE WITNESS:  Yes, Your Honor, I understand the

2    question.

3    A.    I believe that for this analysis that it's appropriate to

4    do what I've done.  If we wanted to do a mathematical exercise

5    where we would reverse all intercompany balance forgiveness, I

6    do believe that you could off -- this number would change the

7    1999.  I don't have that in front of me -- but yes, I do

8    believe that that number --

9          THE COURT:  Do you know whether it would go up or

10   down?

11         THE WITNESS:  I do think the 199 would become a

12   smaller negative number.  But I think if I reverse all of it --

13   I hadn't done that, I had done that for the ones that were

14   reflected on rows 1 through 16 on that chart, where applicable.

15   Q.    You've never done it, or you didn't do it for your expert

16   report?

17   A.    I didn't do it for my expert report.

18   Q.    But you have done the analysis, right?

19   A.    We just did it here.  We just did it here for row 2.

20   Q.    Well, I'm asking you if you ever did the analysis that

21   unwound all 16.6 billion dollars of debt forgiveness and saw

22   what the impact was on all intercompany balances?

23         THE WITNESS:  Your Honor, I think --

24         THE COURT:  Can you answer that yes or no?

25   A.    The answer is no because some of them are not applicable

1    to this schedule, because some of them are nondebtors.

2                THE COURT:  Your analysis was just of the debtors?

3                THE WITNESS:  Correct.

4                THE COURT:  And how much of the sixteen billion was

5    forgiveness of intercompany balances for debtors?  Do you know

6    that?

7                THE WITNESS:  I don't, Your Honor.  I could spend some

8    time to add it up, but --

9                THE COURT:  But you haven't done that previously?

10               THE WITNESS:  I had not done it previously.  Because,

11   again, they're international entities, the nondebtor entities,

12   and I believe some entities have been sold.

13               THE COURT:  Okay.

14               THE WITNESS:  So --

15               THE COURT:  I just wanted to know whether -- do you

16   have a work paper somewhere where you deter -- that you could

17   look at and it reflects the total of intercompany balance

18   forgiveness for all debtors?  Do you understand what I'm

19   asking?

20               THE WITNESS:  I do.  I do.

21               THE COURT:  I think that's the point that Ms. Miller's

22   question really goes to.  She may go beyond that with

23   nondebtors, but my question is specifically with respect to

24   debtors.  Have you previously prepared a worksheet, working

25   paper where you looked at the total, the aggregate of

1    intercompany balance forgiveness for all debtor entities?

2            THE WITNESS:  I think the answer is yes, Your Honor.

3    I'm not sure it's specifically to the way she asked -- Ms.

4    Miller asked --

5            THE COURT:  Well, that was my question, not hers.

6    So --

7            THE WITNESS:  Yeah.

8            THE COURT:  And do you have that here in court?

9            THE WITNESS:  No, Your Honor.

10   BY MS. MILLER:

11   Q.   Mr. Fazio did that analysis, right?

12   A.   I can't --

13   Q.   In his expert report?

14   A.   If I could look at his expert report to refresh my memory,

15   that would be great.

16   Q.   It's in your binder.

17           THE COURT:  Is it in his rebuttal or his expert

18   report?  There's two reports by Fazio in here.

19           MS. MILLER:  I'm just flipping through.  I believe

20   it's in his opening report.  I believe it's on --

21           THE COURT:  Which report?

22           MS. MILLER:  It's in his opening report --

23           THE COURT:  Okay.

24           MS. MILLER:  -- on pages 14 through 16.

25   Q.   And, Mr. Renzi, if you look at page 15 of Mr. Fazio's

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1   opening report, it's titled "offset/reduce existing

2   intercompany claim balances."  And to your point, Mr. Fazio in

3   his report states that of the 16.6 billion dollars of

4   previously forgiven intercompany claims, 9.1 are between

5   entities in the waterfall model?

6   A.   I'm sorry, what page are you on?

7   Q.   Page 15.

8   A.   Okay.  I see what he's written.

9        THE COURT:  Did you do any analysis to confirm or

10  reject Mr. Fazio's statement that Ms. Miller has just pointed

11  to?

12       THE WITNESS:  I did not do what he's referring to -- I

13  don't think so, Your Honor.

14       THE COURT:  Okay.  Go ahead, Ms. Miller.

15  Q.   Mr. Renzi, when I asked you -- Mr. Renzi, do you know what

16  the impact of avoiding all of the intercompany debt

17  forgivenesses between debtor entities would have on the

18  outstanding intercompany balances?

19  A.   In terms of the waterfall?

20  Q.   In terms of the waterfall -- well, no, sorry -- in terms

21  of the claim -- the stated claim amount of the intercompany

22  balance?

23  A.   I'm not sure I follow the question.

24  Q.   Well, if you unwound all of the intercompany debt

25  forgivenesses between debtors, what would the total impact be

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1   on the intercompany balances, net intercompany balances?

2   A.   Are you asking me to verify whether or not Mr. Fazio's

3   statement in the second bullet on page 15 is correct?

4            THE COURT:  No, I think the question was very -- you

5   can either -- that wasn't the question.

6            THE WITNESS:  Okay.  I don't understand.

7            THE COURT:  All right.

8   Q.   The question is, if you unwound all of the debt

9   forgiveness between debtor entities, what would the impact be

10  on the net intercompany balances as of the petition date?

11  A.   I don't think I can answer the question here.

12  Q.   Okay.  At your deposition looking back at page 128,

13  continuing where we left off at line 14, after you told me that

14  the 1999 --

15           THE COURT:  Hang on.

16           MS. MILLER:  Sorry.

17           THE COURT:  Let me get back there.  Stop.  Stop.

18           MS. MILLER:  Sorry.

19           THE COURT:  Page 128 of the deposition?

20           MS. MILLER:  Page 128, line 14.

21  Q.   After you told me that the 1999 number in row 17 would be

22  offset, I asked you if you know by how much.  You said "I don't

23  remember."  Then I asked, "A billion?"  And you testified, "I

24  think it's more than a billion."  Is that right?

25  A.   Yes, I see that.

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1   Q.   And that's still your testimony today, right?

2   A.   That's still my testimony.

3   Q.   Mr. Renzi, you reviewed a lot of transactions within the

4   company to see if they were possible -- possibly avoidable as

5   fraudulent conveyances, right?

6   A.   I did.

7   Q.   Not just intercompany debt forgivenesses, right?

8   A.   I had focused on that for this analysis.  So my primary

9   focus was this analysis.

10  Q.   But outside of the scope of your expert report, in your

11  work as an FA for the debtors, you reviewed a lot of

12  transactions as possible fraudulent conveyances, not just debt

13  forgiveness, right?

14  A.   We have a large team, so I'm sure that other members of

15  the team had.

16  Q.   And for nondebt forgiveness transactions, you looked back

17  a year, right?

18  A.   I think other members of our team had.

19  Q.   When you were reviewing debt forgiveness, you went all the

20  way back to January of 2008, right?

21  A.   For this analysis and my expert report and direct

22  testimony, yes.

23  Q.   And the only significant debt forgiveness that you avoid

24  in scenario 1B that has a material impact was actually a debt

25  forgiveness that took place in March of 2008, right?

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1  A.    Again, I don't have that detail to confirm March of 2008,

2  but I do recognize the two-billion-dollar number that occurred

3  during 2008.

4  Q.    Mr. Renzi, if you look at page 137 --

5          THE COURT:  Of what?

6  Q.    -- of your deposition testimony?

7          THE COURT:  Line numbers?

8          MS. MILLER:  Sorry.  Line numbers 18 through 138/7.

9          THE COURT:  Let me read it to myself, first.

10          Okay, go ahead.  Does that refresh your recollection?

11          THE WITNESS:  It does.  It does.  I'm not sure that I,

12  when I answered it, I recalled that it happened in March, but

13  the fact that you're asking the question so many times and --

14          THE COURT:  Did you have the Westman Exhibit 39 in

15  front of you when you --

16          THE WITNESS:  I think I did.

17          THE COURT:  Is there any dispute -- Mr. Kerr, is there

18  any dispute that it was March 31, 2008?

19          MR. KERR:  Your Honor, Charles Kerr.  I don't believe

20  there is any dispute.

21          THE COURT:  Okay, so let's just go on, okay?

22          MS. MILLER:  Thank you.

23  Q.    Mr. Renzi, is there a difference in your mind between a

24  debt and an intercompany balance?

25  A.    Meaning the -- for example, the Ally revolver?  Or --

1          THE COURT:  Well, meaning that you've been fencing and

2     Ms. Miller has been fencing with you -- she keeps referring to

3     it as intercompany debt and you keep referring to it as

4     intercompany balance.  So --

5     A.    Yes, I think of them as intercompany balances.  I don't

6     think of them as intercompany debt.  I think that that's what

7     phase 2 is all about.

8     Q.    And Mr. Renzi --

9          THE COURT:  In part.

10    Q.    And Mr. Renzi, you understood that the intercompany debts

11    had to be forgiven in order to ensure compliance with net worth

12    covenants, right?

13         THE COURT:  Are you going to continue to fence?

14    A.    I wouldn't say debt.  I just don't think of it the same

15    way.  So I can't answer the question in the way you asked it,

16    because you said debt, not balance.

17    Q.    Well, what impact does a debt -- what impact --

18         THE COURT:  Why don't you just agree to disagree.

19    He's not going to say.--

20         MS. MILLER:  I'll agree to disagree in one minute.

21    Q.    Mr. Renzi, I'd like you to look at the expert report that

22    you submitted in this action at paragraph -- which is in your

23    binder.

24         MR. KERR:  Which one?

25         MS. MILLER:  Sorry, you're right.  And I'm looking.

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

 1  The expert report of Mark Renzi, phase 2.

 2  A.    Dated October 18th?

 3  Q.    Dated October 18th.

 4  A.    I'm there.

 5  Q.    In paragraph 18, about five lines up from the bottom --

 6          THE COURT:  Let me get there.  Tell me once again,

 7  paragraph 18?

 8          MS. MILLER:  Paragraph 18, yes, sorry.

 9          THE COURT:  All right.  I'm there.

10  Q.    Do you see that about two-thirds of the way down you

11  describe the sixteen-billion-dollar debt forgiveness that we've

12  been talking about?

13  A.    I do see it written there.

14  Q.    And you specifically refer to it as --

15          THE COURT:  Okay, she got you, she found the place

16  where you refer to it as debt forgiveness.  Can we just move

17  on?

18          THE WITNESS:  Your Honor, if I could go back, I would

19  change this.

20          THE COURT:  No.

21          MS. MILLER:  I was going to move on, but my next point

22  is --

23          THE COURT:  Come on.

24  Q.    Mr. Renzi, when you did have is a another chance --

25          THE COURT:  Ms. Miller, can we just go on?  You may

1  win, but not because you're fencing with him and he used debt

2  in one place, okay?  And you may not win, but let's just go on.

3  Q.    Mr. Renzi, you spent months collecting and reviewing

4  information from the company about the intercompany balances,

5  right?

6  A.    Yes, that's correct.

7  Q.    You did it both pre-petition and you continued for months

8  post petition, right?

9  A.    I did.

10 Q.    And you didn't submit an expert report offering an opinion

11 on whether those intercompany balances are debt or equity

12 right?

13 A.    I don't think there was litigation throughout the entire

14 case --

15         THE COURT:  It's just a question, did you submit an

16 expert report on --

17         THE WITNESS:  I'm sorry?

18         THE COURT:  Did you submit an expert report on whether

19 it's debt or equity?

20         THE WITNESS:  No, Your Honor.

21         THE COURT:  Okay.  Next question.

22         MS. MILLER:  I have no further questions, Your Honor.

23         THE COURT:  Thank you.

24         Further cross-examination from anyone?

25         MR. DONNELL:  Just very briefly, Your Honor.  Your

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1  Honor, Jim Donnell for Wachovia, WFBNA.

2  CROSS-EXAMINATION

3  BY MR. DONNELL:

4  Q.   Mr. Renzi --

5  A.   Good morning.

6  Q.   -- I'm counsel for Wachovia, WFBNA, in connection with the

7  deposit agreement between AFI and WFBNA.

8       Are you familiar with the deposit agreement between --

9            THE COURT:  Is there an exhibit?

10           MR. DONNELL:  I'm sorry?

11           THE COURT:  Is there an exhibit?

12           MR. DONNELL:  No, Your Honor.

13           THE COURT:  I keep hearing people talk about deposit

14 agreements, but I haven't seen anything.

15           MR. DONNELL:  It's in a stipulation we agreed to with

16 the debtor that's filed.

17           THE COURT:  Yes, a stipulation to what effect?  That

18 you have a deposit agreement?  I mean, what --

19           MR. DONNELL:  I'm only trying to establish this

20 witness has no knowledge.

21           THE COURT:  Go ahead, ask the question.  But --

22 Q.   So you have not undertaken a valuation of WFBNA's claims

23 against AFI as part of the liquidation analysis, is that

24 correct?

25 A.   No.

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1   Q.   Okay.

2          THE COURT:  It is correct, right?

3          THE WITNESS:  I'm sorry, it is correct, Your Honor.

4          MR. DONNELL:  Thank you, Your Honor.

5          THE COURT:  Okay.  Any further cross-examination from

6   anyone?  I couldn't tell.  Are you coming up to cross-examine?

7          UNIDENTIFIED SPEAKER:  No.

8          THE COURT:  No.  Does anybody else wish to cross-

9   examine?

10          Redirect examination?

11          MR. KERR:  I apologize, Your Honor.  Charles Kerr, for

12   the debtors.  No redirect, Your Honor.

13          THE COURT:  Okay.

14          MR. O'NEILL:  Your Honor, I have just a few questions.

15          THE COURT:  Okay.  Mr. O'Neill.

16   REDIRECT EXAMINATION

17   BY MR. O'NEILL:

18   Q.   Good morning, Mr. Renzi.

19   A.   Good morning.

20   Q.   Do you recall on your direct (sic) examination Ms. Miller

21   asked you a series of questions about Exhibit APA?

22          THE COURT:  I'm sure it's vividly in his mind, but

23   we'll turn to it.  Okay?

24   Q.   And I'm going to ask you to focus in particular on page 6

25   of Exhibit APA.

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1   A.   I'm on page 6 of Exhibit DX-APA.

2   Q.   And that is the beginning of a chart of the top seven

3   intercompany balances?

4   A.   Correct.

5   Q.   And do you recall that Ms. Miller asked you basically to

6   look at the first bullet in each of the entries on that chart

7   and asked you whether you agreed with them?

8   A.   I do recall that.

9   Q.   I'll ask you to look at the last bullet of the first

10  entry.  What does that say?

11  A.   "For the first entry Res Holding has no assets other than

12  an approximate fifty million intercompany claim against GMACM,

13  so any intercompany claim asserted against it would have little

14  if any value."

15  Q.   Do you agree with that?

16  A.   I do.

17  Q.   Would you look at the last bullet in the second entry on

18  the chart on page 6 of Exhibit APA?

19  A.   I'm there.

20  Q.   What does that say?

21  A.   "ResCap has no unencumbered assets, so any intercompany

22  claim," in quotations, "asserted against it would have little

23  if any value absent an AFI contribution to ResCap."

24  Q.   Would you look at the last bullet in the third entry --

25  this is at the top of page 7 -- of Exhibit APA?

1  A.    I'm there.

2            THE COURT:  Are you going to ask  him when he agrees

3  what he just read in the second bullet?

4            MR. O'NEILL:  I would do the same for all of them,

5  Your Honor.

6            THE COURT:  Okay.  So go ahead.  But let me hear it.

7  With respect to your statement in the second bullet, page 6,

8  the last, you agree with that statement?

9            THE WITNESS:  I do, Your Honor.

10            THE COURT:  All right.  Go ahead.

11  A.    I'll read the last bullet of entry 3 on page 7:  "There is

12  no documentation reflecting this intercompany relationship.

13  Documentation exists reflecting the reverse lending

14  relationship from RFC to Homecomings.  Intercompany advance

15  agreement, dated June 30th, 2006, between Homecomings as a

16  borrower and RFC as a lender -- as lender," excuse me.

17  Q.    And do you agree with that?

18  A.    I do.

19  Q.    And just to short-circuit this, Your Honor, Mr. Renzi

20  would you look at the last bullet of each of the entries and

21  tell me whether you disagree with any of them?

22  A.    I've read the last bullet of each entry on pages 7 and 8,

23  and I agree with all of them.

24            MR. O'NEILL:  Thank you, Mr. Renzi.  No further

25  questions.

1            THE COURT:  I have some questions.  This really

2    follows from Mr. O'Neill's question.

3            Is it correct that in virtually every multidebtor case

4    you've worked on there's been a cash management system in place

5    when the debtor filed?

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  And is it frequently the circumstance that

8    amounts reflected on intercompany balances in a cash management

9    system are not backed up by further documentation other than

10   the entries in the cash management system.

11           THE WITNESS:  There are instances where it's both,

12   it's either very well documented or it's not documented at all.

13           THE COURT:  Okay.  It's pretty common that the only

14   documentation is the entries that are made in the cash

15   management system, correct?

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  Because there's frequently a sweep of

18   accounts and it happens on a daily basis, is that correct?

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  Have you testified previously as an expert

21   as to whether intercompany balances reflected in a cash

22   management system should properly be considered debt or equity?

23           THE WITNESS:  I have not testified to that before.

24           THE COURT:  I have no other questions.  Any further

25   examination, Ms. Miller?

1        MS. MILLER:  Your Honor, Atara Miller, Milbank Tweed,

2   on behalf of the JSNS.  No further questions, but I would first

3   like to move to strike paragraphs 5 and 6 and paragraphs 28

4   through 32 of Mr. Renzi's direct testimony as being improper

5   expert testimony, undisclosed expert testimony, under Federal

6   Rule of Civil Procedure 26(a)(2)(B).

7        MR. KERR:  Sorry, which paragraphs?

8        MS. MILLER:  Paragraphs 5 and 6 and 28 through 32.  5,

9   6, 28 through 32.

10      (Pause)

11       THE COURT:  I'm going to reserve ruling.  Each side

12   will submit letter briefs not to exceed five pages with respect

13   to whether paragraphs 5, 6 and 28 through 32 of Mr. Renzi's

14   direct testimony should be stricken or not.  I'd like those

15   letter briefs by next Monday at noon.

16       MS. MILLER:  Your Honor, I'd also like to move into

17   evidence certain exhibits --

18       THE COURT:  I'm just making a note.

19       MS. MILLER:  Oh, sorry.

20       THE COURT:  Tell me, what would you like to move in?

21       MS. MILLER:  I'd like to move into evidence Exhibits

22   DX-ANK, X-APA, DX- --

23       THE COURT:  Just a --

24       MS. MILLER:  Sorry.

25       THE COURT:  Okay.  After APA is what?

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1            MS. MILLER:  DX-AUC, DX-AWR, DX-AXK, and DX-BDE.

2            THE COURT:  Mr. Kerr?

3            MR. KERR:  Can I have a moment, Your Honor?

4            THE COURT:  Absolutely.

5            MR. KERR:  I've got to find them.

6            THE COURT:  Sure.

7        (Pause)

8            MR. KERR:  One more second.

9            THE COURT:  Absolutely.  That's fine.

10           MR. KERR:  I have one more --

11           THE COURT:  Yeah.

12           MR. KERR:  -- one exhibit.

13           THE COURT:  That's fine.

14           MR. KERR:  Can I take a look at one thing?

15           THE COURT:  Fine.

16           MR. KERR:  Your Honor, with respect to Exhibits

17  DX-ANK, DX-APA, DX-AUC, DX-AWR, DX-AXK, we have no objection.

18           THE COURT:  All right, so Exhibits ANK, APA, AUC, AWR,

19  AXK are in evidence.

20  (Defense exhibits regarding Mr. Renzi's testimony were hereby

21  received into evidence as Defendants' Exhibits DX-ANK, DX-APA,

22  DX-AUC, DX-AWR, DX-AXK, as of this date.)

23           THE COURT:  What about BDE?

24           MR. KERR:  And with BDE, Your Honor, that was the

25  exhibit that we raised a 408 issue with yesterday, and we would

1   object --

2            MS. MILLER:  It's not --

3            THE COURT:  Talk to each other, okay, go ahead.

4            THE COURT:  This is not the same.

5            MR. KERR:  It is not the same, I apologize, Your

6   Honor.

7            THE COURT:  No.

8            MR. KERR:  Your Honor, we have no objection to DX-BDE.

9            THE COURT:  BDE?

10           MR. KERR:  Yes.

11           THE COURT:  Okay.  So Exhibit BDE is in evidence as

12   well.  So each of the exhibits ANK, APA, AUC, AWR, AXK and BDE

13   are all in evidence.

14   (Exhibit re Mr. Renzi's testimony was hereby received into

15   evidence as Defendant's Exhibit DX-BDE, as of this date.)

16           MR. KERR:  Yes.

17           MS. MILLER:  Thank you, Your Honor.

18           THE COURT:  You're excused, Mr. Renzi.

19           THE WITNESS:  Thank you.

20           THE COURT:  Thank you very much for your testimony.

21           THE WITNESS:  Thank you, Your Honor.

22           MR. KERR:  Your Honor, we'll just rearrange.  But

23   we'll have a couple --

24           THE COURT:  Yeah, that's fine.

25           MR. KERR:  -- in just a second.

1          THE COURT:  Let me find my chart.

2          It's a little early, but let's take our fifteen-minute

3   recess now.

4          MR. KERR:  Very good, Your Honor.

5          THE COURT:  Give everyone a chance to get reorganized

6   here.

7          Who is the next witness?

8          MR. LAWRENCE:  Oh, yes, Your Honor.  It's -- our next

9   witness will be Nancy Mueller-Handal.  But she's --

10         THE COURT:  Okay.

11         MR. LAWRENCE:  -- she's not going to be crossed, so

12   we'll just.

13         THE COURT:  Who's the next witness that's going to be

14   cross-examined?

15         MR. LAWRENCE:  The next witness that'll be crossed, I

16   believe, will be Ms. Hamzehpour.

17         THE COURT:  Okay.  And we're going to have her here

18   ready to go, right?

19         MR. LAWRENCE:  We will, Your Honor.  She's here.

20       (Recess from 10:07 a.m. until 10:23 a.m.)

21         THE COURT:  Please be seated.

22         MR. LAWRENCE:  Your Honor, we have three witnesses

23   we'll try to move through quickly.

24         THE COURT:  Okay.

25         MR. LAWRENCE:  First off, in support of the Chapter 11

 1 | plan, the debtors offer --

 2 |      THE COURT:  You have to identify yourself.

 3 |      MR. LAWRENCE:  Oh, I'm sorry, Your Honor.  Alex

 4 | Lawrence for the debtors.  I apologize.

 5 |      In support of the Chapter 11 plan, the debtors offer

 6 | the declaration of Nancy Mueller-Handal dated November 12,

 7 | 2013, which was filed as docket entry number 5688.  If Ms.

 8 | Mueller-Handal were called to testify she would testify as to

 9 | what's in her declaration.

10 |      THE COURT:  Any objections to the declaration of Nancy

11 | Mueller-Handal?

12 |      MR. COHEN:  No objection, Your Honor and we do not

13 | intend to cross.

14 |      THE COURT:  All right.  It's in evidence.

15 | (Direct testimony of Nancy Mueller-Handal was hereby received

16 | into evidence as Plan Proponents' Exhibit, as of this date.)

17 |      THE COURT:  Any exhibits with it?

18 |      MR. LAWRENCE:  There are no exhibits.

19 |      THE COURT:  All right.

20 |      MR. LAWRENCE:  Second, Your Honor, in support of the

21 | Chapter 11 plan, the debtors offer the declaration of Ralph

22 | Mabey, including the materials incorporated therein.  It's

23 | dated November 12, 2013, and it was filed as docket entry

24 | number 5686.

25 |      If Mr. Mabey were called to testify, he would testify

 1  as to what is in his declaration, Your Honor.

 2          THE COURT:  Mr. Cohen?

 3          MR. COHEN:  No objection and we do not intend to

 4  cross.

 5          THE COURT:  All right.  The direct testimony of Ralph

 6  Mabey, ECF 5686, is in evidence.

 7  (Direct testimony of Ralph Mabey was hereby received into

 8  evidence as Plan Proponents' Exhibit, as of this date.)

 9          MR. O'NEILL:  Good morning, Your Honor, Brad O'Neill

10  on behalf co-proponents.  The co-proponents now offer the

11  declaration of Susheel Kirpalani in support of the plan of

12  reorganization, found at docket number 5681.  It was filed on

13  November 12, 2013.

14          If called to testify, Mr. Kirpalani would testify to

15  the substance of his declaration.  There are no exhibits.

16          THE COURT:  Mr. Cohen?

17          MR. COHEN:  No, objection.  We do not intend to cross.

18          THE COURT:  Did you have a nice two-hour deposition of

19  him?

20          MR. COHEN:  We did actually, thank you very much.

21          THE COURT:  All right.  The direct testimony of

22  Susheel Kirpalani which is at ECF 5681 is in evidence.

23  (Direct testimony of Susheel Kirpalani was hereby received into

24  evidence as Plan Proponents' Exhibit, as of this date.)

25          THE COURT:  Let me just check them off on my list.

1    Hold on a second.

2           MR. LAWRENCE:  Your Honor, Alex Lawrence for the

3    debtors, again.  We now have a witness who I understand will be

4    cross-examined.

5           THE COURT:  Okay.

6           MR. LAWRENCE:  So I'll invite Ms. Hamzehpour up and

7    we'll distribute some binders.

8           THE COURT:  Do you want to identify her direct

9    testimony?

10           MR. LAWRENCE:  I will, Your Honor.  In support of the

11   joint Chapter 11 plan and in these consolidated proceedings,

12   the debtors offer the direct testimony of Tammy Hamzehpour,

13   dated November 12, 2013, which was filed as docket entry number

14   5708.  If Ms. Hamzehpour were called to testify, she would

15   testify as to what is in her direct testimony.

16           THE COURT:  If you want to just stand there for a

17   moment.  If you would raise your right hand and be sworn.

18       (Witness sworn)

19           THE COURT:  All right.  Please have a seat.

20           Go ahead, I'm sorry.

21           MR. LAWRENCE:  So if Ms. Hamzehpour were to called to

22   testify, she would testify as to what is in her direct

23   testimony.  And we offer her testimony, Your Honor.

24           THE COURT:  All right.  Any objections to the direct

25   testimony of  Ms. Hamzehpour.  Mr. Perry?

1              MR. PERRY:  Not to the testimony, Your Honor.

2              THE COURT:  All right.  The direct testimony of Tammy

3      Hamzehpour which is ECF 5708 is in evidence.

4      (Direct testimony of Tammy Hamzehpour was hereby received into

5      evidence as Plan Proponents' Exhibit, as of this date.)

6              MR. LAWRENCE:  And Your Honor there are a number of

7      exhibits.

8              THE COURT:  Okay.

9              MR. LAWRENCE:  I think there is eight or nine.  And

10     I'll distribute some binders and we'll go through them and see

11     what objections there are, Your Honor.

12             THE COURT:  All right.  Thank you.

13             I'm going to disappear back here.

14         (Pause)

15             MR. LAWRENCE:  Your Honor, in connection with Ms.

16     Hamzehpour's direct testimony, we offer the following exhibits,

17     which were previously identified on the plan proponents' trial

18     exhibit list.  They are Exhibit numbers 589, 590, 592, 593,

19     594, 595, 614, 615, 620, 633, 636, 637, 652, 666, 682, 761 and

20     762.

21             THE COURT:  Mr. Perry?

22             MR. PERRY:  We have an objection to Exhibits 633 on

23     lack of foundation, hearsay, and completeness grounds and 682

24     on hearsay grounds.

25             THE COURT:  Okay.

1          MR. PERRY:  And completeness, as I looked it up.

2          THE COURT:  But with respect to the rest, you have no

3    objection?

4          MR. PERRY:  Correct.

5          THE COURT:  All right.  So Exhibits 589, 590, 592,

6    593, 594, 595, 614, 615, 620, 636, 637, 652, 666, 761 and 762

7    are all admitted in evidence.

8    (Exhibits regarding Ms. Hamzehpour's testimony were hereby

9    received into evidence as Plan Proponents' Exhibit 589, 590,

10   592, 593, 594, 595, 614, 615, 620, 636, 637, 652, 666, 761 and

11   762, as of this date.)

12         THE COURT:  Let me just look at the others and we'll

13   see whether I will now or we'll wait.

14      (Pause)

15         What is the purpose of the offer of 633 and 682?

16         MR. LAWRENCE:  Your Honor, let me take --

17         THE COURT:  Does -- they're full hearsay.

18         MR. LAWRENCE:  Right.  Let me take 633 first.

19         THE COURT:  Okay.

20         MR. LAWRENCE:  I will say with respect to 633, Ms.

21   Westman, who will testify next, lays a foundation for this in

22   her direct testimony --

23         THE COURT:  Well, then we'll have to --

24         MR. LAWRENCE:  -- so we may take another run at that

25   when Ms. Westman --

1          THE COURT:  Okay.  What's the basis?  I assume, Mr.

2    Perry, that the completeness is because of the redactions?

3          MR. PERRY:  No.  Actually if you look at what I think

4    is probably Ms. Westman's spreadsheet, which starts at page 9

5    of 19 --

6          THE COURT:  All right, hang on, let me get there.

7    Okay.

8          MR. PERRY:  -- there's some commentary in the far

9    right column.  And just by way of example, the first line,

10   which is discussing the two billion dollar debt forgiveness --

11         THE COURT:  Yes.

12         MR. PERRY:  -- refers to attached documents.  This

13   exhibit doesn't have any attached documents.  So that's the

14   completeness part of the objection.

15         THE COURT:  Well, let me ask this.  Have the

16   attachments been provided to you?

17         MR. PERRY:  I don't know.  This is how the document

18   was produced and presented as an exhibit.  I don't know what

19   the attachment is.

20         MR. LAWRENCE:  I'm not aware of any attachment, Your

21   Honor, to this document.  I think this is a freestanding

22   document.  It may refer to documents, but we can investigate

23   further.

24         THE COURT:  Well, if it says attachments, there ought

25   to be attachments.

1          MR. LAWRENCE:  Well, let me investigate this document

2     and see if there were attachments that were not --

3          THE COURT:  All right.  What about 682?  What's the

4     issue about 682?

5          MR. PERRY:  Well, on --

6          THE COURT:  First off, since Ms. Westman is going to

7     be a witness, I guess it's still -- even if she testifies, I

8     mean, the document's still hearsay.

9          What's the purpose of the offer -- come back to the

10    question I asked, what's the purpose of the offer?

11         MR. LAWRENCE:  It is a -- it is a document --

12         THE COURT:  And we're talking about 633.

13         MR. LAWRENCE:  It's a document that outlines debt

14    forgiveness, historical debt forgiveness.  It is a summary of

15    the debt forgiveness, Your Honor.

16         THE COURT:  And the debt forgiveness is what's

17    reflected at pages 8 through -- well, it's that Excel copy --

18    print of an Excel spreadsheet that goes from pages 8 through 19

19    of 19.  Is that what you're talking about?

20         MR. LAWRENCE:  Yes, Your Honor.  And as I understand,

21    it's information that's downloaded from the company's books and

22    records.

23         THE COURT:  And Ms. Westman's going to be able to

24    testify to that?

25         MR. LAWRENCE:  She actually has, Your Honor, in her

1  direct testimony --

2          THE COURT:  Well, so that's not in yet, but that --

3  all right, but she has testified as to that?

4          MR. LAWRENCE:  She will, Your Honor.

5          THE COURT:  Mr. Perry, you're still -- what about --

6  what comes before the printout of the Excel spreadsheet you're

7  offering for what purpose?  I mean, it's an e-mail thread.

8          MR. LAWRENCE:  It's actually for no purpose, Your

9  Honor.  It's just because.  It's --

10          THE COURT:  It's part of the same document.

11          MR. LAWRENCE:  Yes.  So it's an e-mail with an

12  attachment, so when we --

13          THE COURT:  You care about the attachment, is what you

14  mean?

15          MR. LAWRENCE:  Exactly, your Honor.  I mean, maybe it

16  puts a date on it.  I don't --

17          THE COURT:  Okay.  And, Mr. Perry, at the top of 8 of

18  19, it says, file provided natively.  So I'm assuming that you

19  actually got the spreadsheet.  It obviously shows it's an Excel

20  spreadsheet debt forgiveness summary 2008, May 13, 2012, with

21  filters, dot XLS.  It's a file number.  Do you know whether you

22  got that?

23          MR. PERRY:  I believe we -- the document was produced

24  to us.

25          THE COURT:  No, not the document.  I mean, it -- okay,

1    do you know whether the Excel spreadsheet was produced to you?

2            MR. PERRY:  I believe it was, Your Honor.

3            THE COURT:  I assume that this is what Mr. --

4            MR. PERRY:  We've been using it in the case.

5            MR. LAWRENCE:  It was, Your Honor.

6            THE COURT:  I'm assuming that's what Mr. Fazio used.

7    Mr. Fazio does his analysis of debt forgiveness --

8            MR. PERRY:  If I may, Your Honor, the --

9            THE COURT:  -- or intercompany balance forgiveness,

10   depending on who's fencing with whom, but --

11           MR. PERRY:  The document entitled debt forgiveness,

12   the objectionable parts are the commentary column and the

13   reason -- the reason columns, which provide more than just sort

14   of business records.

15           THE COURT:  Okay.  Let me ask this.  Are you objecting

16   on the grounds of foundation because it hasn't been

17   authenticated?  I mean --

18           MR. PERRY:  No, Your Honor.

19           THE COURT:  No.

20           MR. PERRY:  Although I don't think it comes in through

21   this witness.  That's not the --

22           THE COURT:  Well, come on.  Look --

23           MR. PERRY:  The objection --

24           THE COURT:  -- are you going to object to it when it's

25   offered with Ms. Westman?  Because, look, if you're not

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1  objecting to the authenticity of the document, tell me that,

2  okay?

3          MR. PERRY:  I am not objecting to the authenticity.

4          THE COURT:  Okay.  The objection's overruled.  Exhibit

5  633 is admitted in evidence.

6  (Summary of the debt forgiveness was hereby received into

7  evidence as Plan Proponents' Exhibit 633, as of this date.)

8          THE COURT:  Now, let's deal with 682.  I mean, you can

9  cross-examine, but look, you don't really have a dispute as to

10 what the document is.  I've been told why it's being offered.

11 It's for the chart on debt forgiveness.

12         Okay.  What about 682?  It's an e-mail chain.  What is

13 it being offered -- let me ask the proponents' counsel, why is

14 it being offered?

15         MR. LAWRENCE:  Your Honor, 682 is -- the purpose of

16 682, it's not the e-mail, again, as we were --

17         THE COURT:  It's just attached.

18         MR. LAWRENCE:  It's attachment, and it is a resolution

19 of authorities that are reserved to the GMAC board.  And it --

20         THE COURT:  Who prepared it?  We're looking -- we're

21 talking about page 3 and 4 of Exhibit 682, right?

22         MR. LAWRENCE:  Yes.  And in fact, Your Honor --

23         THE COURT:  Just answer me that.  What you want in

24 really --

25         MR. LAWRENCE:  Is 3 of 4 and it bleeds over into 4 of

1   4.

2            THE COURT:  Yeah, okay.  And --

3            MR. LAWRENCE:  And as to actually who prepared the

4   document --

5            THE COURT:  Yes.

6            MR. LAWRENCE:  -- I can't answer that here today, Your

7   Honor.

8            THE COURT:  Well --

9            MR. LAWRENCE:  But it was prepared by someone at GMAC.

10  And if necessary, we can --

11           THE COURT:  Tell me what the purpose of the offer is.

12           MR. LAWRENCE:  Your Honor, it is to show that the GMAC

13  board reserved the authority to approve certain levels of

14  capital -- to have preapproval for certain levels of capital

15  infusion.

16           THE COURT:  All right.

17           MR. LAWRENCE:  And I think this is not a point that

18  anyone disputes.

19           THE COURT:  I don't know.  It may be.

20           MR. LAWRENCE:  Well, the --

21           THE COURT:  Is your objection no foundation to the --

22           MR. LAWRENCE:  Yeah, well, also --

23           THE COURT:  Look, the e-mail chain isn't -- nobody

24  cares about it.  That's not what it's being offered for.

25           Are you objecting to lack of foundation on pages 3 and

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1  4 of Exhibit 682?

2          MR. PERRY:  The document is -- yes, the document's

3  identified as a final draft.

4          Mr. Lawrence described it as a resolution.  It's not a

5  resolution.  It's a bullet point list prepared by, it looks

6  like Mr. Schaeffer.  I don't know who that is.

7          THE COURT:  All right.  The objection is sustained on

8  lack of foundation.  If there's somebody -- look, during Phase

9  I, I think I made this point that if there is an issue about

10 foundation, I don't care whether somebody's on your witness

11 list or not, you'll call -- if you have to call another -- if

12 you can't work this out by stipu -- I assume this was a

13 document that's been used for cross-examination in depositions,

14 but what do I know.

15         MR. LAWRENCE:  Your Honor, and we will get a records

16 custodian from Ally who can authenticate this.

17         THE COURT:  Okay.  Well, look, what we did in Phase I,

18 when an issue like this came up, I required the debtors to get

19 an affidavit that established the foundation, and they did.

20 And I think the issue went away anyway.  I think people agreed.

21 But they went ahead and they got an affidavit declaration that

22 supported the foundation.

23         So for now, you're going to have to do that.  You'll

24 either work it out with counsel or not, okay?

25         MR. LAWRENCE:  That's fair enough, Your Honor.  And I

RESIDENTIAL CAPITAL, LLC, ET AL.                    68

1    will point out that it does say on page 2 of 4 that this was a

2    delegation of authority that was discussed and approved by the

3    GMAC board --

4            THE COURT:  It may say that, but that doesn't

5    establish the --

6            MR. LAWRENCE:  We'll work it out, Your Honor.

7            THE COURT:  I --

8            MR. LAWRENCE:  Thank you, Your Honor.

9            THE COURT:  Mr. Perry, I'm saying this, but are you

10   really disputing what's in those two pages?

11           MR. PERRY:  What I'd like is the actual final board

12   resolution and not somebody's bullet point summary of the board

13   resolution.

14           THE COURT:  Fine, all right.  We'll see.  I'm not

15   saying I'm going to require the actual board minutes, but for

16   now, there's no foundation and the objection is sustained for

17   now.

18           Okay.  So the only one of the exhibits that's been

19   offered -- they're all in evidence, except for 682, as to which

20   the court has reserved decision.

21           And of course, that means, Mr. Perry, you're not

22   allowed to cross-examine about it either.

23           MR. PERRY:  Understood, Your Honor.

24           THE COURT:  All right, cross-examination.

25   CROSS-EXAMINATION

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1   BY MR. PERRY:

2   Q.   Morning, Ms. Hamzehpour.

3   A.   Good morning.

4   Q.   You've been designated as the corporate representative on

5   all corporate practices, policies, procedures, guidelines and

6   decisions to forgive, cancel, settle and/or waive intercompany

7   claims, correct?

8   A.   That's correct.

9   Q.   Directing your attention --

10       MR. PERRY:  Do we have binders for --

11       THE COURT:  You do have a binder, and I have it up

12   here already.

13   Q.   You have a binder in front you, Ms. Hamzehpour, a witness

14   binder.  It's black.

15       THE COURT:  It's a little thin --

16       THE WITNESS:  This?

17       THE COURT:  No.  A little thin black -- yeah, you got

18   it.

19   Q.   Okay.  If you could open to PX-593.

20   A.   Yes.

21   Q.   Okay.  Can you identify this document for the record?

22   A.   Yes.  This is an e-mail from Barbara Westman to myself.

23   Q.   And it's dated March 26, 2010, correct?

24   A.   Yes, that's right.

25   Q.   And directing your attention to page 2 of 125 -- I'm going

1   to use the page numbering at the bottom of the document.

2   A.   Okay.

3   Q.   Directing your attention to page 2 of 125, you would agree

4   with me that the debt forgiveness procedures listed on page 2

5   of 125 and 3 of 125 is an accurate summary of the pre-petition

6   policies and procedures with respect to debt forgiveness?

7   A.   This is a listing of policies of the accounting team.

8   It's not a complete or the only policy that relates to debt

9   forgiveness.  But this is their --

10         THE COURT:  Would you just pull the microphone a

11   little closer to you?

12         THE WITNESS:  Sorry.

13   A.   This is a -- a list of policies and procedures -- or it's

14   not even a policy, it's a procedure that addresses what the

15   finance team does in connection with debt forgiveness.

16   Q.   This document addresses the processes that the accounting

17   team had in place to monitor upcoming changes in capital that

18   might require a need for debt forgiveness, correct?

19   A.   That's right.

20   Q.   Now, I want to go to page 59 of 125.

21   A.   Okay, I'm there.

22   Q.   You would agree with me that this attachment is a sample

23   spreadsheet analyzing Residential Funding Company's compliance

24   with HUD and various state net worth requirements, correct?

25   A.   Yes, that's what it appears to be.

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1   Q.   And directing your attention to page 59, for HUD purposes,

2   intercompany receivables were excluded as assets for purposes

3   of calculating net worth, correct?

4   A.   That's correct.

5   Q.   But HUD did not exclude intercompany payables as

6   liabilities for purposes of calculating net worth, correct?

7   A.   I don't know.  I don't know the HUD rules and -- backward

8   and forward.

9   Q.   And you don't, based on your review of the HUD

10  calculations set forth on page 59 of 125, see any evidence that

11  HUD excluded intercompany payables as liabilities for purposes

12  of calculating net worth, right?

13  A.   No, I don't think so.

14  Q.   Okay.  Directing your attention to the next page --

15           THE COURT:  Next page being 60?

16           MR. PERRY:  60 of 125.  Thank you, Your Honor.

17  BY MR. PERRY:

18  Q.   In contrast to HUD, some states did not require the

19  exclusion of intercompany receivables as assets for purposes of

20  calculating net worth, correct?

21  A.   That's my understanding, yes.

22  Q.   Okay.  And specifically directing your attention to the

23  Michigan calculation, it's true that Michigan did not exclude

24  intercompany receivables as assets for purposes of calculating

25  net worth, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1   A.   They're -- they're not listed specifically on here.  I

2   don't know the Michigan rules by heart.

3   Q.   You would -- directing your attention to page 61, there's

4   a box with text labeled Michigan.

5   A.   Yes, I see it.

6   Q.   Could you just take a moment to familiarize yourself with

7   the text?  I know it's small.

8   A.   Even with glasses, it's hard.

9   Q.   Let me just direct your -- the first question --

10         THE COURT:  Look at the screen.

11         THE WITNESS:  Oh, maybe that's --

12         THE COURT:  Look at the screen.  You'll see it.

13         THE WITNESS:  That's much easier.  Thank you.

14   Q.   And directing your attention specifically to sub D, you

15   would agree with me that this document does note that Michigan

16   excludes an investment shown on the balance sheet in joint

17   venture subsidiaries or affiliates which are greater than the

18   market value of the assets, correct?

19   A.   That's what this page reflects, yes.

20   Q.   Okay.  And going back to the Michigan calculation on page

21   60 of 125, you'd agree with me that there is nothing in the

22   calculation relating to Michigan that identifies any excluded

23   investments in subsidiaries or affiliates on RFC's balance

24   sheet in the 2009 and 2010 periods, correct?

25   A.   I don't see anything on here that reflects that.

RESIDENTIAL CAPITAL, LLC, ET AL.                          73

1   Q.    Okay.  Why don't we go to page 64.  You would agree with

2   me that GMAC M had to comply with the Michigan net worth

3   requirements, correct?

4   A.    Yes.

5   Q.    And you understood that the accounting department prepared

6   and monitored compliance with these various net worth

7   requirements in the ordinary course of business, correct?

8   A.    Correct.

9   Q.    And if the finance department determined that ResCap or

10  any of its subsidiaries would fail an applicable net worth

11  requirement, debt forgiveness was one of the ways that the

12  debtors used to put that entity in compliance with its net

13  worth requirements, correct?

14  A.    Correct.

15  Q.    And it wasn't just ResCap, RFC and GMAC M that had

16  specific net worth requirements, correct?

17  A.    That's right, any of the entities that had a state license

18  that required a particular level of net worth would have also

19  been on the -- on the list to monitor.

20  Q.    Okay.  So for example, Homecomings Financial during the

21  time that it held state mortgage banking licenses would have

22  had regulatory capital requirements, right?

23  A.    Yes.

24  Q.    And the same is true of Executive Trustee Services,

25  correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1   A.   Yes.

2   Q.   Now, Ms. Westman also included a written consent

3   authorizing the forgiveness of intercompany indebtedness.

4        If you could turn to, by way of example, page 9 of 125.

5   A.   Yes.

6   Q.   Okay.  You'd agree with me that this is a written consent

7   of GMAC Mortgage, LLC dated December 10th, 2009, correct?

8   A.   Yes, that's right.

9   Q.   Okay.  And directing your attention to the first paragraph

10  labeled Resolved, the documents states that "From and effective

11  as of June 30, 2008, the directors of the company hereby

12  approve capital injections into the affiliates from time to

13  time in the form of forgiveness of the debt of each of the

14  affiliates in order to replenish each of their respective

15  capital in each case in an amount necessary to enable the

16  respective affiliate to be solvent and carry a positive capital

17  at the end of each calendar month, including with respect to

18  amounts that may become known after any such month end based on

19  the affiliate's month-end financial statements".

20       You believe that to be an accurate summary of the

21  resolution adopted by the GMAC M Board of Directors on or about

22  December 10, 2009?

23  A.   Yes, that's the text of the resolution.

24  Q.   And you would agree with me that there's nothing in this

25  particular resolution that authorizes capital injections in an

RESIDENTIAL CAPITAL, LLC, ET AL.                    75

1   amount in excess of --

2           MR. PERRY:  Strike that.

3   Q.   You would agree with me that there's nothing in this

4   resolution that authorizes capital injections in excess of an

5   amount necessary to enable the respective affiliate of GMAC M

6   to be solvent and carry a positive capital balance at the end

7   of each calendar month, right?

8   A.   That's correct.

9   Q.   And the Board of Directors of GMAC M authorized the GMAC M

10  CFO to take any and all actions necessary to effect this

11  approved -- any approved debt forgivenesses, correct?

12  A.   That's correct.

13  Q.   Why don't you to take a look at DX-AOK.

14          Now directing -- this is an e-mail that you wrote to Mr.

15  Marano and Mr. Young, correct?

16  A.   That's correct.

17  Q.   And there's some redacted text at the top of the e-mail,

18  but the text appearing below your name and the asterisk, you

19  believe you drafted that text, correct?

20  A.   Yes.

21  Q.   And you informed Mr. Marano and Mr. Young that --

22          MR. PERRY:  Well, strike that.

23  Q.   This involved a forgiveness of debt with respect to GMAC

24  RFC Limited, right?

25  A.   Yes, that's correct.

1  Q.   And that was one of the UK subsidiaries, correct?

2  A.   Yes.

3  Q.   And in the case of the UK entities, intercompany

4  receivables were one way that actual cash was being repatriated

5  back to ResCap, correct?

6  A.   Yes.

7  Q.   And in your e-mail you were suggesting that ResCap in its

8  capacity as intercompany lender only release the minimum amount

9  of debt necessary to maintain the required level of capital at

10  GMAC RFC Limited, right?

11  A.   Yes, that's right.

12  Q.   And you would agree with me that, just focusing on the

13  lending entity's perspective, it's not typically in the

14  interest of a lender to forgive any more intercompany debt than

15  necessary in order to achieve whatever purpose the debt was

16  being forgiven for, correct?

17        MR. LAWRENCE:  Objection.

18  A.   Yes, that's correct.

19        THE COURT:  Overruled.

20  BY MR. PERRY:

21  Q.   Now, why don't you go to DX-AON.  This is an e-mail chain

22  that was sent to you by Mr. Young on March 20th, 2008.

23        You were in the courtroom for Mr. Renzi's testimony

24  earlier this morning, correct?

25  A.   Correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1  Q.   And you recall there was a series of questions and answers

2  about a March 2008 debt forgiveness that he had used in his

3  analysis, right?

4  A.   That's right.

5  Q.   And do you believe DX-AON relates to the debt forgiveness

6  that Mr. Renzi was testifying about earlier this morning?

7  A.   I believe that it does, yes.

8  Q.   And in that particular -- this particular debt

9  forgiveness, RFC --

10            MR. PERRY:  Or strike that.

11 Q.   -- ResCap was being asked to forgive two billion of

12 intercompany indebtedness to RFC in March of 2008, right?

13 A.   Yes, that's correct.

14 Q.   And it was being asked to do so in order to replenish

15 capital that had been diminished by operating losses at RFC,

16 right?

17 A.   Yes.

18 Q.   And there was a concern that RFC needed the two billion

19 dollars to show adequate net worth in order to cover its

20 financial covenants, right?

21 A.   Yes.  Its net worth was being depleted by losses.

22 Q.   And as of March 2008, RFC was in danger of failing to

23 maintain required capital levels in at least one of its credit

24 facilities, right?

25 A.   I believe that's the message of this e-mail, yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    78

1   Q.   And a default by RFC for failure to maintain required

2   capital levels would have triggered a cross-default across all

3   of ResCap's credit facilities, right?

4   A.   Yes.

5   Q.   And that would have put in danger the entire enterprise's

6   ability to operate, right?

7   A.   I believe it would have given various lenders rights to

8   accelerate.

9          THE COURT:  If you'd just pull the microphone a

10  little closer.

11  A.   It would have given various lenders rights to accelerate

12  their funding facilities.

13  Q.   And the forgiveness of indebtedness by ResCap in 2008

14  alleviated the danger of acceleration that you just testified

15  to, correct?

16  A.   In that instance, yes.

17  Q.   Okay.  And from the perspective of ResCap, in exchange for

18  its forgiveness of indebtedness, it received additional equity

19  in the subsidiary, correct?

20  A.   Yes.

21  Q.   There would have been the accounting impact of the debt

22  forgiveness as well, correct?

23  A.   Yes, it -- it converts the debt into equity.

24  Q.   Okay.  And from a practical standpoint, it enabled

25  ResCap's wholly owned subsidiary to continue to operate in

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1  conformance with the financial covenants contained in its

2  credit facilities, correct?

3  A.    Correct.

4  Q.    And ultimately, the Ally board was presented with and

5  approved this particular debt forgiveness, right?

6  A.    I don't know for sure.  I don't remember.  I believe they

7  would have.

8  Q.    So your testimony, just so I understand it, is you believe

9  the Ally board would have approved this particular debt

10 forgiveness in 2008, correct?

11     THE COURT:  I'm sorry, your voice trailed off as you were

12 looking over.  Could you just repeat that?

13     MR. PERRY:  Okay.

14 BY MR. PERRY:

15 Q.    Just to be clear, you believe the Ally board would have

16 ultimately approved this particular debt forgiveness in 2008,

17 correct?

18 A.    I believe they would have.  There was a time when Ally

19 reserved to itself the decision around injections of equity

20 over fifty million dollars.  I don't know if that was in place

21 by March 20, but that would have been the -- if it were in

22 place, we would have gotten their approval.

23 Q.    Okay.  And you would agree with me -- just directing your

24 attention back farther in the document, it's heavily redacted.

25 You're the general counsel of the company, right, Ms.

RESIDENTIAL CAPITAL, LLC, ET AL.                                80

1  Hamzehpour?

2  A.    Not today.  I was at this time.  I was in 2008, yeah.

3  Q.    Okay.  And you would -- it's difficult to see from --

4  given the redactions, but you would agree with me that at least

5  it appears on the subject line of these memos that approval for

6  the debt forgiveness was being requested from the ResCap

7  Executive Committee, right?

8  A.    Yes, from the ResCap Executive Committee.

9  Q.    You also understand that if you report a quarterly

10 financial statement to a state licensing agency that doesn't

11 show the appropriate capital level, there would be a danger of

12 having them pull your license to do business in the state,

13 right?

14 A.    I think -- I think there is some risk of that, yes.

15 Q.    And with respect to the GSEs, there's no license to do

16 business, rather, they require an approval to do business with

17 the government-sponsored entities, right?

18 A.    That's right.  We also had special agreements with Fannie

19 Mae and Freddie Mac as to capital levels.

20 Q.    Okay.  But absent a special agreement, if the ResCap

21 company doing business with the GSE did not maintain adequate

22 capital levels, the company would be in danger of having the

23 GSE approval revoked, correct?

24 A.    That's correct.

25 Q.    And there's nothing in the special agreements that you

RESIDENTIAL CAPITAL, LLC, ET AL.                    81

1    just testified to that changed the requirement that --

2              MR. PERRY:  Well, strike that.

3    BY MR. PERRY:

4    Q.   The special agreements that you testified to changed the

5    required capital levels for ResCap and GMAC M and RFC, correct?

6    A.   They essentially set the required capital levels and they

7    changed from time to time through negotiation with the GSEs,

8    but those agreements set the rules by which we needed to

9    operate.

10   Q.   Okay.  And a failure to comply with the revised agreements

11   would put ResCap's ability to do business with the GSEs in

12   danger, correct?

13   A.   Yes.

14             MR. PERRY:  I don't have any other questions, Your

15   Honor.

16             THE COURT:  Any other cross-examination?  Mr.

17   Schaeffer?  Anybody, any cross-examination?

18             Ms. Hamzehpour, can you tell me whether the debtors

19   ever reflected in their books and records that intercompany

20   balances were collateral for any secured facilities?

21             THE WITNESS:  Not to my knowledge, Your Honor.

22             THE COURT:  Redirect?

23             MR. LAWRENCE:  No, Your Honor.

24             THE COURT:  All right.  You're excused.  Thank you

25   very much.

RESIDENTIAL CAPITAL, LLC, ET AL.                    82

1              THE WITNESS:  Thank you.

2              THE COURT:  Mr. Perry, you had concluded your exam.

3    Is there something about what I asked that's leading you to ask

4    more questions?

5              MR. PERRY:  No, Your Honor.

6              THE COURT:  All right.  You're excused, Ms.

7    Hamzehpour.

8              THE COURT:  It's okay if it -- it's fair, if you have

9    a follow-up question limited to the scope of what I asked.

10             MR. PERRY:  I don't, Your Honor.  Thank you.

11             THE COURT:  All right.  Thank you very much, Ms.

12   Hamzehpour.

13             MR. KERR:  Your Honor, can I just move some of these

14   binders?

15             THE COURT:  Yeah, that's fine.

16             So while people are moving paper around, with respect

17   to Exhibit 682, which has not come in, that was the -- it

18   includes the chart with, I suppose, a summary of board

19   resolutions on authority, and I guess the debtors were going to

20   seek to get a declaration to establish the foundation.

21             I would just note that you should also consider

22   whether Rule 1006 of the Federal Rules of Evidence, which deals

23   with summaries to prove content, would be applicable.

24             That, of course, would require, if there's been a

25   request, that you produce the underlying documents to Mr.

1    Perry.

2              So rather than -- if it's a summary of what's in

3    voluminous board minutes and things like that, give the minutes

4    to Mr. Perry and let him confirm the accuracy.  But I just

5    point that out.

6              MR. KERR:  Your Honor, we'll do so.  Let me over lunch

7    or something figure this out, but we'll straighten it away.

8              Excuse us for moving things around, Your Honor.

9              Your Honor, Charles Kerr on behalf of the debtors.  In

10   support of the Chapter 11 plan proposed by the debtors and the

11   Official Committee of the Unsecured Creditors, the debtors

12   offer the direct testimony of Barbara Westman dated November

13   12, 2013, which was filed as docket entry number 5709.

14             If Ms. Westman was called to testify, she would

15   testify to what's in her direct written testimony.

16             We, therefore, offer her written direct testimony for

17   the support of the consolidated proceedings and plan

18   confirmation.

19             THE COURT:  All right.  Mr. Cohen?  Or Ms. Miller?

20             MS. MILLER:  No objections, Your Honor.

21             THE COURT:  All right.  The direct testimony of

22   Barbara Westman which is at ECF docket number 5709 is admitted

23   in evidence.

24   (Direct testimony of Barbara Westman was hereby received into

25   evidence as Plan Proponents' Exhibit, as of this date.)

1          MR. KERR:  Let me just check one thing, if I can find

2     something.

3          Your Honor, in connection with Ms. Westman's direct

4     testimony, we have -- we also offer the following exhibits, all

5     of which were previously identified in our exhibit list.

6          Let me run them down.  There's a series of them and

7     they're in the two binders that I think we put up on your desk,

8     because you didn't have enough, and so they'll be there.  If

9     there are any objections, we can deal with them, okay?

10          Let me run down the list, Your Honor:  575, 576, 577,

11     578, 585, 586, 588, 592, 593, 594, 595, 599, 601, 602, 604,

12     605, 621, 627, 628, 629, 731, 732, 733, 734, 735 -- Your Honor,

13     I apologize.  I've been -- let me start up again.  I was using

14     sevens instead of sixes and I screwed up my numbers.

15          THE COURT:  Wait, wait.  Timeout.

16          MR. KERR:  Okay.

17          THE COURT:  Let's stop for a second.

18          MR. KERR:  I apologize, Your Honor.  I --

19          THE COURT:  Wait.

20          MR. KERR:  I think the -- I apologize, Your Honor.

21          THE COURT:  No.  Could I make this suggestion?

22     Perhaps at the start of the lunch break you and Ms. Miller can

23     confer and, as we did yesterday where there were voluminous

24     exhibits for a witness, you can do a --

25          MR. KERR:  Your Honor, that's a great suggestion.

1           THE COURT:  -- schedule.  Okay.

2           MR. KERR:  Great suggestion, Your Honor.

3           THE COURT:  I'm going to run out of pad room if I have

4    to cross all these numbers all the time.

5           MR. KERR:  We'll do that, Your Honor.  We'll confer

6    and if there's any issues, we'll raise them with you.

7           THE COURT:  Okay.  All right, I appreciate that.

8           MR. KERR:  And with that, Your Honor, there were other

9    ones, but we'll talk about them with Ms. Miller.

10          THE COURT:  Yes, but it was -- the list kept going and

11   I --

12          MR. KERR:  Yeah, the list kept going and I screwed up.

13   So with that, Ms. Westman's available to be cross-examined.

14          THE COURT:  Okay.  Ms. Westman, if you would come up

15   and be sworn.

16          Just push them right out of the way, Ms. Westman.

17          If you would raise your right hand and be sworn.

18       (Witness sworn)

19          THE COURT:  All right.  Please have a seat.  And

20   there's water in the pitcher, so if you need --

21          THE WITNESS:  Okay.

22          THE COURT:  I don't know whether you got a bottle of

23   water for her, but --

24          MR. KERR:  I will make that happen, Your Honor.

25          THE COURT:  There's fresh water in the pitcher and

1   cups, so --

2           MR. KERR:  I will get one in a second.

3           THE COURT:  That's okay.

4           All right.  Well, we'll wait until the documents get

5   spread out here a little more.  Anytime.

6           MS. MILLER:  Atara Miller, Milbank, Tweed, Hadley &

7   McCloy on behalf of the JSNs.

8           Good morning, Ms. Westman.

9           THE WITNESS:  Good morning.

10          MS. MILLER:  Before we start, I just want to -- I know

11  we delivered very large binders to the Court and to the

12  witness, and I just want to note that Volume II has one

13  document that is particularly voluminous.

14          THE COURT:  I see that.

15          MS. MILLER:  So most of the --

16          THE COURT:  Are we going to go through that -- we're

17  going to have a responsive reading page by page or what?

18          MS. MILLER:  I think we provided them electronically.

19  We will not read them -- all the pages.  So most of the

20  documents that we're looking at will be in the smaller volumes

21  there.  That will help move things along here.

22  CROSS-EXAMINATION

23  BY MS. MILLER:

24  Q.   Ms. Westman, you're a certified CPA, right?

25  A.   Correct.

1  Q.   And you began working for ResCap in 2007 as a consultant,

2  right?

3  A.   In 2008.

4  Q.   And you've worked for ResCap as a consultant from 2008

5  through 2010, right?

6  A.   Correct.

7  Q.   And you became an official employee of ResCap in 2010; is

8  that right?

9  A.   That's correct.

10  Q.   And when you started at ResCap, you were responsible for

11  ResCap's financial controls, right?

12  A.   That is correct.

13  Q.   And that included ResCap's general ledger, right?

14  A.   Correct.

15  Q.   And intercompany transactions were recorded in the general

16  ledger, right?

17  A.   That's correct.

18  Q.   And you're now the senior director and controller of

19  ResCap; is that right?

20  A.   That's correct.

21  Q.   And, Ms. Westman, you know that you're testifying here

22  today as the corporate representative with respect to a number

23  of topics, right?

24  A.   Yes.

25  Q.   And included in them are all matters relating to the cash

1  management system, Treasury Management, used by the debtors,

2  including about the movement of cash management and

3  intercompany transactions, right?

4  A.    Yes.

5  Q.    And you're also testifying as the corporate representative

6  on all matters relating to the intercompany transactions or

7  intercompany claims, right?

8  A.    Yes.

9  Q.    And you're testifying also as the corporate representative

10  about all matters relating to accounting and audit of the

11  debtors' financial statements on a non-consolidated basis,

12  right?

13  A.    Yes.

14  Q.    And do you believe that you are competent to testify as

15  the corporate representative as to all of those -- as to all of

16  those subjects?

17  A.    Yes.

18  Q.    Ms. Westman, there was a cash management process in place

19  at ResCap, right?

20  A.    Correct.

21  Q.    And all intercompany cash movement under the cash

22  management system resulted in intercompany payables and

23  intercompany receivables being booked in the intercompany

24  accounts; is that right?

25  A.    Correct, if there was money moved between entities, it

1  would create an intercompany transaction.

2  Q.   And those intercompany transactions were carefully

3  recorded in the general ledger, right?

4  A.   Correct.

5  Q.   And ResCap in its general ledger had both debt and equity

6  accounts, right?

7  A.   I'm sorry, could you repeat the question?

8  Q.   All right.  ResCap had separate payable and receivable

9  accounts that were different from capital contribution or

10 payment in capital accounts, right?

11 A.   Correct.

12 Q.   And the intercompany balances were recorded in the general

13 ledger payable in receivable accounts, right?

14 A.   Correct.

15 Q.   And in contrast, the equity contributions from a parent to

16 a subsidiary would have been reported in the additional paid in

17 capital account, right?

18 A.   That's correct.

19 Q.   And similarly, if a subsidiary issued a dividend or

20 distribution to a parent entity, that transaction would be

21 recorded in the general -- in the paid in capital account,

22 right?

23 A.   Correct.

24 Q.   And all equity transactions, including capital

25 contributions, dividends and distributions, required either

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1  ResCap executive committee or board approval, right?

2             THE COURT:  Could you say that -- I'm sorry.

3             MS. MILLER:  Sure.

4  BY MS. MILLER:

5  Q.      That equity transactions, including capital

6  contributions, or on the other side, dividends and

7  distributions, required ResCap executive committee or ResCap

8  board approval?

9  A.    I'm only aware of the intercompany transaction forgiveness

10 which required board approval.  I wasn't involved in any other

11 direct dividends or equity transactions.

12 Q.    And they required board approval because when they were

13 being forgiven, it was a capital contribution or a dividend or

14 a distribution, right?

15 A.    Correct.

16 Q.    And equity transactions over fifty million dollars

17 required Ally Bank approve -- Ally board approval, right?

18 A.    Correct, at certain periods of time.

19 Q.    And again, intercompany transactions -- debt forgiveness

20 over fifty million dollars required the Ally board approval,

21 right?

22 A.    Correct.

23 Q.    Ms. Westman, you reviewed the documentation relating to

24 intercompany balances in connection with ResCap's bankruptcy

25 filing, right?

RESIDENTIAL CAPITAL, LLC, ET AL.                                91

1  A.    Yes, I did.

2  Q.    But you had also -- you had started that review a lot

3  earlier, right?

4  A.    That's correct.

5  Q.    In the fall of 2011 you began reviewing the intercompany

6  balances in order to comply with a new Ally policy, right?

7  A.    Correct.

8  Q.    And the Ally policy specifically related to ensuring that

9  all intercompany balances complied with a certain protocol,

10  right?

11  A.    Correct.

12  Q.    And as part of your review, you identified that a lot of

13  the intercompany balances on ResCap's general ledger resulted

14  from cash management activity, right?

15  A.    That's correct.

16  Q.    And that those intercompany balances didn't cash settle;

17  is that right?

18  A.    There were intercompany balances that didn't cash settle,

19  yes.

20  Q.    And Ally --

21          THE COURT:  Just explain what you mean by that, that

22  they didn't cash settle.

23          THE WITNESS:  By "cash settle", I -- that to me means

24  that we purposely made a repayment of an intercompany

25  transaction.

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1          THE COURT:  As opposed to crossing one against

2     the another?

3          THE WITNESS:  As opposed to one day I lend money to

4     you and the next day you give money back, correct.

5          THE COURT:  That's fine.

6          Go ahead, Ms. Miller.

7          MS. MILLER:  Okay.

8     BY MS. MILLER:

9     Q.    And Ally's new global intercompany policy required that

10    intercompany cash balances settle periodically, right?

11    A.    Yes.

12    Q.    But ResCap's intercompany balances that were arising out

13    of the cash management system were not cash settling, right?

14    A.    That is correct.

15    Q.    And so ResCap had to ask Ally for an exception to their

16    global intercompany policy for the intercompany balances that

17    were created as a result of the cash management process, right?

18    A.    That's correct.  We discussed with them whether they felt

19    that would meet the criteria of the policy.

20    Q.    And I'd like you to look at DX-AXI.  DX-AXI.  It's about

21    the third --

22          THE COURT:  It's near the back of the binder.

23    Q.    -- third to last exhibit of the first binder.

24          And, Ms. Westman, Exhibit DX-AXI is an e-mail from you

25    to Mary Lou Lee and others dated November 15, 2011, right?

RESIDENTIAL CAPITAL, LLC, ET AL.                    93

1   A.   That's correct.

2   Q.   And did this e-mail relate to the review of the

3   intercompany transactions that you were supervising to ensure

4   compliance with the Ally global intercompany policy?

5   A.   Yes, this is one of the draft documents prepared under

6   that review.

7   Q.   And if you look at the second page of the document Bates

8   ending 952, this document titled Intercompany Process, is this

9   a document that you prepared?

10  A.   I don't specifically recall preparing it.

11  Q.   Is this a document that you're familiar with?

12  A.   Yes, I've seen it.

13  Q.   And looking down toward the bottom, the second to last

14  bullet states that "ResCap has a number of intercompany

15  balances within the ResCap legal entities that are created as a

16  result of the cash management process that moves money

17  regularly, but does not completely settle and will need to be

18  listed as an exception".

19      And the next step says, "Obtain approval from Ally.

20  Decide if balances should be reduced".  Do you see that?

21          THE COURT:  I apologize, where in the document?  I was

22  looking at something else in the document and I --

23          MS. MILLER:  Sorry, I'm in the second to last black

24  bullet from the bottom.

25          THE COURT:  Okay, thank you.

1   Q.   Ms. Westman, do you see that?

2   A.   Yes.

3   Q.   And did you, in fact, obtain approval from Ally to treat

4   the intercompany balances generated as a result of the cash

5   management system as an exception to their equivalent or

6   company policy?

7   A.   We did not qualify them as not in compliance.  So we

8   didn't get a formal exception request per se.  But they agreed

9   that those could be considered in compliance with the policy.

10  Q.   And so even though they weren't cash settling, the

11  intercompany balances that you identified to Ally were treated

12  as intercompany balances in compliance with the Ally policy, is

13  that right?

14  A.   That's correct.

15  Q.   And the next -- sort of after the semicolon it says,

16  "decide if balances should be reduced".  Do you recall whether

17  a determination was made about whether the intercompany

18  balances that you were reviewing should be reduced?

19  A.   They were not reduced at the time.  Later in 2012, they

20  were reviewed for possible reduction.

21  Q.   And at the time when you reviewed them in 2011, did you

22  consider whether they were debt or equity?

23  A.   No.

24  Q.   And if they had been equity transactions -- if you had

25  determined after your review that they were equity

RESIDENTIAL CAPITAL, LLC, ET AL.                    95

1    transactions, would you have been required under GAAP to change

2    their treatment in the company's books and records?

3            MR. KERR:  Objection.

4            THE COURT:  Sustained.

5    Q.   Ms. Westman, under GAAP, were you required to conduct a

6    periodic review of the intercompany balances?

7    A.   I believe there's specific GAAP guidance that requires you

8    to review intercompany balances.

9    Q.   And if you identify a debt that's being carried on the

10   books and records that you believe is mischaracterized and

11   should be equity, are you obligated to change that

12   characterization?

13   A.   Well, we need to ensure that our financial statements are

14   correct.

15   Q.   And so if something was improperly recorded in a debt

16   account, you would be required to move it to an equity account

17   if it really should have been equity?

18   A.   If that was the conclusion that was drawn.

19   Q.   In your review of the intercompany balances, did you ever

20   determine that -- did you conclude that it was the intention of

21   the company that the intercompany debts were really equity?

22   A.   Could you repeat the question?

23   Q.   Yeah.  In your review of the intercompany balances, did

24   you ever see anything that indicated to you that ResCap

25   intended those balances to be equity as opposed to debt?

RESIDENTIAL CAPITAL, LLC, ET AL.                    96

1   A.   We never reviewed with that criteria.  That was never a

2   subject of our review.

3   Q.   Did you ever tell anybody that you believed that the

4   intercompany balances were something other than valid debt?

5   A.   I would never have opined on whether they were valid debt

6   one way or another.

7   Q.   Did you ever opine on whether they were properly recorded

8   in the intercompany payables and receivables account?

9   A.   I believe they were properly recorded there.

10           THE COURT:  Is there GAAP guidance for evaluating

11  whether something is equity or debt?  In other words, I take it

12  you were doing an impairment analysis with respect to the

13  intercompany balances, that was one thing you did.

14           THE WITNESS:  We were not normally doing an impairment

15  analysis on the intercompany balances.

16           THE COURT:  Well, can you tell me, is there GAAP

17  guidance for determining whether something is debt or equity?

18           THE WITNESS:  I'm not specifically aware.  Again, I

19  wasn't primarily doing the GAAP financials, but I'm not aware.

20           THE COURT:  Okay.  Go ahead.

21  Q.   Ms. Westman, if you can look at Exhibit DX-AUB.  It's Ally

22  accounting policy 1040 on intercompany accounting.  Do you see

23  that?

24  A.   Yes.

25  Q.   Is this a document that you're familiar with?

1  A.   Yes.

2  Q.   And if you look at Section 6.1 in this document, it states

3  that "this policy, including all risks standards described

4  herein, is intended to be consistent with all applicable legal

5  and regulatory requirements regarding their subject matter".

6  Do you see that?

7  A.   Yes.

8  Q.   And it includes reference to a number of -- it includes a

9  number of GAAP-related references, do you see that?

10  A.   Yes.

11  Q.   And is it your understanding that this Ally intercompany

12  accounting policy was intended to be consistent with GAAP?

13  A.   Yes.

14  Q.   Looking at Section 6.3 of the document, under intercompany

15  reporting and reconciliations, it says that "intercompany

16  transactions should be booked to proper intercompany accounts

17  for both balance sheet and income statement" -- "for both

18  balance sheet and income statement accounts to ensure

19  efficiencies and consolidation and proper elimination of

20  intercompany transactions".  Do you see that?

21  A.   Yes.

22  Q.   And in order for an elimination or consolidation process

23  to work properly, the intercompany -- the transactions need to

24  be reflected in the right accounts, right?

25  A.   You need to it be aware of where they're reflected so that

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

 1 | they can be properly eliminated.

 2 | Q.   And so if I improperly record certain debt transactions as

 3 | equity, that may cause a problem on consolidation, right?

 4 | A.   I can't speak to that.

 5 | Q.   But part of --

 6 |         THE COURT:  I'm sorry, I didn't hear your answer.

 7 |         THE WITNESS:  Pardon?

 8 |         THE COURT:  Did you answer the question?

 9 |         THE WITNESS:  I can't answer that question.  I'm

10 | not --

11 |         THE COURT:  Okay.  That's fine.  I just didn't hear

12 | what you said.

13 |         Go ahead, Ms. Miller.

14 | Q.   Ms. Westman, you were responsible for the quarterly

15 | review -- sorry.  You did a quarterly review of ResCap's

16 | financials, right?

17 | A.   I was not directly responsible for the quarterly review of

18 | financials.

19 | Q.   But you were involved in it, right?

20 | A.   I was involved in portions of it, yes.

21 | Q.   And part of the portion that you were responsible for was

22 | ensuring that intercompany transactions were recorded in the

23 | proper accounts in the books and records, right?

24 | A.   I was responsible for reviewing to ensure that

25 | transactions for a certain subset were properly eliminated.  I

RESIDENTIAL CAPITAL, LLC, ET AL.                    99

1    wasn't reviewing that they were recorded in the proper

2    accounts.

3    Q.    Did that include intercompany balances?

4    A.    It would include that intercompany receivables and

5    payables were eliminated.

6    Q.    And Ms. Westman, it's your testimony here that the

7    intercompany balances arose out of ten of thousands of

8    individual journal entries, right?

9    A.    Correct.

10   Q.    And you didn't review those individual journal entries,

11   right?

12   A.    I did not.

13   Q.    But you were responsible for reviewing the types of

14   transactions that were underlying the intercompany balances,

15   right --

16           MS. MILLER:    Sorry; let me restate that.

17   Q.    You were responsible for reviewing the types of

18   transactions underlying the intercompany payables and

19   receivables, right?

20   A.    I was asked at several time periods for information about

21   those balances.  It wasn't part of my normal day-to-day

22   responsibilities.

23   Q.    Ms. Westman, I'd like you to look at your exhibit --

24   sorry.  Ms. Westman, is it your testimony that you were not

25   responsible for reviewing the types of transactions that were

1   being eliminated from the intercompany accounts?

2   A.   I did review a subset of transactions that were performed

3   by people within my team.  I was responsible for reviewing a

4   spreadsheet that listed the types of transactions and ensuring

5   that that was a complete list so that they would be properly

6   eliminated, yes.

7   Q.   And so there were people working for you who were

8   reviewing the underlying transactions and preparing a

9   spreadsheet of the types of transactions that you were then

10  responsible for reviewing and making sure that they were

11  accurate, is that right?

12  A.   Correct.  That spreadsheet was prepared by someone within

13  my team that listed the types of transactions that needed to be

14  eliminated.

15  Q.   Was there ever a time --

16          MS. MILLER:  Sorry, strike that.

17  Q.   And Ms. Westman, in reviewing that documentation, you

18  never determined that the types of transactions that were being

19  presented and recorded in the intercompany payables and

20  receivable accounts were not properly recorded there, right?

21  A.   Let me clarify.  The intercompany payable and receivable

22  accounts were one line item on that spreadsheet.  So it just

23  indicated intercompany payables and receivables, and that they

24  eliminate -- they naturally offset.  So it was a single line

25  item and that was the only item related to the payables and

RESIDENTIAL CAPITAL, LLC, ET AL.                    101

1    receivables on the spreadsheet.  And by nature of controls we

2    had in place, we would ensure that they eliminated.

3            THE COURT:  Were you involved in preparing a

4    consolidating balance sheet for ResCap?

5            THE WITNESS:  We prepared a consolidated balance

6    sheet --

7            THE COURT:  Consolidating.

8            THE WITNESS:  Consolidating?

9            THE COURT:  Yes, separate, standalone for ResCap.

10           THE WITNESS:  Not necessarily.

11           THE COURT:  You  were or weren't -- when you say not

12   necessarily?

13           THE WITNESS:  I was not directly responsible for

14   producing any consolidating balance sheet.

15           THE COURT:  You wouldn't eliminate the intercompany

16   balances, am I correct about that?  You don't eliminate

17   intercompany balances in a consolidating balance sheet?

18           THE WITNESS:  Certain intercompanies underneath each

19   of the consolidation points would be eliminated, but any

20   intercompany that survived that particular consolidation point

21   would exist in those consolidating --

22           THE COURT:  And did you have any responsibility for

23   reviewing entries for intercompany balances that appeared in

24   consolidating financial statements?

25           THE WITNESS:  I had reviewed intercompany transactions

 1  that were included in separate standalone financial statements

 2  that were produced.  So for instance RFC or GMAC mortgage had

 3  their own standalone financial statements.

 4          THE COURT:  Right.

 5          THE WITNESS:  And I was involved at times in those.

 6          THE COURT:  And those would -- the RFC financials

 7  would reflect amounts for intercompany balances affecting RFC,

 8  right, in a standalone financial statement?

 9          THE WITNESS:  If RFC had an intercompany balance with

10  any entity outside of its own structure, yes.

11          THE COURT:  And you were involved in reviewing that?

12          THE WITNESS:  At times, I was.

13          THE COURT:  Go ahead, Ms. Miller.

14  BY MS. MILLER:

15  Q.   Ms. Westman, those -- following up on the Court's

16  questioning -- those -- I'm going to call them consolidating,

17  but at a particular level -- those consolidating RFC financials

18  reflected intercompany payables and receivables between

19  anything above or outside of RFC, right?

20  A.   That's correct.

21  Q.   And similarly, GMAC mortgage consolidating financials

22  reflected all intercompany payables and receivables outside of

23  the GMAC mortgage family, right?

24  A.   That's correct.

25  Q.   And Ms. Westman, do you also know that Homecomings

RESIDENTIAL CAPITAL, LLC, ET AL.                    103

1   Financial filed standalone, or consolidating financial

2   statements during certain periods?

3   A.    They filed a financial statement in certain periods, yes.

4   Q.    And that those Homecoming Financial LLC accounts --

5   Financials -- also reflected intercompany payables and

6   receivables outside of the Homecomings' Financial Group's,

7   right?

8   A.    That's correct.

9           THE COURT:  What, if anything, did you do to determine

10  the validity or enforceability of amounts shown in

11  consolidating balance sheets for intercompany balances?

12          THE WITNESS:  I was only directly involved in

13  reviewing that in one instance.

14          THE COURT:  By one was that?

15          THE WITNESS:  It was an instance with RFC, in a

16  balance between RFC and ResCap.

17          THE COURT:  And what is it that you did to review it?

18          THE WITNESS:  We reviewed the financial statements of

19  ResCap and ResCap's subsidiaries to see whether, from a balance

20  sheet perspective, there was support that RFC -- the RFC

21  receivable from ResCap could be supported by ResCap's financial

22  statement, and we concluded that it could.

23          THE COURT:  And what is it that you looked at to make

24  that determination?

25          THE WITNESS:  The financial statements, the balance

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1  sheets of ResCap.

2            THE COURT:  Did you look at underlying documentation?

3            THE WITNESS:  No, we did not.

4            THE COURT:  Okay, Ms. Miller.

5            MS. MILLER:  I'm just looking for the document I'm

6  going to --

7            THE COURT:  That's fine.

8            MS. MILLER:  -- follow up on.  Sorry.

9  BY MS. MILLER:

10 Q.   It's only one document back from where I am.  Ms. Westman,

11 if you could turn back one document in your binder to DX-ATW,

12 which is an e-mail from you to Ms. Dondzila dated March 22,

13 2012; do you see that?

14 A.   Yes.

15 Q.   And you -- sorry, and Ms. Dondzila writes to you in the

16 second paragraph, "I'm thinking we need to get in front of

17 D&T".  Who is D&T?

18 A.   Deloitte & Touche, our auditors at the time.

19 Q.   Did you, in fact, speak to Deloitte & Touche about the

20 impairment analysis that you had done on the intercompany

21 receivable between RFC and ResCap?

22 A.   Yes.

23 Q.   I'm looking to the next page.  Is this the memo that you

24 prepared regarding your impairment analysis?

25 A.   Yes, this is the memo.

RESIDENTIAL CAPITAL, LLC, ET AL.                    105

1   Q.   And did you provide this memo to Deloitte & Touche?

2   A.   Yes.  I'm not sure if this is the final form of the memo.

3   As this indicated, Cathy gave comments.  But I believe it to be

4   close to the final, if not the final.

5   Q.   And you told them that your conclusion was that the

6   intercompany should not be impaired, right?

7   A.   Correct.

8   Q.   And that was -- did you tell them also that part of your

9   analysis, part of your conclusion was based on -- of ResCap's

10  ability to repay the intercompany, was based on the fact that

11  ResCap maintained a 3.6 billion dollar intercompany receivable

12  from GMAC Mortgage?

13  A.   We did indicate that based on the balance sheet, ResCap's

14  balance sheet supported that it had assets sufficient to

15  support the receivable.

16  Q.   I'm reading the conclusion and I'm not seeing -- can you

17  just show me where you say balance sheet?

18  A.   I just indicated that's what our review was.

19  Q.   Okay.  And so you thought it was important in assessing

20  the collectability of an intercompany balance between RFC and

21  ResCap that ResCap also had an intercompany receivable from

22  GMACM, right?

23  A.   Yes, that was on ResCap's books.

24          THE COURT:  To what extent did you interact with

25  Deloitte & Touche in connection with audits of the debtors?

1        THE WITNESS:  I was not necessarily directly involved.

2   I was directly involved in this instance because I had been

3   working on intercompany balances and so I was included in a

4   conversation about this particular item.

5        THE COURT:  Were there other instances in which, to

6   your knowledge, Deloitte & Touche looked at intercompany

7   balances to determine collectability, whether they were

8   properly recorded or characterized.

9        THE WITNESS:  Not to my knowledge.

10        THE COURT:  Go ahead, Ms. Miller.

11        MS. MILLER:  Your Honor, we have a demonstrative of

12   the intercompany transactions which may be helpful to just put

13   up.  So --

14        THE COURT:  Since I'm not going to take that back in

15   chambers, do you have a small version to hand up to me as well?

16        MS. MILLER:  It's actually -- it's in our --

17        THE COURT:  We're going to get Mr. Uzzi to do

18   something useful now and set up the tripod.

19        MS. MILLER:  It's actually included as an exhibit to

20   our --

21        THE COURT:  Just tell him where to go.

22        MS. MILLER:  Right -- how about right there -- right

23   there.  Perfect.  That's great.

24        THE COURT:  We ought to let Ms. Westman see it as well

25   as me.

RESIDENTIAL CAPITAL, LLC, ET AL.                    107

1          MS. MILLER:  Yeah, yeah.

2          THE COURT:  That's a good place for it.

3          MS. MILLER:  That's perfect.

4          THE COURT:  Do you have a small version of it as well?

5          MS. MILLER:  It is figure 2 in the contentions.  Do we

6     have --

7          THE COURT:  I can see it.

8          I have the contentions here.  Let me get them out.

9     Just bear with me a second, okay?

10         MR. KERR:  Your Honor, if you give me one second, I

11    just want to dig up something.

12         THE COURT:  Sure.

13         MR. UZZI:  Do you want me to stand here, Your Honor,

14    like this?

15         THE COURT:  Ms. Miller, I have the contentions open.

16    Do you know what page in the contention?

17         MS. MILLER:  I do not.

18         THE COURT:  All right.  I actually have it.  In the

19    contentions, if anyone's looking for it, it's page 130 of 264

20    of -- this is the joint pre-trial order, figure 2.

21         MS. MILLER:  Thank you for your assistance, Your

22    Honor.

23    BY MS. MILLER:

24    Q.   Just so the demonstrative is clear, in color, the green

25    reflects the movement of the cash or other assets and the red

RESIDENTIAL CAPITAL, LLC, ET AL.                    108

1  reflects the direction of the outstanding payable on the

2  petition date.

3         THE COURT:  So you've got arrows that start out green

4  and then turn red.

5         MS. MILLER:  Something like that.  Well, they move in

6  two directions.  SO it shows you -- some of the documents talk

7  about the balance is --

8         MR. KERR:  I have a copy I could put in front of her

9  if that's better.

10         THE COURT:  Maybe somebody turn that so Ms. Westman

11  can see it.  No, that's okay; I'm looking at the -- it's easier

12  for me to read the one -- easier to read the one in the book.

13  Just don't block -- you can't block my view of the witness.

14  That's good.

15         Can you see it, Ms. Westman?

16         THE WITNESS:  Yes.

17         THE COURT:  Do you want it closer to you?  You can

18  move it closer to her.  Go ahead; move it closer.

19         THE WITNESS:  That's good.

20         THE COURT:  Okay.  You can see the witness, Ms.

21  Miller?

22         MS. MILLER:  I can; yes.

23         THE COURT:  Okay.  All right.  I'm looking at the one

24  in my binder, which is the one that's -- the chart that's in

25  the pre-trial order; same exhibit, same demonstrative.

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1          Go ahead.

2          MS. MILLER:  Okay.  So -- now I have to come up.

3          THE COURT:  We'll let Mr. Uzzi hold that for you.  Do

4   you really expect her to see that?

5          MS. MILLER:  That's fine.  I have it my head at this

6   point, so.

7          THE COURT:  Yeah, that's -- put it there.  That's

8   closer.

9          MS. MILLER:  Okay.  Thank you.

10  BY MS. MILLER:

11  Q.   So Ms. Westman, just so we're clear, the intercompany --

12  sorry, the impairment analysis we were just talking about in

13  DX-ATW is talking about the intercompany receivable between RFC

14  and ResCap, right?

15  A.   Correct.

16  Q.   Ms. Westman, periodically, ResCap -- certain ResCap

17  entities were required to forgive intercompany debts in order

18  to ensure that the counterparty was able to maintain compliance

19  with its net worth covenants, right?

20  A.   Correct.

21  Q.   And when intercompany balances were forgiven, they were

22  recorded in the equity accounts, right?

23  A.   Yes.

24  Q.   And that's consistent with GAAP, right?

25  A.   Yes.

1  Q.    And the intercompany payables needed to be forgiven

2  because without the forgiveness, the subsidiary -- or the other

3  -- the counterparty would not have -- would have had too much

4  debt on its balance sheet and wouldn't have been able to

5  demonstrate compliance with net worth covenants, right?

6  A.    Their net worth would not have met the requirements.

7  Q.    And if those intercompany balances had actually been

8  equity transactions, they would not have created this problem

9  for the net worth analysis, right?

10 A.    That's correct.

11 Q.    Ms. Westman, I'd like you to look at DX-ARY.

12         THE COURT:  It would be helpful -- I don't need it

13 today -- if you could just print that one-page chart in color

14 for me, okay, because it shows -- in color, it shows funds

15 flowing both ways.

16         So I'm assuming, Ms. Miller, for this RFC ResCap one

17 you focused on, when it says claim 2, 1,955,000,000, that's the

18 net of what's flowing back and forth?

19         MS. MILLER:  Correct.  All of the intercompany

20 balances --

21         THE COURT:  Those are net.

22         MS. MILLER:  Are recorded as net; right.

23         THE COURT:  Okay.

24 Q.    And Ms. Westman, is the net balance consistent with the

25 way that the debtors represented the intercompany balances on

RESIDENTIAL CAPITAL, LLC, ET AL.                    111

1  their statements of assets and liabilities in this case?

2  A.   I'm sorry, could you repeat the question?

3  Q.   Did the debtors represent intercompany payables and

4  receivables on a net basis on the statement of assets and

5  liabilities filed in these cases?

6  A.   No.  I believe they were reflected gross.

7          THE COURT:  So you'd show both the payable and a

8  receivable?

9          THE WITNESS:  To my knowledge.

10          THE COURT:  And then -- okay.

11          MS. MILLER:  I'm reading it in the wrong order.  Just

12  give me one second.

13          Mr. Kerr pointed out that the exhibit that I directed

14  everyone to does not exist in the binder.  So I'm just

15  clarifying that.

16          MR. KERR:  It looks like it's AYR that's on the

17  screen.

18          MS. MILLER:  It's ARY and it is the second to last

19  document that is in volume 2.  Sorry.

20          THE COURT:  I'm not going to even attempt to turn the

21  pages of volume 2.  I'll look at the screen.

22  Q.   Ms. Westman, you can look at the screen.

23  A.   Okay.

24          THE COURT:  It's being projected on the screen.

25  BY MS. MILLER:

RESIDENTIAL CAPITAL, LLC, ET AL.                    112

1   Q.   If at any time you feel like you need to look at the

2   entire document, just let me know --

3   A.   Okay.

4   Q.   -- and I'll give you time to turn pages.  Ms. Westman, do

5   you recognize -- sorry, Exhibit DX-ARY is an e-mail from you to

6   Kelly Sather (ph.), dated 9/14/2011.  Do you see that?

7   A.   It's from Kelly to me.

8   Q.   Right.  From Kelly to you.  Do you recognize this

9   document?

10  A.   Yes.

11  Q.   And this document is a discussion of sister-to-sister debt

12  forgiveness.  Do you see that?

13  A.   Yes.

14  Q.   And Ms. Westman, would sister-to-sister debt forgiveness

15  flow through the income statement?

16  A.   In the particular instance here, yes, the senior-to-sister

17  debt forgiveness went through the income statement.

18  Q.   Were there other instances where sister-to-sister debt

19  forgiveness did not flow through the income statement?

20  A.   I'm not aware of other sister-to-sister debt forgiveness.

21  Q.   Do you have an understanding of whether under GAAP,

22  sister-to-sister debt forgiveness should be flowed through

23  equity accounts?

24  A.   I'm not sure if it's GAAP.  The Ally claim policy

25  discusses and indicates, it depends on what kind of economic

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1  substance is behind the transaction.

2  Q.   And so sometimes it will flow through equity and sometimes

3  it will flow through the P&L?

4  A.   Correct.

5       THE COURT:  Explain to me how it can flow through the

6  P&L, give me an example of a transaction --

7       THE WITNESS:  In this particular instance, you would

8  remove the intercompany receivable payable and you would

9  recognize a loss or income in your income statement, a gain or

10 loss related to that transaction.  So the entity that had a

11 payable and didn't have to -- would reverse that payable, they

12 would recognize a gain on their income statement because they

13 no longer had that liability on the books.

14      THE COURT:  And that would properly flow through to

15 the consolidated balance sheet as an income item?

16      THE WITNESS:  It would depend.  When it was sister to

17 sister, it would live in their independent financial

18 statements, and then upon consolidation of ResCap, it would

19 eliminate.

20      THE COURT:  It would eliminate there.

21      THE WITNESS:  Yes.

22      THE COURT:  Go ahead.

23 Q.   Ms. Westman, you stated in your direct testimony,

24 paragraphs 54 to 56, that certain -- you identify certificate

25 intercompany balances that were identified for debt forgiveness

1   because they had no business purpose.  Do you see that, or do

2   you recall testifying to that effect?

3   A.   Yes.

4   Q.   And Ms. Westman, was that statement about business purpose

5   reflective of the business purpose on the date that you were

6   evaluating the intercompany balances?

7   A.   Yes; it was indicating that those particular entities no

8   longer had a business purpose or were dormant entities, et

9   cetera.

10   Q.   And so you didn't go back to when the intercompany

11   balances accrued and determine whether at the time of each

12   underlying transaction there was a business purpose, right?

13   A.   No.  We did not.

14   Q.   And you also didn't do an assessment of whether -- what

15   the intention of the transacting parties was at the time that

16   those transactions underlying the intercompany balances were

17   transacted, right?

18   A.   We did not.

19   Q.   You testified earlier about a number of financials that

20   you reviewed, and I just want to make sure that the ResCap --

21   ResCap's financials were audited, right?

22   A.   Correct.

23   Q.   And the subsidiaries that prepared consolidated financials

24   at the subsidiary level were also audited, right?

25   A.   Certain subsidiaries were audited.

RESIDENTIAL CAPITAL, LLC, ET AL.                    115

1  Q.   And GMAC Mortgage's consolidating financials were audited,

2  right?

3  A.   Their consolidated financials were audited.

4  Q.   And RFC's consolidated financials were also audited,

5  right?

6  A.   Yes.

7  Q.   As were Homecoming Financials'?

8  A.   Yes, at different periods of time.

9       THE COURT:  Can I just go back for a second?  Did I

10  understand you correctly to say that there was forgiveness of

11  an intercompany balance because it no longer had a business

12  purpose?

13       THE WITNESS:  It was not forgiven.  It was on a list

14  of proposed debt forgiveness.

15       THE COURT:  But just explain to me about -- you had

16  proposed to forgive an intercompany balance.  What do you mean

17  by it no longer had a business purpose?

18       THE WITNESS:  Generally, through our review, those

19  were balances that were not in compliance with the Ally policy;

20  where the entities were dormant, they would have no further

21  business purpose or continued cash flow occurring --

22       THE COURT:  They didn't have the ability to repay

23  balance?

24       THE WITNESS:  Correct.  And therefore they were on a

25  list that we were going to propose to management to debt

RESIDENTIAL CAPITAL, LLC, ET AL.                          116

 1    forgive those balances.

 2            THE COURT:  Is that the same thing as you do an

 3    impairment analysis and conclude they can't pay it, so you've

 4    got to write it off?

 5            THE WITNESS:  It wasn't necessarily an impairment.  We

 6    weren't necessarily looking at an ability to pay.  We were

 7    looking at whether there was any continuing activity or

 8    continuing transactions occurring through those entities, any

 9    continuing business purpose in those entities.  So it wasn't

10    necessarily an impairment analysis.

11            THE COURT:  And is there something -- there is

12    something specifically in the Ally accounting policy that talks

13    about forgiveness when there is no longer a business purpose?

14            THE WITNESS:  No.  The policy doesn't outline when you

15    can do forgiveness.  The policy outlined the types of support

16    that they wanted to have behind intercompany balances, and we

17    indicated that these balances didn't generally have that type

18    of support.  And rather than try to obtain or -- when there

19    wasn't the support, our recommendation was going to be to debt

20    forgive them.

21            THE COURT:  Okay.  So are you finished with these

22    demonstratives?  Only because when you are, then somebody will

23    remove them so that everybody can see what's going on here,

24    okay?  If you're still using it, it's fine.

25            MS. MILLER:  All right, we will -- I'll remove them

1  when we're done.  I think we're still going to come back to

2  them.

3          THE COURT:  That's fine.  Go ahead.

4  BY MS. MILLER:

5  Q.    Am I right that -- sorry.

6        The debt forgivenesses that you identified as having no

7  business purpose, it's actually kind of the reverse of an

8  impairment analysis, right?

9          MR. KERR:  Objection, Your Honor.

10          THE COURT:  Sustained.

11          MS. MILLER:  Okay.

12  Q.    When you were reviewing the intercompany -- when you were

13  reviewing the intercompany balances and you identified certain

14  of those balances for debt forgiveness, was the entity with the

15  receivable the entity that was dormant?

16  A.    It depended.  I don't recall specific entities or specific

17  instances.  We would have reviewed both sides of the

18  transaction.

19  Q.    And you don't recall if any of the ones that you had

20  identified for debt forgiveness was because there was a payable

21  due and owing to or --

22          MS. MILLER:  Sorry; let me restate that.

23  Q.    You don't recall if in preparing the list of intercompany

24  balances to be forgiven, you identified intercompany balances

25  that -- intercompany receivables flowing to entities that were

RESIDENTIAL CAPITAL, LLC, ET AL.                    118

 1  no longer operational?

 2  A.   I don't recall the specific balances without looking at

 3  the list.

 4  Q.   If an intercompany receivable were owed to a dormant

 5  entity, would you have identified it for forgiveness?

 6  A.   It might depend on the entities.  If the receivable was --

 7  I'm sorry, can you again explain the direction?

 8  Q.   If an intercompany payable -- sorry, if an intercompany

 9  receivable was held by a dormant entity, would you have

10  identified that under the Ally policy for forgiveness?

11  A.   We may have, yes.

12  Q.   And that wasn't necessarily a reflection of the ability of

13  the obligated entity to repay the debt, right?

14  A.   It may not have been.  Again, if it was a parent-

15  subsidiary relationship, we may have looked at that and

16  recommended debt forgiveness.

17  Q.   Ms. Westman, pre-petition you worked with FTI to collect

18  and provide them with information about the intercompany

19  balances, right?

20  A.   Yes.

21  Q.   And Ms. Westman, did you provide -- did you try to be as

22  responsive as possible to their requests?

23  A.   We did, but it was often difficult to fulfill some of the

24  requests.

25  Q.   Did you try to give them as much information as you could

RESIDENTIAL CAPITAL, LLC, ET AL.                    119

1  about the nature of the intercompany balances?

2  A.   We gave them as much information as we were able to

3  identify.  But again, because there are so many transactions,

4  that was very difficult to generalize what made up a balance.

5  We provided whatever we could obtain.

6  Q.   Did they ask you for a lot of information in the weeks

7  leading up to the preparation -- sorry, to the petition?

8  A.   I don't recall the time periods.  They asked for a lot of

9  information, but I don't recall the time periods.

10 Q.   Do you recall if they asked for a lot of information pre-

11 petition?

12 A.   I don't specifically recall.

13 Q.   And did you review the intercompany balances as they were

14 reflected on the statements of assets and liabilities filed in

15 this case?

16 A.   We provided a support schedule that was used to populate

17 the schedules.

18 Q.   And did you review the schedules after they were prepared?

19 A.   I did not review every one of the schedules.  I did look

20 at certain schedules.

21 Q.   And in any of the schedules that you looked at, did you

22 tell anybody that you believed that the way the intercompany

23 payables or receivables were reflected was incorrect?

24 A.   No.

25 Q.   And would you have told someone that if you thought it was

RESIDENTIAL CAPITAL, LLC, ET AL.                    120

1   true?

2   A.   Yes.

3   Q.   And do you believe that the debtor's statements of assets

4   and liabilities as filed in this case are true and accurate?

5   A.   I only know the information that I provided and I felt the

6   information that was provided and that I reviewed was true and

7   accurate.  I can't speak to their -- to the entire schedules.

8   Q.   And that included schedules that were underlying the

9   intercompany balances reflected in the statement of assets and

10  liabilities, right?

11  A.   Yes.

12          THE COURT:  Do you have an estimate of how much

13  further you're going to be?  How much longer?

14          MS. MILLER:  I don't think it's long.  It may be even

15  shorter if we break for lunch and I consolidate, but --

16          THE COURT:  Well, the reason I raise it, there's a

17  problem with the elevators.  If you think they were bad before,

18  the one operating public elevator is currently out of service.

19  There is a court security officer who is operating the judge's

20  elevator, and the freight elevator, which is right outside the

21  doors here, is also operating and can take people up and down,

22  but it presents a logistical challenge.  I don't think there

23  are any other big hearings going on today, but there are a lot

24  of people here, so I'm just cautioning everybody.  That was an

25  e-mail five minutes ago.

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1          MR. COHEN:  Your Honor, in terms of timing, we are way

2   ahead of where we thought we would be this far in the case.  So

3   if it requires -- the logistical challenge -- a little bit of

4   extra time at lunch, I don't think we're going to hit a

5   deadline.  In fact I think we may end this week or Monday

6   morning.

7          THE COURT:  What would you like to do, Ms. Miller?

8          MS. MILLER:  I'm happy to take a break and it will be

9   short when we come back.

10         THE COURT:  Mr. Kerr, what is your view?

11         MR. KERR:  It's fine, Your Honor.  Why don't we break

12  for lunch?

13         THE COURT:  All right.  We're going to resume at 1:30,

14  okay?

15         MS. MILLER:  Thank you, Your Honor.

16         THE COURT:  Thank you very much, Ms. Westman.

17      (Recess from 12:02 p.m. until 1:37 p.m.)

18         THE CLERK:  All rise.

19         THE COURT:  Please be seated.

20         Mr. Lee?

21         MR. LEE:  Good afternoon.  Gary Lee from Morrison

22  Foerster for the debtors.

23         Your Honor, I just have a couple of housekeeping

24  matters to attend to.

25         As Your Honor knows, the mediation order expired on

RESIDENTIAL CAPITAL, LLC, ET AL.                    122

1  October the 28th.  So the parties have requested that the Court

2  extend the mediation order nunc pro tunc back to October 28th

3  and ask that you so order the record.

4         THE COURT:  Anybody else wish to be heard?

5         Mr. Uzzi?

6         MR. UZZI:  For the record, Your Honor, Gerard Uzzi of

7  Milbank Tweed on behalf of UMB Bank and the ad hoc group.

8         Just for precision, Your Honor, there is a couple of

9  mediation orders so that the record is clear.  There is one at

10  docket number 3101, one at docket number 3877, and then there

11  is the additional order in aid of mediation which we refer to

12  sometimes as the Vitro order and even the Eckstein order I

13  think at one point.  That's docket number --

14         THE COURT:  Call it the Peck order.

15         MR. UZZI:  All right.  Even better, Your Honor.

16         That is docket number 4379.  With respect to that last

17  order, 4379, it has a provision in it that is a sunset

18  provision.  So just to make sure it all works in paragraph 6,

19  we would say that the expiration date is November 27th, 2013.

20  Pursuant to the terms of the order we have the ability to

21  extend that if necessary among the parties, but I just want to

22  make sure everything is working tightly.

23         And with that, Your Honor, we ask that you so order

24  the record.

25         THE COURT:  Mr. Lee, do you agree as to Mr. Uzzi's

RESIDENTIAL CAPITAL, LLC, ET AL.                    123

1  addition to the --

2          MR. LEE:  Yes.  Gary Lee for the debtors.  Yes, we do,

3  Your Honor.

4          THE COURT:  Mr. Eckstein?

5          MR. ECKSTEIN:  Your Honor, the company is supportive

6  of both orders and the amendment of the name of the order.

7          THE COURT:  I'm really supportive of it, too.  So, so

8  ordered.

9          Would you like to all leave now, or what?  Wait until

10  5 o'clock.

11          MR. UZZI:  We multitask, Your Honor.

12          Thank you, Your Honor.

13          THE COURT:  All right.  Let's continue with the cross-

14  examination, Ms. Miller.

15          MS. MILLER:  Ms. Westman needs to take the stand.

16          THE COURT:  We need a witness, I know.

17          Come on, Ms. Westman.  Take your time, though.

18          MS. MILLER:  Come on up.

19          THE COURT:  I hope you were able to use the lunch

20  fruitfully to shorten your -- the remaining part of your

21  examination.

22          MS. MILLER:  Let's just say the binders have been

23  back.

24          THE COURT:  You understand you're still under oath,

25  Ms. Westman?

RESIDENTIAL CAPITAL, LLC, ET AL.                          124

1          THE WITNESS:  Yes.

2          THE COURT:  Okay, go ahead, Ms. Miller.

3          Mr. Kerr, were you trying to say something else?

4          MR. KERR:  No, no.  I was just standing for my

5  witness.

6          THE COURT:  Okay.  Very nice.

7          Go ahead, Ms. Miller.

8  RESUMED CROSS-EXAMINATION

9  BY MS. MILLER:

10 Q.   Good afternoon, Ms. Westman.

11 A.   Good afternoon.

12 Q.   Ms. Westman, we were talking earlier --

13         MS. MILLER:  Oh.  Doug, can you get me the

14 demonstrative?  Mr. Uzzi is going to set up the demonstrative

15 again.

16         THE COURT:  Well, the problem is it was blocking the

17 camera view for the overflow room.

18         MS. MILLER:  Oh, I'm sorry.

19         THE COURT:  I --

20         MS. MILLER:  We're just going to use it for one

21 question very quickly, and then --

22         THE COURT:  Okay.

23         MR. UZZI:  Okay, you want to put it here?

24         THE COURT:  Yeah.  As soon as you finish with it,

25 you're going to have to move it because there is one camera up

RESIDENTIAL CAPITAL, LLC, ET AL.                    125

1  back there that apparently was being blocked.

2         MR. UZZI:  Here, I'll put it right here.

3         THE COURT:  How's that?  Can you see it?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.

6  BY MS. MILLER:

7  Q.   Ms. Westman, at --

8         THE COURT:  Do you need Mr. Uzzi to hold it?

9         UNIDENTIFIED SPEAKER:  He's very good at that

10  multitasking, Your Honor.

11  Q.   Ms. Westman, at paragraph 56 of your direct testimony that

12  we were talking about earlier, you referred to a number of

13  intercompany balances that you, along with FTI, had identified

14  for possible forgiveness -- well, you had identified pre-

15  petition for possible forgiveness, right?

16  A.   Correct.

17  Q.   And just so the record's clear, none of those debt

18  forgivenesses -- sorry, none of those intercompany balances

19  were actually forgiven before the filing of these cases, right?

20  A.   Yeah, let me just correct what you said, you said we

21  identified them with FTI.  We did not.  We identified them

22  independently prior to working with FTI.  But none of those

23  balances were forgiven.

24  Q.   Okay, so with that clarification, let me just reask my

25  question.  So that we're clear, none of the intercompany

RESIDENTIAL CAPITAL, LLC, ET AL.                               126

1  balances that you identified were actually forgiven before the

2  case was filed, the bankruptcy cases, right?

3  A.    Correct.

4  Q.    Okay.  And looking at the bottom of paragraph 56 on page

5  34, the first intercompany balance that you identify for

6  possible forgiveness was an intercompany balance between

7  Homecomings and RFC?

8  A.    Yes.

9  Q.    And just looking at the chart or from your knowledge, do

10  you understand that that was an intercompany balance that RFC

11  owed to Homecomings?

12          THE COURT:  You're in her witness statement?

13          MS. MILLER:  I'm in her witness statement, yes.

14          THE COURT:  What page?

15          MS. MILLER:  Paragraph 56 --

16          THE COURT:  Okay.

17          MS. MILLER:  -- the very last line on page 34.

18          THE COURT:  Fine.

19  A.    I understand that it's between RFC and Homecomings.  I am

20  not sure the direction of your chart.

21  Q.    Based on your knowledge of how intercompany balances arose

22  in ResCap, do you understand that Homecomings would have

23  generated money that then got swept up the chain?

24  A.    Yes.

25  Q.    And that would have resulted in an intercompany payable

1   due and owing to Homecomings, right?

2   A.   Correct.

3   Q.   Okay.  And that's the intercompany -- that's the first

4   intercompany balance that you identified for possible

5   forgiveness in paragraph 56 of your direct testimony, right?

6   A.   Correct.

7   Q.   And in that intercompany balance, it would be Homecomings

8   that would no longer have continuing business operations such

9   that the forgiveness of that intercompany balance would be

10  justified, right?

11  A.   Correct.

12  Q.   Not RFC, right?

13  A.   Correct.

14          THE COURT:  Was this an intercompany balance that

15  resulted from operation of the cash management system?  I don't

16  know if that makes sense the way I asked it, but.

17          THE WITNESS:  Partially yes.  So those entities would

18  have moved cash, you know, according to that same process.  But

19  again, the intercompany balances can be made up of --

20          THE COURT:  A mix.

21          THE WITNESS:  -- a variety of reasons why they were --

22          THE COURT:  Do you know what this one was made up of?

23          THE WITNESS:  No, we don't know any of them in detail

24  what they're made up of.

25          THE COURT:  Okay.

1    Q.    Ms. Westman, if you could turn to Exhibit DX-AXJ.

2            THE COURT:  ASJ?

3            MS. MILLER:  AX.

4            THE COURT: X.

5            MS. MILLER:  It's a one-page document that, if we make

6    a little bigger, it's probably easy to look at on the screen.

7    Q.    Ms. Westman, what is this document?

8    A.    This was an internal certification document that we did to

9    ensure that balances were properly eliminated in the financial

10   statements.

11   Q.    And do you recognize your signature on the bottom?

12   A.    Yes.

13   Q.    And was this document to ensure compliance with Ally's

14   policies?

15   A.    It was not.

16   Q.    Was it to ensure compliance with Sarbanes-Oxley?

17   A.    Yes, it was.

18           MS. MILLER:  No further questions.

19           THE COURT:  Thank you very much.  Any other cross-

20   examination of Ms. Westman?

21           Redirect examination?

22           MR. LAWRENCE:  Charles Kerr on behalf of the debtors.

23   REDIRECT EXAMINATION

24   BY MR. KERR:

25   Q.    Ms. Westman, are you familiar with the CFDR?

1  A.   Yes, I am.

2  Q.   Ms. Westman, if I could refer you to your direct testimony

3  and specifically paragraph 34, which has subparts A, B and C

4  through G, and it runs from page 17 to page 23 of your direct

5  testimony; do you see that?

6  A.   Yes.

7  Q.   And in that part of your direct testimony you identify

8  nine intercompany balances that you discuss in your direct

9  testimony, correct?

10  A.   Correct.

11  Q.   Were any of those intercompany balances recorded on the

12  CFDR?

13  A.   They were not.

14         MR. KERR:  No further questions, Your Honor.

15         THE COURT:  Let me follow up on that.

16         Were any intercompany balances recorded in any of the

17  books and records of the debtors as collateral for any loan

18  facility?

19         THE WITNESS:  Not to my knowledge.

20         THE COURT:  Okay.  Any additional questions?  Well,

21  the committee obviously wants to ask some questions.

22         MR. KAUFMAN:  Philip Kaufman from Kramer Levin for the

23  committee.

24  REDIRECT EXAMINATION

25  BY MR. KAUFMAN:

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1   Q.   Just a couple of questions, Ms. Westman.  And believe it

2   or not, my questions relate to a question that the Court asked

3   you this morning.

4         MR. KAUFMAN:  If we could pull up that exchange.

5   Q.   There's been a lot of semantics surrounding this --

6         THE COURT:  I can't read it on the screen.

7         MR. KAUFMAN:  I've actually had it printed out, but

8   that's for my benefit.  I thought we could get it up on the --

9         THE COURT:  Maybe somebody will highlight -- what is

10  the page and line number that you're --

11        MR. KAUFMAN:  Unfortunately --

12        THE COURT:  Oh, it's not -- okay, it's not --

13        MR. KAUFMAN:  -- I couldn't pull it up.

14        THE COURT:  Okay.  Well, now it's --

15        MR. KAUFMAN:  There we go.

16  Q.   Okay, so do you have that, Ms. Westman?

17  A.   Yes.

18  Q.   The Court asked you what if anything did you do to

19  determine the validity or enforceability of amounts shown in

20  consolidating balance sheets for intercompany balances.

21     And you went on to refer to an instance where you

22  reviewed, as your testimony reflects, the financial statement

23  of ResCap and its subsidiaries for purposes of determining

24  whether it, as you used the term, supported from a balance

25  sheet perspective the receivable held by RFC.

RESIDENTIAL CAPITAL, LLC, ET AL.                    131

1        When you used the term "support" from a balance sheet

2   perspective, what were you talking about?

3   A.    That by looking at the balance sheet, we could have the

4   GAAP support to have that receivable on our -- stay on our

5   balance sheet.

6   Q.    And when you say you have GAAP support, does that mean

7   that the receivable is collectable from a GAAP standpoint?

8   A.    From a GAAP standpoint, that it was collectable, yes.

9   Q.    Okay.  Did you intend to be discussing the legalities of

10  whether or not the receivable was, in the judge's words, valid

11  or enforceable?

12  A.    No.  I'm not an attorney.

13        MR. KAUFMAN:  Okay.

14        THE COURT:  All right.  Ms. Miller, do you have

15  further questions?

16        MS. MILLER:  I do.

17  RECROSS-EXAMINATION

18  BY MS. MILLER:

19  Q.    Ms. Westman, are you familiar with the concept of blanket

20  collateral under the security agreement?

21  A.    I am.

22  Q.    And are you familiar also with -- that Ally had a blanket

23  lien on certain collateral?

24  A.    Yes, well, I'm not sure whether Ally had the blanket lien.

25  There was a blanket lien under the revolver that I'm aware of,

1    yes.

2    Q.    And was collateral subject to the blanket lien tracked in

3    the CFDR?

4    A.    Not prior to petition it wasn't, but after petition, it

5    was.

6            MS. MILLER:  No further questions.

7            THE COURT:  Were intercompany balances recorded in the

8    CFDR after the petition date as collateral for the AFI

9    revolver?

10           THE WITNESS:  They were not.

11           THE COURT:  Thank you.

12           Any further questions anyone?

13           MS. MILLER:  We'd like to move a number of documents

14   into evidence.

15           THE COURT:  All right.  Can the witness --

16           MS. MILLER:  Yes.

17           THE COURT:  -- be excused?

18           MS. MILLER:  Yes.

19           THE COURT:  You're excused.

20           Okay, go ahead.

21           MS. MILLER:  We'd like to move exhibits DX-AXI, DX-

22   AUB, DX-ATW, DX-ARY, DX-AWN and DX-AXJ into evidence.

23           THE COURT:  I'll give Mr. Kerr an opportunity.

24           MR. KERR:  I just want to make sure I got the letters

25   right.

1          THE COURT:  Yeah, okay.

2          MR. KERR:  Give me one second, Your Honor.

3          THE COURT:  Yeah, absolutely.

4      (Pause)

5          MR. KERR:  Your Honor, just let me look at one

6  document.  Hold on.

7      (Pause)

8          MR. KERR:  Your Honor, we do not object to any of

9  those exhibits.

10          THE COURT:  All right.  Exhibits AXI, AUB, ATW, ARY,

11  AWN and AXJ are all admitted in evidence.

12  (Various document was hereby received into evidence as

13  Defendant's Exhibits AXI, AUB, ATW, ARY, AWN and AXJ, as of

14  this date.)

15          MR. KERR:  Your Honor, again, Charles Kerr.

16          At the beginning of Ms. Westman's testimony, I started

17  reading exhibit numbers and wandered off and I apologize.

18          So we went through and came up with a list of what had

19  been in and we e-mailed it, but apparently Ms. Miller hasn't

20  had a chance to look at it yet.  So can you just give us time

21  to get that straightened out?

22          THE COURT:  Yes, you can.

23          MS. MILLER:  Thank you, Your Honor.

24          MR. KERR:  Your Honor, two other housekeeping things,

25  if we can.

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1           First, this morning when we were putting up testimony

2    from Mr. Blumentritt, we also had a long list of insurance

3    policies and you asked us to check with the JSNs.  And we have

4    given them our list and I believe they don't have any

5    objections to any of those documents.  So let me just, if I

6    can, just state for the record what they are.  Or actually, I

7    can -- we actually filed, actually we filed a list of those

8    exhibits last night on ECF 5917, which lists all the exhibits

9    that went in through Mr. Blumentritt.  And I believe that the

10   JSNs have no objection to those document.

11          THE COURT:  All right, let me just -- this may be the

12   simplest way.

13          Mr. Cohen?

14          MR. COHEN:  That is correct, Your Honor.

15          THE COURT:  All right.  So the documents listed in the

16   pleading filed as ECF 5197 (sic), which were offered -- did I

17   misspeak?

18          MR. KERR:  No, it is 5917, Your Honor.

19          THE COURT:  Okay, 5917.  I did misspeak.

20          Okay, so the exhibits offered in connection with Mr.

21   Blumentritt's direct testimony, which are listed in the

22   pleading filed as 5917 are all in evidence.

23   (Exhibits offered in connection with Mr. Blumentritt's direct

24   testimony, listed at ECF 5917, were hereby received into

25   evidence as Plan Proponents' Exhibits, as of this date.)

RESIDENTIAL CAPITAL, LLC, ET AL.                    135

1          MR. KERR:  Thank you, Your Honor.

2          THE COURT:  Mr. Rains?

3          MR. RAINS:  Thank you, Your Honor.  Same deal with Mr.

4  Lipps.  You'll recall yesterday morning we offer -- we have a

5  number of exhibits to offer through him.  We filed that list

6  last night.  That's ECF 5916.  All of the exhibits are listed

7  there.  We shared that with the JSNs last night.  Again, I'm

8  informed there are no objections.

9          THE COURT:  Mr. Cohen?

10         MR. COHEN:  That is correct.

11         THE COURT:  All right.  So the exhibits offered in

12  connection with the testimony of Jeffrey Lipps and the list of

13  those exhibits as filed on ECF as ECF docket number 5916 are

14  all in evidence.

15  (Exhibits offered in connection with Jeffrey Lipps' testimony,

16  listed at ECF docket number 5916, were hereby received into

17  evidence as Plan Proponents' Exhibits, as of this date.)

18         MR. LAWRENCE:  Good afternoon, Your Honor.  Alex

19  Lawrence for the debtors.

20         We have Fernando Acebedo who --

21         THE COURT:  Yes.

22         MR. LAWRENCE:  -- we would like to introduce his

23  direct testimony into evidence.

24         THE COURT:  Okay.  Is he going to be cross-examined?

25         MR. LAWRENCE:  He will not be cross-examined, as I

RESIDENTIAL CAPITAL, LLC, ET AL.                    136

1    understand.

2              THE COURT:  All right, so --

3              MR. COHEN:  That's correct.

4              MR. LAWRENCE:  So with that, Your Honor, in support of

5    the Chapter 11 plan and these consolidated proceedings, the

6    debtors offer the declaration of Fernando Acebedo, dated

7    November 12, 2013, which was filed as docket entry number 5674

8    and which is also marked as plan proponents' exhibit number

9    1565.

10             If Mr. Acebedo were called to testify, he would

11   testify as to what is in his written declaration.

12             THE COURT:  I take it no objection, right?

13             MR. COHEN:  No objection, Your Honor.

14             THE COURT:  All right.  The direct testimony of

15   Fernando Acebedo on ECF as number 5674 and marked as

16   Plaintiff's Exhibit 1565 is in evidence.

17   (Declaration of Fernando Acebedo was hereby received into

18   evidence as Plan Proponents' Exhibit 1565, as of this date.)

19             MR. LAWRENCE:  And in connection with Mr. Acebedo's

20   direct testimony, Your Honor, there is one exhibit.  It's a

21   prior declaration.  I believe it's from the FGIC hearing.

22             THE COURT:  Okay.

23             MR. LAWRENCE:  It's exhibit number 1566.

24             THE COURT:  1566.  Any objection, Mr. Cohen?

25             MR. COHEN:  None, Your Honor.

1          THE COURT:  All right, so Exhibit 1566 is in evidence.

2    (Prior declaration of Fernando Acebedo was hereby received into

3    evidence as Plan Proponents' Exhibit 1566, as of this date.)

4          MR. LAWRENCE:  Your Honor, two more items.

5          With respect to two of the exhibits that we introduced

6    into evidence this morning, it actually turns out they were

7    unsigned copies of agreements and we have replacements which

8    are signed copies.

9          THE COURT:  Okay, you'll just substitute -- is that

10   acceptable, Mr. Cohen, that we just --

11         MR. COHEN:  Yeah, we'd like to take a look at them,

12   but I don't think we'll have any problem.

13         MR. LAWRENCE:  I showed them to Dan.  He was --

14         THE COURT:  Mr. Perry?

15         MR. PERRY:  We have no objection, Your Honor.

16         THE COURT:  All right, all right.

17         MR. LAWRENCE:  And we've marked that as 614-1 and 614-

18   2.

19         THE COURT:  Okay.  As far as I was concerned you

20   could've just subs -- but that's fine.  They're a -- yeah,

21   that's okay.

22         MR. LAWRENCE:  Thank you, Your Honor.

23         And we have a certification of a Ms. Cathy Quinoval

24   (ph.) which we've provided which has a number of documents, the

25   certification of business records, one of which is the 682

1    document that we had some issues with this morning.

2              THE COURT:  Mr. Perry?

3              MR. PERRY:  No objection, Your Honor.

4              THE COURT:  All right.  So Exhibit 682, you have no

5    objection to the exhibit now?

6              MR. PERRY:  We're withdrawing our objection --

7              THE COURT:  Okay.

8              MR. PERRY:  -- and have no objection.

9              THE COURT:  All right.

10             MR. LAWRENCE:  And there -- the other document.

11             THE COURT:  Hold on, let me --

12             MR. LAWRENCE:  Oh, I'm sorry, Your Honor.

13             THE COURT:  So Exhibit 682 is in evidence.

14   (Certification of business records was hereby received into

15   evidence as Plan Proponents' Exhibit 682, as of this date.)

16             MR. LAWRENCE:  There are four other documents

17   identified in the certification:  509, 691, 702 and 703.

18             THE COURT:  Has the other side had an opportunity

19   to -- Mr. Perry?

20             MR. PERRY:  We have, Your Honor and we have no

21   objection.

22             THE COURT:  All right.  So Plaintiff's Exhibit --

23   Proponents' Exhibits 509, 691, 702 and 703 are all in evidence.

24   (Certification of business records was hereby received into

25   evidence as Plan Proponents' Exhibits 509, 691, 702 and 703, as

1  of this date.)

2           MR. LAWRENCE:  And with that, Your Honor, I believe we

3  have our next witness, who will be Mr. Jim Young.

4           THE COURT:  Okay.

5           MR. LAWRENCE:  Your Honor, may I just move these

6  binders out of the way?

7           THE COURT:  Please.  Would you like to move some of

8  mine, too?

9           MR. LAWRENCE:  Mr. Uzzi has to pick up his.

10          THE COURT:  While you're doing -- everybody stay in

11  place.  While you're doing the shift, I'll be right back out.

12  Nobody get up, okay?

13          You'll get the witness up there, get whatever binders

14  you need, get me whatever binder -- I assume Mr. Young is going

15  to be cross-examined, right?

16          MR. LAWRENCE:  Yes, he will, Your Honor.

17      (Pause)

18          MR. LAWRENCE:  Your Honor, Mr. Young is -- he's on his

19  way down the hall.

20          Oh, there he is.

21          THE COURT:  Could you stand and be sworn, Mr. Young?

22          MR. YOUNG:  Yes, yes.

23          THE COURT:  You got away from him.

24          MR. YOUNG:  Yes.

25          THE COURT:  All right, raise your right hand.

1      (Witness sworn)

2            THE COURT:  Please have a seat.  Do you have water?

3            THE WITNESS:  I've got some.  Thank you.

4            THE COURT:  Okay, go ahead, have a seat.

5            MR. LAWRENCE:  Your Honor, in support of the joint

6      Chapter 11 plan in these consolidated proceedings, the debtors

7      offer the direct testimony of Jim Young, dated November 12,

8      2013, which was filed as docket entry number 5696.

9            If Mr. Young were called to testify, he would testify

10     as to what is in his written direct testimony.

11           THE COURT:  Mr. Cohen?

12           MR. COHEN:  Your Honor, we'd like the Court to reserve

13     ruling on the admissibility of the direct testimony.  I think

14     some of the questions in cross-examination --

15           THE COURT:  Well, you have to tell me -- I just -- you

16     can cross-examine him, obviously, but I know to know what it is

17     in his direct testimony that you wish to examine on before his

18     statement, before the testimony is admitted.

19           MR. COHEN:  Certainly.  Paragraphs 7 through 16.

20           THE COURT:  Let me just look at those.

21           MR. COHEN:  It's his testimony regarding the intent of

22     the parties in connection with the MSR swap agreements.

23           THE COURT:  All right, let me look at that first.

24      (Pause)

25           THE COURT:  All right.  I'll reserve ruling on the

RESIDENTIAL CAPITAL, LLC, ET AL.                    141

1  admissibility of Mr. Young's direct witness statement.  Okay?

2          MR. LAWRENCE:  Your Honor, in connection with Mr.

3  Young's testimony we have seven documents that we would like to

4  move into evidence as Plan Proponents' Exhibits.  They are 511,

5  623, 624, 716, 731, 732 and 734.

6          MR. COHEN:  We have no objection.

7          THE COURT:  All right.  So exhibits 511, 623, 624,

8  716, 731, 732 and 734 are all in evidence.

9  (Documents in connection with Mr. Young's testimony were hereby

10 received into evidence as Plan Proponents' Exhibits 511, 623,

11 624, 716, 731, 732 and 734, as of this date.)

12         MR. LAWRENCE:  Thank you, Your Honor.

13         THE COURT:  Mr. Cohen, cross-examination?

14         MR. COHEN:  Thank you, Your Honor.  We're passing out

15 some binders.  Unfortunately, they're quite large.

16 CROSS-EXAMINATION

17 BY MR. COHEN:

18 Q.   Good afternoon, Mr. Young.

19 A.   Good afternoon.

20         MR. COHEN:  Could you speak into the microphone?

21         THE COURT:  Yeah, I think you're going to have to pull

22 the microphone closer or for you to get closer to it.

23         THE WITNESS:  Yup.

24 A.   Good afternoon.

25 Q.   Mr. Young, you're currently the CFO at Ally Bank, right?

RESIDENTIAL CAPITAL, LLC, ET AL.                    142

1   A.   That's correct.

2   Q.   And prior to taking on the position of CFO at Ally Bank,

3   you were the CFO at ResCap, right?

4   A.   That's correct.

5   Q.   And you were the CFO at ResCap from 2008 until you went to

6   Ally Bank in the spring of 2011, is that right?

7   A.   That's correct.

8   Q.   Were you also the controller and chief accounting officer

9   at ResCap?

10  A.   Yes, I was.

11  Q.   And as the CFO, controller, and chief accounting officer

12  at ResCap, you were responsible for ensuring proper controls

13  with respect to financial reporting were in place, weren't you?

14  A.   Yes.

15  Q.   And you did ensure that proper controls were in place,

16  right?

17  A.   I did.

18  Q.   And among the controls that you ensured were in place were

19  the proper reporting of assets and liabilities, right?

20  A.   That would be included in the body of controls, yes.

21  Q.   And so with respect to intercompany payables, if they were

22  recorded as assets and liabilities, you would ensure that they

23  were actual assets and liabilities, right?

24  A.   Yes.

25  Q.   During your tenure at ResCap as controller, chief

1  accounting officer and CFO, do you believe the financial
2  statements were fairly presented in all material respects?
3  A.   I do.
4  Q.   And was that true on a consolidated basis as well as an
5  individual legal entity basis?
6  A.   For the financial statements that we issued that were in
7  accordance with GAAP, yes.  Whether it was consolidated or at
8  the subsidiary level, yes.
9  Q.   Now you mentioned GAAP; the purpose, the overarching
10  purpose of GAAP is to fairly and accurately present financial
11  information in a way that the reader can meaningfully
12  understand, right?
13  A.   The standard under GAAP is materially, fair in all
14  material respects on a consolidated basis for that particular
15  legal entity.
16  Q.   And with respect to the intercompany payables and
17  receivables, which were in the billions of dollars, if those
18  were actually equity and capital transactions, that would be a
19  problem under GAAP, wouldn't it?
20  A.   We recorded the accounts in accordance with GAAP.  So if
21  they were payables and receivables, under accounting rules they
22  would be recorded as payables and receivables.  If they were
23  equity transactions under GAAP, we would have recorded them as
24  equity transactions.
25  Q.   Okay.  What is your understanding of what a payable is?

1    A.    My general business understanding would be a payable is

2    when one party owes money to another party.

3    Q.    So that would be a liability, right?

4    A.    Yes.

5    Q.    And what is a receivable?

6    A.    My general business understanding, a receivable would be

7    if one party is owed money from the counterparty, that would be

8    a receivable.

9    Q.    And that's a liab -- the receivable, rather, is an asset,

10   right?

11   A.    Receivable is an asset, that's correct.

12   Q.    Okay.  So payables and receivables are properly reflected

13   on the financial statements in the asset and liability columns

14   as opposed to the equity columns, right?

15   A.    Yes.

16   Q.    Okay.  In your capacity as the CFO at Ally Bank and during

17   your tenure at ResCap, were there accounting policies in place

18   to govern the way the books and records were prepared?

19   A.    Yes.

20   Q.    Would you look in your binder at, I think it's the first

21   document once you get past the deposition transcript.  It's

22   behind tab DX-AYD.  This is a document that has the Bates

23   number 24848 through 242866.  Let me know when you're there.

24        THE COURT:  I'm not there, either, so --

25        MR. COHEN:  Okay.

1   A.    I'm sorry, could you repeat the --

2           MR. COHEN:  Your Honor, it's in the front; it's right

3   behind the deposition.  So it's the first of the documents that

4   bears the DX numbers.

5           THE COURT:  Got it.

6   A.    I'm there.

7   Q.    And this document is titled Accounting Policy 1075,

8   Related Party.  It superseded a prior version; it became

9   effective January 1, 2010, and it was published January 1,

10  2010.  Do you see that?

11  A.    I see that, yes.

12  Q.    Are you familiar with Ally's accounting policy for related

13  party transactions?

14  A.    Well, I'm familiar with accounting policies in general.  I

15  am familiar with the generally accepted accounting principles

16  underlying related party transactions.  I can't say that I've

17  specifically reviewed this policy, but certainly understand

18  that the concepts under GAAP that would be in this policy.

19  Q.    So as the CFO at Ally and as the former CFO at ResCap, you

20  understood that these Ally policies were an attempt to

21  implement GAAP throughout the Ally family of companies, right?

22  A.    Yes, I would agree with that.

23  Q.    And the Ally policies applied to ResCap as a wholly owned

24  subsidiary of Ally, right?

25  A.    They would apply to ResCap -- yes.  Now, ResCap may have

RESIDENTIAL CAPITAL, LLC, ET AL.                    146

1   had other accounting policies at the same time that were not

2   specifically this document, but they would have contained the

3   same guidance under GAAP with respect to related party

4   transactions, really any transaction.  But at some point in

5   time ResCap had its own accounting policies, but really no

6   substantive difference in content.

7   Q.   Okay.  Would you turn to the third page of this document

8   and I'd like to direct your attention to the section marked

9   6.0, Standards, Practices and Procedures.  Will you let me know

10  when you're there?

11  A.   I'm there.

12  Q.   Okay.  Would you look at the first sentence which says

13  there is a general presumption that transactions between

14  related parties cannot be carried out on an arms'-length basis.

15  Do you see that?

16  A.   I do.

17  Q.   And that was Ally's accounting policy, right?

18  A.   That is a sentence from Ally's accounting policy, correct.

19  Q.   And that's also GAAP, right?

20  A.   I would say yes, that is GAAP.

21  Q.   Okay.  So for all related party transactions, there is a

22  presumption that they're not arms' length, Ally's accounting

23  policy and GAAP, right?

24  A.   Correct.

25  Q.   So the fact that a transaction is not arms' length does

1    not mean it's a capital transaction as opposed to a payable and

2    a receivable, right?

3              THE COURT:  I'm sorry, just ask that again.

4              MR. COHEN:  Sure.

5    Q.    The fact that a transaction, a related party transaction,

6    is not at arms' length does not impact whether it is a capital

7    transaction, an equity transaction versus a payable or

8    receivable, right?

9    A.    If I understand your question correct --

10             THE COURT:  Don't answer it if you don't understand

11   it.  If you understand it, answer it.

12   A.    The -- whether a transaction is arms' length or not would

13   not drive the accounting as to whether it's an intercompany

14   payable receivable or an equity transaction in and of itself.

15   Q.    Okay.

16   A.    It's a facts-and-circumstances-based decision.

17   Q.    Would you turn to the page in this document which has the

18   Bates number that ends in 854, and at the top is Section 6.3.1,

19   Presumed Lack of Arms'-Length Basis.

20   A.    I see that.

21   Q.    And the first sentence of that section says, "The nature

22   of a transaction may be indicative that the arrangement is not

23   being conducted on an arms'-length basis and is a related party

24   transaction.  Examples include," do you see that?

25   A.    I do.

RESIDENTIAL CAPITAL, LLC, ET AL.                    148

1    Q.   So one of the examples that would indicate to you that a

2    related party transaction is not arms' length is if there was

3    borrowing or lending on an interest-free basis, correct?

4    A.   That is the first bullet, yes.

5    Q.   Okay.  And so that would indicate to you that a related

6    party transaction is not arms' length, right?

7    A.   That would be one -- one -- one indicative factor that

8    should be considered, yes, in making your accounting

9    conclusion.

10   Q.   Let's go to the fourth bullet.  "Another factor that would

11   be indicative that a transaction between related parties is not

12   arms' length is making loans with no scheduled terms for when

13   or how the funds will be repaid."  Do you see that?

14   A.   I do.

15   Q.   And so if you see a related party transaction that has

16   those features, it will tell you it's probably not arms'

17   length, right?

18   A.   Yes.

19   Q.   Okay.  Let's look two bullets down or three bullets down

20   from there.  It says, "Loans to parties that do not possess the

21   ability to repay".  Do you see that?

22   A.   I do.

23   Q.   And that would also indicate to you that a related party

24   transaction is not arms' length, right?

25   A.   That would be another factor to consider, yes, that

1  evaluation.

2  Q.    And then let's go down to three more bullets, "Loans

3  advanced ostensibly for a valid business purpose and later

4  written off as uncollectable," that's another factor that would

5  indicate a transaction is not arms' length, right?

6  A.    Correct.

7  Q.    Let's go to the page in this document that ends with the

8  Bates number 857, and about halfway down the page there is a

9  Section 6.5 titled Classification and Presentation.  And under

10 that there is a Section 6.5.2, Debt Forgiveness or

11 Extinguishment.  Will you let me know when you're there?

12 A.    I'm there.

13 Q.    And under that section, Ally's accounting policy states

14 that "Extinguishment of debt transactions between related

15 entities may be, in essence, capital transactions.  As such

16 forgiveness of debt and related interest between the related

17 parties and the associated gains or losses generally should not

18 be classified as an income statement item, but rather as

19 capital transactions."  Do you see that?

20 A.    I do.

21 Q.    So Ally's accounting policy and GAAP require that if you

22 have a related party transaction that is not on arms' length,

23 if there is a debt forgiveness, then you treat it as a capital

24 transaction as opposed to an income statement item, right?

25 A.    Well, it would be a facts-and-circumstances assessment.

RESIDENTIAL CAPITAL, LLC, ET AL.                     150

1  So if you had a related party transaction and there was debt

2  forgiveness, you'd have to assess those particular facts and

3  circumstances to determine if it's an income statement or a

4  capital item.

5  Q.   Okay.  And you're aware of the fact that while you were at

6  ResCap and later at Ally Bank, that there were debt forgiveness

7  transactions at ResCap.  Weren't you?

8  A.   Yes.

9  Q.   And when determining how to account for those, consistent

10  with GAAP and Ally's accounting policy, did you look at the

11  facts and circumstances in making the determination as to the

12  proper accounting?

13  A.   Yes, I would say we did.

14  Q.   Okay.  And you would determine that if a related party

15  transaction was not at arms' length pursuant to the policy, it

16  should be recorded as a capital transaction?

17  A.   Well, again, the -- there are facts to -- factors to

18  consider; whether it's arms' length or not is one of those

19  factors to consider.  There may be other thing to consider.

20  But we certainly would have evaluate the facts and

21  circumstances for all those transactions and recorded them in

22  accordance with GAAP.

23  Q.   Okay.  You testified a little bit earlier that when ResCap

24  was reporting intercompany transactions as payables and

25  receivables, there was proper accounting for that, right?

RESIDENTIAL CAPITAL, LLC, ET AL.                    151

1   A.   Yes, to the best of my knowledge, yes.

2   Q.   And if at some point you determined that the payables and

3   receivables were not actually payables and receivables, they

4   were capital transactions, you would have to correct the

5   financial statements, right?

6   A.   Yes, we would.

7   Q.   And the obligation to ensure that payables and receivables

8   were actually payables and receivables was an ongoing

9   obligation, right?

10  A.   It is an ongoing obligation under GAAP to ensure those --

11  that the accounting treatment is still valid, yes.

12  Q.   And ResCap lived up to its ongoing obligation under GAAP

13  to ensure that they continued to be payables and receivables,

14  right?

15  A.   Yes.

16  Q.   During your time at ResCap and later at Ally Bank, are you

17  aware of anybody trying to mislead people through ResCap's

18  financial statements?

19  A.   No, I'm not aware of that.

20  Q.   So you're not aware of people recording things as payables

21  and receivables to confuse investors or the public?

22  A.   No.  I don't believe that happened.

23  Q.   Okay.  Are you familiar with the phrase forgiveness of

24  debt?

25  A.   Yes, I am.

1   Q.   What does that mean to you?

2   A.   To me that means if there is a relationship between two

3   parties and one owes the other some form of consideration,

4   let's call it cash, then the party that is owed that money

5   communicates to the other that they no longer have to pay that

6   back, that would be forgiveness of debt.

7   Q.   Okay.  If one party doesn't owe the other party money,

8   does the phrase "forgiveness of debt" make any sense?

9   A.   Not to me.

10  Q.   Okay.  At ResCap, were there procedures that had to be

11  followed if ResCap wanted to forgive intercompany debt?

12  A.   Yes.

13  Q.   What were those procedures?

14  A.   It would have varied based upon the type of arrangement

15  that would have been forgiven, the size of the forgiveness, the

16  accounting ramification for the forgiveness.

17       So for instance, I'm aware of the fact that while at

18  ResCap we had requirements for approvals of capital allocations

19  which could result from forgiveness of debt.  So there were,

20  yes, processes in place.

21  Q.   Certainly somebody, an accounting clerk couldn't just go

22  into the general ledger and move things from payables and

23  receivables into capital, right?

24  A.   That is correct.

25  Q.   All right.  And during your time at ResCap, under what

1    circumstances are you aware of approvals being sought to

2    forgive debt?

3    A.    Oh, there -- there would have been several.  I can't

4    recall them all.  There would have been situations where

5    certain subsidiaries didn't meet capital requirements for

6    various purposes, debt would have needed to have been forgiven

7    in order to supplement the capital of that -- the certain legal

8    entity, and that would then flow the process, the details of

9    which I can't recall exactly, but there was certainly a

10   process.

11   Q.    Okay.  And the process was followed, right?

12   A.    To the best of my knowledge, yes.

13   Q.    Are you aware of any instance during your time at ResCap

14   and later at Ally Bank where ResCap was forgiving intercompany

15   debt without a valid business purpose?

16   A.    I am not aware of any time when I was at ResCap that debt

17   was being forgiven without a valid business purpose.

18   Q.    Are you aware of any instance during your time at ResCap

19   and later at Ally Bank where debt was forgiven in an amount in

20   excess of that which was needed for the valid business purpose?

21   A.    Not to my knowledge, no.  We would use judgment on how

22   much to forgive based upon the capital requirement of any given

23   subsidiary, and of course we would assess future needs and make

24   a judgment as to how much to forgive.  So it may not have been

25   the exact amount.  It may have been a cushioned amount involved

RESIDENTIAL CAPITAL, LLC, ET AL.                    154

 1  that would have allowed some room for error.  But that was a

 2  thoughtful process and a judgment we made.

 3  Q.   And the thoughtful process and judgment that you made was

 4  to ensure that you weren't forgiving more debt than you needed

 5  for the valid business reason that drove that transaction in

 6  the first place, right?

 7  A.   I agree with that.  We made the decisions considering

 8  uncertainties that may have occurred in accounting for those

 9  uncertainties.

10  Q.   Okay.  What is a tax allocation agreement?

11  A.   Well, from my perspective, a tax allo -- tax allocation

12  agreement is an agreement between a parent and a subsidiary

13  where the parent is the tax filer, the subsidiary issues

14  separate GAAP-compliant financial statements, and in order to

15  reflect accounting for taxes on the subsidiaries' financial

16  statement, the tax allocation agreement is a method of

17  establishing how that tax accounting should be carried out.

18  Q.   You're not aware of any instance in which there is a tax

19  allocation agreement between companies that are not in the same

20  corporate family, are you?

21  A.   I am not aware of any tax allocation agreements outside of

22  a consolidated group of companies, that's correct.

23  Q.   Okay.  So by definition, tax allocation agreements are

24  related-party transactions, right?

25  A.   I agree with that, yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    155

1  Q.   Okay.  Would you turn in -- give me one second.  Do you

2  have your witness statement in front of you?

3  A.   I -- I don't know.

4  Q.   I think it's in the white binder.

5  A.   Sorry, which binder?

6         THE COURT:  It's in the front of the white binder.

7         THE WITNESS:  Oh, okay.

8         MR. COHEN:  In the white binder.

9  A.   Yep, I have it.

10 Q.   All right, let me find where we're going in here.  It's

11 one of the attachments to your witness statement.  Would you

12 turn to the document that has at the top, it is titled Second

13 Tax Allocation Agreement page 1 of 6.

14        MR. COHEN:  Let me see if I can find an easier way

15 because there's not tabs in here.

16        THE COURT:  There are Bates number at the bottom right

17 corner, but I don't know whether that helps or  not.

18        MR. COHEN:  But they don't follow.

19        THE COURT:  Yeah.

20        MR. COHEN:  So let me look through.  Bear with me for

21 one second, Your Honor.

22        THE COURT:  Everything used to be something of 203, if

23 you look at the top, ECF legend.  Oh, wait.  First tax

24 allocation agreement follows 203 of 303.  It's Exhibit A to it.

25        MR. COHEN:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                          156

1  Q.   All right, in the black binder there is a tab DX-AQV.

2  Apologies for the confusion.  In the black binder.  I'm sorry.

3  A.   Oh, all right.

4          THE COURT:  Give me that exhibit number again.

5          MR. COHEN:  DX-AQV.

6  A.   All right, I'm at DX-AQV.

7          THE COURT:  I'm not.  I can't find it.  If somebody

8  could come up here and help me with this.

9          Okay, thanks.

10  Q.   In this document --

11          THE COURT:  AQV, as in Victor.

12          MR. COHEN:  AQV as in Victor.  And the agreement is

13  actually within this document at the Bates number that ends in

14  16379.  It's Exhibit A.

15          THE COURT:  Okay.

16          MR. COHEN:  Sorry about that.

17          THE WITNESS:  I'm there.

18          MR. COHEN:  Hopefully the other documents will come

19  more smoothly.

20          THE COURT:  No, I found it in this first binder too,

21  but that's all right.  It doesn't matter which one.

22          MR. COHEN:  You were faster than me.

23  Q.   Mr. Young, have you ever seen this document, which is

24  Exhibit A in DX-AQV?

25  A.   I have seen this document.

RESIDENTIAL CAPITAL, LLC, ET AL.                                157

1  Q.   What is this document?

2  A.   To -- to the best of my recollection, this is a -- a draft

3  tax allocation agreement that was presented to ResCap in --

4  in -- sometime in -- well, I don't recall the exact -- that

5  time, but it was a draft tax allocation agreement presented to

6  ResCap.

7  Q.   Was this document first presented to ResCap in late 2009,

8  to the best of your knowledge?

9  A.   I -- I just cannot -- I cannot remember right now.

10 Q.   Was this --

11 A.   It -- the document is -- it's dated November 1st, 2009,

12 but I can't remember when it was presented -- the -- I'm sorry,

13 the opening statement in the document indicates it's November

14 1st of 2009, but I can't remember when it was presented.

15 Q.   Okay.  Do you recall that ResCap has designated you as its

16 corporate representative for purposes of testing -- testifying

17 about this document?

18 A.   Yes.

19 Q.   Okay.  Were you the lead negotiator at ResCap with respect

20 to this, what you phrase is a draft tax allocation agreement?

21 A.   I would say I was the -- very involved with the

22 negotiation, along with others in the company, Tammy

23 Hamzehpour, for instance, and it may have involved some of our

24 tax people, but I was clearly, yes, involved.

25 Q.   Who at ResCap would you say took the lead in negotiating

RESIDENTIAL CAPITAL, LLC, ET AL.                    158

1   this tax allocation agreement?

2   A.    I would say it was, you know, Tammy and I combined.

3   Q.    Is this a document that you negotiated with Ally for some

4   period of time?

5   A.    I don't -- I don't recall the specific period of time

6   that -- that this was negotiated prior to presenting it to the

7   ResCap board.

8   Q.    Okay.  So this document, this Exhibit A, you actually did

9   present it to the ResCap board?

10  A.    Well, the -- the -- I don't -- I mean, record would --

11  would have what was presented to the ResCap board, but there

12  was a draft allocation agreement that was presented to the

13  ResCap board, yes.

14  Q.    In your mind, was the draft allocation agreement that you

15  presented to the ResCap board consistent with other tax

16  allocation agreements that you had seen?

17  A.    I would say it was not consistent.

18  Q.    In what way was it inconsistent with other tax allocation

19  agreements you had seen?

20  A.    It contained a provision that was very technical, but it

21  contained a provision whereby the -- the subsidiary, who is not

22  the fax filer -- so this agreement is all about allocating tax

23  attributes, those -- those tax attributes are actually owned by

24  the parent company, who files the tax return.  That -- that

25  this -- the -- the portion of this agreement which was non --

RESIDENTIAL CAPITAL, LLC, ET AL.                    159

1    that I -- that was non-standard was the -- an allocation of the

2    tax attribute to the subsidiary.  That would allow the

3    subsidiary to account for those tax implications prior to the

4    time it would otherwise be able to account for those tax

5    implications as if it were a standalone filer of tax.

6    Q.    And from the subsidiary's perspective, was that a good

7    thing or a bad thing?

8    A.    Well, from the subsidiary's perspective, there is a lot of

9    things to think about with respect to a tax-sharing agreement.

10        So from a -- I would -- I would reply in two ways.  From

11   a -- from a pure accounting perspective it's -- because it

12   deviates from a standard tax-sharing agreement, for financial

13   reporting purposes it's -- it's probably not better because it

14   may be confusing to readers of the financial statements.

15        However, the provision did -- certainly would mean some

16   cash would flow to ResCap ahead of when it might otherwise flow

17   to ResCap under the -- under a standalone tax-sharing

18   agreement.

19   Q.    Okay.  And when you were negotiating this agreement with

20   AFI, you understood that that was a provision in this

21   agreement, right?

22   A.    I understood that that was a provision of this agreement,

23   that's correct.

24   Q.    You didn't demand that that provision was in this

25   agreement.  In fact, AFI put it in there in the first draft you

RESIDENTIAL CAPITAL, LLC, ET AL.                    160

1   saw, right?

2   A.    Correct.

3   Q.    And the reason AFI put it in the first draft you saw is

4   because it was consistent with the other tax allocation

5   agreements they had with other subsidiaries, right?

6         MR. LAWRENCE:  Objection.

7         THE COURT:  Overruled.  Go ahead.

8   A.    Yeah, I don't know.

9         THE COURT:  Do you know?

10        THE WITNESS:  Sorry.

11        THE COURT:  Go ahead.

12  A.    I do not know.  I don't know why they would have put that

13  in there.  I could only speculate.

14  Q.    Okay.  Did you finally get to the point where you were

15  done negotiating this agreement and you felt comfortable going

16  to ResCap's Board of Directors and making a recommendation as

17  to whether ResCap ought to sign on to this agreement?

18  A.    I did reach the point where it was presented to the ResCap

19  board and certainly made the recommendation that -- that it --

20  it's an agreement that -- that -- that is something that we

21  could -- we should be adopting -- could adopt.

22  Q.    And --

23  A.    Not the only possibility, but certainly at that time, yes,

24  we could adopt it -- should adopt it.

25  Q.    And at the time you were negotiating this agreement, you

1  were only representing ResCap's interests, right?

2  A.    Yes.

3  Q.    You had no interest in representing AFI's interests in the

4  negotiation, right?

5  A.    Correct.

6  Q.    And when you presented this agreement to ResCap's board,

7  along with your recommendation that they approve the agreement,

8  did you explain that feature you were just talking about, that

9  cash would flow to ResCap earlier than it otherwise might have?

10  A.    I don't specifically recall.  I wouldn't be surprised if I

11  did because it's a deviation from a standalone tax-sharing

12  agreement.

13  Q.    Okay.  Would you look at page 8 of this agreement -- or

14  page 6, rather?  It has the Bates number ending in 384.

15  A.    I'm there.

16  Q.    And you'll see under Residential Capital, LLC there's a

17  signature line with your name.

18  A.    I see that.

19  Q.    Did the board authorize you to sign this agreement?

20  A.    The board delegated the authority to me to execute the

21  agreement when I felt it's -- when -- when I had gotten the

22  agreement, read through it again and was -- and was --

23  everything was in order, I was given the authority to sign the

24  agreement.

25  Q.    And you were going to read through it again just to make

RESIDENTIAL CAPITAL, LLC, ET AL.                          162

1    sure there were no mistakes, right?

2    A.    Correct.

3    Q.    When you presented this to the board and you got the

4    delegated authority, other than finding mistakes, typos, things

5    like that, you didn't intend to further per negotiate the

6    agreement, did you?

7    A.    I did not intend to further negotiate the agreement.

8    Q.    Okay.  So if AFI had given you this document right after

9    the board meeting and you read through it, didn't find any

10   typos, you would have signed it, wouldn't you?

11   A.    Yes.  If they -- if I had gotten the agreement immediately

12   after the board meeting and reviewed it for completeness, I

13   would have signed it.

14   Q.    Did there come a time when AFI called you and told you not

15   to sign it?

16   A.    There came a time when AFI let me know that the

17   ramifications of the -- this exception provision that we've

18   been discussing was not fully contemplated by AFI or the

19   ramifications of it was not formally considered by AFI, and

20   made it very -- they made it very clear that they needed to --

21   to consider that more carefully, because it hadn't been

22   considered up to that point.

23   Q.    And did you honor that request?

24   A.    I -- I did honor that request because of many other things

25   that were going on with -- with ResCap at the time, primarily

RESIDENTIAL CAPITAL, LLC, ET AL.                    163

1   the fact that ResCap at that time was solely dependent, for all

2   practical purposes, on AFI for capital and other cash liquidity

3   transactions, and that relationship with them as provider of

4   capital liquidity was very important to the company.

5        So yes, I -- I -- in my judgment, I was -- I listened to

6   them, and I did not sign the agreement until they were clear

7   with what it is this -- this particular aspect of the agreement

8   entailed, what it may or may not mean, and -- and I gave them

9   the time to do that.

10  Q.   Did AFI, during these conversations you had with them,

11  explain to you what they were worried about with respect to

12  this provision?

13  A.   I don't recall the exact details, but I would say I

14  generally recall that they were concerned about the fact that

15  that aspect of this tax-sharing agreement could result in

16  inadvertent capital transactions with ResCap.

17  Q.   What do you mean by "inadvertent capital transactions with

18  ResCap"?

19  A.   I mean that it -- that this is a tax-sharing agreement,

20  and as I explained, it's primarily for accounting for tax and a

21  subsidiary level for tax attributes that aren't owned by that

22  subsidiary.  They're owned by the filer.

23       In this case ResCap was not a tax filer, so this agreement

24  was for purposes of financial accounting, and that this

25  particular exception provision could result in an accounting

RESIDENTIAL CAPITAL, LLC, ET AL.                    164

1   for cash that may come in under the agreement as -- as capital

2   and not as a tax payable or receivable.

3   Q.   Okay.  So you understood the problem to be -- well, you

4   recognized from the first time you saw this agreement that

5   ResCap would get cash earlier than it otherwise might have

6   under the terms of this agreement.

7        Ally hadn't considered how much cash ResCap was going to

8   get under this agreement; isn't that right?

9   A.   I'm not sure what they did or didn't consider, but they

10  clearly hadn't contemplated the -- my -- my -- my view is they

11  hadn't contemplated at the right level in AFI that -- that

12  there could be any capital contribution, irrespective of size.

13  Q.   So did they ultimately come to a point where they told

14  you, it's fine, go ahead, sign this what you call draft

15  agreement?

16  A.   No.  There came a time where they came back and said

17  that -- that -- that they could not support at the highest

18  levels of AFI that particular provision in this document and

19  that -- that it needed to be removed.

20  Q.   Now, when they first told you that, did you go right to

21  ResCap's board and let them know?

22  A.   I don't recall exactly when I went to the ResCap board on

23  that matter.

24  Q.   Do you know if you went to the ResCap board at all before

25  you got another agreement from AFI?

RESIDENTIAL CAPITAL, LLC, ET AL.                    165

1  A.   I don't recall at what time I would have talked to the AFI

2  board.

3  Q.   Did you start negotiating another agreement with AFI?

4  A.   Well, I -- I -- I'm sure there was some back and forth on

5  the provision and -- and taking the provision out, yes.

6  Q.   All right.  Would you turn, I think it's three documents

7  earlier than this one in your binder, and it has the labels

8  behind the tab, DX-AQM.  Please let me know when you're there.

9  A.   I'm there.

10  Q.   Do you recognize this document, DX-AQM?

11  A.   I believe this to be the final tax-sharing agreement that

12  was agreed to between the parties and signed and executed

13  accordingly.

14  Q.   All right.  And if you turn to page 6, the last page in

15  this exhibit, is that your signature on behalf of Residential

16  Capital, LLC?

17  A.   Yes, it is.

18  Q.   And when did you sign that document?

19  A.   It's --it's hard to make out, but I believe it's January

20  of 2011.

21  Q.   Okay.  If you turn to the first page of the document in

22  the first paragraph, it says, "This amended and restated

23  agreement made as of November 1, 2009".

24      Why, if you didn't sign the agreement until January of

25  2011, is the agreement dated as of November 1, 2009?

1   A.   I don't recall exactly why, but it really didn't matter

2   because the company was operating under an existing tax-sharing

3   agreement and/or there's a default position under generally

4   accepted accounting principles that if you don't have a tax-

5   sharing agreement, that you operate -- you -- you account for

6   and issue your financial statements using a standalone basis

7   of -- of tax accounting.

8   Q.   So it had to be backdated because there was no agreement

9   in place for that GAAP period?

10  A.   No.  Again, I -- I don't recall exactly when the

11  agreements were in place or not.  I don't know.

12  Q.   What is the principal difference between this agreement

13  and the agreement we just looked at that you characterized as a

14  draft?

15  A.   The principal difference, to the best of my recollection,

16  is that that provision we were talking about before was

17  removed.

18  Q.   And which provision was that, to be clear?

19  A.   The provision we were discussing whereby the subsidiary

20  would receive cash in advance of being able to account for

21  those on their own financial statements as if they were

22  standalone -- a standalone filer, it did -- did not have that

23  in it.

24       Plus, this agreement made clear that this was a two-way

25  payment system under a tax allocation agreement, meaning

1  that -- that if the -- the -- the provision would require

2  capital or cash to come into ResCap if there were losses at

3  ResCap which were accounted for ahead of when they would have

4  otherwise been accounted for.

5      If the ResCap would have been making money in, say, a

6  subsequent year, those -- the tax allocation agreement would

7  generally require cash to go back the other way.

8      So there -- there were two things, to the best of my

9  recollection, one was the removal of the provision of utilizing

10  losses ahead of the subsidiary being able to use them as if

11  they were a standalone filer, and ensuring that it was clear

12  that this is a two-way street so that if -- if -- whatever the

13  tax accounting ramifications are under the agreement, they fall

14  back and forth between the parent and the subsidiary.

15  Q.   Do you know when ResCap first brought on restructuring

16  advisors?

17  A.   I do not.

18  Q.   Do you know if it was before January 2011?

19  A.   I do not recall.  And I -- I -- I guess -- I'm sorry.  The

20  restructuring advisors?  Who do you mean by "restructuring

21  advisors"?

22  Q.   Either lawyers like Morrison and Foerster to consider

23  bankruptcy options, or financial advisors like FTI.

24  A.   I don't recall the exact time, but I believe, for

25  instance, FTI would have been in before the fall of 2010, yes.

1    Q.    So they would have been there before the fall of 2010?

2    A.    Yes.

3    Q.    And the reason FTI was brought in is because ResCap had

4    fallen on very hard economic times, right?

5    A.    I would say yes, FTI was there to help the company develop

6    and improve cash for casting and other -- other cash liquidity

7    information that would help us, given the difficulties in the

8    markets, liquidity markets.

9    Q.    So at the time that you were negotiating the tax

10    allocation agreement on of ResCap with AFI, you weren't really

11    thinking about the prospect of making a lot of money and having

12    to pay back up to AFI, were you?

13    A.    Well, I wasn't -- I was -- I -- I -- I don't recall

14    exactly at the time.  ResCap, I think, was actually making

15    money in 2010.  But I mean, that's clear.  We can check that.

16    Q.    Okay.  And you signed this on behalf of ResCap in January

17    of 2011, right?

18    A.    That's correct.

19    Q.    And you started talking to Ally Bank about becoming their

20    CFO in December of 2010, right?

21    A.    Actually I didn't talk to Ally Bank about that, but a

22    representative from AFI mentioned it to me in December of 2010,

23    yes.

24    Q.    And you ultimately took that opportunity and left ResCap

25    to go to AFI, right?

1  A.   I did.  I -- I took that opportunity in --in approximately

2  May of 2011 after discussing with the bank's CEO and -- and

3  also by way of receiving regulatory non-objection that I was

4  allowed to -- to move.

5  Q.   All right.

6  A.   Because the FDIC needed to approve that move.

7  Q.   Let me find the next exhibit for you.  If you turn -- it's

8  at the front of the binder.  It's about the fourth or fifth

9  document back.  It's DX-AJA.

10          UNIDENTIFIED SPEAKER:  What is it?

11          MR. COHEN:  DX-AJA.

12  A.   I'm there.

13          THE COURT:  I'm not.  Hold on.  I am now.

14          While Mr. Cohen is looking for documents, did you

15  discuss with the ResCap board the changes between the unsigned

16  tax allocation agreement in the subsequently revised tax

17  allocation agreement?

18          THE WITNESS:  Oh, definitely.

19          THE COURT:  When did you do that?

20          THE WITNESS:  I believe I first mentioned it in

21  November during a board meeting.

22          THE COURT:  November of?

23          THE WITNESS:  November of -- of '10.

24          THE COURT:  Okay.

25          THE WITNESS:  And then again in, excuse me, December

RESIDENTIAL CAPITAL, LLC, ET AL.                    170

1    of '11.  So we first introduced the -- the concept at the

2    November board meeting.  There was further discussion about it.

3    The independent directors of ResCap engaged outside counsel.

4    Wanted to look at it.  That occurred in that time frame.

5            And there were discussions with the independent

6    counsel of ResCap -- or their -- I'm sorry, independent counsel

7    of the independent directors.  And that was carried on in

8    December.  Then ultimately the board decided to authorize the

9    signing of the second agreement.

10           THE COURT:  Go ahead, Mr. Cohen?

11   BY MR. COHEN:

12   Q.   All right.  Would you look at page 5 of this document,

13   which has the Bates number ending in 1144?

14           THE COURT:  We're looking at Exhibit AJA, right?

15           MR. COHEN:  We are.

16           THE COURT:  And the Bates page, the last three digits

17   were what?  I'm sorry.

18           MR. COHEN:  I'm sorry, 1144.

19           THE COURT:  Okay.  Got it.

20   A.   I'm there.

21   Q.   Do you have an understanding as to the tax benefits, if

22   any, that AFI will received as a result of the contribution of

23   2.1 billion dollars under the plan in this case?

24   A.   I don't.

25   Q.   You understand that AFI, I think you testified earlier,

RESIDENTIAL CAPITAL, LLC, ET AL.                         171

1  owns ResCap's tax attributes, right?

2  A.   Yes.

3  Q.   Do you have an understanding as to whether by virtue of

4  that ownership they will receive a benefit as a result of the

5  settlement payment?

6  A.   I -- I don't.

7  Q.   You haven't discussed that with anyone?

8  A.   I have not discussed that with anyone.

9  Q.   Okay.  I'd like to talk to you about the MSR swap.  Are

10 you familiar with that?

11 A.   Yes, I am.  There are a number of separate agreements that

12 we commonly refer to as the MSR swap.

13 Q.   Okay.  Did up negotiate the MSR swap documents?

14 A.   I did not negotiate the MSR.  The original MSR swap

15 documents, I was certainly at ResCap at the time.  I was not

16 involved in the day-to-day negotiation, but I did end up

17 signing the confirmation schedules on behalf of GMAC Mortgage

18 for those agreements.

19 Q.   Separate and apart from signing the schedules, did you

20 have any involvement at all with negotiating that business

21 relationship?

22 A.   Well, I certainly would have been involved with what the

23 objective was, what was in -- what the intent was of the

24 agreements between the parties and -- you know, given my -- my

25 position at ResCap at the time.  And -- but what I'm saying is

RESIDENTIAL CAPITAL, LLC, ET AL.                                    172

1   I wasn't involved in the -- in the day-to-day marking of the

2   document, et cetera.

3   Q.   What specifically was your involvement in establishing

4   that business relationship with respect to intent?

5   A.   I don't recall exact details, but it would have just been

6   talking to the parties to make sure that the -- the -- the

7   outcome was that -- that everybody was on the same page with

8   respect to what the outcome would be.

9   Q.   Excuse me.  Could you look at your deposition transcript,

10  which I think should be at the front of your binder?

11  A.   The front -- front of the black binder?

12  Q.   The black binder.  It's after your witness statement and

13  the exhibits, so it's behind Exhibit 10.

14  A.   I'm there.

15  Q.   And I'd like you to turn -- it's a little confusing.  At

16  the bottom it's page 51 and there are four deposition pages on

17  this.  I'd like you to look at page 200, lines 2 through 15.

18          THE COURT:  Just bear with me, okay?  Okay.

19  Q.   Would you take a moment to review that.

20  A.   I -- I see that -- I'm sorry, you said 2 through what?

21  Q.   Through 15.

22  A.   Yeah, I see that.

23  Q.   Do you recall testifying as to this at your deposition?

24  A.   Yes.

25  Q.   Does this reflect -- refresh your recollection as to

1   whether you had any role in the initiation or development of

2   the MSR swap?

3   A.   Yeah, I -- I -- I was not a party to the development.  And

4   what I meant by that was -- this is what I was referring to.  I

5   mean, I wasn't a party to the -- to the detailed negotiation of

6   the transaction, but I was certainly aware of what it was.

7   Q.   And your understanding of the intent of the parties with

8   respect to the MSR swap is not reflected in the documentation

9   for the MSR swap.  You would agree with that, right?

10  A.   I would agree that there are a couple of provisions that,

11  yes, are not -- are not crystal clear.

12  Q.   All right.  And in fact, the provisions that you think are

13  key to how the swap ought to be operating are not in the

14  documentation, right?

15  A.   I -- I -- I would say that there is one very particular

16  piece that's not in there that is -- is almost self-evident

17  from a total return swap basis, which is really the intent of

18  this agreement, was that it was a total return swap.

19      I do agree that that particular very detailed provision is

20  not spelled out.  But again, I -- I -- from my professional

21  judgment, it -- it's almost self-evident.

22  Q.   And what is that very detailed provision?

23  A.   The very detailed provision is that the -- you had the

24  MSRs that -- excuse me, that are capitalized on the books of

25  the bank.  They come in two forms.  Those forms would be

RESIDENTIAL CAPITAL, LLC, ET AL.                    174

1    transactions where loans were purchased from others with an

2    embedded MSR in it.  The other transaction would be originating

3    a loan directly with a customer or through a broker, not

4    purchased.

5         In a situation where you are originating a loan directly

6    with a customer, there's an MSR right -- a right -- a mortgage

7    servicing right embedded in that loan.

8         When you sell that loan in the marketplace through

9    securitizations with Fannie and Freddie and you retain that

10   servicing right, that servicing right has value that is

11   recognized when you sell the underlying loan.  That value runs

12   through the income statement of the seller.

13        The other -- the first piece I mentioned is a -- where

14   you're purchasing a loan.  And ResCap would purchase loans from

15   correspondence.  In that case, the purchase price would include

16   a premium and that premium was there for the fact that -- to

17   recognize that the seller is going to be compensated for that

18   embedded MSR.

19        So if you're purchasing a loan with that embedded MSR in

20   it, you're paying out cash.  So on your books, you then sell

21   it.  In that case, you have a basis in that MSR, so when you

22   sell the underlying loan, but you retain that mortgage

23   servicing right, there is no gain or loss because you've paid

24   someone else for that mortgage servicing right.

25        And that's the particular piece that I'm talking about, is

RESIDENTIAL CAPITAL, LLC, ET AL.                    175

1    that when loans were purchased with an embedded MSR,

2    subsequently sold in the market and there's -- and if the bank

3    had a basis in that, not creating any gain or loss on the

4    income statement, the fact that -- that that is not swapped

5    back to ResCap under a total return swap, you will not find

6    that language in the documentation.

7    Q.   And the absence of that language and the uncertainty as

8    how different people can read that contract is a very big issue

9    in terms of monetary impact, isn't it?

10   A.   Well, again, I -- I really don't believe so, because it --

11   well, it -- it's -- a total return swap is an agreement

12   where -- between the two parties where the totality of the

13   return is swapped to the counterparty in exchange for a

14   predetermined payment.

15       In this case, it was a LIBOR-based return coming through

16   the bank to ResCap.  And the -- the -- if there were some

17   concept of -- of swapping that amount the bank paid to ResCap

18   under that swap, it's -- it no longer is a total return swap.

19   Q.   So let's say somebody -- a court decides, you know what,

20   we're going to enforce this contract according to its literally

21   terms and we're not going to hear anybody's view on intent

22   because we think the contract is clear.  Let's assume that.

23       If that's right, then the payments under the documentation

24   that have been forced according to their literally terms would

25   be almost two billion dollars, wouldn't it?

RESIDENTIAL CAPITAL, LLC, ET AL.                              176

1              MR. LAWRENCE:  Objection.

2    A.   I have no idea what that number would be.

3              THE COURT:  Overruled.

4    Q.   It would be a lot of money, wouldn't it?

5    A.   I would suspect it's a sizable sum, but I've never looked

6    at it.  I have no idea what it would be.

7              THE COURT:  Mr. Young, this was an agreement between

8    ResCap and Ally Bank; is that correct?

9              THE WITNESS:  Yes, I think actually, Your Honor, it

10   was GMAC Mortgage and --

11             THE COURT:  And Ally Bank?

12             THE WITNESS:  -- and Ally Bank.

13             THE COURT:  Did you personally have any conversations

14   with anyone from Ally Bank where you discussed what you've

15   described as the intent for a total return swap.

16             THE WITNESS:  With Ally Bank?

17             THE COURT:  Yes.

18             THE WITNESS:  Not that I recall.

19             THE COURT:  The counterparty.

20             THE WITNESS:  Not that I recall.

21   Q.   Okay.  Let's talk about the brokering agreement and the

22   MML PSA.  You're familiar with that?

23   A.   I am.

24   Q.   Do you know who Adam Glassner is?

25   A.   I do.

RESIDENTIAL CAPITAL, LLC, ET AL.                    177

1   Q.   Who is Mr. Glassner?

2   A.   Adam Glassner is a former employee of -- of -- actually a

3   former plea of the -- of the group of companies.  I'm not

4   exactly -- I don't recall which company he was paid by, but he

5   was a former employee of the group of companies.

6   Q.   Did you know him personally?

7   A.   I -- I knew -- well, I knew him, yes.

8   Q.   Did you hold him in high regard?

9   A.   I -- I certainly respected his view on things, yes.

10  Q.   Okay.  Did Mr. Glassner come to share information with you

11  regarding his view of the way mortgages that were brokered by

12  GMAC Mortgage to Ally Bank, the way the profits were being

13  divided as between those two entities?

14  A.   He did at one point share with me a concern.

15  Q.   And what was that concern?

16  A.   He not only shared with me, but I believe he shared it

17  with the chief auditor of AFI, that he -- he held a view that

18  he wasn't sure whether the profit allocation under the MML PSA

19  was being handled as he thought it should be handled.

20  Q.   Did he tell you why he had that view?

21  A.   I do -- I don't recall.

22  Q.   Okay.  Were you able to pull out the contract and just

23  explain to him, here, look at this provision, this answers your

24  question, and be done with it?

25  A.   No.  We -- we -- we launched a very formal extensive

1  review of his allegation.

2  Q.   Why weren't you able just to look at the contract and read

3  the contract, ask a lawyer and say, this is the way this profit

4  should be allocated?

5  A.   Because it's a very -- well -- well, the -- it -- it's a

6  very complex set of agreements with -- with very complex

7  underlying instruments, and the language needs to be applied,

8  of course, to those underlying transactions.  So it was -- it

9  was -- it was -- it's complex.

10  Q.   From the Ally Bank point of view, who led the

11  investigation?

12  A.   From the Ally Bank point of view?

13  Q.   Yeah.

14  A.   I would suggest that I led the investigation.  I mean, I

15  was responsible for the team that I directed to do the work and

16  assess the findings.

17  Q.   Okay.  As the leader of the investigation from the Ally

18  Bank point of view, you went into the investigation with an

19  open mind, right?

20  A.   Absolutely.

21  Q.   So you looked at the possibility that Mr. Glassner was

22  right and the possibility that Mr. Glassner was wrong, right?

23  A.   Correct.

24  Q.   And in looking at the possibility that Mr. Glassner's

25  interpretation of the contract was right, you also understood

RESIDENTIAL CAPITAL, LLC, ET AL.                                179

1   the magnitude of the impact that would have on Ally Bank,

2   right?

3   A.    I don't recall ever quantifying that -- that impact.

4   Q.    Well, if you didn't quantify it to the penny, you

5   certainly knew it was hundreds of millions of dollars at issue

6   if Mr. Glassner was right, didn't you?

7   A.    I would have had a general knowledge that it was sizable,

8   yes.

9   Q.    Hundreds of millions of dollars, right?

10  A.    I didn't do the analysis, so I can't say exactly.

11  Q.    So when you say "sizable", what do you mean?

12  A.    It -- it -- it could be, you know, more than a couple

13  million.

14  Q.    Did you consider that if Mr. Glassner was right, the bank

15  may have to restate its financials?

16  A.    Absolutely that thought crossed my mind.

17  Q.    And did you consider if Mr. Glassner was right, that the

18  bank would take a hit to its capital?

19  A.    Correct.

20  Q.    And at the time Mr. Glassner raised these issues, AFI had

21  been receiving TARP money from the Federal Government, right?

22  A.    I don't know exactly when AFI received TARP money.

23  Q.    Okay.  If Mr. Glassner raised his allegations in 2011 and

24  the company investigated this in 2012, would that help you know

25  whether AFI was a recipient of TARP funds?

RESIDENTIAL CAPITAL, LLC, ET AL.                    180

1    A.    Yeah, yeah, AFI, to the best of my knowledge, would have

2    received TARP money before that.

3    Q.    And AFI, when it received TARP money, it was not one of

4    the banks -- the healthy banks that received TARP money so that

5    people wouldn't know which banks needed it and which didn't.

6    It wasn't in that list, was it?

7    A.    Well, again, I was never at AFI.  I -- I did not have any

8    negotiation with the U.S. Government.  I'm really not in a

9    position to comment why -- or why they -- why they got TARP

10   money.

11   Q.    Mr. Young, you're the CFO of Ally Bank.  Do you not know

12   whether AFI needed TARP money to boost its capital?

13   A.    I certainly would -- would suggest that that's the case,

14   but I was not involved in the direct conversations at all.

15   Q.    Okay.  And as you sit here today in November 2013, has AFI

16   repaid the Federal Government all of the TARP money that it has

17   borrowed?

18   A.    They have not repaid all of the TARP money that they have

19   borrowed.

20   Q.    Okay.  So the idea of doing a restatement of earnings and

21   taking a hit on capital was probably something that you viewed

22   as very unpalatable at the time you were weighing Mr.

23   Glassner's allegations and doing your investigation, right?

24   A.    No, I -- I -- I don't think that's true at all.  I

25   think -- for a couple of reasons.

1       First of all, the issuance of the financial statements in

2   accordance with GAAP is extremely important to -- to accounting

3   professionals.  There is no way that -- that I would -- despite

4   how difficult any situation would be, if I felt those financial

5   statements were materially misstated, we would correct them.

6       I have a history that have with ResCap as well.  I think

7   we actually had an instance when I was at ResCap where we had

8   to restate our financial statements.  And it was not fun and

9   it's not something that I would not take extremely seriously.

10      The second reason I don't think that -- well, I -- I know

11  it didn't come into play for me and I wouldn't think it would

12  come into play for AFI is that you're talking about Ally Bank

13  and you're talking about ResCap.  Those are two separate legal

14  entities with separate financial statements, but the

15  consolidated entity of AFI is the entity that received the TARP

16  money.

17      And all of these transactions we're talking about

18  eliminating consolidation at the AFI level, they don't survive

19  consolidation because they're between related entities.  Ally

20  Bank, yes.  GMAC Mortgage ResCap, yes.  But AFI, it

21  consolidates its one company, all that eliminates in

22  consolidation, so it wouldn't matter.

23  Q.   Do you remember when ResCap filed its bankruptcy petition,

24  its Chapter 11 petition?

25  A.   Well, I wasn't with ResCap at the time.  I was with Ally

RESIDENTIAL CAPITAL, LLC, ET AL.                182

1    Bank.  But to the best of my recollection, it was May of 2012.

2    Q.    And do you recall when your investigation into the

3    allocation of revenue between Ally Bank and GMAC Mortgage was

4    completed?

5    A.    I would say that we finished it up and discussed it with

6    the Ally Bank board near the end of March 2012.

7    Q.    So roughly a month before ResCap went into bankruptcy?

8    A.    Roughly.

9    Q.    To what extent, if any, did the fact that ResCap was

10   preparing a Chapter 11 case influence the outcome of your

11   investigation and decision not to pay hundreds of millions of

12   dollars into ResCap?

13   A.    My -- would you repeat the question, please?

14   Q.    Sure.  I'll ask it a little bit differently.

15         Were you concerned as part of your investigation that if

16   you found out that Mr. Glassner's allegations had substance and

17   his interpretation of the contract was right, you would have to

18   put hundreds of millions of dollars into ResCap as it was

19   preparing its Chapter 11 filing?

20   A.    I was not concerned about that.  I was concerned about the

21   sanctity of the financial statements.

22   Q.    Let's go back to the MSR swap.  To what extent does mark-

23   to-market accounting drive your view as to how those agreements

24   should be interpreted?

25   A.    Well, mark-to-market accounting -- the application of

1   mark-to-market accounting, I would say yes, has a bearing on my

2   view on how these agreements are -- are carried out, in

3   addition to the fact that, as I mentioned, their -- their

4   purpose being a total return swap.  But that's certainly a

5   piece of it as how you apply fair value accounting.

6   Q.   Okay.  When you say "fair value accounting", what do you

7   mean?

8   A.   I mean, how -- how -- how do you -- how -- the agreements

9   call for changes in fair value to be swapped.  So changes in

10  the fair value of the asset is -- is recorded in accordance

11  with GAAP under fair value standards, and the change is picked

12  up and swapped to the counterparty.

13  Q.   So with respect to loans that are originated at Ally Bank

14  and then sold to GMAC Mortgage, how -- or how does the swap

15  work with respect to loans that are originate by Ally Bank?

16  A.   With respect to the mortgage servicing right in

17  particular, as I was explaining before, if a loan is originate

18  by Ally Bank directly to a customer, there is an embedded value

19  of an MSR in that loan.  When that loan is sold to the market,

20  that mortgage servicing right is left behind and retained by

21  Ally Bank, and that that has a value in the marketplace.

22      So that value is created when the loan is sold and that

23  right is retained.  And on that day, with the creation of that

24  value, that -- that is a gain on the income statement of Ally

25  Bank and -- and then runs through the swap because it's --

RESIDENTIAL CAPITAL, LLC, ET AL.                    184

1   again, under the concept of a total return swap, it's running

2   through the income statement.  And that value was swapped over

3   to ResCap.

4   Q.    Okay.  And with respect to a loan that was not originate

5   by Ally Bank, but was purchased and then sold to GMAC mortgage,

6   how does the swap work with respect to that loan?

7   A.    As I think I mentioned before, that loan is purchased with

8   the embedded MSR.  So, for example, you pay 101 for a loan that

9   you send to the customer for 100, so you're paying a premium

10  for that loan, by the seller.

11       That premium, generally speaking -- it's complicated --

12  but generally speaking would represent the value of the

13  mortgage servicing right.  So you paid cash for it.

14       You then sell the underlying loan, you -- and record the

15  MSR, so you strip it out of the loan, but you said 101, so all

16  you're doing is allocating relative value.  And so there is no

17  gain or loss when you sell the loan on a loan that you

18  purchased with respect to the MSR, because the MSR is

19  capitalized, generally speaking at the amount you paid for it.

20  And it doesn't run through the income statement, and then not

21  caught up in the swap, in the total return swap.

22  Q.    Are you familiar with FAS 156?

23  A.    I'm familiar with yes, most FASB statements.  I can't

24  quote 156 by verse, but I'm familiar -- very familiar with

25  generally accepted accounting principles.

RESIDENTIAL CAPITAL, LLC, ET AL.                    185

1  Q.    Does FAS 156 deal with accounting for servicing of

2  financial assets?

3  A.    I'd have to check it.

4  Q.    Are you familiar with Ally's accounting policy 2451 which

5  deals with mortgage servicing rights?

6  A.    I'd have to look.

7  Q.    Well, it's in your binder towards the back.  It's got the

8  Bates number and it's on the tab RC4 and then it ends at 802.

9         MR. COHEN:  Your Honor, this doesn't have a DX number.

10 This is a rebuttal exhibit.

11        THE COURT:  Still need to give it an exhibit number.

12        MR. COHEN:  We'll give --

13        THE COURT:  All right, so what the witness is being

14 shown is Ally accounting policy 2451, Mortgage Servicing Rights

15 and it will be -- you can advise me in the morning --

16        MR. COHEN:  I can advise you now.

17        THE COURT:  Okay.

18        MR. COHEN:  It will be DX-BDG.

19        THE COURT:  All right.

20 (Ally Accounting Policy 2451, Mortgage Servicing Rights was

21 hereby marked for identification as Defendant's Exhibit DX-BDG,

22 as of this date.)

23 Q.    Have you seen this document before?

24 A.    I don't recall seeing this specific document before.

25 Q.    And just like Ally accounting policy 1075 that we saw

1    before, do you know whether this is a document that covers the

2    way Ally, including Ally Bank, is supposed to account for

3    mortgage servicing rights?

4    A.    Again, I haven't seen the document, but given it's an

5    accounting policy for mortgage servicing rights, I would assume

6    that's the case.

7    Q.    Okay.  Would you turn to the page in this document that

8    has the Bates number RC40821.  And I'd like to draw your

9    attention to the bottom of that page, at 10.0, which is titled

10   affected areas and exceptions.  Do you see that?

11   A.    I see that.

12   Q.    And do you see that Ally's accounting policy states that

13   this policy applies to all of Ally; there are no exceptions to

14   this policy?  Do you see that?

15   A.    I see that.

16   Q.    Okay.  And I'd like you to turn to the fifth page of the

17   document, which has the Bates number RC4806.  And at the bottom

18   of that page,  titled Initial Capitalization of MSR Assets.

19   A.    I see that.

20   Q.    Would you take a moment to look at Ally's accounting

21   policy with respect to mortgage servicing assets.

22        (Pause)

23            THE COURT:  You want him to read all of 6.2?  It goes

24   on for several pages.

25   Q.    So what I'd like to ask you, does Ally's accounting policy

RESIDENTIAL CAPITAL, LLC, ET AL.                    187

1   with respect to the capitalization of mortgage servicing right
2   assets draw a distinction in any way between the mortgage
3   servicing rights that are for Ally-originated loans versus
4   those that are acquired from third parties?

5          THE COURT:  You know, he said he hasn't seen it.  I'm
6   going to let him answer.  It goes on for several pages.

7          If there's a particular language or paragraph you want
8   to point him to, otherwise we're going to take a recess and
9   allow him to review it.  We're going to take an afternoon
10  recess at some point anyway.  But it's unfair to ask the
11  witness to answer a question about a technical accounting
12  policy that he says he hasn't seen before.

13         Which would you like to do?

14         MR. COHEN:  I'd like to take the recess, please.

15         THE COURT:  All right.  We're going to take a 15-
16  minute recess.  You don't have to spend your whole break
17  reviewing it.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  But I do --

20         MR. COHEN:  Thank you, Your Honor.

21         THE COURT:  Before we resume, I want you to have read
22  it over, okay?

23         THE WITNESS:  Okay.

24         THE COURT:  Mr. Cohen, do you have an estimate of how
25  long you're going to be on cross?

RESIDENTIAL CAPITAL, LLC, ET AL.                                188

1           MR. COHEN:  I'm sorry?

2           THE COURT:  Do you have an estimate of how much longer

3    you're going to be on cross?

4           MR. COHEN:  It's probably going to be five or ten

5    minutes, and then we'll go to Ms. Gutzeit.

6           THE COURT:  That's fine.

7           MR. COHEN:  Thank you.

8           THE COURT:  I'm not holding you to that.

9           MR. COHEN:  No, I understand.  But I'll streamline

10   during the break.

11          THE COURT:  No, it's okay.  I just wanted to have --

12          MR. COHEN:  Thank you.

13       (Recess from 3:21 p.m. until 3:44 p.m.)

14          THE CLERK:  All rise.

15          THE COURT:  Please be seated.

16          All right, Mr. Cohen?

17   RESUMED CROSS-EXAMINATION

18   BY MR. COHEN:

19   Q.   Mr. Young, have you had an opportunity to review DX-BDG?

20   A.   I have had an opportunity to review the section that you

21   pointed out, which I believe was 6.2 through essentially 6.5.

22   Q.   And my question was, is there anything in Ally's

23   accounting policy that would call for the separate -- the

24   different accounting treatment for loans originated by Ally

25   versus loans acquired from some other originator?

1    A.    Well, I would say that there is in the sense the

2    accounting policy you've set forth here relates to mortgage --

3    the initial valuation of mortgage servicing rights, as well as

4    the ongoing valuation of mortgage servicing rights.  And in

5    fact, it does state --

6             THE COURT:  Where are you reading?

7             THE WITNESS:  I'm looking at --

8             THE COURT:  See, the Bates number are on the lower

9    right.  Just give me the last three digits.

10            THE WITNESS:  Yup, looking at 808.

11   A.    And as I had said, there are two things going on here.

12   One is the purchase of an MSR and the other is the extension of

13   a loan and then selling the loan.

14       And on 808, in the paragraph just under number 2, "where

15   there is no better estimate of fair value, Ally will capitalize

16   purchased or assumed MSRs", and that's what I'm talking about

17   with respect to whether the bank was paying for it, purchased,

18   not originated, Ally will capitalize purchased MSRs at their

19   purchase price paid or received, which approximates the fair

20   value.  So obviously in that case, there is no gain or loss.

21   Their fair value is, as indicated, approximated by the purchase

22   price.  Obviously, there's no gain or loss there.

23       There's another accounting standard that's going.  You

24   don't have -- and I'm sure there is a policy on it -- on

25   transfers of financial assets.  And that's when you originate

RESIDENTIAL CAPITAL, LLC, ET AL.                    190

1    the loan and you sell and you retain the MSR, and that's

2    standard, it will talk about the fact that you take your

3    relative values and allocate them to the transaction, and it's

4    complicated.  But if you retain the MSR, that standard would

5    clearly say there's a gain to be recorded in that situation

6    when you're having purchased the MSR, that you've originated

7    the MSR.

8    Q.   So Mr. Young, the premise for your suggestion that the

9    accounting treatment is different is you rely on this language

10   where there is no better estimate of fair value; is that

11   correct?

12   A.   No.  I'm just pointing out that this would give an

13   indication of what I'm talking about, but that generally

14   accepted accounting principles, there is no gain to be recorded

15   when you purchase any kind of asset.

16   Q.   But isn't it true that the accounting policy says when you

17   originate or purchase a loan you have to independently value

18   the mortgage servicing right?  And the paragraph that you just

19   pointed to said, where there is no better estimate of fair

20   value, with respect to the mortgage servicing right, Ally will

21   capitalize purchased or assumed MSRs at their purchase price

22   paid or received, right?

23   A.   I would agree with you that all mortgage-servicing rights

24   would be valued at fair value.

25        If for some -- if one of these -- if the case existed

1  where a purchased loan that had an embedded MSR in it was

2  purchased and that loan was sold, and let's for argument sake

3  say the fair value was different than the purchase price, in

4  that case it would create a gain in the income statement and it

5  would be caught up in the swap.

6  Q.   Okay.  But with respect to the loans that Ally is buying

7  from third parties, you testified that those loans had a

8  premium.  Why isn't the premium the value of the MSR?

9  A.   Well, I think generally speaking it is the value of the

10  MSR.

11  Q.   All right.  In that case, you do have an estimate of fair

12  value, it's the premium, don't you?

13  A.   But you've paid for it; there's no gain or loss.  But yes,

14  it -- and I think that's exactly what this says, is that the

15  purchase price paid, the premium paid is a good proxy for

16  value.

17  Q.   You don't know -- I think before the break you testified

18  that you don't know whether FAS 156 deals with mortgage

19  servicing rights; is that right?

20  A.   I said I'd have to check the standard.

21  Q.   Okay.  So you don't know whether this policy is an attempt

22  to implement FAS 156?

23  A.   I would have to check the standard.  I would have to check

24  the standard.

25  Q.   All right.  Mr. Young, while you were the CFO at ResCap,

RESIDENTIAL CAPITAL, LLC, ET AL.                    192

1  did you have oversight authority with respect to the CFDR?

2  A.   CFDR is a data repository that houses data.  It's not a

3  general ledger.  It's used for various purposes.

4       During my time as ResCap's CFO, there would have been

5  people reporting to me who managed that database.

6  Q.   Did the CFDR track all collateral on which Ally had a

7  lien?

8  A.   I don't know.

9  Q.   So you don't know whether -- if somebody had a lien on the

10 intercompany receivables and payables that -- whether or not

11 that would be tracked in the CFDR?

12 A.   Correct.  I don't know.

13 Q.   Now, you pointed out that the CFDR is not the general

14 ledger.  In your view, which is more of an accurate reflection

15 of the company's books and records, the general ledger or the

16 CFDR?

17 A.   The general ledger.

18 Q.   Okay?

19           MR. COHEN:  Your Honor, could I have one minute,

20 please?

21           THE COURT:  Yes.

22       (Pause)

23           MR. COHEN:  I have no further questions.

24           THE COURT:  Anyone else wish to cross-examine?

25           Redirect examination?

1      I have a few questions; let me ask them now because it

2   may spur further questions.

3      Did Ally have an accounting policy that required

4   recording of entries showing when assets have been pledged as

5   collateral for any loan facility?

6      THE WITNESS:  No, to the best of my knowledge, there's

7   not an accounting policy directing pledging of entries made for

8   pledging of collateral.

9      THE COURT:  Did ResCap have its own accounting

10  policies or just simply follow the Ally ones?

11     THE WITNESS:  During the course of time, there would

12  have been sort of different responses to that.  When I first

13  joined ResCap, ResCap had its own set of accounting policies.

14     THE COURT:  Then let me ask this.  Did ResCap have an

15  accounting policy that required recording of entries showing

16  when assets have been pledged as collateral for any loan

17  facility?

18     THE WITNESS:  Not to my knowledge.

19     THE COURT:  Different subject.  On what do you base

20  the statement in your direct testimony with regard to the

21  intent of the parties with respect to the MSR swap?

22     THE WITNESS:  I'd say it's primarily two things.  It

23  would be my discussions around the purpose of the total return

24  swap but also --

25     THE COURT:  With whom?

1        THE WITNESS:  With -- to the best -- I don't recall

2    ever talking to Ally Bank people, but it doesn't mean I didn't.

3    I just don't recall that.

4        THE COURT:  But my question specifically, you say

5    based on discussions.  I want to know with whom you discussed

6    the intent behind the MSR swap.

7        THE WITNESS:  I would have discussed it with people at

8    ResCap, the Treasury people, the capital markets people.

9        THE COURT:  Did you discuss it with any of the people

10   who negotiated the terms of the MSR swap with Ally Bank?

11       THE WITNESS:  I believe the answer is yes.

12       THE COURT:  With whom?

13       THE WITNESS:  I would say Barry Beer (ph.), for

14   instance.  That's the name that comes to mind.

15       The other thing I'd like to say is that, with respect

16   to intent, the fact that the agreement was in place --

17       THE COURT:  I tell you what.  You've answered my

18   questions.

19       THE WITNESS:  Okay.

20       THE COURT:  We'll see whether anybody else has

21   questions.

22       Go ahead.

23       MR. BROWN:  Thank you, Your Honor.  Judson Brown of

24   Kirkland & Ellis.

25   CROSS-EXAMINATION

RESIDENTIAL CAPITAL, LLC, ET AL.                    195

1   BY MR. BROWN:

2   Q.    Mr. Young, you discussed the MSR swap with Mr. Cohen and

3   the judge.  I'm going to ask you a few questions about that.

4   Okay?  What was your understanding of the intent and purpose of

5   the MSR swap from ResCap's side when that swap was implemented?

6           MR. COHEN:  Objection; calls for hearsay.

7           THE COURT:  I'm going to sustain the objection to that

8   question, but you can clearly inquire -- I mean, I've asked who

9   he spoke to and I need to know whether he told someone else

10  what he believe the intent -- he can testified to his own

11  statements, but not -- we'll see whether I let him testify

12  about what other people said to him.

13  Q.    Mr. Young, did you have an understanding of the purpose of

14  the MSR swap from ResCap's side?

15  A.    Yes.

16  Q.    Did you share that with anyone else at ResCap?

17  A.    I don't recall specifically, but there's no reason I would

18  keep it to myself.  I'm sure it was commonly discussed among

19  the group at ResCap.

20  Q.    And what was the intent as discussed among the group at

21  ResCap of that MSR swap?

22          MR. COHEN:  Objection; lack of foundation.

23          THE COURT:  Sustained.

24  Q.    Mr. Young, when would you have had those discussions with

25  individuals at ResCap concerning the intent of the MSR swap?

RESIDENTIAL CAPITAL, LLC, ET AL.                    196

1              MR. COHEN:  Objection; lack of foundation.

2              THE COURT:  Overruled.

3  A.    During the time that the swap was being formulated and the

4  documentation was coming together.

5  Q.    And who at ResCap would you have had those conversations

6  or discussions --

7              THE COURT:  Not would, did.

8              MR. BROWN:  I'm sorry?

9              THE COURT:  Did you have -- you mentioned a couple of

10 names.  Did you discuss the intent from ResCap's standpoint

11 with specific people at ResCap?

12             THE WITNESS:  I don't recall specific people other

13 than -- I can't recall the names, but I would say Barry Beer

14 would certainly have been one of them.

15             THE COURT:  If you can't recall the specific people,

16 is it your recollection that you did discuss the intent with

17 people at ResCap?

18             THE WITNESS:  That is my recollection.  I just can't

19 name them --

20             THE COURT:  Go ahead with your questions, Mr. Brown.

21             THE WITNESS:  -- name the individuals.

22 Q.    And what is it that you discussed with respect to the

23 intent of the MSR swap, Mr. Young?

24 A.    The basic concepts of the swap, that it's a total return

25 swap.

RESIDENTIAL CAPITAL, LLC, ET AL.                          197

1    Q.    What do you mean by that, "total return swap"?

2    A.    As I explained earlier, that the totality of the economics

3    of the MSR flows to the counterparty in exchange for an agreed-

4    upon payment.  In this case, it was a LIBOR-based payment.

5    Q.    Mr. Young, under a total return swap, as you've described

6    it, would it make sense for the bank to pay GMAC mortgage the

7    initial capitalized value of MSRs from correspondent loans --

8    from loans purchased from correspondents?

9             MR. COHEN:  Objection.

10            THE COURT:  Sustained.

11   Q.    Mr. Young, do you know whether Ally Bank understood the

12   MSR swap to be a total return swap?

13            MR. COHEN:  Objection.

14            THE COURT:  Sustained.

15            MR. BROWN:  Your Honor, may I approach?  I've got an

16   exhibit that is not in any of the binders in front of Mr.

17   Young.

18            THE COURT:  Just make sure Mr. Cohen has a copy of it.

19            MR. BROWN:  I will.

20            MR. KERR:  Judge, I'll take them.

21       (Pause)

22            MR. BROWN:  Your Honor, we can proceed.

23   Q.    Mr. Young, you've been handed --

24            THE COURT:  Can you give us the next exhibit number?

25            MR. BROWN:  It's already marked, Your Honor.  It's

RESIDENTIAL CAPITAL, LLC, ET AL.                    198

1   DX-AZ0 (sic).  I was going to make that clear on the record.

2           THE COURT:  Yes, all right.  Go ahead.

3           MR. BROWN:  My apologies.

4           THE COURT:  AZ0 -- AZO.

5           MR. BROWN:  Correct.

6   Q.   Mr. Young, you have been handed Exhibit DX-AZ0 (sic).

7           THE COURT:  AZO is letter and not a number.

8           MR. BROWN:  My apologies, Your Honor.

9   Q.   AZO.  Do you have that, Mr. Young?

10  A.   I do.

11  Q.   Do you see that this is -- well, what is this document,

12  Mr. Young?

13  A.   Well, it looks to be an analysis of the cash flow impact

14  of the MSRs into the bank and, you know, with some detail

15  information on the characteristics of the swap.

16  Q.   On the second page of AZ0 (sic), is there a --

17          THE COURT:  AZO.

18          MR. BROWN:  AZO.

19  Q.   Is there a memorandum on the second page of this exhibit,

20  Mr. Young?

21  A.   Yes.

22  Q.   Who is the memorandum from?

23  A.   Bob Groody and Keith Lundy (ph.).

24  Q.   Who is Mr. Groody?

25  A.   Bob Groody was an employee of Ally Bank.

RESIDENTIAL CAPITAL, LLC, ET AL.                   199

1    Q.    What's the date of the memorandum, Mr. Young?

2    A.    October 16th, 2007.

3    Q.    When was the MSR swap implemented, Mr. Young?

4    A.    I don't recall exactly but sometime in 2007, I think the

5    fall of 2007.

6    Q.    Who received the memo from Mr. Groody and Mr. Lundy?

7    A.    John Peterson.

8    Q.    And who was copied?

9    A.    Barry Beer, Jerry Lombardo, and Jim Young.

10            THE COURT:  Who's Mr. Lundy?

11            THE WITNESS:  Keith Lundy was an accounting person.

12            THE COURT:  Where?

13            THE WITNESS:  At that time, I believe at GMAC

14   mortgage.

15   Q.    Do you see in the upper right-hand corner where the memo

16   says "GMAC Bank", Mr. Young?

17   A.    I do.

18   Q.    And the subject, as you mentioned earlier, is "cash flow

19   impact of bank MSRs".  Do you see that?

20   A.    I do.

21   Q.    And then there's some numbered bullets in the memorandum.

22   Do you see those?

23   A.    I do.

24   Q.    What does the first bullet say, Mr. Young?

25            MR. COHEN:  Objection.  This document is hearsay.

1          THE COURT:  Are you going to challenge the

2   authenticity of this document?

3          MR. COHEN:  I'm not going to challenge the

4   authenticity of the document, but I don't think it can come

5   into evidence because it's hearsay.  And having the witness

6   read it is just -- that's hearsay also.

7          THE COURT:  See if it refreshes his recollection, Mr.

8   Brown.

9          MR. BROWN:  I will, Your Honor.  That's exactly what

10  I'll do.

11  Q.   Mr. Young, read the first numbered entry of the memo.

12  A.   "Cash flow from the MSR" --

13  Q.   No, no.  I'm sorry, Mr. Young.  Not into the record.  Read

14  it to yourself.

15         THE COURT:  Look, it's not in evidence, but whether he

16  reads it out loud or not, I don't really care.  It's not in

17  evidence at this point.

18  Q.   Mr. Young, read it to yourself.  Let me know when you've

19  read it.

20  A.   I've read it.

21  Q.   Mr. Young, does this refresh your recollection that as of

22  October 16, 2007, Mr. Groody of GMAC Bank considered the MSR

23  swap to be a total return swap?

24         MR. COHEN:  Objection; hearsay.

25         THE COURT:  Overruled.

RESIDENTIAL CAPITAL, LLC, ET AL.                    201

 1  A.   I do think that Bob Groody at the time, I believe, was CFO

 2  of the bank and clearly, I mean, he was a part of the

 3  discussions, as was I.

 4          THE COURT:  Do I understand correctly GMAC Bank is

 5  Ally Bank?

 6          MR. BROWN:  Now Ally Bank, Your Honor.

 7  Q.   So, Mr. Young, does this refresh your recollection that

 8  the bank, GMAC Bank at the time and now Ally Bank, considered

 9  the MSR swap to be a total return swap?

10  A.   Yes, I believe that was their understanding.

11  Q.   Mr. Young, since the MSR swap was put in place in the fall

12  of 2007, as you said, has GMAC Bank or Ally Bank ever paid GMAC

13  Mortgage the value of the initial capitalization of MSRs from

14  loans purchased from correspondents, to your knowledge?

15  A.   Not to my knowledge.

16  Q.   Has anyone from GMAC Mortgage or ResCap complained about

17  that, to your knowledge?

18  A.   Not to my knowledge.

19  Q.   Mr. Young, you were also asked about an issue that Mr.

20  Glassner raised during Mr. Cohen's questions.  Do you recall

21  that?

22  A.   Yes.

23  Q.   And you testified that you led an investigation from Ally

24  Bank's perspective into that issue.  Do you recall that?

25  A.   I do.

RESIDENTIAL CAPITAL, LLC, ET AL.                    202

1  Q.    What was the conclusion that you and your team reached

2  with respect to the issue that Mr. Glassner raised?

3  A.    We investigated the period of time from January 1st, 2009,

4  through the time of the examination.  Our conclusion was that

5  the transaction was accounted for in accordance with the

6  agreement from the period of August 1st, '09, forward.  We also

7  looked at the period of January 1st, '09, through July 31st of

8  '09.  And we concluded during that period of time that there

9  was an error made in the accounting and the flow of

10 transactions under the agreement, and we worked with ResCap and

11 others and determined that that error should be corrected.

12 Q.    And what was the error, Mr. Young?

13 A.    The error was that the -- under the MML PSA, the loan

14 sales were not being recorded at fair value; they were being

15 recorded at something other than fair value.  And our view of

16 the agreement was that the purchase price was fair value.

17 Q.    What price, in relation to fair value, was GMAC Mortgage

18 being charged during that time period, January 1 to July 31,

19 Mr. Young?

20 A.    Something less than fair value, and it was -- I don't

21 recall the specifics, but some combination of net carry value

22 and origination income, but it was not fair value.  So it

23 needed to be corrected.

24 Q.    Mr. Young, did the potential impact that Mr. Glassner's

25 issue would have on the financial statements or the capital

1  account of the bank have any impact or influence on the

2  conclusion that you and your team reached?

3  A.    No, none.

4  Q.    Aside from the Ally Bank investigation into that issue,

5  did anyone else investigate the issue that Mr. Glassner raised?

6  A.    Yes.  Mr. Glassner had informed the chief auditor of AFI.

7  The chief auditor of AFI engaged the Global Security Division

8  of AFI.  AFI engaged an independent accounting firm, KPMG.

9  Then, of course, ResCap -- the team from ResCap also

10 investigated the matter.

11 Q.    Did anyone disagree with the conclusion that you and your

12 team at the bank reached?

13 A.    No.

14 Q.    Now, Mr. Young, you discussed a tax allocation agreement

15 with Mr. Cohen, and then the judge had a couple of questions

16 about the tax allocation agreement that was ultimately -- that

17 you ultimately signed on behalf of ResCap.  Do you recall that?

18 A.    Yes.

19 Q.    In your discussions with the judge, the judge asked you

20 when you took the issue with the draft tax allocation agreement

21 to ResCap's board, and you indicated you first took it in

22 November of 2010.  Do you remember that?

23 A.    Yes.

24 Q.    And then you also said that you next took it to the board

25 in December of 2011.  Was that correct or a misstatement,

RESIDENTIAL CAPITAL, LLC, ET AL.                    204

1  Mr. --

2  A.    That was a misstatement.  It was clearly the next month.

3  Q.    December of 2010?

4  A.    December of '10, yes.

5          MR. BROWN:  Nothing further, Your Honor.

6          THE COURT:  Thank you, Mr. Brown.

7          Any further examination?

8          Mr. Cohen, do you have -- Mr. Kaufman.

9          MR. KAUFMAN:  Phil Kaufman, Kramer Levin, for the

10 committee.

11 CROSS-EXAMINATION

12 BY MR. KAUFMAN:

13 Q.    Mr. Young, in response to various questions by Mr. Cohen,

14 you testified at some length about how ResCap's accounting

15 personnel recorded intercompany transactions in accordance with

16 GAAP, including transactions recorded as payables and

17 receivables.  Do you recall that testimony?

18 A.    Yes, I do.

19 Q.    Did the methodology that was followed in recording

20 transactions in the manner you described involve or reflect any

21 legal evaluation or analysis as to what constituted debt as

22 opposed to equity?

23 A.    No, no legal analysis was done.

24 Q.    Is it correct, therefore, that the methodology followed by

25 ResCap reflected nothing more than an accounting perspective?

1  A.    That's correct.

2           MR. KAUFMAN:  Thank you.  Nothing further.

3           THE COURT:  Thank you.

4           Mr. Cohen.

5           MR. COHEN:  No redirect or cross -- I'm not sure which

6  I was doing.

7           THE COURT:  Anybody else have any questions for Mr.

8  Young?

9           All right.  You're excused, Mr. Young.

10          MR. LAWRENCE:  Your Honor, we would ask to move in Mr.

11  Young's testimony into evidence.  Mr. Lawrence for the debtors.

12          THE COURT:  Mr. Cohen?

13          MR. COHEN:  So, Your Honor --

14          THE COURT:  Let me flip back to it, okay.

15          MR. COHEN:  Sure, sure.

16          THE COURT:  Just bear with me a minute.

17          MR. COHEN:  It is, again, paragraphs 7 through 16.

18       (Pause)

19          THE COURT:  I'll hear argument on it, Mr. Cohen.  Go

20  ahead.

21          MR. COHEN:  Beg your pardon.

22          THE COURT:  I'll hear your argument on it.

23          MR. COHEN:  Your Honor, I think it is clear from Mr.

24  Young's testimony that he does not have personal knowledge with

25  respect to the intent of the parties in entering into the MSR

RESIDENTIAL CAPITAL, LLC, ET AL.                    206

1   swap.  He was not involved in the negotiation.  While he has a

2   general recollection that at or around the time the agreement

3   was entered into, he may have had conversations and thought he

4   probably would have, he can't with specificity tell us who he

5   spoke to, what they told him or --

6            THE COURT:  Well, he said -- he named some specific

7   names of who he spoke to.  He wasn't certain, but he named some

8   names of who he believed he was talking to.

9            MR. COHEN:  Exactly, he wasn't certain.  And so

10  testifying as to the intent that he learned from other people

11  who were actually negotiating the agreement is classic hearsay.

12           In addition, in paragraph 11, he talks about the

13  proper interpretation of the contract, makes a reference to FAS

14  156 mark to market accounting, and on the stand told us that he

15  wasn't sure what the provisions of FAS 156 --

16           THE COURT:  He said he'd have to review it.

17           MR. COHEN:  I understand that, but he's here saying

18  that this is the intent of the parties to be accounted for

19  under FAS 156 and then goes on in that paragraph to explain how

20  it would apply here.  So I think, again, he lacks personal

21  knowledge and was not available to be cross-examined on that

22  because he didn't know.

23           THE COURT:  All you had to do was show him 156 and he

24  would --

25           MR. COHEN:  Well, we showed him the Ally accounting

RESIDENTIAL CAPITAL, LLC, ET AL.                    207

1  policy and he had to review it.

2              THE COURT:  Yes, detailed accounting policy.  You

3  wanted to show him 156; you could have shown him 156 as well.

4              MR. COHEN:  That is true.  That is true.  But I think

5  the broader objection is it's hearsay and he lacks personal

6  knowledge as to intent.

7              THE COURT:  It's not like he said that he didn't know

8  what GAAP required.  You asked him about a specific accounting

9  FASB statement 156.  Yes, he references it in paragraph 11.

10 You certainly could have cross-examined with 156.

11             MR. COHEN:  I could have, but that's actually relative

12 to the hearsay issue; that is a more minor point.

13             THE COURT:  All right.  The objection is overruled.

14 To whatever extent Mr. Young was unable, during your cross-

15 examination, to identify what he based his statement of intent

16 from the other side of the transaction, namely the Ally Bank

17 when Mr. Brown refreshed his recollection with DX-AZO, which is

18 not in evidence, but was properly used to refresh the witness's

19 recollection, he testified that it did refresh his

20 recollection.

21             The objection is overruled with respect to each -- and

22 I think, you know, there are several paragraphs that you've

23 pointed to that talk about a statement of intent.  There are

24 others that don't at all.  But I take it your objection really

25 goes to the issue of intent of the parties; am I correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    208

1          MR. COHEN:  Correct, Your Honor.

2          THE COURT:  Okay.  Because there are some other -- if

3    you have some other -- I want to be sure that I'm fairly

4    addressing your --

5          MR. COHEN:  You are.  It goes to intent, and I could

6    have parsed sentences within paragraphs, but I think the key of

7    those paragraphs is intent, and I understand the Court's

8    ruling.

9          THE COURT:  Okay.  The objection is overruled.  Thank

10   you.

11         MR. COHEN:  All right.  We would like to offer into

12   evidence certain of the exhibits that we used with Mr. Young.

13         THE COURT:  Yes, sure.

14         MR. COHEN:  Let me know, Mr. Kerr, when you're ready,

15   and Mr. Lawrence.

16         MR. KERR:  Sure.  Give us a second.

17         MR. COHEN:  DX-AYD, which is the related-party

18   accounting policy; DX-AQV, which is the board minutes and the

19   first tax allocation agreement; DX-AQM, which is the second tax

20   allocation agreement; DX-AJA, which is the memo on tax

21   accounting; and DX-BDG, which is the Ally Mortgage servicing

22   right accounting policy.

23         MR. KERR:  Give us one second.

24         MR. COHEN:  Certainly.

25      (Pause)

1              MR. LAWRENCE:  We have no objection, Your Honor.

2              THE COURT:  All right.  DX-AYD, AQV, AQM, AJA and BDG

3    are all in evidence.

4    (Exhibits regarding Ms. Young's testimony were hereby received

5    into evidence as Defendant's Exhibits AYD, AQV, AQM, AJA, and

6    BDG, as of this date.)

7              MR. COHEN:  Thank you, Your Honor.

8              THE COURT:  May I move these binders now?

9              MR. KERR:  Yeah, let me --

10             THE COURT:  Who's our next witness?

11             MR. KERR:  Ms. Gutzeit.

12             THE COURT:  Ms. Gutzeit, do you want to come on up in

13    the meantime?

14        (Witness sworn)

15             MR. KERR:  Your Honor, Charles Kerr on behalf of the

16    debtors.  Your Honor, in support of the joint Chapter 11 plan

17    proposed by the debtors and the official committee of unsecured

18    creditors, the debtors offer the direct testimony of Gina

19    Gutzeit dated November 12, 2013, which was filed as docket

20    entry number 5707.

21             If Ms. Gutzeit was called to testify, she would

22    testify to what is in her written direct testimony.  We

23    therefore offer her written direct testimony in factual support

24    of the consolidated proceedings and the plan confirmation.

25             THE COURT:  Mr. Cohen?

RESIDENTIAL CAPITAL, LLC, ET AL.                    210

1        MR. COHEN:  No objection, Your Honor.

2        THE COURT:  All right.  The direct testimony of Gina

3   Gutzeit, which is on ECF as number 5707, is in evidence.

4   (Direct testimony of Gina Gutzeit was hereby received into

5   evidence as Plan Proponents' Exhibit, as of this date.)

6        MR. KERR:  And, Your Honor, in connection with Ms.

7   Gutzeit's direct testimony, we will also offer the following

8   exhibits, all of which have been previously identified in the

9   plan proponent's trial exhibit list.  They are Exhibit 587,

10  600, 608, 672, 712, 745, 747, and 749.

11       MR. COHEN:  Your Honor, if I could review the list --

12       THE COURT:  Yeah, please.

13       MR. COHEN:  -- and we can let you know tomorrow

14  morning.

15       THE COURT:  That's fine.

16       MR. COHEN:  Thank you.

17       THE COURT:  Okay.

18       MR. KERR:  With that, Your Honor, Ms. Gutzeit is

19  available to be cross-examined.

20       THE COURT:  All right.

21       MR. COHEN:  Unfortunately, Your Honor, we have more

22  big binders.

23  CROSS-EXAMINATION

24  BY MR. COHEN:

25  Q.   Good afternoon, Ms. Gutzeit.

RESIDENTIAL CAPITAL, LLC, ET AL.                     211

1   A.   Good afternoon.

2   Q.   You're a senior managing director in FTI's corporate

3   finance practice; is that correct?

4   A.   Yes.

5   Q.   And you began working with ResCap as a client in May of

6   2008; is that right?

7   A.   Yes.

8   Q.   Was ResCap in financial distress in May 2008?

9   A.   Yes.

10  Q.   And that's the reason they engaged FTI?

11  A.   Yes.

12  Q.   Did you work with ResCap continuously -- by "you" I mean

13  FTI -- work with ResCap continuously from May 2008 through now?

14  A.   No.

15  Q.   When did the 2008 engagement end?

16  A.   Fairly, the firm probably through January of 2010.  It may

17  not have been full time, and then again in August of 2011.

18  Q.   And when you began working with ResCap in August 2011,

19  were you one of the leaders of that engagement?

20  A.   Yes, myself and Bill Nolan.

21  Q.   And how were responsibilities divided between Mr. Nolan

22  and yourself?

23  A.   It was -- Mr. Nolan has more of a financial services

24  background and has worked on other mortgage bankruptcies.  He's

25  more of what I'll call the front office, has much more

1    knowledge of the front office, the mortgage business, and a lot

2    of my responsibilities related to treasury, reporting, prepping

3    for bankruptcy, a variety of things as well, but focused mostly

4    on the -- I'll call it the back office.

5    Q.   With respect to the debtors' books and records, as between

6    Mr. Nolan and you, who would have had primary responsibility

7    for that?

8    A.   Well, neither one of us would have had primary

9    responsibility for their books and records.

10   Q.   So FTI was not involved in reviewing the debtors' books

11   and records in preparation for the bankruptcy filing?

12   A.   You used the word "responsibility for", so I'm not

13   responsible for their books and records.

14   Q.   As between Mr. Nolan and you, who would have worked with

15   the debtors in connection with issues that arose with respect

16   to their books and records?

17   A.   Primarily me, but Mr. Nolan also had a lot of experience

18   in accounting for the revenue side of the business.

19   Q.   And when you say "the revenue side of the business", what

20   do you mean --

21   A.   Loan --

22   Q.   Let me finish, please.

23   A.   I'm sorry.

24   Q.   When you say "the revenue side of the business", what do

25   you mean?

RESIDENTIAL CAPITAL, LLC, ET AL.                    213

1   A.   How they've accounted for their gains or losses on loans.

2   Q.   How about with respect to the intercompany payables and

3   receivables?  If there were questions that arose as to those,

4   as between Mr. Nolan and you, who would have taken ownership of

5   those issues?

6   A.   It really depends on the work streams at the time.  So

7   there are times that it would me, and other times it would be

8   Mr. Nolan.

9   Q.   Okay.  Between August of 2011 and say September 30th of

10  2013, were you involved in any issues involving -- concerning

11  the intercompany payables and receivables at ResCap?

12  A.   Yes.  I mean, Bill Nolan and I have a team of people that

13  work for us, and including Mr. Renzi, who at the time was not a

14  senior managing director.  And so we would both be aware of

15  what we were doing as a team.  We would know what our

16  engagement included, what work streams each of our people were

17  doing.  As part of the management of the engagement, we would

18  both be aware of what our team members were doing.

19  Q.   Okay.  Between August of 2011 and September 30th of 2013,

20  what did you personally do in connection with the intercompany

21  payables and receivables on ResCap's books and records?

22  A.   I don't recall exactly.  Obviously, there's a significant

23  amount of time records that are submitted to the court for fee

24  applications.  But I would say that, you know, if there were

25  reports as in the report of intercompanies related back to

RESIDENTIAL CAPITAL, LLC, ET AL.                      214

1   April pre-filing, I'd probably review that.  In terms of

2   statements and schedules, I've reviewed those and helped manage

3   the personnel, the FTI people as well as the company people in

4   pooling those together.

5   Q.   As between Mr. Renzi and yourself, who would you say spent

6   more time analyzing the debtors' intercompany payables and

7   receivables?

8   A.   Mr. Renzi at points in time.

9   Q.   How about throughout the engagement, as between Mr.

10  Renzi --

11  A.   In terms of shear hours --

12  Q.   Please let me finish my question.

13  A.   I'm sorry.

14  Q.   Throughout the engagement, as between Mr. Renzi and you,

15  who spent total more time working on the intercompanies -- the

16  payables and receivables?

17  A.   Mr. Renzi.

18  Q.   Okay.  And do you know whether it was, you know, ten times

19  more time than you did?  Can you give me an order of magnitude

20  as to how much more time he spent than you?

21  A.   No.

22  Q.   You have no idea?

23  A.   No.

24  Q.   When were you first asked to offer opinions in this case

25  with respect to the intercompany payables and receivables?

RESIDENTIAL CAPITAL, LLC, ET AL.                    215

1    A.    I was asked -- after Mr. Bingham's rebuttal report was

2    issued, I was asked to work on the rebuttal report for that.

3    Q.    Okay.  So you had done no work in connection with expert

4    testimony in this case until Mr. Bingham's report was served;

5    is that right?

6    A.    Yes.

7    Q.    And when you were asked to offer an expert opinion in this

8    case, did you call Mr. Renzi?

9    A.    No.

10    Q.    Why not?

11    A.    Well, I didn't call him directly.  We did have group calls

12    with Morrison and Foerster to discuss what needed to happen

13    between the October 19th and November 1st deadline for expert

14    reports/rebuttal reports.

15    Q.    Okay.  And what had to happen between October 19th and

16    November 1st?

17    A.    Well, there were several items that Mr. Renzi was going to

18    continue to work on, reports specifically related to the

19    waterfall, and I was working on the intercompany rebuttal to

20    Mr. Bingham's report.

21    Q.    Given Mr. Renzi's familiarity and prior analysis of the

22    debtors' intercompany payables and receivables, you didn't

23    think it was important to talk to him?

24    A.    Well, I talked with him in conjunction with my team, and

25    I'm sure my team has talked to him as well.  There are also

RESIDENTIAL CAPITAL, LLC, ET AL.                    216

1   several team members that worked with him during this process,

2   during the, you know, pre- and post-bankruptcy process.

3   Q.   What do you mean when you say you talked to him in

4   conjunction with your team?

5   A.   Meaning on those collective calls that I just referred to,

6   and I'm sure some of my team members who worked with me on my

7   rebuttal report also spoke to him as well.  I can't be sure

8   what they spoke to him about, but we also looked at the

9   documents considered, and one of those documents considered

10  would be the intercompany analysis that Mr. Renzi and his team

11  did, which would be part of the FTI team.

12  Q.   So Mr. Renzi was on those large group calls?

13  A.   On a couple of them.

14  Q.   How many of them?

15  A.   Off the top of my head, I think two.

16  Q.   Okay.  How many hours did you spend working on your

17  report?

18  A.   Well, since our deposition, I went back and looked at my

19  detailed time records, and I spent 47.7 hours and my team spent

20  527 hours, which includes my time.

21  Q.   Okay.  And Mr. Nolan spent forty-four hours?

22  A.   Yes.

23  Q.   What portions of your report did Mr. Nolan work on?

24  A.   He was helping to facilitate some of the discussions

25  with -- to verify some of the issues, for example, with Tammy

1  Hamzehpour.  As you know, it was a very short time frame to do

2  a rebuttal, so there was divide and conquer.

3        THE COURT:  You can thank me for that.

4        MR. COHEN:  In fairness, I asked for an extension.

5        THE COURT:  What's fair about that?

6        MR. COHEN:  No comment.

7  BY MR. COHEN:

8  Q.    I'm sorry to interrupt.

9  A.    I believe I answered.

10  Q.    Okay.  You were done?

11        So the total time that you spent on your report was less

12  than ten percent of the total of the FTI time; is that about

13  right?

14  A.    If you include my time, yes.  If you exclude my time, then

15  it's about ten percent.

16  Q.    In your work at ResCap since August of 2011, have you had

17  the opportunity to look at the internal controls that ResCap

18  has with respect to its accounting systems?

19  A.    No.

20  Q.    Have you had an opportunity to review ResCap's books and

21  records?

22  A.    That's a very broad statement.  I've certainly looked at a

23  lot of financial information from the company.

24  Q.    In general, is your sense that the financial information

25  that ResCap pools together is of a high quality?

RESIDENTIAL CAPITAL, LLC, ET AL.                         218

1    A.    Yes, I believe it's accurate.

2    Q.    And the company works very hard to keep accurate books and

3    records?

4    A.    I believe the records fairly reflect financial

5    information.

6    Q.    Before you were asked to form an opinion in this case on

7    the intercompany payables and receivables, did you have a view

8    as to whether they were not fairly stated on the company's

9    financials?

10   A.    No.

11   Q.    Do you have a view today as to whether they are fairly

12   stated on the company's financials?

13   A.    There's nothing that came to my attention that would say

14   that the financial statements are incorrect.

15   Q.    Okay.  So as you sit here today, having done the work and

16   analyzed the 500-plus hours of the collective FTI effort,

17   including your own, you still think that the financials that

18   reflect intercompany payables as payables and intercompany

19   receivables as receivables is still proper, right?

20   A.    That's not the question you just asked.  You asked me if

21   the --

22   Q.    I'm asking you a different question.

23   A.    Okay.  Fine.

24         THE COURT:  Can you answer the one he just asked?

25         THE WITNESS:  Sure, absolutely.

1  A.   I think the financial information is accurately recorded

2  and reflected on the financial statements.

3  Q.   Okay.  What are the opinions that you're offering in this

4  case?

5  A.   Well, the opinions are of a rebuttal.  So there's two

6  points of the rebuttal report.  One is whether reviewing Mr.

7  Bingham's report, I don't agree with his conclusion that

8  because the books and records reflect accounts receivable and

9  accounts payable, that that makes them valid debt.

10      I also looked at the nine large intercompany balance,

11  looked at the history, accounting literature and then made an

12  assessment.  And my opinion is that those are more like equity

13  than debt; they have the characteristics more of equity than

14  debt.

15  Q.   You're not a lawyer, right?

16  A.   No.

17  Q.   And you're not offering a legal opinion, are you?

18  A.   No.

19  Q.   And you have not reached the conclusion that with respect

20  to the nine largest payables, that they actually are equity and

21  not debt, are you?

22  A.   Correct.

23  Q.   Okay.  And with respect to your first opinion, upon your

24  review of Mr. Bingham's report, what do you mean when you say

25  "valid debt"?

RESIDENTIAL CAPITAL, LLC, ET AL.                    220

1   A.   Well, I'm actually paraphrasing what he used in his

2   report.  So while there's not really a term similar to that in

3   the standard literature, but just a layperson's interpretation

4   is that it is debt, a liability.

5   Q.   Okay.  And so it is your opinion that you disagree with

6   Mr. Bingham's conclusion that the payables are liabilities?

7   A.   That they're debt in the meaning of -- the liabilities are

8   reflected on the books and records.  They're debits and credits

9   to record the intercompany activity between related parties.

10  In order for them to be considered debt, GAAP -- the literature

11  basically explains that you need to look just not beyond the

12  bookkeeping, but also the intent.  And the standards, I

13  believe, are very similar to the legal standards where you look

14  at whether there's an agreement, whether there's a stated

15  interest rate, whether there's a maturity date, whether there's

16  a repayment schedule, whether there's an ability to repay.  And

17  so there's a series of them and I believe I've listed those in

18  my rebuttal report.  And those characteristics need to be

19  considered when issuing financial statements.

20  Q.   But to be clear, you're not offering an opinion as to

21  ResCap's intent in the creation and formation of the

22  intercompany payables and receivables, are you?

23  A.   I'm not offering an opinion as to what they intended.  I

24  took the historical information, the pattern that was provided

25  in terms of how often loans were -- and obligations were moved

1   back and forth because entities, obligations were forgiven, and

2   I looked at that and made my assessment not just on one thing,

3   but a myriad of data points.

4   Q.   But to be really clear, you didn't investigate the intent

5   when these payables and receivables were created and recorded

6   on the books and records as part of forming your opinion in

7   this case, right?

8   A.   Agreed.

9   Q.   Okay.  So what you're actually doing is from October 20th

10  through November 1st, you looked backwards and looked at

11  factors with the benefit of hindsight and came to your opinions

12  in your report, right?

13  A.   Yes, I looked at the financial information that was

14  produced at that point in time, though.  So however it was

15  reflected --

16          THE COURT:  That point in time was --

17          THE WITNESS:  Meaning 2008, 2009, 2010.

18  A.   So I looked at annual financial information that was

19  produced almost contemporaneously with those activities.  And

20  as well as -- you know, you've mentioned that I've spent two

21  weeks on this and 47.7 hours.  I'd also like to say that I've

22  worked for this company, worked with the management team, both

23  Mr. Young, Ms. Westman, Ms. Hamzehpour on and off for five

24  years and I'm fairly familiar with the company.

25  Q.   Do you know how the company, pursuant to the global

RESIDENTIAL CAPITAL, LLC, ET AL.                        222

1   settlement, is reached with certain creditors and its proposed

2   plan of reorganization intends to treat the intercompany

3   payables and receivables?

4   A.   The pre-petition are the -- the global settlement is for

5   the pre-petition obligations are -- basically receive no value,

6   from what I understand.

7   Q.   Okay.  And what's happening with the post-petition

8   intercompany payables and receivables?

9   A.   The post-petition is really very -- is similar but

10  different from pre-petition.  One is it's governed by the DIP

11  and the cash collateral order, and it also -- which required

12  additional changes to the company's cash management system in

13  order to accommodate the pools, the collateral pools and the

14  tracking of those collateral pools.  So there's much more

15  stringent reporting and monitoring of the intercompany

16  activities post-petition.

17  Q.   Other than with respect to the collateral pools, though,

18  the cash management system is working the same way post-

19  petition as it did pre-petition, right?

20  A.   It's very similar, but there are certain adjustments that

21  were made, for example, the nondebtor entities.  There were

22  certain things that were sort of taken apart and/or

23  supplemented in order to accommodate the reporting requirements

24  of the facilities.

25  Q.   So holding the collateral pools aside, is there anything

1  that was changed in the cash management system post-petition

2  that would impact the opinions you set forth in your expert

3  report had they been implemented pre-petition?

4  A.   I think, other than the monitoring and tracking of each

5  individual activity -- and maybe it would be easier to give an

6  example that I think one of the things we've talked about in my

7  deposition was that how could you go back and look at these

8  balances, and there's thousands upon thousands upon thousands

9  over years of activity.  Where post-petition, it's a much more

10 finite -- although still many, I'm sure, it's more finite and

11 it is recorded monthly.

12 Q.   Since your deposition, have you reviewed -- your

13 deposition in connection with your expert report -- have you

14 reviewed more deposition testimony?

15 A.   Yes.

16 Q.   Whose deposition testimony did you review after your

17 deposition?

18 A.   Mr. Renzi's.

19 Q.   All right.  Did anything in Mr. Renzi's deposition impact

20 your opinions in this case?

21 A.   No.

22 Q.   Have you been monitoring the transcripts of the trial

23 since it started on Tuesday?

24 A.   Yes.

25 Q.   And has anything been entered into evidence, has any

RESIDENTIAL CAPITAL, LLC, ET AL.                    224

1    witness said anything that has influenced your opinions in this

2    case?

3    A.    No.  I think my only conclusion is that attorneys are

4    complicated -- complicating GAAP, and they're trying to

5    interpret it.

6    Q.    Says the accountant calling the attorney complicated.

7    A.    I don't quote the Bankruptcy Code, so you shouldn't be

8    quoting GAAP.

9    Q.    Touche.  Were you here for Mr. Young's testimony this

10   afternoon?

11   A.    I was upstairs and listened in.

12   Q.    And so you heard Mr. Young talk about during his time at

13   ResCap and his understanding of ResCap that the intercompany

14   payables and receivables were subject to continuous monitoring

15   and that they were constantly looking at them to make sure that

16   these were actually debts and liabilities, right?

17   A.    If that's what he said.  I don't recall the phrase for it,

18   but I'll take your word that's what he said.

19   Q.    But that's the gist of what he said?

20   A.    Sure.

21   Q.    Did you disagree with him?

22   A.    Well, the constantly monitoring is somewhat of a

23   subjective interpretation.  So in my experience you really

24   don't monitor them more than -- you couldn't monitor them more

25   than monthly.  You close the books monthly and you could make

1    an assessment.  I also find that companies typically spend more

2    time on a quarterly basis and especially more time when they're

3    doing annual financial statements or audited financial

4    statements.  So there might have been a control process in

5    place for them to monitor them.  I wasn't aware that it was

6    continuous.

7    Q.    Okay.  But you certainly don't have any evidence to

8    suggest that his testimony wasn't accurate and truthful?

9    A.    No, or his understanding at the time.

10   Q.    And one of the takeaways whether they were monitoring it

11   monthly or quarterly, certainly not the situation where these

12   thousands of transactions built up over years and years and

13   years and no one looked at them -- I mean, isn't that what he

14   said also?

15          MR. KERR:  Objection, Your Honor.

16          THE COURT:  Sustained.

17   Q.    Did you understand when Mr. Young talked about monitoring,

18   that at least whether -- we can debate whether it was constant

19   or continuous --

20          THE COURT:  Let's not debate what Mr. Young -- we're

21   not interpreting Mr. Young.  If you want to ask a direct

22   question, ask a direct question.

23          MR. COHEN:  All right.

24          THE COURT:  It's improper to ask a witness to

25   interpret somebody else's testimony.

RESIDENTIAL CAPITAL, LLC, ET AL.                    226

1    Q.    In your work at the company, both in 2008 and from August

2    2011 through today, do you have an understanding as to whether

3    the company would periodically look at its accounting for

4    intercompany payables and receivables?

5    A.    I don't have a direct understanding, but I'd assume they

6    would.

7    Q.    Okay.

8    A.    And the company had -- AFI had policies that governed

9    that, and I assume they would in the ordinary course.

10   Q.    Okay.  And so if you were to sit here today and say, if I

11   wanted to look back at the last four years of how these

12   intercompany payables and receivables were generated, it would

13   be thousands and thousands of transactions.  If you were doing

14   it monthly or some other periodic basis, it would be a more

15   reasonable task, right?

16   A.    It should be.

17   Q.    Okay.  And it's your understanding that that's what they

18   were doing?

19   A.    I'm -- if that's -- that's what they represent they did,

20   so that's my understanding.

21   Q.    Okay.  One of the things that you mention in your report

22   is this idea that the accounting for intercompany payables and

23   receivables were done in the way that they were done so that

24   they would eliminate in consolidation.  Is that one of the

25   attributes that you point out in your report?

RESIDENTIAL CAPITAL, LLC, ET AL.                    227

1  A.    Yes, and it's also required under GAAP and under the AFI

2  policy, which is consistent with GAAP, that you must record the

3  debit and the credit, receivable and payable, on your books and

4  records so that they could properly eliminate in consolidation.

5  Q.    And you cite that fact as support for your conclusion that

6  these look more like equity than debt, right?

7  A.    That is one of many factors that I point to in my report.

8  Q.    Understood.  But it is one of the factors that you look

9  at, right?

10  A.    Yes.

11  Q.    And isn't it also true, though, that if the company

12  intended these to be equity in capital transactions, that would

13  also eliminate in consolidation?

14  A.    Yes.  All intercompany activity eliminates in

15  consolidation for the subsidiaries directly beneath it.

16  Q.    Okay.  So if the intercompany transactions are going to

17  eliminate in consolidation whether they're payables and

18  receivables or capital, you can't really draw any conclusions

19  as to intent from that, can you?

20  A.    Well, you draw conclusions from the fact that because they

21  eliminate and because GAAP says that you have to assume that

22  related-party transactions are not arms' length, that if you

23  were to disclose related-party activities and discuss that they

24  were indeed arms' length, meaning they're what a normal buyer,

25  seller, borrower or lender would do, then you would disclose

1  that.  Even though they were eliminated, you would still

2  disclose that.

3  Q.    Do you know whether ResCap did impairment analyses on its

4  intercompany payables and receivables pre-petition?

5  A.    I assumed it did it as part of their audit process.

6  Q.    And do you know whether ResCap, if they found that a

7  payable or receivable was impaired, they took appropriate

8  action under GAAP and the AFI accounting policy?

9  A.    Yes, I assume so.

10 Q.    Okay.  And you haven't seen any instance where AFI found

11 an impaired intercompany payable or receivable where they

12 failed to take appropriate action, have you?

13         MR. KERR:  Objection, Your Honor.

14 A.    Not that I'm aware.

15         THE COURT:  Let me hear the question.  I'm sorry.

16         MR. COHEN:  Sure.

17 Q.    You haven't seen any instance where AFI did an impairment

18 analysis, found a payable or receivable, the intercompany

19 transaction to be impaired and didn't take appropriate action

20 under GAAP in its accounting policy, have you?

21         MR. KERR:  I'm going to object.

22         THE COURT:  Tell me what your objection is.

23         MR. KERR:  He said AFI did an impairment analysis.

24         THE COURT:  Yeah, she may know.

25         Do you know whether AFI did an impairment analysis?

RESIDENTIAL CAPITAL, LLC, ET AL.                    229

1          THE WITNESS:  I didn't hear the AFI.  I assumed we

2     were talking about ResCap, so I didn't know.

3          THE COURT:  No.  He asked about AFI.  Do you know

4     whether AFI did an impairment analysis?

5          THE WITNESS:  I don't know, and I just -- I would

6     assume they would.

7          THE COURT:  Okay.

8     Q.   So my question is -- it was actually -- I'll lay a better

9     foundation.  It's your understanding that ResCap was governed

10    by AFI's global accounting policy, right?

11    A.   Yes, subsidiaries usually adhere to their parent company's

12    policies and procedures.

13    Q.   Okay.  So my question is, when ResCap was doing its

14    impairment analysis pursuant to AFI's accounting policy --

15    A.   Well, I don't know that AFI's accounting policy actually

16    discusses an impairment analysis, but --

17    Q.   Okay.  When ResCap was doing an impairment analysis as

18    part of the audit process, are you aware of any instance when

19    ResCap discovered an impaired payable or receivable

20    relationship and failed to take appropriate action under GAAP?

21    A.   I'm not aware of any.

22    Q.   Would you turn to the tab in your binder that has the

23    label DX-AVF?

24    A.   Yes.

25    Q.   Have you seen this document before?

1    A.    Yes.

2    Q.    What is DX-AVF?

3    A.    A schedule of assets and liabilities.

4    Q.    Did FTI play a role in helping the debtors prepare this

5    document?

6    A.    Yes.

7    Q.    What role did FTI play in helping the debtors prepare this

8    document?

9    A.    This was another tight deadline that were filed within

10    forty-five days after the bankruptcy, so yes, we took it.

11            THE COURT:  Are you blaming me for that one too?

12            THE WITNESS:  No, I'm not.  I'm blaming MoFo for that

13    one.

14    A.    So it was a huge task to put these together within forty-

15    five days.  But yes, we had a team of people working very

16    closely with the company who worked very hard to pool this

17    together.

18    Q.    Okay.  And if you look at the top of the document, the top

19    line on any one of the pages, it looks like it was filed with

20    the Bankruptcy Court on June 30th of 2012.  Do you see that?

21    A.    Yes.

22    Q.    Does that comport with your memory?

23    A.    Yes, vividly.

24    Q.    Now, FTI had been working for several months looking at

25    the intercompany payables and receivables at -- by the time

RESIDENTIAL CAPITAL, LLC, ET AL.                    231

1    this was filed, right?

2    A.    Yes.  There was a project on and off.  I wouldn't say it

3    was full time necessarily.

4    Q.    But a lot of work went into it, right?

5    A.    Certainly.  It's a very complicated issue.

6    Q.    And FTI working with the debtors and with the lawyers at

7    Morrison & Foerster, you did everything you could to get it

8    right, correct?

9    A.    We did everything we could to gather the information that

10   was available, yes.

11   Q.    And get it right, correct?

12   A.    Well, that's our intention is to reflect -- properly

13   reflect the information, yes.

14   Q.    Okay.  As you sit here today, is there anything in this

15   document with respect to the intercompany payables and

16   receivables that you think is incorrect?

17   A.    Well, I think as always, there are several pages of global

18   notes here, and there was a lot of pain taken to draft those,

19   which I was a part of.  So I believe if you look at the

20   intercompany specifically in the notes, it talks about

21   reserving some rights.  And I don't pretend to practice law,

22   but my understanding is that there's an order to basically warn

23   the reader, as you would in the GAAP financial statements, that

24   there may be issues with these liabilities.

25   Q.    Okay.  So let's go to that section.  It's on page 5 of DX-

1  AVF.

2  A.    Yes.

3  Q.    And there is a section there titled "Intercompany

4  Transactions".  Would you take a moment to read that?  The

5  second to the last sentence says, "The debtors have made every

6  attempt to properly characterize, prioritize, and classify all

7  intercompany transactions."  Do you see that?

8  A.    Yes.

9  Q.    Is that a true statement?

10  A.    Yes, to the best of my knowledge.

11  Q.    And is that one of the notes that you labored on in

12  working with the company in preparing this?

13  A.    I believe that's one of them.

14  Q.    Okay.  The next sentence is, I think it's reservation of

15  rights, "Each debtor reserves all rights to recharacterize,

16  reprioritize, and reclassify claims against and debts owed to

17  other debtors and nondebtor affiliates."  Do you see that?

18  A.    Yes.

19  Q.    Did you understand that each individual debtor was going

20  to make that determination when this document was filed?

21  A.    Well, on behalf of each debtor, so there was one

22  management team so that -- that governed all of the ResCap and

23  below.  So it would really be the management team or the

24  company collectively would make those assessments for it and

25  all of its subsidiaries.

RESIDENTIAL CAPITAL, LLC, ET AL.                    233

1   Q.   And it would make it on a collective basis rather than a

2   debtor-by-debtor basis?

3   A.   No.

4   Q.   Was that your understanding when this sentence was put in

5   this document?

6   A.   Well, I don't know -- I can't recall exactly what the

7   thought was with these particular sentences, but you have to

8   look at it individual company by company to make an assessment

9   of those balances.

10  Q.   Okay.  Going back to the sentence before that where it

11  states the debtors have made every attempt to properly

12  characterize, prioritize and classify all intercompany

13  transactions -- as you sit here today, would you change

14  anything in the intercompany transactions as they're listed in

15  this document?

16  A.   I think any time you make a change just before a

17  bankruptcy would raise a red flag.  So even though the company

18  did an analysis and identified several of these debt

19  obligations to be, you know, forgiven, the thought of doing

20  that right before a Chapter 11 is just not a wise management

21  decision and that you leave them the way they are, and the

22  determination could be made in a more public forum.

23  Q.   Okay.  So other than those transactions, which I

24  understand they were considering asking for forgiveness before

25  the bankruptcy but they never actually got the approval --

RESIDENTIAL CAPITAL, LLC, ET AL.                    234

1   other than those transactions, is there anything in this

2   document, given your work in this case, DX-ABF, that you would

3   change?

4   A.   Not that I'm aware of.  Not that I can think of at this

5   moment.

6   Q.   So to the extent that this document continues to call the

7   intercompany payables, payables, and the intercompany

8   receivables, receivables, even today you wouldn't change that,

9   would you?

10  A.   No.

11  Q.   Okay.

12         THE COURT:  While Mr. Cohen is looking, could you tell

13  me what is the authoritative accounting literature that covers

14  treatment of intercompany transactions as equity or debt?

15         THE WITNESS:  Is my accounting literature in here?

16  Q.   Your report, I think, is the first document.

17  A.   I know, but it -- I need to -- I wish I had my GAAP binder

18  with me.  My first --

19         MR. COHEN:  We actually -- I don't think I'm going to

20  finish in the next three minutes.  We can bring it tomorrow, if

21  that would be helpful.

22         THE WITNESS:  Yes, it would be.

23         MR. COHEN:  Okay.

24         THE COURT:  I have some GAAP books on my bookshelf,

25  believe it or not, Ms. Gutzeit, but I'm not going to go look at

RESIDENTIAL CAPITAL, LLC, ET AL.                    235

1   them tonight.

2            MR. COHEN:  So now we have a judge who is talking

3   GAAP.

4            THE COURT:  I'm not talking.  I'm just --

5            THE WITNESS:  I'm not going to tell you what to do or

6   what not to do.  Wouldn't be wise.

7            THE COURT:  The one thing I'll guarantee you is I'm

8   not going to look at it tonight.

9            THE WITNESS:  I understand.  They're not easy reading.

10           THE COURT:  I read them often enough, but I --

11           THE WITNESS:  It's ASC-470.  So accounting standards

12   codification, GAAP had to change all their numbers just to make

13   everything more complicated, and us older people don't remember

14   actually what they all are, so I have to look them up.

15           MR. COHEN:  We will bring a copy of that for you

16   tomorrow and for the court.

17           THE WITNESS:  And there's also 810, ASC-810 where it

18   quotes in one of my footnotes here, "The preparation of

19   consolidated financial statements, intrabalances transactions

20   shall be eliminated."

21           THE COURT:  Okay.

22           MR. COHEN:  Your Honor, I know we like to use every

23   minute, but I'm about to go into a new document.

24           THE COURT:  Yeah, if you're going to go into a new

25   document, we'll resume 9 o'clock tomorrow morning.  Do you have

1   an approximate estimate of how long you expect to be on cross-

2   examination?

3               MR. COHEN:  I would say an hour.

4               THE COURT:  Okay.  And this is the last witness the

5   proponents are putting forth; am I correct?

6               MR. KERR:  That is correct, Your Honor.  Charles Kerr

7   on behalf of the debtors.  We have some exhibit issues to deal

8   with, but this will be the last witness as part of our

9   affirmative case.

10               THE COURT:  Okay.  Mr. Cohen, who is your first

11   witness?

12               MR. COHEN:  Our first witness is William Marx, who is

13   an Ally employee.  So we obviously weren't able to do a

14   written direct.  So we will do a direct examination of him

15   live.  I understand from Ally's counsel --

16               THE COURT:  So you only had three witnesses on your

17   list, right?

18               MR. COHEN:  That's right.  It's Mr. Marx and then two

19   experts.  And Mr. Marx will be here in the morning.  So as soon

20   as we're done with Ms. Gutzeit, we're ready to go.

21               THE COURT:  That's fine.

22               See you all in the morning at 9 o'clock.

23               MR. COHEN:  Thank you, Your Honor.

24               THE COURT:  Thank you.

25          (Whereupon these proceedings were concluded at 4:57 PM)

```
 1

 2                          I N D E X

 3

 4   WITNESS               EXAMINATION BY        PAGE

 5   Mark Renzi            Ms. Miller             14

 6   Mark Renzi            Mr. Donnell            47

 7   Mark Renzi            Mr. O'Neill            48

 8   Tammy Hamzehpour      Mr. Perry              69

 9   Barbara Westman       Ms. Miller             86

10   Barbara Westman       Mr. Kerr              128

11   Barbara Westman       Mr. Kaufman           129

12   Barbara Westman       Ms. Miller            131

13   Jim Young             Mr. Cohen             141

14   Jim Young             Mr. Brown             195

15   Jim Young             Mr. Kaufman           204

16   Gina Gutzeit          Mr. Cohen             210

17

18                        E X H I B I T S

19   DEFENDANT'S           DESCRIPTION           PAGE

20   DX-ANK, DX-APA,       Defense exhibits       53

21   DX-AUC, DX-AWR,       regarding Mr.

22   DX-AXK                Renzi's testimony

23

24   DX-BDE                Exhibit re:  Mr.       54

25                         Renzi's testimony
```

```
 1

 2   DX-AXI, AUB,        Various documents            133

 3   ATW, ARY, AWN, AXJ

 4

 5   AYD, AQV, AQM,      Exhibits regarding           209

 6   AJA, and BDG       Ms. Young's testimony

 7

 8

 9   PLAN PROPONENTS'

10   --                 Direct testimony              56

11                      of Nancy Mueller-Handal

12

13   --                 Direct testimony              57

14                      of Ralph Mabey

15

16   --                 Direct testimony              57

17                      of Susheel Kirpalani

18

19   --                 Direct testimony              59

20                      of Tammy Hamzehpour

21

22   589, 590, 592,     Exhibits regarding            60

23   593, 594, 595,     Ms. Hamzehpour's

24   614, 615, 620,     testimony

25   636, 637, 652,
```

```
 1   666, 761 and 762

 2

 3   633                 Summary of the               65

 4                       debt forgiveness

 5

 6

 7   --                  Direct testimony of          83

 8                       Barbara Westman

 9

10   Various             Exhibits offered            134

11                       in connection with

12                       Mr. Blumentritt's

13                       direct testimony,

14                       listed at ECF 5917

15

16   Various             Exhibits offered            135

17                       in connection with

18                       Jeffrey Lipps'

19                       testimony, listed

20                       at ECF docket

21                       number 5916

22

23   1565                Declaration of              136

24                       Fernando Acebedo

25
```

| | | |
|---|---|---|
| 1 | 1566 | Prior declaration | 137 |
| 2 | | of Fernando Acebedo |
| 3 | | | |
| 4 | 682 | Certification of | 138 |
| 5 | | business records |
| 6 | | | |
| 7 | 509, 691, 702 and | Certification of | 138 |
| 8 | 703 | business records |
| 9 | | | |
| 10 | 511, 623, 624, | Documents in | 141 |
| 11 | 716, 731, 732 and | connection with Mr. |
| 12 | 734 | Young's testimony |
| 13 | | | |
| 14 | -- | Direct testimony of | 210 |
| 15 | | Gina Gutzeit |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2                          C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:   November 21, 2013

19

20

21

22

23

24

25