1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matters of:

6  RESIDENTIAL CAPITAL, LLC, et al.,        Case No. 12-12020-mg

7              Debtors.

8  - - - - - - - - - - - - - - - - - - - - -x

9  RESIDENTIAL CAPITAL, LLC, et al.,

10             Plaintiffs,              Adv. No. 13-01343-mg

11        - against -

12  UMB BANK, N.A., in its Capacity as

13  INDENTURE TRUSTEE,

14             Defendant.

15  - - - - - - - - - - - - - - - - - - - - -x

16  OFFICIAL COMMITTEE OF UNSECURED

17  CREDITORS, et al.,

18             Plaintiffs,              Adv. No. 13-01277-mg

19        - against -

20  UMB BANK, N.A., et al.,

21             Defendants.

22  - - - - - - - - - - - - - - - - - - - - -x

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    United States Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    November 22, 2013

19                    9:01 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

3

1

2   12-12020-mg   Residential Capital, LLC

3   PHASE II TRIAL

4

5   Adversary proceeding: 13-01277-mg   Official Committee of

6   Unsecured Creditors et al. v. UMB Bank, N.A., et al.

7   PHASE II TRIAL

8

9   Adversary proceeding: 13-01343-mg Residential Capital, LLC et

10   al. v. UMB Bank, N.A., in its Capacity as Indenture Trustee

11   PHASE II TRIAL

12

13   12-12020-mg   Residential Capital, LLC

14   CONFIRMATION HEARING.

15

16   Fairness Hearing RE: Kessler Settlement Class.

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

**4**

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for Debtors
 5        1290 Avenue of the Americas
 6        New York, NY 10104
 7
 8   BY:   GARY S. LEE, ESQ.
 9         CHARLES L. KERR, ESQ.
10         LORENZO MARINUZZI, ESQ.
11         JOSEPH ALEXANDER LAWRENCE, ESQ.
12
13
14   MORRISON & FOERSTER LLP
15        Attorneys for Debtors
16        755 Page Mill Road
17        Palo Alto, CA 94304
18
19   BY:   DARRYL P. RAINS, ESQ.
20
21
22
23
24
25
```

```
 1   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 2         Conflicts Counsel to Debtors
 3         101 Park Avenue
 4         New York, NY 10178
 5
 6   BY:   THERESA A. FOUDY, ESQ.
 7
 8
 9   SILVERMANACAMPORA LLP
10         Special Counsel to Creditors' Committee
11         100 Jericho Quadrangle
12         Suite 300
13         Jericho, NY 11753
14
15   BY:   RONALD J. FRIEDMAN, ESQ.
16         ROBERT D. NOSEK, ESQ.
17
18
19   U.S. DEPARTMENT OF JUSTICE
20         U.S. Attorney's Office
21         86 Chambers Street
22         3rd Floor
23         New York, NY 10007
24
25   BY:   JOSEPH N. CORDARO, ESQ.
```

 1

 2  KIRKLAND & ELLIS LLP

 3          Attorneys for Ally Bank and Ally Financial, Inc.

 4          601 Lexington Avenue

 5          New York, NY 10022

 6

 7  BY:   RAY C. SCHROCK, P.C.

 8

 9

10  KIRKLAND & ELLIS LLP

11          Attorneys for Ally Bank and Ally Financial, Inc.

12          655 Fifteenth Street, N.W.

13          Washington, DC 20005

14

15  BY:   DANIEL T. DONOVAN, ESQ.

16          JUDSON D. BROWN, ESQ.

17

18

19  KIRKLAND & ELLIS LLP

20          Attorneys for Ally Bank and Ally Financial, Inc.

21          555 California Street

22          San Francisco, CA 94104

23

24  BY:   MARK E. MCKANE, P.C.

25

7

1

2  KRAMER LEVIN NAFTALIS & FRANKEL LLP

3          Attorneys for Official Creditors' Committee

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7  BY:   KENNETH H. ECKSTEIN, ESQ.

8          PHILIP S. KAUFMAN, ESQ.

9          DOUGLAS MANNAL, ESQ.

10         STEPHEN ZIDE, ESQ.

11         P. BRADLEY O'NEILL, ESQ.

12         JOSEPH A. SHIFER, ESQ.

13         NORMAN C. SIMON, ESQ.

14

15

16  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

17         Attorneys for Ad Hoc Group of Junior Secured Notes

18         1633 Broadway

19         New York, NY 10019

20

21  BY:   DANIEL A. FLIMAN, ESQ.

22

23

24

25

```
 1   MILBANK, TWEED, HADLEY & MCCLOY LLP
 2          Attorneys for Ad Hoc Group of Junior Secured Notes
 3          1850 K Street, NW
 4          Washington, DC 20005
 5
 6   BY:   DAVID S. COHEN, ESQ.
 7
 8
 9   MILBANK, TWEED, HADLEY & MCCLOY LLP
10          Attorneys for Ad Hoc Group of Junior Secured Notes
11          One Chase Manhattan Plaza
12          New York, NY 10005
13
14   BY:   GERARD UZZI, ESQ.
15          DANIEL M. PERRY, ESQ.
16          ATARA MILLER, ESQ.
17
18
19   MORGAN, LEWIS & BOCKIUS LLP
20          Attorneys for Deutsche Bank, Bank of NY Mellon
21          101 Park Avenue
22          New York, NY 10178
23
24   BY:   GLENN E. SIEGEL, ESQ.
25          JAMES L. GARRITY, JR., ESQ.
```

1

2  JONES DAY

3         Attorneys for FGIC

4         222 East 41st Street

5         New York, NY 10017

6

7  BY:   LANCE E. MILLER, ESQ.

8

9

10  JONES DAY

11         Attorneys for FGIC

12         555 South Flower Street

13         Fiftieth Floor

14         Los Angeles, CA 90071

15

16  BY:   RICHARD L. WYNNE, ESQ.

17

18

19  WINSTON & STRAWN LLP

20         Attorneys for WFBNA - Wachovia

21         200 Park Avenue

22         New York, NY 10166

23

24  BY:   JAMES DONNELL, ESQ.

25         NATHAN P. LEBIODA, ESQ.

```
 1
 2   ROPES & GRAY LLP
 3        Attorneys for Institutional Investor Steering Committee
 4        800 Boylston Street
 5        Boston, MA 02199
 6
 7   BY:  D. ROSS MARTIN, ESQ.
 8        ANDREW G. DEVORE, ESQ.
 9
10
11   ALLEN & OVERY LLP
12        Attorneys for HSBC Bank USA, N.A. as Trustee
13        1221 Avenue of the Americas
14        New York, NY 10020
15
16   BY:  JOHN KIBLER, ESQ.
17
18
19   MORRISON COHEN LLP
20        Attorneys for Independent Directors
21        909 Third Avenue
22        New York, NY 10022
23
24   BY:  JOSEPH T. MOLDOVAN, ESQ.
25
```

1

2   SEWARD & KISSEL LLP

3         Attorneys for US Bank as RMBS Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7   BY:   MARK D. KOTWICK, ESQ.

8         THOMAS ROSS HOOPER, ESQ.

9         ARLENE R. ALVES, ESQ.

10        DALE C. CHRISTENSEN, JR., ESQ.

11

12

13  CLEARY GOTTLIEB STEEN & HAMILTON LLP

14        Attorneys for Wilmington Trust

15        One Liberty Plaza

16        New York, NY 10006

17

18  BY:   MARK A. LIGHTNER, ESQ.

19        JEREMY R. OPOLSKY, ESQ.

20

21

22

23

24

25

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3          Attorneys for MBIA Insurance Co.

4          700 6th Street NW,

5          Washington, DC 20001

6

7    BY:   MARK C. ELLENBERG, ESQ.

8

9

10   PENSION BENEFIT GUARANTY CORPORATION

11         Office of the Chief Counsel

12         1200 K Street, N.W.

13         Washington, DC 20005

14

15   BY:   VICENTE MATIAS MURRELL, ESQ.

16

17

18   REED SMITH LLP

19         Attorneys for Wells Fargo Bank, N.A.

20         599 Lexington Avenue

21         New York, NY 10022

22

23   BY:   ERIC A. SCHAFFER, ESQ.

24         MARK D. SILVERSCHOTZ, ESQ.

25

 1

 2  LOWENSTEIN SANDLER LLP

 3          Attorneys for N.J. Carpenters

 4          65 Livingston Avenue

 5          Roseland, NJ 07068

 6

 7  BY:   MICHAEL S. ETKIN, ESQ.

 8

 9

10  DECHERT LLP

11          Attorneys for Bank of New York Mellon

12          1095 Avenue of the Americas

13          New York, NY 10036

14

15  BY:   MAURICIO A. ESPANA, ESQ.

16

17

18  ALSTON & BIRD LLP

19          Attorneys for Wells Fargo Bank, N.A.

20          90 Park Avenue

21          15th Floor

22          New York, NY 10016

23

24  BY:   MICHAEL E. JOHNSON, ESQ.

25

```
 1   POLSINELLI

 2        Attorneys for Kessler Settlement Class

 3        700 West 47th Street

 4        Suite 1000

 5        Kansas City, MO 64112

 6

 7   BY:  DAN FLANIGAN, ESQ.

 8

 9

10   SCHULTE ROTH & ZABEL, LLP

11        Attorneys for Cerberus Capital Management

12        919 Third Avenue

13        New York, NY 10022

14

15   BY:  HOWARD O. GODNICK, ESQ. (TELEPHONICALLY)

16

17

18

19   MUNGER, TOLLES & OLSON LLP

20        Attorneys for Berkshire Hathaway, Inc.

21        355 South Grand Avenue

22        35th Floor

23        Los Angeles, CA 90071

24

25   BY:  THOMAS B. WALPER, ESQ. (TELEPHONICALLY)
```

1

2   QUINN EMANUEL URQUHART & SULLIVAN, LLP

3         Attorneys for AIG, Allstate, Prudential, and Mass Mutual

4         51 Madison Avenue

5         22nd Floor

6         New York, NY 10010

7

8   BY:   SCOTT C. SHELLEY, ESQ.

9

10

11   ALSO PRESENT:

12         RICHARD RODE, Party Pro Se

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    16

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  Just give me a minute

3    to get organized here.

4         (Pause)

5              THE COURT:  Okay.  Good morning, Mr. Cohen.

6              MR. COHEN:  Good morning, Your Honor.

7              THE COURT:  Good morning, Ms. Gutzeit.

8              THE WITNESS:  Good morning.

9              THE COURT:  You know you're still under oath.

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  We'll continue with the cross-examination.

12             MR. COHEN:  Thank you, Your Honor.

13   RESUMED CROSS-EXAMINATION

14   BY MR. COHEN:

15   Q.   Ms. Gutzeit, do you recall yesterday shortly before we

16   broke the Court asked you whether there was authoritative

17   accounting literature that covers the treatment of intercompany

18   transactions as equity or debt?

19   A.   Yes.

20   Q.   And you asked if you could have reference to certain

21   accounting provisions under ASC, GAAP?

22   A.   Yes.

23   Q.   And you asked for ASC-470 and ASC-810?

24   A.   Yes.

25   Q.   Okay.  We were able to find those and they were actually

 1  already on the exhibit list, but I have copies here, so I'll

 2  come up and hand these out.  It is PX-745 and PX-749.

 3         MR. KERR:  Ms. Gutzeit, I believe they may be the last

 4  three documents in your white binder.

 5         THE COURT:  They are.  They're in the white binder.

 6  Thank you.

 7  Q.   Ms. Gutzeit, looking at either PX-745 or PX-749, in

 8  whichever order you think makes sense, given your expertise in

 9  areas of accounting, could you explain to us how these two

10  provisions of GAAP cover the treatment of intercompany

11  transactions as equity or debt?

12  A.   Yes.  There's two sections.  One is the 850, 850 ASC-850,

13  which is related party disclosures and overall background of

14  related parties.

15  Q.   And could you tell me which document you're looking at,

16  which PX?

17  A.   PX-747.

18         THE COURT:  747, okay.

19  A.   So this one specifically talks about related parties.  And

20  then the next one, PX-749, specifically talks about debt.  'and

21  then in conjunction with the one prior to that, which is

22  PX-745, those were the three primary accounting literatures,

23  not the only ones, but the primary ones that I referenced in my

24  report.

25  Q.   And with respect to, let's start with PX-745, which is

1   ASC-810, could you point specifically here as to where it

2   discusses the recharacterization of debt and equity as relevant

3   to the opinions you're offering in this case?

4   A.   Sure.

5           THE COURT:  This is only part of ASC-810, isn't it?

6           THE WITNESS:  This is an excerpt, yeah.  This is not

7   the entire document.  Actually, I'm not sure why it's not the

8   entire document.

9           THE COURT:  This is only a small part of the document.

10  A.   But you could -- part of it is the section 45-11, which is

11  on page 2 of 4 here.  And it talks about in some cases parents'

12  entity financial statements may be needed.  In addition,

13  consolidated financial statements indicate adequately the

14  position of the bondholders, creditors.  So it talks about the

15  consolidated financial statements in here.  But I really would

16  prefer -- it's probably easier to go back to my report and the

17  footnotes related there would be helpful.

18  Q.   Okay.

19  A.   So --

20  Q.   Your report is in the big black binder.

21  A.   Yes, the first exhibit.  I'm looking at actually the

22  direct testimony.

23  Q.   Okay.  Could you tell us what page you're on?

24  A.   I certainly will, once I get there.  We start off with the

25  first 850, which is the one we were just talking about.

RESIDENTIAL CAPITAL, LLC, ET AL.                              19

1    Q.    And which page?

2    A.    On page 2, footnote 1.

3    Q.    Uh-huh.

4    A.    It refers to ASC-850, which is PX-747.  And this, again,

5    talks about related parties.

6    Q.    Okay.  And what specifically in PX-747 is relevant to the

7    opinions you're offering in this case?

8    A.    It's Section 10-50-5.

9    Q.    Disclosures about arm's length bases of transactions?

10   A.    Yes.

11   Q.    And that has the Bates number RCPC-65086?

12   A.    Yes.

13   Q.    Okay.  And that section, as I read it, is transactions

14   involving related parties cannot be presumed to be carried out

15   on an arm's-length basis, as the requisite conditions of

16   competitive free-market dealings may not exist.

17   Representations about transactions with related parties, if

18   made, shall not imply that the related-party transactions were

19   consummated on terms equivalent to those that prevail in arm's-

20   length transactions unless such representations can be

21   sustained.

22   A.    Yes.

23          MR. KERR:  Objection, Your Honor.  I think the last

24   word is "substantiated".

25          THE WITNESS:  Substantiated.

1        MR. COHEN:  Substantiated, sorry.

2    Q.   And how does that statement impact your opinion that the

3    intercompany payables and receivables are more like equity than

4    debt?

5    A.   Well, the criteria here says, as it says, it's not arm's

6    length.  So therefore, you have to look at the transaction and

7    make an assessment.  And I think Mr. Young quoted yesterday,

8    you have to look at the facts and circumstances behind the

9    transaction.  And so you would look at whether there is an

10   agreement, whether there's a stated interest rate, whether

11   there's a maturity date, whether there's a repayment, either

12   schedule and/or history of repayment, and importantly too, you

13   have to look at whether the company that's borrowed the money

14   has the financial wherewithal to pay it back.

15        THE COURT:  Those factors that you just discussed and

16   Mr. Young discussed yesterday, are those factors identified in

17   the authoritative accounting literature that you're referring

18   to?

19        THE WITNESS:  They are in some -- in certain

20   instances, they are, and they're unfortunately GAAP, the way

21   this is written, they are not as user friendly.  So that's why

22   companies put together accounting policies, more user friendly,

23   more easily readable.  And so you'd have to go to three or four

24   different sections in here to get there.  But those factors are

25   typical business factors.  Would you lend --

1          THE COURT:  I understand that --

2          THE WITNESS:  Right.

3          THE COURT:  -- but my question remains --

4          THE WITNESS:  Sorry, Your Honor.

5          THE COURT:  -- are these factors identified in the

6    authoritative accounting literature upon which you are relying?

7          THE WITNESS:  There is a discussion on debt in the

8    debt section, so yes.

9          THE COURT:  Tell me where.  That's --

10         THE WITNESS:  Sure.

11         THE COURT:  I didn't mean to interfere with your

12   examination, Mr. Cohen, but this --

13         MR. COHEN:  That's fine, Your Honor.

14         THE WITNESS:  There is a section in -- where it talks

15   about extinguishment of debt.

16         THE COURT:  Which exhibit are you --

17         THE WITNESS:  I'm sorry, I apologize, Your Honor.

18   PX-749.

19         THE COURT:  Okay.

20         THE WITNESS:  So if you look at the top of Bates --

21         THE COURT:  Well, they're numbered 1 of 10 --

22         THE WITNESS:  Yes, 4 of 10 on the very top.

23         THE COURT:  Okay.

24         THE WITNESS:  So just to sort of highlight my point

25   that there is nothing easy about reading GAAP

1  literature similar to, I assume other things --

2           THE COURT:  Earlier in my career I spent a lot of time

3  having to do this, so.

4           THE WITNESS:  Okay.  There is -- a section of it says

5  extinguishment of debt.  It also refers to yet another section

6  of ASC-470-50, which talks about the general guidance on

7  liabilities.

8           THE COURT:  Yes.

9           THE WITNESS:  And there would be in that, I believe,

10  more information.  Certainly I can get one of my colleagues --

11           THE COURT:  No, I just --

12           THE WITNESS:  You would like to see, all of us would

13  like to see it in one place and easily discernible.

14           THE COURT:  No, but my question remains.  I mean, Mr.

15  Young identified a series of factors.  You've essentially

16  repeated that.  And my question to you was where in the

17  authoritative accounting literature do you derive those factors

18  from?

19           THE WITNESS:  And I could certainly --

20           THE COURT:  Well, you're on the stand now.  But I --

21           THE WITNESS:  -- take a break and look at the

22  particular section, Your Honor.

23           THE COURT:  All right.  Go ahead, Mr. Cohen.

24  BY MR. COHEN:

25  Q.   Ms. Gutzeit, if you would turn in your black binder, the

RESIDENTIAL CAPITAL, LLC, ET AL.                    23

 1  black binder that I gave you, to I think, the second to the
 2  last DX number, the designation at the end of the binder; it's
 3  DX-BCV?
 4  A.    BCV like in Victor?
 5  Q.    Yes, Boy Charlie Victor.  It's about midway through the
 6  document, it has the Bates number in the lower right corner
 7  RCUCCJSN-87193 -- I'm sorry, it's the next page.
 8          THE COURT:  The last three are 193?  Is that what
 9  you're saying?
10          MR. COHEN:  No, 196, I'm sorry.
11          THE COURT:  196.
12  A.    196, yes.
13  Q.    It's titled related accounting policy 1075 related party.
14  A.    Yes.
15  Q.    And it's effective January 1, 2012; and the next review
16  date is January 1, 2014.  This is one of the documents that you
17  considered in forming your opinions in this case, right?
18  A.    Yes.
19  Q.    Do you have an understanding that this document is an
20  attempt by Ally to pull together all of the different related
21  party provisions of GAAP in one document, as you said many
22  companies do for convenience?
23  A.    Yes, and it actually refers to it on Section 6.1.
24  Q.    Okay.
25  A.    All the applicable provisions.

1   Q.   And in your review of this document in preparing your

2   expert opinions in this case, did you find this to be an

3   accurate representation of GAAP provisions and a collection of

4   the GAAP provisions with respect to related-party transactions?

5   A.   Yes.

6   Q.   Okay.  So I think the Court's question to you was with

7   respect to debt forgiveness, is there GAAP -- or are there GAAP

8   provisions that apply.

9        And if you look at the page that ends in 7205, in the

10  middle of the page there is a number 6.5 titled classification

11  and presentation; and under that is 6.5.2, debt forgiveness or

12  extinguishment.  Do you see that?

13  A.   Yes.

14  Q.   The first paragraph says "Extinguishment of debt

15  transactions between related entities may be in essence capital

16  transactions.  As such, forgiveness of debt and related

17  interest between related parties and the associated gains or

18  losses generally should not be classified as income statement

19  items, but rather as capital transactions."  Do you see that?

20  A.   Yes.

21  Q.   Is that consistent with your understanding of the GAAP

22  instructions with respect to cancellation of indebtedness or

23  debt forgiveness in related-party transactions?

24  A.   Yes, it's generally -- yes, it says here it's generally

25  the case.

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1  Q.   Okay.  Is there anything in the GAAP literature where you

2  actually haven't had debt forgiveness in related-party

3  transactions that would allow you to treat the unforgiven

4  portion of the payable as a capital transaction?

5  A.   The unforgiven portion?  Not that I'm aware of.

6  Q.   I didn't hear the first part of that answer?

7  A.   Not that I'm aware of.  I was just trying to repeat your

8  question.  Okay, sorry --

9  Q.   Okay.

10 A.   -- in my head.  I apologize.

11 Q.   So if the debt hasn't actually been forgiven, then under

12 GAAP there is not a basis for treating it as a capital

13 transaction, right?

14 A.   Well, there are -- you asked if there is the remaining

15 balance and receivable.  I mean, there can be instances where a

16 capital contribution or a -- you transfer an asset for no

17 value, those would be areas in which you would also

18 characterize those as capital contributions.

19 Q.   Okay.  With respect to the matters identified in your

20 expert report and then the opinions you want to offer in this

21 case, are either of those two situations you just mentioned

22 relevant?

23 A.   No, not in the particular receivables that we're disc --

24 the particular balances that we're referring to in the report,

25 the top nine.  It doesn't -- it doesn't apply.

RESIDENTIAL CAPITAL, LLC, ET AL.                              26

1   Q.   Okay.  So let's be very specific.  With respect to the

2   opinions you're offering in this case, you're only talking

3   about instances where there was actual forgiveness, correct?

4   A.   The report, yes, refers to actual forgiveness.

5   Q.   And where there is actual forgiveness under GAAP and AFI's

6   accounting policy implementing GAAP, it is the forgiven portion

7   that is treated as a capital contribution, right?

8   A.   Yes.  And part of that is because it's not an arm's-length

9   transaction.  You can have a related-party loan that's been

10  substantiated that is equivalent to an arm's-length

11  transaction.  And if that was forgiven, that would not be a

12  capital contribution.  That would be -- that would hit the P&L,

13  the income statement.  So to the extent you could verify that

14  the transaction is arm's length --

15          THE COURT:  So if you're dealing with a third party --

16          THE WITNESS:  Yes.

17          THE COURT:  -- and you write off part of the

18  receivable --

19          THE WITNESS:  It's the same as if it's a third-party

20  debt, Your Honor.

21  Q.   Okay, but --

22          THE COURT:  I'm sorry, go ahead.

23  Q.   But with respect to related-party transactions that have

24  the indicia of not being arm's length either because there's no

25  loan documentation, there's no stated interest rate, there's no

1    maturity date, interest may be accruing but unpaid, all of

2    those things that would indicate that it's not an arm's-length

3    transaction, you don't actually move it into the capital

4    account, you don't make an adjustment until there is actual

5    forgiveness, right?

6    A.    Right, yes, forgiveness or contribution.

7    Q.    Okay.  Are there any other provisions of GAAP relevant to

8    the opinions in your case, in this case, that deal with

9    extinguishment of debt and forgiveness of debt?

10   A.    There are several accounting references in here, and there

11   are numerous literatures that -- not only are there the actual

12   ASC, but there is also historical literature and similar to the

13   law there is interpretations, and some of the large accounting

14   firms also provide interpretations to some of these GAAP.  So

15   it's not always as easy as here's the section, and this is

16   exactly what you need to do.  I think in some cases it's

17   similar to law, you need to look at the other literature and

18   publications as well.  And as well as the SEC, for public

19   companies they put out some of their own guidance.

20   Q.    But in doing the work to form the opinions you have in

21   this case, you're not suggesting that the financial statements

22   of ResCap and its affiliates and subsidiaries don't conform

23   with GAAP, are you?

24   A.    No.

25   Q.    Okay.  One of the things that you point out in your report

1   as an example that leads you to the conclusion that this looks
2   more like equity than debt is that some federal regulators
3   don't treat the receivable on the intercompany books as an
4   asset, and I think you pointed out the Department of Housing
5   and Urban Development, is that right?
6   A.    Yes.
7   Q.    And in what way does that influence your opinion that the
8   payables and receivables are more like equity than debt?
9   A.    It's just another factor, that the regulatory bodies also
10  look at it as not an arm's length and therefore don't want to
11  rely on that asset in assessing the company's net worth.
12  Q.    Okay.  Do you know whether HUD on the payables side
13  considers that to be a valid liability and requires reporting
14  of that?
15  A.    No.  I mean it's a conservative basis.  So if you're
16  looking at net worth, you wouldn't deduct liabilities.  You
17  would just deduct assets.
18  Q.    Okay.
19  A.    You would --
20  Q.    Okay, so with respect to the payables and receivables,
21  even those regulators that don't consider a receivable to be an
22  asset still consider the payable to be a liability, right?
23  A.    Yes, that's the conservative approach.
24  Q.    All right.  And the company in preparing its books and
25  records, because of the elimination provision that we talked

1    about, couldn't present its financials in the same way, could

2    it?

3    A.    That's a very broad -- do you want to talk about which

4    entity you're referring to or --

5    Q.    Well, let me give you two entities.

6    A.    Okay.

7    Q.    Where there is a payable and receivable and they have to

8    report to HUD.  So when they -- one of the entities, the entity

9    with the receivable reports to HUD, takes that receivable off

10   because HUD doesn't want to consider that to be an asset to be

11   conservative, correct?

12   A.    Correct.  They provide a -- they don't change the actual

13   financial statements that are audited.  They provide supplement

14   to HUD.  I believe there is a standard form that they require,

15   I'm not a hundred percent sure.  But they then show that net of

16   that so that HUD could calculate the net worth --

17   Q.    Okay, so --

18   A.    -- what they consider acceptable --

19         THE COURT:  What do you call it, regulatory net worth

20   or --

21         THE WITNESS:  Acceptable -- there's a term, yes.  The

22   HUD documentation is in there and they refer to it.

23   Q.    And there are other things that HUD does not consider to

24   be an acceptable asset, right?

25   A.    I'd assume so.

1  Q.   Nonperforming mortgages, perhaps?

2  A.   I don't know off the top of my head.

3  Q.   Okay.  But in these related-party transactions, if one

4  entity, the entity with the payable is striking that from its

5  HUD reporting, it can't strike it from its books for all

6  purposes because it wouldn't eliminate in consolidation

7  anymore, right?

8  A.   That's correct.

9  Q.   All right.  So while it's one of the things you look at,

10 you recognize that on the liability side, the regulators still

11 consider that?

12 A.   Yes.  I mean it's one of many factors.

13 Q.   Right.  And you also recognize that a lot of state

14 regulators have their own view as to what are acceptable assets

15 for purposes of reporting, right?

16 A.   Yes.

17 Q.   And you recognize that while HUD may not consider a

18 payable to be an adequate asset, other states have a different

19 view of that, right?

20 A.   I'm not personally aware of it, but it wouldn't surprise

21 me.

22 Q.   Okay.  And do you know when ResCap was determining its

23 capital needs and whether it needed forgiveness or a capital

24 infusion for determining the solvency of its own balance sheet

25 or its affiliates and subsidiaries, whether it was counting

RESIDENTIAL CAPITAL, LLC, ET AL.                    31

1  payables and receivables as assets and liabilities for purposes

2  of determining solvency?

3  A.    If we're talking about ResCap, the intercompany obviously

4  would eliminate and you wouldn't be considering the

5  intercompany balances beneath it.  If you're talking about RFC,

6  for example, and you're looking at the -- RFC, if you're

7  looking at the 2 --

8  Q.    You're looking at figure 2?

9  A.    Yes, I am.

10         THE WITNESS:  Sorry, Your Honor.

11  A.    -- two billion -- approximately two billion dollars of

12  receivable from ResCap to RFC, you would consider -- you would

13  consider not just the balance, but you would also consider

14  whether there is, you know, the wherewithal to pay, whether

15  that needed to be adjusted.  And there were several instances

16  where ResCap did forgive loans to RFC in order for RFC to meet

17  its regulatory net worth compliance.

18  Q.    When you say the wherewithal to pay, are you talking about

19  an impairment analysis?

20  A.    I think it's an assessment of the financial -- yes, it's

21  similar to an impairment analysis.

22  Q.    Do you have an understanding as to whether ResCap was

23  performing impairment analyses with respect to its intercompany

24  payables and receivables?

25  A.    I'm not directly -- I don't have direct knowledge, but I'd

RESIDENTIAL CAPITAL, LLC, ET AL.                                    32

1  assume that it followed its Ally accounting policies.

2  Q.    The Ally account --

3  A.    -- procedures.

4  Q.    Sorry, I didn't mean to cut you off.

5  A.    Yes.

6  Q.    And the Ally accounting policies would have required an

7  impairment assessment, right?

8  A.    On a periodic basis, I assume so, yes, as well as GAAP.

9  Q.    And you have no reason, as you sit here today, to believe

10 they weren't doing that, right?

11 A.    Correct.

12         THE COURT:  Did you ever meet with Deloitte & Touche

13 with respect to the audits of AFI and ResCap?

14         THE WITNESS:  No.

15 Q.    All right.  Would you turn to the black binder at -- this

16 is in the front -- DX-APA.

17 A.    APA.  Sorry.

18 Q.    The document appears to be a document that was prepared by

19 FTI and Morrison & Foerster.  It starts with the Bates number

20 EXAM-345894 and goes through 5905.

21 A.    Yes.

22 Q.    Is this one of the documents that you considered in

23 forming your opinions in this case?

24 A.    Yes.

25 Q.    Were you involved in the work that led up to this document

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1  in the spring of 2013?

2  A.    I don't recall being involved, but I'm sure I probably

3  read the report at some point during that time frame.

4  Q.    Would you have read the report prior to it being

5  finalized?

6  A.    I don't recall.

7  Q.    Do you see on the back -- well, for what purpose is your

8  understanding that this report was prepared?

9  A.    It was to provide information and consolidate that

10  information from the company in order to give some historical

11  and current view on the intercompany activity and balances.

12  Q.    To what extent did you rely on this report in forming your

13  opinions in this case?

14  A.    The page 3, which has the balances, is as of the petition

15  date.  So that -- didn't necessarily rely on this, but I can --

16  I believe there is a section in here that talks about the debt

17  forgiveness.

18  Q.    Which page are you on?

19  A.    10.  So this is a summary of the forgiveness by year.  And

20  so we used this as a reference, but also went back to the

21  source data this related to.  And as you can see, as I was

22  referring to before, ResCap forgave 2.1 billion dollars --

23          THE COURT:  Where are you looking?

24          THE WITNESS:  I'm sorry, the first line, Your Honor.

25          THE COURT:  On which page?

1          THE WITNESS:  On page 10.

2          THE COURT:  Okay.

3   A.    So here is a summary of the forgiveness.  And ResCap

4   forgave 2.1 billion dollars of its receivables from RFC.  And

5   then if you look at the current balance, RFC owes ResCap

6   approximately two billion dollars.

7          THE COURT:  And I find that where?

8          THE WITNESS:  On this chart here.

9          THE COURT:  The figure 2 chart?

10         THE WITNESS:  Yes.

11         THE COURT:  Okay.

12  A.    So in looking at this, I guess my assessment of reviewing

13  whether it's more debt than equity or more equity than debt is,

14  but for this two-billion-dollar forgiveness, it would be

15  basically a zero balance due from either ResCap or due to

16  from --

17         THE COURT:  So, on page 3 --

18         THE WITNESS:  Page 3?

19         THE COURT:  Yes, I'm looking at the chart on page 3 of

20  Exhibit APA.

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Line 2, that's the 1,955,000,000 it's due

23  from Residential -- which way is it -- who owes whom the 1.955?

24         THE WITNESS:  The RFC owes ResCap.

25         THE COURT:  Okay.  And that's the same figure that's

1  on figure 2?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Okay.

4  Q.  Now isn't it a fact that these balances after reflecting

5  the forgiveness are --

6          THE WITNESS:  I'm sorry, Your Honor.  If you look at

7  page 2, I apologize.

8          THE COURT:  Go ahead.

9          MR. COHEN:  Page 2.

10         THE COURT:  Yeah, I want to make sure I understand

11  this.

12         THE WITNESS:  Page 3.  So the paying entity, ResCap,

13  and I assume that's why there's red from here --

14         THE COURT:  Okay.  You're saying it owed Residential

15  Funding

16         THE WITNESS:  Yes.

17         THE COURT:  -- 1,955,000,000 dollars.

18         THE WITNESS:  Yes, I apologize.  So the receiving

19  entity would be RFC.  I apologize, Your Honor.

20         THE COURT:  Okay.  No, that's all right.  I just want

21  to be sure.  And that's the figure shown on figure 2.

22         THE WITNESS:  Exactly.  And then if you go to page

23  10 --

24         THE COURT:  Right.

25         THE WITNESS:  -- on the first line in 2008 and 2009,

1    Residential Capital forgave 2.1 billion dollars.

2              THE COURT:  That was owed by RFC?

3              THE WITNESS:  Correct.  So in considering -- and then

4    if you look down below, Your Honor, these are all subsidiaries

5    of RFC --

6              THE COURT:  Below which?  Below on what page?

7              THE WITNESS:  If -- below that -- page 10 --

8              THE COURT:  Yes.

9              THE WITNESS:  -- if you go under Residential Funding

10   Capital, in favor of, that column, and you go down to -- these

11   entities are subsidiaries of RFC and there's a subtotal.  So

12   over this four-year period there was approximately seven-

13   billion-dollars'-worth of loans, intercompany balances,

14   whatever we want to use, from Res Capital.  So Residential

15   Capital forgave over seven billion dollars.

16             THE COURT:  The 7,120,000,000 --

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  -- is the amount that you're saying that

19   ResCap forgave from RFC and RFC's subsidiaries?

20             THE WITNESS:  Subsidiaries, yes, Your Honor.  So in

21   looking at the -- I'm sorry, I guess I'm not supposed to just

22   keep talking.

23             THE COURT:  No.  I'm looking for an -- I want to

24   understand this chart and then Mr. Cohen is going to go on.

25             THE WITNESS:  So in looking at the criteria or the --

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1          THE COURT:  Now you're going into something else.

2   I'll let Mr. Cohen continue.

3          THE WITNESS:  No.  When looking at this chart --

4          THE COURT:  Yes.

5          THE WITNESS:  -- you could also say that there is

6   seven billion dollars in comparison to the two billion dollars

7   that was owed at the filing date.

8          THE COURT:  Okay.  Go ahead, Mr. Cohen.

9   BY MR. COHEN:

10  Q.   Okay.  You are not offering an opinion that any of this

11  debt forgiveness did not comply with ResCap's policies and

12  procedures to implement forgiveness --

13         THE COURT:  AFI's policies and procedures.

14         MR. COHEN:  As applicable to ResCap.

15  A.   Yes, I agree.

16         MR. COHEN:  Let me ask you --

17         THE COURT:  Ask it again.

18  Q.   I'll ask you again.

19         THE COURT:  I think you agreed with you, but --

20         THE WITNESS:  It's a double negative.  I was trying to

21  follow.

22  Q.   A clearer question.  You're not testifying that any of the

23  debt forgiveness transactions reflected in DX-APA were out of

24  compliance with AFI's policies and procedures with respect to

25  debt forgiveness as applicable to ResCap?

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1    A.    Yes.

2    Q.    You're not?

3    A.    I'm not.  Double negatives.

4    Q.    Okay.  And you're not able to point to anything in GAAP

5    that would suggest that the unforgiven portions of the debt,

6    the payables and receivables, should be treated as capital

7    transactions, right?

8    A.    No.

9            THE COURT:  It's not an all or nothing thing.  I mean,

10   you have to --

11           THE WITNESS:  It's not black and white.

12           THE COURT:  But whether it's -- when I say it's not an

13   all or nothing thing, it may be that a portion of an

14   intercompany balance should be recharacterized as equity, but

15   not necessarily the whole balance.  Would you agree with that?

16           THE WITNESS:  Yes.  And I also think that when you

17   have one management team that's looking at all of the entities,

18   they're trying to solve a problem at each entity.

19           THE COURT:  All right.

20           THE WITNESS:  So you wouldn't necessarily forgive more

21   than you needed to solve that problem at that entity.

22   Q.    And in fact, you understand that when debt forgiveness was

23   being discussed within ResCap, they tried very hard not to

24   forgive more than they needed to, right?

25   A.    I don't know what they tried to do or not do, but I'd

RESIDENTIAL CAPITAL, LLC, ET AL.                    39

1   assume they did what they needed to do to be compliant with the

2   net worth test.  And the pattern is that they forgave enough in

3   order for the entity to meet net worth test, nothing -- very

4   little in excess, or just marginally perhaps -- as Mr. Young

5   said yesterday, in order to have certain cushion.  But they

6   would only forgive what they needed to.

7   Q.   And there was a process in place that would help them

8   determine how much they needed to, and approvals that needed to

9   take place, to get that transaction done, right?

10  A.   Yes.

11  Q.   Okay.  If you turn to the last page of DX-APA, there is a

12  due diligence list.  Do you see that?

13  A.   Page 12, yes.

14  Q.   And there is a list of twenty-two items.  Did you review

15  this list of twenty-two items --

16          THE COURT:  I only have fifteen on mine.

17          MR. KERR:  Yeah, objection, Your Honor.

18          MR. COHEN:  Well, there are seven -- oh, I'm sorry, I

19  miscounted.  Fifteen items.

20  Q.   There are fifteen items, do you see that?

21          THE COURT:  You don't add them.  They're each numbered

22  separately.

23          MR. COHEN:  I misread.

24  A.   There are fifteen items, yes.

25          MR. COHEN:  This is why I'm not an accountant.

1      THE COURT:  Among other reasons.

2  A.   I wouldn't necessarily -- this is a due diligence list.

3  It looks more like questions versus answers.

4  Q.   Correct, correct.  So does this suggest that at least as

5  of April 4, 2013, this was additional work that needed to be

6  done on the intercompany project?

7  A.   Yes, I would believe so.  This was an iterative process.

8  It wasn't done at one point in time.  It was done over a period

9  of time.

10  Q.   Did you, in forming your opinions in this case, see the

11  results of these fifteen items of due diligence?

12  A.   I don't really know.

13  Q.   Did you, in forming your opinions in this case, undertake

14  these fifteen items of due diligence?

15  A.   I'd have to read them.

16  Q.   Okay.  Please take your time.

17      And as you go through them, you can tell me which items

18  you did undertake as part of forming the opinions in this case.

19  A.   I think if not exactly these questions, maybe some

20  similarity to these.

21      THE COURT:  To all?

22      THE WITNESS:  Similarity.  For example, describe what

23  operationals give rise to intercompany transactions; you know,

24  we tried to get those characteristics.

25      Explain the reasons for the intercompany forgiveness;

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1   we've certainly talked about that.  So if not exactly worded

2   this way, or maybe not precisely, but some -- I'm just -- I'm a

3   slow reader, as opposed to if you're not adding math, I'm a

4   slow reader, so just give me a minute.

5           Perhaps, yeah, perhaps some of these, but not

6   necessarily in this level of detail.

7   Q.   When you say "not in this level of detail", what do you

8   mean?

9   A.   If I look at the time, how timely were the general ledger

10  entries for intercompany and loans forgiveness made on the

11  ledger.  Certainly that was a level of detail that wouldn't be

12  necessary for this analysis.  That's an example.

13  Q.   Okay.  Any others?

14  A.   We didn't -- I didn't go back and verify 9 to provide a

15  general sense of the numbers, because I pretty much already

16  knew what that was in my historical dealing with the cash

17  management system and some of the others.

18  Q.   And one of the reasons you knew with respect to number 9

19  it was large, is because you were looking at a period of years

20  as opposed to on a regular basis, as the company was doing this

21  in the ordinary course of business, right?

22  A.   I think it was back in 2008 or 2009, I was helping the

23  company further enhance their cash management system, and in

24  that process also to be compliant of their loans at the time.

25  So there was a lot of work done in order to understand and

1   provide the lender an understanding of what -- intercompany

2   balances and how they were moving through the cash management

3   system.

4        So based on that, which is some time ago, but I had some

5   general knowledge of how frequent and how the intercompanies

6   went through the cash management system.

7   Q.   In 2008, what work were you doing for the company with

8   respect to the cash management system?

9   A.   2008 began the project as being, prepping for potential

10  filing.  And it sort of evolved into assisting with debt

11  refinancing.  We had a team of people working with them on

12  their cash management, helping them get a better handle on

13  their advances, the servicing advances.  It was a very volatile

14  time for the business, and we were helping them to put some

15  more rigor in able to monitor their cash needs.

16  Q.   And did that project come to completion?

17  A.   I'm sure it did at some point.  It was an evolution.  I

18  think maybe in 2009.  I don't recall the date exactly.

19  Q.   Okay, but at the end of your work in 2008 and 2009 with

20  respect to the cash management system, would you say it was a

21  better cash management system than it was before?

22  A.   Well, it was certainly better documented.

23  Q.   All right.  So once you left, so we can see from 2009

24  forward, in your view there was more enhanced documentation in

25  the cash management system?

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1   A.    Yes.

2   Q.    And when you came back to the company in the fall of 2011,

3   were they still implementing the enhanced cash management

4   system that you developed with them?

5   A.    It was different.

6   Q.    In what way was it different?

7   A.    There was just additional complexities based on yet

8   additional funding and loans that happened in that interim

9   period.  So it wasn't the same -- although it was similar to

10  what it was when we left, if I used the cash collateral -- the

11  cash management motion as a sample, took out the draft from

12  2009, and it basically needed to be significantly verified and

13  changed because the company continues to evolve.  It is not a

14  stagnant -- it's not a stagnant system.

15  Q.    And when you say the company continues to evolve, they

16  were making the cash management system better, not worse,

17  right?

18  A.    I would assume so.

19  Q.    Well --

20  A.    Yes.

21  Q.    -- in your view, from 2009 when you left, to 2011 when you

22  came back --

23  A.    I didn't -- I didn't really make an assessment if it was

24  better.  I jut -- it was different.

25  Q.    Was it worse?

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1   A.   It was more complex.

2   Q.   Was it less accurate?

3   A.   Not that I'm aware of, no.

4   Q.   Have you ever testified as an expert before as to whether

5   something looks more like equity than debt?

6   A.   No.

7   Q.   This is the first time you've been asked to offer an

8   opinion on that?

9   A.   Yes.

10  Q.   In your experience do -- you've been involved until a

11  number of multidebtor bankruptcy cases, haven't you?

12  A.   I've counted.  I've over a hundred bankruptcies, not all

13  multi.

14  Q.   In your experience in --

15  A.   Thirty years.  No?

16  Q.   -- a significant number of bankruptcy cases -- in a

17  significant number of bankruptcy cases, have you ever

18  encountered multidebtor situations where a cash management

19  system was in place.

20  A.   Yes.

21  Q.   With respect to those multidebtor situations where cash

22  management systems are in place, do you typically find

23  documentation that supports individual journal entries?

24  A.   Individual journal entries?  They're typically not very

25  well documented.

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1    Q.    And that is just a general function of having a cash

2    management system, right?

3    A.    No.  It's a function of there is less attention spent to

4    entries that are going to eliminate in consolidation.

5    Q.    In your experience in a significant number of multidebtor

6    cases, have you ever testified that the cash management system,

7    which generates payables and receivables at the individual

8    debtors, that those payables and receivables should be

9    disregarded and everything reclassified as capital

10   contribution?

11   A.    I think I mentioned before that I haven't testified on

12   anything.  You said testified.

13   Q.    I'm testifying (sic) more specifically about the --

14   A.    No.

15   Q.    -- results of the cash management system.  Have you ever

16   testified that the payables and receivables that are generated

17   out of a cash management system in a multidebtor case should be

18   disregarded and that everything should be treated as equity?

19   A.    No.

20   Q.    Can you look at figure 2?

21   A.    Yes.

22   Q.    And you see that we've labeled these by claim number:

23   claim 1, 2, 3, and they track, I'll represent to you, the

24   analysis of the claims that you did in your report.

25   A.    Yes.

1  Q.    That was the intent.  So if any of them are off, let me

2  know.

3       So with respect to claim 1, that is between ResCap and Res

4  Holdings.  Do you see that?

5  A.    Yes.

6  Q.    And you evaluated that intercompany payable and receivable

7  relationship as part of your report, right?

8  A.    Yes.

9  Q.    Do you know whether this claim arose out of an agreement

10  between ResCap and GMAC Residential Holding?

11  A.    I don't know if it arose out of that.  I do know that

12  there is an agreement between the parties.

13  Q.    And is that significant to the opinions you reach in this

14  case?

15  A.    It's certainly one of the factors.

16  Q.    Do you know whether interest was paid on this intercompany

17  receivable-payable relationship?

18  A.    Yes, regular interest payments were made.

19  Q.    Do you know whether ResCap characterized internally this

20  balance as a line of credit?

21  A.    I believe you showed me a document -- an internal document

22  during this deposition that called it a line of credit.

23  Q.    In your experience is a line of credit something that

24  would be more consistent with a debt transaction or an equity

25  transaction?

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1   A.   Well, the word itself would lend itself to be more debt.

2   Q.   Okay.  So typically lines of credit don't work like equity

3   contributions, right?

4   A.   It's just a title in a general ledger.

5   Q.   Have you ever seen an equity transaction described as a

6   line of credit in your substantial experience?

7   A.   I generally don't look at general ledger account names,

8   but not that I'm aware of.

9   Q.   Okay.  Do you know what the netting agreement in place

10   with respect to this was?

11   A.   The netting agreement.  I'm sorry, no.  Maybe you're using

12   a term that I'm not --

13   Q.   Okay.  Let's look at DX-AYI.

14   A.   Okay.  Just a second.  AYI.  Yes, I'm here.

15   Q.   I'm going to give you a Bates number in a minute.

16   A.   Sure.

17   Q.   Would you turn to Bates number RCJSNII-100774537?

18   A.   Just give me the last --

19   Q.   74537.

20   A.   Wow.  Okay.  It's a document dated April 22nd?  I just

21   want to make sure I'm on the right page.

22   Q.   Yes, 2011.

23   A.   Yes.

24   Q.   Is this a document you considered in forming your opinions

25   in this case?

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1   A.   I don't remember if it's a document we considered, but I

2   certainly have seen it as a result of, I believe, Ms. Westman's

3   deposition.  I'm not -- I don't recall off the top of my head

4   whether it was considered or not.

5   Q.   What is your understanding of the purpose of this

6   document?

7   A.   Well, in reading this document, basically GMAC Mortgage is

8   selling, transferring certain mortgage loans to RFC.  And in

9   order to finance that, on the next page, little A, B and C and

10  D talks about how they're going to -- in order to avoid

11  transferring cash between themselves, to discharge their

12  payment obligations in the amounts set forth, they basically

13  just moved around journal entries.  So, in essence, they've

14  moved mortgages from GMAC Mortgage to RFC.  And on --t hey just

15  moved around journal entries in order to do that.

16  Q.   Would it be fair to say that they paid for the mortgages

17  with the intercompany payables and receivables?

18  A.   Well, no.  Because basically, if you draw this little

19  triangle out, you would see that ResCap actually didn't pay

20  anything, didn't increase or decrease its loans.  It really was

21  funded through this GMAC RHC and then GMAC RHC went to ResCap,

22  so this is sort of circular.

23  Q.   In what way is it circular?

24  A.   So you move assets from GMAC Mortgage to RFC, but you take

25  the intercompany and you go around the bend.  You don't

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1  actually move it from RHC to GMAC Mortgage.

2           THE COURT:  Can I ask you this?  Do you know, the

3  mortgages that were transferred, were they collateral for any

4  loan facility?

5           THE WITNESS:  I don't know, Your Honor.

6  Q.   It's not your testimony that the mortgages were

7  transferred for free, is it?

8  A.   Well, there is an intercompany balance, but all I'm saying

9  is that I don't see where RFC actually had a decrease or

10 increase in its receivables and payables, and that GMAC

11 Mortgage basically the intercompany balances moved around.

12 Q.   As did the assets in the form of mortgages?

13 A.   Yes.

14 Q.   You're familiar with intercompany claim number 2?

15 A.   Clam number 2.  Yes.

16 Q.   How did intercompany claim number 2 arise?

17 A.   Intercompany -- I mean there is a myriad of things that

18 I'm sure contributed to intercompany number 2, everything from

19 cash management to liquidation of assets.  So there was quite a

20 few things, I believe.

21 Q.   Do you know whether or not before the bankruptcy filing

22 Ms. Westman did an impairment analysis with respect to

23 intercompany number 2?

24 A.   Yes.

25 Q.   And what was the result of that impairment analysis?

1   A.   There was an -- the analysis would be that this should be

2   considered to be forgiven.

3   Q.   Was it forgiven?

4   A.   No.   That analysis was done only shortly before the

5   bankruptcy, so there was no major actions made to do that.

6        THE COURT:   Mr. Cohen, before you go on; going back to

7   claim number 1 --

8        MR. COHEN:   Sure --

9        THE COURT:   -- are you able to tell me whether the

10  JSNs had a lien on the mortgages that were transferred both

11  before and after the transfer?

12       MR. COHEN:   I am not, standing here right now, but I

13  can look into that question.

14       THE COURT:   Okay.

15       MR. COHEN:   Did the Court have any other questions on

16  that?

17       THE COURT:   No.   Obviously the witness didn't know

18  whether there was a lien, and I wouldn't necessarily expect you

19  to know as you stand there, but that's a question I have.

20       MR. COHEN:   All right.   We can certainly address that.

21       THE COURT:   Okay.

22  Q.   How about intercompany claim number 7?

23  A.   Yes.

24  Q.   How did that claim arise?

25  A.   That claim is primarily due to payments and/or expenses

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1   being transferred or allocated either from Ally or from ResCap

2   to the subsidiaries.  I believe I describe it in my report.

3   Q.   Can you show me where?

4   A.   I just want to make sure I'm looking at --

5   Q.   You can either refer to your report or declaration,

6   whichever is easier -- witness statement.

7   A.   Yeah, the direct testimony is the first tab, so it's

8   probably the easiest one.  Page 22, paragraph -- I mean, excuse

9   me, page 32, it starts with paragraph 78.  And if you look at

10  paragraph 79, the majority of the balances consist of accounts

11  recorded in connection with AFI billings of shared services,

12  payroll, outside counsel, service fee income received by GMAC

13  Mortgage for servicing RFC master servicing rights.  As part of

14  the normal operation, RFC routinely remitted payment to AFC for

15  services -- excuse me, RFC -- RFC would then charge GMAC

16  Mortgage for its portion.

17  Q.   Do you know whether GMAC Mortgage was paying back those

18  charges?

19  A.   They were regularly paying them.

20  Q.   And how were they paying them?

21  A.   Movement of cash.

22  Q.   Okay.  Does that suggest to you that it looks more like a

23  payable receivable, a debt transaction, than an equity

24  transaction?

25  A.   Yes.  As I mentioned in my deposition, it has more

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1  characteristics of debt than equity, but it also doesn't have

2  all the characteristics of debt.  There is no agreement, there

3  is no interest rate, there is no interest charged.

4  Q.   With respect to the nine transactions that you looked at,

5  how many, in your view, have more characteristics of debt than

6  they do of equity?

7  A.   I didn't count them.  If you want to go through them one

8  by one, we can.

9  Q.   Okay.  Number 1?

10 A.   I think if you look at number 1, there are several factors

11 you can look at.  One is it does have a loan agreement, which

12 would be more like debt.  But then when you look at the holding

13 company in which it owes the money, it had a receivable from

14 GMAC Mortgage and it was forgiven for 2.5 billion dollars.

15      So in order for GMAC Residential Holding to pay back 3.3

16 billion dollars to ResCap, its major asset, 2.5 billion

17 dollars, was forgiven.  So that, to me, says it's the

18 likelihood of collectability or the view of ResCap looking at a

19 holding company and saying it has the wherewithal to pay that

20 back will be unlikely.  So to me, that one's more like equity

21 than debt, even though it has a loan agreement --

22 Q.   Okay.

23 A.   -- even though it had interest payments.  But that's just,

24 again, it's a characteristic.  It's not a finite conclusion.

25 Q.   How about number 2?

RESIDENTIAL CAPITAL, LLC, ET AL.                          53

1    A.    I think we talked about 2 earlier.  I look at 2 as there

2    would be no intention, aside from Ms. Westman's review of these

3    intercompany balances and saying they should be forgiven, I

4    lent you and all of your companies eight billion dollars, I

5    forgave it, and then I gave you two more -- you gave me two

6    billion dollars and you want the two billion back?  It's highly

7    unlikely.

8    Q.    So that's a collectability issue?

9    A.    I think it's multiple issues.  There is no agreement, I

10   don't believe, or if the agreement is, it's the reverse -- the

11   agreement is the reverse of what it was previously before it

12   was forgiven.

13   Q.    How about number 3?

14   A.    Just bear with me, a minute.  Number 3, again, would be,

15   it was on the list to be forgiven and for good reasons.

16   Homecomings Financial stopped operations in 2008.  It had lost

17   a significant amount of money.  And it was liquidating its

18   assets, and these are cash that was funneled back up to its

19   parent in order to, you know, repay -- it was liquidating.

20   There would be no need to push cash back to Homecomings.  It's

21   not operating.

22   Q.    You said it was scheduled to be forgiven and for good

23   reason.  What do you mean by that?

24   A.    Homecomings is a nonoperating entity.  It was being

25   dissolved.

1  Q.   You're not suggesting that intercompany payables and

2  receivables should be forgiven if there is not a good reason,

3  are you?

4  A.   No.

5  Q.   Okay.

6  A.   I'm sorry.

7  Q.   How about number 4?

8  A.   Again, this is between PATE, passive asset transactions.

9  This is a holding company that was created as part of one of

10  the financings, and it again was holding assets that were being

11  liquidated.  And as those assets were being liquidated the cash

12  would move back up to GMAC Mortgage.  It's a holding company.

13  It is just that, it is a passive asset transaction entity, that

14  held, I believe, foreign -- interests in foreign subsidiaries.

15  Q.   Do you see that claim number 4 has GMAC Mortgage owing

16  PATE approximately 700 million dollars?

17  A.   Yes.

18  Q.   Do you know if PATE has any creditors?

19  A.   I don't know off the top of my head.

20  Q.   Okay.  Do you know if the JSNs have an equity lien on

21  PATE?

22  A.   I don't know.

23  Q.   How about number 5?

24  A.   Executive Trust Services is actually one of the entities

25  that was profitable, but it was profitable because it charged

1  its parent and sister companies fees for servicing and

2  foreclosing on loans.  So it is basically cash that would go up

3  to GMAC Mortgage over a period of time.  And this, again, was

4  one that was identified to be forgiven.

5  Q.   Why was it identified to be forgiven?

6  A.   I don't know.  I'd have to look at -- I'm not sure if

7  there was rationale behind Ms. Westman's report.  I don't

8  recall this one off the top of my head as to why.

9  Q.   Okay.  How about number 6?

10 A.   Number 6, Rahi, yes, another special case.  This is

11 another one that was identified to be forgiven.  In the

12 analysis that Ms. Westman did, Rahi had significant losses from

13 2007 to 2011, of over 2.4 billion dollars.  And so the fact

14 that it was liquidating and providing -- giving -- as it was

15 liquidating sending cash back up to RFC -- again, this was

16 identified to be forgiven.

17 Q.   And it was identified to be forgiven because there was an

18 assessment that it didn't have the ability to repay, right?

19 A.   I'd assume so.  Again, I'd have to go back to Ms.

20 Westman's and verify.  I'm just reading my report here to make

21 sure there was nothing specifically.

22 Q.   Okay.  Number 7 we've talked about.  How about number 8?

23 A.   Number 8, Home Connects.  The fifty-four million

24 dollars -- fifty-five, excuse me, billion -- intercompany -- I

25 just want to go to my page, for a minutes.  Home Connects is

1   sort of more the mortgage servicing type businesses where it

2   sold insurance, sort of like PMI insurance, to the mortgagees.

3   It was -- ceased operation in 2008.  So the cash that's coming

4   in here is really related to sort of more legacy operations or

5   wind-down.  So it's sending the cash back up to its parent.  So

6   there, again, would be little need for the liquidating

7   subsidiary to have cash back to it.  And borrowers continue to

8   make premiums, and that's where the cash was coming from.

9   Q.   Um-hum.  So the business reason changed?

10  A.   Yes.  2008 they ceased doing business.  So it was

11  basically a liquidating company.

12  Q.   Okay.  But to be clear, there was a business rationale

13  there, right?

14  A.   Yes.

15  Q.   All right.  How about number 9?

16  A.   Number 9 is -- it sort of relates to the number 1 to a

17  certain degree, because as I mentioned earlier, Residential

18  Holdings, the holding company beneath ResCap, forgave 2.5

19  billion dollars from GMAC Mortgage.  But it still had an

20  obligation to ResCap.  And as part of that obligation, as we

21  talked about earlier, they were making interest payments to

22  ResCap.  So basically Res Holdings had no ability, had no cash.

23  So it would borrow cash from its subsidiary to pay the interest

24  to the parent.  I mean, it's just, again, the characteristics

25  there of the forgiveness, the inability of the holding company.

1  The fact that it was paying interest is, again, one of those
2  factors, but where did it get its money to pay the interest?
3  From a subsidiary that it just forgave 2.5 billion dollars
4  from.
5  Q.   And again, going back to your review of AFI accounting
6  policy 1057, those were all of the factors that you look at to
7  determine whether a related party is not an arm's-length
8  transaction, right?
9  A.   Yes, those are a summary of -- yes.
10  Q.   Okay.  In determining whether any or all of the
11  intercompany balances could be repaid, did you take into
12  consideration that the ResCap entities may have a source of
13  recovery by virtue of claims that they would hold against Ally
14  Bank or AFI?
15  A.   No.
16  Q.   Okay.
17          MR. COHEN:  I have no further questions.
18          THE COURT:  Thank you, Mr. Cohen.  Any other cross-
19  examination from anyone?
20          Redirect examination?
21          MR. KERR:  Your Honor, no redirect.
22          THE COURT:  Mr. Kaufman, you have some questions?
23          MR. KAUFMAN:  Phil Kaufman, Kramer Levin for the
24  committee.
25  REDIRECT EXAMINATION

1   BY MR. KAUFMAN:

2   Q.    Ms. Gutzeit, I just have a couple of questions regarding

3   an area that Mr. Cohen explored with you early this morning

4   regarding a situation where you have a balance and some of it

5   is forgiven and some of it is not.  Do you remember that?

6   A.    Yes.

7   Q.    Okay.  I believe you testified -- and correct me if I'm

8   wrong -- that where you have an entire balance that you believe

9   has the indicia of equity and only some of that balance is

10  forgiven, you said that GAAP would tend to require you to

11  record the forgiveness -- the forgiven portion as a capital

12  transaction.  Is that essentially right?

13  A.    Essentially.

14  Q.    Okay.

15          THE COURT:  I don't think that's quite what she said.

16          THE WITNESS:  Right, it's not exactly what I said.

17          THE COURT:  It's not what she said.

18  Q.    Okay, I meam, but, it would be appropriate under GAAP to

19  where there is indicia of equity for the forgiven portion to be

20  recorded as a capital transaction?

21          THE COURT:  Could you explain.

22  A.    Actually I think it's more of the related party-

23  transaction, guidance says if you have intercompany loans or

24  debt, or whatever it is, you forgive it in the equity section.

25  And the exception is if the loan is equivalent to a third-party

1   arm's-length transaction.

2   Q.   Okay, thank you.  Here is my question:  Does the fact --

3   where you have an entire balance that does have the indicia of

4   equity as opposed to debt, does the fact that only some is

5   forgiven and a balance still remains impact whether the

6   remaining balance still has the indicia of equity as opposed to

7   debt?

8            MR. COHEN:  Objection.

9            THE COURT:  What's your objection?  I understand what

10  he's asking about.  What is your objection to the question?

11           MR. COHEN:  I don't think it's a question.

12           THE COURT:  It was.  He's asked her to agree or

13  disagree.

14           MR. COHEN:  Okay.

15           THE COURT:  What is your objection?

16           MR. COHEN:  My objection is I don't think it's a

17  question, I think it's a statement, does the fact remain that

18  the other portion has --

19           THE WITNESS:  Maybe I could just answer it a different

20  way than it was asked.

21           THE COURT:  Let me ask you a question.

22           THE WITNESS:  Sure.

23           THE COURT:  So there are some transactions where there

24  was partial loan forgiveness and part remained as an

25  intercompany balance.  Are there circumstances in which you

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1   believe it's appropriate to recharacterize the remainder of the

2   transaction?

3          THE WITNESS:  It is for public companies.  Actually

4   there is SEC guidance for public companies in which you would

5   take that and reflect it in the equity section.  For non --

6   there is no guidance.  It's really at your -- there really is

7   no guidance.  For public companies there is very specific

8   guidance.  Intercompany needs to be reflected in the equity.

9   And to the extent that you think it is more like debt and its

10  equivalent to more of an arm's-length transaction, then SEC,

11  GAAP, AFI policy, all I'm saying is you need to disclose that

12  in your financial statements.  So the lack of disclosure in the

13  financial statements about the characteristics of the

14  intercompany receivable or payables really points the reader to

15  the fact that it's not arm's length and, you know, take that,

16  reader, and beware.

17         THE COURT:  Go ahead, Mr. Kaufman.

18         MR. KAUFMAN:  Okay.  Your Honor, that wasn't actually

19  my question.  I was asking --

20         THE COURT:  Then I didn't understand your question.

21  Q.   I was asking you a hypothetical --

22         THE COURT:  You just proved the point.

23         MR. KAUFMAN:  I'm sorry.

24  Q.   I was asking you essentially a hypothetical.

25  A.   Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                        61

1  Q.    Okay.

2  A.    Let's go down this GAAP.

3  Q.    Here is the hypothetical:  You've determined that an

4  entire intercompany balance has more indicia of equity than

5  debt, okay?

6  A.    Okay.

7  Q.    Let's say it's a billion dollars.  750 million of it is

8  forgiven.  And you've already determined that it has more

9  indicia of equity than debt.  And the 750 that's forgiven is

10  recorded as a capital transaction.  Okay.

11  A.    Got you so far.

12  Q.    Here's my question:  In that situation does the fact that

13  you haven't forgiven the whole balance at the same time change

14  your evaluation of whether the part that wasn't forgiven still

15  has more indicia of equity than debt?

16  A.    No.  It's still -- it's still an assessment of the

17  balances.

18         MR. KAUFMAN:  Thank you very much.

19         THE COURT:  Go ahead, Mr. Cohen.

20  RECROSS-EXAMINATION

21  BY MR. COHEN:

22  Q.    Ms. Gutzeit, do you agree that under GAAP, if a company

23  like ResCap came to the conclusion that what it was reporting

24  as payables and receivables were more properly classified as

25  capital transactions, they had an obligation to make that

RESIDENTIAL CAPITAL, LLC, ET AL.                    62

1  change?

2  A.    They had an obligation to assess it and make a

3  determination.  So if you look at their RFC, for example,

4  financial statements, there's discussion in there.  And even

5  the audit opinion talks about the fact that there is a lot of

6  related-party affiliate transactions.  So they may not have

7  recharacterized it, but even the auditors gave a warning to the

8  reader.  One warning is there's doubt that they'll go as a

9  going concern, and that was from 2008 and forward, all of the

10  subsidiaries had that --

11       THE COURT:  That's a going concern opinion.

12  A.    -- opinion.  And then it highlighted in the opinions that

13  there was a lot of intercompany transactions.

14  Q.    Okay.  But my question is a little bit different.  If the

15  company determined, let's use Mr. Kaufman's example, that there

16  was a billion-dollar payable and they decided to forgive 750

17  million because of a net worth requirement and they went

18  through the analysis and they got the formal approval.  Isn't

19  it true that under GAAP if they determined that the other 250

20  million was equity and not debt, they had an obligation under

21  GAAP to treat it as such?

22  A.    It's not quite that black and white.  I think they had --

23  they had an obligation to assess it and make a determination.

24  And I know there is, for example, a Barb Westman document in

25  here somewhere that you showed me during my deposition where

1   she says to the auditors, or an e-mail that supposedly went to

2   the auditors, that says, well, if need be ResCap, or whatever

3   entity, could potentially liquidate assets and satisfy the

4   obligation.

5        I mean, those are hypothetical scenarios.  And so yeah,

6   there is a possibility they could have, but it doesn't -- it's

7   not as black and white as saying I absolutely believe there is

8   no way you're going to pay this and there is absolutely --

9   there's no way I'm going to enforce that.  I hate to say this,

10  but it's somewhat of a judgment call.

11  Q.   And is it your understanding that the company's employees,

12  accounting officers, the CFO, Ms. Westman, the people who are

13  actually responsible for the books and records, were looking at

14  these transactions, the payables and receivables, applying

15  their judgment and determining whether they should continue to

16  be booked as payables and receivables and not capital

17  contributions?

18  A.   Yes, when they were -- certainly when they were doing

19  individual financial statements for the subsidiaries -- if we

20  use GMAC Mortgage and RFC as the example, because at the ResCap

21  level it eliminates it, it has no impact.

22  Q.   Okay, but at the subsidiary level --

23  A.   Yes, they should -- certainly at the times in which those

24  financial statements were issued.

25  Q.   They were doing it, they were making the judgment and they

RESIDENTIAL CAPITAL, LLC, ET AL.                          64

1  were complying with the GAAP guidance, correct?

2  A.    Yes.

3            MR. COHEN:  Thank you.

4            THE COURT:  Okay.Any further questions from anyone?

5            All right.  You're excused.  Thank you very much.

6            THE WITNESS:  Thank you.

7            THE COURT:  I've checked off every name on your list,

8  Mr. Kerr.

9            MR. KERR:  We're not done, Your Honor.  We have some

10  housekeeping to do.

11           THE COURT:  Okay.

12           MR. KERR:  Charles Kerr, on behalf of the debtors,

13  Your Honor.  We have no more witness, but we have for two of

14  our witnesses we had left in question about documents to go in.

15  Let me deal with Ms. Gutzeit first.  We had sent a list of, I

16  think, the exhibits we wanted to put in, and they were going to

17  look at them.  Let me just run them off.

18           THE COURT:  How many are you going to run off.

19           MR. KERR:  About 8 or 9.

20           THE COURT:  Okay.  Go ahead.

21           MR. KERR:  PX-587, PX-600, PX-608, PX-672 and PX-712.

22  And I don't believe there is any objections to those.

23           MR. COHEN:  There are none.

24           MR. KERR:  So --

25           THE COURT:  All right.  So Exhibits 587, 600, 608, 672

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1    and 712 are all in evidence.

2    (Exhibits regarding Ms. Gutziet's testimony were hereby

3    received into evidence as Plan Proponents' Exhibits 587, 600,

4    608, 672 and 712, as of this date.)

5            MR. KERR:  And then, Your Honor, there were three

6    additional exhibits that were in the binder and I'm now aware

7    that they were incomplete, and they were Exhibit PX-745, which

8    is FASB accounting standard 810 --

9            THE COURT:  I shouldn't have raised it because the

10   accounting standards are pretty voluminous.

11           MR. KERR:  I know that, Your Honor.  And so -- but I

12   need to complete my record.

13           THE COURT:  Go ahead.

14           MR. KERR:  So what I would propose doing, Your

15   Honor --

16           THE COURT:  Let me ask this.  What are the other

17   numbers that you --

18           MR. KERR:  Just PX-745, 747 and 749.

19           THE COURT:  Here is what I would ask you to do --

20   those are all the accounting standards?

21           MR. KERR:  Yes, Your Honor.

22           THE COURT:  Confer with Mr. Cohen.  I recognize that

23   they were excerpts of the accounting standards.  It may be that

24   you'll both agree that the excerpts are sufficient for purposes

25   of our record.  If Mr. Cohen wants the -- for completeness

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1    wants the entire document in, you can do it.  I don't know

2    whether you have a position on that now, Mr. Cohen or not.

3              MR. COHEN:  I'm sure we'll work it out.

4              THE COURT:  Okay?

5              MR. KERR:  We'll work it out, Your Honor.

6              THE COURT:  Subject to resolving the issue whether the

7    excerpt or the entire standards come in, do you have any

8    objections to the exhibit, Mr. Cohen.

9              MR. COHEN:  I don't.

10             THE COURT:  All right.  So I'm going to provisionally

11   admit it in evidence subject to you working out whether for

12   purposes of completeness you need to put in the whole

13   accounting standards or not.

14   (Accounting standards were hereby received into evidence as

15   Plan Proponents' Exhibit 745, 747 and 749, as of this date.)

16             THE COURT:  And as I understood from Ms. Gutzeit, she

17   went back to the Ally summary of the applicable standards and

18   the excerpts plus the Ally may be sufficient for purposes of

19   the record; but why don't the two of you work that out and

20   you'll just let me know, okay?

21             MR. COHEN:  It certainly won't be less, it may be more

22   --

23             THE COURT:  Yes.

24             MR. COHEN:  -- and would you just like us to

25   substitute what's in the record?

1          THE COURT:  Yes.

2          MR. COHEN:  We'll do that.

3          MR. KERR:  We'll do that with those same numbers, Your

4    Honor.

5          THE COURT:  It'll be the same numbers.  And it'll

6    be -- I have no problem with just the excerpt if the two of you

7    agree on it.

8          MR. COHEN:  Yeah, we'll talk about it.  I'm sure we'll

9    reach an agreement.

10         MR. KERR:  We will reach an agreement, Your Honor.

11   Okay.  Your Honor, the other set of exhibits that we had

12   offered or proposed to offer and then we held off, given to the

13   other side, were the exhibits that we were submitting with Ms.

14   Westman.  And that's a longer list.  We had sent that list to

15   Mr. Cohen last night and I'm not sure whether you have --

16         MR. COHEN:  We have no objection to the list you sent

17   us.

18         MR. KERR:  Okay, so --

19         THE COURT:  You're going to file the list on ECF, if

20   you haven't already.

21         MR. KERR:  Yes, we will file as a list the Westman

22   exhibits on ECF.

23         THE COURT:  All right.  Is that acceptable to you.

24         MR. COHEN:  That is acceptable.

25         THE COURT:  So the Westman exhibits will all be

1  admitted in evidence, they'll be listed on a document that will

2  be filed on ECF.  You'll just confirm with Mr. Cohen or his

3  colleagues that he agrees the list is the correct list.

4  (Exhibits relating to Ms. Westman's testimony were hereby

5  received into evidence as Plan Proponents' Exhibits, as of this

6  date.)

7           MR. COHEN:  Right.

8           THE COURT:  Okay, and it will save you having to read

9  numbers --

10          MR. KERR:  And make mistakes.

11          THE COURT:  Okay.

12          MR. KERR:  Okay.  Your Honor, two other items or a

13  couple of other items.  There was --

14          MR. COHEN:  Actually we have exhibits to move in also.

15          THE COURT:  Okay, well, Mr. --

16          MR. KERR:  Why don't I finish these and maybe you

17  can --

18          THE COURT:  Let Mr. Kerr finish.

19          MR. KERR:  Two other -- there was a stipulation

20  prepared between the debtors, Ally Financial Bank and Wachovia,

21  and Ally and Ally Financial Bank and Wachovia, and the

22  committee, to try and resolve some of the potential facts

23  involving the Wachovia objection.  And there is a stipulated

24  facts that have been submitted under ECF 5912.  And I have a

25  copy here, Your Honor, if you'd like to see it.

1          THE COURT:  I would like to see it.  Has Mr. Cohen

2    seen it?  He may be agnostic to it, but --

3          MR. COHEN:  I did not.

4          MR. KERR:  Your Honor, I'll tell you what -- and I

5    apologize, this is my fault -- Mr. Cohen hadn't seen it yet.

6    I'll have Mr. Cohen has seen it, and we'll raise it again.

7          THE COURT:  All right.

8          MR. KERR:  All this is trying to do, I believe, is

9    through some stipulated facts, put these deposit agreements

10   that have been at issue with Wachovia.  But why don't I have

11   Mr. Cohen look at it and then we'll decide.  Okay?

12         THE COURT:  Okay.

13         MR. KERR:  Thank you.  And we have a couple of more

14   issues, just short issues, Your Honor.

15         THE COURT:  Sure.

16         MR. LAWRENCE:  Yes, Your Honor.  Alex Lawrence, for

17   the debtors.  Yesterday when I was moving in an exhibit and it

18   was the exhibit that was agreed to, I misspoke and gave the

19   wrong number.  It was 620-1.  I referred to it as 614-2.  I

20   just wanted to correct that on the record.  And there was no

21   objection to the document.

22         THE COURT:  All right.  Is that correct, Mr. Cohen?

23         MR. COHEN:  Yes.

24         THE COURT:  All right.  So Exhibit 620-1 is in

25   evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                     70

1  (620-1 was hereby received into evidence as Plan Proponents'

2  Exhibit Agreement, as of this date.)

3          THE COURT:  And is there a 614-2?

4          MR. LAWRENCE:  No, I completely misspoke, Your Honor.

5          THE COURT:  Okay.  So if I said 614-2 is in evidence,

6  it's not, it doesn't exist?

7          MR. LAWRENCE:  It does not exist.

8          THE COURT:  Okay.

9          MR. LAWRENCE:  Thank you, Your Honor.

10          THE COURT:  All right.  Anything else from the

11  proponents.

12          MR. KERR:  Charles Kerr for the debtors.  We have

13  nothing else, Your Honor.

14          THE COURT:  All right.  Mr. Cohen?

15          MR. COHEN:  We have a couple of documents that we used

16  with Ms. Gutzeit --

17          THE COURT:  Right.

18          MR. COHEN:  -- that we would like admitted into

19  evidence.  And that would be DX-BCV, DX-AVF and DX-AYI.

20          MR. KERR:  Can I just have one second, Your Honor?

21          THE COURT:  Yes.

22          MR. KERR:  One second, Your Honor.

23          THE COURT:  Mr. Cohen, because I think I misheard, let

24  me just make sure I got the right numbers -- letters written

25  down.  BCV, AVF and AYI?

1          MR. COHEN:  Correct.

2          THE COURT:  Okay.

3      (Pause)

4          MR. KERR:  Charles Kerr for the debtors.  We have no

5  objection.

6          THE COURT:  All right.  So Exhibits BCV, AVF and AYI

7  are in evidence.

8  (Exhibits re Ms. Gutzeit ere hereby received into evidence as

9  Defendants' Exhibits BCV, AVF and AYI, as of this date.)

10          MR. COHEN:  Thank you, Your Honor.

11          THE COURT:  Do the proponents rest in both phase 2 of

12  the adversary proceedings and in support of plan confirmation?

13          MR. KERR:  One second, Your Honor.

14          Your Honor, the -- this is Charles Kerr on behalf of

15  the debtors.  The plan proponents rest both with respect to

16  plan confirmation and phase 2.

17          THE COURT:  Okay.

18          MR. KAUFMAN:  And the committee rests as well, Your

19  Honor.

20          THE COURT:  Well, I counted you in the plan

21  proponents.

22          MR. KAUFMAN:  Well, I think Mr. Kerr just said on

23  behalf of the debtors, that's why I added that.

24          THE COURT:  Okay.  All right.  That's fine.  All

25  right.  So the plan proponents and plaintiffs in the adversary

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1   proceedings rest.  Let's take our morning recess, fifteen
2   minutes, and you're calling a witness who was an AFI person and
3   you're doing a direct examination?
4           MR. COHEN:  Correct.  I think Mr. Schaffer, though,
5   would like to take his witness out of order because of
6   scheduling, and that's fine with us.
7           THE COURT:  That's fine.  I have no problem with that.
8           MR. SCHAFFER:  Thank you, Your Honor.
9           MR. COHEN:  Thank you, Your Honor.
10          THE COURT:  Fifteen-minute recess.
11      (Recess from 10:20 a.m. until 10:40 a.m.)
12          THE COURT:  Please be seated.
13          Mr. Kerr?
14          MR. KERR:  Charles Kerr, on behalf of the debtors.
15  Two additional housekeeping items, Your Honor.  Mr. Cohen has
16  had an opportunity to look at the stipulated set of facts,
17  which was filed as ECF 5912 regarding Wachovia.  Can I bring
18  this up for Your Honor?
19          THE COURT:  Yes, please.  Thank you.
20          MR. KERR:  Your Honor, we would just ask that once
21  you've had an opportunity to review it, if it's approved, we
22  could just get it so ordered as well.
23          THE COURT:  Let me look at it, quickly.
24      (Pause)
25          THE COURT:  Well, I've reviewed the stipulated facts.

1    I don't think there is anything for me to approve, frankly, nor

2    is there any place for me to do that.  I appreciate the parties

3    stipulating to the facts and will consider them.  A lot of it

4    is reservation of rights, but we'll consider such facts as are

5    included in the stipulation.  The Court will consider it as

6    part of the evidence.

7              And Mr. Cohen, I take it, you have no objection?

8              MR. COHEN:  No objection, Your Honor.

9              THE COURT:  Does that resolve your --

10             MR. KERR:  It does, Your Honor.

11             THE COURT:  Okay.

12             MR. KERR:  One other housekeeping issue.  Your Honor,

13   the parties consistent with the scheduling order, had submitted

14   a list of deposition designations and counter-designations.

15   There's still some objections we're still trying to work

16   through.  I've spoken to Mr. Cohen.  We'd like to have a couple

17   of more days just to try to get those resolved and then submit

18   a comprehensive resolved set, hopefull.

19             THE COURT:  Mr. Cohen.

20             MR. COHEN:  Your Honor, it was my understanding that

21   that was consistent with what happened in phase 1.

22             THE COURT:  Absolutely.  I think what we'll do is

23   when, if you want to talk about -- when all the evidence is

24   done and everybody has rested, we can talk about what the

25   schedule is going to be for people will submit things, but I

1    fully anticipated that you will iron out any disagreements,

2    hopefully resolve as many objections as you can on depositions

3    designations, counter-designations, et cetera.  And that's how

4    we will proceed.

5          MR. COHEN:  We'll certainly work as hard as we can.

6    We've gone a good job on documents.

7          THE COURT:  No, I don't -- I really -- this is the

8    easy part, I think.  Whatever I have to rule on, I'll rule on.

9    But I think you'll resolve it.  I've said this before, I mean

10   to the extent you don't resolve deposition -- objections to

11   deposition designations and counter-designations, I'll rule.

12   But I've yet to see where it makes any difference.  I mean, I

13   just --

14         MR. COHEN:  Understood.

15         THE COURT:  -- frankly, I just --

16         MR. KERR:  We'll work hard to make sure it doesn't

17   become an issue.

18         MR. COHEN:  Exactly.

19         THE COURT:  And we can talk about what the appropriate

20   schedule will be when we get done.

21         MR. COHEN:  Thank you.

22         MR. KERR:  One final thing, Your Honor.  You had made

23   a request yesterday that -- for the plan proponents to put

24   together a set of all of the directs in one place.  We have put

25   together a binder which has all of the direct testimony.

RESIDENTIAL CAPITAL, LLC, ET AL.                    75

1            THE COURT:  Just the direct testimony?

2            MR. KERR:  Just direct testimony.  And, Your Honor, I

3    have to be clear that some of the direct testimony had

4    voluminous attachments; we have not included that at all.

5            THE COURT:  Fine.

6            MR. KERR:  This is just direct testimony.

7            THE COURT:  I can find all of that stuff, easily

8    enough.

9            MR. KERR:  Right.  So we have those binders and we'll

10   bring one up for you and your clerks.

11           THE COURT:  One binder?

12           MR. KERR:  We have one for you and two for your

13   clerks.

14           THE COURT:  No, I mean only  -- it's all in one

15   binder?

16           MR. KERR:  It's all in one binder, Your Honor.

17           THE COURT:  I like that.  And Mr. Cohen, you can do

18   the same thing for me.

19           MR. COHEN:  We will.

20           THE COURT:  You only have three witnesses, and you one

21   is testifying live, so there will only be two of them.

22           MR. COHEN:  We will.  We will give you a very thin

23   binder.

24           THE COURT:  Okay.  All right, Mr. Schaffer.

25           MR. SCHAFFER:  Thank you, Your Honor.  Eric Schaffer,

1   Reed Smith, for Wells Fargo as collateral agent.  Your Honor,

2   our witness in connection with Wells Fargo's objection to the

3   plan proposed by the plan proponents and the phase 2 issues is

4   Michael Pinzon.  If Mr. Pinzon were called to testify, he would

5   testify as to what is in his written direct testimony.

6           We are therefore offering his written direct testimony

7   in factual support of our plan objection in connection with the

8   consolidated proceedings.

9           THE COURT:  Is it on ECF?

10          MR. SCHAFFER:  It is, Your Honor.

11          THE COURT:  Can you give me the number?

12          MR. SCHAFFER:  The direct testimony appears in three

13  places.  It is docket entry --

14          THE COURT:  I only need one of them.

15          MR. SCHAFFER:  Docket 203 in Committee v. UMB.  That's

16  adversary --

17          THE COURT:  Let me just --is it in the main --  do you

18  have it filed in the main case.

19          MR. SCHAFFER:  It is in the main case as docket

20  entry --

21          THE COURT:  Just give me that .

22          MR. SCHAFFER:  -- 5921.

23          THE COURT:  Okay, that's the only one I need.

24          Is there -- yes, go ahead.

25          MR. SCHAFFER:  So we would offer his direct testimony

RESIDENTIAL CAPITAL, LLC, ET AL.                        77

1  into evidence.

2          THE COURT:  All right.  Any objections?

3          MR. COHEN:  No objection.

4          MS. FOUDY:  For the record, Theresa Foudy from Curtis,

5  Mallet-Prevost, Colt & Mosle.  No objection from the debtors.

6          THE COURT:  All right.  The direct testimony of

7  Michael Pinzon which appears on ECF in the main case as ECF

8  docket number 5921 is in evidence.

9  (Direct testimony of Michael Pinzon was hereby received into

10  evidence as Wells Fargo's Exhibit, as of this date.)

11          MR. SCHAFFER:  Your Honor, we also have twenty-six

12  exhibits, but our binder is perhaps one of the thinner ones.

13  Twenty-five of them are proofs of claim.  They were marked on

14  the trial exhibit list as exhibits DX-CAA through DX-CAY.  The

15  twenty-sixth exhibit is our plan objection, which was filed at

16  docket entry 5410 in the main case and it's marked in the trial

17  exhibit list as Exhibit DX-CAZ.

18          We have provided the Court previously with binders,

19  and we have extra copies.  If we can hand them up now to the

20  Court and to your clerks.

21          THE COURT:  Let me just ask, Ms. Foudy, do you have

22  any objection to the exhibits.  Proofs of claims are not coming

23  in for the truth of the matter asserted.

24          MR. SCHAFFER:  They are not, Your Honor.  It's for the

25  limited purpose.

1          MS. FOUDY:  Neither the objection either.  So all of

2     them for just their independent legal significance and not for

3     the truth.

4          THE COURT:  All right.  But what you need to do, Mr.

5     Schaffer, is to spare me from having to read twenty-five

6     exhibit numbers for the proofs of claims.  Follow the

7     procedures we've otherwise followed and file on ECF a single

8     document that lists each of the exhibits that have been

9     admitted in evidence.

10     (Exhibits regarding Mr. Pinzon's testimony was hereby received

11     into evidence as Wells Fargo's Exhibit DX-CAA through DX-CAZ,

12     as of this date.)

13          MR. SCHAFFER:  We'll do that, Your Honor.  And --

14          THE COURT:  And just check with Ms. Foudy to and make

15          MR. SCHAFFER:  Of course.

16          THE COURT:  -- sure she's satisfied.  Okay?

17          MR. SCHAFFER:  and with that, we would offer the

18     exhibits into evidence with the proofs of claim, of course,

19     coming in for the limited purpose.

20          THE COURT:  Well, so is the pleading that you filed.

21          MR. SCHAFFER:  Yes, Your Honor.

22          THE COURT:  Okay.  So exhibits CAA through CAY, and

23     they'll be specifically listed on a separate pleading --

24          MR. SCHAFFER: Yes.

25          THE COURT:  --  and CAZ, which is ECF 5410, will be

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1  admitted in evidence all for the limited purpose.  Okay?

2            MR. SCHAFFER:  Thank you, Your Honor.

3            THE COURT:  All right.  Are you going to cross-

4  examine, Ms. Foudy?

5            MS. FOUDY:  Yes, Your Honor.

6            THE COURT:  All right, may we have the witness come

7  up?  And do we have a cross-examination binder?

8            UNIDENTIFIED SPEAKER:  May I approach?

9            THE COURT:  Yeah, absolutely.  Come on up.

10           This is Mr. Schaffer's binder.  Do you have a separate

11 binder for cross-examination materials, or are you just going

12 to use what's in --

13           MS. FOUDY:  I'm just going to use the witness binder

14 that Mr. Schafter prepared.

15           THE COURT:  That's fine.  Okay.

16           You have to stand and be sworn.  Just raise your right

17 hand.

18      (Witness sworn)

19           THE COURT:  Please have a seat.

20           MS. FOUDY:  Again, for the record, Theresa Foudy of

21 Curtis, Mallet-Prevost, Colt & Mosle, LLP, conflicts counsel

22 for the debtors.

23 CROSS-EXAMINATION

24 BY MS. FOUDY:

25 Q.   Good morning.

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1   A.   Good morning.

2   Q.   Now, Wells Fargo filed a plan objection, correct?

3   A.   Yes.

4   Q.   And that plan objection is in the binder before you under

5   the last tab that's marked DX-C as in cat, A as in alpha, Z as

6   in zoo, that is correct?

7   A.   Yes.

8   Q.   And your direct witness testimony is in the front folder

9   of your binder, is that correct?

10  A.   That is correct.

11  Q.   And you submitted that testimony in support of Wells

12  Fargo's objection to the plan, correct?

13  A.   Yes.

14  Q.   And is it fair to say that Wells Fargo's objection to the

15  plan is that to the extent the third-party releases release any

16  claim by Wells Fargo as collateral agent against the debtors'

17  former or current officers, directors, or counsel, Wells Fargo

18  objects to the plan, correct?

19  A.   Yes.

20  Q.   But Wells Fargo has not actually asserted any claims

21  against the debtors' current or former officers, directors, or

22  counsel, has it?

23  A.   Could you rephrase that?  I don't understand.

24  Q.   Well, has Wells Fargo filed a lawsuit against any of the

25  debtors' current or former officers, directors' or counsel?

RESIDENTIAL CAPITAL, LLC, ET AL.                    81

1    A.    No.

2    Q.    Okay.  And has Wells Fargo --

3              MS. FOUDY:  Actually, strike that.

4    Q.    Is it fair to say that Wells Fargo doesn't plan to file a

5    lawsuit against the debtors' current or former directors,

6    officers, or counsel unless the JSNs file lawsuit against Wells

7    Fargo over the release of the JSN collateral?

8    A.    Yes.

9    Q.    And you believe that Wells Fargo's release of the JSN

10   collateral was wholly proper, correct?

11   A.    Yes.

12   Q.    And nonetheless, you assert in your direct testimony that

13   there is a "real and credible threat that claims may be

14   asserted against Wells Fargo" in connection with that wholly

15   proper release of collateral, correct?

16   A.    Yes.

17   Q.    And who is it that you apprehend is going to be bring

18   claims against Wells Fargo based on these wholly proper

19   releases of collateral?

20   A.    The JSNs.

21   Q.    And is that the indenture trustee for the JSNs?

22   A.    On behalf of the JSNs, yeah.

23   Q.    Okay.  And do you apprehend that the individual

24   noteholders as well are going to bring a claim against Wells

25   Fargo over the release of the collateral?

RESIDENTIAL CAPITAL, LLC, ET AL.                    82

1   A.   The trustee acts on behalf of the note holders.  I don't

2   know specifically.

3   Q.   And you anticipate such -- so basically you're

4   anticipating that's the indenture trustee who would be bringing

5   his claims against Wells Fargo, correct?

6   A.   Yes.

7   Q.   And you anticipate these claims even though Wells Fargo's

8   role as collateral agent is strictly ministerial, correct?

9   A.   Yes.

10  Q.   And Wells Fargo's role and responsibilities with respect

11  to the JSNs' collateral as collateral agent is set forth in

12  unequivocal language in the governing agreements, correct?

13  A.   Yes.

14  Q.   And those agreements bind the indenture trustee, correct?

15  A.   Yes.

16  Q.   And the holders of the junior secured notes are bound to

17  those agreements through the indenture trustee, correct?

18  A.   Yes.

19  Q.   And it is correct, isn't it, that the governing agreements

20  explicitly authorized Wells Fargo to release the JSN

21  collateral, correct?

22  A.   Yes.

23  Q.   And the governing agreements and specifically the JSN

24  security agreement authorized Wells Fargo to rely conclusively

25  on officers' certificates and opinions of counsel delivered to

RESIDENTIAL CAPITAL, LLC, ET AL.                    83

1   the collateral agent in releasing the collateral, correct?

2   A.    Yes.

3   Q.    And did Wells Fargo ever release JSN collateral without

4   having received an officer's certificate and opinion of

5   counsel?

6   A.    No, not that I'm aware of.

7   Q.    And with respect to the JSN collateral, has anyone even

8   alleged that Wells Fargo released collateral without having

9   first received an officer's certificate and opinion of counsel?

10  A.    Not that I'm aware of.

11  Q.    And you understand, right, that both under the JSN

12  security agreement and under the intercreditor agreement Wells

13  Fargo has no liability for any action or any inaction except to

14  the extent it was the result of gross negligence or intentional

15  misconduct, correct?

16  A.    Again, please?

17  Q.    You understand that under both the JSN security agreement

18  and the intercreditor agreement, that Wells Fargo has no

19  liability for any action or any inaction except to the extent

20  that it constitutes gross negligence or willful misconduct,

21  correct?

22  A.    Yes.

23  Q.    And with respect to the JSN collateral, has anyone even

24  suggested that Wells Fargo engaged in gross negligence or

25  willful misconduct?

RESIDENTIAL CAPITAL, LLC, ET AL.                        84

1  A.    Not that I'm aware of.

2  Q.    So is it fair to say, then, that in light of the facts

3  here and the contractual provisions that limit Wells Fargo's

4  role in the scope of any liability, that you believe that any

5  lawsuit against Wells Fargo for releasing the JSN collateral

6  would be frivolous, right?

7           MR. SCHAFFER:  Objection insofar as it asks for a

8  legal conclusion.

9           THE COURT:  Sustained.

10 Q.    But nonetheless, you state that there is a real and

11 credible threat that such a lawsuit will be brought --

12          MS. FOUDY:  Strike that.

13 Q.    But nonetheless, you believe that there is a real and

14 credible threat that a lawsuit would be brought against Wells

15 Fargo as a result of the release of the JSN collateral,

16 correct?

17 A.    Yes.

18 Q.    And one of the bases for your assertion that such a real

19 and credible threat exists is that the debtors, mea culpa,

20 stated in a brief on a motion to dismiss that if the releases

21 were improper that the JSNs should look to whatever remedies

22 they might have against the collateral agent, correct?

23 A.    That's correct.

24 Q.    And in addition the Court made a similar comment, correct?

25 A.    That is correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    85

1  Q.   But the Court also specified, right, that the Court was
2  not expressing an opinion on the merits of any such potential
3  action, correct?
4           THE COURT:  I'm not going to let you go into that.  I
5  mean I said whatever I said, and he's not testifying here as a
6  lawyer.  Let's move on in your examination.
7  Q.   So has either the indenture trustee or the noteholders
8  filed a lawsuit against Wells Fargo.
9  A.   No, they haven't, that I'm aware of.
10 Q.   And has the indenture trustee made a written demand to
11 Wells Fargo for compensation?
12 A.   I don't know.
13 Q.   Not to your knowledge?
14 A.   Not to my knowledge.
15 Q.   And the debtors are contractually bound to indemnify Wells
16 Fargo with respect to any claims brought against Wells Fargo in
17 its role as a collateral agent, correct?
18 A.   Yes.
19 Q.   And that's a secured claim, correct?
20 A.   Yes.
21 Q.   And the plan does not extinguish that claim, correct?
22 A.   Well, once the plan is confirmed and there's liquidation,
23 then at that point then we wouldn't have  --
24           THE COURT:  This is really not an appropriate
25 examination.  You want to represent on the record that the

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

1   proposed plan does not extinguish a secured claim of Wells

2   Fargo as collateral agent a secured claim?  I mean that's just

3   not appropriate examination of this -- cross-examination of the

4   witness.

5           MS. FOUDY:  Okay.  I'll move on, Your Honor.

6           MR. SCHAFFER:  We could certain stipulate --

7           THE COURT:  I mean, I'd like to know whether the plan

8   proponents stipulate that under the proposed plan, if

9   confirmed, Wells Fargo's claim for indemnification is not

10  extinguished and would be treated as a secured claim.  That's

11  the import of your question.  Is that accurate?

12          That's what I understood the question to be asking a

13  witness and it doesn't seem to be appropriate to be asking the

14  witness that question.

15      (Pause)

16          MS. FOUDY:  Yes, to the extent the claim is allowed,

17  it's a secured claim that is not extinguished by the plan.

18          THE COURT:  We had some discussion the other day, it

19  might have to be estimated.

20          MS. FOUDY:  Exactly, yes.  It's subject to an

21  estimation proceeding --

22          THE COURT:  It's not going to survive forever.  But if

23  it's an allowed claim, and it may be necessary to estimate it,

24  but you're agreeing on behalf of the plan proponents that any

25  allowed claim by Wells Fargo is a secured claim -- would be a

1    secured claim, not extinguished by the plan.  Is that a fair

2    statement?

3              MS. FOUDY:  If it's allowed and not estimated at zero,

4    yes, it's a secured claim that is not extinguished by the plan.

5              THE COURT:  Okay.  Mr. Lee, do you agree with that?

6    Mr. Zide?  I just want some clarity on this point.

7              MR. LEE:  Your Honor, the answer to that question is

8    we are going to file an estimation motion prior to the

9    effective date and the Court will determine whether or not it

10   is an allowed claim, not an allowed claim, secured claim, not a

11   secured claim.

12             THE COURT:  If the Court determines and it becomes

13   final that they have an allowed claim for whatever the amount,

14   you agree it's a secured claim.

15             MR. ZIDE:  Your Honor, if the Courd --

16             THE COURT:  You have to identify yourself for the

17   record.

18             MR. ZIDE:  Stephen Zide from Kramer Levin on behalf of

19   the committee.  If the Court determines that they have an

20   allowed secured claim, they have an allowed secured claim

21   that's not extinguished under the plan, and they'll get a

22   recovery treated as a secured claim under the plan..  To the

23   extent Your Honor determines they have a pre-petition or an

24   unsecured claim, they'll get an unsecured claim.

25             THE COURT:  Well, Ms. Foudy asked a question about the

1   premise of which was they had a secured claim.  I'm not forcing

2   you -- I just want to know -- I mean it's not fair to ask this

3   of a witness, you're asking him for a legal conclusion about

4   what the effect of a proof of claim is.

5          Ms. Foudy's question suggested that they'd have a

6   secured claim.  I'm not forcing you into saying what it is, but

7   I do want to know what the position of the plan proponents, if

8   Wells Fargo has an allowed claim, whether it's secured,

9   unsecured, what your position is, and then we can move on from

10  there.

11         Mr. Eckstein:

12         MR. ECKSTEIN:  Your Honor, Kenneth Eckstein.  I think

13  to answer Your Honor's question, I don't think it should be

14  that complicated.  If there is going to apparently need to be

15  another hearing --

16         THE COURT:  An estimation proceeding.

17         MR. ECKSTEIN:  -- and estimation proceeding where

18  we're going to ask the Court to disallow the claim and treat it

19  at zero.

20         THE COURT:  All right.  And --

21         MR. ECKSTEIN:  And if Your Honor finds that it has a

22  value, that claim will be get paid, reserved essentially.

23         THE COURT:  Be treated as a secured claim or not?

24         MR. ECKSTEIN:  I don't think it'll matter, Your Honor.

25  Because I think it's going to get treat -- whether it's an

1    unsecured claim it will get paid in full, or if it's going to

2    be a secured claim it's going to get paid in full.

3             THE COURT:  All right.

4             MR. ECKSTEIN:  But either way, if Your Honor finds

5    that the claim has value, I believe the plan will provide for

6    it to be paid.

7             THE COURT:  All right. Just so we're clear, if the

8    Court allows the claim in a specific amount other than zero,

9    the plan proponents represent that the Wells Fargo claim will

10   be paid in full?

11            MR. ECKSTEIN:  I believe the answer is yes, although

12   the only question -- I want to just confirm with my colleagues

13   that in the event the Court determines that it is an unsecured

14   claim, we have to -- I want to confirm how the unsecured claim

15   will be treated.  It may be that it will be treated as a claim

16   that will have a claim against each of the debtors.  And so I

17   just want to confirm that one question.

18            THE COURT:  Okay, all right.

19            MR. ECKSTEIN:  But subject to that, it will be treated

20   under the plan for its full rights.

21            THE COURT:  I didn't mean to get diverted into this.

22   It was Ms. Foudy's question --

23            MR. ECKSTEIN:  I understand.

24            THE COURT:  -- that set me off on this inquiry.  Ms.

25   Foudy, go ahead with your examination.

1          MR. ECKSTEIN:  Phase 4 maybe, it will be.

2          THE COURT:  Oh, God, no.

3          MS. FOUDY:  I apologize for having started all that,

4    Your Honor.

5    BY MS. FOUDY:

6    Q.    So despite all the contractual protections and contractual

7    indemnification rights that Wells Fargo had as a collateral

8    agent, you believe that Wells Fargo needs to maintain claims

9    against the debtors' current and officers and directors to

10   protect itself from this lawsuit that you anticipate may be

11   filed, correct?

12   A.    That's right.

13   Q.    Okay.  And, in fact, in paragraph 35 of your testimony,

14   you aver that Wells Fargo holds direct and independent claims

15   against the officers and counsel who delivered the officer's

16   certificates and opinions of counsel, correct?

17   A.    Yes.

18   Q.    And you understand, though, right, that the directors and

19   officers do not have any contractual obligation to indemnify

20   Wells Fargo, correct?

21   A.    But we're relying upon the -- when we did releases, we

22   relied upon those officers' certificates and opinions prior to

23   making -- effecting a release.

24   Q.    And --

25          THE COURT:  That wasn't the question.  You agree that

RESIDENTIAL CAPITAL, LLC, ET AL.                    91

1   you don't have any contractual relationship with the officers

2   and directors?  I know you said you relied on certificates, but

3   do you agree that you do not have a direct contractual

4   relationship with the officers and directors?

5          THE WITNESS:  That's right.

6   Q.   And would you also agree that you don't have a direct

7   contractual relationship with the debtors' counsel, correct?

8   A.   That's correct.

9   Q.   So you would not be able to bring a breach of contract --

10  you have no -- so the officers' counsel has no contractual

11  indemnification obligations to you either, correct?

12  A.   Repeat that again, please?

13  Q.   So the officer -- I'm sorry -- the debtors' counsel has no

14  contractual obligation to indemnify Wells Fargo either,

15  correct?

16         MR. SCHAFFER:  Objection.

17         THE COURT:  Sustained.

18  Q.   So what are the direct and independent claims to which you

19  refer in paragraph 35 of your testimony?

20     (Pause)

21  A.   Well, we're the first party collateral agent.  So we would

22  have to have, you know, acting in that capacity, right to

23  indemnification.

24  Q.   And from whom?

25  A.   From the estate.

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1  Q.   And not from the directors and officers of the estate,

2  correct?

3          MR. SCHAFFER:  Your Honor, I'm going to object.  There

4  are a lot of questions asking for --

5          THE COURT:  Sustained.  You're really asking for legal

6  conclusions, okay, which is not appropriate.

7  Q.   So are there any other direct and independent claims that

8  you are referring to in your testimony at paragraph 35?

9          THE COURT:  You're not a lawyer, are you, Mr. Pinzon?

10          THE WITNESS:  No.

11          THE COURT:  I think Ms. Foudy's question is because of

12  paragraph 35, you say that the collateral agent holds direct

13  independent claims, she's entitled to inquire when you made

14  that statement what direct and independent claims you're

15  referring to.  Do you know?

16      (Pause)

17          THE WITNESS:  Well, those officers were officers of

18  the debtor.  So it would be against the debtor.

19          MS. FOUDY:  All right.  Thank you.  No further

20  questions, Your Honor.

21          THE COURT:  Okay.  Any redirect?  First off, does

22  anybody else have any questions before Mr. Schaffer gets up?

23          Okay.  Go ahead, Mr. Schaffer.

24  REDIRECT EXAMINATION

25  BY MR. SCHAFFER:

RESIDENTIAL CAPITAL, LLC, ET AL.                                  93

1   Q.   Mr. Pinzon, in paragraph 35 you state that the collateral

2   agent was entitled to and did rely conclusively on the various

3   documents, certificates, opinions; is that correct?

4   A.   Yes, that's correct.

5           MR. SCHAFFER:  Nothing more.

6           THE COURT:  Okay.  You're excused.  Can I see Mr.

7   Schaffer and Mr. Lee and Mr. Eckstein up at the bench.  This is

8   off the record.

9       (Off the record sidebar discussion)

10          MR. COHEN:  Your Honor, the JSNs call William Marx.

11          THE COURT:  Mr. Marx, if you'd come up to the witness

12  stand and be sworn.

13      (Witness sworn)

14          THE COURT:  Please have a seat.  Thank you very much.

15          THE WITNESS:  Thank you.

16  DIRECT EXAMINATION

17  BY MR. COHEN:

18  Q.   Good morning, Mr. Marx.  We're passing out some binders.

19  A.   Good morning.

20          THE COURT:  Thank you.

21          Mr. Marx, you hold the distinction of being the only

22  witness in this case who hasn't -- who we haven't had a written

23  direct testimony.  So for better or worse.  Go ahead, Mr.

24  Cohen.

25  Q.   Mr. Marx, you're current employer is Ally Financial, Inc.?

RESIDENTIAL CAPITAL, LLC, ET AL.                    94

1  A.   Correct.

2  Q.   And you've held the position of executive tax director of

3  operations at Ally Financial, Inc. since 2006, is that right?

4  A.   Yes.

5  Q.   Among your responsibilities as the executive director of

6  tax operations at Ally Financial, Inc., you were responsible

7  for negotiating a tax allocation agreement with ResCap in or

8  about the fall of 2009, is that right?

9  A.   Yes.  I participated in that negotiation.

10  Q.   From the Ally Financial, Inc. side of the negotiation, who

11  took the lead role?

12  A.   I took the lead role.

13  Q.   From the Ally Financial, Inc. side who took the lead in

14  drafting?

15  A.   I did.

16  Q.   In connection with the negotiations of the tax allocation

17  agreement that was being considered in the fall of 2009, who as

18  between AFI and ResCap took the first crack at drafting that

19  agreement?

20  A.   AFI.  AFI tax; myself.

21  Q.   All right.  And when you drafted that agreement, did you

22  draft the agreement in a manner consistent with other tax

23  allocation agreements that AFI had with affiliates?

24  A.   Yes.

25  Q.   With respect to tax attributes -- why don't we go to a

1   document.  If you could turn in your binder to AQV, tab AQV.

2   Let me know when you're there and then I'll direct to you a

3   specific page number.

4   A.    Did you say B or V?

5   Q.    V, Victor.

6   A.    I am there.

7   Q.    Okay.  I'd like you to turn to the document that has the

8   Bates number RC-40016379.  It says "Exhibit A" at the top.  And

9   this agreement goes through RC-40016384.

10  A.    I'm sorry, the last four digits were 6374?

11  Q.    379, was the first page, and --

12  A.    Okay, so this is --

13  Q.    -- 384.

14  A.    Yes, I'm there.

15  Q.    Do you recognize this document?

16  A.    Yes.

17  Q.    What is this document?

18  A.    This is the draft agreement that was initially proposed in

19  I believe, I don't know, December of '09.

20  Q.    And when you say initially proposed, you mean you

21  initially proposed it, right?

22  A.    Yes.  This was the draft that was put out there for

23  discussion.

24  Q.    All right.  Would you look at -- going back a couple of

25  pages to the page that ends with 374.  It's a memo that says

1    "GMAC ResCap memorandum", dated August 6, 2010?

2    A.    I'm there.

3    Q.    Do you see that you are listed as one of the senders of

4    this document?

5    A.    I do.

6    Q.    Along with Mr. Young?

7    A.    Yes.

8    Q.    And Ms. Hamzehpour?

9    A.    Yes.

10   Q.    And the recipients of this memo were the Board of

11   Directors of Residential Capital, LLC?

12   A.    Yes.

13   Q.    And the subject of the memo is agreements for allocation

14   of taxes?

15   A.    Yes.

16   Q.    And what we were just looking at, Exhibit A, is the

17   agreement that you are presenting to ResCap's board along with

18   others, right?

19   A.    I believe that's correct, yes.

20   Q.    So in your view, was Exhibit A, as it's attached to this

21   cover memo, a fully negotiated document?

22   A.    I would say this was a fully negotiated document to be

23   presented to the ResCap board for their consideration.

24   Q.    All right.  Were you presenting it to the ResCap board for

25   their consideration with the hope that they would approve it?

1    A.    Yes.

2    Q.    And you thought that, in your capacity as the executive

3    director of tax operations at AFI, it was a good deal for both

4    ResCap and AFI, correct?

5    A.    I don't know that I would characterize it as a good deal.

6    A tax allocation isn't really a deal.  It's an allocation of

7    tax between parties of an affiliated group.  So --

8    Q.    In what way did this tax allocation agreement provide

9    payment -- potential payments from AFI to ResCap; under what

10   circumstances?

11   A.    It would have provided payments to or from ResCap -- it

12   was a two-way sharing agreement -- based on generally a

13   calculation of the ResCap standalone tax liability or refund,

14   as the case may be, with three exceptions to that.  So it was

15   generally standalone, but in the case where ResCap operations

16   may have generated operating losses, capital losses, or foreign

17   tax credits, the proposal was that if other members of the Ally

18   group currently utilized them before the Ally -- I'm sorry, the

19   ResCap group could use them on a standalone basis, they would

20   be compensated currently.

21   Q.    And did you consider that to be a valuable benefit to

22   ResCap?

23   A.    Yes.

24   Q.    Why?

25   A.    Because it had the potential, but not necessarily the

RESIDENTIAL CAPITAL, LLC, ET AL.                            98

1  case, of accelerating a tax benefit, the realization of a tax

2  benefit for a loss or a credit to a point in time earlier than

3  they might have gotten it on a standalone basis.

4  Q.    And AFI is the party that originally put that in this

5  draft agreement, right?

6  A.    AFI tax, myself, put it in there.

7  Q.    Correct.  And when you presented it to the board of ResCap

8  with the recommendation that they sign it, that provision was

9  in the agreement, right?

10  A.    Yes.  I would just -- I didn't present it to the board.  I

11  was not present at the meeting.  I had input to the document

12  that was presented to the board, and obviously I did most of

13  the drafting on the document, but I was not there and present

14  when it was presented.

15  Q.    But certainly when you knew it was going to be the board

16  along with the memo that you did most of the drafting on, you

17  wanted the board to authorize someone to sign it, right?

18  A.    Yes.

19  Q.    And in fact, ResCap's board did authorize someone to sign

20  it, right?

21  A.    That is my -- yes, they did.

22  Q.    They authorized Mr. Young to sign it, right?

23  A.    I think they -- I don't know that they were that specific

24  that it was Mr. Young.  It was they authorized, I think,

25  management to execute the agreement.

RESIDENTIAL CAPITAL, LLC, ET AL.                     99

1   Q.   To the best of your understanding ResCap did not expect

2   further negotiations of this agreement, did they?

3   A.   I don't believe so, no.

4   Q.   And on the AFI side, you checked with in-house counsel and

5   they told you that no additional corporate governance on the

6   AFI side was needed, right?

7   A.   Yes.

8   Q.   And so you went forward and you actually had someone at

9   AFI sign the agreement, didn't you?

10  A.   Yes.

11  Q.   You had Mr. DeBrunner sign it, right?

12  A.   Yes.

13  Q.   And it was your understanding based on your conversations

14  with AFI's counsel that Mr. DeBrunner was an authorized signer

15  for an agreement like this, right?

16  A.   At that point in time, I believed him to be authorized,

17  yes.

18  Q.   And so you took the next step and you decided that it was

19  time to circulate the agreement to gather up everyone's

20  signatures, correct?

21  A.   Correct.

22  Q.   And among the other signatures that is you wanted to

23  gather up were the ResCap signatures, right?

24  A.   Yes.

25  Q.   And by that time you knew that ResCap had delegated

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1  authority to sign to Mr. Young, correct?

2  A.   I don't know if I was informed of that or if that was just

3  an assumption that he being the chief accounting officer, that

4  he's the right person.  I may have made that assumption.  I

5  don't know that somebody told me that.

6  Q.   Who is Mr. Frucci?

7  A.   Jay Frucci is currently the chief tax officer for Ally.

8  Q.   Did there come a time where you gave this Exhibit A that

9  had been signed by AFI to Mr. DeBrunner to Mr. Frucci and asked

10 him to take it and obtain Mr. Young's signature?

11 A.   Yes.

12 Q.   When did that happen?

13 A.   It would have been sometime, I don't know, third quarter,

14 I think, of 2010.

15 Q.   Do you recall if it was in September of 2010?

16 A.   It could have been.  I don't have a specific date for you.

17 Q.   But it was certainly your hope and expectation that Mr.

18 Frucci would take this document to Mr. Young, get Mr. Young's

19 signature, and then the deal would be done, correct?

20 A.   That was the expectation at the time.

21 Q.   And Mr. Frucci forgot to bring the document with him,

22 right?

23 A.   That is correct.

24 Q.   And to the best of your understanding that's the only

25 reason the document wasn't signed in this September or the fall

1   time period you've talked about, right?

2   A.   Well, that certainly precluded signature at that time.  I

3   can't say that it's the only reason it wasn't signed.  You

4   know, I expect Mr. Young may have signed it, but I don't know

5   for sure that he would have.

6   Q.   Okay.  That would be up to Mr. Young, right?

7   A.   That's correct.

8   Q.   But it was your hope and expectation that Mr. Frucci

9   would, after seeing Mr. Young, bring you back a signed

10  document, right?

11  A.   Yes.

12  Q.   And at some point after that, AFI started looking at what

13  compliance with this document would cost, correct?

14  A.   I would not characterize it that way.  As part of our

15  normal tax compliance, tax return preparation process, on or

16  about September 15th we filed our consolidated federal tax

17  return for the 2009 period and, you know, the whole world

18  doesn't revolve around ResCap.  There's other companies in the

19  group and other tax allocation agreements.  And so there is an

20  ongoing normal process of you finish the return and then you do

21  the tax allocation.  So, you know, it's a column in our

22  spreadsheet with all of the entities in the group, and

23  allocation calculations are made for each and every entity in

24  the group, and ResCap was a subset of that group.

25  Q.   Okay.  So -- but it was after this agreement had been

RESIDENTIAL CAPITAL, LLC, ET AL.                        102

1   signed by AFI, presented to ResCap's board, you were attempting

2   to obtain Mr. Young's signature that you started to do the

3   actual work to implement the agreement, right?

4   A.   Yes.

5   Q.   And that was the first time that AFI understood the

6   economic impact of this favorable treatment that you

7   purposefully put into the agreement, right?

8   A.   Yes.  The magnitude of that clause, the effect of that

9   clause surprised us, quite frankly.

10  Q.   And it surprised you because it showed that it was

11  hundreds of millions of dollars in 2009 and hundreds of

12  millions of dollars looking forward to 2010, right?

13  A.   Potentially, yes.

14  Q.   And potentially hundreds of millions of dollars going

15  forward, right?

16  A.   Depending on facts.

17  Q.   Right.  But at least as you're sitting there in the fall

18  of 2010, you had a good sense that it was 250 million for 2009,

19  another 200 million for 2010, right?

20  A.   Yes.

21  Q.   And that concerned you greatly, didn't it?

22  A.   It did.

23  Q.   Notwithstanding the fact that you intended to put the

24  provision that gave rise to those payments into the agreement,

25  correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    103

1  A.    I intended to put the provision in, but we weren't looking

2  down are the road and connecting the dots and saying, oh, this

3  could result in these large capital contributions.

4       I'd like to back up for a moment and talk about the

5  purpose for putting that provision -- the primary reason for

6  putting that provision in the document in the first place.  In

7  early November 2009, ResCap rejoined our consolidated group.

8  It had formerly been a partnership.  It became part of the

9  group.  There was in existence a tax allocation agreement that

10  allocated on a strict standalone basis, but it was not exactly

11  clear whether that agreement was broad enough to cover the

12  federal tax allocations in this new business construct.  So we

13  thought just for clarification let's put together a new

14  agreement

15      In addition, what was going on at that point in time is

16  that when ResCap ceased to it be a partnership, it was required

17  to book up deferred taxes on its financial statements and it

18  was in a net preferred tax asset position.  Unfortunately due

19  to the loss history, they were required to put up a full

20  valuation allowance effectively writing those assets down by, I

21  don't recall the specific number, let's just say it was 150

22  million dollars.  So the thought, when we put that clause in,

23  was at the parent company level, Ally Financial is not in an

24  allowance situation.  So if we put that clause in, the thought

25  was perhaps under the guidance we would be able to not have a

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1  valuation allowance at the ResCap level, thus preserving the,

2  say call it 150 million dollars of capital that was already in

3  the company.

4  Q.   Are you familiar with the phrase equity bump?

5  A.   Yes, that's what I'm referring to here.

6  Q.   Okay.  And one of the things that you wanted to provide

7  through Exhibit A, this tax allocation agreement that AFI

8  signed and you were trying to obtain Mr. Young's signature on,

9  was you wanted to give ResCap an equity bump, that was a

10  desire, correct?

11  A.   We wanted -- we were attempting to preserve the equity

12  that was already inside of ResCap.

13  Q.   Okay.  Do you recall when you discovered the magnitude of

14  contributions that you would be required to make under this

15  agreement for the 2009 and 2010 tax year?

16  A.   It would have been, I believe, sometime in late

17  November -- I'm sorry, late October.

18  Q.   Would you turn to --

19          THE COURT:  Of which year?

20          THE WITNESS:  I'm sorry, of 2010.

21  Q.   Would you turn to the document marked DX-ALF in your

22  binder?  And the Bates number on the first page is Ally-424660

23  and the last page ends in 664.

24  A.   Yes, I'm there.

25  Q.   And this is an e-mail chain, so we'll start at the back

RESIDENTIAL CAPITAL, LLC, ET AL.                    105

1   and work our way forward.

2   A.   Okay.

3   Q.   So it looks like the first e-mail picks up on page 663,

4   and it's an e-mail from you to Mr. Mackey and Mr. Aretakis.  Do

5   you see that?  It's dated Wednesday, October 23rd, 2010?

6   A.   I don't see that date.  I see October 13th.

7   Q.   I'm sorry.  I need to wear my glasses.

8         THE COURT:  Well --

9   Q.   So it's an e-mail from you to Mr. Mackey, Mr. Aretakis,

10  Wednesday, October 13, 2010.

11  A.   Yes, I'm there.

12  Q.   All right.  Who is Mr. Mackey?

13  A.   He was the interim chief financial officer at that point

14  in time.

15  Q.   Who was Mr. Aretakis?

16  A.   He was -- let me make sure I get this right -- he was

17  interim chief tax officer at that time.

18  Q.   At AFI?

19  A.   Yes.

20  Q.   And the subject line is "high priority tax allocation,

21  large payment possibility, due ResCap, October 30th," right?

22  A.   Yes.

23  Q.   Now you're talking about a cash payment, not an accounting

24  entry, right?

25  A.   That's correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

1   Q.   And if you look at the fourth bullet, you say

2   "calculations are still in process, but the payment may be on

3   the order of 200 to 250 million due 10/31."  You're talking

4   about two weeks out from this e-mail?

5   A.   Approximately, yes.

6   Q.   And an additional 300 to 400 million would likely be due

7   for the 2010 tax year payable this time next year.  So that's

8   an additional 300 to 400 million for the next year going

9   forward, right?

10  A.   That's what it says, yes.

11  Q.   And you had not projected out what 2011 or 2012 might look

12  like, right?

13  A.   No.

14  Q.   But it's possible that there would be payments in that

15  order of magnitude going forward?

16  A.   It's possible.

17  Q.   Okay.  If you look down to the second from the last

18  bullet, you lay out a couple of options, don't you?

19  A.   I do.

20  Q.   Option 1:  complete the execution of the documents and

21  follow the proposed agreements, paying ResCap 200 million to

22  250 million for the 2009 use of the NOLs by 10/30.  That was

23  one of the options you presented?

24  A.   Yes.

25  Q.   And you also presented option 2:  do not complete the

1   execution of the documents.  That was another option?

2   A.   That's what the e-mail says.

3   Q.   All right.  At the time you were proposing that option,

4   AFI had already signed the agreement, hadn't it?

5   A.   Yes.

6   Q.   All right.  And the last bullet suggests "We would propose

7   a new strict standalone agreement with ResCap for which the

8   ResCap board would likely require a fairness opinion of outside

9   counsel.  Absent this opinion and agreement, we might not have

10  the ability to exact future tax payments from ResCap, if they

11  earn through their NOL (may be not be issue).  This would

12  likely be unpopular as the board has already been presented and

13  approved a more beneficial agreement."  Do you see that?

14  A.   I do.

15  Q.   Is that a true statement?

16  A.   I believe it is.

17  Q.   All right.  So --

18  A.   Or was.

19  Q.   So what you're proposing is either honor the agreement

20  that AFI has already signed, or you come up with a new

21  agreement that is not as beneficial to ResCap, right?

22  A.   I would -- again, I would not characterize it that way.  I

23  would say that the first option was to halt the execution of

24  the first agreement and propose another one, or let it go

25  through.

RESIDENTIAL CAPITAL, LLC, ET AL.                    108

1  Q.   Okay.  Would you look at the page with the Bates numbers

2  663, and about midway through the page, Mr. Mackey sends an

3  e-mail to Mr. Aretakis and you, Friday, October 15th.  Do you

4  see that?

5  A.   I do.

6  Q.   And he asks, what happens if we just ignore this for now.

7  Was one of the suggestions you received that AFI just ignore

8  the issue?

9  A.   That was not something that I presented.  He raised that

10 question --

11 Q.   All right.

12 A.   -- what happens if we do nothing.

13 Q.   Did you think that was a good idea?

14 A.   I don't recall really having an opinion of it.

15 Q.   Okay.  Would you look at your response to his e-mail,

16 which is, just one e-mail up, it's from you, it's Friday

17 October 15th at 11:03 a.m..  You're responding to Mr. Mackey

18 and Mr. Aretakis.  And I'd like you to look at the third

19 bullet.  You say, "People at ResCap think the method of

20 allocation has been resolved and we're just finalizing the docs

21 and allocation will follow."  Do you see that?

22 A.   I do.

23 Q.   What did you mean when you wrote that?

24 A.   I think the statement stands on its own.

25 Q.   Did you think -- at the time you wrote that e-mail, did

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1  you understand that ResCap thought you had a fully negotiated

2  agreement that called for the favorable tax treatment we've

3  been talking about?

4  A.    Yes.  I think the people who have -- yes.

5  Q.    Would you look at the prior page, which has the Bates

6  number 662?

7  A.    I'm there.

8  Q.    And I'm looking at the e-mail, again, about halfway down

9  the page.  It's from you to Mr. Mackey and Mr. Aretakis, sent

10  Friday, October 15th at 11:36.

11  A.    I'm there.

12  Q.    And the second to the last bullet says, "If the ResCap

13  agreements are ultimately similar to bank and insurance, the

14  impact on the balance sheet would be material."  Do you see

15  that?

16  A.    I do.

17  Q.    And by that you mean it will be materially beneficial to

18  ResCap, don't you?

19  A.    I honestly don't recall what was in my mind at the time.

20  It could have been --

21             THE COURT:  Don't speculate.

22             THE WITNESS:  Yeah.

23             THE COURT:  If you remember, he's entitled to an

24  answer to the question, but --

25  A.    I don't recall.

RESIDENTIAL CAPITAL, LLC, ET AL.                              110

1    Q.    Would a 200- to 250-million-dollar cash payment to ResCap

2    by the end of October 2010 be materially beneficial to them in

3    your view?

4    A.    Yes.

5    Q.    All right.  And how about in 2011 for the 2010 tax year,

6    would a 3- to 400-million-dollar cash payment be materially

7    beneficial to ResCap in your view?

8    A.    Yes.

9    Q.    All right.  And then one e-mail above that, Mr. Mackey

10   writes to Mr. Aretakis and you and he says, "Do we actually

11   give them cash?"  And you respond in the e-mail above, "Yes,

12   settlements in both directions under the allocation agreements

13   are settled in cash."  Do you see that?

14   A.    I do.

15   Q.    Those are both -- you answered his question honestly,

16   right?

17   A.    Of course.

18   Q.    So these are not just accounting bookkeeping entries, this

19   is real movement of money, right?

20   A.    Yes.

21   Q.    Then let's go to the first page in this document.  It has

22   the Bates number Ally-042660.  Do you see that?

23   A.    Yes, I do.

24   Q.    And this is an e-mail -- going to the second e-mail down,

25   it's from you to Mr. Mackey and Mr. Aretakis, sent Tuesday,

1    November 2nd at 11:50, and you're updating them on a call that

2    you had with Jim Young of ResCap, right?

3    A.    Correct.

4    Q.    And you told them why you stopped the execution on the

5    ResCap side of the tax allocation agreement, is that correct?

6    A.    Yes.

7    Q.    And the third bullet says "He," referring to Mr. Young,

8    "understood the reason and did not think changing the draft

9    agreements was disadvantageous to ResCap because the change

10   would eliminate beneficial treatment which Ally is not

11   compelled to provide to ResCap."  Do you see that?

12   A.    I do.

13   Q.    What did you understand him to mean when he said that?

14   A.    I understood him to be in agreement that changing the

15   agreement to a strict standalone agreement did not disadvantage

16   ResCap.  It was -- we were proposing an agreement that had the

17   absence of a windfall rather than one with a windfall.

18   Q.    Certainly as between the agreement that you recommended to

19   ResCap's board and that AFI signed, a strict standalone

20   agreement would be less advantageous, correct?

21   A.    Under the facts as they developed, yes.

22   Q.    Right.  So if ResCap didn't sign the agreement that you

23   drafted, sent to them, negotiated, assisted in recommending to

24   the board and had AFI sign, if they didn't take that agreement,

25   the agreement you were now proposing would not entitle them to

RESIDENTIAL CAPITAL, LLC, ET AL.                                112

1  200 to 250 million dollars for the 2009 tax year, right?

2  A.   That is correct.

3  Q.   And it wouldn't entitle them to 3- to 400 million dollars

4  the following year, right?

5  A.   That is correct, although I would point out that that 3-

6  to 400 million dollars was a very soft estimate at the time.

7  Q.   Sure, sure.  And to the extent that there were additional

8  losses that ResCap couldn't use but Ally could, going into the

9  future it wouldn't entitle them to those payments either,

10 right?

11 A.   That is correct.

12 Q.   And ultimately you were successful in convincing ResCap to

13 not sign the original agreement that AFI had signed and you

14 negotiated an agreement that stripped out that beneficial

15 provision, correct?

16 A.   Partly correct, yeah.  I wouldn't say I convinced them not

17 to sign.  I presented Mr. Young with what we had learned and

18 that it had not been vetted with our senior management, and he

19 made the decision not to execute the agreement.  I did not tell

20 him to do it or convince him to do it.

21 Q.   Okay.  Were you involved in discussions with ResCap's

22 board on signing a different agreement than the one that you

23 assisted them in originally presenting?

24 A.   No.

25 Q.   Were you asked to be involved in that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1  A.    No.

2           MR. COHEN:  No further questions.

3           THE COURT:  Thank you.  Cross-examination?

4           MR. MCKANE:  One moment so I could --

5           THE COURT:  Yes, sure.

6           MR. MCKANE:  Good morning, Your Honor.  For the

7  record, Mark McKane of Kirkland & Ellis.

8           THE COURT:  Good morning, Mr. McKane.  I haven't seen

9  you in a while.

10          MR. MCKANE:  It's good to see you sir.

11          THE COURT:  I saw him in a different case, Mr. Cohen.

12 CROSS-EXAMINATION

13 BY MR. MCKANE:

14 Q.    Mr. Marx, just some foundational questions regarding tax

15 attributes that arise at the ResCap level.  Which entity owns

16 tax attributes generated at the ResCap entity levels --

17 operating levels?

18 A.    From 11/1 -- November 1st, 2009 forward, ResCap was

19 treated as a disregarded entity for federal tax purposes.  So

20 all of the attributes that arose from the operations of ResCap

21 during that time frame were actually the property of Ally

22 Financial, Inc. as a matter of tax law.

23 Q.    And so as a matter of tax laws, for the period of time for

24 which you were talking about this draft tax allocation

25 agreement with Mr. Cohen, ResCap doesn't own those tax

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1    attributes?

2    A.    That's correct.

3    Q.    When -- I believe Mr. Cohen asked you a series of

4    questions about, we'll call it the reimbursement provision, for

5    that draft tax allocation agreement.  You're familiar with that

6    provision, right?

7    A.    Yes.

8    Q.    Is that relatively unusual to have that provision in tax

9    allocation agreements?

10   A.    Yes, it is.  As Mr. Cohen pointed out, it's consistent

11   with some other agreements within our group, specifically

12   agreements with our bank subsidiary and our insurance

13   subsidiaries because the regulators require it.  But normal

14   GAAP accounting SEC guidance all suggest -- they don't suggest,

15   they -- the guidance says that the standalone allocation method

16   is the preferred method.

17   Q.    So both the GAAP and the SEC guidance prefer strict

18   standalone?

19   A.    That is correct.  And I would also point out that the

20   operating agreement so -- calls for a standalone calculation.

21   Q.    And specifically the operating agreement that you're

22   referring to is the operating agreement that ResCap has with

23   Ally?

24   A.    That's correct.

25   Q.    That's the 2006 operating agreement?

RESIDENTIAL CAPITAL, LLC, ET AL.                               115

1    A.    That's correct.

2    Q.    And, sir, with regards to this strict standalone

3    agreement, the ultimate agreement that both sides execute for

4    the November 1, 2009 period, is that strict standalone?

5    A.    Yes.

6    Q.    And the agreement that it amended, what treatment did that

7    provide for?

8    A.    Strict standalone.

9    Q.    And if there was no operating agreement that required

10   there being a tax allocation agreement, what would Ally apply?

11   A.    The norm would be a strict standalone agreement.

12   Q.    And under Ally's accounting policies, would it apply GAAP?

13   A.    Yes.

14   Q.    Sir, I believe you testified under questions from Mr.

15   Cohen that as of the time that the draft tax allocation

16   agreement was presented to the ResCap board, Ally senior

17   management had not considered the agreement, is that right?

18   A.    That is correct.

19   Q.    Okay.  Is there -- and you also, I believe you testified,

20   that at the time it was presented to Mr. DeBrunner to sign, you

21   thought he was authorized to do so?

22   A.    That is correct.

23   Q.    But you said "at that time".  Did you later learn that he

24   may not be authorized to do so?

25   A.    Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    116

1  Q.    And what did you come to learn?

2  A.    Well, I learned subsequently that there was a board

3  resolution passed that reserved unto the board authority to

4  approve capital contributions to subsidiaries of fifty million

5  dollars or more -- I believe it's fifty or more, it might have

6  been more than fifty, I'm not precisely sure.  And at the time

7  I was not aware -- when we were working through the first draft

8  agreement, I was not aware that that was out there.

9          THE COURT:  I'm sorry, what did that resolution

10  require for capital contributions of more than fifty million?

11          THE WITNESS:  If -- any capital contributions of

12  greater than fifty million to a subsidiary, or I think it's

13  termed investment in any company, had to be approved by the

14  board.

15  Q.    Sir, when you say the board, do you mean the Ally

16  Financial, Inc. board?

17  A.    That is correct.

18  Q.    The board of the ultimate parent.  You understood that to

19  be an express reservation of authority?

20  A.    Yes, that's correct.

21  Q.    Okay.  And you mentioned it was regarding capital

22  contributions.  Can you explain the accounting treatment of the

23  payments to and from ResCap that would have -- if there were

24  any, under that first draft tax allocation agreement?

25  A.    Yes.  Once you deviate from a strict standalone treatment

RESIDENTIAL CAPITAL, LLC, ET AL.                    117

1  of tax allocation, any deviation from that in terms of the

2  payments are treated either as a capital contribution to the

3  subsidiary or a dividend capital distribution from the

4  subsidiary, depending on which direction the payment goes.

5  Q.   All right.  So to the extent that there are going to be

6  payments from AFI down to ResCap, under this draft tax

7  allocation agreement, because it deviated from strict

8  standalone, it would have been considered a capital

9  contribution?

10  A.   That's correct.

11  Q.   And at the time that you presented that to Mr. --

12  presented the agreement to Mr. DeBrunner to sign, did you

13  discuss the possibility of there being capital contributions?

14  A.   We did not.

15  Q.   At any point in time before you presented this to the

16  ResCap board, did you contemplate the fact that these may be

17  capital contributions?

18  A.   You know, we just never -- we were not thinking down the

19  road to the potential for these large capital contributions.

20  To my knowledge, the agreements that we drafted in a similar

21  manner for the bank and insurance subsidiaries have never

22  resulted in large payments of this type.  And like I said, when

23  we put that clause in the agreement to begin with, we were

24  attempting to preserve the capital that was already at ResCap

25  and really didn't connect the dots and think down the road of,

RESIDENTIAL CAPITAL, LLC, ET AL.                    118

1   oh, if this, this, and this happens, this could result in very

2   large capital contribution.

3   Q.   And when you talk about the size of the capital

4   contributions, am I correct that the first time you realized

5   the potential magnitude of these capital contributions was

6   after the 2009 tax returns had been completed?

7   A.   That's correct.

8   Q.   And when you were doing that calculation and doing that

9   assessment, were you beginning to implement and execute the

10  draft agreement, or were you doing work that you would do

11  because of other preexisting agreements?

12  A.   We were doing work that we had to do for all the other

13  agreements.  Again, every entity in the group is part of this

14  allocation calculation; and at that time we expected that it

15  was likely that that first draft agreement would be what would

16  happen.  So the calculations were performed along those lines,

17  but the calculations were not specifically targeted at

18  implementing that agreement.

19  Q.   So at the time that you realized that you'd have the

20  potential magnitude of a 250-million-dollar capital

21  contribution down to ResCap under this draft agreement, what

22  did you do?

23  A.   I immediately notified Mr. Mackey and told him what the

24  situation was, and we've already referred to that e-mail.

25  Q.   Right.  And is this the first time that Mr. Mackey's

1    hearing anything about this?

2    A.    Yes.

3    Q.    Is this the first time that anyone at Ally senior

4    management is hearing anything about this?

5    A.    To my knowledge, yes.  When we initiated this discussion

6    in December of '09.  I'm sure I would have had discussions with

7    our then chief tax officer, Dina Shapiro.  I don't know what,

8    if any, discussions she might have had beyond that, although I

9    understand through subsequent discussions that her boss, Rob

10   Hall, who was the CFO at the time, has no recollection of

11   discussions about tax allocation.

12   Q.    So to the best of your knowledge, no one at AFI senior

13   management or the board had been aware of the potential for

14   these types of cash contributions?

15   A.    That's correct.

16   Q.    All right.  Sir, Mr. Cohen asked you a series of questions

17   about the process that you used to execute the agreement -- to

18   get the signatures on the agreement..  Do you recall those?

19   A.    I do.

20   Q.    Why did you go through such an extended process to secure

21   the signatures from each of the parties on that draft tax

22   allocation agreement?

23   A.    It just seemed plainly obvious to me that we needed to

24   have executed agreements, we needed each party to the agreement

25   signing on saying, yes, this is the agreement that we've agreed

1  to.

2  Q.    Did you intend the agreement to be enforceable prior to

3  everyone's execution?

4  A.    No.

5  Q.    Mr. Cohen also asked you some questions -- actually let's

6  go to a document Mr. Cohen used.  It was DX-ALF.

7  A.    I'm there.

8  Q.    And Mr. Cohen asked you about some of the e-mails; and I

9  want to focus on the e-mail to Mr. Mackey on November 3rd, on

10  the first page of that document.  Do you see it?

11  A.    The first page or the last page?

12  Q.    The first page.

13  A.    Okay.

14  Q.    The one dated November 2nd.

15  A.    Yes, at 11:50.

16  Q.    And you're reporting to Mr. Mackey, the interim CFO of

17  Ally Financial, about your conversation with Mr. Young?

18  A.    Yes.

19  Q.    What did -- did Mr. Young resist when you explained the

20  situation to him regarding the fact that senior management had

21  not vetted this draft tax allocation agreement?

22  A.    He did not.

23  Q.    Did he express concerns about whether the Ally board --

24  excuse me, the ResCap board would consider another agreement?

25  A.    He expressed that, you know, there would be process and

1   procedure to go through with the board, but he thought that a

2   strict standalone agreement was not inherently unfair, and at

3   the end of the day, it shouldn't present a problem.

4   Q.   And there had been process and procedure the first time it

5   was presented to the ResCap board, right?

6   A.   There was a lot of process and procedure.

7   Q.   And, in fact, you were involved in answering questions

8   that the counsel for the independent directors of the ResCap

9   board had regarding the agreement, right?

10  A.   That's correct.

11  Q.   And you were involved in that the first time and the

12  second time, right?

13  A.   Yes.

14  Q.   Sir, let me ask you to turn to an exhibit that is in Mr.

15  Cohen's binder that he did not use.  And it's the next

16  document, DX-ALH.

17  A.   I'm there.

18  Q.   Do you see at the top of DX-ALH an e-mail from you to Mr.

19  Aretakis and Mr. Frucci, dated December 22nd of 2010?

20  A.   I do.

21  Q.   Can you explain to the Court what this e-mail is?

22  A.   This was a call, and as I recall it, it was late in the

23  afternoon that day we had a call with the ResCap board's

24  independent outside counsel, and they had raised some concerns

25  about the drafting of the agreement.  And, you know, a lot of

RESIDENTIAL CAPITAL, LLC, ET AL.                          122

1    it was kind of whining about it being unfair.

2    Q.    All right.  And were you asked to join a call with the

3    independent directors' counsel for ResCap to address the

4    fairness of the second agreement?

5    A.    Yes.

6    Q.    So the discussion on December 22nd of 2010 was relating to

7    the second agreement, the one that is strict standalone?

8    A.    That's correct.

9    Q.    And what was the discussion you had with the independent

10   counsel -- sorry, the counsel for the independent directors of

11   the ResCap board --

12          THE COURT:  Who is the independent counsel, because it

13   refers to MoFo attorneys.

14          THE WITNESS:  I'm sorry, could you restate?

15          MR. MCKANE:  You want me to do it, Your Honor?

16          THE COURT:  Go ahead.  Yes.

17   Q.    So there's sometimes confusion between MoFo and MoCo.

18   A.    I know, I always get it wrong myself.

19   Q.    And is it possible you got it wrong in this e-mail?

20   A.    It's quite likely that I got it wrong in this e-mail.

21   Q.    To the best of your recollection is the counsel for the

22   independent directors of the ResCap board Morrison & Connolly?

23   A.    I think it's Cohen.

24   Q.    I got it wrong too.

25   A.    Connolly & Grossman I know are correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    123

1   Q.   All right.  So Mr. Connolly and Mr. Grossman are --

2           THE COURT:  Is there any Connolly and Grossman are

3   with , Mr. Cohen.

4           MR. COHEN:  I do not.

5           THE COURT:  You don't dispute that?

6           MR. COHEN:  I don't.

7           THE COURT:  Okay.

8   Q.   All right.  So can you please -- and they were tax counsel

9   as well, right, they were sophisticated in tax issues, right?

10  A.   That's my understanding.

11  Q.   All right.  And what did you discuss with the counsel for

12  the independent directors on December 22nd regarding the

13  fairness of a strict standalone treatment for ResCap under a

14  tax allocation agreement?

15  A.   Well, they made an assertion that it seems unfair that a

16  Mortgage would have losses and there is no tax ultimately

17  due -- and I've got to get this right, because it didn't make

18  sense to me then either -- it seems to be unfair that ResCap

19  earns a profit, but Mortgage Ally loses and no tax is

20  ultimately due then ResCap must still pay Mortgage all the

21  hypothetical tax based on ResCap's profit.

22  Q.   Okay.

23  A.   And, you know, we just had a lengthy discussion around why

24  that's not inherently unfair, that the fact that the

25  consolidated company may not have a payment to make currently

RESIDENTIAL CAPITAL, LLC, ET AL.                    124

1  out to the IRS doesn't mean that assets haven't been utilized.

2  So, you know, you try to keep all those attributes lined up

3  specifically with the entities and track them separately under

4  the separate company method, and this is what we were proposing

5  to do.  And we made the point very strongly that the second

6  proposed agreement would put down in a strict standalone

7  position, which is precisely where they would be if they were

8  their own independent company filing their own consolidated tax

9  return.  So there is no loss of value through this allocation

10 agreement.

11 Q.   And did ResCap's CFO, Mr. Young, participate in that

12 discussion?

13 A.   He did.

14 Q.   And what was his view that he articulated on that call

15 with you?

16 A.   He was very much in agreement that standalone was not

17 unfair.

18 Q.   And was it your understanding that the confusion or the

19 misperception of the lawyers for the independent directors was

20 that they failed to appreciate that the reason why Ally wasn't

21 paying out to the taxing authority was because it was consuming

22 other tax attributes that it had from other subsidiaries?

23 A.   I honestly am not sure what their understanding was or was

24 not.

25 Q.   How did that call end?

RESIDENTIAL CAPITAL, LLC, ET AL.                    125

1  A.   It ended actually fairly abruptly.  We were going along

2  having the conversation about fairness and why this is not

3  unfair.  And, you know, almost in mid sentence one of them, I

4  forget which one, I'd have to reread the note, said, you know,

5  okay, you know -- what was his words that I wrote here -- I

6  think he came to the conclusion that a standalone allocation

7  agreement is not an unreasonable business position or

8  proposition, I forget the exact words he used.

9        THE COURT:  Just explain to me how there was -- there

10  would be no loss in value if ResCap had a standalone agreement.

11        THE WITNESS:  Well, because the agreement called for a

12  hypothetical calculation based on the Internal Revenue Code.

13  So, you know, any rules that would apply to them as if they

14  were their own standalone company would apply under this

15  agreement.  So if they generate a profit, they pay tax.  If

16  they have a loss, they'd carry it forward or back and get

17  refunds or benefits in the future period --

18        THE COURT:  That's the point I wanted to get to.  If

19  ResCap had a standalone agreement and it had future profits in

20  subsequent years, it would be able to apply a carry-forward --

21  a loss carry forward in the subsequent years.

22        THE WITNESS:  Absolutely.

23  Q.   And sir --

24        THE WITNESS:  And in fact --

25  Q.   Let me ask you, sir, isn't it true that ResCap did utilize

1   the loss carry-forward provision in the standalone agreement in

2   2010?

3   A.   Yes, I believe they actually ended up having modest

4   taxable income in 2010 that was offset by '09 losses coming

5   forward.

6   Q.   And, sir, wasn't that an issue that in the second

7   agreement the independent directors' counsel asked that you

8   clarify?

9   A.   Yes.  In fact, we had, you know, significant back-and-

10   forth on that and eventually agreed to add language, something

11   to the effect of, and for the absence oor the avoidance of

12   doubt, if the losses hadn't been used by ResCap in a prior

13   year, they get to carry it forward.  I'd have to find the

14   specific language, but we added that language.

15   Q.   And in addition to this e-mail, did you also have a

16   conversation with Mr. Young by e-mail after this call with the

17   Morrison -- with the independent directors' counsel?

18   A.   Yes, I believe -- I don't know that it was a call.  I

19   think it was an e-mail exchange just thanking him for being on

20   the call , you know, and expressing --

21        THE COURT:  Can I ask you, was there some crisis,

22   because this e-mail is at 12:39 a.m.

23        THE WITNESS:  Honestly, things were crazy.  You know,

24   it's quite possible I was writing an e-mail at 12:39 a.m.  But

25   I can't say --

RESIDENTIAL CAPITAL, LLC, ET AL.                    127

1        THE COURT:  And you say the call had just ended.

2        THE WITNESS:  Yeah.  I think there's something wrong

3   with the date stamp on this e-mail.  I'm quite sure that that

4   phone call occurred like 5 or 6 p.m. Eastern Time, and it might

5   be that it got hung up in an outbox or something because of the

6   volume of e-mail in my inbox.  You know, sometimes you get

7   things like that.  But --

8        THE COURT:  All right.

9        THE WITNESS:  I can't account for that.

10       MR. MCKANE:  Your Honor, I've asked the technical

11  people to pull up Plaintiffs' Exhibit 717.

12       THE COURT:  717?

13       MR. MCKANE:  Yeah, and I have a copy for the witness.

14  May I approach or have someone approach?

15       THE COURT:  Yes, sure.

16       THE WITNESS:  I can see it on the screen here.

17       THE COURT:  I can see it on the screen, too.  You

18  don't have too --

19       MR. MCKANE:  Okay.

20  Q.   So to the point of there being a time issue, first of all,

21  do you recognize PX-717, Mr. Marx?

22  A.   Yes.

23  Q.   What is PX-717?

24  A.   It is an e-mail -- maybe I should have a copy of it.  It

25  was an e-mail initiated by me to Jim Young, subject tonight's

1  call.  You know, "Jim, thank you for the support on tonight's

2  call.  I was a little surprised at how abruptly Michael

3  Connelly ended the argument.  My sense was that this was

4  starting be a more protracted argument.  I never doubted we

5  would get to this resolution, but thought it might take a

6  little longer.  Thanks for taking the time tonight, Bill."

7  Q.   And did Mr. Young respond?

8  A.   He did, and his response was, "Whereas I'm not surprised

9  by the point they're making, treating a company as a standalone

10 entity is not unfair.  The situation could be more

11 advantageous, but it is not unfair.  I believe their view is

12 they have done their job and will leave the decision to the

13 directors."

14         THE COURT:  May I ask this?  I'm confused about the

15 dates because Mr. Marx's e-mail to Mr. Young shows at Tuesday,

16 December 21 at 6:42 p.m., "Jim thank you for your support on

17 tonight's call."  But Exhibit ALH is 12:39 a.m., December 22.

18         MR. MCKANE:  Your Honor, I will say that in extracting

19 and producing these e-mails, there was some apparently

20 technical difficulties.  There are inconsistencies on the

21 timestamps throughout this.  I can represent to the best of our

22 knowledge the call happened on the 21st and then there was a

23 subsequent ResCap board meeting on the 22nd.

24         THE COURT:  Mr. Cohen, do you have any information

25 about that?

RESIDENTIAL CAPITAL, LLC, ET AL.                        129

1           MR. COHEN:  I don't.

2           THE COURT:  Okay.  Go ahead.

3   Q.   Mr. Marx, was there a ResCap board meeting on December

4   22nd?

5   A.   It's my understanding that there was, yes.

6   Q.   And what is the basis for your understanding?

7   A.   I believe I saw a board -- subsequently saw a board

8   resolution, but I also would have been having back-and-forth

9   with Ms. Hamzehpour at ResCap, just trying to monitor, hey'

10  what's going on, did the board approve this; where are we at.

11  Q.   And what was the resolution that the board -- ResCap

12  board, entered on December 22nd?

13  A.   Paraphrasing here, but I believe it was along the lines

14  of, you know, the board will review the agreement with its

15  outside counsel to make sure that the agreement is not unfair

16  to ResCap.  And then there was a resolution to authorize that

17  agreement pending implementation of proposed language by their

18  counsel.  So as long as we made the changes they were

19  proposing, the board was approving the agreement.

20  Q.   And were you involved in the preparation of the final tax

21  allocation agreement?

22  A.   Yes.

23  Q.   And what was the nature of that agreement?  Was it strict

24  standalone?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1  Q.    And were there any corrections or modifications or

2  clarifications that were asked for by the independent

3  counsel -- independent directors counsel?

4  A.    Well, the language that we added regarding the avoidance

5  of doubt about loss carryovers was in that agreement as well.

6  But no, once we put all of that in place, that's the agreement

7  that was ultimately executed.

8  Q.    And were you in charge with securing the signatures for

9  the final executed agreement?

10 A.    Yes.

11 Q.    And when did you secure those signatures?

12 A.    I'd have to look at it.  It was January of '11 --2011.  I

13 believe the last signature was Mr. Young's, and I want to say

14 it was January 29th.

15 Q.    Let me ask you to turn to the last document in the binder

16 that Mr. Cohen gave you, it's DX-AQM.

17 A.    I'm sorry.

18 Q.    AQW?

19 Q.    No, DX-AQM in my binder.

20        THE COURT:  That's not the last in my binder.

21        MR. MCKANE:  There's an inconsistency in the binders,

22 Your Honor.

23 A.    Yeah.  Here it is.

24        THE COURT:  Is there an AQM.  I don't have it.

25        THE WITNESS:  Yes, I have it here.

RESIDENTIAL CAPITAL, LLC, ET AL.                    131

1           THE COURT:  I don't have it.

2           MR. MCKANE:  We have it as well as a Plaintiffs'

3    Exhibit, Your Honor.  We can do it that way.

4           THE COURT:  Let me just look and make sure. Oh, it's

5    way in the front of the binder.  I have it now.  Go ahead.

6    Q.   Mr. Marx, do you recognize DX-AQM?

7    A.   I do.

8    Q.   What is it?

9    A.   This is the final executed agreement that was, as I

10   indicated a moment ago, January 29th Mr. DeBrunner -- I'm

11   sorry, that looks like the 26th -- it's hard to make these

12   out -- 26th, 24th, 29th, somewhere in that time frame.  It's

13   not a good copy.

14   Q.   But this is what is referred to as the 2009 tax allocation

15   agreement between Ally and ResCap?

16   A.   That's correct.

17   Q.   And this is the agreement that is still in effect today?

18   A.   That's correct.

19          MR. MCKANE:  If I can confer with the plan proponents?

20          THE COURT:  Sure.

21          MR. MCKANE:  Your Honor, I'm done.  But I believe

22   there are other questions by the plan proponents.

23          THE COURT:  Okay.  The committee wishes to examine.

24          MR. SIMON:  Good morning, Your Honor.  Norm Simon from

25   Kramer Levin for the committee.  Your Honor, let me first state

RESIDENTIAL CAPITAL, LLC, ET AL.                    132

1   it's a little frightening that I recall this, but I think

2   there's calendar entry that reflects the date and time of the

3   meeting that you referred to and Mr. Cohen has agreed to look

4   at it and we can maybe stipulate and submit it to the Court

5   once we locate it.

6            MR. COHEN:  That would be fine.

7   CROSS-EXAMINATION

8   BY MR. SIMON:

9   Q.   Mr. Marx, I'd like to draw your attention again to DX-ALF,

10  as in Frank, the document that you were asked some questions

11  about earlier.  And I'd like to refer you to the next to last

12  page of the document that ends in Bates 663.

13  A.   Okay.  I'm still not there, I'm sorry.

14  Q.   Sure.  Take your time.  Again, it's DX-ALF, as in Frank.

15  A.   Got it.

16  Q.   And again the next to last page, I think Mr. Cohen asked

17  you to look at the middle of that page and Mr. Mackey's

18  question "what happens if we just ignore this for now."  Do you

19  recall that question?

20  A.   I do.

21  Q.   And he showed you a portion of your response.  I'd

22  actually like to, if the technology can blowup the response at

23  11/03 there were several bullets; and I'd like to direct your

24  attention to the second bullet in your response and ask you

25  whether -- if you have an understanding if that was your

RESIDENTIAL CAPITAL, LLC, ET AL.                    133

1   response at the time and if you could read to the Court what it

2   was?

3        THE COURT:  I have it.  I've read it.

4   Q.   Is that accurate?

5   A.   Yes.

6   Q.   Okay.  And I believe you testified today that you

7   didn't -- and actually, Mr. Marx, at the time you wrote this

8   e-mail, I believe you testified that the ResCap Board had

9   already approved the first draft agreement and authorized

10  management to execute on its behalf, is that correct?

11  A.   I wouldn't use the word approved.  I would say they

12  authorized the draft for execution.  Approved in my mind lends

13  finality, and there were still steps to occur.

14  Q.   Fair enough.  But that had taken place at this point

15  already?

16  A.   Yes.

17  Q.   Okay.  And I think you testified today that as you sit

18  here, that you thought it obvious that it was not a binding

19  executed contract until signed by all parties, correct?

20  A.   That's correct.

21  Q.   And it's true, sir, that at the time, as reflected in your

22  e-mail, you actually recorded a belief consistent with your

23  testimony today, correct?

24        THE COURT:  I didn't understand the question.

25        MR. SIMON:  Let me rephrase.

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1  Q.    Your bullet in your e-mail is consistent with your

2  testimony today.

3  A.    Yes.

4              MR. SIMON:  Thank you, Mr. Marx.  I have nothing

5  further.

6              THE COURT:  Before Mr. Cohen, Mr. Marx, to your

7  knowledge after the draft, and I won't go through the -- that

8  remained unsigned by ResCap, do you know whether ResCap changed

9  its position or took any action in reliance on there being an

10  enforceable agreement on a tax allocation?

11              THE WITNESS:  I cannot imagine any change in behavior

12  that they would have --

13              THE COURT:  Do you know of any.

14              THE WITNESS:  I know of none.

15              THE COURT:  And did AFI do anything, take any action

16  or alter its position in reliance on there being an enforceable

17  agreement, the enforceable agreement being the first draft?

18              THE WITNESS:  Not to my knowledge.

19              THE COURT:  All right.  Go ahead, Mr. Cohen.

20              MR. COHEN:  Just a brief redirect.

21              THE COURT:  I'm sorry?

22              MR. COHEN:  Just a brief redirect.

23              THE COURT:  Fine.

24  REDIRECT EXAMINATION

25  BY MR. COHEN:

1  Q.   You testified that GAAP and the SEC have a preference for

2  strict standalone tax allocation agreements, right?

3  A.   Yes.

4  Q.   And at the time you proposed the first tax-sharing

5  agreement you were aware of the GAAP and the SEC preference,

6  right?

7  A.   That's correct.

8  Q.   And you proposed the favorable ability to generate cash

9  contributions at ResCap earlier than they otherwise would have,

10 notwithstanding your knowledge of the GAAP and SEC preference,

11 right?

12 A.   Yes.

13 Q.   All right.  To be clear, before you gave the document, the

14 first tax allocation agreement to Mr. DeBrunner to sign, you

15 consulted with internal legal counsel, right?

16 A.   Yes.

17 Q.   And internal legal counsel told you that he was authorized

18 to sign, correct?

19 A.   I don't know if the statement was that specific.  I think

20 I asked if there was anything else that we needed to do here or

21 other people we needed to include.

22         THE COURT:  Just speak up.  Pull the microphone a

23 little closer.  Okay.

24 A.   I don't know that there was a specific these people are

25 authorized to sign.  I think it was more a general question of

1   are we good here, do we have more approvals, authorizations

2   that is we need to seek.

3   Q.   And you were told no additional corporate governance is

4   needed, right?

5   A.   Yes.

6   Q.   And you took that to mean that it didn't have to go to

7   senior management and it didn't have to go to the board, right?

8   A.   That was my understanding at the time.

9   Q.   Now when you began to suspect that Mr. DeBrunner might not

10  have authority to sign, you didn't go back to legal counsel,

11  did you?

12  A.   No, I did not.

13  Q.   Did you just determined that in your own mind?

14  A.   No, I did not.  What I did is I identified the fact that

15  we were about to finalize the execution of an allocation

16  agreement, the result of which would be the recording of large

17  capital contributions, and given what had been going on in the

18  company over the prior several months, I realized that, oh,

19  this is something that people above me ought to know is going

20  on, and I don't believe they do.  That's why I went to Mr.

21  Mackey with it and explained the situation.

22  Q.   All right.  Now you understand that the tax allocation

23  agreement is a contract, right?

24  A.   I do.

25  Q.   And the payments that AFI would be required to pay to

RESIDENTIAL CAPITAL, LLC, ET AL.                    137

1    ResCap would be contract payments, right, payments pursuant to

2    a contract?

3            MR. MCKANE:  I'm going to object.  Is he asking for a

4    legal conclusion as to the classification of the --

5            THE COURT:  What is your understanding of --

6            THE WITNESS:  It's a strange question.  There would

7    have been payments coming from that agreement in both

8    directions.

9    Q.   Okay.  And they may have been accounted for as capital

10   contributions, correct?

11   A.   They would have been, yes.

12   Q.   Okay.  But the source of those payments was the allocation

13   of tax attributes as opposed to a desire to make a capital

14   contribution, right?

15   A.   I'm sorry, I didn't follow you.

16   Q.   The reason those payments were being made was as a result

17   of the agreement regarding the division of tax attributes as

18   opposed to a desire to make a capital contribution, correct?

19   A.   I think that's a fair statement, yes.

20   Q.   Are you aware of any board limitation on contract

21   payments?

22   A.   I can't say with certainty.  That resolution that I was

23   referring to had a number of things in it, and I just don't

24   know.

25   Q.   Okay.

1           MR. COHEN:  No further questions.

2           THE COURT:  Thank you, Mr. Cohen.  Any further

3    examination from anybody?

4           MR. MCKANE:  No further questions, Your Honor.

5           THE COURT:  Mr. Kerr?

6           MR. KERR:  Your Honor, Charles Kerr on behalf of the

7    debtors.  We would just like to move in four exhibits --

8           THE COURT:  Okay.

9           MR. KERR:  -- the witness referred to.

10          THE COURT:  Sure.

11          MR. KERR:  It would be DX-ALH, PX-717, DX-AQM and

12   DX-ALF.

13          MR. COHEN:  No objection.

14          THE COURT:  All right.  Exhibits DX-ALH, PX-717,

15   DX-AQM and DX-ALM are in evidence.

16   (Exhibits regarding Mr. Marx's testimony were hereby received

17   into evidence as Defendants' Exhibits DX-ALH, DX-aQM, DX-ALM,

18   as of this date.)

19   (Exhibit regarding Mr. Marx's testimony was hereby marked for

20   identification as Plan Proponents' Exhibit PX-717, as of this

21   date.)

22          THE COURT:  You're excused.

23          THE WITNESS:  Thank you.

24          THE COURT:  Before we -- who is the next witness?

25          MR. SCHAFFER:  Mr. Bingham, Your Honor.

1      THE COURT:  All right.  I assume there's going to be

2  cross-examination of Mr. Bingham.  Let's -- are you going to

3  have an objection to his report coming in?

4      MR. KERR:  I'm not aware of Mr. Bingham.  We are going

5  to have an objection to Mr. Fazio's report coming in.

6      THE COURT:  Let's get the Bingham report in and then

7  we'll break for lunch.  And we'll have cross-examination when

8  we get back.  But let's just do this --

9      MR. KERR:  Your Honor, I don't know if anybody else

10  has an objection to Mr. Bingham's --

11      THE COURT:  Yeah, okay.

12      MR. KERR:  -- but we do not.

13      THE COURT:  So why don't you offer the direct

14  testimony?

15      MR. PERRY:  Your Honor, the junior secured noteholders

16  offer the direct testimony of Robert Bingham dated November

17  13th, 2013, which was filed as docket entry number 5740.  If

18  Mr. Bingham were called to testify, he would testify as to what

19  is in his written direct testimony.  We therefore offer his

20  direct testimony into evidence.

21      THE COURT:  Are there any objections to the direct

22  testimony?

23      MR. KERR:  No objection, Your Honor.

24      THE COURT:  All right.  So the direct testimony of

25  Robert Bingham, which is ECF 5740 is in evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                    140

1   (Direct testimony of Mr. Bingham was hereby received into

2   evidence as Defendants' Exhibit, as of this date.)

3         MR. PERRY:  Your Honor, in connection with Mr.

4   Bingham's testimony we'd like to offer a number of exhibits

5   that are referenced in his direct testimony.  Those are DX-AUH,

6   DX-ATL, DX-AYE, DX-AUI, DX-AYH, DX-ATQ, DX-AME, DX-ASH, DX-ASI,

7   DX-ANE, DX-ASJ, DX-ANQ, DX-ATF and DX-AOK.

8         THE COURT:  Okay.  Mr. Kerr, are you in a position to

9   respond now, or do you want to do that after lunch?

10         MR. KERR:  Your Honor, we could do this -- Charles

11   Kerr of Morrison & Foerster.  If we could do it after lunch,

12   Your Honor, I'd appreciate it.

13         THE COURT:  Okay.  All right.  So the first thing

14   we'll take up when we come back is what the proponents'

15   position is with respect to the exhibits, and then we'll

16   proceed with the cross-examination.  I'm told by my law clerk

17   that  -- before we break for lunch that PNC wants to be heard

18   before lunch -- I'm not qute sure on what.  Is there somebody

19   here representing PNC?  Doesn't appear to be.  They can't be

20   heard if they're not here.

21         Mr. Marinuzzi, can you shed some light on this?

22         MR. MARINUZZI:  Your Honor, for the record, Lorenzo

23   Marinuzzi of Morrison & Foerster.  I received not more than

24   fifteen minutes ago an e-mail -- I was copied on an e-mail to

25   Your Honor's chambers requesting adjournment of the hearing on

1    the Kessler settlement because counsel for PNC would be

2    unavailable on, I forgot the date, the 25th or the 26th.  So

3    that must be the reason for the request.

4              THE COURT:  That must be what it's about.  Okay.  All

5    right.  So we'll break for lunch.  Do we have estimates -- so

6    we have two more witnesses, two experts for the objectors..  Do

7    we have an estimate of the length of cross-examinations?

8    Because we're stopping at 3.

9              UNIDENTIFIED SPEAKER:  My estimate on Mr. Bingham,

10   depending upon how it goes, will be somewhere in the

11   neighborhood of forty-five minutes, maybe an hour.

12             THE COURT:  And the other expert is?

13             MR. PERRY:  Mr. Fazio.

14             THE COURT:  Mr. Fazio.  And how long do we expect Mr.

15   Fazio's cross is going to go?

16             MR. KERR:  I think we reserved -- I think we estimated

17   forty-five minutes.  It'll be forty-five minutes or fifty

18   minutes or something like that.  But we're going to have -- I

19   think my cross will be shorter, I believe the committee may do

20   a short cross of him as well.  But --

21             THE COURT:  It seems to me likely that -- you can

22   discuss this when we break, that I would as soon have all of

23   the Fazio -- if we start at 2 o'clock, we're not going to get

24   done with Mr. Fazio today, if we're stopping at 3.  So at least

25   discuss among yourselves whether you want Fazio to come on at

1  all today or just come on Monday morning.

2          MR. KERR:  Your Honor, we'll do that.  Your Honor, as

3  I indicated we will have an issue with Mr. Fazio's direct and

4  we can raise that with you after lunch when he's presented.

5          THE COURT:  Let's do that.  We'll at least cover that,

6  and whether we start the cross or not -- talk about it among

7  yourselves whether it makes sense to start the cross.  Okay?

8  See you at 2 o'clock.  Thank you very much.

9      (Recess from 12:18 p.m. until 1:59 p.m.)

10          THE COURT:  Please be seated.  Mr. Kerr?

11          MR. KERR:  Your Honor, Charles Kerr on behalf of the

12  debtors.  Before the lunch break -- during the lunch break we

13  conferred on the exhibits that Mr. Perry had proposed be

14  admitted with respect to Mr. Bingham --

15          THE COURT:  Yes.

16          MR. KERR: -- and we have no objection.

17          THE COURT:  Okay.  Rather than putting the whole list,

18  with me reading the whole list, why don't you again do what

19  we're doing with other large groups?  Put them on a pleading

20  that you'll file on ECF.  They're all admitted into evidence.

21  (Exhibits regarding Mr. Bingham's testimony were hereby

22  received into evidence as Defendants' Exhibits DX-AUH, DX-ATL,

23  DX-AYE, DX-AUI, DX-AYH, DX-ATQ, DX-AME, DX-ASH, DX-ASI, DX-ANE,

24  DX-ASJ, DX-ANQ, DX-ATF and DX-AOK, as of this date.)

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    143

1          THE COURT:  Okay?

2          MR. PERRY:  We will, Your Honor.

3          THE COURT:  Okay.

4          MR. KERR:  One other housekeeping, Your Honor.

5          THE COURT:  Yes.

6          MR. KERR:  I know there's --

7          THE COURT:  I want to get moving and --

8          MR. KERR:  -- there's some discussion about when the

9   Kessler -- we're trying to figure that out right now.

10          THE COURT:  Okay.  I'll just tell you my view.  If the

11  parties agree on it not going forward on Monday, it can go

12  forward on Tuesday.  Absent an agreement this is going forward

13  on Monday.  This has been scheduled.  This confirmation hearing

14  goes day to day.  I'm mindful of people's schedules, but I

15  don't have a lot of sympathy when somebody says they got a

16  mediation scheduled.  I have a trial scheduled.

17          MR. KERR:  And, Your Honor, from the debtors' point of

18  view, I think we're going to move it to Tuesday, we just have

19  to figure out what itme.  Because we have the witnesses.

20          THE COURT:  That's okay.

21          MR. KERR:  When Mr. Lee comes back, I'll let you know.

22          THE COURT:  Okay.  Let's -- Mr. Perry -- Mr. Bingham,

23  come on up.  All right, so Mr. Bingham's direct testimony at

24  ECF 5740 is in evidence.  The exhibits that Mr. Perry offered

25  have all been admitted.  If you'd raise your right hand, Mr.

RESIDENTIAL CAPITAL, LLC, ET AL.                    144

1    Bingham, you'll be sworn.

2         (Witness sworn)

3              THE COURT:  Okay, please have a seat.

4              We'll do this expeditiously and we'll get everybody

5    out of here.

6              MR. KAUFMAN:  We'll try.

7    CROSS-EXAMINATION

8    BY MR. KAUFMAN:

9    Q.    Good afternoon, Mr. Bingham.

10   A.    Good afternoon.

11   Q.    You've not previously been qualified as an expert witness

12   by any court, have you?

13   A.    No, sir.

14   Q.    Let's make clear at the outset on exactly what you are

15   giving an opinion and on what you're not.  Your opinion is set

16   forth in your corrected direct testimony sworn to November 13,

17   2013, correct?

18   A.    Correct.

19   Q.    Do you have that in front of you?

20   A.    I assume so.

21             THE COURT:  It's right in front of the binder.

22   A.    The first thing in front of my binder says deposition

23   transcript.

24             THE COURT:  Well, your binder is different than mine.

25   It doesn't say direct testimony?

1          THE WITNESS:  No, sir.

2          MR. KERR:  Is that his binder.

3          THE COURT:  That can't be the right binder.

4          UNIDENTIFIED SPEAKER:  Your Honor, may I just --

5          THE COURT:  Please.

6          THE WITNESS:  Actually it says William Marx on it.

7          THE COURT:  Somebody give him his right binder.  Let's

8   go.  Thanks, Mr. Kerr.

9          THE WITNESS:  Thanks.

10         THE COURT:  Okay.  Look in the beginning.  It should

11  be your direct testimony.

12         THE WITNESS:  That is?

13  Q.   Do you have the direct testimony?

14  A.   Yes, sir.

15  Q.   And that was sworn to on November 13, 2013, correct?

16  A.   I believe so, yes.

17  Q.   And you swore to the contents of that submission under

18  penalty of perjury, did you not?

19  A.   Yes.

20  Q.   And the opinion you're giving here is that the debtors

21  consistently treated intercompany obligations as valid

22  liabilities, correct?

23  A.   Yes.

24  Q.   Okay.  And that opinion is stated in the first sentence of

25  paragraph 17 of your direct testimony, is it not?

1    A.    Yes.

2    Q.    Okay.  The so-called obligations you're specifically

3    focusing on are the nine intercompany balances that are

4    discussed in your declaration, correct?

5    A.    Yes, sir.

6    Q.    Okay.  And your opinion that the debtors consistently

7    treated those balances as valid liabilities is based on

8    essentially two things:  one, that the various transactions

9    giving rise to the balances were accurately recorded in the

10   debtors' general ledgers as payables and receivables; and two,

11   that the balances --

12            THE COURT:  Let's break it down.  Is that correct?

13   Q.    Is that correct?

14   A.    Could you repeat it?

15   Q.    Okay.  Number one, that the various transactions giving

16   rise to the balances were accurately recorded in the debtors'

17   general ledgers as payables and receivables?

18   A.    Yes, I believe that's correct.

19   Q.    Okay.  And the other aspect of your opinion is that the

20   balances were reported on the debtors' financial statements in

21   accordance with generally accepted accounting principles, or

22   GAAP, correct?

23   A.    Where there were separate audited financial statements,

24   yes, that's correct.

25   Q.    Okay.  You are not a CPA, is that correct?

 1   A.    Not at the moment.

 2   Q.    Okay.  When was the last time you had a CPA license?

 3   A.    December 30the, 2011.

 4   Q.    Okay.  You don't profess to be an authority on GAAP, do

 5   you?

 6   A.    No.

 7   Q.    Okay.  You are not offering any opinion here on whether

 8   the balances were, in fact, properly recorded, right?

 9   A.    I'm not sure that's correct.

10   Q.    You're not sure that's correct, okay.  Could you take a

11   look at your deposition transcript, page 94?

12   A.    Which exhibit is it, please?  I don't have it.

13           THE COURT:  It doesn't appear to be in the binder.

14           MR. KAUFMAN:  It should be.

15           THE COURT:  Well, you say so.

16   A.    I'm sorry, I don't seem to find it.

17           THE COURT:  It's not in the binder, Mr. Kaufman.

18   Q.    We'll get it to you promptly.  Because you should have it,

19   I'm sorry.

20           THE COURT:  Go on with your next question while

21   somebody is looking for it.

22           MR. KAUFMAN:  Well, I think it's important, Your

23   Honor, I'm sorry.

24           THE COURT:  I think it's important too.  But I don't

25   have it, he doesn't have it.  Let's move on.  Come back to it.

RESIDENTIAL CAPITAL, LLC, ET AL.                    148

1    Q.   You believe you are offering an opinion on whether the

2    balances were in fact properly recorded?

3    A.   I think I'm offering an opinion that the company's

4    financial statements and audited opinions say that they're

5    properly reported.

6    Q.   I didn't say reported.  I said recorded.  I meant recorded

7    in the general ledger.

8    A.   No.

9    Q.   You're not offering an opinion as to that, are you?

10   A.   I don't believe so.  No.

11   Q.   Okay.  And you're not offering any opinion on whether the

12   balances were, in fact, collectable, are you?

13   A.   Only to the extent that the company did work to verify

14   collectability.

15   Q.   You're not offering any opinion on whether the balances,

16   in fact, represent valid liabilities, are you?

17   A.   I think I'm offering an opinion that the company believed

18   they were valid liabilities.

19   Q.   Okay.  You're not offering any opinion on whether the

20   debtors properly characterized their intercompany balances as

21   debt, are you?

22   A.   No.

23   Q.   You're not offering any opinion on whether the balances

24   should be recharacterized as equity, are you?

25   A.   No.

RESIDENTIAL CAPITAL, LLC, ET AL.                    149

1  Q.    You're not offering any opinion on the value of any of the

2  intercompany balances, correct?

3  A.    No.

4         THE COURT:  That's not correct, or it is correct?

5  Careful with the double negatives.

6  Q.    You are not offering any opinion on that, are you?

7  A.    I am not offering any opinion on that.

8  Q.    And you're not offering any opinion on whether any of the

9  balances comprise any part of the JSNs' collateral in this

10 case, are you?

11 A.    I am not offering that opinion either.

12 Q.    And you're not offering any opinion on the reasonableness

13 of the settlement of intercompany claims as part of the plan

14 here, are you?

15 A.    I'm not offering any opinion in that respect either.

16 Q.    Okay.  So let's just focus on the opinion you are giving,

17 that the debtors treated their intercompany balances as valid

18 liabilities, okay?

19 A.    Yes, sir.

20 Q.    Okay.  Is the fact that the debtors recorded the

21 transactions comprising the balances as payables or receivables

22 on their general ledgers something one can ascertain by looking

23 at the ledgers themselves?

24 A.    I believe so.

25 Q.    So would you agree that it doesn't require any special

1   expertise to detect that?

2           THE COURT:  I don't understand.

3   Q.   Do you think it requires some special expertise to see

4   from the general ledgers that the debtors recorded intercompany

5   transactions as payables and receivables?

6           MR. COHEN:  Objection.

7           THE COURT:  Overruled.

8   A.   I don't believe so.

9   Q.   Okay.  And the fact that the debtors may have reported

10  intercompany balances on financial statements is something one

11  can see just by reading the financial statements, right?

12  A.   Yes.

13  Q.   So it doesn't take any special expertise to figure that

14  out either, does it?

15  A.   No.

16  Q.   Your witness statement cites to a few memos or e-mails

17  written by representatives of the debtors where the

18  intercompany balances are referred to as debt, right?

19  A.   Yes.

20  Q.   Okay.  But one can find those references simply by reading

21  the correspondence, right?

22  A.   Yes.

23          THE COURT:  I don't understand your question.

24  Q.   You can see the references in the documents themselves to

25  the word "debt," correct, just by reading it?

RESIDENTIAL CAPITAL, LLC, ET AL.                    151

1   A.    Yes.

2   Q.    You don't have to be an expert to do that, do you?

3   A.    I don't believe so.

4   Q.    Well, forgive me for asking, Mr. Bingham, but in what way

5   must you be an expert to render the opinion you're offering

6   here?

7            THE COURT:  Fair question.

8   A.    I'm not sure I can answer it.  I believe I've spent a lot

9   of time analyzing intercompany accounts in complex cases with

10  multiple debtors, and as such I have some expertise.

11  Q.    But in terms of the opinion you're rendering here, that

12  the debtors treated their intercompany balances as debt or as

13  valid liabilities, you've cited to basically three things:  one

14  that they recorded the transactions on their ledgers as

15  payables and receivables; they reported the intercompany

16  balances in financial statements as liabilities or receivables

17  or payables; and there are some memos where reference was made

18  to debt.  And I'm just curious what expertise do you require to

19  render the opinion that the debtors treated their intercompany

20  payables -- intercompany transactions as valid liabilities

21  based on those things?

22  A.    Well, I think there are other things in my report that I

23  highlight.  But as to those things, I would agree, it doesn't

24  require a particularly sophisticated expertise.

25  Q.    Okay.  Let's talk about how the debtors recorded

1    intercompany transactions on their general ledgers, all right?

2    Based on what you know, it's true, isn't it, that the

3    intercompany balances at issue are comprised of tens of

4    thousands of individual transactions recorded on the ledgers?

5    A.    That's my understanding.

6    Q.    And you point out in your declaration that the entries

7    appearing on the ledgers seem to have resulted from various

8    types of transactions, correct?

9    A.    Correct.

10   Q.    And in paragraph 16 of your declaration, if you could look

11   at that, you list some of those categories of transactions, do

12   you not?

13   A.    Yes.

14   Q.    And one of the several that you list is the cash

15   management -- the functioning of the debtors' cash management

16   system, correct?

17   A.    Correct.

18   Q.    That's just one of a number of them that you identified?

19   A.    Yes.

20   Q.    Okay.  The individual entries appearing in the ledgers

21   don't reflect what types of transactions gave rise to them, do

22   they?

23   A.    Some do.  Many don't.

24   Q.    Most don't, right?

25   A.    I was unable to do a count, but I would believe that most

1   don't.

2   Q.   Okay.  Did you make any effort to link individual ledger

3   entries that you reviewed to specific types of intercompany

4   transactions, that is, to decipher exactly what transactions

5   gave rise to the particular balance?

6   A.   Yes, we did.

7   Q.   And how did you come out?

8   A.   We had some success, but not a huge amount.

9   Q.   Would you agree that without backup documentation, you

10  don't really know whether it would be possible, at this point,

11  to link all of the ledger entries to particular transactions?

12  A.   I would agree with that.

13  Q.   And do you have any idea whether that supporting

14  documentation exists?

15  A.   I don't know.

16  Q.   Okay.  So you're unable to say, for example, whether any

17  of the entries in the debtors' general ledgers resulted from

18  any particular intercompany agreement, correct?

19  A.   That's correct.

20  Q.   And that's because the ledger entries don't actually make

21  specific reference to agreements, correct?

22  A.   I believe that's correct.

23  Q.   Now let's talk about the reporting of intercompany

24  balances on financial statements.  You believe that by

25  including intercompany balances on their financial statements

RESIDENTIAL CAPITAL, LLC, ET AL.                    154

1   in accordance with GAAP, the debtors assess the collectability

2   of those balances, right?

3   A.   Just to be clear, we're talking about receivables,

4   intercompany receivables?

5   Q.   Yes.

6   A.   Because I don't think you assess collectability of

7   payables.

8   Q.   Yes, collectability.

9   A.   It applies to receivables -- yes, I believe that.

10  Q.   Okay.  And you believe that because you think GAAP

11  requires an intercompany balance to be collectable in order to

12  be put on the financial statement prepared in accordance with

13  GAAP, correct?

14  A.   I believe any asset that you put on the balance sheet of

15  an audited set of financial statements needs to be realizable.

16  Q.   And you believe that --

17  A.   And that would apply to intercompany as well as any other

18  asset.

19  Q.   Okay.  And you believe that because you think that's what

20  GAAP requires?

21  A.   Yes, sir.

22  Q.   Okay.  Are you able to cite to any provision in GAAP that

23  says an intercompany receivable can only be included on a

24  financial statement if the receivable has been assessed to be

25  collectable?

RESIDENTIAL CAPITAL, LLC, ET AL.                    155

1   A.    I don't believe there is anything specifically in GAAP

2   that addresses intercompany receivables as distinct from any

3   other asset in terms of assessing collectability.

4   Q.    Okay.  Do you think there's a -- can you cite me to a

5   provision of GAAP that says that in order to put an asset on a

6   financial statement it has to be collectable?

7   A.    Not off the top of my head.

8   Q.    You would agree, though, that concluding a balance as

9   collectable for GAAP purposes isn't the same as saying the

10  balance will be collected, correct?

11  A.    I would agree with that.

12  Q.    Okay.  Take a look at paragraph 47 of your witness

13  statement.  Let me know when you're there?

14  A.    Yes, sir.

15  Q.    Okay.  You say there that ResCap regularly reported

16  supplemental financial information that included separate

17  parent and subsidiary balance sheet information to the SEC.  Do

18  you see that?

19  A.    Yes.

20  Q.    And you cite as an example the Form 10-QA that ResCap

21  filed for the quarterly period ended June 30, 2009 which you

22  say reflected "in excess of 5.5 billion dollars of borrowings

23  outstanding among ResCap and its subsidiaries in the liability

24  section of its condensed consolidating balance sheet."  Do you

25  see that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    156

1   A.    Yes.

2   Q.    Okay.  And you refer to a number of earlier financial

3   statements filed by ResCap in that paragraph, do you not?

4   A.    Yes.

5   Q.    Okay.  The reason you don't point to any financial

6   statements after June 30, 2009 is that ResCap filed no such

7   statements after that date, correct?

8   A.    I believe that's correct.

9   Q.    So for three years before the petition date, ResCap didn't

10  report intercompany balances on any financial statements filed

11  with the SEC, as far as you know?

12  A.    As far as I know, that's correct.

13  Q.    Okay.  You say the table presented in paragraph 47 of your

14  declaration sets forth a summary of the intercompany balance

15  information shown on the financial statements filed by ResCap

16  between June 30, 2008 and June 30, 2009.  Is that right?

17  That's basically what your tables present?

18  A.    Yes.

19  Q.    Okay.  The so-called borrowings from parent that you show

20  in your table refers to what?

21  A.    I believe those would be borrowings from either the

22  guarantor subsidiaries or the nonguarantor subsidiaries from

23  ResCap or borrowings by ResCap from Ally.

24  Q.    The amounts appearing in the columns in your table are the

25  consolidated amounts, that is, the aggregates, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                              157

1    A.    The extreme right-hand column is consolidated.  I believe

2    the column that says "guarantor subsidiaries" would be the

3    guarantor subsidiaries consolidated, and the column that says

4    "nonguarantor subsidiaries" would be the nonguarantor

5    subsidiaries.

6    Q.    Consolidated?

7    A.    Consolidated, yes.

8    Q.    Right, okay.

9    A.    But not everything consolidated.

10   Q.    Okay.  But those numbers that you present there don't show

11   any individual balances that may exist between two particular

12   ResCap entities, correct?

13   A.    That's correct.

14   Q.    And the financial statements that ResCap filed in 2009 and

15   earlier don't show that either, do they?

16   A.    I would argue that the footnotes are part of the financial

17   statements, and this is what they show.  They don't show the

18   individual balances, I agree with that.

19   Q.    Okay.  Let's talk about the information you present from

20   ResCap's June 30, '09 10-Q, okay?

21   A.    Yes.

22   Q.    Can you tell me where in your columns next to the June 30,

23   '09 date, I can find the purported borrowings among ResCap and

24   its subsidiaries themselves as opposed to amounts that ResCap

25   and its subsidiaries may have borrowed from AFI?

RESIDENTIAL CAPITAL, LLC, ET AL.                    158

1    A.    No.

2    Q.    Okay.  Not enough information to say, right?

3    A.    There's not enough detail.

4    Q.    Okay.  Two of the columns in your table are headed

5    "guarantor subsidiaries" and "nonguarantor subsidiaries",

6    right?

7    A.    Yes.

8    Q.    Okay.  And am I correct that the amounts shown under the

9    guarantor subsidiaries column could include borrowings by

10   guarantor subsidiaries from nonguarantor subsidiaries,

11   borrowings by guarantor subsidiaries from AFI and its

12   affiliates, or borrowings from ResCap itself?

13   A.    I believe that's correct.

14   Q.    Okay.  And the financial statements don't break that out,

15   do they?

16   A.    No.

17   Q.    Am I also correct that the amount shown under the heading

18   "nonguarantor subsidiaries" could include borrowings by

19   nonguarantor subsidiaries from guarantor subsidiaries,

20   borrowings by nonguarantor subsidiaries from AFI, or borrowings

21   from ResCap itself?

22   A.    I agree with that.

23   Q.    And the financial statements don't tell you how much was

24   in any of those three categories in particular, right?

25   A.    I agree with that as well.

RESIDENTIAL CAPITAL, LLC, ET AL.                    159

1          THE COURT:  Is your chart taken directly from the

2    financial -- well, you looked at a bunch of different Q's.

3          THE WITNESS:  It's taken directly from the footnote on

4    each of those 10-Qs.

5          THE COURT:  Okay.  Did you look behind -- did you get

6    the data behind what was in the footnote in the Q's?

7          THE WITNESS:  No.

8    Q.   Please take a look at paragraph 40 of your declaration

9    where you talk about audited financial statements of certain

10   ResCap subsidiaries, specifically GMAC Mortgage, RFC and

11   Homecomings, right?

12   A.   Yes.

13   Q.   And you say those subsidiaries provided independent

14   financial statements because of various state licenses and

15   certain liquidity facilities and contracts, including contracts

16   with HUD and Ginnie Mae, right?

17   A.   Yes.

18   Q.   Whatever financial statements may have been provided in

19   that regard would have been on a consolidated basis, correct?

20   A.   Consolidated at the level of the reporting entity.  Yes, I

21   agree with that.

22   Q.   Okay.  And you agree, don't you, that the reporting of

23   consolidated intercompany balances on financials would not have

24   reflected any assessment that balances between and among the

25   reporting entity and its subsidiaries would actually be

1  satisfied?

2  A.   I would agree with that as well.

3  Q.   You say that GMAC Mortgage, RFC, and Homecomings were

4  required to have their own financial statements because of

5  various state licenses and certain liquidity facilities and

6  contracts.  Do you know to which states those entities provided

7  financial statements?

8  A.   No, I do not.

9  Q.   Do you know in what years they may have done so?

10  A.   I believe Homecomings stopped in 2009, maybe 2008.  The

11  other two financial statements were prepared and audited

12  through December 31st, 2011.

13  Q.   Well, I was asking you about financial statements that may

14  have been provided to states.  Do you know in what years any

15  state received the financial statement?

16  A.   No, I don't.

17  Q.   Do you know whether the states to which financials may

18  have been provided regarded intercompany receivables to be an

19  unacceptable asset for purposes of evaluating net worth?

20  A.   I don't.

21  Q.   You mentioned HUD.  HUD required its filers to have

22  certain net worth levels, right?

23  A.   That's my understanding.

24  Q.   And you understand that HUD did require its filers to

25  adjust their net worth to exclude certain defined unacceptable

1  assets, correct?

2  A.   Yes.

3  Q.   And you understand that one category of unacceptable

4  assets to be excluded under HUD's guidelines was any asset due

5  from a related entity, right?

6  A.   Yes.

7  Q.   And any asset due from a related entity would include any

8  intercompany receivable, right?

9  A.   Yes.

10  Q.   Isn't it true that under both AFI's accounting policies

11  and GAAP there is a general presumption that transactions

12  between related parties are not made at arm's length?

13  A.   I would agree with that.

14  Q.   And AFI's policies were applicable, as far as you know, to

15  all of AFI's direct and indirect subsidiaries, correct?

16  A.   Correct.

17  Q.   And as a result of the presumptively non-arm's-length

18  nature of related-party transactions, is it your understanding

19  that the financial statements of those entities were required

20  to include certain disclosures about the transactions?

21  A.   I think the disclosure may be restricted to the balances,

22  but there is disclosure that highlights the fact that the

23  receivables may have been entered into in other than arm's-

24  length transactions.

25  Q.   So its your understanding that if it is not arm's length,

1    some disclosure is required?

2    A.    That's my understanding.

3    Q.    Okay.  Were you here for Ms. Gutzeit's testimony this

4    morning?

5    A.    Yes, sir, I was.

6    Q.    Did you hear her testify that it's the opposite, that

7    because there is a presumption that related-party transactions

8    are not at arm's length, that in order to overcome that

9    presumption, if you wish to do so, you need to make an

10   affirmative showing to substantiate the non-arm's length -- the

11   arm's-length basis?

12   A.    I'm confused.  I agree that if you have related-party

13   transactions, you need to disclose, that they're at an other

14   than arm's-length basis so that the reader of the financial

15   statements is aware that those transactions may not have been

16   consummated on an arm's-length basis.

17   Q.    Okay.  So that's your understanding?

18   A.    That's my understanding.

19   Q.    Okay.  You do agree, though, that both GAAP and AFI's

20   accounting policies distinguish between related-party

21   transactions and transactions made with third parties?

22   A.    Yes, I agree.

23   Q.    Okay.  And all of the intercompany balances at issue here

24   involved intercompany transactions, right?

25   A.    That's my understanding.

RESIDENTIAL CAPITAL, LLC, ET AL.                        163

1   Q.    Okay.  You are aware, are you not, that at least as early

2   as December 2008, ResCap included in its consolidated financial

3   statements an explicit warning that adverse developments in its

4   business raised substantial doubt about its ability to continue

5   as a going concern?

6   A.    Yes, I'm aware.

7   Q.    And you understand that a going-concern warning alerts the

8   user that there is risk that the company may end up in an

9   insolvency proceeding, correct?

10  A.    Yes.

11  Q.    So wouldn't you agree that the going-concern warnings in

12  ResCap's financial statements alerted those receiving the

13  financials that there was a question whether even obligations

14  to third parties, let alone intercompany balances, would ever

15  be satisfied?

16  A.    I think it's an alert that liabilities may not be

17  satisfied, whether it's as absolute as the question implied,

18  I'm not sure.  You may interpret that to mean I might get less

19  than a hundred cents.

20  Q.    Okay.  Let's now move to what you say about so-called debt

21  forgiveness, okay?  Could you look at paragraph 114 of your

22  written statement?  Do you have that?

23  A.    Yes, sir.

24  Q.    Okay.  And there you quote from Article 2, section K, of

25  the revised disclosure statement in this case which states:

RESIDENTIAL CAPITAL, LLC, ET AL.                         164

1   "On numerous occasions where the existence of an intercompany

2   payable on a debtor's balance sheet threatened the solvency and

3   net worth thresholds required under external funding

4   agreements, or by federal or state regulations, the putative

5   debt obligations were forgiven.  Additionally, putative debt

6   obligations were forgiven among the debtors and certain

7   nondebtor subsidiaries in connection with the debtors'

8   international transactions and the dissolution of entities.

9   Approximately 16.6 billion dollars of debt was forgiven without

10  consideration from 2007 through the petition date."  Do you see

11  that?

12  A.    Yes.

13  Q.    You don't dispute the accuracy of any of those statements,

14  do you?

15  A.    No.

16  Q.    Okay.  And wasn't it your understanding that the 16.6

17  billion dollars of forgiveness mentioned in the disclosure

18  statement consisted of 149 separate instances of forgiveness?

19  A.    My understanding, yes, although most of them had nothing

20  to do with debtor-to-debtor.

21  Q.    Well, you say that, but you understand that the 16.6

22  billion of forgiveness mentioned in the disclosure statement

23  involved 149 separate instances of forgiveness, right?

24  A.    Yes, I do.

25  Q.    Okay.  And in all 149 instances, one of the debtors was

RESIDENTIAL CAPITAL, LLC, ET AL.                    165

1    involved on at least one side of the transaction, correct?

2    A.    That's my understanding.

3    Q.    Okay.  That is, a debtor forgave appear balance or was

4    forgiven a balance, correct?

5    A.    That would be correct.

6    Q.    Okay.  And in every instance where debtors were on both

7    sides of the forgiveness, the forgiveness was treated by the

8    debtors as a capital contribution or an adjustment to equity,

9    correct?

10   A.    Well, on the subsidiary that there was a beneficiary of

11   the forgiveness, the entry was to reduce the accounts payable

12   to the parent and increase the subsidiary's equity account.

13        On the forgiving parent's books, the entry was to reduce

14   the accounts receivable and increase the investment in

15   subsidiary.  So on the parent book, I don't believe it actually

16   hits the parent's equity.  It hits two asset accounts.

17   Q.    Okay. Don't you regard that treatment as, in effect, a

18   capital transaction?

19   A.    Oh, it's a capital transaction, but it doesn't hit the

20   parent's equity account.

21   Q.    Okay.

22        THE COURT:  I understand, Mr. Kaufman.

23   Q.    Isn't it your understanding that in 148 of the 149

24   instances of forgiveness comprising the 16.6 billion dollars of

25   forgiveness, the treatment was as a capital transaction?

RESIDENTIAL CAPITAL, LLC, ET AL.                                166

1    A.    That's my understanding, although I only looked at the

2    seven transactions that were between debtors.

3    Q.    Okay.  And it's your understanding that recording

4    forgiveness of an intercompany balance as a capital

5    contribution was consistent with AFI's accounting policies,

6    right?

7    A.    Yes.

8    Q.    Mr. Bingham, do you believe the debtors were in a position

9    to disregard AFI's policy?

10    A.    It seems unlikely.

11    Q.    And that's because subsidiaries generally are bound by

12    what its parent -- what their parent decides, right?

13    A.    My experience with multiple entities is if the parent has

14    an accounting policy, the expectation is that every entity in

15    that organization would follow that accounting policy without

16    getting explicit permission not to.

17    Q.    Okay.  In paragraph 116 of your witness statement, you

18    point out that "the forgiveness of intercompany balances

19    required various levels of approval depending upon the amount

20    forgiven."  Do you see that?

21    A.    Yes.

22    Q.    And in paragraph 121, you identified those approval

23    levels, right?

24    A.    I think all that's identified is fifty million or more

25    requires the Ally board approval.  I'm not sure I see any other

RESIDENTIAL CAPITAL, LLC, ET AL.                    167

1    levels.

2    Q.    Okay.  You identify that one?

3    A.    I identify a level, I think.

4    Q.    All right.  You go on to say, though, "The formal process

5    described and carefully followed for each such transaction is

6    further evidence that the transactions that resulted in the

7    intercompany balances were considered debt transactions, not

8    equity investments or distributions, when they were completed."

9    Do you see that?

10   A.    Yes.

11   Q.    Let me ask you this, Mr. Bingham:  Are you aware of a

12   single instance where a request to record forgiveness of an

13   intercompany balance as a capital contribution was refused?

14   A.    No.

15   Q.    Please take a look at paragraph 124 of your witness

16   statement.  Do you have that?

17   A.    Yes.

18   Q.    And there you say:  In my opinion, there is nothing about

19   the debt forgiveness process that would suggest to me that the

20   debtors intended to treat the intercompany balances as anything

21   other than debt.  Do you see that?

22   A.    Yes, sir.

23   Q.    Based on what you've reviewed, isn't it true that the

24   debtors forgave intercompany balances whenever they saw the

25   need, whenever it suited their business purposes?

1   A.   I believe when there was a valid business purpose, they

2   would forgive debt.

3   Q.   Whenever they saw the need, right?

4   A.   When there was a valid business purpose.

5   Q.   Okay.

6   A.   I have not seen anything that said it was willy-nilly.  I

7   think there was a valid business purpose to preserve the value

8   of the business in the entity benefiting from the debt

9   forgiveness.

10  Q.   For whatever the actual purpose may have been and assuming

11  it was valid, they basically did it whenever they saw fit,

12  didn't they?

13  A.   I can't answer that, because I don't know.

14  Q.   Okay.  But whenever they did forgive balances, they

15  consistently treated them as capital transactions, right?

16  A.   I don't believe they had an alternative under the policy.

17  Q.   Okay, moving on.  At least between the time ResCap began

18  to include going concern warnings in its financial statements

19  in 2008 and the petition date, is it your professional opinion

20  that any prudent outside lender would have extended to ResCap

21  or any of its subsidiaries the amounts reflected in the

22  debtors' intercompany balances without a written agreement?

23  A.   That seems highly unlikely.

24  Q.   Without any collateral?

25  A.   You know, in 2008 there were lenders making loans without

RESIDENTIAL CAPITAL, LLC, ET AL.                        169

1    collateral that in hindsight, I would think were not the

2    smartest move in the world.

3    Q.    How about between 2008 and the petition date?

4    A.    There were still some dumb loans out there, but generally

5    speaking --

6    Q.    Okay.

7    A.    -- one would hope that one got collateral.

8    Q.    Would the typical outside lender have lent the amount of

9    money we're talking about without any stated interest?

10   A.    Seems highly unlikely.

11   Q.    Without any maturity date?

12   A.    Also it seems highly unlikely.

13   Q.    Without any repayment schedule?

14   A.    Also seems highly unlikely.

15   Q.    Without any default provisions?

16   A.    Somewhat more likely, but unlikely.

17   Q.    Okay.  Do you believe any prudent outside lender would

18   have accepted being subordinated to all other creditors?

19   A.    Seems unlikely.

20   Q.    Are you familiar with the credit agreements between the

21   debtors and AFI?

22   A.    Not really.

23   Q.    Okay.  So you don't know to what extent the various

24   characteristics I just mentioned appear in those agreements,

25   right?

1   A.   No, I don't.

2   Q.   Now let's talk about the nine intercompany balances that

3   you reviewed, okay?  And that begins on page 57 of your witness

4   statement.

5          THE COURT:  There is only 44 pages to the witness

6   statement.

7          MR. KAUFMAN:  Paragraph 57, I said.

8          THE COURT:  I thought you said page.

9          MR. KAUFMAN:  I meant paragraph.

10  Q.   Paragraph 57 that continues through paragraph 113.  We're

11  going to talk about that.  And within those paragraphs you

12  address the nine largest intercompany balances appearing on the

13  debtors' books and records as of the petition date, correct?

14  A.   Yes.

15  Q.   Okay.  Balance number 1 is a 3.3-billion-dollar receivable

16  held by ResCap from its direct subsidiary Res Holding, right?

17  A.   Yes.

18  Q.   As to that balance, you point out in paragraph 58 that

19  "The debtors noted in Exhibit 6 to the revised disclosure

20  statement that the balance generally arose from transactions

21  under an agreement between ResCap and Res Holding."  Do you see

22  that?

23  A.   Yes.

24  Q.   You don't know from personal knowledge, though, whether

25  that statement is factually accurate, do you?

RESIDENTIAL CAPITAL, LLC, ET AL.                    171

1   A.   I'm assuming if they put it in the disclosure statement,

2   it is accurate.  But other than that, no.

3   Q.   Okay.  So you have not actually seen a lending agreement

4   of any kind between ResCap and Res Holding that might have

5   governed this balance?  Correct.

6   A.   I have I may have seen a note.  I just don't remember.

7   Q.   Okay.  Take a look at paragraph -- by the way, Mr.

8   Bingham, that's the answer you gave me when I asked you the

9   question at your deposition; but take a look at paragraph 66 of

10   your declaration or your witness statement here.  You seem to

11   refer to the existence of agreement in that paragraph, right

12   A.   Yes.

13   Q.   But you don't really know whether that agreement exists,

14   am I correct?

15   A.   I believe it does, but I'd have to find it.

16   Q.   Well, you believe it does based on what's in the

17   disclosure statement, but you don't have personal knowledge of

18   it?

19   A.   I thought I read it, but I don't have it in front of me

20   and I don't know.

21   Q.   Let's look at balance number 2, which is a 1.95-billion-

22   dollar receivable held by RFC from ResCap, right?

23   A.   Yes, sir.

24   Q.   Okay.  As to this balance, you say in paragraph 169 of

25   your declaration --

1   A.   169 or 69?

2   Q.   169 -- I'm sorry, 69 -- do you have that?

3   A.   Yes, sir.

4   Q.   Okay.  And there you say:  "Based on my review of RFC's

5   independently audited financial statements for the years ended

6   December 31, 2011 and 2010, RFC treated and recorded its

7   intercompany balancing due from ResCap as a fully collectable

8   intercompany receivable."  Do you see that?

9   A.   Yes.

10  Q.   Interest on this balance was never paid, was it?

11  A.   Not to my knowledge.

12  Q.   And interest was not even accrued, was it?

13  A.   Not to my knowledge.

14  Q.   And you're not aware of any agreements showing RFC as the

15  lender and ResCap as the borrower, are you?

16  A.   No.

17  Q.   So far as you know, there is no actual agreement

18  reflecting this relationship?

19  A.   Not to my knowledge.

20  Q.   Is it your professional opinion, Mr. Bingham, that a

21  prudent outside lender would have ever loaned nearly two

22  billion dollars to ResCap without any agreement?

23  A.   No.

24  Q.   Without any interest?

25  A.   No.

RESIDENTIAL CAPITAL, LLC, ET AL.                    173

1   Q.   Without any maturity date?

2   A.   No.

3   Q.   Without any repayment schedule?

4   A.   No.

5   Q.   Without any default provisions?

6   A.   No.

7   Q.   Without any collateral?

8   A.   No.

9   Q.   So the only things to which you can point in saying RFC

10  treated this balance as a fully collectable intercompany

11  receivable are that it recorded the balances and receivable on

12  its ledger and reported it in its financial statements in

13  accordance with GAAP, correct?

14  A.   There's also an internal memo, I believe, from Ms. Westman

15  that they had investigated and concluded it was realizable.

16  Q.   That is, it could be repaid?

17  A.   Yes.

18  Q.   Okay.  Anything other than that?

19  A.   No.

20  Q.   Okay.  Let's look at balance number 3, which is a 1.25-

21  billion-dollar receivable held by Homecomings from RFC, right?

22  A.   Yes.

23  Q.   Okay.  And in paragraph 82 of your witness statement, you

24  state:  "Indeed, it is apparent from the contemporaneous

25  financial statements prepared by Homecomings that Homecomings

RESIDENTIAL CAPITAL, LLC, ET AL.                    174

1   expected its intercompany receivable balance due from RFC to

2   repay."  Do you see that?

3   A.    Yes.

4   Q.    But the mere recording of the receivable on Homecomings'

5   financial statements does not establish an actual expectation

6   of repayment, does it?

7   A.    Probably not.

8   Q.    Okay.  It might reflect an assessment of collectability

9   from a GAAP standpoint, but not an expectation of repayment,

10  right?

11  A.    The footnotes to the financial say that that as stated net

12  realizable value, so.

13  Q.    So your declaration is overstated, correct?

14  A.    I would say that's a little bit of a stretch.

15  Q.    Okay.  And you're not aware of any other way in which

16  Homecomings manifested an expectation that RFC would repay this

17  balance, are you?

18  A.    No.

19  Q.    You're also not aware of any agreement between Homecomings

20  and RFC showing Homecomings as the lender and RFC as the

21  borrower, are you?

22  A.    I'm not.

23  Q.    If Homecomings had been a typical outside lender, is it

24  your professional opinion that it would have loaned RFC 1.25

25  billion dollars without a loan agreement identifying it as the

RESIDENTIAL CAPITAL, LLC, ET AL.                    175

1  lender?

2  A.   I would agree that's not going to happen.

3  Q.   Okay.  Let's look at balance number 4.  Andthat's a 697-

4  million-dollar receivable that Passive Asset Transactions or

5  PATE has from GMAC Mortgage, correct?

6  A.   Correct.

7  Q.   Okay.  And in paragraph 85 of your witness statement, you

8  point out that "The schedules filed by GMAC mortgage and PATE

9  in this case reflect this balance as amounts owing from GMAC to

10 PATE," right?

11 A.   Yes, sir.

12 Q.   But recording this balance as payables or receivables on

13 the schedules filed post-petition certainly doesn't reflect any

14 expectation that the balance will be repaid, right?

15 A.   Well, I think it reflects a belief that it's a valid asset

16 or liability.  What it would recover, you can't tell from the

17 schedules.

18 Q.   Okay.  And you're not aware of any other way in which PATE

19 ever manifested an expectation that this receivable from GMAC

20 would be repaid, are you?

21 A.   No, I'm not.

22 Q.   And you're not aware of any agreement between PATE and

23 GMAC Mortgage reflecting a lending agreement between them, are

24 you?

25 A.   No, I'm not.

 1    Q.    So you're not aware of any stated interest rate, repayment

 2    schedule, maturity date, default provisions, or collateral in

 3    this instance, right?

 4    A.    No, I'm not.

 5    Q.    Okay.  And you would agree, wouldn't you, that if PATE

 6    were a typical outside lender, it wouldn't have made a loan of

 7    697 million dollars without a loan agreement?

 8    A.    I would agree.

 9    Q.    Okay.  Let's look at intercompany balance number 5, which

10    is a 265.4-million-dollar receivable that ETS has from GMAC

11    Mortgage, right?

12    A.    Yes, sir.

13    Q.    Other than the fact that this balance was recorded on the

14    parties' ledgers as a payable or receivable, is there anything

15    else you believe evidences the debtor's intention or

16    expectation that the balance would ever be repaid?

17    A.    I'm not aware of anything.

18    Q.    And you're not aware of any loan agreement between ETS and

19    GMAC Mortgage, are you?

20    A.    No, I'm not.

21    Q.    So you're not aware of the existence of any repayment

22    schedule, any maturity date, any stated interest, any default

23    provisions or any collateral there either, right?

24    A.    That's correct.

25    Q.    And is it your professional opinion that a typical outside

1  lender would have loaned GMAC mortgage 265 million dollars

2  without any agreement?

3  A.    I don't believe that would happen.

4  Q.    Let's look at intercompany balance number 6, which is a

5  232-million-dollar receivable held by RFC from Rahi, R-A-H-I,

6  right?

7  A.    Yes, sir.

8  Q.    Other than the fact that the balance was recorded on the

9  debtor's ledgers as a payable or receivable, is there anything

10 else you believe evidences any intention or expectation that

11 this balance would be repaid?

12 A.    I'm not aware of anything.

13 Q.    And you're not aware of any loan agreement between RFC and

14 Rahi with respect to this balance, correct?

15 A.    No, sir.

16 Q.    So you're not aware of any maturity date, repayment

17 schedule, stated interest, default provisions or collateral

18 here either, right?

19 A.    No, sir.

20 Q.    Okay.  Is it your professional opinion that any typical

21 outside lender would have loaned Rahi this amount of money

22 without any agreement?

23 A.    It seems unlikely.

24 Q.    Let's look at intercompany balance number 7, which is a

25 139.7-million-dollar receivable held by RFC from GMAC Mortgage,

RESIDENTIAL CAPITAL, LLC, ET AL.                    178

1    right?

2    A.   Yes, sir.

3    Q.   As to this balance, you purport to quote in paragraph 99

4    of your declaration, your witness statement, from the

5    disclosure statement as to how this balance arose, right?

6    A.   Yes.

7    Q.   Okay.  As far as you know, interest was never accrued, let

8    alone paid on this balance, right?

9    A.   That's my understanding.

10   Q.   And you're not aware of any agreement between RFC and GMAC

11   Mortgage with respect to this balance, are you?

12   A.   Only what Ms. Gutzeit testified to this morning, that

13   generally this was satisfied on a fairly regular basis in cash.

14   Q.   Did you know that before Ms. Gutzeit said so?

15   A.   I think I remember reading it somewhere.  But --

16   Q.   You're not sure?

17   A.   Don't remember for sure.

18   Q.   Okay.  So you're not aware of any maturity date for a

19   loan, any stated interest requirement, any repayment schedule,

20   any default provisions or any collateral governing this

21   balance, right?

22   A.   No, sir.

23   Q.   Right, yes?

24   A.   I'm not aware of anything.

25   Q.   Okay.  Is it your professional opinion that any typical

1   outside lender would have extended credit in this amount to

2   GMAC Mortgage without any agreement?

3   A.   This one is a little different in that if it's settled

4   monthly a normal trade vendor might extend credit, although

5   seventy million seems a little big.

6   Q.   Okay.  You note in paragraph 101 of your witness statement

7   that this balance is between two sister companies rather than a

8   parent and subsidiary, right?

9   A.   That's correct.

10  Q.   And you say that this fact is "reflective of an intent to

11  treat this balance as debt because you would not expect an

12  equity investment between sister companies to be reflected on a

13  company's books and records as an intercompany receivable."  Do

14  you see that?

15  A.   Yes.

16  Q.   Okay.  But RFC and GMAC Mortgage were both part of the

17  ResCap enterprise, and thus both were subject to AFI's

18  accounting policies, right?

19  A.   That's correct.

20  Q.   Other than the facts that this balance was recorded on the

21  debtors' ledgers as a payable or receivable and was reported as

22  such in financial statements, is there anything else you

23  believe evidences an intention or expectation that the balance

24  would actually be repaid?

25  A.   Other than what Ms. Gutzeit testified to this morning,

1   that as a matter of course it was normally paid.

2   Q.   But until Ms. Gutzeit said that, you hadn't thought about

3   that, had you?

4   A.   That's correct.

5   Q.   Okay.  Let's look at intercompany balance number 8, which

6   is a 54.6-million-dollar receivable held by Home Connects from

7   Res Holding, correct?

8   A.   Yes.

9   Q.   And there, other than the fact that this balance was

10  recorded as a payable or receivable on the debtor's ledgers,

11  can you point to anything you think evidences an intention or

12  expectation that this balance would be repaid?

13  A.   No.

14  Q.   Let's look at intercompany balance number 9, which is a

15  51.4-million-dollar receivable held by Res Holding from GMAC

16  Mortgage, right?

17  A.   Yes, sir.

18  Q.   In paragraph 112 of your declaration -- do you have that

19  in front of you?

20  A.   Yes.

21  Q.   There you say, "It is apparent from these contemporaneous

22  financial statements that the intercompany balance was treated

23  as a valid liability on GMAC M's statements and is a valid and

24  collectable receivable on RFC's statements.  Such accounting is

25  an indication that these entities expected the intercompany

1   balances would be repaid and/or that repayment could be

2   demanded."  Do you see that?

3   A.   Yes.

4   Q.   But as we discussed a few moments ago, you now agree that

5   the mere reporting of a receivable on a financial statement

6   while possibly reflecting collectability does not evidence an

7   actual expectation of collection, right?

8   A.   That's correct.

9         MR. KAUFMAN:  Okay.  Give me one moment, Your Honor.

10        THE COURT:  Yes, Mr. Kaufman.

11        MR. KAUFMAN:  I have nothing further.

12        THE COURT:  Thank you.  Any additional cross-

13   examination?

14        MR. ELLENBERG:  If the Court, please, Mark Ellenberg

15   with Cadwalader on behalf MBIA.

16   CROSS-EXAMINATION

17   BY MR. ELLENBERG:

18   Q.   Good afternoon, Mr. Bingham.

19   A.   Good afternoon, Mr. Ellenberg.

20   Q.   I'd like to ask you just a few questions about how the

21   cash management system operated prior to the petition date.

22   Did the ResCap cash management system concentrate cash in a

23   single entity?

24   A.   I believe it concentrated most of the cash at ResCap.  I

25   don't know if there were other place where is they may have

1  concentrated cash.

2  Q.   And were there periodic sweeps of the cash?

3  A.   That's my understanding.

4  Q.   How often?

5  A.   I don't know.

6  Q.   Daily?

7  A.   The sweeps seem to have been generated by a manual

8  process, so in many cases they may have been daily, but I did

9  not look at the frequency of the sweeps.

10  Q.   Each time there is a transfer, a sweep, an intercompany

11  receivable would be generated?

12  A.   A receivable and a payable would be generated.

13  Q.   Okay.  And then if an entity needed cash, ResCap would

14  send the cash down to the entity who needed it?

15  A.   That's my understanding.

16  Q.   And each time that happened, a receivable and a payable

17  would be generated?

18  A.   That's my understanding, yes.

19  Q.   Okay.  So let's say that at the end of the day RFC ended

20  up with a hundred dollars and it was swept to ResCap pursuant

21  to the cash management system.  So RFC books a hundred-dollar

22  receivable from ResCap as an asset, correct?

23  A.   That's correct.

24  Q.   And RFC debits cash by a hundred dollars?

25  A.   RFC --

1   Q.   Debits cash by a hundred dollars, because its cash has now

2   gone up to ResCap.

3   A.   So it would credit cash.

4   Q.   Credit cash, okay.

5   A.   I think.  The entity that gave up the cash would credit

6   cash and debit a receivable.

7   Q.   Okay.

8   A.   The entity that receives the cash would debit cash, which

9   would increase the cash balance, and credit the receivable.

10   Q.   Fair enough

11   A.   -- credit payable, I'm sorry.

12   Q.   And the net worth of RFC is not altered by that transfer,

13   correct?

14   A.   As long as the receivable that it has is collectable,

15   that's true.

16   Q.   And is the net worth of ResCap altered?

17   A.   No.

18   Q.   Okay.  So we had a hundred dollars in cash.  After that

19   transfer we now have a hundred dollars in cash and a hundred-

20   dollar intercompany receivable, correct?

21   A.   We no longer have the a hundred dollars in cash.  If by

22   "we" you mean the entity that transferred the cash?  I'm

23   confused by your question.

24   Q.   Consolidated ResCap.

25   A.   Oh, consolidated ResCap, you still have a hundred dollars

RESIDENTIAL CAPITAL, LLC, ET AL.                    184

1  in cash and the intercompany payable and receivable eliminate

2  at the ResCap level consolidated.  So nothing has changed on a

3  consolidated basis.

4  Q.    But on an intercompany basis there is now a hundred

5  dollars in cash at ResCap and there is an intercompany

6  receivable for a hundred dollars?

7  A.    The intercompany receivables would be on RFC.

8  Q.    Correct.

9  A.    The payable is on ResCap where the cash resides.

10  Q.    Okay.  And if you now take the hundred dollars and send it

11  down to GMAC M because they need the money, there will be a

12  hundred dollars in cash added to GMAC M, and GMAC M will book a

13  payable back to ResCap?

14  A.    That's correct.

15  Q.    Okay.  So we now have a hundred dollars in cash at GMAC M

16  and we have in the system 200 dollars of intercompany

17  receivables?

18  A.    That's correct, there would be an intercompany receivable

19  of a hundred at ResCap and a hundred dollar receivable at, what

20  did we say, RFC.

21  Q.    And now, if GMAC M has a good day and the cash is excess

22  and it sends it back to ResCap, what happens to the

23  intercompany receivable, do we just add another one?

24  A.    Are we assuming that it's the same hundred dollars?

25  Q.    I don't know.  At the end of the day GMAC M has a hundred-

RESIDENTIAL CAPITAL, LLC, ET AL.                    185

1    dollar balance, it gets swept pursuant to the cash management

2    system.

3    A.    Okay.  So prior to that GMAC M had an intercompany balance

4    payable to ResCap.  When the hundred dollars moves, it's my

5    understanding you would credit cash to GMAC M and debit the

6    intercompany account, which would then eliminate the balance

7    between ResCap and GMAC M.

8    Q.    Okay.  Is it possible they would just book another

9    intercompany receivable?

10   A.    My understanding of the general ledger is they only had

11   one intercompany, generally had one intercompany account

12   between two entities.  So all the debits and credits went into

13   the same account.  So they were automatically netted.

14   Q.    Okay.  So we now have a hundred dollars at ResCap and a

15   hundred-dollar intercompany receivable?

16   A.    ResCap has an intercompany payable to RFC.

17   Q.    Right.

18   A.    And RFC has a hundred-dollar receivable from ResCap.

19   Q.    Okay.

20          MR. ELLENBERG:  No further questions.

21          THE COURT:  Thank you, Mr. Ellenberg.

22          Mr. Perry?

23   REDIRECT EXAMINATION

24   BY MR. PERRY:

25   Q.    Let's focus on the cash management system that Mr.

 1  Ellenberg was just taking you through.  And I want to focus

 2  specifically on the questions that Mr. Kaufman asked you about

 3  the typical features of a loan made by a prudent outside

 4  lender.  What is your experience with respect to the types of

 5  documentation that would be applicable to intercompany balances

 6  created by the ordinary-course use of a cash management system?

 7  A.   My experience has been consistently where there is a

 8  centralized cash management system with a multientity structure

 9  where cash is moving through a cash management system, the

10  documentation of that is generally only the entries in the

11  books of account.

12  Q.   Okay.  And with respect to Mr. Ellenberg's questions about

13  cash moving through the ResCap system, do you have any

14  understanding one way or another about whether there were

15  different creditors and different guarantors and different

16  financial obligations at each of the entities within the ResCap

17  system?

18  A.   I haven't looked at detail.  I have looked at the

19  statements of liabilities; and there are different creditors on

20  different statement, bankruptcy statements of liabilities,

21  which would imply there is different creditors with different

22  interests within the consolidated group.

23  Q.   Okay.  Now I want to talk about the equity or debt

24  characterization of balances where the parent owes the

25  subsidiary money.  In your experience, is it usual or unusual

1   for a subsidiary to make equity investments in the parent

2   entity?

3   A.   Generally, I don't think you would see a subsidiary make

4   an equity investment in a parent.  What you would see is if

5   cash moved that was approved as an equity transaction, you

6   would see it either as a dividend or a return of capital.

7   Q.   Now, so let's talk about dividends for a second.  What

8   is -- in your experience, how are dividends documented and

9   effected within a corporate organization?

10  A.   Okay.  Let's just -- I had been an officer of numerous

11  subsidiaries at Enron and Prime Motor -- Enron was obviously

12  just post-petition, but there were a lot of nondebtor

13  subsidiaries.  My experience is in order for a dividend to be

14  effectuated, it needs board approval of the subsidiary and it

15  generally is backed up by an analysis that says there is

16  nothing in state law or nothing in any of our agreements that

17  would impair the ability of that subsidiary to meet whatever

18  obligations it has.

19  Q.   And did you see any evidence that the debtors performed

20  any sort of analysis before of the type that you just testified

21  to before cash was distributed up from subsidiary to parent?

22  A.   I found no evidence of that.

23  Q.   In your experience, are equity investments within a

24  corporate organization frequent or infrequent?

25  A.   My experience is generally that equity transactions among

1  entities within a consolidated group are infrequent.  They're

2  generally in round numbers, you know, whole numbers.  They're

3  certainly not more than -- usually once a quarter you might

4  declare a dividend, or once a quarter you might investigate

5  whether you need to make an equity contributions.  But I have

6  never been involved in a situation where equity transactions

7  were frequent.

8  Q.   And so how would you compare your experience with equity

9  transactions with the operation of the cash management system

10  at ResCap pre-petition?

11  A.   Given the frequency of the transactions and that they were

12  generally tied to ordinary-course of business transactions,

13  they're atypical of the type of thing I would expect to see

14  recorded in equity accounts.

15  Q.   Now if you can take out your direct testimony, I think Mr.

16  Kaufman pointed you to paragraph 47 --

17          THE COURT:  Mr. Perry, how long do you -- I'm not

18  rushing you, I'm just asking you how long do you anticipate

19  being in your redirect?

20          MR. PERRY:  I may have ten minutes more.  I'm just

21  moving through my notes.

22          THE COURT:  Okay, go ahead.

23  Q.   Why did you include this table within your direct

24  testimony?

25          THE COURT:  Sorry, which paragraph?

1          MR. PERRY:  47.

2          THE COURT:  Thank you.

3          THE WITNESS:  It's the SEC summary, Your Honor.

4   A.    I included it because it's indicative that in their

5   financial reporting they reported the intercompany liabilities

6   as liabilities.

7   Q.    And on that subject, Mr. Kaufman asked you a series of

8   questions about HUD filings and excluded or impermissible

9   assets in HUD filings.  Can you tell me one way or another

10  whether intercompany liabilities are -- impact an entity's net

11  worth for purposes of a HUD filing?

12  A.    Again, I only yesterday looked at the HUD regulation, and

13  it starts with the entities' reported net worth.  And then it

14  takes out impermissible assets.  But I didn't see anything in

15  there that would adjust for -- I'm not even sure the term makes

16  sense -- impermissible liabilities.  Implicitly all the

17  liabilities are left there.  The only thing that is taken out

18  are intercompany assets.

19  Q.    So from -- just to make sure I understand, from the

20  perspective of a state or federal regulator that treats

21  intercompany assets as excluded for purposes of calculating net

22  worth, the intercompany liabilities are still included in

23  connection with the financials submitted to the regulator for

24  their evaluation?

25  A.    Well, to --

RESIDENTIAL CAPITAL, LLC, ET AL.                    190

1           MR. KERR:  Objection, Your Honor.

2           THE COURT:  Sustained.

3  Q.   Well, with respect to federal and state regulators, are

4  intercompany liabilities, to the best of your knowledge,

5  included in the calculation of net worth?

6  A.   I think I can answer something more narrow.  The financial

7  statements, consolidated financial statements that were

8  prepared and audited that I saw that I understand were

9  submitted to regulators or states, reflected both the

10  intercompany assets to the extent they were assets related to

11  people outside the consolidated group upon which the report was

12  on.  Similarly, the liabilities outside of that group, but

13  still within ResCap, are reflected on the balance sheet.

14          THE COURT:  They'd eliminate the ones within the

15  group, but show them with respect to those outside the group,

16  either way, payables or receivables?

17          THE WITNESS:  That's my understanding, that

18  anything -- for instance, on GMACM, anything within GMACM would

19  eliminate, but anything outside would show.  As to what the

20  regulator may or may not do, based on my reading of the HUD

21  document I saw yesterday, the regulator would give no benefit

22  in terms of determining whatever net worth it deemed sufficient

23  for the intercompany receivables, and a bunch of other stuff

24  that's listed there.  I didn't see anything in there that said

25  the regulator would ignore the intercompany payables, which in

RESIDENTIAL CAPITAL, LLC, ET AL.                    191

1  essence would give the reporting entity more equity than it

2  otherwise had.

3  Q.   Okay.  And to follow up on a series of questions Mr.

4  Kaufman asked you about the presumption of intercompany

5  transactions not being at arm's length; what do you make of

6  that fact in connection with your analysis of the debtors'

7  intent with respect to the intercompany balances?

8           MR. KAUFMAN:  Objection.

9           THE COURT:  Sustained.

10  Q.   Is it relevant or --

11          MR. PERRY:  Strike that.

12  Q.   Is it important to your analysis of the intercompany

13  balances that related-party transactions were not treated --

14  were treated as not at arm's length for purposes of Ally and

15  ResCap's accounting policy?

16  A.   I'm troubled by the question, because I'm not sure the

17  accounting policy dictated how you treated those transactions

18  because they were not arm's length.  The fact that they're not

19  arm's length, as I read the accounting guidance, says that you

20  need to disclose that there is information in the audited

21  financial statements, or unaudited if they purport to be with

22  GAAP -- under GAAP, that may have been consummated in other

23  than an arm's length basis.  I'm not sure that's responsive.

24          THE COURT:  I think it is, actually.

25  Q.   No, I think it is.

RESIDENTIAL CAPITAL, LLC, ET AL.                    192

1          In terms of the -- you referenced in your testimony a

2     collectability analysis that you reviewed that was prepared by

3     Ms. Westman.  How did that affect your analysis of the

4     intercompany at issue with respect to Ms. Westman's review?

5     A.   I think it provided additional evidence that management

6     reviewed the intercompany balances in those cases where there

7     was a receivable reflected on financial statements where an

8     auditor was going to sign an opinion and presumably management

9     is going to sign a representation letter that they believed

10    that those assets were fairly stated under GAAP, which would

11    imply you had to do a realizability test on whatever those

12    assets are.

13    Q.   Okay.  And do you know when that collectability analysis

14    was reported by Ms. Westman?

15    A.   The one in my memory related to the December 31st, 2011

16    Res Holdings, I think, financial statements, it and it was done

17    sometime I believe February of 2012.

18              THE COURT:  That's the only one you saw, right?

19              THE WITNESS:  That's the only one I saw.

20              THE COURT:  Because that was the one she testified was

21    the only one she had done that -- the memo.  You never saw any

22    others?

23              THE WITNESS:  I mean, we did extensive searches

24    through the data and we did not find anything else.

25    Q.   And that relates to intercompany number 2 in your

1    analysis, correct?

2    A.    That's correct.

3    Q.    Mr. Kaufman asked you a question about your experience

4    with respect to intercompanies, and I think you gave some

5    testimony about your experiences with Enron.  Can you tell --

6    can you tell me what the issue was with respect to

7    intercompanies in the Enron bankruptcy?

8                MR. KERR:  Objection.

9                THE COURT:  Sustained.  I'm sure we'd all love to hear

10   about Enron, but we're not going to.

11               THE WITNESS:  Thank you.

12               MR. PERRY:  I don't have anything else, Your Honor.

13               THE COURT:  Thank you very much.  Are there any

14   further questions.

15               MR. KERR:  No, Your Honor, but we have one issue that

16   we need to take up quickly of your time, if we can.

17               THE COURT:  Okay, is the witness excused?

18               MR. KERR:  The witness is done.

19               THE COURT:  Thank you very much for your testimony.

20               THE WITNESS:  You're welcome.

21               THE COURT:  Have a nice weekend.

22               THE WITNESS:  You too.

23               THE COURT:  Go ahead.  Mr. Rains?

24               MR. RAINS:  Your Honor, Darryl Rains from Morrison &

25   Foerster --

RESIDENTIAL CAPITAL, LLC, ET AL.                194

1          THE COURT:  Can Mr. Eckstein be excused if he wants to

2    be?

3          MR. ECKSTEIN:  Thank you very much, Your Honor.

4          MR. RAINS:  I'm sorry?

5          THE COURT:   Mr. Ecktein can be excused if he wants

6    to?

7          MR. RAINS:  Yes, this is about Mr. Fazio, Your Honor.

8          THE COURT:  Okay.

9          MR. RAINS:  We'd like to try to take that issue up

10   because it's going to affect a lot of people's weekends, what

11   we do with Mr. Fazio's direct testimony.  So my understanding

12   is Mr. Perry wants to offer a revised direct testimony,

13   something he shared with us late last night.  We're going to

14   have objections to several paragraphs which are new, and I

15   think it makes sense to try to air that so we'll know what is

16   the testimony that is going to come in on Monday.

17         MR. PERRY:  If I may, Your Honor.

18         THE COURT:  Go ahead.

19         MR. PERRY:  Okay.  So in reaction to Your Honor's

20   comments during Mr. Cohen's opening, we went back to look at

21   Mr. Fazio's direct, which was obviously submitted before Your

22   Honor's decision with respect to the Lyons report --

23         THE COURT:  I decided that on Monday.  Today is

24   Friday.  You gave them a revised direct testimony last night?

25         MR. PERRY:  Well --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    195

1          THE COURT:  I don't think so.

2          MR. PERRY:  Well, Your Honor, the debtors on Wednesday

3   sent us a brief seeking to strike portions of Mr. Fazio's

4   testimony that are derivative of Judge Lyons' expert opinion,

5   which as I said, Your Honor excluded on Monday.  We've met and

6   conferred.  We've proposed to file updated direct testimony.

7   And all this does is one thing and one thing only.  It takes

8   the number that was derived by Judge Lyons' analysis, it was a

9   1.2-billion-dollar number, and it replaces it with a 200-

10  million- to 1.2-billion sensitivity, which is exactly what Mr.

11  Fazio did in his rebuttal to Mr. Renzi's report.

12         And so we've submitted that -- it's not new opinion,

13  it's not even new facts, it's simply a new number that gets

14  plugged into the waterfall.  This really ought not to be an

15  issue, because as Mr. Renzi testified, the FTI waterfall and

16  the Houlihan waterfall are basically equivalent.  So Mr. Renzi

17  could go do the same exact calculations that Mr. Fazio did --

18  seriously -- that was his testimony, that was Mr. Fazio's

19  testimony.

20         And so the only question is basically a question of

21  mathematics, and it relates to one issue and one issue only.

22  If Your Honor finds the lien attaches to the intercompanies but

23  not the AFI contribution, it's an easy calculation.  Whatever

24  the number is, it increases our collateral value by that

25  number.  If the lien attaches just to the AFI contribution and

1    not the intercompanies, same thing, easy, dollar-for-dollar.

2           The issue becomes what happens if Your Honor, for

3    example, says 200 million for the intercompanies and 200

4    million for the AFI contribution.  And then because -- then you

5    have to run the intercompanies and the AFI contribution through

6    the waterfall, it produces a number that's slightly less than

7    400 million dollars.  Mr. Fazio's original report and original

8    direct testimony did that.  We would simply propose to run and

9    do the exact same thing with non-Judge Lyons' number; and

10   that's all this is about.

11          THE COURT:  Mr. Rains?

12          MR. RAINS:  Mr. Perry says it's just math.  It's not

13   really one plus one equals two math.  It's closer to the

14   differential equation kind of math.  What we heard from Mr.

15   Renzi on Wednesday is that these waterfall models are

16   incredibly complex.  They have thousands of lines, and that

17   varying one or two variables will impact the outcome in a

18   number of ways.

19          The idea that he can basically arm you, the Court,

20   with a bunch of assumptions, a sensitivity analysis, and then

21   say to the Court you can get in the driver's seat and decide

22   your own allocation and then figure out what the model would

23   produce, and do that without allowing us the opportunity to

24   have Mr. Renzi come back and help you understand the

25   sensitivities and the issues and the assumptions behind that

RESIDENTIAL CAPITAL, LLC, ET AL.                    197

1  work, it's a little late in the day to be giving us knew expert

2  opinions, new expert reports, new expert calculations. It's

3  several new pages, several new spreadsheets, several new

4  tables, several new paragraphs.  It's too late in the day for

5  that.

6          THE COURT:  All right.  I don't want to hear anymore.

7          There was a schedule agreed upon for motions in

8  limine, each side to file one.  It was.  That was what

9  happened.  I read the motions in limine when they were filed.

10 I waited to get the oppositions to the motions in limine, which

11 wasn't until last Friday, leaving me a weekend to work on --

12 Friday afternoon, I think it was due Friday at noon.

13         In addition to getting ready for everything else about

14 this trial, I worked on responding to the motions in limine.

15 Originally I had said I would rule on those Tuesday morning at

16 the start of the evidence.  I felt it was important for the

17 parties to know in preparing opening statements and in any

18 further witness examination that they know as soon as possible.

19 So Monday morning at about 9 a.m., I issued the two orders

20 granting one motion in limine, denying the other motion in

21 limine.

22         Hearing now on Friday afternoon, fifteen minutes after

23 I said we would adjourn, that last night the JSNs provided the

24 proponents with revised proposed testimony from Mr. Fazio, I

25 believe it's too late.  If this issue had been raised with me

1    Tuesday morning, having had all day Monday to digest what, if

2    any impact, my ruling on the motion in limine with respect to

3    Mr. Lyons' testimony had, I would have heard it and, you know,

4    it's not uncommon -- well, I shouldn't say it's not uncommon --

5    it certainly is not desirable, but I can remember having to

6    take a deposition during trial to examine a witness about

7    something that's come up at the last minute.  So the request to

8    submit revised Fazio -- amended Fazio testimony is denied.

9           You know, you'll either have an agreement as to what

10   paragraphs of his direct testimony that was submitted and

11   already reviewed by the Court is to be stricken.  If you don't

12   have an agreement on it, I'll rule on that Monday.  I will see

13   you all on Monday.

14          Before we break, I was given a note, one of my law

15   clerks apparently -- don't look so startled -- this is with

16   respect to post-trial submissions.  So what I was -- what was

17   suggested to me, you'll either confirm or say it's not so, that

18   the parties agreed that post-trial briefs, which I take to be

19   both proposed findings of fact and briefs, would be -- the date

20   proposed is Thursday, December 5th, and closing argument for

21   December 11th.  Do I have that accurate?

22          MR. UZZI:  If you're available, Your Honor.  We --

23          THE COURT:  I am, but let me say this, the 11th is a

24   ResCap day.  You've got to move what's scheduled for the 11th.

25   Last week was absolute chaos for me because I had Friday a very

1   full ResCap calendar, and I said on Thursday -- believe it or

2   not, it's the first time that I've gotten on the bench in a

3   ResCap calendar and I wasn't fully prepared on everything that

4   was on the calendar.  Last Friday was one of those days,

5   because we were up half the night getting an opinion done that

6   went out Friday morning.  So there is another day, what, on the

7   17th or something like that -- December 16 --

8           MR. LEE:  Yes, Your Honor.

9           THE COURT:  Okay.  So you've got to move what's on the

10  11th.  I'm not going to deal with anything else.  I'm prepared

11  to deal with closing argument on the 11th, if all the briefs

12  are -- if all the submissions are in on the 5th.  I hope I'm

13  being reasonable about it.  Friday was impossible for me last

14  week.

15          MR. LEE:  Your Honor, I understand that.  We didn't do

16  a good enough job moving things, but we will clear the calendar

17  for December the 11th.  Because we have two empty days?

18          THE COURT:  Does that work for you, Mr. Uzzi?

19          MR. UZZI:  Yes, Your Honor.

20          THE COURT:  Mr. Cohen, that's okay?

21          MR. COHEN:  That's fine, Your Honor.

22          THE COURT:  All right.

23          MR. LEE:  Your Honor -- sorry.

24          THE COURT:  Let me just -- and I guess I was -- there

25  was something else that was communicated to me.  Look, you

1    know, Mr. Uzzi, when he got up to make his opening statement, I

2    think everybody has basically acknowledged in terms of

3    confirmation, the two and maybe three disputed issues:  the

4    intercompany balances, the settlement with -- allocation of the

5    settlement with AFI.  And when I read your brief, Mr. Uzzi, you

6    raised issue about the third-party non-debtor release.  I'm not

7    sure how that exactly fits in.  But so it's either two or three

8    issues.

9            You all briefed, certainly the proponents briefed all

10   the confirmation standards.  I don't want to get that again.

11   There is no reason for me to get that again.  What I would urge

12   is that -- so there's no surprises, you talk to each other, and

13   just agree on what issues are going to be addressed in the

14   briefs and you can limit the briefs, you don't have to repeat

15   what was in the original submissions on it.

16           So focus on those things that are in dispute.  But

17   with respect to the proposed findings of fact, I do want

18   proposed findings of facts on everything, not just on the

19   disputed issues.  It would probably be easier for you to do the

20   stuff that isn't disputed, but that's my thinking now.  Is that

21   amenable to all of you?

22           MR. LEE:  Your Honor, my suggestion would be to

23   bifurcate confirmation and the phase 2 issues so that we'll

24   provide proposed findings of fact relating to confirmation and

25   a brief to the extent to which there are any opening issues.

RESIDENTIAL CAPITAL, LLC, ET AL.                    201

1   And then with respect to the phase 2 issues, I think I

2   understand there will be a separate brief and findings of fact,

3   if that's the way Your Honor wants it or --

4           THE COURT:  Look, I mean -- and I'll let Mr. Uzzi

5   speak in a second.  If the two of you agree on it, it's fine.

6   But I have to say that confirmation issues seem to be to be the

7   phase 2 issues.  Those are the issues.

8           MR. LEE:  I'll discuss it with Mr. Uzzi.  And we'll

9   reach an agreement.

10          THE COURT:  I've got enough paper already.  Just put

11  it in a separate section of the same document.  Unless I'm

12  missing something, that's why I did this together, okay.  The

13  disputed confirmation issues are the phase 2 issues.  Is there

14  something else that I'm missing?

15          MR. LEE:  No, Your Honor.

16          THE COURT:  The guess the only other thing would be

17  about Wachovia.

18          MR. LEE:  I can do a separate brief on Wachovia too if

19  you want, or maybe just a picture or cartoon.

20          THE COURT:  Work it out.  Look, I'll live with what

21  you all do, okay.  We didn't talk about page numbers.  Look,

22  there is no -- findings of fact there's never a limit on page

23  numbers.  At this stage I want to give everybody a fair

24  opportunity on the things that are in dispute.  So we have one

25  witness on Monday.  I anticipate that I may give you all -- I'm

1   not certain about this -- I may give you all some guidance

2   about things I want to be sure that you address.  Again, I did

3   it once, you know, early on, and I may do some more of that on

4   Monday when the evidence is all closed.  Okay?  Is there going

5   to be any rebuttal case?  Mr. Kerr?

6           MR. LEE:  No, Your Honor.

7           THE COURT:  No.  Good, okay.  Have a good weekend

8   everybody.

9           MR. UZZI:  You too, Your Honor.

10          MR. KERR:  Thank you, Your Honor.

11       (Whereupon these proceedings were concluded at 3:19 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4    WITNESS              EXAMINATION BY          PAGE

5    Ms. Gutzeit          Mr. Cohen               16/61

6    Ms. Gutzeit          Mr. Kaufman             57

7    Mr. Pinzon           Ms. Foudy               79

8    Mr. Pinzon           Mr. Schaffer            92

9    Mr. Marx             Mr. Cohen               93/135

10   Mr. Marx             Mr. McKane              113

11   Mr. Marx             Mr. Simon               132

12   Mr. Bingham          Mr. Kaufman             144

13   Mr. Bingham          Mr. Ellenberg           181

14   Mr. Bingham          Mr. Perry               185

15

16                          E X H I B I T S

17   PLAN PROPONENTS'     DESCRIPTION             PAGE

18   587, 600, 608, 672   Exhibits regarding      65

19   and 712              Ms. Gutziet's

20                        testimony

21   745, 747 and 749     Accounting              66

22                        standards

23   --                   Exhibits relating       68

24                        to Ms. Westman's

25                        testimony

| | | |
|---|---|---|
| **PLAN PROPONENTS'** | **DESCRIPTION** | **PAGE** |
| Agreement | 620-1 | 70 |
| PX-717 | Exhibit regarding | 138 |
| | Mr. Marx's | |
| | Testimony | |
| | | |
| **DEFENDANTS'** | **DESCRIPTION** | **PAGE** |
| BCV, AVF and AYI | Exhibits re Ms. | 71 |
| | Gutzeit | |
| DX-ALH, DX-aQM, | Exhibits regarding | 138 |
| DX-ALM | Mr. Marx's | |
| | testimony | |
| -- | Direct testimony | 140 |
| | of Mr. Bingham | |
| DX-AUH, DX-ATL, | Exhibits regarding | 142 |
| DX-AYE, DX-AUI, | Mr. Bingham's | |
| DX-AYH, DX-ATQ, | testimony | |
| DX-AME, DX-ASH, | | |
| DX-ASI, DX-ANE, | | |
| DX-ASJ, DX-ANQ, | | |
| DX-ATF and DX-AOK | | |

1

2  WELLS FARGO'S          DESCRIPTION              PAGE

3  --                     Direct testimony         77

4                         of Michael Pinzon

5  DX-CAA through         Exhibits regarding       78

6  DX-CAZ                 Mr. Pinzon's

7                         testimony

8

9                              RULINGS

10                                          Page    Line

11  Request to submit amended Fazio testimony is 198      8

12  denied

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11

12   _____

13   PENINA WOLICKI

14   AAERT Certified Electronic Transcriber CET**D-569

15

16   eScribers

17   700 West 192nd Street, Suite #607

18   New York, NY 10040

19

20   Date:   November 25, 2013

21

22

23

24

25