1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 - - - - - - - - - - - - - - - - - - - -x

5 In the Matters of:

6 RESIDENTIAL CAPITAL, LLC, et al.,        Case No. 12-12020-mg

7                 Debtors.

8 - - - - - - - - - - - - - - - - - - - -x

9 RESIDENTIAL CAPITAL, LLC, et al.,

10                 Plaintiffs,                Adv. No. 13-01343-mg

11         - against -

12 UMB BANK, N.A., in its Capacity as

13 INDENTURE TRUSTEE,

14                 Defendant.

15  - - - - - - - - - - - - - - - - - - - -x

16 OFFICIAL COMMITTEE OF UNSECURED

17 CREDITORS, et al.,

18                 Plaintiffs,                Adv. No. 13-01277-mg

19         - against -

20 UMB BANK, N.A., et al.,

21                 Defendants.

22  - - - - - - - - - - - - - - - - - - - -x

23

24

25

2

United States Bankruptcy Court

One Bowling Green

New York, New York


November 25, 2013

9:02 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1   12-12020-mg   Residential Capital, LLC

2   PHASE II TRIAL

3

4   Adversary proceeding: 13-01277-mg   Official Committee of

5   Unsecured Creditors et al. v. UMB Bank, N.A., et al.

6   PHASE II TRIAL

7

8   Adversary proceeding: 13-01343-mg Residential Capital, LLC et

9   al. v. UMB Bank, N.A., in its Capacity as Indenture Trustee

10  PHASE II TRIAL

11

12  12-12020-mg   Residential Capital, LLC

13  CONFIRMATION HEARING.

14

15  Fairness Hearing RE: Kessler Settlement Class.

16

17  Doc# 5828, 5829 Motion for Approval of Debtors Entry Into the

18  Settlement Agreement Among the Debtors, The Committee, and Ally

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

4

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:   GARY S. LEE, ESQ.

9        CHARLES L. KERR, ESQ.

10       LORENZO MARINUZZI, ESQ.

11       JOSEPH ALEXANDER LAWRENCE, ESQ.

12       JAMES J. BEHA, II, ESQ.

13

14

15   MORRISON & FOERSTER LLP

16       Attorneys for Debtors

17       755 Page Mill Road

18       Palo Alto, CA 94304

19

20   BY:   DARRYL P. RAINS, ESQ.

21

22

23

24

25

1

2  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3        Conflicts Counsel to Debtors

4        101 Park Avenue

5        New York, NY 10178

6

7  BY:    THERESA A. FOUDY, ESQ.

8         ELLEN TOBIN, ESQ.

9

10

11  SILVERMANACAMPORA LLP

12        Special Counsel to Creditors' Committee

13        100 Jericho Quadrangle

14        Suite 300

15        Jericho, NY 11753

16

17  BY:    RONALD J. FRIEDMAN, ESQ.

18         ROBERT D. NOSEK, ESQ.

19

20

21

22

23

24

25

1

2  U.S. DEPARTMENT OF JUSTICE

3          U.S. Attorney's Office

4          86 Chambers Street

5          3rd Floor

6          New York, NY 10007

7

8  BY:   JOSEPH N. CORDARO, ESQ.

9

10  KIRKLAND & ELLIS LLP

11          Attorneys for Ally Bank and Ally Financial, Inc.

12          601 Lexington Avenue

13          New York, NY 10022

14

15  BY:   RAY C. SCHROCK, P.C.

16

17

18  KIRKLAND & ELLIS LLP

19          Attorneys for Ally Bank and Ally Financial, Inc.

20          655 Fifteenth Street, N.W.

21          Washington, DC 20005

22

23  BY:   DANIEL T. DONOVAN, ESQ.

24          JUDSON D. BROWN, ESQ.

25

1

2   KIRKLAND & ELLIS LLP

3        Attorneys for Ally Bank and Ally Financial, Inc.

4        555 California Street

5        San Francisco, CA 94104

6

7   BY:   MARK E. MCKANE, P.C.

8

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for Official Creditors' Committee

12        1177 Avenue of the Americas

13        New York, NY 10036

14

15   BY:   KENNETH H. ECKSTEIN, ESQ.

16        PHILIP S. KAUFMAN, ESQ.

17        DOUGLAS MANNAL, ESQ.

18        STEPHEN ZIDE, ESQ.

19        P. BRADLEY O'NEILL, ESQ.

20        JOSEPH A. SHIFER, ESQ.

21        NORMAN C. SIMON, ESQ.

22        GREGORY A. HOROWITZ, ESQ.

23

24

25

1

2 KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3        Attorneys for Ad Hoc Group of Junior Secured Notes

4        1633 Broadway

5        New York, NY 10019

6

7 BY:   DANIEL A. FLIMAN, ESQ.

8

9

10 MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for Ad Hoc Group of Junior Secured Notes

12        1850 K Street, NW

13        Washington, DC 20005

14

15 BY:   DAVID S. COHEN, ESQ.

16

17

18 MILBANK, TWEED, HADLEY & MCCLOY LLP

19        Attorneys for Ad Hoc Group of Junior Secured Notes

20        One Chase Manhattan Plaza

21        New York, NY 10005

22

23 BY:   GERARD UZZI, ESQ.

24        DANIEL M. PERRY, ESQ.

25        ATARA MILLER, ESQ.

9

1

2    MORGAN, LEWIS & BOCKIUS LLP

3         Attorneys for Deutsche Bank, Bank of NY Mellon

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:   GLENN E. SIEGEL, ESQ.

8         JAMES L. GARRITY, JR., ESQ.

9

10

11   JONES DAY

12        Attorneys for FGIC

13        222 East 41st Street

14        New York, NY 10017

15

16   BY:   LANCE E. MILLER, ESQ.

17

18

19   JONES DAY

20        Attorneys for FGIC

21        555 South Flower Street

22        Fiftieth Floor

23        Los Angeles, CA 90071

24

25   BY:   RICHARD L. WYNNE, ESQ.

1

2   WINSTON & STRAWN LLP

3           Attorneys for WFBNA - Wachovia

4           200 Park Avenue

5           New York, NY 10166

6

7   BY:    JAMES DONNELL, ESQ.

8           NATHAN P. LEBIODA, ESQ.

9

10  ROPES & GRAY LLP

11          Attorneys for Institutional Investor Steering Committee

12          800 Boylston Street

13          Boston, MA 02199

14

15  BY:    D. ROSS MARTIN, ESQ.

16          ANDREW G. DEVORE, ESQ.

17

18

19  ALLEN & OVERY LLP

20          Attorneys for HSBC Bank USA, N.A. as Trustee

21          1221 Avenue of the Americas

22          New York, NY 10020

23

24  BY:    JOHN KIBLER, ESQ.

25

```
 1   MORRISON COHEN LLP

 2          Attorneys for Independent Directors

 3          909 Third Avenue

 4          New York, NY 10022

 5

 6   BY:   JOSEPH T. MOLDOVAN, ESQ.

 7

 8

 9   SEWARD & KISSEL LLP

10          Attorneys for US Bank as RMBS Trustee

11          One Battery Park Plaza

12          New York, NY 10004

13

14   BY:   MARK D. KOTWICK, ESQ.

15          THOMAS ROSS HOOPER, ESQ.

16          ARLENE R. ALVES, ESQ.

17          DALE C. CHRISTENSEN, JR., ESQ.

18

19

20   CADWALADER, WICKERSHAM & TAFT LLP

21          Attorneys for MBIA Insurance Co.

22          700 6th Street NW,

23          Washington, DC 20001

24

25   BY:   MARK C. ELLENBERG, ESQ.
```

```
 1  CLEARY GOTTLIEB STEEN & HAMILTON LLP

 2         Attorneys for Wilmington Trust

 3         One Liberty Plaza

 4         New York, NY 10006

 5

 6  BY:   MARK A. LIGHTNER, ESQ.

 7         JEREMY R. OPOLSKY, ESQ.

 8

 9

10  PENSION BENEFIT GUARANTY CORPORATION

11         Office of the Chief Counsel

12         1200 K Street, N.W.

13         Washington, DC 20005

14

15  BY:   VICENTE MATIAS MURRELL, ESQ.

16

17

18  REED SMITH LLP

19         Attorneys for Wells Fargo Bank, N.A.

20         599 Lexington Avenue

21         New York, NY 10022

22

23  BY:   ERIC A. SCHAFFER, ESQ.

24         MARK D. SILVERSCHOTZ, ESQ.

25         DAVID M. SCHLECKER, ESQ.
```

1

2   LOWENSTEIN SANDLER LLP

3           Attorneys for N.J. Carpenters

4           65 Livingston Avenue

5           Roseland, NJ 07068

6

7   BY:   MICHAEL S. ETKIN, ESQ.

8           TANIA INGMAN, ESQ.

9

10

11  DECHERT LLP

12          Attorneys for Bank of New York Mellon

13          1095 Avenue of the Americas

14          New York, NY 10036

15

16  BY:   MAURICIO A. ESPANA, ESQ.

17

18

19  ALSTON & BIRD LLP

20          Attorneys for Wells Fargo Bank, N.A.

21          90 Park Avenue

22          15th Floor

23          New York, NY 10016

24

25  BY:   MICHAEL E. JOHNSON, ESQ.

1

2   POLSINELLI

3        Attorneys for Kessler Settlement Class

4        700 West 47th Street

5        Suite 1000

6        Kansas City, MO 64112

7

8   BY:   DAN FLANIGAN, ESQ.

9

10

11   ZUCKERMAN SPAEDER LLP

12        Attorneys for National Credit Union Administration Board

13        1800 M Street, NW

14        Washington, DC 20035

15

16   BY:   ANDREW N. GOLDFARB, ESQ.

17

18

19   SCHULTE ROTH & ZABEL, LLP

20        Attorneys for Cerberus Capital Management

21        919 Third Avenue

22        New York, NY 10022

23

24   BY:   HOWARD O. GODNICK, ESQ. (TELEPHONICALLY)

25

1

2  MUNGER, TOLLES & OLSON LLP

3       Attorneys for Berkshire Hathaway, Inc.

4       355 South Grand Avenue

5       35th Floor

6       Los Angeles, CA 90071

7

8  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10  QUINN EMANUEL URQUHART & SULLIVAN, LLP

11       Attorneys for AIG, Allstate, Prudential, and Mass Mutual

12       51 Madison Avenue

13       22nd Floor

14       New York, NY 10010

15

16  BY:   SCOTT C. SHELLEY, ESQ.

17

18

19  ALSO PRESENT:

20       RICHARD RODE, Party Pro Se

21       STEVEN TILGHMAN, Tilghman & Company (TELEPHONICALLY)

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    16

1                          P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  We're here in Residential Capital number

4    12-12020 and in connection with two adversary proceedings,

5    number 13-01343 and 13-01277.  All right.

6              We're ready to go with our last witness.  Mr. Perry?

7              MR. PERRY:  Good morning, Your Honor.  The JSNs offer

8    the direct testimony of Michael Fazio, dated November 12, 2013,

9    which was filed as docket entry 5711.  If Mr. Fazio were called

10   to testify, he would testify as to what is in his written

11   direct testimony.  We therefore offer his direct testimony into

12   evidence.  We have binders with the testimony.

13             Your Honor, we have over the weekend, met and

14   conferred with the debtors and agreed to remove certain

15   portions of Mr. Fazio's report referencing Judge Lyons.  I

16   believe Mr. Kerr has an objection; he doesn't think it goes

17   quite far enough, and so we have our proposal and I'll cede the

18   podium to Mr. Kerr.

19             THE COURT:  Okay.

20             MR. HOROWITZ:  Excuse me, Your Honor.  Greg Horowitz

21   for the creditors' committee.

22             THE COURT:  Yes, Mr. Horowitz.

23             MR. HOROWITZ:  We never received a copy of this new

24   proposed direct testimony, nor were we consulted.  I'd like to

25   get a copy.

1          THE COURT:  Mr. Perry, is there some reason you didn't

2     consult with a party-in-interest, one of the proponents of the

3     plan?

4          MR. PERRY:  My understanding was --

5          THE COURT:  We've got two separate adversary

6     proceedings --

7          MR. PERRY:  No, no --

8          THE COURT:  -- one brought by the committee -- stop.

9     Two separate adversary proceedings, one brought by the

10    committee, one brought by the debtors.  They're co-proponents

11    of the plan.  The committee needed to be consulted.  All right.

12    Let me have it.

13         Mr. Kerr, you want to be heard?

14         MR. KERR:  Good morning, Your Honor.  Charles Kerr of

15    Morrison & Foerster on behalf of the debtors.  We do object to

16    certain additional portions of the direct testimony of Mr.

17    Fazio that Mr. Perry has just handed up.

18         Just to kind of bring it back into context, Mr.

19    Fazio's report, which was -- his original October 18th report

20    and his direct testimony, which was filed November 12th,

21    referred to and incorporated a series of opinions and

22    statements by Judge Lyons.  And when Judge Lyons' report was

23    excluded, his testimony was excluded, we raised on Wednesday

24    morning the fact that those portions of Mr. Fazio's testimony

25    should be deleted as well.

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1      We've gone back and forth.  Last night at 10:07 we

2  received their proposed language about what should be taken

3  out, and we don't think it goes far enough, Your Honor.

4  Specifically, in his -- both his October 18th, 2013 expert

5  report and then as incorporated into his direct testimony, Mr.

6  Fazio incorporated in his scenarios B and C the numbers and

7  analysis done by Judge Lyons, and that we think, should all be

8  taken out, Your Honor.

9      I have an alternative proposed redaction of what I

10  think should come out of Mr. Fazio's report.  I sent it to the

11  JSNs last Wednesday, we've talked about it.  What they've

12  submitted doesn't go quite far enough, Your Honor.  So -- and I

13  can go through by line and by page what it is that we think

14  should be further deleted beyond what they have done already,

15  if that would be helpful to you.

16      THE COURT:  Let me ask this, Mr. Perry, looking at the

17  binder that's just been handed to me, I see that in the direct

18  testimony of Michael Fazio there are certain portions that are

19  highlighted.  Are those the proposed redactions?

20      MR. PERRY:  Yes, Your Honor.

21      THE COURT:  Well, the way I think we should proceed is

22  that I'm not admitting the direct testimony until the committee

23  has had an opportunity to review the proposed redactions.  Mr.

24  Kerr, if you have a marked copy of the direct testimony with

25  the redactions --

1          MR. KERR:  I do, Your Honor.

2          THE COURT:  -- I don't care whether it's redacted

3    frankly --

4          MR. KERR:  Your Honor --

5          THE COURT:  -- I mean, as you've done in the past,

6    I'll rule on objections to specific page -- paragraph

7    references or portions of paragraphs.  So if you've got a

8    proposed version of Mr. Fazio's direct testimony as to what

9    should be excluded, let me have that.  And we're going to

10   proceed with, as we've done, I think, with several other

11   witnesses, let's put him up here for cross-examination.  I'll

12   reserve ruling on what in his direct testimony is admissible.

13         MR. KERR:  I do, Your Honor.  Let me hand them up, if

14   I can.

15         THE COURT:  Okay.  All right.  Have you consulted with

16   Mr. Horowitz?

17         MR. KERR:  Yes, we did.  Well --

18         MR. HOROWITZ:  Your Honor, I first learned of this

19   when Mr. Kerr told me about it about five minutes before we

20   started, but he did consult with me.

21         THE COURT:  Well, look, you weren't here on Friday.

22         MR. HOROWITZ:  I actually was.  I was just upstairs.

23         THE COURT:  Well, you weren't in the courtroom.  We

24   had a discussion about Mr. Fazio and issues about whether an

25   amended modified direct testimony by Mr. Fazio would be

1  permitted.  I ruled against that.

2          MR. KERR:  Your Honor, just so I -- this is Charles

3  Kerr.  Our proposed redactions of Mr. Fazio's testimony I gave

4  to both the committee, I gave to Mr. O'Neill, not to Mr.

5  Horowitz, but Mr. O'Neill, Mr. Kaufman and to Mr. Perry last

6  Wednesday morning.  Our proposed redactions haven't been

7  changed.

8          THE COURT:  Fine.  Let me have it.

9          MR. HOROWITZ:  And we did see those, yes.

10         THE COURT:  Okay.

11         MR. HOROWITZ:  And we concur with those, just for the

12 record.

13         THE COURT:  All right.  So you used the same color

14 highlighting as Mr. Perry did.

15         MR. KERR:  I would like to say he used the same color

16 as I used.

17         THE COURT:  All right.  Let me just --

18         I'm just putting at the top of mine "redactions

19 proposed by proponents".  And let's have Mr. Fazio come up and

20 be sworn.

21         If you would raise your right hand, Mr. Fazio, and be

22 sworn.

23     (Witness sworn)

24         THE COURT:  Please have a seat.  Thank you very much.

25         Mr. Perry, are you offering exhibits in connection

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1  with Mr. Fazio's testimony?

2           MR. PERRY:  We are not, Your Honor.

3           THE COURT:  Okay.

4           Mr. Kerr, cross-examination.

5  CROSS-EXAMINATION

6  BY MR. KERR:

7  Q.   Good morning, Mr. Fazio.

8  A.   Good morning.

9  Q.   You are a managing director in the financial restructuring

10 group of Houlihan Lokey Capital, Inc., correct?

11 A.   Correct.

12 Q.   And Houlihan Lokey is the financial advisor for the ad hoc

13 group of junior secured noteholders, correct?

14 A.   Correct.

15 Q.   And Houlihan has had that role since before the petition

16 was filed in these cases in May of 2012, correct?

17 A.   Correct.

18          MR. KERR:  Your Honor, may I just -- I realize I need

19 to pass up a binder, if I can.

20          THE COURT:  Sure.  Thank you.

21 Q.   Mr. Fazio, we've just handed up to you a binder.  In that

22 binder I think you'll find there is a copy of your direct

23 testimony of Michael Fazio, which was docket number 5711 in

24 unredacted form, as well as the deposition and I think a couple

25 other documents.

RESIDENTIAL CAPITAL, LLC, ET AL.                          22

1        Let's turn to your direct testimony, which was filed as

2   docket number 5711, Mr. Fazio.  Before filing that direct

3   testimony, you prepared an expert report of Michael Fazio-

4   recovery analysis dated October 18, 2013, correct?

5   A.    Yes.

6   Q.    And that's attached as Exhibit A to your direct testimony?

7   A.    Yes, it is.

8   Q.    And you also prepared a rebuttal report to the expert

9   report of Mark A Renzi, dated November 1st, 2013, correct?

10  A.    Correct.

11  Q.    And that's attached as Exhibit B to your direct testimony?

12  A.    Yes.

13  Q.    And your witness statement, which is the first seventeen

14  pages of your direct testimony, summarizes key points in your

15  two expert reports, correct?

16  A.    It summarizes my reports.

17  Q.    And your witness statement along with your attached expert

18  reports constitute your direct testimony that are being offered

19  in this matter, correct?

20  A.    Yes.

21  Q.    Okay.  Now prior to preparing your direct testimony, Mr.

22  Fazio, you never spoke to Barb Westman, did you?

23  A.    No, did I not.

24  Q.    And prior to preparing your direct testimony here you

25  never spoke to Cathy Dondzila, did you?

RESIDENTIAL CAPITAL, LLC, ET AL.                          23

1  A.   I don't believe so.

2  Q.   And prior to preparing your direct testimony here, you do

3  not recall speaking to Tammy Hamzehpour, isn't that correct?

4  A.   That's correct.

5  Q.   Okay.  So let's turn to the work you did in connection

6  with your first expert report, the October 18th, 2013 report.

7       For purposes of your October 18th, 2000 report, Mr. Fazio,

8  you were asked to provide sensitivity outputs on the debtors'

9  collateral scenario recoveries to estimate the impact of

10 certain issues subject to phase 2 of the adversary proceeding,

11 correct?

12 A.   Correct.

13 Q.   And that is what you describe in the first sentence of

14 paragraph 6 of your direct testimony, which is on page 3,

15 correct?

16 A.   That's correct.

17 Q.   Okay.  And as a general matter, the assumptions that you

18 utilized in the debtors' collateral scenario are intended to be

19 consistent with those utilized by the debtors in there

20 disclosure statement and any updates thereto, correct?

21 A.   Yes, so we can isolate any differences just for the

22 changes in the assumptions.

23 Q.   And to do the analysis that you did, you used a waterfall

24 model developed by Houlihan, correct?

25 A.   That's correct.

1   Q.    And that is a mathematical tool that models the recovery

2   of different claimants based on different assumptions, correct?

3   A.    That's correct.

4   Q.    And it calculates the ultimate recoveries to the different

5   claimants based on the various assumptions that are being made,

6   correct?

7   A.    That's correct.

8   Q.    And for your first report, you used the debtors' April

9   30th, 2013 trial balances containing the book value of assets

10  at each debtor, correct?

11  A.    That was one of the things utilized, yes.

12  Q.    And the assumptions you utilized in the debtors'

13  collateral scenario --

14          MR. KERR:  Strike that.

15  Q.    The assumptions that you utilized in the debtors'

16  collateral scenario would also include the allocation of

17  administrative claims that were used by the debtors in the

18  disclosure statement, correct?

19  A.    That's correct.

20  Q.    And you also used the amount and allocations of allowed

21  claims for general unsecured creditors that were in the

22  disclosure statement for all of your scenarios, correct?

23  A.    Yes, we used that, that's correct.

24  Q.    And you are providing no opinion as to the merits or

25  validity of those assumptions, correct?

1  A.   That's correct.  That's what this is about; this hearing.

2  Q.   And what you did was to use your waterfall model to test

3  several scenarios by changing one or more of the debtors'

4  assumptions in isolation in order to determine the impact that

5  those changed assumptions have on the JSNs' collateral value,

6  correct?

7  A.   That's correct.

8  Q.   Let's turn, Mr. Fazio, to the analysis you did with

9  respect to the intercompany balances.

10       Now one of the scenarios you did was to use the debtors'

11  collateral scenario assumptions, but include all pre-petition

12  intercompany claims as if they were valid, in the amount shown

13  on the debtors' statement of assets and liabilities, correct?

14  A.   That's correct.

15  Q.   And that was scenario A that you describe in paragraph 18A

16  of your direct testimony, correct?

17  A.   I have to get to 18A.  I'm sorry.

18  Q.   It's on page 7 of your direct.

19  A.   Okay.  Yes, that's correct.

20  Q.   And for purposes of this analysis, you just assumed that

21  the JSNs have a lien on those intercompany balances, correct?

22  A.   That was the assumption, that's correct.

23  Q.   And you're not offering an opinion that the JSNs do, in

24  fact, have a lien on any of those intercompany balances?

25  A.   Nope, I'm not making a legal determination.

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1  Q.    And the results of scenario A, this analysis, is shown in

2  the chart in paragraph 19 of your direct testimony under the

3  column listed A -- that's at page 8 of your direct testimony --

4  isn't that correct?

5  A.    That's correct.

6  Q.    Now, sir, you are not offering any opinion that as of the

7  petition date the intercompany balances, in fact, had a value

8  equal to the face value shown on the debtors' statement of

9  assets and liabilities, are you?

10 A.    No.  The value that's being opined here is the recovery --

11 the secured recovery value, if you plug in the intercompanies

12 as scheduled and as the amounts shown.

13 Q.    But my question is a little more specific than that.

14       You're not offering any opinion, sir, that as of the

15 petition date the intercompany balances, in fact, had a value

16 equal to the face value as shown on the statement of assets and

17 liabilities, correct?

18 A.    That's correct.  I'm going through and showing the face

19 value and how that impacts and then running it through the

20 waterfall to come up with a valuation.

21 Q.    Sir, in your experience, is every debt collectable at its

22 face amount?

23 A.    No.

24 Q.    Okay.  Now, sir, you assumed that the intercompany claims

25 as reflected on the statement and assets of liability were

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1  based on the books and records of the company, correct?

2  A.   That's correct.

3  Q.   And you did not do any independent investigation what

4  those intercompany balances were based upon or where they were

5  derived from, correct?

6  A.   They were derived from the books and records, as I

7  understand it.  But I didn't do an investigation to determine

8  that.  Other people did.

9  Q.   Okay.  And you did not do any investigation to determine

10 where individual intercompany balances were derived from as

11 reflected in the books and records, correct?

12 A.   No, I did not.

13 Q.   Okay.  And you're not offering an opinion, sir, that the

14 intercompany claims reflected on the debtors' books and records

15 are valid, correct?

16 A.   That's correct.

17 Q.   And you're not offering any opinion that the intercompany

18 balances as shown on the books and records are enforceable,

19 correct, sir?

20 A.   That's correct.  That's a legal determination.

21 Q.   And you're not offering any opinion about the value of the

22 individual intercompany balances as of the petition date,

23 correct, sir?

24 A.   That's correct.  I'm taking them as scheduled and at the

25 amounts shown.

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1  Q.   And when you ran your scenario A, you assumed that the

2  intercompany claims were valid as scheduled, but you did not

3  change any of the other assumptions that were built into the

4  waterfall model, correct?

5  A.   That's correct.  In scenario A.

6  Q.   And you did not change the assumption used in the

7  disclosure statement about the amounts and the allocation of

8  the other general unsecured claims in your scenario A, correct?

9  A.   That's correct.

10 Q.   And in fact, in scenario A you assumed that if you allow

11 for the intercompany claims to be treated as valid, that none

12 of the other general unsecured creditors would change their

13 position about the amounts they should be receiving for their

14 claims, isn't that correct?

15 A.   I am taking it, as I've said, keeping the constants

16 associated with the claimants' amounts shown in the disclosure

17 statement.

18 Q.   And sir, you're familiar with the global statement that is

19 referred to in the disclosure statement, correct?

20 A.   I am familiar with it.

21 Q.   And you agree, sir, that scenario A, as described in your

22 direct testimony, is not consistent with the assumptions made

23 in the global settlement, correct?

24 A.   That's correct, because the global settlement does not

25 include the intercompanies as a valid claim.  That's what we're

1   here for.

2   Q.   And in running scenario A, you did not take into

3   consideration that certain of the intercompany balances had

4   been identified by the debtors to be forgiven and treated as an

5   equity infusion, did you, sir?

6   A.   I did not do a hypothetical, as if intercompanies were

7   forgiven.  I understand they were not forgiven and that's what

8   this is based off of.

9   Q.   And you just assumed that if you treated the intercompany

10  balances as valid and at face value, that would not change the

11  amount and allocations of allowed claims for other general

12  unsecured creditors, correct?

13  A.   No.  I've used what's scheduled, as I've told you.

14  Q.   Okay.  Now, Mr. Fazio, you were here, you know we're going

15  to have some issues about other aspects of your report, but let

16  me ask you a few questions about that.

17       You also ran a scenario B and C as part of this analysis,

18  correct?

19  A.   That's correct.

20  Q.   And with those scenarios, you assumed that the JSNs have a

21  direct lien on a certain portion of the contemplated 2.1-

22  billion-dollar AFI contribution, correct?

23  A.   That's one of the assumptions we modeled in scenario B,

24  correct.

25  Q.   Okay.  And the amounts that you assume for purposes of

1    this analysis are set forth in paragraph 18B of your direct

2    testimony, correct?

3    A.    That is correct.

4    Q.    And those amounts are based on the value set forth in

5    Judge Lyons' expert opinion, correct?

6    A.    Those amounts, yes.

7    Q.    And that is the expert opinion that's now been excluded by

8    the Court, correct?

9    A.    I think the direct amounts have been excluded.  However,

10   I've also run, as you know, a scenario where you range it from

11   anywhere between 200 and 1.2 billion.

12   Q.    Sir, for purposes of your October 18th, 2013 report and

13   your November 12th, 2013 direct testimony filed as document

14   number 5711, these were the only amounts that you used for

15   these scenario B and C, what's reflected in paragraph 18B,

16   isn't that correct?

17   A.    That is the assumption that was run, as if it was 1.2

18   billion, approximately.

19   Q.    Okay.  And in your October 18th, 2013 report and in your

20   November 12th, 2013 direct testimony, as filed on November

21   12th, you did not show the results under scenario B or scenario

22   C using any different figures for the amount of the AFI

23   contribution that the JSNs would have a lien on, correct?

24   A.    It's a mathematical model.  I can run it on many different

25   scenarios.  This was the one what was run at the time.

1        THE COURT:  Mr. Fazio, listen to the question that's

2   asked.  Answer the question.  If Mr. Perry wants a longer

3   explanation, he'll ask you for it.

4        THE WITNESS:  Okay.

5   Q.   Let me ask my question again, Mr. Fazio.  In your October

6   18th, 2013 report and in your November 12th, 2013 direct

7   testimony as filed on November 12th, 2013, you did not show the

8   results under scenario B or scenario C using different figures

9   for the amount of the AFI contribution that the JSNs would have

10  a lien on, correct?

11  A.   That's correct.

12  Q.   Okay.  And you were not involved in the mediation before

13  Judge Peck in the ResCap cases, were you?

14  A.   I was not.

15  Q.   And you're not offering an opinion that any of the claims

16  that you reference in paragraph 18B of your direct testimony

17  are valid enforceable claims against AFI, correct?

18  A.   That is correct.

19  Q.   And you're not offering an opinion as to the value of any

20  of those claims, correct?

21  A.   I am opining on the value.  If you run the 1.2 billion

22  dollars through the model, I am saying the recovery value is

23  the opinion that I'm showing here, and in total, as you see on

24  B, is 3.1 billion dollars.

25        MR. KERR:  Your Honor, I'm continue.

1          THE COURT:  Go ahead.  No, if you want to move to

2    strike --

3          MR. KERR:  I'll move to strike that, Your Honor.

4          THE COURT:  The testimony is stricken.

5          Mr. Fazio, I think we had this problem when you were

6    here testifying during phase 1.  You need to listen to Mr.

7    Kerr's questions.  You need to answer his questions.  If you

8    can answer them yes or no, please do.  If you can't, tell me

9    that you can't.  If Mr. Perry wishes to examine you further, he

10   has an opportunity to do that.  Do you understand?

11         THE WITNESS:  Yes, Your Honor, but he asked me a

12   specific question.

13         THE COURT:  Let's ask your next question.

14         THE WITNESS:  Okay.

15   Q.   My next question, Mr. Fazio:  in fact you're not offering

16   an opinion here today about the value of any claims that the

17   debtors allegedly have against AFI, correct, sir?

18   A.   That's incorrect.

19   Q.   Okay.  Mr. Fazio, do you recall being deposed in this case

20   in connection with this confirmation hearing?

21   A.   Yes, I do.

22   Q.   And you came to my office -- actually I came to your

23   office and we had a deposition?

24         THE COURT:  You can skip the preliminaries.

25         MR. KERR:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1   Q.   If you would turn in your binder to your deposition page

2   81, line 14 and you were asked -- are you there, Mr. Fazio?

3   A.   Not yet.  Page 81, line 14, yes.

4   Q.   And you were asked this question and gave this answer:

5        "Okay.  And I believe you've already testified, Mr. Fazio,

6   that you're not offering an opinion about the value of any of

7   the specific claims the debtors allegedly have against AFI,

8   correct?

9   "A.   That is correct."

10       Were you asked that question and did you give that answer?

11  A.   I did give that answer, yes.

12  Q.   Okay.  So let's turn in your October 18th report, sir,

13  to -- you did a separate analysis in which you assum that the

14  RMBS trust claims and the monoline claims are subordinated to

15  other unsecured claims, correct?

16  A.   That's correct.

17  Q.   And that is described in paragraph 25 of your direct

18  testimony on page 10, isn't that correct?

19  A.   That is correct.

20  Q.   You would agree, sir, that the assumption that the RMBS

21  trust claims and the monoline claims are subordinated to the

22  other general unsecured creditors is not consistent with the

23  assumptions made as part of the global settlement, correct?

24  A.   That's correct.

25  Q.   And you would agree that the RMBS trust claims and the

1  monoline claims are a large percentage of the overall general

2  unsecured claims, correct?

3  A.    That's correct.

4  Q.    In fact, you told me they were over eighty-five percent of

5  the general unsecured claims, correct?

6  A.    That's correct.

7  Q.    So let's turn to your -- actually a slide in your October

8  18th, 2013 expert report, which is Exhibit A to your direct

9  testimony.  It'll just the bottom say slide 13.

10 A.    Yes, sir.

11 Q.    Now under scenario A of the analysis as shown on this

12 slide 13, you are assuming that the intercompany balances are

13 deemed to be valid, and you are assuming that the RMBS trust

14 claims and the monoline claims are subordinated, but that all

15 of the other assumptions in the debtors' collateral scenario

16 remain the same, correct?

17 A.    Other than the intercompany being turned on, that's

18 correct.

19 Q.    And you're not offering an opinion here today of whether

20 that outcome would ever occur, are you, sir?

21 A.    No, I'm not making any legal determinations here.

22 Q.    Okay.  Now, you also ran a separate analysis as part of

23 your October 18th, 2013 report under which you attempted to

24 assess the impact of reinstating intercompany claims forgiven

25 by the debtors between 2008 and the petition date, correct,

1  sir?

2  A.   That's correct.

3  Q.   And these previously forgiven intercompany claims total

4  16.6 billion dollars over the period from 2008 to the petition

5  date, correct?

6  A.   That's correct.

7  Q.   And if you avoid that 16.6 billion dollars in previously

8  intercompany claim forgiveness, some of that reduces the

9  secured recovery of the JSNs, correct?

10  A.   Correct, some reduce, some increase, as I've stated in

11  there.

12  Q.   And one of the ways that can happen is that there is a

13  reinstatement of intercompany claims between the same legal

14  entities that have intercompany claims existing in the petition

15  date, but in the opposite lending direction, isn't that

16  correct?

17  A.   That's correct, if you assume that you're netting, yeah,

18  it's correct.

19  Q.   Now of the 16.6 billion dollars of previous debt

20  forgiveness, you indicate that 9.1 billion of that amount are

21  between entities in the waterfall model, correct?

22  A.   That is correct.

23  Q.   And you indicate that 6.5 billion of previously forgiven

24  intercompany claims are between legal entities that have no

25  existing intercompany claim in the opposite direction, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1   A.   That's correct.

2   Q.   And what this means, that if you avoid the 6.5 billion of

3   previously forgiven intercompany claims, your model shows that

4   this would increase claim value to the JSNs, as the JSNs, as

5   you indicate, would have a direct lien on certain of the

6   receivables and an indirect benefit from others through equity

7   pledges, is that correct?

8   A.   That's correct.

9   Q.   But this is only true, sir, if you assume that the JSNs

10  continue to have a lien on any increase to the intercompany

11  balances as a result of those avoidance actions?

12           THE COURT:  Let me hear that one again, Mr. Kerr,

13  sorry.

14  Q.   But this is only true if you assume that the JSNs continue

15  to have a lien on any increase to the intercompany balances as

16  a result of those avoidance actions, correct, sir?

17  A.   I believe that's correct.  I would have to actually get a

18  legal determination if they would be due, if they didn't have a

19  direct lien.   But --

20  Q.   Okay.  Now, sir, in your October 18th, 2013 report, you

21  also commented on the debtors' liquidation analysis, correct?

22  A.   That's correct.

23  Q.   And in paragraph 29 of your direct testimony, which is on

24  page 12 of your direct, you say that the debtors' liquidation

25  analysis is misleading for several reasons, correct?

1   A.   I don't know if it's on this page, but yes, I remember

2   that.

3   Q.   Well, if you could just read to yourself paragraph 29 of

4   your direct testimony?

5   A.   I do say it on paragraph 29, correct.

6   Q.   Okay.  And the liquidation analysis that you are referring

7   to is the liquidation analysis that was part of the disclosure

8   statement, correct?

9   A.   That's correct.

10  Q.   And one of the reasons that you suggest that the

11  liquidation analysis is misleading is because it ascribes zero

12  value to any potential claims the debtors might have against

13  AFI in a liquidation scenario, correct?

14  A.   Say that again, sorry?

15  Q.   One of the reasons that you suggest that the liquidation

16  analysis is misleading is because it ascribes zero value to any

17  potential claims that the debtors might have against AFI in a

18  liquidation scenario, correct?

19  A.   That's correct.

20  Q.   But when you read the liquidation analysis, you understood

21  that it ascribed zero value to the alleged claims against AFI,

22  correct?

23  A.   I did, that's correct.

24  Q.   Therefore, you, Mr. Fazio, were not misled by what was in

25  the liquidation analysis on that point, correct?

1   A.   I'm an educated reader of it, so I was not mislead; I went

2   through it in fine detail, correct.

3   Q.   And another reason why you suggest that the liquidation

4   analysis is misleading is because it ascribes zero value to the

5   intercompany claims, correct?

6   A.   That's correct.

7   Q.   And when you read the liquidation analysis, Mr. Fazio, you

8   understood that it ascribed zero value to the intercompany

9   claims, correct?

10   A.   That's correct.

11   Q.   Therefore, you were not misled by the liquidation analysis

12   on that point, were you, sir?

13   A.   I'm not.  I'm an educated reader with a model that

14   actually can see the impact of that, that's correct.

15   Q.   Mr. Fazio, let's return, if we can, to your November 1st,

16   2013 rebuttal report, which was attached as Exhibit B to your

17   direct testimony.

18      This was a report that you prepared in rebuttal to Mr.

19   Renzi's October 18th, 2013 expert report submitted in this

20   case, correct?

21   A.   That's correct.

22   Q.   In this rebuttal report, you were asked to do sensitivity

23   outputs on the JSNs' projected recoveries under the

24   hypothetical liquidation analysis included in annex B to Mr.

25   Renzi's October 18th, 2013 report, correct?

1   A.    I don't know if it's annex B, but that's correct.

2   Q.    And you used the same waterfall model that you've used

3   previously, but you adjusted for the assumptions underlying the

4   debtors' liquidation analysis, correct?

5   A.    That's correct.

6   Q.    And you're not providing any opinion on the merits or

7   validity of those assumptions, correct, sir?

8   A.    Not in this testimony.  I think I did before in phase 1.

9   Q.    Sir, here today you're not providing any opinion on the

10  merits or validity of those assumptions, correct?

11  A.    Not as part of phase 2.  Phase 1 I did, I said.

12  Q.    And what you do as part of this analysis is to run

13  hypothetical AFI contributions through this model to see the

14  impact on the JSNs' recovery, correct?

15  A.    That's one of the assumptions changed, correct.

16  Q.    And under this liquidation analysis assumptions --

17        MR. KERR:  strike that.

18  Q.    Under your liquidation analysis assumptions that you

19  describe in your report, there is no third-party release being

20  provided by AFI, correct?

21  A.    Say that one more time, I'm sorry?

22  Q.    Under these liquidation assumptions, there is no third-

23  party release being provided by AFI, correct?

24  A.    Under the scenario -- say it one more time, I apologize.

25  Q.    Let me back up.

1    A.    Yep.

2    Q.    In the liquidation scenario --

3    A.    Um-hum.

4    Q.    -- there is assumed to be no AFI, no third-party releases

5    being provided by AFI, correct?

6    A.    That's correct.

7    Q.    And when you run your analysis using the liquidation

8    scenarios, you don't change that assumption, right?

9    A.    That's correct.

10    Q.    Okay.  So let me ask the question again.

11         Under this liquidation analysis assumptions, there is no

12    third-party release being provided to AFI, correct?

13    A.    As I understand it, the third-party release in a

14    liquidation analysis will survive a liquidation.  So the JSNs

15    will have rights of privity to go after AFI.

16    Q.    Okay.  And you offer no opinion as to how long it will

17    take to obtain any of the recoveries from AFI, correct?

18    A.    That's correct.

19    Q.    You offer no opinion as to how much it will cost to obtain

20    those net recoveries from AFI, correct?

21    A.    That's correct.

22    Q.    Okay.  If we could look at paragraph 38 of your direct

23    testimony?  And in this paragraph, sir, you republish a chart

24    that is at the bottom of slide 6 of your expert rebuttal

25    report, correct?

1   A.   I know it's in my -- I didn't cross-references to see

2   exact pages, but I assume that's correct, if you've gone

3   through it.

4   Q.   Okay.  And , sir, in the column -- in two columns entitled

5   secured recovery, low and high you show the amount of secured

6   recovery the JSNs could get under the scenario you have run,

7   correct?

8   A.   That's correct.

9   Q.   And with respect to the scenario A, which is described in

10  paragraph 38, under none of the examples that you have run does

11  the JSNs secured recovery exceed 2.223 billion dollars,

12  correct?

13  A.   Under those assumptions that are detailed in my report,

14  that's correct.

15  Q.   Okay.  If you turn down to paragraph 39 of your direct

16  testimony, in that paragraph you republish a slide (sic) from

17  slide 7 of your rebuttal report, correct?

18  A.   I'd have to go between the two, but it is a republished --

19  I don't know what slide number it is offhand.  But --

20  Q.   Well, if you look at the first line of paragraph 39, does

21  that assist you, sir?

22  A.   Yes, it says slide 7 on my rebuttal report.

23  Q.   Okay.  Under this scenario B, would you agree with me,

24  sir, that if the amount of any net Ally contribution is 1.25

25  billion dollars, the amount of the secured recovery either --

1    under either the low or high scenario is still below 2.223

2    billion dollars?

3    A.    Under these assumptions, that's correct.

4    Q.    Now in running these scenarios as outlined here, sir, you

5    assume that even though --

6              MR. KERR:  Strike that.

7    Q.    In running these scenarios, this A and B in paragraphs 38

8    and 39 of your direct testimony, you assume that the

9    intercompany claims are valid as scheduled, but that none of

10   the other claims of the general unsecured creditors would

11   change in value, correct?

12   A.    They wouldn't change in amount.

13   Q.    They would not change in amount?

14   A.    That's correct.

15   Q.    Okay.  Sir, if you could turn to paragraph 41 of your

16   direct testimony, sir, can you tell me where in your rebuttal

17   report you describe what counsel had instructed you to do as

18   you say in paragraph 41?  I could not find it in your rebuttal

19   report.

20   A.    If you look at page 20 of Exhibit A, slide 20, where it

21   goes through what counsel has informed me, that the claims

22   against AFI will survive a liquidation and therefore it is

23   inappropriate to ascribe zero value to such claims.

24   Q.    So that is where you turned to when you believe you

25   previously describe what is in paragraph 41 of your direct

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1   testimony?

2   A.    Yes.

3   Q.    Mr. Fazio, if the JSNs receive the total amount of their

4   allowed claim, plus any post-petition interest and expenses

5   that they are due, if they can establish that they are owed

6   those amounts, you would agree that the JSNs would not be

7   harmed by the partial consolidation that's contemplated under

8   the plan, correct?

9   A.    That's correct, if they receive all post petition interest

10  and expenses, that's correct.

11          MR. KERR:  I have no further questions, Your Honor.

12          THE COURT:  All right.  I'm prepared to rule on the

13  issue of the redactions.  So --

14          MR. KERR:  Your Honor, can I just get my copy?

15          THE COURT:  Yes.  So what I'm going to do is compare

16  the two.  I've got in front of me Mr. Perry's redacted version,

17  and I've compared that against Mr. Kerr's redacted version.

18          MR. KERR:  Let me just -- Your Honor, give me one

19  second --

20          THE COURT:  Yeah, go ahead.

21          MR. KERR:  -- to get myself organized here.  Okay.

22          THE COURT:  Paragraph 6 on page 3, the additional

23  proposed redaction by the proponents, the objection is

24  overruled.

25          Going to page 7, in paragraph 18B, the additional

1  proposed redaction is the first sentence under B, "AFI

2  contribution utilizes the debtors' collateral scenario

3  assumptions, but assume the JSNs have a direct lien on certain

4  components of the contemplated 2.1 billion AFI contribution."

5  I'll stop it there.  The remaining portion of paragraph B is

6  included in Mr. Perry's redaction.  So the language that I

7  quoted, the first clause of 18B, the objection is overruled.

8          In paragraph 18C, the objection is overruled.

9          Next on page 9, paragraph 21 and paragraph 22 --

10          MR. KERR:  Your Honor, if I may, just to make sure

11  you're clear, we had also in paragraph 19 highlighted the two

12  columns.

13          THE COURT:  Oh, oh, oh.  I missed that.  Okay, sorry.

14  Give me a second.  I apologize, Mr. Kerr.

15          The objection to columns B and C in slide 19, the

16  objection is sustained.

17          Paragraphs 21 and 22, the objection is sustained.

18          Paragraph 23, the reference to, in the second line, "B

19  and C against", the objection is sustained.

20          In paragraph 24, the first line, reference to B and C,

21  the objection is sustained.

22          Paragraph 25, in the third line, the reference to B

23  and C, and then in the -- beginning in the sixth line the

24  sentence, "There is no effect on scenario B because scenario B

25  derived increased value only from a portion of the AFI

1  contribution and not the intercompany claims which are general

2  unsecured claims that would recover pari passu, with the RMBS

3  trust and monolines claims absent subordination of those claims

4  and scenario C the increased recovery value of intercompany

5  claims increases the JSNs' total secured recovery to 4.609

6  billion," and then in the next sentence the reference to B and

7  C, those objections are sustained; all of those objections that

8  the proponents have made to paragraph 25, the objection is

9  sustained.

10        In paragraph 28, the proponents' objection beginning

11  the third line "receive no secured recovery from the AFI

12  contribution, and the committee fully prevails on its

13  challenges to the scope and amount of the JSNs collateral," the

14  objection is sustained.

15        Paragraph 30, the objection is sustained.

16        That's it, isn't it, Mr. Kerr?

17        MR. KERR:  Well, Your Honor, because Mr. Fazio

18  incorporated Exhibit A and made it part of his direct

19  testimony, we also had identified places in Exhibit A.

20        THE COURT:  Okay, let me look at that.

21        MR. KERR:  The first is slide 4, Your Honor.

22        THE COURT:  Yes.  The objection on slide 4, the

23  objections are sustained.

24        Objection on slide 6, sustained.

25        Mr. Perry, you have the copy, I don't have to quote

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1  the language on the record, do you agree with that?

2           MR. PERRY:  Yes, Your Honor.

3           THE COURT:  Okay.  On slide 11, the objection is

4  sustained.

5           Slide 12, the objections are sustained.

6           Slide 13, the objections are sustained.

7           Is there anything in the appendices, Mr. --

8           MR. KERR:  No, Your Honor, that's it.

9           THE COURT:  All right.  And in the rebuttal report,

10 are there?

11          MR. KERR:  No, nothing in there, Your Honor.

12          THE COURT:  Okay.  Now, with the Court having ruled on

13 the further objections, do you wish to cross-examine any

14 further, Mr. Kerr?

15          MR. KERR:  No, I'm all done.

16          THE COURT:  Mr. Horowitz, are you going to cross-

17 examine?

18          MR. HOROWITZ:  I am, Your Honor.  Fairly briefly, Your

19 Honor.

20          THE COURT:  Okay.

21          MR. HOROWITZ:  For the record, Greg Horowitz, from

22 Kramer Levin, on behalf of the committee.

23 CROSS-EXAMINATION

24 BY MR. HOROWITZ:

25 Q.   Good morning, Mr. Fazio.

RESIDENTIAL CAPITAL, LLC, ET AL.                              47

1   A.   Good morning.

2   Q.   Now, Mr. Fazio, you're not offering any opinion in phase 2

3   about the value of any adequate protection claims, right?

4   A.   I'm valuing the scenarios that have been put forth.

5   Whether or not that allows the JSNs to be adequately protected

6   or not is a legal determination.

7   Q.   Well, let me ask you to turn to your deposition.  You've

8   still got that tab there.  And let me refer you to page 29 of

9   your deposition.  Tell me when you're there.

10   A.   Page 29, yes.

11   Q.   Yes.  And I'm referring you to line 13, do you see where

12   Mr. Kerr asked you the following question and you gave the

13   following answer.

14   "Q.  Okay.  You're not providing an opinion here in the value

15   of any adequate protection claims, is that correct?

16   "A.  Not in this report.  As I said, I did some reports in

17   phase 1."

18       That's accurate, right?

19   A.   I'd have to read this whole thing.  I mean you're pointing

20   out something in isolation and it does not say anything about

21   the word --

22          THE COURT:  Take your time to read what you want.

23          THE WITNESS:  Okay.

24          MR. HOROWITZ:  Sure.

25       (Pause)

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1   A.    Yes, I see that.

2   Q.    Okay.  And I take it that when you hedged before, your

3   concern was that you feel like some of the opinion that you're

4   offering here might have some bearing on adequate protection

5   claims, is that fair?

6   A.    That's fair.

7   Q.    Okay.  Well, let's talk about that.

8        You are not in your reports or your direct testimony here

9   offering any opinion as to the value of any putative

10  intercompany claims as of the petition date, right?

11  A.    The petition date would be phase 1, yeah.

12  Q.    Okay.

13  A.    The --

14  A.    And in your direct testimony and in your reports, neither

15  of the reports that you've submitted here, did you make any

16  effort to ascribe any value to intercompany claims as of the

17  petition date, correct?

18  A.    The intercompany balances being used here are as of the

19  petition date.  So, therefore, the value that's being run

20  through the waterfall could be said to be the value of the

21  intercompanies as of the petition date, because that's the

22  referenced balance that the intercompanies we're using here.

23  Q.    Well, in your waterfall you treat intercompany claims as

24  unsecured claims, correct?

25  A.    No.  In some of the models here we're saying that there is

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1  a direct lien on the intercompany.

2  Q.    And the value of the intercompany claim itself is based on

3  what an intercompany claim would be worth as an unsecured claim

4  against the obligor on that intercompany claim?

5  A.    That's correct.

6  Q.    You follow me now?

7  A.    Yes.  Yep.

8  Q.    Okay.  And the value of an intercompany claim, a putative

9  intercompany claim, therefore, is a function, among other

10 things, of the assets that are available at the obligor company

11 to satisfy unsecured claims, correct?

12 A.    That's correct.

13 Q.    All right.  So you need, in order to determine the value

14 of the intercompany claim, to come to some conclusion as to

15 what assets are available at the obligor, correct?

16 A.    That's correct.

17 Q.    And you need to come to a conclusion as to the value of

18 those assets, right?

19 A.    That's correct.

20 Q.    And the value of those assets may change over time, right?

21 A.    That's correct.

22 Q.    And here what you did is you used the values shown on the

23 company's April 30th, 2013 trial balances, right?

24 A.    That's correct.

25 Q.    And the debtors' estimates of the recovery values in the

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1   disclosure statement, right?

2   A.    That's correct.

3   Q.    Okay.  You did not use any estimate of the value of assets

4   as of the petition date, right?

5   A.    That's correct, in this analysis.  But as I pointed out

6   what all the assumptions were, you can run it, since it's a

7   mathematical model, based on any of the assumptions that you

8   wanted to vary those.

9   Q.    Well, in order to run it, you would need to have some

10  information about what the value of assets was on the petition

11  date, right?

12  A.    That's correct.

13  Q.    Okay.  And you did not do that, right?

14  A.    Not in this analysis, correct.

15  Q.    Okay.  And if asset values increased between the petition

16  date and the estimated effective date, then the value of

17  intercompany claims would also increase, right?

18  A.    Mathematically, yes.

19  Q.    Okay.  But nothing in your analysis quantifies that

20  impact, right?

21  A.    That's correct.

22  Q.    Okay.  And it, therefore, follows, doesn't it, that

23  nothing in your analysis shows whether the value of putative

24  intercompany claims diminished between the petition date and

25  the effective date, right?

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1   A.   It could have increased or decreased.  We could have one

2   different scenarios if you wanted through the model.  But

3   nothing here is stressing that value, that's correct.  We used,

4   as I've said, the disclosure statement values as a baseline for

5   the report.

6   Q.   Okay.  By the way, also nothing in your opinion offers an

7   opinion as to the aggregate value of the junior secured note

8   holders' collateral as of the petition date, right?  And by

9   aggregate value, I mean including the putative intercompany

10  claims.

11  A.   I'm not sure.  We -- it depends on what assumptions you

12  want to run.  If you say that they have a direct lien on the

13  AFI contribution, if you say that the intercompanies are valid

14  as scheduled, then we do come up with a valuation of the total

15  secured recovery associated with the JSNs' collateral.

16  Q.   To be clear, my question was as of the petition date.

17       Nothing in your report attempts to quantify the aggregate

18  value of JSN collateral as of the petition date, correct?

19  A.   I'm not sure technically if it's correct.  If the

20  assumption is that the collateral value is the 1.88 billion as

21  of the petition date, that's could to be an assumption that you

22  run through.

23       We're using a baseline of the disclosure statement, but if

24  an assumption was said to make the value associated with the

25  disclosure statement effective as of the petition date, that

1   could be an assumption that's run at the 1.88 billion.

2   Q.   Sir, you did not, in your report, make an assumption that

3   the 1.88 billion base collateral as of the effective date was

4   actually the value of JSN collateral as of the petition date,

5   did you?

6   A.   We just assumed the baseline that was in the debtors'

7   analysis as I've stated.

8   Q.   Sir, is there anything in your report that makes any

9   assumption as to the value of the JSN collateral as of the

10  petition date?

11  A.   Nothing over and above what I've just said.

12  Q.   Now also, sir, to be clear, the waterfall model that you

13  use assumes the receipt of -- in addition to using the April

14  30th, 2013 trial balances, right?

15  A.   Correct.

16  Q.   It also assumes that the debtors have received the 2.1-

17  billion-dollar AFI contribution, correct?

18  A.   That's correct.

19  Q.   So when you value your intercompany -- the putative

20  intercompany claims, part of the assets available for

21  distribution is the 2.1-billion-dollar AFI contribution,

22  correct?

23  A.   That's correct.

24  Q.   Now that 2.1-billion-dollar AFI contribution was not

25  available for distribution on intercompany claims as of the

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

 1  petition date, correct?

 2  A.    I do not believe the settlement what was done on the

 3  petition date, correct.

 4  Q.    Right.  And, in fact, the 2.1 billion isn't even in the

 5  hands of the debtors as we sit here today, right?  Or in my

 6  case, stand here.

 7  A.    I'm not sure where it stands.

 8  Q.    Okay.  You're not familiar with the terms of the global

 9  settlement, sir?

10  A.    I am, but I'm not sure if it's in escrow or where it is.

11  I assume that it's not settled, because this case isn't

12  settled.

13  Q.    Okay.  But your analysis assumes a point in time where

14  both the intercompany balances are treated as valid enforceable

15  claims and the AFI contribution has been received, correct?

16  A.    That's correct, in the analysis.

17  Q.    Okay.  Now the waterfall model that you used, sir, in your

18  direct testimony in paragraph 10 -- if you could turn to that.

19  A.    Yes.

20  Q.    Are you there?  You say "To perform my analysis, I

21  developed a waterfall model with the assistance of my team at

22  Houlihan Lokey."  Do you see that?

23  A.    Yes, I do.

24  Q.    Now, in fact, sir, it's true, is it not, that the

25  waterfall model had been developed by Houlihan prior to the

RESIDENTIAL CAPITAL, LLC, ET AL.                    54

1   petition date?

2   A.   It was -- the beginning of the development was before, and

3   then there it was subsequently tweaked along with my comments

4   in there.

5   Q.   Okay.  You were not involved in this representation during

6   the pre-petition period, correct?

7   A.   That's correct.

8   Q.   You didn't become involved until you got involved for

9   purposes of providing expert reports for phase 1 and phase 2,

10  correct?

11  A.   That's correct.

12  Q.   Okay.  But by the time you got involved, Houlihan had

13  already developed a fully functioning waterfall model, correct?

14  A.   It was fully functioning, and as I said I've tweaked the

15  model to ensure that I'm in conformity with all my desires for

16  the modeling, correct.

17  Q.   Okay.  And it's fair to assume that in the course of your

18  work you familiarized yourself with all of the facts and

19  circumstances surrounding Houlihan's development of the model,

20  right?

21  A.   I'm not sure about all facts and circumstances.  I'm

22  familiar with the model, and I'm comfortable that the model is

23  representative of a waterfall model in the scenario.

24  Q.   And you were assisted by team members who had been

25  involved in the development of the model during the pre-

RESIDENTIAL CAPITAL, LLC, ET AL.                                  55

1   petition period, right?

2   A.    That's correct.

3   Q.    Including Jeffrey Lewis?

4   A.    Yes.

5   Q.    And Ben Ilhardt?

6   A.    That's correct.

7   Q.    And those individuals have been involved in the

8   representation during the entire period, right?

9   A.    That's correct.

10  Q.    And you relied on them to fill you in on whatever

11  background information you deemed to be material, right?

12  A.    I made all the questioning I thought I needed to, yes.

13  Q.    Okay.  And you were aware that prior to the petition date

14  the Houlihan model had the ability to consider and run

15  intercompany claims, right?

16  A.    I'm not exactly sure when that functionality became

17  present in the model.

18  Q.    As you sit here today, do you have any reason to doubt

19  that the pre-petition model had the functionality to value

20  intercompany claims?

21  A.    Like I said, I did not go through, and pre-petition time

22  period of the model development was not of concern to me.

23  Q.    Okay.

24          THE COURT:  Did it when you first became involved?

25          THE WITNESS:  It had it when I first became involved

RESIDENTIAL CAPITAL, LLC, ET AL.                56

1  as an expert, yes, Your Honor.

2           MR. HOROWITZ:  Thank you, Your Honor.

3  Q.    Let me ask you to take a look at the last tab in your

4  book, which is Defendant's Exhibit BAM.

5       This is a pair of e-mails including the last one is an

6  e-mail from Jeffrey Lewis to Mark Renzi.  Do you see this?

7  A.    I do see this.

8  Q.    This is dated June 29th, 2012, and it's entitled "ResCap

9  intercompany balances".  Are you familiar with this e-mail,

10 sir?

11 A.    No, I'm not.

12 Q.    Okay.  Did Mr. Lewis -- by the way, do you see that the

13 second e-mail on this page, the one that's being forwarded, is

14 an e-mail from Mr. Ilhardt, right?

15 A.    I do see that.

16 Q.    With the same subject line, right?

17 A.    Yes.

18 Q.    So did Mr. Lewis and Mr. Ilhardt brief you in connection

19 with your work on this matter about their work in seeking to

20 understand the intercompany claims before and shortly after the

21 petition date?

22 A.    I think throughout the whole case they gave me their

23 debrief of their intercompany balances throughout the whole

24 case.

25 Q.    So let me refer you to the first e-mail on this document,

**RESIDENTIAL CAPITAL, LLC, ET AL.** 57

1  the one from Mr. Lewis.  And take a look at the second to last

2  paragraph that says, "We know the schedules will be published

3  this weekend."  Do you see that?

4  A.    Yes, I do.

5  Q.    Now, first of all, by the way, just for context, June

6  29th, 2012, that's about a month and a half after the petition

7  date, right?

8  A.    That's correct.

9  Q.    And you understand that the schedules that are referred to

10  in the sentences that I started reading are the schedules of

11  assets and liabilities?

12  A.    Yes, I believe so.

13  Q.    Okay.  And June 29th, 2012 is shortly after those

14  schedules were filed, right?

15  A.    That's June 28th, is shortly before, I think you said,

16  right?

17  Q.    I said June 29th, but --

18  A.    Okay.

19  Q.    -- yes.

20      So reading on on that sentence, "We know the schedules

21  will be published this weekend, but since we have not seen

22  them, we do not know how the intercompany claims will be

23  described/detailed in the schedules.  We anticipate we will

24  start getting calls on the schedules starting on Monday.  We

25  would like to be able to say more than the company has

RESIDENTIAL CAPITAL, LLC, ET AL.                    58

1  indicated the intercompany claims should be treated as equity

2  contributions and not loans, but after weeks of asking and

3  multiple requests we do not have their support for this

4  assertion."

5        Do you see that sentence, sir?

6  A.   Yes, I do.

7  Q.   Okay.  So did Mr. Lewis and Mr. Ilhardt advise you in

8  connection with your work that before the schedules of assets

9  and liabilities had been filed the debtors had actively been

10 taking the position that intercompany claims should be treated

11 as equity contributions and not loans?

12 A.   I am not sure.  I know there was discussion before or

13 after, but I am not positive and did not go through this with

14 them.

15 Q.   Okay.  But reading this here, you understand that Mr.

16 Lewis was indicating that the company had been taking the

17 position for weeks prior to the filing of the schedules of

18 assets and liabilities that the intercompany claims should be

19 treated as equity contributions and not as loans?

20        MR. PERRY:  Objection.

21        THE COURT:  Sustained.

22        MR. HOROWITZ:  Thank you.

23        I have nothing further.

24        THE COURT:  Thank you.

25        MR. HOROWITZ:  Your Honor, I'd like to offer that last

RESIDENTIAL CAPITAL, LLC, ET AL.                                    59

1  document, Defendant's Exhibit BAM.

2          MR. PERRY:  No objection.

3          THE COURT:  All right.  DX-BAM is admitted in

4  evidence.

5  (E-mail chain was hereby received into evidence as Defendants'

6  Exhibit DX-BAM, as of this date.)

7          THE COURT:  Any further cross from anybody?

8          All right, Mr. Perry.

9          MR. PERRY:  Brief redirect, Your Honor.

10 REDIRECT EXAMINATION

11 BY MR. PERRY:

12 Q.   Mr. Fazio, can you describe how any allocation of the AFI

13 contribution would impact the JSNs' secured recovery in your

14 waterfall model?

15 A.   In the waterfall model, if you have a direct lien on any

16 portion of the AFI contribution, that would increase the JSNs'

17 secured recovery associated with that.

18      If it's -- if you're asking about the AFI contribution of

19 2.1 billion, in scenario A it's assumed as indicated in the

20 disclosure statement that the 2.1 is allocated to the legal

21 entities, as described in the disclosure statement; and through

22 the waterfall the intercompanies get the benefit associated

23 with that.

24 Q.   Just focusing for a second on the AFI contribution, would

25 any allocation of the AFI contribution increase the JSNs'

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1   secured recovery on a dollar-for-dollar basis under your model?

2           MR. KERR:  Objection, Your Honor.

3   A.   Yes.

4           THE COURT:  Overruled.  You can examine him further.

5   I'm not sure I understand what he's just said, but, I mean, I

6   heard the words.

7   Q.   Can you describe for the Court why it is that the -- any

8   allocation of the AFI contribution would impact the JSNs'

9   secured recovery on a dollar-for-dollar basis?

10  A.   Because if they are allocated directly, a secured

11  interest, then what you basically have is an increase in the

12  security value.

13          If you look at scenario C and you're running A and B

14  together, it's not dollar-for-dollar.  In scenario B it's

15  dollar-for-dollar.  Scenario C you increase, say, by say 1.2

16  billion dollars you increase and you say that's a secured

17  recovery.  That means there's less to go to the intercompany

18  and the equity pledges.

19          So it's not a dollar-for-dollar in scenario C.  It is in

20  scenario B.

21  Q.   Okay.  So just -- I want to wait to get to a circumstance

22  where there's a recovery for both intercompany claims and the

23  AFI contribution.  So let's just --

24  A.   Okay.

25  Q.   -- put that to the side for a second.

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1        Am I correct that scenario A sets forth the impact on the

2   JSNs' secured recovery if intercompany claims are allowed?

3   A.    That's correct.

4   Q.    And am I correct that if there is an allocation of some

5   portion of the AFI contribution, that allocation would increase

6   the JSNs' secured recovery on a dollar-for-dollar basis?

7   A.    That would be scenario B, yes, it would be dollar-for-

8   dollar.

9   Q.    Okay.  Now, if there is both an allocation of the AFI

10  contribution and intercompany claims are allowed, how would

11  that, those two items working together, impact the JSNs'

12  secured recovery?

13  A.    Well, the secured recovery goes up for the dollar-for-

14  dollar in scenario B.  However, the intercompany -- the value

15  of the intercompany and the equity pledges goes down by a

16  percentage, you have to run it through the model.  So it's not

17  totally dollar-for-dollar, but you're increasing the value for

18  the direct security interest and the intercompany value,

19  because instead of having a 2.1-billion-dollar contribution,

20  you're having something less than that, the value of the

21  intercompanies and equity pledges goes down slightly.

22  Q.    Okay.  And are you able to run any recovery scenario based

23  on the determination that the Court makes with respect to the

24  JSN liens on intercompany claims and the AFI contribution

25  through your waterfall model?

1   A.   I can run any of those through any of the model, yep.

2   Q.   Mr. Kerr asked you a series of questions about the 16.6

3   billion dollars of pre-petition forgivenesses that were

4   identified in Mr. Renzi's report.  Do you recall those

5   questions?

6   A.   Yes, I do.

7   Q.   Do the debtors include in their 16.6-billion-dollar number

8   forgivenesses by debtor entities of intercompany balances with

9   nondebtor entities?

10  A.   Yes, in the 16.6 billion there is at least, I think it's

11  around 6.3 billion dollars of intercompany receivables that are

12  between receivables of entities in the model with entities

13  outside of the model.

14  Q.   And what would be the effect of including forgivenesses of

15  debt to nondebtor entities on JSN recoveries, if you could

16  model that?

17  A.   If we had the information to model, it would have to

18  increase the recoveries, the exact extent I'd have to get the

19  information to model it through, but 6.3 --

20       THE COURT:  Mr. Fazio, when you say it would increase

21  the JSNs' recovery, after phase 1, I concluded the JSNs are

22  undersecured by 318 million dollars.

23       If the plan is confirmed and the JSNs remain

24  undersecured, it won't have any effect on the JSNs' recovery,

25  correct?  Not secured recovery; recovery.  Is that correct?

1        I mean we're going through this exercise because they

2    remain 318 million dollars undersecured after phase 1.  You can

3    keep talking about their secured recovery will increase dollar-

4    for-dollar or by some amount.  But if they remain undersecured,

5    it will have no effect on their recoveries, isn't that true?

6            THE WITNESS:  I guess that's more of a legal

7    determination --

8            THE COURT:  Well, I'm asking you to assume that they

9    remain undersecured after phase 2.  If the plan is confirmed,

10   if they get a portion of the AFI contribution or a portion of

11   intercompany claims, if they're still undersecured it won't

12   have any effect on the recovery if the plan is confirmed, isn't

13   that true?

14           THE WITNESS:  There is one scenario in the deficiency

15   that nobody asked in front of you, but it depends on the legal

16   determination of the deficiency and whether or not if you're --

17           THE COURT:  Let's put the deficiency issue aside.

18           THE WITNESS:  Okay.  If they're undersecured after --

19   and considering the intercompanies, the AFI contribution and

20   the intercompany receivables of 6.3 billion that have not been

21   modeled, and if they're still undersecured, then I think you're

22   correct.

23           THE COURT:  Okay.  Go ahead.

24           THE WITNESS:  If you don't include the deficiency.

25   BY MR. PERRY:

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1  Q.   Why don't you go to paragraph 38 of your direct testimony.

2  This was a chart that Mr. Kerr took you through.

3      What are the assumptions used for the JSN secured recovery

4  columns set forth in paragraph 38 of your direct testimony?

5  A.   As you see, those numbers don't change.   So the assumption

6  was the liquidation analysis that was prepared by Mr. Renzi.

7  And so that was kept constant throughout this scenario A in the

8  rebuttal.

9  Q.   So am I correct that you were simply adopting Mr. Renzi's

10  secured recovery figure for purposes of this analysis?

11  A.   That was the assumption made in this analysis, correct.

12  Q.   Do you -- on the subject of Mr. Renzi, do you understand

13  FTI to have developed a waterfall model?

14  A.   Yes, I do.

15  Q.   And Mr. Horowitz asked you a series of questions about

16  Houlihan's development of its waterfall model.

17      My question to you, sir, is, is the Houlihan model

18  intended to be different than the FTI model?

19  A.   No.   The raw model itself is substantially similar and

20  would run various scenarios with Mr. Renzi and his work and his

21  workforce at -- I've helped him develop a model, and they're

22  substantially similar models.

23  Q.   Mr. Kerr asked you some questions about your assumption

24  that if intercompanies were valid unsecured claims would stay

25  the same.  Are you familiar with the terms of the global

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1   settlement, sir?

2   A.    Yes, I am.

3   Q.    And are you aware of whether any unsecured creditor can

4   object if the Court rules for purposes of calculating the JSN

5   claims, that intercompany claims are valid?

6          THE COURT:  I don't understand your question.

7   Q.    Do you know whether under the global settlement, any other

8   party can object if, for purposes of calculating the JSN

9   claims, the Court rules that the intercompany claims are valid?

10         THE COURT:  I still don't understand.  It sounds like

11  you're asking for a legal opinion from the witness, and I'm not

12  going to permit you to ask this witness for legal opinions.

13         MR. PERRY:  Understood, Your Honor.

14         I have no further questions, Your Honor.

15         THE COURT:  Thank you.  Any further recross, Mr. Kerr?

16         MR. KERR:  No, Your Honor.

17         THE COURT:  All right.

18         All right, Mr. Fazio, you're excused.

19         Mr. Perry, are you going to offer the -- the direct is

20  still not in, so.

21         MR. PERRY:  Subject to Your Honor's rulings earlier we

22  offer the direct testimony of Mr. Fazio with the exhibits

23  thereto.

24         THE COURT:  Mr. Kerr?

25         MR. KERR:  Subject to Your Honor's rulings that were

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1   on the record about what portions should be redacted, we don't

2   have an objection to the remaining portion.

3          THE COURT:  All right.  I would appreciate it if,

4   since I have two competing versions, neither quite what I've --

5   consistent with what I've ruled, if the two of you can agree on

6   one final version reflecting the Court's rulings, I would

7   appreciate that.

8          MR. KERR:  We will do that, Your Honor.

9          THE COURT:  So with the Court's rulings, the direct

10  testimony of Michael Fazio, which is ECF 5711, and I guess it

11  includes those portions of Exhibits A and Exhibit B, are in

12  evidence.  Okay?

13  (Direct testimony of Michael Fazio was hereby received into

14  evidence as Defendants' Exhibit, as of this date.)

15         THE COURT:  All right.  Do you have any further

16  witnesses, Mr. Cohen?

17         MR. COHEN:  We have no further witnesses, Your Honor.

18         There is an evidentiary issue we'd like to raise with

19  the Court.

20         THE COURT:  Okay.

21         MR. COHEN:  It came up first during my opening

22  statement and it had to do with whether the examiner's report

23  was going to be considered for the limited purpose of

24  identifying potential claims and potential damages, which we

25  had understood from the Court's earlier statements at an August

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1  30th hearing that that would come in.

2          We would like the report to come in for those limited

3  purposes and we'd be prepared to brief that at the Court's

4  convenience.

5          THE COURT:  Mr. Kerr?

6          MR. KERR:  Your Honor, we would object to that.  After

7  Mr. Cohen's previous raising the issue before, I went back and

8  looked, and I apologize, I don't have it here with me, but I

9  believe that Your Honor had made very clear the examiner report

10 was not going to be coming in for any purpose.

11         So we object to that, Your Honor, and we could brief

12 it, if you'd like.

13         THE COURT:  No, the --

14         MR. O'NEILL:  The committee concurs, Your Honor.

15         THE COURT:  Mr. O'Neill.

16         The objection is sustained.

17         Mr. Cohen, the evidence in the record reflects

18 testimony regarding certain claims that the examiner identified

19 in his report.  There's conflicting evidence that's been

20 offered with respect to claims relating to the tax allocation

21 agreements.  There's conflicting evidence that's been offered,

22 I guess, with the MSR swap.  And there's conflicting evidence

23 that's been offered with respect to allocation of revenue from

24 the broker claims.

25         There is, I believe -- and when we talk about where we

1   go from here, I think without having gone back and looked at

2   everything, there is some evidence about securities claims,

3   some evidence about avoidance claims, and maybe one or two -- I

4   mean it seemed to me, Mr. Cohen, that your evidence related to

5   the three specific claims that I just referenced.

6          Were there others that you -- and as to those, I mean

7   I don't think you need the examiner report.  You've put in

8   evidence arguing that there are breach of contract claims for

9   those three specific matters.  They were identified in your, in

10  the pre-trial order; they were identified in your objection to

11  confirmation.  You did introduce and there was conflicting

12  witness testimony that I guess I'll ultimately have to resolve.

13  But it seems to me that you've gotten -- you've had the

14  opportunity and have introduced evidence with respect to those

15  three specific claims which you assert are breach of contract

16  claims.  The proponents dispute some or all of those as either

17  being avoidance claims or whatever.

18         So I think you've had a fair opportunity to offer

19  evidence with respect to claims.  When I sustained -- for

20  example when I sustained the objection to the Lyons report, I

21  specifically noted that -- not noted, it's in the text -- but

22  the order references the fact that the parties could introduce

23  nonhearsay evidence with respect to claims.

24         So you've had that opportunity.  So the bottom line is

25  the offer of the examiner's report for any purpose, the

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1    objection to that is sustained.

2          MR. COHEN:  Your Honor, you're certainly right that

3    with respect to the three contract claims that you've

4    identified we have introduced nonhearsay evidence --

5          THE COURT:  Right.

6          MR. COHEN: -- consistent with the Court's

7    instructions.  What we understood from the August 30th

8    statement was that that was not a hearsay purpose, the

9    examiner's identification of the nature of claims -- potential

10   claims and potential damages.  So to an extent it certainly

11   influenced the discovery we took and the way we put on our

12   case.

13         We don't think those are hearsay portions, but I

14   understand the Court's ruling.

15         THE COURT:  Okay.  As I indicated, I mean there is

16   some evidence that has come in with respect to other claims.

17   For example -- correct me if I'm wrong, Mr. Kerr -- I thought

18   that the committee's STN motion, the committee's STN motion,

19   the senior unsecured noteholders', the trustees', STN motion --

20   I thought those came into evidence without objection, and those

21   identify other claims other than the contract claims.  So

22   that's in evidence as well.

23         MR. KERR:  I believe that's correct, Your Honor.

24         THE COURT:  Okay, so in any event, my ruling stands

25   with respect to the examiner's report.

RESIDENTIAL CAPITAL, LLC, ET AL.                    70

1          MR. COHEN:  Understood.

2          THE COURT:  Okay.  Let me ask, do the -- are there any

3   other parties that object to confirmation of the plan that wish

4   to offer evidence in support of their objection?

5          No one has rise to that.

6          So the question from the Court then is, do the

7   objectors to the plan and the defendants in the two adversary

8   proceedings rest?

9          MR. COHEN:  Your Honor, with the caveat that with

10  respect to the deposition designations --

11         THE COURT:  Yes.

12         MR. COHEN:  -- there are a number of exhibits --

13         THE COURT:  I agree.

14         MR. COHEN:  -- big long list we can work through --

15         THE COURT:  Okay.

16         MR. COHEN: -- and we will do that as we try and clear

17  the objections in the designations and the rest of the

18  documents.

19         THE COURT:  I was wasn't seeking to preclude any of

20  that, Mr. Cohen.  I know we have to -- I know you'll endeavor

21  as best you can to resolve as many objections as you can.

22  So --

23         MR. COHEN:  We certainly will.

24         THE COURT:  Okay.  With that caveat -- Mr. Kerr, what

25  do you want to say?

1          MR. KERR:  Just so we're clear, Your Honor.  I

2     understand from Mr. Cohen that there is both deposition

3     designations, but there are additional exhibits you --

4          MR. COHEN:  Documents that are in connection with the

5     deposition designations.  So we'll work through both of those.

6          MR. KERR:  So these are documents that are being, that

7     were identified during the depositions and offered -- I'm just

8     trying to understand if they're offering different exhibits or

9     just --

10          THE COURT:  That's what I was understanding Mr. Cohen

11     to be saying.

12          MR. COHEN:  I am.  I am.

13          MR. KERR:  All right.  Well, then we'll work through

14     those issues --

15          THE COURT:  Okay.

16          MR. KERR: -- Your Honor, and straighten them away.

17          THE COURT:  Okay.  Mr. Cohen, subject to ironing out

18     issues of objections to deposition designations or exhibits

19     identified and referred to in depositions for which an excerpt

20     is being offered, do the plan objectors and defendants in the

21     phase 2 of the adversary rest?

22          MR. COHEN:  I'm told that my list may include certain

23     other documents --

24          THE COURT:  Well, no, I don't want to know about other

25     documents.  I mean if you've got other documents, let's deal

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1   with other documents.

2        MR. COHEN:  Okay.

3        THE COURT:  What I understood the parties agreed and

4   what I had said before earlier in this trial, that with respect

5   to the deposition designations, counter-designations and

6   objections, and I include with that if there are exhibits that

7   are referred to and are subject of testimony and deposition

8   testimony that's being offered, I'll wait on that.  But I

9   don't, no one should have any misunderstanding; I'm not --

10  there is no chance to go back and decide I want these exhibits

11  or those exhibits.

12       So if you've got exhibits you wish to offer now that

13  are other than what is included in the references in the

14  deposition designations and counter-designations, now is the

15  time.  Because you're going to rest.

16       MR. COHEN:  I understand.  I understand.  If I could

17  have a brief recess to look at my list.

18       THE COURT:  Okay.  We'll take a fifteen-minute recess.

19       Before you do that, Mr. Kerr, are the proponents

20  offering any rebuttal?

21       MR. KERR:  No, Your Honor.

22       THE COURT:  Okay.  All right.  We'll take a fifteen-

23  minute recess.

24       MR. KERR:  Thank you, Your Honor.

25       (Recess from 10:22 a.m. until 10:43 a.m.)

1              THE COURT:  Please be seated.

2          Mr. Perry?

3              MR. PERRY:  One piece of housekeeping, Your Honor.

4    Yesterday -- or Friday, I guess -- we offered a series of

5    exhibits in connection with Mr. Bingham.  You asked that we

6    file --

7              THE COURT:  Yes.

8              MR. PERRY:  -- the list.  We've done so at docket 5938

9    and we would now offer the exhibits set forth in docket 5938

10   into evidence.

11             THE COURT:  Mr. Kerr?

12             MR. KERR:  We have no objection to that, Your Honor.

13             THE COURT:  All right.  So those exhibits -- and this

14   was done at the Court's request -- those exhibits that are

15   listed on the document filed as ECF 5938 are all admitted in

16   evidence.

17   (Exhibits listed on ECF 5938 were hereby received into evidence

18   as Defendants' Exhibit, as of this date.)

19             MR. KERR:  Your Honor, Charles Kerr.  One other

20   housekeeping matter.  We had done a similar thing with Ms.

21   Westman's exhibits.  We had filed that after conferring with

22   the JSNs.

23             After it was filed we discovered there was one

24   transposition of numbers, so we refiled it as a corrected list

25   of plan confirmation exhibits offered into evidence in

1    connection with the direct testimony of Barbara Westman.  That

2    was filed yesterday with ECF 5937.  It was just a correction of

3    one exhibit number.  But we wanted to make sure it was correct.

4                  THE COURT:  Okay.  Mr. Cohen?

5                  MR. COHEN:  So, Your Honor, before we broke --

6                  THE COURT:  No, but just with respect to -- could you

7    just -- Ms. Miller?

8                  MS. MILLER:  We have no objection.

9                  THE COURT:  All right.  So the Westman exhibits that

10   are admitted in evidence are listed in the document filed on

11   ECF as 5937.

12                  Okay, Mr. Cohen.

13                  MR. COHEN:  All right.  Before we broke I handed Mr.

14   Kerr the list of documents that we would like added to the

15   record.

16                  Unfortunately, the version that was prepared to bring

17   into court didn't have his objections or the witnesses with

18   whom they were used on.

19                  What he's graciously agreed to do, with the Court's

20   indulgence, it take a look at the list, get back to us tonight

21   and we can get you a final list and resolve any objection

22   tomorrow.

23                  THE COURT:  Mr. Kerr?

24                  MR. KERR:  Your Honor, Mr. Cohen is correct.  There is

25   about 200 documents on this list.  I understand that some of

1  them are documents referenced in the deposition designations,

2  some of them may already be in evidence, some are -- so I think

3  we've both been able to work cooperatively before, and we want

4  to do it again.

5          So we can do this quickly and make sure that the

6  record subject to this -- these exhibits going in or these

7  determinations about these exhibits and the deposition

8  designations we can then close the record.

9          THE COURT:  So we have a hearing tomorrow at 4?

10         MR. KERR:  We will have it done by then, Your Honor.

11         THE COURT:  I don't want to go too late.  So put this

12  way, if you can't resolve all of the issues, if there are

13  objections, come in at 3.  Okay?  Is that okay?

14         MR. KERR:  We'll do that, Your Honor.

15         THE COURT:  All right.  So the hearing tomorrow at 4

16  is with respect to which settlement again?  Somebody remind me.

17         MR. LEE:  Kessler, Your Honor.

18         THE COURT:  Kessler, right.  Because of scheduling

19  issues about some of the counsel for the objector, PNC, that

20  hearing on the approval of the Kessler settlement which is part

21  of the plan confirmation is scheduled for tomorrow at 4.

22         And so we're clear, if -- Mr. Cohen, if you're able to

23  resolve issues with Mr. Kerr on the exhibits, then just come in

24  at 4, but otherwise come in at 3.

25         MR. KERR:  Your Honor, just again, so I'm perfectly

1    clear what Your Honor is directing to us do, we'll do that with

2    respect to the list of exhibits that Mr. Cohen just gave me.

3           With respect to the deposition designations --

4           THE COURT:  That's not tomorrow.

5           MR. KERR:  Okay, great.

6           THE COURT:  Okay. What's going to happen on the

7    depositions is, the two of you are going to work cooperatively

8    the way you have on everything else --

9           MR. KERR:  Yes, Your Honor.

10          THE COURT:  And you're going to try and resolve as

11   many of the objections to the deposition designations, counter-

12   designations, et cetera as possible.

13          MR. COHEN:  Exactly.

14          THE COURT:  And the exhibits that are referred to in

15   the deposition, some of them may get sorted out tomorrow in any

16   event, okay?

17          MR. COHEN:  Correct.

18          THE COURT:  and subject to the exhibits we'll deal

19   with tomorrow, do you rest?

20          MR. COHEN:  We do.

21          THE COURT:  Okay.

22          And so -- just so the record is clear, the objectors

23   to the plan and the defendants in phase 2 of the adversary

24   rest, subject to the last issues we have to worked out,

25   correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1           MR. COHEN:  Correct, Your Honor.

2           THE COURT:  Come on up.

3           MR. SCHLECKER:  Your Honor, David Schlecker, from Reed

4   Smith on behalf of Wells Fargo as collateral agent.  We do

5   rest, Your Honor.

6           THE COURT:  Okay.  Thank you very much.  I appreciate

7   it.

8           All right.  And I take it there is no rebuttal case?

9           MR. KERR:  Your Honor, Charles Kerr.  On behalf of the

10  debtor, there is no rebuttal case.

11          THE COURT:  So what I thought I would do now, I

12  indicated that I would try and raise some questions and give

13  some guidance about things that I want to be sure are covered

14  in the post-trial briefing.  And you can order a transcript of

15  what I'm going to list  I may not go through everything on my

16  three-page list, but I'll go through some of them.

17          So these are questions that I have.  Some of them are

18  hypotheticals, many of them.

19          If pursuant to the cash management system ten million

20  dollars in cash is swept from the accounts of RFC and deposited

21  into a ResCap concentration account, what security interest

22  would the JSNs hold?

23          If instead of sweeping the money into the ResCap

24  concentration account, RFC held the funds in its own account,

25  what liens would the JSNs have?

1        Is there any difference in the economic substance of

2   the two transactions from the standpoint of a secured creditor

3   that would have a lien on the cash, whether it was in the

4   ResCap or RFC accounts?

5        Two:  If journal entries were recorded in RFC's ledger

6   showing a receivable from ResCap for ten million dollars and in

7   ResCap's ledger showing a payable from ResCap to RFC, would AFI

8   and the JSNs have a lien on the receivable?

9        Three:  Would ALI -- AFI, excuse me.  If I said ALI, I

10  typed wrong.  Would AFI and the JSNs have a lien on the ten

11  million dollars in the concentration account?  And I'm

12  referring to ResCap's concentration account.

13        Four:  Can the JSNs assert a lien on both the ten

14  million dollars in the ResCap concentration account and the

15  intercompany receivable?  What is the legal or economic basis

16  for being able to assert a lien on both?  Would permitting the

17  lien on both the cash and the receivable result in double

18  accounting?

19        Fifth:  If RFC borrows ten million dollars from AFI

20  under the revolver and purchases or originates ten million

21  dollars of mortgages with the proceeds, what if any lien do the

22  JSNs have?

23        If the loan from AFI was under the revolver, would

24  both AFI and the JSNs have a lien on the mortgages?

25        Six:  If ResCap then directed a release of the liens

1    on those mortgages so it could borrow from the AFI LOC, with

2    the mortgages then pledged to the AFI LOC, would the JSNs have

3    any remaining lien?

4           Six (sic):  If instead of RFC borrowing the money

5    directly from AFI under the revolver, ResCap borrowed the ten

6    million dollars, made a journal entry for an advance to RFC

7    which then purchased the same ten million dollars in mortgages,

8    what liens would the JSNs have?  Is there any difference in the

9    economic substance of this transaction from the one I listed as

10   number 5?

11          If the Court concludes that the 2.1-billion-dollar

12   payment from AFI must be allocated, please address each of the

13   direct and third-party claims against AFI as to which evidence

14   was introduced at trial, including third-party claims against

15   AFI for violation of the 1933 and 1934 acts.  What is the

16   magnitude of the claims asserted were claims asserted for

17   statutory control person liability, and if so what are the

18   applicable legal standards for a Section 15 or Section 20

19   control person liability claim?

20          Address third-party aiding and abetting or other

21   common law claims against AFI.

22          Address direct claims for avoidance or common law tort

23   claims.  Again, this is such as has been introduced into

24   evidence.  And last, the breach of contract claims.  And before

25   the break, I briefly referenced the three that the objectors

RESIDENTIAL CAPITAL, LLC, ET AL.                80

1  identified.

2          Do the JSNs have a lien on intercompany receivables

3  between obligors or guarantors under the JSN loan documents?

4  As a comment, on my part, it would seem counterintuitive to

5  recognize liens on intercompany transactions in such

6  circumstances because it could result in double or more

7  counting.  It relates to some of those earlier hypotheticals I

8  gave.

9          I know this is addressed in the pre-trial order and

10  the briefing already, but if the JSNs are undersecured, may

11  they nevertheless recover post-petition interest and fees

12  through aggregation of recoveries?  May the JSNs' recovery on

13  their deficiency claims pay post-petition interest and fees?

14  That's already addressed, but I think you need to address that

15  in your closing briefs.

16          If the JSNs are unimpaired at some debtors, may they

17  apply their recoveries from those debtors to post-petition

18  interest and fees.?

19          This is already addressed in the pre-trial briefing,

20  but I'm assuming it will be specifically addressed in post-

21  trial findings of fact and the briefs.  Did the AFI -- does the

22  AFI proposed 2.1-billion-dollar payment create a "new asset"

23  created post-petition through considerable effort and expense

24  from the debtors' estates, and as such the contribution need

25  not be allocate among the specific claims that were released?

1          May AFI receive a third-party release of bank claims

2    relating solely to separate bank accounts maintained by AFI

3    that do not relate to accounts or activities of ResCap?

4          And this relates to the Wells Fargo as successor to

5    Wachovia:  In the plan proponents' omnibus reply to objections

6    to confirmation at page 46, that brief says -- this is not

7    Ally's brief, this is the proponents' reply -- it says through

8    discussions in which Ally has confirmed -- I'm reading part of

9    it, but it was -- "Through discussions in which Ally has

10   confirmed what was already plain from the face of the release

11   provisions, that claims arising solely out of Ally's business

12   in not the debtors are not released and enjoined."  And then

13   also at pages 50/51, "To the extent WFBNA legitimately has

14   claims against Ally that would not affect the debtors -- which

15   WFBNA does not articulate either -- then those claims would not

16   be covered by the third-party release."

17         So I had the proponents' position about that, but not

18   AFI's.  And at least whether -- there is that stipulation that

19   was -- of facts that was entered, and I haven't gone back to

20   review underlying documents.  Its not clear to me whether --

21         I guess I would ask this question:  Does AFI have a

22   claim for indemnification against ResCap for bank claims that

23   relate exclusively to bank accounts maintained by AFI?  Did AFI

24   file such a POC?

25         So it's just unclear to me whether AFI agrees with the

1  statements that I've quoted from the reply to -- the plan

2  proponents' omnibus reply to objections, which seemed to say

3  AFI doesn't object if it relates exclusively to AFI.

4         So I'm sure if I -- that was part of the weekend's

5  endeavor trying to go through my notes and see what questions I

6  have.  So those -- that isn't to say you won't cover other

7  things, but at least that was what came to mind over the

8  weekend.

9         And let me just -- I didn't put it on this list,

10 but -- and the issue came up again this morning briefly in Mr.

11 Fazio's testimony.  And that is -- and this is in the joint

12 pre-trial conference order, and it's included in both the --

13 not in its entirety, but the objectors' confirmation objections

14 and in the debtors' --the proponents' omnibus reply, this issue

15 of how a deficiency claim by the -- let's assume for discussion

16 that the JSNs are undersecured.  What are they entitled to

17 recover as part of a deficiency claim?

18        They obviously assert they're entitled to post-

19 petition interest, fees, essentially what I read them as saying

20 is they're entitled to everything they're asking for, if

21 they're oversecured they're entitled to it, even if

22 undersecured -- that may be a slight overstatement, but that

23 was the gist of what I read.  Some of that is addressed in the

24 papers, but that needs to be spelled out.

25        Let me say, the plan proponents dismissed it --

1  dismissed that argument, fairly summarily, and I expect to see

2  a fuller treatment from both sides about the issue.  Anybody

3  have any questions?

4         So I've already agreed to the schedule that you all

5  worked out.  That was acceptable to the Court.

6         I guess my courtroom deputy asked about whether you

7  can leave things -- this is logistic -- whether you can leave

8  things in court, as long as the counsel table is cleared off, I

9  have no problem about you leaving what you need to leave here

10 for the December 11th closing arguments.

11        Mr. Kerr?

12        MR. KERR:  Your Honor, Charles Kerr on behalf of the

13 debtors.  It was our intention to remove pretty much everything

14 we brought here tomorrow.

15        THE COURT:  That would make me brokenhearted.

16        MR. KERR:  Your Honor we could leave the empty boxes

17 here, or something.  Just make you feel comfortable.

18        THE COURT:  Paper that would get put on the other side

19 would be okay, but --

20        MR. KERR:  We'll do our best to not leave you those

21 Christmas presents and just take them away at this point, okay?

22        MR. COHEN:  We will do the same.

23        MR. UZZI:  Your Honor, I thought I'd live the easel.

24        THE COURT:  Well, the charts in front of the podium

25 too.  It's been -- you did a wonderful job of holding it up,

1    too, Mr. Uzzi.

2            MR. KERR:  Your Honor, one additional question, in

3    terms of timing on the 11th, we'll be here at 10 o'clock on the

4    11th?

5            THE COURT:  Yeah, let's start it at 10:00.  You're

6    moving whatever else was on the calendar for the 11th?

7            MR. KERR:  I'm looking to Mr. Lee.

8            THE COURT:  And I think we should be able to start at

9    10 and I'm going to give everybody, you know, I'm going to give

10   you all a chance to say what you have to say, and I undoubtedly

11   will have questions.

12           MR. KERR:  Okay.

13           THE COURT:  Okay.

14           MR. KERR:  Good.  Thank you, Your Honor.

15           THE COURT:  All right.  Thank you very much.  You

16   know, obviously this was the confirmation hearing as well as

17   the phase 2 of the adversary proceedings.  It was exactly as I

18   thought in that the confirmation objections, about ninety-five

19   percent of it related to the phase 2 confirmation issue, so I'm

20   glad we did it together.

21           And I know these issues have been extremely hard

22   fought and I'm sure will continue to be -- although Judge Peck

23   is very happy to meet with you all, and I hope you will take

24   him up on that.

25           But I want to express my appreciation.  I think

RESIDENTIAL CAPITAL, LLC, ET AL.                    85

1  that -- I didn't set this as a time limit, but everybody

2  handled this very expeditiously and I appreciate that.  It was

3  efficiently done.  I thought counsel performed admirably on all

4  sides and I very much appreciate that.  And I assume it will

5  continue through closing arguments, right?

6          Thanks very much.

7          Mr. Marinuzzi?

8          MR. MARINUZZI:  Your Honor, there are two settlements

9  that are on for today, one with the National Credit Union

10 Administration Board and then there is one relating to a claim

11 asserted by at THE FHFA.

12         I don't know that everybody needs to stay for it.  To

13 the extent they'd like to leave.

14         THE COURT:  Anybody that wants to be excused, can be

15 excused.  Why don't you have a seat for a couple minutes, and

16 anybody who wants to be excused, please feel free.  All right?

17    (Pause)

18         THE COURT:  Okay.  Go ahead, Mr. Marinuzzi.

19         MR. MARINUZZI:  So, Your Honor, we've got two motions

20 seeking authority to enter into settlements, one of which was

21 opposed by the JSNs, one of which has no objection.

22         Would Your Honor prefer to start with the one with no

23 objection?

24         THE COURT:  Yes.

25         MR. MARINUZZI:  Okay.  So that, Your Honor, is the

1    debtors' application seeking -- debtors' motion seeking

2    approval for the debtors to enter into a settlement agreement

3    between and among the debtors, AFI, and the committee, and this

4    is a settlement relating to the FHFA's claim that's been

5    settled as part of the plan.

6            It was filed on the docket, at docket ECF number 5828

7    and supported by the declaration of Lewis Kruger at 5829 of the

8    docket.

9            Your Honor, a little bit of history.  Freddie Mac

10   purchased approximately six billion dollars of RMBS issued by

11   the debtors, and the FHFA took over for Freddie Mac as

12   conservator and commenced a series of lawsuits including one

13   which named the debtors, certain of the debtors, Ally, and

14   certain of its affiliates.

15           When we filed for bankruptcy, the FHFA dismissed or

16   dropped us from the lawsuit and continued with AFI.  We, in

17   this bankruptcy court, filed a motion seeking to extend the

18   stay to cover that litigation which went up and down between

19   the district court and the Second Circuit.  But it's been

20   settled.

21           The FHFA in the bankruptcy case, as conservator, filed

22   six proofs of claim against the debtors.  And under the plan,

23   as it was originally proposed and filed by the plan proponents,

24   the full treatment was the subordination of those claims, but

25   to the extent they could demonstrate that the claims shouldn't

1  be subordinated, the FHFA would get some recovery of

2  approximately two percent.

3          And since the August 21st disclosure statement here

4  and where Your Honor made some comments regarding the treatment

5  of FHFA's claims, the parties, including Ally-AFI, have worked

6  hard to try to resolve those issues globally and also as part

7  of that in connection with the plan.

8          So we are pleased that on or around October 25th, 2013

9  the FHFA and AFI-Ally entered into a settlement agreement, a

10 term sheet.  And it resolved the litigation brought by the FHFA

11 against Ally for a payment that's not public and undisclosed.

12         As part of that settlement the FHFA agreed to resolve

13 their issues in connection with the bankruptcy plan and to

14 support it so long as we made certain modifications and agreed

15 to allow their claims as follows.

16         So for all six of the claims filed against the

17 debtors, the FHFA claim will be allowed in the amount of 1.2

18 billion dollars against ResCap and will receive on the

19 effective date of the plan a 24-million-dollar cash

20 distribution.

21         As part of the term sheet between FHFA and Ally, the

22 FHFA has agreed to direct the debtors, the plan proponents to

23 make that 24-million-dollar distribution to AFI, and we've

24 agreed to do that; and the plan and confirmation order provide

25 for that.

1        The objections filed by the FHFA and Freddie Mac as

2    part of this are gone.  They're withdrawn.  We think that's

3    big, because it doesn't require the Court to address a number

4    of difficult issues.

5        One of the issues that was raised by the FHFA was the

6    applicability of HERA and specific provisions of HERA relating

7    to avoidance actions.  That took a position that they are

8    senior lien, in effect, on those actions.  We disagreed.  But

9    fortunately the resolution doesn't require the Court to decide

10   it.  And importantly, from the FHFA's perspective, if there's

11   no decision on it, the Court doesn't address it at all and the

12   confirmation order's been modified to make it clear.  They were

13   concerned about precedent, we understand that; and so we've

14   accommodated them in that respect.

15       So we're clear, Your Honor, nothing in this settlement

16   affects whatever rights the FHFA as conservator for Freddie

17   Mac, have to receive distributions under the waterfall on

18   account of the RMBS certificates that they hold.  This is

19   solely with respect to those six enumerated proofs of claim

20   that were filed against the debtors.

21       As I noted, there has been no objection.  And unless

22   the Court has any questions, we'd ask that the Your Honor

23   approve our entry into the --

24       THE COURT:  What happens if the plan is not confirmed?

25       MR. MARINUZZI:  All bets are off.  We'll be fighting

1    over whatever treatment we get -- we give them in any plan.

2            THE COURT:  All right.  Does anybody else wish to be

3    heard with respect to the settlement of the FHFA?

4            All right.  It's approved.

5            MR. MARINUZZI:  Thank you, Your Honor.  And that

6    brings us to the settlement with the National Credit Union

7    Administration Board, and I will cede the podium to my

8    colleague James Beha.

9            THE COURT:  Okay.

10           MR. BEHA:  Good morning, Your Honor.

11           THE COURT:  Good morning.

12           MR. BEHA:  James Beha --

13           THE COURT:  I saw you checked your watch to make sure

14   it was still morning.

15           MR. BEHA:  I wanted to make sure I got it right.  Yes.

16   Try to be precise.  James Beha from Morrison & Foerster on

17   behalf of the debtors.

18           I'm here to present Your Honor with the settlement --

19   the proposed settlement that National Credit Union

20   Administration Board as liquidating agent for Western Corporate

21   Federal Credit Union and U.S. Central Federal Credit Union.

22           The motion is at docket number 5535 and it's supported

23   by declarations from Mr. Kruger -- that's at 5536 -- and a

24   declaration from Mr. Lipps, which is at 5537.

25           The NCUAB's eleven proofs of claim in this bankruptcy

1   arise from two pre-petition lawsuits that it filed against the

2   debtors and others as liquidating agent for two failed federal

3   credit unions, which had purchased the debtors' RMBS

4   securities.  Their proofs of claim in total were approximately

5   for 293 million dollars.

6           Your Honor may recall that back in July the debtors

7   objected to those proofs of claim.  We had an initial hearing

8   on that objection here, and Your Honor suggested that

9   settlement should be explored.

10          We took Your Honor's suggestion seriously.  There were

11  extensive arm's-length, I would say, hard-fought negotiations.

12  And in October, with the assistance of the committee, the

13  debtors and the NCUAB reached what we think is an extremely

14  fair and reasonable settlement.

15          The settlement settles those 233 million dollars of

16  claims --

17          THE COURT:  I thought -- 293 or 233?

18          MR. BEHA:  293; 293, Your Honor, excuse me -- for

19  allowed claims totaling approximately 78 million dollars.

20          It's a 77.8-million-dollar claim against RALI (ph.)

21  and 149,000 claim against RFMS-2.

22          There is one limited objection to the settlement.

23  That is from the ad hoc committee of junior secured

24  noteholders, and the JSNs' objection is based on their view

25  that these claims should be subordinated.

1    I know that Your Honor is well aware of this issue,

2   and it's an issue that the debtors have addressed in connection

3   with the just concluded hearing, so I won't rehash that, except

4   just to say that Your Honor has previously ruled and made

5   clear --

6        THE COURT:  In the FGIC case?

7        MR. BEHA:  -- that that's something that can be

8   settled -- yes, FGIC.

9        But other than that limited objection, there are no

10  objections to the settlement.  So I would offer in support, Mr.

11  Kruger's declaration, dated October 28th.  As I said that's

12  docket entry 5536.  And if Mr. Kruger were called to testify,

13  he would testify to what is in his declaration and he's here

14  and available for cross-examination.

15       THE COURT: All right.

16       Who wants to be heard in support of the -- well, does

17  anybody else want to speak in favor of settlement?  Mr. Mannal?

18       MR. MANNAL:  Your Honor, Doug Mannal on behalf of the

19  creditors committee.  Just briefly, Your Honor.  This was a

20  hard-fought negotiation that took several months to accomplish.

21       Just to clarify, however, the claim, or the allowed

22  claim that has been agreed to of seventy-eight million dollars

23  in the aggregate against certain RFC entities is only agreed to

24  if the plan -- similar to FHFA, if the plan does go effective.

25       THE COURT:  All right.  Thank you, Mr. Mannal.

1          Anybody else in support?

2          All right.  Opposition?  Mr. Uzzi?

3          MR. UZZI:  Your Honor, very briefly, we filed a

4    limited objection just to ensure that our plan objection wasn't

5    waived.  We otherwise -- we're dealing with that issue in the

6    plan objection, and given that the whole settlement is subject

7    to approval of the plan, I don't need to take up any of your

8    time.

9          And while I'm at the podium, Your Honor, we won't be

10   cross examining anybody either, so --

11         THE COURT:  Thank you.

12         MR. UZZI:  Thank you, Your Honor.

13         THE COURT:  Do you want to offer the --

14         MR. BEHA:  Yes, Your Honor.

15         THE COURT:  Mr. Kruger's --

16         MR. BEHA:  If I may, I'd like to offer Mr. Kruger's

17   declaration.  So I do offer it.

18         THE COURT:  What's the ECF?

19         MR. BEHA:  It's at 5536 on the docket.

20         THE COURT:  Okay.

21         MR. BEHA:  And there is also a declaration of Jeffrey

22   A. Lipps submitted in support of the motion.  That's at 5537.

23         And Mr. Lipps is here and available to testify,

24   although I understand that there will be no cross, but we offer

25   his declaration as well.

RESIDENTIAL CAPITAL, LLC, ET AL.                          93

1          THE COURT:  All right.  I take it no objection to

2    either declaration, Mr. Uzzi?

3          MR. UZZI:  No objection.

4          THE COURT:  All right.  So the Kruger and Lipps

5    declarations are admitted into evidence.

6    (Declaration of Lewis Kruger was hereby received into evidence

7    as Debtors' Exhibit, as of this date.)

8    (Declaration of Jeffery Lipps was hereby received into evidence

9    as Debtors' Exhibit, as of this date.)

10         THE COURT:  With respect to the JSNs' limited

11   objection, I'm going to overrule the objection for purposes of

12   approving the settlement.  It's obviously going to be subject

13   to plan confirmation.  The JSNs have asserted the subordination

14   objection -- 510 subordination objection as part of plan

15   confirmation.  Nothing I'm ruling on now will prejudice in any

16   way that issue for purposes of plan confirmation.

17         As has already been noted, in connection with the

18   contested hearing on approval of the FGIC settlement for which

19   I wrote an opinion, I specifically concluded there that issues

20   regarding subordination, whether a claim should or shouldn't be

21   subordinated, could be settled and that's what's happened here.

22         The result of the settlement here is to reduce a 293-

23   million-dollar claim to an approximately 78-million-dollar

24   allowed claim.  So having reviewed the papers it's quite easy

25   and I do find that the settlement is in the best interests --

RESIDENTIAL CAPITAL, LLC, ET AL.                    94

1   is fair and equitable and in the best interests of the estate.

2   And so it's approved, and the JSNs' objection on subordination

3   is certainly preserved for purposes of the confirmation

4   hearing.  Okay?

5           MR. BEHA:  Thank you, Your Honor.

6           THE COURT:  All right. Anything else we need to deal

7   with now?  Mr. Marinuzzi?

8           MR. MARINUZZI:  No, Your Honor.

9           THE COURT:  Everybody have a very nice Thanksgiving.

10  I'll see you tomorrow, I guess, one way or the other.  So those

11  who won't be here, have a nice Thanksgiving.

12          IN UNISON:  Thank you, Your Honor.

13      (Whereupon these proceedings were concluded at 11:18 AM)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4   WITNESS              EXAMINATION BY      PAGE

5   Mr. Fazio            Mr. Kerr           21

6   Mr. Fazio            Mr. Horowitz       46

7   Mr. Fazio            Mr. Perry          59

8

9                          E X H I B I T S

10  DEFENDANTS'           DESCRIPTION        PAGE

11  DX-BAM                E-mail chain       59

12  --                    Direct testimony   66

13                        of Michael Fazio

14  --                    Exhibits listed on 73

15                        ECF 5938

16  DEBTORS'

17  --                    Declaration of     93

18                        Lewis Kruger

19  --                    Declaration of     93

20                        Jeffery Lipps

21

22

23

24

25

1

2                                RULINGS

3                                            Page      Line

4    Additional redactions to Mr. Fazio's        43        23

5    testimony are sustained in part and

6    overruled in part, as delineated on the

7    record.

8    Debtors' and Ally's settlement with FHFA is  89         5

9    approved.

10   Debtors' settlement with NCUAB is approved.  94         3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4   I, Penina Wolicki, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10

11

12   _____

13   PENINA WOLICKI

     AAERT Certified Electronic Transcriber CET**D-569

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18

19

     Date:   November 26, 2013

20

21

22

23

24

25