**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL DECLARATION OF LEWIS**
**<u>KRUGER IN SUPPORT OF PLAN CONFIRMATION</u>**

I, Lewis Kruger, being duly sworn, state the following under penalty of perjury:

1.      I am the Chief Restructuring Officer ("<u>CRO</u>") of the debtors and debtors in

possession (collectively, the "<u>Debtors</u>") in the above-captioned cases.  I submit this declaration

(the "<u>Declaration</u>") (i) in further support of Plan Confirmation, (ii) in support of the recent

proposed settlement (the "<u>JSN Settlement</u>") among the Plan Proponents on the one hand and the

Ad Hoc Group and the Junior Secured Notes Indenture Trustee (together with the Ad Hoc

Group, the "<u>JSN Objectors</u>") on the other, (iii) in support of waiver of the Bankruptcy Rule

3020(e) stay, and (iv) to update the Court on issues regarding Wells Fargo Bank, N.A., which

objected to the Plan in its capacities as First Priority Collateral Agent, Third Priority Collateral

Agent, and Collateral Control Agent for the Junior Secured Notes ("<u>Wells Fargo</u>"); Wachovia

Bank and Wachovia Bank of Delaware, both of which were succeeded by Wells Fargo Bank,

N.A. ("<u>WFBNA</u>"); and the remaining Borrower objectors.[1]  Except as otherwise noted, I have

personal knowledge of the matters set forth herein.  If I were called to testify as a witness in this

matter, I would testify competently to the facts set forth herein.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan or Disclosure
Statement, as amended.

## BACKGROUND

2.       On November 12, 2013, I submitted my direct testimony in support of the Joint Chapter 11 Plan (the "Plan") proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Committee").  (See Direct Testimony of Lewis Kruger, dated November 12, 2013 [Dkt. No. 5709] ("Kruger Direct").)

3.       At the evidentiary stage of the Plan Confirmation Hearing conducted over five days commencing on November 19, 2013, and ending on November 25, 2013, I testified further regarding my view that the Plan is a proper exercise of the Debtors' business judgment and complies with Section 1129(a) of the Bankruptcy Code.  (Nov. 20, 2013 Trial Tr. at 183:13-185:6; see Kruger Direct ¶¶ 136-152.)  I further testified that the settlements embodied in the Plan meet the Iridium Factors and were a reasonable exercise of the Debtors' business judgment. (See Kruger Direct ¶¶ 47-119, 153-182.)

4.       I offer this Declaration in continuing support of the Plan, to provide evidence that the JSN Settlement, incorporated in the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al, and the Official Committee of Unsecured Creditors [Dkt. No. 5993-1], filed December 3, 2013, represents a fair and reasonable compromise, and to attest that the Plan Proponents negotiated the JSN Settlement at arm's-length, without undue influence or coercion by any party, and under the direction and supervision of the Mediator.

## THE JSN SETTLEMENT

5.       On November 21, 2013, the Plan Proponents and the JSNs requested that the Court extend the Mediation Order nunc pro tunc to October 28, 2013, when the Mediation Order had previously expired, through and including November 27, 2013.  (Dkt. Nos. 3101, 3877, 4379.)  The Court so ordered the extension of the Mediation Order on the record.  (Nov. 21, 2013 Trial Tr. at 123.)

6.      The Plan Proponents and the JSNs thereafter engaged in further negotiations regarding a possible settlement.  The negotiations were conducted under the supervision of the Honorable James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, as mediator (the "Mediator").

7.      As a result of those discussions, the Parties agreed upon the JSN Settlement.

8.      The material terms of the JSN Settlement, which resolves the most significant outstanding objection to confirmation, can be described as follows:

- In addition to payment in full of outstanding principal and prepetition interest, holders of Junior Secured Notes Claims will receive under the Plan an additional $125 million in full satisfaction of all amounts allegedly due and owing with respect to the Junior Secured Notes Claims, including post-petition interest, fees, costs, expenses, and indemnities, subject to the Plan becoming effective.  (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.155, Art. III.D.1.c, Art. III.D.2.c, Art. III.D.3.c, Art. IV.A.l.)

- The Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured Notes Collateral Agent, and those holders of Junior Secured Notes who originally voted to accept (or have subsequently changed their votes to accept) the Plan (the "Consenting JSNs"), the Ad Hoc Group, and their respective successors and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, affiliates and Representatives (the "JSN Released Parties"), will be considered "Debtor Released Parties" and "Exculpated Parties" under the Plan.  (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.75, Art. I.A.102.)

- As set forth in more detail in Article IX.G of the Plan, the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent, and each of their successors and assigns, members (but with respect to the members of the Ad Hoc Group, to the extent such member previously voted to reject the Plan, only if such member is a Consenting JSN as of the Confirmation Date), partners, advisors, and Representatives, each solely in their capacities as such, will be deemed to have exchanged mutual releases with each other and the Debtors, the Creditors' Committee, each of the Consenting Claimants and the Ally Released Parties, and each of their successors and assigns, members, partners, advisors and Representatives, in their capacities as such, for Claims and Causes of Action arising from or related to the Debtors. (Second Am. Plan [Dkt. No. 5993-1], Art. IX.G.)

- Upon the Effective Date of the Plan, all claims, counterclaims, and/or issues raised in the JSN Adversary Proceeding and the FGIC Settlement Appeal shall be deemed finally and irrevocably settled by the Plan.  (Second Am. Plan [Dkt. No. 5993-1], Art. IV.J.)

**A.    Considerations That Informed my Decision to Enter Into the JSN Settlement**

9.    Prior to approving the JSN Settlement, I, along with the Debtors' advisors, reviewed materials related to the arguments raised by the JSN Objectors in these Cases.  I also engaged in discussions with Debtors' counsel, and the other parties and constituencies involved in the settlement discussions.

10.    In making my decision, I relied on my independent business judgment and balanced the benefits and risks associated with the JSN Settlement.  I believe that the benefits to be received through the JSN Settlement outweigh the attendant risks.  Therefore I believe that the JSN Settlement is in the best interests of the Debtors' estates.  The reasoning underlying my decision to approve the JSN Settlement is set forth below.

**B.    Factors Underlying My Decision to Enter into the JSN Settlement**

11.    The JSN Settlement is fair, equitable, in the best interests of the Debtors' Estates and satisfies the *Iridium* standards for approval of settlements under Bankruptcy Rule 9019.

**1.    The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits.**

12.    I believe that a balancing of the possibility of success on the merits and benefits of the JSN Settlement weighs in favor of the Court approving the JSN Settlement.

13.    The principal issues in the JSN Adversary Proceeding and these confirmation proceedings are (i) whether the holders of Junior Secured Notes Claims are oversecured such that they are entitled to post-petition interest and (ii) whether and the extent to which the JSN Objectors are entitled to reimbursement of the fees, costs and other expenses they have incurred during the course of these cases.  (*See Official Comm. of Unsecured Creditors v. UMB Bank,*

*N.A. (In re Residential Capital, LLC)*, No. 03-1277, 2013 WL 6086456, at *1 (Bankr. S.D.N.Y.

Nov. 15, 2013) (the "Phase I Decision").)  The JSN Objectors have asserted that, as of December

15, 2013, outstanding post-petition interest at the default rate will be approximately $342

million. (*Id*. at *57.)  The JSN Objectors estimate that, in addition, their legal expenses alone will

be in excess of $60 million. (*See* Joint Pretrial Order (Proposed) ¶ 371, dated November 12, 2013

[Dkt. No. 5716] ("Phase II PTO").)

      14.     It is my understanding that, in the absence of a settlement, the determination of

whether the holders of Junior Secured Notes Claims are oversecured and entitled to post-petition

interest will require the resolution of numerous hotly contested issues of both law and fact.  The

litigation among the Plan Proponents and the JSN Objectors thus far has been extensive and

hard-fought and has involved the following:

- More than 200 pages of briefing on motions to dismiss claims and counterclaims which were resolved by two separate opinions of the Court. (*See* JSN Adversary Proceeding [Dkt. Nos. 74, 100].)

- 110 pages of Phase I fact stipulations and contentions.  (*See* Phase I Revised Joint Pretrial Order, JSN Adversary Proceeding [Dkt. No. 161].)

- Multiple motions in limine to exclude the testimony of various proffered experts in connection with Phase I. (*See* JSN Adversary Proceeding [Dkt. Nos. 107, 109].)

- A Phase I trial that lasted six days, involved the submission of written testimony from thirteen witnesses and the admission of more than 700 exhibits.  (*See* Phase *I Decision*, 2013 WL 6086456, at *5.)

- More than 500 pages of Phase I post-trial legal briefing and proposed findings of fact.  (*See* JSN Adversary Proceeding [Dkt. Nos. 185, 186, 187, 190, 191].)

- A 117 page memorandum opinion of the Court including findings of fact and conclusions of law after the conclusion of the Phase I trial.  (*See* JSN Adversary Proceeding [Dkt. No. 228].)

- 177 pages of Phase II fact stipulations and contentions. (*See* Phase II PTO, JSN Adversary Proceeding [Dkt. No. 220].)

- More than 275 pages of legal briefing by the Plan Proponents and the JSN Objectors in connection with Phase II/Plan confirmation issues. (*See* Dkt. Nos. 5443, 5718, 5720, 5913.)

- Motions in limine to exclude the testimony of various proffered experts in connection with Phase II of the JSN Adversary Proceeding and the Confirmation Hearing. (*See* JSN Adversary Proceeding [Dkt. Nos. 200, 202].)

- A Phase II/Confirmation Hearing that lasted five days, involved the submission of written testimony of thirty-one witnesses and the admission of 900 exhibits into evidence (in addition to the more than 700 exhibits admitted during Phase I).

15.     Many of the issues in dispute in the JSN Adversary Proceeding were addressed by the Court in the Phase I Decision, but, absent the JSN Settlement, can be expected to be the subject of appeals upon the entry of a final judgment in the JSN Adversary Proceedings.  Those Phase I issues include, but are not limited to:

- Whether a portion of the Junior Secured Notes Claims should be disallowed as original issue discount.

- Whether there has been a diminution in value of the collateral securing the Junior Secured Notes such that the holders of Junior Secured Notes are entitled to an adequate protection claim.

- Whether for purposes of calculating diminution in value, collateral should be valued as of the Petition Date at foreclosure value or fair market value.

- Whether the holders of Junior Secured Notes must be oversecured at a single Debtor to be entitled to post-petition interest or whether such holders may establish that they are oversecured by aggregating their collateral across all Debtor entities.

- Whether the collateral securing the Junior Secured Notes includes (a) $66 million of cash proceeds from a sale of assets to Berkshire Hathaway; (b) $17 million resulting from an increase in value of certain FHA/CA loans; (c) equity interests in certain non-Debtor subsidiaries valued at $40 million; (d) $910 million in collateral pledged to the AFI LOC; (e) refinancing opportunities associated with GSE MSRs; (f) goodwill; (g) $24 million of collateral released from Bilateral Facilities; (h) $10 million in released and reacquired mortgage loans; (i) $48.4 million in certain deposit accounts; and (j) $20.8 million of certain real property.

- Whether any portion of the proceeds of the Ocwen and Walter sales should be allocated to the following assets which the JSN Objectors contend are subject to

their liens:  (a) $18.395 million for software sold to Ocwen and (b) $10 million for tradename/marks, iconography and logotype sold to Ocwen and Walter.

- Whether the Plan Proponents can avoid $270 million in allegedly preferential transfers made to the holders of Junior Secured Notes.

- Whether the secured claim of the holders of Junior Secured Notes can be reduced by $143 million as a result of Carve Out expenses.

(*See generally* Phase I Decision.)

16.     In addition to the issues that were litigated during Phase I, I understand that there are numerous hotly contested legal and factual issues that, absent a consensual resolution, would need to be resolved by the Court in connection with Phase II of the JSN Adversary Proceeding and confirmation of the Plan.  Those issues include, but are not limited to:

- Whether the Debtors have the authority to waive Intercompany Balances and release claims against Ally under the Plan without the consent of the holders of the Junior Secured Notes Claims.

- Whether the waiver of Intercompany Balances under the Plan is reasonable and in the best interests of the Debtors' Estates.

- Whether the holders of Junior Secured Notes Claims are entitled to adequate protection or some other form of compensation as a result of the Plan's waiver of Intercompany Balances and release of claims against Ally.

- Whether the holders of Junior Secured Notes Claims are secured by liens on the Intercompany Balances and the extent to which, if any, those liens have value.

- Whether the holders of Junior Secured Notes Claims are secured by liens on any claims that the Debtors may hold against Ally.

- Whether, and the extent to which, the Court is required to allocate any portion of the Ally Contribution to any claims upon which the JSN Objectors purport to have liens.

- Whether the Ally Contribution is a "new asset" for purposes of section 552(a) of the Bankruptcy Code.

- Whether, for purposes of section 552(b) of the Bankruptcy Code, any portion of the Ally Contribution can be considered "proceeds, products, offspring, or profits" of any assets on which the holders of Junior Secured Notes Claims held prepetition liens.

- Whether the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code should preclude any of the liens held by the holders of Junior Secured Notes Claims from attaching to any portion of the Ally Contribution.

- Whether the Plan's settlements of the claims of the Monolines, the RMBS Trustees and investor securities claims are permissible or whether such settlements violate section 510(b) of the Bankruptcy Code or otherwise cause the Plan to violate the absolute priority rule.

- Whether the holders of Junior Secured Notes Claims, even if undersecured, are entitled to collect post-petition interest through the aggregation of recoveries on account of their deficiency claims.

- If the holders of Junior Secured Notes Claims are entitled to collect post-petition interest, whether such post-petition interest accrues at the contractual default rate, contractual non-default rate or some other rate.

- Whether, and the extent to which, the holders of Junior Secured Notes Claims are entitled to reimbursement of fees costs and expenses incurred in connection with these cases.

(*See generally* Phase II PTO.)

17.     I believe that all of the foregoing issues (and many sub-issues subsumed within) have been hotly contested and pose significant risk to the Debtors and their Estates.  Many involve disputed issues of law or turn on heavily disputed issues of fact.  The JSN Objectors need not prevail on all of those issues, and, in some cases, need only prevail on a few, for the holders of Junior Secured Notes Claims to be entitled to compensation and/or reimbursement of more than $400 million for post-petition interest and professionals' fees incurred during the course of these cases.  Regardless of the outcome, the JSN Objectors would be expected to appeal and seek to stay the effectiveness of any Confirmation Order, thereby creating further obstacles to the Debtors' efforts to promptly conclude these Chapter 11 Cases.

18.     In exchange for, among other things, the payment of an additional $125 million in cash, the JSN Settlement allows the Debtors to avoid those risks and uncertainties and to avoid

the incurrence of additional costs and expenses associated with continued litigation through appellate and related proceedings.

19.    In light of the substantial reduction in the Debtors' potential liability for post-petition interest and professional fees, costs and expenses, and the certainty afforded to the Debtors and their creditors provided by the JSN Settlement, I believe that a balancing of the risks presented by the cost of continued litigation and the uncertainty of a successful outcome against the benefits of the JSN Settlement weighs in favor of approving the JSN Settlement as part of the Plan.

**2.    The Likelihood of Complex and Protracted Litigation**

20.    Even though there has already been progress towards the resolution of the issues presented in the JSN Adversary Proceeding in the form of the Phase I Decision, a final resolution has not been reached.  Absent approval of the JSN Settlement, I understand that the parties would be required to submit post-trial legal briefs and proposed findings of fact in connection with Phase II and confirmation.  And even after the Court issues a ruling on the Phase II and confirmation issues, the Court would still be required to resolve significant issues relating to the JSN Objectors' request of more than $60 million in professional fees (an issue that was deferred until after confirmation).

21.    Moreover, given the extent to which the parties have litigated disputed issues in these Cases to date, it is likely that, in the absence of a consensual resolution, active litigation will continue throughout the appellate process, causing the Plan Proponents to incur significant additional legal expenses.

22.    As a result, absent approval of the JSN Settlement, the Debtors would expect to continue to face protracted and expensive litigation.

**3.    The JSN Settlement Is In the Interests of Creditors and Is Supported by Significant Creditors and Other Parties-In-Interest**

23.    In exchange for, among other things, a cash payment in the amount of $125 million, the JSN Settlement allows the Debtors' Estates to avoid the risks and uncertainties associated with continued litigation against the JSN Objectors which could, if the Plan Proponents are not successful, result in the Debtors' Estates being required to pay the holders of Junior Secured Notes Claims up to approximately $400 million in post-petition interest, fees, costs and expenses.

24.    The JSN Settlement permits the Plan Proponents to avoid the significant costs that they would incur as a result of continued litigation in the absence of a consensual resolution.

25.    Moreover, the JSN Settlement will facilitate the effectiveness of the Plan and avoid any disputes that could arise concerning the Debtors' establishment of reserves pending appeal, thereby expediting distributions to creditors.

26.    The JSN Settlement has the support of the Creditors' Committee and the Consenting Claimants, representing substantially all of the major constituencies in these Chapter 11 Cases.

27.    Accordingly, in light of the significant creditor support for the JSN Settlement and the benefits to the Debtors' estates, I believe that the JSN Settlement in the best interests of creditors.

**4.    The Settling Parties Were Counseled by Experienced and Skilled Counsel and Advisors**

28.    All of the Parties were represented by competent and experienced counsel throughout the negotiation of the JSN Settlement.  (Kruger Direct ¶¶ 175-177.)

29.    The Debtors are represented by Morrison Foerster, FTI Consulting and Centerview Partners.  (Kruger Direct ¶ 175.)  The Creditors' Committee is represented by

Kramer Levin Naftalis & Frankel, Moelis and Alix Partners.  (Kruger Direct ¶ 176.)  The JSN

Objectors are represented by Akin Gump Strauss Hauer and Feld; Milbank, Tweed, Hadley, and

McCloy; White & Case; Zolfo Cooper, LLC; and Houlihan Lokey.

### 5.     The JSN Settlement Is the Product of Arm's Length Bargaining

30.     The JSN Settlement is the product of good faith and arm's length negotiations.

31.     The JSN Settlement was reached under the direct supervision of Judge Peck as

Mediator after months of negotiations which continued throughout the litigation process.

32.     Moreover, I witnessed the lengthy and contentious litigation preceding the JSN

Settlement, removing any doubt that the parties to the JSN Settlement were vigorously asserting

their own interests in direct opposition to their adversaries that were doing the same.

### 6.     The Nature and Breadth of the Releases

33.     I understand that the JSN Settlement provides for the JSN Released Parties to

become Debtor Released Parties under the Plan (Second Am. Plan [Dkt. No. 5993-1], Art.

I.A.75) and to be deemed to have exchanged mutual releases with each other and the Debtors,

the Creditors' Committee, the Consenting Claimants, and the Ally Released Parties (Second Am.

Plan [Dkt. No. 5993-1], Art. IX.G).  Those releases are consensual and appropriate in light of the

significant benefits being provided to the Debtors, their Estates and their creditors through the

JSN Settlement.

34.     In addition, the JSN Settlement provides for the JSN Released Parties to be

become Exculpated Parties under the Plan.  (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.102.)

The Debtors, their Estates and creditors are receiving significant consideration under the JSN

Settlement Agreement in exchange for the JSN Released Parties becoming Exculpated Parties

under the Plan, including, among other things (i) the fixing of the Junior Secured Notes Claims

for post-petition interest, fees, costs and expenses at an amount significantly below the asserted

amounts by the JSN Objectors, (ii) the avoidance of the significant costs and expenses that the

Plan Proponents would incur on behalf of the Debtors' Estates should the litigation with the JSN

Objectors continue, and (iii) the facilitation of a prompt and orderly exit from chapter 11 without

the costs, risks, and delays associated with continued litigation through the appellate process.

**7.** **The JSN Settlement Avoids the Need for a Cramdown of Junior Secured Notes Classes**

35.     I am informed that the Consenting JSNs who change their votes to accept the Plan

will cause classes R-3, GS-3, and RS-3 (the "JSN Classes") to be accepting classes for purposes

of section 1126(g) of the Bankruptcy Code because such Consenting JSNs will hold at least two-

thirds in amount and more than one-half in number of the allowed claims in such classes.

36.     Accordingly, I believe the Plan will comply with section 1129(a)(8) of the

Bankruptcy Code with respect to the JSN Classes and, as a result, the Plan Proponents will not

need to satisfy the requirements of section 1129(b) with respect to those classes.

**C.**     **No Further Re-Solicitation of the Plan is Required**

37.     Confirmation of the solicitation version of the Plan was not conditioned on

disallowance of post-petition interest on account of Junior Secured Notes Claims, and expressly

contemplated that the Junior Secured Notes Claims could be awarded post-petition interest

should the JSN Objectors prevail in the JSN Adversary Proceeding.  (*See, e.g.*, PX-256 at 184.)

38.     The Disclosure Statement expressly disclosed to creditors that the Plan

Proponents were engaged in litigation with the JSN Objectors concerning their entitlement to

post-petition interest and, as a result, were the Court to determine that such holders are entitled to

post-petition interest, recoveries to other creditors in these cases would be lower than the

amounts projected under the Disclosure Statement.  (PX-256 at 184.)  In fact, the Disclosure

Statement contained an extensive discussion of the risks associated with the litigation with the

Junior Secured Noteholders. (PX-256 at 51.) Therefore, I believe those who voted on the Plan

did so with the understanding that there might be a dilution to unsecured creditors for potentially

the full amount of post-petition interest.

39.    In addition, no re-solicitation of the Plan is required because the Plan Proponents

are not expecting any material change in anticipated recoveries to holders of General Unsecured

Claims after payment of the additional $125 million to the Junior Secured Noteholders as a

result of the JSN Settlement. Because the Debtors have been outperforming projections on

certain asset recoveries and expenses to date, the Debtors expect that the recoveries available to

satisfy the claims of general unsecured creditors receiving Units under the Plan will likely

remain substantially similar to what was reflected in the recovery analysis in the Disclosure

Statement.

40.    In light of the foregoing, I believe that the JSN Settlement does not provide for

any material modifications to the Plan that require a re-solicitation of votes.

## **WELLS FARGO**

41.    The JSN Settlement also resolves the objection of Wells Fargo. (*See* Objection of

Wells Fargo, October 21, 2013 [Dkt. No. 5410].)

42.    Wells Fargo's objection arose from the Plan Proponents' disputes with the Ad

Hoc Group, which have since been resolved pursuant to the JSN Settlement. Specifically, Wells

Fargo's release of liens and security interests securing the Junior Secured Notes was at issue in

the JSN Adversary Proceeding. (*Id*.) As a result, Wells Fargo objected to the Plan, citing

concerns that the Ad Hoc Group and UMB Bank could assert claims against it in connection with

those lien and security interest releases. (*Id*.) Wells Fargo alleged that, to the extent such claims

were asserted, the Debtors would be required to indemnify Wells Fargo. (*Id*.) In light of those

potential claims, Wells Fargo also objected to the Plan's Third-Party Release. (*Id*.) Wells Fargo

alleged that it potentially had independent claims against non-Debtors upon whom it relied in releasing liens and security interests, and that such claims would be impermissibly extinguished by the Third-Party Release.  (*Id.*)

43.    The JSN Settlement resolves Wells Fargo's objection, because that objection's sole concern is liabilities that are derivative of the Debtors' disputes with the Ad Hoc Group. Under the Plan, Wells Fargo is named as one of the Debtor Released Parties and an Exculpated Party and Wells Fargo will be protected from potential claims in accordance with Plan Article IX.G and the Confirmation Order.

### WACHOVIA/WFBNA

44.    I understand that WFBNA is still objecting to the Plan.  (*See Limited Objection of WFBNA to Confirmation of Joint Chapter 11 Plan Proposed by Residential Capital, LLC and the Official Committee Of Unsecured Creditors* [Dkt. No. 5411].)  It is my understanding that the parties are discussing a potential resolution to WFBNA's objection.  The facts underlying the dispute, which according to WFBNA's counsel, largely arises out of a disagreement between WFBNA and Ally regarding payment of attorneys' fees, is set forth in detail in the *Stipulated Facts in Connection With the Limited Objection of WFBNA to Confirmation of the Joint Chapter 11 Plan Proposed By Residential Capital, LLC and the Official Committee of Unsecured Creditors* [Dkt. No. 5912] (the "Stipulation").  However, if a resolution is not reached, as will be set forth in the Plan Proponents' proposed findings of fact, I believe there is ample support in the record to overrule WFBNA's objection to the Third-Party Releases contained in the Plan.

45.    As an initial matter, it is unlikely that WFBNA has any claim against the Debtors because the Debtors' accounts at WFBNA were closed within a month of the Petition Date.  In fact, WFBNA has represented to the Court that their dispute is not with the Debtors per se and they would be willing to waive their fee claims against the Debtors.  (Nov. 19, 2013 Trial Tr. at

245:20-21.)  With respect to WFBNA's purported claims against Ally, any claims that WFBNA could assert against Ally on account of its purported guaranty of the Debtors' obligations under the Deposit Agreement (as defined in the Stipulation) —which guaranty was the result of a unilateral amendment to the Deposit Agreement made without Ally's consent—fall squarely within the Third Party Release provision of the Plan.  (Stipulation ¶¶ 9-10.)  Any claims that WFBNA could bring against Ally unrelated to the Debtors would not fall under the Third Party Release, and such claims, if any, do not present an obstacle to confirmation of the Plan in any event.

### REMAINING BORROWER OBJECTORS

46.      I understand there are six unresolved borrower-related objections purporting to oppose confirmation of the Plan:  Kevin C. Kovacs [Dkt. No. 5264]; David R. Munger [Dkt. No. 5273]; Caren Wilson [Dkt. No. 5409]; Richard Rode [Dkt. No. 5414]; Paul N. Papas II [Dkt. No. 5466]; and Deborah D. Bennett [Dkt. No. 5522].  The objections filed by Mr. Papas and Ms. Bennett were late filed and those individuals neither requested an extension from the Plan Proponents nor received authorization from the Court to file it after the Objection Deadline of October 21, 2013 at 4 p.m. Eastern.

47.      The unresolved borrower-objections filed by Ms. Wilson, Mr. Rode, and Mr. Papas were joinders to the now-withdrawn objection filed by Wendy Nora [Dkt. No. 5398]. None of the individuals who filed joinders presented any evidence bearing on confirmation, and only one of them, Mr. Rode, actively participated in the confirmation hearing.  I understand that counsel for both the Plan Proponents have been—and continue to be—engaged in discussions with Mr. Rode and his counsel and with Ocwen, who is now the servicer for Mr. Rode's mortgage loan, regarding his concerns about his mortgage loan and whether the proofs of claim Mr. Rode filed against the Debtors and his Plan objection can be consensually resolved.

48.     With respect to the arguments raised in Ms. Nora's objection opposing

confirmation, the responses set forth in the chart attached as Exhibit A to the Plan Proponents'

Omnibus Reply [Dkt. No. 5718] are equally applicable to each of the joinders, which raised no

independent basis for denying confirmation.  Ms. Nora's objection raised four issues.  First, she

argued that the Plan was not proposed in good faith.  As set forth at length in my prior testimony

in support of confirmation of the Plan, as well as that of Mr. Dubel [Dkt. No. 5697], the Plan was

developed through lengthy good faith negotiations, which were conducted under the supervision

of Judge Peck.  The Plan Proponents have also submitted voluminous evidence establishing that

the Plan is intended to provide creditors with an expeditious distribution of estate assets in

compliance with the Bankruptcy Code and applicable non-bankruptcy law, and has

overwhelming creditor support.  Accordingly, the evidence in the record establishes that the Plan

is being proposed in good faith within the meaning of section 1129(a)(3).

49.     Second, Ms. Nora asserted that the Plan does not comply with the requirements of

section 1125 of the Bankruptcy Code, and that the Plan Proponents provided inadequate notice

of the confirmation proceedings.  Ms. Nora raised identical arguments at the hearing to approve

the Disclosure Statement, which the Court overruled, holding that the Disclosure Statement

contained adequate information pursuant to section 1125 of the Bankruptcy Code.  (Aug. 21,

2013, Disclosure Hr'g Tr. at 122:24-25.)  Further, as set forth in the uncontested *Affidavit Of P.

Joseph Morrow IV Certifying The Tabulation Of Votes On The Joint Chapter 11 Plan Proposed

By Residential Capital, LLC, et al. And The Official Committee Of Unsecured Creditors* [Dkt.

No. 5699], the Disclosure Statement, appropriate ballots, notices, and related solicitation

materials were distributed to all parties in accordance with the terms of the Disclosure Statement

Order.  In addition, the date and time of the voting deadline and confirmation hearing were

published in the *Wall Street Journal* and *USA Today* on September 3, 2013. (*See* Affidavit of Publication, [Dkt. No. 5025].)

50.    <u>Third</u>, Ms. Nora argued that the funding of the Borrower Claims Trust was inadequate, and that the Plan inappropriately treats Borrower Claims as a separate class of general unsecured claims. At the confirmation hearing, the Plan Proponents proffered the uncontested testimony of William Thompson, ResCap's General Counsel, to explain why Borrower Claims are qualitatively different from those of other general unsecured claimants, thus warranting their separate classification. (*See* Direct Testimony of William Thompson ¶¶ 2(a), 10-12, dated November 12, 2013 [Dkt. No. 5713].) Mr. Thompson's testimony also addressed why the proposed treatment of Borrower Claims under the Plan is disparate, but is in fact more beneficial to borrowers. (*Id.*) Specifically, borrowers are receiving cash, rather than Liquidating Trust Units, and to the extent appropriate, the Borrower Claims Trust will implement and utilize alternative dispute resolution procedures to allow for the specialized resolution of Borrower Claims. (*Id.*) Significantly, none of the individuals that filed joinders to Nora's objection were in classes that voted to reject the Plan, and thus they lack standing to object to the Plan on the basis that it does not satisfy section 1129(b) of the Bankruptcy Code, which only applies to impaired rejecting classes. (*Id.*) Mr. Thompson's testimony also establishes that, based on extensive analyses performed by the Plan Proponents and their advisors, Borrower Claims will receive a distribution under the Plan that is estimated to be equivalent to that received by other general unsecured creditors at the same Debtor Group. (*Id.*) Accordingly, the evidence establishes that the treatment of Borrower Claims under the Plan has a valid business purpose and is fair and equitable. (*Id.*)

51.  <u>Fourth</u>, Ms. Nora objected on the grounds that the Third Party Release under the Plan is unjustified.  With respect to the individuals joining Ms. Nora's objection, the Debtors are unaware of any claims those individual might hold against Ally that are being released under the Plan, and even if such claims existed, I believe the Plan Proponents have submitted evidence during the confirmation hearing establishing that the Third Party Release nonetheless should be granted.  (*See* Kruger Direct ¶¶ 194-197; s*ee generally* Direct Testimony of Thomas Marano, dated November 12, 2013 [Dkt. No. 5705]; Direct Testimony of Michael A. Carpenter, dated November 12, 2013, [Dkt. No. 5695].)

52.  The individuals who filed the three remaining unresolved borrower-related objections, Mr. Kovacs, Mr. Munger, and Ms. Bennett, also did not actively participate in the confirmation hearing or present any evidence bearing on confirmation.  Mr. Kovacs filed a proof of claim against the Debtors (Claim No. 1275) that was expunged pursuant to the *Order Granting Debtors' Fiftieth Omnibus Objection To Claims (No Liability Borrower Claims – Books And Records)* [Dkt. No. 5892].  Mr. Munger and Ms. Bennett have not filed any claims against the Estates.  Accordingly, these individuals do not hold valid claims against the Debtors' Estates, nor is there any reason to believe that they hold claims against Ally.

53.  I understand that attorneys at SilvermanAcampora LLP, special counsel to the Creditors' Committee for borrower matters, attempted to contact each of these individuals to ascertain the basis for each of their objections, which do not articulate any specific basis for denying confirmation of the Plan, and that such efforts were unsuccessful.

## WAIVER OF THE RULE 3020(e) STAY

54.     There is ample support in the record for the Court to permit waiver of the

Bankruptcy Rule 3020(e) fourteen day stay of effectiveness of the Confirmation Order.[2]  As

noted by the Court at the status conference held on December 3, 2013, one factor that courts

consider in connection with a request for waiver of the Rule 3020(e) stay is whether there are

any remaining substantial objections to the Plan.  As set forth in the record of the Confirmation

Hearing, and after reaching the JSN Settlement, the Plan is nearly consensual with only seven

parties continuing to prosecute their objections to the Plan: (i) WFBNA, (ii) three borrowers who

filed joinders to the withdrawn objection to the Plan filed by Wendy Alison Nora, namely Caren

Wilson, Richard Rode, and Paul Papas, and (iii) three standalone borrowers, namely Kevin

Kovacs, David Munger and Deborah Bennett.  Further, as a practical matter, the party most

likely to have appealed entry of the Confirmation Order, the Ad Hoc Group, is now a consenting

party supporting the Plan.  In light of the near unanimous acceptance of the Plan and the lack of

any remaining substantial objections to the Plan, waiver of the Rule 3020(e) stay is appropriate.[3]

55.     In addition, the business deal reached among the parties to the JSN Settlement

weighs in favor of waiver of the Rule 3020(e) stay.  The parties to the JSN Settlement, approval

of which will result in a near global resolution to these complex Chapter 11 Cases, have made

the prompt effectiveness of the Confirmation Order—on or before December 24, 2013—a

condition to the effectiveness of the settlement.  I understand that if the Effective Date does not

occur promptly after entry of the Confirmation Order, some parties to the JSN Settlement believe

that there may be adverse tax consequences that could scuttle the settlement.  In addition, Ally

---

[2] The Plan Proponents submitted the [Proposed] Order Confirming First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, *et al.* and the Official Committee of Unsecured Creditors, dated November 12, 2013 [Dkt. No. 5723] (the "Confirmation Order").

[3] I also believe that, to the extent applicable, it is appropriate for the Court to waive any stay provided for under any other applicable Bankruptcy Rule, such as Rules 6004(h) or 6006(d).

has agreed to extend the Plan Support Agreement deadline for effectiveness of the Plan to

December 24, 2013.

56.     In the Confirmation Order, the Plan Proponents requested that the Court waive the

Rule 3020(e) stay.  (Confirmation Order ¶¶ YY, 57.)  Accordingly, all parties in interest have

had notice of the waiver of stay since November 12 and could have raised an objection anytime

thereafter, including at the confirmation hearing.  However, no party has done so.  Due to the

lack of objection to the waiver, the lack of outstanding substantial objections to confirmation,

and the fact that the JSN Settlement, which provides a great benefit and certainty to the estate, is

conditioned on the waiver, I believe it is appropriate and reasonable for the Court to grant the

waiver of the Rule 3020(e) stay.[4]

## **CONCLUSION**

57.     Based on all of the factors described above, I conclude that settlement on the

terms set forth in the JSN Settlement is fair to the Debtors and well within the range of

reasonableness and certainly not below the lowest point in the range of reasonableness.  I also

believe that based on the lack of any remaining substantial objections to the Plan, waiver of the

fourteen day stay of effectiveness of the Confirmation Order contained in Bankruptcy Rule

3020(e) would be appropriate.

*[signature page follows]*

---

[4] In the event that the Court waives the Rule 3020(e) stay and a Claimant or Objector then sought a stay of the
Court's Confirmation Order pending appeal, the potential harm of such a stay to the Debtors would be substantial
given the uncertainty of the AFI Contribution and of the JSN Settlement if Effectiveness of the Plan is delayed.  The
Debtors would accordingly seek a substantial bond in an amount commensurate with the threatened loss to the
Debtors and other non-moving parties.  (*See* Bankruptcy Rule 8005.)

I declare under penalty of perjury that the foregoing is true and correct.


Executed the 5th day of December, 2013, at New York, New York.


_____/s/ Lewis Kruger_____
Lewis Kruger
