**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |
|---|---|
| In re: | ) |
|  | ) Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) |
|  | ) Chapter 11 |
| Debtors. | ) |
|  | ) Jointly Administered |
|  | ) |

---------------------------------------------------------------

## PLAN PROPONENTS' PROPOSED FINDINGS OF FACT

**MORRISON & FOERSTER LLP**
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

-and-

**CURTIS, MALLET-PREVOST, COLT**
**& MOSLE LLP**
Steven J. Reisman
Theresa A. Foudy
Michael Moscato
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-8860
Facsimile:  (212) 697-1559

*Counsel to the Debtors and*
*Debtors in Possession*

**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
Kenneth H. Eckstein
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

-and-

**PACHULSKI STANG ZIEHL**
**& JONES LLP**
Robert J. Feinstein
John A. Morris
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Counsel to the Official Committee of*
*Unsecured Creditors*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

I.      BACKGROUND ........................................................................................................ 2

II.     FINDINGS RELEVANT TO CONFIRMATION UNDER THE BANKRUPTCY
        CODE......................................................................................................................... 5

        A.      Proper Notice ................................................................................................ 5

        B.      Transmission of Ballots – Section 1124 ..................................................... 9

        C.      Good Faith Solicitation – Section 1125(e)................................................. 9

        D.      Modification of the Plan – Section 1127(a) ............................................... 9

        E.      Plan Confirmation – Section 1129(a) ...................................................... 10

                1.      Contents of the Plan – Section 1129(a)(1)................................. 11

                2.      Disclosure and Solicitation – Section 1129(a)(2) .................... 12

                3.      Good Faith – Section 1129(a)(3) ............................................... 17

                4.      Payments for Costs and Services – Section 1129(a)(4) .......... 17

                5.      Identity of Proposed Officers, Directors and Voting Trustees –
                        Section 1129(a)(5) ....................................................................... 18

                6.      Government Regulation – Section 1129(a)(6)........................... 19

                7.      Best Interests of the Creditors – Section 1129(a)(7)............... 19

                8.      Classes of Claims or Interests – Section 1129(a)(8)............... 21

                9.      Payment of Certain Priority Claims – Section 1129(a)(9)...... 22

                10.     Impaired Claims – Section 1129(a)(10).................................... 22

                11.     Feasibility – Section 1129(a)(11)............................................... 22

                12.     Bankruptcy Fees – Section 1129(a)(12) ................................... 22

                13.     Retiree Benefits – Section 1129(a)(13)...................................... 23

                14.     Domestic Support Obligations Objections, and Transfers of
                        Property – Sections 1129(a)(14), (15) and (16) ....................... 23

        F.      Fair and Equitable – Section 1129(b) ...................................................... 23

        G.      Confirmation of a Single Plan – Section 1129(c) .................................. 24

        H.      Avoidance of Taxes – Section 1129(d)...................................................... 25

        I.      Small Businesses – Section 1129(e) .......................................................... 25

III.    IMPLEMENTATION OF THE PLAN ........................................................... 25

IV.     CONDITIONS TO THE CONFIRMATION OF THE PLAN ....................... 26

# TABLE OF CONTENTS
(continued)

**Page**

V.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES......................................... 26

VI.   THE ALLY CONTRIBUTION AND THE GLOBAL SETTLEMENT........................ 27

    A.     Factual Background ........................................................................................ 27

        1.     The Original Ally Settlement.................................................... 27

        2.     The Creditors' Committee's Investigation................................ 28

        3.     The SUN Trustee Standing Motion .......................................... 32

        4.     The Mediation Process Yields a Global Settlement ................. 33

    B.     The Global Settlement and the Individual Plan Settlements ............................. 38

        1.     The Ally Settlement .................................................................. 42

        2.     The RMBS Settlement ............................................................... 43

             a.     RMBS Attorneys' Fees ................................................. 48

             b.     The RMBS Trustee Findings ......................................... 49

                  (i)     Prior Approval of the FGIC Settlement and the Trustee Findings Related Thereto.................................... 50

                  (ii)    The RMBS Trustees Retained and Relied on Experienced Financial Professionals and Sophisticated Counsel in Entering into the Settlement ...................................................... 51

                  (iii)   The Best Interests of the Investors in the RMBS Trusts.................................................................. 52

                  (iv)   The RMBS Trustees Acted in Good Faith and in the Best Interests of the Investors in Each RMBS Trust ....... 55

                  (v)    The RMBS Trustees' Notice of the Plan Support Agreement, the Plan, the Global Settlement, and the RMBS Settlement ........................................... 56

        3.     Settlement of the Monoline Claims ........................................... 57

             a.     The FGIC Settlement .................................................... 58

             b.     The MBIA Settlement.................................................... 60

             c.     The Assured Settlement ................................................. 62

             d.     The Ambac Settlement................................................... 64

             e.     The Syncora Settlement ................................................. 66

         4.     Private Securities Litigation Settlements ................................... 68

             a.     The Private Securities Claims Settlement..................... 69

# TABLE OF CONTENTS
(continued)

**Page**

b.     The NJ Carpenters Settlement ..................................................... 72

c.     The Kessler Settlement ............................................................... 74

d.     The SUNs Settlement ................................................................. 75

e.     National Credit Union Administration Board Settlement............ 76

5.     The FHFA Settlement .......................................................................... 76

6.     The Settlement of Issues Relating to Subordination of Claims .............. 78

7.     Compromise of the Intercompany Balances ........................................... 78

8.     Treatment of the Borrower Claims ........................................................ 79

9.     Borrower Class Action Settlements ....................................................... 81

10.    Amendment to Consent Order and Impact on Borrowers ...................... 82

C.     Other Aspects of the Plan Settlements ................................................................. 84

1.     Substantive Consolidation ..................................................................... 84

2.     Limited Partial Consolidation ................................................................ 84

3.     Division of Administrative Expenses Among Debtor Groups ................ 85

D.     Facts Supporting the Debtors' Entry into the Plan Settlements ........................... 86

1.     Basis for the Debtors' Business Judgment ............................................. 86

2.     The Possibility of Success of Litigating the Claims at Issue and the
Plan Settlements' Future Benefits to the Debtors .................................. 87

a.     Litigation Uncertainty ................................................................ 87

b.     The Plan Settlements' Future Benefits ....................................... 88

3.     The Likelihood of Complex and Protracted Litigation........................... 88

a.     Monolines .................................................................................. 88

b.     Private Securities Investors......................................................... 89

c.     Institutional Investors................................................................. 90

d.     Other Litigation......................................................................... 91

4.     The Paramount Interests of the Estates' Creditors................................. 91

5.     The Plan Settlements' Support from Other Parties-in-Interest ............... 92

6.     The Plan Settlements' Releases of the Debtors' Officers and
Directors................................................................................................ 93

7.     The Plan Settlements' Parties' Counsel.................................................. 94

8.     Arm's-Length Negotiations ................................................................... 95

# TABLE OF CONTENTS

(continued)

**Page**

VII.  THE PLAN'S RELEASE, EXCULPATION, INJUNCTION, AND JUDGMENT
      REDUCTION PROVISIONS ........................................................................... 95

    A.  The Debtor Release ................................................................................ 96

    B.  Third Party Releases ............................................................................. 99

        1.  Jurisdictional Facts Regarding the Third-Party Claims ........................ 100

            a.  Indemnification and Contribution Obligations ......................... 101

                (i)  Ally and Former Officer and Director Indemnity
                      Claims ............................................................................ 104

            b.  Shared Insurance .................................................................... 105

        2.  Unique Circumstances Surrounding the Third Party Release ............... 107

            a.  The Third Party Release Is Overwhelmingly Consensual ......... 107

            b.  The Third Party Release Is Supported By Substantial
               Consideration and is Essential to the Plan ................................. 109

        3.  The Debtors' Directors and Officers Provided Substantial
            Consideration in Exchange for Releases .................................. 118

    C.  Exculpation ......................................................................................... 119

    D.  The Injunction ..................................................................................... 121

    E.  The Judgment Reduction .................................................................... 121

    F.  Releases Related to Continuing Obligations ...................................... 123

VIII. FINDINGS RELEVANT TO THE JSN SETTLEMENT ............................................ 124

    A.  The JSN Settlement Is in the Best Interests of the Debtors' Estates ................. 126

        1.  The Balance Between the Litigation's Possibility of Success and
            the Settlement's Future Benefits ............................................... 126

        2.  The Likelihood of Complex and Protracted Litigation .......................... 130

        3.  The JSN Settlement Is in the Interests of Creditors and Is
            Supported by Significant Creditors and Other Parties-in-Interest ........ 131

        4.  The Settling Parties Were Counseled by Experienced and Skilled
            Counsel and Advisors ............................................................. 132

        5.  The JSN Settlement Is the Product of Arm's-Length Bargaining ......... 132

        6.  The Nature and Breadth of the Releases .............................................. 132

    B.  The JSN Settlement Avoids the Need for a Cramdown of Junior Secured
       Notes Classes ...................................................................................... 133

    C.  No Further Re-Solicitation of the Plan Is Required ........................... 134

# TABLE OF CONTENTS
(continued)

**Page**

D.    The Objection of Wells Fargo as Collateral Agent ............................................ 135

IX.    REMAINING BORROWER OBJECTIONS ................................................................. 137

X.    FINDINGS RELEVANT TO WACHOVIA .................................................................. 140

XI.    WAIVER OF THE RULE 3020(e) STAY .................................................................. 143

Residential Capital, LLC ("**ResCap**")[1] and its direct and indirect subsidiaries, each as a chapter 11 debtor and debtor-in-possession (collectively, the "**Debtors**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), and the Official Committee of Unsecured Creditors (the "**Creditors' Committee**" or "**Committee**" and, together with the Debtors, the "**Plan Proponents**") hereby submit the following proposed findings of fact.[2]

## INTRODUCTION

1.        On December 3, 2013, the Plan Proponents filed the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al, and the Official Committee of Unsecured Creditors* [Dkt. No. 5993-1] (as may be amended, modified, or supplemented, the "**Plan**," "**Second Am. Plan**," or "**Modified Plan**").  The Plan is a proper exercise of the Debtors' business judgment and is confirmable under Section 1129 of the Bankruptcy Code.

2.        The Plan enjoys overwhelming support from the Estates' creditors, including the Estates' largest claimant constituencies, which have asserted hundreds of billions of dollars in claims against the Debtors and the Debtor's ultimate parent, Ally Financial Inc. ("**Ally**").  The supporting creditors include, but are not limited to, the Creditors' Committee, the Consenting Claimants, the RMBS Trustees, the Supporting Senior Unsecured Noteholders (including Paulson, and Wilmington Trust, as indenture trustee), the Kessler Class Claimants, the Federal Housing Finance Agency ("**FHFA**"), Financial Guaranty Insurance Company ("**FGIC**"), MBIA Insurance Corporation ("**MBIA**"), Ambac Assurance Corporation ("**Ambac**"), Assured Guaranty, Ltd. ("**Assured**"), and the Ad Hoc Group of Junior Secured Noteholders (the "**Ad Hoc**

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

[2] These findings of fact are being submitted solely in connection with confirmation of the Plan as amended to incorporate the JSN Settlement, and to the extent the Plan is not confirmed, the parties agree that all parties to the JSN Adversary Proceeding may submit additional findings of fact in connection with not only the JSN Adversary Proceeding, but any attempt to confirm a Plan not incorporating the JSN Settlement.

ny-1118499

Group" or "**JSNs**").[3]  A full list of the Consenting Claimants who executed the Plan Support

Agreement, dated as of May 13, 2013, is annexed to the Disclosure Statement as Exhibit 5.  The

Plan has also received virtually unanimous support from those creditors that voted on the Plan,

with approximately 95.7% of creditors voting to accept the Plan.

3.    The Plan is the culmination of extensive, good faith negotiations guided by the

Honorable James M. Peck, a United States Bankruptcy Judge for the Southern District of New

York, as mediator (the "**Mediator**"), among the Debtors, the Creditors' Committee, Ally, and the

Consenting Claimants.  The terms of the Plan are premised upon Ally's agreement to provide, in

addition to the substantial financial and operational support already provided to the Estates

throughout the Chapter 11 Cases, an additional contribution of $2.1 billion in plan funding (the

"**Ally Contribution**"), in exchange for the Debtor Release and Third Party Release.

4.    The Plan settles a variety of highly complex disputes that have been a source of

contention throughout the Chapter 11 Cases and which would otherwise have led to years of

costly litigation and resulted in significant uncertainty and delays in distributions to creditors.

Each of the settlements embodied in the Plan is dependent upon all others.

## I.    BACKGROUND

5.    On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of Bankruptcy Code [Dkt. No. 1].  On July 3,

2012, the Court approved the appointment of Arthur J. Gonzalez as the examiner (the

"**Examiner**") to investigate the pre-petition activities of the parties and the Pre-Petition Ally-

ResCap Settlement Agreement [Dkt. No. 674].  On November 21, 2012, the Court approved the

Debtors' sale of (i) their mortgage servicing businesses and (ii) most of the Estates' whole loan

---

[3] The Plan Proponents reached a settlement with the JSNs subsequent to the Plan Confirmation Hearing [Dkt. No. 5998].

ny-1118499

portfolio [Dkt. Nos. 2246, 2247]. After the auction of the Debtors' major assets, the Debtors and

the Creditors' Committee focused their efforts on obtaining consensus on the terms of a Chapter

11 plan.

6.        After months of negotiations that failed to lead to a consensual Chapter 11 plan,

the Debtors, with the support of the Creditors' Committee, sought the appointment of a plan

mediator and, separately, of a chief restructuring officer. The Court appointed the Honorable

James M. Peck, as Mediator on December 26, 2012 [PX-835, Dkt. No. 2519; PX-848, Dkt. No.

3101; Dkt. Nos. 3877, 4379]. Thereafter, the Court approved the appointment of Lewis Kruger

as the Debtors' Chief Restructuring Officer (the "**CRO**") [PX-849, Dkt. No. 3103]. Mr. Kruger

is an independent business representative with significant restructuring experience. (Direct

Testimony of Lewis Kruger ¶¶ 9-10, dated November 12, 2013 [Dkt. No. 5709] ("**Kruger**

**Direct**").)

7.        Following the Court's appointment of the Mediator, and after several months of

arm's-length mediation negotiations, the Debtors, the Creditors' Committee, and the vast

majority of the Debtors' creditor constituencies reached a broad settlement embodied in the Plan

Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Term

Sheet, dated May 23, 2013 [Dkt. No. 3814]. The Debtors' entry into the Plan Support

Agreement was approved by the Court on June 26, 2013, and the Court thereafter entered a

written opinion approving the Plan Support Agreement on June 27, 2013 [Dkt. Nos. 4098, 4102].

8.        The Ad Hoc Group was not initially supportive of the Plan. In addition, the Ad

Hoc Group and the Plan Proponents were engaged in litigation in two related consolidated

adversary proceedings (the "**JSN Adversary Proceeding**") concerning, among other things, the

extent of the JSNs' liens, the size of their allowed claim, and their entitlement to post-petition

3

interest.  [Adv. Proc. Case Nos. 13-01343 & 13-01277.]  The Court entered an order bifurcating

trial on the issues raised in the JSN Adversary Proceeding into "Phase I" and "Phase II."  The

Court conducted a six-day hearing on Phase I on October 15 through 17 and October 21 through

23, 2013, and issued its *Memorandum Opinion, and Findings of Fact and Conclusions of Law,*

*After Phase I Trial*, dated November 15, 2013 [Dkt. No. 5772] ("**Phase I Opinion**").

9.      In addition to the JSNs, a handful of other parties filed objections to the Plan.  The

Court conducted a five-day hearing on confirmation of the Plan and Phase II issues on November

19 through 22 and November 25, 2013.  The parties submitted, and the Court admitted into

evidence, the written direct testimony of thirty-one witnesses:  Joseph Morrow, Jeffrey A. Lipps,

Thomas Marano, Michael Carpenter, John Dubel, Lewis Kruger, Frank Sillman, Fernando

Acebedo, Robert H. Major, Brendan Meyer, Thomas Musarra, Mamta K. Scott, Mary Sohlberg,

Allen M. Pfeiffer, Jose Fraga, Ralph R. Mabey, Nancy Mueller-Handal, Lucy Allen, Susheel

Kirpalani, Ronald Friedman, William Thompson, Martin Blumentritt, Mark A. Renzi, Barbara

Westman, Tammy Hamzehpour, James Young, and Gina Gutzeit by the Plan Proponents; and

Michael Fazio, Robert S. Bingham, and Michael Pinzon by the Defendants and Plan Objectors.[4]

Certain of these witnesses were subject to cross-examination and redirect over the course of the

hearing.  None of the parties called any rebuttal witnesses.  The Plan Proponents and the Plan

Objectors sent their final exhibit lists to the Court post-trial.  More than 900 exhibits were

admitted in evidence, some for limited purposes.  The parties filed consolidated deposition

---

[4] During the Plan Confirmation and Phase II trial, Wachovia Bank and Wachovia Bank of Delaware, now succeeded
by Wells Fargo Bank, N.A. ("**WFBNA**") also filed the direct testimony of Ms. Heather A. Lawrence [Dkt. No.
5827] in support of WFBNA's objection to the Plan (the "**WFBNA Objection**").  During the Plan Confirmation and
Phase II trial, the Plaintiffs filed stipulated facts resolving issues in connection with the WFBNA Objection [Dkt.
No. 5912].  WFBNA did not enter the testimony of Ms. Lawrence into evidence.

designations on November 12, 2013 [Dkt. No. 5714] and second consolidated deposition

designations on November 18, 2013 [Dkt. No. 5803].

      10.     Following the hearing, further mediation ensued between the Plan Proponents and

the JSN Objectors (defined below), and Wells Fargo Bank, N.A., who objected to the Plan in its

capacities as First Priority Collateral Agent, Third Priority Collateral Agent, and Collateral

Control Agent for the Junior Secured Notes, resulting in an additional settlement (the "**JSN**

**Settlement**").  (Supplemental Declaration of Lewis Kruger ¶ 6, dated December 5, 2013 [Dkt.

No. 6018] ("**Kruger Supp. Decl.**").)  The JSN Settlement is discussed in greater detail in

Section VIII, *infra*.

## II.    FINDINGS RELEVANT TO CONFIRMATION UNDER THE BANKRUPTCY CODE

### A.    Proper Notice

      11.     On August 23, 2013, the Bankruptcy Court entered the *Order (I) Approving*

*Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to*

*Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of*

*Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for*

*Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and*

*(VI) Granting Related Relief* (the "**Disclosure Statement Order**") [Dkt. No. 4809] establishing,

among other things, certain solicitation and tabulation procedures in connection with the Plan.

(Affidavit of P. Joseph Morrow IV Certifying the Tabulation of Votes on the Joint Chapter 11

Plan Proposed by Residential Capital, LLC, *et. al.* and the Official Committee of Unsecured

Creditors ¶ 6, dated November 12, 2013 [Dkt. No. 5699] ("**Voting Certification**").)

      12.     Thereafter, as provided in the Disclosure Statement Order, Kurtzman Carson

Consultants LLC ("**KCC**") worked with the Plan Proponents, their respective counsel, and the

ny-1118499

Debtors' other professionals to (i) provide notice of the Plan and Confirmation Hearing,

(ii) distribute the Solicitation Package, including voting ballots to accept or reject the Plan, to

those creditors entitled to vote on the Plan, and (iii) tabulate the ballots returned by creditors

voting on the Plan.  (Voting Certification ¶ 7.)

   13.  Pursuant to the Disclosure Statement Order, the Court approved (i) a notice of

non-voting status to be sent to holders of claims and interests in the Unimpaired Classes (the

"**Unimpaired Non-Voting Status Notice**"), (ii) a notice of non-voting status to be sent to

holders of claims and equity interests in the Rejecting Classes (the "**Rejecting Non-Voting**

**Status Notice**"), and (iii) a Confirmation Hearing Notice.  (Voting Certification ¶ 12.)  The

Unimpaired Non-Voting Status Notice, the Rejecting Non-Voting Status Notice, and the

Confirmation Hearing Notice each contained the following legend informing recipients about the

injunction, release, and exculpation provisions of the Plan:

> **INJUNCTIONS, RELEASES, AND EXCULPATION**. The
> Plan contains certain injunction, release, and exculpation
> provisions, including **third party releases**, that are subject to
> approval by the Bankruptcy Court and may be found at Article IX
> of the Plan and Article V of the Disclosure Statement.
>
> ARTICLE IX OF THE PLAN CONTAINS RELEASE,
> EXCULPATION, AND INJUNCTION PROVISIONS, AND
> **ARTICLE IX.D CONTAINS A THIRD PARTY RELEASE.**
> THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER
> THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT
> BE AFFECTED THEREUNDER.
>
> **THIRD PARTY RELEASES**. Article IX.D of the Plan provides
> for the following Third Party Release:
>
> **ON AND AS OF THE EFFECTIVE DATE OF THE PLAN,
> THE HOLDERS OF CLAIMS AND EQUITY INTERESTS,
> SHALL BE DEEMED TO PROVIDE A FULL AND
> COMPLETE DISCHARGE AND RELEASE TO THE ALLY
> RELEASED PARTIES AND THEIR RESPECTIVE
> PROPERTY FROM ANY AND ALL CAUSES OF ACTION**

6

**WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, DERIVATIVE OR DIRECT, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, VEIL PIERCING OR ALTER-EGO THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO RMBS ISSUED AND/OR SOLD BY THE DEBTORS OR THEIR AFFILIATES AND/OR THE CHAPTER 11 CASES OR THE PLAN, AND ANY OBLIGATIONS UNDER THE DOJ/AG SETTLEMENT, THE CONSENT ORDER, AND THE ORDER OF ASSESSMENT.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, UNDER SECTION 1123 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THIS THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD, VALUABLE AND SUBSTANTIAL CONSIDERATION PROVIDED BY THE ALLY RELEASED PARTIES; (2) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (3) FAIR, EQUITABLE AND REASONABLE; (4) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR A HEARING; (5) JUSTIFIED BY TRULY UNUSUAL CIRCUMSTANCES; (6) AN ESSENTIAL COMPONENT AND CRITICAL TO THE SUCCESS OF THE PLAN; (7) RESULTED IN DISTRIBUTIONS TO THE CREDITORS THAT WOULD OTHERWISE HAVE BEEN UNAVAILABLE; (8) THE RESULT OF AN IDENTITY OF INTEREST BETWEEN THE DEBTORS AND THE ALLY RELEASED PARTIES REGARDING THE PLAN; AND (9) A BAR TO ANY PARTY ASSERTING A CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THIS THIRD PARTY RELEASE AGAINST ANY OF THE ALLY RELEASED PARTIES.**

7

(*Id.* ¶ 13.)

14.    On or before August 29, 2013, KCC caused to be served the Unimpaired Non-Voting Status notice on all known members of the classes that were deemed to be unimpaired under the Plan.  (Voting Certification ¶¶ 8, 14.)  On or before August 29, 2013, KCC caused to be served the Rejecting Non-Voting Status notice on all known members of the classes that were deemed to reject the Plan because they will not receive or retain any property under the Plan. (*Id*. ¶¶ 9, 14.)  On or about August 29, 2013, KCC caused the Confirmation Hearing Notice to be served on over two million parties, including (a) the United States Trustee; (b) counsel to the Creditors' Committee; (c) all persons or entities that have requested notice of the proceedings in the Chapter 11 Cases; (d) all persons or entities that have filed claims as of the date of the notice; (e) all known creditors or known holders of pre-petition claims as of the date of the Disclosure Statement Order; (f) all persons or entities listed in the Schedules at the addresses stated therein; (g) all counterparties to the Debtors' executory contracts and unexpired leases listed on the Schedules at the addresses stated therein; (h) all parties to litigation with the Debtors; (i) all parties to litigation with Ally relating to the Debtors' businesses, regardless of whether such parties are entitled to vote on the Plan; (j) all known members of potential class action lawsuits; (k) the Internal Revenue Service, the Securities and Exchange Commission, the United States Attorney for the Southern District of New York and any other required governmental units; (l) the parties listed on the Special Service List and the General Service List as defined in the Case Management Procedures Order; (m) known potential creditors with claims unknown by the Debtors; (n) all holders of Claims and Equity Interests, regardless of whether such holders are entitled to vote on the Plan; and (o) individual borrowers whose loans were serviced by the Debtors as of September 20, 2012.  (*Id*. ¶ 15; PX-908.)

15.    On September 3, 2013, KCC caused the Confirmation Hearing Notice, which included the legend with respect to the release, exculpation, and injunction provisions contained in the Plan to be published in the *Wall Street Journal* and *USA Today*.  (Voting Certification ¶ 16; PX-905.)

16.    Notice of the Disclosure Statement, the Plan (including the Debtor Release and the Third Party Release), the Plan Supplement, and the Confirmation Hearing, together with all deadlines for voting on or objecting to the Plan and with respect to confirmation, was provided in compliance with the Bankruptcy Code and Bankruptcy Rules.  (PX-865; Voting Certification ¶¶ 6-16.)

**B.    Transmission of Ballots – Section 1124**

17.    Ballots were transmitted to holders of Claims and Equity Interests in the Classes under the Plan that are treated as impaired ("**Impaired**") within the meaning of Section 1124 of the Bankruptcy Code (the "**Voting Classes**") and entitled to vote on the Plan in accordance with the Plan and the Disclosure Statement Orders.  (Voting Certification ¶¶ 10, 23.)

**C.    Good Faith Solicitation – Section 1125(e)**

18.    The Plan Proponents solicited votes for the Plan from the holders of Claims in the Voting Classes in good faith and in a manner consistent with the Bankruptcy Code, including, but not limited to, Section 1125(e) of the Bankruptcy Code.  (PX-865; Voting Certification ¶¶ 17-25.)

**D.    Modification of the Plan – Section 1127(a)**

19.    Pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3018, the Plan Proponents proposed certain modifications to the Plan as reflected in the modified version of the Plan filed on November 13, 2013.  (PX-927.)  The Plan modifications do not (i) affect the

9

classification of Claims or Equity Interests (*see* PX-927, Modified Plan, Art. III), (ii) constitute

material modifications of the Plan under Section 1127 of the Bankruptcy Code (*see, e.g.*, PX-

927, Modified Plan, Art. XI.A), (iii) cause the Plan to fail to meet the requirements of

Sections 1122 or 1123 of the Bankruptcy Code (*see* PX-927, Modified Plan, Arts. III.A, C; IV.A,

C), (iv) materially and adversely change the treatment of Claims or Equity Interests (other than

any Claims and Equity Interests held by those who have accepted such Plan modifications in

writing or in open court) (*see* PX-927, Modified Plan, Art. III), (v) require re-solicitation of

acceptances or rejections from any holders of Claims or Equity Interests (*see* PX-927, Modified

Plan, Art. XI.B), or (vi) require that any such holders be afforded an opportunity to change

previously cast acceptances or rejections of the Plan (*see* PX-927, Modified Plan, Arts. XI.A, B;

XIII.A.)  Under the circumstances, the form and manner of notice of the proposed modifications

are adequate, and no other or further notice of the proposed modifications is necessary or

required.  (*See, e.g*., PX-927, Modified Plan, Art. XI.A.)

20.    In addition, as discussed further below, the Plan Proponents made certain

additional modifications to the Plan on December 3, 2013, to resolve the objections of the Ad

Hoc Group.  (*Second Amended Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et

al. and The Official Committee of Unsecured Creditors* [Dkt. No. 5993-1] ("Second Am. Plan

[Dkt. No. 5993-1]").)

E.    **Plan Confirmation – Section 1129(a)**

21.    The Plan complies with the elements of Section 1129(a) of the Bankruptcy Code.

### 1.    Contents of the Plan – Section 1129(a)(1)

22.    The Plan complies with each applicable provision of the Bankruptcy Code

relating to classification of claims and the mandatory contents of a plan as dictated by Section

1129(a)(1) of the Bankruptcy Code.  (Kruger Direct ¶ 137.)

23.    Pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III

of the Plan provides for the classification of Claims and Interests into separate Classes, based on

differences in the legal nature or priority of such Claims and Interests (other than Administrative

Claims, Fee Claims, Priority Tax Claims, and Statutory Fees, which are addressed in Article II of

the Plan and which are not required to be designated as separate Classes pursuant to

Section 1123(a)(1) of the Bankruptcy Code).  The Plan is designed to comply with the

requirements of Sections 1122 and 1123 of the Bankruptcy Code as follows:

- In accordance with Section 1122(a) of the Bankruptcy Code, Article III of the Plan classifies each Claim against and Equity Interest in the Debtors into a Class containing only substantially similar Claims or Equity Interests (Second Am. Plan [Dkt. No. 5993-1], Art. III.C-D);

- In accordance with Section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan properly classifies all Claims and Equity Interests that require classification.  With respect to Claims and Equity Interests in all Classes, the Plan Proponents have provided proof of a legitimate reason for the separate classification of such Claims and Equity Interests, and such classification is justified.  Separate classification was not done for any improper purpose and does not unfairly discriminate between or among holders of Claims or Equity Interests (Second Am. Plan [Dkt. No. 5993-1], Art. III.C-D);

- In accordance with Section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan properly identifies and describes each Class of Claims and Equity Interests that is Unimpaired under the Plan (Second Am. Plan [Dkt. No. 5993-1], Art. III.C-D);

- In accordance with Section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan properly identifies and describes the treatment of each Class of Claims or Equity Interests that is Impaired under the Plan (Second Am. Plan [Dkt. No. 5993-1], Art. III.C-D);

11

- In accordance with Section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the holder of such a Claim or Equity Interest has agreed to less favorable treatment (Second Am. Plan [Dkt. No. 5993-1], Art. III.C-D);

- In accordance with Section 1123(a)(5) of the Bankruptcy Code, the Plan, including the Plan Supplement, provides in detail adequate and proper means for its implementation, including, pursuant to Section 1123(a)(5)(B), transfer and assignment of certain GM Insurance Rights to the Kessler Settlement Class, the Liquidating Trust, and others (Second Am. Plan [Dkt. No. 5993-1], Art. IV.G);

- Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date.  Thus, Section 1123(a)(6) of the Bankruptcy Code is not applicable in these cases (Second Am. Plan [Dkt. No. 5993-1], Art. IV.P);

- Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date and no individuals will serve as officers, directors or voting trustees of the Debtors after the Effective Date.  Thus, Section 1123(a)(7) of the Bankruptcy Code is inapplicable in these cases. Nevertheless, the initial members of the Liquidating Trust Board and Liquidating Trust Management were set forth in Exhibits 6 and 7 to the Plan Supplement and, thus, were disclosed prior to the Confirmation Hearing.  The Liquidating Trust Board and Liquidating Trust Management were selected by members of the Consenting Claimants in accordance with the terms of the Plan Support Agreement. (Second Am. Plan [Dkt. No. 5993-1], Art. IV.P.)

## 2.    Disclosure and Solicitation – Section 1129(a)(2)

24.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by Section 1129(a)(2) of the Bankruptcy Code, including Sections 1122, 1123, 1124, 1125, 1126, 1127 and 1128 and Bankruptcy Rules 3017, 3018 and 3019, and all other applicable rules, laws and regulations with respect to the Plan and the solicitation of acceptances or rejections thereof.  (Kruger Direct ¶ 138.)  Acceptances or rejections of the Plan were solicited in good faith and in compliance with the requirements of Sections 1125 and 1126 of the Bankruptcy Code as follows:

12

- In compliance with the Disclosure Statement Order on August 29, 2013, the Plan Proponents, through KCC, caused copies of the following materials to be served on all holders of Claims in Classes that were entitled to vote to accept or reject the Plan (*i.e.*, Claims in Classes R-3, RS-3, GS-3, R-4, GS-4A, GS-4B, RS-4, R-5, GS-5, RS-5, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, RS-11, R-12, GS-10, and RS-12) (Voting Certification ¶¶ 7, 10, 17, 23; PX-908 at ¶¶ 5, 7-23):

    o   the Confirmation Hearing Notice setting forth (a) the Court's approval of the Disclosure Statement, (b) the deadline for voting on the Plan, (c) the date of the Confirmation Hearing, (d) the deadline for objections to the confirmation of the Plan, and (e) the Plan Releases;

    o   the Disclosure Statement (together with the exhibits thereto, including the Plan and the Disclosure Statement Order) in a CD-ROM;

    o   the letter from the Creditors' Committee to holders of General Unsecured Claims in Classes R-4, GS-4A, GS-4B, RS-4, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, and RS-11 and the letter from the Creditors' Committee to holders of Borrower Claims in Classes R-5, GS-5, and RS-5;

    o   the appropriate form of Ballot with a postage prepaid return envelope.

- In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused copies of the Disclosure Statement and the Confirmation Hearing Notice to be served on (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the parties comprising the Monthly Service List (as defined in the *Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 And Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management And Administrative Procedures* [Dkt. No. 141]. (Voting Certification ¶¶ 7, 12, 15; PX-908 at 5 & Exhibit J.)

- In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused a copy of the Unimpaired Non-Voting Status Notice and the Impaired Non-Voting Status Notice to be served on all holders of Claims and Equity Interests in the non-voting classes (*i.e.*, Classes R-1, GS-1, RS-1, R-2, GS-2, RS-2, R-9, R-10, GS-8, GS-9, RS-9, and RS-10). (Voting Certification ¶¶ 12-14; PX-908 at 5 & Exhibits H, I.)

13

- On October 11, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following exhibits to the Plan Supplement (together with the Plan and any and all documents executed in connection therewith including the FGIC Settlement, the "Plan Documents") (*see* PX-875), in substantially final forms:

  - the Liquidating Trust Agreement (Exhibit 2 to the Plan Supplement);

  - the RMBS Claims Trust Agreement (Exhibit 3 to the Plan Supplement);

  - the Borrower Claims Trust Agreement (Exhibit 4 to the Plan Supplement);

  - the Private Securities Claims Trust Agreement (Exhibit 5 to the Plan Supplement);

  - the Initial Members of the Liquidating Trust Board (Exhibit 6 to the Plan Supplement);

  - the Initial Members of Liquidating Trust Management (Exhibit 7 to the Plan Supplement);

  - the Initial Members of the Borrower Claims Trust Committee and Identity of the Borrower Claims Trustee (Exhibit 8 to the Plan Supplement);

  - the Identity of the Private Securities Claims Trustee (Exhibit 9 to the Plan Supplement);

  - the Borrower Trust True-Up (Exhibit 10 to the Plan Supplement);

  - the Cooperation Agreement between the Liquidating Trust and the Kessler Settlement Class (Exhibit 11 to the Plan Supplement);

  - the Policy Numbers for the GM Policies (Exhibit 12 to the Plan Supplement);

  - the Liquidating Trust Causes of Action (Exhibit 13 to the Plan Supplement);

  - the Stipulated Allocation of the Allowed Fee Claim (Exhibit 14 to the Plan Supplement);

14

     o     the Borrower-Related Causes of Action (<u>Exhibit 15</u> to the Plan Supplement);

     o     the Updated RMBS Trust Claims Schedules (<u>Exhibit 16</u> to the Plan Supplement);

     o     the Ally Contract Claims Estimate (<u>Exhibit 17</u> to the Plan Supplement);

     o     the identity of the RMBS Claims Trust Trustee (<u>Exhibit 18</u> to the Plan Supplement);

     o     the Material Terms on which the Plan Proponents may Pay Post-Petition Interest Over Time (<u>Exhibit 19</u> to the Plan Supplement);

     o     the Initial List of Claims to be Subordinated under the Plan (<u>Exhibit 20</u> to the Plan Supplement);

     o     the Updated Disclosure Statement Exhibits 12 and 13 (<u>Exhibit 21</u> to the Plan Supplement); and

     o     the updated Excluded Asset list (Schedule 5 to Dkt. No. 5854-1).

- On October 29, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) and served the Assumption Schedule setting forth Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan [Dkt. No. 5547] as <u>Exhibit 1</u> to the Plan Supplement.  *See* Affidavit of Service [Dkt. No. 5561].

- On November 12, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following amended Plan Supplement documents, in substantially final form [Dkt. No. 5719]:

     o     the Liquidating Trust Agreement (<u>Amended Exhibit 2</u> to the Plan Supplement);

     o     the Borrower Claims Trust Agreement (<u>Amended Exhibit 4</u> to the Plan Supplement);

     o     the Liquidating Trust Causes of Action (<u>Amended Exhibit 13</u> to the Plan Supplement); and

     o     the Borrower-Related Causes of Action (<u>Amended Exhibit 15</u> to the Plan Supplement).

25.    The Confirmation Hearing Notice provided due and proper notice of the

Confirmation Hearing and all relevant dates, deadlines, procedures and other information

relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the

voting deadline, the objection deadline, the time, date and place of the Confirmation Hearing and

the release provisions in the Plan, including the Debtor Release and the Third Party Release.

(*See* PX-865.)

26.    The Plan was voted on by 183 sub-Classes of Impaired Claims that were entitled

to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement

Order (*i.e.*, each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-

12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-

11, and RS-12).  (Voting Certification ¶ 10 & Exhibit B.)

27.    KCC has made a final determination of the validity of, and tabulation with respect

to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan,

including the amount and number of accepting and rejecting Claims in each sub-Class entitled to

vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-

6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12 under the Plan.

(Voting Certification ¶¶ 26-27 & Exhibit B.)  As set forth in the Voting Certification, and

pursuant to resolutions reached with various parties after the filing of the Voting Certification,

each of the sub-Classes within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A,

GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3 RS-4, RS-5 (at all sub-Classes other than Residential

Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-12 have accepted the

Plan by at least two-thirds in amount and a majority in number of the Claims in such Classes

actually voting.  (*See* Voting Certification, Exhibit B.)

16

ny-1118499

28.     All persons entitled to receive notice of the Disclosure Statement, the Plan and the

Confirmation Hearing have received proper, timely and adequate notice in accordance with the

Disclosure Statement Order and the applicable provisions of the Bankruptcy Code and the

Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto.

(PX-865; Voting Certification ¶¶ 8-25.)

29.     The Plan Proponents solicited votes on the Plan in good faith and in a manner

consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.

(*See* PX-865.)  The Plan Proponents are entitled to the protections afforded by Section 1125(e) of

the Bankruptcy Code and the exculpation provisions set forth in Article IX.G of the Plan.

### 3.     Good Faith – Section 1129(a)(3)

30.     The Plan has been proposed in good faith and not by any means forbidden by law.

(Kruger Direct ¶ 139.)  The Plan is the result of extensive good faith, arm's-length negotiations

between the Debtors, the Creditors' Committee, Ally, and certain of the Debtors' principal

creditor constituencies, including each of the Consenting Claimants and their respective

representatives.  (*Id*. ¶ 140.)

### 4.     Payments for Costs and Services – Section 1129(a)(4)

31.     Articles II(B)(1), (2), (3), and (4) of the Plan outline payments for services or

costs made, or to be made, by the plan proponent, the Estates or by a person issuing securities or

receiving property under the plan that have been approved by, or are subject to approval of, the

Court as required by Section 1129(a)(4) of the Bankruptcy Code.  (*Id*. ¶ 142.)

32.     The Plan provides that Professional Fee Claims submitted by Professionals for

services incurred prior to the Effective Date will receive payment only if and to the extent they

are approved by the Court.  (Second Am. Plan [Dkt. No. 5993-1], Art. II.B.2.)  The Plan also

provides for the payment of the reasonable pre- and post-petition fees and expenses of the RMBS

Trustees pursuant to the provisions of and subject to the procedures set forth in the *Final*

*Supplemental Order under Bankruptcy Code Sections 105(a), 362, 363, 1107(a) and 1108, and*

*Bankruptcy Rule 9019 (i) Authorizing the Debtors to Continue Implementing Loss Mitigation*

*Programs; (ii) Approving Procedures for Compromise and Settlement of Certain Claims,*

*Litigations and Causes of Action; (iii) Granting Limited Stay Relief to Permit Foreclosure and*

*Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and*

*(iv) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses*

[Dkt. No. 774], and the *Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002,*

*6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase*

*Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of*

*Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting*

*Related Relief* [Dkt. No. 2246], which provisions and procedures will also apply to HSBC.

(Second Am. Plan [Dkt. No. 5993-1], Art. IV.C.5.)  The Plan also provides for the allowance of

the Allowed Fee Claim, with Units and distributions on account of such claim made to counsel

for the Institutional Investors.  (Second Am. Plan [Dkt. No. 5993-1], Arts. I.A.11, IV.C.6.)  In

accordance with the Plan, all other Administrative Claims will receive payment only to the

extent they are Allowed Claims.  (*See* Second Am. Plan [Dkt. No. 5993-1], Arts. I.A.11, II.A.1-

2.)

### 5. Identity of Proposed Officers, Directors and Voting Trustees – Section 1129(a)(5)

33.     Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Plan discloses the

identities and compensation structure for the members of the Liquidating Trust Board,

ny-1118499

Liquidating Trust Management, the Private Securities Claims Trustee, the RMBS Claims Trust

Trustee, the Borrower Claims Trustee and the Borrower Claims Trust Committee.  (Kruger

Direct ¶ 143.)  Members of the Liquidating Trust Board and Liquidating Trust Management set

forth on Exhibits 6 and 7 to the Plan Supplement are qualified, and their selection is consistent

with the interests of holders of Claims and Equity Interests and with public policy.  (*Id.*)

### 6.    Government Regulation – Section 1129(a)(6)

34.    The Plan does not provide for any changes in rates that require regulatory

approval of any governmental agency, rendering Section 1129(a)(6) of the Bankruptcy Code

inapplicable in these Chapter 11 Cases.  (*See* Second Am. Plan [Dkt. No. 5993-1].)

### 7.    Best Interests of the Creditors – Section 1129(a)(7)

35.    The Plan satisfies the "best interests of creditors" test outlined by Section

1129(a)(7) of the Bankruptcy Code.  (Kruger Direct ¶ 144.)  FTI, the Debtors' financial advisor,

conducted an analysis to determine whether the creditors received greater value under the Plan

than they would receive in a Chapter 7 liquidation.  (PX-863, Exhibit 8 – Liquidation Analysis

¶ 1.)  FTI concluded that all creditors would receive a better recovery under the Plan than in a

Chapter 7 liquidation.  (Direct Testimony of Mark A. Renzi ¶ 23, dated November 12, 2013

[Dkt. No. 5702] ("**Renzi Direct**").)

36.    The Liquidation Analysis contained in the Disclosure Statement provides an

estimate of recoveries that would be generated from the liquidation of the Debtors' assets and

properties in the context of a proceeding under Chapter 7 of the Bankruptcy Code, as well as a

projection of costs associated with Chapter 7 liquidation.  (Renzi Direct ¶ 15; PX-863, Exhibit 8

– Liquidation Analysis at ¶ 1.)  The Liquidation Analysis also examines how a hypothetical

Chapter 7 liquidation might impact the recoveries of holders of Claims and Equity Interests.

(Renzi Direct ¶ 15.)  Based upon the assumptions set forth in the Liquidation Analysis, each

holder of a claim or interest of each impaired class of claims or interests will likely receive or

retain under the Plan a recovery of a value, as of the Effective Date of the Plan, that is not less

than the amount that such holder would receive or retain if the Debtors were liquidated under

Chapter 7.  (Renzi Direct ¶ 23.)  Because the $2.1 billion Ally Contribution will be provided

only under the Plan and would be unavailable in a Chapter 7 liquidation, confirmation of the

Plan will result in meaningfully higher recoveries for creditors than such creditors would likely

receive in a hypothetical Chapter 7 scenario.  (Renzi Direct ¶ 23.)[5]  Mr. Kruger reviewed FTI's

analysis and came to the same conclusion.  (Kruger Direct ¶ 144.)

37.    Although FTI's Liquidation Analysis did not attribute value to the Ally

Contribution or the Intercompany Balances in Chapter 7, these two particular assumptions were

reasonable.[6]  (Renzi Direct ¶¶ 18, 21, 29.)  First, the $2.1 billion Ally Contribution would not be

available in a Chapter 7 liquidation because it is specifically conditioned on Ally obtaining broad

third-party releases, *i.e.*, obtaining "global peace" among Ally, the Debtors and their competing

claimants and creditors.  (*Id.* ¶ 21.)  These third-party releases could not be obtained in a Chapter

7 liquidation.  In addition, if third parties pursued significant claims against Ally and its

affiliates, such third-party litigation could have significant negative results, including: (i) Ally's

---

[5] Because the Recovery Analysis and the Liquidation Analysis show that there are estimated to be more assets than claims at Debtor Executive Trustee Services, LLC ("**ETS**"), holders of General Unsecured Claims at ETS will be entitled to receive the same recovery under the Plan as they would be entitled to receive under a hypothetical Chapter 7 liquidation scenario.  (*See* Renzi Direct ¶ 24.)  The Plan provides that holders of Allowed ETS Unsecured Claims will receive their pro rata share of cash equal to the value of assets available at the ETS Estate after payment of all allowed claims senior in priority.  (*Id.*)  The Plan properly provides for separate classification and treatment of the ETS Unsecured Claims, and ensures that holders of Allowed ETS Unsecured Claims will receive the same recovery under the Plan that they would in a hypothetical Chapter 7 scenario.  (*Id.*)

[6] As part of the Phase II trial, the JSNs presented evidence in support of their contention that the Intercompany Balances constituted valid, quantifiable debt and would therefore yield a substantial recovery in liquidation.  (*See* Corrected Direct Testimony of Robert Bingham ¶¶ 16-19, dated November 13, 2013 [Dkt. No. 5740] ("**Bingham Direct**"); Nov. 21, 2013 Trial Tr. 150:14-151:22.)

ny-1118499

pursuit of indemnity claims against the Debtors' Estates; (ii) increasing litigation costs;

(iii) dilution of any potential recoveries to creditors; and (iv) a risk that the Debtors may become

administratively insolvent before the conclusion of any third-party litigation against Ally.  (*Id.*)

38.    Second, for the reasons discussed in Section VI.B.7, *infra*, it was reasonable

under the Liquidation Analysis not to attribute any recovery on account of the Intercompany

Balances.  Based on a review of a variety of factors, the Intercompany Balances on the Debtors'

books and records have a number of attributes more akin to equity than debt (*see, e.g.*, Renzi

Direct ¶ 30; Direct Testimony of Gina Gutzeit ¶¶ 6-11, dated November 12, 2013 [Dkt. No.

5707] ("**Gutzeit Direct**")), and although the Debtors spent a substantial amount of time trying to

discern the history and bases for the Intercompany Balances, they could not successfully do so

with any degree of precision (Direct Testimony of Barbara A. Westman ¶ 6, dated November 12,

2013 [Dkt. No. 5704] ("**Westman Direct**")).[7]

39.    No creditors are harmed by the proposed grouping of the Debtors under the Plan's

provision for limited partial consolidation and the proposed structure of the limited partial

consolidation in the Plan will not result in a class of creditors receiving a lower recovery under

the Plan than in a hypothetical Chapter 7 scenario.  (Renzi Direct ¶¶ 25-27.)

**8.    Classes of Claims or Interests – Section 1129(a)(8)**

40.    Each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11,

R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5 (at all sub-Classes

other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-

12 have voted to accept the Plan, and the sub-Class entitled to vote in Class RS-5 at the

Residential Funding Real Estate Holdings, LLC sub-Class has voted to reject the Plan.  (Voting

---

[7] *But see* footnote 6 *infra*.

Certification, Exhibit B.)  Holders of Intercompany Claims in Classes R-9, GS-8, and RS-9, and

holders of Equity Interests in R-10, GS-9 and RS-10 are deemed to have rejected the Plan

(collectively with Class RS-5 (at the Residential Funding Real Estate Holdings, LLC sub-Class),

the "**Rejecting Classes**").  Nevertheless, the Plan is confirmable because it does not discriminate

unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies

Section 1129(b)(1) of the Bankruptcy Code.

### 9.    Payment of Certain Priority Claims – Section 1129(a)(9)

41.    The Plan provides treatment for Administrative Claims, Priority Tax Claims and

Other Priority Claims in a manner consistent with the requirements of Section 1129(a)(9) of the

Bankruptcy Code.  (Kruger Direct ¶ 146.)

### 10.    Impaired Claims – Section 1129(a)(10)

42.    The Plan has been accepted by at least one class of Impaired Claims at each

Debtor that is entitled to vote on the Plan, determined without including any acceptance of the

Plan by any "insider."  (*See* Voting Certification Exhibit B.)

### 11.    Feasibility – Section 1129(a)(11)

43.    The Plan is feasible within the meaning of Section 1129(a)(11) of the Bankruptcy

Code.  The Debtors' projections show that the Debtors expect to have sufficient funds to make

the payments required under the Plan.  (Kruger Direct ¶ 147.)

### 12.    Bankruptcy Fees – Section 1129(a)(12)

44.    The Plan provides that fees payable pursuant to 28 U.S.C. § 1930 will be paid by

the Debtors on or before the Effective Date.  (Kruger Direct ¶ 148.)  On and after the Effective

Date, notwithstanding the grouping of the Debtors into the Debtor Groups under the Plan, each

of the Debtors shall (i) pay the applicable U.S. Trustee fees when due in the ordinary course until

ny-1118499

such time as the Bankruptcy Court enters a final decree in such Debtors' Chapter 11 Case or

until each Chapter 11 Case is converted or dismissed, and (ii) file consolidated post-confirmation

quarterly status reports.  (Second Am. Plan [Dkt. No. 5993-1], Arts. II.D & XIII.C.)

### 13.    Retiree Benefits – Section 1129(a)(13)

45.    The retirement plan covering the Debtors' employees is sponsored by Ally, the

indirect parent of ResCap and a non-Debtor.  (*See* Second Am. Plan [Dkt. No. 5993-1], Art.

IX.E.)  Article IX.E of the Plan provides that nothing in the Plan releases Ally or any other party

from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC

and ERISA.  The Debtors have no other retiree benefit obligations.  (*See, e.g.*, Second Am. Plan

[Dkt. No. 5993-1], Art. IX.E.)  Therefore, to the extent applicable, the Plan satisfies

Section 1129(a)(13) of the Bankruptcy Code.

### 14.    Domestic Support Obligations Objections, and Transfers of Property – Sections 1129(a)(14), (15) and (16)

46.    The Debtors do not owe any domestic support obligations and are not individuals.

Therefore, Sections 1129(a)(14) and (15) of the Bankruptcy Code do not apply to the Debtors.

The Debtors are moneyed, business, or commercial corporations or trusts, not nonprofit entities,

and, therefore, Section 1129(a)(16) of the Bankruptcy Code does not apply to the Debtors.  To

the extent that any transfer of property under the Plan will be made by a nonprofit corporation or

trust and Section 1129(a)(16) of the Bankruptcy Code is thus applicable to the Debtors, such

transfers shall be made in accordance with applicable non-bankruptcy law, thereby satisfying

Section 1129(a)(16) of the Bankruptcy Code.

### F.    Fair and Equitable – Section 1129(b)

47.    The Plan satisfies Section 1129(b) of the Bankruptcy Code with respect to the

Rejecting Classes.  The evidence proffered or adduced at the Confirmation Hearing is persuasive

23

and credible, has not been controverted by other evidence, and establishes that the Plan does not

discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. (*See infra*

Sections VI.A.4 (discussing the mediation process) & VI.B (discussing the individual

settlements); *see also* Direct Testimony of John S. Dubel (UCC) ¶¶ 79, 84-85, dated November

12, 2013 [Dkt. No. 5697] ("**Dubel Direct**"); Kruger Direct ¶¶ 5, 63, 70, 103, 106, 131, 139, 141,

169, 173, 186.)

48.    As required by Section 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code,

the Plan is fair and equitable with respect to the Intercompany Balances and Equity Interests

because (a) no holder of a Claim or Equity Interest will receive more than it is legally entitled to

receive on account of its Claim or Equity Interest, and (b) the Plan does not provide a recovery

on account of any Claim or Equity Interest that is junior to the Rejecting Classes. The Plan also

resolves any question that certain claims must be subordinated to all general unsecured claims

pursuant to Section 510(b) of the Bankruptcy Code.

49.    The Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code

such that the Plan may be confirmed even though Section 1129(a)(8) of the Bankruptcy Code is

not satisfied. After entry of the Confirmation Order and upon the occurrence of the Effective

Date, the Plan shall be binding upon the members of the Rejecting Classes.

**G.    Confirmation of a Single Plan – Section 1129(c)**

50.    The Plan (including previous versions thereof) is the only plan that has been filed

in these Chapter 11 Cases that has been found to satisfy the requirements of subsections (a) and

(b) of Section 1129 of the Bankruptcy Code. The Plan complies with the requirements of

Section 1129(c) of the Bankruptcy Code.

**H.      Avoidance of Taxes – Section 1129(d)**

51.      No party in interest has requested that the Court deny Confirmation of the Plan on

grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the

application of Section 5 of the Securities Act, and the principal purpose of the Plan is not such

avoidance.  The Plan satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

**I.      Small Businesses – Section 1129(e)**

52.      None of these Chapter 11 Cases is a small business case within the meaning of the

Bankruptcy Code.

53.      Based upon the foregoing and all other pleadings and evidence proffered or

adduced at or prior to the Confirmation Hearing, the Plan and the Plan Proponents as proponents

of the Plan satisfy the requirements for confirmation set forth in Section 1129 of the Bankruptcy

Code.

**III.      IMPLEMENTATION OF THE PLAN**

54.      All documents and agreements necessary to implement the Plan, including, but

not limited to, the Plan Documents, are essential elements of the Plan and consummation of each

agreement is in the best interests of the Debtors, the Estates and holders of Claims.  The Plan

Proponents have exercised reasonable business judgment in determining to enter into the Plan

Documents, and each of the Plan Documents have been negotiated in good faith, at arm's-length,

are fair and reasonable, and shall, upon execution and upon the occurrence of the Effective Date,

constitute legal, valid, binding, enforceable, and authorized obligations of the respective parties

thereto and will be enforceable in accordance with their terms.  Pursuant to Section 1142(a) of

the Bankruptcy Code, the Plan Documents, and any other agreements necessary to implement the

Plan, will apply and be enforceable, notwithstanding any otherwise applicable non-bankruptcy law.

## IV.    CONDITIONS TO THE CONFIRMATION OF THE PLAN

55.    Each of the conditions precedent to entry of the Confirmation Order has been satisfied in accordance with Article X.A of the Plan or properly waived in accordance with Article X.C of the Plan.

## V.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

56.    Pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Effective Date, Article V of the Plan provides for the assumption, assumption and assignment, or rejection of certain Executory Contracts and Unexpired Leases.  (Second Am. Plan [Dkt. No. 5993-1], Art. V.)  The Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases are based on and within their sound business judgment, are necessary to the implementation of the Plan and are in the best interests of the Debtors, their Estates, holders of Claims and other parties in interest in the Chapter 11 Cases.  The Plan Proponents have filed the Assumption Schedule (as it may have been amended or supplemented) and have provided notice to counterparties of the Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases and any related Cure Claims.  (*See* KCC Affidavit of Service [Dkt. No. 951].)

## VI.    THE ALLY CONTRIBUTION AND THE GLOBAL SETTLEMENT

### A.    Factual Background

#### 1.    The Original Ally Settlement

57.    Prior to the Petition Date, the Debtors identified billions of dollars of potential claims against their parent, Ally.  Beginning in February 2012, the Debtors, Ally, and their respective advisers began discussing a potential settlement of all claims the Debtors might have against Ally, and a process to develop a comprehensive Chapter 11 plan for the Debtors.  The Debtors were able to reach a settlement with Ally pre-petition (the "**Original Ally Settlement**") after extensive review with its legal advisors, and negotiations between the advisors, the Special Review Committee, and Ally representatives.  (Direct Testimony of Thomas Marano ¶¶ 39-40, dated November 12, 2013 [Dkt. No. 5705] ("**Marano Direct**").)

58.    After extensive negotiations, the Debtors, Ally, certain of the JSNs and certain holders of RMBS (as defined below) reached an initial settlement in the spring of 2012.  The settlement was memorialized in a Plan Sponsor Agreement (the "**Pre-Petition PSA**"), which was approved by the ResCap board of directors (the "**Board**") on May 13, 2012, and was subsequently executed and filed with the Court on the Petition Date.  (PX-65; Marano Direct ¶ 39.)

59.    Under the terms of the Pre-Petition PSA, Ally agreed to make substantial monetary and non-monetary contributions to support the Debtors leading up to and during their Chapter 11 Cases, including:  (i) making a cash contribution to the Debtors of $750 million; (ii) providing $200 million in additional DIP financing; (iii) agreeing to allow the Debtors to use Ally's cash collateral; (iv) providing a stalking horse bid (with no bid protections) for the held-for-sale loan portfolio; (v) entering into a shared services agreement that provided the Debtors

27

with operational support they needed to run their business in a regulatory compliant manner;
(vi) agreeing to negotiate a transition services agreement with the purchaser of the Debtors'
assets; (vii) honoring the ordinary course of business obligations under the employee retirement
plan for employees of the Debtors; and (viii) supporting the Debtors' origination operations
through the closing of the asset sales by allowing the Debtors to continue originating loans on
Ally's books post-petition.  (Marano Direct ¶ 40; PX-137 at 129-30.)  Ally also agreed to allow
the Debtors to continue servicing Ally Bank's loan portfolio, which represented approximately
30% of the loans serviced by the Debtors and accounted for approximately 10% of the Debtors'
servicing-related income.  (Marano Direct ¶ 40.)

   60.  Neither Ally nor the Debtors allocated any of the $750 million contribution to any
causes of action the Debtors or third parties may have had against Ally.  (PX-137 at 129.)

## 2.  The Creditors' Committee's Investigation

   61.  In the weeks following the Petition Date, the Committee—which was composed
of members of each major creditor constituency that was not party to the Pre-Petition PSA—
observed that the Pre-Petition PSA (i) did not resolve $4 billion in claims asserted by monoline
insurers (the "**Monolines**") who provided financial guaranty insurance policies insuring amounts
payable to residential mortgage-backed securities, notes and certificates ("**RMBS**") issued by the
Debtors (the "**Monoline Claims**"); (ii) did not resolve securities claims, including over $2.4
billion in private securities claims, more than $13 billion of class action securities claims, and
securities claims held by the Federal Housing Finance Agency on behalf of Freddie Mac (the
"**FHFA Claims**"); (iii) did not have support of the holders of more than $1 billion in senior
unsecured notes maturing between May 2013 and July 2014 issued by ResCap (the "**Senior
Unsecured Notes**"); (iv) did not address hundreds of millions of dollars in individual and class

action claims asserted by individuals whose current or former mortgage loans were originated,

serviced, sold, consolidated, or owned by any of the Debtors (the "**Borrower Claims**"); and

(v) did not address representation and warranty claims by RMBS Trusts (the "**RMBS Trust**

**Claims**") other than in connection with Trusts sponsored by the Debtors between 2004 and 2007.

(Dubel Direct ¶ 18.)  The Committee also believed that the plan contemplated by the Pre-Petition

PSA would have left a *de minimis* recovery for unsecured creditors, which would have been

obtained only after massive litigation, expense, and delay over the size and treatment of most

categories of allowed claims.  (*Id.*)

       62.     The Committee understood that the outcome of the Chapter 11 Cases would

largely be driven by the handling of claims against Ally, on the one hand, and the resolution of

the myriad inter-creditor disputes, on the other.  (Dubel Direct ¶ 19.)  Rather than confront these

issues in isolation, the Committee favored a "holistic approach."  (*Id*. at 20.)  The Committee

concluded that the likelihood of a settlement with Ally that maximized recoveries for all

stakeholders would be greatest if inter-Debtor and inter-creditor disputes could be settled or set

aside.  (*Id*. ¶ 20.)  The Committee believed that the alternative scenario, in which all inter-debtor

and inter-creditor conflicts were resolved through litigation, would destroy significant value for

all stakeholders and significantly delay the conclusion of these cases.  (*Id.*)  The Committee

resolved to pursue a global settlement with Ally and among creditors that reflected broad creditor

engagement and support.  (*Id.*; Nov. 20, 2013 Trial Tr. 121:21-25.)

       63.     In pursuit of this goal, the Committee directed its retained professionals to

perform three separate investigations and assessments:  (i) of the Original RMBS Settlement;

(ii) of the Pre-Petition PSA; and (iii) of the claims held by each creditor constituency against the

Estates and Ally.  (Dubel Direct ¶ 21.)  These inquiries, and the knowledge derived therefrom,

were prerequisites for any chance of a consensual outcome in the case:  they prepared the

Committee, its members, and other key stakeholders to pursue not only a settlement with Ally,

but also consensus among creditor constituencies without the need of further litigation.  *Id.*

64.    The Committee's investigations were exhaustive.  From June 2012 until early

2013, its Professionals reviewed more than ten million pages of documents and applied extensive

accounting, financial, economic, tax, and valuation expertise.  (Dubel Direct ¶ 35.)

65.    Based on its investigation, the Committee determined that the Estates held claims

against Ally based on alter ego/veil piercing, fraudulent conveyance, preferential transfer,

recharacterization, equitable subordination, breach of fiduciary duty, and aiding and abetting

breach of fiduciary duty.  (Dubel Direct ¶ 36.)  On April 11, 2013, the Committee filed a motion

seeking standing to prosecute and settle the claims it had identified against Ally on the Estates'

behalf.  *See Motion of the Official Committee of Unsecured Creditors for Entry of an Order*

*Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors'*

*Estates*, filed April 11, 2013 [Dkt. No. 3412] (the "**Committee STN Motion**").  (PX-852; Dubel

Direct ¶ 40.) [8]

66.    The Committee asserted in the Committee STN Motion that the Estates held a

veil-piercing claim against Ally under Delaware law, resulting from Ally's unjust operation of

the Debtors as a single economic entity with Ally.  (*See* PX-852 at 30-37.)  This veil-piercing

claim had the potential to "ascribe Ally with responsibility for *all* liabilities of the [E]states."

(Dubel Direct ¶ 36.)

---

[8] While the Creditors' Committee did not seek to pursue breach of contract claims against Ally, the JSNs have
contended that the Debtors had viable breach of contract claims against Ally for, *inter alia,*  misallocation of
revenues under the 2001 Master Mortgage Loan Purchase and Sale Agreement (the "Misallocation of Revenues
Claim") (*see* DX AJI, DX AXX); violation of a 2007 Mortgage Servicing Rights Swap Agreement (the "MSR Swap
Claim") (*see* DX AJO, DX AZJ), and violation of the 2009 Tax Allocation Agreement (the "Tax Allocation Claim")
(*see* DX APE, DX APX, DX ALF, DX AYZ, DX AJA, DX AZF).

ny-1118499

67.    The Committee also stated that the Estates held constructive and actual fraudulent transfer claims against Ally under Sections 544(b) and 548(a) of the Bankruptcy Code, in connection with Ally's seizure of control of Old GMAC Bank's mortgage assets.  (PX-852 at 37.)  Ally allegedly compelled ResCap to transfer the thrift charter and other assets of Old GMAC Bank to GM for no consideration, and simultaneously to sell Old GMAC Bank's remaining assets and mortgage business to Ally for $1.61 billion.  (*See id.* at 23.)  In return, ResCap received only non-voting interests in Ally Bank, the entity now holding the bank.  (*See id.*)

68.    The Committee identified a further fraudulent transfer claim against Ally under Sections 544(b) and 548(a) of the Bankruptcy Code in connection with Ally's execution in various swaps, including the "Fair Market Value Swap" and the "Net Funding Swap."  (PX-852 at 25, 37.)  According to the Committee, as a result of these swaps, Ally benefitted from guaranteed steady income for Ally, and simultaneously shifted MSR risk to the Debtor GMAC Mortgage, LLC ("**GMACM**").  (*See id.* at 25.)  The Committee alleged that the swaps required that GMACM make massive overpayments to Ally Bank and absorb other economic losses.  (*Id.*)

69.    The Committee also determined that, as of the Petition Date, the Estates held an indemnification claim based on the June 24, 2005 Operating Agreement (the "**Operating Agreement**") between GM, GMAC, and ResCap.  (*See* PX-852 at 38.)  The Operating Agreement provided that Ally "will, to the fullest extent permitted by law, indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GMAC Indemnifiable Liabilities."  (*Id.*)  Both "Losses" and "GMAC Indemnifiable Liabilities" were broadly defined and encompassed Debtor payments arising from:

- Losses related to claims based on the representations and warranties made by Ally and its non-Debtor subsidiaries in loans originated or acquired by Old GMAC Bank and Ally Bank (*see id* at 11, 38);

- Settlements with the Government Sponsored Enterprises ("**GSEs**") Freddie Mac and Fannie Mae, which Ally caused the Debtors to enter into in 2010, and through which Debtors assumed liability for nearly $800 million in settlement payments (*see id.* at 27); and

- Settlements entered into with federal regulators, the United States Department of Justice, and state attorneys general for which Debtors assumed all costs of performance pursuant to a letter agreement (the "**January 30 Letter Agreement**") entered into shortly before the bankruptcy, which shifted compliance costs to ResCap and GMACM, including hard dollar penalties and indemnity for all loan modifications (*see id.* at 28).

70.     Lastly, the Committee concluded that the Estates have an avoidance claim under Section 547(b) of the Bankruptcy Code for a preferential payment of $49 million to Ally Bank, which was made by the Debtor GMACM under the auspices of the indemnity provisions of the January 30 Letter Agreement.  (*See id.* at 38.)  According to the Creditors' Committee, Ally's counsel had conceded that the $49 million payment was an avoidable preference in a contemporaneous email.  (*See id.*)

### 3.     The SUN Trustee Standing Motion

71.     On April 19, 2013, Wilmington Trust, National Association, as indenture trustee for the Senior Unsecured Notes issued by ResCap, filed a motion seeking standing to prosecute claims on behalf of the ResCap estate, including fraudulent transfer, constructive trust, indemnification, contribution, and aiding and abetting breach of fiduciary duty claims against Ally, and breach of fiduciary duty claims against the directors and officers of ResCap.  (*See* PX-853 (the "**SUNs' STN Motion**").)

72.     Wilmington Trust, on behalf of the Senior Unsecured Noteholders, identified many of the same claims against Ally identified by the Committee.  Specifically, the SUNs' STN

Motion identified potential Debtors' claims against Ally for constructive and actual fraudulent

transfer claims against Ally, and indemnification claims arising from the Operating Agreement.

(*See* PX-853 at 15-17, 22-23.)

73.    The SUNs' STN Motion identified the following additional claims against Ally:

- A constructive trust against Ally relating to its ownership of Ally Bank, because Ally violated its promise not to engage in any transaction with the Debtors that would contravene the Operating Agreement (PX-853 at 16, 23);

- A claim for contribution from Ally in connection with the losses suffered by the Debtors as a result of Ally's actions relating to losses from government fines, settlement with the GSEs, and indemnification payments such as those made to Ally Bank (PX-853 at 17, 23);

- Recovery from Ally, resulting from the forgiveness of Debtors' subsidiaries' debts, which was done for the benefit of Ally, and with actual intent to hinder, delay or defraud the Noteholders and the Trustee (PX-853 at 16, 22-23);

- A claim against Ally for aiding and abetting directors and officers of the Debtors in breaching their fiduciary duties to the Debtors (PX-853 at 16, 23);

- A constructive trust against Ally for all property held by Ally (including cash, tax attributes, and other assets) which Ally explicitly or implicitly promised, in writing or otherwise, to hold for the benefit of the Debtors (PX-853 at 17, 23); and

- A claim against Ally by the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, relating to alleged breaches of the Senior Unsecured Notes Indenture (Dubel Direct ¶ 69).

### 4.    The Mediation Process Yields a Global Settlement

74.    In late 2012, the Debtors, Ally, and the Committee determined that formal

mediation could accelerate negotiations between the parties, forestall years of burdensome and

costly litigation, and push the cases towards resolution.  (Dubel Direct ¶ 41; Marano Direct ¶ 70.)

The Debtors, with the support of the Committee, requested the appointment of a mediator to

assist with the plan negotiation process.  (See PX-832.)  On December 26, 2012, this Court

entered an order appointing the Honorable James M. Peck as Mediator in these Chapter 11 Cases

to assist in plan negotiations, foster a dialogue with key stakeholders, and reach resolution of

significant plan issues (the "**Mediation**").  (PX-835.)  Between January 2013 and March 2013,

Judge Peck held a series of individual meetings, teleconferences, and discussions with the

Committee, the Debtors, each significant creditor constituency, and Ally.  (Dubel Direct ¶ 48.)

75.    The Mediation was designed by the Debtors and the Committee and approved by

this Court to encompass two major areas:  (i) the claims asserted by the Debtors' Estates and the

third-party claims held by individual creditors against Ally, and (ii) the inter-creditor and inter-

Debtor issues, including, but not limited to, those related to (a) the allocation of proceeds from

the sale of the Debtors' assets, (b) the validity of certain security interests, and entitlement, if

any, to post-petition interest and fees, (c) the allocation of administrative claims among the

Debtor entities, (d) the extent, validity and priority of various creditors' claims, and (e) the

treatment of intercompany claims under a plan, issues relating to fraudulent conveyances, and

subrogation claims.  (Kruger Direct ¶ 23.)

76.    As part of the Mediation, the Court put strict confidentiality protections in place,

which precluded the parties from disclosing the substance of any of the negotiations.  (Kruger

Direct ¶ 24; PX-835 at 2.)

77.    The Mediation involved intense, good faith, arm's-length negotiations conducted

among sophisticated parties with differing and conflicting interests.  (Kruger Direct ¶ 25; Dubel

Direct ¶ 43.)  It allowed the parties to meet in a confidential forum, and to articulate and present

their respective positions and interests.  (Kruger Direct ¶ 25.)

78.    The Mediation involved the Debtors' major creditor constituencies, including

Ally and the Creditors' Committee.  (Kruger Direct ¶ 26.)  Most, if not all, of those parties are

extremely sophisticated and were represented by experienced counsel and financial advisors who could advocate on their behalf. (Kruger Direct ¶ 34; Dubel Direct ¶ 46.)

79.    The negotiations spanned five months, commencing in January 2013. (Kruger Direct ¶ 27.) The creditors as a whole, including their lawyers and other advisors, were heavily involved in many intense negotiation sessions, calls and meetings, both in small and large groups, and both with Judge Peck present and without. (Kruger Direct ¶ 27; *see also* Dubel Direct ¶¶ 44-45, 48.)

80.    For example, on April 22 and 23, 2013, the Debtors participated in a "mediation summit" at the offices of Kramer Levin Naftalis & Frankel, LLP with Judge Peck, the Committee and its advisors, and the advisors and/or business level leads of each of the Debtors' major creditor constituencies. (Kruger Direct ¶ 28.) The April 22, 2013 session lasted approximately twelve hours, and the April 23, 2013 session lasted approximately nine hours. (Dubel Direct ¶ 49.) Over one hundred people attended, including representatives from over twenty different creditors or creditor groups, seventy attorneys and thirty financial advisors to the various parties. (Kruger Direct ¶ 28; Dubel Direct ¶ 49.) These creditor constituencies included, but were not limited, to the following parties:

- AIG;

- Allstate;

- Ally;

- the Committee;

- FGIC;

- FHFA;

- the Kessler Class Claimants;

- representatives of the Junior Secured Noteholders;

- representatives of the NJ Carpenters Class;

- MassMutual;

- MBIA;

- Paulson;

- Prudential;

- Deutsche Bank;

- BNY Mellon;

- US Bank;

- Wells Fargo;

- Law Debenture;

- HSBC;

- the Steering Committee Consenting Claimants;

- counsel to certain holders of the Senior Unsecured Notes;

- the Talcott Franklin Consenting Claimants; and

- Wilmington Trust.

(Kruger Direct ¶ 28.)

81.    Following the "mediation summit," there were numerous additional large group

mediation sessions in an effort to continue negotiations among the parties, and Judge Peck held

additional conference calls and smaller group meetings with certain parties-in-interest.  (Kruger

Direct ¶ 29; Dubel Direct ¶ 50.)

82.    The final terms of the Global Settlement set forth in the Plan Support Agreement

were hammered out in multiple hard-fought arm's-length negotiations in May.  (Kruger Direct ¶

ny-1118499

30.) There were numerous in-person meetings and conference calls, and two additional

marathon mediation sessions on May 9 and May 10, 2013, between the Debtors, the Committee,

Ally and other creditors. (*Id.*) Ultimately, on May 13, 2013, the Mediation yielded a global

compromise (the "**Global Settlement**"), which was documented in a plan support agreement and

term sheet (the "**Plan Support Agreement**" and "**Plan Term Sheet**," respectively) executed by

the Debtors, the Committee, a majority of the Debtors' creditor constituencies, and Ally. (PX-

855; Dubel Direct ¶ 51; Kruger Direct ¶¶ 30-31.) The Plan Support Agreement and Plan Term

Sheet called for, *inter alia*, Ally to provide the $2.1 billion Ally Contribution to the Debtors'

Estates in exchange for a global release of all estate and third-party claims made against Ally.

(PX-855 at 51-55.)

83.     Ally was willing to provide the Ally Contribution only in exchange for a global

resolution of its potential ResCap-related liability and an accompanying comprehensive set of

releases. (Direct Testimony of Michael A. Carpenter ¶ 26, dated November 12, 2013 [Dkt. No.

5695] ("**Carpenter Direct**").) A comprehensive settlement, including full debtor and third-party

releases and an injunction against such claims, was a *sine qua non* to Ally's agreement to enter

into the Plan Support Agreement. (Carpenter Direct ¶ 26; Nov. 20, 2013 Trial Tr. 93:11-16.)

84.     Following the execution of the Plan Support Agreement, the Debtors, the

Committee, Ally and the Consenting Claimants continued negotiations regarding the more

detailed terms of the settlements contemplated by the Plan Support Agreement. (Kruger Direct ¶

31; Dubel Direct ¶ 52.) This process culminated with a negotiation session beginning the

morning of May 22, 2013, lasting through the night and ending with the execution and filing of

the Supplemental Term Sheet (along with the Plan Support Agreement and Plan Term Sheet) at

approximately 9:00 a.m. on May 23, 2013. (Kruger Direct ¶ 31; Dubel Direct ¶ 53.)

85.    Thereafter, the Plan Proponents, in consultation with various parties in interest, drafted the Plan, which implemented and was consistent with the terms of the Plan Support Agreement and Term Sheets, as well as the related Disclosure Statement and motion seeking approval of the Disclosure Statement and solicitation procedures (the "**Disclosure Statement Motion**").  (Kruger Direct ¶ 32.)

86.    After further arm's-length negotiations among the parties to the Plan Support Agreement, on July 3, 2013, the Debtors filed the Plan, Disclosure Statement, and Disclosure Statement Motion.  (Kruger Direct ¶ 33.)  In response to both formal and informal objections from certain parties in interest, the Plan Proponents amended the Plan and Disclosure Statement on August 16, 2013 and August 20, 2013.  (*Id*.)  On August 23, 2013, the Court entered an order approving the Disclosure Statement, as amended, and authorizing the Plan Proponents to solicit votes on the Plan.  (Kruger Direct ¶ 33.)  Thereafter, the Plan Proponents commenced solicitation of votes on the Plan.  (*Id*.)

### B.    The Global Settlement and the Individual Plan Settlements

87.    The Plan settles numerous litigable issues in the Chapter 11 Cases pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code.  These settlements are in consideration for the compromises, distributions and other benefits provided under the Plan.  The Plan constitutes a compromise of all Claims, Equity Interests or Causes of Action relating to the contractual, legal and subordination rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such an Allowed Claim or Equity Interest.

88.    The Plan Support Agreement, as approved by the Court in its June 26, 2013 Order (*see* PX-857), sets forth the Parties' commitments and obligations with respect to the Plan Term

Sheet and Supplemental Term Sheet, attached as exhibits to the Plan Support Agreement.

(Kruger Direct ¶ 37.)  The Plan Support Agreement includes customary conditions for such

documents, such as an agreement to support a Plan that is consistent with the terms of the

Agreement, to negotiate in good faith to reach definitive documentation and to not take any

action that will delay or impede consummation of the Plan.  (Kruger Direct ¶ 37.)  The Plan

Term Sheet contemplates the incorporation of a settlement with Ally, pursuant to which Ally has

agreed to contribute value to the Debtors' Estates in exchange for releases from the Debtors, the

Committee and the Supporting Parties.  (Kruger Direct ¶ 37.)

89.    As noted above, the Ally Contribution facilitated the resolution of numerous inter-

Debtor, Debtor-creditor and inter-creditor disputes, and provided recoveries to all constituencies

of the Debtors' Estates, which were substantially enhanced over those contemplated by the

Debtors' original pre-petition settlement with Ally.  (Kruger Direct ¶ 38.)  Among other things,

the Plan resolves disputes relating to: (i) the RMBS Trust Claims; (ii) the claims asserted by

certain of the Monolines (*i.e.*, MBIA, FGIC, Ambac, Assured, and Syncora); (iii) the Private

Securities Claims; (iv) the claims held by Wilmington Trust, as indenture trustee for the Senior

Unsecured Notes; (v) the NJ Carpenters Claims; (vi) the division of assets (including the Ally

Contribution) among the Debtors' Estates; (vii) the division of expenses among the Debtors;

(viii) the settlement of Intercompany Balances, subrogation claims, and fraudulent conveyance

claims; and (ix) potential substantive consolidation litigation.  (Kruger Direct ¶ 38.)

90.    As the Plan embodies a Global Settlement of these issues, each of the Plan

Settlements is inextricably intertwined with all others, and the failure of any one settlement

would jeopardize the ability to consummate the Plan as a whole.  (Kruger Direct ¶ 39; Dubel

Direct ¶ 55.)  None of the Settling Parties would have reached agreement on a resolution of their

claims against the Debtors or the Ally Released Parties absent the other settlements embodied in

the Plan.  (Kruger Direct ¶ 39.)  For example, the Monolines would not have agreed to settle the

amount or allocation of the Monoline Claims against the Debtors and agreed to the Third Party

Release absent agreement among the parties as to, among other things:  (i) the amount of the

Ally Contribution, (ii) the settlement of the division of the Ally Contribution and administrative

expenses among the Debtor Groups, (iii) a settlement of issues relating to the substantive

consolidation of the Debtor Estates, and (iv) the treatment of Intercompany Balances and issues

relating to fraudulent conveyances and subrogation claims.  (*Id.*)  Likewise, none of the other

Consenting Claimants would have agreed to settle the amount and allocation of their Claims

against the Debtors and the Ally Released Parties absent an appropriate settlement of all other

Consenting Claimants' Claims against such parties and consensus regarding the treatment for

any other Claims in the Plan.  (*Id.*)  And Ally would not have agreed to fund the $2.1 billion Ally

Contribution absent consent by the Plan Proponents and each of the Consenting Claimants to the

Debtor and Third Party Releases embodied in the Plan.  (Kruger Direct ¶ 39; Carpenter Direct ¶¶

26-27.)

91.    After the Plan Support Agreement was executed, the Debtors and the Committee

continued to work to resolve significant contested litigation claims against the Estates.  (Kruger

Direct ¶ 40.)  As a result of these efforts, the Plan Proponents were able to resolve a substantial

number of contested claims, as well as the vast majority of formal and informal objections to the

Plan.  (*Id.*)  The result of those efforts is overwhelming support for the Plan from almost all of

the Debtors' creditor constituencies and other parties in interest.  (*Id.*)  After the entry into the

Plan Support Agreement, the Plan Proponents resolved the claims of Ambac, Assured, Syncora,

the Rothstein Plaintiffs, the RESPA Plaintiffs, the NCUAB, FHFA, Freddie Mac, Amherst, the

PBGC, Ocwen, and the Ad Hoc Group.  (*Id.*)

92.     Based on a settlement among the Plan Proponents, the Consenting Claimants,

Ally and certain of the Junior Secured Noteholders (the "**Consenting JSNs**"), the Consenting

JSNs have agreed to change their vote to a vote in favor of the Plan (discussed further at Section

VIII, *infra*).  Pursuant to the settlement with the Consenting JSNs, the Plan has been modified to

provide for the settlement and release of all secured and unsecured claims held by the Junior

Secured Noteholders, the Junior Secured Notes Indenture Trustee, and the Junior Secured Notes

Collateral Agent, including, but not limited to, any claims for principal, pre- and post-petition

interest, fees and expenses, indemnification claims, and other charges, in exchange for the Junior

Secured Notes Distribution.  This modification to the Plan is not material and does not require

resolicitation of the Plan.

93.     The Global Settlement and each of the settlements contemplated therein provide

benefits to the Estate.  (Kruger Direct ¶ 41.)  Litigation is inherently uncertain, time-consuming

and expensive.  (*Id.*)  By reaching these settlements, the Debtors have eliminated this risk and

uncertainty and quantified for the Estates' creditors the exposure for claims and litigation

costs.  (*Id.*)  These settlements will allow for numerous parties to recover from the Estates soon

after the Effective Date, and because these litigations are resolved, will benefit creditors at large

because it will allow for a greater percentage of funds to be distributed initially to the creditors

rather than held back in a disputed claims reserve until such time that these litigations were to be

resolved.  (*Id.*)

### 1.    The Ally Settlement

94.    The Ally Contribution facilitated the resolution of numerous inter-Debtor, Debtor-

creditor and inter-creditor disputes, and provided recoveries to all constituencies of the Debtors'

Estates, which were substantially enhanced over those contemplated by the Debtors' original

pre-petition settlement with Ally embodied in the Pre-Petition PSA.  (Kruger Direct ¶ 38.)  These

efforts resulted in an increase in the amount of the Ally Contribution from $750 million to $2.1

billion, and resolved claims that were not included in the original pre-petition settlement.  (Dubel

Direct ¶¶ 18, 60-73; Kruger Direct ¶¶ 42-45.)  These claims include those asserted in the

(i) Private Securities Litigation, (ii) Monoline Litigation, (iii) RMBS Trust Litigation, and

(iv) Borrower Litigation.  (Kruger Direct ¶¶ 56-112.)

95.    A fundamental characteristic of the Global Settlement and the Plan is that each

component of the deal is inextricable from the settlement as a whole, relying on and relating to

the others.  (Dubel Direct ¶ 55.)  The Global Settlement and Plan thus embody a mosaic of

interrelated settlements that cannot be fairly evaluated in isolation.  (*Id.*)

96.    The Global Settlement does not allocate the Ally Contribution by causes of

action.  (Kruger Direct ¶¶ 126-31.)  The Global Settlement allocates the Ally Contribution as

follows:  $782.74 million to the ResCap Debtors; $462.32 million to the GMACM Debtors;

$462.32 million to the RFC Debtors; $235 million to the Private Securities Claims Trust; $57.62

million to the Borrower Claims Trust; and $100 million for the NJ Carpenters Claims

Distribution.  (*Id*. ¶ 127.)

97.    Because the Ally Contribution resolves both estate and third-party claims against

the Ally Released Parties, and because certain claims and causes of action against the Ally

Released Parties may be asserted by more than one Debtor entity or third party, it would be

42

extremely difficult—if not impossible—to allocate the Ally Contribution to the Debtor Groups

on account of specific causes of action.[9]  (Kruger Direct ¶ 128.)

98.    Ally was unwilling to entertain negotiations unless such a negotiation was

premised on a global aggregation and release of claims, and Ally would not settle claims on an

individual or claim-by-claim basis.  (Dubel Direct ¶ 81.)

99.    Reallocation of the Ally Contribution on account of any number of variables

would not only threaten the Global Settlement as a whole, but also would be time consuming,

costly, and subject to challenge by all parties to the Global Settlement.  (Kruger Direct ¶ 128.)

Settling the allocation of the Ally Contribution through the Global Settlement was far superior to

litigating these issues.  (*Id.*)

100.    Under the terms of the Plan and the Global Settlement, there will be no allocation

of the Ally Contribution amongst the various causes of action that could have been asserted

against Ally.  (*See* PX-858.)

### 2.    The RMBS Settlement

101.    Another part of the Global Settlement, incorporated into the Plan, is the

allowance, priority and allocation of claims of approximately 1,100 RMBS Trusts (the "**RMBS**

**Settlement**").  (Kruger Direct ¶ 56.)

102.    In connection with their RMBS business, the debtors entered into a number of

agreements with the RMBS Trusts.  These agreements typically included representations and

warranties about the loans underlying the securities.  (Direct Testimony of Jeffrey A. Lipps ¶ 74,

dated November 12, 2013 [Dkt. No. 5701] ("**Lipps Direct**"); *see, e.g.*, PX-640 through PX-647

---

[9] The JSNs elicited testimony, however, that the Debtors never attempted to allocate the Ally Contribution on account of specific causes of action.  (Nov. 20, 2013 Trial Tr. 220:16-22.)  The JSNs argued that it was possible to allocate the Ally Contribution, and the Plan Proponents' failure to do so necessitated an allocation by the Court. (Phase II PTO at 75; Nov. 19, 2013 Trial Tr. 203:24-204:23.)

(representative RMBS transaction documents).)  The Debtors also frequently made contractual

commitments to act as servicer or master servicer for loans underlying the securities.  (Lipps

Direct ¶ 74.)  The RMBS Trustee for each Trust has primary authority to enforce the Trust's

rights, but, under certain circumstances (including when a certain percentage of investors,

usually 25%, act in concert), investors may direct the RMBS Trustee to pursue certain remedies

and, if the trustee fails to act, may pursue those remedies directly on behalf of the trust.  (*Id*. ¶

75.)

103.    Before the Petition Date, in the fall of 2011, a group of institutional investors

represented by Gibbs & Bruns LLP asserted contract claims on behalf of the RMBS trusts

against the Debtors for breaches of various agreements related to the Debtors' RMBS

securitizations.  (Lipps Direct ¶ 76.)  In the spring of 2012, another group of institutional

investors represented by Talcott Franklin P.C. asserted similar claims (the Gibbs & Bruns and

Talcott Franklin groups are referred to herein as the "**Institutional Investors**").  (*Id*.)  The

Institutional Investors also asserted claims against Ally under control person and other derivative

theories.  (*Id*.)  The RMBS Trustees for the RMBS Trusts ultimately filed consolidated proofs of

claim against the Debtors on behalf of the RMBS Trusts in which the Institutional Investors and

other holders invested.  (*Id*. ¶ 77.)[10]  In aggregate, the claims filed by the RMBS Trustees on

behalf of the RMBS Trusts involve more than one thousand RMBS trusts.  (*Id*.)

---

[10] The RMBS Trustee proofs of claim were admitted into evidence (for limited purposes) as PX-1219 (Claim Nos.
6451 through 6501 by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas
against all Debtors); PX-1222 (Claim Nos. 6706 through 6756 by Deutsche Bank National Trust Company and
Deutsche Bank Trust Company Americas against all Debtors); PX-956 (Claim Nos. 6758 through 6767 and 6772
through 6779 by Bank of New York Mellon Trust Co., N.A. against nine Debtors); PX-1223 (Claim No. 6757 by
Bank of NY Mellon as Master Servicer); PX-955 (Claim Nos. 6655 through 6705 by U.S. Bank National
Association against all Debtors); PX-1204 (Claim Nos. 5130 through 5145 by HSBC Bank USA, N.A. against
RFC); PX-1205 (Claim Nos. 5146 through 5255 by HSBC Bank USA, N.A. against GMAC Mortgage, LLC); PX-
954 (Claim Nos. 6604 through 6654 by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A.

104.    After extensive negotiations in early 2012, the Debtors entered into settlement

agreements with the Institutional Investors (the "**Original RMBS Settlement**"), covering 392

RMBS Trusts sponsored by the Debtors between 2004 and 2007 for an allowed unsecured claim

amount of $8.7 billion (with the potential for Trusts to opt out, in which case the allowed amount

would be reduced accordingly).  (Kruger Direct ¶ 58; Lipps Direct ¶ 78.)  The Original RMBS

Settlement was reached prior to Mr. Kruger's appointment as CRO.  (Kruger Direct ¶ 57.)  At the

time, the Debtors' management, in consultation with their advisors and Board of Directors,

entered into a settlement that it believed was in the best interests of the Debtors and important to

the success of these cases.  (*Id*.)  The Original RMBS Settlement ultimately permitted the

Debtors to (i) proceed with the sales of the Estates' assets in an orderly manner and (ii) resolve

objections regarding the severability of the Debtors' pooling and servicing agreements and the

appropriate priority of the RMBS Trusts' alleged origination-based claims to a future date or,

potentially, to avoid the dispute altogether.  (*Id*.)  The Original RMBS Settlement was subject to

this Court's approval under Bankruptcy Rule 9019.  (Lipps Direct ¶ 78.)  In connection with that

proceeding, the Debtors' expert, Frank Sillman, determined that the estimated lifetime losses for

these Trusts could range from $45.6 billion to $49.8 billion.  (PX-811, Declaration of Frank

Sillman ¶ 43, dated June 11, 2012.)

105.    As with the initial proposed contribution from Ally, however, the Original RMBS

Settlement faced objections from the Creditors' Committee and a number of creditor

constituencies, including MBIA, FGIC, Wilmington Trust, Assured, and the Ad Hoc Group.

(Kruger Direct ¶ 59; Dubel Direct ¶ 27.)  Confronted with those objections, the Debtors

determined that further negotiations were necessary.  Subsequent negotiations in connection with

---

against all Debtors); and PX-1220 (Claim Nos. 6553 through 6603 and 6502 through 6552 by Wells Fargo Bank,
N.A. as Master Servicer against all Debtors).

the Mediation ultimately resulted in the Global Settlement contained within the Plan, which

includes the modified RMBS Settlement.  (Kruger Direct ¶ 59.)  The RMBS Settlement

embodied in the Plan resolves claims asserted by the RMBS Trustees. (*see* Dubel Direct ¶¶ 60-

62; Kruger Direct ¶ 60.)

106.    The RMBS Settlement resolves:  (i) alleged and potential claims for breaches of

representations and warranties held by all RMBS Trusts; (ii) all alleged and potential claims for

damages arising from servicing; and (iii) any cure claims (which, if allowed, would be treated as

administrative expense claims), in exchange for Allowed Claims in the aggregate amount of

$7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the

RFC Debtors.  (Kruger Direct ¶ 56.)  As part of this settlement, the Plan provides for the

formation of an RMBS Claims Trust to facilitate distribution to the RMBS Trusts.  (*Id.*)  The

method for allocating this total allowed claim amount among the RMBS Trusts with allowed

claims is more fully described in Exhibits 9 and 13 to the Disclosure Statement, filed on August,

23, 2013 [Dkt. No. 4819-1].  (*See* PX-256 at 516-19, 614-17 of 664.)

107.    The RMBS Settlement contemplated by the Plan expands the scope of the

released claims, clarifies the treatment of RMBS Trusts with monoline insurance, and reduces

the total allowed claim amount for the RMBS Trusts.  (Kruger Direct ¶ 60.)  Altogether, the

RMBS Settlement in the Plan now provides for the release of claims by approximately 1,100

RMBS Trusts, including all of the RMBS Trusts that were the subject of the Original RMBS

Settlement.  (*Id.*)  The primary improvements in the RMBS Settlement are as follows:

(i)    The RMBS Settlement settles the claims of RMBS Trusts sponsored by

the Debtors from 1999 to 2004, in addition to those sponsored between 2004 and 2007;

(ii)    The RMBS Settlement releases the claims of RMBS Trusts that were not

sponsored by the Debtors, but that include loans sold by the Debtors as to which the

Debtors made representations and warranties;

(iii)    The RMBS Settlement settles all servicing and cure claims of all

participating RMBS Trusts;

(iv)    The RMBS Settlement now settles all cure claims of the RMBS Trusts

which, if allowed, would be treated as administrative expense clams; and

(v)    The total allowed claim amount has been reduced from $8.7 billion in the

Original RMBS Settlement to $7.3 billion.

(Kruger Direct ¶ 60; PX-875, Exhibit 17 at Schedules 2G through 4R.)

108.    For RMBS Trusts insured by a Monoline, the RMBS Settlement contemplates a

release of the insured RMBS Trusts' claims against the Debtors, while preserving those Trusts'

rights to seek payment from their respective Monoline, whose separate claims against the

Debtors are addressed in the monoline settlements.  (Kruger Direct ¶ 61.)  Generally speaking,

the RMBS Settlement allocates no payment from the RMBS Settlement Trust to insured RMBS

Trusts with respect to insured tranches for which the Monoline is expected to make full

payments.  (*Id*.; PX-875, Exhibit 17 at Schedules 2G through 3R.)

109.    The potential losses for RMBS Trusts asserting breaches of representations and

warranties range from $42.4 billion to $43.2 billion, excluding losses that are insured by a

Monoline.  (Direct Testimony of Frank Sillman ¶¶ 4, 15, dated November 11, 2013 [Dkt. No.

5703] ("**Sillman Direct**").)  Of that amount, $32.9 billion are historical losses to Debtor-

sponsored trusts and $1.45 billion represent historical losses in non-Debtor sponsored trusts that

correspond to the percentage of loans in those trusts sold by the Debtors.  (*Id*. ¶¶ 35, 38.)  The

additional forecasted losses range from $7.76 billion to $8.4 billion for the Debtor-sponsored

RMBS Trusts, and $0.3 billion to $0.4 billion for the portion of non-Debtor-sponsored RMBS

Trusts corresponding to the portion of loans sold by the Debtors.  (*Id.* ¶¶ 35, 39-40.)  Absent

settlement, the likely amount of recoverable damages for the RMBS Trusts' representation and

warranty claims, after consideration of legal defenses and litigation costs, ranges from $7.38

billion to $8.6 billion.  (Sillman Direct ¶ 60; Kruger Direct ¶ 62.)  This range does not account

for servicing claims and cure claims.  (*See, e.g.*, Sillman Direct ¶¶ 6, 13; Kruger Direct ¶ 87.)

110.    The RMBS Settlement is in the best interests of the Debtors' Estates and their

creditors.  (Kruger Direct ¶ 62.)  In addition to the potential recoverable damages, this finding

takes into account, among other things, the litigation risks with respect to defenses, including

subordination under Section 510(b) of the Bankruptcy Code, and the risk that substantial cure

claims of the RMBS Trusts could be allowed as administrative expenses.  (*Id.*)

111.    As part of the Global Settlement, the RMBS Trustees consented to the Third Party

Releases, which was a principal inducement to Ally in agreeing to the $2.1 billion contribution to

the Debtors' Estates.  (Kruger Direct ¶ 64.)

### a.    RMBS Attorneys' Fees

112.    The RMBS Settlement incorporated into the Plan includes and provides for

attorneys' fees in connection with the RMBS Settlement, known as the "Allowed Fee Claim."

(Kruger Direct ¶ 210; *see generally* Declaration of Nancy Mueller-Handal, dated November 12,

2013 [Dkt. No. 5688] ("**Mueller-Handal Direct**").)  The Allowed Fee Claim is 5.7% of the

Allowed RMBS Trust Claims, which shall be distributed to counsel to the Institutional Investors

as fees via direct allocation to counsel for the Institutional Investors and without conveyance to

the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts.  (Kruger Direct ¶ 210; *see*

*also* Declaration of Ralph R. Mabey ¶ 3, dated November 12, 2013 [Dkt. No. 5686] ("**Mabey Direct**").)

113.    As set forth in the Plan, the amount of the Allowed Fee Claim reduced the total Units distributed (and Cash distributed thereon) by the Liquidating Trust on account of RMBS Trust Claims to the RMBS Claims Trust, and has no impact on any other party entitled to a distribution under the Plan.  (Kruger Direct ¶ 211; Mueller-Handal Direct ¶ 16.)  No party has objected to the Allowed Fee Claim.  The Allowed Fee Claim is fair, reasonable, and appropriate under the circumstances of this case.  (Kruger Direct ¶ 212; *see generally* Mueller-Handal Direct; Mabey Direct.)

### b.    The RMBS Trustee Findings

114.    The RMBS Settlement, and thus the Global Settlement, contemplates that the order approving it will contain findings that the Plan, including the RMBS Settlement and the FGIC Settlement Agreement (discussed further at Section VI.B.3.a, *infra*), is in the best interests of the Investors in each RMBS Trust and each such RMBS Trust, and that the RMBS Trustees[11] acted reasonably, in good faith and in the best interests of the Investors in entering into the Plan Support Agreement, performing their obligations thereunder, and in agreeing to and performing under the Global Settlement and each of the settlements embodied therein.  (Second Am. Plan

---

[11] Unless otherwise noted, the term "RMBS Trustees" has the meaning ascribed to it in the Plan, to wit, BNY Mellon Trust Company and The Bank of New York Mellon ("**BNY Mellon**"); U.S. Bank National Association ("**U.S. Bank**"); Wells Fargo Bank, N.A. ("**Wells Fargo**"); Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (together, "**Deutsche Bank**"); Law Debenture Trust Company of New York ("**Law Debenture**"); and HSBC Bank USA, N.A. ("**HSBC**"), each solely in their respective capacities as trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or other similar agencies.  BNY Mellon, Deutsche Bank, and U.S. Bank, as RMBS Trustees, are also members of the Creditors' Committee.

49

ny-1118499

[Dkt. No. 5993-1], Art. IV.C.7.)[12]  No party in interest contested the entry of these findings during the Plan confirmation hearing.

> **(i)      Prior Approval of the FGIC Settlement and the Trustee Findings Related Thereto**

115.     The Court has already determined that the FGIC Settlement Agreement is in the best interests of the Debtors, their Estates, their creditors, the Investors in each RMBS Trust, the RMBS Trustees and all other parties in interest; and that the RMBS Trustees, in agreeing to the FGIC Settlement Agreement, acted reasonably, in good faith and in the best interests of the Investors in each Trust and each such Trust.  (*See Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among FGIC, the Debtors, the Trustees and the Institutional Investors*, dated September 20, 2013 [Dkt. No. 5125]; PX-872

---

[12] The Proposed Confirmation Order contains the following findings:

> The Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Debtors, their Estates, their creditors, the Investors in each RMBS Trust, each such RMBS Trust, the RMBS Trustees and all other parties in interest.  The RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement, including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the settlements embodied therein, including the RMBS Settlement and the FGIC Settlement Agreement.  The RMBS Trustees' Notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein, was sufficient and effective in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the transactions contemplated by each of the foregoing, including the releases given therein.  The findings of fact and conclusions of law set forth in this paragraph shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts (including the Investors in the RMBS of such RMBS Trusts) and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and Plan, including the RMBS Settlement and the FGIC Settlement Agreement.  In addition, the Allowed Fee Claim is reasonable and appropriate under the circumstances.

(Order Confirming First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, *et al*. and the Official Committee of Unsecured Creditors at I.JJ, dated November 18, 2013 [Dkt. No. 5855-1].)

ny-1118499

(*Memorandum Opinion and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Agreement*, dated September 13, 2013 [Dkt. No. 5042]).) [13]  No party in interest contested the entry of these findings during the Plan confirmation hearing.

>              (ii)    **The RMBS Trustees Retained and Relied on Experienced Financial Professionals and Sophisticated Counsel in Entering into the Settlement.**

116.    At the outset of these Chapter 11 Cases, certain RMBS Trustees retained Duff & Phelps, LLC ("**Duff & Phelps**") as their financial advisor in the bankruptcy.  Duff & Phelps was chosen by the RMBS Trustees over other qualified candidates after a rigorous interview process, because, among other things, it had extensive experience in mortgage loan servicing agreements and loan origination agreements, asset valuation, complex securitizations and RMBS loan repurchase actions. (Declaration of Fernando Acebedo ¶ 13, dated November 12, 2013 [Dkt. No. 5674] ("**Acebedo Direct**"); Declaration of Robert H. Major ¶¶ 16-17, dated November 12, 2013 [Dkt. No. 5677] ("**Major Direct**"); Declaration of Brendan Meyer ¶¶ 19-20, dated November 12, 2013 [Dkt. No. 5690] ("**Meyer Direct**"); Declaration of Thomas Musarra ¶ 16, dated November 12, 2013 [Dkt. No. 5675] ("**Musarra Direct**"); Declaration of Mamta K. Scott ¶¶ 14-15 , dated November 12, 2013 [Dkt. No. 5683] ("**Scott Direct**"); Declaration of Mary L. Sohlberg ¶ 15 & n.9, dated November 12, 2013 [Dkt. No. 5680] ("**Sohlberg Direct**").)  The RMBS Trustees also retained experienced and knowledgeable counsel and have been advised by counsel throughout these Chapter 11 Cases, including in connection with their consideration of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, and the FGIC Settlement Agreement.  (Major Direct ¶ 15; Meyer Direct ¶ 18; Scott Direct ¶ 13; Sohlberg Direct ¶ 15 n.19; Kruger Direct ¶ 185.)

---

[13] While the Ad Hoc Group appealed from the Court's order approving the FGIC Settlement Agreement, that appeal will be deemed resolved upon the effectiveness of the Plan.  (Second Am. Plan [Dkt. No. 5993], Art. IV.J.)

117.    Duff & Phelps assisted the RMBS Trustees with, among other things, the
identification, quantification, litigation and resolution of the RMBS Trust Claims.  (Acebedo
Direct ¶ 13; Major Direct ¶ 16; Meyer Direct ¶ 19; Musarra Direct ¶ 16; Scott Direct ¶ 14;
Sohlberg Direct ¶ 15.)

### (iii)    The Best Interests of the Investors in the RMBS Trusts

118.    In response to objections by two Investors to the manner in which the Allowed
Claim was to be allocated among the Original Settling RMBS Trusts in the Original RMBS
Settlement Agreement, Duff & Phelps evaluated the claim allocation methodology in the
Original RMBS Settlement Agreements, which would have allocated RMBS Representation and
Warranty Claims among the Original Settling RMBS Trusts *pro rata* on the basis of the sum of
the net losses that have been experienced and are estimated to be experienced by each such
RMBS Trust through the date of its termination.  (Major Direct ¶¶ 19, 21; Meyer Direct ¶¶ 17,
22; Musarra Direct ¶¶ 18, 20; Scott Direct ¶¶ 17, 19; Sohlberg Direct ¶¶ 17, 19.)  Based on Duff
& Phelps's suggestion, and after lengthy discussions with the Steering Committee Consenting
Claimants, the Debtors and other parties in interest, the claim allocation methodology in the
Original RMBS Settlement Agreements was modified (the "**Revised Claim Allocation
Methodology**") to provide for RMBS Representation and Warranty Claims to be allocated *pro
rata* based on differences among the RMBS Trusts with respect to (i) losses and (ii) the
incidence of breaches of representations and warranties, as revealed by loan sampling and
statistical work to be performed by Duff & Phelps.  (Acebedo Direct ¶ 31; Major Direct ¶ 22;
Meyer Direct ¶ 22; Musarra Direct ¶ 21; Scott Direct ¶ 20; Sohlberg Direct ¶ 19.)  In light of
Duff & Phelps' analysis, the RMBS Trustees concluded that the Revised Claim Allocation
Methodology was reasonable.  (Major Direct ¶ 22; Meyer Direct ¶ 22; Musarra Direct ¶ 22; Scott

Direct ¶ 20.)  Consistent with Duff & Phelps's recommendations, the Revised Claim Allocation

Methodology is part of the RMBS Settlement as embodied in Exhibits 9 and 13 to the Disclosure

Statement, filed on August, 23, 2013 [Dkt. No. 4819-1].  (*See* PX-256 at 516-19, 614-17 of 664.)

119.    Duff & Phelps also assessed the reasonableness of the $8.7 billion Allowed Claim

settlement consideration in the Original RMBS Settlement Agreements by reviewing a sample of

more than 6,500 mortgage loan files provided by the Debtors.  (Declaration of Allen M. Pfeiffer

¶ 18, dated November 12, 2013 [Dkt. No. 5682] ("**Pfeiffer Direct**").  In that review, Duff &

Phelps sought to identify breaches of representations and warranties made by the Debtors, and

used statistical methodologies to estimate the incidence of those breaches across the population

of mortgage loans in the RMBS Trusts.  (*Id.*)  Duff & Phelps also used historical information and

financial analyses to calculate the total present and projected future losses of the RMBS Trusts

that were associated with breaches of representations and warranties by the Debtors.  (*Id.*)[14]

Duff & Phelps concluded that the $8.7 billion settlement amount falls within the estimated range

of RMBS Representation and Warranty Claims for the Original Settling RMBS Trusts, which it

estimated at between $6.5 billion and $10.2 billion.  (Major Direct ¶ 24; Meyer Direct ¶ 24;

Musarra Direct ¶¶ 25-26; Scott Direct ¶ 21; Sohlberg Direct ¶ 21.)

120.    In the context of the Plan Mediation, the RMBS Trustees contemplated that the

resolution of RMBS Trust Claims should include the RMBS Representation and Warranty

Claims of all RMBS Trusts for which the Trustees acted, and not just the RMBS Representation

and Warranty Claims of the Original Settling RMBS Trusts.  (Acebedo Direct ¶¶ 16-17; Major

Direct ¶ 36; Meyer Direct ¶ 32; Musarra Direct ¶ 31; Scott Direct ¶ 30; Sohlberg Direct ¶ 32.)

---

[14] *See also* PX-1600-3 (Exhibit 6 to the Disclosure Statement For The Joint Chapter 11 Plan Proposed By
Residential Capital, LLC, *et al.*, and The Official Committee Of Unsecured Creditors) at ¶ 1 (explaining
methodology for calculating RMBS Representation and Warranty Claims).

The RMBS Trustees therefore worked with Duff & Phelps to identify these additional trusts (the

"**Additional Settling RMBS Trusts**"), calculate the range of RMBS Representation and

Warranty Claims for those trusts using the same methodologies employed to evaluate the

Original Settling RMBS Trusts' claims, and fold them into the RMBS Settlement.  (Major Direct

¶ 37; Meyer Direct ¶ 32; Musarra Direct 32; Scott Direct ¶ 31; Sohlberg Direct ¶ 33; *see also*

Second Am. Plan [Dkt. No. 5993-1], Art. IV.C.1 ("Modification of Original RMBS Settlement

Agreements").)

121.    Absent approval of the RMBS Settlement, the RMBS Representation and

Warranty Claims would have to be asserted, litigated and liquidated on an individual basis.

(Acebedo Direct ¶ 26; Major Direct ¶ 25; Meyer Direct ¶ 25; Musarra Direct ¶ 24; Scott Direct ¶

22; Sohlberg Direct ¶ 44.)  The RMBS Representation and Warranty Claims, if litigated on an

individual basis, would be subject to significant litigation risks and factual and legal defenses.

(Major Direct ¶ 25; Meyer Direct ¶ 25; Musarra Direct ¶ 24; Scott Direct ¶ 45; Sohlberg Direct ¶

44-45.)

122.    Negotiations in the Plan Mediation also led to the Servicing Claims of the RMBS

Trusts being wrapped into the RMBS Settlement.  (Acebedo Direct ¶ 18; Major Direct ¶ 39;

Meyer Direct ¶ 35; Musarra Direct ¶ 34; Scott Direct ¶ 33; Sohlberg Direct ¶ 36.)  Duff & Phelps

attempted to quantify the Debtors' liability as servicer related to: (i) misapplied and

miscalculated payments; (ii) wrongful foreclosure and improper loss mitigation practices; and

(iii) extended foreclosure timing issues caused by improper or inefficient servicing behavior such

as falsified affidavits, improper documentation, and improper collection practices.  (Acebedo

Direct ¶ 19; Major Direct ¶ 40; Meyer Direct ¶ 36; Musarra Direct ¶ 35; Scott Direct ¶ 34;

Sohlberg Direct ¶ 35.)  Duff & Phelps concluded that the potential liability of the Debtors as

Servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion, but that the assertion of such claims involved significant risk and uncertainty.  (Acebedo Direct ¶ 19; Major Direct ¶ 40; Meyer Direct ¶ 36; Musarra Direct ¶ 35; Scott Direct ¶ 34; Sohlberg Direct ¶ 35.)  Under the Plan, the servicing related claims are settled as "**RMBS Cure Claims**" and allowed in an aggregate amount of $96 million.  (Acebedo Direct ¶ 20; Major Direct ¶ 41; Meyer Direct ¶ 37; Musarra Direct ¶ 36; Scott Direct ¶ 35; Sohlberg Direct ¶ 36.)

123.    The Institutional Investors, which were represented by Kathy Patrick at Gibbs & Bruns LLP, Talcott Franklin of Talcott Franklin P.C., and Ropes & Gray, are themselves supporters of the RMBS Settlement, demonstrating that, in their judgment, the RMBS Settlement is in the best interests of the Investors in the Trusts, in which they are investors.  (Kruger Direct ¶ 184.)

### (iv)    The RMBS Trustees Acted in Good Faith and in the Best Interests of the Investors in Each RMBS Trust.

124.    The RMBS Trustees entry into the Plan Support Agreement, the Plan, the Global Settlement, and the RMBS Settlement is the result of months-long, arm's-length negotiations among many sophisticated parties and overseen by Judge Peck.  (Acebedo Direct ¶ 15; Major Direct ¶ 30; Meyer Direct ¶ 30; Musarra Direct ¶ 30; Scott Direct ¶ 28; Sohlberg Direct ¶ 25.)  Those agreements reflect the active participation and influence of the RMBS Trustees, their counsel, and Duff & Phelps.  (*See, e.g.*, Acebedo Direct ¶ 31 & Major Direct ¶ 33 (Trustees' influence on allocation of units); Meyer Direct ¶ 32 (inclusion of Additional Settling RMBS Trusts).)  The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential pursuant to the Mediation Order and cannot be disclosed in detail.  In general, however, the RMBS Settlement must be understood as part of an integrated Global Settlement that was the product of contentious, arm's-length negotiations conducted by and

among sophisticated parties (including the RMBS Trustees) with differing and conflicting

interests, each advised by sophisticated advisors, conducted under the close supervision and

guidance of a sitting bankruptcy judge.  (Acebedo Direct ¶ 15; Major Direct ¶ 30; Meyer Direct ¶

30; Musarra Direct ¶ 30; Scott Direct ¶ 28; Sohlberg Direct ¶ 25.)

125.    The RMBS Trustees acted professionally, reasonably, in good faith, and in the

best interests of the Investors in each RMBS Trust and each such RMBS Trust.  (Kruger Direct ¶

185; Major Direct ¶ 63; Meyer Direct ¶ 57; Musarra Direct ¶ 60; Scott Direct ¶ 28; Sohlberg

Direct ¶ 57.)  The RMBS Trustees are some of the largest and most sophisticated financial

institutions in the country.  (Kruger Direct ¶ 185.)  They were all represented by sophisticated

counsel and engaged with and were assisted by extremely competent and professional financial

advisors.  (*Id*.)

**(v)    The RMBS Trustees' Notice of the Plan Support
Agreement, the Plan, the Global Settlement, and the
RMBS Settlement.**

126.    Following the filing of the initial RMBS 9019 Motion, certain RMBS Trustees

jointly retained an agent, The Garden City Group, Inc. ("**GCG**"), to coordinate and facilitate

notice to Investors in the RMBS Trusts regarding the RMBS 9019 Motion, developments with

respect to the RMBS 9019 Motion, and other important events in the Chapter 11 Cases.

(Acebedo Direct ¶ 35; Major Direct ¶ 61; Meyer Direct ¶ 54; Musarra Direct ¶ 57; Scott Direct ¶

58; Sohlberg Direct ¶ 52.)  With the aid of GCG, the RMBS Trustees employed a robust notice

program during these Chapter 11 Cases that combines physical delivery of notices and notice

through the Trustee Website to ensure that all investors were provided notice of significant

developments affecting their interests.  (Acebedo Direct ¶¶ 34, 36; Major Direct ¶ 62; Meyer

Direct ¶¶ 55-56; Musarra Direct ¶¶ 56, 58; Scott Direct ¶¶ 59-60; Sohlberg Direct ¶¶ 53-54; *see*

56

*generally* Affidavit Regarding Dissemination of Notices and Information to RMBS Trust

Certificateholders of Jose C. Fraga, dated November 11, 2013 [Dkt. No. 5687] (describing notice

procedures); *see, e.g.*, PX-1507 through PX-1513, PX-1523, PX-1524, PX-1535, PX-1555

through PX-1557, PX-1580 through PX-1590 (various time sensitive notices provided to

investors).)

### 3.    Settlement of the Monoline Claims

127.    When the Debtors filed their bankruptcy petitions, certain of the Debtors were

defendants in fifteen lawsuits brought by Monolines, alleging that the Debtors committed fraud

and breached various representations and warranties in connection with the Monolines'

insurance policies.  (Lipps Direct ¶¶ 5, 54.)  In all, five Monoline insurers filed thirty-two proofs

of claim seeking tens of billions of dollars in realized and potential losses.  (*Id.* ¶ 5.)

128.    Monoline insurers also brought claims against Ally related to the Debtors' RMBS.

(Lipps Direct ¶ 71.)  FGIC and Assured Guaranty both filed pre-petition lawsuits seeking to hold

Ally liable under various "control person" theories for claims related to the debtors' RMBS, and

MBIA filed a post-petition lawsuit against Ally based on similar theories.  (*Id.*)  Assured

Guaranty and MBIA also asserted claims against Ally Securities arising from the Debtors'

RMBS. (*Id.*)  FGIC and Assured Guaranty also asserted claims against Ally Bank based on its

role as custodian and originator.  (*Id.*; *see also* PX-754.)  As discussed further in Section VII.B,

*infra*, these claims against Ally will be released under the Plan.  (Lipps Direct ¶ 71.)  The only

monoline insurers that have paid claims on Debtor-sponsored securitizations filed proofs of

claim in these cases, and the debtors are not aware of any other monoline insurers who may have

claims against the Debtors or Ally based on the debtors' RMBS business.  (*Id.* ¶ 72.)

a.      The FGIC Settlement

129.    In the Fall of 2011, FGIC filed a series of lawsuits against various Debtors and

Ally entities.  (Lipps Direct ¶ 61.)  When the Debtors filed for bankruptcy, FGIC had filed

twelve suits involving twenty RMBS securitizations.  (*Id.*)  All of the cases were assigned to

Judge Crotty in the U.S. District Court for the Southern District of New York and coordinated

under the lead case *Financial Guaranty Insurance Co. v. GMAC Mortgage LLC,* No. 11-cv-

09729-PAC (S.D.N.Y.).  (*Id.*)  These cases involved securitizations sponsored by RFC and

GMACM from 2005 through 2007.  (*Id.*)  FGIC then filed three proofs of claim against the

Debtors for approximately $1.85 billion.  (*Id.* ¶ 66; *see also* PX-951 through PX-953 ("**FGIC's**

**Proofs of Claim**").)  FGIC's Proofs of Claim describe FGIC's claims against the Debtors,

including FGIC's claims against ResCap ( the "**FGIC ResCap Claim**," and collectively the

"**FGIC Claims**").  (*Id.*; PX-750; PX-751.)  The FGIC Claims, including the FGIC ResCap

Claim, arise out of the insurance policies that FGIC issued in connection with the RFC- and

GMACM-sponsored securitizations.  (Direct Testimony of John S. Dubel on behalf of FGIC ¶ 8,

dated November 12, 2013 [Dkt. No. 5692] ( "**Dubel FGIC Direct**"); *see also* PX-719 through

PX-730; PX-754.)  These include claims for breaches of insurance and indemnity agreements

and, for a majority of the securitizations, fraudulent inducement to enter into the insurance and

indemnity agreements.

130.    FGIC's Claims are resolved through a separate FGIC settlement agreement,

entered into as of May 23, 2013 (the "**FGIC Settlement**"), which has already been approved by

the Court [Dkt. No. 5125].  The FGIC Settlement consists of three parts:  (i) the allowance of the

FGIC Claims against certain of the Debtors' Estates in the minimum aggregate amount of $596.5

million and a maximum potential aggregate amount of $1.79 billion comprised of a claim of

$596.5 million against each of three Debtor entities; (ii) the settlement, discharge and release by

the FGIC Trustees of FGIC's obligations under its Policies in exchange for, among other

consideration, a bulk cash payment of $253.3 million from FGIC to the FGIC Trusts; and (iii) the

release against the Debtors' Estates of the remainder of the FGIC Claims and the vast majority of

the FGIC Trusts' Claims, as well as a release of the FGIC Trusts' Claims against Ally.  (Kruger

Direct ¶ 67; Dkt. No. 5125 ¶ 4.)  The remainder of the FGIC Trusts' Claims is released pursuant

to the RMBS Settlement.  (Kruger Direct ¶ 67.)

     131.    The Plan provides that the FGIC Claims will be allowed in the following

amounts:  (i) $415 million against the RFC Debtors; (ii) $181.5 million against the GMACM

Debtors; and (iii) $337.5 million against ResCap.  The aggregate allowed amount of $934

million falls in the lower half of the range established by the minimum and maximum allowed

claims established in the FGIC Settlement.  (Kruger Direct ¶ 69; Second Am. Plan [Dkt. No.

5993-1], Art. IV.D.2.)  Upon the Plan Effective Date, Ally will also be released from the FGIC

Claims, with FGIC's support, pursuant to the Third Party Releases (as defined below).  (Kruger

Direct ¶¶ 69, 194; Second Am. Plan [Dkt. No. 5993-1], Art. IX.D.)

     132.    For the forty-seven RMBS Trusts for which FGIC provided insurance, the

potential covered bond losses (absent settlement) could have ranged from $1.64 billion to $1.71

billion, of which $1.01 billion are historical losses.  (Sillman Direct ¶¶ 93, 97-98; Kruger Direct

¶ 72.)  That amount does not include any amount for interest or indemnification of fees, costs,

and expenses.  (Sillman Direct ¶ 98.)  FGIC's likely amount of recoverable damages could have

ranged from $1.31 billion to $1.7 billion.  (Sillman Direct ¶ 101; Kruger Direct ¶ 72.)

     133.    The FGIC Settlement is in the best interests of the Debtors' Estates and their

creditors, and no contrary evidence was submitted that suggests otherwise.

### b.    The MBIA Settlement

134.    Prior to the Petition Date, MBIA sued Debtors RFC and GMACM in two actions

in New York Supreme Court.  Carpenter Lipps & Leland LLP, special litigation and discovery

counsel to the Debtors in these cases, represented the Debtors in that pre-petition litigation with

MBIA.  (Lipps Direct ¶ 55.)  Both cases involved extensive fact discovery and, in the RFC case,

the parties had exchanged the initial round of expert reports before the imposition of the

automatic stay.  (*Id*. ¶ 57.)  *MBIA Insurance Corp. v. Residential Funding Company, LLC*, which

was the first filed of those actions, illustrates the enormity and difficulty of litigation of the

Monoline Claims.  (Kruger Direct ¶ 75.)  In that litigation, RFC produced more than one million

pages of documents, including loan files for more than 63,000 mortgage loans.  (Kruger Direct ¶

75; Lipps Direct ¶ 57.)  MBIA took more than eighty days of depositions of ResCap personnel

over the course of more than a year and RFC took fifty days of depositions of MBIA personnel.

(Kruger Direct ¶ 75.)

135.    After the Debtors filed for bankruptcy, MBIA brought two additional lawsuits

related to the Debtors' RMBS securitizations.  (Lipps Direct ¶ 58.)  On September 14, 2012,

MBIA sued J.P. Morgan Securities LLC, as successor to Bear Stearns in Westchester County,

New York, asserting claims based on Debtors' RMBS that Bear Stearns underwrote.  That case

is captioned *MBIA Insurance Corp. v. JP Morgan Securities LLC*, No. 64676/2012 (Sup. Ct.

Westchester Cnty.).  (*Id*. ¶ 59.)  On September 17, 2012, MBIA sued various Ally entities in

Minnesota state court, and the defendants removed the case to federal court.  That case is

captioned *MBIA Insurance Corp. v. Ally Financial Inc.*, No. 12-cv-02563 (D. Minn.).  (*Id*. ¶ 60.)

136.    MBIA filed six proofs of claim against the Debtors for a total of approximately

$13.2 billion, of which $2.2 billion was asserted against ResCap, $2.2 billion was asserted

against GMACM and $2.2 billion was asserted against each of four RFC Debtors.  (Kruger

Direct ¶ 74; Lipps Direct ¶¶ 64-65.)[15]  As with FGIC, these claims generally alleged fraud and

breaches of representations and warranties in connection with the Policies written by MBIA to

insure principal and interest payments to bondholders in certain RMBS Trusts (the "**MBIA**

**Insured Trusts**").  (Kruger Direct ¶ 74; *see, e.g.*, PX-1211.)  MBIA sought to recover all

payments it has made under its Policies net of premiums received, as well as interest and

indemnification for fees, costs and expenses.  (Kruger Direct ¶ 74.)  It alleged that RFC and

GMACM aided and abetted each other's fraud and that ResCap was also liable for the same

damages under alter ego and aiding and abetting theories.  (*Id*.)

    137.    The Plan resolves the allowed amount and allocation of MBIA's claims and

avoids the need for further litigation between the Debtors and MBIA.  (Kruger Direct ¶ 76.)  The

Plan allows MBIA's claims as General Unsecured Claims in the amount of $719 million against

ResCap, $1.45 billion against GMACM, and $1.45 billion against RFC.  (Kruger Direct ¶ 76;

Second Am. Plan [Dkt. No. 5993-1], Art. IV.D.1.)  Under the RMBS Trust Allocation Protocol,

the MBIA Insured Trusts will not share in the distribution to the RMBS Trusts, except where

certain Insured Exceptions apply.  (Kruger Direct ¶ 76; PX-1600-3.)

    138.    Prior to entering into this settlement with MBIA (the "**MBIA Settlement**"), the

Debtors performed an analysis of MBIA's estimated potential lifetime losses, and determined

that a settlement of these claims represents a reasonable resolution of the novel and fact-intensive

issues that have already been the subject of several years of litigation and is in the best interest of

the Debtors' Estates and their creditors.  (Kruger Direct ¶ 77.)

---

[15]*See also* PX-1211 through PX-1216 (Claim Nos. 5846 through 5851 by MBIA against Homecomings, ResCap,
RFMSII, RFC, RAMP, and GMACM).

139.    For the twenty-six RMBS Trusts for which MBIA provided insurance, MBIA's

potential past and future exposure to cover bond losses ranged from $2.26 billion to $2.29

billion, of which $2.16 billion are historical losses.  (Sillman ¶¶ 102, 106-107; Kruger Direct ¶

78.)  That amount does not include any amount for interest or indemnification of fees, costs, and

expenses, which could be significant in light of the extensive pre-petition litigation.  (*Id*.)  The

likely amount of recoverable damages with respect to the Debtor-sponsored trusts ranges from

$1.81 billion to $2.29 billion.  (Sillman Direct ¶ 110; Kruger Direct ¶ 78.)

140.    The MBIA Settlement is in the best interests of the Debtors' Estates and their

creditors, and no contrary evidence was submitted that suggests otherwise.

### c.    The Assured Settlement

141.    Following the filing of the Plan, the Plan Proponents were also able to settle the

claims of Assured (the "**Assured Settlement**").  (Kruger Direct ¶ 80.)  The Assured Settlement

was then incorporated into the Plan and Disclosure Statement that was sent with the Solicitation

of votes on the Plan.  (*Id*.)

142.    On May 11, 2012, Assured sued several of the Debtors and their non-Debtor

affiliates in the Southern District of New York in a case captioned *Assured Guaranty Municipal

Corp. v. GMAC Mortgage LLC*, No. 12-cv-3776 (S.D.N.Y.).  (Lipps Direct ¶ 62.)  The Assured

suit involved one RFC-sponsored securitization and one GMACM-sponsored securitization.

(*Id*.)  Assured filed proofs of claim asserting $185.8 million in claims against the GMACM

Debtors and approximately $82.1 million in claims against the RFC Debtors and asserted claims

with respect to three RMBS Trusts for which Assured provided insurance.  (Kruger Direct ¶ 80;

Lipps Direct ¶ 68; Sillman Direct ¶ 84.)[16]  Of the $185.8 million in claims against the GMACM

---

[16] *See also* PX-1177 through PX-1189; PX-1195; PX1209 through PX-1210; and PX-1217 (the twenty proofs of

ny-1118499

Debtor, approximately $104 million relates to servicing claims.  (Kruger Direct ¶ 80; *see also* PX-953.)  The other $81.8 million asserted against GMACM and substantially all of the claims against RFC relate to alleged breaches of representations and warranties and/or fraud, and are similar to the claims asserted by FGIC and Ambac.  (Kruger Direct ¶ 80; PX-951 through PX-953; PX-1206 through PX-1208.)  Assured sought recovery of insured bond losses as well as interest, fees, and expenses with respect to Debtor-sponsored Trusts wrapped by Assured (the "**Assured Insured Trusts**"), on the basis of breach of representation and warranty and aiding and abetting theories.  (Kruger Direct ¶ 80; PX-1177 through PX-1189; PX-1195; PX1209 through PX-1210; PX-1217.)

143.    The settlement provides Assured with an allowed unsecured claim in the amount of $88,868,346 against GMACM and $57,950,560 against RFC.  (Kruger Direct ¶ 81.)  As with the other settling Monolines, Assured (and/or the Assured Insured Trusts) will not share in the distribution to the RMBS Trusts, except where certain Insured Exceptions apply.  (*Id*.; PX-1600-3.)

144.    Assured's estimated potential lifetime exposure to covered bond losses for the three Debtor-sponsored Assured Insured Trusts ranged from $73.6 million to $77.6 million, of which $70.5 million are historical losses.  (Sillman Direct ¶¶ 88-89; Kruger Direct ¶ 82.)  That amount does not include interest or indemnification for fees, costs, and expenses.  (Sillman Direct ¶ 89; Kruger Direct ¶ 82.)  The likely amount of recoverable damages with respect to the Debtor-sponsored trusts ranges from $58.9 million to $77.6 million.  (Sillman Direct ¶ 92; Kruger Direct ¶ 82.)  That $58.9 million to $77.6 million range is in addition to the $104 million

claim filed by Assured and its affiliates).

63

in servicing claims that Assured asserted against GMACM.  (Sillman Direct ¶¶ 84-85, 92;
Kruger Direct ¶ 82.)

145.    The Assured Settlement is in the best interests of the Debtors' Estates and their
creditors and no contrary evidence was submitted that suggests otherwise.

### d.    The Ambac Settlement

146.    Ambac's proofs of claim assert liquidated claims of $119.7 million against the
RFC Debtors and $85.6 million against the GMACM Debtors for Ambac's current obligations
on Ambac-insured bond losses.  (Kruger Direct ¶ 83; Lipps Direct ¶ 69; *see also* PX-1206
through PX-1208 (Ambac's proofs of claim).)  Ambac also asserts claims for unliquidated
amounts representing future bond losses and indemnification for costs and expenses, which
Ambac estimates exceeds $223 million in the aggregate.  (Kruger Direct ¶ 83; *see also* PX-1206
through PX-1208.)

147.    In connection with the Ocwen sale, Ambac objected to the assignment of
servicing rights with respect to Ambac-insured transactions and alleged that its cure claims could
range from $15.5 million to $26.2 million or more.  (Kruger Direct ¶ 84; *see, e.g.*, PX-877.)
Ambac had already taken the position that it had terminated or asserted an existing right to
terminate servicing for thirteen Trusts, and Ambac had further objected to the assignment of the
servicing for approximately fifty-six additional Ambac-insured transactions under the terms of
the Ocwen sale order.  (Kruger Direct ¶ 84.)  As a result, absent a negotiated or successfully
litigated resolution, the Debtors could not assign the servicing rights, or receive the payment
from Ocwen for outstanding advances and MSR that would otherwise be received in connection
with the assignment and assumption of the servicing for these transactions to Ocwen.  (*Id*.)  The
precise amount of the payment the Debtors would receive for advances and MSR varies monthly

for each Trust, and was estimated to be over $61 million for these Trusts as of September 30,
2013.  (Kruger Direct ¶ 84.)

148.    Ultimately, the Debtors and Ambac were able to reach a resolution of all of
Ambac's claims and its objection to the assignment and assumption of the servicing of the
Ambac insured transactions, pursuant to a Stipulation and Order approved by the Bankruptcy
Court on October 18, 2013 (the "**Ambac Settlement**").  (Kruger Direct ¶ 85; PX-877.)  The
Ambac Settlement provides Ambac with Allowed General Unsecured Claim amounts of
$207,315,815 against GMACM, and $22,800,000 against RFC subject to confirmation of the
Plan and the occurrence of the Effective Date.  (Kruger Direct ¶ 85; PX-877.)  Ambac insured
trusts will not share in the distribution to the RMBS Trusts, except where certain Insured
Exceptions apply.  (Kruger Direct ¶ 85; PX-1600-3.)

149.    The Ambac Settlement contemplates: (i) a transfer of a subset of the Ambac
insured transaction to a third-party servicer in exchange for the reimbursement to the Debtors of
the outstanding advances at an agreed upon percentage; (ii) the transfer of the balance of the
transactions to Ocwen for the purchase price provided for under the Ocwen Asset Purchase
Agreement; and (iii) the payment to Ambac of $750,000 as a cure claim.  (Kruger Direct ¶ 86;
PX-877 at 8-9, 11.)  The settlement further provides for the assignment of all the transactions to
Ocwen if certain deadlines are not met, but that is not expected to occur.  (Kruger Direct ¶ 86.)
Based on estimates as of September 2013, the Debtors will receive more than $61 million net of
the cure payment to Ambac under the stipulated settlement. (Kruger Direct ¶ 86; PX-877 at 8-9,
11.)  As with the above settlements, the Debtors entered into this settlement only after
determining that it was in the best interest of the Debtors' Estates and their creditors, and that it
was supported by the Committee. (Kruger Direct ¶ 86.)

150.    Ambac's estimated potential lifetime exposure to covered bond losses for the

sixty-six Debtor-sponsored Ambac Insured Trusts ranged from $201.5 million to $212.3 million,

of which $159.1 million are historical losses.  (Sillman Direct ¶¶ 75, 79-80; Kruger Direct ¶ 87.)

That amount does not include interest or indemnification of fees, costs, and expenses. (Sillman

Direct ¶ 80; Kruger Direct ¶ 87.)  The likely amount of recoverable damages with respect to the

Debtor-sponsored trusts ranges from $161.2 million to $212.3 million.  (Sillman Direct ¶ 83;

Kruger Direct ¶ 87.)  Mr. Sillman's analysis did not consider additional consideration the

Debtors received from Ambac, including the substantial reduction of Ambac's Cure Amount or

the direct benefits to the Debtors' Estates from resolving Ambac's objection to the Ocwen sale

that will enable the Debtors to transfer their mortgage servicing rights with respect to certain

Ambac-wrapped trusts which, based on estimates as of September 2013, is estimated to generate

more than $61 million in value for the Debtors' Estates (net of cure costs).  (Kruger Direct ¶ 87.)

151.    The Ambac Settlement is in the best interests of the Debtors' Estates and their

creditors and no contrary evidence was submitted that suggests otherwise.

### e.    The Syncora Settlement

152.    Syncora Guaranty Inc.'s ("**Syncora**") most recent Second Amended Proof of

Claim asserts claims totaling at least $83.4 million against the RFC Debtors and $216.6 million

against the GMACM Debtors.  (Kruger Direct ¶ 88; Lipps Direct ¶ 70; *see also* PX-1329

(Syncora's proofs of claim).)  The claims against RFC relate to alleged breaches of

representations and warranties and breach of servicing obligations with respect to one trust

sponsored and serviced by the Debtors.  (Kruger Direct ¶ 88; *see also* PX-1329.)  The claims

against GMACM allege breach of servicing obligations with respect to two non-Debtor-

sponsored trusts for which GMACM is a loan servicer.  (*Id.*)  Syncora seeks recovery of insured

bond losses as well as interest, fees, and expenses, including remediation expenses, with respect

to the trusts wrapped by Syncora (the "**Syncora Insured Trusts**"). (*Id.*) Syncora filed two

objections to the sale to Ocwen of servicing agreements related to the Syncora Insured Trusts

serviced by GMACM. (Kruger Direct ¶ 88.)

153.    The settlement with Syncora (the "**Syncora Settlement**") provides that the

Debtors will pay to Syncora a cure amount of $4.5 million in connection with the assumption

and assignment of servicing agreements to Ocwen. (Kruger Direct ¶ 89.) The Syncora

Settlement also provides that Syncora's claims against GMACM and RFC will be reduced and

allowed as General Unsecured Claims of approximately $7.8 million against GMACM and

approximately $7.1 million against RFC. (*Id.*) As with the other settling Monolines, Syncora

(and/or the Syncora Insured Trusts) will not share in the distribution to the RMBS Trusts, except

where certain Insured Exceptions apply. (Kruger Direct ¶ 89; PX-1600-3.) Instead, Syncora will

receive *pro rata* shares of the GMACM Debtors Unit Distribution and the RFC Debtors Unit

Distribution. (Kruger Direct ¶ 89.)

154.    The Debtors entered into this settlement only after determining that the Syncora

Settlement was in the best interest of the Debtors' Estates and their creditors, and was supported

by the Committee. (Kruger Direct ¶ 90.)

155.    Syncora's proof of claim was the subject of a pending objection at the time of

settlement, and Syncora's objection to the sale of servicing rights to Ocwen was also still

pending. (Kruger Direct ¶ 91.) The outcome of that objection was uncertain.

156.    Among other things, the Debtors asserted that Syncora's claims were time-barred

and also disputed that Syncora could recover the full extent of bond losses based on the alleged

breaches of GMACM's servicing obligations. (Kruger Direct ¶ 91.) Syncora's relatively lower

recovery on its claims, as compared to the other Monolines, is reasonable in light of the strength

of the Debtors' objection to Syncora's claims.

157.    The Syncora Settlement is in the best interests of the Debtors' Estates and their

creditors and no contrary evidence was submitted that suggests otherwise.

### 4.    Private Securities Litigation Settlements

158.    Before the Debtors filed for bankruptcy, private securities investors had brought

seventeen lawsuits against one or more of the Debtors.[17]  These lawsuits asserted claims for state

and federal securities law violations, common law fraud, and negligent misrepresentation based

on alleged material misstatements in the Debtors' RMBS registration statements and

prospectuses.  (Lipps Direct ¶ 16; *see also id.* ¶ 17 (listing the seventeen pre-petition securities

cases).)  Collectively, these lawsuits involved more than one hundred RMBS securitizations, and

a combined original principal balance of more than $100 billion.  (*Id.* ¶ 18.)  As of the Petition

Date, these lawsuits were mostly in the pleading stage or in early stages of discovery, and

discovery had not been completed in any of the cases.  (*Id.* ¶ 19.)  One of the cases—filed by

Thrivent Financial for Lutherans—was settled before the Petition Date in a settlement that

covered both debtors and non-debtor Ally entities.  Seven of these cases have survived pre-

answer motions to dismiss in whole or substantial part.  (*Id.*)  Twelve of the suits also asserted

claims against certain Ally entities.  (*Id.* ¶ 20.)  These claims were based on alleged

misstatements in the Debtors' offering materials.  (*Id.*)  The claims against Ally are based on

Ally's roles as sellers or underwriters of the Debtors' securities, as "control persons" over the

Debtors under federal and state securities laws, and under various common law aiding and

abetting or joint liability theories.  (*Id.*)

---

[17] *See* PX-610, PX-653 through PX-665, PX-667, and PX-670 through PX-671 (initial pleadings in those lawsuits).

159.     In addition to these pending cases, nine private securities investors entered into pre-petition tolling agreements with the Debtors and Ally.  (Lipps Direct ¶ 21.)

160.     One part of the Global Settlement incorporated in the Plan is the resolution of the ongoing private securities litigation related to the Debtors' RMBS business.  (Kruger Direct ¶ 92.)  The Plan provides for the settlement of federal and state securities law claims asserted by twenty large institutional investors in RMBS certificates who either filed suits against Ally and the Debtors or entered into tolling agreements with them (the "**Private Securities Claims Settlement**") and the settlement of a federal class action brought on behalf of purchasers of fifty-nine Debtor RMBS offerings (the "**NJ Carpenters Settlement**").  (*Id.*)  The underlying claims raise novel and difficult legal issues.  (*Id.*)  Similar litigations have taken several years, only to result in substantial settlements.  (*Id.*)  The Debtors' potential exposure in these cases is significantly larger than the settlement amounts that would be paid under the Plan, and continued litigation would be extremely expensive.  (*Id.*)

### a.     The Private Securities Claims Settlement

161.     The Private Securities Claims Settlement resolves certain private securities claims against the Debtors and Ally arising from the purchase or sale of RMBS, asserted by parties who either filed pre-petition lawsuits against the Debtors and Ally (including Ally Securities, LLC ("**Ally Securities**")) within the relevant limitations period or who entered into pre-petition tolling agreements with Ally and the Debtors.  (Kruger Direct ¶¶ 93-94; Declaration of Susheel Kirpalani ¶ 1, dated November 12, 2013 [Dkt. No. 5681] ("**Kirpalani Direct**").)  The Private Securities Claimants include twenty entities, or groups of affiliated entities.  (Kruger Direct ¶ 93; Lipps Direct ¶ 22; *see also* Second Am. Plan [Dkt. No. 5993-1], Art. I.A.223.)

ny-1118499

162.    The Private Securities Claimants are:  (i) AIG; (ii) Allstate; (iii) Asset

Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, and AMF Ultra Short

Mortgage Fund; (iv) Bank Hapoalim B.M.; (v) Cambridge Place Investment Management, Inc.,

in two capacities based on separate actions; (vi) Deutsche Zentra-Genossenschaftsbank, New

York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust; (vii) Federal Home Loan Bank

of Boston; (viii) Federal Home Loan Bank of Chicago; (ix) Federal Home Loan Bank of

Indianapolis; (x) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank

AG New York Branch, HSH Nordbank Securities S.A.; (xi) Huntington Bancshares Inc.;

(xii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation; (xiii) John Hancock

Life Insurance Company (U.S.A.); (xiv) MassMutual; (xv) Principal Life Insurance Company,

Principal Funds, Inc., Principal Variable Contracts Funds, Inc.; (xvi) Prudential; (xvii) Sealink

Funding Limited; (xviii) Stiching Pensioenfonds ABP; (xix) The Union Central Life Insurance

Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company; and (xx) the Western

and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus

Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance

Company, and Fort Washington Investment Advisors, Inc.  (Kruger Direct ¶ 94; Lipps Direct ¶

22.)

163.    The Plan provides for, establishes, and funds a private securities claims trust (the

"**PSC Trust**") to resolve claims filed by these twenty private securities investors.  (Kruger Direct

¶ 97; Lipps Direct ¶ 22; Kirpalani Direct ¶¶ 8, 15.)  In total, the Private Securities Claims

Settlement resolves approximately $2.429 billion of securities law claims against the Debtors

and Ally, including approximately $1.409 billion in aggregate asserted securities law claims

against Ally Securities, arising from the Debtors' loan origination activities and the structuring,

sponsoring, underwriting, and sale of RMBS.  (Kruger Direct ¶ 95; Kirpalani Direct ¶ 13; *see
also* Lipps Direct ¶¶ 25-47 (outlining each proof of claim resolved by the Private Securities
Claims settlement).)  The Private Securities Claim Settlement also provides for the release of
claims against Ally and its affiliates by the Private Securities Claimants.  (Kruger Direct ¶ 95.)
The Ally Contribution would not have been possible without this release, among others.  (*Id.*)

164.   On the Effective Date, the PSC Trust will receive units from the Liquidating Trust
with estimated value of $235.0 million in aggregate.  (Kruger Direct ¶ 97; Lipps Direct ¶ 24.)
Distributions from the Private Securities Claims Trust will be allocated among the Private
Securities Claimants as they have agreed among themselves according to the PSC Trust
agreement governing the operation of the PSC Trust.  (Kruger Direct ¶ 97; Lipps Direct ¶ 24; *see
also* PX-875 (the PSC Trust Agreement).)  The Private Securities Claimants will forego any
other recovery from the Debtors or the Liquidating Trust in respect of their Private Securities
Claims.  (Kruger Direct ¶ 97.)

165.   The Private Securities Claims Settlement avoids significant litigation regarding
some of the largest claims asserted against the Debtors, including litigation over the validity and
value of the Private Securities Claims and whether such claims should be subordinated pursuant
to Section 510(b) of the Bankruptcy Code.  (Kruger Direct ¶ 96; Kirpalani Direct ¶ 14.)

166.   The settlement of these private securities claims is in the best interests of the
Debtors' Estates and their creditors because, among other reasons, the settlement provides a
global resolution for twenty different large and uncertain claims against the Debtors.  (Kruger
Direct ¶ 98.)  Continued litigation over those claims would be burdensome and time-consuming,
and the result would be uncertain.  (Kruger Direct ¶ 98; Kirpalani Direct ¶ 14.)  This
determination is confirmed by the opinion of Lucy P. Allen, one of the Debtors' experts for Plan

Confirmation.  (Kruger Direct ¶ 98; *see* Corrected Direct Testimony of Lucy Allen, dated

November 19, 2013 [Dkt. No. 5879-1] ("**Allen Direct**").)  Ms. Allen is a Senior Vice President

of NERA, a member of NERA's Securities and Finance Practice, and an expert in estimating

damages and analyzing settlement in securities litigation cases.  (Allen Direct ¶¶ 6-7.)  Ms. Allen

employed several different commonly employed metrics to compare the Private Securities

Claims Settlement with every identified publicly available RMBS-related securities litigation

settlement.  (*Id.* ¶¶ 3-5, 10-12.)  Based on Ms. Allen's analysis, the proposed settlement amount

of $235 million for these claims is consistent with, and within the range of, other recent

settlements in comparable RMBS-related litigation.  (Allen Direct ¶¶ 3-5; Kruger Direct ¶ 98.)

The treatment of the Private Securities Claims under the Plan was a key component of the Global

Settlement without which the Ally Contribution and other benefits under the Global Settlement

would not be realized.  (Kruger Direct ¶ 98.)

### b.        The NJ Carpenters Settlement

167.     The Plan also settles an ongoing securities class action filed against Ally, certain

Debtors and their former officers and directors, *New Jersey Carpenters Health Fund v.*

*Residential Capital LLC*, No. 08 Civ. 8781 (HB) (S.D.N.Y.).  (Kruger Direct ¶ 99; *see also* PX-

957 (proofs of claim filed by New Jersey Carpenters Health Fund and New Jersey Carpenters

Vacation Fund); PX-676 (the New Jersey Carpenters settlement agreement).)  The NJ Carpenters

complaint asserted claims against ResCap, RFC, RALI, Ally Securities, Bruce J. Paradis,

Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David

M. Bricker, James N. Young, and several unaffiliated underwriters on behalf of a class of

investors in fifty-nine of the Debtors' RMBS securitizations with original principal balance of

over $38 billion and claimed losses of approximately $13 billion.  (Kruger Direct ¶ 99; Lipps

Direct ¶ 48.)  Although the Debtors dispute these claims, they are a source of significant

potential liability.  (Kruger Direct ¶ 99.)  The Plan resolves these claims for a distribution of

$100 million.  (*Id.*)

168.    The District Court approved the NJ Carpenters Settlement on October 7, 2013.

(Lipps Direct ¶ 48; *see also* PX-677 (Judge Baer's order approving settlement).)  Reasonable

costs of class notice and administration (estimated to be $450,000) were advanced by the

Debtors pursuant to authorization by the Bankruptcy Court, and these amounts will be deducted

from the NJ Carpenters Claims Distribution.  (Kruger Direct ¶ 100; Lipps Direct ¶ 48.)  If

members of the class opt out of the settlement class, they will be ineligible to share in the

settlement distribution.  (Kruger Direct ¶ 100.)  To the extent such opt-outs have allowed claims

against the Estates, or if the settlement is not approved and any class members have allowed

claims against the Estates, such claims will be treated as General Unsecured Claims, provided

that they may be subject to contractual, legal, or equitable subordination.  (*Id.*)

169.    The NJ Carpenters Settlement is in the best interests of the Debtors' Estates and

their creditors.  (Kruger Direct ¶ 101.)  Like the Private Securities Claims Settlement, the NJ

Carpenters Settlement resolves highly uncertain and potentially burdensome litigation.  (*Id.*)  Ms.

Allen employed several different commonly employed metrics to compare the NJ Carpenters

Settlement with every identified publicly available RMBS-related securities litigation settlement.

(Allen Direct ¶¶ 3-5, 10-12.)  Based on Ms. Allen's analysis, the proposed settlement amount of

$100 million for these claims is consistent with, and within the range of, other recent settlements

in comparable RMBS-related litigation.  (Allen Direct ¶¶ 3-5; Kruger Direct ¶ 98.)

### c.    The Kessler Settlement

170.    The Plan also contemplates a resolution of claims asserted against the Debtors in

*In re: Community Bank of Northern Virginia Second Mortgage Lending Practices Litigation*, a

multidistrict proceeding filed in the United States District Court for the Western District of

Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386 (the "**Kessler**

**Class Action**").  (Kruger Direct ¶ 104.)  The multidistrict proceeding involves several putative

class actions related primarily to some 44,535 second mortgage loans originated to borrowers

nationwide and acquired by RFC and alleges violations of various consumer protection statutes.

(*Id.*)  The named plaintiffs in the Kessler Class Action filed proofs of claim on behalf of the

putative class against Debtors RFC, ResCap, GMACM and GMAC-RFC Holdings Company,

LLC.  (*Id.*; PX-962 through PX-964 (Proofs of Claim); Direct Testimony of William R.

Thompson ¶ 25, dated November 12, 2013 [Dkt. No. 5713] ("**Thompson Direct**").)  The Kessler

Class Action has been pending against the Debtors for over ten years, and is one of the largest

putative Borrower class actions pending against the Debtors.  (Kruger Direct ¶ 104.)  In the

Kessler Class Action and in the class proofs of claims, the claimants allege in excess of $1.87

billion of damages.  (*Id.*)

171.    In connection with the Plan mediation process and the continuation thereof

following the execution of the Plan Support Agreement, and through intensive good faith and

hard fought negotiation, on or about June 27, 2013, certain of the Debtors and representatives of

the named plaintiffs in the Kessler Class Action entered into a settlement agreement (the

"**Kessler Settlement**") resolving the Claims asserted against the Debtors in connection with the

Kessler Class Action.  (Kruger Direct ¶ 105; *see also* PX-864.)  The settlement provides for the

reduction and allowance of the class proofs of claims in the amount of $300 million claim

74

against RFC only.  (*Id.*)  On July 31, 2013, the Debtors and representatives of the named

plaintiffs filed a joint motion for preliminary and final approval of the Kessler Settlement

Agreement, which among other things seeks to certify the class under Bankruptcy Rule 7023 for

settlement purposes only and related relief.  (Kruger Direct ¶ 105; *see also* PX-864.)  On

August 23, 2013, the Court granted preliminary approval of the settlement.  (Kruger Direct ¶

105.)

172.    This settlement is fair and reasonable, and in the best interests of the Debtors'

Estates and their creditors.  (Kruger Direct ¶ 106.)  The Court approved the Kessler Settlement

on November 27, 2013.  (*See Final Order Pursuant to Fed. R. Civ. P. 23 and Fed. R. Bankr. P.

9019 Approving the Settlement Agreement Between the Kessler Settlement Class Members and

the Settling Defendants and Granting Related Relief*, dated November 27, 2013 [Dkt. No. 5968].)

### d.      The SUNs Settlement

173.    The Plan also provides for a settlement of claims that the Senior Unsecured Notes

Indenture Trustee, on behalf of the Senior Unsecured Noteholders (the "**SUNs**"), has against

Ally and certain Debtors.  (Kruger Direct ¶ 102.)  The claims related to, among other things, a

breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap Estate

against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the

benefit of Ally.  (*Id.*)

174.    The Plan provides the SUNs with an allowed claim of $1.003 billion against

ResCap.  (Kruger Direct ¶ 103.)  This allowed claim is fair and reasonable and in the best

interests of the Debtors' Estates and their creditors.  (*Id.*)

ny-1118499

### e.    National Credit Union Administration Board Settlement

175.    The NCUAB submitted a proof of claim as liquidating agent for U.S. Central

Federal Credit Union and ten proofs of claim as liquidating agent for Western Corporate Federal

Credit Union.  (Lipps Direct ¶ 51.)  The proofs of claim were based on allegations contained in

*National Credit Union Administration Board v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D.

Cal.), and *National Credit Union Administration Board v. RBS Securities, Inc.*, No. 11 Civ. 2340

(D. Kan.).  (*Id*.)  The proofs of claim total approximately $293 million.  (*Id*.)  The Debtors and

the NCUAB have reached a settlement under which NCUAB would receive allowed general

unsecured claims of $78 million against the RFC Debtors.  (*Id*; PX-639.)  On October 28, 2013,

the Debtors filed a separate motion for approval of the NCUAB settlement under Bankruptcy

Rule 9019, and the Court approved the settlement after an evidentiary hearing held on November

25, 2013.  (*Order Granting Debtors' Motion for Approval of the Settlement Agreement Between

the Debtors and the National Credit Union Administration Board as Liquidating Agent for

Western Corporate Federal Credit Union and U.S. Central Federal Credit Union*, dated

November 26, 2013 [Dkt.  No. 5955].)

### 5.    The FHFA Settlement

176.    On November 30, 2012, the FHFA filed six proofs of claim against certain of the

Debtors (the "**FHFA Claims**").  (Kruger Direct ¶ 117; Lipps Direct ¶ 49.)  These claims are

based on the FHFA's pre-petition complaint against Ally and the Debtors in *Federal Housing

Finance Agency v. Ally Financial, Inc.*, No. 11 Civ. 7010 (S.D.N.Y.) (the "**FHFA Litigation**").

(*Id*.)  The FHFA asserts claims based on Freddie Mac's purchase of over $6 billion of Debtor-

sponsored RMBS.  (*Id*.)  The FHFA has asserted that the FHFA Claims or some portion thereof

are entitled to be treated as priority claims under the Housing and Economic Recovery Act of 2008 ("**HERA**"), as codified in 12 U.S.C. §§ 4617(b)(15). (Kruger Direct ¶ 117.)

177. The Plan Proponents have reached an agreement with Ally that settles the FHFA Claims and related issues. (Kruger Direct ¶ 118.) Pursuant to this settlement, the Plan will grant the FHFA an "FHFA Allowed Claim" of $1.2 billion against RFC, entitling it to a cash payment of approximately $24 million (the "**FHFA Settlement**"). (Kruger Direct ¶ 118.) The FHFA Settlement will secure the FHFA's support for the Plan. (*Id.*) The FHFA has also reached a separate settlement with Ally that resolves the FHFA's claims against Ally and affiliated non-Debtor defendants in the FHFA Litigation, which claims are not subject to the Plan's Third Party Release. (*Id.*) That settlement is not contingent on Plan confirmation. (*Id.*) Under the FHFA Settlement, the FHFA has assigned to Ally its right to receive distributions on account of its Allowed Claims.

178. The FHFA Settlement is a favorable resolution of these claims for the Debtors. (Kruger Direct ¶ 119.) The claims presented a substantial potential liability and uncertainty for the Debtors. (*Id.*) While the Debtors do not believe that HERA entitles the FHFA Claims to priority, uncertainty over litigation of that issue presented a substantial risk to the successful resolution of the Debtors' bankruptcy cases. (*Id.*) The FHFA Settlement would also avoid complicated litigation over the subordination of the FHFA Claims pursuant to Section 510(b) of the Bankruptcy Code. (*Id.*)

179. The Court approved the FHFA settlement on November 25, 2013. (Nov. 25, 2013 Trial Tr. 89:2-4.)

### 6.     The Settlement of Issues Relating to Subordination of Claims

180.     The Global Settlement also resolves any question that the RMBS Trust Claims, the Monoline Claims, and the Private Securities Claims must be subordinated to all general unsecured claims pursuant to Section 510(b) of the Bankruptcy Code.

181.     As part of the Plan, the Debtors settled the RMBS Trust Claims (Kruger Direct ¶ 56), each of the Monoline Claims, including FGIC's (*id.* ¶ 67), MBIA's (*id.* ¶ 76), Assured's (*id.* ¶ 81), Ambac's (*id.* ¶ 85), Syncora's (*id.* ¶ 89), and the Private Securities Claims (*id.* ¶ 92). Pursuant to each settlement and the terms of the Plan, none of the claims are subordinated. For the reasons stated above in Section VI.B, each settlement was reasonable.

### 7.     Compromise of the Intercompany Balances

182.     Another part of the Global Settlement incorporated into the Plan is the compromise of intercompany payables and receivables among various Debtor entities (the "**Intercompany Balances**"). (Kruger Direct ¶ 47.) The issue of whether the Intercompany Balances should be treated as debt or as equity has been hotly contested.

183.     The Plan Proponents submitted evidence in support of their assertion that the Intercompany Balances are more akin to equity than they are to valid and collectible debt. (*See generally*, Gutzeit Direct; Westman Direct; Kruger Direct; Direct Testimony of Tammy Hamzehpour ¶ 17, dated November 12, 2013 [Dkt. No. 5708] ("**Hamzehpour Direct**").)

184.     The JSN Objectors submitted evidence in support of their assertion that the Intercompany Balances are more akin to debt than they are to equity. (*See generally*, Bingham Direct ¶¶ 16-19.)

185.     As a result of the JSN Settlement, there are no outstanding objections challenging the reasonableness of the Plan's waiver of Intercompany Balances as part of the overall Plan.

186.    The waiver of the Intercompany Balances under the Plan as part of the Plan

Settlements and the JSN Settlement, in light of all of the benefits inuring to the Debtors' Estates

as a result of those settlements, is reasonable and in the best interests of the Debtors' Estates.

### 8.    Treatment of the Borrower Claims

187.    The Plan provides for the Debtors' continued performance under two nationwide

settlements with the Federal Government—one with the Department of Justice and forty-nine

state attorneys general (the "**DOJ/AG Settlement**") and the other with the Board of Governors

of the Federal Reserve and the FDIC (the "**FRB Consent Order**")—that have provided, directly

and indirectly, more than $579 million to Borrowers.  (Thompson Direct ¶¶ 3(a), 10-12.)

188.    The Plan provides for the treatment of claims asserted by Borrowers through the

establishment of the Borrower Claims Trust, which will be funded with cash.  (Thompson Direct

¶¶ 3(b), 13-16; Kruger Direct ¶ 107.)  Under the Plan, holders of Allowed Borrower Claims will

receive a percentage recovery comparable to the projected recoveries to be received by holders

of Allowed General Unsecured Claims at their respective Debtor Groups.  (Thompson Direct ¶

14.)

189.    The decision to provide a Borrower Claims Trust was made by the Plan

Proponents, in consultation with their advisors, and counsel for Ms. Rowena Drennen, the

Borrower representative sitting on the Creditors' Committee.  (Thompson Direct ¶ 14.)  The

purpose of the Borrower Claims Trust is to streamline and expedite the process of making

distributions to Borrowers.  First, holders of Allowed Borrower Claims will receive distributions

in cash, rather than Units.  (Thompson Direct ¶ 15.)  This will prevent the Borrowers from

having to receive distributions over time, unlike other General Unsecured Claim holders whose

distributions will be paid as claims are resolved and assets are liquidated by the Liquidating

Trust. (*Id*.) Second, the Borrower Claims Trust includes a feature that will authorize the

Borrower Claims Trustee to pay an incremental $500 to those Borrowers agreeing to reduce their

Borrower Claim to $8,500 or less, if against GMACM, and $28,000 or less, if against RFC,

which may avoid the need for many Borrowers to incur the expense of counsel to resolve their

claims. (*Id*.)

190.    The Plan further provides that the Borrower Claims Trust will be funded with

$57.6 million less any amounts paid by the Debtors to or on behalf of holders of Borrower

Claims prior to, or in connection with, the Effective Date pursuant to orders of the Bankruptcy

Court. (Thompson Direct ¶¶ 3(b), 16.) The Debtors and their advisors performed the Borrower

Trust True-up calculation called for by the Plan. (Thompson Direct ¶ 22.) Based on data as of

November 4, 2013, the $57.6 million is projected to be sufficient to comply with the Plan by

providing comparable recoveries to holders of Allowed Borrower Claims. (Thompson Direct ¶¶

6, 53.) Therefore, the Borrower Trust True-up is not required. (*Id*. ¶ 6; Kruger Direct ¶ 110.)

191.    Certain Borrower Claims may also be covered by insurance policies. (Kruger

Direct ¶ 111.) The Plan provides that, except as set forth in the Kessler Settlement Agreement or

other orders of the Court, to the extent a Borrower recovers insurance proceeds on account of all

or a portion of a Borrower Claim, the Allowed Borrower Claim amount shall be reduced to the

extent paid by insurance proceeds. (Thompson Direct ¶ 16; Kruger Direct ¶ 111; Second Am.

Plan [Dkt. No. 5993-1], Art. IV.F.6.) If a covered Borrower Claim has already been paid from

the Borrower Claims Trust, the direct recipient of insurance proceeds will be required to return a

proportionate amount of any prior distributions from the Borrower Claims Trust Assets made on

account of such Borrower Claim to the Borrower Claims Trust, and will then be entitled to its

ny-1118499

proportionate share of any future distribution from the Borrower Claims Trust.  (Thompson

Direct ¶ 16; Kruger Direct ¶ 111; Second Am. Plan [Dkt. No. 5993-1], Art. IV.F.6.)

### 9.    Borrower Class Action Settlements

192.    Following the entry into the Plan Support Agreement, the Plan Proponents

negotiated and reached resolutions of claims filed by approximately thirteen putative class action

plaintiffs asserting claims (all but one of which are Borrower Claims) against the Debtors certain

of which class actions named Ally or other non-Debtor affiliates as defendants.  (Kruger Direct ¶

112.)  Before the Petition Date, the Debtors and certain of their non-Debtor affiliates were

subject to a variety of litigation throughout the country that sought redress for the Debtors'

allegedly improper origination and servicing practices.  (*Id*.)  None of the putative classes were

certified under the Federal Rules of Civil Procedure before the Petition Date; however, the

named plaintiffs who filed the claims collectively purported to represent hundreds of thousands

of claimants, and the alleged damages asserted against the Debtors amounted to several billion

dollars.  (*Id*.)  For those matters that have been or are subject to a proposed settlement, the

Debtors and the Committee engaged with each of the named plaintiffs in an effort to reach

amicable resolutions of the claims and avoid the time and expense of litigating claims that would

only serve to delay distributions to creditors and create greater uncertainty for each of the

Estates.  (*Id*)  As a result of these efforts, the Plan Proponents have reached settlements with the

named plaintiffs, which they are currently in the process of documenting and bringing to both

this Court and where applicable, either the state or federal court in which the action is pending,

for the requisite approvals.  (*Id*.)

193.    If the Plan goes into effect, each of the settlements of putative borrower class

action claims will result in Allowed Borrower Class Action Claims transferred to the Borrower

Claims Trust or direct cash payments. (Thompson Direct ¶¶ 16, 25.) Each of these settlements

was factored into the Debtors' assessment of the funding for the Borrower Claims Trust based on

the preliminary settlement amounts plus estimates for the remaining matters where a preliminary

settlement had not been reached. (*Id.* ¶ 25.)

### 10.    Amendment to Consent Order and Impact on Borrowers

194.    As one component of the Global Settlement, the Debtors, the Creditors'

Committee, and Ally agreed to support a settlement with the Board of Governors of the Federal

Reserve System (the "**FRB**") regarding the Debtors' and Ally's obligations under the Consent

Order. (Kruger Direct ¶ 113.) In the Fall of 2012, the Debtors originally sought approval of the

retention of PricewaterhouseCoopers LLP and certain law firms to provide services in

connection with a foreclosure review to be conducted by the Debtors, as mandated by the terms

of the Consent Order. (*Id.*) This retention was contested by the Creditors' Committee, who

argued that the costs of the foreclosure review should not be borne by the Debtors' Estates, and

these issues were adjourned and preserved in interim orders authorizing the retention of

professionals in connection with the foreclosure review process. (*Id.*)

195.    Upon further review of the Debtors' and Ally's obligations under the Consent

Order, and in light of the escalating cost of the foreclosure review process, the Debtors filed a

motion seeking a determination that the foreclosure review obligations should be classified as

general unsecured claims and that the automatic stay barred the enforcement of such claims.

(Kruger Direct ¶ 114.) The result of such a determination would have required Ally to pay for

any ongoing foreclosure review obligations, and attempt to pursue a claim for contribution

against the Debtors in the bankruptcy cases. The Debtors' motion was contested by Ally and the

FRB. (*Id.*)

196.    The parties negotiated a resolution of such obligations through the Mediation as one component of the Global Settlement.  (Kruger Direct ¶ 115.)  In furtherance of such settlement, the FRB and the Debtors entered into an amendment to the Consent Order, which was approved by the Bankruptcy Court on July 26, 2013, pursuant to which approximately $230 million previously placed into an escrow account by GMACM was released into a Qualified Settlement Fund, from which the Borrowers would be paid directly, in full satisfaction of the Debtors' foreclosure review requirements under the Consent Order.  (Kruger Direct ¶ 115; Hamzehpour Direct ¶¶ 15-16; *see also* PX-860.)  The Borrowers who will be entitled to some payment under the FRB settlement include any Borrower who was in some stage of active foreclosure proceedings during 2009 and 2010.[18]  (Kruger Direct ¶ 115.)

197.    By entering into the amendment to the Consent Order, the Debtors eliminated nearly all of the costly professionals' fees associated with the foreclosure review, resolved the outstanding litigation with Ally regarding the allocation of liabilities for the foreclosure review obligations, and ensured expedited payment of remediation payments to Borrowers.  (Kruger Direct ¶ 116; Hamzehpour Direct ¶ 15.)  To the extent a holder of a Borrower Claim receives payment pursuant to the settlement of the Debtors' obligations under the Consent Order, the amount of such Borrower Claim shall be reduced in an amount equal to the amount received. (Kruger Direct ¶ 116.)

---

[18] Certain Borrowers will also receive remediation payments as a consequence of a separate review related to Borrowers who were eligible to receive benefits under the Service Members' Civil Relief Act from January 1, 2006 through March 12, 2012, undertaken as part of the DOJ/AG Settlement.  (Kruger Direct ¶ 115 n.35.)

ny-1118499

### C.   Other Aspects of the Plan Settlements

#### 1.   Substantive Consolidation

198.   The Plan embodies a settlement and compromise of potential disputes over whether the Debtors should be substantively consolidated and their assets and liabilities pooled for purposes of efficiency in making distributions under the Plan.  (Kruger Direct ¶ 120.)

199.   After considering the claims of creditors arguing that the Debtors should be substantively consolidated, and those arguing that they should not be, the Plan Proponents ultimately determined that substantive consolidation would be inappropriate in these Chapter 11 Cases, and would result in uncertainty, costs, and delays related to additional litigation.  (Kruger Direct ¶ 121; Deposition of Lewis Kruger 151:16-22, Oct. 30, 2013.)  Substantive consolidation is not in the best interests of the Debtors' Estates and their creditors.  (Kruger Direct ¶ 121.)

#### 2.   Limited Partial Consolidation

200.   Instead of substantive consolidation, the Plan provides for a limited partial consolidation purely for administrative convenience.  (Kruger Direct ¶ 122.)  It groups the Debtors into three Debtor Groups—the ResCap Debtors, the GMACM Debtors, and the RFC Debtors—solely for purposes of describing their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.  (Kruger Direct ¶ 122; Renzi Direct ¶ 25.)  No Debtor will be consolidated with a Debtor in another Debtor Group for any other purpose. (Kruger Direct ¶ 122.)  In fact, as set forth in the Voting Certification, creditors voted at each Debtor against which their claims were asserted, rather than at the Debtor Groups.  (*Id*.)

201.   This limited partial consolidation has one exception:  holders of General Unsecured Claims against Debtor ETS.  (Kruger Direct ¶ 123; Renzi Direct ¶ 24.)  Holders of Allowed claims against ETS may be entitled to a greater recovery in a Chapter 7 liquidation than

other unsecured claims against the GMACM Debtors. (Kruger Direct ¶ 123; Renzi Direct ¶ 24.)

Therefore, to ensure that the Plan meets the "best interest of creditors" test, the Plan provides that

holders of ETS Unsecured Claims will receive Cash, to be distributed pro rata, in an amount

equal to the value of assets remaining in the ETS estate after the payment of Allowed Claims

with a senior priority.  (*Id*.)

202.    This grouping of the Debtors into the Debtor Groups solely for description and

distribution purposes, with the one exception described above, is in the best interests of creditors

and the Debtors' Estates.  (Kruger Direct ¶ 124.)  The proposed grouping also has the support of

each of the parties to the Plan Support Agreement.  (*Id*.)

203.    The proposed grouping provides the following:  (i) a more efficient distribution,

(ii) that no creditors are prejudiced by the partial consolidation proposed in the Plan, and (iii) the

proposed settlement, as a component of the Global Settlement, maximizes distributions to

unsecured creditors and is in the best interest of the Debtors' Estates.  (Kruger Direct ¶ 125.)

**3.     Division of Administrative Expenses Among Debtor Groups**

204.    The Global Settlement also allocates the Administrative Expenses among the

Debtor Groups and Plan trusts.  (Kruger Direct ¶¶ 126, 129.)  It was the subject of hard fought

and, at times, contentious negotiations.  (*Id*. ¶ 126; Dubel Direct ¶ 79.)

205.    The accrued and projected administrative costs are allocated as follows:  $836.3

million to the GMACM Debtors, $249.8 to the RFC Debtors, and no administrative costs

allocated to ResCap.  (Kruger Direct ¶ 129.)

206.    Because the costs to wind down the Debtors' Estates remain uncertain and the

value of certain non-cash assets held by the Estates will vary as they are liquidated over time, the

Plan provides that any increase or decrease in administrative expenses and/or the value of all of

ny-1118499

the Debtors' Estates from current projections would be shared among the ResCap Debtors, the

GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata, in

accordance with the Plan.  In the circumstances of these Chapter 11 Cases, the agreed-upon

allocation embodied in the Plan is reasonable and appropriate.  (Kruger Direct ¶ 130.)

207.    Absent agreement over the proper allocation of administrative expenses among

the Debtor Groups, the Debtors would be forced to wade through each and every administrative

expense and determine to which Debtor such expense should be allocated.  (Kruger Direct ¶

131.)  This task would be burdensome, costly, and the subject of substantial disputes among the

parties.  (Kruger Direct ¶ 131.)  Because substantial expenses are shared among two or more

Debtors, the Debtors would still need to make a determination as to how to allocate such shared

expense among Debtor entities.  (*Id.*)  Settling the allocation of administrative expenses in the

manner set forth above is fair, avoids unnecessary disputes, and facilitates the implementation of

the Global Settlement for the benefit of all creditors.  (*Id.*)

**D.      Facts Supporting the Debtors' Entry into the Plan Settlements**

**1.      Basis for the Debtors' Business Judgment**

208.    The Plan Settlements enable the Debtors to reduce the potentially significant

litigation costs that would otherwise have been incurred if the Debtors had continued to pursue

confirmation of a nonconsensual plan, as well as the attendant litigation risk of such a plan.

(Kruger Direct ¶ 151.)

209.    The Plan Proponents took into account the delay and enormous expense expected

to result from litigating the otherwise settled claims.  (Kruger Direct ¶ 154.)  The Plan

Settlements resolve actual disputes, as well as complex potential disputes with Ally, the

Creditors' Committee, the RMBS Trustees, the securities litigants and other investors, the

Kessler Class Claimants, FGIC, and MBIA as insurers in connection with certain Debtor-sponsored RMBS Trusts, and certain holders of the Senior Unsecured Notes issued by ResCap, including Paulson, as well as their indenture trustee, Wilmington Trust.  (Kruger Direct ¶ 154.)

210.    Based on the divergent interests of the parties to the Plan Settlements, as well as the complex issues pervading these cases, it was in the best interests of the Debtors' Estates to find common ground and have nearly all major parties coalesce around the Plan and the Plan Settlements contained within.  (Kruger Direct ¶ 155.)

211.    The Plan Settlements enable the Debtors to progress and preserve value rather than spend an inordinate amount of time and money immersed in litigation.  (Kruger Direct ¶ 156.)

### 2.    The Possibility of Success of Litigating the Claims at Issue and the Plan Settlements' Future Benefits to the Debtors

#### a.    Litigation Uncertainty

212.    With respect to the claims settled by the Plan Settlements, there is significant uncertainty regarding the outcome of any litigation addressing the validity, priority, and amount of such claims through the claims resolution process.  (Kruger Direct ¶ 157.)  Due to this uncertainty, the Plan Settlements provide substantial benefits to the Debtors, the Debtors' Estates and their creditors.  (*Id.*)

213.    After reviewing the claims, some of the filings in related suits, pertinent agreements, and past adverse rulings in related suits, the Debtors believe that they have strong defenses to the various claims.  (Kruger Direct ¶ 158.)  If forced to litigate, the Debtors would mount a vigorous defense.  (*Id.*)  Nonetheless, the issues that would be involved in litigating these claims are likely to be fact-intensive in nature and the legal issues involved are relatively novel.  (*Id.*)

87

214.    Litigation involving these types of claims would involve substantial litigation risk.  (Kruger Direct ¶ 158.)  The results of litigation in similar suits, generally, have resulted in unfavorable outcomes for RMBS sponsors.  (*Id.*)

215.    In light of the foregoing, the Debtors would face substantial litigation uncertainty and risk in connection with litigating these issues.  (Kruger Direct ¶ 158.)

### b.    The Plan Settlements' Future Benefits

216.    The Plan Settlements provide substantial benefits to the Debtors' Estates and their creditors.  (Kruger Direct ¶ 159.)  The Plan Settlements provide benefits in the form of (i) a substantial reduction of claims asserted against each of the Debtors' Estates as described above; (ii) increased certainty regarding the validity, priority and amount of the claims; and (iii) substantial cost savings when compared with the likely costs of professional fees and experts that would be needed if litigation proceeded.  (*Id.*)  The alternative of not entering into the Plan Settlements is not in their best interests and the best interests of the Debtors' Estates and/or the their creditors.  (*Id.*)

### 3.    The Likelihood of Complex and Protracted Litigation

217.    Prior to the stay imposed by the Debtors' Chapter 11 filing, the Debtors faced a significant number of lawsuits related to their securitization practices.  (Kruger Direct ¶ 160.) These lawsuits were brought by (i) the Monolines, (ii) private securities investors, and (iii) institutional investors.  The litigation against each entity would be complex, protracted and expensive.  (*Id.*)

### a.    Monolines

218.    The ongoing disputes in recent years among mortgage originators on the one hand, and Monolines and securitization trustees on the other, are well publicized.  (Kruger Direct

88

¶ 161.)  A number of the lawsuits and other proceedings involving RMBS breach of

representation and warranty and fraudulent inducement allegations against mortgage originators

have been ongoing for years, in many cases without resolution.  (*Id.*)  Absent a settlement, the

Debtors are almost certain to become embroiled in additional, complex litigation with the

Monolines over the validity, amount and possible subordination of their asserted claims.  (*Id.*)

219.   Given the highly fact intensive nature of RMBS litigation, any monoline litigation

is also almost certain to be complex and protracted.  (Kruger Direct ¶ 162.)  The Debtors have

experienced such litigation first-hand with MBIA, which spanned three and a half years leading

up to the Petition Date.  (Lipps Direct ¶¶ 116-120; Kruger Direct ¶ 162.)  The discovery

necessary to resolve the Monoline Claims—along with the various pleadings and hearings

necessary for the Court to decide the allowed amount of the Monoline Claims—would be

massive.  (Kruger Direct ¶ 162.)

220.   Litigation regarding the validity, amount and priority of the Monoline Claims

would almost certainly be exceedingly complex and could drag on for years, much like other

lawsuits of a similar nature that are currently pending in other state and federal courts.  (Kruger

Direct ¶ 163.)  Finally, as with any other complex litigation that extends for years, the expenses

associated with any litigation of the Monoline Claims would almost certainly be immense, and,

given the asserted size of those claims, could result in a delay of distributions to other creditors

even in the event of a confirmed Plan.  (*Id.*)

### b.   Private Securities Investors

221.   Prior to the Chapter 11 filing, the Debtors faced at least seventeen lawsuits

premised on the allegation that the registration statements and the prospectuses for the securities

ny-1118499

contained material misstatements.  (Kruger Direct ¶ 164.)  None of them had progressed beyond the early stages of discovery.  (*Id.*).

222.     The Debtors anticipate that the likely scope of discovery and burden to the Debtors will be similar to the burden associated with the Monoline Claims.  (*Id.*)  Each case over each claim will involve extensive document and deposition discovery of the Debtors relating to the particular securitizations at issue in that particular case, including the origination, acquisition, underwriting and pooling of the loans for each securitization, the preparation of the transaction documents for each securitization, the diligence performed on loans contained within the collateral pools for each securitization, and the performance of the loans underlying each securitization.  (*Id.*)

223.     The settlements with private securities investors under the Plan, including the Private Securities Claims Trust settlement and the *NJ Carpenter's* settlement, are consistent with, and within the range of, public settlements of similar RMBS-related securities litigation, based on commonly applied settlement metrics.  (Allen Direct ¶ 4.)

c.       **Institutional Investors**

224.     The Debtors also faced a potential lawsuit from two groups of institutional investors, one represented by Kathy Patrick of Gibbs & Bruns LLP, the other by Talcott Franklin of Talcott Franklin P.C., pertaining to various Pooling and Servicing Agreements, Assignment and Assumption Agreements, or other sale agreements.  (Kruger Direct ¶ 166.)  Like with the monoline suits and private securities lawsuits, the anticipated scope of discovery and burden to the Debtors would have been enormous.  (*Id.*)

#### d.    Other Litigation

225.    Absent the Global Settlement, the Debtors would also be faced with years of lengthy and costly litigation involving the RMBS Trustees, borrowers, governmental agencies like the FHFA, and class action securities claimants, as well as their claims against Ally, the enforceability of the Intercompany Balances, and substantive consolidation.  (Kruger Direct ¶ 167.)  In fact, prior to the Global Settlement, Wilmington Trust, on behalf of the Senior Unsecured Noteholders, was seeking standing to pursue allegations that forgiveness of Intercompany Balances constituted constructive and actual fraudulent transfer.  (*Id.*)

226.    The Global Settlement, and its resolution of a host of contentious issues, has helped the Debtors avoid years of costly litigation.  (Kruger Direct ¶ 168.)

#### 4.    The Paramount Interests of the Estates' Creditors

227.    The Debtors strived to reach a fair and equitable resolution of claims brought against them and, if possible, to enter into a consensual Chapter 11 plan that had the support of Debtors' creditors.  (Kruger Direct ¶ 169.)  Entering into the Plan Settlements is consistent with those goals.  (*Id.*)  As described above, the Plan Settlements resolve substantial claims against the Debtors' Estates.  (*Id.*)  Obtaining the releases in the Plan Settlements insures that the Debtors will not have to litigate and face the risk of being responsible for the full amount of claims asserted by the settling parties.  (*Id.*)  It was in the best interests of not only the Debtors' Estates, but also the Estates' creditors, to find common ground and have nearly all major parties coalesce around the Plan and the Plan Settlements contained within.  (*Id.*)

228.    The Plan Settlements are part of the Plan that, if ultimately approved, will bring substantial, additional benefits to the Debtors' creditors.  Approval of the Plan Settlements is a necessary and required step.  (Kruger Direct ¶ 170.)

ny-1118499

229.    The Plan and the Plan Settlements contained within are in the paramount interests of the creditors as evidenced by their overwhelming, near-unanimous, support for the Plan. (Kruger Direct ¶ 171.)  The Plan has enjoyed overwhelming support from those creditors that voted on the Plan.  (*Id.*)  Approximately 95.7% of the creditors voting on the Plan, representing hundreds of billions of dollars of claims, voted to accept the Plan.  (*See* Voting Certification Ex. B.)  No creditor has objected to the Plan Settlements.

**5.    The Plan Settlements' Support from Other Parties-in-Interest**

230.    The Plan and its contemplated Plan Settlements also have the support of other parties-in-interest, such as:

- Ally;

- Allstate Insurance Company and its subsidiaries and affiliates;

- American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in these Chapter 11 Cases;

- the Bank of New York Mellon, and the Bank of New York Mellon Trust Company, N.A. solely in their capacities as trustees, indenture trustees, or separate trustees;

- Deutsche Bank, N.A., solely in its capacity as an RMBS Trustee for certain RMBS Trusts;

- FGIC and its subsidiaries and affiliates;

- FHFA;

- the Kessler Class Claimants (as defined in the Plan Support Agreement);

- Law Debenture Trust Company of New York solely in its capacity as separate trustee;

- Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates;

- MBIA and its subsidiaries and affiliates;

ny-1118499

- The National Credit Union Administration Board;

- certain funds and accounts managed by Paulson & Co. Inc., holders of Senior
  Unsecured Notes issued by ResCap;

- each of the Private Securities Claimants;

- Prudential Insurance Company of America and its subsidiaries and affiliates;

- the Steering Committee Consenting Claimants (as defined in the Plan Support
  Agreement);

- each of the Supporting Senior Unsecured Noteholders (as defined in the Plan
  Support Agreement) that executed a joinder to the Plan Support Agreement;

- the Talcott Franklin Consenting Claimants (as defined in the Plan Support
  Agreement);

- U.S. Bank National Association solely in its capacity as an RMBS Trustee for
  certain RMBS Trusts;

- Wells Fargo Bank, N.A. solely in its capacity as an RMBS Trustee for certain
  RMBS Trusts; and

- Wilmington Trust, National Association, not individually, but solely in its
  capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

(Kruger Direct ¶ 172; PX-855.)

### 6.     The Plan Settlements' Releases of the Debtors' Officers and Directors

231.     The releases of the Debtors' officers and directors in the Plan are reasonable and

provided in exchange for fair value.  (Kruger Direct ¶ 173.)

232.     In exchange for these Releases, as discussed in greater detail below, the Debtors'

officers and directors will waive any claims for coverage they may have under any directors and

officers ("**D&O**") or errors and omissions ("**E&O**") policies covering the Debtors or their

officers and directors for the period between November 2006 and the Effective Date, with

ny-1118499

respect to those Claims that are released under the Plan.  (Kruger Direct ¶ 174.)  Their

willingness to do so was an important part of the overall Global Settlement.  (*Id*.)

### 7. The Plan Settlements' Parties' Counsel

233.    The Debtors were represented by competent and experienced counsel throughout

the negotiation of each Plan Settlement.  (Kruger Direct ¶ 175.)  The Debtors were represented

by competent and experienced counsel, including Morrison & Foerster LLP, Carpenter, Lipps, &

Leland LLP, and Curtis, Mallet-Prevost, Colt & Mosle LLP.  (*Id*.)

234.    All of the parties to the Plan Settlements were represented by competent and

experienced counsel, including a number of well-regarded law firms.  (Kruger Direct ¶ 176;

Dubel Direct ¶ 46.)  For example, the Creditors' Committee was represented by Kramer Levin,

Naftalis & Frankel LLP; Ally by Kirkland & Ellis LLP; the RMBS Trustees by Alston & Bird

LLP, Dechert LLP, Seward & Kissel LLP, Morgan, Lewis & Bockius LLP, and Allen & Overy

LLP; the Private Securities Claimants by Quinn Emanuel, Urquhart & Sullivan LLP; the Senior

Unsecured Notes Indenture Trustee by Loeb & Loeb LLP, and Cleary, Gottlieb, Stein &

Hamilton LLP; NJ Carpenters by Lowenstein Sandler LLP; FGIC by Jones Day LLP; the

National Credit Union Administrative Board by Zuckerman Spaeder LLP; MBIA by

Cadwalader, Wickersham & Taft LLP; Ambac by Patterson, Belknap, Webb & Tyler LLP;

Syncora by Weil, Gotshal and Manges LLP and Wollmuth, Maher & Deutsch LLP; and Assured

by Proskauer Rose LLP.  (Kruger Direct ¶ 176.)

235.    The Court has already found that the parties to the Mediation that negotiated the

various Plan Settlements were represented by sophisticated counsel.  (Kruger Direct ¶ 177; Dkt.

No. 5125; PX-872.)

### 8.    Arm's-Length Negotiations

236.    The Plan Settlements arose out of the Mediation directed by Judge Peck, which

was a robust process that continued for months.  (Kruger Direct ¶ 179.)  A substantial number of

different parties engaged in that process, many of which had divergent and competing interests

and agendas.  (*Id*.)  That process allowed the various parties to meet in a confidential forum and,

under Judge Peck's guidance, to present their respective positions and interests.  (*Id*.)  Most, if

not all, of those parties are highly sophisticated and represented by experienced counsel and

financial advisors who could and did advocate on their behalf.  (*Id*.)

237.    Based on the claims asserted by the various parties in these Chapter 11 Cases and

the positions they have taken in the various matters before the Court, it is evident that many

interests were divergent.  (Kruger Direct ¶ 180.)  Many of these groups were not hesitant to

advocate for their positions and were willing to aggressively pursue their own agendas.  (*Id*.)  For

instance, the Debtors had commenced litigation seeking to subordinate the claims of Private

Securities Claimants and had been preparing to prosecute claims objections to many of the other

significant claims filed in these cases.  FGIC and MBIA, meanwhile, were pursuing litigation

directly against Ally outside of the Bankruptcy Court.  (*Id*.)

238.    The Court has already found that certain negotiations in the Mediation were at

arm's-length and in good faith.  (Kruger Direct ¶ 181.)  For example, the Court found that

negotiation of the FGIC Settlement during the Mediation to have been conducted at arm's-

length.  (Kruger Direct ¶ 181; PX-872.)

## VII.    THE PLAN'S RELEASE, EXCULPATION, INJUNCTION, AND JUDGMENT
REDUCTION PROVISIONS

239.    The Plan contains several release-related provisions negotiated as part of the

Global Settlement and necessary to provide closure and protection for all participating parties: a

ny-1118499

release by the Debtors of the Debtor Released Parties (Second Am. Plan [Dkt. No. 5993-1], Art.

IX.C); a release by holders of Claims and Interests of the Ally Released Parties (Second Am.

Plan [Dkt. No. 5993-1], Art. IX.D); exculpation of the Exculpated Parties (Second Am. Plan

[Dkt. No. 5993-1], Art. IX.H); an injunction provision that implements the Debtor Release, the

Third Party Release, the Exculpation, the Judgment Reduction, and the discharge provisions of

the Plan (Second Am. Plan [Dkt. No. 5993-1], Art. IX.I); and a judgment reduction provision for

co-defendants in securities litigation matters whose potential claims for indemnification or

contribution would be affected by the Third Party Release (Second Am. Plan [Dkt. No. 5993-1],

Art. IX.L) (the "**Judgment Reduction**").

### A.    The Debtor Release

240.    The Debtor Release releases and discharges the Debtor Released Parties from all

causes of action by the Debtors "arising from or related in any way to the Debtors." (Second

Am. Plan [Dkt. No. 5993-1], Art. IX.C.)  The Debtor Released Parties are (i) the Ally Released

Parties, (ii) the Creditors' Committee, (iii) the Consenting Claimants, (iv) the Junior Secured

Notes Indenture Trustee and the Junior Secured Notes Predecessor Indenture Trustee, (v) the

Junior Secured Notes Collateral Agent, (vi) the Consenting JSNs, (vii) the Ad Hoc Group, and

(viii) their respective successors and assigns, members (except any such member of the Ad Hoc

Group that voted to reject the Plan and has not changed its vote to accept the Plan by the

Confirmation Date), partners, non-Debtor affiliates, and Representatives.  (Second Am. Plan

[Dkt. No. 5993-1], Art. I.A.75.)  "Representatives" includes an "entity's former and current

officers, former and current directors, former and current principals, employees, agents, financial

advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each

solely in its capacity as such."  (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.245.)

241.    The Debtor Release is fair, equitable and in the best interests of the Estates, and

represents a valid exercise of the Debtors' business judgment.  (Kruger Direct ¶ 186.)  The

release of Ally and its affiliates reflects a fair compromise of the Debtors' potential claims

against Ally in return for Ally's contribution of $2.1 billion in plan funding.  The Debtors

initially investigated a number of potential claims against Ally and its affiliates, including claims

for substantive contribution, veil-piercing, alter ego, fraudulent conveyance, subordination,

breach of fiduciary duty, and indemnity and contribution.  (*See generally* Kruger Direct ¶ 191.)

Following the Petition Date, the Creditors' Committee investigated potential claims against Ally

arising out of pre-petition transactions among the Debtors and Ally.  (Kruger Direct ¶ 187; Dubel

Direct ¶¶ 33-40.)  During the course of these Chapter 11 Cases, the Creditors' Committee

considered the merits and defenses to potential claims and causes of action against Ally.  (*Id*.)

As a result of these investigations, the Plan Proponents, with the support of the Consenting

Claimants, reasonably, in good faith, and with the best interests of their respective constituencies

in mind, concluded that the $2.1 billion Ally Contribution represents a fair compromise of

disputed claims.  (Kruger Direct ¶ 187.)

242.    The settlement of the Estate claims against the Ally Released Parties is the

product of extensive arm's-length bargaining among the Creditors' Committee, the Consenting

Claimants, the Debtors and Ally, overseen by the Mediator, as discussed in more detail above.

(Kruger Direct ¶ 187.)

243.    The Debtor Release is broadly supported by nearly all of the Debtors' key

constituencies, including, in addition to the Creditors' Committee: all six RMBS Trustees; the

Institutional Investors; the largest securities fraud claimants; MBIA, FGIC, Ambac and Assured,

as the largest Monoline claimants; Wilmington Trust; the Supporting Senior Unsecured

Noteholders, including Paulson & Co., Inc.; and the representatives of the Borrowers on the

Committee.  (Kruger Direct ¶ 188.)  Each of these parties was represented by competent and

experienced counsel in the negotiations leading to agreement on the terms of the Debtor Release.

(*Id.*)

244.    The settlement reflects a reasonable balance between the litigation's possibility of

success and the settlement's future benefits.  (Kruger Direct ¶ 189.)  Each party to the

negotiations that led to the settlement had access to a wealth of information gathered over the

course of months-long investigations conducted by the Creditors' Committee and the

voluminous materials made available from the Examiner's investigation.  (*Id.*)  To facilitate

settlement negotiations, the parties reviewed extensive document discovery, briefed the merits of

the claims, and exchanged written and oral presentations regarding their legal positions.  (*Id.*;

Dubel Direct ¶¶ 37-38.)  With the knowledge accumulated in this process, each party

independently determined that the settlement of the Estate claims against the Ally Released

Parties reflected a reasonable resolution of the claims.  (*Id.*)

245.    The Debtor Release resolves myriad complex disputes among the parties

regarding the nature, scope and validity of the Estate claims against Ally, obviating the need for

protracted litigation and its attendant expense, inconvenience and delay.  (Kruger Direct ¶ 190.)

The settlement spares all parties, including the Debtors, costly and uncertain litigation that would

inevitably delay consummation of a plan and recoveries to holders of Claims.  (*Id.*)  The

settlement also eliminates the risk that Ally (which provides a reciprocal release under the Plan)

would assert claims against the Debtors, including claims for contractual indemnification,

equitable indemnification, and contribution.  The Debtor Release benefits the Estates by avoiding

these risks and expenses.

246.    The Debtor Release also releases potential claims against the Consenting

Claimants and members of the Creditors' Committee.  The Debtors have not identified any

material claims against them, and these creditors played important roles in the Mediation and the

development of the Plan. [Second Am. Plan [Dkt. No. 5993-1], Arts. I.A.75, IX.C.]  No party has

raised any objection to this aspect of the Debtor Release.  The release of these potential claims

falls within the range of reasonableness.

247.    While the Ad Hoc Group and the Junior Secured Notes Indenture Trustee engaged

in significant litigation with the Plan Proponents, the Consenting JSNs' agreement to accept the

Modified Plan and cease all pending litigation provides significant benefits to the Debtors'

Estates by avoiding the costs, delays and risks associated with ongoing litigation.

248.    The Debtor Release also discharges potential estate claims against the Debtors'

current and former directors, officers, employees and advisors.  The release in favor of these

individuals is reasonable in light of their agreement, under the Plan, to assign their insurance

protection to Ally and forego their rights to indemnification.

### B.    Third Party Releases

249.    The Third Party Release provides that the holders of Claims and Equity Interests

will be deemed to release and discharge the Ally Released Parties from "any and all Causes of

Action . . . arising from or related in any way to the Debtors, including those in any way related

to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the

Plan."  (Second Am. Plan [Dkt. No. 5993-1], Art. IX.D.)  The "Ally Released Parties" include

Ally and each of Ally's and the Debtors' respective members, shareholders, partners, non-Debtor

affiliates, and Representatives.  (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.21.)

"Representatives" includes an "entity's former and current officers, former and current directors,

99

former and current principals, employees, agents, financial advisors, attorneys, accountants,

investment bankers, consultants, and other professionals, each solely in its capacity as such."

(Second Am. Plan [Dkt. No. 5993-1], Art. I.A.245.)

250.    The Third Party Release does not release certain claims against Ally held by

Freddie Mac and Fannie Mae.  Nor does it release claims against the Ally Released Parties held

by the United States and the DOJ/AG Settling States arising under the DOJ/AG Settlement,

preserved under the DOJ/AG Settlement, or claims against Ally held by the United States and the

State for liabilities, if any, under the Internal Revenue Code or based on, environmental, civil

fraud, or criminal laws.  (Second Am. Plan [Dkt. No. 5993-1], Art. IX.E.)

### 1.    Jurisdictional Facts Regarding the Third-Party Claims

251.    The Court has "related to" jurisdiction over the claims subject to the Third Party

Release.  The claims covered by the Third Party Release might have an effect on the Debtors'

Estates.  (Hamzehpour Direct ¶¶ 3, 7.)  The claims, if allowed to proceed, could implicate

various indemnification and contribution obligations between the Debtors and the Ally Released

Parties, as asserted in numerous proofs of claim.  (*Id.*)  Similarly, to the extent that claims were

asserted against the Debtors' officers and directors—many of which have filed proofs of claim in

these proceedings—those claims might trigger the Debtors' obligations to indemnify those

officers and directors under certain agreements.  (*Id.*)  The Debtors and their officers and

directors share insurance coverage with Ally and other non-Debtor affiliates under insurance

policies procured by Ally.  Those policies cover claims that are subject to the Third Party

Release.  (Hamzehpour Direct ¶ 13; Direct Testimony of Martin Blumentritt ¶ 18, dated

November 12, 2013 [Dkt. No. 5698] ("**Blumentritt Direct**").)

### a.    Indemnification and Contribution Obligations

252.    The Debtors have certain indemnification obligations to Ally and its affiliates

pursuant to an Amended and Restated Operating Agreement, dated as of November 27, 2006, by

and between General Motors Corporation, GMAC LLC (n/k/a as Ally) and ResCap (the

"**Operating Agreement**").  (Hamzehpour Direct ¶ 8; PX-589.)[19]  Section 3(c) of the Operating

Agreement provides that "ResCap will, to the fullest extent permitted by law, indemnify, defend

and hold harmless" Ally and its Affiliates "from and against any losses related to ResCap

Indemnifiable Liabilities."  (PX-589 § 3(c); Hamzehpour Direct ¶ 8.)  Pursuant to this provision,

the Debtors have agreed to indemnify Ally and its Affiliates for "Liabilities [that] (a) relate to,

(b) arise out of or (c) result principally from" the "businesses and operations . . . of ResCap or its

Subsidiaries."  (*Id.* § 1 at 4-5; Hamzehpour Direct ¶ 8.)  Thus, Ally and/or an Affiliate may seek

indemnification from the Debtors if it incurs losses, damages and/or costs of defense costs

resulting in or from actions where claims and allegations "relate to, arise out of or result

principally from" the "businesses and operations . . . of ResCap or its Subsidiaries"—*e.g.*, the

origination, acquisition, securitization, and servicing of mortgage loans.  (*Id.* § 1 at 4-5 & § 3(c);

Hamzehpour Direct ¶ 8.)  These indemnification obligations are closely parallel to the Plan's

release of Ally Released Parties for liability "arising from or related in any way to the Debtors."

(Second Am. Plan [Dkt. No. 5993-1], Art. IX.D.)  Ally filed multiple proofs of claim including a

claim for contractual indemnification pursuant to this Operating Agreement.  (Lipps Direct ¶ 97;

PX-1230 – PX-1327; PX-1376 – PX-1427.)

---

[19] Under the Operating Agreement, "Affiliates" is defined very broadly and means with respect to Ally, any other
Person—defined to be any "individual, corporation, partnership, joint venture, limited liability company, limited
liability partnership, association, joint stock company, trust, unincorporated organization, or other organization,
whether or not a legal entity and any Governmental Authority—directly or indirectly Controlling or Controlled by or
under direct or indirect common Control with such Person."  (PX-589 § 1.)

253.    The Debtors' current and former directors and officers are entitled to
indemnification from ResCap for a broad variety of claims pursuant to the Amended and
Restated Limited Liability Company Agreement of Residential Capital, LLC, dated and effective
March 31, 2008 (the "**ResCap LLC Agreement**").  (Hamzehpour Direct ¶ 9; PX-590.)  The
ResCap LLC Agreement provides for indemnification for any loss or damage incurred by any
employee, officer, or director who is "a party or is threatened to be made a party to any
threatened, pending or completed action, suit or proceeding, whether civil, criminal,
administrative or investigative" and provides indemnification for "expenses (including attorneys'
fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the
[officer, director, or employee or on that person's behalf] in connection with such action, suit or
proceeding and any appeal therefrom."  (PX-590 § 18(a)(i)-(ii).)  Those indemnification
obligations cover losses and defense costs associated with claims arising out of an act or
omission committed in good faith while acting as an officer, director, or employee.  (*Id.*)  Fees
must be advanced, regardless of whether the officer or director is alleged to have acted in bad
faith, and only if it is ultimately determined that the director or officer is not entitled to
indemnity must the director or officer repay the advanced fees.  (*Id.* § 18(d)(i).)

254.    The Debtors have certain indemnification obligations to Ally Securities pursuant
to various underwriting agreements the Debtors entered into in connection with the sale of
certificates for different securitized trusts (the "**Underwriting Agreements**").  (Hamzehpour
Direct ¶ 10.)  A representative example of these Underwriting Agreements is the Residential
Funding Mortgage Securities II, Inc. Home Equity Loan Pass-Through Certificates, Series 2007-
HSA2 Underwriting Agreement, dated April 23, 2007.  (Hamzehpour Direct ¶ 10; PX-620-1.)
Section 7 of this Underwriting Agreement provides that RFMSII and RFC, jointly and severally,

agree to indemnify the underwriters, and each person who controls any underwriter, named in the

various Underwriting Agreements (including Ally Securities) for claims related to the offering

materials.  (PX-620-1 § 7.)  To the extent that Ally Securities incurs liability in connection with

the Underwriting Agreements, it will have direct claims against the Debtors' Estates based on

these indemnification provisions in these Underwriting Agreements.  (Hamzehpour Direct ¶ 10.)

The majority of the Underwriting Agreements entered into by the Debtors in connection with

other securitization trusts contain similar indemnification obligations.  (*Id.*)

255.     Ally Bank has indemnity rights against GMACM (f/k/a GMAC Mortgage

Corporation) under certain custodial agreements entered into between, among others, Ally Bank

and GMACM in connection with numerous private label, Ginnie Mae, and GSE securitization

transactions (the "**Custodial Agreements**").  (Hamzehpour Direct ¶ 11.)  A representative

example of these agreements is the Custodial Agreement, dated June 29, 2006, by and between

JPMorgan Chase Bank, National Association, GMACM and Ally Bank.  (Hamzehpour Direct ¶

11; PX-614-1.)  Under this Custodial Agreement, Ally Bank agreed to serve as a custodian of the

underlying mortgage loan files on behalf of the respective RMBS Trust.  (Hamzehpour Direct ¶

11.)  Section 3.2 of this Custodial Agreement provides that GMACM, as the servicer of the

underlying mortgage loans, "agrees to indemnify and hold the Custodian [Ally Bank] harmless

from and against all claims and liabilities, *including payment of the Custodian's legal fees and

expenses*."  (PX-614-1 § 3.2.)

256.     The Debtors' current and former directors and officers are entitled to

indemnification from Ally under Article VIII(D) of Ally's Amended and Restated Certificate of

Incorporation, as Amended.  (Hamzehpour Direct ¶ 12; PX-636.)  Under this Certificate of

Incorporation, Ally

shall indemnify and hold harmless each person who was or is made a party or is
threatened to be made a party to or is involved in or participates as a witness with
respect to any action, suit or proceeding, whether civil, criminal, administrative or
investigative (each a "Proceeding"), by reason of the fact that he or she, or a
person of whom he or she is the legal representative, is or was a director or an
officer, or is or was serving at the request of the Corporation as a manager,
director, officer, employee, fiduciary or agent of another entity (collectively, the
"Indemnified Persons") from and against any and all loss, cost, damage . . .
(including reasonable attorney's fee and expenses of attorneys and other advisors
and any court costs incurred by any Indemnified Person) or liability actually and
reasonably incurred by the person in connection with the Proceeding . . ."

(PX-636, Art. VIII(D).)  Ally is also responsible for paying in advance any reasonable expenses,

including the reasonable costs of defense, incurred by an Indemnified Person.  (*Id.* Art. VIII(E).)

To the extent that Ally incurs any such costs with respect to liabilities that arise out of or result

principally from the business and operation of ResCap and its Subsidiaries, Ally may seek

indemnification from the Debtors under the Operating Agreement.  (Hamzehpour Direct ¶ 12.)

### (i)   Ally and Former Officer and Director Indemnity Claims

257.   Ally, Ally Bank, and Ally Securities filed 150 proofs of claim against the

Debtors.  (*see* Lipps Direct ¶¶ 97-98 (cataloging proofs of claim); *see also* PX-1230 through PX-

1327 and PX-1376 through PX-1427 (Ally entities' proofs of claim).)  Those proofs of claims

assert claims for contractual indemnity under (i) the Operating Agreement (ii) a revolving loan

agreement entered into between Ally and various debtors on December 30, 2009 (the "**Revolving**

**Loan Agreement**") (*see* PX-6); (iii) a line of credit agreement entered into between Ally and

certain of the debtors on December 30, 2009 (the "**Line of Credit**") (*see* PX-9); (iv) various

agreements governing surety bonds issued by Motors Insurance Company for the debtors'

benefit; and (v) an amended servicing agreement entered into between Ally Bank and GMACM

on May 11, 2012 (*see* PX-761).  Ally's proofs of claim assert rights to indemnification and

104

contribution based on its potential liability in connection with litigation concerning the Debtors'

RMBS securitizations.  (Lipps Direct ¶ 8.)

258.     Forty-six of the Debtors' former officers and directors filed 128 proofs of claim

for contractual indemnity in connection with their service as officer or trustee.  (Lipps Direct ¶

99; *see also* PX-1330 through PX-1375 (former officers' and directors' proofs of claim).)  These

included forty-four individuals and two trust companies, Wilmington Trust SP Services Inc. and

Wilmington Trust SP Services SP (Nevada), Inc.  (Lipps Direct ¶ 99.)  These proofs of claims

seek indemnification in connection with RMBS-related litigations and assert rights under the

Debtors' D&O policies.  (*Id.*)

### b.     Shared Insurance

259.     The Court also has "related to" jurisdiction arising from shared insurance policies

covering both the Debtors and the Debtors' officers and directors, and Ally and other non-Debtor

affiliates.  (*See* Hamzehpour Direct ¶ 13.)  These policies cover many of the third-party claims

that are the subject of the Third-Party Release.  (Blumentritt Direct ¶ 18; *see also id.* ¶ 19.)

260.     Any policy proceeds spent on indemnifying or defending Ally or other non-

Debtor affiliates in connection with claims arising out of the Debtors' business would reduce the

amount of insurance coverage available to Debtors under those policies and, thus, could have a

conceivable effect on the Debtors' Estates.  (Hamzehpour Direct ¶ 13.)

261.     Each policy year beginning in 2006-2007, and continuing to the present, Ally has

obtained E&O and D&O policies on behalf of itself, its subsidiaries and affiliate (including the

Debtors), and their respective officers, directors, and employees.  (Blumentritt Direct ¶ 7.)  These

policies extend insurance coverage to both "Organizations" (also sometimes called the

"**Insureds**") and "Insured Persons."  (*Id.*)  For example, the group's primary E&O policy for the

2007-2008 policy year extends coverage to both "the Organization," which is defined to include the "Parent Organization and any Subsidiary," and "the Insured Person," which includes any director, officer, or employee of the Organization "while acting in his or her capacity as such." (Blumentritt Direct ¶ 8; PX-930 at 4 & 5 of 57.)[20]  Similarly, the group's primary D&O policy for the 2007-2008 policy year covers both the "Organization," defined to include Ally (f/k/a GMAC, LLC) and "any Subsidiary," and "Insured Persons," defined to include "any past, present or future duly elected director or duly elected or appointed officer of the Organization." (Blumentritt Direct ¶ 9; PX-931 at 4 & 12-13 of 117.)

262.    Ally entered into similar E&O and D&O policies for each subsequent year, and each year's policies extended coverage to Ally, its subsidiaries, and its insured persons, including the directors, officers, and employees of Ally and all its subsidiaries (including the Debtors and their officers, directors, and employees).  (Blumentritt Direct ¶ 10.)

263.    Ally's E&O policies provide coverage for "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, before or during the Policy Period by any Insured or any person for whose acts the Insured is legally liable" for any provision of "professional services."  (PX-930 at 7 of 57; *see also id.* at 38-47 of 57 (endorsement #13 modifying coverage); Blumentritt Direct ¶ 11.)  Similarly, Ally's D&O policies provided broad coverage for "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an Insured Person, individually or otherwise, in his Insured

---

[20] Some of Ally's insurers have taken the position that Ally's "claims" arose in the 2007-2008 policy year, and that all subsequent claims are "related claims" that must be consolidated with the original claim and covered by the policies in effect in that year.  (Blumentritt Direct ¶ 8 n.2.)

ny-1118499

Capacity, or any matter claimed against him solely by reason of his serving in such Insured

Capacity." (PX-931 at 13 of 117; Blumentritt Direct ¶ 12.)

264.    The policy limits for the group's E&O and D&O insurance are aggregate annual

limits. (Blumentritt Direct ¶ 14.) This means that each claim, against any insured, during the

policy year reduces the remaining available insurance for all insureds. (*Id.*) All defense costs

and expenses count against policy limits. (*Id.*) Thus, the policies are "wasting asset" policies,

meaning that each payment for liability or defense costs serves to reduce the level of insurance

coverage available for other claims or insureds. (*Id.*)

265.    These insurance policies cover claims subject to the Third Party Release,

including claims stemming from the Debtors' mortgage-backed securitizations (the so-called

Private Label Securitization and Representation and Warranty lawsuits). (Blumentritt Direct ¶¶

18-19.) As a result, any costs of defense incurred or payments made as a result of a settlement or

judgment of these claims by the non-debtor Ally entities would trigger insurance obligations

under the shared policies. (*Id.*) If these claims (and other potential claims against Ally arising

from or relating to the Debtors' business) were to go forward against the non-debtor Ally entities

and were not released pursuant to the proposed Plan, the insurance policies and proceeds shared

between Ally and the Debtors would be depleted, in turn reducing an asset of the Debtors'

Estates. (Blumentritt Direct ¶ 20; Hamzehpour Direct ¶ 13.)

### 2.    Unique Circumstances Surrounding the Third Party Release

#### a.    The Third Party Release Is Overwhelmingly Consensual

266.    All of the Consenting Claimants agreed to the Third Party Release by signing on

to the Plan Support Agreement. (*See* PX-855 § 4.2 (Plan Support Agreement).) Since that time,

all of the Private Securities Claimants—each of which has asserted claims against Ally—have

agreed to their treatment under the Plan, including the Third Party Release.  (PX-256, Disclosure

Statement, Art. V.C.II, at 135-36 of 664.)  And numerous creditors, including the members of the

Ad Hoc Group, have provided their consent as part of individual or group settlements agreed to

since solicitation of the Plan began.  (*See* Kruger Direct ¶¶ 85-86 (regarding Ambac settlement);

Lipps Direct ¶¶ 50-51 (regarding settlements with NCUAB and West Virginia Investment

Management Board); Thompson Direct ¶ 25 (describing agreement in principle with Moore and

the Rothstein plaintiffs)).)

267.    The first page of the disclosure statement states as follows, in bold and capital

letters:

> **IF YOU ARE ENTITLED TO VOTE ON THE PLAN AND
> RECEIVE A BALLOT: (1) YOUR VOTE TO ACCEPT THE
> PLAN, OR (2) YOUR FAILURE TO TIMELY AND/OR
> PROPERLY SUBMIT A BALLOT, WILL BE DEEMED
> YOUR CONSENT TO THE THIRD PARTY RELEASE
> CONTAINED IN ARTICLE IX.D OF THE PLAN, THE
> EXCULPATION PROVISION CONTAINED IN ARTICLE
> IX.G OF THE PLAN, AND THE INJUNCTION PROVISION
> CONTAINED IN ARTICLE IX.H OF THE PLAN, EACH AS
> DESCRIBED IN FURTHER DETAIL IN ARTICLE V.X OF
> THIS DISCLOSURE STATEMENT.**

(PX-256 at 6.)

268.    The ballots stated as follows, in bold and capital letters:

> **IF YOU: (1) VOTE TO ACCEPT THE PLAN, OR (2) FAIL
> TO TIMELY AND/OR PROPERLY SUBMIT A BALLOT,
> YOU WILL BE DEEMED TO HAVE CONSENTED TO THE
> THIRD PARTY RELEASE CONTAINED IN ARTICLE IX.D
> OF THE PLAN, THE EXCULPATION PROVISION
> CONTAINED IN ARTICLE IX.G OF THE PLAN, AND THE
> INJUNCTION PROVISION CONTAINED IN ARTICLE
> IX.H OF THE PLAN, EACH COPIED BELOW.**

(Voting Certification ¶ 18.)

269. Both the ballots and the Disclosure Statement included the following warning:

**REGARDLESS AS TO HOW OR WHETHER YOU VOTED ON THE PLAN, IF THE PLAN IS CONFIRMED, THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN ARTICLE IX OF THE PLAN WILL BE BINDING UPON YOU. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

(Voting Certification ¶ 18; PX-256 at 6.)

270. Creditors overwhelmingly voted to support the Plan: 1,453 of 1,517 (approximately 95.7%) discrete creditors voted in favor (excluding insiders and ballots submitted by others ineligible to vote). (*See generally* Voting Certification Exhibit B-1.)

### b.   The Third Party Release Is Supported By Substantial Consideration and is Essential to the Plan

271. The circumstances of these Chapter 11 Cases are unique and unusual because of the size and complexity of the Debtors' operations: The Debtors, along with their non-Debtor affiliates, were one of the largest mortgage servicers in the United States, with approximately two million servicing accounts. (Marano Direct ¶ 2; *see also* Phase I Opinion at 5.)

272. Post-petition, the Debtors were able to accomplish the sale of a majority of the Debtors' assets, including the Debtors' mortgage servicing rights ("**MSRs**") and associated advances, for their ultimate value of $4.5 billion. (Marano Direct ¶ 2.) An asset sale at this price was possible only with the Debtors' continued operations, during bankruptcy, through the date of the sale. (Marano Direct ¶ 84.) This required extensive work and planning by the Debtors both pre- and post-petition, including the following: obtaining debtor-in-possession ("**DIP**") financing, engaging in lengthy settlement discussions with a wide range of governmental agencies and constituencies, identifying viable stalking horse bidders, procuring related and

necessary concessions from Ally, and reaching a settlement with two groups of institutional RMBS investors asserting tens of billions of dollars of claims arising out of alleged representation and warranty breaches. (Marano Direct ¶ 2; *see generally* Phase I Opinion at 20-37.)

273.    To maximize the value of the assets to the benefit of the Debtors and their creditors by proceeding with an orderly sale of assets in the context of a bankruptcy proceeding, the Debtors needed a sufficient time after the sale date to complete the contractual obligations required for the Debtors to be able to transfer their assets at their enhanced value. (Marano Direct ¶¶ 28, 29.) To achieve this, the Debtors needed sufficient financial and operational support from Ally to be able to continue operations for at least a year. (*Id.* ¶ 29.) Ally was uniquely situated to provide this support; no other entity was willing to do so. (Carpenter Direct ¶ 19.) Without Ally's contributions, the Debtors would not have had the operational support they needed to continue to run their business post-petition, putting at risk the value of the MSRs and associated advances, nor would potential purchasers have had assurances that Ally would support and facilitate a smooth transition following the asset sales, which might have inhibited bidding. (Marano Direct ¶ 81.)

274.    By continuing to operate post-petition, the Debtors were able to (i) sell their assets "free and clear" pursuant to Bankruptcy Code Section 363; (ii) market their assets as a whole or in combinations necessary to maximize value (*e.g.*, servicing advances sold together with mortgage servicing rights); (iii) achieve consents and settlements with various government entities that were necessary to close the asset sales; (iv) continue to originate mortgage loans; (v) perform under the DOJ/AG Settlement and Consent Order; (vi) amend Pooling and Servicing Agreements; (vii) clear whole loan exceptions; and (viii) avoid legal challenges to allocation of

proceeds from RMBS trustees and government agencies, including approximately $1.4 billion in

servicing advances that the RMBS trustees threatened to withhold.  (Marano Direct ¶ 3.)

276.    From the beginning, Ally required any resolution to include a release of claims

relating to the Debtors' business (including any claims the Debtors believed they could assert

against Ally, as well as any potential third-party claims against Ally relating to the Debtors'

business).  (Carpenter Direct ¶ 17.)

276.    Negotiations between ResCap's independent directors and representatives from

Ally resulted in a settlement, under which Ally agreed to—and did—provide substantial

monetary and non-monetary contributions to the Debtors.  (Marano Direct ¶¶ 4, 39.)  Ally's

contributions included the following:  (i) agreeing to make a cash contribution to the Debtors of

$750 million, which was eventually increased to $2.1 billion as part of the Global Settlement in

the Plan; (ii) providing $200 million in additional DIP financing, which was necessary to fund

the Debtors' second biggest category of expenses and was unavailable from third parties;

(iii) agreeing to allow the Debtors to use Ally's cash collateral; (iv) providing a stalking horse

bid (with no bid protections) for the held-for-sale loan portfolio, which helped set a high floor for

bidding with favorable terms, provided regulators with reassurance that the asset sales would be

completed quickly and efficiently, and enabled the Debtors to conduct separate auctions for their

held-for-sale portfolio and servicing and origination platform, thereby allowing the Debtors to

target their marketing efforts to corresponding, and strategically different, interested bidders;

(v) entering into a shared services agreement that provided the Debtors with operational support

they needed to run their business in a regulatory compliant manner; (vi) agreeing to negotiate

(and, ultimately entering into) a transition services agreement with the purchaser of the Debtors'

assets, which further enhanced the sale process and provided the Debtors with operational

support and cooperation needed to efficiently close the asset sales; (vii) honoring in the ordinary

course of business obligations under the employee retirement plan for employees of the Debtors;

(viii) supporting the Debtors' origination operations through the closing of the asset sales by

allowing the Debtors to continue originating loans on Ally's books post-petition, thereby

generating additional MSRs (and related servicing fees) that were retained by the Debtors.

(Marano Direct ¶¶ 4, 40; Carpenter Direct ¶ 18(a); PX-137 at 129-30.)  Ally also agreed to allow

the Debtors to continue servicing Ally Bank's loan portfolio, which represented approximately

30% of the loans serviced by the Debtors and accounted for approximately 10% of all the

Debtors' servicing related income.  (Marano Direct ¶ 40.)

277.    The Debtors were able to use the infusion of cash from Ally to negotiate

settlements with other creditors.  (Marano Direct ¶ 42.)  The origination and shared services

support from Ally allowed the Debtors to continue to originate and service loans in bankruptcy,

thereby maximizing the value of the assets the Debtors were trying to sell.  (*Id.*)

278.    Ally's contributions helped the Debtors garner the support of government

agencies and government-sponsored enterprises ("**GSEs**") for the sale of the Debtors' assets.

(Marano Direct ¶¶ 51-52.)  The Debtors were able to convince the GSEs that the Debtors could

sell the assets without damaging the MSRs and associated advances.  (*Id.* ¶ 52.)  If the GSEs had

concluded that the Debtors could not operate or credibly pursue an orderly sale of the Mortgage

Servicing Assets, and that the GSE-related assets might therefore be subject to liquidation, the

GSEs would have raised the cost of doing business and seized the Debtors' assets.  (*Id.*)  In other

cases where a mortgage servicer had filed for bankruptcy without continuing to operate or

conducting an orderly sale process, the GSEs moved to seize their collateral after filing.  (*Id.*)

Thus, by obtaining financing, use of cash, continuity of management through the end of sale, and

a stalking horse bidder, the Debtors reassured the GSEs that a process was in place, and that the

Debtors' business would continue to function as usual pending an orderly sale of their assets.

(*Id.*)

       279.    Ally also facilitated the Debtors' conversations with governmental authorities by,

among other things, permitting the Debtors to solicit borrowers in the owned loan portfolios of

Ally and its affiliates for potential borrower relief including refinancing of those loans under

HARP, which allowed the Debtors to remain in compliance with the DOJ settlement

requirements.  (Marano Direct ¶ 53.)

       280.    Ally enhanced the sale process by agreeing to serve as a stalking horse bidder for

the Debtors' portfolio of held-for-sale loans with minimal bid protections, and by enabling the

Debtors to separately market and sell their held-for sale loan portfolio and origination and

servicing business, which increased the potential pool of bidders.  (Marano Direct ¶ 81;

Carpenter Direct ¶ 18(d).)  Ally's bid set the floor for the bidding to continue at auction, which

was critical to the Debtors given the relatively few interested bidders.  (Carpenter Direct ¶

18(d).)  As a result of the stalking horse process, on the Petition Date, the Debtors filed two

stalking horse bids with the Bankruptcy Court.  (Marano Direct ¶ 56; PX-61.)  The first was with

Nationstar, which proposed a $2.3 billion stalking horse bid for the Debtors' mortgage servicing

rights and related advances.  (Marano Direct ¶ 56.)  The second was with Ally, which was the

proposed bidder for the Debtors' held-for-sale loan portfolio.  (*Id.*)  The Debtors' development of

the Ally stalking horse bid increased the flexibility of the marketing process and expanded the

range of potential bidders for estate assets.  (*Id.* ¶ 57.)

       281.    Without Ally's stalking horse bid, the Debtors would have been required to

include their held-for-sale loan portfolio in the Nationstar stalking horse bid.  (Marano Direct ¶

57.)  Without Nationstar's consent to any kind of alternative bidding structure, competing bidders would have been required to purchase both the mortgage loan origination and servicing business as well as the held-for-sale loan portfolio in a single transaction.  (*Id.*)  As a result, Ally's stalking horse bid allowed the Debtors to market two very different pools of assets with corresponding, different interested bidders.  (*Id.*)  This separation enabled competing bidders, like Ocwen, to bid without having to partner with other bidding groups in order to put forth a qualified bid.  (*Id.*)  The Ally stalking horse bid provided a platform on which the Debtors could—and did—obtain a $1.5 billion purchase price for the held-for-sale loan portfolio with minimal due diligence outs.  (*Id.*)  The Debtors recognized that, because the loans had been held-for-investment loans on Ally's books prior to having been contributed to ResCap as capital, Ally would submit a strong bid with minimal representation and warranty and due diligence outs.  (*Id.*)  By isolating these assets with a strong stalking horse bid, the Debtors were able to entice Berkshire Hathaway to bid on these assets.  (*Id.*)  The winning bidder (Berkshire Hathaway) ultimately agreed to pay approximately $225 million more than Ally's bid for the same assets in a Section 363 sale (after adjusting for the change in unpaid principal balance between the Ally bid date and Berkshire Hathaway bid date).  (Carpenter Direct ¶ 18(d); PX-46.)  Berkshire Hathaway agreed to pay that amount without doing any significant due diligence of its own, instead relying on Ally's own diligence and familiarity with the loan portfolio.  (Carpenter Direct ¶ 18(d).)

282.    DIP financing from Ally enabled the Debtors to cover their second largest expense, the repurchases of certain whole loans that were sold into securitization trusts guaranteed by Ginnie Mae (the "**Ginnie Buybacks**").  (Marano Direct ¶ 36.)  These repurchases were funded prior to the Petition Date under a line of credit from Ally (the "**Ally LOC**").  (*Id.*)

Because the Ginnie Buybacks and the receivables they created were collateral under the Ally

LOC, they could not be pledged to a third-party lender on a first lien basis, and the Debtors did

not believe that a third-party lender would be willing to provide replacement financing for those

obligations on a second lien basis.  (*Id.*)  The documentation supporting the Ginnie Mae loans

was generally viewed as deficient, such that previous attempts to use those loans as collateral had

been rejected by third-party lenders.  (*Id.*)  As a result, Ally's continued funding of the Ginnie

Buybacks post-petition was critical.  (*Id.*)  Without the Ally DIP facility, the Debtors would have

been unable to effectuate buybacks required by Ginnie Mae, which would have impaired the

value of the Ginnie Mae assets (MSR and advances), and potentially led to Ginnie Mae sweeping

$94 million of restricted cash the Debtors were required to post to compensate for any losses

resulting from the Debtors' actions.  (*Id.*; Carpenter Direct ¶ 18(c).))

283.    Ally Bank agreed to allow ResCap to service the MSRs that were owned by Ally

Bank, rather than moving the MSRs to a backup servicer.  (Carpenter Direct ¶ 18(b).)  This

arrangement helped preserve and enhance the Debtors' ongoing business as a servicer, and was

critical to the GSEs.  (*Id.*)

284.    Ally Bank agreed to fund mortgages originated by the Debtors, which enabled the

Debtors to continue to originate loans during their bankruptcy cases.  (Carpenter Direct ¶ 18(a).)

No other party was willing to enter into such an agreement with the Debtors.  (*Id.*)  Ally Bank's

support in this regard benefitted the Debtors in two material respects.  (*Id.*)  First, the fees paid

by Ally Bank to the Debtors for loans originated following the bankruptcy filing were paid at

market rates and totaled approximately $160 million to $180 million.  (*Id.*)  Because of this

support, the Debtors were able to continue to originate loans during the bankruptcy proceedings.

(*Id.*)  Second, Ally Bank's support also enabled the Debtors to preserve their ability to service

115

loans that they had sold to the GSEs.  (*Id.*)  The GSEs had indicated that they would revoke the
Debtors' authorization to service those loans if the Debtors did not have the ability to originate
mortgages throughout their bankruptcy proceedings.  (*Id.*)

285.    The Debtors were permitted to use Ally Bank's portfolio of loans for the purposes
of satisfying the Debtors' loan modification obligations to the Department of Justice.  (Carpenter
Direct ¶ 18(e).)  Ally Bank was the only mortgage originator willing or able to allow the Debtors
to use its loans for this purpose.  (*Id.*)  Ally also allowed the loans subserviced by the Debtors to
remain with the Debtors throughout these cases and ultimately to be sold as part of the servicing
platform. (*Id.*)

286.    Ally continued to provide the Debtors with the use of Ally's shared services, such
as centralized payroll and risk management services, and cooperated to permit the smooth
transition of the Debtors' businesses to purchasers of the Debtors' assets, which generated
substantial value for their Estates.  (Carpenter Direct ¶ 18(f).)  Additionally, Ally assumed the
Debtors' pension obligations, which helped the Debtors retain hundreds of employees including
its management team, and eliminated substantial claims by the Pension Benefit Guaranty
Corporation in these cases.  (*Id.*)  This was critical because the GSEs had made clear to the
Debtors that the GSEs would take prompt action if the Debtors experienced either a moderate
uptick in delinquencies or a significant change in management; Ally's shared services enabled
the Debtors to avoid an increase in delinquencies or a significant change in management.
(Marano Direct ¶¶ 6, 34; Carpenter Direct ¶ 18(f).)

287.    The $2.1 billion Ally Contribution constitutes a substantial contribution to the
Estates by the Ally Released Parties and constitutes the vast majority of the $2.6 billion that is
estimated to be available for distribution to unsecured creditors.  (*See* PX-869 at 27; Carpenter

Direct ¶ 24.)  It is the cornerstone of the Plan and Global Settlement, without which a consensual

resolution of these Chapter 11 Cases would be impossible.  (Kruger Direct ¶ 46; Dubel Direct ¶¶

51, 57.)  Ally's $2.1 billion contribution allows the Junior Secured Noteholders to be paid in full

and allows the unsecured creditors to receive at least three times more (and in many cases even

more) than they would have received absent Ally's cash contribution.  (*See* PX-869 at 27, 29;

Dubel Direct ¶ 74.)

288.    In exchange for these substantial contributions, as part of the Global Settlement,

the Ally Released Parties required that the Third Party Release be included in the Plan.

(Carpenter Direct ¶ 26.)  A comprehensive set of releases for Ally was the foundation for the

negotiations that led to the Debtors' pre-petition settlement with Ally and the inclusion of those

releases remained a guiding principle during the Mediation.  (Carpenter Direct ¶ 26.)  In entering

into the Mediation with Ally, the Committee understood that any deal with Ally would have to

include comprehensive releases from both estate and third-party claims.  (Dubel Direct ¶ 56.)  If

the Ally Contribution were in exchange only for releases from the Debtors, Ally would not have

agreed to the Ally Contribution and would not support the Plan because it would not have

provided a global resolution of potential claims against Ally regarding the Debtors' businesses.

(Carpenter Direct ¶ 26.)  Ally would not have entered into the Global Settlement and would not

have agreed to the Ally Contribution without the inclusion of the Debtor and Third Party

Releases in the Plan.  (Kruger Direct ¶¶ 39, 197; Carpenter Direct ¶ 26.)  The Ally Contribution

is the lynchpin of the Plan, without which the cases would devolve into endless litigation, the

Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan

would not exist.  (Kruger Direct ¶¶ 46, 197; s*ee also* Carpenter Direct ¶¶ 24-27.)

     **3.**       **The Debtors' Directors and Officers Provided Substantial
Consideration in Exchange for Releases**

289.    The Plan also provides that, in exchange for valuable consideration, the Debtor

Release and Third Party Release shall release all Claims that have been or could have been

brought against the Debtors' current and former officers and directors, including the Debtors'

CRO.  (Kruger Direct ¶ 202; *see also* Second Am. Plan [Dkt. No. 5993-1], Art. I.A.21 (definition

of "Ally Released Parties"), Art. I.A.75 (definition of "Debtor Released Parties"), Art. I.A.243

(definition of "Released Party"), Art. I.A.245 (definition of "Representatives"), Art. IX.C-D

(setting forth releases).)

290.    The Claims to be released under the Plan against such individuals include, but are

not limited to, claims relating to the pre-petition settlements with Ally and certain RMBS

investors, the DOJ/AG Settlement, the Consent Order, and the pre-petition sales of certain of the

Debtors' assets to Ally and affiliates of Cerberus Capital Management.  (Kruger Direct ¶ 203;

*see also* Second Am. Plan [Dkt. No. 5993-1], Art. IX.C-D (setting forth releases).)  In exchange

for these Releases, the Debtors' officers and directors will forego any claims for coverage they

may have under any D&O or E&O policies covering the Debtors or their officers and directors

for the period between November 2006 and the Effective Date, with respect to those Claims that

are released under the Plan.  (Kruger Direct ¶ 204; Hamzehpour Direct ¶ 14; *see also* Second

Am. Plan [Dkt. No. 5993-1], Art. I.A.282 (definition of "Settlement Insurance Policies"), Art.

IV.B.c (setting forth the settlement of the Debtors' Rights to and under Settlement Insurance

Policies).)

291.    This forbearance increased the amount that Ally was willing to contribute to the

Plan through the Ally Contribution because it will facilitate Ally's reaching a settlement with

certain of Ally's insurers regarding coverage issues.  (Kruger Direct ¶ 204.)  The Ally

Contribution includes the first $150,000,000 received by Ally for any D&O or E&O policy

claims it pursues against its insurance carriers related to the Claims released in connection with

the Plan.  (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.19.)  The Debtors' officers' and

directors' willingness to forego coverage directly increased the Ally Contribution by

$150,000,000.  (Kruger Direct ¶ 174.)

292.    The Debtors' officers and directors will also waive contractual claims, if any, for

indemnification that the Debtors' officers and directors may have against the Debtors and Ally

with respect to those Claims released under the Plan.  (Hamzehpour Direct ¶ 14; *see also* Second

Am. Plan [Dkt. No. 5993-1], Art. IV.B.c.)  As a result, Ally was willing to make a greater

contribution to the Plan and the Debtors and Ally were relieved of these contractual

indemnification claims.  (Kruger Direct ¶ 204.)

293.    By giving up their insurance and contractual indemnity claims, the Debtors'

officers and directors will have provided substantial consideration to the Debtors' Estates, which

is important to the success of the Plan.  (Hamzehpour Direct ¶ 14.)

C.    **Exculpation**

294.    The Plan provides that the Debtors, the Consenting Claimants, Ally, the

Creditors' Committee and its members, the Consenting JSNs, the Junior Secured Notes Indenture

Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured Notes

Collateral Agent, the Ad Hoc Group, and each of the foregoing entities' successors, assigns,

members, subsidiaries, officers, directors, partners, principals, employees and representatives

(the "**Exculpated Parties**"), will be exculpated from liability in connection with the negotiation

and documentation for any pre-petition plan support agreements, the Plan Support Agreement,

the Plan, Disclosure Statement, FGIC Settlement, RMBS Settlement, the JSN Settlement, and

any other documents entered into in connection with the Plan, other than for gross negligence or

willful misconduct.  (Kruger Direct ¶ 206.)  All objections to the exculpation provisions have

been consensually resolved or otherwise withdrawn.

295.    The exculpation provision in the Plan covers the Exculpated Parties' conduct

subsequent to the filing of these Chapter 11 Cases and, to the limited extent relevant, the conduct

of certain Exculpated Parties before the cases commenced.  (Kruger Direct ¶ 207.)  Moreover,

the Exculpated Parties covered by the exculpation provision includes both estate fiduciaries, such

as the Debtors, the Creditors' Committee, and the Debtors' officers and directors, as well as non-

estate fiduciaries, including the Consenting Claimants, the Consenting JSNs, the Junior Secured

Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior

Secured Notes Collateral Agent, the Ad Hoc Group, and Ally.  (*Id.*)

296.    The Exculpated Parties played a meaningful role in one form or another both prior

to the Petition Date through the negotiation and entry into various plan support agreements that

eased the Debtors' transition into Chapter 11, and after the Petition Date, in the mediation

process, and through the negotiation and implementation of the Global Settlement and Plan.

(Kruger Direct ¶ 208.)  The Exculpated Parties made a substantial contribution to the Debtors'

liquidation efforts and played an integral role in working towards an expeditious resolution of

this bankruptcy.  (*Id.*)  While the Ad Hoc Group and the Junior Secured Notes Indenture Trustee

engaged in significant litigation with the Plan Proponents, the Consenting JSNs' agreement to

accept the Modified Plan and cease all pending litigation provides significant benefits to the

Debtors' Estates by avoiding the costs, delays and risks associated with ongoing litigation.  In

addition, the Debtors, while involved in the negotiations with the officers and directors

(including the independent directors who are represented and advised by separate counsel)

regarding the exculpation provisions specific to the Debtors' officers and directors, understood that the directors' and officers' agreement to waive their right to insurance coverage and contractual indemnification under the plan was expressly conditioned on their receipt of exculpations for both pre- and post-petition conduct.  (*Id.*)

### D.    The Injunction

297.    The injunction provisions set forth in Article IX.H of the Plan are necessary to preserve and enforce the Debtor Releases, the Third Party Releases, and the exculpation provisions in Article IX of the Plan, and are narrowly tailored to achieve that purpose.  (*See* Second Am. Plan [Dkt. No. 5993-1], Art. IX.H)

### E.    The Judgment Reduction

298.    In fifteen of the RMBS-related litigations against the Debtors or Ally, their co-defendants included unaffiliated underwriters whose alleged liability is premised on the Debtors' RMBS securitizations.  (Lipps Direct ¶ 91; *see also id.* ¶ 96 (listing litigations in which unaffiliated underwriters are co-defendants).)  Because their purported liability in those suits is premised on alleged misstatements in the Debtors' RMBS offering materials, and due to certain contractual indemnities, thirteen unaffiliated underwriter co-defendants may have valid contribution or indemnification claims against the Debtors or Ally in connection with those cases: Bank of America, Barclays, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Lehman Brothers, Morgan Stanley, Merrill Lynch, RBS, UBS, and Merrill Lynch.  (Lipps Direct ¶ 91.)  These underwriters each filed proofs of claim against the Debtors for indemnification or contribution.  (*Id.*)

299.    Under the Plan, any claims for contribution or indemnification these unaffiliated underwriters may have against Ally arising from or related to the Debtors would be released.

121

(Lipps Direct ¶ 92.)  These unaffiliated underwriters are represented by sophisticated counsel and have appeared in this bankruptcy.  (*Id.*)  None of them has objected to the Third-Party Release. Three of them (Credit Suisse, Morgan Stanley, and RBS) voted to reject the plan.  (*Id.*)

300.    In light of the releases of contribution or indemnification claims against Ally, the Plan provides that any co-defendants in RMBS-related securities litigation with a valid contribution or indemnification claim against Ally that is subject to the Third-Party Releases shall be entitled to a judgment credit in the underlying litigation in accordance with, and to the extent permitted under, applicable statutory or common law, as determined by a court of competent jurisdiction.  (Lipps Direct ¶ 93.)  Certain counsel for unaffiliated underwriters were actively involved in drafting the Plan's judgment reduction language.  (*Id.*)

301.    The class action settlement approved by the district court in the *NJ Carpenters* litigation similarly provides that the unaffiliated underwriter co-defendants "shall be entitled to appropriate judgment reduction . . . in accordance with and to the extent permitted under applicable law."  (PX-677 at 9 of 9 (order approving settlement).)  The unaffiliated underwriter co-defendants in the *NJ Carpenters* consented to the settlement order (and the judgment reduction language) in that case.  (Lipps Direct ¶ 94.)

302.    In addition to the FHFA settlement with the Debtors described above, the FHFA has entered into a settlement with Ally.  (Lipps Direct ¶ 95.)  On November 5, 2013, Ally and the FHFA submitted a joint motion for voluntary dismissal of the FHFA action against Ally.  (PX-673 (Ally and FHFA joint motion for voluntary dismissal with prejudice).)  The proposed order submitted to the district court in connection with that motion provides that the unaffiliated underwriter co-defendants shall receive "a judgment credit in an amount that is the greater of (a) the amount of Plaintiff's settlement with the Ally Defendants in this Action that FHFA

allocated to the relevant security . . . or (b) for each such claim, state or federal, on which

contribution or indemnity is available, the proportionate share of each of the Ally Defendant's

fault as proven at trial."  (PX-674 (proposed order of dismissal with prejudice and bar order) at

3-4 of 7.)

### F.    Releases Related to Continuing Obligations

303.    The Plan provides that the Debtors shall perform any of their remaining

obligations under the DOJ/AG Settlement (other than certain obligations assumed by Ocwen

Loan Servicing, LLC, and Walter Investment Management Corporation), and the Consent Order.

(Kruger Direct ¶ 198.)  The Liquidating Trust shall assume any and all rights and remaining

obligations of only the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order

of Assessment.  (*Id*.)

304.    On the Effective Date, upon the appointment of the Liquidating Trust Board, the

persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as

the case may be, will be released from all further authority, duties, responsibilities, and

obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases.

(Kruger Direct ¶ 199.)  Upon such release and discharge, the Liquidating Trust Board will be

charged with the authority, duties, responsibilities, and obligations relating to and arising from

operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties,

responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee,

the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ

Carpenters Claims Distribution, in each case as provided in the Plan.  (*Id*.)

305.    As described above, the consideration provided by the Debtors' current and

former officers and directors in exchange for the release discussed in this section includes their

forbearance regarding any claims for coverage they may have under any D&O or E&O policies

covering the Debtors or their officers and directors between November 2006 and the Effective

Date, and their forbearance regarding any contractual claims for indemnification that they may

have against Ally or the Debtors.  (Kruger Direct ¶ 200.)  The Plan's release provisions also seek

to release the Debtors' current and former officers and directors from any post-Effective Date

liability, thereby preventing certain of these individuals, as a practical matter, from performing

the Continuing Obligations described in this section post-Effective Date.  (*Id.*)

306.    Notwithstanding anything to the contrary herein, nothing in the Plan shall release,

enjoin, or preclude the Debtors' officers and directors from pursuing any rights they may have

(i) to indemnification or advancement from Ally solely for any claims that are not released by the

Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased

by Ally or covering officers and directors of the Debtors, or against any party (other than the

Debtors) arising out of such policies of insurance, solely for any claims that are not released by

the Plan and the Confirmation Order.  (Kruger Direct ¶ 201.)  Nothing in the Plan expands or

reduces any existing indemnification rights or rights as an "insured" for any officer or director of

the Debtors for claims that are not released by the Plan.  (*Id.*)  No rights of the Consenting

Claimants are released under the Plan in their capacity as liability insurance or reinsurance

carriers for Ally or the Debtors.  (*Id.*)

## VIII.   FINDINGS RELEVANT TO THE JSN SETTLEMENT

307.    On December 3, 2013, the Plan Proponents filed the Second Amended Plan [Dkt.

No. 5993-1], which incorporates the terms of the JSN Settlement among the Plan Proponents,

and the Ad Hoc Group, (together with the Junior Secured Notes Indenture Trustee, the "**JSN**

**Objectors**") reached after the close of evidence in the Confirmation Hearing and Phase II of the

JSN Adversary Proceeding. (Kruger Supp. Decl. ¶¶ 1, 6-7.) The material terms of the JSN

Settlement, which resolves the most significant outstanding objection to confirmation, can be

described as follows:

- In addition to payment in full of outstanding principal and pre-petition interest, holders of Junior Secured Notes Claims will receive under the Plan an additional $125 million in full satisfaction of all amounts allegedly due and owing with respect to the Junior Secured Notes Claims, including post-petition interest, fees, costs, expenses, and indemnities, subject to the Plan becoming effective. (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.155; *id.* Art. III.D.1.c; *id.* Art. III.D.2.c; *id.* Art. III.D.3.c; *id.* Art. IV.A.l.)

- The Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured Notes Collateral Agent, and those holders of Junior Secured Notes who originally voted to accept (or have subsequently changed their votes to accept) the Plan ("Consenting JSNs"), the Ad Hoc Group, and their respective successors and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, affiliates and Representatives (the "JSN Released Parties"), will be considered "Debtor Released Parties" and "Exculpated Parties" under the Plan. (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.75; *id.* Art. I.A.102.)

- As set forth in more detail in Article IX.G of the Plan, the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent, and each of their successors and assigns, members (but with respect to the members of the Ad Hoc Group, to the extent such member previously voted to reject the Plan, only if such member is a Consenting JSN as of the Confirmation Date), partners, advisors, and Representatives, each solely in their capacities as such, will be deemed to have exchanged mutual releases with each other and the Debtors, the Creditors' Committee, each of the Consenting Claimants and the Ally Released Parties, and each of their successors and assigns, members, partners, advisors and Representatives, in their capacities as such, for Claims and Causes of Action arising from or related to the Debtors. (Second Am. Plan [Dkt. No. 5993-1], Art. IX.G.)

- Upon the Effective Date of the Plan, all claims, counterclaims, and/or issues raised in the JSN Adversary Proceeding and the FGIC Settlement Appeal shall be deemed finally and irrevocably settled by the Plan. (Second Am. Plan [Dkt. No. 5993-1], Art. IV.J.)

125

(Kruger Supp. Decl. ¶ 8.)

A.    **The JSN Settlement Is in the Best Interests of the Debtors' Estates**

308.    The JSN Settlement is fair, equitable, in the best interests of the Debtors' Estates

and satisfies the *Iridium* standards for approval of settlements under Bankruptcy Rule 9019.

(Kruger Supp. Decl. ¶ 11.)

1.    **The Balance Between the Litigation's Possibility of Success and the
Settlement's Future Benefits.**

309.    A balancing of the possibility of success on the merits and benefits of the JSN

Settlement weighs in favor of the Court approving the JSN Settlement.  (Kruger Supp. Decl. ¶

12.)

310.    The principal issues in the JSN Adversary Proceeding and these confirmation

proceedings are (i) whether the holders of Junior Secured Notes are oversecured such that they

are entitled to post-petition interest and (ii) whether and the extent to which the JSN Objectors

are entitled to reimbursement of the fees, costs and other expenses they have incurred during the

course of these cases.  (*See Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re

Residential Capital, LLC)*, No. 03-1277, 2013 WL 6086456, at *1 (Bankr. S.D.N.Y. Nov. 15,

2013) (the "**Phase I Decision**"); Kruger Supp. Decl. ¶ 13.)  The JSN Objectors have asserted

that, as of December 15, 2013, outstanding post-petition interest at the default rate will be

approximately $342 million.  (Phase I Decision at *57; Kruger Supp. Decl. ¶ 13)  The JSN

Objectors estimate that, in addition, their legal expenses alone will be in excess of $60 million.

(*See* Joint Pretrial Order (Proposed) ¶ 371, dated November 12, 2013 [Dkt. No. 5716] ("**Phase II

PTO**"); Kruger Supp. Decl. ¶ 13.)

311.    A determination of whether the holders of Junior Secured Notes Claims are

oversecured and entitled to post-petition interest will require the resolution of numerous hotly

contested issues of both law and fact.  (Kruger Supp. Decl. ¶ 14.)  The litigation among the Plan

Proponents and the JSN Objectors has been extensive and hard-fought and has involved the

following:

- More than 200 pages of briefing on motions to dismiss claims and counterclaims which were resolved by two separate opinions of the Court. (*See* JSN Adversary Proceeding Dkt. Nos. 74, 100.)

- 110 pages of Phase I fact stipulations and contentions.  (*See* Phase I Revised Joint Pretrial Order, JSN Adversary Proceeding Dkt. No. 161.)

- Multiple motions in limine to exclude the testimony of various proffered experts in connection with Phase I.  (*See* JSN Adversary Proceeding Dkt. Nos. 107, 109.)

- A Phase I trial that lasted six days, involved the submission of written testimony from thirteen witnesses and the admission of more than 700 exhibits.  *See Phase I Decision*, 2013 WL 6086456, at *5.

- More than 500 pages of Phase I post-trial legal briefing and proposed findings of fact.  (*See* JSN Adversary Proceeding Dkt. Nos. 185, 186, 187, 190, 191.)

- A 117 page memorandum opinion of the Court including findings of fact and conclusions of law after the conclusion of the Phase I trial.  (*See* JSN Adversary Proceeding Dkt. No. 228.)

- 177 pages of Phase II fact stipulations and contentions.  (*See* Phase II Proposed Joint Pretrial Order, JSN Adversary Proceeding Dkt. No. 220.)

- More than 275 pages of legal briefing by the Plan Proponents and the JSN Objectors in connection with Phase II/Plan confirmation issues.  (*See* Dkt. Nos. 5443, 5718, 5720, 5913.)

- Multiple motions in limine to exclude the testimony of various proffered experts in connection with Phase II of the JSN Adversary Proceeding and the Confirmation Hearing.  (*See* JSN Adversary Proceeding Dkt. Nos. 200, 202.)

- A Phase II/Confirmation Hearing that lasted five days, involved the submission of written testimony of thirty-one witnesses and the admission of 900 exhibits into evidence (including the more than 700 exhibits admitted during Phase I).

(Kruger Supp. Decl. ¶ 14.)

312.    Many of the issues in dispute in the JSN Adversary Proceeding were addressed by

the Court in the Phase I Decision, but in the absence of the JSN Settlement can be expected to be

the subject of appeals upon the entry of a final judgment in the JSN Adversary Proceeding.

(Kruger Supp. Decl. ¶ 15.)

313.    In addition to the issues that were litigated during Phase I, there are numerous

hotly contested legal and factual issues that, absent a consensual resolution, would need to be

resolved by the Court in connection with Phase II of the JSN Adversary Proceeding and

confirmation of the Plan.  (Kruger Supp. Decl. ¶ 16.) Those issues include, but are not limited to:

- Whether the Debtors have the authority to waive Intercompany Balances and release claims against Ally under the Plan without the consent of the holders of the Junior Secured Notes Claims.

- Whether the waiver of Intercompany Balances under the Plan is reasonable and in the best interests of the Debtors' Estates.

- Whether the holders of Junior Secured Notes Claims are entitled to adequate protection or some other form of compensation as a result of the Plan's waiver of Intercompany Balances and release of claims against Ally.

- Whether the holders of Junior Secured Notes Claims are secured by liens on the Intercompany Balances and the extent to which, if any, those liens have value.

- Whether the holders of Junior Secured Notes Claims are secured by liens on any claims that the Debtors may hold against Ally.

- Whether, and the extent to which, the Court is required to allocate any portion of the Ally Contribution to any claims upon which the JSN Objectors purport to have liens.

- Whether the Ally Contribution is a "new asset" for purposes of Section 552(a) of the Bankruptcy Code.

- Whether, for purposes of Section 552(b) of the Bankruptcy Code, any portion of the Ally Contribution can be considered "proceeds, products, offspring, or

profits" of any assets on which the holders of Junior Secured Notes Claims
held pre-petition liens.

- Whether the "equities of the case" exception contained in Section 552(b) of
  the Bankruptcy Code should preclude any of the liens held by the holders of
  Junior Secured Notes Claims from attaching to any portion of the Ally
  Contribution.

- Whether the Plan's settlements of the claims of the Monolines, the RMBS
  Trustees and investor securities claims are permissible or whether such
  settlements violate Section 510(b) of the Bankruptcy Code or otherwise cause
  the Plan to violate the absolute priority rule.

- Whether the holders of Junior Secured Notes Claims, even if undersecured,
  are entitled to collect post-petition interest through the aggregation of
  recoveries on account of their deficiency claims.

- If the holders of Junior Secured Notes Claims are entitled to collect post-
  petition interest, whether such post-petition interest accrues at the contractual
  default rate, contractual non-default rate or some other rate.

- Whether, and the extent to which, the holders of Junior Secured Notes Claims
  are entitled to reimbursement of fees, costs, and other expenses incurred in
  connection with these cases.

(Kruger Supp. Decl. ¶ 16; *see generally* Phase II PTO.)

314.    All of the foregoing issues (and many sub-issues subsumed within) have been

hotly contested and pose significant risk to the Debtors and their Estates.  (Kruger Supp. Decl. ¶

17.)  Many involve disputed issues of law or turn on heavily disputed issues of fact.  (*Id.*)  The

JSN Objectors need not prevail on all of those issues, and, in some cases, need only prevail on a

few, for the holders of Junior Secured Notes Claims to be entitled to compensation and/or

reimbursement of more than $400 million for post-petition interest and professionals' fees

incurred during the course of these cases.  (*Id.*)  Regardless of the outcome, the JSN Objectors

can be expected to appeal and seek to stay the effectiveness of any Confirmation Order, thereby

creating further obstacles to the Debtors' efforts to promptly conclude these Chapter 11 Cases.

(*Id.*)

315.    In exchange for, among other things, the payment of an additional $125 million in cash, the JSN Settlement allows the Debtors to avoid those risks and uncertainties and to avoid the incurrence of additional costs and expenses associated with continued litigation through appellate and related proceedings.  (Kruger Supp. Decl. ¶ 18.)

316.    In light of the substantial reduction in the Debtors' potential liability for post-petition interest and professional fees, costs and expenses, and the certainty afforded to the Debtors and their creditors provided by the JSN Settlement, a balancing of the risks presented by the cost of continued litigation and uncertainty of a successful outcome against the benefits of the JSN Settlement weighs in favor of approving the JSN Settlement as part of the Plan.  (Kruger Supp. Decl. ¶ 19.)

### 2.    The Likelihood of Complex and Protracted Litigation

317.    Even though there has already been progress towards the resolution of the issues presented in the JSN Adversary Proceeding in the form of the Phase I Decision, a final resolution has not been reached.  (Kruger Supp. Decl. ¶ 20.)  Absent approval of the JSN Settlement, the parties would be required to submit post-trial legal briefs and proposed findings of fact in connection with Phase II and confirmation.  (*Id.*)  And even after the Court issues a ruling on the Phase II and confirmation issues, the Court would still be required to resolve significant issues relating to the JSN Objectors' request of more than $60 million in professional fees (an issue that was deferred until after confirmation).  (*Id.*)

318.    Given the extent to which the parties have litigated disputed issues in these Cases to date (*see* Section VIII.A.1 above), it is likely that, in the absence of a consensual resolution,

ny-1118499

active litigation will continue throughout the appellate process, causing the Plan Proponents to incur significant additional legal expenses.  (Kruger Supp. Decl. ¶ 21.)

319.    As a result, absent approval of the JSN Settlement, the Debtors will continue to face protracted and expensive litigation.  (Kruger Supp. Decl. ¶ 22.)

> **3.    The JSN Settlement Is in the Interests of Creditors and Is Supported by Significant Creditors and Other Parties-in-Interest**

320.    In exchange for, among other things, a cash payment in the amount of $125 million, the JSN Settlement allows the Debtors' Estates to avoid the risks and uncertainties associated with continued litigation against the JSN Objectors which could, if the Plan Proponents are not successful, result in the Debtors' Estates being required to pay the holders of Junior Secured Notes Claims up to approximately $400 million in post-petition interest, fees, costs and expenses.  (Kruger Supp. Decl. ¶ 23.)

321.    The JSN Settlement permits the Plan Proponents to avoid the significant costs that they would incur as a result of continued litigation in the absence of a consensual resolution. (Kruger Supp. Decl. ¶ 24.)

322.    The JSN Settlement will also facilitate the effectiveness of the Plan and avoid any disputes that could arise concerning the Debtors' establishment of reserves pending appeal, thereby expediting distributions to creditors.  (Kruger Supp. Decl. ¶ 25.)

323.    The JSN Settlement has the support of the Creditors' Committee and the Consenting Claimants, representing substantially all of the major constituencies in these Chapter 11 Cases.  (Kruger Supp. Decl. ¶ 26.)

4.    **The Settling Parties Were Counseled by Experienced and Skilled Counsel and Advisors**

324.    The parties to the JSN Settlement are represented by highly experienced and skilled counsel and advisors.  (Kruger Direct ¶ 175-77; Kruger Supp. Decl. ¶ 28.)

325.    The Debtors are represented by Morrison Foerster, FTI Consulting and Centerview Partners.  (Kruger Direct ¶ 175; Kruger Supp. Decl. ¶ 29.)

326.    The Creditors' Committee is represented by Kramer Levin Naftalis & Frankel, Moelis and Alix Partners.  (Kruger Direct ¶ 176; Kruger Supp. Decl. ¶ 29.)

327.    The JSN Objectors are represented by Akin Gump Strauss Hauer and Feld; Milbank, Tweed, Hadley and McCloy; White & Case; Zolfo Cooper, LLC; and Houlihan Lokey.

5.    **The JSN Settlement Is the Product of Arm's-Length Bargaining**

328.    The JSN Settlement is the product of good faith and arm's-length negotiations. (Kruger Supp. Decl. ¶ 30.)

329.    The JSN Settlement was reached under the direct supervision of Judge Peck as Mediator after months of negotiations which continued throughout the litigation process. (Kruger Supp. Decl. ¶ 31.)

330.    Moreover, the litigation preceding the JSN Settlement has been lengthy and contentious, removing any doubt that the parties to the JSN Settlement were vigorously asserting their own interests in direct opposition to their adversaries that were doing the same.  (Kruger Supp. Decl. ¶ 32.)

6.    **The Nature and Breadth of the Releases**

331.    The JSN Settlement provides for the JSN Released Parties to become Debtor Released Parties under the Plan (Second Am. Plan [Dkt. No. 5993-1], Art. I.A.75) and to be deemed to have exchanged mutual releases with each other and the Debtors, the Creditors'

Committee, the Consenting Claimants, and the Ally Released Parties (Second Am. Plan [Dkt. No. 5993-1], Art. IX.G).  (Kruger Supp. Decl. ¶ 33.)  Those releases are consensual and appropriate in light of the significant benefits being provided to the Debtors, their Estates and their creditors through the JSN Settlement.  (*Id*.)

332.    In addition, the JSN Settlement provides for the JSN Released Parties to be become Exculpated Parties under the Plan.  (Kruger Supp. Decl. ¶ 34; Second Am. Plan [Dkt. No. 5993-1], Art. I.A.102.)  The Debtors, their Estates and creditors are receiving significant consideration under the JSN Settlement Agreement in exchange for the JSN Released Parties becoming Exculpated Parties under the Plan, including, among other things (i) the fixing of the Junior Secured Notes Claims for post-petition interest, fees, costs and expenses at an amount significantly below the asserted amounts by the JSN Objectors, (ii) the avoidance of the significant costs and expenses that the Plan Proponents would incur on behalf of the Debtors' Estates should the litigation with the JSN Objectors continue, and (iii) the facilitation of a prompt and orderly exit from Chapter 11 without the costs, risks, and delays associated with continued litigation through the appellate process.  (Kruger Supp. Decl. ¶ 34.)

**B.    The JSN Settlement Avoids the Need for a Cramdown of Junior Secured Notes Classes**

333.    The Consenting JSNs who have changed their votes to accept the Plan have caused classes R-3, GS-3, and RS-3 (the "**JSN Classes**") to be accepting classes for purposes of Section 1126(g) of the Bankruptcy Code because such Consenting JSNs hold at least two-thirds in amount and more than one-half in number of the allowed claims in such classes.  (Kruger Supp. Decl. ¶ 35; Supplemental Voting Declaration ¶ **[ __ ]**, dated December [ __ ], 2013 [Dkt. No. [ __ ] ].)

133

334.    Accordingly, the Plan complies with section 1129(a)(8) of the Bankruptcy Code
with respect to the JSN Classes and, as a result, the Plan Proponents need not satisfy the
requirements of section 1129(b) with respect to those classes.  (Kruger Supp. Declaration ¶ 36.)

### C.    No Further Re-Solicitation of the Plan Is Required

335.    Confirmation of the solicitation version of the Plan was not conditioned on
disallowance of post-petition interest on account of Junior Secured Notes Claims and expressly
contemplated that the Junior Secured Notes Claims could be awarded post-petition interest
should the JSN Objectors prevail in the JSN Adversary Proceeding.  (Kruger Supp. Decl. ¶ 37;
*see, e.g.*, PX-256, Disclosure Statement at 184 of 664.)

336.    The Disclosure Statement expressly disclosed to creditors that the Plan
Proponents were engaged in litigation with the JSN Objectors concerning their entitlement to
post-petition interest and, as a result, were the Court to determine that such holders are entitled to
post-petition interest, recoveries to other creditors in these cases would be lower than the
amounts projected under the Disclosure Statement.  (Kruger Supp. Decl. ¶ 38; PX-256,
Disclosure Statement at 51 of 664.)

337.    In addition, no re-solicitation of the Plan is required because the Plan Proponents
are not expecting any material change in anticipated recoveries to holders of General Unsecured
Claims after payment of the additional $125 million to the Junior Secured Noteholders as a result
of the JSN Settlement.  (Kruger Supp. Decl. ¶ 39.)  Because the Debtors have been
outperforming projections on certain asset recoveries and expenses to date, the Debtors currently
expect that the recoveries available to satisfy the claims of general unsecured creditors receiving
Units under the Plan will likely remain substantially similar to what was reflected in the recovery
analysis in the Disclosure Statement.  (*Id.*)

338.    Accordingly, the JSN Settlement does not provide for any material modifications

to the Plan that require a re-solicitation of votes.  (Kruger Supp. Decl. ¶ 40.)

       **D.**    **The Objection of Wells Fargo as Collateral Agent**

339.    The JSN Settlement also resolves the objection of Wells Fargo, who objected to

the Plan in its capacities as First Priority Collateral Agent, Third Priority Collateral Agent, and

Collateral Control Agent for the Junior Secured Notes (the "**Collateral Agent**").  (Kruger Supp.

Decl. ¶ 41; s*ee* Objection of Wells Fargo, dated October 21, 2013 [Dkt. No. 5410].)

340.    The Collateral Agent's objection arose from the Plan Proponents' disputes with

the Ad Hoc Group, which have since been resolved pursuant to the JSN Settlement.  (Kruger

Supp. Decl. ¶ 42.) The Collateral Agent's release of liens and security interests securing the

Junior Secured Notes was at issue in the JSN Adversary Proceeding.  (*Id*.)  The Collateral Agent

objected to the Plan, citing concerns that the Ad Hoc Group and UMB Bank could assert claims

against it in connection with those lien and security interest releases.  (*Id*.)  The Collateral Agent

alleged that, to the extent such claims were asserted, the Debtors would be required to indemnify

it.  (*Id*.)  In light of those potential claims, the Collateral Agent also objected to the Plan's Third-

Party Release.  (*Id*.)  The Collateral Agent alleged that it potentially had independent claims

against non-Debtors upon whom it relied in releasing liens and security interests, and that such

claims would be impermissibly extinguished by the Third Party Release.  (*Id*.)

341.    From time to time the Collateral Agent was directed to execute releases of liens

and security interests granted under the Revolver Security Agreement.  (Direct Testimony of

Michael Pinzon ¶ 16, dated November 12, 2013 [Dkt. No. 5921] ("**Pinzon Direct**"); Direct

Testimony of Teresa Rae Farley ¶ 44, dated October 8, 2013 [Adv. Pro. No. 13-01277, Dkt. No.

135

131; Adv. Pro. No. 13-01343, Dkt. No. 78] ("**Farley Direct**") (filed in connection with the Phase

I Adversary Proceeding).)

342.    The Junior Secured Notes Indenture provides that the liens and security interests

under the Notes Security Agreement may be released in accordance with the Intercreditor

Agreement and also under the enumerated circumstances.  (PX-1 (Junior Secured Notes

Indenture) at § 8.04; Farley Direct ¶ 16.)

343.    In executing releases of liens and security interests granted under the Notes

Security Agreement, the Collateral Agent was entitled to rely conclusively on Officer's

Certificates and Opinions of Counsel delivered to it.  (PX-4 (Notes Security Agreement) at § 10;

Pinzon Direct ¶ 25.)

344.    Each of the Officer's Certificates delivered to the Collateral Agent (i) stated the

authorization of the signatory to execute and deliver the Officer's Certificate; (ii) requested the

release of liens and security interests on certain Collateral; and (iii) stated that the conditions

specified in Section 8.04 of the Junior Secured Notes Indenture applicable to the release of liens

and security interests on the Collateral had been satisfied.  (Pinzon Direct ¶ 26.)

345.    Each of the Opinions of Counsel delivered to the Collateral Agent (i) stated that

the signatory was counsel; (ii) stated that the signatory examined the Security Agreement,

Indenture, and the Officer's Certificate; and (iii) opined that the Officer's Certificate was in the

form required by Section 8.04 of the Junior Secured Notes Indenture and that no other

documents were required to be delivered to the Collateral Agent or the Indenture Trustee as a

condition to the requested release of liens and security interests on the collateral.  (Pinzon Direct

¶ 27.)

346.    The Collateral Agent testified, and no witness in this case has testified to the

contrary, that the Collateral Agent acted in good faith and in accordance with its duties,

obligations, and responsibilities under the AFI Revolver, the Revolver Security Agreement, the

Intercreditor Agreement, the Junior Secured Notes Indenture, and the Notes Security Agreement.

(*See generally* Pinzon Direct.)

347.    The JSN Settlement resolves the Collateral Agent's objection, because that

objection's sole concern is liability derivative of the Debtors' disputes with the Ad Hoc

Group.  (Kruger Supp. Decl. ¶ 43.)   Under the Plan, the Collateral Agent is named as one of the

Debtor Released Parties and an Exculpated Party, and The Collateral Agent will be protected

from potential claims in accordance with Plan Article IX.G and the Confirmation Order.

## IX.    REMAINING BORROWER OBJECTIONS

348.    There are six unresolved borrower-related objections purporting to oppose

confirmation of the Plan:  Kevin C. Kovacs [Dkt. No. 5264]; David R. Munger [Dkt. No. 5273];

Caren Wilson [Dkt. No. 5409]; Richard Rode [Dkt. No. 5414]; Paul N. Papas II [Dkt. No. 5466];

and Deborah D. Bennett [Dkt. No. 5522].  (Kruger Supp. Decl. ¶ 46.)  The objections filed by

Mr. Papas and Ms. Bennett were filed after the Objection Deadline of October 21, 2013 at 4 p.m.

Eastern, and those individuals neither requested an extension from the Plan Proponents nor

received authorization from the Court to file after that Objection Deadline.  (*Id.*)

349.    The unresolved borrower-objections filed by Ms. Wilson, Mr. Rode, and Mr.

Papas were joinders to the now-withdrawn objection filed by Wendy Nora [Dkt. No. 5398].

(Kruger Supp. Decl. ¶ 47.)  None of the individuals who filed joinders presented any evidence

bearing on confirmation, and only one of them, Mr. Rode, actively participated in the

confirmation hearing.  (*Id.*)  Counsel for both the Debtors and the Creditors' Committee have

been—and continue to be—engaged in discussions with Mr. Rode and his counsel and with

Ocwen, who is now the servicer for Mr. Rode's mortgage loan, regarding his concerns about his

mortgage loan and whether the proofs of claim Mr. Rode filed against the Debtors and his Plan

objection can be consensually resolved.  (*Id.*)

350.    Ms. Nora's objection raised four issues.  First, she argued that the Plan was not

proposed in good faith.  (Kruger Supp. Decl. ¶ 48.)  The Plan Proponents submitted uncontested

evidence that the Plan was developed through lengthy good faith negotiations, which were

conducted under the supervision of Judge Peck.  (Kruger Direct ¶ 25; Dubel Direct ¶ 43.)  The

Plan Proponents have also submitted uncontested evidence that the Plan is intended to provide

creditors with an expeditious distribution of estate assets in compliance with the Bankruptcy

Code and applicable non-bankruptcy law, and has overwhelming creditor support.  (*See

generally supra* Section II (Findings Relevant to Confirmation under the Bankruptcy Code) and

Section VI.A (outlining the mediation).)

351.    Second, Ms. Nora asserted that the Plan does not comply with the requirements of

Section 1125 of the Bankruptcy Code, and that the Plan Proponents provided inadequate notice

of the confirmation proceedings.  (Kruger Supp. Decl. ¶ 49.)  Ms. Nora raised identical

arguments at the hearing to approve the Disclosure Statement, which the Court overruled,

holding that the Disclosure Statement contained adequate information pursuant to Section 1125

of the Bankruptcy Code.  (Aug. 21, 2013 Disclosure Hr'g Tr. 122:24-25.)  Also, as set forth in

the uncontested *Affidavit Of P. Joseph Morrow IV Certifying The Tabulation Of Votes On The

Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al. And The Official Committee

Of Unsecured Creditors* [Dkt. No. 5699], the Disclosure Statement, appropriate ballots, notices,

and related solicitation materials were distributed to all parties in accordance with the terms of

the Disclosure Statement Order. The date and time of the voting deadline and confirmation

hearing were also published in the *Wall Street Journal* and *USA Today* on September 3, 2013.

(*See* Affidavit of Publication, [Dkt. No. 5025].)

352.    Third, Ms. Nora argued that the funding of the Borrower Claims Trust was

inadequate, and that the Plan inappropriately treats Borrower Claims as a separate class of

general unsecured claims. (Kruger Supp. Decl. ¶ 50.) Borrower Claims are qualitatively

different from those of other general unsecured claimants, thus warranting their separate

classification. (*See* Thompson Direct ¶¶ 3, 10-12.) Under the Plan, Borrowers are receiving

cash, rather than Liquidating Trust Units, and to the extent appropriate, the Borrower Claims

Trust will implement and utilize alternative dispute resolution procedures to allow for the

specialized resolution of Borrower Claims. (*Id.*) Borrower Claims will receive a distribution

under the Plan that is estimated to be equivalent to that received by other general unsecured

creditors at the same Debtor Group. (*Id.*) Also, none of the individuals that filed joinders to Ms.

Nora's objection were in classes that voted to reject the Plan, and thus they lack standing to

object to the Plan on the basis that it does not satisfy Section 1129(b) of the Bankruptcy Code,

which only applies to impaired rejecting classes. (*Id.*)

353.    Fourth, Ms. Nora objected on the grounds that the Third Party Release under the

Plan is unjustified. (Kruger Supp. Decl. ¶ 51.) There is no evidence that the individuals joining

Ms. Nora's objection hold claims against Ally that are being released under the Plan. Also, the

Plan Proponents submitted uncontested evidence during the confirmation hearing that the Third

Party Release should be granted. (*See* Kruger Direct ¶¶ 194-97; s*ee generally* Marano Direct;

Carpenter Direct; *see also supra* Section VII (findings regarding the releases).)

354.    The individuals who filed the three remaining unresolved borrower-related objections, Mr. Kovacs, Mr. Munger, and Ms. Bennett, also did not actively participate in the confirmation hearing or present any evidence bearing on confirmation.  (Kruger Supp. Decl. ¶ 52.)  Mr. Kovacs filed a proof of claim against the Debtors (Claim No. 1275) that was expunged pursuant to the *Order Granting Debtors' Fiftieth Omnibus Objection To Claims (No Liability Borrower Claims – Books And Records)* [Dkt. No. 5892].  (Kruger Supp. Decl. ¶ 52.)  Mr. Munger and Ms. Bennett have not filed any claims against the Estates, nor is there any evidence that they hold claims against Ally.  (*Id.*)

355.    SilvermanAcampora LLP, special counsel to the Creditors' Committee for borrower matters, attempted to contact each of these individuals to ascertain the basis for each of their objections, which do not articulate any specific basis for denying confirmation of the Plan, but such efforts were unsuccessful.  (Kruger Supp. Decl. ¶ 53.)

## X.    FINDINGS RELEVANT TO WACHOVIA

356.    On January 3, 2012, Ally, Ally Servicing LLC, and Motors Insurance Corp., (collectively, the "**Ally Depositors**") and ResCap, together with certain of its subsidiaries, (collectively, the "**Debtor Depositors**") together with the Ally Depositors, (collectively, the "**Depositors**") executed that certain Commercial Deposit Agreement for Large Corporate Customers dated as of January 3, 2012 (the "**Deposit Agreement**") with Wachovia Bank and Wachovia Bank of Delaware, both of which were succeeded by Wells Fargo Bank, N.A. ("**WFBNA**").  (*See Stipulated Facts in Connection with the Limited Objection of WFBNA to Confirmation of the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, and the Official Committee of Unsecured Creditors* ¶ 1, dated November 20, 2013 [Dkt. No. 5912-1].)

357.     The Depositors have reserved all rights, remedies, and arguments in connection

with the Deposit Agreement, including their right to dispute its validity and enforceability and

their right to challenge any liability for, and the reasonableness of, any legal fees and expenses

arising from or related to the Deposit Agreement.  (*Id*. ¶ 2.)

358.     All of the Debtor Depositors' accounts were closed on or before June 12, 2012.

(*Id*. ¶ 4.)

359.     WFBNA sent a letter, dated March 19, 2012, to the Depositors purporting to

amend the Deposit Agreement effective as of April 25, 2012 (the "**Purported Amendment**"),

subject to the Depositors' continued use of WFBNA's services under the Deposit Agreement,

including holding bank accounts at WFBNA, as of April 25, 2012.  (*Id*. ¶ 5.)

360.     The Depositors dispute the validity and enforceability of the Purported

Amendment and reserve all rights, remedies, and arguments in connection therewith, including

their right to challenge any liability for, and the reasonableness of, any legal fees and expenses

arising from or related to the Amendment.  (*Id*. ¶ 6.)

361.     The closing of any Ally Depositor account required WFBNA to approve such

closure in accordance with its internal administrative processes, and at all relevant times

WFBNA controlled the timing of the closing of any account upon a request for account closure,

WFBNA was fully aware of the processes required to close such accounts.  (*Id*. ¶ 7.)

362.     As of August 2, 2013, one of Ally's forty accounts at WFBNA was closed.  (*Id*. ¶

8.)  As of August 28, 2013, thirty-seven of Ally's remaining thirty-nine accounts at WFBNA

were closed.  (*Id*.)  As of September 21, 2013, one additional Ally account at WFBNA was

closed.  (*Id*.)  As of October 25, 2013, the final remaining Ally account at WFBNA was closed.

(*Id*.)  On November 5, 2013, WFBNA informed Ally of a legacy account opened in 1978. (*Id*.)

That account was closed on November 6, 2013. (*Id*.) Certain of such accounts may have had positive balances prior to their closure. (*Id*.)

363.    WFBNA filed unliquidated proofs of claim against the Debtors on account of the Debtor Depositors' accounts. (*Id*. ¶ 9.) WFBNA asserts, through its counsel Winston & Strawn LLP ("**Winston**"), that it has incurred an aggregate amount of approximately $850,000.00 on account of legal services provided by Winston related to the Debtor Depositors' accounts, including the preparation and filing of three limited objections and two reservations of rights in these Chapter 11 Cases. (*Id*.)

364.    As of the date hereof, WFBNA's known claims against the Debtors arise solely from legal services and expenses related to the Debtor Depositors' accounts. (*Id*. ¶ 10.) WFBNA also alleges that it has the right to indemnification from Ally under the Purported Amendment for such legal services and expenses. (*Id*.)

365.    On November 29, 2012, Ally received WFBNA's request for payment in an amount of $388,486.02, for reimbursement of Winston's fees and expenses for services related to the Debtor Depositors' accounts allegedly rendered through September 2012. (*Id*. ¶ 11.)

366.    On December 11 and 12, 2012, in response to the request of Kirkland & Ellis LLP ("**Kirkland**"), as Ally's counsel, Winston provided invoices to Kirkland in support of the fees allegedly incurred for its representation of WFBNA in connection with the Debtor Depositors' accounts. (*Id*. ¶ 12.) The invoices were substantially redacted. (*Id*.)

367.    On December 18, 2012, Kirkland sent a letter to Winston, questioning the reasonableness of Winston's request for payment and the ethics of Winston's billing practices. (*Id*. ¶ 13.)

368.    WFBNA sent a letter to Ally dated December 21, 2012, stating that WFBNA

planned to debit amounts from Ally's accounts to pay obligations allegedly owed by Ally's

subsidiaries, consisting of Winston's legal fees and expenses related to the Debtor Depositors'

accounts.  (*Id.* ¶ 14.)

369.    WFBNA claims that Ally, as guarantor of the Debtor Depositors' obligations, is

responsible to pay Winston's fees and expenses.  (*Id.* ¶ 16.)

370.    Ally disputes WFBNA's claim that Ally is responsible for Winston's fees and

expenses and reserves all right, remedies, and arguments in connection with that and all other

claims.  (*Id.* ¶ 17.)

371.    On December 26, 2012, WFBNA debited approximately $472,000 from Ally's

accounts at WFBNA to reimburse itself for payment of a portion of Winston's fees and expenses

incurred in connection with the Debtor Depositors' accounts.  (*Id.* ¶ 18.)

## XI.    WAIVER OF THE RULE 3020(e) STAY

372.    Waiver of the fourteen day stay of effectiveness of the Confirmation Order

contained in Bankruptcy Rule 3020(e) is appropriate.  (Kruger Supp. Decl. ¶ 54.)[21]  The Plan is

nearly consensual with only seven parties continuing to prosecute their objections to the Plan: (i)

WFBNA (defined below), (ii) three borrowers who filed joinders to the withdrawn objection to

the Plan filed by Wendy Alison Nora, namely Caren Wilson, Richard Rode, and Paul Papas, and

(iii) three standalone borrowers, namely Kevin Kovacs, David  Munger and Deborah Bennett.

(*Id.*)  As a practical matter, the party most likely to have appealed entry of the Confirmation

Order, the Ad Hoc Group, is now a consenting party supporting the Plan.  (*Id.*)

---

[21] To the extent applicable, it is appropriate for the Court to waive any stay provided for under any other applicable
Bankruptcy Rule, such as Rules 6004(h) or 6006(d).

ny-1118499

373.     The business deal reached among the parties to the JSN Settlement weighs in favor of waiver of the Rule 3020(e) stay.  (Kruger Supp. Decl. ¶ 55.)  The parties to the JSN Settlement, approval of which will result in a near global resolution to these complex Chapter 11 Cases, have made the prompt effectiveness of the Confirmation Order—on or before December 24, 2013—a condition to the effectiveness of that settlement.  (*Id*.)  If the Effective Date does not occur promptly after entry of the Confirmation Order, some parties to the JSN Settlement believe that there may be adverse tax consequences that could undermine and potentially abrogate the settlement.  (*Id*.)  Ally has agreed to extend the Plan Support Agreement deadline for effectiveness of the Plan, but only to December 24, 2013.  (*Id*.)  All parties in interest have had notice of the waiver of stay since November 12 and could have raised an objection anytime thereafter, including at the confirmation hearing.  (*Id*. ¶ 56.)  No party has done so.  (*Id*.)  Due to the lack of objection to the waiver, the lack of outstanding substantial objections to confirmation, and the fact that the JSN Settlement, which provides a great benefit and certainty to the estate, is conditioned on the waiver, it is appropriate and reasonable for the Court to grant the waiver of the Rule 3020(e) stay.  (*Id*.)

ny-1118499

Dated:  December 5, 2013

**MORRISON & FOERSTER LLP**

 /s/  *Gary S. Lee*
Gary S. Lee
Charles L. Kerr
Darryl P. Rains
J. Alexander Lawrence
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900


-and-

**CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP**

 /s/  *Steven J. Reisman*
Steven J. Reisman
Theresa A. Foudy
Michael Moscato
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-8860
Facsimile:  (212) 697-1559

*Counsel to the Debtors and
Debtors in Possession*

**KRAMER LEVIN NAFTALIS
& FRANKEL LLP**

 /s/ *Kenneth H. Eckstein*
Kenneth H. Eckstein
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000


-and-

**PACHULSKI STANG ZIEHL
& JONES LLP**

 /s/  *Robert J. Feinstein*
Robert J. Feinstein
John A. Morris
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Counsel to the Official Committee of
Unsecured Creditors*

ny-1118499