**Hearing Date: December 20, 2013 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: December 13, 2013 at 4:00 p.m. (Eastern Time)**

MORRISON & FOERSTER LLP
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Joseph A. Shifer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

---------------------------------------------------------------

**PLAN PROPONENTS' MOTION FOR ORDER ESTABLISHING**
**THE DISPUTED CLAIMS RESERVE IN CONNECTION WITH THE JOINT**
**CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC,**
<u>**ET AL. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................2

JURISDICTION AND VENUE.......................................................................................3

BACKGROUND ..............................................................................................................3

THE PLAN .......................................................................................................................5

THE CLAIMS PROCESS ................................................................................................8

RELIEF REQUESTED ...................................................................................................10

    A.      Components of the Disputed Claims Reserve .........................................10

        i.      Liquidated Claims ........................................................................10

        ii.     Partially Unliquidated Claims .....................................................11

        iii.    Wholly Unliquidated Claims........................................................12

        iv.    Claims Subject to Objection ........................................................13

        v.      No Liability Claims ......................................................................14

        vi.    Contingent Claims .......................................................................14

    B.      The Disputed Claims Reserve Will be Cumulative................................15

BASIS FOR RELIEF ......................................................................................................17

NOTICE ..........................................................................................................................23

CONCLUSION ...............................................................................................................24

## TABLE OF AUTHORITIES

Page(s)

Cases

Adelphia Bus. Solutions, Inc. v. Abnos,
    482 F.3d 602 (2d Cir. 2007) ........................................................................18

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),
    10 F.3d 944 (2d Cir. 1993) .........................................................................18

In re Adelphia Commc'ns Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2003) .......................................................18

In re Bally Total Fitness of Greater N.Y., Inc.,
    No. 08-14818 (BRL) (Bankr. S.D.N.Y. Oct. 5, 2009) ...............................17

In re Chemtura Corp.,
    No. 09-11233 (REG) (Bankr. S.D.N.Y. Oct. 29, 2010) .............................22

In re Dana Corp.,
    No. 06-10354 (BRL) (Bankr. S.D.N.Y. Nov. 28, 2007) ............................17

In re Delphi Corp.,
    No. 05-44481 (RDD) (Bankr. S.D.N.Y. Sept. 28, 2007) ...........................22

In re Enron Corp.,
    No. 01-16034, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006) .........17, 19

In re General Maritime Corp.,
    No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 26, 2012) ..............................22

In re Lomas Fin. Corp.,
    172 B.R. 3 (S.D.N.Y. 1994) ........................................................................17

In re Lyondell Chem. Co.,
    No. 09-10023 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) ............................22

In re Motors Liquidation Co.,
    No. 09-50026 (REG) (Bankr. S.D.N.Y. Mar. 23, 2011) ............................22

In re N.Y. Med. Grp., P.C.,
    265 B.R. 408 (Bankr. S.D.N.Y. 2001) ........................................................18

Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co. of Union Square,
    Inc.),
    160 B.R. 40 (S.D.N.Y. 1993) ......................................................................18

Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs.,
      LLC),
      423 F.3d 166 (2d Cir. 2005) ........................................................................................ 19

**STATUTES**

11 U.S.C. § 105(a) ............................................................................................................ 19

11 U.S.C. § 502(c) ............................................................................................................ 17

11 U.S.C. § 1142(b) .......................................................................................................... 18

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3021 ...................................................................................................... 17

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")[1] and the Official Committee of Unsecured Creditors (the "Creditors' Committee," and together, the "Plan Proponents"), hereby submit this motion (the "Motion") for entry of an order in substantially the form annexed hereto as Exhibit 1 (the "Proposed Order") pursuant to sections 105(a), 502(c) and 1142(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), and Rule 3021 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), establishing a disputed claims reserve (the "Disputed Claims Reserve") for disputed claims in Classes R-4 (ResCap Unsecured Claims), GS-4 (GMACM Unsecured Claims), and RS-4 (RFC Unsecured Claims) (collectively, the "Disputed Class 4 Claims") in connection with distributions to be made under the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 5993] (as may be amended or modified from time to time, the "Plan").[2]  In support of the Motion, the Plan Proponents rely upon and incorporate by reference the Declaration of Deanna Horst, Chief Claims Officer for Residential Capital, LLC and its affiliates, a copy of which is annexed hereto as Exhibit 2 (the "Horst Declaration"), and represent as follows:

---

[1]   The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Motions [Docket No. 6] (the "Whitlinger Affidavit").

[2]   Capitalized terms not otherwise defined herein shall have the meaning set forth in the Plan.

## PRELIMINARY STATEMENT

1.      Under the Plan, the Liquidating Trust will be established for the purposes of winding down the Debtors' estates and making distributions to creditors.  Holders of Unsecured Claims (with certain limited exceptions)[3] will receive Units in the Liquidating Trust, which will entitle the holders thereof to Cash distributions after the payment of all senior claims.

2.      Because a number of the Unsecured Claims classified in Classes R-4 (ResCap Unsecured Claims), GS-4 (GMACM Unsecured Claims), and RS-4 (RFC Unsecured Claims) under the Plan will be Disputed as of the Effective Date, the Plan provides that the Plan Proponents will establish the Disputed Claims Reserve.  The Disputed Claims Reserve will hold Units in reserve for these disputed Unsecured Claims so that, following the Effective Date, the Liquidating Trust can make distributions to holders of Unsecured Claims that are Allowed.

3.      By this Motion, the Plan Proponents seek to establish the Disputed Claims Reserve based on an estimate of Disputed Class 4 Claims in the amount of $380.3 million.[4]  For the reasons discussed herein, the Plan Proponents believe that the requested reserve is conservative and will ensure that holders of Disputed Class 4 Claims will receive the treatment under the Plan to which they are entitled if and when their claims are Allowed.  To be clear, the Plan Proponents believe that the actual Allowed amounts of the Disputed Class 4 Claims will be far lower than the amount being reserved.

---

[3]     Under the Plan, holders of Allowed Borrower Claims will receive a Cash distribution from the Borrower Claims Trust in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.  Accordingly, the establishment of the Disputed Claims Reserve does not implicate recoveries to on account of Borrower Claims.

[4]     As explained in the Motion, the Plan provides that the Units will be distributed to Allowed Claims in Classes 4 and 6 of the three Debtor Groups.  Because no Claims in Class 6 are disputed, no reserve is needed for Class 6 Claims.

4.      Thus, the Court is not being asked to estimate any particular Disputed Class 4 Claim pursuant to this Motion.  Rather, the purpose of this Motion is to obtain approval of the estimate for the total amount of the Disputed Claims Reserve established for all Disputed Class 4 Claims, thereby enabling the Liquidating Trust to allocate Units to the Disputed Claims Reserve, distribute Units to holder of Allowed Claims, and make Cash payments on account of the Units as soon as practicable.  Without the relief requested herein, the Liquidating Trust's ability to effectuate timely distributions to holders of Allowed Unsecured Claims following the Effective Date could be delayed for an indefinite period of time.  Accordingly, for the reasons set forth herein, the Plan Proponents request that the Court enter the Proposed Order establishing the Disputed Claims Reserve under the Plan.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 502(c) and 1142(b) and Bankruptcy Rule 3021.

## BACKGROUND

7.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases.

- 3 -

8.      On May 16, 2012, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee.

9.      On August 29, 2012, the Bankruptcy Court entered an order establishing: (i) November 9, 2012 as the deadline for Creditors to file proofs of claim against the Debtors (the "General Bar Date"), and (ii) November 30, 2012 as the deadline for governmental units to file proofs of claim [Docket No. 1309].  Due to events precipitated by Hurricane Sandy, the Bankruptcy Court approved an extension of the General Bar Date to November 16, 2012 [Docket No. 2093]; however, the governmental units bar date was not extended.

10.     On March 21, 2013, the Bankruptcy Court entered an order approving certain omnibus claim objection procedures [Docket No. 3294] (the "Claims Procedures Order").  The Claims Procedures Order permits the Debtors, in consultation with the Creditors' Committee, to: (i) object to filed Claims on a collective basis on additional grounds not set forth in Bankruptcy Rule 3007(d); (ii) object to Borrower Claims subject to certain specified procedures; (iii) settle certain Claims without further Bankruptcy Court approval; and (iv) amend the Debtors' Schedules to resolve any discrepancies that may be discovered as part of the claims reconciliation process.

11.     On July 3, 2013, the Plan Proponents filed the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4153] and the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4157] (the "Disclosure Statement").  On August 16, 2013, the Plan Proponents filed a revised Disclosure Statement, which included a revised copy of

- 4 -

the plan filed on July 3, 2013 [Docket No. 4733], each of which were further revised on

August 20, 2013 [Docket No. 4770] and August 23, 2013 [Docket No. 4819].  On August

23, 2013, the Court entered an order approving, *inter alia*, the Disclosure Statement, as

amended [Docket No. 4809].

12.     The hearing to consider confirmation of the Plan was conducted on

November 19-22, and 25-26, 2013.

## THE PLAN

13.     Under the Plan, substantially all of the Debtors' assets, including the Ally

Contribution, will vest with the Liquidating Trust.  See Plan, Article VI.C.  Following the

Effective Date, the Liquidating Trust will, among other things, (i) monetize the Debtors'

non-Cash assets; (ii) make Cash payments to holders of Allowed Administrative, Priority,

Secured, and certain Unsecured Claims;[5] (iii) issue Units to holders of Allowed

Unsecured Claims (as well as to the Disputed Claims Reserve) that are Liquidating Trust

Unit Beneficiaries; and (iv) make periodic distributions to holders of Units, including

Units held in the Disputed Claims Reserve.  See Disclosure Statement, Article II.N.2.

14.     The Liquidating Trust Unit Beneficiaries consist of Allowed Claims in the

following Classes under the Plan:  (i) Class R-4 (ResCap Unsecured Claims); (ii) Class

R-6 (ResCap Private Securities Claims); (iii) Class GS-4 (GMACM Unsecured Claims);

(iv) Class GS-6 (GMACM Private Securities Claims); (v) Class RS-4 (RFC Unsecured

Claims), and (vi) Class RS-6 (RFC Private Securities Claims).  The allocation of the

---

[5]     The Plan provides that holders of Unsecured Claims that are either General Unsecured Convenience
Class Claims or ETS Unsecured Claims will receive distribution of Cash on account of their Claims.
See Plan, Article VII.B.

- 5 -

Units among each Debtor Group and the Private Securities Claims Trust is specifically provided for in the Plan.[6]

15.     The Class 6 Claims consist of the Private Securities Claims, none of which are Disputed under the Plan.  See Plan, Article IV.E.  The Class 4 Claims, however, include many Unsecured Claims that are unliquidated, contingent, or Disputed and thus are not treated as Allowed Claims under the Plan.  To calculate the allocation of Units for all Allowed Claims (including those that are presently Disputed), the Disputed Claims Reserve must be established to provide for Disputed Class 4 Claims that may become Allowed Claims in the future.[7]

16.     The Disputed Claims Reserve will hold Units in reserve for future allocation to holders of Disputed Class 4 Claims that are subsequently Allowed, and will also hold Cash distributions made on those Units by the Liquidating Trust.  Units, and a corresponding amount of the Cash distributions made on those Units, will be given to holders of Disputed Class 4 Claims at the time, and to the extent, the claims are subsequently Allowed.  See Plan, Article VIII.D.

17.     After the Reserve Amount (as defined below) is established, the Liquidating Trust will be able to calculate, for each Debtor Group, a ratio of Units to be

---

[6]     Pursuant to the Plan, 100 million Units will be initially allocated as follows: (i) 30,413,337 Units for the ResCap Debtor Group; (ii) 27,045,339 Units for the GMACM Debtor Group; (iii) 32,995,746 for the RFC Debtor Group; and (iv) 9,545,578 Units for the Private Securities Claims Trust.  See Plan, Article I.A.129, 223, 248, & 254. Following the determination of the Reserve Amount, this allocation will be adjusted in accordance with Article IV.K. of the Plan.

[7]     Under the Plan, the Initial Unit Distribution Record Date, which is the record date for determining the holders of Allowed Claims entitled to participate in the initial distribution of Units from the Liquidating Trust, is the date as of which the Disputed Claims are to be estimated.  See Plan, Article I.A.141.  However, because many of the Unsecured Claims that will be Allowed as of the Effective Date, are Allowed only upon the effectiveness of the Plan, for the purposes of establishing the Disputed Claims Reserve, to the extent the allowance of a Claim as of the Initial Unit Distribution Record Date is contingent only upon the effectiveness of the Plan, such Claim shall be deemed to be Allowed as of the Initial Unit Distribution Record Date.  The Proposed Order provides that the Initial Unit Distribution Record Date shall be the date of this Motion.

issued per dollar amount of Allowed General Unsecured Claim against the respective Debtor Group and the number of Units to be allocated to the Disputed Claims Reserve. The Units to be reserved in the Disputed Claims Reserve for the Disputed Class 4 Claims will be the number of Units that would be distributed on account of these Claims were they to be Allowed in full in their estimated amounts.  See Plan, Article VIII.D.  As a consequence, the Liquidating Trust Unit Beneficiaries will receive the same distributions irrespective of whether their Claims are Allowed before or after the Effective Date, depending only on the Allowed amounts of their Claims and the Debtor Group against which their Claims are held.

18.    Once the Disputed Claims Reserve is established, no additional Units will be added to the Disputed Claims Reserve following the Effective Date.  In the event that at any time the Units and the related Cash remaining in the Disputed Claims Reserve are insufficient to satisfy all of the Disputed Class 4 Claims that at the time have become Allowed, then the Allowed Disputed Class 4 Claims that at the time are unsatisfied will be satisfied *pro rata* from the remaining Units and Cash in the Disputed Claims Reserve. After all Units, and the Cash distributed with respect thereto, have been distributed from the Disputed Claims Reserve, no further distributions will thereafter be made in respect of Disputed Class 4 Claims.  See Plan, Article VIII.D.  Notwithstanding, it is the Plan Proponents' belief that the aggregate reserve proposed and described in greater detail herein utilizes a conservative methodology that adequately protects the claimants' interests and ensures that the reserve is more than sufficient to provide the Disputed Class 4 Claims with sufficient Units.

ny-1120292

## THE CLAIMS PROCESS

19.     The Debtors and their advisors have been and continue to be engaged in a diligent and comprehensive review and reconciliation of all Claims filed against the Debtors' Estates.  As of November 14, 2013, over 8,200 Claims in the aggregate amount of approximately $109.8 billion were filed or scheduled against the Debtors.  The Claims pool is composed of approximately 7,310 filed proofs of claim and 932 scheduled claims, the latter of which were scheduled as liquidated and undisputed where no proof of claim was filed.  See Horst Decl. at ¶ 5.

20.     Since the entry of the Claims Procedures Order, the Debtors, in consultation with the Creditors' Committee, have made substantial progress in examining, reconciling and adjudicating the Claims.

21.     First, the Plan Support Agreement among the Debtors, the Creditors' Committee, AFI, and the Consenting Claimants, dated May 13, 2013, resolves 1,183 Claims in the aggregate face amount of $36.3 billion.  Second, the Debtors filed 51 omnibus claims objections and 22 individual claim objections, including 29 objections addressing 871 non-Borrower Claims in the aggregate amount of $22.0 billion.  To date, the successful prosecution of omnibus and individual claims objections has expunged 824 non-Borrower Claims in the aggregate face amount of $22.0 billion, and pending claims objections address an additional 5 non-Borrower Claims in the aggregate face amount of $2.0 million.  Third, the collective efforts of the Debtors and the Creditors' Committee also led to the withdrawal of 306 non-Borrower Claims in the aggregate amount of $7.8 billion.  See Horst Decl. at ¶ 7.

22.     As of the filing of this Motion, however, approximately 554 Disputed Class 4 Claims in the aggregate face amount of approximately $312.3 million remain to

- 8 -

be resolved.[8]  See Horst Decl. at ¶ 8. The following chart illustrates the current status of

the Claims Register and the identification of the Disputed Class 4 Claims:

| Claim Type | Number of Claims | Number of Unliquidated Claims | Asserted Amount for DCR ($ in millions) |
|---|---|---|---|
| **Total Claims** | **8,225** | **1,797** | **$109,870.5** |
| Claims Ordered Expunged | (2,689) | (381) | ($39,571.7) |
| Convenience Class Claims | (1,297) | (3) | ($3.6) |
| Claims Resolved Pursuant to the Plan | (1,183) | (697) | ($36,273.0) |
| Borrower Claims | (1,138) | (56) | ($2,010.4) |
| Claims Withdrawn or Stipulated Expunged | (358) | (24) | ($17,824.6) |
| Secured, Priority, and Administrative Expense Claims | (340) | (4) | ($31.4) |
| Allowed Claims | (283) | (2) | ($3,403.4) |
| DOJ/AG Consent Order | (177) | (175) | ($0.0) |
| ETS Claims | (17) | (6) | ($205.5) |
| No Liability Class 4 Claims | 189 | 100 | $10,234.4 |
| **Disputed Class 4 Claims** | **554** | **349** | **$312.3** |

---

[8]    The asserted amount of the Disputed Class 4 Claims does not include the No Liability Claims (defined below) for which, as discussed below, the Debtors do not believe they will have any liability, including $10.1 billion in contingent Claims filed by the PBGC that the Plan Proponents understand the PBGC intends to withdraw upon the Effective Date.

ny-1120292

**RELIEF REQUESTED**

23.    By this Motion, the Plan Proponents respectfully request, pursuant to Bankruptcy Code sections 105(a), 502(c) and 1142(b) and Bankruptcy Rule 3021, that the Court enter the Proposed Order establishing a reserve of Units based on Disputed Class 4 Claims of $380.3 million (the "Reserve Amount"), allocated among the Debtor Groups as follows: (i) $21.8 million against the ResCap Debtor Group, (ii) $242.6 million against the GMACM Debtor Group, and (iii) $115.9 million against the RFC Debtor Group. See Horst Decl. at ¶ 9.

24.    The Plan Proponents believe this amount strikes a careful balance between enabling the Liquidating Trust to make meaningful distributions of Units to holders of Allowed Class 4 and Class 6 Claims as of the initial distribution date under the Plan without jeopardizing the potential recoveries of holders of Class 4 Claims that are presently disputed, unliquidated, contingent, or otherwise not Allowed but that may be subsequently Allowed. See Horst Decl. at ¶ 10.

A.    **Components of the Disputed Claims Reserve**

25.    Consistent with the terms of the Plan, the Plan Proponents have allocated these Claims to five categories for purposes of the Disputed Claims Reserve.[9] See Horst Decl. at ¶ 10.

    i.    *Liquidated Claims*

26.    The Disputed Class 4 Claims include 124 liquidated Claims that assert an aggregate amount of $254.2 million (the "Liquidated Claims"). A list of the Liquidated

---

[9]    As part of this Motion, Claims are included in the Disputed Claims Reserve that were filed as something other than "General Unsecured." Based on their review of the Claims, the Debtors believe that such Claims are more appropriately classified as "General Unsecured" and have therefore classified them as such in the Exhibits annexed hereto. These Claims are designated with an asterisk (*) on the right-hand column of the Exhibits.

- 10 -

Claims is annexed hereto as <u>Exhibit 3-A</u>.  Although the Plan Proponents believe that

most of the Liquidated Claims are either meritless or assert amounts far in excess of the

amounts to which the claim holder is entitled, for purposes of establishing the Disputed

Claims Reserve, the Plan Proponents seek to estimate the Liquidated Claims at their <u>full</u>

asserted amount, or $254.2 million, which is allocated among the Debtor Groups as

follows: (i) $3.8 million against the ResCap Debtor Group, (ii), $199.6 million against

the GMACM Debtor Group, and (iii) $50.8 million against the RFC Debtor Group.  <u>See</u>

Horst Decl. at ¶ 11.

### ii.    *Partially Unliquidated Claims*

27.    The Disputed Class 4 Claims include 76 Claims that assert both liquidated

and unliquidated amounts (the "<u>Partially Unliquidated Claims</u>").  <u>See</u> Horst Decl. at ¶ 12.

The aggregate liquidated amount asserted in the Partially Liquidated Claims is $50.0

million.  <u>See id.</u>  A list of the Partially Unliquidated Claims is annexed hereto as <u>Exhibit</u>

<u>3-B.</u>

28.    Based on the Debtors' review of the Partially Unliquidated Claims, the

Debtors believe that most of these Claims are either meritless or assert amounts far in

excess of the amounts to which the claim holder is entitled.  In addition, the Debtors

believe that the unliquidated portion of the Partially Unliquidated Claims, in many cases,

is speculative and protective in nature.  For example, for many of these Claims, the

claimant included a short reference to the possibility that additional amounts may be

added to the proof of claim simply as a means to protect its ability to later seek amounts

that were not identified in the Claim.  The Plan Proponents assert that such a "protective"

reservation of rights (particularly more than one year after the General Bar Date) is not

indicative of actual amounts owed.  <u>See</u> Horst Decl. at ¶ 13.  Other Partially Unliquidated

- 11 -

Claims reserve for the possibility of additional amounts that are inappropriate, such as the ongoing accrual of interest that is prohibited under section 502(b)(2) of the Bankruptcy Code.  In addition, certain of the Partially Unliquidated Claims assert claims that may be disallowed as asserting contingent indemnity claims under section 502(e) or claims related to securities issued by the Debtors that may be subordinated under section 510(b).

29.    Nevertheless, for purposes of establishing the Disputed Claims Reserve, the Plan Proponents seek to reserve for the Partially Unliquidated Claims at their _full_ asserted liquidated portion, or $50.0 million plus an additional $25.0 million representing an additional 50% for the unliquidated portion of the Partially Unliquidated Claims, which is allocated among the Debtor Groups as follows: (i) $200,000 against the ResCap Debtor Group, (ii) $20.6 million against the GMACM Debtor Group, and (iii) $54.1 million against the RFC Debtor Group.  See Horst Decl. at ¶ 14.

### iii.    Wholly Unliquidated Claims

30.    There are approximately 349 Disputed Class 4 Claims that assert only unliquidated amounts (the "Wholly Unliquidated Claims").  See Horst Decl. at ¶ 15.  A list of the Wholly Unliquidated Claims is annexed hereto as Exhibit 3-C.

31.    The Wholly Unliquidated Claims primarily relate to: (i) indemnification claims that are likely to be disallowed under section 502(e) of the Bankruptcy Code, including claims by parties receiving releases under the Plan; (ii) servicing claims; (iii) human resources claims, including indemnification of legal costs; and (iv) accounts payable claims.  See Horst Decl. at ¶ 16.  To determine the reserve amount to be included in the Disputed Claims Reserve on account of the Wholly Unliquidated Claims, the Debtors reviewed and analyzed the Wholly Unliquidated Claims, including, to the extent feasible, appropriate and/or necessary: (a) the Debtors' books and records; (b) the

- 12 -

underlying proofs of claim; (c) the known facts and circumstances surrounding these Claims; (d) the legal issues, if any, associated with these Claims; (e) communications, if any, with the holders of these Claims; (f) the Debtors' historical experience with similar Claims (both prior to and during these cases); and (g) other factors the Debtors deemed relevant.  See id.

32.    Based on this evaluation, the Plan Proponents believe that these Claims are meritless and that the Debtors have little, if any, liability with respect to these Claims. See Horst Decl. at ¶ 17.  However, out of an abundance of caution, the Plan Proponents propose a reserve on account of the Wholly Unliquidated Claims in the aggregate amount of $20 million, which is allocated among the Debtor Groups as follows: (i) $5 million against the ResCap Debtor Group, (ii) $10 million against the GMACM Debtor Group, and (iii) $5 million against the RFC Debtor Group.  See id.

### iv.    Claims Subject to Objection

33.    There are four liquidated Claims and one partially liquidated Claim for which the Debtors filed objections, the claimants filed responses, and the Bankruptcy Court has not yet entered orders expunging these Claims (the "Pending Disallowed Claims").  A list of the Pending Disallowed Claims is annexed hereto as Exhibit 3-D. The Plan Proponents expect that all of these claims will be disallowed in full. Nonetheless, out of an abundance of caution, the Debtors have determined to reserve for the Pending Disallowed Claims at their full asserted amount (i.e., $8.1 million), which is allocated among the Debtor Groups as follows: (i) $6.7 million against the ResCap Debtor Group, (ii) $1.4 million against the GMACM Debtor Group, and (iii) $0 against the RFC Debtor Group.  See Horst Decl. at ¶ 18.

### v.    *No Liability Claims*

34.    There are 29 liquidated Claims, 60 partially liquidated Claims, and 100 wholly unliquidated Claims that the Plan Proponents expect to be withdrawn or included on future claims objections (the "No Liability Claims").  See Horst Decl. at ¶ 19.  A list of the No Liability Claims is annexed hereto as Exhibit 3-E.

35.    Certain of the No Liability Claims relate to: (i) executory contracts assumed by the Debtors; (ii) Claims for which the claimant indicated to the Debtors that they intend to withdraw their Claim or Claims, including 50 claims filed by the Pension Benefit Guaranty Corporation ("PBGC") asserting aggregate liquidated amounts of $10.1 billion, in addition to 100 unliquidated claims; (iii) Claims that were amended and/or superseded by subsequently filed Claims (which are otherwise reserved for), late-filed Claims, and duplicate debt Claims; or (iv) are duplicative of ETS Unsecured Claims for which the claimants may receive a 100% recovery.  See Horst Decl. at ¶ 20.  The Plan Proponents understand that the PBGC's Claims will be resolved upon the effectiveness of the Plan and that the PBGC intends to withdraw its Claims following the Effective Date. Based on their review of the other No Liability Claims, the Debtors do not believe they will have any liability on account of these Claims, but out of an abundance of caution, the Plan Proponents intend to reserve $3.0 million on account of the No Liability Claims, which is allocated among the Debtor Groups as follows: (i) $1 million against the ResCap Debtor Group, (ii) $1 million against the GMACM Debtor Group, and (iii) $1 million against the RFC Debtor Group.  See id.

### vi.    *Contingent Claims*

36.    The Bar Date for most Claims passed over one year ago.  Accordingly, Claims that are first filed at this point in the Chapter 11 Cases would be barred by the Bar

- 14 -

Date Order and subject to disallowance. Nevertheless, it is possible that some Claims, which are presently unknown to the Plan Proponents and are not listed on the Claims Register, may at some point become Allowed Unsecured Claims that would be entitled to a distribution of Units (the "Contingent Claims"). For example, on November 18, 2013, the Debtors filed the *Notice of Rejection of Executory Contracts and Unexpired Leases* seeking to reject 56 executory contracts and unexpired leases. Although the Debtors do not believe that there are any associated damages claims associated with the rejection of these agreements, counterparties have until January 2, 2014 to file a Claim in connection with the rejection. In addition, there may be future Claims arising under section 502(h) of the Bankruptcy Code from the avoidance and recovery of any avoidable transfers, or Claims that currently are classified in another class may be reclassified into a class that is a Liquidating Trust Unit Beneficiary. Although the Debtors believe there is minimal exposure for these contingent Claims, based on the Debtors' analysis of these issues and out of an abundance of caution, the Plan Proponents seek to reserve for the Contingent Claims at $20 million, which is allocated among the Debtor Groups as follows: (i) $5 million against the ResCap Debtor Group, (ii), $10 million against the GMACM Debtor Group, and (iii) $5 million against the RFC Debtor Group. See Horst Decl. at ¶ 21.

**B.    The Disputed Claims Reserve Will be Cumulative**

37.    For the avoidance of doubt, although the Plan Proponents calculated the Reserve Amount by reference to the various categories of Claims listed above, the Plan Proponents propose to create an aggregate reserve of Units for all of the Disputed Class 4 Claims. Thus, Units held in the Disputed Claims Reserve are not allocated to specific Claims, and all Units are available for the satisfaction of all subsequently Allowed Claims, irrespective of the categories described herein. To the extent the Plan Proponents

- 15 -

have underestimated the amount that should be attributed to one category of Claims, the overestimation with respect to another category will mean that sufficient Units should be available to address all Disputed Class 4 Claims that become Allowed Claims after the Effective Date. <u>See</u> Horst Decl. at ¶ 22. The Plan Proponents believe this framework, together with the overly conservative Reserve Amount, ensures that all Disputed Class 4 Claims will receive fair and equal treatment under the Plan. <u>See id.</u>

38.    The Plan Proponents believe that the Reserve Amount represents reasonable and conservative estimates for the Disputed Class 4 Claims that will ultimately be Allowed in these cases. The Plan Proponents further believe that the Reserve Amount strikes a careful and reasonable balance between enabling the Plan Proponents to make meaningful distributions to the holders of Allowed Claims while not jeopardizing the potential recoveries to claimants holding Disputed Class 4 Claims in the event such Claims subsequently are Allowed. <u>See</u> Horst Decl. at ¶ 23.

39.    The proposed Reserve Amount is not indicative of the Plan Proponents' estimate of the ultimate Allowed amount of such Claims. Rather, the Reserve Amount represents the Plan Proponents' estimate of the maximum liability that has been or could reasonably be asserted by the claimants on account of the Disputed Class 4 Claims. By this Motion, the Plan Proponents are not proposing to allow the Disputed Class 4 Claims at the Reserve Amount, and the Plan Proponents anticipate that substantive objections will be filed against a substantial number of these Claims that will result in the disallowance of such Claims. The Plan Proponents reserve all rights, both for themselves and their successors, to object to any or all Disputed Class 4 Claims either in whole or in

- 16 -

part, or to seek to estimate, any and all Disputed Class 4 Claims at lesser amounts.  See

Horst Decl. at ¶ 24.

### BASIS FOR RELIEF

40.     Bankruptcy Rule 3021 provides that after a plan is confirmed, a

distribution "shall be made to creditors whose claims have been allowed . . . ."  Fed. R.

Bankr. P. 3021.   To effectuate distributions under the Plan on account of Allowed

Claims, the Plan Proponents seek authorization to establish the Disputed Claims Reserve

pursuant to sections 502(c), 1142(b), and 105(a) of the Bankruptcy Code, as

contemplated by the Plan.

41.     Section 502(c) of the Bankruptcy Code provides for the estimation of

contingent or unliquidated claims:

> (c) There shall be estimated for purpose of allowance under this section—
>
> > (1) any contingent or unliquidated claim, the fixing or liquidation of which,
> > as the case may be, would unduly delay the administration of the case; or
>
> > (2) any right to payment arising from a right to an equitable remedy for
> > breach of performance.

11 U.S.C. § 502(c).

42.     Although Section 502(c) refers to the estimation of claims for the purposes

of allowance, courts have estimated claims for other purposes, including to establish

reserves for plan distributions. See, e.g., In re Lomas Fin. Corp., 172 B.R. 3, 4 (S.D.N.Y.

1994) (noting that the court had estimated a claim to set a reserve and cap recovery on the

claim); In re Bally Total Fitness of Greater N.Y., Inc., No. 08-14818 (BRL) (Bankr.

S.D.N.Y. Oct. 5, 2009) (approving the debtors' motion to estimate claims for purposes of

establishing claims reserves) [Docket No. 1547]; In re Dana Corp., No. 06-10354 (BRL)

(Bankr. S.D.N.Y. Nov. 28, 2007) (same) [Docket No. 7236]; In re Enron Corp., No. 01-

- 17 -

16034, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006) (approving the debtors' motion to estimate claims for purposes of establishing reserves and setting the reserve amount as the maximum amount of recovery).

43.     Section 502(c) does not prescribe the method for estimating a claim, and the Court therefore has discretion to utilize any valuation model that best suits the circumstances of the case at hand. See, e.g., Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co. of Union Square, Inc.), 160 B.R. 40, 42 (S.D.N.Y. 1993) (stating that a bankruptcy court may use whatever method is best suited to the circumstances). "[W]hen estimating claims, bankruptcy courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently." In re Adelphia Commc'ns Corp., 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2003) (citation and internal quotations omitted).    Indeed, the clearly stated purpose for allowing the estimation of claims is to "avoid undue delay in the administration of bankruptcy proceedings." Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 957 (2d Cir. 1993); In re N.Y. Med. Grp., P.C., 265 B.R. 408, 415 (Bankr. S.D.N.Y. 2001) ("Under 11 U.S.C. § 502(c), a claim may be estimated for purposes of allowance if it is unliquidated and liquidation would unduly delay the administration of the case.").

44.     In addition, the Court has broad authority under sections 1142(b) and 105(a) of the Bankruptcy Code over the property of the estate administered under the Plan to issue any order necessary to implement the provisions of the Plan and the Bankruptcy Code.  See 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any

- 18 -

instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan."); 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). See also Adelphia Bus. Solutions, Inc. v. Abnos, 482 F.3d 602, 609 (2d Cir. 2007) ("Section 105(a) grants broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code."); Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 183 (2d Cir. 2005) ("Section 105 grants the bankruptcy court equitable powers to implement the provisions of the Bankruptcy Code."); In re Enron Corp., 2006 Bankr. LEXIS 4294, at *3 (estimating, pursuant to sections 105(a), 502(c), and 1142 of the Bankruptcy Code, certain claims at $0 for purposes of establishing reserve claim amounts).

45.    As described herein, the Plan Proponents determined the Reserve Amount in good faith, conservatively, and based on an appropriate review and analysis of the claims at issue.  More specifically, the Plan Proponents, with the assistance of their respective professionals, proffer estimations of unresolved Unsecured Claims based on a comprehensive review of (i) the proofs of claim and supporting documentation, (ii) the Debtors' books and records, (iii) communications, if any, with the holders of Disputed Claims, (iv) the Debtors' historical experience with similar Claims, (v) the legal issues, if any, associated with the Claims, and (vi) such other factors as the Plan Proponents deemed relevant.  See Horst Decl. at ¶ 25.  Accordingly, the Plan Proponents have

estimated (for reserve purposes only) the liquidated portion of each Disputed Claim at what they believe is the maximum possible liability to such claimant. See id.

46.     During the Chapter 11 cases, the Debtors have expunged, caused to be withdrawn and/or reduced in amount more than 2,713 Claims, resulting in a reduction of more than $57.3 billion in asserted Claims, and have resolved or will resolve more than 2,627[10] in Claims through various pending claims objections and settlements under the Plan. This effort demonstrates the Debtors' ability to properly and accurately estimate the Disputed Class 4 Claims. Accordingly, the Court can and should rely upon the Debtors' estimate of the Disputed Class 4 Claims for distribution and reserve purposes under the Plan. See Horst Decl. at ¶ 26.

47.     Due to the magnitude and complexity of the Claims filed against the Debtors' Estates, the Plan Proponents submit that establishing the Disputed Claims Reserve using the Reserve Amount is necessary to make timely distributions to holders of Allowed Unsecured Claims that are Liquidating Trust Unit Beneficiaries as soon as practicable after the Effective Date. The Reserve Amount balances the need to make prompt and material distributions to Creditors while ensuring that a sufficient number of Units and Cash will be available for the benefit of holders of the Disputed Class Claims, to the extent that such Claims are ultimately Allowed. See Horst Decl. at ¶ 27.

48.     Moreover, the Plan Proponents submit that the Disputed Claims Reserve will not unfairly prejudice the holders of the Disputed Class 4 Claims. First, the majority of the Liquidated Claims are being reserved for at the full liquidated amount (other than those Claims the Debtors understand will be withdrawn following the Effective Date).

---

[10]     This figure includes 1,463 Borrower Claims comprised of 654 Filed Borrower Claims, 163 identified for objection Borrower Claims, and 646 non-reconciled Borrower Claims, which, as provided for in the Plan, will be resolved through the Borrower Claims Trust. See Plan, Article IV.F.

The Plan Proponents determined to take this conservative approach even though the Debtors believe many of these Claims ultimately will be Allowed in lower amounts or expunged in their entirety.  See Horst Decl. at ¶ 28.  Reserving for these Claims at the face amount will both insure that the Debtors are reserving a conservative amount for these Claims and provide additional cushion for the benefit of creditors in the event other Disputed Class 4 Claims are ultimately Allowed at amounts higher than expected.  See id.

49.    Second, the No Liability Claims are for amounts that either cannot or will not be Allowed.  It would not be practicable, therefore, for the Debtors to establish the amount of the Disputed Claims Reserve by funding the full asserted amount of each No Liability Claim.  Rather, doing so would be inequitable to holders of Allowed Claims because value that should otherwise be available for distribution to them would instead be held in the Disputed Claims Reserve while the No Liability Claims are resolved.  Therefore, to strike a fair balance between the holders of Allowed Claims and the holders of any No Liability Claims that may ultimately become allowed in the event that any of the No Liability Claims are Allowed, the Plan Proponents propose to increase the reserve by $3.0 million to account for the No Liability Claims.  See Horst Decl. at ¶ 29.

50.    Third, although the Debtors do not believe they will have any significant liability with respect to the Wholly Unliquidated Claims or the Contingent Claims, the Debtors have increased the Disputed Claims Reserve by $40.0 million as a cushion in the event any of these Claims become Allowed.  See Horst Decl. at ¶ 30.

51.    Moreover, the relief requested herein does not limit the amount that any individual Creditor can recover.  Rather, the Plan Proponents seek to reserve an amount in the aggregate, and not limit the ability of any one Creditor to prove the amount of its

- 21 -

Claim or to recover on the basis of that proven amount, subject only to the aggregate cap on the number of Units held in the Disputed Claims Reserve and the subsequent allowance of other Disputed Class 4 Claims.  See Horst Decl. at ¶ 31.

52.    The relief requested in this Motion is requested only in connection with the confirmation of the Plan, and the effectiveness of the relief requested is contingent on the occurrence of the Effective Date under the Plan.  In the event that the Effective Date does not occur, the Debtors request that the Court deem any relief granted in this Motion void.

53.    Finally, the relief being sought in this Motion is similar to relief granted by courts in this District in recent cases.  See, e.g., In re General Maritime Corp., No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 26, 2012) [Docket No. 770] (estimating the maximum aggregate amount of unsecured claims for purposes of establishing an unsecured claims reserve); In re Motors Liquidation Co., No. 09-50026 (REG) (Bankr. S.D.N.Y. Mar. 23, 2011) [Docket No. 9877] (estimating the maximum amount of individual claims for purposes of establishing a claims reserve under a plan); In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) [Docket No. 5356] (setting and establishing a disputed claims reserve); In re Chemtura Corp., No. 09-11233 (REG) (Bankr. S.D.N.Y. Oct. 29, 2010) [Docket No. 4383] (setting and approving the establishment of a distribution reserve); In re Delphi Corp., No. 05-44481 (RDD) (Bankr. S.D.N.Y. Sept. 28, 2007) [Docket No. 9685] (estimating the maximum amount of individual claims for purposes of establishing a claims reserve and establishing claim estimation procedures).

## **NOTICE**

54.     The Plan Proponents have provided notice of this Motion in accordance

with the Case Management Procedures Order, approved by this Court on May 23, 2012

[Docket No. 141], as well as to all holders of the Disputed Class 4 Claims.  The Plan

Proponents submit that no other or further notice need be provided.

*[Remainder of Page Intentionally Left Blank]*

- 23 -

## <u>CONCLUSION</u>

WHEREFORE, the Plan Proponents respectfully request that this Court enter the

Proposed Order granting the relief requested in this Motion, and such other and further

relief as may be just and proper.


Dated:  December 5, 2013                    /s/ Norman S. Rosenbaum
        New York, New York            Gary S. Lee
                                     Norman S. Rosenbaum
                                     Jordan A. Wishnew
                                     Samantha Martin
                                     MORRISON & FOERSTER LLP
                                     1290 Avenue of the Americas
                                     New York, New York  10104
                                     Telephone: (212) 468-8000
                                     Facsimile: (212) 468-7900

                                     *Counsel for the Debtors*
                                     *and Debtors in Possession*

                                     -and-

                                     KRAMER LEVIN NAFTALIS &
                                     FRANKEL LLP
                                     Kenneth H. Eckstein
                                     Douglas H. Mannal
                                     Stephen D. Zide
                                     Joseph A. Shifer
                                     1177 Avenue of the Americas
                                     New York, New York 10036
                                     Telephone: (212) 715-3280
                                     Facsimile:  (212) 715-8000

                                     *Counsel for the Official Committee of*
                                     *Unsecured Creditors*

- 24 -