## **Exhibit 2**
## **Horst Declaration**

ny-1120292

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- )
                                                                            )
In re:                                                                      )        Case No. 12-12020 (MG)
                                                                            )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,                                    )        Chapter 11
                                                                            )
                                                    Debtors.                )        Jointly Administered
                                                                            )
-------------------------------------------------------------------------- )

**DECLARATION OF DEANNA HORST IN SUPPORT OF**
**PLAN PROPONENTS' MOTION FOR ORDER ESTABLISHING THE DISPUTED**
**CLAIMS RESERVE IN CONNECTION WITH THE JOINT CHAPTER 11 PLAN**
**PROPOSED BY RESIDENTIAL CAPITAL, LLC,** *ET AL*. **AND THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

I, Deanna Horst, hereby declare as follows:

**BACKGROUND**

          1.        I am the Chief Claims Officer for Residential Capital, LLC and its

affiliates ("ResCap"), a limited liability company organized under the laws of the state of

Delaware and the parent of the other debtors and debtors in possession in the above-captioned

Chapter 11 cases (collectively, the "Debtors").[1]  I have been employed by affiliates of ResCap

since August of 2001.  I began my association with ResCap in 2001 as the Director, Responsible

Lending Manager, charged with managing the Debtors' responsible lending on-site due diligence

program.  In 2002, I became the Director of Quality Asset Management, managing Client

Repurchase, Quality Assurance and Compliance -- a position I held until 2006, at which time I

became the Vice President of the Credit Risk Group, managing Correspondent and Broker

approval and monitoring.  In 2011, I became the Vice President, Business Risk and Controls, and

---

[1]     The names of the Debtors in these cases and their respective tax identification numbers are identified on
<u>Exhibit 1</u> to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support
of Chapter 11 Petitions and First Day Pleadings* [Docket No. 6], dated May 14, 2012.

supported GMAC Mortgage, LLC and Ally Bank in this role.  In June 2012, I became Senior

Director of Claims Management for ResCap and have held my current position since October of

2013.  In my current position, I am responsible for Claims Management and Reconciliation and

Client Recovery.  I am authorized to submit this declaration (the "Declaration") in support of the

*Plan Proponents' Motion for Order Establishing the Disputed Claims Reserve in Connection*

*with the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al., and the Official*

*Committee of Unsecured Creditors* (the "Motion").[2]

2.        Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge of the Debtors' operations and finances, information learned

from my review of relevant documents, and information I have received through my discussions

with other members of the Debtors' management or other employees, the Debtors' professionals

and consultants, and/or Kurtzman Carson Consultants LLC, the Debtors' notice and claims

agent.  If I were called upon to testify, I could and would testify competently to the facts set forth

in the Motion on that basis.

3.        In my capacity as Chief Claims Officer, I am intimately familiar with the

Debtors' claims reconciliation process.  Except as otherwise indicated, all statements in this

Declaration are based upon my familiarity with the Debtors' books and records (the "Books and

Records"), the Debtors' schedules of assets and liabilities and statements of financial affairs filed

in the Chapter 11 cases (collectively, the "Schedules"), my review and reconciliation of claims,

and/or my review of relevant documents.

4.        In connection with the claims reconciliation, where applicable, the

Debtors have reviewed (a) information supplied or verified by personnel in departments within

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

ny-1119377

the Debtors' various business units, (b) the Books and Records, (c) the Schedules, (d) the proofs of claim that are the subject of the Motion and any attachments thereto, (e) information supplied by the respective claimants, (f) analyses prepared by the Debtors' personnel and professional advisors, and/or (g) the official claims register maintained in the Debtors' Chapter 11 cases.

## THE CLAIMS PROCESS

5.      The Debtors and their advisors have been and continue to be engaged in a diligent and comprehensive review and reconciliation of all Claims filed against the Debtors' Estates.  As of November 14, 2013, over 8,200 Claims in the aggregate amount of approximately $109.8 billion were filed or scheduled against the Debtors in these Chapter 11 cases.  The Claims pool is comprised of approximately 7,310 filed proofs of claim and 932 scheduled claims, the latter of which were scheduled as liquidated and undisputed where no proof of claim was filed.

6.      Based on a thorough and ongoing examination of the proofs of claim and in accordance with the Claims Procedures Order, the Debtors and their advisors continue to evaluate the filed Claims that should be Allowed, and those that should be either disallowed and expunged, reduced in amount, reclassified, or subordinated, so as to avoid providing certain creditors with improper recoveries to the detriment of other creditors.

7.      Since the entry of the Claims Procedures Order, first, the Plan Support Agreement among the Debtors, the Creditors' Committee, AFI, and the Consenting Claimants, dated May 13, 2013, resolves 1,183 Claims in the aggregate face amount of $36.3 billion. Second, the Debtors filed 51 omnibus claims objections and 22 individual claim objections, including 29 objections addressing 871 non-Borrower Claims in the aggregate amount of $22.0 billion.  To date, the successful prosecution of omnibus and individual claims objections has expunged 824 non-Borrower Claims in the aggregate face amount of $22.0 billion, and pending

3

claims objections address an additional 5 non-Borrower Claims in the aggregate face amount of

$2.0 million.  Third, the collective efforts of the Debtors and the Creditors' Committee also led

to the withdrawal of 306 non-Borrower Claims in the aggregate amount of $7.8 billion.

8.    As of the filing of the Motion, however, approximately 554 Disputed

Class 4 Claims in the aggregate face amount of approximately $312.3 million remain to be

resolved.[3]  The following chart illustrates the current status of the Claims Register and the

identification of the Disputed Class 4 Claims:[4]


[*Remainder of Page Left Blank*]


---

[3]    The asserted amount of the Disputed Class 4 Claims does not include the No Liability Claims (defined below)
for which, as discussed below, the Debtors do not believe they will have any liability, including $10.1 billion
in contingent Claims filed by the PBGC that the Plan Proponents understand the PBGC intends to withdraw
upon the Effective Date.

[4]    Data provided as of December 4, 2013.

| Claim Type | Number of Claims | Number of Unliquidated Claims | Asserted Amount ($ in millions) |
|---|---|---|---|
| **Total Claims** | **8,225** | **1,797** | **$109,870.5** |
| Claims Ordered Expunged | (2,689) | (381) | ($39,571.7) |
| Convenience Class Claims | (1,297) | (3) | ($3.6) |
| Claims Resolved Pursuant to the Plan | (1,183) | (697) | ($36,273.0) |
| Borrower Claims | (1,138) | (56) | ($2,010.4) |
| Claims Withdrawn or Stipulated Expunged | (358) | (24) | ($17,824.6) |
| Secured, Priority, and Administrative Expense Claims | (340) | (4) | ($31.4) |
| Allowed Claims | (283) | (2) | ($3,403.4) |
| DOJ/AG Consent Order | (177) | (175) | ($0.0) |
| ETS Claims | (17) | (6) | ($205.5) |
| No Liability Class 4 Claims | 189 | 100 | $10,234.4 |
| **Disputed Class 4 Claims** | **554** | **349** | **$312.3** |

## DISPUTED CLAIMS

9.      By the Motion, the Plan Proponents seek to estimate the amount of the Reserved Claims, for the sole purpose of establishing a Reserve Amount of $380.3 million, allocated among the Debtor Groups as follows: (i) $21.8 million against the ResCap Debtor Group, (ii), $242.6 million against the GMACM Debtor Group, and (iii) $115.9 million against the RFC Debtor Group.

10.      The Plan Proponents believe this amount strikes a careful balance between enabling the Liquidating Trust to make meaningful distributions of Units to holders of Allowed Class 4 and Class 6 Claims as of the initial distribution date under the Plan without jeopardizing

5

the potential recoveries of holders of Class 4 Claims that are presently disputed, unliquidated, contingent, or otherwise not Allowed but that may be subsequently Allowed. Consistent with the terms of the Plan, the Plan Proponents have allocated these Claims to five categories for purposes of the Disputed Claims Reserve.

## A.    Liquidated Claims

11.    The Disputed Class 4 Claims include 124 liquidated Claims that assert an aggregate amount of $254.2 million (the "Liquidated Claims"). A list of the Liquidated Claims is annexed to the Motion as Exhibit 3-A. Although the Plan Proponents believe that most of the Liquidated Claims are either meritless or assert amounts far in excess of the amounts to which the claim holder is entitled, for purposes of establishing the Disputed Claims Reserve, the Plan Proponents seek to estimate the Liquidated Claims at their full asserted amount, or $254.2 million, which is allocated among the Debtor Groups as follows: (i) $3.8 million against the ResCap Debtor Group, (ii), $199.6 million against the GMACM Debtor Group, and (iii) $50.8 million against the RFC Debtor Group.

## B.    Partially Unliquidated Claims

12.    The Disputed Class 4 Claims include 76 Claims that assert both liquidated and unliquidated amounts (the "Partially Unliquidated Claims"). The aggregate liquidated amount asserted in the Partially Liquidated Claims is $50.0 million. A list of the Partially Unliquidated Claims is annexed to the Motion as Exhibit 3-B.

13.    Based on the Debtors' review of the Partially Unliquidated Claims, the Debtors believe that most of these Claims are either meritless or assert amounts far in excess of the amounts to which the claim holder is entitled. In addition, the Debtors believe that the unliquidated portion of the Partially Unliquidated Claims, in many cases, is speculative and protective in nature. For example, for many of these Claims, the claimant included a short

6

reference to the possibility that additional amounts may be added to the proof of claim simply as
a means to protect its ability to later seek amounts that were not identified in the Claim. The
Plan Proponents assert that such a "protective" reservation of rights (particularly more than one
year after the General Bar Date) is not indicative of actual amounts owed.

14.    Nevertheless, for purposes of establishing the Disputed Claims Reserve,
the Plan Proponents seek to reserve for the Partially Unliquidated Claims at their <u>full</u> asserted
liquidated portion, or $50.0 million plus an additional $25.0 million representing an additional
50% for the unliquidated portion of the Partially Unliquidated Claims, which is allocated among
the Debtor Groups as follows: (i) $200,000 against the ResCap Debtor Group, (ii), $20.6 million
against the GMACM Debtor Group, and (iii) $54.1 million against the RFC Debtor Group.

## C.    Wholly Unliquidated Claims

15.    There are approximately 349 Disputed Class 4 Claims that assert only
unliquidated amounts (the "<u>Wholly Unliquidated Claims</u>"). A list of the Wholly Unliquidated
Claims is annexed to the Motion as <u>Exhibit 3-C</u>.

16.    The Wholly Unliquidated Claims primarily relate to: (i) indemnification
claims, which I am advised are likely to be disallowed under section 502(e) of the Bankruptcy
Code, including claims by parties receiving releases under the Plan; (ii) servicing claims; (iii)
human resources claims, including indemnification of legal costs; and (iv) accounts payable
claims. To determine the reserve amount to be included in the Disputed Claims Reserve on
account of the Wholly Unliquidated Claims, the Debtors reviewed and analyzed the Wholly
Unliquidated Claims, including, to the extent feasible, appropriate and/or necessary: (a) the
Debtors' books and records; (b) the underlying proofs of claim; (c) the known facts and
circumstances surrounding these Claims; (d) the legal issues, if any, associated with these
Claims; (e) communications, if any, with the holders of these Claims; (f) the Debtors' historical

7

experience with similar Claims (both prior to and during these cases); and (g) other factors the
Debtors deemed relevant.

17.     Based on this evaluation, the Plan Proponents believe that these Claims
are meritless and that the Debtors have little, if any, liability with respect to these Claims.
However, out of an abundance of caution, the Plan Proponents propose a reserve on account of
the Wholly Unliquidated Claims in the aggregate amount of $20 million, which is allocated
among the Debtor Groups as follows: (i) $5 million against the ResCap Debtor Group, (ii) $10
million against the GMACM Debtor Group, and (iii) $5 million against the RFC Debtor Group.

**D.     Claims Subject to Objection**

18.     There are four liquidated Claims and one partially liquidated Claim for
which the Debtors filed objections, the claimants filed responses, and the Bankruptcy Court has
not yet entered orders expunging these Claims (the "Pending Disallowed Claims").  A list of the
Pending Disallowed Claims is annexed to the Motion as Exhibit 3-D.  The Plan Proponents
expect that all of these claims will be disallowed in full.  Nonetheless, out of an abundance of
caution, the Debtors have determined to reserve for the Pending Disallowed Claims at their full
asserted amount (*i.e.*, $8.1 million), which is allocated among the Debtor Groups as follows: (i)
$6.7 million against the ResCap Debtor Group, (ii) $1.4 million against the GMACM Debtor
Group, and (iii) $0 against the RFC Debtor Group.

**E.     No Liability Claims**

19.     There are 29 liquidated Claims, 60 partially liquidated Claims, and 100
wholly unliquidated Claims that the Plan Proponents expect to be withdrawn or included on
future claims objections (the "No Liability Claims").  A list of the No Liability Claims is
annexed to the Motion as Exhibit 3-E.

20.    Certain of the No Liability Claims relate to: (i) executory contracts assumed by the Debtors; (ii) Claims for which the claimant indicated to the Debtors that they intend to withdraw their Claim or Claims, including 50 claims filed by the Pension Benefit Guaranty Corporation ("PBGC") asserting aggregate liquidated amounts of $10.1 billion, in addition to 100 unliquidated claims; (iii) Claims that were amended and/or superseded by subsequently filed Claims (which are otherwise reserved for), late-filed Claims, and duplicate debt Claims; or (iv) are duplicative of ETS Unsecured Claims for which the claimants may receive a 100% recovery.  The Plan Proponents understand that the PBGC's Claims will be resolved upon the effectiveness of the Plan and that the PBGC intends to withdraw its Claims following the Effective Date.  Based on their review of the other No Liability Claims, the Debtors do not believe they will have any liability on account of these Claims, but out of an abundance of caution, the Plan Proponents intend to reserve $3.0 million on account of the No Liability Claims, which is allocated among the Debtor Groups as follows: (i) $1 million against the ResCap Debtor Group, (ii), $1 million against the GMACM Debtor Group, and (iii) $1 million against the RFC Debtor Group.

**F.    Contingent Claims**

21.    The Bar Date for most Claims passed over one year ago.  Accordingly, Claims that are first filed at this point in the Chapter 11 cases would be barred by the Bar Date Order and subject to disallowance.  Nevertheless, it is possible that some Claims, which are presently unknown to the Plan Proponents and are not listed on the Claims Register, may at some point become Allowed Unsecured Claims that would be entitled to a distribution of Units (the "Contingent Claims").  For example, on November 18, 2013, the Debtors filed the *Notice of Rejection of Executory Contracts and Unexpired Leases* seeking to reject 56 executory contracts and unexpired leases.  Although the Debtors do not believe that there are any associated damages

9

claims associated with the rejection of these agreements, counterparties have until January 2, 2014 to file a Claim in connection with the rejection. In addition, there may be future Claims arising under section 502(h) of the Bankruptcy Code from the avoidance and recovery of any avoidable transfers, or Claims that currently are classified in another class may be reclassified into a class that is a Liquidating Trust Unit Beneficiary. Although the Debtors believe there is minimal exposure for these contingent Claims, based on the Debtors' analysis of these issues and out of an abundance of caution, the Plan Proponents seek to reserve for the Contingent Claims at $20 million, which is allocated among the Debtor Groups as follows: (i) $5 million against the ResCap Debtor Group, (ii), $10 million against the GMACM Debtor Group, and (iii) $5 million against the RFC Debtor Group.

**DISPUTED CLAIMS RESERVE**

22.     For the avoidance of doubt, although the Plan Proponents calculated the Reserve Amount by reference to the various categories of Claims listed above, the Plan Proponents propose to create an aggregate reserve of Units for all of the Disputed Class 4 Claims. Thus, Units held in the Disputed Claims Reserve are not allocated to specific Claims, and all Units are available for the satisfaction of all subsequently Allowed Claims, irrespective of the categories described in the Motion. To the extent the Plan Proponents have underestimated the amount that should be attributed to one category of Claims, the overestimation with respect to another category will mean that sufficient Units should be available to address all Disputed Class 4 Claims that become Allowed Claims after the Effective Date. The Plan Proponents believe this framework, together with the overly conservative Reserve Amount, ensures that all Disputed Class 4 Claims will receive fair and equal treatment under the Plan.

23.    The Plan Proponents believe that the Reserve Amount represents reasonable and conservative estimates for the Disputed Class 4 Claims that will ultimately be Allowed in these cases. The Plan Proponents further believe that the Reserve Amount strikes a careful and reasonable balance between enabling the Plan Proponents to make meaningful distributions to the holders of Allowed Claims while not jeopardizing the potential recoveries to claimants holding Disputed Class 4 Claims in the event such Claims subsequently are Allowed.

24.    The proposed Reserve Amount is not indicative of the Plan Proponents' estimate of the ultimate Allowed amount of such Claims. Rather, the Reserve Amount represents the Plan Proponents' estimate of the maximum liability that has been or could reasonably be asserted by the claimants on account of the Disputed Class 4 Claims. By the Motion, the Plan Proponents are not proposing to allow the Disputed Class 4 Claims at the Reserve Amount, and the Plan Proponents anticipate that substantive objections will be filed against a substantial number of these Claims that will result in the disallowance of such Claims. The Plan Proponents reserve all rights, both for themselves and their successors, to object to any or all Disputed Class 4 Claims either in whole or in part, or to seek to estimate, any and all Disputed Class 4 Claims at lesser amounts.

25.    As described in the Motion, the Plan Proponents determined the Reserve Amount in good faith, conservatively, and based on an appropriate review and analysis of the claims at issue. More specifically, the Plan Proponents, with the assistance of their respective professionals, proffer estimations of unresolved Unsecured Claims based on a comprehensive review of (i) the proofs of claim and supporting documentation, (ii) the Debtors' books and records, (iii) communications, if any, with the holders of Disputed Claims, (iv) the Debtors' historical experience with similar Claims, (v) the legal issues, if any, associated with the Claims,

11

and (vi) such other factors as the Plan Proponents deemed relevant.  Accordingly, the Plan

Proponents have estimated (for reserve purposes only) the liquidated portion of each Disputed

Claim at what they believe is the maximum possible liability to such claimant.

26.    During the Chapter 11 cases, the Debtors have expunged, caused to be

withdrawn and/or reduced in amount more than 2,713 Claims, resulting in a reduction of more

than $57.3 billion in asserted Claims, and have resolved or will resolve more than 2,627[5] in

Claims through various pending claims objections and settlements under the Plan.  This effort

demonstrates the Debtors' ability to properly and accurately estimate the Disputed Class 4

Claims.  Accordingly, the Court can and should rely upon the Debtors' estimate of the Disputed

Class 4 Claims for distribution and reserve purposes under the Plan.

27.    Due to the magnitude and complexity of the Claims filed against the

Debtors' Estates, the Plan Proponents submit that establishing the Disputed Claims Reserve

using the Reserve Amount is necessary to make timely distributions to holders of Allowed

Unsecured Claims that are Liquidating Trust Unit Beneficiaries as soon as practicable after the

Effective Date.   The Reserve Amount balances the need to make prompt and material

distributions to Creditors while ensuring that a sufficient number of Units and Cash will be

available for the benefit of holders of the Disputed Class Claims, to the extent that such Claims

are ultimately Allowed.

28.    Moreover, the Plan Proponents submit that the Disputed Claims Reserve

will not unfairly prejudice the holders of the Disputed Class 4 Claims.  First, the majority of the

Liquidated Claims are being reserved for at the full liquidated amount (other than those Claims

---

[5]    This figure includes 1,463 Borrower Claims comprised of 654 Filed Borrower Claims, 163 identified for
objection Borrower Claims, and 646 non-reconciled Borrower Claims, which, as provided for in the Plan, will
be resolved through the Borrower Claims Trust. See Plan, Article IV.F.

the Debtors understand will be withdrawn following the Effective Date).  The Plan Proponents determined to take this conservative approach even though the Debtors believe many of these Claims ultimately will be Allowed in lower amounts or expunged in their entirety.  Reserving for these Claims at the face amount will both insure that the Debtors are reserving a conservative amount for these Claims and provide additional cushion for the benefit of creditors in the event other Disputed Class 4 Claims are ultimately Allowed at amounts higher than expected.

29.    Second, the No Liability Claims are for amounts that either cannot or will not be Allowed.  It would not be practicable, therefore, for the Debtors to establish the amount of the Disputed Claims Reserve by funding the full asserted amount of each No Liability Claim.  Rather, doing so would be inequitable to holders of Allowed Claims because value that should otherwise be available for distribution to them would instead be held in the Disputed Claims Reserve while the No Liability Claims are resolved.  Therefore, to strike a fair balance between the holders of Allowed Claims and the holders of any No Liability Claims that may ultimately become allowed in the event that any of the No Liability Claims are Allowed, the Plan Proponents propose to increase the reserve by $3.0 million to account for the No Liability Claims.

30.    Third, although the Debtors do not believe they will have any significant liability with respect to the Wholly Unliquidated Claims or the Contingent Claims, the Debtors have increased the Disputed Claims Reserve by $40.0 million as a cushion in the event any of these Claims become Allowed.

31.    Moreover, the relief requested in the Motion does not limit the amount that any individual Creditor can recover.  Rather, the Plan Proponents seek to reserve an amount in the aggregate, and not limit the ability of any one Creditor to prove the amount of its Claim or

13

to recover on the basis of that proven amount, subject only to the aggregate cap on the number of

Units held in the Disputed Claims Reserve and the subsequent allowance of other Disputed Class

4 Claims.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated:  December 5, 2013

/s/  Deanna Horst
Deanna Horst
Chief Claims Officer for Residential Capital,
LLC

14