**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------

|  |  |
|---|---|
| In re: | ) )  Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al*., | ) )  Chapter 11 )  |
| Debtors. | )  Jointly Administered ) |

--------------------------------------------------------------------

**FINDINGS OF FACT**

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the confirmation of the *Revised Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al, and the Official Committee of Unsecured Creditors* (the "Plan," ECF Doc. # 6030-1).  The Court finds that the Plan is confirmable under Bankruptcy Code Section 1129.

**THE PLAN**

1.       The Plan is supported by the vast majority of the Estates' creditors, including the Estate's largest creditor constituencies.  Some of those large creditors have asserted billions of dollars in claims against both the Debtors[1] and the Debtors' ultimate parent, Ally Financial, Inc. ("Ally").  The supporting creditors include the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents"), the Consenting Claimants,[2] the RMBS Trustees, the Supporting Senior Unsecured Noteholders (including Paulson, and Wilmington Trust, as indenture trustee), the Kessler Class Claimants, the Federal Housing

---

[1]       The "Debtors" refers to Residential Capital, LLC ("ResCap") and its direct and indirect subsidiaries, each as a chapter 11 debtor and debtor-in-possession in these chapter 11 cases (the "Chapter 11 Cases").

[2]       All capitalized terms used but not defined in these Findings have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

Finance Agency ("FHFA"), Financial Guaranty Insurance Company ("FGIC"), MBIA Insurance Corporation ("MBIA"), Ambac Assurance Corporation ("Ambac"), Assured Guaranty, Ltd. ("Assured"), and the Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group" or "JSNs").[3]  Nearly all creditors that voted on the Plan (95.7%) voted to accept the Plan.

2.      The Plan reflects agreements reached through extensive negotiations guided by the Honorable James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, as mediator, among the Debtors, the Committee, Ally, and the Consenting Claimants. If the Plan is confirmed, Ally will contribute $2.1 billion to Plan funding (the "Ally Contribution"), on top of the financial and operational support it has provided to the Debtors throughout the Chapter 11 Cases.  The Ally Contribution is a crucial component of the Plan, and without the Contribution, the Debtors may not have been able to settle a variety of complex disputes.  Without settling these complex disputes, the Debtors may have been drawn into years of costly litigation that would jeopardize distributions to creditors.   In exchange for its Contribution, Ally secured the Debtor Release and Third Party Release.

## I.      BACKGROUND

3.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for chapter 11 relief in this Court (ECF Doc. # 1).  Following a motion by Berkshire Hathaway Inc., the Court approved the appointment of Arthur J. Gonzalez as the examiner (the "Examiner") on July 3, 2012, to investigate the Debtors' and Ally's prepetition activities, including (1) any claims the Debtors have held against their officer and directors, (2) any claims the Debtors may have held against Ally's officers and directors, and (3) any claims the Debtors proposed to release under a prepetition settlement agreement with Ally (ECF Doc. # 674).

---

[3]      The Plan Proponents reached a settlement with the JSNs after the Plan Confirmation Hearing (ECF Doc. # 5998).

4.      On November 21, 2012, the Court approved the Debtors' sale of (1) their
mortgage servicing businesses and (2) most of the Estates' whole loan portfolio (ECF Doc.
## 2246, 2247).  In the ensuing months, the Plan Proponents attempted to obtain consensus on
the terms of a chapter 11 plan, but they were unable to reach a consensual plan.  The Plan
Proponents therefore asked the Court to appoint a plan mediator and, separately, of a chief
restructuring officer.  The Court appointed the Honorable James M. Peck, as Mediator on
December 26, 2012 (ECF Doc. # 2519). On March 5, 2013, the Court appointed Lewis Kruger as
the Debtors' Chief Restructuring Officer (the "CRO") (ECF Doc. # 3103).  Kruger's task was to
"make decisions on behalf of each Debtor with respect to Chapter 11 plan negotiations and
formulation, in such a manner as is consistent with the business judgment rule, the provisions of
applicable law, taking into account the respective fiduciary duties of the CRO to each Debtor's
respective estate."  (ECF Doc. # 3074.)  Mr. Kruger is a former partner and co-chair of
restructuring at Stroock and Stroock & Lavan LLP and has more than fifty years of restructuring
experience.  (Kruger Direct,[4] ECF Doc. # 5709, ¶ 9–10.)

5.      After several months of mediation negotiations, the Debtors, the Committee, and
the majority of the creditor constituencies reached a settlement embodied in the Plan Support
Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Term Sheet,
dated May 23, 2013 (ECF Doc. # 3814).  The Court approved the Debtors' entry into the Plan
Support Agreement on June 26, 2013, and entered a written opinion approving the Plan Support
Agreement the next day (ECF Doc. ## 4098, 4102).  The Ad Hoc Group did not support the Plan
initially, and the Plan Proponents and Ad Hoc Group litigated two consolidated adversary
proceedings regarding the extent of the JSNs' liens, the size of their allowed claim, and their

---

[4]      "___ Direct" refers to the written direct testimony offered in support of the Plan and submitted before the
Plan Confirmation Hearing.

entitlement to postpetition interest (ECF 13-01343, ECF 13-01277). The Court bifurcated the proceedings into two phases and conducted a Phase I trial from October 15 through 17 and October 21 through 23, 2013. On November 15, 2013, the Court issued a memorandum opinion, findings of fact, and conclusions of law regarding the Phase I issues (the "Phase I Opinion," ECF Doc. # 5772).

6.      Aside from the JSNs, a handful of other parties objected to the Plan. The Court conducted a five-day hearing on Plan confirmation and Phase II issues on November 19 through 22 and November 25, 2013. The parties submitted, and the Court admitted into evidence, the written direct testimony of thirty-one witnesses: Joseph Morrow, Jeffrey A. Lipps, Thomas Marano, Michael Carpenter, John Dubel, Lewis Kruger, Frank Sillman, Fernando Acebedo, Robert H. Major, Brendan Meyer, Thomas Musarra, Mamta K. Scott, Mary Sohlberg, Allen M. Pfeiffer, Jose Fraga, Ralph R. Mabey, Nancy Mueller-Handal, Lucy Allen, Susheel Kirpalani, Ronald Friedman, William Thompson, Martin Blumentritt, Mark A. Renzi, Barbara Westman, Tammy Hamzehpour, James Young, and Gina Gutzeit by the Plan Proponents; and Michael Fazio, Robert S. Bingham, and Michael Pinzon by the Defendants and Plan Objectors.[5] Some of these witnesses were cross-examined and subject to redirect. After the Plan Confirmation and Phase II trial, the Plan Proponents and the Plan Objectors sent their final exhibit lists to the Court. These lists included more than 900 exhibits that were admitted in evidence, some for limited purposes. The parties filed consolidated deposition designations on November 12, 2013

_____

[5]      During the Plan Confirmation and Phase II trial, Wachovia Bank and Wachovia Bank of Delaware, now succeeded by Wells Fargo Bank, N.A. ("WFBNA") also filed the direct testimony of Ms. Heather A. Lawrence (ECF Doc. # 5827) in support of WFBNA's Plan objection (the "WFBNA Objection"). During the Plan Confirmation and Phase II trial, the Plaintiffs filed stipulated facts in connection with the WFBNA Objection (ECF Doc. # 5912). WFBNA did not enter the testimony of Ms. Lawrence into evidence.

(ECF Doc. # 5714) and second consolidated deposition designations on November 18, 2013 (ECF Doc. # 5803).

7.     After the hearing, the Plan Proponents, the JSN Objectors (defined below), and Wells Fargo Bank, N.A.,[6] engaged in further mediation.  This mediation resulted in an additional settlement (the "JSN Settlement").  (Kruger Supp. Decl. ECF Doc. # 6018, ¶ 6.)  These Findings discuss the JSN Settlement in greater detail below.

## II.     CONFIRMATION IS APPROPRIATE UNDER THE BANKRUPTCY CODE

### A.  Proper Notice

8.     On August 23, 2013, the Bankruptcy Court entered the *Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* (the "Disclosure Statement Order") (ECF Doc. # 4809) establishing solicitation and tabulation procedures for the Plan.  (Affidavit of P. Joseph Morrow IV Certifying the Tabulation of Votes on the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, *et. al.* and the Official Committee of Unsecured Creditors, ECF Doc. # 5699, ¶ 6 ("Voting Certification").)

9.     Kurtzman Carson Consultants LLC ("KCC") then worked with the Plan Proponents, their respective counsel, and the Debtors' other professionals to (1) provide notice of the Plan and Confirmation Hearing, (2) distribute the Solicitation Package, including voting

---

[6]     Wells Fargo had objected to the Plan in its capacities as First Priority Collateral Agent, Third Priority Collateral Agent, and Collateral Control Agent for the Junior Secured Notes.

ballots to accept or reject the Plan, to those creditors entitled to vote on the Plan, and (3) tabulate

the ballots returned by creditors voting on the Plan.  (*Id.* ¶ 7.)

      10.     Pursuant to the Disclosure Statement Order, the Court approved (1) a notice of

non-voting status to be sent to holders of claims and interests in the Unimpaired Classes (the

"Unimpaired Non-Voting Status Notice"), (2) a notice of non-voting status to be sent to holders

of claims and equity interests in the Rejecting Classes (the "Rejecting Non-Voting Status

Notice"), and (3) a Confirmation Hearing Notice.  (*Id.* ¶ 12.)  The Unimpaired Non-Voting

Status Notice, the Rejecting Non-Voting Status Notice, and the Confirmation Hearing Notice

each contained the following information about the injunction, release, and exculpation

provisions of the Plan:

> **INJUNCTIONS, RELEASES, AND EXCULPATION**. The
> Plan contains certain injunction, release, and exculpation
> provisions, including **third party releases**, that are subject to
> approval by the Bankruptcy Court and may be found at Article IX
> of the Plan and Article V of the Disclosure Statement.
>
> ARTICLE IX OF THE PLAN CONTAINS RELEASE,
> EXCULPATION, AND INJUNCTION PROVISIONS, AND
> **ARTICLE IX.D CONTAINS A THIRD PARTY RELEASE.**
> THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER
> THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT
> BE AFFECTED THEREUNDER.
>
> **THIRD PARTY RELEASES**. Article IX.D of the Plan provides
> for the following Third Party Release:
>
> **ON AND AS OF THE EFFECTIVE DATE OF THE PLAN,
> THE HOLDERS OF CLAIMS AND EQUITY INTERESTS,
> SHALL BE DEEMED TO PROVIDE A FULL AND
> COMPLETE DISCHARGE AND RELEASE TO THE ALLY
> RELEASED PARTIES AND THEIR RESPECTIVE
> PROPERTY FROM ANY AND ALL CAUSES OF ACTION
> WHATSOEVER, WHETHER KNOWN OR UNKNOWN,
> ASSERTED OR UNASSERTED, DERIVATIVE
> OR DIRECT, FORESEEN OR UNFORESEEN, EXISTING OR
> HEREINAFTER ARISING, IN LAW, EQUITY, OR
> OTHERWISE, WHETHER FOR TORT, FRAUD,**

**CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, VEIL PIERCING OR ALTER-EGO THEORIES OF LIABILITY, CONTRIBUTION, INDEMNIFICATION, JOINT LIABILITY, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO RMBS ISSUED AND/OR SOLD BY THE DEBTORS OR THEIR AFFILIATES AND/OR THE CHAPTER 11 CASES OR THE PLAN, AND ANY OBLIGATIONS UNDER THE DOJ/AG SETTLEMENT, THE CONSENT ORDER, AND THE ORDER OF ASSESSMENT.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, UNDER SECTION 1123 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THIS THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD, VALUABLE AND SUBSTANTIAL CONSIDERATION PROVIDED BY THE ALLY RELEASED PARTIES; (2) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (3) FAIR, EQUITABLE AND REASONABLE; (4) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR A HEARING; (5) JUSTIFIED BY TRULY UNUSUAL CIRCUMSTANCES; (6) AN ESSENTIAL COMPONENT AND CRITICAL TO THE SUCCESS OF THE PLAN; (7) RESULTED IN DISTRIBUTIONS TO THE CREDITORS THAT WOULD OTHERWISE HAVE BEEN UNAVAILABLE; (8) THE RESULT OF AN IDENTITY OF INTEREST BETWEEN THE DEBTORS AND THE ALLY RELEASED PARTIES REGARDING THE PLAN; AND (9) A BAR TO ANY PARTY ASSERTING A CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THIS THIRD PARTY RELEASE AGAINST ANY OF THE ALLY RELEASED PARTIES.**

(*Id.* ¶ 13.)

11.     On or before August 29, 2013, KCC caused the (1) Unimpaired Non-Voting

Status notice to be served on all known members of the classes deemed to be unimpaired under

the Plan (*id.* ¶¶ 8, 14); (2) the Rejecting Non-Voting Status notice to be served on all known

members of the classes that were deemed to reject the Plan because they will not receive or

retain any property under the Plan (*id.* ¶¶ 9, 14); and (3) Confirmation Hearing Notice to be

served on over two million parties, including (a) the United States Trustee; (b) counsel to the

Creditors' Committee; (c) all persons or entities that have requested notice of the proceedings in

the Chapter 11 Cases; (d) all persons or entities that have filed claims as of the date of the notice;

(e) all known creditors or known holders of prepetition claims as of the date of the Disclosure

Statement Order; (f) all persons or entities listed in the Schedules at the addresses stated therein;

(g) all counterparties to the Debtors' executory contracts and unexpired leases listed on the

Schedules at the addresses stated therein; (h) all parties to litigation with the Debtors; (i) all

parties to litigation with Ally relating to the Debtors' businesses, regardless of whether those

parties are entitled to vote on the Plan; (j) all known members of potential class action lawsuits;

(k) the Internal Revenue Service, the Securities and Exchange Commission, the United States

Attorney for the Southern District of New York and any other required governmental units;

(l) the parties listed on the Special Service List and the General Service List as defined in the

Case Management Procedures Order; (m) known potential creditors with claims unknown by the

Debtors; (n) all holders of Claims and Equity Interests, regardless of whether such holders are

entitled to vote on the Plan; and (o) individual borrowers whose loans were serviced by the

Debtors as of September 20, 2012.  (*Id.* ¶ 15; PX[7] 908.)

12.     On September 3, 2013, KCC caused the Confirmation Hearing Notice, included

information regarding the release, exculpation, and injunction provisions contained in the Plan,

to be published in the *Wall Street Journal* and *USA Today*.  (Voting Certification ¶ 16; PX 905.)

---

[7]     "PX __" refers to the Plan Proponents' exhibits submitted in support of Plan Confirmation.

13.     Notice of the Disclosure Statement, the Plan (including the Debtor Release and the Third Party Release), the Plan Supplement (*see* PX 875), and the Confirmation Hearing, together with all deadlines for voting on or objecting to the Plan, complied with the Bankruptcy Code and Bankruptcy Rules.  (PX 865; Voting Certification ¶¶ 6–16.)

### B.  Section 1124:  Ballot Transmission

14.     Ballots were transmitted to holders of Claims and Equity Interests in the Classes under the Plan that are treated as impaired within the meaning of Bankruptcy Code section 1124 (the "Voting Classes") and entitled to vote on the Plan in accordance with the Plan and the Disclosure Statement Orders.  (Voting Certification ¶¶ 10, 23.)

### C.  Section 1125(e):  Good Faith Solicitation

15.     The Plan Proponents solicited votes for the Plan from claimholders in the Voting Classes in good faith and in a manner consistent with the Bankruptcy Code, including, but not limited to, Bankruptcy Code section 1125(e).  (*Id.* ¶¶ 17–25.)

### D.  Section 1127(a):  Modification of the Plan

16.     Pursuant to Bankruptcy Code section 1127 and Bankruptcy Rule 3018, the Plan Proponents proposed certain modifications to the Plan as reflected in the modified version of the Plan filed on November 13, 2013.  (PX 927.)  The Plan modifications do not (1) affect the classification of Claims or Equity Interests (*see* PX 927 Art. III), (2) constitute material modifications of the Plan under Bankruptcy Code section 1127 (*see, e.g.*, PX 927 Art. XI.A), (3) cause the Plan to fail the requirements of Sections 1122 or 1123 of the Bankruptcy Code (*see* PX 927 Arts. III.A, C; IV.A, C), (4) materially and adversely change the treatment of Claims or Equity Interests (other than any Claims and Equity Interests held by those who have accepted the Plan modifications in writing or in open court) (*see* PX 927 Art. III), (5) require re-solicitation of

acceptances or rejections from any holders of Claims or Equity Interests (*see* PX 927 Art. XI.B),

or (6) require that any holders of Claims or Equity Interests be afforded an opportunity to change

previously cast acceptances or rejections of the Plan (*see* PX 927 Arts. XI.A, B; XIII.A.)  The

Court finds the form and manner of notice of the proposed modifications to be adequate, and no

other notice of the proposed modifications is necessary.

17.     The Court notes that the Plan Proponents made certain additional modifications to

the Plan on December 3, 2013 (ECF Doc. # 5993-1), to resolve the objections of the Ad Hoc

Group, and these modifications are discussed further below.

### E.  Section 1129(a):  Plan Confirmation

18.     The Plan complies with the elements of Section 1129(a) of the Bankruptcy Code.

### 1.     *Section 1129(a)(1):  Plan Contents*

19.     The Plan complies with each applicable provision of the Bankruptcy Code

relating to classification of claims and the mandatory contents of a plan required by Bankruptcy

Code section 1129(a)(1).  (Kruger Direct ¶ 137.)

20.     Pursuant to Bankruptcy Code sections 1122(a) and 1123(a)(1), Article III of the

Plan classifies Claims and Equity Interests separately, based on differences in the legal nature or

priority of those Claims and Equity Interests (other than Administrative Claims, Fee Claims,

Priority Tax Claims, and Statutory Fees, which are addressed in Article II of the Plan and are not

required to be designated as separate Classes pursuant to Bankruptcy Code section 1123(a)(1)).

The Plan complies with sections 1122 and 1123's requirements through the following provisions:

- In accordance with Bankruptcy Code section 1122(a), Article III of the Plan classifies each Claim against and Equity Interest in the Debtors into a Class containing only substantially similar Claims or Equity Interests (Plan Art. III.C–D);

- In accordance with Bankruptcy Code section 1123(a)(1), Article III of the Plan properly classifies all Claims and Equity Interests that require classification.  With respect to Claims and Equity Interests in all Classes, the Plan Proponents have provided proof of a legitimate reason for the separate classification of the Claims and Equity Interests.  Claims and Equity Interests were not separately classified for improper purposes and do not unfairly discriminate between or among holders Claims or Equity Interests (Plan Art. III.C–D);

- In accordance with Bankruptcy Code section 1123(a)(2), Article III of the Plan properly identifies and describes each Class of Claims and Equity Interests that is Unimpaired under the Plan (Plan Art. III.C–D);

- In accordance with Bankruptcy Code section 1123(a)(3), Article III of the Plan properly identifies and describes the treatment of each Class of Claims or Equity Interests that is Impaired under the Plan (Plan Art. III.C–D);

- In accordance with Bankruptcy Code Section 1123(a)(4), the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the holder of a Claim or Equity Interest has agreed to less favorable treatment (Plan Art. III.C–D);

- In accordance with Bankruptcy Code section 1123(a)(5), the Plan, including the Plan Supplement, details adequate and proper means for its implementation, including, pursuant to section 1123(a)(5)(B), transfer and assignment of certain GM Insurance Rights to the Kessler Settlement Class, the Liquidating Trust, and others (Plan Art. IV.G);

- Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date.  Thus, Bankruptcy Code section 1123(a)(6) is not applicable here (Plan Art. IV.P);

- Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date, and no individuals will serve as officers, directors or voting trustees of the Debtors after the Effective Date.  Thus, Bankruptcy Code s 1123(a)(7) is inapplicable in these cases. Nevertheless, the initial members of the Liquidating Trust Board and Liquidating Trust Management were listed in Exhibits 6 and 7 to the Plan Supplement and, thus, were disclosed before the Confirmation Hearing. The Liquidating Trust Board and Liquidating Trust Management were selected by members of the Consenting Claimants in accordance with the terms of the Plan Support Agreement. (Plan Art. IV.P.)

### 2.    Section 1129(a)(2):  Disclosure and Solicitation

21.    The Plan complies with all applicable provisions of the Bankruptcy Code required

by section 1129(a)(2), including sections 1122, 1123, 1124, 1125, 1126, 1127 and 1128 and

Bankruptcy Rules 3017, 3018 and 3019, and all other applicable rules, laws and regulations

concerning the Plan and the solicitation of acceptances or rejections.  (Kruger Direct ¶ 138.)

Acceptances or rejections of the Plan were solicited in good faith and in compliance with the

requirements of Bankruptcy Code sections 1125 and 1126 as follows:

- On August 29, 2013, the Plan Proponents, through KCC, caused copies of the
  following materials to be served on all holders of Claims in Classes that were
  entitled to vote on the Plan (*i.e.*, Claims in Classes R-3, RS-3, GS-3, R-4, GS-
  4A, GS-4B, RS-4, R-5, GS-5, RS-5, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7,
  RS-8, R-11, RS-11, R-12, GS-10, and RS-12) (Voting Certification ¶¶ 7, 10,
  17, 23; PX 908 at ¶¶ 5, 7–23):

  - the Confirmation Hearing Notice describing (a) the Court's approval
    of the Disclosure Statement, (b) the voting deadline, (c) the
    Confirmation Hearing date, (d) the deadline for objections to the
    confirmation of the Plan, and (e) the Plan Releases;

  - the Disclosure Statement (together with the exhibits thereto, including
    the Plan and the Disclosure Statement Order) in a CD-ROM;

  - the letter from the Creditors' Committee to holders of General
    Unsecured Claims in Classes R-4, GS-4A, GS-4B, RS-4, R-6, GS-6,
    RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, and RS-11 and the letter
    from the Creditors' Committee to holders of Borrower Claims in
    Classes R-5, GS-5, and RS-5; and

  - the appropriate form of Ballot with a postage prepaid return envelope.

- Also on August 29, 2013, the Plan Proponents, through KCC, caused copies
  of the Disclosure Statement and the Confirmation Hearing Notice to be served
  on (and made available on the Debtors' restructuring website at
  www.kccllc.net/rescap) the parties comprising the Monthly Service List (as
  defined in ECF Doc. # 141).  (Voting Certification ¶¶ 7, 12, 15; PX-908 at 5
  & Exhibit J.)

- That same day, the Plan Proponents, through KCC, caused a copy of the
  Unimpaired Non-Voting Status Notice and the Impaired Non-Voting Status

Notice to be served on all holders of Claims and Equity Interests in the non-voting classes (*i.e.*, Classes R-1, GS-1, RS-1, R-2, GS-2, RS-2, R-9, R-10, GS-8, GS-9, RS-9, and RS-10). (Voting Certification ¶¶ 12–14; PX 908 at 5 & Exhibits H, I.)

- On October 11, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following exhibits to the Plan Supplement (*see* PX 875), in substantially final forms:

    o  the Liquidating Trust Agreement (Exhibit 2 to the Plan Supplement);

    o  the RMBS Claims Trust Agreement (Exhibit 3 to the Plan Supplement);

    o  the Borrower Claims Trust Agreement (Exhibit 4 to the Plan Supplement);

    o  the Private Securities Claims Trust Agreement (Exhibit 5 to the Plan Supplement);

    o  the Initial Members of the Liquidating Trust Board (Exhibit 6 to the Plan Supplement);

    o  the Initial Members of Liquidating Trust Management (Exhibit 7 to the Plan Supplement);

    o  the Initial Members of the Borrower Claims Trust Committee and Identity of the Borrower Claims Trustee (Exhibit 8 to the Plan Supplement);

    o  the Identity of the Private Securities Claims Trustee (Exhibit 9 to the Plan Supplement);

    o  the Borrower Trust True-Up (Exhibit 10 to the Plan Supplement);

    o  the Cooperation Agreement between the Liquidating Trust and the Kessler Settlement Class (Exhibit 11 to the Plan Supplement);

    o  the Policy Numbers for the GM Policies (Exhibit 12 to the Plan Supplement);

    o  the Liquidating Trust Causes of Action (Exhibit 13 to the Plan Supplement);

    o  the Stipulated Allocation of the Allowed Fee Claim (Exhibit 14 to the Plan Supplement);

- o the Borrower-Related Causes of Action (Exhibit 15 to the Plan Supplement);

- o the Updated RMBS Trust Claims Schedules (Exhibit 16 to the Plan Supplement);

- o the Ally Contract Claims Estimate (Exhibit 17 to the Plan Supplement);

- o the identity of the RMBS Claims Trust Trustee (Exhibit 18 to the Plan Supplement);

- o the Material Terms on which the Plan Proponents may Pay Postpetition Interest Over Time (Exhibit 19 to the Plan Supplement);

- o the Initial List of Claims to be Subordinated under the Plan (Exhibit 20 to the Plan Supplement);

- o the Updated Disclosure Statement Exhibits 12 and 13 (Exhibit 21 to the Plan Supplement); and

- o the updated Excluded Asset list (Schedule 5 to (ECF Doc. # 5854-1).

- On October 29, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) and served the Assumption Schedule identifying Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan (ECF Doc. # 5547) as Exhibit 1 to the Plan Supplement.  (*See* ECF Doc. # 5561.)

- On November 12, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following amended Plan Supplement documents, in substantially final form (ECF Doc. # 5719):

  - o the Liquidating Trust Agreement (Amended Exhibit 2 to the Plan Supplement);

  - o the Borrower Claims Trust Agreement (Amended Exhibit 4 to the Plan Supplement);

  - o the Liquidating Trust Causes of Action (Amended Exhibit 13 to the Plan Supplement); and

  - o the Borrower-Related Causes of Action (Amended Exhibit 15 to the Plan Supplement).

22.    The Confirmation Hearing Notice provided due and proper notice of the Confirmation Hearing and all relevant dates, deadlines, and procedures.  The Notice also adequately provided information relating to the Plan and/or the solicitation of votes, including the voting deadline, the objection deadline, the time, date, and place of the Confirmation Hearing, and the release provisions in the Plan, including the Debtor Release and the Third Party Release.  (*See* PX 865.)

23.    One-hundred and eighty three sub-Classes of Impaired Claims voted on the Plan (*i.e.*, each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12).  (Voting Certification ¶ 10 & Exhibit B.)

24.    KCC determined the validity and tabulation of all Plan acceptances and rejections, including the amount and number of accepting and rejecting Claims in each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12 under the Plan. (Voting Certification ¶¶ 26–27 & Exhibit B.)  Pursuant to resolutions reached with various parties after the filing of the Voting Certification, each of the sub-Classes within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3 RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-12 have accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in those Classes actually voting.  (*See* Voting Certification, Exhibit B.)

25.    All parties entitled to receive notice of the Disclosure Statement, the Plan, and the Confirmation Hearing received proper, timely, and adequate notice in accordance with the

Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and have had an

opportunity to appear and be heard regarding the Plan. (PX 865; Voting Certification ¶¶ 8–25.)

26.    The Plan Proponents solicited votes on the Plan in good faith and consistent with

the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order. (*See* PX 865.)

The Court finds that the Plan Proponents are entitled to the protections afforded by Bankruptcy

Code section 1125(e) and the Plan's exculpation provisions described in Article IX.G.

### 3.    Section 1129(a)(3):  Good Faith

27.    The Plan was proposed in good faith and not by any means prohibited by law.

(Kruger Direct ¶ 139.)  The Plan is the result of extensive good faith, arm's-length negotiations

between the Debtors, the Committee, Ally, and certain of the Debtors' principal creditor

constituencies, including each of the Consenting Claimants and their respective representatives.

(*Id*. ¶ 140.)

### 4.    Section 1129(a)(4):  Payments for Costs and Services

28.    Articles II(B)(1), (2), (3), and (4) of the Plan outline payments for services or

costs made, or to be made, by the Plan Proponents, the Estates, or a party issuing securities or

receiving property under the Plan that have been approved by, or are subject to approval of, the

Court as required by Bankruptcy Code section 1129(a)(4).  (*Id*. ¶ 142.)

29.    The Plan provides that Professional Fee Claims submitted for services incurred

before the Effective Date will receive payment only if and to the extent the Court approves them.

(Plan Art. II.B.2.)  The Plan also provides for the payment of the RMBS Trustees' reasonable

pre- and postpetition fees and expenses pursuant to the provisions of and subject to the

procedures provided in the *Final Supplemental Order under Bankruptcy Code Sections 105(a),*

*362, 363, 1107(a) and 1108, and Bankruptcy Rule 9019 (i) Authorizing the Debtors to Continue*

*Implementing Loss Mitigation Programs; (ii) Approving Procedures for Compromise and*

*Settlement of Certain Claims, Litigations and Causes of Action; (iii) Granting Limited Stay*

*Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title*

*Disputes to Proceed; and (iv) Authorizing and Directing the Debtors to Pay Securitization*

*Trustee Fees and Expenses* (ECF Doc. # 774), and the *Order under 11 U.S.C. §§ 105, 363, and*

*365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets*

*Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased*

*Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related*

*Agreements; and (II) Granting Related Relief* (ECF Doc. # 2246).  Those provisions and

procedures will also apply to HSBC.  (*Id.* Art. IV.C.5.)  The Plan also provides for the allowance

of the Allowed Fee Claim, with Units and distributions on account of the claim made to counsel

for the Institutional Investors.  (*Id.* Arts. I.A.11, IV.C.6.)  In accordance with the Plan, all other

Administrative Claims will receive payment only to the extent they are Allowed Claims.  (*See id.*

Arts. I.A.11, II.A.1–2.)

> 5.    *Section 1129(a)(5):  Identity of Proposed Officers, Directors and Voting Trustees*

30.    Pursuant to Bankruptcy Code section 1129(a)(5) of the Bankruptcy Code, the Plan

discloses the identities and compensation structure for the members of the Liquidating Trust

Board, Liquidating Trust Management, the Private Securities Claims Trustee, the RMBS Claims

Trust Trustee, the Borrower Claims Trustee, and the Borrower Claims Trust Committee.

(Kruger Direct ¶ 143.)  The Members of the Liquidating Trust Board and Liquidating Trust

Management listed on Plan Supplement Exhibits 6 and 7 are qualified, and their selection is

consistent with the interests of holders of Claims and Equity Interests and with public policy.

(*Id.*)

6.    *Section 1129(a)(6):  Government Regulation*

31.    The Plan does alter any rates that require regulatory approval from any governmental agency, rendering Bankruptcy Code section 1129(a)(6) inapplicable here.  (*See generally* Plan.)

7.    *Section 1129(a)(7):  Best Interests of the Creditors*

32.    The Plan satisfies the "best interests of creditors" test outlined by Bankruptcy Code section 1129(a)(7).  (Kruger Direct ¶ 144.)  FTI, the Debtors' financial advisor, conducted an analysis to determine whether creditors would receive greater value under the Plan than they would receive in a Chapter 7 liquidation.  (PX 863 Ex. 8 ¶ 1.)  FTI concluded that all creditors would receive a better recovery under the Plan than in a Chapter 7 liquidation.  (Renzi Direct, ECF Doc. # 5702, ¶ 23.)

33.    The Disclosure Statement's Liquidation Analysis estimates recoveries that would be generated from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 proceeding, along with the associated costs associated.  (*Id.* ¶ 15; PX 863 Ex. 8 ¶ 1.)  The Liquidation Analysis also examines how a hypothetical Chapter 7 liquidation might impact the recoveries of holders of Claims and Equity Interests.  (Renzi Direct ¶ 15.)  Based on the Liquidation Analysis' assumptions, under the Plan, each holder of a Claim or Equity Interest will likely receive or retain a recovery of a value, as of the Plan's Effective Date, that is greater than or equal to the amount that the holder would receive or retain if the Debtors were liquidated under Chapter 7.  (*Id.* ¶ 23.)  Because the $2.1 billion Ally Contribution will be provided only under the Plan and would be unavailable in a Chapter 7 liquidation, Plan confirmation will result in meaningfully higher recoveries for creditors than those creditors would likely receive in a

Chapter 7 scenario.  (*Id*. Direct ¶ 23.)[8]  Mr. Kruger reviewed FTI's analysis and came to the

same conclusion.  (Kruger Direct ¶ 144.)

34.      Although FTI's Liquidation Analysis did not attribute value to the Ally

Contribution or the Intercompany Balances in Chapter 7, these two particular assumptions were

reasonable.[9]  (Renzi Direct ¶¶ 18, 21, 29.)  First, the $2.1 billion Ally Contribution would not be

available in a Chapter 7 liquidation because it is specifically conditioned on Ally obtaining third

party releases, *i.e.*, obtaining "global peace" among Ally, the Debtors and their competing

claimants and creditors.  (*Id.* ¶ 21.)  Additionally, if third parties pursued significant claims

against Ally and its affiliates, that third party litigation could have significant negative results,

including:  (1) Ally's pursuit of indemnity claims against the Debtors' Estates; (2) increasing

litigation costs; (3) dilution of any potential recoveries to creditors; and (4) a risk that the

Debtors may become administratively insolvent before the conclusion of any third party

litigation against Ally.  (*Id.*)

35.      Second, for the reasons discussed below, it was reasonable for the Liquidation

Analysis to not attribute any recovery on account of the Intercompany Balances.  Based on a

review of a variety of factors, the Intercompany Balances on the Debtors' books and records

have a number of attributes more akin to equity than debt (*see, e.g.*, Renzi Direct ¶ 30; Gutzeit

Direct, ECF Doc. # 5707, ¶¶ 6–11), and although the Debtors tried to discern the history and

---

[8]      Because the Recovery Analysis and the Liquidation Analysis show that there are estimated to be more
assets than claims at Debtor Executive Trustee Services, LLC ("ETS"), holders of General Unsecured Claims at
ETS will be entitled to receive the same recovery under the Plan that they would be entitled to receive under a
Chapter 7 liquidation scenario.  (*See* Renzi Direct ¶ 24.)  The Plan provides that holders of Allowed ETS Unsecured
Claims will receive their pro rata share of cash equal to the value of assets available at the ETS Estate after payment
of all allowed claims senior in priority.  (*Id.*)  The Plan properly provides for separate classification and treatment of
the ETS Unsecured Claims and ensures that holders of Allowed ETS Unsecured Claims will receive the same
recovery under the Plan that they would in a Chapter 7 scenario.  (*Id.*)

[9]      As part of the Phase II trial, the JSNs presented evidence in support of their contention that the
Intercompany Balances constituted valid, quantifiable debt and would therefore yield a substantial recovery in
liquidation.  (*See* Bingham Direct ¶¶ 16-19 (ECF Doc. # 5740); Nov. 21, 2013 Tr. 150:14–151:22.)

bases for the Intercompany Balances, they could not successfully do so with any degree of

precision (Westman Direct, ECF Doc. # 5704, ¶ 6.)[10]

36.     No creditors are harmed by the proposed grouping of the Debtors under the Plan's

provision for limited partial consolidation, and the proposed structure of the limited partial

consolidation will not result in a class of creditors receiving a lower recovery under the Plan than

in a Chapter 7 scenario.  (Renzi Direct ¶¶ 25–27.)

### 8.     Section 1129(a)(8):  Classes of Claims or Interests

37.     Each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11,

R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5 (at all sub-Classes

other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-

12 has voted to accept the Plan, and the sub-Class entitled to vote in Class RS-5 at the

Residential Funding Real Estate Holdings, LLC sub-Class has voted to reject the Plan.  (Voting

Certification Ex. B.)  Holders of Intercompany Claims in Classes R-9, GS-8, and RS-9, and

holders of Equity Interests in R-10, GS-9 and RS-10 are deemed to have rejected the Plan

(collectively with Class RS-5 (at the Residential Funding Real Estate Holdings, LLC sub-Class),

the "Rejecting Classes").  Nevertheless, the Plan is confirmable because it does not discriminate

unfairly and is fair and equitable with respect to the Rejecting Classes.  The Plan satisfies

Bankruptcy Code section 1129(b)(1).

### 9.     Section 1129(a)(9):  Payment of Certain Priority Claims

38.     The Plan provides treatment for Administrative Claims, Priority Tax Claims, and

Other Priority Claims in a manner consistent with the Bankruptcy Code section 1129(a)(9)'s

requirements.  (Kruger Direct ¶ 146.)

---

[10]     *But see* footnote 9 *infra*.

      *10.     Section 1129(a)(10):  Impaired Claims*

39.     The Plan has been accepted by at least one class of Impaired Claims at each Debtor that is entitled to vote on the Plan, determined without including any "insider" acceptance of the Plan.  (*See* Voting Certification Ex. B.)

      *11.     Section 1129(a)(11):  Feasibility*

40.     The Plan is feasible within the meaning of Bankruptcy Code section 1129(a)(11). The Debtors' projections show that the Debtors expect to have sufficient funds to make the Plan's required payments.  (Kruger Direct ¶ 147.)

      *12.     Section 1129(a)(12):  Bankruptcy Fees*

41.     The Plan provides that fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors on or before the Effective Date.  (*Id*. ¶ 148.)  On and after the Effective Date, notwithstanding the grouping of the Debtors into the Debtor Groups under the Plan, each of the Debtors shall (1) pay the applicable U.S. Trustee fees when due in the ordinary course until the Bankruptcy Court enters a final decree in the relevant Chapter 11 Case or until each Chapter 11 Case is converted or dismissed, and (2) file consolidated post-confirmation quarterly status reports.  (Plan Arts. II.D & XIII.C.)

      *13.     Section 1129(a)(13):  Retiree Benefits*

42.     Ally (ResCap's indirect parent and a non-Debtor) sponsors the retirement plan covering the Debtors' employees.  (*See* Plan Art. IX.E.)  Article IX.E of the Plan provides that nothing in the Plan releases Ally or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC and ERISA.  The Debtors have no other retiree benefit obligations.  (*See, e.g.*, Plan Art. IX.E.)  The Plan therefore satisfies Bankruptcy Code section 1129(a)(13).

14.    *Sections 1129(a)(14)–(16):  Domestic Support Obligations, Objections, and Property Transfers*

43.    The Debtors do not owe any domestic support obligations and are not individuals. Therefore, Bankruptcy Code sections 1129(a)(14) and (15) do not apply here.  The Debtors are moneyed, business, or commercial corporations or trusts, not nonprofit entities, and, therefore, Bankruptcy Code section 1129(a)(16) does not apply to the Debtors either.  To the extent that any transfer of property under the Plan will be made by a nonprofit corporation or trust and Bankruptcy Code section 1129(a)(16) applies, those transfers will be made in accordance with applicable non-bankruptcy law, thereby satisfying section 1129(a)(16).

### F.  Section 1129(b):  Fair and Equitable

44.    The Plan satisfies Bankruptcy Code section 1129(b) with respect to the Rejecting Classes.  The evidence presented at the Confirmation Hearing is persuasive and credible, and it establishes that the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes.  (*See* discussions of mediation process and individual settlements below; *see also* Dubel Direct, ECF Doc. # 5697, ¶¶ 79, 84–85; Kruger Direct ¶¶ 5, 63, 70, 103, 106, 131, 139, 141, 169, 173, 186.)

45.    Satisfying Bankruptcy Code sections 1129(b)(2)(B) and 1129(b)(2)(C), the Plan is fair and equitable with respect to the Intercompany Balances and Equity Interests because (1) no holder of a Claim or Equity Interest will receive more than it is legally entitled to receive, and (2) the Plan does not provide a recovery on account of any Claim or Equity Interest that is junior to the Rejecting Classes.  The Plan also resolves any question that certain claims must be subordinated to all general unsecured claims pursuant to Bankruptcy Code section 510(b).

46.    The Plan satisfies the requirements of Bankruptcy Code section 1129(b), making the Plan confirmable even though section 1129(a)(8) is not satisfied.  After entry of the

Confirmation Order and once the Effective Date arrives, the Plan will be binding upon the members of the Rejecting Classes.

### G.  Section 1129(c):  Confirmation of a Single Plan

47.     The Plan (including previous versions thereof) is the only plan that has been filed in these Chapter 11 Cases that has been found to satisfy the requirements of subsections Bankruptcy Code sections 1129(a) and (b).  The Plan also complies with section 1129(c)'s requirements.

### H.  Section 1129(d):  Avoidance of Taxes

48.     No party in interest has requested that the Court deny Plan Confirmation on grounds that the Plan's principal purpose is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act.  The Plan's principle purpose is not the avoidance of taxes or the avoidance of Section 5 of the Securities Act, and the Plan therefore satisfies Bankruptcy Code section 1129(d)'s requirements.

### I.  Section 1129(e):  Small Businesses

49.     None of these Chapter 11 Cases is a small business case within the meaning of the Bankruptcy Code.

50.     Based upon the foregoing and all other pleadings and evidence proffered at or before the Confirmation Hearing, the Plan and the Plan Proponents satisfy Bankruptcy Code section 1129's requirements for confirmation.

### III.     IMPLEMENTATION OF THE PLAN

51.     All documents and agreements necessary to implement the Plan, including, but not limited to, the Plan Documents,[11] are essential elements of the Plan, and consummation of

---

[11]     The "Plan Documents" comprise the Plan and all documents executed in connection with the Plan, including the FGIC Settlement.

each agreement is in the best interests of the Debtors, the Estates, and Claimholders.  The Plan

Proponents have exercised reasonable business judgment entering into the Plan Documents, and

each of the Plan Documents has been negotiated in good faith at arm's-length.  The Plan

Documents are fair and reasonable, and will, upon execution and the occurrence of the Effective

Date, constitute legal, valid, binding, enforceable, and authorized obligations of the respective

parties to the Documents and will be enforceable in accordance with their terms.  Pursuant to

Bankruptcy Code section 1142(a), the Plan Documents, and any other agreements necessary to

implement the Plan, will apply and be enforceable, notwithstanding any otherwise applicable

non-bankruptcy law.

### IV.    CONDITIONS TO THE CONFIRMATION OF THE PLAN

52.    Each of the conditions precedent to entry of the Confirmation Order has been

satisfied in accordance with Article X.A of the Plan or properly waived in accordance with

Article X.C of the Plan.

### V.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

53.    Pursuant to Bankruptcy Code sections 365 and 1123(b)(2), upon the occurrence of

the Effective Date, Article V of the Plan provides for the (1) assumption, (2) assumption and

assignment, or (3)  rejection of certain Executory Contracts and Unexpired Leases.  (Plan Art.

V.)  The Debtors used their reasonable business judgment to reach determinations regarding the

assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired

Leases, and those decisions are necessary to the Plan's implementation and are in the best

interests of the Debtors, their Estates, Claimholders, and other parties in interest in the

Chapter 11 Cases.  The Plan Proponents have filed the Assumption Schedule (and any

amendments or supplements) on the public docket and have provided notice to contract

counterparties of the Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases and any related Cure Claims.  (*See* ECF Doc. # 951.)

## VI.    THE ALLY CONTRIBUTION AND THE GLOBAL SETTLEMENT

### A.    Factual Background

*1.    The Original Ally Settlement*

54.    Before the Petition Date, the Debtors identified billions of dollars of potential claims against their parent, Ally.  Beginning in February 2012, the Debtors, Ally, and their respective advisers began discussing a potential settlement of all potential Debtor claims against Ally, along with a process to develop a comprehensive Chapter 11 plan for the Debtors.  The Debtors reached a prepetition settlement with Ally (the "Original Ally Settlement") after review with legal advisors and negotiations between the advisors, the Special Review Committee, and Ally representatives.  (Marano Direct, ECF Doc. # 5705 ¶¶ 39-40.)

55.    After extensive negotiations, the Debtors, Ally, certain of the JSNs, and certain RMBS holders (as defined below) reached an initial settlement in the spring of 2012.  The settlement was memorialized in a Plan Sponsor Agreement (the "Prepetition PSA"), which the ResCap board of directors approved on May 13, 2012, and the parties executed and filed with the Court on the Petition Date.  (PX 65; Marano Direct ¶ 39.)

56.    Under the terms of the Prepetition PSA, Ally agreed to provide substantial monetary and non-monetary contributions to support the Debtors leading up to and during their Chapter 11 Cases, including:  (1) making a $750 million cash contribution to the Debtors; (2) providing $200 million in additional DIP financing; (3) agreeing to allow the Debtors to use Ally's cash collateral; (4) providing a stalking horse bid (with no bid protections) for the Debtors' held-for-sale loan portfolio; (5 ) entering into a shared services agreement affording the

Debtors the operational support they needed to run their business consistent with regulatory requirements; (6) agreeing to negotiate a transition services agreement with the buyer of the Debtors' assets; (7) honoring the ordinary course of business obligations under the employee retirement plan for the Debtors' employees; and (8) supporting the Debtors' origination operations through the closing of the asset sales by allowing the Debtors to continue originating loans on Ally's books postpetition.  (Marano Direct ¶ 40; PX 137 at 129–30.)  Ally also agreed to allow the Debtors to continue servicing Ally Bank's loan portfolio, which represented approximately 30% of the loans serviced by the Debtors and accounted for approximately 10% of the Debtors' servicing-related income.  (Marano Direct ¶ 40.)

57.     Neither Ally nor the Debtors allocated any of the $750 million contribution to any causes of action that the Debtors or third parties may have had against Ally.  (PX 137 at 129.)

### 2.     *The Committee's Investigation*

58.     After the Petition Date, the Committee—which was composed of members of each major creditor constituency that was not party to the Prepetition PSA—observed that the Prepetition PSA (1) did not resolve $4 billion in claims asserted by monoline insurers (the "Monolines") that provided financial guaranty insurance policies insuring amounts payable to residential mortgage-backed securities, notes and certificates ("RMBS") issued by the Debtors (the "Monoline Claims"); (2) did not resolve securities claims, including over $2.4 billion in private securities claims, more than $13 billion of class action securities claims, and securities claims held by the Federal Housing Finance Agency on behalf of Freddie Mac (the "FHFA Claims"); (3) was not supported by holders of more than $1 billion in senior unsecured notes maturing between May 2013 and July 2014 issued by ResCap (the "Senior Unsecured Notes"); (4) did not address hundreds of millions of dollars in individual and class action claims asserted by individuals whose current or former mortgage loans were originated, serviced, sold,

consolidated, or owned by any of the Debtors (the "Borrower Claims"); and (5) did not address

representation and warranty claims by RMBS Trusts (the "RMBS Trust Claims") other than in

connection with Trusts sponsored by the Debtors between 2004 and 2007.  (Dubel Direct ¶ 18.)

The Committee also believed that the plan contemplated by the Prepetition PSA would have left

a *de minimis* recovery for unsecured creditors due to massive litigation, expense, and delay over

the size and treatment of most categories of allowed claims.  (*Id.*)

59.    The Committee believed that the outcome of the Chapter 11 Cases would largely

be driven by the handling of claims against Ally, on one hand, and the resolution of the myriad

inter-creditor disputes, on the other.  (Dubel Direct ¶ 19.)  Rather than confront these issues in

isolation, the Committee favored a "holistic approach."  (*Id*. at 20.)  The Committee concluded

that the likelihood of a settlement with Ally that maximized recoveries for all stakeholders would

be greatest if inter-Debtor and inter-creditor disputes could be settled or set aside.  (*Id*. ¶ 20.)

The Committee believed that the alternative scenario, in which all inter-debtor and inter-creditor

conflicts were resolved through litigation, would destroy significant value for all stakeholders

and significantly delay the conclusion of these cases.  (*Id.*)  The Committee resolved to pursue a

global settlement with Ally and among creditors that reflected broad creditor engagement and

support.  (*Id.*; Nov. 20, 2013 Trial Tr. 121:21–25.)

60.    In pursuit of this goal, the Committee directed its retained professionals to

investigate and assess:  (1) the Original RMBS Settlement; (2)  the Prepetition PSA; and (3) the

claims held by each creditor constituency against the Estates and Ally.  (Dubel Direct ¶ 21.)

These inquiries were prerequisites for any chance of a consensual outcome in the case:  they

prepared the Committee, its members, and other key stakeholders to pursue not only a settlement

with Ally, but also consensus among creditor constituencies without the need of further

litigation.  (*Id.*)

61.    The Committee's professionals conducted thorough investigations.  From June

2012 until early 2013, its Professionals reviewed more than ten million pages of documents and

applied extensive accounting, financial, economic, tax, and valuation expertise.  (*Id.* ¶ 35.)

62.    Based on its investigation, the Committee determined that the Estates held claims

against Ally based on alter-ego/veil-piercing, fraudulent conveyance, preferential transfer,

recharacterization, equitable subordination, breach of fiduciary duty, and aiding and abetting

breach of fiduciary duty.  (*Id.* ¶ 36.)  On April 11, 2013, the Committee filed a *Motion of the*

*Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to*

*Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* (the "Committee STN

Motion," ECF Doc. # 3412).  (PX 852; Dubel Direct ¶ 40.) [12]

63.    In the Committee STN Motion, the Committee argued that the Estates held a veil-

piercing claim against Ally under Delaware law, resulting from Ally's unjust operation of the

Debtors as a single economic entity with Ally.  (*See* PX 852 at 30–37.)  This veil-piercing claim

had the potential to "ascribe Ally with responsibility for *all* liabilities of the [E]states."  (Dubel

Direct ¶ 36.)

64.    The Committee also asserted that the Estates held constructive and actual

fraudulent transfer claims against Ally under Bankruptcy Code sections 544(b) and 548(a), in

connection with Ally's seizure of control of Old GMAC Bank's mortgage assets.  (PX 852 at

---

[12]    While the Committee did not seek to pursue breach of contract claims against Ally, the JSNs have
contended that the Debtors had viable breach of contract claims against Ally for, *inter alia*,  misallocation of
revenues under the 2001 Master Mortgage Loan Purchase and Sale Agreement (the "Misallocation of Revenues
Claim") (*see* DX AJI, DX AXX); violation of a 2007 Mortgage Servicing Rights Swap Agreement (the "MSR Swap
Claim") (*see* DX AJO, DX AZJ), and violation of the 2009 Tax Allocation Agreement (the "Tax Allocation Claim")
(*see* DX APE, DX APX, DX ALF, DX AYZ, DX AJA, DX AZF).

37.)  Ally allegedly compelled ResCap to transfer the thrift charter and other assets of Old

GMAC Bank to GM for no consideration, and simultaneously to sell Old GMAC Bank's

remaining assets and mortgage business to Ally for $1.61 billion.  (*See id.* at 23.)  In return,

ResCap received only non-voting interests in Ally Bank, the entity now holding the bank.  (*See

id.*)

65.    The Committee identified a further fraudulent transfer claim against Ally under

Bankruptcy Code sections 544(b) and 548(a) in connection with Ally's execution of various

swaps, including the "Fair Market Value Swap" and the "Net Funding Swap."  (*Id.* at 25, 37.)

According to the Committee, as a result of these swaps, Ally benefitted from guaranteed steady

income and simultaneously shifted MSR risk to the Debtor GMAC Mortgage, LLC

("GMACM").  (*See id.* at 25.)  The Committee alleged that the swaps required that GMACM

make massive overpayments to Ally Bank and absorb other economic losses.  (*Id.*)

66.    The Committee also determined that, as of the Petition Date, the Estates held an

indemnification claim based on the June 24, 2005 Operating Agreement (the "Operating

Agreement") between GM, GMAC, and ResCap.  (*See id.* at 38.)  The Operating Agreement

provided that Ally "will, to the fullest extent permitted by law, indemnify, defend and hold

harmless ResCap and its Subsidiaries from and against any Losses related to GMAC

Indemnifiable Liabilities."  (*Id.*)  Both "Losses" and "GMAC Indemnifiable Liabilities" were

broadly defined and encompassed Debtor payments arising from:

- Losses related to claims based on the representations and warranties made by Ally and its non-Debtor subsidiaries in loans originated or acquired by Old GMAC Bank and Ally Bank (*see id.* at 11, 38);

- Settlements with the Government Sponsored Enterprises ("GSEs") Freddie Mac and Fannie Mae, which Ally caused the Debtors to enter into in 2010, and through which Debtors assumed liability for nearly $800 million in settlement payments (*see id.* at 27); and

- Settlements entered into with federal regulators, the United States Department of Justice, and state attorneys general for which Debtors assumed all costs of performance pursuant to a letter agreement (the "January 30 Letter Agreement") entered into shortly before the bankruptcy, which shifted compliance costs to ResCap and GMACM, including hard dollar penalties and indemnity for all loan modifications (*see id.* at 28).

67.     Lastly, the Committee asserted that the Estates have an avoidance claim under Bankruptcy Code section 547(b) for a preferential payment of $49 million to Ally Bank, which was made by the Debtor GMACM under the auspices of the January 30 Letter Agreement's indemnity provisions.  (*See id.* at 38.)  According to the Committee, Ally's counsel had conceded that the $49 million payment was an avoidable preference in a contemporaneous email.  (*See id.*)

### 3.    The SUN Trustee Standing Motion

68.     On April 19, 2013, Wilmington Trust, National Association, as indenture trustee for the Senior Unsecured Notes issued by ResCap, filed a motion seeking standing to prosecute claims on behalf of the ResCap estate, including fraudulent transfer, constructive trust, indemnification, contribution, and aiding and abetting breach of fiduciary duty claims against Ally, and breach of fiduciary duty claims against the directors and officers of ResCap.  (*See* PX 853 (the "SUNs' STN Motion").)

69.     Wilmington Trust, on behalf of the Senior Unsecured Noteholders, identified many of the same claims against Ally that the Committee identified.  Specifically, the SUNs' STN Motion identified potential Debtors' claims against Ally for constructive and actual fraudulent transfer, and indemnification claims arising from the Operating Agreement.  (*See id.* at 15–17, 22–23.)

70.     The SUNs' STN Motion identified the following additional claims against Ally:

- A constructive trust against Ally relating to its ownership of Ally Bank, because Ally violated its promise not to engage in any transaction with the Debtors that would contravene the Operating Agreement (*id.* at 16, 23);

- A claim for contribution from Ally in connection with the losses suffered by the Debtors as a result of Ally's actions involving losses from government fines, settlement with the GSEs, and indemnification payments such as those made to Ally Bank (*id.* at 17, 23);

- Recovery from Ally, resulting from the forgiveness of Debtors' subsidiaries' debts, which was done for the benefit of Ally, and with actual intent to hinder, delay or defraud the Noteholders and the Trustee (*id.* at 16, 22–23);

- A claim against Ally for aiding and abetting the Debtors' directors and officers in breaching their fiduciary duties to the Debtors (*id.* at 16, 23);

- A constructive trust against Ally for all property held by Ally (including cash, tax attributes, and other assets) that Ally explicitly or implicitly promised, in writing or otherwise, to hold for the benefit of the Debtors (*id.* at 17, 23); and

- A claim against Ally by the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, relating to alleged breaches of the Senior Unsecured Notes Indenture (Dubel Direct ¶ 69).

a.      The Mediation Process Yields a Global Settlement

71.      In late 2012, the Debtors, Ally, and the Committee determined that formal mediation could accelerate negotiations between the parties, forestall years of burdensome and costly litigation, and push the cases towards resolution.  (*Id.* ¶ 41; Marano Direct ¶ 70.)  The Debtors, with the support of the Committee, requested the appointment of a mediator to assist with the plan negotiation process.  (*See* PX 832.)  On December 26, 2012, this Court entered an order appointing the Honorable James M. Peck as Mediator in these Chapter 11 Cases to assist in plan negotiations, foster a dialogue with key stakeholders, and reach resolution of significant plan issues (the "Mediation").  (PX 835.)  Between January 2013 and March 2013, Judge Peck held a series of individual meetings, teleconferences, and discussions with the Committee, the Debtors, each significant creditor constituency, and Ally.  (Dubel Direct ¶ 48.)

72.     The Mediation was designed by the Debtors and the Committee and approved by

this Court to encompass two major areas:  (1) the claims asserted by the Debtors' Estates and the

third party claims held by individual creditors against Ally, and (2) the inter-creditor and inter-

Debtor issues, including, but not limited to, those related to (a) the allocation of proceeds from

the sale of the Debtors' assets, (b) the validity of certain security interests, and entitlement, if

any, to postpetition interest and fees, (c) the allocation of administrative claims among the

Debtor entities, (d) the extent, validity and priority of various creditors' claims, and (e) the

treatment of intercompany claims under a plan, issues relating to fraudulent conveyances, and

subrogation claims.  (Kruger Direct ¶ 23.)

73.     As part of the Mediation, the Court put strict confidentiality protections in place,

which precluded the parties from disclosing the substance of any of the negotiations.  (*Id.* ¶ 24;

PX 835 at 2.)

74.     The Mediation involved good faith, arm's-length negotiations conducted among

sophisticated parties with differing and conflicting interests.  (Kruger Direct ¶ 25; Dubel Direct

¶ 43.)  It allowed the parties to meet in a confidential forum, and to articulate and present their

respective positions and interests.  (Kruger Direct ¶ 25.)

75.     The Mediation involved the Debtors' major creditor constituencies, including

Ally and the Committee.  (*Id.* ¶ 26.)  Most, if not all, of those parties are highly sophisticated and

were represented by experienced counsel and financial advisors who could advocate on their

behalf.  (*Id.* ¶ 34; Dubel Direct ¶ 46.)

76.     The negotiations spanned five months, commencing in January 2013.  (Kruger

Direct ¶ 27.)  The creditors as a whole, including their lawyers and other advisors, were heavily

involved in many intense negotiation sessions, calls and meetings, both in small and large groups, and both with and without Judge Peck. (*Id.* ¶ 27; *see also* Dubel Direct ¶¶ 44–45, 48.)

77.    For example, on April 22 and 23, 2013, the Debtors participated in a "mediation summit" at the offices of Kramer Levin Naftalis & Frankel, LLP with Judge Peck, the Committee and its advisors, and the advisors and/or business level leads of each of the Debtors' major creditor constituencies.  (Kruger Direct ¶ 28.)  The April 22, 2013 session lasted approximately twelve hours, and the April 23, 2013 session lasted approximately nine hours. (Dubel Direct ¶ 49.)  Over one hundred people attended, including representatives from over twenty different creditors or creditor groups, seventy attorneys and thirty financial advisors to the various parties.  (Kruger Direct ¶ 28; Dubel Direct ¶ 49.)  These creditor constituencies included to the following parties:

- AIG;
- Allstate;
- Ally;
- the Committee;
- FGIC;
- FHFA;
- the Kessler Class Claimants;
- representatives of the Junior Secured Noteholders;
- representatives of the NJ Carpenters Class;
- MassMutual;
- MBIA;
- Paulson;
- Prudential;
- Deutsche Bank;
- BNY Mellon;
- US Bank;
- Wells Fargo;
- Law Debenture;
- HSBC;
- the Steering Committee Consenting Claimants;
- counsel to certain holders of the Senior Unsecured Notes;
- the Talcott Franklin Consenting Claimants; and
- Wilmington Trust.

(Kruger Direct ¶ 28.)

78.    Following the "mediation summit," the parties participated in numerous additional large group mediation sessions in an effort to continue negotiations, and Judge Peck held additional conference calls and smaller group meetings with certain parties-in-interest. (Kruger Direct ¶ 29; Dubel Direct ¶ 50.)

79.    The parties reached the final terms of the global compromise (the "Global Settlement") detailed in a plan support agreement and term sheet (the "Plan Support Agreement" and "Plan Term Sheet") executed by the Debtors, the Committee, a majority of the Debtors' creditor constituencies, and Ally following multiple arm's-length negotiations in May.  (PX 855; Kruger Direct ¶ 30.)  During the negotiations, the parties engaged in numerous in-person meetings and conference calls and two additional marathon mediation sessions on May 9 and May 10, 2013, between the Debtors, the Committee, Ally, and other creditors.  (Kruger Direct ¶¶ 30–31)  Ultimately, on May 13, 2013, the Mediation yielded the Global Settlement, which the Plan Support Agreement and Plan Term Sheet memorialized.  (PX 855; Dubel Direct ¶ 51; Kruger Direct ¶¶ 30-31.)  The Plan Support Agreement and Plan Term Sheet called for Ally to provide the $2.1 billion Ally Contribution to the Debtors' Estates in exchange for a global release of all estate and third party claims made against Ally.  (PX 855 at 51–55.)

80.    Ally was willing to provide the Ally Contribution only in exchange for a global resolution of its potential ResCap-related liability and an accompanying comprehensive set of releases.  (Carpenter Direct, ECF Doc. # 5695, ¶ 26.)  A comprehensive settlement, including full Debtor and third party releases and an injunction against Debtor and third party claims, was indispensable to Ally's agreement to enter into the Plan Support Agreement.  (Carpenter Direct ¶ 26; Nov. 20, 2013 Trial Tr. 93:11–16.)

34

81.     Following the execution of the Plan Support Agreement, the Debtors, the
Committee, Ally and the Consenting Claimants continued negotiations regarding the more
detailed terms of the settlements contemplated by the Plan Support Agreement.  (Kruger Direct
¶ 31; Dubel Direct ¶ 52.)  This process culminated with a negotiation session beginning the
morning of May 22, 2013, lasting through the night, and ending with the execution and filing
of the Supplemental Term Sheet (along with the Plan Support Agreement and Plan Term
Sheet) at approximately 9:00 a.m. on May 23, 2013.  (Kruger Direct ¶ 31; Dubel Direct ¶ 53.)

82.     After those filings, the Plan Proponents, in consultation with various parties in
interest, drafted the Plan, which implemented and was consistent with the terms of the Plan
Support Agreement and Term Sheets, as well as the related Disclosure Statement and motion
seeking approval of the Disclosure Statement and solicitation procedures (the "Disclosure
Statement Motion").  (Kruger Direct ¶ 32.)

83.     After further arm's-length negotiations among the parties to the Plan Support
Agreement, on July 3, 2013, the Debtors filed the Plan, Disclosure Statement, and Disclosure
Statement Motion.  (*Id.* ¶ 33.)  In response to both formal and informal objections from certain
parties in interest, the Plan Proponents amended the Plan and Disclosure Statement on
August 16, 2013 and August 20, 2013.  (*Id.*)  On August 23, 2013, the Court entered an order
approving the Disclosure Statement, as amended, and authorizing the Plan Proponents to solicit
votes on the Plan.  (*Id.* ¶ 33.)  The Plan Proponents then commenced solicitation of votes on the
Plan.  (*Id.*)

### B.     The Global Settlement and the Individual Plan Settlements

84.     The Plan settles numerous litigable issues in the Chapter 11 Cases pursuant to
Bankruptcy Rule 9019 and Bankruptcy Code section 1123.  These settlements are in

consideration for the compromises, distributions, and other benefits provided under the Plan.

The Plan constitutes a compromise of all Claims, Equity Interests, or Causes of Action relating

to the contractual, legal, and subordination rights that a holder of a Claim or Equity Interest may

have with respect to any Allowed Claim or Equity Interest or any distribution to be made on

account of an Allowed Claim or Equity Interest.

85.    The Plan Support Agreement—approved by the Court in its June 26, 2013 Order

(PX 857)—details the Parties' commitments and obligations regarding the Plan Term Sheet and

Supplemental Term Sheet, attached as exhibits to the Plan Support Agreement. (Kruger Direct

¶ 37.) The Plan Support Agreement includes customary conditions for those types of documents,

such as an agreement to support a Plan that is consistent with the terms of the Agreement, to

negotiate in good faith to reach definitive documentation, and to not delay or impede

consummation of the Plan. (*Id*. ¶ 37.) The Plan Term Sheet contemplates the incorporation of a

settlement with Ally, pursuant to which Ally has agreed to contribute value to the Debtors'

Estates in exchange for releases from the Debtors, the Committee and the Supporting Parties.

(*Id*. ¶ 37.)

86.    As noted above, the Ally Contribution facilitated the resolution of numerous inter-

Debtor, Debtor-creditor and inter-creditor disputes, and provided recoveries to all constituencies

of the Debtors' Estates, which were substantially enhanced over the recoveries contemplated by

the Debtors' original prepetition settlement with Ally. (*Id.* ¶ 38.) Among other things, the Plan

resolves disputes relating to: (1) the RMBS Trust Claims; (2) the claims asserted by certain of

the Monolines (*i.e.*, MBIA, FGIC, Ambac, Assured, and Syncora); (3) the Private Securities

Claims; (4) the claims held by Wilmington Trust, as indenture trustee for the Senior Unsecured

Notes; (5) the NJ Carpenters Claims; (6) the division of assets (including the Ally Contribution)

among the Debtors' Estates; (7) the division of expenses among the Debtors; (8) the settlement

of Intercompany Balances, subrogation claims, and fraudulent conveyance claims; and

(9) potential substantive consolidation litigation.  (*Id.*)

87.    The Plan embodies a Global Settlement of these issues, so each of the Plan

Settlements is inextricably intertwined with all others, and the failure of any one settlement

would jeopardize the ability to consummate the Plan as a whole.  (Kruger Direct ¶ 39; Dubel

Direct ¶ 55.)  None of the Settling Parties would have reached agreement on a resolution of their

claims against the Debtors or the Ally Released Parties absent the other settlements embodied in

the Plan.  (Kruger Direct ¶ 39.)  For example, the Monolines would not have agreed to settle the

amount or allocation of the Monoline Claims against the Debtors and agreed to the Third Party

Release absent agreement among the parties as to, among other things:  (1) the amount of the

Ally Contribution, (2) the settlement of the division of the Ally Contribution and administrative

expenses among the Debtor Groups, (3) a settlement of issues relating to the substantive

consolidation of the Debtor Estates, and (4) the treatment of Intercompany Balances and issues

relating to fraudulent conveyances and subrogation claims.  (*Id.*)  Likewise, none of the other

Consenting Claimants would have agreed to settle the amount and allocation of their Claims

against the Debtors and the Ally Released Parties absent an appropriate settlement of all other

Consenting Claimants' Claims against those parties and consensus regarding the treatment for

any other Claims in the Plan.  (*Id.*)  And Ally would not have agreed to fund the $2.1 billion Ally

Contribution absent consent by the Plan Proponents and each of the Consenting Claimants to the

Debtor and Third Party Releases embodied in the Plan.  (Kruger Direct ¶ 39; Carpenter Direct

¶¶ 26–27.)

88.     After executing the Plan Support Agreement, the Debtors and the Committee continued to work to resolve significant contested litigation claims against the Estates.  (Kruger Direct ¶ 40.)  As a result of these efforts, the Plan Proponents resolved a substantial number of contested claims, as well as the vast majority of formal and informal objections to the Plan.  (*Id.*) The result of those efforts is overwhelming support for the Plan from almost all of the Debtors' creditor constituencies and other parties in interest.  (*Id.*)  After the entry into the Plan Support Agreement, the Plan Proponents resolved the claims of Ambac, Assured, Syncora, the Rothstein Plaintiffs, the RESPA Plaintiffs, the NCUAB, FHFA, Freddie Mac, Amherst, the PBGC, Ocwen, and the Ad Hoc Group.  (*Id.*)

89.     Based on a settlement among the Plan Proponents, the Consenting Claimants, Ally and certain of the Junior Secured Noteholders (the "Consenting JSNs"), the Consenting JSNs have agreed to change their vote to a vote in favor of the Plan (discussed further below). Pursuant to the settlement with the Consenting JSNs, the Plan has been modified to provide for the settlement and release of all secured and unsecured claims held by the Junior Secured Noteholders, the Junior Secured Notes Indenture Trustee, and the Junior Secured Notes Collateral Agent, including, but not limited to, any claims for principal, pre- and postpetition interest, fees and expenses, indemnification claims, and other charges, in exchange for the Junior Secured Notes Distribution.  This modification to the Plan is not material and does not require resolicitation of the Plan.

90.     The Global Settlement and each of the settlements contemplated therein provide benefits to the Estate.  (Kruger Direct ¶ 41.)  Litigation is inherently uncertain, time-consuming and expensive, and by reaching these settlements, the Debtors have eliminated this risk and uncertainty.  (*Id.*)  These settlements will allow for numerous parties to recover from the Estates

soon after the Effective Date, and because these litigations are resolved, the settlements will

benefit creditors at large because they will allow for a greater percentage of funds to be

distributed initially to the creditors rather than held back in a disputed claims reserve.  (*Id.*)

### 1.    The Ally Settlement

91.    The Ally Contribution facilitated the resolution of numerous inter-Debtor, Debtor-

creditor and inter-creditor disputes, and provided recoveries to all constituencies of the

Debtors' Estates.  (*Id.* ¶ 38.)  Those recoveries were substantially enhanced over the recoveries

contemplated by the Debtors' original prepetition settlement with Ally embodied in the

Prepetition PSA.  (*Id.*)  These efforts resulted in an increase in the amount of the Ally

Contribution from $750 million to $2.1 billion, and resolved claims that were not included in

the original prepetition settlement.  (Dubel Direct ¶¶ 18, 60–73; Kruger Direct ¶¶ 42–45.)

These claims include those asserted in the (1) Private Securities Litigation, (2) Monoline

Litigation, (3) RMBS Trust Litigation, and (4) Borrower Litigation.  (Kruger Direct ¶¶ 56–

112.)

92.    Fundamental to the Global Settlement and the Plan, each component of the deal is

inextricable from the settlement as a whole, relying on and relating to the others.  (Dubel Direct

¶ 55.)  The Global Settlement and Plan thus embody a mosaic of interrelated settlements that

cannot be fairly evaluated in isolation.  (*Id.*)

93.    The Global Settlement does not allocate the Ally Contribution by causes of

action.  (Kruger Direct ¶¶ 126–31.)  The Global Settlement allocates the Ally Contribution as

follows:  $782.74 million to the ResCap Debtors; $462.32 million to the GMACM Debtors;

$462.32 million to the RFC Debtors; $235 million to the Private Securities Claims Trust; $57.62

million to the Borrower Claims Trust; and $100 million for the NJ Carpenters Claims

Distribution.  (*Id.* ¶ 127.)

94.    Because the Ally Contribution resolves both estate and third party claims against the Ally Released Parties, and because certain claims and causes of action against the Ally Released Parties may be asserted by more than one Debtor entity or third party, it would be extremely difficult—if not impossible—to allocate the Ally Contribution to the Debtor Groups on account of specific causes of action.[13]  (Kruger Direct ¶ 128.)

95.    Ally was unwilling to entertain negotiations unless they were premised on a global aggregation and release of claims, and Ally would not settle claims on an individual or claim-by-claim basis.  (Dubel Direct ¶ 81.)

96.    Reallocation of the Ally Contribution on account of any number of variables would not only threaten the Global Settlement as a whole, but also would be costly, time consuming, and subject to challenge by all parties to the Global Settlement.  (Kruger Direct ¶ 128.)  Settling the allocation of the Ally Contribution through the Global Settlement was preferable to litigating these issues.  (*Id.*)

97.    Under the terms of the Plan and the Global Settlement, there will be no allocation of the Ally Contribution among the various causes of action that could have been asserted against Ally.  (*See* PX 858.)

2.    *The RMBS Settlement*

98.    The Global Settlement—incorporated into the Plan—also provides for the allowance, priority, and allocation of claims of approximately 1,100 RMBS Trusts (the "RMBS Settlement").  (Kruger Direct ¶ 56.)

---

[13]    At the Phase II Trial, however, the JSNs elicited testimony that the Debtors never attempted to allocate the Ally Contribution on account of specific causes of action.  (Nov. 20, 2013 Trial Tr. 220:16–22.)  The JSNs argued that it was possible to allocate the Ally Contribution, and the Plan Proponents' failure to do so necessitated an allocation by the Court.  (Phase II Pretrial Order ("Phase II PTO"), ECF Doc. # 12-12020, at 75; Nov. 19, 2013 Trial Tr. 203:24–204:23.)

99.     In connection with their RMBS business, the debtors entered into a number of
agreements with the RMBS Trusts.  These agreements typically included representations and
warranties about the loans underlying the securities.  (Lipps Direct, ECF Doc. # 5701, ¶ 74; *see
also, e.g.*, PX 640–647.)  The Debtors also frequently made contractual commitments to act as
servicer or master servicer for loans underlying the securities.  (Lipps Direct ¶ 74.)  The RMBS
Trustee for each Trust has primary authority to enforce the Trust's rights, but, under certain
circumstances (including when a certain percentage of investors, usually 25%, act in concert),
investors may direct the RMBS Trustee to pursue certain remedies and, if the trustee fails to act,
may pursue those remedies directly on behalf of the trust.  (*Id.* ¶ 75.)

100.     Before the Petition Date, in the fall of 2011, a group of institutional investors
represented by Gibbs & Bruns LLP asserted contract claims on behalf of the RMBS trusts
against the Debtors for breaches of various agreements related to the Debtors' RMBS
securitizations.  (*Id.* ¶ 76.)  In the spring of 2012, another group of institutional investors
represented by Talcott Franklin P.C. (together with the Gibbs & Bruns investors, the
"Institutional Investors") asserted similar claims.  (*Id.*)  The Institutional Investors also asserted
claims against Ally under control person and other derivative theories.  (*Id.*)  The RMBS
Trustees for the RMBS Trusts ultimately filed consolidated proofs of claim against the Debtors
on behalf of the RMBS Trusts in which the Institutional Investors and other holders invested.
(*Id.* ¶ 77.)[14]  In aggregate, the claims filed by the RMBS Trustees on behalf of the RMBS Trusts
involve more than one thousand RMBS trusts.  (*Id.*)

---

[14]     The RMBS Trustee proofs of claim were admitted into evidence (for limited purposes) as PX 1219 (Claim
Nos. 6451 through 6501 by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas
against all Debtors); PX 1222 (Claim Nos. 6706 through 6756 by Deutsche Bank National Trust Company and
Deutsche Bank Trust Company Americas against all Debtors); PX 956 (Claim Nos. 6758 through 6767 and 6772
through 6779 by Bank of New York Mellon Trust Co., N.A. against nine Debtors); PX 1223 (Claim No. 6757 by
Bank of NY Mellon as Master Servicer); PX 955 (Claim Nos. 6655 through 6705 by U.S. Bank National
Association against all Debtors); PX-1204 (Claim Nos. 5130 through 5145 by HSBC Bank USA, N.A. against

101.    After extensive negotiations in early 2012, the Debtors entered into settlement

agreements with the Institutional Investors (the "Original RMBS Settlement"), covering 392

RMBS Trusts sponsored by the Debtors between 2004 and 2007 for an allowed unsecured claim

amount of $8.7 billion (with the potential for Trusts to opt out, in which case the allowed amount

would be reduced accordingly).  (Kruger Direct ¶ 58; Lipps Direct ¶ 78.)  The Original RMBS

Settlement was reached before Mr. Kruger's appointment as CRO.  (Kruger Direct ¶ 57.)  At the

time, the Debtors' management, in consultation with their advisors and Board of Directors,

believed that the settlement was in the best interests of the Debtors and important to the success

of these cases.  (*Id.*)  The Original RMBS Settlement ultimately permitted the Debtors to

(1) proceed with the sales of the Estates' assets in an orderly manner and (2) resolve objections

regarding the severability of the Debtors' pooling and servicing agreements and the appropriate

priority of the RMBS Trusts' alleged origination-based claims to a future date or, potentially, to

avoid the dispute altogether.  (*Id.*)  The Original RMBS Settlement was subject to this Court's

approval under Bankruptcy Rule 9019.  (Lipps Direct ¶ 78.)  The Debtors' expert Frank Sillman

determined that the estimated lifetime losses for these Trusts could range from $45.6 billion to

$49.8 billion.  (PX 811 ¶ 43.)

102.    Similar to the initial proposed contribution from Ally, however, the Original

RMBS Settlement faced objections from the Committee and a number of creditor constituencies,

including MBIA, FGIC, Wilmington Trust, Assured, and the Ad Hoc Group. (Kruger Direct

¶ 59; Dubel Direct ¶ 27.)  Confronted with those objections, the Debtors determined that further

negotiations were necessary.  Subsequent negotiations in connection with the Mediation

---

RFC); PX 1205 (Claim Nos. 5146 through 5255 by HSBC Bank USA, N.A. against GMAC Mortgage, LLC); PX
954 (Claim Nos. 6604 through 6654 by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A.
against all Debtors); and PX 1220 (Claim Nos. 6553 through 6603 and 6502 through 6552 by Wells Fargo Bank,
N.A. as Master Servicer against all Debtors).

ultimately resulted in the Global Settlement contained in the Plan, which includes the modified

RMBS Settlement.  (Kruger Direct ¶ 59.)  The RMBS Settlement embodied in the Plan resolves

claims asserted by the RMBS Trustees. (Dubel Direct ¶¶ 60–62; Kruger Direct ¶ 60.)

103.    The RMBS Settlement resolves:  (1) alleged and potential claims for breaches of

representations and warranties held by all RMBS Trusts; (2) all alleged and potential claims for

damages arising from servicing; and (3) any cure claims (which, if allowed, would be treated as

administrative expense claims), in exchange for Allowed Claims in the aggregate amount of

$7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the

RFC Debtors.  (Kruger Direct ¶ 56.)  As part of this settlement, the Plan provides for the

formation of an RMBS Claims Trust to facilitate distribution to the RMBS Trusts.  (*Id.*)  The

method for allocating this total allowed claim amount among the RMBS Trusts with allowed

claims is more fully described in Exhibits 9 and 13 to the Disclosure Statement.  (*See* PX 256 at

516–19, 614–17 of 664.)

104.    The RMBS Settlement contemplated by the Plan expands the scope of the

released claims, clarifies the treatment of RMBS Trusts with monoline insurance, and reduces

the total allowed claim amount for the RMBS Trusts.  (Kruger Direct ¶ 60.)  Altogether, the

RMBS Settlement in the Plan now provides for the release of claims by approximately 1,100

RMBS Trusts, including all of the RMBS Trusts that were the subject of the Original RMBS

Settlement.  (*Id.*)  The primary improvements in the RMBS Settlement are as follows:

> (a) The RMBS Settlement settles the claims of RMBS Trusts sponsored by the
> Debtors from 1999 to 2004, in addition to those sponsored between 2004 and
> 2007;
>
> (b) The RMBS Settlement releases the claims of RMBS Trusts that were not
> sponsored by the Debtors, but that include loans sold by the Debtors as to
> which the Debtors made representations and warranties;
>
> (c) The RMBS Settlement settles all servicing and cure claims of all participating
> RMBS Trusts;

43

    (d) The RMBS Settlement now settles all cure claims of the RMBS Trusts which, if allowed, would be treated as administrative expense clams; and

    (e) The total allowed claim amount has been reduced from $8.7 billion in the Original RMBS Settlement to $7.3 billion.

(Kruger Direct ¶ 60; PX-875, Exhibit 17 at Schedules 2G through 4R.)

105.    For RMBS Trusts insured by a Monoline, the RMBS Settlement contemplates a release of the insured RMBS Trusts' claims against the Debtors, while preserving those Trusts' rights to seek payment from their respective Monoline, whose separate claims against the Debtors are addressed in the Monoline settlements.  (Kruger Direct ¶ 61.)  Generally speaking, the RMBS Settlement allocates no payment from the RMBS Settlement Trust to insured RMBS Trusts with respect to insured tranches for which the Monoline is expected to make full payments.  (*Id*.; PX 875 Ex. 17 at Schedules 2G–3R.)

106.    The potential losses for RMBS Trusts asserting breaches of representations and warranties range from $42.4 billion to $43.2 billion, excluding losses that are insured by a Monoline.  (Sillman Direct, ECF Doc. # 5703, ¶¶ 4, 15.)  Of that amount, $32.9 billion are historical losses to Debtor-sponsored trusts, and $1.45 billion represent historical losses in non-Debtor sponsored trusts that correspond to the percentage of loans in those trusts sold by the Debtors.  (*Id*. ¶¶ 35, 38.)  The additional forecasted losses range from $7.76 billion to $8.4 billion for the Debtor-sponsored RMBS Trusts, and $300 to $400 million for the portion of non-Debtor-sponsored RMBS Trusts corresponding to the portion of loans sold by the Debtors.  (*Id*. ¶¶ 35, 39–40.)  Absent settlement, the likely amount of recoverable damages for the RMBS Trusts' representation and warranty claims, after consideration of legal defenses and litigation costs, ranges from $7.38 billion to $8.6 billion.  (Sillman Direct ¶ 60; Kruger Direct ¶ 62.)  This range does not account for servicing claims and cure claims.  (*See* Sillman Direct ¶¶ 6, 13; Kruger Direct ¶ 87.)

107.    The RMBS Settlement is in the best interests of the Debtors' Estates and their

creditors.  (Kruger Direct ¶ 62.)  Aside from the potential recoverable damages, this finding takes

into account the litigation risks regarding defenses, including subordination under Bankruptcy

Code section 510(b), and the risk that substantial cure claims of the RMBS Trusts could be

allowed as administrative expenses.  (*Id.*)

108.    As part of the Global Settlement, the RMBS Trustees consented to the Third Party

Releases, which was essential to Ally's agreement to contribute $2.1 billion to the Debtors'

Estates.  (*Id.* ¶ 64.)

a.    RMBS Attorneys' Fees

109.    The RMBS Settlement incorporated into the Plan includes and provides for

attorneys' fees in connection with the RMBS Settlement, known as the "Allowed Fee Claim."

(Kruger Direct ¶ 210; *see generally* Mueller-Handal Direct, ECF Doc. # 5688.)  The Allowed

Fee Claim is 5.7% of the Allowed RMBS Trust Claims, which will be distributed to counsel to

the Institutional Investors as fees via direct allocation to counsel for the Institutional Investors

and without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts.

(Kruger Direct ¶ 210; *see also* Mabey Direct, ECF Doc. # 5686, ¶ 3.)

110.    As set forth in the Plan, the amount of the Allowed Fee Claim reduced the total

Units distributed (and Cash distributed thereon) by the Liquidating Trust on account of RMBS

Trust Claims to the RMBS Claims Trust, and has no impact on any other party entitled to a

distribution under the Plan.  (Kruger Direct ¶ 211; Mueller-Handal Direct ¶ 16.)  No party has

objected to the Allowed Fee Claim.  The Allowed Fee Claim is fair, reasonable, and appropriate

under the circumstances of this case.  (Kruger Direct ¶ 212; *see generally* Mueller-Handal

Direct; Mabey Direct.)

b.      The RMBS Trustee Findings

111.    The RMBS Settlement contemplates that the order approving it will contain

findings that (1) the Plan, including the RMBS Settlement and the FGIC Settlement Agreement

(discussed below), is in the best interests of the Investors in each RMBS Trust, and (2) each

RMBS Trust and the RMBS Trustees[15] acted reasonably, in good faith, and in the best interests

of the Investors in entering into the Plan Support Agreement and Global Settlement.  (Plan Art.

IV.C.7.)[16]  No party in interest contested the entry of these findings during the Plan confirmation

hearing.

---

[15]      Unless otherwise noted, the term "RMBS Trustees" has the meaning ascribed to it in the Plan, which
includes BNY Mellon Trust Company and The Bank of New York Mellon ("BNY Mellon"); U.S. Bank National
Association ("U.S. Bank"); Wells Fargo Bank, N.A. ("Wells Fargo"); Deutsche Bank National Trust Company and
Deutsche Bank Trust Company Americas (together, "Deutsche Bank"); Law Debenture Trust Company of New
York ("Law Debenture"); and HSBC Bank USA, N.A. ("HSBC"), each solely in their respective capacities as
trustee, indenture trustee, separate trustee, securities administrator, co-administrator, paying agent, grantor trustee,
master servicer, custodian and/or other similar agencies.  BNY Mellon, Deutsche Bank, and U.S. Bank, as RMBS
Trustees, are also members of the Committee.

[16]      The Proposed Confirmation Order contains the following findings:

The Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC
Settlement Agreement and all the transactions contemplated by each of the foregoing, including
the releases given therein, are in the best interests of the Debtors, their Estates, their creditors, the
Investors in each RMBS Trust, each such RMBS Trust, the RMBS Trustees and all other parties in
interest.  The RMBS Trustees acted reasonably, in good faith and in the best interests of the
Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support
Agreement, (ii) performing their obligations under the Plan Support Agreement, including voting
in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global
Settlement and each of the settlements embodied therein, including the RMBS Settlement and the
FGIC Settlement Agreement.  The RMBS Trustees' Notice of the Plan Support Agreement, the
Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement and all the
transactions contemplated by each of the foregoing, including the releases given therein, was
sufficient and effective in satisfaction of federal and state due process requirements and other
applicable law to put the parties in interest in these Chapter 11 Cases and others, including the
Institutional Investors and the Investors in each RMBS Trust, on notice of the Plan Support
Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement
Agreement and all the transactions contemplated by each of the foregoing, including the releases
given therein.  The findings of fact and conclusions of law set forth in this paragraph shall be
binding solely in connection with the RMBS Trustees, the RMBS Trusts (including the Investors
in the RMBS of such RMBS Trusts) and the actions of the RMBS Trusts and the RMBS Trustees
with respect to the Plan Support Agreement and Plan, including the RMBS Settlement and the
FGIC Settlement Agreement.  In addition, the Allowed Fee Claim is reasonable and appropriate
under the circumstances.

(ECF Doc. # 5855-1 at I.JJ.)

(i)     Prior Approval of the FGIC Settlement and the Related<br>Trustee Findings

112.    The Court approved the FGIC Settlement Agreement on September 20, 2013,

determining that the FGIC Settlement Agreement is in the best interests of the Debtors, their

Estates, their creditors, the Investors in each RMBS Trust, the RMBS Trustees, and all other

parties in interest, and finding that the RMBS Trustees, in agreeing to the FGIC Settlement

Agreement, acted reasonably, in good faith, and in the best interests of the Investors in each

Trust. (ECF Doc. ## 5042, 5125.)[17] No party in interest contested the entry of these findings

during the Plan confirmation hearing.

(ii)     The RMBS Trustees Retained and Relied on Experienced<br>Financial Professionals and Sophisticated Counsel in<br>Entering into the Settlement.

113.    At the outset of these Chapter 11 Cases, certain RMBS Trustees retained Duff &

Phelps, LLC ("Duff & Phelps") as their financial advisor in the bankruptcy. (Acebedo Direct,

ECF Doc. # 5674, ¶ 13; Musarra Direct, ECF Doc. # 5675, ¶ 16.) Duff & Phelps was chosen by

the RMBS Trustees over other candidates after a rigorous interview process due to, among other

reasons, its extensive experience in mortgage loan servicing agreements and loan origination

agreements, asset valuation, complex securitizations, and RMBS loan repurchase actions, as well

as the depth of resources available to the firm. (Major Direct, ECF Doc. # 5677, ¶¶ 16–17;

Meyer Direct, ECF Doc. # 5690, ¶¶ 19–20; Scott Direct, ECF Doc. # 5683, ¶¶ 14–15; Sohlberg

Direct, ECF Doc. # 5680, ¶ 15 & n.19.) The RMBS Trustees also retained experienced and

knowledgeable counsel and have been advised by counsel throughout these Chapter 11 Cases,

including in connection with their consideration of the Plan Support Agreement, the Plan, the

---

[17]    The Ad Hoc Group's appeal from the Court's order will be deemed resolved upon the effectiveness of the Plan. (Plan at Art. IV.J.)

Global Settlement, the RMBS Settlement, and the FGIC Settlement Agreement.  (Major Direct

¶ 15; Meyer Direct ¶ 18; Scott Direct ¶ 13; Sohlberg Direct ¶ 15 n.19; Kruger Direct, ECF Doc.

# 5709, ¶ 185.)

114.    Duff & Phelps assisted the RMBS Trustees with, among other things, the

identification, quantification, litigation and resolution of the RMBS Trust Claims.  (Acebedo

Direct ¶ 13; Major Direct ¶ 16; Meyer Direct ¶ 19; Musarra Direct ¶ 16; Scott Direct ¶ 14;

Sohlberg Direct ¶ 15.)

(iii)    The Best Interests of the Investors in the RMBS Trusts

115.    Two investors objected to the manner in which the Allowed Claim was to be

allocated among the Original Settling RMBS Trusts in the Original RMBS Settlement

Agreement.  (Major Direct ¶ 19; Meyer Direct ¶ 17; Musarra Direct ¶ 18; Scott Direct ¶ 17;

Sohlberg Direct ¶ 17.)  In response, Duff & Phelps evaluated the claim allocation methodology

in the Original RMBS Settlement Agreements, which would have allocated RMBS

Representation and Warranty Claims among the Original Settling RMBS Trusts *pro rata* on the

basis of the sum of the net losses that have been and are estimated to be experienced by each

such RMBS Trust through the date of its termination.  (Major Direct ¶ 21; Meyer Direct ¶ 22;

Musarra Direct ¶ 20; Scott Direct ¶ 19; Sohlberg Direct ¶ 19.)  Based on Duff & Phelps's

suggestion, and after lengthy discussions with the Steering Committee Consenting Claimants, the

Debtors, and other parties in interest, the claim allocation methodology in the Original RMBS

Settlement Agreements was modified (the "Revised Claim Allocation Methodology").  (Acebedo

Direct ¶ 31; Major Direct ¶ 22; Meyer Direct ¶¶ 22–23; Musarra Direct ¶ 21; Scott Direct ¶ 20;

Sohlberg Direct ¶ 19.)  The Revised Claim Allocation Methodology provided for RMBS

Representation and Warranty Claims to be allocated *pro rata* based on differences among the

RMBS Trusts with respect to (i) losses and (ii) the incidence of breaches of representations and

warranties, as revealed by loan sampling and statistical work to be performed by Duff & Phelps.

(Acebedo Direct ¶ 31; Major Direct ¶ 22; Meyer Direct ¶¶ 22–23; Musarra Direct ¶ 21; Scott

Direct ¶ 20; Sohlberg Direct ¶ 19.)  In light of Duff & Phelps' analysis, the RMBS Trustees

concluded that the Revised Claim Allocation Methodology was reasonable.  (Major Direct ¶ 22.)

Consistent with Duff & Phelps's recommendations, the Revised Claim Allocation Methodology

is part of the RMBS Settlement as embodied in Exhibits 9 and 13 to the Disclosure Statement.

(*See* ECF Doc. # 4819-1; PX 256 at 516–19, 614–17.)

116.    Duff & Phelps also assessed the reasonableness of the $8.7 billion Allowed Claim

settlement consideration in the Original RMBS Settlement Agreements by reviewing a sample of

more than 6,500 mortgage loan files provided by the Debtors.  (Major Direct ¶ 24; Meyer Direct

¶ 24; Scott Direct ¶ 21; Pfeiffer Direct, ECF Doc. # 5682, ¶ 18.)  Duff & Phelps sought to

identify breaches of representations and warranties made by the Debtors, using statistical

methodologies to estimate the incidence of those breaches across the population of mortgage

loans in the RMBS Trusts.  (Pfeiffer Direct ¶ 18.)  Duff & Phelps also used historical

information and financial analysis to calculate the total present and projected future losses of the

RMBS Trusts that were associated with breaches of representations and warranties by the

Debtors.  (*Id*.)[18]  Duff & Phelps concluded that the $8.7 billion settlement amount falls within

the estimated range of RMBS Representation and Warranty Claims for the Original Settling

RMBS Trusts, which it estimated at between $6.5 billion and $10.2 billion.  (Major Direct ¶ 24;

Meyer Direct ¶ 24; Musarra Direct ¶¶ 25–26; Scott Direct ¶ 21; Sohlberg Direct ¶ 21.)

---

[18]    *See also* PX 1600-3 (Exhibit 6 to the Disclosure Statement For The Joint Chapter 11 Plan Proposed By Residential Capital, LLC, *et al.*, and The Official Committee Of Unsecured Creditors) at ¶ 1 (explaining methodology for calculating RMBS Representation and Warranty Claims).

117.    In the context of the Plan Mediation, the RMBS Trustees contemplated that the resolution of RMBS Trust Claims should include the RMBS Representation and Warranty Claims of all RMBS Trusts for which the Trustees acted, and not just the RMBS Representation and Warranty Claims of the Original Settling RMBS Trusts.  (Acebedo Direct ¶¶ 16–17; Major Direct ¶ 36; Meyer Direct ¶ 32; Musarra Direct ¶ 31; Scott Direct ¶ 30; Sohlberg Direct ¶ 32.) The RMBS Trustees therefore worked with Duff & Phelps to identify these additional trusts (the "Additional Settling RMBS Trusts"), calculate the range of RMBS Representation and Warranty Claims for those trusts using the same methodologies employed to evaluate the Original Settling RMBS Trusts' claims, and fold them into the RMBS Settlement.  (Major Direct ¶¶ 36–37; Meyer Direct ¶ 32; Musarra Direct 32; Scott Direct ¶ 31; Sohlberg Direct ¶ 33; *see also* Plan Art. IV.C.1 ("Modification of Original RMBS Settlement Agreements").)

118.    Absent approval of the RMBS Settlement, the RMBS Representation and Warranty Claims would have to be asserted, litigated and liquidated on an individual basis. (Acebedo Direct ¶ 26; Major Direct ¶ 25; Meyer Direct ¶ 25; Musarra Direct ¶ 24; Scott Direct ¶ 22; Sohlberg Direct ¶ 44.)  The RMBS Representation and Warranty Claims, if litigated on an individual basis, would be subject to significant litigation risks and factual and legal defenses. (Major Direct ¶ 25; Meyer Direct ¶ 25; Musarra Direct ¶ 24; Scott Direct ¶¶ 45–46; Sohlberg Direct ¶ 44–45.)  Moreover, litigating those claims would be an expensive and protracted process, and even if such litigation were successful, it would deplete the Debtors' estates, and might result in diminished recoveries to all creditor constituencies, including the RMBS Trusts. (Major Direct ¶ 25; Meyer Direct ¶ 25; Musarra Direct ¶ 24.)

119.    Negotiations in the Plan Mediation also led to the Servicing Claims of the RMBS Trusts being wrapped into the RMBS Settlement.  (Acebedo Direct ¶ 18; Major Direct ¶ 39;

Meyer Direct ¶ 35; Musarra Direct ¶ 34; Scott Direct ¶ 33; Sohlberg Direct ¶ 36.)  Duff & Phelps

attempted to quantify the Debtors' liability as servicer related to: (i) misapplied and

miscalculated payments; (ii) wrongful foreclosure and improper loss mitigation practices; and

(iii) extended foreclosure timing issues caused by improper or inefficient servicing behavior such

as falsified affidavits, improper documentation, and improper collection practices.  (Acebedo

Direct ¶ 19; Major Direct ¶ 40; Meyer Direct ¶ 36; Musarra Direct ¶ 35; Scott Direct ¶ 34;

Sohlberg Direct ¶ 35.)  Duff & Phelps concluded that the potential liability of the Debtors as

Servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion,

but that the assertion of such claims involved significant risk and uncertainty.  (Acebedo Direct

¶19; Major Direct ¶ 40; Meyer Direct ¶ 36; Musarra Direct ¶ 35; Scott Direct ¶ 34; Sohlberg

Direct ¶ 35.)  Under the Plan, the servicing related claims are settled as "RMBS Cure Claims"

and allowed in an aggregate amount of $96 million.  (Acebedo Direct ¶ 20; Major Direct ¶ 41;

Meyer Direct ¶ 37; Musarra Direct ¶ 36; Scott Direct ¶ 35; Sohlberg Direct ¶ 36.)

120.    The Institutional Investors, which were represented by Kathy Patrick at Gibbs &

Bruns LLP, Talcott Franklin of Talcott Franklin P.C., and Ropes & Gray, are themselves

supporters of the RMBS Settlement, demonstrating that, in their judgment, the RMBS Settlement

is in the best interests of the Investors in the Trusts, in which they are investors.  (Kruger Direct

¶ 184.)

                    (iv)    The RMBS Trustees Acted in Good Faith and in the Best
                            Interests of the Investors in Each RMBS Trust.

121.    The RMBS Trustees' entry into the Plan Support Agreement, the Plan, the Global

Settlement, and the RMBS Settlement is the result of months long, arm's-length negotiations

among many sophisticated parties and overseen by Judge Peck.  (Acebedo Direct ¶ 15; Major

Direct ¶ 30; Meyer Direct ¶ 30; Musarra Direct ¶ 30; Scott Direct ¶ 28; Sohlberg Direct ¶ 25.)

Those agreements reflect the active participation and influence of the RMBS Trustees, their

counsel, and Duff & Phelps.  (*See, e.g.*, Acebedo Direct ¶ 31 & Major Direct ¶ 33 (Trustees'

influence on allocation of units); Meyer Direct ¶ 32 (inclusion of Additional Settling RMBS

Trusts).)  The communications and analyses relating to negotiations conducted during the Plan

Mediation are confidential pursuant to the Mediation Order and cannot be disclosed in detail.  In

general, however, the RMBS Settlement must be understood as part of an integrated Global

Settlement that was the product of contentious, arm's-length negotiations conducted by and

among sophisticated parties (including the RMBS Trustees) with differing and conflicting

interests, each advised by sophisticated advisors, conducted under the close supervision and

guidance of Judge Peck.  (Acebedo Direct ¶ 15; Major Direct ¶ 30; Meyer Direct ¶ 30; Musarra

Direct ¶ 30; Scott Direct ¶ 28; Sohlberg Direct ¶ 25.)

     122.    The RMBS Trustees acted professionally, reasonably, in good faith, and in the

best interests of the Investors in each RMBS Trust and each such RMBS Trust.  (Kruger Direct

¶ 185; Major Direct ¶ 63; Meyer Direct ¶ 57; Musarra Direct ¶ 60; Scott Direct ¶ 63; Sohlberg

Direct ¶ 57.)  The RMBS Trustees are some of the largest and most sophisticated financial

institutions in the country.  (Kruger Direct ¶ 185.)  They were all represented by sophisticated

counsel and engaged with and were assisted by extremely competent and professional financial

advisors.  (*Id.*)

                (v)    The RMBS Trustees' Notice of the Plan Support
                      Agreement, the Plan, the Global Settlement, and the RMBS
                      Settlement.

     123.    Following the filing of the initial RMBS 9019 Motion, certain RMBS Trustees

jointly retained an agent, The Garden City Group, Inc. ("GCG"), to coordinate and facilitate

notice to Investors in the RMBS Trusts regarding the RMBS 9019 Motion and other important

events in the Chapter 11 Cases.  (Acebedo Direct ¶ 35; Major Direct ¶ 61; Meyer Direct ¶ 54;

Musarra Direct ¶ 57; Scott Direct ¶ 58; Sohlberg Direct ¶ 52.)  With the aid of GCG, the RMBS

Trustees employed a robust notice program during these Chapter 11 Cases that combined

physical delivery of notices and notice through the Trustee Website to ensure that all investors

were provided notice of significant developments affecting their interests.  (Acebedo Direct

¶¶ 34, 36; Major Direct ¶ 62; Meyer Direct ¶¶ 55–56; Musarra Direct ¶¶ 56, 58; Scott Direct

¶¶ 59–60; Sohlberg Direct ¶¶ 53–54; *see generally* ECF Doc. # 5687 (describing notice

procedures); *see, e.g.*, PX 1507–1513, 1523, 1524, 1535, 1555–1557, 1580–1590 (various time

sensitive notices provided to investors).)

### 3.    *Settlement of the Monoline Claims*

124.    When the Debtors filed their bankruptcy petitions, certain of the Debtors were

defendants in fifteen lawsuits brought by the Monolines, alleging that the Debtors committed

fraud and breached various representations and warranties in connection with the Monolines'

insurance policies.  (Lipps Direct ¶¶ 5, 54.)  In all, five Monoline insurers filed thirty-two proofs

of claim seeking tens of billions of dollars in realized and potential losses.  (*Id.* ¶ 5.)

125.    Monoline insurers also brought claims against Ally based on the Debtors' RMBS.

(Lipps Direct ¶ 71.)  FGIC and Assured Guaranty both filed prepetition lawsuits seeking to hold

Ally liable under various "control person" theories for claims related to the debtors' RMBS, and

MBIA filed a postpetition lawsuit against Ally based on similar theories.  (*Id.*)  Assured

Guaranty and MBIA also asserted claims against Ally Securities arising from the Debtors'

RMBS.  (*Id.*)  FGIC and Assured Guaranty also asserted claims against Ally Bank based on its

role as custodian.  (*Id.*; *see also* PX 754.)  As discussed further in Section VII.B, *infra*, these

claims against Ally will be released under the Plan.  (Lipps Direct ¶ 71.)  The only monoline

insurers that have paid claims on Debtor-sponsored securitizations filed proofs of claim in these

cases, and the debtors are not aware of any other monoline insurers who may have claims against the Debtors or Ally based on the debtors' RMBS business.  (*Id.* ¶ 72.)

a.    The FGIC Settlement

126.    In the fall of 2011, FGIC filed a series of lawsuits against various Debtors and Ally entities, including AFI and Ally Bank.  (Lipps Direct ¶ 61.)  On the Petition Date, FGIC had filed twelve suits involving twenty RMBS securitizations.  (*Id*.)  All of the cases were assigned to Judge Crotty in the U.S. District Court for the Southern District of New York and coordinated under the lead case *Financial Guaranty Insurance Co. v. GMAC Mortgage LLC,* No. 11-cv-09729-PAC (S.D.N.Y.).  (*Id*.)  These cases involved securitizations sponsored by RFC and GMACM from 2005 through 2007.  (*Id*.)  FGIC then filed three proofs of claim against the Debtors for approximately $1.85 billion.  (*Id.* ¶ 66; *see also* PX 951–953 ("FGIC's Proofs of Claim").)  FGIC's Proofs of Claim describe FGIC's claims against the Debtors, including FGIC's claims against ResCap (the "FGIC ResCap Claim," and collectively the "FGIC Claims").  (PX 951–953; 750–751.)  The FGIC Claims arise out of the insurance policies that FGIC issued in connection with the RFC- and GMACM-sponsored securitizations.  (Dubel FGIC Direct, ECF Doc. # 5692, ¶ 8; *see also* PX 719–730; 754.)  These include claims for breaches of insurance and indemnity agreements and, for a majority of the securitizations, fraudulent inducement to enter into the insurance and indemnity agreements.  (*See* PX 754.)

127.    A separate FGIC settlement entered into as of May 23, 2013 resolves FGIC's Claims (the "FGIC Settlement"), which has already been approved by the Court (ECF Doc. # 5125).  The FGIC Settlement consists of three parts:  (i) the allowance of the FGIC Claims against certain of the Debtors' Estates in the minimum aggregate amount of $596.5 million and a maximum potential aggregate amount of $1.79 billion comprised of a claim of $596.5 million against each of three Debtor entities; (ii) the settlement, discharge and release by the FGIC

Trustees of FGIC's obligations under its Policies in exchange for, among other consideration, a bulk cash payment of $253.3 million from FGIC to the FGIC Trusts; and (iii) the release against the Debtors' Estates of the remainder of the FGIC Claims and the vast majority of the FGIC Trusts' Claims, as well as a release of the FGIC Trusts' Claims against Ally.  (Kruger Direct ¶67; FGIC Settlement ¶ 4.)  The RMBS Settlement releases the remainder of the FGIC Trusts' Claims.  (Kruger Direct ¶ 67.)

128.    The Plan provides that the FGIC Claims will be allowed in the following amounts:  (i) $415 million against the RFC Debtors; (ii) $181.5 million against the GMACM Debtors; and (iii) $337.5 million against ResCap.  (Kruger Direct ¶ 69.)  The aggregate allowed amount of $934 million falls in the lower half of the range established by the minimum and maximum allowed claims established in the FGIC Settlement.  (Kruger Direct ¶ 69; Plan Art. IV.D.2.)  Upon the Effective Date of the Plan, Ally will also be released from the FGIC Claims, with FGIC's support, pursuant to the Third Party Releases (as defined below).  (Kruger Direct ¶¶69, 194; Plan Art. IX.D.)

129.    For the forty-seven RMBS Trusts for which FGIC provided insurance, the potential covered bond losses (absent settlement) could have ranged from $1.64 billion to $1.71 billion, of which $1.01 billion are historical losses.  (Sillman Direct ¶¶ 93, 97–98.)  That amount does not include any amount for interest or indemnification of fees, costs, and expenses.  (*Id.* ¶98.)  FGIC's likely amount of recoverable damages could have ranged from $1.31 billion to $1.7 billion.  (*Id.* ¶ 101.)

130.    The FGIC Settlement is in the best interests of the Debtors' Estates and their creditors.

b.    The MBIA Settlement

131.    Prior to the Petition Date, MBIA sued Debtors RFC and GMACM in two actions

in New York Supreme Court.  (Lipps Direct ¶ 55.)  Carpenter Lipps & Leland LLP, special

litigation and discovery counsel to the Debtors in these cases, represented the Debtors in that

prepetition litigation with MBIA.  (*Id.*)  Both cases involved extensive fact discovery and, in the

RFC case, the parties had exchanged the initial round of expert reports before the imposition of

the automatic stay.  (*Id.* ¶ 57.)  *MBIA Insurance Corp. v. Residential Funding Company, LLC*,

which was the first filed of those actions, illustrates the enormity and difficulty of litigation of

the Monoline Claims.  (Kruger Direct ¶ 75.)  In that litigation, RFC produced more than one

million pages of documents, including loan files for more than 63,000 mortgage loans.  (Kruger

Direct ¶ 75; Lipps Direct ¶ 117.)  MBIA took more than eighty days of depositions of ResCap

personnel over the course of more than a year and RFC took fifty days of depositions of MBIA

personnel.  (Kruger Direct ¶ 75.)

132.    After the Debtors filed for bankruptcy, MBIA brought two additional lawsuits

related to the Debtors' RMBS securitizations.  (Lipps Direct ¶ 58.)  On September 14, 2012,

MBIA sued J.P. Morgan Securities LLC, as successor to Bear Stearns in Westchester County,

New York, asserting claims based on Debtors' RMBS that Bear Stearns underwrote.  (*Id.* ¶ 59.)

That case is captioned *MBIA Insurance Corp. v. JP Morgan Securities LLC*, No. 64676/2012

(Sup. Ct. Westchester Cnty.).  (*Id.*)  On September 17, 2012, MBIA sued various Ally entities in

Minnesota state court, and the defendants removed the case to federal court.  (*Id.* ¶ 60.)  That

case is captioned *MBIA Insurance Corp. v. Ally Financial Inc.*, No. 12-cv-02563 (D. Minn.).

(*Id.*)

133.    MBIA filed six proofs of claim against the Debtors for a total of approximately

$13.2 billion, of which $2.2 billion was asserted against ResCap, $2.2 billion was asserted

against GMACM and $2.2 billion was asserted against each of four RFC Debtors.  (Kruger

Direct ¶ 74; Lipps Direct ¶¶ 64-65.)[19]  As with the FGIC Claims, these claims generally alleged

fraud and breaches of representations and warranties in connection with the Policies written by

MBIA to insure principal and interest payments to bondholders in certain RMBS Trusts (the

"MBIA Insured Trusts").  (Kruger Direct ¶ 74; *see, e.g.*, PX 1211.)  MBIA sought to recover all

payments it has made under its Policies net of premiums received, as well as interest and

indemnification for fees, costs and expenses.  (Kruger Direct ¶ 74.)  It alleged that RFC and

GMACM aided and abetted each other's fraud and that ResCap was also liable for the same

damages under alter ego and aiding and abetting theories.  (*Id.*)

134.    The Plan resolves the allowed amount and allocation of MBIA's claims and

avoids the need for further litigation between the Debtors and MBIA by allowing MBIA's claims

as General Unsecured Claims in the amount of $719 million against ResCap, $1.45 billion

against GMACM, and $1.45 billion against RFC.  (*Id.* ¶ 76; Plan Art. IV.D.1.)  Under the RMBS

Trust Allocation Protocol, the MBIA Insured Trusts will not share in the distribution to the

RMBS Trusts, except where certain Insured Exceptions apply.  (Kruger Direct ¶ 76; PX 1600-3.)

135.    Prior to entering into this settlement with MBIA (the "MBIA Settlement"), the

Debtors performed an analysis of MBIA's estimated potential lifetime losses, and determined

that a settlement of these claims represents a reasonable resolution of the novel and fact-intensive

issues that have already been the subject of several years of litigation and is in the best interest of

the Debtors' Estates and their creditors.  (Kruger Direct ¶ 77.)

136.    For the twenty-six RMBS Trusts for which MBIA provided insurance, MBIA's

potential past and future exposure to cover bond losses ranged from $2.26 billion to $2.29

---

[19]        *See also* PX 1211–1216 (Claim Nos. 5846 through 5851 by MBIA against Homecomings, ResCap,
RFMSII, RFC, RAMP, and GMACM).

billion, of which $2.16 billion are historical losses.  (Sillman ¶¶ 102, 106–107; Kruger Direct

¶ 78.)  That amount does not include any amount for interest or indemnification of fees, costs,

and expenses, which could be significant in light of the extensive prepetition litigation.  (*Id*.)

The likely amount of recoverable damages with respect to the Debtor-sponsored trusts ranges

from $1.81 billion to $2.29 billion.  (Sillman Direct ¶ 110; Kruger Direct ¶ 78.)

137.    The MBIA Settlement is in the best interests of the Debtors' Estates and their

creditors.

c.    The Assured Settlement

138.    Following the filing of the Plan, the Plan Proponents were also able to settle the

claims of Assured (the "Assured Settlement").  (Kruger Direct ¶ 80.)  The Assured Settlement

was then incorporated into the Plan and Disclosure Statement that was sent with the Solicitation

of votes on the Plan.  (*Id*.)

139.    On May 11, 2012, Assured sued several of the Debtors and their non-Debtor

affiliates in the Southern District of New York in a case captioned *Assured Guaranty Municipal*

*Corp. v. GMAC Mortgage LLC*, No. 12-cv-3776 (S.D.N.Y.).  (Lipps Direct ¶ 62.)  The Assured

suit involved one RFC-sponsored securitization and one GMACM-sponsored securitization.

(*Id*.)  Assured filed proofs of claim asserting $185.8 million in claims against the GMACM

Debtors and approximately $82.1 million in claims against the RFC Debtors and asserted claims

with respect to three RMBS Trusts for which Assured provided insurance.  (Kruger Direct ¶ 80;

Lipps Direct ¶ 68.)[20]  Of the $185.8 million in claims against the GMACM Debtor,

approximately $104 million relates to servicing claims.  (Kruger Direct ¶ 80; *see also* PX 953.)

The other $81.8 million asserted against GMACM and substantially all of the claims against

---

[20]    *See also* PX 1177–1189; 1195; 1209–1210; 1217 (the twenty proofs of claim filed by Assured and its
affiliates).

RFC relate to alleged breaches of representations and warranties and/or fraud, and are similar to the claims asserted by FGIC and Ambac.  (Kruger Direct ¶ 80; PX 951–953; 1206–1208.) Assured sought recovery of insured bond losses as well as interest, fees, and expenses with respect to Debtor-sponsored Trusts wrapped by Assured (the "Assured Insured Trusts"), on the basis of breach of representation and warranty and aiding and abetting theories.  (Kruger Direct ¶ 80; PX 1177–1189; 1195; 1209–1210; 1217.)

140.    The settlement provides Assured with an allowed unsecured claim in the amount of $88,868,346 against GMACM and $57,950,560 against RFC.  (Kruger Direct ¶ 81.)  As with the other settling Monolines, Assured (and/or the Assured Insured Trusts) will not share in the distribution to the RMBS Trusts, except where certain Insured Exceptions apply.  (*Id.*; PX 1600-3.)

141.    Assured's estimated potential lifetime exposure to covered bond losses for the three Debtor-sponsored Assured Insured Trusts ranged from $73.6 million to $77.6 million, of which $70.5 million are historical losses.  (Sillman Direct ¶¶ 88–89.)  That amount does not include interest or indemnification for fees, costs, and expenses.  (*Id.* ¶ 89.)  The likely amount of recoverable damages with respect to the Debtor-sponsored trusts ranges from $58.9 million to $77.6 million.  (*Id.* ¶ 92.)  That $58.9 million to $77.6 million range is in addition to the $104 million in servicing claims that Assured asserted against GMACM.  (*Id.* ¶¶ 84–85, 92.)

142.    The Assured Settlement is in the best interests of the Debtors' Estates and their creditors.

d.    The Ambac Settlement

143.    Ambac filed three proofs of claim that assert liquidated claims of $119.7 million against the RFC Debtors and $85.6 million against the GMACM Debtors for Ambac's current obligations on Ambac-insured bond losses.  (Kruger Direct ¶ 83; Lipps Direct ¶ 69; *see also* PX

1206–1208 (Ambac's proofs of claim).)  Ambac also asserts claims for unliquidated amounts

representing future bond losses and indemnification for costs and expenses, which Ambac

estimates exceeds $223 million in the aggregate.  (Kruger Direct ¶ 83; *see also* PX 1206–1208.)

144.    In connection with the Ocwen sale, Ambac objected to the assignment of

servicing rights with respect to Ambac-insured transactions and alleged that its cure claims could

range from $15.5 million to $26.2 million or more.  (Kruger Direct ¶ 84; *see, e.g.*, PX 877.)

Ambac had already taken the position that it had terminated or asserted an existing right to

terminate servicing for thirteen Trusts, and Ambac had further objected to the assignment of the

servicing for approximately fifty-six additional Ambac-insured transactions under the terms of

the Ocwen sale order.  (Kruger Direct ¶ 84.)  As a result, absent a negotiated or successfully

litigated resolution, the Debtors could not assign the servicing rights, or receive the payment

from Ocwen for outstanding advances and MSR that would otherwise be received in connection

with the assignment and assumption of the servicing for these transactions to Ocwen.  (*Id*.)  The

precise amount of the payment the Debtors would receive for advances and MSR varies monthly

for each Trust, and was estimated to be over $61 million for these Trusts as of September 30,

2013.  (*Id.*)

145.    Ultimately, the Debtors and Ambac were able to reach a resolution of all of

Ambac's claims and its objection to the assignment and assumption of the servicing of the

Ambac insured transactions, pursuant to a Stipulation and Order approved by the Bankruptcy

Court on October 18, 2013 (the "Ambac Settlement").  (Kruger Direct ¶ 85; PX 877.)  The

Ambac Settlement provides Ambac with Allowed General Unsecured Claim amounts of

$207,315,815 against GMACM, and $22,800,000 against RFC subject to confirmation of the

Plan and the occurrence of the Effective Date.  (Kruger Direct ¶ 85; PX 877.)  Ambac insured

trusts will not share in the distribution to the RMBS Trusts, except where certain Insured

Exceptions apply.  (Kruger Direct ¶ 85; PX 1600-3.)

146.    The Ambac Settlement contemplates: (i) a transfer of a subset of the Ambac

insured transaction to a third-party servicer in exchange for the reimbursement to the Debtors of

the outstanding advances at an agreed upon percentage; (ii) the transfer of the balance of the

transactions to Ocwen for the purchase price provided for under the Ocwen Asset Purchase

Agreement; and (iii) the payment to Ambac of $750,000 as a cure claim.  (Kruger Direct ¶ 86;

PX 877 at 8–9, 11.)  The settlement further provides for the assignment of all the transactions to

Ocwen if certain deadlines are not met, but that is not expected to occur.  (Kruger Direct ¶ 86.)

Based on estimates as of September 2013, the Debtors will receive more than $61 million net of

the cure payment to Ambac under the stipulated settlement.  (*Id.* ¶ 86; PX-877 at 8–9, 11.)  As

with the above settlements, the Debtors entered into this settlement only after determining that it

was in the best interest of the Debtors' Estates and their creditors, and that it was supported by

the Committee.  (Kruger Direct ¶ 86.)

147.    Ambac's estimated potential lifetime exposure to covered bond losses for the

sixty-six Debtor-sponsored Ambac Insured Trusts ranged from $201.5 million to $212.3 million,

of which $159.1 million are historical losses.  (Sillman Direct ¶¶ 75, 79–80.)  That amount does

not include interest or indemnification of fees, costs, and expenses. (*Id.* ¶ 80.)  The likely amount

of recoverable damages with respect to the Debtor-sponsored trusts ranges from $161.2 million

to $212.3 million.  (*Id.* ¶ 83.)  Mr. Sillman's analysis did not consider additional consideration

the Debtors received from Ambac, including the substantial reduction of Ambac's Cure Amount

or the direct benefits to the Debtors' Estates from resolving Ambac's objection to the Ocwen sale

that will enable the Debtors to transfer their mortgage servicing rights with respect to certain

Ambac-wrapped trusts. (Kruger Direct ¶ 87.) Based on estimates as of September 2013, this resolution is estimated to generate more than $61 million in value for the Debtors' Estates (net of cure costs). (*Id.*)

148.    The Ambac Settlement is in the best interests of the Debtors' Estates and their creditors.

e.    The Syncora Settlement

149.    Syncora Guaranty Inc.'s ("Syncora") most recent Second Amended Proof of Claim asserts claims totaling at least $83.4 million against the RFC Debtors and $216.6 million against the GMACM Debtors. (Kruger Direct ¶ 88; *see also* PX 1329 (Syncora's proofs of claim).) The claims against RFC relate to alleged breaches of representations and warranties and breach of servicing obligations with respect to one trust sponsored and serviced by the Debtors. (Kruger Direct ¶ 88; *see also* PX 1329.) The claims against GMACM allege breach of servicing obligations with respect to two non-Debtor-sponsored trusts for which GMACM is a loan servicer. (Kruger Direct ¶ 88.) Syncora seeks recovery of insured bond losses as well as interest, fees, and expenses, including remediation expenses, with respect to the trusts wrapped by Syncora (the "Syncora Insured Trusts"). (*Id.*) Syncora filed two objections to the sale to Ocwen of servicing agreements related to the Syncora Insured Trusts serviced by GMACM. (*Id.*)

150.    The settlement with Syncora (the "Syncora Settlement") provides that the Debtors will pay to Syncora a cure amount of $4.5 million in connection with the assumption and assignment of servicing agreements to Ocwen. (Kruger Direct ¶ 89.) The Syncora Settlement further provides that Syncora's claims against GMACM and RFC will be reduced and allowed as General Unsecured Claims of approximately $7.8 million against GMACM and approximately $7.1 million against RFC. (*Id.*) Consistent with the other settling Monolines, Syncora (and/or

the Syncora Insured Trusts) will not share in the distribution to the RMBS Trusts, except where certain Insured Exceptions apply.  (Kruger Direct ¶ 89; PX 1600-3.)  Instead, Syncora will receive *pro rata* shares of the GMACM Debtors Unit Distribution and the RFC Debtors Unit Distribution.  (Kruger Direct ¶ 89.)

151.    Before entering into this settlement, the Debtors determined that the Syncora Settlement was in the best interest of the Debtors' Estates and their creditors, and was supported by the Committee.  (Kruger Direct ¶ 90.)

152.    At the time of settlement, Syncora's proof of claim was the subject of a pending objection, and Syncora's objection to the sale of servicing rights to Ocwen was also still pending. (Kruger Direct ¶ 91.)  The outcome of those objections were uncertain.

153.    Among other things, the Debtors asserted that Syncora's claims were time-barred and also disputed that Syncora could recover the full extent of bond losses based on the alleged breaches of GMACM's servicing obligations.  (*Id.*)  Syncora's relatively lower recovery on its claims, as compared to the other Monolines, is reasonable in light of the strength of the Debtors' objection to Syncora's claims.  (*Id.*)

154.    The Syncora Settlement is in the best interests of the Debtors' Estates and their creditors.

### 4.    *Private Securities Litigation Settlements*

155.    Prior to the Petition Date, private securities investors had brought seventeen lawsuits against one or more of the Debtors.  (Lipps Direct ¶ 16.)[21]  These lawsuits asserted claims for state and federal securities law violations, common law fraud, and negligent misrepresentation based on alleged material misstatements in the Debtors' RMBS registration statements and prospectuses.  (*Id.* ¶ 16; *see also id.* ¶ 17 (listing the seventeen prepetition

---

[21]    *See* PX 610, 653–665, 667, and 670–671 (initial pleadings in those lawsuits).

securities cases).)  Collectively, these lawsuits involved more than one hundred RMBS

securitizations and a combined original principal balance of more than $100 billion.  (*Id.* ¶ 18.)

When the Debtors filed for bankruptcy, these lawsuits were mostly in the pleading stage or in

early stages of discovery; discovery had not been completed in any of the cases.  (*Id.* ¶ 19.)  One

of the cases—filed by Thrivent Financial for Lutherans—was settled prior to the Petition Date in

a settlement that covered both debtors and non-debtor Ally entities.  (*Id.*)  Seven of these cases

have survived pre-answer motions to dismiss in whole or substantial part.  (*Id.*)  Twelve of the

suits asserted additional claims against certain Ally entities.  (*Id.* ¶ 20.)  These claims were based

on alleged misstatements in the Debtors' offering materials.  (*Id.*)  The claims against Ally are

based on Ally's roles as sellers or underwriters of the Debtors' securities, as "control persons"

over the Debtors under federal and state securities laws, and under various common law aiding

and abetting or joint liability theories.  (*Id.*)

      156.    In addition to these pending cases, nine private securities investors entered into

prepetition tolling agreements with the Debtors and Ally.  (*Id.* ¶ 21.)

      157.    One part of the Global Settlement incorporated in the Plan is the resolution of the

ongoing private securities litigation related to the Debtors' RMBS business.  (Kruger Direct ¶

92.)  The Plan provides for the settlement of federal and state securities law claims asserted by

twenty large institutional investors in RMBS certificates who either filed suits against Ally and

the Debtors or entered into tolling agreements with them (the "Private Securities Claims

Settlement") and the settlement of a federal class action brought on behalf of purchasers of fifty-

nine Debtor RMBS offerings (the "*NJ Carpenters* Settlement").  (*Id.*)  The underlying claims

raise novel and difficult legal issues.  (*Id.*)  Similar litigation has taken several years, only to

result in substantial settlements.  (*Id.*)  The Debtors' potential exposure in these cases is

significantly larger than the settlement amounts that would be paid under the Plan, and continued litigation would be extremely expensive.  (*Id.*)

a.    The Private Securities Claims Settlement

158.    The Private Securities Claims Settlement resolves certain private securities claims against the Debtors and Ally arising from the purchase or sale of RMBS, asserted by parties who either filed prepetition lawsuits against the Debtors and Ally (including Ally Securities, LLC ("Ally Securities")) within the relevant limitations period or who entered into prepetition tolling agreements with Ally and the Debtors.  (Kruger Direct ¶¶ 93–94; Kirpalani Direct, ECF Doc. # 5681, ¶ 1.)  The Private Securities Claimants include twenty entities, or groups of affiliated entities.  (Kruger Direct ¶ 93; Lipps Direct ¶ 22; *see also* Plan Art. I.A.223.)

159.    The Private Securities Claimants are:  (i) AIG; (ii) Allstate; (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, and AMF Ultra Short Mortgage Fund; (iv) Bank Hapoalim B.M.; (v) Cambridge Place Investment Management, Inc., in two capacities based on separate actions; (vi) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust; (vii) Federal Home Loan Bank of Boston; (viii) Federal Home Loan Bank of Chicago; (ix) Federal Home Loan Bank of Indianapolis; (x) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A.; (xi) Huntington Bancshares Inc.; (xii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation; (xiii) John Hancock Life Insurance Company (U.S.A.); (xiv) MassMutual; (xv) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc.; (xvi) Prudential; (xvii) Sealink Funding Limited; (xviii) Stiching Pensioenfonds ABP; (xix) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company; and (xx) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus

Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc. (Kruger Direct ¶ 94; Lipps Direct ¶ 22.)

160.    The Plan provides for, establishes, and funds a private securities claims trust (the "PSC Trust") to resolve claims filed by these twenty private securities investors. (Kruger Direct ¶ 97; Lipps Direct ¶ 22; Kirpalani Direct ¶¶ 8, 15.) In total, the Private Securities Claims Settlement resolves approximately $2.429 billion of securities law claims against the Debtors and Ally, including approximately $1.409 billion in aggregate asserted securities law claims against Ally Securities, arising from the Debtors' loan origination activities and the structuring, sponsoring, underwriting, and sale of RMBS. (Kruger Direct ¶ 95; Kirpalani Direct ¶ 13; *see also* Lipps Direct ¶¶ 25–47 (outlining each proof of claim resolved by the Private Securities Claims settlement).) The Private Securities Claim Settlement also provides for the release of claims against Ally and its affiliates by the Private Securities Claimants. (Kruger Direct ¶ 95.) The Debtors assert that the Ally Contribution would not have been possible without this release, among others. (*Id.*)

161.    On the Effective Date, the PSC Trust will receive units from the Liquidating Trust with estimated value of $235.0 million in aggregate. (Kruger Direct ¶ 97; Lipps Direct ¶ 24.) Distributions from the Private Securities Claims Trust will be allocated among the Private Securities Claimants as they have agreed among themselves according to the PSC Trust agreement governing the operation of the PSC Trust. (Kruger Direct ¶ 97; Lipps Direct ¶ 24; *see also* PX 875 (the PSC Trust Agreement).) The Private Securities Claimants will forego any other recovery from the Debtors or the Liquidating Trust in respect of their Private Securities Claims. (Kruger Direct ¶ 97.)

162.     The Private Securities Claims Settlement avoids significant litigation regarding some of the largest claims asserted against the Debtors, including litigation over the validity and value of the Private Securities Claims and whether such claims should be subordinated pursuant to Section 510(b) of the Bankruptcy Code.  (Kruger Direct ¶ 96; Kirpalani Direct ¶ 14.)

163.     The settlement of these private securities claims is in the best interests of the Debtors' Estates and their creditors.  Among other reasons, the settlement provides a global resolution for twenty different large and uncertain claims against the Debtors.  (Kruger Direct ¶ 98.)  Continued litigation over those claims would be an expensive and protracted process, and the result would be uncertain.  (Kruger Direct ¶ 98; Kirpalani Direct ¶ 14.)  This determination is confirmed by the opinion of Lucy P. Allen, one of the Debtors' experts for Plan Confirmation.  (Kruger Direct ¶ 98; *see generally* Allen Direct, ECF Doc. # 5879-1.)  Ms. Allen is a Senior Vice President of NERA, a member of NERA's Securities and Finance Practice, and an expert in estimating damages and analyzing settlement in securities litigation cases.  (Allen Direct ¶¶ 6–7.)  Ms. Allen compared the Private Securities Claims Settlement with every identified publicly available RMBS-related securities litigation settlement, employing several commonly used methodologies.  (*Id.* ¶¶ 3–5, 10–12.)  Based on her analysis, the proposed settlement amount of $235 million for these claims is consistent with, and within the range of, other recent settlements in comparable RMBS-related litigation.  (Allen Direct ¶¶ 3–5; Kruger Direct ¶ 98.)  The treatment of the Private Securities Claims under the Plan was a key component of the Global Settlement, without which the Ally Contribution and other benefits under the Global Settlement would not be realized.  (Kruger Direct ¶ 98.)

b.     The *NJ Carpenters* Settlement

164.     The Plan also settles an ongoing securities class action filed against Ally, certain Debtors and their former officers and directors, *New Jersey Carpenters Health Fund v.*

*Residential Capital LLC*, No. 08 Civ. 8781 (HB) (S.D.N.Y.).  (Kruger Direct ¶ 99; *see also* PX

957 (proofs of claim filed by New Jersey Carpenters Health Fund and New Jersey Carpenters

Vacation Fund); 676 (the New Jersey Carpenters settlement agreement).)  The *NJ Carpenters*

complaint asserted claims against ResCap, RFC, RALI, Ally Securities, Bruce J. Paradis,

Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David

M. Bricker, James N. Young, and several unaffiliated underwriters on behalf of a class of

investors in fifty-nine of the Debtors' RMBS securitizations with original principal balance of

over $38 billion and claimed losses of approximately $13 billion.  (Kruger Direct ¶ 99; Lipps

Direct ¶ 48.)  Although the Debtors dispute these claims, they are a source of significant

potential liability.  (Kruger Direct ¶ 99.)  The Plan resolves these claims for a distribution of

$100 million.  (*Id.*)

165.    The district court approved the *NJ Carpenters* Settlement on October 7, 2013.

(Lipps Direct ¶ 48; *see also* PX 677 (Judge Baer's order approving settlement).)  The Debtors

advanced reasonable costs of class notice and administration (estimated to be $450,000) pursuant

to authorization by the Bankruptcy Court; these amounts will be deducted from the *NJ*

*Carpenters* Claims Distribution.  (Kruger Direct ¶ 100; Lipps Direct ¶ 48.)  Members of the class

who elect to opt out of the settlement class will be ineligible to share in the settlement

distribution.  (Kruger Direct ¶ 100.)  To the extent such opt-outs have allowed claims against the

Estates, or if the settlement is not approved and any class members have allowed claims against

the Estates, such claims will be treated as General Unsecured Claims, provided that they may be

subject to contractual, legal, or equitable subordination.  (*Id.*)

166.    The *NJ Carpenters* Settlement is in the best interests of the Debtors' Estates and

their creditors.  (Kruger Direct ¶ 101.)  Like the Private Securities Claims Settlement, the NJ

Carpenters Settlement resolves highly uncertain and potentially burdensome litigation.  (*Id*.)  Ms.

Allen employed several different commonly used methodologies to compare the NJ Carpenters

Settlement with every identified publicly available RMBS-related securities litigation settlement.

(Allen Direct ¶¶ 3–5, 10–12.)  Based on Ms. Allen's analysis, the proposed settlement amount of

$100 million for these claims is consistent with, and within the range of, other recent settlements

in comparable RMBS-related litigation.  (Allen Direct ¶¶ 3–5; Kruger Direct ¶ 98.)

> c.    The Kessler Settlement

167.    The Plan also contemplates the resolution of claims asserted against the Debtors

in a multidistrict proceeding filed in the United States District Court for the Western District of

Pennsylvania, *In re: Community Bank of Northern Virginia Second Mortgage Lending Practices

Litigation*, a, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386 (the "Kessler

Class Action").  (Kruger Direct ¶ 104.)  The multidistrict proceeding involves several putative

class actions related primarily to some 44,535 second mortgage loans originated to borrowers

nationwide and acquired by RFC and alleges violations of various consumer protection statutes.

(*Id*.)  The named plaintiffs in the Kessler Class Action filed proofs of claim on behalf of the

putative class against Debtors RFC, ResCap, GMACM and GMAC-RFC Holdings Company,

LLC.  (*Id*.; PX 962–964 (Proofs of Claim); Thompson Direct, ECF Doc. # 5713, ¶ 25.)  The

Kessler Class Action is one of the largest putative Borrower class actions pending against the

Debtors and has been pending against the Debtors for over ten years.  (Kruger Direct ¶ 104.)  In

the Kessler Class Action and in the class proofs of claims, the claimants allege in excess of $1.87

billion of damages.  (*Id*.)

168.    In connection with the Plan mediation process and the continuation thereof

following the execution of the Plan Support Agreement, and through intensive good faith and

hard fought negotiation, on or about June 27, 2013, certain of the Debtors and representatives of

the named plaintiffs in the Kessler Class Action entered into a settlement agreement (the

"Kessler Settlement") resolving the Claims asserted against the Debtors in connection with the

Kessler Class Action. (Kruger Direct ¶ 105; *see also* PX 864.) The settlement provides for the

reduction and allowance of the class proofs of claims in the amount of $300 million claim

against RFC only. (Kruger Direct ¶ 105.) On July 31, 2013, the Debtors and representatives of

the named plaintiffs filed a joint motion for preliminary and final approval of the Kessler

Settlement Agreement, which among other things seeks to certify the class under Bankruptcy

Rule 7023 for settlement purposes only and related relief. (Kruger Direct ¶ 105; *see also* PX

864.) On August 23, 2013, the Court granted preliminary approval of the settlement. (Kruger

Direct ¶ 105.)

169.    This settlement is fair and reasonable, and in the best interests of the Debtors'

Estates and their creditors. (Kruger Direct ¶ 106.) The Court approved the Kessler Settlement

on November 27, 2013. (*See* ECF Doc. # 5968.)

d.    The SUNs Settlement

170.    The Plan also provides for a settlement of claims that the Senior Unsecured Notes

Indenture Trustee, on behalf of the Senior Unsecured Noteholders (the "SUNs"), has against

Ally and certain Debtors. (Kruger Direct ¶ 102.) The claims related to, among other things, a

breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap Estate

against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the

benefit of Ally. (*Id*.)

171.    The Plan provides the SUNs with an allowed claim of $1.003 billion against

ResCap. (Kruger Direct ¶ 103.) This allowed claim is fair and reasonable and in the best

interests of the Debtors' Estates and their creditors. (*Id*.)

70

e.      National Credit Union Administration Board Settlement

172.    The NCUAB submitted a proof of claim as liquidating agent for U.S. Central

Federal Credit Union and ten proofs of claim as liquidating agent for Western Corporate Federal

Credit Union.  (Lipps Direct ¶ 51.)  The proofs of claim were based on allegations contained in

*National Credit Union Administration Board v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D.

Cal.), and *National Credit Union Administration Board v. RBS Securities, Inc.*, No. 11 Civ. 2340

(D. Kan.).  (*Id*.)  The proofs of claim total approximately $293 million.  (*Id*.)  The Debtors and

the NCUAB have reached a settlement under which NCUAB would receive allowed general

unsecured claims of $78 million against the RFC Debtors.  (*Id*; PX 639.)  On October 28, 2013,

the Debtors filed a separate motion for approval of the NCUAB settlement under Bankruptcy

Rule 9019.  (ECF Doc. # 5535.)  The Court approved the settlement after an evidentiary hearing

held on November 25, 2013.  (ECF Doc. # 5955.)

5.      *The FHFA Settlement*

173.    On November 30, 2012, the FHFA filed six proofs of claim against certain of the

Debtors (the "FHFA Claims").  (Kruger Direct ¶ 117; Lipps Direct ¶ 49.)  These claims are

based on the FHFA's prepetition complaint against Ally and the Debtors in *Federal Housing*

*Finance Agency v. Ally Financial, Inc*., No. 11 Civ. 7010 (S.D.N.Y.) (the "FHFA Litigation").

(Kruger Direct ¶ 117.)  The FHFA asserts claims based on Freddie Mac's purchase of over $6

billion of Debtor-sponsored RMBS.  (*Id*.)  The FHFA has asserted that the FHFA Claims or

some portion thereof are entitled to be treated as priority claims under the Housing and

Economic Recovery Act of 2008 ("HERA"), as codified in 12 U.S.C. §§ 4617(b)(15).  (*Id.*)

174.    The Plan Proponents have reached an agreement with Ally that settles the FHFA

Claims and related issues.  (*Id.* ¶ 118.)  Pursuant to this settlement, the Plan will grant the FHFA

an allowed claim of $1.2 billion against RFC (the "FHFA Allowed Claim"), entitling it to a cash

payment of approximately $24 million (the "FHFA Settlement"). (*Id.* ¶ 118.) The FHFA

Settlement will secure the FHFA's support for the Plan. (*Id.*) The FHFA also reached a separate

settlement with Ally that resolves the FHFA's claims against Ally and affiliated non-Debtor

defendants in the FHFA Litigation, which claims are not subject to the Plan's Third Party

Release. (*Id.*) That settlement is not contingent on Plan confirmation. (*Id.*) Under the FHFA

Settlement, the FHFA has assigned to Ally its right to receive distributions on account of its

Allowed Claims. (*Id.*)

175. The FHFA Settlement is a favorable resolution of these claims for the Debtors.

(*Id.* ¶ 119.) The claims presented substantial potential liability and uncertainty for the Debtors.

(*Id.*) While the Debtors do not believe that HERA entitles the FHFA Claims to priority,

uncertainty over litigation of that issue presented a significant risk to the successful resolution of

the Debtors' bankruptcy cases. (*Id.*) The FHFA Settlement also avoids complicated litigation

over the subordination of the FHFA Claims pursuant to Section 510(b) of the Bankruptcy Code.

(*Id.*)

176. The Court approved the FHFA settlement on November 25, 2013. (Nov. 25, 2013

Trial Tr. 89:2–4.)

      *6.    The Settlement of Issues Relating to Subordination of Claims*

177. The Global Settlement also resolves any question that the RMBS Trust Claims,

the Monoline Claims, and the Private Securities Claims must be subordinated to all general

unsecured claims pursuant to Section 510(b) of the Bankruptcy Code.

178. As part of the Plan, the Debtors settled the RMBS Trust Claims (Kruger Direct

¶ 56), each of the Monoline Claims, including FGIC's (*id.* ¶ 67), MBIA's (*id.* ¶ 76), Assured's

(*id.* ¶ 81), Ambac's (*id.* ¶ 85), Syncora's (*id.* ¶ 89), and the Private Securities Claims (*id.* ¶ 92).

Pursuant to each settlement and the terms of the Plan, none of the claims are subordinated. For

the reasons stated above in Section VI.B, each settlement was reasonable.

### 7.    Compromise of the Intercompany Balances

179.    Another part of the Global Settlement incorporated into the Plan is the

compromise of intercompany payables and receivables among various Debtor entities (the

"Intercompany Balances"). (*Id.* ¶ 47.) The issue of whether the Intercompany Balances should

be treated as debt or as equity was hotly contested during Phase II.

180.    The Plan Proponents submitted evidence in support of their assertion that the

Intercompany Balances are more akin to equity than they are to valid and collectible debt. (*See

generally*, Gutzeit Direct; Westman Direct; Kruger Direct; Hamzehpour Direct, ECF Doc. #

5708, ¶ 17.) The JSN Objectors also submitted evidence in support of their assertion that the

Intercompany Balances are more akin to debt than they are to equity. (*See generally*, Bingham

Direct ¶¶ 16–19.) As a result of the JSN Settlement, there are no outstanding objections

challenging the reasonableness of the Plan's waiver of Intercompany Balances as part of the

overall Plan.

181.    The waiver of the Intercompany Balances under the Plan as part of the Plan

Settlements and the JSN Settlement, in light of all of the benefits inuring to the Debtors' Estates

as a result of those settlements, is reasonable and in the best interests of the Debtors' Estates.

### 8.    Treatment of the Borrower Claims

182.    The Plan provides for the Debtors' continued performance under two nationwide

settlements with the Federal Government—one with the Department of Justice and forty-nine

state attorneys general (the "DOJ/AG Settlement") and the other with the Board of Governors of

the Federal Reserve and the FDIC (the "FRB Consent Order")—that have provided, directly and

indirectly, more than $579 million to Borrowers. (Thompson Direct ¶¶ 3(a), 10–12.)

183.    The Plan provides for the treatment of claims asserted by Borrowers through the establishment of the Borrower Claims Trust, which will be funded with cash.  (Thompson Direct ¶¶ 3(b), 13–16; Kruger Direct ¶ 107.)  Under the Plan, holders of Allowed Borrower Claims will receive a percentage recovery comparable to the projected recoveries to be received by holders of Allowed General Unsecured Claims at their respective Debtor Groups.  (Thompson Direct ¶ 14.)

184.    The decision to provide a Borrower Claims Trust was made by the Plan Proponents, in consultation with their advisors, and counsel for Ms. Rowena Drennen, the Borrower representative sitting on the Creditors' Committee.  (*Id.* ¶ 14.)  The purpose of the Borrower Claims Trust is to streamline and expedite the process of making distributions to Borrowers.  (*Id.* ¶ 15.)  First, holders of Allowed Borrower Claims will receive distributions in cash, rather than Units.  (*Id.*)  This will prevent the Borrowers from having to receive distributions over time, unlike other General Unsecured Claim holders whose distributions will be paid as claims are resolved and assets are liquidated by the Liquidating Trust.  (*Id.*)  Second, the Borrower Claims Trust includes a feature that will authorize the Borrower Claims Trustee to pay an incremental $500 to those Borrowers agreeing to reduce their Borrower Claim to $8,500 or less, if against GMACM, and $28,000 or less, if against RFC, which may avoid the need for many Borrowers to incur the expense of counsel to resolve their claims.  (*Id.*)

185.    The Plan further provides that the Borrower Claims Trust will be funded with $57.6 million less any amounts paid by the Debtors to or on behalf of holders of Borrower Claims prior to, or in connection with, the Effective Date pursuant to orders of the Bankruptcy Court.  (*Id.* ¶¶ 3(b), 16.)  The Debtors and their advisors performed the Borrower Trust True-up calculation called for by the Plan.  (*Id.* ¶ 22.)  Based on data as of November 4, 2013, the $57.6

million is projected to be sufficient to comply with the Plan by providing comparable recoveries

to holders of Allowed Borrower Claims.  (*Id.* ¶¶ 6, 53.)  Therefore, the Borrower Trust True-up

is not required.  (*Id.* ¶ 6; Kruger Direct ¶ 110.)

186.    Some Borrower Claims may also be covered by insurance policies.  (Kruger

Direct ¶ 111.)  The Plan provides that, except as set forth in the Kessler Settlement Agreement or

other orders of the Court, to the extent a Borrower recovers insurance proceeds on account of all

or a portion of a Borrower Claim, the Allowed Borrower Claim amount shall be reduced to the

extent paid by insurance proceeds.  (Thompson Direct ¶ 16; Kruger Direct ¶ 111; Plan Art.

IV.F.6.)  If a covered Borrower Claim has already been paid from the Borrower Claims Trust,

the direct recipient of insurance proceeds will be required to return a proportionate amount of

any prior distributions from the Borrower Claims Trust Assets made on account of such

Borrower Claim to the Borrower Claims Trust, and will then be entitled to its proportionate share

of any future distribution from the Borrower Claims Trust.  (Thompson Direct ¶ 16; Kruger

Direct ¶ 111; Plan Art. IV.F.6.)

### 9.    *Borrower Class Action Settlements*

187.    Following the entry into the Plan Support Agreement, the Plan Proponents

negotiated and resolved claims filed by approximately thirteen putative class action plaintiffs

asserting claims (all but one of which are Borrower Claims) against the Debtors, certain of which

class actions named Ally or other non-Debtor affiliates as defendants.  (Kruger Direct ¶ 112.)

Before the Petition Date, the Debtors and certain of their non-Debtor affiliates were subject to a

variety of litigation throughout the country that sought redress for the Debtors' allegedly

improper origination and servicing practices.  (*Id.*)  None of the putative classes were certified

under the Federal Rules of Civil Procedure before the Petition Date.  (*Id.*)  But the named

plaintiffs who filed the claims collectively purported to represent hundreds of thousands of

claimants, and the alleged damages asserted against the Debtors amounted to several billion

dollars. (*Id.*) For those matters that have been or are subject to a proposed settlement, the

Debtors and the Committee engaged with each of the named plaintiffs in an effort to reach

amicable resolutions of the claims and avoid the time and expense of litigating claims that would

only serve to delay distributions to creditors and create greater uncertainty for each of the

Estates. (*Id*) As a result of these efforts, the Plan Proponents reached settlements with the

named plaintiffs, which they are currently in the process of documenting and bringing to both

this Court and where applicable, either the state or federal court in which the action is pending,

for the requisite approvals. (*Id.*)

188.    If the Plan goes into effect, each of the settlements of putative borrower class

action claims will result in Allowed Borrower Class Action Claims transferred to the Borrower

Claims Trust or direct cash payments. (Thompson Direct ¶¶ 16, 25.) Each of these settlements

was factored into the Debtors' assessment of the funding for the Borrower Claims Trust based on

the preliminary settlement amounts plus estimates for the remaining matters where a preliminary

settlement had not been reached. (*Id.* ¶ 25.)

### 10.    Amendment to Consent Order and Impact on Borrowers

189.    As another component of the Global Settlement, the Debtors, the Creditors'

Committee, and Ally agreed to support a settlement with the Board of Governors of the Federal

Reserve System (the "FRB") regarding the Debtors' and Ally's obligations under the Consent

Order. (Kruger Direct ¶ 113.) In the fall of 2012, the Debtors originally sought approval of the

retention of PricewaterhouseCoopers LLP and certain law firms to provide services in

connection with a foreclosure review to be conducted by the Debtors, as mandated by the terms

of the Consent Order. (*Id.*) The Creditors' Committee requested this retention, arguing that the

costs of the foreclosure review should not be borne by the Debtors' Estates. (*Id.*) These issues

were adjourned and preserved in interim orders authorizing the retention of professionals in

connection with the foreclosure review process.  (*Id.*)

190.     Upon further review of the Debtors' and Ally's obligations under the Consent

Order, and in light of the escalating cost of the foreclosure review process, the Debtors filed a

motion seeking a determination that the foreclosure review obligations should be classified as

general unsecured claims and that the automatic stay barred the enforcement of such claims.

(Kruger Direct ¶ 114.)  Such a determination would have required Ally to pay for any ongoing

foreclosure review obligations, and attempt to pursue a claim for contribution against the Debtors

in the bankruptcy cases.  (*Id.*)  The Debtors' motion was contested by Ally and the FRB.  (*Id.*)

191.     The parties negotiated a resolution of such obligations through the Mediation as a

component of the Global Settlement.  (*Id.* ¶ 115.)  The FRB and the Debtors entered into an

amended Consent Order, which was approved by the Bankruptcy Court on July 26, 2013,

pursuant to which approximately $230 million previously placed into an escrow account by

GMACM was released into a Qualified Settlement Fund, from which the Borrowers would be

paid directly, in full satisfaction of the Debtors' foreclosure review requirements under the

Consent Order.  (Kruger Direct ¶ 115; Hamzehpour Direct ¶¶ 15–16; *see also* PX 860.)  The

Borrowers who will be entitled to some payment under the FRB settlement include any Borrower

who was in some stage of active foreclosure proceedings during 2009 and 2010.[22]  (Kruger

Direct ¶ 115.)

192.     By entering into the amendment to the Consent Order, the Debtors eliminated

nearly all of the costly professionals' fees associated with the foreclosure review, resolved the

outstanding litigation with Ally regarding the allocation of liabilities for the foreclosure review

---

[22]     Certain Borrowers will also receive remediation payments as a consequence of a separate review related to
Borrowers who were eligible to receive benefits under the Service Members' Civil Relief Act from January 1, 2006
through March 12, 2012, undertaken as part of the DOJ/AG Settlement.  (Kruger Direct ¶ 115 n.35.)

obligations, and ensured expedited payment of remediation payments to Borrowers.  (Kruger

Direct ¶ 116; Hamzehpour Direct ¶ 15.)  To the extent a holder of a Borrower Claim receives

payment pursuant to the settlement of the Debtors' obligations under the Consent Order, the

amount of such Borrower Claim shall be reduced in an amount equal to the amount received.

(Kruger Direct ¶ 116.)

### C.    Other Aspects of the Plan Settlements

#### 1.    *Substantive Consolidation*

193.    The Plan embodies a settlement and compromise of potential disputes over

whether the Debtors should be substantively consolidated and their assets and liabilities pooled

for purposes of efficiency in making distributions under the Plan.  (*Id.* ¶ 120.)

194.    After considering the claims of creditors arguing that the Debtors should be

substantively consolidated, and those arguing that they should not be so consolidated, the Plan

Proponents ultimately determined that substantive consolidation would be inappropriate in these

Chapter 11 Cases, and would result in uncertainty, costs, and delays related to additional

litigation.  (*Id.* ¶ 121; Kruger Dep. 151:16–22.)  Substantive consolidation is not in the best

interests of the Debtors' Estates and their creditors.  (Kruger Direct ¶ 121.)

#### 2.    *Limited Partial Consolidation*

195.    Instead, the Plan provides for a limited partial consolidation purely for

administrative convenience.  (*Id.* ¶ 122.)  It groups the Debtors into three Debtor Groups—the

ResCap Debtors, the GMACM Debtors, and the RFC Debtors—solely for purposes of describing

their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.

(*Id.* ¶ 122; Renzi Direct ¶ 25.)  No Debtor will be consolidated with a Debtor in another Debtor

Group for any other purpose.  (Kruger Direct ¶ 122.)  In fact, as set forth in the Voting

Certification, creditors voted at each Debtor against which their claims were asserted, rather than
at the Debtor Groups.  (*Id.*)

196.    This limited partial consolidation has one exception:  holders of General
Unsecured Claims against Debtor ETS.  (*Id.* ¶ 123; Renzi Direct ¶ 24.)  Holders of Allowed
claims against ETS may be entitled to a greater recovery in a chapter 7 liquidation than other
unsecured claims against the GMACM Debtors. (Kruger Direct ¶ 123; Renzi Direct ¶ 24.)
Therefore, to ensure that the Plan meets the "best interest of creditors" test, holders of ETS
Unsecured Claims will receive Cash, to be distributed *pro rata*, in an amount equal to the value
of assets remaining in the ETS estate after the payment of Allowed Claims with a senior priority.
(Kruger Direct ¶ 123; Renzi Direct ¶ 24.)

197.    Grouping the Debtors into the Debtor Groups solely for description and
distribution purposes, with the one exception noted above, is in the best interests of creditors and
the Debtors' Estates.  (Kruger Direct ¶ 124.)  Each of the parties to the Plan Support Agreement
support the proposed grouping.  (*Id.*)

198.    The proposed grouping (i) provides a more efficient distribution, (ii) no creditors
are prejudiced by the partial consolidation proposed in the Plan, and (iii) the proposed settlement,
as a component of the Global Settlement, maximizes distributions to unsecured creditors and is
in the best interest of the Debtors' Estates.  (*Id.* ¶ 125.)

### 3.    *Division of Administrative Expenses Among Debtor Groups*

199.    The Global Settlement also allocates the Administrative Expenses among the
Debtor Groups and Plan trusts.  (*Id.* ¶¶ 126, 129.)  It was the subject of hard fought and
contentious negotiations.  (*Id.* ¶ 126; Dubel Direct ¶ 79.)

200.    The accrued and projected administrative costs are allocated as follows:  $836.3

million to the GMACM Debtors, $249.8 to the RFC Debtors, and no administrative costs

allocated to ResCap.  (Kruger Direct ¶ 129.)

201.    The costs to wind down the Debtors' Estates remain uncertain and the value of

certain non-cash assets held by the Estates will vary as they are liquidated over time.  (*Id.* ¶ 130.)

To account for this, the Plan provides that any increase or decrease in administrative expenses

and/or the value of all of the Debtors' Estates from current projections would be shared among

the ResCap Debtors, the GMACM Debtors, the RFC Debtors, and the Private Securities Claims

Trust, *pro rata*, in accordance with the Plan.  (*Id.*)  In the circumstances of these Chapter 11

Cases, the agreed-upon allocation embodied in the Plan is reasonable and appropriate.  (*Id.*)

202.    Absent agreement over the proper allocation of administrative expenses among

the Debtor Groups, the Debtors would be forced to carefully examine each and every

administrative expense to determine to which Debtor such expense should be allocated.  (*Id.*

¶ 131.)  This task would be burdensome, costly, and the subject of substantial disputes among the

parties.  (*Id.*)  Because substantial expenses are shared among two or more Debtors, the Debtors

would still need to make a determination as to how to allocate such shared expense among

Debtor entities.  (*Id.*)  Settling the allocation of administrative expenses in the manner set forth

above is fair, avoids unnecessary disputes, and facilitates the implementation of the Global

Settlement for the benefit of all creditors.  (*Id.*)

D.    **Facts Supporting the Debtors' Entry into the Plan Settlements**

1.    *Basis for the Debtors' Business Judgment*

203.    The Plan Settlements enable the Debtors to reduce the potentially significant

litigation costs that would have otherwise been incurred if the Debtors had continued to pursue

confirmation of a nonconsensual plan, as well as the attendant litigation risk of such a plan.  (*Id.* ¶ 151.)

204.    The Plan Proponents considered the delay and enormous expense expected to result from litigating the otherwise settled claims.  (*Id.* ¶ 154.)  The Plan Settlements resolve actual disputes, as well as complex potential disputes with Ally, the Creditors' Committee, the RMBS Trustees, the securities litigants and other investors, the Kessler Class Claimants, FGIC, and MBIA as insurers in connection with certain Debtor-sponsored RMBS Trusts, and certain holders of the Senior Unsecured Notes issued by ResCap, including Paulson, as well as their indenture trustee, Wilmington Trust.  (*Id.*)

205.    Based on the divergent interests of the parties to the Plan Settlements, as well as the complex issues pervading these cases, it was in the best interests of the Debtors' Estates to find common ground and have nearly all major parties coalesce around the Plan and the Plan Settlements contained within.  (*Id.* ¶ 155.)

206.    The Plan Settlements enable the Debtors to progress and preserve value rather than spend an inordinate amount of time and money immersed in litigation.  (*Id.* ¶ 156.)

       *2.*    *The Possibility of Success of Litigating the Claims at Issue and the Plan Settlements' Future Benefits to the Debtors*

       a.    Litigation Uncertainty

207.    With respect to the claims settled by the Plan Settlements, there is significant uncertainty regarding the outcome of any litigation addressing the validity, priority, and amount of such claims through the claims resolution process.  (Kruger Direct ¶ 157.)  Due to this uncertainty, the Plan Settlements provide substantial benefits to the Debtors, the Debtors' Estates and their creditors.  (*Id.*)

208.    After reviewing the claims, some of the filings in related suits, pertinent

agreements, and past adverse rulings in related suits, the Debtors believe that they have strong

defenses to the various claims.  (Kruger Direct ¶ 158.)  If forced to litigate, the Debtors would

mount a vigorous defense.  (*Id.*)  Nonetheless, the issues that would be involved in litigating

these claims are likely to be fact-intensive in nature and the legal issues involved are relatively

novel.  (*Id.*)

209.    Litigation involving these types of claims would involve substantial litigation

risk.  (Kruger Direct ¶ 158.)  The results of litigation in similar suits, generally, have resulted in

unfavorable outcomes for RMBS sponsors.  (*Id.*)

210.    In light of the foregoing, the Debtors would face substantial litigation uncertainty

and risk in connection with litigating these issues.  (Kruger Direct ¶ 158.)

> b.    The Plan Settlements' Future Benefits

211.    The Plan Settlements provide substantial benefits to the Debtors' Estates and their

creditors.  (Kruger Direct ¶ 159.)  The Plan Settlements provide benefits in the form of (i) a

substantial reduction of claims asserted against each of the Debtors' Estates as described above;

(ii) increased certainty regarding the validity, priority and amount of the claims; and

(iii) substantial cost savings when compared with the likely costs of professional fees and experts

that would be needed if litigation proceeded.  (*Id.*)  The alternative of not entering into the Plan

Settlements is not in their best interests and the best interests of the Debtors' Estates and/or the

their creditors.  (*Id.*)

> *3.    The Likelihood of Complex and Protracted Litigation*

212.    Prior to the stay imposed by the Debtors' Chapter 11 filing, the Debtors faced a

significant number of lawsuits related to their securitization practices.  (Kruger Direct ¶ 160.)

These lawsuits were brought by (i) the Monolines, (ii) private securities investors, and

(iii) institutional investors.  The litigation against each entity would be complex, protracted and

expensive.  (*Id.*)

a.    Monolines

213.    The ongoing disputes in recent years among mortgage originators on the one

hand, and Monolines and securitization trustees on the other, are well publicized.  (Kruger Direct

¶ 161.)  A number of the lawsuits and other proceedings involving RMBS breach of

representation and warranty and fraudulent inducement allegations against mortgage originators

have been ongoing for years, in many cases without resolution.  (*Id.*)  Absent a settlement, the

Debtors are almost certain to become embroiled in additional, complex litigation with the

Monolines over the validity, amount and possible subordination of their asserted claims.  (*Id.*)

214.    Given the highly fact intensive nature of RMBS litigation, any monoline litigation

is also almost certain to be complex and protracted.  (Kruger Direct ¶ 162.)  The Debtors have

experienced such litigation first-hand with MBIA, which spanned three and a half years leading

up to the Petition Date.  (Lipps Direct ¶¶ 116–120; Kruger Direct ¶ 162.)  The discovery

necessary to resolve the Monoline Claims—along with the various pleadings and hearings

necessary for the Court to decide the allowed amount of the Monoline Claims—would be

massive.  (Kruger Direct ¶ 162.)

215.    Litigation regarding the validity, amount and priority of the Monoline Claims

would almost certainly be exceedingly complex and could drag on for years, much like other

lawsuits of a similar nature that are currently pending in other state and federal courts.  (Kruger

Direct ¶ 163.)  Finally, as with any other complex litigation that extends for years, the expenses

associated with any litigation of the Monoline Claims would almost certainly be immense, and,

given the asserted size of those claims, could result in a delay of distributions to other creditors

even in the event of a confirmed Plan.  (*Id.*)

b.      Private Securities Investors

216.    Prior to the Chapter 11 filing, the Debtors faced at least seventeen lawsuits premised on the allegation that the registration statements and the prospectuses for the securities contained material misstatements.  (Kruger Direct ¶ 164.)  None of them had progressed beyond the early stages of discovery.  (*Id*.)

217.    The Debtors anticipate that the likely scope of discovery and burden to the Debtors will be similar to the burden associated with the Monoline Claims.  (*Id*.)  Each case over each claim will involve extensive document and deposition discovery of the Debtors relating to the particular securitizations at issue in that particular case, including the origination, acquisition, underwriting and pooling of the loans for each securitization, the preparation of the transaction documents for each securitization, the diligence performed on loans contained within the collateral pools for each securitization, and the performance of the loans underlying each securitization.  (*Id*.)

218.    The settlements with private securities investors under the Plan, including the Private Securities Claims Trust settlement and the *NJ Carpenter's* settlement, are consistent with, and within the range of, public settlements of similar RMBS-related securities litigation, based on commonly applied settlement metrics.  (Allen Direct ¶ 4.)

c.      Institutional Investors

219.    The Debtors also faced a potential lawsuit from two groups of institutional investors, one represented by Kathy Patrick of Gibbs & Bruns LLP, the other by Talcott Franklin of Talcott Franklin P.C., pertaining to various Pooling and Servicing Agreements, Assignment and Assumption Agreements, or other sale agreements.  (Kruger Direct ¶ 166.)  Like with the monoline suits and private securities lawsuits, the anticipated scope of discovery and burden to the Debtors would have been enormous.  (*Id*.)

84

d.        Other Litigation

220.      Absent the Global Settlement, the Debtors would also be faced with years of

lengthy and costly litigation involving the RMBS Trustees, borrowers, governmental agencies

like the FHFA, and class action securities claimants, as well as their claims against Ally, the

enforceability of the Intercompany Balances, and substantive consolidation.  (Kruger Direct

¶ 167.)  In fact, prior to the Global Settlement, Wilmington Trust, on behalf of the Senior

Unsecured Noteholders, was seeking standing to pursue allegations that forgiveness of

Intercompany Balances constituted constructive and actual fraudulent transfer.  (*Id.*)

221.      The Global Settlement, and its resolution of a host of contentious issues, has

helped the Debtors avoid years of costly litigation.  (Kruger Direct ¶ 168.)

4.        *The Paramount Interests of the Estates' Creditors*

222.      The Debtors strived to reach a fair and equitable resolution of claims brought

against them and, if possible, to enter into a consensual Chapter 11 plan that had the support of

Debtors' creditors.  (Kruger Direct ¶ 169.)  Entering into the Plan Settlements is consistent with

those goals.  (*Id.*)  As described above, the Plan Settlements resolve substantial claims against

the Debtors' Estates.  (*Id.*)  Obtaining the releases in the Plan Settlements insures that the

Debtors will not have to litigate and face the risk of being responsible for the full amount of

claims asserted by the settling parties.  (*Id.*)  It was in the best interests of not only the Debtors'

Estates, but also the Estates' creditors, to find common ground and have nearly all major parties

coalesce around the Plan and the Plan Settlements contained within.  (*Id.*)

223.      The Plan Settlements are part of the Plan that, if ultimately approved, will bring

substantial, additional benefits to the Debtors' creditors.  Approval of the Plan Settlements is a

necessary and required step.  (Kruger Direct ¶ 170.)

224.    The Plan and the Plan Settlements contained within are in the paramount interests of the creditors as evidenced by their overwhelming, near-unanimous, support for the Plan. (Kruger Direct ¶ 171.)  The Plan has enjoyed overwhelming support from those creditors that voted on the Plan.  (*Id.*)  Approximately 95.7% of the creditors voting on the Plan, representing hundreds of billions of dollars of claims, voted to accept the Plan.  (*See* Voting Certification Ex. B.)  No creditor has objected to the Plan Settlements.

### 5.    *The Plan Settlements' Support from Other Parties-in-Interest*

225.    The Plan and its contemplated Plan Settlements also have the support of other parties-in-interest, such as:

- Ally;

- Allstate Insurance Company and its subsidiaries and affiliates;

- American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in these Chapter 11 Cases;

- the Bank of New York Mellon, and the Bank of New York Mellon Trust Company, N.A. solely in their capacities as trustees, indenture trustees, or separate trustees;

- Deutsche Bank, N.A., solely in its capacity as an RMBS Trustee for certain RMBS Trusts;

- FGIC and its subsidiaries and affiliates;

- FHFA;

- the Kessler Class Claimants (as defined in the Plan Support Agreement);

- Law Debenture Trust Company of New York solely in its capacity as separate trustee;

- Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates;

- MBIA and its subsidiaries and affiliates;

- The National Credit Union Administration Board;

- certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap;

- each of the Private Securities Claimants;

- Prudential Insurance Company of America and its subsidiaries and affiliates;

- the Steering Committee Consenting Claimants (as defined in the Plan Support Agreement);

- each of the Supporting Senior Unsecured Noteholders (as defined in the Plan Support Agreement) that executed a joinder to the Plan Support Agreement;

- the Talcott Franklin Consenting Claimants (as defined in the Plan Support Agreement);

- U.S. Bank National Association solely in its capacity as an RMBS Trustee for certain RMBS Trusts;

- Wells Fargo Bank, N.A. solely in its capacity as an RMBS Trustee for certain RMBS Trusts; and

- Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

(Kruger Direct ¶ 172; PX 855.)

6.    *The Plan Settlements' Releases of the Debtors' Officers and Directors*

226.    The releases of the Debtors' officers and directors in the Plan are reasonable and are provided in exchange for fair value.  (Kruger Direct ¶ 173.)

227.    In exchange for these Releases, the Debtors' officers and directors will waive any claims for coverage they may have under any directors and officers ("D&O") or errors and omissions ("E&O") policies covering the Debtors or their officers and directors for the period between November 2006 and the Effective Date, with respect to those Claims that are released

under the Plan.  (*Id.* ¶ 174.)  Their willingness to do so was an important part of the overall

Global Settlement.  (*Id.*)

7.    <em>Counsel for Parties to the Plan Settlements</em>

228.    The Debtors were represented by competent and experienced counsel throughout

the negotiation of each Plan Settlement.  (*Id.* ¶ 175.)  The Debtors were represented by

competent and experienced counsel, including Morrison & Foerster LLP, Carpenter, Lipps, &

Leland LLP, and Curtis, Mallet-Prevost, Colt & Mosle LLP.  (*Id.*)

229.    All of the parties to the Plan Settlements were represented by competent and

experienced counsel.  (*Id.* ¶ 176; Dubel Direct ¶ 46.)  For example, the Committee was

represented by Kramer Levin, Naftalis & Frankel LLP; Ally by Kirkland & Ellis LLP; the

RMBS Trustees by Alston & Bird LLP, Dechert LLP, Seward & Kissel LLP, Morgan, Lewis &

Bockius LLP, and Allen & Overy LLP; the Private Securities Claimants by Quinn Emanuel,

Urquhart & Sullivan LLP; the Senior Unsecured Notes Indenture Trustee by Loeb & Loeb LLP,

and Cleary, Gottlieb, Stein & Hamilton LLP; NJ Carpenters by Lowenstein Sandler LLP; FGIC

by Jones Day LLP; the National Credit Union Administrative Board by Zuckerman Spaeder

LLP; MBIA by Cadwalader, Wickersham & Taft LLP; Ambac by Patterson, Belknap, Webb &

Tyler LLP; Syncora by Weil, Gotshal and Manges LLP and Wollmuth, Maher & Deutsch LLP;

and Assured by Proskauer Rose LLP.  (Kruger Direct ¶ 176.)

230.    The Court has already found that the parties to the Mediation that negotiated the

various Plan Settlements were represented by sophisticated counsel.  (*Id.* ¶ 177; ECF Doc. #

5125; PX 872.)

8.    *Arm's-Length Negotiations*

231.    The Plan Settlements arose out of the Mediation directed by Judge Peck, which was a robust process that continued for months.  (Kruger Direct ¶ 179.)  A substantial number of parties engaged in that process, many of which had divergent and competing interests and agendas.  (*Id.*)  That process allowed the various parties to meet in a confidential forum and, under Judge Peck's guidance, to present their respective positions and interests.  (*Id.*)  Most, if not all, of those parties are highly sophisticated and were represented by experienced counsel and financial advisors who could and did advocate on their behalf.  (*Id.*)

232.    Based on the claims asserted and positions taken by the various parties in these Chapter 11 Cases, it is evident that many of the mediating parties' interests were divergent.  (*Id.* ¶ 180.)  The parties did not hesitate to advocate for their positions, and several were willing to aggressively pursue their own agendas.  (*Id.*)  For instance, the Debtors had commenced litigation seeking to subordinate the claims of Private Securities Claimants and had been preparing to prosecute claims objections to many of the other significant claims filed in these cases.  FGIC and MBIA, meanwhile, were pursuing litigation directly against Ally outside of the Bankruptcy Court.  (*Id.*)

233.    The Court has already found that certain negotiations in the Mediation were at arm's-length and in good faith.  For example, the Court found that negotiation of the FGIC Settlement during the Mediation to have been conducted at arm's-length.  (PX 872.)

## VII.    THE PLAN'S RELEASE, EXCULPATION, INJUNCTION, AND JUDGMENT REDUCTION PROVISIONS

234.    The Plan contains several release-related provisions negotiated as part of the Global Settlement and necessary to provide closure and protection for all participating parties: a release by the Debtors of the Debtor Released Parties (Plan Art IX.C); a release by holders of

Claims and Equity Interests of the Ally Released Parties (*Id.* Art. IX.D); exculpation of the

Exculpated Parties (*Id.* Art. IX.H); an injunction provision that implements the Debtor Release,

the Third Party Release, the Exculpation, the Judgment Reduction, and the discharge provisions

of the Plan (*Id.* Art. IX.I); and a judgment reduction provision for co-defendants in securities

litigation matters whose potential claims for indemnification or contribution would be affected

by the Third Party Release (*Id.* Art. IX.L) (the "Judgment Reduction").

### A.    The Debtor Release

235.    The Debtor Release releases and discharges the Debtor Released Parties from all

causes of action by the Debtors "arising from or related in any way to the Debtors." (*Id.*, Art.

IX.C.)  The Debtor Released Parties are (i) the Ally Released Parties, (ii) the Committee, (iii) the

Consenting Claimants, (iv) the Junior Secured Notes Indenture Trustee and the Junior Secured

Notes Predecessor Indenture Trustee, (v) the Junior Secured Notes Collateral Agent, (vi) the

Consenting JSNs, (vii) the Ad Hoc Group, and (viii) their respective successors and assigns,

members (except any member of the Ad Hoc Group that voted to reject the Plan and did not

change its vote to accept the Plan by the Confirmation Date), partners, non-Debtor affiliates, and

Representatives.  (*Id.* Art. I.A.75.)  "Representatives" includes an "entity's former and current

officers, former and current directors, former and current principals, employees, agents, financial

advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each

solely in its capacity as such." (*Id.* Art. I.A.245.)

236.    The Debtor Release is fair, equitable and in the best interests of the Estates, and

represents a valid exercise of the Debtors' business judgment.  (*See* Kruger Direct ¶ 186.)  The

release of Ally and its affiliates reflects a fair compromise of the Debtors' potential claims

against Ally in return for Ally's contribution of $2.1 billion in plan funding.  (S*ee id.* ¶ 187.)

Following the Petition Date, the Committee investigated potential claims against Ally arising out of pre-petition transactions among the Debtors and Ally, including claims held by the Debtors for substantive contribution, veil-piercing, alter ego, fraudulent conveyance, subordination, breach of fiduciary duty, and indemnity and contribution. (Dubel Direct ¶¶ 33–40.) During the course of these Chapter 11 Cases, the Committee considered the merits and defenses to potential claims and causes of action against Ally, and filed a motion seeking standing to prosecute and settle many of these claims on the estates' behalf. (ECF Doc. # 3412; Dubel Direct ¶¶ 37–40.)

237.    The settlement of the Estates' claims against the Ally Released Parties is the product of extensive arm's-length bargaining among the Committee, the Consenting Claimants, the Debtors and Ally, overseen by Judge Peck, as discussed in more detail above. (Kruger Direct ¶ 187.) As a result of the Committee's investigation, the Plan Proponents, with the support of the Consenting Claimants, reasonably, in good faith, and with the best interests of their respective constituencies in mind, concluded that the $2.1 billion Ally Contribution represents a fair compromise of disputed claims. (*Id.*)

238.    The Debtor Release is broadly supported by nearly all of the Debtors' key constituencies, including not only the Committee, but also: all six RMBS Trustees; the Institutional Investors; the largest securities fraud claimants; the largest Monoline claimants (MBIA, FGIC, Ambac and Assured); Wilmington Trust; the Supporting Senior Unsecured Noteholders, including Paulson & Co., Inc.; and the representatives of the Borrowers on the Committee. (*Id.* ¶ 188.) Each of these parties was represented by competent and experienced counsel in the negotiations leading to agreement on the terms of the Debtor Release. (*Id.*)

239.    The settlement reflects a reasonable balance between the litigation's possibility of success and the settlement's future benefits. (*Id.* ¶ 189.) Each party to the negotiations that led

to the settlement had access to a wealth of information gathered over the course of months-long

investigations conducted by the Committee and the voluminous materials made available from

the Examiner's investigation.  (*Id*.)  To facilitate settlement negotiations, the parties reviewed

extensive document discovery, briefed the merits of the claims, and exchanged written and oral

presentations regarding their legal positions.  (*Id*.; Dubel Direct ¶¶ 37–39.)  With the knowledge

accumulated in this process, each party independently determined that the settlement of the

Estates' claims against the Ally Released Parties reflected a reasonable resolution of the claims.

(Kruger Direct ¶ 187.)

240.    The Debtor Release resolves myriad complex disputes among the parties

regarding the nature, scope and validity of the Estates' claims against Ally, obviating the need

for protracted litigation and its attendant expense, inconvenience and delay.  (*Id.* ¶ 190.)  The

settlement spares all parties, including the Debtors, costly and uncertain litigation that would

inevitably delay consummation of a plan and recoveries to holders of Claims.  (*Id*.)  The

settlement also eliminates the risk that Ally (which provides a reciprocal release under the Plan)

would assert claims against the Debtors, including claims for contractual indemnification,

equitable indemnification, and contribution.  (*See* Plan Art IX.F.)  The Debtor Release benefits

the Estates by avoiding these risks and expenses.

241.    The Debtor Release also releases potential claims against the Consenting

Claimants and members of the Committee.  (*Id.* Arts. I.A.75, IX.C.)  The Debtors have not

identified any material claims against them, and these creditors played important roles in the

Mediation and the development of the Plan.  No party has raised any objection to this aspect of

the Debtor Release.  The release of these potential claims falls within the range of

reasonableness.

242.     While the Ad Hoc Group and the Junior Secured Notes Indenture Trustee engaged in significant litigation with the Plan Proponents, the Consenting JSNs' subsequent agreement to accept the Plan and cease all pending litigation provides significant benefits to the Estates by avoiding the costs, delays and risks associated with ongoing litigation.

243.     The Debtor Release also discharges potential claims held by the Estates against the Debtors' current and former directors, officers, employees and advisors.  (Plan Art IX.C.) The release in favor of these individuals is reasonable in light of their agreement, under the Plan, to assign their insurance protection to Ally and forego their rights to indemnification.

### B.     Third Party Releases

244.     The Third Party Release provides that the holders of Claims and Equity Interests will be deemed to release and discharge the Ally Released Parties from "any and all Causes of Action . . . arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan."  (Plan Art IX.D.)  The "Ally Released Parties" include Ally and each of Ally's and the Debtors' respective members, shareholders, partners, non-Debtor affiliates, and Representatives. (*Id.*, Art. I.A.21.)  "Representatives" includes an "entity's former and current officers, former and current directors, former and current principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in its capacity as such."  (*Id.*, Art. I.A.245.)

245.     The Third Party Release does not release certain claims against Ally held by Freddie Mac and Fannie Mae.  (Plan Art IX.E.)  Nor does it release claims against the Ally Released Parties held by the United States and the DOJ/AG Settling States arising under the DOJ/AG Settlement, preserved under the DOJ/AG Settlement, or claims against Ally held by the

United States and the State for liabilities, if any, under the Internal Revenue Code or based on,

environmental, civil fraud, or criminal laws. (*Id.*)

              1.     *Jurisdictional Facts Regarding the Third party Claims*

246.    The Court has "related to" jurisdiction over the claims subject to the Third Party

Release. The claims covered by the Third Party Release might have an effect on the Debtors'

Estates. (Hamzehpour Direct ¶¶ 3, 7.) The claims, if allowed to proceed, could implicate

various indemnification and contribution obligations between the Debtors and the Ally Released

Parties, as asserted in numerous proofs of claim. (*Id.*) Similarly, to the extent that claims were

asserted against the Debtors' officers and directors—many of which have filed proofs of claim in

these proceedings—those claims might trigger the Debtors' obligations to indemnify those

officers and directors under certain agreements. (*Id.*) The Debtors and their officers and

directors share insurance coverage with Ally and other non-Debtor affiliates under insurance

policies procured by Ally. If claims against Ally arising from or relating to the Debtors'

business were to go forward against non-debtor Ally entities and were not released pursuant to

the Plan, the insurance proceeds shared between Ally and the Debtors would be depleted, in turn

reducing an asset of the Debtors' estate. (*Id.* ¶ 13; Blumentritt Direct, ECF Doc. # 5698, ¶ 18,

20.)

              a.     Indemnification and Contribution Obligations

247.    The Debtors have certain indemnification obligations to Ally and its affiliates[23]

pursuant to an Amended and Restated Operating Agreement, dated as of November 27, 2006, by

and between General Motors Corporation, GMAC LLC (n/k/a as Ally) and ResCap (the

---

[23]      Under the Operating Agreement, "Affiliates" is defined very broadly and means with respect to any
Person—defined to be "any individual, corporation, partnership, joint venture, limited liability company, limited
liability partnership, association, joint stock company, trust, unincorporated organization, or other organization,
whether or not a legal entity and any Governmental Authority"—"any other Person directly or indirectly Controlling
or Controlled by or under direct or indirect common Control with such Person." (PX 589 § 1.)

"Operating Agreement," PX 589).  (*See* Hamzehpour Direct ¶ 8.)  Section 3(c) of the Operating

Agreement provides that "ResCap will, to the fullest extent permitted by law, indemnify, defend

and hold harmless" Ally and its Affiliates "from and against any losses related to ResCap

Indemnifiable Liabilities."  (PX 589 § 3(c); Hamzehpour Direct ¶ 8.)  Pursuant to this provision,

the Debtors agreed to indemnify Ally and its affiliates for "Liabilities [that] (a) relate to, (b) arise

out of or (c) result principally from" the "businesses and operations . . . of ResCap or its

Subsidiaries."  (*Id.* § 1 at 4-5; Hamzehpour Direct ¶ 8.)  Thus, Ally and/or an Affiliate may seek

indemnification from the Debtors if it incurs losses, damages and/or costs of defense costs

resulting in or from actions where claims and allegations "relate to, arise out of or result

principally from" the "businesses and operations . . . of ResCap or its Subsidiaries"—*e.g.*, the

origination, acquisition, securitization, and servicing of mortgage loans.  (*Id.* §§ 1 at 4–5, 3(c);

Hamzehpour Direct ¶ 8.)  The Plan's release of Ally Released Parties for liability "arising from

or related in any way to the Debtors" closely parallels these indemnification obligations in scope.

(*See* Plan Art IX.D; Hamzehpour Direct ¶ 8.)  Ally filed multiple proofs of claim against the

Debtors, including a claim for contractual indemnification pursuant to this Operating Agreement.

(Lipps Direct ¶ 97; PX 1230–1327; PX1376–1427.)

248.    The Debtors' current and former directors and officers are entitled to

indemnification from ResCap for a broad variety of claims pursuant to the Amended and

Restated Limited Liability Company Agreement of Residential Capital, LLC, dated and effective

as of March 31, 2008 (the "ResCap LLC Agreement," PX 590).  (*See* Hamzehpour Direct ¶ 9.)

The ResCap LLC Agreement provides for indemnification for any loss or damage incurred by

any employee, officer, or director who is "a party or is threatened to be made a party to any

threatened, pending or completed action, suit or proceeding, whether civil, criminal,

administrative or investigative" and provides indemnification for "expenses (including attorneys'

fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the

[officer, director, or employee or on that person's behalf] in connection with such action, suit or

proceeding and any appeal therefrom." (PX 590 § 18(a)(i)-(ii).) Those indemnification

obligations cover losses and defense costs associated with claims arising out of an act or

omission committed in good faith while acting as an officer, director, or employee. (*Id.*) Fees

must be advanced, regardless of whether the officer or director is alleged to have acted in bad

faith, and the director or officer must repay the advanced fees only if it is ultimately determined

that the director or officer is not entitled to indemnity. (*Id.* § 18(d)(i).)

249.    The Debtors have certain indemnification obligations to Ally Securities pursuant

to various underwriting agreements the Debtors entered into in connection with the sale of

certificates for different securitized trusts (the "Underwriting Agreements"). (Hamzehpour

Direct ¶ 10.) A representative example of these Underwriting Agreements is the Residential

Funding Mortgage Securities II, Inc. ("RFMSII") Home Equity Loan Pass-Through Certificates,

Series 2007-HSA2 Underwriting Agreement, dated April 23, 2007 (PX 620-1. (*See*

Hamzehpour Direct ¶ 10.) Section 7 of this Underwriting Agreement provides that RFMSII and

RFC, jointly and severally, agree to indemnify the underwriters, and each person who controls

any underwriter, named in the various Underwriting Agreements (including Ally Securities) for

claims related to the offering materials. (PX 620-1 § 7.) To the extent that Ally Securities incurs

liability in connection with the Underwriting Agreements, it will have direct claims against the

Debtors' Estates based on these indemnification provisions in these Underwriting Agreements.

(Hamzehpour Direct ¶ 10.) The majority of the Underwriting Agreements entered into by the

Debtors in connection with other securitization trusts contain similar indemnification obligations.

(*Id.*)

250.    Ally Bank has indemnity rights against GMACM (f/k/a GMAC Mortgage

Corporation) under certain custodial agreements entered into between, among others, Ally Bank

and GMACM in connection with numerous private label, Ginnie Mae, and GSE securitization

transactions (the "Custodial Agreements").  (Hamzehpour Direct ¶ 11.)  A representative

example of these agreements is the Custodial Agreement, dated June 29, 2006, by and between

JPMorgan Chase Bank, National Association, GMACM and Ally Bank (PX 614-1).  (*See*

Hamzehpour Direct ¶ 11.)  Under this Custodial Agreement, Ally Bank agreed to serve as a

custodian of the underlying mortgage loan files on behalf of the respective RMBS Trust.  (*Id.*)

Section 3.2 of this Custodial Agreement provides that GMACM, as the servicer of the underlying

mortgage loans, "agrees to indemnify and hold the Custodian [Ally Bank] harmless from and

against all claims and liabilities," including payment of the Custodian's legal fees and expenses.

(PX 614-1 § 3.2.)

251.    The Debtors' current and former directors and officers are entitled to

indemnification from Ally under Article VIII(D) of Ally's Amended and Restated Certificate of

Incorporation, as Amended (PX 636).  (*See* Hamzehpour Direct ¶ 12.)  Under this Certificate of

Incorporation, Ally

> shall indemnify and hold harmless each person who was or is made a party or is
> threatened to be made a party to or is involved in or participates as a witness with
> respect to any action, suit or proceeding, whether civil, criminal, administrative or
> investigative (each a "Proceeding"), by reason of the fact that he or she, or a
> person of whom he or she is the legal representative, is or was a director or an
> officer, or is or was serving at the request of the Corporation as a manager,
> director, officer, employee, fiduciary or agent of another entity (collectively, the
> "Indemnified Persons") from and against any and all loss, cost, damage . . .
> (including reasonable attorney's fee and expenses of attorneys and other advisors

and any court costs incurred by any Indemnified Person) or liability actually and
reasonably incurred by the person in connection with the Proceeding . . . .

(PX 636, Art. VIII(D).)  Ally is also responsible for paying in advance any reasonable expenses,

including the reasonable costs of defense, incurred by an Indemnified Person.  (*Id.*, Art. VIII(E).)

To the extent that Ally incurs any such costs with respect to liabilities that arise out of or result

principally from the business and operation of ResCap and its Subsidiaries, Ally may seek

indemnification from the Debtors under the Operating Agreement.  (Hamzehpour Direct ¶ 12.)

> (i)    Ally and Former Officer and Director Indemnity Claims

252.    Ally, Ally Bank, and Ally Securities filed 150 proofs of claim against the Debtors.

(*See* Lipps Direct ¶¶ 97–98 (cataloging proofs of claim); *see also* PX 1230–1327; PX 1376–1427

(Ally entities' proofs of claim).)  Those proofs of claims assert claims for contractual indemnity

under (i) the Operating Agreement (ii) a revolving loan agreement entered into between Ally and

various Debtors on December 30, 2009 (the "Revolving Loan Agreement") (*see* PX 6); (iii) a

line of credit agreement entered into between Ally and certain of the Debtors on December 30,

2009 (the "Line of Credit") (*see* PX 9); (iv) various agreements governing surety bonds issued

by Motors Insurance Company for the Debtors' benefit; and (v) an amended and restated

servicing agreement entered into between Ally Bank and GMACM on May 11, 2012 (*see* PX

761).  Ally's proofs of claim assert rights to indemnification and contribution based, among other

things, on its potential liability in connection with litigation concerning the Debtors' RMBS

securitizations.  (Lipps Direct ¶ 8.)

253.    Forty-six of the Debtors' former officers and directors filed 128 proofs of claim

for contractual indemnity in connection with their service as officer or trustee.  (*Id.* ¶ 99; *see also*

PX 1330–1375 (former officers' and directors' proofs of claim).)  These included forty-four

individuals and two trust companies, Wilmington Trust SP Services Inc. and Wilmington Trust

SP Services SP (Nevada), Inc.  (Lipps Direct ¶ 99.)  Among other things, these proofs of claims

seek indemnification in connection with RMBS-related litigations and assert rights under the

Debtors' D&O policies.  (*Id*.)

> b.      Shared Insurance

254.    The Court also has "related to" jurisdiction arising from shared insurance policies

covering both the Debtors and the Debtors' officers and directors, and Ally and other non-Debtor

affiliates.  (*See* Hamzehpour Direct ¶ 13.)  These policies cover many of the third party claims

that are the subject of the Third party Release.  (Blumentritt Direct ¶ 18–20.)

255.    If claims against Ally arising from or relating to the Debtors' business were to go

forward against non-debtor Ally entities and were not released pursuant to the Plan, the

insurance proceeds shared between Ally and the Debtors would be depleted, in turn reducing an

asset of the Debtors' estate.  (*Id.*; Hamzehpour Direct ¶ 13.)

256.    Each policy year beginning in 2006-2007, and continuing to the present, Ally has

obtained E&O and D&O policies on behalf of itself, its subsidiaries and affiliates (including the

Debtors), and their respective officers, directors, and employees.  (Blumentritt Direct ¶ 7.)  These

policies extend insurance coverage to both "Organizations" (also sometimes called the

"Insureds") and "Insured Persons."  (*Id*.)  For example, the group's primary E&O policy for the

2007-2008 policy year extends coverage to both "the Organization," which is defined to include

the "Parent Organization and any Subsidiary," and "the Insured Person," which includes any

director, officer, or employee of the Organization "while acting in his or her capacity as such."

(*Id.* ¶ 8; PX 930 at 4–5.)[24]  Similarly, the group's primary D&O policy for the 2007-2008 policy

year covers both the "Organization," defined to include Ally (f/k/a GMAC, LLC) and "any

---

[24]      The 2007-2008 policy year is relevant because some of Ally's insurers have taken the position that Ally's "claims" arose in that year, and that all subsequent claims are "related claims" that must be consolidated with the original claim and covered by the policies in effect in that year.  (Blumentritt Direct ¶ 8 n.2.)

Subsidiary," and "Insured Persons," defined to include "any past, present or future duly elected

director or duly elected or appointed officer of the Organization." (Blumentritt Direct ¶ 9; PX-

931 at 4, 12–13.)

257.    Ally entered into similar E&O and D&O policies for each subsequent year, and

each year's policies extended coverage to Ally, its subsidiaries, and its insured persons, including

the directors, officers, and employees of Ally and all its subsidiaries (including the Debtors and

their officers, directors, and employees). (Blumentritt Direct ¶ 10.)

258.    Ally's E&O policies provided coverage for all sorts of wrongful acts. Its primary

policy from 2007-2008, for example, provided coverage for "any error, misstatement, misleading

statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly

committed or attempted, before or during the Policy Period by any Insured or any person for

whose acts the Insured is legally liable" for any provision of "professional services." (PX 930 at

7, 38–47 (endorsement #13 modifying coverage); Blumentritt Direct ¶ 11.) Similarly, Ally's

2007-2008 D&O policy provided broad coverage for "any error, misstatement, misleading

statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly

committed or attempted, by an Insured Person, individually or otherwise, in his Insured

Capacity, or any matter claimed against him solely by reason of his serving in such Insured

Capacity." (PX 931 at 13; Blumentritt Direct ¶ 12.) Subsequent years' E&O and D&O policies

contained similar provisions. (Blumentritt Direct ¶¶ 11–12.)

259.    The policy limits for the Ally's E&O and D&O insurance are aggregate annual

limits. (*Id.* ¶ 14.) This means that each claim, against any insured, during the policy year

reduces the remaining insurance available for all insureds. (*Id.*) All defense costs and expenses

count against policy limits. (*Id.*) Thus, the policies are "wasting asset" policies, meaning that

each payment for liability or defense costs serves to reduce the level of insurance coverage
available for other claims or insureds.  (*Id.*)

260.    These insurance policies cover claims subject to the Third Party Release,
including claims stemming from the Debtors' mortgage-backed securitizations (the Private Label
Securitization and Representation and Warranty lawsuits).  (*Id.* ¶¶ 18–19.)  As a result, any costs
of defense incurred or payments made as a result of a settlement or judgment of these claims by
non-debtor Ally entities would trigger insurance obligations under the shared policies.  (*Id.*)  If
these claims (and other potential claims against Ally arising from or relating to the Debtors'
business) were to go forward against non-debtor Ally entities and were not released pursuant to
the proposed Plan, the insurance policies and proceeds shared between Ally and the Debtors
would be depleted, in turn reducing an asset of the Debtors' Estates.  (*Id.* ¶ 20; Hamzehpour
Direct ¶ 13.)

> 2.    *Unique Circumstances Surrounding the Third Party Release*

> a.    The Third Party Release Is Overwhelmingly Consensual

261.    All of the Consenting Claimants agreed to the Third Party Release by signing on
to the Plan Support Agreement.  (*See* PX 855 § 4.2.)  Since that time, all of the Private Securities
Claimants—each of which has asserted claims against Ally—have agreed to their treatment
under the Plan, including the Third Party Release.  (Disclosure Statement, Art. V.C.2.)  And
numerous creditors, including the members of the Ad Hoc Group, have provided their consent as
part of individual or group settlements agreed to since Plan solicitation began.  (*See* Kruger
Direct ¶¶ 85–86 (regarding Ambac settlement); Lipps Direct ¶¶ 50–51 (regarding settlements
with NCUAB and West Virginia Investment Management Board); Thompson Direct ¶ 25
(describing agreement in principle with the Moore and Rothstein plaintiffs).)

262.    The first page of the disclosure statement states as follows, in bold and capital

letters:

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN AND
RECEIVE A BALLOT: (1) YOUR VOTE TO ACCEPT THE
PLAN, OR (2) YOUR FAILURE TO TIMELY AND/OR
PROPERLY SUBMIT A BALLOT, WILL BE DEEMED
YOUR CONSENT TO THE THIRD PARTY RELEASE
CONTAINED IN ARTICLE IX.D OF THE PLAN, THE
EXCULPATION PROVISION CONTAINED IN ARTICLE
IX.G OF THE PLAN, AND THE INJUNCTION PROVISION
CONTAINED IN ARTICLE IX.H OF THE PLAN, EACH AS
DESCRIBED IN FURTHER DETAIL IN ARTICLE V.X OF
THIS DISCLOSURE STATEMENT.**

(Disclosure Statement at 3.)

263.    The ballots stated as follows, in bold and capital letters:

**IF YOU: (1) VOTE TO ACCEPT THE PLAN, OR (2) FAIL
TO TIMELY AND/OR PROPERLY SUBMIT A BALLOT,
YOU WILL BE DEEMED TO HAVE CONSENTED TO THE
THIRD PARTY RELEASE CONTAINED IN ARTICLE IX.D
OF THE PLAN, THE EXCULPATION PROVISION
CONTAINED IN ARTICLE IX.G OF THE PLAN, AND THE
INJUNCTION PROVISION CONTAINED IN ARTICLE
IX.H OF THE PLAN, EACH COPIED BELOW.**

(Voting Certification ¶ 18.)

264.    Both the ballots and the Disclosure Statement included the following warning:

**REGARDLESS AS TO HOW OR WHETHER YOU VOTED
ON THE PLAN, IF THE PLAN IS CONFIRMED, THE
RELEASE, EXCULPATION AND INJUNCTION
PROVISIONS CONTAINED IN ARTICLE IX OF THE
PLAN WILL BE BINDING UPON YOU. THUS, YOU ARE
ADVISED TO REVIEW AND CONSIDER THE PLAN
CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE
AFFECTED THEREUNDER.**

(*Id.*; Disclosure Statement at 3.)

265.    Creditors overwhelmingly voted to support the Plan: 1,453 of 1,517

(approximately 95.7%) discrete creditors voted in favor (excluding insiders and ballots submitted

by others ineligible to vote).  (*See generally* Voting Certification, Ex. B-1.)

> b.    The Third Party Release Is Supported By Substantial
> Consideration and is Essential to the Plan

266.    The circumstances of these Chapter 11 Cases are unique and unusual because of

the size and complexity of the Debtors' operations:  The Debtors, along with their non-Debtor

affiliates, were one of the largest mortgage servicers in the United States, with approximately

two million servicing accounts.  (Marano Direct ¶ 2; *see also* Phase I Opinion at 5.)

267.    Postpetition, the Debtors were able to accomplish the sale of a majority of the

Debtors' assets, including the Debtors' mortgage servicing rights ("MSRs") and associated

advances, for an ultimate value of $4.5 billion.  (Marano Direct ¶ 2.)  An asset sale at this price

was possible only with the Debtors' continued operations, during bankruptcy, through the date of

the sale.  (*Id.* ¶ 84.)  This required extensive work and planning by the Debtors both pre- and

postpetition, including the following:  obtaining debtor-in-possession ("DIP") financing,

engaging in lengthy settlement discussions with a wide range of governmental agencies and

constituencies, identifying viable stalking horse bidders, procuring related and necessary

concessions from Ally, and reaching a settlement with two groups of institutional RMBS

investors asserting tens of billions of dollars of claims arising out of alleged representation and

warranty breaches.  (Marano Direct ¶ 2; *see generally* Phase I Opinion at 20–37.)

268.    To maximize the value of the assets to the benefit of the Debtors and their

creditors by proceeding with an orderly sale of assets in the context of a bankruptcy proceeding,

the Debtors needed a sufficient time after the sale date to complete the contractual obligations

required for the Debtors to be able to transfer their assets at their enhanced value.  (Marano

Direct ¶¶ 28–29.)  To achieve this, the Debtors needed sufficient financial and operational

support from Ally to be able to continue operations for at least a year.  (*Id.* ¶ 29.)  Ally was

uniquely situated to provide this support; no other entity was willing to do so.  (Carpenter Direct

¶ 19.)  Without Ally's contributions, the Debtors would not have had the operational support

they needed to continue to run their business postpetition, putting at risk the value of the MSRs

and associated advances.  (Marano Direct ¶ 81.)  Additionally, potential purchasers would not

have had assurances that Ally would support and facilitate a smooth transition following the

asset sales, which might have inhibited bidding.  (*Id.*)

269.    By continuing to operate postpetition, the Debtors were able to (i) sell their assets

"free and clear" pursuant to Bankruptcy Code Section 363; (ii) market their assets either as a

whole or in combinations necessary to maximize value (*e.g.*, selling servicing advances together

with mortgage servicing rights); (iii) achieve consents and settlements with various government

entities that were necessary to close the asset sales; (iv) continue to originate mortgage loans;

(v) perform under the DOJ/AG Settlement and Consent Order; (vi) amend Pooling and Servicing

Agreements; (vii) clear whole loan exceptions; and (viii) avoid legal challenges to allocation of

proceeds from RMBS trustees and government agencies, including approximately $1.4 billion in

servicing advances that the RMBS trustees threatened to withhold.  (*Id.* ¶ 3.)

270.    From the very start of prepetition negotiations, Ally required any resolution to

include a release of claims related to the Debtors' business (including any claims the Debtors

believed they could assert against Ally, as well as any potential third party claims against Ally

relating to the Debtors' business).  (Carpenter Direct ¶ 17.)

271.    Negotiations between ResCap's independent directors and representatives from

Ally resulted in a settlement, under which Ally agreed to—and did—provide substantial

monetary and non-monetary contributions to the Debtors.  (Marano Direct ¶¶ 4, 39.)  Ally's

contributions included the following:  (i) agreeing to make a cash contribution to the Debtors of

$750 million, which was eventually increased to $2.1 billion as part of the Global Settlement in

the Plan; (ii) providing $200 million in additional DIP financing, which was necessary to fund

the Debtors' second biggest category of expenses and was unavailable from third parties;

(iii) agreeing to allow the Debtors to use Ally's cash collateral; (iv) providing a stalking horse

bid (with no bid protections) for the held-for-sale loan portfolio, which helped set a high floor for

bidding with favorable terms, provided regulators with reassurance that the asset sales would be

completed quickly and efficiently, and enabled the Debtors to conduct separate auctions for their

held-for-sale portfolio and servicing and origination platform, thereby allowing the Debtors to

target their marketing efforts to corresponding, and strategically different, interested bidders;

(v) entering into a shared services agreement that provided the Debtors with operational support

they needed to run their business in a regulatory compliant manner; (vi) agreeing to negotiate

(and, ultimately entering into) a transition services agreement with the purchaser of the Debtors'

assets, which further enhanced the sale process and provided the Debtors with operational

support and cooperation needed to efficiently close the asset sales; (vii) honoring in the ordinary

course of business obligations under the employee retirement plan for employees of the Debtors;

(viii) supporting the Debtors' origination operations through the closing of the asset sales by

allowing the Debtors to continue originating loans on Ally's books postpetition, thereby

generating additional MSRs (and related servicing fees) that were retained by the Debtors.

(Marano Direct ¶¶ 4, 40; Carpenter Direct ¶ 18(a); PX 137 at 129–30.)  Ally also agreed to allow

the Debtors to continue servicing Ally Bank's loan portfolio, which represented approximately

30% of the loans serviced by the Debtors and accounted for approximately 10% of all the Debtors' servicing related income. (Marano Direct ¶ 40.)

272.    The Debtors were able to use the infusion of cash from Ally to negotiate settlements with other creditors. (*Id.* ¶ 42.) The origination and shared services support from Ally allowed the Debtors to continue to originate and service loans in bankruptcy, thereby maximizing the value of the assets the Debtors were trying to sell. (*Id.*)

273.    Ally's contributions helped the Debtors garner the support of government agencies and GSEs for the sale of the Debtors' assets. (*Id.* ¶¶ 51–52.) The Debtors were able to convince the GSEs that the Debtors could sell the assets without damaging the MSRs and associated advances. (*Id.* ¶ 52.) If the GSEs had concluded that the Debtors could not operate or credibly pursue an orderly sale of the Mortgage Servicing Assets, and that the GSE-related assets might therefore be subject to liquidation, the GSEs would have raised the cost of doing business and seized the Debtors' assets. (*Id.*) Indeed, in other cases where mortgage servicers have filed for bankruptcy without continuing to operate or conducting an orderly sale process, GSEs have tried to seize their collateral after filing. (*Id.*) Thus, by obtaining financing, use of cash, continuity of management through the end of sale, and a stalking horse bidder, the Debtors reassured the GSEs that a process was in place, and that the Debtors' business would continue to function as usual pending an orderly sale of their assets. (*Id.*)

274.    Ally also facilitated the Debtors' conversations with governmental authorities by, among other things, permitting the Debtors to solicit borrowers in the owned loan portfolios of Ally and its affiliates for potential borrower relief including refinancing of those loans under HARP, which allowed the Debtors to remain in compliance with the DOJ settlement requirements. (*Id.* ¶ 53.)

275.    Ally enhanced the sale process by agreeing to serve as a stalking horse bidder for
the Debtors' portfolio of held-for-sale loans with minimal bid protections, and by enabling the
Debtors to separately market and sell their held-for sale loan portfolio and origination and
servicing business, which increased the potential pool of bidders.  (*Id.* ¶ 81; Carpenter Direct
¶ 18(d).)  Ally's bid set the floor for the bidding to continue at auction, which was critical to the
Debtors given the relatively few interested bidders.  (Carpenter Direct ¶ 18(d).)  As a result of
the stalking horse process, the Debtors filed with the Bankruptcy Court two stalking horse bids
on the Petition Date.  (Marano Direct ¶ 56; PX 61.)  The first was with Nationstar, which
proposed a $2.3 billion stalking horse bid for the Debtors' mortgage servicing rights and related
advances.  (Marano Direct ¶ 56.)  The second was with Ally, which was the proposed bidder for
the Debtors' held-for-sale loan portfolio.  (*Id.*)  The Debtors' development of the Ally stalking
horse bid increased the flexibility of the marketing process and expanded the range of potential
bidders for estate assets.  (*Id.* ¶ 57.)

276.    Without Ally's stalking horse bid, the Debtors would have been required to
include their held-for-sale loan portfolio in the Nationstar stalking horse bid.  (*Id.*)  Without
Nationstar's consent to any kind of alternative bidding structure, competing bidders would have
been required to purchase both the mortgage loan origination and servicing business as well as
the held-for-sale loan portfolio in a single transaction.  (*Id.*)  As a result, Ally's stalking horse bid
allowed the Debtors to market two very different pools of assets with corresponding, different
interested bidders.  (*Id.*)  This separation enabled competing bidders, like Ocwen, to bid without
having to partner with other bidding groups in order to put forth a qualified bid.  (*Id.*)  The Ally
stalking horse bid provided a platform on which the Debtors could—and did—obtain a $1.5
billion purchase price for the held-for-sale loan portfolio with minimal due diligence outs.  (*Id.*)

The Debtors recognized that, because the loans had been held-for-investment loans on Ally's books prior to having been contributed to ResCap as capital, Ally would submit a strong bid with minimal representation and warranty and due diligence outs. (*Id*.)  By isolating these assets with a strong stalking horse bid, the Debtors were able to entice Berkshire Hathaway to bid on these assets. (*Id*.)  The winning bidder (Berkshire Hathaway) ultimately agreed to pay approximately $225 million more than Ally's bid for the same assets in a Section 363 sale (after adjusting for the change in unpaid principal balance between the Ally bid date and Berkshire Hathaway bid date). (Carpenter Direct ¶ 18(d); PX 46.)  Berkshire Hathaway agreed to pay that amount without doing any significant due diligence of its own, instead relying on Ally's own diligence and familiarity with the loan portfolio. (Carpenter Direct ¶ 18(d).)

277.    DIP financing from Ally enabled the Debtors to cover their second largest expense, the repurchases of certain whole loans that were sold into securitization trusts guaranteed by Ginnie Mae (the "Ginnie Buybacks"). (Marano Direct ¶ 36.)  These repurchases were funded prior to the Petition Date under a line of credit from Ally (the "Ally LOC"). (*Id*.)  Because the Ginnie Buybacks and the receivables they created were collateral under the Ally LOC, they could not be pledged to a third party lender on a first lien basis, and the Debtors did not believe that a third party lender would be willing to provide replacement financing for those obligations on a second lien basis. (*Id.*)  The documentation supporting the Ginnie Mae loans was generally viewed as deficient, such that previous attempts to use those loans as collateral had been rejected by third party lenders. (*Id.*)  As a result, Ally's continued funding of the Ginnie Buybacks postpetition was critical. (*Id.*)  Without the Ally DIP facility, the Debtors would have been unable to effectuate buybacks required by Ginnie Mae, which would have impaired the value of the Ginnie Mae assets (MSR and advances), and potentially led to Ginnie Mae sweeping

$94 million of restricted cash the Debtors were required to post to compensate for any losses resulting from the Debtors' actions.  (*Id*.; Carpenter Direct ¶ 18(c).))

278.    Ally Bank agreed to allow ResCap to service the MSRs that were owned by Ally Bank, rather than moving the MSRs to a backup servicer.  (Carpenter Direct ¶ 18(b).)  This arrangement helped preserve and enhance the Debtors' ongoing business as a servicer, and was critical to the GSEs.  (*Id*.)

279.    Ally Bank agreed to fund mortgages originated by the Debtors, which enabled the Debtors to continue to originate loans during the Chapter 11 Cases.  (*Id*. ¶ 18(a).)  No other party was willing to enter into such an agreement with the Debtors.  (*Id*.)  Ally Bank's support in this regard benefitted the Debtors in two material respects.  (*Id*.)  First, the fees paid by Ally Bank to the Debtors for loans originated following the bankruptcy filing were paid at market rates and totaled approximately $160 million to $180 million.  (*Id*.)  Because of this support, the Debtors were able to continue to originate loans during the bankruptcy proceedings.  (*Id*.)  Second, Ally Bank's support also enabled the Debtors to preserve their ability to service loans that they had sold to the GSEs.  (*Id*.)  The GSEs had indicated that they would revoke the Debtors' authorization to service those loans if the Debtors did not have the ability to originate mortgages throughout their bankruptcy proceedings.  (*Id*.)

280.    The Debtors were permitted to use Ally Bank's portfolio of loans for the purposes of satisfying the Debtors' loan modification obligations to the Department of Justice.  (*Id*. ¶ 18(e).)  Ally Bank was the only mortgage originator willing or able to allow the Debtors to use its loans for this purpose.  (*Id*.)  Ally also allowed the loans subserviced by the Debtors to remain with the Debtors throughout these cases and ultimately to be sold as part of the servicing platform. (*Id*.)

281.    Ally continued to provide the Debtors with the use of Ally's shared services, such as centralized payroll and risk management services, and cooperated to permit the smooth transition of the Debtors' businesses to purchasers of the Debtors' assets, which generated substantial value for the Estates.  (*Id.* ¶ 18(f).)  Additionally, Ally assumed the Debtors' pension obligations, which helped the Debtors retain hundreds of employees including its management team, and eliminated substantial claims by the Pension Benefit Guaranty Corporation in these cases.  (*Id.*)  This was critical because the GSEs had made clear to the Debtors that the GSEs would take prompt action if the Debtors experienced either a moderate uptick in delinquencies or a significant change in management; Ally's shared services enabled the Debtors to avoid an increase in delinquencies or a significant change in management.  (Marano Direct ¶¶ 6, 34; Carpenter Direct ¶ 18(f).)

282.    The $2.1 billion Ally Contribution constitutes a substantial contribution to the Estates by the Ally Released Parties and constitutes the vast majority of the $2.6 billion that is estimated to be available for distribution to unsecured creditors.  (*See* PX 869 at 27; Carpenter Direct ¶ 24.)  It is the cornerstone of the Plan and Global Settlement, without which a consensual resolution of these Chapter 11 Cases would be impossible.  (Kruger Direct ¶ 46; Dubel Direct ¶¶ 51, 57.)  Ally's $2.1 billion contribution allows the Junior Secured Noteholders to be paid in full and allows the unsecured creditors to receive at least three times more than they would have received absent Ally's cash contribution.  (*See* PX 869 at 27, 29; Dubel Direct ¶ 74.)

283.    In exchange for these substantial contributions, as part of the Global Settlement, the Ally Released Parties required that the Third Party Release be included in the Plan.  (Carpenter Direct ¶ 26.)  A comprehensive set of releases for Ally was the foundation for the negotiations that led to the Debtors' pre-petition settlement with Ally and the inclusion of those

releases remained a guiding principle during the Mediation.  (*Id.*)  In entering into the Mediation

with Ally, the Committee understood that any deal with Ally would have to include

comprehensive releases from both estate and third party claims.  (Dubel Direct ¶ 56.)  If the Ally

Contribution were in exchange only for releases from the Debtors, Ally would not have agreed to

the Ally Contribution, would not have entered into the Global Settlement, and would not support

the Plan because it would not have provided a global resolution of potential claims against Ally

regarding the Debtors' businesses.  (Carpenter Direct ¶ 26; Kruger Direct ¶¶ 39, 197.)  The

inclusion of the Debtor and Third Party Releases in the Plan was critical for obtaining the Ally

Contribution.  (Kruger Direct ¶¶ 39, 197; Carpenter Direct ¶ 26.)  And the Ally Contribution is

the lynchpin of the Plan, without which the cases would devolve into endless litigation, the Plan

would not be confirmable or feasible, and the recoveries currently contemplated by the Plan

would not exist.  (Kruger Direct ¶¶ 46, 197; s*ee also* Carpenter Direct ¶¶ 24–27.)

> 3.      *The Debtors' Directors and Officers Provided Substantial Consideration*
> *in Exchange for Releases*

284.    The Plan also provides that, in exchange for valuable consideration, the Debtor

Release and Third Party Release shall release all Claims that have been or could have been

brought against the Debtors' current and former officers and directors, including the Debtors'

CRO.  (Kruger Direct ¶ 202; *see also* Plan Arts. I.A.21, I.A.75, I.A.243, I.A.245, IX.C–D.)

285.    The Claims against such individuals to be released under the Plan include claims

relating to the pre-petition settlements with Ally and certain RMBS investors, the DOJ/AG

Settlement, the Consent Order, and the pre-petition sales of certain of the Debtors' assets to Ally

and affiliates of Cerberus Capital Management.  (Kruger Direct ¶ 203; *see also* Plan Art IX.C–

D.)  In exchange for these Releases, the Debtors' officers and directors will forego any claims for

coverage they may have under any D&O or E&O policies covering the Debtors or their officers

and directors for the period between November 2006 and the Effective Date, with respect to
those Claims that are released under the Plan. (Kruger Direct ¶ 204; Hamzehpour Direct ¶ 14;
*see also* Plan Arts. I.A.282, IV.B.c.)

286.    This forbearance increased the amount that Ally was willing to contribute to the
Plan through the Ally Contribution because it will facilitate Ally's reaching a settlement with
certain of Ally's insurers regarding coverage issues. (Kruger Direct ¶ 204.)  The Ally
Contribution includes the first $150,000,000 received by Ally for any D&O or E&O policy
claims it pursues against its insurance carriers related to the Claims released in connection with
the Plan. (Plan Art. I.A.19.)  The willingness of the Debtors' officers and directors to forego
coverage directly increased the Ally Contribution by $150,000,000. (Kruger Direct ¶ 174.)

287.    The Debtors' officers and directors will also waive contractual claims, if any, for
indemnification that the Debtors' officers and directors may have against the Debtors and Ally
with respect to those Claims released under the Plan. (Hamzehpour Direct ¶ 14; *see also* Plan
Art. IV.B.c.)  As a result, Ally was willing to make a greater contribution to the Plan and the
Debtors and Ally were relieved of these contractual indemnification claims. (Kruger Direct
¶ 204.)

288.    By giving up their insurance and contractual indemnity claims, the Debtors'
officers and directors will have provided substantial consideration to the Debtors' Estates, which
is important to the success of the Plan. (Hamzehpour Direct ¶ 14.)

## C.    Exculpation

289.    The Plan provides that the Debtors, the Consenting Claimants, Ally, the
Committee and its members, the Consenting JSNs, the Junior Secured Notes Indenture Trustee,
the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured Notes Collateral

Agent, the Ad Hoc Group, and each of the foregoing entities' successors, assigns, members,

subsidiaries, officers, directors, partners, principals, employees and representatives (the

"Exculpated Parties"), will be exculpated from liability in connection with the negotiation and

documentation for any prepetition plan support agreements, the Plan Support Agreement, the

Plan, Disclosure Statement, FGIC Settlement, RMBS Settlement, the JSN Settlement, and any

other documents entered into in connection with the Plan, other than for gross negligence or

willful misconduct.  (Kruger Direct ¶ 206.)  All objections to the exculpation provisions have

been consensually resolved or otherwise withdrawn.

290.    The exculpation provision in the Plan covers the Exculpated Parties' conduct

subsequent to the filing of these Chapter 11 Cases and, to the limited extent relevant, the conduct

of certain Exculpated Parties before the cases commenced.  (Kruger Direct ¶ 207.)  Moreover,

the Exculpated Parties covered by the exculpation provision includes both estate fiduciaries, such

as the Debtors, the Committee, and the Debtors' officers and directors, as well as non-estate

fiduciaries, including the Consenting Claimants, the Consenting JSNs, the Junior Secured Notes

Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured

Notes Collateral Agent, the Ad Hoc Group, and Ally.  (*See id.*; Plan Art. I.A.102.)

291.    The Exculpated Parties played a meaningful role both prior to the Petition Date

through the negotiation and entry into various plan support agreements that eased the Debtors'

transition into Chapter 11, and after the Petition Date, in the mediation process, and through the

negotiation and implementation of the Global Settlement and Plan.  (Kruger Direct ¶ 208.)  The

Exculpated Parties made a substantial contribution to the Debtors' liquidation efforts and played

an integral role in working towards an expeditious resolution of this bankruptcy.  (*Id.*)  While the

Ad Hoc Group and the Junior Secured Notes Indenture Trustee engaged in significant litigation

with the Plan Proponents, the Consenting JSNs' agreement to accept the Plan and cease all

pending litigation provides significant benefits to the Debtors' Estates by avoiding the costs,

delays and risks associated with ongoing litigation.  In addition, the Debtors, while involved in

the negotiations with the officers and directors (including the independent directors who are

represented and advised by separate counsel) regarding the exculpation provisions specific to the

Debtors' officers and directors, understood that the directors' and officers' agreement to waive

their right to insurance coverage and contractual indemnification under the plan was expressly

conditioned on their receipt of exculpations for both pre- and postpetition conduct.  (*Id.*)

### D.    The Injunction

292.    The injunction provisions set forth in Article IX.I of the Plan are necessary to

preserve and enforce the Debtor Releases, the Third Party Releases, and the exculpation

provisions in Article IX of the Plan, and are narrowly tailored to achieve that purpose.  (*See* Plan

Art. IX.I)

### E.    The Judgment Reduction

293.    In fifteen of the RMBS-related litigations against the Debtors or Ally, their co-

defendants included unaffiliated underwriters whose alleged liability is premised on the Debtors'

RMBS securitizations.  (Lipps Direct ¶ 91, ¶ 96 (listing litigations in which unaffiliated

underwriters are co-defendants).)  Because their purported liability in those suits is premised on

alleged misstatements in the Debtors' RMBS offering materials, and due to certain contractual

indemnities, thirteen unaffiliated underwriter co-defendants may have valid contribution or

indemnification claims against the Debtors or Ally in connection with those cases: Bank of

America, Barclays, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JP

Morgan, Lehman Brothers, Morgan Stanley, Merrill Lynch, RBS, UBS, and Merrill Lynch.  (*Id.*

¶ 91.)  These underwriters each filed proofs of claim against the Debtors for indemnification or contribution.  (*Id.*)

294.    Under the Plan, any claims for contribution or indemnification these unaffiliated underwriters may have against Ally arising from or related to the Debtors will be released.  (*Id.* ¶ 92.)  These unaffiliated underwriters are represented by sophisticated counsel and have appeared in this bankruptcy.  (*Id.*)  None of them has objected to the Third party Release.  Three of them (Credit Suisse, Morgan Stanley, and RBS) voted to reject the Plan.  (*Id.*)

295.    In light of the releases of contribution or indemnification claims against Ally, the Plan provides that any co-defendants in RMBS-related securities litigation with a valid contribution or indemnification claim against Ally that is subject to the Third party Releases shall be entitled to a judgment credit in the underlying litigation in accordance with, and to the extent permitted under, applicable statutory or common law, as determined by a court of competent jurisdiction.  (*Id.* ¶ 93.)  Certain counsel for unaffiliated underwriters were actively involved in drafting the Plan's judgment reduction language.  (*Id.*)

296.    The district court's approval of the NJ Carpenters Settlement similarly provides that the unaffiliated underwriter co-defendants "shall be entitled to appropriate judgment reduction . . . in accordance with and to the extent permitted under applicable law."  (PX 677 ¶ 20.)  The unaffiliated underwriter co-defendants in the NJ Carpenters litigation consented to the settlement order (and the judgment reduction language) in that case.  (Lipps Direct ¶ 94.)

297.    In addition to the FHFA settlement with the Debtors described above, the FHFA has entered into a settlement with Ally.  (*Id.* ¶ 95.)  On November 5, 2013, Ally and the FHFA submitted a joint motion for voluntary dismissal of the FHFA action against Ally.  (PX 673.) The proposed order submitted to the district court in connection with that motion provides that

the unaffiliated underwriter co-defendants shall receive "a judgment credit in an amount that is

the greater of (a) the amount of Plaintiff's settlement with the Ally Defendants in this Action that

FHFA allocated to the relevant security . . . or (b) for each such claim, state or federal, on which

contribution or indemnity is available, the proportionate share of each of the Ally Defendant's

fault as proven at trial."  (PX 674 at 3–4.)

### F.    Releases Related to Continuing Obligations

298.    The Plan provides that the Debtors shall perform any of their remaining

obligations under the DOJ/AG Settlement (other than certain obligations assumed by Ocwen

Loan Servicing, LLC, and Walter Investment Management Corporation), and the Consent Order.

(Kruger Direct ¶ 198.)  The Liquidating Trust shall assume any and all rights and remaining

obligations of only the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order

of Assessment.  (*Id.*)

299.    On the Effective Date, upon the appointment of the Liquidating Trust Board, the

persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as

the case may be, will be released from all further authority, duties, responsibilities, and

obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases.  (*Id.*

¶199.)  Upon such release and discharge, the Liquidating Trust Board will be charged with the

authority, duties, responsibilities, and obligations relating to and arising from operations of the

Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities,

and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims

Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims

Distribution, in each case as provided in the Plan.  (*Id.*)

300.     As described above, the consideration provided by the Debtors' current and former officers and directors in exchange for the release discussed in this section includes their forbearance regarding any claims for coverage they may have under any D&O or E&O policies covering the Debtors or their officers and directors between November 2006 and the Effective Date, and their forbearance regarding any contractual claims for indemnification that they may have against Ally or the Debtors.  (Kruger Direct ¶ 200.)  The Plan releases the Debtors' current and former officers and directors from any post-Effective Date liability, thereby preventing certain of these individuals, as a practical matter, from performing the Continuing Obligations described in this section post-Effective Date.  (*Id.*)

301.     Notwithstanding anything to the contrary herein, nothing in the Plan shall release, enjoin, or preclude the Debtors' officers and directors from pursuing any rights they may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering officers and directors of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released by the Plan and the Confirmation Order.  (*Id.* ¶ 201.)  Nothing in the Plan expands or reduces any existing indemnification rights or rights as an "insured" for any officer or director of the Debtors for claims that are not released by the Plan.  (*Id.*)  No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors.  (*Id.*)

## VIII.   FINDINGS RELEVANT TO THE JSN SETTLEMENT

302.     The Plan, filed by the Plan Proponents on December 3, 2013, incorporates the terms of the JSN Settlement among the Plan Proponents and the Ad Hoc Group (together with

the Junior Secured Notes Indenture Trustee, the "JSN Objectors"), reached after the close of

evidence in the Confirmation Hearing and Phase II of the JSN Adversary Proceeding. (Kruger

Supp. Decl. ¶¶ 1, 6–7.) The material terms of the JSN Settlement, which resolves the most

significant outstanding objection to confirmation, can be described as follows:

- In addition to payment in full of outstanding principal and pre-petition interest, holders of Junior Secured Notes Claims will receive under the Plan an additional $125 million in full satisfaction of all amounts allegedly due and owing with respect to the Junior Secured Notes Claims, including postpetition interest, fees, costs, expenses, and indemnities, subject to the Plan becoming effective. (Plan Arts. I.A.155, III.D.1.c, III.D.2.c, III.D.3.c, IV.A.)

- The Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured Notes Collateral Agent, and those holders of Junior Secured Notes who originally voted to accept (or have subsequently changed their votes to accept) the Plan, the Ad Hoc Group, and their respective successors and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, affiliates and Representatives, will be considered "Debtor Released Parties" and "Exculpated Parties" under the Plan. (Plan Arts. I.A.75, I.A.102.)

- As set forth in more detail in Article IX.G of the Plan, the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent, and each of their successors and assigns, members (but with respect to the members of the Ad Hoc Group, to the extent such member previously voted to reject the Plan, only if such member is a Consenting JSN as of the Confirmation Date), partners, advisors, and Representatives, each solely in their capacities as such, will be deemed to have exchanged mutual releases with each other and the Debtors, the Committee, each of the Consenting Claimants and the Ally Released Parties, and each of their successors and assigns, members, partners, advisors and Representatives, in their capacities as such, for Claims and Causes of Action arising from or related to the Debtors. (Plan Art. IX.G.)

- Upon the Effective Date of the Plan, all claims, counterclaims, and/or issues raised in the JSN Adversary Proceeding and the FGIC Settlement Appeal shall be deemed finally and irrevocably settled by the Plan. (Plan Art. IV.J.)

(Kruger Supp. Decl. ¶ 8.)

A.      **The JSN Settlement Is in the Best Interests of the Debtors' Estates**

303.    The JSN Settlement is fair, equitable, in the best interests of the Debtors' Estates

and satisfies the standards for approval of settlements under Bankruptcy Rule 9019 laid out by in

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478

F.3d 452, 462 (2d Cir. 2007).  (Kruger Supp. Decl. ¶ 11.)  No objections to the JSN Settlement

were filed.

1.      *The Balance Between the Litigation's Possibility of Success and the
                Settlement's Future Benefits.*

304.    A balancing of the possibility of success on the merits and benefits of the JSN

Settlement weighs in favor of the Court approving the JSN Settlement.  (*Id.* ¶ 12.)

305.    The principal issues in the JSN Adversary Proceeding and these confirmation

proceedings are (i) whether the holders of Junior Secured Notes are oversecured such that they

are entitled to postpetition interest and (ii) whether and the extent to which the JSN Objectors are

entitled to reimbursement of the fees, costs and other expenses they have incurred during the

course of these cases.  (*See* Phase I Opinion at 1; Kruger Supp. Decl. ¶ 13.)  The JSN Objectors

have asserted that, as of December 15, 2013, outstanding postpetition interest at the default rate

will be approximately $342 million.  (Phase I Opinion at 115; Kruger Supp. Decl. ¶ 13)  The JSN

Objectors estimate that, in addition, their legal expenses alone will be in excess of $60 million.

(*See* Phase II PTO ¶ 371.)

306.    A determination of whether the holders of Junior Secured Notes Claims are

oversecured and entitled to postpetition interest will require the resolution of numerous hotly

contested issues of both law and fact.  (Kruger Supp. Decl. ¶ 14.)  The litigation among the Plan

Proponents and the JSN Objectors has been extensive and hard-fought and has involved the

following:

- More than 200 pages of briefing on motions to dismiss claims and counterclaims which were resolved by two separate opinions of the Court. (*See* ECF No. 13-01277 Doc. ## 74, 100.)

- 110 pages of Phase I fact stipulations and contentions. (*See* ECF No. 13-01277 Doc. # 161.)

- Multiple motions in limine to exclude the testimony of various proffered experts in connection with Phase I. (*See* ECF No. 13-01277 Doc. ## 107, 109.)

- A Phase I trial that lasted six days, involved the submission of written testimony from thirteen witnesses and the admission of more than 700 exhibits. (*See* Phase I Opinion.)

- More than 500 pages of Phase I post-trial legal briefing and proposed findings of fact. (*See* ECF No. 13-01277 Doc. ## 185, 186, 187, 190, 191.)

- A 117 page memorandum opinion of the Court including findings of fact and conclusions of law after the conclusion of the Phase I trial. (*See* ECF No. 13-01277 Doc. # 228.)

- 177 pages of Phase II fact stipulations and contentions. (*See* Phase II PTO.)

- More than 275 pages of legal briefing by the Plan Proponents and the JSN Objectors in connection with Phase II/Plan confirmation issues. (*See* ECF Doc. ## 5443, 5718, 5720, 5913.)

- Multiple motions in limine to exclude the testimony of various proffered experts in connection with Phase II of the JSN Adversary Proceeding and the Confirmation Hearing. (*See* ECF No. 13-01277 Doc. ## 200, 202.)

- A Phase II/Confirmation Hearing that lasted five days, involved the submission of written testimony of thirty-one witnesses and the admission of 900 exhibits into evidence (in addition to the more than 700 exhibits admitted during Phase I).

(Kruger Supp. Decl. ¶ 14.)

307.    Many of the issues in dispute in the JSN Adversary Proceeding were addressed by the Court in the Phase I Opinion, but in the absence of the JSN Settlement the Debtors expect many of the issues to be the subject of appeals upon the entry of a final judgment in the JSN Adversary Proceeding. (*Id.* ¶ 15.)

308.    In addition to the issues that were litigated during Phase I, there are numerous

hotly contested legal and factual issues that, absent a consensual resolution, would need to be

resolved by the Court in connection with Phase II of the JSN Adversary Proceeding and

confirmation of the Plan.  (*Id.* ¶ 16.)  Those issues include, but are not limited to:

- Whether the Debtors have the authority to waive Intercompany Balances and release claims against Ally under the Plan without the consent of the holders of the Junior Secured Notes Claims.

- Whether the waiver of Intercompany Balances under the Plan is reasonable and in the best interests of the Debtors' Estates.

- Whether the holders of Junior Secured Notes Claims are entitled to adequate protection or some other form of compensation as a result of the Plan's waiver of Intercompany Balances and release of claims against Ally.

- Whether the holders of Junior Secured Notes Claims are secured by liens on the Intercompany Balances and the extent to which, if any, those liens have value.

- Whether the holders of Junior Secured Notes Claims are secured by liens on any claims that the Debtors may hold against Ally.

- Whether, and the extent to which, the Court is required to allocate any portion of the Ally Contribution to any claims upon which the JSN Objectors purport to have liens.

- Whether the Ally Contribution is a "new asset" for purposes of Section 552(a) of the Bankruptcy Code.

- Whether, for purposes of Section 552(b) of the Bankruptcy Code, any portion of the Ally Contribution can be considered "proceeds, products, offspring, or profits" of any assets on which the holders of Junior Secured Notes Claims held pre-petition liens.

- Whether the "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code should preclude any of the liens held by the holders of Junior Secured Notes Claims from attaching to any portion of the Ally Contribution.

- Whether the Plan's settlements of the claims of the Monolines, the RMBS Trustees and investor securities claims are permissible or whether such

settlements violate Section 510(b) of the Bankruptcy Code or otherwise cause the Plan to violate the absolute priority rule.

- Whether the holders of Junior Secured Notes Claims, even if undersecured, are entitled to collect postpetition interest through the aggregation of recoveries on account of their deficiency claims.

- If the holders of Junior Secured Notes Claims are entitled to collect postpetition interest, whether such postpetition interest accrues at the contractual default rate, contractual non-default rate or some other rate.

- Whether, and the extent to which, the holders of Junior Secured Notes Claims are entitled to reimbursement of fees, costs, and other expenses incurred in connection with these cases.

(Kruger Supp. Decl. ¶ 16; s*ee also generally* Phase II PTO.)

309.    All of the foregoing issues (and many sub-issues subsumed within) have been hotly contested and expose the Debtors and their Estates to significant risk.  (Kruger Supp. Decl. ¶ 17.)  Many of the issues involve disputed issues of law or turn on heavily disputed issues of fact.  (*Id.*)  The JSN Objectors need not prevail on all of those issues, and, in some cases, need only prevail on a few, for the holders of Junior Secured Notes Claims to be entitled to compensation and/or reimbursement of more than $400 million for postpetition interest and professionals' fees incurred during the course of these cases.  (*Id.*)  If unsuccessful, it is expected that the JSN Objectors would appeal and seek to stay the effectiveness of any Confirmation Order, thereby creating further obstacles to the Debtors' efforts to promptly conclude these Chapter 11 Cases.  (*Id.*)

310.    In exchange for, among other things, the payment of an additional $125 million in cash, the JSN Settlement allows the Debtors to avoid those risks and uncertainties and to avoid the incurrence of additional costs and expenses associated with continued litigation through appellate and related proceedings.  (*Id.* ¶ 18.)

311.    In light of the substantial reduction in the Debtors' potential liability for postpetition interest and professional fees, costs and expenses, and the certainty afforded to the Debtors and their creditors provided by the JSN Settlement, a balancing of the risks presented by the cost of continued litigation and uncertainty of a successful outcome against the benefits of the JSN Settlement weighs in favor of approving the JSN Settlement as part of the Plan. (*Id.* ¶ 19.)

### 2.    *The Likelihood of Complex and Protracted Litigation*

312.    Even though there has already been progress towards the resolution of the issues presented in the JSN Adversary Proceeding in the form of the Phase I Opinion, a final resolution has not been reached. (*Id.* ¶ 20.) Absent approval of the JSN Settlement, the parties would be required to submit post-trial legal briefs and proposed findings of fact in connection with Phase II and confirmation. (*Id.*) And even after the Court issues a ruling on the Phase II and confirmation issues, the Court would still be required to resolve significant issues relating to the JSN Objectors' request of more than $60 million in professional fees (an issue that was deferred until after confirmation). (*Id.*)

313.    Given the extent to which the parties have litigated disputed issues in these Cases to date (*see* Section VIII.A.1 above), it is likely that, in the absence of a consensual resolution, active litigation will continue throughout the appellate process, causing the Plan Proponents to incur significant additional legal expenses. (*Id.* ¶ 21.)

314.    As a result, absent approval of the JSN Settlement, the Debtors will continue to face protracted and expensive litigation. (*Id.* ¶ 22.)

     3.     *The JSN Settlement Is in the Interests of Creditors and Is Supported by Significant Creditors and Other Parties-in-Interest*

315.    In exchange for, among other things, a cash payment in the amount of $125 million, the JSN Settlement allows the Debtors' Estates to avoid the risks and uncertainties associated with continued litigation against the JSN Objectors which could, if the Plan Proponents are not successful, result in the Debtors' Estates being required to pay the holders of Junior Secured Notes Claims up to approximately $400 million in postpetition interest, fees, costs and expenses.  (*Id.* ¶ 23.)

316.    The JSN Settlement permits the Plan Proponents to avoid the significant costs that they would incur as a result of continued litigation in the absence of a consensual resolution.  (*Id.* ¶ 24.)

317.    The JSN Settlement will also facilitate the effectiveness of the Plan and avoid any disputes that could arise concerning the Debtors' establishment of reserves pending appeal, thereby expediting distributions to creditors.  (*Id.* ¶ 25.)

318.    The JSN Settlement has the support of the Committee and the Consenting Claimants, representing substantially all of the major constituencies in these Chapter 11 Cases.  (*Id.* ¶ 26.)

     4.     *The Settling Parties Were Counseled by Experienced and Skilled Counsel and Advisors*

319.    The parties to the JSN Settlement are represented by highly experienced and skilled counsel and advisors.  (Kruger Direct ¶ 175–77; Kruger Supp. Decl. ¶ 28.)

320.    The Debtors are represented by Morrison Foerster, FTI Consulting, and Centerview Partners.  (Kruger Direct ¶ 175; Kruger Supp. Decl. ¶ 29.)

321.    The Committee is represented by Kramer Levin Naftalis & Frankel, Moelis, and Alix Partners.  (Kruger Direct ¶ 176; Kruger Supp. Decl. ¶ 29.)

322.    The JSN Objectors are represented by Akin Gump Strauss Hauer and Feld, Milbank Tweed Hadley and McCloy, White & Case, Zolfo Cooper, LLC, and Houlihan Lokey. (Kruger Supp. Decl. ¶ 29.)

   5. *The JSN Settlement Is the Product of Arm's-Length Bargaining*

323.    The JSN Settlement is the product of good faith and arm's-length negotiations. (*Id.* ¶ 30.)

324.    The JSN Settlement was reached under the direct supervision of Judge Peck as mediator after months of negotiations which continued throughout the litigation process.  (*Id.* ¶ 31.)

325.    Moreover, the litigation preceding the JSN Settlement has been lengthy and contentious, removing any doubt that the parties to the JSN Settlement were vigorously asserting their own interests, in direct opposition to their adversaries, who were doing the same.  (*Id* ¶ 32.)

   6. *The Nature and Breadth of the Releases*

326.    The JSN Settlement provides for the JSN Released Parties to become Debtor Released Parties under the Plan (Plan Art. I.A.75) and to be deemed to have exchanged mutual releases with each other and the Debtors, the Committee, the Consenting Claimants, and the Ally Released Parties (Plan Art. IX.G).  (*See* Kruger Supp. Decl. ¶ 33.)  Those releases are consensual and appropriate in light of the significant benefits being provided to the Debtors, their Estates and their creditors through the JSN Settlement.  (*Id.*)

327.    In addition, the JSN Settlement provides for the JSN Released Parties to be become Exculpated Parties under the Plan.  (*Id.* ¶ 34; Plan Art. I.A.102.)  The Debtors, their Estates and creditors are receiving significant consideration under the JSN Settlement Agreement in exchange for the JSN Released Parties becoming Exculpated Parties under the Plan, including, among other things (i) the fixing of the Junior Secured Notes Claims for postpetition interest,

fees, costs and expenses at an amount significantly below the asserted amounts by the JSN

Objectors, (ii) the avoidance of the significant costs and expenses that the Plan Proponents would

incur on behalf of the Debtors' Estates should the litigation with the JSN Objectors continue, and

(iii) the facilitation of a prompt and orderly exit from Chapter 11 without the costs, risks, and

delays associated with continued litigation through the appellate process.  (*Id.* ¶ 34.)

### B.    The JSN Settlement Avoids the Need for a Cramdown of Junior Secured Notes Classes

328.    The Consenting JSNs who have changed their votes to accept the Plan have

caused classes R-3, GS-3, and RS-3 (the "JSN Classes") to be accepting classes for purposes of

Section 1126(g) of the Bankruptcy Code because such Consenting JSNs hold at least two-thirds

in amount and more than one-half in number of the allowed claims in such classes.  (*Id.* ¶ 35; *see

also* ECF Doc. # 6058 ¶ 9.)

329.    Accordingly, the Plan complies with section 1129(a)(8) of the Bankruptcy Code

with respect to the JSN Classes and, as a result, the Plan Proponents need not satisfy the

requirements of section 1129(b) with respect to those classes.  (Kruger Supp. Decl. ¶ 36.)

Indeed, all of the JSNs that voted on the Plan voted to approve the Plan.  (Marinuzzi Supp. Decl.,

ECF Doc. # 6061, ¶¶ 5–8.)

### C.    No Further Re-Solicitation of the Plan Is Required

330.    Confirmation of the solicitation version of the Plan was not conditioned on

disallowance of postpetition interest on account of Junior Secured Notes Claims and expressly

contemplated that the Junior Secured Notes Claims could be awarded postpetition interest should

the JSN Objectors prevail in the JSN Adversary Proceeding.  (*Id.* ¶ 37; *see also, e.g.*, Disclosure

Statement at 181.)

126

331.     The Disclosure Statement expressly disclosed to creditors that the Plan

Proponents were engaged in litigation with the JSN Objectors concerning their entitlement to

postpetition interest and, as a result, were the Court to determine that such holders are entitled to

postpetition interest, recoveries to other creditors in these cases would be lower than the amounts

projected under the Disclosure Statement.  (Kruger Supp. Decl. ¶ 38; Disclosure Statement at

48.)

332.     In addition, no re-solicitation of the Plan is required because the Plan Proponents

are not expecting any material change in anticipated recoveries to holders of General Unsecured

Claims after payment of the additional $125 million to the Junior Secured Noteholders as a result

of the JSN Settlement.  (Kruger Supp. Decl. ¶ 39.)  Because the Debtors have been

outperforming projections on certain asset recoveries and expenses to date, the Debtors currently

expect that the recoveries available to satisfy the claims of general unsecured creditors receiving

Units under the Plan will likely remain substantially similar to what was reflected in the recovery

analysis in the Disclosure Statement.  (*Id.*)

333.     Accordingly, the JSN Settlement does not provide for any material modifications

to the Plan that require a re-solicitation of votes.  (*Id.* ¶ 40.)

**D.     The Objection of Wells Fargo as Collateral Agent**

334.     The JSN Settlement also resolves the objection of Wells Fargo, who objected to

the Plan in its capacities as First Priority Collateral Agent, Third Priority Collateral Agent, and

Collateral Control Agent for the Junior Secured Notes (the "Collateral Agent").  (*Id.* ¶ 41; s*ee*

Objection of Wells Fargo, ECF Doc. # 5410.)

335.     The Collateral Agent's objection arose from the Plan Proponents' disputes with

the Ad Hoc Group, which have since been resolved pursuant to the JSN Settlement.  (Kruger

Supp. Decl. ¶ 42.) The Collateral Agent's release of liens and security interests securing the

Junior Secured Notes was at issue in the JSN Adversary Proceeding.  (*Id*.)  The Collateral Agent

objected to the Plan, citing concerns that the Ad Hoc Group and UMB Bank could assert claims

against it in connection with those lien and security interest releases.  (*Id*.)  The Collateral Agent

alleged that, to the extent such claims were asserted, the Debtors would be required to indemnify

it.  (*Id*.)  In light of those potential claims, the Collateral Agent also objected to the Plan's Third

Party Release.  (*Id*.)  The Collateral Agent alleged that it potentially had independent claims

against non-Debtors upon whom it relied in releasing liens and security interests, and that such

claims would be impermissibly extinguished by the Third Party Release.  (*Id*.)

336.    From time to time the Collateral Agent was directed to execute releases of liens

and security interests granted under the Revolver Security Agreement.  (Pinzon Direct, ECF Doc.

# 5921, ¶ 16; Farley Direct, ECF No. 13-01277 Doc. # 131, ¶ 44.)

337.    The Junior Secured Notes Indenture provides that the liens and security interests

under the Notes Security Agreement may be released in accordance with the Intercreditor

Agreement and also under certain enumerated circumstances.  (PX 1 § 8.04; Farley Direct ¶ 16.)

338.    In executing releases of liens and security interests granted under the Notes

Security Agreement, the Collateral Agent was entitled to rely conclusively on Officer's

Certificates and Opinions of Counsel delivered to it.  (PX 4 § 10; Pinzon Direct ¶ 25.)

339.    Each of the Officer's Certificates delivered to the Collateral Agent (i) stated the

authorization of the signatory to execute and deliver the Officer's Certificate; (ii) requested the

release of liens and security interests on certain Collateral; and (iii) stated that the conditions

specified in section 8.04 of the Junior Secured Notes Indenture applicable to the release of liens

and security interests on the Collateral had been satisfied.  (Pinzon Direct ¶ 26.)

340.    Each of the Opinions of Counsel delivered to the Collateral Agent (i) stated that

the signatory was counsel; (ii) stated that the signatory examined the Security Agreement,

Indenture, and the Officer's Certificate; and (iii) opined that the Officer's Certificate was in the

form required by section 8.04 of the Junior Secured Notes Indenture and that no other documents

were required to be delivered to the Collateral Agent or the Indenture Trustee as a condition to

the requested release of liens and security interests on the collateral.  (*Id.* ¶ 27.)

341.    The Collateral Agent testified, and no witness in this case has testified to the

contrary, that the Collateral Agent acted in good faith and in accordance with its duties,

obligations, and responsibilities under the AFI Revolver, the Revolver Security Agreement, the

Intercreditor Agreement, the Junior Secured Notes Indenture, and the Notes Security Agreement.

(*See generally* Pinzon Direct.)

342.    The JSN Settlement resolves the Collateral Agent's objection, because that

objection's sole concern is liability derivative of the Debtors' disputes with the Ad Hoc

Group.  (Kruger Supp. Decl. ¶ 43.)   Under the Plan, the Collateral Agent is named as one of the

Debtor Released Parties and an Exculpated Party, and The Collateral Agent will be protected

from potential claims in accordance with Plan Article IX.G and the Confirmation Order.

## IX.    REMAINING BORROWER OBJECTIONS

343.    There are six unresolved borrower-related objections purporting to oppose

confirmation of the Plan:  Kevin C. Kovacs (ECF Doc. # 5264); David R. Munger (ECF Doc.

# 5273); Caren Wilson (ECF Doc. # 5409); Richard Rode (ECF Doc. # 5414); Paul N. Papas II

(ECF Doc. # 5466); and Deborah D. Bennett (ECF Doc. # 5522).  (*see* Kruger Supp. Decl. ¶ 46.)

The objections filed by Mr. Papas and Ms. Bennett were filed after the Objection Deadline of

October 21, 2013 at 4 p.m. Prevailing Eastern Time, and those individuals neither requested an

extension from the Plan Proponents nor received authorization from the Court to file after that

Objection Deadline.  (*Id.*)

344.    The unresolved borrower-objections filed by Ms. Wilson, Mr. Rode, and Mr.

Papas were joinders to the now-withdrawn objection filed by Wendy Nora (ECF Doc. # 5398).

(*See* Kruger Supp. Decl. ¶ 47.)  None of the individuals who filed joinders presented any

evidence bearing on confirmation, and only one of them, Mr. Rode, actively participated in the

confirmation hearing.  (*Id.*)  Counsel for both the Debtors and the Committee have been—and

continue to be—engaged in discussions with Mr. Rode and his counsel and with Ocwen, who is

now the servicer for Mr. Rode's mortgage loan, regarding his concerns about his mortgage loan

and whether the proofs of claim Mr. Rode filed against the Debtors and his Plan objection can be

consensually resolved.  (*Id.*)

345.    Ms. Nora's objection raised four issues.  First, she argued that the Plan was not

proposed in good faith.  (*Id.* ¶ 48.)  The Plan Proponents submitted uncontested evidence that the

Plan was developed through lengthy good faith negotiations, which were conducted under the

supervision of Judge Peck.  (Kruger Direct ¶ 25; Dubel Direct ¶ 43.)  The Plan Proponents have

also submitted uncontested evidence that the Plan is intended to provide creditors with an

expeditious distribution of estate assets in compliance with the Bankruptcy Code and applicable

non-bankruptcy law, and has overwhelming creditor support.  (*See generally supra* §§ II, VI.A.)

346.    Second, Ms. Nora asserted that the Plan does not comply with the requirements of

Bankruptcy Code section 1125, and that the Plan Proponents provided inadequate notice of the

confirmation proceedings.  (Kruger Supp. Decl. ¶ 49.)  Ms. Nora raised identical arguments at

the hearing to approve the Disclosure Statement, which the Court overruled, holding that the

Disclosure Statement contained adequate information pursuant to Section 1125 of the

Bankruptcy Code.  (Aug. 21, 2013 Hearing Tr. 122:24–25.)  Also, as set forth in the uncontested

Voting Certification, the Disclosure Statement, appropriate ballots, notices, and related

solicitation materials were distributed to all parties in accordance with the terms of the

Disclosure Statement Order.  (*See generally* Voting Certification.)  The date and time of the

voting deadline and confirmation hearing were also published in the *Wall Street Journal* and

*USA Today* on September 3, 2013.  (*See* ECF Doc. # 5025.)

347.    Third, Ms. Nora argued that the funding of the Borrower Claims Trust was

inadequate, and that the Plan inappropriately treats Borrower Claims as a separate class of

general unsecured claims.  (Kruger Supp. Decl. ¶ 50.)  Borrower Claims are qualitatively

different from those of other general unsecured claimants, thus warranting their separate

classification.  (*See* Thompson Direct ¶¶ 3, 10–21.)  Under the Plan, Borrowers are receiving

cash, rather than Liquidating Trust Units, and to the extent appropriate, the Borrower Claims

Trust will implement and utilize alternative dispute resolution procedures to allow for the

specialized resolution of Borrower Claims.  (Kruger Supp. Decl. ¶ 50.)  Borrower Claims will

receive a distribution under the Plan that is estimated to be equivalent to that received by other

general unsecured creditors at the same Debtor Group.  (*Id.*)  Also, none of the individuals that

filed joinders to Ms. Nora's objection were in classes that voted to reject the Plan, and thus they

lack standing to object to the Plan on the basis that it does not satisfy Section 1129(b) of the

Bankruptcy Code, which only applies to impaired rejecting classes.  (*Id.*)

348.    Fourth, Ms. Nora objected on the grounds that the Third Party Release under the

Plan is unjustified.  (*Id.* ¶ 51.)  There is no evidence that the individuals joining Ms. Nora's

objection hold claims against Ally that are being released under the Plan.  Also, the Plan

Proponents submitted uncontested evidence during the confirmation hearing that the Third Party

Release should be granted.  (*See* Kruger Direct ¶¶ 194–97; s*ee also generally* Marano Direct; Carpenter Direct; *supra* § VII.)

349.    The individuals who filed the three remaining unresolved borrower-related objections, Mr. Kovacs, Mr. Munger, and Ms. Bennett, also did not actively participate in the confirmation hearing or present any evidence bearing on confirmation.  (Kruger Supp. Decl. ¶ 52.)  Mr. Kovacs filed a proof of claim against the Debtors (Claim No. 1275) that was expunged pursuant to the *Order Granting Debtors' Fiftieth Omnibus Objection To Claims (No Liability Borrower Claims – Books And Records)* (ECF Doc. # 5892).  (*See* Kruger Supp. Decl. ¶ 52.)  Mr. Munger and Ms. Bennett have not filed any claims against the Estates, nor is there any evidence that they hold claims against Ally.  (*Id.*)

350.    SilvermanAcampora LLP, special counsel to the Committee for borrower matters, attempted to contact each of these individuals to ascertain the basis for each of their objections, which do not articulate any specific basis for denying confirmation of the Plan, but such efforts were unsuccessful.  (*Id.* ¶ 53.)

## X.    WAIVER OF THE RULE 3020(e) STAY

351.    Waiver of the fourteen day stay of effectiveness of the Confirmation Order contained in Bankruptcy Rule 3020(e) is appropriate.  (Kruger Supp. Decl. ¶ 54.)[25]  The Plan is nearly consensual with only six parties continuing to prosecute their objections to the Plan: (i) three borrowers who filed joinders to the withdrawn objection to the Plan filed by Wendy Alison Nora, namely Caren Wilson, Richard Rode, and Paul Papas, and (ii) three standalone borrowers, namely Kevin Kovacs, David  Munger and Deborah Bennett.  (*Id.*)  As a practical matter, the

---

[25]    To the extent applicable, it is appropriate for the Court to waive any stay provided for under any other applicable Bankruptcy Rule, such as Rules 6004(h) or 6006(d).

party most likely to have appealed entry of the Confirmation Order, the Ad Hoc Group, is now a

consenting party supporting the Plan. (*Id.*)

352.    The business deal reached among the parties to the JSN Settlement weighs in

favor of waiver of the Rule 3020(e) stay. (*Id.* ¶ 55.) The parties to the JSN Settlement, approval

of which will result in a near global resolution of these complex Chapter 11 Cases, have made

the prompt effectiveness of the Confirmation Order—on or before December 24, 2013—a

condition to the effectiveness of that settlement. (*Id.*) If the Effective Date does not occur

promptly after entry of the Confirmation Order, some parties to the JSN Settlement believe that

there may be adverse tax consequences that could undermine and potentially abrogate the

settlement. (*Id.*) Ally has agreed to extend the Plan Support Agreement deadline for

effectiveness of the Plan to December 24, 2013. (*Id.*) All parties in interest have had notice of

the waiver of stay since November 12, 2013 and could have raised an objection anytime

thereafter, including at the confirmation hearing. (*Id.* ¶ 56.) No party has done so. (*Id.*) Due to

the lack of objection to the waiver, the lack of outstanding substantial objections to confirmation,

and the fact that the JSN Settlement, which provides a great benefit and certainty to the estate, is

conditioned on the waiver, it is appropriate and reasonable for the Court to grant the waiver of

the Rule 3020(e) stay. (*Id.*)


Dated: December 11, 2013
       New York, New York


_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge