## EXHIBIT 7

Claim #6897  Date Filed: 8/9/2013

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
**Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Ignacio Rodriguez**

☑ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Vito Torchia
Brookstone Law, PC
4000 MacArthur Blvd., Suite 1110
Newport Beach, CA 92660

**Court Claim Number:** 3252
*(If known)*

Filed on: 11/9/2012

Telephone number: 800-946-8655 ext. 709       email: bankruptcy@brookstonelaw.com

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:       email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

**1. Amount of Claim as of Date Case Filed:** $   **1,300,000.00**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Claims, including fraud related to mortgage origination
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|
| ___ ___ ___ ___ | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

**Value of Property:** $_____  **Annual Interest Rate**_____% ☐ Fixed ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
if any: $_____       **Basis for perfection:** _____

**Amount of Secured Claim:** $_____       **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____       (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature: (See instruction #9)** Check the appropriate box.

☐ I am the creditor.   ☑ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or   ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
(See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Vito Torchia
Title: Managing Attorney
Company: Brookstone Law, PC
Address and telephone number (if different from notice address above):

(Signature)       8/8/2013
(Date)

**RECEIVED**

**AUG 0 9 2013**

**KURTZMAN CARSON CONSULTANTS**

Telephone number:       Email:

**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.

1212020130809000000000015

Plaintiff filed the initial complaint on May 9, 2012, and the first amended complaint on October 31, 2012. The case was dismissed on January 31, 2013. An initial proof of claim was filed on November 9, 2012.

Plaintiffs are submitting with this amended proof of claim as evidence an Amended Complaint in Support of the Amended Proof of Claim. In the interest of judicial economy, this summary incorporates by reference the Amended Complaint in Support of the Amended Proof of Claim that is attached to the amended proof of claim filed by Claimant Carolyn Hairston, Claim Number 3524. Ms. Hairston is a plaintiff along with this Plaintiff, and this Plaintiff joins her in the complaint.

1  Vito Torchia, Jr. (SBN244687)
   vjt@brookstonelaw.com
2  Sasan Behnood (SBN 250626)
   sbehnood@brookstonelaw.com
3  **BROOKSTONE LAW, PC**
   4000 MacArthur Blvd., Suite 1110
4  Newport Beach, California 92660
   Telephone: (800) 946-8655
5  Facsimile: (866) 257-6172
   E-mail: HairstonvAlly@BrookstoneLaw.com
6
7  Attorneys for Plaintiffs

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **COUNTY OF LOS ANGELES**

10

11  CAROLYN HAIRSTON, an individual;          Case No.:
    CHRISTINE PETERSEN, an individual;
12  WILLIAM MIMIAGA, an individual;           **AMENDED COMPLAINT IN SUPPORT OF**
    ROBIN GASTON, an individual;              **AMENDED PROOF OF CLAIM:**
13  PATRICK GASTON, an individual;
14  MARY SERRANO, an individual; SARAH        1.  **INTENTIONAL PLACEMENT OF**
    SEBAGH, an individual;                        **BORROWERS INTO DANGEROUS LOANS**
15  RICK ALBRITTON, an individual;                **THEY COULD NOT AFFORD THROUGH**
    DEBORAH ALBRITTON, an individual;             **COORDINATED DECEPTION, IN THE NAME**
16  VERONICA GREY, an individual;                 **OF MAXIMIZING LOAN VOLUME AND THUS**
    BRENDA MELLA, an individual;                  **PROFIT**
17  JOSELITO MELLA, an individual;
18  MICHAEL MAN, an individual; JUDY              **COUNT 1**- FRAUDULENT CONCEALMENT
    LIM, , an individual; DAVID CRUZ, an
19  individual; YESENIA CRUZ, an                  **COUNT 2**- INTENTIONAL
    individual; GREGORY BUCK, an                  MISREPRESENTATION
20  individual;
    CRISTINA PALBICKE, an individual;             **COUNT 3**- NEGLIGENT MISREPRESENTATION
21  KHALIL SUBAT , an individual;
    MANIJA SUBAT, an individual;                  **COUNT 4**- NEGLIGENCE
22  GENEVIE CABANG, an individual;
23  JULIO GONZALEZ, an individual; LISA           **COUNT 5**- UNFAIR, UNLAWFUL, AND
    SIMONYI , an individual; RICK EWALD,          FRAUDULENT BUSINESS PRACTICES
24  an individual; REGINA FAISON, an              (VIOLATION OF CAL. BUS. & PROF. CODE
    individual; ALEX IBARRA, an individual;       §17200)
25  MARIA ELENA DEL CID, an individual;
26  JULIO DEL CID, an individual; MESBEL      2.  **INDIVIDUAL APPRAISAL INFLATION**
    MOHAMOUD, an individual;
27  MICHAEL  MOULTRIE, an individual;             **COUNT 6**- INTENTIONAL
28                                                MISREPRESENTATION

                                                  **COUNT 7**- NEGLIGENT MISREPRESENTATION

                                                  **COUNT 8**- NEGLIGENCE

                                                  **COUNT 9**- UNFAIR, UNLAWFUL, AND
                                                  FRAUDULENT BUSINESS PRACTICES
                                                  (VIOLATION OF CAL. BUS. & PROF. CODE
                                                  §17200)

                                   i
─────────────────────────────────────────────────────────
       **AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

WILLIE GILMORE, an individual;
PHYLLIS MCCREA, an individual;
CECILIA CHAUBE, an individual;
MAGDALENA AVILA, an individual;
GRICELDA RUANO, an individual;
ELISA JORDAN, an individual; LOIS
TERRELL SULLIVAN, an individual;
GLORIA PORTILLO, an individual;
FLORASTENE HOLDEN, an individual;
MARCO BADILLA, an individual;
MANUELA BADILLA, an individual;
IGNACIO RODRIGUEZ, an individual;
ROSA RODRIGUEZ, an individual;
SALVADOR BARAJAS, an individual;
MARIA BARAJAS, an individual; BRIAN
FOOTE, an individual; OLAN ROSS, an
individual; EVELYN ROSS, an individual;
GARY JOHNSON, an individual;
JOELLYN JOHNSON, an individual;
RODELINA SANTOS, an individual; JUN
O. SANTOS, an individual; MICHAEL
BROWN, an individual; CLAUDINETTE
BROWN, an individual; MARTIN
KASSOWITZ, an individual; SHIRLEY
KAPLAN, an individual;
HENRY COMPLETO, an individual;
IRMA Laredo, an individual; MARCIA
WILLOUGHBY, an individual; VICTOR
PAZOS, an individual.

Plaintiffs,

vs.

ALLY BANK, N.A., f/k/a GMAC BANK,
a Utah Corporation, in its own capacity and
as an acquirer of certain assets and
liabilities of GMAC; GMAC, a National
Banking Association; ALLY FINANCIAL,
INC. f/k/a/ GMAC, LLC, a Delaware
Corporation; GMAC MORTGAGE
GROUP, INC., A Delaware Corporation;
RESIDENTITAL CAPITAL, LLC f/k/a
RESIDENTIAL CAPITAL
CORPORATION, a Delaware Corporation;
GMAC-RFC HOLDING COMPANY,

**3.   MARKET FIXING**

**COUNT 10** – FRAUDULENT CONCEALMENT

**COUNT 11** – NEGLIGENCE

**COUNT 12**- PRICE FIXING - VIOLATION OF
SHERMAN ACT 15 USC §1 ET SEQ.

**COUNT 13**- UNFAIR, UNLAWFUL, AND
FRAUDULENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE
§17200)

**4.   DECEPTION IN LOAN MODIFICATIONS**

**COUNT 14**- COUNT 14 : VIOLATION OF CAL.
CODE CIV. PROC. § 580B AND §726
PROHIBITING COLLECTION OF DEBT AFTER
ELECTING TO FORECLOSE

**COUNT 15** – FRAUDULENT CONCEALMENT

**COUNT 16** – INTENTIONAL
MISREPRESENTATION

**COUNT 17** – NEGLIGENT
MISREPRESENTATION

**COUNT 18**- RESCISSION OF CONTRACT
AND/OR RESTITUTION ON THE GROUNDS OF
FRAUD, AND/OR UNCONSCIONABILITY

**COUNT 19** – BREACH OF CONTRACT

**COUNT 20**- VIOLATION OF THE CRIER RULE
(CAL. CIV. CODE §2994G)

**COUNT 21**- UNFAIR DEBT COLLECTION
PRACTICES (VIOLATION OF CAL. CIV. CODE
§1788 ET SEQ)

**COUNT 22**- UNLAWFUL, UNFAIR &
FRAUDULENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE
§17200)

**5.   INTENTIONAL UNAUTHORIZED
FORECLOSURES PURSUED IN THE NAME
OF PROFIT**

**COUNT 23**- WRONGFUL FORECLOSURE

**COUNT 24**- UNFAIR, UNLAWFUL, AND
FRAUDULENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE
§17200)

**[JURY TRIAL DEMANDED]**

ii

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1

2

3

4

5

6

7

8

9

10

11

12

13

LLC d/b/a/ GMAC RESIDENTIAL FUNDING CORPORATION, a Delaware Corporation; RESIDENTIAL FUNDING COMPANY, LLC f/k/a RESIDENTIAL FUNDING CORPORATION, a Delaware Corporation; HOMECOMINGS FINANCIAL, LLC, a Delaware Corporation; EXECUTIVE TRUSTEE SERVICES DBA ETS SERVICES ,LLC, a Delaware limited liability company; HOME CONNECTS LENDING SERVICES, LLC, a Pennsylvania limited liability company; MTC FINANCIAL INC. d/b/a Trustee Corps, a California Corporation; and Does 1 through 1000 , inclusive.

      Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1

## TABLE OF CONTENTS

2     **NATURE OF ACTION**............................................................................................ - 1 -

3     **PARTIES**............................................................................................................... - 7 -

4         Plaintiffs.......................................................................................................... - 7 -

5         Defendants ...................................................................................................... - 7 -

6

7         Relationship of Defendants ............................................................................ - 11 -

8     **FIRST CAUSE OF ACTION: INTENTIONAL PLACEMENT OF BORROWERS INTO**
**DANGEROUS LOANS THEY COULD NOT AFFORD THROUGH COORDINATED**
9     **DECEPTION, IN THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT.. - 14 -**

10         Defendants Systematically Abused and Abandoned Industry Standard Underwriting
Guidelines to Intentionally Place Unqualified Borrowers into Loans Which
11         Defendants Knew They Could Never Afford........................................................ - 16 -

12

13         Defendants Turned Substantial Profits Through Their Borrowers' Default
Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible
14         and Unaffordable Loans .................................................................................... - 19 -

15         Defendants Intentionally Misrepresented, Partially Misrepresented, & Concealed
Highly Material Information In Order To Induce Plaintiffs to Unknowingly
16         Take Dangerous Loans So that Defendants Could Profit...................................... - 21 -

17

18            Authority to Bind.......................................................................................... - 29 -

19            Plaintiffs Reasonably Relied on Defendants' Numerous Deceptions in
Deciding to Enter into Contracts With Them............................................... - 30 -
20

21            Bank Defendants Owed Plaintiffs a Duty.................................................... - 32 -

22         COUNT 1: FRAUDULENT CONCEALMENT ................................................. - 37 -

23         COUNT 2: INTENTIONAL MISREPRESENTATION ...................................... - 38 -

24         COUNT 3: NEGLIGENT MISREPRESENTATION............................................ - 39 -

25         COUNT 4: NEGLIGENCE .................................................................................. - 39 -

26

27         COUNT 5 : UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE §17200)........................................ - 40 -
28

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

**SECOND CAUSE OF ACTION: INDIVIDUAL APPRAISAL INFLATION** ............................. - 42 -

    COUNT 6: INTENTIONAL MISREPRESENTATION ......................................................... - 48 -

    COUNT 7: NEGLIGENT MISREPRESENTATION ............................................................. - 49 -

    COUNT 8: NEGLIGENCE ..................................................................................................... - 49 -

    COUNT 9: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
    (VIOLATION OF CAL. BUS. & PROF. CODE §17200)......................................................... - 51 -

**THIRD CAUSE OF ACTION:  MARKET  FIXING** ........................................................... - 56 -

    COUNT 10: FRAUDULENT CONCEALMENT ................................................................. - 64 -

    COUNT 11: NEGLIGENCE ................................................................................................... - 65 -

    COUNT 12: PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ. ..... - 66 -

    COUNT 13:  UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES
    (VIOLATION OF CAL. BUS. & PROF. CODE §17200)......................................................... - 67 -

**FOURTH CAUSE OF ACTION: DECEPTION IN LOAN MODIFICATIONS** ........................ - 68 -

    Defendants' Scheme To To Extract Workout Payments From Borrowers In
    Distress And Then Foreclosing, As Opposed To Genuinely Offering Loan Modifications .... - 68 -

        Bank Defendants' Adhesive Workout Agreements Are Unconscionable ................... - 73 -

        Bank Defendants Fail To Withdraw Foreclosure Proceedings Even When Borrowers
        Have Made All Plan Payments Under The Workout Agreement ................................. - 74 -

    Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs'
    Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else ................................ - 76 -

    Defendants Used The Promise Of Loan Modifications As Bait For An Outright
    Cash-Grab With No Intent To Ever Modify Plaintiffs ............................................................. - 76 -

    COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726
    PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE.............. - 78 -

    COUNT 15 : FRAUDULENT CONCEALMENT ................................................................. - 79 -

    COUNT 16 : INTENTIONAL MISREPRESENTATION ..................................................... - 80 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

COUNT 17: NEGLIGENT MISREPRESENTATION.................................................................- 81 -

COUNT 18: RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY.............................................- 82 -

COUNT 19: BREACH OF CONTRACT .............................................................................- 82 -

COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G).................- 83 -

COUNT 21: UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ).........................................................................................- 83 -

COUNT 22: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES...........- 84 -

FIFTH CAUSE OF ACTION : INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT..............................................................................- 86 -

COUNT 23: WRONGFUL FORECLOSURE .....................................................................- 87 -

COUNT 24: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200).......................................................- 92 -

PRAYER FOR RELIEF ...........................................................................................................- 94 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

2

3                                  **NATURE OF ACTION**

4       1.    **Glossary**. As used herein…

5           a.   "DEFENDANTS" shall collectively refer to each and every Defendant named in this

6                action, who are alleged to have acted in coordinated conspiracy with one another.

7           b.   "BANK DEFENDANTS" shall refer to all Defendants acting to originate or service loans

8                including: GMAC Bank aka Ally Bank, GMAC Mortgage, GMAC Residential Funding

9                Corporation, Residential Funding Corporation, Homecomings Financial, LLC

10          c.   "ALLY DEFENDANTS" shall refer to all entities formerly owned by Ally Financial

11               Brothers Holdings.  In other words the term "ALLY DEFENDANTS" shall refer to all

12               Defendants with the exception of MERS and MTC Financial Inc., d/b/a Trustee Corps.

13          d.   "TRUSTEE DEFENDANTS" shall refer to Defendant Executive Trustee Services d/b/a

14               ETS Services, LLC and Defendant MTC FINANCIAL INC. d/b/a Trustee Corps,

15               collectively.

16          e.    "DOT" shall act as an abbreviation for the term: Deed of Trust

17      2.    This lawsuit arises from Defendants' wrongs and deception in inducing Plaintiffs to enter

18   into mortgages from 2003 through 2008 with the Bank Defendants, as well as deception in loan

19   modifications and wrongful foreclosure activities through current day.

20      3.    The gravamen of Plaintiffs' Complaint is that –Defendants had ceased acting as

21   conventional money lenders and instead morphed into an enterprise engaged in systematic fraud upon its

22   borrowers. With profit as their motive, the conspiracy of Defendants set out upon a massive and

23   centrally-directed fraud by which Defendants (1) placed the Plaintiff-homeowners into loans which

24   Defendants *knew* Plaintiffs could not afford and would default upon to a mathematical certainty, (2)

25   abandoned industry-standard underwriting guidelines, (3) concealed/misrepresented the terms of their

26   loans to borrowers to induce their unwitting consent, and (4) intentionally inflated the appraisal values

27   of homes throughout California in a market-fixing scheme – all for the sole purpose of herding as many

28   borrowers as they could into the largest loans possible which Defendants would then sell on the

                                          - 1 -
                  **AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

secondary market at inflated values for unimaginable profit (wildly surpassing the profit they would

make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of*

*all homes throughout California,* including those of Plaintiffs herein.

4. Because Bank Defendants stood to reap so much more profit by securitizing and selling these

loans on the secondary market, than they would by holding their loans under the conventional "originate to

hold model" of traditional banking, Defendants ceased acting as conventional money lenders and instead

adopted the "originate to sell" model - originating loans with an eye towards (1) *immediately* selling the

loans on the secondary market, while (2) simultaneously becoming a servicer of the loan – both immensely

profitable. The result was simple. Because Defendants knew the purchasers of these loans  (secondary

market investors) would bear all the risk in the event of default, Bank Defendants no longer had any

incentive to verify a borrower's creditworthiness, or ensure that the borrower qualified for (or could afford)

the loans they were being given. Indeed they had an incentive to do the opposite: the sheer profit made by

selling high volumes of these loans.

5. To feed their investors and continue to make such never-before-seen profits, all of which

inured to the benefit of the conspiracy of Defendants, Bank Defendants needed more borrowers. In turn,

Bank Defendants began (1) disregarding their own as well as industry-standard underwriting standards,

(2) intentionally approving borrowers who they knew were grossly under-qualified, who they knew

could not afford their loans and who they knew would default to a mathematical certainty,  (3) falsifying

the income and asset documentation of Plaintiff-borrowers without their consent, and (4) concealing  the

material terms of their loans to induce a borrower's unwitting consent - all in the name of getting as

many loans out the door, and sold to investors for profit, as possible. (Cause of Action for **"Intentional**

**Placement of Borrowers into Dangerous Loans Which They Could Not Afford"** )

6. Bank Defendants also ceased acting as a conventional money lender by originating loans

**with an eye towards immediately becoming the servicer on the loan.** Servicers earn more money

from initiating foreclosures and collecting various fees and thus have significantly different incentives

and motivations than do lenders.  Knowing that they would soon become servicers, Bank Defendant

Banks had an (additional) incentive to place borrowers into loans they knew their borrowers could not

afford and to conceal highly material information regarding the loans, because as servicers they would

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  make more money by collecting fees from borrowers who couldn't afford their loans such as late fees,

2  default fees, and foreclosure fees. In other words, because Bank Defendants made more money

3  collecting fees from borrowers who couldn't afford their loans, Bank Defendants had an incentive to

4  place their borrowers into loans they couldn't afford.  In doing so, Bank Defendants became anything

5  but a conventional money lender – their interests were aligned solely with those of a servicer.

6          7.        Part and parcel with this scheme, the conspiracy of Defendants undertook a scheme to

7  artificially manipulate and inflate California's real estate market through their wholly-owned appraisal

8  subsidiary, Defendant Home Connects Lending Services, LLC ("HCLS") over whom Bank Defendants

9  exercised complete dominion.  As is common knowledge in the real estate industry, appraisers are

10  required to calculate the value of a home based almost entirely on the value of other nearby homes

11  (called comparables aka "comps"). Defendants, including Bank Defendants seized on this vulnerability

12  in the system.  Exercising dominion over their HCLS, Defendants directed HCLS to begin

13  systematically inflating the valuations they rendered upon the subject properties of each of their loans

14  (including loans of Plaintiffs herein),  *knowing that by doing so* their falsely inflated valuations would

15  act as comps upon which numerous *other* appraisers based their valuations of *other* homes.  These

16  inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted

17  as the predicate for even higher appraisals on other homes. The result was a vicious self-feeding

18  exponential cycle, both expected and intended by Defendants - the intentional, systematic, artificial

19  inflation of home values throughout California.  Because Bank Defendants had such massive market

20  share, they had the means and the ability to fully manipulate the market on a scale that few others could,

21  and indeed they did. **(The "Market Fixing Scheme Cause of Action" and separately the "Individual**

22  **Appraisal Fraud Cause of Action")**

23          8.        Bank Defendants' reasons for artificially inflating the prices of real estate were simple.

24  First, **by doing so Defendants created the illusion of a naturally-appreciating real economy, which**

25  **resulted in a purchase *and* refinance boom** – which meant more loans for Defendants, and thus more

26  profit. Second, by doing so, Bank Defendants induced Plaintiffs to enter into contract with them by

27  convincing Plaintiffs that the value of their home was sufficient to justify taking out a loan of that size –

28  or in other words, to assure Plaintiffs that their collateral was sound. Third, by doing so, Bank

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1 | Defendants intended to induce Plaintiffs to consummate their purchase transactions by falsely reassuring

2 | them that they were paying what the home was worth, and not more – the result of which was, once

3 | again, more loans generated by Defendants and thus more profit. <u>Fourth,</u> by driving the prices of real

4 | estate up, borrowers were forced to take out larger loans to afford the same property, once again

5 | resulting in more profit to Bank Defendants. <u>Fifth,</u> then, based on these fraudulently inflated loan

6 | amounts, Bank Defendants deceptively extracted excessive and unearned payments, points, fees, and

7 | interest from Plaintiffs. All of these profits were shared among the conspiracy of Defendants, and inured

8 | to the benefit of the Conspiracy.

9 |      9.     The inevitable and intended result of Defendants' conspiracy was the creation of a super-

10 | heated pricing bubble in the real estate economy, created by and at the direction of the conspiracy of

11 | Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of

12 | lining the conspiracy of Defendant's pockets with money.

13 |      10.    Ally and Bank Defendants and their co-conspirators conducted their scheme *knowing it*

14 | *would cause the wide-spread crash of property values throughout California* and the substantial loss of

15 | equity to Plaintiffs, and indeed it did. As a result of Defendants' market fixing scheme, Plaintiffs were

16 | forced to pay much more for their homes, then their true uninflated worth. Even for those Plaintiffs who

17 | did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the

18 | value of their property far below its original purchase price, once again resulting in the loss of

19 | substantial equity.

20 |      11.    From 2008 to the present, Californians' home values decreased by considerably more

21 | than most other areas in the United States as a direct and proximate result of the Defendants' scheme set

22 | forth herein.

23 |      12.    As a result, Plaintiffs have lost their equity in their homes, if not their homes themselves,

24 | their credit ratings and histories were damaged or destroyed, among a host of other damages and harms

25 | which will be laid out in detail throughout this Complaint.

26 |      13.    The profit-driven scheme/conspiracy did not end there. To further their profit, the

27 | conspiracy of Defendants then intentionally steamrolled wrongful and unauthorized foreclosures upon

28 | those borrowers whose very peril was caused by Defendants' fraud in the first place. They intentionally

- 4 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   initiated these wrongful foreclosures without regard to whether they had authority to foreclose, or had

2   complied with the requirements under California Law, because foreclosure is a profitable business,

3   creating profit not only for the foreclosing trustee, but also the servicing bank, as well as the owner of

4   the Deed of Trust.  By initiating such unauthorized/wrongful foreclosures Bank Defendants and Trustee

5   Defendants were able to charging a host of profitable "foreclosure fees' including trustee fees, attorney

6   fees, late fees, default fees, inspection fees, among many others.  (**"Intentional Wrongful Foreclosure**

7   **Cause of Action"**)

8         14.      Further, in the face of the escalating foreclosure crisis in the United States and especially

9   in California, the Bank Defendants have further victimized and preyed on those struggling to keep by

10  offering and inducing customers into illusory "Loan Modification" or "Workout Agreements," which

11  purport to offer hope of an opportunity to cure loan default, but in truth and fact are merely a ruse

12  through which the Bank Defendants dupe homeowners into paying them thousands of dollars

13  immediately before they foreclose. On information and belief, the Bank Defendants have reaped illicit

14  profits from these actions exceeding $100 million. (**the "Deception in Loan Modification Cause of**

15  **Action"**)

16        15.      These activities have been the subject of intense scrutiny, enforcement actions and

17  litigation.  As recently as April 13, 2011, multiple Federal regulators entered into stipulated consent

18  orders with other similarly situated banks and related entities such as MERS (described below)

19  describing massive failures and taking the first steps toward requiring Defendants and other banks to

20  refund sums to homeowners improperly foreclosed upon by Defendants and other banks.

21        16.      These illusory work-out agreements were nothing more than a cash-grab designed to

22  circumvent California's prohibition against deficiency judgments. Plaintiffs are entitled to rescind and

23  obtain back from the Bank Defendants their promised (and delivered) consideration, namely the

24  payments that were made to the Bank Defendants under the Workout Agreements and Extended

25  Workout Agreements. Because California law prohibits deficiency judgments, the Bank Defendants

26  were not entitled to require post-election-to-sell payments and foreclose on the loans. In addition, such

27  payments included attorney and other fees which Plaintiffs had no obligation to pay under their

28  mortgages absent Bank Defendants' Work out Agreement Scheme

- 5 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

17.    Plaintiffs are entitled to rescind and obtain back from the Bank Defendants their promised (and delivered) consideration, namely the payments that were made to the Bank Defendants under the illusory Workout Agreements and Extended Workout Agreements. Because California law prohibits deficiency judgments, Bank Defendants were not entitled to require post-election-to-sell payments and foreclose on the loans. In addition, such payments included legal and other fees which Plaintiffs had no obligation to pay under their mortgages absent the Bank Defendants' Work out Agreement Scheme.

18.    Through this Action, Plaintiffs seek to stop Bank Defendants from preying on their customers through its Workout Agreement Scheme. Where Bank Defendants have exercised their election to sell under non-judicial foreclosure, they must not be permitted to extract thousands of dollars in additional payments with illusory promises and false statements of opportunities to cure defaulted loans. Bank Defendants herein have sold or initiated foreclosures on many of the Plaintiffs in this action. At the very least, Plaintiffs are entitled to a return of the payments they made under the false promise from Bank Defendants, that Plaintiffs would at least have an opportunity to avoid foreclosure.

19.    This Complaint alleges in no uncertain terms that had Plaintiff known the truth of any of these material facts, they would never have entered into any loans and/or modifications with Defendants. If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008. Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in entering their loans, "trial" modification agreements (aka Workout Plans), and forbearing from exercising their rights to rescind or refinance their loans.

20.    It bears emphasizing – that this action is not about the harm and frauds that Defendants have perpetrated on third-party investors, but rather the harms and frauds perpetrated upon Plaintiffs herein – the borrowers. The frauds described in the Complaint upon the investor, were merely the *incentive* for Defendants' fraud on Plaintiff-borrowers. The Complaint brings no action for Defendants' fraud upon the investors. It only brings an action for fraud upon the borrower-Plaintiffs herein.

21.    No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers. If Banks are to conduct business,

- 6 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    their business *must not be* that of fraud and deception.

2    **PARTIES**

3    ***Plaintiffs***

4    22.    All Plaintiffs listed in the above caption are competent adults and individuals residing in

5    the State of California, who borrowed money from one or more of the Defendants or its subsidiaries or

6    affiliates or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed

7    of trust on his or her California real estate(s). At all material times hereto, one or more of the

8    Defendants have acted as Servicer or some other control or capacity over processing the loan.

9    23.    Based on information now available to them, fewer than 100 plaintiffs are alleging claims

10    in amounts that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction

11    under 28 U.S.C. § 1332(a).

12    24.    **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS**

13    **COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE**

14    **NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES**

15    **INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS**

16    **ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference,

17    Plaintiffs hereby incorporate Appendix "A" to this Complaint.

18    25.    **Statute of Limitations & Equitable Tolling** - All of the concealments, partial

19    misrepresentations and affirmative misrepresentations were unknown to all Plaintiffs referenced herein

20    at the time of loan origination. Defendants' scheme was built on deception and keeping borrowers in the

21    dark. All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years

22    prior to the date of filing this action. A reasonable person would have been unable to reasonably

23    discover said frauds any earlier. The circumstances, and date of discovery of these wrongs are alleged

24    with specificity as to each and every Plaintiff in Appendix A.

25

26    ***Defendants***

27    26.    Defendant Ally Bank, Inc. ("Ally Bank") is a multi-national bank that became a bank

28    holding company in December 2008. The bank is headquartered in Detroit, Michigan and incorporated

- 7 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   in the State of Utah. The bank is based at 6895 Union Park Center, Midvale, Utah, and is FDIC insured.

2   Since August 2, 2004 it operated two main offices in the United States, one in Utah and one in

3   Pennsylvania, and has 616 employees as of June 2009. It also has a Canadian operation, simply called

4   Ally which operates under Resmor Trust Company, and which is Canadian Deposit Insurance

5   Corporation insured. Ally Bank is a direct bank that markets to customers offering mortgages, savings

6   products, certificates of deposit, online savings accounts, money market accounts and interest checking

7   accounts. Back office operations for Ally Bank and Ally Financial are located in Charlotte, North

8   Carolina. Ally Bank does business in the State of California.

9       27.    Defendant Ally Financial, Inc. ("Ally"), a leading, multi-national financial services firm

10  with a corporate office center in New York, has approximately $179 billion of assets and operations in

11  approximately 25 countries. Ally is the parent and sole owner of Defendants GMAC Mortgage Group,

12  Inc. and Residential Funding Services, LLC. Prior to 2010, Ally was known as GMAC, LLC. Ally does

13  business in the State of California.

14          a.    Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally

15              considers itself both a common enterprise operating as a greater whole and without

16              meaningful distinctions as to its operating units, and the successor to GMAC Mortgage,

17              Homecomings, RFC and its subsidiaries.

18      28.    Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly-owned subsidiary and

19  the mortgage arm of Ally. GMACM is a Delaware corporation with its principal place of business at

20  1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMACM transacted and is continuing to

21  do business in the State of California.

22      29.    Defendant Residential Capital, LLC ("ResCap") is a wholly-owned subsidiary of

23  GMACM and originates, services, and securitizes mortgage loan in the United States, including

24  California. ResCap was incorporated in the State of Delaware and its principal office is located at One

25  Meridian Crossings, Minneapolis, Minnesota 55423. Prior to 2007, ResCap was known as Residential

26  Capital Corporation. ResCap does business in the State of California.

27      30.    Defendant GMAC-RFC Holding Company, LLC, doing business as GMAC Residential

28  Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquires residential

- 8 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   mortgages and loans, which it then packages as mortgage –backed securities and sells to institutional

2   investors.  GMAC-RFC was incorporated in the State of Delaware and its principal office is located at

3   8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. GMAC-RFC transacted business in

4   California.

5          31.     Defendant Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of

6   GMAC-RFC. RFC is a Delaware corporation. Prior to October 2006, RFC was known as Residential

7   Funding Corporation. RFC was known as Sponsor of Securitization transactions which involve some of

8   the Plaintiffs in this complaint. Defendant RFC is the parent and sole owner of Homecomings Financial,

9   LLC ("HFN"), the originator of loans underlying some of the Plaintiffs in this complaint. Prior to 2006,

10  HFN was known as Homecomings Financial Network, Inc. RFC does business in the State of California.

11         32.     Defendant Homecomings Financial, LLC ("HFN") is a wholly-owned subsidiary of RFC.

12  HFN is a Delaware corporation and its principal office is located at 8400 Normandale Lake Boulevard,

13  Minneapolis, Minnesota 55437. Prior to October 2006, HFN was known as Homecomings Financial

14  Network, Inc. HFN is the originator of some of the Plaintiffs loans included in this complaint. HFN

15  continues to do business in the State of California.

16         33.     Defendant Home Connects Lending Services, LLC ("HCLS") is a wholly–owned

17  subsidiary of Ally. Home Connects Lending Services is a limited liability company organized and

18  existing under the laws of the state of Pennsylvania, with its principal place of business in Fort

19  Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles.

20  Home Connects Lending Services, LLC is a settlement service provider for Ally and assigns and

21  reviews all of Ally's appraisals.

22         a.   As Ally's wholly-owned appraisal subsidiary, HCLS was a necessary and integral

23              element of Defendants' fraud. At the direction and behest of the conspiracy of

24              Defendants, HCLS artificially inflated and manipulated values of properties throughout

25              California, including the properties of Plaintiffs, in furtherance of the wrongs described

26              throughout this Complaint, and to increase the profits inuring to the conspiracy of

27              Defendants.

28         b.   The customer (Plaintiffs herein) never had a choice as to the settlement providers.  Bank

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Defendants controlled and took the choice out of the customer's hands and directed and collaborated with all their partners to systematically inflate and disgorge the homeowners of their freedom to choose. In furtherance of this act they used the manipulated property valuations to seek premiums on their loans to Plaintiffs, and Secondary Market transactions.

34.    Defendant MTC Financial Inc., doing business as Trustee Corps ("Trustee Corps"), is a California Corporation with its principal place of business in Irvine, California, and doing business in the State of California. Plaintiff herein can allege with detailed factual specificity Trustee Corps's involvement as an essential element of Defendants' fraud in executing foreclosures which Defendants knew were wrongful and without right and intended would be unavoidable, and whose sales resulted in additional profit to Defendants, in furtherance of the Defendants' conspiracy described herein.

35.    Defendant Executive Trustee Services ("ETS") is a **wholly-owned subsidiary** of ALLY. ETS was and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles, acting as the foreclosing trustee on behalf of the other Defendants named herein.

36.    Defendants ETS and Trustee Corps (collectively "Trustee Defendants") were the vital foreclosing arm of the fraudulent conspiracy of Defendants, intentionally and maliciously foreclosing on Plaintiffs herein knowing they had no authority to do so, at the direction of the conspiracy, in the name of profit. Further ETS and Trustee Corps intentionally and maliciously concealed the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5 and 15 U.S.C. § 1641, as more fully described herein. ETS and Trustee Corps are also independently liable as co-conspirators in the broad fraudulent conspiracy among all Defendants.

a.    Upon information and belief, ETS and Trustee Corps are acting under the direct control of Ally Defendants. ETS and Trustee Corps are personally responsible for robo-signing affidavits, executing assignments, and recording of Notice of Defaults and Trustee Sale

- 10 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Notices which are defective and not in accordance to California Law.

2    b.  This Complaint seeks significant relief from ETS and Trustee Corps given the key role

3    that they played caused many of the Plaintiffs herein to lose their homes. Through a

4    number of wrongful foreclosure actions they conspired with the other Defendants to

5    commit assorted violations of California Law. All of the violations done by this specific

6    defendant were made in the State of California against California citizens.

7    c.  Furthermore it is alleged that ETS's and Trustee Corps' action in moving forward with

8    the foreclosure, and their actions as co-conspirators in the fraud and other harms

9    complained of herein, are done with actual malice and in bad faith – eviscerating any

10    defense of qualified trustee immunity. See *Kachlon v. Markowitz* (2008) 168 Cal.App.4th

11    316, 341; *Latino v. Wells Fargo Bank, N.A.* (E.D. Cal, Oct. 27 2011) 2011 WL 4928880

12    at *5

13    37.    The true names and capacities of the Defendants listed herein as DOES 1 through 1,000

14    are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names.  Each of the

15    DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby

16    participated in all of the wrongdoing set forth herein.  On information and belief, each such Defendant is

17    responsible for the acts, events and concealment set forth herein and is sued for that reason.  Upon

18    learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint

19    accordingly.

20    ### ***Relationship of Defendants***

21    38.    Defendants herein acted pursuant to a coordinated conspiracy.

22    a.  At all times material hereto, the business of Defendants was operated through a common

23    plan and scheme designed to effectuate the wrongs complained of herein, misrepresent

24    and/or conceal material facts set forth herein from Plaintiffs, from the California public,

25    and from regulators, either directly or as successors-in-interest to other Defendants.

26    b.  These wrongful acts including (but not limited to) misrepresentation and concealment

27    were completed, ratified and/or confirmed by each Defendant herein directly or as a

28    successor-in-interest for another Defendant, and each Defendant performed the tortious

- 11 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

acts set forth herein for its own monetary gain and as a part of a common plan developed
and carried out with the other Defendants, or as a successor-in-interest to a Defendant
that did the foregoing.

c.  Each Defendant herein agreed to participate in the Conspiracy, shared in the profit of the
conspiracy, and took tortious action in furtherance of the conspiracy.

d.  Each of the conspirators reached a unity of purpose, common design, and meeting of the
minds in the unlawful arrangement and acts alleged throughout this Complaint.

e.  "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who,
although **not actually committing a tort themselves**, share with the immediate tortfeasors a
common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia
Ltd.,* 7 Cal.4th 503, 510-11 (1994). "By participation in a civil conspiracy, a coconspirator
**effectively adopts as his or her own the torts of other coconspirators within the ambit of
the conspiracy**." *Id.* at 511 (citing *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 784 (1979).
"In this way, a coconspirator **incurs tort liability co-equal with the immediate tortfeasors**."
*Id.* See also *Vieux v. East Bay Regional Park District,* 906 F.3d 1330, 1343 (9th Cir. 1990)

f.  As to each and every Cause of Action and Count herein, Plaintiffs allege that such actions
were taken at the direction,  behest, knowledge, and in furtherance of the conspiracy, with
all acts an proceeds inuring to the benefit of the members of the Conspiracy. Defendants
have adopted as their own, the torts of their co-conspirators all of which fell within the
ambit of the conspiracy alleged throughout this Complaint.  Accordingly all Defendants
are liable for each Count and Cause of action under a theory of Conspiracy.

39.     Plaintiffs believe and thereon allege that the agents and co-conspirators through which the
named Defendants operated included, without limitation, financial institutions and other firms that originated
loans on behalf of the Defendants.  These institutions acted at the behest and direction of the Defendants, or
agreed to participate – knowingly or unknowingly - in the fraudulent scheme described herein.

40.     Those firms originating loans that knowingly participated in the scheme are jointly and
severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and
ratifying the wrongful acts of the knowing participants.  Upon learning the true name of such knowing

- 12 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

participants, Plaintiffs may seek leave to amend this Complaint to identify such knowing participants as Doe Defendants.

41.    For avoidance of doubt, such knowing participants include, without limitation, legal and natural persons owned in whole or in part by the Defendants or affiliates thereof; legal and natural persons owning directly or through affiliates financial interests in Defendants; legal and natural persons directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree, committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least some degree, acting in concert with the Defendants.

42.    As to those legal and natural persons acting in concert without an express legal relationship with Defendants or their affiliates, on information and belief, Defendants knowingly induced and encouraged the parallel acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming jointly and severally liable therefore.

43.    As to those legal and natural persons whose acts and omissions in support of the Defendants scheme were unwitting, on information and belief, Defendants knowingly induced and encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefore.

44.    To the extent that certain Plaintiffs herein become aware of information that provides a basis for asserting the Defendants herein are liable for the origination of their loans, those Plaintiffs reserve the right to seek leave of this Court to re-assert the appropriate claims herein. Plaintiffs are informed and believe, and thereon allege, that: (1) the Defendants are liable for all wrongful acts of the companies which Defendants acquired prior to the date thereof as the successor-in-interest to those companies; (2) Ally Defendants directly and through its subsidiaries and other agents sued herein as Does have continued the unlawful practices of the acquired companies since the dates of their acquisition, including, without limitation thereof, writing fraudulent mortgages as set forth above and concealing wrongful acts that occurred in whole or in part prior thereto, and (3) Ally Defendants and its subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

45.     Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally considers itself both a common enterprise operating as a greater whole and without meaningful distinctions as to its operating units.

46.     The other Defendants followed Ally's directions because they are or were either subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are thereby controlled and dominated by Ally.

## FIRST CAUSE OF ACTION:
## INTENTIONAL PLACEMENT OF BORROWERS INTO DANGEROUS LOANS THEY COULD NOT AFFORD THROUGH COORDINATED DECEPTION, IN THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT

*(By All Plaintiffs against Ally and Bank Defendants, and all other Defendants as Co-Conspirators)*

47.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, Bank Defendants made loans in accordance with its stated underwriting and appraisal standards.

48.     Under the traditional mortgage model, which Ally and Bank Defendants originally subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to maturity, and therefore retained the credit default risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

49.     Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payments of interest and fees, and also bore the risk of loss

- 14 -

if the borrower defaulted and the value of collateral was not sufficient to repay the loan. As a result of this "**originate to hold**" model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

50.    With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to sell" model, in which mortgage originators sold the mortgages and transferred credit risk to their investors through the issuance and sale of Mortgage Backed Securities. Securitization concurrently provided lenders like Bank Defendants with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality.

51.    With the aforementioned mandate for growth as the backdrop and incentive for their fraud, Bank Defendants abandoned the traditional model of "**originate to hold**" and instead adopted the much more lucrative "**originate to sell**" model, and in the early 2000's Bank Defendants began to systematically disregard its stated underwriting guidelines in an effort to originate an unprecedented number of loans for securitization.

52.    But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Ally and Bank Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

53.    In fact they *preferred* under qualified borrowers.  Because Ally and Bank Defendants had taken out insurance policies against the possibility of default, Ally and Bank Defendants and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant insurance policies on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted.  In other words, Ally and Bank Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made profit.

54.    With profit as their motive, Ally and Bank Defendants, in conspiracy with the other Defendants herein, set out upon a massive and centrally directed fraud by which Bank Defendants placed

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard

2  underwriting guidelines, and intentionally inflated the appraisal values of homes throughout California for

3  the sole purpose of herding as many borrowers as they could into the largest loans possible which Ally and

4  Bank Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten

5  profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would*

6  *cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs

7  herein.

8       55.    To be clear, it is alleged that Ally and Bank Defendants' actions in intentionally placing

9  borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of

10  the generalized market crash which caused the prices of real estate values throughout California to

11  plummet, damaging Plaintiffs herein.

12       56.    Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed.

13  Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and

14  whose default they knew was a mathematical certainty.

15       57.    To achieve this loan volume, Bank Defendants (acting in furtherance of the conspiracy of

16  Defendants), intentionally concealed and misrepresented numerous material terms of their loans, to

17  induce Plaintiffs' unwitting, uninformed consent to those loans– for instance going to extraordinary

18  lengths to conceal the true negatively amortizing nature of the loan, or in other instances affirmatively

19  misrepresenting that the true payment of a loan, among numerous other deceptions described below.

20       58.    To further increase their loan volume and maximize their profit, Defendants intentionally

21  abandoned industry standard-underwriting guidelines (as well as their own underwriting guidelines) in

22  order to approve borrowers for loans which Bank Defendants knew were dangerous for them.

### *Defendants Systematically Abused and Abandoned Industry Standard Underwriting Guidelines to Intentionally Place Unqualified Borrowers into Loans Which Defendants Knew They Could Never Afford*

27       59.    As mentioned above, however, Defendants' fraud was multipronged. To feed their

28  investors and continue to make such never-before-seen profits, Bank Defendants needed more

- 16 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

borrowers. In turn, Bank Defendants systematically and intentionally began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

60.    In other words, not only did Bank Defendants inflate appraisal values, hand-in-hand with HCLS, in the name of making the loans appear safer to investors, and thus more profitable to the banks (discussed below in the causes of action for "Individual Appraisal Inflation" and "Market Fixing"), but Bank Defendants also abandoned their own underwriting guidelines to approve more and more borrowers for loans. In doing so, Defendants intentionally placed borrowers into dangerous loans which would imperil their entire livelihoods, and often cases into loans whose default was an absolute mathematical certainty. The result was, once again, more profit obtained through deception.

61.    To achieve their fraud, Bank Defendants intentionally and grossly falsified Plaintiffs' salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values, rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to approve borrowers who could never have been approved under their own published conventional underwriting guidelines (as well as industry standard underwriting guidelines used throughout the United States.) Second, they were able to conceal from the investor the highly risk nature of the loan, which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans. The translation is that Defendants had every incentive to deceive borrowers into entering loans which they realistically could never afford.  The result was that Defendants turned profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left without a chair.

62.    Bank Defendants' long-term campaign of misrepresentations, concealments and abandonment of industry standard underwriting guidelines – all of which were designed to maximize loan volume by placing as many borrowers into loans as possible, whether qualified or unqualified – was implemented by the Board, Management and Ownership of the Ally Defendants and Bank Defendants pursuant to a **top-down policy**. Ally and Bank Defendants intentionally put mechanisms and programs in place to allow their own employee's/Loan Consultants/Loan Representatives to **falsify** borrower income, asset and other material information of their borrowers, without a borrower ever knowing that their income or assets had been inflated. One such program was called the **"Stated Income"** program. Under this

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   program, Defendant would take as true any income stated on the application, without requesting any

2   documentation in support. Seizing this unbridled free-for-all, Defendants' **own** employees who were paid

3   commission based on the number and size of loans they got approved, rampantly falsified material income

4   and asset information of their borrowers. By doing so they were paid more commission. But more

5   importantly, Bank Defendant themselves created more products to be sold on the secondary market for

6   even more profit. In other words, Ally and Bank Defendants intentionally put policies and programs into

7   motion which would allow it to place unqualified borrowers into dangerous loans – all while maintaining

8   the semblance of propriety, and all without ever having to disclose to their investors that the incomes listed

9   on their loan applications were false.

10       63.     Numerous others similar programs were also adopted such as **"stated assets"**, and **"low**

11   **documentation loans".** Both of which allowed Bank Defendants to falsify information, and get loans

12   approved which would  never been approved under traditional documentation

13       64.     Even in the absence of these programs Bank Defendants and their employees

14   nevertheless had the ability to and did, falsify their borrower's income and assets through numerous

15   other means. For example, Defendants would inflate a borrower's income by making it appear as though

16   the borrower was earning rental income on of their other properties when in fact they were earning none.

17   To legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely

18   false rental agreement, showing the false monthly rental income, complete with the forged signature of a

19   non-existent renter.

20       65.     Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions

21   by as much as a mind-numbing 500%.

22       66.     Defendants were intentionally turning a blind-eye to the rampant and egregious

23   manipulations of incomes by their own employees, through policies and programs intentionally set forth

24   by Defendants' very own top executives to achieve *just such a result*. The result was that Bank

25   Defendants were able to originate loans which they knew were false, and they intended to be false, but

26   without ever having to *admit* to their secondary market investors that the loans were, in fact, false.

27       67.     Ally and Bank Defendants knew and intended that their employees would falsify this

28   information, for the very reasons set forth above, and in fact incentivized them through their commission

- 18 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    and reward structure to do so.  In other words Ally and Bank Defendants intended that this program

2    would be abused. And by doing so, allowed and intended for their borrowers to be placed into loans

3    which the  borrowers had no chance of being able to afford had their true income/asset information been

4    used .

5              68.    Defendants then told their borrowers, and Plaintiffs herein, that a determination by the

6    Bank that they were "*qualified*" for a loan meant that the borrowers would be able to "*afford*" their loan.

7              69.    Industry Standard and Conventional Underwriting guidelines, including those used by

8    Bank Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be

9    rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be

10   rejected – and that 45% figure was on the on the *very* high end. For a loan with a 45% "back end" debt

11   to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as

12   720+ median credit score and high liquid asset reserves totaling more than 12 months of their mortgage

13   payment.

14             70.    However, Bank Defendants in this action regularly approved loans with front end ratios

15   wildly exceeding 35% (and back end ratios wildly exceeding 45%) on a regular basis, and as a matter of

16   course, in violation of their own published underwriting guidelines as well industry standard

17   underwriting guidelines used throughout the banking industry.   Defendant Banks intentionally placed

18   borrowers into these dangerous loans, which fall wildly outside of their own underwriting guidelines –

19   and intentionally did so in the name of profit without any regard for a borrower's safety.  Then, to

20   ensure that these wrongs and deceptions went unnoticed Defendants embarked on a campaign of

21   concealments and misrepresentations all of which were designed to conceal the true nature and

22   payments of the loan and designed induce the borrower's belief that they could "afford" the loan.

24   ***Defendants Turned Substantial Profits Through Their Borrowers' Default Furthering Their***

25   ***Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans***

26             71.    Not only did Ally and Bank Defendants approve under qualified borrowers – they

27   preferred them. That's because a defaulting borrower meant profit for the conspiracy of Defendants.

28             72.    All of the Defendants managed risk through leverage and derivatives trading. With the

- 19 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  advent of "Credit Default Swaps" ("CDS"), an insurance policy of sorts, they had the protection they

2  needed to push these loans out the door to grossly under qualified borrowers, without any fear of loss

3  whatsoever. The CDS gave defendants *another* incentive to give grossly under qualified borrowers –

4  whose default was virtually certain. Not only (1) were Defendants incentivized to give loans to

5  unqualified borrowers because they were turning other-worldly profit by selling as many loans on the

6  secondary market as possible, *but also* ... (see next paragraph).

7      73.    (2) Because Defendants had taken out these insurance policies – aka Credit Default

8  Swaps - against the possibility of default, Ally and its co-conspirators (Defendants herein) would get

9  paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous

10 redundant Credit Default Swaps and insurance policies out on the same property, so that when default

11 occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were

12 *actually turning a profit* when borrowers defaulted. In other words, Ally and Bank Defendants had an

13 *incentive* to place borrowers into impossible loans, because by doing so they were making money.

14      74.    This technique gave these Defendants the insurance they needed to pass the risk along to

15 third party without taking the risk themselves. Since they planned on securitizing all of their loans and

16 not keeping any of them, Ally and Bank Defendants could not care less about quality or who they hurt.

17 They would push insurance on the investors and actually over insure the loan pools, at times betting that

18 the Plaintiffs and other borrowers would default.

19      75.    Since the Defendants created these pools to begin with, they were fully aware of the lack

20 of quality and lack of due diligence that went into setting up these pools. These "swaps" are life

21 insurance policies that are placed on Plaintiffs' loans. If the loan dies, the Defendants get paid.

22      76.    But insurance against default wasn't the only way Defendants made money from the

23 losses of their imperiled borrowers. Bank Defendants and Trustee Defendants also made money by

24 charging a litany of unearned and egregiously marked up fees associated with the initiation of and

25 conducting (their own wrongful) foreclosures including: inspection fees, default fees, late fees, advance

26 fees, attorney's fees, and trustee fees. In short Bank Defendants had an incentive *to place Plaintiff*

27 *borrowers into loans they knew their borrowers could not afford* because by doing so, Bank Defendants

28 and Trustee Defendants would turn a profit. Not only that, but Defendants had an incentive *to*

- 20 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

*wrongfully initiate foreclosures* because they made money by doing so through the assessment of excessive, disproportionate and unearned fees. This topic is further developed in the Cause of Action for Wrongful Foreclosure (discussed below).

### *Defendants Intentionally Misrepresented, Partially Misrepresented, & Concealed Highly Material Information In Order To Induce Plaintiffs to Unknowingly Take Dangerous Loans So that Defendants Could Profit*

77.    To maximize their profit, Defendants needed loan volume. In turn, Bank Defendants (acting in furtherance of the conspiracy of Defendants), intentionally concealed and misrepresented numerous material terms of their loans, to induce Plaintiffs' unwitting, uninformed consent to those loans , in order to get as many borrowers into loans as possible – for instance going to extraordinary lengths to conceal the true negatively amortizing nature of the loan, or in other instances affirmatively misrepresenting the true payment and terms of a loan, among numerous other deceptions described below.

78.    To further their fraud, Ally and Bank Defendants, acting at the behest of the Conspiracy of Defendants, operated with the primary imperative of keeping Plaintiffs in the dark about the truth of their scheme and the terms of the loans because Defendants knew that if Plaintiffs knew the truth, Plaintiffs would never have entered into the loans with Bank Defendants.

79.    To that end, Ally and Bank Defendants embarked on a long term campaign of misinformation, including intentional misrepresentations, partial misrepresentations & half-truths calculated to deceive, as well as active suppression of material facts, all in aims of inducing Plaintiffs to enter into a loan contract with Defendant which they would not have otherwise.

80.    Defendants, hand-in-hand with one another, **actively concealed** the following highly material items of information:

      a.    The fact that Bank Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines *for the purpose of* placing borrowers into loans which they knew borrowers could not afford and upon which they knew borrowers would default to a mathematical certainty;

- 21 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

b. That Bank Defendants had abandoned the "originate to hold" business model of conventional money lenders, and instead became **a loan packaging and re-selling facility in which Bank Defendants originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan.

c. That Bank Defendants had falsified Plaintiffs' income and asset documentation to intentionally place them into loans they could not otherwise afford;

d. That Bank Defendants internally knew the products they were selling were dangerous and referred to them, among other things as "sacks of shit" as established by numerous internal emails;

e. That Bank Defendants possessed internal reports concluding that if a Plaintiff took a loan from Defendants, that Plaintiff would suffer material losses, including but not limited to the loss of substantial equity;

f. That Bank Defendants knew their scheme would cause a liquidity crisis that would devastate home prices;

g. That Bank Defendants were no longer making loans based on a borrower's qualifications or their ability to afford such a loan and that those ideas were now unimportant to them, but were instead making loans without regard for a borrowers qualifications or ability to afford simply to create sufficient product to sell to investors on the secondary market for profit;

h. That Bank Defendants *knew* Plaintiff-borrowers could not afford the loans they were being placed into and which they knew Plaintiffs would default upon to a mathematical *certainty*, but intentionally placed them into these impossible loans nonetheless in the name of making profit;

i. That Bank Defendants actively concealed the material terms of their loans from their borrowers, including but not limited to the fact a borrower was *certain* to defer interest under an Option ARM loan by making the minimum payment

- 22 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

j.  That Defendants were no longer making loans based upon the profitability of their mortgage lending business (but rather instead upon the profitability of sales of these loans to investors and secondary markets);

k.  That Because of this profitable scheme and because their loans were insured, Defendants stood to profit regardless of whether their loans performed and as such had no incentive to insure that the loans they were placing their borrowers into were safe, or that their borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

l.  That Bank Defendants were in fact dependent on selling loans it originated into the secondary mortgage market, to sustain its business;

m.  That Bank Defendants were making loans simply to create sufficient product to sell to investors for profit;

n.  That Bank Defendants had ceased acting as conventional money lenders and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs;

o.  That Bank Defendants had ceased acting as conventional money lenders who carried their own risk and turned profit through the production of low-risk loans, and instead morphed into a loan conveyor belt, packaging loans with little if any regard for their underwriting standards, and selling those loans at substantial profit to investors on the secondary market to whom the risk would be passed on, through fraud and misrepresentation – a business enterprise vastly more profitable than the business model of being a conventional money lender;

p.  That in furtherance of this scheme, Bank Defendants had in fact abandoned their conventional lending business and prudent lending standards, consistently lending to those who were grossly under-qualified and who they knew could not afford their loans and would default upon to a mathematical certainty;

q.  Bank Defendants knew these loans were unsustainable for themselves and the borrowers and to a certainty would result in a crash that would destroy the equity invested by

- 23 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Plaintiffs and other of Defendants' borrowers;

r.  Bank Defendants, their officers and employees internally referred to these loans as "Sacks of Shit" and "Garbage Loans";

s.  Bank Defendants knew the sheer scope of their loan portfolio and fraudulent packaging of the portfolio would cause a liquidity crisis that would devastate home prices and gravely damage Plaintiffs;

t.  Bank Defendants knew Plaintiffs would be materially and substantially harmed by contracting with Defendants;

u.  Bank Defendants pursuit of a matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators dangerously placed borrowers into loans regardless of whether or not they were actually qualified for the loan or could actually afford the loan, instead ceding their underwriting guidelines to whoever was the most lax lender at the time, regardless of whether or not *that* lenders guidelines were proper, safe, negligent or even dangerous or guided by reason;

v.  The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

w.  Bank Defendants definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

x.  The high percentage of Bank Defendants subprime originations that had a loan to value ratio of 100%; and

y.  Bank Defendants subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

81.    The Plaintiffs did not know any of the concealed facts. Defendants had exclusive knowledge of these facts.

82.    Ally and Bank Defendants, at the benefit of the Conspiracy of Defendants, further stated

- 24 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

and asset documentation as well as abandoned their own underwriting guidelines);

f.  Representations to a borrower that his payment would cover both principal and interest, and calculated to induce the borrower to believe that his or her payment would always cover principal and interest, when in reality that same payment would no longer cover any principal after a very short period of time, and indeed would not even cover the minimum interest on the loan resulting in deferred interest;

g.  Representations made in the Loan Documents that by making the minimum payment of an Option ARM loan, a party *may* defer interest (aka "negatively amortize"), when in *reality* by making the minimum payment a party was *certain* to defer interest. **The California Court of Appeals in *Boschma* has held that these identical allegations give rise to an actionable claim for fraudulent concealment.**; The *Boschma* court held that where, as here, the disclosures in Defendants' Option ARM loans discussing negative amortization, only frame negative amortization as a mere **possibility**, rather than the reality which is that when making a minimum payment negative amortization is a **certainty**, the disclosure is insufficient under law, giving rise to a valid cause of action not only for UCL but also for fraudulent concealment . (*Boschma v. Home Loan Center*, Inc. (2011) 198 Cal.App.4th 230.)  In so holding the court in *Boshcma* explicitly held that Banks have a duty to disclose such material information. Plaintiffs allege that Bank Defendants, identically, failed to disclose the certainty of negative amortization in the Option ARM loans. Plaintiffs have attached supporting documentation. (See Appendix A).

h.  The provision of an intentionally ambiguous Truth in Lending Disclosure ("TILDS") Payment Schedule which did not make it clear that borrowers could have avoided negative amortization (under an Option ARM loan) by making payments larger than those that were mandated by the payment schedule, in fact the payment schedule created the materially false impression that by following the payment schedule, Plaintiff borrowers would not negatively amortize their loan;

i.  Other partial misrepresentations and half-truths calculated to induce the borrower to fundamentally misunderstand the nature of their loan, such that Plaintiff-borrowers would

- 26 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

numerous half-truths and made partial representations calculated to deceive Plaintiffs and to create a

substantially false impression. (*Boschma v. Home Loan Center, Inc. (2011) 198 Cal.App.4th 230, 250,*

["Defendant [bank] had a common law duty to avoid making partial, misleading representations that

effectively concealed material facts"]; ((*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th

282, 292 [**"Even where no duty to disclose would otherwise exist**, where one **does** speak he must

speak the whole truth to the end that he does not conceal any facts which materially qualify those

stated." ]).  By making such partial misrepresentations, Defendants incurred a duty to speak the whole

truth such that Defendants do not conceal any facts which materially qualify those stated. Such **partial

misrepresentations** include:

   a.  Representations calculated to make a borrower believe that his or her payment would

       only be X dollars, when in reality such payment was only available for a limited

       undisclosed period of time and would then drastically increase;

   b.  Representations that a borrower could afford payments under their loan, calculated to

       make a borrower believe that the loan payment would always be constant, but made

       knowing that the such payments would later drastically increase and knowing that the

       borrower would be *unable* to afford such increased payments;

   c.  Representations that a borrower qualified for a loan, when in reality the borrowers'

       qualification was only obtained through Defendants falsification of the borrowers'

       income, asset and other documentation, done without the borrower's knowledge;

   d.  Defendants' intentional publication and dissemination of their underwriting guidelines

       intended to create the perception that Bank Defendants lent in conformity with those

       guidelines and that their lending standards were safe, when in reality Defendants had

       abandoned their underwriting guidelines and were issuing loans which they knew were in

       unsafe;

   e.  Representations made that a borrower *qualified* for a loan (oftentimes based on

       documents falsified by Defendants) calculated to induce the borrower's belief they could

       *afford* their loan, when in reality Defendants knew borrowers would be unable to afford

       their loan as a matter of fact (oftentimes because Defendants had falsified their income

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  agree to a loan they would not have otherwise agreed to, such as the meaning of a pre-

2  payment penalty, or whether they had a pre-payment penalty.

3      83.    Ally and Bank Defendants, hand in hand with one another, **intentionally and**

4  **affirmatively misrepresented**:

5      a.   That Plaintiffs would be able to *afford* the loans they were being given;

6      b.   That Defendants' calculations confirmed that Plaintiffs will be able to afford the loans

7      they were being given;

8      c.   That Defendants calculations confirmed that Plaintiffs would be able to shoulder the

9      additional debt resulting from Defendant's loans, even in light of Plaintiffs' other debts

10      and expenses;

11      d.   That the term "qualify" was synonymous with being able to "afford" a loan.

12      e.   That by paying the minimum payment on the Option ARM loan they would not be

13      deferring interest (aka "negatively amortizing"), when in reality, they would be deferring

14      interest;

15      f.   That by paying the minimum payment on the Option ARM loan, Plaintiffs would be

16      paying principal and interest, when in reality the minimum payment did not pay down

17      any principal, and actually resulted in deferred interest (aka negative amortization);

18      g.   That the value arrived at by Defendants' and HCLS' appraisals of Plaintiffs' property

19      was indeed the true value of Plaintiffs' property (when in reality Defendants appraisals'

20      were intentionally and artificially inflated, and moreover when Defendants had engaged

21      in a systematic price fixing scheme which had already falsely inflated the value of

22      Plaintiffs' property);

23      h.   The true terms of the their loans, including their interest rate, the terms of their loans,

24      whether the loan was variable or fixed, the duration of any fixed period, and the

25      inclusion of a prepayment penalty;

26      i.   That Defendants only entered into mortgages with qualified borrowers (when in reality

27      Defendants were recklessly and intentionally ignoring their own underwriting standards,

28      and offering mortgages to substantially under-qualified borrowers, including Plaintiffs

- 27 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

herein who they knew could not afford their loans);

j. That Defendants were financially sound (when in reality Defendants were dependent on selling their fraudulently-pooled loans to investors and the secondary market to sustain their business);

k. That Defendants held their loans in their own portfolio and did not sell them on the secondary market (when in reality Defendants sold the overwhelming majority of their loans on the secondary market);

l. That Defendants were engaged in lending of the highest caliber (when in reality Defendants (1)were disregarding industry standard quality assurance and underwriting guidelines as well as their own underwriting guidelines, (2)had ceded their underwriting guidelines to the bottom of the market by virtue policy to match loans of any other lender no matter how unsafe,  and (3) were lending to under qualified borrowers upon properties which were intentionally overvalued – all in the name of making as much money on the secondary/investor market as quickly as possible);

m. That the loans they offered were safe and secure (when internally Defendants and their officers were referring to their loans as "SACKS OF SHIT" and "GARBAGE LOANS");

n. That Plaintiffs and other borrowers were qualified for the loans Defendants were placing them into and that Plaintiffs were capable of affording the fully amortized payments on those loans (when internally Defendants knew that Plaintiffs were not qualified, that Plaintiffs could not afford the loan, and that, in many instances, it was a mathematical inevitability that the Plaintiffs would default);

o. That Plaintiffs would be able to refinance their loans at a later date (when internally Defendants knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set forth above);

p. That Defendants would modify Plaintiffs' loans (when in fact Defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more profitable for Defendants to

- 28 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

leave the loans unmodified).

### *Authority to Bind*

84.    These representations were not made as statements of opinion, but as statements of fact, made by the employees and agents of the Ally and Bank Defendants charged with the duty of originating loans ("**Loan Representatives**") and who were specifically employed by Bank Defendants to walk Plaintiff borrowers through the loan process, and vested with the authority, both apparent and actual, to bind Defendants.

85.    Each and every one of these Loan Representatives was vested by the respective bank they work for – the bank/lending institution from which a Plaintiff got his/her loan – with both actual and apparent authority to bind that bank/lending institution.  These Loan Representatives were the *primary*, if not sole, interface between the bank/lending institution and the customer/borrower/plaintiff. Defendant banks very much intended to create the distinct perception that the representations made by these Loan Representatives, were factual representations coming directly from the  bank, and representations upon which the borrower Plaintiffs could reasonably rely, well above-and-beyond that of mere opinion.

86.    Specifically, with regard to the representation made by Bank Defendants to Plaintiff borrowers, that they could "afford" the loans they were being given were statements delivered as statements of fact upon which Plaintiffs could reasonably rely, particularly in light of the specialized expertise of the Defendant employees who made the statements.  These employees spend months and years, undergoing specialized education, to learn the highly complicated mathematics of lending such as loan amortization, loan re-casting, front end debt to income ratios, back end debt to income ratios, and loan to value ratios – mathematics which borrowers simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendant Banks, as described above, Plaintiffs herein reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

- 29 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

*Plaintiffs Reasonably Relied on Defendants' Numerous Deceptions in Deciding to Enter into Contracts With Them*

87.     Defendants intended to deceive Plaintiffs and induce their reliance, by intentionally misrepresenting and failing to disclose the material facts.

88.     Plaintiffs did in fact rely on each of the aforementioned misrepresentations, partial representations and concealments in deciding to contract with Defendants

89.     Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a Loan contract with Bank Defendants - Defendants were among the nation's leading providers of Loan.  It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.

90.     Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Bank Defendants. Their knowledge of this process, its details, as well as their loan products was vastly superior to those of Plaintiff borrowers. Indeed, Bank Defendants had exclusive knowledge of these material facts which were not known to Plaintiff.

91.     The reality is that borrowers simply don't understand the highly complicated mathematics of lending such as amortization, loan re-casting, loan to value ratios, or debt to income ratios, etc. Nor could they be expected to – those mathematics require specialized training and education. The borrower's knowledge is inferior. Because of the vast imbalance of knowledge, when a loan consultant tells a borrower that they can afford their loan, borrowers are put in a position where they must repose their trust on their lender's knowledge.

92.     Indeed, Bank Defendants induce their borrowers (Plaintiffs) to repose trust in them by holding themselves out as (1) experienced professionals with (2) superior knowledge, education and expertise,  and **by offering them financial guidance on how to structure their assets, equity position, and debt – all of which was held out as being for the borrower's (Plaintiffs') benefit**. In many

- 30 -

instances Bank Defendants called Borrowers to **solicit loans under the guise of offering them "financial advice" and "investment strategies."** In so acting, Defendants acted as fiduciaries or quasi-fiduciaries.

93.    Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing  as well as Defendant Banks' capacity as an advisor, in addition to their (4) intentionally misleading and/or partially true statements found in omissions, including in their securities filings, numerous documents, advertisements and other media, statements made by their employees and agents with apparent and/or actual authority and their publicly available underwriting guidelines the Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably relied that no material information necessary to their decisions would be withheld or incompletely, inaccurately or otherwise improperly disclosed.  In so relying, the Plaintiffs were gravely damaged as described herein.  The Defendants acted willfully with the intention to conceal and deceive in order to benefit therefrom at the expense of the Plaintiffs.

94.    Further, Plaintiffs had no way of knowing, among other things, that Defendants (1) were secretly departing from their own stated underwriting guidelines to intentionally approve borrowers for loans they couldn't afford in aims of selling as many loans as possible on the secondary market for profit, or (2) had surreptitiously manipulated the appraised values of their borrower's properties and had otherwise artificially pumped up values of real estate through California (aka "market fixing").  Defendants' knowledge of these items was exclusive. Their scheme was built on keeping borrowers in the dark

95.    Furthermore, because of a lender's (2) vastly superior knowledge compared to that of their borrowers, and because of (3) the highly-advisory role a lender takes in the lending process (advising borrowers how much they can afford, what type of loan and term they should take, what size loan to take, how to structure their loan, and what their payments will be), Bank Defendants intentionally placed their borrowers in a position where they *must* repose trust in their lender.

96.    In reliance on the above concealments and/or material misrepresentations, Plaintiffs

- 31 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   entered into mortgage contracts with Defendants they otherwise would not have entered into and as a

2   result thereof were damaged. This damage was not only foreseeable by Defendants, but actually

3   foreseen (and then concealed) by them.

4        97.    The unraveling of Defendants' scheme has caused the material depression of real estate

5   values throughout California, including the real estate of Plaintiffs herein.

6        98.    Defendants knew that within a foreseeable period, its investors would discover that

7   Defendants' borrowers could not afford their loans and the result would be foreclosures and economic

8   devastation.

9        99.    Despite their awareness of and concerns about the increasing risk the Defendants were

10   undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

11        100.    These frauds and concealments, partial misrepresentations and affirmative

12   misrepresentations were unknown to all Plaintiffs referenced herein at the time of loan origination. All

13   Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the

14   date of filing this action. A reasonable person would have been unable to reasonably discover said

15   frauds any earlier.

16
17
                             ***Bank Defendants Owed Plaintiffs a Duty***

18        101.    For seven separate and independent reasons, Bank Defendants owed Plaintiffs a duty.

19        102.    **First** under California Civil Code §1572, parties to a contract have an unequivocal duty

20   to disclose material facts to one another. (*Walker v. KFC Corp.* (S.D.Cal. 1981) 515 F.Supp. 612, 622

21   ["[section] 1572 affirmatively imposes the duty not to suppress facts on persons who are parties to a

22   contract or who are inducing others to enter into a contract."]) Here Plaintiffs are engaged in contracts

23   with respective loan contracts with each of the Bank Defendants, and plaintiffs have alleged numerous

24   failures to disclose such material facts. (See paragraph 333, and Appendix A).

25        103.    **Second**, California Civil Code §§1709 and 1710 establish a separate independent duty of

26   disclosure, even in the absence of a contractual relationship, where, as here, Bank Defendants and HCLS

27   have made partial inaccurate disclosures which are likely to mislead for want of the missing fact,

28   codifying the long-standing rule that the "telling of a half-truth calculated to deceive, is fraud." Plaintiffs

- 32 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    have alleged numerous such partially misleading disclosures at paragraph 336, of this Complaint, and in

2    Appendix A. The Supreme Court of California has held the same. (Warner Constr. Corp., supra, 2

3    Cal.3d at 294 [A defendant has a duty of disclosure "when the defendant makes partial representations

4    but also suppresses some material facts."]).

5         104.    **Third**, Bank Defendants and HCLS had exclusive knowledge of numerous items of highly

6    material information which they did not disclose. Numerous cases including those from the Supreme Court

7    of California hold that a defendant has a duty of disclosure "when the defendant had exclusive knowledge

8    of material facts not known to plaintiff." *Warner Constr. Corp.*, supra, 2 Cal.3d at 294.

9         105.    **Fourth**, a Defendant has a duty to disclose "when it actively conceals a material fact

10    from the plaintiff." Warner Constr. Corp., supra, 2 Cal.3d at 294.  This Complaint alleges throughout

11    that Bank Defendants and HCLS embarked on a campaign of active suppression and concealment of

12    numerous material facts.

13         106.    **Fifth**, Numerous court, including the California Court of Appeal have held that where,

14    as here, the disclosures in Plaintiffs' Option ARM loans discussing negative amortization, only frame

15    negative amortization as a mere possibility, rather than the reality which is that when making a

16    minimum payment negative amortization is a certainty, the disclosure is insufficient under law, giving

17    rise to a valid cause of action not only for UCL but also for fraud/misrepresentation. (Boschma v. Home

18    Loan Center, Inc. (2011) 198 Cal.App.4th 230.)  The court in Boshcma explicitly held that Banks have a

19    duty to disclose such material information. Plaintiffs allege that Bank Defendants, identically, failed to

20    disclose the certainty of negative amortization in the Option ARM loans. Plaintiffs have attached

21    supporting documentation. (See Appendix A).

22         107.    **Sixth**, Defendants have **ceased acting as conventional money lenders**. In conducting

23    the wrongs described above and throughout this Complaint, the Bank Defendants stepped vastly outside

24    of their role as conventional money lenders, and instead morphed into an enterprise engaged in

25    intentional fraud upon their borrowers.  Among their numerous departures from the actions of a

26    conventional money lender, Defendants:

27            a.  **Intentionally falsified the values and appraisals of each of the Plaintiffs' subject**

28               **properties** – numerous courts have held that such falsification of appraisals "do not fall

- 33 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

within a bank's role as a traditional money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

b. Artificially and fraudulently inflated the value of all of the California real estate market, (as opposed to just those of Plaintiffs herein) in **a Price Fixing scheme achieved through pervasive and coordinated falsification of appraisals**, knowing that by doing so their fraudulent appraisals would act as comparables which would artificially inflate the rest of the market (as detailed in the Causes of Action for "Individual Appraisal Inflation" and "Market Fixing" below)

c. **Coerced their appraisers to falsify their appraisals through bribery, undue influence, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit** – that if their appraisals didn't return a valuation above that demanded by Bank Defendants (1) future business with the appraiser would either diminish or discontinue altogether or (2) that the individual appraiser would be fired/blacklisted.

d. Intentionally and knowingly subjected their appraisers to known conflicts of interest.

e. **Intentionally falsifying the income and asset documentation** of their borrowers to place them into loans which Defendants knew Plaintiffs could not afford, and would default upon to a mathematical certainty. Numerous courts have held banks liable for fraud for such identical acts because such acts "do not fall within a bank's traditional role as money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

f. Abandoned the "originate to hold" business model of conventional money lenders, and instead became **a loan packaging and re-selling facility in which bank defendants originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan.

AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

g. Intentionally abandoned industry-standard underwriting guidelines – the hallmark of conventional money lending - in order to place borrowers into loans they knew they could not afford solely in the name of profit;

h. **Originated loans with an eye towards immediately securitizing and re-selling them on the secondary market and becoming the servicer on the loan**, thus creating an incentive to place borrowers into loans they knew their borrowers could not afford because by doing so Defendants-now-turned-servicers would be in a position to collect highly-lucrative fees from their imperiled borrowers, such as late fees, default fees, and indeed foreclosure fees. In doing so, Defendants became anything but conventional money lenders – **their interests were directly aligned with those of a servicer**. Numerous courts have held that where, as here, a bank acts as servicer they have exceed their role as a conventional money lender. (*Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D.Cal. 2012) 2012 WL 928433 *4.)

i. **Entered into loan modifications with Plaintiffs.** A lender goes beyond its "role as a silent lender and loan servicer [when it] offer[s] an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan. ... [T]his is precisely beyond the domain of a usual money lender ... [and] constitutes sufficient active participation to create a duty of care", as held by numerous courts. (*Garcia v. Ocwen Loan Serv.*, LLC (N.D. Cal.) 2010 WL 1881098 at *3; *Ansanelli v. JPMorgan Chase Bank, N.A.*, No. C 10-03892 WHA, 2011 U.S. Dist. LEXIS 32350, at *21-22 (N.D.Cal. Mar. 28, 2011; *Johnson v. HSBC Bank USA*, (S.D. Cal. 2012) 2012 WL 928433 at *3.)

j. **Engaged in massive intentional fraud upon its borrowers**. While a bank may in the course of conventional lending act negligently from time to time, intentional committed torts cannot be said to be conventional practice for lenders. If Bank Defendants wish to assert that massive intentional fraud on their borrowers is conventional practice for lenders, they should do so at trial. Numerous courts, including the Supreme Court of the United States have recognized that a duty properly attaches to a bank when it acts intentionally, rather than negligently. (*Connor v. Great Western Sav. & Loan Ass'n*

- 35 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

(1968) 69 Cal.2d 850, 865; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231

Cal.App.3d 1089; *Becker v. Wells Fargo Bank, N.A.* (E.D.Cal. 2011) 2011 WL 3319577;

Dumas, supra, 2011 WL 4906412; *Champlaie, supra,* 706 F.Supp.2d at 1060; *Watkinson*

*v. MortgageIT, Inc.* (S.D. Cal. 2010) 2010 WL 2196083.)

    k.  **Seventh**, and finally, even when acting as a conventional money lender, Banks

nevertheless owe a duty to their borrowers, when they meet the following test:

> In California, the test for determining whether a financial institution owes
> a duty of care to a borrower-client " 'involves the balancing of various
> factors, among which are [1] the extent to which the transaction was
> intended to affect the plaintiff, [2] the foreseeability of harm to him, [3]
> the degree of certainty that the plaintiff suffered injury, [4] the closeness
> of the connection between the defendant's conduct and the injury suffered,
> [5] the moral blame attached to the defendant's conduct, and [6] the policy
> of preventing future harm.

(*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1098). Each

of the 6 elements is amply alleged throughout this Complaint.

    108.    Defendants' profit-driven scheme to herd as many borrowers into loans at any cost

through coordinate deception was implemented pursuant to a top down policy ratified at the highest

levels of each of Bank Defendants, and done at the behest of the Conspiracy.

    109.    Defendants' actions in intentionally placing borrowers into impossible loans in the

pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

    110.    The unraveling of the Defendants' scheme has materially depressed the price of real

estate throughout California, including the real estate owned by the Plaintiffs, resulting in losses to the

Plaintiffs.

    111.    As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing

decline in residential property values and further erosion of their credit records.

    112.    Defendants' concealments and misrepresentations, both as to the their scheme to profiteer

from the mortgage melt-down and as to their purported efforts to resolve loan modifications with

Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

    113.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

- 36 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses

2  related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,

3  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

4  as fees and costs, including, without limitation, attorneys' fees and costs.

5      114.    Counts 1 – 5 arise under this Cause of Action, and are brought by all Plaintiffs named in

6  this Cause of Action, against all Defendants named in this Cause of Action.

7

8              **COUNT 1: FRAUDULENT CONCEALMENT**

9      115.    The preceding paragraphs and the paragraphs following this cause of action are

10 incorporated by reference as though fully set forth herein

11     116.    Ally and Bank Defendants, at the direction, behest, and on behalf of the Conspiracy of

12 Defendants intentionally concealed the material facts alleged above at Paragraph 76 and 78, in order to

13 induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants

14     117.    Plaintiffs did in fact rely on the non-existence of the concealed facts in deciding to enter

15 into Loan Contracts with Ally and Bank Defendants.  Had Plaintiffs known the truth, they would not

16 have entered into the Loan Contracts.

17     118.    Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping

18 their borrowers (Plaintiffs herein) in the dark.

19     119.    Defendants had a duty to disclose such material information but intentionally failed to do so.

20     120.    As a result of such concealments Plaintiffs were damaged as described in this Cause of

21 Action. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages

22 arising from this Cause of Action also include loss of equity in their houses, growth in their loan

23 balances resulting from concealed negative amortization, costs and expenses related to protecting

24 themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability

25 of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs,

26 including, without limitation, attorneys' fees and costs.

27     121.    Defendants' actions in intentionally placing borrowers into impossible loans in the

28 pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

- 37 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

2      122.   Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of

3  punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief

4  this court shall deem just and proper.

5              **COUNT 2: INTENTIONAL MISREPRESENTATION**

6      123.   The preceding paragraphs and the paragraphs following this cause of action are

7  incorporated by reference as though fully set forth herein

8      124.   Ally and Bank Defendants, at the direction, behest, and on behalf of the Conspiracy of

9  Defendants intentionally misrepresented the material facts alleged above at Paragraphs 77 and 78, in

10  order to induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants

11      125.   Plaintiffs did in fact rely on the truth of the misrepresented facts in deciding to enter into

12  Loan Contracts with Ally and Bank Defendants.  Had Plaintiffs known the truth, they would not have

13  entered into the Loan Contracts.

14      126.   Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping

15  their borrowers (Plaintiffs herein) in the dark.

16      127.   As a result of such intentional misrepresentations Plaintiffs were damaged as described in

17  this Cause of Action. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

18  damages arising from this Cause of Action also include loss of equity in their houses, loan payments

19  falsely represented to be much lower than what they truly were, growth in their loan balances resulting

20  from negative amortization which Defendants represented would not occur,  costs and expenses related

21  to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,

22  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

23  as fees and costs, including, without limitation, attorneys' fees and costs.

24      128.   Defendants' actions in intentionally placing borrowers into impossible loans in the

25  pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

26  caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

27      129.   Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of

28  punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief

- 38 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

this court shall deem just and proper.

## COUNT 3: NEGLIGENT MISREPRESENTATION

130.    The preceding paragraphs and the paragraphs following this cause of action are
incorporated by reference as though fully set forth herein.

131.    The allegations of this Count are identical to those above in the previous Count except
that the degree of intent herein is that of negligence. Put another way, at the time Ally and Bank
Defendants made the misrepresentations described in this Cause of Action, they did not have reasonable
grounds to believe them to be true.

## COUNT 4: NEGLIGENCE

132.    The preceding paragraphs and the paragraphs following this cause of action are
incorporated by reference as though fully set forth herein

133.    Ally and Bank Defendants had a duty to act reasonably, and further had duties of care
imposed upon them by law and statute as alleged above at paragraphs 96-102

134.    In undertaking to place as many borrowers into loans as possible in the pursuit of profit
without regard for their ability to afford them, their creditworthiness, or the distinct risk of default
(either a known likelihood of default or reckless disregard thereof) and the commensurate effects such
wide scale defaults would have on property values and the economic system, Ally and Bank Defendants
breached that duty.

135.    Ally and Bank Defendants further breached their duty by abandoning industry standard
underwriting guidelines.

136.    Ally and Bank Defendants breached their duty in numerous other fashions as described
throughout this Complaint, whose allegations in their entirety are incorporated by reference as to all
Causes of Action and all Counts.

137.    In breaching their duty, Ally and Bank Defendants, acting in conspiracy with the other
Defendants herein, caused grave damage to Plaintiffs herein and numerous others.

138.    These harms were foreseeable if not actually foreseen by Defendants.

139.    Further, Defendants' actions in intentionally placing borrowers into impossible loans in
the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

- 39 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1 | caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein

2 | 140.      Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

3 | damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses

4 | related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,

5 | reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

6 | as fees and costs, including, without limitation, attorneys' fees and costs.

7 | **COUNT 5 : UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES**

8 | **(VIOLATION OF CAL. BUS. & PROF. CODE §17200)**

9 | 141.      The preceding paragraphs and the paragraphs following this cause of action are

10 | incorporated by reference as though fully set forth herein.

11 | 142.      Ally and Bank Defendants' acts, hand-in-hand with the conspiracy of Defendants, as

12 | described in this Cause of Action are Fraudulent as set forth above

13 | 143.      In addition to being fraudulent, Ally and Bank Defendants' actions are also unlawful.

14 | Defendants' actions in implementing and perpetrating their fraudulent scheme of inducing Plaintiffs to

15 | accept mortgages for which they were not qualified based on inflated property valuations and undisclosed

16 | disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all

17 | the while knowing that the plan would crash and burn, taking the Plaintiffs down and costing them the

18 | equity in their homes and other damages, violates numerous federal and state statutes and common law

19 | protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce. In

20 | addition to being fraudulent and violates numerous federal and state statutes and common law protections

21 | enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce.

22 |          a.    Ally and Bank Defendants violated the Truth in Lending Act ("**TILA**") by failing to

23 |             make the necessary disclosures under Law, including the failure to sufficiently disclose

24 |             the certainty of negative amortization in their Loan Documents as well as the

25 |             accompanying Truth In Lending Disclosure Statement. These identical allegations have

26 |             been recognized by the California Court of Appeal in *Boschma*, to give rise to an

27 |             actionable claim for Fraudulent Concealment, Violation of TILA & Violation of the

28 |             UCL.

- 40 -

b. Defendants further violated TILA by failing to properly disclose or fraudulently hiding prepayment penalties, points, origination discounts, kickbacks, commissions, etc. to Plaintiffs oftentimes resulting in Plaintiff being forced to incur or pay unnecessary or unfair charges which they were never aware of, and which they never had an opportunity to contest.

144.    The acts of the Conspiracy of Defendants are also patently unfair as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as they intentionally place unsuspecting borrowers into loans which jeopardize their financial livelihoods and risk potential homelessness. Simply put, Defendants' scheme is to use borrowers as pawns to increase their profit. It speaks for itself that such acts are patently unfair.

145.    Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

146.    These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

147.    The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets.

148.    Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened

- 41 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

harm to competition.

149.    Plaintiffs are entitled to restitution of the loan payments obtained by Defendants pursuant to their unlawful, unfair, and fraudulent business practices.

150.    Further, as a result of the foregoing conduct, Plaintiffs suffered injury in fact including diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs.

151.    As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

152.    Finally, as a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

153.    Plaintiffs hereby also request injunctive relief against future violation of the same.

## SECOND CAUSE OF ACTION: INDIVIDUAL APPRAISAL INFLATION

*(By All Plaintiffs against Ally Defendants and Bank Defendants and HCLS, and all other Defendants as Co-Conspirators)*

154.    An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any loan over 80% LTV was considered risky, and would require the purchase of "Mortgage Insurance" to insure against the additional risk associated with such high LTV loans. The idea being that a high LTV

- 42 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

means that a borrower has invested little of his own money in the property, and is thus more likely to

walk away from the property when things get tough. Now imagine the above scenario with a slight

modification - instead of the above property being appraised at $100,000 dollars, the appraisal was

manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio would appear

as a much safer, and less risky 80% LTV ($90,000 Loan divided by $112,500 property value = 80%).

155.    From an **investor's perspective**, a high LTV ratio represents a greater risk of default on

the loan, which means they are unwilling to pay as much for that loan as they would one which was less

risky. This is true for a number of reasons. First borrowers with a small equity position in the

underlying property have "less to lose" in the event of default. Second, even a slight drop in housing

prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which

might cause the borrower to default and would prevent the issuing trust recouping its expected return in

the case of foreclosure and subsequent sale of the property.

156.    From the **Defendants' perspective**, Because of their shift from the "originate to hold"

model to the "originate to sell" model, Bank Defendants (and the conspiracy of Defendants) were

incentivized to enter into as many loans as possible to sell on to the secondary market for profit. Because

Bank Defendants weren't holding these loans anymore, they held no risk – they had no reason to ensure

that the borrower was adequately qualified, or more importantly, in the context of *this* discussion, that

the property had sufficient value, because Bank Defendants immediately turned around and sold that

loan. Because investors were willing to pay more for less risky loans (lower LTV loans), Defendants

were given an incentive to fraudulently inflate the appraisal values of their property, thus making the

collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them.

More value to the investors means more profit to Defendants. And so it began, Bank Defendants acting

to the benefit of the conspiracy quickly embarked on a scheme to inflate their appraisals, and more

broadly, property values throughout the State of California (discussed below in the Market Fixing Cause

of Action), because, in short, they made a *lot more money by doing so*.

157.    To maximize their loan volume and accordingly profit, Bank Defendants began falsely

inflating and intentionally misrepresenting the appraised values of the Plaintiff's subject properties.

Their purpose was three-fold :

- 43 -

a. **First**, by doing so, Bank Defendants induced Plaintiffs to consummate their purchase transactions by falsely and intentionally reassuring them that they were paying what the home was worth, and not more – the result of which was, once again, more loans generated by Defendants and thus more profit. Put another way, Defendants falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase and loan, and not back out. For those who were refinancing, the fraudulent appraisal inflation acted to falsely assure them that sufficient equity existed in their home, to merit incurring additional debt.

b. **Second,** by doing so, Bank Defendants induced Plaintiffs to consummate their transactions by falsely and intentionally reassuring them that their collateral was sound.

c. Third, **because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were given an incentive to fraudulently inflate the appraisal values of their property,** thus making the collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them. This in turn led to more sales and even more profits on the secondary market.

158.    To achieve this, Ally and Bank Defendants exercised dominion over Ally's wholly-owned appraisal subsidiary HCLS, directing them to provide the results requested, or engaged in a practice of pressuring and intimidating HCLS into using appraisal techniques that met Ally and Bank Defendants' business objectives even if the use of such appraisal technique was improper and in violation of industry standards. Ally and Bank Defendant black-listed appraisers who did not provide appraisal reports with their expectations.

159.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. Ally would use their in-house or contract appraisers at Home Connects Lending Services (HCLS) to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions.

160.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span

- 44 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   mentioned in this complaint, and determined through its investigation that appraisers were often

2   pressured by mortgage originators, among others, to "produce inflated results."

3         161.    This coercion by Defendants to fraudulently inflate appraisal values was particularly

4   rampant in the context of refinance transactions.  When a property didn't appraise for a high enough

5   value, a deal wouldn't "go through"  this meant that (1) the loan consultant on the transaction wouldn't

6   get a commission, (2) the Area Divisions (sometimes referred to as "Home Loan Centers" – often

7   comprised of hundreds of loan consultants over several cities, and managed by a single manager) which

8   were paid handsomely for each funded loan wouldn't get paid, and (3) Ally and Bank Defendants

9   wouldn't be able to sell the loan on the secondary market for profit.  Nobody made money.  However,

10  the system was set up to allow coercion, bribery, and undue influence over the appraisers. Loan

11  consultants would contact appraiser and direct them specifically as to what value was "needed" to make

12  the deal go through, some even going so far as to give gifts to the appraisers, and many were given

13  outright bribes. Area Division managers who also had a financial incentive as mentioned earlier, would

14  exercise undue influence and contact appraisers and demand certain values from them, abolishing the

15  exercise of independent thought necessary to render an accurate/good faith appraisals. The same Area

16  Division Managers, because of their power and influence within the company, would even go so far as

17  to call the appraisal group's *managers* and request (read "demand") an appraisal to come in at a certain

18  value, or if that appraisal had already been rendered and it was too low, would request the appraisal

19  value to be "bumped" or increased. The Area Division Managers who often had personal or friendly

20  relationships with HCLS' Appraisal *managers* would coerce, bribe or influence, give gifts to or "call in

21  favors" from the Appraisal managers to ensure that the appraised value of the subject property was high

22  enough to make the deal "go through," so that all parties could make their money. The Appraisal

23  managers obliged.

24        162.    On other occasions Bank Defendants, hand-in-hand with HCLS, would use overvalued,

25  inflated or out-of-area comps from non-comparable *superior* properties in valuating the subject property

26  for the wrongful purpose of arriving at a higher value than would be supported by nearby or appropriate

27  comps. Bank Defendants intended this to artificially inflate the appraised value of the subject property.

28        163.    On the rare occasion when a loan consultant's or Area Division Manager's influence

- 45 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    didn't get the appraiser to inflate the value of the appraisal by a sufficient amount, Defendants' policies

2    gave them another, more effective way to fraudulently inflate the amount – they were allowed to hire an

3    *outside appraiser*. It was well known in the industry that outside appraisers would deliver an appraisal in

4    the amount they were told to deliver. Why? Because they were being paid directly by the loan

5    consultant, or the Area Division Manager. In other words, loan consultants and Area Division

6    Manager's had outside appraisers "in their pockets." Outside appraisers would deliver the results

7    (meaning inflated values) they were expected to deliver for two reasons: (1) In the interest of keeping

8    the client happy and hopefully earning future business and (2) for fear of not getting paid on their

9    individual deal if they didn't deliver the results they were expected to deliver. This procedure (allowing

10    the hiring of easily-influenced outside appraises) was explicitly made part of Defendants' own policies,

11    and its use was encouraged by Defendants, as well as their mid-level and upper management.

12          164.    This coercion and influence even existed from the **top down** – Regional Managers (in

13    charge of entire portions of the country, several states large) would also call in favors and demand

14    appraised values to be inflated or changed to make deals happen in the interest of making money. This

15    pattern was not only tolerated by Defendants, but ratified and encouraged by them, because more funded

16    loans meant more money for Defendants (who as described above, held none of the risk). In fact,

17    Defendants had intentionally set up the appraisal system in such a way as to allow for the exercise of

18    influence over appraisals and the appraisal departments. This influence was intended and foreseen.

19          165.    In short, Ally and Bank Defendants intentionally designed an appraisal system which

20    they could manipulate through influence and coercion to further their own ends – namely, profit. By its

21    very design, the independence of thought necessary for a professional appraiser to render a good faith

22    opinion was decimated. (1) Defendants held dominion over the very appraisal company which was

23    supposed to render independent appraisals, HCLS. Then, (2) Bank Defendants through its explicit (as

24    well as unwritten) policies and procedures, intentionally allowed their own employees who made

25    commission/money as a function of every funded loan (managers, loan consultants, etc.), to contact

26    individual appraisers and bribe, exercise influence, call in favors, harass, and coerce appraisers into

27    rendering the exact value they needed. And finally, when all else failed (3) Defendants set up a fail-

28    safe; they created an internal policy which allowed for the hiring of "outside" appraisers who were

- 46 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

particularly well known within the industry for being willing to "fudge" the numbers.

166.     Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis which appraisers issued their appraisal without reasonable bases for doing so.

167.     A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review* , found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation.

168.     Through their intentional misrepresentations and fraudulent appraisal inflation Ally and Bank Defendants, and HCLS intended to induce Plaintiffs' reliance on the truth of their valuations and representations, and to induce them to move forward with their loan transactions, which were profitable to Bank Defendants and the conspiracy of Defendants – and did indeed induce such reliance.

169.     A professional appraiser's (such as those used by Defendants) knowledge of property valuation is vastly superior to that of the lay borrower.  The complicated mathematics and calculations of appraisals require highly specialized education. Their training and knowledge is so specialized, in fact, that one cannot act as an appraiser without being properly trained and licensed. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional appraiser – particularly in light of their complicated nature. Plaintiffs did in fact rely on the representations and concealments of these parties.

170.     Ally Defendants, Bank Defendants and HCLS knew that it was foreseeable that Plaintiffs would rely on their appraisals and/or (mis)representations of values.

171.     These misrepresentations were material to Plaintiffs decision to enter into the Loans

172.     Plaintiffs did rely on the truth of such (mis)representations and, in doing so, entered into

- 47 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   Loan Contracts with Defendants. Had Plaintiffs known the truth they would not have moved forward

2   with the purchase transactions, or loan transactions.

3          173.    Ally and Bank Defendants, together with HCLS,  perpetrated this systematic appraisal

4   fraud at the direction of and for the benefit of the conspiracy, and with the knowledge, ratification, and

5   acquiescence of their executives and board members.

6          174.    As a result of such Appraisal Inflation, Plaintiffs were induced to pay more for their

7   homes than their true value, induced to take larger loans than would have been necessary, pay larger

8   down payments, pay additional interest, fees, and pay additional property taxes.

9          175.    Counts 6 through 9 arise under this (Second) Cause of Action for Individual Appraisal

10  Inflation, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named

11  in this Cause of Action.

12                    **COUNT 6: INTENTIONAL MISREPRESENTATION**

13         176.    The preceding paragraphs and the paragraphs following this cause of action are

14  incorporated by reference as though fully set forth herein.

15         177.    Ally and Bank Defendants and HCLS, at the direction, behest, and on behalf of the

16  Conspiracy of Defendants intentionally inflated and misrepresented the true values of Plaintiffs' homes,

17  in order to induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants,

18  as described at length throughout this Cause of Action.

19         178.    Plaintiffs did in fact rely on the truth of the misrepresented facts in deciding to enter into

20  Loan Contracts with Ally and Bank Defendants.  Had Plaintiffs known the truth, they would not have

21  entered into the Loan Contracts.

22         179.    Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping

23  their borrowers (Plaintiffs herein) in the dark.

24         180.    As a result of such Appraisal Inflation, Plaintiffs were induced to pay more for their

25  homes than their true value, induced to take larger loans than would have been necessary, pay larger

26  down payments, pay additional interest, fees, and pay additional property taxes. Without limiting the

27  damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action

28  also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced

- 48 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and

services tied to credit ratings, increased costs of those services, as well as fees and costs, including,

without limitation, attorneys' fees and costs.

181.    Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of

punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief

this court shall deem just and proper.

### COUNT 7: NEGLIGENT MISREPRESENTATION

182.    The preceding paragraphs and the paragraphs following this cause of action are

incorporated by reference as though fully set forth herein.

183.    The allegations of this Count are identical to those above in the previous Count except

that the degree of intent herein is that of negligence. Put another way, at the time of the

misrepresentations described in this Cause of Action (and listed in part above), Ally and Bank

Defendants and HCLS did not have reasonable grounds to believe them to be true.

### COUNT 8: NEGLIGENCE

184.    The preceding paragraphs and the paragraphs following this cause of action are

incorporated by reference as though fully set forth herein

185.    Ally Defendants, Bank Defendants and HCLS had a duty to act reasonably, and further

had duties of care imposed upon them by law and statute as alleged above at paragraphs 97-103 to

provide accurate appraisals. Such duties are also established by the applicable standards of care within

the profession.

186.    In falsely inflating and causing to be inflated the appraisals of Plaintiffs herein Ally

Defendants, HCLS and Bank Defendants breached that duty.

187.    In (recklessly, knowingly, or intentionally) placing borrowers into loans upon which they

would be instantly upside down and be instantly upside down by virtue of inflated valuations – all so that the

Conspiracy of Defendants could profit - Ally and Bank Defendants further breached their duty.

188.    In (recklessly, knowingly, or intentionally) furnishing false and inflated appraisals – all so

that the Conspiracy of Defendants could profit – Ally Defendants, Bank Defendants, and HCLS further

breached their duty.

- 49 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

189.    In (recklessly, knowingly, or intentionally) failing to observe the standards of care in the appraisal profession, HCLS breached its duty.

190.    In undertaking to place as many borrowers into loans as possible in the pursuit of profit without regard for their ability to afford them, their creditworthiness, or the distinct risk of default (either a known likelihood of default or reckless disregard thereof) and the commensurate effects such wide scale defaults would have on property values and the economic system, Ally and Bank Defendants breached that duty.

191.    Ally and Bank Defendant additionally breached their duty by coercing and bribing their appraisers, as well as subjecting their appraisers to conflicts of interest, as more fully set forth in this Cause of Action.

192.    HCLS additionally breached their duty by accepting such bribes, and/or acting under known conflicts of interest, as more fully set forth in this Cause of Action.

193.    Ally Defendants, Bank Defendants and HCLS breached their duty in numerous other fashions as described throughout this Complaint, whose allegations in their entirety are incorporated by reference as to all Causes of Action and all Counts.

194.    In breaching that duty Ally and Bank Defendants, and HCLS acting in conspiracy with the other Defendants herein, caused grave damage to Plaintiffs herein and numerous others.

195.    These harms were foreseeable if not actually foreseen by Defendants.

196.    Defendants' actions in intentionally manipulating and inflating appraised property values, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

197.    Further, Defendants' actions in intentionally placing borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein

198.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   as fees and costs, including, without limitation, attorneys' fees and costs.

3   ### COUNT 9: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
4   ### (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

5   199.   The preceding paragraphs and the paragraphs following this cause of action are
6   incorporated by reference as though fully set forth herein.

7   200.   Ally and Bank Defendants' acts in intentionally causing falsely inflated appraisals in
8   order to induce their borrowers to move forward with Loans were unlawful, unfair, **and** fraudulent – all
9   in the disjunctive.

10   201.   Such acts are **fraudulent** for all of the reasons described above, whose allegations are
11   hereby incorporated by reference.

12   202.   These acts are also **unlawful**.

13   203.   California Civil Code §1090.5 "Valuation of real estate; improper influence; violation"
14   forbids the exercise of influence over the valuation of property by any person with an interest in that real
15   estate transaction. Defendants have violated this law.

16   a.   Bank Defendants and their Co-conspirators herein had a direct interest in the valuation of
17        real estate transactions at issue, as they were the institution that was lending on the
18        property, and moreover because they stood to profit from the consummation of the real
19        estate transaction – which depended in large part on a sufficient valuation being returned
20        by the appraiser. Their wrongful influence occurred in connection with the "development,
21        reporting, result, or review of that valuation" in accord with the language of the statute.

22   b.   Defendants herein both in their individual capacity, and in their capacity as co-
23        conspirators with one another and with HCLS (Ally's wholly-owned appraisal
24        management company) have violated California Civil Code §1090.5 by violating
25        appraiser independence through, among other things, compensation, coercion, extortion,
26        bribery, intimidation of their appraisers, as well as the appraisal management company
27        itself, and its management and executives, as well as other independent, outside, or "fee
28        appraisers" not employed by Nationwide Appraisals.

- 51 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

c.  As described throughout this Complaint at length, Citi and Defendants herein as well as their employees, officers, and agents intentionally:

d.  Caused the appraisers to  base the value of their appraisals on a factor other than the independent judgment of the appraiser;

e.  Mischaracterized and/or suborned the mischaracterization of the appraised value of the property securing the extension of credit;

f.  Sought to influence the appraiser  to facilitating the making of and pricing of their transactions;

g.  Sought to influence the appraiser to achieve a targeted value;

h.  Withheld or threatened to withhold payment for the appraisal services rendered in conformity with the contract between the parties;

i.  Implied, directly or indirectly or threatened that the future retention of the appraiser was contingent upon their return of a satisfactory valuation; and

j.  Excluded other appraisers from rendering future valuations based on the return of valuations which did not meet a certain target in the past.

k.  Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

204.    As alleged at length above, Bank Defendants violated California Civil Code §1090.4 by subjecting, both, their appraisers as well as their appraisal management company, to coercion, undue influence, bribery, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit – that if their appraisals didn't come back in at value (1) future business with the appraisers would either diminish or discontinue altogether or (2) that the individual appraiser would be blacklisted.

205.    Ally and Bank Defendants also violated 15 U.S.C. §1639e (entitled "Violation of Appraiser Independence") by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside,

- 52 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

or "fee appraisers" not employed by their Appraisal management company.

    a.  Ally and Bank Defendants herein were in the business of extending credit and providing services related to the extension of credit in the consumer credit transactions secured by the principal dwelling of the customer – Plaintiffs herein.

    b.  As described throughout this Complaint at length, Ally and Bank Defendants herein as well as their employees, officers, and agents, while acting for the benefit of the Conspiracy of Defendants intentionally:

        i.  Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

        ii.  Mischaracterized and/or suborned the mischaracterization of the appraised value of the property securing the extension of credit

        iii.  Sought to influence the appraiser to facilitating the making of and pricing of their transactions;

        iv.  Sought to influence the appraiser to achieve a targeted value; and

        v.  Withheld or threatened to withhold payment for the appraisal services rendered in conformity with the contract between the parties.

206.   Ally and Bank Defendants and HCLS, acting on behalf of the Conspiracy also violated 12 C.F.R §323.5 by allowing their staff appraisers to have an direct or indirect financial or other interest in the property, namely Ally and Bank Defendants and HCLS often bribed, or incentivized their staff appraisers for who appraised homes whose loans ended up funding, and further by penalizing and denying the appraiser pay for not valuing a property at a high enough value.

    a.  As to fee appraisers, outside appraisers and independent appraisers, Ally and Bank Defendants and HCLS also violated 12 C.F.R. §323.5 in knowingly allowing their loan consultants, brokers, and other such loan origination employees to engage the appraisers themselves directly, knowing that such employees would exercise influence over the appraisers. Further, these fee/outside/independent appraisers were given a direct interest in the transaction – their pay and the possibility of future business would often be contingent on the results they provided, namely high values.

- 53 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

b.  Additionally, Ally and Bank Defendants and HCLS violated this section as to both Staff
and "fee"/outside/independent appraisers by "blacklisting" any appraiser who
consistently brought back lower values than expected. In other words, Defendants
conditioned the appraiser's very job on their willingness to "play ball" – a strong
financial interest in the value of the property if ever there were any.  Appraisers who
would bring back conservative or low values were let go and never re-hired.  This was a
well-known reality within the appraisal and banking industry and influenced the
independence of thought of any appraiser working with a big bank such as bank
Defendant Banks herein. Defendants intended the threat of being blacklisted to deter
appraisers from rendering uninhibited good faith appraisals and instead to influence
appraisers to exaggerate their values. When taken in the aggregate, Defendants' policies,
coercion and acts resulted in the systematic and artificial inflation of California real estate
values (as discussed below in the "**Market Fixing**" Cause of Action).

c.  The loan transactions alleged in this cause of action qualify as "federally regulated
transactions" under the statute because such transactions are defined in the definition
section of the statute as "any real-estate-related financial transaction entered into on or
after August 9, 1990 that… requires the services of an appraiser."

207.   Further, Defendants acts in tricking borrowers to enter into Loans with them by
intentionally misleading them about the value of their homes, are fundamentally **unfair** and deceptive.
Defendants knowingly placed Plaintiffs borrowers in a position of peril, for their own personal gain.

208.   No business, particularly one as centrally-important to the American economy as
banking, should be allowed to so egregiously deceive its consumers.  If Banks are to conduct business,
their business *must not be* that of fraud and deception.

209.   Without limiting the allegations above which are fully incorporated herein, Bank
Defendants' acts are **unfair** insofar as they intentionally place unsuspecting borrowers into loans which
jeopardize their financial livelihoods and risk potential homelessness. Simply put, Defendants' scheme
is to use borrowers as pawns to increase their profit. It speaks for itself that such acts are patently unfair.

210.   Such acts and practices violate established public policy and the harm they cause to

- 54 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  consumers in California greatly outweighs any benefits associated with those practices.

2    211.    These actions were immoral, unethical, oppressive, unscrupulous and substantially

3  injurious to similarly situated borrowers, and Plaintiffs herein. Ally and Bank Defendants' and HCLS's

4  conduct had no utility other than for their own personal gain, and the harm was great not only to

5  Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and

6  property values as a result of the bursting of the super-heated pricing bubble created by Defendants'

7  fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would

8  cause the precipitous decline in property values throughout the State of California. Defendant's acts

9  caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have

10  reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and

11  omission.  Further, Defendants acts significantly threatened harm to competition.

12    212.    Defendant's acts caused substantial consumer injury with no benefits to consumer

13  competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants'

14  intentional deceit, misrepresentation, and omission.  Further, Defendants acts significantly threatened

15  harm to competition.

16    213.    Defendants acted with malice and with the intent of artificially inflating California Real

17  estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

18    214.    As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all

19  sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent

20  conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants,

21  including, without limitation, the excessive fees paid at Defendants' direction, and premiums received

22  upon selling the mortgages at an inflated value.

23    215.    Plaintiffs are entitled to restitution of the loan payments obtained by Defendants pursuant

24  to their unlawful, unfair, and fraudulent business practices.

25    216.    Further, as a result of the foregoing conduct, Plaintiffs suffered injury in fact including

26  diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit,

27  fees and costs, including, without limitation, attorneys' fees and costs.

28    217.    Finally, as a result of these acts, Plaintiffs were placed into larger loans than they could

- 55 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   afford or should have been placed into. The additional fees, points and interests paid as a result of the

2   higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

3       218.    The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a

4   continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are

5   harmful and disruptive to business and financial markets and merit the award of injunctive relief.

6

7                   **THIRD CAUSE OF ACTION:  MARKET FIXING**

8       *(By All Plaintiffs against Ally Defendants, Bank Defendants, and HCLS, and all other Defendants as*

9                                   *Co-Conspirators)*

10      219.    To further the wrongs alleged throughout this Complaint (and its profit), Ally and Bank

11  Defendants, using its size and prominent market share, began **systematically** creating false and inflated

12  property appraisals **throughout California**, hand-in-hand with their wholly-owned appraisal subsidiary

13  HCLS, in a Market Fixing Scheme designed to inflate the property values of homes throughout

14  California.  (The "Market Fixing Scheme").

15      220.    Though conceptually related to the Cause of Action for Individual Appraisal Inflation,

16  the harms, actions, and reasons behind the Market Fixing Scheme were unique.

17      221.    From **Bank Defendants' perspective**, their reasons (in other words, their intent) for

18  fraudulently inflating Plaintiff's appraisals and engaging in the Market Fixing Scheme was three-fold:

19          a.  **First, by doing so Bank Defendants created the illusion of a naturally appreciating**

20              **real economy, which resulted in a purchase *and* refinance boom** – which meant more

21              loans for Bank Defendants, and thus more profit for the conspiracy of Defendants. And

22              so it began, Defendants together with HCLS quickly embarked on a scheme to inflate

23              their appraisals, and more broadly, property values throughout the State of California,

24              because, in short, they made a *lot more money by doing so*.

25          b.  **Second**, by systematically driving the prices of real estate up, borrowers were required to

26              take out larger loans to afford the same property, once again resulting in more profit to

27              Defendants.  The damages to Plaintiffs resulting from these larger loans are discussed

28              below.

- 56 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

c.  **Third**, Defendants falsely inflated the appraised values, because by doing so Defendants were able to turn more profit on the sale of these loans to investors. Because investors were willing to pay more for less risky loans (lower Loan-to-Value loans), Ally Defendants, Bank Defendants and HCLS were given an incentive to fraudulently inflate the appraisal values of their property, thus making the collateral (the subject property) of the loan seem safer to the investor, resulting in more profit to Defendants.

222.  To carry out this fraud, Ally and Bank Defendants used its size and market share as one of the largest lenders in California to systematically create false and inflated property appraisals throughout California, hand-in-hand with their wholly-owned appraisal subsidiary, HCLS.

223.  At Ally and Bank Defendants' direction, HCLS began systematically and wrongfully inflating the valuations of properties throughout California – not just on the properties of Plaintiffs herein, but on all properties throughout California. As is common knowledge in the real estate industry, appraisers take the value of other nearby homes (called comparables aka "comps") into account in determining the value of the homes they appraise. **These inflated appraisals and home valuation conducted by Ally and Bank Defendants and their subsidiaries *then* acted as comps upon which numerous *other* appraisers based their valuations of *other* homes.   The results were a vicious self-feeding exponential cycle, both expected and intended by Defendants.   These inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even higher appraisals and which caused even more homes to be valued for more than they were worth**. The inevitable and intended result of Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy, created by and at the direction of Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of lining Defendants' pockets with money. The harm it inflicted to Plaintiffs herein, California's real estate economy, and more broadly, the American economy mattered little. Defendants were making money and plenty of it.

224.  Moreover, as Ally's wholly owned subsidiary, HCLS was specifically directed by Defendants to systematically "bump" or inflate appraisal values of homes throughout California, with the intent of creating housing appreciation, leading to a real estate boom, which Defendants could then

- 57 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

capitalize on by selling not only more loans, but more loans at even higher loan amounts. From the very top to the very bottom, Defendants created a system intended to render consistently inflated appraisals. But they knew the 'boom' they were creating, was one stilted up and fueled by their fraud – and that when the music stopped playing the house of cards they'd built would come crumbling down destroying any and all equity Plaintiff borrowers had in their home.

225.    Rapidly, these two intertwined schemes (the Market Fixing Scheme [Third Cause of Action], and the Scheme to place borrowers into loans they could not afford [First Cause of Action]) grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

226.    According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

> To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much as 10%. This means one out of two appraisals was still within an acceptable tolerance for our end investors. Our experiences showed that 10% was the most an appraisal could be overvalued and still be purchased by investors. Another quarter that we reviewed was overvalued by 11-20%. These loans were either declined or we reduced the property to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. *Throwing a dart at a board while blindfolded would've produced more accurate results*

227.    Mr. Bitner testified about the implications of inflated appraisals:

> **If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself.** We saw it on several occasions. We'd close a loan in January, and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant.

228.    Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street

- 58 -
**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled

2  with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

3      229.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2,

4  2011 they outlined how this brazen planned worked.  Ally and Bank Defendants would use their in-

5  house or contract appraisers to artificially inflate Plaintiff's home values in order for their loans to be

6  used in Securitization transactions. According to that complaint, "an inflated appraisal will understate,

7  sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs' homes.

8      230.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated

9  appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span

10  mentioned in this complaint, and determined through its investigation that appraisers were often

11  pressured by mortgage originators, among others, to "produce inflated results".

12      231.    Since California homes (including those of Plaintiffs herein) were Ally and Bank

13  Defendants' main target, this scheme led directly to a mortgage meltdown for Plaintiffs in this complaint

14  that was substantially worse than any economic problems facing Defendants' borrowers in the rest of the

15  United States.

16      232.    At the time of their respective Purchase and/or Loan Transactions Plaintiffs relied on the

17  fact that the real estate market was operating normally, and thus the prices Plaintiffs were paying were

18  naturally occurring, uninflated prices – a reasonable reliance.

19      233.    Ally and Bank Defendants and HCLS however intentionally failed to disclose the

20  material fact that the market was not operating normally – but rather that they had systematically and

21  intentionally manipulated the market hand-in-hand with their co-conspirators, to inflate real estate prices

22  for their own profit.

23      234.    Specifically, Ally Defendants, Bank Defendants and HCLS intentionally **concealed** the

24  material facts that they:

25          a.   had intentionally and falsely inflated the appraisals on Plaintiffs properties throughout

26              California;

27          b.   had subjected their appraisers over whom they exercised complete dominion to a massive

28              conflict of interest precluding them from being able to render good-faith, accurate,

- 59 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

technically proper appraisals in conformity with the standards required in the profession;

c.  had systematically, intentionally, and artificially inflated the prices of real estate throughout California (otherwise known as "market fixing"), resulting in:

d.  had fixed the real-estate market and systematically driven the prices of property well above what they were worth, with the intent of creating the illusion of a naturally-appreciating real estate economy to spur a purchase and refinance boom resulting in more business and thus more profits for the bank;

e.  knew that the true uninflated value of Plaintiffs' homes were insufficient to justify the size of the loans Plaintiffs were being given;

f.  falsely inflated the appraisals of Plaintiffs' properties in order to place Plaintiffs into loans that they would not otherwise be able to obtain or afford, all so Defendants and their employee-Loan Consultants could turn profit;

g.  falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase;

h.  falsely inflated the appraisals of Plaintiffs' properties to induce plaintiffs to enter into loan and assure them that their collateral was sound;

i.  knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside" down followed by inevitable default

j.  knew their scheme would cause a liquidity crisis that would devastate home prices.

235.   As a result everybody, even people who didn't originate their loans through or get an appraisal from Defendants, were forced to purchase their homes for a higher price than they should absent Defendants' Market Fixing activities – the additional amounts they were forced to pay constitute substantial damage to Plaintiffs.

236.   This underscores the difference between the Broad Market Fixing Scheme and the Cause of Action for Individual Appraisal Inflation. Yes, they are conceptually related in the sense that Defendants' individual appraisal inflations when taken in the aggregate had the intended cumulative

- 60 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   effect of further bolstering their market manipulation/inflation. But their conceptual relationship does

2   not make them the same fraud.  Unlike the Broad Market Fixing fraud which involved the fraudulent

3   **concealment** of the material fact that they had **manipulated the market** for the reasons listed in

4   paragraph 221 of this Complaint , the Individual Appraisal inflation was an **affirmative intentional**

5   **misrepresentation** of the **individual values of Plaintiffs' homes** for the reasons listed in paragraph 157

6   of this Complaint (i.e "with the intent of inducing Plaintiffs to enter into their loans… and with the

7   intent of assuring them their collateral was sound", *inter alia*).

8      237.   As a result of Ally Defendants, Bank Defendants and HCLS' Market Fixing Activities, in

9   furtherance of the Conspiracy of Defendants, Plaintiffs were harm harmed in each of the following

10  manners:

11        a.  **First,** the hyper-inflated property values resulting from Defendants' inflated appraisals

12            and market-fixing scheme directly caused Plaintiffs to pay a substantially higher price for

13            their home than they would have otherwise, and then their home was truly worth at the

14            time. The additional amounts Plaintiffs were forced to pay above and beyond the true

15            uninflated value of their property at the time of purchase, constitutes damage to Plaintiffs

16            directly caused by Defendant's scheme.

17        b.  **Second,** the damage didn't end there however - the unraveling of Defendants' scheme

18            caused the market to be sent into a downward spiral, which Defendants knew and

19            foresaw would be the result of their actions, and caused Plaintiffs' home value to

20            plummet *much below the true value* of the property at the time of purchase. **To be clear,**

21            **it is alleged that Defendants' Appraisal Inflation and Market Fixing Activities, were**

22            **a substantial factor in if not *the* cause of the generalized market crash which caused**

23            **the prices of Real Estate values throughout California to plummet.**  This is a separate

24            and distinct loss from item number "a" – item "a" deals with false inflation, while item

25            "b" alleges diminution in value/depression. These two losses in sum constitute Plaintiffs'

26            loss of equity, and can be determined by subtracting the current depressed value of

27            Plaintiffs' property from the artificially inflated price they were forced to purchase it for.

28            Even for those Plaintiffs who did not purchase their property, but rather refinanced it, the

- 61 -
**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

demise of Defendants' scheme drove the value of their property far below its original

purchase price, once again resulting in the loss of substantial equity;

c.    **Third,** another intended effect of Defendants' silent market-fixing/appraisal inflation

fraud was that Plaintiffs were forced to take out larger loans to purchase the inflated-

value homes. Not only were Plaintiffs forced to pay additional principal on this

artificially created-value, but additional interest as well. As an example, let's say that

because of Defendants' market inflation, Plaintiffs purchased a home for $600,000 (when

in reality its true uninflated value would have been $500,000), and took a loan from

Defendants at 6% interest. Not only were Plaintiffs forced to pay $100,000 more for this

home than they should have had to, but they were also forced to pay interest on that

additional $100,000 in false value, in the amount of $500 dollars per month. Had

Defendants abstained from conducting their fraud, Plaintiffs would never have needed to

pay the interest on this falsely created value. The additional interest Plaintiffs were forced

to pay constitutes damage to Plaintiffs;

d.    **Fourth,** for the same reason as directly above (in sub-paragraph "b"), Plaintiffs were also

forced to pay additional fees and points (all of which are a function of the inflated loan

size). As is common knowledge throughout the industry, lenders, including Defendants

herein, often charge what are known as "points" to originate a loan. Charging one "point"

is another way of saying that the bank will charge you 1% of your loan amount. Two

points would be 2% of the loan amount. Now, using the above example (of a 500k home,

artificially inflated to 600k), let's say a borrower was forced to pay 2 points (or in other

words 2% of his total loan amount). Because the loan amount was inflated he was forced

to pay 2% of 600k ($12,000), when in reality, had Defendants not embarked on their

scheme, he would only have had to pay 2% of 500k ($10,000). The additional $2,000

paid ($12,000 - $10,000) constitutes additional damage.

e.    **Fifth,** the falsely-inflated property values also caused Plaintiffs to pay substantially

higher property taxes.

f.    **Sixth,** Bank Defendants also used these inflated values, to induce Plaintiffs and other

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

borrowers into entering ever-larger loans on increasingly risky terms. The result was

more money for the conspiracy of Defendants.

    g.  **Seventh,** The resultant higher payments coupled with the housing crash (both known if

not intended by Defendants) resulted in Plaintiffs' inevitable default, wreaking havoc

with their credit, and upon which Bank Defendants and Trustee Defendants charged a

host of excessive fees (trustee fees, default fees, cleanup fees, inspection fees, late fees,

advance fees, and attorney fees) all of which were marked up dramatically. In short,

Defendants couldn't lose; they were making money no matter what, and were benefitting

from Plaintiffs' default. By tossing on so many fees Defendants made it impossible for

Plaintiffs to be able to ever pay off their "default" amounts. Why? Because Defendants

made money by doing so. Recall, that by this time, Defendant Banks had already sold

these loans to their investors, and were only acting as servicers. Servicers have

significantly different motivations than do lenders. Servicers earn more from foreclosing

even when the noteholder (investors) may benefit financially in the long-term by

modifying Plaintiffs' loans. And because they were servicers (rather than note-holders),

Bank Defendants' incentives were not to preserve the loans and prevent default, but

rather to the contrary, they made money initiating foreclosures and charging fees. In other

words Defendant Banks' interests as a servicer were exactly the opposite of those when

they originated the loan and were note-holders. Their interests were aligned directly with

those of a servicer. They had become anything but a conventional money lender. By

making it impossible for Plaintiffs to pay off their unilaterally imposed default amounts,

Defendants could come in and scoop up whatever equity Plaintiffs had left in the

property. It was a win, win, win scenario.

    238.  Bank Defendants', Ally Defendants', and HCLS's fraudulent inflation and manipulation

of real estate values throughout the State of California, the demise of which sent real estate values

spiraling downwards, caused Plaintiffs to be placed in homes that were immediately upside-down, and

to instantly lose their equity – if not their homes altogether. And as a result of these two schemes

coupled together (the scheme to place borrowers into loans they could not afford, and the Market Fixing

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Scheme), Plaintiff-borrowers were placed into loans far larger than would be supported by the true value of their property or their income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs – all of which comprise damage to Plaintiffs.

239.    As a result of the improper scheme undertaken by Ally Defendants, Bank Defendants and HCLS, at the behest and benefit of the Conspiracy, Plaintiffs paid more for their homes then they should have, then adding insult to injury lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

240.    Ally Defendants, Bank Defendants and HCLS perpetrated this systematic individual appraisal inflation and market fixing scheme at the direction of and for the benefit of the conspiracy, and with the knowledge and acquiescence of their executives and board members.

241.    Defendants had exclusive knowledge of their silent scheme to inflate appraisals and fix the market.

242.    Counts 10-13 arise under this (Third) Cause of Action for Market Fixing, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

## COUNT 10: FRAUDULENT CONCEALMENT

243.    All preceding and following paragraphs of this Complaint are incorporated by reference as though fully set forth herein

244.    Ally Defendants, Bank Defendants, and HCLS, at the direction, behest, and on behalf of the Conspiracy of Defendants intentionally concealed the material facts alleged above at Paragraph 234 (a)-(j), (namely their systematic market fixing activities) in order to induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants

245.    Plaintiffs did in fact rely on the non-existence of the concealed facts in deciding to enter into Loan Contracts with Ally and Bank Defendants. Had Plaintiffs known the truth, they would not have entered into the Loan Contracts.

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

246.   Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping their borrowers (Plaintiffs herein) in the dark.

247.   Bank Defendants, Ally Defendants, and HCLS, had a duty to disclose such material information but intentionally failed to do so.

248.   As a result of such concealments Plaintiffs were damaged as described in this Cause of Action as set forth above in Paragraph 237(a)-(g)

249.   Further, without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses,, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

250.   Defendants' actions in systematically and falsely pumping up real estate values throughout California, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

251.   These harms were both known and foreseen, if not intended, by the Conspiracy of Defendants.

252.   Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 11: NEGLIGENCE

253.   All preceding paragraphs and following paragraphs are hereby incorporated as though fully set forth herein.

254.   Specifically, each and every allegation of Count 8 (for Negligence) arising under the *previous* Cause of Action for Individual Appraisal Inflation, are set forth identically  herein and realleged here, in the interest of brevity. All of the wrongs and harms alleged in that Count are specifically brought here in this Count as well.

255.   In addition to the allegations of Count 8, Plaintiffs further allege as follows.

256.   Ally Defendants, Bank Defendants, and HCLS additionally breached their duty by

- 65 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    maliciously (or alternatively, knowingly, or recklessly) inflating values of real estate throughout

2    California in a Market Fixing Scheme, as described throughout this Cause of Action.

3            **COUNT 12**: **PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ.**

4        257.    All preceding paragraphs and following paragraphs are hereby incorporated as though

5    fully set forth herein.

6        258.    The Market Fixing Scheme alleged throughout this Cause of Action falls within the

7    definition of a price fixing conspiracy under 15 USC §1 et Seq

8        259.    Plaintiffs herein bring this count for injuries occurring as a direct result of Ally and Bank

9    Defendants' and HCLS's (and their Co-Conspirator's) Price Fixing conspiracy, as described throughout

10    this Cause of Action ("Market Fixing").

11        260.    Ally and Bank Defendants herein were among the leading lenders at all times alleged

12    herein and had sizeable market share, individually and collectively.

13        261.    The purpose and effect of this anti-competitive conspiracy was to fix, raise, and stabilize

14    the prices of homes throughout California, in order to bolster and increase Defendants' profits at the

15    expense and injury of their borrowers, as well as other fairly competing lending institutions. These

16    actions led to commensurate inflation of real estate values in states contiguous to California.

17        262.    Ally Defendants, Bank Defendants and HCLS collusively and affirmatively conspired

18    with one another to artificially raise the values of real estate throughout California, with effects

19    spreading throughout contiguous states, because in doing so, all parties would see significantly more

20    profit. The Bank Defendants were able to charge higher loan amounts, higher interest, and higher fees

21    and points, while simultaneously able to increase their sales on the secondary market by creating the

22    substantially false impression that the loans being sold were less risky than they were. Because of the

23    intentionally increased danger of their loans, and increased likelihood of default the Servicing

24    Defendants were able to collect highly lucrative late fees, default fees, and other such fees. Both

25    Lending and Servicing Defendants turned additional profit when their borrowers, through their

26    coordinated acts of deception and Market Fixing inevitably defaulted and were foreclosed upon, because

27    Lending and Servicing Defendants were profitably insured against loss. Finally the Trustee Defendants

28    also profited through this price fixing scheme in that more foreclosures allowed them to collect lucrative

- 66 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  foreclose fees, trustee fees, inspection fees, and numerous other such fees.

2  263.    Ally Defendants, Bank Defendants and HCLS acted intentionally and with the specific

3  intent of fixing the market, and inhibiting fair competition.

4  264.    Ally Defendants, Bank Defendants and HCLS succeeded in inflating, fixing, and raising

5  real estate prices throughout the areas described, to the grave detriment of their consumers all of whom

6  were unknowingly forced to pay substantially more for their homes than they would have absent such

7  price/market fixing. Defendants' acts were the direct and proximate causes of Plaintiffs' harms.

8  265.    As a result of such acts Plaintiffs have been damaged as set forth in Paragraph 237 (a)-(g)

9  266.    Further, without limiting the damages as described elsewhere in this Complaint, Plaintiffs

10  damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses

11  related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,

12  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

13  as fees and costs, including, without limitation, attorneys' fees and costs.

14  ### COUNT 13: UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES

15  ### (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

16  267.    All preceding paragraphs and following paragraphs are hereby incorporated as though

17  fully set forth herein.

18  268.    Specifically, each and every allegation of Count 9 (for violation of the UCL) arising

19  under the *previous* Cause of Action for Individual Appraisal Inflation, are set forth identically herein

20  and realleged here, in the interest of brevity. All of the wrongs and harms alleged in that Count are

21  specifically brought here in this Count as well.

22  269.    In addition to the allegations of Count 9, Plaintiffs further allege as follows.

23  270.    Ally Defendants, Bank Defendants and HCLS acts are additionally **fraudulent** as set

24  forth throughout this Third Cause of Action and the preceding Counts, all of which are hereby

25  incorporated by reference.

26  271.    Ally Defendants, Bank Defendants and HCLS's acts are additionally **unfair** in that the

27  intentional systematic manipulation and inflation of real estate values throughout California, causing

28  Plaintiffs (and numerous others) to have to pay substantially more for their homes, loans, taxes, and

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

numerous other fees – all so that the Conspiracy of Defendants could profit is patently unfair.

272.   Ally Defendants, Bank Defendants and HCLS acts are additionally **unlawful** in that

a.   their market and price fixing activities constitute violation of Anti-Trust law under the Sherman Act.

273.   Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

## FOURTH CAUSE OF ACTION: DECEPTION IN LOAN MODIFICATIONS

*(By Plaintiffs Norberto Flores-Zenteno, Margarita Flores-Zenteno, Robert Payne, Mary Serrano, Terrance Hutchinson, Star Hutchinson, Gregory Calvillo, Marilyn Calvillo, David Dewayne Thomas, Gilberto Pelayo, Carlos Orillosa and Carolina Sanots-Orillosa, Ana Casillas, Samuel Silva and Carmen Silva – Against Bank Defendants and all other Defendants as Co-Conspirators)*

### *Defendants' Scheme To Extract Workout Payments From Borrowers In Distress And Then Foreclosing, As Opposed To Genuinely Offering Loan Modifications*

274.   In the face of the escalating foreclosure crisis in the United States and especially in California, Bank Defendants have further victimized and preyed on those struggling to keep by offering and inducing customers into illusory "Workout Agreements," which purport to offer hope of an opportunity to cure loan default, but in truth and fact are merely a ruse through which Bank Defendants dupes homeowners into paying them thousands of dollars immediately before they foreclose. On information and belief, Bank Defendants have reaped illicit profits from these actions exceeding $100

- 68 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   million.

2       275.   In their capacity as loan servicers, Bank Defendants are paid by and beholden to the

3   investors that hold the principal and interest rights to the loan being serviced.  The larger the face value

4   of the pools of loan Bank Defendants service, the more it makes.  Quality of servicing and

5   responsiveness to borrowers are irrelevant to the bottom line.  In fact, for loans in default, past due, and/

6   or on the brink of foreclosure, Bank Defendants makes *more money* in fees.  As such, it is in Bank

7   Defendants interest to have loans in default and arrears for as long as possible prior to foreclosure, then

8   foreclosing. Bank Defendants stand only to lose revenue by giving loan modifications to borrowers

9   instead of foreclosing.

10      276.   Bank Defendants' servicing agreements with investors provide that the Bank Defendants

11  gets a set percentage of every dollar it collects from borrowers. If a borrower is in default and not

12  making any payments, Bank Defendants then receive no compensation for servicing the loan.  In

13  addition, most of Bank Defendants' loan servicing agreements requires them to advance to investors the

14  monthly payments that defaulted borrowers do not make.  This requires Bank Defendants to borrow

15  money from its parent bank to cover such advances.  It is thus disastrous to Bank Defendants'

16  profitability to have defaulted loan where no payments are being made.

17      277.   As a result, Bank Defendants designed the "Workout Agreements" at issue here to

18  convert non-performing loans that only cost it money into "cash-flowing" loans that made it money. Its

19  policies from the outset of its use of the Workout Agreements require any borrower asking for a

20  modification to first sign-up for a Workout Agreement, and it financially incentivized its call center

21  employees to push the Workout Agreements on all defaulted borrowers.  It is in Aurora's interest to

22  delay – but not prevent- foreclosure when by doing so it can avoid making the payment advances to its

23  investors and collect additional sums from distressed borrowers prior to foreclosure.

24      278.   Under California's non-judicial foreclosure rules, by electing to foreclose, a party loses

25  the right to collect any amount owed on the loan that exceeds the amount recovered through the

26  foreclosure process. Thus, when a home is worth less than the amount owed, after an election is made to

27  non-judicially foreclose on the borrower, that borrower does not have to repay any deficiecncy, and

28  Bank Defendants has no legal authority to collect, any arrearage or missed payments on the loan(s).

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Importantly, once a foreclosure has been initiated, a borrower has no legal obligation to make payments

2  on the loan and the lender has no legal ability to collect any such payments.

3        279.    These activities have been the subject of intense scrutiny, enforcement actions and

4  litigation. As recently as April 13, 2011, multiple Federal regulators entered into stipulated consent

5  orders with certain Defendants herein and related entities such as MERS (described below) describing

6  massive failures and taking the first steps toward requiring Defendants and other banks to refund sums

7  to homeowners improperly foreclosed upon by Defendants and other banks.

8        280.    Some Plaintiffs entered into "Workout Agreements" with Bank Defendants in which

9  Plaintiffs promised to pay and paid thousands of dollars- including legal and other fees which were not

10  owed under their mortgages- on the seeming return promise of a review for a loan modification and an

11  opportunity to cure their default at the end of a review period. But Bank Defendants' promises in return

12  were empty: At the end of the Workout Agreements it told borrowers to continue to make monthly

13  payments as it "considered" modification. Then it foreclosed on Plaintiffs' homes *without allowing*

14  *borrowers access to any "cure method" despite its promises in the Workout Agreements to do so*.

15        281.    In fact, Bank Defendants' internal policies and procedures were *not* to render a

16  modification decision during the term of the Workout Agreements and its policy was *not* to provide cure

17  information to the borrower at the end of the Workout Agreement absent a specific request from the

18  borrower. As a result, Bank Defendants fraudulently induced their customers to enter the Workout

19  Agreements and pay them thousands of dollars, while making no legally binding promise in return to

20  Plaintiffs. The Plaintiffs in this action are entitled to rescind. In the alternative, Plaintiffs allege that

21  Aurora breached its duty of good faith and fair dealing when it foreclosed on Plaintiffs' homes without

22  first giving an opportunity to cure the default.

23        282.    In return for Plaintiffs' promises to make monthly payments, under the "workout

24  agreements", which included legal and other fees not required to be paid under Plaintiffs' mortgages,

25  Bank Defendants promised: (a)not to foreclose for the duration of the Workout Agreement; and (b) at

26  the end of the Workout Agreements to provide an opportunity for Plaintiffs to "cure: their loan

27  deficiency through: (1)reinstatement (*i.e.,* bring the loan current); (2) payoff( i.e., refinancing with

28  another lender to pay off the serviced loan); (3) modification at the discretion of Bank Defendants; or (4)

- 70 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    another workout "option" at the discretion of Bank Defendants.

2        283.    The Workout Agreements signed and offered to Plaintiffs by Bank Defendants were a

3    sham. They were illusory because Bank Defendants made materially false statements in the Workout

4    Agreements and made no legally binding promises in exchange for the borrowers' promises to make

5    payments. The (1) loan modification and (2) "other" workout options were entirely at Bank Defendants'

6    discretion, and thus not a binding promise. The options to cure by (3) reinstatement or (4) payoff were

7    also illusory because Bank Defendants' policy was to foreclose on properties *without providing the*

8    *opportunity to cure* default through another means to avoid foreclosure. Borrowers had no opportunity

9    to cure through reinstatement or pay-off their loan because they were not told at least five days before

10    the Trustee's sale date that a modification other workout plan was denied. As a result, Plaintiffs' consent

11    to the Workout Agreements was fraudulently obtained and Bank Defendants' consideration for the

12    Workout Agreements failed, rendering such agreements *void ab initio* and subject to rescission. In

13    addition, under the black letter California law, Plaintiffs are entitled to punitive damages where, as here,

14    consent to a contract is fraudulently induced. *See Mahon v. Berg*, 267 Cal. App. 2d 588, 589 (1968).

15        284.    Plaintiffs are entitled to rescind and obtain back from Bank Defendants their promised

16    (and delivered) consideration, namely the payments that were made to Aurora under the Workout

17    Agreements and Extended Workout Agreements. Because California law prohibits deficiency

18    judgments, Aurora was not entitled to require, post-election-to-sell payments and foreclose on the loans.

19    Nor were Plaintiffs required to make such payments. These payments were new consideration. Such

20    payments included legal and other fees which Plaintiffs had no obligation to pay under their mortgages

21    absent Bank Defendants' Work out Agreement Scheme.

22        285.    In the alternative, should the Workout Agreements and/or Extended Workout

23    Agreements be deemed enforceable, Bank Defendants has breached its duty of good faith and fair

24    dealing by foreclosing on Plaintiffs' properties without providing the opportunity to cure the loan default

25    at least five days prior to the Trustee's sale. Plaintiffs complied with all of their obligations under the

26    Workout Agreements and Extended Workout Agreements. At the very least, Bank Defendants were

27    required by good faith and fair dealing to provide notice to Plaintiffs that had been rejected and that

28    Plaintiffs needed to invoke another of the permitted means to cure their defaults.

- 71 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

286. Irrespective of validity of the Workout Agreements and Extended Workout Agreements, Bank Defendants has violated the Rosenthal Fair Debt Collections Practices Act, Cal. Civ. Code § 1788, *et seq.*, by using false, deceptive and misleading statements in connection with their collection of Plaintiffs' mortgage debt – namely the false promise of modification.

287. Through this Action, Plaintiffs seek to stop Bank Defendants from preying on their customers through its Workout Agreement Scheme. Where Bank Defendants intend to foreclose on a property, and after it has exercised its election to sell under non-judicial foreclosure, it must not be permitted to extract thousands of dollars in additional payments with illusory promises and false statements of opportunities to cure defaulted loans. Bank Defendants have sold or initiated foreclosures on many of the Plaintiffs in this action. At the very least, Plaintiffs are entitled to a return of the payments they made under the false promise from Bank Defendants that Plaintiffs would at least have an opportunity to avoid foreclosure.

288. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

    a. California law forbids deficiency judgments in non-judicial foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

    b. The notion that a mortgage lender must elect his remedy is also codified in the "Security First Rule," Cal. Code Civ. Proc. § 726. It provides that where Cal Code Civ. Proc. § 580b applies; an action in foreclosure is the *only* means by which a mortgagor can forcibly collect on a note secured by a deed of trust.

289. California law provides that a Trustee's sale can be postponed by mutual agreement. *See* Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d). Bank Defendants herein count on the crier rule in the design and implementation of its Workout

- 72 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Agreement Scheme. It knows that borrowers will not be present at the first scheduled Trustee's sale

2    because it tells them that such sale is "suspended" or "on hold." Thus, it knows that Plaintiffs will have

3    no way to know whether a new date and time has been set for the foreclosure and will have to rely on

4    Aurora's assurances that such sales will not occur if Aurora's demands for payment are met.

5

6                    ***Bank Defendants' Adhesive Workout Agreements Are Unconscionable***

7            290.    Plaintiffs have entered in Workout Agreements with Bank Defendants. The terms of

8    Bank Defendants' Workout Agreements are contained in a standard form, which is drafted by Bank

9    Defendants.

10           291.    Moreover, Plaintiffs are not in a bargaining position with respect to the imposition of

11   Aurora's from Workout Agreement. Aurora is a large lender and loan servicer with substantial assets

12   and resources. Plaintiffs are individual homeowners under financial hardship and have substantially less

13   bargaining power.

14           292.    Bank Defendants prepare the Workout Agreements and presents them to borrowers for

15   their signature.

16           293.    Bank Defendants thus requires borrowers to agree to the Workout Agreement as

17   presented. It does not provide an opportunity to negotiate or opt-out of the unconscionable terms at issue

18   herein. The inequality of bargaining power this results in no real negotiation and absence of a

19   meaningful choice on the part of Plaintiffs.

20           294.    Bank Defendants' form Workout Agreements contain multiple provisions that are

21   unfairly one-sided, overly harsh and punitive to borrowers, and thus substantively unconscionable.

22   Under the terms of the form Workout Agreement, Bank Defendants systematically (1) fail to withdraw

23   foreclosure proceedings against borrowers who are in "Workout Agreements" and who make payments

24   under the Workout Agreement; (2) create payment plans whereby the aggregate payments are

25   insufficient to cure the borrower's deficiency; and (3) initiate foreclosures with no notice and

26   opportunity for the borrower to cure any alleged default.

27

28

- 73 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

*Bank Defendants Fail To Withdraw Foreclosure Proceedings Even When Borrowers Have*
*Made All Plan Payments Under The Workout Agreement*

295.    Bank Defendants' Workout Agreements purport to obtain the borrower's agreement that foreclosure proceedings commenced by Bank Defendants will not be withdrawn unless Bank Defendants determines to do so. In this regard, the Workout Agreement Provides:

> **Section 2.B.**   Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived unless prohibited by law;

(See Exhibit "A" to Complaint, p.2)

296.    Relying on the above provision, Bank Defendants fails to withdraw foreclosure proceedings while borrowers are supposedly being considered for a loan modification. Once borrowers begin making payments under the Workout Agreement, Bank Defendants unilaterally postpone any pending foreclosure sales date without obtaining the borrowers mutual consent and without informing borrowers of the reset foreclosure dates. It does so *even if* borrowers make all Plan Payments under the Workout Agreement.

297.    Bank Defendants' policy of failing to withdraw foreclosure proceedings and resetting the foreclosure sale date without the mutual agreement of, or notice to, borrowers in unfair, unlawful, and injurious to such borrowers. This practice is calculated to ultimately allow Bank Defendants to foreclose without notice or an opportunity to cure after obtaining payments under the Workout Agreement.

298.    After inducing Plaintiff Borrowers into entering dangerous loans through outright deception and in the name of greed - loans which would threaten their livelihoods - Defendants refused to modify Plaintiff Borrowers' loans despite laws and court orders which required them to make good faith efforts to do. Why? To protect themselves. Not the borrowers, but themselves. Because Defendants were required to buy back loans from their investors if a material misrepresentation was discovered, Bank Defendants refused to modify loans which qualified in every regard for one, for fear of having their own fraud and falsified information discovered by the investor, and having to buy back their

- 74 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  fraudulent loans, and incurring massive loss.  In other words, Bank Defendants placed their fiscal

2  interests ahead of borrowers who desperately needed and *qualified* for the modifications, and who would

3  face financial ruin or homelessness without one.  Instead, Defendants chose to line their coffers, rather

4  than offer assistance to the very people they imperiled through their greed – assistance they were under a

5  good faith obligation to provide. Simply put, Bank Defendants were looking out for themselves.

6        299.    Plaintiffs believe and hereby allege that the servicers would want to use MERS to keep the

7  investor information private is to obscure truth from the Plaintiffs and the Certificate Holders of the Trust.

8        300.    Every Pooling and Servicing Agreement has strict Warranties and Material

9  Misrepresentation Provisions that must be honored by the Depositors. In the event that a loan has a

10  material misrepresentation or violates the warranties given to certificate holders and the Trustee of the

11  REMIC, the loan must be purchased from the Certificate Holders and whatever insurance was in place is

12  now void due to fraud being detected on the loan.

13        301.    In the case of loan modifications it benefits the servicer to keep vital information away

14  from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected

15  on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes

16  the same company, would be forced to take back the loan. In this case Bank Defendants would be forced

17  to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy

18  that is in place due to fraud.

19        302.    When Plaintiffs are desperate for help, Bank Defendants refuses to assist them. In the

20  event that Bank Defendants forwards the true and accurate financial information to the Trustee

21  overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find

22  material misrepresentations that took place at origination. A Plaintiff supplies current financial

23  information up to and including a signed 4506-T and the investor or Aurora through their processing

24  centers find out that the income listed on the initial loan application was not correct.

25        303.    This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on

26  evidence Plaintiffs will introduce at trial Bank Defendants instructs their employees to decline any

27  application to modify a loan that contains a material misrepresentation for *fear of having to buy back*

28  *the loan.*

- 75 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

304.    This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

305.    This practice alone has led to millions of American's losing their homes for fear of reprisal from investors that were lied to, when they purchased these *Toxic* loans. Defendants' wrongful acts continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State of California. Since 2010, these tactics and Defendants' other wrongful acts have been revealed as a result of extensive litigation and Government investigations.

### *Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else*

306.    Bank Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification.

307.    In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank.

308.    By recommending that Plaintiffs fall behind, Bank Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

309.    At its most fundamental level, these sorts of unscrupulous business tactics, undermine notions of fair play and good faith in business dealings, and jeopardize the consuming public.

### *Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs*

310.    Bank Defendants also had an unfair and fraudulent pattern of offering borrowers what

- 76 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**