1    appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were

2    nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans.

3    Specifically, Bank Defendants would offer Plaintiffs and homeowners who were already on the brink of

4    default/foreclosure a lower payment called a "trial payment" or "Workout Agreement". Bank

5    Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months,

6    Defendants would permanently modify Plaintiffs' payment to be the same amount under the trial

7    payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs'

8    compliance with every term of the loan modification offer. Instead Bank Defendants would use the offer

9    as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest

10   of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking

11   what little money the financially imperiled plaintiffs had left, and duping them into spending it on

12   unfairly placed fees and late charges. Bank Defendants never had any intent of modifying their loans,

13   despite Plaintiffs' full compliance with the terms of the offer. Such acts are patently unfair and

14   fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment

15   plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More

16   specifically, Bank Defendants unlawful and unfair practices in this regard include, but are not limited to,

17   the following:

18            a.    failing to make good faith efforts to provide them with a loan modification and

19                  breaching their contractual obligations, written and implied promises, loan servicing

20                  functions owed to Plaintiffs, who fulfilled their obligations by making timely modified

21                  payments;

22            b.    making false and/or misleading representations that Plaintiffs were eligible and

23                  entered into the trial modification period, which would lead to a permanent

24                  modification of their mortgage payment;

25            c.    failing to disclose to Plaintiffs that their modified payments may be reported to credit

26                  bureaus as default or late payments that would destroy their credit scores;

27            d.    delaying processing, demanding duplicate documentation, and failing to provide

28                  adequate information or communication regarding the loan modification programs to

- 77 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Plaintiffs;

    e.   engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint; and

    f.   omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees

311.   Counts 14 through 22 arise under this (Fourth) Cause of Action for Deception in Loan Modifications, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

## COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE

312.   The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

313.   As described above, California law forbids deficiency judgments in non-judicial foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

314.   As alleged throughout this Cause of Action, Bank Defendants have entered into Workout Agreements with Plaintiffs after initiating foreclosures on their properties, under which it has intentionally extracted thousands of dollars of payments from each of the Plaintiffs named herein in explicit and *knowing* violation of Cal. Code Civ. Proc §580(b) and §726 prohibiting the collection of payments on the note after the election to foreclose.

315.   Bank Defendants' acts comprise a scheme to circumvent the statutory bar against seeking a deficiency judgment. These acts were taken in furtherance of the conspiracy among all Defendants

AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   alleged throughout this Complaint.

2   316.   Such unlawfully extracted payments constitute damage to Plaintiffs herein. These

3   payments must be returned to Plaintiffs, plus pre-judgment interest.  Further, Bank Defendants should be

4   enjoined from continuing to violate this rule in the future.

5   ## COUNT 15 : FRAUDULENT CONCEALMENT

6   317.   The preceding paragraphs and the paragraphs following this cause of action are

7   incorporated by reference as though fully set forth herein

8   318.   Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements described

9   above in this Cause of Action

10   319.   By intentionally failing to disclose the material information described above in this Cause

11   of Action, Aurora fraudulently induced Plaintiffs to enter into such Workout Agreements. To reiterate,

12   *in part* here, Bank Defendants intentionally concealed the materials facts:

13   a.   that the true purpose of such Loan Workout Agreements were to extract additional

14   payments from Plaintiffs, and

15   b.   that Plaintiffs would not be modified despite their exact compliance with the terms of the

16   agreement

17   c.   that such payments would not be applied to their loan balance,

18   320.   Bank Defendants were under a duty to disclose this information to Plaintiffs

19   321.   By intentionally failing to disclose such information Bank Defendants intended to induce

20   Plaintiffs reliance to enter in the illusory Workout Agreements, and to induce their payments made

21   thereunder

22   322.   Plaintiffs under this Cause of Action did rely on Bank Defendants' failure to disclose

23   such information in deciding to enter into the Workout Agreements and Extended Workout Agreements

24   323.   If Plaintiffs had known the truth, they would not have entered into the Workout

25   Agreements and Extended Workout Agreements

26   324.   As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum

27   Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-

28   judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the

- 79 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    unavailability of financing.

2    325.    Plaintiffs are further entitled to an award of punitive damages for Defendants intentional

3    fraudulent conduct.

4    **COUNT 16 : INTENTIONAL MISREPRESENTATION**

5    326.    The preceding paragraphs and the paragraphs following this cause of action are

6    incorporated by reference as though fully set forth herein

7    327.    Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed

8    in this Cause of Action.

9    328.    By intentionally misrepresenting the material information described above in this Cause

10    of Action, Bank Defendants fraudulently induced Plaintiffs to enter into such Workout Agreements. To

11    reiterate, *in part* here, Bank Defendants intentionally misrepresented the materials facts:

12        a.    it wanted to help Plaintiffs maintain ownership of their homes. In particular, Bank

13            Defendants sent the letters and made the statements described herein.

14        b.    that by complying with the Workout Agreements, Plaintiffs loans would be permanently

15            modified

16        c.    that their homes would not be foreclosed as long as Plaintiffs continued to make

17            payments under the Workout Agreements and Extended Workout Agreements. In

18            particular, Plaintiffs were repeatedly told to continue to make payments and that their

19            homes would not be foreclosed, as described herein.

20        d.    whether they were approved for a loan modification and would have a genuine

21            opportunity to cure their loan defaults prior to the execution of a Trustee's sale on their

22            homes. Plaintiffs were never given such an opportunity

23        e.    that upon the expiration of the Work out Agreements, Plaintiffs would have an

24            opportunity to cure their defaults through: (1) reinstatement; (2) payoff; (3) HAMP

25            sponsored Loan Modification; or (4) Investor Sponsored internal modification

26        f.    that their foreclosures would continue to be on hold after the expiration of the Workout

27            Agreements if Plaintiffs continued to make payments to Aurora.

28    329.    At the time Bank Defendants made these representations to the Plaintiffs, Bank

- 80 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Defendants knew they were not true. Bank Defendants intended to and did foreclose during the time period for which the Plaintiffs had already made payments under their Extended Workout Agreements.

330.   Bank Defendants made these representations with the purpose of inducing Plaintiffs reliance to enter into the Workout Agreements, and Extended workout Agreements, and to continue to make payments of thousands of dollars per month.

331.   Plaintiffs relied on these representations in entering the Workout Agreements, and extended Workout agreements, and in continuing to make payments thereunder.

332.   Plaintiffs would not have entered into the Workout Agreements and Extended Workout Agreements had they known that these representations were not true. That is, had they known that they would not have a genuine opportunity to save their homes and to cure, and that Bank Defendants could and would foreclose on their properties without any notice that modifications were denied and after they had paid thousands of dollars to Bank Defendants, Plaintiffs would not have entered into the Workout Agreements to begin with and would not have made the payments during the terms of the Workout Agreements and the Extended Workout Agreements.

333.   As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the unavailability of financing.

334.   Plaintiffs are further entitled to an award of punitive damages for Defendants intentional fraudulent conduct.

### COUNT 17: NEGLIGENT MISREPRESENTATION

335.   The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

336.   The allegations of this Count are identical to those above in the previous Count except that the degree of intent herein is that of negligence. Put another way, at the time Bank Defendants made the misrepresentations described in this Cause of Action (and listed in part above), Bank Defendants did not have reasonable grounds to believe them to be true.

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

**COUNT 18**: **RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY**

337. All preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

338. As described throughout this Cause of Action, consent to the Workout Agreements and Extended Workout Agreements was not real or free in that it was obtained solely through fraud and misrepresentations as herein alleged.

339. As described throughout this Cause of Action, the Workout Agreements were both procedurally and substantively unconscionable. Rescission is appropriate for this separate and independent reason.

340. Plaintiffs thus seek to rescind the agreements under California Civil Code § 1689 (b)(1). Plaintiffs have retained no consideration provided by Bank Defendants that can be tendered back to Bank Defendants prior to rescission.

**COUNT 19: BREACH OF CONTRACT**

341. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

342. Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed in this Cause of Action.

343. Plaintiffs furnished consideration under the Loan Workout Agreement in the form of thousands of dollars of payments

344. Bank Defendants breached their obligations to Plaintiffs under Contract as set forth above in this Cause of action, including but not limited to:

    a. Breaching its obligations to modify plaintiffs upon their compliance with the terms of the Workout agreement

    b. Breaching its obligation to not foreclose while Plaintiffs made payments under the Workout Agreement

    c. Breaching its obligation to allow Plaintiffs an opportunity to cure under the Workout Agreement

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

345.    Separately Bank Defendants has breached the duty of good faith and fair dealing implicit in all contracts, as alleged above.

346.    As a result, Plaintiffs have been damaged in an amount to be proven at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest.

347.    Alternatively Plaintiffs request enforcement of the Workout Agreement. Specifically Plaintiffs request enforcement of the promise of Loan Modification pursuant to the terms and payments made thereunder, and any other legal or equitable remedies which this Court may deem just and proper.

## COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G)

348.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

349.    California law provides that a Trustee's sale can be postponed by mutual agreement. *See* Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d).

350.    Bank Defendants have violated this law by failing to provide the time of the new postponed sale at the time of the prior scheduled sale.

351.    In doing so, Defendants have failed to comply with the fundamental notice requirements of California's non-judicial foreclosure statutes, with which "strict compliance" is required. *Ung v. Koehler* (2005) 37 Cal.App.4th 186, 202. Without proper notice, there is no power of sale, and accordingly the foreclosure sales at issue are void.   .

## COUNT 21: UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)

352.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

353.    Bank Defendants, in their capacity as servicers, are "debt collector" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). See

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Cal. Civ. Code § 1788.2 (c).

354.    Bank Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' mortgage debt, as alleged herein. See Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. § 1692(e). For example(and without limitation), Plaintiffs were consistently led to believe that modification review was pending under the Workout Agreements and that the requests for additional documents and receipt thereof would continue the review process and Workout Agreements. But Bank Defendants unilaterally ceased the review process and foreclosed on dates previously represented as being postponed.

355.    The Rosenthal Act was also violated because the Workout Agreements were themselves deceptive in that they ambiguously appeared to offer an opportunity for borrowers to cure their arrearage and save their homes from foreclosure *and* stated that the arrearage would not be cured at the end of the Workout Agreement. The Rosenthal Act allows for a private right of action to the same extent permitted under the federal Fair Debt Collection Practices Act ("FDCPA"). *See* Cal. Civ. Code § 1788.17; *Gonzales v. Arrow Financial Services, LLC*, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

356.    Plaintiffs have suffered damages and harm as a result of Bank Defendants' unfair debt collection practices, including irreparable harm to their credit and the amounts paid under the Workout Agreements and Extended Workout Agreements.

### COUNT 22: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

357.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

358.    Bank Defendants' acts described in this action are **Unlawful** in that they violate:

a.    The prohibition against collection of deficiency judgments after electing to foreclose (Cal. Code Civ. Proc. § 580b)

b.    The Security First Rule (Cal. Code Civ. Proc. § 726)

c.    The Crier rule (Cal. Civ. Code §2994(g)

d.    The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

- 84 -

359.   Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above.

360.   Bank Defendants' acts are also patently **Unfair** as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as:

    a.   they unfairly bait Plaintiffs to make thousands of dollars of monthly payments under the false promise of having their loan modified, when in reality Defendants have no intent of modifying. These illusory work-out agreements were nothing more than unfair, and fraudulent cash-grabs

    b.   they used the promise of Loan Modification as bait to damage plaintiffs' credit preventing them from obtaining financing anywhere else.

    a.   they are designed a subterfuge to the crier rule, and are designed to allow Defendants to foreclose on Plaintiffs without their knowledge and without giving them notice.

361.   The Bank Defendants' acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

362.   Bank Defendants' conduct offends public policy and/or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Bank Defendants' conduct in this regard includes, but is not necessarily limited to, the following:

    a.   Bank Defendants have commonly failed to withdraw foreclosure proceedings against borrowers who made all Plan Payments under Workout Agreement;

    b.   Bank Defendants have initiated foreclosure proceedings without providing borrowers notice or opportunity to cure their remaining arrearage or default;

    c.   Bank Defendants have engaged in conduct that constitutes systematic breach of contract and breach of the implied covenant of good faith and fair dealing.

363.   Bank Defendants' conduct as set forth herein resulted in loss of money or property to Plaintiffs, including (1) principal and interest that they were not obligated to pay after Bank Defendants elected to exercise non-judicial foreclosure and to which Bank Defendants had no ability to collect after foreclosure; and (2) legal and other fees that Plaintiffs paid to Bank Defendants under the Workout Agreements and Extended Workout Agreements.

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

364.   Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition

365.   Plaintiffs' payments made under the Workout Agreements constitute cognizable restitution which must be returned to Plaintiffs as well as pre-judgment interest thereon.

366.   The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets. Accordingly, Plaintiffs request injunctive relief to preclude the actions/wrongs described above by Bank Defendants.

## FIFTH CAUSE OF ACTION :
## INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE
## NAME OF PROFIT

*(By Plaintiffs Norberto Zenteno Flores, Margarita Flores, Sushila Patel, Maria del Carmen Torres, Ana Rosa, Gumersindo Castaneda, Adell Aldrich, Benjamin Avalos, Jr., Eugene Marzette, Ervetta Marzette, Elmer Clarke, Pearlie Clarke, Ferdinand Paragas-Whittier, Josephine Paragas-Whittier, Mihai Schera, Gilberto Pelayo, Helidoro Hernandez, Cristina Hernandez, Antonio Hernandez Jamie, Gloria Vargas Jamie, Ivan Iles, and Shewkali Rajkumar, John Ahlstead, Gina Ahlstead, Ivan Iles —
Against All Defendants)*

367.   Continuing their chronology of profit-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into known dangerous and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans -  with no intent of ever actually modifying Plaintiffs' loans, but in a final coup-de-grace (3) intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust, in the name of collecting preposterous and unmerited "foreclosure fees" including:

- 86 -

1   inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees – hand in hand with

2   the Trustee Defendants, who while purporting to act merely in their capacity as trustee, act intentionally

3   and maliciously to foreclose knowing they have no authority to do so, and in knowing violation of

4   California foreclosure statutes.  As discussed above, Trustee Defendants are the vital foreclosure arm of

5   Defendants' fraudulent scheme alleged throughout this Complaint.

6       368.   Bank Defendants along with Trustee Defendants unilaterally charged these ill-defined

7   and ambiguous fees whose amounts were *never* disclosed, nor consented to Plaintiffs in any writing or

8   contract whatsoever. They decided how much they wanted to charge for whatever reason they wanted to

9   charge it. The amounts they charged were tantamount to price gauging, often charging double, triple or

10   even quadruple the fair market value for these "services."  The outrageous price markups all inured to

11   the benefit of the conspiracy of Defendants. As Defendants did not have an ownership interest in the

12   property upon which to foreclose, these charges and fees were entirely unjustified, and constitute

13   numerous cognizable sources of restitution.

14       369.   In short, Bank Defendants together with Trustee Defendants made money by initiating

15   foreclosures, and for this very reason intentionally steamrolled wrongful foreclosures over plaintiffs

16   without having any true possessory or ownership interest in the deed of trust – the document which

17   confers the power of foreclosure -  threatening to wrongfully dispossess Plaintiffs of their homes and

18   placing them on the streets.

19       370.   In the greed-driven world of Defendants, neither law nor ethics would be allowed to

20   stand as an obstacle in their insatiable hunt for profit.

21       371.   Counts 23 through 24 arise under this (Fifth) Cause of Action for "Intentional

22   Unauthorized Foreclosure in the Pursuit of Profit" and are brought by all Plaintiffs named in this Cause

23   of Action, against all Defendants named in this Cause of Action.

24

25                       **COUNT 23: WRONGFUL FORECLOSURE**

26       372.   Bank Defendants' continue to demand payment and to foreclose and threaten to foreclose

27   on Plaintiffs (through co-conspirator Trustee Defendants), despite the facts that:

28         a.   The Foreclosing Defendants have no proof that they own the notes and deeds of trust they

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

seek to enforce;

b. The Foreclosing Defendants have never received a proper assignment of the Deed of Trust (**"DOT"**) - the document which confers the power of foreclosure. Accordingly, they have no authority to foreclose.

c. There is considerable evidence that the Foreclosing Defendants do not own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and

373. As alleged with further detail in Appendix A, in many instances, the foreclosing Bank Defendants never properly received an assignment of the DOT (and therefore had no authority to foreclose) because the trusts they were being assigned into had been closed long prior, and therefore could not legally accept assignment of the Loans and DOTs.

a. The reason loans are pooled and placed into these loan trusts named REMIC's is due to income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and certificate holders. It is like an S Corp where there is no double taxation.

b. Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two years** after the set-up of the Trust due to tax implications. A loan substituted in or out of such trust after the two year period, results in a massive tax penalty of 100% of the face value of *all the assets in the trust*.

374. The trusts which foreclosed on many of the Plaintiffs never received assignment of the DOT – the document which confers the power of foreclosure. Specifically, Bank Defendants foreclosed on numerous Plaintiffs herein on behalf of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long closed under the terms of their very own PSA.** In other words Defendants had no authority whatsoever to foreclose on Plaintiffs herein. The foreclosing trust had no ownership interest in the DOT which would give it the power to foreclose.

375. Established authority makes clear that a Plaintiff states a claim for wrongful foreclosure

- 88 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

when it is alleged that the assignment to the trust was executed after the closing date of the trust. *Vogan v. Wells Fargo Bank, N.A.* (E.D. Cal., Nov. 17, 2011,) 2011 WL 5826016 at *7; *Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D. Cal., Mar. 19, 2012) 2012 WL 928433at *3.

376.    As to other Plaintiffs, Bank Defendants and Trustee Defendants foreclosed on them despite having no ownership interest in the DOT, because the DOT was **never endorsed to them**. In other words, they never had the authority to foreclose. A Plaintiff states a viable claim for wrongful foreclosure when it is alleged that the Defendants are "not the proper parties to foreclose." *Ohlendorf v. Am. Home Mortg.,* (E.D.Cal. 2010) 2010 U.S. Dist. LEXIS 31098, at *21–24; *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472 *11'* [same] *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same].

377.    As to other Plaintiffs herein, Bank Defendants and Trustee Defendants had no authority to foreclose because *at the time* they initiated foreclosure (by filing a Notice of Default), they had not yet received an assignment of the DOT. In other words, at the time they initiated foreclosure, they had no authority to foreclose. ""[S]ince the plaintiffs had alleged facts **suggesting the foreclosing party had no legal interest in the deed <u>at the appropriate time</u>**, there [is] a valid cause of action." *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472 *11*, citing *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8 [[holding plaintiff had stated a valid cause of action for wrongful foreclosure where the foreclosing entity had no authority to foreclose because it had "**no beneficial interest in the Deed of Trust <u>when</u> it acted to foreclose** on Plaintiffs' home."]; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same]. Foreclosures initiated by or on behalf of a party, who at the time had no authority to foreclose are *void ab initio*. *Tamburri; Castillo.*

378.    As to other Plaintiffs still, Bank Defendants and Trustee Defendants had no authority to foreclose because they had failed to comply with Cal. Civ. Code §2923.5 – a necessary prerequisite to foreclosure – which requires a lender to contact its borrower to disclose alternatives to foreclosure. Foreclosing Bank Defendants have failed to, and continue to fail to comply with this legal requirement.

379.    Still, as to other Plaintiffs, Bank Defendants' and Trustee Defendants' foreclosures were

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

void because the trustee who conducted the foreclosure sale was an unauthorized trustee who had never been properly substituted as trustee. Under California Law, a foreclosure sale conducted by an unauthorized trustee is void as a matter of law. *Dimock v. Emerald Properties* (2000) 198 Cal.App.4th 868.

380.    Finally, such foreclosures were additionally wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who (1) concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them to afford, and would result in their default to a *mathematical certainty*, and (2) falsely tampered with the appraised values of their homes  – so that Bank Defendants, Trustee Defendants,  and their conspirators could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

381.    Whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure mortgages are funded with monies obtained lawfully.

382.    Plaintiffs allege that Bank Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory notes Defendants are purportedly servicing.   Plaintiffs believe and thereon allege that because Defendants are not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of trust.

383.    Bank Defendants have already foreclosed upon the following property owned by the following Plaintiffs – allegations establishing the specific factual basis of the wrongful nature of the foreclosure as against each of the Plaintiffs below are set forth in **APPENDIX A.**

> a) Norberto Zenteno-Flores and Margarita Flores  (Appendix A, ¶ 1)
> 3321 Taurus Lane, Unit #3
> Santa Ana, CA 92704

> b) Sushila Patel (Appendix A, ¶ 5)
> 5841 Ranch View Road
> Oceanside, CA 92057

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

c) Maria del Carmen Torres (Appendix A, ¶ 8)
8332 Brimfield Avenue
Panorama City, CA 91402

d) Ana Rosa and Gumersindo Castaneda (Appendix A, ¶ 9)
22616 S. Menlo Avenue
Torrance, CA 90502

e) Adell Aldrich (Appendix A, ¶ 10)
222238 Flanco Road
Woodland Hills, CA 91762

f) Benjamin Avalos, Jr. (Appendix A, ¶ 12)
108 Cormorant Drive
Ontario, CA 91762

g) Eugene and Ervetta Marzette (Appendix A, ¶ 15)
5707 Sycamore Avenue
Rialto, CA 92377

h) Elmer and Pearlie Clarke (Appendix A, ¶ 16)
3569 Mulford Avenue
Lynwood, CA 90262

i) Ferdinand and Josephine Paragas-Whittier (Appendix A, ¶ 17)
10621 Victoria Avenue
Whittier, CA 90604

j) Mihai Schera (Appendix A, ¶ 22)
35565 Grandview Drive
Yucaipa, CA 92399

k) Gilberto Pelayo (Appendix A, ¶ 30)
31501 Stoney Creek Drive
Lake Elsinore, CA 92532

l) Helidoro and Cristina Hernandez (Appendix A, ¶ 34)
8296 Velvet Lane
Fontana, CA 92335

m) Antonio Hernandez Jamie and Gloria Vargas Jamie (Appendix A, ¶ 35)
630 West 149 Street
Gardena, CA 90247

n) Ivan Iles (Appendix A, ¶ 42)

- 91 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1758 Duncan Way
Corona, CA 92881

o) Shewkali Rajkumar (Appendix A, ¶ 43)
1420 Stoddard Street
Sacramento, CA 95828

p) John Ahlstead and Gina Ahlstead (Appendix A, ¶44)
9529 Brook Drive
Rancho Cucamonga CA 91730

q) Ivan Iles (Appendix A, ¶42)
17548 Duncan Way
Corona CA 92881

384.    Because the foreclosing Bank Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

385.    Bank Defendants, and Trustee Defendants, acted outrageously, persistently, intentionally and with actual malice in performing the acts alleged in this cause of action.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

386.    As a result of the foregoing unlawful acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses,  suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

## COUNT 24: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
## (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

387.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

388.    Bank Defendants' and Trustee Defendants' acts described in this action are **Unlawful** in that they violate:

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

a. The requirement to make contact with a defaulting borrower prior to foreclosure in order to explore alternatives to foreclosure (Cal. Civ. Code §2923.5)

b. The requirement that the party on behalf of whom foreclosure is being instituted must first have an ownership interest in the Deed of Trust before acting to foreclose. (Cal. Civ. Code §2924 et seq.)

c. The Requirement that a trustee must first be authorized as a trustee before it can conduct a trustee/foreclosure sale (Cal. Civ. Code §2924 et seq.)

d. The Requirement that a party must first record an NOD before they have the power to foreclose (Cal. Civ. Code §2924 et seq).

e. The Crier Rule (Cal. Civ. Code §2994(g)

f. The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

389.    Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above.

390.    Such foreclosures were **additionally** wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them to afford, and would result in their default to a *mathematical certainty* – so that Plaintiffs and their conspirators and could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

391.    Bank Defendants' and Trustee Defendants' acts in intentionally foreclosing upon their borrowers in the name of profit, and/or without authority, as described above are also unfair.

392.    Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

393.    These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Bank Defendants' and Trustee Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by

- 93 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Defendants' intentional wrongful foreclosure which now devastate real estate values.

2    394.    At the time of their fraud, Defendants *knew* that their conduct would cause the

3    precipitous decline in property values throughout the State of California.

4    395.    Defendant's acts caused substantial consumer injury with no benefits to consumer

5    competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants'

6    intentional deceit, misrepresentation, and omission.  Further, Defendants acts significantly threatened

7    harm to competition.

8    396.    Defendant's acts caused substantial consumer injury with no benefits to consumer

9    competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants'

10    intentional deceit, misrepresentation, and omission.  Further, Defendants acts significantly threatened

11    harm to competition.

12    397.    Ally and Bank Defendants acted with malice and with the intent of artificially inflating

13    California Real estate properties generally, as well as the values of Plaintiffs' individual properties and

14    homes.

15    398.    As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all

16    sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent

17    conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants,

18    including, without limitation, trustee fees, and the excessive fees paid at Defendants' direction, and

19    premiums received upon selling the mortgages at an inflated value.

20    399.    As a result of the foregoing unfair, unlawful, and fraudulent acts Plaintiffs have been

21    damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation

22    expenses, suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees,

23    suffering damage to their credit scores, experiencing reduced availability of financing, among the other

24    damages described throughout this Complaint.

25

26    **PRAYER FOR RELIEF**

27    WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

28    1.    General, Actual, Compensatory, Special and Exemplary damages according to proof

- 94 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

under the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twenty-First, and Twenty-Third Counts, and any other Counts for which such relief may be available;

2.    Punitive Damages under the First, Second, Sixth, Tenth, Fifteenth, and Sixteenth Counts and any other Counts for which such relief may be available;

3.    Statutory relief according to proof under the Twelfth, Fourteenth, Twentieth, and Twenty-First Counts and any other Counts for which such relief may be available;

4.    Restitution and Injunctive Relief under the Ninth, Thirteenth, Eighteenth, Twenty-Second and Twenty Fourth Counts and any other Counts for which such relief may be available;

5.    Rescission under the Eighteenth Count;

6.    On all Counts, for costs of suit herein;

7.    On all Counts, for pre- and post-judgment interest;

8.    On all Counts for which attorney's fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys' fees; and

9.    On all Counts, for such other and further relief as this Court may deem just and proper.

Dated: August 9, 2013                              Respectfully submitted,

**BROOKSTONE LAW, PC**

By: _____
Vito Torchia, Jr.
Attorneys for Plaintiffs

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

| PLAINTIFF: EO MACARTHUR, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT: BROOKSTONE LAW, P.C. | 30-2013-00660219-CL-UD-HNB |

7. [✓] Plaintiff and defendant further stipulate as follows *(specify)*:

Plaintiff agrees to hold this Stipulation and not file it with the Court, so long as Defendant surrenders possession of the premises referred to in paragraph 2, on or before the close of business, September 8, 2013. If Defendant surrenders possession of the premises referred to in paragraph 2 on or before September 8, 2013, Plaintiff agrees to dismiss this matter without prejudice.

8. a. **The parties named in item 1 understand that they have the right to (1) have an attorney present and (2) receive notice of and have a court hearing about any default in the terms of this stipulation.**

   b. Date:

   Daniel P. Stimpert, Esq., Attorney for Plaintiff
   _____
   (TYPE OR PRINT NAME)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   ▶ _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   [ ] Continued on *Attachment* 8b (form MC-025).

   c. Date: 8/6/2013

   Vito Torchia, Jr., Attorney for Defendant
   _____
   (TYPE OR PRINT NAME)

   _____
   (TYPE OR PRINT NAME)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   [ ] Continued on *Attachment* 8c (form MC-025).

9. IT IS SO ORDERED.


Date:

_____
JUDICIAL OFFICER

**STIPULATION FOR ENTRY OF JUDGMENT**
**(Unlawful Detainer)**

**UD–115**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and state bar number, and address):*<br>Daniel P. Stimpert, Esq.   SBN: 147420<br>STIMPERT & FORD, LLP<br>6300 Wilshire Blvd., Suite 1890, Los Angeles, CA 90048-5220<br>TELEPHONE NO.: (323) 782-6782   FAX NO. *(Optional):* (323) 782-6788<br>E-MAIL ADDRESS *(Optional):* info@stimpertford.com<br>ATTORNEY FOR *(Name):* EO MacArthur, LLC | FOR COURT USE ONLY |

| |
|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>STREET ADDRESS: 4601 Jamboree Road<br>MAILING ADDRESS: 4601 Jamboree Road<br>CITY AND ZIP CODE: Newport Beach, 92660-2595<br>BRANCH NAME: Harbor Justice Center - Newport Beach Facility |
| PLAINTIFF: EO MACARTHUR, LLC<br><br>DEFENDANT: BROOKSTONE LAW, P.C. |

| | |
|---|---|
| **STIPULATION FOR ENTRY OF JUDGMENT**<br>**(Unlawful Detainer)** | CASE NUMBER:<br>30-2013-00660219-CL-UD-HNB |

1. IT IS STIPULATED by plaintiff *(name each):* EO MACARTHUR, LLC                and
defendant *(name each):* BROOKSTONE LAW, P.C.

2. [X] Plaintiff [ ] Defendant *(specify name):*                               is awarded
   a. [X] possession of the premises located at *(street address, apartment number, city, and county):*
      4000 MacArthur Blvd, Suite 1110, Newport Beach, CA  92660 Orange County

   b. [ ] cancellation of the rental agreement.   [ ] forfeiture of the lease.
   c. [ ] past due rent $
   d. [ ] total holdover damages $
   e. [ ] attorney fees $
   f. [ ] costs $
   g. [ ] deposit of $                              [ ] See item 3.
   h. [X] other *(specify):* $10,000.00 as and for general damages.
   i. [ ] Total $   to be paid by [ ] *(date):*        [ ] installment payments (see item 5)

3. [ ] Deposit.  If not awarded under item 2g, then plaintiff must
   a. [ ] return deposit of $                        to defendant by *(date):*
   b. [ ] give an itemized deposit statement to defendant within three weeks after defendant vacates the premises
         (Civ. Code, § 1950.5).
   c. [ ] mail the [ ] deposit [ ] itemized statement   to the defendant at *(mailing address):*

4. [X] A writ of possession will issue immediately, but there will be no lockout before *(date):* September 9, 2013

5. [ ] AGREEMENT FOR INSTALLMENT PAYMENTS
   a. Defendant agrees to pay $                on the *(specify day)*             day of each month beginning
      on *(specify date)*              until paid in full.
   b. If any payment is more than *(specify)*          days late, the entire amount in item 2i will become immediately due and
      payable plus interest at the legal rate.

6. a. [X] Judgment will be entered now.
   b. [ ] Judgment will be entered only upon default of payment of the amount in item 2i or the payment arrangement in item 5a.
         The case is calendared for dismissal on *(date and time)*              in
         department *(specify)*              unless plaintiff or defendant otherwise notifies the court.
   c. [ ] Judgment will be entered as stated in *Judgment —Unlawful Detainer Attachment* (form UD-110S), which is attached.
   d. [ ] Judgment will be entered as stated in item 7.

---

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>UD-115 [New January 1, 2003] | **STIPULATION FOR ENTRY OF JUDGMENT**<br>**(Unlawful Detainer)** | Page 1 of 2<br>Code of Civil Procedure, § 664.6<br>Westlaw Doc & Form Builder™ |

| PLAINTIFF: EO MACARTHUR, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT: BROOKSTONE LAW, P.C. | 30-2013-00660219-CL-UD-HNB |

7. [X] Plaintiff and defendant further stipulate as follows *(specify):* Plaintiff agrees to hold this Stipulation and not file
it with the Court, so long as Defendant surrenders possession of the premises referred to in
paragraph 2, on or before the close of business, September 8, 2013.  If Defendant surrenders
possession of the premises referred to in paragraph 2 on or before September 8, 2013, Plaintiff
agrees to dismiss this matter without prejudice.

8. a. **The parties named in item 1 understand that they have the right to (1) have an attorney present and (2) receive
notice of and have a court hearing about any default in the terms of this stipulation.**

   b. Date:

   Daniel P. Stimpert, Esq.
   _____
   (TYPE OR PRINT NAME)

   ▶
   _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   _____
   (TYPE OR PRINT NAME)

   ▶
   _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   [ ] Continued on *Attachment* 8b (form MC-025).

   c. Date:

   Attorney for BROOKSTONE LAW, PC
   Vito Torchia, Jr.
   _____
   (TYPE OR PRINT NAME)

   ▶
   _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   _____
   (TYPE OR PRINT NAME)

   ▶
   _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   _____
   (TYPE OR PRINT NAME)

   ▶
   _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   [ ] Continued on *Attachment* 8c (form MC-025).

9. IT IS SO ORDERED.

   Date:

   _____
   JUDICIAL OFFICER

**STIPULATION FOR ENTRY OF JUDGMENT**
**(Unlawful Detainer)**

**UD–115**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Daniel P. Stimpert, Esq.                          SBN: 147420<br>STIMPERT & FORD, LLP<br>6300 Wilshire Blvd., Suite 1890, Los Angeles, CA 90048-5220<br>TELEPHONE NO.: (323) 782-6782    FAX NO. *(Optional)*: (323) 782-6788<br>E-MAIL ADDRESS *(Optional)*: info@stimpertford.com<br>ATTORNEY FOR *(Name)*: EO MacArthur, LLC | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 4601 Jamboree Road
MAILING ADDRESS: 4601 Jamboree Road
CITY AND ZIP CODE: Newport Beach, 92660-2595
BRANCH NAME: Harbor Justice Center- Newport Beach Facility

PLAINTIFF: EO MACARTHUR, LLC

DEFENDANT: BROOKSTONE LAW, P.C.

| STIPULATION FOR ENTRY OF JUDGMENT<br>(Unlawful Detainer) | CASE NUMBER:<br>30-2013-00660219-CL-UD-HNB |
|---|---|

1.  IT IS STIPULATED by plaintiff *(name each)*: EO MACARTHUR, LLC                              and
    defendant *(name each)*: BROOKSTONE LAW, P.C.

2.  ☑ Plaintiff  ☐ Defendant *(specify name)*:                                                is awarded
    a. ☑ possession of the premises located at *(street address, apartment number, city, and county)*:
         4000 MacArthur Blvd., Suite 1110, Newport Beach, CA 92660 Orange County

    b. ☐ cancellation of the rental agreement.   ☐ forfeiture of the lease.
    c. ☐ past due rent $
    d. ☐ total holdover damages $
    e. ☐ attorney fees $
    f. ☐ costs $
    g. ☐ deposit of $                                                 ☐ See item 3.
    h. ☑ other *(specify)*: $10,000.00 as and for general damages.
    i. ☐ Total $        to be paid by ☐ *(date)*:           ☐ installment payments (see item 5)

3.  ☐ Deposit.  If not awarded under item 2g, then plaintiff must
    a. ☐ return deposit of $                              to defendant by *(date)*:
    b. ☐ give an itemized deposit statement to defendant within three weeks after defendant vacates the premises
         (Civ. Code, § 1950.5).
    c. ☐ mail the ☐ deposit ☐ itemized statement to the defendant at *(mailing address)*:

4.  ☑ A writ of possession will issue immediately, but there will be no lockout before *(date)*: September 9, 2013

5.  ☐ AGREEMENT FOR INSTALLMENT PAYMENTS
    a. ☐ Defendant agrees to pay $           on the *(specify day)*           day of each month beginning
         on *(specify date)*           until paid in full.

    b. If any payment is more than *(specify)*        days late, the entire amount in item 2i will become immediately due and
       payable plus interest at the legal rate.

6.  a. ☐ Judgment will be entered now.
    b. ☐ Judgment will be entered only upon default of payment of the amount in item 2i or the payment arrangement in item 5a.
         The case is calendared for dismissal on *(date and time)*                            in
         department *(specify)*           unless plaintiff or defendant otherwise notifies the court.
    c. ☐ Judgment will be entered as stated in *Judgment —Unlawful Detainer Attachment* (form UD-110S), which is attached.
    d. ☑ Judgment will be entered as stated in item 7.

Form Approved for Optional Use
Judicial Council of California
UD-115 [New January 1, 2003]

**STIPULATION FOR ENTRY OF JUDGMENT**
**(Unlawful Detainer)**

Code of Civil Procedure, § 664.6

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1       1.     Plaintiff Carolyn Hairston ("Hairston") discussed refinancing an existing

2    mortgage on her property located at 1544-46 Hauser Boulevard, Los Angeles, CA 90019 and

3    A.P.N. 5069-031-030 with a loan consultant (the "Loan Consultant"), a representative and

4    authorized agent of Paul Financial, LLC, a correspondent of GMAC Mortgage Group, Inc. and

5    authorized by GMAC Mortgage Group, Inc. and Defendants herein (the "Defendants") to lend

6    on its behalf, in or around January, 2007. In the course of their discussions ranging from January

7    2007 until March 2007, Defendants and Loan Consultant steered her into a negatively amortized

8    PayOption ARM in the amount of $550,000.00 with an interest rate at 7.875% for a term of 30

9    years. Little did Hairston know, however, the disclosed interest rate was never "fixed" but

10   applied to only her first monthly payment and could adjust every six months thereafter. The

11   maximum interest rate is 12.875%. The amount of Hairston's minimum monthly payment was

12   "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the

13   minimum monthly payment is insufficient to cover the amount of interest due, then the amount

14   of that deficiency is added onto the unpaid principal balance of her loan. The recast point of this

15   loan is 115% of the original loan amount. This loan was originated by GMAC and Defendants,

16   on the note and deed of trust Paul Financial, LLC is identified as the lender, and GMAC is

17   currently servicing the loan.

18       Defendants and Loan Consultant represented to Hairston that her monthly payment

19   would always be $114.58. Although the amount of Hairston's initial, disclosed minimum

20   monthly payment was $114.58, Defendants and Loan Consultant failed to clarify their partially

21   true representations and advise Hairston: (1) how the interest rate on her loan was calculated; (2)

22   that the initial, disclosed minimum monthly payment of $114.58 would not always be available;

23   (3) that the initial, disclosed minimum monthly payment would not be the permanent payment

24   under the loan despite Defendants' and  Loan Consultant's affirmative representations to the

25   contrary; (4) that by paying the initial, disclosed minimum monthly payment she would be

26   definitively deferring interest on her loan, increasing the principal balance of her loan every time

27   she made the minimum monthly payment; (5) that by paying the minimum monthly payment the

28   principal balance of her loan was certain to increase; or (6) her loan would be recast within a few

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    years and she would be forced to pay considerably higher payments.

2       The disclosures in Hairston's loan documents discussing negative amortization only

3    frame negative amortization as a mere **possibility** rather than a **certainty** when making the

4    minimum payment. However, the reality was that by making the minimum payment, negative

5    amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

6    Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

7    schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

8    result in negative amortization. Hairston was not provided, before entering into the loans, with

9    any other payment schedule or with any informed option to make payments different than those

10    listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment

11    pursuant to the TILDS Hairston would be deferring interest, or had Defendants disclosed the

12    payment amounts sufficient to avoid negative amortization from occurring, Hairston would not

13    have entered into the loan. **Defendants intentionally omitted a clear disclosure of the nature**

14    **of Hairston's loan because giving a clear explanation of how the loan worked would have**

15    **punctured the illusion of a low-payment, low interest rate loan.**

16       Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc

17    Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

18    documentation requirement to fraudulently inflate her income by $7,000, a factor of 250%; and

19    in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

20    payments she could not afford given her true, un-inflated monthly income. Defendants and Loan

21    Consultant altered Hairston's loan application without her knowing consent and authorization as

22    Loan Consultant completed Hairston's application without giving Hairston an opportunity to

23    review the loan application.

24       Defendants and Loan Consultant also explicitly represented to Hairston that she could

25    afford her loan and further represented that she could shoulder the additional financial burden of

26    repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

27    amortized monthly payment on the loan was $6,804.14. Given Hairston's true monthly income

28    of $4,500.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

1   before any other debts are even considered, of over 151%- grossly in excess of industry standard

2   underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

3   and Loan Consultant further represented to Hairston that she could rely on the assessment that

4   she was "qualified" to mean that she could afford the loan. Because of Hairston's lack of

5   familiarity with how much debt a person can and should reasonably take on compared to her

6   monthly income, and because Hairston reasonably relied on Defendants' and Loan Consultant's

7   expertise that any payment she was "qualified" for would take into account what the maximum

8   debt a person such as Hairston should be shouldering was, Hairston reasonably believed

9   Defendants' and Loan Consultant's representations that she could afford her loan and its

10  payments. Although Defendants and the Loan Consultant represented to Hairston that she was

11  "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

12  Loan Consultant misled Hairston into believing that her monthly payments would always only be

13  $114.58. Furthermore, at no point did Defendants or Loan Consultant clarify Hairston's false

14  belief and advise her that $114.58 would not be her permanent payment under the loan, or that

15  every time she made a monthly payment in the amount of $114.58, which is less than interest

16  only, she would be deferring interest on her loan, increasing the principal balance of her loan.

17      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

18  on behalf of Defendants were accurate and made in good faith. On or around February 2007, an

19  appraisal company under the direct control and supervision of Defendants conducted an appraisal

20  on Hairston's home, which was fraudulently inflated to a grossly and intentionally overstated

21  value.  Defendants and Loan Consultant represented that, per appraisal, Hairston's home was

22  worth $1,200,000.00 at the time she entered into her loan, and that such a valuation was a true

23  and correct measure of her home's worth. The current fair market value of Hairston's home is

24  approximately $511,922.00. Hairston alleges that the appraisal was artificially inflated, and that

25  she has suffered damages in the amount of $688,078.00 ($1,200,000.00-$511,922.00) due to a

26  substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

27  acts described herein.

28      Defendants and Loan Consultant also represented to Hairston that she would be able to

1  refinance her loan at a later time. Hairston relied on this assurance in deciding to enter into the

2  mortgage contract. However, Hairston has not been able to refinance her loan.  Defendants and

3  Loan Consultant also represented that it would modify Hairston's loan, and Hairston relied on

4  this representation in deciding to enter into the loan. However, Hairston was unable to modify

5  her loan.

6       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

7  reputable and complied with industry standard underwriting guidelines and were engaged in

8  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

9  made in good faith;  (3) Hairston could afford the loan ; (4) She was "qualified" for her loan;  (5)

10 "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and

11 (7) She would be able to refinance her loan.

12      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

13 otherwise improperly disclosed to Hairston that: (1) Defendants and Loan Consultant knew that

14 she could not and would not be able to afford her loan and that there was a very high probability

15 that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

16 loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

17 "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

18 and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

19 to communicate that she could actually "afford" the loan which she was being given; (5)

20 Defendants had abandoned its conventional lending business, prudent lending standards, and

21 industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

22 Hairston's home to require her to borrow more money with the knowledge that the true value of

23 Hairston's home was insufficient to justify the amount of Hairston's loan; or (7) Defendants

24 knew that due to its scheme of fraudulently manipulating and inflating property values

25 throughout the State of California that the real estate market would crash and Hairston would

26 lose substantial equity in her home.

27      Based on these misrepresentations and omissions, the material facts concerning

28 Hairston's loan were concealed from her, and she decided to move forward with her loan. On

4

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    March 30, 2007, Hairston signed the loan and Deed of Trust, before a notary. Had she known the

2    truth however, Hairston would not have accepted the loan. As a result of Defendants' fraudulent

3    acts described throughout this complaint, Hairston has lost substantial equity in her home, has

4    damaged or destroyed credit, and at the time Hairston entered into the loan her home was worth

5    $1,200,000.00, now her home is worth approximately $511.922.00. Hairston did not discover

6    any of these misrepresentations or omissions until after a consultation with legal counsel at

7    Brookstone Law, and through a complete and thorough investigation of the loan documentation,

8    and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

9    throughout this complaint, were brought to light on or around July 19, 2011. (True and correct

10    copy of the aforementioned documents are attached hereto as *Exhibit 1*).

11        2.        Plaintiff Carolyn Hairston ("Hairston") discussed refinancing an existing

12    mortgage on her property located at 1534-36 Hauser Blvd, Los Angeles, CA 90019 and A.P.N.

13    5069-031-032 with a Loan Consultant ("Loan Consultant") with Paul Financial, LLC, a

14    correspondence of GMAC Financial and Defendants herein ("the Defendants"), and authorized

15    by Defendants to lend on its behalf, in or around January 2007. In the course of their discussions

16    ranging from January 2007 until March 2007, Defendants and Loan Consultant steered her into a

17    negatively amortized PayOption ARM in the amount of $500,000.00 with an interest rate at

18    0.250% for a term of 30 years. Little did Hairston know that the interest rate of 0.250% is the

19    amount used to calculate the amount of her minimum monthly payment. Hairston also did not

20    know that she was accruing interest on her loan at the interest rate of 8.375%.  Hairston's true

21    interest rate of 8.375% is "fixed" for ten years and can adjust every six months thereafter. The

22    maximum interest rate is 13.375%. The amount of Hairston's minimum monthly payment is also

23    "fixed" for ten years. When the amount of the minimum monthly payment is insufficient to cover

24    the amount of interest due, then the amount of that deficiency is added onto the unpaid principal

25    balance of her loan. Her loan has a recast point of 155% of the original amount. Once her loan

26    hits the recast point, Hairston will be obligated to make interest only payment for the remainder

27    of the ten year "fixed" period. This loan was originated by GMAC and Defendants, on the note

28    and deed of trust Paul Financial, LLC is identified as the lender, and GMAC is currently

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  servicing the loan.

2        Defendants and Loan Consultant recommended the loan, representing that this was a

3  worthy loan. Defendants and Loan Consultant represented to Hairston that her monthly payment

4  would always be $104.00 Although the amount of Hairston's initial, minimum monthly payment

5  was $104.00, Defendants and Loan Consultant failed to clarify their partially true representations

6  and advise Hairston: (1) how the interest rate on her loan was calculated; (2) that the initial

7  minimum monthly payment of $104.00 would not always be available; (3) that the initial

8  minimum monthly payment would not be the permanent payment under the loan despite

9  Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by

10  paying the initial minimum monthly payment she would be definitively deferring interest on her

11  loan, increasing the principal balance of her loan every time she made the minimum monthly

12  payment; (5) that by paying the minimum monthly payment the principal balance of her loan was

13  certain to increase; or (6) her loan would be recast within a few years and she would be forced to

14  pay considerably higher payments.

15        The disclosures in Hairston's loan documents discussing negative amortization only

16  frame negative amortization as a mere **possibility** rather than a **certainty** when making the

17  minimum payment. However, the reality was that by making the minimum payment, negative

18  amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

19  Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

20  schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

21  result in negative amortization. Hairston was not provided, before entering into the loans, with

22  any other payment schedule or with any informed option to make payments different than those

23  listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment

24  pursuant to the TILDS Hairston would be deferring interest, or had Defendants disclosed the

25  payment amounts sufficient to avoid negative amortization from occurring, Hairston would not

26  have entered into the loan. **Defendants intentionally omitted a clear disclosure of the nature**

27  **of Hairston's loan because giving a clear explanation of how the loan worked would have**

28  **punctured the illusion of a low-payment, low interest rate loan.**

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Defendants and Loan Consultant altered Hairston's loan application without her knowing

2  consent or authorization as Loan Consultant completed Hairston's application without giving

3  Hairston an opportunity to review the loan application. Further, Defendants and Loan Consultant

4  advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time,

5  Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate

6  her income and in doing so, Defendants and Loan Consultant caused her to be placed into a loan

7  whose payments she could not afford given her true, un-inflated monthly income.

8    Defendants and Loan Consultant also explicitly represented to Hairston that she could

9  afford her loan and further represented that she could shoulder the additional financial burden of

10  repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

11  amortized monthly payment on the loan was $6,517.23. Given Hairston's true monthly income

12  of $4,500.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

13  before any other debts are even considered, of over 144%- in excess of industry standard

14  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

15  and Loan Consultant further represented to Hairston that she could rely on the assessment that

16  she was "qualified" to mean that she could afford the loan. Because of Hairston's lack of

17  familiarity with how much debt a person can and should reasonably take on compared to her

18  monthly income, and because Hairston reasonably relied on Defendants' and Loan Consultant's

19  expertise that any payment she was "qualified" for would take into account what the maximum

20  debt a person such as Hairston should be shouldering was, Hairston reasonably believed

21  Defendants' and Loan Consultant's representations that she could afford her loan and its

22  payments. Although Defendants and the Loan Consultant represented to Hairston that she was

23  "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

24  Loan Consultant misled Hairston into believing that her monthly payments would always only be

25  $104.00. Furthermore, at no point did Defendants or Loan Consultant clarify Hairston's false

26  belief and advise her that $104.00 would not be her permanent payment under the loan, or that

27  every time she made a monthly payment in the amount of $104.00, which is less than interest

28  only, she would be deferring interest on her loan, increasing the principal balance of her loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1     In addition, Defendants and Loan Consultant represented that appraisals conducted by or

2    on behalf of Defendants were accurate and made in good faith. On or around March 2005, an

3    appraisal company under the direct control and supervision of Defendants conducted an appraisal

4    on Hairston's home, which was fraudulently inflated to a grossly and intentionally overstated

5    value. Defendants and Loan Consultant represented that, per appraisal, Hairston's home was

6    worth $1,000,000.00 at the time she entered into her loan, and that such a valuation was a true

7    and correct measure of her home's worth. The current fair market value of Hairston's home is

8    approximately $281,312.00. Hairston alleges that the appraisal was artificially inflated, and that

9    she has suffered damages in the amount of $718,688.00 ($1,000,000.00-$281,312.00) due to a

10    substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

11    acts described herein.

12    Due to the economic crash, caused by the Defendants fraudulent acts described through

13    this complain, Hairston suffered from extreme financial hardship, and sought the assistance of

14    the Defendants in repaying her loan. Hairston applied for loan modification with the Defendants.

15    The Defendants delayed processing, repeatedly demanding that Hairston furnish duplicate

16    documentation and information over the course of four months. Hairston was ultimately denied

17    a loan modification because she did not have sufficient income. At the time Hairston applied for

18    a loan modification her "fixed" income was the same as it was when she entered into the loan.

19    Hairston inquired about getting a loan modification HAMP. A representative an

20    authorized agent of Defendants informed Hairston that she did not qualify for HAMP but refused

21    to provide a reason why. Moreover, the Defendants failed to provide adequate information or

22    communication regarding the loan modification programs to Hairston.

23    Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

24    reputable and complied with industry standard underwriting guidelines and were engaged in

25    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

26    made in good faith; (3) Hairston could afford the loan ; (4) she was "qualified" for her loan; (5)

27    "qualified" meant that she could afford her loan; (6) she would be able to modify her loan in the

28    future; and (7) Defendants would refinance her loan in the future.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

2   otherwise improperly disclosed to Hairston that: (1) Defendants and Loan Consultant knew that

3   she could not and would not be able to afford her loan and that there was a very high probability

4   that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

5   loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

6   "qualification" process was for Defendants' own protection and not her; (4) that Defendants' and

7   Loan Consultant's representations that she was "qualified" to pay her loan was not intended to

8   communicate that she could actually "afford" the loan which she was being given; (5)

9   Defendants had abandoned its conventional lending business, prudent lending standards, and

10   industry standard underwriting guidelines;(6) Defendants influenced the appraiser to over-value

11   Hairston's home to require her to borrow more money with the knowledge that the true value of

12   Hairston's home was insufficient to justify the amount of Hairston's loan; or (7) Defendants

13   knew that due to its scheme of fraudulently manipulating and inflating property values

14   throughout the State of California that the real estate market would crash and Hairston would

15   lose substantial equity in her home.

16    Based on these misrepresentations and omissions, the material facts concerning

17   Hairston's loan were concealed from her, and she decided to move forward with her loan. On

18   March 22, 2007, Hairston signed the loan and Deed of Trust, before a notary. Had she known the

19   truth however, Hairston would not have accepted the loan. As a result of Defendants' fraudulent

20   acts described throughout this complaint Hairston has lost substantial equity in her home, has

21   damaged or destroyed credit, and at the time Hairston entered into the loan her home was worth

22   $1,000,000.00, now her home is worth approximately $281,312.00. Hairston did not discover

23   any of these misrepresentations or omissions until after a consultation with legal counsel at

24   Brookstone Law, and through a complete and thorough investigation of the loan documentation,

25   and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

26   throughout this complaint, were brought to light on or around July 5, 2011. (True and correct

27   copy of the aforementioned documents are attached hereto as *Exhibit 2*).

28    3.    Plaintiffs William Mimiaga ("Mimiaga") and Christine Petersen ("Petersen")

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    discussed refinancing an existing mortgage on their property located at 936 Coronado Drive,

2    Costa Mesa, CA 92626 and APN 141-323-21 with a Loan Consultant ("Loan Consultant") with

3    Homecomings Financial, LLC, a correspondent of GMAC and the Defendants (the

4    "Defendants"), and authorized by Defendants to lend on its behalf, in or around November 2006.

5    In the course of their discussions ranging from November 2006 until January 2007, Defendants

6    and Loan Consultant steered them into a fixed rate Interest-Only mortgage in the amount of

7    $534,000.00 with an interest rate at 6.500% for a term of 30 years. Little did Mimiaga and

8    Petersen know, however, payments made during the first ten years of their loan were Interest-

9    Only. This loan was originated by GMAC and Defendants, on the note and deed of trust

10    Homecomings Financial, LLC is identified as the lender, and GMAC is currently servicing the

11    loan.

12         Defendants and Loan Consultant represented to Mimiaga and Petersen that their monthly

13    payment would always be $2,892.50 Although the amount of Mimiaga and Petersen's initial

14    monthly payment was $2,892.50, Defendants and Loan Consultant failed to clarify their partially

15    true representations and advise Mimiaga and Petersen that: (1) their monthly payment would not

16    pay down any of their principal balance during the Interest-Only period, or (2) their monthly

17    payment would drastically increase at the end of the Interest-Only period, or (3) the amount of

18    their initial, disclosed monthly payment would not remain "fixed" for the entire term of his loan.

19         Defendants and Loan Consultant altered Mimiaga and Petersen's loan application without

20    their knowing consent or authorization as Loan Consultant completed Mimiaga and Petersen's

21    application without giving Mimiaga and Petersen an opportunity to review the loan application.

22    Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc

23    Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

24    documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

25    Loan Consultant caused them to be placed into a loan whose payments they could not afford

26    given their true, un-inflated monthly income.

27         Defendants and Loan Consultant also explicitly represented to Mimiaga and Petersen that

28    they could afford their loan and further represented that they could shoulder the additional

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   financial burden of repaying their loan in consideration of their other existing debts; yet failed to

2   disclose that the fully amortized monthly payment on the loan was $3,981.36. Defendants and

3   Loan Consultant further represented to Mimiaga and Petersen that they could rely on the

4   assessment that they were "qualified" to mean that they could afford the loan. Because of

5   Mimiaga and Petersen's lack of familiarity with how much debt a person can and should

6   reasonably take on compared to their monthly income, and because Mimiaga and Petersen

7   reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

8   "qualified" for would take into account what the maximum debt a person such as Mimiaga and

9   Petersen should be shouldering was, Mimiaga and Petersen reasonably believed Defendants' and

10   Loan Consultant's representations that they could afford their loan and its payments. Although

11   Defendants and Loan Consultant represented to Mimiaga and Petersen that they were "qualified"

12   for their loan and could afford their loan and its monthly payments, Defendants and Loan

13   Consultant misled Mimiaga and Petersen into believing that their monthly payments would

14   always only be $2,892.50. Furthermore, at no point did Defendants or Loan Consultant clarify

15   Mimiaga and Petersen's false belief and advise them that $2,892.50 would not be their

16   permanent payment under the loan, or that every time they made a monthly payment in the

17   amount of $2,892.50, they were not paying down any of their principal balance.

18        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

19   on behalf of Defendants were accurate and made in good faith. On or around January 2007,

20   Bradbury Appraisal Service, Inc., an appraisal company under the direct control and supervision

21   of Defendants, conducted an appraisal on Mimiaga and Petersen's home, which was fraudulently

22   inflated to $715,000.00 - a grossly an intentionally overstated value. The current fair market

23   value of Petersen's home is approximately $494,202.00. Mimiaga and Petersen allege that the

24   appraisal was artificially inflated, and that they have suffered damages in the amount of

25   $220,798.00 ($715,000.00-$494,202.00) due to a substantial loss of equity in their home as a

26   result of Defendants' fraudulent inflation and other acts described herein.

27        Defendants and Loan Consultant also represented to Mimiaga and Petersen that they

28   would be able to refinance their loan at a later time. Mimiaga and Petersen relied on this

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    assurance in deciding to enter into the mortgage contract. However, Mimiaga and Petersen have

2    not been able to refinance their loan because they did not generate enough income, had a low

3    credit score and the value of their home was of under value.

4        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

5    reputable and complied with industry standard underwriting guidelines and were engaged in

6    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

7    made in good faith; (3) Mimiaga and Petersen could afford the loan; (4) they were "qualified" for

8    their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify

9    their loan; and (7) they would be able to refinance their loan.

10        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

11    otherwise improperly disclosed to Mimiaga and Petersen that: (1) Defendants and Loan

12    Consultant knew that they could not and would not be able to afford their loan and that there was

13    a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

14    incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

15    and Loan Consultant's "qualification" process was for Defendants' own protection and not

16    theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

17    pay their loan was not intended to communicate that they could actually "afford" the loan which

18    they were being given; (5) Defendants had abandoned its conventional lending business, prudent

19    lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

20    appraiser to over-value Mimiaga and Petersen's home to require them to borrow more money

21    with the knowledge that the true value of Mimiaga and Petersen's home was insufficient to

22    justify the amount of Mimiaga and Petersen's loan; or (7) Defendants knew that due to its

23    scheme of fraudulently manipulating and inflating property values throughout the State of

24    California that the real estate market would crash and Petersen would lose substantial equity in

25    their home.

26        Based on these misrepresentations and omissions, the material facts concerning Mimiaga

27    and Petersen's loan were concealed from them, and they decided to move forward with their

28    loan. On January 24, 2007, Mimiaga and Petersen signed the loan and Deed of Trust, before a

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   notary. Had they known the truth however, Mimiaga and Petersen would not have accepted the

2   loan. As a result of Defendants' fraudulent acts described throughout this complaint  Mimiaga

3   and Petersen have lost substantial equity in their home, have damaged or destroyed credit, and at

4   the time Mimiaga and Petersen entered into the loan their home was worth $715,000.00, now

5   their home is worth approximately $494,202.00. Mimiaga and Petersen did not discover any of

6   these misrepresentations or omissions until after a consultation with legal counsel at Brookstone

7   Law, and through a complete and thorough investigation of the loan documentation, and a

8   discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

9   throughout this complaint, were brought to light on or around January 12, 2011. (True and

10   correct copy of the aforementioned documents are attached hereto as *Exhibit 3*).

11       4.    Plaintiffs Robin Gaston and Patrick Gaston (collectively referred to as "Mr. and

12   Mrs. Gaston") discussed refinancing an existing mortgage on their property located at 10726

13   Lynn Circle, Cypress, CA 90630, A.P.N.:134-553-39 with a Loan Consultant ("Loan

14   Consultant"), a representative and authorized agent of Homecoming Financial Corporation and

15   Defendants herein (the "Defendants") in or around August 2006. In the course of their

16   discussions ranging from August 2006 until October 2006, Defendants and Loan Consultant

17   steered them into a fixed rate mortgage in the amount of $552,000.00 with an interest rate at

18   4.125% for a term of 30 years. This loan was originated by GMAC, on the note and deed of trust

19   Homecoming Financial Corporation is identified as the lender, and GMAC is servicing the loan.

20       Further, Defendants and Loan Consultant advised them that they were eligible for a Low

21   Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

22   documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

23   Loan Consultant caused them to be placed into a loan whose payments they could not afford

24   given their true, *un-inflated* monthly income. Defendants and Loan Consultant altered Mr. and

25   Mrs. Gaston's loan application without their knowing consent or authorization as Loan

26   Consultant completed Mr. and Mrs. Gaston's application without giving Mr. and Mrs. Gaston an

27   opportunity to review the loan application.

28       Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Gaston that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    they could afford their loan and further represented that they could shoulder the additional

2    financial burden of repaying their loan in consideration of their other existing debts. Defendants

3    and Loan Consultant also represented to them that they could afford a $2,675.27 monthly

4    payment, despite their $7,494.00 true monthly income (a "front-end" debt-to-income ratio,

5    meaning a debt-to-income ratio, before any other debts are even considered, of over 36%).

6    Defendants and Loan Consultant further represented to Mr. and Mrs. Gaston that they could rely

7    on the assessment that they were "qualified" to mean that they could afford the loan. Because of

8    Mr. and Mrs. Gaston's lack of familiarity with how much debt a person can and should

9    reasonably take on compared to their monthly income, and because Mr. and Mrs. Gaston

10   reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

11   "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs.

12   Gaston should be shouldering was, Mr. and Mrs. Gaston reasonably believed Defendants' and

13   Loan Consultant's representations that they could afford their loan and its payments.

14          In addition, Defendants and Loan Consultant represented that appraisals conducted by or

15   on behalf of Defendants were accurate and made in good faith. On or around October 3, 2006, an

16   appraisal company under the direct control and supervision of Defendants conducted an appraisal

17   on Mr. and Mrs. Gaston's home, which was fraudulently inflated to an intentionally overstated

18   value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Gaston's

19   home was worth $690,000.00 at the time they entered into their loan, and that such a valuation

20   was a true and correct measure of their home's worth. The current fair market value of Mr. and

21   Mrs. Gaston's home is approximately $321,300.00. Mr. and Mrs. Gaston allege that the appraisal

22   was artificially inflated, and that they have suffered damages in the amount of $368,700.00

23   ($690,000.00-$321,300.00) due to a substantial loss of equity in their home as a result of

24   Defendants' fraudulent inflation and other acts described herein.

25          Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

26   reputable and complied with industry standard underwriting guidelines and were engaged in

27   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

28   made in good faith; (3) Mr. and Mrs. Gaston could afford the loan; (4) they were "qualified" for

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   their loan; and (5) "qualified" meant that they could afford their loan.

2       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

3   otherwise improperly disclosed to Mr. and Mrs. Gaston that: (1) Defendants and Loan

4   Consultant knew that they could not and would not be able to afford their loan and that there was

5   a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

6   incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

7   and Loan Consultant's "qualification" process was for Defendants' own protection and not

8   theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

9   pay their loan was not intended to communicate that they could actually "afford" the loan which

10  they were being given; (5) Defendants had abandoned its conventional lending business, prudent

11  lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

12  appraiser to over-value Mr. and Mrs. Gaston's home to require them to borrow more money with

13  the knowledge that the true value of Mr. and Mrs. Gaston's home was insufficient to justify the

14  amount of Mr. and Mrs. Gaston's loan; or (7) Defendants knew that due to its scheme of

15  fraudulently manipulating and inflating property values throughout the State of California that

16  the real estate market would crash and Mr. and Mrs. Gaston would lose substantial equity in their

17  home.

18      Based on these misrepresentations and omissions, the material facts concerning Mr. and

19  Mrs. Gaston's loan were concealed from them, and they decided to move forward with their

20  loan. On October 31, 2006, Mr. and Mrs. Gaston signed the loan and Deed of Trust, before a

21  notary. Had they known the truth however, Mr. and Mrs. Gaston would not have accepted the

22  loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and

23  Mrs. Gaston have lost substantial equity in their home, have damaged or destroyed credit, and at

24  the time Mr. and Mrs. Gaston entered into the loan their home was worth $690,000.00, now their

25  home is worth approximately $321,300.00. Mr. and Mrs. Gaston did not discover any of these

26  misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

27  and through a complete and thorough investigation of the loan documentation, and a discussion

28  of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

1  complaint, were brought to light on or around March 26, 2011.

2      5.      Plaintiff Mary Serrano ("Serrano") discussed obtaining a mortgage to purchase

3  her home located at 3423 East White Chapel Court Unit B, Orange, CA 92869 and A.P.N. 939-

4  21-315 with a Loan Consultant ("Loan Consultant") with Nationwide Lending Corporation, a

5  correspondent of GMAC and Defendants herein (the "Defendants"), and authorized by

6  Defendants to lend on its behalf, in or around January 2006. In the course of their discussions

7  ranging from January 2006 until March 2006, Defendants steered her into a negatively amortized

8  PayOption ARM in the amount of $412,000.00 with an interest rate at 1.750% for a term of 40

9  years. Little did Serrano know, however, the interest rate was never "fixed" but applied to only

10  her first monthly payment and could adjust every 12 months thereafter. The amount of Serrano's

11  minimum monthly payment was "fixed" for 12 months and could adjust every 12 months

12  thereafter. When the amount of the minimum monthly payment is insufficient to cover the

13  amount of interest due, then the amount of that deficiency is added onto the unpaid principal

14  balance of her loan. The recast point of this loan is 115% of the original loan amount.  Loan

15  Consultant and Defendants also steered Serrano into a piggy-back loan in the amount of

16  $51,500.00 with the interest rate 11.57% for a term of 15 years. This loan was originated by

17  GMAC and Defendants, the note and deed of trust identifies Nationwide Lending Corporation as

18  the lender, and Aurora is currently servicing the loan.

19      Defendants represented to Serrano  that her monthly payment would always be $1,194.00

20  Although the amount of Serrano's initial, minimum monthly payment was $1,194.00,

21  Defendants failed to clarify their partially true representations and advise Serrano : (1) how the

22  interest rate on her loan was calculated; (2) that the initial minimum monthly payment of

23  $1,194.00 would not always be available; (3) that the initial minimum monthly payment would

24  not be the permanent payment under the loan despite Defendants' affirmative representations to

25  the contrary; (4) that by paying the initial minimum monthly payment she would be definitively

26  deferring interest on her loan, increasing the principal balance of her loan every time she made

27  the minimum monthly payment; (5) that by paying the minimum monthly payment the principal

28  balance of her loan was certain to increase; or (6) her loan would be recast within a few years

1    and she would be forced to pay considerably higher payments.

2         The disclosures in Serrano's loan documents discussing negative amortization only frame

3    negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

4    payment. However, the reality was that by making the minimum payment, negative amortization

5    was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

6    Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

7    to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

8    amortization. Serrano was not provided, before entering into the loans, with any other payment

9    schedule or with any informed option to make payments different than those listed in the TILDS

10   payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

11   Serrano would be deferring interest, or had Defendants disclosed the payment amounts sufficient

12   to avoid negative amortization from occurring, Serrano would not have entered into the loan.

13   **Defendants intentionally omitted a clear disclosure of the nature of Serrano's loan because**

14   **giving a clear explanation of how the loan worked would have punctured the illusion of a**

15   **low-payment, low interest rate loan.**

16        Defendants altered Serrano's loan application without her knowing consent or

17   authorization as Defendants completed Serrano's application without giving Serrano an

18   opportunity to review the loan application. Further, Defendants advised her that she was eligible

19   for a Low Doc Loan. Unbeknownst to her at the time, Defendants used this low documentation

20   requirement to fraudulently inflate her income and in doing so, Defendants caused her to be

21   placed into a loan whose payments she could not afford given her true, *un-inflated* monthly

22   income.

23        Defendants also explicitly represented to Serrano that she could afford her loan and

24   further represented that she could shoulder the additional financial burden of repaying her loan in

25   consideration of her other existing debts; yet failed to disclose that the fully amortized monthly

26   payment on the loan was $3,013.00. Given Serrano's true monthly income of $3,112.00, this

27   represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other

28   debts are even considered, of over 96%- in excess of industry standard underwriting guidelines,

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  and in excess of Defendants' own underwriting guidelines. Defendants further represented to

2  Serrano that she could rely on the assessment that she was "qualified" to mean that she could

3  afford the loan. Because of Serrano's lack of familiarity with how much debt a person can and

4  should reasonably take on compared to her monthly income, and because Serrano reasonably

5  relied on Defendants' expertise that any payment she was "qualified" for would take into account

6  what the maximum debt a person such as Serrano should be shouldering was, Serrano reasonably

7  believed Defendants' representations that she could afford her loan and its payments. Although

8  Defendants represented to Serrano that she was "qualified" for her loan and could afford her loan

9  and its monthly payments, Defendants misled Serrano into believing that her monthly payments

10  would always only be $1,194.00. Furthermore, at no point did Defendants clarify Serrano's false

11  belief and advise her that $1,194.00 would not be her permanent payment under the loan, or that

12  every time she made a monthly payment in the amount of $1,194.00, which is less than interest

13  only, she would be deferring interest on her loan, increasing the principal balance of her loan.

14       In addition, Defendants represented that appraisals conducted by or on behalf of

15  Defendants were accurate and made in good faith. On or around March 2006, an appraisal

16  company under the direct control and supervision of Defendants conducted an appraisal on

17  Serrano's home, which was fraudulently inflated to an intentionally overstated value. Defendants

18  represented that, per appraisal, Serrano's home was worth $430,000.00 at the time she entered

19  into her loan, and that such a valuation was a true and correct measure of her home's worth. The

20  current fair market value of Serrano's home is approximately $301,100.00. Serrano alleges that

21  the appraisal was artificially inflated, and that she has suffered damages in the amount of

22  $128,900.00 ($430,000.00-$301,100.00) due to a substantial loss of equity in her home as a

23  result of Defendants' fraudulent inflation and other acts described herein.

24       Defendants also represented to Serrano that she would be able to refinance her loan at a

25  later time. Serrano relied on this assurance in deciding to enter into the mortgage contract.

26  However, Serrano has not been able to refinance her loan.  Defendants also represented that it

27  would modify Serrano's loan, and Serrano relied on this representation in deciding to enter into

28  the loan. However, Serrano was unable to modify her loan.

1    Furthermore, Defendants represented that: (1) Defendants were reputable and complied

2    with industry standard underwriting guidelines and were engaged in lending of the highest

3    caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3)

4    Serrano could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she

5    could afford her loan; (6) Defendants would modify her loan in the future; and (7) Defendants

6    would refinance her loan in the future.

7    Moreover, Defendants withheld or incompletely, inaccurately or otherwise improperly

8    disclosed to Serrano that: (1) Defendants knew that she could not and would not be able to afford

9    her loan and that there was a very high probability that she would default and/or be foreclosed

10    upon;  (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently

11    inflated prices; (3) Defendants' "qualification" process was for Defendants' own protection and

12    not hers; (4) that Defendants' representations that she was "qualified" to pay her loan was not

13    intended to communicate that she could actually "afford" the loan which she was being given;

14    (5) Defendants had abandoned its conventional lending business, prudent lending standards, and

15    industry standard underwriting guidelines;(6) Defendants influenced the appraiser to over-value

16    Serrano's home to require her to borrow more money with the knowledge that the true value of

17    Serrano's home was insufficient to justify the amount of Serrano's loan; or (7) Defendants knew

18    that due to its scheme of fraudulently manipulating and inflating property values throughout the

19    State of California that the real estate market would crash and Serrano would lose substantial

20    equity in her home.

21    Based on these misrepresentations and omissions, the material facts concerning Serrano's

22    loan were concealed from her, and she decided to move forward with her loan. On March 22,

23    2006, Serrano signed the loan and Deed of Trust, before a notary. Had she known the truth

24    however, Serrano would not have accepted the loan. As a result of Defendants' fraudulent acts

25    described throughout this complaint Serrano has lost substantial equity in her home, has

26    damaged or destroyed credit, and at the time Serrano entered into the loan her home was worth

27    $430,000.00, now her home is worth approximately $301,100.00. Serrano did not discover any

28    of these misrepresentations or omissions until after a consultation with legal counsel at

19

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Brookstone Law, and through a complete and thorough investigation of the loan documentation,

and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

throughout this complaint, were brought to light on or around February 1, 2011. (True and

correct copy of the aforementioned documents are attached hereto as *Exhibit 4*).

6.    Plaintiff Sarah Sebagh ("Sebagh") discussed refinancing an existing mortgage on

their property located at 1233 N Flores Street #302, West Hollywood CA 90069 and APN 5554-

025-162 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of

SBMC, a correspondent of GMAC and Defendants herein (the "Defendants"), and authorized by

Defendants to lend on its behalf, in or around March 2006. In the course of their discussions

ranging from March 2006 until May 2006, Defendants and Loan Consultant steered her into a

negatively amortized PayOption ARM in the amount of $430,000.00 with an interest rate at

1.000% for a term of 30 years. Little did Sebagh know, however, the interest rate was never

"fixed" but applied to only their first monthly payment and could adjust every month thereafter.

The maximum interest rate is 9.950%. The amount of Sebagh's minimum monthly payment was

"fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the

minimum monthly payment is insufficient to cover the amount of interest due, then the amount

of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this

loan is 110% of the original loan amount. In addition, Defendants and Loan Consultant

recommended the loan, representing that the loan was a good loan. The loan was originated by

GMAC, on the note and deed of trust SBMC was identified as the lender, and GMAC was the

servicer of the loan.

Defendants and Loan Consultant represented to Sebagh that her monthly payment would

always be $1,383.05. Although the amount of Sebagh's initial minimum monthly payment was

$1,383.05, Defendants and Loan Consultant failed to clarify their partially true representations

and advise Sebagh: (1) how the interest rate on her loan was calculated; (2) that the initial

minimum monthly payment of $1,383.05 would not always be available; (3) that the initial

minimum monthly payment would not be the permanent payment under the loan despite

Defendants' and  Loan Consultant's affirmative representations to the contrary; (4) that by

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    paying the initial minimum monthly payment she would be definitively deferring interest on her

2    loan, increasing the principal balance of her loan every time she made the minimum monthly

3    payment; (5) that by paying the minimum monthly payment the principal balance of her loan was

4    certain to increase; or (6) her loan would be recast within a few years and she would be forced to

5    pay considerably higher payments.

6        The disclosures in Sebagh's loan documents discussing negative amortization only frame

7    negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

8    payment. However, the reality was that by making the minimum payment, negative amortization

9    was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

10   Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

11   to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

12   amortization. Sebagh was not provided, before entering into the loans, with any other payment

13   schedule or with any informed option to make payments different than those listed in the TILDS

14   payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

15   Sebagh would be deferring interest, or had Defendants disclosed the payment amounts sufficient

16   to avoid negative amortization from occurring, Sebagh would not have entered into the loan.

17   **Defendants intentionally omitted a clear disclosure of the nature of Sebagh's loan because**

18   **giving a clear explanation of how the loan worked would have punctured the illusion of a**

19   **low-payment, low interest rate loan.**

20       Defendants and Loan Consultant also explicitly represented to Sebagh that she could

21   afford her loan and further represented that she could shoulder the additional financial burden of

22   repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

23   amortized monthly payment on the loan was $3,161.018. Given Sebagh's true monthly income

24   of $2,610.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

25   before any other debts are even considered, of over 121%- grossly in excess of industry standard

26   underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

27   and Loan Consultant further represented to Sebagh that she could rely on the assessment that she

28   was "qualified" to mean that she could afford the loan. Because of Sebagh's lack of familiarity

1    with how much debt a person can and should reasonably take on compared to her monthly

2    income, and because Sebagh reasonably relied on Defendants' and Loan Consultant's expertise

3    that any payment she was "qualified" for would take into account what the maximum debt a

4    person such as Sebagh should be shouldering was, Sebagh reasonably believed Defendants' and

5    Loan Consultant's representations that she could afford her loan and its payments.

6         Although Defendants and the Loan Consultant represented to Sebagh that she was

7    "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

8    Loan Consultant misled Sebagh into believing that her monthly payments would always only be

9    $1,383.05. Furthermore, at no point did Defendants or Loan Consultant clarify Sebagh's false

10   belief and advise her that $1,383.05 would not be her permanent payment under the loan, or that

11   every time she made a monthly payment in the amount of $1,383.05, which is less than interest

12   only, she would be deferring interest on her loan, increasing the principal balance of her loan.

13        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

14   on behalf of Defendants were accurate and made in good faith. On or around April 26, 2006, an

15   appraisal company under the direct control and supervision of Defendants conducted an appraisal

16   on Sebagh's home, which was fraudulently inflated to an intentionally overstated value. The

17   current fair market value of Sebagh's home is approximately $330,650.00. Sebagh alleges that

18   the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss

19   of equity in her home as a result of Defendants' fraudulent inflation and other acts described

20   herein.

21        Defendants and Loan Consultant also represented to Sebagh that she would be able to

22   refinance her loan at a later time. Sebagh relied on this assurance in deciding to enter into the

23   mortgage contract. However, Sebagh has not been able to refinance her loan because her income

24   was insufficient to justify the size of the loan. Defendants and Loan Consultant also represented

25   that it would modify Sebagh's loan, and Sebagh relied on this representation in deciding to enter

26   into the loan. However, Sebagh were unable to modify her loan. After many unsuccessful

27   applications for a loan modification, Sebagh received a three-month trial-payment plan in

28   September 2011, hoping that Defendants would offer her a permanent loan modification at the

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  end of the trial period. Per Defendants' request Sebagh made three timely trial payments or even

2  made them in advance of the due date. However, Defendants rejected Sebagh's loan

3  modification despite Sebagh's compliance with every term of the modification offer. First,

4  Defendants sent Sebagh an approval letter for a loan modification, then only two days of the

5  receipt of the approval letter Defendants mailed her a conflicting denial letter stating that

6  Sebagh's loan was not approved for a permanent loan modification. Defendants refused to

7  permanently modify Sebagh's loan.

8    In addition, the foreclosure against Sebagh was wrongful. The assignment deed of trust

9  (February 22, 2011) noted MERS as the party assigning the beneficiary interest in the property in

10  its individual capacity. However, under California law MERS is only a nominee acting on behalf

11  of the true beneficiary, and cannot initiate foreclosure in its own name. MERS can only act when

12  acting in its nominal capacity. Here, MERS assigned the interest in the Deed of Trust from to

13  Deutsch Bank Nation Trust Company in its own name, rendering the ADOT void. Accordingly,

14  Deutsch Bank National Trust Company was never properly assigned the beneficial interest as a

15  foreclosing beneficiary of the Deed. Therefore, any subsequent recorded documents based on

16  that assignment in order to move forward with the foreclosure sale would be void as well.

17  Moreover, the foreclosure against Sebagh was wrongful because at the time the NOD was

18  recorded (April 22, 2011), the foreclosing trustee (Executive Trustee Services) did not have the

19  legal authority to initiate the foreclosure because the foreclosing trustee was never properly

20  substituted as trustee. The original trustee under the Deed of Trust (recorded May 31, 2006) was

21  T.D Services.

22    Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

23  reputable and complied with industry standard underwriting guidelines and were engaged in

24  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

25  made in good faith; (3) Sebagh could afford the loan; (4) she was "qualified" for her loan; (5)

26  "qualified" meant that she could afford their loan; (6) Defendants would modify her loan in the

27  future; and (7) she would be able to refinance her loan in the future.

28    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    otherwise improperly disclosed to Sebagh that: (1) Defendants and Loan Consultant knew that

2    she could not and would not be able to afford her loan and that there was a very high probability

3    that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

4    loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

5    "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

6    and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

7    to communicate that she could actually "afford" the loan which she were being given; (5)

8    Defendants had abandoned its conventional lending business, prudent lending standards, and

9    industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

10   Sebagh's home to require her to borrow more money with the knowledge that the true value of

11   Sebagh's home was insufficient to justify the amount of Sebagh's loan; or (7) Defendants knew

12   that due to its scheme of fraudulently manipulating and inflating property values throughout the

13   State of California that the real estate market would crash and Sebagh would lose substantial

14   equity in her home.

15       Based on these misrepresentations and omissions, the material facts concerning Sebagh's

16   loan were concealed from her, and she decided to move forward with her loan. On May 10,

17   2006, Sebagh signed the loan and Deed of Trust, before a notary. Had she known the truth

18   however, Sebagh would not have accepted the loan. As a result of Defendants' fraudulent acts

19   described throughout this complaint Sebagh has lost substantial equity in her home, has damaged

20   or destroyed credit, and at the time Sebagh entered into the loan her home was worth

21   substantially more than the approximately $330,650.00 it is worth today. Mr. and Mrs. Sebagh

22   did not discover any of these misrepresentations or omissions until after a consultation with legal

23   counsel at Brookstone Law, and through a complete and thorough investigation of the loan

24   documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants,

25   as described throughout this complaint, were brought to light on or around April 10, 2012. (True

26   and correct copy of the aforementioned documents are attached hereto as *Exhibit 5*).

27       7.    Plaintiffs Rick Albritton and Deborah Albritton ("Mr. and Mrs. Albritton")

28   discussed refinancing an existing mortgage on their property located at 2030 West Windhaven

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Drive, Rialto, CA 92377 and A.P.N: 0239-711-22 with a Loan Consultant ("Loan Consultant") a

2    representative and authorized agent of GMAC and Defendants herein (the "Defendants") in or

3    around August 2006. In the course of their discussions ranging from August 2006 until October

4    2006, Defendants and Loan Consultant steered them into an Adjustable Rate Mortgage in the

5    amount of $310,000.00 with the initial interest rate of 6.250% for a term of 30 years. Loan

6    Consultant recommended the loan, representing that this is the best loan for Mr. and Mrs.

7    Albritton. This loan was originated by GMAC, on the note and deed of trust GMAC was

8    identified as the lender, and GMAC was the servicer of the loan.

9        Defendants and Loan Consultant altered Mr. and Mrs. Albritton's loan application

10    without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs.

11    Albritton's application without giving Mr. and Mrs. Albritton an opportunity to review the loan

12    application.  Further, Defendants and Loan Consultant advised them that they were eligible for a

13    Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this

14    low documentation requirement to fraudulently inflate their income ; and in doing so, Defendants

15    and Loan Consultant caused them to be placed into a loan whose payments they could not afford

16    given their true, *un-inflated* monthly income.

17        Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Albritton that

18    they could afford their loan; and further represented that they could shoulder the additional

19    financial burden of repaying their loan in consideration of their other existing debts. Defendants

20    and Loan Consultant also represented to them that they could afford a $1,908.00 monthly

21    payment, despite their $3,643.00 true monthly income (a "front-end" debt-to-income ratio,

22    meaning a debt-to-income ratio, before any other debts are even considered, of over 52%- in

23    excess of industry standard underwriting guidelines, and in excess of Defendants' own

24    underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs.

25    Albritton that they could rely on the assessment that they were "qualified" to mean that they

26    could afford the loan. Because of Mr. and Mrs. Albritton's lack of familiarity with how much

27    debt a person can and should reasonably take on compared to their monthly income, and because

28    Mr. and Mrs. Albritton reasonably relied on Defendants' and Loan Consultant's expertise that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  any payment they were "qualified" for would take into account what the maximum debt a person

2  such as Mr. and Mrs. Albritton should be shouldering was, Mr. and Mrs. Albritton reasonably

3  believed Defendants' and Loan Consultant's representations that they could afford their loan and

4  its payments.

5        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

6  on behalf of Defendants were accurate and made in good faith. On or around September 12,

7  2006, an appraisal company under the direct control and supervision of Defendants conducted an

8  appraisal on Mr. and Mrs. Albritton's home, which was fraudulently inflated to $420,000.00 - an

9  intentionally overstated value. The current fair market value of Mr. and Mrs. Albritton's home is

10  approximately $146,566.00. Mr. and Mrs. Albritton allege that the appraisal was artificially

11  inflated, and that they have suffered damages in the amount of $273,434.00 ($420,000.00-

12  $146,566.00) due to a substantial loss of equity in their home as a result of Defendants'

13  fraudulent inflation and other acts described herein.

14        Defendants and Loan Consultant also represented to Mr. and Mrs. Albritton that they

15  would be able to refinance their loan at a later time. Mr. and Mrs. Albritton relied on this

16  assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Albritton have

17  not been able to refinance their loan.  Defendants and Loan Consultant also represented that it

18  would modify Mr. and Mrs. Albritton's loan, and Mr. and Mrs. Albritton relied on this

19  representation in deciding to enter into the loan. In addition, Mr. and Mrs. Albritton were advised

20  by a representative of Defendants, to stop making payments in order to be eligible for a

21  modification. Mr. and Mrs. Albritton relied on Defendants' and representative's advice and

22  stopped making their monthly payments causing them to fall even further behind. However, Mr.

23  and Mrs. Albritton were unable to modify their loan.

24        The foreclosure against Rick Albritton and Deborah Albritton (collectively referred to as

25  "Mr. and Mrs. Albritton") was wrongful because the Substitution of Trustee (SOT) is ineffective.

26  Under California law, MERS is only a nominee acting on behalf of the true beneficiary and

27  cannot initiate foreclosure in its own name. MERS only has the power to act when acting in its

28  nominal capacity. Here, MERS in its individual capacity purports to substitute Executive Trustee

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Services, LLC. The original trustee on the deed of trust was Executive Trustee Services,

2    Incorporation. However, MERS cannot do so in its individual capacity, rendering the SOT

3    without effect. Accordingly ETS, LLC was never properly substituted as the foreclosing trustee

4    and thus unauthorized to conduct the trustee's sale. Under California law, a trustee's sale

5    conducted by an unauthorized trustee as here, is void as a matter of law. Therefore, any

6    subsequent foreclosure sale based on that SOT is also void ad initio.

7        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

8    reputable and complied with industry standard underwriting guidelines and were engaged in

9    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

10    made in good faith;  (3) Mr. and Mrs. Albritton could afford the loan ; (4) they were "qualified"

11    for their loan;  (5) "qualified" meant that they could afford their loan; (6) they would be able to

12    modify their loan in the future; and (7) they would be able to refinance their loan in the future.

13        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

14    otherwise improperly disclosed to Mr. and Mrs. Albritton that: (1) Defendants and Loan

15    Consultant knew that they could not and would not be able to afford their loan and that there was

16    a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

17    incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

18    and Loan Consultant's "qualification" process was for Defendants' own protection and not

19    theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

20    pay their loan was not intended to communicate that they could actually "afford" the loan which

21    they were being given; (5) Defendants had abandoned its conventional lending business, prudent

22    lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

23    appraiser to over-value Mr. and Mrs. Albritton's home to require them to borrow more money

24    with the knowledge that the true value of Mr. and Mrs. Albritton's home was insufficient to

25    justify the amount of Mr. and Mrs. Albritton's loan; or (7) Defendants knew that due to its

26    scheme of fraudulently manipulating and inflating property values throughout the State of

27    California that the real estate market would crash and Mr. and Mrs. Albritton would lose

28    substantial equity in their home.

1    Based on these misrepresentations, the material facts concerning Mr. and Mrs. Albritton's

2    loan were concealed from them, and they decided to move forward with their loan. On October

3    2, 2006, Mr. and Mrs. Albritton signed the loan and Deed of Trust, before a notary. Had they

4    known the truth however, Mr. and Mrs. Albritton would not have accepted the loan. As a result

5    of Defendants' fraudulent acts described throughout this complaint  Mr. and Mrs. Albritton have

6    lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and

7    Mrs. Albritton entered into the loan their home was worth $420,000.00, now their home is worth

8    approximately $146,566.00.  Mr. and Mrs. Albritton did not discover any of these

9    misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

10    complete and thorough investigation of the loan documentation, and a discussion of the

11    surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

12    were brought to light on or around March 16, 2011. (True and correct copy of the

13    aforementioned documents are attached hereto as *Exhibit 6*).

14    8.    Plaintiff Veronica Grey ("Grey") discussed obtaining a mortgage to purchase her

15    home located at 217 4th Avenue #2, Venice, CA 90291 and A.P.N.: 4286-001-048 with a Loan

16    Consultant ("Loan Consultant") with Green Point Mortgage Funding, Inc., a correspondent of

17    GMAC and Defendants herein ("the Defendants"), and authorized by Defendants to lend on its

18    behalf, in or around April 2006. In the course of their discussions ranging from April 2006 until

19    June 2006, Defendants and Loan Consultant steered her into a negatively amortized PayOption

20    ARM in the amount of $736,000.00 with an interest rate at 2.000% for a term of 40 years. Little

21    did Grey know, however, the interest rate was never "fixed" but applied to only her first monthly

22    payment and could adjust every 12 months thereafter. The maximum interest rate is 12.000%.

23    The amount of Grey's minimum monthly payment was "fixed" for 12 months and could adjust

24    every 12 months thereafter. When the amount of the minimum monthly payment is insufficient

25    to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid

26    principal balance of her loan. The recast point of this loan is 125% of the original loan amount.

27    The loan was originated by GMAC. On the note and Deed of Trust Green Point Mortgage

28    Funding, Inc. is identified as the lender, and the loan is being serviced by GMAC.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Defendants and Loan Consultant represented to Grey that her monthly payment would

2    always be $2,228.00 Although the amount of Grey's initial, minimum monthly payment was

3    $2,228.00, Defendants and Loan Consultant failed to clarify their partially true representations

4    and advise Grey: (1) how the interest rate on her loan was calculated; (2) that the initial

5    minimum monthly payment of $2,228.00 would not always be available; (3) that the initial

6    minimum monthly payment would not be the permanent payment under the loan despite

7    Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by

8    paying the initial minimum monthly payment she would be definitively deferring interest on her

9    loan, increasing the principal balance of her loan every time she made the minimum monthly

10    payment; (5) that by paying the minimum monthly payment the principal balance of her loan was

11    certain to increase; or (6) her loan would be recast within a few years and she would be forced to

12    pay considerably higher payments.

13    The disclosures in Grey's loan documents discussing negative amortization only frame

14    negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

15    payment. However, the reality was that by making the minimum payment, negative amortization

16    was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

17    Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

18    to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

19    amortization. Grey was not provided, before entering into the loans, with any other payment

20    schedule or with any informed option to make payments different than those listed in the TILDS

21    payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

22    Grey would be deferring interest, or had Defendants disclosed the payment amounts sufficient to

23    avoid negative amortization from occurring, Grey would not have entered into the loan.

24    **Defendants intentionally omitted a clear disclosure of the nature of Grey's loan because**

25    **giving a clear explanation of how the loan worked would have punctured the illusion of a**

26    **low-payment, low interest rate loan.**

27    Defendants and Loan Consultant altered Grey's loan application without her knowing

28    consent or authorization as Loan Consultant completed Grey's application without giving Grey

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    an opportunity to review the loan application. Further, Defendants and Loan Consultant advised

2    her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and

3    Loan Consultant used this low documentation requirement to fraudulently inflate her income,

4    and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

5    payments she could not afford given her true, *un-inflated* monthly income.

6        Defendants and Loan Consultant also explicitly represented to Grey that she could afford

7    her loan and further represented that she could shoulder the additional financial burden of

8    repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

9    amortized monthly payment on the loan was $5,460.54. Given Grey's true monthly income of

10   $10,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

11   before any other debts are even considered, of over 54%- in excess of industry standard

12   underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

13   and Loan Consultant further represented to Grey that she could rely on the assessment that she

14   was "qualified" to mean that she could afford the loan. Because of Grey's lack of familiarity

15   with how much debt a person can and should reasonably take on compared to her monthly

16   income, and because Grey reasonably relied on Defendants' and Loan Consultant's expertise that

17   any payment she was "qualified" for would take into account what the maximum debt a person

18   such as Grey should be shouldering was, Grey reasonably believed Defendants' and Loan

19   Consultant's representations that she could afford her loan and its payments. Although

20   Defendants and the Loan Consultant represented to Grey that she was "qualified" for her loan

21   and could afford her loan and its monthly payments, Defendants and the Loan Consultant misled

22   Grey into believing that her monthly payments would always only be $2,228.00. Furthermore, at

23   no point did Defendants or Loan Consultant clarify Grey's false belief and advise her that

24   $2,228.00 would not be her permanent payment under the loan, or that every time she made a

25   monthly payment in the amount of $2,228.00, which is less than interest only, she would be

26   deferring interest on her loan, increasing the principal balance of her loan.

27        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

28   on behalf of Defendants were accurate and made in good faith. On or around May 2006, an

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   appraisal company under the direct control and supervision of Defendants conducted an appraisal

2   on Grey's home, which was fraudulently inflated to an intentionally overstated value.

3   Defendants and Loan Consultant represented that, per appraisal, Grey's home was worth

4   $800,000.00 at the time she entered into her loan, and that such a valuation was a true and

5   correct measure of her home's worth. The current fair market value of Grey's home is

6   approximately $467,074.00. Grey alleges that the appraisal was artificially inflated, and that she

7   has suffered damages in the amount of $332,926.00 ($800,000.00-$467,074.00) due to a

8   substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

9   acts described herein.

10      Defendants and Loan Consultant also represented to Grey that she would be able to

11  refinance her loan at a later time. Grey relied on this assurance in deciding to enter into the

12  mortgage contract. However, Grey has not been able to refinance her loan.  Defendants and Loan

13  Consultant also represented that it would modify Grey's loan, and Grey relied on this

14  representation in deciding to enter into the loan.

15      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

16  reputable and complied with industry standard underwriting guidelines and were engaged in

17  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

18  made in good faith; (3) Grey could afford the loan ; (4) she was "qualified" for her loan; (5)

19  "qualified" meant that she could afford her loan; (6) she would be able to modify her loan; and

20  (7) she would be able to refinance her loan.

21      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

22  otherwise improperly disclosed to Grey that: (1) Defendants and Loan Consultant knew that she

23  could not and would not be able to afford her loan and that there was a very high probability that

24  she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan,

25  and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

26  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

27  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

28  to communicate that she could actually "afford" the loan which she was being given; (5)

1  Defendants had abandoned its conventional lending business, prudent lending standards, and

2  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

3  Grey's home to require her to borrow more money with the knowledge that the true value of

4  Grey's home was insufficient to justify the amount of Grey's loan; or (7) Defendants knew that

5  due to its scheme of fraudulently manipulating and inflating property values throughout the State

6  of California that the real estate market would crash and Grey would lose substantial equity in

7  her home.

8      Based on these misrepresentations and omissions, the material facts concerning Grey's

9  loan were concealed from her, and she decided to move forward with her loan. On June 16,

10  2006, Grey signed the loan and Deed of Trust, before a notary. Had she known the truth

11  however, Grey would not have accepted the loan. As a result of Defendants' fraudulent acts

12  described throughout this complaint Grey has lost substantial equity in her home, has damaged

13  or destroyed credit, and at the time Grey entered into the loan her home was worth $800,000.00,

14  now her home is worth approximately $467,074.00. Grey did not discover any of these

15  misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

16  and through a complete and thorough investigation of the loan documentation, and a discussion

17  of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

18  complaint, were brought to light on or around February 12, 2011. (True and correct copy of the

19  aforementioned documents are attached hereto as *Exhibit 7*).

20      9.      Plaintiffs Joselito Mella and Brenda Mella ("Mr. and Mrs. Mella") discussed

21  refinancing an existing mortgage on their home located at 6 Caltrop Way, Ladera Ranch, CA

22  92694 and A.P.N.:741-362-22 with a loan consultant (the "Loan Consultant"), and representative

23  and authorized agent of Defendants herein (the "Defendants") in or around November 2005. In

24  the course of their discussions ranging from November 2005 until January 2005, Defendants and

25  Loan Consultant steered them into a loan of which the Defendants and Loan Consultant

26  concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms

27  and information concerning the loan. This loan was originated by GMAC, on the note and deed

28  of trust Wescom Credit Union is identified as the lender.

1    Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Mella that they

2    could afford their loan; and further represented that they could shoulder the additional financial

3    burden of repaying their loan in consideration of their other existing debts.  Loan Consultant and

4    Defendants further represented to Mr. and Mrs. Mella that they could rely on the assessment that

5    they were "qualified" to mean that they could afford the loan.  Because of Mr. and Mrs. Mella's

6    lack of familiarity with how much debt a person can and should reasonably take on compared to

7    his/her monthly income, and because Mr. and Mrs. Mella reasonably relied on Defendants' and

8    Loan Consultant's expertise that any payment they were "qualified" for would take into account

9    what the maximum debt a person such as Mr. and Mrs. Mella should be shouldering was, Mr.

10    and Mrs. Mella reasonably believed Defendants' and Loan Consultant's representations that they

11    could afford their loan and its payments.

12        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

13    on behalf of Defendants were accurate and made in good faith.  An appraisal company under the

14    direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Mella's

15    home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Mella

16    allege that the appraisal was artificially inflated, and that they have suffered damages due to a

17    substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

18    acts described herein.

19        Loan Consultant and Defendants also represented to Mr. and Mrs. Mella that they would

20    be able to refinance their loan at a later time. Mr. and Mrs. Mella relied on this assurance in

21    deciding to enter into the mortgage contract.  However, Mr. and Mrs. Mella have not been able

22    to refinance their loan.  Loan Consultant and Defendants also represented that it would modify

23    Mr. and Mrs. Mella's loan, and Mr. and Mrs. Mella relied on this representation in deciding to

24    enter into the loan.  In addition, Mr. and Mrs. Mella were advised by a representative and

25    authorized agent of Defendants to stop making payments in order to be eligible for a

26    modification.  Mr. and Mrs. Mella relied on the Defendants' and the Defendants representative

27    and authorized agents' advice and stopped making their monthly payments causing them to fall

28    even further behind.  However, Mr. and Mrs. Mella were unable to modify their loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

2    reputable and complied with industry standard underwriting guidelines and were engaged in

3    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

4    made in good faith; (3) Mr. and Mrs. Mella could afford the loan; (4) They were "qualified" for

5    their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to

6    modify their loan in the future; and (7) They would be able to refinance their loan in the future.

7    Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

8    otherwise improperly disclosed to Mr. and Mrs. Mella that: (1) Loan Consultant and Defendants

9    knew that they could not and would not be able to afford their loan and that there was a very high

10    probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

11    sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and

12    Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That

13    Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan

14    was not intended to communicate that they could actually "afford" the loan which they was

15    being given; (5) Defendants had abandoned its conventional lending business, prudent lending

16    standards, and industry standard underwriting guidelines; (6) Defendants influenced the

17    appraiser to over-value Mr. and Mrs. Mella's home to require them to borrow more money with

18    the knowledge that the true value of Mr. and Mrs. Mella's home was insufficient to justify the

19    amount of Mr. and Mrs. Mella's loan; or (7) Defendants knew that due to its scheme of

20    fraudulently manipulating and inflating property values throughout the State of California that

21    the real estate market would crash and Mr. and Mrs. Mella would lose substantial equity in their

22    home.

23    Based on these misrepresentations and omissions, the material facts concerning Mr. and

24    Mrs. Mella's loan were concealed from them, and they decided to move forward with their loan.

25    On January 26, 2006, Mr. and Mrs. Mella signed the loan and Deed of Trust, before a notary.

26    Had they known the truth however, Mr. and Mrs. Mella would not have accepted the loan. As a

27    result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Mella

28    have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   and Mrs. Mella entered into the loan their home was worth substantially more than its current

2   fair market value. Mr. and Mrs. Mella did not discover any of these misrepresentations or

3   omissions until after a consultation with legal counsel at Brookstone Law, and through a

4   complete and thorough investigation of the loan documentation, and a discussion of the

5   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

6   were brought to light on or around April 6, 2011.

7        10.     Plaintiffs Michael Man and July Lim ("Man and Lim") discussed refinancing an

8   existing mortgage on their property located at 15417 Roper Avenue, Norwalk, CA 90650 and

9   A.P.N.:8082-028-020 with a Loan Consultant ("Loan Consultant"), a representative and

10  authorized agent of SCME Mortgage Bankers, a correspondent of GMAC and Defendants herein

11  (the "Defendants"), and authorized by Defendants to lend on its behalf, in or around November

12  2006. In the course of their discussions ranging from November 2006 until January 2007,

13  Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of

14  $500,000.00 with an interest rate at 6.75% for a term of 30 years. This loan was originated by

15  GMAC, on the note and deed of trust SCME is identified as the lender, and GMAC is currently

16  servicing the loan.

17       Defendants and Loan Consultant advised them that they were eligible for a Low Doc

18  Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

19  documentation requirement to fraudulently inflate their income by $6,990.00, a factor of 117%;

20  and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

21  payments they could not afford given their true, *un-inflated* monthly income. Defendants and

22  Loan Consultant also fraudulently overstated Man and Lim's assets. Defendants and Loan

23  Consultant altered Man and Lim's loan application without their knowing consent or

24  authorization as Loan Consultant completed Man and Lim's application without giving Man and

25  Lim an opportunity to review the loan application.

26       Defendants and Loan Consultant also explicitly represented to Man and Lim that they

27  could afford their loan and further represented that they could shoulder the additional financial

28  burden of repaying their loan in consideration of their other existing debts. Defendants and Loan

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Consultant also represented to them that they could afford a $3,242.99 monthly payment, despite

2  their $6,000.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-

3  income ratio, before any other debts are even considered, of over 54% - in excess of industry

4  standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines).

5  Defendants and Loan Consultant further represented to Man and Lim that they could rely on the

6  assessment that they were "qualified" to mean that they could afford the loan. Because of Man

7  and Lim's lack of familiarity with how much debt a person can and should reasonably take on

8  compared to their monthly income, and because Man and Lim reasonably relied on Defendants'

9  and Loan Consultant's expertise that any payment they were "qualified" for would take into

10  account what the maximum debt a person such as Man and Lim should be shouldering was, Man

11  and Lim reasonably believed Defendants' and Loan Consultant's representations that they could

12  afford their loan and its payments.

13      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

14  on behalf of Defendants were accurate and made in good faith. On or around December 12,

15  2007, an appraisal company under the direct control and supervision of Defendants conducted an

16  appraisal on Man and Lim's home, which was fraudulently inflated to an intentionally

17  overstated. Man and Lim's loan documentation indicates that their home was worth $650,000.00

18  at the time they entered into their loan. The current fair market value of Man and Lim's home is

19  approximately $272,646.00. Man and Lim allege that the appraisal was artificially inflated, and

20  that they have suffered damages in the amount of $377,354.00 ($650,000.00-$272,646.00) due to

21  a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

22  acts described herein.

23      Due to the economic crash caused by Defendants' fraudulent acts described throughout

24  the complaint, Man and Lim suffered from financial hardship because their income substantially

25  decreased. Defendants and Loan Consultant also represented to Man and Lim that they would be

26  able to refinance their loan at a later time. Man and Lim relied on this assurance in deciding to

27  enter into the mortgage contract. However, Man and Lim have not been able to refinance their

28  loan because their home value has dropped by 50% since they entered into the loan.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

2  reputable and complied with industry standard underwriting guidelines and were engaged in

3  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

4  made in good faith; (3) Man and Lim could afford the loan; (4) they were "qualified" for their

5  loan; (5) "qualified" meant that they could afford their loan; and (6) Defendants would refinance

6  their loan in the future.

7    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

8  otherwise improperly disclosed to Man and Lim that: (1) Defendants and Loan Consultant knew

9  that they could not and would not be able to afford their loan and that there was a very high

10  probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

11  sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

12  Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

13  Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

14  was not intended to communicate that they could actually "afford" the loan which they were

15  being given; (5) Defendants had abandoned its conventional lending business, prudent lending

16  standards, and industry standard underwriting guidelines; (6) Defendants influenced the

17  appraiser to over-value Man and Lim's home to require them to borrow more money with the

18  knowledge that the true value of Man and Lim's home was insufficient to justify the amount of

19  Man and Lim's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating

20  and inflating property values throughout the State of California that the real estate market would

21  crash and Man and Lim would lose substantial equity in their home.

22    Based on these misrepresentations and omissions, the material facts concerning Man and

23  Lim's loan were concealed from them, and they decided to move forward with their loan. On

24  January 2, 2007, Man and Lim signed the loan and Deed of Trust, before a notary. Had they

25  known the truth however, Man and Lim would not have accepted the loan. As a result of

26  Defendants' fraudulent acts described throughout this complaint Man and Lim have lost

27  substantial equity in their home, have damaged or destroyed credit, and at the time Man and Lim

28  entered into the loan their home was worth $650,000.00, now their home is worth approximately

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    $272,646.00. Man and Lim did not discover any of these misrepresentations or omissions until

2    after a consultation with legal counsel at Brookstone Law, and through a complete and thorough

3    investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent

4    acts of the Defendants, as described throughout this complaint, were brought to light on or

5    around April 8, 2011. (True and correct copy of the aforementioned documents are attached

6    hereto as *Exhibit 8*).

7        11.    Plaintiffs David Cruz and Yesenia Cruz ("Mr. and Mrs. Cruz") discussed

8    obtaining a mortgage to purchase their home located at 48159 Sol De Lind, Coachella, CA

9    92236 and A.P.N.: 612-433-009 with a Loan Consultant ("Loan Consultant"), Equi-First

10   Corporation, a correspondent of GMAC Mortgage, LLC, Defendants herein ("the Defendants),

11   and authorized by Defendants to lend on its behalf, in or around April 2005. In the course of their

12   discussions ranging from April 2005 until June 2005, Defendants and Loan Consultant advised

13   them to enter into a fixed rate loan in the amount of $232,500.00 with the interest rate of 6.500%

14   for a term of 30 years. This loan was originated by GMAC, on the note and deed of trust Equi-

15   First Corporation is identified as the lender, and the loan is currently being serviced by GMAC.

16       Further, Defendants and Loan Consultant advised them that they were eligible for a Low

17   Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

18   documentation requirement to fraudulently inflate their income by $1,000.00, a factor of 27%;

19   and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

20   payments they could not afford given their true, *un-inflated* monthly income. Defendants and

21   Loan Consultant altered Mr. and Mrs. Cruz's loan application without their knowing consent or

22   authorization as Loan Consultant completed Mr. and Mrs. Cruz's application without giving Mr.

23   and Mrs. Cruz an opportunity to review the loan application.

24       Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Cruz that they

25   could afford their loan; and further represented that they could shoulder the additional financial

26   burden of repaying their loan in consideration of their other existing debts. Defendants and Loan

27   Consultant also represented to them that they could afford a $1,469.00 monthly payment, despite

28   their $3,700.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-

1    income ratio, before any other debts are even considered, of over 39%- in excess of industry

2    standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines).

3    Defendants and Loan Consultant further represented to Mr. and Mrs. Cruz that they could rely on

4    the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr.

5    and Mrs. Cruz's lack of familiarity with how much debt a person can and should reasonably take

6    on compared to their monthly income, and because Mr. and Mrs. Cruz reasonably relied on

7    Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would

8    take into account what the maximum debt a person such as Mr. and Mrs. Cruz should be

9    shouldering was, Mr. and Mrs. Cruz reasonably believed Defendants' and Loan Consultant's

10    representations that they could afford their loan and its payments.

11    In addition, Defendants and Loan Consultant represented that appraisals conducted by or

12    on behalf of Defendants were accurate and made in good faith. On or around May 27, 2005, an

13    appraisal company under the direct control and supervision of Defendants conducted an appraisal

14    on Mr. and Mrs. Cruz's home, which was fraudulently inflated to an intentionally overstated

15    value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Cruz's

16    home was worth $310,000.00 at the time they entered into their loan, and that such a valuation

17    was a true and correct measure of their home's worth. The current fair market value of Mr. and

18    Mrs. Cruz's home is approximately $118,579.00. Mr. and Mrs. Cruz allege that the appraisal was

19    artificially inflated, and that they have suffered damages in the amount of $191,421.00

20    ($310,000.00-$118,579.00) due to a substantial loss of equity in their home as a result of

21    Defendants' fraudulent inflation and other acts described herein.

22    Defendants and Loan Consultant also represented to Mr. and Mrs. Cruz that they would

23    be able to refinance their loan at a later time. Mr. and Mrs. Cruz relied on this assurance in

24    deciding to enter into the mortgage contract. However, Mr. and Mrs. Cruz have not been able to

25    refinance their loan.  Defendants and Loan Consultant also represented that it would modify Mr.

26    and Mrs. Cruz's loan, and Mr. and Mrs. Cruz relied on this representation in deciding to enter

27    into the loan. In addition, Mr. and Mrs. Cruz were advised by a representative of Defendants, to

28    stop making payments in order to be eligible for a modification. Mr. and Mrs. Cruz relied on

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Defendants' and representative's advice and stopped making their monthly payments causing

2    them to fall even further behind. However, Mr. and Mrs. Cruz were unable to modify their loan.

3        The foreclosure against Cruz is wrongful. Under California law MERS is only a nominee

4    acting on behalf of the true beneficiary, and cannot initiate foreclosure in its own name. MERS

5    only has the power to act when acting in its nominal capacity. Here, MERS in its individual

6    capacity purports to substitute Executive Trustee Services, LLC dba ETS Services, LLC –

7    however MERS cannot do so in its individual capacity, rendering their substitution of trustee

8    without effect. Accordingly, ETS was never properly substituted as trustee and thus

9    unauthorized to conduct the trustee's sale. Under California law, a trustee's sale conducted by an

10    unauthorized trustee as here, is void as a matter of law.

11        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

12    reputable and complied with industry standard underwriting guidelines and were engaged in

13    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

14    made in good faith; (3) Mr. and Mrs. Cruz could afford the loan; (4) they were "qualified" for

15    their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to

16    modify their loan; and (7) they would be able to refinance their loan.

17        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

18    otherwise improperly disclosed to Mr. and Mrs. Cruz that: (1) Defendants and Loan Consultant

19    knew that they could not and would not be able to afford their loan and that there was a very high

20    probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

21    sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

22    Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

23    Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

24    was not intended to communicate that they could actually "afford" the loan which they were

25    being given; (5) Defendants had abandoned its conventional lending business, prudent lending

26    standards, and industry standard underwriting guidelines; (6) Defendants influenced the

27    appraiser to over-value Mr. and Mrs. Cruz's home to require them to borrow more money with

28    the knowledge that the true value of Mr. and Mrs. Cruz's home was insufficient to justify the

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  amount of Mr. and Mrs. Cruz's loan; or (7) Defendants knew that due to its scheme of

2  fraudulently manipulating and inflating property values throughout the State of California that

3  the real estate market would crash and Mr. and Mrs. Cruz would lose substantial equity in their

4  home.

5       Based on these misrepresentations, the material facts concerning Mr. and Mrs. Cruz's

6  loan were concealed from them, and they decided to move forward with their loan. On June 17,

7  2005, Mr. and Mrs. Cruz signed the loan and Deed of Trust, before a notary. Had they known the

8  truth however, Mr. and Mrs. Cruz would not have accepted the loan. As a result of Defendants'

9  fraudulent acts described throughout this complaint Mr. and Mrs. Cruz have lost substantial

10 equity in their home, has damaged or destroyed credit, and at the time Mr. and Mrs. Cruz entered

11 into the loan their home was worth $310,000.00, now their home is worth approximately

12 $118,579.00. Mr. and Mrs. Cruz did not discover any of these misrepresentations until after a

13 consultation with legal counsel at Brookstone Law, and through a complete and thorough

14 investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent

15 acts of the Defendants, as described throughout this complaint, were brought to light on or

16 around May 11, 2011. (True and correct copy of the aforementioned documents are attached

17 hereto as *Exhibit 9*).

18       12.    Plaintiff Gregory Buck ("Buck") discussed obtaining a mortgage on his home

19 located at 68 Toulon Avenue, Foothill Ranch, CA 92610 and A.P.N.: 601-215-04 with a loan

20 consultant (the "Loan Consultant"), and representative and authorized agent of Defendants

21 herein (the "Defendants") in or around June 2006. In the course of their discussions ranging from

22 June 2006 until August 2006, Defendants and Loan Consultant steered him into a loan, of which

23 the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise

24 improperly disclosed the material terms and information concerning the loan to him. This loan

25 was originated by GMAC, on the note and deed of trust Provident Funding Associates is

26 identified as the lender, and GMAC is currently servicing the loan.

27       Defendants and Loan Consultant explicitly represented to Buck that he could afford his

28 loan; and further represented that he could shoulder the additional financial burden of repaying

41

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  his loan in consideration of his other existing debts.  Loan Consultant and Defendants further

2  represented to Buck that he could rely on the assessment that he was "qualified" to mean that he

3  could afford the loan.  Because of Buck's lack of familiarity with how much debt a person can

4  and should reasonably take on compared to his/her monthly income, and because Buck

5  reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was

6  "qualified" for would take into account what the maximum debt a person such as Buck should be

7  shouldering was, Buck reasonably believed Defendants' and Loan Consultant's representations

8  that he could afford his loan and its payments.

9        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

10  on behalf of Defendants were accurate and made in good faith.  An appraisal company under the

11  direct control and supervision of Defendants conducted an appraisal on Buck's home, which was

12  fraudulently inflated to an intentionally overstated value.  Buck alleges that the appraisal was

13  artificially inflated, and that he has suffered damages due to a substantial loss of equity in his

14  home as a result of Defendants' fraudulent inflation and other acts described herein.

15        Loan Consultant and Defendants also represented to Buck that he would be able to

16  refinance his loan at a later time.  Buck relied on this assurance in deciding to enter into the

17  mortgage contract.  However, Buck has not been able to refinance his loan.  Loan Consultant and

18  Defendants also represented that it would modify Buck's loan, and Buck relied on this

19  representation in deciding to enter into the loan.  In addition, Buck was advised by a

20  representative and authorized agent of Defendants to stop making payments in order to be

21  eligible for a modification.  Buck relied on Defendants' and the Defendants representative and

22  authorized agent's advice and stopped making his monthly payments causing him to fall even

23  further behind.  However, Buck was unable to modify his loan.

24        Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

25  reputable and complied with industry standard underwriting guidelines and were engaged in

26  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

27  made in good faith; (3) Buck could afford the loan; (4) He was "qualified" for his loan; (5)

28  "qualified" meant that he could afford his loan; (6)  He would be able to modify his loan in the

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    future; and (7)  He would be able to refinance his loan in the future.

2    Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

3    otherwise improperly disclosed to Buck that: (1) Loan Consultant and Defendants knew that he

4    could not and would not be able to afford his loan and that there was a very high probability that

5    he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

6    did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

7    "qualification" process was for Defendants' own protection and not his; (4) That Loan

8    Consultant's and Defendants' representations that he was "qualified" to pay his loan was not

9    intended to communicate that he could actually "afford" the loan which he was being given; (5)

10   Defendants had abandoned its conventional lending business, prudent lending standards, and

11   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

12   Buck 's home to require him to borrow more money with the knowledge that the true value of

13   Buck 's home was insufficient to justify the amount of Buck's loan; or (7) Defendants knew that

14   due to its scheme of fraudulently manipulating and inflating property values throughout the State

15   of California that the real estate market would crash and Buck would lose substantial equity in

16   his home.

17   Based on these misrepresentations and omissions, the material facts concerning Buck's

18   loan were concealed from him, and he decided to move forward with his loan. On August 23,

19   2006, Buck signed the loan and Deed of Trust, before a notary. Had he known the truth however,

20   Buck would not have accepted the loan.  As a result of the Defendants' fraudulent acts described

21   throughout this complaint Buck has lost substantial equity in his home, has damaged or

22   destroyed credit, and at the time Buck entered into the loan his home was worth substantially

23   more than its current fair market value.  Buck did not discover any of these misrepresentations or

24   omissions until after a consultation with legal counsel at Brookstone Law, and through a

25   complete and thorough investigation of the loan documentation, and a discussion of the

26   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

27   were brought to light on or around May 19, 2011.

28   13.    Plaintiff Cristina Palbicke ("Palbicke") discussed refinancing an existing

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    mortgage on her property located at 27949 Harwood Drive, Santa Clarita, CA, 91350 and APN

2    3244-065-009 with a loan consultant (the "Loan Consultant"), a representative and authorized

3    agent of GMAC and Defendants herein (the "Defendants"), in or around February 2007. In the

4    course of their discussions ranging from February 2007 until April 2007, Defendants and Loan

5    Consultant advised her to enter into fixed rate loan in the amount of $346,000.00, with an

6    interest rate of 5.125%, for a term of 15 years. This loan was originated by GMAC, on the note

7    and deed of trust GMAC is identified as the lender, and GMAC was the servicer of the loan.

8        Defendants and Loan Consultant explicitly represented to Palbicke that she could afford

9    her loan and further represented that she could shoulder the additional financial burden of

10   repaying her loan in consideration of her other existing debts. Defendants and Loan Consultant

11   also represented to her that she could afford a $3,097.31 monthly payment. Defendants and Loan

12   Consultant further represented to Palbicke that she could rely on the assessment that she was

13   "qualified" to mean that she could afford the loan. Because of Palbicke's lack of familiarity with

14   how much debt a person can and should reasonably take on compared to her monthly income,

15   and because Palbicke reasonably relied on Defendants' and Loan Consultant's expertise that any

16   payment they were "qualified" for would take into account what the maximum debt a person

17   such as Palbicke should be shouldering was, Palbicke reasonably believed Defendants' and Loan

18   Consultant's representations that she could afford her loan and its payments.

19       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

20   on behalf of Defendants were accurate and made in good faith. On or around March 2007, an

21   appraisal company under the direct control and supervision of Defendants conducted an appraisal

22   on Palbicke's home, which was fraudulently inflated to an intentionally overstated value.

23   Defendants and Loan Consultant represented that, per appraisal, Palbicke's home was worth

24   $485,000.00 at the time she entered into their loan, and that such a valuation was a true and

25   correct measure of their home's worth. The current fair market value of Palbicke's home is

26   approximately $314,036.00. Palbicke allege that the appraisal was artificially inflated, and that

27   she has suffered damages in the amount of $170,964.00 ($485,000.00-$314,036.00) due to a

28   substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

1  acts described herein.

2      Defendants and Loan Consultant also represented to Palbicke that she would be able to

3  refinance her loan at a later time.  Palbicke relied on this assurance in deciding to enter into the

4  mortgage contract. However, Palbicke has  not been able to refinance her loan because she has

5  been told that her home does not contain enough equity. Defendants and Loan Consultant also

6  represented that it would modify Palbicke's loan, and Palbicke relied on this representation in

7  deciding to enter into the loan. However, Palbicke were unable to modify her loan.

8      The foreclosure against Palbicke was wrongful because the ADOT (recorded February

9  28, 2011) notes MERS as the party assigning the beneficial interest in the property in its

10  individual capacity to the foreclosing party (GMAC). However, under California law MERS is

11  only a nominee acting on behalf of the true beneficiary, and cannot initiate foreclosure in its own

12  name. MERS can only act when acting in its nominal capacity. Here, MERS assigned the interest

13  in the Deed of Trust to GMAC in its own name, rendering its ADOT void. Accordingly, GMAC

14  was never properly assigned the beneficiary interest as a foreclosing beneficiary of the Deed.

15  Therefore, any subsequent recorded documents based on that assignment in order to move

16  forward with the foreclosure sale would be ineffective as well. Therefore, since the assignment

17  of deed of trust from MERS to the foreclosing party (GMAC) was void, it will render any

18  subsequent transactions based on that assignment void ab initio.

19      In addition, the foreclosure against Palbicke was wrongful because at the time the

20  Trustee's deed was recorded (August 11, 2011), the foreclosing trustee (Executive Trustee

21  Services, LLC) did not have the legal authority to initiate the foreclosure because the foreclosing

22  trustee was never properly substituted as trustee. The original trustee under the Deed of Trust

23  (recorded April 4, 2007) was Executive Trustee Services, Incorporation.

24      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

25  reputable and complied with industry standard underwriting guidelines and were engaged in

26  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

27  made in good faith; (3)  Palbicke could afford the loan; (4) they were "qualified" for their loan;

28  (5) "qualified" meant that they could afford their loan; (6) they would be able to modify her

45

1  loan; and  (7) they would be able to refinance her loan.

2  Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

3  otherwise improperly disclosed to Palbicke that: (1) Defendants and Loan Consultant knew that

4  she could not and would not be able to afford her loan and that there was a very high probability

5  that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

6  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

7  "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants'

8  and Loan Consultant's representations that she was "qualified" to pay her  loan was not intended

9  to communicate that she could actually "afford" the loan which they were being given; (5)

10  Defendants had abandoned its conventional lending business, prudent lending standards, and

11  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

12  Palbicke home to require them to borrow more money with the knowledge that the true value of

13  Palbicke's home was insufficient to justify the amount of Palbicke's loan; or (7) Defendants

14  knew that due to its scheme of fraudulently manipulating and inflating property values

15  throughout the State of California that the real estate market would crash and Palbicke would

16  lose substantial equity in their home.

17  Based on these misrepresentations, the material facts concerning Palbicke's loan was

18  concealed from her, and she decided to move forward with her loan. On April 4, 2007, Palbicke

19  signed the loan and Deed of Trust, before a notary. Had she known the truth however, Palbicke

20  would not have accepted the loan. As a result of Defendants' fraudulent acts described

21  throughout this complaint, Palbicke has lost substantial equity in her home, has damaged or

22  destroyed credit, and at the time Palbicke entered into the loan her home was worth $485,000.00,

23  now her home is worth approximately $314,036.00.  Palbicke did not discover any of these

24  misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

25  complete and thorough investigation of the loan documentation, and a discussion of the

26  surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

27  were brought to light on or around April 7, 2011. (True and correct copy of the aforementioned

28  documents are attached hereto as *Exhibit 10*).

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

14.    Plaintiffs Khalil Subat and Manija Subat ("collectively referred to as "Mr. and Mrs. Subat") discussed refinancing an existing mortgage on their property located at 7330 Cerritos Avenue, Stanton, CA 90680 and A.P.N.:079-541-55 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Greenpoint Mortgage Funding, a correspondent of GMAC and Defendants herein (the "Defendants") and authorized by Defendants to lend on its behalf, in or around April 2006. In the course of their discussions ranging from April 2006 until June 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $650,000.00 with an interest rate at 3.000% for a term of 30 years. Little did Mr. and Mrs. Subat know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Subat was not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every month thereafter. The maximum interest rate is 12%. The amount of Mr. and Mrs. Subat's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 110% of the original loan amount. In addition, Loan Consultant steered them into an ARM "piggy-back" loan in the amount of $100,000.00 for a term of 15 years. These loans were originated by GMAC, on the note and deed of trust Greenpoint Mortgage Funding is identified as the lender, and GMAC is currently servicing the loan.

Defendants and Loan Consultant represented to Mr. and Mrs. Subat that their monthly payment would always be $2,740.43. Although the amount of Mr. and Mrs. Subat's initial minimum monthly payment was $2,740.43. Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Subat: (1) how the interest rate on their loan was calculated; (2) that the initial minimum monthly payment of $2,740.43 would not always be available; (3) that the initial minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial minimum monthly payment they would be definitively deferring interest on their loan, increasing the principal balance of their loan every

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   time they made the minimum monthly payment; (5) that by paying the minimum monthly

2   payment the principal balance of their loan was certain to increase; or (6) their loan would be

3   recast within a few years and they would be forced to pay considerably higher payments.

4        The disclosures in Mr. and Mrs. Subat's loan documents discussing negative amortization

5   only frame negative amortization as a mere **possibility** rather than a **certainty** when making the

6   minimum payment. However, the reality was that by making the minimum payment, negative

7   amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

8   Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

9   schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

10   result in negative amortization. Mr. and Mrs. Subat were not provided, before entering into the

11   loans, with any other payment schedule or with any informed option to make payments different

12   than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the

13   payment pursuant to the TILDS Mr. and Mrs. Subat would be deferring interest, or had

14   Defendants disclosed the payment amounts sufficient to avoid negative amortization from

15   occurring, Mr. and Mrs. Subat would not have entered into the loan. **Defendants intentionally**

16   **omitted a clear disclosure of the nature of Mr. and Mrs. Subat's loan because giving a clear**

17   **explanation of how the loan worked would have punctured the illusion of a low-payment,**

18   **low interest rate loan.**

19        Further, Defendants and Loan Consultant advised them that they were eligible for a Low

20   Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

21   documentation requirement to fraudulently inflate their income by $6,620.00, a factor of 69%;

22   and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

23   payments they could not afford given their true, *un-inflated* monthly income. Defendants and

24   Loan Consultant altered Mr. and Mrs. Subat's loan application without their knowing consent or

25   authorization as Loan Consultant completed Mr. and Mrs. Subat's application without giving Mr.

26   and Mrs. Subat an opportunity to review the loan application.

27        Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Subat that

28   they could afford their loan and further represented that they could shoulder the additional

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    financial burden of repaying their loan in consideration of their other existing debts; yet failed to

2    disclose that the fully amortized monthly payment on the loan was $5,627.94 for both the first

3    loan and the piggy-back loan. Given Mr. and Mrs. Subat's true monthly income of $9,630.00 this

4    represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other

5    debts are even considered, of over 58% - in excess of industry standard underwriting guidelines,

6    and in excess of Defendants' own underwriting guidelines. Defendants and Loan Consultant

7    further represented to Mr. and Mrs. Subat that they could rely on the assessment that they were

8    "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Subat's lack of

9    familiarity with how much debt a person can and should reasonably take on compared to their

10    monthly income, and because Mr. and Mrs. Subat reasonably relied on Defendants' and Loan

11    Consultant's expertise that any payment they were "qualified" for would take into account what

12    the maximum debt a person such as Mr. and Mrs. Subat should be shouldering was, Mr. and Mrs.

13    Subat reasonably believed Defendants' and Loan Consultant's representations that they could

14    afford their loan and its payments.

15        Although Defendants and the Loan Consultant represented to Mr. and Mrs. Subat that

16    they were "qualified" for their loan and could afford their loan and its monthly payments,

17    Defendants and the Loan Consultant misled Mr. and Mrs. Subat into believing that their monthly

18    payments would always only be $2,740.43. Furthermore, at no point did Defendants or Loan

19    Consultant clarify Mr. and Mrs. Subat's false belief and advise them that $2,740.43 would not be

20    their permanent payment under the loan, or that every time they made a monthly payment in the

21    amount of $2,740.43, which is less than interest only, they would be deferring interest on their

22    loan, increasing the principal balance of their loan.

23        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

24    on behalf of Defendants were accurate and made in good faith. On June 7, 2006, an appraisal

25    company under the direct control and supervision of Defendants conducted an appraisal on Mr.

26    and Mrs. Subat's home, which was fraudulently inflated to $1,000,000.00 - an intentionally

27    overstated value. The current fair market value of Mr. and Mrs. Subat's home is approximately

28    $620,000.00. Mr. and Mrs. Subat allege that the appraisal was artificially inflated, and that they

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  have suffered damages in the amount of $380,000.00 ($1,000,000.00-$620,000.00) due to a

2  substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

3  acts described herein.

4       Due to the economic crash caused by Defendants' fraudulent acts described throughout

5  the complaint, Mr. and Mrs. Subat suffered from financial hardship that they were struggling to

6  make the mortgage payments. At the time of entering into the loan, Defendants and Loan

7  Consultant represented to Mr. and Mrs. Subat that they would be able to refinance their loan at a

8  later time. Mr. and Mrs. Subat relied on this assurance in deciding to enter into the mortgage

9  contract. However, Mr. and Mrs. Subat have not been able to refinance their loan. Mr. and Mrs.

10  Subat also sought to modify their loan with Defendants to lower the mortgage payments.

11  Although Mr. and Mrs. Subat's loan was modified, the modification is active only for a limited

12  time. When the modification expires, Mr. and Mrs. Subat's monthly payment will climb to the

13  point that the loan is unaffordable to Mr. and Mrs. Subat.

14       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

15  reputable and complied with industry standard underwriting guidelines and were engaged in

16  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

17  made in good faith; (3) Mr. and Mrs. Subat could afford the loan; (4) they were "qualified" for

18  their loan; (5) "qualified" meant that they could afford their loan; and (6) they would be able to

19  refinance their loan in the future.

20       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

21  otherwise improperly disclosed to Mr. and Mrs. Subat that: (1) Defendants and Loan Consultant

22  knew that they could not and would not be able to afford their loan and that there was a very high

23  probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

24  sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

25  Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

26  Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

27  was not intended to communicate that they could actually "afford" the loan which they were

28  being given; (5) Defendants had abandoned its conventional lending business, prudent lending

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    standards, and industry standard underwriting guidelines; (6) Defendants influenced the

2    appraiser to over-value Mr. and Mrs. Subat's home to require them to borrow more money with

3    the knowledge that the true value of Mr. and Mrs. Subat's home was insufficient to justify the

4    amount of Mr. and Mrs. Subat's loan; or (7) Defendants knew that due to its scheme of

5    fraudulently manipulating and inflating property values throughout the State of California that

6    the real estate market would crash and Mr. and Mrs. Subat would lose substantial equity in their

7    home.

8         Based on these misrepresentations and omissions, the material facts concerning Mr. and

9    Mrs. Subat's loan were concealed from them, and they decided to move forward with their loan.

10    On June 26, 2006, Mr. and Mrs. Subat signed the loan and Deed of Trust, before a notary. Had

11    they known the truth however, Mr. and Mrs. Subat would not have accepted the loan. As a result

12    of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Subat have lost

13    substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs.

14    Subat entered into the loan their home was worth $1,000,000.00, now their home is worth

15    approximately $620,000.00. Mr. and Mrs. Subat did not discover any of these misrepresentations

16    or omissions until after a consultation with legal counsel at Brookstone Law, and through a

17    complete and thorough investigation of the loan documentation, and a discussion of the

18    surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

19    were brought to light on or around August 1, 2011. (True and correct copy of the

20    aforementioned documents are attached hereto as *Exhibit 11*).

21         15.    Plaintiff Genevie Cabang ("Cabang") discussed refinancing an existing mortgage

22    on her property located at 37915 52nd Street East, Palmdale, CA 92252 and A.P.N.: with a loan

23    consultant (the "Loan Consultant"), a representative and authorized agent of Homecomings

24    Financial Services, LLC, a correspondent of GMAC Mortgage (herein "Defendants"), and

25    authorized by Defendants to lend on its behalf, in or around August 2007. In the course of their

26    discussions ranging from August 2007 until October 2007, Defendants and Loan Consultant

27    advised her to enter into a fixed rate loan in the amount of $416,500.00, with an interest rate of

28    7.875%, for a term of 30 years. This loan was originated by GMAC, on the note and deed of trust

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Homecomings Financial Services, LLC is identified as the lender, and this loan is currently being

2  serviced by GMAC.

3  Further, Defendants and Loan Consultant advised her she was eligible for a Low Doc

4  Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

5  documentation requirement to fraudulently inflate her income by $2,024.00, a factor of 35% ;

6  and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

7  payments she could not afford given her true, *un-inflated* monthly income. Defendants and Loan

8  Consultant altered Cabang's loan application without her knowing consent or authorization as

9  Loan Consultant completed Cabang's application without giving Cabang an opportunity to

10  review the loan application.

11  Defendants and Loan Consultant explicitly represented to Cabang that she could afford

12  her loan; and further represented that she could shoulder the additional financial burden of

13  repaying her loan in consideration of her other existing debts. Defendants and Loan Consultant

14  also represented to her that she could afford a $3,443.35 monthly payment, despite her $5,876.00

15  true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before

16  any other debts are even considered, of over 59%- in excess of industry standard underwriting

17  guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan

18  Consultant further represented to Cabang that she could rely on the assessment that she was

19  "qualified" to mean that he could afford the loan. Because of Cabang's lack of familiarity with

20  how much debt a person can and should reasonably take on compared to her monthly income,

21  and because Cabang reasonably relied on Defendants' and Loan Consultant's expertise that any

22  payment she was "qualified" for would take into account what the maximum debt a person such

23  as Cabang should be shouldering was, Cabang reasonably believed Defendants' and Loan

24  Consultant's representations that she could afford her loan and its payments.

25  In addition, Defendants and Loan Consultant represented that appraisals conducted by or

26  on behalf of Defendants were accurate and made in good faith. On or around September 2007, an

27  appraisal company under the direct control and supervision of Defendants conducted an appraisal

28  on Cabang's home, which was fraudulently inflated to a grossly and intentionally overstated

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    value. Defendants and Loan Consultant represented that, per appraisal, Cabang's home was

2    worth $416,000.00 at the time she entered into their loan, and that such a valuation was a true

3    and correct measure of her home's worth. The current fair market value of Cabang's home is

4    approximately $147,000.00. Cabang alleges that the appraisal was artificially inflated and that

5    she has suffered damages in the amount of $269,900.00 ($416,000.00-$147,000.00) due to a

6    substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

7    acts described herein.

8        Defendants and Loan Consultant also represented to Cabang that she would be able to

9    refinance her loan at a later time. Cabang relied on this assurance in deciding to enter into the

10   mortgage contract. However, Cabang has not been able to refinance her loan because she has

11   been told that her home does not contain enough equity. Defendants and Loan Consultant also

12   represented that it would modify Cabang's loan, and Cabang relied on this representation in

13   deciding to enter into the loan. However, Cabang was unable to modify her loan.

14       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

15   reputable and complied with industry standard underwriting guidelines and were engaged in

16   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

17   made in good faith; (3) Cabang could afford the loan ; (4) she was "qualified" for her loan;  (5)

18   "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

19   future; and (7) she would be able to refinance her loan in the future.

20       At no point was it revealed to Cabang that her mortgage payment included a Private

21   Mortgage Insurance ("PMI"). After being told her new payment of $3,019.91 would be her

22   payment after combining both of her previous loans through refinancing, Defendants and Loan

23   Consultant failed to represent that in order to combine both loans, a PMI rate of $423.33 was

24   added each month to her payment without her knowing. Cabang alleges that this increase caused

25   her new, refinanced mortgage payment to be unaffordable.

26       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

27   otherwise improperly disclosed to Cabang that: (1) Defendants and Loan Consultant knew that

28   they could not and would not be able to afford her loan and that there was a very high probability

1     that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

2     loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

3     "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

4     and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

5     to communicate that she could actually "afford" the loan which she was being given; (5)

6     Defendants had abandoned its conventional lending business, prudent lending standards, and

7     industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

8     Cabang's home to require her to borrow more money with the knowledge that the true value of

9     Cabang's home was insufficient to justify the amount of Cabang's loan; or (7) Defendants knew

10    that due to its scheme of fraudulently manipulating and inflating property values throughout the

11    State of California that the real estate market would crash and Cabang would lose substantial

12    equity in her home.

13         Based on these misrepresentations, the material facts concerning Cabang's loan were

14    concealed from her, and she decided to move forward with her loan. On October 11, 2007,

15    Cabang signed the loan and Deed of Trust, before a notary. Had she known the truth however,

16    Cabang would not have accepted the loan. As a result of Defendants' fraudulent acts described

17    throughout this complaint Cabang has lost substantial equity in her home, has damaged or

18    destroyed credit, and at the time Cabang entered into the loan her home was worth $416,000.00,

19    now her home is worth approximately $147,000.00. Cabang did not discover any of these

20    misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

21    complete and thorough investigation of the loan documentation, and a discussion of the

22    surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

23    were brought to light on or around September 6, 2011.  (True and correct copy of the

24    aforementioned documents are attached hereto as ***Exhibit 12***).

25         16.      Plaintiff Julio Gonzalez ("Gonzalez") discussed obtaining a mortgage on his

26    home located at 13552 Abana Street, Cerritos, CA 90703 and A.P.N.: 7006-027-004 with a loan

27    consultant (the "Loan Consultant"), and representative and authorized agent of GMAC herein

28    (the "Defendants") in or around April 2005. In the course of their discussions ranging from April

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    2005 until June 2005, Defendants and Loan Consultant steered him into a loan, of which the

2    Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise

3    improperly disclosed the material terms and information concerning the loan to him. This loan

4    was originated by E-loan, Inc., on the note and deed of trust GMAC is identified as the lender,

5    and GMAC is currently servicing the loan.

6       Defendants and Loan Consultant explicitly represented to Gonzalez that he could afford

7    his loan; and further represented that he could shoulder the additional financial burden of

8    repaying his loan in consideration of his other existing debts. Loan Consultant and Defendants

9    further represented to Gonzalez that he could rely on the assessment that he was "qualified" to

10    mean that he could afford the loan. Because of Gonzalez's lack of familiarity with how much

11    debt a person can and should reasonably take on compared to his/her monthly income, and

12    because Gonzalez reasonably relied on Defendants' and Loan Consultant's expertise that any

13    payment he was "qualified" for would take into account what the maximum debt a person such

14    as Gonzalez should be shouldering was, Gonzalez reasonably believed Defendants' and Loan

15    Consultant's representations that he could afford his loan and its payments.

16       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

17    on behalf of Defendants were accurate and made in good faith. An appraisal company under the

18    direct control and supervision of Defendants conducted an appraisal on Gonzalez's home, which

19    was fraudulently inflated to an intentionally overstated value. Gonzalez alleges that the appraisal

20    was artificially inflated, and that he has suffered damages due to a substantial loss of equity in

21    his home as a result of Defendants' fraudulent inflation and other acts described herein.

22       Loan Consultant and Defendants also represented to Gonzalez that he would be able to

23    refinance his loan at a later time. Gonzalez relied on this assurance in deciding to enter into the

24    mortgage contract. However, Gonzalez has not been able to refinance his loan. Loan Consultant

25    and Defendants also represented that it would modify Gonzalez's loan, and Gonzalez relied on

26    this representation in deciding to enter into the loan. In addition, Gonzalez was advised by a

27    representative and authorized agent of Defendants to stop making payments in order to be

28    eligible for a modification. Gonzalez relied on Defendants' and the Defendants representative

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    and authorized agent's advice and stopped making his monthly payments causing him to fall

2    even further behind. However, Gonzalez was unable to modify his loan.

3      Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

4    reputable and complied with industry standard underwriting guidelines and were engaged in

5    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

6    made in good faith; (3) Gonzalez could afford the loan; (4) He was "qualified" for his loan; (5)

7    "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the

8    future; and (7) He would be able to refinance his loan in the future.

9      Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

10    otherwise improperly disclosed to Gonzalez that: (1) Loan Consultant and Defendants knew that

11    he could not and would not be able to afford his loan and that there was a very high probability

12    that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan,

13    and did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

14    "qualification" process was for Defendants' own protection and not his; (4) That Loan

15    Consultant's and Defendants' representations that he was "qualified" to pay his loan was not

16    intended to communicate that he could actually "afford" the loan which he was being given; (5)

17    Defendants had abandoned its conventional lending business, prudent lending standards, and

18    industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

19    Gonzalez 's home to require him to borrow more money with the knowledge that the true value

20    of Gonzalez 's home was insufficient to justify the amount of Gonzalez 's loan; or (7)

21    Defendants knew that due to its scheme of fraudulently manipulating and inflating property

22    values throughout the State of California that the real estate market would crash and Gonzalez

23    would lose substantial equity in his home.

24      Based on these misrepresentations and omissions, the material facts concerning

25    Gonzalez's loan were concealed from him, and he decided to move forward with his loan. On

26    June 22, 2005, Gonzalez signed the loan and Deed of Trust, before a notary. Had he known the

27    truth however, Gonzalez would not have accepted the loan. As a result of the Defendants'

28    fraudulent acts described throughout this complaint Gonzalez has lost substantial equity in his

1    home, has damaged or destroyed credit, and at the time Gonzalez entered into the loan his home

2    was worth substantially more than its current fair market value.  Gonzalez did not discover any

3    of these misrepresentations or omissions until after a consultation with legal counsel at

4    Brookstone Law, and through a complete and thorough investigation of the loan documentation,

5    and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

6    throughout this complaint, were brought to light on or around October 10, 2011.

7         17.     Plaintiff Lisa Simonyi ("Simonyi") discussed refinancing an existing mortgage on

8    her property located at 14442 Rancho Del Prado Trail, San Diego, CA 92127 and APN 303-230-

9    25-00 with a loan consultant (the "Loan Consultant") with Plaza Home Mortgage, Inc., a

10    correspondent of GMAC and the Defendants (the "Defendants"), and authorized by Defendants

11    to lend on its behalf, in or around November 2006. In the course of their discussions ranging

12    from November 2006 until January 2007, Defendants and Loan Consultant steered her into a

13    negatively amortized PayOption ARM in the amount of $1,500,000.00 with an interest rate at

14    3.750% for a term of 30 years. Little did Simonyi know, however, the disclosed interest rate was

15    never "fixed" but applied to only the first five years of her loan and could adjust every six

16    months thereafter. The maximum interest rate is 11.750%. The amount of Simonyi's minimum

17    monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When

18    the amount of the minimum monthly payment is insufficient to cover the amount of interest due,

19    then the amount of that deficiency is added onto the unpaid principal balance of her loan. The

20    recast point of this loan is 115% of the original loan amount. This loan was originated by GMAC

21    and Defendants, on the note and deed of trust Plaza Home Mortgage is identified as the lender,

22    and GMAC is currently servicing this loan.

23         Defendants and Loan Consultant represented to Simonyi that her monthly payment would

24    always be $4,687.50. Although the amount of Simonyi's initial, disclosed minimum monthly

25    payment was $4,687.50, Defendants and Loan Consultant failed to clarify their partially true

26    representations and advise Simonyi: (1) how the interest rate on her loan was calculated; (2) that

27    the initial, disclosed minimum monthly payment of $4,687.50 would not always be available; (3)

28    that the initial, disclosed minimum monthly payment would not be the permanent payment under

the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary;
(4) that by paying the initial, disclosed minimum monthly payment she would be definitively
deferring interest on her loan, increasing the principal balance of her loan every time she made
the minimum monthly payment; (5) that by paying the minimum monthly payment the principal
balance of her loan was certain to increase; or (6) her loan would be recast within a few years
and she would be forced to pay considerably higher payments.

The disclosures in Simonyi's loan documents discussing negative amortization only
frame negative amortization as a mere **possibility** rather than a **certainty** when making the
minimum payment. However, the reality was that by making the minimum payment, negative
amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending
Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment
schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*
result in negative amortization. Simonyi was not provided, before entering into the loans, with
any other payment schedule or with any informed option to make payments different than those
listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment
pursuant to the TILDS Simonyi would be deferring interest, or had Defendants disclosed the
payment amounts sufficient to avoid negative amortization from occurring, Simonyi would not
have entered into the loan. **Defendants intentionally omitted a clear disclosure of the nature
of Simonyi's loan because giving a clear explanation of how the loan worked would have
punctured the illusion of a low-payment, low interest rate loan.**

Defendants and Loan Consultant also explicitly represented to Simonyi that she could
afford her loan and further represented that she could shoulder the additional financial burden of
repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully
amortized monthly payment on the loan was $12,500.00. Given Simonyi's true monthly income
of $16,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income
ratio, before any other debts are even considered, of over 78%- in excess of industry standard
underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants
and Loan Consultant further represented to Simonyi that she could rely on the assessment that

1  she was "qualified" to mean that she could afford the loan. Because of Simonyi's lack of

2  familiarity with how much debt a person can and should reasonably take on compared to her

3  monthly income, and because Simonyi reasonably relied on Defendants' and Loan Consultant's

4  expertise that any payment she was "qualified" for would take into account what the maximum

5  debt a person such as Simonyi should be shouldering was, Simonyi reasonably believed

6  Defendants' and Loan Consultant's representations that she could afford her loan and its

7  payments.

8      Although Defendants and the Loan Consultant represented to Simonyi that she was

9  "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

10  Loan Consultant misled Simonyi into believing that her monthly payments would always only be

11  $4,687.50. Furthermore, at no point did Defendants or Loan Consultant clarify Simonyi's false

12  belief and advise her that $4,687.50 would not be her permanent payment under the loan, or that

13  every time she made a monthly payment in the amount of $4,687.50, which is less than interest

14  only, she would be deferring interest on her loan, increasing the principal balance of her loan.

15      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

16  on behalf of Defendants were accurate and made in good faith. On or around December 2006, an

17  appraisal company under the direct control and supervision of Defendants conducted an appraisal

18  on Simonyi's home, which was fraudulently inflated to an intentionally overstated value.

19  Defendants and Loan Consultant represented that, per appraisal, Simonyi's home was worth

20  $2,000,000.00 at the time she entered into her loan, and that such a valuation was a true and

21  correct measure of her home's worth. The current fair market value of Simonyi's home is

22  approximately $1,242,642.00. Simonyi alleges that the appraisal was artificially inflated and that

23  she has suffered damages in the amount of $757,358.00 ($2,000,000.00-$1,242,642.00) due to a

24  substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

25  acts described herein.

26      Defendants and Loan Consultant also represented to Simonyi that she would be able to

27  refinance her loan at a later time. Simonyi relied on this assurance in deciding to enter into the

28  mortgage contract Defendants and Loan Consultant also represented that it would modify

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   Simonyi's loan, and Simonyi relied on this representation in deciding to enter into the loan.

2   However, Simonyi was unable to modify her loan.

3   Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

4   reputable and complied with industry standard underwriting guidelines and were engaged in

5   lending of the highest caliber;(2) property appraisals done by Defendants were accurate and

6   made in good faith;  (3) Simonyi could afford the loan ; (4) she was "qualified" for her loan;  (5)

7   "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and

8   (7) she would be able to refinance her loan.

9   Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

10  otherwise improperly disclosed to Simonyi that: (1) Defendants and Loan Consultant knew that

11  she could not and would not be able to afford her loan and that there was a very high probability

12  that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

13  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

14  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

15  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

16  to communicate that she could actually "afford" the loan which she was being given; (5)

17  Defendants had abandoned its conventional lending business, prudent lending standards, and

18  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

19  Simonyi's home to require her to borrow more money with the knowledge that the true value of

20  Simonyi's home was insufficient to justify the amount of Simonyi's loan; or (7) Defendants

21  knew that due to its scheme of fraudulently manipulating and inflating property values

22  throughout the State of California that the real estate market would crash and Simonyi would

23  lose substantial equity in her home.

24  Based on these misrepresentations and omissions, the material facts concerning

25  Simonyi's loan were concealed from her, and she decided to move forward with her loan. On

26  January 5, 2007, Simonyi signed the loan and Deed of Trust, before a notary. Had she known the

27  truth however, Simonyi would not have accepted the loan. As a result of Defendants' fraudulent

28  acts described throughout this complaint, Simonyi has lost substantial equity in her home, has

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   damaged or destroyed credit, and at the time Simonyi entered into the loan her home was worth

2   $2,000,000.00, now her home is worth approximately $1,242,624.00. Simonyi did not discover

3   any of these misrepresentations or omissions until after a consultation with legal counsel at

4   Brookstone Law, and through a complete and thorough investigation of the loan documentation,

5   and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

6   throughout this complaint, were brought to light on or around November 11, 2011.

7          18.    Plaintiff Rick Ewald ("Ewald") discussed refinancing an existing mortgage on his

8   property located at 108 Grove Street, Nevada City, CA 95959 and A.P.N.: 05-395-02-000 with a

9   loan consultant (the "Loan Consultant"), a representative and authorized agent of Green Point

10  Mortgage, a correspondent of GMAC and Defendants herein (the "Defendants"), and authorized

11  by Defendants to lend on its behalf, in or around February 2006. In the course of their

12  discussions ranging from January 2006 until March 2006, Defendants and Loan Consultant

13  steered him into a negatively amortized PayOption ARM in the amount of $626,400.00 with an

14  interest rate at 7.875% for a term of 30 years. Little did Ewald know, however, the disclosed

15  interest rate was never "fixed" but applied to only his first monthly payment and could adjust

16  every month thereafter. The maximum interest rate is 12.000%. The amount of Ewald's

17  minimum monthly payment was "fixed" for 60 months and could adjust every 12 months

18  thereafter. When the amount of the minimum monthly payment is insufficient to cover the

19  amount of interest due, then the amount of that deficiency is added onto the unpaid principal

20  balance of his loan. The recast point of this loan is 115% of the original loan amount. This loan

21  was originated by GMAC, on the note and deed of trust Green Point Mortgage is identified as the

22  lender, and the loan is being serviced by GMAC.

23          The disclosures in Ewald's loan documents discussing negative amortization only frame

24  negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

25  payment. However, the reality was that by making the minimum payment, negative amortization

26  was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

27  Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

28  to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    amortization. Ewald was not provided, before entering into the loans, with any other payment

2    schedule or with any informed option to make payments different than those listed in the TILDS

3    payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

4    Ewald would be deferring interest, or had Defendants disclosed the payment amounts sufficient

5    to avoid negative amortization from occurring, Ewald would not have entered into the loan.

6    **Defendants intentionally omitted a clear disclosure of the nature of Ewald's loan because**

7    **giving a clear explanation of how the loan worked would have punctured the illusion of a**

8    **low-payment, low interest rate loan.**

9    Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc

10    Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low

11    documentation requirement to fraudulently inflate his income by $9,854.00, a factor of 54%; and

12    in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose

13    payments he could not afford given his true, *un-inflated* monthly income. Defendants and Loan

14    Consultant altered Ewald's loan application without his knowing consent or authorization as

15    Loan Consultant completed Ewald's application without giving Ewald an opportunity to review

16    the loan application.

17    Defendants and Loan Consultant represented to Ewald that his monthly payment would

18    always be $2,014.75. Although the amount of Ewald's initial, disclosed minimum monthly

19    payment was $2,014.75, Defendants and Loan Consultant failed to clarify their partially true

20    representations and advise Ewald: (1) how the interest rate on his loan was calculated; (2) that

21    the initial, disclosed minimum monthly payment of $2,014.75 would not always be available; (3)

22    that the initial, disclosed minimum monthly payment would not be the permanent payment under

23    the loan despite Defendants' and  Loan Consultant's affirmative representations to the contrary;

24    (4) that by paying the initial, disclosed minimum monthly payment he would be definitively

25    deferring interest on his loan, increasing the principal balance of his loan every time he made the

26    minimum monthly payment; (5) that by paying the minimum monthly payment the principal

27    balance of his loan was certain to increase; or (6) his loan would be recast within a few years and

28    he would be forced to pay considerably higher payments.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Defendants and Loan Consultant also explicitly represented to Ewald that he could afford

2  his loan and further represented that he could shoulder the additional financial burden of

3  repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully

4  amortized monthly payment on the loan was $4,541.83. Given Ewald's true monthly income of

5  $5,416.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

6  before any other debts are even considered, of over 84%- in excess of industry standard

7  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

8  and Loan Consultant further represented to Ewald that he could rely on the assessment that he

9  was "qualified" to mean that he could afford the loan. Because of Ewald's lack of familiarity

10  with how much debt a person can and should reasonably take on compared to his monthly

11  income, and because Ewald reasonably relied on Defendants' and Loan Consultant's expertise

12  that any payment he was "qualified" for would take into account what the maximum debt a

13  person such as Ewald should be shouldering was, Ewald reasonably believed Defendants' and

14  Loan Consultant's representations that he could afford his loan and its payments. Although

15  Defendants and the Loan Consultant represented to Ewald that he was "qualified" for his loan

16  and could afford his loan and its monthly payments, Defendants and the Loan Consultant misled

17  Ewald into believing that his monthly payments would always only be $2,014.75. Furthermore,

18  at no point did Defendants or Loan Consultant clarify Ewald's false belief and advise him that

19  $2,014.75 would not be his permanent payment under the loan, or that every time he made a

20  monthly payment in the amount of $2,014.75, which is less than interest only, he would be

21  deferring interest on his loan, increasing the principal balance of his loan.

22    In addition, Defendants and Loan Consultant represented that appraisals conducted by or

23  on behalf of Defendants were accurate and made in good faith. On or around February 2006, an

24  appraisal company under the direct control and supervision of Defendants conducted an appraisal

25  on Ewald's home, which was fraudulently inflated to a grossly and intentionally overstated

26  value. Defendants and Loan Consultant represented that, per appraisal, Ewald's home was worth

27  $755,000.00 at the time he entered into his loan, and that such a valuation was a true and correct

28  measure of his home's worth. The current fair market value of Ewald's home is approximately

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    $303,798.00. Ewald alleges that the appraisal was artificially inflated, and that he has suffered

2    damages in the amount of $451,202.00 ($755,000.00-$303,798.00) due to a substantial loss of

3    equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

4        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

5    reputable and complied with industry standard underwriting guidelines and were engaged in

6    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

7    made in good faith;  (3) Ewald could afford the loan ; (4) he was "qualified" for his loan;  (5)

8    "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the

9    future; and (7) Defendants would refinance his loan in the future.

10        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

11    otherwise improperly disclosed to Ewald that: (1) Defendants and Loan Consultant knew that he

12    could not and would not be able to afford his loan and that there was a very high probability that

13    he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

14    did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

15    "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and

16    Loan Consultant's representations that he was "qualified" to pay his loan was not intended to

17    communicate that he could actually "afford" the loan which he was being given; (5) Defendants

18    had abandoned its conventional lending business, prudent lending standards, and industry

19    standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Ewald's

20    home to require him to borrow more money with the knowledge that the true value of Ewald's

21    home was insufficient to justify the amount of Ewald's loan; or (7) Defendants knew that due to

22    its scheme of fraudulently manipulating and inflating property values throughout the State of

23    California that the real estate market would crash and Ewald would lose substantial equity in his

24    home.

25        Based on these misrepresentations and omissions, the material facts concerning Ewald's

26    loan were concealed from him, and he decided to move forward with his loan. On March 31,

27    2006, Ewald signed the loan and Deed of Trust, before a notary. Had he known the truth

28    however, Ewald would not have accepted the loan. As a result of Defendants' fraudulent acts