# EXHIBIT 2

# Thompson Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF WILLIAM R. THOMPSON IN SUPPORT OF DEBTORS' MOTION PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 APPROVING DEBTORS' ENTRY INTO SETTLEMENT AGREEMENTS RELATED TO CERTAIN PENDING BORROWER PUTATIVE CLASS ACTION LITIGATIONS, AND AUTHORIZING DEBTORS TO PERFORM OBLIGATIONS THEREUNDER**

I, William R. Thompson, under penalty of perjury, declare as follows:

1.  I am the General Counsel of the Debtors, and I have held that position since February 2013. I have been employed by the company since April 2005, serving as Chief Litigation Counsel for GMAC Mortgage, LLC ("GMACM") and later for its parent, Residential Capital, LLC ("ResCap"). In those capacities, I had supervisory responsibility over all of the mortgage litigation portfolio, including core mortgage cases involving all origination and servicing issues, and personally handled or supervised all commercial, complex, and class action cases for the mortgage entities. I assumed the role of General Counsel for ResCap and its subsidiaries in February 2013. I am authorized to make this declaration on behalf of the Debtors and in support of the motion (the "Motion")[1] for entry of an order approving the Debtors' entry

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

ny-1113383

into four (4) settlement agreements related to certain various pending borrower putative class action litigations, and authorizing the Debtors to perform their obligations thereunder.

2.      In my capacity as General Counsel, I am familiar with the Debtors' ongoing litigation matters, including each of the Actions. I submit this declaration (the "Declaration") on the Debtors' behalf in conjunction with and in support of the Motion. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the various business units of the Debtors; my review of the Debtors' relevant documents; or my general experience, expertise, and knowledge of the Debtors' ongoing litigation. In making my statements based on my review of the Debtors' relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing, collecting, or verifying any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**A.     The Cronk Class Action**

3.      On or about July 10, 2006, Elizabeth Cronk ("Cronk") executed a note (the "Cronk Note") in favor of First Acceptance Mortgage, secured by a mortgage (the "Cronk Mortgage") encumbering the real property commonly known as 447 Dunlin Plaza, Secaucus, New Jersey 07094. The Cronk Note, Cronk Mortgage and associated origination documents are collectively referred to as the "Cronk Loan Documents," and set forth the terms of the Cronk loan (the "Cronk Loan"). The Cronk Loan Documents and the Cronk Loan were subsequently assigned to Debtor GMACM.

4.      On August 12, 2011, Cronk, individually and purportedly on behalf of all others similarly situated, commenced a nationwide putative class action against GMACM styled as *Cronk*

2

ny-1113383

*v. GMAC Mortgage, LLC*, No. 2:11-cv-5161, in the United States District Court for the Eastern District of Pennsylvania (the "Cronk Action").  A class has not been certified in the Cronk Action.

5. On November 15, 2012, Cronk filed a putative class action proof of claim in the amount of $35,000,000 in GMACM's chapter 11 case (identified as Claim No. 4911 on the Claims Register) (the "Cronk Claim").  The Cronk Claim alleges that GMACM holds the Cronk Loan and has improperly purchased, and charged her for, flood insurance for her property.

6. GMACM denies liability for both the Cronk Action and the Cronk Claim.

**B.    The Throm Class Action**

7. On or about November 3, 1997, Vernon Throm and his wife, Agnes Throm, executed a note (the "Throm Note") in favor of Manning Financial Group, secured by a mortgage (the "Throm Mortgage") encumbering the real property commonly known as 138 Kildare Drive, Sebastian, Florida a/k/a Lot 14, Block 559, Sebastian Highlands, Unit 16.  The Throm Note, Throm Mortgage and associated origination documents are collectively referred to as the "1997 Throm Loan Documents," and set forth the terms of the Throm loan (the "1997 Throm Loan").  The 1997 Throm Loan Documents and the 1997 Throm Loan were subsequently assigned to GMACM.  On or about August 25, 2010, Vernon Throm and his wife executed an Assumption of Liability Agreement with respect to the 1997 Throm Loan Documents and the 1997 Throm Loan (the "Assumption Agreement") and a Non-HAMP Loan Modification Agreement with respect to the 1997 Throm Loan Documents and the 1997 Throm Loan (the "Modification Agreement").  The 1997 Throm Loan Documents, the Assumption Agreement, and the Modification Agreement are collectively referred to as the "Throm Loan Documents," and set forth the terms of the "Throm Loan".

3

ny-1113383

8. On October 31, 2011, Dennis Throm (son of Vernon and Agnes Throm, "Throm"), individually and purportedly on behalf of all others similarly situated, commenced an action against GMACM styled as *Throm v. GMAC Mortgage, LLC*, Case No. 2:11-cv-06813, in the United States District Court for the Eastern District of Pennsylvania (the "Throm Action"). A class has not been certified in the Throm Action.

9. On November 15, 2012, Throm filed a putative class action proof of claim in the amount of $35,000,000 in GMACM's chapter 11 case (identified as Claim No. 4902 on the Claims Register) (the "Throm Claim"). The Throm Claim alleges that GMACM holds the Throm Loan and has improperly purchased, and charged him for, flood insurance for his property.

10. GMACM denies liability for both the Throm Action and the Throm Claim.

C.  **The Gardner/Smith Class Actions**

11. On October 20, 2010, Alan Gardner ("Gardner") filed a putative class action against GMACM, captioned *Alan Gardner, et al. v. GMAC Mortgage, LLC*, Case No. 10-2-36902-3 SEA (the "Gardner Action"), on behalf of borrowers in the State of Washington, alleging that GMACM improperly recouped from borrowers fees that GMACM incurred to record substitution of trustee or appointment of substitute trustee documents with county recorders ("Substitution Recording Fees") when borrowers paid off loans serviced by GMACM.

12. On March 18, 2011, Tiffany Smith ("Smith") filed a putative class action against Debtor Homecomings, captioned *Tiffany Smith, et al. v. Homecomings Financial, LLC*, Case No. 11-2-10126-6 SEA (the "Smith Action" and, together with the Gardner Action, the "Gardner/Smith Actions"), on behalf of borrowers in the State of Washington, alleging that Homecomings improperly recouped from borrowers Substitution Recording Fees when borrowers paid off loans serviced by Homecomings.

4

ny-1113383

13.     On October 23, 2012, plaintiffs' counsel in the Gardner/Smith Actions filed two proofs of claim: (a) an unsecured claim against GMACM in the amount of $1,926,222.33 on behalf of the putative class in the Gardner Action (identified as Claim No. 2881 on the Claims Register) (the "<u>Gardner Claim</u>") and (b) an unsecured claim against Homecomings in the amount of $740,591.98 on behalf of the putative class in the Smith Action (identified as Claim No. 2761 on the Claims Register) (the "<u>Smith Claim</u>" and, together with the Gardner Claim, the "<u>Gardner/Smith Claims</u>").

14.     GMACM denies liability for both the Gardner Action and the Gardner Claim. Similarly, Homecomings denies liability for both the Smith Action and the Smith Claim.

**D.     The Peel Class Action**

15.     Russ Debout, Michael Sanford, Marilyn Sanford and Desiree McIlrath (the "<u>Peel Plaintiffs</u>")[2] obtained payment-option adjustable rate mortgage loans from BrooksAmerica Mortgage Corporation ("<u>BrooksAmerica</u>") in late 2006 and early 2007. BrooksAmerica subsequently sold the Peel Plaintiffs' loans to Debtor RFC.

16.     Currently pending in the United Stated District Court for the Central District of California is a case styled *Timothy R. Peel, et al. v. BrooksAmerica Mortgage Corporation., et al.*, Case No. 8:11-cv-00079-JST-RNB, removed from the Superior Court of Orange County, California, Case No. 30-2010-00348134 (the "<u>Peel Action</u>").[3]

17.     In the Peel Action, the Peel Plaintiffs filed a "First Amended Class Action Complaint," dated October 20, 2010, in which they brought putative class action claims against

---

[2] The Peel Plaintiffs, together with Cronk, Throm, Gardner, Smith and all others similarly situated and/or whom they purport to represent in the Actions (as defined below), shall be collectively referred to herein as the "<u>Plaintiffs</u>."

[3] The Peel Action, together with the Cronk Action, the Throm Action, and the Gardner/Smith Actions, are collectively referred to herein as the "<u>Actions</u>").

5

ny-1113383

RFC for alleged (a) fraudulent omissions in loan documents; (b) violation of California Business and Professions Code § 17200 ("UCL"); and (c) breach of contract. The breach of contract claim was dismissed on RFC's motion to dismiss.

18. By motion filed April 12, 2012 in connection with the Peel Action, the Peel Plaintiffs moved to certify a class action on their UCL claim only. On May 9, 2012, RFC filed its opposition to the Peel Plaintiffs' motion for class certification. The Peel Plaintiffs withdrew their motion for class certification as against RFC on May 18, 2012.

19. On November 6, 2012, the Peel Plaintiffs, on behalf of themselves and the putative class, filed a proof of claim in the amount of $175,000,000 in RFC's chapter 11 case (identified as Claim No. 2530 on the Claims Register) (the "Peel Claim" and, collectively with the Cronk Claim, the Throm Claim, the Gardner/Smith Claims, the "Claims"). The Peel Claim alleges the same facts alleged in the Peel Action.

20. RFC denies liability for both the Peel Action and the Peel Claim.

### E. The Settlement Agreements[4]

21. Rather than lift the stay and allow the Actions to proceed either in the respective district or state courts and/or litigation of the Claims in this Court, over the course of several months, the Debtors and the respective Plaintiffs engaged in settlement negotiations and entered into settlement agreements resolving the various Actions and Claims. The Settlement Agreements resolve all of the Plaintiffs' claims against the Debtors with respect to the subject matter of the Actions and the Claims.

---

[4] This Declaration summarizes several aspects of the Settlement Agreements. Nothing in this Declaration is intended to or should be considered to alter, amend, limit, expand or otherwise interpret the terms of the Settlement Agreements.

6

ny-1113383

22. <u>The Cronk Settlement Agreement</u>.  Pursuant to the Settlement and Release Agreement by and between GMACM and Cronk (the "<u>Cronk Settlement Agreement</u>"), GMACM has agreed to make a cash payment to Cronk of $30,000.00 and an additional cash payment to Cronk's counsel of $95,000.00, for a total cash payment of $125,000.00 (the "<u>Cronk Settlement Amount</u>").  Cronk agrees to dismiss the Cronk Action with prejudice and without costs upon payment of the Cronk Settlement Amount.  Upon the effectiveness of the Cronk Settlement Agreement, the Debtors may take any and all steps to expunge the Cronk Claim from the Debtors' claims register (the "<u>Claims Register</u>").  Cronk, for and on behalf of herself and, among others, her successors, assigns and all other persons who could claim through them, unconditionally and irrevocably releases GMACM and, among others, all entities related to GMACM, from the Cronk Claim and any and all other claims relating to GMACM's flood insurance requirements, policies and practices, whether or not they could have been asserted in the Cronk Action or the Cronk Claim, which Cronk has or may have through and including the Effective Date of the Chapter 11 Plan.

23. <u>The Throm Settlement Agreement</u>.  Pursuant to the Settlement and Release Agreement by and between GMACM and Throm (the "<u>Throm Settlement Agreement</u>"), GMACM has agreed to make a cash payment to Throm of $30,000.00 and an additional cash payment to Throm's counsel of $95,000.00, for a total cash payment of $125,000.00 (the "<u>Throm Settlement Amount</u>").  Throm has agreed to dismiss the Throm Action with prejudice and without costs upon payment of the Throm Settlement Amount. Upon the effectiveness of the Throm Settlement Agreement, the Debtors may take any and all steps to expunge the Throm Claim from the Claims Register.  Throm, for and on behalf of himself and, among others, his successors, assigns and all other persons who could claim through them, unconditionally and

7

ny-1113383

irrevocably releases GMACM and, among others, all entities related to GMACM, from the Throm Claim and any and all other claims relating to GMACM's flood insurance requirements, policies and practices, whether or not they could have been asserted in the Throm Action or the Throm Claim, which Throm has or may have through and including the Effective Date.

24.     The Gardner/Smith Settlement Agreement.  Pursuant to that Amended Class Action Settlement Agreement between and among GMACM, Homecomings, and Gardner and Smith (on behalf of themselves and a settlement class proposed for certification solely for settlement purposes) (the "Gardner/Smith Settlement Agreement"), GMACM and Homecomings have agreed to deliver the sum of $285,000.00 (the "Gardner/Smith Settlement Amount") to counsel for GMACM and Homecomings, as escrow agent, to be held for further disbursement in accordance with the terms of the Gardner/Smith Settlement Agreement.  Upon the effective date of the Gardner/Smith Settlement Agreement, the Gardner/Smith Actions shall be dismissed with prejudice and without an award of costs or fees except as expressly provided in the Gardner/Smith Settlement Agreement.  In addition, no later than five business days after the effective date of the Gardner/Smith Settlement Agreement, Gardner and Smith shall withdraw the Gardner/Smith Claims.  Upon the effective date of the Gardner/Smith Settlement Agreement, Gardner, Smith and each Settlement Class Member (as defined in the Gardner/Smith Settlement Agreement), among others, will be deemed to have completely and unconditionally released GMACM and Homecomings, among others, from any and all of the Settled Class Claims (as defined in the Gardner/Smith Settlement Agreement), including Unknown Class Claims (as defined in the Gardner/Smith Settlement Agreement) and the Gardner/Smith Claims.

25.     The Peel Settlement Agreement.  Pursuant to that Settlement and Release Agreement by and among RFC and the Peel Plaintiffs (the "Peel Settlement Agreement" and,

8

ny-1113383

collectively with the Cronk Settlement Agreement, the Throm Settlement Agreement and the Gardner/Smith Settlement Agreement, the "Settlement Agreements"), RFC, or its successor in interest under the Chapter 11 Plan, has agreed to pay to the Peel Plaintiffs and their counsel, collectively, the total sum of $600,000.00, which shall be inclusive of all legal fees and expenses payable to counsel to the Peel Plaintiffs (the "Peel Settlement Amount").  The Peel Plaintiffs agree to dismiss the Peel Action as against RFC in its entirety, with prejudice, as to the Peel Plaintiffs' individual claims, and without prejudice as to the claims brought on behalf of the putative class, within three (3) days after execution of the Peel Settlement Agreement and the Peel Settlement Amount has been tendered to the Peel Plaintiffs' counsel.  In addition, upon tender of the Peel Settlement Amount, the Peel Claim will be deemed withdrawn and expunged in its entirety.  Other than the obligations of RFC under the Peel Settlement Agreement, and in consideration thereof, the Peel Plaintiffs, for themselves and, among others, their successors and assigns, fully release RFC, among others, from any and all claims, including the Peel Claim, in any way relating to or arising out of the Peel Action.

F.     **Basis for Approval of Settlement Agreements**

26.     As part of the negotiations leading up to the Settlement Agreements, the Debtors concluded that each of the Cronk Settlement Amount, the Throm Settlement Amount, the Gardner/Smith Settlement Amount, and the Peel Settlement Amount (collectively, the "Settlement Amounts") was reasonable based on their assessment of the possibility of success of the underlying Actions and the benefits of the settlements.  If the Settlement Agreements are not effectuated and the Debtors were to proceed with objecting to the Claims related to the matters at issue in the Actions, then the Debtors would risk the allowance of claims and, ultimately,

9

distributions under the Chapter 11 Plan at least similar to and possibly substantially higher than the Settlement Amounts.

27. If the Settlement Agreements are not approved and the Debtors have to litigate the issues involved in the Actions (either in the respective district or state courts or in this Court through the claims resolution process), then the time and resources to be expended litigating the substance of those claims would be substantial. Based on the duration and complexity of the Actions (and the associated Claims), the Debtors estimate that if they litigated the issues involved, they would expend fees and expenses in connection with the Actions comparable to, and in all likelihood much greater than, the aggregate Settlement Amounts.

28. If the Settlement Agreements are not effectuated and the Plaintiffs were to succeed in their prosecution of Claims related to the Actions (even in part), the Debtors could face allowed claims in substantial multiples of the aggregate Settlement Amounts and in an uncertain magnitude. The Plaintiffs have asserted Claims of approximately $247 million (*i.e.*, $35,000,000 with respect to the Cronk Claim; $35,000,000 with respect to the Throm Claim; $2,666,814.31 with respect to the Gardner/Smith Claims; and $175,000,000 with respect to the Peel Claim). If the Plaintiffs were to succeed, even in part, with respect to their respective Claims, the corresponding cash distributions on such allowed claims under the Chapter 11 Plan could easily well exceed the one-time cash payments aggregating $1,135,000 as provided for in the Settlement Agreements (*i.e.*, $125,000.00 in connection with the Cronk Settlement Agreement; $125,000.00 in connection with the Throm Settlement Agreement; $285,000.00 in connection with the Gardner/Smith Settlement Agreement; and $600,000.00 in connection with the Peel Settlement Agreement).

ny-1113383

29. The Debtors do not believe that the Plaintiffs would agree to resolutions on better terms than what are presently before the Court. Moreover, in addition to the risk of substantially larger exposure, the Debtors (or their successors under the Chapter 11 Plan) would incur significant litigation costs, and face the risk of a multitude of claims substantially in excess of the Settlement Amounts.

30. By quantifying and fixing the Debtors' exposure to the Plaintiffs in the Actions, the Debtors have capped their exposure, identified the fixed amount to be deducted from the aggregate funding being provided to the Borrower Claims Trust, and potentially expedited the timing of distributions to holders of Allowed Borrower Claims. As a result, approval of the Settlement Agreements will not require the trustee for the Borrower Claims Trust to reserve substantial sums until the Actions are resolved; rather, the settlements provide parties with certainty while limiting the sums to be deducted from the funding for the Borrower Claims Trust.

31. According to the terms of the Settlement Agreements, the released persons include, among other parties, GMAC's, Homecomings' or RFC's (as the case may be) past, present and future officers and directors, as well as various other Debtor and non-debtor entities. The inclusion of non-debtor parties, including, without limitation, such officers and directors was a business decision and good practice to ensure that such related entities are protected from incurring liabilities relating to the claims asserted against the Debtors solely in connection with the Actions.

32. The Settlement Agreements were negotiated separately between the Debtors and the Plaintiffs, without collusion, in good faith, and from arm's-length bargaining positions, and all parties were represented by experienced and sophisticated counsel.

11

ny-1113383

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on December 16, 2013

By: /s/ William R. Thompson
William R. Thompson
General Counsel for the Debtors

ny-1113383