# Exhibit 3

# Declaration of William Tyson

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                                       )
In re:                                                 )    Case No. 12-12020 (MG)
                                                       )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,               )    Chapter 11
                                                       )
                                Debtors.               )    Jointly Administered
                                                       )
---------------------------------------------------------------

## DECLARATION OF WILLIAM TYSON IN SUPPORT OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 554(a) OF THE BANKRUPTCY CODE FOR AN ORDER APPROVING ABANDONMENT OF DEBTORS' INTERESTS IN CERTAIN ESTATE ASSETS

I, William Tyson, declare as follows:

      1.    I am the Chief Asset Disposition Officer of Residential Capital, LLC and its affiliates (collectively, the "<u>Debtors</u>"). I joined GMAC Mortgage, LLC ("<u>GMACM</u>") in May 2012, and I served as Senior Vice President and Manager of the Asset Disposition Group since June 2012. Prior to joining GMACM, I was employed by Ally Financial, Inc. ("<u>AFI</u>"), where I served in a number of positions, including, most recently, as Manager and Chief Risk Officer of the Special Asset Group. As Chief Asset Disposition Officer, I am responsible for disposing of and liquidating the Debtors' remaining assets and loans, winding up and dissolving certain non-debtor affiliates (primarily international companies), and managing servicing and sub-servicing contracts in connection with the sale of the Debtors' servicing platform.

      2.    I am authorized to submit this declaration (the "<u>Declaration</u>") in support of the Debtors' Motion Pursuant to Sections 105(a) and 554(a) of the Bankruptcy Code for an Order Approving Abandonment of Debtors' Interest in Certain Estate Assets (the "<u>Motion</u>").[1]

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion.

ny-1121895

A.  **NERDs**

3.  The NERDs are one of the categories of illiquid intangible assets remaining in the Debtors' estate. NERDs represent the non-economic residual interests in REMICs, which are tax flow-through vehicles widely used in mortgage-backed securitizations, including by the Debtors during the last two decades after Congress added specific REMIC provisions to the Internal Revenue Code. While potentially considered an asset of the Debtors' estate, the NERDs are, in fact, a liability to the Debtors. NERDs typically have no or minimal cash flows, and the owner of these interests (as determined under the Internal Revenue Code) is responsible for the associated tax liability on income allocated to the residual, which may include so-called "phantom" income, i.e., taxable income that exceeds economic income.

4.  Residential Funding Company, LLC ("RFC") and GMACM collectively have legal title to NERDs associated with ninety-one distinct securitization deals; however AFI, not the Debtors, is considered under the Internal Revenue Code to be the tax owner of the NERDs.[2]

5.  The Debtors solicited two financial institutions in order to gauge whether there was any interest in taking an assignment of the NERDs. Although the Debtors received expressions of interest from certain parties, each interested party requested an "exclusive" agreement to review and analyze the economic impact of the NERDs. It is a labor-intensive and detailed process to analyze the portfolio of NERDs, and the third party was only willing to undertake the analysis if the Debtors agreed to give that third party the exclusive right to assess and purchase the NERD portfolio. Notwithstanding that a grant of exclusivity is a typical industry practice when marketing NERDs, the Debtors did not believe it was appropriate or

---

[2] The Debtors are disregarded entities for federal income tax purposes and, as such, are considered divisions of AFI for federal income tax purposes. Therefore, the Debtors do not pay federal income taxes.

ny-1121895                                                2

feasible to provide one party with exclusivity; rather, the Debtors wanted to have the opportunity to speak with more than one party at a time while marketing the portfolio. *See* Id. However, as is the case with such unique and illiquid assets, the market of willing and interest purchasers is limited, so the legal owners are left to pay third parties inducement payments to assume ownership of the asset. Accordingly, the Debtors hired an independent third party, KPMG, to provide an analysis of the anticipated inducement fee required to be paid by the Debtors to a third party assignee of the NERDs. The high level analysis from KPMG indicated that the inducement fee payment required to be paid by the Debtors to a purchaser would likely range from $3.2 million to $6.1 million. Thus, the Debtors determined that assigning the NERDs was not in the estates' best interests.

6.  In the ordinary course of its business, the Debtors sold into a securitization (individually, a "Securitization") a pool of mortgage loans pursuant to a pooling and servicing agreement (the "Pooling and Servicing Agreement"). As noted above, RFC and GMACM retained ownership of the "Class R Certificate" issued as part of the securitizations. Class R Certificates, which represent residual interests in the associated REMIC, are considered NERDs because they do not entitle the holder to any cash distributions. The life span of a NERD is the life of the underlying Securitization, which can be up to twenty (20) or more years. In the first few years of existence, a NERD typically generates "phantom income" on which tax is payable, but then starts to generate losses from matching deductions in later years.

**B.    Non-REMIC Residual Interests (i.e., Trust Certificates)**

7.  RFC Asset Holdings II, LLC and GMACM presently hold approximately sixteen residual interests in non-REMIC securitizations.

8.  These non-REMIC transactions were structured as Delaware statutory trusts (each a "Trust"), with the "residual" interests embodied in trust certificates ("Trust

Certificates"), which are legally owned by RFC and GMACM. These certificates were issued by the Trust, and the payments to the certificateholders are defined in the underlying trust documentation.

9. Each Trust is a disregarded entity ("DRE") for federal income tax purposes. Therefore, the holder of the Trust Certificate is treated as the owner of the Trust's assets (i.e., the mortgages) and as the obligor with respect to the associated liabilities (i.e., the notes).

10. Although there is minimal value in these Trust Certificates, the cash flows to which RFC and GMACM are entitled are less than the tax liabilities that Unit Holders would incur as a result of the deposit of such Certificates into the Liquidating Trust.

11. Although the Trust Certificates appear to be "assets," these interests are more akin to liabilities for the Debtors. If the Liquidating Trust holds the Trust Certificates, the Unit Holders will incur tax liability that will exceed the minimal cash flows to which they would be entitled as owner of the Certificates (through the Liquidating Trust). In addition, in the ordinary course of business, the holder of a Trust Certificate is, among other things, (i) liable for entity level taxes of the corresponding trust, (ii) subject to tax or governmental charge imposed in connection with the transfer of the Trust Certificate, and (iii) upon a proposed transfer of the Trust Certificate is required to obtain from the proposed transferee an opinion of counsel stating that the transfer would not cause the trust to be classified as a publicly traded partnership, association taxable as a corporation, a corporation or a taxable mortgage pool for tax purposes and a certification stating that the transferee is not a partnership, grantor trust or S corporation for federal income tax purposes.

12. Based on an analysis of the performance of the underlying mortgages and the obligations due on the notes, the Debtors have concluded that the Trust Certificates have de minimus value at best. Accordingly, given the immaterial economic value that the Trust Certificates represent combined with the administrative burden of transferring the Trust Certificates to the Liquidating Trust, abandonment of the Trust Certificates is justified and reasonable under the circumstances.

C. **PFIC Equity**

13. The Debtors presently hold an equity interest in a securitization that is a PFIC for federal income tax purposes. A PFIC interest is generally an interest in a foreign corporation that has significant passive income or significant passive assets. Similar to the NERDS and the Trust Certificates described above, the cash flows expected on this PFIC equity interest are less than the taxes that could be incurred by Unit Holders should these equity interests be transferred into the Liquidating Trust. From a legal standpoint, RFC and GMACM own the PFIC equity, but AFI currently includes income and deductions from the PFIC equity on its tax return and is ultimately responsible to the federal government for any tax liabilities deriving from the PFIC equity.

14. There is currently minimal value in the PFIC equity. Based on an analysis of the performance of the underlying assets and the obligations due on the Notes, the Debtors have concluded that the PFIC equity is of immaterial value.

D. **Common Land**

15. The Debtors have an interest in five (5) parcels of land within residential developments. These land parcels consist of common areas within residential developments (i.e., parks, playgrounds, retention ponds, or waste spray fields) that are normally referred to as "common land" because they are not capable of being developed and monetized for the benefit

of creditors. One parcel is owned by a Debtor entity, and the other four parcels are titled in the name of non-Debtor entities, LenOne, LLC and GMAC Model Home Finance, LLC. Typically, when a development is complete, the ownership of the common land is transferred to the homeowners association.

16. To the extent the Estates retain these interests in the "common land", it would unnecessarily expose them (and the Liquidating Trust) to unknown and potentially detrimental liabilities that would deplete any value, thereby harming the creditors' interests. The Debtors have reached out to the homeowners associations for each of these developments, and neither these associations nor the developers have been willing to assume control of the Debtors' interests in the common lands. These parcels do not have any economic value to the Estates, either now or in the future.

E. **HELOCs**

17. Before the Petition Date, the Debtors maintained a held-for-investment portfolio of HELOCs on their consolidated balance sheet, which is derived from either loan purchases from Ally Bank, origination of the loan by the Debtors prior to the financial crisis, loan purchases from other sellers, or repurchases of loans out of securitization trusts as a result of a breach or breaches of loan-level representations and warranties made in the loan purchase agreement. Currently, there are no unpaid balances owing to the Debtors on these HELOCs; however, the funding commitment period for the HELOCs has not yet expired (i.e., typically, a borrower has ten years from inception to draw on the line, but certain loans are structured with draw periods throughout the terms of the loan). There are approximately ten thousand two hundred HELOCs in the Debtors' loan portfolio as of November 30, 2013. The HELOCs have no value to the Debtors. These assets were excluded from the sale to Berkshire Hathaway at the request of Berkshire, and since then, the Debtors have been unable to obtain value for them.

18. The Debtors commenced these Chapter 11 cases with a modest amount of unencumbered cash. With the Court's authority under the HELOC Suspension Order, during the initial stage of these cases, the Debtors sent notices to parties-in-interest advising them of the Debtors' intent to suspend any further funding of their credit lines. As part of the asset sales earlier this year, the Debtors included this portfolio of zero balance home equity loans among the assets interested buyers could bid on; however, third parties, such as Berkshire Hathaway (which excluded such assets from its purchase) were not interested in bidding on this loan portfolio. Subsequent to the asset sales, the Debtors sought out other parties-in-interest to acquire this loan portfolio, but such marketing efforts did not yield an interested party to acquire the Debtors' interest in the HELOCs. Despite the Debtors' best efforts and extensive marketing, the Debtors were unable to transfer the HELOCs to a new lender.

19. The HELOC borrowers who received notice of the Debtors' intent to suspend funding at the outset of these Chapter 11 cases were also served with notice of the Bar Date and approximately twenty borrowers filed claims asserting damages relating to the suspension of funding of the HELOCs (the Debtors and their successors will address such claims in due course pursuant to the terms of the Plan).

20. Absent the relief sought herein, GMACM would have to maintain its licenses and undertake significantly administrative costs associated with servicing the inactive HELOCs. Moroever, funding future draws for HELOCs on the Debtors' consolidated balance sheet is not feasible. As a result, the Debtors have concluded that HELOCS are inordinately burdensome and costly without adding any incremental value to the estates that inures to the benefit of creditors. Therefore, funding future draws for HELOCs on the Debtors' consolidated balance sheet is not feasible and would prejudice the Liquidating Trust.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 17, 2013

      /s/ William Tyson
William Tyson
Chief Asset Disposition Officer
Residential Capital, LLC and its affiliates