**Hearing Date and Time: January 30, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: January 15, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

SHEARMAN & STERLING LLP
Fredric Sosnick
William J.F. Roll III
Edmund M. Emrich
599 Lexington Avenue
New York, New York 10022
Telephone:    (212) 848-4000
Facsimile:    (212) 848-7179

*Counsel for Citibank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF HEARING ON MOTION OF CITIBANK, N.A. FOR AN ORDER
(I) DETERMINING THAT IT IS ENTITLED TO POST-PETITION INTEREST ON
ITS OVERSECURED MSR FACILITY CLAIMS AT THE CONTRACTUAL
DEFAULT RATE, AND (II) DIRECTING DEBTORS TO PAY SUCH INTEREST AS
WELL AS CITIBANK'S DUE AND UNPAID COUNSEL FEES AND EXPENSES**

**PLEASE TAKE NOTICE** that a hearing on the annexed *Motion of Citibank, N.A. for an*

*Order (I) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR*

*Facility Claims at the Contractual Default Rate, and (II) Directing Debtors to Pay Such Interest*

*as Well as Citibank's Due and Unpaid Counsel Fees and Expenses* (the "**Motion**") will be held

on **January 30, 2014 at 10:00 a.m. (Prevailing Eastern Time)** before the Honorable Martin

Glenn, at the United States Bankruptcy Court for the Southern District of New York, Alexander

Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case Management and Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], to be filed electronically by registered users of the Bankruptcy Court's electronic case filing system, and be served, so as to be received no later than **January 15, 2014 at 4:00 p.m. (Prevailing Eastern Time)** upon (a) counsel for Citibank, N.A., Shearman & Sterling, LLP. 599 Lexington Avenue, New York, NY 10022 (Attention: Fredric Sosnick & Edmund M. Emrich); (b) Citibank, N.A., Secured Lender under Mortgage Servicing Rights Facility, 390 Greenwich Street, 6th Floor, New York, NY 10013 (Attention: Bobbie Theivakumaran); (c) Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Rifkin & Brian S. Masumoto); (d) Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, DC 20530-0001 (Attention: U.S. Attorney General, Eric H. Holder, Jr.); (e) Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord & Enid M. Stuart); (f) Office of the United States Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: U.S. Attorney Preet Bharara); (g) United States Attorney's Office for the Southern District of New York Civil Division, 86 Chambers Street, 3rd Floor, New York, NY 10007 (Attention: Joseph Cordaro & Cristine Irvin Philips); (h) counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Larren M. Nashelsky, Gary S. Lee, Lorenzo Marinuzzi, Kayvan B. Sadegui & Tammy Hamzehpour); (i) counsel to the Official Committee of Unsecured Creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas,

New York, NY 10036 (Attention: Kenneth H. Eckstein, Thomas Moers Mayer, Douglas H. Mannal & Jeffrey Trachman); (j) co-counsel to Ad Hoc Group of Junior Secured Noteholders, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005 (Attention: Gerard Uzzi); (k) special counsel to Wilmington Trust National Association, as Indenture Trustee to Various Series of Unsecured Notes, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006 (Attention: Sean A. O'Neal & Thomas J. Moloney); (l) counsel to Wilmington Trust N.A., as Indenture Trustee, Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154 (Attention: Walter H. Curchack, Vadim J. Rubinstein & Debra W. Minoff); (m) counsel to UMB Bank, N.A., Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (Attention: James S. Carr & Eric R. Wilson); (n) Wells Fargo Bank N.A., GMEN Indenture Trustee, P.O. Box 98, Columbia, MD 21046 (Attention: Corporate Trust Services - GMACM Home Equity Notes 2004 Variable Funding Trust); (o) The Bank of New York Mellon, Indenture Trustee under the Pre-Petition GSAP Facility, 101 Barclay Street 4W, New York, NY 10286 (Attention: Asset-Backed Securities Group); (p) counsel to Ally Financial & Ally Bank, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY, 10022-4611 (Attention: Richard M. Cieri, Ray C. Schrock & Stephen E. Hessler); (q) counsel to Ocwen Loan Servicing LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco & Adam Lesman); (r) Internal Revenue Service, Centralized Insolvency Operation, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, 2970 Market Street, Philadelphia, PA 19104) & Insolvency Section, 31 Hopkins Plz, Room 1150, Baltimore, MD 21201; (s) Securities & Exchange Commission, Attention: Secretary of the Treasury, 100 F Street N.E., Washington, DC 20549; (t) Securities & Exchange Commission New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S.

Canellos, Regional Director) and (u) Kurtzman Carson Consultants, Claims & Noticing Agent,

2335 Alaska Avenue, El Segundo, CA 90245 (Attention: P. Joe Morrow).

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written

objection to the relief requested in the Motion, the Bankruptcy Court may deem any opposition

waived, treat the Motion as conceded, and enter an order granting the relief requested in the

Motion without further notice or hearing.

SHEARMAN & STERLING LLP

*/s/ Fredric Sosnick*_____
Fredric Sosnick
William J.F. Roll, III
Edmund M. Emrich
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile:  (212) 848-7179

*Counsel for Citibank, N.A.*

**Hearing Date and Time:  January 30, 2014 at 10:00 a.m. (Prevailing Eastern Time)**

**Objection Deadline:  January 15, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

SHEARMAN & STERLING LLP
Fredric Sosnick
William J.F. Roll, III
Edmund M. Emrich
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 484-4000
Facsimile:  (212) 484-7179

*Counsel for Citibank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**MOTION OF CITIBANK, N.A. FOR AN ORDER (I) DETERMINING THAT IT IS ENTITLED TO POST-PETITION INTEREST ON ITS OVERSECURED MSR FACILITY CLAIMS AT THE CONTRACTUAL DEFAULT RATE, AND (II) DIRECTING DEBTORS TO PAY SUCH INTEREST AS WELL AS CITIBANK'S DUE AND UNPAID COUNSEL FEES AND EXPENSES**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................2

JURISDICTION AND VENUE .........................................................................................3

BACKGROUND .................................................................................................................3

RELIEF REQUESTED .......................................................................................................7

ARGUMENT ......................................................................................................................8

A.    Citibank is Entitled to Post-Petition Interest at the Contractual Default Rate ....................8

       **1.**    Application of the Contractual Default Rate is Not Inequitable and
          Would Not Have a Meaningful  Impact on the Unsecured Creditors........12

       2.    The Contractual Default Interest Rate Does Not Constitute a Penalty ......15

B.    Citibank Is Entitled to Payment of Its Legal Fees and Expenses ........................................16

CONCLUSION .................................................................................................................18

EXHIBITS:

Exhibit A: Amended and Restated Loan and Security Agreement, dated as of June 30, 2010

Exhibit B: Amendment Number Ten (to Credit Agreement)

Exhibit C: Proposed Order

# TABLE OF AUTHORITIES

## Cases

*Butner v. U.S.*, 440 U.S. 48 (1979) ............................................................ 8

*General Elec. Capital Corp. v. Future Media Productions Inc.*, 536 F.3d 969 (9th Cir. 2008) .... 9

*In re 785 Partners LLC*, 470 B.R. 126 (Bankr. S.D.N.Y. 2012) ........................... 10, 11-12, 13, 16

*In re Lapiana*, 909 F.2d 221 (7th Cir. 1990) ....................................... 10, 12-13

*In re Liberty Warehouse Assocs.*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998) .................................. 16

*In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189 (Bankr. S.D.N.Y. 2012) ...................... 13, 15

*In re P.G. Realty Co.*, 220 B.R. 773 (Bankr. E.D.N.Y. 1998) ......................................... 10

*In re Terry Ltd. P'ship*, 27 F.3d 241 (7th Cir.1994), *cert. denied sub nom.*,
    *Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa*, 513 U.S. 948 (1994) ................ 11, 12

*In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002) ...................... 16

*In re Vest Assocs.*, 217 B.R. 696 (Bankr. S.D.N.Y. 1998) ................................. 13, 15, 16

*Key Bank NA v. Milham (In re Milham)*, 141 F.3d 420 (2d Cir. 1998) ...................................... 10

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) .......................................... 8

*Rake v. Wade*, 508 U.S. 464 (1993) ........................................................... 9

*Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15 (2000) ........................................... 8

*Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) ......................................... 15-16

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007) .................... 8, 9

*U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) ............................. 9, 11, 12, 13

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) .......................................................................... 9, 12

*Urban Communicators PCS LP v. Gabriel Capital, LP*, 394 B.R. 325 (S.D.N.Y. 2008) ...... 10, 13

## Statutes

11 U.S.C. § 506(b) ............................................................................ *passim*

28 U.S.C § 1334 ............................................................................... 3

28 U.S.C. § 1409 .............................................................................. 3

28 U.S.C. § 157 ............................................................................... 3

28 U.S.C. § 157(b)(2) ......................................................................... 3

## Rules

Federal Rule of Bankruptcy Procedure 3012 .................................................... 3

Federal Rule of Bankruptcy Procedure 9013 .................................................... 3

Federal Rule of Bankruptcy Procedure 9014 .................................................... 3

Local Bankruptcy Rule 9013-1 ................................................................. 3

## Treatises

4 *Collier on Bankruptcy* ¶ 506.04[2][b][ii] (15th Ed. 1996) ................................. 9

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

      Citibank, N.A. ("**Citibank**") respectfully submits this motion (this "**Motion**") for the entry of an order (i) determining that Citibank is entitled to post-petition interest at the contractual default rate with respect to its oversecured claims relating to the Citibank MSR Facility (as defined below) and (ii) directing the Debtors to pay the contractual default interest as well as Citibank's due and unpaid counsel fees and expenses, and respectfully represents as follows:

**PRELIMINARY STATEMENT**

      1.    Citibank, as an oversecured creditor, is entitled, under section 506(b) of the Bankruptcy Code, to the benefit of its contractual bargain through the receipt of post-petition interest at the contractual default rate under the Citibank MSR Facility. Supreme Court precedent is clear that the substantive rights of a claimant are defined by applicable non-bankruptcy law, absent qualifying or contrary language in the Bankruptcy Code. With respect to the payment of post-petition default interest to an oversecured creditor, like Citibank, no such qualifying or contrary language exists in section 506(b) or any other section of the Bankruptcy Code.

      2.    Despite the clear legal basis for Citibank's claim for post-petition default interest, the Debtors, to date, have been attempting to eviscerate Citibank's bargained-for rights by refusing to pay the post-petition default interest owing to Citibank. The basis for the Debtors' position seems to lie in their mistaken belief that a bright line test exists that prevents a bankruptcy court from awarding post-petition default interest to an oversecured creditor if the estate does not have sufficient assets to provide a full recovery to unsecured creditors. Such a bright line test does not exist, and a bankruptcy court's ability to rely upon equitable principles in

2

applying section 506(b) is extremely limited. Even if the Court were to apply an equitable test, there is a strong legal presumption that the contract rate of interest contained in the Citibank MSR Facility applies, and the Debtors cannot satisfy their burden of proving facts sufficient to overcome that presumption because the actual impact on unsecured creditors would be virtually nil and, in any event, would be far less than the relative harm that Citibank would suffer if it were to be deprived of the benefits of its contractual bargain.

3.    Lacking a legal basis to withhold payment of post-petition default interest with respect to the Citibank MSR Facility, the Debtors should be ordered to pay such interest to Citibank. Likewise, because Citibank has not been paid in full under the terms of the Citibank MSR Facility, the Debtors should be ordered to pay Citibank's unpaid counsel fees relating to these cases in accordance with the Final Citibank Cash Collateral Order (as defined below).

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this proceeding in this district is proper pursuant to 28 U.S.C. § 1409. The statutory basis for the relief requested herein is 11 U.S.C. § 506(b), as supplemented by Rules 3012, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 9013-1.

## BACKGROUND

5.    On May 14, 2012 (the "**Petition Date**"), the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). On May 16, 2012, the United States Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**").

6.      Prior to the Petition Date, Citibank entered into a secured revolving credit facility (the "**Citibank MSR Facility**"), dated June 30, 2010, with GMAC Mortgage, LLC ("**GMACM**"), as borrower, and Residential Capital, LLC ("**ResCap**"), as guarantor, a copy of which is annexed hereto as Exhibit A (the "**Original Credit Agreement**"). The Original Credit Agreement was amended by several different amendments, the last of which was Amendment No. 10 to Credit Agreement ("**Amendment 10**" and, together with the Original Credit Agreement and all other amendments thereto, the "**Credit Agreement**"), a copy of which is annexed hereto as Exhibit B.

7.      The Citibank MSR Facility was secured by certain mortgage servicing rights (the "**MSRs**") with respect to mortgage loans in Freddie Mac and Fannie Mae securitization pools and the proceeds thereof (respectively, the "**Freddie Mac MSRs**" and the "**Fannie Mae MSRs**"). The outstanding principal amount under the Citibank MSR Facility as of the Petition Date was approximately $152 million.[1]

8.      Pursuant to the terms of the Credit Agreement,[2] the non-default interest rate was LIBOR plus 8.5%. An Event of Default occurred upon the filing of the Debtors' bankruptcy petitions (*see* Credit Agreement, § 8.01(q)), thus triggering a Default Rate of 4% above the non-default rate (*see Credit Agreement, Schedule I* (definition of "Default Rate").

9.      In order to facilitate the Debtors' reorganization efforts, Citibank entered into a consensual arrangement for the Debtors' use of Citibank's cash collateral with respect to the Citibank MSR Facility. On June 20, 2013, following a hearing, the Court issued its *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, and (III)*

---

[1]      Citibank is not aware of any factual disputes with regard to this Motion.

[2]      *See* Amendment 10 at p. 4 (definition of "Applicable Margin").

*Modifying the Automatic Stay* [Docket No. 471] (the "**Final Citibank Cash Collateral**

**Order**").[3]  Pursuant to the Final Citibank Cash Collateral Order, which is now final and non-

appealable, the Court found, *inter alia*, that "in light of the Prepetition MSR Obligations and the

value of the MSR Prepetition Collateral with respect thereto, Citibank is oversecured and,

accordingly, is entitled to interest and fees with respect to the Prepetition MSR Obligations in

accordance with the Prepetition MSR Credit Documents." *Final Citibank Cash Collateral

Order*, ¶ G.(iv) at 5.[4]

        10.     Pursuant to the Final Citibank Cash Collateral Order, the Debtors were

required to make Adequate Protection Payments[5], including "(i) payments of interest on the

Prepetition MSR Obligations at the non-default rate set forth in the Prepetition MSR Agreement,

(ii) any fees of Citibank pursuant to the Prepetition MSR Agreement payable at the times

specified in the Prepetition MSR Agreement, and (iii) ongoing payment of the reasonable fees,

costs and expenses of Citibank, including, without limitation, the payment of the reasonable fees

and expenses of legal and other professionals retained by Citibank in accordance with Paragraph

11 hereof." *Final Citibank Cash Collateral Order*, ¶ 6(a) at 12.  The Final Citibank Cash

Collateral Order also required the Debtors to "seek authority in any order approving the sale of

the Prepetition MSR Collateral to provide that the net proceeds of such sale shall be applied by

---

[3]     On May 15, 2012, the Court issued an interim order governing the Debtors' use of Citibank's cash collateral. *See Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* [Docket No. 79].

[4]     The findings in the Final Citibank Cash Collateral Order were made subject to a 120-day Challenge Period granted to the any Statutory Committee (*i.e.*, the Creditors' Committee) and certain third parties.  No Challenge was ever made within the Challenge Period.

[5]     All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Final Citibank Cash Collateral Order or the Disclosure Statement (as defined below), as applicable.

the Debtors to repay the Obligations under the Prepetition MSR Credit Documents" (the

"**Collateral Sale Requirement**"). *Id.* ¶ H at 8.[6]

11.    By Order dated November 21, 2012, the Court approved the sale of the

Debtors' mortgage originations and servicing platform to Ocwen Loan Servicing LLC

("**Ocwen**") and its designee, Walter Investment Management Corp. ("**Walter**"), pursuant to

section 363 of the Bankruptcy Code (the "**Ocwen Sale Order**") [Docket No. 2246].  Consistent

with the Collateral Sale Requirement, the Ocwen Sale Order stated that "provided that the

Agency Interests are satisfied through the Sale, the Debtors are authorized and directed to apply

the net proceeds of the Sale attributable to the Prepetition MSR Collateral to repay the

Obligations under the Prepetition MSR Credit Documents." Ocwen Sale Order, ¶ 39.

12.    On January 31, 2013, the Debtors completed that portion of the sale of their

mortgage servicing portfolio that was designated for Walter (the "**Walter Sale**"), which

included the Fannie Mae MSRs.  Through the sale, certain specified interests of Fannie Mae

were satisfied, and as a result, the under terms of the Final Citibank Cash Collateral Order, the

Debtors were obligated to satisfy the Obligations under the Citibank MSR Facility – which

included "the Outstanding Aggregate Loan Amount, all accrued interest thereon and all other

amounts payable by the Borrower . . ."[7] -- from the net proceeds of the sale.

13.    At the time of the Walter Sale, Citibank advised the Debtors that among the

"Obligations" due to Citibank were the $152 million principal balance of its claim and unpaid

interest under the Credit Agreement, including accrued but unpaid contractual default rate

interest in the amount of $4,489,698.52 (as of January 31, 2012, the "**Accrued Default**

---

[6]    The term "Obligations," as used in the Prepetition MSR Credit Documents, includes "the Outstanding
Aggregate Loan Amount, all accrued interest thereon and all other amounts payable by the Borrower to the
Lender." *Credit Agreement, Schedule I.*

[7]    *Id.*

6

Interest"). Without disputing the fact that the Accrued Default Interest was an Obligation, the

Debtors informed Citibank that they would not agree to the payment thereof. In order to avoid

any interference with the closing of the Walter Sale or the Debtors' restructuring efforts, the

Debtors and Citibank agreed, among other things, that (i) Citibank would be paid the $152

million outstanding principal amount at the closing, together with post-petition interest at the

contractual non-default rate, (ii) the default interest issue would be left for later resolution or

determination, and (iii) the parties would continue to abide by the terms of the Final Citibank

Cash Collateral Order and all rights thereunder would be fully preserved. In or around June

2013, the Debtors breached that agreement by ceasing to pay Citibank's legal fees, as required

by the Final Citibank Cash Collateral Order.

14.    Citibank's default interest claims under the Citibank MSR Facility

(collectively, the "**Default Interest Claims**") are asserted against GMACM, as borrower (the

"**GMACM Claim**"), and ResCap, as guarantor (the "**ResCap Claim**"). No objection has ever

been filed by the Debtors or any other party to the allowance of the Default Interest Claims.[8]

**RELIEF REQUESTED**

15.    Citibank seeks the issuance of an order (i) determining that, as an

oversecured creditor, it is entitled, under section 506(b) of the Bankruptcy Code, to receive post-

petition interest at the contractual default rate, and (ii) directing the Debtors to pay the

---

[8]    On July 3, 2013, the Debtors filed their *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (as amended, the "**Plan**") [Docket No. 4153]. On July 4, 2013, the Debtors filed their *Disclosure Statement for the Joint Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (as amended, the "**Disclosure Statement**") [Docket No. 4157]. The Disclosure Statement, as approved by the Court on August 23, 2013, describes in general terms the dispute between Citibank and the Debtors and the manner in which the Debtors proposed to address it in their Plan if it was not otherwise resolved (*i.e.*, as an Allowed Other Secured Claim to the extent allowed, and as a Disputed Claim pending resolution or determination). Disclosure Statement at pp. 55 & 71 [Docket No.4819-1]. The Plan was confirmed on December 11, 2013. *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6065].

contractual default interest as well as Citibank's claim for all due and outstanding legal fees and

expenses that have been invoiced to the Debtors in accordance with the Citibank Final Cash

Collateral Order.

## ARGUMENT

### A.      Citibank is Entitled to Post-Petition Interest at the Contractual Default Rate

16.      The Supreme Court in *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas &*

*Elec. Co.* made clear "the settled principle that '[c]reditors' entitlements in bankruptcy arise in

the first instance from the underlying substantive law creating the debtor's obligation, subject to

any qualifying or contrary provisions of the Bankruptcy Code.'" 549 U.S. 443, 450 (2007)

(quoting *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000)); *accord Norwest Bank*

*Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the

bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

In *Travelers*, the Supreme Court found that it has "long recognized that the '"basic federal rule"'

in bankruptcy is that state law governs the substance of claims, Congress having 'generally left

the determination of property rights in the assets of a bankrupt's estate to state law.'" *Id.*

(quoting *Butner v. U.S.*, 440 U.S. 48, 57, 54 (1979)). The Supreme Court further noted that "we

generally presume that *claims enforceable under applicable state law will be allowed in*

*bankruptcy unless they are expressly disallowed.*" *Id.* at 452 (emphasis added).

17.      Section 506(b) provides that "[t]o the extent that an allowed secured claim

is secured by property the value of which, after any recovery under subsection (c) of this section,

is greater than the amount of such claim, there shall be allowed to the holder of such claim,

interest on such claim, and any reasonable fees, costs or charges provided under the agreement

under which such claim arose." 11 U.S.C. § 506(b). Notably, section 506(b), which itself

provides no authority to disregard an oversecured creditor's state law rights with regard to

8

interest, makes no distinction with regard to pre-petition or post-petition interest, and makes no

distinction between ordinary and default interest.

18.     In *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989), the Supreme

Court ruled that an oversecured creditor holding a non-consensual lien was entitled under section

506(b) to receive post-petition interest even though the debtor's estate was insolvent. The

Supreme Court found that "[a]lthough the payment of postpetition interest is arguably in tension

with the desirability of paying all creditors as uniformly as practicable, ***Congress expressly***

***chose to create that alleged tension***." *Id.* at 245-46 (emphasis added). In *Rake v. Wade*, the

Supreme Court summarized its previous holding as follows: "[i]n *Ron Pair* we held that the

right to postpetition interest under § 506(b) is 'unqualified' . . . ." 508 U.S. 464, 468 (1993).

This is consistent with the Supreme Court's recognition in *United Savings Assoc. of Texas v.*

*Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988), that section 506(b) gives an

oversecured creditor priority over unsecured creditors to the extent of its equity cushion. *Id.* at

374.

19.     In *General Elec. Capital Corp. v. Future Media Productions Inc.*, 536 F.3d

969 (9th Cir. 2008), a case, which (like the present one) involved the issue of whether an

oversecured creditor is entitled to default interest at the contract rate under section 506(b) of the

Bankruptcy Code, the U.S. Court of Appeals for the Ninth Circuit found that the simply stated

rule is that a "bankruptcy court should apply a presumption of allowability for the contracted for

default rate 'provided that the rate is not unenforceable under applicable nonbankruptcy law.'"

*Id.* at 974 (quoting 4 *Collier on Bankruptcy* ¶ 506.04[2][b][ii] (15th Ed. 1996)). Following the

mandate of *Travelers*, the Ninth Circuit based its conclusion upon a finding that there was no

contrary Bankruptcy Code provision that qualifies the enforceability of a contractual default rate

in the context of post-petition interest being awarded to a secured creditor whose collateral was

sold in an asset sale under section 363 of the Bankruptcy Code. *Id.* Accordingly, the Court of

Appeals held that "the parties' arms length bargain, governed by New York law, controls." *Id.*

   20.  As the foregoing makes clear, to the extent that bankruptcy courts can

exercise equitable powers at all with respect to an oversecured creditor's claim for default

interest, they are constrained by the tension that Congress intentionally created in section 506(b).

The limitation on the use of equitable powers in respect of section 506(b) interest claims was

well summarized by the Seventh Circuit in *In re Lapiana*, 909 F.2d 221 (7th Cir. 1990), which

held that "Creditors have rights, among them the right of oversecured creditors to post-petition

interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity." *Id.*

at 223-24. Similarly, the Second Circuit, while holding that equitable principles can sometimes

be used by bankruptcy courts to override the contractual rate of post-petition interest, noted that

the bankruptcy courts have only "limited discretion" to do so and that most courts in fact apply

the contractual rate. *Key Bank N.A. v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998).

*See also Urban Communicators PCS LP v. Gabriel Capital, LP*, 394 B.R. 325, 338 (S.D.N.Y.

2008) (holding that "the Court should be ***loathe to exercise*** [general equitable powers under

section 506(b)] in the absence of compelling evidence that recognition of a right created by state

statute or private agreement would do violence to the principles which constitute the foundation

of bankruptcy law'") (quoting *In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998)

(emphasis added)); *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) ("[t]he

power to modify the contract rate based upon notions of equity should be ***exercised sparingly...***")

(emphasis added).

21.    Under facts analogous to the present dispute, the Seventh Circuit affirmed

the grant to an oversecured creditor of default interest at the contract rate, despite the fact that the

estate was insolvent and other creditors (including a junior undersecured creditor) would get no

recovery. *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir.1994), *cert. denied sub nom., Invex

Holdings, N.V. v. Equitable Life Ins. Co. of Iowa,* 513 U.S. 948 (1994).  In *Terry*, the Seventh

Circuit affirmed the bankruptcy court's award of contractual interest to a second lien creditor at

17.25% -- inclusive of an incremental 3% default rate -- based upon the bankruptcy court's

finding that "'[t]here is nothing equitable . . . in diminishing one creditor's bargained for rights in

order to augment the rights bargained for by a second creditor.'" *Id.* at 243 (quoting bankruptcy

court).  The Seventh Circuit found that although many courts have construed *Ron Pair* to require

analyzing default rates based upon the facts and equities of the case, "[c]reditors have a right to

bargained-for post-petition interest and 'bankruptcy judges are not empowered to dissolve rights

in the name of equity.'"  *Id.* (citation omitted).

22.    An important underpinning of the Seventh Circuit's decision in *Terry* was

the conclusion that, there would be "nothing equitable" about depriving a senior creditor of the

fullest extent of its contract rights in order to make a distribution to junior creditors, even if it

meant that junior creditors would receive no recovery. *Id.* at 245.  Accordingly, the only

equitable inquiry performed by the Seventh Circuit was whether the 3% default interest rate was

so high as to be unreasonable, which the court concluded it was not. *Id.* at 244.

23.    When considering whether to award post-petition default interest, some

courts in this district go beyond *Terry* and look at certain equitable factors in addition to the

quantum of the default rate.  For example, Judge Bernstein held in *785 Partners* that "[t]he

power to modify the contract rate based upon notions of equity should be exercised sparingly and

11

limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *785 Partners*, 470 B.R. at 134 (emphasis added) (citations omitted). Judge Bernstein emphasized, however, that "the debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition." *Id.* (citations omitted).

### 1. Application of the Contractual Default Rate is Not Inequitable and Would Not Have a Meaningful Impact on the Unsecured Creditors

24.    The Debtors no doubt will contend that their estates have insufficient assets to pay unsecured creditors in full and thus it would be inequitable to allow Citibank to collect the contractual default interest. As described in greater detail below, such an argument would be wholly unavailing.

25.    The fact that oversecured creditors recover the full amount due them under their contracts, even though unsecured creditors may recover less than 100% on their claims, is a function of the priority scheme upon which the entire bankruptcy process (as well as state law) is based, not an indication that an inequity has occurred. *See, e.g., Ron Pair*, 489 U.S. at 244 (finding that "Congress expressly chose to create [the] alleged tension" between the oversecured creditor and unsecured creditors); *Timbers of Inwood,* 484 U.S. at 374 (section 506(b) gives an oversecured creditor priority over unsecured creditors to the extent of its equity cushion); *Terry,* 27 F.3d at 244 (finding "nothing equitable" about redistributing sale proceeds from the senior secured creditor to the junior secured creditor); *Lapiana*, 909 F.2d at 223-24 ("Creditors have rights, among them the right of oversecured creditors to post-petition interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity."). In the words of the Seventh Circuit in *Lapiana*, "the idea behind section 506(b) . . . is that until the secured

12

creditor's claim plus interest on it has eaten up the entire value of the security[,] the payment of

that interest does not infringe the reasonable expectations of any other creditor." *Id.* at 223.

Indeed, it is unreasonable for an unsecured creditor to expect to get paid anything from the

proceeds of an oversecured creditor's equity cushion in its collateral unless the oversecured

creditor is assured of collecting everything due it under applicable non-bankruptcy law.

      26.     It is hardly a novel concept that payments to secured creditors with respect

to distributions from the proceeds of their collateral come before payments to unsecured

creditors . *See Ron Pair*, 489 U.S. at 242-43 (holding that allowing post-petition interest on a

non-consensual lien "does not does not conflict with any other section of the Code, or with any

important state or federal interest; nor is a contrary view suggested by the legislative history.").

Default interest is no different from regular interest in that regard, because *any* interest that an

oversecured creditor collects from an insolvent debtor has *some* impact on unsecured creditor

distributions; yet section 506(b) *mandates* payment of interest to oversecured creditors and does

not distinguish between default and regular interest.  Although the rate may be higher for default

interest than it is for regular interest, it would be illogical to conclude that such a distinction

matters in the section 506(b) analysis when section 506(b) itself makes no such distinction.  If

Congress had wanted the focus of the section 506(b) analysis to be the impact on unsecured

creditor distributions, it certainly could have so provided, but it did not.

      27.     Even if, as some case law in this district suggests,[9] consideration of harm

that the unsecured creditors allegedly would suffer in terms of reduced recoveries were relevant,

any theoretical harm here would be miniscule, and certainly not sufficient to overcome the

---

[9]    *See, e.g., Urban Communicators*, 394 B.R. at 340; *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 199
(Bankr. S.D.N.Y. 2012); *785 Partners*, 470 B.R. at 134; *In re Vest Assocs.*, 217 B.R. 696, 703 (Bankr.
S.D.N.Y. 1998).

presumption that the oversecured creditor's bargained-for contractual rights should be respected.

According to the Disclosure Statement, holders of allowed GMACM Unsecured Claims against

the GMACM Debtors (against which Citibank is asserting the GMACM Claim), which are

estimated to be $2,205.07 million in the aggregate, are expected to receive a distribution of

between 26.0% and 34.7% based upon a distributable pot of $665.9 million. Moreover, holders

of allowed ResCap Unsecured Claims against the ResCap Debtors (against which Citibank is

asserting the ResCap Claim), which are estimated to be $2,060.44 million in the aggregate, are

expected to receive a distribution of between 31.5% and 41.9% based upon a distributable pot of

$748.8 million.[10] *See* Disclosure Statement at pp. 10-12 & 44. Citibank's approximately $4.5

million claim for contractual default interest pales in comparison to the *$1.147 billion* that the

Debtors are projecting to distribute to the unsecured creditors of the GMACM Debtors and the

ResCap Debtors, and, therefore, allowing Citibank's default interest claim in full would have

only a miniscule impact on their recovery (*i.e.,* approximately 0.1%). Accordingly, this is not a

case in which the allowance of default interest would inhibit the unsecured creditors from

receiving any recovery or even a meaningful recovery. Indeed, the projected distributions to the

unsecured creditors are quite substantial.

       28.    Given the lack of actual harm that would be suffered by unsecured

creditors, disallowing default interest under the facts here would necessitate that the Court adopt

a *per se* rule against paying default interest in a case where unsecured creditors are not being

---

[10]    Since Citibank's Default Interest Claims are asserted against both GMACM and ResCap, the pools of
distributable assets under the Plan of both the GMACM Debtors and the ResCap Debtors must be included
in the analysis, but to prevent double-counting, the payment of approximately $4.5 million to Citibank must
be included only once for purposes of this analysis. Moreover, since the Plan provides no indication how
the Debtors would allocate responsibility, as between the GMACM Debtors and the ResCap Debtors, for
paying Citibank's Default Interest Claims, Citibank is using a blended distribution percentage based upon
the combined distributable assets and the combined unsecured claims obligations of the GMACM Debtors
and the ResCap Debtors.

paid in full. No case has ever suggested, however, that such a *per se* rule exists. In *In re Madison 92nd St. Assocs.*, Judge Bernstein, in a case involving the request of an oversecured judgment lien creditor for interest at the judgment rate applicable under state law rather than at the federal judgment rate, made clear that a *per se* rule with regard to insolvency does not exist under section 506(b):

> This is not intended to imply that a court should adjust the "contract rate" simply because the debtor is insolvent and the unsecured creditors will not be paid in full if at all. Most chapter 11 cases involve insolvent debtors, and such an exception would swallow up the rule that the oversecured creditor is presumptively entitled to the "contract rate."

472 B.R. at 200 n. 7. The same logic applies in a default interest situation.

## 2.    The Contractual Default Interest Rate Does Not Constitute a Penalty

29.    Contractual default interest does not constitute a penalty under New York law. *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("A variable interest provision in event of a stated default . . . is not a penalty, nor should it be considered unconscionable."); *accord 785 Partners*, 126 B.R. at 131-32 & 135 ("under New York law, a variable interest rate that increases following a default is not a penalty"). The purpose of a default interest rate is to compensate the secured creditor for the unknown expenses and the inconvenience in monitoring payments in the event of a default. *In re Vest Assocs.*, 217 B.R. at 701. Accordingly, in *Ruskin*, the Second Circuit recognized that having a default rate specified in a loan agreement could be beneficial for the debtor, because a specified default rate may allow a borrower

> to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

*Ruskin*, 269 F.2d at 832 .[11]

   30. In the absence of a default rate constituting an inordinately high penalty or

violating applicable non-bankruptcy law, there ordinarily is no cause for a bankruptcy court to go

any further and examine the reasonableness of the rate. The 4% spread over the non-default that

was charged under the Citibank MSR Facility is reasonable and, in fact, is below the rates

approved in other cases in this district. *See, e.g., In re Liberty Warehouse Assocs.*, 220 B.R. 546,

552 (Bankr. S.D.N.Y. 1998) (finding that the 8.8% spread between the non-default and default

rate of interest was "smaller than the differential present in most cases where courts have found

the default rate to be a penalty); *Vest Assocs.*, 217 B.R. at 703 ("a differential of 5% certainly

falls within the range of reasonableness"); *see also In re Vanderveer Estates Holdings, Inc.*, 283

B.R. 122, 134 (Bankr. E.D.N.Y. 2002) ("the differential of 5% between the default and on-

default rates, are well within the range of default rates that have been allowed as reasonable

charges under 506(b)").

  **B.**  **Citibank Is Entitled to Payment of Its Legal Fees and Expenses**

   31. Section 8.02(c) of the Credit Agreement provides that "[a]ll out-of-pocket

costs incurred by [Citibank] in the collection of all Obligations, and the enforcement of its rights

hereunder, including reasonable attorneys' fees and legal expenses, shall be paid out of the

Collateral." As discussed above, the Final Citibank Cash Collateral Order reaffirms this right

and obligates the Debtors to pay Citibank's legal fees and expenses in accordance with the

procedures set forth therein. Additionally, the agreement entered into between the Debtors and

---

[11] In *785 Partners*, Judge Bernstein, in addressing the issue of prepetition interest at the default rate, also found that "[a] higher default interest rate reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee . . . ." 126 B.R. at 131.

Citibank immediately prior to the Walter Sale recognizes that the protections afforded by the Final Citibank Cash Collateral Order continue post-sale.

32.    Notwithstanding Citibank's rights under the Credit Agreement, the Final Citibank Cash Collateral Order and the agreement with respect to the closing of the Walter Sale, the Debtors, beginning with the April 2013 invoice, have stopped paying the monthly legal fees and expenses of Citibank's counsel, Shearman & Sterling LLP.  They have not done so on the basis that any of the fees are not reasonable, but apparently solely on the basis of an argument by the Creditors' Committee that because it believes Citibank is not entitled to post-petition default interest, Citibank has already been paid in full.  Such a position not only is incorrect because, as described above, Citibank has not yet been paid the post-petition default interest that it is entitled to receive, but it also improperly eviscerates the agreement reached between Citibank and the Debtors in conjunction with the closing of the Walter Sale.  Therefore, in addition to seeking a determination that the Default Interest Claims should be allowed in full and a direction that such claims should be paid (subject to a single satisfaction), Citibank seeks a direction from the Court that the Debtors be required to pay Citibank's claim for all due and outstanding legal fees and expenses that have been invoiced to the Debtors.

## CONCLUSION

Citibank respectfully requests that the Court enter an order, substantially in the form annexed hereto as Exhibit C, (i) allowing Citibank's Default Interest Claims in full, and (ii) directing the Debtors to pay the contractual default interest as well as Citibank's claim for all due and outstanding legal fees and expenses that have been invoiced to the Debtors in accordance with the Citibank Final Cash Collateral Order.

Dated:  New York, New York
December 23, 2013

SHEARMAN & STERLING LLP


*/s/ Fredric Sosnick*
Fredric Sosnick
William J.F. Roll, III
Edmund M. Emrich
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 484-4000
Facsimile:  (212) 484-7179

*Counsel for Citibank, N.A.*