<u>EXHIBIT A</u>

AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

dated as of June 30, 2010

among


GMAC MORTGAGE, LLC,
as Borrower,

RESIDENTIAL CAPITAL, LLC,
as Guarantor,

and

CITIBANK, N.A.,
as Lender

## Table of Contents

                                                                                              Page

BACKGROUND ................................................................................................................1

ARTICLE I DEFINITIONS AND ACCOUNTING MATTERS................................................1

    Section 1.01    Definitions; Construction. ....................................................................1
    Section 1.02    Accounting Matters. ............................................................................2

ARTICLE II LOANS, BORROWING, PREPAYMENT .........................................................2

    Section 2.01    Loans. ...................................................................................................2
    Section 2.02    Note. .....................................................................................................2
    Section 2.03    Borrower Electronic Files and Funding Requests. ..............................3
    Section 2.04    Borrowing Base Reports. .....................................................................5
    Section 2.05    Interest. .................................................................................................5
    Section 2.06    Increased Capital Costs. .......................................................................5
    Section 2.07    Alternate Rate of Interest. ....................................................................6
    Section 2.08    Mandatory Repayment of Loans. .........................................................6
    Section 2.09    Optional Prepayment ...........................................................................7
    Section 2.10    Reduction of Commitment Amount. ....................................................7

ARTICLE III PAYMENTS; COMPUTATIONS; TAXES; FEES ...........................................7

    Section 3.01    Payments and Computations, Etc. ........................................................7
    Section 3.02    Taxes. ...................................................................................................8
    Section 3.03    Fees and Expenses. ...............................................................................9

ARTICLE IV SECURITY INTEREST .................................................................................10

    Section 4.01    Security Interest. .................................................................................10
    Section 4.02    Provisions Regarding Pledge of Freddie Mac Servicing Rights and  Fannie
                    Mae Servicing Rights to Be Included In Financing Statements. .......10
    Section 4.03    Authorization of Financing Statements. .............................................11
    Section 4.04    Lender's Appointment as Attorney In Fact. .......................................11
    Section 4.05    [Reserved]. ..........................................................................................12
    Section 4.06    [Reserved]. ..........................................................................................13
    Section 4.07    [Reserved]. ..........................................................................................13
    Section 4.08    [Reserved]. ..........................................................................................13
    Section 4.09    Release of Security Interest. ...............................................................13

ARTICLE V CONDITIONS PRECEDENT .........................................................................13

    Section 5.01    Conditions Precedent...........................................................................13
    Section 5.02    Further Conditions Precedent. .............................................................13

ARTICLE VI REPRESENTATIONS AND WARRANTIES ..................................................13

    Section 6.01    Representations and Warranties of the Borrower. ..............................13
    Section 6.02    Representations Concerning the Collateral. ........................................17

ARTICLE VII COVENANTS .............................................................................................18

    Section 7.01    Affirmative Covenants of Borrower. ..................................................18

i

Section 7.02   Negative Covenants of the Borrower. ........................................24
Section 7.03   Notice of Certain Occurrences. .................................................26

ARTICLE VIII EVENTS OF DEFAULT ....................................................27
Section 8.01   Events of Default. ...................................................................27
Section 8.02   Remedies. ............................................................................30
Section 8.03   Collection Account; Application of Proceeds. ...............................31

ARTICLE IX ASSIGNMENT...................................................................32
Section 9.01   Restrictions on Assignments. ...................................................32
Section 9.02   Evidence of Assignment; Endorsement on Notes. ..........................32
Section 9.03   Rights of Assignee. .................................................................32
Section 9.04   Permitted Participants; Effect. ..................................................33
Section 9.05   Voting Rights of Participants. ...................................................33

ARTICLE X INDEMNIFICATION .............................................................33
Section 10.01  Indemnities by the Borrower. ...................................................33
Section 10.02  General Provisions. ................................................................34

ARTICLE XI MISCELLANEOUS ..............................................................34
Section 11.01  Amendments, Etc. ..................................................................34
Section 11.02  Notices, Etc. .........................................................................34
Section 11.03  No Waiver; Remedies. .............................................................35
Section 11.04  Binding Effect; Assignability. ....................................................35
Section 11.05  GOVERNING LAW; SUBMISSION TO JURISDICTION. .....................35
Section 11.06  Reserved. .............................................................................36
Section 11.07  Entire Agreement. ..................................................................36
Section 11.08  Acknowledgement. .................................................................36
Section 11.09  Captions and Cross References. .................................................36
Section 11.10  Execution in Counterparts. .......................................................36
Section 11.11  Confidentiality. ......................................................................36
Section 11.12  Survival. ..............................................................................36

**Schedules**

| | |
|---|---|
| Schedule I | Definition |
| Schedule 5.01 | Conditions Precedent to the Effectiveness of this Agreement |
| Schedule 5.02 | Conditions Precedent to each Loan |
| Schedule 6.02 | Eligibility Criteria with respect to the Mortgage Loans |
| Schedule 7.01(j) | Citibank, N.A. Required Investor Reports |
| Schedule 11.02 | Notices |

**Exhibits**

| | |
|---|---|
| Exhibit 2.02(a) | Form of Note |
| Exhibit 2.03 | Form of Borrower Funding Request |
| Exhibit 2.08(a) | Form of Repayment Notice |
| Exhibit 2.08(b) | Form of Prepayment Notice |
| Exhibit 4.08 | Reserved |

Exhibit 5.03          Reserved
Exhibit 7.01          Form of Compliance Certificate

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (as amended or supplemented from time to time, this "Agreement") dated as of June 16, 2010 is between GMAC MORTGAGE, LLC, a Delaware limited liability company, (the "Borrower"), RESIDENTIAL CAPITAL, LLC, a Delaware limited liability company, (the "Guarantor") and CITIBANK, N.A., a national banking association, (the "Lender").

This Amended and Restated Loan and Security Agreement amends and restates that certain Loan and Security Agreement, dated as of September 10, 2007, between the Borrower and the Lender (the "Previous Agreement"). This Amended and Restated Loan and Security Agreement is intended to be and shall be an amendment and restatement of the Previous Agreement and not a novation of such Previous Agreement.

## BACKGROUND

The Borrower wishes to obtain financing from time to time to provide funding for the origination or acquisition of certain Eligible Servicing Rights, which Eligible Servicing Rights shall secure Loans (as defined herein) to be made by the Lender hereunder.

The Lender has agreed, subject to the terms and conditions of this Agreement (as defined herein), to provide such financing to the Borrower.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01 Definitions; Construction.

(a) Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in Schedule I.

(b) All terms used in Article 9 of the UCC, and not specifically defined herein, are used herein as defined in such Article 9.

(c) Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

(d) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.

(e) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(f) The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall".

1

(g)    Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.02 <u>Accounting Matters</u>.  Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lender hereunder shall be prepared in accordance with GAAP.

## ARTICLE II

## LOANS, BORROWING, PREPAYMENT

Section 2.01 <u>Loans</u>.  On the terms and subject to the conditions set forth in this Agreement, the Lender (i) shall make loans in an aggregate amount not to exceed the Commitment Amount, and (ii) in the event that the Outstanding Aggregate Loan Amount is equal to the Commitment Amount, may, in its sole discretion, make loans on an uncommitted basis in an aggregate amount not to exceed the Uncommitted Amount (each loan under the preceding subclauses (i) and (ii), a "<u>Loan</u>") to the Borrower from time to time. The Lender shall distribute the proceeds of such Loan to the Borrower no later than 1:00 p.m. (New York City time) on the related Funding Date in accordance with Section 2.03.

Section 2.02 <u>Note</u>.

(a)    The Loans made by the Lender shall be evidenced by a single promissory note of the Borrower substantially in the form of Exhibit 2.02(a) hereto (the "<u>Note</u>"), dated the date hereof, payable to the Lender in a principal amount not to exceed an amount equal to the sum of the Commitment Amount plus the Uncommitted Amount as originally in effect and otherwise duly completed.

(b)    The date, amount, and interest rate of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of the Note, noted by the Lender on the grid attached to the Note or any continuation thereof, provided, that failure of the Lender to make any such recordation or notation shall not affect the obligations of the Borrower to make a payment when due of any amount hereunder or under the Note in respect of the Loans.

2

Section 2.03  Borrower Electronic Files and Funding Requests.

(a)    On any Funding Notice Date, the Borrower may request the Lender to make a Loan on the related Funding Date by delivering to the Lender an irrevocable Borrower Funding Request, a Book Value Report and the Subsequent Electronic File with respect to all Eligible Servicing Rights that constitute the Collateral under the terms and conditions of this Agreement no later than 3:00 p.m. (New York City time) on such Funding Notice Date. Separate Borrower Funding Requests shall be delivered with respect to Fannie Mae Servicing Rights and Freddie Mac Servicing Rights. The amount of any Loan requested pursuant to a Borrower Funding Request shall be not greater than the related Available Loan Amount.

Regardless of whether the Borrower intends to deliver a Borrower Funding Request during any calendar month, the Borrower shall deliver to the Lender on the tenth (10th) Business Day of each month (the "Collateral Reporting Date"), a Book Value Report and a Subsequent Electronic File with respect to all Eligible Servicing Rights that constitute the Collateral under the terms and conditions of this Agreement, which shall include all updates to the Collateral since the preceding Book Value Report and Subsequent Electronic File, respectively. Each Book Value Report shall set forth the Borrower's book value of all Eligible Servicing Rights that constitute the Collateral under the terms and conditions of this Agreement.

From the Borrower's delivery of the Book Value Report until such time as the Lender determines the Market Value of the Eligible Servicing Rights in a Borrowing Base Report, the Borrower may, at its option, request the Lender (and the Lender hereby agrees) to rely upon the Borrower's book value in its determination of the Collateral Value of the related Eligible Servicing Rights (such period, the "Borrower Valuation Period"). In the event that the book value on any Book Value Report differs from the book value on the prior Book Value Report, then the Lender shall utilize the most recent book value in its determination of Collateral Value during the Borrower's Valuation Period; *provided, however*, that the Lender shall not consider any increased book value identified on any Book Value Report that is over five percent (5%) from the prior Book Value Report. In Lender's determination of Collateral Value for either the Fannie Mae Servicing Rights or the Freddie Mac Servicing Rights hereunder, it shall apply the lesser of (i) with respect to the Fannie Mae Servicing Rights (A) the book value in the related Book Value Report for such Fannie Mae Servicing Rights or (B) Market Value of the Fannie Mae Servicing Rights in a related Borrowing Base Report (and the date of such determination will be deemed to be the conclusion of any related Borrower Valuation Period) and (ii) with respect to the Freddie Mac Servicing Rights (A) the book value in the related Book Value Report for such Freddie Mac Servicing Rights or (B) Market Value of the Freddie Mac Servicing Rights in a related Borrowing Base Report (and the date of such determination will be deemed to be the conclusion of any related Borrower Valuation Period). Any excess of the amount funded on such Loan over the Collateral Value (determined using the Market Value after the Borrower Valuation Period) shall result in a Borrowing Base Deficiency as set forth in Section 2.08(b).

On each Collateral Reporting Date, the Lender may make one (1) Loan on such date for each of the following: (a) the addition of new Collateral comprised of Freddie Mac Servicing Rights and (b) the addition of new Collateral comprised of Fannie Mae Servicing Rights. Notwithstanding anything to the contrary in the foregoing, the Borrower may, on a weekly basis, based upon an updated Book Value Report that it provides, request that the Lender recalculate the Collateral Value for the purpose of making one (1) Loan with respect to each of the Freddie Mac Servicing Rights and the Fannie Mae Servicing Rights then pledged as Collateral pursuant to the

3

terms and conditions of this Agreement (the "Weekly Request"). A Weekly Request shall not include the addition of any new Collateral. In connection with such Weekly Request, and upon its determination of the Collateral Value for the related Eligible Servicing Rights, the Lender shall fund any excess Loan amount, if any, based upon Lender's determination of the Collateral Value for such Eligible Servicing Rights; provided, however, that any excess of the amount funded on such Loan over the Collateral Value (determined using the Market Value after the Borrower Valuation Period) shall result in a Borrowing Base Deficiency as set forth in Section 2.08(b).

Notwithstanding anything to the contrary contained in this Section 2.03(a), the Lender shall have the right to determine Market Value at any time in its sole discretion. For purposes of preparing each Borrowing Base Report, the Lender shall calculate the Collateral Value of the Eligible Servicing Rights described in the Relevant Electronic File.

(b)    By delivering a Borrower Funding Request, the Borrower represents and warrants to the Lender that, after taking into account the amount of the requested Loan, all conditions precedent to such Loan specified in Section 5.02 have been satisfied.

Section 2.04 <u>Borrowing Base Reports</u>.  With respect to each Funding Date, unless the Borrower has elected to exercise a Borrower Valuation Period in accordance with Section 2.03(a) of this Agreement, (i) the Borrower shall deliver a Book Value Report on or prior to the seventh Business Day preceding the related Funding Notice Date, and (ii) the Lender shall determine and report in a Borrowing Base Report the Market Value of the Eligible Servicing Rights, in each case no less frequently than once per calendar month and no later than the fifth Business Day following delivery of each Subsequent Electronic File in accordance with Section 2.03; <u>provided, however</u>, that the Lender shall have the right to determine Market Value at any time in its sole discretion.  For purposes of preparing each Borrowing Base Report, the Lender shall calculate the Collateral Value of the Eligible Servicing Rights described in the Relevant Electronic File.

Section 2.05 <u>Interest</u>.  Interest shall accrue on each Loan for each day during a related Interest Period at a per annum rate equal to the product of (x) the outstanding principal balance of such Loan on such day, multiplied by (y) the sum of (i) the applicable LIBOR Rate for such day and (ii) the Applicable Margin. Interest shall be payable in arrears with respect to each Interest Period through the final day of each Interest Period (regardless of whether such day is a Business Day), such amount to be payable on the first Business Day following the end of such Interest Period. The Lender shall determine the LIBOR Rate for each Loan, which may be reset on a daily basis, as set forth in the definition of "LIBOR Rate" and provide notice of such determination to the Borrower. The Lender shall also calculate the amount of interest or other amounts due to be paid by the Borrower from time to time hereunder (including in connection with any prepayment or repayment of Loans permitted hereunder) and shall provide a written statement thereof to the Borrower at least two Business Days prior to the due date of such payments (or the relevant repayment or prepayment after having received a notice thereof); <u>provided</u>, that failure to provide such statements on a timely basis shall not relieve the Borrower of the obligation to pay any interest and principal due on the applicable payment date (based upon its good faith calculation of the amount due, such amount to be promptly reconciled after receipt of a subsequent statement from the Lender) and other such amounts hereunder promptly upon receipt of such statement.

Section 2.06 <u>Increased Capital Costs</u>.  If any change in, or the introduction, adoption, effectiveness, interpretation or reinterpretation or phase-in, in each case after the date hereof, of any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any court, central bank, regulator or other Governmental Authority affects or would affect the amount of capital required or reasonably expected to be maintained by the Lender or any Person controlling the Lender and the Lender reasonably determines (in its sole discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans or other advances of funds made by the Lender pursuant to this Agreement or any of the Facility Documents relating to fundings or commitments under this Agreement is reduced to a level below that which the Lender or such controlling Person would have achieved but for the occurrence of any such circumstance, then, in any such case after notice from time to time by the Lender to the Borrower, the Borrower shall pay to the Lender compensation sufficient to compensate the Lender or such controlling Person for such reduction in rate of return; <u>provided, however</u>, that the Borrower shall not have any obligation to pay any such amount under this <u>Section 2.06</u> with respect to any day or days preceding the fourth Business Day following the date on which the Lender has notified the Borrower that it intends to make a claim under this <u>Section 2.06</u>. Upon receipt of such notice from the Lender, the Borrower may prepay the

Obligations in full prior to the end of such fourth Business Day, and if such prepayment is made within such time frame, the Borrower shall have no liability for increased costs under this Section 2.06. A statement of the Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail), in the absence of manifest error, shall be conclusive and binding on the Borrower and the Lender; provided, further, that the initial payment of such compensation shall include a payment for accrued amounts due under this Section 2.06 prior to such initial payment but not before four Business Days after such notice. In determining such additional amount, the Lender may use any method of averaging and attribution that it (in its reasonable discretion) shall deem applicable so long as it applies such method to other similar transactions.

Section 2.07 Alternate Rate of Interest. If on any Business Day, the Lender determines (which determination shall be conclusive absent manifest error) (a) that adequate and reasonable means do not exist for ascertaining the LIBOR Rate; or (b) that the LIBOR Rate will not adequately and fairly reflect the cost to the Lender of making or maintaining its Loan; or (c) that it has become unlawful for it to honor its obligation to make or maintain Loans hereunder using the LIBOR Rate, or maintaining its Loans (or its Loan) included in any advance, then the Lender shall give notice thereof to the Borrower by telephone, facsimile, or other electronic means as promptly as practicable thereafter and, until the Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist, any Borrower Funding Request that requests the continuation of any Loan will be made, subject to the timely approval of the Borrower after receipt of notice of such revised rate, at a rate per annum that the Lender determines in it reasonable discretion adequately reflects the cost to the Lender of making or maintaining the Loan.

Section 2.08 Mandatory Repayment of Loans.

(a)    The Borrower shall repay the Outstanding Aggregate Loan Amount with respect to all Loans and all other amounts due under this Agreement in full on the Loan Repayment Date. Loans may be prepaid in accordance with the terms of Section 2.09 hereof and, to the extent prepaid, may be re-borrowed hereunder in accordance with the terms hereof (including satisfaction of all conditions precedent contained in Section 5.02.

(b)    If, on any Business Day (a "Borrowing Base Shortfall Day"), the Lender provides written notice to the Borrower that the Lender has determined in its sole reasonable discretion based on the Borrowing Base Report most recently delivered by the Lender pursuant to Section 2.04 that the Outstanding Aggregate Loan Amount on such day exceeds the lesser of (i) the Borrowing Base and (ii) the Commitment Amount plus the Uncommitted Amount on such day (such circumstance, a "Borrowing Base Deficiency"), the Borrower shall within one (1) Business Day after the Borrowing Base Shortfall Day repay outstanding Loans, in an amount equal to the amount of the Borrowing Base Deficiency specified in the notice provided to the Borrower by the Lender (such requirement a "Margin Call"); provided that, Lender shall not be entitled to make a Margin Call if the Borrowing Base Deficiency is less than the lesser of (i) ($5,000,000) or (ii) 1% of the Borrowing Base then outstanding; provided further that if Borrower transfers cash, Lender shall apply such cash against the Borrowing Base Deficiency. If, at the time a Margin Call is made pursuant to this Section 2.08(b), the Borrower has additional Eligible Servicing Rights available to pledge to the Lender that are not reflected in the then current Borrowing Base, the Borrower may provide the Lender with an updated Electronic File and/or Book Value Report and the Lender shall adjust the Borrowing Base to reflect such additional

Eligible Servicing Rights at a value to be determined by the Lender in its sole reasonable discretion, based up on the available information provided to the Lender.

(c)    The Borrower shall deliver a Repayment Notice with respect to each repayment of outstanding Loan amounts made pursuant to Section 2.08(b) by 10:00 a.m. (New York time) on the first Business Day following the related Borrowing Base Shortfall Day.

Section 2.09 <u>Optional Prepayment</u>. The Borrower may, at its option, prepay any Loan advanced hereunder in full or in part on any Business Day (each an "<u>Optional Prepayment Date</u>"); <u>provided</u>, that the Borrower delivers a Prepayment Notice to the Lender, no later than 1:00 p.m. New York City time on a Business Day that is at least three (3) Business Days preceding the Optional Prepayment Date; and provided further, that the Borrower shall be limited to prepaying Loans on a maximum of eight (8) Optional Prepayment Dates in any calendar month, unless otherwise agreed by the Lender. Any partial prepayment shall be in a minimum principal amount of not less than $10,000,000 and in increments of $1,000,000. Any such prepayment shall be paid over to the Lender by the Borrower by 1:00 p.m. (New York City time) on such Optional Prepayment Date, and shall be in amount equal to the sum of (i) the Loan amount being prepaid on the date of such prepayment, <u>plus</u> (ii) all accrued and unpaid interest on the principal amount of the Loan being prepaid through and including the day immediately preceding the date of such prepayment, <u>plus</u> (iii) the allocable portion (determined by the Lender in its sole reasonable discretion) of all other amounts due from the Borrower hereunder. In the absence of a timely delivered Prepayment Notice, the Lender shall automatically and without further action by the Borrower continue each Loan at the termination of each Interest Period for a successive Interest Period beginning on the day immediately following the final day of the immediately preceding Interest Period.

Section 2.10 <u>Reduction of Commitment Amount</u>. The Borrower may elect, by notice in writing to the Lender, to reduce the Commitment Amount to such lower amount as the Borrower shall specify in such notice. Such reduction in the Commitment Amount shall take effect on and from the date specified in such notice (the "<u>Commitment Reduction Date</u>"), which date shall be no earlier than three (3) Business Days from the date of the Lender's actual receipt of such notice. The Borrower may make only two such elections.

## ARTICLE III

## PAYMENTS; COMPUTATIONS; TAXES; FEES

Section 3.01 <u>Payments and Computations, Etc.</u>

(a)    Unless otherwise expressly stated herein, all amounts to be paid or deposited hereunder shall be paid or deposited in accordance with the terms hereof no later than 1:00 p.m. (New York time) on the day when due in lawful money of the United States of America in same day funds.

(b)    The Borrower shall, to the extent permitted by law, pay interest on all amounts (including principal, interest and fees) due but not paid on the date such payment is due hereunder as provided herein, for the period from, and including, such due date until, but excluding, the date paid, at the applicable Default Rate, payable on demand; <u>provided</u>, <u>however</u> that such interest rate shall not at any time exceed the maximum rate permitted by applicable law.

(c)     All computations of interest and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

(d)     The Borrower agrees that the principal of and interest on the Loans shall be recourse obligations of the Borrower.

(e)     All payments made by the Borrower under this Agreement shall be made without set-off or counterclaim.

Section 3.02 Taxes. All payments by the Borrower of principal of, and interest on, the Loans and all other amounts payable hereunder (including fees) shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, levies, imposts, deductions, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority, but excluding, (i) taxes imposed on or measured by the overall net income, overall receipts or overall assets of the Lender and (ii) franchise taxes imposed on the Lender by the United States of America or the jurisdiction of the Lender, as the case may be, in which it is organized or is operating or is otherwise subject to tax as a result of any connection unrelated to this Agreement or any political subdivision thereof, or any political subdivision thereof (such non-excluded items being called "Taxes" and such excluded items being called "Excluded Taxes"). In the event that any withholding or deduction from any payment to be made by the Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then the Borrower will:

(a)     pay directly to the relevant authority the full amount required to be so withheld or deducted;

(b)     promptly forward to the Lender an official receipt or other documentation satisfactory to the Lender or evidencing such payment to such authority; and

(c)     pay to the Lender such additional amount or amounts as is necessary to ensure that the net amount actually received by the Lender will equal the full amount the Lender would have received had no such withholding or deduction been required.

Moreover, if any Taxes are directly asserted against the Lender with respect to any payment received by the Lender, the Lender may pay such Taxes and the Borrower, as applicable, will promptly upon receipt of prior written notice stating the amount of such Taxes pay such additional amounts (including any penalties, interest or expenses) as are necessary in order that the net amount received by the Lender after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount the Lender would have received had not such Taxes been asserted.

If the Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify the Lender for any incremental Taxes, interest or penalties that may become payable by the Lender.

The Lender shall, prior to the initial due date of any payments made to the Lender hereunder, execute and deliver to the Borrower (i) if the Lender is not incorporated under the

8

laws of the United States or any State thereof, two duly completed copies of the U.S. Internal Revenue Service Form W-8ECI or Form W-8BEN claiming treaty benefits, or in either case successor applicable forms required to evidence that the Lender is entitled to receive payments under the Facility Documents without deduction or withholding of any United States federal income taxes, (ii) otherwise, a duly completed U.S. Internal Revenue Service Form W-9 or successor applicable or required forms, and (iii) such other forms and information as may be required to confirm the availability of any applicable exemption from United States federal, state or local withholding taxes. The Lender also agrees to deliver to the Borrower, upon written request of the Borrower at such time, two further copies of such Form W-8ECI, Form W-8BEN claiming treaty benefits or Form W-9, or such successor applicable forms or other manner of certification, as the case may be, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it hereunder, and such extensions or renewals thereof as may reasonably be requested. The Lender certifies, represents and warrants as of the date hereof that (x) it is entitled to receive payments under the Facility Documents without deduction or withholding of any United States federal income taxes and (y) it is entitled to an exemption from United States backup withholding tax. The Borrower shall not be required to pay any increased amount under this Section 3.02 to the Lender if the Lender fails to comply with the requirements set forth in this paragraph.

    Section 3.03   Fees and Expenses.

        (a)     Reserved.

        (b)     On the last Business Day of each month and on the Loan Repayment Date, the Lender shall determine the average daily utilization during the preceding calendar month (with respect to the Loan Repayment Date, during the period from the date through which the last non-utilization fee calculation has been made to the Loan Repayment Date) by the Borrower by dividing (a) the sum of the Loans (advanced on a committed basis) outstanding on each day during such period, by (b) the number of days in such period (the "Utilization Amount"). The Borrower shall pay to the Lender on such payment date or Loan Repayment Date, a non-utilization fee (the "Non-Utilization Fee") equal to the product of (i) 3.00% (300 basis points), (ii) the Commitment Amount minus the Utilization Amount, and (iii)(A) the actual number of days in the applicable period divided by (B) 360.  For the avoidance of doubt, Loans advanced in respect of the Uncommitted Amount shall not be factored into, or used to calculate, the Utilization Amount or the Non-Utilization Fee.  All payments shall be made to the Lender in Dollars, in immediately available funds, without deduction, setoff or counterclaim.  Upon the occurrence of an increase or a decrease in the Lender's capital costs in respect of the non-utilized portion of the Commitment Amount, as determined by the Lender in its sole reasonable discretion, the Lender shall, upon notice to the Borrower, increase or decrease the Non-Utilization Fee to account for such change in the Lender's capital costs.

        (c)     The Borrower agrees to pay to the Lender all costs and expenses (including reasonable fees and expenses of Lender's counsel) incurred in connection with the execution of this Agreement (and any amendments thereto) and the Facility Documents up to a maximum aggregate amount of $60,0000 with respect to this Agreement and the sixteenth and seventeenth amendment to the Previous Agreement.

(d)     In consideration of the renewal and extension of the Agreement from June 30, 2010 until the Loan Repayment Date, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender (1) an amount equal to $833,333.33, with respect to the period from May 31, 2010, through (but excluding) June 30, 2010, such payment to be made on the date hereof, and (2) an amount equal to $1,166,666.67, with respect to the period beginning on June 30, 2010, through August 31, 2010, such payment to be made on July 6, 2010 (collectively, the "Extension Fee"). The Borrower hereby agrees that each payment or installment of the Extension Fee shall be both fully earned and nonrefundable for any reason whatsoever as of the date hereof and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

## ARTICLE IV

## SECURITY INTEREST

Section 4.01  Security Interest.  As security for the prompt payment and performance of all of its Obligations, the Borrower hereby assigns and pledges to the Lender, and grants a security interest, subject to the interests of Freddie Mac and Fannie Mae, each as set forth in Section 4.02 and in the related Acknowledgement Agreement, to the Lender, all of the Borrower's right, title and interest, in, to, and under, whether now owned or hereafter acquired, in all of the following, whether now or hereafter existing and wherever located: (i) the Servicing Rights whether or not yet accrued, earned due or payable as well as all other present and future rights and interests of Borrower in such Servicing Rights, (ii) the Freddie Mac Contracts and all rights and claims thereunder, (iii) the Fannie Mae Contracts and all rights and claims thereunder, (iv) the Collection Account, (v) the Acknowledgement Agreements and all rights and claims thereunder, (vi) all books and records, including computer disks and other records or physical or virtual data or information, related to the foregoing (but excluding computer programs) and (vii) all monies due or to become due with respect to the foregoing and all proceeds of the foregoing, but with respect to (i)-(vii) above specifically excluding the Excluded Collateral (collectively, the "Collateral").

Section 4.02  Provisions Regarding Pledge of Freddie Mac Servicing Rights and  Fannie Mae Servicing Rights to Be Included In Financing Statements.

(a)     Notwithstanding anything to the contrary in this Agreement or any of the other Facility Documents, the security interest of the Lender created hereby with respect to the Freddie Mac Servicing Rights is subject to the following provision to be included in each financing statement filed in respect hereof:

The security interest referred to in this financing statement is subject and subordinate in each and every respect (a) to all rights, powers and prerogatives of one or more of the following: the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Federal National Mortgage Association ("Fannie Mae"), the Government National Mortgage Corporation ("Ginnie Mae"), or such other investors that own mortgage loans, or which guaranty payments on securities based on and backed by pools of mortgage loans, identified on the exhibit(s) or schedule(s) attached to this financing statement (the "Investors"); and (b) to all claims of an Investor arising out of any and all defaults and outstanding obligations of the debtor to the Investor. Such rights, powers and

10

prerogatives of the Investors may include, without limitation, one or more of the following: the right of an Investor to disqualify the debtor from participating in a mortgage selling or servicing program or a securities guaranty program with the Investor; the right to terminate contract rights of the debtor relating to such a mortgage selling or servicing program or securities guaranty program; and the right to transfer and sell all or any portion of such contract rights following the termination of those rights.

(b)    Notwithstanding anything to the contrary in the Agreement or any of the other Facility Documents, the security interest of the Lender created hereby with respect to the Fannie Mae Servicing Rights is subject to the following provision to be included in each financing statement filed in respect hereof:

The Security Interest created by this financing statement is subject and subordinate to all rights, powers, and prerogatives of Fannie Mae under and in connection with (i) the terms and conditions of that certain Acknowledgment Agreement, with respect to the Security Interest, by and between Fannie Mae, GMAC Mortgage, LLC (the "Debtor") and Citibank, N.A., (ii) the Mortgage Selling and Servicing Contract, all applicable Pool Purchase Contracts between Fannie Mae and the Debtor and all agreements between Fannie Mae and the Debtor that impose servicing requirements or servicing transfer restrictions, and (iii) the Selling Guide, Servicing Guide, and other Guides, as each of such Guides is amended from time to time ((ii) and (iii) collectively, the "Fannie Mae Contract"), which rights, powers, and prerogatives include, without limitation, the right of Fannie Mae to terminate the Fannie Mae Contract with or without cause and the right to sell, or have transferred, the Fannie Mae Servicing Rights as therein provided.

Section 4.03 <u>Authorization of Financing Statements</u>.    To the extent permitted by applicable law, the Borrower hereby authorizes the Lender to file any financing or continuation statements required to perfect, protect, or more fully evidence the Lender's security interest in the Collateral granted hereunder. The Lender will notify the Borrower of any such filing (but the failure to deliver such notice shall not prejudice any rights of the Lender under this <u>Section 4.03</u>).

Section 4.04 <u>Lender's Appointment as Attorney In Fact</u>.

(a)    The Borrower hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time in the Lender's discretion, if an Event of Default, shall have occurred and be continuing, for the purpose of carrying out the terms of this Agreement (or any Servicing Contracts), to take any action on behalf of the Borrower pursuant to the Acknowledgment Agreement and to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement (or any Servicing Contracts) to the extent such actions are permitted to be taken by the Lender under the Acknowledgement Agreement, and, without limiting the generality of the foregoing, the Borrower hereby gives the Lender the power and right, on behalf of the Borrower, without assent by, but with notice to, the Borrower, if an Event of Default shall have occurred and be continuing, to do the following (subject to limitations contained in the Acknowledgement Agreement):

(i)      in the name of the Borrower or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any other Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due under any such mortgage insurance or with respect to any other Collateral whenever payable;

(ii)      (A) to direct any party liable for any payment under any Collateral to make payment of any and all moneys due or to become due thereunder directly to the Lender or as the Lender shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any of the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) in connection with the above, to give such discharges or releases as the Lender may deem appropriate; and (F) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Lender deems necessary to protect, preserve or realize upon the Collateral and the Lender's Liens thereon and to effect the intent of this Agreement, all as fully and effectively as the Borrower might do;

(iii)      perform or cause to be performed, the Borrower's obligations under any Servicing Contract to the extent permitted by the related Acknowledgement Agreement.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. The power of attorney is a power coupled with an interest and shall be irrevocable but shall terminate upon release of the Lender's security interest as provided in Section 4.09.

(b)      The Borrower also authorizes the Lender, at any time and from time to time, to execute, in connection with the sale provided for in Section 8.02(c) hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; provided that the exercise of such powers are in accordance with the Acknowledgment Agreement.

(c)      The powers conferred on the Lender are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Lender nor any of its officers, directors, or employees shall be responsible to the Borrower for any act or failure to act hereunder, except for its own negligence or willful misconduct; provided that the Lender shall exercise such powers only in accordance with the Acknowledgment Agreement.

Section 4.05 [Reserved].

12

Section 4.06 [Reserved].

Section 4.07 [Reserved].

Section 4.08 [Reserved].

Section 4.09 <u>Release of Security Interest</u>.  Upon termination of this Agreement and repayment to the Lender of all Obligations and the performance of all obligations under the Facility Documents, the Lender shall release its security interest in any remaining Collateral; <u>provided</u> that if any payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervener or conservator of, or a trustee or similar officer for the Borrower or any substantial part of its Property, or otherwise, this Agreement, all rights hereunder and the Liens created hereby shall continue to be effective, or be reinstated, until such payments have been made.

## ARTICLE V

## CONDITIONS PRECEDENT

Section 5.01 <u>Conditions Precedent</u>.  The effectiveness of this Agreement is subject to the condition precedent that the Lender shall have received each of the items set forth in <u>Schedule 5.01</u> (unless otherwise indicated) dated such date, and in such form and substance, as is satisfactory to the Lender.

Section 5.02 <u>Further Conditions Precedent</u>.  The funding of each Loan hereunder, and the automatic continuation of each Loan after the termination of the immediately preceding calendar month related to any Loan, shall in all events be subject to satisfaction of the further conditions precedent set forth in <u>Schedule 5.02</u> as of the making of such Loan; <u>provided,</u> that with respect to the automatic continuation of each Loan after the termination of the immediately preceding calendar month related to any Loan in accordance with <u>Section 2.09</u> of this Agreement, only the conditions precedent set forth in paragraphs (b) through (f) inclusive of <u>Schedule 5.02</u> shall be required to be satisfied.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01 <u>Representations and Warranties of the Borrower</u>.  The Borrower represents and warrants to the Lender that throughout the term of this Agreement (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case, such representation or warranty shall have been true or correct as of such date):

(a)    <u>Organization and Good Standing</u>.  The Borrower has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of organization, and has all requisite limited liability company power and authority to own its properties and to

conduct its business as such properties are presently owned and such business is presently conducted, and had at all relevant times, and the Borrower now has, all necessary power, authority and legal right to own the Collateral.

     (b)   <u>Due Qualification</u>. The Borrower is duly qualified to do business, and has obtained all necessary material licenses and approvals, in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification, licenses or approvals to the extent that the failure to obtain or maintain such qualifications, licenses and approvals could reasonably be expected to have a Material Adverse Effect.

     (c)   <u>Power and Authority, Due Authorization</u>. The Borrower (i) has all necessary power and authority and legal right to (A) execute and deliver each of the Facility Documents to be executed and delivered by it in connection herewith, (B) carry out the terms of the Facility Documents to which it is a party, and (C) borrow the Loans and grant a security interest in the Collateral on the terms and conditions herein provided, and (ii) has taken all necessary corporate action to duly authorize (A) such borrowing and grant and (B) the execution, delivery, and performance of this Agreement and all of the Facility Documents to which it is a party.

     (d)   <u>Binding Obligations</u>. Each Facility Document to which the Borrower is a party, when duly executed and delivered by it will constitute, legal, valid and binding obligations of the Borrower enforceable against it in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

     (e)   <u>No Violation</u>. Neither the Borrower's execution and delivery of the Facility Documents nor the consummation of the transactions contemplated hereby and thereby will (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice, lapse of time or both) a default under the Borrower's organizational documents, or any material indenture, loan agreement, mortgage, deed of trust, or other material agreement or instrument to which it is a party or by which it is otherwise bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument, other than this Agreement, or (ii) violate any Legal Requirement applicable to it of any Governmental Authority having jurisdiction over it or any of its properties if such violation, individually, or in the aggregate, is reasonably likely to have a Material Adverse Effect.

     (f)   <u>No Proceedings</u>. There are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against the Borrower, the Guarantor or any Material Affiliate or affecting any of their respective Property before any Governmental Authority, (1) as to which there is a reasonable likelihood of an adverse decision, and which, in the event of an adverse decision, would reasonably be likely to have a Material Adverse Effect, (2) which questions the validity or enforceability of any of the Facility Documents, or (3) which seeks to prevent the consummation of any of the transactions contemplated by any Facility Documents; provided, however, that this representation shall not apply to matters that have been disclosed in writing to the Lender prior to May 14, 2010.

(g)    <u>Government and Agency Investor Approvals</u>.    No authorization, consent, approval, or other action by, and no notice to or filing with, any court, governmental authority or regulatory body or other Person domestic or foreign, including either Agency Investor, is required for the Borrower's due execution, delivery or performance of any Facility Document to which it is a party except for (i) consents that have been obtained in connection with transactions contemplated by the Facility Documents, (ii) filings to perfect the security interest created by this Agreement, (iii) consents and approvals that may be required by either Agency Investor from time to time after the Closing Date, and (iv) authorizations, consents, approvals, filings, notices, or other actions the failure to make could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(h)    <u>Solvency; Fraudulent Conveyance</u>.    Each of the Borrower and the Guarantor and their respective Subsidiaries are Solvent and will not cease to be Solvent due to any Loan hereunder or the Guaranty (both immediately before and after giving effect to such Loan or Guaranty).    The amount of consideration being received by the Borrower after giving effect to each Loan by the Lender constitutes reasonably equivalent value and fair consideration for such Loan.    The Borrower is not pledging any Collateral with any intent to hinder, delay, or defraud any of its creditors.    As used herein, the term "Solvent" means, with respect to the Borrower and the Guarantor on a particular date, that on such date (i) the most recently reported value of the assets of such Borrower and the Guarantor, taking into account the fair value of assets accounted for on a fair value basis and the carrying value of other assets, is greater than the total amount of the most recently reported liabilities of such Borrower and the Guarantor (including the fair value of liabilities reported on a fair value basis), (ii) after giving effect to each Loan, the Borrower is able to realize upon its assets and pay its debts and other liabilities as they mature, assuming an orderly disposition, and (iii) neither the Borrower nor the Guarantor has an unreasonably small capital with which to conduct its business.

(i)    <u>Margin Regulations</u>.    Margin Stock (as defined in the regulations of the Board), constitutes less than 25% of the value of those assets of the Borrower that are subject to any limitation on sale, pledge, or other restriction hereunder.

(j)    <u>Accurate Reports</u>.    No written information, exhibit, financial statement, document, book, record, or report furnished or to be furnished by the Borrower to the Lender in connection with this Agreement was inaccurate in any material respect as of the date it was dated or (except as otherwise disclosed in writing to the Lender at such time) as of the date so furnished, or contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

(k)    <u>No Default</u>.    No Default has occurred and is continuing, other than any Default or purported Default that has been disclosed in writing to the Lender prior to May 14, 2010.

(l)    <u>Investment Company Act</u>.    None of the Borrower, the Guarantor or any of their respective Subsidiaries are required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(m)    <u>Taxes</u>.    The Borrower has filed all United States federal tax returns and all other tax returns that are required to be filed, and have paid all taxes due pursuant to said returns

or pursuant to any assessment received by the Borrower, except such taxes, if any, as are being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided in accordance with GAAP.

(n)    No Adverse Actions. The Borrower has not received a notice from Freddie Mac or Fannie Mae indicating any adverse fact or circumstance in respect of the Borrower which adverse fact or circumstance may reasonably be expected to entitle Freddie Mac or Fannie Mae, as the case may be, to terminate the Borrower with cause or with respect to which such adverse fact or circumstance has caused Freddie Mac or Fannie Mae, as the case may be, to threaten to terminate, or consider the termination of, the Borrower in such notice.

(o)    Financial Statements. The Borrower has furnished to Lender a copy of (1) the audited, consolidated financial statements of the Borrower dated as of December 31, 2009, comprised of the consolidated statements of income or operations and cash flows for the preceding twelve (12) month period and the consolidated balance sheet as at December 31, 2009, and (2) the quarterly consolidated financial report of the Borrower for the period ended March 31, 2010, each as prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, subject to ordinary, good faith year-end audit adjustments; and each of (1) and (2) are correct in all material respects and fairly present the consolidated financial condition of such Borrower and its consolidated subsidiaries, as of the date thereof and consolidated results of operations for the period covered thereby.

(p)    Chief Executive Office. The Borrower's chief executive office on the date hereof is located at 1100 Virginia Drive, Fort Washington, Pennsylvania, and the Guarantor's chief executive office on the date hereof is located at One Meridian Crossings, Suite 100 Minneapolis, Minnesota 55423.

(q)    Location of Books and Records. Each of the Borrower and the Guarantor keeps its corporate books and records at its respective chief executive office or a custodian's offices.

(r)    Agency Investor Set Off Rights. The Borrower has no actual notice, including any notice received from Freddie Mac, Fannie Mae, or any reason to believe, that, other than in the normal course of Borrower's business, any circumstances exist that would result in the Borrower being liable to Freddie Mac or Fannie Mae for any amount due by reason of: (i) any breach of servicing obligations or breach of mortgage selling warranty to Freddie Mac or Fannie Mae under the Freddie Mac Contract and the Fannie Mae Contract, respectively, or any other similar contracts relating to the Borrower's entire Freddie Mac or Fannie Mae servicing portfolio (including without limitation any unmet mortgage repurchase obligation), (ii) any unperformed obligation with respect to mortgages in an MBS pool that the Borrower is servicing for Freddie Mac or Fannie Mae under the regular servicing option or other mortgages subject to recourse agreements, (iii) any loss or damage to Freddie Mac or Fannie Mae by reason of any inability to transfer to a purchaser of the Servicing Rights the Borrower's selling and servicing representations, warranties and obligations, as well as any existing MBS recourse (regular servicing option) obligations, or other recourse obligations, and (iv) any other unmet obligations to Freddie Mac or Fannie Mae under the Freddie Mac Contract and the Fannie Mae Contract, respectively, or any other similar contracts relating to the Borrower's entire Freddie Mac or Fannie Mae servicing portfolio.

16

(s)    Reserved.

Section 6.02 <u>Representations Concerning the Collateral</u>.  The Borrower represents and warrants to the Lender that as of each day that a Loan is outstanding pursuant to this Agreement:

(a)    Except for Liens to be released simultaneously with the Liens granted in favor of the Lender hereunder, the Borrower has not assigned, pledged, conveyed, or encumbered any Collateral to any other Person, and immediately prior to the pledge of any such Collateral, the Borrower was the sole owner of such Collateral and had good and marketable title thereto (subject to the rights of Fannie Mae or Freddie Mac, as applicable, with respect to the related Servicing Rights), free and clear of all Liens, and no Person, other than the Lender has any Lien on any Collateral.

(b)    The provisions of this Agreement are effective to create in favor of the Lender a valid security interest in all right, title, and interest of the Borrower in, to and under the Collateral, subject only (i) in the case of Freddie Mac Servicing Rights to the interests of Freddie Mac or (ii) in the case of Fannie Mae Servicing Rights to the interests of Fannie Mae.

(c)    All Recourse Servicing Obligations have been identified as such in a schedule attached to the Electronic File most recently delivered to the Lender. All information concerning all Servicing Rights set forth on the Electronic File pursuant to which such Servicing Rights were, are or will be (as applicable) pledged to the Lender will not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading as of the date of such Electronic File.

(d)    The Lender has a duly perfected first priority security interest under the UCC in all right, title, and interest of Borrower in, to and under, subject to the interests of Freddie Mac or Fannie Mae, as applicable, the Servicing Rights.

(e)    [reserved]

(f)    Upon the execution and delivery of the Collection Account Control Agreement, all filings and other actions necessary to perfect the security interest in the Collection Account created under this Agreement have been duly made or taken and are in full force and effect, and the Facility Documents create in favor of the Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collection Account, securing the payment of the Obligations, and all filings and other actions necessary to perfect such security interest have been duly taken. Subject to the rights of Fannie Mae and Freddie Mac as set forth in Section 4.02 and in the related Acknowledgement Agreements, the Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien, except for the liens and security interests created or permitted under the Facility Documents and liens and security interests being released simultaneously with the liens granted in favor of the Lender hereunder.

(g)    Subject only to the terms of the related Acknowledgment Agreements, the Borrower has and will continue to have the full right, power and authority, to pledge the Servicing Rights, and the pledge of such Servicing Rights may be further assigned without any requirement, except as may be specified in the related Agency Investor Guides.

17

(h)     In connection with any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds entered into by the Borrower, the Guarantor or any Material Affiliate on the one hand and any third party (including an Affiliate of the Borrower, the Guarantor or any Material Affiliate but excluding the Lender or any Affiliate of Lender) on the other, including without limitation, any other facility for the funding of Advances, no such third party has the right pursuant to the terms of such repurchase agreement, loan and security agreement or similar credit facility or agreement, to cause the Borrower to terminate, rescind, cancel, pledge, hypothecate, liquidate or transfer any of the Collateral.

## ARTICLE VII

## COVENANTS

Section 7.01  <u>Affirmative Covenants of Borrower</u>.  The Borrower covenants and agrees with the Lender that, so long as any Loan is outstanding and until all Obligations have been paid in full:

(a)     <u>Compliance with Laws, Etc</u>.  The Borrower will comply in all material respects with all applicable Requirements of Law.

(b)     <u>Performance and Compliance with Servicing Contracts</u>.  The Borrower will comply with all terms, provisions, covenants and other promises required to be observed by it under each of the Facility Documents to which it is a party, maintain the Facility Documents to which it is a party in full force and effect in all material respects and enforce the Servicing Contracts in all material respects in accordance with the terms thereof.

(c)     <u>Taxes</u>.  The Borrower will pay and discharge promptly when due all material Taxes and governmental charges imposed upon it or upon its income or profits or in respect of its property, in each case before the same shall become delinquent or in default and before penalties accrue thereon, unless and to the extent the same are being contested in good faith by appropriate proceedings and with respect to which adequate reserves shall, to the extent required by GAAP, have been set aside.

(d)     <u>Due Diligence</u>.  The Borrower acknowledges that the Lender, at the Lender's own expense except as provided herein, has the right to perform continuing due diligence reviews with respect to the Servicing Rights and the other Collateral, for purposes of verifying compliance with the representations, warranties, and specifications made hereunder and under the other Facility Documents, or otherwise. The Borrower agrees that the Lender and its Authorized Representatives will be permitted during normal business hours to examine, inspect, make copies of, and make extracts of, any and all documents, records, agreements, instruments or information relating to the Collateral, Fannie Mae and Freddie Mac in the possession of the Borrower; provided, however, the foregoing shall not apply with respect to any information that the Borrower is required by Fannie Mae or Freddie Max to keep confidential. Notwithstanding anything to the contrary herein, the Borrower shall reimburse the Lender for any and all out-of-pocket costs and expenses reasonably incurred by the Lender and its respective designees in connection with the ongoing due diligence and auditing activities during any period in which an Event of Default has occurred and is continuing.

(e)    <u>Changes in Servicing Contracts</u>.    The Borrower shall provide written notice to the Lender of any changes in any Freddie Mac Contracts, Freddie Mac Guides, Fannie Mae Contracts or Fannie Mae Guides (other than those made to effect an Excess Servicing Rights Disposition (as defined herein)) that may materially affect the Servicing Rights within three (3) Business Days after the Borrower receives notice thereof.

(f)    <u>Legal existence, etc</u>. The Borrower shall (i) preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises; and (ii) keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied.

(g)    The Borrower shall cause to be maintained at all times a combined servicing portfolio of the Borrower and Ally Bank of no less than $175,000,000,000.

(h)    [Reserved].

(i)    <u>Financial Statements</u>.    The Borrower shall deliver to the Lender:

(1)    As soon as available and in any event within thirty (30) days after the end of each calendar month the consolidated balance sheets of the Borrower as at the end of such calendar month and the related consolidated statements of income for the Borrower for such month, setting forth in each case in comparative form the figures for the previous month;

(2)    As soon as available and in any event within forty-five (45) days after the end of each of the first three quarterly fiscal periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower as at the end of such period, the related unaudited, consolidated statement of income for the Borrower for such period and the portion of the fiscal year through the end of such period, and the related unaudited, consolidated statements of retained earnings and of cash flows for the Borrower for the portion of the fiscal year through the end of such period, in each case setting forth in comparative form the figures for the previous year;

(3)    As soon as available and in any event within ninety (90) days after the end of each fiscal year of the Borrower, the consolidated balance sheets of the Borrower as at the end of such fiscal year and the related consolidated statements of income and retained earnings and of cash flows for the Borrower for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Borrower at the end of, and for, such fiscal year in accordance with GAAP;

(4)    On or before March 31st of each year beginning March 31, 2011, the Borrower, at its expense, shall either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Lender to the effect that such firm has

19

examined certain documents and records for the preceding fiscal year (or during
the period from the date of commencement of such Servicer's duties hereunder
until the end of such preceding fiscal year in the case of the first such certificate),
and that, on the basis of such examination conducted substantially in compliance
with the Uniform Single Attestation Program for Mortgage Bankers, such firm is
of the opinion that the Borrower's overall servicing operations have been
conducted in compliance with the Uniform Single Attestation Program for
Mortgage Bankers except for such exceptions that, in the opinion of such firm, the
Uniform Single Attestation Program for Mortgage Bankers requires it to report, in
which case such exceptions shall be set forth in such statement, or (b) furnish to
Lender the Borrower's assessment of Borrower's compliance with the servicing
criteria set forth in Section 1122(d) of Securities and Exchange Commission
Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be
attested to by a firm of independent public accountants which is a member of the
American Institute of Certified Public Accountants;

(5)     Together with each set of the financial statements delivered under
clauses (1) through (3) above, a certificate of a Responsible Officer of Borrower
(in substantially similar form as the certificate set forth in Schedule 7.01 hereto)
certifying (x) Borrower's compliance with the Consolidated Tangible Net Worth
requirement and the Guarantor's compliance with the Consolidated Liquidity
requirement and setting forth the calculations demonstrating compliance the
Consolidated Tangible Net Worth requirement and the Consolidated Liquidity
requirement as of the close of business on the Business Day immediately
preceding the date such certificate is delivered to Lender, (y) that no Default or
Event of Default exists under any Facility Documents, the Goldman Repurchase
Facility or the GMAC Facilities as of the date of such certificate and (z) that
neither the Goldman Repurchase Facility nor the GMAC Facilities have been
amended, modified or supplemented other than in accordance with the terms of
the Citi Repurchase Facility; and

(6)     From time to time such other information regarding the Servicing
Rights, financial condition, operations, or business of Borrower, as Lender may
reasonably request

(j)     <u>Required Reports: Additional Information.</u>  The Borrower will at the times
specified in Schedule 7.01(j), attached hereto, deliver to the Lender the reports identified in such
schedule (unless any information to be included in such report is required by Fannie Mae or
Freddie Mac to be kept confidential), and promptly furnish to the Lender all notices of all final
written audits, examinations, evaluations, reviews and reports of its origination and servicing
operations by any state mortgage banking licensing agency or instrumentality (including those
prepared on a contract basis for any such agency) in which there are material adverse findings,
including without limitation notices of termination or impairment of approved status, and notices
of probation, suspension, or non-renewals, and such other information, documents, records or
reports with respect to the conditions or operations, financial or otherwise, of the Borrower as the
Lender may from time to time reasonably request, no later than fifteen (15) Business Days after
the date of the Lender's request.

(k)    Agency Investor Approval.    The Borrower shall at all times maintain copies of relevant portions of all final written Agency Investor audits, examinations, evaluations, monitoring reviews and reports of its origination and servicing operations (including those prepared on a contract basis for any such agency) in which there are material adverse findings, including without limitation notices of defaults, notices of termination of approved status, notices of imposition of supervisory agreements or interim servicing agreements, and notices of probation, suspension, or non-renewal, and all necessary approvals from each Agency Investor. The Borrower shall not take any action, or fail to take any action, that could permit either Agency Investor to terminate or threaten to terminate its right to service loans for such Agency Investor with cause.

(l)    Quality Control.    Borrower shall conduct quality control reviews of its servicing operations in accordance with industry standards and Agency Investor requirements. Borrower shall report to Lender quality control findings as such reports are produced and upon reasonable request by Lender.

(m)    Special Affirmative Covenants Concerning Servicing Rights.

(i)    The Borrower will warrant and will forever defend the right, title and interest of the Lender in and to the Servicing Rights pledged to the Lender against the claims and demands of all Persons whomsoever, subject to the restrictions imposed by the Acknowledgment Agreement to the extent that such restrictions are valid and enforceable under the applicable UCC and other Requirements of Law.

(ii)    The Borrower shall preserve the security interests granted hereunder and upon request by the Lender undertake all actions which are necessary or appropriate, in the reasonable judgment of the Lender, to (i) maintain the Lender's security interest (including the priority thereof) in the Collateral in full force and effect at all times prior to the satisfaction of all obligations under this Agreement and the release of the Lender's lien in accordance with the terms and provisions of this Agreement (including upon a Change of Control with respect to the Borrower), and (ii) preserve and protect the Collateral and protect and enforce the rights of the Lender to the Collateral, including the making or delivery of all filings and recordings (of financing or continuation statements), or amendments thereto or assignments thereof, and such other instruments or notices, as may be necessary or appropriate, cause to be marked conspicuously its master data processing records with a legend, acceptable to the Lender, evidencing that such security interest has been granted in accordance with this Agreement.

(iii)    The Borrower shall diligently fulfill its duties and obligations under the Servicing Contracts in all material respects and shall not default in any material respect under any of the Servicing Contracts or the Acknowledgment Agreements; provided that it shall not be a breach of this covenant if: (a) either Agency Investor shall terminate the Borrower's rights under any Servicing Contract, the Borrower shall repay (without duplication of payment) to the Lender an amount equal to the excess of the sum of the Loans then outstanding over the sum of the Borrowing Base of all the Servicing Rights then pledged to the Lender within the time periods set forth in Section 2.08(b) or (b) any such Servicing Contract expires in accordance with its terms and without renewal or (c) a default declared by either Agency Investor in respect of a Servicing Contract arose from a failure of the portfolio of serviced Mortgage Loans to perform as required by the related Servicing Contract and such Agency Investor has elected in

21

writing to continue to use the Borrower as servicer of both that and other pools of Mortgage Loans and individual Mortgage Loans and has not rescinded or revoked such election.

(n)    <u>Maintenance of Property; Insurance</u>.  The Borrower shall keep all property useful and necessary in its business in good working order and condition.  The Borrower shall maintain a fidelity bond and be covered by insurance of the kinds and in the amounts customarily maintained by such similarly situated entities in the same jurisdiction and industry as the Borrower, in amounts acceptable to the Agency Investors.

(o)    <u>Use of Proceeds</u>.  The Borrower shall not use the proceeds of the Loans in contravention of the requirements, if any, of either Agency Investor.

(p)    <u>Sale of Collateral</u>.  The Borrower shall provide the Lender with three (3) Business Days' prior written notice of material sales of any Collateral and the proceeds thereof shall be applied, to the extent that there exists, or such sale results in, a failure to satisfy any Borrowing Base Deficiency, until such Borrowing Base Deficiency is cured.

(q)    <u>Reserved.</u>

(r)    <u>Reserved.</u>

(s)    <u>Reserved.</u>

(t)    <u>Reserved.</u>

(u)    <u>Applicability of provisions to Guarantor</u>.    The Borrower hereby acknowledges and agrees that the representations, warranties, covenants and Events of Default contained in Sections 6.01(a), 6.01(b), 6.01(c)(i)(A), 6.01(c)(i)(B), 6.01(c)(ii)(B), 6.01(d), 6.01(e), 6.01(f), 6.01(g) disregarding the exceptions set forth in clauses (ii) and (iii) thereof, 6.01(j), 6.01(k) but solely with respect to those provisions of Section 8.01 specified in this Section 7.01(u), 6.01(m), 6.01(n), 7.01(a), 7.01(b) except for the final clause thereof relating to the Servicing Contracts, 7.01(c), 7.01(f), 7.01(n) but solely as to the first sentence relating to maintenance of property, 7.02(d), 7.02(e)(i), 7.02(e)(ii), 7.02(e)(iii), 7.02(e)(v), 7.02(f), 7.03(a), 7.03(b), 7.03(c), 7.03(d), 7.03(i), 7.03(j), 8.01(a) with "hereunder" being deemed to be a reference to the Guaranty, 8.01(b) but solely with respect to the provisions of Sections 7.01 and 7.02 specified in this Section 7.01(u) as applicable to the Guarantor, 8.01(c)(i)except for the references to Section 6.01(g)(ii), (g)(iii), (o), (p) and (r) thereunder, 8.01(c)(ii), 8.01(c)(iii) and 8.01(l), of this Agreement shall apply to the Guarantor as if they were made by the Guarantor as well as the Borrower, and any breach, violation or failure to perform under such Sections by the Guarantor shall constitute a breach under the terms and conditions of this Agreement, which entitles the Lender to exercise any rights or remedies under this Agreement as if the Borrower had breached, violated or failed to perform under any such Section.  Notwithstanding anything to the contrary in this Section 7.01(u), all representations, warranties, covenants and Events of Default contained in the Agreement shall continue to apply to the Borrower.

(v)    <u>Maintenance of Insurance by Guarantor</u>.  The Guarantor shall maintain a fidelity bond and be covered by insurance (including, without limitation, errors and omissions insurance) of the kinds and in the amounts customarily maintained by such similarly situated entities in the same jurisdiction and industry as the Guarantor.

(w)   Notice of Disposal of Servicing Rights. In the event that the Borrower sells or otherwise disposes of any of the related Servicing Rights, it shall give the Lender five (5) Business Days' prior written notice of such sale or disposition, during which time the Lender shall recalculate the Collateral Value for the Collateral remaining after such sale or disposition.

(x)   Requests for Information. The Borrower shall furnish to the Lender within three (3) Business Days after the Lender's request, any reasonable information, documents, records or reports with respect to the servicing of the Collateral as the Lender may from time to time request.

(y)   Terms of other Debt Facilities. The Borrower shall (i) give not less than ten (10) Business Days' prior written notice to Lender of any amendment of the GMAC Facilities, which amendment or facility varies from this Agreement as to: (v) whether Obligors other than the Guarantor make representations as to, or are required to be, Solvent, (w) the definition of "Solvent" or an equivalent or any representation related to solvency, (x) the definition of "Change of Control" or the equivalent in any such facility, (y) any financial covenant (including the imposition of a new financial covenant), any additional financial reporting requirements, the maximum amount available to be borrowed thereunder, any of the payment features (including the amortization or acceleration) of such agreement and the termination dates and/or maturity dates of such agreement or (z) any of the definitions of the terms referenced in the provisions described in clauses (w), (x) or (y) above, and (ii) no later than the date on which such provisions(s) shall be amended under the GMAC Facilities, enter into such amendments as may be required by Lender to conform in all material respects the related provisions of this Agreement to such amendment(s). The Borrower shall deliver executed copies of any other amendment not contemplated in clauses (w), (x), (y) or (z) above to the GMAC Facilities within two (2) Business Days of execution of such amendment. The Borrower shall (i) give not less than ten (10) Business Days' prior written notice to Lender of any proposed amendment to the Goldman Repurchase Facility and (ii) no later than the date on which such provisions(s) shall be amended under the Goldman Repurchase Facility, enter into such amendments as may be required by Lender to conform in all material respects the related provisions of this Agreement to such amendment(s).

(z)   Additional Commitment. Borrower shall, maintain at all times throughout the term of this Agreement, the GMAC Facilities, the Goldman Repurchase Facility and the Citi Repurchase Facility, in each case with the maximum amount available for borrowing at least equal to the amount available on the date hereof (taking into consideration any mandatory reduction of the GMAC Facilities, the Goldman Repurchase Facility and/or the Citi Repurchase Facility in accordance with their terms) and with a term at least equal to the term on the date hereof; provided however that the Goldman Repurchase Facility and the Citi Repurchase Facility may be paid to $0.00 in accordance with the terms and provisions of the Goldman Repurchase Facility and the Citi Repurchase Facility, as applicable.

(aa)   Bank Holding Status. Ally Financial will continue to maintain its bank holding company status with the Board.

(bb)   Fannie Mae Collateral Account. On the last day of each month (beginning with the date hereof), the Borrower shall deliver a notice to the Lender setting forth the amount on deposit in the Fannie Mae Collateral Account, provided that if any such date is not a Business Day, such notice shall be delivered to the Lender on the next succeeding Business Day. To the

extent not prohibited by Fannie Mae, the Borrower shall promptly notify the Lender (and provide a copy of any written request) of any request it receives from Fannie Mae indicating either (i) that the Borrower must deposit additional amounts in the Fannie Mae Collateral Account or (ii) that the Borrower is entitled to withdraw amounts from the Fannie Mae Collateral Account and such notice shall include the amount required to be deposited or withdrawn, as applicable.

(cc)   Fannie Mae Information.   On or about July 30, 2010, and thereafter as requested by the Lender in its sole discretion, the Borrower shall make available the following individuals: (1) the Chief Executive Officer of the Guarantor and (2) the Treasury Executive of Ally Financial, to participate in discussions with Lender and provide information with respect to the following: (i) a projection of the obligations of the Borrower in connection with (A) repurchase obligations to Fannie Mae and (B) amounts that may have been required to be deposited or withdrawn from the Fannie Mae Collateral Account (the "Fannie Mae Obligations"), (ii) a projection of the impact the Fannie Mae Obligations may have on the operations of the Borrower, including but not limited to, the net impact on liquidity, statements of income, retained earnings and cash flows, (iii) a projection of the impact the Fannie Mae Obligations may have on the amount available for borrowing under the GMAC Facilities, (iv) the projected date of resolution of the Fannie Mae Obligations, and (v) such other information as may be reasonably requested by the Lender, in all cases to the extent the Borrower is not prohibited from disclosing such information.

Section 7.02 Negative Covenants of the Borrower.   The Borrower covenants and agrees with the Lender that, so long as any Loan is outstanding and until all Obligations have been paid in full, the Borrower shall not:

(a)   other than in accordance with Section 7.02(c), take any action that would directly or indirectly materially impair or materially adversely affect the Borrower's title to, or the value of, the Collateral;

(b)   create, incur or permit to exist any lien, encumbrance or security interest in or on the Collateral except (i) the security interest granted hereunder in favor of the Lender or (ii) the rights of the Agency Investors under the Contracts and Agency Investor Guidelines, or assign any right to receive income in respect thereof except as permitted under 7.02(c);

(c)   sell, lease or otherwise dispose of any Collateral (other than sales or dispositions of Servicing Rights (i) resulting from the payoff of the related Mortgage Loans or the repurchase of the related Mortgage Loans by the Borrower, (ii) as required by any relevant Agency Investor or (iii) in the ordinary course of the Borrower's servicing business) except as expressly permitted by this Agreement;

(d)   engage in any line or lines of business activity other than the businesses in substantially the same fields of enterprise as are presently conducted by it;

(e)   (i) cancel or terminate any Facility Documents to which it is a party or consent to or accept any cancellation or termination thereof, (ii) amend, amend and restate, supplement or otherwise modify any Facility Document, (iii) consent to any amendment, modification or waiver of any term or condition of any Facility Document, without the prior written consent of the Lender, which consent shall not be unreasonably withheld, provided that if the amendment of a Servicing Contract is done unilaterally by the related Agency Investor, the

prior written consent of the Lender is not required, (iv) waive any material default under or breach of any Servicing Contracts, or (v) take any other action in connection with any such Facility Documents that would impair in any material respect the value of the interests or rights of the Borrower thereunder or that would impair in any material respect the interests or rights of the Lender;

(f)    change the state of its organization unless the Borrower shall have given the Lender at least 30 days' prior written notice thereof and unless, prior to any such change, the Borrower shall have filed, or caused to be filed, such financing statements or amendments as the Lender determines may be reasonably necessary to continue the perfection of the Lender's interest in the Collateral;

(g)    appoint any subservicers with respect to any Servicing Rights pledged to the Lender pursuant to this Agreement;

(h)    take any action that would directly or indirectly materially impair or materially adversely affect the Borrower's title to, or the value, of the Eligible Servicing Rights or materially increase the duties, responsibilities or obligations of the Borrower, with the exception of (i) that certain letter agreement relating to excess yield between the Borrower and Fannie Mae dated August 22, 2005 and the related Fannie Mae Stripped Mortgage-Backed Securities Trust Number 362, and the Mortgage Selling and Servicing Contract as defined pursuant to the Acknowledgement Agreement with Fannie Mae, (ii) that certain Receivables Sale Agreement related to the Borrower's right to reimbursement for advances dated as of June 30, 2004, between the Borrower and GMAC Mortgage Products, Inc. (the "Receivables Sale Agreement"), as set forth in the Acknowledgment Agreement with Freddie Mac, (iii) that certain letter agreement relating to excess yield between the Borrower and Freddie Mac dated as of July 30, 2008, and (iv) any other sale, grant of Lien or other transfer or disposition of rights to receive payments of servicing fees (and other amounts in respect of the Freddie Mac Contracts or the Fannie Mae Contracts that otherwise would constitute Servicing Rights) in excess of the minimum servicing fees that either Freddie Mac or Fannie Mae requires servicers to retain (such rights to receive such excess servicing fees and other amounts being herein called "Excess Servicing Rights"), so long as, concurrently with any such transaction, (A) the Borrower delivers to the Lender a new Subsequent Electronic File and a new Book Value Report reflecting the Eligible Servicing Rights after giving effect to such transaction, and (B) the Borrower repays the Loans to the extent necessary to cure any Borrowing Base Deficiency that otherwise would result from such transaction. Each transaction permitted under the foregoing clause (iii) is herein called an "Excess Servicing Rights Disposition". In connection with each Excess Servicing Rights Disposition, the Lender agrees to execute and deliver, promptly upon request and receipt of payment of all Obligations in respect of the related Excess Servicing Rights, such releases and financing statement amendments as may be reasonably requested by the Borrower to reflect the fact that the relevant Excess Servicing Rights are no longer subject to the Liens granted under the Facility Documents; and

(i)    make any Restricted Payments other than Permitted Tax Distributions, unless such Permitted Tax Distributions would cause the occurrence of a Default or Event of Default under this Agreement.

Section 7.03 <u>Notice of Certain Occurrences</u>. The Borrower covenants and agrees with the Lender that, so long as any Loan is outstanding and until all Obligations have been paid in full:

(a)    <u>Defaults</u>. As soon as possible, but in any event within one Business Day, after the occurrence of the Borrowers' knowledge of any Default, the Borrower shall furnish to the Lender a written statement of a Responsible Officer of the Borrower setting forth details of such Default and no more than three (3) Business Days after the Borrower's knowledge of any Default a Borrower's Responsible Officer's written statement setting forth the action that the Borrower has taken or proposes to take with respect to such Default;

(b)    <u>Litigation</u>. As soon as possible, but in any event within three (3) Business Days, after its knowledge thereof, the Borrower shall furnish to the Lender notice of any material action, suit or proceeding instituted by or against the Borrower, any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority as to which there is a reasonable likelihood of an adverse decision, reasonably likely to have a Material Adverse Effect, or that questions the validity or enforceability of the Facility Documents, or seeks to prevent the consummation of any of the transactions contemplated by the Facility Documents, but excluding matters that have been disclosed in writing to the Lender prior to June 4th, 2008;

(c)    <u>Material Adverse Effect on Collateral</u>. Upon the Borrower becoming aware of any default related to any Collateral which should reasonably be expected to have a material adverse effect on the enforceability, perfection or priority of the Lender's security interest in the Collateral;

(d)    <u>Change of Control</u>. The Borrower shall furnish the Lender notice of any Change of Control upon the occurrence of such event;

(e)    <u>Reserved</u>.

(f)    <u>Servicing Contract Transfer</u>. The transfer, expiration without renewal, termination or other loss of all or any part of any Servicing Contract (or the termination or replacement of the Borrower thereunder), the reason for such transfer, loss or replacement, if known to it and the effects that such transfer, loss or replacement will have (or will likely have) on the prospects for full and timely collection of all amounts owing to the Borrower under or in respect of the Borrower's Servicing Contracts;

(g)    <u>Agency Notices</u>. The Borrower shall promptly furnish the Lender copies of all notices it receives from Fannie Mae or Freddie Mac indicating any adverse fact or circumstance in respect of the Borrower which adverse fact or circumstance may entitle Fannie Mae or Freddie Mac, respectively, to terminate or to threaten to terminate the Borrower with cause;

(h)    <u>Agency Investor Notices</u>. Copies of all notices it receives from either Agency Investor that materially affect the Eligible Servicing Rights, including any notice received with respect to the events set forth in Section 6.01(r)(i) through (iv), and any demand by either Agency Investor or an Insurer for the repurchase of or indemnification with respect to a mortgage loan and the reason for such repurchase or indemnification within three (3) Business Days after Borrower receives notice thereof;

26

(i)     Servicer Rating.  The Borrower shall furnish the Lender notice of any decrease in any servicer rating of the Borrower by Fannie Mae, Freddie Mac or any rating agency to a level below the level on the date hereof;

(j)     Other.  Within fifteen (15) Business Days after the Lender's request, the Borrower will furnish to the Lender such other information, documents, records or reports with respect to the Collateral or the corporate affairs, conditions or operations, financial or otherwise, of the Borrower as the Lender may from time to time reasonably request.

(k)     Bank Holding Status.  The Borrower shall furnish to the Lender notice as soon as possible, but in any event within one (1) Business Day of Borrower's knowledge thereof, that the Board has rescinded, cancelled or otherwise terminated Ally Financial's bank holding company status.

(l)     Fannie Mae Requirements.  Notice of any change in Fannie Mae's requirements regarding the Borrower's or the Guarantor's minimum consolidated tangible net worth or any change in Fannie Mae's requirements regarding the Guarantor's consolidated liquidity within three (3) Business Days after Borrower receives notice thereof.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.01  Events of Default.  The following events shall be "Events of Default":

(a)     The Borrower shall fail to make any payment or deposit to be made by it hereunder when due (whether of principal or interest at stated maturity, upon acceleration, or at mandatory prepayments);

(b)     The Borrower shall fail to comply with the requirements of (i) Subsections 7.01(j), 7.02 (other than 7.02(g)), or 7.03; (ii) Subsections 7.01(f), (m)(i), (m)(ii), (p), (w), (x) or (y) and such default shall continue unremedied for a period of one (1) Business Day; (iii) Subsection 7.01(d), (i), (m)(iii), (o), 7.02(g) or, solely to the extent the Borrower is contesting in good faith any lien, encumbrance or security interest in or on the Collateral, 7.02(b), and such default shall continue unremedied for a period of ten (10) Business Days; or (iv) Subsections 7.01(a), (c), (k) or (l) and such default shall continue unremedied for a period of thirty (30) days; or the Borrower shall otherwise fail to observe or perform any other agreement contained in this Agreement or any other Facility Document and such failure to observe or perform shall continue unremedied for a period of five (5) Business Days;

(c)     (i) The Borrower shall fail to comply with the requirements of Subsections 6.01(b), (e)(ii), (g), (j), (n), (o), (p), (q) or (r) or, solely to the extent that the Borrower is contesting in good faith any proceeding or investigation, (f), or Ally Financial fails on any day to maintain bank holding company status, and any failure described in this clause (i) continues unremedied for a period of ten (10) Business Days, (ii) the Borrower shall fail to comply with Subsection 6.01(m), and such failure continues unremedied for a period of thirty (30) days, or (iii) any other representation or warranty made or deemed to be made by the Borrower (or any of the Borrower's officers) under or in connection with this Agreement (other than the representations and warranties set forth in Section 6.02(a)–(g) which shall be considered solely for the purpose of

determining the Market Value of the Collateral unless: (1) Borrower shall have made any such representations and warranties with knowledge that they were materially false or misleading at the time made or (2) any such representations and warranties have been determined by Lender in its sole discretion to be materially false or misleading on a regular basis), any other Facility Document or any written information, certificate, or report delivered pursuant hereto shall be breached in any material respect or shall prove to have been false or incorrect in any material respect when made or repeated or deemed to have been made or repeated;

(d)    (1) The failure of the Borrower to be an approved servicer under the guidelines of either Agency Investor with respect to which any Eligible Servicing Rights pledged under this Agreement relate, (2) the Borrower fails to service in accordance with the Freddie Mac Guides or the Fannie Mae Guides and the Lender determines in its good faith discretion that such failure may have a Material Adverse Effect, (3) the Borrower is terminated as servicer with respect to any Eligible Servicing Rights by either Agency Investor (except if the provisions of Section 7.01(m)(iii)(a)-(c) are met), (4) the Borrower shall at any time be terminated by Fannie Mae or Freddie Mac as servicer for cause, (5) the Borrower shall at any time be terminated as servicer with respect to any whole loan servicing rights that make up a material portion of Borrower's servicing portfolio, or (6) receipt by the Borrower of a notice from either Agency Investor indicating material breach, default or material non-compliance by the Borrower which the Lender reasonably determines may entitle such Agency Investor to terminate the Borrower, which notice has not been rescinded or nullified within five (5) Business Days of its receipt by the Borrower or such lesser time as Lender believes is necessary to protect its interest and provides Borrower with written notice thereof, as the case may be;

(e)    Any "event of default" or other breach or failure to perform shall have occurred and shall be continuing beyond the expiration of any applicable grace period under the terms of any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds entered into by the Borrower, the Guarantor or any Material Affiliate on the one hand and any third party (including an Affiliate of the Borrower, the Guarantor or any Material Affiliate but excluding the Lender or any Affiliate of Lender), which relates to the Indebtedness of such Borrower, Guarantor or Material Affiliate in an amount individually or in the aggregate greater than $25,000,000;

(f)    Reserved;

(g)    The Lender does not, or ceases to, have a first priority perfected security interest in the Collateral or any material part thereof, subject only to the interests of Freddie Mac with respect to Freddie Mac Servicing Rights and any Collateral related thereto or Fannie Mae with respect to Fannie Mae Servicing Rights and any Collateral related thereto, other than as a result of a release of such security interest by the Lender and such default continues unremedied for a period of one (1) Business Day after the earlier of (i) a Responsible Officer of the Borrower having actual knowledge thereof and (ii) written notice of such default from the Lender;

(h)    Reserved;

(i)    The Borrower shall at any time and for any reason no longer be approved as an owner of servicing rights by either Agency Investor or any other event shall occur with respect to the Borrower's relationship with either Agency Investor that could reasonably be expected to have a Material Adverse Effect;

(j)    Any "event of default" or other breach or failure to perform shall have occurred and shall be continuing beyond the expiration of any applicable grace period under any instrument, agreement or contract between the Borrower, the Guarantor or any Material Affiliate, on the one hand, and the Lender or any of Lender's Affiliates on the other;

(k)    The Borrower shall fail to maintain either (i)(1) at all times while Fannie Mae is utilizing the monthly Peak Score rating system, a monthly Peak Score which equates to "Excellent" or better or (2) at all times after Fannie Mae has developed and implemented a replacement rating system for the monthly Peak Score rating system, a score or rating in respect of such replacement rating system that is reasonably equivalent to a monthly Peak Score of "Excellent" or better, as agreed upon by the Borrower and the Lender, or (ii) an Investor Reporting and Remitting rating from Freddie Mac which equates to "Tier 2" or better;

(l)    The Borrower's Consolidated Tangible Net Worth as of the last Business Day of each fiscal month shall be less than $250,000,000 or the Guarantor's Consolidated Liquidity as of any Business Day shall be less than $250,000,000; provided the Borrower agrees that any proposed change to the Goldman Repurchase Facility, the GMAC Facilities or any other financing facility which has the effect of imposing a financial covenant (on the Borrower or the Guarantor) which is more restrictive or in addition to this subsection 8.01(l) shall be notified to Lender two (2) Business Days prior to its effectiveness and if in the sole judgment of Lender such proposed change is more restrictive or in addition to the financial covenant contained in this subsection 8.10(l), such financial covenant(s) shall be deemed to be incorporated by reference into this subsection 8.01(l), and shall thereafter continue in effect for purposes of this Agreement. Any such incorporation by reference into this subsection 8.01(l) shall take effect concurrently with the effectiveness of the relevant provision in the Citi, Repurchase Facility, the Goldman Facility, the GMAC Facilities or any other financing facility. Notice of such incorporation shall be provided by Lender to the parties hereto;

(m)    The failure of Borrower to maintain the  Freddie Mac or Fannie Mae net worth requirements;

(n)    Any judgment or order for the payment of money in excess of $25,000,000 shall be rendered against the Borrower, the Guarantor or any Material Affiliate, by a court, administrative tribunal or other body having jurisdiction over them and the same shall not be satisfied or discharged (or provisions shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within thirty (30) days from the date of entry thereof or, if a stay of execution is procured, thirty (30) days from the date such stay is lifted;

(o)    [reserved];

(p)    [reserved].

(q)    (1) The Borrower, the Guarantor or any Material Affiliate files a voluntary petition in bankruptcy, seeks relief under any provision of any Insolvency Law or consents to the filing of any petition against it under any such law; (2) a proceeding shall have been instituted by any Affiliate of the Borrower, the Guarantor or Material Affiliate in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Borrower, Guarantor or Material Affiliate in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or

other similar official of such Borrower, Guarantor or Material Affiliate, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs, (3) a proceeding shall have been instituted by any Person (other than an Affiliate of such Borrower, Guarantor or Material Affiliate) in a court having jurisdiction in the premises seeking a decree or order for relief in respect of the Borrower, the Guarantor or any Material Affiliate in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Borrower, Guarantor or Material Affiliate, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs and such Borrower, Guarantor or Material Affiliate shall have failed to obtain a relief (including, without limitation, a dismissal) or a stay of such involuntary proceeding within thirty (30) days, (4) the admission in writing by the Borrower, the Guarantor or any Material Affiliate of its inability to pay its debts as they become due, (5) the Borrower, the Guarantor or any Material Affiliate consents to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official, of all or any part of its Property or any custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official takes possession of all or any part of the Property of the Borrower, the Guarantor or any Material Affiliate; (6) the Borrower, the Guarantor or any Material Affiliate makes an assignment for the benefit of any of its creditors; or (7) the Borrower, the Guarantor or any Material Affiliate generally fails to pay its debts as they become due;

(r)     Any Governmental Authority or any Person, agency or entity acting or purporting to act under Governmental Authority (including any Agency) shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the Property of the Borrower, the Guarantor or any Material Affiliate, or shall have taken any action to displace the management of any of the Borrower, the Guarantor or any Material Affiliate or to curtail the Borrower's, the Guarantor's or any Material Affiliate's authority in the conduct of its business; or

(s)     The Borrower shall fail to effect a repayment of all Loans hereunder within three (3) Business Days if (i) any GMAC Facility shall be prepaid by the borrowers thereunder other than in the ordinary course or pursuant to a refinancing thereof, (ii) the maturity date of any GMAC Facility shall be changed to be a date earlier than the Loan Repayment Date hereof, (iii) the commitment amount of the lender under the GMAC Facilities shall be reduced by an amount less than the amount available for borrowing on the date hereof (taking into consideration any mandatory reduction of the GMAC Facilities).

Section 8.02 <u>Remedies</u>.

(a)     <u>Optional Acceleration</u>. Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 8.01(q)</u>, the Lender may by written notice to the Borrower, terminate the Facility and declare all Loans and all other Obligations to be immediately due and payable.

(b)     <u>Automatic Acceleration</u>. Upon the occurrence of an Event of Default described in <u>Section 8.01(q)</u> the Facility shall be automatically terminated and the Loans and all other Obligations shall be immediately due and payable upon the occurrence of such event, without demand or notice of any kind.

30

(c)    Remedies. Upon any acceleration of the Loans pursuant to this Section 8.02, the Lender, in addition to all other rights and remedies under this Agreement or otherwise, shall have all other rights and remedies provided under the UCC of each applicable jurisdiction and other applicable laws, which rights shall be cumulative. The Borrower agrees, upon the occurrence of an Event of Default and notice from the Lender, to assemble, at its expense, all of the Collateral that is in its possession (whether by return, repossession, or otherwise) at a place designated by the Lender. All out-of-pocket costs incurred by the Lender in the collection of all Obligations, and the enforcement of its rights hereunder, including reasonable attorneys' fees and legal expenses, shall be paid out of the Collateral. Without limiting the foregoing, upon the occurrence of an Event of Default and the acceleration of the Loans pursuant to this Section 8.02, the Lender may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, (i) enter upon any premises where any of the Collateral which is in the possession of the Borrower (whether by return, repossession, or otherwise) may be located and take possession of and remove such Collateral, (ii) sell any or all of such Collateral, free of all rights and claims of the Borrower therein and thereto, at any public or private sale, and (iii) bid for and purchase any or all of such Collateral at any such sale. Any such sale shall be conducted in a commercially reasonable manner and in accordance with applicable law. The Borrower hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings or process of law in connection with the exercise by the Lender of any of its rights and remedies upon the occurrence of an Event of Default. Each of the Lender and the Borrower shall have the right (but not the obligation) to bid for and purchase any or all Collateral at any public or private sale. The Borrower hereby agrees that in any sale of any of the Collateral, the Lender is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable law (including, without limitation, compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Governmental Authority, and the Borrower further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner. The Lender shall not be liable for any sale, private or public, conducted in accordance with this Section 8.02(c). If an Event of Default occurs, and upon acceleration of the Loans hereunder, the Loans and all other Obligations shall be immediately due and payable, and collections on the Eligible Servicing Rights and proceeds of sales and securitizations of Eligible Servicing Rights, and other Collateral will be used to pay the Obligations.

Section 8.03    Collection Account; Application of Proceeds.

(a)    Collection Account. Prior to the Closing Date, the Borrower and the Lender shall have established at Ally Bank in the name of the Lender a non-interest bearing segregated special purpose trust account (such account being herein called the "Collection Account"). The Lender will maintain the Collection Account only with the financial institution acting as Lender hereunder or with a bank that has agreed with the Lender to comply with instructions originated by the Lender directing the disposition of funds in such account without the further consent of the Borrower, such agreement to be in form and substance reasonably satisfactory to the Lender (a "Collection Account Control Agreement"). The Lender may, at any

time and without notice to, or consent from, the Borrower, transfer, or direct the transfer of, funds from the Collection Account to satisfy the Lender's obligations under the Facility Documents if an Event of Default shall have occurred and be continuing.

(b)    <u>Distributions from the Collection Account</u>. On each Business Day during which an Event of Default has occurred and is continuing hereunder, the Lender shall apply Collections in the following order:

(i)    to pay to the Lender, any fees due pursuant to the terms hereof;

(ii)    if the Borrower is then servicing the Eligible Servicing Rights pledged as Collateral hereunder, to pay to the Borrower (x) the Borrower Default Servicing Fee and (y) the Recovered Advance Amount to an account specified in writing by the Borrower;

(iii)    to pay to the Lender or any Indemnified Party an amount equal to any other amounts (including the Outstanding Aggregate Loan Amount) then due to such Persons pursuant to this Agreement that have not been paid by the Borrower (and to the extent that there are insufficient funds to pay all of the foregoing amounts, such amount shall be distributed to the foregoing parties, pro rata in accordance with the amounts due to such parties); and

(iv)    to pay any remaining amounts to the Borrower by transferring such amount to the account specified in writing by the Borrower.

## ARTICLE IX

## ASSIGNMENT

Section 9.01  <u>Restrictions on Assignments</u>.  The Borrower shall not assign its rights hereunder or any interest herein without the prior written consent of the Lender. The Lender may, in the ordinary course of its business and in accordance with applicable law, assign any or all of its rights and obligations under this Agreement, under any Loan pursuant to this Agreement or under the other Facility Documents, to any of its Affiliates or Subsidiaries and, with the Borrower's prior written consent, any bank or other entity; provided, that (i) such assignment is approved by Fannie Mae and Freddie Mac, and (ii) the Borrower, Fannie Mae, Freddie Mac and the related assignee enter into an acknowledgement agreement in which Fannie Mae and Freddie Mac acknowledges the related security interest of such assignee in the Fannie Mae Contracts and the Freddie Mac Contracts.

Section 9.02  <u>Evidence of Assignment; Endorsement on Notes</u>.  The Lender hereby agrees that it shall, endorse the Notes to reflect any assignments made pursuant to this <u>Article IX</u> or otherwise.

Section 9.03  <u>Rights of Assignee</u>.  Upon the assignment the Lender of all of its rights and obligations hereunder, under the Notes and under the other Facility Documents to an assignee in accordance with <u>Section 9.01</u>, such assignee shall have all such rights and obligations of the Lender as set forth in such assignment or delegation, as applicable, and all references to the Lender in this Agreement or any Facility Document shall be deemed to apply to such assignee to the extent of such interest; provided that the Borrower shall not be liable to any

assignee for amounts pursuant to Article V in excess of the amount that would have been payable thereunder to the initial Lender. If any interest in any Facility Document is transferred to any assignee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such assignee, concurrently with the effectiveness of such transfer, to comply with the provisions of Section 3.02.

Section 9.04  Permitted Participants; Effect.  The Lender may, in the ordinary course of its business and in accordance with applicable law, at any time (and from time to time) sell to one or more banks or other entities (each a "Participant") participating interests in any Loan owing to the Lender, any Note held by the Lender, any Commitment Amount of the Lender, or any other interest of the Lender under this Agreement or the other Facility Documents. In the event of any such sale by the Lender of a participating interest to a Participant, (i) the Lender's obligations hereunder and under the other Facility Documents shall remain unchanged; (ii) the Lender shall remain solely responsible to the Borrower for the performance of such obligations; and (iii) the Lender shall remain the owner of its Loans and the holder of any Note issued to it in evidence thereof for the purposes under the Loan Documents. All amounts payable by the Borrower under this Agreement shall be determined as if the Lender had not sold such participating interests. The Borrower and the Lender shall continue to deal solely and directly with each other in connection with the Lender's rights and obligations under the Facility Documents.

Section 9.05  Voting Rights of Participants.  The Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Facility Documents other than any amendment, modification, or waiver with respect to any Loan or Commitment Amount in which such Participant has an interest which forgives principal, interest, or fees or reduces the interest rate or fees payable with respect to any such Loan or Commitment Amount, extends the Loan Repayment Date, postpones any date fixed for any regularly scheduled payment of principal of, or interest or fees on, any such Loan or Commitment Amount or releases all or substantially all of the Collateral (other than as expressly permitted pursuant to the Facility Documents).

## ARTICLE X

## INDEMNIFICATION

Section 10.01  Indemnities by the Borrower.  Without limiting any other rights which any such Person may have hereunder or under applicable law, the Borrower hereby agrees to indemnify, the Lender, its Affiliates, successors, permitted transferees and assigns and all officers, directors, shareholders, controlling persons, employees and agents of any of the foregoing (each an "Indemnified Party"), forthwith on demand, from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any of them arising out of or as a result of this Agreement, the other Facility Documents, or any transaction contemplated hereby or thereby excluding, however, (a) Indemnified Amounts to the extent a court of competent jurisdiction determines that they resulted from gross negligence, bad faith or willful misconduct on the part of such Indemnified Party, (b) in the event that the Lender has assigned its rights or delegated its obligations in respect of this Agreement, and the Indemnified Amounts with respect to such assignee exceed the Indemnified Amounts that would otherwise have been payable by

the Borrower to the Lender, the amount of such excess, (c) Excluded Taxes (other than any incremental Taxes arising solely by reason of a breach by any Transaction Party of its obligations under this Agreement), and (d) any lost profits or indirect, exemplary, punitive or consequential damages of any Indemnified Party. In any suit, proceeding or action brought by the Lender in connection with any Collateral for any sum owing thereunder, or to enforce any provisions of any Collateral, the Borrower will save, indemnify and hold the Lender harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by the Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Borrower. The Borrower also agrees to reimburse the Lender as and when billed by the Lender for all the Lender's reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or the preservation of the Lender's rights under this Loan Agreement, the Note, any other Facility Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its counsel. The Borrower hereby acknowledges that, notwithstanding the fact that the Note is secured by the Collateral, the obligation of the Borrower under the Note is a recourse obligation of the Borrower. Under no circumstances shall any Indemnified Party be liable to the Borrower for any lost profits or indirect, exemplary, punitive or consequential damages.

Section 10.02 <u>General Provisions</u>.  If for any reason the indemnification provided above in <u>Section 10.01</u> (and subject to the limitations on indemnification contained therein) is unavailable to an Indemnified Party or is insufficient to hold an Indemnified Party harmless on the basis of public policy, then the Borrower shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received by such Indemnified Party on the one hand and the Borrower on the other hand but also the relative fault of such Indemnified Party as well as any other relevant equitable considerations.

The provisions of this <u>Article X</u> shall survive the termination of this Agreement and the payment of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

Section 11.01 <u>Amendments, Etc</u>.  Neither this Agreement nor any provision hereof may be amended, supplemented, or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender.

Section 11.02 <u>Notices, Etc</u>.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including facsimile communication) and shall be personally delivered or sent by certified mail or overnight air courier, postage prepaid, or by facsimile, to the intended party at the address or facsimile number of such party set forth opposite its name on <u>Schedule 11.02</u> or at such other address or facsimile number as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall be effective, (i) if personally delivered, when received, (ii) if sent by overnight air courier, the next Business Day after delivery to the related air courier

service, if delivery is guaranteed as of the next Business Day, (iii) if sent by certified mail, three Business Days after having been deposited in the mail, postage prepaid, and (iv) if transmitted by facsimile, when sent, receipt confirmed by telephone or electronic means, if sent during business hours (if sent after business hours, then on the next Business Day) except that notices and communications pursuant to Article I shall not be effective until received. In addition to the available means of delivering notice above, all notices and other communication provided for hereunder shall, unless stated otherwise herein, be in writing and shall be effective when sent via email during business hours to the Borrower at treasurer@gmacrescap.com and to the Lender at bobbie.theivakumaran@citi.com, once receipt has been confirmed by telephone or electronic means (if sent via email after business hours, then on the next Business Day).

Section 11.03 <u>No Waiver; Remedies</u>. No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 11.04 <u>Binding Effect; Assignability</u>. This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender, and their respective successors and assigns, <u>provided</u>, <u>however</u>, that nothing in the foregoing shall be deemed to authorize any assignment not permitted in <u>Section 9.01</u>.

Section 11.05 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT). EACH PARTY HERETO HEREBY SUBMITS TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT IN THE BOROUGH OF MANHATTAN AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY OTHER JURISDICTION.

EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 11.06 Reserved.

Section 11.07 Entire Agreement.    This Agreement and the Facility Documents embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understanding relating to the matters provided for herein.

Section 11.08 Acknowledgement. The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and deliver of this Agreement, the Note and the other Facility Documents to which it is a party;

(b)    the Lender has no fiduciary relationship to the Borrower, and the relationship between the Borrower and the Lender is solely that of debtor and creditor; and

(c)    no joint venture exists among or between the Lender and the Borrower.

Section 11.09 Captions and Cross References. The various captions (including, without limitation, the table of contents) in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement. References in this Agreement to any underscored Section or Exhibit are to such Section or Exhibit of this Agreement, as the case may be.

Section 11.10 Execution in Counterparts.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

Section 11.11 Confidentiality.    Each party hereto agrees for the benefit of the other party and for the benefit of the Guarantor that it will hold any confidential information received from the other party or from the Guarantor pursuant to this Agreement or any other Facility Document, it being understood that this Agreement is confidential information of the Lender, in strict confidence, as long as such information remains confidential except for disclosure to (i) its Affiliates, (ii) its legal counsel, accountants, and other professional advisors or to a permitted assignee or participant, (iii) regulatory officials, (iv) any Person as requested pursuant to or as required by law, regulation, or legal process, (v) any Person in connection with any legal proceeding to which it is a party, (vi) rating agencies if requested or required by such agencies in connection with a rating, and (vii) either Agency Investor. The Lender also agrees that it will comply with all applicable securities laws with respect to any non-public information of the type referenced in the preceding sentence in its possession. This Section 11.11 shall survive termination of this Agreement.

Section 11.12 Survival. The obligations of the Borrower under Sections 3.02 and 10.01 hereof shall survive the repayment of the Loans and the termination of this Loan Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and

warranty, and the Lender shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lender may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____

Name: Jerry Lombardo
Title:  Global Funding & Liquidity Executive and Treasurer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____

Name: Jerry Lombardo
Title:  Treasury Executive

CITIBANK, N.A., as Lender

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____
Name:
Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____
Name:
Title:

CITIBANK, N.A., as Lender

By:_____
Name:    Susan Mills
Title:    Vice President

SCHEDULE I

DEFINITIONS

1.1    <u>Definitions</u>.  As used in this Agreement the following terms have the meanings as indicated:

"<u>Acknowledgement Agreement</u>" means, as applicable, (a) the Acknowledgement Agreement, dated March 12, 2009, by and between Freddie Mac, the Borrower as servicer, and the Lender as secured party pursuant to which Freddie Mac shall acknowledge the Lender's security interest in the Freddie Mac Servicing Contracts, together with any amendments and addenda thereto, or (b) the Acknowledgement Agreement dated as of September 7, 2007 by and among Fannie Mae, the Borrower as servicer, and the Lender as secured party, pursuant to which Fannie Mae acknowledges the security interest of the Lender in the Fannie Mae Servicing Contracts, together with any amendments and addenda thereto.

"<u>Advance</u>" means any P&I Advance, T&I Advance, Corporate Advance or S&A Advance.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power (a) to vote 20% or more of the securities (on a fully diluted basis) having ordinary voting power for the directors or managing general partners (or their equivalent) of such Person, or (b) to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Agency Investor</u>" shall mean either Freddie Mac or Fannie Mae individually, or collectively as the context may require.

"<u>Agency Investor Guidelines</u>" means the Fannie Mae Guide and the Freddie Mac Guide as amended from time to time.

"<u>Agreement</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Ally Bank</u>" shall mean Ally Bank, a Utah state-chartered bank, formerly known as GMAC Bank.

"<u>Ally Financial</u>" shall mean Ally Financial, Inc., a Delaware corporation, formerly known as GMAC Inc.

"<u>Ancillary Income</u>" means all money which is due and payable in connection with each Mortgage Loan other than the Servicing Fee and specifically including, without limitation, late charge fees, assignment transfer fees, insufficient funds check charges, amortization schedule fees, interest from escrow accounts and all other incidental fees and charges and any Float Benefit, in each case, to the extent such amounts are allocable to a Mortgage Loan, and specifically excluding the Excluded Collateral.

"Applicable Law" shall mean as to any Person, any law, treaty, rule or regulation (including the Investment Company Act of 1940, as amended) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Applicable Margin" shall mean at any date 6.00% (600) basis points.

"Attributed Rate" shall mean (a) with respect to Eligible Servicing Rights (other than "payment option ARMs" and "HELOCs"), from and after June 30, 2010, through and including August 31, 2010, 72.5%, and (b) with respect to "payment option ARMs" and "HELOCs", zero (0). For the avoidance of doubt, if more than one of the foregoing applicable percentages could apply to the Eligible Servicing Rights, the lowest percentage shall be applied.

"Available Loan Amount" means, on any Business Day, an amount equal to the lesser of (a) (i) the then current Commitment Amount plus the Uncommitted Amount minus (ii) the Outstanding Aggregate Loan Amount, and (b) the Borrowing Base.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Book Value Report" means a report, substantially in the form of Exhibit 2.04(b).

"Borrower" has the meaning set forth in the preamble.

"Borrower Default Servicing Fee" means the fee payable to Borrower as compensation for servicing the Mortgage Loans when an Event of Default has occurred and is continuing in an amount equal to $5 per Mortgage Loan per month.

"Borrower Funding Request" means the request to fund a Loan on any Funding Date, substantially in the form of Exhibit 2.03, delivered in accordance with Section 2.03(b).

"Borrower Valuation Period" has the meaning set forth in Section 2.03(a).

"Borrowing Base" means, as of any date of determination, an amount equal to the aggregate Collateral Value of all Collateral for Loans that have been and remain pledged to the Lender hereunder.

"Borrowing Base Deficiency" has the meaning set forth in Section 2.08(b).

"Borrowing Base Report" means the borrowing base report, substantially in a format agreed upon between Borrower and Lender, delivered by the Lender in accordance with Section 2.04(b).

"Borrowing Base Shortfall Day" has the meaning set forth in Section 2.08(b).

"Business Day" means any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in the State of New York are required or authorized by law to be closed.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership

2

interests, including, without limitation, limited and general partnership interests, in a person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents" shall mean (i) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States government or any agency thereof, (ii) certificates of deposit and eurodollar time deposits with weighted average maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000 and a rating of at least A+ and A1 from S&P and Moody's, respectively, (iii) repurchase obligations of any commercial bank satisfying the requirements of clause (ii) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (iv) securities with weighted average maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A+ by S&P or A1 by Moody's, (v) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (ii) of this definition or, (vi) shares of 2-a7 money market mutual funds rated AAA by Moody's & S&P that have a weighted average maturity of 90 days or less or similar funds which invest exclusively in assets satisfying the requirements of clauses (i) through (v) of this definition.

"Change in Law" means a change in any Applicable Law applicable to the Facility Documents that would have an adverse effect, as determined by Lender in its sole discretion, on Lender's exercise of remedies following an Event of Default.

"Change of Control" means (i) the Disposition of all or substantially all of the assets of the Borrower and the Guarantor, taken as a whole (excluding any Dispositions of "purchased mortgage loans" permitted pursuant to the Cit Repurchase Facility or the Goldman Facility), (ii) any "person" or "group" (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934), other than General Motors, Cerberus Capital Management, L.P., any of its affiliates or any affiliated funds or managed accounts, the United State Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts, shall acquire ownership, directly or indirectly, beneficially or of record, in the aggregate, Capital Stock representing a majority of the Voting Stock of the Guarantor; or (iii) at any time, the Guarantor shall fail to own, directly or indirectly, 100% of the aggregate issued and outstanding Capital Stock of the Borrower; provided that in no event shall the sale by Guarantor of its European operations be deemed to be a Change of Control.

"Citi Repurchase Facility" shall mean that certain Master Repurchase Facility as evidenced by the Master Repurchase Agreement, dated as of May 14, 2010 by and between GMAC Mortgage, LLC as Seller, Residential Funding Company, LLC as Seller, Residential Capital, LLC as Guarantor and Citibank, N.A. as Buyer, as such agreement may be amended, in accordance with the Master Repurchase Agreement.

"Closing Date" means the date on which all of the conditions set out in Section 5.01 are satisfied.

3

"Collateral" has the meaning set forth in Section 4.01.

"Collateral Value" means, for purposes of determining the value of the Borrowing Base from time to time, with respect to the Eligible Servicing Rights, the Attributed Rate for Eligible Servicing Rights multiplied by the Market Value of the Eligible Servicing Rights as determined by the Lender in good faith.

"Collection Account" means the account established by Borrower in accordance with Section 8.03(a).

"Collection Account Control Agreement" has the meaning set forth in Section 8.03(a).

"Collection Period" means, with respect to any Monthly Settlement Date, the calendar month most recently ended.

"Collections" means any Servicing Fees, any excess servicing rights or retained yield, and any Ancillary Income that Borrower, as servicer, is entitled to receive pursuant to the Freddie Mac Contracts or the Fannie Mae Contracts.

"Commitment Amount" means, as of the Closing Date, $700,000,000. The Commitment Amount may be reduced in accordance with Section 2.10.

"Commitment Reduction Date" has the meaning set forth in Section 2.10.

"Compliance Certificate" means a certificate in form acceptable to the Lender substantially in the form of Exhibit 7.01 hereto.

"Consolidated Liquidity" means the unrestricted and unencumbered cash and Cash Equivalents of the Guarantor, determined on a consolidated basis.

"Consolidated Net Worth" shall mean, at any date, the amount which would appear in accordance with GAAP on a consolidated balance sheet of Guarantor and its Subsidiaries opposite the heading "equity" (or any similar item).

"Consolidated Tangible Net Worth" shall mean, at any date, the result of (a) Consolidated Net Worth, minus (b) the net book value of all assets on the consolidated balance sheet of Guarantor used to calculate Consolidated Net Worth that would be treated as intangible assets under GAAP (including goodwill, trademarks, trade names, service marks, service names, copyrights, patents, organizational expenses and the excess of any equity in any Subsidiary over the cost of the investment in such Subsidiary, but not including mortgage servicing rights or any retained interest in securitized receivables), all as determined on a consolidated basis in accordance with GAAP.

"Corporate Advance" means, collectively, (a) any advance (other than those described in clause (b) below) made by the Borrower as servicer pursuant to the Freddie Mac Contracts or the Fannie Mae Contracts to inspect, protect, preserve or repair properties that secure defaulted Mortgage Loans or that have been acquired through foreclosure or deed in lieu of foreclosure or other similar action pending disposition thereof, or for similar or related purposes, including, but not limited to, necessary legal fees and costs expended or incurred by the Borrower as servicer in connection with foreclosure, bankruptcy, eviction or litigation actions with or involving

4

Mortgagors on defaulted Mortgage Loans, as well as costs to obtain clear title to such a property, to protect the priority of the lien created by a Mortgage Loan on such a property, and to dispose of properties taken through foreclosure or by deed in lieu thereof or other similar action, (b) any advance made by the Borrower as servicer pursuant to the Freddie Mac Contracts or the Fannie Mae Contracts to foreclose or undertake similar action with respect to a Mortgage Loan, and (c) any other out of pocket expenses incurred by the Borrower as servicer pursuant to the Freddie Mac Contracts or the Fannie Mae Contracts (including, for example, costs and expenses incurred in loss mitigation efforts and in processing assumptions of Mortgage Loans), to the extent such advances are reimbursable pursuant to the Freddie Mac Contract or the Fannie Mae Contracts, as applicable.

"Custodial File" means with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan being held by the Custodian that contains the mortgage documents pertaining to such Mortgage Loan.

"Custodian" means any financial institution that holds documents for any of the Mortgage Loans on behalf of the Agency Investor related thereto.

"Default" means an Event of Default or an Unmatured Event of Default.

"Default Rate" means, with respect to any Loan for any Interest Period, and any late payment of fees or other amounts due hereunder, the LIBOR Rate for the related Interest Period (or for all successive Interest Periods during which such fees or other amounts were delinquent), plus the Applicable Margin, plus 4% per annum.

"Disposition" shall mean, with respect to any Person, any sale or other whole or partial conveyance of all or any portion of such Person's Property, or any direct or indirect interest therein to a third party, including the granting of any purchase options, rights of first refusal, rights of first offer or similar rights in respect of any portion of such assets or the subjecting of any portion of such assets to restrictions on transfer.

"Dollars" means dollars in lawful money of the United States of America.

"Electronic Files" means the Initial Electronic File or any Subsequent Electronic File, as the context requires.

"Eligible Seller" means a Person who sold Mortgage Loans to the Borrower, which Mortgage Loans the Borrower subsequently resold to another party or securitized, and retained the servicing rights and obligations with respect thereto under the Servicing Contracts.

"Eligible Servicing Rights" means, as of any date of determination, Servicing Rights with respect to which the eligibility criteria set out in Schedule 6.02 hereto are true and correct as of such date.

"Event of Default" has the meaning set forth in Section 8.01.

"Excess Servicing Rights" has the meaning set forth in Section 7.02(h).

"Excess Servicing Rights Disposition" has the meaning set forth in Section 7.02(h).

"Excluded Taxes" has the meaning set forth in Section 3.02.

"Excluded Collateral" means all right, title and interest of the Borrower, whether now owned or hereafter acquired, in, to and under (a) its rights to reimbursement for all Advances made under the Freddie Mac Contracts or the Fannie Mae Contracts, (b) the rights to "Excess Yield" transferred in connection with Fannie Mae Stripped Mortgage-Backed Securities Trust Number 362, (c) the right to reimbursement for advances transferred in connection with the Receivables Sale Agreement, (d) the rights to excess yield transferred in connection with that certain letter agreement dated as of July 30, 2008, (e) any Excess Servicing Rights that have been the subject of an Excess Servicing Rights Disposition, and (f) all monies due or to become due and all amounts received or receivable with respect to the property described in the foregoing clauses (a), (b), (c), (d), (e), and (f) and all proceeds (including "proceeds" as defined in the Uniform Commercial Code in effect in all relevant jurisdictions) thereof, together with all rights of the Borrower to enforce its rights to reimbursement in respect of such property.

"Extension Fee" has the meaning set forth in Section 3.03(d).

"Facility" means the loan facility provided to the Borrower by the Lender pursuant to this Agreement.

"Facility Documents" means this Agreement, the Notes, the Servicing Contracts, each Acknowledgement Agreement, the Guaranty, the Collection Account Control Agreement and all notices, certificates, financing statements and other documents to be executed and delivered by the Borrower in connection with the transactions contemplated by this Agreement.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"Fannie Mae Collateral Account" means the account established by the Borrower for the benefit of Fannie Mae with The Bank of New York Mellon.

"Fannie Mae Contracts" With respect to all Pools, the Mortgage Selling and Servicing Contracts between the Borrower and Fannie Mae, the applicable Master Commitments between the Borrower and Fannie Mae, and the applicable Schedules of Mortgages (Form 2005), in each case as such agreements may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Fannie Mae Guides" means the Fannie Mae Selling Guide and the Fannie Mae Servicing Guide, as amended from time to time, and any related announcements, directives and correspondence issued by Fannie Mae.

"Fannie Mae Servicing Rights" means all Servicing Rights with respect to Fannie Mae.

"Fee Letter" means that certain Fee Side Letter dated as of the date hereof by and between Borrower and Lender.

"Fitch" means Fitch, Inc., and its successors in interest.

"Float Benefit" means the net economic benefit resulting from investments of funds representing escrow and custodial deposits held for the account of the servicer, Freddie Mac or Fannie Mae relating to the Mortgage Loans.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"Freddie Mac Contracts" means the applicable Purchase Contract (as defined in the Freddie Mac Guide) between the Borrower and Freddie Mac, the related Purchase Documents (as defined in the Freddie Mac Guide), the applicable Mortgage Submission Schedule (Form 11), and the applicable Agreement for Subsequent Transfer of Servicing (Form 981) or Agreement for Concurrent Transfer of Servicing (Form 960), including any modifications or waivers relating to those contracts.

"Freddie Mac Guide" means the Freddie Mac Single-Family Seller/Servicer Guide, and all amendments and additions thereto.

"Freddie Mac Servicing Rights" means the Servicing Rights with respect to Freddie Mac.

"Funding Date" shall mean the date of any Loan advance hereunder as provided in Section 2.03 hereof.

"Funding Notice Date" means the date on which the Borrower shall deliver a Borrower Funding Request, which shall be at least three (3) Business Days prior to the date which the Borrower has requested as a Funding Date as provided therein; provided, however, that if the Borrower has elected to exercise a Borrower Valuation Period in connection with such Loan, then the Borrower shall deliver a Borrower Funding Request by 3:00 p.m. on the Business Day prior to the date which the Borrower has requested as a Funding Date as provided therein .

"GAAP" shall mean United States Generally Accepted Accounting Principles inclusive of, but not limited to, applicable statements of Financial Accounting Standards issued by the Financial Accounting Standards Board, its predecessors and successors and SEC Staff Accounting Guidance as in effect from time to time applied on a consistent basis.

"GM Trust" means a trust initially naming General Motors as beneficiary thereof that has been established to hold Capital Stock in GMAC held directly or indirectly by General Motors as of May 22, 2009.

"GMAC Facilities" means (i) that certain $1,100,000,000 line of credit facility provided by Ally Financial to the Borrower and (ii) that certain senior debt loan agreement, dated as of December 30, 2009 provided by Ally Financial to Borrower, in each case as in effect on the date hereof and as amended in accordance with the Citi Repurchase Facility.

"Goldman Repurchase Facility" shall mean that certain Master Repurchase Facility as evidenced by the Master Repurchase Agreement, dated as of May 14, 2010 by and between GMAC Mortgage, LLC as Seller, Residential Funding Company, LLC as Seller, Residential Capital, LLC as Guarantor, and Goldman Sachs Mortgage Company as Buyer, as such agreement may be amended, in accordance with the Master Repurchase Agreement.

"Governmental Action" means all permits, authorizations, registrations, consents, approvals, waivers, exceptions, variances, orders, decrees, licenses, exemptions, publications, filings, notices to and declarations of or with, or required by, any Governmental Authority, or required by any Legal Requirement.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any municipality and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantor" means ResCap and any successor thereto.

"Guaranty" shall mean, the Amended and Restated Master Guarantee of the Guarantor in favor of the Lender, dated June 16, 2010; provided, that this Agreement shall be deemed a "Finance Document" pursuant to the terms and conditions of such Master Guarantee."

"Indebtedness" means as to any Person, (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) indebtedness of others secured by a Lien on the property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person; (e) capital lease obligations of such Person; (f) obligations of such Person under repurchase agreements or like arrangements; (g) indebtedness of others guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; and (j) any other indebtedness of such Person by a note, bond, debenture or similar instrument.

"Indemnified Amounts" has the meaning set forth in Section 10.01.

"Indemnified Party" has the meaning set forth in Section 10.01.

"Initial Borrowing Base Report" means the borrowing base report, substantially in the form agreed to between the Borrower and the Lender, delivered by the Lender in accordance with Section 2.04(a) based on the Initial Electronic File.

"Initial Borrower Funding Request" means the request to fund the Loan on the Initial Funding Date, substantially in the form of Exhibit 2.03, delivered in accordance with Section 2.03(a), that is current as of the end of the previous calendar month.

"Initial Electronic File" means the electronic file, containing the information agreed to between the Borrower and the Lender, delivered by the Borrower to the Lender pursuant to Section 2.03(a).

8

"Initial Funding Date" means the Funding Date on which the first Loan is made pursuant to this Agreement, as specified in the Initial Borrower Funding Request.

"Insolvency Law" shall mean any bankruptcy, reorganization, moratorium, delinquency, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction in effect at any time during the term of this Agreement."

"Interest Period" means, for any Loan, (i) an initial period beginning on the Funding Date for such Loan and ending on the last day of the calendar month in which such Funding Date occurs; and (ii) subsequent consecutive periods thereafter, beginning on the first day of each subsequent calendar month and ending on the earlier of (x) the last day of the same calendar month in which such Interest Period began and (y) the Loan Repayment Date.

"Interest Rate" means, with respect to all Loans, the LIBOR Rate plus the Applicable Margin, payable on the last Business Day of each Interest Period.

"Investment Company Act" means the Investment Company Act of 1940, as amended, together with the rules and regulations promulgated thereunder.

"Lender" means Citibank, N.A. together with any affiliate of Citibank N.A. through which Citibank, N.A. elects at its absolute discretion, by notice to the Borrower, to make any Loans available to the Borrower provided that for all purposes of voting or consenting with respect to (a) any amendment, supplementation or modification of any Facility Document or (b) any default or Event of Default and its consequences or (c) any other matter as to which a Lender may vote or consent of this Agreement, the Lender making such election shall be deemed Citibank, N.A. rather than such affiliate, which shall not be entitled to vote or consent.

"Lender Commitment Reduction" has the meaning set forth in Section 2.10.

"LIBOR Rate" means, with respect to each day on which any Loan is outstanding (or if such day is not a Business Day, the next succeeding Business Day), the rate appearing on Page 3750 of the Dow Jones "Markets" screen (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Lender from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time on such day, as the rate for dollar deposits with a maturity of one (1) month. In the event that the rate set forth above is not available at such time for any reason, then such rate with respect to such Interest Period shall be the rate at which dollar deposits of an amount comparable to the amount of the requested Loan and for a maturity of one (1) month are offered by the principal London office of JPMorgan Chase Bank in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, on such day.

"Lien" means with respect to any property or asset of any Person (a) any mortgage, lien, pledge, charge or other security interest or encumbrance of any kind in respect of such property or asset or (b) the interest of a vendor or lessor arising out of the acquisition of or agreement to acquire such property or asset under any conditional sale agreement, lease purchase agreement or other title retention agreement, and in each case, other than Fannie Mae's rights and interests in

the related Fannie Mae Servicing Rights or Freddie Mac's rights and interests in the related Freddie Mac Servicing Rights.

"Loan Repayment Date" means, the earlier to occur of (i) August 31, 2010, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

"Loans" has the meaning set forth in Section 2.01.

"Margin Call" has the meaning set forth in Section 2.08.

"Market Value" means, with respect to (i) any Eligible Servicing Right included in the Borrowing Base the value ascribed to such asset by the Lender in its sole reasonable discretion, taking into account any outstanding obligations owed by Lender to Fannie Mae or Freddie Mac, as applicable, as marked to market as often as daily, (ii) a Servicing Right which is not an Eligible Servicing Right included in the Borrowing Base or deemed by Lender as ineligible or otherwise uncollectible, zero. The Lender's determination of Market Value shall be conclusive upon the parties, absent manifest error on the part of the Lender. The Borrower acknowledges that the Lender's determination of Market Value is for the limited purpose of determining Collateral Value for lending purposes hereunder without the ability to perform customary purchaser's due diligence and is not necessarily equivalent to a determination of the fair market value of the Eligible Servicing Rights achieved by obtaining competing bids in an orderly market in which the Borrower is not in default under a revolving debt facility and the bidders have adequate opportunity to perform customary loan and servicing due diligence.

"Material Adverse Effect" shall mean a material adverse effect since December 31, 2009 on (a) the property, business, operations, financial condition or prospects of Guarantor and its Subsidiaries taken as a whole, (b) the ability of either Borrower or Guarantor to perform its obligations under any of the Facility Documents to which it is a party, (c) the validity or enforceability of any of the Facility Documents, (d) the rights and remedies of Lender under any of the Facility Documents, or (e) the Collateral; provided, however, that a Material Adverse Effect shall not include the occurrence of a ratings downgrade of Ally Financial, or any of its Affiliates (including Guarantor) or any of their outstanding debt (it being understood that the events giving rise to such downgrade may constitute a Material Adverse Effect).

"Material Affiliate" shall mean any or all of GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC and any Subsidiary of Guarantor which meets either of the following conditions: (i) the Guarantor and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of such Subsidiary exceeds 10% of the total assets of the Guarantor and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or (ii) such Subsidiary's income from continuing operations before income taxes, extraordinary items and the cumulative effect of a change in accounting principles exceeds 10% percent of such income of the Guarantor and its Subsidiaries on a consolidated basis for the most recently completed fiscal year; provided that the foregoing shall not include any special purpose entity that is an issuer, depositor, purchaser or borrower in any non-recourse structured finance transaction, or any entity organized under the laws of any jurisdiction other than the United States, any state thereof, and the District of Columbia.

10

"MBS" means Mortgage Backed Security.

"MBS Trust" means any of the trusts or trust estates in which the Mortgage Loans being serviced by the Borrower pursuant to the Freddie Mac Contracts or the Fannie Mae Contracts are held by the related MBS Trustee.

"MBS Trustee" means a trustee or indenture trustee for an MBS Trust.

"Monthly Settlement Date" means the 12th day of each calendar month or, if such 12th is not a Business Day, the first Business Day thereafter, commencing September 12, 2007.

"Moody's" means Moody's Investors Service, Inc. or its successor in interest.

"Mortgage" means a mortgage, mortgage deed, deed of trust, or other instrument creating a first lien on or first priority security interest in an estate in fee simple in real property securing a Mortgage Note including any riders, assumption agreements or modifications relating thereto.

"Mortgage File" means, with respect to any Mortgage Loan, a file or files pertaining to such Mortgage Loan that contains the mortgage documents pertaining to such Mortgage Loan which are specified in Exhibit A-2, and incorporated herein by reference, and any additional mortgage documents pertaining to such Mortgage Loan required by the Freddie Mac Guide or the Fannie Mae Guide.

"Mortgage Loan" means any mortgage loan or installment sales contract or similar asset serviced by the Borrower pursuant to any Servicing Contract.

"Mortgage Note" means note or other evidence of indebtedness of a Mortgagor secured by a Mortgage pertaining to a Mortgage Loan.

"Mortgagor" means the obligor on a Mortgage Note.

"Net Worth", with respect to any Person, means an amount equal to, on a consolidated basis, such Person's stockholder equity (determined in accordance with GAAP).

"Non-Utilization Fee" has the meaning set forth in Section 3.03(b).

"Note" means the amended and restated promissory note of the Borrower issued to the Lender, in substantially the form of Exhibit 2.02(a), as amended from time to time, and any replacement thereof or substitution therefor.

"Obligations" means the Outstanding Aggregate Loan Amount, all accrued interest thereon and all other amounts payable by the Borrower to the Lender pursuant to this Agreement, the Note or any other Facility Document.

"Outstanding Aggregate Loan Amount" means, at any time, the aggregate principal amount of the Loans funded by the Lender, minus the aggregate amount of payments received by the Lender prior to such time and applied to reduce the principal amount of the Loans.

"Participant" has the meaning set forth in Section 9.04.

11

"Permitted Tax Distributions" shall mean with respect to any period during which Guarantor is treated as a disregarded entity or partnership for U.S. federal, state and/or local income tax purposes, distributions to Borrower's or Guarantor's direct owner(s) (whether pursuant to a tax sharing agreement or otherwise) to fund the income tax liabilities of such owner(s) (or, if a direct owner is a pass-through entity, of an indirect owner) resulting from Borrower or Guarantor being a partnership or a disregarded entity for federal, state and/or local income tax purposes, in an aggregate amount not to exceed the product of (a) the net taxable income of Borrower or Guarantor for such period, calculated in accordance with applicable law, reduced by any cumulative net taxable loss with respect to all prior post-closing periods (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the current period; and (b) the highest combined marginal federal, state and/or local income tax rate (taking into account the deductibility of state and local income taxes for federal income tax purposes and the character of the taxable income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any such direct or indirect owner of Borrower or Guarantor. Subject to the terms of this Agreement, Permitted Tax Distributions may be made quarterly based on the Borrower's or the Guarantor's good faith estimate of its taxable income, with appropriate adjustments to be made on an annual basis based upon determination of Borrower's or Guarantor's actual taxable income.

"Person" means any individual, corporation, estate, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, business trust, trust, unincorporated organization, government or any agency or political subdivision thereof, or other entity of a similar nature.

"P&I" means principal and interest.

"P&I Advance" means any advance disbursed by the Borrower as servicer pursuant to any Servicing Contract of delinquent interest and/or principal on the related Mortgage Loans.

"Pool" means a group of Mortgage Loans, which are the security for a mortgage-backed security issued by any Agency Investor.

"Prepayment Notice" means a notice substantially in the form of Exhibit 2.08(b).

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Recourse Servicing Obligations" means with respect to any mortgage loan, (a) any obligation or liability (actual or contingent) of the servicer in respect of such Mortgage Loan to indemnify the relevant Agency Investor for any losses incurred in respect of any Mortgage Loan that was determined at the time of sale to have been ineligible for sale to the applicable Agency Investor due to a breach of one or more representations and warranties but accepted for purchase subject to any waiver and indemnity obligations, or (b) any other obligations described from time to time as being sold "with recourse" as such term (or terms of similar meaning) are defined in the Freddie Mac Guide or Fannie Mae Guide, as applicable, each as amended or supplemented from time to time, and any successor publications thereto having the same general contents and purpose.

"Recovered Advance Amount" means amounts paid from time to time pursuant to Section 8.03 hereof to the extent the servicer has recovered such amounts during the related Collection Period from proceeds received from the related Mortgagor or from the related mortgage insurance or related guaranty claim receipts, and specifically related to the amount of P&I Advances, Prepayment Interest Shortfall advances and Corporate Advances theretofore made by the Borrower on the related Mortgage Loan which have not previously been reimbursed.

"Related Escrow Account Balances" means the balance, on the related Funding Date, of any escrow or impound accounts maintained by the Borrower which relate to any Mortgage Loan, including, without limitation, items escrowed for mortgage insurance, property taxes (either real or personal), hazard insurance, flood insurance, ground rents, or any other escrow or impound items required by any Mortgage Note or Mortgage, reduced by any unpaid real estate taxes or insurance premiums required to be paid by the Borrower, with respect to which amounts have been escrowed by the related Mortgagor.

"Related Principal and Interest Custodial Accounts" means all principal and interest custodial accounts maintained by the Borrower that relate to any Mortgage Loan or Pool.

"Relevant Electronic File" means, on any Business Day, the most recently delivered Electronic File that was delivered at least three Business Days prior to such date of determination (or such lesser number of days as the Lender may deem acceptable from time to time in its sole discretion).

"Repayment Notice" means a notice substantially in the form of Exhibit 2.08(a).

"Requirements of Law" means, with respect to any Person or any of its property, the certificate of incorporation or articles of association and by-laws, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether Federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

"ResCap" means Residential Capital, LLC, a Delaware limited liability company and its successor in interest.

"Responsible Officer" means (a) with respect to the Borrower, the chief executive officer, president, chief financial officer, treasurer, assistant vice president, assistant treasurer, secretary or assistant secretary of the Borrower, or any other officer having substantially the same authority and responsibility; provided, that with respect specifically to the obligations of the Borrower set forth in Section 7.01(i) hereof, only the chief financial officer, treasurer, assistant treasurer, or comptroller of the Borrower shall be deemed to be a Responsible Officer; and (b) with respect to the Lender, a lending officer charged with responsibility for the day to day management of the relationship of such institution with the Borrower.

"Restricted Payment" shall mean with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by

13

virtue of redemption or otherwise, on any class of equity securities (including, warrants, options or rights therefor) issued by such Person, which may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly other than payments made in the ordinary course solely for the purpose of originating, servicing and/or administrating Mortgage Loans.

"S&A Advance" means (a) any amount paid by the Borrower to either Agency Investor to repurchase a Mortgage Loan previously sold by the Borrower to such Agency Investor due to an ineligibility of such Mortgage Loan for sale for such Agency Investor, and (b) any amount required to be paid by the Borrower to such Agency Investor or an MBS Trust as a result of an overstated principal balance by an Eligible Seller with respect to a Mortgage Loan sold by such Eligible Seller to the Borrower and further conveyed by the Borrower to such Agency Investor or an MBS Trust, in respect of either of which the Borrower has a valid and enforceable contractual claim against an Eligible Seller who had sold such Mortgage Loan to the Borrower to repurchase such Mortgage Loan from the Borrower for at least the same amount paid by the Borrower to such Agency Investor or an MBS Trust to repurchase such Mortgage Loan.

"S&P" means Standard & Poor's, a division of The McGraw Hill Companies, Inc.

"Servicing Contracts" means the Freddie Mac Contracts and/or the Fannie Mae Contracts, individually or collectively, as the context requires.

"Servicing Fee" means the total amount of the fee payable to the Borrower as compensation for servicing and administering the Mortgage Loans.

"Servicing Rights" means with respect to each Mortgage Loan, all the Borrower's right, title and interest in, to and under the related Servicing Contracts, whether now or hereafter existing, acquired or created, whether or not yet accrued, earned, due or payable, as well as all other present and future right and interest under such Servicing Contracts, including, without limitation, the right (i) to receive the Servicing Fee income payable after the related Funding Date (including without limitation, any Uncollected Fees), (ii) to receive reimbursement for any Advances, (iii) any and all Ancillary Income received after the related Funding Date, (iv) to hold and administer the Related Escrow Account Balances, (v) to hold and administer, in accordance with the applicable Agency Investor Guidelines, the Related Principal and Interest Custodial Account, the Custodial File, and the Mortgage File arising from or connected to the servicing of such Mortgage Loan under this Agreement and (vi) all proceeds, income, profits, rents and products of any of the foregoing including, without limitation, all of the Borrower's rights to proceeds of any sale or other disposition of the Servicing Rights; but with respect to (i)-(vi) above specifically excluding the Excluded Collateral.

"Subsequent Electronic File" means any electronic file, in form and substance acceptable to the Lender and containing the information agreed to between the Borrower and the Lender; delivered by the Borrower to the Lender on each Funding Notice Date, pursuant to Section 2.03(b), and reflecting Mortgage Loans serviced by the Borrower as of the close of business no more than two (2) Business Days prior to the date of its delivery, except with regard to the Subsequent Electronic File delivered on or prior to the third Business Day of each calendar month, which shall reflect such information as of the close of business on the last Business Day of the preceding calendar month.

"Subsidiary" means a corporation of which a Person and/or its other Subsidiaries own, directly or indirectly, such number of outstanding shares as have more than 50% of the ordinary voting power for the election of directors.

"T&I Advance" means an advance made by the Borrower as servicer with respect to a Mortgage Loan pursuant to the servicer's obligation to do so under any Servicing Contract of real estate taxes and assessments, or of hazard, flood or primary mortgage insurance premiums, required to be paid by the related Mortgagor under the terms of the related Mortgage Loan.

"Taxes" has the meaning set forth in Section 3.02.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of Delaware.

"Uncollected Fees" With respect to any Mortgage Loan, any accrued late charges, NSF fees, assumption fees, and other fees charged to Mortgagors in connection with the servicing of such Mortgage Loan which have not been collected by the Borrower as of the related Funding Date.

"Uncommitted Amount" shall mean $50,000,000.

"Unmatured Event of Default" means any event that, with the giving of notice or lapse of time, or both, would become an Event of Default.

"Utilization Amount" has the meaning set forth in Section 3.03(b).

"Voting Stock" means, with respect to any person, such person's Capital Stock having the right to vote for election of directors (or the equivalent thereof) of such person under ordinary circumstances.

SCHEDULE 5.01

<u>CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF THIS AGREEMENT</u>

(a)    This Agreement duly executed by the parties hereto;

(b)    The Note duly executed by the Borrower;

(c)    The Guaranty and the Fee Letter, duly executed by the parties thereto;

(d)    A certificate of a secretary or assistant secretary of each of the Borrower or the Guarantor, each certifying the names and true signatures of the persons authorized on the Borrower's or Guarantor's behalf to sign, as applicable, this Agreement, the Notes and the other Facility Documents to be delivered by the Borrower and Guarantor in connection herewith;

(e)    A certificate of a Responsible Officer of each of the Borrower and the Guarantor, certifying as to the accuracy and completeness of each of the representations and warranties contained in each Facility Document to which the Borrower or the Guarantor is a party (except for representations and warranties made in respect of specific mortgage loans) and as to the absence of Default under such Facility Documents to which the Borrower or the Guarantor is a party as of the Closing Date;

(f)    The certificate of formation, of each of the Borrower and the Guarantor, duly certified by the Secretary of State of Delaware, as of a recent date acceptable to Lender; and

(g)    Receipt by the Lender of the Extension Fee and all additional fees due on, or prior to the Closing Date, as required under the Agreement and any other fee letter or amendment which contemplated a fee entered into between the Lender and the Borrower on, or prior to the date hereof (including the reimbursement of all reasonable expenses relating to due diligence performed by the Lender prior to the Closing Date).

SCHEDULE 5.02

<u>CONDITIONS PRECEDENT TO EACH LOAN</u>

(including, with respect to paragraphs (b)-(e) inclusive,
to the automatic continuation of a Loan upon the conclusion of an Interest Period)

(a)    The Lender shall have received a duly executed copy of the Borrower Funding Request for such Loan in accordance with <u>Section 2.03</u>;

(b)    The making of such Loan, and the application of the proceeds thereof, shall not result in the Outstanding Aggregate Loan Amount exceeding the sum of the Commitment Amount plus the Uncommitted Amount;

(c)    The making of such Loan, and the application of the proceeds thereof, shall not result in a Borrowing Base Deficiency;

(d)    On the applicable Funding Date, the following statements shall be true (and the Borrower by delivering such Borrower Funding Request shall be deemed to have certified that):

(i)    the representations and warranties set forth in <u>Article VI</u> are true and correct on and as of such day as though made on and as of such day and shall be deemed to have been made on such day (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case, such representation or warranty shall have true and correct as of such date);

(ii)    the Borrower is in compliance with all covenants set forth in <u>Article VII</u>;

(iii)    all conditions precedent to the making of such Loan have been satisfied; and

(iv)    no Default has occurred and is continuing, or would result from such Loans;

(v)    all of the Servicing Rights included in the most recently delivered Electronic File are Eligible Servicing Rights, except for any non-qualifying Servicing Rights listed as such therein, and all Recourse Servicing Obligations have been identified as such in a schedule attached to such Electronic File;

(e)    the amount of the initial Loan shall be not less than $100,000,000;

(f)    the Lender shall have received (i) with respect to the Initial Borrower Funding Request, the Initial Electronic File; and (ii) with respect to any subsequent Borrower Funding Request, a Subsequent Electronic File on or prior to time required by <u>Section 2.03</u> Funding Date; and

(g)    all Facility Documents shall continue to be in full force and effect in all material respects.

17

SCHEDULE 6.02

ELIGIBILITY CRITERIA WITH RESPECT TO THE SERVICING RIGHTS

All owned Servicing Rights for loans serviced by the Borrower on behalf of Fannie Mae and all owned Servicing Rights for loans serviced by the Borrower on behalf of Freddie Mac

SCHEDULE 7.01(j)

CITIBANK REQUIRED INVESTOR REPORTS

Address for delivery of monthly reports:

Kathryn Munkres
Assistant Vice President
Phoenix Analytic Services, Inc.
303.539.7227
www.phnxcap.com

SCHEDULE 11.02

NOTICES

The Borrower:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention: Jerry Lombardo
Email: jerry.lombardo@ally.com
Phone: (952) 857-6565
Facsimile: (952) 857-7166

With copy to:

Hu Benton, Associate Counsel
7501 Wisconsin Ave., Suite 800
Bethesda, MD 20814
Tel. No. (301) 215-6320
Facsimile No. (301) 664-6999
e-mail: hu.benton@ally.com

The Lender:

Citibank, N.A.
390 Greenwich Street, 6th Floor
New York, NY 10013
Attention: Bobbie Theivakumaran
Email: bobbie.theivakumaran@citi.com
Telecopier number: (646) 291-3799
Telephone number: (212) 723-6753

EXHIBIT 2.02(a)

## FORM OF PROMISSORY NOTE

[        ], 2007

$_____

New York, New York

FOR VALUE RECEIVED, GMAC Mortgage, LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to the order of CITIBANK, N.A. (the "Lender"), at the principal office of the Lender at 390 Greenwich Street, New York, New York 10013, in lawful money of the United States, and in immediately available funds, the principal sum of [_____] ($[_____]) (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Loan Agreement), on the dates and in the principal amounts provided in the Loan Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Loan Agreement.

The date, amount and interest rate of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof; provided, that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under the Loan Agreement or hereunder in respect of the Loans made by the Lender.

This Note is the Note referred to in the Amended and Restated Loan and Security Agreement dated as of June 16, 2010 (as amended, supplemented or otherwise modified and in effect from time to time, the "Loan Agreement") between the Borrower, and the Lender, and evidences Loans made by the Lender thereunder. Terms used but not defined in this Note have the respective meanings assigned to them in the Loan Agreement.

The Borrower agrees to pay all the Lender's costs of collection and enforcement (including reasonable attorneys' fees and disbursements of Lender's counsel) in respect of this Note when incurred, including, without limitation, reasonable attorneys' fees through appellate proceedings.

Notwithstanding the pledge of the Collateral, the Borrower hereby acknowledges, admits and agrees that the Borrower's obligations under this Note are recourse obligations of the Borrower to which the Borrower pledges its full faith and credit.

The Borrower, and any indorsers or guarantors hereof, (a) severally waive diligence, presentment, protest and demand and also notice of protest, demand, dishonor and

21

nonpayments of this Note, (b) expressly agree that this Note, or any payment hereunder, may be extended from time to time, and consent to the acceptance of further Collateral, the release of any Collateral for this Note, the release of any party primarily or secondarily liable hereon, and (c) expressly agree that it will not be necessary for the Lender, in order to enforce payment of this Note, to first institute or exhaust the Lender's remedies against the Borrower or any other party liable hereon or against any Collateral for this Note. No extension of time for the payment of this Note, or any installment hereof, made by agreement by the Lender with any person now or hereafter liable for the payment of this Note, shall affect the liability under this Note of the Borrower, even if the Borrower is not a party to such agreement; provided, however, that the Lender and the Borrower, by written agreement between them, may affect the liability of the Borrower.

Any reference herein to the Lender shall be deemed to include and apply to every subsequent holder of this Note. Reference is made to the Loan Agreement for provisions concerning optional and mandatory prepayments, Collateral, acceleration and other material terms affecting this Note.

Any enforcement action relating to this Note may be brought by motion for summary judgment in lieu of a complaint pursuant to Section 3213 of the New York Civil Practice Law and Rules.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS NOTE). THE BORROWER HEREBY SUBMITS TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE BORROWER HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT IN THE BOROUGH OF MANHATTAN AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. THE BORROWER HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THE LOAN AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE LENDER. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY OTHER JURISDICTION.

**THE BORROWER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT
TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING
OUT OF OR RELATING TO THIS NOTE.**

GMAC MORTGAGE, LLC

By:
Name:
Title:

23

## SCHEDULE OF LOANS

This Note evidences Loans made under the within-described Loan Agreement to the Borrower, on the dates, in the principal amounts and bearing interest at the rates set forth below, and subject to the payments and prepayments of principal set forth below:

| Date Made | Principal Amount of Loan | Amount Paid or Prepaid | Unpaid Principal Amount | Notation Made by |
|-----------|--------------------------|------------------------|-------------------------|------------------|
|           |                          |                        |                         |                  |

EXHIBIT 2.03
to Loan and Security Agreement

## FORM OF BORROWER FUNDING REQUEST

[DATE]

Citibank, N.A.
390 Greenwich Street, 4th Floor
New York, New York 10013

Attention: [      ]

Ladies and Gentlemen:

This [Initial] Borrower Funding Request is delivered to you pursuant to Section 2.03(a) of the Amended and Restated Loan and Security Agreement, dated as of June 16, 2010 (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), between GMAC Mortgage, LLC, as the Borrower (the "Borrower") and Citibank, N.A., as lender (the "Lender"). Unless otherwise defined herein or as the context otherwise requires, terms used herein have the meaning assigned thereto under Schedule I of the Loan Agreement.

The undersigned hereby requests that a Loan be made in the aggregate principal amount of $____ on _____, 20__ to be secured by the [Fannie Mae]/[Freddie Mac] Servicing Rights.

As of the date hereof, the Borrower has [(i) a [Peak Score] / [NEW SCORE] from Fannie Mae which equates to ["Excellent" or better] / [NEW SCORE] or better and (ii)] an Investor Reporting and Remitting rating from Freddie Mac which equates to "Tier 2" or better.

An updated Electronic File, revised to reflect the acquisition of any additional Servicing Rights purchased by the Borrower since the most recently delivered Electronic File, has been delivered pursuant to Section 2.03 of the Loan Agreement. Such Electronic File reflects all Eligible Servicing Rights that constitute Collateral under the terms and conditions of the Agreement and a hyperlink to such Electronic File is attached hereto as Schedule One.

[TO BE USED FOR ALL FUNDINGS THAT INVOLVE NEW COLLATERAL]    [The Borrower hereby acknowledges and agrees that (other than with respect to the Agreement) (i) the Servicing Rights currently pledged as Collateral under the Agreement and (ii) any of the Servicing Rights identified on Schedule One attached hereto, are not currently assigned, pledged, conveyed or encumbered under any credit, warehouse or financing facility.  The Borrower further acknowledges and agrees that (other than under the Agreement) it shall not assign, pledge, convey or encumber such Servicing Rights under any credit, warehouse or financing facility in the future, except with prior notice to, and consent from, the Lender.]

The undersigned hereby acknowledges that the delivery of this [Initial] Borrower Funding Request and the acceptance by the undersigned of the proceeds of the Loan requested hereby constitute a representation and warranty by the undersigned that all conditions precedent

25

to such Loan specified in Article V of the Loan Agreement have been satisfied and will continue to be satisfied after giving effect to such Loan.

The undersigned further represents and warrants that either (a) the Freddie Mac Guides , the Fannie Mae Guides, and the Servicing Contracts have not been materially modified since the last date the undersigned delivered a Borrower Funding Request or (b) attached hereto is a true and complete description of any changes to the applicable Servicing Contracts since the last date the undersigned delivered a Borrower Funding Request.

Please wire transfer the proceeds of the Loan to the following account pursuant to the following instructions:

Wachovia Bank ABA: 031-201-467
a/c GMAC Mortgage, LLC, 2100012764397

The undersigned has caused this [Initial] Borrower Funding Request to be executed and delivered, and the certification and warranties contained herein to be made, by its duly authorized officer this _____ day of _____, 20__.

GMAC MORTGAGE, LLC, as the Borrower

By: _____
     Name:
     Title:


Acknowledged and agreed:

CITIBANK, N.A.

By: _____
     Name:
     Title:

## SCHEDULE ONE

## ELECTRONIC FILE

[hyperlink to be provided by Borrower]

EXHIBIT 2.04(b)

## FORM OF BOOK VALUE REPORT

**BOOK VALUE REPORT – Exhibit 2.04(b)**

| Delivery Date: [Month Day, 20[   ]] | | | |
|---|---|---|---|
| **Determination/Valuation Date:** | | | |
| **[Month Day, 20[   ]]\*** | **Book Value** | **Loan Count** | **UPB** |
| Fannie Mae – net | $0 | 0 | $0 |
| Fannie Mae Excess – 20[   ] | $0 | 0 | $0 |
| Fannie Mae – total | $0 | 0 | $0 |
| | | | |
| Freddie Mac – net | $0 | 0 | $0 |
| Freddie Mac Excess– 20[   ] | $0 | 0 | $0 |
| Freddie Mac – total | $0 | 0 | $0 |

\* Determination/Valuation Date shall not be more that two (2) calendar days prior to the Delivery Date.

All Eligible Servicing Rights that constitute Collateral under the terms and conditions of the Agreement are identified on Schedule One attached hereto.

EXHIBIT 2.08(a)

## FORM OF REPAYMENT NOTICE

[   ], 20__

TO:    The Lender as defined in the Loan Agreement referred to below

Reference is hereby made to the Amended and Restated Loan and Security Agreement, dated as of June 16, 2010 (as heretofore amended, the "Loan Agreement"), between GMAC Mortgage, LLC, as the Borrower (the "Borrower") and Citibank, N.A., as lender (the "Lender"). Capitalized terms not otherwise defined herein are used herein as defined in the Loan Agreement.

The Borrower hereby notifies you that, pursuant to Section 2.08[(a)/(b)] of the Loan Agreement, it shall make a repayment of the Loans outstanding under the Loan Agreement to the Lender on [     ], 20__ in the amount of $_____.

Also included in the repayment amount shall be accrued and unpaid interest, in the amount of $_____.

29

The undersigned has caused this Repayment Notice to be executed and delivered by its duly authorized officer this_____ day of _____, 20__.

GMAC MORTGAGE, LLC, as the Borrower


By:_____
    Name:
    Title:

EXHIBIT 2.08(b)

FORM OF PREPAYMENT NOTICE

[      ], 20__

TO:    The Lender as defined in the Loan Agreement referred to below

Reference is hereby made to the Amended and Restated Loan and Security Agreement, dated as of June 16, 2010 (as heretofore amended, the "Loan Agreement"), between GMAC Mortgage, LLC, as the Borrower (the "Borrower") and Citibank, N.A., as lender (the "Lender"). Capitalized terms not otherwise defined herein are used herein as defined in the Loan Agreement.

The Borrower hereby notifies you that pursuant to and in compliance with Section 2.09 of the Loan Agreement, it shall make a prepayment of Loans outstanding under the Loan Agreement on [      ], 20__ in the amount of $_____.

Also included in the prepayment amount shall be accrued and unpaid interest, in the amount of $_____.

31

The undersigned has caused this Prepayment Notice to be executed and delivered by its duly authorized officer this_____ day of _____, 20__.

GMAC MORTGAGE, LLC, as the Borrower

By:_____

    Name:

    Title:

EXHIBIT 4.08

<u>RESERVED</u>

EXHIBIT 7.01

## FORM OF COMPLIANCE CERTIFICATE

Citibank, N.A.
390 Greenwich Street, 4th Floor
New York, New York 10013
Attn:

Re:   Reporting Date

Reference is made to the Amended and Restated Loan and Security Agreement (the "Loan Agreement") dated as of June 16, 2010, as amended, and now in effect by and between GMAC Mortgage, LLC, (the "Borrower") and Citibank, N.A., as Lender. Terms defined in the Loan Agreement and not otherwise defined herein are used herein as defined in the Loan Agreement.

Pursuant to Section 7.01(i) of the Loan Agreement, the Borrower is furnishing to you herewith (or has recently furnished to you) the financial statements of the Borrower and the Guarantor for the fiscal period ended as of the reporting date shown above (the "Reporting Date"). Such financial statements have been prepared in accordance with GAAP and present fairly, in all material respects, the financial position of the Borrower and the Guarantor covered thereby at the date thereof and the results of its operations for the period covered thereby, subject in the case of interim statements only to normal year-end audit adjustments and the addition of footnotes.

Each of the undersigned Responsible Officers of the Borrower and the Guarantor has caused the provisions of the Loan Agreement to be reviewed and certifies to the Lender that: (a) the undersigned has no knowledge of any Default or Event of Default, (b) the undersigned has no knowledge of any Default or Event of Default under the GMAC Facilities or the Goldman Repurchase Facility, (c) the undersigned has no knowledge that the GMAC Facilities or the Goldman Repurchase Facility have been amended, modified or supplemented other than in accordance with the terms of the Citi Repurchase Facility, (d) attached hereto as Schedule 1, Schedule 2 and Schedule 3 are the representations of the Borrower and the Guarantor and computations necessary to determine that each of the Borrower and the Guarantor, as applicable, is in compliance with the provisions of the Loan Agreement as of the Reporting Date referenced thereon, and (e) to the best of the undersigned's knowledge no event has occurred since the date of the most recent financial statements upon which such covenant compliance was calculated that would cause the Borrower or the Guarantor, as applicable, to no longer be in compliance with said provisions.

The statements made herein (and in the Schedules attached hereto) shall be deemed to be representations and warranties made in a document for the purposes of Section 6.01(j) of the Loan Agreement.

SCHEDULE 1
To form of Compliance Certificate

**1.    Servicer Ratings (Section 8.01(k)):**

As of the date hereof, [(a)the Borrower's most recent [Peak Score] / [NEW SCORE] from Fannie Mae equates to [ ] (which is reflective of the most recent [Peak Score] / [NEW SCORE] received from Fannie Mae) and (b)] the Borrower's most recent Investor Reporting and Remitting rating from Freddie Mac equates to [ ] (which is reflective of the most recent Investor Reporting and Remitting rating received from Freddie Mac).

**2.    Consolidated Tangible Net Worth of the Borrower (Section 8.01(l)):**

As of the close of business for the calendar month ended _____, the Borrower was in compliance with the financial covenant set forth in Section 8.01(l).

**3.    Consolidated Liquidity of the Guarantor (Section 8.01(l)).**

As of the close of business for the calendar month ended _____, the Guarantor was in compliance with the financial covenant set forth in Section 8.01(l).

**4.    Financial Covenants:**

Attached as Schedule 2 to this Compliance Certificate are (i) the Statement of Consolidated Liquidity as of the close of business on the Business Day immediately preceding the date such certificate is delivered demonstrating the Guarantor's compliance with the financial covenants set forth in Section 8.01(l) of the Agreement and (ii) the calculations demonstrating the Guarantor's compliance with the financial covenants set forth in Section 8.01(l) of the Agreement.

**5.    Fannie Mae:**

(i)    Compliance:

(a)    As of the close of business for the calendar month ended _____, the Borrower or the Guarantor, as applicable, was in compliance with the minimum consolidated tangible net worth requirement of Fannie Mae.

(b)    Guarantor has, at all times, complied with the minimum consolidated liquidity requirement of Fannie Mae.

(ii)    The Borrower's or the Guarantor's minimum consolidated tangible net worth requirement of Fannie Mae is as follows: [_____].

(iii)    The Guarantor's minimum consolidated liquidity requirement of Fannie Mae is as follows: [_____].

(iv)    Attached as Schedule 3 to this Compliance Certificate are the calculations demonstrating the Borrower's or the Guarantor's, as applicable, compliance with the Fannie Mae covenants listed in Section 5(ii) and (iii) above.

35

6.    **<u>Freddie Mac</u>:**

(i)    Compliance:

(a) To the best of its knowledge, as of the close of business for the
calendar month ended ___, the Borrower was in compliance with
all applicable requirements of Freddie Mac, including without
limitation, any financial covenants and any servicing or other
corporate requirements.

SCHEDULE 2
To form of Compliance Certificate

1.    **<u>Calculation: Consolidated Tangible Net Worth of the Borrower
(Section 8.01(l)):</u>**

[_____]

2.    **<u>Consolidated Liquidity of the Guarantor (Section 8.01(l)):</u>**

[_____]

37

SCHEDULE 3
To form of Compliance Certificate

1.    **Calculation: consolidated tangible net worth of the Borrower (Fannie Mae):**

[_____]

2.    **Consolidated Liquidity of the Guarantor (Fannie Mae):**

[_____]