1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  RESIDENTIAL CAPITAL, LLC, et al.,          Case No.

7              Debtors.                       12-12020-mg

8  - - - - - - - - - - - - - - - - - - - - -x

9  ALFREDIA PRUITT, Plaintiff,                Adv. Proc. No.

10   - against -                              13-01350-mg

11  GMAC, et al., Defendants.

12  - - - - - - - - - - - - - - - - - - - - -x

13  JENKINS, ET AL., Plaintiffs,              Adv. Proc. No.

14   - against -                              12-01935-mg

15  RESIDENTIAL FUNDING COMPANY, LLC, ET AL.

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - -x

18              United States Bankruptcy Court

19              One Bowling Green

20              New York, New York

21              December 17, 2013

22              10:06 AM

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

1

2   (CC: Doc# 5526) Debtors' Motion, Pursuant To Rule 9019 of the

3   Federal Rules Of Bankruptcy Procedures, for Approval Of

4   Stipulation Resolving Dispute.

5

6   (Doc. No. 5501) Debtors' Motion for an Order Pursuant to

7   Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019

8   Approving Settlement Agreement Between Debtor GMAC Mortgage,

9   LLC and GVC Mortgage, Inc.

10

11   (CC: Doc# 5838) Summary of Fourth Interim Application of

12   Bradley Arant Boult Cummings LLP as Special Litigation and

13   Compliance Counsel for the Debtors for Compensation and

14   Reimbursement of Expenses Incurred for the Period May 1, 2013

15   through August 31, 2013 for Bradley Arant Boult Cummings LLP,

16   Special Counsel, period: 5/1/2013 to 8/31/2013, fee:

17   $724,297.96, expenses: $71,408.27.

18

19   (CC: Doc# 5826) Application for Interim Professional

20   Compensation/Summary of Interim Application of Bryan Cave LLP

21   as Ordinary Course Counsel for the Debtors for Compensation and

22   Reimbursement of Expenses Incurred for the Period May 1, 2013

23   through June 30, 2013 for Bryan Cave LLP, Other Professional,

24   period: 5/1/2013 to 6/30/2013, fee: $285,783.50, expenses:

25   $4,913.67.

1

2   (CC: Doc# 5801) Fourth Application for Interim Professional

3   Compensation for Carpenter Lipps & Leland LLP, Special Counsel,

4   period: 5/1/2013 to 8/31/2013, fee: $832,475.50, expenses:

5   $402,651.28.

6

7   (CC: Doc# 5830) Application for Interim Professional

8   Compensation/Summary of Fourth Interim Application of

9   Centerview Partners LLC as Investment Banker for the Debtors

10  for Compensation and Reimbursement of Expenses Incurred for the

11  Period May 1, 2013 through August 31, 2013 for Centerview

12  Partners LLC, Other Professional, period: 5/1/2013 to

13  8/31/2013, fee: $1,200,000.00, expenses: $3,878.62.

14

15  (CC: Doc# 5825) Fourth Interim Application of Curtis, Mallet-

16  Prevost, Colt & Mosle LLP as Conflicts Counsel to the Debtors

17  and Debtors in Possession for Allowance and Payment of

18  Compensation for Professional Services Rendered and

19  Reimbursement of Actual and Necessary Expenses Incurred from

20  May 1, 2013 Through and Including August 31, 2013 for Curtis,

21  Mallet-Prevost, Colt & Mosle LLP, Debtors' Attorney, period:

22  5/1/2013 to 8/31/2013, fee: $3,456,395.50, expenses:

23  $15,169.08.

24

25

1

2   (CC: Doc# 5831) Application for Interim Professional

3   Compensation/Fourth Interim Fee Application of Deloitte &

4   Touche LLP for Compensation for Services Rendered and

5   Reimbursement of Expenses as Independent Auditor and Attest

6   Service Provider to the Debtors for the Period From May 1, 2013

7   through August 31, 2013 for Deloitte & Touche LLP, Auditor,

8   period: 5/1/2013 to 8/31/2013, fee: $134,692.15, expenses:

9   $0.00.

10

11  (CC: Doc# 5793) Fourth Application for Interim Professional

12  Compensation for Dorsey and Whitney LLP, Special Counsel,

13  period: 5/1/2013 to 8/31/2013, fee: $122,807.70, expenses:

14  $1,376.97.

15

16  (CC: Doc# 5840, 5818) Application for Interim Professional

17  Compensation/Second Interim Application of Ernst & Young LLP

18  for Allowance and Payment of Compensation for Professional

19  Services and Reimbursement of Actual and Necessary Expenses for

20  Ernst & Young LLP, Other Professional, period: 5/1/2013 to

21  8/31/2013, fee: $849,954.25, expenses: $35,273.37.

22

23  (CC: Doc# 5833) Application for Interim Professional

24  Compensation/Summary of Third Interim Application of Fortace

25  LLC as Consultant for the Debtors for Compensation and

1  Reimbursement of Expenses Incurred for the Period January 1,

2  2013 through August 31, 2013 for Fortace LLC, Consultant,

3  period: 1/1/2013 to 8/31/2013, fee: $238,597.50, expenses:

4  $150,000.00.

5

6  (CC: Doc# 5853) Fourth Interim Application of FTI Consulting,

7  Inc., as Financial Advisor for the Debtors for the Compensation

8  and Reimbursement of Expenses Incurred for the Period May 1,

9  2013 through August 31, 2013 for FTI Consulting, Inc., Other

10 Professional, period: 5/1/2013 to 8/31/2013, fee:

11 $4,342,805.00, expenses: $130,547.97.

12

13 (CC: Doc# 5796) Fourth Application for Interim Professional

14 Compensation for Locke Lord LLP, Special Counsel, period:

15 5/1/2013 to 8/31/2013, fee: $222,492.30, expenses: $3,805.60,

16 filed by Locke Lord LLP.

17

18 (CC: Doc# 5841) Fourth Interim Application of Morrison Cohen

19 LLP for Allowance of Interim Compensation for Professional

20 Services Rendered and Expenses Incurred During the Period May

21 1, 2013 through August 31, 2013 for Morrison Cohen LLP, Other

22 Professional, period: 5/1/2013 to 8/31/2013, fee:

23 $1,231,368.50, expenses: $36,075.45.

24

25

1

2  (CC: Doc# 5839) Fourth Interim Application of Morrison &

3  Foerster LLP as Bankruptcy Counsel for the Debtors for

4  Compensation and Reimbursement of Expenses Incurred for the

5  Period May 1, 2013 through August 31, 2013 for Morrison &

6  Foerster LLP, Debtors' Attorney, period: 5/1/2013 to 8/31/2013,

7  fee: $21,653,139.30, expenses: $551,388.56.

8

9  (CC: Doc. No. 5811) Fourth Application for Interim Professional

10 Compensation for Orrick, Herrington & Sutcliffe LLP, Special

11 Counsel, period: 5/1/2013 to 8/31/2013, fee: $145,104.28,

12 expenses: $668.50, filed by Orrick, Herrington & Sutcliffe LLP.

13

14 (CC: Doc# 5836) Summary of Second Interim Application of

15 Perkins Coie LLP as Special Insurance Coverage Counsel to the

16 Debtors for Compensation and Reimbursement of Expenses Incurred

17 for the Period May 1, 2013 through August 31, 2013 for Perkins

18 Coie LLP, Other Professional, period: 5/1/2013 to 8/31/2013,

19 fee: $901,482.00, expenses: $13,055.76.

20

21 Doc# 5185 Adj. Hrg. RE: Motion for Relief from Stay.

22

23 (CC: Doc# 5858) Fourth Interim Application Of AlixPartners,

24 LLP, Financial Advisor To The Official Committee Of Unsecured

25 Creditors, For Compensation And Reimbursement Of Expenses For

1  The Period May 1, 2013 Through August 31, 2013 for

2  AlixPartners, LLP, Other Professional, period: 5/1/2013 to

3  8/31/2013, fee: $2,156,280.50, expenses: $1,309.41.

4

5  (CC: Doc# 5852) Summary of Third Interim Application of

6  Coherent Economics, LLC as Consultant to the Official Committee

7  of Unsecured Creditors for Compensation and Reimbursement of

8  Expenses Incurred for the Period May 1, 2013 through August 31,

9  2013 for Coherent Economics LLC, Consultant, period: 5/1/2013

10 to 8/31/2013, fee: $52,735.00, expenses: $0.

11

12 (CC: Doc# 5857) Third Interim Application Of Epiq Bankruptcy

13 Solutions, LLC, As Information Agent For The Official Committee

14 Of Unsecured Creditors, For Allowance And Payment Of

15 Compensation For Professional Services Rendered And For

16 Reimbursement Of Actual And Necessary Expenses Incurred From

17 May 1, 2013 Through August 31, 2013 for Epiq Bankruptcy

18 Solutions, LLC, Other Professional, period: 5/1/2013 to

19 8/31/2013, fee: $29,092.70, expenses: $8,697.64.

20

21 (CC: Doc# 5866) Third Interim Application of J.F. Morrow,

22 Consultant to the Official Committee of Unsecured Creditors,

23 for Allowance of Compensation for Professional Services

24 Rendered and for Reimbursement of Actual and Necessary Expenses

25 Incurred From May 1, 2013 Through August 31, 2013 for J.F.

1    Morrow, Consultant, period: 5/1/2013 to 8/31/2013, fee:

2    $7,520.00, expenses: $0.00.

3

4    (CC: Doc# 5867) Fourth Application of Kramer Levin Naftalis &

5    Frankel LLP, Counsel for the Official Committee of Unsecured

6    Creditors, For Interim Allowance of Compensation for

7    Professional Services Rendered and for Reimbursement of Actual

8    And Necessary Expenses Incurred From May 1, 2013 Through August

9    31, 2013 for Kramer Levin Naftalis & Frankel LLP, Creditor

10   Comm. Aty, period: 5/1/2013 to 8/31/2013, fee: $11,386,709.50,

11   expenses: $412,285.71.

12

13   (CC: Doc# 5856) Fourth Interim Application Of Moelis & Company

14   LLC For Compensation For Professional Services Rendered And

15   Reimbursement Of Actual And Necessary Expenses Incurred As

16   Investment Banker To The Official Committee Of Unsecured

17   Creditors For The Period From May 1, 2013 Through August 31,

18   2013 for Moelis & Company LLC, Other Professional, period:

19   5/1/2013 to 8/31/2013, fee: $1,200,000.00, expenses:

20   $20,364.50.

21

22   (CC: Doc# 5814) Third Application for Interim Professional

23   Compensation for Pachulski Stang Ziehl & Jones LLP, Creditor

24   Comm. Aty, period: 5/1/2013 to 8/31/2013, fee: $2,322,386.50,

25   expenses: $28,182.74 (related document(s) 3162, 4534)

1

2    (CC: Doc# 5862) Third Interim Application of San Marino

3    Business Partners LLC as Consultant to the Official Committee

4    of Unsecured Creditors for Compensation and Reimbursement of

5    Expenses Incurred for the Period May 1, 2013 Through August 31,

6    2013 for San Marino Business Partners LLC, Consultant, period:

7    5/1/2013 to 8/31/2013, fee: $16,424.00, expenses: $36.66.

8

9    Doc# 5809 Third Application for Interim Professional

10   Compensation/Third Interim Application of SilvermanAcampora

11   LLP, Special Counsel to Official Committee of Unsecured

12   Creditors, for Interim Allowance of Compensation for

13   Professional Services Rendered and for Reimbursement of Actual

14   and Necessary Expenses Incurred from May 1, 2013 through August

15   31, 2013 for SilvermanAcampora LLP, Special Counsel, period:

16   5/1/2013 to 8/31/2013, fee: $422,933.50, expenses: $2,821.54.

17

18   (CC: Doc# 5859) Second Interim Fee Application Of Wilmer Cutler

19   Pickering Hale And Dorr LLP, As Special Counsel For Certain

20   Regulatory Matters To The Official Committee Of Unsecured

21   Creditors Of Residential Capital, LLC, et al. For Interim

22   Allowance Of Compensation And For The Reimbursement Of Expenses

23   For Services Rendered During The Period From May 1, 2013

24   Through August 31, 2013 for Wilmer Cutler Pickering Hale and

25   Dorr LLP, Special Counsel, period: 5/1/2013 to 8/31/2013, fee:

1    $246,850.00, expenses: $831.53.

2

3    (CC: Doc# 5849) Final Application for Final Professional

4    Compensation Final Application of Chadbourne & Parke LLP,

5    Counsel to the Examiner, for Allowance of Compensation and

6    Reimbursement of Expenses for Chadbourne & Parke LLP, Other

7    Professional, period: 7/3/2013 (sic) to 10/31/2013, fee:

8    $46,818,245, expenses: $2,990,547.82.

9

10   (CC: Doc# 5850) Final Application for Final Professional

11   Compensation/Final Application of Arthur J. Gonzalez, as

12   Chapter 11 Examiner, for Allowance of Compensation and

13   Reimbursement of Expenses for Arthur J. Gonzalez, Examiner,

14   Other Professional, period: 7/3/2013 to 10/31/2013, fee:

15   $568,612.50, expenses: $0.00.

16

17

18   (CC: Doc# 5844) Final Application for Final Professional

19   Compensation Final Fee Application of Leonard, Street and

20   Deinard Professional Association for Allowance of Compensation

21   for Services Rendered and Reimbursement of Expenses Incurred as

22   Special Minnesota Counsel for the Examiner for Leonard, Street

23   and Deinard Professional Association, Other Professional,

24   period: 4/15/2013 to 5/31/2013, fee: $100,000.00, expenses:

25   $4,210.00.

1

2   (CC: Doc# 5848) Final Application for Final Professional

3   Compensation Fourth and Final Fee Application of Mesirow

4   Financial Consulting, LLC for Compensation and Reimbursement of

5   Expenses as Financial Advisor to the Examiner for the Period

6   July 24, 2012 Through October 31, 2013 for Mesirow Financial

7   Consulting, LLC, Other Professional, period: 7/24/2012 to

8   10/31/2013, fee: $39,535,526, expenses: $344,747.

9

10  (CC: Doc# 5846) Final Application for Final Professional

11  Compensation Final Fee Application of Wolf Haldenstein Adler

12  Freeman & Herz LLP, Conflicts Counsel to the Examiner, for

13  Allowance of Compensation and Reimbursement of Expenses for the

14  Period for Wolf Haldenstein Adler Freeman & Herz LLP, Other

15  Professional, period: 10/15/2012 to 4/30/2013, fee: $82,997.85,

16  expenses: $1,670.56.

17

18  Doc# 5280, 5098 Adj. Hrg. RE: Lilia Medranos' Motion to Dismiss

19  Foreclosure with Prejudice for Fraud on the Court. (related

20  document(s) 5098)

21

22  (CC: Doc# 5784) Motion for Relief from Stay.

23

24  (CC: Doc# 5105) Adj. Hrg. RE: Motion for Objection to Claim(s)

25  Number: 3835.

 1

 2  (CC: Doc# 4887) Adj. Hrg. RE: Motion for Omnibus Objection to

 3  Claim(s)/Debtors Thirtieth Omnibus Objection to Claims (No

 4  Liability Borrower Claims - Books and Records). Going Forward

 5  as to claim of M. Francine Modderno (Claim No. 4866).

 6

 7  (CC: Doc# 5162) Motion for Omnibus Objection to

 8  Claim(s)/Debtors Fiftieth Omnibus Objection to Claims (No

 9  Liability Borrower Claims - Books and Records). Hearing on this

10  matter, solely as to claim filed by Philip G. Wright, will be

11  going forward. Hearing adjourned to 01/09/2014 and 1/30/2014 as

12  to other claims.

13

14  Doc# 5646 Motion for Omnibus Objection to Claim(s)/Debtors

15  Fifty-First Omnibus Objection to Claims (Borrower Books and

16  Records Claims - Res Judicata and Wrong Debtor)

17

18  Adversary proceeding: 13-01350-mg Pruitt v. GMAC et al

19  Doc #26 (CC:  Doc no. 28, 30, 31, 33) Debtor Defendants' Motion

20  to Dismiss Plaintiffs' Adversary Complaint. (related

21  document(s) 4, 1)

22

23  Adversary proceeding: 12-01935-mg Jenkins et al v. Residential

24  Funding Company, LLC et al (CC: Doc# 43, 44) Motion to Dismiss

25  Adversary Proceeding. (related document(s) 32,1)

1

2   (CC: Doc no. 5815) Fourth Application for Interim Professional

3   Compensation for Severson & Werson, PC, Special Counsel,

4   period: 5/1/2013 to 8/31/2013, fee: $271,728.85, expenses:

5   $21,965.03, filed by Severson & Werson, PC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8   BY:   LORENZO MARINUZZI, ESQ.

9          ERICA J. RICHARDS, ESQ.

10         ADAM A. LEWIS, ESQ.

11         NORMAN S. ROSENBAUM, ESQ.

12         MERYL L. ROTHCHILD, ESQ.

13         JORDAN WISHNEW, ESQ.

14

15

16  MORRISON & FOERSTER LLP

17         Attorneys for Debtors

18         425 Market Street

19         San Francisco, CA 94105

20

21  BY:   JEFFREY K. ROSENBERG, ESQ.

22

23

24

25

1

2  MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

3         Attorneys for the Debtors

4         990 Stewart Avenue

5         Garden City, NY 11530

6

7  BY:   JESSICA G. BERMAN, ESQ.

8

9

10  BRYAN CAVE LLP

11         Attorneys for Debtors

12         1290 Avenue of the Americas

13         New York, NY 10104

14

15  BY:   MICHAEL G. BIGGERS, ESQ. (TELEPHONICALLY)

16         EMMA DILL, ESQ. (TELEPHONICALLY)

17

18

19  CARPENTER LIPPS & LELAND LLP

20         Litigation Counsel to Debtors

21         280 North High Street

22         Columbus, OH 43215

23

24  BY:   DAVID A. BECK, ESQ.

25         JEFFREY A. LIPPS, ESQ.

1

2   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3        Conflicts Counsel to Debtors

4        101 Park Avenue

5        New York, NY 10178

6

7   BY:   MARYANN GALLAGHER, ESQ.

8

9

10    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

11        Attorneys for FTI Consulting, Inc.

12        900 Third Avenue

13        16th Floor

14        New York, NY 10022

15

16   BY:   JOHN H. DRUCKER, ESQ.

17

18

19   KRAMER LEVIN NAFTALIS & FRANKEL LLP

20        Attorneys for Official Creditors' Committee

21        1177 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   KENNETH H. ECKSTEIN, ESQ.

25        RACHAEL L. RINGER, ESQ.

1

2  CLEARY GOTTLIEB STEEN & HAMILTON LLP

3        Attorneys for Wilmington Trust

4        One Liberty Plaza

5        New York, NY 10006

6

7  BY:   SEAN A. O'NEAL, ESQ.

8        MARK A. LIGHTNER, ESQ.

9

10

11 POLSINELLI PC

12        Attorneys for Mitchell Class - Borrower Claims Trustee

13        900 Third Avenue

14        21st Floor

15        New York, NY 10022

16

17 BY:   DAN FLANIGAN, ESQ.

18

19

20

21

22

23

24

25

1

2  PACHULSKI STANG ZIEHL & JONES

3        Conflicts Counsel to Creditors' Committee

4        780 Third Avenue

5        36th Floor

6        New York, NY 10017

7

8  BY:   ROBERT J. FEINSTEIN, ESQ.

9

10

11  HOGAN LOVELLS US LLP

12        Wells Fargo and U.S. Bank, as Trustee

13        875 Third Avenue

14        New York, NY 10022

15

16  BY:   JONATHAN E. SAMON, ESQ.

17

18

19  CHADBOURNE & PARKE LLP

20        Attorneys for Examiner

21        30 Rockefeller Plaza

22        New York, NY 10112

23

24  BY:   HOWARD SEIFE, ESQ.

25        DAVID M. LEMAY, ESQ.

1

2  DELOITTE LLP

3          Attorneys for Deloitte & Touche LLP

4          30 Rockefeller Plaza

5          New York, NY 10112

6

7  BY:   ROLAND S. YOUNG, ESQ.

8

9

10  WILMER CUTLER PICKERING HALE AND DORR LLP

11          Special Counsel to the Committee

12          7 World Trade Center

13          250 Greenwich Street

14          New York, NY 10007

15

16  BY:   WILLIAM J. PERLSTEIN, ESQ.

17

18

19  BRADLEY ARANT BOULT CUMMINGS LLP

20          Special Litigation Counsel to Debtors

21          One Federal Place

22          1819 Fifth Avenue North

23          Birmingham, AL 35203

24

25  BY:   JAY R. BENDER, ESQ.

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        201 Varick Street

5        Suite 1006

6        New York, NY 10014

7

8  BY:   BRIAN MASUMOTO, ESQ.

9

10

11  FRIED FRANK HARRIS, SHRIVER & JACOBSON LLP

12        Attorneys for Citigroup Global Markets Inc., et al.

13        One New York Plaza

14        New York, NY 10004

15

16  BY:   SHANNON LOWRY NAGLE, ESQ.

17

18

19  MORRISON COHEN LLP

20        Attorneys for Independent Directors of ResCap

21        909 Third Avenue

22        New York, NY 10022

23

24  BY:   ROBERT K. DAKIS, ESQ.

25

1

2   PERKINS COIE LLP

3         Attorneys for Debtors

4         700 Thirteenth Street N.W.

5         Washington, D.C. 20005

6

7   BY:   VIVEK CHOPRA, ESQ. (TELEPHONICALLY)

8

9

10  GARY A. COLBERT, ATTORNEY AT LAW

11        Attorney for Mr. Davis

12        30630 West Twelve Mile Road

13        Suite D

14        Farmington Hills, MI 48334

15

16  BY:   GARY A. COLBERT, ESQ. (TELEPHONICALLY)

17

18

19  FREEBORN & PETERS LLP

20        Attorneys for Mercer

21        311 Lower Wacker Drive

22        Chicago, IL 60606

23

24  BY:   DEVON J. EGGERT, ESQ. (TELEPHONICALLY)

25

1

2    ORRICK, HERRINGTON & SUTCLIFFE LLP

3         Attorneys for Debtors

4         1152 15th Street, N.W.

5         Washington, DC 20005

6

7    BY:   DEBRA L. FELDER, ESQ. (TELEPHONICALLY)

8

9

10   WILLKIE FARR & GALLAGHER LLP

11        Attorneys for AlixPartners

12        787 Seventh Avenue

13        New York, NY 10019

14

15   BY:   SHAUNNA D. JONES, ESQ. (TELEPHONICALLY)

16

17

18   LEONARD, STREET AND DEINARD

19        Attorneys for Examiner, Arthur Gonzalez

20        150 South 5th Street

21        Suite 2300

22        Minneapolis, MN 55402

23

24   BY:   ROBERT KUGLER, ESQ. (TELEPHONICALLY)

25

1

2  FOLEY & LARDNER LLP

3          Attorneys for Ernst & Young

4          Suite 5000

5          150 East Gilman Street

6          Madison, WI 53703

7

8  BY:   MATTHEW D. LEE, ESQ. (TELEPHONICALLY)

9

10

11  LAW OFFICES OF STEPHEN R. WADE, P.C.

12          Attorneys for Marlow & Monique Hooper

13          350 West 4th Street

14          Claremont, CA 91711

15

16  BY:   WILLIAM D. MAY, ESQ. (TELEPHONICALLY)

17

18

19  CONSUMER ACTION LAW GROUP

20          Attorneys for Leanetha Darby

21          3700 Eagle Rock Boulevard

22          Los Angeles, CA 90041

23

24  BY:   LAUREN RODE, ESQ. (TELEPHONICALLY)

25

1

2  MUNGER, TOLLES & OLSON LLP

3        Attorneys for Berkshire Hathaway

4        355 South Grand Avenue

5        35th Floor

6        Los Angeles, CA 90071

7

8  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11  WALTERS, BENDER, STROHBEHN & VAUGHAN

12        1100 Main Street

13        Suite 2500

14        Kansas City, MO 64105

15

16  BY:   FREDRICK WALTERS, ESQ. (TELEPHONICALLY)

17

18

19  JONES DAY

20        Attorneys for Financial Guaranty Insurance Company

21        555 South Flower Street

22        Fiftieth Floor

23        Los Angeles, CA 90071

24

25  BY:   RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

1

2  KRIGEL & KRIGEL, P.C.

3          Attorneys for Becky Spence

4          4550 Belleview Avenue

5          Kansas City, Missouri

6  BY:    ERLENE W. KRIGEL, ESQ. (TELEPHONICALLY)

7

8

9  ALSO PRESENT (TELEPHONICALLY):

10         EDWARD R. BERGSTROM, San Marino Business Partners, LLC

11         SEPIDEH S. CIRINO, Party Pro Se

12         LAURA J. EISELE, AlixPartners, LLC

13         ALAN FRANKEL, Coherent Economics

14         ALAN D. HOLTZ, AlixPartners, LLC

15         MARION JENKINS, Party Pro Se

16         M. FRANCINE MODDERNO, Party Pro Se

17         J.F. MORROW, Party Pro Se

18         ALFREDIA PRUITT, Party Pro Se

19         RAMONA M. ROBERTS, Party Pro Se

20         BECKY A. SPENCE

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1                      P R O C E E D I N G S

2           THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.

4           Mr. Marinuzzi.

5           So I think my courtroom deputy advised everybody that

6    I want to take the contested matters first.  There are some

7    people on the telephone for that.  But before we begin, I have

8    a couple things I want to say.

9           So the agenda for today's hearing was forty-two pages

10   long.  And I want to make some comments about the omnibus

11   hearings and the way you've been handling the objections in

12   this case.  I understand that Morrison & Foerster will not be

13   handling the borrower claims once the plan is effective, but I

14   think that what I am now going to say is still relevant and

15   applicable going forward.

16          My chambers and I spend time thoroughly reviewing all

17   matters prior to the scheduled hearings.  That includes all of

18   the papers and exhibits which are often voluminous.  And I

19   understand that the nature of litigation is that matters get

20   adjourned, but when you schedule a heavy docket the way you

21   have been doing in this case, particularly today and the last

22   two omnibus hearings, I have to work extremely hard to make

23   sure that every matter gets the attention it deserves, and

24   that's okay.  However, you seem to have fallen into the

25   practice of loading up the docket only to adjourn matters a day

1  or two before the hearing, or sometimes as was the case last

2  night, even the night before.  This means that my chambers and

3  I spend hours working on matters that do not end up going

4  forward.

5       I am not entirely thrilled with the way you've been

6  scheduling these hearings and the related briefing, but I want

7  to make clear that that makes me especially upset when I spend

8  days preparing for an extremely heavy docket and then find out

9  that there are only a handful of matters going forward.  I have

10  other cases with omnibus hearing dates, and counsel usually let

11  me know a week ahead of time which matters are going forward.

12  Everyone's time would be better spent here if you strategically

13  scheduled only those matters that you believe needed to go

14  forward on a given day.

15       And one last thing.  Since we are spending so much

16  time working on dozens of motions with voluminous exhibits, I

17  would ask that you make sure that every motion and exhibit that

18  you submit is text searchable, because if you don't do that --

19  and you haven't been doing that.  And when that's not done, it

20  makes it extremely difficult for myself, my law clerks and

21  interns to find things in the papers.  And that's not an

22  efficient use of our time.

23       So maybe now that the case is -- I finally -- the case

24  was confirmed and hopefully will go effective this week, but

25  today's hearing sort of was the straw that broke the camel's

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1   back for me and my staff.

2         Mr. Marinuzzi.

3         MR. MARINUZZI:  Your Honor, first of all, Your Honor's

4   views are quite understandable, and I sincerely apologize on

5   behalf of everyone on the claims team, not just to the Court

6   but to everyone in chambers that has to review these papers.

7   So all Your Honor's points are well noted, and this will not

8   repeat itself.

9         Your Honor, we're going to start on page 27 of the

10  agenda.  First item under contested matters is Lilia Medranos'

11  motion to dismiss foreclosure with prejudice for fraud on the

12  court.  And for that matter, I will cede the podium to my

13  colleague, Meryl Rothchild.

14        THE COURT:  Okay.

15        MS. ROTHCHILD:  Good morning, Your Honor.  Meryl

16  Rothchild of Morrison & Foerster on behalf of the debtors.

17        THE COURT:  All right.  Is anybody appearing for

18  Medranos, for Lilia Medrano (sic)?

19        All right.  Go ahead.

20        MS. ROTHCHILD:  So as Mr. Marinuzzi stated, the first

21  contested matter is listed on the bottom of page 27 of the

22  agenda, Lilia Medranos' motion to dismiss foreclosure with

23  prejudice for fraud on the court, filed at docket number 5098.

24  The debtors filed an objection along with the declaration of

25  Lauren Graham Delehey in support of said objection, to both

1   this motion as well as to another of Ms. Medranos' motions,

2   which is a motion for reconsideration of the Court's entry of

3   the order sustaining the debtors' twenty-fifth omnibus claims

4   objection, amended and superseded borrower claims at docket

5   number --

6           THE COURT:  Let me see if I can cut through this.

7           MS. ROTHCHILD:  Sure.

8           THE COURT:  What I don't understand -- maybe I do with

9   Medranos.  I disallowed an expunged claim number 1981 because

10  it was amended and superseded by claim 3466, which is the

11  surviving claim, and the motion for reconsideration is to

12  reinstate claim 1981.  I don't -- am I reading this correctly?

13  And the surviving claim is still surviving.  Do I have that

14  right?

15          MS. ROTHCHILD:  I had thought, Your Honor, that the

16  claim that you had expunged was 1981.  Let me just confirm --

17          THE COURT:  I did.  That's right.  Let me try it

18  again.

19          MS. ROTHCHILD:  Okay.

20          THE COURT:  I expunged 1981, okay.  The motion for

21  reconsideration is to reinstate 1981, but claim 3466 remains as

22  the surviving claim.  Do I understand that correctly?

23          MS. ROTHCHILD:  Well, Your Honor, actually, claim 3466

24  has since been expunged from the claims register because in the

25  midst of all of this, it was subject to the debtors' fiftieth

1    omnibus claims objection, which was an objection to the claims

2    for no liability, books and records.  And that was formally

3    expunged when the Court entered the order approving that

4    fifty --

5              THE COURT:  What's the order number?

6              MS. ROTHCHILD:  The order for the fiftieth --

7              THE COURT:  Yes.

8              MS. ROTHCHILD:  -- is -- bear with me -- 5892, and

9    that was entered on November 20th.

10             THE COURT:  Is that in your papers?

11             MS. ROTHCHILD:  No.  Unfortunately, Your Honor --

12             THE COURT:  Yeah, it's not.  I mean, it is so

13   frustrating for me to have to go through all this stuff and

14   then -- this is a key point.  They've moved to reinstate the

15   earlier claim which was expunged because there was a surviving

16   claim, and I didn't see in your papers that the surviving claim

17   has been expunged.  All right.  I'm going to take this under --

18   just address the foreclosure motion.

19             MS. ROTHCHILD:  Okay.  But, Your Honor, the fiftieth

20   omnibus claims objection was filed on September 20th and --

21             THE COURT:  I will look at the order.  Just tell me

22   what the foreclosure motion -- about the -- address the

23   foreclosure motion.

24             MS. ROTHCHILD:  Okay.

25             THE COURT:  You know, when you do papers and it isn't

1  clear what's happening, I lose my temper.  That's today, okay,

2  because it was a huge docket.

3         Tell me about the foreclosure motion.

4         MS. ROTHCHILD:  Yes, Your Honor.  With respect to the

5  foreclosure motion, Ms. Medranos seeks to dismiss a foreclosure

6  action involving her property, which Ms. Medranos contends is

7  an action pending in the circuit court of the Tenth Judicial

8  Circuit of the State of Florida in and for Polk County,

9  Florida, general jurisdiction.

10         THE COURT:  All right.  And you're no longer servicing

11  the loan; it went to Ocwen?

12         MS. ROTHCHILD:  Correct.

13         THE COURT:  All right.  And --

14         MS. ROTHCHILD:  And based on the debtors'

15  investigation and in further consultation with Ocwen, neither

16  the debtors nor Ocwen believe that there is any pending

17  foreclosure action.

18         THE COURT:  All right.  I'm going to take the Medrano

19  matter and it's -- both the motion for consideration, dismissal

20  of the foreclosure action will be taken under submission.

21         MS. ROTHCHILD:  Thank you, Your Honor.

22         I believe next is the Darby motion for relief from

23  stay, which my --

24         THE COURT:  All right.

25         MS. ROTHCHILD:  -- colleague, Erica Richards, will

 1  handle.

 2           MS. RICHARDS: Good morning, Your Honor.  Erica

 3  Richards of Morrison & Foerster appearing on behalf of the

 4  debtors.

 5           The next item on the agenda is matter 2 under part 7

 6  of the agenda found on page 28, and that is the motion of

 7  Leanetha Darby for relief from stay, that was filed at docket

 8  number 5784.  The debtors filed an objection at docket number

 9  6055.  Ms. Darby is represented by counsel, but she did not

10  file a reply.  I don't know if she --

11           THE COURT:  Is anybody appearing for Leanetha Darby?

12           MS. RODE:  Lauren Rode appearing on CourtCall on

13  behalf of Leanetha Darby.

14           THE COURT:  Just tell me your name again.  I'm sorry.

15           MS. RODE:  Lauren Rode.  Last name is spelled R-O-D-E.

16           THE COURT:  Thank you, Ms. Rode.

17           Okay.  Go ahead, Ms. Martin (sic).  Go ahead.  Yes,

18  please.

19           MS. RICHARDS:  Would you like me to present --

20           THE COURT:  Yeah.

21           MS. RICHARDS:  Your Honor, Ms. Darby's husband, Ray

22  Darby, was a borrower under a loan that was serviced by GMAC

23  Mortgage.  We understood that Mr. Darby -- again, who's the

24  sole borrower on the note and the mortgage -- is now deceased.

25  In February 2011, Executive Trustee Services, acting as agent

1    for GMAC Mortgage, served and recorded a notice of default on

2    the loan.  A trustee sale was held in August 2011, and the

3    property reverted at that time to GMAC.  In March 2012, the

4    property was sold to a third party.

5         One year later, in March of this year, Ms. Darby filed

6    a lawsuit in California State court against GMAC Mortgage and

7    Executive Trustee Services relating to the foreclosure.  The

8    complaint asserts various claims for fraudulent concealment,

9    intentional misrepresentation, negligent misrepresentation,

10   state and federal violations of the Fair Debt Collection

11   Practices Acts and negligence.  And in the complaint, Ms. Darby

12   seeks rescission of the notice of default and mortgage,

13   compensatory damages, and attorneys' fees and costs in an

14   accounting.

15        Although the action was filed post-petition, the

16   claims asserted in the complaint all relate to pre-petition

17   acts.

18        THE COURT:  So what happened when it was filed,

19   because it named what, two of the debtors.  It was filed post-

20   petition.  What, did you file a notice to the pendency of the

21   bankruptcy --

22        MS. RICHARDS:  We did, Your Honor.  And because --

23        THE COURT:  In -- go ahead.

24        MS. RICHARDS:  I don't mean to interrupt.

25        THE COURT:  Go ahead.

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

1          MS. RICHARDS:  Because the trustee's sale had occurred

2    a year before and the property had been sold to a good-faith

3    third-party purchaser, at that point the only remedies

4    available to Ms. Darby, assuming she were to prevail on the

5    lawsuit, are monetary.  She can't --

6          THE COURT:  So if I understand this matter correctly,

7    the Darbys never filed a proof of claim.

8          MS. RICHARDS:  That's correct, Your Honor.  And we did

9    attach as Exhibit 2 to our motion affidavits of service showing

10   that she and her counsel were served with notice of the bar

11   date.

12         THE COURT:  Okay.  Let me hear from Ms. Rode.

13         Go ahead.  Let me hear from you on be -- go ahead.

14         MS. RODE:  Yes, Your Honor, all of that is correct.

15   We were hoping that this would fit in with the order for

16   limited relief from stay dealing with foreclosure actions.  We

17   do understand that this is -- this sale did occur in March of

18   2012, so it's not a pending foreclosure; it was sold to a third

19   party.  However, Ms. Darby is seeking remedies because she did

20   provide the full reinstatement amount and the house sold

21   anyway.  So in the state court action in California, we were

22   seeking relief from stay in order to pursue that claim based on

23   the order for limited relief of stay.

24         THE COURT:  Let me ask you this.  Was your client

25   served with the notice of the bar date?

1          MS. RODE:  I do not know.  I asked the client, and she

2    did not know either.

3          THE COURT:  You saw the --

4          MS. RODE:  So we do not have anything -- sorry.  Go

5    ahead.

6          THE COURT:  I'm sorry.  No, you say that the debtors

7    have offered evidence that Ms. Darby was served with the bar

8    date notice.  You understand that, correct?

9          MS. RODE:  Yes, it's understood.

10          THE COURT:  And you never filed a motion for leave to

11    file a late claim?

12          MS. RODE:  That is correct.

13          THE COURT:  All right.  Go ahead with your argument.

14    I mean, the only relief you're able to seek at this point which

15    is damages, which the supplemental servicing order didn't

16    permit.

17          MS. RODE:  Right.  Okay.

18          THE COURT:  Go ahead.  Is there anything else you want

19    to --

20          MS. RODE:  No.  That's it, Your Honor.

21          THE COURT:  All right.  I'm going to take the matter

22    under submission.

23          MS. RICHARDS:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MS. RODE:  Thank you, Your Honor.

1          THE COURT:  And you're excused from the phone.  You're

2   welcome to stay on, but you're excused if you wish.

3          MS. RODE:  Okay.  Thank you, Your Honor.

4          THE COURT:  Mr. Marinuzzi.

5          MR. MARINUZZI:  Your Honor, I'm not sure whether the

6   Court would like to now proceed to the contested claims

7   objections which --

8          THE COURT:  I would.  I want to take -- I want to

9   get -- well, yes, I do.  I want to get -- let's deal with --

10         MR. MARINUZZI:  Okay.  That's fine.

11         THE COURT:  I want to get everything done, and then

12   we're going to deal with all the fee applications.

13         MR. MARINUZZI:  Okay.

14         THE COURT:  Because there are people on the phone, I

15   didn't want to have to have them just hang on all morning while

16   I dealt with fee applications.

17         MR. MARINUZZI:  Fair point, Your Honor.

18         Your Honor, I think that brings us now to page 34 of

19   the agenda, which is item number 8, the debtors' thirtieth

20   omnibus objection to claims, no liability borrower claims -

21   books and records.  And I will cede the podium to Jordan

22   Wishnew who is handling the matter.

23         THE COURT:  Thank you.

24         MR. WISHNEW:  Good morning, Your Honor.  Jordan

25   Wishnew, Morrison & Foerster, for the debtors.

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1      This is in regards to the thirty-fourth -- I'm

2  sorry -- thirtieth omnibus objection.  There was one matter

3  that was put back on the calendar today from a prior hearing.

4  That is the matter of Ms. Francine Modderno.  As Your Honor may

5  recall at the last omnibus hearing, she had submitted a

6  reply -- oh, I'm sorry.  She had appeared telephonically,

7  wanted to submit a statement.  You had instructed her to submit

8  that statement.  It got docketed the day of the hearing, and

9  then you asked for us to recalendar it.

10      THE COURT:  Right.

11      MR. WISHNEW:  So we put it back on the calendar today

12  for Your Honor's consideration.

13      THE COURT:  All right.  Is anybody appearing for

14  Francine Modderno?

15      MS. MODDERNO:  Yes, sir.  This is Ms. Modderno.

16      THE COURT:  Thank you, Ms. Modderno.

17      All right.  Go ahead, Mr. Wishnew.

18      MR. WISHNEW:  Your Honor, this is really a question of

19  whether Ms. Modderno's claim is precluded by res judicata,

20  which we assert that it is.

21      There -- by way of background, there -- the debtors

22  serviced a loan.  There was a foreclosure associated with that

23  loan.  There -- the foreclosure took place or began in 2010 but

24  was stopped in 2011 because of litigation that Ms. Modderno

25  commenced in Virginia.  After giving -- having the ability to

1    amend the complaint to restate her causes of action, the matter

2    was later dismissed because of a failure to state a claim.  The

3    action -- or the allegations, the basis for damages, and the

4    proof of claim are really the same operative nucleus of facts

5    as what was at issue in the Virginia federal litigation.  Since

6    that matter was granted on a motion to dismiss, which has a

7    preclusive effect, we argue, Your Honor, that Ms. Modderno is

8    not -- should not be permitted and allowed a claim in this

9    estate.  And for the reasons set forth in both the thirtieth

10   omnibus objection as well as our supplemental reply and the

11   second supplemental reply recently filed last week, we'd ask

12   that the relief be granted.

13          THE COURT:  All right.  Ms. Modderno, do you want to

14   respond?

15          MS. MODDERNO:  My arguments are in my response there

16   that I just sent to you.  I -- the -- I'm sorry.  The court --

17   the case that makes it illegal to have both signatures --

18   U.S. -- I forgot what it is.  I have it -- it's in my -- it's

19   in my response there.  That came after that foreclosure

20   hearing -- the -- I'm sorry, the one in 2011.  And my -- my

21   understanding is that it is now illegal, whatever, that they --

22   that a robo-signature be allowed, and I don't think my personal

23   case is -- I guess my argument is that it doesn't matter how it

24   affects me personally or a foreclosure against me, but the fact

25   is a robo-signature renders that invalid, and they can't do

1    anything with it and you can't do anything with it because it's

2    invalid.

3           THE COURT:  So the issue here, Ms. Modderno, is the

4    debtors attached to their reply a copy of your twenty-two-count

5    complaint that you filed --

6           MS. MODDERNO:  Yes, yes.

7           THE COURT:  -- in Virginia.  And in that complaint,

8    you, among other things, among many other things, alleged that

9    the debtors perpetrated a fraud by claiming ownership of your

10   property.

11          MS. MODDERNO:  Yes.

12          THE COURT:  And you specifically raised the issue

13   about robo-signing.

14          MS. MODDERNO:  Yes.

15          THE COURT:  And your complaint in Virginia was

16   dismissed by the court with prejudice.  And so what the debtor

17   is arguing is that the legal doctrine of res judicata --

18          MS. MODDERNO:  Yes, I understand.

19          THE COURT:  -- which essentially prevents you from

20   litigating things that have been fully and finally decided in

21   another forum, bars you claim here because you're essentially

22   raising the same issues in your claim here which you raised in

23   the twenty-two-count complaint that's been dismissed with

24   prejudice.  Is it correct that you raised the issue of robo-

25   signing in your complaint in Virginia?

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1          MS. MODDERNO:  Yes, I did, but I didn't -- I did not

2     raise the issue of whether the court -- whether anybody has any

3     right to do anything with it now because it's not a legal

4     document.  Do you know what I'm saying?  It's not -- whether or

5     not I am relitigating that or not -- I'm not relitigating that.

6     I'm litigating -- I'm litigating the fact that it doesn't

7     matter whether I litigated it before or not because it's not

8     against me personally.  Do you know what I'm saying?

9          THE COURT:  Okay.  I understand your position.

10         MS. MODDERNO:  Okay.

11         THE COURT:  Is there anything else you wish to say?

12         MS. MODDERNO:  No, sir.

13         THE COURT:  All right.  I'm going to take the matter

14    under submission.

15         MR. WISHNEW:  Thank you, Your Honor.

16         Skipping ahead, Your Honor, to the next --

17         THE COURT:  And Ms. Modderno, you're welcome to stay

18    on the line or you're excused if you wish so --

19         MS. MODDERNO:  All right.  Thank you, sir.

20         THE COURT:  Okay.  All right.  Thank you very much for

21    your participation.

22         Go ahead, Mr. Wishnew.

23         MR. WISHNEW:  Thank you, Your Honor.

24         The next contested claims objection matter is item 15

25    on page 40 of the agenda, the fifty-first omnibus objection.

1          THE COURT:  Let me just flip to my -- fifty-first?

2          MR. WISHNEW:  Yes, Your Honor.

3          THE COURT:  Okay.  Go ahead.

4          MR. WISHNEW:  Your Honor, this is a omnibus objection

5    filed as to twenty-five borrower claims seeking to expunge each

6    of those claims on the basis of res judicata.  We --

7          THE COURT:  Let me just -- so these claims, as I

8    understand it, are Jeffrey Davis which is claims 1541 and 1542.

9    That's one of them?

10         MR. WISHNEW:  This is one of them, correct.

11         THE COURT:  Is anybody on the telephone or in court

12   for Mr. Davis?

13         MR. COLBERT:  Yes, Your Honor.  Gary A. Colbert by

14   phone.

15         THE COURT:  Okay.  And also included in this is claim

16   3893 of Sepideh --

17         MR. WISHNEW:  Cirino.

18         THE COURT:  Cirino.  Is anybody on the phone for Ms.

19   Cirino?

20         All right.  And also the claim number 1007 of Marlow

21   and Monique Hooper.  Is anybody on the telephone or in court

22   for the Hoopers?

23         MR. MAY:  Yes, Your Honor.  William May for the

24   Hoopers.

25         THE COURT:  Okay.  And as I understand it, Mr.

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1  Wishnew, the last included in here are claims 15 -- excuse

2  me -- 5422 and 5431 of Jamie Gindele.

3         MR. WISHNEW:  Yes.  We received a response earlier

4  this week from Mr. and Ms. Gindele and --

5         THE COURT:  Gindele.

6         MR. WISHNEW:  -- agreed to adjourn that to January

7  30th, Your Honor.

8         THE COURT:  All right.  So Gindele, which is claims

9  5422 and 5431 are adjourned?

10        MR. WISHNEW:  That's correct, Your Honor.

11        THE COURT:  All right.  So I've noted the appearance.

12 Why don't you go ahead with respect to the Davis claim.

13        MR. WISHNEW:  Very good, Your Honor.

14        Your Honor, the Davis claim is two claims, as you

15 noted:  1541, an unsecured claim for 195,000 dollars; claim

16 1542, a second unsecured claim for 698,000 dollars.  These

17 relate to two separate litigations commenced by Mr. Davis in

18 connection with a foreclosure commenced in the State of

19 Michigan.  The first foreclosure, what had happened, there was

20 a foreclosure advertisement; it was subsequently set aside by

21 GMAC Mortgage.  And after the foreclosure was set aside, the

22 debtor then moved for summary disposition in the first

23 litigation and was granted summary disposition based on the

24 argument that because the foreclosure was set aside, the relief

25 was moot.

1        So after the first foreclosure was set aside,

2    foreclosure proceedings eventually recommenced, and then a

3    second litigation was commenced by Mr. Davis.  That's the

4    subject of claim 1541.  And with regards to the second

5    litigation, the court basically bifurcated the claims into what

6    we call the permitted claims and the nonpermitted claims.  And

7    that's consistent with the general terms of the supplemental

8    servicing office that's operative in our case in terms of

9    the -- those matters contested in the foreclosure were the

10   permitted claims.  Those monetary damages were the nonpermitted

11   claims.

12       And in regards to each of those, there were -- each of

13   those matters were dealt with on a summary basis with

14   prejudice.  And so it's our contention that notwithstanding the

15   fact that there is an appeal of these matters pending in

16   Michigan, and under Michigan state law, if there is a final

17   judgment, then it does have a preclusive effect notwithstanding

18   the pendency of an appeal.

19       So it's that similar argument, Your Honor, that also

20   carries and would apply equally to Ms. Cirino's claim as well

21   as the Hoopers' claim.

22       THE COURT:  So one question I have, Mr. Wishnew,

23   because the automatic stay is preventing the appeal from going

24   forward, correct?

25       MR. WISHNEW:  Correct, Your Honor.

1          THE COURT:  All right.  You're seeking to expunge the

2     claim based on res judicata, and my reading of Michigan law is

3     the same as yours, that res judicata applies even though an

4     appeal is pending.  But shouldn't I lift the stay to permit --

5     I mean, it's one thing to say res judicata applies and then tie

6     their hands behind their back by saying the automatic stay

7     prevents the appeal from going forward.

8          MR. WISHNEW:  I mean, if there was a stated exception

9     to the res judicata principle to that effect and analysis --

10         THE COURT:  I don't know about -- I'm not saying

11    there's an exception to the res judicata.  I'm asking whether a

12    bankruptcy court in addressing your motion -- your objection to

13    the claim seeking to expunge the claim where you rely on res

14    judicata, which you're entitled to do, but at the same time

15    you're preventing the claimant from prosecuting an appeal that

16    they filed, that seems -- I have a little trouble with that.

17    Let me put it that way.  I mean, it would be one thing if you

18    were -- well, I think I've said what I wanted to say.

19         I mean, I -- look, if I expunge the claim but the stay

20    is lifted to permit them the prosecute the appeal and they go

21    ahead, and if they were ultimately to prevail on the appeal,

22    they could subsequently move, under 502(j) to reconsider the

23    disallowance of their claim.  So you want to cut off their

24    appellate rights but have this Court determine, which I agree

25    is the law in Michigan, that res judicata applies even though

 1   there was appeal that was filed.  That seems fundamentally

 2   unfair to me.  Let me put it that way.  That doesn't mean that

 3   I won't ultimately sustain your position.  But it does -- I'm

 4   bothered by that notion, and I didn't see any case law that

 5   deals with -- well, that's what's bothering me.

 6           MR. WISHNEW:  And that same -- I won't say problem,

 7   but that same quandary that we face, I thought about, and we

 8   researched it and didn't really come across a case that said,

 9   well, if you file a proof of claim while the matter under

10   litigation's on appeal, the proof of claim should survive

11   notwithstanding.

12           THE COURT:  Oh, I didn't say the claim should survive.

13   I think the law -- I'll certainly listen to Mr. Davis' counsel

14   on this point.  Let's assume, for purposes of our discussion, I

15   agree that under existing law the claim should be disallowed.

16   But what I'm inquiring:  whether in doing so, I should also

17   lift the stay to permit the appeal to go forward.  And if Mr.

18   Davis is unsuccessful, he's batter out; if he is successful, he

19   would have to seek to have the claim allowed under 502(j) even

20   though it was previously disallowed.  That's, I mean -- and I

21   haven't seen any case law on this, I have to acknowledge, but

22   it does seem to me to be fundamentally -- it'd be one thing

23   if -- so, from time to time, in states where res judicata

24   doesn't apply -- and I think I wrote an opinion in one of the

25   claim objections recently, where I think -- I can't remember

1  whether it was --

2          MR. WISHNEW:  It was Mr. Papas, Your Honor.

3          THE COURT:  -- involving Arizona or --

4          MR. WISHNEW:  Mr. Papas.

5          THE COURT:  Yeah, where res judicata didn't apply

6  because the state rule -- there was no finality because there

7  was an appeal pending.  But I dealt with the claim on the

8  merits.

9          MR. WISHNEW:  Right, right.  Actually, I'm sorry --

10          THE COURT:  And I sustained the objection on the

11  merits even though res judicata didn't apply.  And that didn't

12  bother me whatsoever.  I didn't think I had to allow this --

13  lift the stay, let him prosecute his appeal.  I sustained the

14  objection and expunged the claim on the merits and not on the

15  basis of res judicata there, because the state rule on res

16  judicata didn't apply.

17          Here, the state rule would apply res judicata; it

18  would result in expunging of the claim.  But the stay would

19  prevent Davis from prosecuting the appeal.  That's what I'm --

20          MR. WISHNEW:  I --

21          THE COURT:  -- bothered by.

22          MR. WISHNEW:  Right.  No, I understand, Your Honor.  I

23  mean, I guess the way we see it is, under 502(b), the Code says

24  that, except as provided in certain subsections, if the

25  objection is made, the Court shall allow a claim in such

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1  amount, except to the extent that such claim is unenforceable

2  against the debtor --

3          THE COURT:  Sure, and I guess what I could do is

4  simply lift the stay, have the appeal prosecuted, sustain the

5  objection without prejudice; the claim would be sitting there.

6  And -- all right, let me hear from Mr. Davis' counsel.

7          Go ahead.

8          MR. COLBERT:  Hello, Your Honor.

9          THE COURT:  Go ahead.

10          MR. COLBERT:  Yes.  I have run into the same problem

11  and have also researched the question, and I don't believe

12  there's any case law.  But I would disagree with fellow counsel

13  and with the Court.  I do not believe that Michigan law would

14  sustain it.  We got these materials by FedEx yesterday, and the

15  case of Annabel v. C.J. Link Trucking (sic) Company, which the

16  Court would find at 115 Mich. App. 116 at page 123 --

17          THE COURT:  Just, could you do me a favor?  I

18  apologize, but give me the citation again; the name and the

19  cite.

20          MR. COLBERT:  Yes, it's Annabel v. C.J. Link Lumber

21  Company, at 115 Mich. App. 116, 123, which you could also find

22  at 320 N.W.2d 54 (sic).  It's a 1982 case.

23          THE COURT:  Just give me that -- 320 N.W.2d -- what

24  was the page, again?

25          MR. COLBERT:  Yes.  320 N.W.2d 64 (1982).  And that

1   holds, if I may, the doctrine of res judicata becomes

2   applicable when the adjudicatory proceeding on a contested

3   issue has progressed to a final determination and all available

4   courses of appeal have been exhausted or have not been pursued.

5   And that case cites another Michigan case, which is Strachan v.

6   Mutual Aid and Neighborhood Club, Inc., 81 Mich. App. 165 at

7   169, 265 N.W.2d 66 (1978), which states the same thing and

8   relies on two prior Michigan Supreme Court cases:  one -- going

9   to love this -- Howell v. Vito's Trucking --

10          THE COURT:  I'm going to look at -- you don't have to

11   give me those.  We'll read those cases.

12          The debtor's relying on Chakan v. City of Detroit, 998

13   F.Supp. 799 (sic) --

14          MR. COLBERT:  Yes --

15          THE COURT:  -- at 783 (E.D. Mich. 1998), a more recent

16   case.  And Chakan said that appeal of judgment in Michigan does

17   not alter the judgment's preclusive effect.  You think that

18   Chakan got it wrong?

19          MR. COLBERT:  Yes.

20          THE COURT:  All right, well, I'm going to have to go

21   read the cases.

22          MR. COLBERT:  I do think that.

23          THE COURT:  All right, anything else you want to add?

24          MR. COLBERT:  If the Court remembers, in my brief, I

25   cited a federal case from December of last year, of 2012, from

1  the Sixth Circuit, that clarified Michigan law on these

2  foreclosures by advertisement.  And that case, by implication,

3  reversed three Eastern District of Michigan cases, court

4  decisions.  And I think, on some of these questions, the

5  district court follows federal law and tries to modify state

6  law to conform with it.  And I think the controlling law and

7  the controlling concept on res judicata is what I just read.

8           THE COURT:  All right, I'm going to have to go read

9  those cases.

10           MR. COLBERT:  And I believe --

11           THE COURT:  Tell me -- what I'd like to know is -- so

12  you filed a notice of appeal.  Did the case move forward in the

13  appellate court at all?  I mean, has there been any briefing

14  done?

15           MR. COLBERT:  Yes, both sides have briefed the second

16  case, the one with the lower dollar amount, and we're waiting

17  for oral argument at this time.  The first case, the one with

18  the 600-and-some-thousand -- 600 and, what, 95,000 dollar one,

19  which I believe is the lower docket number on your docket, has

20  been put on stay by the court of appeals; it's been on stay for

21  about two years.  We're just waiting for either relief from the

22  stay or disposal of the bankruptcy case so we can proceed on

23  it.

24           THE COURT:  Well, disposal of the bankruptcy case

25  isn't going to help you, because --

1          MR. COLBERT:  Well, it will because there are other

2    parties that --

3          THE COURT:  Oh, okay.

4          MR. COLBERT:  -- are there.

5          THE COURT:  You've got other parties.  So the court

6    stayed it as to the nondebtors?

7          MR. COLBERT:  Please?

8          THE COURT:  The court stayed the appeal even as to

9    nondebtors?

10         MR. COLBERT:  Yes.  The whole case has been stayed.

11         THE COURT:  Okay.

12         MR. COLBERT:  Ally Bank is one of the other parties, I

13   believe.

14         THE COURT:  Okay.  All right, I'm going to have to

15   take this matter under submission and read.

16         Mr. Wishnew, you didn't seek to expunge the claim on

17   the merits of the underlying claim; you did so on the basis of

18   res judicata, correct?

19         MR. WISHNEW:  That's correct, Your Honor.  There was

20   an alternative basis with regard to certain of the claims that

21   they were filed against the wrong debtor.

22         THE COURT:  Right.

23         MR. WISHNEW:  But there was no additional substantive

24   arguments as to these claims.

25         THE COURT:  All right, I'm going to take the Davis

1  matter under submission.  Thank you, counsel.

2          MR. COLBERT:  Thank you, Your Honor.

3          THE COURT:  And you're excused if you wish to be.

4          MR. COLBERT:  Thank you.

5          THE COURT:  All right.  Go ahead with Cirino.

6          MR. COLBERT:  Thank you, Your Honor.  Your Honor, this

7  is simply a matter where we had a motion to dismiss that was

8  granted without leave to amend.  The underlying facts don't

9  really appear to be at issue by Ms. Cirino, so we believe that

10 the briefing on the matter is complete, that res judicata does

11 apply and that there really aren't any counterpoints raised by

12 the claimant to contest our objection.

13         THE COURT:  All right, again, anybody appearing for

14 Cirino?

15         All right, the matter's under submission.

16         MR. WISHNEW:  Thank you, Your Honor.  Finally, Your

17 Honor, is the matter of Hooper.  And I believe counsel for Mr.

18 and Mrs. Hooper is on the line.

19         THE COURT:  Right.

20         MR. WISHNEW:  Again, it's a similar argument as to Mr.

21 Davis as well.  In this case, counsel argued that the claim was

22 premature -- that the -- I'm sorry -- the objection was

23 premature because the claim was contingent under 502(b)(1).  We

24 would contest his characterization as contingent.  And for,

25 again, the arguments previously noted, we believe that res

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1    judicata is an appropriate basis for the objection.

2                THE COURT:  All right.  Who's appearing for Hooper?

3                MR. MAY:  William May, Your Honor, on CourtCall.

4                THE COURT:  Go ahead.

5                MR. MAY:  Yes, Your Honor.  Similar to your comments

6    on the prior case, I'm in agreement that res judicata is likely

7    a bar to this claim.  But the debtor would like to proceed on

8    his appeal; it is January -- oral argument is set on January

9    9th of next year.  So we're very close to a resolution on this

10   matter, and we wouldn't like the rug pulled out from underneath

11   us at this late juncture.

12               Both sides have briefed the case; they've acknowledged

13   that, in accordance with one of the Court's final orders on

14   stay relief, that this is a case that's excepted from the stay

15   and that it can go forward.  So with Your Honor's comments

16   regarding the debtor being able to move under 502(j) to

17   reconsider disallowance of the claim, we'd like to proceed

18   under that route.

19               Possibly, just to cover the debtor, if the Court would

20   be willing to, on a disallowance of the claim, without

21   prejudice, to state that there is a relief from stay for the

22   appeal to go forward, we would definite -- the creditors would

23   definitely appreciate something like that in the order.

24               THE COURT:  Well, let me -- the background of this

25   case is different, as I understand it, because the Hoopers had

1    filed a Chapter 7, and the Chapter 7 trustee sought to avoid

2    transfers to GMAC and filed a proof of claim.  And then the

3    Chapter 7 trustee filed a motion seeking approval of a

4    settlement of an adversary proceeding.  The Hoopers opposed the

5    settlement and objected to GMAC's claim; and I guess, in their

6    bankruptcy, the bankruptcy judge approved the settlement,

7    overruled the objection to GMAC's claim.  The Hoopers appealed

8    both of those decisions, and the BAP affirmed the bankruptcy

9    court.  The Hoopers then appealed the BAP decision to the Ninth

10   Circuit; that's the appeal that remains pending.  Am I correct

11   in that?

12          MR. MAY:  Yes you are, Your Honor.

13          THE COURT:  And as I understand the law with respect

14   to res judicata, a judicially approved settlement agreement is

15   considered a final judgment on the merits.  And in support of

16   that, the debtor cites Reim v. Providian Financial Corp., 270

17   F.3d 895 at 903 (9th Cir. 2001).  They cite an earlier Ninth

18   Circuit case, the Dominelli case, as well, giving preclusive

19   effect to a settlement of a trustee's action in a bankruptcy

20   proceeding.

21          So I don't see why res judicata does not apply with

22   respect to your claim.  Do you agree that it does?

23          MR. MAY:  I do, Your Honor, but I don't agree with

24   counsel, and I kind of agree with Your Honor's comments that it

25   should not cut off my client's right to appeal -- finish their

1  appeal with the Ninth Circuit and possibly move to reconsider

2  disallowance if there's a reversal on the appeal.

3          THE COURT:  Mr. Wishnew, what is the -- the Ninth

4  Circuit appeal is going forward?

5          MR. MAY:  Yes, Your Honor.

6          THE COURT:  Well, let me ask the debtors' counsel.

7  debtors' counsel.  The stay doesn't affect the Ninth Circuit

8  appeal?

9          MR. WISHNEW:  Not that I am specifically aware of but

10  I --

11          THE COURT:  Was this covered by the supplemental

12  servicing order?  I'm just trying to understand -- fine with me

13  if the Ninth Circuit appeal is going forward but --

14          MR. WISHNEW:  I mean since this was not originally a

15  foreclosure matter, I would not imagine that it would be

16  covered by a supplemental servicing order, Your Honor.

17          THE COURT:  So Hooper's counsel, and I apologize, I

18  didn't get your name down, so the stay doesn't affect the

19  pending appeal in the Ninth Circuit?

20          MR. MAY:  Your Honor, the final supplemental order

21  that this Court entered regarding stay of the matter, I'm

22  trying to find a docket number on it.  One second.

23          THE COURT:  Let me ask you this.  Who is

24  representing -- are there nondebtors involved in the appeal or

25  just the debtors?

1          MR. MAY:  There's the -- the Chapter 7 trustee is a

2     party to the appeal.

3          THE COURT:  Because he settled.

4          MR. MAY:  The debtor is the main party though.

5          THE COURT:  The Chapter 7 trustee entered the

6     settlement and the Hoopers are challenging --

7          MR. MAY:  Right.

8          THE COURT:  -- the Chapter 7 trustee's settlement.  I

9     have that right?

10          MR. MAY:  Right, Your Honor.

11          THE COURT:  Okay.

12          MR. MAY:  And we were proceeding that there was an

13     exception to the stay based on your final supplemental order --

14          THE COURT:  Okay.

15          MR. MAY:  -- docket 774 filed July 13, 2012,

16     specifically paragraph 23 of that order.

17          THE COURT:  Well, even if I expunged the claim, if the

18     Ninth Circuit somehow reverses and you can make a motion under

19     502(j) to seek to have -- I mean even if I grant -- because it

20     does seem to me you're going forward with the appeal.

21          MR. MAY:  Yes.

22          THE COURT:  I take it you acknowledge that under

23     applicable Ninth Circuit law, the settlement agreement is a

24     final judgment on the merits and res judicata -- the federal

25     rule on res judicata applies to that judgment.  That would

1  support sustaining the debtors' objection to your claim.  If

2  you get it reversed, you make a motion under 502(j) and seek to

3  have it allowed.  I'm not --

4          MR. MAY:  Yes, sir.

5          THE COURT:  I'm not precluding that.

6          MR. MAY:  Your Honor --

7          THE COURT:  Okay.  All right?

8          MR. MAY:  Yes, Your Honor.  And I agree that res

9  judicata does seem to apply to this claim.

10         THE COURT:  Okay.

11         MR. MAY:  I was hoping that perhaps the Court would be

12 willing to continue this hearing pending the outcome of the

13 appeal but if the Court is not inclined to do that --

14         THE COURT:  Well --

15         MR. MAY:  -- then I would just move under 502(j).

16         THE COURT:  You may be arguing it on January 9th but

17 the Ninth Circuit doesn't always act that promptly.

18         MR. MAY:  Right.

19         THE COURT:  And so it could be a very long wait before

20 the Ninth Circuit rules; maybe, maybe not.  I don't know.  I

21 mean it could be on their summary disposition calendar.  I

22 don't know.  But look, the Code -- if the claim is expunged,

23 the Code provides you a remedy if you can -- under 502(j) if

24 you have a basis to proceed with it.  Okay.  I have the

25 arguments.  I am going to take it under submission.  I'll enter

1    an order.  Thank you very much, counsel.

2            MR. MAY:  Right.  Thank you, Your Honor.

3            THE COURT:  Okay.  So the last one of these is being

4    adjourned --

5            MR. WISHNEW:  That's correct, Your Honor.

6            THE COURT:  Gindele, okay.

7            MR. WISHNEW:  May we submit an order with regard to

8    the balance of claims?

9            THE COURT:  Yes, you can.

10           MR. WISHNEW:  Okay.  Very well.  I believe that is the

11   end of the contested claims objections calendar, so I will turn

12   the podium back over to my colleague, Mr. Marinuzzi.

13           THE COURT:  Okay.

14           MS. KRIGEL:  Excuse me.  This is Erlene Krigel for

15   Becky Spence.

16           THE COURT:  I haven't gotten to the Spence matter yet.

17   I'll get there.

18           MS. KRIGEL:  I apologize.

19           THE COURT:  Go ahead, Mr. Marinuzzi.

20           MR. MARINUZZI:  Your Honor, I was actually just

21   getting up to address the Court on the Spence matter as a

22   matter of fact.

23           THE COURT:  All right.  Well, we're going to deal with

24   the Spence matter now.  Go ahead.

25           MR. MARINUZZI:  Your Honor, the agenda, and I

1   apologize for skipping over this, it's page 29, item number 2,

2   this is the debtors' objection to the proof of claim filed by

3   Becky Spence which the agenda reflects is going forward today

4   but my partner who is en route to New York was contacted

5   between the time the agenda was getting finalized and when it

6   was filed and was told that Ms. Spence had retained counsel and

7   that they were not prepared to go forward this morning.  So we

8   apologize.  The agenda got filed reflecting it as going

9   forward.

10          THE COURT:  And I did a lot of work on Spence.

11          MR. MARINUZZI:  And for that, I apologize, Your Honor

12   but we were requested last night after the -- we became aware

13   of it because Mr. Lewis was en route in the air and did not

14   receive the e-mail that there was a request for an adjournment

15   of this hearing by new counsel for Ms. Spence.

16          THE COURT:  All right.  On the phone, you're appearing

17   for Ms. Spence; is that correct?

18          MS. KRIGEL:  I am, Your Honor.

19          THE COURT:  And your name is?  Tell me your name.

20          MS. KRIGEL:  It's Erlene Krigel.

21          THE COURT:  All right.

22          MS. KRIGEL:  I'm an attorney in Kansas City, Missouri,

23   representing Ms. Spence in her own Chapter 11 proceeding in the

24   Western District of Missouri.

25          THE COURT:  What judge is that pending before?

 1          MS. KRIGEL:  Arthur Federman.

 2          THE COURT:  Okay.  Yes, I know Judge Federman.

 3          MS. KRIGEL:  And due to her very limited resources,

 4  she had attempted to handle this claim on her own pro se but as

 5  a result of an objection that debtor filed last Friday, late

 6  afternoon, she asked me if I would try and intervene and see if

 7  I could help her.  So --

 8          THE COURT:  Well, let me be -- I want to make sure I

 9  understand.  Are you filing -- are you intending to file a

10  notice of appearance in this case and seek to be admitted pro

11  hac vice to represent Ms. Spence?  If you're just trying to

12  help her, I'm not going to permit you to appear.  If you are,

13  in fact, filing a notice of appearance and if you're not a

14  member of the bar of this court, if you're going to seek to be

15  admitted pro hac vice, I'll respect that you're newly retained.

16  But so you need to get on the record right now and tell me what

17  it is you're doing.  Helping Ms. Spence is not enough.

18  Appearing for Ms. Spence, getting admitted pro hac vice would

19  undoubtedly lead me to adjourn this matter to a subsequent

20  hearing.  Which is it?

21          MS. KRIGEL:  Well, that puts me in a bad spot, Your

22  Honor.

23          THE COURT:  Well, I don't care whether it puts you in

24  a bad spot or not because if you're not appearing -- if you do

25  not represent to me now that you intend within the next two or

RESIDENTIAL CAPITAL, LLC, ET AL.                          60

1    three days to file a notice of appearance on behalf of Ms.

2    Spence and seek to be admitted pro hac vice, if you're not

3    already admitted in New York, we're going forward.

4            Ms. Spence contacted chambers over the last few days

5    and asked for the Court to waive the fee for her to appear

6    personally on CourtCall and an order was entered permitting her

7    to do so.  So this is the first I'm hearing that a lawyer is

8    trying to help her.  I have no objection to Ms. Spence getting

9    help but if you're going to appear, you have to -- you are

10   going to be counsel of record for Ms. Spence and be admitted

11   pro hac vice.  So you need to tell me now because otherwise, I

12   am going forward with the Spence matter.

13           MS. KRIGEL:  Well, Your Honor, I don't want to put her

14   in that predicament, so I guess I would represent to you that I

15   would be filing my motion or petition to appear pro hac vice.

16           THE COURT:  Okay.  It's pretty simple in our court to

17   do that, although you have to pay a fee to get admitted pro hac

18   vice but you're representing her in her Chapter 11?  Did I

19   understand you correctly?

20           MS. KRIGEL:  I am, Your Honor.

21           THE COURT:  Okay.  All right.  I'm sorry.  Do you want

22   to make your appearance?

23           MR. LEWIS:  Yes, Your Honor.  It's Adam Lewis of

24   Morrison & Foerster for the debtors.

25           Just to kind of clarify exactly what happened

1  yesterday, while I was in the air coming from San Francisco,

2  Mr. Wishnew got an e-mail from Ms. Spence asking if we would

3  adjourn and saying she felt the need to get counsel.  Ms.

4  Krigel, counsel, spoke with Mr. Harris, who helped me prepare

5  these materials, sometime around 6:45, maybe 7, something like

6  that, last night and asked for an adjournment.

7          What we told Ms. Krigel was, we were willing to

8  adjourn to whatever might be the next date or whatever date the

9  Court proposed, but we're not willing to agree to have Ms.

10 Spence file more papers.  I mean this has been on file a long

11 time.

12         THE COURT:  Yes, Ms. Spence -- just so we're clear,

13 Ms. Spence filed a response which is at ECF docket number 5897;

14 the debtors filed a reply which is at ECF 6090, whether or

15 not -- I'm not sure I am going to agree that --

16         MR. LEWIS:  I understand, Your Honor.

17         THE COURT:  -- the debtor (sic) can't file any more

18 papers but I do want to get the -- since Ms. Krigel has

19 indicated she is going to file a notice of appearance and seek

20 to be admitted pro hac vice, why shouldn't Ms. Krigel be

21 permitted to file -- now that Ms. Spence has counsel, I'm

22 reluctant, Mr. Lewis, to say I'm not going to permit counsel --

23 you know that counsel is going to have to -- their argument is

24 going to have to rise or fall on the response that the pro se

25 claimant, Ms. Spence, filed.

1        MR. LEWIS:  I understand, Your Honor, and of course

2   it's not my prerogative to deny her.  I just want it to be

3   clear that we're not consenting to that.

4        THE COURT:  Okay.

5        MR. LEWIS:  But we do think there's a good argument

6   why she shouldn't be allowed to.  She filed her original

7   response to our objection late.  It didn't come through until

8   eight days after it was due in October.  The hearing was set

9   for the 7th of November and got adjourned, as a consequence, to

10  this date and then we filed our reply on time.  And in our

11  view, she's had plenty of time to find counsel and get counsel

12  to represent her.  We've spent and time and money responding to

13  her response and now she's decided at the last moment to do

14  this.  I would note too, Your Honor --

15       THE COURT:  Well, it's -- I'm going to -- never mind.

16       MR. LEWIS:  It's not in her papers, Your Honor, but --

17  our papers, Your Honor, but I checked yesterday.  She did not

18  schedule these claims in her Chapter 11 case.  She scheduled

19  claims against other lenders, but not these claims -- any

20  claims against Homecomings.

21       THE COURT:  All right.  So Ms. Spence filed a claim

22  against Homecomings Financial, LLC in the amount of 5,876,900

23  dollars.  The stated basis for the claim is "wrongful

24  foreclosures".  The claim did not attach any supporting

25  documentation.  She referred to an action Becky Spence v.

RESIDENTIAL CAPITAL, LLC, ET AL.                    63

1   Homecomings Financial, LLC which is a pending litigation in the

2   31st Judicial Circuit Court, Greene County, Missouri.  It's a

3   state court action, and Ms. Spence filed that state court

4   action on April 11th, 2011.

5          Well, since Ms. Krigel has indicated that she intends

6   promptly to file a notice of appearance and seek to be admitted

7   pro hac, I'm going to adjourn the matter.

8          Ms. Krigel, when will you -- I want to impose a

9   deadline on any supplemental filing that you're going to make.

10  When can you have your filing ready?

11         MS. KRIGEL:  If the Court would allow us fourteen

12  days, I think we could have something filed within that time,

13  Your Honor.

14         THE COURT:  Let me just look at the calendar a minute.

15         MS. KRIGEL:  We're bumping up against the holidays.

16  That was my concern.

17         THE COURT:  I know that and I want to -- I just want

18  to look at the calendar.  All right.  Ms. Krigel, I am going to

19  give you until 5 p.m. Friday, January 10th to file any

20  supplemental papers.

21         Mr. Lewis, I am going to give the debtors until 5 p.m.

22  Friday, January 17th to file any supplemental reply.  No papers

23  will be permitted after that, Ms. Krigel, okay?  So I'm giving

24  you -- I don't want you to have to work on -- you know

25  specifically on the holidays, too.  So I am going to give

RESIDENTIAL CAPITAL, LLC, ET AL.                              64

1   you -- that's why I am giving you a little more than the two

2   weeks you asked for.

3              MS. KRIGEL:  Thank you.

4              THE COURT:  Okay.  And I don't know what -- whether we

5   have hearing dates after January 17th.

6              MR. LEWIS:  I think the next omnibus date is January

7   30th.

8              THE COURT:  Okay.  We'll put this on the calendar for

9   January 30th.  Is that okay, Ms. Krigel?  And I'll permit you

10  to appear by telephone.

11             MS. KRIGEL:  That would be great.  Thank you, Your

12  Honor.

13             THE COURT:  Okay.  And what we'll try and do when it's

14  on for January 30th, if you're appearing by phone, I don't know

15  what else is going to be on that day but I'll see if we can get

16  it fairly early on the calendar so that you're not sitting all

17  morning on the telephone, okay?

18             MS. KRIGEL:  Thank you very much.

19             THE COURT:  All right.  Thank you very much, Ms.

20  Krigel.

21             MR. LEWIS:  Thank you, Your Honor.

22             THE COURT:  Okay.  Thank you, Mr. Lewis.

23             MR. MARINUZZI:  Your Honor, on page 41 of the agenda,

24  we have two adversary proceedings.  The first is Pruitt v.

25  ResCap and my colleague, Jeff Rosenberg, will address the Court

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1   on that.

2           THE COURT:  Okay.  Is anybody appearing for Alfredia

3   Pruitt?

4           MS. PRUITT:  Yes, I am on the phone.

5           THE COURT:  You're Ms. Pruitt?

6           MS. PRUITT:  Yes, Your Honor.

7           THE COURT:  Okay.  Thank you, Ms. Pruitt.  All right.

8   Counsel, go ahead.  Tell me your name again.  I'm sorry.

9           MR. ROSENBERG:  Good morning, Your Honor.  It's Jeff

10  Rosenberg for the debtors.

11          THE COURT:  Okay, Mr. Rosenberg.

12          MR. ROSENBERG:  And it's for adversary case number

13  13-01350.  This is a case where foreclosure was completed in

14  September of 2010.  We believe it presents a textbook case of

15  res judicata.  Ms. Pruitt asserted and lost the same claims

16  that are issue in this adversary proceeding four times in

17  Georgia State Court.  Her four prior Georgia actions contained

18  the same allegations and the same claims as her adversary

19  proceeding.

20          THE COURT:  All right.  And after the fourth action,

21  which was filed on February 15, 2012, on March 12, 2012, the

22  state court entered an order dismissing the fourth action and

23  the court likewise entered something; I'm not familiar with the

24  term, a bill of peace --

25          MR. ROSENBERG:  That's right.

1        THE COURT:  -- enjoining the plaintiff from continuing

2   her attempts to relitigate the same issues.  That was her

3   fourth unsuccessful attempt.  That's basically the sum --

4   without skipping the intermediate steps, that's where we get

5   to, right?

6        MR. ROSENBERG:  Yes, I think that's right, Your Honor.

7        THE COURT:  Okay.

8        MR. ROSENBERG:  And so as Your Honor probably recalls,

9   Ms. Pruitt filed a motion for relief from the automatic stay

10  and Your Honor --

11       THE COURT:  And I denied that on April 12th, 2013.

12       MR. ROSENBERG:  Right.  Which brings us to this

13  adversary proceeding.  Although there's one sort of recent

14  development which I wanted to bring to your attention and

15  that --

16       THE COURT:  Okay, go ahead.

17       MR. ROSENBERG:  We found out, I think on November

18  21st, that Ms. Pruitt had filed a new action in Georgia State

19  Court.  That action was dismissed by the Georgia State Court on

20  November 26th and it referred back to the bill of peace that

21  Your Honor mentioned a moment ago.

22       Essentially we believe the elements of res judicata

23  are easily satisfied here and I can tick through them if you

24  like but --

25       THE COURT:  No, let me hear from Ms. Pruitt.

1          Ms. Pruitt, you know the Georgia State Courts and this

2     court have been very patient with you but my patience is

3     running out and it obviously ran out for the Georgia state

4     courts.  Why shouldn't your claim 835 -- proof of claim 835 be

5     expunged on the grounds of res judicata?

6          MS. PRUITT:  Excuse me, Your Honor?

7          THE COURT:  Go ahead.

8          MS. PRUITT:  Well --

9          THE COURT:  I want to know why I shouldn't dismiss

10    your -- why I shouldn't expunge your claim.  You've been

11    attempting to litigate the exact same issues -- your --

12         MS. PRUITT:  Well, Your Honor --

13         THE COURT:  Hold on, just a second.

14         MS. PRUITT:  -- this is --

15         THE COURT:  Your first action was filed on December 6,

16    2010; your second action on September 21, 2011; your third

17    action on October 7, 2011; your fourth action on February 15,

18    2012.  And everyone has resulted in essentially the same

19    result, except the last time the Georgia court got fed up and

20    enjoined you from filing anything else.

21         MS. PRUITT:  Your Honor, when I originally filed the

22    claim, I was trying desperately to stay in my home.  When I

23    filed that original claim, the date of the hearing -- I sent

24    you copies of the transcript -- on that particular date of the

25    hearing, the judge because I filed pauperis, I could not pay

1    the money to the court registry.  The judge stated that the

2    case would not be heard because the money had not been paid.  I

3    then turned around, Your Honor, and I filed a motion for

4    reconsideration.  I -- I was merely trying to be heard in

5    court.  I was never -- my case was never heard on the merits.

6    I was denied being indigent which I supplied all the documents.

7    I supplied my -- my -- my monetary -- that I did not have, I --

8    I -- I put everything down.  I was eligible for pauperis.

9    Because it was me, I kept filing things in -- into the Court

10   trying to remain in my home.

11          GMAC, Your Honor -- I supplied documents to you --

12   GMAC foreclosed on my home and I've never paid money to them.

13   GMAC has never sent me a late notice.  I kept trying every time

14   I applied for a pauperis, being indigent, poor not having the

15   money, that's how I lost my home, every time I applied, I think

16   the Court just got angry with me and they denied it.

17          I filed a notice of appeal, along with a pauperis

18   affidavit.  The court just denied it, did not have a hearing or

19   anything.  Every time I applied, whenever the court, the state

20   court will deny my motion for pauperis, I would turn around and

21   file something else.  I don't know if the court thought I was

22   just filing what I didn't know, but I do know, Your Honor, I

23   had a right as being indigent because I were indigent and the

24   court just point blank:  this is Alfredia Pruitt; I'm denying

25   it.

1          I requested a jury trial in the original claim.  I

2    wasn't given a trial.  It was never heard on the merits.  The

3    transcript that I provided to you, it -- it shows Your Honor

4    that it was not heard.  I went to court on the -- the judge

5    gave a final order in the state court in reference to the lis

6    pendens that I filed.  Well, I filed a lis pendens, Your Honor,

7    because I -- I felt that my home was wrongfully foreclosed on.

8    Georgia State Superior Court just denied everything without

9    holding hearings as to my being indigent.  Georgia would not

10   even -- to appeal their action.  I have never had a day in

11   court.

12         Your Honor, there is -- there's a break in the chain

13   of title.  I have not had a day in court.  The judge just ruled

14   on it.  I'm not trying to waste the Court's time.  I have other

15   things I'm trying to pursue.  I don't have the education, the

16   attorneys have but I do have God-given sense to know that I've

17   been mistreated.  Res judicata, Your Honor, should not apply

18   because my case was never heard on the merits.

19         If you read the first claim, the judge states in

20   there, Ms. Pruitt, this is not what we're here today -- we're

21   here for the lis pendens.  I'm not stating you can't sue

22   otherwise.  I think, Your Honor, the judge just got aggravated

23   because my research -- the little research I would do, I was

24   only trying to get a day in court.  Those people wrongfully

25   stole my home without any documents or anything.  I feel that

RESIDENTIAL CAPITAL, LLC, ET AL.                    70

1    if -- if res judicata -- one of the elements of res judicata

2    and collateral estoppel is that I've had a fair opportunity for

3    someone to hear me.  I have never been given that opportunity.

4    My indigence was taken away from me.  I -- I was poor.  I'm

5    still poor.  And the Court have the documents.  I filed all

6    this stuff.  I tried to appeal it.  The court would not even

7    honor my indigence.

8            THE COURT:  All right.  I --

9            MS. PRUITT:  They would not.

10           THE COURT:  I'm going to take the matter under

11   submission.  I have all the papers.  I've reviewed it and I'll

12   take the matter under submission and enter an appropriate

13   decision.  Thank you.

14           MS. PRUITT:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16           MS. CIRINO:  Judge Glenn?

17           THE COURT:  Yes, who is that?

18           MS. CIRINO:  Yes, my name is Sepideh Cirino.  I've

19   been on the call -- CourtCall.  I'm one of the claimants,

20   number 51 and you asked if I was here.  I was on but it was for

21   listening only.  So I just want to say that I've been on the

22   phone and I've been listening.

23           THE COURT:  All right.  Hold on, Ms. Cirino.

24           MR. WISHNEW:  Your Honor, Jordan Wishnew for the

25   record.  Ms. Cirino's claim is part of the fifty-first omnibus.

1  I believe you took it under advisement.

2           THE COURT:  Yes, I have it.  This is claim number

3  3893.

4           MR. WISHNEW:  That's correct, Your Honor.

5           MS. CIRINO:  Happy holidays, Judge.

6           THE COURT:  Well, thank you.  You too, Ms. Cirino.

7  Ms. Cirino, I've read the papers.  I'm going to give you a

8  chance to argue.  Go ahead.  I've got the papers open in front

9  of me and I know this relates to claim 3893 and it relates to

10 two loans that were obtained in 2004 and you had filed a

11 lawsuit against the debtors in California in federal court in

12 the -- the Federal District Court in the Central District of

13 California dismissed your complaint with prejudice for failure

14 to state a claim upon which relief can be granted.  And the

15 debtors argue that the district court had federal question

16 jurisdiction over your lawsuit because you were alleging

17 violations of federal law and that the federal preclusion law

18 applies in the circumstances and, therefore, the decision is

19 final.  The dismissal in the federal district court was final

20 and you're barred.  So what is your argument?

21          MS. CIRINO:  Well, my argument is same as Mr. Davis.

22 My court is -- my case is in appeal in court in the Ninth

23 District, and I have done a forensic audit on the books, and

24 there -- I believe that there has been some mispresentation

25 (sic) and that's why I filed it on the appellant court, and

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1  it's holding on that, and, again, this is a -- I believe that

2  if you honor the other -- the res rejudal (sic) then I won't

3  have any fair tries to go into appeal court and, you know, tell

4  them what my finding is.

5              THE COURT:  Okay.  Anything else you want to add, Ms.

6  Cirino?

7              MS. CIRINO:  No, thank you, Your Honor.

8              THE COURT:  Okay.  Thank you very much, Ms. Cirino.

9              All right.  Thank you, Mr. Wishnew.

10             All right.  Ms. Cirino, you're excused if you wish to

11 be.  All right.

12             MS. PRUITT:  Excuse me.  Your Honor, this is Ms.

13 Pruitt.  Am I excused or do I have to stay on?

14             THE COURT:  You're excused, Ms. Pruitt.  Yes.  Thank

15 you very much.

16             MS. PRUITT:  Okay.  Thank you.

17             THE COURT:  Okay.  Mr. Rosenbaum?

18             MR. ROSENBAUM:  Good morning, Your Honor.  Norm

19 Rosenbaum, Morrison & Foerster.

20             The next matter on the agenda is the Jenkins adversary

21 proceeding.

22             THE COURT:  Right.

23             MR. ROSENBAUM:  This is actually the motion of Wells

24 Fargo to dismiss.

25             THE COURT:  Right.

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1          MR. ROSENBAUM:  Their counsel is here, and debtor has

2     filed a joinder.

3          THE COURT:  Is anybody present in court or on the

4     phone for Ms. Jenkins?  Okay.

5          MR. SAMON:  Good morning, Your Honor.  Jonathan Samon,

6     Hogan Lovells.

7          THE COURT:  Your last name again?  I'm sorry.

8          MR. SAMON:  Samon, S-A-M-O-N.

9          THE COURT:  Thank you.

10          MR. SAMON:  Hogan Lovells, counsel for Wells Fargo and

11     U.S. Bank, as trustee.  Excuse me.

12          We have am unopposed motion to dismiss the adversary

13     complaint.  This is proceeding number 12-01935, and the debtors

14     have joined in three of our four independent bases for

15     dismissal.  I'm happy to go into them.

16          THE COURT:  No.  Let me -- I've reviewed the papers.

17          MR. SAMON:  Sure.

18          MS. JENKINS:  I'm sorry.  Judge, excuse me, please.

19     I'm sorry.  We are on the call, Sharon Jenkins and Marion

20     Jenkins.

21          THE COURT:  Okay.  Let me hear from Ms. Jenkins, okay?

22     I've read the moving papers.

23          Ms. Jenkins, go ahead.

24          MS. JENKINS:  Yes, sir.  Thank you for -- for the

25     opportunity.  But we have had several occasions where we have

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1  been trying to get a lawyer that's admitted, I guess, that

2  y'all's word in New York, and haven't actually had a lawyer to

3  accept our case as of yet.  But our basis for filing our motion

4  and asking for the Court not to expunge our case is that we had

5  been making our payments on our mortgage, and they would keep

6  our payments for a number of months, and then all of a sudden

7  stopped taking payments, and we would be talking back and forth

8  to the mortgage company, and then they were -- finally put us

9  on a loan modification trial payment.  We'd make those for a

10  number of months, then up and they stopped taking them without

11  any explanation at all.  And that's how we got into this

12  situation.

13          Right now they haven't started a foreclosure again,

14  but if our -- if our bankruptcy one time here in Atlanta and

15  the judge threw the mortgage company's motion out to foreclose

16  on us because he said that -- there's so many words -- that the

17  procedures -- they didn't follow the correct procedures and

18  there was enough evidence that he saw that was erroneous.  The

19  robo-signing and all of the other things that the judge noted

20  in Atlanta during the bankruptcy.  So he dismissed the bank --

21  our side of the bankruptcy without prejudice and told the

22  mortgage loan -- you see, I think it was Swartzdigger (ph.) --

23  that they need to figure out what's going on with our mortgage

24  and don't just foreclose on us like that, which they haven't,

25  and it's been in limbo ever since.

1            All we've been trying to do is pay our mortgage and

2    stay in our home and try to figure out why all of the -- the

3    papers in the court are so -- I don't know what the word is --

4    combobulated (sic).  They got so many different assignments,

5    and they have corrective assignments after corrective

6    assignments.  And, Judge, Your Honor, they have corrective

7    assignments on the corrective assignments.

8            And so we haven't been able to figure out, you know,

9    what to do as far as the loan modification, as far as anything

10   with our home.  We want to our Legal Aid here in Atlanta, and

11   they're baffled.  They've been talking back and forth to the

12   mortgage company, and no one, it seems, can figure out what to

13   do with our mortgage.

14           So that's where we are, sir, and we don't want to be

15   realty is expunged, because we feel like we have a valid case,

16   and we just want to move forward and get this thing cleared up.

17           THE COURT:  Okay.  Counsel, are you appearing for both

18   Wells Fargo and U.S. National Bank?

19           MR. SAMON:  That's correct.

20           THE COURT:  All right.  And one of the things you

21   argue in support of your motion to dismiss is the Court lacks

22   subject matter jurisdiction over the claims against Wells Fargo

23   and U.S. National Bank.  Correct?

24           MR. SAMON:  Correct.

25           THE COURT:  And did Wells Fargo file a claim for

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1    indemnification against the debtors?

2           MR. SAMON:  Your Honor --

3           THE COURT:  I'll ask the question -- did both Wells

4    Fargo and U.S. National Bank file claims for indemnification

5    against the debtors?

6           MR. SAMON:  My understanding is no, Your Honor.  In

7    this instance Wells Fargo is appearing solely as servicer for

8    the trust and the trust is not.

9           THE COURT:  Okay.  So, and you argue that because the

10   resolution of the claims against Wells Fargo and U.S. National

11   Bank would have no conceivable effect on the debtors' estate

12   because there's no claim for indemnification, that therefore

13   the Court lacks related-to jurisdiction.  Is that correct?

14          MR. SAMON:  That is correct.

15          THE COURT:  All right.  And so if I dismiss this case

16   for lack of subject matter jurisdiction, Ms. Jenkins would go

17   ahead and sue you somewhere else.  Correct?

18          MR. SAMON:  That is correct.

19          THE COURT:  Okay.

20          MR. JENKINS:  Your Honor?

21          THE COURT:  Who's that?

22          MR. JENKINS:  This is Mr. Jenkins.  If I may?

23          THE COURT:  Oh.

24          MR. JENKINS:  He brought up the point that Wells Fargo

25   is the servicer of my loan, but I received a letter from

1   American Servicing Center on October the 3rd, 2013 stating that

2   we recently applied 716 dollars to your escrow account advance

3   balancing using the funds that were previously readmitted and

4   unapplied.  And there's -- they are asking that the case be

5   dismissed for lack of service, and we did service --

6            THE COURT:  No, I know that.  I saw -- we got your, I

7   think, I'm not sure whether it was timely or late, but we

8   received your papers, and you addressed the issue of service.

9   I'm not -- my questions to the counsel was not about servicer

10  process but whether there's what's -- the legal term for it is

11  subject matter jurisdiction over the claims against Wells Fargo

12  and U.S. National Bank.  They, essentially, argue you're in the

13  wrong court in suing them, that this court has no subject

14  matter jurisdiction, even assuming you served them, over the

15  claims against Wells Fargo and U.S. National Bank.

16           Just to back up for a minute, the background of this

17  case is that the Jenkins originally filed their action

18  against -- their adversary proceeding against the debtors and

19  some individuals in MERS, and originally the debtors moved for

20  a more definite statement.  Under 12(e) I granted that motion.

21  They filed an amended complaint that, essentially, was almost

22  identical to the complaint that was defective.  Wells Fargo and

23  U.S. National Bank were not parties to that original motion.

24           On July 12th, 2013 the defendants Judy Faber and MERS

25  filed a motion to dismiss the adversary proceeding as to them,

1    and the Court granted that motion on September 18, 2013.

2    That's at ECF docket number 40.

3              The debtor has joined in the current motion except for

4    the issue about subject matter jurisdiction.  So I will have to

5    dispose of that.  But I just wanted to be clear that Wells

6    Fargo and U.S. National Bank argued that -- you also moved

7    under 12(b)(6), but if I don't have subject matter jurisdiction

8    I don't even get to the issue of whether the complaint fails to

9    state a claim.  I first have to decide whether there's subject

10   matter jurisdiction over the claims asserted against Wells

11   Fargo and U.S. National Bank.  If there's no subject matter

12   jurisdiction the complaint gets dismissed on that basis, and

13   the Jenkins can go find another court where they can assert

14   jurisdiction against you.

15             You agree with that, counsel?

16             MR. SAMON:  Yes, Your Honor.

17             THE COURT:  All right.  I'm going to take the matter

18   under submission and dispose of it in an order.

19             MR. SAMON:  Thank you.

20             THE COURT:  Thank you.

21             MR. ROSENBAUM:  Well, Your Honor, that concluded the

22   joinders.

23             THE COURT:  Okay.  Thank you, Mr. Rosenbaum.

24             Mr. Marinuzzi?  Now we can get to what the courtroom

25   is full for.

1          MR. MARINUZZI:  Here, Your Honor, that brings us to

2     the fourth interim fee applications of the committee and

3     debtors' professionals as well as the final applications of the

4     examiner and his professionals.  There's been a request by the

5     examiner's counsel for the examiner's professionals to go first

6     on their final request --

7          THE COURT:  That's fine.

8          MR. MARINUZZI:  -- which is fine with us.

9          THE COURT:  I'll be happy to do that.

10         MR. MARINUZZI:  Thank you.

11         MR. SEIFE:  Good morning, Your Honor.  Howard Seife

12    from the law firm of Chadbourne & Parke, counsel for the

13    examiner.  And I'd like to approach these final fee

14    applications on behalf of the examiner and all of the

15    examiner's professionals, though the other parties, I believe,

16    are available if there are any particular questions.

17         THE COURT:  The first issue I want to deal with, Mr.

18    Seife, initially I got a letter from the committee, as you

19    know, asking that this hearing be adjourned with respect to the

20    final application of the examiner and the examiner's

21    professionals.  You responded in a letter and opposed that, and

22    I entered an order saying we'd go forward.

23         Subsequent to that the committee filed an objection,

24    limited objection, reiterating that their request, that since

25    this is a final fee application that this matter be adjourned.

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1        I mean, have all of your interim fees been paid at

2   this point?  This is an issue about the final fee application.

3        MR. SEIFE:  Primarily.  There was a small amount

4   outstanding under what is called the fourth fee application.

5        THE COURT:  Okay.  And how much is that, Mr. Seife?

6        MR. SEIFE:  For Chadbourne it's --

7        THE COURT:  Because here -- let me deliver the bad

8   news to you right now.

9        MR. SEIFE:  Yes.

10        THE COURT:  I am adjourning the hearing with respect

11   to the final fee applications of the examiner and the

12   examiner's professionals.  I'm prepared to proceed with respect

13   to the interim application only.  And I know in your letter to

14   the Court you said how early you filed the application, and the

15   committee or anyone else should have had ample time to prepare.

16   We've had a little going on in this court, Mr. Seife.

17        MR. SEIFE:  Yes, Your Honor.

18        THE COURT:  And whatever the committee may think, I'm

19   not prepared on a final basis, because of the consequences of

20   an order approving fee applications on a final basis I'm not

21   prepared to do that.  I am prepared to move forward only with

22   respect to the applications on an interim basis, reserving all

23   issues with respect to the applications on a final basis.

24        So on that point I don't want to hear argument.

25   That's the Court's determination on it.  If you wish to proceed

RESIDENTIAL CAPITAL, LLC, ET AL.                    81

1    now with respect to the interim applications or if you wish --

2    and I'm going to take up the final applications of the examiner

3    and the examiner's professionals at the time when I hear the

4    final applications for compensation of all of the other estate

5    professionals.

6            I certainly agree that the examiner and the examiner's

7    professionals are, in my view, differently situated from the

8    regular estate professionals, so this is not an invitation for

9    leverage or horse-trading or anything else.  This is simply a

10   matter of the Court's docket.

11           I think that the committee's request that the hearing

12   on final applications be adjourned in light of everything

13   that's been going on in this case -- we've had three trials.

14   Last Wednesday was scheduled for final argument on the

15   confirmation, when a few days before a settlement was reached

16   with the JSNs.  And so both the committee's regular counsel,

17   the committee's conflicts counsel, they were both fully engaged

18   with respect to certainly the phase 1 trial, the phase 2

19   confirmation trial, and I do not fault them in the least for

20   not having had the opportunity to fully vet the examiner and

21   the examiner's professionals' applications on a final basis.

22   And I know that there is no objection that's been raised with

23   respect to the examiner, but I think, in fairness, the examiner

24   and the examiner's professionals should all be dealt with

25   together.  So I'm prepared to go forward on the interim

1    application to the extent but not on the final applications.

2            MR. SEIFE:  Very well, Your Honor.  I won't,

3    obviously, revisit what Your Honor has just ruled.

4            THE COURT:  Right.

5            MR. SEIFE:  Thought it is a dramatic change from your

6    prior ruling.

7            THE COURT:  Well, I got a letter asking to adjourn.  I

8    hadn't gotten a formal objection from the committee.  I did.

9    If you want to call it an about-face, fine.  It's an about-

10   face, but that's my ruling.

11           MR. SEIFE:  Very well, Your Honor.  In that case I'll

12   proceed with what is the fourth interim application from the

13   examiner's professionals.  I take it, Your Honor, you'll

14   address the issue of holdbacks and payment of holdbacks --

15           THE COURT:  I will.  Yes.

16           MR. SEIFE:  -- at a later time during the hearing.

17           THE COURT:  Go ahead.  Yes.

18           MR. SEIFE:   In this fourth interim period, docket

19   number 5850, the examiner, Mr. Arthur Gonzalez, is seeking fees

20   for the fourth period in the amount of 45,750 dollars with 0

21   expenses.  No objections have been filed as to that interim fee

22   request.

23           THE COURT:  All right.  Does anybody wish to -- Mr.

24   Masumoto, do you want to be heard?

25           MR. MASUMOTO:  No, Your Honor.  As indicated in our

RESIDENTIAL CAPITAL, LLC, ET AL.                                    83

1  footnote to our omnibus response we had no objection to the

2  examiner's fees or expenses.

3          THE COURT:  All right.  So the Court has reviewed the

4  application for fees for the period -- I guess it's, what?

5  With respect to Mr. Gonzalez the period is May 1 to May 31.  Is

6  that correct, Mr. Seife?

7          MR. SEIFE:  No, it's for the entire fourth interim

8  period, though the bulk of the fees were in the --

9          THE COURT:  Okay.

10          MR. SEIFE:  -- in the May -- I don't have the

11  application in front of me --

12          THE COURT:  Okay.  All right.

13          MR. SEIFE:  -- as to whether there's any time after

14  May.  There may not have been.

15          THE COURT:  All right.  But it was 45,750 dollars.

16          MR. SEIFE:  Yes, Your Honor.

17          THE COURT:  All right.  That's approved on an interim

18  basis.  Okay?

19          MR. SEIFE:  The next application is that of Chadbourne

20  & Parke, docket 5849, seeking fees of $2,728,057.50, expenses

21  of $814,712.64.  An objection was filed by the U.S. Trustee's

22  office.  That objection has been resolved, and we've agreed to

23  reduce the fee request by 100,000 dollars.

24          THE COURT:  Mr. Masumoto?

25          MR. MASUMOTO:  Your Honor, that's correct, and the

RESIDENTIAL CAPITAL, LLC, ET AL.                    84

1   global settlement settled the various discrete issues raised in

2   their fees regarding duplicate time entries, multiple attending

3   of hearings and charges for associates not admitted and

4   responses to fee objections.

5           With respect to our request to substantiate their

6   expenses those were provided and our objection was withdrawn

7   with respect to those expense amounts.

8           THE COURT:  Mr. Seife, if -- I'm getting down to the

9   nits, but can you represent to the Court that your copying

10  charges did not exceed ten cents a page?  I didn't --

11          MR. SEIFE:  Yes.

12          THE COURT:  -- find what the rate was.  I assumed that

13  was it, but I didn't see it, so I'm asking you to represent --

14          MR. SEIFE:  I think it was part of our declaration,

15  but I can confirm that, Your Honor.

16          THE COURT:  It could be.

17          MR. SEIFE:  Yes.

18          THE COURT:  There was a lot of paper I had.

19          MR. SEIFE:  I understand.

20          THE COURT:  And were all meal expenses capped at

21  twenty dollars per person?

22          MR. SEIFE:  Yes, Your Honor.

23          THE COURT:  Anybody else wish to be heard with respect

24  to the Chadbourne interim fee application?

25          So, let me just -- Mr. Masumoto or Mr. Seife, what's

1 | the agreed amount with the adjustment?

2 |         MR. MASUMOTO:  100,000 dollars, Your Honor is --

3 |         THE COURT:  So the amount that was sought was

4 | $2,728,057.50?

5 |         MR. SEIFE:  Yes, Your Honor.

6 |         THE COURT:  And from that 100,000 dollars is being

7 | deducted?

8 |         MR. SEIFE:  Yes, Your Honor.

9 |         THE COURT:  Let me see that.  I guess I do have --

10 |         MR. SEIFE:  I think there --

11 |         THE COURT:  Let me --

12 |         MR. SEIFE:  The debtor has prepared a chart.

13 |         THE COURT:  Here's the chart.  Okay.  Let me -- I

14 | just -- bear with me, okay?

15 |         MR. MASUMOTO:  It's on page 5, Your Honor.

16 |         THE COURT:  No, that's okay.  I didn't see the chart

17 | before I took the bench so --

18 |         All right.  So on an interim basis the Chadbourne fees

19 | are approved in the amount of $2,628,057.50, and expenses of

20 | $814,712,64.  Is that correct, Mr. Masumoto?

21 |         MR. MASUMOTO:  Yes, Your Honor.

22 |         THE COURT:  All right.  It's approved on an interim

23 | basis.

24 |         MR. SEIFE:  Thank you, Your Honor.  The next

25 | application is for the financial advisor to the examiner,

1   Mesirow Financial Consulting, LLC, docket number 5848, seeking

2   of 2,000,899 (sic) dollars and --

3            THE COURT:  Say that again.

4            MR. SEIFE:  Two million, eight hundred, ninety-nine --

5            THE COURT:  Thousand.

6            MR. SEIFE:  -- thousand and 686 dollars, and expenses

7   of 12,752 dollars.  There, again, was an objection raised by

8   the U.S. Trustee.  I'm told that matter has also been resolved

9   with a reduction of 100,000 dollars in fees.  Counsel for

10  Mesirow is here if you have any questions, Your Honor.

11           THE COURT:  Mr. Masumoto?

12           MR. MASUMOTO:  Your Honor, that's correct, although,

13  essentially, all expenses and fee objections were addressed by

14  the 100,000-dollar reduction.

15           THE COURT:  Okay.  Anybody else wish to be heard with

16  respect to the Mesirow Financial Consulting interim fee

17  application?

18           All right.  The interim application is approved.

19           MR. SEIFE:  Thank you, Your Honor.  Wolf Haldenstein

20  filed the final.  They have nothing in this interim fourth

21  period.

22           THE COURT:  All right.  Well, the final is going to be

23  held.

24           MR. SEIFE:  Finally, the Leonard, Street firm, the

25  Minnesota counsel for the examiner, seeks fees for this fourth

1  period in the amount of 11,897 dollars, which brought them up

2  to their agreed fee cap of 100,000, and seeking expenses of

3  1,865 dollars.  There are no objections other than the

4  committee limited objection.

5          THE COURT:  Mr. Masumoto?

6          MR. MASUMOTO:  No objections, Your Honor.

7          THE COURT:  All right.  It's approved on an interim

8  basis.

9          MR. SEIFE:  Thank you, Your Honor.  That's it for the

10  examiner.

11          THE COURT:  All right.  Thank you, Mr. Seife.

12          MR. MARINUZZI:  Your Honor, for the record, again,

13  Lorenzo Marinuzzi, Morrison & Foerster.  I will cover the

14  debtors' professionals' interim applications.

15          There were two objections filed, Your Honor.  One was

16  filed by the U.S. Trustee's office; the other by the committee.

17  The U.S. Trustee's objections have been resolved with respect

18  to each of the professionals other than Bryan Cave, Carpenter

19  Lipps, and FTI, and my understanding is that it is a single

20  issue that overlaps each of the applications relating to travel

21  expenses and travel costs, and I'll let the applicants address

22  the Court on that.

23          THE COURT:  Okay.

24          MR. MARINUZZI:  With respect to the committee's

25  objection, which sought an agreement that all professionals be

1   subject to a continued twenty percent holdback through the

2   final fee hearing, we were able to resolve it on a consensual

3   basis with the committee, and we suggested to each of the other

4   debtors' professionals that they agree, and this morning we got

5   the final signoff, so everybody on the debtors' professional

6   side is in agreement.

7           There currently sits ten percent of approved fees that

8   were covered by the third interim fee application from January

9   through April.  There's also a twenty percent sitting with the

10  debtors from May through August covered by the instant

11  application.  The debtors' professionals have agreed to leave

12  the ten percent that's been sitting there since January with

13  the debtors and to limit the request for the payment of the

14  holdback amounts to ten percent for the second interim period.

15  So at the end of the day, essentially, for the period January

16  through August there would be ten percent of fees sitting with

17  the debtors' estate subject to final application.

18          THE COURT:  What's that total number?

19          MR. MARINUZZI:  Your Honor, I remember -- I don't know

20  that we totaled the total number, but it is not an

21  insignificant amount of money.

22          THE COURT:  I'm sure it's not.

23          MR. MARINUZZI:  For Morrison & Foerster alone it's

24  over five million dollars.

25          THE COURT:  Mr. Masumoto, what's the U.S. Trustee's

RESIDENTIAL CAPITAL, LLC, ET AL.                    89

1  position with respect to holdback?

2          MR. MASUMOTO:  At this time, Your Honor, we don't

3  oppose any additional holdback given the status of the case and

4  the amounts being held back.

5          THE COURT:  Mr. Eckstein, do you want to be heard on

6  this?  This is an issue I'm keenly focused on so --

7          MR. ECKSTEIN:  Your Honor, as Mr. Marinuzzi said, we

8  tried to come up with a reasonable balance on this issue.

9  Obviously at the end of the year, in particular, with the fact

10 that the case is at the stage it's achieved, in fact, Your

11 Honor, the case went effective during the hearing this morning.

12 So we're in a position to make that --

13         THE COURT:  So you all can go out and celebrate when

14 this is over, okay?

15         MR. ECKSTEIN:  That's correct.

16         THE COURT:  I'll go get ready for my 2 o'clock first

17 day hearing.

18         MR. ECKSTEIN:  Having actually achieved the effective

19 date and given the fact that we're --

20         THE COURT:  Congratulations.

21         MR. ECKSTEIN:  Thank you.  And given the fact that

22 we're approaching year-end, we recognize that all firms were

23 interested in collecting as much as possible.  At the same

24 time, there have been substantial ongoing payments that were

25 actually released; we released a hundred percent of the third

1    interim.  And so this was, I think, roughly speaking, the

2    holdback, it's not precise.  Every firm's a little different.

3    But I think the holdback probably is somewhere between six and

4    eight percent of the total applications by most of the

5    professionals, which is not an insignificant amount, but, at

6    the same time, with over ninety percent having been paid

7    currently, the committee felt this was a reasonable place to,

8    sort of, come to rest on the issues of holdbacks pending final

9    fee applications.  And, again, hopefully the final fee

10   applications will be handled in the way the other matters in

11   the case have ultimately been handled.  But at the same time,

12   the feeling was this was, sort of, a prudent and appropriate

13   way to manage the final fee applications.

14          As I said, the debtor was comfortable.  The committee

15   is comfortable.  This would be the way we would propose all fee

16   applications be treated, and on that basis the objection was

17   resolved.

18          THE COURT:  Okay.  Does anybody else want to be heard

19   on the issue of the holdback, because the same holdback can

20   apply to everybody?

21          MR. MARINUZZI:  Thank you, Your Honor.  That was the

22   point I was just addressing with Mr. Eckstein.

23          THE COURT:  Yes.

24          MR. MARINUZZI:  Okay.  Your Honor --

25          THE COURT:  So just to save the point that I will

1    agree to.  I will approve that agreement for the ten percent

2    holdback.

3                MR. MARINUZZI:  Thank you, Your Honor.

4                THE COURT:  Okay?

5                MR. MARINUZZI:  So I'd just like to proceed through

6    the chart, which is organized in alphabetical order, beginning

7    on page 1.  The first application is the application of Bradley

8    Arant Boult Cummings, requesting fees in the amount of

9    $724,297.96 and expenses of $71,408.27.

10                To satisfy the U.S. Trustee's objection the firm has

11   agreed to reduce the fees to $720,435.58 and the expenses to

12   $68,505.76.

13                THE COURT:  So --

14                MR. BENDER:  And Your Honor, Jay Bender from Bradley

15   Arant is on the line.

16                THE COURT:  Okay.  Your Honor, I have to say that in

17   reviewing this whole round of fee applications -- there are

18   exceptions to this -- I was mildly disappointed, because many

19   of my past comments about vague entries, lumped billing seem to

20   have fallen by the wayside.

21                And so I didn't go back to look at the transcript, but

22   Bradley Arant is an example.  I know I've raised this issue.

23   Like previous applications, this application is hundreds of

24   pages long, and it's organized by client matter, with only five

25   or six entries on any given page.  The format doesn't comport

1  with the U.S. Trustee guidelines, which require time entries to

2  be organized by project category, and within that time and

3  service entries are to be reported in chronological order under

4  appropriate project category.

5          There are also additional lump or vague entries.

6  Example:  "May 8, 2013, five hours, analyze issues."  Great.

7  That's really helpful.

8          "May 16, 13.4"-- whoever RRM is -- 13.4 hours for

9  "continuing preparing for meeting".

10          "August 12, 2013" -- whoever's initials are JOHO, four

11  and a half hours, "continued redacting March review set".

12  Well, that tells me a lot.

13          So Bradley Arant is the first to come up, but my

14  comments carry throughout.

15          Mr. Masumoto, tell me what process you and your

16  colleagues went through in this?  I just, you know, I raise

17  this every time we have a fee hearing.

18          MR. MASUMOTO:  Yes, Your Honor.  In this case some of

19  the time records were particularly difficult, one, because it

20  involved, in some cases, a lot of discovery work with large

21  voluminous documents, which oftentimes resulted in repetitive

22  entries.

23          With Bradley Arant they're, essentially, loan reviews

24  that are going on, and given the large number of loan reviews,

25  in many cases it did not seem practical for each individual

1  entry to identify exactly the repetitive work done on

2  individual loans.

3        THE COURT:  That may be, but then I get these vague

4  time entries.  I have no clue what somebody was doing.

5        MR. MASUMOTO:  You're right, Your Honor.  In the

6  initial it was a major concern, and during that investigation

7  we tried to determine with the applicant what sort of

8  compliance procedures and evaluation procedures they had in

9  place to supplement the -- I guess the somewhat general time

10 entries, and I believe that at the time, we were satisfied, at

11 least during our initial review, that in addition to the

12 admittedly general descriptions they had, they did have some

13 efforts to ensure that the work that was being done was in a

14 form that was accountable and that provided for some sort of

15 oversight.

16        So with that supplementation or review in place we did

17 take into consideration the somewhat vague entries.

18        THE COURT:  So let me ask you this.  Your original

19 objection to this application, you objected to $19,312.79 of

20 fees and $2,902.51 in expenses.  How did you get from that to

21 the proposed resolution?

22        MR. MASUMOTO:  Well, Your Honor, I think we discussed

23 various objections to the different matters such as the

24 transitory timekeepers, the vague entries and the repetitive

25 time entries, and we essentially agreed on a global amount

RESIDENTIAL CAPITAL, LLC, ET AL.                    94

1   which -- which was essentially $2,800.62.

2           MR. BENDER:  And, Your Honor, this is Jay Bender.  We

3   did go back to the timekeepers who were flagged for vague and

4   lump time entries.  We asked them for additional information

5   regarding those time entries.  We obtained that and provided

6   that the U.S. Trustee's Office.

7           With respect to your comments about the lumping and

8   the vague time entries, I heard the Court; I apologize for

9   that, and I'm responsible for it so I'll take the

10  responsibility there.  We do have a number -- we've had many,

11  many timekeepers, we've internally tried to educate them about

12  how to disclose their time entries with sufficient detail

13  without disclosing essential litigation threads here,

14  proprietary information or personally identifiable information.

15  And we've not -- and I think we've improved, but the Court is

16  correct, there are time entries that the Court and the U.S.

17  Trustee have identified that we need to do a better job on, and

18  we'll continue to work on that internally.

19          THE COURT:  Hopefully, there won't be much more work

20  on it but -- all right.

21          Mr. Masumoto, as I understand it, what was the amount

22  of the reduction you agreed on?

23          MR. MASUMOTO:  Your Honor, I believe, with respect to

24  the fees, the reduction was $3,862.38 and with respect to the

25  travel expense they conceded the amount of $2,902.51.

RESIDENTIAL CAPITAL, LLC, ET AL.                    95

1          THE COURT:  All right.  With respect to fees, and I

2    don't want to double-count, instead of the agreed reduction of

3    $3,862.38, the Court is imposing a total reduction of 5,000

4    dollars and that's inclusive of -- obviously, I'm not -- it's

5    not 8,000, it's 5,000.  Okay.  All right.  Let's move on.

6          MR. BENDER:  Thank you, Your Honor.

7          MR. MARINUZZI:  Your Honor, that brings us Bryan Cave.

8    It's docket number 5826 requesting fees of $285,783.50 and

9    expenses of $4,913.67.  The U.S. Trustee filed an objection

10   which I understand has not been resolved so I'll cede the

11   podium to someone from Bryan Cave.

12         MR. MASUMOTO:  Your Honor, if I --

13         THE COURT:  Go ahead, Mr. Masumoto.

14         MR. MASUMOTO:  Your Honor, as Mr. Marinuzzi had

15   indicated, the only remaining objection that we had not

16   resolved involved three professionals:  Bryan Cave, Carpenter

17   Lipps and FTI.

18         The issue does center around the travel expense with

19   respect to all three, but with FTI it also involves the

20   associated travel time.  But I don't know if Your Honor wants

21   to deal with them all together?

22         THE COURT:  I do.  Let's deal with them together.

23         MR. MASUMOTO:  Very well, Your Honor.

24         THE COURT:  Let me hear from you first, Mr. Masumoto

25   and I think that's the most efficient way and I'll give counsel

RESIDENTIAL CAPITAL, LLC, ET AL.                    96

1   an opportunity to respond.

2           MR. BIGGERS:  Your Honor, Michael Biggers for Bryan

3   Cave.  Could I request that Mr. Masumoto be closer to the

4   microphone?

5           THE COURT:  He was on his way to the microphone and

6   he's there now.  Okay.

7           MR. BIGGERS:  Thank you.

8           MR. MASUMOTO:  Thank you, Your Honor.  Brian Masumoto

9   for the Office of the United States Trustee.

10          As has been indicated, the outstanding issue is --

11  relates to travel expenses of non-New York employees or

12  professionals.  Although Your Honor has ruled specifically with

13  respect to professionals who are retained post-petition, in

14  these instances involved professionals have been working for

15  the debtor prior to the filing of the petition and who continue

16  to work for the debtor post-petition.

17          I believe in the case of FTI, they have been working

18  with the debtor in the bankruptcy matters prior to the filing.

19  With respect to Bryan Cave and Carpenter Lipps, I believe

20  they're essentially ordinary course professionals who have

21  exceeded the cap in the case and, thereby were subject to the

22  fee application requirement.  And therefore, these -- by its

23  terms, the ordinary course professionals, the OCPs as we call

24  them, are typically professionals who are retained by the

25  debtor prior to the filing and continue to be working post-

1  petition.

2          These individuals feel that -- that their travel

3  expenses are necessary to the estate.  And as a reminder, and I

4  believe it's been raised in some of the papers, this issue as

5  to pre -- professionals retained pre-petition was not

6  specifically addressed.  And from our standpoint, although we

7  would like to have reviewed it, given the status that there

8  will be another fee application, this issue will repeat and at

9  the time we were negotiating with the parties, we were

10  concerned that given the approaching completion of the case

11  that there may be other OCPs who will exceed the cap and,

12  thereby, presenting the same issue.

13          I did get a chance to speak to Mr. Marinuzzi this

14  morning and he advises me that he doesn't think there will be

15  any further OCPs exceeding the cap.  Nevertheless, if Carpenter

16  Lipps, Bryan Cave and FTI file final interim fee applications,

17  the issue will still exist.

18          And again, the one distinction between the three

19  applicants is that with respect to FTI, in addition to the

20  travel-related expenses such as airfare, lodging and taxi cabs

21  and meals, our office also objected to the associated travel

22  time for those individuals.

23          And what we did -- what we are urging, we do believe

24  that it's certainly different from the staffing decisions made

25  at the time of the post-petition retention.  However, we do

1  feel that, that although some consideration should be given to

2  their pre-petition retention, that there should be imposed some

3  form of a restraint on the parties that would, perhaps,

4  encourage them to use alternative means of participation either

5  telephonically or through video conferencing or other means to

6  reduce the cost.  If not, it would give -- there wouldn't be

7  any sort of a deterrence for engaging in trips to New York at

8  the expense of the estate.

9         THE COURT:  And so with Bryan Cave, as I understood,

10  the requested expenses for the period is $4,913.67.

11         MR. MASUMOTO:  That's correct, Your Honor.

12         THE COURT:  For Carpenter Lipps, the expenses are

13  $402,651.28.  So with respect to the retained professionals,

14  absent demonstration of special circumstances, the Court's

15  position has been that I will not reimburse professionals for

16  travel to and from New York.  They're staffing a matter that's

17  pending in New York.  I'm quite happy to have professionals

18  from elsewhere in the country involved in the case, but the

19  Court's view in a case of this magnitude, I consider it to be

20  overhead.  And there could be specific particular showing with

21  respect to specific matters that could justify the travel

22  expense to New York, but it would require a specific showing

23  with respect to each matter in which the expenses are sought to

24  be reimbursed.  And I guess the issue you're raising is what

25  about the ordinary course professionals.  And the debtor --

RESIDENTIAL CAPITAL, LLC, ET AL.                    99

1          MR. MASUMOTO:  And in -- I'm sorry, Your Honor.

2          THE COURT:  Go ahead.

3          MR. MASUMOTO:  And also in the case of FTI, they're

4   not ordinary course --

5          THE COURT:  Oh, that's right.

6          MR. MASUMOTO:  But they -- they have been performing

7   services for the debtor pre-petition.

8          THE COURT:  Right.  So -- and you've not been able to

9   resolve the issue as to Bryan Cave, Carpenter Lipps or FTI; is

10  that right?

11         MR. MASUMOTO:  Well, Your Honor, I -- we were

12  concerned about the, one, unequal treatment among the parties

13  as to each one believing that, as you indicated whether or not

14  they had particular reason to travel to New York and given that

15  there were a number of professionals involved and sort of a

16  repeatable circumstance, we thought that perhaps a bright-line

17  test issued by Your Honor would eliminate the uncertainty with

18  respect to all applicants.

19         THE COURT:  Well, bright-line tests, I've expressed my

20  view in this case and in other large cases on multiple

21  occasions that I'm happy to have out-of-town professionals

22  participate in this case but the estate shouldn't be

23  reimbursing them for travel and hotel.

24         I've seen -- I don't know, I'm not speaking about this

25  specific application of these applicants but in the past, when

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1    I've reviewed expense applications, in particular, and people

2    are paying 900, 1,000 dollars a night for hotel coming from out

3    of town, staying in the best that New York has to offer, I

4    don't think the estate should be paying for it.  I'm -- they

5    can stay at the Holiday Inn.  They could -- lots of other -- I

6    don't mean to pick on Holiday Inn; there are other choices.

7    There -- they ought to just consider it part of -- do they want

8    this engagement that they've been retained for?  I think they

9    do.  The only question is should the estate be paying for it?

10           Let me hear -- Bryan Cave counsel, do you want to be

11   heard on this issue?

12           MR. BIGGERS:  Very briefly, Your Honor.  Michael

13   Biggers on the phone for Bryan Cave.

14           Only to say that the less than 4,000 dollars that

15   we've reduced our application to are just the airfare and hotel

16   for a couple of days of meetings that we've been retained to

17   defend this class action -- the so-called Kessler class action

18   prior to or prior to the bankruptcy.  The case was not settled

19   before the petition was filed.  We had a couple of lawyers fly

20   in to meet to hold settlement discussions with the committee

21   and the debtor and the plaintiffs and actually, the Court

22   knows, the case was settled successfully and Your Honor

23   approved that settlement.  So we think that that particular

24   trip certainly, if any trip could qualify for an appropriate

25   reason, not at our convenience to come to New York, but that

1    one did provide benefit to the estate.

2            THE COURT:  Why couldn't you do it by video

3    conference?  You weren't -- this wasn't negotiating with the

4    other side, this was meeting with the debtor and the committee.

5            MR. BIGGERS:  No, the plaintiff's lawyers were also

6    there, Your Honor.

7            THE COURT:  Okay.

8            MR. BIGGERS:  This was the start of negotiations that

9    resulted in a settlement.

10           THE COURT:  All right.  Let me hear from Carpenter

11   Lipps counsel.

12           MR. LIPPS:  Your Honor, Jeff Lipps on behalf of

13   Carpenter Lipps & Leland.

14           I wanted to correct one thing that Mr. Mosimyoto (sic)

15   said --

16           THE COURT:  Mr. Masumoto.

17           MR. LIPPS:  Masumoto.  We are a 327(e) special

18   litigation and discovery counsel.  We were representing the

19   debtors pre-petition, as you know, in some seventeen cases

20   around the country when we entered into the arrangement with --

21   pre-petition.  We had very competitive Midwestern rates that we

22   offered to them and we had travel expenses associated with

23   defending those cases that were part of the arrangement.

24           THE COURT:  Well, I -- the one thing I've always

25   approved, Mr. Lipps, is when -- I don't know.  Where is your

 1  office?

 2          MR. LIPPS:  Columbus, Ohio.  I'm just -- we were just

 3  Columbus, Ohio and we --

 4          THE COURT:  Just Columbus, Ohio?

 5          MR. LIPPS:  -- we're not doing anything -- just

 6  Columbus, Ohio.

 7          THE COURT:  People in Columbus wouldn't like you to

 8  just say "just Columbus, Ohio."  Okay.  So when you travel

 9  around the country to defend any of the debtors in the

10  lawsuits, I haven't questioned the travel costs associated with

11  that.

12          MR. LIPPS:  Well, I think what's being contested here

13  post-petition -- obviously, we continue to assist the special

14  litigation counsel -- the activities are essentially hotel and

15  airfare related to, for example, the FGIC trial.  I was

16  deposed.  I've been deposed a couple times.

17          As Your Honor knows, I've submitted declarations and

18  so that --

19          THE COURT:  But nobody wanted to cross-examine you.

20  You were there for cross-examination and nobody cross-examined

21  you.

22          MR. LIPPS:  They did not cross-examine me.

23          THE COURT:  They thought your direct testimony was so

24  persuasive they didn't even want to take a chance.

25          MR. LIPPS:  They did take my deposition a couple of

RESIDENTIAL CAPITAL, LLC, ET AL.                           103

1   times but I think we're in a different situation than other

2   firms where they do have offices within New York and I

3   understood that's what you were intending to refer to in your

4   overhead.  Maybe I understood it somewhat narrowly, but the way

5   that we price our services, obviously, were, we think very

6   competitive in the Midwest and certainly competitive out here

7   in the East and the adjunct to that is we have travel expenses.

8   And if we don't have that ability to have that reimbursed, then

9   we really sink.  I mean I think --

10          THE COURT:  Well, look, I feel -- and I'd be

11  interested in Mr. Masumoto's reaction to this, so -- but you

12  were retained as an expert and --

13          MR. LIPPS:  Our firm was --

14          THE COURT:  I think I didn't let you testify as an

15  expert in the FGIC trial but you testified as a fact witness,

16  but you testified.

17          I think your testimony was admitted in the

18  confirmation trial and you weren't cross-examined but in my own

19  mind, I draw a distinction where you're a retained expert and

20  you come to New York to testify in court and I have less

21  trouble about reimbursing -- approving reimbursement of the

22  expenses for that.

23          MR. LIPPS:  And I would say, Your Honor --

24          THE COURT:  I view that rule -- your service as either

25  a fact witness, which I permitted in FGIC -- I didn't permit

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1  you to testify as an expert; I permitted your testimony as a

2  fact witness.  I had that right, don't I?  I think that's what

3  I did.

4       MR. LIPPS:  I think you did allow me to --

5       THE COURT:  Okay.

6       MR. LIPPS:  -- testify as a fact witness but you did

7  take some of my declaration as briefing.

8       THE COURT:  Right.

9       MR. LIPPS:  Legal briefing.

10      THE COURT:  Correct.  I view that differently than

11  when you come to New York to meet about your general rep --

12  what I refer to as important but the representation of the

13  debtors generally as special litigation counsel.

14      Again, I have no problem -- I don't think Mr.

15  Masumoto's objected when you travel from Columbus to wherever

16  the cases are pending to argue or do whatever and -- so that's

17  not -- and I've never raised an issue about that.  It's when

18  people come to New York for the case that's pending here

19  other -- and I distinguish between where you're coming

20  specifically because you've been called to testify as a fact or

21  an expert witness in the case.

22      MR. LIPPS:  Yes.  And the other correction I wanted to

23  make, Your Honor, out of the 402,000 dollars in expenses, a lot

24  of that's discovery-related activity that we were passing

25  through at cost to the estate.

RESIDENTIAL CAPITAL, LLC, ET AL.                              105

1              THE COURT:  I know Mr. Masumoto, I think, raised some

2    questions about some of the past here but you got the backup,

3    and I guess -- were you satisfied about that, Mr. Masumoto?

4              MR. MASUMOTO:  Yes, Your Honor.  It wasn't raised as

5    an objection.  The only expense objection was related to --

6              THE COURT:  Right.

7              MR. MASUMOTO:  -- the 4,000 -- 14,000 dollars in

8    travel expenses.

9              MR. LIPPS:  Yes.  That's what I --

10             THE COURT:  Anything else you wanted --

11             MR. LIPPS:  -- the point I wanted to make is it's only

12   14,000 and a --

13             THE COURT:  All right.

14             MR. LIPPS:  Nothing --

15             THE COURT:  I'm sorry.

16             MR. LIPPS:  It's only 14,000 that they're objecting

17   to.

18             THE COURT:  That's what we're talking about is the

19   travel.

20             MR. LIPPS:  Which is the airfare and the hotel

21   associated.

22             THE COURT:  Does that include your services as a fact

23   or expert witness?

24             MR. LIPPS:  Yes.

25             THE COURT:  Okay.  Do you know how much of the 14,000

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

1   was not as a fact or expert witness?  I mean, look, you were

2   called to testify as a fact or an expert because you had a

3   unique vantage on the RMBS -- on the underlying claims and read

4   your testimony at each of those instances, you had to be here

5   for cross-examination; nobody chose to cross-examine you.  But

6   to me that's different than -- I don't know how much of the

7   14,000 would be travel on matters other than your connection

8   with your testimony.

9          MR. LIPPS:  Yes.  I don't have it at hand, that

10  breakdown.

11         THE COURT:  Let me -- before I rule --

12         MR. LIPPS:  But I think it was largely related to the

13  testimony and the depositions where I had to travel here to be

14  deposed.

15         THE COURT:  Right.  Again, I mean if you're -- if

16  you're being -- Mr. Masumoto, what -- let me ask Mr. Masumoto

17  this because -- what's your view about if Mr. Lipps -- his

18  deposition's going to be taken because he submitted written

19  direct testimony and the counsel who are going to depose him

20  are here, they want the deposition here, so rather than a whole

21  slew of lawyers trundling off to Columbus for Mr. Lipps'

22  deposition, he comes here.

23         MR. MASUMOTO:  Your Honor, I believe the distinction

24  Your Honor appear to be making with respect to a fact witness

25  or an expert witness may create a different circumstance than

1    the typical professional services that are normally rendered by

2    retained professionals.

3              THE COURT:  Okay.

4              MR. MASUMOTO:  And I would also like to indicate that

5    I'm not sure I agree that the fact that a professional doesn't

6    have a New York office should be dispositive.

7              THE COURT:  I don't agree with that either.

8              MR. MASUMOTO:  So --

9              THE COURT:  Okay.

10             MR. MASUMOTO:  So from my standpoint, the fact that

11   there is no New York office shouldn't alter the rule regarding

12   whether or not the travel should be permitted at all.

13             THE COURT:  I don't -- that point I don't -- I'll say

14   it now, that I don't find persuasive.  And -- okay.  Let me

15   hear from FTI's counsel.  And here, the amount of the expenses

16   are sought in this application is $130,547.97.  Go ahead.

17             MR. DRUCKER:  Good morning, Your Honor.  John Drucker

18   from Cole, Schotz, Meisel, Forman & Leonard --

19             THE COURT:  Think we missed the morning by about a

20   minute or two, but that's okay.

21             MR. DRUCKER:  I checked before I said that, Your

22   Honor.

23             THE COURT:  Okay.

24             MR. DRUCKER:  So I'll speak quickly while it's still

25   morning.

1          But again, good morning, and I'm here on behalf of FTI

2   Consulting, Inc. as financial advisers to the debtor.  With me

3   today is Mr. William Nolan, a senior managing director of FTI.

4   I'm happy to report that with the exception of the items

5   identified by Mr. Masumoto, being the travel and related

6   expenses, and the travel time billed at one-half rate incurred

7   by two professionals who are based out of New York where the

8   firm has an office in New York, and where such professionals

9   are senior level and had been retained and have been providing

10  professional services prior to the bankruptcy petition -- and

11  I'll go into a little bit more detail in that in a moment --

12  all other objections and issues have been resolved.

13          THE COURT:  Answer this for me, if you would.  The

14  travel time that remains at issue is travel time for

15  professionals office outside of New York traveling to New York?

16          MR. DRUCKER:  Yes.  It is travel time for

17  professionals --

18          THE COURT:  Nonworking travel time?

19          MR. DRUCKER:  Nonworking travel time billed at one-

20  half rate.  And just to put it in perspective, we're talking

21  about 17,000 dollars at issue here.  FTI has waived

22  substantially more with regard to other professionals that fit

23  within the guideline direction of the court, but were

24  professionals who came on board as of the petition date, as

25  contrasted with the two individuals we're talking here.  We're

1    talking about Mr. William Nolan, senior managing director, and

2    Mr. Mark Renzi, senior managing director, who were both

3    involved pre-petition.  Mr. Nolan, since back as far as 2008,

4    so has substantial history with the company, industry-specific

5    knowledge.

6            I also just want to comment and just as far as we're

7    talking about the dollar amounts at issue, you asked a specific

8    question regarding the travel time.  That was 17,000 dollars

9    between the two individuals; the travel-related expenses, the

10   total amount is about 45,000 dollars.

11           Your Honor asked a question earlier with regard to

12   having not been able to resolve these issues.  As I indicated,

13   Mr. Masumoto spent a lot of time resolving all of the other

14   issues and we were successful in doing that.  We certainly

15   offered to settle these issues as well.  As Mr. Masumoto

16   indicated, this is something that he clearly wants to have some

17   direction going forward, which is why we're here today.  But

18   we --

19           THE COURT:  So let me just ask this.  So Mr. Renzi

20   testified, I think, twice in front of me.  But I don't think

21   his -- it's not covered by this period because the period for

22   which you're seeking fees and expenses ends August 31st.  And

23   so Mr. Renzi's testimony, both instances are after that.  Am

24   I -- I see the committee's counsel --

25           MR. DRUCKER:  I heard the --

RESIDENTIAL CAPITAL, LLC, ET AL.                    110

1          THE COURT:  -- shaking --

2          MR. DRUCKER:  I heard the discussion regarding the

3     prior application and how that might affect the next

4     application with regard to those --

5          THE COURT:  Well, but I do hear -- Mr. Drucker, it's

6     the point I made with Mr. Lipps.  So when Mr. Renzi who

7     testified I guess both phase 1 and phase 2, he's been

8     designated as an expert.  He put in written narrative direct

9     testimony.  He had to be available for cross-examination; I

10    don't know when or where his deposition was taken.  And he had

11    to travel to New York and be in court to be available to

12    testify and he did testify.

13         So in that instance, Mr. Masumoto, my view is I would

14    shift the presumption and say I would presume that his expenses

15    in connection with his testimony, when he comes -- if he shows

16    up a day early -- I'm not going to pay for weeks of hotel.  But

17    if he shows up to  be prepared and to testify and -- I would

18    leave room for judgment about one day or two days before.  I'm

19    not sure -- where does Mr. Renzi come from, Mr. Drucker?

20         MR. DRUCKER:  I believe he comes from Boston.  From

21    Boston.

22         THE COURT:  Okay.  I would certainly put my

23    presumption in favor of reimbursing his travel and hotel when

24    he travels here to testify as a witness.

25         MR. DRUCKER:  Okay.

1        MR. MASUMOTO:  That's fine, Your Honor.  I will

2   endeavor to apply that payment.

3        THE COURT:  Okay.  What I'm not -- okay, address the

4   issue of the nonworking travel time to New York, okay?  Because

5   I've said in this case and others that I think the general rule

6   that I follow and I believe my colleagues do and judges

7   elsewhere, if it was a New York-based professional and they're

8   traveling elsewhere for the client, I approve reimbursement of

9   reasonable coach, airfare, and hotel and meals, and one-half of

10  nonworking travel time.  If there -- whatever they work, they

11  work, okay, and they bill for.

12       When FTI, which had a very large team working on this

13  case -- did a good job; I'm not -- that's not an issue for

14  me -- when they staffed from out of town -- I'll give you a

15  chance to address this, but I'll tell you, my very strong

16  instinct and maybe my ruling, we'll see, is that the only

17  travel time that they get reimbursed for is actual travel time,

18  not one-half of travel time.  Mr. Renzi, very capable, I'm sure

19  his role was more than just being an expert witness in the

20  case, he -- FTI ought to recover for his actual working time

21  but I draw the line at whether he either should be reimbursed

22  for his travel expenses or nonworking travel time when he's

23  assigned to what was a very lucrative and huge engagement for

24  FTI.  That I view as overhead.  But I want to give you a

25  chance -- I'm not ruling yet, but that's -- I'm telling you

1    where I'm coming from.

2              MR. DRUCKER:  I appreciate that, but the focus and the

3    only reason we're here, is we heard loud and clear the general

4    position of the Court and we agreed in discussions with the

5    U.S. Trustee to eliminate all of the time that fits within Your

6    Honor's guidelines for those individual employees of FTI who

7    came from out-of-state locations to and from New York.  That

8    time's excluded.  We're dealing on this time that's in

9    contention only with respect to these two individuals --

10             THE COURT:  Okay.

11             MR. DRUCKER:  -- and the argument, the distinction --

12             THE COURT:  Because they were pre-petition.

13             MR. DRUCKER:  -- is that they not only -- yes, one,

14   that I think is a significant distinction alone.  But then we

15   drill into the details with regard to these two individuals.

16   And here, were talking about individuals who had been retained

17   and working for the debtor, in the case of Mr. Nolan,

18   periodically since 2008, Mr. Renzi from 2011, with regard to

19   the activities that ultimately led up to a bankruptcy.  We're

20   talking about being retained, Mr. Nolan being handpicked by the

21   company --

22             THE COURT:  But Mr. Drucker --

23             MR. DRUCKER:  -- because of his industry expertise --

24             THE COURT:  Mr. Drucker, FTI, for the four-month

25   period, May through the end of August, is seeking fees of

RESIDENTIAL CAPITAL, LLC, ET AL.                              113

 1  4,342,805 dollars.  I think it's wonderful that Mr. Renzi has

 2  worked on this matter pre-petition.  In a case of this

 3  magnitude, with fees of this magnitude, I draw no

 4  distinction -- whatever was paid pre-petition, I'm not

 5  policing.  But on the post-petition fees and expenses, I draw

 6  no distinction between Mr. Nolan and Mr. Renzi, and the other

 7  capable people from FTI who've worked on the engagement.

 8          So, Mr. Masumoto, my guidelines are this -- Mr.

 9  Drucker, I've heard what I need to hear.

10          MR. DRUCKER:  If I could just take two more strokes

11  against the tide, Your Honor, and I understand the tide is

12  flowing very strongly against me but I would like to just point

13  something out.  I understand that you need some type of special

14  circumstance to warrant breaking from Your Honor's general

15  policy.  Not only were they retained pre-petition, but both

16  these two individuals, again I'm only talking about the two of

17  them, were intricately involved in the negotiations in the

18  months leading up to the bankruptcy with regard to the

19  settlement that was then proposed when these cases filed

20  bankruptcy.  It was not known where these cases would file

21  bankruptcy.  They were embedded in the system for a

22  substantially long period of time.  It would not have been

23  appropriate because of the circumstances that the debtor chose

24  to file in New York; they could have chosen other places --

25          THE COURT:  Let me ask you this.  Do you want me to go

1  back and look at the merits of the pre-petition plan support

2  agreement and determine whether the amount that FTI collected

3  for that reflected value to this estate?  Is that what you want

4  me to do?

5          MR. DRUCKER:  Your Honor, I --

6          THE COURT:  Because I have some very strong feelings

7  about the pre-petition plan support agreement and whether

8  somebody actually had the nerve to stand up and tell me I don't

9  think so, that this was a pre-pack, but that was what was

10  reported in the press.  This was, as we all know today, as far

11  from a pre-package bankruptcy as one could get; one of the most

12  contentious, hotly litigated cases around.  So unless you want

13  me to go back and you want to put under the microscope the

14  value to this estate of all the work that was done before we

15  got to the second plan support agreement -- I don't think you

16  want me to do that.

17          MR. DRUCKER:  I believe I interrupted Your Honor when

18  you were speaking to Mr. Masumoto.

19          THE COURT:  Mr. Masumoto?

20          MR. MASUMOTO:  Your Honor, we certainly await eagerly

21  Your Honor's ruling regarding the guidelines.

22          THE COURT:  Here's what -- look, I'm not ruling for

23  all cases, okay?  I think in MF Global, in ResCap and there

24  have been a few other large cases, I view them -- you know,

25  where you draw the line, I'm not quite sure, but I view those

1   cases differently than the usual fare on my docket.  With

2   respect to professionals in this case, retained or ordinary

3   course, post-petition, on travel to New York, only

4   reimbursement is for actual time spent.  With respect to those

5   people -- and this is not in this period with respect to Mr.

6   Renzi -- when I get an application that -- it ought to be

7   specific -- when Mr. Renzi's travel expenses are included when

8   he came to testify as a witness in trials, I will reimburse for

9   that.  And that would apply to the other -- if it applies,

10  certainly it applies to Mr. Lipps, I think.  I see that as

11  different than -- don't get me wrong when I say the day-to-day

12  work in the case.  It was important; I don't doubt that.  And I

13  know that their face-to-face participation in a meeting is very

14  important and appearing on a video conference isn't --

15  frequently is not an adequate substitute.  But it becomes an

16  issue of what should be considered overhead for the firm

17  professionals.

18          So for firm professionals that's seeking fees of over

19  four million dollars for this period alone, I'm getting no

20  traction -- you're getting no traction, Mr. Drucker.

21          I don't know.  Does that answer your questions, Mr.

22  Masumoto?

23          MR. MASUMOTO:  Yes, Your Honor.  Just one point of

24  clarification.

25          THE COURT:  Okay.

1           MR. MASUMOTO:  With respect to professionals who are

2    traveling for a deposition or expert testimony, is a fifty-

3    percent travel time permitted or just the actual time?

4           THE COURT:  I guess I would treat that with the usual

5    fifty percent of travel time rule.  I consider traveling -- I

6    mean, sometimes they maybe ought to use common sense and figure

7    it's just not worth having to make an issue of it.  But I view

8    the role of the professional as a witness as different than in

9    their ongoing day-to-day important activities in the case.

10          MR. MASUMOTO:  Very well, Your Honor.

11          THE COURT:  Okay.

12          MR. MASUMOTO:  I think that's clear and very helpful.

13          THE COURT:  All right, thank you.  So what it's going

14   to require, Mr. Masumoto, with respect -- as I understand it,

15   you resolved all the issues with FTI?

16          MR. MASUMOTO:  That's correct, Your Honor.

17          THE COURT:  And with respect to Bryan Cave and

18   Carpenter Lipps, you've resolved all of their issues?

19          MR. MASUMOTO:  Yes, although we didn't make a

20   distinction between expert -- I'm not sure if Carpenter, Lipps

21   had any expert --

22          THE COURT:  I don't think it fit in this -- I don't

23   know that it was in this period, but here's what I'm going

24   to -- I'm going to approve -- does anybody else want to be

25   heard on these issues?

RESIDENTIAL CAPITAL, LLC, ET AL.                          117

1          I'm going to approve the applications.  With respect

2    to any time billed for travel during nonworking time and travel

3    and expenses, the order that gets submitted -- and because this

4    is still an interim order, see if you can resolve the issue

5    quickly.  Otherwise, I'll approve these applications and you

6    make the adjustment in the next set of bills.

7          I know everybody wants to get paid and you've got a

8    lot on your plate.  That's what -- okay?  Is that satisfactory?

9          MR. MASUMOTO:  Yes.  That's fine, Your Honor.

10          THE COURT:  All right.  So that applied to those

11   three.

12          MR. MASUMOTO:  Thank you, Your Honor.

13          THE COURT:  Go ahead, Mr. Marinuzzi.

14          MR. MARINUZZI:  Your Honor, I actually made a note on

15   my hand to ask the Court if my partner Adam Lewis can be

16   excused to travel to San Francisco on MoFo's dime?

17          THE COURT:  Have a nice trip, Mr. Lewis.

18          MR. LEWIS:  Thank you, Your Honor.  It's a pleasure to

19   meet you.

20          THE COURT:  Okay.

21          MR. MARINUZZI:  Thank you.

22          THE COURT:  You sure the plane's flying?

23          MR. LEWIS:  Yeah, I just checked.

24          MR. MARINUZZI:  Your Honor, I know we talked about the

25   outstanding objections to Carpenter Lipps.  I believe that's

1 | been resolved.

2 | THE COURT: Yes.

3 | MR. MARINUZZI: That brings us to Centerview Partners,

4 | docket number 5830, requesting fees of 1,200,000 dollars, and

5 | expenses of $3,878.62. To resolve the U.S. Trustee's

6 | objection, the expenses being sought have been reduced to

7 | $3,119.28.

8 | MR. MASUMOTO: That's correct, Your Honor.

9 | THE COURT: All right. It's approved.

10 | MR. MARINUZZI: Brings us to Curtis, Mallet, docket

11 | number 5825, seeking fees of $3,456,395.50 and expenses of

12 | $15,169.08. To resolve the U.S. Trustee's objection, the fee

13 | request has been reduced to $3,451,643.50.

14 | MR. MASUMOTO: That's correct, Your Honor.

15 | THE COURT: Just bear with me one moment.

16 | (Pause)

17 | THE COURT: Mr. Masumoto, can you give me a general

18 | understanding of the basis for the agreement on the reduction

19 | fees? I mean, what --

20 | MR. MASUMOTO: Yes, Your Honor.

21 | THE COURT: And I understand, this isn't even the

22 | trial yet.

23 | MR. MASUMOTO: Yes, Your Honor.

24 | THE COURT: And there were entries --

25 | MR. MASUMOTO: Your Honor, as indicated in our --

1           THE COURT:  -- 12.6 hours, 9-1/2 of which was

2   reviewing and marking documents; 7.9 hours, 6.4 of which was

3   reviewing and issue-coding documents.

4           MR. MASUMOTO:  Your Honor, we did note -- again, the

5   areas of objection for the U.S. Trustee involved transitory

6   timekeepers for 935 dollars.  We identified vague and lump time

7   entries which were listed in Exhibit B to our response of

8   10,700 dollars.  And there were review and revision of time

9   record amounts of 7,211 dollars that we objected to.  In

10  addition, there was a small amount of miscellaneous time that

11  seemed to have been a mathematical calculation of 125 --

12          THE COURT:  So you agreed on a write down of 4,752

13  dollars?

14          MR. MASUMOTO:  I think our -- no, our settled fee

15  portion was 14,000 overall, 14,752 with respect to --

16          THE COURT:  I'm looking at the chart I was just given.

17          MR. MASUMOTO:  I'm sorry; no, I'm sorry.  Oh, I'm

18  sorry, Your Honor; yes, it was -- I'm sorry.  It carried --

19  it's 4,752 dollars.

20          THE COURT:  All right.  Let me hear from Curtis,

21  Mallet's counsel.

22          MS. GALLAGHER:  Good afternoon, Your Honor.  Maryann

23  Gallagher for Curtis, Mallet-Prevost, Colt & Mosle.

24          Your Honor, we did have -- we did respond to the U.S.

25  Trustee's objection and we've reviewed the time entries with

1   them.

2          THE COURT:  So what did you do with respect to the

3   lumped or block-billed time entries that the U.S. Trustee

4   provided?  What's always so --

5          MS. GALLAGHER:  We provided --

6          THE COURT:  -- impossible to go back and recreate time

7   sheets after they've been done, and months have passed.

8          MS. GALLAGHER:  With respect to the time entries that

9   were lumped and vague, we went back to the timekeepers and

10   asked them to provide additional clarification which we

11   provided to the U.S. Trustee.

12          THE COURT:  Yeah, and I -- look, it's like throwing

13   darts.  It really -- months after somebody records the time and

14   they have 6.4 hours for some lumped entry, and they're really

15   going to figure out what they did four months before, six

16   months before?

17          MS. GALLAGHER:  Some of the larger time entries

18   which were with respect to a very large document production in

19   which we were involved, it was a compressed document review,

20   and involved an inordinate amount of time during one particular

21   month and several members of our litigation department who were

22   brought in just to participate in the document review.

23          THE COURT:  Mr. Masumoto?

24          MR. MASUMOTO:  Your Honor's indicated over -- although

25   the settlement was, as a general matter, typically for lumped

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1   vague time entries, as Your Honor knows, our rule is that if no

2   corrections are made, we ask for typically about thirty percent

3   reduction.  If revised entries are submitted, we still insist

4   on a ten percent reduction.  We did -- I've made statements.

5   I'm not sure how effective it was, but as Your Honor indicated,

6   continuing problems throughout the case might warrant a higher

7   reduction.

8           THE COURT:  All right, I've heard enough.  The U.S.

9   Trustee agreed on a reduction of 4,752 dollars.  I've been

10  increasing it to a total of 6,000.  So I'm not double-counting

11  it, but -- I know this is the end of the case.  But, come on,

12  people are not getting the message.  It just -- all right, so

13  that's my decision with respect -- I'm approving their

14  application with a reduction of 6,000 dollars.

15          MS. GALLAGHER:  Thank you, Your Honor.

16          MR. MASUMOTO:  Thank you, Your Honor.

17          MR. MARINUZZI:  Your Honor, that brings us to Deloitte

18  & Touche, docket number 5831, requesting fees of $134,692.15;

19  no expenses.  To satisfy the U.S. Trustee's objection, Deloitte

20  has agreed to reduce its fee request to $132,692.15.

21          MR. MASUMOTO:  That's correct, Your Honor.  It was a

22  reduction of 2,000 dollars in fees.

23          THE COURT:  You know, the application included -- this

24  was pointed out in the U.S. Trustee's objection -- there was

25  over 5,000 dollars in fees for reviewing and revising billing

RESIDENTIAL CAPITAL, LLC, ET AL.                    122

1    invoices.  I don't know how often I have to say that that's not

2    compensable.  And so you put the Court and the U.S. Trustee to

3    the burden of going through every line entry in an

4    application -- here it's only a 130,- -- only -- $134,692.15.

5    I'm going to approve it with the agreed reduction, but it's my

6    opening comment on fee applications that --

7              Mr. Seife, you want to be excused?

8              MR. SEIFE:  May the examiner's professionals --

9              THE COURT:  Yes, absolutely.

10             MR. SEIFE:  Thank you, Your Honor.

11             THE COURT:  You should have asked before; I would have

12   been happy to excuse you.

13             MR. SEIFE:  Thank you.

14             THE COURT:  What's next?

15             MR. MARINUZZI:  Your Honor, the next application is

16   the application of Dorsey & Whitney, docket number 5793,

17   requesting fees of $122,807.70 and expenses of $1,376.97.  To

18   resolve the U.S. Trustee's objection, Dorsey & Whitney has

19   agreed to reduce their fee request to $119,785.62.

20             MR. MASUMOTO:  That's correct, Your Honor.  It

21   represents a $3,022.08 reduction.

22             THE COURT:  Approved.

23             MR. MARINUZZI:  Next, Your Honor, Ernst & Young,

24   docket number 5840, requesting fees of $849,954.25 and expenses

25   of $35,273.37.  To resolve the U.S. Trustee's objection, the

 1  fees have been reduced to $847,254.25.

 2          THE COURT:  Approved.

 3          MR. MASUMOTO:  That's correct, Your Honor.

 4          MR. MARINUZZI:  Next, Your Honor, is Fortace, docket

 5  number 5833, requesting fees of $238,597.50 and expenses of

 6  150,000 dollars.  To resolve the U.S. Trustee's -- actually

 7  there were -- doesn't appear that there was an objection.

 8          THE COURT:  So your objection, Mr. Masumoto,

 9  originally had been as to -- you wanted to reduce it by 61,340

10  dollars and wind up with no reduction.  And just explain it to

11  me.

12          MR. MASUMOTO:  Yes, Your Honor.  There were numerous,

13  sort of, repetitive time entries which were not particularly

14  descriptive.  But what was supplied to us --

15          THE COURT:  Modeling and analytical services.

16          MR. MASUMOTO:  What was supplied to us were revised,

17  essentially, I guess, time entries which indicated the quantity

18  of work that was being done.  And based upon those revised

19  invoices, we accepted the amounts at issue.

20          THE COURT:  Is that work done, Mr. Marinuzzi?

21          MR. MARINUZZI:  I'm sorry, Your Honor?

22          THE COURT:  Is that work done?

23          MR. MARINUZZI:  Is Fortace's work done?  Yes.

24          THE COURT:  All right, approved.

25          MR. MARINUZZI:  Your Honor, we've already covered FTI.

1    Next is Locke Lord, docket 5796, requesting fees of $220,492.30

2    and expenses of $3,805.60.  Locke Lord has agreed to reduce its

3    fee request to 220,975 to satisfy the U.S. Trustee's objection.

4              MR. MASUMOTO:  That's correct, Your Honor.  The

5    $1,500.30 -- we did also receive a commitment from the

6    applicant to seek court approval in advance for all future

7    redactions.

8              THE COURT:  Okay.  They did give you the unredacted

9    materials upon your request, correct?

10             MR. MASUMOTO:  Yes, Your Honor.

11             THE COURT:  All right, approved.

12             MR. MARINUZZI:  Your Honor, just a clarification on

13   Fortace.  When -- they're done; they're done as of today.  They

14   did testify -- Mr. Sillman testified in connection with

15   confirmation, so we'll see some more invoices from Fortace.

16             THE COURT:  Okay.  All right.

17             MR. MARINUZZI:  Your Honor, that brings us to Morrison

18   Cohen, docket number 5841, requesting fees of $1,231,368.50 and

19   expenses of $36,075.45.  Just before the hearing started, Your

20   Honor, Morrison Cohen resolved the U.S. Trustee's objection by

21   reducing the fee request to 1,208,260.

22             MR. MASUMOTO:  That's correct, Your Honor, represents

23   a $23,108.50 to address the issue regarding multiple attendees.

24             THE COURT:  Yeah.  In this -- I mean, from my

25   standpoint, the big issue with Morrison Cohen, was they'd have

1  six lawyers attending a meeting.  I know they were counsel to

2  the independent directors of the board.  I've raised the issue

3  about the number of attorneys attending meetings, attending

4  court hearings in the past.  Like, for example, June 24th, six

5  attorneys including the lead bankruptcy attorney, two

6  litigators and senior corporate attorney and two associates

7  with litigation and bankruptcy expertise attended a meeting to

8  discuss review analysis and research arising from the

9  examiner's report.

10         MR. MASUMOTO:  Yes, Your Honor.  And in fact, the

11  23,000 represents the excess over the three attorneys that Your

12  Honor permits.

13         THE COURT:  You know, at some point after the Court --

14  I don't think I could have been any clearer about it, but then

15  I get the next fee application from them and they, frankly,

16  have the nerve to submit an application seeking reimbursement

17  of six attorneys at a meeting.  Yes, I know, they say well,

18  they have special expertise and --

19         MR. MASUMOTO:  Well, Your Honor, as indicated in our

20  pleadings, I believe, that six other professionals also had the

21  issue of multiple attendees raised.  Those all -- those

22  professionals all elected to concede the issue of the billing

23  over three attorneys --

24         THE COURT:  All right.

25         MR. MASUMOTO:  -- but they all requested the full

RESIDENTIAL CAPITAL, LLC, ET AL.                          126

1  amount in their application.

2         THE COURT:  I'm going to approve the reduction -- I'm

3  going to approve the Morrison Cohen fees with the agreed

4  reduction.

5         And, Mr. Masumoto, if the next -- if they actually put

6  it in the next billing segment, I want to know that it's there.

7  It better not be there, okay?  I don't know -- if somebody from

8  Morrison Cohen here?

9         MR. MASUMOTO:  Yes, Your Honor.

10        THE COURT:  Come on up and tell me your name, because

11 if I see it again, you're going to be the guy that gets called

12 on.

13        MR. DAKIS:  Absolutely, Your Honor; Robert Dakis from

14 Morrison Cohen.  We understand the Court's direction.

15        Just to be clear, at the last hearing, we didn't

16 understand that the Court had put in a per se rule but instead

17 asked us to explain when we had more than three attorneys at a

18 meeting.  We went through and explained at every meeting where

19 we had more than three attorneys, we understood --

20        THE COURT:  I guess it just wasn't a persuasive

21 explanation.

22        MR. DAKIS:  I understand, Your Honor, and we

23 understand that at this point the Court's putting in a per se.

24        THE COURT:  Okay.  So I won't see it again.  I won't

25 see another application for fees that includes more than three

1   attorneys at a meeting.

2           MR. DAKIS:  We'll write down --

3           THE COURT:  Okay.

4           MR. DAKIS:  -- any meeting where there's more than

5   three attorneys.

6           THE COURT:  All right, thank you.

7           MR. DAKIS:  Thank you.

8           MR. MASUMOTO:  Thank you, Your Honor.

9           MR. MARINUZZI:  Your Honor, next on the agenda is

10  Morrison & Foerster, docket number 5839, seeking fees of

11  $21,653,139.30 and expenses of $551,388.56.  To satisfy the

12  U.S. Trustee's objection, Morrison & Foerster's reduced the fee

13  request to $21,525,639.30 and the expenses have been reduced to

14  $533,839.16.

15          THE COURT:  I have -- go ahead, Mr. Masumoto.

16          MR. MASUMOTO:  No, that's correct, Your Honor.  Wanted

17  to indicate that the very large amount of the -- on the expense

18  reductions involved discovery costs; we did ask for the backup

19  and substantiation.  We received additional documents including

20  time records to support the amounts.

21          THE COURT:  So, Mr. Marinuzzi, one of the entries that

22  was particularly intriguing to me was on June 11th, 2013, 2.6

23  hours for "analyze Alston & Bird's travel fees".

24          MR. MARINUZZI:  Your Honor, Alston & Bird represents

25  one of the RMBS trustees, and we have an order that this Court

1    entered in connection with, I believe, supplemental servicing

2    that required the debtors to pay the reasonable costs and

3    expenses of the RMBS trustees.

4              THE COURT:  So what was the result of the 2.6 hours

5    reviewing their travel expenses?

6              MR. MARINUZZI:  Your Honor, I don't know.  I know that

7    there was a lot of time going back and forth with a lot of the

8    professionals for the RMBS trustees, trying to get some backup

9    and justification for some of the expenses they were passing

10   through to the estate.  I don't know where it resolved itself.

11             THE COURT:  There was an entry on May 19th, "organize

12   (4.3) and assemble excluded insufficient non-PLS notices of

13   claim for attorney's review", seven and a half hours.  What's

14   the difference between organize and assemble?

15             MR. MARINUZZI:  Your Honor, I don't know that there is

16   a distinction.  This is a bone of contention I have in

17   particular where "review and revise" -- for some reason -- my

18   understanding is the U.S. Trustee's office views it as two

19   different things.  And when I'm reviewing and revising a

20   pleading --

21             THE COURT:  Well, I'm going to stop you, because I'm

22   going to approve the application with the agreed adjustment.

23   But it just -- when you submit an application for more than

24   21,000,000 dollars in time, and 551,000 in expenses, somebody

25   ought to be looking at what it actu -- what goes into adding up

1    to that number, and questioning whether the description is

2    appropriate.  I'm going to approve the application with the

3    agreed adjustment.

4              MR. MARINUZZI:  Thank you, Your Honor.  That brings us

5    to Orrick, Herrington & Sutcliffe, docket number 5811,

6    requesting fees of $145,104.28 and expenses of $668.50.  To

7    satisfy the U.S. Trustee's objection, Orrick has agreed to

8    reduce the fee request to $133,606.44.

9              MR. MASUMOTO:  That's correct, Your Honor.

10             THE COURT:  Approved.

11             MR. MARINUZZI:  Next is Perkins Coie, docket number

12   5836, requesting fees of $901,482 and expenses of $13,055.76.

13   To satisfy the U.S. Trustee's objection, they've agreed to

14   reduce the fees requested, to $891,431.50, and the expenses to

15   $12,181.59.

16             MR. MARINUZZI:  That's correct, Your Honor.

17             THE COURT:  Approved.

18             MR. MARINUZZI:  Your Honor, the last of the debtors'

19   professionals is Severson & Werson, docket number 5815,

20   requesting fees of $271,728.85 and expenses of $21,965.03.  To

21   satisfy the U.S. Trustee's objection, Severson has agreed to

22   reduce the fee request to $266,728.85.

23             MR. MASUMOTO:  That's correct.

24             THE COURT:  I don't -- did you get to see the detail

25   on the expenses there?  For example, there're some blanket

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1    entries:  July 30th, 2013, the entry is for $1,834.13, for

2    "travel and expenses to deposition of Kyle Lucas (ph.),

3    Dallas", and then the dates of the depositions, close quote.  I

4    don't know how much is hotel, how much is airfare.  That's what

5    they submitted to the Court.

6           MR. MASUMOTO:  I believe, Your Honor, we did review

7    some backup documentation regarding the expenses, and we were

8    satisfied.

9           THE COURT:  All right, I'll approve it with the agreed

10   reduction.

11          MR. MARINUZZI:  Thank you, Your Honor.  Now we turn to

12   the committee's professionals.  I'll cede the podium to Rachael

13   Ringer.

14          MS. RINGER:  Good afternoon, Your Honor.  Rachael

15   Ringer from Kramer Levin, on behalf of the committee.

16          The U.S. Trustee objected to seven of the committee

17   professionals' fee applications, and we've been able to resolve

18   the U.S. Trustee's objections with respect to all of them.  To

19   the extent Your Honor has questions with respect to them,

20   individuals are either on the phone or here in the courtroom.

21   But I can just walk through the chart for the committee's

22   professionals if you'd like.

23          THE COURT:  That's fine.

24          MS. RINGER:  Okay, first is AlixPartners, docket

25   number 5858, requesting fees in the amount of $2,156,280.50 and

RESIDENTIAL CAPITAL, LLC, ET AL.                    131

1   expenses in the amount of $1,309.41.  To resolve the U.S.

2   Trustee's objection, AlixPartners agreed to reduce its fee

3   request by $196; but for administrative convenience, that

4   amount is going to come out of their December invoice rather

5   than out of their --

6              THE COURT:  All right.

7              MS. RINGER:  -- fourth interim fee app.

8              THE COURT:  Mr. Masumoto?

9              MR. MASUMOTO:  No objection, Your Honor.

10             THE COURT:  Approved.

11             MS. RINGER:  Next is Coherent Economics, requesting

12  fees in the amount of $52,735 and no expenses, and there was no

13  objection.

14             THE COURT:  Approved.

15             MS. RINGER:  Next is Epiq Bankruptcy Solutions, docket

16  number 5857, requesting fees in the amount of $29,092.70 and

17  expenses in the amount of $8,697.64.  To resolve the U.S.

18  Trustee's objection, Epiq agreed to reduce its fees to

19  $25,276.73, and its expenses to $8,697.64.

20             MR. MASUMOTO:  That's correct, Your Honor.

21             THE COURT:  Approved.

22             MS. RINGER:  Next is J.F. Morrow, docket number 5866,

23  requesting --

24             THE COURT:  Approved.

25             MS. RINGER:  Thank you.

1        THE COURT:  Well, go ahead and say how much and --

2        MS. RINGER:  Thank you, Your Honor.

3        THE COURT:  7,520 --

4        MS. RINGER:  Seven thousand --

5        THE COURT:  -- dollars in fees, and no expenses.  No

6    objection.  Approved.

7        MS. RINGER:  Thank you.  Next is Kramer Levin Naftalis

8    & Frankel, docket number 5867, requesting fees in the amount of

9    $11,386,709.50, and expenses in the amount of $412,285.71.  To

10   resolve the U.S. Trustee's objection, Kramer Levin agreed to

11   reduce its fees to $11,- -- or, excuse me -- $11,314,2-- --

12       THE COURT:  Mr. Eckstein was going to be very mad at

13   you.

14       MS. RINGER:  Let me say that again.  $11,314,026.40,

15   and expenses to $408,285.71.

16       MR. MASUMOTO:  That's correct, Your Honor.

17       THE COURT:  Approved.

18       MS. RINGER:  The next is Moelis & Company, docket

19   number 5856, requesting fees in the amount of 1.2 million and

20   expenses in the amount of $20,364.50.  To resolve the U.S.

21   Trustee's objection, Moelis agreed to reduce its expenses to

22   $15,864.50.

23       THE COURT:  Approved.

24       MS. RINGER:  The next is Pachulski Stang Ziehl &

25   Jones, docket number 5814, requesting fees in the amount of

1  $2,322,386.50 and expenses in the amount of $28,182.74.  To

2  resolve the U.S. Trustee's objection, Pachulski agreed to

3  reduce its requested fees to $2,298,470.82, and expenses to

4  $27,098.42.

5          MR. MASUMOTO:  That's correct, Your Honor.

6          THE COURT:  All right, approved.

7          MS. RINGER:  The next is San Marino Business Partners,

8  docket number 5862, requesting fees in the amount of $16,424

9  and expenses in the amount of $36.66.

10          THE COURT:  Approved.  No objections?

11          MS. RINGER:  No objections.

12          The next is SilvermanAcampora, docket number 5809,

13  requesting fees in the amount of $422,933.50 and expenses in

14  the amount of $2,821.54.  To resolve the U.S. Trustee's

15  objection, Silverman agreed to reduce its fees to $421,000 --

16  or $421,638, and its expenses remain the same.

17          THE COURT:  So let me ask, Mr. Masumoto, there were

18  multiple attendees at internal meetings here.

19          MR. MASUMOTO:  Yes, Your Honor, and based upon our

20  calculation, I believe they eliminated the amounts that were in

21  excess of the three attendees.

22          THE COURT:  All right.  And there was also time spent

23  reviewing and editing time records.

24          MR. MASUMOTO:  Yes, I believe the objection was for

25  $565.  We did withdraw our objection based on that there were

RESIDENTIAL CAPITAL, LLC, ET AL.                      134

1  some voluntary reductions taken previously.

2          THE COURT:  All right, approved.

3          MS. RINGER:  And finally, Your Honor, is Wilmer Cutler

4  Pickering Hale & Dorr, docket number 5859, requesting fees in

5  the amount of $246,850 and expenses in the amount of $831.53.

6  To resolve the U.S. Trustee's objection, Wilmer Hale agreed to

7  reduce its fees to $240,866 dollars, and its expenses remain

8  the same.

9          THE COURT:  Mr. Masumoto?

10          MR. MASUMOTO:  That's correct, Your Honor.

11          THE COURT:  All right, approved.

12          MS. RINGER:  Your Honor, I believe that's it for the

13  committee professionals.

14          THE COURT:  All right.  And a number of the

15  applications were adjourned, right, in connection with the

16  foreclosure review?

17          MR. MARINUZZI:  That's correct, Your Honor.

18          THE COURT:  All right.

19          MR. MARINUZZI:  It's Pepper Hamilton, Hudson Cook, and

20  PwC.

21          THE COURT:  All right.  What is going to happen about

22  those?  What are you going to do?

23          MR. MARINUZZI:  Your Honor, those orders speak to the

24  debtors' ability to pay PwC for the work that it did and for

25  the two law firms to be retained as 327(e) professionals.  Our

1    view is they should just become final orders, everything is

2    subject to reasonableness, and they'll file final applications

3    as will all the rest of the professionals.

4              We've, as Your Honor noted, been distracted by a bunch

5    of other things that have been going on in the case, so we're

6    going to turn to making that a final order.

7              THE COURT:  Okay.  Mr. Eckstein?

8              MR. ECKSTEIN:  Your Honor, if I may.  I thought it

9    might be appropriate, at the conclusion of this hearing, to

10   just note that I would expect in the next few weeks, maybe

11   right after the 1st of the year, we will try to put in place an

12   order scheduling the, both submission and hearing on the final

13   fee applications.  The way the plan is structured, the final

14   fee applications will not be due earlier than seventy-five days

15   after the effective date, which I think will take us to early

16   March.  And I think there'll be sixty days, after the

17   submission of the applications, for hearings; that probably

18   suggests early May.

19             But I think it probably makes sense if we actually get

20   an order of the court, scheduling the final fee process, so

21   that everybody knows exactly what the deadlines are, what the

22   objection dates are going to be, and when the Court would

23   schedule a hearing.

24             THE COURT:  All right, and I want -- you know, the --

25   well, it's certainly true -- obviously I've approved the

1    interim applications.  Everything remains open to challenge in

2    the final applications.

3              Mr. Masumoto, I'd ask that you consult with the

4    debtors and the committee's professionals, in terms of

5    scheduling the final fee hearings, as well.  I look to you and

6    your office with respect to this important function, and the

7    fees in this case are very high.

8              MR. MASUMOTO:  I understand, Your Honor, and --

9              THE COURT:  And I want to be sure that you and your

10   colleagues have sufficient time to weigh in, as well.

11             MR. MASUMOTO:  Thank you, Your Honor.  We appreciate

12   that.

13             THE COURT:  And you can all confer with my courtroom

14   deputy and we'll work out an appropriate date that works for

15   everybody.

16             MR. ECKSTEIN:  We'll be able to coordinate --

17             THE COURT:  Okay.

18             MR. ECKSTEIN:  The group of us will coordinate an

19   order --

20             THE COURT:  I appreciate that.

21             MR. ECKSTEIN:  -- with chambers and the U.S. Trustee.

22             THE COURT:  And best news of the day for me is that

23   you went effective today.

24             MR. ECKSTEIN:  It did go effective.

25             THE COURT:  Congratulations to all of you.

1           MR. ECKSTEIN:  It's a major milestone.

2           THE COURT:  Major milestone.  Thank you very much.

3    We're adjourned.

4           MR. ROSENBAUM:  Your Honor --

5           THE COURT:  Mr. Rosenbaum?

6           MR. ROSENBAUM:  I'm sorry, Your Honor; we had three

7    uncontested motions.

8           THE COURT:  Oh, okay.

9           MR. ROSENBAUM:  I think, hopefully it can go very

10   quick.

11          THE COURT:  Very quick.

12          MR. ROSENBAUM:  Back to page 14.

13          THE COURT:  Anybody who wants to be excused can be

14   excused.

15          Go ahead.

16          MR. ROSENBAUM:  It's on page 14 of the agenda, Your

17   Honor.

18          THE COURT:  Let me -- but I've got a memo dealing even

19   with --

20          All right, go ahead.

21          MR. ROSENBAUM:  Your Honor, the first matter is --

22   it's number 1 under Roman number V.  This is a motion under

23   Bankruptcy Rule 9019 to approve a settlement of a claim made in

24   the Estate of Mark Wolf (ph.).  No objections were received.

25          Meyer Suozzi was handling that for the debtors as

1  special counsel, and they're here to speak if Your Honor has

2  any questions.

3          THE COURT:  No.  Does anybody want to be heard with

4  respect to that matter?

5          All right, it's approved.

6          MR. ROSENBAUM:  Your Honor, the next matter's number 2

7  on page 14, docket number 5501.  This was our continued motion

8  to approve the settlement between GMAC Mortgage and GVC

9  Mortgage.  If Your Honor'll recall, Your Honor objected to and

10 did not approve our request to seal the settlement agreement.

11         THE COURT:  Right.

12         MR. ROSENBAUM:  You advised that we would have the

13 opportunity to speak to the U.S. Trustee, which we did.  And

14 our agreement with the U.S. Trustee, if acceptable to Your

15 Honor, is we would include in the motion approving the sealing

16 a sunset provision that would allow the disclosure of the

17 settlement agreement after the estate, and now the liquidating

18 trustee, completes work with respect to repurchase demands in

19 litigation or the closing of the case.

20         THE COURT:  Is somebody still here from the U.S.

21 Trustee?

22         What's the rationale for that resolution?

23         MR. ROSENBAUM:  That was what the U.S. Trustee would

24 feel appropriate, that it would not prejudice the liquidating

25 trustee's rights with respect to other settlements.  Our

1    expectation is this is going to be a very large undertaking of

2    liquidating trusts, in terms of lawsuits they have commenced

3    against correspondent lenders.

4            THE COURT:  Just repeat on the record what the period

5    of sealing is going to be.

6            MR. ROSENBAUM:  Do you want to have a --

7            THE COURT:  Let me see it.

8            Your way is blocked; you're going to have to walk

9    around.

10       (Pause)

11           THE COURT:  All right, I'm going to insist on a change

12   in the order that you've submitted.  In paragraph 3, there's a

13   proviso; it says, "provided further that nothing in this order

14   shall be deemed to prejudice the ability of parties-in-interest

15   to file a motion with the Court, requesting access to the

16   sealed documents, in the event the debtors do not consent to

17   provide such access".  That language needs to be changed to

18   "that nothing in this order shall be deemed to prejudice the

19   ability of anyone to file a motion with the Court, requesting

20   access to the sealed documents", et cetera, and continue on.

21           While I doubt that this will be of -- this settlement

22   will be of press interest, I am not going to preclude anyone

23   from filing a motion seeking to unseal documents filed under

24   seal in this court.

25           MR. ROSENBAUM:  Thank you, Your Honor.

1        THE COURT:  With that change, I will approve the

2   order.

3        MR. ROSENBAUM:  Thank you, Your Honor.  The last

4   matter on the agenda and for this calendar, Your Honor, is

5   number 3 on page 15, docket number 5700.

6        THE COURT:  Go ahead.

7        MR. ROSENBAUM:  Your Honor, this is the debtors'

8   motion to approve the settlement agreement, really with the

9   class of plaintiffs called the Mitchell plaintiffs, and also

10  for limited relief from the automatic stay, to allow the

11  Mitchell plaintiffs to seek final class-action approval of the

12  settlement.

13       Your Honor, we've received no objections to the

14  motion.  I'm happy to answer your questions or provide any

15  details.

16       THE COURT:  Describe the settlement to me.

17       MR. ROSENBAUM:  Your Honor, the settlement provides

18  the original -- this goes back -- one of these class actions

19  goes back many years, and one of the remaining outstanding

20  issues in litigation was an award of punitive damages and other

21  potential sanctions against the debtors.  Pre-petition, there

22  was a settlement of that amount for approximately fourteen

23  million dollars.  During the pendency of the case, we came to

24  the agreement that we would -- the debtors would allow the

25  claim, the amount of fourteen -- I think it's 14,250,000

1   dollars, as an allowed proof of claim.  That was acceptable to

2   the class plaintiffs and they will seek approval of that as

3   part of final approval of the class action.

4        THE COURT:  So the fourteen million dollar judgment

5   was entered against the debtors pre-petition?

6        MR. ROSENBAUM:  There was a finding of liability

7   against the debtors, and there was also -- as part of the

8   original judgment after trial, there was an award of punitive

9   damages of ninety-two million dollars; that went on appeal.

10  And the underlying judgment, net of the ninety-two million

11  dollars, was actually paid along with legal fees.  That part of

12  the judgment was satisfied as between the parties, prior to the

13  filing.  The ninety-two million (sic) punitive damages remained

14  outstanding; it was basically reset for trial.  That's when the

15  parties came to the settlement agreement and then commenced the

16  cases.

17       THE COURT:  What court was the case pending in?

18       MR. ROSENBAUM:  I believe there's other parties on the

19  phone.  I think Mr. Walters and Mr. Biggers are on the phone;

20  it's in state court in Missouri.

21       MR. WALTERS:  Judge, this is Fred Walters.  And it's

22  pending in Jackson County Circuit Court in Kansas City, if that

23  answers your question as to where it's pending.

24       THE COURT:  Yes, it does.  Thank you very much.

25       MR. WALTERS:  And the actual agreement, Your Honor, is

1    for 14.5 million dollars.

2             THE COURT:  Mr. Rosenbaum?

3             MR. ROSENBAUM:  That's correct, Your Honor.  I

4    apologize.

5             THE COURT:  All right.  Does anybody else wish to be

6    heard?

7             Go ahead.  Just identify yourself.

8             MR. FLANIGAN:  Your Honor, Dan Flanigan of the

9    Polsinelli firm, appearing for the Mitchell settlement class.

10            We have the state court standing by to approve the

11   settlement at 3 p.m. Central today.

12            THE COURT:  It's approved here.

13            MR. FLANIGAN:  Is it possible to get --

14            THE COURT:  It's approved here.

15            MR. FLANIGAN:  Thank you, Your Honor.

16            THE COURT:  If you've got -- do you need the order or

17   just -- I'll so-order the transcript.  But if you've got an

18   order, give my law clerks the disk and we'll get that one

19   entered right away.

20            MR. ROSENBAUM:  Yeah.

21            THE COURT:  Okay?

22            MR. ROSENBAUM:  I believe it was submitted to

23   chambers, Your Honor.

24            THE COURT:  Well, there's a lot of stuff that got

25   submitted to chambers.

RESIDENTIAL CAPITAL, LLC, ET AL.                    143

1          MR. ROSENBAUM:  We'll -- I'll follow up.

2          THE COURT:  Yeah.  So make sure you -- because we have

3   another hearing starting at 2 o'clock, so we don't have much

4   time.  We'll get it entered right away, but make sure you give

5   us the disk with that specific order, okay?

6          MR. ROSENBAUM:  Thank you, Your Honor.  I believe that

7   concludes the agenda.  Appreciate it.

8          THE COURT:  Okay.  We're adjourned.  Thank you.

9          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10        (Whereupon these proceedings were concluded at 12:52 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                              RULINGS

5                                           Page      Line

6   Final Application for Final Professional      83        17

7   Compensation of Arthur J. Gonzalez, approved.

8   Fee application for Chadbourne approved       85        17

9   on an interim basis

10  Final Application for Final Professional

11  Fourth and Final Fee Application              86        18

12  of Mesirow Financial Consulting, LLC for

13  approved.

14  Leonard, Street matter approved on an         87         7

15  interim basis.

16  Holdback of ten percent, approved.            91         1

17  Applications for Interim Professional        117         1

18  Compensation of Bryan Cave LLP, FTI

19  Consulting, and Carter Lipps for the

20  Compensation and  Reimbursement of

21  Expenses Incurred approved; adjustments to

22  be made in subsequent applications for

23  travel expenses in contention

24  Fourth Interim Application of Centerview     118         9

25  Partners LLC for Compensation and

 1    Reimbursement of Expenses approved with

 2    agreed reduction.

 3    Fourth Interim Application of Curtis,      121      12

 4    Mallet-Prevost, Colt & Mosle LLP for

 5    Professional Services Rendered and

 6    Reimbursement approved with a reduction

 7    of 6,000 dollars.

 8    Fourth Interim Fee Application of          122       5

 9    Deloitte & Touche LLP for Compensation

10    approved with agreed reduction.

11    Fourth Application for Interim Professional 122      22

12    Compensation for Dorsey and Whitney LLP,

13    Special Counsel, approved with agreed

14    reduction.

15    Second Interim Application of Ernst &      123       2

16    Young LLP for Professional Services approved

17    with agreed reduction.

18    Third Interim Application of Fortace LLC    123      24

19    for Compensation and Reimbursement of

20    Expenses Incurred approved.

21    Fourth Application for Interim Professional 124      11

22    Compensation for Locke Lord LLP

23    approved with agreed reduction.

24    Fourth Interim Application of Morrison      126       4

25    Cohen LLP for Compensation for Professional

1   Services Rendered approved with agreed

2   reduction.

3   Fourth Interim Application of Morrison &      128      21

4   Foerster LLP as Bankruptcy Counsel for the

5   Debtors for Compensation and Reimbursement

6   of Expenses approved with agreed adjustment.

7   Fourth Interim Application of Orrick,      129      10

8   Herrington & Sutcliffe LLP for Compensation

9   and Reimbursement of Expenses Incurred

10  approved with agreed reduction.

11  Second Interim Application of Perkins Coie  129      17

12  LLP Compensation and Reimbursement of

13  Expenses approved with agreed reduction.

14  Fourth Interim Application of Severson &      130       9

15  Werson, P.C. for Compensation and

16  Reimbursement of Expenses Incurred

17  approved with agreed reduction.

18  Fourth Interim Application of AlixPartners, 131      10

19  LLP for Compensation and Reimbursement of

20  Expenses approved with agreed reduction.

21  Third Interim Application of Coherent      131      14

22  Economics, LLC for Compensation and

23  Reimbursement of Expenses Incurred approved.

24  Third Interim Application of Epiq      131      21

25  Bankruptcy Solutions, LLC for Allowance

1  and Payment of Compensation approved

2  with agreed reduction.

3  Third Interim Application of J.F. Morrow    132        6

4  for Allowance of Compensation for

5  Professional Services Rendered and

6  Reimbursement of Expenses Incurred approved.

7  Fourth Application of Kramer Levin Naftalis 132        17

8  & Frankel LLP for Interim Allowance of

9  Compensation for Professional Services

10  Rendered and Reimbursement of Expenses

11  Incurred approved with agreed reduction.

12  Fourth Interim Application of Moelis &      132        23

13  Company LLC for Compensation for

14  Professional Services Rendered and

15  Reimbursement of Actual and Necessary

16  Expenses Incurred approved with agreed reduction.

17  Third Interim Application of Pachulski      133        6

18  Stang Ziehl & Jones LLP for Compensation for

19  Services Rendered and Reimbursement of

20  Expenses granted with agreed reduction.

21  Third Interim Application of San Marino     133        10

22  Business Partners LLC for Compensation

23  and Reimbursement of Expenses Incurred

24  approved.

25  Third Interim Application of                134        2

```
 1    SilvermanAcampora LLP for Interim Allowance

 2    of Compensation for Professional Services

 3    Rendered and for Reimbursement of Expenses

 4    Incurred approved with agreed reduction.

 5    Second Interim Fee Application of Wilmer     134       11

 6    Cutler Pickering Hale and Dorr LLP for

 7    Interim Allowance of Compensation

 8    and Reimbursement of Expenses approved

 9    with agreed reduction.

10    Debtors' Motion for Approval of             138       4

11    Stipulation Resolving Dispute approved.

12    Debtors' Motion for an Order                140       1

13    Approving Settlement Agreement Between

14    Debtor GMAC Mortgage, LLC and GVC

15    Mortgage, Inc. approved with amendment

16    as stated on the record.

17    Debtors' Motion Granting the Claimants      142       12

18    Limited Relief from Automatic Stay and

19    Approving the Debtors' Entry Into the

20    Settlement Agreement approved.

21

22

23

24

25
```

C E R T I F I C A T I O N

I, David Rutt, certify that the foregoing transcript is a true
and accurate record of the proceedings.

_____

DAVID RUTT

AAERT Certified Electronic Transcriber CET**D-635

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  December 17, 2013