Madison Taylor Real Estate, Inc.

File No. MTR-1179 Page #2

# Uniform Residential Appraisal Report

File # MTR-1179

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| Property Address | | City CULPEPER | | State VA | Zip Code 22701-3234 |
|---|---|---|---|---|---|

Borrower CAREN WILSON    Owner of Public Record  CAREN WILSON    County CULPEPER

Legal Description  METES & BOUNDS

Assessor's Parcel #  41-A1- 4- E-7    Tax Year 2006    R.E. Taxes $ 1,284

Neighborhood Name  CITY OF CULPEPER    Map Reference  29-3    Census Tract 9902.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $ N/A    ☐ PUD   HOA $ N/A    ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)

Lender/Client  SERVICE 1ST MORTGAGE INC.    Address  1415 MADISON PARK DR, GLEN BURNIE, MD 21060

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?    ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).    MRIS

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  N/A

Contract Price $ N/A    Date of Contract N/A    Is the property seller the owner of public record? ☐ Yes ☐ No   Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?    ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.    N/A

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☒ Stable ☐ Declining | | PRICE | AGE | One-Unit | 75 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | $ (000) | (yrs) | 2-4 Unit | 5 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | 100 Low | NEW | Multi-Family | 5 % |
| Neighborhood Boundaries   THE SUBJECTS NEIGHBORHOOD IS DEFINED AS: SEE ATTACHED MAP | | | 500 High | 75+ | Commercial | 10 % |
| | | | 250-350 Pred. 30-60+ | | Other | 5 % |

Neighborhood Description    THE SUBJECT IS LOCATED CULPEPER COUNTY APX. 70 MILES FROM THE WASHINGTON D.C CENTRAL BUSINESS DISTRICT. SCHOOLS, SHOPPING, TRANSPORTATION, EMPLOYMENT AND OTHER SERVICES ARE CONVENIENTLY LOCATED. SMSA CODE:8840

Market Conditions (including support for the above conclusions)    TYPICAL LOANS IN THE MARKET HAVE FHA, VA OR CONVENTIONAL FINANCING WITH 0-20% DOWN PAYMENT AND THE SELLER PAYING 0-3 LOAN DISCOUNT POINTS AND/OR CONTRIBUTIONS TOWARD CLOSING COSTS. PROPERTY VALUES ARE CONSIDERED STABLE, DEMAND & SUPPLY ARE IN BALANCE AT THIS TIME & MARKETING TIME IS APPROXIMATELY 1 WEEK TO 3 MONTHS. THESE CONCLUSIONS ARE SUPPORTED BY SALES AND CURRENT AVAILABLE LISTINGS IN THE SUBJECTS MARKETING AREA.

| Dimensions PLAT NOT PROVIDED | Area 6,098 SF | Shape IRREGULAR/TYPICAL | View TYPICAL OF NEIGH. |
|---|---|---|---|

Specific Zoning Classification R-1    Zoning Description RESIDENTIAL

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street ASPHALT | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone  X    FEMA Map # 51004200028    FEMA Map Date 3/2/1989

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?    ☐ Yes ☒ No  If Yes, describe

THERE ARE NO ADVERSE CONDITIONS APPARENT TO THE APPRAISER. THE NORMAL PUBLIC UTILITY EASEMENTS ARE A PART OF THE CONVEYANCE AND ARE STANDARD.

| General Description | | Foundation | | Exterior Description  materials/condition | | Interior  materials/condition | |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls | CONCRETE/GD-AV | Floors | HARDWOOD/GD |
| # of Stories  2 +BSMT | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | SIDING/GD | Walls | DRYWALL/GD |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area  1,008  sq.ft. | | Roof Surface | COMPOSITION/GD | Trim/Finish | WOOD/GD |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish  UNFINISHED  % | | Gutters & Downspouts | ALUMINUM/GD-AV | Bath Floor | CERAMIC/GD |
| Design (Style)  CAPE COD/GD | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | VINAL/GD | Bath Wainscot | CERAMIC/GD |
| Year Built  1944 | | Evidence of ☐ Infestation | | Storm Sash/Insulated | THERMAL/GD-AVG | Car Storage | ☐ None |
| Effective Age (Yrs)  31-32 YEARS | | ☐ Dampness ☐ Settlement | | Screens | YES | ☒ Driveway   # of Cars  2 |
| Attic | ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities | | Woodstove(s) # | | Driveway Surface  GRAVEL |
| ☐ Drop Stair | ☐ Stairs | ☐ Other | Fuel GAS | ☐ Fireplace(s) # | ☒ Fence | | ☐ Garage   # of Cars |
| ☐ Floor | ☒ Scuttle | Cooling ☒ Central Air Conditioning | ☐ Patio/Deck | ☒ Porch WOOD | | ☐ Carport   # of Cars |
| ☐ Finished | ☐ Heated | ☐ Individual ☐ Other FANS | ☐ Pool | ☐ Other | | ☐ Att. ☐ Det. ☐ Built-In |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☐ Microwave ☒ Washer/Dryer ☐ Other (describe)

Finished area above grade contains:    7  Rooms    4  Bedrooms    1.5  Bath(s)    1,872  Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).    HOME FEATURES: UPGRADED PLUMBING AND ELECTRICAL, HARDWOOD FLOORS THROUGH OUT,UPDATED KITCHEN WITH NEW APPLIANCES, GRANITE COUNTERS, CHAIR RAIL IN DINING ROOM.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).    THE SUBJECT APPEARS TO BE ADEQUATELY MAINTAINED AND HAS EFFECTIVE AGE LESS THAN ACTUAL AGE. THIS REPORT IS NOT A HOME INSPECTION NOR A GUARANTEE OF CONDITION.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?    ☐ Yes ☒ No  If Yes, describe

THE APPRAISER NOTED NO PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS AT THE TIME OF THE INSPECTION THAT WOULD AFFECT THE LIVABILITY, SOUNDNESS OR STRUCTURAL INTEGRITY OF THE PROPERTY. HOWEVER, THE APPRAISER IS NOT A HOME INSPECTOR AND THEREFORE MAKES NO GUARANTEES AS TO THE CONDITION OF THE PROPERTY.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?    ☒ Yes ☐ No  If No, describe

THE SUBJECTS DESIGN, APPEAL AND STYLE IS TYPICAL AND CONFORMS WELL WITH THE NEIGHBORHOOD.

-EXHIBIT - E

File No. MTR-1179( Page #3

## Uniform Residential Appraisal Report

File # MTR-1179

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| There are | 10 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 199,500 to $ 399,900 | | | | | |
| There are | 3 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 240,000 to $ 300,000 | | | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | CULPEPER, VA 22701-3234 | 916 NORTH MAIN ST CULPEPER, VA | | 2318 ORANGE RD CULPEPER, VA | | 120 SYCAMORE ST CULPEPER, VA | |
| Proximity to Subject | | 0.91 miles NE | | 0.86 miles S | | 0.84 miles NE | |
| Sale Price | $ N/A | $ 255,000 | | $ 300,000 | | $ 240,000 | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 206.81 sq.ft. | | $ 148.96 sq.ft. | | $ 177.91 sq.ft. | |
| Data Source(s) | | MRIS/AGENT/VISUAL | | MRIS/AGENT/VISUAL | | MRIS/AGENT/VISUAL | |
| Verification Source(s) | | CNTY ASSESS | | CNTY ASSESS | | CNTY ASSESS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONVENTIONAL $9,700 | | CONVENTIONAL $11,000 | | CONVENTIONAL NONE | |
| Date of Sale/Time | | SD: 8/2006 | | SD: 5/2006 | | SD: 9/2006 | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 6,098 SF | 9,147 SF | NO ADJ. | 16,998 SF | +5,000 | 12,221SF | -2,500 |
| View | TYPICAL OF NE | TYPICAL | | TYPICAL | | TYPICAL | |
| Design (Style) | CAPE COD/GD | CAPE COD/GD | | CAPE COD/GD | | CAPE COD/GD | |
| Quality of Construction | SIDING/GD | SIDING/GD | | SIDING/GD | | SIDING/GD | |
| Actual Age | 62 YEARS | 56 YEARS | | 16 YEARS | -20,000 | 66 YEARS | |
| Condition | GOOD-AVG | GOOD-AVG | | GOOD-AVG | | GOOD-AVG | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 7  4  1.5 | 7  3  1 | +2,000 | 8  4  2 | -2,000 | 8  3  2 | -2,000 |
| Gross Living Area | 1,872 sq.ft. | 1,233 sq.ft. | +22,000 | 2,014 sq.ft. | -5,000 | 1,349 sq.ft. | +18,000 |
| Basement & Finished | FULL BSMT | FULL BSMT | | NO BSMT | +10,000 | FULL BSMT | |
| Rooms Below Grade | UNFINISHED | RR,HB | -8,000 | N/A | | UNFINISHED | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | HFA/CAC | HFA/W-UNITS | +10,000 | HFA/CAC | | HFA/CAC | |
| Energy Efficient Items | STANDARD | STANDARD | | STANDARD | | STANDARD | |
| Garage/Carport | NONE | 1 CARPORT | -3,000 | NONE | | NONE | |
| Porch/Patio/Deck | PORCH | PATIO | +2,000 | NONE | +4,000 | PORCH | |
| FIREPLACE | 1 FIREPLACE | 1 FIREPLACE | | NO FIREPLACE | +2,500 | NO FIREPLACE | +2,500 |
| Net Adjustment (Total) | | ☒ + ☐ - $ 25,000 | | ☐ + ☒ - $ -5,500 | | ☒ + ☐ - $ 16,000 | |
| Adjusted Sale Price of Comparables | | Net Adj. 9.8 % Gross Adj. 18.4 % $ 280,000 | | Net Adj. 1.8 % Gross Adj. 16.2 % $ 294,500 | | Net Adj. 6.7 % Gross Adj. 10.4 % $ 256,000 | |

☒ I did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   MRIS/COUNTY ASSESS
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   MRIS/COUNTY ASSESS
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 9/2004 | NO PRIOR TRANSFER | NO PRIOR TRANSFER | NO PRIOR TRANSFER |
| Price of Prior Sale/Transfer | $232,000 | IN PAST 12 MONTHS | IN PAST 12 MONTHS | IN PAST 12 MONTHS |
| Data Source(s) | CNTY RECORDS/MRIS | CNTY RECORDS/MRIS | CNTY RECORDS/MRIS | CNTY RECORDS/MRIS |
| Effective Date of Data Source(s) | 8/9/2006 | 10/29/2006 | 10/29/2006 | 10/25/2006 |

Analysis of prior sale or transfer history of the subject property and comparable sales   SUBJECT TRANSFERRED IN 9/2004 FOR $232,000. INCREASE IN VALUE ATTRIBUTED TO MARKET APPRECIATION AS WELL AS UPGRADES BY OWNER SUCH AS UPGRADED ELECTRIC, PLUMBING AND INTERIOR FEATURES.

Summary of Sales Comparison Approach   ALL COMPARABLES ARE FROM THE SUBJECTS MARKETING AREA AND ARE CONSIDERED BEST AVAILABLE.

Indicated Value by Sales Comparison Approach $   280,000

Indicated Value by Sales Comparison Approach $   280,000   Cost Approach (if developed) $   180,785   Income Approach (if developed) $   N/A

INCOME APPROACH NOT DEVELOPED DUE OF LACK OF DATA AS NEIGHBORHOOD IS PREDOMINANTLY OCCUPIED. COST APPROACH IS NOT CONSIDERED SUPPORT OF VALUE. SINCE SUFFICIENT MARKET DATA IS AVAILABLE, THE DIRECT SALES COMPARISON APPROACH HAS BEEN FAVORED AS IT IS CONSIDERED TO BEST REFLECT ACTION OF BUYERS/SELLERS IN MARKET.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $   280,000   , as of   10/31/2006   , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005                    Page 2 of 6                    Fannie Mae Form 1004 March 2005

File No. MTR-1179 Page #4

## Uniform Residential Appraisal Report

File # MTR-1179

NONE

**ADDITIONAL COMMENTS**

---

**COST APPROACH TO VALUE (not required by Fannie Mae)**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    SITE VALUE IS DETERMINED BY RECENT SALES OF SIMILAR SIZE PARCELS IN THE MARKETING AREA. IN THE EVENT THERE ARE NO SALES OF SIMILAR PARCELS (I.E. TOWNHOME LOTS, ETC.) OR LACK OF RECENT SALES IN THE MARKETING AREA, THEN LAND VALUE IS DERIVED FROM MARKET DATA AND/OR PUBLIC RECORDS.

| | | |
|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ 75,000 |
| Source of cost data   LOCAL BUILDERS, MARSHALL & SWIFT, COST GUIDES, COUNTY ASSES. | DWELLING   1,872 Sq.Ft. @ $   90.00 | =$ 168,480 |
| Quality rating from cost service   GOOD   Effective date of cost data  9/2006 | BASEMENT   1,008 Sq.Ft. @ $   50.00 | =$ 50,400 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ |
| NO FUNCTIONAL OR EXTERNAL OBSOLESCENCE NOTED. THE | Garage/Carport   Sq.Ft. @ $ | =$ |
| PRESENT LAND TO VALUE RATIO IS TYPICAL OF THE MARKET | Total Estimate of Cost-New | =$ 218,880 |
| AREA AND IS DUE TO POSITIVE LOCATIONAL FACTORS. THE COST | Less   Physical   Functional   External | |
| APPROACH IS NOT FELT APPLICABLE TO THE ASSIGNMENT DUE | Depreciation   15,000 | =$( 15,000) |
| TO THE AGE OF THE SUBJECT BUT HAS BEEN PROVIDED PER THE | Depreciated Cost of Improvements | =$ 203,880 |
| LENDERS REQUEST. | "As-is" Value of Site Improvements | =$ |
| | | |
| Estimated Remaining Economic Life (HUD and VA only)   35+/- Years | INDICATED VALUE BY COST APPROACH | =$ 278,880 |

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $   N/A   X Gross Rent Multiplier   N/A   = $   N/A | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM)   INCOME APP. NOT DEVELOPED DUE TO LACK OF DATA AS NEIGHBORHOOD IS PREDOMINANTLY OWNER OCCUPIED. |

**PROJECT INFORMATION FOR PUDs (if applicable)**

Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes   ☐ No   Unit type(s)   ☐ Detached   ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project   N/A

| | | |
|---|---|---|
| Total number of phases   N/A | Total number of units   N/A | Total number of units sold   N/A |
| Total number of units rented   N/A | Total number of units for sale   N/A | Data source(s)   N/A |

Was the project created by the conversion of existing building(s) into a PUD?   ☐ Yes   ☐ No   If Yes, date of conversion.   N/A

Does the project contain any multi-dwelling units?   ☐ Yes   ☐ No   Data Source   N/A

Are the units, common elements, and recreation facilities complete?   ☐ Yes   ☐ No   If No, describe the status of completion.   N/A

Are the common elements leased to or by the Homeowners' Association?   ☐ Yes   ☐ No   If Yes, describe the rental terms and options.   N/A

Describe common elements and recreational facilities.   N/A

---

Freddie Mac Form 70 March 2005                    Page 3 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. MTR-1179 Page #5

# Uniform Residential Appraisal Report

File # MTR-1179

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report
File # MTR-1179

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

File No. MTR-1179 Page #7

# Uniform Residential Appraisal Report
File # MTR-1179

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER / APPRAISER TRAINEE**

Signature
Name MATTHEW SHUE
Company Name MADISON TAYLOR REAL ESTATE INC.
Company Address P.O. BOX 868, GAINESVILLE, VA 20181

Telephone Number 703-754-1140
Email Address MYHOMEWARRANTY@AOL.COM
Date of Signature and Report November 05, 2006
Effective Date of Appraisal 10/31/2006
State Certification #
or State License # 4001009670
or Other (describe)                     State #
State VA
Expiration Date of Certification or License 7/31/2008

ADDRESS OF PROPERTY APPRAISED
211 W Chandler St
CULPEPER, VA 22701-3234
APPRAISED VALUE OF SUBJECT PROPERTY $ 280,000
LENDER/CLIENT
Name JEFFREY RUSSELL
Company Name SERVICE 1ST MORTGAGE INC.
Company Address 1415 MADISON PARK DR, GLEN BURNIE, MD 21060
Email Address JEFFREY-RUSSELL@COMCAST.NET

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature
Name APRIL TAYLOR
Company Name MADISON TAYLOR REAL ESTATE
Company Address P.O. BOX 868, GAINESVILLE, VA 20181

Telephone Number 703-754-1140
Email Address MYHOMEWARRANTY@AOL.COM
Date of Signature November 05, 2006
State Certification #
or State License # 4001011046
State VA
Expiration Date of Certification or License 5/31/2006

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
    Date of Inspection
☒ Did inspect interior and exterior of subject property
    Date of Inspection 10/30/2006

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☒ Did inspect exterior of comparable sales from street
    Date of Inspection 10/30/2006

Freddie Mac Form 70 March 2005          Page 6 of 6          Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. MTR-1179l Page #8

## Subject Photo Page

| Borrower/Client | CAREN WILSON | | | | |
|---|---|---|---|---|---|
| Property Address | | | | | |
| City | CULPEPER | County CULPEPER | State VA | Zip Code 22701-3234 | |
| Lender | SERVICE 1ST MORTGAGE INC. | | | | |



**Subject Front**

| | |
|---|---|
| 211 W Chandler St | |
| Sales Price | N/A |
| Gross Living Area | 1,872 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1.5 |
| Location | AVERAGE |
| View | TYPICAL OF NEIGH. |
| Site | 6,098 SF |
| Quality | SIDING/GD |
| Age | 62 YEARS |



**Subject Rear**



**Subject Street**

Form PICPIX.SR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. MTR-1179I Page #9

## Subject Interior Photo Page

| Borrower/Client | CAREN WILSON | | | | |
|---|---|---|---|---|---|
| Property Address | 211 W Chandler St | | | | |
| City | CULPEPER | County | CULPEPER | State VA | Zip Code 22701-3234 |
| Lender | SERVICE 1ST MORTGAGE INC. | | | | |



**Subject Interior**

| | |
|---|---|
| 211 W Chandler St | |
| Sales Price | N/A |
| Gross Living Area | 1,872 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 1.5 |
| Location | AVERAGE |
| View | TYPICAL OF NEIGH. |
| Site | 6,098 SF |
| Quality | SIDING/GD |
| Age | 62 YEARS |



**Subject Interior**



**Subject Interior**

File No. MTR-1179 Page #10

## Comparable Photo Page

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | CAREN WILSON | | | | |
| Property Address | | | | | |
| City | CULPEPER | County | CULPEPER | State VA | Zip Code 22701-3234 |
| Lender | SERVICE 1ST MORTGAGE INC. | | | | |



### Comparable 1
916 NORTH MAIN ST
| | |
|---|---|
| Prox. to Subject | 0.91 miles NE |
| Sales Price | 255,000 |
| Gross Living Area | 1,233 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1 |
| Location | AVERAGE |
| View | TYPICAL |
| Site | 9,147 SF |
| Quality | SIDING/GD |
| Age | 56 YEARS |



### Comparable 2
2318 ORANGE RD
| | |
|---|---|
| Prox. to Subject | 0.86 miles S |
| Sales Price | 300,000 |
| Gross Living Area | 2,014 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2 |
| Location | AVERAGE |
| View | TYPICAL |
| Site | 16,988 SF |
| Quality | SIDING/GD |
| Age | 16 YEARS |



### Comparable 3
120 SYCAMORE ST
| | |
|---|---|
| Prox. to Subject | 0.84 miles NE |
| Sales Price | 240,000 |
| Gross Living Area | 1,349 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | AVERAGE |
| View | TYPICAL |
| Site | 12,221 SF |
| Quality | SIDING/GD |
| Age | 66 YEARS |

Madison Taylor Real Estate, Inc.

File No. MTR-1179 Page # 11

| Borrower/Client | CAREN WILSON | | | File No. MTR-1179 | |
|---|---|---|---|---|---|
| Property Address | | | | | |
| City | CULPEPER | County CULPEPER | State VA | Zip Code 22701-3234 | |
| Lender | SERVICE 1ST MORTGAGE INC. | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This Appraisal Report is one of the following types:

☐ Self Contained    (A written report prepared under Standards Rule  2-2(a)  , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☒ Summary    (A written report prepared under Standards Rule  2-2(b)  , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ Restricted Use    (A written report prepared under Standards Rule  2-2(c)  , pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

· The statements of fact contained in this report are true and correct.
· The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
· I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with respect to the parties involved.
· I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
· My engagement in this assignment was not contingent upon developing or reporting predetermined results.
· My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
· My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
· I have (or have not) made a personal inspection of the property that is the subject of this report.
· No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report.)

### Comments on Appraisal and Report Identification
Note any USPAP related issues requiring disclosure and any State mandated requirements:
THIS REPORT IS SIGNED USING A DIGITAL SIGNATURE. THIS METHOD OF SIGNING REPORTS HAS BEEN APPROVED BY USPAP.
SMT-8.

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: *Matthew Shue* | Signature: *April Taylor* |
| Name: MATTHEW SHUE | Name: APRIL TAYLOR |
| Date Signed: November 05, 2006 | Date Signed: November 05, 2006 |
| State Certification #: | State Certification #: |
| or State License #: 4001009670 | or State License #: 4001011046 |
| State: VA | State: VA |
| Expiration Date of Certification or License: 7/31/2008 | Expiration Date of Certification or License: 5/31/2008 |
| | Supervisory Appraiser Inspection of Subject Property: |
| Effective Date of Appraisal: 10/31/2006 | ☐ Did Not    ☐ Exterior-only from street    ☒ Interior and Exterior |

File No. MTR-1179| Page #12

## Building Sketch

| Borrower/Client | CAREN WILSON | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 211 W Chandler St | | | | | |
| City | CULPEPER | County | CULPEPER | State | VA | Zip Code 22701-3234 |
| Lender | SERVICE 1ST MORTGAGE INC. | | | | | |



Sketch by Apex IV™

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1008.0 | 1008.0 |
| GLA2 | Second Floor | 864.0 | 864.0 |
| BSMT | Basement | 1008.0 | 1008.0 |
| | Net LIVABLE Area | (Rounded) | 1872 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 28.0 x 36.0 | | 1008.0 |
| Second Floor | | |
| 24.0 x 36.0 | | 864.0 |
| 2 Items | (Rounded) | 1872 |

File No. MTR-1179| Page #13

## Location Map

| Borrower/Client | CAREN WILSON | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 211 W Chandler St | | | | | | |
| City | CULPEPER | | County | CULPEPER | State | VA | Zip Code 22701-3234 |
| Lender | SERVICE 1ST MORTGAGE INC. | | | | | | |



Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



# RALI SERIES 2007-QS1 TRUST

Home Coming Financial LLC
(Nominal Lender on DOT & Note)

Residential Funding Company LLC
[Seller/ Sponsor]

(an affiliate of Residential Funding Company, LLC.)
Residential  Accredit Loans, Inc
DEPOSITOR

RALI Series 2007-QS1 Trust
ISSUING ENTITY (TRUST)

Trustee's Duties are just
Administrative
WHAT
Trustee is doing is without any
AUTHORITY

never
Went
to
Trust

ZERO

Note never went to the
Trust Empty (No Assets)

Deutsche Bank Trust Company Americas
Trustee

Loans

Cash

Loans

Cash

Certificates/Bonds

Cash

Loan was sold 11 Months Before Closing

S-3 Registration Form filed by Residential  Accredit Loans with Securities and
Exchange Commission as per SEC file # 333-131213 on 01/23/2006 and declared
effective on 03/03/2006, of Mortgage  Asset-Backed  Pass-Through Certificates,
RALI Series 2007-QS1

Citigroup Global Markets Inc
Morgan Stanley & Co
Residential Funding Securities, LLC
(SECURITIES UNDERWRITERS)

Dealers

Certificates
Bonds

Cash

Agents

Certificates
Bonds

Cash

Investors

Certificates
Bonds

Cash

*EXHIBIT F*

SEC Info - RALI Series 2007-QS1 Trust - FWP - RALI Series 2007-QS1 ...    http://www.secinfo.com/$/SEC/Filing.asp?404;http://www.secinfo.com/...

```
                              7.0000              616.81
     JEFFERSONVILLEIN 47130   1                   12/14/06          00
     0471674754               03                  02/01/07          0.0000
     0471674754               N                   01/01/37
     0


     11217905      E22/G02    F                   112,500.00        ZZ
                              360                 112,500.00        1
                              7.1250              757.93            75
                              6.8750              757.93
     INDIANAPOLIS  IN 46227   2                   12/14/06          00
     0471704429               05                  02/01/07          0.0000
     0471704429               O                   01/01/37
     0


     11217913      E22/G01    F                   176,000.00        ZZ
                              360                 176,000.00        1
                              6.3750              1098.01           80
                              6.1250              1098.01
     SAINT PETERSBUFL 33713   2                   12/14/06          00
     0471710988               05                  02/01/07          0.0000
     0471710988               O                   01/01/37
     0


     11217919      E22/G02    F                   196,000.00        ZZ
                              360                 196,000.00        1
                              6.6250              1255.01           72
                              6.3750              1255.01
     BOISE       ID 83713     2                   12/13/06          00
     0471722181               03                  02/01/07          0.0000
     0471722181               O                   01/01/37
     0


     11217921      E22/G02    F                   152,000.00        ZZ
                              360                 152,000.00        1
                              6.7500              985.87            70
                              6.5000              985.87
     ALBUQUERQUE  NM 87110    2                   12/13/06          00
     0471701201               05                  02/01/07          0.0000
     0471701201               O                   01/01/37
     0


     11217925      E22/G02    F                   234,800.00        ZZ
                              360                 234,800.00        1
                              7.1250              1581.89           80
                              6.8750              1581.89
     COMBINE     TX 75159     1                   12/19/06          00
     0471726760               05                  02/01/07          0.0000
     0471726760               O                   01/01/37
     0


     11217935      E22/G02    F                   236,000.00        ZZ
                              360                 236,000.00        1
                              7.1250              1589.98           80
                              6.8750              1589.98
     COLORADO SPRINCO 80920   2                   12/14/06          00
     0471740712               05                  02/01/07          0.0000
     0471740712               O                   01/01/37
     0


     11217945      E22/G02    F                   236,000.00        ZZ
                              360                 236,000.00        1
                              6.7500              1530.69           80
                              6.5000              1530.69
     CULPEPPER    VA 22701    2                   12/13/06          00
     0471754754               05                  02/01/07          0.0000
```

*SEC Info*   Home   Search   My Interests   Help   User Info   *Nawaz Raja*

# RALI Series 2007-QS1 Trust ▦

*1 Closely Related:*  Residential Accredit Loans Inc - SEC # 949493 - 2/11/08   Go

*Click on these tabs to view other information related to RALI Series 2007-QS1 Trust.*

*View:*   Registrant   About   **Filings**   Files   Relationships   Names   Topics   Sites   *All*

## 28 SEC Filings (from 11/30/06 to 3/31/08)

*E-Mail:*  ✉  Send me notifications of *all* future filings involving **RALI Series 2007-QS1 Trust**

*Most-Recent:*  10-K -- Annual Report -- Form 10-K -- for 12/31/07 -- as Filer
List All Filings   ☑ as Filer   ☑ as "Owner"   ☑ as "Issuer"   ☑ as Filing Agent

Find          in recent filings.   Show  Filings with "hits" and every "hit".
Help...  *Wildcards:* ? (any letter), * (many).  *Logic:*  for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

---

## Documents & Exhibits (as Filer or "Owner")

| Last Filing | Type | | Description | Documents |
|---|---|---|---|---|
| 3/31/08 | 10-K | Reports | Annual Report -- Form 10-K | 1 |
| 9/27/07 | 8-K | Reports | Current Reports -- Form 8-K | 4 |
| | | | · ABS Change of Servicer or Trustee | |
| | | | · Financial Statements and Exhibits | |
| | | | · Other Events | |
| 1/22/08 | 15-15D | Reports | Notice of Suspension of Duty to File Reports -- Form 15 | 1 |
| 1/9/08 | 10-D | Reports | Periodic Distribution Reports by Asset-Backed Issuers -- Form 10-D | 23 |
| 12/7/07 | FWP | Registrations | Free Writing Prospectuses -- Rule 163/433 | 6 |
| 12/20/07 | 424B5 | Registrations | Prospectuses -- Rule 424(b)(5) | 4 |
| 3/31/08 | EX-34 | | Attestation Reports on Assessments of Compliance with Servicing Criteria for Asset-Backed Securities | 10 |
| 3/31/08 | EX-31 | | Certification per Sarbanes-Oxley Act (Section 302) | 1 |
| 12/20/07 | GRAPHIC | | Images and Pictures | 4 |
| 2/15/07 | EX-10 | | Material Contracts | 4 |
| 1/9/08 | EX-99 | | Miscellaneous Exhibits, including Press Releases | 24 |
| 1/29/07 | EX-5 | | Opinion re: Legality | 1 |
| 1/29/07 | EX-8 | | Opinion re: Tax Matters | 1 |
| 3/31/08 | EX-33 | | Reports of Compliance with Servicing Criteria for Asset-Backed Securities | 10 |
| 3/31/08 | EX-35 | | Servicer Compliance Statements for Asset-Backed Securities | 5 |

---

## Documents & Exhibits (as Subject Company or "Issuer")

| Last Filing | Type | Description | Documents |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 12/7/07 | FWP | Registrations | Free Writing Prospectuses -- Rule 163/433 | 6 |
| 12/7/07 | GRAPHIC | Image or Picture | | 1 |

Sponsored Ads...

AdChoices ▷

Copyright © 2011 *Fran Finnegan & Company*.  All Rights Reserved.
*About* – *Privacy* – *Redactions* – *Help* — Sat, 25 Jun 06:59:56.2 GMT

| | | | | | |
|---|---|---|---|---|---|
| 0471754754 0 | | O | | 01/01/37 | |
| 11217947 | E22/G02 | F 360 6.2500 6.0000 | | 182,400.00 182,400.00 1123.07 1123.07 | ZZ 1 80 |
| LONGMONT 0471754887 0471754887 0 | CO 80504 | 1 03 O | | 12/19/06 02/01/07 01/01/37 | 00 0.0000 |
| 11217991 | E22/G02 | F 360 7.1250 6.8750 | | 371,200.00 371,200.00 2204.00 2204.00 | ZZ 1 79 |
| BROOKLINE 0471791459 0471791459 0 | NH 03033 | 2 05 O | | 12/14/06 02/01/07 01/01/37 | 00 0.0000 |
| 11218023 | E22/G02 | F 360 7.0000 6.7500 | | 155,600.00 155,600.00 1035.21 1035.21 | ZZ 1 80 |
| ARVADA 0471941575 0471941575 0 | CO 80003 | 1 05 O | | 12/18/06 02/01/07 01/01/37 | 00 0.0000 |
| 11218031 | E22/G02 | F 360 7.8750 7.6250 | | 160,000.00 160,000.00 1160.11 1160.11 | ZZ 1 80 |
| TAMPA 0471951459 0471951459 0 | FL 33602 | 5 05 O | | 12/14/06 02/01/07 01/01/37 | 00 0.0000 |
| 11218045 | E22/G02 | F 360 7.3750 7.1250 | | 111,920.00 111,920.00 773.00 773.00 | ZZ 1 80 |
| MONROE 0471968644 0471968644 0 | GA 30655 | 2 03 O | | 12/14/06 02/01/07 01/01/37 | 00 0.0000 |
| 11218063 | E22/G02 | F 360 7.1250 6.8750 | | 200,000.00 200,000.00 1347.44 1347.44 | ZZ 1 80 |
| SIKESTON 0471991729 0471991729 0 | MO 63801 | 1 05 O | | 12/19/06 02/01/07 01/01/37 | 00 0.0000 |
| 11218069 | E22/G02 | F 360 7.7500 7.5000 | | 104,000.00 104,000.00 671.67 671.67 | ZZ 1 80 |
| INDIAN TRAIL 0472004928 0472004928 0 | NC 28079 | 1 03 N | | 12/19/06 02/01/07 01/01/37 | 00 0.0000 |

SEC Info - RALI Series 2007-QS1 Trust - FWP - RALI Series 2007-QS1 ...       http://www.secinfo.com/$/SEC/Filing.asp?404;http://www.secinfo.com/...

# RALI Series 2007-QS1 Trust · FWP · RALI Series 2007-QS1 Trust · On 1/24/07

**Filed On 1/24/07 4:01pm ET   ·   SEC File 333-131213-34   ·   Accession Number 1382368-7-6**

| Find |  | in  this entire Filing. |   Show  Docs searched  and  every "hit". |
Help...   *Wildcards*: **?** (any letter), ***** (many). *Logic*: for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), "**(&)**" (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs | Issue |
|---|---|---|---|---|---|
| 1/24/07 | RALI Series 2007-QS1 Trust | FWP | | 1:885 | RALI Series 2007-( |

**Free Writing Prospectus  ·  Rule 163/433**
**Filing Table of Contents**

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1:  FWP | Free Writing Prospectus | 885± | 2,906K |

| FWP | 1st "Page" of 3 | TOC | Top | Previous | Next | Bottom | Just 1st |
|---|---|---|---|---|---|---|---|

Sponsored Ads...

AdChoices▷

(Filed pursuant to Rule 433; SEC File No. 333-131213)

FREE WRITING PROSPECTUS - PRELIMINARY POOL INFORMATION

RESIDENTIAL FUNDING COMPANY, LLC
MASTER SERVICER AND SPONSOR

RESIDENTIAL ASSET ACCREDIT LOANS, INC.
DEPOSITOR

RALI SERIES 2007-QS1 TRUST
ISSUING ENTITY

MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES,
SERIES 2007-QS1 (THE "CERTIFICATES")

Statement Regarding Assumptions as to Certificates, Pricing Estimates, and Other
Information

Disclaimer

The depositor has filed a registration statement (including the prospectus (the
"Prospectus")) with the SEC for the offering to which this communication
relates.  Before you invest,  you should read the Prospectus in the registration
statement  and other  documents  the  depositor  has filed  with the SEC for more

## MORTGAGE FORENSIC SECURITIZATION ANALYSIS REPORT

**Name of the Borrower:**    Ms. Caren J. Wilson    *2011-L-304*
**Name on the Title:**    Ms. Caren J. Wilson

**Property Address:**    ▮▮▮▮▮▮ Culpeper Virginia 22701

## Current Servicer & Investor Information found on MERS

# LOAN-1

**MIN:**    ▮▮▮▮▮▮547543

**Note Date:**    12/13/2006

**MIN Status:**    INACTIVE

**Servicer:**    GMAC Mortgage, LLC

Phone: (800) 766-4622

**Investor:**    This investor has chosen not to display their information

# LOAN-2

**MIN:**    ▮▮▮▮▮▮7709

**Note Date:**    12/13/2006

**MIN Status:**    ACTIVE

**Servicer:**    GMAC Mortgage, LLC

Phone: (800) 766-4622

**Investor:**    This investor has chosen not to display their information

**Borrower's Attorney:**    N/A

A forensic analysis report should state as follows:

**a.** The borrower is going through the hardship, when she lost her employment and was placed in foreclosure. To save her primary residence the borrower was forced to file Chapter-7 Bankruptcy on

1

06/10/2010 in Western District of Virginia per case # 10-61734 and
received discharge on 09/08/2010.

**b.** Borrower Ms. Caren J. Wilson was working with the present servicer,
"GMAC Mortgage LLC" for loan modification. "GMAC Mortgage LLC"
received $ 1,518, 398, 139-00 on April 13, 2009 from Treasury for
"MAKING HOME AFFORDABLE" (The Mortgage Loan Modification Plan)
"Program under Emergency Economic Stabilization Act, The amount
received by "GMAC Mortgage LLC" can be verified from
**www.financialstability.gov.**

**c.** If irregularities in the modification /short sale/ foreclosure process
reflect deeper failures to document properly changes of ownership as
mortgage loans were securitized, then it is possible that Treasury is
dealing with the wrong parties in the course of the Home Affordable
Modification Program (HAMP). This could mean that borrowers either
received or were denied modifications improperly.

**d.** Some servicers, "GMAC Mortgage LLC" in this case dealing with Treasury
may have no legal right to initiate modification/short sale/ foreclosures,
**which may call into question their ability to grant modifications or
to demand payments from homeowners, whether they are part of a
modification/ short sale/ foreclosure mitigation program or
otherwise.**


**SUMMARY**

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED
BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE
SECURITIESCOMMISSIN OR HAS THE SECURITIES ANDEXCHANGE
COMMISSION OR ANY STATE SECURITIES COMMISSION, therefore the
parties were selling the unregistered and unregulated securities.


**RELEVANT PARTIES**

**a. Sub-servicers.................**Homecomings    Financial,    LLC,    a
wholly-owned subsidiary of Residential Funding Company, LLC, will
subservice approximately 56.6% by principal amount of the group I
loans. GMAC Mortgage, LLC an affiliate of Residential  Funding
Company, LLC, will    subservice approximately 12.2% by principal
amount of the group I loans. National City Mortgage  Company  will
subservice approximately 16.5% by principal amount of the group I
loans. Homecomings    Financial,    LLC,    a wholly-owned subsidiary
of Residential Funding Company, LLC, will subservice approximately
53.1% by principal amount of the group II loans. GMAC Mortgage, LLC,
an affiliate of Residential Funding Company,    LLC,    will    subservice
approximately 9.7% by principal amount of  the  group II loans.
National  City Mortgage  Company  will  subservice approximately

17.2% by principal amount of the group II loans. SunTrust Mortgage, Inc. will subservice approximately 10.0% by principal amount of the group II loans.

**b. Master servicer and sponsor**.......... Residential Funding Company, LLC.

**c. Originators**.......................... Homecomings Financial, LLC f/k/a Home comings Financial net work Inc

**d. Depositor**........................... Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, **LLC.**

**e. Securities Underwriter** ....... In this case there are 03 Securities Underwriters are involved (collectively, the SECURITIES *"UNDERWRITERS")* and named as under;

    1) Citigroup Global Markets Inc
    2) Morgan Stanley & Co
    3) Residential Funding Securities, LLC

**f. Issuing Entity**............ RALI Series 2007-QS1 Trust. The depositor will establish a trust with respect to the Series 2007-QS1Certificates under a series supplement, dated as of <u>January 1, 2007</u>, to the Standard terms of pooling and servicing agreement, dated as of <u>December 1, 2006</u>, among the depositor, the master servicer and the trustee. On the closing date ( 01/30/2007), the depositor will deposit the pool of mortgage loans

**g. Servicer**................. Present Servicer is "GMAC Mortgage, LLC

**h. Trustee**................... Deutsche Bank Trust Company America

**i. Yield Maintenance Agreements**
    Provider........................ Bear Stearns Financial Products Inc.

j. Mortgage pool...................5,293 fixed rate mortgage loans with an aggregate principal balance of approximately $1,297,367,277 as of the cut-off date, secured by first liens on one-to four-family residential properties or interests in shares issued by a cooperative apartment corporation and the related proprietary lease

   M. Nawaz Raja deposes and states sworn under penalty of perjury as follows:

1.    I am over the age of eighteen years and qualified to make this affidavit. I have no direct or indirect interest in the outcome of the case at bar for which I am offering my observations, analysis, opinions and testimony. I am a Mortgage Forensic Auditor. My resume is attached and incorporated herein.

2.    My area of expertise, based upon knowledge, training, and experience is in the field of securities, the securities industry, derivative securities, securities regulation, special purpose vehicles, structured investment vehicles, creation of trusts pooling agreements, issuance of asset backed securities and specifically mortgage backed securities by special purpose

3

vehicles in which an entity is named as trustee for the holders of certificates of mortgage backed securities. The Trustee Disclaims any economic interest in the mortgage loans the economics of securitized residential mortgages, securitization of mortgage loans, accounting in the context of said securitizations and REMIC vehicles and pooling and servicing of securitized loans.

3.     I have knowledge, training and experience of various precursor asset protection strategies, including minimization of tax liability, which also are constructed to be made bankruptcy remote in commercial and real estate settings.

4.     I have knowledge, training and experience in loan originations, underwriting and the assignment and assumption of securitized residential mortgage loans.

5.     I also have knowledge, training and experience, including the areas of securities, real property, Internal Revenue Code as applicable to REMICs and Uniform Commercial Code. I also have knowledge, training and experience in the practices prevalent during the period of 2001-2009 that enabled the accumulation and availability of an overwhelming abundance of investment dollars, made possible because the derivatives sold to investors were made to appear that they contained both exceptional growth and zero risk, back the history of mortgage success up to that point in time had been high, and because these instruments were in addition made to appear undeniably and excessively guaranteed by 3rd party sources.

6.     I also have knowledge, training and experience that this abundance of funding was one of the direct and inevitable causes of violations against homeowners and purchasers pertaining to funding of mortgage loans for purchase and refinancing, including predatory lending practices and Truth in Lending Act Violations.

7.     "All factual testimony made by me is true and correct to the best of my knowledge and belief. All opinion testimony made by me is beyond a reasonable degree of probability in my area of expertise, which is set forth in the above paragraph and in my resume.

8.     I have no direct or indirect interest in the outcome of the case at Bar for which I am offering observations, analysis, opinions and testimony.

9.     "I have been asked to render opinions pertaining to the above case, in which **Ms. Caren J. Wilson** is the Borrower, and the Mortgage Note ("Note"), **Ms. Caren J. Wilson** on title. "Mortgage/Deed of Trust" the propriety of foreclosure, and securitization issues, among others, are in question. The original nominal Lender according to said documents is "Home comings Financial LLC f/k/a Home Coming Financial net work Inc, 2101 REXFORD Suite # 250 W Charlotte NC 28211 ("Nominal Lender")

10.     I evaluated the materials listed below, among other materials, facts and data in basing my opinions and inferences. Each of these documents and other materials, facts and data are of the type that expertise in my field would customarily rely upon in forming opinions and inferences. The information sources, I reviewed were sufficient for me to testify as to the

4

facts and opinions that are included herein. Where additional information is required to make other factual statements and express opinions on further subject matter, I have so stated. The documents were presented to me by **Ms. Caren J. Wilson**, 211 W. Chandler Street Culpeper Virginia 22701, for the forensic review, analysis and opinion.

11.    I have reviewed the settlement papers, Securities Exchange Commission filings, and various land records of the Culpeper County of Virginia. I also performed independent searches as to Securitization Documents available to the public online at **http://www.sec.gov/.** Most of the testimony in this Declaration was plainly clear from review of the below listed materials, but to the extent that technical or specialized principles and methods were required, they have been reliably applied:

A. The closing loan documents relating to the loan transactions that are the subject of this lawsuit. Not attached, because too voluminous and others are already of record with the Court. Mortgage and Note are attached as **EXHIBIT-A&B**

B. The factual results of a forensic review and analysis performed by me which I have attached as a chart showing the path of borrower's note as **EXHIBIT-C**

C. In addition I also reviewed additional correspondence sent to, GMAC Mortgage LLC, and others, from the borrower **Ms. Caren J. Wilson**, requesting an accounting and other information pertaining to accounting of the borrower's mortgage account.

D. The following recorded documents: Mortgage; Note; (Note was not recorded in the county lands record) are attached as **EXHIBIT, A & B** above.

E. Various applicable Securitization Documents pertaining to Mortgage Trust Pool, 10 K, 8k, Pooling and Servicing Agreement, prospectus Supplement, entitled "**RALI Series 2007-QS1 Trust**", including but not limited to the Pooling and Servicing Agreement ("PSA") dated 12/01/2006; filed with SEC, file #RALI Series 2007-QS1 Trust · 8-K/A · For 2/15/07 as EX-10 Filed On 2/15/07 3:31pm ET, SEC File 333-131213-34 · Accession Number 1382368-7-12 and Prospectus Supplement 424B5, dated 12/06/2006 ("ProS") filed with the SEC, file # Filed On 01/29/2007 at 4:37pm ET , SEC File 333-131213, -34 Accession Number 891092-7-238

F. The Securitization Documents are too voluminous to attach to this Declaration as they are perhaps more than 2000 pages. I have attached a few key pages from the PSA, Prospectus Supplement, 8K and 10K including a diagram of the transaction, with the identity of the various Participants typed thereon, and a few pages from the ProS, FWP showing

5

the borrower's loan Number, zip code, city name and principle amount of
the note etc.

G.  The investor on loan as per MERS record shows has been intentionally
    hidden and the investor in this case has chosen not to disclose its
    information, which is incorrect, misleading and fraud, in the present
    case. Deutsche Bank Trust Company Americas also is the trustee on the
    Trust, "**RALI Series 2007-QS1 Trust**". **Deutsche Bank Trust Company
    Americas <u>cannot be Trustee or investor or own the note, lest it
    becomes a partnership with the certificate holders.</u>** The information
    about the investor was intentionally withheld by the securitization
    partners which are violations of the Federal Reserve new amendment
    which is law now and TILA. Borrowers repeatedly requested this
    information and were not provided. This information will expose the
    foreclosing parties before the court who have acted and are acting ultra-
    virus.

H.  Deutsche Bank Trust Company Americas is also acting under the
    various layers 424(b) (5) Prospectus, Pooling & Servicing Agreement (PSA)
    filed with the SEC.of Trustees, without any specific description, where
    One Trustee ends and other Trustee Begins. It is classic obfuscation and
    musical chairs. Note that **Deutsche Bank Trust Company Americas is
    identified "as trustee" but the usual language of "under the terms of
    that certain trust dated....etc" is absent.** This is because there usually
    is **NO TRUST AGREEMENT designated as such and NO TRUST.** In
    fact, as stated here **it is merely an agreement between the co-issuers
    and Deutsche Bank Trust Company Americas, which it means that
    far from being a trust it is more like the operating agreement of an
    LLC**

I.  The Nominal Lender on the Mortgage/Deed of Trust is "Home comings
    Financial LLC", which rented its name and charter to some undisclosed
    lender for the payment of hidden fees for standing in between for
    undisclosed lender, which is a violation. As the undisclosed lender was
    not disclosed to the borrower as of today in spite of repeated requests of
    borrowers.

J.  Promissory Note has no endorsements, whereas the note should have at
    least nine (09) or more endorsements; which are missing on the note,
    reasons best known to the entities involved;

    1)  Home Coming Financial LLC→ **Residential Funding Company,
        LLC**→ Residential   Accredit Loans, Inc. (an affiliate of Residential
        Funding Company, **LLC.**)→ Citigroup Global Markets Inc→Morgan
        Stanley & Co →Residential  Funding  Securities, LLC→ Dealers→

6

Agents→ Investors(Prospectus Supplement 424B5, dated 12/06/2006 ("ProS") <u>RALI Series 2007-QS1 Trust</u>, et al.  424B5 filed On 1/29/07 4:37pm ET    SEC Files <u>333-131213</u>, <u>-34</u> Accession Number 891092-7-238

2) The name of all of the above parties was not there on the note and no endorsement was done. The note never made to the Trust and there was no endorsement in the name of Trustee, "Deutsche Bank Trust Company Americas" therefore the assets were never became the assets of the Trust, "<u>RALI Series 2007-QS1 Trust</u>" and "Deutsche Bank Trust Company Americas" has acted and still acting ultra-virus.

3) The Chain of transfer is not perfect and raises many legal questions, which Honorable court can look in providing the justice whoever deserves.

4) Concerns about securitization chain of title also go to the standing question; if the mortgages were not properly transferred and recorded in the Culpeper County Lands Records, in the securitization process, then the party bringing the foreclosure does not in fact own the mortgage and therefore lacks standing to foreclose.

5) The mortgage lenders and securitization servicers including "GMAC Mortgage LLC" should not undertake to foreclose on any homeowner unless they are able to do so in full compliance with applicable laws and their contractual agreements with the homeowner.

6) In the present case, the nominal lender "Home Coming Financial LLC" sold the borrower's loan for cash to "**Residential Funding Company, LLC**, who further sold it for cash to Residential Accredit Loans, Inc., which further sold it to Citigroup Global Markets Inc, Morgan Stanley & Co, and to Residential Funding Securities.  Citigroup Global Markets Inc, Morgan Stanley & Co, and Residential Funding Securities further sold for cash to Investors through the Dealers and Agents. On each stage the cash was received for the loan of **Ms. Caren J. Wilson**, which was not disclosed to the Borrower, **Ms. Caren J. Wilson** at closing or after the closing till this date.

7) It is obvious from the securitization documents that the loan of **Ms. Caren J. Wilson** was sold prior[1] to her settlement on 12/13/2006 as Asset Backed Security.

8) Chain of Transfer of Note is broken and not perfect.

**9)** The securitization process is complicated, requires several properly executed transfers and then recorded in the County Lands Records. **If at any point the required legal steps are not followed to the letter, then the ownership of the mortgage loan could fall into question.**

**10)** The Borrower, **Ms. Caren J. Wilson** signed a Promissory Note and the investor received a "BOND", both are not the same, having the different terms, and Borrower, **Ms. Caren J. Wilson** was not the party in the "Bond" deal. Borrower's identity, personal information was used without the borrower's knowledge, consent and permission.

**11)** The problems in the mortgage market are highly technical, but they are extremely serious. **At best they present problems of fraud on the court, fraud on borrowers and clouded title to property.**

**12)** These issues are no more technicalities than the borrower's signature on a mortgage. Cutting corners may improve securitization's economic efficiency, but it undermines its legal viability.

**13)** Deutsche Bank Trust Company Americas was hired to manage the Trust by the Depositor which is "Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC.", and the duties of the Trustee are just the administrative as per section 8.01 of the "PSA" dated 12/01/2006. The "PSA" is one of the Exhibit 10 of the current report 8K filed before the SEC as per file # 333-131213-34, and Accession # 1382368-7-12, filed on 02/15/2007 at 3:31 pm ET, by the securitization partners, who have admitted that the borrowers loan was sold to various parties for cash. According to the "PSA" section 8.01 Deutsche Bank Trust Company Americas has acted and is still acting ultra-virus.

**14)** The True Sale is from Depositor (Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC.) to the Securities underwriters, which are Citigroup Global Markets Inc,

---

[1] S-3 Registration Form filed by Residential Accredit Loans with Securities and Exchange Commission as per SEC file # 333-131213 on 01/23/2006 and declared effective on 03/03/2006, of Mortgage Asset-Backed Pass-Through Certificates, RALI Series 2007-QS1

Morgan Stanley & Co and Residential Funding Securities, LLC, in this case, and not to the Trustee, "Deutsche Bank Trust Company Americas" in this case.

**15)**   The event of Credit Default Swaps, AIG Bail out and insurance proceeds caused the Trust, "<u>RALI Series 2007-QS1 Trust</u>" to dissolve and "Deutsche Bank Trust Company Americas" is no more a trustee of the Trust, <u>RALI Series 2007-QS1 Trust</u>, in this case, and therefore "Deutsche Bank Trust Company Americas" acted without any authority and committing the civil theft on the Borrower, **Ms. Caren J. Wilson**

16)   If irregularities in the foreclosure process reflect deeper failures to document properly changes of ownership as mortgage loans were securitized, then it is possible that Treasury is dealing with the wrong parties in the course of the Home Affordable Modification Program (HAMP). This could mean that borrowers either received or were denied modifications improperly. Borrower **Ms. Caren J. Wilson** requested GMAC Mortgage LLC for help in modification but was not helped.

12.   I use the following definition of "Creditor" taken from research in cases, the Bankruptcy Code and the Uniform Commercial Code. A "Creditor" is a legal entity that has advanced funds, goods or services in consideration of the right to payment, or has purchased the right to be paid. A "Creditor" is an entity that had a Claim against Debtor before the case was filed. 11 U.S.C § 101(10). A "Claim" is a right to payment. § 101(5). Only a Creditor may file a Proof of Claim. § 501(a). The "Official Form 10 reflects this requirement by describing the 'Name of Creditor' as 'the person or other entity to whom the debtor owes money or property."

13.   In the context of securitized residential mortgages (including the one in the instant case), a "Creditor" is a legal entity or group of entities or persons under the law who have advanced money for the funding of mortgage loans and who are owed money from those mortgage loans.

14. The creditor in the case at bar can be generically described as an Investor, (which remained undisclosed to the borrowers in spite of repeated requests), as defined under the rules and regulations of the Securities and Exchange Commission, who has paid money to an intermediary in a chain of securitization that resulted in the funding of one or most residential loan transactions; **the promise to pay is from an entity usually referred to as a Special Purpose Vehicle (SPV) which is the frequently erroneously referred to as a "Trust" with a "Trustee,"** that in the applicable Pool in this case as a **"Deutsche Bank Trust Company Americas "**. The investor in

9

this case, was intentionally misstated or has chosen not to display their information and the borrower, **Ms. Caren J. Wilson** tried her level best to get the information but it was intentionally not disclosed to the borrower, **Ms. Caren J. Wilson**, and Honorable court can determine this violation.

15. The creditor/Investor receives an instrument which is generically referred to as a Mortgage Backed Asset Certificate/Bond ("Certificate/ Bond"). The Certificate/Bond incorporates terms by which the promise to pay interest and principal is made by the issuing SPV and the manager for this is **"Deutsche Bank Trust Company Americas "** in the present case.

16. Meanwhile the lender/investor gets a **mortgage bond NOT SIGNED BY THE BORROWER**. (borrower signed a note but the lender received a bond from a party not involved in the borrower's closing), **There is no nexus between borrower and lender without recognizing the obvious — there were parties, documents, agreements and corresponding duties and obligations existing in the UNDISCLOSED MIDDLE**, which the Honorable court need to ask the foreclosing entities in doing justice, whoever deserves.

17. The promise to pay is conditioned upon several terms, including but now limited to the performance of pool of loans, the obligations of third parties, and impliedly the receipt of insurance proceeds triggered by partial non-performance of the pool of assets allocated to the SPV.

18. In turn the SPV pool is carved out of other pools created by Aggregators employed by investment banking firms. **The Aggregators are parties to Pooling and Service Agreements and Assignment and Assumption Agreements, which are Securitization documents** that predate [2]the **funding of the loans in any of the Pools.** The Certificate/Bond issued to the Investor conveys a percentage interest in the Pool of assets that is allocated to the SPV. I was asked to render an opinion as to the factual basis pertinent to the issue of Standing. As relates to Constitutional Standing, my opinion is premised on the following definition:

> "Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the other party's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by a favorable decision".

19. My presumption, in the context of the question posed to me, **is that standing requires that a party will suffer financial loss** derived from non-

---

[2] Borrower's loan was sold forward almost 11 months before her loan closing. S-3 Registration Form filed by Residential Accredit Loans with Securities and Exchange Commission as per SEC file # 333-131213 on 01/23/2006 and declared effective on 03/03/2006, of Mortgage Asset-Backed Pass-Through Certificates, RALI Series 2007-QS1

performance (i.e., non-payment) of the subject contract, which in this case is the obligation that arose when the subject loan was funded on behalf of the borrower as homeowner. <u>Since the funding occurred out of a pool of money received by the investment banker from the investors, the investors are creditors, which in the present case were not disclosed to the borrower,</u> **Ms. Caren J. Wilson.** By the way indenture (usually incorporation a prospectus) the investors agreed to an operating plan that defined the functions of the conduit which was used to funnel funds to the investor from the pool. **This operating plan is loosely and erroneously referred to as a trust** ("RALI Series 2007-QS1 Trust" in this case), with the manager referred to as a Trustee ("Deutsche Bank Trust Company Americas" in this case). However, since now assets remain in the conduit which is defined under the Internal Revenue Code as REMIC (Real Estate Mortgage Investment Conduit). The REMIC is referred to in the world of finance as an SPV (Special Purpose Vehicle). I presume the words "conduit" and "vehicle" convey the fact that no actual business events of taxable or monetary significance takes place in the REMIC. **I conclude that this corroborates my opinion that the investors, which have not been disclosed to the borrower** Ms. Caren J. **Wilson, are the creditors, having been the only parties to advance funds from which the subject loan was funded.**

20.    The note signed by said borrowers and the mortgage-backed bond[3] accepted by the investor who purchased said security are both evidence of the obligation. The Mortgage/Deed of Trust is intended to be incident to the note and possibly incident to the "BOND", **if the chain of title was perfected, which is not perfected  in this case, as mentioned above.**

21. **The Payee on the note and the payee on the bond are different parties.**
The bonds were issued with three principal indentures:
    (1) Repayment of principal non-recourse based upon the payments by obligors under the terms of notes and mortgages in the pool
    (2) Payment of interest under the same conditions and
    (3) The conveyance of a percentage ownership in the pool of loans, which means that collectively 100% of the investors own 100% of the entire pool of loans. **This means that the "Trust" does NOT own the pool or the loans in the pool** (This was admitted [4]of

---

[3] The borrower signed a *note* and the lender received a *bond*. Those are two different things. If someone let them continue with this fraud, then someone is giving houses to brokers who never put up a dime for the funding of the loan.

[4] Please see their admission under the "METHOD OF DISTRIBUTION" of Prospectus Supplement 424 (b) 5

11

Prospectus Supplement 424 (b)5 dated 12/06/2006 of "RALI Series 2007-QS1 Trust, et al. 424B5 · On 1/29/07Filed on 1/29/07 4:37pm ET · SEC Files 333-131213, -34    Accession Number 891092-7-238

It means that the **"Trust" is merely an operating agreement through which the investors may act collectively under certain conditions**. Accordingly, it is my opinion that the parties with standing in relation to a securitized loan are the debtor/borrowers and the creditor/investors **(which remained undisclosed in the present case Please see MERS record EXHIBIT D & E)**. This would be further corroborated if, as a matter of fact, the investment banker followed industry standing of selling the mortgage backed security FORWARD. **"Selling forward" means that the security was sold and the money was collected before the first loan was funded on behalf of the borrowers.** However, even if the investment banker had not closed the sale of securities with investors before accepting applications for loans, it would have been on the basis of expectation of said funding. **Ultimately, in all securitized loans there is really only one transaction ("ONE TRANSACTION THEORY") --- a loan from the investors to the homeowner.** Without an investor there would be no loan; conversely without a borrower there would be no investor or investment.

22.    It is accordingly my opinion that **none of the following parties are or ever were creditors and that they therefore lack standing as defined above**: Home Coming Financial LLC, ("Nominal Lender on the Deed of Trust and Note"), **Residential Funding Company, LLC** (Seller, Sponsor, who sold this loan to Residential   Accredit Loans, Inc, , for cash), Residential Accredit Loans, Inc ( which is Depositor, who sold this loan for cash to Citigroup Global Markets Inc, Morgan Stanley & Co, Residential  Funding Securities,  LLC ( who as  "securities underwriters" bought the loans for cash from Depositor and further sold these loans as certificate and bonds to Dealers/Agents for cash), The dealers/agents who in turn sold these certificates and bonds to investors for cash. "Deutsche Bank Trust Company Americas" as trustee for **RALI Series 2007-QS1 Trust**, just converted these loans into certificates/ bonds and sent them back to the Depositor, in a series of securitization transactions, pursuant to Pooling and Servicing Agreement, *nor* Dealers/Agents who are part of securities underwriter, as Securities Underwriter ,had at any time relevant to the subject matter before this Court, to the present, suffered any actual or threatened injury as a result of the Borrower's  non-payment of monthly payments pursuant to the

12

original terms of the Note, nor because of alleged default thereon, nor can any actual or threatened injury be traced to any other proceedings in any other court, any action involving Proof of Claim, or otherwise, and therefore there never was any legitimate redress available to any of these parties by a favorable decision.

23. Specifically, pursuant to the materials I have reviewed, which I have been asked to assume includes all evidence presented to the Court, along with my knowledge and experience involving securitized mortgages, and my training and knowledge and experience involving securitized mortgages, and my training and experience, it is certain that none of the parties mentioned in para "22" above, had at any time relevant to the subject matter before this Court, were the:

    A) Holder of the Note;

    B) Owner of the Note; or

    C) Party with the right to enforce the Note.

    D) Nor held any interest at all in the Property, Note nor Mortgage/ Deed of Trust at the time the action was initiated, or any time thereafter.

24. As it relates to the issue of the Real Party in interest, the factual criteria and the question I have presupposed is: "Whether any of said Creditors own financial interest was at stake in the outcome of the litigation before the Court." "My opinion is offered based on all evidence before the Court to date is as follows."

A) "Deutsche Bank Trust Company Americas" as trustee for "**RALI Series 2007-QS1 Trust**", in a series of securitization transactions, pursuant to Pooling and Servicing Agreement dated 12/01/2006, filed with SEC as EX-10 Filed on 02/15/2007 at 3:31pm ET as per SEC file # 333-131213-34 and Accession # 1382368-7-12, did not have any of its own funds at risk in the outcome of the litigation.

B) "Deutsche Bank Trust Company Americas" as trustee for "**RALI Series 2007-QS1 Trust**" as Trustee in my opinion was not, fully and completely authorized to appear as the named party on behalf of the Real Party in Interest, in a representative capacity for the investors in the securities for the above described and named Mortgage Trust Pool.

C) Also, the proof in the record is inadequate to establish that the ownership of the Note, holder ship of the Note, or right to enforce the Note was properly pooled to the above described Mortgage Trust Pool.

D) Accordingly, as the record stands the evidence does not establish "Deutsche Bank Trust Company Americas" as trustee for **"RALI Series 2007-QS1 Trust"** as being the Real Party in Interest, because the Trustee's duties were terminated, Trust was dissolved, due to the major trigger event of AIG Bailout, when the Toxic Assets were purchased by the Maiden Lane LLC as per "Asset Purchase Agreement" dated 12/12/2008.

E) Due to major trigger event, AIG Bailout and insurance proceeds from "MBIA", "Ambac" and many other insurance companies, the trust has been dissolved and the "Deutsche Bank Trust Company Americas" as trustee for **"RALI Series 2007-QS1 Trust"** is acting ultra-virus and committing civil theft.

F) Home Coming Financial LLC, ("Nominal Lender on the Deed of Trust and Note"), **Residential Funding Company, LLC** (Seller, Sponsor, who sold this loan to Residential Accredit Loans, Inc, , for cash), Residential Accredit Loans, Inc ( which is Depositor, who sold this loan for cash to Citigroup Global Markets Inc, Morgan Stanley & Co, Residential Funding Securities, LLC ( who as "securities underwriters" bought the loans for cash from Depositor and further sold these loans as certificate and bonds to Dealers/Agents for cash), The dealers/agents who in turn sold these certificates and bonds to investors for cash. "Deutsche Bank Trust Company Americas" as trustee for **RALI Series 2007-QS1 Trust**, just converted these loans into certificates/ bonds and sent them back to the Depositor, in a series of securitization transactions, pursuant to Pooling and Servicing Agreement, *nor* Dealers/Agents who are part of securities underwriter, as Securities Underwriter and MERS, are the parties whose own funds were at risk in the outcome of the litigation, and therefore none of them were a Real Party in Interest.

G) In terms of the real estate portion of the transaction, the homeowner was the Borrower and the Investor was the actual Creditor (which are still undisclosed to the borrower, **Ms. Caren J. Wilson** in this case).

H) The investor is still the Creditor **if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation,** or **paid through a federal program with or without subrogation.** Since no such instruments appear on record, any right of subrogation would appear to be equitable.

I) Thus for purposes of this declaration, the unknown and undisclosed Investors constitutes the only Creditor presumed to Exist until the undersigned is presented with contrary evidence of the type that an expert

14

in my field of expertise would normally take into account in forming opinions and conclusions.

J) Therefore I conclude that if there remain any Creditors, pursuant to the Note signed by **Ms. Caren J. Wilson**, they are the unidentified investors and **all other parties are intermediary or representative or disinterested.**

K) The borrower has made unsuccessful attempts to obtain from these entities and others, the identity of the lender, the documentation authenticating the identity of the lender, and an accounting from the lender as to all money paid or received in connection with the subject obligation.

L) Neither Affiant, nor Defendants, nor the court will be able to determine amount of the borrower's equity in the property **until a complete accounting of all debits and credits including but not limited to the third party payments referred above.** Until such time as requests for said information have been answered, I will be unable to identify with certainty the exact identity of the current creditor, meaning the true owner of the alleged obligation, **other than to say that it is not,** Home Coming Financial LLC, ("Nominal Lender on the Deed of Trust and Note"), **Residential Funding Company, LLC** (Seller, Sponsor, who sold this loan to Residential Accredit Loans, Inc, , for cash), Residential Accredit Loans, Inc ( which is Depositor, who sold this loan for cash to Citigroup Global Markets Inc, Morgan Stanley & Co, Residential Funding Securities, LLC ( who as "securities underwriters" bought the loans for cash from Depositor and further sold these loans as certificate and bonds to Dealers/Agents for cash), The dealers/agents who in turn sold these certificates and bonds to investors for cash. "Deutsche Bank Trust Company Americas" as trustee for **RALI Series 2007-QS1 Trust**, *nor* Dealers/Agents who are part of securities underwriter, as Securities Underwriter and MERS *as computer data base company,* or any participant in securitization chain are the parties whose own funds were at risk in the outcome of the litigation, **and therefore none of them were a Real Party in Interest**.

M) The only parties that can claim to be a Holder in Due Course of the note are those that paid value for the note, without knowledge that there were any pending challenges to its validity and who fulfill the other requirement for Holder In Due Course status. This HDC and third party sources are the only ones that could conceivable suffer a monetary or pecuniary loss resulting from the non-payment of the obligation.

N) The investor could lose if because they advanced the actual funds from which the financial product "LOAN" was funded, assuming these investors that purchased Asset Backed Securities were those in which ownership of the loans were described with sufficient specificity as to , at least express

15

the intent to convey ownership of the obligation as evidenced by the promissory note and an interest in real property consisting of security interest held by an entity that was described as beneficiary of the trust created by an instrument entitled, "Mortgage"/ "Deed of Trust".

O) These **Investors were not named, the practice has been intentional**, in my opinion, based on overwhelming commonality of this obvious reoccurring, obvious failure, and other overwhelming evidence. The THIRD PARTY SOURCES that could conceivably lose because they would have paid value prior to default or notice of default, and fall within one or more of the following classifications:

   1) Insurers that paid some party on behalf of said investor;
   2) Counterparties on Credit Default Swap;
   3) Conveyance or constructive trusts arising by operation of law through cross collateralization and over collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches; (Tranches is an industry term of art referring to the types of division within a Special Purpose Vehicle)
   4) The US Treasury Department through the Troubled Assets Relief Program in which approximately $ 600 Billion of $ 700 Billion has been authorized and paid to purchase or pay the obligation on "TROUBLED" (non performing) assets of the loans are part of the class of assets targeted by "TARP"
   5) The US Federal Reserve, which has extended credit on said troubled assets and has exercised options to purchase said troubled assets, through the Maiden Lane LLC as per "Assets Purchase Agreement" dated 12/12/2008;
   6) Any other party that has traded in Mortgage Backed Securities ("MBS") from the aggregated pools or securitized tranches containing interests in the notes

25.    I concur with the allegations that challenge the validity of endorsements and/ or transfers as they have been presented in the court to obtain relief, and I believe that there is good cause, **based on the totality of circumstances to challenge that the note was endorsed or otherwise properly transferred to the Mortgage Trust "RALI Series 2007-QS1 Trust" for which Deutsche Bank Trust Company Americas, was the Trustee.**

26.    In my opinion, it is unlikely that any Holder in Due Course ("HDC") exists, because of the way the securitization was universally practiced with in the Investment Banking Community during 2001-2009. Hence the loan product sold to the subject homeowner included a promissory note that was

16

evidence of real obligation that arose when the transaction was funded but
**lost its negotiability in the securitization process, which thus bars
anyone from successfully claiming "HDC" status,** such as by:

    i)    The negotiability of the note was negatively affected by;

        (1) The splitting of the note and Deed of Trust as described
herein;

        (2) by the addition of terms, conditions, third party obligors
and undisclosed profits, fees, kickbacks all contrary to
existing federal and state applicable statues and common
law; and Naming "MERS" as beneficiary on the Deed of
Trust, when "MERS" was not a creditor and there was no
name of the MERS on the Promissory Note signed by the
borrower, **Ms. Caren J. Wilson;**

        (3) Knowledge of title and chain of title defects in the
ownership of the note,

        (4) Beneficial interest in encumbrance, and position as
obligee on the obligation originally undertaken by the subject
homeowner.

    ii)    None of the known participants in the subject securitization chain,
including but not limited to entities mentioned above herein, has
suffered any financial loss relating to the loan, nor are they
threatened with any future loss even if foreclosure never occurs.

    iii)    None of the known securitization participants has ever been the
real party in interest as a lender or financial institution
underwriting a loan while funding the same with respect to the
loan.

    iv)    None of the known securitization participants will suffer any
monetary loss through nonperformance of the loan.

    v)    All of the known securitization participants received fees and profits
relating to the loans.

    vi)    The existence and identity of the real parties in interest was
withheld from the borrowers in the closing and servicing of the
loan, and since.

    vii)    All of the known securitization participants fail to meet one or more
of the following two tests required for Holder in Due Course ("HDC")
status:

        1) Without actual knowledge of defects; and/or

        2) In good faith, meaning a legitimate belief that the loan was sold,
based upon the information they had at the time of purchase of the
Note.

17

27.    In the case at bar, it is my opinion based upon a reasonable degree of
financial analytical certainty, that the total fees and profits generated were
actually in excess of the principal stated on the note which is to say that
investors unknowingly placed money at risk the amount of which vastly
exceeding the funding on the loan to the borrower.

28.    The only way this could be accomplished was by preventing both the
borrower, **Ms. Caren J. Wilson** in this case and the investor (still
undisclosed to **Ms. Caren J. Wilson**) from accessing the true information,
which is why the industry practice of the nominees and beneficiary( like
MERS) was created, when MERS was not creditor. Even where MERS is not
specifically named in the originating documents presented to the borrower
at the "closing" it was industry practice from 2001-2009 to utilize MERS
"Services", or to implement practices similar to those utilized by MERS.

**29.**    Therefore it is possible and even probable that the data from the closing
was entered into the MERS electronic registry and that an assignment was
executed to MERS purportedly giving MERS same power over the obligation,
the Note and/ or the encumbrance. As a general rule in securitized
transactions and especially where MERS is named as nominee, documents
of transfer (assignment, endorsement, etc) are created and executed
contemporaneously with the notice of default, **thus selecting a
participant in or outside the securitization chain to be the party who
initiates collection and foreclosures.**

30.    The Loan made to the borrower, **Ms. Caren J. Wilson** was part of a two
way transaction in which the two parties at each end thereof each
purchased a "FINANCIAL PRODUCT". On one end, the home buyer or the
refinancer was "Sold" a residential home loan. On the other end, the
Mortgage Bond was sold to an investor. In my opinion, both financial
products were securities **(Unregistered and unregulated Security)**. As
mentioned in the Prospectus 424(b) 5, "THESE SECURITIES HAVE NOT
BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND
EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR
HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE
SECURITIES COMMISSION", therefore the parties were selling the
unregistered and unregulated securities.

31.    **Neither set of securities were properly registered or regulated**, and
the information that would reveal the identity of the "LENDER" is in the sole
care, custody and control of the loan servicer or another intermediary
conduit in the securitization chain, including but not limited to the trustee
or depositor for the special purpose vehicle ("SPV") that re-issued the

18

homeowner's note and encumbrance as a "DERIVATIVE HYBRID DEBT INSTRUMENT " ("BOND") and equity instrument (Ownership of percentage share of pool assets, of which the subject loan was one such asset in said pool.

32.    Said Security, the Bond, **that was sold to an investor was done by use of borrower's identity and obligation without permission.** In my opinion, it is equally probable that the investors were kept unaware that a maximum of only 2/3 of their investment was actually going to fund Debtor /Borrower's loan and other similarly situated, with the excess being used to create instant income for participants.

33.    Borrower, **Ms. Caren J. Wilson** was, unaware that such large profits or premiums were being generated by virtue of her identity and signature on the purported loan documents.

34.    According to information's from the borrower, **Ms. Caren J. Wilson**, in this case, has made unsuccessful attempts to obtain from these parties and others the identity of the investor/creditor and possession documentation authenticating this identity. Neither Affiant, nor the court will be able to determine the identity of the creditor, if any still remains, until requests for information and documentation have been complied with.

35.    It is also my opinion, that there is a very high probability that all or part of the Borrower's Note was paid in whole or in part by the third parties, based upon the industry practice, my personal review of hundreds of similar transactions including the one at bar, and the published reports. Until such time the identity of the creditor, the document trail, and precise money pertaining to payments by third party sources is disclosed, neither Affiant, nor the court will be able to determine the amounts of borrower's equity in the property.

36.    Borrower's "OBLIGATION" is the amount of the money owed to the creditor, which are none of the entities involved in this case. **The obligation originated with the advance of capital by the investor who purchased mortgage backed securities and ended with the promise to pay by the homeowner who is borrower in the transaction**. The securitization chain obscures the fact that the investor was the creditor to the homeowner/ borrower.

37.    Further, based upon repeated interactions with servicers across the country and specific documents reviewed in this case, it is highly unlikely that any of the current parties in litigation have or desire to have any knowledge of third party debits or credit transaction in the securitization chain of the transaction originated from the subject of this action.

19

38. Hence, based upon the industry practice, it is my opinion that it is far more likely than not they would be ignorant of the true status of the amount of principal or interest due, if any on the subject obligation.

39. Whether the Borrower's note is or ever was in default, a fact that can only be known by the real creditor, the investment bank that is the party in charge of the securitization management decisions. Based upon experience with the parties claiming an interest in the financial product sold to the homeowner in this case and their behavior and method of operating as demonstrated in other case, it is my opinion that none of the participants, with whom the borrower had contact, individually or collectively, has knowledge, or has done due diligence to determine the existence of a default as to the creditor, nor whether as a factual matter, the Note, Mortgage/Deed of Trust or obligation has been extinguished or paid in whole or in part by co-obligors, insurers, Federal bailouts and / or etcetera.

**40.** The reason "as a factual matter" is emphasized is that Investment Bank in charge of the entire security, **never intended to credit any borrowers accounts for payments by these third parties sources.** Considering the fact that Affiant is aware of many dozens of times in which there is a pending action to enforce a mortgage and to foreclose upon the home in which information providing the identity of the creditor and the fact that third Party payments have been made on behalf of borrower's obligation, **it is my opinion that this behavior is intentional and designed to obscure the facts long enough for the court to presume that the action taken to collect on the debt or foreclose on the home was reasonable and proper.**

41. It is in my opinion that many different parties in the securitization chain came to express title or claim right to enforce the Mortgage/ Deed of Trust and Note and that **there was an intention to split the Note from the Deed of Trust,** while heretofore unusual in the market place was common place in securitization of residential loans.

42. The recorded **encumbrance was never effectively or constructively transferred because it was never executed in recordable form nor was an effort made to create such document by the parties to the instant case until they decided to pursue foreclosure.** All transfer or purported transfers because the Mortgage/Deed of Trust interest as recorded remained in the name of the originator, or that party defined as "NOMINAL LENDER" in the Note and Deed of Trust. Virginia Mortgage statues require that every change of beneficiary interest in Mortgage to real property to be recorded.

43. Virginia recording statues require that every change of beneficiary interest in a Mortgage to real property to be recorded to be enforceable

20

against a bonafide purchaser for value without notice of a competing claim. Hence, in my opinion, that the holder of the Note, either Singular or plural, were not the same parties as those who purportedly held the Mortgage at any time pertinent to this case and that was the result that was intended by the mortgage originator (nominal lender) and the participants in the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009.

44.    In my opinion, with high degree of certainty, **the Borrower's title was and is subject to a cloud on title,** a claim of unmarketable title and possibility **a title defect that cannot be cured without the court order as a result of the manner in which borrower's loan was securitized.** In all cases reviewed by me, which include more than 50 securitization chains, the prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by the real estate, and sometimes as not being secured by the real estate, depending on the context and purpose of the accounting.

45.    The naming of the party[5] other than the investor as Beneficiary under the Mortgage as distinct from a third party named as Payee on the Promissory Note and the same or other third party named as Beneficiary under the policy of the title insurance **demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Mortgage/Deed of Trust,** thus creating the cloud  on the title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

46.    I have also reviewed, for the past many years, published financial accounting standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, Securities issuance and securities sale and trading. **If the known parties in securitization scheme followed the rule, they did not post the instant transaction as a loan receivable[6].** The transaction most likely was posted on their ledgers as fee income or profit which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transaction was posted on or off the books of the ledger originating entity. **These entries adopted**

---

[5] MERS when MERS is not creditor and there is no name of MERS on the Promissory Note
[6] The Trust is for the current receivables and when the loan is in default it is thrown out of the trust.

21

**by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet, or on the ledgers used to prepare the balance sheet, but rather shown on the income statement as fee for service as a conduit.** These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own names on their own behalf, including but not limited to the securitization participants in this case.

47.    It also appears that the standard industry practice of creating a yield spread premiums between the creditor and originator was extended in the case of securitization chain such that in this case, in my opinion, it is highly probable, for beyond 50% probability that the borrower's loan was sold or presold to the investors at a gross profit to the participants in the securitization chain of at least 35% of the total principal balance of the note. It is also my opinion that this was done without full disclosure to the investors and that is tantamount to fraud upon the investors.

48.    In my opinion the investors were and remain completely unaware that much, and in many cases most of the money they supplied was used to fund fees for the participants in the securitization chain, with the rest used to fund bloated mortgage loans based upon inflated appraisals by companies that had a less than an arm length relationship with the originator and others involved in obtaining approval for the loan. These yield spread premiums far exceed those ever paid prior to the securitization of the residential mortgages. With yield spread premiums such as these, there was no way that there could ever be a legitimate profit made by any investor under ordinary circumstances, with the exception of those in upper tranches, whose profit was insured from the start, no matter how lacking in viability were these investment vehicles on the whole, because of the way payments to the investors were prearranged.

49.    It is also opinion that **the overall security was planned by the aggregator and other participants to fail from the start.** The reason for the intended failure of the overall pool in my opinion was to better insure that the fraud perpetrated on the investors would be less likely to be discovered and to make it so that additional unearned profit could be made by the aggregator and the other participants, based on the third party payments discussed above that were payable only when there was a declaration of default by the pool, often called a "trigger event". **[This trigger event caused the trust, "RALI Series 2007-QS1 Trust" to dissolve, thus terminating the duties of Trustee, "Deutsche Bank Trust Company Americas")**

50. In my opinion, the allegations regarding the fraud and conversion, as well as intentional aiding and abetting or conspiracy are well known. The theory that each participant, including the very first party in the securitization chain, the lender on the Mortgage/Deed of Trust, is complicit in acts and series of acts with the knowledge that these actions will harm the borrowers, including fraud and conversion, and/ or are part of a scheme to commit fraud in the form of not crediting borrowers account by the third parties source payments, thereby converting ownership of the property from the borrower, the plaintiff in this case, is well respected among those that study transactions of this sort.

51. The following are types of wrong performed upon borrowers, at least some of which occurred with the Borrower, **Ms. Caren J. Wilson**, in this case, by loan brokers and originator " Home Coming Financial LLC" in the original Mortgage/Deed of Trust), which were acts in furtherance of an overall fraud and conversion scheme that were necessary to its success, because without a large number of loans doomed to fail from the start the main planner and major participants could not be certain that the mortgage pools as whole would fail.

a) The fact that the Borrowers paid as much as double what the homes were actually worth, due to a real estate market that was artificially inflated because of the wealth of investment dollars looking for a home following the bursting of the dot.com bubble, followed by what amount to an economic depression for the working poor.
b) Borrowers cannot afford the payments and they are losing their homes, and the unbelievable abundance of foreclosures shows the extent to which any defect in character they may have in common to large numbers of persons.
c) Appraisal values were often over-inflated even above the artificially high values provided by the market and appraisers were advised they would not receive further business unless they cooperated.
d) Borrower was misled as to what the monthly payments would be a few years into the loans.
e) In more extreme cases, borrowers were often offered teaser rates that they qualified for, but which greatly increased within a very short period of time.
f) There was so much investment money looking for someone to borrow it that could sign a note during this time, that loans were pushed at people with persuasive and high pressure tactics;
g) Borrowers were advised that they could afford much more home then they really could. It appears hard to resist a home that is much nicer

than one thought they could afford, when someone that appears to be reputable professional assures them they can afford. Optimism and wishful thinking overpower reason.

h) Loan brokers were pushed to offer loans that were on worse terms than the borrowers could qualify for. Sometimes they received higher commissions, often in secret (Yield Spread Premiums "YSP"), for getting people to take out loans on terms that were less beneficial than a loan that borrowers would have qualified for. And sometimes the only loan products that loan brokers had available to them were those containing unfavorable terms.

i) Borrowers were advised that they did not have to worry about the payments being unaffordable in the future, because they would be definitely be able to refinance again at that point, because was so solid.

j) Underwriters were pushed by their supervisors to pass through bad loans, many of which were obviously doomed to fail from the start.

52.    These undisclosed yield spread premiums ("YSP Tier-I, II and III") are a liability of the participants in the securitization chain, including the loan originator and all participants owed to Homeowner /Borrower. **In my opinion, this disclosure does not appear on any of the Homeowner's documents identifying the parties participating in fee – splitting or yield spread premiums nor the amounts involved as required and other Federal and State laws.** Further, no information appears in debtor's closing documents that would have caused him to inquire about such a premium.

53.    Questions as to statute of limitation would not be applicable on a number of theories, including, but not limited to: fraud tolls the statute of limitations; until the name of the true creditors, lender, and beneficiary is made known to the borrower, the statute of limitations time frame does not begin to run.

54.    A MBS Pool Trust, "**RALI Series 2007-QS1 Trust**" is not really a "TRUST". The Trustee, "Deutsche Bank Trust Company Americas" thereof has been involved in a joint enterprise with the other participants in the creation of "Financial Product" for sale to the investors, the purchasers of "Mortgage Bonds". The so called pool "Trustee" is more like an administrator (In the present case admitted in Pooling and Servicing Agreement dated 12/01/2006 filed as Exhibit 10 with the 8K report, filed on 02/15/2007 at 3:31pm ET as per Securities and Exchange File # 333-131213-34 and Accession # 1382368-7-12.

55.    The first loyalty of the pool trustee, "Deutsche Bank Trust Company Americas is not to the investors, but to the parties (Residential Accredit

24

Loans, Inc., as depositor, **Residential Funding Company, LLC**, as a seller&
Sponsor, Residential Funding Company, LLC, as master servicer (the
*"Master Servicer")*, Citigroup Global Markets Inc, Morgan Stanley & Co,
Residential Funding Securities, LLC (Securities Underwriters) to which it
entered into contract with, the participants. Based on its actions as can be
seen over and over again, it seems it is more interested finding ways not to
reimburse the investors than find ways to do so.

56.   In securitization of the loans, the rights of various named mortgagees,
assignees and/ or trustees has each been superseded by succeeding
conduits including the alleged trustee or officer of the Special Purpose
Vehicle (SPV) that issued bonds to the investors who at least at some point
in time material to the subject transaction with the homeowner in subject
transaction was holder of Mortgage Backed Security (MBS).

57.   The power of said officer or Trustee, "Deutsche Bank Trust Company
Americas", is limited to only what the certificate holders authorize. These
have also admitted in pooling and Servicing Agreement, dated 12/01/2006
under the "Duties of Trustee" (filed as Exhibit 10 with the 8K report, Filed
On 2/15/07 3:31pm ET  SEC File 333-131213-34
Accession Number 1382368-7-12

58.   It cannot be overemphasized that the investors were not signatories to
the securitization documents. Only the participants were. The transaction
with the investor in which they advanced "LOAN" money for the subject
homeowner's product, was consumed most likely before the transaction
with the homeowners or **was subject to binding agreement between
various participants in securitization scheme that pre-dated the
transaction with the homeowner.**

59.   Therefore the actual undisclosed Creditor was the investor who advanced
the cash and who was known by the securitization participants. And
therefore was the only party entitled to claim first lien either legally or under
equitable subrogation.

60.   Accordingly, the only potential party to a foreclosure wherein the
purported creditor alleges financial injury and therefore a right to collect the
obligation, enforce the note or Mortgage/Deed of Trust is either a party who
has actually advanced cash and stands to lose money or an authorized
representative who can disclose the principal, provide proof of service or
notice and show such express, unequivocal and complete authority to
perform all acts and make all decisions without condition.

61.   In my opinion, any condition placed upon the trustee to act for the MBS
Pool Certificate Holders, including the power to enter into any compromise,
makes the Trustee, "Deutsche Bank Trust Company Americas" something

less than a Real Party in interest on behalf of the certificate Holders.(Now
the Trusts have been dissolved)

62.    Also, a party must be present that is answerable to the claims,
affirmative defenses and counter claims of the homeowners for such causes
of action or defenses as might be applicable or they would be blocked
potentially by collateral estoppel if the court determined that the foreclosing
party was acting within the scope of its agency for principal, the certificate
holders.

63.    In my opinion, as above, and with a reasonable degree of factual and
certainty, the disclosed principals in the securitization chain, up to and
including the pool trustee (Deutsche Bank Trust Company Americas), are
neither creditors nor are they authorized agents for the creditors, without
proof that they have been granted this authority pursuant to the terms of
the securitization documents.

64.    Otherwise, **the participants, including servicers and pool trustees, in
my opinion, are interlopers or imposters whose design is to take title
to the property they have no right to claim, and to enforce a note
which is evidence of an obligation that is not owed to them but rather
to another.** The details of this information , whether the Special Purpose
Vehicle still exists, whether the investor has been paid in full through
"THIRD PARTY PAYMENTS" are known only to these securitization
participants and therefore undisclosed investors. And the participants have
demonstrated time and time again that they are not credible.

65.    In my opinion the attorneys for the known securitizations participants do
not have any authority to represent the creditor, and could not represent
them due to the obvious conflict of interest, to wit: the investor upon
learning that a substantial amount of their advance of cash was pocketed by
the intermediaries and now is left with  the mortgage whose nominal value
is far below what was paid, and whose fair market value is far below the
nominal value, would have potential substantial claims against the
securitization participants for fraud, conversion, breach of contract, and
other claims.

66.    Fraud upon investors in relevant to borrowers because it  is additional
evidence  of an overall fraud and conversion scheme against  borrowers,
because it tends to show  motive and intent in the fraud and conversion
claims by the borrowers.

26

67.    Dismantling of "QSPE" [7]/ "TRUST" (**RALI Series 2007-QS1 Trust**) and consolidation of Bank's Balance sheets demonstrate the falsity of foreclosures. Assignments to a Trust is now gone. Mezzaine Tranches are locked out long before their time, market collapsed due to the trigger events topped, when cumulative losses on the mortgage are higher than the certain level and delinquency event occurred and as a result of credit default swaps payments[8] were executed, senior tranches were paid and nothing remained for the Mezzaine Tranches, who were already getting nothing as these were locked out, the trust was dissolved;

    a)    No payments are owed to any certificate holders (Tranches) or synthetic security holders (derivatives)

    b)    How can a fabricated document are formalized to trust after dissolution of TRUST.

    c)    Fabricated documents to a Trust that no longer function and for which "TRUSTEE[9]'S DUTIES" have been TERMINATED

    d)    Currently no distribution to certificate holders, even for the "CURRENTLY PAYING MORTGAGES".

    e)    Payments are not being directed to the original designated trust, "**RALI Series 2007-QS1 Trust**" in Plaintiff's case, because the trigger event and payments of credit default swaps, insurance proceeds, caused its demise.

    f)    Since Trust has been dissolved and Deutsche Bank Trust Company Americas, is no more Trustee, has acted wrongly in regard to the issue at hand and now acting without any standing, "those seeking equity must do equity"

    g)    The True Sale is from Depositor (Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC.) to the Securities underwriters, which are Citigroup Global Markets Inc, Morgan Stanley & Co and Residential Funding Securities, LLC, and not to the Trustee which is Deutsche Bank Trust Company Americas in the present case.

---

[7] Maiden Lane Transactions, Maiden Lane LLC, Maiden Lane II LLC, Maiden Lane III LLC, Federal Reserve Statistical Release". Federal Reserve-Bank of New York August 10, 2010. http://www.federalreserve.gov/releases/h41/Current/, "SIGTARP Report 10-003 - Factors Affecting Efforts to Limit Payments

[8] Maiden Lane III LLC (a Special Purpose Vehicle consolidated by the Federal Reserve Bank of New York) (the "LLC") is a Delaware limited liability company that was formed on October 14, 2008 to acquire Asset-Backed Security Collateralized Debt Obligations ("ABS CDOs") from certain third-party counterparties(Banks) of AIG Financial Products Corp. ("AIGFP"). In connection with the acquisitions, the third-party counter parties (Banks) agreed to terminate their related credit derivative contracts with AIGFP.
[9] Deutsche Bank Trust Company Americas  et al

68. Borrower's obligation, from prior to its inception;
   a. Was destined for a transition to a Mortgage Backed Security. This was never disclosed, to borrower.
   b. It was never conveyed that the obligation was going to be converted to bond and forever separated from the security (Title) that borrower; **Ms. Caren J. Wilson** gave as collateral.
   c. It was never disclosed that future assignments and sales would not be recorded in the Culpeper County Lands Record.
   d. It was never disclosed that the lending institution (Home Coming Financial LLC) had been involved in this practice for several years prior to borrower's signing of the note and that all the actors were already in place. Prospectus Supplement filed with the SEC as per, dated 12/06/2006 ("ProS") filed with the SEC, file # Filed On 01/29/2007 at 4:37pm ET, SEC File 333-131213-34 , Accession Number 891092-7-238) and borrower **Ms. Caren J. Wilson** signed the settlement papers on 12/13/2006.
   e. It is quite possible, given the number and frequency of the MBS offerings by Home Coming Financial LLC, that this loan was a "table funded loan", where the nominal lender, Home Coming Financial LLC, in this case never even put up any funds and the loan was prefunded by the bond offering. **(Money was aggregated first)** This "prefunding" being something that is addressed in the Prospectus issued by Depositor, Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC.
69. Based on the fact that the obligation was sold, on 01/23/2006 (11 months before) into the **RALI Series 2007-QS1 Trust**, according to SEC filings, and prior to Plantiff's first scheduled loan payment due on 02/01/2007 (S-3 Registration Form filed by Residential Accredit Loans with Securities and Exchange Commission as per SEC file # 333-131213 on 01/23/2006 and declared effective on 03/03/2006, of Mortgage Asset-Backed Pass-Through Certificates, RALI Series 2007-QS1)
   a. It is easy to surmise the intent was in-place prior to closing of the obligation.
   b. Given the sequence with which borrower, **Ms. Caren J. Wilson's** obligation was transferred, by the various actors involved in the bond offering of the, "**RALI Series 2007-QS1 Trust**", it is easy to apply the Step-transaction doctrine to see that this was the intent from the very beginning and should have been disclosed, to **Ms. Caren J. Wilson** when she signed the documents at closing;
   c. Step-transaction doctrine is a principle applicable to Taxation laws. According to this principle effect should be given to the substance, rather than the form, of a transaction, by ignoring for tax purposes steps of an integrated transaction that when taken separately are without substance. In short, the tax

28

liability should be determined by viewing the transaction as a whole, disregarding one or more non substantive, intervening transactions taken to achieve the final result.

d. This doctrine expresses the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling. The U.S. Supreme Court has expressly sanctioned the step transaction doctrine in many cases, noting that interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction.

e. Courts generally enunciate three basic tests that define the criteria upon which application of the step transaction doctrine applies;

    a) The interdependence test,

    b) The end result test and the binding commitment test.

    c) The interdependence test requires an inquiry as to whether the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. The end result test examines whether it appears that separate transactions were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result. The binding commitment test examines whether there was a binding commitment to undertake the later step in a series of transactions. [Falconwood Corp. v. United States, 422 F.3d 1339 (Fed. Cir. 2005)]

70.    Because of the IRS rules, regulations and Taxation laws relating to REMIC's it is a necessity on the part of the various actors in the securitization process that there must be a de-recognition of the assets (obligation) and thus a TRUE sale of the obligation. This is also a requirement of General Acceptable Accounting Practices (GAAP) as well as FASB Statement No.140.

71.    The questions that beg to be asked are; 1) Since the loan with the earliest payment to the trust was months prior to borrower **Ms. Caren J. Wilson's** Mortgage, why wasn't it revealed to borrower on 12/13/2006, at closing that the obligation was intended to be put in a MBS? **Was there fraud committed at the closing by this failure to disclose?**

i. That fraud was perpetrated from the very beginning.

ii. There was NO disclosure as to the intent of Home Coming Financial LLC and **Residential Funding Company, LLC** (seller and sponsor) to sell the loan and assign the Mortgage to Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC. (A bankruptcy remote shell company), sold the loan and assigned the Mortgage to Deutsche Bank Trust Company Americas (trustee). The trustee then repackaged several thousand loans together and sold them as a BOND offering to

Citigroup Global Markets In, Morgan Stanley & Co, Residential Funding
Securities, LLC (Securities Underwriters).

iii. **When this was done the obligation (note) was separated from the
security (Mortgage/Deed) and thus unperfected.**

iv. Citigroup Global Markets In, Morgan Stanley & Co, Residential Funding
Securities, LLC (Securities Underwriters), then made the offering of sale
of the "NO RECOURSE" bond available to the market place.

v. The bonds are exchanged with an underwriter (Citigroup Global
Markets In, Morgan Stanley & Co, Residential Funding Securities, and
LLC) for cash. The underwriter then sells the securities to investors,
through the Dealers and Agents for cash."

vi. Only the subordinate tranches were sold first — while the
"Underwriter" — kept most of the senior pass through securities.

vii. The "holding" of the note — STOPS — with the Depositor (Residential
Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC)

viii. Only a "pool" of cash rights is "sold" in the securitization process. At the
very least, the "Holder" theory would be with the TRANCHE owners —
which are, primarily, the security underwriter (Citigroup Global Markets
In, Morgan Stanley & Co, Residential Funding Securities, LLC)

ix. At that point it was sold to several entities which Residential  Accredit
Loans, Inc., an affiliate of Residential Funding Company, LLC,  was
required to disclose to the SEC. (Securities and Exchange Commission).
These investors, by all rights of logic, would now be the "Holder in Due
Course" of the obligation minus of course the security due to the
separation committed by the actors in the PSA.

x. Harm has been committed on the Title to Plaintiffs property in that it
has been **"clouded"** by the actions of these actors, they have **failed to
maintain a "PERFECTED LIEN",** and by the very fact of the
methodology of the PSA they knew from prior to the inception that they
were going to bifurcate (separate) the note from the obligation and were
going to hide this fact behind a wall of secrecy.

72. First the act of closing a loan wherein the lender is not revealed
invalidates or destroys the note even though acceptance of the money
creates an obligation. **The question is to whom that obligation is owed.**
Second by **"securitizing the receivable according to terms far different
than the note ever recited,** the **description contained in the note
becomes increasingly remote from a proper description of the
obligation,** which **keeps changing as the receivable, not the note, moves
up the securitization chain.** Thus the receivable — the actual obligation
that the note purported to describe — keeps changing while the note
remains the same and **the original note never moves physically by
delivery, transfer documents (endorsement, assignment etc.)**

73. Thus the point is that the note is destroyed by operation of law.

74. The formation of the Maiden Lane LLCs in 2008 occurred during a time
of severe economic distress in the United States. The sharp deterioration in

30

the U.S. housing market in 2007, led to a loss of confidence in the value of mortgage-related products and in the financial institutions with exposures to these products. The ensuing funding pressures on a range of financial institutions and strained liquidity conditions across the financial system led the Federal Reserve to take a series of unprecedented policy actions to contain the broader risks the financial crisis posed to the economy. Among these actions, the Federal Reserve Board authorized the Federal Reserve Bank of New York (New York Fed) to form three limited liability companies under **Section 13(3) of the Federal Reserve Act** to facilitate lending in support of specific institutions.

75.    **Maiden Lane I LLC: Purpose:** ML LLC was created to facilitate the merger of JP Morgan Chase & Co. (JPMC) and Bear Stearns Companies, Inc. (Bear Stearns) by purchasing approximately $30 billion in assets from the mortgage desk at Bear Stearns. The New York Fed lent ML LLC approximately $28.82 billion.

76.    **Maiden Lane II, LLC: Purpose:** ML II LLC was created to alleviate capital and liquidity pressures on American International Group Inc. (AIG) stemming from its securities lending program by purchasing $20.5 billion in residential mortgage-backed securities (RMBS) from several of AIG's U.S. insurance subsidiaries. The New York Fed lent ML II LLC approximately $19.5 billion

77.    **Maiden Lane III, LLC: Purpose:** ML III LLC was created to alleviate capital and liquidity pressures on American International Group Inc. (AIG) stemming from credit default swap contracts by purchasing $29.3 billion in multi-sector collateralized debt obligations from certain counterparties of AIG Financial Products Corp. (AIGFP), enabling AIGFP to terminate the associated CDS. The New York Fed lent ML III LLC approximately $24.3 billion.

78.    The U.S. Treasury is reported to own $4.6 TRILLION in mortgage bonds, which would make it the creditor in millions of homes that; (a) have already been "foreclosed"

(b) Are in "foreclosure" or

(c) Going to be foreclosed. Yet not once in any court action is the U.S. Treasury named as the creditor or having any interest in any mortgage. They paid 100 cents on the dollar to save the big powers, Deutsche Bank et al and many more on Wall Street (ignoring the smaller players who had played fair and square) and now they are going to test the market by starting to sell these mortgage bonds back into the marketplace.

31

79.    Why the government's programs have been so anemic in confronting the fraudulent, illicit and immoral behavior of Deutsche Bank et al and many more on Wall Street and the pretender lenders out there foreclosing on homes they never financed, you don't have to look any further than the $4.6 TRILLION that the government says it is holding in mortgage-backed bonds that are backed by fatally defective and fraudulent mortgages and notes.

80.    If the government were to tell the truth the way should be done, then the government would have to admit that

(a) Under the best case scenario they spent 100 cents when the speculative value was only 2-3 cents and

(b) There is something fundamentally wrong with the mortgage backed bonds and the underlying fatally defective, fraudulent mortgages and notes. THAT WOULD AMOUNT TO ADMISSION THAT THE TAXPAYERS GIFTED $4.6 TRILLION TO WALL STREET.

81.    To put this into perspective: 7 million homes have been fraudulently sold at auction on credit bids submitted by non-creditors. Not one penny was paid at these auctions or any money before that because the bidder never lent any money nor did they purchase the receivable. The bidder was paid as a stand-in for the undisclosed and potentially unknowable creditor just like the "loan originator" was paid to stand in as the lender.

82.    Applying the $4.6 TRILLION from the U.S. Treasury to cover losses to investors and homeowners caused by fraudulent appraisals, fraudulent ratings, and deceptive lending practices, (instead of giving the money to Deutsche Bank Trust Company Americas et al and many more on Wall Street) would have allowed an average of $657,142 to be applied on each so-called mortgage transaction providing more than enough to provide substantial relief to investors, and correcting the bogus loans to fair market value levels, thus leaving the investors where they intended to be and the homeowners where they intended to be. Oops!

83.    U.S. Treasury maintains the illusion of authenticity of the mortgage bonds and the mortgages, obscures the identity of creditors in foreclosures, and continues to indirectly prop up balance sheets of mega institutions on Wall Street. The true value of the group is not as reported but more like a negative figure. Let it fall, and do what is right for investors and homeowners and the economy is largely fixed. Continue with current policy and our credibility in world markets will continue to erode. I'm not the only one who figured this out. Central Bankers and world economists understand this perfectly well.

84.    Further affiant saith not

This concludes this Sworn, Declaration made under penalty of perjury" on this day _01ST_____, of _July_____2011.





M. Nawaz Raja

Mortgage Forensic Auditor

42907 Parkbrooke Court

Broadlands Virginia 20148

(540) 687-0004

therajafamily@gmail.com

State of _VIRGINIA_

County of _LOUDOUN_

Acknowledged, subscribed and sworn to before me this _01_ day of _July_ 2011

Notary Registration Number: _7042295_    Notary Public: _____

My Commission Expires: _1/31/2014_

SEAL

> JOSEPH LINDSEY STARK
> Notary Public
> Commonwealth of Virginia
> 7042295
> My Commission Expires Jan 31, 2014

33