**Hearing Date: January 30, 2014 at 10:00 a.m. (ET)**

**KRIGEL & KRIGEL, P.C.**
4550 Belleview
Kansas City, MO 64111
Telephone: 816-756-5800
Facsimile: 816-756-1999
**Erlene W. Krigel**
**Counsel for Creditor**
**Becky A. Spence**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| RESIDENTIAL CAPITAL LLC, et al., | )   Case No.  12-12020 (MG) |
| | )   Chapter 11 |
| Debtor. | )   Jointly Administered |

CLAIMANT BECKY A. SPENCE SUPPLEMENTAL RESPONSE TO DEBTORS'
OBJECTION TO HER PROOF OF CLAIM NO. 3835

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Becky Ann Spence, a Claimant herein, by and through her attorneys, provides the following Supplemental Response in support of her Proof of Claim, No. 3835.  This Response supplements her earlier Response (Docket No. 5897) and responds, in part, to Debtors' Objection to the Proof of Claim (Docket No. 5105) and Debtors' Reply to Response dated December 13, 2013 (Docket No. 6090), as follows:

1.	Homecomings Financial LLC ("Homecomings") was the mortgage lender for Becky Spence ("Spence") for the properties listed below:

3871 S. Cottage, Springfield, MO

3864 S. Cottage, Springfield, MO

3870 S. Cottage, Springfield, MO

2770 W. LaSalle, Springfield, MO

3877 S. Homewood, Springfield, MO

1061 E. Gaslight Dr., Springfield, MO

1413 W. Glenwood, Springfield, MO

Spence was required to pay monthly mortgage payments to Homecomings.

2. The Deeds of Trust held by Homecomings did contain a provision for an assignment of the rents.

3. In the case of *In re Title Guaranty Trust Co.*, 113 S.W.2d 1053 (Mo.App. 1938), the Court held that

"[W]hen the Commonwealth Farm Loan Company purchased the farm at the foreclosure sale, it did it subject to the lien of the note holders' first mortgage, which mortgage however contained no **assignment** of **rents**. In Missouri a mortgage or **deed** of **trust** is treated as a mere security for the payment of the debt and not as an outright conveyance of the title.  Allen v. Pullam, 223 Mo.App. 1053, 10 S.W.2d 64; Missouri Real Estate & Loan Co. v. Gibson, 282 Mo. 75, 220 S.W. 675. Absent an **assignment** of **rents**, the **rents** and profits of the land are incident to the possession; they belong to the person in **rightful** possession by himself or tenants. As was held in Grafeman Dairy Co. v. Mercantile Club, Mo.Sup., 241 S.W. 923, 927, "in the absence of a stipulation in the mortgage to the contrary, the mortgagor is owner to all the world, and is entitled to the rents and profits until the mortgagee enters into the actual possession, or takes some equivalent action."

The law in Missouri is clear that Homecomings had no right to claim an interest in the rents at a time when Spence owned the properties until Homecomings took the appropriate action to assert its right to the rents.  In Missouri, that action requires either possession of the property or an action equivalent to possession.  Case law holds that the lender must give the tenant a written notice of its demand for the rent. The notice must provide the tenant with enough information for the tenant to know who to pay and where to send the payment.  See *In Re Northwest Commons, Inc.*, 136 B.R. 215 (E.D. MO 1991).

4. Homecomings sent a representative to the properties and orally notified the tenants that they should no longer pay rent to Spence.  The representative failed to advise the tenants to whom the rent should now be paid, the address of where to send the rent payments, and when the payments needed to be made.  By giving an insufficient notice, Homecomings failed to "take possession of the property or to take some equivalent action".  *In Re Northwest Commons, Inc.*, supra.

5. As a consequence of this action, the tenants stopped paying Spence but did not pay Homecomings as the tenants did not know who to pay or where to send the payments.  It followed that without the rents, Spence had no chance of making the mortgage payments (or bringing the loans current).

6. Clearly, Homecomings interfered with Spence's contractual rights with her tenants by demanding that the tenants stop paying Spence. The leases that Spence had with her tenants provided for the tenants to pay her monthly rent. Prior to the demands made by Homecomings' agent, the tenants were paying their rents on a regular basis to Spence. With these rents, Spence paid for the maintenance of the properties, and until fairly recently (before the spring of 2008) had been paying the mortgage payments to Homecomings.

The wrongful actions of Homecomings by interfering with the contractual relationship between Spence and her tenants constituted tortious interference with contract. The elements of this tort include: there was a contract in existence (the leases), Homecomings had knowledge of the leases, Homecomings induced the tenants to stop paying Spence by visiting each tenant and advising them to stop paying Spence, Homecomings' actions were not justified and thereby Spence was damaged. See *Smith v. Standard Oil, Division of Amoco Oil Co.*, 567 S.W.2d 412 (E.D. MO Ct. App. 1978).

The absence of justification by Homecomings was twofold. First, it failed to give adequate notice and therefore did not have possession of the properties nor took equivalent action. Second, it failed to properly foreclose as set forth in paragraph 10 herein.

Missouri bankruptcy courts have recognized tortious interference with contract. In *In Re Kroh Brothers Development Company*, 91 B.R. 525 (W.D.MO 1988), the Bankruptcy Court held that a lender could tortiously interfere with a debtor's contractual rights with its tenants. The Honorable Arthur Federman represented the Debtor in that case. The Bankruptcy Judge recognized the Restatement of Torts (Second) Section 766.

7. After the agent for Homecomings advised the tenants to stop paying Spence, the tenants received a certified letter addressed to Spence which advised of the foreclosure sales on May 7, 2008.

8. Spence spoke with multiple Homecomings' representatives (Mary Taylor, Loss Mitigation, Gwen Hill, Kelley, Damion, Recovery, Customer Service is how she identified the representatives) and the cumulative time spent on the phone with Homecomings can be measured in hours.

9. As a consequence of Spence's numerous phone calls, the properties were not foreclosed on May 7, 2008 because Homecomings agreed to cancel the sales. Subsequently, between May 20 and May 23, 2008, South & Associates, the foreclosing attorneys, faxed Spence letters which provided reinstatement quotes for the purpose of avoiding foreclosures for all of these seven (7) properties. Spence was given until June 9 through June 17, 2008 to pay the reinstatement amounts for these seven (7) properties.

10. Homecomings canceled the sales. They were not continued. Missouri Revised Statute 443.355 allows a lender to continue a sale but only for a maximum of 7 days. The lender is allowed to cancel a sale and commence a new sale but only in compliance with Revised Missouri Statute 443.310-.325. These provisions require the lender to re-advertise the sale (as was done for the initial sales in May, 2008). See attached Trustee Deeds as Exhibit A which evidences the dates of publication were the publications for the original sales (not the ultimate sales that occurred in June and July, 2008). The second sales were held as follows:

3871 S, Cottage: 1st sale date canceled: 5/6/08. 2nd sale date 6/11/08

3877 S. Homewood: 1st sale date canceled: 5/7/08. 2nd sale date 6/11/08

3864 S. Cottage: 1st sale date canceled: 5/7/08. 2nd sale date 6/11/08

3870 S. Cottage: 1st sale date canceled: 5/7/08. 2nd sale date 6/11/08

2770 W. LaSalle: 1st sale date canceled: 5/7/08. 2nd sale date 6/11/08

1061 E. Gaslight: 1st sale date canceled: 6/25/08. 2nd sale date: 7/25/08.

1413 W. Glenwood: 1st sale date canceled: 6/25/08. 2nd sale date: 7/25/08.

ALL of the Trustee Deeds recite the dates of publication and NONE of the Trustee Deeds recite publication dates immediately preceding the second foreclosure dates. For example, one Trustee Deed recites publication dates of 4/9/08-5/7/08, which was the initial publication for the first sale date. A second round of publications were not done in violation of Revised Missouri Statute 443.320-443.325. Without a proper publication notice, the sale was void. Thus, ALL of the sales conducted by Homecomings' attorneys on 6/11/08 and 7/25/08 were void. As a consequence, Spence was damaged by Homecomings' unlawful taking of these properties.

11. A further dilemma is that Homecomings and South & Associates were not communicating. Jessica at South & Associates insisted that her firm had communicated with Homecomings and that the SECOND sales were not canceled. Spence called back and forth between Homecomings and South & Associates. Homecomings insisted that the foreclosure sales were canceled (and that new reinstatement quotes were going to be sent); but their agent South & Associates were saying they had not been advised of this fact. The first sales were in fact canceled. Second sales were scheduled and Spence was given reinstatement quotes that were good up to the date of the second sale dates with the exception of the property at 3871 S. Homewood where the reinstatement quote was good until 6/17/08 and the sale occurred prematurely on 6/11/08.

12. Spence expected to receive an account receivable due to her of $100,000 from Elegant Homes LLC in early June 2008. Spence was ready, willing and able to bring the loans current and to pay the reinstatement fees. She communicated with Homecomings and was told that the foreclosure sales would be canceled pending her receipt of the $100,000 so that it could be used to pay the reinstatement amounts for these seven (7) properties.

The funds were sent to Spence in late June, 2008 and were deposited into the Elite Properties' account. Bank Midwest notified Spence that there would be a hold on the funds until July 17, 2008. This was communicated to Homecomings and Homecomings agreed that it would cancel the sales that were set for June 11, 2008. Further, Homecomings agreed to send new reinstatement quotes as the ones that Spence had were now expiring.

13. Despite Homecomings representations that it would cancel the sales, it foreclosed prematurely on June 11, 2008 on six of the properties. In one instance, such as with 3871 S. Cottage, Springfield, Missouri, the reinstatement quote was good until June 17, 2008. The foreclosure occurred 6 days prior to the deadline for Spence to pay the reinstatement amount.

14. Homecomings, despite its representations, both in writing and over the phone to Spence that it would cancel the second scheduled foreclosure sales, did foreclose on eight (8) properties on June 11, 2008 and July 25, 2008.

15. Further, Homecomings "chilled" the public foreclosure sales by attempting to sell the properties prior to the June 11, 2008 foreclosure sales. Spence previously provided an example of the advertising through Realty.Trac.com (for 1413 W. Glenwood, 1061 E. Gaslight) in her earlier response to the Debtor's Objection to her claim.

16. At the time of the foreclosures, Spence had equity in these seven (7) properties after factoring in the approximate mortgage balances. The calculations are as follows:

| ADDRESS | VALUE | MORTGAGE BALANCE | EQUITY |
| --- | --- | --- | --- |
| 3864 S. Cottage | $166,000 | $116,000 | $50,000 |
| 3870 S. Cottage | $166,000 | $116,000 | $50,000 |
| 3871 S. Cottage | $170,000 | $116,000 | $54,000 |
| 2770 W. LaSalle | $195,000 | $125,000 | $70,000 |
| 3877 S. Homewood | $170,000 | $116,000 | $54,000 |
| 1061 E. Gaslight Dr | $443,000 | $330,000 | $113,000 |
| 1413 W. Glenwood | $125,000 | $ 70,000 | $55,000 |
| | | TOTAL EQUITY | $446,000 |

Thus, Spence lost her anticipated equity in these seven (7) properties of $446,000 due to the wrongdoing of Homecomings. This is a loss directly linked to the wrongful actions of Homecomings.

17. In addition, Spence had all seven (7) properties rented with tenants who were paying their rents. The rents that Spence was collecting in the spring and summer of 2008 was $8,550/month. Her monthly mortgage payments (including taxes and insurance) were approximately $6,600, leaving anticipated gross income of $2,000 /month. If we speculate that Spence would have continued to receive these rents for at least 24 months (until the spring of 2010), she realized a loss of rents of AT LEAST $48,000.

18. As a result of the wrongful foreclosures of these seven (7) properties as recited above and in prior responses filed by Spence, Spence's credit score went from 780 to 550. Spence had arranged a real estate loan with Associated Leasing International Corporation in the amount of $1,800,000. This loan was going to be used to (i) allow the refinancing of an apartment complex at South Street and South Campbell in

Springfield, Missouri (to pay off the mortgage loan held by Louis Rauch) and (ii) raze the improvements (apartment building) at 505 E. St. Louis, Springfield, Missouri, to make way for a hotel. Spence had secured the franchise of Wyndham/Ramada Inn & Suites.

19.     Associated provided a letter to confirm that it was committed to loaning the $1,800,000 to Spence in January, 2008. The loan was set to close in Spring of 2008 but when her credit score dropped as a result of Homecomings' reporting of the foreclosures, Associated refused to fund the loan. The letter is attached as Exhibit B to this Response. Spence was a developer and builder. Once her credit score dropped dramatically due to Homecomings' actions, she was unable to recover. Her credit reputation was severely damaged by Homecomings' actions.

20.     Further, Associated was willing to loan Spence $35,000,000 for the construction of a hotel at the 505 E. St. Louis location. Had Spence known that Homecomings was going to foreclose on the seven (7) properties when it represented that it would wait for her funds, Spence would not have gone ahead and had the improvements at 505 E. St. Louis razed. If she had not razed the improvements, she would have continued to realize rents on the property of $24,000/month or a total of $288,000 per year. Even for two years, this rent would have been $576,000. From the rents, Spence would have paid insurance, real estate taxes, and maintenance costs. She would have realized a profit, after deducting these costs, of approximately $473,641 for the two years. Further, Spence needlessly paid for the Wyndham/Ramada franchise fee of $50,000, architectural fees for hotel renderings of $85,000 and the cost of razing the apartment building of $150,000 for a total of $285,000.

21.     Additionally, the apartment complex at South Street and Campbell Street in Springfield, MO was ultimately foreclosed in 2010. There were 72 units. The property had a value of $3,250,000 and a mortgage of $1,365,000, leaving equity of $1,885,0000. Further, Spence collected rents of approximately $25,000/month on this property. She not only lost the equity but the revenue as well. Spence estimates an annual loss of approximately $180,000 per year (after deduction for mortgage debt, taxes and insurance and maintenance). If we again calculate two years of loss revenue, Spence's conservative loss on this property was $360,000.

22. Also, Spence owned 10 other rental properties which were producing income. Spence was servicing the mortgage loans on all 10 properties until Homecomings sent a representative to direct the 7 tenant in the Homecomings' properties to stop paying the rent to Spence. Actually, when Homecomings began sending certified letters addressed to Spence for the May 2008 initial foreclosure of the 7 properties (in April, 2008), Homecomings sent these letters to 15 addresses, which included the 7 being foreclosed but also included other properties that Spence owned as rentals. For example, these letters were also sent to 220 Burton and 302 Burton and 3645 Newton. See copies of certified letters attached to the Trustee Deeds. Once word spread that Spence's 7 properties were being foreclosed, the other 10 tenants were reluctant to pay rent. Spence did not receive the rents as expected and she was unable to pay the mortgage payments on those 10 properties. They are as follows:

| Address | Value | Mortgage | Lost Equity |
|---|---|---|---|
| 3628 E. Loren Springfield | $315,000 | $230,000 | $ 85,000 |
| 1865 W. Bristol Springfield | $340,000 | $275,000 | $ 65,000 |
| 3645 S. Newton Springfield | $155,000 | $ 70,000 | $ 85,000 |
| 220 Burton Springfield | $150,000 | $90,000 | $ 60,000 |
| 302 Burton Springfield | $150,000 | $90,000 | $ 60,000 |
| 2364 S. Forrest Hgts Springfield | $525,000 | $340,000 | $185,000 |
| 1022-1024 S. Lexington Spgfield | $150,000 | $75,000 | $ 75,000 |
| 3709 E. Regent Springfield | $325,000 | $200,000 | $125,000 |
| 3421 S. Woodstock Springfield | $325,000 | $213,000 | $112,000 |
| 2445 E. Grand Springfield | $175,000 | $130,000 | $ 45,000 |

The total lost equity for these ten (10) properties is $897,000. There is an 11th property: 4339 E. Misty Woods Springfield. This is Spence's residence. It was worth $550,000 and she owed $320,000, leaving equity of $235,000. When the tenants all refused to pay their rent and she couldn't service her mortgage debt, she was also without income to pay her regular household expenses, including her personal mortgage payment. Thus, her loss for these eleven (11) properties is $1,132,000.

23. In addition, she lost rents for these ten (10) properties of over $20,915/month. After deducting mortgage expense, taxes, insurance and maintenance, Spence lost annual revenue for the ten properties of approximately $130,550.

24. A recap of Spence's losses is more fully detailed on attached Exhibit C and at a conservative figure is:

| | |
|---|---|
| Loss of equity of seven (7) properties: | $ 446,000 |
| Loss of rents for seven (7) properties: | $ 168,000 |
| Loss of income on South & Campbell: | $1,260,000 |
| Loss of equity on South & Campbell: | $1,885,000 |
| Loss of equity for E. St Louis: | $1,087,000 |
| Loss of expenses for E. St. Louis: | $ 285,000 |
| Loss of income for E. St. Louis: | $1,657,740 |
| Loss of equity for 11 properties: | $1,132,000 |
| Loss of income 10 properties: | $1,756,860 |
| TOTAL LOSS: | $9,677,600 |

25. The original Proof of Claim was filed for just under $6,000,000 ($5,876,900). These figures provided in this Response justify the amount originally claimed and significantly more. Spence respectfully urges the Court to approve her Claim of $5,876,900.

KRIGEL & KRIGEL, P.C.

/s/ Erlene W. Krigel
Erlene W. Krigel, MO 29416
4550 Belleview
Kansas City, Missouri 64111
Telephone: (816) 756-5800
Facsimile: (816) 756-1999
ATTORNEYS FOR CLAIMANT

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was either emailed or mailed this 23rd day of January, 2014, to Gary S. Lee, Adam A. Lewis, Norman S. Rosenbaum and Jordan A. Wishnew of Morrison & Foerster, LP 1290 Avenue of the Americas, New York, NY 10104 and to all parties listed on the Court's ECF noticing system.

/s/ Erlene W. Krigel
Erlene W. Krigel