**Hearing Date and Time: January 30, 2014 at 10:00 a.m. (Prevailing Eastern Time)**

SHEARMAN & STERLING LLP
Fredric Sosnick
William J.F. Roll, III
Edmund M. Emrich
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 484-4000
Facsimile: (212) 484-7179

*Counsel for Citibank, N.A.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**REPLY OF CITIBANK TO LIQUIDATING TRUST'S OBJECTION TO CITIBANK'S MOTION FOR AN ORDER (I) DETERMINING THAT IT IS ENTITLED TO POST-PETITION INTEREST ON ITS OVERSECURED MSR FACILITY CLAIMS AT THE CONTRACTUAL DEFAULT RATE, AND (II) DIRECTING DEBTORS TO PAY SUCH INTEREST AS WELL AS <u>CITIBANK'S DUE AND UNPAID COUNSEL FEES AND EXPENSES</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT…………………………………………………………1

ARGUMENT…………………………………………………………………………..3

I.    Citibank is Entitled to Default Interest………………...……………………….3

II.   Citibank is Entitled to Reimbursement of its Legal Fees and Expenses………….9

CONCLUSION………………………………………………………………………..10

EXHIBITS:

Exhibit A: Fee Invoices

Exhibit B: Correspondence

# TABLE OF AUTHORITIES
## CASES

*General Elec. Capital Corp. v Future Media Productions Inc.*, 536 F.3d 969 (9th Cir. 2008) .................................................................................................................5, 6

*Heiner v. Donnan*, 285 U.S. 312 (1932) ........................................................................................4

*In re 785 Partners LLC*, 470 B.R. 126 (Bankr. S.D.N.Y. 2012) ................................................3, 4

*In re Bownetree, LLC*, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009) ......................... 4, 5-6

*In re General Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) ...................................3

*In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998) ................ 3-4

*In re Nw Airlines Corp.*, Case No. 05-17930 (ALG), 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007) ...............................................................................................5

*In re Residential Capital, LLC*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) ........................................3

*In re Terry Ltd. P'ship*, 27 F.3d 241 (7th Cir.1994), *cert. denied sub nom., Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa, 513 U.S. 948 (1994)* ....................3, 5, 6

*In re Vest Assocs,* ,217 B.R. 696 (Bankr. S.D.N.Y. 1998) ..........................................................4, 5

*Key Bank NA v. Milham (In re Milham)*, 141 F. 3d 420 (2d Cir. 1998) .....................................1, 3

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007) ..............1, 3, 4, 9

*Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008) ..................................................................................................................3, 4, 5

## STATUTES

11 U.S.C. § 506(b) ................................................................................................................ *passim*

## TREATISES

4 COLLIER ON BANKRUPTCY ¶ 506.04[2][b], at 506-102 (16th ed. 2012) ...............................4

Citibank, N.A. ("**Citibank**") respectfully submits this Reply to the Objection (the "**Objection**") of the Liquidating Trust (the "**Trust**"), dated January 15, 2014 [Docket No. 6276], to the Motion of Citibank, N.A. for an Order (i) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (ii) Directing Debtors to Pay Such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses (the "**Motion**"), dated December 23, 2013 [Docket No. 6174].[1]

## PRELIMINARY STATEMENT

1.  In its Objection, the Trust starts from the mistaken premise that Citibank fully received the benefit of its contractual bargain, and then proceeds to present a reading of case law that erroneously seeks to portray as routine the denial of default interest in any case in which unsecured creditors are not paid in full. The Objection falls well short of satisfying the Trust's burden because (as discussed more fully below):

o   ***There is a presumption in favor of applying the contract rate of interest.*** To the extent that the Trust relies on the Second Circuit's decision in *Key Bank NA v. Milham* (*In re Milham*), 141 F. 3d 420 (2d Cir. 1998) to argue there is not a (rebuttable) presumption that the contract rate applies in the first instance (*see* Objection, ¶¶ 5, 17), such a position is both incorrect and inconsistent with the Supreme Court's more recent decision in *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443* (2007) and other cases, including cases in this district, that were decided since *Milham*.

o   ***There is no "extensive case law from within the Second Circuit in which courts routinely deny default rate interest for an oversecured creditor of an insolvent debtor"[2] where the rate being charged is reasonable and the impact on creditor distributions is not dramatic.*** The Trust cites only four cases in support of its sweeping contention about the case law with regard to the impact of insolvency (*see* Objection, ¶ 7), and, as described below, at least three of them are readily distinguishable because of their high interest rate, substantial adverse impact on unsecured creditor recoveries, and/or other fundamental reasons discussed below.

---

[1] Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Motion, except that the Citibank Final Cash Collateral Order shall hereinafter be referred to as the "**Cash Collateral Order**."

[2] Objection, ¶ 2.

- o   *Citibank is seeking a reasonable and simple (i.e. non-compounded) rate of interest.* Unlike the facts in some of the cases cited by the Trust, the interest calculation used in the Credit Agreement is a non-compounding rate (*see* Motion, ¶ 8), the reasonableness of which has not been challenged by the Trust.[3]

- o   *Citibank did not receive the benefit of its contractual bargain.* Although it is true that the bankruptcy filing constituted the initial default under the Citibank MSR Facility (*see* Motion, ¶ 8), it also is indisputable that the facility matured only 16 days after the commencement of the Debtors' chapter 11 cases (*see* Motion, Exhibit B, § 1(p)), yet was not repaid for more than eight months after the commencement date.

- o   *Citibank's right to receive default interest was neither expressly nor impliedly waived in the Cash Collateral Order.* The Trust's suggestion that by agreeing to limit its adequate protection claims to payment of interest at the non-default rate, Citibank somehow waived its right to ever claim default interest, is incorrect. The Cash Collateral Order specifically provides that: "Citibank is oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR Obligations **in accordance with the Prepetition MSR Credit Documents**." Cash Collateral Order, p. 5, ¶ G(iv) (emphasis added) [Docket No. 471]. Moreover, it further provides that "[n]otwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly . . . any of the rights of Citibank under the Bankruptcy Code or non-bankruptcy law. . . ." Cash Collateral Order, ¶ 21.

- o   *The Trust's assertion that it is not seeking to impose a bright line test is wrong.* Contrary to the Trust's disclaimer (*see* Objection, p. 7, n. 6), the only logical way to reconcile the Trust's various arguments is to conclude that it is indeed advocating bright line test based on insolvency. If default interest cannot be granted in a situation such as this, where there is no dispute with respect to the reasonableness of the rate and there is virtually no adverse economic impact on creditor distributions, then, Citibank submits that, effectively, it could never be granted where a debtor is insolvent.

- o   *The Trust's argument that Citibank is not entitled to reimbursement of counsel fees is undermined by its own arguments.* Absent there being a bright line test, which (as noted above) the Trust concedes there is not, it defies logic that Citibank should be denied counsel fees for pursing its rights under its loan documents.

## ARGUMENT

### I.   Citibank is Entitled to Default Interest

2.      The Trust premises the Objection on the incorrect suggestion that, despite there being no dispute as to Citibank's treatment as a secured creditor in the Debtors' cases, the

---

[3]   Citibank is seeking interest on the amount that was not paid at the closing of the Walter Sale.

contract rate should not be used as the starting point for consideration of default interest.[4] The Trust bases its suggestion upon a citation to the Second Circuit's decision in *Milham*[5] and several other cases (*see* Objection ¶¶ 5, 17), all of which – other than *In re 785 Partners LLC*, 470 B.R. 126 (Bankr. S.D.N.Y. 2012) – were decided prior to the Supreme Court's decision in *Travelers*. In a misplaced attempt to distinguish *Travelers*, the Trust, after first conceding that in *Travelers* the Supreme Court was not expressing a novel view of the law,[6] argues that *Travelers*' clear expression of the starting point for a claim is somehow not applicable to Citibank's claim because *Travelers* was not a default interest case. Aside from the Trust's assertion being unsupported, it is noteworthy that the one post-*Travelers* case cited by the Trust, *785 Partners*, is clear that there is "a rebuttable presumption that the oversecured creditor is entitled to default interest at the contract rate . . . ." *In re 785 Partners LLC*, 470 B.R. at 134 (citing *In re Terry Ltd. P'ship,* 27 F.3d 241, 243 (7th Cir.1994), *cert. denied sub nom., Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa,* 513 U.S. 948 (1994); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.,* 394 B.R. 325, 338 (S.D.N.Y. 2008); *In re General Growth Props., Inc.,* 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011); *In re Liberty Warehouse Assocs. Ltd. P'ship,* 220 B.R. 546, 550 (Bankr.

---

[4] Because there is no dispute here with respect to the fact that Citibank is an oversecured creditor or that it has a valid contract with the Debtors under which it is asserting its secured claim, it has established its claim on a *prima facie* basis and has no other affirmative burden of proof. Accordingly, this Court's decision in *In re Residential Capital, LLC*, 501 B.R. 549, 590 (Bankr. S.D.N.Y. 2013), which is cited by the Trust (*see* Objection, ¶ 19), is inapplicable to the issue of which party has the burden of proof in this dispute.

[5] Although the Second Circuit in *Milham* found that the postpetition interest rate under section 506(b) is not based on contract, it did not address the presumption in favor of using the contract rate as the starting point, but did find that "pendency interest **runs (often, though not necessarily, at the contract rate)** until the time of confirmation." *Milham*, 141 F.3d at 425 (emphasis added).

[6] In *Travelers*, the Supreme Court articulated unambiguously that "'[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'" *Travelers*, 549 U.S. at 450 (citation omitted).

3

S.D.N.Y. 1998); *In re Vest Assocs.,* 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998); and 4 COLLIER ON BANKRUPTCY ¶ 506.04[2][b], at 506–102 (16th ed. 2012) (collecting cases)).[7]

3. The effect of this presumption is that the burden of proof shifts to the party contesting the applicability of the contractual default rate. *See Heiner v. Donnan*, 285 U.S. 312, 329 (1932) ("A rebuttable presumption clearly is a rule of evidence which has the effect of shifting the burden of proof . . . .") (citation omitted); *see also 785 Partners*, 470 B.R. at 134 (debtor bears burden of rebutting the presumptive contract rate). Thus, the Trust has the burden here of demonstrating sufficiently compelling equitable circumstances to rebut the presumption that the contract rate applies – a burden that it cannot satisfy.

4. Even if Citibank had the burden of proving that the equities support the allowance of default interest – which it does not – it nevertheless must prevail. The Trust's suggestion that courts in this Circuit "routinely" deny default interest to an oversecured creditor on the basis of the debtor's insolvency[8] is a gross overstatement of the applicable law. In support of its assertion about what is routine, the Trust cites four cases, three of which fail to support the contention that insolvency is the basis for denying default interest, particularly where – as is the case here – the oversecured creditor has matured debt with a reasonable rate of interest:

- o *In re Bownetree, LLC*, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009) involved a default rate of 25% that would have reduced creditor recoveries to a "minimal amount," and, in any event, the alleged default was nullified by the curing and reinstatement of the loan under the debtor's plan (which Citibank's past-maturity debt was not), *id*. at *4-5;

---

[7] Curiously, later in the Objection, the Trust, despite the clear language of *785 Partners*, argues that the unequivocal pronouncement in *Travelers* on the starting point for a determination of a claim, somehow would not be relevant to the determination of a claim under section 506(b). *See* Objection, ¶ 18. There simply is no basis for such an assertion, which is contrary to *785 Partners* and the legion of cases it cites – including *Urban Communicators*, a case on which the Trust otherwise heavily relies.

[8] *See* Objection, ¶¶ 2, 5 & 7.

4

- o *Urban Communicators,* involved "unique circumstances" in which the delay caused by nine years of litigation by the estate to preserve the oversecured creditor's collateral resulted in a compounded default rate of interest equivalent to 38% simple interest, the payment in full of which would have impacted unsecured creditor recoveries "severely." 394 B.R. at 337-41; and

- o *In re Nw* Airlines *Corp.*, Case No. 05-17930 (ALG), 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007) involved a situation in which not only would there have been some diminution in unsecured creditor recoveries, but also (quite unlike the maturity in the Citibank MSR Facility) there was no contractual basis to call a retroactive default (because the debtors had the right to substitute another engine as collateral) and the default was not called in accordance with the terms of the contract.  Additionally, although the court did not need to decide the matter on those grounds, it is also noteworthy that, in *Nw Airlines*, the debtors' plan was reinstating the secured debt under section 1124(2) of the Bankruptcy Code (which helped to ensure that all other defaults had been eliminated).

Even the one case that comes closest to supporting the Trust's position falls short of saying that insolvency ordinarily was a dispositive factor, but rather indicates only that it was an "important factor" in determining whether to allow default interest).  *See Vest Assocs.*, 217 B.R. at 703.

5. Based upon the case law cited by the Trust in support of its position (while avoiding or downplaying other applicable cases, like the Seventh Circuits' decision in *Terry*, 27 F.3d 241, and the Ninth Circuit's decision in *General Elec. Capital Corp. v Future Media Productions Inc.*, 536 F.3d 969 (9th Cir. 2008)),[9] it is difficult to understand the Trust's position that the Court can elect not to award the contractual default rate of interest based upon an equitable assessment that creditors would be harmed, but, in doing so, should not focus on the degree of that impact.  In contrast, in *Bownetree* (upon which the Trust relies, *see* Objection, ¶ 7), the court focused not only on the high percentage of the default interest rate, but also on the extent of the harm, when it concluded that: "the application of the default rate at twice the rate of the non-default rate, would reduce an already limited recovery to unsecured creditors to a

---

[9] The importance of the decisions in *Terry* and *Future Media* is discussed at length in the Motion. *See* Motion, ¶¶ 19, 21-22.

5

minimal amount." *Bownetree,* 2009 WL 2226107, at *4. As discussed in the Motion, in light of the magnitude of these multi-billion dollar chapter 11 cases, paying Citibank default interest at the contractual rate would have virtually no impact on recoveries to other creditors.[10] Motion, ¶ 27.

6. Despite the lack of support for its own affirmative position, the Trust attempts to argue that the Seventh Circuit's holding in *Terry*, is "the proverbial exception that proves the rule." Objection, ¶ 21. In doing so, the Trust completely ignores the Ninth Circuit's decision in *Future Media*, which, in remanding, held, in accordance with the "majority rule," that "[t]he bankruptcy court should apply a presumption of allowability for the contracted for default rate, 'provided that the rate is not unenforceable under applicable nonbankruptcy law.'" 536 F.3d at 974 (citation omitted).

7. Here, even the Trust does not challenge the reasonableness of the rate. Accordingly, in the absence of a body of cases in this Circuit denying default interest claims solely on the basis of the estate's insolvency, *Terry*'s and *Future Media*'s holdings are not an exception at all, but rather important authorities that clearly support Citibank's claim for default interest.

8. In a further effort to deflect the fact that the junior creditors would suffer no meaningful harm if Citibank's default interest were to be paid, the Trust tries to argue why Citibank would not be harmed if default interest were not to be paid. *See* Objection, ¶ 1. Contrary to the Trust's position, it is clear that Citibank did *not* receive the benefit of its bargain

---

[10] Even if the distribution analysis were to include all unsecured creditors covered by the Trust (as the Trust suggests, *see* Objection, p. 6 , n. 4), including unsecured creditors of debtors against whom Citibank has not asserted claims, the net effect on distributions to unsecured creditors still would be a tiny percentage of the aggregate distributions to unsecured creditors. In any event, the unsecured creditors in these cases were aware of the risks presented by the present dispute, since it was described in the Disclosure Statement (at pages 55 & 71), and voted in favor of the Plan.

6

under the Citibank MSR Facility. The "bargain" required full payment of principal at maturity (*i.e.*, May 30, 2012), which occurred only 16 days into the Debtors' cases, and it was not until more than seven months later that Citibank was repaid.

9. The Trust's further suggestion that Citibank's agreement under the Cash Collateral Order to receive payment at the non-default rate as adequate protection somehow caused a waiver of its contractual claim for default interest simply is wrong. The adequate protection provisions of the Cash Collateral Order were not in any way a concession that default interest would not have to be paid after its collateral was sold and the relative rights of Fannie Mae and Freddie Mac (collectively, the "**GSEs**") and the other creditors became known. Aside from lacking any conceivable basis for a waiver (particularly with a broad non-waiver provision in the Cash Collateral Order),[11] the Cash Collateral Order specifically provided that the net proceeds of the sale of the collateral "shall be applied by the Debtors to repay the Obligations under the Prepetition MSR Credit Documents," Cash Collateral Order, ¶ H; *see also*, Motion ¶ 10 & n. 6, and the Trust points to no reason that the plain meaning of Obligations (including interest at the contractual default rate) would not apply.

10. The Trust's assertion that in the period from the commencement of the Debtors' chapter 11 cases through the completion of the Walter Sale (during which time the Citibank MSR Facility matured and Citibank was unable to redeploy its capital) Citibank's position as a secured creditor was not at risk (*see* Objection, ¶ 15) conveniently glosses over the fact that the GSEs each had a virtual veto power over the Debtors' asset sales. In fact, the GSEs interposed very strenuous objections to the sales and asserted enormous first-priority claims,[12]

---

[11]    Cash Collateral Order, ¶ 21.

[12]    *See*, *e.g.*, Objection of Fannie Mae to the Debtors' Motion and Notice of (i) Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired

7

the result of which was that it was not until the claims of the GSEs were finally settled shortly prior to the closing of the Walter Sale in January 2013 that Citibank had any assurance that the principal balance of its loan would be paid in full.  Indeed, given the level of secured debt in these cases, and the importance of the GSEs to the ongoing business, it is not clear that the adequate protection liens granted to Citibank would have been of any value had the Walter Sale not closed due to a failure of the Debtors to reach a settlement with the GSEs that allowed the closing to occur.

11. In summary, the Trust failed in its burden (and to the extent Citibank has the burden, it must prevail) because:

(i) there is no body of cases in this Circuit in which courts deny claims for default interest based merely on the basis of insolvency,

(ii) an equitable inquiry (absent a *per se* rule that interest must never be paid in a case where unsecured creditors are not getting a full recovery), would require an analysis of the degree of harm that would be caused to junior creditors by the payment of default interest, and awarding Citibank default interest here would not result in any appreciable harm to unsecured creditors; and

(iii) to the extent it is even relevant, Citibank:  (a) was harmed by not having been paid at maturity and (b) did not waive (and, to the contrary, preserved) its entitlement to receive default interest in the Cash Collateral Order.

---

Leases of Non-Residential Real Property, (ii) Cure Amounts Related Thereto, dated 10/1/12 [Docket No. 1689]; Federal Home Loan Mortgage Corporation's Objection to Debtors' Proposed Assumption and Assignment of Executory Contracts and Related Cure Amounts, dated 10/1/12 [Docket No. 1690]; and related supplements [Docket Nos. 2200 & 2196].

8

## II.   Citibank is Entitled to Reimbursement of its Legal Fees and Expenses

12.   Although the reasonableness of fees and expenses does not, as the Trust suggests (*see* Objection, ¶ 22), turn on who prevails on the underlying dispute regarding default interest, even on that basis, Citibank's claim for the payment of its legal fees and expenses should be allowed.  Assuming *arguendo* that Citibank did not prevail on the merits of its default interest claim, it nevertheless has a contractual right to be reimbursed for its reasonable legal fees and expenses (as reinforced by the terms of the Cash Collateral Order) (*see* Motion, ¶¶ 9, 31). As the Supreme Court made clear in *Travelers*, a creditor that has a contractual right to attorney's fees in a prepetition agreement is entitled to receive those fees for litigating issues of federal bankruptcy law relative to the agreement.  *See Travelers*, 549 U.S. at 449.  Here, even if the Court were to deny Citibank its contractual default interest (which it should not), it would be doing so on an equitable basis in response to a general right to post-petition interest that is given to oversecured creditors under section 506(b) of the Bankruptcy Code), which, almost by definition, means that Citibank had a good faith basis upon which to pursue its claim.

13.   Citibank recognizes that section 506(b) has a reasonableness requirement with regard to fees and expenses.  With respect to the reasonableness of Citibank's fees and expenses, the Trust's position that Citibank has not provided it with any evidence of the amount of its legal fees (*see* Objection, ¶ 25) is incorrect.  Even after the Debtors stopped paying Citibank's fees, Citibank continued to provide invoices to the Debtors and to counsel for the Creditors' Committee (now the Trust's counsel) in accordance with the terms of the Cash Collateral Order,[13] copies of which are annexed hereto as Exhibit A. [14]

---

[13]   Only after the futility of such an effort became apparent did Citibank cease providing invoices.  Citibank, however, will promptly provide such additional invoices.

9

**CONCLUSION**

Citibank respectfully requests that the Court overrule the Objection and grant the relief sought in the Motion.

Dated: New York, New York
January 24, 2014

SHEARMAN & STERLING LLP

*/s/ Fredric Sosnick*_____
Fredric Sosnick
William J.F. Roll, III
Edmund M. Emrich
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 484-4000
Facsimile: (212) 484-7179

*Counsel for Citibank, N.A.*

---

[14] In addition, to the extent it is relevant, contrary to the statement in the Objection that the Trust was not clear on what the agreement was that was reached relative to maintaining the *status quo* in connection with the closing of the Walter Sale (*see* Objection, ¶ 23), the Trust's counsel was copied on correspondence that described that matter several months ago, when it likewise was counsel to the Creditors' Committee. A copy of that correspondence is annexed hereto as Exhibit B.