## Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR - 4 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | )  | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **12 0361** |
| BANK OF AMERICA CORP. *et al.*, | ) ) | Civil Action No. _____ |
| Defendants. | ) ) ) ) ) ) ) ) | |

**CONSENT JUDGMENT**

WHEREAS, Plaintiffs, the United States of America and the States of Alabama, Alaska,

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming,

the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of

Columbia filed their complaint on March 12, 2012, alleging that Residential Capital, LLC, Ally

Financial, Inc., and GMAC Mortgage, LLC (collectively, "Defendant") violated, among other

laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States, the False Claims

Act, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the

Servicemembers Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy

Procedure;

WHEREAS, the parties have agreed to resolve their claims without the need for

litigation; ·

WHEREAS, Defendant, by its attorneys, has consented to entry of this Consent Judgment

without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent

Judgment is entered as submitted by the parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit the

allegations of the Complaint other than those facts deemed necessary to the jurisdiction of this

Court;

WHEREAS, the intention of the United States and the States in effecting this settlement

is to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant;

AND WHEREAS, Defendant has agreed to waive service of the complaint and summons

and hereby acknowledges the same;

NOW THEREFORE, without trial or adjudication of issue of fact or law, without this

Consent Judgment constituting evidence against Defendant, and upon consent of Defendant, the

Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is

therefore ORDERED, ADJUDGED, AND DECREED:

## I.   JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, 1345, 1355(a), and 1367, and under 31 U.S.C. § 3732(a) and (b), and over

Defendant.  The Complaint states a claim upon which relief may be granted against Defendant.

Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a).

2

## II.  SERVICING STANDARDS

2.      Defendant shall comply with the Servicing Standards, attached hereto as Exhibit

A, in accordance with their terms and Section A of Exhibit E, attached hereto.

## III.  FINANCIAL TERMS

3.      *Payment Settlement Amounts.*  Defendant shall pay into an interest bearing escrow

account to be established for this purpose the sum of $109,628,425, which sum shall be added to

funds being paid by other institutions resolving claims in this litigation (which sum shall be

known as the "Direct Payment Settlement Amount") and which sum shall be distributed in the

manner and for the purposes specified in Exhibit B.  Defendant's payment shall be made by

electronic funds transfer no later than seven days after the Effective Date of this Consent

Judgment, pursuant to written instructions to be provided by the United States Department of

Justice.  After Defendant has made the required payment, Defendant shall no longer have any

property right, title, interest or other legal claim in any funds held in escrow.  The interest

bearing escrow account established by this Paragraph 3 is intended to be a Qualified Settlement

Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue

Code of 1986, as amended.  The Monitoring Committee established in Paragraph 8 shall, in its

sole discretion, appoint an escrow agent ("Escrow Agent") who shall hold and distribute funds as

provided herein.  All costs and expenses of the Escrow Agent, including taxes, if any, shall be

paid from the funds under its control, including any interest earned on the funds.

4.      *Payments to Foreclosed Borrowers.*  In accordance with written instructions from

the State members of the Monitoring Committee, for the purposes set forth in Exhibit C, the

Escrow Agent shall transfer from the escrow account to the Administrator appointed under

3

Exhibit C $1,489,813,925.00 (the "Borrower Payment Amount") to enable the Administrator to provide cash payments to borrowers whose homes were finally sold or taken in foreclosure between and including January 1, 2008 and December 31, 2011; who submit claims for harm allegedly arising from the Covered Conduct (as that term is defined in Exhibit G hereto); and who otherwise meet criteria set forth by the State members of the Monitoring Committee. The Borrower Payment Amount and any other funds provided to the Administrator for these purposes shall be administered in accordance with the terms set forth in Exhibit C.

5. *Consumer Relief.* Defendant shall provide $185,000,000 of relief to consumers who meet the eligibility criteria in the forms and amounts described in Paragraphs 1-8 of Exhibit D, and $15,000,000 of refinancing relief to consumers who meet the eligibility criteria in the forms and amounts described in Paragraph 9 of Exhibit D, to remediate harms allegedly caused by the alleged unlawful conduct of Defendant. Defendant shall receive credit towards such obligation as described in Exhibit D.

## IV. ENFORCEMENT

6. The Servicing Standards and Consumer Relief Requirements, attached as Exhibits A and D, are incorporated herein as the judgment of this Court and shall be enforced in accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit E.

7. The Parties agree that Joseph A. Smith, Jr. shall be the Monitor and shall have the authorities and perform the duties described in the Enforcement Terms, attached hereto as Exhibit E.

8. Within fifteen (15) days of the Effective Date of this Consent Judgment, the participating state and federal agencies shall designate an Administration and Monitoring Committee (the "Monitoring Committee") as described in the Enforcement Terms. The

4

Monitoring Committee shall serve as the representative of the participating state and federal agencies in the administration of all aspects of this and all similar Consent Judgments and the monitoring of compliance with it by the Defendant.

## V.    RELEASES

9.    The United States and Defendant have agreed, in consideration for the terms provided herein, for the release of certain claims, and remedies, as provided in the Federal Release, attached hereto as Exhibit F.  The United States and Defendant have also agreed that certain claims, and remedies are not released, as provided in Paragraph 11 of Exhibit F.  The releases contained in Exhibit F shall become effective upon payment of the Direct Payment Settlement Amount by Defendant.

10.    The State Parties and Defendant have agreed, in consideration for the terms provided herein, for the release of certain claims, and remedies, as provided in the State Release, attached hereto as Exhibit G.  The State Parties and Defendant have also agreed that certain claims, and remedies are not released, as provided in Part IV of Exhibit G.  The releases contained in Exhibit G shall become effective upon payment of the Direct Payment Settlement Amount by Defendant.

## VI.    SERVICEMEMBERS CIVIL RELIEF ACT

11.    The United States and Defendant have agreed to resolve certain claims arising under the Servicemembers Civil Relief Act ("SCRA") in accordance with the terms provided in Exhibit H.  Any obligations undertaken pursuant to the terms provided in Exhibit H, including any obligation to provide monetary compensation to servicemembers, are in addition to the obligations undertaken pursuant to the other terms of this Consent Judgment.  Only a payment to

an individual for a wrongful foreclosure pursuant to the terms of Exhibit H shall be reduced by the amount of any payment from the Borrower Payment Amount.

## VII.    OTHER TERMS

12.    The United States and any State Party may withdraw from the Consent Judgment and declare it null and void with respect to that party if the Defendant does not make the Consumer Relief Payments (as that term is defined in Exhibit F (Federal Release)) required under this Consent Judgment and fails to cure such non-payment within thirty days of written notice by the party.

13.    This Court retains jurisdiction for the duration of this Consent Judgment to enforce its terms. The parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court. This Consent Judgment may be modified only by order of this Court.

14.    The Effective Date of this Consent Judgment shall be the date on which the Consent Judgment has been entered by the Court and has become final and non-appealable. An order entering the Consent Judgment shall be deemed final and non-appealable for this purpose if there is no party with a right to appeal the order on the day it is entered.

15.    This Consent Judgment shall remain in full force and effect for three and one-half years from the date it is entered ("the Term"), at which time the Defendants' obligations under the Consent Judgment shall expire, except that, pursuant to Exhibit E, Defendants shall submit a final Quarterly Report for the last quarter or portion thereof falling within the Term and cooperate with the Monitor's review of said report, which shall be concluded no later than six months after the end of the Term. Defendant shall have no further obligations under this Consent Judgment six months after the expiration of the Term, but the Court shall retain

6

jurisdiction for purposes of enforcing or remedying any outstanding violations that are identified in the final Monitor Report and that have occurred but not been cured during the Term.

16.    Except as otherwise agreed in Exhibit B, each party to this litigation will bear its own costs and attorneys' fees associated with this litigation.

17.    Nothing in this Consent Judgment shall relieve Defendant of its obligation to comply with applicable state and federal law.

18.    The parties further agree to the additional terms contained in Exhibit I hereto.

19.    The sum and substance of the parties' agreement and of this Consent Judgment are reflected herein and in the Exhibits attached hereto.  In the event of a conflict between the terms of the Exhibits and paragraphs 1-18 of this summary document, the terms of the Exhibits shall govern.

SO ORDERED this ___4___ day of ___April___, 2012

UNITED STATES DISTRICT JUDGE

7

# EXHIBIT E

**Enforcement Terms**

A.    **Implementation Timeline.**  Servicer anticipates that it will phase in the
implementation of the Servicing Standards and Mandatory Relief Requirements
(i) through (iv), as described in Section C.12, using a grid approach that
prioritizes implementation based upon:  (i) the importance of the Servicing
Standard to the borrower; and (ii) the difficulty of implementing the Servicing
Standard.  In addition to the Servicing Standards and any Mandatory Relief
Requirements that have been implemented upon entry of this Consent Judgment,
the periods for implementation will be:  (a) within 60 days of entry of this
Consent Judgment; (b) within 90 days of entry of this Consent Judgment; and (c)
within 180 days of entry of this Consent Judgment.  Servicer will agree with the
Monitor chosen pursuant to Section C, below, on the timetable in which the
Servicing Standards and Mandatory Relief Requirements (i) through (iv) will be
implemented.  In the event that Servicer, using reasonable efforts, is unable to
implement certain of the standards on the specified timetable, Servicer may apply
to the Monitor for a reasonable extension of time to implement those standards or
requirements.

B.    **Monitoring Committee.**  A committee comprising representatives of the state
Attorneys General, State Financial Regulators, the U.S. Department of Justice,
and the U.S. Department of Housing and Urban Development shall monitor
Servicer's compliance with this Consent Judgment (the "Monitoring Committee").
The Monitoring Committee may substitute representation, as necessary.  Subject
to Section F, the Monitoring Committee may share all Monitor Reports, as that
term is defined in Section D.2 below, with any releasing party.

C.    **Monitor**

*Retention and Qualifications and Standard of Conduct*

1.    Pursuant to an agreement of the parties, Joseph A. Smith Jr. is appointed
to the position of Monitor under this Consent Judgment.  If the Monitor is
at any time unable to complete his or her duties under this Consent
Judgment, Servicer and the Monitoring Committee shall mutually agree
upon a replacement in accordance with the process and standards set forth
in Section C of this Consent Judgment.

2.    Such Monitor shall be highly competent and highly respected, with a
reputation that will garner public confidence in his or her ability to
perform the tasks required under this Consent Judgment.  The Monitor
shall have the right to employ an accounting firm or firms or other firm(s)
with similar capabilities to support the Monitor in carrying out his or her
duties under this Consent Judgment.  Monitor and Servicer shall agree on
the selection of a "Primary Professional Firm," which must have adequate
capacity and resources to perform the work required under this agreement.

The Monitor shall also have the right to engage one or more attorneys or other professional persons to represent or assist the Monitor in carrying out the Monitor's duties under this Consent Judgment (each such individual, along with each individual deployed to the engagement by the Primary Professional Firm, shall be defined as a "Professional").  The Monitor and Professionals will collectively possess expertise in the areas of mortgage servicing, loss mitigation, business operations, compliance, internal controls, accounting, and foreclosure and bankruptcy law and practice.  The Monitor and Professionals shall at all times act in good faith and with integrity and fairness towards all the Parties.

3.    The Monitor and Professionals shall not have any prior relationships with the Parties that would undermine public confidence in the objectivity of their work and, subject to Section C.3(e), below, shall not have any conflicts of interest with any Party.

(a)    The Monitor and Professionals will disclose, and will make a reasonable inquiry to discover, any known current or prior relationships to, or conflicts with, any Party, any Party's holding company, any subsidiaries of the Party or its holding company, directors, officers, and law firms.

(b)    The Monitor and Professionals shall make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a conflict of interest for the Monitor or Professionals.  The Monitor and Professionals shall disclose any conflict of interest with respect to any Party.

(c)    The duty to disclose a conflict of interest or relationship pursuant to this Section C.3 shall remain ongoing throughout the course of the Monitor's and Professionals' work in connection with this Consent Judgment.

(d)    All Professionals shall comply with all applicable standards of professional conduct, including ethics rules and rules pertaining to conflicts of interest.

(e)    To the extent permitted under prevailing professional standards, a Professional's conflict of interest may be waived by written agreement of the Monitor and Servicer.

(f)    Servicer or the Monitoring Committee may move the Court for an order disqualifying any Professionals on the grounds that such Professional has a conflict of interest that has inhibited or could inhibit the Professional's ability to act in good faith and with integrity and fairness towards all Parties.

4.      The Monitor must agree not to be retained by any Party, or its successors or assigns, for a period of 2 years after the conclusion of the terms of the engagement.  Any Professionals who work on the engagement must agree not to work on behalf of Servicer, or its successor or assigns, for a period of 1 year after the conclusion of the term of the engagement (the "Professional Exclusion Period").  Any Firm that performs work with respect to Servicer on the engagement must agree not to perform work on behalf of Servicer, or its successor or assigns, that consists of advising Servicer on a response to the Monitor's review during the engagement and for a period of six months after the conclusion of the term of the engagement (the "Firm Exclusion Period").  The Professional Exclusion Period and Firm Exclusion Period, and terms of exclusion may be altered on a case-by-case basis upon written agreement of Servicer and the Monitor.  The Monitor shall organize the work of any Firms so as to minimize the potential for any appearance of, or actual, conflicts.

### *Monitor's Responsibilities*

5.      It shall be the responsibility of the Monitor to determine whether Servicer is in compliance with the Servicing Standards and the Mandatory Relief Requirements (as defined in Section C.12) and whether Servicer has satisfied the Consumer Relief Requirements, in accordance with the authorities provided herein and to report his or her findings as provided in Section D.3, below.

6.      The manner in which the Monitor will carry out his or her compliance responsibilities under this Consent Judgment and, where applicable, the methodologies to be utilized shall be set forth in a work plan agreed upon by Servicer and the Monitor, and not objected to by the Monitoring Committee (the "Work Plan").

### *Internal Review Group*

7.      Servicer will designate an internal quality control group that is independent from the line of business whose performance is being measured (the "Internal Review Group") to perform compliance reviews each calendar quarter ("Quarter") in accordance with the terms and conditions of the Work Plan (the "Compliance Reviews") and satisfaction of the Consumer Relief Requirements after the (A) end of each calendar year (and, in the discretion of the Servicer, any Quarter) and (B) earlier of the Servicer assertion that it has satisfied its obligations thereunder and the third anniversary of the Start Date (the "Satisfaction Review").  For the purposes of this provision, a group that is independent from the line of business shall be one that does not perform operational work on mortgage servicing, and ultimately reports to a Chief Risk Officer, Chief Audit

Executive, Chief Compliance Officer, or another employee or manager who has no direct operational responsibility for mortgage servicing.

8.    The Internal Review Group shall have the appropriate authority, privileges, and knowledge to effectively implement and conduct the reviews and metric assessments contemplated herein and under the terms and conditions of the Work Plan.

9.    The Internal Review Group shall have personnel skilled at evaluating and validating processes, decisions, and documentation utilized through the implementation of the Servicing Standards.  The Internal Review Group may include non-employee consultants or contractors working at Servicer's direction.

10.   The qualifications and performance of the Internal Review Group will be subject to ongoing review by the Monitor.  Servicer will appropriately remediate the reasonable concerns of the Monitor as to the qualifications or performance of the Internal Review Group.

*Work Plan*

11.   Servicer's compliance with the Servicing Standards shall be assessed via metrics identified and defined in Schedule E-1 hereto (as supplemented from time to time in accordance with Sections C.12 and C.23, below, the "Metrics").  The threshold error rates for the Metrics are set forth in Schedule E-1 (as supplemented from time to time in accordance with Sections C.12 and C.23, below, the "Threshold Error Rates").  The Internal Review Group shall perform test work to compute the Metrics each Quarter, and report the results of that analysis via the Compliance Reviews.  The Internal Review Group shall perform test work to assess the satisfaction of the Consumer Relief Requirements within 45 days after the (A) end of each calendar year (and, in the discretion of the Servicer, any Quarter) and (B) earlier of (i) the end of the Quarter in which Servicer asserts that it has satisfied its obligations under the Consumer Relief Provisions and (ii) the Quarter during which the third anniversary of the Start Date occurs, and report that analysis via the Satisfaction Review.

12.   In addition to the process provided under Sections C.23 and 24, at any time after the Monitor is selected, the Monitor may add up to three additional Metrics and associated Threshold Error Rates, all of which (a) must be similar to the Metrics and associated Threshold Error Rates contained in Schedule E-1, (b) must relate to material terms of the Servicing Standards, or the following obligations of Servicer: (i) after the Servicer asserts that it has satisfied its obligation to provide a refinancing program under the framework of the Consumer Relief Requirements ("Framework"), to provide notification to eligible borrowers indicating

that such borrowers may refinance under the refinancing program described in the Framework, (ii) to make the Refinancing Program available to all borrowers fitting the minimum eligibility criteria described in 9.a of the Framework, (iii) when the Servicer owns the second lien mortgage, to modify the second lien mortgage when a Participating Servicer (as defined in the Framework) reduces principal on the related first lien mortgage, as described in the Framework, (iv) with regard to servicer-owned first liens, to waive the deficiency amounts less than $250,000 if an Eligible Servicemember qualifies for a short sale under the Framework and sells his or her principal residence in a short sale conducted in accordance with Servicer's then customary short sale process, or (v) without prejudice to the implementation of pilot programs in particular geographic areas, to implement the Framework requirements through policies that are not intended to disfavor a specific geography within or among states that are a party to the Consent Judgment or discriminate against any protected class of borrowers (collectively, the obligations described in (i) through (v) are hereinafter referred to as the "Mandatory Relief Requirements"), (c) must either (i) be outcomes-based (but no outcome-based Metric shall be added with respect to any Mandatory Relief Requirement) or (ii) require the existence of policies and procedures implementing any of the Mandatory Relief Requirements or any material term of the Servicing Standards, in a manner similar to Metrics 5.B-E, and (d) must be distinct from, and not overlap with, any other Metric or Metrics.  In consultation with Servicer and the Monitoring Committee, Schedule E-1 shall be amended by the Monitor to include the additional Metrics and Threshold Error Rates as provided for herein, and an appropriate timeline for implementation of the Metric shall be determined.

13.    Servicer and the Monitor shall reach agreement on the terms of the Work Plan within 90 days of the Monitor's appointment, which time can be extended for good cause by agreement of Servicer and the Monitor.  If such Work Plan is not objected to by the Monitoring Committee within 20 days, the Monitor shall proceed to implement the Work Plan.  In the event that Servicer and the Monitor cannot agree on the terms of the Work Plan within 90 days or the agreed upon terms are not acceptable to the Monitoring Committee, Servicer and Monitoring Committee or the Monitor shall jointly petition the Court to resolve any disputes.  If the Court does not resolve such disputes, then the Parties shall submit all remaining disputes to binding arbitration before a panel of three arbitrators. Each of Servicer and the Monitoring Committee shall appoint one arbitrator, and those two arbitrators shall appoint a third.

14.   The Work Plan may be modified from time to time by agreement of the Monitor and Servicer.  If such amendment to the Work Plan is not objected to by the Monitoring Committee within 20 days, the Monitor shall proceed to implement the amendment to the Work Plan.  To the extent possible, the Monitor shall endeavor to apply the Servicing Standards uniformly across all Servicers.

15.   The following general principles shall provide a framework for the formulation of the Work Plan:

   (a)   The Work Plan will set forth the testing methods and agreed procedures that will be used by the Internal Review Group to perform the test work and compute the Metrics for each Quarter.

   (b)   The Work Plan will set forth the testing methods and agreed procedures that will be used by Servicer to report on its compliance with the Consumer Relief Requirements of this Consent Judgment, including, incidental to any other testing, confirmation of state-identifying information used by Servicer to compile state-level Consumer Relief information as required by Section D.2.

   (c)   The Work Plan will set forth the testing methods and procedures that the Monitor will use to assess Servicer's reporting on its compliance with the Consumer Relief Requirements of this Consent Judgment.

   (d)   The Work Plan will set forth the methodology and procedures the Monitor will utilize to review the testing work performed by the Internal Review Group.

   (e)   The Compliance Reviews and the Satisfaction Review may include a variety of audit techniques that are based on an appropriate sampling process and random and risk-based selection criteria, as appropriate and as set forth in the Work Plan.

   (f)   In formulating, implementing, and amending the Work Plan, Servicer and the Monitor may consider any relevant information relating to patterns in complaints by borrowers, issues or deficiencies reported to the Monitor with respect to the Servicing Standards, and the results of prior Compliance Reviews.

   (g)   The Work Plan should ensure that Compliance Reviews are commensurate with the size, complexity, and risk associated with the Servicing Standard being evaluated by the Metric.

(h)     Following implementation of the Work Plan, Servicer shall be
required to compile each Metric beginning in the first full Quarter
after the period for implementing the Servicing Standards
associated with the Metric, or any extension approved by the
Monitor in accordance with Section A, has run.

*Monitor's Access to Information*

16.     So that the Monitor may determine whether Servicer is in compliance with
the Servicing Standards and Mandatory Relief Requirements, Servicer
shall provide the Monitor with its regularly prepared business reports
analyzing Executive Office servicing complaints (or the equivalent);
access to all Executive Office servicing complaints (or the equivalent)
(with appropriate redactions of borrower information other than borrower
name and contact information to comply with privacy requirements); and,
if Servicer tracks additional servicing complaints, quarterly information
identifying the three most common servicing complaints received outside
of the Executive Office complaint process (or the equivalent).  In the event
that Servicer substantially changes its escalation standards or process for
receiving Executive Office servicing complaints (or the equivalent),
Servicer shall ensure that the Monitor has access to comparable
information.

17.     So that the Monitor may determine whether Servicer is in compliance with
the Servicing Standards and Mandatory Relief Requirements, Servicer
shall notify the Monitor promptly if Servicer becomes aware of reliable
information indicating Servicer is engaged in a significant pattern or
practice of noncompliance with a material aspect of the Servicing
Standards or Mandatory Relief Requirements.

18.     Servicer shall provide the Monitor with access to all work papers prepared
by the Internal Review Group in connection with determining compliance
with the Metrics or satisfaction of the Consumer Relief Requirements in
accordance with the Work Plan.

19.     If the Monitor becomes aware of facts or information that lead the Monitor
to reasonably conclude that Servicer may be engaged in a pattern of
noncompliance with a material term of the Servicing Standards that is
reasonably likely to cause harm to borrowers or with any of the Mandatory
Relief Requirements, the Monitor shall engage Servicer in a review to
determine if the facts are accurate or the information is correct.

20.     Where reasonably necessary in fulfilling the Monitor's responsibilities
under the Work Plan to assess compliance with the Metrics or the
satisfaction of the Consumer Relief Requirements, the Monitor may
request information from Servicer in addition to that provided under

Sections C.16-19.  Servicer shall provide the requested information in a format agreed upon between Servicer and the Monitor.

21. Where reasonably necessary in fulfilling the Monitor's responsibilities under the Work Plan to assess compliance with the Metrics or the satisfaction of the Consumer Relief Requirements, the Monitor may interview Servicer's employees and agents, provided that the interviews shall be limited to matters related to Servicer's compliance with the Metrics or the Consumer Relief Requirements, and that Servicer shall be given reasonable notice of such interviews.

### *Monitor's Powers*

22. Where the Monitor reasonably determines that the Internal Review Group's work cannot be relied upon or that the Internal Review Group did not correctly implement the Work Plan in some material respect, the Monitor may direct that the work on the Metrics (or parts thereof) be reviewed by Professionals or a third party other than the Internal Review Group, and that supplemental work be performed as necessary.

23. If the Monitor becomes aware of facts or information that lead the Monitor to reasonably conclude that Servicer may be engaged in a pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers or tenants residing in foreclosed properties or with any of the Mandatory Relief Requirements, the Monitor shall engage Servicer in a review to determine if the facts are accurate or the information is correct.  If after that review, the Monitor reasonably concludes that such a pattern exists and is reasonably likely to cause material harm to borrowers or tenants residing in foreclosed properties, the Monitor may propose an additional Metric and associated Threshold Error Rate relating to Servicer's compliance with the associated term or requirement.  Any additional Metrics and associated Threshold Error Rates (a) must be similar to the Metrics and associated Threshold Error Rates contained in Schedule E-1, (b) must relate to material terms of the Servicing Standards or one of the Mandatory Relief Requirements, (c) must either (i) be outcomes-based (but no outcome-based Metric shall be added with respect to any Mandatory Relief Requirement) or (ii) require the existence of policies and procedures required by the Servicing Standards or the Mandatory Relief Requirements, in a manner similar to Metrics 5.B-E, and (d) must be distinct from, and not overlap with, any other Metric or Metrics.  Notwithstanding the foregoing, the Monitor may add a Metric that satisfies (a)-(c) but does not satisfy (d) of the preceding sentence if the Monitor first asks the Servicer to propose, and then implement, a Corrective Action Plan, as defined below, for the material

term of the Servicing Standards with which there is a pattern of
noncompliance and that is reasonably likely to cause material harm to
borrowers or tenants residing in foreclosed properties, and the Servicer
fails to implement the Corrective Action Plan according to the timeline
agreed to with the Monitor.

24.    If Monitor proposes an additional Metric and associated Threshold Error
Rate pursuant to Section C.23, above, Monitor, the Monitoring Committee,
and Servicer shall agree on amendments to Schedule E-1 to include the
additional Metrics and Threshold Error Rates provided for in Section C.23,
above, and an appropriate timeline for implementation of the Metric.  If
Servicer does not timely agree to such additions, any associated
amendments to the Work Plan, or the implementation schedule, the
Monitor may petition the court for such additions.

25.    Any additional Metric proposed by the Monitor pursuant to the processes
in Sections C.12, C.23, or C.24 and relating to provision VIII.B.1 of the
Servicing Standards shall be limited to Servicer's performance of its
obligations to comply with (1) the federal Protecting Tenants at
Foreclosure Act and state laws that provide comparable protections to
tenants of foreclosed properties; (2) state laws that govern relocation
assistance payments to tenants ("cash for keys"); and (3) state laws that
govern the return of security deposits to tenants.

## D.  Reporting

*Quarterly Reports*

1.    Following the end of each Quarter, Servicer will report the results of its
Compliance Reviews for that Quarter (the "Quarterly Report").  The
Quarterly Report shall include:  (i) the Metrics for that Quarter; (ii)
Servicer's progress toward meeting its payment obligations under this
Consent Judgment; (iii) general statistical data on Servicer's overall
servicing performance described in Schedule Y.  Except where an
extension is granted by the Monitor, Quarterly Reports shall be due no
later than 45 days following the end of the Quarter and shall be provided
to:  (1) the Monitor, and (2) the Board of Servicer or a committee of the
Board designated by Servicer.  The first Quarterly Report shall cover the
first full Quarter after this Consent Judgment is entered.

2.    Following the end of each Quarter, Servicer will transmit to each state a
report (the "State Report") including general statistical data on Servicer's
servicing performance, such as aggregate and state-specific information
regarding the number of borrowers assisted and credited activities
conducted pursuant to the Consumer Relief Requirements, as described in
Schedule Y.  The State Report will be delivered simultaneously with the

submission of the Quarterly Report to the Monitor.  Servicer shall provide copies of such State Reports to the Monitor and Monitoring Committee.

*Monitor Reports*

3. The Monitor shall report on Servicer's compliance with this Consent Judgment in periodic reports setting forth his or her findings (the "Monitor Reports").  The first three Monitor Reports will each cover two Quarterly Reports.  If the first three Monitor Reports do not find Potential Violations (as defined in Section E.1, below), each successive Monitor Report will cover four Quarterly Reports, unless and until a Quarterly Report reveals a Potential Violation (as defined in Section E.1, below).  In the case of a Potential Violation, the Monitor may (but retains the discretion not to) submit a Monitor Report after the filing of each of the next two Quarterly Reports, provided, however, that such additional Monitor Report(s) shall be limited in scope to the Metric or Metrics as to which a Potential Violation has occurred.

4. Prior to issuing any Monitor Report, the Monitor shall confer with Servicer and the Monitoring Committee regarding its preliminary findings and the reasons for those findings.  Servicer shall have the right to submit written comments to the Monitor, which shall be appended to the final version of the Monitor Report.  Final versions of each Monitor Report shall be provided simultaneously to the Monitoring Committee and Servicers within a reasonable time after conferring regarding the Monitor's findings.  The Monitor Reports shall be filed with the Court overseeing this Consent Judgment and shall also be provided to the Board of Servicer or a committee of the Board designated by Servicer.

5. The Monitor Report shall: (i) describe the work performed by the Monitor and any findings made by the Monitor's during the relevant period, (ii) list the Metrics and Threshold Error Rates, (iii) list the Metrics, if any, where the Threshold Error Rates have been exceeded, (iv) state whether a Potential Violation has occurred and explain the nature of the Potential Violation, and (v) state whether any Potential Violation has been cured.  In addition, following each Satisfaction Review, the Monitor Report shall report on the Servicer's satisfaction of the Consumer Relief Requirements, including regarding the number of borrowers assisted and credited activities conducted pursuant to the Consumer Relief Requirements, and identify any material inaccuracies identified in prior State Reports.  Except as otherwise provided herein, the Monitor Report may be used in any court hearing, trial, or other proceeding brought pursuant to this Consent Judgment pursuant to Section J, below, and shall be admissible in evidence in a proceeding brought under this Consent Judgment pursuant to Section J, below.  Such admissibility shall not prejudice Servicer's right

and ability to challenge the findings and/or the statements in the Monitor Report as flawed, lacking in probative value or otherwise. The Monitor Report with respect to a particular Potential Violation shall not be admissible or used for any purpose if Servicer cures the Potential Violation pursuant to Section E, below.

*Satisfaction of Payment Obligations*

6.      Upon the satisfaction of any category of payment obligation under this Consent Judgment, Servicer, at its discretion, may request that the Monitor certify that Servicer has discharged such obligation. Provided that the Monitor is satisfied that Servicer has met the obligation, the Monitor may not withhold and must provide the requested certification. Any subsequent Monitor Report shall not include a review of Servicer's compliance with that category of payment obligation.

*Compensation*

7.      Within 120 days of entry of this Consent Judgment, the Monitor shall, in consultation with the Monitoring Committee and Servicer, prepare and present to Monitoring Committee and Servicer an annual budget providing its reasonable best estimate of all fees and expenses of the Monitor to be incurred during the first year of the term of this Consent Judgment, including the fees and expenses of Professionals and support staff (the "Monitoring Budget"). On a yearly basis thereafter, the Monitor shall prepare an updated Monitoring Budget providing its reasonable best estimate of all fees and expenses to be incurred during that year. Absent an objection within 20 days, a Monitoring Budget or updated Monitoring Budget shall be implemented. Consistent with the Monitoring Budget, Servicer shall pay all fees and expenses of the Monitor, including the fees and expenses of Professionals and support staff. The fees, expenses, and costs of the Monitor, Professionals, and support staff shall be reasonable. Servicer may apply to the Court to reduce or disallow fees, expenses, or costs that are unreasonable.

## E.  Potential Violations and Right to Cure

1.      A "Potential Violation" of this Consent Judgment occurs if the Servicer has exceeded the Threshold Error Rate set for a Metric in a given Quarter. In the event of a Potential Violation, Servicer shall meet and confer with the Monitoring Committee within 15 days of the Quarterly Report or Monitor Report indicating such Potential Violation.

2.      Servicer shall have a right to cure any Potential Violation.

3.      Subject to Section E.4, a Potential Violation is cured if (a) a corrective action plan approved by the Monitor (the "Corrective Action Plan") is determined by the Monitor to have been satisfactorily completed in

accordance with the terms thereof; and (b) a Quarterly Report covering the Cure Period reflects that the Threshold Error Rate has not been exceeded with respect to the same Metric and the Monitor confirms the accuracy of said report using his or her ordinary testing procedures. The Cure Period shall be the first full quarter after completion of the Corrective Action Plan or, if the completion of the Corrective Action Plan occurs within the first month of a Quarter and if the Monitor determines that there is sufficient time remaining, the period between completion of the Corrective Action Plan and the end of that Quarter.

4.    If after Servicer cures a Potential Violation pursuant to the previous section, another violation occurs with respect to the same Metric, then the second Potential Violation shall immediately constitute an uncured violation for purposes of Section J.3, provided, however, that such second Potential Violation occurs in either the Cure Period or the quarter immediately following the Cure Period.

5.    In addition to the Servicer's obligation to cure a Potential Violation through the Corrective Action Plan, Servicer must remediate any material harm to particular borrowers identified through work conducted under the Work Plan. In the event that a Servicer has a Potential Violation that so far exceeds the Threshold Error Rate for a metric that the Monitor concludes that the error is widespread, Servicer shall, under the supervision of the Monitor, identify other borrowers who may have been harmed by such noncompliance and remediate all such harms to the extent that the harm has not been otherwise remediated.

6.    In the event a Potential Violation is cured as provided in Sections E.3, above, then no Party shall have any remedy under this Consent Judgment (other than the remedies in Section E.5) with respect to such Potential Violation.

## F. Confidentiality

1.    These provisions shall govern the use and disclosure of any and all information designated as "CONFIDENTIAL," as set forth below, in documents (including email), magnetic media, or other tangible things provided by the Servicer to the Monitor in this case, including the subsequent disclosure by the Monitor to the Monitoring Committee of such information. In addition, it shall also govern the use and disclosure of such information when and if provided to the participating state parties or the participating agency or department of the United States whose claims are released through this settlement ("participating state or federal agency whose claims are released through this settlement").

2.      The Monitor may, at his discretion, provide to the Monitoring Committee
or to a participating state or federal agency whose claims are released
through this settlement any documents or information received from the
Servicer related to a Potential Violation or related to the review described
in Section C.19; provided, however, that any such documents or
information so provided shall be subject to the terms and conditions of
these provisions.  Nothing herein shall be construed to prevent the Monitor
from providing documents received from the Servicer and not designated
as "CONFIDENTIAL" to a participating state or federal agency whose
claims are released through this settlement.

3.      The Servicer shall designate as "CONFIDENTIAL" that information,
document or portion of a document or other tangible thing provided by the
Servicer to the Monitor, the Monitoring Committee or to any other
participating state or federal agency whose claims are released through
this settlement that Servicer believes contains a trade secret or confidential
research, development, or commercial information subject to protection
under applicable state or federal laws (collectively, "Confidential
Information").  These provisions shall apply to the treatment of
Confidential Information so designated.

4.      Except as provided by these provisions, all information designated as
"CONFIDENTIAL" shall not be shown, disclosed or distributed to any
person or entity other than those authorized by these provisions.
Participating states and federal agencies whose claims are released
through this settlement agree to protect Confidential Information to the
extent permitted by law.

5.      This agreement shall not prevent or in any way limit the ability of a
participating state or federal agency whose claims are released through
this settlement to comply with any subpoena, Congressional demand for
documents or information, court order, request under the Right of
Financial Privacy Act, or a state or federal public records or state or
federal freedom of information act request; provided, however, that in the
event that a participating state or federal agency whose claims are released
through this settlement receives such a subpoena, Congressional demand,
court order or other request for the production of any Confidential
Information covered by this Order, the state or federal agency shall, unless
prohibited under applicable law or the unless the state or federal agency
would violate or be in contempt of the subpoena, Congressional demand,
or court order, (1) notify the Servicer of such request as soon as
practicable and in no event more than ten (10) calendar days of its receipt
or three calendar days before the return date of the request, whichever is
sooner, and (2) allow the Servicer ten (10) calendar days from the receipt
of the notice to obtain a protective order or stay of production for the

documents or information sought, or to otherwise resolve the issue, before
the state or federal agency discloses such documents or information. In all
cases covered by this Section, the state or federal agency shall inform the
requesting party that the documents or information sought were produced
subject to the terms of these provisions.

**G.**  **Dispute Resolution Procedures.**  Servicer, the Monitor, and the Monitoring
Committee will engage in good faith efforts to reach agreement on the proper
resolution of any dispute concerning any issue arising under this Consent
Judgment, including any dispute or disagreement related to the withholding of
consent, the exercise of discretion, or the denial of any application.  Subject to
Section J, below, in the event that a dispute cannot be resolved, Servicer, the
Monitor, or the Monitoring Committee may petition the Court for resolution of
the dispute.  Where a provision of this agreement requires agreement, consent of,
or approval of any application or action by a Party or the Monitor, such agreement,
consent or approval shall not be unreasonably withheld.

**H.**  **Consumer Complaints.**  Nothing in this Consent Judgment shall be deemed to
interfere with existing consumer complaint resolution processes, and the Parties
are free to bring consumer complaints to the attention of Servicer for resolution
outside the monitoring process.  In addition, Servicer will continue to respond in
good faith to individual consumer complaints provided to it by State Attorneys
General or State Financial Regulators in accordance with the routine and practice
existing prior to the entry of this Consent Judgment, whether or not such
complaints relate to Covered Conduct released herein.

**I.**  **Relationship to Other Enforcement Actions.**  Nothing in this Consent Judgment
shall affect requirements imposed on the Servicer pursuant to Consent Orders
issued by the appropriate Federal Banking Agency (FBA), as defined in 12 U.S.C.
§ 1813(q), against the Servicer.  In conducting their activities under this Consent
Judgment, the Monitor and Monitoring Committee shall not impede or otherwise
interfere with the Servicer's compliance with the requirements imposed pursuant
to such Orders or with oversight and enforcement of such compliance by the FBA.

**J.**  **Enforcement**

1.  **Consent Judgment.**  This Consent Judgment shall be filed in the U.S.
District Court for the District of Columbia (the "Court") and shall be
enforceable therein.  Servicer and the Releasing Parties shall waive their
rights to seek judicial review or otherwise challenge or contest in any
court the validity or effectiveness of this Consent Judgment.  Servicer and
the Releasing Parties agree not to contest any jurisdictional facts,
including the Court's authority to enter this Consent Judgment.

2.  **Enforcing Authorities.**  Servicer's obligations under this Consent
Judgment shall be enforceable solely in the U.S. District Court for the

E-14

District of Columbia. An enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee. Monitor Report(s) and Quarterly Report(s) shall not be admissible into evidence by a Party to this Consent Judgment except in an action in the Court to enforce this Consent Judgment. In addition, unless immediate action is necessary in order to prevent irreparable and immediate harm, prior to commencing any enforcement action, a Party must provide notice to the Monitoring Committee of its intent to bring an action to enforce this Consent Judgment. The members of the Monitoring Committee shall have no more than 21 days to determine whether to bring an enforcement action. If the members of the Monitoring Committee decline to bring an enforcement action, the Party must wait 21 additional days after such a determination by the members of the Monitoring Committee before commencing an enforcement action.

3.    **Enforcement Action.**  In the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired, the sole relief available in such an action will be:

(a)    Equitable Relief.  An order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action.

(b)    Civil Penalties.  The Court may award as civil penalties an amount not more than $1 million per uncured Potential Violation; or, in the event of a second uncured Potential Violation of Metrics 1.a, 1.b, or 2.a (*i.e.*, a Servicer fails the specific Metric in a Quarter, then fails to cure that Potential Violation, and then in subsequent Quarters, fails the same Metric again in a Quarter and fails to cure that Potential Violation again in a subsequent Quarter), where the final uncured Potential Violation involves widespread noncompliance with that Metric, the Court may award as civil penalties an amount not more than $5 million for the second uncured Potential Violation.

Nothing in this Section shall limit the availability of remedial compensation to harmed borrowers as provided in Section E.5.

(c)    Any penalty or payment owed by Servicer pursuant to the Consent Judgment shall be paid to the clerk of the Court or as otherwise agreed by the Monitor and the Servicer and distributed by the Monitor as follows:

1.    In the event of a penalty based on a violation of a term of the Servicing Standards that is not specifically related to conduct in bankruptcy, the penalty shall be allocated, first, to cover the costs incurred by any state or states in prosecuting the violation, and second, among the participating states according to the same allocation as the State Payment Settlement Amount.

2.    In the event of a penalty based on a violation of a term of the Servicing Standards that is specifically related to conduct in bankruptcy, the penalty shall be allocated to the United States or as otherwise directed by the Director of the United States Trustee Program.

3.    In the event of a payment due under Paragraph 10.d of the Consumer Relief requirements, 50% of the payment shall be allocated to the United States, and 50% shall be allocated to the State Parties to the Consent Judgment, divided among them in a manner consistent with the allocation in Exhibit B of the Consent Judgment.

K.    **Sunset.**  This Consent Judgment and all Exhibits shall retain full force and effect for three and one-half years from the date it is entered (the "Term"), unless otherwise specified in the Exhibit.  Servicer shall submit a final Quarterly Report for the last quarter or portion thereof falling within the Term, and shall cooperate with the Monitor's review of said report, which shall be concluded no later than six months following the end of the Term, after which time Servicer shall have no further obligations under this Consent Judgment.