1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, et al.,

9

10                 Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                 United States Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 January 27, 2014

19                 2:07 PM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

1

2   (CC: Doc. No. 6139) Adjourned Hearing Re: Debtors' Motion

3   Pursuant to Sections 105(a) and 554(a) of the Bankruptcy Code

4   for an Order Approving Abandonment of Debtors' Interests in

5   Certain Assets.  Filed by Lorenzo Marinuzzi on Behalf of

6   Residential Capital, LLC

7

8   (Doc No. 5786) Adjourned Hearing Re: Debtors' Objection to

9   Claim No. 5420 of Vachagan Abed-Stephen and Suzie Abed-Stephen

10

11  (CC: Doc. No. 5150, 5909) Adjourned Hearing Re: Motion for

12  Omnibus Objection to Claim(s)/Debtors' Forty-Second Omnibus

13  Objection to Claims (Reduce and Allow Borrower Claims).  Going

14  Forward as to Claims of Jennifer and Jason Schermerhorn

15

16

17

18

19

20  Transcribed by:  Esther Accardi

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8  BY:   LORENZO MARINUZZI, ESQ.

9         NORMAN S. ROSENBAUM, ESQ.

10        JORDAN A. WISHNEW, ESQ.

11        MELISSA A. HAGER, ESQ.

12

13

14  SILVERMAN ACAMPORA LLP

15        Attorneys for Declarant/Proposed Special Counsel to

16        Borrowers' Trustee

17        100 Jericho Quadrangle

18        Suite 300

19        Jericho, NY 11753

20

21  BY:   ROBERT D. NOSEK, ESQ.

22

23

24

25

1

2  BUTLER, FITZGERALD, FIVESON & MCCARTHY

3        Attorneys for Jennifer and Jason Schermerhorn

4        Nine East 45th Street

5        Ninth Floor

6        New York, NY 10017

7

8  BY:   DAVID K. FIVESON, ESQ.

9

10

11  POLSINELLI PC

12        Attorneys for Borrower Trust

13        900 Third Avenue

14        21st Floor

15        New York, NY 10022

16

17  BY:   DAN FLANIGAN, ESQ.

18

19

20  CLIFFORD CHANCE

21        Attorneys for Ocwen Loan Financing LLC

22        31 West 52nd Street

23        New York, NY 10019

24

25  BY:   JENNIFER D. DEMARCO, ESQ.

1

2   PYLE, SIMS, DUNCAN & STEVENSON, PC

3       Attorneys for Jennifer and Jason Schermerhorn

4       401 B Street

5       Suite 1500

6       San Diego, CA 92101

7

8   BY:   KATHLEEN CASHMAN-KRAMER, ESQ. (TELEPHONICALLY)

9       MICHAEL MACKINNON, ESQ. (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.

4            Mr. Marinuzzi?

5            MR. MARINUZZI:  Good afternoon, Your Honor.  Lorenzo

6    Marinuzzi, Morrison & Foerster, on behalf of the ResCap

7    reorganized debtors.

8            Your Honor, we're going to begin this afternoon on

9    page 2 of the agenda under item 1, uncontested matters.  And

10   that's the debtors' motion pursuant to Sections 105(a) and

11   554(a) for an order approving abandonment of the debtors'

12   interests in certain estate assets.

13           The abandonment motion, Your Honor, seeks approval of

14   the abandonment as of the filing date for the motion, which is

15   December 17th, 2013, of certain categories of assets that are

16   under the definition of excluded assets under the plan, not

17   transferred to the liquidating trust.

18           And there are basically five categories.

19           The first is what we call the NERDS, which are the

20   noneconomic residuals and REMIC securitizations.  I didn't make

21   up the term, Your Honor.  The trust certificates and nonREMIC

22   securitizations.  Equity in a passive foreign investment

23   company.  The debtors' interests in what we refer to as the

24   "common land."  And 10,200 approximately home equity lines of

25   credit, or HELOC loans.

1          Since the motion was filed in mid-December we fielded

2     some telephone calls from the Department of Justice, from

3     Ocwen, from some borrowers, from representatives of the New

4     Jersey Carpenters class action.  And if I didn't -- and the

5     RMBS trustees, importantly, Your Honor.

6          And we've had some discussions with them, provided

7     them with some additional details and explanations.  And I'm

8     happy to report that none of those parties has filed an

9     objection.  So the motion is uncontested.

10         In support of the motion we offer the declaration of

11    William Tyson, who is the debtors' -- or was the debtors' chief

12    asset disposition officer, now employed by the liquidating

13    trust.  He's here in court with us, Your Honor, today, should

14    Your Honor have any questions of him.  And I'd like to move

15    that declaration into evidence, if I might.

16         THE COURT:  All right.  Any objections?

17         All right, the declaration is admitted in evidence.

18    (Declaration of William Tyson was hereby received into

19    evidence, as of this date.)

20         MR. MARINUZZI:  Thank you, Your Honor.  So let me just

21    provide the Court with an overview of what these asset

22    categories are.

23         So we have the NERDS, and those are set forth in

24    Exhibit 2-A to the motion.

25         THE COURT:  I was fascinated by the NERDS.

1      MR. MARINUZZI:  They are fascinating, Your Honor,
2  fascinating.

3      These are noneconomic residual interests in REMICs,
4  which are real estate mortgage investment conduits.  They're a
5  tax flow-through vehicle widely used in mortgage-backed
6  securities.  They typically have no or minimal cash flow.
7  They're viewed -- while they're "an asset" they're viewed more
8  as a liability.   And we tried to market these and tried to
9  sell them.  But our experience in this, and we've done this in
10  a prior case, as well, Delta Financial, is you actually have to
11  pay somebody to take them from you, because they have to absorb
12  some losses over the immediate period before they can use them
13  to offset some other gains.  And we were able to sell them.

14      Now, importantly, AFI is the taxpayer because the
15  debtors were a disregarded entity.  And so the tax liability
16  for the NERDS rests with AFI, and AFI has been honoring those
17  tax liabilities.

18      Under the tax code, as I understand it, until there is
19  what's known as an effective transfer, the IRS views the
20  taxpayer of record as continuing to be the taxpayer of record.
21  So it's important for the Court to understand that by filing
22  this motion we're not seeking to implicate or otherwise affect
23  the tax obligations of AFI or any entity with respect to these
24  assets.

25      THE COURT:  So AFI will continue to probably have to

RESIDENTIAL CAPITAL, LLC, et al.                        9

1    pay some tax liability and then at some point you recapture

2    that.

3           MR. MARINUZZI:  The IRS will look to AFI to pay for

4    these tax obligations.  Whether AFI in the future will be able

5    to offset this with gains, overseas gains, I can't speak to

6    that, your Honor.

7           THE COURT:  Okay.

8           MR. MARINUZZI:  Now, they're a burdensome liability to

9    the debtors, this category of assets, Your Honor.  We've

10   anticipated abandoning them for quite some time.

11          Second category of assets are the trust certificates,

12   and those are identified in Exhibit 2-B to the motion.  And

13   these are certificates held by RFC Asset Holdings II LLC and

14   GMAC Mortgage in sixteen nonREMIC securitizations.  Each of

15   these trusts is a disregarded entity for tax purposes.  And

16   because AFI chose to treat the debtors as disregarded entities,

17   this also falls on AFI's shoulders as far as tax burdens are

18   concerned.

19          And an analysis of the underlying mortgages that make

20   up the securitization pool shows that there's not value here to

21   be transferred to the liquidating trust.  And so we carefully

22   evaluated this bucket of assets to see if there might be some

23   value that was worth trying to take into the liquidating trust,

24   and concluded that there just wasn't any, or to the extent

25   there was, it wasn't worth any associated risks.

RESIDENTIAL CAPITAL, LLC, et al.                    10

1        So we'd ask the Court to permit the debtors to abandon

2    that category of assets as well.

3        The third, Your Honor, is the equity interest in a

4    securitization that is a passive foreign investment conduit or

5    PFIC, I guess is the way you'd say it.  And it is established

6    for federal income tax purposes.  Again, as I've already said,

7    AFI is the taxpayer of record for this particular asset.

8        And similar to the NERDS and the trust certificates,

9    the cash flows expected from this PFIC equity are less than the

10   taxes that could be incurred by the LT to the extent we were to

11   transfer it to the liquidating trust.  And while RFC and GMAC

12   own this equity, it really remains an AFI tax liability.  And

13   so we would ask Your Honor, since we don't really see a benefit

14   to continuing ownership or transferring them to the trust, that

15   they be abandoned.

16       THE COURT:  So with respect to the NERDS, the trust

17   certificates, and the PFIC equity, AFI will continue to bear

18   any burden or benefit associated with these categories of

19   assets.

20       MR. MARINUZZI:  Right.  That's my understanding based

21   on the discussions with the tax partners involved in the case,

22   Your Honor.

23       THE COURT:  Okay.

24       MR. MARINUZZI:  They were served with a copy of the

25   motion, and they haven't responded.

1    Your Honor, the fourth category of assets is the

2   common lands.  And these are --

3    THE COURT:  This is the one that I had a question

4   about.

5    MR. MARINUZZI:  Sure.

6    THE COURT:  Go ahead and explain it.

7    MR. MARINUZZI:  So there are five parcels.  And this

8   is land that we can't develop, we can't sell.  It's land within

9   a development, it might be part of a park, it might be

10  retention pond.  It might be what I'll call -- I guess they use

11  nice words to describe a dump, or they might put waste that's

12  generated.  And so within the --

13    THE COURT:  That's probably the one category you

14  shouldn't describe.  No, I'm quite serious about it, because I

15  think it's the Midlantic case that if there's potential

16  environmental liability, courts are not supposed to let you

17  abandon them.

18    MR. MARINUZZI:  Well, Your Honor, on that note, the

19  DOJ reached out to us.  And the DOJ -- we provided them with

20  the information regarding these parcels, they conducted their

21  own internal investigation, and concluded not to oppose the

22  abandonment.

23    THE COURT:  Okay.  So what happens -- this is the

24  one -- with respect to the first three categories, I understood

25  from the pleadings that AFI would continue to bear any burden

1  or any benefit resulting from the debtors' abandonment.  It

2  wasn't so clear to me what -- common land, I mean, there's

3  land.  I gather that these developments didn't want to take it.

4           MR. MARINUZZI:  They did not want to take it.

5           THE COURT:  So what happens to the land?

6           MR. MARINUZZI:  Well, Your Honor, that's a very good

7  question.  And it begs the question when you look at the cases

8  in the context of a Chapter 11 case on abandonment what happens

9  with property once it's abandoned by the debtors' estates.  And

10 I've never been able to get for myself a satisfactory answer.

11 And the last time this issue was approach in a case I was

12 involved in, it was the Pacific Energy case down in Delaware in

13 front of Judge Carey, Judge Carey wouldn't take the bait as to

14 what happened afterwards.  His analysis was I make a

15 determination that it's burdensome for the estate, I'm

16 authorizing the abandonment, what happens afterwards is not my

17 business.  I just don't have an answer for Your Honor.

18           I think the practical reality is the lawn will be

19 mowed, no one's going to skip a particular part.

20           THE COURT:  Who's going to mow it?

21           MR. MARINUZZI:  The homeowner's association that's

22 going to handle the rest of the land that shares common

23 interest.

24           THE COURT:  Who's going to insure it, who's going to

25 bear any personal liability for a slip and fall when somebody

RESIDENTIAL CAPITAL, LLC, et al.                         13

1  falls into the pond, or --

2          MR. MARINUZZI:  Your Honor, and that's part of the

3  analysis as to why it would be abandoned, because to accept the

4  risk for a piece of property in this case that just poses risk,

5  but no benefit, I mean, that's why you have 554 and are

6  permitted to abandon it.  I recognize Your Honor's distinction

7  regarding Midlantic --

8          THE COURT:  But usually you abandon property to a

9  party who would have a possessory interest.

10         MR. MARINUZZI:  Or the last interest prior to the

11 transfer.  And so presumably somebody owned this land before

12 the debtors took title to it, how long ago I don't know.  But

13 there's a line of cases that say you look at the party that had

14 ownership immediately prior to the debtors' taking ownership of

15 it.  So -- there must have been an owner, I don't know who that

16 owner is, I can't identify that owner for the Court.  But

17 according to those lines of cases -- to that line of cases,

18 that owner would now take title to the property.

19         THE COURT:  So who did you give notice to with

20 respect -- this is the only category that I had a problem

21 about, because there's potential liability associated with

22 land.  Ordinarily one doesn't think of land just not belonging

23 to anyone.

24         MR. MARINUZZI:  Your Honor --

25         THE COURT:  When you say that the homeowners will

1  continue to mow the grass, and maybe they will and maybe they

2  won't, the real issue is potential liabilities; if someone was

3  injured, or things of that nature.

4          MR. MARINUZZI:  I don't have an answer for Your Honor.

5  I think --

6          THE COURT:  So who did you give notice to?

7          MR. MARINUZZI:  We gave notice to everybody on the

8  service list.  And I believe we also gave notice to the

9  homeowner's associations and the developers of the property.

10          THE COURT:  So when you say the developers of the

11  property, did you make an inquiry to find out who the last

12  owner was before the debtors acquired the property?

13          MR. MARINUZZI:  Your Honor, I did not, and I'm looking

14  at Mr. Tyson sitting in the front row.

15          MR. TYSON:  I think we just noticed the homeowners

16  association.

17          MR. MARINUZZI:  Just the homeowner's association.  We

18  did not make that inquiry.  If Your Honor would like us to seek

19  to identify the prior owner we could carry this aspect of the

20  relief to make the Court more comfortable.

21          THE COURT:  I'm not trying to be difficult about it,

22  but this -- just when I tried to conceive of what was being

23  proposed here, this was the one -- the land just sits there,

24  not owned by anybody.  That might all well and good, other than

25  potential liability.  You got a development, you know, if there

1  was a holding pond, or something, and -- these are common

2  areas.

3          MR. MARINUZZI:  Right.

4          THE COURT:  And what happens if a kid gets killed?

5          MR. MARINUZZI:  Your Honor, hopefully that never

6  happens.

7          THE COURT:  I hope so too.  I hope it never happens as

8  well.

9          MR. MARINUZZI:  But I think we could think of a lot of

10  things that might happen.  At the end of the day there is no

11  definitive answer about who takes --

12          THE COURT:  See with respect to everything else that

13  you're trying to abandon, analytically I understand what

14  happens to it.  The HELOCs, there's no liability associated

15  because they're undrawn, you've already given notice that

16  nobody could draw any additional money.  If there is any money,

17  other people are getting the benefit, you're abandoning the

18  claim, they're never going to owe anything.  Okay.

19          MR. MARINUZZI:  We're eliminating the mortgages.

20          THE COURT:  And with respect to the first three

21  categories I understood that as well.  It's the common land

22  that's giving me pause.

23          MR. MARINUZZI:  Right.  And, Your Honor, in the

24  Pacific Energy case, which is the last case that I worked on

25  where this issue arose, I represented the State of Alaska.  And

 1   the debtor filed in Delaware.  It was a lessee of oil and gas

 2   leases in Alaska.  And so they filed a motion to abandon their

 3   interest in the oil and gas leases.  And in that case you had

 4   the State of Alaska, which obviously owned the land, and you

 5   had Chevron, and you had -- I forget which other oil company

 6   was involved in it, in the chain of title.  And so there there

 7   was a particular focus on the ownership because of potential

 8   environmental liability because of agreements among parties to

 9   the oil and gas leases as to how to apportion liability.  And

10   even with those particular facts, where parties were very

11   interested in trying to understand under law in a Chapter 11

12   case, who now bears that responsibility, there simply wasn't an

13   answer.  And so --

14          THE COURT:  No, but there's an answer about if you're

15   abandoning a lease the fee owner winds up owning it not subject

16   to the lease, I suppose.

17          MR. MARINUZZI:  Well, it depends, because the fee

18   owner, looking at the case law that says the prior occupier of

19   the property, the prior lessee now takes ownership of the

20   lease.  If you were seeking to impose liability on that party

21   based on this handful of Chapter 11 cases you would have a

22   different ownership -- a different argument about who owns it.

23          THE COURT:  Did you give notice to the last prior

24   lessees?

25          MR. MARINUZZI:  Your Honor, we did not.  Oh, in that

 1   case?

 2           THE COURT:  Yes.

 3           MR. MARINUZZI:  Yes, absolutely.

 4           THE COURT:  Okay.

 5           MR. MARINUZZI:  Yes.

 6           THE COURT:  But so if it's -- if you abandon property

 7   and it vests back in the last prior owner, and you gave notice

 8   to them, they at least were told your client's going to abandon

 9   the property, this is a potential consequence, speak now or

10   ever hold your peace.  That's what's giving me pause here is, I

11   don't -- that's not happening here with respect to the common

12   land.

13           MR. MARINUZZI:  So, Your Honor, we can notice -- we

14   can try to identify the prior owners of the land.  I'm assuming

15   somewhere there's some document that evidences who owns it.

16   I'm not sure how far back we're going, but we can make those

17   efforts.

18           In the Pacific Energy case there was pointing fingers

19   about who actually owns it.  And the reason the prior land

20   owner or owner of the lease was present in court, was because

21   they were still active in the case.  Right.  And so their

22   interest was to make sure that nothing touched them, they

23   wanted to be out of it.

24           THE COURT:  I apologize, Mr. Marinuzzi, did you

25   address this specific issue --

1        MR. MARINUZZI:  I did not address the specific issue

2    in the papers, no.

3        THE COURT:  That's what I -- I didn't -- I didn't see

4    it and that's --

5        MR. MARINUZZI:  Right.  We did not and we -- we had a

6    lot of discussions with Kramer Levin, and the question was what

7    happens to these properties.  And the answer is really good

8    question, but the case law doesn't tell us what happens to it.

9    So if the Court looks at it from the perspective of there's

10   just no benefit to the estate, the liquidating trust doesn't

11   want it, it's an excluded asset, there's somebody who will take

12   care of it, it's part of common land.  That was the approach we

13   had, because we just didn't have an answer under law, Your

14   Honor, we just didn't.

15       But to the extent the Court is uncomfortable granting

16   the relief without having given notice to the prior owners

17   we'll do that.  We'll seek to identify them and send them a

18   copy of the motion, and we can carry this aspect of the relief

19   to a later hearing.

20       THE COURT:  Okay.  Do you want to just address the --

21   the HELOCs I think I understand that, pretty clear on it.

22       MR. MARINUZZI:  Your Honor's comments tell me that

23   Your Honor does understand it very well.  And the only aspect

24   of it that I don't think Your Honor raised in your comments, is

25   that we're actually undertaking the cost to release the

1    mortgages represented by these HELOCs.  So instead of a

2    borrower having to worry if they want to actually go through

3    and get another HELOC from someone to clear title, we'll take

4    care of that, the liquidating -- the debtors will fund it.

5            THE COURT:  All right.  Anybody wish to be heard with

6    respect to the debtors' motion to authorize abandonment of

7    interests in certain estate assets?

8            All right.  I'm going to grant the motion as to

9    everything other than the common land.  And as to that I'll

10   carry the motion.  And I do want you to address specifically

11   for me what happens to the land.

12           MR. MARINUZZI:  We'll do that, Your Honor.

13           THE COURT:  Someone has to own it.  And if you

14   identify -- if you have good authority that it would revert to

15   the last prior owner, try and identify who that is, give them

16   notice and it put it back on for hearing.

17           MR. MARINUZZI:  We'll do that, your Honor.

18           THE COURT:  Okay.

19           MR. MARINUZZI:  Thank you very much, Your Honor.

20           THE COURT:  All right.  Thank you very much.

21           MR. MARINUZZI:  The next item on the agenda is at the

22   bottom of page 2, it's the claims objections number 1.  And I

23   will cede the podium to my colleague Melissa Hager.

24           THE COURT:  Thank you very much.

25           MR. MARINUZZI:  Thank you.

1        MS. HAGER:  Good afternoon, Your Honor.  Melissa Hager

2    from Morrison & Foerster.  And I'm appearing today on behalf of

3    the ResCap borrowers' trust.

4        Your Honor, the next item on the agenda was originally

5    the debtors' application, it's now the ResCap borrowers' trust

6    objection, to proof of claim number 5420 filed by Vachagan and

7    Suzie Abed-Stephen.

8        This matter was opposed by the claimants, and the

9    borrowers' trust did submit a reply in support of the

10   objection.

11       With me in court today is Ms. Delehey who filed two

12   declarations in support of the objection, and she currently

13   serves as the chief litigation counsel for the ResCap

14   liquidating trust, and is available for any questions.

15       There's two other declarants that are also in court

16   today that submitted declarations on the filing of the claim

17   process protocol, if the Court has any questions about that as

18   well.

19       Getting to the merits of the proofs of claim, Your

20   Honor, it was one single proof of claim filed by the claimants

21   against Residential Capital and GMAC Mortgage LLC in the amount

22   of 1.75 million, of which 1.2 million, is on the face of the

23   claim alleged to be a secured claim, and it listed the real

24   property that's subject to a loan and deed of trust as a

25   security for that.

1        The proof of claim, it was a one-pager, has no

2   supporting documentation.  Really, it was very difficult to

3   decipher what the basis of it was.  In accordance with Your

4   Honor's protocol that was approved as part of the Chapter 11

5   cases, we sent out the notice to them.  We got a response back

6   to them and they did file the reply.  And when you cobble those

7   together you come up with three possible causes of action upon

8   which the claim is possibly based.  And those are slander of

9   title, breach of contract with respect to a loan modification,

10  and cancellation of an instrument.

11       Also, if you look at their reply -- or, I'm sorry,

12  their response to the objection it also appears that they

13  have -- are arguing that they are entitled to the return of the

14  monies paid to GMAC as a result of an improper filing of an

15  assignment of a deed of trust and alleged defects associated

16  with the securitization of the note.

17       Your Honor, as set forth in the objection and the

18  reply, none of these claims have any merit based upon the facts

19  and the state of the law in California, which is very clear on

20  all of these issues.

21       And the cancellation of an instrument argument relates

22  to a pre-petition lawsuit that the claimants brought against

23  the debtors, pre-petition.  It was dismissed without leave to

24  plead.  And there was an appeal filed, actually, post-petition,

25  after the ResCap debtors filed for bankruptcy.

1       THE COURT:  And res judicata doesn't apply because the

2   California rule requires it be final with no appeals pending.

3       MS. HAGER:  Correct, Your Honor.  And that's why it's

4   not addressed in our papers.

5       THE COURT:  Right.

6       MS. HAGER:  But I think here when you look at the

7   actual claims, when you look at the body of California case law

8   that goes back to 1908 on these issues, I think it's very clear

9   that they do not have a claim, and they have not -- and they

10  also state in their reply that -- response to the protocol that

11  they incurred some legal fees and research fees, but they've

12  never provided, despite numerous requests, any documentation to

13  it.

14      So, Your Honor, just briefly I'm going to go through

15  the causes of action.  I'm not sure if any of the claimants are

16  on the phone today, they didn't seem to sign up for live, but

17  I'm not sure.

18      THE COURT:  Is anybody from Abed-Stephen on the phone?

19      All right, go ahead.

20      MS. HAGER:  Okay.  The first possible cause of action

21  is slander of title.  And that would arise from the allegations

22  that the notice of default and the wrongful assignment of the

23  deed of trust, those are the basis for those claims, asserted

24  by the claimant.

25      THE COURT:  When did GMAC record the deed?  I know

RESIDENTIAL CAPITAL, LLC, et al.                    23

1    First Federal assigned the deed to GMAC in 2006, in May 2006.

2    When did GMAC record the deed?

3            MS. HAGER:  The assignment of the deed of trust was

4    recorded on October 30th, 2008.

5            THE COURT:  Okay.

6            MS. HAGER:  It was assigned on May 22nd, 2006.  And it

7    was recorded on October 30th, 2008.

8            THE COURT:  Is there some reason there was a two-year

9    gap before it was recorded?

10           MS. HAGER:  Yes, Your Honor.  Although, if you look at

11   the California case law, and the case law that we cited,

12   there's actually no requirement that it be recorded prior to

13   the commencement of foreclosure on the property, particularly

14   because there's a big difference between a deed of trust and a

15   mortgage that I know Your Honor is well aware of, and I don't

16   need to probably go into that difference, unless, of course,

17   you want me to.

18           THE COURT:  No.  I just -- I saw -- I couldn't tell

19   whether it was a typo, because I saw it looked like May 2006

20   GMAC gets the assignment, and I saw the October 30th, 2008 date

21   as the day it was recorded, and I wasn't quite sure why that

22   long time gap.

23           MS. HAGER:  I just know the dates, I don't have any

24   further background for that, Your Honor.

25           THE COURT:  All right.  All right, go ahead.

RESIDENTIAL CAPITAL, LLC, et al.                    24

1          MS. HAGER:  With regard to a slander of title claim,

2     there's four elements:  a publication, which is without

3     privilege or justification, which is false, and which causes a

4     direct and immediate pecuniary loss.

5          With regard to the claimant's allegation of the

6     wrongful recording of the notice of default, it fails to

7     satisfy that test for at least two of the elements.

8          First, the notice of default was not a false

9     publication.  The claimants had defaulted on their loan, and

10    actually have remained in default since 2008.  At no time have

11    they submitted any proof otherwise.  Also, under California law

12    there is a -- for nonjudicial foreclosure, which is what we

13    were talking about here -- and one other fact to just point out

14    to the Court, too, is that ultimately the notice of default in

15    the trustee sale were rescinded, so that they're still in

16    possession of the property, so it's even harder to prove a --

17          THE COURT:  The reason it was rescinded is what?

18          MS. HAGER:  It was really a timing issue, Your Honor.

19    We looked into that and tried to get as much information as we

20    could.  And they felt the information was a little bit stale,

21    it was over a year and they didn't feel comfortable going

22    forward with that, so they rescinded it.  And this loan was

23    part of the transfer of the plat -- of the platform over to --

24    as part of the bankruptcy sale.  So I'm not sure what would

25    happen.

RESIDENTIAL CAPITAL, LLC, et al.                    25

1           THE COURT:  So it's in Ocwen's court to decide what to

2    do.

3           MS. HAGER:  Thankfully, yes, Your Honor.

4           So there is a privilege -- there's a privilege under

5    California law for the filing of a notice of default, unless

6    you can prove a willful or a malicious filing of that.  Again,

7    none of the facts have been alleged here for that.

8           Slander of title claim is also asserted with regard to

9    the assignment of the deed of trust to GMAC.  And, again, that

10   fails to satisfy the elements for a slander of title claim,

11   because it was not a false publication, there's been no

12   allegation that it was, and, also, there's been no allegation

13   of any direct and proximate damages as a result of that.

14          With regard to the loan -- the second potential cause

15   of action, which is the loan modification, there are numerous

16   elements that are not even alleged, let alone supported, which

17   would be necessary in order to provide for a claim of a breach

18   of contract with regard to a loan modification.

19          And the first one is the one that's the most

20   problemsome (sic), is it's the existence of a contract.  Here,

21   there's been no allegation, no proof, that there was an actual

22   contract to modify the original loan.  There's been no written

23   documentation, the deed of trust actually provides that if

24   there's a modification among the borrower and the lender it has

25   to be in writing, and there's been nothing here.

1          The other elements are the plaintiff's performance, or

2    excuse for nonperformance, defendant in this case would be the

3    debtors' breach of the contract and resulting damages.

4          Here, as is set forth in the papers, and particularly

5    in the declaration, there was some discussions back in 2009

6    about doing a forbearance type of agreement and maybe getting

7    to a loan modification.  However, there was never a contract

8    agreeing to modify the loan, and also the claimants failed to

9    make the last payment.

10          THE COURT:  So did the debtors search their books and

11    records to determine whether there were any documents received

12    from the borrowers seeking a loan modification?

13          MS. HAGER:  When you say any documents received from

14    the borrowers --

15          THE COURT:  Was there a -- did the debtors make an

16    offer of a loan modification?

17          MS. HAGER:  No.  There was an offer made with regard

18    to a forbearance.  There were certain forbearance plans in

19    2009.  And under those plans they were to make monthly payments

20    of approximately 3,000 dollars per month for a period of time.

21    They made -- they did make over 18,000 dollars in payments

22    under that forbearance plan, but they did not make a payment --

23    a payment that was due in October -- I'll just get the date for

24    you -- October 26th of 2009, they failed to make that payment.

25          As part of this process the debtors were advising the

1   claimants that they'd be making these 3,000-dollar monthly

2   payments in order to forebear on the foreclosing of the

3   property, with ultimately hopefully obtaining a loan

4   modification.  There was no promise, there was no doc -- there

5   was certainly documents exchanged, there was payments

6   exchanged.  There's also the debtor sent them a workout package

7   to the debtors.

8           THE COURT:  Were any countersigned by the borrowers?

9           MS. HAGER:  I am not aware of any.  As is part of

10  the -- as part of the process of this, we went through the

11  files and we put forth all the facts in the declaration of

12  which we're aware of.  And I don't think that there was ever

13  anything as well, because back in February of 2009, the

14  claimants did submit a workout package to the debtors seeking a

15  loan modification; that's what started this whole process.  But

16  for a four- or five-month period between June of 2009 and

17  October of 2009, that's when they made the payments, and --

18  under the forbearance plan.  And the debtors also contacted

19  them on seven different occasions saying that they needed more

20  information in order to proceed with the loan modification

21  package because the information was stale.  So --

22          THE COURT:  Okay.  All right.

23          MS. HAGER:  -- based upon that information, to my

24  knowledge, there was never a loan modification --

25          THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    28

1           MS. HAGER: -- agreed to, signed, sealed and delivered.

2           THE COURT:  All right.  I think I understand your

3    arguments.

4           Is anyone appearing on behalf of the claimants?  This

5    relates to the objection to claim number 5420?

6           All right, I'm going to take it under submission.

7           MS. HAGER:  Thank you, Your Honor.

8           THE COURT:  Okay, thank you.

9           MS. HAGER:  The next item on the agenda is going to be

10   handled by my colleague, Jordan Wishnew.

11          THE COURT:  Okay.

12          MR. WISHNEW:  Good afternoon, Your Honor.  Jordan

13   Wishnew, Morrison & Foerster, appearing for the ResCap

14   liquidating trust.

15          Your Honor, this is two matters left in today's

16   calendar.  The first is the item 2 on page 3, twenty-sixth

17   omnibus objection.  That matter has been adjourned till March

18   11th consistent with Ms. Mitchell's request, I think, last

19   week.

20          So that brings us to the final matter on today's

21   calendar, the forty-second omnibus objection with regards to

22   the claims, claims 338 and 339 of Mr. and Mrs. Schermerhorn.

23          THE COURT:  Mr. Fiveson's appearing on behalf of the

24   claimants?

25          MR. FIVESON:  Yeah, I'm just local counsel, Your

1    Honor.  We have somebody on the phone.

2              THE COURT:  Okay.

3              MR. FIVESON:  Mr. MacKinnon?

4              MR. MACKINNON:  Michael MacKinnon, Pyle, Sims, Duncan

5    & Stevenson on behalf of Jason and Jennifer Schermerhorn.

6              THE COURT:  All right.  I just note for the record,

7    I've known Mr. Fiveson for a very long time.

8              MR. FIVESON:  We were members of the same synagogue --

9              THE COURT:  Same synagogue.

10             MR. FIVESON:  -- but I don't think that'll -- okay.

11             THE COURT:  I always disclose it when it comes up, but

12   go ahead.

13             MR. WISHNEW:  Thank you, Your Honor.

14             So, Your Honor, this is on two claims filed by Mr. and

15   Mrs. Schermerhorn, numbers 338 and 339 on the debtors' claims

16   register against GMAC Mortgage and ETS.  These claims arise out

17   of pre-petition litigation between the debtors and Mr. and Mrs.

18   Schermerhorn and their title insurers concerning, really, a

19   title issue.  As is really exhaustively detailed in both the

20   response of the Schermerhorn as well as the debtors' reply and

21   supporting declara -- and the debtors' reply --

22             THE COURT:  The debtors lost but the issue is about

23   attorneys' fees.

24             MR. WISHNEW:  That's exactly right, Your Honor.  It's

25   basically, there was a judgment against us.  We acknowledged

RESIDENTIAL CAPITAL, LLC, et al.                    30

1   that.  There were two statements of decisions that preceded

2   that judgment.  The court said debtors, nice try, but you're

3   wrong.  And basically they said the issue of attorneys' fees

4   and costs, we'll take up at another time.

5          So the Schermerhorns took up their costs very

6   promptly, and after some back-and-forth of the parties, there

7   was an acknowledged claim of $14,463.51.  And that is the basis

8   for the debtors' wanting to reduce and allow what is a $580,000

9   filed claim to $14,463.51, because that memorandum of costs

10  that was approved by the parties and received by the court in,

11  I believe, February of 2012, at least three months before the

12  bankruptcy filing, is something that's reflected in our books

13  and records.

14         The issue, as Your Honor will see in the judgment

15  that's attached to the response, the judgment does not take up

16  nor does it make any sort of finding of automatic entitlement

17  to attorneys' fees.  Rather, the Schermerhorns were required

18  under the California Rules of Courts and California Civil

19  Procedure to submit a motion for attorneys' fees within sixty

20  days of the judgment being entered which is the same time

21  period that they're required to appeal the judgment.

22         They didn't appeal the judgment; they didn't file the

23  motion for attorneys' fees.  They never sought leave to extend

24  the time to file; they never got a stipulation from the debtors

25  extending their time to file.  So --

1        THE COURT:  So this basically comes down to, if I

2    understand it correctly, that judgment was entered.  Your

3    position is that they had sixty days from the entry of judgment

4    to seek to recover attorneys' fees.  They didn't do it within

5    that time period, and therefore the debtors argue they're

6    precluded from advancing their claim for the attorneys' fees.

7    Here it's 568,000 of attorneys' fees, so it's a considerable

8    sum of money.

9        MR. WISHNEW:  That's exactly right.  I think that's

10   absolutely our first argument.  If Your Honor questions that

11   argument, I think we have a second --

12       THE COURT:  How many days after the judgment did they

13   first seek attorneys' fees?

14       MR. WISHNEW:  Well, that's the thing, Your Honor.

15   They really never did file to seek attorneys' fees.  They

16   submitted in a status report attached to their papers -- they

17   say oh, we're going to be filing this -- and this is May 25th.

18   But they've never actually filed the motion and put it on

19   notice.

20       THE COURT:  So is the first time when they filed the

21   proof of claim here?

22       MR. WISHNEW:  That's my argument, Your Honor, yes.

23   Absolutely.

24       THE COURT:  And how long after the entry of judgment

25   did they file a proof of claim seeking to recover attorneys'

1  fees?

2          MR. WISHNEW:  I believe their -- give me -- roughly,

3  Your Honor, if the judgment was in January and the proof of

4  claim, let's call it October or November.  Eight, nine, ten

5  months, Your Honor.

6          THE COURT:  Okay.

7          MR. WISHNEW:  Just give me one minute.  I just want to

8  double-check the date of their proof of claim.

9          Okay.  Let me just correct the record, Your Honor.

10         THE COURT:  Sure.

11         MR. WISHNEW:  The proof of claim was filed July 26th,

12  but still, Your Honor, we're talking six months after the

13  judgment.

14         THE COURT:  Okay.

15         MR. WISHNEW:  Well, more than six months after the

16  judgment.  So --

17         THE COURT:  And the bankruptcy was filed in May?

18         MR. WISHNEW:  May 14th, Your Honor.

19         THE COURT:  May 14th.

20         MR. WISHNEW:  Yes.

21         So with regards -- so that's really the first

22  argument.  We think --

23         THE COURT:  So how many days after the judgment was

24  entered was the bankruptcy petition filed?

25         MR. WISHNEW:  Let's -- roughly four months, Your

1    Honor.  Roughly four months.

2              THE COURT:  Okay.

3              MR. WISHNEW:  So that's argument number one.  If Your

4    Honor doesn't want to take that argument, then we have the

5    second argument which is Section 1717 of the California Civil

6    Code which talks about the reciprocal rights to get attorneys'

7    fees when --

8              THE COURT:  The prevailing party rule.

9              MR. WISHNEW:  It is the prevailing party rule, Your

10   Honor.  But there's two fatal flaws with the 1717 argument in

11   this context.  One is that the document that the Schermerhorns

12   reference as being the applicable document entitling them to

13   attorneys' fees is the deed of trust.  The deed of trust, if

14   you look at the face of the complaint also attached to the

15   Schermerhorns' response, doesn't speak of any sort of

16   enforcement of the deed of trust; it seeks to interpret a --

17   notes of substitution and a full reconveyance.  It does not

18   seek to enforce in any way the deed of trust, because the

19   Schermerhorns weren't a party to the deed of trust with the

20   debtors.  It was the Toziers --

21             THE COURT:  The underlying dispute is because the

22   debtors erroneously released their first lien --

23             MR. WISHNEW:  Absolutely correct, Your Honor.  That's

24   exactly right.

25             So what the debtors were trying to do through their

RESIDENTIAL CAPITAL, LLC, et al.                    34

1  action pre-petition was to simply have the court interpret in

2  their favor documents that while they acted improperly and that

3  the first lien against the real property, which the debtors

4  didn't even service at that time, could essentially get put

5  back in place.  The debtors didn't succeed on that.  So

6  basically, as Your Honor understands, there was no action on

7  the contract, the deed of trust, and there was also no

8  enforcement of the deed of trust.  And so you don't have the

9  requisite elements under Section 1717 of the California Civil

10  Code to entitle them to this reciprocity that's contemplated by

11  a prevailing party, especially when, again, looking at the face

12  of the pleadings, the debtors didn't seek to enforce any sort

13  of damages or get recovery of any monetary damages from the

14  Schermerhorns.

15         So I'll certainly applaud them for their creativity,

16  but it's -- it fails on its face, Your Honor, and for that

17  reason we would ask that the objection be sustained.

18         THE COURT:  Okay.  Let me hear from their counsel.

19  Mr. Fiveson, are you going to argue or Mr. --

20         MR. FIVESON:  Mr. MacKinnon?  I think Mr. MacKinnon

21  wants to take the --

22         THE COURT:  All right.  Mr. MacKinnon, why don't you

23  go ahead?

24         MR. MACKINNON:  Thank you, Your Honor.  Michael

25  MacKinnon on behalf of the Schermerhorns.

1          Your Honor, obviously this was a long and painful case

2   for all of us involved.  One of the issues was the expungement

3   of the lis pendens that the plaintiffs had filed in the case or

4   a withdrawal, a voluntary withdrawal, of the lis pendens.  In

5   one of the post-judgment -- pre-entry of the judgment but post-

6   trial hearings on September the 16th, 2011, Judge Ziebarth

7   ordered that all remaining issues be dealt with at the same

8   time, and that was including the attorneys' fees and the costs

9   as well as the issue of the lis pendens.

10          And at that time, it had been the pronounced

11   expectation from the debtors' counsel, Mr. Ensberg, that they

12   would be filing an appeal.  The judgment itself is leaving the

13   determination for adjudication subsequently.  And the

14   subsequent adjudication, in our understanding, was that it

15   would be heard in conjunction with the expungement motion or

16   the withdrawal of the lis pendens.

17          Obviously when the appeal period ran without there

18   being an appeal filed, then we were in a position to compel the

19   expungement or to request a withdrawal of the proof of claim --

20   excuse me -- of the lis pendens.  And in fact, the debtor did

21   file a withdrawal of the lis pendens in June of 2012.  So

22   our -- post-petition.  Our feeling, understanding, all along is

23   that the two matters would be heard simultaneously so that,

24   obviously, attorneys' fees involved in any motion to expunge

25   the lis pendens would be part of the same hearing and not

1  require a separate second hearing on the same issue.

2          That, in a nutshell, is where we are on the timing

3  fact.  It goes back all the way to --

4          THE COURT:  But you did --

5          MR. MACKINNON:  -- September the 16th of 2011.  And --

6          THE COURT:  You did go forward -- hold it, just stop a

7  second.

8          You did go forward and submit a bill of costs, and

9  that was resolved by the court.  I mean, the parties agreed

10  on -- was that by agreement or did the court have to resolve

11  disputes with respect to the bill of costs?

12          MR. MACKINNON:  We resolved our dispute consensually

13  with the plaintiffs.  There were others who did it differently.

14  The bills of cost, however, are things which are set at the

15  time of trial, whereas the attorneys' fees were still open-

16  ended at that point.

17          THE COURT:  But the bill of costs was resolved within

18  the time specified by the California statute, correct?

19          MR. MACKINNON:  Yes, it was.  For us; it was not for

20  all the parties.

21          THE COURT:  All right.  Go ahead.  Go ahead with your

22  argument.

23          MR. MACKINNON:  Okay.  And, Your Honor, turning to

24  Civil Code -- California Civil Code Section 1717, what we're

25  looking for here is, frankly, the -- the plaintiff asked on his

1   third cause of action for a determination and -- I'm quoting

2   now -- "that the one digit misnumbering is corrected so as to

3   ensure that all subsequent encumbrances on the subject real

4   property are properly subject to the first position deed of

5   trust as evidenced by Exhibit 1 and incorporated here and by

6   this reference," which is the deed of trust itself.

7            In other words, the deed of -- what the plaintiffs

8   were seeking against my clients was a determination that the

9   deed of trust, including the ability to have attorneys' fees

10  and costs added as a lien against the property, be enforced and

11  reinstated in full.

12           THE COURT:  But the judgment that was entered was a

13  judgment on the entire matter.  The debtor lost on the issue of

14  trying to avoid its lien release, and a single judgment was

15  entered.  Did the judgment say that it was a judgment in part

16  and that issues remain to be resolved?

17           MR. MACKINNON:  Well --

18           THE COURT:  I mean, it looked to me to be a judgment

19  resolving the litigation.  It wasn't a partial judgment.  Can

20  you answer that, Mr. MacKinnon?

21           MR. FIVESON:  Yeah, excuse me, if I may.  Your Honor,

22  the judgment which was proffered by counsel --

23           THE COURT:  You know, Mr. Fiveson, what I -- I let one

24  lawyer argue --

25           MR. FIVESON:  Sorry.

RESIDENTIAL CAPITAL, LLC, et al.                    38

1          THE COURT:  -- on a matter, okay?

2          MR. FIVESON:  Excuse me, Your Honor.

3          THE COURT:  If he can't, I'll give you a chance, but

4   I --

5          MR. FIVESON:  Okay, I'm sorry, sir.

6          THE COURT:  -- don't want to interrupt Mr. MacKinnon's

7   argument.

8          MR. MACKINNON:  Okay, thank you, Your Honor.

9          The unresolved matters in the issuance on January

10   10th, 2012 of the judgment were the manner of getting a viable

11   expungement or release of the lis pendens and the attorneys'

12   fees.  And the judge had ordered that those be resolved either

13   consensually or by a separate motion, but that they be

14   determined together.  The time given the --

15          THE COURT:  Where does it say that?

16          MR. MACKINNON:  That's what he told us on --

17          THE COURT:  Well, I hear what you just told me, but

18   that's not what the judgment says.  So point me to a document

19   that says what you've just told me that the issue of

20   expungement of the lis pendens and attorneys' fees remain to be

21   resolved.

22          MR. MACKINNON:  For that, Your Honor, I would have to

23   get a copy of the transcript of the September 16th hearing.

24   This was not an issue we'd expected, so we have not yet

25   procured that.

1      THE COURT:  That I don't understand.  I can't -- you

2  know what the debtors' argument is.  It's been clear what the

3  debtors' argument is; that there was a final judgment and you

4  had sixty days thereafter to seek your attorneys' fees and you

5  didn't do it.  So your telling me that you didn't anticipate

6  this issue I find surprising.

7      MR. MACKINNON:  Well, you know --

8      THE COURT:  And the fact -- whatever the judge may

9  have said in the transcript, the judgment is the judgment.

10      MR. MACKINNON:  That -- we certainly understand that,

11  Your Honor.

12      THE COURT:  Which court was this in?

13      MR. MACKINNON:  The California Superior Court in San

14  Bernardino County.  Excuse me, of Riverside County, Your Honor.

15      THE COURT:  Okay.  Okay, anything else you want to

16  add?

17      MR. MACKINNON:  No, that's all, Your Honor.

18      THE COURT:  Okay.

19      Mr. Fiveson, I'll give you a chance if you want.

20      MR. FIVESON:  If I may, Your Honor.  I'd like to draw

21  the Court's attention to the reply submitted by ResCap and the

22  judgment in question; the last page of the judgment is page 57.

23      THE COURT:  Let me find it, okay?  Hang on.

24      MR. FIVESON:  Thank you, sir.

25      MR. WISHNEW:  Your Honor, it's attached to -- as

1  Exhibit 1 to the debtors' reply is the claimants' proof of

2  claim.

3          THE COURT:  Where in this big binder will I find it?

4          MR. WISHNEW:  Should be in the binder, tab 5, I think,

5  Your Honor.  Probably the last --

6          THE COURT:  I don't think so.

7          MS. HAGER:  I believe it's tab 12 --

8          THE COURT:  Hold on.  Tab 16, my law clerk tells me.

9          All right, Mr. Fiveson, where -- I've got the reply.

10         MR. FIVESON:  The last page, page 57 --

11         THE COURT:  Of which?

12         MR. FIVESON:  Of that document.  It's the last page of

13 the judgment.

14         THE COURT:  Hold on.

15         MR. WISHNEW:  It's Exhibit 1 to the debtors' reply is

16 Mr. and Mrs. Schermerhorns' proof of claim.

17         THE COURT:  Okay.

18         MR. WISHNEW:  It's at the end of their proof of claim.

19         THE COURT:  All right, hang on.

20         MR. FIVESON:  And it says, "Issues concerning" -- this

21 is right before the signature of the deciding judge -- "Issues

22 concerning costs including claim for attorneys' fees shall be

23 adjudicated via post-judgment proceedings and thereafter

24 interlineated herein."

25         THE COURT:  Yeah, post-judgment proceedings is within

1   sixty days, what the California Civil Code requires.  It's a

2   post-judgment proceeding required by 1717 to be within sixty

3   days.  So I take your point, but I'm not sure it gets you where

4   you want to go.

5           MR. FIVESON:  Well, I'm not -- it --

6           THE COURT:  I mean, could they have waited a year?

7           MR. FIVESON:  If -- well, what happened was is that

8   the lis pendens at this time had not -- as I understand, had

9   not been vacated, so there would have been counsel fees

10  incurred in connection with removing that lis pendens.  And I

11  think what Mr. MacKinnon is saying is that it was the

12  understanding, when I think it can be read into this order,

13  that those proceedings of attorneys' fees would be adjudicated

14  at some future point in time.  And what happened was is that

15  the debtor filed the Chapter 11, I believe, in May -- it was

16  May of that year.  So --

17          THE COURT:  Okay, so what you're -- but, Mr. Fiveson,

18  I'm looking at page 6 of the judgment, it's in paragraph 7, and

19  it says, "Issues concerning costs including claims for

20  attorneys' fees shall be adjudicated via post-judgment

21  proceedings and thereafter interlineated herein."  So there are

22  some blanks --

23          MR. FIVESON:  Right.

24          THE COURT:  -- to fill in costs.  There's nothing

25  about subsequent procedures with respect to a lis pendens.  It

1   specifically -- what you're pointing to specifically references

2   issues concerning cost including claims for attorneys' fees.

3   And then there are blanks:  there's one for the Schermerhorns

4   and one for Bank -- three -- one for Bank of America and one

5   for Wells Fargo.  And there were blanks to be filled in, and

6   basically you got sixty days to do it after there's been a

7   judgment.  The date of the judgment is January 10th, 2012.

8   What am I -- what's wrong about what I just said?

9           MR. FIVESON:  I think the statute -- and if you have a

10  stipulation or you have an order otherwise, and I think it can

11  be --

12          THE COURT:  Does the statute say that?

13          MR. FIVESON:  I think it says by stipulation of the

14  parties, yes.

15          Mr. MacKinnon, isn't that correct?  I --

16          MR. MACKINNON:  Your Honor --

17          THE COURT:  Go ahead.

18          MR. MACKINNON:  Michael MacKinnon.  Rule 3.1702 of the

19  California Rules of Court (d) states, "Extensions.  For good

20  cause, the trial judge may extend the time for filing a motion

21  for attorney's fees in the absence of a stipulation or for a

22  longer period than allowed by the stipulation."

23          THE COURT:  Okay.  And does that have to be done

24  before the time runs out?

25          MR. MACKINNON:  I believe so, yes.

1          THE COURT:  I mean, ordinarily, you can't -- once -- a

2    court may be able to extend time during a period when it would

3    still be timely to file.  That certainly happens in bankruptcy

4    court.

5          MR. MACKINNON:  Yes.

6          THE COURT:  But once the time is expired, I can't

7    revive it.  So do you have -- I mean, is there something in

8    that statute that says after the time has expired, the court

9    for good cause shown can provide additional time?

10          MR. MACKINNON:  No, Your Honor.  There is not.  But

11    then I'm going back to the September 16th hearing when --

12          THE COURT:  Let me ask you this.  Just, Mr. MacKinnon,

13    give me the rule number that you referenced.

14          MR. MACKINNON:  It's 3.1702(d), D as in dog.

15          THE COURT:  Okay, thank you.  All right, go ahead.  I

16    interrupted you.  Go ahead.

17          MR. MACKINNON:  I'm sorry.  That's -- but our

18    understanding was that in the post-trial motion -- hearing on

19    September the 16th, 2011, the judge made clear that the

20    clearing of the title, the expungement or withdrawal of the lis

21    pendens and the attorneys' fees were to be heard at the same

22    time.  And, in fact, we did not get the withdrawal of the lis

23    pendens until June of 2012.

24          Now, Judge Ziebarth is a retired judge who sits by

25    designation as needed and according to what his schedule is.

1   So he's not generally on site.  In fact, he doesn't live near

2   the courthouse in Riverside.  So he wanted to make sure that

3   everything was heard as collectively as possible.

4           THE COURT:  Who appeared in the case for the debtors?

5           MR. WISHNEW:  It was --

6           MR. MACKINNON:  Stephen Ensberg did, Your Honor.

7           MR. WISHNEW:  Stephen Ensberg.

8           THE COURT:  Ensberg.

9           MR. WISHNEW:  Your Honor, just to note, Mr. Ensberg --

10  there was Exhibit 2 to the debtors' reply -- I'm sorry, Exhibit

11  3 to the debtors' reply includes a letter from Mr. Ensberg to

12  Mr. MacKinnon as well as his colleague Ms. Cashman-Kramer

13  specifically addressing the fact that the request for the

14  attorneys' fees was untimely and to which we never got a

15  response to that.

16          THE COURT:  Okay.  All right --

17          MR. WISHNEW:  I'd also -- just one other point for the

18  record.

19          THE COURT:  Go ahead, quickly.

20          MR. WISHNEW:  Your Honor correctly points out Cha --

21  sorry -- section 7 of the judgment, and Mr. MacKinnon is

22  arguing well, at a hearing the judge said this and there's

23  nothing in the record before Your Honor to support that.  The

24  lis pendens and the attorneys' fees were not treated together;

25  in fact, the judge made a point of specifically saying at the

1    beginning of section 7, "The lis pendens filed by plaintiffs

2    with respect to the subject property is hereby expunged."

3              THE COURT:  It was dealt with.

4              MR. WISHNEW:  It was dealt with, Your Honor.  So our

5    position is the lis pendens was dealt with, the attorneys' fees

6    was to be addressed consistent with California Civil Procedure.

7    The Schermerhorns didn't do that.  This was not an action on

8    the contract, so Your Honor can either knock it out -- I'm

9    sorry, disallow the claim because it was untimely or disallow

10   it as well because there is no reciprocal benefiters, under

11   Section 1717.

12             THE COURT:  Okay.  I'm going to take the matter under

13   submission.

14             MR. WISHNEW:  Thank you, Your Honor.

15             MR. MACKINNON:  Thank you, Your Honor.

16             THE COURT:  Thank you, Mr. MacKinnon.

17             MR. WISHNEW:  That is the last matter on today's

18   calendar and unless Your Honor has any questions, I guess we'll

19   see you Thursday morning.

20             THE COURT:  Yes.

21             MR. WISHNEW:  Thank you, Your Honor.

22             THE COURT:  I thought we were supposed to be reducing

23   the number of ResCap --

24             MR. WISHNEW:  Honestly, we're trying, Your Honor.  We

25   are, I promise.

1          THE COURT:  All right.  Thank you very much.  All

2    right, we're adjourned.

3          (Whereupon these proceedings were concluded at 2:58 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1

 2                          **I N D E X**

 3

 4                       **E X H I B I T S**

 5     **DESCRIPTION**                              **PAGE**

 6     **Declaration of William Tyson**              **7**

 7

 8                       **R U L I N G S**

 9                                      **PAGE      LINE**

10     Debtors' Motion Pursuant Order Approving      19         7

11     Abandonment of Debtors' Interests

12     in Certain Assets granted as to everything

13     other than the common land

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4   I, Esther Accardi, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10  _____

11  ESTHER ACCARDI

12  AAERT Certified Electronic Transcriber CET**D-485

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:  January 28, 2014

19

20

21

22

23

24

25