**EXHIBIT 1**

]UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: **Residential Capital, LLC, *et.als*.**                    **Case No.: 1:12-BK-12020(MG)**
                                                                 Chapter 11

        Debtors.

                                                                 Jointly Administered

DECLARATION OF KEITH PARKER-LOWE IN SUPPORT OF THE GILBERTS' MOTION
FOR RECONSIDERATION OF THE MEMORANDUM OPINION AND ORDER
SUSTAINING IN PART AND OVERRULING IN PART DEBTORS' OBJECTION TO
PROOF OF CLAIM NO. 1984 FILED BY KATHERINE PARKER-LOWE AND PROOF OF
CLAIM NO. 1991 FILED BY REX T. GILBERT, JR. AND DANIELA GILBERT

  I, Keith Parker-Lowe, hereby declare as follows:

  1.  I am a free lance consultant working on software development projects.

  2.  I completed training for the business planning department of AETNA Life and
Casualty. This course of study included calculations, financial yields, actuarial tables, compound
interest tables, statistics, and financial plotting and modeling.

  3.  I completed training for and obtained a Securities and Exchange Commission
Brokers License

  4.  I was a licensed Realtor in North Carolina. The course study included not only
the study of financial calculations for mortgage loans and installment loans but the actual
preparation of the financial calculations required for making these loans and making accurate
disclosures to consumers on these loans.

  5.  I completed Canon's computer programming school in 1973.

  6.  I wrote the financial programs and several operating manuals for Sharp
Electronics on installment loan calculations and amortization schedules.

7.      I have written computer programs for installment loan calculations to meet the compliance requirements of Truth in Lending for various banks and lending institutions including The Federal Land Bank, PCA and Southern National Bank and Bank of Montgomery, Bank of Raeford and NCNB.

8.      I have written computer programs to calculate installment loans, amortization schedules, mortgage loans, APR's, and special compound interest calculations for Canon, Sharp and the Federal Reserve.

9.      I have created and used various programs to review and check the finance charges against the stated APR, terms, interest, payments and repayment schedule.

10.      I worked closely with the Federal Reserve to implement the Federal Truth in Lending Act and Regulation Z to assist many banks in meeting compliance requirements.

11.      My experience in drafting and understanding compliance issues for profit sharing and various investment vehicles has proven invaluable in checking and verifying financial accounts of all types.

12.      I previously testified on behalf of Ms. Parker-Lowe in <u>Irene Britt v. Thomas Jones,</u> 123 N.CApp. 108, 472 S.E.2d 199 (1996). This case was originally filed in Hertford County, North Carolina.

13.      Based upon my testimony, the Court of Appeals upheld the application of monthly payments to interest first and principal second.

14.      Since February 1990, I have reviewed numerous loan agreements, promissory notes, schedules of payments on notes, mortgages, Truth in Lending Disclosure Statements (TIL), and related documents related to actions pending in the North Carolina trial courts and before the U.S. Bankruptcy Court for the Eastern District of North Carolina.

15.    I have reviewed ledgers, amortization schedules, repayment schedules, deeds, deeds of trust, land surveys, paper documents, and electronic records for compliance with Truth in Lending and the state usury laws.

16.    At Ms. Parker-Lowe's request, I familiarized myself with the Gilberts' promissory note, interest only addendum to the promissory note and the federal Truth in Lending disclosure statement.

17.    At Ms. Parker-Lowe's request, I compared the payment schedules set forth in the promissory note, the addendum to the promissory note and the one set forth in the federal Truth in Lending disclosure statement.

18.    The payment schedule set forth in the Truth in Lending disclosure statement does not match either the promissory note or the interest only addendum to the promissory note. The disclosed payment schedule sets forth four series of payments; however, the promissory note calls for the interest rate to be subject to change at the 85th payment and then every six months thereafter for the life of the loan. The payment schedule disclosure should reflect that the monthly payments are subject to change beginning with the 85th payment and thereafter every six months. Unlike the APR, there is no tolerance for the payment schedule disclosure on the Truth in Lending disclosure statement.

19.    From a review of the loan documents and the disclosure statement, there is no way that the lender could have known what the new interest rate was going to be at the 85th payment and at each change date thereafter. The lender did not make estimated disclosures as there is no "e" on the disclosure statement. The lender did not comply with the other requirements for making estimated disclosures. The disclosure in the payment schedule of 36 payments at $3500.00 07/01/2013 is not correct and accurate.

20.    Next, I examined the Truth in Lending material disclosures in the federal box and calculated the APR.

| Table 1 | Rate | Finance Charge | Amount Financed | Total of Payments |
|---|---|---|---|---|
| 1. Actual TILA provided | 7.953% | $943,469.57 | $507,473.43 | $1,450,943.00 |
| 2. Corrected Finance Charge | 7.953% | $827,063.32 | $507,473.43 | $1,334,536.75 |
| 3. Corrections shown | 9 % | | | |
| 4. Differences | 1.047% | $116,496.25 | Unchanged | $116,496.25 |

21.    Table 1 reflects the actual steps I took to determine the accuracy of the TIL Disclosure boxes used to display the actual Annual Percentage Rate charged, the finance charge including any prepaid finance charges, the amount financed less any prepaid finance, and the total of payments to be made. This total of payments should be the same as the schedule of payments shown in the payments listing area below these display boxes.

22.    The first step I took was to do the simple math on the information provided in these boxes for the finance charge, amount financed and total of payments on this disclosure form. These boxes are required to add up correctly and be exact. This disclosure form is supposed to be relied upon by itself as a simple way, for a lay person understand their costs of doing this loan. There is no tolerance of error allowed in this calculation. All boxes added together correctly.

23.    I then ran a calculation on a spreadsheet setup to calculate the finance charge based on the APR stated. I entered the data from these TIL disclosure boxes including rate, total number payments, finance charges, the amount financed and the total of payments. The spreadsheet then calculated the total finance charge and the total of all payments and compared each of the entries to the calculated amounts.

Line 1 in table 1 shows what was actually disclosed on the TIL Disclosure form.
Line 2 in table 1 shows what should have been charged for the finance charge based on the rate disclosed with the same term and amount financed. In this case

there was a difference in the calculation of $116,496.25 more than the rate should have charged at the TIL disclosure rate shown of 7.953%. This means that the finance charge was over charged by $116,496.25.

Line 3 in table 1 shows the actual APR(9% rate) needed to charge the amount of finance charges shown on the TIL disclosure.

Line 3 in table 1 shows the overcharge of the finance charge by using the wrong APR(9% rate) that was 1.047% greater than the stated APR (rate) of 7.953%.

24.    There is a statutory tolerance for the APR (rate) of 1/8 of 1% above or below the stated rate. The next step I calculated was the actual APR (rate) reflected in the finance charge amount disclosed. This was 9% and more than 1.047% greater than the stated APR or more than 8 times the allowable tolerance.

25.    The APR using the information disclosed in the TIL results in an APR of 9% using the actuarial method as set out in Appendix J to Regulation Z when rounded as provided under Truth in Lending. The APR is not disclosed accurately within 1/8[th] of 1 percent.

This the 2 day of December 2013.

_____
Keith Parker-Lowe

Hyde County, North Carolina
Sworn to and subscribed before me this day by Keith Parker-Lowe.

Date: 12/2/2013

_____
Notary Public Signature
Notary's printed or typed name: Laura Dunlow Belch
(SEAL)
My Commission Expires: 10-13-2018

LAURA DUNLOW BELCH
NOTARY
PUBLIC
HYDE COUNTY, NC

## EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: **Residential Capital, LLC,** *et.als.*  ) | **Case No.: 1:12-BK-12020(MG)** |
| ) | Chapter 11 |
| Debtors.  ) | |
| ) | Jointly Administered |

DECLARATION OF KATHERINE PARKER-LOWE IN SUPPORT OF THE GILBERTS'
MOTION FOR RECONSIDERATION OF THE MEMORANDUM OPINION AND ORDER
SUSTAINING IN PART AND OVERRULING IN PART DEBTORS' OBJECTION TO
PROOF OF CLAIM NO. 1984 FILED BY KATHERINE PARKER-LOWE AND PROOF OF
CLAIM NO. 1991 FILED BY REX T. GILBERT, JR. AND DANIELA GILBERT

I, Katherine S. Parker-Lowe, hereby declare as follows:

1.      I am counsel for Rex T. Gilbert, Jr. and Daniela Gilbert in the foregoing action.

2.      On August 23, 2011, I received via Fedex a package from counsel for the
defendants in the Gilbert Litigation including GMAMC. The package contained, among other
things, a copy of an Adjustable Rate Note and Interest-Only Addendum to Adjustable Rate
Promissory Note purportedly signed by Mr. Gilbert together with a copy of an Allonge to Note
previously advanced by Deutsche Bank at the state court foreclosure hearing and a new page
appended to the aforementioned documents entitled "Note Allonge." See attached

3.      The Note Allonge shows a purported transfer by an "authorized officer of
Residential Funding Corporation, LLC as attorney in fact for Deutsche Bank Trust Company
Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 to Deutsche Bank
Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6." In
other words, a purported transfer by Deutsche Bank to Deutsche Bank.

1

4.    The Note Allonge was not appended to the Adjustable Rate Note, Interest only Addendum to Adjustable Rate Promissory note and Allonge to Note when the purported original documents were introduced at the state court foreclosure hearing in 2009.

5.    The last indorsement on the Allonge to Note reveals that this indorsement was purportedly made by a vice president of Residential Funding Corporation to Deutsche Bank Trust Company Americas as Trustee. The new indorsement was purportedly made by an officer of Residential Funding Company, LLC.....an entirely different entity.

6.    On August 18, 2009, on appeal de novo of an order entered by the Hyde County Clerk of Superior Court authorizing the substitute trustee in this matter to proceed with a foreclosure sale, the superior court likewise entered an order authorizing the substitute trustee to proceed with sale.

7.    Gilberts duly gave notice of appeal to the North Carolina Court of Appeals and posted sufficient bond to stay the order authorizing the foreclosure sale.

8.    On May 3, 2011, the North Carolina Court of Appeals reversed the trial court's order authorizing the substitute trustee to proceed with a foreclosure sale.

9.    On June 13, 2011, David A. Simpson, P.C. Substitute Trustee, filed a voluntary dismissal in this proceeding.

10.    On or about March 15, 2012, David W. Neill, Attorney at Law, Rogers Townsend & Thomas, PC, Attorneys for David A. Simpson, PC, executed on behalf of David A. Simpson, PC a document entitled "Amended Notice of Substitute Trustee's Foreclosure Sale of Real Property" (hereinafter "Amended Notice") which purported to set for sale on April 17, 2012, the Gilberts' real property. (See Exhibit 3)

2

11.    At the time the Amended Notice was signed by David W. Neill no Order was in effect authorizing the substitute trustee to proceed with a foreclosure sale of the Gilberts' real property.

12.    On information and belief, a cover letter dated March 12, 2012, and signed by Andrea Montgomery, an employee of Rogers Townsend & Thomas, P.C., requested the Hyde County Clerk of Superior Court staff to stamp filed the Amended Notice, post the Amended Notice on the county courthouse bulletin board, and return the stamp filed copy to Rogers Townsend & Thomas, P.C.

13.    On or about March 23, 2012, the cover letter, Amended Notice and a Certificate of Service were received in the Office of the Hyde County Clerk of Superior Court.

14.    On information and belief, the Amended Notice was stamped filed, posted on the county courthouse bulletin board and the copies were returned to Rogers Townsend & Thomas, P.C.

15.    On March 27, 2012, I received a copy of the Amended Notice.

16.    On March 28, 2012, I contacted the Hyde County Clerk of Superior Court to inquire whether the Amended Notice had, despite no order allowing a  foreclosure sale, been posted on the courthouse bulletin board. I was informed that the Amended Notice had been posted. Upon demand, the Hyde County Clerk of Superior Court removed the Amended Notice from the county courthouse bulletin board.

17.    I subsequently placed a call to David W. Neill at Rogers Townsend & Thomas, P.C. After asking for Mr. Neill and providing the file number, counsel was placed on hold. After more than five minutes, counsel hung up.

18.    I called back a second time to Rogers Townsend & Thomas, P.C. After providing her name, title as Respondents' counsel, and file number, counsel again requested to speak with Mr. Neill. Counsel was sent to voice mail for Mr. Neill.

19.    On March 29, 2012, David W. Neill left a voice mail me a message stating that "the file had been given to Mike Spicer to look into why the Amended Notice was issued." Neill further stated that "the file indicated that a voluntary dismissal had been taken last year."

20.    On April 3, 2012, I again attempted to contact David W. Neill and Rogers Townsend & Thomas, P.C. Counsel placed nine (9) separate calls to Rogers Townsend & Thomas, P.C. each time identifying myself as counsel for Respondents, providing the file number and requesting to address the Amended Notice. Each phone call resulted in either disconnection or voice mail except for one. I spoke with a Kelly who took down the information regarding the Amended Notice and placed me on hold. Then, this call also was disconnected. When I called back to speak with Kelly, the receptionist advised that Kelly was on the phone and unavailable. When I explained that she had been on the phone with Kelly and disconnected and that Kelly may be unaware that I had been disconnected, I was again advised that Kelly was unavailable and sent into voice mail. Counsel left a voice mail message for Kelly, Paulette Myers, Mike Spicer, Andrea Montgomery and David W. Neill.

21.    On April 11, 2012, Mike Spicer called me and advised that Rogers Townsend & Thomas, P.C. was not retained and not engaged to handle any foreclosure against Rex T. Gilbert, Jr.

22.    David W. Neill, Rogers Townsend & Thomas, and David A. Simpson, P.C. all claim to have extensive experience in the area of foreclosure law; there is no factual basis for the

filing of the Amended Notice; and the decision of the North Carolina Court of Appeals specifically determined that the petition filed in this matter was obviously meritless.

23.     The parties' actions resulted in a notice of foreclosure sale of Respondents' property being placed upon the county courthouse bulletin board for at least six (6) days and information being entered into the North Carolina VCAP court reporting system. This false and misleading information concerning Respondents' property was available to the general public.

24.     It is unclear what if any steps were taken by the parties involved to publish this false and misleading notice of foreclosure sale in a newspaper published and qualified for legal advertising in the county in which the property is located. G.S. § 54-21.17.

25.     It is unclear whether this false and misleading information has been captured by any credit reporting agencies.

26.     It is unclear whether the parties herein would have proceeded with a sale of Respondents' property had their counsel not taken affirmative steps to have the Amended Notice removed from the county courthouse bulletin board.

27.     At a hearing in Hyde County Superior Court related to this rouge notice of sale posting, counsel for GMAC's lawyers advised the court that GMAC had called the firm and told the firm to proceed with foreclosure. A person in the firm opened the file and found an order of sale as the top item in the file (despite two years of litigation). From there, the above recited actions were taken.

This the 2nd day of December, 2013

_____
Katherine S. Parker-Lowe

Hyde County, North Carolina
Sworn to and subscribed before me this day by Katherine S Parker-Lowe
Date: 12 2 2013

_____
Notary Public Signature

My Commission Expires: 10·13·2018

LAURA DUNLOW BELL
NOTARY
PUBLIC
HYDE COUNTY, NC

# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| May 5, 2006 | MCLEAN | VA |
|---|---|---|
| [Date] | [City] | [State] |

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00                (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **July 1, 2006**                .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 62768, PHOENIX, AZ 85085-2768**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments  See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32                . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

5300000843

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

VMP-838N (0210)                    Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 4                          Initials:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of June, 2013                , and on that day every 6th        month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters            percentage points (              2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than              13.375 % or less than              2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one                        percentage point(s) (              1.000 %) from the rate of interest I have been paying for the preceding 6            months. My interest rate will never be greater than              13.375 %, OR LESS THAN 2.750  .

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

5300000843

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

5300000843

-838N (0210)

Form 3520 1/01
Initials: KTG

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Rex T. Gilbert, JR              -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                      -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                      -Borrower


*[Sign Original Only]*


5300000843

-838N (0210)                              Page 4 of 4                              Form 3520 1/01

# INTEREST-ONLY ADDENDUM
# TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: _5300000843_____

Property Address: _134 West End Road, Ocracoke, NC  27960_____

**THIS ADDENDUM** is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note.  None of the other provisions of the Note are changed by this addendum.

## 3.    PAYMENTS

### (A)    Time and Place of Payments
I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues.  I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

### (B)    Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $3,226.57.  This payment amount is based on the original principal balance of the Note.  This payment amount may change.

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note.  The result of this calculation will be the new amount of my monthly payment.  After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)    A Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter.  I will pay this late charge promptly but only once on each late payment.

_ _ _ 5/5/06



# 1st
## NATIONAL
# BANK OF ARIZONA

1665 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8321 Fax 480-224-8522

## **ALLONGE TO NOTE**

LOAN NUMBER: 5300000843
BORROWER:  Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

First National Bank of
Nevada

WITHOUT RECOURSE BY:

**AMY HAWKINS, ASSISTANT VICE PRESIDENT**
**FIRST NATIONAL BANK OF ARIZONA**

Pay to The order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:
Deutsche Bank National Trust
Company, F/K/A Bankers Trust
Company of California, N. A.
as Custodian as Attorney In
Fact

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY
Judy Faber, Vice President

## NOTE ALLONGE

Note Date:          May 5, 2006

Borrower:           Rex T. Gilbert, Jr.

Address:            134 West End Road, Ocracoke NC 27960

Loan Amt:           $525,000.00


Pay to the Order of

Deutsche Bank Trust Company Americas as Trustee for

Residential Accredit Loans, Inc. Series 2006-QA6

Without Recourse


By: _____

Lisa Magnuson, Authorized Officer
Residential Funding Company, LLC as attorney in fact
For Deutsche Bank Trust Company Americas as Trustee
For Residential Accredit Loans, Inc. Series 2006-QA6

**EXHIBIT 3**



EXHIBIT
Rx-1

19055
09-SP-9

## AMENDED NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY

UNDER AND BY VIRTUE of the power and authority contained in that certain Deed of Trust executed and delivered by Rex T. Gilbert, Jr. and Daniela L. Gilbert, dated May 5, 2006 and recorded on May 10, 2006, in Book No. 219, at Page 53 in the Office of the Register of Deeds of Hyde County, North Carolina; and because of default in the payment of the indebtedness secured thereby and failure to carry out and perform the stipulations and agreements contained therein and, pursuant to demand of the holder of the indebtedness secured by said Deed of Trust, the undersigned Substitute Trustee will place for sale, at public auction, to the highest bidder for cash at the usual place of sale at Hyde County Courthouse, Swanquarter, North Carolina on **April 17, 2012 at 10:00 AM** that parcel of land, including improvements thereon, situated, lying and being in the City of Ocracoke, County of Hyde, State of North Carolina, and being more particularly described in the above referenced Deed of Trust.

Address of property:
Tax Parcel ID:
Present Record Owners:

134 West End Road, Ocracoke, NC 27960
9500-48-9384
Rex T. Gilbert, Jr.;  Daniela L. Gilbert

The terms of the sale are that the real property hereinbefore described will be sold for cash to the highest bidder. A deposit of five percent (5%) of the amount of the bid or Seven Hundred Fifty Dollars ($750.00), whichever is greater, is required and must be tendered in the form of certified funds at the time of the sale. In the event that the Owner and Holder or its intended assignee is exempt from paying the same, the successful bidder shall be required to pay revenue stamps on the Trustee's Deed, and any Land Transfer Tax.

The real property hereinabove described is being offered for sale "AS IS, WHERE IS" and will be sold subject to all superior liens, unpaid taxes, and special assessments. Other conditions will be announced at the sale. The sale will be held open for ten (10) days for upset bids as by law required. If a third party is the high bidder at the time of sale confirmation, the third party will have fifteen (15) days following the sale confirmation to remit the balance of his/her bid to the Trustee. In the sole discretion of the Trustee, an extension may be granted, but in that instance, if required by the noteholder or loan servicer, the bidder shall be required to pay per diem interest at the current rate on the note secured by the deed of trust described herein until the day he/she remits the balance of his/her bid to the Trustee.

If for any reason the Trustee is unable to convey title to this property or the sale is set aside, the sole remedy of the purchaser is the return of the deposit. Furthermore, if the validity of the sale is challenged by any party, the Trustee, in it's sole discretion, if it believes the challenge to have merit, may declare the sale to be void and return the deposit. In either event the purchaser will have no further recourse against the Mortgagor, the Mortgagee, the Mortgagee's attorney or the Trustee.



## Additional Notice Where the Real Property is Residential With Less Than 15 Rental Units:

An order for possession of the property may be issued pursuant to G.S. 45-21.29 in favor of the purchaser and against the party or parties in possession by the clerk of superior court of the county in which the property is sold. Any person who occupies the property pursuant to a rental agreement entered into or renewed on or after October 1, 2007, may, after receiving the notice of sale, terminate the rental agreement upon 10 days' written notice to the landlord. Upon termination of a rental agreement, the tenant is liable for rent due under the rental agreement prorated to the effective date of the termination.

Any person who occupies the property pursuant to a bona fide lease or tenancy may have additional rights pursuant to Title VII of 5.896 - Protecting Tenants at Foreclosure Act which became effective on May 20, 2009.

Posted:_____

Witness:_____
   Assistant/Deputy Clerk of Superior Court

David A. Simpson, P.C., Substitute Trustee

By: _____
      **David W. Neill**
_____
Attorney at Law
Rogers Townsend & Thomas, PC
Attorneys for David A. Simpson, P.C.
Substitute Trustee
2550 West Tyvola Road
Suite 520
Charlotte, NC 28217
(704) 442-9500

**EXHIBIT 4**

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO. 4:09-CV-00181-D

| | |
|---|---|
| REX T. GILBERT, JR. and<br>DANIELA L. GILBERT,<br><br>                Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK TRUST COMPANY<br>AMERICAS, *As Trustee for*,<br>RESIDENTIAL ACCREDIT LOANS, INC,<br>DAVID A. SIMPSON, P.C., Substitute Trustee,<br>RESIDENTIAL FUNDING, LLC, and<br>GMAC MORTGAGE, LLC,<br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF THOMAS A. COX

I, Thomas A. Cox, being duly sworn, hereby depose and say:

1.      I am Thomas A. Cox, an attorney-at-law licensed to practice before the courts of the State of Maine (Maine Bar No. 1248) and the United States District Court for the District of Maine.  I am co-counsel for the Defendant in the matter of *Federal National Mortgage Association v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Dist. 9, Nor. Cumb.) now pending.

2.      In *Federal National Mortgage Association v. Bradbury, id.,*  I deposed Jeffrey D. Stephan, a Limited Signing Officer of GMAC Mortgage, LLC, on June 7, 2010 in Narberth, Pennsylvania, Pennsylvania.

3.   I have in my possession the original transcript of the aforesaid deposition of Jeffrey D. Stephan and have read it. A copy of that transcript is attached to this Affidavit as Exhibit A.  Said attached deposition transcript accurately sets forth the testimony given under oath in my presence by Jeffrey D. Stephan on June 7, 2010.  No signature page or errata sheet for this deposition transcript has been presented or filed on behalf of Mr. Stephan

DATED: October 12, 2010

_____
Thomas A. Cox

STATE OF MAINE
CUMBERLAND, ss

Personally appeared the above signed Thomas A. Cox before me this 11th day of October, 2010 and stated under oath that the foregoing statements made by him are true of his own personal knowledge.

_____ Bar No. 9152
Notary Public/ Attorney at Law

1

MAINE DISTRICT COURT, DISTRICT NINE
DIVISION OF NORTHERN CUMBERLAND
- - -

FEDERAL NATIONAL            :
MORTGAGE ASSOCIATION       : DOCKET NO.
            Plaintiff     : BRI-RE-09-65
                           :
    V.                     :
                           :
NICOLE M. BRADBURY         :
            Defendant:
    and                    :
GMAC MORTGAGE, LLC         :
d/b/a DITECH, LLC.COM     :
and BANK OF AMERICA, NA:
    Parties in Interest:
                           - - -

June 7, 2010

- - -

Oral deposition of JEFFREY D.

STEPHAN, taken pursuant to notice, was

held at the law offices of LUNDY FLITTER

BELDECOS & BERGER, P.C., 450 N. Narberth

Avenue, Narberth, Pennsylvania 19072,

commencing at 10:10 a.m., on the above

date, before Susan B. Berkowitz, a

Registered Professional Reporter and

Notary Public in the Commonwealth of

Pennsylvania.

- - -

Exhibit A

1

MAINE DISTRICT COURT, DISTRICT NINE
DIVISION OF NORTHERN CUMBERLAND
-   -   -
FEDERAL NATIONAL              :
MORTGAGE ASSOCIATION    : DOCKET NO.
          Plaintiff   : BRI-RE-09-65
                              :
      V.                      :
                              :
NICOLE M. BRADBURY       :
            Defendant:
      and                     :
GMAC MORTGAGE, LLC       :
d/b/a DITECH, LLC.COM   :
and BANK OF AMERICA, NA:
    Parties in Interest:
                  -   -   -
              June 7, 2010
                  -   -   -
       Oral deposition of JEFFREY D.
STEPHAN, taken pursuant to notice, was
held at the law offices of LUNDY FLITTER
BELDECOS & BERGER, P.C., 450 N. Narberth
Avenue, Narberth, Pennsylvania 19072,
commencing at 10:10 a.m., on the above
date, before Susan B. Berkowitz, a
Registered Professional Reporter and
Notary Public in the Commonwealth of
Pennsylvania.
                  -   -   -

2

APPEARANCES:

BRIAN M. FLEISCHER, ESQUIRE
FLEISCHER, FLEISCHER & SUGLIA, P.C.
        Plaza 1000 at Main Street
        Suite 208
        Voorhees, New Jersey  08043
        (856) 489-8977
        bfleischer@fleischerlaw.com
        Counsel for GMAC


THOMAS A. COX, ESQUIRE
LAW OFFICES OF THOMAS A. COX
        P.O. Box 1315
        Portland, Maine 04104
        (207) 749-6671
        tac@gwi.net
        Counsel for Defendant,
        Nicole M. Bradbury


VIA TELEPHONE:
JULIA G. PITNEY, ESQUIRE
DRUMMOND & DRUMMOND
        One Monument Way
        Portland, Maine 04101
        (207) 774-0317
        JPitney@ddlaw.com
        Counsel for GMAC and Fannie Mae

3

1

2          (Document marked Exhibit-1

3      for identification.)

4              -   -   -

5          (It is hereby stipulated and

6      agreed by and between counsel that

7      sealing, filing and certification

8      are waived; and that all

9      objections, except as to the form

10      of questions, be reserved until

11      the time of trial.)

12              -   -   -

13          JEFFREY D. STEPHAN, after

14      having been duly sworn, was

15      examined and testified as follows:

16              -   -   -

17          MS. PITNEY:  I would like to

18      put on the record that we

19      requested a stipulation, and

20      Attorney Cox has denied our

21      request for that stipulation.  And

22      that would be a stipulation that

23      this deposition transcript be used

24      for this case, FNMA versus

25      Bradbury, only.

4

```
1                      STEPHAN
2              MR. COX:  Mr. Fleischer, we
3        understand that Julia Pitney
4        represents the plaintiff in this
5        case.  Who do you represent today?
6              MR. FLEISCHER:  I believe
7        Ms. Pitney both represents Fannie
8        Mae and GMAC, and I am here on
9        GMAC's behalf.
10             MR. COX:  GMAC is neither a
11       plaintiff nor defendant in this
12       case, so we may have some issues
13       around that, but we'll cross that
14       bridge when we get to it.
15                    -   -   -
16                   EXAMINATION
17                    -   -   -
18  BY MR. COX:
19             Q.    Mr. Stephan, for the record,
20  would you state your full name, please?
21             A.    Jeffrey Stephan.
22             Q.    How old are you?
23             A.    I am 41, in June.
24             Q.    You live in Sellersville,
25  Pennsylvania?
```

5

STEPHAN

1
2          A.     That is correct.
3          Q.     Have you had your deposition
4    taken previously?
5          A.     In other cases, yes.
6          Q.     How many other cases?
7          A.     This will be my third time.
8          Q.     What other cases were you
9    deposed in, to your recollection?
10         A.     In what kind of cases?
11         Q.     Well, can you remember the
12   names of the cases?
13         A.     No, I don't.
14         Q.     When is the last time that
15   you've had your deposition taken?
16         A.     I would approximate two,
17   three months ago.
18         Q.     Was that in Florida?
19         A.     No.   That was in New Jersey.
20         Q.     That would have been in
21   2010?
22         A.     Yes.
23         Q.     Then you were deposed in
24   Florida in December of 2009?
25         A.     That is correct.

6

                        STEPHAN

1

2          Q.    When was the other

3    deposition, the third deposition?

4          A.    This one today is the third.

5          Q.    Have you testified in court

6    as a witness before?

7          A.    No.

8          Q.    Did you review any documents

9    to prepare for this deposition?

10         A.    Yes.

11         Q.    What documents did you

12   review?

13         A.    I looked at the deposition

14   that was sent to me.  And I went over the

15   Complaint with Brian.

16              THE WITNESS:  When was that,

17         Thursday, Wednesday?

18              MR. FLEISCHER:  You're

19         directed not to say anything with

20         regard to what we spoke about,

21         but, yes, you can answer to what

22         you looked at.

23              THE WITNESS:  Yes.

24              MS. PITNEY:  I'm sorry to

25         interrupt.  I'm just having a

7

```
 1                  STEPHAN
 2        little difficulty hearing you.  Is
 3        there any way to push the phone a
 4        little closer to Mr. Stephan?
 5             MR. FLEISCHER:  Okay.  And,
 6        Julia, let me know during the
 7        course if there's still a problem.
 8             MS. PITNEY:  You were doing
 9        fine, and then it got a little
10        fuzzy.
11             THE WITNESS:  I'll talk
12        louder.
13             MS. PITNEY:  Thank you.
14   BY MR. COX:
15        Q.    What deposition did you look
16   at?
17        A.    The deposition for this
18   case.
19        Q.    The Deposition Notice?
20        A.    Right, the Deposition
21   Notice.
22        Q.    It was not another
23   deposition transcript --
24        A.    No.
25        Q.    -- that you were referring
```

8

```
 1                    STEPHAN
 2    to?
 3         A.    No.
 4              MR. FLEISCHER:  Let him
 5         finish the question, and then
 6         respond, because it makes it
 7         cleaner for the transcript.
 8              THE WITNESS:  Thank you.
 9    BY MR. COX:
10         Q.    What is your educational
11    background?
12         A.    I have a four-year degree at
13    Penn State University in liberal arts.
14         Q.    When did you go to work for
15    GMAC?
16         A.    I began work at GMAC
17    September 30th of '04.
18         Q.    What was your work history,
19    in a summary form, before you went to
20    work for GMAC?
21         A.    I have done collections and
22    mortgage foreclosures for other
23    companies.
24         Q.    Who have you done mortgage
25    foreclosure work for?
```

9

STEPHAN

1

2      A.    ContiMortgage, Fairbanks
3  Capital, GMAC.
4      Q.    The first one, I'm not sure
5  about.  Is that Conti, C-O-N-T-E (sic)?
6      A.    C-O-N-T-I.
7      Q.    What period of time did you
8  work for ContiMortgage?
9      A.    I began there in '92.  I
10 believe I left there in '98.
11     Q.    What years, approximately,
12 did you work for Fairbanks Capital?
13     A.    '98 to '04.
14     Q.    You work in the GMAC
15 Mortgage office in Fort Washington,
16 Pennsylvania; is that correct?
17     A.    That is correct.
18     Q.    Approximately, how many
19 people work in that office?
20     A.    I can't estimate the number
21 of people.  I can say my department,
22 approximately 50 to 60 people.
23     Q.    What's the name of your
24 department?
25     A.    Foreclosures.

10

STEPHAN

1
2       Q.     When you began working for
3   GMAC Mortgage in 2004, what position did
4   you begin working in?
5       A.     I was a foreclosure
6   specialist.
7       Q.     What kinds of duties did
8   that involve?
9       A.     That involved the day-to-day
10  handling and servicing of a portfolio of
11  loans that fell into a foreclosure
12  category.
13      Q.     What kinds of duties did you
14  carry out with respect to those matters?
15          MS. PITNEY:  Object to form.
16          MR. COX:  You have to
17      answer.
18          MS. PITNEY:  You can answer
19      the question.
20          THE WITNESS:  The everyday
21      servicing of the file, from
22      contacting the attorney, supplying
23      an attorney who's handling a case
24      within my portfolio with any
25      information they may need, a copy

11

STEPHAN

1
2          of documents that may be needed
3          through a fax form or e-mail form,
4          the calculation of figures for
5          judgments, reporting sale results
6          at that time, and properly
7          conveying properties to the proper
8          departments for post sale action.
9   BY MR. COX:
10          Q.    How long did you hold the
11  position of foreclosure specialist?
12          A.    With GMAC, three years.
13          Q.    So you would have assumed a
14  new position sometime in 2007?
15          A.    Yes.
16          Q.    What position did you assume
17  in 2007?
18          A.    I became a team lead within
19  the foreclosure department.
20          Q.    What duties did you assume
21  as the team lead in the foreclosure
22  department?
23          A.    At that time, GMAC
24  segregated our department into teams, and
25  I was put into place as the supervisor or

12

```
 1                     STEPHAN
 2   team lead for our bidding team, which
 3   would be a team of individuals who
 4   calculate the bids for sales.
 5          Q.    Calculate the bids for sales
 6   of mortgage --
 7          A.    Foreclosure sales.
 8                MR. FLEISCHER:  Again, let
 9          him finish the question.
10   BY MR. COX:
11          Q.    Just so I can understand it,
12   your role in that position was to help
13   GMAC calculate what it was going to bid
14   at any given foreclosure sale?
15          A.    That would be correct.
16          Q.    The foreclosure
17   department -- is that what it's called?
18          A.    Yes.
19          Q.    That has units within it?
20          A.    Yes.
21          Q.    And when you were doing the
22   bidding work, what unit were you a part
23   of at that time?
24          A.    The bid team.
25          Q.    How long did you serve on
```

13

```
 1                    STEPHAN
 2    the bid team?
 3          A.    I'm going to estimate six
 4    months to a year, at the most.
 5          Q.    Does it sound roughly
 6    correct that sometime in 2008, you
 7    assumed a new position?
 8          A.    Yes.
 9          Q.    What was the next position
10    that you held after working on the bid
11    team?
12          A.    My present position, which
13    is the team lead of the document
14    execution team.
15          Q.    Is there also a service
16    transfer unit?
17          A.    Yes, there is.
18          Q.    Are you the team lead of
19    that as well?
20          A.    Yes, I am.  That falls into
21    the document execution team.
22          Q.    So I talk your language,
23    there's a foreclosure department?
24          A.    Yes.
25          Q.    And the subdivisions within
```

14

STEPHAN

1
2    that, do you call them teams or units?
3         A.     Teams.
4         Q.     So there's a foreclosure
5    department, and then within it are a
6    group of teams that do different
7    functions; is that correct?
8         A.     That is correct.
9         Q.     What does the document
10   execution team do?
11              MR. FLEISCHER:   Objection as
12        to form.
13              THE WITNESS:   Can you
14        rephrase that?
15   BY MR. COX:
16        Q.     What are the functions of
17   the document execution team?
18        A.     The functions of my document
19   execution team is, I have staff that
20   prints documents, from our computer
21   system, that are submitted from our
22   attorney network.  I have staff, also, on
23   that team who prepares the documents
24   which have already received figures from
25   our attorneys.  So there are completed

15

                    STEPHAN

1

2   documents.  They fill in the blanks, they

3   stamp names.  They ensure that all of the

4   notary lines are completed properly once

5   it's returned from the notary.  And that

6   staff also is in charge of making sure

7   they Federal Express the document back to

8   the designated attorney within our

9   network.

10          Q.    What does the service

11  transfer team do?

12          A.    The service transfer team

13  receives a list of loans from our

14  transfer management team, which is

15  located in Iowa.  The service transfer

16  team within foreclosure only handles

17  loans that fall into a bankruptcy or

18  foreclosure category.  They prepare files

19  or CDs, and transfer them to the new

20  servicer.  So they're loans that are

21  either acquired, or they're loans that

22  are being transferred to a new servicer

23  for service.

24          Q.    How many employees are on

25  the document execution team?

16

```
 1                    STEPHAN
 2          A.    14.
 3          Q.    Including yourself?
 4          A.    No; including me, 15.
 5          Q.    What training have you
 6   received from GMAC to function in your
 7   capacity as the team lead for the
 8   document execution team?
 9               MS. PITNEY:   Object to form.
10   BY MR. COX:
11          Q.    Let me restate the question.
12   Have you received any training from GMAC
13   to use in conjunction with your
14   performance as the team lead for the
15   document execution team?
16          A.    Yes.
17          Q.    What training have you
18   received?
19          A.    I received side-by-side
20   training from another team lead to
21   instruct me on how to review the
22   documents when they are received from my
23   staff.
24          Q.    Who was that person?
25          A.    That person, at the time, I
```

```
                         STEPHAN
 1
 2    believe was a gentleman by the name of
 3    Kenneth Ugwuadu, U-G-W-U-A-D-U.   He is no
 4    longer with GMAC.
 5            Q.    How long did that training
 6    last?
 7            A.    Three days.
 8            Q.    Were there any written or
 9    printed training materials or manuals
10    used as a part of that training?
11            A.    No.
12            Q.    Again, just so I understand
13    what your testimony was, that training
14    involved your learning how to review the
15    documents that were being processed
16    through your hands; is that correct?
17            A.    That's correct.
18            Q.    What were you trained to do
19    with respect to those documents by that
20    gentleman?
21            A.    Basically, how to review the
22    system, which I already basically knew
23    from preparing documents in my prior
24    position before becoming a team lead.  So
25    it was more or less a rehash, let's say,
```

18

```
 1                    STEPHAN
 2  or retraining, to confirm that I was
 3  looking at things correctly in the
 4  system.
 5        Q.    When you refer to a system,
 6  you're referring to a computer system?
 7        A.    Yes.
 8        Q.    Other than what you might
 9  call it when you're not happy, does that
10  system have a name?
11        A.    Yes.  That system is called
12  Fiserv, F-I-S-E-R-V.
13        Q.    Have you received any
14  training on how to use that system?
15        A.    Yes, when I was hired.
16        Q.    Are there any manuals or
17  training materials associated with your
18  training on that system?
19        A.    Yes, there is.
20        Q.    Do you have those manuals in
21  your possession?
22        A.    Presently, no.
23        Q.    Do they exist in your office
24  at GMAC?
25        A.    I honestly don't know.
```

19

```
1                    STEPHAN
2        Q.    In your role as team lead
3   for the document execution team, do you
4   have any duties with respect to the
5   receipt, application, or counting for
6   loan payments?
7        A.    No.
8              MS. PITNEY:  Object to the
9        form of the question.
10  BY MR. COX:
11       Q.    What department has that
12  responsibility?
13       A.    To my understanding, that
14  would be customer service.  And within
15  customer service, I believe there is a
16  cash unit.
17       Q.    Have you ever worked in that
18  cash unit?
19       A.    No.
20       Q.    Have you ever worked in that
21  customer service department?
22       A.    No.
23       Q.    Have you ever had any
24  training in how that department and unit
25  work?
```

20

```
1                    STEPHAN
2         A.    No.
3         Q.    In your capacity as team
4    lead for the document execution team, do
5    you have any responsibility for data
6    entry into the computer system regarding
7    payments received by GMAC?
8         A.    No.
9         Q.    In your capacity as the team
10   lead for the document execution team, do
11   you have any role in the foreclosure
12   process at GMAC, other than the signing
13   of documents?
14              MR. FLEISCHER:  Objection as
15         to the form of the question.
16              THE WITNESS:  Can you
17         rephrase?
18   BY MR. COX:
19         Q.    In your capacity as the team
20   lead for the document execution team, do
21   you have any role in the foreclosure
22   process, other than the signing of
23   documents?
24         A.    No.
25         Q.    I'm going to hand you what
```

21

```
 1                    S T E P H A N
 2    we have marked as Deposition Exhibit
 3    Number 1, which is your affidavit in this
 4    case, dated August 5, 2009.
 5              MS. PITNEY:  Excuse me, Tom.
 6         This is Julia.  Am I to presume
 7         that this is the only exhibit
 8         you're going to be introducing?
 9         Because I haven't received any
10         exhibits that you plan to produce
11         at this deposition today.
12              MR. COX:  I had no idea you
13         were going to be participating
14         today, Julia.
15              MS. PITNEY:  Well, I
16         represent the plaintiff.  It
17         shouldn't come as any surprise.
18              MR. COX:  We're not going to
19         have a debate on the record.  The
20         exhibits are here.  You're welcome
21         to come see them.  I had no idea
22         that you were going to participate
23         in this fashion.
24              MS. PITNEY:  You had no
25         idea?
```

22

```
 1                    STEPHAN
 2            MR. COX:  I'm not going to
 3       have this exchange on the record
 4       with you.  If you want to go off
 5       the record for a minute, I'll be
 6       happy to do it.
 7            MS. PITNEY:  No, we're going
 8       to stay right on the record, Tom.
 9            MR. COX:  That's fine.
10            MS. PITNEY:  Is it your
11       intent to introduce these exhibits
12       that have not been produced to the
13       opposing party?
14            MR. COX:  I'm not going to
15       respond to that.  I will entertain
16       objections that you are going to
17       make.  But I'm not going to
18       respond to your questions on the
19       record.
20            MS. PITNEY:  I'm going to
21       object to each and every exhibit.
22            MR. COX:  That's your right
23       to do that.
24  BY MR. COX:
25            Q.   I've handed you Deposition
```

23

STEPHAN

1

2    Exhibit Number 1, Mr. Stephan.    Is that a

3    document signed by you?

4            A.    Yes, that is my signature.

5            Q.    And that's dated August 5,

6    2009?

7            A.    That is correct.

8            Q.    Do you have any memory of

9    signing that document?

10           A.    No, I do not.

11                MS. PITNEY:    I'd like to

12           take a brief break and speak with

13           Attorney Fleischer separately.

14           There's no question pending.

15                (Whereupon, a short recess

16           was taken.)

17                MR. COX:    I gather you have

18           something you want to say on the

19           record, Julia?

20                MS. PITNEY:    Yes.    I object

21           to not being provided copies of

22           the documents that you intend to

23           introduce in this deposition.    And

24           in an effort to make things more

25           efficient, my proposal is that --

24

STEPHAN

1
2       I understand there's not a large
3       number of documents.  I propose
4       that we have Attorney Fleischer
5       fax them to me, or e-mail, in
6       bulk, or we're going to have to
7       stop.  I would object.  And each
8       time I'm going to stop and have
9       each document sent to me.
10          MR. COX:  Your objection is
11      noted.
12          MR. FLEISCHER:  Why don't we
13      at least just deal with the one
14      document that's in front of us at
15      this point, which is the
16      affidavit, and then we'll address
17      each one as they come up.
18          MS. PITNEY:  Fair enough.
19  BY MR. COX:
20      Q.   Mr. Stephan, you've
21  testified that in addition to yourself,
22  there are 14 other employees in your
23  document execution team.
24      A.   That is correct.
25      Q.   You have a title of limited

25

```
 1                      STEPHAN
 2   signing officer; is that correct?
 3          A.     That is correct.
 4          Q.     How long have you been a
 5   limited signing officer for GMAC
 6   Mortgage?
 7          A.     I'm going to estimate, two
 8   years.
 9          Q.     Are there any other limited
10   signing officers among the 14 people on
11   your team?
12          A.     No, not amongst my 14
13   people.
14          Q.     Exhibit-1, on the bottom of
15   the first page, says:  I have under my
16   custody and control the records relating
17   to the mortgage transaction referenced
18   below.
19                 What records does GMAC
20   maintain with respect to mortgage
21   transactions?
22                 MS. PITNEY:  Object to the
23          form.
24                 THE WITNESS:  Please
25          rephrase.
```

26

```
1                        STEPHAN
2    BY MR. COX:
3            Q.      What records does GMAC
4    maintain with respect to mortgage loans?
5            A.      We keep our records for the
6    foreclosure department and the rest of
7    the company on our Fiserv system for
8    availability throughout our company.
9            Q.      Do paper records exist
10   anywhere within GMAC Mortgage?
11           A.      Yes, they do.
12           Q.      Where do they exist?
13           A.      I believe they are housed
14   either in our Iowa office or in
15   Minnesota, or with any of our custodians
16   involved within the company.
17           Q.      Do you have any
18   responsibilities for making entries in
19   the Fiserv system?
20           A.      Other than just usual notes,
21   no.
22           Q.      What kind of usual notes do
23   you enter?
24                   MS. PITNEY:  Object.  I'm
25              objecting to the form of the
```

27

```
 1              S T E P H A N
 2         question.  And, furthermore, I'm
 3         objecting to the extent that
 4         you're basically asking him an
 5         incredibly broad-based question
 6         here, Tom.  If you want to ask him
 7         about this case and any entries he
 8         made with respect to this case,
 9         then that's fine.  But your
10         question is pretty sweeping there.
11 BY MR. COX:
12         Q.    What is your usual business
13 practice and routine with respect to
14 making usual notes in the Fiserv system?
15         A.    If a customer were to call
16 in, I would make a note in our computer
17 system.
18         Q.    Do customers call you in
19 your capacity as team lead for the
20 document execution team?
21         A.    No, they do not.
22         Q.    So if that's the only kind
23 of notes that you would make in the
24 system, is it fair to say that you don't
25 make notes in that system?
```

28

```
 1                    STEPHAN
 2          A.     That would be correct.
 3          Q.     And you have no role in the
 4     entry of any other data into that system;
 5     isn't that correct?
 6          A.     That is correct.
 7          Q.     What department maintains
 8     that system?
 9                MR. FLEISCHER:  Objection as
10          to form.
11     BY MR. COX:
12          Q.     Do you know what department
13     maintains that system?
14          A.     The system is used by the
15     entire company.
16          Q.     Do you know what department
17     maintains the security for that system?
18          A.     The IT department.
19          Q.     Where is that located?
20          A.     Throughout the entire
21     country.
22          Q.     Do you know what department
23     makes entries into that system?
24          A.     Numerous departments.
25          Q.     Do you know what departments
```

29

STEPHAN

1 
2  have the ability to change entries in
3  that system?
4          A.    Nobody has the ability to
5  change an entry in the system, as far as
6  a note would go.
7          Q.    What do you mean by that?
8          A.    Such as if a customer calls
9  in, you type in the system.  Once you
10  type it, it's entered.
11          Q.    Does GMAC keep a paper
12  record of loan payments made by mortgage
13  customers?
14          A.    I do not know.
15          Q.    I think you said that the
16  cash department receives payments --
17  customer payments; is that correct?
18          A.    To my knowledge, yes.
19          Q.    That's the department that
20  you've said you have not worked in; is
21  that correct?
22          A.    That is correct.
23          Q.    So you don't have firsthand
24  knowledge about how it operates; is that
25  correct?

30

STEPHAN

1

2      A.    That is correct.

3            MS. PITNEY:  Object.

4  BY MR. COX:

5      Q.    Do you have any knowledge

6  about how the data relating to those

7  payments are entered into the system?

8      A.    I do not have that

9  knowledge.

10     Q.    Do you have any knowledge

11 about how GMAC ensures the accuracy of

12 the data entered into the system?

13     A.    No, I do not.

14     Q.    Do you have any knowledge as

15 to what measures GMAC takes to preserve

16 the integrity and security of the system?

17     A.    No, I do not.

18           MS. PITNEY:  Object to the

19     form of that question.

20 BY MR. COX:

21     Q.    In your capacity as team

22 lead for the document execution team,

23 what kinds of documents do you sign?

24     A.    The types of documents I

25 sign are assignments of mortgage,

31

STEPHAN

1

2  numerous types of affidavits, deeds that

3  need to be done post sale, a substitution

4  of trustees.  And that covers it in a

5  general span.

6         Q.     You said you sign a variety

7  of affidavits.  What kinds of affidavits

8  do you sign?

9         A.     I sign judgment affidavits

10  for judicial foreclosure actions.  I will

11  sign an affidavit verifying military

12  duty.  I sign affidavits in reference to

13  -- if GMAC has exhausted all options

14  through lost mitigation upon reviewing

15  notes in our Fiserv system.  That's a

16  general description of different types

17  of affidavits.

18         Q.     Your document execution team

19  provides documents for foreclosures in

20  what states?

21         A.     Throughout the country.

22         Q.     Are there other document

23  execution teams within the GMAC system?

24         A.     I believe our bankruptcy

25  unit also has a document execution team.

32

                              STEPHAN

1

2        Q.      That's the only other

3    document execution team that you're aware

4    of?

5        A.      To my knowledge, yes.

6        Q.      When you referred in one of

7    your answers a few moments ago to

8    judgment affidavits, are you referring to

9    the type of affidavit in front of you, as

10   Deposition Exhibit-1?

11       A.      That is a similar type of

12   affidavit, yes.  This states Affidavit in

13   Support of the Plaintiff's Motion for

14   Summary Judgment.

15       Q.      Have you received any

16   training regarding the summary judgment

17   process in judicial foreclosure states?

18       A.      No.

19       Q.      Do you have any knowledge as

20   to what a summary judgment affidavit is

21   used for in the State of Maine?

22               MR. FLEISCHER:  Objection as

23       to form.

24   BY MR. COX:

25       Q.      Would you please answer the

33

```
 1                    STEPHAN
 2   question?
 3        A.    To my knowledge, a borrower
 4   would have filed a contested answer.  And
 5   this would be our next step within the
 6   process, to confirm the amount that is
 7   due to support the summary judgment.
 8        Q.    Do you understand how the
 9   affidavit is used, that is, Deposition
10   Exhibit Number 1?
11             MS. PITNEY:  Objection.
12        Tom, you're getting dangerously
13        close here to the privileged area.
14        I mean, this affidavit, in itself,
15        was prepared in preparation for
16        litigation -- in litigation; not
17        even preparation for it, but
18        during litigation.
19             MR. COX:  I have not the
20        slightest interest in getting into
21        attorney/client privilege.  I'll
22        rephrase the question.
23   BY MR. COX:
24        Q.    Do you have any knowledge of
25   how summary judgment affidavits are used
```

34

```
 1                    STEPHAN
 2    in judicial foreclosure states?
 3         A.    No.
 4         Q.    Are you aware that they are
 5    given to a judge?
 6         A.    Yes.
 7         Q.    And do you understand that
 8    the judge relies upon them?
 9         A.    Yes.
10         Q.    At the time that you
11    executed Deposition Exhibit-1 on August
12    5, 2009, you were, at that time, in your
13    position as team lead for the document
14    execution department?
15         A.    Yes.
16         Q.    Has the manner in which you
17    perform your duties as the team lead for
18    the document execution department changed
19    in any way over the period from August 5,
20    2009 to the present date?
21         A.    No.
22         Q.    Has your job description
23    changed in any manner during that time?
24         A.    I assumed the responsibility
25    at that time of also handling the service
```

35

STEPHAN

1
2    transfer team as an additional
3    responsibility; other than document
4    execution, no.
5         Q.   In your usual business
6    practice as a team lead for the document
7    execution team, how does a summary
8    judgment affidavit come to you, such as
9    the one that is Deposition Exhibit Number
10   1?
11            MS. PITNEY:  Objection.
12        Tom, if you'd like to ask him
13        about how this specific affidavit
14        came to him, that's fine.  But,
15        again, you're asking way too
16        broad.
17   BY MR. COX:
18        Q.   Do you know how this
19   specific affidavit got to you, Mr.
20   Stephan?
21        A.   We have a process in place
22   that if our attorney network needs an
23   affidavit, they will upload it into our
24   system, which is called LPS.  We have
25   another system, which is a communication

36

```
 1                    STEPHAN
 2  tool, between our attorneys.  They load
 3  it into a process called signature
 4  required.
 5              MS. PITNEY:  Jeff, I'm going
 6         to interrupt you right there.  To
 7         the extent that this answer or
 8         anything else that you say has to
 9         do with your communication between
10         you and your attorney -- GMAC and
11         its attorney, it's attorney/client
12         privilege.
13              THE WITNESS:  So I won't
14         answer.
15              MR. COX:  Well, let's go
16         back and ask the question again.
17              MS. PITNEY:  He's answered
18         the question.  He gets the
19         affidavit from the attorney.
20  BY MR. COX:
21         Q.    What is the LPS system?
22         A.    That is a communication tool
23  with our attorney network.
24         Q.    Is LPS a separate company?
25         A.    Yes.
```

37

```
 1                    STEPHAN
 2                MS. PITNEY:  Objection.  The
 3           means by which he communicates any
 4           details about -- the means by
 5           which he communicates with his
 6           attorneys is privileged.
 7   BY MR. COX:
 8           Q.    What does LPS do?
 9                MS. PITNEY:  I'm going to
10           object again on privilege grounds.
11           Same objection.  Do not answer
12           that question.
13                THE WITNESS:  Okay.
14   BY MR. COX:
15           Q.    Is the source of what you
16   know about what LPS does based upon any
17   communication that you've had with
18   lawyers?
19           A.    Sorry.  Please rephrase
20   that.  I don't understand your question.
21           Q.    Do you know what LPS does
22   with respect to documents processed by
23   your unit?
24                MS. PITNEY:  Objection.
25           Same objection.
```

38

STEPHAN

1

2          MR. COX:  He can answer that

3      yes or no.

4          THE WITNESS:  I still don't

5      understand what you're asking.

6  BY MR. COX:

7      Q.    You've mentioned LPS.

8      A.    Right.

9      Q.    That's a separate company;

10  is that correct?

11      A.    It's a system that we have

12  acquired from a company by the name of

13  Fidelity, in order to have communication

14  between our attorneys.

15      Q.    Do you have any memory of

16  specifically receiving Deposition

17  Exhibit-1?

18      A.    No.

19      Q.    Again, I'm asking you, based

20  upon that, to describe what the usual

21  business practice is within your unit, as

22  far as how affidavits, such as Deposition

23  Exhibit-1, come to you.

24      A.    Our attorney will load it to

25  the LPS system.  Members of my team will

39

```
 1                    S T E P H A N
 2  print it.  Other members will prepare it.
 3  The figures have already been loaded from
 4  our network of attorneys.  So my team
 5  does not have any input on the affidavit,
 6  other than filling in my name.  They
 7  bring it to me.  I review it against our
 8  Fiserv system, execute it, hand it back.
 9  They get it notarized.  It's Federal
10  Expressed back to the individual attorney
11  asking.
12          Q.    Do you keep a log of any
13  sort of what documents you execute?
14               MS. PITNEY:  I'm sorry.  Can
15          you repeat the question, Tom?  I
16          could not hear that.
17  BY MR. COX:
18          Q.    Do you keep a log of any
19  sort of what documents you execute?
20               MS. PITNEY:  Objection.
21          Work product.  Any type of log
22          that he keeps relative to these
23          affidavits is prepared in
24          preparation for litigation; to the
25          extent that one even exists.
```

40

STEPHAN

1

2          MR. COX:  He can answer the

3      question of whether or not he

4      keeps a log, before I ask him what

5      goes into the log.

6          MS. PITNEY:  Fine.

7          THE WITNESS:  No, I don't

8      have a log.

9  BY MR. COX:

10         Q.    Does anybody keep a log of

11  what documents you sign?

12         MS. PITNEY:  Object to the

13      form of that question.

14         THE WITNESS:  Please

15      rephrase.

16  BY MR. COX:

17         Q.    Do you know if anybody keeps

18  a log of what documents you execute?

19         A.    We have notaries in our

20  department, approximately six, who keep a

21  log for what they notarize.

22         Q.    These are notaries within

23  your department?

24         A.    That is correct.

25         Q.    As I understand it, the

41

```
 1                         STEPHAN
 2   first step is, in your department, a
 3   document comes in on the LPS system from
 4   the outside lawyer; is that correct?
 5            A.     That is correct.
 6            Q.     And then an employee in your
 7   department prints it out; is that
 8   correct?
 9            A.     That is correct.
10            Q.     And then you said that the
11   employee prepares the document.  What
12   does that mean?
13                 MS. PITNEY:  Objection.  The
14            document is prepared for
15            litigation.  It is privileged.
16            How it is prepared is privileged.
17            Do not answer that question.
18   BY MR. COX:
19            Q.     Do your employees have any
20   direct communication with outside
21   counsel?
22            A.     Yes, through the LPS system.
23                 MS. PITNEY:  Objection.  How
24            and what he communicates with his
25            attorney is privileged, Tom.
```

42

```
 1                    STEPHAN
 2              MR. COX:  I haven't asked
 3         for the content.  I asked if it
 4         happens.
 5  BY MR. COX:
 6         Q.    Would you answer the
 7  question, please?
 8         A.    Yes, through the LPS system.
 9         Q.    Is anything done to a
10  document submitted to the LPS system by
11  an outside lawyer before it reaches your
12  hands?
13              MS. PITNEY:  Objection.
14         Preparation of the document is
15         privileged.  It's for litigation.
16         Do not answer the question.
17  BY MR. COX:
18         Q.    Is the document that is
19  received in the LPS system from outside
20  counsel presented to you in exactly the
21  form that it is received in from outside
22  counsel?
23              MS. PITNEY:  Objection.
24         Same objection.
25              MR. COX:  Is it an
```

43

```
 1                    STEPHAN
 2          objection, or are you instructing
 3          him not to answer?
 4              MS. PITNEY:  I'm instructing
 5          him not to answer, to the extent
 6          you're asking him questions about
 7          a document that was prepared
 8          specifically during the course of
 9          litigation.  It's protected by
10          privilege, and you can't ask him
11          questions about it.
12   BY MR. COX:
13          Q.     Deposition Exhibit-1 has
14   your name stamped on it with a stamp; is
15   that correct?
16          A.     That is correct.
17          Q.     And below your name, the
18   words "limited signing officer" appear;
19   is that correct?
20          A.     That is correct.
21          Q.     Who puts that stamp on these
22   affidavits?
23          A.     My team.
24          Q.     On this particular
25   affidavit, your name and title is stamped
```

44

```
 1                    STEPHAN
 2   twice on the first page, and once on the
 3   signature page for you; is that correct?
 4        A.    That is correct.
 5        Q.    And then it's stamped again
 6   on the notary page; is that correct?
 7        A.    That is correct.
 8        Q.    So as I understand it, an
 9   affidavit, such as Deposition Exhibit-1,
10   is initially prepared by outside counsel?
11            MS. PITNEY:   Objection.
12   BY MR. COX:
13        Q.    Is that correct?
14        A.    Yes, that is correct.
15        Q.    Does anybody on your team
16   verify the accuracy of any of the
17   contents of the affidavit before it
18   reaches your hands?
19            MS. PITNEY:   Objection
20         again.  How the document is
21         prepared -- you can ask him
22         questions about the document and
23         what's stated in the document.
24         The preparation of the document,
25         which is prepared for litigation,
```

45

```
1                        STEPHAN
2            is privileged.  Do not answer the
3            question, Jeff.
4    BY MR. COX:
5            Q.    Mr. Stephan, do you recall
6    testifying in your Florida deposition in
7    December, with regard to your employees,
8    and you said, quote, they do not go into
9    the system and verify the information as
10   accurate?
11           A.    That is correct.
12                 MS. PITNEY:  I'm sorry.
13           Tom, could you please repeat what
14           you just said?  I just couldn't
15           hear.
16                 MR. COX:  Quote:  They do
17           not go into the system and verify
18           the information as accurate.
19   BY MR. COX:
20           Q.    Is that correct?
21           A.    That is correct.
22                 MR. FLEISCHER:  Tom, can you
23           reference what litigation that was
24           in, do you know?
25                 MR. COX:  The Florida case
```

46

```
1                    STEPHAN
2         that he testified in.
3              MR. FLEISCHER:  I just
4         thought you might have a reference
5         there.
6              MR. COX:  I'll get it
7         shortly.
8  BY MR. COX:
9         Q.    Do you and your 14-person
10 team all work in the same physical space?
11        A.    Yes.  We're all in the same
12 department.
13        Q.    Do you have an office or a
14 cubicle, or what?
15        A.    Cubicle.
16        Q.    Do the employees bring
17 documents to you to sign?
18        A.    That is correct.
19        Q.    How many do they bring to
20 you at a time, on average?
21        A.    For a month, anywhere from
22 six to 8,000 documents.
23        Q.    Do you recall testifying in
24 your Florida deposition in December that
25 you estimated it was 10,000 documents a
```

47

STEPHAN

1
2       month?
3              A.     I do not recall.  I'm going
4       off of numbers within the past month or
5       so.
6              Q.     Have those numbers gone down
7       in the past month or so?
8              A.     There has been a decrease.
9              Q.     Back in December, were you
10      signing in the range of 10,000 documents
11      a month?
12             A.     I may have been.
13             Q.     Back in August of 2009,
14      roughly, how many documents a month were
15      you signing?
16             A.     I cannot estimate.  I don't
17      know.
18             Q.     Do you believe that it was
19      more or less than the number you were
20      signing in December?
21             A.     I'm going to assume, more.
22             Q.     And on a given day, I
23      understand an employee brings you a group
24      of documents for you to sign; is that
25      correct?

48

STEPHAN

1

2       A.      That would be correct.

3       Q.      Roughly, how many are

4   brought to you in a group, on average?

5       A.      Throughout a day, I believe

6   we are averaging approximately 400 new

7   requests coming in from our attorney

8   network.  So I would say approximately

9   400 per day.

10      Q.      This sounds very basic.

11  But, physically, are you handed a pile of

12  100 documents, 300 documents?  How does

13  that work?

14      A.      They bring them to me in

15  individual folders from each one of the

16  members of my team.  I do not count how

17  many are in the files.

18      Q.      So each team employee has a

19  folder of document; is that correct?

20      A.      That is correct.

21      Q.      When you receive a summary

22  judgment affidavit to be signed by you,

23  is it accompanied by any other documents

24  relating to the loan?

25              MS. PITNEY:  Objection.  The

49

```
 1                        STEPHAN
 2         document is prepared for
 3         litigation.  And anything he does
 4         when he's preparing it is
 5         privileged.
 6              MR. COX:  Are you telling
 7         him not to answer?
 8              MS. PITNEY:  I am.  Tom, if
 9         you want to ask him about general
10         procedures, which you have been,
11         then I'm not going to object as
12         much.  But if you want to ask him
13         about what goes into preparing a
14         document that was used for summary
15         judgment, that's clearly prepared
16         for litigation, and it's
17         privileged and protected.
18              MR. COX:  I think you
19         haven't heard my question, Julia.
20         I'll state it again.
21  BY MR. COX:
22         Q.    When you receive a summary
23  judgment document for your execution, is
24  it accompanied by any other documents?
25              MS. PITNEY:  My objection is
```

50

```
 1                      STEPHAN
 2           -- you can answer that question,
 3           Jeff.
 4                   THE WITNESS:  There are
 5           times when it has the Complaint
 6           connected.  There are times when
 7           it is brought to me just as the
 8           affidavit.
 9   BY MR. COX:
10           Q.    When you say that there are
11   times when it comes to you with a
12   Complaint connected, you mean attached as
13   an exhibit?
14           A.    Such as this one, yes.
15           Q.    When you say "this one,"
16   you're referring to Deposition Exhibit-1?
17           A.    Yes, that is correct.
18           Q.    Deposition Exhibit-1 has
19   several exhibits attached to it; is that
20   correct?
21                   MS. PITNEY:  Could you
22           please tell me what the exhibits
23           that are attached are, because I
24           don't have the benefit of having
25           them in front of me?
```

51

```
 1                    STEPHAN
 2            THE WITNESS:  Exhibit-A is a
 3       copy of the note and the --
 4            MR. COX:  Julia, this is
 5       your summary judgment affidavit.
 6            MS. PITNEY:  I'm not
 7       doubting that it is.  I just don't
 8       know what these other exhibits
 9       attached are.
10            MR. COX:  Don't you have
11       your copy?
12            MS. PITNEY:  You're the one
13       verifying if they're the same as
14       the one I'm looking at, Tom.
15            THE WITNESS:  Exhibit-B is
16       the mortgage.  Exhibit-C is the
17       assignment of note and mortgage.
18       Exhibit-D -- I believe we're
19       looking at the demand, or the
20       breach letter.  And those are the
21       four documents that are connected
22       to this affidavit of summary
23       judgment.
24  BY MR. COX:
25            Q.    In your usual practice, are
```

52

```
 1                        STEPHAN
 2    those exhibits attached to the affidavit
 3    at the time that you sign them?
 4                 MS. PITNEY:  Objection.
 5           You're asking about a document
 6           that was prepared by an attorney.
 7           Anything that comes with it that
 8           he's asked to review is
 9           privileged -- the communication
10           between a client and an attorney.
11           Do not answer the question.
12    BY MR. COX:
13           Q.    Mr. Stephan, would you
14    please look at Paragraph 3 of Exhibit-1.
15    Do you see there the statement:  That a
16    true and correct copy of which is
17    attached hereto is Exhibit-A?
18           A.    Where are you looking?
19           Q.    Paragraph 3.  Do you see
20    that statement?
21           A.    Yes, I do.
22           Q.    When you sign an affidavit
23    such as Exhibit-1, are the exhibits
24    attached to it?
25                 MS. PITNEY:  Objection.  A
```

53

```
 1                      STEPHAN
 2          document that's provided to him by
 3          an attorney is privileged.
 4               MR. COX:  Are you telling
 5          him not to answer that question?
 6               MS. PITNEY:  Yes.  I'll say
 7          again, Tom, if you would like to
 8          ask him about the facts that are
 9          in the affidavit, the details
10          about this loan -- which I might
11          remind you involves a woman by the
12          name of Nicole Bradbury -- then
13          I'm sure Jeff will answer your
14          question?
15               MR. COX:  Well, he has the
16          affidavit in front of him in this
17          case.  And the affidavit which he
18          swore to says a true and correct
19          copy of the note is attached to
20          it.  And I'm asking him if that
21          document was attached to it at the
22          time that he signed it.
23   BY MR. COX:
24          Q.   Would you please answer that
25   question?
```

54

```
 1                    STEPHAN
 2         A.    To my knowledge, I do not
 3   recall.
 4         Q.    Is it your usual business
 5   practice to have exhibits attached to
 6   affidavits that you sign?
 7         A.    Yes.
 8         Q.    All exhibits?
 9               MS. PITNEY:  Object to form.
10               THE WITNESS:  I do not know.
11   BY MR. COX:
12         Q.    When you sign a summary
13   judgment affidavit, do you check to see
14   if all the exhibits are attached to it?
15         A.    No.
16         Q.    Does anybody in your
17   department check to see if all the
18   exhibits are attached to it at the time
19   that it is presented to you for your
20   signature?
21         A.    No.
22         Q.    When you sign a summary
23   judgment affidavit, do you inspect any
24   exhibits attached to it?
25         A.    No.
```

55

```
 1                    STEPHAN
 2              MS. PITNEY:  Could you
 3         repeat the question, Tom?  Did you
 4         say -- or can you have it read
 5         back, please?
 6              (Whereupon, the pertinent
 7         portion of the record was read.)
 8              MS. PITNEY:  Object to the
 9         form.
10   BY MR. COX:
11         Q.    What happens to an affidavit
12   in your department after you sign it?
13              MS. PITNEY:  Objection.
14         What happens to the document
15         afterwards is -- it's in the
16         course of litigation.  The same
17         objection as I said before.  Where
18         it goes is privileged.
19              MR. COX:  Where it goes is
20         not a communication.  It is not
21         privileged.
22              MS. PITNEY:  You don't know
23         that.
24              MR. COX:  Pardon me?
25              MS. PITNEY:  You don't
```

56

```
 1                      STEPHAN
 2          necessarily know that.
 3              MR. COX:   The physical
 4          movement of a document is not a
 5          communication.  It's a fact.
 6   BY MR. COX:
 7          Q.    My question to you is, where
 8   does a summary judgment go after you sign
 9   it?
10          A.    After I sign it, it is
11   handed back to my staff.  My staff hands
12   it to a notary for notarization.  It is
13   then handed back to my staff.  They send
14   it back to the network attorney
15   requesting any type of affidavit.
16          Q.    So you do not appear before
17   the notary; is that correct?
18          A.    I do not.
19          Q.    What does your staff do with
20   a summary judgment affidavit, such as
21   Deposition Exhibit-1, after it receives
22   it back from the notary?
23          A.    They go into our LPS system,
24   close out process, stating it's being
25   sent back to --
```

57

```
 1                    STEPHAN
 2              MS. PITNEY:  Objection.
 3         Sorry.  I don't mean to interrupt
 4         you, Jeff.  I'm going to instruct
 5         you not to answer anything else,
 6         because you've already testified
 7         that the LPS system is the means
 8         by which you communicate with your
 9         attorney.  The attorney/client
10         communication is privileged.  So
11         don't continue to answer the
12         question.
13              Actually, if there is no
14         question, pending, I'd like to
15         take a brief break to discuss
16         something with Brian Fleischer.
17              (Whereupon, a short recess
18         was taken.)
19    BY MR. COX:
20         Q.   Mr. Stephan, do you recall
21    testifying in your Florida deposition in
22    December that you rely on your attorney
23    network to ensure that the documents that
24    you receive are correct and accurate?
25         A.    That is correct.
```

58

```
 1                      STEPHAN
 2           Q.     And is that, in fact, the
 3     case?
 4           A.     Yes.
 5           Q.     And your department does not
 6     do any independent accuracy check of
 7     those records; isn't that correct?
 8                  MR. FLEISCHER:  Objection as
 9           form.
10                  THE WITNESS:  Can you
11           rephrase?
12     BY MR. COX:
13           Q.     Your department does not do
14     any independent check of the accuracy of
15     the information on the summary judgments
16     coming to you; isn't that correct?
17           A.     I review, quickly, the
18     figures.  Other than that, that's about
19     it.
20           Q.     Do you recall testifying in
21     your Florida deposition in December, that
22     the affidavits that you sign are not
23     based upon your own personal knowledge?
24           A.     I do not recall.
25                  MS. PITNEY:  Objection to
```

59

STEPHAN

1

2          the form.

3    BY MR. COX:

4          Q.     You do not recall that?

5          A.     I do not recall.

6          Q.     When you receive a summary

7    judgment affidavit from one of your staff

8    members, what do you do with it?

9          A.     I will first review it

10   against our computer system, which is

11   Fiserv, in general terms, to verify that

12   the figures are correct.  And then I will

13   execute it and hand it back to my staff

14   to have it notarized.

15         Q.     You say "in general terms"

16   you review it.  What do you mean?

17              MS. PITNEY:  Objection.

18              THE WITNESS:  I compare the

19         principal balance.  I review the

20         interests.  I take a look at the

21         late charges.  I look at the

22         outstanding escrow amounts.  When

23         I say "general terms," I mean I'm

24         not looking at the escrow and

25         breaking it down to the penny.

60

```
 1                    STEPHAN
 2         I'm saying, yes, it looks correct
 3         in my computer system.
 4  BY MR. COX:
 5         Q.    Is there anything else that
 6  you look at in your computer system when
 7  you're signing a summary judgment
 8  affidavit?
 9              MS. PITNEY:  I'm sorry.  I
10         couldn't hear the last part of
11         that.
12  BY MR. COX:
13         Q.    Is there anything else that
14  you look at in your computer system at
15  the time that you sign a summary judgment
16  affidavit?
17         A.    The only other thing I
18  can --
19              MS. PITNEY:  One second.
20         Are we talking about the computer
21         system, the communication system?
22         I just was asking for
23         clarification of --
24              MR. COX:  Let me clarify it.
25              MS. PITNEY:  What computer
```

61

STEPHAN

1
2          communication system Tom was
3          asking him about.
4    BY MR. COX:
5          Q.    You testify that you go into
6    the First Serve (sic) system; is that
7    correct?
8          A.    Yes, Fiserv.
9          Q.    Fiserv.  Do you go into any
10   other computer system at the time that
11   you're signing a summary judgment
12   affidavit?
13         A.    No.
14         Q.    And you just testified that
15   you look at principal, interest, late
16   charges and escrow; is that correct?
17         A.    That is correct.
18         Q.    Is there anything else that
19   you look at in your computer system when
20   you're signing a summary judgment
21   affidavit?
22         A.    The only thing I review,
23   other than that, is who the borrower is.
24         Q.    When you receive a summary
25   judgment affidavit to sign, do you read

62

STEPHAN

1

2    every paragraph of it?

3         A.    No.

4         Q.    What do you read?

5         A.    I look for the figures.

6         Q.    That's all that you look at

7    when you sign a summary judgment

8    affidavit?

9         A.    Yes, to ensure that the

10   figures are correct.

11        Q.    Is it fair to say then that

12   when you sign a summary judgment

13   affidavit, you do not know what it says,

14   other than what the figures are that are

15   contained within it?

16             MR. FLEISCHER:  Objection as

17        to form.

18             MS. PITNEY:  Objection to

19        the form of the question.

20             THE WITNESS:  Please

21        rephrase.

22   BY MR. COX:

23        Q.    It fair to say that when you

24   sign a summary judgment affidavit, you

25   don't know what information it contains,

63

```
 1              STEPHAN
 2   other than the figures that are set forth
 3   within it?
 4        A.   Other than the borrower's
 5   name, and if I have signing authority for
 6   that entity.  That is correct.
 7        Q.   The practice that you've
 8   just described for signing summary
 9   judgment affidavits is the practice that
10   you use signing all summary judgment
11   affidavits that you handle; is that
12   correct?
13              MR. FLEISCHER:  Again, I'm
14        going to object to the form of the
15        question.
16   BY MR. COX:
17        Q.   Is that correct?
18        A.   The practice that I use for
19   summary judgment affidavits is the same
20   practice that I use for all affidavits.
21        Q.   And that's the one that
22   you've just described?
23        A.   Yes.
24        Q.   Is any part of your
25   compensation at GMAC Mortgage tied to the
```

64

```
 1                    STEPHAN

 2   volume of documents that you sign?

 3         A.    No.

 4         Q.    Is any part of your

 5   compensation tied to the volume of

 6   documents that your department processes?

 7         A.    No.

 8         Q.    Is it your understanding

 9   that the process that you follow in

10   signing summary judgment affidavits is

11   in accordance with the policies and

12   procedures required of you by GMAC

13   Mortgage?

14         A.    Yes.

15         Q.    Does GMAC do any quality

16   assurance training for your department?

17         A.    Presently, no.

18         Q.    Has it in the past?

19         A.    I do not know.

20         Q.    You don't recall any?

21         A.    I never received any.

22         Q.    Do you have any memory of

23   checking the numbers on the Bradbury

24   affidavit that's in front of you as

25   Deposition Exhibit-1?
```

65

```
 1                    STEPHAN
 2         A.    I do not recall.
 3         Q.    If a loan has been modified,
 4   does that show up in the Fiserv system
 5   that you look at?
 6         A.    When you say "modified," are
 7   you stating a loan modification?
 8         Q.    Yes.
 9         A.    Yes.
10         Q.    Does that show up?
11         A.    Yes.
12         Q.    If a loan has been modified,
13   is any information put in the summary
14   judgment affidavits that you sign about
15   that?
16              MR. FLEISCHER:  Objection.
17         Are you talking about modified, or
18         his term was loan modification.  I
19         just want to make sure we're
20         clear.
21              MR. COX:  That's fine.
22   BY MR. COX:
23         Q.    If there's a loan
24   modification, does information about a
25   loan modification appear in the summary
```

66

```
 1                     STEPHAN
 2    judgment affidavits that you sign?
 3          A.    I do not know.
 4                MS. PITNEY:  In all of them,
 5          or in this one?
 6                MR. COX:  In any of them.
 7                THE WITNESS:  I don't know.
 8    BY MR. COX:
 9          Q.    Based upon your testimony,
10    Mr. Stephan, is it correct that when you
11    sign a summary judgment affidavit, such
12    as Deposition Exhibit-1 that is in front
13    of you, you don't know whether any
14    portion of it is true, other than the
15    paragraph containing the numbers that
16    you just described; is that correct?
17                MS. PITNEY:  Object to the
18          form.  Tom, are you asking him
19          about this affidavit?
20                MR. COX:  Well, he's
21          testified that doesn't recall
22          signing this particular affidavit,
23          so that was not my question.  Let
24          me restate it.
25    BY MR. COX:
```

67

```
                        STEPHAN
 1
 2          Q.      In your practice of signing
 3    summary judgment affidavits, Mr. Stephan,
 4    is it correct that they always have a
 5    paragraph containing the numbers of the
 6    amounts claiming to be due?
 7          A.      That would be correct.
 8          Q.      And is it correct that when
 9    you sign those affidavits, you don't know
10    whether any other part of the affidavit
11    is true or correct?
12          A.      Please advise me.  What do
13    you mean by "any other part"?
14          Q.      Any other paragraph, other
15    than the one containing the numbers.
16          A.      I review it for the due
17    date, if that's included in there.
18          Q.      So all of them --
19          A.      So that would be the
20    numbers.
21          Q.      So other than the due date
22    and the balances due, is it correct that
23    you do not know whether any other part of
24    the affidavit that you sign is true?
25          A.      That could be correct.
```

68

```
 1                    STEPHAN
 2         Q.    Is it correct?
 3         A.    That is correct.
 4         Q.    And isn't it also correct
 5  that you do not check the numbers on
 6  every single summary judgment affidavit
 7  that you sign?
 8         A.    That is not correct.
 9         Q.    You check every single one?
10         A.    Yes.
11         Q.    How long does it take you,
12  on average, to process the execution of a
13  summary judgment affidavit?
14              MS. PITNEY:  Object to the
15         form.
16              MR. COX:  Please answer.
17              THE WITNESS:  Anywhere from
18         five to 10 minutes, off the top of
19         my head.
20              MR. COX:  If we can take a
21         break.  I may be done, but we can
22         take a break for five minutes.
23              (Whereupon, a short recess
24         was taken.)
25  BY MR. COX:
```

69

```
 1                    STEPHAN
 2        Q.    Mr. Stephan, referring you
 3   again to the bottom line on Page 1 of
 4   Exhibit-1, it states:  I have under my
 5   custody and control, the records relating
 6   to the mortgage transaction referenced
 7   below.
 8             It's correct, is it not,
 9   that you did not have in your custody any
10   records of GMAC at the time that you
11   signed a summary judgment affidavit?
12             MS. PITNEY:  Objection to
13        the form.
14             THE WITNESS:  I have the
15        electronic record.  I do not have
16        papers.
17   BY MR. COX:
18        Q.    You have access to a
19   computer.  Is that what you mean?
20        A.    Yes.
21        Q.    You have no control over
22   that system, do you?
23             MR. FLEISCHER:  Objection as
24        to form.
25   BY MR. COX:
```

70

                        STEPHAN

1

2       Q.    You have no control over

3  that Fiserv computer system, do you?

4       A.    No, I do not.

5       Q.    And someone else within GMAC

6  is responsible for ensuring the accuracy

7  of that system; isn't that correct?

8       A.    That would be correct.

9            MR. COX:  I have no further

10           questions.

11           MR. FLEISCHER:  We're done,

12           Julia, unless you have something

13           to add.

14           MS. PITNEY:  No.

15           (Witness excused.)

16                 -  -  -

17           (Whereupon, the deposition

18           concluded at 11:45 a.m.)

19

20

21

22

23

24

25

71

1

2                    I N D E X

3    Testimony of:   Jeffrey Stephan

4    By Mr. Cox . . . . . . . . . 4

5

6

7                         -   -   -

8                    E X H I B I T S

9                         -   -   -

10

11   NO.          DESCRIPTION            PAGE

12

13   1            Affidavit              3

14                August 5, 2009

15

16

17

18

19

20

21

22

23

24

25

72

1

2          I have read the foregoing transcript

3     of my deposition given on June 7, 2010,

4     and it is true, correct and complete, to the

5     best of my knowledge, recollection and belief,

6     except for the corrections noted hereon and/or

7     list of corrections, if any, attached on a

8     separate sheet herewith.

9

10

11                    _____

12                    JEFFREY  STEPHAN

13

14

15

16

17    Subscribed and sworn to

18    before me this ____ day

19    of _____, 2010.

20

21

22    _____

23    Notary Public

24

25

73

1

2                     C E R T I F I C A T E

3          I HEREBY CERTIFY that the witness

4   was duly sworn by me and that the

5   deposition is a true record of the

6   testimony given by the witness.

7

8

9

10

           Susan B. Berkowitz, a

11         Registered Professional Reporter

           and Notary Public

12         Dated:  June 9, 2010

13

14

15

16

17

18              (The foregoing certification

19   of this transcript does not apply to any

20   reproduction of the same by any means,

21   unless under the direct control and/or

22   supervision of the certifying

23   reporter.)

24

25