**<u>EXHIBIT 5</u>**

Consor & Associates
Reporting and Transcription, Inc.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2008 CA 040805XXXX MB

GMAC MORTGAGE, LLC,

       Plaintiff,

-vs-

ANN M NEU A/K/A ANN MICHELLE
PEREZ; DOUGLAS WILLIAM NEU;
UNKNOWN TENANT (S) IN
POSSESSION OF THE SUBJECT
PROPERTY,
       Defendants.
_____

DEPOSITION OF JEFFREY STEPHAN

Thursday, December 10, 2009
1:00 p.m. - 2:30 p.m.


Consor & Associates
1655 Palm Beach Lakes Blvd., Ste. 500
West Palm Beach, Florida 33401


Reported By:
Jamie Reynolds Bentley, Court Reporter
Notary Public, State of Florida
Consor & Associates
1655 Palm Beach Lakes Blvd., Suite 500
West Palm Beach, Florida 33401
(561)682-0905

Sonsor & Associates
Reporting and Transcription, Inc.

```
                                                    Page 2
 1      APPEARANCES:
 2      On behalf of the Plaintiff:
 3          ALEJANDRA ARROYAVE, ESQ.
            Lapin & Leichtling
 4          225 Alahamra Circle
            Suite 800
 5          Coral Gables, Florida 33134
            (305) 569-4100
 6
 7
 8      On behalf of the Defendant:
 9          CHRISTOPHER IMMEL, ESQ.
            Ice Legal, P.A.
10          1975 Sansbury's Way
            Suite 104
11          West Palm Beach, Florida 33411
            (561) 798-5658
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Consor & Associates
Reporting and Transcription, Inc.

Page 3

```
 1                              -  -  -
 2                        I N D E X
 3                              -  -  -
 4
 5     WITNESS:          DIRECT      CROSS      REDIRECT    RECROSS
 6     JEFFREY STEPHAN
       BY MR. IMMEL            4                                    54
 7
       JEFFREY STEPHAN
 8     BY MS. ARROYAVE                51
 9
10                              -  -  -
11                        E X H I B I T S
12                              -  -  -
13
       NUMBER                                  PAGE
14
15     DEFENDANT'S  EX. A                 17
       DEFENDANT'S  EX. B                 24
16     DEFENDANT'S  EX. C                 26
       DEFENDANT'S  EX. D                 30
17     DEFENDANT'S  EX. E                 32
       DEFENDANT'S  EX. F                 33
18     DEFENDANT'S  EX. G                 37
       DEFENDANT'S  EX. H                 37
19     DEFENDANT'S  EX  I                 38
       DEFENDANT'S  EX. J                 40
20     DEFENDANT'S  EX. K                 41
       DEFENDANT'S  EX. L                 44
21     DEFENDANT'S  EX. M                 46
       DEFENDANT'S EX.  N                 49
22
23
24
25
```

Gonsor & Associates
Reporting and Transcription, Inc.

Page 4

1                    P R O C E E D I N G S

2                           - - -

3       Deposition taken before Jamie Reynolds Bentley, Court

4    Reporter and Notary Public in and for the State of Florida

5    at Large, in the above cause.

6                           - - -

7              THE COURT REPORTER: Do you swear or affirm that

8          the testimony you are about to give will be the truth,

9          the whole truth and nothing but the truth?

10             THE WITNESS:  I do.

11   Thereupon,

12                    (JEFFREY STEPHAN)

13   having been first duly sworn or affirmed, was examined

14   and testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. IMMEL:

17       Q.   All right.  We are here on GMAC Mortgage, LLC

18   versus Neu.  This is the deposition of Jeffrey Stephan.

19   I'm sure your attorney has gone over things with you a

20   little bit.  But if you could just keep one thing in

21   mind, to answer, not to simply nod your head or anything

22   like that.  We need for your answers to be clear for the

23   court reporter that way.

24       A.   Yes.

25       Q.   Could you please state your name for the

Consor & Associates
Reporting and Transcription, Inc.

Page 5

1    record.

2         A.    My name is Jeffrey Stephan.

3         Q.    Okay.  And who do you work for?

4         A.    GMAC, LLC.

5         Q.    And is there a difference between GMAC, LLC

6    and GMAC Mortgage, LLC?

7         A.    GMAC, LLC -- I'm trying to think of the word

8    to use -- the most recent name.

9         Q.    Okay.

10        A.    It's GMCA Mortgage Corporation.

11        Q.    Okay.

12        A.    I'm not sure how you would word that.

13        Q.    Okay.  So are they -- does GMAC, LLC -- now

14   has that basically taken over these other entities --

15        A.    Yes.

16        Q.    -- that formerly existed?

17        A.    Yes.

18        Q.    So these entities no longer currently exist?

19        A.    Right.

20        Q.    Okay.  And how long then have you been

21   employed by GMAC, LLC?

22        A.    Five years.

23        Q.    Okay.  And prior to that, it was GMAC Mortgage

24   and GMAC Corporation?

25        A.    That was as the whole five years.

1          Q.    Oh, okay.

2          A.    Yes.

3          Q.    As the whole five years.  And what is your

4     title?

5          A.    I'm a team leader in the foreclosure

6     department.

7          Q.    Okay.  And what are your responsibilities?

8          A.    I am the team lead of the document execution

9     unit.

10         Q.    Okay.

11         A.    And also the service transfer unit.

12         Q.    And so what type of documents do you

13    ordinarily execute?

14         A.    I execute on a daily basis assignments of

15    mortgage, affidavits of any type that might be needed,

16    deeds.  Any type of the document that would need a

17    signature of an officer of GMAC.

18         Q.    Okay.  And who do you report to?

19         A.    I report to Margie Kwiatanowski.

20         Q.    Could you spell that?

21         A.    Yes.  It's K-W-I-A-T-A-N-O-W-S-K-I.

22         Q.    Okay.  And approximately how many employees

23    does GMAC Mortgage, LLC have?

24         A.    I couldn't guess.  I don't know.

25         Q.    Sure.  Okay.  And as part of your

Consof & Associates
Reporting and Transcription, Inc.

Page 7

```
 1    responsibilities, you execute assignments as a vice
 2    president of MERS?
 3         A.   Yes, that's correct.
 4         Q.   And in executing affidavits as a vice
 5    president, do you receive any compensation from MERS?
 6         A.   No.
 7         Q.   Have you had any training from MERS?
 8         A.   No.
 9         Q.   Okay.  How many documents would you say you
10    sign on an average week as far as executing affidavits
11    and things of that nature?
12         A.   It's very tough to estimate that to be honest
13    with you.
14         Q.   In a given month, would that be easier to say
15    --
16         A.   I would say --
17         Q.   -- one hundred, 500?
18         A.   -- in a month, my team brings to me
19    approximately, I'd say a round number of 10,000.  That's
20    just an estimate, of course.
21         Q.   Okay.  And so, 10,000 your team brings to you.
22    How many people do you oversee?
23         A.   A team of 13 people.
24         Q.   Okay.  Now, would these people be given the
25    duties of actually preparing the documents that you
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Censor & Associates
Reporting and Transcription, Inc.

Page 8

1    ultimately sign and execute?

2         A.    They would review the document that is given

3    to them through our computer systems.

4         Q.    Okay.

5         A.    So they don't actually prepare it per se.

6    They review it for the accuracy of what type of entity

7    I'm signing as.

8         Q.    Okay.  How many different entities do you sign

9    as?

10              MS. ARROYAVE:    Objection:  Form.

11    BY MR. IMMEL:

12         Q.    Can you name what entities you sign --

13         A.    I sign presently as MERS.

14         Q.    Okay.

15         A.    And under MERS as vice president or an

16    assistant secretary.  Also, I sign for GMAC Mortgage.

17    And to be honest with you, it's too many entities for me

18    to actually quote under GMAC.  But it is as a limited

19    signing officer.

20         Q.    Okay.  And earlier you stated that right now

21    it's GMAC, LLC.

22         A.    Uh-huh.

23         Q.    You do still currently sign documents as GMAC

24    Mortgage, LLC?

25         A.    Yes, I do.

Consor & Associates
Reporting and Transcription, Inc.

Page 9

1          Q.    Okay.  And also as a corporation --

2          A.    Yes.

3          Q.    -- and some of the others that we've seen your

4     signature on?

5          A.    Yes, I do.

6          Q.    Okay.  Where then does the information that

7     goes into the system that your team reviews --

8          A.    Yes.

9          Q.    -- where does that information come from?

10         A.    The process that we use is -- and this is to

11    my knowledge -- a file is referred to a foreclosure

12    attorney stating exactly what entity would be needed

13    through the referral unit.  And at that point, the

14    attorney receives the file to proceed with the

15    foreclosure.  That foreclosure name is generated upon

16    GMAC supplying it on the referral.  I'm not 100 percent

17    sure of what that process is.

18         Q.    Okay.

19         A.    The documentation, as you stated, that you're

20    asking about, is given to us after the attorney has been

21    instructed on what name to foreclose in.

22         Q.    And who instructs the attorney as to what name

23    to foreclose it in?

24         A.    It comes to our referral unit.  Which is

25    another process to my knowledge.

Consor & Associates
Reporting and Transcription, Inc.

Page 10

1      Q.    Okay.  Approximately, if 10,000 are signed in

2    a given month, you know, on an average, how long would

3    you say you spend executing each one and actually

4    signing?

5      A.    It's tough to say.

6      Q.    Okay.  Would it be accurate to say that when

7    these documents have been presented to you by your team

8    --

9      A.    Uh-huh.

10     Q.    -- you take the face value that they are --

11   they have been checked by your team?

12     A.    That would be a correct statement, yes.

13     Q.    So these documents wouldn't be actually

14   executed on your own personal knowledge?

15     A.    Right.

16     Q.    It would be based on knowledge that came

17   through --

18     A.    Right.

19     Q.    -- the chain --

20     A.    I'm sorry.

21          MS. ARROYAVE:  Can I interrupt just for a

22          second?  I just want to make sure that he finishes

23          his question before you answer.

24          THE WITNESS:  Sure.  Sorry.

25

**Consor & Associates**
Reporting and Transcription, Inc.

Page 11

1    BY MR. IMMEL:

2        Q.    Yes, yes, that's true, too.

3            So the information that your team obtains

4    isn't based on their personal knowledge either, it's

5    located within the computer networks?

6            MS. ARROYAVE:   Objection: Form.

7    BY MR. IMMEL:

8        Q.    The information on the documents that you

9    execute is stored within your data base?

10       A.    No, somewhere else.

11       Q.    No.  Okay.  The information then is that --

12   your team, they get that from a computer network that

13   you have, correct?

14       A.    No.

15       Q.    Where does your team get that information?

16       A.    That information is first given to the

17   attorney to foreclose under which name as needed.  If we

18   are stating some type of assignment, for example, the

19   attorney, to my knowledge, and I'm not 100 percent sure

20   of their process because I don't work for the attorney,

21   they would do a title check to verify what name the lien

22   is presently in.

23       Q.    Okay.

24       A.    At that point is when it would initial if an

25   assignment would be needed or not.

**Consor & Associates**
Reporting and Transcription, Inc.

Page 12

```
 1           Q.   So at the direction of the attorney, your team
 2      creates these documents and then you execute them?
 3                MS. ARROYAVE:  Objection:  Form.
 4      BY MR. IMMEL:
 5           Q.   So your team executes documents at the request
 6      of attorneys?
 7                MS. ARROYAVE:  Objecting:  Form.  You can
 8           still answer it if you understand the question.
 9      BY MR. IMMEL:
10           Q.   Do you understand what I'm asking?
11           A.   Yes, I understand what you're asking.  My team
12      does not create any documents.
13           Q.   These documents are then sent from the
14      attorney?
15           A.   Yes.
16           Q.   Okay.  And you're -- so then the team that you
17      oversee --
18           A.   Uh-huh.
19           Q.   -- simply reviews them for accuracy?
20           A.   That's correct.
21           Q.   Okay.  And how do they verify the information
22      is accurate?
23           A.   They do not go into the system and verify the
24      information as accurate.  We are relying on our attorney
25      network to ensure that they are asking for the correct
```

Consor & Associates
Reporting and Transcription, Inc.

Page 13

1    information.

2        Q.    So the attorney creates these documents and

3    you are relying that the attorney is correct?

4        A.    Yes.

5            MS. ARROYAVE:  Objection:  Form.

6    BY MR. IMMEL:

7        Q.    Okay.  And then they are required to be

8    notarized.  Are they notarized in your office?

9        A.    Yes.

10       Q.    Is the notary present with you or is it down

11   the hall?

12       A.    The notary is in the same department.

13       Q.    Same department.  Okay.  Are they physically

14   present when you (sic) notarize this -- or when they

15   notarize and then you execute it?

16       A.    No, they are not physically present.  But I

17   will -- I do deliver them to the notary.

18       Q.    All right.

19       A.    And I wait for them to notarize it to hand

20   them back to my team.

21       Q.    Okay.  All right.  What department then?  You

22   said your department?

23       A.    Right.

24       Q.    And as part of their job responsibilities,

25   would notarizing be their sole responsibility, or do

Consor & Associates
Reporting and Transcription, Inc.

Page 14

1    they have other responsibilities?

2        A.    They have other responsibilities.

3        Q.    Are any of the members of your team, people

4    that also notarize documents that you execute?

5        A.    Yes.

6        Q.    Yes.  Okay.  Is there a job requirement that

7    certain employees become notaries?

8        A.    I don't know.

9        Q.    Okay.  And what type of -- what level of a

10   type of employee would it typically be that is a notary?

11       A.    I don't know that either.

12       Q.    All right.  Does the company pay for the

13   process of becoming a notary or the renewal fees?

14       A.    Yes.

15       Q.    Okay.  If a notary feels that they are being

16   asked to notarize something that's done improperly, is

17   there a process which they can, you know, raise that to

18   anybody's attention?

19       A.    I honestly don't know.

20       Q.    You are not sure.  Do you notarize any

21   assignments of mortgage or other documents yourself?

22       A.    No.

23       Q.    Are you a notary?

24       A.    No.

25       Q.    How are witnesses ordinarily chosen?

Consor & Associates
Reporting and Transcription, Inc.

Page 15

```
 1              MS. ARROYAVE:  Object:  Form.
 2              Chosen for what?
 3      BY MR. IMMEL:
 4         Q.   The witnesses to, say, the assignments of the
 5      mortgage, and the witnesses of things that you execute.
 6         A.   They are just chosen randomly.
 7         Q.   Chosen randomly.  Okay.  Approximately how
 8      many days a week do you spend executing assignments,
 9      affidavits, and the various documents that you execute?
10         A.   Five.
11         Q.   Five.  Okay.  Are there any specific days
12      where it's one day these types of documents, this type
13      of documents, or can it be just a mix?
14         A.   It's a mix.
15         Q.   Okay.  Approximately how many documents would
16      you say are presented to you by your team at a given
17      time?  Is it one at a time, or ten at a time?
18         A.   It is done in bulk.
19         Q.   Done in bulk.
20         A.   I could not quote you the exact number.
21         Q.   Okay.  Going back to the signing officer as
22      Mortgage Electronic Registration Systems, you said that
23      you are -- you sign as both vice president and as an
24      assistant secretary?
25         A.   That is correct.
```

Consor & Associates
Reporting and Transcription, Inc.

Page 16

1        Q.    Is there any basis for one -- you sign as one

2    versus the other?

3        A.    The majority of the time I sign as a vice

4    president.  Most times we do not need an assistant

5    secretary, unless they are asking for a second signature

6    on any type of an affidavit or assignment.

7        Q.    Okay.  And, again, you are not paid by MERS.

8    Do you hold any other responsibilities with MERS that

9    would be consistent with having the title of a vice

10   president?

11       A.    No.

12       Q.    No.  Okay.  So you don't attend any board

13   meetings for MERS?

14       A.    No.

15       Q.    You don't report to the secretary of MERS or

16   any other people at MERS?

17       A.    No.

18       Q.    How did you become a MERS representative?  Did

19   you request to be a vice president of MERS?

20       A.    I received the responsibility as being the

21   team lead for document executing.  It was assigned to me

22   by our legal area.

23       Q.    Okay.  All right.  So your responsibilities as

24   a vice president of MERS to execute the assignments is

25   really your job perspective, or an aspect of your job at

Consor & Associates
Reporting and Transcription, Inc.

Page 17

```
 1    GMAC Mortgage, LLC or GMAC, LLC?
 2         A.   That is correct.
 3         Q.   Okay.  And you've never been to any MERS
 4    offices or their headquarters?
 5         A.   No.
 6         Q.   Are you aware of why you were given the title
 7    of vice president versus assistant secretary or...
 8         A.   No, I'm not aware of that.
 9         Q.   Okay.  All right.  I have here the assignment
10    of mortgage which you executed in this case.
11         A.   Okay.
12              MR. IMMEL:  I'll enter that as Exhibit A.
13              (Defendant's Exhibit Letter A  was marked for
14         identification.)
15              MR. IMMEL:  I have a copy for you, as well.
16              THE WITNESS:  Thank you.
17    BY MR. IMMEL:
18         Q.   In the top left-hand corner it says, Record
19    and return to offices of Marshall C. Watson.
20              Based on your earlier statements, it's
21    accurate to say that attorneys at Marshall C. Watson
22    created the information on this document?
23              MS. ARROYAVE:  Objection:  Form.
24              THE WITNESS:  That would be correct.
25
```

**Consor & Associates**
Reporting and Transcription, Inc.

Page 18

1    BY MR. IMMEL:

2        Q.   Okay.  And who -- so an attorney chose the

3    date of the 4th day of March, 2009.

4             Can you tell me the date actually.  Whether

5    that's the 3rd or the 5th of March.

6        A.   To me it seems to be the 5th.

7        Q.   Okay.

8        A.   Actually, excuse me, let me change that.  It

9    would have to be the 3rd, because the notary did it on

10   the 4th.

11       Q.   Okay.  And that is your signature on this

12   document?

13       A.   That is correct.

14       Q.   Okay.  Is it commonplace then for the notary

15   to notarize a document the day after you've apparently

16   executed it?

17            MS. ARROYAVE:  Objection:  Form.

18            THE WITNESS:  I would say, yes, it would be

19       common.

20   BY MR. IMMEL:

21       Q.   Okay.  So typically when you hand these off to

22   the notary, and then they kind of catch up?

23       A.   Uh-huh.  Yes.

24       Q.   Okay.  The witnesses, Heather Reinhart, do you

25   know her personally?

Consor & Associates
Reporting and Transcription, Inc.

Page 19

1           A.    Yes, she is one of my employees.

2           Q.    Is she on your team?

3           A.    Yes.

4           Q.    Is it possible that she would have been one of

5      the people who reviewed this for accuracy?

6           A.    That is possible.

7           Q.    And the other person appears to be Tyra

8      Wilks --

9           A.    Wilson.

10          Q.    Tyra Wilson.  Okay.  Is she also a member of

11     your team?

12          A.    Yes.

13          Q.    And you know her personally, as well?

14          A.    Yes.

15          Q.    The notary, Susan Turner, is she a member of

16     your team?

17          A.    No, she is not.

18          Q.    Do you know her personally?

19          A.    Yes.

20          Q.    It says here that you personally appeared

21     before her on the 4th day of March.  Is it possible that

22     you executed then on the 3rd, and handed it to her and

23     then you weren't personally in front of her at the time

24     she notarized this?

25          A.    I don't know.  I can't recollect.

Consor & Associates
Reporting and Transcription, Inc.

Page 20

```
 1        Q.   All right.  And how did you determine on this

 2    to execute it to GMAC Mortgage, LLC?

 3            MS. ARROYAVE:  Objection:  Form.

 4            THE WITNESS:  I'm not sure if I understand the

 5        question.

 6    BY MR. IMMEL:

 7        Q.   Okay.  Did you have any say in the creation of

 8    who MERS would assign this to?

 9        A.   No.

10        Q.   No.  Your attorney, the Law Office of Marshall

11    C. Watson, determined that?

12        A.   No.

13        Q.   No.

14        A.   That is, as I stated earlier, when the

15    foreclosure referral goes out, the referral unit

16    determines what entity they should be foreclosing on.

17        Q.   Okay.  And the foreclosure referral unit that

18    you speak of, is that part of your department?

19        A.   Yes.

20        Q.   Okay.  So would they have records that they

21    are able to refer to to determine who the new mortgagee

22    should be according to these assignments?

23        A.   Yes.

24        Q.   And who -- do you have a name of any person

25    that keeps those documents?
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Consor & Associates
Reporting and Transcription, Inc.

Page 21

```
 1          A.    The team lead for that would be Brenda.

 2          Q.    Brenda?

 3          A.    Her last name is Staehle, S-T-A-E-H-L-E.

 4          Q.    Okay.

 5          A.    I think that's the way it's spelled.

 6          Q.    Can you tell me -- you really don't have any

 7   knowledge or information as to who should be the

 8   mortgagee?  According to this document, you take it for

 9   face value; is that correct?

10          MS. ARROYAVE:  Objection:  Form.

11          THE WITNESS:  Can you explain that further?

12   BY MR. IMMEL:

13          Q.    You take it for face value that GMAC Mortgage,

14   LLC is expected to be the mortgagee?

15          MS. ARROYAVE:  Objection:  Form.

16   BY MR. IMMEL:

17          Q.    Who would have information who -- who MERS

18   should assign this to?  Would it be you or Brenda

19   Staehle?

20          A.    Brenda Staehle would be the individual or her

21   team to refer the files, and they determine what name

22   should be foreclosing in.

23          Q.    Okay.  So everything from that point on is

24   based on the presumption that her team has ascertained

25   those things to be correct?
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Consor & Associates
Reporting and Transcription, Inc.

Page 22

```
 1          A.    That is correct.

 2               MS. ARROYAVE:  Objection:  Form.

 3     BY MR. IMMEL:

 4          Q.    All right.  Okay.  So on March 5th, 2009,

 5     you're not aware --

 6          A.    I believe it's the 3rd.

 7          Q.    March 3rd.  I'm sorry.  March 3rd, 2009,

 8     you're not aware of any physical transfer of the

 9     mortgage?

10          A.    Can you rephrase that?  I'm not following.

11          Q.    Are you aware of any reason why the assignment

12     of mortgage had to be executed on March 5th, 2009 -- or

13     the 3rd, 2009?  I'm sorry.

14          A.    We have a process that's set up with our

15     attorney network.  And Marshall Watson is in that

16     attorney network.  The file is referred to them with a

17     certain name to proceed with the foreclosure in.  They

18     will pull title.  And whatever they see title is in, in

19     order to proceed in the proper name, they need to get an

20     assignment.  In this instance it's MERS to GMAC.

21          Q.    Okay.  Are the assignments supposed to be

22     completed prior to the filing of the foreclosure

23     lawsuit?

24               MS. ARROYAVE:  Objection:  Form.

25
```

Consof & Associates
Reporting and Transcription, Inc.

Page 23

BY MR. IMMEL:

1

2        Q.    Are you aware if it's a company policy at

3   least?

4        A.    I don't know.

5        Q.    Okay.  So as this assignment of mortgage, on

6   the face of it, transfers from Mortgage Electronic

7   Registration Systems as nominee for Mortgage Investors

8   Corporation to GMAC Mortgage, LLC on March 3rd, 2009,

9   would it be accurate to say that prior to that, this

10  assignment, Mortgage Electronic Registration Systems was

11  the mortgagee?

12       A.    No.

13       Q.    No.  Okay.  Why would that not be accurate to

14  say?

15       A.    Mortgage Electronic Registration, to my

16  knowledge, is an origination entity to allow the passing

17  of assignments through performing loans to make it more

18  easier, I guess you would say, to transfer amongst

19  different companies.  MERS does not own loans.

20       Q.    They wouldn't own the loan.  But they would

21  own the mortgage; is that correct?

22            MS. ARROYAVE:  Objection:  Form.

23            THE WITNESS:  It's not correct, no.

24  BY MR. IMMEL:

25       Q.    No.  So they are the named mortgagee, so that

Consor & Associates
Reporting and Transcription, Inc.

                                                    Page  24

1     when the note is passed from entity to entity it doesn't

2     have to be rerecorded?

3          A.    That is to my knowledge, yes.

4          Q.    All right.  On this it also says that MERS is

5     assigning the mortgage together with the note.  I don't

6     know if you see that line there.  It's right there

7     (indicating).

8               As you just stated, MERS has no interest in

9     the note ever; is that correct?

10         A.    I honestly don't know.

11         Q.    Oh, okay.  As far as you're aware --

12         A.    Yes.

13         Q.    -- MERS doesn't --

14         A.    As far as I'm aware.  (Witness nods head.)

15         Q.    Okay.  Are you aware of whether that's common

16    language to exist in the assignments that you execute?

17         A.    I honestly don't know.

18         Q.    You're not sure.  Okay.  All right.

19              MR. IMMEL:  And I have a copy of the first

20         page of the mortgage here.  Which I'll enter as

21         ExhibitB.

22              (Defendant's Exhibit Letter B was marked for

23         identification.)

24    BY MR. IMMEL:

25         Q.    If you will notice it says that the mortgagee

Consor & Associates
Reporting and Transcription, Inc.

Page 25

1    according to the mortgage is Mortgage Electronic

2    Registration Systems.

3              I believe it's right down there (indicating).

4         A.   I disagree with that interpretation.

5              MS. ARROYAVE:  Was there a question?

6              MR. IMMEL:  Yes.

7              MS. ARROYAVE:  What was the question?

8    BY MR. IMMEL:

9         Q.   According to the mortgage, it says that MERS

10   is the mortgagee?

11        A.   My interpretation, it says right in the same

12   paragraph, it says they are a nominee for the lender or

13   the lender successors.

14        Q.   Right.  Okay.  They are the mortgagee as

15   nominee --

16        A.   Uh-huh.

17        Q.   --  for the lenders?

18        A.   Yes.

19        Q.   Okay.  But they are a different entity from

20   the lender and lender successors and things?

21        A.   Yes.

22        Q.   Okay.  What does nominee in that regards mean?

23        A.   I don't know.

24        Q.   Okay.  We can move on from there.

25              I have here -- which I'll enter as Exhibit

Consof & Associates
Reporting and Transcription, Inc.

```
                                                    Page 26
 1     C -- some discovery that we received from MERS.

 2              (Defendant's Exhibit Letter C was marked for

 3         identification.)

 4     BY MR. IMMEL:

 5         Q.   And if you will turn to the second page.  It

 6     is the document entitled, Min Summary.

 7              And have you ever seen these records before?

 8         A.   No, I have not.

 9         Q.   So in executing the assignments of mortgage on

10     behalf of MERS, do you consult any of MERS' records?

11         A.   No.

12         Q.   And you are not able to tell me what any of

13     these entries would then mean?  This is the first time

14     you have seen this type of information?

15         A.   In this format, yes.

16         Q.   Okay.  Have you seen this type of information

17     in other formats?

18         A.   Some of it.  I understand what they mean as

19     far as the acronyms in there.

20         Q.   Okay.  Based on your understanding, the

21     investor says -- the investor is identified as

22     Government National Mortgage Association - Ginnie Mae.

23     What does the word "investor" mean in MERS' acronym?

24     Are you aware?

25         A.   I'm not sure how I can explain it.  GMAC would
```

Consor & Associates
Reporting and Transcription, Inc.

Page 27

1      be the holder and the owner of the mortgage.  GMAC would

2      be the investor who is in the organization that

3      contributed the fund.  That's really the only way I can

4      explain the relationship of an investor and servicer.

5            Q.    Okay.

6            A.    But that's only to my knowledge.  I mean, I

7      don't work in that fashion.

8            Q.    Okay.  So the servicer is supposed to take on

9      the day-to-day activities of administering the mortgage

10     of loan and collecting payments and so forth?

11           A.    That would be correct.

12           Q.    And they do that on behalf of the investor who

13     loaned the monies?

14           A.    Yes.

15           Q.    Okay.  And any monies that are received from

16     the servicers, would they really be for the investor

17     then to pay him back the loan?

18           A.    I don't know.

19           Q.    Okay.  And as custodian, also, that would mean

20     that they are in possession of the mortgage file,

21     essentially, the note and any other applicable

22     documents?

23           A.    That's correct.

24           Q.    Okay.  All right.  Where it has the pool

25     number and it is blacked out.  Do you know what the pool

Consior & Associates
Reporting and Transcription, Inc.

Page 28

1      number refers to?

2          A.   No, I don't.

3          Q.   No.   Okay.   And what about the investor loan

4      number?

5          A.   Yes, I understand what that is.

6          Q.   And what would that relate to?

7          A.   Every investor would have their own loan

8      number.   The same as GMAC would have their own loan

9      number to classify the different files.

10         Q.   Okay.   And are you aware of how a mortgage

11     that has been securitized, a mortgage note that's been

12     securitized, would be reflected on something like this,

13     on this summary?

14         A.   I am not familiar.

15         Q.   You are not familiar.   Okay.   Are you aware of

16     anyone at GMAC Mortgage, LLC that has access to these

17     MERS documents and records?

18         A.   No, I'm not.

19         Q.   You are not aware.   Okay.   Are you aware of

20     anybody at GMAC that would have a responsibility to

21     update the MERS documentation?

22         A.   No.

23         Q.   Okay.   So the various individuals at GMAC that

24     execute assignments on behalf of MERS have no

25     responsibility to update the MERS' system that they had

Consor & Associates
Reporting and Transcription, Inc.

Page 29

1    actually done those assignments or anything like that?

2        A.    That would be correct.

3        Q.    Okay.  Are you aware then of how the MERS'

4    system is updated?

5        A.    No.

6        Q.    Okay.  As a vice president, do you owe a

7    fiduciary duty to the original lender to ensure that the

8    mortgage is assigned to the proper entity?

9            MS. ARROYAVE:  Objection: Form.

10            THE WITNESS:  I actually don't understand your

11        question.

12    BY MR. IMMEL:

13        Q.    Do you own any duty to the -- when you assign

14    these mortgages, you execute them as -- for MERS as

15    nominee for a particular entity, correct?

16        A.    That would be correct.

17        Q.    Do you owe any responsibility then to that

18    particular entity that MERS is nominee for to ensure

19    that the mortgage is transferred to the new correct

20    entity?

21        A.    I don't know.

22        Q.    Okay.  All right.

23            MR. IMMEL:  I have the corporate resolution

24        here.  Which I'll enter it as Exhibit D.

25

Consof & Associates
Reporting and Transcription, Inc.

Page 30

```
 1              (Defendant's Exhibit Letter D was marked for

 2         identification.)

 3    BY MR. IMMEL:

 4         Q.    Have you seen this document before?

 5         A.    Yes, I have.

 6         Q.    When was the first time you saw it?

 7         A.    I'm sorry, I can't say.  I don't recollect.

 8         Q.    You're not sure.  Is it fair to say it was

 9    quite a while ago?

10         A.    Yes.

11         Q.    Did you have any role in creating it or

12    negotiating it?

13         A.    No, I did not.

14         Q.    No.  Okay.  The first paragraph says that you

15    are authorized to assign a lien of any mortgage loan

16    registered on the MERS register to the member.

17              Who would be the member according to this?

18    Would that be GMAC Mortgage, LLC?

19         A.    I don't know.

20         Q.    Okay.  Assign the lien, in paragraph 2, of any

21    mortgage loan naming MERS as the mortgagee when the

22    member is also the current promissory note-holder, or if

23    the mortgage loan is registered on the MERS system, is

24    shown to be registered to the member.

25              When you are assigning liens, you already
```

1    stated that you don't consult with any of the MERS

2    records to determine whether or not it's registered to

3    who -- whoever?

4              MS. ARROYAVE:  Objection:  Form.  Asked and

5         answered.  Mischaracterization of prior testimony.

6    BY MR. IMMEL:

7         Q.   Okay.  You don't consult MERS system when

8    assigned these liens?

9         A.   Yes.

10             MS. ARROYAVE:  Asked and answered.

11    BY MR. IMMEL:

12         Q.   All right.  Okay.  But is it fair to say that

13    you don't ascertain whether the member is the current

14    promissory note-holder when you assign the lien?

15         A.   That would be correct.

16         Q.   And you also don't know if the mortgage loan

17    is registered on the MERS system?

18         A.   We are relying on our attorney network when

19    they check the title --

20         Q.   Okay.

21         A.   -- to verify what title it is presently in.

22    If it is MERS, we would sign for MERS.

23         Q.   Okay.

24             MR. IMMEL:  Exhibit E.

25

Consor & Associates
Reporting and Transcription, Inc.

                                                            Page 32

1              (Defendant's Exhibit Letter E was marked for

2        identification.)

3    BY MR. IMMEL:

4        Q.    Here is the GMAC Mortgage, LLC certificate of

5    assistant secretary.  Here you go.

6              And you are considered a limited signing

7    officer giving you basically the same responsibility as

8    a junior officer?

9              MS. ARROYAVE:  Objection:  Form.

10             THE WITNESS:  I don't know if that's a correct

11       statement.

12   BY MR. IMMEL:

13       Q.    Okay.  Are you familiar with this document?

14       A.    I have a copy of this document.  Which to my

15   recollection means that next to my name it gives me the

16   authority to sign for GMAC and its entities as a limited

17   signing officer.

18       Q.    Okay.  In this case, you also filed an

19   affidavit of lost original document?

20             MS. ARROYAVE:  Objection:  Form.

21   BY MR. IMMEL:

22       Q.    Okay.  And you executed this document.  Is

23   this your signature?  Here is a copy of it.

24             MR. IMMEL:  I'll enter this as Exhibit F, I

25       believe.

Consac & Associates
Reporting and Transcription, Inc.

Page 33

1              (Defendant's Exhibit Letter F was marked for

2         identification.)

3              THE WITNESS:  Yes, that is my signature.

4    BY MR. IMMEL:

5         Q.   Okay.  And you signed this affidavit claiming

6    that at the time plaintiff was not presently in custody

7    or control of plaintiff or any of plaintiff's agents,

8    and that would be the note that was not in your -- their

9    custody or control?

10        A.   Yes.  Once again, we have a process in place

11   where if our attorney needs an original document, they

12   open up a request in our system.  At that time, we have

13   another unit -- which is not located in Pennsylvania

14   where I am located -- contact custodians, contact their

15   own records, go to different investors.  They do not do

16   an affidavit of this fashion unless they've exhausted

17   all efforts.

18        Q.   Okay.  Would it be fair to say that you're not

19   involved in any of those efforts?

20        A.   That is fair to say.

21        Q.   Okay.  Why then do they ask you to execute the

22   affidavit of lost document -- lost original document?

23        A.   They asked me to execute this for the

24   foreclosure department.  Because after conversations

25   between the attorney and this other department, they

Consol & Associates
Reporting and Transcription, Inc.

Page 34

1    determine that it is not available.  I am the

2    foreclosure team lead that handles document execution.

3        Q.    Okay.  So would it be accurate to say that the

4    department that actually searches for the lost note

5    would have a better understanding of why it's lost and

6    where the search occurred?

7        A.    That is a fair statement.

8        Q.    Okay.  It says that the copy of said note

9    attached to the complaint is a true and correct and

10   substantial copy of the lost or destroyed note.

11        Do you review any documents before executing

12   the affidavits of lost original documents?

13        A.    No, I do not.  I review this.  Let me change

14   this.  Excuse me.  I do review this.  However, I do not

15   review any documents.  I rely, once again, on my

16   attorney network who is requesting the document, and

17   communications between the departments to determine if

18   it's -- if a lost affidavit is needed.

19        Q.    Okay.  So the portion that sets claims in

20   paragraph 1:  Affiant has custody and personal knowledge

21   of the account pertaining the original mortgage loan

22   instruments.  Affiant has actual and personal knowledge

23   of the facts stated herein and is authorized to make

24   this affidavit.  Would that be accurate?

25        A.    Yes, that is accurate.

```
 1        Q.   You being the affiant have custody and
 2   personal knowledge of the account pertaining to the
 3   original mortgage loan instruments?
 4            MS. ARROYAVE:  Object to the form.  Go ahead.
 5            THE WITNESS:  I do not have the specific
 6        knowledge to this one account.  But I understand
 7        what the other department does in general to try to
 8        locate these documents.
 9   BY MR. IMMEL:
10        Q.   Okay.  All right.  And so in this particular
11   case, the -- there was no note attached to the
12   complaint.  You would have no way of ascertaining that
13   because you don't actually review?
14        A.   That, once again, is determined by our
15   attorneys' office.
16        Q.   Okay.  I'm going to just -- I have a
17   substantial copy of the complaint.  And just to show
18   that there is no note attached to it, that was the
19   original filing of the complaint.
20            You have never reviewed that, nor do you
21   review any other note to determine whether it is, in
22   fact, a true, correct and substantial copy of the lost
23   or destroyed note?
24            MS. ARROYAVE:  Objection:  Form.
25            THE WITNESS:  Can you rephrase that for me?  I
```

Reporting and Transcription, Inc.

Page 36

1          don't completely follow what you are saying.

2     BY MR. IMMEL:

3          Q.   When you execute the affidavit of lost

4     original document, and make the claim that you've seen a

5     copy of the note that is attached and that's a

6     substantial copy, you really have no basis for making

7     that claim.

8               THE WITNESS:  I'm still not following.

9               MS. ARROYAVE:  Objection:  Form.

10    BY MR. IMMEL:

11         Q.   When the complaint in this case was filed,

12    there was no note attached to the complaint, correct?

13         A.   From what you have just handed to me, there is

14    no note.

15         Q.   Okay.  Based on what I've provided you.

16         A.   Yes.

17         Q.   Do you normally review notes to make sure that

18    they are a true copy of the lost note?

19              MS. ARROYAVE:  Objection:  Form.

20              THE WITNESS:  That is -- no, I do not.  It is

21         not in my position.

22    BY MR. IMMEL:

23         Q.   It's not in your position.

24              MR. IMMEL:  All right.  I guess I can enter

25         this a Exhibit G.

Consor & Associates
Reporting and Transcription, Inc.

Page 37

1          (Defendant's Exhibit Letter G was marked for

2          identification.)

3    BY MR. IMMEL:

4          Q.    And going back, just for a second, to the lost

5    note affidavit.  That is your signature?

6          A.    Yes, that's correct.

7          Q.    And your understanding is that the attorney

8    representing -- from your network drafts this?

9          A.    That is correct.

10         Q.    Okay.

11         MR. IMMEL:  This is going to be Exhibit H.

12         (Defendant's Exhibit Letter H was marked for

13         identification.)

14    BY MR. IMMEL:

15         Q.    This is a copy of the note filed after the

16    complaint in this case.  I don't have the notice of

17    filing page.

18         Have you ever seen this document before?

19         A.    I have seen these documents.  I have not seen

20    this document.

21         Q.    Okay.  And this wouldn't have been the

22    document that you reviewed in executing the lost note

23    affidavit?

24         A.    No.  We do not -- once again, we do not review

25    the note.  Our attorney determines that the note is not

Consor & Associates
Reporting and Transcription, Inc.

Page 38

1      available through our processes.

2          Q.    Okay.

3              MR. IMMEL:   This would be Exhibit I.

4              (Defendant's Exhibit Letter I was marked for

5          identification.)

6      BY MR. IMMEL:

7          Q.    This is the newly found note.  Here.  And as

8      you can see, if you could compare the two notes, one has

9      a couple of additional endorsements.  Whereas, the

10     previous one did not.  Is that correct?

11         A.    That is what I observe here, yes.

12         Q.    Okay.  In the review of the two notes and the

13     endorsements that are on them, have you seen this type

14     of situation before where one note that's been filed in

15     the case is partially endorsed and the other is a more

16     complete record of endorsements?

17         A.    No, I have not.

18         Q.    In following along the endorsements, can you

19     determine who was the last owner of the note prior to

20     your companies?

21         A.    I'm sorry.  Can you rephrase that for me?

22         Q.    Can you determine who GMAC Mortgage, LLC has

23     acquired the mortgage note from?

24         A.    The first endorsement I see here has a date.

25     It says, Mortgage Investor Corporation.  It's signed on

Consor & Associates
Reporting and Transcription, Inc.

                                                      Page 39

1      February 27th, I believe, that's 2002.

2          Q.    All right.    And they were the original lender.

3      And then, as you can see, there is another endorsement

4      there to, I believe, GMAC Mortgage Corporation.    And

5      there is also one GMAC Bank.    Correct?

6          A.    That is correct according to the observation

7      that I see on this document.

8          Q.    So would you need an assignment from -- why do

9      you assign the MERS -- as a vice president of MERS, why

10     do you assign the MERS -- I'm sorry.    Let me start over

11     there.

12              Why do you execute the assignment of mortgage

13     on behalf of MERS as nominee for the original lender and

14     not the last lender?

15              MS. ARROYAVE:    Objection:    Form.

16              THE WITNESS:    Because as you stated, it's an

17              assignment of mortgage.    It's not an assignment of

18              note.

19     BY MR. IMMEL:

20         Q.    Right.

21         A.    That's the only way I can answer that.    The

22     mortgage itself, which we've both reviewed, states that

23     it's MERS as a nominee for Mortgage Investor

24     Corporation.

25         Q.    Okay.    So would you agree then that as the

Consor & Associates
Reporting and Transcription, Inc.

Page 40

1    note was transferred through these endorsements to new

2    note-holders and owners that MERS remained the

3    mortgagee?

4              MS. ARROYAVE:  Objection:  Form.

5              THE WITNESS:  I wouldn't have that knowledge.

6    BY MR. IMMEL:

7         Q.   Okay.  It's your understanding that MERS does

8    not assign the mortgage every time the note is

9    transferred; is that correct?

10             MS. ARROYAVE:  Objection:  Form.

11             THE WITNESS:  I wouldn't have that knowledge

12         either.

13   BY MR. IMMEL:

14        Q.   Okay.  All right.  Do you know who would have

15   that knowledge?

16        A.   No, I do not.

17        Q.   Okay.  All right.

18             MR. IMMEL:  And we have here defendant's

19        request for production regarding the Jeffrey

20        Stephan documents.  That will be Exhibit J.

21             (Defendant's Exhibit Letter J was marked for

22        identification.)

23   BY MR. IMMEL:

24        Q.   Have you seen that document before?

25        A.   I have not seen this document until recently

Consor & Associates
Reporting and Transcription, Inc.

Page 41

1    when I found out that I was coming here.

2        Q.    Okay.  And also we have the response to the

3    request for production regarding the Jeffrey Stephan

4    document.

5            MR. IMMEL:  That will be marked as Exhibit K.

6            (Defendant's Exhibit Letter K was marked for

7        identification.)

8    BY MR. IMMEL:

9        Q.    I'm going to direct you to paragraph 5 where

10   there has been an objection based on our request for all

11   MERS system documents, records, computer data, or other

12   MERS information reviewed by Jeffrey Stephan prior to

13   executing the assignment of mortgage filed in this case

14   to determine the proper SNE.

15           It's been objected to as vague and ambiguous

16   and improperly presumes that plaintiff has custody or

17   control over any MERS system documents.

18           As a MERS vice president, you don't have

19   access to any MERS system documents?

20       A.    No, I do not.

21       Q.    Okay.

22       A.    I do not work for MERS.

23       Q.    Okay.  And so you don't actually review any

24   documents prior to executing the assignment of mortgage?

25           MS. ARROYAVE:  Asked and answered.

1    BY MR. IMMEL:

2         Q.    Okay.  And are there any -- do you receive any

3    letters, e-mails, or other correspondence from other

4    departments that have given you any instruction on any

5    of the documents which you execute?

6         A.    No.

7         Q.    No.  And in paragraphs -- request No. 7, as

8    far as the search for the lost note, you didn't actually

9    partake in that search.  So you are not aware of any of

10    the locations searched, other than by other people?

11         A.    That's correct.

12         Q.    Do you know who those people would be that

13    searched for the note?

14         A.    There is a team that's in our Minnesota

15    office.  I am not familiar with who would actually

16    search for the said document.

17         Q.    What is the name of that team?  Do you know

18    the name of that team?

19         A.    I don't have a formal name for them.  I call

20    them document control.  But that's my own name for them.

21         Q.    Okay.  All right.  You said that the attorneys

22    representing you prior in this case only ask you to

23    execute the lost note affidavit after a substantial

24    effort has occurred?

25              MS. ARROYAVE:  Objection.  That goes into the

Consor & Associates
Reporting and Transcription, Inc.

Page 43

1          attorney-client privilege.

2     BY MR. IMMEL:

3          Q.    As far as you understand, a substantial search

4     for the lost note has already occurred by various people

5     within your team, other teams within GMAC at the request

6     of the attorneys?

7          A.    Within GMAC the lost note affidavit or lost

8     instrument affidavit would not be executed until

9     everything has been exhausted.

10         Q.    Okay.  Is it common for a lost note affidavit

11    to be executed and then later the note to be found?

12         A.    I don't know.

13         Q.    You're not sure.  Okay.  Earlier you were

14    mentioning that now you work for GMAC, LLC; is that

15    correct?

16         A.    That is correct.

17         Q.    And you still execute documents as GMAC

18    Mortgage, LLC limited signing officers, as well?

19         A.    That's the same thing you just stated.

20         Q.    Right.  One they dropped the name -- the

21    mortgage from the name, and one they haven't; is that

22    correct?

23         A.    No.

24         Q.    No.

25         A.    One they dropped corporation and changed it to

Consor & Associates
Reporting and Transcription, Inc.

Page 44

1    LLC.

2            Q.    Oh, okay.

3            A.    They became a limited liability company.

4    That's what LLC stands for.

5            Q.    Okay.  You said that there was an -- initially

6    there was a referral from the referral department to the

7    attorneys?

8            A.    That would be correct.

9            Q.    Do you ever review any of those documents in

10   your duties as executing these other documents?

11           A.    No.

12           Q.    So I'm going to turn to the -- this is the

13   note of authenticity ownership interrogatories limited

14   answers.  Here you are.

15                 MR. IMMEL:  That will be Exhibit L.

16                 (Defendant's Exhibit Letter L was marked for

17           identification.)

18   BY MR. IMMEL:

19           Q.    Do you know, I think, it is Juan A. Aquirre?

20           A.    I do not know him.  But I am familiar with his

21   name.

22           Q.    Okay.  Are you familiar with his duties?  He's

23   a senior litigation analyst.

24           A.    Yes.

25           Q.    Do you know if he's a senior litigation

Consor & Associates
Reporting and Transcription, Inc.

Page 45

1    analyst for GMAC Mortgage, LLC, or are there other

2    entities that he works for?

3        A.    I honestly do not know.

4        Q.    Okay.  Would he be part of the document team

5    in Minnesota that may find a note?

6        A.    No.

7        Q.    No.  Okay.  Would he be somebody, do you know,

8    if in his duties he's somebody that searches for lost

9    documents?

10       A.    No.

11       Q.    Okay.

12            MS. ARROYAVE:  Is that, no, you don't know?

13            THE WITNESS:  No.  He does not do that.

14    BY MR. IMMEL:

15       Q.    He doesn't do that.  Do you know what his

16    duties are?

17       A.    As it states here, he is a senior litigation

18    analyst.  I'm not sure of what his exact

19    responsibilities would be.

20       Q.    Okay.  But searching for lost documents

21    wouldn't be one of his responsibilities, more than

22    likely?

23       A.    No, it would not be.

24       Q.    Okay.  And here are plaintiff's amended

25    answers.  Okay.

 1              MR. IMMEL:  I'll mark it as Exhibit M.

 2              (Defendant's Exhibit Letter M was marked for

 3         identification.)

 4    BY MR. IMMEL:

 5         Q.   It asks to identify all persons and/or

 6    entities who are the current beneficial owners of, or

 7    who have a beneficial or equitable interest in the

 8    promissory note.  And Federal National Mortgage

 9    Association has been identified, Fannie Mae.

10              Are you aware -- and then if you look at No.

11    3, it says, Please identify all person and/or entities

12    who are current legal owners of, or who have legal

13    interest in the promissory note.

14         A.   I don't have the same affidavit you have.

15         Q.   Okay.  Defendant's note.  Do you have the

16    mortgage loan?

17         A.   That's the mortgage loan.

18         Q.   Okay.

19              MS. ARROYAVE:  What has been introduced?  Has

20         this set of interrogatory been --

21              MR. IMMEL:  Yes.

22              MS. ARROYAVE:  But not the other?

23              MR. IMMEL:  No.  This was also entered,

24         correct?

25              THE COURT REPORTER:  I think it was the last

Consor & Associates
Reporting and Transcription, Inc.

Page 47

1          one.

2     BY MR. IMMEL:

3          Q.    So if you look at paragraphs 2 and 3, can you

4     explain to me why Fannie Mae would have the beneficial

5     or equitable interest in the promissory note, based on

6     your understanding?

7               MS. ARROYAVE:  Objection.  It calls for a

8          legal conclusion.

9               THE WITNESS:  No, I can't.

10    BY MR. IMMEL:

11         Q.    And earlier when we discussed the MERS

12    documentation where Ginnie Mae was identified as the

13    investor, would it be fair to say that the beneficial or

14    equitable interest would actually lie with the person

15    who made the loan?

16              MS. ARROYAVE:  Objection.  It calls for a

17         legal conclusion.

18              THE WITNESS:  I don't have that knowledge.

19    BY MR. IMMEL:

20         Q.    Okay.  And based on the MERS documentation

21    that I presented to you earlier, where the investor was

22    identified as Ginnie Mae.  In paragraph 5 here, they are

23    identifying Fannie Mae as the investor.

24              Do you have any understanding of -- as to why

25    those two things would --

Consor & Associates
Reporting and Transcription, Inc.

Page 48

1         A.    No, I don't.

2         Q.    -- there would be a discrepancy there?  Okay.

3    All right.

4              And going back to the mortgage loan ownership

5    and the interrogatories one more time.  Can you explain

6    why one entity would have the beneficial interest and

7    another entity would have a legal interest --

8         MS. ARROYAVE:  Objection.  It calls for a

9         legal conclusion.

10   BY MR. IMMEL:

11        Q.    -- based on your company's protocols?

12        A.    I don't have that knowledge.

13        Q.    Okay.  GMAC Mortgage owns some loans and

14   services other; is that correct?

15        A.    To my knowledge that would be a correct

16   statement.

17        Q.    Okay.  Do they -- and then in other instances,

18   they both own loan and service the loan?

19        A.    That would be a fair statement.

20        Q.    Okay.  Is it possible that GMAC Mortgage is

21   the servicer for this loan and another entity -- whether

22   it be Fannie Mae, Ginnie Mae, or any other entity --

23   perhaps is the owner and GMAC is just the servicer?

24        A.    That's possible.  But I'm not familiar enough

25   to say yes or no.

Consor & Associates
Reporting and Transcription, Inc.

Page 49

1          Q.    Okay.  All right.  I'm just going to go over

2     the notice of taking the deposition duces tecum.

3                (Defendant's Exhibit Letter N was marked for

4          identification.)

5     BY MR. IMMEL:

6          Q.    All right.  This is -- and just for the

7     record, Exhibit A, if you would turn to that.  This is a

8     list of the documents that we requested that you bring.

9     A request for production.  And you provided some of them

10    earlier.

11               I just wanted to go over it and see if you

12    brought any of these documents today, or if you were

13    just relying on what was produced in the request for

14    production.  Okay?

15               The deponent's most recent curriculum vitae?

16         A.    I didn't feel I needed to bring that.  That's

17    personal.

18         Q.    Okay.  You actually provided the corporate

19    resolution for MERS and for GMAC.  You presented the

20    list of certifying officers.  And the MERS system

21    documents records, you already stated that you don't

22    have any access.

23               Your team brings you the documents.  And you

24    don't receive any direct communication from the

25    attorneys that draft them?

Conso & Associates
Reporting and Transcription, Inc.

Page 50

1       A.    The only type of communication I would receive

2    from an attorney is if a document is late in being

3    returned.

4       Q.    Okay.  All right.  And it would be fair to say

5    that your primary responsibility is to create and

6    execute these documents, not to actually do any of the

7    underlying duties of ascertaining specific knowledge or

8    information about them, correct?

9            MS. ARROYAVE:  Objection:  Form.  Asked and

10           answered.

11           THE WITNESS:  And the answer to that would be,

12           no.

13           MR. IMMEL:  All right.  I think that's most of

14           it.  Just let me have on second to review, but I

15           think that's most of it.  All right.  I think that

16           should do it for today.

17           Thank you very much for traveling here.

18           MS. ARROYAVE:  I have a few questions.

19           MR. IMMEL:  Yeah.  I'm sorry about that.

20           MS. ARROYAVE:  You can't have all of the fun.

21    Can I look at the exhibits?

22                  CROSS (JEFFREY STEPHAN)

23    BY MS. ARROYAVE:

24       Q.    I'm going to show you what has been previously

25    marked as Defendant's Exhibit C to your deposition.

Consor & Associates
Reporting and Transcription, Inc.

Page 51

1              Do you have any knowledge of how this document

2     is created?

3          A.    No.

4          Q.    Do you have any knowledge as to whether the

5     information in this document is accurate?

6          A.    No.

7          Q.    Do you know how this is prepared?

8          A.    No.

9          Q.    Okay.  Let me show you what has been

10    previously marked as Defendant's Exhibit A to your

11    deposition.  It is the assignment of mortgage.

12              The information that is used to prepare this

13    mortgage is kept in GMAC Mortgages' business records; is

14    that correct?

15         A.    Yes.

16         Q.    And these business records from where this

17    information came from were created by persons in GMAC

18    Mortgage, employees of GMAC Mortgage, right?

19         A.    Yes.

20         Q.    And the information was entered into the

21    computer system by these GMAC Mortgage employees at the

22    time that they became aware of the information?

23         A.    Yes.

24         Q.    And they had a business duty to enter the

25    information into the computer system; is that correct?

Page 52

1          A.    Yes.

2          Q.    And this information, these business records

3    are kept within the course and scope of GMAC's regularly

4    conducted business activities; is that correct?

5          A.    I'm going to say yes.

6          Q.    Okay.  I'm going to show you what has been

7    previously marked as Defendant's Exhibit F to your

8    deposition.  And it's the affidavit of lost original

9    document.

10          Is the information you used to prepare this

11    lost original document kept in GMAC Mortgages' business

12    records?

13          A.    I don't understand the question.

14          Q.    Okay.  The information in the lost original

15    document, is that -- GMAC Mortgage is the owner and

16    holder of the note, correct?

17          A.    Yes.

18          Q.    Is that information kept within the course and

19    scope of GMAC's business records?

20          A.    Yes.

21          Q.    And the information in GMAC's business records

22    are entered by persons with knowledge of the information

23    that GMAC is the owner of the note?

24          MR. IMMEL:  Objection:  Leading.

25          THE WITNESS:  Can you rephrase it?  I'm not

Consor & Associates
Reporting and Transcription, Inc.

Page 53

1          sure if I follow what you are saying.

2     BY MS. ARROYAVE:

3          Q.    The business records that GMAC has regarding

4     whether it is the original -- whether it is the owner of

5     the note, was entered by persons that have personal

6     knowledge of whether GMAC is the owner of the note; is

7     that correct?

8          A.    I honestly don't know.  I do not work in those

9     departments.

10         Q.    Okay.

11              MS. ARROYAVE:  I have nothing further.

12                   REDIRECT (JEFFREY STEPHAN)

13    BY MR. IMMEL:

14         Q.    I would just ask:  The assignment of the

15    mortgage and the information on it, this is not created

16    by anyone at -- this specific document isn't actually

17    created by a member or a worker for GMAC Mortgage, it is

18    actually created by the attorney?

19         A.    Yes.

20         Q.    Okay.  So the attorney would have to be

21    relying on business records of GMAC Mortgage in forming

22    this?

23         A.    That would be correct.

24         Q.    Okay.  And as to the lost note, this too is

25    created by the attorney, correct?

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Consor & Associates
Reporting and Transcription, Inc.

Page 54

1          A.     That is correct.

2          Q.     Okay.

3                 MR. IMMEL:  All right.  That does it.

4                 MS. ARROYAVE:  That's it.

5                 MR. IMMEL:  All right.  Thank you.

6                 MS. ARROYAVE:  We will read.

7                 THE COURT REPORTER:  Okay.

8                 (Witness excused.)

9                 (Deposition was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1                    CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5

6            I, the undersigned authority, certify that Jeffrey

7    Stephan personally appeared before me and was duly

8    sworn.  Dated the 10th day of December, 2009.

9

10           Dated this 22nd day of December, 2009.

11

12

13   _____

14

     Jamie Reynolds Bentley, Court Reporter

15   Notary Public - State of Florida

     My Commission Expires:  7/20/2013

16   My Commission No.:  DD 453053

17

18

19

20

21

22

23

24

25

Consor & Associates
Reporting and Transcription, Inc.

Page 56

1                    C E R T I F I C A T E
2      THE STATE OF FLORIDA
3      COUNTY OF PALM BEACH
4
5          I, Jamie Reynolds Bentley, Court Reporter and
       Notary Public in and for the State of Florida at
6      large, do hereby certify that I was authorized to
       and did report said deposition in stenotype; and
7      that the foregoing pages are a true and correct
       transcription of my shorthand notes of said
8      deposition.
9          I further certify that said deposition was
       taken at the time and place hereinabove set forth
10     and that the taking of said deposition was commenced
       and completed as hereinabove set out.
11
           I further certify that I am not attorney or
12     counsel of any of the parties, nor am I a relative
       or employee of any attorney or counsel of party
13     connected with the action, nor am I financially
       interested in the action.
14
           The foregoing certification of this transcript
15     does not apply to any reproduction of the same by
       any means unless under the direct control and/or
16     direction of the certifying reporter.
17         Dated this 22nd day of December, 2009.
18
19         _Jamie Reynolds Bentley_
20     _____
           Jamie Reynolds Bentley, Court Reporter
21
22
23
24
25

Page 57

1   DATE:        December 31, 2009

2   TO:          Jeffrey Stephan

3   IN RE:       GMAC Mortgage, LLC vs Ann M. Neu, Michelle Perez,
    Douglas William

4

    CASE NO.:  50 2008 CA 040805XXXX   MB

5

         Please take notice that on Thursday, the 10th
6   of December, 2009, you gave your deposition in the
    above-referred matter.  At that time, you did not
7   waive signature.  It is now necessary that you sign
    your deposition.

8        Please call our office at the below-listed
    number to schedule an appointment between the hours
9   of 9:00 a.m. and 4:30 p.m., Monday through Friday,
    at the Consor & Associates office located nearest
10  you.

         If you do not read and sign the deposition
11  within a reasonable time, the original, which has
    already been forwarded to the ordering attorney, may
12  be filed with the Clerk of the Court.  If you wish
    to waive your signature, sign your name in the blank
13  at the bottom of this letter and return it to us.

14                       Very truly yours,

15

16                       _____

17                       Jamie Reynolds Bentley, Court Reporter
                         Consor & Associates

18                       1655 Palm Beach Lakes Blvd., Suite 500
                         West Palm Beach, Florida 33401

19

20  I do hereby waive my signature.

21  _____

22  Jeffrey Stephan

23  I do hereby waive my signature:

24  Cc:  Via transcript:  Chrisopher Immel,Esquire

25  File copy

Page 58

1                    C E R T I F I C A T E

2                         -  -  -

3    THE STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5        I hereby certify that I have read the foregoing

6    deposition by me given, and that the statements

7    contained herein are true and correct to the best of

8    my knowledge and belief, with the exception of any

9    corrections or notations made on the errata sheet,

10   if one was executed.

11

12       Dated this _____ day of _____,

13   2009.

14

15

16

17

18   _____

19   JEFFREY STEPHAN

20

21

22

23

24

25

```
 1              E R R A T A   S H E E T
 2    IN RE: GMAC MORTGAGE, LLC VS ANN M. NEU, MICHELLE PEREZ,
      DOUGLAS WILLIAM
 3    CR: JAMIE REYNOLDS BENTLEY
      DEPOSITION OF: JEFFREY STEPHAN
 4    TAKEN: 12/10/09
 5
 6       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 7    PAGE #  LINE #   CHANGE                REASON
      _____
 8
      _____
 9
      _____
10
      _____
11
      _____
12
      _____
13
      _____
14    _____
15    _____
16    _____
17    _____
18    Please forward the original signed errata sheet to this
      office so that copies may be distributed to all parties.
19
      Under penalty of perjury, I declare that I have read my
20    deposition and that it is true and correct subject to any
      changes in form or substance entered here.
21
22    DATE: _____
23
24    SIGNATURE OF DEPONENT:_____
25
```

Consor & Associates
Reporting and Transcription, Inc.

**A**

**able** 20:21 26:12
**above-referred** 57:6
**access** 28:16 41:19 49:22
**account** 34:21 35:2,6
**accuracy** 8:6 12:19 19:5
**accurate** 10:6 12:22,24 17:21 23:9,13 34:3 34:24,25 51:5
**acquired** 38:23
**acronym** 26:23
**acronyms** 26:19
**action** 56:13,13
**activities** 27:9 52:4
**actual** 34:22
**additional** 38:9
**administering** 27:9
**affiant** 34:20,22 35:1
**affidavit** 16:6 32:19 33:5,16 33:22 34:18,24 36:3 37:5,23 42:23 43:7,8 43:10 46:14 52:8
**affidavits** 6:15 7:4,10 15:9 34:12
**affirm** 4:7
**affirmed** 4:13
**agents** 33:7
**ago** 30:9
**agree** 39:25
**ahead** 35:4
**Alahamra** 2:4
**ALEJANDRA**

2:3
**allow** 23:16
**ambiguous** 41:15
**amended** 45:24
**analyst** 44:23 45:1,18
**and/or** 46:5,11 56:15
**Ann** 1:8,8 57:3 59:2
**answer** 4:21 10:23 12:8 39:21 50:11
**answered** 31:5 31:10 41:25 50:10
**answers** 4:22 44:14 45:25
**anybody** 28:20
**anybody's** 14:18
**apparently** 18:15
**APPEARAN...** 2:1
**appeared** 19:20 55:7
**appears** 19:7
**applicable** 27:21
**apply** 56:15
**appointment** 57:8
**approximately** 6:22 7:19 10:1 15:7,15
**Aquirre** 44:19
**area** 16:22
**ARROYAVE** 2:3 3:8 8:10 10:21 11:6 12:3,7 13:5 15:1 17:23 18:17 20:3 21:10,15 22:2 22:24 23:22

25:5,7 29:9
31:4,10 32:9
32:20 35:4,24
36:9,19 39:15
40:4,10 41:25
42:25 45:12
46:19,22 47:7
47:16 48:8
50:9,18,20,23
53:2,11 54:4,6
**ascertain** 31:13
**ascertained** 21:24
**ascertaining** 35:12 50:7
**asked** 14:16 31:4,10 33:23 41:25 50:9
**asking** 9:20 12:10,11,25 16:5
**asks** 46:5
**aspect** 16:25
**assign** 20:8 21:18 29:13 30:15,20 31:14 39:9,10 40:8
**assigned** 16:21 29:8 31:8
**assigning** 24:5 30:25
**assignment** 11:18,25 16:6 17:9 22:11,20 23:5,10 39:8 39:12,17,17 41:13,24 51:11 53:14
**assignments** 6:14 7:1 14:21 15:4,8 16:24 20:22 22:21 23:17 24:16 26:9 28:24 29:1

**assistant** 8:16 15:24 16:4 17:7 32:5
**Associates** 1:17 1:22 57:9,17
**Association** 26:22 46:9
**attached** 34:9 35:11,18 36:5 36:12
**attend** 16:12
**attention** 14:18
**attorney** 4:19 9:12,14,20,22 11:17,19,20 12:1,14,24 13:2,3 18:2 20:10 22:15,16 31:18 33:11,25 34:16 37:7,25 50:2 53:18,20 53:25 56:11,12 57:11
**attorneys** 12:6 17:21 35:15 42:21 43:6 44:7 49:25
**attorney-client** 43:1
**authenticity** 44:13
**authority** 32:16 55:6
**authorized** 30:15 34:23 56:6
**available** 34:1 38:1
**average** 7:10 10:2
**aware** 17:6,8 22:5,8,11 23:2 24:11,14,15 26:24 28:10,15 28:19,19 29:3

42:9 46:10 51:22
**a.m** 57:9
**A/K/A** 1:8

**B**

**B** 3:11,15 24:22
**back** 13:20 15:21 27:17 37:4 48:4
**Bank** 39:5
**base** 11:9
**based** 10:16 11:4 17:20 21:24 26:20 36:15 41:10 47:5,20 48:11
**basically** 5:14 32:7
**basis** 6:14 16:1 36:6
**Beach** 1:1,17,18 1:23,23 2:11 55:3 56:3 57:18,18 58:4
**becoming** 14:13
**behalf** 2:2,8 26:10 27:12 28:24 39:13
**belief** 58:8
**believe** 22:6 25:3 32:25 39:1,4
**below-listed** 57:8
**beneficial** 46:6,7 47:4,13 48:6
**Bentley** 1:21 4:3 55:14 56:5,20 57:17 59:3
**best** 58:7
**better** 34:5
**bit** 4:20
**blacked** 27:25
**blank** 57:12

Consor & Associates
Reporting and Transcription, Inc.

**Blvd** 1:17,23
  57:18
**board** 16:12
**bottom** 57:13
**Brenda** 21:1,2
  21:18,20
**bring** 49:8,16
**brings** 7:18,21
  49:23
**brought** 49:12
**bulk** 15:18,19
**business** 51:13
  51:16,24 52:2
  52:4,11,19,21
  53:3,21

**C**

**C** 3:16 4:1 17:19
  17:21 20:11
  26:1,2 50:25
  56:1,1 58:1,1
**CA** 1:2 57:4
**call** 42:19 57:8
**calls** 47:7,16
  48:8
**case** 1:2 17:10
  32:18 35:11
  36:11 37:16
  38:15 41:13
  42:22 57:4
**catch** 18:22
**cause** 4:5
**Cc** 57:24
**certain** 14:7
  22:17
**certificate** 32:4
  55:1
**certification**
  56:14
**certify** 55:6 56:6
  56:9,11 58:5
**certifying** 49:20
  56:16
**chain** 10:19
**change** 18:8

34:13 59:7
**changed** 43:25
**changes** 59:6,20
**check** 11:21
  31:19
**checked** 10:11
**chose** 18:2
**chosen** 14:25
  15:2,6,7
**Chrisopher**
  57:24
**CHRISTOPH...**
  2:9
**Circle** 2:4
**CIRCUIT** 1:1,1
**claim** 36:4,7
**claiming** 33:5
**claims** 34:19
**classify** 28:9
**clear** 4:22
**Clerk** 57:12
**collecting** 27:10
**come** 9:9
**comes** 9:24
**coming** 41:1
**commenced**
  56:10
**Commission**
  55:15,16
**common** 18:19
  24:15 43:10
**commonplace**
  18:14
**communication**
  49:24 50:1
**communicatio...**
  34:17
**companies**
  23:19 38:20
**company** 14:12
  23:2 44:3
**company's**
  48:11
**compare** 38:8
**compensation**

7:5
**complaint** 34:9
  35:12,17,19
  36:11,12 37:16
**complete** 38:16
**completed** 22:22
  56:10
**completely** 36:1
**computer** 8:3
  11:5,12 41:11
  51:21,25
**concluded** 54:9
**conclusion** 47:8
  47:17 48:9
**conducted** 52:4
**connected** 56:13
**considered** 32:6
**consistent** 16:9
**Consor** 1:17,22
  57:9,17
**consult** 26:10
  31:1,7
**contact** 33:14,14
**contained** 58:7
**contributed**
  27:3
**control** 33:7,9
  41:17 42:20
  56:15
**conversations**
  33:24
**copies** 59:18
**copy** 17:15
  24:19 32:14,23
  34:8,10 35:17
  35:22 36:5,6
  36:18 37:15
  57:25
**Coral** 2:5
**corner** 17:18
**corporate** 29:23
  49:18
**corporation**
  5:10,24 9:1
  23:8 38:25

39:4,24 43:25
**correct** 7:3
  10:12 11:13
  12:20,25 13:3
  15:25 17:2,24
  18:13 21:9,25
  22:1 23:21,23
  24:9 27:11,23
  29:2,15,16,19
  31:15 32:10
  34:9 35:22
  36:12 37:6,9
  38:10 39:5,6
  40:9 42:11
  43:15,16,22
  44:8 46:24
  48:14,15 50:8
  51:14,25 52:4
  52:16 53:7,23
  53:25 54:1
  56:7 58:7
  59:20
**corrections** 58:9
**correspondence**
  42:3
**counsel** 56:12,12
**COUNTY** 1:1
  55:3 56:3 58:4
**couple** 38:9
**course** 7:20 52:3
  52:18
**court** 1:1,21 4:3
  4:7,23 46:25
  54:7 55:14
  56:5,20 57:12
  57:17
**CR** 59:3
**create** 12:12
  50:5
**created** 17:22
  51:2,17 53:15
  53:17,18,25
**creates** 12:2
  13:2
**creating** 30:11

**creation** 20:7
**CROSS** 3:5
  50:22
**current** 30:22
  31:13 46:6,12
**currently** 5:18
  8:23
**curriculum**
  49:15
**custodian** 27:19
**custodians**
  33:14
**custody** 33:6,9
  34:20 35:1
  41:16

**D**

**D** 3:2,16 4:1
  29:24 30:1
**daily** 6:14
**data** 11:9 41:11
**date** 18:3,4
  38:24 57:1
  59:22
**Dated** 55:8,10
  56:17 58:12
**day** 15:12 18:3
  18:15 19:21
  55:8,10 56:17
  58:12
**days** 15:8,11
**day-to-day** 27:9
**DD** 55:16
**December** 1:14
  55:8,10 56:17
  57:1,6
**declare** 59:19
**deeds** 6:16
**Defendant** 2:8
**Defendants** 1:11
**defendant's**
  3:15,15,16,16
  3:17,17,18,18
  3:19,19,20,20
  3:21,21 17:13

**Consor & Associates**
Reporting and Transcription, Inc.

24:22 26:2
30:1 32:1 33:1
37:1,12 38:4
40:18,21 41:6
44:16 46:2,15
49:3 50:25
51:10 52:7
**deliver** 13:17
**department** 6:6
13:12,13,21,22
20:18 33:24,25
34:4 35:7 44:6
**departments**
34:17 42:4
53:9
**DEPONENT**
59:24
**deponent's**
49:15
**deposition** 1:12
4:3,18 49:2
50:25 51:11
52:8 54:9 56:6
56:8,9,10 57:6
57:7,10 58:6
59:3,20
**destroyed** 34:10
35:23
**determine** 20:1
20:21 21:21
31:2 34:1,17
35:21 38:19,22
41:14
**determined**
20:11 35:14
**determines**
20:16 37:25
**difference** 5:5
**different** 8:8
23:19 25:19
28:9 33:15
**direct** 3:5 4:15
41:9 49:24
56:15
**direction** 12:1

56:16
**disagree** 25:4
**discovery** 26:1
**discrepancy**
48:2
**discussed** 47:11
**distributed**
59:18
**document** 6:8
6:16 8:2 16:21
17:22 18:12,15
21:8 26:6 30:4
32:13,14,19,22
33:11,22,22
34:2,16 36:4
37:18,20,22
39:7 40:24,25
41:4 42:16,20
45:4 50:2 51:1
51:5 52:9,11
52:15 53:16
**documentation**
9:19 28:21
47:12,20
**documents** 6:12
7:9,25 8:23
10:7,13 11:8
12:2,5,12,13
13:2 14:4,21
15:9,12,13,15
20:25 27:22
28:17 34:11,12
34:15 35:8
37:19 40:20
41:11,17,19,24
42:5 43:17
44:9,10 45:9
45:20 49:8,12
49:21,23 50:6
**Douglas** 1:8
57:3 59:2
**draft** 49:25
**drafts** 37:8
**dropped** 43:20
43:25

**duces** 49:2
**duly** 4:13 55:7
**duties** 7:25
44:10,22 45:8
45:16 50:7
**duty** 29:7,13
51:24

**E**

**E** 3:2,11,17 4:1
4:1 31:24 32:1
56:1,1 58:1,1
59:1,1,1
**earlier** 8:20
17:20 20:14
43:13 47:11,21
49:10
**easier** 7:14
23:18
**effort** 42:24
**efforts** 33:17,19
**either** 11:4
14:11 40:12
**Electronic** 15:22
23:6,10,15
25:1
**employed** 5:21
**employee** 14:10
56:12
**employees** 6:22
14:7 19:1
51:18,21
**endorsed** 38:15
**endorsement**
38:24 39:3
**endorsements**
38:9,13,16,18
40:1
**ensure** 12:25
29:7,18
**enter** 17:12
24:20 25:25
29:24 32:24
36:24 51:24
59:6

**entered** 46:23
51:20 52:22
53:5 59:20
**entities** 5:14,18
8:8,12,17
32:16 45:2
46:6,11
**entitled** 26:6
**entity** 8:6 9:12
20:16 23:16
24:1,1 25:19
29:8,15,18,20
48:6,7,21,22
**entries** 26:13
**equitable** 46:7
47:5,14
**errata** 58:9
59:18
**ESQ** 2:3,9
**essentially** 27:21
**estimate** 7:12,20
**EX** 3:15,15,16
3:16,17,17,18
3:18,19,19,20
3:20,21,21
**exact** 15:20
45:18
**exactly** 9:12
**EXAMINATI...**
4:15
**examined** 4:13
**example** 11:18
**exception** 58:8
**excuse** 18:8
34:14
**excused** 54:8
**execute** 6:13,14
7:1 8:1 11:9
12:2 13:15
14:4 15:5,9
16:24 20:2
24:16 28:24
29:14 33:21,23
36:3 39:12
42:5,23 43:17

50:6
**executed** 10:14
17:10 18:16
19:22 22:12
32:22 43:8,11
58:10
**executes** 12:5
**executing** 7:4,10
10:3 15:8
16:21 26:9
34:11 37:22
41:13,24 44:10
**execution** 6:8
34:2
**exhausted** 33:16
43:9
**Exhibit** 17:12,13
24:22 25:25
26:2 29:24
30:1 31:24
32:1,24 33:1
36:25 37:1,11
37:12 38:3,4
40:20,21 41:5
41:6 44:15,16
46:1,2 49:3,7
50:25 51:10
52:7
**ExhibitB** 24:21
**exhibits** 50:21
**exist** 5:18 24:16
**existed** 5:16
**expected** 21:14
**Expires** 55:15
**explain** 21:11
26:25 27:4
47:4 48:5
**e-mails** 42:3

**F**

**F** 3:17 32:24
33:1 52:7 56:1
58:1
**face** 10:10 21:9
21:13 23:6

Consora & Associates
Reporting and Transcription, Inc.

fact 35:22
facts 34:23
fair 30:8 31:12
    33:18,20 34:7
    47:13 48:19
    50:4
familiar 28:14
    28:15 32:13
    42:15 44:20,22
    48:24
Fannie 46:9
    47:4,23 48:22
far 7:10 24:11
    24:14 26:19
    42:8 43:3
fashion 27:7
    33:16
February 39:1
Federal 46:8
feel 49:16
feels 14:15
fees 14:13
fiduciary 29:7
FIFTEENTH
    1:1
file 9:11,14
    22:16 27:20
    57:25
filed 32:18 36:11
    37:15 38:14
    41:13 57:12
files 21:21 28:9
filing 22:22
    35:19 37:17
financially
    56:13
find 45:5
finishes 10:22
first 4:13 11:16
    24:19 26:13
    30:6,14 38:24
five 5:22,25 6:3
    15:10,11
Florida 1:1,18
    1:22,23 2:5,11

4:4 55:2,15
56:2,5 57:18
    58:3
follow 36:1 53:1
following 22:10
    36:8 38:18
follows 4:14
foreclose 9:21
    9:23 11:17
foreclosing
    20:16 21:22
foreclosure 6:5
    9:11,15,15
    20:15,17 22:17
    22:22 33:24
    34:2
foregoing 56:7
    56:14 58:5
form 8:10 11:6
    12:3,7 13:5
    15:1 17:23
    18:17 20:3
    21:10,15 22:2
    22:24 23:22
    29:9 31:4 32:9
    32:20 35:4,24
    36:9,19 39:15
    40:4,10 50:9
    59:20
formal 42:19
format 26:15
formats 26:17
formerly 5:16
forming 53:21
forth 27:10 56:9
forward 59:18
forwarded
    57:11
found 38:7 41:1
    43:11
Friday 57:9
front 19:23
fun 50:20
fund 27:3
further 21:11

53:11 56:9,11
—————
G
G 3:18 4:1 36:25
    37:1
Gables 2:5
general 35:7
generated 9:15
Ginnie 26:22
    47:12,22 48:22
give 4:8
given 7:14,24
    8:2 9:20 10:2
    11:16 15:16
    17:6 42:4 58:6
gives 32:15
giving 32:7
GMAC 1:3 4:17
    5:4,5,6,7,13,21
    5:23,24 6:17
    6:23 8:16,18
    8:21,23 9:16
    17:1,1 20:2
    21:13 22:20
    23:8 26:25
    27:1 28:8,16
    28:20,23 30:18
    32:4,16 38:22
    39:4,5 43:5,7
    43:14,17 45:1
    48:13,20,23
    49:19 51:13,17
    51:18,21 52:11
    52:15,23 53:3
    53:6,17,21
    57:3 59:2
GMAC's 52:3
    52:19,21
GMCA 5:10
go 12:23 32:5
    33:15 35:4
    49:1,11
goes 9:7 20:15
    42:25
going 15:21

35:16 37:4,11
41:9 44:12
48:4 49:1
50:24 52:5,6
Government
    26:22
guess 6:24 23:18
    36:24
—————
H
H 3:11,18 37:11
    37:12 59:1
hall 13:11
hand 13:19
    18:21
handed 19:22
    36:13
handles 34:2
head 4:21 24:14
headquarters
    17:4
Heather 18:24
hereinabove
    56:9,10
hold 16:8
holder 27:1
    52:16
honest 7:12 8:17
honestly 14:19
    24:10,17 45:3
    53:8
hours 57:8
hundred 7:17
—————
I
Ice 2:9
identification
    17:14 24:23
    26:3 30:2 32:2
    33:2 37:2,13
    38:5 40:22
    41:7 44:17
    46:3 49:4
identified 26:21
    46:9 47:12,22

identify 46:5,11
identifying
    47:23
IMMEL 2:9 3:6
    4:16 8:11 11:1
    11:7 12:4,9
    13:6 15:3
    17:12,15,17
    18:1,20 20:6
    21:12,16 22:3
    23:1,24 24:19
    24:24 25:6,8
    26:4 29:12,23
    30:3 31:6,11
    31:24 32:3,12
    32:21,24 33:4
    35:9 36:2,10
    36:22,24 37:3
    37:11,14 38:3
    38:6 39:19
    40:6,13,18,23
    41:5,8 42:1
    43:2 44:15,18
    45:14 46:1,4
    46:21,23 47:2
    47:10,19 48:10
    50:5 50:13,19
    52:24 53:13
    54:3,5
Immel,Esquire
    57:24
improperly
    14:16 41:16
indicating 24:7
    25:3
individual 21:20
individuals
    28:23
information 9:6
    9:9 11:3,8,11
    11:15,16 12:21
    12:24 13:1
    17:22 21:7,17
    26:14,16 41:12
    50:8 51:5,12

Consono & Associates
Reporting and Transcription, Inc.

51:17,20,22,25
52:2,10,14,18
52:21,22 53:15
**initial** 11:24
**initially** 44:5
**instance** 22:20
**instances** 48:17
**instructed** 9:21
**instruction** 42:4
**instructs** 9:22
**instrument** 43:8
**instruments**
  34:22 35:3
**interest** 24:8
  46:7,13 47:5
  47:14 48:6,7
**interested** 56:13
**interpretation**
  25:4,11
**interrogatories**
  44:13 48:5
**interrogatory**
  46:20
**interrupt** 10:21
**introduced**
  46:19
**investor** 26:21
  26:21,23 27:2
  27:4,12,16
  28:3,7 38:25
  39:23 47:13,21
  47:23
**investors** 23:7
  33:15
**involved** 33:19

_____ **J** _____

**J** 3:19 40:20,21
**Jamie** 1:21 4:3
  55:14 56:5,20
  57:17 59:3
**Jeffrey** 1:12 3:6
  3:7 4:12,18 5:2
  40:19 41:3,12
  50:22 53:12

55:6 57:2,22
58:19 59:3
**job** 13:24 14:6
  16:25,25
**Juan** 44:19
**JUDICIAL** 1:1
**junior** 32:8

_____ **K** _____

**K** 3:20 41:5,6
**keep** 4:20
**keeps** 20:25
**kept** 51:13 52:3
  52:11,18
**kind** 18:22
**know** 6:24 10:2
  14:8,11,17,19
  18:25 19:13,18
  19:25 23:4
  24:6,10,17
  25:23 27:18,25
  29:21 30:19
  31:16 32:10
  40:14 42:12,17
  43:12 44:19,20
  44:25 45:3,7
  45:12,15 51:7
  53:8
**knowledge** 9:11
  9:25 10:14,16
  11:4,19 21:7
  23:16 24:3
  27:6 34:20,22
  35:2,6 40:5,11
  40:15 47:18
  48:12,15 50:7
  51:1,4 52:22
  53:6 58:8
**Kwiatanowski**
  6:19
**K-W-I-A-T-A...**
  6:21

_____ **L** _____

**L** 3:20 44:15,16

**Lakes** 1:17,23
  57:18
**language** 24:16
**Lapin** 2:3
**large** 4:5 56:6
**late** 50:2
**Law** 20:10
**lawsuit** 22:23
**lead** 6:8 16:21
  21:1 34:2
**leader** 6:5
**Leading** 52:24
**left-hand** 17:18
**legal** 2:9 16:22
  46:12,12 47:8
  47:17 48:7,9
**Leichtling** 2:3
**lender** 25:12,13
  25:20,20 29:7
  39:2,13,14
**lenders** 25:17
**letter** 17:13
  24:22 26:2
  30:1 32:1 33:1
  37:1,12 38:4
  40:21 41:6
  44:16 46:2
  49:3 57:13
**letters** 42:3
**level** 14:9
**liability** 44:3
**lie** 47:14
**lien** 11:21 30:15
  30:20 31:14
**liens** 30:25 31:8
**limited** 8:18
  32:6,16 43:18
  44:3,13
**line** 24:6 59:7
**list** 49:8,20
**litigation** 44:23
  44:25 45:17
**little** 4:20
**LLC** 1:3 4:17
  5:4,5,6,7,13,21

6:23 8:21,24
  17:1,1 20:2
  21:14 23:8
  28:16 30:18
  32:4 38:22
  43:14,18 44:1
  44:4 45:1 57:3
  59:2
**loan** 23:20 27:10
  27:17 28:3,7,8
  30:15,21,23
  31:16 34:21
  35:3 46:16,17
  47:15 48:4,18
  48:18,21
**loaned** 27:13
**loans** 23:17,19
  48:13
**locate** 35:8
**located** 11:5
  33:13,14 57:9
**locations** 42:10
**long** 5:20 10:2
**longer** 5:18
**look** 46:10 47:3
  50:21
**lost** 32:19 33:22
  33:22 34:4,5
  34:10,12,18
  35:22 36:3,18
  37:4,22 42:8
  42:23 43:4,7,7
  43:10 45:8,20
  52:8,11,14
  53:24

_____ **M** _____

**M** 1:8 3:21 46:1
  46:2 57:3 59:2
**Mae** 26:22 46:9
  47:4,12,22,23
  48:22,22
**majority** 16:3
**making** 36:6
**March** 18:3,5

19:21 22:4,7,7
  22:12 23:8
**Margie** 6:19
**mark** 46:1
**marked** 17:13
  24:22 26:2
  30:1 32:1 33:1
  37:1,12 38:4
  40:21 41:5,6
  44:16 46:2
  49:3 50:25
  51:10 52:7
**Marshall** 17:19
  17:21 20:10
  22:15
**matter** 57:6
**MB** 1:2 57:4
**mean** 25:22
  26:13,18,23
  27:6,19
**means** 32:15
  56:15
**meetings** 16:13
**member** 19:10
  19:15 30:16,17
  30:22,24 31:13
  53:17
**members** 14:3
**mentioning**
  43:14
**MERS** 7:2,5,7
  8:13,15 16:7,8
  16:13,15,16,18
  16:19,24 17:3
  20:8 21:17
  22:20 23:19
  24:4,8,13 25:9
  26:1,10,10,23
  28:17,21,24,25
  29:3,14,18
  30:16,21,23
  31:1,7,17,22
  31:22 39:9,9
  39:10,13,23
  40:2,7 41:11

41:12,17,18,19
41:22 47:11,20
49:19,20
**Michelle** 1:8
57:3 59:2
**Min** 26:6
**mind** 4:21
**Minnesota**
42:14 45:5
**Mischaracteri...**
31:5
**mix** 15:13,14
**Monday** 57:9
**monies** 27:13,15
**month** 7:14,18
10:2
**mortgage** 1:3
4:17 5:6,10,23
6:15,23 8:16
8:24 14:21
15:5,22 17:1
17:10 20:2
21:13 22:9,12
23:5,6,7,8,10
23:15,21 24:5
24:20 25:1,1,9
26:9,22 27:1,9
27:20 28:10,11
28:16 29:8,19
30:15,18,21,23
31:16 32:4
34:21 35:3
38:22,23,25
39:4,12,17,22
39:23 40:8
41:13,24 43:18
43:21 45:1
46:8,16,17
48:4,13,20
51:11,13,18,18
51:21 52:15
53:15,17,21
57:3 59:2
**mortgagee**
20:21 21:8,14

23:11,25 24:25
25:10,14 30:21
40:3
**mortgages**
29:14 51:13
52:11
**move** 25:24

**N**

**N** 3:2,21 4:1
49:3
**name** 4:25 5:2,8
8:12 9:15,21
9:22 11:17,21
20:24 21:3,21
22:17,19 32:15
42:17,18,19,20
43:20,21 44:21
57:12
**named** 23:25
**naming** 30:21
**National** 26:22
46:8
**nature** 7:11
**nearest** 57:9
**necessary** 57:7
**need** 4:22 6:16
16:4 22:19
39:8
**needed** 6:15
9:12 11:17,25
34:18 49:16
**needs** 33:11
**negotiating**
30:12
**network** 11:12
12:25 22:15,16
31:18 34:16
37:8
**networks** 11:5
**Neu** 1:8,8 4:18
57:3 59:2
**never** 17:3 35:20
**new** 20:21 29:19
40:1

**newly** 38:7
**nod** 4:21
**nods** 24:14
**nominee** 23:7
25:12,15,22
29:15,18 39:13
39:23
**normally** 36:17
**notaries** 14:7
**notarize** 13:14
13:15,19 14:4
14:16,20 18:15
**notarized** 13:8,8
19:24
**notarizing** 13:25
**notary** 1:22 4:4
13:10,12,17
14:10,13,15,23
18:9,14,22
19:15 55:15
56:5
**notations** 58:9
**note** 24:1,5,9
27:21 28:11
33:8 34:4,8,10
35:11,18,21,23
36:5,12,14,18
37:5,15,22,25
37:25 38:7,14
38:19,23 39:18
40:1,8 42:8,13
42:23 43:4,7
43:10,11 44:13
45:5 46:8,13
46:15 47:5
52:16,23 53:5
53:6,24
**notes** 36:17 38:8
38:12 56:7
**note-holder**
30:22 31:14
**note-holders**
40:2
**notice** 24:25
37:16 49:2

57:5
**number** 3:13
7:19 15:20
27:25 28:1,4,8
28:9 57:8

**O**

**O** 4:1
**OATH** 55:1
**Object** 15:1 35:4
**objected** 41:15
**Objecting** 12:7
**objection** 8:10
11:6 12:3 13:5
17:23 18:17
20:3 21:10,15
22:2,24 23:22
29:9 31:4 32:9
32:20 35:24
36:9,19 39:15
40:4,10 41:10
42:25 47:7,16
48:8 50:9
52:24
**observation**
39:6
**observe** 38:11
**obtains** 11:3
**occurred** 34:6
42:24 43:4
**office** 13:8 20:10
35:15 42:15
57:8,9 59:18
**officer** 6:17 8:19
15:21 32:7,8
32:17
**officers** 43:18
49:20
**offices** 17:4,19
**Oh** 6:1 24:11
44:2
**okay** 5:3,9,11,13
5:20,23 6:1,7
6:10,18,22,25
7:9,21,24 8:4,8

8:14,20 9:1,6
9:18 10:1,6
11:11,23 12:16
12:21 13:7,13
13:21 14:6,9
14:15 15:7,11
15:15,21 16:7
16:12,23 17:3
17:9,11 18:2,7
18:11,14,21,24
19:10 20:7,17
20:20 21:4,23
22:4,21 23:5
23:13 24:11,15
24:18 25:14,19
25:22,24 26:16
26:20 27:5,8
27:15,19,24
28:3,10,15,19
28:23 29:3,6
29:22 30:14,20
31:7,12,20,23
32:13,18,22
33:5,18,21
34:3,8,19
35:10,16 36:15
37:10,21 38:2
38:12 39:25
40:7,14,17
41:2,21,23
42:2,21 43:10
43:13 44:2,5
44:22 45:4,7
45:11,20,24,25
46:15,18 47:20
48:2,13,17,20
49:1,14,18
50:4 51:9 52:6
52:14 53:10,20
53:24 54:2,7
**once** 33:10
34:15 35:14
37:24
**open** 33:12
**order** 22:19

Consor & Associates
Reporting and Transcription, Inc.

**ordering** 57:11
**ordinarily** 6:13
14:25
**organization**
27:2
**original** 29:7
32:19 33:11,22
34:12,21 35:3
35:19 36:4
39:2,13 52:8
52:11,14 53:4
57:11 59:18
**origination**
23:16
**oversee** 7:22
12:17
**owe** 29:6,17
**owner** 27:1
38:19 48:23
52:15,23 53:4
53:6
**owners** 40:2
46:6,12
**ownership**
44:13 48:4
**owns** 48:13

——————
**P**
**P** 4:1
**page** 3:13 24:20
26:5 37:17
59:7
**pages** 56:7
**paid** 16:7
**Palm** 1:1,17,18
1:23,23 2:11
55:3 56:3
57:18,18 58:4
**paragraph**
25:12 30:14,20
34:20 41:9
47:22
**paragraphs**
42:7 47:3
**part** 6:25 13:24

20:18 45:4
**partake** 42:9
**partially** 38:15
**particular** 29:15
29:18 35:10
**parties** 56:12
59:18
**party** 56:12
**passed** 24:1
**passing** 23:16
**pay** 14:12 27:17
**payments** 27:10
**penalty** 59:19
**Pennsylvania**
33:13
**people** 7:22,23
7:24 14:3
16:16 19:5
42:10,12 43:4
**percent** 9:16
11:19
**Perez** 1:8 57:3
59:2
**performing**
23:17
**perjury** 59:19
**person** 19:7
20:24 46:11
47:14
**personal** 10:14
11:4 34:20,22
35:2 49:17
53:5
**personally**
18:25 19:13,18
19:20,23 55:7
**persons** 46:5
51:17 52:22
53:5
**perspective**
16:25
**pertaining**
34:21 35:2
**physical** 22:8
**physically** 13:13

13:16
**place** 33:10 56:9
**plaintiff** 1:4 2:2
33:6,7 41:16
**plaintiff's** 33:7
45:24
**please** 4:25
46:11 57:5,8
59:18
**point** 9:13 11:24
21:23
**policy** 23:2
**pool** 27:24,25
**portion** 34:19
**position** 36:21
36:23
**possession** 1:9
27:20
**possible** 19:4,6
19:21 48:20,24
**prepare** 8:5
51:12 52:10
**prepared** 51:7
**preparing** 7:25
**present** 13:10,14
13:16
**presented** 10:7
15:16 47:21
49:19
**presently** 8:13
11:22 31:21
33:6
**president** 7:2,5
8:15 15:23
16:4,10,19,24
17:7 29:6 39:9
41:18
**presumes** 41:16
**presumption**
21:24
**previous** 38:10
**previously**
50:24 51:10
52:7
**primary** 50:5

**prior** 5:23 22:22
23:9 31:5
38:19 41:12,24
42:22
**privilege** 43:1
**proceed** 9:14
22:17,19
**process** 9:10,17
9:25 11:20
14:13,17 22:14
33:10
**processes** 38:1
**produced** 49:13
**production**
40:19 41:3
49:9,14
**promissory**
30:22 31:14
46:8,13 47:5
**proper** 22:19
29:8 41:14
**PROPERTY**
1:10
**protocols** 48:11
**provided** 36:15
49:9,18
**Public** 1:22 4:4
55:15 56:5
**pull** 22:18
**P.A** 2:9
**p.m** 1:14,14 57:9

——————
**Q**
**question** 10:23
12:8 20:5 25:5
25:7 29:11
52:13
**questions** 50:18
**quite** 30:9
**quote** 8:18 15:20

——————
**R**
**R** 4:1 56:1 58:1
59:1,1
**raise** 14:17

**randomly** 15:6,7
**read** 54:6 57:10
58:5 59:19
**really** 16:25
21:6 27:3,16
36:6
**reason** 22:11
59:7
**reasonable**
57:11
**receive** 7:5 42:2
49:24 50:1
**received** 16:20
26:1 27:15
**receives** 9:14
**recollect** 19:25
30:7
**recollection**
32:15
**record** 5:1 17:18
38:16 49:7
**records** 20:20
26:7,10 28:17
31:2 33:15
41:11 49:21
51:13,16 52:2
52:12,19,21
53:3,21
**RECROSS** 3:5
**REDIRECT** 3:5
53:12
**refer** 20:21
21:21
**referral** 9:13,16
9:24 20:15,15
20:17 44:6,6
**referred** 9:11
22:16
**refers** 28:1
**reflected** 28:12
**regarding** 40:19
41:3 53:3
**regards** 25:22
**register** 30:16
**registered** 30:16

30:23,24 31:2
31:17
**Registration**
15:22 23:7,10
23:15 25:2
**regularly** 52:3
**Reinhart** 18:24
**relate** 28:6
**relationship**
27:4
**relative** 56:12
**rely** 34:15
**relying** 12:24
13:3 31:18
49:13 53:21
**remained** 40:2
**renewal** 14:13
**rephrase** 22:10
35:25 38:21
52:25
**report** 6:18,19
16:15 56:6
**Reported** 1:21
**reporter** 1:21
4:4,7,23 46:25
54:7 55:14
56:5,16,20
57:17
**representative**
16:18
**representing**
37:8 42:22
**reproduction**
56:15
**request** 12:5
16:19 33:12
40:19 41:3,10
42:7 43:5 49:9
49:13
**requested** 49:8
**requesting**
34:16
**required** 13:7
**requirement**
14:6

**rerecorded** 24:2
**resolution** 29:23
49:19
**response** 41:2
**responsibilities**
6:7 7:1 13:24
14:1,2 16:8,23
45:19,21
**responsibility**
13:25 16:20
28:20,25 29:17
32:7 50:5
**return** 17:19
57:13
**returned** 50:3
**review** 8:2,6
34:11,13,14,15
35:13,21 36:17
37:24 38:12
41:23 44:9
50:14
**reviewed** 19:5
35:20 37:22
39:22 41:12
**reviews** 9:7
12:19
**Reynolds** 1:21
4:3 55:14 56:5
56:20 57:17
59:3
**right** 4:17 5:19
8:20 10:15,18
13:18,21,23
14:12 16:23
17:9 20:1 22:4
24:4,6,18 25:3
25:11,14 27:24
29:22 31:12
35:10 36:24
39:2,20 40:14
40:17 42:21
43:20 48:3
49:1,6 50:4,13
50:15 51:18
54:3,5

**role** 30:11
**round** 7:19

———————
**S**

**S** 1:9 3:11 4:1
59:1
**Sansbury's** 2:10
**saw** 30:6
**saying** 36:1 53:1
**says** 17:18 19:20
24:4,25 25:9
25:11,12 26:21
30:14 34:8
38:25 46:11
**schedule** 57:8
**scope** 52:3,19
**se** 8:5
**search** 34:6 42:8
42:9,16 43:3
**searched** 42:10
42:13
**searches** 34:4
45:8
**searching** 45:20
**second** 10:22
16:5 26:5 37:4
50:14
**secretary** 8:16
15:24 16:5,15
17:7 32:5
**securitized**
28:11,12
**see** 22:18 24:6
38:8,24 39:3,7
49:11
**seen** 9:3 26:7,14
26:16 30:4
36:4 37:18,19
37:19 38:13
40:24,25
**senior** 44:23,25
45:17
**sent** 12:13
**service** 6:11
48:18

**servicer** 27:4,8
48:21,23
**servicers** 27:16
**services** 48:14
**set** 22:14 46:20
56:9,10
**sets** 34:19
**sheet** 58:9 59:18
**shorthand** 56:7
**show** 35:17
50:24 51:9
52:6
**shown** 30:24
**sic** 13:14
**sign** 7:10 8:1,8
8:12,13,16,23
15:23 16:1,3
31:22 32:16
57:7,10,12
**signature** 6:17
9:4 16:5 18:11
32:23 33:3
37:5 57:7,12
57:20,23 59:24
**signed** 10:1 33:5
38:25 59:18
**signing** 8:7,19
10:4 15:21
32:6,17 43:18
**simply** 4:21
12:19
**situation** 38:14
**SNE** 41:14
**sole** 13:25
**somebody** 45:7
45:8
**sorry** 10:20,24
22:7,13 30:7
38:21 39:10
50:19
**speak** 20:18
**specific** 15:11
35:5 50:7
53:16
**spell** 6:20

**spelled** 21:5
**spend** 10:3 15:8
**Staehle** 21:3,19
21:20
**stands** 44:4
**start** 39:10
**state** 1:22 4:4,25
55:2,15 56:2,5
58:3
**stated** 8:20 9:19
20:14 24:8
31:1 34:23
39:16 43:19
49:21
**statement** 10:12
32:11 34:7
48:16,19
**statements**
17:20 58:6
**states** 39:22
45:17
**stating** 9:12
11:18
**Ste** 1:17
**stenotype** 56:6
**Stephan** 1:12
3:6,7 4:12,18
5:2 40:20 41:3
41:12 50:22
53:12 55:7
57:2,22 58:19
59:3
**stored** 11:9
**subject** 1:9
59:20
**substance** 59:20
**substantial**
34:10 35:17,22
36:6 42:23
43:3
**successors** 25:13
25:20
**Suite** 1:23 2:4
2:10 57:18
**summary** 26:6

Consolo & Associates
Reporting and Transcription, Inc.

28:13
**supplying** 9:16
**supposed** 22:21
27:8
**sure** 4:19 5:12
6:25 9:17
10:22,24 11:19
14:20 20:4
24:18 26:25
30:8 36:17
43:13 45:18
53:1
**Susan** 19:15
**swear** 4:7
**sworn** 4:13 55:8
**system** 9:7 12:23
28:25 29:4
30:23 31:7,17
33:12 41:11,17
41:19 49:20
51:21,25
**systems** 8:3
15:22 23:7,10
25:2
**S-T-A-E-H-L-E**
21:3

---

**T**

**T** 3:11 56:1,1
58:1,1 59:1,1
**take** 10:10 21:8
21:13 27:8
57:5
**taken** 4:3 5:14
56:9 59:4
**team** 6:5,8 7:18
7:21,23 9:7
10:7,11 11:3
11:12,15 12:1
12:5,11,16
13:20 14:3
15:16 16:21
19:2,11,16
21:1,21,24
34:2 42:14,17

42:18 43:5
45:4 49:23
**teams** 43:5
**tecum** 49:2
**tell** 18:4 21:6
26:12
**ten** 15:17
**TENANT** 1:9
**testified** 4:14
**testimony** 4:8
31:5
**Thank** 17:16
50:17 54:5
**thing** 4:20 43:19
**things** 4:19 7:11
15:5 21:25
25:20 47:25
**think** 5:7 21:5
44:19 46:25
50:13,15,15
**Thursday** 1:14
57:5
**time** 15:17,17,17
16:3 19:23
26:13 30:6
33:6,12 40:8
48:5 51:22
56:9 57:6,11
**times** 16:4
**title** 6:4 11:21
16:9 17:6
22:18,18 31:19
31:21
**today** 49:12
50:16
**top** 17:18
**tough** 7:12 10:5
**training** 7:7
**transcript** 56:14
57:24 59:6
**transcription**
56:7
**transfer** 6:11
22:8 23:18
**transferred**

29:19 40:1,9
**transfers** 23:6
**traveling** 50:17
**true** 11:2 34:9
35:22 36:18
56:7 58:7
59:20
**truly** 57:14
**truth** 4:8,9,9
**try** 35:7
**trying** 5:7
**turn** 26:5 44:12
49:7
**Turner** 19:15
**two** 38:8,12
47:25
**type** 6:12,15,16
8:6 11:18 14:9
14:10 15:12
16:6 26:14,16
38:13 50:1
**types** 15:12
**typically** 14:10
18:21
**Tyra** 19:7,10

---

**U**

**Uh-huh** 8:22
10:9 12:18
18:23 25:16
**ultimately** 8:1
**underlying** 50:7
**undersigned**
55:6
**understand** 12:8
12:10,11 20:4
26:18 28:5
29:10 35:6
43:3 52:13
**understanding**
26:20 34:5
37:7 40:7 47:6
47:24
**unit** 6:9,11 9:13
9:24 20:15,17

33:13
**UNKNOWN**
1:9
**update** 28:21,25
**updated** 29:4
**use** 5:8 9:10

---

**V**

**vague** 41:15
**value** 10:10 21:9
21:13
**various** 15:9
28:23 43:4
**verify** 11:21
12:21,23 31:21
**versus** 4:18 16:2
17:7
**vice** 7:1,4 8:15
15:23 16:3,9
16:19,24 17:7
29:6 39:9
41:18
**vitae** 49:15
**vs** 1:6 57:3 59:2

---

**W**

**wait** 13:19
**waive** 57:7,12
57:20,23
**want** 10:22
**wanted** 49:11
**Watson** 17:19
17:21 20:11
22:15
**way** 2:10 4:23
21:5 27:3
35:12 39:21
**week** 7:10 15:8
**weren't** 19:23
**West** 1:18,23
2:11 57:18
**we've** 9:3 39:22
**Wilks** 19:8
**William** 1:8
57:3 59:2

**Wilson** 19:9,10
**wish** 57:12
**Witness** 3:5 4:10
10:24 17:16,24
18:18 20:4
21:11 23:23
24:14 29:10
32:10 33:3
35:5,25 36:8
36:20 39:16
40:5,11 45:13
47:9,18 50:11
52:25 54:8
**witnesses** 14:25
15:4,5 18:24
**word** 5:7,12
26:23
**work** 5:3 11:20
27:7 41:22
43:14 53:8
**worker** 53:17
**works** 45:2
**wouldn't** 10:13
23:20 37:21
40:5,11 45:21
**WRITE** 59:6

---

**X**

**X** 3:2,11

---

**Y**

**Yeah** 50:19
**years** 5:22,25
6:3

---

**0**

**040805XXXX**
1:2 57:4

---

**1**

**1** 34:20
**1:00** 1:14
**10** 1:14
**10th** 55:8 57:5
**10,000** 7:19,21

10:1
**100** 9:16 11:19
**104** 2:10
**12/10/09** 59:4
**13** 7:23
**1655** 1:17,23
  57:18
**17** 3:15
**1975** 2:10

---

**2**

**2** 30:20 47:3
**2:30** 1:14
**2002** 39:1
**2008** 1:2 57:4
**2009** 1:14 18:3
  22:4,7,12,13
  23:8 55:8,10
  56:17 57:1,6
  58:13
**22nd** 55:10
  56:17
**225** 2:4
**24** 3:15
**26** 3:16
**27th** 39:1

---

**3**

**3** 46:11 47:3
**3rd** 18:5,9 19:22
  22:6,7,7,13
  23:8
**30** 3:16
**305** 2:5
**31** 57:1
**32** 3:17
**33** 3:17
**33134** 2:5
**33401** 1:18,23
  57:18
**33411** 2:11
**37** 3:18,18
**38** 3:19

---

**4**

**4** 3:6
**4th** 18:3,10
  19:21
**4:30** 57:9
**40** 3:19
**41** 3:20
**44** 3:20
**453053** 55:16
**46** 3:21
**49** 3:21

---

**5**

**5** 41:9 47:22
**5th** 18:5,6 22:4
  22:12
**50** 1:2 57:4
**500** 1:17,23 7:17
  57:18
**51** 3:8
**54** 3:6
**561** 2:11
**561)682-0905**
  1:24
**569-4100** 2:5

---

**7**

**7** 42:7
**7/20/2013** 55:15
**798-5658** 2:11

---

**8**

**800** 2:4

---

**9**

**9:00** 57:9

**EXHIBIT 6**

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT, IN AND FOR DUVAL
COUNTY, FLORIDA

CASE NUMBER: 16-2004-CA-4835-XXXX-MA
DIVISION: CV-E

TCIF REO2, LLC,

       Plaintiff,

v.

MARTIN L. LEIBOWITZ, AS TRUSTEE,
etc., et al.,

       Defendants.

_____/



### MOTION FOR SANCTIONS FOR FRAUD UPON THE COURT

COME NOW, Defendants Robert and Lillian Jackson, by and through their undersigned

counsel, and pursuant to Rule 1.140, Florida Rules of Civil Procedure,  hereby move the Court to

enter sanctions against the Plaintiff, including Dismissal of the pending matter with prejudice and

such other sanctions as the Court deems appropriate.  In support of this Motion, Defendants

would state as follows:

    1.    On or about August 6, 2004, Plaintiff filed a Motion for Summary Judgment with

this Court.  In support of the Motion for Summary Judgment, Plaintiff contemporaneously filed

an Affidavit of Indebtedness signed and subscribed by Margie Kwiatanowski, a "Limited Signing

Officer" with GMAC Mortgage Corporation ("GMAC"), the servicing agent for Plaintiff.

Plaintiff filed subsequent Amended Motions for Summary Judgment on March 10, 2005 and

November 3, 2005, and again filed Affidavits of Indebtedness signed and subscribed by Ms.

Kwiatanowski, as a Limited Signing Officer.

2.      The Affidavits of Indebtedness contains Ms. Kwiatanowski's statements,

allegedly under oath, on behalf of GMAC, that she:

(a) has "personal knowledge of the status of all mortgages and notes owned and

held by said corporation." (Affidavit, paragraph 1).

(b) has "examined the relevant loan documents and the Complaint, and each

allegation of the Complaint is correct." (Affidavit, paragraph 2).

(c) is familiar with the loan payment records, which are regularly compiled and

maintained as business records: "These records properly reflect loan payments, charges, and

advances that are noted in the records at the time of the applicable transactions by persons whose

regular duties include recording this information." (Affidavit, paragraph 3).

(d) swore and subscribed to the statements before a Notary.

3.      The Affidavits additionally detail the alleged facts as the status of the mortgage,

including the material dates, the amount owed and the fees and charges.

4.      Ms. Kwiatanowski was deposed at GMAC's facility in Horsham, Pennsylvania,

on January 31, 2006.  See, Notice of Deposition, attached hereto as Exhibit "A" and incorporated

by reference.  During the deposition, Ms. Kwiatanowski admitted the above statements under

oath were false:

**(a) has "personal knowledge of the status of all mortgages and notes owned**

**and held by said corporation." (Affidavit, paragraph 1).**

Ms. Kwiatanowski admitted that, while she can *access* other loan documents, the

statement regarding personal knowledge was false:

2

Q.    All right. Let me ask you to go to the Amended Affidavit, which is Jackson 00006. And we'll start with page - - I'm sorry, paragraph 1.

It states that you're a limited signing officer and that you have personal knowledge of the status of all mortgages and notes owned and held by said corporation.

Do you see that?

A.    Yes, I do.

Q.    How is that true?

A.    Well, generally, I understand what a note and a mortgage is, and how - - how the loan is originated.

Q.    Right. But this says you have personal knowledge of the status of all mortgages owned and held by said corporation; corporation being TCIF RE02, LLC?

A.    Well, actually, we're the servicing agent for them. We would not have originated the loan.

I'm not quite sure how to answer your question, though.

Q.    Well, how is it that you have personal knowledge of the status of all mortgages serviced by GMAC for this claimant?

A.    Again, I'm not - - I don't know.

**Q.    Do you have personal knowledge of the status of all mortgages and notes serviced by GMAC for this claimant?**

**A.    No, I do not.**

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 30 line 9 - p. 31 line 15) (emphasis added)

**(b) has "examined the relevant loan documents and the Complaint, and each allegation of the Complaint is correct." (Affidavit, paragraph 2).**

3

Ms. Kwiatanowski testified she reviewed only a single computer screen prepared by someone else.  She did not review <u>any</u> loan documents, much less the "relevant" ones, and did not read the Complaint:

> Q.    Now, paragraph 2 - - and I'm just jumping ahead to your affidavit.  But your affidavits, as you may be familiar, referenced the fact that you reviewed certain things in order to sign the affidavits?
>
> A.    That's correct.
>
> Q.    Okay.  The records in paragraph 2 that are requested are: Any and all documents, electronic memoranda, policy manuals, servicing manuals, or other items of any kind reviewed in preparation for completion of the Affidavit of Indebtedness dated July 15, 2004, and Amended Affidavit of Indebtedness dated October 20, 2005.  And your affidavits are then attached after this.
>
> But my next question is: Is there anything other than what's sitting to your left, that you recall reviewing in order to prepare the two affidavits?
>
> A.    I would have - - excuse me, I"m sorry.  I would have reviewed a screen in our system that populates what the total indebtedness is.  And I don't believe a copy of that screen is within this pile.
>
> Q.    Okay.  Are you saying that you reviewed a single screen?
>
> A.    Yes.
>
> Q.    And when I'm picturing a screen, I'm picturing a single page of information; or is there more than one page of information that appears on your screen?
>
> A.    There is one page of information.
>
> Q.    What is that page of information called?
>
> A.    It's called the foreclosure work screen.

4

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 19 line 13 - p. 20 line 24)

\*          \*          \*

Q.      Okay.  Did you review the payment history separately?

A.      I would have no reason to review it separately.

Q.      Okay.  In other words, you did not review the payment history before completing your affidavit?

A.      That's correct.

Q.      Would you have reviewed the actual note of mortgage before completing your affidavit?

A.      No, I would not have.

Q.      Would you have reviewed any of the customer history log, the document, the discussions back and forth between the mortgagors and the servicing company?

A.      No, I would not have.

**Q.      Is it fair to say, then, that in completing an affidavit such as the ones we have attached as Bates stamped Jackson 3 through 5, and Jackson 6 through 8, that you would have reviewed one computer screen called the foreclosure work screen?**

**A.      That's correct.**

Q.      And nothing else?

A.      That's correct.

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 22 line 16 - p. 23 line 17) (emphasis added)

5

*          *          *

Q.      Paragraph 2, it says: I have examined the relevant loan documents and the Complaint, and each allegation of the Complaint is correct.

Is the Complaint part of the foreclosure work screen?

A.      No, it is not.

Q.      Would you have actually read the Complaint before signing the Amended Affidavit of Indebtedness?

A.      No, I would not.  I could have reviewed it because generally they are downloaded in a system that we have linked to our attorneys.

Q.      Scanned?

A.      Yes.  Imaged.

Q.      Imaged?

A.      Um-hmm.

Q.      Do you know whether it's general practice to bring up the image of the Complaint when you're reviewing the foreclosure work screen?

A.      No, I would not.

Q.      So typically you would not examine the Complaint before signing the affidavit?

A.      That's correct.

Q.      We've already covered that you review the foreclosure work screen.

What are the "relevant loan documents" that are referenced in paragraph 2?

6

A.    I would think that they would have been anything that is
supplied to the foreclosing attorney; it would be the mortgage, the
note, the title policy.

Q.    **And did you review the relevant loan documents**
**consisting of the mortgage and the note and the title policy**
**before signing the Amended Affidavit of Indebtedness?**

A.    **No, I did not.**

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 31 line 16 - p. 33
line 6) (emphasis added)

**(c)  "These records properly reflect loan payments, charges, and advances that**

**are noted in the records at the time of the applicable transactions by persons whose regular**

**duties include recording this information." (Affidavit, paragraph 3).**

Ms. Kwiatanowski admitted that she had <u>no knowledge</u> of whether the

information kept was recorded "at the time of the applicable transaction by persons whose

regular duties include recording this information," and simply relies on the "system" without

having any idea how or whether the "system" confirms entries are made accurately and timely:

Q.    Do you agree that that sentence, the last sentence of
paragraph 3 of your affidavit, indicates that the entries are made at
the time of the transactions?

A.    Yes, I do.

Q.    Okay.  So then, let me step back and re-ask the question.
How is the system set up to confirm that those entries are made
accurately and timely?

A.    I wouldn't be able to answer that.
That's not my area of expertise.

Q.    Well, you swore to this affidavit.

A.    Well –

7

Q.      You swore to the truth of the fact that the history is noted in
the record at the time of the transaction.

How do you know that to be true?

A.      Because I – I have to rely on our system of record.

Q.      Right.  I agree that it's set up for you to rely on that, but
that's not what this says.  It says you're swearing to the fact that
that record is accurate and timely.

A.      I just would have to have confidence in my system that it is
true and correct.

Q.      Okay.  Is there any – let me go back to my hypothetical that
I asked you, where a mortgagor has a conversation with a loan
specialist or work-out specialist, or whatever their title is, and
reaches some sort of payment plan.  Okay?

A.      Okay.

Q.      How is the system set up to confirm, number one, that that
conversation is entered that day, for example, versus an employee
taking a note and entering it a week later when they come back
from vacation; and now is it set up to confirm that the data is
entered accurately, that the employee has the payment numbers and
times of payment and method of payment entered accurately?

A.      I wouldn't be able to answer that because that's not in my
unit.

Q.      As part of your unit, have you ever gone back to confirm
how you can swear to the truth of this sentence?

A.      There are times when I might have to review a loan as far
as conversations, if a borrower was disputing something.  There
would be those times that I would review the notes and the account
at that point.

But in – in this particular affidavit, I had no reason to go back to review anything.

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 34 line 13 - p. 36
line 20)

8

The record in the instant case demonstrates why some minimal scrutiny (as otherwise sworn to in the subject Affidavits, but never actually completed by the Affiant) would be necessary:

Q.    And is it fair to say that as of November 25, 2003, the Jacksons were completely paid up with GMAC, according to that entry?

A.    I would – I would have to confirm that by looking at the payment history.

Q.    Well, tell me what else that entry would mean; in other words, why would that entry be made in the comment history if the payment history didn't reflect it as true?

A.    Well, as it should, it should agree. I don't – I'm not disputing that. But my feeling would be I would look to see how the payments were applied, to see if they were applied correctly, if I had a reason to review this account.

Q.    Which you did not?

A.    That's correct.

Q.    Well, isn't it fair to say that your affidavit indicates that the payment due February 1, 2004, is the one that placed this loan in default, correct?

A.    That's correct.

Q.    And that would be a payment due for December, a payment due for January, and a payment due for February of '04, correct?

A.    That's correct.

Q.    Did you ever go back to confirm whether those were the payments that threw this loan into default?

A.    I would only know what the due date is in the system.

9

Q.    Just based on what the foreclosure work screen says?

A.    That's correct.

Q.    Would you know who the person – because I want to be fair, now that I have an understanding of your role in this.

Would you know who the person would be who would be most familiar with the entries on the comment history that we're going over right now?

A.    I don't think I could give you a specific person, no.

Q.    Okay.  If I told you that Mr. and Mrs. Jackson have canceled checks showing payments cashed by GMAC on January 5th of '04 and February 14, of '04, you have no explanation for that; that's not your role in reviewing this?

A.    That's correct.  That's something payment research would handle.

Q.    Okay.  With regard to whether the payments were accurately allotted to principal and interest as opposed to paid from suspense or pay to suspense, that would not be your role?

A.    That's correct.

Q.    Allotting the payments accurately is not your role?

A.    That's correct.

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 49 line 10 - p. 51 line 21)

Unfortunately, while the Affidavit reflecting sworn testimony to the Court

indicates the Affiant has conducted a complete review of the file, GMAC's system is designed so

that other departments within GMAC are responsible for reviewing the data:

Q.    All right.  Ms. Kwiatanowski, let me ask you this: Is there any reason or any way in the system that is set up within GMAC for the foreclosure work screen to indicate any problems or issues or disputes prior to the day you review it?

A.    No.

10

Q.      If there are comments in the – I forget what we called them – the comment history, if there are comments here that note, for example, that the borrower is having problems trying to get someone to resolve escrow and payment applications issues, if there are comments that say Account escrow payment may not be correct, sent for explanation, that type of thing, are any of those – or do any of those result in any sort of flags that get to the foreclosure work screen?

A.      If there were any reason, if there was a dispute prior to a loan being referred, they would put what we call a CIT on the loan; that would prevent it from being referred while it was being researched.

Q.      Okay.  And I do see that, the listing for CIT, throughout this history.

What then, stops that CIT trigger and sends it on to your department, or stops the CIT hold and then sends it on to your department?

A.      I believe there's -- I believe there's two different CITs for different lengths of time to keep it on hold.  I believe – and also it would fall into someone's queue to see whether or not that should be removed prior to removing it; to see, for example, to see if the research has been completed.  And if it has been and they find no error of GMAC's, then they would remove that CIT and that would move forward to foreclosure.

Q.      Okay.  Which department conducts that analysis –

A.      It would –

Q.      – is it done before it gets to your department or your unit?

A.      Yes.

Q.      Okay.  How's that get done?

A.      It would be through customer service.   It would really depend on what the issue was as to what unit would be handling it.

11

Q.     Okay.  Well, for example, here we have – and I'm just summarizing this, and just because I think it is accurate – but there are entries here throughout with regard to a dispute in how the payments are being applied; you know, one notation here made by a GMAC individual that the account escrow payment may not be correct, sent for explanation.

How can you – or can you tell from that which unit is handling the review?

A.     No, I cannot.

Q.     What are the names of the units that do the reviews; you said there were two?

A.     Well, there's a payment – there's payment research. There's an escrow unit if it were a dispute with taxes or insurance, they would need to review it.  For an MI issue, that area would review it.  It would all depend on the issue –

Q.     Okay.

A.     – who would be researching it.

Q.     Is there a way to tell from the comment histories which units resolve the dispute?

A.     It would show by that teller number on there who the associate was.

Q.     Okay.

A.     And then you would know from there what unit they would come from.

Q.     And again, that gets done on the DocTrac – I'm sorry.

A.     The XNet.

Q.     XNet?

A.     Preconversion, on the XNet.

Q.     Okay.

A.     Postconversion, we can do it right on our system.

12

Q.    Is there a review process to make sure that the conclusion is accurate?

A.    I wouldn't be able to answer that.

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 58 line 7 - p. 61 line 24)

### (d) swore and subscribed to the statements before a Notary.

Finally, Ms. Kwiatanowski admitted at the deposition she did not sign the

Affidavits in front of a notary, but that it was "our" regular practice for the Affidavits to be

placed in a folder and sent across the building to be signed by the notary, sometimes on another

day:

Q.    On Ms. Holmes' notary section, do you see there that she does not fill out the name of the person who is taking the oath?

A.    I see that now, yes.

Q.    And do you see that she also does not have a notary stamp?

A.    I see that also, yes.

Q.    Are you familiar with Pennsylvania's notary statute?

A.    I realize that they have to have a stamp to notarize.

Q.    And that both of those are violations of Pennsylvania's notary statute?

A.    I would think so, yes.

Q.    How is it that you and Ms. Holmes ended up in the same place at the same time for completion of the affidavit, how does that physically work?

A.    Well, all documents that we sign already sworn in, she would hand me personally.  So she would just sign off – she would notarize it after I signed off.

Q.    Are you two in the same room when that's done?

13

A.      Yes.

Q.      Okay. How is that physically done, is what I am asking?

A.      We would – anything that I would sign over to – anything I would sign off, I would give to her to notarize.

**Q.      Okay. And how – again, how is that physically done; do you and she meet in the same room, at the same time in the same place?**

**A.      She is in the same building. I – I would leave – it could be more than just one affidavit in a folder and I waited for her to notarize.**

Q.      Okay. But by then, I'm taking it that she notarizes it at a different time than you sign it?

A.      That's correct.

Q.      Okay. Is that also true for the signature on Jackson 00008?

A.      Yes, that's correct.

Q.      And that appears to be a Brenda Staehle?

A.      Brenda Staehle.

Q.      Staerle, S-T-A-E-R-L-E.

A.      Actually it's S-T-A-E-H-L-E.

Q.      Okay. Thank you.

And she does indicate that you are the person swearing, and she does have her notary stamp here. But what you're indicating is you signed the document –

**For example, the Amended Affidavit of Indebtedness, which is 6 through 8 on our Bates stamp, you sign the document, you put it in a folder, it gets routed to Ms. Staehle and then she signs it at a later time?**

**A.      That's correct.**

Q.      Do you know if she signs it on the same day that you do?

14

A.    Generally, yes, she would.

Q.    How do you know that, what's the control for that?

A.    Because they would try to complete something within the same day; as we have our guidelines to follow and our time frames to get it back to the processor, to supply it back to the attorney.

**Q.    Okay.  But there's no doubt that she doesn't notarize it – or she doesn't witness your signing?**

**She does not witness or did not witness you placing your signature on Bates stamp 8; is that correct?**

A.    **That's correct.**

Deposition of Margie Kwiatanowski, taken January 31, 2006 (p. 27 line 4 - p. 30 line 8) (emphasis added)

Clearly, the notary statutes of both Pennsylvania (57 P.S. 158) and Florida (Section 117.05, Florida Statutes) are violated by the process used by GMAC in the instant case (and in all other cases, given the procedure outlined by Ms. Kwiatanowski.)  Violation of Florida's notary statutes in the manner described (notarizing a signature if the person whose signature is being notarized is not in the presence of the notary at the time) constitutes malfeasance and misfeasance in the conduct of official duties, pursuant to Section 117.107(9), Florida Statutes.  Under Pennsylvania law, when a notary certifies a document, the notary attests that the document has been executed, that the notary *was confronted by the signor*, that the signor is the person whose name is subscribed, and that the notary is *verifying the date of execution*.  In Re Fisher, 320 B.R. 52, at 63 (E.D. Penn. 2005) (emphasis added.)

5.    As referenced above, the Affidavits of Indebtedness filed by GMAC in furtherance of the foreclosure constitute sworn testimony to this Court in validation of the debt and GMAC's right to collect the debt.  Unfortunately, the Affidavits are rife with falsehoods and misstatements; GMAC's system does not allow the Affiant (or her entire department, for that

15

matter) any opportunity to review the actual history of the loan or any of the loan document, as

the Affidavit otherwise maintains to the Court. Defendants assert the filing of such false sworn

testimony is a fraud upon this Court.

6.      It is appropriate for the trial court to dismiss an action based on fraud,

provided that there is a blatant showing of "fraud, pretense, collusion, or other similar

wrongdoing." Distefano v. State Farm Mutual Automobile Ins. Co., 846 So. 2d 572, 574 (Fla. 1st

DCA 2003).

7.      Misrepresentations in the Affidavit are willful fraud, interfering with the

Court's "ability to impartially adjudicate a matter by improperly influencing the trier of fact or

unfairly hampering the presentation of the opposing party's claim or defense."Id.

8.      This Court should dismiss the pending action with prejudice and award such other

relief as the Court deems just and appropriate.

WHEREFORE, Defendants Robert and Lillian Jackson, respectfully request this Court

enter sanctions against Plaintiff, including entry of a Dismissal with Prejudice and such other

relief as the Court deems just and appropriate.

DATED at Jacksonville, Duval County, Florida, this ___3___ day of March, 2006.

**LAW OFFICES OF TROMBERG
& KOWALSKI**


Fred Tromberg, Esquire (FBN 246514)
James A. Kowalski, Jr., Esquire (FBN: 852740)
Charlie F. Schmitt (FBN: 0012803)
4925 Beach Boulevard
Jacksonville, FL 32207
Telephone: (904) 396-5321
Facsimile: (904) 396-5730
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail this ___3___ day of March, 2006, to Diana B. Matson, Esq., 2691 East Oakland Park, Suite 303, Ft. Lauderdale, FL 33306.

_____

James A. Kowalski, Jr., Esquire

**EXHIBIT "A"**

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT, IN AND FOR DUVAL
COUNTY, FLORIDA

CASE NUMBER: 16-2004-CA-4835-XXXX-MA

DIVISION: CV-E

TCIF REO2, LLC,

      Plaintiff,

v.

MARTIN L. LEIBOWITZ, AS TRUSTEE ,
etc., et al.,

      Defendants.

_____/

## NOTICE OF DEPOSITION
## OF MARGIE KWIATANOWSKI WITH REQUEST
## TO PRODUCE DOCUMENTS AT DEPOSITION
## (BY VIDEOTAPE RECORDING)

TO:   Diana B. Matson, Esq.
      2691 East Oakland Park Blvd.
      Suite 303
      Fort Lauderdale, FL 32306

PLEASE TAKE NOTICE that on **Tuesday, January 31, 2005, at 12:30 p.m. and**

**continuing thereafter until complete,** at 500 Enterprise Road, Horsham, Pennsylvania, 19044, the

Defendants, Robert Jackson and Lillian Jackson, will take the videotaped deposition of the

following:

### MARGIE KWIATANOWSKI

upon oral and video examination pursuant to the Florida Rules of Civil Procedure before Esquire

Deposition Services, or before some other officer authorized by law to take depositions. Said

deposition is being taken for the purpose of discovery, for use at trial, or both.

At the date, time and place of the deposition, the witness shall have with her the following:

1.     All books, records, and documents kept or maintained by Plaintiff and or its agents or employees which relate in any way to Robert and Lillian Jackson.

2.     Any and all documents, electronic memoranda, policy manuals, servicing manuals, or other items of any kind reviewed in preparation for completion of that certain Affidavit of Indebtedness dated July 15, 2004 and Amended Affidavit of Indebtedness dated October 20, 2005, copies of which are attached hereto.

DATED, at Jacksonville, Duval County, Florida, this _8_ day of December, 2005.

> LAW OFFICES OF TROMBERG & KOWALSKI
>
> Fred Tromberg, Esquire (FBN: 246514)
> James A. Kowalski, Jr., Esquire (FBN: 852740)
> Charlie F. Schmitt, Esquire (FBN: 12803)
> 4925 Beach Boulevard
> Jacksonville, FL 32207
> Telephone: (904) 396-5321
> Facsimile: (904) 396-5730
> Counsel for Defendants Robert and Lillian Jackson

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail delivery, this _____ day of December, 2005, to Diana B. Matson, Esq., 2691 East Oakland Park, Suite 303, Ft. Lauderdale, FL 33306.

> James A. Kowalski, Jr., Esquire

cc:    Esquire Deposition Services
       1600 JFK Boulevard, Suite 1210
       Philadelphia, PA 19103

2

STATE OF FLORIDA
DUVAL COUNTY
I, THE UNDERSIGNED Clerk of the Circuit Court, Duval County
Florida, DO HEREBY CERTIFY the within and foregoing is a true
and correct copy of the original as it appears on record and fil
in the office of the Clerk of Circuit Court of Duval County, Florida
WITNESS my hand and seal of Clerk of Circuit Court at
Jacksonville, Florida, this ___ day of _____ A.D. 20__
JIM FULLER
Clerk, Circuit and County Court
Duval County, Florida
By _____
Deputy Clerk

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT, IN AND FOR DUVAL
COUNTY, FLORIDA

CASE NUMBER: 16-2004-CA-4835-XXXX-MA

DIVISION: CV-E

TCIF REO2, LLC,

       Plaintiff,

v.

MARTIN L. LEIBOWITZ, AS TRUSTEE,
etc., et al.,

       Defendants.

_____/



## ORDER GRANTING DEFENDANTS' MOTION FOR SANCTIONS

    This cause came before the Court on April 5, 2006 on Defendants Robert Jackson and Lillian Jackson's Motion for Sanctions for Fraud Upon the Court. The Court has reviewed the pleadings, considered arguments of counsel, and is otherwise fully advised in the premises.

    The Court finds Plaintiff, through its servicing entity, GMAC Mortgage Corporation, submitted false testimony to the Court in the form of Affidavits of Indebtedness signed and subscribed by Margie Kwiatanowski, a "Limited Signing Officer" with GMAC Mortgage Corporation. The submission of the false Affidavits was pursuant to protocols and procedures wherein Ms. Kwiatanowski, as Limited Signing Officer, would attest to review of the relevant loan documents, the Complaint, and the loan payment records, when in fact (as sworn to by Ms. Kwiatanowski in her deposition) she neither reviewed the referenced records nor was familiar with the manner in which the records were created by GMAC on behalf of Plaintiff. In her deposition, Ms. Kwiatanowski admitted none of the Affidavits were signed before a Notary, and that Affidavits of the sort filed by Plaintiff would be signed and then left in a folder, to be notarized at a different

time.  The admissions by Ms. Kwiatanowski in her deposition directly contradict the sworn

testimony to the Court in the form of the referenced Affidavits, both as to the substance of the

Affidavits and with regard to whether the Affidavits were sworn to before a notary.

The Court recognizes the statements made by Plaintiff's counsel at the hearing to the effect

that the procedures in place at GMAC with regard to servicing of this Plaintiff's loans were being

corrected.  The Court finds the submission of false testimony to the Court in the manner described

does not rise to the level required in order for this Court to dismiss the action.  Cox v. Burke, 706

So.2d 43 (Fla. 5th DCA 1998.)  The Court will not condone Plaintiff's actions in filing false

testimony, however, and the Court has both the inherent authority to sanction Plaintiff's actions,

based upon the findings set forth above, and finds sanctions to be appropriate.  It is therefore:

**ORDERED AND ADJUDGED:**

1.    Defendants' Motion for Sanctions for Fraud Upon the Court is GRANTED.

2.    The subject Affidavits as completed by Ms. Kwiatanowski are and same be stricken.

3.    The Court orders Plaintiff to pay Defendants' attorneys' fees and costs for the efforts

related to the taking of Ms. Kwiatanowski's deposition.  Based upon a review of the record and the

Affidavit filed by Defendants' counsel, the Court finds a reasonable sanction to be _30_ hours of

attorney's time and further finds a reasonable, local hourly rate to be $250.00, and further awards

costs in the amount of $_634,5_.  Therefore, the Plaintiff, TCIF REO2, LLC, Inc. shall forward to

defense counsel payment of $ _8,134,5_ in sanctions for the reasons set forth above within

_30_ days from the date of this Order.

4.    Counsel for Plaintiff shall file with the Court GMAC's written explanation and

confirmation, on behalf of Plaintiff, that GMAC's policies and procedures with regard to the

servicing of all of this Plaintiff's loans within the State of Florida have been modified, in accord with

2

representations made by counsel to the Court that such modifications were being made, to confirm

the affidavits filed in future foreclosure actions in Florida accurately memorialize the actions and

conduct of the affiants.    The written confirmation of policy changes, and an explanation for the

policies now in place, shall be filed with the Court within _____30_____ days of the date of this

Order.

**DONE AND ORDERED,** in Chambers, at Jacksonville, Duval County, Florida, this _____

day of May, 2006.

_____
Circuit Court Judge

Copies to:    James A. Kowalski, Jr., Esquire
              Roy A. Diaz, Esquire

STATE OF FLORIDA
DUVAL COUNTY
    I, THE UNDERSIGNED Clerk of the Circuit Court, Duval County,
Florida, DO HEREBY CERTIFY the within and foregoing is a true
and correct copy of the original as it appears on record and file
in the office of the Clerk of Circuit Court of Duval County, Florida
    WITNESS my hand and seal of Clerk of Circuit Court at
Jacksonville, Florida, this the _____ day of _____ A.D. 20___
                                      JIM FULLER
                            Clerk, Circuit and County Courts
                                Duval County, Florida
                            By _____
                                      Deputy Clerk

IN THE CIRCUIT COURT FOR DUVAL
COUNTY, FLORIDA. CIVIL DIVISION

CASE NO. 162004CA004835XXXXMA

TCIF REO2, LLC,

      Plaintiff,

vs.

MARTIN L. LEIBOWITZ, AS TRUSTEE UNDER THE
JACKSON FAMILY LAND TRUST DATED NOVEMBER
18, 2002; ROBERT L. JACKSON; LILLIAN M. JACKSON;
WILLIAM W. MASSEY, III; STATE OF FLORIDA
DEPARTMENT OF REVENUE; UNKNOWN TENANT
NO. 1; UNKNOWN TENANT NO. 2, et. al.,

      Defendants.

_____/



CV-E

THIS INSTRUMENT
IN COMPUTER
J.T.

## PLAINTIFF'S NOTICE OF COMPLIANCE WITH THIS COURT'S ORDER DATED MAY 1, 2006

      COMES NOW, the Plaintiff, TCIF REO2, LLC., by and through its undersigned counsel, and files this Notice of Compliance with this Court's Order dated May 1, 2006, and states that the Plaintiff has forwarded a check to opposing counsel as required pursuant to paragraph 3 of said Order, and has simultaneously herewith submitted the Directive to the Court, as required pursuant to paragraph 4 .

### CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Compliance has been sent via U.S. Mail this 12th day of June, 2006 to all parties on the attached Service List.

                      SMITH, HIATT & DIAZ, P.A.
                      Attorneys for Plaintiff
                      2691 East Oakland Park Boulevard, Suite 303
                      Fort Lauderdale, Florida 33306
                      Telephone: (954) 564-0071
                      Facsimile: (954) 564-9252

      BY: _____
                      ROY A. DIAZ
                      Florida Bar No. 767700

# SERVICE LIST
## Case No. 162004CA004835XXXXMA

Martin L. Leibowitz, as Trustee under
the Jackson Family Land Trust
2120 Oak Street
Jacksonville, FL 32204

Fred Tromberg, Esq.
4925 Beach Blvd.
Jacksonville, FL 32207
Attorney For Robert L. Jackson
    And Lillian M. Jackson

William W. Massey, III
2254 Riverside Ave
Jacksonville, FL 32204

State of Florida Department of Revenue
c/o Dr. Dr. James A. Zingale, Executive Director
501 South Calhoun Street, Carlton Building, Room 104
Tallahassee, FL 32399

# Smith, Hiatt & Diaz, P.A.

A T T O R N E Y S

2691 E. Oakland Park Blvd.
Suite 303
Fort Lauderdale, Florida 33306

(954) 564-0071 Telephone
(954) 564-9252 Facsimile

Mailing Address:
PO Box 11438
Fort Lauderdale, Florida 33339-1438

**THIS INSTRUMENT IN COMPUTER J. THAYER**



June 12, 2006

BERNARD NACHMAN

*Via Overnight UPS*

The Honorable Bernard Nachman
Duval County Courthouse
330 E. Bay Street, Room 202
Jacksonville, FL 32202-

File in

RE:   TCIF REO2, LLC v. MARTIN LEIBOWITZ, as Trustee, et al.

Case No.   162004CA004835XXXXMA

*CV E*

Dear Judge Nachman:

Enclosed with this correspondence is a courtesy copy of the Plaintiff's Notice of Compliance with this Court's Order dated May 1, 2006, and the original signed Directive from GMAC regarding its policies on Affidavits being filed with the court in connection with mortgage foreclosure cases.

Thank you for your consideration.

Respectfully submitted,
SMITH, HIATT & DIAZ, P.A.

Roy A. Diaz
For the Firm

Enclosures

cc:.James A. Kowalski, Jr., Esq

## A POLICY DIRECTIVE FROM THE LEGAL STAFF

### DOCUMENT SIGNATURE PRACTICES

The Legal Staff and its retained outside counsel present evidence to the courts in probably all jurisdictions. This evidence takes the form of written documentation signed by authorized corporate representatives. Some of these documents are notarized either as a simple notarial certificate and others notarized as sworn instruments before the notary. The following directives make not only good business sense but are commanded by statute. Thus, besides financial impact in the cases we handle, the signing process may invoke sanctions by a court. It is the integrity of our cases that is at stake and we cannot afford anything less than full accuracy.

1. Any signatory in behalf of the corporation must read and fully understand the instrument that is being signed. Do not sign unless you have that comfort level.

2. Any signatory in behalf of the corporation must be properly authorized by the corporation. When in doubt, consult with your manager or the Legal Staff for guidance.

3. Do not sign verifications on court pleading documents unless you have independently reviewed and checked the facts.

4. Sign instruments **_only in the presence of_** the witnessing notary public.

5. If the text of the notarial certificate contains an oath (e.g. "Subscribed and sworn to before me. . ." or similar words) the notary must affirmatively say to the signer, "Do you so swear?".

6. Pre-signing notarial certificates before the signer are prohibited by law everywhere.

## CERTIFICATION

The undersigned certifies that as of June 1, 2006, the attached Policy Directive on Document Signature Procedure has been distributed to the associate general counsel and associate counsel of the respective business units of GMAC Mortgage Corporation for distribution to authorized signatories within the enterprise.  This Policy Directive is a reaffirmation of existing procedures incorporating the statutory mandates to notaries public of the respective residence states of such notaries public.

June 6, 2006

_____
James J. Barden
Associate Counsel – Legal Staff

STATE OF FLORIDA
DUVAL COUNTY
   I, THE UNDERSIGNED Clerk of the Circuit Court, Duval County, Florida, DO HEREBY CERTIFY the within and foregoing is a true and correct copy of the original as it appears on record and file in the office of the Clerk of Circuit Court of Duval County, Florida.
   WITNESS my hand and seal of said Court at Jacksonville, Florida, this the ___ day of _____ A.D. 20__
                                            JIM FULLER
                                     Clerk, Circuit and County Courts
                                         Duval County, Florida
                              By_____
                                          Deputy Clerk

**EXHIBIT 7**

STATE OF MAINE                                    BRIDGTON DISTRICT COURT
CUMBERLAND, ss.                                   DOCKET NO.  BRI-RE-09-65


FEDERAL NATIONAL MORTGAGE ASSOC.        )
                                                       )
                        Plaintiff                      )
                                                       )
                                                       )
              v.                                        )
                                                       )       ORDER ON FOUR
                                                       )       PENDING MOTIONS
                                                       )
NICOLLE BRADBURY                                        )
                                                       )
                        Defendant                      )
              and                                      )
                                                       )
GMAC MORTGAGE, LLC d/b/a DiTech, LLC     )
.com and BANK OF AMERICA, NA                  )
                                                       )
                 Parties-in-Interest               )

*STATE OF MAINE Cumberland, ss, Clerk's Office SEP 2 4 2010 RECEIVED*

        The Court has reviewed each of the four pending motions before it, as well as all
supporting materials, including supporting affidavits and statements of material fact.  The
Court held oral argument on September 1, 2010.  Those present were attorneys Tom Cox,
Esq. and Geoffrey Lewis, Esq. for Defendant, and attorney John Aromando, Esq. for
Plaintiff and Party-in-Interest GMAC.  Attorneys Cox and Aromando argued capably for
their positions.

        On the question of summary judgment, before the Court is Plaintiff's Renewed
Motion for Summary Judgment, as well as Defendant's Motion for Revision and
Reversal of the Partial Summary Judgment Order.  By its motion, Plaintiff asks that the
Court affirm its previously issued order of January 27, 2010 granting summary judgment
in its favor on the issue of liability, and further seeks summary judgment in its favor on
the issue of the amounts owed.  The Defendant's motion seeks to set aside this Court's
previous order granting partial summary judgment for Plaintiff.

        Defendant urges that this Court set aside its order on the ground that in so ruling,
the Court relied upon the affidavit of Jeffrey Stephan, which was deficient under M. R.
Civ. P. 56(e) because Mr. Stephan had signed the affidavit outside the presence of a
notary and without reading its contents.  The Plaintiff contends that the order can stand
even putting aside the Stephan affidavit, and in any event has sought to cure the
irregularities in its filing by submitting a properly sworn affidavit to support its motion.

There are, however, deficiencies in Plaintiff's filing which are not cured by the newly-submitted affidavit, namely deficiencies in its statement of material facts (SMF). The Law Court has made clear that in ruling on a summary judgment motion, Maine courts are "neither required *nor permitted* to search outside the facts properly referenced in the statements of material facts ...." *See, e.g, Camden Nat'l Bank v. Peterson*, 2008 ME 85 ¶ 26, 948 A.2d 1251, 1258 (emphasis added). In *Chase Home Finance LLC v. Higgins*, 2009 ME 136, 985 A.2d 508, the Law Court set forth a list of those facts which "must be included in the mortgage holder's statement of material facts." *Id.* at ¶ 11, 985 A.2d at 511. Plaintiff was bound to abide by this mandate, because both its initial and renewed summary judgment motions were filed after the June 15, 2009 effective date noted in *Chase*. *See id* at ¶ 11 n.2, 985 A.2d at 510 n. 2 (explaining that new statutes and rules will apply to summary judgment motions filed after their effective dates, regardless of when the foreclosure action was commenced, and adding: "We include the new requirements here for future reference of parties moving for summary judgment in residential foreclosure actions").

Neither Defendant's initially-filed statement of material facts nor its revised statement of material facts comports with *Chase*. For example, the mortgage holder's statement of facts must include "the existence of the mortgage, including the book and page number of the mortgage, and an adequate description of the mortgaged premises, including the street number, if any." *Id.* at ¶ 11, 985 A.2d at 511 (citing P.L. 2009, ch. 402 §§ 9, 17, effective June 15, 2009). Plaintiff's initial and subsequently filed statement of facts provide the book and page number, but fail to include the street address. *See* Plaintiff's SMFs at ¶ 2. Failure to include the street address is enough in itself to preclude the granting of summary judgment. *See Mortgage Elec. Registration Sys. v. Saunders*, 2010 ME 79 ¶ 25 (explaining that "While the book and page number – but not the mortgaged property's address – were included in the affidavit supporting one of MERS's original statements of material fact, facts not set forth in the parties' statements of material facts are not part of the summary judgment record").

Plaintiff's SMFs contain other omissions as well. It is not enough to state, as Plaintiff does, that "Demand has been made upon Defendant for payment of all amounts due ...." Plaintiff's SMFs at ¶ 5. 14 M.R.S.A. § 6111 requires that a mortgagee's default notice set forth the mortgagor's right to cure, and specifies the requisite content of such notices as well as the procedures which must be followed. As the Law Court stated in discussing compliance with the statutory written notice requirements of foreclosure, "For a mortgagee to legally foreclose, all steps mandated by statute must be strictly enforced." *Camden Nat'l Bank*, 2008 ME at ¶ 21, 948 A.2d at 1257. Plaintiff's statements of fact fail to set forth facts showing compliance with § 6111. Granting summary judgment despite such an omission would contravene the Law Court's clear pronouncements on this issue.

Accordingly, this Court's Partial Summary Judgment Order dated January 27, 2010 is hereby vacated per the request in the Defendant's Motion for Revision and Reversal, and Plaintiff's Renewed Motion for Summary Judgment is denied. No further summary judgment motions will be heard, as the deadline for filing dispositive motions

has long passed and Plaintiff has already been given a second bite of the apple. The parties have twenty days to file an agreed pre-trial order so that this matter may promptly be placed on the trial list in Portland. This file is now transferred to the Portland District Court for further filings and trial.

In addition to renewing its Motion for Summary Judgment, Plaintiff has also filed a Motion for Entry of Protective Order pursuant to M.R. Civ. P. 26(c). This motion is likewise denied.

Rule 26(c) provides that "for good cause shown" a court may enter a protective order "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." M.R.Civ. P. 26(c). Plaintiff seeks a protective order "prohibiting the dissemination of discovery materials obtained in this case." Plaintiff's Motion for Entry of Protective Order at 7. As grounds for its motion, Plaintiff points to the embarrassment GMAC and its employees have suffered, and will continue to suffer, from the posting of excerpts from Stephan's deposition transcript on an Internet blog. The Court is not persuaded that the Plaintiff has shown the requisite "good cause" to justify entry of a protective order in this case. *See, e.g., Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 789 (1st Cir. 1988) (agreeing with Second Circuit in noting that "the party seeking a protective order has the burden of showing that good cause exists exists for issuance of that order.... [and] the obverse is also true, i.e. if good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection") (citation omitted).

Stephan's deposition was taken to advance a legitimate purpose, and the testimony elicited has direct probative value to this dispute. Attorney Cox did not himself take action other than to share the deposition transcript with an attorney in Florida. That the testimony reveals corporate practices that GMAC finds embarrassing is not enough to justify issuance of a protective order. Further, Plaintiff has failed to establish that GMAC has been harmed specifically as a result of the dissemination of the June 7, 2010 deposition transcript, given that similarly embarrassing deposition testimony from Stephan's December 10, 2009 Florida deposition also appears on the Internet, and will remain even were this Court to grant Plaintiff's motion. Accordingly, because Plaintiff has failed to satisfy its burden of persuasion under Rule 26(c), its Motion for Entry of Protective Order is denied.

In addition to seeking the reversal of this Court's previously granted Order for Partial Summary Judgment, the Defendant has moved for sanctions pursuant to M.R. Civ. P. 56(g). This motion is granted in part, as explained below.

The facts underlying Defendant's motion are for the most part undisputed. Plaintiff does not dispute that its affiant, Jeffery Stephan, in his role as limited signing officer for GMAC, Plaintiff's servicing agent, signed the affidavit which Plaintiff submitted in support of its Motion for Summary Judgment without even reading it and without signing in the presence of a notary. These facts came into the record because the

Defendant went to the time and expense of traveling to Pennsylvania to take Stephan's deposition. In that deposition, which took place on June 7, 2010, Stephan testified that he signs some 400 documents per day, and that the process he follows in signing summary judgment affidavits is consistent with GMAC's policies and procedures.

The Court is particularly troubled by the fact that Stephan's deposition in this case is not the first time that GMAC's high-volume and careless approach to affidavit signing has been exposed. Stephan himself was deposed six months earlier, on December 10, 2009, in Florida. His Florida testimony is consistent with the testimony given in this case: except for some limited checking of figures, he signs summary judgment affidavits without first reading them and without appearing before a notary. Even more troubling, in addition to that Florida action, in May, 2006 another Florida court not only admonished GMAC, it sanctioned the Plaintiff lender for GMAC's affidavit signing practices. As part of its order, the Florida court required GMAC to file a Notice of Compliance, indicating its commitment to modify its affidavit signing procedures to conform to proper practices. The experience of this case reveals that, despite the Florida Court's order, GMAC's flagrant disregard apparently persists. It is well past the time for such practices to end.

Accordingly, Defendant asks that this Court impose sanctions pursuant to M.R. Civ. P. 56(g), which provides:

> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

Although there are no Maine Law Court cases applying it, the plain language of Rule 56(g) makes clear that the Court must determine, first, whether it appears "to the satisfaction of the court" that an affidavit submitted for summary judgment purposes was presented "in bad faith or solely for the purpose of delay." The Law Court has defined "bad faith", albeit in a different context: "Bad faith 'imports a dishonest purpose and implies wrongdoing or some motive of self-interest.' Bad faith means 'dishonesty of belief or purpose ....'" *Seacoast Hangar Condo. II Ass'n. v. Martel*, 2001 ME 112 ¶ 21, 775 A.2d 1166, 1171-72 (citing a Utah case and Black's Law Dictionary).[1] It is left to the Court's discretion to determine whether offending conduct rises to the level of "bad faith" such that Rule 56(g) sanctions are warranted. *See, e.g., Cobell v. Norton*, 214 F.R.D. 13, 20 (D.D.C. 2003) (noting that "as a practical matter a court has wide discretion in deciding what constitutes 'bad faith'") (citing Wright & Miller, Federal Practice and Procedure § 2742 (3d ed. 1998)). If a Court is satisfied that the affidavit was

---

[1] *Seacoast Hangar*'s definition of "bad faith" occurred in the context of discussing the business judgment rule, which "does not insulate directors from liability for breach of their fiduciary duties if they 'acted primarily through bad faith or fraud ....'" *Id.* at ¶ 20 n. 1, 775 A.2d at 1171 n.1 (citation omitted).

4

submitted in bad faith, then the mandatory language of Rule 56(g) requires that the Court forthwith order "the party employing [the affidavit] to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees." M.R.Civ. P. 56(g).

Both parties cite *Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co.*, 866 F.2d 11 (1st Cir. 1989), in which the First Circuit analyzed the cases applying the Federal Rule 56(g) to conclude that the matters in which sanctions were imposed involved "particularly egregious" conduct. Characterizing its misconduct as a mere "procedural deficiency," Plaintiff urges the Court to find no bad faith; Defendant, on the other hand, argues that, on the spectrum of egregiousness, the conduct at issue more than meets the standard for bad faith under the rule.

The Court agrees with Defendant, and finds to its satisfaction that the Stephan affidavit was submitted in bad faith. Rather than being an isolated or inadvertent instance of misconduct, the Court finds that GMAC has persisted in its unlawful document signing practices long after and even in the face of the Florida Court's order, and that such conduct constitutes "bad faith" under Rule 56(g). These documents are submitted to a court with the intent that the court find a homeowner liable to the Plaintiff for thousands of dollars and subject to foreclosure on the debtor's residence. Filing such a document without significant regard for its accuracy, which the court in ordinary circumstances may never be able to investigate or otherwise verify, is a serious and troubling matter. Accordingly, the Court orders Plaintiff[2] to compensate Defendant's counsel for his attorney's fees and costs "which the filing of the Affidavit caused [him] to incur" – in other words, that Plaintiff pay Defendant's counsel for his time and expenses in preparing for and taking Stephan's deposition, as well as for his time and expenses in preparing for, filing, and prosecuting Defendant's Rule 56(g) motion.[3]

---

[2] As the Florida court imposed sanctions on the Plaintiff lender for GMAC's conduct, the Court likewise finds it appropriate to hold Plaintiff responsible for the conduct of its servicing agent, GMAC. Requiring Plaintiff to pay Defendant counsel's attorney's fees comports both with the language of Rule 56(g) (award of expenses should be ordered against party "employing" affidavits) as well as with principles of agency law. *See, e.g., Dupuis v. Federal Home Loan Mortgage Corp.*, 879 F. Supp. 139, 144 (D. Me. 1995) (holding that "[a]s a matter of agency law, it would be unfair for [the note and mortgage holder] to have the benefit of [the servicing agent's] servicing of the note and mortgage without also making [the note and mortgage holder] responsible for [the servicing agent's] excesses and failures").

[3] The Court declines to award fees for opposing Plaintiff's summary judgment or protective order motions, because those tasks were not "caused" by the bad faith affidavit. Because the Court finds its award of attorney's fees and costs to be a sufficient sanction for Plaintiff's bad faith conduct, the Court declines to explore the issue of contempt in this case as requested by Defendant.

Defendant has ten days from the date of this order to file an affidavit setting forth his time spent, usual hourly rate,[4] and expenses incurred in taking Stephan's deposition and filing and pursuing Defendant's Rule 56(g) motion. Plaintiff's written objection to Defendant's counsel's claimed expenses, if any, must be filed within seven days thereafter, and shall only address the sums claimed. The Court will thereupon issue an order setting forth the reasonable sum Plaintiff owes to Defendant's counsel.

The clerk shall docket this order by reference under Rule 79(a).

DATED: _____9/24/10_____          _____
                                 Hon. Keith A. Powers, Judge
                                 Maine District Court

---

[4] That Defendant's counsel is entitled to an award of attorney's fees is not affected by the fact that he has labored in this case on a pro bono basis. *Cf., Foster v. Mydas Assoc., Inc.*, 943 F.2d 139, 144 n.7 (1st Cir. 1991) (noting that civil rights attorneys who work pro bono and prevail are usually awarded attorney's fees under civil rights statutes).

**EXHIBIT 8**

# STANDARD TERMS OF
# POOLING AND SERVICING AGREEMENT

Dated as of March 1, 2006

Residential Accredit Loans, Inc.
Mortgage Asset-Backed Pass-Through Certificates

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS................................................................................................ 2

    Section 1.01.  Definitions.................................................................................. 2

    Section 1.02.  Use of Words and Phrases ...................................................... 34

ARTICLE II        CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE
               OF CERTIFICATES...................................................................... 35

    Section 2.01.  Conveyance of Mortgage Loans .............................................. 35

    Section 2.02.  Acceptance by Trustee.............................................................. 41

    Section 2.03.  Representations, Warranties and Covenants of the Master Servicer
               and the Company ................................................................ 42

    Section 2.04.  Representations and Warranties of Residential Funding......................... 44

    Section 2.05.  Execution and Authentication of Certificates/Issuance of
               Certificates Evidencing Interests in REMIC I Certificates................ 46

    Section 2.06.  Conveyance of Uncertificated REMIC I and REMIC II Regular
               Interests; Acceptance by the Trustee. ................................................ 46

    Section 2.07.  Issuance of Certificates Evidencing Interests in REMIC II..................... 46

    Section 2.08.  Purposes and Powers of the Trust............................................ 46

ARTICLE III        ADMINISTRATION AND SERVICING OF MORTGAGE LOANS......... 46

    Section 3.01.  Master Servicer to Act as Servicer............................................ 46

    Section 3.02.  Subservicing Agreements Between Master Servicer and
               Subservicers; Enforcement of Subservicers' and Sellers'
               Obligations......................................................................... 48

    Section 3.03.  Successor Subservicers ............................................................ 49

    Section 3.04.  Liability of the Master Servicer ................................................ 49

    Section 3.05.  No Contractual Relationship Between Subservicer and Trustee or
               Certificateholders............................................................... 50

    Section 3.06.  Assumption or Termination of Subservicing Agreements by
               Trustee................................................................................ 50

    Section 3.07.  Collection of Certain Mortgage Loan Payments;  Deposits to
               Custodial Account............................................................... 50

    Section 3.08.  Subservicing Accounts; Servicing Accounts ........................... 53

    Section 3.09.  Access to Certain Documentation and  Information Regarding the
               Mortgage Loans .................................................................. 55

Section 2.06.   Conveyance of Uncertificated REMIC I and REMIC II Regular Interests;
Acceptance by the Trustee.

As provided in Section 2.06 of the Series Supplement.

Section 2.07.   Issuance of Certificates Evidencing Interests in REMIC II.

As provided in Section 2.07 of the Series Supplement.

Section 2.08.   Purposes and Powers of the Trust.

The purpose of the trust, as created hereunder, is to engage in the following activities:

(a)      to sell the Certificates to the Company in exchange for the Mortgage Loans;

(b)      to enter into and perform its obligations under this Agreement;

(c)      to engage in those activities that are necessary, suitable or convenient to
accomplish the foregoing or are incidental thereto or connected therewith; and

(d)      subject to compliance with this Agreement, to engage in such other activities as
may be required in connection with conservation of the Trust Fund and the making of
distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities.
Notwithstanding the provisions of Section 11.01, the trust shall not engage in any activity other
than in connection with the foregoing or other than as required or authorized by the terms of this
Agreement while any Certificate is outstanding, and this Section 2.08 may not be amended,
without the consent of the Certificateholders evidencing a majority of the aggregate Voting
Rights of the Certificates.

## ARTICLE III

## ADMINISTRATION AND SERVICING
## OF MORTGAGE LOANS

Section 3.01.   Master Servicer to Act as Servicer.

(a)      The Master Servicer shall service and administer the Mortgage Loans in
accordance with the terms of this Agreement and the respective Mortgage Loans and shall have
full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do
any and all things which it may deem necessary or desirable in connection with such servicing
and administration.  Without limiting the generality of the foregoing, the Master Servicer in its
own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee
when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its
best judgment, to execute and deliver, on behalf of the Certificateholders and the Trustee or any
of them, any and all instruments of satisfaction or cancellation, or of partial or full release or
discharge, or of consent to assumption or modification in connection with a proposed

46

conveyance, or of assignment of any Mortgage and Mortgage Note in connection with the repurchase of a Mortgage Loan and all other comparable instruments, or with respect to the modification or re-recording of a Mortgage for the purpose of correcting the Mortgage, the subordination of the lien of the Mortgage in favor of a public utility company or government agency or unit with powers of eminent domain, the taking of a deed in lieu of foreclosure, the commencement, prosecution or completion of judicial or non-judicial foreclosure, the conveyance of a Mortgaged Property to the related Insurer, the acquisition of any property acquired by foreclosure or deed in lieu of foreclosure, or the management, marketing and conveyance of any property acquired by foreclosure or deed in lieu of foreclosure with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any expenses incurred in connection with the actions described in the preceding sentence shall be borne by the Master Servicer in accordance with Section 3.16(c), with no right of reimbursement; provided, that if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS System, it becomes necessary to remove any Mortgage Loan from registration on the MERS System and to arrange for the assignment of the related Mortgages to the Trustee, then any related expenses shall be reimbursable to the Master Servicer. Notwithstanding the foregoing, subject to Section 3.07(a), the Master Servicer shall not permit any modification with respect to any Mortgage Loan that would both constitute a sale or exchange of such Mortgage Loan within the meaning of Section 1001 of the Code and any proposed, temporary or final regulations promulgated thereunder (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.13(d) hereof) and cause any REMIC formed under the Series Supplement to fail to qualify as a REMIC under the Code. The Trustee shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans. The Trustee shall not be liable for any action taken by the Master Servicer or any Subservicer pursuant to such powers of attorney. In servicing and administering any Nonsubserviced Mortgage Loan, the Master Servicer shall, to the extent not inconsistent with this Agreement, comply with the Program Guide as if it were the originator of such Mortgage Loan and had retained the servicing rights and obligations in respect thereof. In connection with servicing and administering the Mortgage Loans, the Master Servicer and any Affiliate of the Master Servicer (i) may perform services such as appraisals and brokerage services that are not customarily provided by servicers of mortgage loans, and shall be entitled to reasonable compensation therefor in accordance with Section 3.10 and (ii) may, at its own discretion and on behalf of the Trustee, obtain credit information in the form of a "credit score" from a credit repository.

(b)    All costs incurred by the Master Servicer or by Subservicers in effecting the timely payment of taxes and assessments on the properties subject to the Mortgage Loans shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the