# EXHIBIT B

## Redacted Agreements

# EXHIBIT B-1

**ACE Agreement**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "*Agreement*") is made as of the $\underline{28^{th}}$ day of January 2014, by and among Ally (defined below), Residential Capital, LLC and certain of its subsidiaries and affiliates (collectively, the "*Debtors*"),[1] and ACE American Insurance Company ("*ACE American*"). Each of Ally, the Debtors and ACE American is a "*Party*" and they are collectively referred to herein as the "*Parties*."

## RECITALS

WHEREAS, ACE American issued to Ally (f/k/a GMAC, LLC) the Policies (defined below) covering periods from November 2006 to December 2013;

WHEREAS, Ally, the Debtors and certain of their affiliates and subsidiaries, and certain of their directors, officers, and employees are insured under some or all of the Policies;

WHEREAS, Ally has submitted notice of certain Insurance Claims (defined below) with ACE American for coverage under the Policies including, but not limited to, the following: (i) the "Private Securities Claims" (as that term is defined in the Plan); (ii) *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-08781, United States District Court, Southern District of New York (the "*NJ Carpenters Lawsuit*"); (iii) *United States of America v. Bank of America*, Case No. 12-00361, United States District Court, District of Columbia and the consent judgment among the United States Department of Justice, the Attorneys General of certain states, ResCap, GMAC Mortgage, LLC (GMACM) and Ally Financial Inc. entered by the District Court for the District of Columbia on February 9, 2012 (the "*USA Litigation*"); (iv) the November 26, 2012 letter issued by counsel for the Official Committee of Unsecured Creditors to the Board of Directors of Ally Financial, Inc. and the November 26, 2013 letter issued by Wilmington Trust, N.A., as the indenture trustee for the senior unsecured notes issued by Residential Capital LLC, to the Board of Directors of Ally Financial, Inc. (collectively, the

---

[1] In addition to Residential Capital, LLC, the Debtors include: Ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

1

"*D&O Demands*"); (v) proofs of claim filed in the Debtors' chapter 11 cases by Wilmington Trust, National Association, including, but not limited to, claim number 5256 (the "*Proofs of Claim*"); and (vi) any and all claims asserted against Ally and other Insureds (as defined in the Policies) by the Federal Housing Finance Agency ("*FHFA*") and the Federal Deposit Insurance Corporation ("*FDIC*"), relating to RMBS (as defined below) or the Debtors (with the D&O Demands and Proofs of Claim, the "*Chapter 11 Demands*");

**WHEREAS**, the Insureds (as defined in the Policies) have incurred, are incurring and will incur in the future certain costs, fees, and expenses in defending, settling or resolving the Insurance Claims;

**WHEREAS**, on February 9, 2012, Ally, the Debtors and the plaintiffs in the USA Litigation agreed to settle, in part, the claims asserted in the USA Litigation in exchange for, among other things, the Debtors making a $109 million hard dollar payment to the plaintiffs;

**WHEREAS**, ACE American previously raised certain coverage issues and defenses under the Policies with respect to the Insurance Claims and has otherwise reserved all of its rights and defenses available under the Policies and at law;

**WHEREAS**, Ally, on its own behalf and on behalf of all Insureds, has disputed the coverage issues and defenses raised by ACE American with respect to the Insurance Claims and has otherwise reserved all of the Insureds' rights and defenses under the Policies and available at law;

**WHEREAS**, on May 14, 2012, the Debtors filed voluntary petitions under Chapter 11 of Title 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") and the associated cases are being jointly administered as *In Re Residential Capital, LLC, et al.,* Case No. 12-12020-mg (Bankr. S.D.N.Y. 2012);

**WHEREAS**, on July 3, 2013, the Debtors and the Official Committee of Unsecured Creditors in the Debtors' chapter 11 cases (the "*Creditors' Committee*") filed the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors [Docket No. 4153] (as may be revised, amended or modified, the "*Plan*") and related disclosure statement [Docket No. 4809] (as may be revised, amended or modified, the "*Disclosure Statement*");

**WHEREAS**, on August 23, 2013, the Bankruptcy Court entered an order approving the Disclosure Statement;

**WHEREAS**, on August 23, 2013, solicitation versions of the Disclosure Statement and the Plan were filed in the Debtors' chapter 11 cases [Docket No. 4819];

**WHEREAS**, the Plan provides, among other things, that Ally will pay to the Debtors' estates $1.95 billion in cash or cash equivalents, and will further contribute $150 million ~~received by Ally for claims it pursues against the Insureds' insurance carriers, including ACE~~ American, in settlement of the claims released in connection with the Plan, with such amount guaranteed by Ally to be paid no later than September 30, 2014 (the "*Insurance Contribution*");

**WHEREAS**, Ally, on behalf of itself and all other Insureds, demanded that ACE American reimburse Ally for amounts the Insureds have incurred, are incurring and will incur in defending, settling and resolving the Insurance Claims, which amounts the Insureds believe constitute covered Loss far-in-excess of the Limit of Liability applicable to each of the Policies;

**WHEREAS**, Ally, the Debtors and all other Insureds under the Policies, and ACE American desired to resolve all coverage issues and disputes among the Parties regarding the Policies and coverage for the Insurance Claims, and therefore agreed to engage in good-faith and arms-length negotiations;

**WHEREAS**, as a result of Ally's and ACE American's negotiations, ACE American has agreed to contribute to the Insurance Contribution, as necessary, by paying the Settlement Amount (defined below) to Ally in exchange for, among other things, a resolution of Ally's, the Debtors' and all other Insureds' current and future disputes, claims, actions, suits, demands, and causes of action relating to or arising out of the Policies or the Insurance Claims, as more fully described herein, and subject to the terms and conditions set forth in this Agreement; and

**WHEREAS**, Ally, the Debtors and ACE American have entered into this Agreement to, among other things, effectuate the Insurance Contribution, as necessary, and, in the interest of avoiding any further uncertainty, amicably resolve all claims and disputes relating to, or arising out of the Policies or the Insurance Claims, subject to the terms and conditions set forth in this Agreement.

<u>**AGREEMENT**</u>

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1.    <u>Definitions</u>.

    a)    "ACE" means ACE American, and its direct and indirect parent companies, affiliates (including, but not limited to, Westchester Fire Insurance Company (hereinafter "Westchester")), and subsidiaries, including each of their respective Representatives.

    b)    "Ally" means Ally Financial, Inc. (f/k/a GMAC LLC) and its direct and indirect non-Debtor affiliates and subsidiaries, including each of their respective Representatives.

    c)    "Causes of Action" means any and all actual or potential actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, costs, attorney's fees, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims whatsoever, whether known or unknown,

foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending as of the date hereof or instituted hereafter against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the date hereof.

d)  "Effective Date" means the effective date of the Plan.

e)  "Excess Indemnification Amount" means ████████, which will be reduced on a dollar-for-dollar basis to the extent of Ally's indemnification of any claim under Section 8 of this Agreement, or under any similar indemnification provision in a claim settlement agreement with any of Ally's insurers (collectively such insurers will form the "*Excess Indemnification Pool*"), in excess of the Limited Indemnification Amount set forth in this Agreement or the limited indemnification amount set forth in any other similar agreement.  For the avoidance of doubt, Ally will have full discretion with regard to participation in the Excess Indemnification Pool and all distributions made from the Excess Indemnification Amount.

f)  "Insurance Claims" means any "Claim" (as defined in the Policies), notice of Wrongful Act (as the term Wrongful Act is defined in the Policies) or potential Claim or other matter that was or could have been noticed or submitted by or on behalf of any Insured under any of the Policies before the Effective Date to ACE for coverage under any insurance policy issued by ACE to Ally, the Debtors or any Insured under the Policies based upon, arising out of, or related to the following:

- the Debtors, including any Claim, notice of Wrongful Act or potential Claim or other matter in any way related to RMBS (as defined below) issued or sold by the Debtors or their affiliates, the Chapter 11 Cases (as defined in the Plan), the Plan, the Consent Order (as defined in the Plan), or the Order of Assessment (as defined in the Plan);

- the Private Securities Claims;

- the "MBS Actions" and "Additional MBS Actions" identified in the March 10, 2009 July 25, 2011 and October 25, 2011 letters issued by or on behalf of Federal Insurance Company to GMAC, LLC and/or Ally Financial, Inc. (the "*Chubb Letters*");

- the "MBIA Litigation" identified in the Chubb Letters;

- ~~the NJ Carpenters Lawsuit;~~

- any claims asserted by Financial Guaranty Insurance Company, MBIA Insurance Corporation, Ambac Assurance Corporation and the Segregated

Account of Ambac Assurance Corporation, Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.) and other insurers who provided financial guaranty insurance policies insuring amounts payable to RMBS in connection with any "RMBS Trusts" (as defined in the Plan);

- the USA Litigation;

- *In the Matter of Ally Financial, Inc., et al.*, FRB Docket No. 11-020-B-HC 11-020-B-DEO;

- the "Robo-Signing Actions" identified in the December 16, 2011 letter issued by counsel to Federal Insurance Company to Marsh FINPRO, in its capacity as the insurance broker for the Insureds under the Policies;

- the RMBS Trust Claims (defined below);

- any claims asserted by FHFA, FDIC, the Federal National Mortgage Association and the National Credit Union Administration Board based, upon, arising out of or related to any RMBS, including, but not limited to, *Federal Housing Finance Agency v. Ally Financial Inc.*, Index No. 652441/2011, New York County Supreme Court, State of New York, *Federal Deposit Insurance Corporation v. Citigroup Mortgage Loan Trust, Inc.*, Case No. 03-CV-201, *Montgomery County Circuit Court, State of Alabama, Federal Deposit Insurance Corporation v. Ally Securities LLC*, Case No. D-1-GN-12-002522, *Travis County District Court, 200th Judicial District, State of Texas, Federal Deposit Insurance Corporation v. Chase Mortgage Finance Corp.*, Case No. 12-06166, United States District Court, Southern District of New York, *Federal Deposit Insurance Corporation v. Bear Stearns Asset Backed Securities I LLC*, Case No. 12-4000, United States District Court, Southern District of New York; and *National Credit Union Administration Board v Residential Funding Securities LLC*, Case No. 13-06730, United States District Court, Southern District of New York;

- the D&O Demands; and

- all other Chapter 11 Demands;

*provided, however*, that the Insurance Claims do not include any claims for coverage under any (i) "Side A-only" policy of insurance, (ii) "Side-A DIC/difference in conditions" policy of insurance including, but not limited to, Westchester Policy No. G23824139 001 (the *"Westchester Policy"*) or (iii) "Excess A side-only" policy of insurance (collectively, the *"Side-A Policies"*); and

*provided, further*, that the Insurance Claims do not include any claims directly or indirectly arising out of or related to the auto finance activities

of Ally, including without limitation any claims relating to the purchase of retail installment sales contracts by Ally;

*notwithstanding anything in this definition,* the ACE Parties (defined below) and Ally Parties (defined below) acknowledge and agree that, except with respect to the Insurance Claims, the provisions of this Agreement do not affect, release, waive or impair any of the ACE Parties' or any of the Ally Parties' rights or defenses with respect to any insurance policies not listed in Section 1(j) of this Agreement.

g)   "Limited Indemnification Amount" means ███████ USD.

h)   "Loss" as used herein shall have the same meaning as defined in the Policies.

i)   "Payment Due Date" means twenty-eight (28) calendar days after the date on which an order approving the 9019 Motion (as defined herein) is entered by the Bankruptcy Court (the "***Order***"); *provided, however*, that if the Order is (i) not entered by the Bankruptcy Court on or before March 31, 2014 (the "***Deadline***"), then the Parties agree this entire Agreement shall, without any further action by any of the Parties, be repudiated, terminated, void, without force and effect and non-binding upon any Party, or (ii) appealed by any individual, entity or other party within fourteen (14) calendar days after the Bankruptcy Court's entry of the Order, then within seven (7) calendar days after the filing of any such appeal, ACE American or Ally may repudiate this entire Agreement in writing pursuant to section 3 of this Agreement.

j)   "Policies" means the insurance policies issued by ACE American to Ally bearing the following policy numbers:

| Policy Number | Policy Period | First Named Insured | Type of Coverage |
|---|---|---|---|
| ██████ | ██████ | ██████ | ██████ |

6

| Policy Number | Policy Period | First Named Insured | Type of Coverage |
|---|---|---|---|
| ███████ | ███████ | ███████ | |
| | | | |
| | | | |

k)    "RMBS" means any residential mortgage-backed securities, notes and certificates issued by the RMBS Trusts (as defined in the Plan).

l)    "RMBS Trust Claims" means claims based upon, arising under, or related to any RMBS issued by any residential mortgage backed securitization trusts, net interest margin trusts or similar residential mortgage backed trusts for which the Debtors have acted or currently act as a sponsor, depositor, servicer, master servicer or in similar capacities, including, but not limited to, any "RMBS R+W Claims" and any "RMBS Cure Claims" (as defined in the Plan).

m)    "Representatives" means current and former: members, associates, shareholders, partners, affiliates, successors, assigns, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, auditors, investment bankers, lenders, consultants, advisors, insurers and reinsurers, representatives, heirs, executors, estates, administrators, receivers, trustees, other professionals, successors and assigns, each solely in his, her or its capacity as such. For the avoidance of doubt, as to the Debtors and Ally, the term Representatives shall include any and all Insureds under the Policies.

n)    "Settlement Amount" means ███████ USD.

2.    Payment of the Insurance Claims and Exhaustion of Policy Limits.

a)    ACE American will pay the Settlement Amount to Ally Financial Inc. on the Payment Due Date. Payment of the Settlement Amount will settle and resolve all of the disputes between and among the Parties regarding the Policies, and between ACE and Ally regarding the Insurance Claims as set forth in this Agreement.

b)    The Settlement Amount will be paid by ACE American by wire transfer. Ally will provide ACE American with account information and wiring instructions upon entry of the Order.

7

c)    The Settlement Amount is net of any and all prior payments by or on behalf of
ACE American under the Policies, and shall not result in Ally, the Debtors, or any
other Insured owing ACE American, with respect to the Policies only, any
retrospective premium adjustments, other post-loss or post-claim payment
adjustments or other payment obligations, such as a deductible, retention, or self-
insured retention.

d)    Ally will pay the Settlement Amount, or the portion thereof necessary to satisfy
the Insurance Contribution, to the Debtors' estates or the liquidating trust, as
applicable, within 30 calendar days after receipt of the Settlement Amount from
ACE American; *provided* that (i) the Debtors are current on their obligations
under section IV(B)(e) of the chapter 11 plan subject to the terms of the Plan and
(ii) Ally has not already paid the Insurance Contribution in full.

e)    ACE American's payment of the Settlement Amount is without prejudice to: (i)
the Ally Parties' (as defined below) right to assert claims for coverage for any
matter that is not an Insurance Claim under any insurance policies covering an
Insured, including but not limited to insurance policies issued by ACE, other than
the Policies; (ii) the Debtors Parties' (defined below) right to assert claims for
coverage under any insurance policy covering an Insured other than the Policies;
and (iii) ACE's rights with respect to coverage for any claim (including the
Insurance Claims) under any insurance policy other than the Policies.

f)    If, as a result of a subsequent arbitration or litigation proceeding between any
Insured and any other insurance company regarding any or all of the Insurance
Claims, a court or appointed arbitrator determines that any or all of the Insurance
Claims should be allocated to a specific policy period or policy type referenced in
section 1(j), ACE American shall not dispute such determination.
Notwithstanding any such determination, ACE American shall not be required to
reallocate any part of the Settlement Amount to any specific policy period or
policy type.    Any such determination shall not release, reduce, increase or
otherwise affect ACE American's payment obligations under this Agreement or
under the Policies, or entitle ACE American to any refund, recoupment, or other
remittance of any kind.

g)    The Settlement Amount represents payment of limits attaching above and excess
of the Underlying Insurance (as defined in the Policies) and is not drop down
coverage, umbrella coverage or any other payment in the stead of, alternative to
or on behalf of any Underlying Insurance provided by any Underlying Insurer (as
defined in the Policies) for each of the years any of the Policies was in effect.

h)    The Parties agree that by ACE American paying the Settlement Amount on the
Payment Due Date, ACE American is not acting as a volunteer.

i)    ACE American acknowledges that Ally, the Debtors and all other Insureds under
the Policies contend that they have incurred and are incurring covered Loss under

8

the Policies in connection with the defense, settlement and resolution of the Insurance Claims that exceeds: (i) any applicable retention amount; (ii) the applicable primary layer of Underlying Insurance coverage; and (iii) the relevant excess layer(s) of the Policies. ACE American agrees that in any litigation or arbitration between any Insured and any insurance company, other than ACE, with respect to the Insurance Claims or the Policies, ACE American will not dispute that Ally, the Debtors and other Insureds contend that it/they have incurred and are incurring such Loss under the Policies; *provided* that ACE American's agreement not to dispute any such contention regarding such Loss will not affect, reduce or increase ACE American's payment obligation under this Agreement.

j)    The Parties agree that the Settlement Amount is not being paid in satisfaction of any obligation due and owing from other insurance companies. In entering into this Agreement, ACE American is receiving a release from an unquantifiable basket of risks and considerations consistent with established public policy of encouraging settlement. This Agreement shall in no way reward or otherwise provide any benefit, including any monetary benefit, to any other insurance company. Nothing in this Agreement is intended to confer third party beneficiary status on any other insurance company.

3.    Effectiveness.

a)    This Agreement shall be effective upon the date on which the Order is entered by the Bankruptcy Court; *provided, however*, that if the Order is (i) not entered by the Bankruptcy Court on or before the Deadline, then the Parties agree this entire Agreement shall, without any further action by any of the Parties, be repudiated, terminated, void, without force and effect and non-binding upon any Party, or (ii) appealed by any individual, entity or other party within fourteen (14) calendar days after the Bankruptcy Court's entry of the Order, then within seven (7) calendar days after the filing of any such appeal, ACE American or Ally may repudiate this entire Agreement by providing written notice to the other Parties of such repudiation, and upon such repudiation, Ally, the Debtors and ACE American agree this entire Agreement shall be without force and effect and non-binding upon any Party.

4.    Mutual Releases.

a)    Except as otherwise provided herein, upon Ally's receipt of the Settlement Amount, Ally on its own behalf and, to the extent permitted under the terms of the Policies, on behalf of its Representatives and all other Insureds (other than the Debtors and their respective Representatives) under the Policies (collectively, the "*Ally Parties*"), shall fully and completely discharge and release ACE and its Representatives (collectively, the "*ACE Parties*") and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution,

9

indemnification, subrogation, joint liability, or otherwise that the Ally Parties had, have or may have in the future against the ACE Parties arising out of or related to the Policies and/or the Insurance Claims, including, without limitation, any claims involving assertions of bad faith or negligent claims handling investigation. For the avoidance of doubt, to the extent the Debtors have assigned their rights under the Policies to Ally pursuant to the Plan, Ally's grant on behalf of others of the aforementioned discharge and release of the Policies shall include a grant of the release and discharge of the Policies on behalf of the Debtors, the Debtors' representatives and all other Insureds under the Policies related to the Debtors. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Ally Parties of the Side-A Policies or any Insurance Claims related to the Side-A Policies or Causes of Action related to the Side-A Policies. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Ally Parties of any claim or Cause of Action directly or indirectly based upon, arising out of, or relating to Ally's auto finance business under any insurance policy (other than the Policies) purchased from any entity related to any of the ACE Parties, including without limitation ACE Bermuda and its subsidiaries and affiliates.

b) Except as otherwise provided herein, upon Ally's receipt of the Settlement Amount, the Debtors on their own behalf and, to the extent permitted under the terms of the Policies, on behalf of their Representatives and all other Insureds under the Policies (collectively, the *"Debtor Parties"*), shall fully and completely discharge and release the ACE Parties and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that the Debtor Parties had, have or may have in the future against the ACE Parties arising out of or related to the Policies, including, without limitation, any claims involving assertions of bad faith or negligent claims handling investigation related to any of the Policies. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Debtor Parties of the Insurance Claims (except as related to the Policies), or the Side-A Policies or Causes of Action related to the Side-A Policies.

c) Except as otherwise provided herein, upon Ally's receipt of the Settlement Amount, the ACE Parties shall fully and completely discharge and release:

      i. the Ally Parties and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that the ACE Parties had, have or may have in the future against the Ally Parties arising out of or related to the Policies and/or the Insurance Claims. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the ACE Parties of any right, defense, claim or Cause of Action directly or

10

indirectly based upon, arising out of, or relating to Ally's auto finance business under any insurance policy (other than the Policies) issued by any entity related to any of the ACE Parties, including without limitation ACE Bermuda and its subsidiaries and affiliates; and

ii. the Debtor Parties and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that ACE Parties had, have or may have in the future against the Debtor Parties arising out of or related to the Policies. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the ACE Parties of any rights or defenses it has against the Debtor Parties related to the Insurance Claims (except as related to the Policies).

For the avoidance of doubt, nothing in this Agreement is intended to or shall be deemed a release by the ACE Parties of any rights or defenses under the Side-A Policies (including, but not limited to, the Westchester Policy) or Causes of Action related to the Side-A Policies, including, but not limited to, any right of subrogation or any rights or defenses with respect to the Insurance Claims.

d)    Sections 4(a), 4(b) and 4(c) of this Agreement shall not apply to any claims or obligations arising from the Parties' obligations to perform under this Agreement, including Ally's obligations under Section 8 of this Agreement.

e)    With respect to the matters described in sections 4(a), 4(b) and 4(c) of this Agreement, each of the Parties acknowledges that it has been advised by its attorney concerning, and is familiar with, the provisions of California Civil Code Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each of the Parties acknowledges that it may have sustained damages, losses, fees, costs or expenses that are presently unknown and unsuspected, and that such damages, losses, fees, costs or expenses as the party may have sustained might give rise to additional damages, losses, fees, costs or expenses in the future. Nevertheless, each of the Parties acknowledges that this Agreement has been negotiated and agreed upon in light of such possible damages, losses, fees, costs and expenses, and each expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.

11

5.    Tolling of Time-Related Defenses.

    a)    In the event this Agreement is repudiated for any reason pursuant to Section 3 of this Agreement, the Parties agree that any and all legal and equitable defenses to any and all claims or causes of action based upon, or related to, the passage of time, including, but not limited to, statutes of limitations defenses, contractual defenses, the equitable defenses of laches and any and all other legal or equitable doctrines barring a claim by reason of the passage of time or by the failure of a claimant to take legal action within a prescribed period of time, shall be tolled from the date this Agreement is fully signed by all of the Parties through the date of any such repudiation.

6.    Preservation of Rights Under Other Insurance Policies, Including "Side A" Policies, and Under the Plan.

    a)    The Parties acknowledge and agree that the provisions of this Agreement are not intended to, and do not, affect, release or impair any of the Parties' or Insureds' rights as to the Side-A Policies.

    b)    Notwithstanding any other provision in this Agreement, the Parties acknowledge and agree that the provisions of this Agreement are not intended to, and do not, affect, release or impair any of the Ally Parties' or ACE Parties' rights or defenses with respect to coverage under any insurance policy that is not specifically listed as one of the Policies in Section 1(j) of this Agreement for any matter that is not an Insurance Claim. For the avoidance of doubt, and as an example only, the Ally Parties and ACE Parties acknowledge that this Agreement does not affect, release or impair any of the Ally Parties' or ACE Parties' rights or defenses with respect to coverage under any insurance policy other than the Polices for any claim or Cause of Action relating to Ally's automotive finance business, including, without limitation, any claim or Cause of Action relating to Ally's purchase of retail installment sales contracts. ACE American and Ally represent and warrant that this provision applies to, among others, any insurance policy issued by ACE Bermuda and its subsidiaries and affiliates.

    c)    ACE American and the Debtors acknowledge and agree that the provisions of this Agreement are not intended to, and do not, affect, release or impair the ACE Parties' or the Debtors Parties' rights or defenses with respect to coverage for any matter under any insurance policy that is not specifically listed as one of the Policies in Section 1(j) of this Agreement.

    d)    For the avoidance of doubt, and notwithstanding any other provision of this Agreement, the Parties agree that nothing herein shall expand or modify the assignment of the Settlement Insurance Policies (as defined in the Plan), as set forth in the Plan.

7.    Representations and Warranties.

    a)    Each Party represents and warrants that:

    i.    it is fully authorized to enter into this Agreement;

    ii.    it has not assigned, sold, transferred or otherwise disposed of the rights which are released herein, with the exception of the Debtors' relinquishment of their insurance rights to Ally as set forth in the Plan;

    iii.    it is duly organized and validly existing in good standing;

    iv.    it has undertaken all necessary corporate and legal actions in drafting, negotiating and performing under this Agreement, and that no further internal approval is necessary;

    v.    the negotiation and performance of this Agreement does not violate any of its respective articles of incorporation, charter or by-laws;

    vi.    the terms of this Agreement are fair, reasonable and equitable; and

    vii.    it has had the opportunity to consult with its own independent counsel regarding the terms of this Agreement.

b)    Each Party represents and warrants that payment of the Settlement Amount will render all limits of liability per Loss and occurrence, as well as aggregate limits of liability for each and every one of the Policies, fully paid and deemed exhausted.

c)    Each Party represents and warrants that ACE American shall have no further obligation or liability whatsoever under any of the Policies because the Policies are deemed fully exhausted by payment under this Agreement of amounts that the Ally Parties and Debtor Parties believe constitute covered Loss under the Policies, which Loss was incurred in connection with the defense, settlement and resolution of the Insurance Claims and exceeds the Policies' attachment points and respective Limits of Liability.  No Party, however, shall have a claim for damages against any of the Debtors based on an allegation that this representation or warranty is inaccurate.

d)    Each Party represents it has read this Agreement and knows the contents hereof, that the terms hereof are contractual and not merely recitals, and that it enters into this Agreement voluntarily and without any inducement other than that which is described herein.

e)    ACE American represents and warrants that it has the authority to enter into this Agreement on behalf of itself and its subsidiaries, affiliates and Representatives.

f)    ACE American represents that it has received timely and adequate notice of the Debtors' chapter 11 cases and other notices throughout the chapter 11 cases, including notice of the Plan and all materials related thereto, and it has been afforded sufficient time to file any related responses or objections.

g)    ~~Ally and the Debtors represent and warrant that to the best of their knowledge,~~ information and belief, the Plan effects a full, complete and enforceable transfer of all of the Debtors' claims, rights and interests under the Policies to Ally.

h)      Ally and the Debtors represent and warrant that they possess a good faith belief that they are authorized to bind themselves, their Representatives and any other Insureds under the Policies to the terms of this Agreement, including the releases herein, according to the terms of this Agreement. For the avoidance of doubt, to the extent the Debtors have assigned their rights under the Policies to Ally pursuant to the Plan, the Ally and the Debtors' release of the ACE Parties with respect to the Policies shall include a grant of the release and discharge on behalf of the Debtors, the Debtors' representatives and all other Insureds under the Policies related to the Debtors.

i)      Each natural person signing this Agreement represents and warrants that he or she has been authorized by the entity on whose behalf he or she is signing, and has the general and specific authority to enter into and execute this Agreement.

8.    Limited Indemnification for Settlement and Defense Costs Paid by ACE American.

a)      If a claim is made against ACE American by an Insured under one of the Policies on or before September 30, 2014, Ally will indemnify ACE American for amounts ACE American incurs in connection with such claim up to (a) the Limited Indemnification Amount and (b) if such amounts exceed the Limited Indemnification Amount, the Excess Indemnification Amount, but only to the extent any Excess Indemnification Amount remain available to indemnify such settlement and defense fees and costs. Ally will provide indemnification from the Excess Indemnification Amount to ACE American or any other insurer to which Ally owes such obligation on a first come, first serve basis until the Excess Indemnification Amount balance is extinguished; *provided; however* that Ally shall have full discretion over all distributions of the Excess Indemnification Amount.

b)      Any indemnification afforded by this Section 8 is subject to ACE American having complied with the following conditions precedent:

i.      ACE American shall provide notice of any such claim to Ally as soon as reasonably practicable, but in no event later than fifteen (15) business days after ACE American becomes aware that such a claim has been made;

ii.     ACE American shall not settle any such claim, incur any fees or costs in defending or otherwise assume any contractual obligation or admit any liability with respect to any such claim without Ally's written consent, which shall not be unreasonably withheld, and Ally shall not be liable for any settlement, fees or costs incurred defending any such claim, assumed obligation or admission to which it has not consented;

iii.    Ally shall have the right and shall be given the opportunity to associate with ACE American in the investigation, defense and settlement, including, but not limited to, the negotiation of a settlement, of any such claim that appears reasonably likely to be covered in whole or in part by this indemnification provision; and

iv.     ACE American shall provide Ally with all information, assistance, and cooperation which Ally reasonably requests and ACE American agrees

that, in the event of such a claim, ACE American will do nothing that may prejudice Ally's position, defense, or its potential or actual rights of recovery.

c)    The payment by Ally for ACE American's settlement and/or defense fees or costs reduces the amount of available Limited Indemnification Amount or Excess Indemnification Amount on a dollar-for-dollar basis.

d)    There is no indemnification whatsoever available under this provision (Section 8) other than the limited indemnification set forth above for claims made against ACE American by an Insured under the Policies. By way of example only, there is no indemnification available to ACE American for a claim made by another insurance company.

e)    ACE American shall have the right to select defense counsel for any claim subject to this section 8 of the Agreement.

9.    <u>Bankruptcy Court Approval.</u>

a)    The Debtors shall prepare a motion (the "***9019 Motion***") seeking approval of this Agreement as executed by the Parties pursuant to Federal Rule of Bankruptcy Procedure 9019. The 9019 Motion and accompanying proposed form of the Order shall be subject to review and approval by ACE American in all respects, which approval will not be unreasonably withheld. The Debtors shall provide a draft of the 9019 Motion and proposed form of the Order to counsel for ACE American before each is filed with the Bankruptcy Court.

b)    The Order approving the 9019 Motion shall approve this Agreement in its entirety, authorize and direct the Debtors to perform the obligations hereunder, and such Order shall have become final, without any appeal or modification thereof, all applicable appeal periods shall have expired and no appeals shall be pending or permitted.

c)    In the event that any individual, entity or other party appeals the Order, Ally shall give written notice to ACE American of any such appeal within two (2) days of the filing of any such appeal. Any such notice shall include copies of all pleadings and other papers filed in connection with such appeal.

10.    <u>Support of the Plan.</u>

a)    ACE American agrees not to: (i) object to confirmation of the Plan; (ii) object to, or otherwise commence any proceeding to oppose, alter, delay or impede the Plan or the other documents relating to the Plan; (iii) vote (to the extent entitled to vote) for, consent to, support or participate in the formulation of any chapter 11 plan other than the Plan; (v) directly or indirectly seek, solicit, negotiate or support any chapter 11 plan other than the Plan, or any sale or disposition of the remaining assets of the Debtors, or any dissolution, winding up, liquidation, merger, transaction, reorganization or restructuring of the Debtors, if such action reasonably could be expected to prevent, delay or impede the successful implementation of the Plan and the other documents related to the Plan;

15

(vi) object to the Debtors' solicitation of votes in favor of the Plan or support any such objection by a third party; or (vii) take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan. Nothing in this Agreement or in the Plan shall limit or impair in any way ACE's rights with respect to any Claim or demand for coverage under any insurance policy issued by ACE other than the Policies. Further, nothing in this Agreement shall affect the release, injunction and related provisions set forth in Article IX of the Plan.

11.    Limited Admissions by the Parties.

a)    This Agreement represents a compromise of disputed claims and ACE American's payment of the Settlement Payment shall not be construed as an admission on the part of ACE or the Insureds with regard to coverage under the Policies or for the Insurance Claims. ACE American acknowledges that Ally, the Debtors and all other Insureds contend that they have incurred and are incurring covered Loss under the Policies in connection with the defense, settlement and resolution of the Insurance Claims, as described herein.

b)    Nothing in this Agreement shall constitute a release, waiver or estoppel of any right of ACE, Ally or any other Insured to assert any claim or defense with respect to any other matter that is not subject to the releases contained herein, including any claims or defenses under any policy issued by ACE that is not one of the Policies.

12.    Construction Against Either Party.

a)    This Agreement shall be deemed to have been drafted jointly by the Parties; accordingly, any rule pertaining to the construction of contracts to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement or of any modifications of or amendments to this Agreement.

13.    Enforceability.

a)    If any provision of this Agreement is held to be illegal, void or unenforceable, such provision shall be of no force or effect.  However, the illegality or unenforceability of such provision shall have no effect upon, and shall not impair the legality or enforceability of, any other provision of this Agreement. Notwithstanding the foregoing, upon any finding by any court of competent jurisdiction that any release provided for in this Agreement is illegal, void or unenforceable (the "*Unenforceable Release*"), the parties agree, promptly upon the request of the other party hereto, to execute a release that is legal and enforceable and provides a release most similar in scope and in fact to the Unenforceable Release without itself being illegal, void or unenforceable.

14.    Application of Agreement Only to the Parties.

a)    Except as expressly provided herein, the Parties do not intend this Agreement to benefit any third party or entity.

15.    Confidentiality and Inadmissibility of Agreement.

    a)    Ally, the Debtors and ACE American agree to maintain the existence and terms of this Agreement in confidence and shall make no disclosure thereof to any third party except as provided herein below. Any evidence of the existence, terms or negotiation of this Agreement shall be inadmissible in any litigation, administrative proceeding or any other forum or tribunal, except as provided herein below. The Debtors will file a motion in the Bankruptcy Court authorizing them to file the Agreement under seal; provided, however, that if the Bankruptcy Court does not grant the motion to file the Agreement under seal, the Parties agree this Agreement may be filed, without redaction, on the Bankruptcy Court's electronic filing system, which is accessible online.

    b)    Notwithstanding the foregoing, the Parties and their respective attorneys may disclose the existence and terms of this Agreement or offer the existence, terms or facts concerning the negotiation of this Agreement in evidence: (i) to the extent necessary to enforce or comply with the terms of this Agreement or in a litigation or proceeding seeking solely to enforce the terms of this Agreement; (ii) as required by securities laws or the rules and regulations of any regulatory authority having jurisdiction over the Parties; (iii) as required by compulsory subpoena, order, or process issued by a court or arbitration tribunal or governmental body of competent jurisdiction; (iv) to other insurance companies; (v) to the Bankruptcy Court, Debtors, Creditors' Committee, and United States Trustee appointed in the Debtors' chapter 11 cases; (vi) to any court or arbitration panel/tribunal overseeing any other insurance coverage proceeding with respect to the Insurance Claims; (vii) to the Parties' management, directors, officers, employees, attorneys, brokers, insurers, investors, shareholders, governmental entities having an oversight role, reinsurers, retrocessionaires, auditors, accountants, and tax advisors who have a need to know such information as reasonably determined by the disclosing Party; and (viii) to any other party, entity, individual, regulator, governmental agency, association, business, or organization that, Ally and any other Insured under the Policies, in their sole discretion, may designate or select.

16.    Entire Agreement/Amendments to Agreement.

    a)    This Agreement is an integrated agreement, containing the entire understanding between the Parties regarding the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises have been made or relied upon by the Parties regarding this Agreement. This Agreement shall prevail over prior communications (written and oral) regarding the matters contained herein.

    b)    This Agreement may not be modified, changed or amended unless agreed upon by each of the Parties in writing.

17.    Notice.

a)    All notices or other communications that any party desires or is required to
provide shall be provided in writing and shall be deemed to have been given if
hand-delivered, emailed, sent by telefax or mailed to the party at the address
noted below or such other address as a party may designate in writing from time
to time:

For Ally:

> Martin Blumentritt, Risk Officer
> Ally Financial, Inc.
> 200 Renaissance Center
> Detroit, MI 48265
> Tel: (313) 656-6461
> Fax: (313) 566-2186
> E-mail: martin.blumentritt@ally.com

For the Debtors:

> William R. Thompson
> General Counsel, ResCap Liquidating Trust
> 1100 Virginia Drive, Suite 250
> MC: 190-FTW-S35
> Fort Washington, PA 19034
> Tel: (267) 419-3746
> Fax: (724) 288-9936
> E-mail: william.thompson@rescapestate.com

For ACE American:

> Norm Rafsol, Sr. Claims Officer
> ACE North America Claims
> 10 Exchange Place
> Jersey City, NJ 07302
> Tel: (201) 356-5287
> Fax: (302) 476-7254
> E-mail: norm.rafsol@acegroup.com

18.    Counterparts.

a)    This Agreement may be executed in multiple counterparts, including by facsimile
and electronic mail, each of which, when so executed and delivered, shall be an
original but such counterparts shall together constitute one and the same
instrument and agreement. Confirmation of execution by facsimile of a facsimile
signature page or electronic transmission of a scanned signature page shall be
binding upon that party so confirming.

19.    <u>Bankruptcy Court Jurisdiction.</u>

    a)    By execution and delivery of this Agreement, each of Ally, the Debtors and ACE American hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive and continuing jurisdiction of all matters arising out of, or in connection with the interpretation and performance of this Agreement.

WHEREOF, the Parties, by their duly authorized representatives, affix their signatures hereto:

**ALLY FINANCIAL INC. on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)**

Date: 1/28/2014

By _Cathy Hulmennurille_

Its _Secretary_

**ACE AMERICAN INSURANCE COMPANY on behalf of itself and its subsidiaries and affiliates**

Date: 1 27. 15

By _Norm K. Rell_

Its _Senior Claim Office, Professional Lines_

**RESIDENTIAL CAPITAL, LLC on behalf of itself and its Debtor subsidiaries**

**By RESCAP LIQUIDATING TRUST, its successor in interest**

**By QUEST TURNAROUND ADVISORS, LLC, as Liquidating Trust Manager**

Date: 1/28/14

By _Jeffrey Brodsky_

Jeffrey A Brodsky, Member

## **EXHIBIT B-2**

**Zurich Agreement**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "*Agreement*") is made as of the $\underline{28}$ day of January 2014, by and among Ally (defined below), Residential Capital, LLC and certain of its subsidiaries and affiliates (collectively, the "*Debtors*"),[1] Zurich American Insurance Company ("*Zurich American*") and Steadfast Insurance Company ("*Steadfast*," and together with Zurich American, defined below as "*Zurich*"). Each of Ally, the Debtors and Zurich is a "*Party*" and they are collectively referred to herein as the "*Parties*.

## RECITALS

WHEREAS, Zurich issued to Ally (f/k/a GMAC, LLC) the Policies (defined below) covering periods from November 2006 to December 2013;

WHEREAS, Ally, the Debtors and certain of their affiliates and subsidiaries, and certain of their directors, officers, and employees are insured under some or all of the Policies;

WHEREAS, Ally has submitted notice of certain Insurance Claims (defined below) with Zurich for coverage under the Policies including, but not limited to, the following: (i) the "Private Securities Claims" (as that term is defined in the Plan); (ii) *New Jersey Carpenters Health Fund v. Residential Capital, LLC,* Case No. 08-08781, United States District Court, Southern District of New York (the "*NJ Carpenters Lawsuit*"); (iii) *United States of America v. Bank of America,* Case No. 12-00361, United States District Court, District of Columbia and the consent judgment among the United States Department of Justice, the Attorneys General of certain states, ResCap, GMAC Mortgage, LLC (GMACM) and Ally Financial Inc. entered by the District Court for the District of Columbia on February 9, 2012 (the "*USA Litigation*"); (iv) the November 26, 2012 letter issued by counsel for the Official Committee of Unsecured Creditors to the Board of Directors of Ally Financial, Inc. and the November 26, 2013 letter issued by Wilmington Trust, N.A., as the indenture trustee for the senior unsecured notes issued

---

[1]    In addition to Residential Capital, LLC, the Debtors include: Ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

by Residential Capital LLC, to the Board of Directors of Ally Financial, Inc. (collectively, the *"D&O Demands"*); (v) proofs of claim filed in the Debtors' chapter 11 cases by Wilmington Trust, National Association, including, but not limited to, claim number 5256 (the *"Proofs of Claim"*); and (vi) any and all claims asserted against Ally and other Insureds (as defined in the Policies) by the Federal Housing Finance Agency (*"FHFA"*) and the Federal Deposit Insurance Corporation (*"FDIC"*), relating to RMBS (as defined below) or the Debtors (with the D&O Demands and Proofs of Claim, the *"Chapter 11 Demands"*);

WHEREAS, the Insureds (as defined in the Policies) have incurred, are incurring and will incur in the future certain costs, fees, and expenses in defending, settling or resolving the Insurance Claims;

WHEREAS, on February 9, 2012, Ally, the Debtors and the plaintiffs in the USA Litigation agreed to settle, in part, the claims asserted in the USA Litigation in exchange for, among other things, the Debtors making a $109 million hard dollar payment to the plaintiffs;

WHEREAS, Zurich previously raised certain coverage issues and defenses under the Policies with respect to the Insurance Claims and has otherwise reserved all of its rights and defenses available under the Policies and at law;

WHEREAS, Ally, on its own behalf and on behalf of all Insureds, has disputed the coverage issues and defenses raised by Zurich with respect to the Insurance Claims and has otherwise reserved all of the Insureds' rights and defenses under the Policies and available at law;

WHEREAS, on May 14, 2012, the Debtors filed voluntary petitions under Chapter 11 of Title 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (the *"Bankruptcy Court"*) and the associated cases are being jointly administered as *In Re Residential Capital, LLC, et al.*, Case No. 12-12020-mg (Bankr. S.D.N.Y. 2012);

WHEREAS, on July 3, 2013, the Debtors and the Official Committee of Unsecured Creditors in the Debtors' chapter 11 cases (the *"Creditors' Committee"*) filed the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors [Docket No. 4153] (as may be revised, amended or modified, the *"Plan"*) and related disclosure statement [Docket No. 4809] (as may be revised, amended or modified, the *"Disclosure Statement"*);

WHEREAS, on August 23, 2013, the Bankruptcy Court entered an order approving the Disclosure Statement;

WHEREAS, on August 23, 2013, solicitation versions of the Disclosure Statement and the Plan were filed in the Debtors' chapter 11 cases [Docket No. 4819];

WHEREAS, the Plan provides, among other things, that Ally will pay to the Debtors' estates $1.95 billion in cash or cash equivalents, and will further contribute $150 million

received by Ally for claims it pursues against the Insureds' insurance carriers, including Zurich, in settlement of the claims released in connection with the Plan, with such amount guaranteed by Ally to be paid no later than September 30, 2014 (the "***Insurance Contribution***");

WHEREAS, Ally, on behalf of itself and all other Insureds, demanded that Zurich reimburse Ally for amounts the Insureds have incurred, are incurring and will incur in defending, settling and resolving the Insurance Claims, which amounts the Insureds believe constitute covered Loss far-in-excess of the Limit of Liability applicable to each of the Policies;

WHEREAS, Ally, the Debtors and all other Insureds under the Policies, and Zurich desired to resolve all coverage issues and disputes among the Parties regarding the Policies and coverage for the Insurance Claims, and therefore agreed to engage in good-faith and arms-length negotiations;

WHEREAS, as a result of Ally's and Zurich's negotiations, Zurich has agreed to contribute to the Insurance Contribution, as necessary, by paying the Settlement Amount (defined below) to Ally in exchange for, among other things, a resolution of Ally's, the Debtors' and all other Insureds' current and future disputes, claims, actions, suits, demands, and causes of action relating to or arising out of the Policies or the Insurance Claims, as more fully described herein, and subject to the terms and conditions set forth in this Agreement; and

WHEREAS, Ally, the Debtors and Zurich have entered into this Agreement to, among other things, effectuate the Insurance Contribution, as necessary, and, in the interest of avoiding any further uncertainty, amicably resolve all claims and disputes relating to, or arising out of the Policies or the Insurance Claims, subject to the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1.  Definitions.

    a)  "Ally" means Ally Financial, Inc. (f/k/a GMAC LLC) and its direct and indirect non-Debtor affiliates and subsidiaries, including each of their respective Representatives.

    b)  "Causes of Action" means any and all actual or potential actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, costs, attorney's fees, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity

3

claims, counterclaims, and cross-claims whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending as of the date hereof or instituted hereafter against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the date hereof.

c)    "Effective Date" means the effective date of the Plan.

d)    "Excess Indemnification Amount" means ▮▮▮▮▮▮, which will be reduced on a dollar-for-dollar basis to the extent of Ally's indemnification of any claim under Section 8 of this Agreement, or under any similar indemnification provision in a claim settlement agreement with any of Ally's insurers (collectively such insurers will form the "*Excess Indemnification Pool*"), in excess of the Limited Indemnification Amount set forth in this Agreement or the limited indemnification amount set forth in any other similar agreement. For the avoidance of doubt, Ally will have full discretion with regard to participation in the Excess Indemnification Pool and all distributions made from the Excess Indemnification Amount.

e)    "Insurance Claims" means any "Claim" (as defined in the Policies), notice of Wrongful Act (as the term Wrongful Act is defined in the Policies) or potential Claim or other matter that was or could have been noticed or submitted by or on behalf of any Insured under any of the Policies before the Effective Date to Zurich for coverage under any insurance policy issued by Zurich to Ally, the Debtors or any Insured under the Policies based upon, arising out of, or related to the following:

- the Debtors, including any Claim, notice of Wrongful Act or potential Claim or other matter in any way related to RMBS (as defined below) issued or sold by the Debtors or their affiliates, the Chapter 11 Cases (as defined in the Plan), the Plan, the Consent Order (as defined in the Plan), or the Order of Assessment (as defined in the Plan);

- the Private Securities Claims;

- the "MBS Actions" and "Additional MBS Actions" identified in the March 10, 2009 July 25, 2011 and October 25, 2011 letters issued by or on behalf of Federal Insurance Company to GMAC, LLC and/or Ally Financial, Inc. (the "*Chubb Letters*");

- the "MBIA Litigation" identified in the Chubb Letters;

4

- the NJ Carpenters Lawsuit;

- any claims asserted by Financial Guaranty Insurance Company, MBIA Insurance Corporation, Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation, Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.) and other insurers who provided financial guaranty insurance policies insuring amounts payable to RMBS in connection with any "RMBS Trusts" (as defined in the Plan);

- the USA Litigation;

- *In the Matter of Ally Financial, Inc., et al.*, FRB Docket No. 11-020-B-HC 11-020-B-DEO;

- the "Robo-Signing Actions" identified in the December 16, 2011 letter issued by counsel to Federal Insurance Company to Marsh FINPRO, in its capacity as the insurance broker for the Insureds under the Policies;

- the RMBS Trust Claims (defined below);

- any claims asserted by FHFA, FDIC, the Federal National Mortgage Association and the National Credit Union Administration Board based, upon, arising out of or related to any RMBS, including, but not limited to, *Federal Housing Finance Agency v. Ally Financial Inc.*, Index No. 652441/2011, New York County Supreme Court, State of New York, *Federal Deposit Insurance Corporation v. Citigroup Mortgage Loan Trust, Inc.*, Case No. 03-CV-201, *Montgomery County Circuit Court, State of Alabama, Federal Deposit Insurance Corporation v. Ally Securities LLC*, Case No. D-1-GN-12-002522, *Travis County District Court, 200th Judicial District, State of Texas, Federal Deposit Insurance Corporation v. Chase Mortgage Finance Corp.*, Case No. 12-06166, United States District Court, Southern District of New York, *Federal Deposit Insurance Corporation v. Bear Stearns Asset Backed Securities I LLC*, Case No. 12-4000, United States District Court, Southern District of New York; and *National Credit Union Administration Board v. Residential Funding Securities LLC*, Case No. 13-06730, United States District Court, Southern District of New York;

- the D&O Demands; and

- all other Chapter 11 Demands; *provided, however,* that the Insurance Claims do not include any claims for coverage under any (i) "Side A-only" policy of insurance, (ii) "Side-A DIC/difference in conditions" policy of insurance or (iii) "Excess A side-only" policy of insurance (collectively, the *"Side-A Policies"*); and

5

*provided, further,* that the Insurance Claims do not include any claims directly or indirectly arising out of or related to the auto finance activities of Ally, including without limitation any claims relating to the purchase of retail installment sales contracts by Ally;

*notwithstanding anything in this definition,* the Zurich Parties (defined below) and Ally Parties (defined below) acknowledge and agree that, except with respect to the Insurance Claims, the provisions of this Agreement do not affect, release, waive or impair any of the Zurich Parties' or any of the Ally Parties' rights or defenses with respect to any insurance policies not listed in Section 1(j) of this Agreement.

f)    "Limited Indemnification Amount" means ███████ USD.

g)    "Loss" as used herein shall have the same meaning as defined in the Policies.

h)    "Payment Due Date" means twenty-eight (28) calendar days after the date on which an order approving the 9019 Motion (as defined herein) is entered by the Bankruptcy Court (the **"Order"**); *provided, however,* that if the Order is (i) not entered by the Bankruptcy Court on or before March 31, 2014 (the **"Deadline"**), then the Parties agree this entire Agreement shall, without any further action by any of the Parties, be repudiated, terminated, void, without force and effect and non-binding upon any Party, or (ii) appealed by any individual, entity or other party within fourteen (14) calendar days after the Bankruptcy Court's entry of the Order, then within seven (7) calendar days after the filing of any such appeal, Zurich or Ally may repudiate this entire Agreement in writing pursuant to section 3 of this Agreement.

i)    "Policies" means the insurance policies issued by Zurich to Ally bearing the following policy numbers:

| Policy No. | Policy Period | Policy |
|---|---|---|



j)  "RMBS" means any residential mortgage-backed securities, notes and certificates issued by the RMBS Trusts (as defined in the Plan).

k)  "RMBS Trust Claims" means claims based upon, arising under, or related to any RMBS issued by any residential mortgage backed securitization trusts, net interest margin trusts or similar residential mortgage backed trusts for which the Debtors have acted or currently act as a sponsor, depositor, servicer, master servicer or in similar capacities, including, but not limited to, any "RMBS R+W Claims" and any "RMBS Cure Claims" (as defined in the Plan).

l)  "Representatives" means current and former: members, associates, shareholders, partners, affiliates, successors, assigns, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, auditors, investment bankers, lenders, consultants, advisors, insurers and reinsurers, representatives, heirs, executors, estates, administrators, receivers, trustees, other professionals, successors and assigns, each solely in his, her or its capacity as such. For the avoidance of doubt, as to the Debtors and Ally, the term Representatives shall include any and all Insureds under the Policies.

m)  "Settlement Amount" means ▮▮▮▮▮▮▮▮ USD.

n)  "Zurich" means Zurich American Insurance Company and Steadfast Insurance Company, including any and all of its direct and indirect parent companies, affiliates and subsidiaries throughout the world, and any and all of the Representatives of any and all of the foregoing entities.

2.  <u>Payment of the Insurance Claims and Exhaustion of Policy Limits.</u>

a)  Zurich will pay the Settlement Amount to Ally Financial Inc. on the Payment Due Date. Payment of the Settlement Amount will settle and resolve all of the disputes between and among the Parties regarding the Policies, and between Zurich and Ally regarding the Insurance Claims as set forth in this Agreement.

b)  The Settlement Amount will be paid by Zurich by wire transfer. Ally will provide Zurich with account information and wiring instructions upon entry of the Order.

c)  The Settlement Amount is net of any and all prior payments by or on behalf of Zurich under the Policies, and shall not result in Ally, the Debtors, or any other Insured owing Zurich, with respect to the Policies only, any retrospective premium adjustments, other post-loss or post-claim payment adjustments or other payment obligations, such as a deductible, retention, or self-insured retention.

d)  Ally will pay the Settlement Amount, or the portion thereof necessary to satisfy the Insurance Contribution, to the Debtors' estates or the liquidating trust, as

7

applicable, within 30 calendar days after receipt of the Settlement Amount from Zurich; *provided* that (i) the Debtors are current on their obligations under section IV(B)(e) of the chapter 11 plan subject to the terms of the Plan and (ii) Ally has not already paid the Insurance Contribution in full.

e)    Zurich's payment of the Settlement Amount is without prejudice to: (i) the Ally Parties' (as defined below) right to assert claims for coverage for any matter that is not an Insurance Claim under any insurance policies covering an Insured, including but not limited to insurance policies issued by Zurich, other than the Policies; (ii) the Debtors Parties' (defined below) right to assert claims for coverage under any insurance policy covering an Insured other than the Policies; and (iii) Zurich's rights with respect to coverage for any claim (including the Insurance Claims) under any insurance policy other than the Policies.

f)    If, as a result of a subsequent arbitration or litigation proceeding between any Insured and any other insurance company regarding any or all of the Insurance Claims, a court or appointed arbitrator determines that any or all of the Insurance Claims should be allocated to a specific policy period or policy type referenced in section 1(j), Zurich shall not dispute such determination. Notwithstanding any such determination, Zurich shall not be required to reallocate any part of the Settlement Amount to any specific policy period or policy type. Any such determination shall not release, reduce, increase or otherwise affect Zurich's payment obligations under this Agreement or under the Policies, or entitle Zurich to any refund, recoupment, or other remittance of any kind.

g)    The Settlement Amount represents payment of limits attaching above and excess of the Underlying Insurance (as defined in the Policies) and is not drop down coverage, umbrella coverage or any other payment in the stead of, alternative to or on behalf of any Underlying Insurance for each of the years any of the Policies was in effect.

h)    The Parties agree that by Zurich paying the Settlement Amount on the Payment Due Date, Zurich is not acting as a volunteer.

i)    Zurich acknowledges that Ally, the Debtors and all other Insureds under the Policies contend that they have incurred and are incurring covered Loss under the Policies in connection with the defense, settlement and resolution of the Insurance Claims that exceeds: (i) any applicable retention amount; (ii) the applicable layers of Underlying Insurance coverage; and (iii) the relevant excess layer(s) of the Policies. Zurich agrees that in any litigation or arbitration between any Insured and any insurance company, other than Zurich, with respect to the Insurance Claims or the Policies, Zurich will not dispute that Ally, the Debtors and other Insureds contend that it/they have incurred and are incurring such Loss under the Policies; *provided* that Zurich's agreement not to dispute any such contention

8

regarding such Loss will not affect, reduce or increase Zurich's payment obligation under this Agreement.

j)     The Parties agree that the Settlement Amount is not being paid in satisfaction of any obligation due and owing from other insurance companies. In entering into this Agreement, Zurich is receiving a release from an unquantifiable basket of risks and considerations consistent with established public policy of encouraging settlement. This Agreement shall in no way reward or otherwise provide any benefit, including any monetary benefit, to any other insurance company. Nothing in this Agreement is intended to confer third party beneficiary status on any other insurance company.

3.     <u>Effectiveness.</u>

a)     This Agreement shall be effective upon the date on which the Order is entered by the Bankruptcy Court; *provided, however*, that if the Order is (i) not entered by the Bankruptcy Court on or before the Deadline, then the Parties agree this entire Agreement shall, without any further action by any of the Parties, be repudiated, terminated, void, without force and effect and non-binding upon any Party, or (ii) appealed by any individual, entity or other party within fourteen (14) calendar days after the Bankruptcy Court's entry of the Order, then within seven (7) calendar days after the filing of any such appeal, Zurich or Ally may repudiate this entire Agreement by providing written notice to the other Parties of such repudiation, and upon such repudiation, Ally, the Debtors and Zurich agree this entire Agreement shall be without force and effect and non-binding upon any Party.

4.     <u>Mutual Releases.</u>

a)     Except as otherwise provided herein, upon Ally's receipt of the Settlement Amount, Ally on its own behalf and, to the extent permitted under the terms of the Policies, on behalf of its Representatives and all other Insureds (other than the Debtors and their respective Representatives) under the Policies (collectively, the "***Ally Parties***"), shall fully and completely discharge and release Zurich and its Representatives (collectively, the "***Zurich Parties***") and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that the Ally Parties had, have or may have in the future against the Zurich Parties arising out of or related to the Policies and/or the Insurance Claims, including, without limitation, any claims involving assertions of bad faith or negligent claims handling investigation. For the avoidance of doubt, to the extent the Debtors have assigned their rights under the Policies to Ally pursuant to the Plan, Ally's grant on behalf of others of the aforementioned discharge and release of the Policies shall include a grant of the

9

release and discharge of the Policies on behalf of the Debtors, the Debtors' representatives and all other Insureds under the Policies related to the Debtors. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Ally Parties of the Side-A Policies or any Insurance Claims related to the Side-A Policies or Causes of Action related to the Side-A Policies. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Ally Parties of any claim or Cause of Action directly or indirectly based upon, arising out of, or relating to Ally's auto finance business under any insurance policy (other than the Policies) purchased from any entity related to any of the Zurich Parties.

b)    Except as otherwise provided herein, upon Ally's receipt of the Settlement Amount, the Debtors on their own behalf and, to the extent permitted under the terms of the Policies, on behalf of their Representatives and all other Insureds under the Policies (collectively, the "**Debtor Parties**"), shall fully and completely discharge and release the Zurich Parties and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that the Debtor Parties had, have or may have in the future against the Zurich Parties arising out of or related to the Policies, including, without limitation, any claims involving assertions of bad faith or negligent claims handling investigation related to any of the Policies. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Debtor Parties of the Insurance Claims (except as related to the Policies), or the Side-A Policies or Causes of Action related to the Side-A Policies.

c)    Except as otherwise provided herein, upon Ally's receipt of the Settlement Amount, the Zurich Parties shall fully and completely discharge and release:

    i.    the Ally Parties and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that the Zurich Parties had, have or may have in the future against the Ally Parties arising out of or related to the Policies and/or the Insurance Claims. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Zurich Parties of any right, defense, claim or Cause of Action directly or indirectly based upon, arising out of, or relating to Ally's auto finance business under any insurance policy (other than the Policies) issued by any entity related to any of the Zurich Parties; and

10

    ii. the Debtor Parties and property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, subrogation, joint liability, or otherwise that Zurich Parties had, have or may have in the future against the Debtor Parties arising out of or related to the Policies. For the avoidance of doubt, nothing in this Agreement is intended to be or shall be deemed a release by the Zurich Parties of any rights or defenses it has against the Debtor Parties related to the Insurance Claims (except as related to the Policies).

For the avoidance of doubt, nothing in this Agreement is intended to or shall be deemed a release by the Zurich Parties of any rights or defenses under the Side-A Policies or Causes of Action related to the Side-A Policies, including, but not limited to, any right of subrogation or any rights or defenses with respect to the Insurance Claims.

d)      Sections 4(a), 4(b) and 4(c) of this Agreement shall not apply to any claims or obligations arising from the Parties' obligations to perform under this Agreement, including Ally's obligations under Section 8 of this Agreement.

e)      With respect to the matters described in sections 4(a), 4(b) and 4(c) of this Agreement, each of the Parties acknowledges that it has been advised by its attorney concerning, and is familiar with, the provisions of California Civil Code Section 1542, which provides:

    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each of the Parties acknowledges that it may have sustained damages, losses, fees, costs or expenses that are presently unknown and unsuspected, and that such damages, losses, fees, costs or expenses as the party may have sustained might give rise to additional damages, losses, fees, costs or expenses in the future. Nevertheless, each of the Parties acknowledges that this Agreement has been negotiated and agreed upon in light of such possible damages, losses, fees, costs and expenses, and each expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.

11

5.    Tolling of Time-Related Defenses.

    a)    In the event this Agreement is repudiated for any reason pursuant to Section 3 of this Agreement, the Parties agree that any and all legal and equitable defenses to any and all claims or causes of action based upon, or related to, the passage of time, including, but not limited to, statutes of limitations defenses, contractual defenses, the equitable defenses of laches and any and all other legal or equitable doctrines barring a claim by reason of the passage of time or by the failure of a claimant to take legal action within a prescribed period of time, shall be tolled from the date this Agreement is fully signed by all of the Parties through the date of any such repudiation.

6.    Preservation of Rights Under Other Insurance Policies, Including "Side A" Policies, and Under the Plan.

    a)    The Parties acknowledge and agree that the provisions of this Agreement are not intended to, and do not, affect, release or impair any of the Parties' or Insureds' rights as to the Side-A Policies.

    b)    Notwithstanding any other provision in this Agreement, the Parties acknowledge and agree that the provisions of this Agreement are not intended to, and do not, affect, release or impair any of the Ally Parties' or Zurich Parties' rights or defenses with respect to coverage under any insurance policy that is not specifically listed as one of the Policies in Section 1(j) of this Agreement for any matter that is not an Insurance Claim.  For the avoidance of doubt, and as an example only, the Ally Parties and Zurich Parties acknowledge that this Agreement does not affect, release or impair any of the Ally Parties' or Zurich Parties' rights or defenses with respect to coverage under any insurance policy other than the Polices for any claim or Cause of Action relating to Ally's automotive finance business, including, without limitation, any claim or Cause of Action relating to Ally's purchase of retail installment sales contracts.

    c)    Zurich and the Debtors acknowledge and agree that the provisions of this Agreement are not intended to, and do not, affect, release or impair the Zurich Parties' or the Debtors Parties' rights or defenses with respect to coverage for any matter under any insurance policy that is not specifically listed as one of the Policies in Section 1(j) of this Agreement.

    d)    For the avoidance of doubt, and notwithstanding any other provision of this Agreement, the Parties agree that nothing herein shall expand or modify the assignment of the Settlement Insurance Policies (as defined in the Plan), as set forth in the Plan.

7.    Representations and Warranties.

    a)    Each Party represents and warrants that:

i.     it is fully authorized to enter into this Agreement;

ii.     it has not assigned, sold, transferred or otherwise disposed of the rights which are released herein, with the exception of the Debtors' relinquishment of their insurance rights to Ally as set forth in the Plan;

iii.     it is duly organized and validly existing in good standing;

iv.     it has undertaken all necessary corporate and legal actions in drafting, negotiating and performing under this Agreement, and that no further internal approval is necessary;

v.     the negotiation and performance of this Agreement does not violate any of its respective articles of incorporation, charter or by-laws;

vi.     the terms of this Agreement are fair, reasonable and equitable; and

vii.     it has had the opportunity to consult with its own independent counsel regarding the terms of this Agreement.

b)     Each Party represents and warrants that payment of the Settlement Amount will render all limits of liability per Loss and occurrence, as well as aggregate limits of liability for each and every one of the Policies, fully paid and deemed exhausted.

c)     Each Party represents and warrants that Zurich shall have no further obligation or liability whatsoever under any of the Policies because the Policies are deemed fully exhausted by payment under this Agreement of amounts that the Ally Parties and Debtor Parties believe constitute covered Loss under the Policies, which Loss was incurred in connection with the defense, settlement and resolution of the Insurance Claims and exceeds the Policies' attachment points and respective Limits of Liability. No Party, however, shall have a claim for damages against any of the Debtors based on an allegation that this representation or warranty is inaccurate.

d)     Each Party represents it has read this Agreement and knows the contents hereof, that the terms hereof are contractual and not merely recitals, and that it enters into this Agreement voluntarily and without any inducement other than that which is described herein.

e)     Zurich represents and warrants that it has the authority to enter into this Agreement on behalf of itself and its subsidiaries, affiliates and Representatives.

f)     Zurich represents that it has received timely and adequate notice of the Debtors' chapter 11 cases and other notices throughout the chapter 11 cases, including notice of the Plan and all materials related thereto, and it has been afforded sufficient time to file any related responses or objections.

13

g)    Ally and the Debtors represent and warrant that to the best of their knowledge, information and belief, the Plan effects a full, complete and enforceable transfer of all of the Debtors' claims, rights and interests under the Policies to Ally.

h)    Ally and the Debtors represent and warrant that they possess a good faith belief that they are authorized to bind themselves, their Representatives and any other Insureds under the Policies to the terms of this Agreement, including the releases herein, according to the terms of this Agreement. For the avoidance of doubt, to the extent the Debtors have assigned their rights under the Policies to Ally pursuant to the Plan, the Ally and the Debtors' release of the Zurich Parties with respect to the Policies shall include a grant of the release and discharge on behalf of the Debtors, the Debtors' representatives and all other Insureds under the Policies related to the Debtors.

i)    Each natural person signing this Agreement represents and warrants that he or she has been authorized by the entity on whose behalf he or she is signing, and has the general and specific authority to enter into and execute this Agreement.

8.    <u>Limited Indemnification for Settlement and Defense Costs Paid by Zurich.</u>

a)    If a claim is made against Zurich by an Insured under one of the Policies on or before September 30, 2014, Ally will indemnify Zurich for amounts Zurich incurs in connection with such claim up to (a) the Limited Indemnification Amount and (b) if such amounts exceed the Limited Indemnification Amount, the Excess Indemnification Amount, but only to the extent any Excess Indemnification Amount remain available to indemnify such settlement and defense fees and costs. Ally will provide indemnification from the Excess Indemnification Amount to Zurich or any other insurer to which Ally owes such obligation on a first come, first serve basis until the Excess Indemnification Amount balance is extinguished; *provided; however* that Ally shall have full discretion over all distributions of the Excess Indemnification Amount.

b)    Any indemnification afforded by this Section 8 is subject to Zurich having complied with the following conditions precedent:

    i.    Zurich shall provide notice of any such claim to Ally as soon as reasonably practicable, but in no event later than fifteen (15) business days after Zurich's Managing Director of Financial Solutions Claims (as specified in section 17) becomes aware that such a claim has been made;

    ii.    Zurich shall not settle any such claim, incur any fees or costs in defending or otherwise assume any contractual obligation or admit any liability with respect to any such claim without Ally's written consent, which shall not be unreasonably withheld, and Ally shall not be liable for any settlement, fees or costs incurred defending any such claim, assumed obligation or admission to which it has not consented;

14

iii.   Ally shall have the right and shall be given the opportunity to associate with Zurich in the investigation, defense and settlement, including, but not limited to, the negotiation of a settlement, of any such claim that appears reasonably likely to be covered in whole or in part by this indemnification provision; and

iv.   Zurich shall provide Ally with all information, assistance, and cooperation which Ally reasonably requests and Zurich agrees that, in the event of such a claim, Zurich will do nothing that may prejudice Ally's position, defense, or its potential or actual rights of recovery.

c)   The payment by Ally for Zurich's settlement and/or defense fees or costs reduces the amount of available Limited Indemnification Amount or Excess Indemnification Amount on a dollar-for-dollar basis.

d)   There is no indemnification whatsoever available under this provision (Section 8) other than the limited indemnification set forth above for claims made against Zurich by an Insured under the Policies. By way of example only, there is no indemnification available to Zurich for a claim made by another insurance company.

e)   Zurich shall have the right to select defense counsel for any claim subject to this section 8 of the Agreement.

9.   Bankruptcy Court Approval.

a)   The Debtors shall prepare a motion (the **"9019 Motion"**) seeking approval of this Agreement as executed by the Parties pursuant to Federal Rule of Bankruptcy Procedure 9019. The 9019 Motion and accompanying proposed form of the Order shall be subject to review and approval by Zurich in all respects, which approval will not be unreasonably withheld. The Debtors shall provide a draft of the 9019 Motion and proposed form of the Order to counsel for Zurich before each is filed with the Bankruptcy Court.

b)   The Order approving the 9019 Motion shall approve this Agreement in its entirety, authorize and direct the Debtors to perform the obligations hereunder, and such Order shall have become final, without any appeal or modification thereof, all applicable appeal periods shall have expired and no appeals shall be pending or permitted.

c)   In the event that any individual, entity or other party appeals the Order, Ally shall give written notice to Zurich of any such appeal within two (2) days of the filing of any such appeal. Any such notice shall include copies of all pleadings and other papers filed in connection with such appeal.

15

10.   Support of the Plan.

a)   Zurich agrees not to: (i) object to confirmation of the Plan; (ii) object to, or
otherwise commence any proceeding to oppose, alter, delay or impede the Plan or
the other documents relating to the Plan; (iii) vote (to the extent entitled to vote)
for, consent to, support or participate in the formulation of any chapter 11 plan
other than the Plan; (v) directly or indirectly seek, solicit, negotiate or support any
chapter 11 plan other than the Plan, or any sale or disposition of the remaining
assets of the Debtors, or any dissolution, winding up, liquidation, merger,
transaction, reorganization or restructuring of the Debtors, if such action
reasonably could be expected to prevent, delay or impede the successful
implementation of the Plan and the other documents related to the Plan;
(vi) object to the Debtors' solicitation of votes in favor of the Plan or support any
such objection by a third party; or (vii) take any other action not required by law
that is inconsistent with, or that would materially delay, the confirmation or
consummation of the Plan.  Nothing in this Agreement or in the Plan shall limit or
impair in any way Zurich's rights with respect to any Claim or demand for
coverage under any insurance policy issued by Zurich other than the Policies.
Further, nothing in this Agreement shall affect the release, injunction and related
provisions set forth in Article IX of the Plan.

11.   Limited Admissions by the Parties.

a)   This Agreement represents a compromise of disputed claims and Zurich's
payment of the Settlement Payment shall not be construed as an admission on the
part of Zurich or the Insureds with regard to coverage under the Policies or for the
Insurance Claims.  Zurich acknowledges that Ally, the Debtors and all other
Insureds contend that they have incurred and are incurring covered Loss under the
Policies in connection with the defense, settlement and resolution of the Insurance
Claims, as described herein.

b)   Nothing in this Agreement shall constitute a release, waiver or estoppel of any
right of Zurich, Ally or any other Insured to assert any claim or defense with
respect to any other matter that is not subject to the releases contained herein,
including any claims or defenses under any policy issued by Zurich that is not one
of the Policies.

12.   Construction Against Either Party.

a)   This Agreement shall be deemed to have been drafted jointly by the Parties;
accordingly, any rule pertaining to the construction of contracts to the effect that
ambiguities are to be resolved against the drafting party shall not apply to the
interpretation of this Agreement or of any modifications of or amendments to this
Agreement.

16

13.   **Enforceability.**

   a)   If any provision of this Agreement is held to be illegal, void or unenforceable, such provision shall be of no force or effect. However, the illegality or unenforceability of such provision shall have no effect upon, and shall not impair the legality or enforceability of, any other provision of this Agreement. Notwithstanding the foregoing, upon any finding by any court of competent jurisdiction that any release provided for in this Agreement is illegal, void or unenforceable (the *"Unenforceable Release"*), the parties agree, promptly upon the request of the other party hereto, to execute a release that is legal and enforceable and provides a release most similar in scope and in fact to the Unenforceable Release without itself being illegal, void or unenforceable.

14.   **Application of Agreement Only to the Parties.**

   a)   Except as expressly provided herein, the Parties do not intend this Agreement to benefit any third party or entity.

15.   **Confidentiality and Inadmissibility of Agreement.**

   a)   Ally, the Debtors and Zurich agree to maintain the existence and terms of this Agreement in confidence and shall make no disclosure thereof to any third party except as provided herein below. Any evidence of the existence, terms or negotiation of this Agreement shall be inadmissible in any litigation, administrative proceeding or any other forum or tribunal, except as provided herein below. The Debtors will file a motion in the Bankruptcy Court authorizing them to file the Agreement under seal; provided, however, that if the Bankruptcy Court does not grant the motion to file the Agreement under seal, the Parties agree this Agreement may be filed, without redaction, on the Bankruptcy Court's electronic filing system, which is accessible online.

   b)   Notwithstanding the foregoing, the Parties and their respective attorneys may disclose the existence and terms of this Agreement or offer the existence, terms or facts concerning the negotiation of this Agreement in evidence: (i) to the extent necessary to enforce or comply with the terms of this Agreement or in a litigation or proceeding seeking solely to enforce the terms of this Agreement; (ii) as required by securities laws or the rules and regulations of any regulatory authority having jurisdiction over the Parties; (iii) as required by compulsory subpoena, order, or process issued by a court or arbitration tribunal or governmental body of competent jurisdiction; (iv) to other insurance companies; (v) to the Bankruptcy Court, Debtors, Creditors' Committee, and United States Trustee appointed in the Debtors' chapter 11 cases; (vi) to any court or arbitration panel/tribunal overseeing any other insurance coverage proceeding with respect to the Insurance Claims; (vii) to the Parties' management, directors, officers, employees, attorneys, brokers, insurers, investors, shareholders, governmental entities having an oversight role, reinsurers, retrocessionaires, auditors, accountants, and tax advisors who have a need to know such information as reasonably determined by

17

the disclosing Party; and (viii) to any other party, entity, individual, regulator, governmental agency, association, business, or organization that, Ally and any other Insured under the Policies, in their sole discretion, may designate or select.

16.   Entire Agreement/Amendments to Agreement.

a)   This Agreement is an integrated agreement, containing the entire understanding between the Parties regarding the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises have been made or relied upon by the Parties regarding this Agreement.   This Agreement shall prevail over prior communications (written and oral) regarding the matters contained herein.

b)   This Agreement may not be modified, changed or amended unless agreed upon by each of the Parties in writing.

17.   Notice.

a)   All notices or other communications that any party desires or is required to provide shall be provided in writing and shall be deemed to have been given if hand-delivered, emailed, sent by telefax or mailed to the party at the address noted below or such other address as a party may designate in writing from time to time:

For Ally:

Martin Blumentritt, Risk Officer
Ally Financial, Inc.
200 Renaissance Center
Detroit, MI 48265
Tel: (313) 656-6461
Fax: (313) 566-2186
E-mail: martin.blumentritt@ally.com

For the Debtors:

18

William R. Thompson
General Counsel, ResCap Liquidating Trust
1100 Virginia Drive, Suite 250
MC: 190-FTW-S35
Fort Washington, PA 19034
Tel: (267) 419-3746
Fax: (724) 288-9936
E-mail:  william.thompson@rescapestate.com

For Zurich:

James J. Real
Vice President & Managing Director
Financial Solutions Claims
One Liberty Plaza, 33rd Floor
New York, NY 10006
Tel: (212) 553-5514
Fax: (212) 225-7034
E-mail: james.real@zurichna.com

18.   Counterparts.

a)   This Agreement may be executed in multiple counterparts, including by facsimile and electronic mail, each of which, when so executed and delivered, shall be an original but such counterparts shall together constitute one and the same instrument and agreement.  Confirmation of execution by facsimile of a facsimile signature page or electronic transmission of a scanned signature page shall be binding upon that party so confirming.

19.   Bankruptcy Court Jurisdiction.

a)   By execution and delivery of this Agreement, each of Ally, the Debtors and Zurich hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive and continuing jurisdiction of all matters arising out of, or in connection with the interpretation and performance of this Agreement.

19

WHEREOF, the Parties, by their duly authorized representatives, affix their signatures hereto:

ALLY FINANCIAL INC. on behalf of itself and its
subsidiaries and affiliates (excluding the Debtors and
their direct and indirect subsidiaries)

Date: 1/27/2014

By _Cathy Quinennville_

Its _Secetary_

ZURICH AMERICAN INSURANCE COMPANY
on behalf of itself and its subsidiaries and affiliates

Date: 1.28.14

By _____

Its _Vice President Claims_

STEADFAST INSURANCE COMPANY on behalf
of itself and its subsidiaries and affiliates

Date: 1.28.14

By _____

Its _Vice President Claims_

RESIDENTIAL CAPITAL, LLC on behalf of itself
and its Debtor subsidiaries

By RESCAP LIQUIDATING TRUST, its successor
in interest

By QUEST TURNAROUND ADVISORS, LLC, as
Liquidating Trust Manager

Date: 1/27/14

By _____

Jeffrey A Brodsky, Member