**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Post-Effective Date Debtors. | Jointly Administered |

**DECLARATION OF MARTIN BLUMENTRITT IN
SUPPORT OF THE RESCAP LIQUIDATING TRUST'S MOTION
FOR ENTRY OF AN ORDER AUTHORIZING THE LIQUIDATING
TRUST TO ENTER INTO CERTAIN SETTLEMENT AGREEMENTS**

I, Martin Blumentritt, being duly sworn, state the following under penalty of perjury:

1. I am a risk officer in the Corporate Insurance and Business Continuity department of Ally Financial Inc. (along with its non-Debtor affiliates and subsidiaries, "*Ally*").[1] I am authorized to submit this declaration (the "*Declaration*") on behalf of Ally in support of the *ResCap Liquidating Trust's Motion for Entry of an Order Authorizing the Liquidating Trust to Enter into Certain Settlement Agreements* (the "*Motion*"), filed contemporaneously herewith.

2. Except as otherwise noted, I have personal knowledge of the matters set forth herein. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**Qualifications**

3. I have served in my current position since June 1, 2006. I hold a Bachelor of Arts degree from Kalamazoo College and a Masters of Business Administration from Michigan State University. Prior to my joining Ally in June 2006, I was a Risk Manager at General Motors. I was directly involved in the negotiation of the Agreements.

---

[1] Capitalized terms used but not defined herein have the meanings set forth in the Motion.

4.     In my position as risk officer for Ally, it is my job to purchase insurance coverage for Ally and the Debtors, as well as their respective officers and directors. It is also the responsibility of my department to assist in providing notice of claims to the insurance companies on behalf of all Insureds. Proper and timely notice was provided as to all relevant claims and is not challenged by any of the Settling Insurers.

5.     I was directly involved in communicating with the insurance companies, including the Settling Insurers, with respect to noticing settlements of claims asserted against Ally and the Debtors, and attempting to persuade the insurance companies not to raise any purported failure to obtain consent to settle as a defense to coverage.

**Background on the Debtors' and Ally's Insurance Policies**

6.     Each year, Ally obtains E&O and D&O insurance policies that also provide coverage to numerous "Insureds," including the Debtors, Ally and other individual and corporate non-Debtors. Under the terms of the Shared Services Agreement between Ally Financial Inc. and Residential Capital, LLC, dated as of May 14, 2012, the Debtors and other individual and corporate non-Debtors are entitled to use insurance proceeds to satisfy defense costs, settlements, and judgments for claims covered by such policies. The shared insurance proceeds are typically paid on a first-billed, first-paid basis after the retention is exhausted, such that payments on behalf of Ally or other non-Debtors would deplete the proceeds available to the Debtors under such policies.

7.     Under the Plan, the Debtors have (i) permitted Ally exclusively to, among other things, recover under all D&O and E&O insurance policies with policy periods between November 2006 and the Effective Date, which provide coverage to Ally or its representative as well as to the Debtors and/or their representatives (the *"Assigned Policies"*), and

2

(ii) relinquished in favor of Ally and its representatives all coverage that might otherwise belong to the Debtors under the Assigned Policies.

### The Settlement Agreements

8.	After a series of negotiations between Ally and each of the Settling Insurers, the parties agreed to settle the Insurance Claims in accordance with the terms of the Agreements, and the Debtors agreed to join the settlements. The terms of the Agreements are fair and reasonable. Additionally, the settlement payments with third parties of the underlying claims reflected as distributions in the Plan are fair and reasonable, and further comport with the requirements under the Policies (as defined in the Agreements) concerning the settlement of claims. Payment of the respective settlement amounts will settle and resolve all Losses in connection with the Insurance Claims under the Policies.

9.	Payment of the settlement amounts will render all limits of liability per loss, as well as aggregate limits of liability for each and every one of the Policies, fully paid and exhausted. The Insurance Claims exceed the amount of coverage available under the Policies regarding such claims. Specifically, the Insurance Claims are for losses that exhaust the applicable self-insured retention, the limits of all applicable underlying insurance (as defined in the Policies) and the limits of the Policies. The Settling Insurers' respective settlement payments do not represent payment on behalf of, or instead of, the underlying insurance. To the extent any amount of the Underlying Limit (as defined in the Policies) is not paid by the insurance companies that sold the underlying insurance, it has been paid by Ally in a manner acceptable to each of the Settling Insurers, such that the parties agree that exhaustion requirements of the Policies have been satisfied. Indeed, the total amount of distributions under the Plan to resolve

claims of the Debtors' creditors far exceeds the aggregate of the Assigned Policies' limits, which totals approximately $1.3 billion.

10. Each of Ally's and the Debtors' liability insurance companies has received timely and adequate notice of the Debtors' chapter 11 cases and other notices throughout the chapter 11 cases, including notice of the Plan and all materials related thereto, and has been afforded sufficient time to file any related responses or objections.

11. As evidenced in Article III of the Plan, the Plan separately classifies creditors for purposes of voting and receiving distributions. Specifically, the Plan separately and distinctly classifies, among other creditor constituencies, certain private securities claimants that asserted securities litigation claims against the Debtors, including claims against the Debtors and Ally in connection with residential mortgage-backed securities ("**RMBS**"), certain monoline insurers that provided financial guaranty insurance policies insuring amounts payable to RMBS trusts, plaintiffs in the class action entitled *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.,* Civ. No. 08-8781(HB) pending in the United States District Court for the Southern District of New York (the "***District Court***"), certain unsecured creditors including Wilmington and individual borrowers whose current or former mortgage loan was originated, serviced, sold, consolidated or owned by any of the Debtors, and other creditors who filed or alleged claims against Ally or any of the Debtors.

12. The claims of these creditors constitute assertions of Wrongful Acts (as the term Wrongful Act is defined in the Policies) and/or Claims (as the term Claim is defined in the Policies), including but not limited to, claims based upon, arising out of, or related to the following:

- the "Private Securities Claims" (as that term is defined in the Plan);

4

- *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-08781, United States District Court, Southern District of New York (the "**NJ Carpenters Lawsuit**");

- *United States of America v. Bank of America*, Case No. 12-00361, United States District Court, District of Columbia and the consent judgment among the United States Department of Justice, the Attorneys General of certain states, ResCap, GMAC Mortgage, LLC (GMACM) and Ally Financial Inc. entered by the District Court for the District of Columbia on February 9, 2012 (the "**USA Litigation**");

- the November 26, 2012 letter issued by counsel for the Official Committee of Unsecured Creditors to the Board of Directors of Ally Financial, Inc. and the November 26, 2013 letter issued by Wilmington Trust, N.A., as the indenture trustee for the senior unsecured notes issued by Residential Capital LLC, to the Board of Directors of Ally Financial, Inc.;

- proofs of claim filed in the Debtors' chapter 11 cases by Wilmington Trust, National Association ("**Wilmington**"), including, but not limited to, claim number 5256;

- the "MBS Actions" and "Additional MBS Actions" identified in the March 10, 2009, July 25, 2011 and October 25, 2011 letters issued by or on behalf of Federal Insurance Company to GMAC, LLC and/or Ally Financial, Inc. (the "**Chubb Letters**");

- the "MBIA Litigation" identified in the Chubb Letters;

- any claims asserted by Financial Guaranty Insurance Company, MBIA Insurance Corporation, Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation, Assured Guaranty Municipal Corp. ( f/k/a Financial Security Assurance Inc.) and other insurers who provided financial guaranty insurance policies insuring amounts payable to RMBS in connection with any "RMBS Trusts" (as defined in the Plan);

- *In the Matter of Ally Financial, Inc., et al.*, FRB Docket No. 11-020-B-HC 11-020-B-DEO (the "**FRB Litigation**");

- the "Robo-Signing Actions" identified in the December 16, 2011 letter issued by counsel to Federal Insurance Company to Marsh FINPRO, in its capacity as the insurance broker for the Insureds under the Policies;

- claims based upon, arising under, or related to any RMBS issued by any residential mortgage backed securitization trusts, net interest margin trusts or similar residential mortgage backed trusts for which the Debtors have acted or currently act as a sponsor, depositor, servicer, master servicer or in similar capacities, including but not limited to, any "RMBS R+W

5

Claims" and any "RMBS Cure Claims" (as defined in the Plan, the "**RMBS Trust Claims**");

- any claims asserted by FHFA, FDIC, the Federal National Mortgage Association and the National Credit Union Administration Board based, upon, arising out of, or related to any RMBS, including, but not limited to, *Federal Housing Finance Agency v. Ally Financial Inc.*, Index No. 652441-2011, New York County Supreme Court, State of New York, *Federal Deposit Insurance Corporation v. Citigroup Mortgage Loan Trust, Inc.*, Case No. 03-CV-201, *Montgomery County Circuit Court, State of Alabama, Federal Deposit Insurance Corporation v. Ally Securities LLC,* Case No. D-1-GN-12-002522, *Travis County District Court, 200th Judicial District, State of Texas, Federal Deposit Insurance Corporation v. Chase Mortgage Finance Corp.*, Case No. 12-06166, United States District Court, Southern District of New York, *Federal Deposit Insurance Corporation v. Bear Stearns Asset Backed Securities I LLC*, Case No. 12-4000, United States District Court, Southern District of New York; and *National Credit Union Administration Board v. Residential Funding Securities LLC*, Case No. 13-06730, United States District Court, Southern District of New York; and

- all other D&O Demands.

### *Examples of Specific Claims Affecting or Affected By the Plan*

13.  The claims listed in paragraph 12 that are encompassed within the settlement with each of the Settling Insurers involve claims in the Debtors' chapter 11 cases and payment of those claims, either in the Debtors' chapter 11 proceedings or by reducing those claims in the Debtors' chapter 11 proceedings based on payments made outside of bankruptcy to the same creditors. For example, Wilmington filed (i) a proof of claim on November 17, 2012, including the claim recorded in the Debtors' chapter 11 cases as claim #5256 and (ii) a proposed complaint against a number of defendants, including Ally Financial Inc. and certain Debtor entities on April 19, 2013 [Docket No. 3475, Ex. B]. Each of the proof of claim and the proposed complaint evidence claims Wilmington asserts against certain Insureds, including claims alleging that the Debtors' or Ally's directors or officers committed wrongful acts in the course of performing their duties and these claims, trigger coverage under the 2011-2013 D&O Policy.

6

14. On June 26, 2013, the Court entered the *Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* [Docket No. 4098]. The PSA approved by this order provides that Wilmington, as the Senior Unsecured Notes Indenture Trustee (as defined in the Plan), will receive a distribution of approximately $351.4 million under the Plan, subject to adjustment and dilution (the "**Wilmington Distribution**"), to resolve Wilmington's claims.[2]

15. Another example is the USA Litigation, which commenced on or about March 12, 2012 when the United States of America and other plaintiffs filed a complaint against Debtors Residential Capital, LLC and GMAC Mortgage, LLC, as well as Ally Financial Inc., on behalf of borrowers, including borrowers who have filed proofs of claim in the Debtors' chapter 11 cases, alleging, among other things, that the Debtors engaged in improper foreclosure activities. Under the terms of a settlement reached prior to the petition date of the Debtors' chapter 11 cases, the Debtors paid $109,628,425 into an escrow fund for distribution by various federal and state government entities to eligible borrowers, including borrowers who have filed proofs of claim in the Debtors' chapter 11 cases.

16. Similarly, in 2011, the Federal Reserve Board (the "**FRB**") and the Federal Deposit Insurance Corporation (the "**FDIC**") filed the FRB Litigation as administrative proceedings against the Debtors and Ally alleging, among other things, that the Debtors engaged in improper foreclosure activities. On April 13, 2011, the Debtors entered into a consent order (the "**Consent Order**") with the FRB and the FDIC, that required, among other things, the

---

[2] *See* PSA, Ex. B, Annex I.; s*ee also* Article X (A)(b) of the Plan, which states that "[t]he Plan shall be reasonably acceptable to the Plan Proponents, Ally and each of the Consenting Claimants, in accordance with the terms of the Plan Support Agreement."

7

Debtors to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions. On July 26, 2013, the Court entered an order approving an amendment to the Consent Order, under which the Debtors made a one-time escrow payment to a borrower fund in the amount of approximately $230 million in satisfaction of the foreclosure review obligations arising under the Consent Order. The $230 million escrow payment will be distributed to certain individual borrowers, including borrowers who filed proofs of claim in the Debtors' chapter 11 cases (the "**Consent Order Borrowers**"), by the FRB or the Office of the Comptroller of the Currency. However, the Plan provides that Consent Order Borrowers' allowed claims will be reduced to the extent that they are paid under the $230 million escrow payment.

17. In addition to the lawsuits described above, various individuals whose current or former mortgage loan was originated, serviced, sold, consolidated, owned or foreclosed by any of the Debtors (the "**Borrowers**") asserted proofs of claim in the Debtors' chapter 11 cases, alleging, among other things, that the Debtors engaged in illegal foreclosure practices. Under the Plan, a trust established for the Borrowers' benefit received approximately $57.6 million on the Effective Date (the "**Borrowers Trust**"). The payment to the Borrowers through the Borrowers Trust evidences claims asserted by the Borrowers against certain Insureds, which trigger coverage under the 2008-2009 E&O Policies as well as under the 2009-2010 BPL Policies and the 2011-12 E&O Policies.

18. A number of securities litigants filed a class action lawsuit against multiple defendants, including Residential Capital, LLC and Ally affiliate Ally Securities, LLC in the NJ Carpenters Lawsuit. The lead plaintiffs in the NJ Carpenters Lawsuit filed proofs of claim in the

8

Debtors' chapter 11 cases, including those recorded as claim numbers 4788, 4796 and 4802.  On June 14, 2013 the lead plaintiffs in the NJ Carpenters Lawsuit, on behalf of the settling plaintiffs (collectively, the "***Settling Plaintiffs***"), and certain defendants, including Ally Securities, LLC and Debtors Residential Capital, LLC, Residential Funding Company, LLC and Residential Accredit Loans, Inc., entered into Stipulation and Agreement of Settlement with Certain Defendants (the "***NJ Carpenters Settlement Agreement***").  Under the NJ Carpenters Settlement Agreement, which was implemented through the Plan and was approved by the District Court, the settling plaintiffs were entitled to a $100 million distribution under the Plan (the "***NJ Carpenters Distribution***") in exchange for, among other things, voting in favor of the Plan.  The NJ Carpenters Distribution evidences the settlement of claims the Settling Plaintiffs asserted against certain Insureds, which trigger coverage under the 2007-2008 E&O Policies.

19. The trustees for certain residential mortgage-backed securitization trusts, net interest margin trusts and similar residential mortgage backed trusts for which the Debtors act as sponsor, depositor, servicer, master servicer or in similar capacities (the "***RMBS Trusts***"), in their capacities as such, filed proofs of claim in the Debtors' chapter 11 cases defined above as the RMBS Trust Claims.  These claims include: (i) claim number 6489 filed by Deutsche Bank National Trust Company and Deutsche Bank Trust Companies Americas; (ii) claim number 4385 filed by United States Bank National Association; (iii) claim number 6503 filed by Wells Fargo Bank, N.A.; (iv) claims number 6604 through 6654 filed by Law Debenture Trust Company of New York; and (v) claims number 5130 through 5143, 5145 through 5252, 5255, 5710 and 5713 filed by HSBC Bank USA, N.A.  Under the Plan, as part of a settlement agreement, the RMBS Trusts received an allowed claim in the amount of approximately $7.3 billion.  The RMBS Trust

9

Claims evidence claims asserted by the RMBS Trustees against certain Insureds, which trigger coverage under the 2011-2013 E&O Policy.[3]

20.     The Ally Contribution, at least in part, will fund all distributions under the Plan. Without the Ally Contribution, the Debtors and the Liquidating Trust would be unable to satisfy the distributions set forth in the Plan that have the effect of fully settling those particular claims. The agreement by the Debtors and the Liquidating Trust, their representatives, and their current and former officers and directors under the PSA to relinquish their rights in the Assigned Policies has facilitated and provided a substantial contribution to this settlement.

*[Signature Page Follows]*

---

[3] The 2011-2013 E&O Policy does not apply to the Insurance Claims arising under the Agreement with Zurich.

Executed this 30th day of January, 2014 at Detroit, Michigan.

>/s/ *Martin Blumentritt*_____
> Martin Blumentritt