1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              January 30, 2014

19              10:05 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2   (CC: Doc# 5835) Fourth Fee Application of KPMG LLP, as Tax

3   Compliance Professionals and Information Technology Advisors to

4   the Debtors and Debtors in Possession, for Interim Allowance

5   and Compensation for Professional Services Rendered and

6   Reimbursement of Actual and Necessary Expenses Incurred from

7   May 1, 2013 through August 31, 2013

8

9   (CC: Doc# 1357) Final Hearing Re: Debtors' Motion for Entry of

10   an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule

11   6004 (I) Authorizing the Debtors to Compensate

12   PricewaterhouseCoopers, LLP for Foreclosure Review Services in

13   Furtherance of the Debtors' Compliance Obligations Under

14   Federal Reserve Board Consent Order and (II) Reaffirming Relief

15   Granting in the GA Servicing Order

16

17   (CC: Doc no. 1426) Final Hearing RE: Debtors' Application for

18   an Order Under Section 327(e) of the Bankruptcy Code,

19   Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the

20   Debtors to Employ and Retain Pepper Hamilton LLP as Special

21   Foreclosure Review Counsel for Bankruptcy Issues to the

22   Debtors, Nunc Pro Tunc to May 14, 2012, filed by Gary S. Lee on

23   behalf of Residential Capital, LLC

24

25

1

2  (CC: Doc no. 1427) Final Hearing Re: Debtors' Application Under

3  Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a)

4  and Local Rule 2014-1 for Authorization to Employ and Retain

5  Hudson Cook, LLP as Special Counsel to the Debtors, Nunc Pro

6  Tunc to May 14, 2012, filed by Gary S. Lee on behalf of

7  Residential Capital, LLC

8

9  (Doc# 6172) Debtors' Motion for Entry of an Order Approving

10  Payment of Success Fee to Debtors' Chief Restructuring Officer,

11  Lewis Kruger

12

13  (Doc no. 4655) Motion to Allow Complaint to Determine Secured

14  Status and Grant Release of Lien of GMAC Mortgage, LLC, filed

15  by Nancy K. and Linton C. Layne

16

17  (CC: Doc# 4838) Adj. Hrg. RE: Debtors' Motion for Objection to

18  Claim(s) Filed by Shane M. Haffey Against Residential Capital,

19  LLC (Claim Nos. 2582 and 4402) Pursuant to Section 502(b) of

20  the Bankruptcy Code and Bankruptcy Rule 3007

21

22

23

24

25

1

2    (CC: Doc# 5163) Adj. Hrg. RE: Motion for Objection to

3    Claim(s)/Debtors' Objection to Proofs of Claim Filed Against

4    Residential Capital, LLC by (I) Ruth Assorgi (Claim No. 2580);

5    (II) John R. Foster and Elizabeth Foster (Claim No 2582) and

6    (III) Mark Moody and Sherrill Moody (Claim No. 2583) Pursuant

7    to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule

8    3007

9

10   (CC: Doc# 5138) Adj. Hrg. RE: Motion for Omnibus Objection to

11   Claim(s)/Debtors' Thirty-Sixth Omnibus Objection to Claims

12   (Misclassified and Wrong Debtor Borrower Claims), going forward

13   as to the claim of Rhonda Deese

14

15   (CC: Doc#5162) Adj. Hrg. Re: Motion for Omnibus Objection to

16   Claim(s)/Debtors' Fiftieth Omnibus Objection to Claims (No

17   Liability Borrower Claims - Books and Records)

18

19   (Doc# 5646) Motion for Omnibus Objection to Claim(s)/Debtors'

20   Fifty-First Omnibus Objection to Claims (Borrower Books and

21   Records Claims - Res Judicata and Wrong Debtor), relating to

22   claims filed by Jamie L. Gindele

23

24

25

1

2  (Doc# 6108) Motion for Omnibus Objection to Claim(s)/Debtors'

3  Fifty-Seventh Omnibus Objection to Claims ((A) Redesignate,

4  Reclassify, Reduce and Allow Claims; (B) Reclassify Claims; (C)

5  Redesignate and Allow Claims; and (D) Redesignate, Reduce and

6  Allow Claims)

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Esther Accardi

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

6

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for The Post-Effective Date Debtors, The ResCap
 5         Liquidating Trust and The ResCap Borrower Claims Trust
 6        1290 Avenue of the Americas
 7        New York, NY 10104
 8
 9   BY:  LORENZO MARINUZZI, ESQ.
10        MELISSA A. HAGER, ESQ.
11        ERICA J. RICHARDS, ESQ.
12        NORMAN S. ROSENBAUM, ESQ.
13        JORDAN A. WISHNEW, ESQ.
14
15
16   KRAMER LEVIN NAFTALIS & FRANKEL LLP
17        Attorneys for Official Committee of Unsecured Creditors
18        1177 Avenue of the Americas
19        New York, NY 10036
20
21   BY:  JOSEPH A. SHIFER, ESQ.
22        RACHAEL RINGER, ESQ.
23
24
25
```

1

2  MCKEEVER LAW OFFICE, PLLC

3        Attorneys for Claimants Shane M. Haffey, and Mark and

4         Sherrill Moody, John and Elizabeth Foster, and Ruth

5         Assorgi

6        P.O. Box 1181

7        Isle of Palms, SC 29451

8

9  BY:   HEATHER BOONE MCKEEVER, ESQ. (TELEPHONICALLY)

10

11

12  POLSINELLI LLP

13        Attorneys for ResCap Borrowers Claims Trust

14        900 Third Avenue

15        21st Floor

16        New York, NY 10022

17

18  BY:   DAN FLANIGAN, ESQ.

19

20

21

22

23

24

25

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        201 Varick Street

5        Suite 1006

6        New York, NY 10014

7

8  BY:   MICHAEL T. DRISCOLL, ESQ.

9        BRIAN S. MASUMOTO, ESQ. (TELEPHONICALLY)

10

11

12  ALSO APPEARING:

13  WILLIAM NOLAN, FTI Consulting, Inc. (TELEPHONICALLY)

14  PAMELA WEST, Residential Capital, Independent Director

15   (TELEPHONICALLY)

16  JOHN DEMPSEY, Mercer USA (TELEPHONICALLY)

17  ARNO I. IZUAGIE, KPMG LLC (TELEPHONICALLY)

18  RHONDA DEESE, IN PROPRIA PERSONA (TELEPHONICALLY)

19  JAMIE AND GARY D. GINDELE, IN PROPRIA PERSONA (TELEPHONICALLY)

20  NANCY K. LAYNE (TELEPHONICALLY)

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                    9

1                     P R O C E E D I N G S
2              THE COURT:  All right, please be seated.  We're here
3      in Residential Capital, number 12-12020.
4              Mr. Marinuzzi?
5              MR. MARINUZZI:  Good morning, Your Honor.  For the
6      record, Lorenzo Marinuzzi, Morrison & Foerster, on behalf of
7      the reorganized debtors.
8              Your Honor, we're going to begin today on page 3 of
9      the agenda, item number 2, the fourth fee application of KPMG.
10     And the amended agenda is partly correct, partly incorrect.
11     It's true that the matter has been resolved as reflected in the
12     amended agenda but, Your Honor, I imagine, with an interim
13     hearing, the Court will want to have a hearing on it.  I do
14     note that the U.S. Trustee, which had filed an objection, has
15     agreed to withdraw the objection.  And the fees originally
16     requested in the amount of 91,133, based on the information
17     provided to the U.S. Trustee and the withdrawal of objection,
18     is in fact the amount that they're seeking.
19             I understand representatives of KPMG are on the phone,
20     if the Court has any questions.
21             THE COURT:  All right.  And I gather there was some
22     confusion as to whether the matter was going forward today.
23             MR. MARINUZZI:  Correct.
24             THE COURT:  The Court prepared on it, so --
25             MR. MARINUZZI:  Okay.

1      THE COURT:  Mr. Driscoll or Mr. Masumoto, do you want

2  to address the issue?

3      MR. DRISCOLL:  Yes, Your Honor.  Subsequent to the

4  December hearing, KPMG sent us over records supporting their

5  time entries.  At issue for the U.S. Trustee were certain

6  duplicate time entries.  So they've provided us with

7  substantiating information to support that they actually worked

8  those hours, so as a result, Your Honor, we've withdrawn our

9  objection.

10      THE COURT:  All right.  Does anyone else wish to be

11  heard with respect to the KPMG fee application?

12      All right, it's approved.

13      MR. MARINUZZI:  Thank you, Your Honor.

14      THE COURT:  And it is an interim fee application --

15      MR. MARINUZZI:  Right.  Correct.

16      THE COURT:  -- just to make that clear.

17      MR. MARINUZZI:  Your Honor, that brings us to page 8

18  of the agenda, under Contested Matters, and the eight, or so,

19  pages' worth of ink on the foreclosure review related,

20  professional-employment orders.  And I'm happy to report, Your

21  Honor, as I've been promising to do for quite some time now,

22  we've actually managed to circulate and get sign-off on final

23  orders for PwC, Hudson Cook and Pepper Hamilton.  For Hudson

24  Cook and Pepper Hamilton, it's pretty simple because those were

25  327(e) retention orders and we've converted them from interim

1  to final.

2          PwC was a bit more complicated because from the time

3  we entered the initial interim order way back when, we've had a

4  settlement of the foreclosure review, we've had an amended FRB

5  consent order, and we've had a new engagement letter to cover

6  the waterfall placement for the settlement with the FRB.  And

7  so the changes to the PwC order are a bit more material.  I

8  have marked copies that reflect changes from the sixteenth

9  interim, if Your Honor would like to review them.

10          THE COURT:  I was given copies yesterday; these are

11  not blackline.  But I was given copies of the three orders.

12  Have they changed since yesterday?

13          MR. MARINUZZI:  Since yesterday, they have not.

14          THE COURT:  So I've reviewed all three.

15          MR. MARINUZZI:  Okay, Your Honor.  We would ask that

16  they be entered on a final basis, and we'll save some ink on

17  the next agenda.

18          THE COURT:  Okay, Mr. Driscoll or Mr. Masumoto, do you

19  want to address --

20          MR. DRISCOLL:  Your Honor, we have no objection to the

21  entry of the final orders.

22          THE COURT:  Okay, so those three orders, ones for

23  PricewaterhouseCoopers, ones for Hudson Cook, and ones for

24  Pepper Hamilton, those are all approved.

25          MR. MARINUZZI:  Thank you, Your Honor.  That brings us

1   to page 17 of the agenda, item number 4 under Contested

2   Matters, and that is the debtors' application for order

3   approving payment of success fee to the debtors' chief

4   restructuring officer, Lewis Kruger.  Mr. Kruger is seated

5   behind me.  And on the phone today we have three declarants,

6   Your Honor.  The U.S. Trustee indicated that they didn't intend

7   to cross-examine.

8            And thank you.

9            And Your Honor, with the Court's permission, has

10  allowed them to participate telephonically; so they're

11  available for any questions --

12           THE COURT:  Okay.

13           MR. MARINUZZI:  -- the Court might have.

14           By the motion, Your Honor, the debtors seek approval

15  of payment of a two million dollar success fee to Mr. Kruger.

16  As we note in the motion, the amount was actually wired to

17  Mr. Kruger's bank account on the effective date of the plan,

18  December 17, 2013.  He hasn't touched it and will not touch it

19  until he obtains a further order of this Court authorizing him

20  to do so.

21           In part because the --

22           THE COURT:  Tempting as it must be.

23           MR. MARINUZZI:  I'm sorry?  As tempting as -- I hope

24  he does use it to go --

25           THE COURT:  Stare at your bank statement.

1       MR. MARINUZZI:  Hope he goes someplace warm with it.

2       Your Honor, in part because the money is sitting

3   there, and also in large part because the success fee

4   represents two-thirds of his compensation, we'd actually like

5   to proceed today on this application rather than wait until the

6   final fee applications are heard.

7       THE COURT:  Yeah, and I know the U.S. Trustee, in

8   their opposition, one of the things they asked was that the

9   hearing on the motion to approve the success fee be adjourned

10  till the final fee applications of all other professionals.

11  And so that aspect of the objection's overruled; we're going to

12  go forward today.

13      MR. MARINUZZI:  Thank you, Your Honor.

14      THE COURT:  Originally this was noticed for hearing,

15  what I think was January 7th.

16      MR. MARINUZZI:  I believe that's correct, Your Honor.

17      THE COURT:  And because of the Court's scheduling, it

18  was adjourned till today, January 30th.  And certainly while

19  the U.S. Trustee had to, and did, file its objection not just

20  to the timing but also as to the substance of it, and did so,

21  and it is the only objection that was filed, the Court's

22  satisfied that the parties-in-interest, including the U.S.

23  Trustee -- and I'll hear Mr. Driscoll or Mr. Masumoto today

24  with anything else they want to add -- have had sufficient time

25  to address the issues.  So we're going to go forward today.

RESIDENTIAL CAPITAL, LLC, et al.                    14

1          MR. MARINUZZI:  Okay.  Thank you, Your Honor.

2          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3          MR. MARINUZZI:  In support of the motion, the

4    reorganized debtors offer:  the declarations of former board

5    member Pamela West, which was filed with the Court originally

6    on September 27, 2013 as docket number 5228; the declaration of

7    John Dempsey of Mercer, which was also filed on that date, as

8    docket number 5229; and the declaration of William Nolan of FTI

9    filed also on September 27th, as docket number 5230.  Those

10   declarations are also exhibits to this instant motion, so --

11         THE COURT:  All right.  Do you want to offer those in

12   evidence?

13         MR. MARINUZZI:  Yes, Your Honor, I'd like to offer

14   them into evidence.

15         THE COURT:  Any objection?

16         MR. DRISCOLL:  No, Your Honor.

17         THE COURT:  All right, so the declarations of Pamela

18   West, ECF 5228, John Dempsey, 5229, and William Nolan, 5230,

19   are admitted into evidence for purposes of the hearing.

20   (Declaration of Pamela West, docket #5228 was hereby received

21   into evidence as a Debtors' Exhibit, as of this date.)

22   (Declaration of John Dempsey, docket #5229 was hereby received

23   into evidence as a Debtors' Exhibit, as of this date.)

24   (Declaration of William Nolan, docket #5230 was hereby received

25   into evidence as a Debtors' Exhibit 1, as of this date.)

1        MR. MARINUZZI:  Thank you, Your Honor.  And Your Honor

2  may recall that those declarations were originally submitted in

3  support of a prior motion heard on October 9 seeking to amend

4  Mr. Kruger's engagement letter to provide for the success fee.

5  And to complete the picture, Your Honor, the debtors filed a

6  reply to the U.S. Trustee's objection last Friday as docket

7  number 6350.

8        Your Honor, I would like to briefly review why

9  Mr. Kruger was selected to serve as the CRO in his

10  accomplishments, then I'd like to discuss the evidence, and

11  then I'd like to discuss the U.S. Trustee's objection and why

12  the evidence doesn't support it.

13        So let's rewind to a point roughly a year before the

14  commencement of the plan confirmation hearing.  And we were

15  before the Court, seeking approval of an auction sale -- the

16  results of the auction.  And the six months in the bankruptcy

17  case leading up to that point -- and frankly, for months before

18  then -- the focus of the company and its board and its

19  professionals and its management was to ensure that we had the

20  most value for the assets as part of the going-concern sale.

21  And that was the priority.

22        And during this period, there were a number of

23  significant activities that were happening all around the

24  company's operations, not the least of which was the examiner's

25  investigation, the committee's investigation, wrangling over

1    the FRB foreclosure process.  There were a lot of potential

2    distractions, and I think it was very important for the company

3    to focus on maximizing value and keeping the company going the

4    way it was going through a sale closing.  And a credit to all

5    parties involved:  nobody cut their noses off to spite their

6    face, and we got to a successful sale process.

7            Now, as successful as that process was, we still

8    needed to figure out how to distribute the value and how to do

9    so under a plan that enjoyed support from creditors and was

10   appropriate and confirmable under the applicable standards,

11   including third-party releases, which we know are not always

12   easy to obtain.  And all roads -- or almost all roads led to

13   AFI.  And the principle question was, how could we negotiate a

14   settlement with AFI that provided enough value that would buy

15   enough support for a plan that enjoyed this popularity that we

16   saw?

17           Now, to this day, I believe the board acted

18   appropriately in focusing on the sale process.  And it was a

19   challenge to continue operating this company in a regulated

20   industry during a bankruptcy case, and they succeeded in doing

21   that.  Having said that, it's understandable that third

22   parties, in trying to negotiate with the debtors regarding

23   claims against AFI, might have a sense of -- might prefer to

24   negotiate with someone other than board members that approved

25   the transactions that are the subject of the investigation,

1   approved a 750 million dollar settlement at the inception of

2   the case, or were involved in the transactions that were the

3   subject of the investigation.  The board understood that.

4             And so what the board sought to do was to find a CRO,

5   and a CRO who could speak for the debtors' estates in

6   connection with these negotiations.  And ultimately, after

7   vetting a number of qualified candidates, the board selected

8   Mr. Kruger in February of 2013.  And they selected Mr. Kruger

9   because of his qualifications:  he clearly knows the law, he

10  understands the important facts, and he was in a position to

11  evaluate the claims that could be asserted by the debtors

12  against AFI, claims that third parties could assert against

13  AFI, and the claims that creditors could assert against one

14  another with respect to the priority of their claims against

15  the debtors' estates.  These were all the things that were most

16  relevant to the parties at the time.  He also was free from

17  conflicts.  He didn't work for the debtors, didn't represent

18  the debtors, had no connection to AFI, had no connection to the

19  transactions.  He could speak, and speak freely.  He was the

20  right person.

21            And when he was appointed in February, had a steep

22  learning curve.  But he got up to speed quickly.  And at the

23  hearing on October 9th, committee counsel commended Mr. Kruger

24  for not only getting up to speed quickly, but getting up to

25  speed in a way that didn't disrupt the process, because he

1    started while the mediation was already beginning.  He immersed

2    himself in that mediation.

3          THE COURT:  I think I approved Mr. Kruger's retention

4    and the appointment of Judge Peck as the mediator; I think that

5    was at the same hearing, wasn't it?

6          MR. MARINUZZI:  Your Honor --

7          THE COURT:  Am I mistaken on that?

8          MR. MARINUZZI:  -- the mediation order was entered, I

9    believe, in December, and Mr. Kruger's order was entered in

10   March, effective as of --

11         THE COURT:  Okay.

12         MR. MARINUZZI:  -- February 7th.

13         THE COURT:  All right.

14         MR. MARINUZZI:  So Mr. Kruger was able to do something

15   that no one else on behalf of the debtors could do up until

16   that point in time:  he was able to bring credibility to the

17   debtors' estates in these negotiations with AFI and the

18   stakeholders.  And he was very vital to the mediation; and it's

19   not just the mediation.  And the mediation, as Your Honor knows

20   from the plan support agreement that came out of that mediation

21   with its seventeen schedules, resolved a number of complicated

22   issues; it was not easy.

23         But Mr. Kruger also participated in the FRB

24   settlement, in the FGIC settlement, in getting creditor support

25   for the plan, and also in overseeing the management operations

1    of the company after Mr. Bronno (ph.) left in May of 2013.

2           I don't think the U.S. Trustee takes any issue with

3    his accomplishments, and we've seen his accomplishments;

4    they're cited in other motions.

5           Now, unlike most CRO candidates who have agreements at

6    the inception of the case, or at least have success fees set

7    forth in letter agreements when they're retained, Mr. Kruger's

8    engagement letter did not have a success fee set forth; it

9    simply said that there will be a success fee.  And the board

10   didn't fill in a blank, and Mr. Kruger didn't insist on a

11   number, because the board and Mr. Kruger believed it was

12   appropriate to negotiate that number with the parties that

13   would be paying it:  the creditors.

14          To Mr. Kruger's credit, those negotiations -- they

15   started, stopped, and ultimately it took some time before they

16   resumed again.  But at no point in time did Mr. Kruger stop

17   working as hard as he was working.  At no point in time did he

18   focus on the success fee at the expense of everything else that

19   he was hired to do.  He was the consummate professional.

20          And by the time we sat down in September and the board

21   ultimately said it's time to get a success fee approved for

22   Mr. Kruger, we had the benefit of twenty-twenty hindsight; it

23   was months after the logjam that existed when he was initially

24   appointed had cleared.  The plan was out, ready for acceptance,

25   supported by many, many creditors.  Mediation was largely

1  concluded.  I mean, we had the benefit --

2          THE COURT:  When you say "mediation was largely

3  concluded," I think there was one minor dispute that remained.

4          MR. MARINUZZI:  Well, "largely" -- that's why I said

5  "largely", Your Honor.  And ultimately we got that resolved --

6  we had that resolved before Your Honor had to rule.  But the

7  act of putting together the plan term sheet with the support of

8  ninety percent of the unsecured creditors at least, that was

9  largely concluded.

10          THE COURT:  So that we have a clear record -- I'm

11  speaking somewhat euphemistically, but that minor dispute was

12  with the junior secured noteholders, which resulted in two

13  trials, one very lengthy decision.  And finally just before

14  closing argument, after the contested confirmation hearing, a

15  phase-two trial, the resumption of the mediation resulted in

16  the successful conclusion and the largely consensual plan.  So

17  my somewhat flippant comment about the minor dispute shouldn't

18  be misinterpreted.  It was obviously a very major dispute that

19  existed throughout Mr. Kruger's tenure as CRO.

20          Go ahead.

21          MR. MARINUZZI:  Thank you, Your Honor.

22          And so in September of 2013, the board asked for

23  advice from its professionals on an appropriate success fee.

24  The debtors again engaged the committee in these discussions,

25  shared the materials put together by their professionals with

1    the committee, and negotiated an amount that was supported by

2    the committee, and that was important to the board; also

3    clearly agreeable to Mr. Kruger, which was also very important.

4            Now, the evidence.  As part of the debtors' motion to

5    amend Mr. Kruger's engagement letter, the debtors submitted the

6    declarations of Pamela West, Bill Nolan and John Dempsey.  And

7    what Ms. West's declaration tells us is that the board acted in

8    an informed manner in appropriately exercising its fiduciary

9    duties in approving the proposed success fee.  She testified

10   that the board considered a number of factors in determining

11   the proposed success fee, including:  the benefits provided to

12   the debtors' estates, through Mr. Kruger's services; the

13   board's view that he undertook activities of a CEO; the support

14   from the creditors' committee, which was vitally important; and

15   the advice of the debtors' advisors.

16           The declarations of Mr. Dempsey and Mr. Nolan, both of

17   whom provided advice to the board in connection with its

18   determination to approve a two million dollar success fee,

19   demonstrate that the two million dollars is market for a

20   success fee for a CRO.

21           So what does Mr. Dempsey tell us when we look at his

22   declaration?  What Mr. Dempsey tells us is that Mercer

23   conducted a market study that reviewed the retention of CROs in

24   bankruptcy since 2005.  Mercer reviewed over thirty cases where

25   a CRO was appointed and, in the cases where a success fee was

1    provided, the median was two million dollars, exactly where we

2    are with Mr. Kruger.  The seventy-fifth percentile was three

3    million dollars.

4           Mr. Dempsey also looked, in particular, at five case

5    examples where the CRO performed the duties of a CEO as well,

6    and in those cases he found that the median was three million

7    dollars and that the seventy-fifth percentile was thirteen

8    million dollars, significantly higher than what Mr. Kruger is

9    seeking.  If you take those five cases out and you look at the

10   ones where the CRO was purely functioning in the CRO

11   capacity -- CRO -- the median is 1.75 million, and the seventy-

12   fifth percentile is 2.2 million.  Mr. Kruger's 2 million falls

13   in between.

14          Mr. Dempsey also spent some time conducting

15   correlation analyses, trying to determine links between certain

16   aspects of the cases he reviewed and the amount of the success

17   fee.  He looked at the size of the asset base, he looked at

18   sale proceeds, he looked at creditor recoveries, and he looked

19   at other measures of enhanced value for creditors.  He

20   considered in his analysis the benefits obtained because of

21   Mr. Kruger.  In particular, he looked at the increased value

22   obtained by the estate through the ultimate AFI contribution,

23   and he looked at the cost savings that arose out of shortening

24   the length of the bankruptcy case.  And we know where we were

25   when Mr. Kruger was appointed.  I don't think there's a doubt

1   that he helped speed this case up.

2           Under each of Mr. Dempsey's analyses, the proposed

3   success fee is reasonable.  Mr. Dempsey looked at a couple of

4   other issues that are relevant to today.  He looked at the

5   correlation between the size of the team -- the CRO's team, and

6   the amount of the success fee, and he found that the empirical

7   correlation between the size of the team and the size of the

8   fee was weaker than the link between the asset size and the

9   amount of the success fee.  He also looked at the relationship

10  between the duration of the engagement and the fee, and found

11  that there was not a strong correlation, not as strong as the

12  size of the assets.  In my view that makes sense, because you

13  want to reward reasonable efficiency.  If the case had lasted

14  five or six months longer, Mr. Kruger's hourly rate would be

15  much less, but we'd spend another hundred million dollars to

16  get there and that doesn't benefit anybody.  So Mr. Dempsey's

17  conclusion is that the best way to assess Mr. Kruger's proposed

18  success fee is based on his contributions rather than the time

19  or resources used in the engagement.

20          Mr. Nolan, of FTI, and his team analyzed ten recent

21  Southern District bankruptcy cases, and he looked at the

22  liabilities.  And determining that the two million was

23  reasonable, he said, if I apply the same percentage of success

24  fee to total liabilities that I saw in these cases to ResCap

25  where we had fifteen billion dollars in liabilities, I get an

RESIDENTIAL CAPITAL, LLC, et al.                    24

1  amount of 2 and a half to 2.8 billion dollars -- I'm sorry --

2  million dollars as a success fee, and we're significantly below

3  that.

4        FTI also conducted an incremental recovery analysis,

5  and what they essentially did, Your Honor, is they looked at

6  the KEIP that was approved by the Court with respect to six

7  executives.  And they said, okay, these six executives are

8  rewarded based on how well they do in recoveries on FHA/VA

9  loans.  And what Mr. Nolan said is, if I look at the target for

10 the reward and the target for the recovery, and then I try to

11 figure out how much more value the estate has to obtain in

12 order for these executives to get the maximum award, what do

13 those numbers reflect?

14       And so Mr. Nolan concluded that in order to achieve

15 the highest amount of award and get an extra 173,000 dollars,

16 we'd have to obtain 52 and a half million dollars of

17 incremental value over the target for these loans.  And so one

18 way to look at it is, so we achieve 52 and a half million

19 dollars of additional money for creditors and we get .033

20 percent of that as enhanced value fee.  And so when Mr. Nolan

21 applied that percentage to the incremental value represented by

22 the increase in the AFI contribution, it came to a very large

23 number.  And so, thinking about it, you can't ascribe a hundred

24 percent of the credit for the additional AFI contribution to

25 Mr. Kruger.  He's good but he's not -- it's not that good.

1    Right?  It took lots of us to get that money out of AFI,

2    including the creditors' committee, obviously.

3            So what Mr. Nolan did is he effectively created three

4    different measurements:  twenty-five percent of the credit to

5    Mr. Kruger, fifty percent and seventy-five percent.  And the

6    median in that analysis was 2.228 million dollars of a success

7    fee, which is in line with the 2 million dollars.  So looking

8    at the evidence that's uncontroverted and submitted in support

9    of the application, Your Honor, two million dollars is

10   reasonable and market.

11           Now, the U.S. Trustee's objection; as I read it, it

12   raises essentially three arguments; the first is that the CRO's

13   compensation, in order to be reasonable, has to be assessed on

14   an hourly-rate basis, much like an attorney retained under 327.

15   And, Your Honor, that's just -- that's not the law.  In the

16   cases cited by the U.S. Trustee's office, they deal with 330

17   analysis of attorney's fees.

18           The cases that analyze success fees and transaction

19   fees, like XO Communications from this jurisdiction, rejected

20   the hourly-rate analysis for these types of fees.  Rather, the

21   relevant inquiry is whether Mr. Kruger's services were

22   necessary and beneficial to the estate at the time they were

23   rendered, and whether the success fee is reasonable based on

24   the market.  I don't believe there's any dispute concerning the

25   necessity or benefit of Mr. Kruger's services in this case.  As

1  for whether the success fee is reasonable based on the market,

2  I think that's what Mr. Dempsey and Mr. Nolan's declarations

3  establish.

4          The next argument of the U.S. Trustee is that

5  Mr. Kruger wasn't really acting as a CEO, so there needs to be

6  a discount.  And I think Mr. Dempsey's analysis, when you look

7  at the numbers -- even if you pulled out the cases where the

8  CRO was acting as the CEO, it's still in the range.  So I'm not

9  sure whether you spend seven or twenty-seven percent makes a

10 difference in the analysis at the end of the day.

11         Now, the third argument the U.S. Trustee makes is that

12 the CRO compensation is excessive given the fact that

13 Mr. Kruger was acting alone as opposed to with an army of

14 advisors.  And the board asked Mr. Dempsey to look at this

15 before the U.S. Trustee objected, because it wanted to see if

16 there was a correlation.  And what Mr. Dempsey tells us is the

17 correlation is far weaker than the correlation between asset

18 size and success fee because it's the accomplishments you

19 should measure, not the size of the team.

20         Your Honor, we believe that Mr. Kruger's

21 accomplishments speak for themselves, and we believe the

22 success fee is reasonable and appropriate; we think the

23 evidence demonstrates that.  And we'd ask the Court to approve

24 the motion, overrule the objection.  Unless Your Honor has any

25 questions for me, for Mr. Kruger seated behind me, or any of

RESIDENTIAL CAPITAL, LLC, et al.                    27

1    the declarants, that concludes my presentation.

2              THE COURT:  Thank you.

3              MR. MARINUZZI:  Thank you.

4              THE COURT:  Mr. Driscoll, are you going to argue?

5              MR. DRISCOLL:  Yes, Your Honor.  Good morning, Your

6    Honor.  Mike Driscoll for the U.S. Trustee.

7              Your Honor, we'd like to make a few points.  Our first

8    point is that we are asking the Court to adopt the standard for

9    evaluating success or completion fees that was enunciated in XO

10   Communications and Northwest Airlines.  In those cases, Judge

11   Gonzalez and Judge Morris, respectively, considered whether a

12   success-fee applicant had proved the nexus between what was

13   achieved and that applicant's efforts.  Also, in Northwest,

14   Judge Morris said that where the efforts of that applicant were

15   in tandem with other applicants, that the success fee was not

16   merited.

17             Here we believe that the success fee was achieved in

18   tandem with that of other professionals.  Even in the Nolan

19   declaration, the debtors conceded that Mr. Kruger was not

20   solely responsible for the success here.  In fact, they assign

21   a less than fifty percent attribution to him.  By most reports,

22   it was the imminent release of the examiner's report and the

23   personal efforts of Judge Peck as the mediator that were

24   critical in the plan negotiations.

25             THE COURT:  You know, Mr. Driscoll, when I think back

1   to early in this case -- and here's where I think Mr. Marinuzzi
2   perhaps overstates how this case was proceeding and understates
3   the difficulties -- when this case filed with a pre-petition
4   plan support agreement and the case was described first day or
5   second day or in the press -- I don't remember exactly where --
6   as a pre-packed -- and I commented about this before -- it was
7   as far from pre-packed as one could get.  And whether fairly or
8   not, the credibility of the debtors' management was severely
9   challenged.  The pre-petition plan support agreement had
10  virtually no support from creditor constituencies other than
11  those that signed the agreement.  And I'm not sure I used the
12  term early in the case, but it seemed to me that, yes, the
13  parties were rational enough to proceed toward the sale of the
14  assets, but in many ways I consider this case to be an almost
15  freefall before the CRO was appointed.
16          At, at least, one hearing on a motion to extend
17  exclusivity, I expressed my displeasure with how the case was
18  proceeding and the inability of the debtors and its
19  professionals to seek to negotiate with the broader creditor
20  constituencies.  And I know I commented from the bench more
21  than once about that, and I think I made it pretty clear that
22  future extensions of exclusivity were going to depend on good-
23  faith negotiations moving forward.
24          I think the reality from the Court's standpoint,
25  Mr. Driscoll, is, the two things that moved the process along

RESIDENTIAL CAPITAL, LLC, et al.                    29

1    were Judge Peck's appointment as the mediator -- and it's fair

2    that the debtors made that motion for an appointment of a

3    mediator, and I selected Judge Peck -- and the appointment of

4    Mr. Kruger as the CRO.  No one will ever know whether we'd be

5    sitting here today talking about a CRO success fee, whether

6    we'd have a confirmed plan, whether this case -- whether a

7    Chapter 11 trustee would have been appointed, what would have

8    happened if a CRO with credibility among all creditor

9    constituencies hadn't been appointed and so that the broader

10   group of parties believed that there was an honest broker with

11   whom they could sit and negotiate.

12          So I think, when you focus solely on how many hours

13   Mr. Kruger spent, considerable though those hours were, the

14   real accomplishments in this case came about because the CRO

15   was someone with -- no one disputed his eminent qualifications,

16   experience, restructuring professional credibility, with all

17   constituencies in the case.  And I don't know where we're --

18   I'm not sure we would have a confirmed plan today had that not

19   occurred.

20          So Judge Gonzalez, in XO Communications -- there he

21   was talking about a transaction fee, but I think -- I'm not so

22   sure -- I don't really view that as very differently.  He

23   talked about the factors under 330 that do not apply.  I mean,

24   he talked about time spent and rates charged.  That's in XO

25   Communications, 398 at page 113.

1          MR. DRISCOLL:  I can address that, Your Honor.

2          THE COURT:  So I think -- I'm not saying that the time

3    spent is irrelevant, but where we're talking about a success

4    fee, having a CRO spend another 1,000 hours but couldn't

5    accomplish very much, or didn't have the credibility to

6    accomplish very much, wouldn't help at all.

7          MR. DRISCOLL:  I understand, Your Honor.  So we're

8    asking the Court to adopt the standard of XO, but not the

9    result.  Obviously, the result goes away from us.

10          THE COURT:  Well, when you say "adopt the standard of

11   XO", Judge Gonzalez specifically talked about factors that do

12   not apply:  time spent or rates charged.

13          MR. DRISCOLL:  Absolutely, Your Honor, he did say

14   that.  But in XO, you had -- Houlihan Lokey was the financial

15   advisor, and they were not being paid by the hour.  Here we

16   have Mr. Kruger, who is an hourly professional.

17          THE COURT:  Well, a portion -- it was clear from the

18   start of this case -- from the time when his engagement was

19   first approved, didn't have an amount, but it contemplated that

20   there would be a success fee.  The amount was going to be

21   determined later, and it was determined later.  And when the --

22   remind me about this, Mr. Driscoll, when the amendment to the

23   engagement letter was approved by the Court and it specifically

24   included the two million amount, subject to determination of

25   reasonableness under the 330 standard, but my recollection is

1  your office did not object to approval of the amendment to the

2  engagement letter.  It certainly reserved all -- I'm not

3  suggesting -- at least you were very clear -- your office was

4  very clear; it reserved this issue of reasonableness under 330.

5  But I mean, you knew what the outer limit was that Mr. Kruger

6  could seek, the two million dollars.  Am I correct on that?

7          MR. DRISCOLL:  You are absolutely correct, Your Honor.

8  The reason we did not object to the amendment, at that time,

9  was because we were specifically given 330 rights --

10          THE COURT:  Sure.

11          MR. DRISCOLL:  -- to be reviewed at the end of the

12  case.

13          THE COURT:  Absolutely.

14          MR. DRISCOLL:  There were variables and there were

15  contingencies that could have occurred in that time.  For

16  example, we were not sure whether the case would even confirm,

17  given the outstanding issue with the JSN trial.  So -- and we

18  were also not sure --

19          THE COURT:  We'll never know.

20          MR. DRISCOLL:  Absolutely, Your Honor.  And I don't

21  want to engage in supposition on it, but also, we were not sure

22  whether the committee was going to extract further reductions,

23  like they're contemplating at the end of this case.  So there

24  was variables there that we didn't want to interrupt at that

25  point.  But not --

1          THE COURT:  So Mr. Driscoll, let me ask you this.  So

2    my recollection is that when I've taken up quarterly fee

3    applications in this case, for all professionals, they've been

4    in the seventy-five to a hundred million dollar range for a

5    quarter, for one quarter.  And so if this case had dragged on

6    for just three more months, as the hotly contested case that it

7    was, and another seventy-five to a hundred million dollars in

8    professional fees, chargeable to the estate, had been burned,

9    you'd be penny wise and pound foolish to suggest that paying a

10   success fee of two million dollars to a CRO to put an end to

11   that is somehow not appropriate.

12         MR. DRISCOLL:  Understood, Your Honor.  And the U.S.

13   Trustee would not advocate a position where we would prefer the

14   estate incur a hundred million dollars in excess fees to save

15   two million dollars.  That's not what we're saying here.  We're

16   saying forget about XO Communications, Your Honor, and

17   Northwest; Judge Morris said that where the professionals --

18   where the applicant's standard was whether they had conducted

19   their achievements in tandem with other professionals, that the

20   success fee was not merited.  And I would say that that hourly

21   rate analysis that Judge Morris did conduct in Northwest is

22   appropriate.

23         I'll give you an example, Your Honor.  In that case,

24   Lazard had requested a 3.25 million dollar success fee.  Judge

25   Morris did conduct an hourly rate analysis, and she determined

1  that if the 3.25 million dollar success fee was given, that the

2  effective hourly rate of that professional would have been

3  1,400 dollars.  And she rejected it on that basis.  She said

4  that their efforts were in tandem with other professionals and

5  that, as a result, they were not entitled to that.  She said

6  that they were already well compensated at 876 dollars per

7  hour.

8           And I'd like to compare this case, Your Honor, to one

9  more case.  The debtors cite a litany of cases in the Nolan

10  declaration.  And we went through those, and we believe none of

11  those cases are analogous.  But I'd like to point out how far

12  those cases are, by using the Kodak example.  In Kodak, the CRO

13  team of AP Services incurred over 96,000 dollars.  They asked

14  for a three million dollar success fee at the end of the case.

15  Their total compensation came to be fifty-two million dollars.

16  So I went and divided that number to find the hourly rate.

17  That hourly rate was 547 dollars.  So to compare to this case,

18  if we add Mr. Kruger's --

19           THE COURT:  What's his total -- what's the total

20  compensation Mr. Kruger would receive in this case, with the

21  hourly fee and the success fee that he's seeking?

22           MR. DRISCOLL:  Approximately 3.2 million, Your Honor.

23  And when we divide the 1,300 hours by that 3.2, it comes out to

24  be around 2,300 dollars per hour.  Again, as --

25           THE COURT:  So you think that 3.2 million total, as

1   compared to -- how much did you say was in Kodak, the total?

2            MR. DRISCOLL:  Adding the success fee --

3            THE COURT:  Fifty-two million?

4            MR. DRISCOLL:  -- fifty-two million.  Here that

5   success fee -- when you factor it in together, you do that

6   hourly rate analysis, Your Honor, it comes out to be

7   approximately 2,300 dollars per hour.

8            THE COURT:  That's fundamentally why I have problems

9   with the approach that you recommend, because it could be very

10  conceivable, in a case such as ResCap, you could have a CRO

11  that could have incurred fifty-two million dollars in fees,

12  hourly, plus the success fee that ultimately -- and here, which

13  I think I commented at the time that I confirmed the plan; I

14  think certainly it was the most complicated case I've had.

15  That doesn't necessarily mean that there -- there certainly are

16  plenty of other complicated cases, but this was an extremely

17  complicated case with very challenging issues, that was not

18  going well at the time that Mr. Kruger was appointed as the

19  CRO.  And one -- he shouldn't let it go to his head, but the

20  fact that we are where we are today, and the total compensation

21  he's seeking is 3.2 million dollars, as opposed to 50 or more

22  million in other cases, it's the -- to me, it's the problem of

23  focusing primarily on hourly rates.  Yes, that's the primary

24  driver with respect -- as a cap, perhaps, with respect to

25  lawyer professionals.

1        And it would be one thing if the engagement letter, as

2    originally provided, and then as amended, didn't expressly

3    contemplate a success fee, subject to reasonableness, but

4    that's where I have the problem about saying that the hourly

5    rate should be the primary driver.  I mean, in big cases now,

6    the hourly rate of senior partners, with less experience than

7    Mr. Kruger brings to the table, are 1,200 dollars or more.  So

8    I'm not saying -- I'm not -- I think judges aren't happy about

9    how expensive these cases are, but the reality is that the

10   hourly rates for lawyers are pretty high today.

11       And if the results in the case, the accomplishments in

12   the case are substantial -- you know, Mr. Marinuzzi talked

13   about the experts', here, effort to quantify the additional

14   value.  We'll never know what the saved expenses are.  I dare

15   say, given what the burn rate was, what I was seeing in the

16   quarterly fee applications, I have little doubt that we would

17   have been one, two, three quarters -- quarters, meaning three-

18   month periods -- down the road before there would have been a

19   confirmed plan, if then.  So I come back to where quarterly

20   fees were in the seventy-five to a hundred million dollar range

21   with no end in sight.  What was in the best interests of all

22   constituencies in this case was to get this done.  You know

23   don't doubt that, do you?

24       MR. DRISCOLL:  No, absolutely, Your Honor.  The U.S.

25   Trustee does not doubt that.  But the way we viewed Mr.

1    Kruger's role in this case is essentially as a quasi-

2    professional.  He's not a traditional CRO, as we have in Kodak,

3    where the CRO team had two individuals filling executive

4    positions.

5            THE COURT:  Yeah, but the biggest drivers in this case

6    were litigation claims.  You know, I didn't say this before,

7    but when the so-called pre-pack, the pre-petition plan support

8    agreement, the claims of the -- involving the RMBS trust, in

9    the billions -- billions.  The liabilities, the securities

10   claims, the claims -- this case, the complexity of this case.

11   Yes, I mean, the asset sales went pretty well, and Mr. Kruger

12   doesn't get the credit for that, okay; he's not seeking the

13   credit for that.  But okay, so that brought a pot of money into

14   the estates, but how was that going to get whacked up?  Was

15   there going to be an agreement about it?  What was -- I mean,

16   this was a heavily litigation, claim-driven case.  That's what

17   added most of the complexity to it after the auction.

18           And someone with Mr. Kruger's background and

19   experience, I would say, was what was needed in a case of this.

20   That might not -- he might not have been the appropriate CRO in

21   a case like Kodak or Northwest, or a case -- Kodak ended,

22   unfortunately, as well, I think, you know, no one could be

23   particularly pleased with how that all ended up for a great

24   company like Kodak.  Northwest was an operational restructuring

25   and a financial restructuring, okay.

1          So pick your professionals for the skill set that's

2    needed to accomplish the results that need to be accomplished.

3    You don't really dispute that Mr. Kruger had the skill set that

4    really was called for in a case such as ResCap, do you?

5          MR. DRISCOLL:  No, absolutely, Your Honor.  We feel

6    that the debtors were lucky to have Mr. Kruger's experience.

7    But we feel that he was really just -- he was essentially like

8    a legal advisor to the debtors, and he was being paid on an

9    hourly basis, similar to the other retained professionals,

10   although he wasn't retained under 327.  And that's why we've

11   been conducting this --

12         THE COURT:  You know, there are a lot of --

13         MR. DRISCOLL:  -- hourly rate analysis.

14         THE COURT:  -- financial professionals who get

15   retained and have a flat monthly fee, for example, and then a

16   transaction success fee.  So it's not unusual to have an hourly

17   or a flat monthly fee plus the success fee.

18         MR. DRISCOLL:  Absolutely, Your Honor.  Those are

19   common in any financial advisor case.  But that just raises the

20   issue that he was -- his role really bleeds over different

21   sides.  On the one hand, he was an officer of the debtor.  On

22   the other hand, he was being paid, not a salary, but on an

23   hourly basis, and he was retained specifically for the plan

24   negotiations.

25         And again, if we were to analogize him as a

RESIDENTIAL CAPITAL, LLC, et al.                    38

1   professional, he is being paid almost twice as much as any

2   professional in this case.  Your Honor cited 1,200 dollars per

3   hour.  We're seeing that now in the last interim fee

4   applications.  And although the debtors are lucky to have Mr.

5   Kruger here, we feel that he was adequately paid --

6           THE COURT:  Okay.

7           MR. DRISCOLL:  -- at his hourly rate.

8           THE COURT:  All right.  I understand your argument.

9           MR. DRISCOLL:  Just a few more points, Your Honor.

10          THE COURT:  Go ahead.  Sure, go ahead.

11          MR. DRISCOLL:  The debtors do not cite at least one

12  case where a CRO was retained and no success fee was requested,

13  and that's In re Dewey & LeBoeuf, Your Honor.  Joff Mitchell of

14  Zolfo Cooper was the CRO in that case.  And although the

15  case --

16          THE COURT:  If you want to talk about disaster cases,

17  I mean --

18          MR. DRISCOLL:  Well, actually, you know, Your Honor,

19  on the first day of the case, there was a possibility that it

20  was going to end up like Coudert Brothers, as this long, drawn

21  out case, where the partners were not --

22          THE COURT:  So you want Mr. Mitchell to apply for a

23  success fee?

24          MR. DRISCOLL:  Perhaps, but it's too late now, Your

25  Honor.  But all kidding aside, he didn't ask for one.  And that

1    was after he had -- him and Mr. Togut had led the efforts to

2    achieve a PCP.  So they're not -- it shouldn't always be

3    requested at every case, and I --

4            THE COURT:  No, but this was -- it was clear from the

5    start.  I mean, Mr. Kruger's engagement letter contemplated a

6    success fee.  The amended engagement letter capped what it was

7    going to be, subject to a reasonableness analysis.  So I mean,

8    I have your point on this.  I think the fact that the

9    creditors' committee does support the application is important

10   too.  I mean, it's coming out of their hide, basically.  But --

11           MR. DRISCOLL:  It is, Your Honor.  One final point.

12           THE COURT:  Go ahead.

13           MR. DRISCOLL:  Just very briefly, Your Honor.  As Your

14   Honor knows, this is one of the most expensive bankruptcy cases

15   in history.  According to the November monthly operating

16   report, the professional fees of this case exceed 477 million

17   dollars.  And one can look at this success fee two ways.  One

18   can say 2 million dollars of 477 million is nothing, in the

19   scheme of things.  Or one can say that, given the high fees of

20   this case, it deserves extra scrutiny.  And that's what we've

21   been doing here, Your Honor.  Now, can I --

22           THE COURT:  I appreciate that.  I just want you to

23   understand that that --

24           MR. DRISCOLL:  I appreciate Your Honor's time, and

25   you've definitely heard us out.

1          Just one final thing, Your Honor.  To put that success

2     fee into perspective, the success fee here is so high that it

3     is nearly as high as all of the reductions that Your Honor has

4     ordered in the four interim periods.

5          THE COURT:  I'm not sure -- I'm not sure what the

6     relevance of that statement is --

7          MR. DRISCOLL:  It's --

8          THE COURT:  -- to the issue before me.

9          MR. DRISCOLL:  Understood, Your Honor.  What we're

10    just trying to say is that this is a large amount of money, in

11    the scheme of things, because --

12         THE COURT:  It is; I agree.

13         MR. DRISCOLL:  And we take every dollar that -- for

14    all of our omnibus objections, we take every dollar seriously.

15    And that's it, Your Honor.

16         THE COURT:  Okay.  Thank you, Mr. Driscoll.

17         MR. DRISCOLL:  Thank you for hearing me out, Your

18    Honor.

19         THE COURT:  Okay.  Thank you.  I'm going to take it

20    under submission.

21         MR. DRISCOLL:  Thank you, Your Honor.

22         THE COURT:  Okay?

23         MR. MARINUZZI:  Thank you, Your Honor.  The next item

24    on the agenda is, I believe, on page 17, item number 5, and

25    that is the motion of Nancy K. and Linton C. Layne to allow

1  complaint to determine secured status and grant release of lien

2  of GMAC Mortgage, LLC.  I will cede the podium to my partner

3  Mr. Rosenbaum for that matter, but I would ask the Court if I

4  may be excused, along with Mr. Kruger and the declarants who

5  are on the phone.

6          THE COURT:  Yes, you may.

7          MR. MARINUZZI:  Thank you, Your Honor.

8          MR. DRISCOLL:  Your Honor, may the U.S. Trustee be

9  excused as well?

10         THE COURT:  Absolutely, Mr. Driscoll.

11         MR. DRISCOLL:  Thank you.

12         THE COURT:  Mr. Masumoto, thank you.

13         MR. DRISCOLL:  Thank you, Your Honor.

14         MR. MASUMOTO:  Mr. Masumoto.  Thank you.

15         MR. ROSENBAUM:  Good morning, Your Honor.  Norm

16 Rosenbaum for the liquidating trust and the debtors.  This is

17 the motion of Ms. Layne.  I don't know if I heard her make a

18 telephonic appearance.

19         THE COURT:  All right.  Is Mr. or --

20         MR. ROSENBAUM:  It's a Miss.

21         THE COURT:  -- Ms. Layne on the phone?

22         Go ahead, briefly.

23         MR. ROSENBAUM:  Your Honor, this motion --

24         MS. LAYNE:  Yes, Ms. Layne is on the phone.

25         THE COURT:  Oh, okay, all right.

1          Go ahead, Mr. Rosenbaum.

2          MR. ROSENBAUM:  Your Honor, this is Ms. --

3          THE COURT:  Well, it's her --

4          MR. ROSENBAUM:  -- it's Ms. Layne's motion.

5          THE COURT:  -- it's her motion.

6          Go ahead, Ms. Layne.

7          MS. LAYNE:  Basically, what I would like to address

8    the Court with today is that ResCap or GMAC has provided a

9    document by a -- excuse me on the name -- Ms. Delehey, whereby

10   she admits that she has gone to several other people to gather

11   information about documents, and she has no first-hand

12   knowledge of the documents.  And so I'm questioning -- and then

13   GMAC came back and said that in fact they did not have any

14   access -- or I'm sorry, no ownership in the note.  And so I'm

15   questioning where they got their authority to actually say that

16   I owe them some money, because I would have made payments, and

17   I showed that in my response, that I had made payments to them

18   and then to some other company.  So I made -- there were

19   several different names that they had used, along the way, for

20   withdrawals from online payments.  So I'm not actually sure who

21   I was, in fact, paying.  I was receiving, I believe, a

22   statement from GMAC, but I'm not sure exactly who in fact was

23   getting payments.

24          And since this is a case that has to do about title of

25   property from the standpoint of they're claiming that I owned

RESIDENTIAL CAPITAL, LLC, et al.                    43

1   them and, in fact, the property -- they haven't produced any

2   work orders declaring they're owners of the trust.  They did

3   not provide any records that showed that they had any ownership

4   in Washington County, which would claim that that's in fact

5   where the County land records exist, which would be a statutes

6   of fraud cause of action.  And any documents connecting their

7   capacity to collect the proceeds, they haven't provided any.

8        Then I would question whether GMAC, in reporting to

9   this Court that they had some interest originally, when they

10  sent me the notice that said, by the way, we have interest in

11  your property because we've been collecting from you, I just

12  want to know what they've shown on their tax returns, if they

13  reported appropriately.

14       Now, if they don't have these documentation and

15  things, I'll give them fourteen days to get them together or

16  thirty days, whatever they need.  I just want to make sure that

17  the right party is standing in front of me.  And if they're not

18  the party that has any interest, then I recommend that it

19  goes -- or actually request that the court (sic) be remanded

20  back down to the state, because that's where the state land

21  records exist, and no federal court should make ruling on state

22  land property.

23       THE COURT:  Let me -- I want to just understand

24  something, Ms. Layne.  You haven't filed a Chapter 13

25  bankruptcy proceeding.  Am I correct in that?

1        MS. LAYNE:  I have not.

2        THE COURT:  Okay.  Because what you're asking the

3   Court to do is permit you to file a complaint to strip a second

4   lien off your home.  And I know of no authority that would

5   permit the Court to do that, except where the borrower is a

6   debtor in a Chapter 13 case, and then it would be for the judge

7   before whom the bankruptcy is pending, and not before me.

8        But do you have any authority that -- case law or

9   statute that says that I can avoid the lien of the second

10  mortgage because the property -- there's no value securing it,

11  the value of the home, as you've alleged, is less than the

12  amount of the first mortgage -- do you have any authority for

13  that?

14       MS. LAYNE:  Correct.  I -- well, by the way, my

15  husband at the time did file a Chapter -- a bankruptcy case.

16  And no one came forward.  So --

17       THE COURT:  Well --

18       MS. LAYNE:  -- he did during --

19       THE COURT:  -- but did --

20       MS. LAYNE:  -- between the times of --

21       THE COURT:  Go ahead.

22       MS. LAYNE:  Yes.  But so he did file a case, and no

23  one came forward.  So I was asserting the fact that since no

24  one had come forward, no one actually had any interest, or that

25  they didn't have an interest.  So --

1    THE COURT:  Yeah, but you have to -- in his bankruptcy

2    case, if he wanted to, what we refer to as, strip the lien,

3    because there was no value behind it -- no collateral value

4    behind it -- because if the value of the property is less than

5    the first mortgage, there's no collateral value securing the

6    second mortgage.  But your husband, if he had a Chapter 13,

7    would have had to either file an adversary proceeding or a

8    motion, depending on the jurisdiction in which the bankruptcy

9    was pending, to --

10    MS. LAYNE:  Okay.

11    THE COURT:  -- avoid the lien.  And you've not made --

12    the papers that you filed make no such assertion.  So I know of

13    no authority --

14    MS. LAYNE:  But I'm saying --

15    THE COURT:  Let me finish.  I know of no authority

16    that would, under any circumstances, allow me to avoid a second

17    lien on your home.  Go ahead.

18    MS. LAYNE:  Well, is not a lien attached to some

19    document?  Meaning a lien is a lien for the purpose of having

20    some document create a lien, is it not?

21    THE COURT:  Well, you don't dispute that there is a

22    recorded second mortgage on your home.  Am I correct?

23    MS. LAYNE:  I don't dispute it.  What I dispute is

24    who's actually making that case or cause or controversy and who

25    is, in fact -- I said I'd been paying GMAC, but in fact, GMAC

1  then says that they have no interest in the note or the

2  property.  And so therefore, who, by -- is it by osmosis or

3  what, how did -- or who did they pay, in fact, and who is the

4  actual lien owed to?

5          THE COURT:  Well, before --

6          MS. LAYNE:  They're the ones coming forth.

7          THE COURT:  -- before -- let me just say.  The

8  debtors' loan servicing business was sold during the course of

9  this Chapter 11 case to Ocwen.  And what the debtors have said

10  is, and it's consistent with everything else that's been

11  happening in this case, that before the sale to Ocwen, the loan

12  was serviced by one of the debtors.  And on February 15th,

13  2013, when the sale to Ocwen closed, Ocwen now services the

14  loan.  I think what the debtors have said is, they don't own

15  the loan.  U.S. Bank is the holder of the second lien for a

16  mortgage trust -- securitization trust.  The debtor --

17          MS. LAYNE:  And I have no evidence of that.  That's

18  the problem.  There is no evidence that they are the ones that

19  own it.  So that's the question.

20          THE COURT:  Well --

21          MS. LAYNE:  They're making a claim that they haven't

22  supported.

23          THE COURT:  No, they're not making a claim.  I assume

24  that your --

25          MS. LAYNE:  Well, do you have the documents --

1        THE COURT:  -- I assume your monthly statements have

2   been coming from Ocwen now.  Do you agree?

3        MS. LAYNE:  No.  I have not even heard from Ocwen.  I

4   don't even know who they are.

5        THE COURT:  All right.  I'm going to ask Mr. Rosenbaum

6   about that.  Anything else you want to add, Ms. Layne?

7        MS. LAYNE:  No.

8        THE COURT:  Okay.  Go ahead, Mr. Rosenbaum.

9        MR. ROSENBAUM:  Your Honor, as you stated, and

10  reciting from our papers, we serviced this second mortgage

11  loan; it was owned by U.S. Bank as trustee for one of the

12  securitization trusts.  The servicing was transferred on

13  February 15th, 2013 as part of the closing of the Ocwen sale.

14       The debtors have checked their records in light of

15  this application.  It was supported by the declaration of

16  Lauren Delehey, the chief liquidation counsel now with the

17  liquidating trust and formerly with the debtors, who checked

18  the records to confirm that there was, in fact, no interest in

19  the second lien.

20       I don't know the status of the second lien with Ocwen,

21  if they have -- the term is -- charged it off, and are no

22  longer seeking to collect.  We don't know that.  So I don't

23  know why --

24       THE COURT:  Okay.

25       MR. ROSENBAUM:  -- Ms. Layne is not receiving the

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    statements.  But the debtors do not have an interest in this.

2            THE COURT:  All right.  I'm going to take the matter

3    under submission.

4            MR. ROSENBAUM:  Thank you, Your Honor.

5            THE COURT:  And I'll enter a decision or order in due

6    course, Ms. Layne.  Thank you very much.

7            MR. ROSENBAUM:  Your Honor --

8            MS. LAYNE:  Thank you.

9            MR. ROSENBAUM:  -- I'll cede the podium to my

10   colleague, Melissa Hager, for the next matter.

11           THE COURT:  Okay.

12           MS. HAGER:  Good morning, Your Honor.  Melissa Hager

13   from Morrison & Foerster on behalf of the ResCap borrowers'

14   trust.  Your Honor, the next matter that's before you is on

15   page 18 of the agenda, and it's the ResCap borrowers' trust

16   objection to two proofs of claim filed by Shane Haffey.

17           THE COURT:  All right.  Is somebody appearing for

18   Shane Haffey?

19           MS. MCKEEVER:  Yes, Your Honor.  Heather McKeever.

20           THE COURT:  Okay.  Go ahead.

21           MS. HAGER:  Certainly.  Thank you, Your Honor.  Your

22   Honor, the objection to the proof of claims -- there are two

23   proof of claims, claim 2582 and 4402 filed by Mr. Haffey.  The

24   objection seeks to expunge the claims in their entirety with

25   prejudice, for failure to state a basis for liability against

1  any of the debtors.

2          In addition to the debtors' original objection, the

3  borrowers' trust filed a supplement to the motion, which is at

4  document number 6361.  And that would be at tab 3 of the second

5  binder that you have in front of you today, Your Honor.

6          THE COURT:  Okay, so it's an appropriate time for me

7  to address some comments about the supplement that was filed.

8  And as you know, yesterday there was a motion to adjourn this

9  hearing, which the Court denied.  The motion for adjournment

10  was filed by Ms. McKeever yesterday, and it raised an issue

11  that has been causing me considerable concern recently.  And

12  I've noticed that with the claims objections that the debtors

13  have filed recently, many of them, they follow the practice of

14  improperly adding new legal theories and grounds for objections

15  in their replies, arguments that were not raised in the

16  original objection, and to which the claimant is not given an

17  adequate opportunity to respond.

18          And the Haffey claim objection is a perfect example of

19  it.  And this problem that I've observed has been more acute

20  with respect to the omnibus claims objections, where the

21  debtors' original objection -- initial objection may contain

22  only a sentence or two ascribing a label to the basis for the

23  objection:  no liability claim; not supported by books and

24  records.  And it's only after the claimant responds two days

25  before the hearing on this matter, that the debtor puts forth

RESIDENTIAL CAPITAL, LLC, et al.                    50

1    their argument in any real detail.

2          And I recently entered an order denying without

3    prejudice a claims objection for this very reason.  See the

4    order denying without prejudice the debtors' fiftieth omnibus

5    objection as to claim number 1574, filed by Rainer P. Warner,

6    CECF docket number 6236.

7          In the matter before me, with respect to Haffey, Mr.

8    Haffey was -- never even filed a response on the docket, and

9    there's considerable amount that's been filed about that --

10   we'll get to that in a little while -- but yet the debtors

11   filed an unsolicited supplement with the stated purpose of

12   updating the Court on the status of the district court

13   litigation since the objection was originally filed.

14         But the supplement goes on to raise new legal

15   arguments why the Haffey claims should be disallowed and

16   expunged; arguments which were not raised in the initial

17   objection, but which certainly could have been.  And I'm

18   troubled by this practice.  This is not the first time this has

19   happened.  It better be the last.

20         And I want to make clear.  I'm not -- and the reason I

21   denied the motion for an adjournment.  I'm not going to

22   consider the new arguments raised by the debtor in the

23   supplement.  That makes Ms. McKeever's request for an

24   adjournment to respond to the supplement moot, because I'm not

25   going to consider those arguments.

1          And if it's not clear from what I've said, I want to
2   make it entirely clear, that I will not consider new arguments
3   improperly raised for the first time in replies.  The debtor
4   should be especially mindful of this in regards to omnibus
5   objections to borrower claims.  If the objection is not
6   sufficiently detailed to give the claimant a meaningful
7   opportunity to respond, I'm not going to grant the objection.
8          So the only grounds on which I'm going forward are the
9   original grounds asserted.
10         Now, with respect to the response that was not
11  originally filed on the docket, when did you first see it,
12  Ms. Hager?
13         MS. HAGER:  I first saw it yesterday afternoon --
14         THE COURT:  Okay.
15         MS. HAGER:  -- when I -- shortly after it was filed.
16         THE COURT:  I find that the explanation for why it was
17  not filed to be untenable.
18         MS. HAGER:  Your Honor, on that issue, if I could just
19  supplement the record a little bit.  And just for purposes of
20  the record, I understand your position with regard to the
21  reply.  And I --
22         THE COURT:  Do you dispute it?  I mean, it's not the
23  first time that I've started -- I've started commenting -- this
24  is the most I've said on this subject, but I've been expressing
25  my displeasure, and it's growing displeasure.

1          MS. HAGER:  Your Honor, I -- if I could take the

2     adjournment request first.

3          THE COURT:  It's not -- forget the adjournment.

4          MS. HAGER:  Okay.

5          THE COURT:  It's not being adjourned.  And I'm not

6     going to consider the arguments made for the first time in the

7     supplement.  It's as simple as that.

8          MS. HAGER:  Understood.  And just for the record, with

9     regard to the adjournment, there was also -- this matter -- the

10    objection to the Haffey claims was originally filed back on

11    August 26th of 2013.  It was originally -- originally the

12    response deadline was September 16th of 2013.  And it was

13    scheduled for a hearing in November.

14         For a variety of reasons, including multiple parties'

15    requests and the Court's calendar, it was adjourned several

16    times.  And I just wanted to point out for the record, with

17    regard to the allegation in the adjournment that they first

18    became aware that the reply had not been timely filed for the

19    September 23rd deadline, number one, there was two other

20    agendas that have been filed with regard to this objection with

21    this Court, electronically noticed, et cetera, which both noted

22    that there was no response filed and that the time to do so had

23    passed.  And that's the agenda for the November 15th hearing at

24    docket number 5741 and the agenda for the December 17th hearing

25    at docket number 6127.

RESIDENTIAL CAPITAL, LLC, et al.                    53

1        THE COURT:  Well, the claimant's counsel has also

2    acknowledged that they've known about the fact that it wasn't

3    filed since -- what was --

4        MS. HAGER:  January 14th.

5        THE COURT:  -- January 14th.  And here we are on

6    January 30th.  And if they knew on January 14th that their

7    response had not been filed, they should have sought leave to

8    file it late then, immediately, and not wait until the day

9    before the hearing.  Okay?

10        So I find the explanation for why it was not filed to

11    be untenable.  And I find the delay -- since they've known that

12    it wasn't filed -- to raise substantial questions as to whether

13    the claimant's acting in good faith.

14        MS. HAGER:  Thank you --

15        THE COURT:  They had an obligation to advise the Court

16    promptly if through some clerical or other mistake, a response

17    that had been prepared wasn't filed.  And I won't review --

18    there was an issue about who the counsel was at the time and

19    all that.  I'm not going through that.

20        MS. HAGER:  Thank you, Your Honor.  And I want to --

21        THE COURT:  I'm going -- let me finish.

22        MS. HAGER:  Sure.  I'm sorry.

23        THE COURT:  I haven't decided yet whether I'm going to

24    consider the arguments raised in the response.  I've now read

25    it.  And when I take this matter under submission, I'll decide

1  whether to consider the arguments that are raised.

2          Go ahead, Ms. Hager.

3          MS. HAGER:  Understood.  Thank you --

4          MS. MCKEEVER:  Your Honor?  May I --

5          THE COURT:  No, you may not.  You'll get your chance.

6          MS. HAGER:  Understood.  Thank you, Your Honor.  Just

7  I wanted to make sure the record was full in case there's an

8  appeal of something -- of some sort.

9          Going to the reply, Your Honor, I understand your

10  position.  I am fully prepared to proceed on the original

11  objection.  And the purpose of the reply certainly materially

12  was to update you with regard to the variety of appeals pending

13  before the Sixth Circuit.  And I do think that if you look at

14  the reply, it's -- the reply is actually thirteen pages long,

15  and that includes a signature page and the caption page of it.

16          If you look at pages 2 through 7, certainly, of the

17  reply, those were really in the nature of updating them.  I can

18  take Your Honor's point of from the bottom of page 7 through

19  the bottom of page 10 that those might be deemed to be outside

20  the four corners of the original objection.

21          Your position is duly noted, and I'm sure it will not

22  happen again.

23          Your Honor, the objection seeks to expunge two claims

24  filed by Mr. Haffey in the amount of five million dollars each,

25  against one debtor, and that's ResCap.  The first proof of

1  claim is purportedly based upon document fraud, forgery, fraud

2  on the court.  The second proof of claim is purportedly based

3  upon qui tam, document fraud, document forgery, slander of

4  title, quiet title, fraud on the court.

5          In support of these claims, the proof of claims attach

6  virtually identical documents to them relating to the various

7  different actions that are pending in the Eastern District of

8  Kentucky, as well as the Sixth Circuit.

9          THE COURT:  As to which there's no stay in place?

10         MS. HAGER:  Correct, Your Honor.  This was something

11 that the Court's familiar with.  We attached a document for it.

12 The stay (sic) has been going forward; there's been multiple

13 appeals.  And one of the items that's attached to the reply was

14 an updated Exhibit A of the schedule of the litigation, which

15 was really -- to try to -- effort of the Court to help with

16 that.

17         But at its core, Your Honor, the claims assert alleged

18 cause of action arising out of a May 2007 refinancing of

19 approximately -- no, of exactly one million dollars for a

20 mortgage loan by the claimant and his wife, and who is also his

21 counsel, Ms. McKeever, who is on the phone today.  The loan was

22 serviced commencing in July of 2007 by GMAC Mortgage.

23         To date, there have been six separate lawsuits filed

24 with regard to the transaction, four of which were filed by Mr.

25 Haffey and/or his wife against the debtors and nondebtor

RESIDENTIAL CAPITAL, LLC, et al.                    56

1   entities, seeking among other relief, to quiet title and to

2   prevent any number of entities, including the debtors, from

3   enforcing the terms of the mortgage loan against the claimant.

4          To date, all of his claims against the debtors have

5   been resolved conclusively in the debtors' favor.  Included in

6   those six lawsuits are two actions brought by -- brought

7   against the Haffeys.  The first one was one that was originally

8   commenced by GMAC Mortgage; ultimately Deutsche Bank as trustee

9   was substituted as the plaintiff.  And that one was a

10  declaratory judgment seeking a finding that the Haffeys'

11  purported rescission of the mortgage was ineffective.  A final

12  judgment was entered on that, finding that the rescission was

13  ineffective, that Deutsche Bank was the holder of the note and

14  the mortgage, and entitled to proceed with whatever rights that

15  that has.

16         A lot of these actions have been pending since 2008,

17  and there have been numerous appeals, some of which are still

18  pending before the Sixth Circuit, upon which there is no

19  automatic stay, and the parties have been free to go forward

20  with them.

21         And if you look at the documents and you look at all

22  of the various pleadings and whatnot, it takes you a long time

23  to get through them all.  And it's clear that there's been a

24  lot of, what I'd say, delay type of tactics, whether it be to

25  certify an action -- certify an issue to New York State Court,

1    which I'm not sure exactly how New York has any bearing in a

2    property and transaction that's based in Kentucky, and other

3    type of things, including various motions to -- filed by the

4    claimant -- to reconsider, et cetera.

5           And I think if you listen to the claimant and you

6    listen to his wife, counsel on the phone, they're going to try

7    to explain to you that this is very complicated; there's a lot

8    of things going on here.  There was a big fraud and conspiracy

9    of which one of the debtors was involved.  Your Honor, it

10   really comes down to something that's very simple, and it's

11   something that's included in the original objection.  You don't

12   even need to get to the reply to, and that's basically four

13   different arguments.

14          One, is that they sued the wrong debtor.  They only

15   sued -- sorry, they filed a claim against the wrong debtor.

16   They only filed claims against ResCap.  And I recognize you may

17   not consider their response that was filed, and in their

18   response they basically say, we used the caption of -- the

19   consolidated caption -- these actions have been consolidated.

20   That's not correct.  The bar date order clearly provides, you

21   need to -- if you have a claim against a particular debtor, you

22   need to file it against that debtor.  They sued GMAC Mortgage

23   on several different occasions, have named them in the

24   lawsuits, but for some unknown reason they list ResCap in the

25   proof of claim.  That is an independent basis alone to expunge

1    the claims.

2            But giving them the benefit of the doubt, and

3    recognizing that they could have named GMAC Mortgage or a

4    couple of the other ancillary debtors that they named in some

5    of their state court actions, the proof of claim should still

6    be expunged on the basis of res judicata and collateral

7    estoppel.

8            And then finally, the fourth argument, and again, just

9    relying on the original objection, is that even if they weren't

10   entitled to res judicata and collateral estoppel which were in

11   the Sixth Circuit, and unlike, Your Honor, when I was here

12   earlier this week we were in the Ninth Circuit in California,

13   when there's an appeal pending, you don't get res judicata

14   benefit, here you do.  In the Sixth Circuit in Kentucky law --

15           THE COURT:  So, they argue -- and by raising the

16   question I'm not suggesting I'm ultimately going to consider

17   the response.  But in the response, I read it as raising one

18   new issue not previously presented to the Court by the

19   claimant.

20           In the response, the claimant argues that res judicata

21   doesn't apply to bar his claims because new facts have come to

22   light that prevented his original claim from being fully and

23   fairly litigated.  And their response points to the Delehey

24   declaration in -- with respect to the date on which the note

25   was executed, whether it was May 18th, 2007, rather than May

 1    14th, 2007.

 2              So address for me, if you would, why that should not

 3    affect the res judicata analysis that I'm required to make.

 4              MS. HAGER:  Your Honor, this is one of the very issues

 5    that has been litigated in four of the actions that they've

 6    commenced against the debtors as other people.

 7              THE COURT:  As I understand it, they've gone back to

 8    federal court in Kentucky and have now raised the issue

 9    pointing to the Delehey declaration as to whether the note was

10    executed on -- whether it was --

11              MS. HAGER:  May 18th.

12              THE COURT:  -- May 18th or May 14th.  So that issue's

13    back in the federal court in Kentucky.

14              MS. HAGER:  That issue has always been in the federal

15    court of Kentucky and is currently before the Sixth Circuit.

16    It's raised as -- it's a red herring, Your Honor.  It's raised

17    as being a new issue.  If you go back and look at Exhibit G to

18    our original objection, you'll see that the court rejected

19    these issues.  They were raised as part of the declaratory

20    judgment.  The one new, I guess, nuance you could have is that

21    you have the Delehey declaration that has -- that uses a May 18

22    date as compared to the 14th date, but that's -- that doesn't

23    impact the claim here.

24              Number one, we were only a servicer.  Number two, we

25    didn't even come in -- and if you look at the papers that were

RESIDENTIAL CAPITAL, LLC, et al.                    60

1  filed in the Sixth Circuit District Court, they acknowledge

2  that GMAC didn't come in until July as a servicer.  So it's a

3  red herring.  It's not new.  It's certainly another twist on

4  another way of arguing it, but it's not new, and it has been

5  decided by the court that Deutsche Bank, as trustee, is the

6  current valid holder of the mortgage and the note.

7          So it's not --

8          THE COURT:  Okay.

9          MS. HAGER:  It doesn't matter.  I mean, I think

10  actually -- and I've read their response, and Your Honor, I

11  don't think it changes anything.  Even if this Court were

12  willing to accept it and consider it, it doesn't change any of

13  the arguments.  There's res judicata.  You have four different

14  actions that were commenced.  And I think you've got res

15  judicata on more than the six causes of action that they've

16  alleged in this -- in his two proofs of claim.  In fact, I dare

17  say, Your Honor, I think most attorneys out there would be at a

18  loss to come up with a new claim that has not yet been asserted

19  against -- by the claimant.

20          So I don't see how that -- especially with regard to

21  res judicata which is much broader than a collateral estoppel,

22  you could have, should have, would have named it in the

23  lawsuit, and it's all arising out of the same transaction and

24  facts.

25          THE COURT:  Res judicata would apply, in your view, if

1    the claim was or could have been asserted in the prior action?

2          MS. HAGER:  Correct, Your Honor.  And I think the

3    cases teach us -- the cases cited in our objection teach us

4    exactly that point.

5          THE COURT:  Okay.

6          MS. HAGER:  Collateral estoppel is a little bit more

7    of a limited argument.  We have cited to that in the paper.

8    And here you actually do have what's referred to as the GMAC-

9    Haffey action, where Mr. Haffey sued GMAC.  It was dismissed

10   with prejudice on the merits.  There was twelve different

11   causes of action including common law causes of action on

12   fraud, federal causes of action on violations of TILA,

13   federal -- Fair Debt Collection Practices Act, so I think even

14   if you look at the more minute legal principle of collateral

15   estoppel, that he's estopped as well.

16         THE COURT:  Okay, so --

17         MS. HAGER:  And --

18         THE COURT:  Move on to the next -- so you've dealt

19   with -- the claim is against the wrong debtor, res judicata.

20   Any other arguments?

21         MS. HAGER:  The other argument, Your Honor, is even if

22   you throw res judicata and collateral estoppel out the window,

23   and you look at the four corners of the proof of claim and the

24   attachments, and even if you add into it -- actually I don't

25   think in their response they added anything new other than a

1  declaration, which is a regurgitation of what's been done in

2  the Sixth Circuit in Kentucky courts -- on their face, they

3  still don't -- do not survive a motion to dismiss.

4            THE COURT:  Okay.

5            MS. HAGER:  They have not set forth the standard.

6  They have not been able to satisfy the shifting burden of proof

7  with regard to the claims objection.

8            THE COURT:  All right.  Let me hear from Ms. McKeever.

9  Thank you, Ms. Hager.

10           MS. HAGER:  Thank you.

11           THE COURT:  Go ahead, Ms. McKeever.

12           MS. MCKEEVER:  Well, Your Honor, I don't -- it's not

13 really all that complicated.  This issue that we're discussing

14 with the Delehey declaration, this is a disputed issue from the

15 beginning.  I mean, we're just talking about the original

16 mortgage documents having --

17           THE COURT:  No, what we're talking about -- Ms.

18 McKeever, what we're talking about is whether res judicata

19 applies based on the judgments of the courts in Kentucky.

20           MS. MCKEEVER:  Well, the supplement is correct in the

21 procedural layout today.  The Sixth Circuit sent back the main

22 foreclosure case -- which is actually one of the last cases to

23 be filed -- they sent it back to the district court, so it's

24 currently sitting in front of the district court.  So it's no

25 longer on appeal, it was deemed not final.  And I believe that

RESIDENTIAL CAPITAL, LLC, et al.                    63

1  I don't have and disagreement with their dissertation of the

2  procedural posture at this point, if that's -- if you consider

3  the updated procedural posture of the case.

4          And, other than that, we have a motion for an

5  evidentiary hearing, which I'd like you to consider, so that we

6  could bring in -- the dates of these original documents are the

7  vital -- one of the vital aspects of all of this.

8          THE COURT:  Ms. McKeever --

9          MS. MCKEEVER:  In GMAC -- yes, sir?

10         THE COURT:  If res judicata applies, it's the end of

11 the discussion, there is no basis for an evidentiary hearing.

12 If res judicata bars the claims -- the two claims that were

13 filed, there's no basis to get an evidentiary hearing.  That's

14 why I see res judicata -- and I know Ms. Hager argues you filed

15 against the wrong debtor, and the Court will deal with that, if

16 necessary, but the key issue that I see is the res judicata

17 issue.  The law in Kentucky -- and state law controls -- is

18 that res judicata applies to a judgment by the trial -- entered

19 by the trial court even if the matter is on appeal.  Do you

20 dispute that?

21         MS. MCKEEVER:  No, Your Honor.  But one of the cases

22 is not on appeal, it's deemed not final.  And it's the case.

23 And it's the case that has all the counterclaims against the

24 debtors.  It's 09-362.

25         THE COURT:  Go ahead with your argument.

1        MS. MCKEEVER:  That's all I have to say.  I do take

2    issue with the fact that I think the Court may be leaning

3    towards thinking that I'm a liar.  I know that you have had a

4    background with Ms. Nora, and I did not discover that the

5    response had not been filed --

6        THE COURT:  May I ask you this?

7        MS. MCKEEVER:  As far as I'm --

8        THE COURT:  You've acknowledged that you knew that it

9    wasn't filed as of January 14th, am I correct in that?

10        MS. MCKEEVER:  Correct.  And I received --

11        THE COURT:  So why didn't you --

12        MS. MCKEEVER:  -- see the declarations from --

13        THE COURT:  Why didn't you immediately bring that to

14    the Court's attention and ask for leave to file it late?  I

15    mean, what's irr -- and I'm not ruling at this point -- I've

16    obviously read your response, and I've asked Ms. Hager some

17    questions based on it.  But the point that particularly irks me

18    is you acknowledge you knew about it since January 14th, and

19    you waited until virtually two days before the hearing to raise

20    the issue with the Court.  So why did you do that?  That's not

21    Ms. Nora.

22        MS. MCKEEVER:  No.  Well, I don't want to get into a

23    spitting contest, but I'm not a bankruptcy practitioner, so I

24    want to make it clear that this has nothing to do with bad

25    faith.  And I was not aware that Ms. Nora's pro hac had been

RESIDENTIAL CAPITAL, LLC, et al.                    65

1    revoked until all of this came down the pike.  So --

2             THE COURT:  What does that -- if you found out on

3    January 14th that it hadn't been filed, and you were

4    representing your husband in connection with this matter, why

5    didn't you file some pleading or send a letter to the Court

6    explaining that a response had been prepared, but apparently

7    hadn't been filed, and requesting that the Court consider it?

8    You waited until just before this hearing to do -- and what you

9    ask is that -- then you ask adjourn the hearing.  I've already

10   dealt with the supplement, so the supplement's not going to be

11   considered, you don't have to respond to that.  But that's

12   what's -- that's what I'm miffed about.

13            This seems to be an effort to simply delay.  So why

14   did you wait -- why didn't you file the response January 14th,

15   15th or as soon as you learned that it hadn't been filed?

16            MS. MCKEEVER:  Well, all I can tell you is that I was

17   communicating with Nora and believed that she was going to take

18   care of it again and did not know that she had not -- that she

19   was not eligible to be filing anything at this point, unless

20   she reapplied.  It's my understanding she'd have to reapply to

21   be in this case.  I can assure you it wasn't in bad faith.

22   Having a thirty-day delay in this case, or having any delay, is

23   in the big picture -- this has been going on for four years.

24   No one would like closure more than my husband and I.

25            THE COURT:  This case is not --

1          MS. MCKEEVER:  And we've made multiple --

2          THE COURT:  This case hasn't been going on for four

3     years.  All right.

4          MS. HAGER:  If I can --

5          THE COURT:  All right.

6          MS. MCKEEVER:  No, the outside cases have been going

7     on for four and a half years, Your Honor.

8          THE COURT:  Okay.

9          MS. MCKEEVER:  No one would like closure more than my

10    husband and I.

11         THE COURT:  All right.  And --

12         MS. MCKEEVER:  I can assure you of that.

13         THE COURT:  Any other --

14         MS. MCKEEVER:  Delay is not in our best interests.  We

15    are running a family farm, and all this has done is completely

16    if not disturbed, it's now paralyzed our ability to run our

17    family farm.

18         THE COURT:  All right.  Any other argument on the

19    merits?

20         MS. MCKEEVER:  Yeah, I --

21         THE COURT:  Any other arguments on the merits?

22         MS. MCKEEVER:  No, Your Honor.  I have nothing else to

23    say at this point, if I can --

24         THE COURT:  Okay.

25         MS. MCKEEVER:  -- leave my --

RESIDENTIAL CAPITAL, LLC, et al.                    67

1           MS. HAGER:  Your Honor, if I can just address just two

2     points, Your Honor?

3           THE COURT:  No, I don't want to hear any further -- I

4     don't want to hear anything further.  The matter's under

5     submission.

6           MS. MCKEEVER:  Thank you.

7           THE COURT:  Thank you.

8           MS. HAGER:  Your Honor, I turn the podium over to my

9     colleague Erica Richards, on the next claims objection with

10    regard to Moody --

11          THE COURT:  Moody, Foster, Assorgi.

12          MS. HAGER:  Yes.  And Ms. McKeever is also the

13    attorney of record --

14          THE COURT:  Correct.

15          MS. HAGER: -- representing the claimants there.

16          MS. RICHARDS:  Good morning, Your Honor.  Again, for

17    the record, Erica Richards, of Morrison & Foerster, appearing

18    on behalf of the ResCap Borrower Claims Trust.

19          As Ms. Hager noted, the next item on the agenda is

20    down on page 19, and that is the objection to the proofs of

21    claim filed by Ruth Assorgi, that was claim number 2580; the

22    claim filed by John and Elizabeth Foster, that was claim 2581;

23    and the claim filed by Mark and Cheryl Moody, which was claim

24    number 2583.

25          The objection was filed in September at docket number

RESIDENTIAL CAPITAL, LLC, et al.                    68

1    5163.  And all those claims were included on the same

2    objection, because they were each filed by Ms. McKeever.

3              I would note, I don't believe she's been admitted pro

4    hac to represent these claimants.  She did not file a response

5    to the objection.  I understand Your Honor's position on the

6    reply that was submitted to the extent it builds in new legal

7    arguments.

8              THE COURT:  I don't know what you were supplementing,

9    because there was no response filed to the objection.

10             MS. RICHARDS:  Understood, Your Honor.

11             Ms. Delehey submitted a declaration in support of the

12   initial objection, and she's, as you know, here in the

13   courtroom today, if you have any questions.

14             I would also like to note for Your Honor, Ms. McKeever

15   reached out to us late yesterday afternoon and indicated that

16   she was willing to withdraw the claims.  We told her in light

17   of the fact that it was the eve of the hearing, both we and

18   presumably your chambers had prepared for it.  And under

19   Bankruptcy Rule 3006, if she wanted to make that request of the

20   Court she could make it today, but we would be prepared to go

21   forward with the objection.

22             THE COURT:  You want to address that, Ms. McKeever?

23   So we're dealing with claims 2580, 2581, and 2583.

24             MS. MCKEEVER:  Yes, correct, Your Honor.

25             THE COURT:  And are you seeking to withdraw the

RESIDENTIAL CAPITAL, LLC, et al.                           69

1  claims?

2          MS. MCKEEVER:  Yes, Your Honor.

3          THE COURT:  All right, claims are withdrawn.  I don't

4  need to hear the argument then.

5          MS. RICHARDS:  Your Honor, can we just clarify that

6  they are withdrawn with prejudice, and that Ms. McKeever

7  understands that she can't pursue those claims.

8          THE COURT:  We're past the bar date.  As far as I'm

9  concerned, the claims that are withdrawn today are with

10 prejudice.  Submit an order, if you would, indicating that as

11 stated on the record by the claimant's counsel the claims are

12 withdrawn.

13         MS. RICHARDS:  We will do that.

14         THE COURT:  And identifying the claims.  Okay?

15         MS. RICHARDS:  Thank you, Your Honor.

16         THE COURT:  All right.  Thank you, Ms. McKeever.

17         MS. RICHARDS:  At this point I'll turn the podium over

18 to --

19         MS. MCKEEVER:  Thank you.  Your Honor, that's all the

20 business I have so I'm withdrawing from the CourtCall.

21         THE COURT:  Okay, you're excused.  Thank you very

22 much.

23         MS. RICHARDS:  Your Honor, I'll turn the podium over

24 to Mr. Jordan Wishnew.

25         THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    70

1          MR. WISHNEW:  Good morning, Your Honor.  Jordan

2     Wishnew of Morrison & Foerster for the ResCap Liquidating --

3     I'm sorry, Borrower Claims Trust.

4          Skipping ahead, Your Honor, to page 22, item 6, the

5     debtors' thirty-sixth omnibus objection to claims,

6     misclassified and wrong debtor borrower claims.

7          There is one contested matter going forward, dealing

8     with the claim of Ms. Rhonda Deese.  I believe she is appearing

9     telephonically.

10          THE COURT:  Ms. Deese, are you on the phone?

11          MS. DEESE:  Yes, sir.

12          THE COURT:  Okay.

13          MR. WISHNEW:  Your Honor, just very quickly.  This is

14     a motion to reclassify and redesignate Ms. Deese's claim, claim

15     number 4927, filed as an administrative priority claim against

16     Residential Capital LLC in the base amount of 142,950 dollars

17     for -- the alleged basis:  failure to produce regarding real

18     estate.

19          So very simply, Your Honor, we are not objecting and

20     seeking to disallow and expunge the claim through this omnibus

21     objection.  Rather, we are simply asking the Court to

22     reclassify from an administrative priority claim to a general

23     unsecured claim, and to redesignate it from Residential Capital

24     to GMAC Mortgage, since that would be the debtor entity that

25     she's interacted with.

RESIDENTIAL CAPITAL, LLC, et al.                    71

1              The -- both the --

2              THE COURT:  So let me just -- on this point I wanted

3    to stop and ask you.  Here you argue that the claim was filed

4    against the wrong debtor, but you're agreeing that it will --

5    that you're prepared to have it as an unsecured claim against

6    GMACM, right?

7              MR. WISHNEW:  Subject -- subject --

8              THE COURT:  Subject to whatever objections you may

9    have down the road.

10             MR. WISHNEW:  That's correct.

11             THE COURT:  But like on the last case, on Haffey,

12   where the argument from Ms. Hager was it was filed against the

13   wrong debtor, there you're not willing to agree that the

14   claim -- that you're prepared to have it considered as a claim

15   against the correct debtor?

16             MR. WISHNEW:  Well, I think that the --

17             THE COURT:  How do you -- this is not the first

18   time -- it was something that I was thinking about, actually,

19   this morning, because it's not the first time that this

20   inconsistency has arisen.  Sometimes you're willing to allow a

21   claim to be basically considered as a claim against the correct

22   debtor, and other times you argue that no, it should be

23   expunged because it's a claim against the wrong debtor.  How do

24   you explain that inconsistency?

25             MR. WISHNEW:  Sure, absolutely, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    72

1          The distinction between those two situations is that

2    this was part of a larger omnibus objection, in which we were

3    basically trying to rebucket claims where we hadn't yet been

4    able to address the merits of the claims.  We wanted to make

5    sure they were put against the correct parties, so going

6    forward we knew where the liabilities would ultimately end up

7    if there was an allowed claim.

8          Whereas, Ms. Hager's objection to --

9          THE COURT:  Well, let's -- we'll deal with this one.

10   It's just I'm noting the inconsistency.  Here you're prepared

11   to have it considered as an unsecured claim against GMACM.

12         MR. WISHNEW:  I would say this, Your Honor, going

13   forward to the extent that there are unresolved borrower

14   claims, it is not our intention to take this two-step approach

15   going forward, rather to address claims on their merits through

16   the objection, as opposed to creating a sort of confusion for

17   the borrower where we think they might perceive that we're

18   seeking to disallow their claim, but we're just moving it

19   around a little bit.  So --

20         THE COURT:  All right.  So just address the issue of

21   this should be --

22         MR. WISHNEW:  Sure.

23         THE COURT:  -- reclassified as a general unsecured

24   claim, rather than an administrative priority claim.

25         MR. WISHNEW:  Thank you, You Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    73

1        So the stated basis for the administrative priority in

2   Ms. Deese's claim is 503(b)(9).  We're not aware of the fact

3   that she provided any services to the debtors during the

4   statutory period.  And other than that, there really is no

5   basis in the Bankruptcy Code to afford her any sort of priority

6   higher than an unsecured claim.  So for that reason we would

7   ask that it be reclassified as an unsecured claim against GMAC

8   Mortgage, who did have some connection to her loan.

9        THE COURT:  All right.  Let me -- Ms. Deese, go ahead.

10       MS. DEESE:  Yes, Your Honor.  It's so complicated I

11  don't even know where to start here.  I have actually spoke

12  with my local attorney, and he has brought up some words that

13  are a little alarming to me.  And I was actually considering

14  possibly asking to see if -- he explained to me that he would

15  be unable to come into the case, and that he is not able to

16  practice -- that he doesn't have a license in New York.  But I

17  was going to go ahead just turn this over to him.  But with

18  some of the words that he was using I'm starting to feel -- I

19  was feeling uncomfortable whether I should ask, perhaps, to --

20  if you would allow me to obtain a New York attorney.  There was

21  words used like an adversary complaint, tainted, false claims.

22       If you'll indulge me, the -- what was explained to me

23  is that whenever I called this third party -- her name is

24  Kristine Hannerty (ph.) -- and was asking some questions

25  regarding the relationship of Residential Capital and GMAC.

1   And she explained that basically that GMAC was the et al., and

2   that Residential Capital was the parent company.  It basically

3   is --

4            THE COURT:  Ms. Deese, let me just stop you there --

5            MS. DEESE:  Okay.

6            THE COURT:  -- because the debtors' counsel, Mr.

7   Wishnew, is not proceeding with this objection on the basis

8   that it named the wrong debtor.  So this issue, whether it was

9   ResCap or GMAC, what the debtors' papers have shown is to the

10  extent there was a claim it should have been a claim against

11  GMAC Mortgage, and they're prepared to have it designated as a

12  claim against GMAC Mortgage.

13           So that issue of -- I think is really no longer an

14  issue.  The real issue before me today is whether this is a

15  general unsecured claim, or whether it's an administrative

16  priority claim.  I don't know whether that -- so what you were

17  describing about your conversations with a lawyer seemed to

18  focus on the entity against which the claim was asserted.  And

19  I think the real issue, for today at least, is whether this is

20  a general unsecured claim, or whether it's an administrative

21  priority claim.  And that's what you ought to focus your

22  comments on.

23           MS. DEESE:  Okay.  Do you have the actual paperwork

24  that I submitted, there's nine pages that I submitted --

25           THE COURT:  I do.

1           MS. DEESE:  -- to you?

2           THE COURT:  I do.

3           MS. DEESE:  Okay.  And the bar -- if it's broken down,

4    and as it was explained to me by another person whenever I

5    called in, that my concern is that it's -- if they take me from

6    Residential Capital over to GMAC that the bar date -- I would

7    be past the bar date.  So the argument --

8           THE COURT:  No, but they're not asserted -- Ms. Deese,

9    let me just stop you there.  Because -- Mr. Wishnew, you're --

10          MS. DEESE:  Okay.

11          THE COURT:  -- not asserting that it was a late filed

12   claim?

13          MR. WISHNEW:  No, Your Honor.

14          THE COURT:  No.  Ms. Deese --

15          MS. DEESE:  Okay.

16          THE COURT:  -- their agreement basically is, they say

17   the claim should have been filed against GMACM.  They said no,

18   she filed it against ResCap, but we're prepared to consider it

19   as a timely claim against GMACM.  But the issue -- that's why I

20   keep coming back to this -- the issue is whether it's a general

21   unsecured claim or a priority claim.  They may come back later

22   in the case, and object to it even as a general unsecured

23   claim, but they're not doing that now.

24          What they're saying is okay, we'll permit this to be a

25   general unsecured claim against GMACM.  It was filed against --

RESIDENTIAL CAPITAL, LLC, et al.                          76

1    a claim against ResCap but we're not going to assert that as a

2    basis for the objection.  Okay.

3           So the real issue that they're raising is this issue

4    of whether it's a general unsecured claim or an administrative

5    priority claim.  Okay.

6           MS. DEESE:  If it is -- well --

7           THE COURT:  Consider yourself victorious at least to

8    that extent.  Okay.

9           MS. DEESE:  Okay.  Okay.  Well, the reason that I was

10   requesting the -- or thought that I should be in that position

11   is that because I submitted a request to produce.  Basically,

12   ownership -- if you read the letter, it breaks it down from

13   origination to date.  Because back from 2005, from the

14   origination, to about 2012 I have paid perfectly.  And I feel

15   that I have engaged in good faith and -- let's see, and I feel

16   that their failure to produce -- they failed to produce but yet

17   they went ahead and assigned it to another -- it was -- they

18   assigned it to a new assignee.  And whenever a note and

19   mortgage is signed I feel that there's rights and

20   responsibilities to each other as a bilateral agreement, not

21   just unilaterally.

22          And what I feel is that whenever I -- I had been

23   requesting orally of the previous assignors to produce who owns

24   me, because of documents that I can bring up here, and I need

25   to clarify the record, coming back to that.  But I feel that

1  there's -- not only the right -- what's explained to me, when I

2  talk to the assignees, is they have the right to the payment,

3  but they don't have the obligation to produce; that would be

4  the previous assignor.  And so I feel like I'm being ping-

5  ponged back and forth.

6          I feel that whenever an assignor assigns the note and

7  mortgage to the assignee and there's a request to produce

8  ownership on the table, that that obligation should transfer --

9  that all rights and obligations should transfer to the new

10 assignee.

11         And just for clarification of the record, there's a

12 couple of things that is not correct.  It's on something that I

13 pulled up here.  It's claim of Rhonda Deese, it's number 34.

14 There's a couple -- whenever I filed my claim it was on

15 Residential Capital and GMAC.  There was one let -- there was

16 the first letter that went -- that I sent to -- it's the letter

17 dated May 25th, that did, indeed -- it was a formal letter that

18 went to GMAC, requesting ownership, or proof of ownership.  But

19 the subsequent letter, they stated that this went to GMAC, but

20 it didn't go to GMAC, it actually went to Residential Capital,

21 et al., so put aka as GMAC.  And this went to Residential

22 Capital per their request of more information.  So just to

23 clarify the record on that.

24         And then, also, under number 37, they're claiming

25 that -- according to the debtors' books, let's see, that

1   Residential Funding Company, LLC, that they placed me in a

2   trust RAMP 2005-R57.  And I'm looking at the paper that was

3   sent to me and there is no mention of my being placed in this

4   RAMP of 2005-R57.  It was sent to me; and this was sent by

5   Ocwen.  Hello?

6           THE COURT:  All right.  Let me ask the debtors'

7   counsel if he wants to address your concerns.  And I certainly

8   know that you had asked for documentation relating to the

9   origination of your loan, it's a property in Auburndale,

10  Florida.  And you had asked for a full accounting --

11          MS. DEESE:  Yes.

12          THE COURT:  -- and some evidence of who owns the loan.

13  Mr. Wishnew.

14          MR. WISHNEW:  Your Honor, I'm not --

15          MS. DEESE:  And, sir, may I say one more thing?

16          THE COURT:  Let me -- Ms. Deese --

17          MS. DEESE:  Okay.

18          THE COURT:  -- let me have the debtors' counsel,

19  Mr. Wishnew, address.

20          MS. DEESE:  Okay.

21          MR. WISHNEW:  I can't specifically address who or when

22  GMAC responded to Ms. Deese's request.  But what I can say

23  going forward to try to bring this matter forward, is that my

24  personal information can be found on our firm's web site.

25          THE COURT:  Well, I don't want to get to that.

1          MR. WISHNEW:  Okay.

2          THE COURT:  It sounds like Ms. Deese has just told me

3  that she received something from Ocwen showing that the loan

4  was assigned to a securitization trust.  Do you have any

5  information on that?

6          MR. WISHNEW:  Not with me today, Your Honor.

7          THE COURT:  Okay.  And --

8          MS. DEESE:  I can barely hear him.  I'm sorry.

9          THE COURT:  Okay.

10          MR. WISHNEW:  Not with me today, Your Honor.

11          THE COURT:  Okay.  Here's what -- I'm going to go

12  ahead and decide the matter, but I'm also going to give you a

13  direction --

14          MR. WISHNEW:  Yes.

15          THE COURT:  -- Mr. Wishnew, to try and help Ms. Deese

16  out on this.

17          MR. WISHNEW:  Yes.

18          THE COURT:  As you been helpful and done in other

19  matters, to contact Ocwen.

20          MR. WISHNEW:  Yep.

21          THE COURT:  I take it Ocwen is now servicing the loan.

22          MR. WISHNEW:  That's my understanding, Your Honor.

23          THE COURT:  Okay.  So first, with respect to the

24  matter that's pending before me, in the thirty-sixth omnibus

25  objection, which is at ECF docket 5138, this omnibus objection,

RESIDENTIAL CAPITAL, LLC, et al.                    80

1   the debtor argues the claims are improperly assert -- assert

2   security interest or priority claims, or they were filed

3   against the wrong debtor.  And the objection today is

4   proceeding only with respect to claim 4927 filed by Rhonda

5   Deese, which asserts an administrative priority claim of

6   142,950 dollars against ResCap.  And the debtors are seeking to

7   modify the claim to a 142,950 general unsecured claim against

8   GMAC Mortgage, not against ResCap, and reserving all of its

9   rights to object to the claim as an unsecured claim in the

10  future.

11          Ms. Deese filed a response to the objection.  Her

12  response is at ECF docket 5492.  And she argued that she's

13  entitled to an administrative priority because the debtors

14  failed to respond to her request to produce additional

15  information about the origination and the loan on this

16  Auburndale, Florida property.  And Ms. Deese attached to her

17  response a letter she sent to GMAC Mortgage requesting the

18  documentation, as well as her follow-up letter, asking that the

19  141,950 dollars be forgiven, plus a 1,000-dollar fine.  And she

20  indicated in her letter that she doesn't know who owns or holds

21  the original note -- the original mortgage and note.  Okay.

22          The debtors submitted a reply, which is at ECF 5730,

23  asserting that Ms. Deese failed to indicate how she's entitled

24  to an administrative priority under the Bankruptcy Code Section

25  503(b).  And the debtor also stated that according to their

1    books and records, Residential Funding Company owned the loan

2    before it was put into a securitization trust in 2005.

3            Homecomings, which is one of the debtors, serviced the

4    loan until July 2009 and then GMAC Mortgage serviced the loan

5    until it was transferred to Ocwen in February 2013.  So Ocwen

6    is the one that's servicing the loan currently, unless they've

7    done anything with it, Ms. Deese.

8            MS. DEESE:  Um --

9            THE COURT:  Let me -- don't interrupt now, okay.

10           MS. DEESE:  Okay.  Okay, sorry.

11           THE COURT:  But to the extent Ms. Deese has a valid

12    claim it should be asserted against GMAC Mortgage.  And the

13    debtors are willing to have it be considered a claim against

14    GMAC Mortgage.

15           On the issue of whether it's properly asserted as an

16    administrative priority claim, no basis for treating the claim

17    as an administrative priority claim has been set forth.  And,

18    consequently, the debtors' objection to the Deese claim is

19    sustained to this extent.  It's reclassified as a general

20    unsecured claim against GMAC Mortgage, expunged as a claim

21    against ResCap.  It's reclassified from an administrative

22    priority claim to a general unsecured claim.  That should be in

23    the order that's submitted to the Court, but not in the

24    order -- what I'm asking is that you or your colleagues,

25    Mr. Wishnew, try to help Ms. Deese in getting the information

 1    she's been requesting.

 2              MR. WISHNEW:  Okay.

 3              THE COURT:  So as you and your colleagues have done in

 4    other instances, contact Ocwen, see if you can get the

 5    information that Ms. Deese has asked for.  So Ms. Deese is not

 6    represented by counsel currently, so you or your colleagues are

 7    certainly free to talk to her directly to see if you can be of

 8    assistance.

 9              MR. WISHNEW:  All right.

10              THE COURT:  Do you have her contact information?

11              MR. WISHNEW:  Unless it's on the pleadings, I do not.

12    I will say that my contact information is on our pleadings, our

13    general office number.  So she can reach out and put a call

14    into me, and I will work with my colleagues to get her the

15    information.

16              THE COURT:  Okay.  So I'm going to -- we'll see

17    whether the debtors' counsel can get you the information you're

18    looking for, Ms. Deese.  But for today at least, the objection

19    is sustained.  The claim is redesignated as a general unsecured

20    claim against GMAC Mortgage.

21              Okay.  Thank you very much, Ms. Deese.  You're

22    excused.

23              Okay.  Go ahead, Mr. Wishnew.

24              MS. DEESE:  Okay.  What is the gentleman's name?

25              MR. WISHNEW:  Jordan Wishnew, W-I-S-H-N-E-W.

1          THE COURT:  Why don't you tell her your phone number?

2          MR. WISHNEW:  Sure.  212-468 --

3          MS. DEESE:  212 --

4          MR. WISHNEW:  -- 468 --

5          MS. DEESE:  Yes.

6          MR. WISHNEW:  -- 8000.

7          MS. DEESE:  000.  I'm sorry, can you spell your last

8   name again, please?

9          MR. WISHNEW:  Sure.

10         THE COURT:  Slowly.

11         MR. WISHNEW:  W-I --

12         MS. DEESE:  Um-hum.

13         MR. WISHNEW:  -- S, as in Sam, H, as in Harry, N, as

14  in Nancy, E, as in Eagle, W, as in Water.

15         THE COURT:  Okay, Ms. Deese.

16         MS. DEESE:  Okay.

17         THE COURT:  Mr. Wishnew or --

18         MS. DEESE:  Okay.

19         THE COURT:  -- one of his colleagues will try and get

20  the information that you're asking for, okay?  Thank you --

21         MS. DEESE:  Okay.

22         THE COURT:  -- very much.

23         MS. DEESE:  Thank you so much.

24         THE COURT:  Thank you very much for your

25  participation.

RESIDENTIAL CAPITAL, LLC, et al.                    84

1           MS. DEESE:  Okay.

2           THE COURT:  Okay.  Mr. Wishnew --

3           MS. DEESE:  Thank you.

4           MR. WISHNEW:  Thank you, Your Honor.

5           THE COURT:  Thank you.  All right.  You're excused.

6           MS. DEESE:  Bye-bye.

7           MR. WISHNEW:  Jumping ahead, Your Honor, to item

8    number 10 on page 27 of today's agenda, the debtors' fifty-

9    first omnibus objection.  There's one contested claim going

10   forward; that of Jamie and Gary Gindele.  I believe Mr. and

11   Mrs. Gindele is also on the phone today.

12          THE COURT:  Mr. and Mrs. Gindele, are you on the

13   phone?

14          MR. GINDELE:  That is correct, Your Honor.

15          THE COURT:  Okay.  Mr. Wishnew, go ahead.

16          MR. WISHNEW:  Thank you, Your Honor.  Your Honor, this

17   is -- relates to the fifty-first omnibus objection, which

18   sought to disallow and expunge claims on the basis of res

19   judicata.  These are claims that -- where there is a pending

20   appeal, and we believe that we've made the case in this

21   instance that the res judicata does apply to this Ohio

22   foreclosure action, notwithstanding the pendency of an appeal.

23          Recognizing how Your Honor has addressed in prior

24   instances, we would propose a similar resolution here, which

25   would be the claim would be disallowed and expunged from the

1   debtors' claims register, notwithstanding, Your Honor, to the

2   extent you're willing to do so, would modify the automatic stay

3   to permit the Gindeles' appeal to proceed to a resolution.

4   Should they succeed in their appeal, they can then move to have

5   the claim reinstated under Bankruptcy Section 502(j).

6          I think that's a resolution, Your Honor, that benefits

7   both the debtor and Mr. Gindele, because I can tell from their

8   pleadings they obviously believe strongly in their appeal.  I

9   think there are issues that should be heard, and the

10  resolution, as proposed, I think, it would address their

11  concern and also address the debtors' concern that there not be

12  a claim outstanding that we think there really is no legal

13  basis to for allowance.

14         THE COURT:  So, Mr. Gindele, what Mr. Wishnew has

15  proposed is what I've ordered in some other -- at least one

16  other matter.  So as I understand Ohio law, the doctrine of res

17  judicata applies even if an appeal is pending, which is the

18  circumstance here.  And what I've done before is, as I think

19  I'm required to do, apply res judicata, expunge the claim on

20  that basis, but permit -- it's called lifting the stay to

21  permit your appeal in Ohio to go forward.

22         If you're successful, you can seek to come back here

23  and have your claim reinstated.  So there's some prior history,

24  as Mr. Wishnew indicated, because I ordered exactly that in

25  another matter where this res judicata issue was involved.  But

 1    I'll hear you if you want to argue, Mr. Gindele.

 2            MR. GINDELE:  Well, I appreciate that, Your Honor, and

 3    I certainly appreciate the fact, in attempting to respond this

 4    101-page brief that showed up in my e-mail at 10 o'clock on

 5    Monday night, that you allowed us to view a 3-page reply

 6    yesterday to at least attempt to put a stake in the ground on

 7    this.  Obviously, the borrowed claims trust counsel has

 8    eloquently positioned their res judicata argument for your

 9    consideration.  And as you've stated, you've considered these

10    issues like this before.  We contend that the res judicata

11    argument is without merit.

12            It's irrelevant and moot.  While attempting to, I

13    guess, articulate a narrative that shifts the focus of the

14    Court away from the true nature of our claims, the secondary

15    argument of res judicata, in our opinion, fails to dispense

16    with either of the primary issues that remain.  First, the

17    facts aren't that the claimants are simply attempting to

18    relitigate the same claims, as the case in Hamilton County.

19    Our issue is one of court's jurisdiction and Residential

20    Capital, et al. lack of standing to invoke the authority of the

21    court in Hamilton County.

22            THE COURT:  So the court in Hamilton County, Mr.

23    Gindele, found that the plaintiff in the case had standing

24    because it held -- it was -- it held the note, the actual --

25    the original note endorsed and blank.  I believe that's

1   referenced in the court's -- the Ohio Court's decision.  And

2   ordinarily, delivery of the original note endorsed and blank is

3   sufficient to establish standing of the party.  Beyond that,

4   it's what the Ohio Court held and entered judgment on.  What

5   res judicata does is prevents this Court from reviewing a

6   judgment of the Ohio Court.  The res judicata rule in Ohio

7   doesn't require that there be no appeals pending.  Res judicata

8   applies in Ohio even where it's simply a judgment entered by a

9   trial court even where there's an appeal.

10          So the issue you're trying to raise, and I understand

11   that you're arguing that the Ohio Court didn't have

12   jurisdiction to do what it did, it found that it did.  The

13   place to raise that issue is on appeal, if that's what you

14   choose to do.  But I don't get to second-guess the decision of

15   the Ohio Court.  That's the fundamental problem you have that's

16   before me.

17          Go ahead and respond to that.

18          MR. GINDELE:  Yes.  The matter of jurisdiction is the

19   subject of the appeal currently stayed in the First District

20   Court of Appeals based on the debtors' request.  What has

21   complicated the issue is subsequent to that and due to the sale

22   of a portfolio of assets to Berkshire Hathaway and the transfer

23   of servicing to Ocwen, now, we have a new owner according to

24   the court plan.  And that new owner is 21st Mortgage

25   Corporation.  21st Mortgage Corporation, being represented by a

RESIDENTIAL CAPITAL, LLC, et al.                    88

1    different law firm, has come into appeals court and issued a
2    request to be substituted as plaintiff.
3           Well, we don't have an issue with 21st Mortgage
4    Corporation.  Our issue is with Residential Capital, et al.  It
5    always has been, and it continues to be so today.  I mean, even
6    in the massive documents and so forth that the borrowed claims
7    trust counsel prepared and entered for your consideration, it
8    includes a letter from the vice president at GreenPoint
9    authenticated via Jamie Gindele's uncontradicted (sic)
10   affidavit that clearly states that the note was not negotiated
11   by or transferred by GreenPoint to Residential Capital.  That
12   letter was six months after Residential Capital alleges the
13   initiation of their chain of custody.
14          So I realize that that is an issue that we'll be
15   dealing with in the appeals court.  But people -- the --
16   there's question as to why we're concerned about this
17   substitution of counsel and this transfer of ownership and so
18   forth, it's because our real issue -- our real beef isn't with
19   this subsequent holder, because our point is that the
20   subsequent -- you can't hand something over to somebody that
21   you don't have.  Jurisdiction trumps res judicata.  You can't
22   get to res judicata without first establishing jurisdiction.
23          THE COURT:  All right.  Mr. Gindele --
24          MR. GINDELE:  Second --
25          THE COURT:  Mr. Gindele.

1        MR. GINDELE:  I'm sorry.

2        THE COURT:  You're going to have --

3        MR. GINDELE:  Yes.

4        THE COURT:  You're going to have to take that issue up

5   with the Ohio Court on appeal, not with me.  The Ohio Court

6   entered a judgment.  The judgment, at this point, stands.  The

7   debtor is seeking to apply res judicata as to it, and you'll

8   have your opportunity to argue the issue in the Ohio Court.

9        All right.  I'm prepared to rule now.  This is respect

10  to the fifty-first omnibus objection, which is at ECF 5646.

11  And the omnibus objection is proceeding only as to claims 5422

12  and 5431 filed by Jamie Gindele.  And the debtor asserts that

13  the Gindele claims are barred by res judicata arising from

14  litigation in Ohio State Court.  The Gindele -- Mr. Gindele's

15  proofs of claim are identical in substance, except one proof of

16  claim relates to RFC and one relates to Residential Funding

17  Real Estate Holdings, LLC.

18        MR. GINDELE:  That's --

19        THE COURT:  In --

20        MR. GINDELE:  That's correct.  It's in the transfer of

21  the assignment --

22        THE COURT:  All right.

23        MR. GINDELE:  -- is -- alleged assignment Your --

24        THE COURT:  Please don't interrupt.

25        MR. GINDELE:  -- Honor suggests.

1      THE COURT:  In the proof of claims, the Gindeles

2   assert that the debtor has liability for claiming an interest

3   in a fraudulently obtained note through a MERS assignment and

4   the claim attached filings from the Ohio foreclosure proceeding

5   initiated by Residential Funding, LLC.

6         With respect to the underlying case in Ohio, the

7   debtors argue that the Ohio State Court action, forming the

8   basis for Gindeles' claims, was dismissed with prejudice as to

9   the debtors and even though an appeal was filed, the pendency

10  of an appeal does not affect the preclusive effect of a

11  judgment on the merits.  See Cully V. Lutheran Medical Center,

12  243 N.E.2d 531 at 532, Ohio Court of Appeal, 1987 (per curiam)

13  (applying Ohio law to explain that "the pendency of an appeal

14  does not prevent the judgment's effect as res judicata in a

15  subsequent action.").

16        The Gindele loan went into default in August of 2008.

17  A modification agreement was reached -- a loan modification was

18  reached with RFC, but Gindele defaulted on their loan

19  modification agreement as well.  The foreclosure action was

20  commenced in Ohio court in June 2009 and answered -- Gindele

21  filed an answer containing several defenses and counterclaims.

22  And in January 2010, the mortgage and note were assigned back

23  to RFC, and RFC then substituted as the plaintiff in the

24  foreclosure action.

25        In February 2012, a magistrate judge presiding over

1   the foreclosure proceedings granted summary judgment in favor

2   of RFC.  And the Court's order provided that unless the

3   Gindeles paid the amount due to RFC within three days of entry

4   of the order, the home would be foreclosed and an order of sale

5   would be issued to the county sheriff.  Nearly one month later,

6   Gindele filed an objection to that court order, and RFC filed a

7   response.  In May 2012, the Ohio Court of Common Pleas entered

8   a decision affirming and adopting the magistrate judge's order,

9   and judgment decree and foreclosure was entered in the Ohio

10  Court on June 8th, 2012.

11          Gindele filed a notice of appeal on June 25th, 2012,

12  and the appeal is currently stayed, although the debtor

13  acknowledges that certain claims within the appeal are

14  permitted to proceed under the Court's supplemental servicing

15  order that was entered in this case.  In February 2012,

16  Berkshire Hathaway bought the Gindele loan from RFC, and 21st

17  Century Mortgage acts as the servicer.  And 21st Century has

18  now been substituted as a plaintiff appellee in place of RFC in

19  the Gindeles' appeal, although Gindele filed an opposition to

20  that substitution in December 2013.  And the appellate court

21  hasn't ruled on the substitution yet.

22          So with respect to the issue of res judicata, since

23  the underlying ruling was in Ohio State Court, this Court

24  applies Ohio State law in res judicata.  See New York v. Sokol,

25  In Re:  Sokol 113 F.3d 3003 at 3004, Second Circuit 1997.  Ohio

1    courts have explained that res judicata encompasses both claim

2    preclusion and issue preclusion.  See O'Nesti v. DeBartolo

3    Realty Corp., 862 N.E.2d 803 at 806, Ohio 2007.  "The doctrine

4    of res judicata encompasses the two related concepts of claim

5    preclusion, also known as res judicata or estoppel by judgment,

6    and issue preclusion, also known as collateral estoppel."

7         The debtors argue that claim preclusion applies here,

8    and the Ohio courts require satisfaction of four criteria to

9    apply claim preclusion.  One, an earlier valid judgment on the

10   merits; two, a second action involving the same parties or

11   their privies; three, the second action raises claims that were

12   or could have been litigated in the first action; and four, the

13   second action arises out of the same transaction or occurrences

14   the first action.  See Hapgood v. City of Warren, 127 F.3d 490

15   at 493, Sixth Circuit 1997.

16        The debtors argue that all four prongs are satisfied

17   here because the Ohio Court of Common Pleas' judgment on the

18   merits involving the same parties and same claims arising from

19   the same transaction or occurrence.  In fact, the debtors argue

20   that both the order affirming and adopting the magistrate

21   judge's summary judgment order and the judgment and decree and

22   foreclosure constitute final judgments on the merits.  In

23   addition to Hapgood, see Butts v. Deutsche National Trust Co.,

24   2013 U.S. District Lexus 157852 at Star 10 Northern District of

25   Ohio, November 10th, 2013.  The pendency of Gindeles' appeal

RESIDENTIAL CAPITAL, LLC, et al.                    93

1  does not alter the preclusive effect of the Ohio judgments.

2  See Hapgood 127 F.3d at 293, note 3 ("The pendency of an

3  appeal, however, does not prohibit application of claim

4  preclusion.")

5          As for Gindeles' argument the Ohio Court lacked

6  jurisdiction and/or judgments after the petition date, the

7  debtors argue that the Court's interim servicing order entered

8  two days after the petition date allowed the debtors to

9  continue foreclosure proceedings and granted limited stay

10 relief to borrowers so they could assert counterclaims in the

11 foreclosure proceedings.

12         Based on the foregoing, the Court sustains the

13 debtors' objection and sustains and expunges the Gindele claims

14 number 5422 and 5431 on the basis of res judicata.  And as I've

15 done in prior matters, I will also -- the order, Mr. Wishnew,

16 as you indicated, should provide that the stay is lifted to

17 permit the Gindele appeal to go forward in the Sixth Circuit.

18 So that'll be the disposition, so the order should just simply

19 say for the reasons stated on the record during the hearing,

20 the objection is sustained with the effect that I've described.

21         All right.  Thank you very much, Mr. Gindele.

22         MR. GINDELE:  Thank you.

23         THE COURT:  Mr. Wishnew, what's next?

24         MR. WISHNEW:  Thank you, Your Honor.  The last matter

25 going forward on today's calendar is item 13 on page 28.

RESIDENTIAL CAPITAL, LLC, et al.                                    94

1   The -- at this point, this an uncontested omnibus objection,

2   where the debtors seek three forms of relief.  I'll just note

3   that these deal with nonborrower claims.  We seek to

4   redesignate, reclassify, reduce and allow certain claims,

5   reclassify claims and redesignate and allow claims and also

6   redesignate, reduce and allow other claims.

7           There was one response received by the McDowell Riga

8   Posternock firm.  We were able to consensually resolve that.

9   We have modified the exhibits of the form of order and shared

10  it with them.  They've -- are okay with that.  So if it would

11  please the Court, we can submit our bias form of order to you

12  after the hearing.

13          THE COURT:  All right.  So what's before me is the

14  fifty-seventh omnibus objection of nonborrower claims; it's at

15  ECF docket number 6108.  In that omnibus objection, the debtor

16  seeks the relief that Mr. Wishnew described on the record.  No

17  responses were filed.  Mr. Wishnew has indicated the

18  disposition, with respect to one, Mr. Wishnew, there was an

19  informal response.  The debtors' objection is sustained, and

20  you can submit the revised order to the Court.

21          MR. WISHNEW:  Very good, Your Honor.  That would

22  conclude this morning's calendar, and I will see you at

23  2 o'clock, Your Honor.

24          THE COURT:  Okay.

25          MR. WISHNEW:  Thank you very much.

RESIDENTIAL CAPITAL, LLC, et al.                    95

1          THE COURT:  Thank you.

2     (Whereupon these proceedings were concluded at 12:11 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           I N D E X

3

4                        E X H I B I T S

5  DEBTORS'      DESCRIPTION                        PAGE

6               Declaration of Pamela West,          14

7               docket #5228

8               Declaration of John Dempsey,         14

9               docket #5229

10              Declaration of William Nolan,        14

11              docket #5230

12

13                          RULINGS

14                                     Page    Line

15  Fourth Fee Application of KPMG LLP for     10      12

16  Interim Allowance and Compensation for

17  Professional Services Rendered and

18  Reimbursement of Actual and Necessary

19  Expenses Incurred from May 1, 2013 through

20  August 31, 2013, approved.

21

22

23

24

25

```
 1

 2                         RULINGS (cont'd.)

 3                                          Page     Line

 4  Debtors' Motion for Entry of an Order      11       24

 5  (I) Authorizing the Debtors to Compensate

 6  PricewaterhouseCoopers, LLP for Foreclosure

 7  Review Services in Furtherance of the

 8  Debtors' Compliance Obligations Under

 9  Federal Reserve Board Consent Order and

10  (II) Reaffirming Relief Granting in the GA

11  Servicing Order, approved.

12  Debtors' Application for an Order           11       24

13  Authorizing the Debtors to Employ and

14  Retain Pepper Hamilton LLP as Special

15  Foreclosure Review Counsel for Bankruptcy

16  Issues to the Debtors, Nunc Pro Tunc to May

17  14, 2012 [Docket No. 1426], approved.

18  Debtors' Application for Authorization to    11       24

19  Employ and Retain Hudson Cook, LLP as

20  Special Counsel to the Debtors, Nunc Pro

21  Tunc to May 14, 2012 [Docket No. 1427],

22  approved.

23

24

25
```

```
 1

 2                          RULINGS (cont'd.)

 3                                          Page      Line

 4   Claims of Assorgi, Foster and Moody are      69         9

 5   withdrawn with prejudice.

 6   Debtors' Thirty-Sixth Omnibus Objection to   81        19

 7   Claims, sustained.  Claim expunged as a

 8   claim against ResCap, and redesignated

 9   as a general unsecured claim against GMAC

10   Mortgage.

11   Debtors' Fifty-First Omnibus Objection to    93        12

12   Claims, sustained and Gindele claims

13   expunged.

14   Debtors' Fifty-Seventh Omnibus Objection to  94        19

15   Claims, sustained.

16

17

18

19

20

21

22

23

24

25
```

1

2                           C E R T I F I C A T I O N

3

4    I, Esther Accardi, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ESTHER ACCARDI

12   AAERT Certified Electronic Transcriber CET**D-485

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  January 31, 2014

19

20

21

22

23

24

25