1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            January 30, 2014

19            2:04 PM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2    Evidentiary Hearing RE: Objection to Claim(s) of Paul and Marge

3    Pfunder

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:   Sharona Shapiro

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

3

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for The Post-Effective Date Debtors, The ResCap

5         Liquidating Trust and The ResCap Borrower Claims Trust

6        1290 Avenue of the Americas

7        New York, NY 10104

8

9   BY:   JORDAN A. WISHNEW, ESQ.

10

11

12   KRAMER LEVIN NAFTALIS & FRANKEL LLP

13        Attorneys for Official Committee of Unsecured Creditors

14        1177 Avenue of the Americas

15        New York, NY 10036

16

17   BY:   NATHANIEL ALLARD, ESQ. (TELEPHONICALLY)

18

19

20

21

22

23

24

25

4

SILVERMAN ACAMPORA LLP

  Special Counsel to Borrowers' Trustee

  100 Jericho Quadrangle

  Suite 300

  Jericho, NY 11753


BY:   ROBERT D. NOSEK, ESQ.



ALSO APPEARING:

MARGE PFUNDER, Pro Se

DEANNA HORST, Residential Capital

KATHY PRIORE, GMAC ResCap (TELEPHONICALLY)

**RESIDENTIAL CAPITAL, LLC, et al.**

5

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE COURT:  Please be seated.  We're here in |
| 3 | Residential Capital, number 12-12020.  We're here in connection |
| 4 | with an evidentiary hearing arising from debtors' thirtieth |
| 5 | omnibus objection to claims, specifically with respect to the |
| 6 | claims of Paul and Marge Pfunder. |
| 7 | Mr. Wishnew? |
| 8 | MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew, |
| 9 | Morrison & Foerster, for the ResCap Borrower Claims Trust. |
| 10 | As Your Honor noted, this is a claim originally |
| 11 | subject to the debtors' thirtieth omnibus objection.  There was |
| 12 | some -- |
| 13 | THE COURT:  Let me -- before you go ahead.  I assume |
| 14 | that's the Pfunders that are sitting there.  Why don't you |
| 15 | introduce yourself to the Court?  Just give me your names. |
| 16 | MS. PFUNDER:  I'm Marge Pfunder.  This is just my |
| 17 | brother Vincent. |
| 18 | THE COURT:  Okay.  Thank you.  All right. |
| 19 | MS. PFUNDER:  His last name is Semnatory (ph.). |
| 20 | THE COURT:  Okay.  Thanks. |
| 21 | Go ahead, Mr. Wishnew. |
| 22 | MR. WISHNEW:  Thank you, Your Honor.  So we are here |
| 23 | after some back and forth with regards to the Pfunder's claim. |
| 24 | Originally the debtors filed their omnibus objection.  Mr. and |
| 25 | Ms. Pfunder put in their response.  There was an initial |

**RESIDENTIAL CAPITAL, LLC, et al.**

6

1    hearing, and the Court asked that this go forward to an

2    evidentiary hearing.  On October 18th, there was a procedures

3    order put in place requiring that, by no later than October

4    25th, the debtors and Silverman Acampora, as borrower's counsel

5    to the creditors' committee, put in their respective pleadings

6    concerning the issue of wrongful denial of a loan modification

7    application and that the debtors file and serve a supplemental

8    declaration detailing the facts of the Pfunder's claims as they

9    relate to law on denial of a loan modification application,

10   annexing any documents in the debtors' possession, custody or

11   control relating to such loan modification request by the

12   respondents.

13         The debtors put in that response, or their memorandum,

14   and Ms. Horst's supporting declaration.  That is found at

15   docket number 5548.  Ms. Deanna Horst, the chief claims officer

16   for the ResCap Liquidating Trust, is in court today, and

17   subject to any questions that Your Honor or Mr. or Ms. Pfunder

18   may have, at this time, as a matter of evidence, I'd ask that

19   her declaration be put into evidence, subject to any cross-

20   examination.

21         THE COURT:  So first let me say that, obviously, Ms.

22   Pfunder, you're not a lawyer, correct?

23         MS. PFUNDER:  Correct.

24         THE COURT:  Okay.  And I will address the issue about

25   your offer of the supplemental Horst declaration, but let me

**RESIDENTIAL CAPITAL, LLC, et al.**

7

1  just say something about the background of the proceeding that

2  we're having this afternoon.

3         The debtor obviously filed its twenty-second omnibus

4  objection, which is at ECF docket 4199, and the twenty-seventh

5  omnibus objection, which is at 4735, and the thirtieth omnibus

6  objection at 4887.  All of these related to -- I'll just

7  categorize as loan modification claims.  And because of the

8  number of claims that borrowers had filed in the ResCap cases,

9  that appeared to derive in whole or in part from efforts to

10 seek a loan modification, the Court did a number of things.

11 One, as you've indicated, I had entered an order requiring the

12 debtors' counsel and the special counsel to the creditors'

13 committee for borrower's issues to file briefs addressing

14 causes of action arising in the loan modification context.  And

15 both of those briefs were filed.  Not to take anything away

16 from the debtors' brief, I think the Silverman Acampora

17 brief -- particularly because I see Mr. Nosek's in the

18 courtroom -- filed on behalf of the creditors' committee, I

19 think, provided -- provides a particularly useful road map for

20 the Court and for pro se parties, in addressing issues arising

21 from loan modifications.

22        And Ms. Pfunder, I take it you got -- you received a

23 copy of those briefs?

24        MS. PFUNDER:  I believe so, yes.

25        THE COURT:  Okay.  So when I entered the order

**RESIDENTIAL CAPITAL, LLC, et al.**

8

1    establishing procedures, that's dated October 18th, 2013, it

2    addressed a number of borrower's claims.  The only one we're

3    hearing today is with respect to Paul and Marge Pfunder.  But I

4    want to make reference to the second and third pages of that

5    procedures order, because in paragraph number 3, which begins

6    at the bottom of page 2, and carrying over -- I won't read the

7    entire paragraph, but I said, "The debtors must file and serve

8    a supplemental declaration detailing the facts of the

9    respondents' claims as they relate to the law on denial of a

10   loan modification application, annexing any documents in the

11   debtors' possession, custody or control relating to any loan

12   modification request made by the respondents."

13        So Mr. Wishnew, I received a binder with the pleadings

14   relating to all of the claims.  The only one we're going

15   forward with today is with respect to the Pfunders.  And the

16   supplemental Horst declaration is attached as Exhibit 1 to the

17   debtors' memorandum of law in further support of the debtors'

18   thirtieth omnibus objections to claims.  It's at ECF -- that

19   memorandum is at 5548.  And Exhibit 1 to that is the Horst

20   declaration.  And Exhibit B to the memorandum is -- it's

21   headed -- and it's ECF 5548-1 -- "Pfunder Loan Modification

22   Documents, Proof of Claim 1430".  And attached to it are a

23   number of pages of documents.

24        You've offered in evidence the "Second Supplemental

25   Declaration Of Deanna Horst, In Support Of The Debtors'

**RESIDENTIAL CAPITAL, LLC, et al.**

9

1  Thirtieth Omnibus Claim Objection, (No Liability Borrower

2  Claims - Books And Records)", which is ECF 5548-1.  And the

3  problem I have is most of this is pure hearsay, not admissible.

4          And I'll refer to paragraph 3, because this is what I,

5  in particular, have a question about.  And it reads, "The

6  claims addressed in this supplemental declaration are claims

7  relating to loan modifications either offered or denied by the

8  Debtors.  To address the allegations made in these claims and

9  in the respective responses, I, or other employees of the

10  debtors under my supervision, examined the debtors' books and

11  records to verify that the debtors took the appropriate steps

12  in considering each loan modification application and in

13  communicating to the claimant the applicable reason for denying

14  an application.  These examinations included a review of the

15  claimant's payment history and the debtors' internal servicing

16  notes for the claimant's loan.  In addition, where applicable,

17  my team reviewed the claimant's loan modification applications,

18  loan modification approval letters, loan modification denial

19  letters, compliance with loan modifications (trial and/or

20  permanent), and the claimant's compliance with any other

21  payment plans.  In addition, the debtors reviewed the relevant

22  investor guidelines and/or directions relating to loan

23  modification requests."

24          And in paragraph 7 of the declaration, on page --

25  beginning at the bottom of page 4, the declaration refers to:

**RESIDENTIAL CAPITAL, LLC, et al.**

10

1   "The forbearance plans were offered by customer service

2   representatives of the debtors' call center".  And further on

3   in that paragraph 7 it says, "Forbearance plans were oral

4   agreements and there was no signature required of a borrower to

5   consummate the plan."

6        Beginning on page 7, specifically, the declaration

7   deals with the claim of Paul and Marge Pfunder.  And in

8   paragraph 16 on page 8, it refers to what the servicing records

9   reflect.  And in paragraph 17, it refers to both traditional

10  and HAMP modification requests.  And paragraph 20 and 21 on

11  page 10 refer to more activities specifically in respect of the

12  Pfunders.

13       And it more or less concludes in paragraph 21 -- it

14  says, in part, "Based on the debtors' review of their books and

15  records, the debtors do not have any liability with respect to

16  the Pfunder claim because the debtors assert that they

17  complied with the appropriate guidelines and policies governing

18  the loan modification process at all times and acted promptly

19  and in good faith with respect to Mr. and Ms. Pfunder's loan

20  modification requests."

21       Where are the servicing notes?

22       MR. WISHNEW:  The servicing notes are maintained on an

23  electronic database.

24       THE COURT:  Can they be printed out?

25       MR. WISHNEW:  Do you want me to, Your Honor?

**RESIDENTIAL CAPITAL, LLC, et al.**

11

1          THE COURT:  Yeah, they should have been -- look, I

2    entered an order that required -- the debtors were supposed to

3    annex "any documents in the debtors' possession, custody or

4    control relating to any loan modification request made by the

5    respondents".  And Ms. Horst's supplemental declaration talks,

6    in some detail, in length, about what's in the debtors' books

7    and records, but you haven't provided it.  You provided a

8    handful of documents, a small number of documents that relate

9    to the denial of the Pfunder's loan modification request.  You

10   don't -- I don't have the documents.  I don't have the

11   servicing notes.  What I have is a hearsay declaration that

12   discusses what's in books and records, not that Ms. Horst

13   prepared.  She's relying -- and it may well be she could rely

14   on what people employed; she could establish their business

15   records.  I don't have the business records.  You haven't

16   provided me with the business records.  The order provided you

17   provide the documents.  What's your response to that?

18          MR. WISHNEW:  With the exception of the servicing

19   notes, which can be printed out, the other documents that are

20   referenced, for instance, the forbearance plan, the traditional

21   modifications, those, in the ordinary course, were not

22   maintained by the debtors.

23          THE COURT:  Are you telling me that the servicing

24   notes -- so --

25          MR. WISHNEW:  The servicing note --

**RESIDENTIAL CAPITAL, LLC, et al.**

12

1          THE COURT:  Wait.  Ms. Horst was able to put in her

2   supplemental declaration what the terms of the forbearance plan

3   were.  She had to have gotten that, I assume, from the

4   servicing notes.

5          MR. WISHNEW:  Correct, You're Honor.

6          THE COURT:  Okay.  The declaration refers to investor

7   guidelines.  Where are the investor guidelines?

8          MR. WISHNEW:  The investor guidelines -- again, I

9   would probably defer back to the servicing notes, and --

10          THE COURT:  Do you know that -- do you know -- look,

11   this is not the first matter in which I've been told that any

12   decision about loan modification depends on the investor

13   guidelines.  So as I understand it, this loan was originated by

14   Quicken.

15          MR. WISHNEW:  Correct, Your Honor.

16          THE COURT:  I don't know whether it was -- I didn't

17   find anything in anything I read that indicated that Quicken

18   sold the loan.  Did it sell it to RFC?  Did it sell it to any

19   one of the debtors?  Is it in a secur -- did the debtor buy it,

20   put it in a securitization trust?  Where was the loan when the

21   Pfunders made each of their loan modification requests?  What

22   were the applicable investor guidelines at the time the loan

23   modification requests were filed?  I don't think there's any

24   ambiguity about what I ordered be provided, and you haven't

25   done that.

**RESIDENTIAL CAPITAL, LLC, et al.**

13

1       MR. WISHNEW:  I understand your position, Your Honor.

2   What I can say is that while Ms. Horst doesn't have the

3   servicing notes in front of her, she would be recalling upon

4   her reviewing of the servicing notes and anything that her

5   colleagues have advised her with regards to the servicing

6   notes, in conjunction with or to further supplement her

7   declaration today.

8       THE COURT:  The declaration -- the offer of the

9   declaration is denied.  The declaration, to the extent it's

10  relevant at all in this proceeding, is hearsay.  The best

11  evidence of what are the loan modifications -- I don't know

12  whether it refers to correspondence.  There are some documents

13  that are attached as Exhibit B.  There's a few documents that

14  are attached, so obviously there are some documents that exist.

15  I don't know whether there are others.  There are references in

16  the declaration to much more.  Let me ask you this; who owns

17  the loan now?

18      MR. WISHNEW:  At this point, I would say, to the best

19  of our knowledge, it's still Quicken, given that we haven't had

20  a -- sorry; it's Freddie Mac who currently owns the loan, Your

21  Honor.

22      THE COURT:  When was it transferred from Quicken to

23  Freddie Mac?

24      MR. WISHNEW:  I'm not quite sure, Your Honor.

25      THE COURT:  At the time the Pfunders sought their loan

**RESIDENTIAL CAPITAL, LLC, et al.**

14

1    modification, who owned the loan?

2              MR. WISHNEW:  Freddie Mac, Your Honor.

3              THE COURT:  Did Freddie Mac have lender guidelines for

4    determining when to grant a loan modification?

5              MR. WISHNEW:  Yes, Your Honor.

6              THE COURT:  Is it in writing?  It may have changed.  I

7    mean, a lot of the loan -- a lot of the lender guidelines

8    change from time to time.  So what's relevant is what were the

9    applicable guidelines at the times, and it was more than one

10   occasion when the Pfunders sought a loan modification.

11             So do the servicing notes -- I understand from the

12   declaration, the Horst declaration, that the forbearance

13   agreement was oral --

14             MR. WISHNEW:  That's correct, Your Honor.

15             THE COURT:  -- it was offered orally.

16             MR. WISHNEW:  Yes.

17             THE COURT:  And would I be wrong to think that the

18   terms that were offered are set forth in the servicing notes?

19             MR. WISHNEW:  It would be -- you would be correct that

20   it would be in the servicing notes.

21             THE COURT:  And there seems to be a dispute as to

22   whether the Pfunders accepted the forbearance plan or not.  The

23   debtor says yes; Ms. Pfunder, in the statement of position,

24   said no.

25             MR. WISHNEW:  I would just say, Your Honor, the

**RESIDENTIAL CAPITAL, LLC, et al.**

15

1    forbearance plan was basically an agreement to forbear from any

2    further foreclosure proceedings, so long as Mr. and Mrs.

3    Pfunder continued to make the prior monthly payment that they

4    had been making.

5            THE COURT:  That's nice of you to say that, but your

6    statement is not evidence.

7            MR. WISHNEW:  Understood, Your Honor.

8            THE COURT:  Here's what I want to do today.  I want to

9    give Ms. Pfunder an opportunity to provide sworn testimony to

10   support the Pfunder's claims.  It seems to the Court -- and

11   here I rely, in part, on the special borrower's counsel's

12   memorandum of law -- that I think, fairly read, the Pfunder

13   claim raises potentially five causes of action under California

14   law.

15           Do you agree that California law controls?

16           MR. WISHNEW:  Yes, Your Honor.

17           THE COURT:  Okay.  Contract claims, promissory

18   estoppel, breach of implied covenant of good faith and fair

19   dealing, I'll treat them together -- fraud and

20   misrepresentation claims; they're obviously separate.  And

21   California unfair competition claims; this is the Business and

22   Professions Code in California.  And I think, related to that,

23   the Pfunders have asserted claims under the California False

24   Advertising Law.  In preparing for the hearing, I've tried to

25   consider what are the elements of the causes of actions under

**RESIDENTIAL CAPITAL, LLC, et al.**

16

1    each of those theories.

2            But I think the way I want to proceed here is -- Ms.

3    Pfunder has come from California for this hearing, and there

4    was some confusion earlier, I think.  I don't think it was

5    confusing.  I ordered that any hearing take place here; she's

6    here today.  So I want to give her a chance to testify.  I'm

7    going to permit her, initially, to testify in the narrative

8    form.  That means I'm going to give you a -- you're going to

9    come up; that's the witness box up there, Ms. Pfunder.  And --

10    just hang on a second.

11            MS. PFUNDER:  Oh, okay.

12            THE COURT:  You'll come up, you'll be sworn by the

13    reporter.

14            MS. PFUNDER:  Okay.

15            THE COURT:  And I want you to tell me whatever you

16    want to say in support of your claims.  I may have some

17    questions for you.  If Mr. Wishnew or his colleague wants to

18    cross-examine you after, they'll be able to do that.  It won't

19    be -- you know, this is -- I understand you're not a lawyer,

20    but this is not a -- no one's going to be brow beating you,

21    okay?  But I want to give you a chance to go ahead and tell the

22    Court why you think you should be able to recover.

23            Now, I would say, in addition, that the procedures

24    order that I entered, I've referred to what I believe ResCap

25    didn't do, namely, provide these documents.  But the order, in

**RESIDENTIAL CAPITAL, LLC, et al.**

17

1   paragraph 4 -- this is the October 18th order -- required you

2   to do two things:  provide the Court and counsel any documents

3   that you wanted to use in support of your claim, any

4   documents -- and I said any documents not provided, by the

5   deadline that I set, wouldn't be considered at the evidentiary

6   hearing.  And then the next subparagraph said, "A statement of

7   the respondent's position with respect to his or her claim" --

8   and you did provide a statement -- "including both the legal

9   and evidentiary reasons why the respondent believes that he or

10  she is entitled to an allowed claim in the debtors' bankruptcy

11  proceedings".  But then it said, "and an itemized statement of

12  the damages asserted in the respondent's claim", and you

13  haven't given me that.

14          It makes it hard for the Court to have a hearing as to

15  whether you have a claim.  What I wanted to know, what's an

16  itemization of what it is that you believe you're entitled to

17  recover.  But -- so I don't want Mr. Wishnew to feel that

18  they're the only ones who I'm picking on about not having

19  provided what I said needed to be provided.  Okay.

20          So that's how we're going to proceed for now.  After

21  hearing your testimony, if I have some questions, I may ask

22  them.  And Mr. Wishnew or his colleague, if they want to cross-

23  examine you, they can do that.  Okay?  Do you have anybody else

24  who's going to testify other than yourself?

25          MS. PFUNDER:  No, sir.

**RESIDENTIAL CAPITAL, LLC, et al.**

18

1          THE COURT:  Okay.  And Mr. Wishnew, do you have

2   witnesses that you're going to call?

3          MR. WISHNEW:  It would only be Ms. Horst, at this

4   point.

5          THE COURT:  Okay.  All right.  Okay.  So Ms. Pfunder,

6   why don't you come up?  If you've got papers you want to bring,

7   notes that you want, you can bring them with you, and certainly

8   I'll permit you to look at those.  When you come up to the box

9   you just need to, while you're standing, raise your right hand.

10  And -- yeah, you can go back over to where you're going to sit

11  down.  Okay.  Okay.  So just raise your right hand.

12      (Witness sworn)

13         THE COURT:  Okay.  Please have a seat.  Pull the seat

14  in a little bit, and pull the microphone toward you.

15         THE WITNESS:  Okay.

16         THE COURT:  It's important that we have a clear

17  record.  So what happens is a transcript can be prepared from

18  everything that's being said here.

19         THE WITNESS:  Okay.

20         THE COURT:  Okay.  So I want to give you a chance --

21  you're under oath, and I want to give you a chance to explain

22  your claim and any reason you think you ought to be able to

23  recover against the debtors, okay?

24         THE WITNESS:  Okay.

25         THE COURT:  All right.

**RESIDENTIAL CAPITAL, LLC, et al.**

**19**

1  DIRECT EXAMINATION

2  BY MS. PFUNDER:

3          THE WITNESS:  In 2008, I was gainfully employed, and

4  my husband's employment was drifting off.  At that time we were

5  up on all of our payments.  We had paid our mortgage for twenty

6  years, twenty solid years, and I tried to enter into the loan

7  modification, knowing that the income was going to change.  At

8  the time, we were not behind, and we were informed by GMAC

9  that, until we're behind, they wouldn't even entertain a loan

10  modification.  So we kept making the payments as best we could,

11  and pretty much, we just couldn't get anything done then.

12  I don't know how -- at some point they said, yeah, okay, we'll

13  deal with you.  I don't know if we stopped the payments; I

14  really don't remember that well.

15          THE COURT:  This was when, 2008?

16          THE WITNESS:  It all started in 2008.

17          THE COURT:  Okay.

18          THE WITNESS:  So I was still gainfully employed, and I

19  think they started the process --

20          THE COURT:  You were a legal secretary; did I read

21  that?

22          THE WITNESS:  Yes.  Yes.  So it was being dragged on,

23  dragged on.  Every three months we had to provide them with pay

24  stubs, bank statements, all -- income taxes, everything.  And

25  this just -- they kept offering us something that we didn't --

**RESIDENTIAL CAPITAL, LLC, et al.**

20

1  we didn't accept because it was not beneficial to us in any

2  way.  All it did was extend our loan, reduce the payments by

3  very little, and we just didn't feel, in good faith, that we

4  could -- we could make that payment.  And so it never happened.

5       And then I hired someone in 2009 to try to help us

6  with the modification; we were denied at that time also.  And

7  the process was still going on, and then the correspondence was

8  going back and forth, the documents were going back and forth.

9       And finally we came to 2010, when they offered us a

10 loan modification that was pretty bizarre, in our opinion.  It

11 reduced our mod -- reduced the payment about twenty dollars a

12 month.  It extended my loan for ten years.  It did not give us

13 a fixed loan, which is what we had always had.  And it asked

14 for a contribution, however that term means; it was a large sum

15 of money, eight or nine thousand dollars, which if someone

16 needs a modification, they sure don't have eight or nine

17 thousand dollars.

18      What I have to -- to show as evidence, and I don't

19 know if it could be admitted, but I could at least state it, in

20 2008 they told us that we did not qualify to make the payments.

21 We had a yearly salary of 33,000 dollars, so --

22      THE COURT:  That was your combined income for the two

23 of you?

24      THE WITNESS:  Yes.  So we clearly could have made the

25 payments at that time.  And that's when they said we did not

**RESIDENTIAL CAPITAL, LLC, et al.**

21

1    qualify.  In 2009 and 2010, our income went down to 10,000

2    dollars.  And in 2010 is when they told me we were qualified

3    for the loan modification if we made that large contribution

4    and all of the other terms that I just outlined:  The increase

5    of the loan, the variable rate, and all of that.

6        And my point is, if I couldn't qualify in 2008, making

7    33,000 dollars a year, how did I possibly qualify for a loan

8    modification in 2009 and 2010, which I present as deceitful.

9    And in my estimation, it's very deceitful, because the numbers

10   couldn't possibly add up to me making -- or my husband and I

11   making a payment.  So of course we didn't enter those

12   modifications because we knew we couldn't do that.  They

13   knew -- in our opinion, they knew we couldn't do that.  How

14   could you possibly qualify to make a 1,600 or something dollar

15   a month mortgage payment if you didn't qualify, making two

16   times that amount, two years prior?  And I have copies of the

17   income taxes to show that.  And they knew what our income was.

18   They were getting these bank statements.  They were getting the

19   income tax.  They were getting our pay stubs.  They were

20   getting profit and loss for my husband.  They knew --

21       THE COURT:  Your husband was a contractor, is that --

22       THE WITNESS:  He's a carpenter/handyman.  So they knew

23   what our income was.  And I guess my ultimate point is I see no

24   reason that they would have approved us for a loan modification

25   in 2010, seeing those numbers, when they didn't approve us when

**RESIDENTIAL CAPITAL, LLC, et al.**

22

1    we made another 23,000 dollars more a month (sic) every year.

2    It just doesn't add up.  So I think that was very deceitful.

3          I wanted to kind of refer to -- could I refer to the

4    debtors' thirtieth omnibus objection?

5          THE COURT:  Yes, you can.

6          THE WITNESS:  Okay.  In there -- and here's where

7    they -- on page 23, they're saying that we'd requested a

8    traditional loan modification.  It was denied because the

9    payment options at the time of the request were not affordable.

10   And this is in 2008.  They were affordable.  I mean, that was

11   the whole --

12         THE COURT:  Let me -- I'll let you go on, but did they

13   make a proposal to you in 2008 for a loan modification?

14   Because I thought you were saying that they made it, but you --

15         THE WITNESS:  I don't --

16         THE COURT:  -- you couldn't do it.

17         THE WITNESS:  I don't think it benefitted us any --

18         THE COURT:  Yes.

19         THE WITNESS:  -- at the time.  I think we could have

20   made the --

21         THE COURT:  No, here's the -- the only point I'm

22   trying to inquire about is -- and which I want to be clear

23   about is, whether they made a specific proposal.  I understand

24   you're saying you couldn't afford it.

25         THE WITNESS:  Um-hum.

**RESIDENTIAL CAPITAL, LLC, et al.**

23

1          THE COURT:  Okay.  But to say you couldn't afford it

2     leads me to conclude they made a proposal, you evaluated it,

3     and you and your husband concluded they made it but we can't

4     afford that.

5          THE WITNESS:  At this point, I can't say yes or no,

6     because we recently moved, with the loss of the house, and --

7          THE COURT:  Yeah.

8          THE WITNESS:  -- and I lost most of those documents.

9          THE COURT:  Okay.

10          THE WITNESS:  And I know the debtor has those

11     documents.  So I can't say what we were thinking at the time.

12     Maybe yes; maybe no.  I don't remember, and I don't have the

13     documentation to prove one way or the other.

14          THE COURT:  All right.  Go ahead.

15          THE WITNESS:  And then further, on page 23, they're

16     saying that the monthly payment in the forbearance was 1,418.

17     I don't remember it ever being that low.  But like, again, I

18     say, I don't have those documents.

19          THE COURT:  What was -- do you remember what your

20     monthly payment under the --

21          THE WITNESS:  It was 1,600 and something, probably --

22          THE COURT:  And that was a variable loan --

23     variable-rate loan?

24          THE WITNESS:  No, that was a fixed.

25          THE COURT:  Fixed?

**RESIDENTIAL CAPITAL, LLC, et al.**

24

1          THE WITNESS:  That was a fixed.

2          THE COURT:  Thirty-year fixed?

3          THE WITNESS:  Well, that might --

4          THE COURT:  I thought it was not, but I might be

5    wrong.

6          THE WITNESS:  I think it was a variable.  What

7    happened was we did some refinancing, and I think it did go to

8    a variable, that last one.  But prior to that we always had a

9    fixed, which is what we always wanted, and that's what we

10   wanted again.

11         Let me see.  Then in 2009, they said we were approved

12   for a traditional loan modification, and with that

13   contribution.  And now, it doesn't state what the contribution

14   was, but I know it was about eight or nine thousand dollars.  I

15   can say that I know two other people -- because many of us have

16   lost our homes through things like this --

17         THE COURT:  Right.

18         THE WITNESS:  I know two other people that went

19   through something like this, gave a contribution, and the bank

20   still foreclosed on them after they got the money.  So I

21   really -- you know, I didn't trust the bank.  That's --

22         THE COURT:  Did --

23         THE WITNESS:  The other thing is --

24         THE COURT:  But did they make -- here's where I'm a

25   little unclear whether this was a -- because I think you read

**RESIDENTIAL CAPITAL, LLC, et al.**

25

1   that it was a traditional loan modification.

2        THE WITNESS:  That's what it says on the documents.

3        THE COURT:  And did you get it in writing from them?

4   I mean, did they say, okay, we're willing to a do a loan

5   modification, the terms are monthly payments of X --

6        THE WITNESS:  I believe I did.

7        THE COURT:  Okay.

8        THE WITNESS:  I believe I did.

9        THE COURT:  And you don't have a copy of that

10   anywhere?

11        THE WITNESS:  No, I don't.  That's --

12        THE COURT:  All right.

13        THE WITNESS:  -- my problem.  So that was the offer

14   that was made in 2009.  And like I -- like I mentioned before,

15   our income was down to 10,000 dollars in 2009.

16        THE COURT:  So it's fair to say that you and your

17   husband didn't accept that offer.

18        THE WITNESS:  No.  Well, in good faith, what --

19        THE COURT:  I understand.

20        THE WITNESS:  -- what could I do?

21        THE COURT:  I'm not questioning --

22        THE WITNESS:  Yeah, I --

23        THE COURT:  I'm not challenging you on it.

24        THE WITNESS:  Yeah, I --

25        THE COURT:  I just want to make sure that I understand

**RESIDENTIAL CAPITAL, LLC, et al.**

26

1  completely.

2  THE WITNESS:  We figured this --

3  THE COURT:  They made an offer; you didn't accept it.

4  THE WITNESS:  Yeah, right.  It was ridiculous --

5  THE COURT:  Because you couldn't --

6  THE WITNESS:  -- for us.

7  THE COURT:  -- afford it --

8  THE WITNESS:  Right.

9  THE COURT:  -- in your view.

10  THE WITNESS:  Then I guess they reviewed our account

11  again for traditional, and another one was offered in January

12  of 2010.

13  THE COURT:  So I know you're reading from --

14  THE WITNESS:  From their --

15  THE COURT:  -- from their -- you're not disagreeing

16  with the chronology they set out?

17  THE WITNESS:  No.  No.  I am --

18  THE COURT:  You believe the chronology is accurate?

19  THE WITNESS:  I -- I believe so.

20  THE COURT:  Okay.

21  THE WITNESS:  And then they're saying it was

22  ultimately denied in April.  I'm trying to --

23  THE COURT:  Is that consistent with your memory?

24  THE WITNESS:  I think so, yes.  There were lots of

25  stalling tactics through this loan modification.  Loan

**RESIDENTIAL CAPITAL, LLC, et al.**

1  modifications aren't supposed to take two years, as far as I

2  know.  I -- I really don't know, other than one person that's

3  ever been granted a legitimate loan modification.  And I know

4  in the forbearance they had mentioned that all of the notice of

5  default and everything would stop on our home.  I don't believe

6  that's true.  I don't have the documentation, but I believe we

7  were still getting notices of default.

8      THE COURT:  So there came some point in time where you

9  stopped paying the mortgage?

10     THE WITNESS:  Yes.

11     THE COURT:  Do you remember when that was?

12     THE WITNESS:  It -- I'm thinking it was either very

13  late in '08 or -- I think it was more in '09 -- 2009.

14     THE COURT:  Were you making partial payments or just

15  no payments at all?

16     THE WITNESS:  We -- we weren't making any payments at

17  all.

18     THE COURT:  Okay.  Were you paying taxes on the

19  property?

20     THE WITNESS:  I don't think so.  I'm not sure.  I

21  don't think so.  We didn't see any way out.  We just figured we

22  were going to lose our home, that, you know -- as far as

23  damages, I know I can't -- I didn't provide that, which I --

24  I -- that's my mistake that I made.  I'd like to go over some

25  of the things.  Aside from losing the home, which was our dream

**RESIDENTIAL CAPITAL, LLC, et al.**

28

1   home that we -- that we invested in.  I think they knew we were

2   good risk in 2008, based on our history of -- I mean, twenty

3   years of payments is still twenty years of payments.  In

4   addition to that, my husband did a lot of upgrades to the

5   house.  And I do estimate those at about 40,000 dollars or so.

6   And I -- I apologize for not providing you with an itemization.

7   I kind of have jotted some things down here, some of the things

8   he did.  This -- this house was also the -- you know, it was

9   going to be our retirement home.

10           THE COURT:  Where is the house?

11           THE WITNESS:  It's in Murrieta, in the Temecula

12  Valley.  So I feel that after -- when we were in the process of

13  the short sale, because we figured this is a no -- no-win

14  situation, how do we --

15           THE COURT:  Tell me about that.  Did you -- when did

16  you decide to --

17           THE WITNESS:  The short sale --

18           THE COURT:  -- sell?

19           THE WITNESS:  -- I think we started in 2010, around

20  the time that this last one was denied.

21           THE COURT:  Now, did you have a discussion with ResCap

22  GMAC before you started your efforts to sell your house?

23           THE WITNESS:  Yes.  As a matter of fact, they told us,

24  oh, well, you should just sell the house because you can't do

25  anything, and you know, and we're not going to do anything to

**RESIDENTIAL CAPITAL, LLC, et al.**

29

1  help you, basically, so you might as well sell the house.  So

2  we entered into the short sale thinking okay, this is the only

3  way that we can cut our losses.

4       THE COURT:  Did you market it through a broker?

5       THE WITNESS:  Yes.  Yes.  It wasn't what we wanted to

6  do, but we were trying to save our credit --

7       THE COURT:  Okay.

8       THE WITNESS:  -- and everything else.  While the short

9  sale was going on, and we had many offers on the house, GMAC

10  continued to harass us, almost on a daily basis at times.

11       THE COURT:  Explain what you mean.

12       THE WITNESS:  They would call us and they would ask us

13  to pay the -- to pay the -- pay the payments -- pay what was,

14  you know, back owed.  And I would tell them, we're in the

15  middle of a short sale; under California law, you're not

16  supposed to harass us when we tell you -- if a debtor keeps

17  calling you, I believe that the debtor is not supposed to

18  continue to call you when you tell them to stop calling you.

19  Well, they told me that they didn't care what California law

20  was; they were just going to do whatever they were going to do.

21  And we actually stopped answering the phone because it never

22  stopped.  And so they continued to ask us for the back due

23  payments.  I told them it's in the middle of a short sale, it's

24  being sold, it's not going to be ours anymore, and it's -- it's

25  all going to be taken care of.  They didn't care about that

**RESIDENTIAL CAPITAL, LLC, et al.**

30

1    either.

2        THE COURT:  Let me ask you something else.  Had you

3    received verbal or written approval from any of the debtors to

4    go ahead with a short sale?

5        THE WITNESS:  I -- I believe so.

6        THE COURT:  You had something -- you think you had

7    something in writing?

8        THE WITNESS:  I know my broker does.  I don't --

9        THE COURT:  Okay.

10       THE WITNESS:  -- but I know the broker does.

11       THE COURT:  All right.  How much was the balance of

12   the mortgage at the time you sold it?

13       THE WITNESS:  I think it was around 433, or something

14   like that.

15       THE COURT:  And what --

16       THE WITNESS:  It sold for --

17       THE COURT:  -- what did you net on the sale?  Well, I

18   know you didn't net anything --

19       THE WITNESS:  Yeah.

20       THE COURT:  -- but what were the proceeds of the sale?

21       THE WITNESS:  I believe it sold for about 211,000.

22       THE COURT:  So you raised in your statement -- I think

23   at the hearing, which I said this was a contested matter -- you

24   participated by telephone in that, right?

25       THE WITNESS:  Yes.

12-12020-mg    Doc 6410    Filed 02/03/14    Entered 02/03/14 10:21:46    Main Document
Pg 31 of 72
**RESIDENTIAL CAPITAL, LLC, et al.**

31

1          THE COURT:  Okay.  And during that hearing, you raised

2     the issue on the phone about the calls you received --

3          THE WITNESS:  Um-hum.

4          THE COURT:  -- from GMAC, and you referred to it as

5     harassment, and it's in your statement of position again.  But

6     your proof of claim doesn't say anything about harassment; it

7     deals with the denial of the short sale.  And I raise it now

8     because -- and the debtors' counsel may well raise it.  You

9     see, ordinarily, you're sort of bound by what you put in the

10    proof of claim.  And this seems to be the first time that I

11    heard from you, or read anything from you, in which you

12    complained about collection calls -- let me just call it

13    that -- was in the telephone hearing.  Okay?  But there's

14    nothing in the proof of claim about it.  Your proof of claim

15    was focused on they denied you a loan modification, you had to

16    do a short sale, and you suffered damages as a result of that.

17         THE WITNESS:  Um-hum.  Truthfully, I didn't know that

18    I needed to do all of that in the proof of claim.  And that was

19    just a mistake on my part.  It wasn't until I started seeing --

20    I really didn't think it was going to go anywhere, to be honest

21    with you.  I thought I -- I had nothing to lose.  I already

22    lost my hou -- I had nothing to lose.

23         THE COURT:  Well, you got a trip to New York.  It

24    wasn't free, unfortunately, but --

25         THE WITNESS:  No.  So I thought, well -- but I didn't

**RESIDENTIAL CAPITAL, LLC, et al.**

32

1  know I needed to include all of that in the initial proof of

2  claim.  I guess it's just like your initial complaint.  But I

3  don't know anything about bankruptcy.

4          THE COURT:  What kind of a lawyer did you work for?

5          THE WITNESS:  Right now I'm working for someone that

6  does securities fraud.  And mostly I've done personal injury

7  and civil litigation.

8          THE COURT:  So let me -- I do want to ask you, because

9  in your statement of position you had said that, you know, the

10  debtors took the position that you told them you weren't

11  working.  And when I looked at the papers that they did attach,

12  there was the financial analysis form, and it's -- let me see

13  if I can see a date on it -- April 29th, 2008.  And the first

14  page of the form, under "Employment history", it has "Currently

15  employed", and for one of you it says yes, and for the other it

16  says no.  And the yes is obviously for your husband, because it

17  says "self-contractor, Paul Pfunder".  And for you it has the

18  box checked no.

19          THE WITNESS:  And I'm sorry, what's the date on that?

20          THE COURT:  The date -- there's a fax date on it of

21  April 29th, 2009.

22          THE WITNESS:  I might not have been working.  My work

23  has been up and down also.  I can't say for sure.

24          THE COURT:  I know that was a point on which you and

25  the debtors' lawyer -- you said, oh, they said I wasn't

**RESIDENTIAL CAPITAL, LLC, et al.**

33

1  working, and you said you were employed throughout the period.

2  But when I look at the document, I see -- this appears to be a

3  document signed by you and your husband.  On the second page,

4  it has the signatures, April 21st, 2009, signed by both of you.

5  And as I say, for you it shows no -- under "Currently

6  employed", no.

7           THE WITNESS:  I don't disagree with that.  What I'm

8  referring to is 2008.  In 2008, I was employed and I was making

9  42,000 dollars a year.

10          THE COURT:  Okay.

11          THE WITNESS:  I hadn't worked that full year, but at

12  the end of that year I did earn thirty -- almost thirty-three

13  thousand dollars.  So I was referring to 2008.  In 2009, I

14  might not have been employed.

15          THE COURT:  And you're working again now?

16          THE WITNESS:  I am, part time.

17          THE COURT:  Okay.  Anything else you want to tell me?

18          THE WITNESS:  No.  You know, I'm sixty-one years old.

19  At this point, I don't have much possibility of owning another

20  home.

21          THE COURT:  Are you and your husband renting?

22          THE WITNESS:  Yes, we are.  You know, unless I buy a

23  broken down house in Syracuse or something, you know, I --

24          THE COURT:  Oh, don't say that about poor Syracuse.

25          THE WITNESS:  I like Syracuse, but I've looked at the

**RESIDENTIAL CAPITAL, LLC, et al.**

34

1    homes online.  But anyway, so I do feel that they were

2    deceitful.

3            THE COURT:  Well, when you say you thought that

4    they're deceitful -- and I'm sure Mr. Wishnew's going to ask

5    you about it, but let me just play devil's advocate with you

6    about it, okay?  Because you say you think they were deceitful,

7    but what you've told me is in 2008 they denied your request for

8    a loan modification.

9            THE WITNESS:  Um-hum.

10            THE COURT:  In 2009, they offered you a loan

11    modification, which you just said it was unrealistic; you

12    couldn't do it.  Deceit ordinarily means that they lied to you

13    or misled you, but what I'm hearing you tell me is not that --

14    you obviously don't agree with what they did, but you said in

15    2008 you applied and they said no.  And in 2009 they told you,

16    okay, you qualify, here are the terms.  And you and your

17    husband -- I'm not questioning your decision about it, but you

18    just couldn't do it, couldn't afford --

19            THE WITNESS:  Right.

20            THE COURT:  -- to do it.  So what's the deceit or lie

21    that you think they told you?

22            THE WITNESS:  In 2008, when I first contacted them by

23    telephone, they said, oh, yeah, you know, you're working, you

24    qualify.  That was verbal.  It's hearsay, just like what they

25    have presented so far.  Okay, so that was verbal.  So -- and

**RESIDENTIAL CAPITAL, LLC, et al.**

35

1     then it didn't work out; then they denied us.  So that --

2           THE COURT:  It was fairly quick that they denied you

3     in 2008.

4           THE WITNESS:  I -- I think so; I'm not sure.

5           THE COURT:  Okay.

6           THE WITNESS:  I'm not sure.

7           THE COURT:  Don't --

8           THE WITNESS:  Yeah.

9           THE COURT:  When I ask you a question like that, if

10    you don't agree, make sure you tell me you don't agree.

11           THE WITNESS:  Yeah, I'm not sure.  You know, I'm

12    recollecting on this.

13           THE COURT:  Okay.

14           THE WITNESS:  The further thing about deceit is, well,

15    why are they trying to collect money from me if I'm in the

16    middle of a short sale?  That -- that's not legal, as far as I

17    know.  They're going to get paid from the short sale; someone

18    else is buying that home.  That's part of the agreement.

19           THE COURT:  One department doesn't know what the other

20    department is doing.  But I'm not saying it's right or wrong,

21    but --

22           THE WITNESS:  Right, so I think there's where some of

23    the deceit is.  But the real deceit, I think, is in approving

24    us in 2010, knowing full well, from our income taxes and the

25    documentation that we provided, that there was no way that we

**RESIDENTIAL CAPITAL, LLC, et al.**

36

1    could make that --

2          THE COURT:  So what would you have had them do?  I

3    mean, you're -- forgive me, you were unhappy when they denied

4    you a loan modification, and you're unhappy when they offered

5    you a modification, because you couldn't afford it.  But that's

6    what --

7          THE WITNESS:  Well --

8          THE COURT:  -- I'm having a little trouble with, okay?

9          THE WITNESS:  -- I guess I would have been happy if

10   they presenting us -- presented us with a modification that was

11   reasonable and that helped both of us.  A loan modification is

12   supposed to lower your payment.  That, in essence, was really

13   not happening.  Twenty dollars a month, if your income is going

14   down, is not going to make much of a difference.

15         THE COURT:  So do you know what a HAMP modification

16   is?  Do you know about HAMP?

17         THE WITNESS:  I do not, no.

18         THE COURT:  Okay.  So they offered you traditional.

19   I'm not sure -- there's a federal program, Home Affordable

20   Modification Program, and the initials, H-A-M-P, that's

21   referred to as HAMP.

22         THE WITNESS:  Okay.  And I'm not advising you on the

23   law, but HAMP generally does provide for a reduced interest

24   rate, but not fixed for thirty years.  It actually steps up and

25   then ultimately fixed.  So what the debtors set forth in their

**RESIDENTIAL CAPITAL, LLC, et al.**

37

1    papers is, they offered you modification; it did have this step

2    up.  It started at a pretty low rate, I don't know, three and a

3    half percent, but moved up in increments --

4              THE WITNESS:  Um-hum.

5              THE COURT:  -- until five percent.  Okay.  I

6    understand you wanted a fixed --

7              THE WITNESS:  Um-hum.

8              THE COURT:  -- loan.  Did anybody ever tell you that

9    the loan modification program has a low rate to start but rates

10   that increase and then become fixed?

11             THE WITNESS:  I don't remember it being explained to

12   me.

13             THE COURT:  All right.  Okay.  Anything else you want

14   to tell me about?  Okay.

15             THE WITNESS:  I guess that's it.

16             THE COURT:  Mr. Wishnew, do you want to cross-examine?

17             MR. WISHNEW:  Thank you, Your Honor.

18   CROSS-EXAMINATION

19   BY MR. WISHNEW:

20   Q.   Good afternoon, Ms. Pfunder.  My name is Jordan Wishnew

21   from the law firm of Morrison & Foerster.  We are currently

22   counsel to the ResCap Borrower Claims Trust, who is a

23   successor-in-interest to GMAC Mortgage and its other parties

24   who recently confirmed a Chapter 11 plan.

25             I wanted to go back to you --

**RESIDENTIAL CAPITAL, LLC, et al.**

38

1      THE COURT:  Did you understand what he just told you?

2      THE WITNESS:  Pretty much.

3      THE COURT:  Okay.  All right.

4   Q.  Well, basically, it was GMAC Mortgage.  Now our assets and

5   the liabilities are being addressed by two trusts; one of them

6   is a borrower trust, who is addressing your claim.

7   A.  Okay.

8   Q.  I want to go back to 2004, when you got the loan from

9   Quicken.  You had mentioned that you previously had a fixed-

10  rate loan.  Do you recall the type of loan that you obtained

11  from Quicken in December of 2004?

12  A.  No, I don't.

13  Q.  Might it have been a payment-option ARM loan?

14  A.  Not -- you're talking about ten years ago, and no, I -- I

15  really don't remember.  I do know that we refinanced in 2007.

16      THE COURT:  Do you know what a payment-option ARM

17  loan -- do you know what an ARM is?

18      THE WITNESS:  It's an adjustable-rate --

19      THE COURT:  Okay.

20      THE WITNESS:  -- mortgage, correct?

21      THE COURT:  All right.  Yes.

22  Q.  When you had the loan with Quicken, were you paying

23  principal and interest, or just interest?

24  A.  I think we were paying both, but I can't be sure.

25  Q.  Okay.  Do you recall whether your payoff balance was

**RESIDENTIAL CAPITAL, LLC, et al.**

39

1    increasing on a month-to-month basis, since the time you took

2    out the loan with Quicken, based on the fact that you might

3    have been paying less than the full amount of interest?  Is

4    that something you recall?

5    A.   That's pro -- that might be correct.  I --

6    Q.   Okay.  Okay.  When you originated or when you refi'd with

7    Quicken, did they offer you -- or did they offer you the

8    ability to take a fixed loan versus an interest-only or

9    adjustable-rate mortgage loan?

10   A.   I don't know.  But at the time, we were taking some advice

11   from a financial advisor --

12   Q.   Right.

13   A.   -- which was not a good benefit for us, in the long run.

14   Q.   Okay.

15        THE COURT:  Did you refinance with Quicken?

16        THE WITNESS:  I don't remember Quicken specifically,

17   no.

18        THE COURT:  Okay.

19   Q.   So it would seem to be that up until -- from 2004 up until

20   the point of the short sale, you were paying -- likely paying

21   only interest on the loan, is that correct?

22   A.   That's possible, but I'm not positive.

23   Q.   Okay.  And do you recall what the monthly payment was at

24   that point in time.  Was it --

25   A.   I know that through some of the refinances, we originally

**RESIDENTIAL CAPITAL, LLC, et al.**

40

1   started out with a payment of 1,800 and something --

2   Q.  Um-hum.

3   A.  -- and went down to 1,600 -- midway in the 1,600 amount.

4   Q.  Were you paying even less than that?  Maybe, like, 1,400

5   or --

6   A.  Never.

7   Q.  Never?

8           THE COURT:  Why did you refinance?

9           THE WITNESS:  Someone advised us to do that, that it

10  would be beneficial to us.

11          THE COURT:  Okay.

12  Q.  And when you reached out -- so the debtors -- you don't

13  dispute Ms. Horst's declaration that there was a forbearance

14  plan; they asked -- they, GMAC Mortgage, asked you to continue

15  making payments at the amounts you were paying on a monthly

16  basis, correct?  And in exchange, we -- GMAC Mortgage would not

17  pursue a foreclosure against the property.

18  A.  I don't remember that specifically, but I can tell you

19  that they never stopped foreclosure procedure.

20  Q.  What do you mean by that?

21  A.  When we were getting notice of the default.

22  Q.  Well, notice of default is one thing.  But actually, do

23  you recall them pursuing --

24  A.  It was up for a trustee sale a few times.

25  Q.  But the sale never went forward?

**RESIDENTIAL CAPITAL, LLC, et al.**

41

1   A.  No.

2   Q.  They forbear from that sale.

3   A.  I -- I guess that's what that means.

4   Q.  Okay.  And with regards to the modifications that were

5   offered to you, do you recall, did they offer to essentially

6   keep your monthly payment the same and stop the negative

7   amortization on your loan?  Do you understand what I mean by

8   negative amortization?

9   A.  I do know -- I do -- I think I understand what you're

10  saying.  I don't think they offered that, but I -- but I

11  don't -- I don't know for sure.

12  Q.  Okay.  Do you have any reason to not believe that that is

13  what they offered, that they offered to keep your payment the

14  same and stop the negative amortization --

15          THE COURT:  I'm going to sustain my own objection to

16  that question.

17          MR. WISHNEW:  All right.  Thank you, Your Honor.

18  Q.  At any point in time, the modification they were offering

19  to you, was that a fixed-rate loan going forward?

20  A.  I think that's what we were requesting, but I don't think

21  that's what they were sending us, which is also probably part

22  of us not going forward with it.  This is just on my

23  recollection.

24  Q.  Okay.  Do you have any reason to dispute what is in Ms.

25  Horst's declaration that --

**RESIDENTIAL CAPITAL, LLC, et al.**

42

1          THE COURT:  I'm not going to let you ask a question in

2    that form.  If you want to put a declaration in front of her

3    and ask her about something specifically in it, I'll let you do

4    that.

5          MR. WISHNEW:  Okay.

6          THE COURT:  But I'm not going to allow you to just ask

7    a general question about whether there's anything you don't

8    agree with.

9          If you want to stay up there and ask her, there's a

10   microphone there, or if you want to point her to something.

11   I'm not forcing you to do that, but -- keep the microphone in

12   front of you.  He'll speak loudly, okay?

13   Q.  Ms. Pfunder, if you could read paragraph 19 of Ms. Horst's

14   declaration, which has been docketed at 5 --

15         THE COURT:  Just speak a little louder.

16         MR. WISHNEW:  Sure.

17   Q.  -- which has been docketed at 5548-1.  Could you just take

18   a moment, read that to yourself, and I'll ask a question if you

19   have any reason to disagree with what's been stated there.

20         THE COURT:  I'm going to sustain an objection to that

21   question.  What you can tell me, Ms. Pfunder -- read it and

22   tell me whether there's anything -- when you read the

23   paragraph, are there any statements in there -- do you agree

24   with what's in the paragraph or there are things that you

25   disagree with.

**RESIDENTIAL CAPITAL, LLC, et al.**

43

1          THE WITNESS:  I initially -- I haven't read the whole

2     thing.  I initially disagree with --

3          THE COURT:  Do me a favor.  Read the whole paragraph

4     to yourself, and then come back and --

5          THE WITNESS:  Okay.

6          THE COURT:  Okay?

7          THE WITNESS:  Okay.  I disagree with that it would be

8     a fixed interest rate once the loan reached five percent

9     interest; I don't recall that being the case.  But I'm going on

10    memory.

11         THE COURT:  Okay.  Do you remember that the initial

12    rate was going to be 3.125 percent?

13         THE WITNESS:  No, I don't.

14         THE COURT:  Okay.

15         THE WITNESS:  Probably most of it is -- is correct.  I

16    would like to point out that every time that they did ask us to

17    return loan documents, we had a tiny increment of time to get

18    it back to them.

19         THE COURT:  Meaning what?

20         THE WITNESS:  Sometimes five days, sometimes less.  It

21    had to be certified checks.  It had to be overnight mail.  It

22    had much criteria to it that was on a very limited time basis.

23         THE COURT:  Okay.

24         THE WITNESS:  So basically, if I wanted an attorney to

25    look at these documents, I didn't have that time.

**RESIDENTIAL CAPITAL, LLC, et al.**

44

1          THE COURT:  Well, did you ever pick up the phone and

2      call them and say you needed more time to look at the

3      documents?

4          THE WITNESS:  No, this particular individual I've

5      never heard of before today.

6          THE COURT:  Well, when you say this particular -- I

7      don't think it would have been Ms. Horst who --

8          THE WITNESS:  Okay.

9          THE COURT:  -- was involved back then, but --

10         THE WITNESS:  Yeah.

11         THE COURT:  -- you did talk to people from GMAC from

12     time to time.

13         THE WITNESS:  I did, yes.

14         THE COURT:  Okay.  And so my question is did you ever

15     call -- if the time they were giving you to respond was too

16     short, did you ever pick up the phone and say I need another

17     week, maybe two weeks?

18         THE WITNESS:  I think I did.  I think there were

19     probably times when I said, I'm pretty sure, I don't have

20     enough time.  And I don't -- I really don't know if I got a

21     response or just a denial.  I -- I can't say.  I don't

22     remember.

23         THE COURT:  So in this paragraph 19, at the bottom,

24     there's the word "contribution" on the last line, and there's a

25     footnote.

**RESIDENTIAL CAPITAL, LLC, et al.**

45

1           THE WITNESS:  Um-hum.

2           THE COURT:  But in Ms. Horst's declaration, it doesn't

3   say how much the contribution was.  In your --

4           THE WITNESS:  I can --

5           THE COURT:  -- recollection --

6           THE WITNESS:  I can tell you how much it was.  It was

7   between seven and nine thousand dollars.  I'm thinking between

8   eight and nine, if I remember correctly.  It was a large sum of

9   money.

10          THE COURT:  Okay.

11          THE WITNESS:  So --

12          THE COURT:  Go ahead, Mr. Wishnew.

13  Q.  Ms. Pfunder, would you agree that you and your husband

14  would have been benefitted if you had a interest-only

15  adjustable loan and it was changed to a fixed-rate loan?

16  Wouldn't that benefit you in the long run?

17          THE COURT:  I'm going to sustain an objection to that

18  question.  I don't know how anybody's supposed to answer that

19  question, Mr. Wishnew.  You don't include enough facts, and

20  it's hypothetical, doesn't include enough facts.  Be fair to

21  this witness.

22  Q.  With regards to the calls, did you receive -- you said you

23  received calls about the short sale while it was ongoing?

24  A.  Um-hum.

25  Q.  And what exactly was said during those calls?

**RESIDENTIAL CAPITAL, LLC, et al.**

46

1   A.  It wasn't really about the short sale.  The short sale was

2   in process, and they would call asking for a payment, the money

3   that was in arrears.  And I would inform them that they needed

4   to -- the right hand needed to know what the left was doing,

5   because we were in a short sale and the home was being sold.

6   There were offers on the home.  And they basically always told

7   me they didn't care about that; they were there to collect.

8   They were specifically looking to collect.  And I -- and I told

9   them:  This is illegal.  You have no right to collect any funds

10  from me; I'm selling this home.  But that never stopped the --

11  Q.  I recognize you're not an attorney, but are you aware of a

12  specific statute in California or a federal statute that

13  required GMAC Mortgage to stop making ordinary collection

14  calls, notwithstanding the fact that a short sale was in

15  process?

16  A.  I -- I don't know of a specific statute.  I -- I don't.  I

17  didn't research it, so I do not know.  But I -- I do know it's

18  pretty commonplace in California, whether or not I --

19  Q.  With regards to your damages, again, I'm truly sorry that

20  you lost your home and that it came to what -- you know, what

21  happened happened.  With regards to your damages, would you

22  agree that, based upon the testimony you gave earlier about the

23  principal balance of the mortgage as compared to the sale

24  price, there was no equity in your home at that time?

25  A.  That's correct. It was -- it was upside down.

**RESIDENTIAL CAPITAL, LLC, et al.**

47

1  Q.  Okay.  And beyond the loss of the home, do you have any

2  other -- any separate other damages that can be quantified at

3  this point in time?

4  A.  Absolutely.  I did do an itemization, and it itemizes out

5  to about 40,000 dollars, between 30 and 40,000 dollars.  We did

6  tile work on the downstairs floor.

7          THE COURT:  That's one of the improvements that you

8  made?

9          THE WITNESS:  Yes.  These are -- these are -- yeah.

10  A.  The entire first floor was redone in tiles.  We did a lot

11  of brick work and concrete work.  We did landscaping and

12  planting of trees.  We did -- my husband did granite sinks

13  and -- and -- in all of the bathrooms.  He did granite in the

14  backyard.  We -- he did overhead lights and fans throughout the

15  entire house, electrical.  We did a kitchen remodel.  We did a

16  master bath, the floor and the sinks and the toilets.  We did

17  light fixtures -- well, I guess I said that; sorry.  Let's --

18  we did lighting in the front of the house, so that was more

19  electrical.  He did -- overdid -- he overhauled the garage.  He

20  did upgrades in the garage, dry-walling, putting in stairs,

21  built-in cabinetries.  And those are most of the things that I

22  can think of that we did in upgrades to the home.

23  Q.  Right, but to your point, those are upgrades to the home

24  that hopefully enured to the overall value of the home,

25  correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

48

1    A.  That would add to -- to -- to the value of the home, I

2    would hope.

3    Q.  Right.  So --

4          THE COURT:  When did you do the upgrades?

5          THE WITNESS:  Probably over the last ten years, maybe,

6    or maybe even before that.  This was an ongoing proc -- we were

7    in the home for twenty-three years, so I would say from -- it

8    could be for the last ten to fifteen years that we did -- over

9    this time period that we did --

10   Q.  Did you do those upgrades around the time of the 2004

11   refinancing with Quicken loans?

12   A.  I think some of them -- most of them were done before

13   that.  I know a lot of the electrical and a lot of the brick

14   work and landscaping and -- and garage work was done before

15   that.

16         THE COURT:  When you refinanced, did you get cash out

17   of the refinance?

18         THE WITNESS:  We did.

19         THE COURT:  Do you remember how much?

20         THE WITNESS:  I do.  It was almost 200,000 dollars.

21   Q.  Is that to say then that your home was probably worth over

22   600,000 dollars in 2000 --

23   A.  No, it was -- it was estimated -- well, the refinance

24   amount was estimated at 435 at the time.

25   Q.  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

49

1  A.   That was at the very beginning of 2007.

2  Q.   Okay.  Okay.

3  A.   That's another point I would like to make.  I think a lot

4  of this could be retribution for us taking the equity out of

5  the house, but that's just a theory.

6  Q.   Retribution by whom?

7  A.   By the lenders.

8  Q.   Okay.  But have you ever -- again, was -- to your

9  knowledge, was GMAC Mortgage the lender or the servicer?

10  A.   I -- I think they were the servicer.  You know, the loans

11  get sold so many times, sometimes you don't even know who

12  you're dealing with.  As long as you make the payment, you're

13  okay.

14  Q.   Right.  Right.

15  A.   So I don't know at this point.  But we made over 450,000

16  in payments over the twenty-year period.

17  Q.   Um-hum.

18  A.   So --

19       THE COURT:  So when -- before you refinanced, what was

20  the approximate outstanding principal balance?

21       THE WITNESS:  I -- I don't know.  It would be a guess

22  at maybe 200,000.

23       THE COURT:  Okay.

24       THE WITNESS:  It would be a guess.

25       THE COURT:  And so after the refinance, the balance

**RESIDENTIAL CAPITAL, LLC, et al.**

50

1   was how much?

2          THE WITNESS:  Four -- low fours.

3          THE COURT:  Okay.

4          MR. WISHNEW:  Just one minute, Your Honor.  I'm just

5   going to check my notes.

6          THE COURT:  Fine.

7   Q.  Ms. Pfunder, do you -- sorry -- you agree that the debtors

8   made modification or a tradition -- sorry -- traditional

9   modification offers to you on two separate occasions, correct?

10  A.  I believe that's correct.  I'm going by the debtors'

11  documentation, and I believe that's correct.

12  Q.  Okay.  And it was -- and were you working with -- you were

13  working with Ms. Ortiz at the time?

14  A.  Yes, Monica Ortiz was someone that was affiliated with a

15  financial advisor, and they said that they could easily get us

16  a loan modification.

17  Q.  Okay.  So you had a chance to consult with her before

18  declining the offer in each instance?

19  A.  No, not really.  They were just to be on the phone and get

20  everything working in the process.  But they were -- they were

21  doing the legwork that I didn't have time to do anymore or

22  was -- was exhausted doing, over the time period.  But no, I --

23  I never asked them for advice as to how to proceed.

24  Q.  Okay.  Did you ever --

25          MR. WISHNEW:  Strike that, Your Honor.  I have no

**RESIDENTIAL CAPITAL, LLC, et al.**

51

1    further questions for this witness.

2             THE COURT:  Okay.  Is there anything else you want to

3    say?

4             THE WITNESS:  Could I ask him a question?

5             THE COURT:  Not really.

6             THE WITNESS:  Oh.

7             THE COURT:  But you can tell me what you want to know

8    about.

9             THE WITNESS:  I want to know exactly what did the

10   contribution -- what was the contribution for.

11            THE COURT:  I want to know that too.

12            MR. WISHNEW:  May I have a minute to consult with Ms.

13   Horst, so I can try to get an answer for the Court?

14            THE COURT:  Well, let's wait, because when I want an

15   answer, I want it under oath, okay?

16            Anything else you want to add?

17            THE WITNESS:  I don't think so.

18            THE COURT:  Okay.  Are there any documents that you

19   want to introduce?  When I say introduce into evidence --

20            THE WITNESS:  I have a copy of the three years of the

21   tax returns showing what we earned, which is my basis for them

22   trying to deceive us with this contribution and not really

23   wanting to give us a loan modification at all.

24            THE COURT:  I would rather not mark your tax returns,

25   because it's sort of a public record at that point.  Maybe --

**RESIDENTIAL CAPITAL, LLC, et al.**

**52**

1  if Mr. Wishnew doesn't object, maybe you could tell us what

2  your gross income was for each of those years, and without

3  going -- are you okay with that, Mr. Wishnew?  I'd just as soon

4  not have the tax returns marked.

5       MR. WISHNEW:  That's fine.

6       THE WITNESS:  Okay.

7       THE COURT:  Okay, just tell me the year and what the

8  gross income was.

9       THE WITNESS:  Okay.  2008, our total income was

10 32,868; 2009, our total income was 9,820; 2010, the total

11 income was 10,819 dollars.

12       THE COURT:  Okay.  If Mr. Wishnew wants to see them,

13 I'll certain permit him to.  I'd just as soon not have it

14 marked as an exhibit.

15       THE WITNESS:  Okay.

16       THE COURT:  And if you want it, I --

17       MR. WISHNEW:  That's fine, Your Honor.  I'll take Ms.

18 Pfunder's word.

19       THE COURT:  Okay.  All right.  All right.  Anything

20 else that you want?

21       All right.  You're excused.

22       THE WITNESS:  Okay.

23       THE COURT:  So I take it that when I ask if you rest,

24 that means that you've put in whatever evidence you're going to

25 put in?

**RESIDENTIAL CAPITAL, LLC, et al.**

53

1          THE WITNESS:  Pretty much.

2          THE COURT:  Okay.  All right.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.

5          Are you going to call any witnesses, Mr. Wishnew?

6          MR. WISHNEW:  Your Honor, I would offer the testimony

7   of Ms. Horst as her direct, and offer her, in case Your Honor

8   has any questions.

9          THE COURT:  Well, I've already sustained my own

10  objection to her declaration; it's hearsay, so that's not

11  coming in.

12          MR. WISHNEW:  Okay.

13          THE COURT:  She's in the courtroom, though --

14          MR. WISHNEW:  I mean, I'd --

15          THE COURT:  -- if you want to call her as a witness.

16          MR. WISHNEW:  -- I'd like to run through her

17  declaration.  It may be that we -- to the extent the Court

18  allows, we supplement the record with the servicing notes to

19  substantiate what's in there.  But I would like the opportunity

20  to --

21          THE COURT:  Look, let me make some observations, okay?

22  And I'm prepared to go ahead and decide this matter on the

23  merits.  I think my procedures order -- as I said earlier, I've

24  tried to do this in a streamlined fashion, recognizing that Ms.

25  Pfunder and some of the other borrowers are pro se.  But I

**RESIDENTIAL CAPITAL, LLC, et al.**

54

1 think the order was pretty clear about what the debtors are

2 supposed to do.  And the Rules of Evidence are the Rules of

3 Evidence are the Rules of Evidence.  So you're not really

4 contending that that declaration isn't virtually entirely

5 hearsay, are you?

6          MR. WISHNEW:  No, Your Honor.

7          THE COURT:  Okay.  So here are some observations.

8 You've got three lawyers -- four lawyers in the courtroom

9 today; I'm including Mr. Nosek in that, and Ms. Horst.  And so

10 I'm just looking at the meter spin for what the cost of this

11 hearing has been to this point.

12          And I mean, one of several things can happen.  If I'm

13 charitable, I continue the hearing and order you to produce all

14 of the records that are weren't produced that should have been

15 produced, and I require the debtors to pay for Ms. Pfunder to

16 travel across the country for a resumption of a hearing, maybe

17 when it isn't quite so cold in New York.  And then the outcome

18 is uncertain.  Or you and your client ought to go and huddle,

19 because when you asked Ms. Pfunder what her damages were, she

20 estimated it at 30 to 40,000 dollars.  I guarantee it's going

21 to cost you more than that if you come back.  And even then, A,

22 I'm not sure -- I might just close the record and say you've

23 offered no evidence, and she's offered her evidence and you've

24 offered none, and what the consequences are.  But my preference

25 is, if the parties can't resolve the matter consensually, is to

**RESIDENTIAL CAPITAL, LLC, et al.**

55

1   resolve things on the merits.  But if Ms. Pfunder has to come

2   back, you're paying for it.  She's here.  She was ready to go.

3   Yes, she didn't put in her itemization of damages, because

4   she's been fairly specific about what it is.  Whether that's

5   recoverable as damages or not, that's a different issue.

6        But I don't get in the midst of settlement discussions

7   ever, other than to encourage the parties to try to resolve

8   matters.  But what I'm looking at here is something where, at

9   least based on Ms. Pfunder's testimony, the amount that she

10  identified as her damages is quite modest, and you're going to

11  spend more than that if you have to come back and you have to

12  pay for her to come back and all of that.

13       So let's take a fifteen-minute recess, and you'll tell

14  me whether you want to try and resolve the matter.  And if you

15  can do it today, that's fine.  If not -- or I'll consider

16  whether I'm going to adjourn the hearing and require you to

17  produce all of the -- search for all of the documents that

18  haven't been produced, provide them to Ms. Pfunder, provide

19  them to me.  After I look at them, I'll decide how we're going

20  to proceed, whether you're going to pay for her to come back

21  and all that.  Okay?  So let's take --

22       MR. WISHNEW:  Understood, Your Honor.

23       THE COURT:  -- a fifteen-minute recess, okay?

24       MR. WISHNEW:  Thank you.

25       THE COURT:  All right.  I encourage you to try and

**RESIDENTIAL CAPITAL, LLC, et al.**

56

1    work it out.

2         (Recess from 3:19 p.m. until 3:46 p.m.)

3         THE COURT:  All right.  Please be seated.  We're back

4    on the record in Residential Capital.  This is in connection

5    with the debtors' objection to the Pfunder's proof of claim.

6         Mr. Wishnew?

7         MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

8    Morrison & Foerster for the ResCap Borrower Claims Trust.

9         We have taken Your Honor's advice and worked with Ms.

10   Pfunder, and have reached a consensual resolution for an

11   allowed unsecured claim -- I'd prefer to not mention the amount

12   on the record -- against GMAC Mortgage.

13        THE COURT:  Is the settlement going to require court

14   approval?

15        MR. WISHNEW:  It will not, Your Honor.  The Borrower's

16   Claims Trust has the authority, under the plan, to resolve

17   claims.

18        THE COURT:  Okay.

19        MR. WISHNEW:  So in that regards, we will be providing

20   Ms. Pfunder and her husband with a form stipulation that we've

21   agreed to with other similar borrowers, and execute that

22   stipulation and formalize the agreement.

23        THE COURT:  All right.  Ms. Pfunder, are you satisfied

24   with the resolution of the matter?  Well, maybe that's the

25   wrong question to ask.  Do you agree to the resolution of the

**RESIDENTIAL CAPITAL, LLC, et al.**

57

1   matter?

2           MS. PFUNDER:  Yes.  Yes.

3           THE COURT:  All right.  How long is it going to take

4   you to prepare a stipulation and get it signed?

5           MR. WISHNEW:  I would expect that we could have the

6   stipulation to Ms. Pfunder tomorrow; at the latest, Monday.

7           THE COURT:  Okay.  When are you scheduled to go home,

8   Ms. Pfunder?

9           MS. PFUNDER:  Sunday evening.

10          THE COURT:  Okay.  So let's try and get it to her

11  tomorrow.

12          MR. WISHNEW:  Okay.

13          THE COURT:  Okay.  So that this can get resolved

14  before she goes home.

15          MR. WISHNEW:  Okay.  I can also -- I mean, if

16  electronic mail is an acceptable substitute, we can --

17          THE COURT:  Well, let's see if you can get it done

18  before she goes home, okay?  Because that --

19          MR. WISHNEW:  Okay.

20          THE COURT:  And look, if it doesn't get done --

21          MR. WISHNEW:  Um-hum.

22          THE COURT:  -- this proceeding is either going forward

23  quickly, or it gets very expensive if she has to come back.

24          MR. WISHNEW:  Understood, Your Honor.

25          THE COURT:  And I'm prepared -- ordinarily, the terms

**RESIDENTIAL CAPITAL, LLC, et al.**

58

1    would be put on the record so there'd be no misunderstanding,

2    and it would be binding on the parties.

3         MS. PFUNDER:  Could I say something, Your Honor?

4         THE COURT:  Go ahead, Ms. Pfunder.

5         MS. PFUNDER:  I would prefer the amount be put on the

6    record also.

7         THE COURT:  Well, I understand, from the Trust's

8    standpoint, why they don't want to do that.  But here's what

9    I'm going to insist, Mr. Wishnew, that before you leave today

10   that you give even a handwritten piece of paper to Ms. Pfunder

11   that sets forth the material terms of the proposed resolution,

12   so she leaves here with a piece of paper in her hand, that if a

13   dispute subsequently arises, she can come back and show me and

14   say here, okay?  I'm not insisting it be put on the rec -- that

15   the amount be put on the record, but I just want Ms. Pfunder to

16   leave with the confidence that she knows what the economic

17   terms of the settlement are.

18        Is that satisfactory, Mr. Wishnew?

19        MR. WISHNEW:  Absolutely, Your Honor.

20        THE COURT:  Ms. Pfunder, does that help you?

21        MS. PFUNDER:  Yes.

22        THE COURT:  Okay.  All right.  I'm glad you were able

23   to reach a resolution of the matter and we can put this to an

24   end.  So for now, what I'm going to do is adjourn the matter,

25   and when I'm advised that a written stipulation has been

**RESIDENTIAL CAPITAL, LLC, et al.**

59

1    entered into resolving the matter, the matter will be -- what I

2    guess the -- what will be the disposition with respect to the

3    claim?  Will that be covered in -- I mean, will --

4         MR. WISHNEW:  So -- yes.  What will happen is that the

5    claim will be deemed allowed on the debtors' claims register,

6    in the agreed-upon amount that we discussed.  And once we

7    execute the stipulation, we will advise KCC, the debtors'

8    noticing and claims agent, and they will make the necessary

9    change to the register to ensure that, going forward, there's a

10   record of this allowed claim.

11        THE COURT:  Okay.  All right.  So but I want to be

12   sure that you leave today with a piece of paper, and I do want

13   you to get this resolved quickly so that it provides the

14   Pfunders with some assurance about what the outcome is, all

15   right?

16        MR. WISHNEW:  I wanted to note for the record just I

17   do appreciate Your Honor's candor with regards to the

18   declaration.  We've taken those points under advisement, and

19   going forward, we'll keep those in mind as we submit

20   addition --

21        THE COURT:  I follow the Rules of Evidence.

22        MR. WISHNEW:  I understand, Your Honor.  I understand.

23        THE COURT:  It's not a mystery.

24        MS. PFUNDER:  I just want to say thank you very much.

25        THE COURT:  Okay.  All right.  I'm glad you were able

**RESIDENTIAL CAPITAL, LLC, et al.**

60

1  to work it out satisfactorily.

2          All right.  We're adjourned.

3          MR. WISHNEW:  Thank you, Judge.

4        (Whereupon these proceedings were concluded at 3:51 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Ms. Pfunder | Ms. Pfunder | 19 |
| Ms. Pfunder | Mr. Wishnew | 37 |

RULINGS

| | Page | Line |
|---|---|---|
| Matter is adjourned until a written stipulation resolving the matter has been entered | 58 | 24 |

62

1

2                        C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   SHARONA SHAPIRO

12   AAERT Certified Electronic Transcriber CET**D-492

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  February 2, 2014

19

20

21

22

23

24

25

## A

**ability (1)**
39:8
**able (6)**
12:1;16:18,22;
18:22;58:22;59:25
**Absolutely (2)**
47:4;58:19
**ACAMPORA (3)**
4:2;6:4;7:16
**accept (3)**
20:1;25:17;26:3
**acceptable (1)**
57:16
**accepted (1)**
14:22
**account (1)**
26:10
**accurate (1)**
26:18
**across (1)**
54:16
**acted (1)**
10:18
**action (2)**
7:14;15:13
**actions (1)**
15:25
**activities (1)**
10:11
**actually (3)**
29:21;36:24;40:22
**add (4)**
21:10;22:2;48:1;
51:16
**addition (5)**
9:16,21;16:23;
28:4;59:20
**address (2)**
6:24;9:8
**addressed (3)**
8:2;9:6;38:5
**addressing (3)**
7:13,20;38:6
**adjourn (2)**
55:16;58:24
**adjourned (1)**
60:2
**adjustable (1)**
45:15
**adjustable-rate (2)**
38:18;39:9
**admissible (1)**
9:3
**admitted (1)**
20:19
**Advertising (1)**
15:24
**advice (3)**
39:10;50:23;56:9
**advise (1)**

**59:7**
**advised (3)**
13:5;40:9;58:25
**advisement (1)**
59:18
**advising (1)**
36:22
**advisor (2)**
39:11;50:15
**advocate (1)**
34:5
**affiliated (1)**
50:14
**afford (6)**
22:24;23:1,4;26:7;
34:18;36:5
**affordable (3)**
22:9,10;36:19
**afternoon (2)**
7:2;37:20
**again (8)**
12:8;23:17;24:10;
26:11;31:5;33:15;
46:19;49:8
**against (3)**
18:23;40:17;56:12
**agent (1)**
59:8
**ago (1)**
38:14
**agree (10)**
15:15;34:14;35:10,
10;42:8,23;45:13;
46:22;50:7;56:25
**agreed (1)**
56:21
**agreed-upon (1)**
59:6
**agreement (4)**
14:13;15:1;35:18;
56:22
**agreements (1)**
10:4
**ahead (8)**
5:13,21;16:21;
23:14;30:4;45:12;
53:22;58:4
**allegations (1)**
9:8
**allow (1)**
42:6
**allowed (4)**
17:10;56:11;59:5,
10
**allows (1)**
53:18
**almost (3)**
29:10;33:12;48:20
**always (4)**
20:13;24:8,9;46:6
**ambiguity (1)**
12:24
**amortization (3)**

**41:7,8,14**
**amount (9)**
21:16;39:3;40:3;
48:24;55:9;56:11;
58:5,15;59:6
**amounts (1)**
40:15
**analysis (1)**
32:12
**and/or (2)**
9:19,22
**annex (1)**
11:3
**annexing (2)**
6:10;8:10
**anymore (2)**
29:24;50:21
**apologize (1)**
28:6
**appeared (1)**
7:9
**APPEARING (1)**
4:11
**appears (1)**
33:2
**applicable (4)**
9:13,16;12:22;14:9
**application (5)**
6:7,9;8:10;9:12,14
**applications (1)**
9:17
**applied (1)**
34:15
**appreciate (1)**
59:17
**appropriate (2)**
9:11;10:17
**approval (3)**
9:18;30:3;56:14
**approve (1)**
21:25
**approved (2)**
21:24;24:11
**approving (1)**
35:23
**approximate (1)**
49:20
**April (4)**
26:22;32:13,21;
33:4
**arises (1)**
58:13
**arising (3)**
5:4;7:14,20
**ARM (3)**
38:13,16,17
**around (3)**
28:19;30:13;48:10
**arrears (1)**
46:3
**Aside (1)**
27:25
**assert (1)**

**10:16**
**asserted (2)**
15:23;17:12
**assets (1)**
38:4
**assume (2)**
5:13;12:3
**assurance (1)**
59:14
**attach (1)**
32:11
**attached (4)**
8:16,22;13:13,14
**attorney (2)**
43:24;46:11
**authority (1)**
56:16
**aware (1)**
46:11
**away (1)**
7:15

## B

**back (20)**
5:23;12:9;18:10;
20:8,8;29:14,22;
37:25;38:8;43:4,18;
44:9;54:21;55:2,11,
12,20;56:3;57:23;
58:13
**background (1)**
7:1
**backyard (1)**
47:14
**balance (5)**
30:11;38:25;46:23;
49:20,25
**bank (1)**
19:24;21:18;24:19,
21
**bankruptcy (2)**
17:10;32:3
**Based (5)**
10:14;28:2;39:2;
46:22;55:9
**basically (5)**
15:1;29:1;38:4;
43:24;46:6
**basis (5)**
29:10;39:1;40:16;
43:22;51:21
**bath (1)**
47:16
**bathrooms (1)**
47:13
**beating (1)**
16:20
**become (1)**
37:10
**beginning (3)**
9:25;10:6;49:1
**begins (1)**

**8:5**
**behalf (1)**
7:18
**behind (2)**
19:8,9
**believes (1)**
17:9
**beneficial (2)**
20:1;40:10
**benefit (2)**
39:13;45:16
**benefitted (2)**
22:17;45:14
**best (3)**
13:10,18;19:10
**beyond (1)**
47:1
**binder (1)**
8:13
**binding (1)**
58:2
**bit (1)**
18:14
**bizarre (1)**
20:10
**Books (5)**
9:2,10;10:14;11:6,
12
**Borrower (6)**
5:9;9:1;10:4;
37:22;38:6;56:8
**borrowers (3)**
7:8;53:25;56:21
**Borrowers' (1)**
4:3
**borrower's (5)**
6:4;7:13;8:2;
15:11;56:15
**both (6)**
7:15;10:9;17:8;
33:4;36:11;38:24
**bottom (3)**
8:6;9:25;44:23
**bound (1)**
31:9
**box (1)**
16:9;18:8;32:18
**breach (1)**
15:18
**brick (2)**
47:11;48:13
**brief (2)**
7:16,17
**briefs (3)**
7:13,15,23
**bring (2)**
18:6,7
**broken (1)**
33:23
**broker (3)**
29:4;30:8,10
**brother (1)**
5:17

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

January 30, 2014

**brow (1)**
16:20
**built-in (1)**
47:21
**business (4)**
11:14,15,16;15:21
**buy (2)**
12:19;33:22
**buying (1)**
35:18

## C

**cabinetries (1)**
47:21
**California (10)**
15:13,15,21,22,23;
16:3;29:15,19;46:12,
18
**call (10)**
10:2;18:2;29:12,
18;31:12;44:2,15;
46:2;53:5,15
**calling (2)**
29:17,18
**calls (6)**
31:2,12;45:22,23,
25;46:14
**came (3)**
20:9;27:8;46:20
**Can (27)**
10:24;11:19;13:2;
17:23;18:7,10,17;
22:5;24:15;29:3;
32:13;40:18;42:21;
45:4,6;47:2,22;51:7,
13;54:12;55:15;
57:13,15,16,17;
58:13,23
**candor (1)**
59:17
**Capital (3)**
4:13;5:3;56:4
**care (4)**
29:19,25,25;46:7
**carpenter/handyman (1)**
21:22
**carrying (1)**
8:6
**case (2)**
43:9;53:7
**cases (1)**
7:8
**cash (1)**
48:16
**categorize (1)**
7:7
**causes (3)**
7:14;15:13,25
**center (1)**
10:2
**certain (1)**
52:13

**certainly (1)**
18:7
**certified (1)**
43:21
**challenging (1)**
25:23
**chance (5)**
16:6,21;18:20,21;
50:17
**change (3)**
14:8;19:7;59:9
**changed (2)**
14:6;45:15
**Chapter (1)**
37:24
**charitable (1)**
54:13
**check (1)**
50:5
**checked (1)**
32:18
**checks (1)**
43:21
**chief (1)**
6:15
**chronology (2)**
26:16,18
**civil (1)**
32:7
**claim (25)**
5:10,23;8:22;9:1;
10:7,16;15:13;17:3,7,
10,12,15;18:22;31:6,
22;38:6;56:5,11;59:3,5,
10
**claimant (1)**
9:13
**claimant's (4)**
9:15,16,17,20
**claims (27)**
5:5,6,9;6:8,15;7:7,
8;8:2,9,14,18;9:2,6,6,
8;15:10,17,20,21,23;
16:16;37:22;56:8,16,
17;59:5,8
**clear (3)**
18:16;22:22;54:1
**clearly (1)**
20:24
**client (1)**
54:18
**close (1)**
54:22
**Code (1)**
15:22
**cold (1)**
54:17
**colleague (2)**
16:17;17:22
**colleagues (1)**
13:5
**collect (4)**

35:15;46:7,8,9
**collection (2)**
31:12;46:13
**combined (1)**
20:22
**coming (1)**
53:11
**committee (3)**
6:5;7:13,18
**commonplace (1)**
46:18
**communicating (1)**
9:13
**compared (1)**
46:23
**competition (1)**
15:21
**complained (1)**
31:12
**complaint (1)**
32:2
**completely (1)**
26:1
**compliance (2)**
9:19,20
**complied (1)**
10:17
**concerning (1)**
6:6
**conclude (1)**
23:2
**concluded (2)**
23:3;60:4
**concludes (1)**
10:13
**concrete (1)**
47:11
**confidence (1)**
58:16
**confirmed (1)**
37:24
**confusing (1)**
16:5
**confusion (1)**
16:4
**conjunction (1)**
13:6
**connection (2)**
5:3;56:4
**consensual (1)**
56:10
**consensually (1)**
54:25
**consequences (1)**
54:24
**consider (2)**
15:25;55:15
**considered (1)**
17:5
**considering (1)**
9:12
**consistent (1)**
26:23

**consult (2)**
50:17;51:12
**consummate (1)**
10:5
**contacted (1)**
34:22
**contending (1)**
54:4
**contested (1)**
30:23
**context (1)**
7:14
**continue (3)**
29:18;40:14;54:13
**continued (3)**
15:3;29:10,22
**Contract (1)**
15:17
**contractor (1)**
21:21
**contribution (10)**
20:14;21:3;24:13,
13,19;44:24;45:3;
51:10,10,22
**control (3)**
6:11;8:11;11:4
**controls (1)**
15:15
**copies (1)**
21:16
**copy (3)**
7:23;25:9;51:20
**correctly (1)**
45:8
**correspondence (2)**
13:12;20:7
**cost (2)**
54:10,21
**Counsel (7)**
4:3;6:4;7:12,12;
17:2;31:8;37:22
**counsel's (1)**
15:11
**country (1)**
54:16
**course (2)**
11:21;21:11
**COURT (214)**
5:2,13,15,18,20;
6:1,16,21,24;7:10,20,
25;10:24;11:1,23;
12:1,6,10,16;13:8,22,
25;14:3,6,15,17,21;
15:5,8,10,17;16:12,
15,22;17:2,14;18:1,5,
13,16,20,25;19:15,
17,20;20:22;21:21;
22:5,12,16,18,21;
23:1,7,9,14,19,22,25;
24:2,4,17,22,24;25:3,
7,9,12,16,19,21,23,
25;26:3,5,7,9,13,15,
18,20,23;27:8,11,14,

18;28:10,15,18,21;
29:4,7,11;30:2,6,9,
11,15,17,20,22;31:1,
4,23;32:4,8,20,24;
33:10,15,17,21,24;
34:3,10,20;35:2,5,7,
9,13,19;36:2,8,15,18;
37:5,8,13,16;38:1,3,
16,19,21;39:15,18;
40:8,11;41:15;42:1,6,
15,20;43:3,6,11,14,
19,23;44:1,6,9,11,14,
23;45:2,5,10,12,17;
47:7;48:4,16,19;
49:19,23,25;50:3,6;
51:2,5,7,11,13,14,18,
24;52:7,12,16,19,23;
53:2,4,9,13,15,17,21;
54:7;55:23,25;56:3,
13,13,18,23;57:3,7,
10,13,17,20,22,25;
58:4,7,20,22;59:11,
21,23,25
**courtroom (3)**
7:18;53:13;54:8
**covenant (1)**
15:18
**covered (1)**
59:3
**credit (1)**
29:6
**creditors' (3)**
6:5;7:12,18
**criteria (1)**
43:22
**cross- (2)**
6:19;17:22
**CROSS-EXAMINATION (1)**
37:18
**cross-examine (2)**
16:18;37:16
**currently (4)**
13:20;32:14;33:5;
37:21
**custody (3)**
6:10;8:11;11:3
**customer (1)**
10:1
**cut (1)**
29:3

## D

**daily (1)**
29:10
**damages (10)**
17:12;27:23;31:16;
46:19,21;47:2;54:19;
55:3,5,10
**database (1)**
10:23
**date (4)**
32:13,19,20,20

**dated (1)**
8:1
**days (1)**
43:20
**deadline (1)**
17:5
**deal (1)**
19:13
**dealing (2)**
15:19;49:12
**deals (2)**
10:7;31:7
**DEANNA (3)**
4:13;6:15;8:25
**debtor (6)**
7:3;12:19;14:23;
23:10;29:16,17
**debtors (22)**
5:24;6:4,7,13;8:7;
9:8,10,11,21;10:15,
16;11:2,22;12:19;
18:23;30:3;32:10;
36:25;40:12;50:7;
54:1,15
**debtors' (17)**
5:4,11;6:10;7:12,
16;8:17,17,25;11:3,6;
22:4;31:8;32:25;
50:10;56:5;59:5,7
**debtors' (6)**
8:11;9:10,15;10:2,
14;17:10
**Deceit (5)**
34:12,20;35:14,23,
23
**deceitful (6)**
21:8,9;22:2;34:2,4,
6
**deceive (1)**
51:22
**December (1)**
38:11
**decide (3)**
28:16;53:22;55:19
**decision (2)**
12:12;34:17
**declaration (32)**
6:8,14,19,25;8:8,
16,20,25;9:6,24,25;
10:6;11:5,11;12:2,6;
13:7,8,9,9,16;14:12,
12;40:13;41:25;42:2,
14;45:2;53:10,17;
54:4;59:18
**declining (1)**
50:18
**deemed (1)**
59:5
**default (4)**
27:5,7;40:21,22
**defer (1)**
12:9
**denial (7)**

6:6,9;8:9;9:18;
11:9;31:7;44:21
**denied (11)**
9:7;13:9;20:6;
22:8;26:22;28:20;
31:15;34:7;35:1,2;
36:3
**denying (1)**
9:13
**department (2)**
35:19,20
**depends (1)**
12:12
**derive (1)**
7:9
**detail (1)**
11:6
**detailing (2)**
6:8;8:8
**determining (1)**
14:4
**devil's (1)**
34:5
**difference (1)**
36:14
**different (1)**
55:5
**DIRECT (2)**
19:1;53:7
**directions (1)**
9:22
**disagree (5)**
33:7;42:19,25;
43:2,7
**disagreeing (1)**
26:15
**discussed (1)**
59:6
**discusses (1)**
11:12
**discussion (1)**
28:21
**discussions (1)**
55:6
**disposition (1)**
59:2
**dispute (4)**
14:21;40:13;41:24;
58:13
**docket (2)**
6:15;7:4
**docketed (2)**
42:14,17
**document (2)**
33:2,3
**documentation (4)**
23:13;27:6;35:25;
50:11
**documents (27)**
6:10;8:10,22,23;
11:3,8,8,10,17,19;
13:12,13,14;16:25;
17:2,4,4;20:8;23:8,

11,18;25:2;43:17,25;
44:3;51:18;55:17
**dollar (1)**
21:14
**dollars (20)**
20:11,15,17,21;
21:2,7;22:1;24:14;
25:15;28:5;33:9,13;
36:13;45:7;47:5,5;
48:20,22;52:11;
54:20
**done (7)**
12:25;19:11;32:6;
48:12,14;57:17,20
**down (9)**
18:11;21:1;25:15;
28:7;32:23;33:23;
36:14;40:3;46:25
**downstairs (1)**
47:6
**dragged (2)**
19:22,23
**dream (1)**
27:25
**drifting (1)**
19:4
**dry-walling (1)**
47:20
**due (1)**
29:22
**during (2)**
31:1;45:25

**E**

**earlier (3)**
16:4;46:22;53:23
**earn (1)**
33:12
**earned (1)**
51:21
**easily (1)**
50:15
**ECF (4)**
7:4;8:18,21;9:2
**economic (1)**
58:16
**efforts (2)**
7:9;28:22
**eight (4)**
20:15,16;24:14;
45:8
**either (4)**
9:7;27:12;30:1;
57:22
**electrical (3)**
47:15,19;48:13
**electronic (2)**
10:23;57:16
**elements (1)**
15:25
**else (9)**
17:23;29:8;30:2;

33:17;35:18;37:13;
51:2,16;52:20
**employed (8)**
11:14;19:3,18;
32:15;33:1,6,8,14
**employees (1)**
9:9
**employment (2)**
19:4;32:14
**encourage (2)**
55:7,25
**end (2)**
33:12;58:24
**enough (3)**
44:20;45:19,20
**ensure (1)**
59:9
**enter (2)**
19:6;21:11
**entered (6)**
7:11,25;11:2;
16:24;29:2;59:1
**entertain (1)**
19:9
**entire (3)**
8:7;47:10,15
**entirely (1)**
54:4
**entitled (2)**
17:10,16
**enured (1)**
47:24
**equity (2)**
46:24;49:4
**ESQ (1)**
4:8
**essence (1)**
36:12
**essentially (1)**
41:5
**establish (1)**
11:14
**establishing (1)**
8:1
**estimate (1)**
28:5
**estimated (3)**
48:23,24;54:20
**estimation (1)**
21:9
**estoppel (1)**
15:18
**evaluated (1)**
23:2
**even (6)**
19:9;40:4;48:6;
49:11;54:21;58:10
**evening (1)**
57:9
**evidence (14)**
6:18,19;8:24;
13:11;15:6;20:18;
51:19;52:24;54:2,3,3,

23,23;59:21
**evidentiary (4)**
5:4;6:2;17:5,9
**exactly (1)**
45:25;51:9
**examination (2)**
6:20;19:1
**examinations (1)**
9:14
**examine (1)**
17:23
**examined (1)**
9:10
**exception (1)**
11:18
**exchange (1)**
40:16
**excused (1)**
52:21
**execute (2)**
56:21;59:7
**exhausted (1)**
50:22
**Exhibit (5)**
8:16,19,20;13:13;
52:14
**exist (1)**
13:14
**expect (1)**
57:5
**expensive (1)**
57:23
**explain (2)**
18:21;29:11
**explained (1)**
37:11
**extend (1)**
20:2
**extended (1)**
20:12
**extent (2)**
13:9;53:17

**F**

**fact (3)**
28:23;39:2;46:14
**facts (4)**
6:8;8:8;45:19,20
**fair (3)**
15:18;25:16;45:20
**fairly (3)**
15:12;35:2;55:4
**faith (3)**
10:19;15:18;20:3;
25:18
**False (1)**
15:23
**fans (1)**
47:14
**far (4)**
27:1,22;34:25;
35:16

12-12020-mg    Doc 6410    Filed 02/03/14    Entered 02/03/14 10:21:46    Main Document
Pg 66 of 72

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

January 30, 2014

**fashion (1)**
53:24
**favor (1)**
43:3
**fax (1)**
32:20
**federal (2)**
36:19;46:12
**feel (4)**
17:17;20:3;28:12;
34:1
**few (2)**
13:13;40:24
**fifteen (1)**
48:8
**fifteen-minute (2)**
55:13,23
**figured (3)**
26:2;27:21;28:13
**file (3)**
6:7;7:13;8:7
**filed (6)**
5:24;7:3,8,15,18;
12:23
**finally (1)**
20:9
**financial (3)**
32:12;39:11;50:15
**find (1)**
12:17
**Fine (4)**
50:6;52:5,17;55:15
**firm (1)**
37:21
**first (6)**
6:21;12:11;31:10;
32:13;34:22;47:10
**five (4)**
15:13;37:5;43:8,20
**fixed (12)**
20:13;23:24,25;
24:1,2,9;36:24,25;
37:6,10;39:8;43:8
**fixed- (1)**
38:9
**fixed-rate (2)**
41:19;45:15
**fixtures (1)**
47:17
**floor (3)**
47:6,10,16
**focused (1)**
31:15
**Foerster (3)**
5:9;37:21;56:8
**follow (1)**
59:21
**footnote (1)**
44:25
**forbear (2)**
15:1;41:2
**forbearance (10)**
10:1,3;11:20;12:2;

14:12,22;15:1;23:16;
27:4;40:13
**forcing (1)**
42:11
**foreclosed (1)**
24:20
**foreclosure (3)**
15:2;40:17,19
**forgive (1)**
36:3
**form (5)**
16:8;32:12,14;
42:2;56:20
**formalize (1)**
56:22
**forth (6)**
5:23;14:18;20:8,8;
36:25;58:11
**forward (8)**
6:1;8:15;40:25;
41:19,22;57:22;59:9,
19
**found (1)**
6:14
**Four (2)**
50:2;54:8
**fours (1)**
50:2
**fraud (2)**
15:19;32:6
**Freddie (1)**
13:20,23;14:2,3
**free (1)**
31:24
**front (4)**
13:3;42:2,12;47:18
**full (3)**
33:11;35:24;39:3
**funds (1)**
46:9
**further (7)**
8:17;10:2;13:6;
15:2;23:15;35:14;
51:1

**G**

**gainfully (2)**
19:3,18
**garage (3)**
47:19,20;48:14
**gave (2)**
24:19;46:22
**general (1)**
42:7
**generally (1)**
36:23
**gets (1)**
57:23
**given (2)**
13:19;17:13
**giving (1)**
44:15

**glad (2)**
58:22;59:25
**GMAC (13)**
4:14;19:8;28:22;
29:9;31:4;37:23;
38:4;40:14,16;44:11;
46:13;49:9;56:12
**goes (2)**
57:14,18
**good (7)**
10:19;15:18;20:3;
25:18;28:2;37:20;
39:13
**governing (1)**
10:17
**granite (2)**
47:12,13
**grant (1)**
14:4
**granted (1)**
27:3
**gross (2)**
52:2,8
**guarantee (1)**
54:20
**guess (10)**
21:23;26:10;32:2;
36:9;37:15;41:3;
47:17;49:21,24;59:2
**guidelines (10)**
9:22;10:17;12:7,7,
8,13,22;14:3,7,9

**H**

**half (1)**
37:3
**HAMP (5)**
10:10;36:15,16,21,
23
**H-A-M-P (1)**
36:20
**hand (4)**
18:9,11;46:4;58:12
**handful (1)**
11:8
**handwritten (1)**
58:10
**hang (1)**
16:10
**happen (2)**
54:12;59:4
**happened (4)**
20:4;24:7;46:21,21
**happening (1)**
36:13
**happens (1)**
18:17
**happy (1)**
36:9
**harass (2)**
29:10,16
**harassment (2)**

31:5,6
**hard (1)**
17:14
**headed (1)**
8:21
**heard (2)**
31:11;44:5
**hearing (18)**
5:4;6:1,2;8:3;
15:24;16:3,5;17:6,14,
21;30:23;31:1,13;
34:13;54:11,13,16;
55:16
**hearsay (6)**
9:3;11:11;13:10;
34:24;53:10;54:5
**help (3)**
20:5;29:1;58:20
**helped (1)**
36:11
**Here's (5)**
15:8;22:6,21;
24:24;58:8
**hired (1)**
20:5
**history (3)**
9:15;28:2;32:14
**home (23)**
27:5,22,25;28:1,9;
33:20;35:18;36:19;
46:5,6,10,20,24;47:1,
22,23,24;48:1,7,21;
57:7,14,18
**homes (2)**
24:16;34:1
**honest (1)**
31:20
**Honor (31)**
5:8,10,22;6:17;
10:25;12:5,15;13:1,
21,24;14:2,5,14,25;
15:7,16;37:17;41:17;
50:4,25;52:17;53:6,
7;54:6;55:22;56:7,
15;57:24;58:3,19;
59:22
**Honor's (2)**
56:9;59:17
**hope (1)**
48:2
**hopefully (1)**
47:24
**HORST (15)**
4:13;6:15,25;8:16,
19,25;11:12;12:1;
13:2;14:12;18:3;
44:7;51:13;53:7;54:9
**Horst's (6)**
6:14;11:5;40:13;
41:25;42:13;45:2
**hou (1)**
31:22
**house (12)**

23:6;28:5,8,10,22,
24;29:1,9;33:23;
47:15,18;49:5
**huddle (1)**
54:18
**husband (13)**
21:10,20,21;23:3;
25:17;28:4;32:16;
33:3,21;34:17;45:13;
47:12;56:20
**husband's (1)**
19:4
**hypothetical (1)**
45:20

**I**

**identified (1)**
55:10
**illegal (1)**
46:9
**implied (1)**
15:18
**important (1)**
18:16
**improvements (1)**
47:7
**include (3)**
32:1;45:19,20
**included (1)**
9:14
**including (2)**
17:8;54:9
**income (16)**
19:7,24;20:22;
21:1,17,17,19,23;
25:15;35:24;36:13;
52:2,8,9,10,11
**increase (2)**
21:4;37:10
**increasing (1)**
39:1
**increment (1)**
43:17
**increments (1)**
37:3
**indicated (1)**
7:11;12:17
**individual (1)**
44:4
**inform (1)**
46:3
**informed (1)**
19:8
**initial (4)**
5:25;32:1,2;43:11
**initially (3)**
16:7;43:1,2
**initials (1)**
36:20
**injury (1)**
32:6
**inquire (1)**

22:22
**insist (1)**
    58:9
**insisting (1)**
    58:14
**instance (2)**
    11:20;50:18
**interest (7)**
    36:23;38:23,23;
    39:3,21;43:8,9
**interest-only (2)**
    39:8;45:14
**internal (1)**
    9:15
**into (5)**
    6:19;19:6;29:2;
    51:19;59:1
**introduce (3)**
    5:15;51:19,19
**invested (1)**
    28:1
**investor (6)**
    9:22;12:6,7,8,12,22
**involved (1)**
    44:9
**issue (4)**
    6:6,24;31:2;55:5
**issues (2)**
    7:13,20
**itemization (4)**
    17:16;28:6;47:4;
    55:3
**itemized (1)**
    17:11
**itemizes (1)**
    47:4

**J**

**January (1)**
    26:11
**Jericho (2)**
    4:4,6
**Jordan (3)**
    5:8;37:20;56:7
**jotted (1)**
    28:7
**Judge (1)**
    60:3

**K**

**KATHY (1)**
    4:14
**KCC (1)**
    59:7
**keep (4)**
    41:6,13;42:11;
    59:19
**keeps (1)**
    29:16
**kept (2)**
    19:10,25

**kind (3)**
    22:3;28:7;32:4
**kitchen (1)**
    47:15
**knew (7)**
    21:12,13,13,17,20,
    22;28:1
**knowing (2)**
    19:7;35:24
**knowledge (2)**
    13:19;49:9
**knows (1)**
    58:16

**L**

**landscaping (2)**
    47:11;48:14
**large (3)**
    20:14;21:3;45:8
**last (6)**
    5:19;24:8;28:20;
    44:24;48:5,8
**late (1)**
    27:13
**later (1)**
    6:3
**latest (1)**
    57:6
**law (11)**
    6:9;8:9,17;15:12,
    14,15,24;29:15,19;
    36:23;37:21
**lawyer (4)**
    6:22;16:19;32:4,25
**lawyers (2)**
    54:8,8
**leads (1)**
    23:2
**least (2)**
    20:19;55:9
**leave (3)**
    58:9,16;59:12
**leaves (1)**
    58:12
**left (1)**
    46:4
**legal (3)**
    17:8;19:20;35:16
**legitimate (1)**
    27:3
**legwork (1)**
    50:21
**lender (3)**
    14:3,7;49:9
**lenders (1)**
    49:7
**length (1)**
    11:6
**less (4)**
    10:13;39:3;40:4;
    43:20
**letters (2)**

9:18,19
**liabilities (1)**
    38:5
**Liability (2)**
    9:1;10:15
**lie (1)**
    34:20
**lied (1)**
    34:12
**light (1)**
    47:17
**lighting (1)**
    47:18
**lights (1)**
    47:14
**likely (1)**
    39:20
**limited (1)**
    43:22
**line (1)**
    44:24
**Liquidating (1)**
    6:16
**litigation (1)**
    32:7
**little (5)**
    18:14;20:3;24:25;
    36:8;42:15
**LLP (1)**
    4:2
**loan (81)**
    6:6,9,11;7:7,10,14,
    21;8:10,11,21;9:7,12,
    16,17,18,18,19,22;
    10:18,19;11:4,9;
    12:12,13,18,20,21,
    22;13:11,17,20,25;
    14:1,4,7,10;19:6,9;
    20:2,10,12,13;21:3,5,
    7,24;22:8,13;23:22,
    23;24:12;25:1,4;
    26:25,25;27:3;31:15;
    34:8,10;36:4,11;37:8,
    9;38:8,10,10,13,17,
    22;39:2,8,9,21;41:7,
    19;43:8,17;45:15,15;
    50:16;51:23
**loans (2)**
    48:11;49:10
**long (5)**
    15:2;39:13;45:16;
    49:12;57:3
**look (9)**
    11:1;12:10;18:8;
    33:2;43:25;44:2;
    53:21;55:19;57:20
**looked (2)**
    32:11;33:25
**looking (3)**
    46:8;54:10;55:8
**lose (3)**
    27:22;31:21,22
**losing (1)**

27:25
**loss (3)**
    21:20;23:6;47:1
**losses (1)**
    29:3
**lost (4)**
    23:8;24:16;31:22;
    46:20
**lot (7)**
    14:7,7;28:4;47:10;
    48:13,13;49:3
**lots (1)**
    26:24
**louder (1)**
    42:15
**loudly (1)**
    42:12
**low (4)**
    23:17;37:2,9;50:2
**lower (1)**
    36:12

**M**

**Mac (4)**
    13:20,23;14:2,3
**mail (2)**
    43:21;57:16
**maintained (2)**
    10:22;11:22
**makes (1)**
    17:14
**making (11)**
    15:4;19:10;21:6,
    10,11,15;27:14,16;
    33:8;40:15;46:13
**many (3)**
    24:15;29:9;49:11
**map (1)**
    7:19
**MARGE (5)**
    4:12;5:6,16;8:3;
    10:7
**mark (1)**
    51:24
**marked (2)**
    52:4,14
**market (1)**
    29:4
**master (1)**
    47:16
**material (1)**
    58:11
**matter (13)**
    6:18;12:11;28:23;
    30:23;53:22;54:25;
    55:14;56:24;57:1;
    58:23,24;59:1,1
**matters (1)**
    55:8
**may (8)**
    6:18;11:13;14:6;
    16:16;17:21;31:8;

51:12;53:17
**Maybe (11)**
    23:12,12;40:4;
    44:17;48:5,6;49:22;
    51:25;52:1;54:16;
    56:24
**mean (12)**
    14:7;22:10;25:4;
    28:2;29:11;36:3;
    40:20;41:7;53:14;
    54:12;57:15;59:3
**Meaning (1)**
    43:19
**means (5)**
    16:8;20:14;34:12;
    41:3;52:24
**memorandum (5)**
    6:13;8:17,19,20;
    15:12
**memory (2)**
    26:23;43:10
**mention (1)**
    56:11
**mentioned (3)**
    25:14;27:4;38:9
**merits (2)**
    53:23;55:1
**meter (1)**
    54:10
**microphone (3)**
    18:14;42:10,11
**middle (3)**
    29:15,23;35:16
**midst (1)**
    55:6
**midway (1)**
    40:3
**might (9)**
    24:3,4;29:1;32:22;
    33:14;38:13;39:2,5;
    54:22
**mind (1)**
    59:19
**minute (2)**
    50:4;51:12
**misled (1)**
    34:13
**misrepresentation (1)**
    15:20
**mistake (2)**
    27:24;31:19
**misunderstanding (1)**
    58:1
**mod (1)**
    20:11
**modest (1)**
    55:10
**modification (56)**
    6:6,9,11;7:7,10,14;
    8:10,12,21;9:12,17,
    18,18,23;10:10,18,
    20;11:4,9;12:12,21,
    23;14:1,4,10;19:7,10;

20:6,10,16;21:3,8,24;
22:8,13;24:12;25:1,
5;26:25;27:3;31:15;
34:8,11;36:4,5,10,11,
15,20;37:1,9;41:18;
50:8,9,16;51:23
**modifications (8)**
7:21;9:7,19;11:21;
13:11;21:12;27:1;
41:4
**moment (1)**
42:18
**Monday (1)**
57:6
**money (5)**
20:15;24:20;35:15;
45:9;46:2
**Monica (1)**
50:14
**month (4)**
20:12;21:15;22:1;
36:13
**monthly (7)**
15:3;23:16,20;
25:5;39:23;40:15;
41:6
**months (1)**
19:23
**month-to-month (1)**
39:1
**more (10)**
10:11,13;13:16;
14:9;22:1;27:13;
44:2;47:18;54:21;
55:11
**Morrison (3)**
5:9;37:21;56:8
**mortgage (14)**
19:5;21:15;27:9;
30:12;37:23;38:4,20;
39:9;40:14,16;46:13,
23;49:9;56:12
**most (5)**
9:3;23:8;43:15;
47:21;48:12
**mostly (1)**
32:6
**moved (2)**
23:6;37:3
**Mrs (1)**
15:2
**much (13)**
13:16;19:11;30:11;
33:19;36:14;38:2;
43:22;45:3,6;48:19;
50:1;53:1;59:24
**Murrieta (1)**
28:11
**must (1)**
8:7
**mystery (1)**
59:23

## N

**name (2)**
5:19;37:20
**namely (1)**
16:25
**names (1)**
5:15
**narrative (1)**
16:7
**necessary (1)**
59:8
**need (2)**
18:9;44:16
**needed (6)**
17:19;31:18;32:1;
44:2;46:3,4
**needs (1)**
20:16
**negative (3)**
41:6,8,14
**net (2)**
30:17,18
**New (2)**
31:23;54:17
**next (1)**
17:6
**nice (1)**
15:5
**nine (5)**
20:15,16;24:14;
45:7,8
**none (1)**
54:24
**NOSEK (2)**
4:8;54:9
**Nosek's (1)**
7:17
**note (2)**
11:25;59:16
**noted (1)**
5:10
**notes (17)**
9:16;10:21,22;
11:11,19,24;12:4,9;
13:3,4,6;14:11,18,20;
18:7;50:5;53:18
**notice (3)**
27:4;40:21,22
**notices (1)**
27:7
**noticing (1)**
59:8
**notwithstanding (1)**
46:14
**no-win (1)**
28:13
**number (8)**
5:3;6:15;7:8,10;
8:2,5,23;11:8
**numbers (2)**
21:9,25

**NY (1)**
4:6

## O

**oath (2)**
18:21;51:15
**object (1)**
52:1
**objection (13)**
5:5,11,24;7:4,5,6;
9:1;22:4;41:15;
42:20;45:17;53:10;
56:5
**objections (1)**
8:18
**observations (2)**
53:21;54:7
**obtained (1)**
38:10
**obviously (6)**
6:21;7:3;13:14;
15:20;32:16;34:14
**occasion (1)**
14:10
**occasions (1)**
50:9
**October (4)**
6:2,3;8:1;17:1
**off (1)**
19:4
**offer (11)**
6:25;13:8;25:13,
17;26:3;39:7;7;41:5;
50:18;53:6,7
**offered (18)**
8:24;9:7;10:1;
14:15,18;20:9;26:11;
34:10;36:4,18;37:1;
41:5,10,13,13;54:23,
23,24
**offering (2)**
19:25;41:18
**offers (3)**
29:9;46:6;50:9
**officer (1)**
6:15
**old (1)**
33:18
**omnibus (9)**
5:5,11,24;7:3,5,5;
8:18;9:1;22:4
**once (2)**
43:8;59:6
**One (17)**
7:11;8:2,14;12:19;
14:9;23:13;24:8;
26:11;27:2;28:20;
32:15;35:19;38:5;
40:22;47:7;50:4;
54:12
**ones (1)**
17:18

**one's (1)**
16:20
**ongoing (2)**
45:23;48:6
**online (1)**
34:1
**only (7)**
8:2,14;17:18;18:3;
22:21;29:2;39:21
**opinion (2)**
20:10;21:13
**opportunity (2)**
15:9;53:19
**options (1)**
22:9
**oral (2)**
10:3;14:13
**orally (1)**
14:15
**order (12)**
6:3;7:11,25;8:5;
11:2,16;16:24,25;
17:1;53:23;54:1,13
**ordered (2)**
12:24;16:5
**ordinarily (3)**
31:9;34:12;57:25
**ordinary (2)**
11:21;46:13
**originally (3)**
5:10,24;39:25
**originated (2)**
12:13;39:6
**Ortiz (2)**
50:13,14
**others (1)**
13:15
**ought (2)**
18:22;54:18
**ours (1)**
29:24
**out (14)**
10:24;11:19;26:16;
27:21;35:1;39:2;
40:1,12;43:16;47:4;
48:16;49:4;56:1;60:1
**outcome (2)**
54:17;59:14
**outlined (1)**
21:4
**outstanding (1)**
49:20
**over (9)**
8:6;18:10;27:24;
48:5,8,21;49:15,16;
50:22
**overall (1)**
47:24
**overdid (1)**
47:19
**overhauled (1)**
47:19
**overhead (1)**

**47:14**
**overnight (1)**
43:21
**owed (1)**
29:14
**own (2)**
41:15;53:9
**owned (1)**
14:1
**owning (1)**
33:19
**owns (2)**
13:16,20

## P

**page (10)**
8:6;9:24,25;10:6,8,
11;22:7;23:15;32:14;
33:3
**pages (2)**
8:4,23
**paid (2)**
19:5;35:17
**paper (3)**
58:10,12;59:12
**papers (3)**
18:6;32:11;37:1
**paragraph (15)**
8:5,7;9:4,24;10:3,
8,9,10,13;17:1;42:13,
23,24;43:3;44:23
**part (7)**
7:9;10:14;15:11;
31:19;33:16;35:18;
41:21
**partial (1)**
27:14
**participated (1)**
30:24
**particular (3)**
9:5;44:4,6
**particularly (2)**
7:17,19
**parties (5)**
7:20;37:23;54:25;
55:7;58:2
**Paul (4)**
5:6;8:3;10:7;32:17
**pay (9)**
19:23;21:19;29:13,
13,13,13;54:15;
55:12,20
**paying (10)**
27:9,18;38:22,24;
39:3,20,20;40:4,15;
55:2
**payment (17)**
9:15,21;15:3;20:4,
11;21:11,15;22:9;
23:16,20;36:12;
39:23;40:1;41:6,13;
46:2;49:12

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

January 30, 2014

**payment-option (2)**
38:13,16
**payments (16)**
19:5,10,13;20:2,20,
25;25:5;27:14,15,16;
28:3,3;29:13,23;
40:15;49:16
**payoff (1)**
38:25
**people (4)**
11:14;24:15,18;
44:11
**percent (4)**
37:3,5;43:8,12
**period (4)**
33:1;48:9;49:16;
50:22
**permanent (1)**
9:20
**permit (3)**
16:7;18:8;52:13
**person (1)**
27:2
**personal (1)**
32:6
**PFUNDER (52)**
4:12;5:6,16,16,19,
25;6:17,22,23;7:22,
24;8:3,21;10:7,16;
14:23;15:3,9,12;16:3,
9,11,14;17:25;18:5;
19:2;32:17;37:20;
42:13,21;45:13;50:7;
53:25;54:15,19;55:1,
18;56:10,20,23;57:2,
6,8,9;58:3,4,5,10,15,
20,21;59:24
**Pfunder's (1)**
10:19
**Pfunders (9)**
5:14;8:15;10:12;
12:21;13:25;14:10,
22;15:23;59:14
**Pfunder's (7)**
5:23;6:8;11:9;
15:10;52:18;55:9;
56:5
**ph (1)**
5:19
**phone (5)**
29:21;31:2;44:1,
16;50:19
**pick (2)**
44:1,16
**picking (1)**
17:18
**piece (3)**
58:10,12;59:12
**place (2)**
6:3;16:5
**plan (8)**
10:5;11:20;12:2;
14:22;15:1;37:24;

40:14;56:16
**plans (3)**
9:21;10:1,3
**planting (1)**
47:12
**play (1)**
34:5
**pleadings (2)**
6:5;8:13
**Please (3)**
5:2;18:13;56:3
**pm (3)**
56:2,2;60:4
**point (21)**
13:18;18:4;19:12;
21:6,23;22:21;23:5;
27:8;32:24;33:19;
39:20,24;41:18;
42:10;43:16;47:3,23;
49:3,15;51:25;54:11
**points (1)**
59:18
**policies (1)**
10:17
**poor (1)**
33:24
**position (6)**
13:1;14:23;17:7;
31:5;32:9,10
**positive (1)**
39:22
**possession (3)**
6:10;8:11;11:3
**possibility (1)**
33:19
**possible (1)**
39:22
**possibly (3)**
21:7,10,14
**potentially (1)**
15:13
**prefer (2)**
56:11;58:5
**preference (1)**
54:24
**prepare (1)**
57:4
**prepared (4)**
11:13;18:17;53:22;
57:25
**preparing (1)**
15:24
**present (1)**
21:8
**presented (2)**
34:25;36:10
**presenting (1)**
36:10
**pretty (8)**
19:11;20:10;37:2;
38:2;44:19;46:18;
53:1;54:1
**previously (1)**

38:9
**price (1)**
46:24
**principal (3)**
38:23;46:23;49:20
**printed (2)**
10:24;11:19
**prior (3)**
15:3;21:16;24:8
**PRIORE (1)**
4:14
**Pro (4)**
4:12;7:20;39:5;
53:25
**probably (7)**
12:9;23:21;41:21;
43:15;44:19;48:5,21
**problem (2)**
9:3;25:13
**proc (1)**
48:6
**procedure (1)**
40:19
**procedures (5)**
6:2;8:1,5;16:23;
53:23
**proceed (4)**
16:2;17:20;50:23;
55:20
**proceeding (3)**
7:1;13:10;57:22
**proceedings (3)**
15:2;17:11;60:4
**proceeds (1)**
30:20
**process (7)**
10:18;19:19;20:7;
28:12;46:2,15;50:20
**produce (2)**
54:13;55:17
**produced (3)**
54:14,15;55:18
**Professions (1)**
15:22
**profit (1)**
21:20
**program (3)**
36:19,20;37:9
**promissory (1)**
15:17
**promptly (1)**
10:18
**Proof (8)**
8:22;31:6,10,14,14,
18;32:1;56:5
**property (2)**
27:19;40:17
**proposal (3)**
22:13,23;23:2
**proposed (1)**
58:11
**prove (1)**
23:13

**provide (10)**
11:17;15:9;16:25;
17:2,8;19:23;27:23;
36:23;55:18,18
**provided (10)**
7:19;11:7,7,16,16;
12:24;17:4,19,19;
35:25
**provides (2)**
7:19;59:13
**providing (2)**
28:6;56:19
**public (1)**
51:25
**Pull (2)**
18:13,14
**pure (1)**
9:3
**pursue (1)**
40:17
**pursuing (1)**
40:23
**put (17)**
5:25;6:3,5,13,19;
12:1,20;31:9;42:2;
52:24,25;55:3;58:1,5,
14,15,23
**putting (1)**
47:20

**Q**

**Quadrangle (1)**
4:4
**qualified (1)**
21:2
**qualify (8)**
20:20;21:1,6,7,14,
15;34:16,24
**quantified (1)**
47:2
**quick (1)**
35:2
**Quicken (12)**
12:14,17;13:19,22;
38:9,11,22;39:2,7,15,
16;48:11
**quickly (2)**
57:23;59:13
**quite (3)**
13:24;54:17;55:10

**R**

**raise (4)**
18:9,11;31:7,8
**raised (2)**
30:22;31:1
**raises (1)**
15:13
**rate (2)**
21:5;36:24;37:2,9;
38:10;43:8,12

**rates (1)**
37:9
**rather (1)**
51:24
**reach (1)**
58:23
**reached (3)**
40:12;43:8;56:10
**read (12)**
8:6;12:17;15:12;
19:20;24:25;31:11;
42:13,18,21,22;43:1,
3
**reading (1)**
26:13
**reads (1)**
9:5
**ready (1)**
55:2
**real (1)**
35:23
**really (12)**
19:14;24:21;27:2;
31:20;36:12;38:15;
44:20;46:1;50:19;
51:5,22;54:3
**reason (6)**
9:13;18:22;21:24;
41:12,24;42:19
**reasonable (1)**
36:11
**reasons (1)**
17:9
**rec (1)**
58:14
**recall (7)**
38:10,25;39:4,23;
40:23;41:5;43:9
**recalling (1)**
13:3
**receive (1)**
45:22
**received (5)**
7:22;8:13;30:3;
31:2;45:23
**recently (2)**
23:6;37:24
**recess (3)**
55:13,23;56:2
**recognize (1)**
46:11
**recognizing (1)**
53:24
**recollecting (1)**
35:12
**recollection (2)**
41:23;45:5
**record (11)**
18:17;51:25;53:18;
54:22;56:4,12;58:1,6,
15;59:10,16
**Records (10)**
9:2,11;10:8,15;

11:7,12,15,15,16;
54:14
**recover (3)**
16:22;17:17;18:23
**recoverable (1)**
55:5
**redone (1)**
47:10
**reduce (1)**
20:2
**reduced (3)**
20:11,11;36:23
**refer (4)**
9:4;10:11;22:3,3
**reference (1)**
8:4
**referenced (1)**
11:20
**references (1)**
13:15
**referred (3)**
16:24;31:4;36:21
**referring (2)**
33:8,13
**refers (5)**
9:25;10:8,9;12:6;
13:12
**refi'd (1)**
39:6
**refinance (5)**
39:15;40:8;48:17,
23;49:25
**refinanced (3)**
38:15;48:16;49:19
**refinances (1)**
39:25
**refinancing (2)**
24:7;48:11
**reflect (1)**
10:9
**regards (8)**
5:23;13:5;41:4;
45:22;46:19,21;
56:19;59:17
**register (2)**
59:5,9
**relate (3)**
6:9;8:9;11:8
**related (2)**
7:6;15:22
**relating (6)**
6:11;8:11,14;9:7,
22;11:4
**relevant (1)**
9:21;13:10;14:8
**rely (2)**
11:13;15:11
**relying (1)**
11:13
**remember (13)**
19:14;23:12,17,19;
27:11;37:11;38:15;
39:16;40:18;43:11;

44:22;45:8;48:19
**remodel (1)**
47:15
**renting (1)**
33:21
**reporter (1)**
16:13
**representatives (1)**
10:2
**request (6)**
6:11;8:12;11:4,9;
22:9;34:7
**requested (1)**
22:7
**requesting (1)**
41:20
**requests (5)**
9:23;10:10,20;
12:21,23
**require (3)**
54:15;55:16;56:13
**required (4)**
10:4;11:2;17:1;
46:13
**requiring (2)**
6:3;7:11
**ResCap (8)**
4:14;5:9;6:16;7:8;
16:24;28:21;37:22;
56:8
**research (1)**
46:17
**Residential (4)**
4:13;5:3;56:4
**resolution (5)**
56:10,24,25;58:11,
23
**resolve (5)**
54:25;55:1,7,14;
56:16
**resolved (2)**
57:13;59:13
**resolving (1)**
59:1
**respect (8)**
5:5;8:3,15;10:11,
15,19;17:7;59:2
**respective (2)**
6:5;9:9
**respond (1)**
44:15
**respondent (1)**
17:9
**respondent's (2)**
17:7,12
**respondents (3)**
6:12;8:12;11:5
**respondents' (1)**
8:9
**response (4)**
5:25;6:3;11:17;
44:21
**responses (1)**

9:9
**rest (1)**
52:23
**result (1)**
31:16
**resumption (1)**
54:16
**retirement (1)**
28:9
**retribution (2)**
49:4,6
**return (1)**
43:17
**returns (3)**
51:21,24;52:4
**review (2)**
9:14;10:14
**reviewed (3)**
9:17,21;26:10
**reviewing (1)**
13:4
**RFC (1)**
12:18
**ridiculous (1)**
26:4
**right (40)**
5:18;18:5,9,11,25;
23:14;24:17;25:12;
26:4,8;30:11,24;
32:5;34:19;35:20,22;
37:13;38:3,21;39:12;
41:17;46:4,9;47:23;
48:3;49:14,14;52:19,
19,21;53:2;55:25;
56:3,23;57:3;58:22;
59:11,15,25;60:2
**risk (1)**
28:2
**road (1)**
7:19
**ROBERT (1)**
4:8
**Rules (4)**
54:2,2,3;59:21
**run (3)**
39:13;45:16;53:16

## S

**salary (1)**
20:21
**sale (23)**
28:13,17;29:2,9,15,
23;30:4,17,20;31:7,
16;35:16,17;39:20;
40:24,25;41:2;45:23;
46:1,1,5,14,23
**same (2)**
41:6,14
**satisfactorily (1)**
60:1
**satisfactory (1)**
58:18

**satisfied (1)**
56:23
**save (1)**
29:6
**saying (7)**
22:7,14,24;23:16;
26:21;35:20;41:10
**scheduled (1)**
57:7
**Se (3)**
4:12;7:20;53:25
**search (1)**
55:17
**seat (2)**
18:13,13
**seated (2)**
5:2;56:3
**second (4)**
8:4,24;16:10;33:3
**secretary (1)**
19:20
**secur (1)**
12:19
**securities (1)**
32:6
**securitization (1)**
12:20
**seeing (2)**
21:25;31:19
**seek (1)**
7:10
**seem (1)**
39:19
**seems (3)**
14:21;15:10;31:10
**self-contractor (1)**
32:17
**sell (6)**
12:18,18;28:18,22,
24;29:1
**selling (1)**
46:10
**Semnatory (1)**
5:19
**sending (1)**
41:21
**separate (3)**
15:20;47:2;50:9
**serve (2)**
6:7;8:7
**service (1)**
10:1
**servicer (2)**
49:9,10
**servicing (17)**
9:15;10:8,21,22;
11:11,18,23,25;12:4,
9;13:3,4,5;14:11,18,
20;53:18
**set (4)**
14:18;17:5;26:16;
36:25
**sets (1)**

58:11
**settlement (3)**
55:6;56:13;58:17
**seven (1)**
45:7
**several (1)**
54:12
**short (18)**
28:13,17;29:2,8,15,
23;30:4;31:7,16;
35:16,17;39:20;
44:16;45:23;46:1,1,5,
14
**show (3)**
20:18;21:17;58:13
**showing (1)**
51:21
**shows (1)**
33:5
**sic (1)**
22:1
**signature (1)**
10:4
**signatures (1)**
33:4
**signed (3)**
33:3,4;57:4
**SILVERMAN (3)**
4:2;6:4;7:16
**similar (1)**
56:21
**sinks (2)**
47:12,16
**sit (1)**
18:10
**sitting (1)**
5:14
**situation (1)**
28:14
**sixty-one (1)**
33:18
**small (1)**
11:8
**sold (7)**
12:18;29:24;30:12,
16,21;46:5;49:11
**solid (1)**
19:6
**someone (6)**
20:5,15;32:5;
35:17;40:9;50:14
**Sometimes (3)**
43:20,20;49:11
**soon (2)**
52:3,13
**sorry (5)**
13:20;32:19;46:19;
47:17;50:7,8
**sort (2)**
31:9;51:25
**sought (2)**
13:25;14:10
**speak (2)**

42:12,15
**Special (3)**
4:3;7:12;15:11
**specific (4)**
22:23;46:12,16;
55:4
**specifically (7)**
5:5;10:6,11;39:16;
40:18;42:3;46:8
**spend (1)**
55:11
**spin (1)**
54:10
**stairs (1)**
47:20
**stalling (1)**
26:25
**standing (1)**
18:9
**standpoint (1)**
58:8
**start (1)**
37:9
**started (7)**
19:16,19;28:19,22;
31:19;37:2;40:1
**state (2)**
20:19;24:13
**stated (1)**
42:19
**statement (8)**
14:23;15:6;17:6,8,
11;30:22;31:5;32:9
**statements (3)**
19:24;21:18;42:23
**statute (3)**
46:12,12,16
**stay (1)**
42:9
**step (1)**
37:1
**steps (2)**
9:11;36:24
**still (6)**
13:19;19:18;20:7;
24:20;27:7;28:3
**stipulation (6)**
56:20,22;57:4,6;
58:25;59:7
**stop (5)**
27:5;29:18;41:6,
14;46:13
**stopped (6)**
19:13;27:9;29:21,
22;40:19;46:10
**streamlined (1)**
53:24
**Strike (1)**
50:25
**stubs (2)**
19:24;21:19
**subject (3)**
5:11;6:17,19

**submit (1)**
59:19
**subparagraph (1)**
17:6
**subsequently (1)**
58:13
**substantiate (1)**
53:19
**substitute (1)**
57:16
**successor-in-interest (1)**
37:23
**suffered (1)**
31:16
**Suite (1)**
4:5
**sum (2)**
20:14;45:8
**Sunday (1)**
57:9
**supervision (1)**
9:10
**supplement (2)**
13:6;53:18
**supplemental (8)**
6:7,25;8:8,16,24;
9:6;11:5;12:2
**support (5)**
8:17,25;15:10;
16:16;17:3
**supporting (1)**
6:14
**supposed (7)**
11:2;27:1;29:16,
17;36:12;45:18;54:2
**sure (17)**
13:24;20:16;25:25;
27:20;32:23;34:4;
35:4,6,10,11;36:19;
38:24;41:11;42:16;
44:19;54:22;59:12
**sustain (3)**
41:15;42:20;45:17
**sustained (1)**
53:9
**sworn (3)**
15:9;16:12;18:12
**Syracuse (3)**
33:23,24,25

**T**

**tactics (1)**
26:25
**talk (1)**
44:11
**talking (1)**
38:14
**talks (1)**
11:5
**tax (4)**
21:19;51:21,24;
52:4

**taxes (4)**
19:24;21:17;27:18;
35:24
**team (1)**
9:17
**telephone (3)**
30:24;31:13;34:23
**TELEPHONICALLY (1)**
4:14
**telling (1)**
11:23
**Temecula (1)**
28:11
**ten (4)**
20:12;38:14;48:5,8
**term (1)**
20:14
**terms (8)**
12:2;14:18;21:4;
25:5;34:16;57:25;
58:11,17
**testify (3)**
16:6,7;17:24
**testimony (5)**
15:9;17:21;46:22;
53:6;55:9
**Thanks (1)**
5:20
**theories (1)**
16:1
**theory (1)**
49:5
**there'd (1)**
58:1
**thinking (4)**
23:11;27:12;29:2;
45:7
**third (1)**
8:4
**thirtieth (6)**
5:4,11;7:5;8:18;
9:1;22:4
**thirty (2)**
33:12;36:24
**thirty-three (1)**
33:12
**Thirty-year (1)**
24:2
**though (1)**
53:13
**thought (5)**
22:14;24:4;31:21,
25;34:3
**thousand (5)**
20:15,17;24:14;
33:13;45:7
**three (4)**
19:23;37:2;51:20;
54:8
**throughout (2)**
33:1;47:14
**tile (1)**
47:6

**tiles (1)**
47:10
**times (7)**
10:18;14:9;21:16;
29:10;40:24;44:19;
49:11
**tiny (1)**
43:17
**today (11)**
6:16;8:3,15;13:7;
15:8;16:6;44:5;54:9;
55:15;58:9;59:12
**together (1)**
15:19
**toilets (1)**
47:16
**told (13)**
12:11;20:20;21:2;
28:23;29:19,23;
32:10;34:7,15,21;
38:1;46:6,8
**tomorrow (2)**
57:6,11
**took (3)**
9:11;32:10;39:1
**total (3)**
52:9,10,10
**toward (1)**
18:14
**tradition (1)**
50:8
**traditional (8)**
10:9;11:20;22:8;
24:12;25:1;26:11;
36:18;50:8
**transcript (1)**
18:17
**transferred (1)**
13:22
**travel (1)**
54:16
**treat (1)**
15:19
**trees (1)**
47:12
**trial (1)**
9:19
**tried (3)**
15:24;19:6;53:24
**trip (1)**
31:23
**trouble (1)**
36:8
**true (1)**
27:6
**truly (1)**
46:19
**Trust (8)**
5:9;6:16;12:20;
24:21;37:22;38:6;
56:8,16
**Trustee (2)**
4:3;40:24

**trusts (1)**
38:5
**Trust's (1)**
58:7
**Truthfully (1)**
31:17
**try (6)**
20:5;51:13;55:7,
14,25;57:10
**trying (5)**
22:22;26:22;29:6;
35:15;51:22
**twenty (6)**
19:5,6;20:11;28:2,
3;36:13
**twenty-second (1)**
7:3
**twenty-seventh (1)**
7:4
**twenty-three (1)**
48:7
**twenty-year (1)**
49:16
**two (10)**
17:2;20:22;21:15,
16;24:15,18;27:1;
38:5;44:17;50:9
**type (1)**
38:10

**U**

**ultimate (1)**
21:23
**ultimately (2)**
26:22;36:25
**Um-hum (11)**
22:25;31:3,17;
34:9;37:4,7;40:2;
45:1,24;49:17;57:21
**uncertain (1)**
54:18
**unclear (1)**
24:25
**under (12)**
9:10;15:13,23,25;
18:21;23:20;29:15;
32:14;33:5;51:15;
56:16;59:18
**Understood (3)**
15:7;55:22;57:24
**unfair (1)**
15:21
**unfortunately (1)**
31:24
**unhappy (1)**
36:3,4
**unless (1)**
33:22
**unrealistic (1)**
34:11
**unsecured (1)**
56:11

**up (18)**
 16:9,9,12;18:6,8;
 19:5;21:10;22:2;
 32:23;36:24;37:2,3;
 39:19,19;40:24;42:9;
 44:1,16
**upgrades (6)**
 28:4;47:20,22,23;
 48:4,10
**upon (2)**
 13:3;46:22
**upside (1)**
 46:25
**use (1)**
 17:3
**useful (1)**
 7:19

## V

**Valley (1)**
 28:12
**value (2)**
 47:24;48:1
**variable (4)**
 21:5;23:22;24:6,8
**variable-rate (1)**
 23:23
**verbal (3)**
 30:3;34:24,25
**verify (1)**
 9:11
**versus (1)**
 39:8
**view (1)**
 26:9
**Vincent (1)**
 5:17
**virtually (1)**
 54:4

## W

**Wait (2)**
 12:1;51:14
**wants (2)**
 16:17;52:12
**way (6)**
 16:2;20:2;23:13;
 27:21;29:3;35:25
**week (1)**
 44:17
**weeks (1)**
 44:17
**weren't (3)**
 27:16;32:10;54:14
**what's (10)**
 11:6,12,17;14:8;
 17:15;32:19;34:20;
 42:19,24;53:19
**Whereupon (1)**
 60:4
**whole (4)**

 7:9;22:11;43:1,3
**who's (1)**
 17:24
**willing (1)**
 25:4
**Wishnew (72)**
 5:7,8,8,21,22;8:13;
 10:22,25;11:18,25;
 12:5,8,15;13:1,18,24;
 14:2,5,14,16,19,25;
 15:7,16;16:17;17:17,
 22;18:1,3;37:16,17,
 19,20;41:17;42:5,16;
 45:12,19;50:4,25;
 51:12;52:1,3,5,12,17;
 53:5,6,12,14,16;54:6;
 55:22,24;56:6,7,7,15,
 19;57:5,12,15,19,21,
 24;58:9,18,19;59:4,
 16,22;60:3
**Wishnew's (1)**
 34:4
**without (1)**
 52:2
**witness (136)**
 16:9;18:12,15,19,
 24;19:3,16,18,22;
 20:24;21:22;22:6,15,
 17,19,25;23:5,8,10,
 15,21,24;24:1,3,6,18,
 23;25:2,6,8,11,13,18,
 20,22,24;26:2,4,6,8,
 10,14,17,19,21,24;
 27:10,12,16,20;
 28:11,17,19,23;29:5,
 8,12;30:5,8,10,13,16,
 19,21,25;31:3,17,25;
 32:5,19,22;33:7,11,
 16,18,22,25;34:9,19,
 22;35:4,6,8,11,14,22;
 36:7,9,17,22;37:4,7,
 11,15;38:2,18,20;
 39:16;40:9;43:1,5,7,
 13,15,20,24;44:4,8,
 10,13,18;45:1,4,6,11,
 21;47:9;48:5,18,20;
 49:21,24;50:2;51:1,4,
 6,9,17,20;52:6,9,15,
 22;53:1,3,15
**witnesses (2)**
 18:2;53:5
**word (2)**
 44:24;52:18
**work (10)**
 32:4,22;35:1;47:6,
 11,11;48:14,14;56:1;
 60:1
**worked (2)**
 33:11;56:9
**working (9)**
 32:5,11,22;33:1,
 15;34:23;50:12,13,20
**worth (1)**

 48:21
**writing (3)**
 14:6;25:3;30:7
**written (2)**
 30:3;58:25
**wrong (4)**
 14:17;24:5;35:20;
 56:25
**wrongful (1)**
 6:6

## Y

**year (6)**
 21:7;22:1;33:9,11,
 12;52:7
**yearly (1)**
 20:21
**years (15)**
 19:6,6;20:12;
 21:16;27:1;28:3,3;
 33:18;36:24;38:14;
 48:5,7,8;51:20;52:2
**York (1)**
 31:23;54:17

## 0

**08 (1)**
 27:13
**09 (1)**
 27:13

## 1

**1 (2)**
 8:16,19
**1,400 (1)**
 40:4
**1,418 (1)**
 23:16
**1,600 (4)**
 21:14;23:21;40:3,3
**1,800 (1)**
 40:1
**10 (1)**
 10:11
**10,000 (2)**
 21:1;25:15
**10,819 (1)**
 52:11
**100 (1)**
 4:4
**11 (1)**
 37:24
**11753 (1)**
 4:6
**12-12020 (1)**
 5:3
**1430 (1)**
 8:22
**16 (1)**
 10:8

**17 (1)**
 10:9
**18th (3)**
 6:2;8:1;17:1
**19 (2)**
 42:13;44:23

## 2

**2 (1)**
 8:6
**20 (1)**
 10:10
**200,000 (2)**
 48:20;49:22
**2000 (1)**
 48:22
**2004 (4)**
 38:8,11;39:19;
 48:10
**2007 (2)**
 38:15;49:1
**2008 (17)**
 19:3,15,16;20:20;
 21:6;22:10,13;28:2;
 32:13;33:8,8,13;34:7,
 15,22;35:3;52:9
**2009 (13)**
 20:5;21:1,8;24:11;
 25:14,15;27:13;
 32:21;33:4,13;34:10,
 15;52:10
**2010 (9)**
 20:9;21:1,2,8,25;
 26:12;28:19;35:24;
 52:10
**2013 (1)**
 8:1
**21 (2)**
 10:10,13
**211,000 (1)**
 30:21
**21st (1)**
 33:4
**23 (2)**
 22:7;23:15
**23,000 (1)**
 22:1
**25th (1)**
 6:4
**29th (2)**
 32:13,21

## 3

**3 (2)**
 8:5;9:4
**3.125 (1)**
 43:12
**3:19 (1)**
 56:2
**3:46 (1)**
 56:2

**3:51 (1)**
 60:4
**30 (2)**
 47:5;54:20
**300 (1)**
 4:5
**32,868 (1)**
 52:10
**33,000 (1)**
 20:21;21:7

## 4

**4 (2)**
 9:25;17:1
**40,000 (4)**
 28:5;47:5,5;54:20
**4199 (1)**
 7:4
**42,000 (1)**
 33:9
**433 (1)**
 30:13
**435 (1)**
 48:24
**450,000 (1)**
 49:15
**4735 (1)**
 7:5
**4887 (1)**
 7:6

## 5

**5 (1)**
 42:14
**5548 (2)**
 6:15;8:19
**5548-1 (3)**
 8:21;9:2;42:17

## 6

**600,000 (1)**
 48:22

## 7

**7 (3)**
 9:24;10:3,6

## 8

**8 (1)**
 10:8

## 9

**9,820 (1)**
 52:10