12-12020-mg  Doc 6427-3  Filed 02/04/14  Entered 02/04/14 15:48:52  Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 1 of 214
CASE 0:12-cv-01841-SRN-JJG  Document 1   Filed 07/27/12   Page 1 of 214

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.); JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) SEPARATE ACCOUNT 6A; JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) SEPARATE ACCOUNT 131; JOHN HANCOCK FUNDS II; JOHN HANCOCK VARIABLE INSURANCE TRUST; JOHN HANCOCK SOVEREIGN BOND FUND; JOHN HANCOCK BOND TRUST; JOHN HANCOCK STRATEGIC SERIES; and JOHN HANCOCK INCOME SECURITIES TRUST, | Court File No. _____ |

*Plaintiffs*,

**COMPLAINT**

v.

ALLY FINANCIAL INC. f/k/a GMAC, LLC; ALLY BANK f/k/a GMAC BANK; ALLY SECURITIES, LLC f/k/a RESIDENTIAL FUNDING SECURITIES, LLC f/k/a RESIDENTIAL FUNDING SECURITIES CORPORATION; GMAC MORTGAGE GROUP, LLC; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC f/k/a CREDIT SUISSE FIRST BOSTON, LLC; BEAR, STEARNS & CO. INC; DEUTSCHE BANK SECURITIES, INC.; J.P. MORGAN SECURITIES LLC f/k/a J.P. MORGAN SECURITIES, INC.; GOLDMAN, SACHS & CO.; BANC OF AMERICA SECURITIES LLC; BARCLAYS CAPITAL INC.; RBS SECURITIES INC. f/k/a GREENWICH CAPITAL MARKETS, INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; UBS SECURITIES LLC; BRUCE J. PARADIS; KENNETH M. DUNCAN; DAVEE L. OLSON; RALPH T. FLEES; JACK R. KATZMARK; LISA R. LUNDSTEN; DAVID C. WALKER; DIANE S. WOLD; JAMES G. JONES; DAVID M. BRICKER; and JAMES N. YOUNG,

*Defendants*.

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................. 2

JURISDICTION AND VENUE ..................................................................................... 9

PARTIES ..................................................................................................................... 10

    A.   PLAINTIFFS ................................................................................................ 10

    B.   ALLY-GMAC DEFENDANTS ...................................................................... 12

    C.   NON-ALLY-GMAC DEFENDANTS ............................................................. 14

    D.   INDIVIDUAL DEFENDANTS ....................................................................... 17

    E.   RELEVANT NON-PARTIES ......................................................................... 24

        1.    Issuing Trusts ................................................................................ 24

        2.    Third Party Originators ................................................................. 26

        3.    Debtors ......................................................................................... 27

SUBSTANTIVE ALLEGATIONS ............................................................................. 30

I.     THE SECURITIZATION PROCESS GENERALLY ........................................... 30

II.    THE SECURITIZATIONS ASSOCIATED WITH PLAINTIFFS'
      CERTIFICATES AND THEIR INVESTMENTS IN THE CERTIFICATES ...... 34

III.   IMPORTANT FACTORS IN THE DECISION OF INVESTORS, SUCH
      AS PLAINTIFFS, TO INVEST IN THE CERTIFICATES ................................. 43

IV.   DEFENDANTS AND DEBTORS KNEW THAT A LARGE
      PERCENTAGE OF THE MORTGAGE LOANS UNDERLYING
      PLAINTIFFS' CERTIFICATES WERE MADE AS A RESULT OF THE
      SYSTEMATIC ABANDONMENT OF PRUDENT UNDERWRITING
      GUIDELINES AND APPRAISAL STANDARDS ............................................... 47

    A.   DEBTORS GMAC AND HOMECOMINGS ABANDONED THEIR
        UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS ...................... 57

        1.    Ally-GMAC Originator Entities ..................................................... 57

        2.    Homecomings ................................................................................. 62

B.      THE THIRD PARTY ORIGINATORS OF THE MORTGAGE LOANS
        UNDERLYING PLAINTIFFS' CERTIFICATES ABANDONED THEIR
        UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS ...................... 66

        1.      Aegis Mortgage Corporation ............................................................ 67

        2.      Decision One Mortgage Company LLC .......................................... 69

        3.      EFC Holdings Corporation ............................................................. 70

        4.      Finance America, LLC ................................................................... 71

        5.      First National Bank of Nevada ....................................................... 72

        6.      First Savings Mortgage Corporation ............................................... 73

        7.      Fremont Investment & Loan ........................................................... 74

        8.      HSBC Mortgage Corp. (USA) ........................................................ 78

        9.      Mortgage Lenders Network USA, Inc. ............................................ 80

        10.     MortgageIT, Inc. ............................................................................ 82

        11.     National City Mortgage Corporation ............................................... 84

        12.     New Century Mortgage Corporation ............................................... 87

        13.     Ownit Mortgage Solutions Inc. ....................................................... 91

        14.     People's Choice Home Loan, Inc. ................................................... 94

        15.     SunTrust Mortgage, Inc. ................................................................. 95

        16.     Wachovia Mortgage Corporation .................................................... 98

V.      A SIGNIFICANT NUMBER OF THE MORTGAGE LOANS WERE
        MADE TO BORROWERS WHO DID NOT OCCUPY THE
        PROPERTIES IN QUESTION ............................................................................ 99

VI.     DEFENDANTS AND DEBTORS MISREPRESENTED THE LTV
        RATIOS OF THE MORTGAGE LOANS AND THE NUMBER OF
        PROPERTIES WORTH LESS THAN THE OUTSTANDING LOANS ........... 103

VII.    DEFENDANTS AND DEBTORS MISREPRESENTED THE EXTENT
        OF CREDIT ENHANCEMENT INCLUDED IN THE CERTIFICATES .......... 106

12-12020-mg Doc 6427-3 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 4 of 214
CASE 0:12-cv-01841-SRN-JJG Document 1 Filed 07/27/12 Page 4 of 214

VIII. THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES
MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE
CERTIFICATES ............................................................................................. 109

IX. DEFENDANTS AND DEBTORS FAILED TO ENSURE THAT TITLE
TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY
TRANSFERRED ............................................................................................. 112

X. DEFENDANTS AND DEBTORS' SPECIFIC MATERIAL
MISSTATEMENTS AND OMISSIONS IN THE OFFERING
DOCUMENTS ................................................................................................ 120

 A. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING UNDERWRITING STANDARDS AND
PRACTICES ............................................................................................. 121

 B. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING QUALITY CONTROL PROCEDURES .................. 124

 C. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING UNDERWRITING EXCEPTIONS......................... 127

 D. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS AND OMISSIONS REGARDING LOAN-TO-VALUE RATIOS
AND APPRAISALS .................................................................................... 129

 E. DEFENDANTS AND DEBTORS MATERIALLY MISREPRESENTED THE
ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE
CERTIFICATES ........................................................................................ 134

 F. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING THE SUFFICIENCY OF THE BORROWERS'
INCOMES ................................................................................................ 140

 G. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING OWNER-OCCUPANCY STATISTICS................... 143

 H. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING THE TRANSFER OF TITLE TO THE ISSUING
TRUSTS.................................................................................................. 146

 I. DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING
STATEMENTS REGARDING THE CREDIT ENHANCEMENTS APPLICABLE
TO THE CERTIFICATES ............................................................................ 151

J.  DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE CHARACTERISTICS OF THE MORTGAGE POOLS ..................................................................... 155

XI.  DEFENDANTS AND DEBTORS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS ................................................................................... 159

XII.  PLAINTIFFS JUSTIFIABLY RELIED ON DEFENDANTS AND DEBTORS' MISREPRESENTATIONS TO THEIR DETRIMENT .................. 161

XIII.  THE LIABILITY OF THE CONTROL PERSON DEFENDANTS ................... 162

A.  DEFENDANTS ALLY FINANCIAL AND ALLY BANK ................................... 162

B.  THE INDIVIDUAL DEFENDANTS. ............................................................ 167

1.  Duncan ................................................................................. 167

2.  Flees ................................................................................. 168

3.  Katzmark ................................................................................. 169

4.  Lundsten ................................................................................. 169

5.  Olson ................................................................................. 170

6.  Paradis ................................................................................. 171

7.  Walker ................................................................................. 172

8.  Wold ................................................................................. 173

9.  Jones ................................................................................. 174

10.  Bricker ................................................................................. 174

11.  Young ................................................................................. 175

XIV.  PLAINTIFFS HAVE SUFFERED DAMAGES AS A RESULT OF THEIR PURCHASES OF THE CERTIFICATES .......................................................... 175

XV.  TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS ............................. 188

CAUSES OF ACTION ...................................................................................... 190

12-12020-mg Doc 6427-3 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 6 of 214
CASE 0:12-cv-01841-SRN-JJG Document 1 Filed 07/27/12 Page 6 of 214

FIRST CAUSE OF ACTION
COMMON-LAW FRAUD
(AGAINST THE CORPORATE DEFENDANTS) ............................................... 190

SECOND CAUSE OF ACTION
AIDING & ABETTING FRAUD
(AGAINST ALL DEFENDANTS) .................................................................. 193

THIRD CAUSE OF ACTION
VIOLATION OF MINNESOTA SECURITIES ACT § 80A.76(B)
(AGAINST THE CORPORATE DEFENDANTS) ............................................... 193

FOURTH CAUSE OF ACTION
NEGLIGENT MISREPRESENTATION
(AGAINST ALL DEFENDANTS) .................................................................. 196

FIFTH CAUSE OF ACTION
VIOLATION OF SECTION 11 OF THE SECURITIES ACT
(AGAINST ALL DEFENDANTS) .................................................................. 199

SIXTH CAUSE OF ACTION
VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
(AGAINST THE UNDERWRITER DEFENDANTS) ........................................... 202

SEVENTH CAUSE OF ACTION
VIOLATION OF SECTION 15 OF THE SECURITIES ACT
(AGAINST ALLY FINANCIAL, ALLY BANK AND THE INDIVIDUAL
DEFENDANTS) ........................................................................................ 205

PRAYER FOR RELIEF ............................................................................ 207

JURY DEMAND ...................................................................................... 208

CASE 0:12-cv-01841-SRN-JJG Document 1 Filed 07/27/12 Page 7 of 214

Plaintiffs John Hancock Life Insurance Company (U.S.A.), John Hancock Life Insurance Company (U.S.A.) Separate Account 6A, John Hancock Life Insurance Company (U.S.A.) Separate Account 131, John Hancock Funds II, John Hancock Variable Insurance Trust, John Hancock Sovereign Bond Fund, John Hancock Bond Trust, John Hancock Strategic Series, and John Hancock Income Securities Trust ("Plaintiffs") make the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters.   This information is derived from the investigation by Plaintiffs' counsel, which has included a review and analysis of annual reports and publicly filed documents, reports of governmental investigations by the United States Securities and Exchange Commission (the "SEC"), the Financial Crisis Inquiry Commission (the "FCIC"), the United States Department of Justice (the "DOJ"), the United States Senate Permanent Subcommittee on Investigations (the "PSI"), and numerous investigations by other federal and state governmental units, as well as press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by Defendants and Debtors, as defined *infra*.   In addition, Plaintiffs' counsel conferred with counsel for other Plaintiffs who have filed other complaints against these Defendants and Debtors based on the same or similar activities. Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     This is an action by Plaintiffs against Defendants for fraud, aiding and abetting fraud, negligent misrepresentation, and violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o, and the Minnesota Securities Act.[1]

2.     This action arises out of Plaintiffs' purchases of certain residential mortgage-backed securities ("RMBS"), as evidenced in the form of "Certificates," in reliance on the false and misleading statements that were made by Defendants and Debtors.  Based on these material misrepresentations and omissions, Plaintiffs purchased securities that were far riskier than had been represented, backed by mortgage loans that were worth significantly less than had been represented and which had been made to borrowers who were much less creditworthy than had been represented.

---

[1] The Defendants are Ally Financial Inc. f/k/a GMAC, LLC ("Ally Financial"); Ally Bank f/k/a GMAC Bank ("Ally Bank"); Ally Securities, LLC f/k/a Residential Funding Securities, LLC f/k/a Residential Funding Securities Corporation ("Residential Funding"); GMAC Mortgage Group, LLC ("GMAC Mortgage Group"); Citigroup Global Markets Inc. ("Citigroup"); Credit Suisse Securities (USA) LLC f/k/a Credit Suisse First Boston, LLC ("Credit Suisse"); Bear, Stearns & Co. Inc. ("Bear Stearns"); Deutsche Bank Securities, Inc. ("Deutsche Bank"); J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities, Inc. ("JPMorgan"); Goldman, Sachs & Co. ("GSC"); Banc of America Securities LLC ("Banc of America"); Barclays Capital Inc. ("Barclays"); RBS Securities Inc. f/k/a Greenwich Capital Markets, Inc. ("RBS Greenwich Capital"); Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"); UBS Securities LLC ("UBS"); Bruce J. Paradis; Kenneth M. Duncan; Davee L. Olson; Ralph T. Flees; Jack R. Katzmark; Lisa R. Lundsten; David C. Walker; Diane S. Wold; James G. Jones; David M. Bricker; and James N. Young (collectively, the "Defendants").  The non-party Debtors are Residential Funding Company, LLC ("RFC"); Residential Capital LLC ("ResCap"); Residential Accredit Loans, Inc. ("RALI"); Residential Asset Securities Corporation ("RASC"); Residential Asset Mortgage Products, Inc. ("RAMP"); Residential Funding Mortgage Securities I, Inc. ("RFMSI"); GMAC Mortgage, LLC ("GMAC Mortgage"); Homecomings Financial, LLC ("Homecomings"); and GMAC Residential Funding Corporation ("GMAC RFC") (collectively, the "Debtors").

12-12020-mg  Doc 6427-3  Filed 02/04/14  Entered 02/04/14 15:48:52  Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 9 of 214

CASE 0:12-cv-01841-SRN-JGG  Document 1  Filed 07/27/12  Page 9 of 214

3.     The securities purchased by Plaintiffs were collateralized against mortgages originated and/or acquired by Ally-GMAC (as defined in ¶30, *infra*).  Ally-GMAC did not, however, hold the mortgage loans it originated and/or acquired.  Rather, taking advantage of an unprecedented boom in the securitization industry, it deposited the loans into special purpose entities or "trusts" and then repackaged the loans for sale to investors in the form of RMBS.  Defendants Ally Securities LLC, Banc of America Securities LLC, Barclays Capital Inc., Bear Stearns & Co. Inc., Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), JPMorgan Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities, LLC, as underwriters, then sold the RMBS to investors such as Plaintiffs.

4.     The Certificates entitled investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the trusts.  The Certificates issued by each trust were divided into several classes (or "tranches") that had different seniority, priorities of payment, exposure to default, and interest payment provisions.  Rating agencies, such as DBRS, Inc. ("DBRS"), Fitch, Inc. ("Fitch"), Moody's Investors Service, Inc. ("Moody's"), and Standard & Poor's Corporation ("S&P"),[2] rated the investment quality of all tranches of Certificates based upon information provided by the Defendants and Debtors regarding the quality of the

---

[2] DBRS, Fitch, Moody's, and S&P are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings that are used to distinguish among grades of creditworthiness of various securities under the federal securities laws.

mortgages in each mortgage pool and the seniority of the Certificate among the various Certificates issued by each trust.  These ratings, in significant part, determined the prices at which these Certificates were offered to investors and the interest rates that the Certificates paid their investors.

5.      The Certificates are "securities" within the meaning of the Securities Act of 1933.  In selling the Certificates, the Defendants and Debtors prepared and filed with the SEC certain registration statements (the "Registration Statements"), prospectuses (the "Prospectuses"), and prospectus supplements (the "Prospectus Supplements", and together with the Registration Statements and Prospectuses, the "Offering Documents"). In these Offering Documents, Defendants and Debtors repeatedly touted the strength of their underwriting guidelines and standards and those of the relevant third party originators, claimed that the underwriting guidelines and standards were designed to ensure the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral, and represented that the mortgages underlying the Certificates were originated in accordance with those stated underwriting guidelines and standards.  Where Defendants and Debtors had not originated the mortgage loans underlying the Certificates, they emphasized their quality control procedures, such as reviewing underwriting information provided by the originators.

6.      In addition, in the Offering Documents Defendants and Debtors repeatedly assured investors as to the soundness of the appraisals used to arrive at the value of the underlying properties and, specifically, that the real estate collateralizing the loans had been subjected to objective real estate appraisals performed in accordance with stated

guidelines.  Defendants and Debtors made numerous other representations regarding the quality of the loan pools and the Certificates, including representations regarding transfer of title, owner-occupancy rates, the loan-to-value and combined loan-to-value ratios of the underlying mortgages, the debt-to-income ratios of the borrowers, the credit ratings assigned to the Certificates, and the credit enhancements used to structure the Certificates.

7.    Plaintiffs and other investors did not have access to the underlying mortgage loan files.  Instead, the Defendants and Debtors were responsible for gathering and verifying information about the credit quality and characteristics of the loans that were deposited into each trust and presenting this information in the Registration Statements, Prospectuses, and Prospectus Supplements prepared for potential investors. This due diligence process is a critical safeguard for investors who rely on this information in making their investment decisions, and is a fundamental legal obligation of the Defendants and Debtors.

8.    As set forth below, the Offering Documents contained material misstatements and omitted material information.  Contrary to Defendants and Debtors' assurances, the originators of the underlying loans had not followed their touted underwriting guidelines and standards when originating and/or acquiring the mortgage loans, and Defendants and Debtors had neither maintained nor conducted quality control procedures.

9.    Specifically, as set forth below, Defendants and Debtors knew of the wholesale and systematic abandonment of underwriting guidelines by both Ally-

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 21:48:52    Exhibit B:
CASE 0:12-cv-01944-SRN-JJG    Document 1    Filed 03/27/12    Page 12 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 12 of 214

GMAC's own affiliated originators as well as various third party originators.  Because Ally-GMAC's affiliated lenders, Debtors GMAC Mortgage and Homecomings, operated primarily to generate loans for Ally-GMAC's RMBS operations, they intentionally granted mortgage loans to borrowers whom they knew did not satisfy the eligibility criteria as described in the Offering Documents.  Faced with Ally-GMAC's demands for as many loans as possible, the third party originators did likewise, knowing that Ally-GMAC would purchase and securitize even risky, low-quality loans.  In many cases, Ally-GMAC purchased and securitized loans on a wholesale basis without reviewing their loan files or having any reason to believe that they complied with its purported underwriting standards.  Furthermore, when deciding whether to originate or purchase loans, Ally-GMAC  and its affiliated lenders made use of proprietary underwriting software that did not apply Ally-GMAC's purported underwriting standards or require basic documentation.

10.    In addition, Defendants and Debtors knew that the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with the stated guidelines, such that the value of the underlying properties and the amount of credit enhancements built into the Certificates were overstated, thereby exposing investors such as Plaintiffs to additional losses in the event of foreclosure.  In many cases, Defendants and Debtors also failed to deliver good title to the Issuing Trusts (defined below) in a timely manner, severely undermining the Issuing Trusts' capacity to manage the assets that were supposed to be underlying the Certificates and contributing to massive foreclosure backlogs and moratoriums.  Defendants and Debtors did not apply

the rigorous quality control procedures they touted in the Offering Documents to uncover lapses, and where Defendants and Debtors did discover problems in the loan pools, they deliberately overlooked them.

11.    Examination of the individual mortgage files underlying Ally-GMAC's RMBS has revealed just how thoroughly and blatantly Ally-GMAC misrepresented the trust assets to investors.  A review of the loans underlying several Ally-GMAC RMBS comparable to those purchased by Plaintiffs revealed that at least *89%* of the delinquent and charged-off loans breached one or more of Ally-GMAC's representations and warranties.  Common defects included unacceptably high loan-to-value and debt-to-income ratios, implausible and unverified borrower incomes, missing documentation, and violations of predatory lending laws, all basic matters readily ascertainable in the exercise of rudimentary due diligence.  The sheer volume of the violations, the fact that they went to the most basic characteristics of the pooled loans, and the ease with which Defendants and Debtors could have discovered the truth all foreclose the possibility that the misrepresentations in the Offering Documents were the product of anything other than intentional wrongdoing.

12.    Defendants and Debtors' conduct with respect to mortgage-backed securities has also been detailed in both the April 13, 2011, report issued by the PSI, chaired by Senator Carl Levin, entitled WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (the "Levin Report") and the January 27, 2011, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (the "FCIC Report").  According to the FCIC Report, Ally-

GMAC is among the top five lenders that have been forced to reimburse the government-sponsored entities Fannie Mae and Freddie Mac hundreds of millions of dollars for mortgages that were not underwritten as represented. It has also been sued for securities fraud in connection with its RMBS sales by the Federal Housing Finance Agency ("FHFA").

13.     In addition, the practices of financial institutions such as Ally-GMAC and their role in inflating the housing bubble have been and continue to be the subject of intense regulatory scrutiny.  Numerous other investigations have been launched by the DOJ, the SEC, and various state Attorneys General.  Indeed, in June 2011, Ally-GMAC acknowledged receipt of subpoenas from both the DOJ and the SEC.  The subpoena received from the SEC requested documentation relating to mortgage loans placed in securitization trusts, and the subpoena received from the DOJ requests documentation and information in connection with the investigation of potential fraud related to the origination and/or underwriting of mortgage loans.

14.     On October 2, 2011, the NEW YORK TIMES reported that the New York Attorney General rejected a proposed nationwide settlement worth more than $20 billion that would also grant full immunity from future prosecution to financial institutions including Ally.  Attorney General Schneiderman stated he believes that the losses caused by investment banks are far greater than the proposed settlement amount and he is unwilling to release these financial institutions from liability resulting from future investigations.  The New York Attorney General's office has since joined forces with Delaware Attorney General Beau Biden to "pursue a wider-ranging probe into Wall

Street's role in the mortgage meltdown," and the attorneys general of Minnesota, Kentucky, and Nevada have expressed criticism of the proposed settlement—calling it weak and inappropriately favorable to the banks.

15. As a result of the untrue statements and omissions in the Offering Documents, Plaintiffs purchased Certificates that were far riskier than represented and that were not equivalent to other investments with the same credit ratings. As the truth regarding Defendants and Debtors' misrepresentations and omissions has come to light, the rating agencies have responded by significantly downgrading the Certificates purchased by Plaintiffs. The Certificates, therefore, are no longer marketable at anywhere near the purchase prices paid by Plaintiffs. As a consequence, Plaintiffs have suffered losses on their purchases of the Certificates.

## JURISDICTION AND VENUE

16. This Complaint asserts claims arising under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77l(a)(2), and 77o, the Minnesota Securities Act, and the common law of Minnesota.

17. This Court has jurisdiction over Plaintiffs' Securities Act claims pursuant to 15 U.S.C. § 77v(a), and pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims are so closely related to Plaintiffs' Securities Act claims as to form part of the same case or controversy.

18. Venue is proper in this District pursuant to 15 U.S.C. § 77v(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants have a substantial presence in this District this

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 16 of 214
CASE 0:12-cv-01844-SRN-JJG Document 1 Filed 07/27/12 Page 16 of 214

District, and certain other Defendants transact business within this District. Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading statements, occurred in this District.

19.     In connection with the wrongful acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, and interstate telephone communications.

## PARTIES

### A.    PLAINTIFFS

20.     Plaintiff John Hancock Life Insurance Company (U.S.A.) ("JHUSA") is a stock life insurance company organized under the laws of the state of Michigan with its principal offices in Boston, Massachusetts. JHUSA is a wholly-owned subsidiary of Canadian insurance and financial services company Manulife Financial Corporation ("Manulife").

21.     Plaintiff John Hancock Life Insurance Company (U.S.A.) for and on behalf of its insurance company Separate Account 6A, a segregated investment portfolio of JHUSA.

22.     Plaintiff John Hancock Life Insurance Company (U.S.A.) for and on behalf of its insurance company Separate Account 131, a segregated investment portfolio of JHUSA.

23.     Plaintiff John Hancock Funds II is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: Global Bond Fund; Strategic Bond Fund; Total Return Fund; Real Return Bond Fund; Core Bond Fund; U.S. Government Securities Fund; Spectrum Income Fund; Active Bond Fund; High Income Fund; and Strategic Income Opportunities Fund.

24.     Plaintiff John Hancock Variable Insurance Trust is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: Lifestyle Balanced Trust; Total Return Trust; Strategic Income Opportunities Trust; Global Bond Trust; American Asset Allocation; Short Term Government Income Trust; High Yield Trust; New Income Trust; Core Bond Trust; Real Return Bond Trust; and Active Bond Trust.

25.     Plaintiff John Hancock Sovereign Bond Fund is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: John Hancock Bond Fund.

26.     Plaintiff John Hancock Bond Trust is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: John Hancock Government Income Fund; John Hancock High Yield Fund; and John Hancock Investment Grade Bond Fund.

27.     Plaintiff John Hancock Strategic Series is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts which holds securities on behalf of its series, including the following series of funds: John Hancock Strategic Income Fund.

28.     Plaintiff John Hancock Income Securities Trust is a Massachusetts business trust and citizen of the Commonwealth of Massachusetts.

29.     Plaintiffs purchased the Certificates from the trusts listed in the table in ¶87, below.

### B.     ALLY-GMAC DEFENDANTS

30.     Defendant Ally Financial Inc. ("Ally Financial") is a bank holding company headquartered in Detroit, Michigan.   Until May 2010, Ally Financial was known as GMAC Financial Services.   Ally Financial was founded to provide financing to automobile purchasers, but expanded over time into areas including mortgage securitization, commercial finance and online banking.   Ally Financial is the direct or indirect owner of Defendants Ally Bank; Ally Securities, LLC and Debtors Residential Funding Company, LLC; Residential Capital LLC; Residential Accredit Loans, Inc.; Residential Asset Securities Corporation; Residential Asset Mortgage Products, Inc.; Residential Funding Mortgage Securities I, Inc.; GMAC Mortgage, LLC; Homecomings Financial, LLC; and GMAC Residential Funding Corporation (together with Ally Financial, collectively referred to hereinafter as "Ally-GMAC.").   The diagram on the next page depicts the relationships of the Ally-GMAC corporate entities:

12-12020-mg  Doc 6427-2  Filed 02/04/14  Entered 02/04/14 15:48:52  Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 19 of 214
CASE 0:12-cv-01944-SRN-JJG  Document 1  Filed 07/27/12  Page 19 of 214



31.     Defendant Ally Bank ("Ally Bank") is the indirect wholly owned banking subsidiary of Ally Financial, Inc.  Ally Bank provided Ally's mortgage loan operations with financing.

32.     Defendant Ally Securities, LLC, f/k/a Residential Funding Securities, LLC, d/b/a GMAC RFC Securities, f/k/a Residential Funding Securities Corporation ("Residential Funding"), is an SEC registered broker-dealer with its principal place of business in Minneapolis, Minnesota.  Residential Funding was an underwriter of Certificates purchased by Plaintiffs.

33.     Defendant GMAC Mortgage Group LLC ("GMAC Mortgage Group") is a residential mortgage originator and servicer with its principal place of business in

Horsham, PA. It is a wholly-owned subsidiary of Defendant Ally Financial.  Debtor ResCap is a wholly-owned subsidiary of GMAC Mortgage Group.

## C.    NON-ALLY-GMAC DEFENDANTS

34.    Defendant Banc of America Securities LLC ("Banc of America") is an SEC registered broker-dealer with its principal place of business in New York.  Banc of America acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Banc of America participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

35.    Defendant Barclays Capital Inc. ("Barclays") is an SEC registered broker-dealer with its principal place of business in New York.  Barclays acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Barclays participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

36.    Defendant Bear Stearns & Co. Inc. ("Bear Stearns") is a Delaware corporation with its principal place of business in New York.  Bear Stearns was a wholly-owned subsidiary of the Bear Stearns Companies Inc.  Bear Stearns acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Bear Stearns participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.  Pursuant to a merger agreement, on or about October 1, 2008, Bear Stearns merged with JPMorgan and

is now doing business as JPMorgan.  All allegations against Bear Stearns are thus made against its successor-in-interest, JPMorgan.

37.    Defendant Citigroup Global Markets Inc. ("Citigroup") is an SEC registered broker-dealer with its principal place of business in New York.  Citigroup acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Citigroup participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

38.    Defendant Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston, LLC) ("Credit Suisse") is a limited liability company organized under the laws of Delaware with its principal place of business in New York.  Credit Suisse acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Credit Suisse participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

39.    Defendant Deutsche Bank Securities LLC, ("Deutsche Bank") is an SEC registered broker-dealer with its principal place of business in New York.  Deutsche Bank acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Deutsche Bank participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

40.    Defendant RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.) ("RBS Greenwich Capital") is an SEC registered broker-dealer, with its principal place of business in Connecticut.   RBS Greenwich Capital acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, RBS

Greenwich Capital underwrote several of the Certificates, including RALI NIM Cl-1, Series 2006-QO4, and participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

41.     Defendant JP Morgan Securities, LLC ("JPMorgan") is an SEC registered broker-dealer with its principal place of business in New York.  JPMorgan acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, JPMorgan participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

42.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (d/b/a Merrill Lynch & Co.) ("Merrill Lynch") is an SEC registered broker-dealer with its principal place of business in New York.  Merrill Lynch acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, Merrill Lynch participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

43.     Defendant UBS Securities, LLC, ("UBS") is an SEC registered broker-dealer with its principal place of business in New York.  UBS acted as an underwriter of the Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, UBS participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

44.     Defendant Goldman, Sachs & Co. ("GSC") is an SEC registered broker-dealer with its principal place of business in New York.  GSC acted as underwriter of Certificates issued by certain Trusts, identified in ¶87, below.  As an underwriter, GSC

participated in the drafting and dissemination of the Offering Documents pursuant to which those Certificates were sold to Plaintiffs.

45.      Defendants Ally Securities, Banc of America, Barclays, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, RBS Greenwich Capital, JPMorgan, Merrill Lynch, Residential Funding and UBS each acted as an "underwriter" within the meaning of the Securities Act of 1933, 15 U.S.C. §77b(a)(11) for the Certificates identified in ¶87 below, and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs.

46.      Defendants Ally Securities, Banc of America, Barclays, Bear Stearns, Citigroup, Credit Suisse, Deutsche Bank, RBS Greenwich Capital, JPMorgan, Merrill Lynch, Residential Funding and UBS are referred to collectively hereinafter as the "Underwriter Defendants."

47.      All Defendants identified in ¶¶30-46 are hereinafter collectively referred to as the "Corporate Defendants."

### D.    INDIVIDUAL DEFENDANTS

48.      Kenneth M. Duncan ("Duncan") was, at relevant times, the Acting Chief Financial Officer of Debtors RALI, RAMP, RASC and RFMSI.  Duncan was also the Executive Vice President, Acting Chief Financial Officer and a Director of RFC, GMAC RFC and Homecomings.  Duncan signed the RAMP Registration Statement dated July 7, 2005; the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006;

the RASC Registration Statement dated March 30, 2006; and the RAMP Registration

Statement dated March 31, 2006, governing certain of the Trusts identified in ¶59, below.

49.    Ralph T. Flees ("Flees") was, at relevant times, the Controller of Debtors

RALI, RAMP, RASC, and RFMSI.  Flees was also the Principal Accounting Officer of

RFC, GMAC RFC and Homecomings.  Flees signed the RAMP Registration Statement

dated July 7, 2005, the RFMSI Registration Statement dated August 3, 2005; the RALI

Registration Statement dated August 9, 2005; the RALI Registration Statement dated

March 6, 2006; the RASC Registration Statement dated March 30, 2006; the RAMP

Registration Statement dated March 31, 2006; the RFMSI Registration Statement dated

April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP

Registration Statement dated April 10, 2007, governing certain of the Trusts identified in

¶59, below.

50.    Jack R. Katzmark ("Katzmark") was, at relevant times, Treasurer and

Controller (Principal Accounting Officer) of Debtors RASC, RAMP, RALI and RFMSI.

Katzmark was also the Managing Director at GMAC RFC and ResCap, and the

Corporate Controller (Chief Accounting Officer) at Residential Funding Corporation.

Katzmark signed the RAMP Registration Statement dated May 1, 2003; the RALI

Registration Statement dated September 23, 2003; the RFMSI Registration Statement

dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the

RAMP Registration Statement dated August 5, 2004; and the RASC Registration

Statement dated April 19, 2005, governing certain of the Trusts identified in ¶59, below.

51.    Lisa R. Lundsten ("Lundsten") became the Senior Vice President of Securitization Management at GMAC RFC in September 2005.  Lundsten signed the RAMP Registration Statement dated May 1, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; the RASC Registration Statement dated April 19, 2005; the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; the RAMP Registration Statement dated March 31, 2006; the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007, governing certain of the Trusts identified in ¶59, below.

52.    Davee L. Olson ("Olson") was, at relevant times, Executive Vice President, Chief Financial Officer, and a Director of Debtors RFMSI and RALI, and a Director of Debtor RASC.  Olson was also the Chief Financial Officer of ResCap, and a Director of GMAC RFC, RFC, and Homecomings.  Olson signed the RAMP Registration Statement dated May 1, 2003; the RALI Registration Statement dated September 23, 2003; the RFMSI Registration Statement dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; the RASC Registration Statement dated April 19, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; and the RAMP Registration Statement dated March 31, 2006, governing certain of the Trusts identified in ¶59, below.

53.     Bruce J. Paradis ("Paradis") was the President and Chief Executive Officer of GMAC RFC from 1994 to 2005, and was the Chief Executive Officer of ResCap from 2005 to 2007.  Paradis was also, at relevant times, the President, Chief Executive Officer, and a Director of the Debtors RALI, RAMP, RASC and RFMSI.  Paradis signed the RAMP Registration Statement dated May 1, 2003; the RALI Registration Statement dated September 23, 2003; the RFMSI Registration Statement dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; and the RASC Registration Statement dated April 19, 2005; the RAMP Registration Statement dated July 7, 2005; the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; and the RAMP Registration Statement dated March 31, 2006, governing certain of the Trusts identified in ¶59, below .

54.     David C. Walker ("Walker") was, at relevant times, a Director of Debtors RAMP and RFMSI.  Walker was also a Director of ResCap, GMAC RFC, GMAC Mortgage, RFC, and Homecomings.  Walker signed the RAMP Registration Statement dated May 1, 2003; the RALI Registration Statement dated September 23, 2003; the RFMSI Registration Statement dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; the RASC Registration Statement dated April 19, 2005; the RAMP Registration Statement dated July 7, 2005; the RFMSI Registration Statement dated August 3, 2005;

and the RALI Registration Statement dated August 9, 2005, governing certain of the Trusts identified in ¶59, below.

55. Diane S. Wold ("Wold") was, at relevant times, GMAC RFC's Senior Vice President of Securitization Management until September 2005, when she moved to ResCap as head of investor relations and corporate finance. Wold signed the RALI Registration Statement dated September 23, 2003 and the RAMP Registration Statement dated July 7, 2005, governing certain of the Trusts identified in ¶59, below.

56. James G. Jones ("Jones") was the Chief Executive Officer of ResCap from 2007 to 2008, and was also, at relevant times, the President, Chief Executive Officer and a Director of Defendant RALI. Jones had previously been ResCap's Chief Operating Officer and President of its U.S. Residential Finance Group. Prior to joining Ally-GMAC, Jones had been the Chief Executive Officer of Aegis Mortgage Corporation. Jones signed the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007, governing certain of the Trusts identified in ¶59, below.

57. David M. Bricker ("Bricker") was, at relevant times, a Director and Chief Financial Officer of Defendant RALI. Bricker was also the Chief Financial Officer of GMAC Mortgage and GMAC RFC. Bricker signed the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007, governing certain of the Trusts identified in ¶59, below.

58.    James N. Young ("Young") was, at relevant times, a Director of Defendant

RALI.  Young was also the Chief Accounting Officer and Controller of ResCap.  Young

signed the RFMSI Registration Statement dated April 3, 2007; the RALI Registration

Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10,

2007, governing certain of the Trusts identified in ¶59, below.

59.    Defendants Duncan, Flees, Katzmark, Lundsten, Olson, Paradis, Walker,

Wold, Jones, Bricker, and Young are referred to collectively hereinafter as the

"Individual Defendants."  The Individual Defendants signed the Registration Statements

listed in the table below.

| Issuing Trust(s) | Document Date | File No. | Signatories |
|---|---|---|---|
| RAMP 2003-RS4<br>RAMP 2003-RS7<br>RAMP 2003-RS10 | 05-01-2003 | Form S-3/A<br>333-104662 | Bruce J. Paradis<br>Davee L. Olson<br>Jack R. Katzmark<br>David C. Walker<br>Lisa R. Lundsten |
| RALI 2005-QA7 | 09-23-2003 | Form S-3/A<br>333-107959 | Bruce J. Paradis<br>Davee L. Olson<br>David C. Walker<br>Jack R. Katzmark<br>Diane S. Wold |
| RFMSI II INC<br>2006-HI1 | 11-07-2003 | Form S-3<br>333-110340 | Bruce J. Paradis<br>Davee L. Olson<br>Jack R. Katzmark<br>David C. Walker |
| GMACM 2004-AR1<br>RAMP 2004-RS5 | 12-02-2003 | Form S-3/A<br>333-110437 | Bruce J. Paradis<br>Davee L. Olson<br>Jack R. Katzmark<br>David C. Walker<br>Lisa R. Lundsten |
| GMACM 2005-AR5 | 08-05-2004 | Form S-3/A<br>333-117232 | Bruce J. Paradis<br>Davee L. Olson<br>Jack R. Katzmark<br>David C. Walker<br>Lisa R. Lundsten |

| | | | |
|---|---|---|---|
| RASC 2005-KS12<br>RASC 2006-EMX2<br>RASC 2006-KS2<br>RASC 2006-KS3 | 04-19-2005 | Form S-3/A<br>333-122688 | Bruce J. Paradis<br>Davee L. Olson<br>Jack R. Katzmark<br>David C. Walker<br>Lisa R. Lundsten |
| GMACM 2005-AR6<br>RAMP 2006-RS1 | 07-07-2005 | Form S-3/A<br>333-125485 | Bruce J. Paradis<br>Kenneth M. Duncan<br>Ralph T. Flees<br>David C. Walker<br>Diane S. Wold |
| RFMSI 2005-SA4<br>RFMSI 2006-S2<br>RFMSI 2006-S3 | 08-03-2005 | Form S-3A<br>333-126745 | Bruce J. Paradis<br>Kenneth M. Duncan<br>David C. Walker<br>Ralph T. Flees<br>Lisa R. Lundsten |
| RALI 2005-QO1<br>RALI 2005-QO2<br>RALI 2005-QO3<br>RALI 2005-QA12<br>RALI 2006-QA1<br>RALI 2006-QA2 | 08-09-2005 | Form S-3/A<br>333-126732 | Bruce J. Paradis<br>Kenneth M. Duncan<br>Ralph T. Flees<br>David C. Walker<br>Lisa R. Lundsten |
| RALI 2006-QO3<br>RALI 2006-QO5<br>RALI 2006-QO6<br>RALI 2006-QS18<br>RALI 2007-QO2 | 03-06-2006 | Form S-3/A<br>333-131213 | Bruce J. Paradis<br>Kenneth M. Duncan<br>Davee L. Olson<br>Ralph T. Flees<br>Lisa R. Lundsten |
| RASC 2006-EMX4<br>RASC 2006-EMX9<br>RASC 2006-KS4<br>RASC 2006-KS6<br>RASC 2006-KS7<br>RASC 2006-KS8<br>RASC 2006-KS9<br>RASC 2007-KS2 | 03-30-2006 | Form S-3/A<br>333-131209 | Bruce J. Paradis<br>Kenneth M. Duncan<br>Davee L. Olson<br>Ralph T. Flees<br>Lisa R. Lundsten |
| RAMP 2006-RS4<br>RAMP 2006-RS6<br>RAMP 2006-RZ2<br>RAMP 2006-RZ3<br>RAMP 2006-RZ4<br>RAMP 2006-RZ5 | 03-31-2006 | Form S-3/A<br>333-131211 | Bruce J. Paradis<br>Kenneth M. Duncan<br>Ralph T. Flees<br>Davee L. Olson<br>Lisa R. Lundsten |
| HELT 2007-HSA2<br>HELT 2007-HSA3 | 04-03-2007 | Form S-3/A<br>333-140605 | James G. Jones<br>David M. Bricker<br>Ralph T. Flees<br>James N. Young<br>Lisa R. Lundsten |

12-12020-mg  Doc 6427-2  Filed 02/04/14  Entered 02/04/14 15:48:52  Exhibit B:
CASE 0:12-cv-01544-SRN-JJG  Document 1  Filed 07/27/12  Page 30 of 214
John Hancock Insurance Company (USA) v. Ally Financial  Inc. fka GMA  Pg 30 of 214

| RALI 2007-QH4<br>RALI 2007-QS6<br>RALI 2007-QS9<br>RALI 2007-QS10<br>RALI 2007-QS11 | 04-03-2007 | Form S-3/A<br>333-140610 | James G. Jones<br>David M. Bricker<br>James N. Young<br>Ralph T. Flees<br>Lisa R. Lundsten |
| GMACM 2007-HE2 | 04-10-2007 | Form S-3/A<br>333-140609 | James G. Jones<br>David M. Bricker<br>Ralph T. Flees<br>James N. Young<br>Lisa R. Lundsten |

### E. RELEVANT NON-PARTIES

#### 1. Issuing Trusts

60.     Non-parties, the "Issuing Trusts", are common law trusts formed under the laws of the State of New York and/or statutory trusts formed under the laws of the State of Delaware.  The Issuing Trusts were created and structured by Ally-GMAC to issue billions of dollars worth of RMBS.  The Issuing Trusts issued the Certificates purchased by Plaintiffs.  The non-party Issuing Trusts are:

- GMACM Home Equity Loan Trust 2007-HE2
- GMACM Mortgage Loan Trust 2005-AR6
- GMACM Mortgage Loan Trust 2005-AR5
- GMACM Mortgage Loan Trust 2004-AR1
- Home Equity Loan Trust 2007-HSA2
- Home Equity Loan Trust 2007-HSA3
- Home Loan Trust 2006-HI1
- RAAC Series 2006-RP2
- RAAC Series 2006-RP3
- RAAC Series 2007-RP3
- RALI Series 2005-QA7 Trust
- RALI Series 2005-QO1 Trust
- RALI Series 2005-QO2 Trust
- RALI Series 2005-QO3 Trust
- RALI Series 2005-QA12 Trust
- RALI Series 2006-QA1 Trust
- RALI Series 2006-QA2 Trust

- RALI Series 2006-QO3 Trust
- RALI Series 2006-QO5 Trust
- RALI Series 2006-QO6 Trust
- RALI Series 2006-QS18 Trust
- RALI Series 2007-QH4 Trust
- RALI Series 2007-QO2 Trust
- RALI Series 2007-QS6 Trust
- RALI Series 2007-QS9 Trust
- RALI Series 2007-QS10 Trust
- RALI Series 2007-QS11 Trust
- RALI NIM Cl-1, Series 2006-QO4
- RAMP Series 2002-RP1 Trust
- RAMP Series 2003-RS4 Trust
- RAMP Series 2003-RS7 Trust
- RAMP Series 2003-RS10 Trust
- RAMP Series 2004-RS5 Trust
- RAMP Series 2006-RS1 Trust
- RAMP Series 2006-RS4 Trust
- RAMP Series 2006-RS6 Trust
- RAMP Series 2006-RZ2 Trust
- RAMP Series 2006-RZ3 Trust
- RAMP Series 2006-RZ4 Trust
- RAMP Series 2006-RZ5 Trust
- RASC Series 2005-KS12 Trust
- RASC Series 2006-EMX2 Trust
- RASC Series 2006-EMX4 Trust
- RASC Series 2006-EMX9 Trust
- RASC Series 2006-KS2 Trust
- RASC Series 2006-KS3 Trust
- RASC Series 2006-KS4 Trust
- RASC Series 2006-KS6 Trust
- RASC Series 2006-KS7 Trust
- RASC Series 2006-KS8 Trust
- RASC Series 2006-KS9 Trust
- RASC Series 2007-KS2 Trust
- RFMSI Series 2005-SA4 Trust
- RFMSI Series 2006-S2 Trust
- RFMSI Series 2006-S3 Trust

(together, the **"Issuing Trusts"**).

### 2.     Third Party Originators

61.     Many of the loans underlying the Certificates were acquired by the sponsor for each securitization from unaffiliated third-party originators, each of which is discussed in greater detail in Section IV.B, *infra*.  These third-party originators include the following:

- Aegis Mortgage Corporation
- Decision One Mortgage Company LLC
- EFC Holdings Corporation
- Finance America, LLC
- First National Bank of Nevada
- First Savings Mortgage Corporation
- Fremont Investment & Loan
- HSBC Mortgage Corporation
- Mortgage Lenders Network USA, Inc.
- MortgageIT, Inc.
- National City Mortgage Corporation
- New Century Mortgage Corporation
- Ownit Mortgage Solutions Inc.
- People's Choice Home Loan, Inc.
- SunTrust Mortgage, Inc.
- Wachovia  Mortgage  Corporation

(together, the "**Originators**").[3]

---

[3] Other non-party originators and/or acquirers of mortgage loans pooled into the Issuing Trusts included American Mortgage Network, Inc., Capital One Home Loans LLC, Capitol Commerce Mortgage Co., CTX Mortgage Co., FMF Capital LLC, Home Loan Center, Inc., Homefield Financial Inc., LoanCity, M&I Bank FSB, Meritage Mortgage Corp., Ohio Savings Bank, Pinnacle Finance Corporation, Provident Funding Assoc., L.P., SCME Mortgage Bankers, Inc., Sea Breeze Financial Services, and Southstar Funding LLC.

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 33 of 214
CASE 0:12-cv-01844-SRN-JJG Document 1 Filed 07/27/12 Page 33 of 214

### 3. Debtors

62. The following are Debtors in Ally-GMAC's bankruptcy and not defendants in this action. Due to their involvement in the securitization and sale of Ally-GMAC RMBS, however, their inclusion in this Complaint is necessary.

63. Debtor GMAC Mortgage, LLC, a/k/a GMAC Mortgage Corporation ("GMAC Mortgage") is an indirectly-owned subsidiary of ResCap and therefore an indirectly-owned subsidiary of Ally Financial, with its principal place of business in Fort Washington, Pennsylvania. GMAC Mortgage originates residential mortgage loans through a network of retail offices and Internet sites. GMAC Mortgage originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs.

64. Debtor GMAC Residential Funding Corporation, a/k/a GMAC-RFC Holding Company, LLC ("GMAC RFC") is a wholly-owned subsidiary of ResCap and therefore an indirectly-owned subsidiary of Ally Financial, with its principal place of business in Minneapolis, Minnesota. GMAC RFC operates as a private issuer of mortgage-backed securities.

65. Debtor Homecomings Financial, LLC, f/k/a Homecomings Financial Network, Inc. ("Homecomings") is an indirectly-owned subsidiary of ResCap and therefore an indirect subsidiary of Ally Financial. Homecomings is a mortgage servicing and origination company. Homecomings originated the mortgage loans underlying certain of the Certificates identified above.

66. Debtor Residential Accredit Loans, Inc. ("RALI") is a wholly-owned, limited-purpose subsidiary of GMAC RFC, with its principal office in Minneapolis,

Minnesota.  Like all the other depositors, RALI was created specifically as a conduit for the securitization and sale of loans.  RALI acted as the depositor in the securitization of certain trusts listed in ¶87, above.  As depositor, RALI filed relevant Registration Statements with the SEC.

67.     Debtor Residential Capital LLC, f/k/a Residential Capital Corporation ("ResCap") is a wholly-owned subsidiary of GMAC Mortgage Group LLC and an indirectly owned subsidiary of Ally Financial, with its principal place of business in Minneapolis, Minnesota.  ResCap originates, securitizes, and services mortgage loans through its subsidiaries.

68.     Debtor Residential Asset Mortgage Products, Inc. ("RAMP") is a wholly-owned, limited-purpose subsidiary of GMAC RFC, with its principal place of business in Minneapolis, Minnesota.  Like all the other depositors, RAMP was created specifically as a conduit for the securitization and sale of loans.  RAMP acted as the depositor in the securitization of certain trusts listed in ¶87, below.  As depositor, RAMP filed relevant Registration Statements with the SEC.

69.     Debtor Residential Asset Securities Corporation ("RASC") is a wholly-owned, limited-purpose subsidiary of GMAC RFC, with its principal office in Minneapolis, Minnesota.  Like all the other depositors, RASC was created specifically as a conduit for the securitization and sale of loans.  RASC acted as the depositor in the securitization of certain trusts listed in ¶87, below.  As depositor, RASC filed relevant Registration Statements with the SEC.

70.     Debtor Residential Funding Mortgage Securities I, Inc. ("RFMSI") is a wholly-owned, limited-purpose subsidiary of ResCap.  Like all the other depositors, RFMSI was created specifically as a conduit for the securitization and sale of loans. RFMSI acted as the depositor in the securitization of certain trusts listed in ¶87, below. As depositor, RFMSI filed relevant Registration Statements with the SEC.

71.     Debtors RALI, RAMP, RASC, and RFMSI are referred to collectively hereinafter as the "Depositor Debtors."  By preparing the Registration Statements identified in the chart in ¶87, below, each of the Depositor Debtors was an "issuer" within the meaning of the Securities Act of 1933, 15 U.S.C. §77b(a)(11), for the Certificates identified in ¶87 below, and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs.

72.     Debtor Residential Funding Company, LLC ("RFC") is a Delaware corporation and a wholly-owned subsidiary of GMAC RFC.  Until October 2006, RFC was known as "Residential Funding Corporation."  RFC was created by GMAC RFC specifically as a conduit for the securitization and sale of loans.  RFC was the sponsor for all of the securitizations at issue in this litigation.  RFC is also the parent company of Homecomings, an originator of mortgage loans underlying certain RMBS purchased by Plaintiffs.

73.     Debtor RFC is referred to hereinafter as the "Sponsor Debtor."

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 36 of 214

CASE 0:12-cv-01844-SRN-JJG   Document 1   Filed 07/27/12   Page 36 of 214

## SUBSTANTIVE ALLEGATIONS

## I.   THE SECURITIZATION PROCESS GENERALLY

74.   Traditionally, the process for extending mortgage loans to borrowers involved a lending institution (the loan originator) making a loan to a home buyer in exchange for a promise by the home buyer, documented in the form of a promissory note, to repay the principal and interest on the loan.  The loan originator obtained a lien against the home as collateral in the event the home buyer defaulted on its obligation.  Under this simple model, the loan originator held the promissory note until it matured, and was exposed to the risk that the borrower might fail to repay the loan.  As such, the loan originator had a financial incentive to ensure that the borrower had the financial wherewithal to repay the loan and that the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted.

75.   Beginning in the 1990s, however, banks and other mortgage lending institutions increasingly used securitizations to finance the extension of mortgage loans to borrowers.  Under the securitization process, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage to a third-party financial institution.  By selling the mortgage, the loan originator not only obtains fees, but receives the proceeds from the sale of the mortgage up-front, and thereby has new capital to issue more mortgages.  The financial institutions which purchase the mortgages then pool the mortgages together and securitize the mortgages into what are commonly referred to as residential mortgage-backed securities or RMBS.  In this manner, unlike the traditional

process for extending mortgage loans, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the RMBS.

76.     The securitization of residential mortgage loans, and the creation of RMBS collateralized against these loans, typically follows the same structure and pattern in each transaction.   First, a loan originator, such as a mortgage lender or bank, originates the underlying residential mortgage loans.   After a loan has been made, a "sponsor" or "seller" (who either originated the loans itself or acquired the loans from other loan originators) sells the mortgage loans to a "depositor."   The depositor pools these loans and deposits them into a special purpose entity or trust created by the depositor.   One trust is established to hold the pool of mortgages for each proposed offering.   In order to facilitate multiple offerings of RMBS, a depositor sets up multiple trusts to hold the different pools of mortgages that are to be securitized.   With respect to each offering, in return for the pool of mortgages acquired from the depositor, the trust issues and distributes RMBS certificates to the depositor.   The depositor then works with an underwriter to price and sell the certificates to investors.   Thereafter, a servicer is appointed to service the mortgage loans held by the trust, *i.e.*, to collect the mortgage payments from the borrower in the form of principal and interest, and to remit them to the trust for administration and distribution to the RMBS investors.   The diagram on the next page illustrates the typical structure of a securitization:

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:53   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 38 of 214

CASE 0:12-cv-01844-SRN-JJG   Document 1   Filed 07/27/12   Page 38 of 214



77.    In selling the certificates to investors, the depositor and underwriters disseminate to investors various disclosure or offering documents describing the certificates being sold.   The offering documents are comprised of: (1) a "shelf" registration statement (under SEC Rule 415, an issuer may file one registration statement covering several offerings of securities made during a period of up to three years after the filing of the registration statement); (2) a "base" prospectus; and (3) a "prospectus supplement."   Because a depositor will create a different trust for each offering of RMBS (as described above), the depositor files one shelf registration statement and one base prospectus that apply to multiple trusts that the depositor proposes to establish.   With respect to each specific trust, however, the depositor also files a prospectus supplement that applies only to that particular trust.   Thus, for any given offering of securities, the

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01844-SRN-JBG   Document 1   Filed 07/27/12   Page 39 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 39 of 214

relevant offering documents will typically be a shared registration statement and shared base prospectus, as well as an individual, trust-specific prospectus supplement.

78.     Each investor who purchases an RMBS certificate is entitled to receive monthly payments of principal and interest from the trust.   The order of priority of payment to each investor, the interest rate to be paid to each investor, and other payment rights accorded to each investor depend on which class or tranche of certificates the investor purchases.

79.     The highest or senior tranche is the first to receive its share of the mortgage payments and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.   Accordingly, these senior tranches receive the highest investment rating by the rating agencies, usually AAA.   After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.   These mezzanine tranches are generally rated from AA to BB by the rating agencies.   The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.    Most RMBS were overcollateralized such that the trusts would receive more income than they were required to distribute, so that payments could be made in the event that some borrowers fell behind.   This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.

## II.    THE SECURITIZATIONS ASSOCIATED WITH PLAINTIFFS' CERTIFICATES AND THEIR INVESTMENTS IN THE CERTIFICATES

80.    In this case, the Certificates purchased by Plaintiffs were structured and sold by Ally-GMAC and its affiliated entities.  As such, the transactions between the sponsor/sellers, depositors, underwriters, and the Issuing Trusts were not arm's length transactions, as Ally-GMAC controlled nearly all the entities.

81.    Depositor Debtor RAMP, an Ally-GMAC entity, created the RAMP Issuing Trust.  RAMP then purchased mortgage loans from another Ally-GMAC entity, the Sponsor Debtor RFC, to place into the trusts.  In addition, the Certificates issued by the nearly all of the RALI Trusts were underwritten by another Ally-GMAC entity: Debtor Residential Funding.

82.    Depositor Debtor RALI, an Ally-GMAC entity, created the RALI Issuing Trusts.  RALI then purchased mortgage loans from another Ally-GMAC entity, the Sponsor Debtor RFC, to place into the trusts.  In addition, the Certificates issued by nearly all of the RALI Trusts were underwritten by another Ally-GMAC entity: Debtor Residential Funding.

83.    Depositor Debtor RASC, an Ally-GMAC entity, created the RASC Issuing Trusts.  RASC then purchased mortgage loans from another Ally-GMAC entity, the Sponsor Debtor RFC, to place into the trusts.  In addition, the Certificates issued by nearly all of the RASC trusts were underwritten by another Ally-GMAC entity: Debtor Residential Funding.

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 21:48:54 Exhibit B:
CASE 0:12-cv-01544-SRN-JJG Document 1 Filed 07/27/12 Page 41 of 214
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 41 of 214

84.     Depositor Debtor RFMSI, an Ally-GMAC entity, created the RFMSI Series 2006-S2 Trust.  RFMSI then purchased mortgage loans from another Ally-GMAC entity, the Sponsor Debtor RFC, to place into the trusts.

85.     In connection with their role as the depositors for the Issuing Trusts that are the subject of this action, Debtors RALI, RAMP, RASC, and RFMSI prepared and filed with the SEC the following shelf registration statements, to which the Certificates purchased by Plaintiffs are traceable:

| Registration Statement | Date Filed | Registrant | Amount Registered |
|---|---|---|---|
| 333-104662 | 5/1/2003 | RAMP | $15,000,000,000 |
| 333-107959 | 9/23/2003 | RALI | $19,397,349,015 |
| 333-110340 | 11/7/2003 | RFMSI | $16,727,612,846 |
| 333-110437 | 12/2/2003 | RAMP | $25,877,917,251 |
| 333-117232 | 8/5/2004 | RAMP | $20,000,000,000 |
| 333-122688 | 4/19/2005 | RASC | $15,000,000,000 |
| 333-125485 | 7/7/2005 | RAMP | $35,350,152,366 |
| 333-126745 | 8/3/2005 | RFMSI | $15,000,000,000 |
| 333-126732 | 8/9/2005 | RALI | $35,000,000,000 |
| 333-131213 | 3/6/2006 | RALI | $34,723,478,970 |
| 333-131211 | 3/31/2006 | RAMP | $34,825,700,727 |
| 333-140605 | 4/3/2007 | RFMSI | $45,000,000,000 |
| 333-140610 | 4/3/2007 | RALI | $80,000,000,000 |
| 333-140609 | 4/10/2007 | RAMP | $60,000,000,000 |

86.     At the time of filing, each Registration Statement contained an illustrative form of a prospectus supplement that would be used in the various offerings of Certificates.  At the effective date of a particular offering of Certificates, one or more Underwriters prepared and filed a final Prospectus Supplement with the SEC, which

contained a description of the mortgage pool for that particular offering of Certificates and a description of the underwriting standards by which the mortgages were originated. The Underwriters or Defendants or Debtors then marketed and sold the Certificates pursuant to these Prospectus Supplements.

87.    The following chart summarizes and identifies (1) each Issuing Trust that issued and sold the Certificates purchased by Plaintiffs; (2) the dates of the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold; and (3) the identities of the depositor, the issuer, underwriters, and the sponsor/seller for each offering.

| Amended Registration File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| 333-104662 (5/01/2003) | RAMP Series 2003-RS7 Trust | 05/27/2003 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co. Inc. Citigroup Global Markets Inc. GMAC RFC Securities JPMorgan Securities Inc | Residential Funding Corporation |
| | RAMP Series 2003-RS4 Trust | 05/29/2003 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co. Inc. CitiGroup Global Markets Inc. GMAC RFC Securities JPMorgan Securities Inc | Residential Funding Corporation |

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
CASE 12-cv-01844-SRN-JJG Document 1 Filed 07/27/12 Page 43 of 214
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 43 of 214

| | RAMP Series 2003-RS10 Trust | 11/24/2003 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co. Inc. CitiGroup Global Markets Inc. GMAC RFC Securities JPMorgan Securities Inc | Residential Funding Corporation |
|---|---|---|---|---|---|
| | | | | | |
| 333-107959 (9/23/2003) | RALI Series 2005-QA7 Trust | 6/28/2005 | Residential Accredit Loans, Inc. | Merrill Lynch & Co. | Residential Funding Corporation |
| | | | | | |
| 333-110340 (11/7/2003) | Home Loan Trust 2006-HI1 | 3/24/2006 | Residential Funding Mortgage Securities II, Inc. | Bear, Stearns & Co., Inc. GMAC RFC Securities | Residential Funding Corporation |
| | | | | | |
| 333-110437 (12/02/2003) | GMACM Mortgage Loan Trust 2004-AR1 | 4/30/2004 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co., Inc. GMAC RFC Securities RBS Greenwich Capital | GMAC Mortgage Corporation, LLC |
| | RAMP Series 2004-RS5 Trust | 5/26/2004 | Residential Asset Mortgage Products, Inc. | Citigroup Global Markets Inc. Credit Suisse First Boston LLC GMAC RFC Securities JPMorgan Securities Inc. | Residential Funding Corporation |
| | | | | | |
| 333-117232 (8/5/2004) | GMACM Mortgage Loan Trust 2005-AR5 | 8/12/2005 | Residential Asset Mortgage Products, Inc. | Credit Suisse First Boston LLC | GMAC Mortgage Corporation, LLC |
| | | | | | |

| 333-122688 (4/19/2005) | RASC Series 2005-KS12 Trust | 12/23/2005 | Residential Asset Securities Corporation | Banc of America Securities LLC<br><br>RBS Greenwich Capital | Residential Funding Corporation |
| | RASC Series 2006-EMX2 Trust | 2/21/2006 | Residential Asset Securities Corporation | Barclays Capital Inc. | Residential Funding Corporation |
| | RASC Series 2006-KS2 Trust | 2/22/2006 | Residential Asset Securities Corporation | Deutsche Bank Securities<br><br>GMAC RFC Securities<br><br>RBS Greenwich Capital | Residential Funding Corporation |
| | RASC Series 2006-KS3 Trust | 3/28/2006 | Residential Asset Securities Corporation | Citigroup Global Markets Inc. | Residential Funding Corporation |
| 333-125485 (7/7/2005) | GMACM Mortgage Loan Trust 2005-AR6 | 10/27/2005 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co., Inc. | GMAC Mortgage Corporation, LLC |
| | RAMP Series 2006-RS1 Trust | 1/25/2006 | Residential Asset Mortgage Products, Inc. | Banc of America Securities, LLC<br><br>Credit Suisse Securities LLC<br><br>GMAC RFC Securities<br><br>RBS Greenwich Capital | Residential Funding Corporation |
| 333-126745 (8/03/2005) | RFMSI Series 2005-SA4 Trust | 8/29/2005 | Residential Funding Mortgage Securities I, Inc. | RBS Greenwich Capital | Residential Funding Corporation |
| | RFMSI Series 2006-S2 Trust | 2/27/2006 | Residential Funding Mortgage Securities I, Inc. | UBS Securities LLC | Residential Funding Corporation. |

| | | | | | |
|---|---|---|---|---|---|
| | RFMSI Series 2006-S3 Trust | 3/29/2006 | Residential Funding Mortgage Securities I, Inc. | Citigroup Global Markets Inc.<br><br>UBS Securities LLC | Residential Funding Corporation |
| | | | | | |
| 333-126732 (8/9/2005) | RALI Series 2005-QA12 Trust | 5/02/2006 | Residential Accredit Loans, Inc. | Citigroup Global Markets Inc. | Residential Funding Corporation |
| | RALI Series 2005-QO1 Trust | 6/27/2006 | Residential Accredit Loans, Inc. | Deutsche Bank Securities Inc. | Residential Funding Corporation |
| | RALI Series 2005-QO2 Trust | 9/28/2005 | Residential Accredit Loans, Inc. | Goldman, Sachs & Co. | Residential Funding Corporation |
| | RALI Series 2005-QO3 Trust | 10/28/2005 | Residential Accredit Loans, Inc. | GMAC RFC Securities | Residential Funding Corporation |
| | RALI Series 2006-QA1 Trust | 1/27/2006 | Residential Accredit Loans, Inc. | Merrill Lynch & Co. | Residential Funding Corporation |
| | RALI Series 2006-QA2 Trust | 2/27/2006 | Residential Accredit Loans, Inc. | Citigroup | Residential Funding Corporation |
| | | | | | |
| 333-131213 (3/06/2006) | RALI Series 2006-QO3 Trust | 3/30/2006 | Residential Accredit Loans, Inc. | Goldman, Sachs & Co. | Residential Funding Corporation |
| | RALI Series 2006-QO5 Trust | 5/31/2006 | Residential Accredit Loans, Inc. | UBS Securities LLC | Residential Funding Corporation |

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
Case 1:12-cv-01844-SRN-JJG Document 1 Filed 07/27/12 Page 46 of 214
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 46 of 214

| | RALI Series 2006-QO6 Trust | 6/29/2006 | Residential Accredit Loans, Inc. | Goldman, Sachs & Co. | Residential Funding Corporation |
|---|---|---|---|---|---|
| | RALI Series 2006-QS18 Trust | 12/28/2006 | Residential Accredit Loans, Inc. | Deutsche Bank Securities Inc. GMAC RFC Securities Lehman Brothers Inc. | Residential Funding Company, LLC |
| | RALI Series 2007-QO2 Trust | 3/01/2007 | Residential Accredit Loans, Inc. | Deutsche Bank Securities Inc. | Residential Funding Company, LLC |
| | | | | | |
| 333-131209 (3/30/2006) | RASC Series 2006-EMX4 Trust | 5/24/2006 | Residential Asset Securities Corporation | GMAC RFC Securities RBS Greenwich Capital | Residential Funding Corporation |
| | RASC Series 2006-KS4 Trust | 5/30/2006 | Residential Asset Securities Corporation | Citigroup Global Markets, Inc. | Residential Funding Corporation |
| | RASC Series 2006-KS6 Trust | 7/27/2006 | Residential Asset Securities Corporation | JPMorgan Securities, Inc. | Residential Funding Corporation |
| | RASC Series 2006-KS7 Trust | 8/28/2006 | Residential Asset Securities Corporation | JPMorgan Securities, Inc. | Residential Funding Corporation |
| | RASC Series 2006-KS8 Trust | 9/28/2006 | Residential Asset Securities Corporation | Barclays Capital Inc. | Residential Funding Corporation |

| | | | | | |
|---|---|---|---|---|---|
| | RASC Series 2006-EMX9 Trust | 10/27/2006 | Residential Asset Securities Corporation | Barclays Capital Inc.<br><br>GMAC RFC Securities | Residential Funding Company, LLC |
| | RASC Series 2006-KS9 Trust | 10/30/2006 | Residential Asset Securities Corporation | Barclays Capital Inc. | Residential Funding Company, LLC |
| | RASC Series 2007-KS2 Trust | 2/23/2007 | Residential Asset Securities Corporation | JPMorgan Securities Inc. | Residential Funding Company, LLC |
| | | | | | |
| 333-131211 (3/31/2006) | RAMP Series 2006-RZ2 Trust | 5/02/2006 | Residential Asset Mortgage Products, Inc. | Barclays Capital Inc.<br><br>Bear, Stearns & Co. Inc.<br><br>GMAC RFC Securities | Residential Funding Corporation |
| | RAMP Series 2006-RS4 Trust | 6/27/2006 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co. Inc.<br><br>Credit Suisse Securities (USA) LLC<br><br>GMAC RFC Securities<br><br>RBS Greenwich Capital | Residential Funding Corporation |
| | RAMP Series 2006-RZ3 Trust | 8/03/2006 | Residential Asset Mortgage Products, Inc. | Banc of America Securities LLC<br><br>Bear, Stearns & Co. Inc.<br><br>GMAC RFC Securities | Residential Funding Corporation |

12-12020-mg Doc 6427-2 Filed 08/04/14 Entered 02/04/14 15:48:52 Exhibit B:
CASE 0:12-cv-01844-SRN-JJG Document 1 Filed 07/27/12 Page 48 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 48 of 214

| | | | | | |
|---|---|---|---|---|---|
| | RAMP Series 2006-RZ4 Trust | 9/25/2006 | Residential Asset Mortgage Products, Inc. | Banc of America Securities LLC<br><br>Credit Suisse Securities (USA) LLC<br><br>GMAC RFC Securities | Residential Funding Corporation |
| | RAMP Series 2006-RS6 Trust | 10/27/2006 | Residential Asset Mortgage Products, Inc. | Deutsche Bank Securities | Residential Funding Company, LLC |
| | RAMP Series 2006-RZ5 Trust | 12/20/2006 | Residential Asset Mortgage Products, Inc. | Credit Suisse Securities (USA) LLC | Residential Funding Company, LLC |
| | | | | | |
| 333-140605 (4/03/2007) | Home Equity Loan Trust 2007-HSA2 | 4/26/2007 | Residential Funding Mortgage Securities II, Inc. | Citigroup Global Markets Inc.<br><br>GMAC RFC Securities<br><br>RBS Greenwich Capital | Residential Funding Company, LLC |
| | Home Equity Loan Trust 2007-HSA3 | 5/29/2007 | Residential Funding Mortgage Securities II, Inc. | Credit Suisse Securities (USA) LLC<br><br>GMAC RFC Securities | Residential Funding Company, LLC |
| | | | | | |
| 333-140610 (4/032007) | RALI Series 2007-QH4 Trust | 4/27/2007 | Residential Accredit Loans, Inc. | GMAC RFC Securities<br><br>Goldman, Sachs & Co. | Residential Funding Company, LLC |
| | RALI Series 2007-QS6 Trust | 4/27/2007 | Residential Accredit Loans, Inc. | Bear, Stearns & Co. Inc. | Residential Funding Company, LLC |

| | | | | | |
|---|---|---|---|---|---|
| | RALI Series 2007-QS9 Trust | 7/30/2007 | Residential Accredit Loans, Inc. | GMAC RFC Securities<br><br>RBS Greenwich Capital | Residential Funding Company, LLC |
| | RALI Series 2007-QS10 Trust | 9/04/2007 | Residential Accredit Loans, Inc. | Bear, Stearns & Co. Inc. | Residential Funding Company, LLC |
| | RALI Series 2007-QS11 Trust | 9/27/2007 | Residential Accredit Loans, Inc. | GMAC RFC Securities | Residential Funding Company, LLC |
| | | | | | |
| 333-140609<br>(4/10/2007) | GMACM Home Equity Loan Trust 2007-HE2 | 6/29/2007 | Residential Asset Mortgage Products, Inc. | Bear, Stearns & Co., Inc.<br><br>GMAC RFC Securities<br><br>RBS Greenwich Capital | GMAC Mortgage Corporation, LLC |
| | | | | | |

## III.    IMPORTANT FACTORS IN THE DECISION OF INVESTORS, SUCH AS PLAINTIFFS, TO INVEST IN THE CERTIFICATES

88.    In purchasing the Certificates, Plaintiffs, like other investors, attached critical importance to: (a) the underwriting standards used to originate the loans underlying the Certificates; (b) the value of the properties securing the underlying mortgage loans and the appraisal methods used to determine this; (c) the ratings assigned to the Certificates; (d) the level of credit enhancement applicable to the Certificates; and (e) the ability of the Issuing Trusts to establish legal title to the underlying loans.

89.    Sound underwriting was critically important to Plaintiffs because the ability of borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificates were valued.    Reflecting the importance of the

underwriting standards, the Offering Documents contained representations concerning

the standards purportedly used to originate the mortgages held by the Issuing Trusts.

90.    For example, the Registration Statement filed by RAMP, dated July 7,

2005, stated that:

> The depositor expects that the originator of each of the loans
> will have applied, consistent with applicable federal and
> state laws and regulations, underwriting procedures intended
> to evaluate the borrower's credit standing and repayment
> ability and/or the value and adequacy of the related
> property as collateral.... The accompanying prospectus
> supplement will describe most aspects of the underwriting
> criteria, to the extent known by the depositor, that were
> applied by the originators of the loans.

91.    Similarly, the Prospectus Supplements indicated that the underwriting

guidelines were primarily intended to assess the ability and willingness of the borrower to

repay the debt and to evaluate the adequacy of the mortgaged property as collateral for

the mortgage loan.

92.    With respect to loans acquired from third-party originators, the Prospectus

Supplements represented that stated underwriting guidelines required them to consider,

among other things, the mortgagor's credit history, repayment ability, and debt-to-income

ratio, as well as the type and use of the mortgaged property.  In addition, the Prospectus

Supplements represented that in order for a loan package to be submitted, the loans must

have been made in compliance with the terms of signed mortgage loan purchase

agreements.

93.    Independent and accurate real estate appraisals were also critically

important to investors such as Plaintiffs because they ensured that the mortgage loans

underlying the Certificates were not under-collateralized, thereby protecting RMBS investors in the event a borrower defaulted on a loan. As such, by allowing RMBS investors to assess the degree to which mortgage loans were adequately collateralized, accurate appraisals provided investors such as Plaintiffs with a basis for assessing the price and risk of the Certificates.

94.     One measure that uses the appraisal value to assess whether mortgage loans are under-collateralized is the loan-to-value ("LTV") ratio. The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total value of the property, as obtained from the appraisal. For example, if a borrower seeks to borrow $900,000 to purchase a house worth $1,000,000, the LTV ratio is $900,000/$1,000,000, or 90%. If, however, the appraised value of the house is artificially increased to $1,200,000, the LTV ratio drops to just 75% ($900,000/$1,200,000).

95.     From the perspective of lenders, and investors such as Plaintiffs, the higher the LTV ratio, the riskier the loan, because it indicates the borrower has a lower equity stake, and a borrower with a lower equity position has less to lose if s/he defaults on the loan. The LTV ratio is a significant measure of credit risk because both the likelihood of default and the severity of loss are higher when borrowers have less equity to protect in the event of foreclosure. Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may *exceed* the value of the property.

96.     As stated above, many of the Offering Documents represented that the adequacy of the mortgaged properties as collateral had generally been determined by

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
Case 0:12-cv-01944-SRN-JJG    Document 1    Filed 07/27/12    Page 52 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 52 of 214

appraisals in accordance with appraisal procedure guidelines set forth in a Seller's Guide drafted by RFC. These guidelines purportedly mandated measures to ensure the accuracy of the appraisals, including that:

- The appraiser or an agent on its behalf was generally required to personally inspect the properties to verify that they were in good condition, and to ensure that construction of new properties had been substantially completed.

- The appraiser was required to consider market data analyses of recent sales of comparable properties and, if applicable, analyses of income generated from the properties or replacement cost analyses.

97.    Reflecting the importance of independent and accurate real estate appraisals to investors such as Plaintiffs, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts and the appraisal methods by which such values were obtained.

98.    The rating assigned to each of the Certificates was another important factor in Plaintiffs' decisions to purchase the Certificates. Plaintiffs and other investors relied on the ratings as an indicator of the safety and likelihood of default of the mortgage loans underlying a particular Certificate.

99.    In purchasing the Certificates, Plaintiffs relied on the ability of each of the Issuing Trusts to be able to show that it in fact had legal title to the underlying mortgage loans. Plaintiffs would never have purchased any of the Certificates from Defendants and Debtors if there was any doubt as to whether the Issuing Trusts had legal title to any of the mortgage loans that were pooled for each offering.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:53   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 53 of 214
CASE 0:12-cv-01944-SRN-JJG   Document 1   Filed 07/27/12   Page 53 of 214

100.   Finally, the Prospectus Supplements represented the level of credit enhancement, or loss protection, associated with the Certificates.  Credit enhancements impact the overall credit rating that a Certificate receives, and are thus material to investors such as Plaintiffs.  The amount of credit enhancement built into the Certificates was overstated, exposing Plaintiffs to additional losses.

## IV.   DEFENDANTS AND DEBTORS KNEW THAT A LARGE PERCENTAGE OF THE MORTGAGE LOANS UNDERLYING PLAINTIFFS' CERTIFICATES WERE MADE AS A RESULT OF THE SYSTEMATIC ABANDONMENT OF PRUDENT UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS

101.   Prior to underwriting and selling the Certificates to investors like Plaintiffs, Defendants and Debtors had identified but failed to disclose the widespread underwriting and appraisal deficiencies by the mortgage originators described below.  This was in direct contrast to the representations in the Offering Documents accompanying the Certificates sold to Plaintiffs.

102.   As has now come to light, contrary to the representations in the Offering Documents, Debtors GMAC Mortgage and Homecomings and the third-party originators that originated the mortgages underlying the Certificates, knowingly departed from the underwriting and appraisal standards that were represented in the Offering Documents.

103.   In the late 1990s and early 2000s an unprecedented boom in the housing market began to unfold.  Between 1994 and 2006, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners.  Likewise, the subprime market grew dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.  According to INSIDE

MORTGAGE FINANCE, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5% of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

104.   To ride this housing boom, financial firms aggressively pushed into the complex, high-margin business of securitization, *i.e.*, packaging mortgages and selling them to investors as RMBS.  This aggressive push created a boom for the mortgage lending industry.  Mortgage originators generated profits primarily through the sale of their loans to financial firms like Ally-GMAC, and the originators were therefore driven to originate and sell as many loans as possible.  This high-volume business model, and the awareness of originators and RMBS issuers that RMBS investors such as Plaintiffs would ultimately take the losses from defaulting loans, led to an overall decline in lending standards and tolerance of mortgage fraud.  Indeed, according to the FBI, a fraud analytics company analyzed more than 3 million loans and found that between 30 and 70 percent of early payment defaults were linked to significant misrepresentations in the original loan applications.

105.   In addition, some appraisers were openly instructed to alter their valuations for the benefit of the mortgage lenders.  According to the June 26, 2007 testimony of Alan Hummel, the chair of the Appraisal Institute's Government Relations Committee, before the House Committee on Financial Services on 'Legislative Proposals on Reforming Mortgage Practices,' "Unfortunately, these parties with a vested interest in the transaction are often the same people managing the appraisal process within many financial institutions, and therein is a terrible conflict of interest. . . . [I]t is common for a

client to ask an appraiser to remove details about the material condition of the property to avoid problems in the underwriting process."   A 2007 study conducted by the October Research Corporation reported that 90% of appraisers had been pressured to raise property valuations so that deals could go through, and that 75% of appraisers reported "negative ramifications" if they did not alter their appraisals accordingly.

106.   Even absent explicit coercion or collusion, mortgage originators could inflate apparent home values simply by offering work to only complaint appraisers. According to the April 7, 2010 testimony of Richard Bitner ("Bitner"), a former executive of a subprime mortgage originator, before the FCIC, "[B]rokers didn't need to exert direct influence.  Instead they picked another appraiser until someone consistently delivered the results they needed."

107.   Widespread and systematic overvaluations by mortgage originators set into motion a snowball effect that inflated housing prices all across the country and further distorted the RMBS market.  As Bitner testified, "If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals.  The process then repeats itself.  We saw it on several occasions.  We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later.  Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. . . . In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country."

108.    In the instant action, the players that structured the Certificates purchased by Plaintiffs were Ally-GMAC and its affiliated entities.  Ally-GMAC embarked on a scheme to profit from the housing boom by acquiring or partnering with subprime lenders, such as the third-party originators described in Section IV.B, below, and then directing or encouraging these lenders to originate and purchase large numbers of mortgage loans, regardless of the borrower's ability to pay, so that the loans could then be quickly flipped at a profit on to an unsuspecting secondary market (that is, RMBS investors such as Plaintiffs).

109.    Ally-GMAC reaped billions of dollars in profits from its activities in the RMBS space during the U.S.  housing boom.  Ally-GMAC's ResCap operation was a vertically integrated business with a hand in nearly every stage of the mortgage securitization business, including originating, purchasing and selling residential mortgage loans, bundling mortgages into RMBS and selling them to investors, and servicing the loans it had securitized.  At nearly every stage in the mortgage securitization process, Ally-GMAC garnered enormous profits.  Ally-GMAC pocketed the difference between what it paid to originate or purchase a pool of mortgage loans and what it received from selling those loans into a securitization.  Ally-GMAC obtained underwriting fees and commissions from selling the RMBS it had securitized to investors.  Ally-GMAC also collected fees for servicing pooled mortgages.  According to *Inside Mortgage Finance,* from 2004 to 2007 Ally-GMAC issued a total of approximately $197.85 billion in non-agency RMBS (which is to say, RMBS not associated with a government agency or government-sponsored enterprise such as Fannie Mae or Freddie Mac).  According to

Ally Financial's Form 10-K filings, Ally-GMAC's ResCap operations produced approximately *$12.76 billion* in net revenue over that same time period.

110.    Ally-GMAC was totally dependent upon a steady supply of mortgage loans – the raw materials of securitization – to keep its lucrative RMBS business in operation. Without such loans, Ally-GMAC would not have been able to issue and sell new RMBS. Thus, Ally-GMAC was far more interested in originating and purchasing a high volume of loans than it was in ensuring that those loans were of high quality.  As a former RFC trader quoted in a separate complaint against Ally-GMAC stated, Ally-GMAC "needed to continue to purchase more loans for the securitizations, or they would have been out of business."[4]  According to this employee, who worked at RFC from 1998 to March 2007, beginning in 2005 RFC began to purchase higher risk loans and allow more frequent exceptions to underwriting guidelines, especially if the third party originators selling the loans were good clients.  At about that time, the third party originators that RFC dealt with began restricting RFC's reviews of the loans it acquired in bulk.  This employee also stated that RFC's sales force was paid commissions based on the volume of the loans acquired and not the creditworthiness of those loans.

111.    According to another former RFC analyst quoted in the complaint in *West Virginia Inv. Mgmt. Board v. Residential Accredited Loans, Inc.,* No. 10-c-412 (W. Va. Cir. Ct filed Mar. 4, 2010), Defendant Paradis, the President and CEO of RFC, would directly intervene with traders who balked at buying low-quality mortgages, especially

---

[4] *West Virginia Investment Management Board v. Residential, et al.,* No. 10-C-412 (W.V. State Circuit Ct., Filed Mar. 4, 2010).

when the sellers were favored vendors.  The analyst stated that "it was not uncommon for Paradis to go down to the desk, put his arm around the trader, and say, 'come on, why not.'"

112.   As represented in the Offering Documents, the originators made loans pursuant to underwriting guidelines primarily intended to assess the ability and willingness of the borrower to repay the mortgage loan, apart from the adequacy of the mortgaged property as collateral for the loan.  Accordingly, the underwriting guidelines required the consideration of, among other things, the borrower's assets, liabilities, income, employment history and credit history.

113.   Notwithstanding these explicit requirements in their underwriting guidelines, the originators extended numerous loans even though the borrower's financial and employment information was not provided, or even if it was, that information was patently false and the originators knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud.

114.   In their respective capacities as sponsor/sellers, depositors, and underwriters of the Certificates purchased by Plaintiffs, Defendants and Debtors had an obligation to conduct due diligence regarding the accuracy and completeness of the Offering Documents prior to their dissemination to investors such as Plaintiffs.   In connection with that due diligence process, Defendants and Debtors had access to information which should have alerted them to the various originators' systematic and widespread abandonment of stated underwriting guidelines and appraisal methods. Defendants and Debtors were supposed to play a "gatekeeper" role for public investors

like Plaintiffs, who did not have access to non-public information through which to test the assertions in the Offering Documents.

115.    Defendants and Debtors did not fulfill their obligation to ensure that investors, like Plaintiffs, were provided with Offering Documents containing accurate and complete information. In connection with a lawsuit, another company, MBIA Insurance Corporation ("MBIA") has conducted loan-level analyses of three Ally-GMAC RMBS with a total original principal balance of more than $4 billion. The RMBS were underwritten by Defendant Residential Funding, the depositor for each offering was Defendant RAMP, and Defendant Ally Bank was the originator of the underlying mortgage loans.

116.    MBIA agreed to insure the payments of these RMBS in the event that the cash flows to the trusts were impaired. When the loans underlying the RMBS began to default at a much higher rate than had been expected, MBIA investigated the individual loan files and documentation to determine the reasons for its losses. This forensic analysis covered 4,104 delinquent and charged-off mortgage loans underlying the Ally-GMAC RMBS.

117.    MBIA discovered that Ally-GMAC had flagrantly disregarded its lending and underwriting standards. As described above, at least *89%* of the delinquent and charged-off loans it reviewed were in breach of one or more of Ally-GMAC's representations and warranties, with most containing multiple breaches. A significant number of mortgage loans were made on the basis of stated incomes that were "grossly unreasonable" or were approved despite debt-to-income or loan-to-value ratios in excess

of those stated in Ally-GMAC's mortgage underwriting guidelines or the prospectus supplements.  Furthermore, the vast majority of the loan files MBIA examined were missing basic and necessary documentation, such as disclosures establishing the chain of title.

118.   On information and belief, the mortgage loans underlying the Certificates purchased by Plaintiffs suffer from similar deficiencies as the mortgage loans underlying the Certificates insured by MBIA.  From the sheer volume of nonconforming loans, it is apparent that Defendants and Debtors either knew or acted with reckless disregard with respect to the risk that a substantial number of the loans that were included in the securitizations purchased by Plaintiffs were not underwritten in compliance with the stated underwriting guidelines.

119.   Ally-GMAC's fraudulent origination and purchasing practices are further evidenced by information obtained from the government sponsored entities Fannie Mae and Freddie Mac (the "GSEs").  Both of the GSEs purchase mortgage loans from financial institutions including Ally-GMAC.  The mortgages that Ally-GMAC sold to the GSEs were originated through substantially the same channels and methods as the mortgages underlying Plaintiffs' Certificates, but unlike the loans underlying the Certificates, not all of the mortgages sold to the GSEs were securitized.  Because the GSEs purchased individual mortgages directly, rather than receiving Certificates from an Issuing Trust, the GSEs were in a better position than Plaintiffs to determine whether the mortgages Ally-GMAC sold them had been originated in conformance with Ally-GMAC's stated underwriting and documentation standards.  If any purchased loans did

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01944-SRN-JJG   Document 1   Filed 07/27/12   Page 61 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 61 of 214

not comply with Ally-GMAC's representations, the GSEs possessed the right to demand that Ally-GMAC repurchase them.

120.    According to documents provided to the FCIC as of September 10, 2010, Fannie Mae has required Ally-GMAC to repurchase 3,457 loans originated by Defendant Ally Bank, GMAC Mortgage, and Residential Funding, with an unpaid principal balance of $679 million, and had requested that Ally-GMAC also repurchase an additional 776 loans with an outstanding principal balance of $159 million.  In December 2010, ResCap agreed to pay Fannie Mae approximately $462 million to settle claims regarding ResCap's obligations to repurchase defective loans.

121.    Freddie Mac also purchased RMBS from Ally-GMAC.  On September 2, 2011, the FHFA, acting as conservator for Freddie Mac, sued Ally-GMAC in New York state court, alleging, as Plaintiffs does, that the offering documents "falsely represented that the mortgage loans underlying the RMBS complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans."

122.    For each of the RMBS named in its lawsuit, Freddie Mac reviewed either a random sample of 1,000 of the underlying loans, or all of the underlying loans if there were less than 1,000 in the pool.  This review confirmed, on a statistically significant basis, that Ally-GMAC's representations regarding owner-occupancy rates, LTV ratios, and underwriting standards had all been materially false.  Likewise, in 2008, 2009, and 2010, Freddie Mac required GMAC Mortgage to repurchase 2,375 defective loans with an unpaid principal balance of $509 million.

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 62 of 214

CASE 0:12-cv-01944-SRN-JJG Document 1 Filed 07/27/12 Page 62 of 214

123.   Ally-GMAC had direct insight into the true quality of the loans underlying the Certificates it issued to Plaintiffs.  This is evidenced by Ally-GMAC's extensive financial relationships with the third-party originators, as well as by the origination of equally defective loans through its own mortgage origination affiliates, Debtors GMAC Mortgage and Homecomings.  Additionally, when originating and purchasing loans, Ally-GMAC made widespread use of proprietary underwriting software despite its awareness that the software did not apply its stated underwriting standards and would approve non-compliant loans.

124.   Defendant Ally Bank, Ally Financial's wholly-owned banking subsidiary, was the vehicle through which Defendant Ally Financial funded and controlled its vertically-integrated mortgage operations, including its mortgage origination, securitization, and servicing activities.[5]  "Ally Bank, our [Ally Financial's] direct banking platform, provides our . . . mortgage loan operations with a stable and low-cost funding source and facilitates prudent asset growth."[6]  Funded and managed by Ally Bank, Ally Financial's mortgage subsidiaries originated or purchased $56.3 billion in mortgage loans in 2011, making it one of the largest residential mortgage originators and servicers in the United States.  In connection with its role in directing Ally Financial's mortgage operations, Ally Bank is currently being required by its regulators to make improvements to its compliance management and training, internal audit program, consumer protection

---

[5] *See* Ally Financial 10-K, filed with the SEC on Feb. 28, 2012.

[6] *See id*. at 1, 4, 93.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
Case 1:12-cv-01844-SRN-JJG   Document 1-1   Filed 07/27/12   Page 63 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 63 of 214

monitoring, consumer complaint resolution, residential mortgage loan pricing, and fee monitoring practices.   According to Ally Financial's 2011 Form 10-K, it generally originates or purchases mortgages for securitization into RMBS.   Ally Bank, as the entity overseeing Ally Financial's mortgage operations, thus creates and manages the legal structures involved in securitizing these mortgage assets.   Ally Bank's direct role in creating, structuring, and overseeing Ally Financial's securitization practice, in addition to its role managing mortgage origination and servicing activities, gives it direct insight into the nature and quality of the applicable underwriting standards and thus of the misstatements contained in the Offering Documents.

### A.   DEBTORS GMAC AND HOMECOMINGS ABANDONED THEIR UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS

#### 1.   Ally-GMAC Originator Entities

125.   GMAC Mortgage Corporation (GMAC) originated mortgage loans pooled into RMBS and purchased by Plaintiffs, including the GMACM Series 2005-AR5, GMACM Series 2005-AR6, RAMP Series 2006-RS4, and RAMP Series 2006-RZ4 Trusts.   GMAC, an affiliate of RFC, was founded in 1985 by the finance subsidiary of General Motors Corp. and grew to be the fourth largest U.S. mortgage loan originator by 2010, originating tens of billions of dollars in mortgages every year.   In addition to selling loans to financial institutions, GMAC also used some of the loans it originated to issue its own RMBS.

126.   GMAC Mortgage, LLC was a wholly-owned subsidiary of GMAC Residential Holding Company, LLC, which was a wholly-owned subsidiary of ResCap.

ResCap was a wholly-owned subsidiary of GMAC Mortgage Group, LLC, which was a wholly-owned subsidiary of GMAC LLC.  GMAC Mortgage, LLC originated mortgage loans pooled into RMBS and purchased by Plaintiffs, including the GMACM Series 2007-HE2, RALI Series 2007-QS9, RALI Series 2007-QS10, RALI Series 2007-QS11, RALI Series 2006-QS18, RAMP Series 2006-RS6 and RAMP Series 2006-RZ5 Trusts.

127.    Ally Bank was a subsidiary of and later sold to GMAC Mortgage, LLC. Ally Bank originated mortgage loans pooled into RMBS and Purchased by Plaintiffs, including the GMACM Series 2007-HE2 Trust.

128.    The quality of the loans in these securitizations illustrated the lax underwriting standards used by Ally-GMAC.  In connection with a securities fraud lawsuit against Ally-GMAC, MBIA analyzed the loan files for 4,804 of the delinquent loans in three Ally-GMAC RMBS and found that 89% of the loans reviewed contained one or more breaches of the representations and warranties contained in the mortgage loan offering documents.[7]  These included routine breaches of underwriting standards, unreasonable stated incomes in loan applications, failure to verify borrower employment or prior mortgage payment history, approval of loans to borrowers with ineligible collateral or credit scores, incomplete documentation and missing title instruments, and breaches of state predatory lending laws.

129.    Former GMAC Mortgage employees were interviewed by Thrivent Financial ("Thrivent") in connection with a separate lawsuit and have confirmed that

---

[7] *MBIA Insurance Corp. v. Residential Funding Company, LLC.*, No. 08-603552 (N.Y. Sup. Ct., Filed Dec. 4, 2008).

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 65 of 214
CASE 0:12-cv-01841-SRN    Document 1    Filed 07/27/12    Page 65 of 214

GMAC Mortgage abandoned its stated underwriting and appraisal standards so as to generate increased volume. One confidential witness, a senior mortgage underwriter for GMAC Mortgage between 2003 and 2005, said that GMAC Mortgage's underwriting procedures were "pretty loose" and were referred to as "creative underwriting."[8] Because corporate personnel wanted more loans approved, the witness said that approving loans was a way of "scratching peoples' backs."

130.    Another confidential witness, a senior wholesale writer for Ally-GMAC between 1997 and 2007, said that her supervisors overrode her underwriting decisions to approve "loans they knew were bad," so as to increase their bonuses.[9] "A lot of times the sales director would raise holy commotion with the supervisor and directors, and under pressure, they'd approve bad loans." She said that GMAC Mortgage approved many loans without verifying the borrowers' income or assets, which were called "liar loans, because we knew damn well they were lying. You can't tell me a manicurist in L.A. was making $12,000 a month." The witness also said that fraudulent appraisals that "you knew damn well did not support the value" were accepted by management. She said that she did not even trust the loan documentation, because she had heard of underwriters placing false information in loan files at management's behest.

131.    This witness traced Ally-GMAC's underwriting practices to the "originate-to-securitize" model, noting that the underwriters would receive emails from the trading

---

[8] *Thrivent Financial for Lutherans v. Countrywide Financial Corp.*, No. 11-5830 (Minn. State Dist. Ct., Filed Apr. 27, 2011).

[9] *Id.*

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 66 of 214
Case 0:12-cv-01944-SRN-JJG    Document 1    Filed 07/27/12    Page 66 of 214

department instructing them that they needed additional loans to fill pools.  She knew of one person who worked as a liaison between trading and underwriting, who was permitted to approve loans despite no underwriting experience.  Another employee in charge of bulk loan files would approve multiple loans at once without taking into account whether they had been approved, declined or pended by the underwriters.  When the witness complained to management, she was told that "everybody knew" about this conduct and that there was no problem with it.

132.    In addition to adopting skewed incentive structures and tolerating mortgage fraud, GMAC Mortgage also weakened its underwriting standards by utilizing badly flawed underwriting software.  In late 2004, Ally-GMAC introduced an automated loan decision-making engine called Assetwise to streamline loan acquisition and origination.  Loan personnel could enter data regarding a proposed loan into Assetwise and receive immediate guidance as to whether that loan would be eligible for purchase by Ally-GMAC.  GMAC Mortgage made extensive use of this software, and also provided it to select third party originators to facilitate sales.    As General Motors Acceptance Corporation stated in an 8-K filing, filed on June 24, 2005,

> To help ensure consistency and efficiency in its production of residential mortgage loans, much of the Residential Capital Group's underwriting analysis is conducted through the use of its proprietary underwriting technology, Assetwise Direct. This proprietary technology implements automated decision, pricing and integration tools that extend mortgage products and risk management and pricing strategies to points of origination, and facilitates secondary market acquisition of mortgage loans.

133.    However, according to the MBIA lawsuit, Assetwise was programmed with looser standards than Ally-GMAC's stated underwriting guidelines. As a result, Assetwise approved loans that should never have been made, which were consequently bundled into RMBS and sold to investors such as Plaintiffs.  Rather than ensuring "consistency and efficiency," Assetwise created inconsistency, masked the true underwriting standards that were being applied, and permitted loan personnel to easily circumvent prudent and necessary safeguards.

134.    GMAC Mortgage also made use of another underwriting program, Desktop Underwriter, which similarly failed to apply Ally-GMAC's stated underwriting standards.  Former Ally-GMAC employees quoted in the complaint brought by Thrivent Financial have discussed the failings of Desktop Underwriter.[10]  One witness, a senior underwriter at GMAC Mortgage from 1986 to 2008, said that GMAC Mortgage used human underwriters only to approve loans that could not be processed through its software, and that the software did not require verification of income or assets.  Thus, Ally-GMAC effectively abdicated its responsibility to substantiate borrower claims for any loans that its software would accept.  The witness further said, "If the application indicates it and the borrower says it, [Desktop Underwriter treated it as] truth.  And we as underwriters rarely saw them."  This witness also referred to GMAC Mortgage's no-documentation loans as liar loans and said that any GMAC Mortgage borrower "could say they made $8,000 a month [when] they really didn't."

---

[10] *Thrivent Financial for Lutherans v. Countrywide Financial Corp.*, No. 11-5830 (Minn. State Dist. Ct., Filed Apr. 27, 2011).

135.   Another witness, who was an Ally-GMAC underwriter from 1997 to 2008, stated that the Desktop Underwriter did not require documentation, had "very loose guidelines," and "rarely turned down a loan."   According to this witness, when processing no-documentation loans, GMAC only verified credit scores and LTV ratios. Requiring borrowers to verify their information "was just unheard of."

136.   A witness who worked at Ally-GMAC as a securities trading analyst from 2006 to 2007 said that Ally-GMAC could have detected fraudulent loans had it chosen to look beyond the basic information in the computer files.   However, because the underwriting was automated, mortgage brokers could submit information based on the criteria needed to close a loan rather than the borrower's actual circumstances.

## 2.   Homecomings

137.   Homecomings Financial Network, Inc. ("HFN") was incorporated in 1995 and was a wholly-owned subsidiary of Residential Funding Corporation.   HFN later became Homecoming Financial, LLC ("Homecomings"), a Delaware limited liability company and a wholly-owned subsidiary of Residential Funding Company, LLC.   HFN originated mortgage loans pooled into securitizations purchased by Plaintiffs, including the RALI Series 2005-QO2, RALI Series 2005-QO3, RALI Series 2005-QA7, RALI Series 2006-QS18, RALI Series 2006-QA2, RALI Series 2006-QO5, RASC Series 2005-KS12, RASC Series 2006-KS2, RASC Series 2006-KS3, RASC Series 2006-KS4, RASC Series 2006-KS6, RASC Series 2006-KS7, RASC Series 2006-KS8, RAMP Series 2003-RS5, RAMP Series 2003-RS7, RAMP Series 2006-RZ2, RAMP Series 2006-RZ3, RAMP Series 2006-RZ4, RAMP Series 2006-RS4, HELT Series 2006-HI1, RFMSI

Series 2005-SA4, RFMSI Series 2006-S2, RFMSI Series 2006-S3 Trusts, HELT Series 2007-HSA3, RALI Series 2007-QS6, RALI Series 2007-QS9, RALI Series 2007-QS10, RAMP Series 2006-RS6, RAMP Series 2006-RZ5 and RASC Series 2006-KS9 Trusts. Homecomings originated nearly $4.5 billion in mortgage loans in 2008.

138.   Homecomings was ResCap's primary wholesale lender from 1995 until its closure in 2008.  A former RFC mortgage trader quoted in the *West Virginia Investment Management Board* complaint said that RFC traders made exceptions for Homecomings loans that were higher risk and did not fit standard underwriting guidelines.

139.   Homecomings has been targeted by lawsuits and come under regulatory scrutiny for offering excessively risky loans and engaging in abusive servicing practices. Tim Boyd, a former Homecomings loan officer, was quoted as saying that Homecomings' "main focus was doing Alt-A [a category of loans supposedly riskier than prime but less risky than subprime] because that's where the money was," in a March 5, 2009 PORTLAND TRIBUNE article, "Shaky Loans May Spur New Foreclosure Wave."

140.   Option ARMs are an especially risky form of loan because borrowers may wind up adding to their total indebtedness by making interest-only payments.  Bill Ridge, a mortgage broker quoted in the PORTLAND TRIBUNE article, noted that Ally-GMAC management was especially keen on pushing such loans, stating, "The V.P.s came down to the office beating the drums about Option ARMs.  I had Wachovia march through there; I had GMAC."  He also said that he knew of loan officers who would instruct title agents not to inform borrowers about the problematic aspects of these loans.  Boyd said that while a loan officer arranging a $300,000 Option ARM loan could collect as much as

$10,500 in fees, he personally did not sell such loans because it made him "sick" to see how they could get borrowers into trouble.

141.    The West Virginia Attorney General's office has investigated Homecomings for predatory lending and mortgage servicing practices, including charging a wide range of excess and unlawful fees and engaging in servicing practices that made foreclosure more likely to occur.  On June 9, 2005, the West Virginia Attorney General's office announced that it had reached a settlement with Homecomings and another mortgage servicing company, whereby they agreed to pay $773,000 in restitution to approximately 2,300 West Virginia consumers and cancel nearly $11 million in debt.

142.    The Federal Trade Commission ("FTC") investigated Homecomings for possible violations of the Equal Credit Opportunity Act after reviewing Homecomings' mortgage loan data and discovering that African-American and Hispanic borrowers paid more for Homecomings mortgage loans than non-Hispanic whites.    The FTC's investigation focused on whether the underwriting risk and credit characteristics of the borrowers justified the reported disparities in loan price.  The investigation revealed that, rather than applying uniform, risk-based underwriting standards to ensure that its borrowers were receiving loans that they could afford, Homecomings permitted independent brokers to tack on fees and hike interest rates on a discretionary basis, increasing the risk of default.

143.    On February 7, 2008, Homecomings borrowers filed a Truth-In-Lending-Act ("TILA") class action complaint against the company, alleging that it had engaged in a "nationwide scheme of illegal, unfair, unlawful and deceptive business practices that

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01944-SRN-JJG   Document 1   Filed 03/27/12   Page 71 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 71 of 214

violate both state and federal law," including structuring account statements, "in a way that makes it extremely difficult or impossible for borrowers to determine how much they owe, or how any mortgage payment will be allocated." The complaint further alleged that Homecomings' improper fees and collection practices increased the likelihood that borrowers would default, a matter of great concern to RMBS investors such as Plaintiffs. The lawsuit settled in November 2009.

144. As discussed in ¶¶114-17, *supra,* the insurer MBIA has conducted loan-level analyses of several Ally-GMAC RMBS and discovered that the vast majority of the underlying mortgages in default were in violation of the representations and warranties made in the offering documents. Homecomings was one of the major originators for a number of the RMBS analyzed by MBIA.

145. On September 3, 2008, ResCap announced that it would stop offering home loans through Homecomings. According to a January 22, 2009 letter from the FTC, Homecomings has stated that it has no intention of resuming mortgage lending in the future.

146. In 2009, a consumer lawsuit was filed against Homecomings for misrepresenting a borrower's income in loan documentation in order to get the borrower approved for a mortgage. The complaint also claimed that Homecomings systematically inflated the market values of properties in order to originate more loans and increase its profits from securitizations.

147. On May 14, 2012, Homecomings filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware.

**B.    THE THIRD PARTY ORIGINATORS OF THE MORTGAGE LOANS
UNDERLYING PLAINTIFFS' CERTIFICATES ABANDONED THEIR
UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS**

148.    As discussed above, many of the underlying mortgage loans that the
Defendants and Debtors packaged into securities and sold to Plaintiffs were originated by
third-party originators and then sold *en masse* to the Sponsor Debtor RFC.  The Offering
Documents associated with each of Plaintiffs' Certificates purported to describe each of
the specific originators' underwriting guidelines, and represented that the underlying
mortgage loans were originated in compliance with the underwriting and appraisal
standards of the originators.

149.    Several of the relevant Originators involved in these transactions are now
known to have, among other things, ignored their own underwriting guidelines and used
inflated appraisals during loan generation.   The questionable practices that were
employed by many of these Originators have led to numerous allegations and
investigations into their operations.  In fact, as noted below, faulty underwriting has led
to the downfall of several of the Originators whose loans Defendants and Debtors
bundled in these offerings.

150.    The Offering Documents contain material representations, relied upon by
Plaintiffs, that Defendants and Debtors performed due diligence on the mortgage loans
they acquired from third parties and undertook certain quality control measures to ensure
that faulty mortgages were ***not*** included in the Certificates they underwrote and sold.
*See*, *e.g.*, Prospectus Supplement for RASC 2005-KS12 (Form 424B5) (Dec. 23, 2005),
at S-32:

> Prior to assignment to the depositor, Residential Funding reviewed the underwriting standards for the mortgage loans and purchased all of the mortgage loans from mortgage collateral sellers who participated in or whose loans were in substantial conformity with the standards set forth in Residential Funding's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.

151.   The third party originators of the mortgage loans underlying the Certificates that departed from stated underwriting guidelines with respect to the mortgages underlying Plaintiffs' Certificates included, but are not limited to the following:

## 1.   Aegis Mortgage Corporation

152.   Aegis Mortgage Corporation ("Aegis") originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs, including the RASC Series 2006-KS9 Trust.  Aegis began life as a privately-held mortgage banking company owned by three individuals.  By 1998, the company was generating $1 billion in annual loan volume.  In 1998 and 1999, Cerberus Capital Management, LP made a $45 million investment in Aegis.  With this cash, Aegis acquired two extremely distressed mortgage production operations, UC Lending and New America.   These and subsequent acquisitions enabled Aegis to grow from 150 employees in nine locations in 1999 to 3,800 employees in over 100 locations in 2005.  By 2006, Aegis was ranked as the 13th largest subprime lender in the country, generating close to $20 billion in annual originations.  In eight years, the company's subprime originations grew by an incredible 1,750%.

153.    Aegis's astronomic growth was fueled by an insatiable appetite for high fee, high-risk mortgages.  To satisfy its enormous appetite, Aegis loosened its loan underwriting standards to the point of near abandonment by 2006.  A large portion of the loans Aegis originated during this time were in fact purchased from unlicensed mortgage brokers.  Because Aegis was selling all the loans it originated to major financial firms like Ally-GMAC, underwriting standards were consistently ignored and more and more loans were approved.

154.    Eventually, the bad loans caught up with Aegis.  A news report issued on August 6, 2007, announced that Aegis could not meet all of its existing funding obligations.  The next day, the company had suspended all loan originations.  On August 13, 2007, the company was forced to file for bankruptcy protection, listing more than $100 million each in assets and liabilities.

155.    Despite filing for bankruptcy, Aegis was still subject to scrutiny for its aggressive loan origination practices.  In August 2010, the U.S. Attorney for the United States District Court for the Northern District of Ohio brought a 49-count indictment against several attorneys, appraisers, and loan officers alleging that, from July 2003 through January 2006, a mortgage fraud scheme was devised involving the preparation and submission of fraudulent mortgage loan applications to various lenders, including Aegis, knowing that they contained false information, including the applicants' "assets, whether the property would be used as their primary residence and the source of the down payment funds…."  The applications also contained phony appraisal values that far exceeded the true value of the underlying properties.

68

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01844-SRN-JJG   Document 1   Filed 07/27/12   Page 9 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 75 of 214

## 2.      Decision One Mortgage Company LLC

156.    Decision One Mortgage Company, LLC ("Decision One") also originated mortgage loans purchased by Plaintiffs, including the RASC Series 2005-KS12, RASC Series 2006-KS6, RASC Series 2006-KS7, RASC Series 2006-KS8, RAMP Series 2003-RS7, RAMP Series 2003-RS10, RAMP 2004-RS5, RAMP Series 2006-RS1, RAMP Series 2006-RZ3, RAMP Series 2006-RZ4 and RAMP Series 2006-RZ5 Trusts. Decision One, which was acquired by HSBC Finance Corp. ("HSBC") in March 2003, operated as a wholesale lender in the area of non-conforming residential loans and specialized in catering to borrowers with poor credit.

157.    Decision One routinely ignored its underwriting guidelines in favor of cashing in on increased loan originations.  The company provided stated income loans to borrowers with risky credit histories and conducted little or no due diligence regarding the borrowers' ability to repay the loans.  Decision One also intentionally overstated borrowers' income on loan documentation in order to generate more loans.  These unscrupulous lending practices eventually led to Decision One's collapse.  In September 2007, HSBC announced that it would be closing Decision One, resulting in an $880 million goodwill impairment and another $65 million in restructuring costs to HSBC.

158.    Decision One has faced numerous consumer lawsuits as a result of its fraudulent and deceptive business practices.  For example, in January 2009, an action was removed from San Diego Superior Court to the Southern District of California, claiming that Decision One engaged in predatory lending practices by knowingly providing loans to borrowers that drastically exceeded their monthly income.  The plaintiff claimed that

Decision One fraudulently overstated her income in order to get the loan approved, disregarded sound underwriting criteria, required no documentation to support the information contained in the loan documentation, and conducted no due diligence regarding the plaintiff's income and employment status.  The complaint also alleged that defendants gave risky loans to unqualified borrowers, often requiring little or no down payments for the loans.  *See Watts v. Decision One Mortgage Co.*, No. 09-cv-0043-JM-BLM (S.D. Cal. Filed Jan. 12, 2009).  A number of other Decision One borrowers have made similar charges against the company in connection with their own TILA suits.  *See, e.g., Bogdan v. Decision One Mortgage Co.*, No. 09-cv-01055-AWI-SMS (E.D. Cal. Filed June 16, 2009); *Kimura v. Decision One Mortgage Co.*, No. 09-cv-01970-GMN-GWF (D. Nev. Filed Aug. 5, 2009); *Monahan v. Decision One Mortgage Co.*, No. 10-cv-2078-H-RBB (S.D. Cal. Filed Oct. 6, 2010); *Rolfes v. Decision One Mortgage Co.*, No. 10-cv-00066-D (E.D.N.C. filed Dec. 22, 2010).

### 3.    EFC Holdings Corporation

159.    EFC Holdings Corporation ("EFC") also originated mortgage loans pooled into RMBS purchased by Plaintiffs, including the RAMP Series 2003-RS7, RASC Series 2006-KS2, RASC Series 2006-KS3, RASC Series 2006-KS6 and RASC Series 2006-KS7 Trusts.  EFC was a wholly-owned subsidiary of Regions Financial Corporation ("Regions") and was a subsidiary of Regions Bank.  EFC, along with Regions, was the parent company of Equifirst Corporation ("Equifirst").

160.    In March 2006, the National Community Reinvestment Coalition ("NCRC") filed a civil complaint to the U.S. Department of Housing and Urban

Development ("HUD"), claiming that EFC and its affiliates engaged in discrimination in connection with its lending practices. The investigation conducted by the NCRC revealed that EFC, among others, was manipulating their underwriting practices to use minimum loan values that allowed redlining of low- to moderate-income communities and exclusion of row houses situated in African American and Latino communities.

### 4. Finance America, LLC

161. Finance America, LLC ("Finance America") originated loans purchased by Plaintiffs, including the RASC Series 2005-KS12 Trust. Finance America was a wholesale subprime lender owned by Lehman Brothers Inc. and was particularly known for its practices of charging "high-rate" interest on a majority of the loans it originated.

162. In 2005, several class action lawsuits were filed against Finance America alleging that it had violated the Fair Credit Reporting Act ("FCRA") by unlawfully accessing individuals' credit reports in order to target potential borrowers with poor credit or those who had recently filed for bankruptcy for subprime loans. *See Fisher v. Finance Am., LLC,* No. 05-cv-00888 (C.D. Cal. filed Sept. 13, 2005); *Murray v. Finance Am., LLC,* No. 05-cv-01255 (N.D. Ill. filed Mar. 2, 2005).

163. Finance America has also faced TILA claims. Suits against Finance America have alleged predatory lending, failing to disclose material terms of loans, "baiting" borrowers with intentionally providing false and inaccurate information and then "switching" to a more costly loan at closing, as well as charging exorbitant broker and lender fees. *See Ferrell v. Finance Am., LLC, et al.*, No. 10-cv-00715 (S.D. W.Va. filed May 7, 2010); *Brannon v. Finance Am., LLC et al.,* No. 06-cv-00996 (M.D. Ala.

filed Nov. 2, 2006); *Ricotta v. Finance Am., LLC et al.*, No. 06-cv-01502 (D. Colo. filed Aug. 2, 2006); *Anderson v. Ocwen Fin. Corp. et al.*, No. 05-cv-00243 (N.D. Miss. filed Oct. 31, 2005).

### 5.      First National Bank of Nevada

164.    First National Bank of Nevada ("FNBN") originated mortgage loans purchased by Plaintiffs, including the HELT Series 2007-HSA3, RALI Series 2005-QA7, RAMP Series 2003-RS7 and RAMP Series 2006-RS1 Trusts.  FNBN was established in 1987 under the name Laughlin National Bank, but later changed its name to First National Bank of Nevada in 1998.  The company garnered success in the industry by offering low-quality, "Alt-A" mortgages to borrowers, accumulating assets of over \$4.3 billion in 2006.  FNBN merged with First National Bank of Arizona on June 30, 2008.

165.    FNBN was no stranger to the subprime lending business and soon fell under the watchful eye of regulators.  According to a June 16, 2009 USA TODAY article entitled *Where were regulators when banks were failing?*, the Office of the Comptroller of the Currency ("OCC") had identified problems with FNBN as early as 2002, finding that it was "adversely impacted by the significant concentration in high-risk mortgage products and weak risk management controls."  On July 25, 2008, the OCC closed FNBN, naming the Federal Deposit Insurance Corporation ("FDIC") as receiver.  Mutual of Omaha Bank entered into a purchase and assumption agreement with the FDIC, agreeing to take over all deposits and certain assets of FNBN.

166.    FNBN was also the target of numerous consumer lawsuits.  The complaints primarily alleged that it engaged in predatory lending practices by originating risky loans

to borrowers that were sold into securitized mortgage pools, all while knowing that the terms of the loans were such that the borrowers were likely to default.  Other lending institutions also filed lawsuits against FNBN.  In early 2007, FNBN was sued by a Lehman Brothers investment trust in New York and Aurora Loan Services in Denver, seeking repurchase of over 38 home mortgage loans.  Lehman and Aurora claimed that FNBN misrepresented the income, debt and employment information of borrowers, as well as the appraisal values of the properties underlying the loans.

### 6.    First Savings Mortgage Corporation

167.    First Savings Mortgage Corporation ("First Savings") also originated loans purchased by Plaintiffs, including the RFMSI Series 2005-SA4 Trust.  First Savings, a privately-held Virginia corporation, is a retail mortgage lender based in Virginia and originated $3.4 billion in mortgage loans in 2005.

168.    According to a complaint filed by the Federal Home Loan Bank of Indianapolis against Banc of America Mortgage Securities, Inc., First Savings, and certain other firms participating in RMBS origination and securitization, First Savings was formed and exists solely for the purpose of originating, receiving, and depositing mortgage loans into trusts for RMBS securitizations.  The complaint alleges that First Savings, along with the other defendants, simply abandoned established underwriting standards.  Instead of occasional, justified exceptions to underwriting standards based on other evidence of a borrower's ability to repay, variance from stated underwriting standards was the norm.

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:53 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 80 of 214
CASE 0:12-cv-01844-SRN-JJG Document Filed 07/27/12 Page 80 of 214

169.     A lawsuit was filed in the United States District Court for the District of Columbia alleging that First Savings engaged in a mortgage scheme to defraud consumers and that it committed TILA violations.  Specifically, in connection with a loan refinance, the plaintiff alleged that First Savings failed to provide him with comparable appraisal values and instead used inflated appraisal values.  Moreover, the complaint alleged that First Savings engaged in "bait and switch" tactics whereby the plaintiff ended up with a loan that he could not afford based on his income at the time of purchase.

### 7.     Fremont Investment & Loan

170.     Fremont Investment & Loan ("Fremont") originated loans that were purchased by Plaintiffs, including the RAMP Series 2004-RS5 Trust.  Fremont was a wholly-owned subsidiary of Fremont General Corporation and, as one of the country's five largest subprime lenders, originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all 50 states.  After declaring bankruptcy in 2008, Fremont reorganized under the name Signature Group Holdings, Inc.

171.     Fremont garnered success by originating high-risk, poor quality subprime loans. The company's financial success, however, came to a halt on March 7, 2007, when the FDIC announced the issuance of a cease and desist order against Fremont related to its unsound subprime mortgage and commercial lending practices.  "The FDIC determined, among other things, that the bank had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:53   Exhibit B:
CASE 0:12-cv-01844-SRN-JJG   Document 1   Filed 07/27/12   Page 81 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 81 of 214

subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank."

172.   Shortly thereafter, on October 5, 2007, the Massachusetts Attorney General (the "Massachusetts AG") filed suit against Fremont and its parent company in Suffolk County Superior Court.  The complaint alleged that the company "was selling risky loan products that it knew [were] designed to fail, such as 100% financing loans and 'no documentation' loans" and that Fremont failed to "supervise, monitor, or otherwise take reasonable measures" to monitor its mortgage brokers who were selling loans by not verifying the information provided in loan documentation.  The complaint further stated that Fremont made loans based on false or inaccurate information, including "borrowers' income, property appraisals, and credit scores."

173.   The Massachusetts Superior Court granted a preliminary injunction against Fremont in February 2008 that was later affirmed by the Supreme Judicial Court of Massachusetts, the commonwealth's highest court, on December 9, 2008.  In upholding the injunction, the court determined that Fremont's loans featured a combination of characteristics that qualified them including:

> (1) the loans were ARM loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty … or a prepayment penalty that extended beyond the introductory rate period.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:53   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 82 of 214
CASE 0:12-cv-01344-SRN-JJG   Document 1   Filed 07/27/12   Page 82 of 214

174.    The record also suggested that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan'" and that the confusing and misleading way Fremont structured its loans was "unreasonable."   Fremont, therefore, "knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow…."

175.    On June 9, 2009, the Massachusetts AG's Office announced that it had reached a $10 million settlement with Fremont.  The funds received were to be used "to redress the negative impact of mortgage foreclosures, predatory lending practices, and to provide relief to Massachusetts borrowers."   The effect of the settlement also made permanent the provisions of the injunction issued by the Superior Court in February 2008.  These proceedings, in conjunction with the FDIC's March 7, 2007, cease and desist order, effectively put Fremont out of the subprime mortgage lending business.

176.    The maelstrom of publicity regarding Fremont's lending practices and increase in defaults resulted in a number of lawsuits based on Fremont's failure to repurchase bad loans.  For example, in October 2007, Morgan Stanley Mortgage Capital Holding LLC ("Morgan Stanley") sued Fremont for $10 million, alleging that it breached agreements relating to the residential mortgage loans that Morgan Stanley purchased from Fremont between May 1, 2005 and December 28, 2006.  Morgan Stanley claimed that Fremont made certain representations and warranties regarding the quality of the loans that Fremont originated and that "hundreds" of the loans breached those representations and warranties.  Specifically, Morgan Stanley claimed that Fremont made

(i) "misrepresentations of the income or employment of the borrower in the loan documents," (ii) "misrepresentations concerning appraisal values," (iii) "misrepresentations of the occupancy of the residence," (iv) "misrepresentations of the assets of the borrower," and that there were (v) "loans failing to meet Fremont's underwriting guidelines, such as a failure to verify assets prior to closing, defective verification of rent, failure to obtain the minimum credit history information, and loans made to borrowers that did not have the requisite credit score…."

177.  Similarly, after the FDIC's cease and desist order became public, Lehman Brothers Bank, FSB and Lehman Brothers Holding, Inc. (collectively, "Lehman Brothers") filed suit against Fremont on June 18, 2007.  Lehman Brothers sought repurchase of a large number of "questionable" loans purchased beginning in March of 2004.

178.  The Lehman Brothers complaint alleged that many of the mortgage loans "proved ineligible for deposit, sale, assignment and/or transfer to mortgage-backed securitizations" due to Fremont's breach of warranties and representations made concerning (i) the "validity of all Mortgage Loan documentation," (ii) "[t]he accuracy and integrity of all information and documentation regarding borrower identity, income, employment, credit, assets, and liabilities used to originate the Mortgage Loans," (iii) "[b]orrower occupancy of the property securing the Mortgage Loans," (iv) "[t]he ownership, nature, condition, and value of the real property securing the respective Mortgage Loans," and (v) "[t]he conformance of the Mortgage Loans with applicable underwriting guidelines and loan program requirements."  Lehman Brothers also claimed

that Fremont assured them that "no error, omission, misrepresentation, negligence, fraud, or similar occurrence took place" and that "no predatory or deceptive lending practices were used in the origination of the Mortgage Loans." The parties reached a settlement agreement in January 2009.

179.   In March 2008, as a result of having insufficient capital, the FDIC ordered Fremont to either recapitalize the bank or sell it, and the company later sold its $5 billion in deposits along with 22 Fremont branches to investment company CapitalSource Inc. That year, Fremont made the Office of the Comptroller of the Currency's "Worst Ten in the Worst Ten" list as one of the lenders with the most foreclosed loans in the ten metropolitan areas with the highest loan foreclosure rates.

### 8.    HSBC Mortgage Corp. (USA)

180.   HSBC Mortgage Corp. (USA) ("HSBC") originated mortgage loans that were purchased by Plaintiffs, including the RFMSI Series 2006-S3 Trust. HSBC is the mortgage banking subsidiary of HSBC Bank USA.

181.   HSBC has had a history of trouble as a result of its practices of originating mortgages and targeting low-income borrowers. In 2005, HSBC began securitizing residential mortgage loans. By the end of that year, it had issued over half a billion dollars of subprime, residential mortgage-backed securities. In 2006 and 2007, HSBC issued $9.6 billion and $6.7 billion, respectively, of residential mortgage-backed securities. The financial incentive to complete as many offerings as quickly as possible was great, and this pressure contributed to the absence of controls necessary to prevent the inclusion of materially false or misleading statements in Registration Statements.

182.    Clayton Holdings, Inc. ("Clayton") was retained by HSBC to analyze the loans it was considering placing in its securitizations.  Clayton recommended a number of loans for exclusion, but HSBC ignored these recommendations and **_included 62 percent of the loans recommended for exclusion_** without taking adequate steps to guarantee that they had been underwritten in accordance with applicable guidelines.

183.    On January 27, 2008, THE NEW YORK TIMES reported that Clayton revealed that it had entered into an agreement with the New York Attorney General ("NYAG") to help investigate whether investment banks failed to include material information in disclosures accompanying securitized loans.  Clayton agreed to provide the NYAG with evidence of "significant deterioration" in lending standards and "a parallel jump in lending expectations."  According to Raymond W. McDaniel Jr., the chief executive of Moody's Investors Service, "[b]oth the completeness and veracity" of Registration Statements received by his company had deteriorated.

184.    In November 2008, due to extremely high delinquency rates on its mortgages, HSBC announced that it would be closing its wholesale origination operations and would stop funding all loans after January 21, 2009.

185.    In addition, the SEC has also scrutinized HSBC's practices.   HSBC received three subpoenas from the SEC seeking production of documents and information relating to HSBC's involvement in specified private-label residential mortgage-backed securities transactions as an issuer, sponsor, underwriter, depositor, trustee, custodian or servicer.

186.    On September 2, 2011, a complaint was filed in the Southern District of
New York alleging that HSBC sold to Fannie Mae and Freddie Mac certain mortgage-
backed securities based on Registration Statements containing materially false or
misleading statements and omissions.    The complaint also alleged that HSBC falsely
represented that certain mortgage loans complied with underwriting guidelines and
standards.

### 9.    Mortgage Lenders Network USA, Inc.

187.    Mortgage Lenders Network USA, Inc. ("MLN") originated mortgage loans
that were pooled in securitizations and purchased by Plaintiffs, including the RASC
Series 2006-EMX2, RASC Series 2006-EMX4 and RASC Series 2006-EMX9 Trusts.
Founded in 1996, MLN was a closely-held company that specialized in providing
mortgages and home equity financing to borrowers with low income and impaired credit.
According to NATIONAL MORTGAGE NEWS, MLN was the 15th largest issuer of subprime
mortgages, originating $3.3 billion in subprime loans in the third quarter of 2006 alone.

188.    MLN was another subprime player that benefited immensely from
employing lax underwriting practices in order to ramp up loan originations.    The
company offered low- and no-documentation loans to borrowers, originated loans
without regard to the borrowers' ability to repay the loans, and shopped for appraisals
that supported the numbers that MLN needed in order to get loans approved.    However,
when the subprime market began to collapse, MLN experienced significant financial
hardships which eventually led to the company's demise.    On January 2, 2007, MLN

announced that it had stopped funding loans and would not be accepting any new loan applications. In February 2007, MLN filed for Chapter 11 bankruptcy.

189. MLN relied heavily on warehouse lines of credit provided by other financial institutions in order to conduct its business. As a result, MLN's contractual agreements with these financial institutions allowed the financial institutions to "put" a significant number of the bad loans back to MLN for repurchase. These "put backs" played a huge role in MLN's eventual collapse.

190. State regulatory agencies also targeted MLN for its subpar lending practices. On January 19, 2007, the Connecticut Department of Banking ("DOB") issued a Temporary Order to Cease and Desist and Notice of Intent to Impose Civil Penalty to MLN as a result of various violations of Connecticut statutes, such as failing to timely disperse loan proceeds, failing to provide complete and accurate loan portfolio information, and failing to show compliance with mortgage lending license requirements. The DOB ordered MLN to suspend all lending activities and threatened to fine the company with up to $7.6 million in civil penalties for its violations. State regulators from Massachusetts, Rhode Island, Michigan, Maine, Vermont, New Hampshire, New York and Pennsylvania have all charged MLN with similar violations.

191. Consumer lawsuits also followed, many alleging violations of the TILA as a result of MLN's dismal underwriting practices. On May 12, 2009, a lawsuit was filed against MLN in the Superior Court of Georgia, Gwinnett County, claiming that MLN intentionally relaxed its underwriting standards and sold risky loan products to borrowers in order to increase its loan origination volume. Specifically, the complaint alleged that

employees were encouraged to steer borrowers into larger mortgages than they could afford in order to maximize MLN's profits.  Plaintiffs also stated that MLN took no meaningful steps to determine whether borrowers could actually afford to repay the loans and used fraudulently inflated appraisals in order to get larger loans approved.

192.   A similar action was filed in July 2010 against MLN in the U.S. District Court for the Northern District of Georgia, alleging that MLN departed from sound underwriting practices by ignoring borrowers' ability to repay the loans and by failing to verify borrowers' income, employment and assets.  The plaintiffs were saddled with a loan that they could not afford and ultimately defaulted.  As a result, the plaintiffs filed for bankruptcy and the action was later terminated.

### 10.   MortgageIT, Inc.

193.   MortgageIT, Inc. ("MortgageIT") originated mortgage loans that were pooled into securitizations and purchased by Plaintiffs, including the RALI Series 2006-QA2 Trust.  The company, founded in 1988, was a residential mortgage banking company that was acquired as a wholly-owned subsidiary of MortgageIT Holdings, a self-registered real estate development trust, and skyrocketed to become one of the top mortgage lenders in the nation.

194.   On March 13, 2006, EMC Mortgage Corp. ("EMC") filed a lawsuit in the U.S. District Court for the Northern District of Texas against MortgageIT for failure to repurchase 587 loans that breached representations made by MortgageIT in its purchase agreements.  EMC alleged that over $70 million in loans had defaulted during the

borrowers' first three scheduled payments, triggering a duty by MortgageIT to repurchase.

195.    In June 2007, MortgageIT entered into a settlement agreement with the Connecticut Department of Banking after an investigation into the company's business revealed that MortgageIT had violated Connecticut law by employing at least 48 originators without first obtaining proper registrations.    As part of the settlement, MortgageIT made a $48,000 contribution to support the Nationwide Mortgage Licensing System.

196.    MortgageIT was further scrutinized for its predatory lending practices, and was named as a defendant in a number of consumer lawsuits.  For example, in September 2010, a TILA action was filed in the U.S. District Court for the Northern District of California, claiming that the company had engaged in fraudulent mortgage lending practices.  The complaint alleged, among other things, that MortgageIT participated in a scheme to obtain mortgages that "grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values…."  Another lawsuit, filed in October 2009 in the Central District of California, claimed that MortgageIT misrepresented mortgage terms to the borrower and extended an adjustable-rate mortgage ("ARM") to the borrower based on stated income, rather than verified income, which ultimately resulted in the borrower's default on the loan.

197.    Most recently, the United States government has also honed in on MortgageIT and its questionable lending practices.  On May 3, 2011, the Department of Justice announced that it had filed a civil mortgage fraud lawsuit against MortgageIT,

seeking damages and penalties under the False Claims Act for allegations that
MortgageIT made false compliance certifications to the Department of Housing and
Urban Development ("HUD") in order to obtain approval of FHA mortgages that were
not, in fact, eligible for FHA insurance under HUD rules.

198.    The complaint also claimed that MortgageIT engaged in reckless lending
practices and disregarded sound underwriting guidelines by ignoring "red flags," failing
to conduct due diligence and extending mortgage loans to unqualified borrowers. In May
2012, MortgageIT, along with another defendant, agreed to pay $202.3 million to the
United States to settle these claims. Also as part of the settlement, MortgageIT  admitted,
acknowledged, and accepted responsibility for certain conduct alleged in the complaint,
including the claims that MortgageIT did not conform to certain HUD regulations and
that it had submitted certifications that certain mortgages were eligible for FHA insurance
when, in fact, they were not eligible.

### 11.    National City Mortgage Corporation

199.    National City Mortgage Corporation ("National City") originated mortgage
loans that were pooled in securitizations and purchased by Plaintiffs, including the
RAMP Series 2003-RS7, RAMP Series 2003-RS10, RALI Series 2006-QS18, RALI
Series 2007-QS6, RALI Series 2007-QS9 and RFMSI Series 2005-SA4 Trusts.  National
City was a subsidiary of National City Corporation, one of the ten largest banks in
America.  In 1999, National City Corp. purchase First Franklin Financial Co. ("First
Franklin"), an originator of subprime and non-conforming mortgages.

200.    Subsequent to the First Franklin acquisition, National City increased its
subprime portfolio at an alarming rate, reaping the benefits from retaining over $3.8
billion, or 60%, of First Franklin's subprime mortgage loans.  In 2002, the company
"express[ed] pride in the progress of its initiative to improve its net interest income" and
was "continuing to bet big on its strategy of holding the majority if its subprime loans."
The company soared to become the nation's sixth-largest mortgage lender, generating
$130 billion in mortgages in 2003 alone.

201.    National City's success, however, was the result of reckless and imprudent
lending and underwriting practices, including providing high-risk mortgages to non-
creditworthy borrowers with little or no documentation regarding the borrower's ability
to repay the loans.  National City utilized third-party brokers across the country to
originate loans, observed loose underwriting guidelines, and offered "piggyback loans" to
borrowers that provided them with the luxury of no down payment but left the borrower
with little or no equity in the property.

202.    The company's persistently risky lending practices and the subsequent
crash of the subprime market left National City facing serious financial trouble, and it
eventually became the target of regulatory scrutiny.  In May 2008, the Department of
Justice announced that it had agreed to a settlement of $4.6 million in order to resolve
charges that it brought against National City for allegations relating to mortgage fraud
under the False Claims Act.  The Department of Justice claimed that National City had
improperly submitted 58 late endorsement loans for FHA insurance coverage that were
not current, in violation of FHA regulations.

203.    A month later, National City's parent corporation entered into a confidential Memorandum of Understanding with the Office of the Comptroller of the Currency, essentially placing the company on probation and signaling that regulators had "concerns" about National City regarding its capital management, risk management, asset quality and liquidity management.    On August 9, 2008, the WALL STREET JOURNAL reported in the article *National City Faces Probe*, that the SEC opened an informal investigation into National City and had requested "certain documents concerning its loan underwriting experience, dividends, bank regulatory matters and the sale of First Franklin Financial Corporation."

204.    National City was later involved in a securities class action lawsuit, filed in the Northern District of Ohio on December 23, 2008.    The complaint alleged that National City made statements regarding its underwriting standards, capitalization and liquidity, and provision for loan losses that were materially false in that:

> (i) … National City's residential real estate loan portfolio was dominated by toxic loans provided to borrowers without regard to the borrowers' creditworthiness or ability to repay the loans; (ii) an overwhelming majority of loans the Company classified as "prime" quality were made to borrowers with subprime credit scores, well below the widely-accepted industry definition of "prime" quality; (iii) National City's allowance and related provisions for loan losses were grossly deficient; (iv) the Company was not "well-capitalized" and, in reality, had insufficient liquidity to absorb the massive losses lingering in its residential real estate loan portfolio; and (v) National City's inability to absorb losses from the inherently risky loans held on its balance sheet … subjected the Company to a debilitating financial crisis.

National City agreed to settle the class action claims in November 2010 for $22.5 million.

205.    As a result of the increasing number of actions and investigations into National City's fraudulent lending practices, National City was denied bailout money by the federal government, making it the only bank out of the top twenty-five in the country to not receive such funds.

### 12.    New Century Mortgage Corporation

206.    New Century Mortgage Corporation ("New Century") originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs, including the RASC Series 2007-KS2 Trust.  Formed in 1996, New Century was a leader in the mortgage lending boom, growing rapidly from only $357 million in loan originations in 1996 to over $56 billion in 2005.

207.    In order to effectuate such a drastic increase in loan originations, the company began taking on riskier loans, relaxed its underwriting standards, and granted numerous exceptions, accepting loans for 100% of the value of the property and utilizing flawed or fraudulent appraisals.  Maggie Hardiman, a former appraiser for New Century, described the demands she faced when reviewing loan applications in a May 7, 2007, WASHINGTON POST article.  She recalled how "all hell would break loose" if she turned away a loan, and that when she did reject an application, "her bosses often overruled her and found another appraiser to sign off on it."

208.    On February 7, 2007, New Century announced that it would be restating its 2006 financials due to material weaknesses in internal controls.  On March 2, 2007, the company revealed that it was the subject of two criminal probes and later announced that it would no longer be accepting applications for subprime mortgages.  By March 12, most

of its creditors had cut off financing or planned to do so.  On April 2, 2007, New Century collapsed and filed for bankruptcy.

209.    Following the bankruptcy, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a 581-page report on February 9, 2008, detailing the various deficiencies at New Century, including lax mortgage origination standards.  "The theme of the report is how easily the loans were originated, how exceptions were made, how they used bad appraisals" and how "[t]here were no appropriate internal controls…."  Missal also described how New Century "engaged in a number of significant[ly] improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."  According to a March 26, 2008 BLOOMBERG article by Tiffany Kary, *New Century Bankruptcy Examiner Says KPMG Aided Fraud*, New Century's loan originations increased dramatically, primarily as a result of the increased exceptions made to its underwriting guidelines and the practice of lending money to homeowners who could not afford the initial "teaser rates."  Missal explained that these practices eventually created "a ticking time bomb that detonated in 2007."

210.    During the course of his investigation, the Examiner conducted 110 interviews of 85 witnesses and reviewed documents from New Century, its outside auditors, and others.  In his Final Report, the Examiner concluded that:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy.  Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.'  Although a primary goal of any mortgage banking

12-12020-mg  Doc 6427-2  Filed 02/04/14  Entered 02/04/14 15:48:52  Exhibit B:
CASE 0:12-cv-01944-SRN-JJG  Document 1  Filed 07/27/12  Page 95 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 95 of 214

company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." (Examiner's Report at 3).

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. Of the New Century loans rejected by investors, issues with appraisals were the cause of more than 25% of these 'kick-outs.'" *Id.* at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks…." *Id.* at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages." *Id.* at 4.

211.    The restatement of New Century's financials also prompted the filing of securities class action lawsuits beginning in February 2007. One complaint filed in the Central District of California alleged that New Century's officers and directors issued materially false and misleading statements regarding the company's business and financial results. On December 3, 2008, the district court denied the defendants' motion

to dismiss, finding actionable certain statements regarding the credit quality of New

Century's loans.  The court wrote:

> The allegations suggest New Century's repeated assurances
> of strong credit quality and strict underwriting practices.
> Even in the sub-prime world, there must be a basis for
> distinction between loans to at-risk borrowers that met basic
> standards of good lending practice and loans that plainly do
> not.  Those standards may provide the measure for evaluating
> Defendants' statements.  Here, Plaintiffs offer New Century's
> statement that it observed standards of high-quality credit and
> underwriting, and set those statements against detailed
> allegations of practices that utterly failed to meet those
> standards.

The court also noted that:

> [t]he Examiner's Report found knowledge within high-levels
> of the company of its declining loan quality and underwriting
> as early as 2004.  The Report mentions the internal reports by
> New Century's Senior Management and negative internal
> audits that acknowledged serious problems with loan quality
> and underwriting, as well as the poor performance of the
> company's high-risk products, and concludes that [ ] New
> Century failed to respond to "red flags.

New Century agreed to pay more than $90 million to settle these claims in July 2010..

212.    The SEC also charged three former top officers of New Century with

securities fraud for misleading investors as New Century's subprime mortgage business

was collapsing in 2006.  The December 7, 2009 complaint alleged that defendants Brad

A. Morrice (former CEO), Patti M. Dodge (former CFO), and David N. Kenneally

(former Controller), failed to disclose dramatic increases in loan defaults, loan

repurchases and pending loan repurchase requests and described the company's business

as "anything but 'good' and it soon became evident that its lending practices, far from

being 'responsible,' were the recipe for financial disaster." The SEC accepted settlement officers from all three defendants in August 2010.

### 13.   Ownit Mortgage Solutions Inc.

213.   Ownit Mortgage Solutions, Inc. ("Ownit") originated mortgage loans that were pooled in securitizations and purchased by Plaintiffs, including the RAMP Series 2006-RZ5, RASC Series 2006-KS8, and RASC Series 2006-KS9 Trusts.   Ownit, formerly known as Oakmont Mortgage Company, Inc., was a wholesale mortgage lender founded in 1989.   Ownit was well-known in the industry for its practices of originating 100%-financed subprime loans and providing loans to borrowers with poor credit and limited income.   NONPRIME NEWS ranked Ownit as the 11th-largest issuer of subprime mortgages in the United States, originating $5.46 billion in loans in the first half of 2006 alone.

214.   In September 2005, Ownit sold a 20% share in the company to Merrill Lynch for $100 million.   According to Ownit founder and CEO William Dallas ("Dallas"), Merrill Lynch instructed Ownit to lower its underwriting standards and to originate more higher-yield, riskier loans, using its ownership stake and its $3.5 billion credit line to Ownit as leverage.   Ownit complied with Merrill Lynch's directive, originating $6 billion in loans from September 2005 to December 2006, including "crazy" 45-year adjustable rate mortgages and no-income-verification loans.   Dallas stated, "The market [was] paying me to do a no-income-verification loan more than it [was] paying me to do the full documentation loans."

215.   A May 8, 2007 article from the NEW YORK TIMES entitled *East Coast Money Lent Out West*, reported how Ownit increased loan volume by weakening underwriting standards and originating more "liar" loans for which no documentation was requested or required to substantiate the borrowers' oral representations of their annual earnings.

216.   Ownit also lowered the credit scores it required of its borrowers.  The most widely accepted measure of creditworthiness in the credit industry is the "FICO" score, developed by the Fair Isaac Corporation.[11]   The Federal Deposit Insurance Corporation ("FDIC") defines a "subprime" loan as one for which the borrower has a FICO score of 660 or below.   Ownit's average new borrower FICO score dropped from 690 to approximately 630.

217.   The intentional weakening of underwriting standards had an immediate and direct impact upon the performance of Ownit's loans.  From December 2005 through May 2006, Ownit began to experience first payment defaults and "early payment defaults" (*i.e.*, defaults on any one of the first three mortgage repayments).  According to a December 8, 2006 article in WORKOUT WIRE entitled *BuyBacks Appear to Shutter Two Firms*, Ownit, unsurprisingly, filed for bankruptcy "amid reports that the subprime lender had been hit by huge loan buyback requests from an investor."

---

[11] Under the FICO scoring system, borrowers are assigned a credit score (the FICO score) ranging from 300 to 850, with 850 being the most creditworthy.   In determining the borrower's overall creditworthiness, the FICO score primarily takes into account the borrower's payment history, current indebtedness, length of credit history, recently established credit and types of credit used.  According to Fitch Ratings, FICO scores are the "best single indicator" of mortgage default risk.  Thus, the lower the FICO score, the greater risk of borrower default.

218.    Several consumer lawsuits followed soon thereafter.  On May 5, 2009, a TILA lawsuit was filed against Ownit alleging that the company had made misrepresentations to the borrower regarding the terms of a loan, including the interest rate, payment amount and the borrower's ability to refinance if the loan became unaffordable.  *See Vanduzen v. Homecomings Fin. Et al.*, No. 09-cv-01237 (E.D. Cal. Filed May 5, 2009).  The complaint stated that Ownit "regularly approved loans to unqualified borrowers, and implemented practices … ranging from questionable to criminal."  Moreover, Ownit "employed brokers and loan officers [who] worked on commissions, meaning the more loans they sold, the more bonus money they received," and these brokers and loan officers steered borrowers "into loans with less favorable terms" or into loans the borrowers were not qualified for in order to make more money.

219.    In October 2009, a lawsuit was filed against Ownit in the District of Nevada alleging that the company placed unqualified borrowers into subprime mortgages "while knowing many of the loans would result in foreclosure." *See Youngren v. Ownit Mortgage Solutions, Inc.*, No. 09-cv-00595 (D. Nev. filed Oct. 5, 2009).  The complaint stated that Ownit and its brokers and agents issued mortgages to borrowers "who were incapable of paying the mortgages throughout the life of the loan," such as those with poor credit scores and inadequate income to afford the loan, and utilized "numerous fees and penalties" that increased the risk of default and foreclosure.  The lawsuit included claims for unfair lending practices and fraud.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 100 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 100 of 214

### 14.    People's Choice Home Loan, Inc.

220.    People's Choice Home Loan, Inc. ("People's Choice") originated mortgage
loans that were pooled in securitizations and purchased by Plaintiffs, including the RASC
Series 2006-KS3 and RASC Series 2006-KS9 Trusts.  People's Choice, founded in 1999,
operated as a subsidiary of People's Choice Financial Corporation and marketed itself as
a subprime lender of wholesale and retail mortgages through the Internet, issuing over
$4.5 billion in mortgage-backed securities in 2005.

221.    People's Choice garnered most of its financial success by targeting and
extending subprime loans to borrowers with poor credit histories and by using
unscrupulously loose underwriting and lending guidelines in its business practice.
People's Choice also came to possess a reputation in the industry for being a "fraud
factory," requiring little or no supporting financial documentation for loans, using
inaccurate appraisal values and doctoring loan documents to get borrowers approved.

222.    James LaLiberte, former Chief Operating Officer at People's Choice, stated
in a March 22, 2009, interview with DATELINE NBC that the company "got where they
are" in the business because "[f]raud is what we do."  LaLiberte described how it was his
job to set underwriting guidelines but that he was met with "resistance" in his attempts to
improve the company's internal procedures.  LaLiberte emphasized how borrowers were
not required to document their financial capacity to repay in order to receive a loan and
recounted how People's Choice once issued two loans, totaling $640,000, to a massage
therapist whose loan documentation claimed that she made $15,000 per month.  A similar

loan was made to a house cleaner whose documentation claimed she made $11,500 per month.

223.   In 2004, a mortgage broker named Heidi Weppelman assisted the FBI in a mortgage fraud investigation in northeast Florida.  Weppelman recorded a telephone conversation with People's Choice employee Jennifer Grosslight that was later used as evidence at the trial of a man, who sold rental homes and referred customers to Weppelman for mortgages.  During that conversation, the two women discussed how People's Choice employees would falsify loan documentation, including appraisal values, signatures on contracts and leases and bank account information, in order to process more loans.  Grosslight described these practices as being "totally fine" and that they were "the furthest from any issue."

224.   In September 2005, a class action lawsuit was filed against People's Choice in the United States District Court for the Northern District of Illinois, alleging that People's Choice used "prescreening" mailers in order to identify "persons who [had] poor credit or [had] recently obtained bankruptcy discharges, for the purpose of targeting them for subprime credit."  On February 5, 2008, the court granted plaintiffs' motion for a default judgment against defendants for $2 million.

## 15.   SunTrust Mortgage, Inc.

225.   SunTrust Mortgage, Inc. ("SunTrust") originated mortgage loans that were packaged into RMBS and purchased by Plaintiffs, including the RFMSI Series 2005-SA4, RALI Series 2005-QA7 and RALI Series 2006 QS18 Trusts.  SunTrust is a Virginia corporation and a direct wholly-owned subsidiary of SunTrust Bank, a Georgia chartered

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 202 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 102 of 214

bank.  According to a January 2009 report by the United States Department of the Treasury entitled *Treasury Department January Monthly Lending and Intermediation Report,* which examined the mortgage origination volumes of the top twenty-one recipients of funds under the Troubled Asset Relief Program ("TARP"), SunTrust originated $3.5 billion in mortgages in January 2009.  SunTrust is one of the largest residential lenders in the United States, and according to *Mortgage Daily*, SunTrust ranked fifth in residential lending, originating $13.4 billion in loans in 2009.

226.   Like many other originators, SunTrust's success is due largely to high loan volumes as a result of an abandonment of its underwriting standards.  On April 14, 2010, SunTrust's Executive Vice President for Capital Markets, Anthony T. Reed, addressed the House Financial Services Committee of the United States House of Representatives.  Mr. Reed admitted that the "recent crisis in our financial system" resulted from "[l]enders and securitizers relax[ing] underwriting standards and risk management practices."  SunTrust's loan origination tactics fell in line with Mr. Reed's observations.

227.   An investigation by the NECA-IBEW Health & Welfare Fund revealed that SunTrust did not apply its underwriting standards to evaluate a prospective borrower's credit standing and repayment ability.   Instead, SunTrust applied a more lax set of standards.  A former Senior Underwriter, who worked with SunTrust from 2001 until November 2007, stated that in 2004, SunTrust began using Automatic Underwriting Systems ("AUS") to underwrite 75% of the loans that the Senior Underwriter saw.  The AUS approved loan applications as long as they met minimum requirements that were well below SunTrust's stated underwriting guidelines.

228.   The Senior Underwriter estimated that each month, she refused to approve approximately 10% of the loan applications that the AUS approved because the applications did not meet SunTrust's underwriting standards.   Typically, the Senior Underwriter's rejection of the loan application would be overruled by a supervisor because SunTrust did not care about the risk associated with these loans as long as an investor purchased them.   The unwritten rule at SunTrust was, "make the loan so we can sell it, so we can make more money."

229.   In order to increase loan volume, SunTrust also approved a high level of stated income and low documentation mortgage loans which attracted mortgage brokers and borrowers who would provide false information in order to secure loans.   SunTrust fostered an environment where these individuals could perpetrate fraud by requiring only minimal data to approve new loans.   In addition, SunTrust emphasized speeding up the loan origination process, deemphasizing the quality control and due diligence necessary to reduce the risk associated with loan origination.   Finally, SunTrust paid loan officers based on the number of loans they approved, further discouraging due diligence and increasing the number of high-risk loans that were later packaged into RMBS and sold to investors like Plaintiffs.

230.   SunTrust's consistent deviation from its underwriting standards eventually took its toll.   On January 22, 2009, MORTGAGE DAILY reported that SunTrust's fourth quarter earnings report for 2008 contained statements by SunTrust Chairman and CEO, James M. Wells, III, explaining that continued declines in home values increased loan delinquencies and resulted in higher than expected credit losses.   That same month, the

parent company of SunTrust and SunTrust Bank, announced that it was ceasing all business activities in FHA loan originations.

231.   According to MORTGAGE SERVICING NEWS, Fitch downgraded SunTrust's RMBS servicer rating in June 2011.

### 16.   Wachovia Mortgage Corporation

232.   Wachovia Mortgage Corporation ("Wachovia") originated mortgage loans purchased by Plaintiffs, including the RALI Series 2007-QS10 and RALI Series 2007-QS11 Trusts.  Wachovia is a wholly-owned subsidiary of Wachovia Bank, which was acquired by Wells Fargo Bank in 2008.  Wachovia operates in the mortgage and home equity loan origination industry.

233.   On September 2, 2011, the FHFA, as conservator for Fannie Mae and Freddie Mac, initiated an action in New York State Court.  The lawsuit alleged violations of federal securities laws arising from, *inter alia*, materially false and misleading statements and omissions in the Prospectus Supplements for certain RMBS purchased by Fannie Mae and Freddie Mac, including two RMBS containing loans originated by Wachovia.  The complaint alleged that Wachovia, amongst other originators, routinely ignored underwriting guidelines and, in some cases, abandoned the guidelines completely.  As a result, the Prospectus Supplements allegedly contained false and misleading statements or omissions regarding compliance with underwriting guidelines for several securities purchased by Fannie Mae and Freddie Mac in violation of the federal securities laws.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 105 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 105 of 214

234.   The FHFA's examination of the loans underlying the RMBS at issue revealed evidence that the originators, including Wachovia, had engaged in improper appraisal and underwriting practices, resulting in misrepresentations of owner-occupancy data and LTV ratio data.   In particular, the offering documents for the two RMBS containing Wachovia-originated loans overstated the owner-occupancy rate by 6.27% and 9.27%, respectively.   The offering documents for these two RMBS further overstated the percentage of pooled loans with low LTV ratios (defined in the document as having an LTV ratio of less than or equal to 80%) by 39.47% and 36.65%, respectively, and understated the percentage of underwater loans by 10.5% and 15.2%.

## V.   A SIGNIFICANT NUMBER OF THE MORTGAGE LOANS WERE MADE TO BORROWERS WHO DID NOT OCCUPY THE PROPERTIES IN QUESTION

235.   The Offering Documents contained information regarding the purported occupancy status of the mortgaged properties, including whether they were primary homes, investment properties, or second homes.   These representations were material to investors such as Plaintiffs because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or properties purchased for real estate speculation.   Thus, Defendants had an incentive to overstate the owner-occupancy rates of the underlying mortgages to make them appear more secure.

236.   Fraudulent representations regarding the owner-occupancy status of pool mortgages were widespread in the securitization industry.   As noted in a January 21, 2011 article in BUSINESSWEEK, at least *25%* of U.S. mortgages that were described as being

secured by "owner occupied" properties when bundled into securities either were not occupied by borrowers, or were occupied for a short time and quickly vacated.

237.   In connection with a separate lawsuit against the Sponsor Debtor RFC, the insurer Massachusetts Mutual Life Insurance Company ("Mass Mutual") conducted a forensic review of the mortgage loans underlying 18 RMBS sponsored by RFC, which included loans from the same series and time period as offerings in which Plaintiffs invested.  For all of the RMBS that Mass Mutual examined, Debtor RFC was the Sponsor and either Debtor RALI, Debtor RASC, or Debtor RAMP was the depositor.  Part of this analysis included testing to determine if the owner-occupancy ratios given in the Offering Documents were accurate.  Mass Mutual investigated whether borrowers were having tax statements and bills sent to the address of the mortgaged properties, whether the borrowers had taken tax exemptions available for owner-occupied properties, and whether property records showed that the borrowers owned multiple houses.

238.   Mass Mutual discovered that the offering documents overstated owner-occupancy ratios by between 5.71% and 15.23% for *each* of the 18 RMBS that it analyzed.  Seven offerings purchased by Plaintiffs were also analyzed in Mass Mutual's loan level investigation.  The chart below illustrates the extent that Defendants and Debtors overstated owner-occupancy rates with respect to those seven offerings.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 107 of 214
CASE 0:12-cv-01841-SRN-FLN   Document 1   Filed 07/27/12   Page 107 of 214

| Issuing Trust | Percentage Owner-Occupancy Rate Overstated |
|---|---|
| RALI 2005-QO3 | 10.9% |
| RALI 2006-QO3 | 9.17% |
| RALI 2006-QO5 | 10.19% |
| RALI 2006-QO6 | 12.36% |
| RAMP 2006-RS4 | 5.71% |
| RAMP 2006-RS6 | 7.67% |
| RAMP 2006-RZ3 | 6.70% |

239. The FHFA performed a similar analysis of individual loan files in connections with its lawsuit against Ally-GMAC. The analysis covered 21 RMBS – which included loans from the same series and time period as offerings in which Plaintiffs invested – and revealed that in each case, the offering documents had overstated the owner-occupancy rates by as much as 13.10%. Six of the RMBS that were the subject of the FHFA's loan level analysis were also purchased by Plaintiffs and overstated owner occupancy rates by at least 8.68%, as set forth below.

| Issuing Trust | Percentage Owner-Occupancy Rate Overstated |
|---|---|
| RALI 2006-QO5 | 10.66% |
| RAMP 2006-RS1 | 9.15% |
| RASC 2006-EMX9 | 12.52% |
| RASC 2006-KS3 | 13.10% |
| RASC 2006-KS9 | 8.68% |
| RASC 2007-KS2 | 9.79% |

240.   With regard to RALI Series 2005-QO3 and RALI Series 2006-QO3, Plaintiffs purchased the exact same securities as Mass Mutual.  As a result, Mass Mutual's loan level analysis provides evidence that the Offering Documents for these certificates contained misstatements and omissions.  The remaining securities were of the same time period or series as those reviewed by FHFA and Mass Mutual.  On information and belief, the Offering Documents for all of these Certificates purchased by Plaintiffs suffer from similar deficiencies as the offering documents reviewed by Mass Mutual and the FHFA.

241.   Two separate analyses covering a total of 34 Ally-GMAC RMBS offerings[12] have uncovered material overstatements of the owner-occupancy ratio in every single offering.  There is no reason to believe that the systematic and pervasive

---

[12] The FHFA's analysis involved 21 RMBS and the Mass Mutual analysis involved 18 RMBS.  There was some overlap between the two analyses, as five (5) RMBS were analyzed by both the FHFA and Mass Mutual.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 109 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 109 of 214

misrepresentations of owner-occupancy rates identified by Mass Mutual and the FHFA
were confined to the RMBS they examined.

## VI. DEFENDANTS AND DEBTORS MISREPRESENTED THE LTV RATIOS OF THE MORTGAGE LOANS AND THE NUMBER OF PROPERTIES WORTH LESS THAN THE OUTSTANDING LOANS

242.   As discussed in Section III, *supra*, the LTV ratio is one of the most
important measures of the riskiness of a loan.  In the Offering Documents, Defendants
and Debtors acknowledge that loans with high LTV ratios are more likely to default.  For
example, the 424B5 Prospectus Supplement for RASC Series 2005-KS12 Trust, filed on
December 23, 2005, states: "The rate of default on mortgage loans that are refinances by
the borrower, were originated with limited documentation, or are mortgage loans with
high LTV ratios, may be higher than for other types of mortgage loans."  Furthermore, if
a borrower does default and the property enters foreclosure, the Issuing Trust is much
more likely to recover the outstanding balance on the loan through a foreclosure sale if
the LTV ratio is low.

243.   Mortgage loans that are "underwater" – that is to say, those where the LTV
ratio is greater than 100% because the value of the outstanding loan exceeds the value of
the collateral – are extremely risky investments.  In these cases, the borrower has a strong
incentive to default, the possibility that the borrower will be capable of refinancing are
virtually nil, and if the mortgage enters foreclosure the Issuing Trust will definitely incur
a loss.

244.   Appraisals that are generated without guidelines can artificially lower LTV
ratios by overstating the value of the mortgaged properties.  In instances where LTV

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 210 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 110 of 214

values have been distorted by faulty appraisals, RMBS investors may be unaware of the true value of their collateral until default and foreclosure occur.  The Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States discussed this problem.

> As the housing market expanded, another problem emerged, in subprime and prime mortgages alike: inflated appraisals. For the lender, inflated appraisals meant greater losses if a borrower defaulted.  But for the borrower or for the broker or loan officer who hired the appraiser, an inflated value could make the difference between closing and losing the deal. Imagine a home selling for $200,000 that an appraiser says is actually worth only $175,000.  In this case, a bank won't lend a borrower, say, $180,000 to buy the home.  The deal dies. Sure enough, appraisers began feeling pressure.  One 2003 survey found that 55% of appraisers had felt pressed to inflate the value of homes; by 2006, this had climbed to 90%.

245.   Defendants and Debtors had a responsibility to ensure that the LTV figures they presented in the Offering Documents were not the product of fraudulent appraisals. As the U.S. Senate Permanent Subcommittee on Investigations stated in its staff report, *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*, "Whether appraisals are conducted internally by the bank or through a vendor, the bank must take responsibility for establishing a standard process to ensure accurate, unbiased home appraisal values."

246.   Mass Mutual and Freddie Mac's reviews of the loans underlying 34 Ally-GMAC RMBS revealed that, in addition to consistently misrepresenting owner-occupancy rates, Ally-GMAC also consistently misrepresented the LTV ratios of the underlying mortgages and the number of properties with high LTV ratios.  For each loan

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 111 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 111 of 214

they examined, Mass Mutual and Freddie Mac used an industry standard automated valuation model ("AVM") to calculate the value of the mortgaged property at the time of origination. AVMs are commonly used in the real estate industry and rely upon similar data as appraisers, including county records, tax records, and data on comparable properties.

247. Freddie Mac's review of 21 Ally-GMAC RMBS revealed that in each case, the offering documents overstated the percentage of loans with low LTV ratios (defined as LTV ratios less than 80%) by between 12.24% and 49.08%. The offering documents understated the percentage of underwater loans (loans with LTV ratios greater than 100%) by between 8.18% and 33.81%. With respect to the six RMBS also purchased by Plaintiffs, FHFA's loan level analysis revealed:

| Issuing Trust | Overstated Percentage with Low LTV's | Understated Percentage of Underwater Loans |
|---|---|---|
| RALI 2006-QO5 | 41.80% | 11.09% |
| RAMP 2006-RS1 | 15.27% | 19.63% |
| RASC 2006-EMX9 | 19.64% | 33.81% |
| RASC 2006-KS3 | 17.48% | 11.68% |
| RASC 2006-KS9 | 17.34% | 26.92% |
| RASC 2007-KS2 | 16.28% | 28.40% |

248. Although Mass Mutual presented its data differently than Freddie Mac did, its review also revealed significant misrepresentations of LTV data. Mass Mutual found that for 17 of the 18 Ally-GMAC RMBS it analyzed, the offering documents had understated the weighted average LTV ratio by between 4.23% and 16.77% and

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-DJF    Document 1    Filed 07/27/12    Page 112 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 112 of 214

understated the percentage of loans with high LTV ratios (defined as LTV ratios greater than 90% or 100%) by between 4.54% and 39.08%. Only one of the RMBS examined did not misrepresent the percentage of loans with high LTV ratios. Mass Mutual's loan level analysis revealed that the Offering Documents for all seven RMBS that were also purchased by Plaintiffs contained understatements regarding the percentage of loans with high LTV ratios.

249. On information and belief, the mortgage loans underlying all of the Certificates purchased by Plaintiffs suffer from similar deficiencies as the mortgage loans underlying the Certificates purchased by Mass Mutual and Freddie Mac. The loan-level analyses demonstrate that Defendants and Debtors have engaged in a systematic practice of understating LTV ratios and the number of underwater properties.

## VII.    DEFENDANTS AND DEBTORS MISREPRESENTED THE EXTENT OF CREDIT ENHANCEMENT INCLUDED IN THE CERTIFICATES

250. Defendants and Debtors used a variety of credit enhancements to make the Certificates seem like more attractive and less risky investments. Credit enhancement represents the amount of "cushion" or protection from loss exhibited by a given security. This cushion is intended to improve the likelihood that holders of investment grade rated certificates receive the interest and principal they expect based on the Offering Documents. The level of credit enhancement offered is based on the makeup of the loans in the underlying collateral pool. Riskier pools necessarily need higher levels of credit enhancement to ensure payment to senior certificate holders. Credit enhancements for a given trust also impact the overall credit rating that a given tranche of certificates

receives.  The level of credit enhancement for the Certificates was material to Plaintiffs because it represented the protection purportedly afforded from loss.

251.    The most common form of credit enhancement in the Offering Documents was "subordination" in which the Defendants and Debtors created a hierarchy of loss absorption among the tranche securities.    To create that hierarchy, Defendants and Debtors placed the pool's tranches in an order, with the lowest tranche required to absorb any losses first, before the next highest tranche.  Losses might occur, for example, if borrowers defaulted on their mortgages and stopped making mortgage payments into the pool.  Lower level tranches most at risk of having to absorb losses typically received non-investment grade ratings from the credit rating agencies, while the higher level tranches that were protected from loss typically received investment grade ratings.  One key task for both Defendants and Debtors and the credit rating agencies was to calculate the amount of "subordination" required to ensure that the higher tranches in a pool were protected from loss and could be given investment grade ratings.

252.    A    second    common    form    of    credit    enhancement    was    "over-collateralization."  In this credit enhancement, the Defendants and Debtors ensured that the revenues expected to be produced by the assets in a pool exceeded the revenues designated to be paid out to each of the tranches.    That excess amount provided a financial cushion for the pool and was used to create an "equity" tranche, which was the first tranche in the pool to absorb losses if the expected payments into the pool were reduced.  This equity tranche was subordinate to all the other tranches in the pool and did not receive any credit rating.  The larger the excess, the larger the equity tranche, and the

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 114 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 114 of 214

larger the cushion created to absorb losses and protect the more senior tranches in the pool. In some pools, the equity tranche was also designed to pay a relatively higher rate of return to the party or parties who held that tranche due to its higher risk.

253. Still another common form of credit enhancement was the creation of "excess spread" or "excess cash flow", which involved designating an amount of revenue to pay the pool's monthly expenses and other liabilities but ensuring that the amount was slightly more than what was likely needed for that purpose. Any funds not actually spent on expenses would provide an additional financial cushion to absorb losses, if necessary.

254. Former ratings agency analysts and managers told the PSI that investment banks pressured them to get their deals done quickly, increase the size of the tranches that received high credit ratings and reduce the credit enhancements protecting the higher rated tranches from loss. In an October 2007 memorandum, Moody's Chief Credit Officer Andrew Kimball wrote, "The real problem is not that the market does underweights [sic] ratings quality but rather that in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the highest rating."

255. As set forth below, representations regarding the inclusion and scope of these credit enhancements were made in all of the Offering Documents. These representations were false and misleading because all of the purported "enhancements" depended on or derived from inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 115 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 215 of 214

## VIII.  THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES

256.    The credit ratings of the Certificates were an important factor in Plaintiffs' decision to purchase the Certificates.

257.    Investment grade securities are understood by investors to be stable, secure, and safe.  A rating of AAA denotes high credit quality and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as treasury bills.  Historically, before 2007, investments with AAA ratings had an expected cumulative loss rate of less than 0.5 percent, with an annual loss rate of close to zero.  According to Standard and Poor's, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to 2007, for example, averaged about 0.094% per year and was not higher than 0.41% in any year.

258.    The Defendants and Debtors well understood (and banked on) the importance that purchasers of mortgage-backed securities attached to credit ratings.  In most cases, the purchasers were institutional investors, such as Plaintiffs, who did not have the knowledge or ability to independently analyze the mortgage pools underlying any particular offering to verify for themselves that the ratings were accurately determined.

259.    Accordingly, Defendants and Debtors featured the ratings prominently in the Offering Documents and discussed at length the ratings assigned to the Certificates and the bases for the ratings.  Each Prospectus Supplement stated that the issuance of each of the Certificates was conditioned on the assignment of particular, investment-

grade ratings and listed the ratings in a chart.  All the Certificates purchased by Plaintiffs were at least investment grade when issued and purchased.

260.    Unbeknownst to Plaintiffs and other investors, at all relevant times, Defendants and Debtors knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by Defendants and Debtors to the rating agencies.    In fact, Defendants and Debtors manipulated the rating agencies to obtain the desired ratings for the Certificates.

261.    Specifically, the ratings of the Certificates were significantly compromised by the misinformation provided by Defendants and Debtors to the rating agencies. Among other matters, Defendants and Debtors did not disclose to the rating agencies that the Originators, including Ally-GMAC-affiliated entities, had abandoned their underwriting standards by, among other things, manipulating the assets, liabilities, income and other important information concerning borrowers; using false metrics to qualify borrowers; and aggressively using exceptions to qualify borrowers.  Defendants and Debtors did not disclose their knowledge that, in obtaining appraisals to value the underlying collateral, the originators used inflated appraisals that departed from industry-approved standards.  Defendants and Debtors did not otherwise disclose their knowledge of the pervasive fraud that affected the mortgages underlying the Certificates.

262.    Apart from supplying incomplete and false information to the rating agencies, Defendants and Debtors also manipulated their relationship with the rating agencies in order to achieve the desired ratings.  The rating agencies received enormous revenues from the issuers who paid them for rating their securities.  Because the desired

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document    Entered 07/27/12    Page 217 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 117 of 214

rating of a securitized product was the starting point for any securities offering, the rating agencies were actively involved in helping issuers structure their products to achieve the requested rating. As a result, the rating agencies essentially worked backwards, starting with the issuer's target rating and then working toward a structure that would yield the desired rating. Among other things, the rating agencies instructed issuers on how much credit enhancement to provide to each tranche of the Certificates in order to secure the desired ratings.

263.    In this manner, Defendants and Debtors were able to manipulate the rating agencies to achieve the inflated ratings they desired. Through repeated communications and collaboration with the rating agencies, Defendants and Debtors were effectively able to reverse engineer aspects of the ratings models and then modify the structure of an offering to improve the ratings without actually improving the underlying credit quality.

264.    In a 2008 report entitled "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies," the SEC confirmed that the issuers and the rating agencies worked together so that securities would receive the highest ratings:

> Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger [sponsor/issuer]. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01842-SRN-JJG    Document 1    Filed 07/27/12    Page 218 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 118 of 214

the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

265.    As a result, the Certificates were not worthy of the investment-grade ratings given to them, as evidenced most clearly by the fact that many of the Certificates now been downgraded to junk a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default.  The collective steep downgrade of the Certificates indicates that the ratings set forth in the Offering Documents were false, unreliable, and inflated.

266.    According to the Levin Report, former ratings agency analysts and managers said that investment banks pressured them to get their deals done quickly, to increase the size of the tranches that received investment grade ratings, and to reduce the credit enhancements protecting the investment grade tranches from loss.

267.    By including and endorsing the investment grade credit ratings contained in the Offering Documents, Defendants and Debtors falsely represented that they actually believed that the ratings were an accurate reflection of the credit quality of the Certificates.

## IX.    DEFENDANTS AND DEBTORS FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED

268.    A fundamental aspect of the mortgage securitization process is that the issuing trust for each offering must obtain good title to the mortgage loans comprising the pool for that offering.  This is necessary in order for the holders of the RMBS, such as Plaintiffs, to be legally entitled to enforce the mortgage loans in the event of default.

Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

269.    The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).  In general, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale.  In addition, state laws generally require that the trustee of the issuing trust have physical possession of the original, manually-signed promissory note in order for the loan to be enforceable by the trustee against the borrower in the event of the borrower's default.

270.    In order to preserve the bankruptcy-remote status of the issuing trusts in RMBS transactions, the notes and security instruments are generally not directly transferred from the mortgage loan originator to the trust.  Rather, the notes and security instruments are initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities.  After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization.  Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

271.    To ensure that the trust qualifies as a tax-free real estate mortgage investment conduit, the PSA generally requires the transfers to the trust to be completed

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 120 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 120 of 214

within a strict time limit after formation of the trust. Furthermore, the applicable trust law in each state generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery, and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

272.   The importance of transferring good title becomes more apparent in the event of a loan default. When the borrower of a loan backing an RMBS defaults, the trustee is usually able to foreclose on the property, sell it, and distribute the proceeds to the trust for disbursement to Certificate-holders in accordance with the governing documents of the trust. The trust must have valid title in order for the trustee to be able to foreclose on the property. However, it is impossible for the trust to hold valid title if the detailed technical requirements for the transfer of title are not met.

273.   Improperly transferring title will prevent the trustee from foreclosing on a defaulted loan, causing harm to investors who purchased RMBS that is backed by the loan. As stated above, foreclosure allows the trustee to collect proceeds that are distributed to Certificate-holders as payment for their investment. If the trustee is unable to foreclose on a loan, the Certificateholders will not receive the proceeds that they are owed. Additionally, if the market realizes that there are issues with the proper transfer of title for the mortgage loans underlying an RMBS, the market would discount that RMBS. Information regarding transfer of title issues is unlikely to be available when the investor purchases the relevant RMBS. As a result, Certificateholders will be harmed when the

12-12020-mg    Doc 6427-3    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 121 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 121 of 214

value of their RMBS are decreased due to undisclosed title transfer issues. Here, Plaintiffs were harmed as a result of Defendants and Debtors' failure to effectively transfer title.

274. Here, the Offering Documents represented in substance that the Issuing Trust for the respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering. In fact, however, Defendants and Debtors routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments. In an October 20, 2010 NEW YORK TIMES article on the failure of large banks to maintain full documentation, "Battle Lines Forming In Clash Over Foreclosures," Rebel A. Cole, a professor of finance and real estate at DePaul University, was quoted as saying that banks "have essentially sidestepped 400 years of property law in the United States. There are so many questionable aspects to this thing it's scary."

275. On October 27, 2010, Katherine Porter, then a visiting a professor at Harvard Law School specializing in consumer credit, consumer protection regulation, and mortgage servicing, testified before the Congressional Oversight Panel:

> The implications of problems with transfer are serious. If the [securitization] trust does not have the loan, homeowners may have been making payments to the wrong party. If the trust does not have the note or mortgage, it may not have standing to foreclose or legal authority to negotiate a loan modification. To the extent that these transfers are being completed retroactively, it raises issues about honesty in creating and dating the assignments/transfers and about what parties can do, if anything, if an entity in the securitization chain, such as Lehman Brothers or New Century, is no longer in existence. Moreover, retroactive transfers may violate the

12-12020-mg    Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 122 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 122 of 214

terms of the trust, which often prohibit the addition of new assets, or may cause the trust to lose its REMIC status, a favorable treatment under the Internal Revenue Code.  Chain of title problems have the potential to expose the banks to investor lawsuits and to hinder their legal authority to foreclose or even to do loss mitigation.

* * * * *

I want to share with the Panel that the lawyers that I have met over years of my research on mortgage servicing both creditor lawyers and debtor lawyers have nearly universally expressed that they believe a very large number (perhaps virtually all) securitized loans made in the boom period in the mid-2000s contain serious paperwork flaws, did not meet underwriting or other requirements of the trust, and have not been serviced properly as to default and foreclosure.

276.  On November 18, 2010, Adam Levitin, a professor at Georgetown University Law Center, provided similar testimony about the importance of the chain of title to investors and the consequences of faulty transfers before a hearing of the House Financial Services Committee:

Concerns about securitization chain of title also go to the standing question; if the mortgages were not properly transferred in the securitization process (including through the use of MERS to record the mortgages), then the party bringing the foreclosure does not in fact own the mortgage and therefore lacks standing to foreclose.  If the mortgage was not properly transferred, there are profound implications too for investors, as the mortgage-backed securities they believed they had purchased would, in fact be non-mortgage-backed securities, which would almost assuredly lead investors to demand that their investment contracts be rescinded[.]

* * * * *

Securitization is the legal apotheosis of form over substance, and if securitization is to work it must adhere to its proper, prescribed form punctiliously.  The rules of the game with securitization, as with real property law and secured credit

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 123 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 123 of 214

are, and always have been, that dotting "i's" and crossing "t's" matter, in part to ensure the fairness of the system and avoid confusions about conflicting claims to property. Close enough doesn't do it in securitization; if you don't do it right, you cannot ensure that securitized assets are bankruptcy remote and thus you cannot get the ratings and opinion letters necessary for securitization to work. Thus, it is important not to dismiss securitization problems as merely "technical;" these issues are no more technicalities than the borrower's signature on a mortgage. Cutting corners may improve securitization's economic efficiency, but it undermines its legal viability.

277. It is now clear that Ally-GMAC did not transfer securitized loans to the Issuing Trusts in a timely fashion, if it did so at all. For example, a September 5, 2011 NATIONAL MORTGAGE NEWS article, "Servicers Are Now Rewriting Their History," discusses Ally-GMAC's transfer of a mortgage to a Deutsche Bank trust on May 18, 2011, for a bond deal *that closed in 2005*. This failure to ensure proper transfer of mortgage documents or maintain the chain of title – tasks which Ally-GMAC received servicing fees for supposedly fulfilling – represents a flagrant breach of the representations contained in the Offering Documents.

278. Ally-GMAC's failure to maintain the chain of title for securitized mortgages as it represented it would do in the Offering Documents has led it to take unlawful shortcuts, resulting in a costly foreclosure moratorium and multiple investigations. Ally-GMAC's former foreclosure counsel, The Law Offices of David J. Stern, P.A., has acknowledged that when engaged in foreclosure proceedings, Ally-GMAC did not confirm whether loan and mortgage documents were properly endorsed, assigned, or in the possession in the appropriate party.

279.   Around September 20, 2010, Ally-GMAC was forced to temporarily halt evictions and foreclosure sales in 23 states after an Ally-GMAC employee, Jeffrey Stephan, admitted in a deposition that he routinely submitted false affidavits in foreclosure cases and that he did not review the exhibits whose accuracy he attested to. According to the FCIC Report, Stephan has stated that he signed 10,000 affidavits in a month, which the FCIC Report calculates to roughly 1 per minute in a 40-hour workweek, thus making it highly unlikely that he verified payment histories in each individual case of foreclosure.  According to the FCIC Report, "all 50 of the nation's state attorneys general banded together in the fall of 2010 to investigate foreclosure irregularities, identify possible solutions, and explore potential redress for borrowers who were harmed by improper foreclosures."  One of the focuses of this investigation, according to the FCIC Report, was on lenders and mortgage servicers who relied on "robo-signers" such as Stephan, who substituted speed for accuracy by signing hundreds of affidavits without personal knowledge of facts concerning the underlying mortgages.

280.   According to a September 30, 2010 article in the NEW YORK TIMES, "Foreclosures Slow As Document Flaws Emerge," shortly after the announcement of the moratorium on foreclosures and evictions, Old Republic National Title, one of the largest title insurers in the country, sent a bulletin to agents saying that "until further notice" it would not insure title to properties foreclosed upon by GMAC Mortgage.

281.   Ally-GMAC resumed foreclosures in October, but the moratorium alerted regulators to Ally-GMAC's unlawful servicing practices and the need to take action.  All fifty state attorneys-general have launched a coordinated investigation into the

foreclosure practices of banks including Ally-GMAC. The Board of Governors of the Federal Reserve System ("Federal Reserve") also launched its own investigation.

282. MERS, the electronic mortgage registry used by the banking industry, has faced multiple investigations for its role in thousands of problematic U.S. foreclosure cases. MERS tracks servicing rights and ownership interests in mortgage loans on its electronic registry, allowing banks to buy and sell loans without recording transfers with individual counties.

283. Most recently, MERS has been the subject of a joint Delaware-New York probe. The registry has been sued by the Delaware Attorney General, which accuses MERS of deceptive practices that led to unlawful shortcuts in dealing with the foreclosure crisis. *See State of Del v. MERSCORP Inc.*, C.A. No. 6987 (Del. Ch. Oct. 27, 2011). The Delaware complaint alleges that "MERS engaged and continues to engage in a range of deceptive trade practices that sow confusion among consumers, investors and other stakeholders in the mortgage finance system, damage the integrity of Delaware's land records, and lead to unlawful foreclosure practices."

284. New York's attorney general has also taken action against MERS, subpoenaing the registry for information about how it is used by major banks, including Ally, and a foreclosure law firm.

285. On April 13, 2011, Defendants Ally Financial, and Debtors ResCap and GMAC Mortgage entered into a consent order (the "Consent Order") with the Federal Reserve regarding Ally-GMAC's mortgage loan servicing business, including its servicing of loans pooled in securitization trusts. The Consent Order noted that entities

controlled by Ally-GMAC had allegedly engaged in unsound servicing practices including initiating foreclosures "without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party." Under the terms of this Consent Order, Ally-GMAC was required to take steps to remedy deficiencies in its servicing and foreclosure activities, including retaining independent consultants to determine whether foreclosures initiated by Ally-GMAC entities had been based upon proper documentation, devising a plan to remediate foreclosure errors, and submitting to the Federal Reserve an acceptable written plan to strengthen oversight of risk management, internal audit and legal compliance programs.

## X.    DEFENDANTS AND DEBTORS' SPECIFIC MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

286.    Defendants and Debtors' representations regarding the mortgage loans underlying the Offerings were highly material to investors such as Plaintiffs. Because the revenue paid to investors is derived from the stream of payments received from the mortgage loan borrowers, the value of an investment is necessarily tied to the perceived risk of default in the mortgage loan pool. In other words, the market value of a Certificate decreases as the perceived risk of the underlying pool increases. Plaintiffs, therefore, closely examined the representations made by the Defendants and Debtors regarding the mortgage loans underlying each of the Offerings at issue here.

287.   In light of the numerous departures from underwriting guidelines and appraisal standards by the Originators described above, the Offering Documents (Registration Statements and Prospectus Supplements) disseminated by Defendants and Debtors in the course of selling the Certificates contained numerous misstatements and omissions.

A.   **DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING STANDARDS AND PRACTICES**

288.   The Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospectus Supplements formed a part, contained the following misleading statements, among others, in identical or substantially similar language, regarding the underwriting standards and practices that the Originators applied in originating the mortgage loans underlying the Certificates.

> Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans: the creditworthiness of a mortgagor, the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan. [13]

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at S-102-103 (Apr. 30, 2004);

---

[13]  Unless otherwise noted, all emphases are added and internal citations are omitted.

Prospectus Supplement HELT Series 2007-HSA2 Trust (Form 424B5), at S-38 (Apr. 26, 2007); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-33 (Dec. 23, 2005); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at S-45 (Mar. 6, 2006); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005);Registration Statement (333-126745) filed by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 10-11 (Aug. 3, 2005); Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-55 (May 28, 2005); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at S-43 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at S-41 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-44 (Feb. 21, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at 13 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 11-12 (Mar. 29, 2006); Registration Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at S-51-52 (Apr. 3, 2007); Registration Statement (333-122688) filed by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-31 (Apr. 19, 2005); Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at S-70 (Mar. 31, 2006).

> The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability

and/or the value and adequacy of the related property as
collateral.

The above misstatements, in identical or substantially similar language, were contained in

the each of the Offering Documents including, for example: Prospectus Supplement for

GMACM 2004-AR1 Trust (Form 424B5), at 18 (Apr. 30, 2004); Prospectus Supplement

for HELT Series 2007-HSA2 Trust (Form 424B5), at 15 (Apr. 26, 2007); Prospectus

Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at 12 (Dec. 28, 2006);

Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 23 (Nov.

24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at

22 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form

424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust

(Form 424B5), at 20 (Jun. 27, 2006); Prospectus Supplement for RASC Series 2006-KS9

Trust (Form 424B5), at 10 (Oct. 30, 2006); Prospectus Supplement for RASC Series

2006-EMX9 Trust (Form 424B5), at 10 (Oct. 27, 2006); Prospectus Supplement for

RASC Series 2007-KS2 Trust (Form 424B5), at 10 (Feb. 23, 2007); Registration

Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A,

Am. 1), at 22 (May 1, 2003); Registration Statement (333-107959) filed by Residential

Accredit Loans, Inc. (Form S-3/A, Am. 1), at 12 (Sep. 23, 2003); Registration Statement

(333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at

22 (Dec. 2, 2003); Registration Statement (333-125485) filed by Residential Asset

Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005).

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 130 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 130 of 214

289.     The statements quoted above were false because they represented that the Originators applied underwriting guidelines and quality control measures to assess the value of the mortgaged properties, evaluate the adequacy of such properties as collateral for the mortgage loans, and assess the applicants' abilities to repay their mortgage loans, when in fact the Originators had actually abandoned these standards so that they could increase the volume of loan origination and the resulting fees that they earned.  The statements also represent that Residential Funding put quality control measures into place in order to assure that the underwriting guidelines were followed.  Instead, Residential Funding ignored the underwriting tactics of the Originators.  For further discussion of Originators' disregard of their stated underwriting guidelines, *see* Section IV.B., *supra*.

**B.     DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING QUALITY CONTROL PROCEDURES**

290.     The Offering Documents represented that numerous quality control procedures were conducted with respect to the loans underlying the Certificates.  For example, the Offering Documents contained, in sum or substance, the following representation:

> Prior to assignment to the depositor, Residential Funding reviewed the underwriting standards for the mortgage loans and purchased all of the mortgage loans from mortgage collateral sellers who participated in or whose loans were in substantial conformity with the standards set forth in Residential Funding's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:   Prospectus Supplement for

GMACM Series 2004-AR1 Trust (Form 424B5), at 22 (Apr. 30, 2004); Prospectus

Supplement HELT Series 2007-HSA2 Trust (Form 424B5), at 14 (Apr. 26, 2007);

Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-32 (Dec.

23, 2005); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc.

(Form S-3/A, Am. 1), at S-45 (Mar. 6, 2006); Registration Statement (333-126745) filed

by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 11 (Aug. 3,

2005); Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-56

(May 28, 2005); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form

424B5), at S-54 (Dec. 28, 2006); Prospectus Supplement for RAMP Series 2006-RS1

Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series

2006-RZ2 Trust (Form 424B5), at S-43 (May 2, 2006); Prospectus Supplement for

RAMP Series 2006-RZ3 Trust (Form 424B5), at S-40 (Aug. 3, 2006);  Prospectus

Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-44 (Feb. 21, 2006);

Prospectus Supplement for RASC Series 2006-KS9 Trust (Form 424B5), at S-11-12, S-

46-48 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form

424B5), at S-10-11, S-55 (Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-

KS2 Trust (Form 424B5), at S-10-12, S-58 (Feb. 23, 2007); Prospectus Supplement for

RFMSI Series 2006-S2 Trust (Form 424B5), at 13 (Feb. 27, 2006); Prospectus

Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 11 (Mar. 29, 2006);

Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-

3/A, Am. 1), at S-31-32 (Sep. 23, 2003); Registration Statement (333-122688) filed by

Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-31 (Apr. 19, 2005);

Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc.

(Form S-3/A, Am. 3), at S-70 (Mar. 31, 2006); Registration Statement (333-140605) filed

by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at 14 (Apr. 3,

2007).

> Residential Funding Corporation, on behalf of the depositor,
> typically will review a sample of the mortgage loans
> purchased by Residential Funding Corporation for conformity
> with the applicable underwriting standards and to assess the
> likelihood of repayment of the mortgage loans.

The above misstatements, in identical or substantially similar language, were contained in

the each of the Offering Documents including, for example:   Prospectus Supplement for

GMACM 2004-AR1 Trust (Form 424B5), at 22 (Apr. 30, 2004); Prospectus Supplement

for HELT Series 2007-HSA2 Trust (Form 424B5), at 14 (Apr. 26, 2007); Prospectus

Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 13 (Mar. 29, 2006);

Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 27 (Nov.

24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at

27 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form

424B5), at 24 (Jun. 27, 2006); Registration Statement (333-104662) filed by Residential

Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 27 (May 1, 2003); Registration

Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A,

Am. 1), at 27 (Dec. 2, 2003); Registration Statement (333-140609) filed by Residential

Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 30 (Apr. 10, 2007); Registration

Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form

S-3/A, Am. 1), at 14 (Apr. 3, 2007).

291.   The above statements of material facts were untrue when made because they failed to disclose that the Sponsor Debtor and Originators did not, in fact, review each loan for compliance with its underwriting standards prior to purchase.

### C.   DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING EXCEPTIONS

292.   The Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, using identical or substantially similar language, regarding the circumstances under which Defendants and Debtors granted underwriting exceptions for loans underlying the Certificates:

> In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator. In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding. ***Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted. Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income***.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 234 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 134 of 214

RASC Series 2005-KS12 Trust (Form 424B5), at S-34 (Dec. 23, 2005); Prospectus

Supplement for RASC Series 2006-KS9 Trust (Form 424B5), at S-58 (Oct. 30, 2006);

Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form 424B5), at S-56-57

(Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust (Form 424B5),

at 12 (Feb. 23, 2007); Registration Statement (333-131213) filed by Residential Accredit

Loans, Inc.  (Form S-3/A, Am. 1), at S-45-46 (Mar. 6, 2006); Registration Statement

(333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at

S-32 (Jul. 7, 2005);Registration Statement (333-126745) filed by Residential Funding

Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 11 (Aug. 3, 2005); Prospectus

Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at S-55 (Dec. 28, 2006);

Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-45-46

(Feb. 21, 2006); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form

424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust

(Form 424B5), at 12-13 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-

S3 Trust (Form 424B5), at S-36 (Mar. 29, 2006); Registration Statement (333-122688)

filed by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-33 (Apr. 19, 2005);

Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc.

(Form S-3/A, Am. 3), at S-72 (Mar. 31, 2006); Prospectus Supplement for Prospectus

Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 23 (Nov. 24, 2003);

Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at 22 (May 26,

2004); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at 20

(Jun. 27, 2006); Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5),

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 135 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 135 of 214

at 14 (May 28, 2005); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at 20 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at 20 (Aug. 3, 2006); Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 22 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at 15 (Sep. 23, 2003); Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 22 (Dec. 2, 2003).

293.    The statements quoted above were false because they represented that Residential Funding Company and the Originators only permitted exceptions to their underwriting guidelines on a case-by-case basis and when the borrowers could show some compensating factors as justification, when in fact the Originators systematically granted exceptions to virtually every borrower who did not qualify for a mortgage loan. For further discussion of Originators' wholesale and systematic abuse of exceptions, *see* Section IV.B., *supra*.

### D.    DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LOAN-TO-VALUE RATIOS AND APPRAISALS

294.    The Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, regarding loan-to-value ratios and appraisals of the properties securing the mortgage loans underlying the Certificates:

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 136 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 136 of 214

The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.

The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at S-103 (Apr. 30, 2004); Prospectus Supplement for HELT 2007-HSA2 Trust (Form 424B5), at 17 (Apr. 26, 2007); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-33-34 (Dec. 23, 2005); Prospectus Supplement for RASC Series 2006-KS9 Trust (Form 424B5), at S-58 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form 424B5), at S-56 (Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust (Form 424B5), at S-60 (Feb. 23, 2007); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc.  (Form S-3/A, Am. 1), at S-45 (Mar. 6, 2006); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration Statement (333-

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 137 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 137 of 214

126745) filed by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at

12 (Aug. 3, 2005); Prospectus Supplement for Prospectus Supplement for RALI Series

2005-QA7 Trust (Form 424B5), at S-56 (May 28, 2005); Prospectus Supplement for

RALI Series 2006-QS18 Trust (Form 424B5), at 13 (Dec. 28, 2006); Prospectus

Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 24 (Nov. 24, 2003);

Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at 23 (May 26,

2004);  Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19

(Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5),

at 21 (Jun. 27, 2006); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form

424B5), at S-44 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3

Trust (Form 424B5), at S-41 (Aug. 3, 2006); Prospectus Supplement for RASC Series

2006-EMX2 Trust (Form 424B5), at S-45 (Feb. 21, 2006); Prospectus Supplement for

RFMSI Series 2006-S2 Trust (Form 424B5), at 14 (Feb. 27, 2006); Prospectus

Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 14 (Mar. 29, 2006);

Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc.

(Form S-3/A, Am. 1), at 23-24 (May 1, 2003); Registration Statement (333-107959) filed

by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at S-31 (Sep. 23, 2003);

Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc.

(Form S-3/A, Am. 1), at S-33 (Dec. 2, 2003); Registration Statement (333-122688) filed

by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-33 (Apr. 19, 2005);

Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc.

(Form S-3/A, Am. 3), at S-71 (Mar. 31, 2006); Registration Statement (333-140609) filed

by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-48 (Apr. 10, 2007); Registration Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at 17 (Apr. 3, 2007).

295.   The statements quoted above were false because they represented that the properties securing the loans underlying the Certificates had been independently appraised based on the market values of comparable properties and replacement cost analyses, when in fact the Originators systematically pressured appraisers to overvalue properties and falsify appraisal reports.   For further discussion of the corruption of the appraisal system, *see* Section III, *supra*.

296.   Furthermore, each Prospectus Supplement contained tables substantially similar to that below, purporting to provide data on the LTV ratios of the mortgage loans underlying the Certificates so that investors could reach their own conclusions about whether or not those loans were backed by sufficient collateral.   The statements were materially untrue and misleading, however, because the value data underlying the LTV calculations had been systematically skewed by fraudulent appraisals.   Thus, these statements understated the true LTV ratios of the loans and the true risk inherent in the Certificates.

**Original Loan-to-Value Ratios of the Mortgage Loans**

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percent of Aggregate Unpaid Principal Balance |
|---|---|---|---|
| 55.00 or less | 118 | $ 46,095,154.53 | 7.72% |
| 55.01 to 60.00 | 67 | 32,126,634.48 | 5.38 |
| 60.01 to 65.00 | 88 | 40,595,054.57 | 6.80 |
| 65.01 to 70.00 | 156 | 72,638,158.61 | 12.16 |
| 70.01 to 75.00 | 231 | 115,390,822.95 | 19.32 |
| 75.01 to 80.00 | 733 | 283,995,271.06 | 47.56 |
| 80.01 to 85.00 | 3 | 1,271,762.92 | 0.21 |
| 85.01 to 90.00 | 10 | 4,041,181.10 | 0.68 |
| 90.01 to 95.00 | 5 | 1,020,608.98 | 0.17 |
| **Total** | **1,411** | **$597,174,649.20** | **100.00%** |

The above misstatement was contained in Prospectus Supplement for GMACM Mortgage Loan Trust 2005-AR5 (Form 424B5), at I-3 (Aug. 12, 2005).

297. The remaining securities purchased by Plaintiff contained similar misstatements regarding LTV ratios. *See, e.g.*, Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at S-31 (Apr. 30, 2004); Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-48 (June 28, 2005); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at I-26 (Dec. 28, 2006); Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at S-29 (Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at S-32 (May 26, 2004);  Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP 2006-RS4 (Form 424B5), at III-3 (June 27, 2006); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at II-3 (May 2, 2006); Prospectus Supplement for RAMP 2006-RZ3 (Form 424B5), at III-3 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at II-3 (Dec. 23, 2005); Prospectus Supplement for RASC

Series 2006-EMX2 Trust (Form 424B5), at II-3 (Feb. 21, 2006); Prospectus Supplement

for RASC Series 2006-KS9 Trust (Form 424B5), at II-26 (Oct. 30, 2006); Prospectus

Supplement for RASC Series 2007-KS2 Trust (Form 424B5), at II-26 (Feb. 23, 2007);

Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at I-2 (Feb. 27,

2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at I-2

(Mar. 29, 2006).

### E.    DEFENDANTS AND DEBTORS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES

298.    The Prospectus Supplements disseminated by Defendants and Debtors in

the course of selling the Certificates, and therefore the Registration Statements of which

those Prospective Supplements formed a part, contained the following misleading

statements using identical or substantially similar language, among others, touting the

credit ratings assigned to the Certificates:

> *Each class of certificates offered hereby and by the accompanying prospectus supplement will be rated at the date of issuance in one of the four highest rating categories by at least one rating agency.*

The above misstatements, in identical or substantially similar language, were contained in

the each of the Offering Documents including, for example: Prospectus Supplement for

GMACM Series 2004-AR1 Trust (Form 424B5), at 123 (Apr. 30, 2004); Prospectus

Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at 128 (Apr. 26, 2007);

Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at 110 (Dec.

23, 2005); Prospectus Supplement for RASC Series 2006-KS9 Trust (Form 424B5), at

112 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form

12-12020-mg  Doc 6427-2  Filed 02/04/14  Entered 02/04/14 15:48:52  Exhibit B:
CASE 0:12-cv-01841-SRN-JJG  Document 1  Filed 07/27/12  Page 141 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 141 of 214

424B5), at 112 (Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust (Form 424B5), at 112 (Feb. 23, 2007); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc.   (Form S-3/A, Am. 1), at 128 (Mar. 6, 2006); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration Statement (333-126745) filed by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 82 (Aug. 3, 2005); Prospectus Supplement for Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at 102 (May 28, 2005); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at 103 (Dec. 28, 2006); Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 128 (Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at 146 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at 130 (Jun. 27, 2006); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at 130 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at 130 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-6 (Feb. 21, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at 98 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at S-94 (Mar. 29, 2006); Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 145 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at 126 (Sep. 23, 2003); Registration Statement

(333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at

146 (Dec. 2, 2003); Registration Statement (333-122688) filed by Residential Asset

Securities Corp. (Form S-3/A, Am. 1), at 130 (Apr. 19, 2005); Registration Statement

(333-131211) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at

164 (Mar. 31, 2006); Registration Statement (333-140605) filed by Residential Funding

Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at 127 (Apr. 3, 2007).

> The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the transaction structure. Fitch's ratings reflect its analysis of the riskiness of the underlying mortgage loans and the structure of the transaction as described in the operative documents. Fitch's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Further, the rating on the Interest Only Certificates does not address whether investors therein will recoup their initial investments. The rating on the Principal Only Certificates only addresses the return of their respective Certificate Principal Balances. The rating on the Residual Certificates only addresses the return of its Certificate Principal Balance and interest on the Residual Certificates at the related pass-through rate.

> The ratings assigned by Standard & Poor's to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates. The rating on the Principal Only Certificates only addresses the return of their respective Certificate Principal Balances. The rating on the Residual Certificates only addresses the return of its Certificate Principal Balance and interest on the Residual Certificates at the related pass-through rate. Standard & Poor's rating on the certificates does

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 143 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 143 of 214

not, however, constitute a statement regarding frequency of prepayments on the mortgages.   See "Certain Yield and Prepayment Considerations" herein.

The ratings assigned by Moody's to the Senior Certificates address the likelihood of the receipt by the Senior Certificateholders of all distributions to which they are entitled under the pooling and servicing agreement.  Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement.  Moody's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the mortgage loans.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at S-87 (Apr. 26, 2007); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at S-142 (Dec. 28, 2006); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc.  (Form S-3/A, Am. 1), at S-91 (Mar. 6, 2006); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration Statement (333-126745) filed by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 147-48 (Aug. 3, 2005); Prospectus Supplement for Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-104 (May 28, 2005); Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at S-119 (Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at S-123-24 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at S-113 (Jun. 27, 2006); Prospectus Supplement for

RAMP Series 2006-RZ2 Trust (Form 424B5), at S-111 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at S-103 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-97 (Dec. 23, 2005); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-115 (Feb. 21, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at S-90-91 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at S-94 (Mar. 29, 2006); Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-57 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at S-86 (Sep. 23, 2003); Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-57 (Dec. 2, 2003); Registration Statement (333-122688) filed by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-68 (Apr. 19, 2005); Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at S-137-38 (Mar. 31, 2006).

It is a condition of the issuance of the Senior Certificates that they be rated "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or S&P, and "AAA" by Fitch Ratings, or Fitch. It is a condition of the issuance of each class of Class M-1, Class M-2 and Class M-3 Certificates that they be rated not lower than "AA," "A" and "BBB," respectively, by S&P.

The depositor has not requested a rating on the senior certificates by any rating agency other than S&P and Fitch or on the Class M Certificates by any rating agency other than S&P. However, there can be no assurance as to whether any other rating agency will rate the offered certificates, or, if it

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 245 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 145 of 214

does, what rating would be assigned by any other rating agency. A rating on the offered certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the offered certificates by S&P or Fitch.

A security rating addresses the likelihood of the receipt by the holders of the offered certificates of distributions on the mortgage loans. The rating takes into consideration the structural and legal aspects associated with the offered certificates. The ratings on the offered certificates do not constitute statements regarding the possibility that the holders of the offered certificates might realize a lower than anticipated yield. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to the offered certificates are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the offered certificates.

Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at S-159 (Apr. 30, 2004); Prospectus Supplement for GMACM Series 2005-AR5 Trust (Form 424B5), at S-78 (Aug. 12, 2005); Prospectus Supplement for GMACM Series 2005-AR6 Trust (Form 424B5), at S-77 (Oct. 27, 2005); Prospectus Supplement for GMACM 2007-HE2 Trust (Form 424B5), at S-14 (June 29, 2007); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am.1), at S-67 (July 7, 2005); Registration Statement (333-140609) filed by Residential Asset Mortgage Products, Inc. (Form S-3), at S-117 (Apr. 10, 2007); Registration Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at S-109 (Apr. 3, 2007).

12-12020-mg Doc 6423-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
CASE 0:12-cv-01841-SRN-JJG Document 1 Filed 02/27/12 Page 146 of 214
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 146 of 214

299.    The statements quoted above were false because they represented that the investment-grade credit ratings of the Certificates were the product of rigorous independent analysis of the nature of the underlying assets and the credit quality of the guarantor, when in fact the Underwriter Defendants had colluded with the rating agencies and/or withheld information from them to obtain higher credit ratings than the Certificates truly deserved.  This made the Certificates appear to be safe, investment-grade securities when they were actually risky and speculative.  For further discussion of the corruption of the rating system, *see* Section VIII, *supra*.

### F.    DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE SUFFICIENCY OF THE BORROWERS' INCOMES

300.    Each of the Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, in identical or substantially similar language regarding the sufficiency of the borrowers' incomes to repay the loans underlying the Certificates:

> Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home (such as property taxes and hazard insurance) and other financial obligations and monthly living expenses.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example: Prospectus Supplement for

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 147 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 147 of 214

GMACM 2004-AR1 Trust (Form 424B5), at S-103 (Apr. 30, 2004); Prospectus

Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at 18 (Apr. 26, 2007);

Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 14 (Mar. 29,

2006); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc.

(Form S-3/A, Am. 1), at 14 (Mar. 6, 2006); Registration Statement (333-125485) filed by

Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005);

Registration Statement (333-126745) filed by Residential Funding Mortgage Securities I,

Inc. (Form S-3/A, Am. 1), at 12 (Aug. 3, 2005); Prospectus Supplement for Prospectus

Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-55 (May 28, 2005);

Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at 13 (Dec. 28,

2006); Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 26

(Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form

424B5), at 26 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust

(Form 424B5), at 19 (Jan. 25, 2006);  Prospectus Supplement for RAMP Series 2006-

RS4 Trust (Form 424B5), at 23 (Jun. 27, 2006); Prospectus Supplement for RAMP Series

2006-RZ2 Trust (Form 424B5), at S-43-44 (May 2, 2006); Prospectus Supplement for

RAMP Series 2006-RZ3 Trust (Form 424B5), at S-41 (Aug. 3, 2006); Prospectus

Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-33 (Dec. 23, 2005);

Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-44-45

(Feb. 21, 2006); Prospectus Supplement for RASC Series 2006-KS9 Trust (Form 424B5),

at 13 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form

424B5), at 13 (Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust

(Form 424B5), at 13 (Feb. 23, 2007); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at 14 (Feb. 27, 2006); Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 26 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at 14 (Sep. 23, 2003); Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 26 (Dec. 2, 2003); Registration Statement (333-122688) filed by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-32 (Apr. 19, 2005); Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at S-70-71 (Mar. 31, 2006); Registration Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at 18 (Apr. 3, 2007).

301. The statements quoted above were false because in fact, the Originators had willfully turned a blind eye to the creditworthiness of their borrowers, lending money without making even cursory attempts to ensure that the loans would be repaid. Indeed, the Originators extended numerous loans even though the borrower's information was not provided, or even if it was, where that information was patently false and the Originators knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud. For further discussion of the Originators' purposeful disregard for income verification, *see* Section IV, *supra*.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 149 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 149 of 214

### G.    DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING OWNER-OCCUPANCY STATISTICS

302.    Each of the Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained tables substantially similar to that below, purporting to provide data on the owner occupancy rates of mortgage loans underlying the Certificates.  The figures contained in these tables were materially false and misleading, however, because Defendants and Debtors systematically overstated the owner occupancy rates.

303.    For example, the following table appears in the Prospectus Supplement for RAMP Series 2006-EMX9 Trust (Form 424B5), at II-6 (Oct. 27, 2006), which was purchased in the offering by Plaintiffs:

| OCCUPANCY TYPE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE | PERCENTAGE OF GROUP I LOANS | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE CREDIT SCORE | WEIGHTED AVERAGE LOAN-TO-VALUE RATIO |
|---|---|---|---|---|---|---|
| Primary Residence ...... | 2,401 | $464,418,391 | 93.91% | $193,427 | 612 | 86.45% |
| Second/Vacation ........ | 67 | 10,743,674 | 2.17 | 160,353 | 657 | 86.78 |
| Non-Owner Occupied ..... | 116 | 19,384,668 | 3.92 | 167,109 | 613 | 82.17 |
| TOTAL ......... | 2,584 | $494,546,733 | 100.00% | $191,388 | 613 | 86.29% |

304.    However, an analysis by FHFA of this same Certificate found that the true owner-occupancy rate for the loans included in this particular mortgage pool was 80.39%, not 92.91% as represented above.  *See* Section V, *supra*.[14]

---

[14] FHFA and Mass Mutual calculated the percentage of the <u>number</u> of mortgage loans identified as owner-occupied (*i.e.*, 100*2984/3558 = 83.87%) rather than the percent aggregate principal balance of the loans identified as owner-occupied in the prospectus supplement.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 150 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 150 of 214

305.    In addition, the following table appears in the Prospectus Supplement for

RALI Series 2006-QO6 (Form 424B5), at I-6 (June 29, 2006), which was purchased in

the offering by Plaintiffs:

```
                       Occupancy Types of the Mortgage Loans

<TABLE>
<CAPTION>
                                                                   Weighted        Weighted
                    Number of                      Percentage      Average          Average
                    Mortgage        Principal       of Mortgage    Average          Credit      Loan-to-Value
Occupancy            Loans          Balance           Loans        Balance          Score          Ratio
------------------  ---------     --------------    ----------    ----------      ----------    -------------
<S>                   <C>             <C>              <C>            <C>             <C>            <C>
Primary Residence ..........  3,124   $1,159,191,170   89.03%       $371,060         701          74.76%
Second/Vacation ...........    160       46,909,327     3.60         293,183         713          77.60
Non-Owner Occupied .........   367       95,915,244     7.37         261,349         714          71.95
                              -----   --------------   ------       --------         ---          -----
Total, Average or Weighted
Average ...................  3,651   $1,302,015,741  100.00%       $356,619         703          74.66%
                             =====   ==============   ======       ========         ===          =====
```

306.    Mass Mutual's analysis of this same Certificate found that the true owner-

occupancy rate for the loans included in this particular mortgage pool was 73.21%, not

85.57% as represented above.  *See* Section V, *supra*.

307.    The above misstatements, in identical or substantially similar language,

were contained in the each of the Offering Documents including, for example: Prospectus

Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at S-32 (Apr. 30, 2004);

Prospectus Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at II-9 (Apr.

26, 2007); Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-

31 (June 28, 2005); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form

424B5), at S-13 (Dec. 28, 2006); Prospectus Supplement for RAMP Series 2003-RS10

Trust (Form 424B5), at S-13 (Nov. 24, 2003); Prospectus Supplement for RAMP Series

2004-RS5 Trust (Form 424B5), at S-13 (May 26, 2004); Prospectus Supplement for

RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus

Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at II-5 (May 2, 2006);

Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at II-5 (Dec.

23, 2005); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at

II-6 (Feb. 21, 2006); Prospectus Supplement for RASC Series 2006-KS9 Trust (Form

424B5), at II-28 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9

Trust (Form 424B5), at II-28 (Oct. 27, 2006); Prospectus Supplement for RASC Series

2007-KS2 Trust (Form 424B5), at II-28 (Feb. 23, 2007); Prospectus Supplement for

RFMSI Series 2006-S2 Trust (Form 424B5), at I-4 (Feb. 27, 2006); Prospectus

Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at I-4 (Mar. 29, 2006).

308.    The above misstatements were contained in the Offering Documents for

the following Certificates that were purchased by Plaintiffs and were the subjects of the

FHFA and Mass Mutual loan level analyses: Prospectus Supplement for RALI Series

2005-QO3 Trust (424B5), at S-33 (Oct. 28, 2005); Prospectus Supplement for RALI

Series 2006-QO3 Trust (424B5), at I-5 (Mar. 30, 2006); Prospectus Supplement for

RALI Series 2006-QO5 Trust (424B5), at I-5 (May 31, 2006); Prospectus Supplement for

RALI Series 2006-QO6 Trust (424B5), at I-6 (June 29, 2006); Prospectus Supplement for

RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus

Supplement for RAMP Series 2006-RS4 Trust (424B5), at III-5 (June 27, 2006);

Prospectus Supplement for RAMP Series 2006-RS6 Trust (424B5), at III-5 (Oct. 27,

2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (424B5), at III-5 (Aug.

03, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (424B5), at II-6

(Oct. 27, 2006); Prospectus Supplement for RASC Series 2006-KS3 Trust (424B5), at II-

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 152 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 152 of 214

6 (Mar. 28, 2006); Prospectus Supplement for RASC Series 2006-KS9 Trust (424B5), at II-6 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust (424B5), at II-6 (Feb. 23, 2007).

309.    Although Plaintiffs may have purchased different tranches of some of these securities, the loan-level analyses revealed that Defendants and Debtors consistently overstated owner occupancy statistics, making it likely that the same discrepancies existed in the Offering Documents for the securities that Plaintiffs purchased.

310.    The results of these loan-level reviews establish that, contrary to Defendants and Debtors' representations, a far lower percentage of borrowers did, in fact, occupy the mortgaged properties than was represented to investors such as Plaintiffs in the Offering Documents.

## H.    DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE TRANSFER OF TITLE TO THE ISSUING TRUSTS

311.    The Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, regarding the transfer of title to the Issuing Trusts.

> ***Residential Funding Company, LLC will generally represent and warrant that … Residential Funding Company, LLC had good title to the mortgage loan or contract*** and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan….

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 153 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 153 of 214

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at 19 (Dec. 28, 2006).

> ***Residential Funding Corporation will generally represent and warrant that … Residential Funding Corporation had good title to the mortgage loan or contract*** and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan….

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Registration Statement (333-140609) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am.1), at 44 (Apr. 10, 2007); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc.  (Form S-3/A, Am. 1), at 21 (Mar. 6, 2006); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration Statement (333-126745) filed by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 15 (Aug. 3, 2005); Prospectus Supplement for GMACM 2004-AR1 Trust (Form 424B5), at 30 (Apr. 30, 2004); Prospectus Supplement for Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at 20 (May 28, 2005); Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 35 (Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at 36 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG  Document 1  Filed 07/27/12  Page 254 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 154 of 214

Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at 34 (Jun. 27, 2006); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at 34 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at 34 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at 19 (Dec. 23, 2005); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at 24 (Feb. 21, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at 17 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 17 (Mar. 29, 2006)Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 36 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at 22 (Sep. 23, 2003); Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 36 (Dec. 2, 2003); Registration Statement (333-122688) filed by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at 23 (Apr. 19, 2005); Registration Statement (333-131211) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at 43 (Mar. 31, 2006).

> *At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee*, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. *The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange*

> *for the mortgage loans or mortgage securities*. Each
> mortgage loan or mortgage security will be identified in a
> schedule appearing as an exhibit to the related pooling and
> servicing agreement. Each schedule of mortgage loans will
> include, among other things, information as to the principal
> balance of each mortgage loan as of the cut-off date, as well
> as information respecting the mortgage rate, the currently
> scheduled monthly payment of principal and interest, the
> maturity of the mortgage note and the LTV ratio or CLTV
> ratio and junior mortgage ratio, as applicable, at origination or
> modification, without regard to any secondary financing.

The above misstatements, in identical or substantially similar language, were contained in

the each of the Offering Documents including, for example: Prospectus Supplement for

RASC Series 2005-KS12 Trust (Form 424B5), at 25-26 (Dec. 23, 2005); Registration

Statement (333-131213) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1),

at 31 (Mar. 6, 2006); Registration Statement (333-125485) filed by Residential Asset

Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration

Statement (333-126745) filed by Residential Funding Mortgage Securities I, Inc. (Form

S-3/A, Am. 1), at 21 (Aug. 3, 2005); Prospectus Supplement for Prospectus Supplement

for RALI Series 2005-QA7 Trust (Form 424B5), at 26 (May 28, 2005); Prospectus

Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at 26 (Dec. 28, 2006);

Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at 32-33

(Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form

424B5), at 33 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust

(Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4

Trust (Form 424B5), at 31-32 (Jun. 27, 2006); Prospectus Supplement for RAMP Series

2006-RZ2 Trust (Form 424B5), at 31-32 (May 2, 2006); Prospectus Supplement for

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 256 of 294
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 156 of 214

RAMP Series 2006-RZ3 Trust (Form 424B5), at 31-32 (Aug. 3, 2006); Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at 27-28 (Apr. 30, 2004); Prospectus Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at 26 (Apr. 26, 2007); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at 34-35 (Feb. 21, 2006); Prospectus Supplement for RASC Series 2006-KS9 Trust (Form 424B5), at 27 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form 424B5), at 27 (Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust (Form 424B5), at 27 (Feb. 23, 2007); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at 26 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at 28 (Mar. 29, 2006); Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 33 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at 30 (Sep. 23, 2003); Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 33 (Dec. 2, 2003); Registration Statement (333-140609) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at 39 (Apr. 10, 2007); Registration Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at 26 (Apr. 3, 2007)..

312.    These representations were false because Defendants and Debtors routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs. These representations were also false because Defendants and Debtors routinely failed to

execute valid endorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs.  The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default.

## I.    DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE CREDIT ENHANCEMENTS APPLICABLE TO THE CERTIFICATES

313.    The Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, in identical or substantially similar language, regarding credit enhancements.

### *CREDIT ENHANCEMENT*

The credit enhancement for the benefit of the offered certificates consists of:

*EXCESS CASH FLOW*. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A Certificates and the Class M Certificates each month and related expenses, there may be excess cash flow with respect to the mortgage loans. Some of this excess cash flow may be used to protect the offered certificates against some realized losses by making an additional payment of principal up to the amount of the realized losses.

*OVERCOLLATERALIZATION*. On each distribution date, to the extent not used to cover realized losses, excess cash flow will be used to pay principal to the Class A Certificates and the Class M Certificates as described in this prospectus supplement, reducing the aggregate certificate principal balance of those certificates below the aggregate principal balance of the mortgage loans, to the extent necessary to

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 158 of 214

CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 158 of 214

reach and maintain the required level of overcollateralization. The excess amount of the balance of the mortgage loans represents overcollateralization, which may absorb some losses on the mortgage loans, if not covered by excess cash flow.

***SUBORDINATION***. So long as the Class M Certificates remain outstanding, losses on the mortgage loans which are not covered by amounts payable under excess cash flow or overcollateralization will be allocated to the Class M Certificates that remain outstanding with the lowest payment priority, and the other classes of certificates will not bear any portion of such losses. If none of the Class M Certificates are outstanding, all such losses will be allocated to the Class A Certificates as described in this prospectus supplement.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at 49-53 (Apr. 30, 2004); Prospectus Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at 50-56 (Apr. 26, 2007); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-10 (Dec. 23, 2005); Prospectus Supplement for Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at S-9-10 (Nov. 24, 2003); Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at S-10-11 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at S-13 (Jun. 27, 2006); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at S-12-13 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at S-12 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2006-EMX2 Trust (Form 424B5), at S-12 (Feb. 21, 2006); Prospectus Supplement for RASC Series

2006-KS9 Trust (Form 424B5), at S-16 (Oct. 30, 2006); Prospectus Supplement for

RASC Series 2006-EMX9 Trust (Form 424B5), at S-14-15 (Oct. 27, 2006); Prospectus

Supplement for RASC Series 2007-KS2 Trust (Form 424B5), at S-16-17 (Feb. 23, 2007);

Registration Statement (333-140605) filed by Residential Funding Mortgage Securities

II, Inc. (Form S-3/A, Am. 1), at 49-55 (Apr. 3, 2007).

### Credit Enhancement

***Allocation of losses***. Most losses on the mortgage loans in each loan group will be allocated in full to the first class listed below with a certificate principal balance greater than zero:

o Class B-3

o Class B-2

o Class B-1

o Class M-3

o Class M-2

o Class M-1

When this occurs, the certificate principal balance of the class to which the loss is allocated is reduced, without a corresponding payment of principal. If the aggregate certificate principal balance of the Class M Certificates and Class B Certificates has been reduced to zero, losses on the mortgage loans will be allocated proportionately among the senior certificates in accordance with their respective remaining certificate principal balances or accrued interest, but only with respect to losses in the related loan group, subject to the special rules mentioned below.

Not all losses will be allocated in the priority described in the third preceding paragraph. Losses due to natural disasters such as floods and earthquakes, fraud in the origination of the mortgage loan, or some losses related to the bankruptcy of a mortgagor will be allocated as described in the third preceding paragraph only up to specified amounts. These

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 160 of 214

CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 160 of 214

types of losses on mortgage loans in a loan group that are in excess of the specified amounts and losses due to other extraordinary events will be allocated among all outstanding classes of certificates related to that loan group, pro rata in proportion to their remaining certificate principal balances or accrued interest relating to that loan group. Therefore, the Class M Certificates and Class B Certificates do not act as credit enhancement for the related senior certificates for these losses.

In addition, losses otherwise allocated to the Class A-II-2 Certificates will be allocated to the Class A-II-3 Certificates as long as the Class A-II-3 Certificates remain outstanding.

\* \* \*

*Priority of distributions*. All or a disproportionately large portion of principal prepayments and other unscheduled payments of principal on the mortgage loans in a loan group will be allocated to the related senior certificates as described in this prospectus supplement during the first eleven years after the closing date, unless those senior certificates are no longer outstanding or the percentage of credit enhancement provided by the Class M Certificates and Class B Certificates has doubled from its initial percentage and certain loss and delinquency tests are met, all as described in this prospectus supplement. This provides additional credit enhancement for the senior certificates by reserving a greater portion of the certificate principal balances of the Class M Certificates and Class B Certificates for absorption of losses.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example: Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-10-11 (May 28, 2005); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at S-18-20 (Dec. 28, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at S-11-12 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at S-11-12 (Mar. 29, 2006).

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 161 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 161 of 214

314.    These representations were false because all of the purported "enhancements" depended on or derived from the false representations regarding the quality of the mortgage loans underlying the Certificates.   Because the bases upon which the credit enhancements were calculated were fatally flawed, the credit enhancements did not provide the promised levels of security.

**J.    DEFENDANTS AND DEBTORS MADE FALSE AND MISLEADING STATEMENTS REGARDING THE CHARACTERISTICS OF THE MORTGAGE POOLS**

315.    The Prospectus Supplements disseminated by Defendants and Debtors in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, in identical or substantially similar language, regarding the mortgage pool characteristics.

(a)    The description in this prospectus supplement of the mortgage pool and the mortgaged properties is based upon the mortgage pool as constituted at the close of business on the cut-off date, as adjusted for the scheduled principal payments due during the month of the cut-off date.  Prior to the issuance of the offered certificates, Residential Funding Company, LLC may remove mortgage loans from the mortgage pool as a result of incomplete or defective documentation, or if it determines that the mortgage loan does not satisfy the characteristics described in this prospectus supplement.  Residential Funding Company, LLC may also add a limited number of other mortgage loans to the mortgage pool prior to the issuance of the offered certificates in substitution for removed loans.  *The information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool as it will be constituted at the time the offered certificates are issued*, although the range

of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary. *In the event mortgage loans are removed from or added to the mortgage pool after the date hereof prior to the closing and any material pool characteristics of the actual mortgage pool differ by 5% or more from the description of the mortgage pool in this prospectus supplement, a current report on Form 8-K describing the final mortgage pool will be filed with the Securities and Exchange Commission within four business days of the related closing.*

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example: Prospectus Supplement for GMACM Series 2004-AR1 Trust (Form 424B5), at S-101 (Apr. 30, 2004); Prospectus Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at S-40 (Apr. 26, 2007); Prospectus Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at S-56 (Dec. 28, 2006); Registration Statement (333-131213) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at S-46 (Mar. 3, 2006); Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25, 2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at S-47-48 (Jun. 27, 2006); Prospectus Supplement for RASC Series 2006-KS9 Trust (Form 424B5), at S-62 (Oct. 30, 2006); Prospectus Supplement for RASC Series 2006-EMX9 Trust (Form 424B5), at S-63 (Oct. 27, 2006); Prospectus Supplement for RASC Series 2007-KS2 Trust (Form 424B5), at S-64 (Feb. 23, 2007); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5), at S-36 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form 424B5), at S-36 (Mar. 29, 2006); Registration Statement (333-131211) filed by

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 163 of 214
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 263 of 214

Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at S-76 (Mar. 31, 2006);

Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc.

(Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration Statement (333-140609) filed

by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-53 (Apr. 10,

2007); Registration Statement (333-140605) filed by Residential Funding Mortgage

Securities II, Inc. (Form S-3/A, Am. 1), at S-52 (Apr. 3, 2007)..

> (b)    ***The mortgage loans were selected for inclusion in the mortgage pool*** from among mortgage loans purchased in connection with the Expanded Criteria Program described below ***based on the Sponsor's assessment of investor preferences and rating agency criteria***.

The above misstatements, in identical or substantially similar language, were contained in

the each of the Offering Documents including, for example: Prospectus Supplement for

HELT Series 2007-HSA2 Trust (Form 424B5), at S-32 (Apr. 26, 2007); Prospectus

Supplement for RALI Series 2006-QS18 Trust (Form 424B5), at S-47 (Dec. 28, 2006);

Prospectus Supplement for RAMP Series 2006-RS1 Trust (Form 424B5), at 19 (Jan. 25,

2006); Prospectus Supplement for RAMP Series 2006-RS4 Trust (Form 424B5), at S-36

(Jun. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S2 Trust (Form 424B5),

at S-32 (Feb. 27, 2006); Prospectus Supplement for RFMSI Series 2006-S3 Trust (Form

424B5), at S-32 (Mar. 29, 2006); Registration Statement (333-131211) filed by

Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 3), at S-35 (Mar. 31, 2006);

Registration Statement (333-140605) filed by Residential Funding Mortgage Securities

II, Inc. (Form S-3/A, Am. 1), at S-34 (Apr. 3, 2007).

CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 264 of 294

(c) ***The depositor believes that the information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool*** as it will be constituted at the time the certificates are issued although the range of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary.

A Current Report on Form 8-K will be available to purchasers of the certificates and will be filed, together with the pooling and servicing  agreement, with the Securities and Exchange Commission within fifteen days after the initial issuance of the offered certificates. ***In the event mortgage loans are removed from or added to the mortgage pool as described in the preceding paragraph, that removal or addition will be noted in the Current Report on Form 8-K***.

The above misstatements, in identical or substantially similar language, were contained in the each of the Offering Documents including, for example:  Prospectus Supplement for GMACM 2004-AR1 Trust (Form 424B5), at S-101-102 (Apr. 30, 2004); Prospectus Supplement for HELT Series 2007-HSA2 Trust (Form 424B5), at S-40 (Apr. 26, 2007); Prospectus Supplement for RALI Series 2005-QA7 Trust (Form 424B5), at S-57 (May 28, 2005); Registration Statement (333-126745) filed by Residential Funding Mortgage Securities I, Inc. (Form S-3/A, Am. 1), at 110-11 (Aug. 3, 2005); Prospectus Supplement for RAMP Series 2003-RS10 Trust (Form 424B5), at S-62 (Nov. 24, 2003)' Prospectus Supplement for RAMP Series 2004-RS5 Trust (Form 424B5), at S-65 (May 26, 2004); Prospectus Supplement for RAMP Series 2006-RZ2 Trust (Form 424B5), at S-45-46 (May 2, 2006); Prospectus Supplement for RAMP Series 2006-RZ3 Trust (Form 424B5), at S-42 (Aug. 3, 2006); Prospectus Supplement for RASC Series 2005-KS12 Trust (Form 424B5), at S-38 (Dec. 23, 2005); Prospectus Supplement for RASC Series 2006-EMX2

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 165 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 165 of 214

Trust (Form 424B5), at S-52 (Feb. 21, 2006); Registration Statement (333-104662) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-35 (May 1, 2003); Registration Statement (333-107959) filed by Residential Accredit Loans, Inc. (Form S-3/A, Am. 1), at S-32-33 (Sep. 23, 2003); Registration Statement (333-110437) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-35 (Dec. 2, 2003); Registration Statement (333-122688) filed by Residential Asset Securities Corp. (Form S-3/A, Am. 1), at S-38 (Apr. 19, 2005); Registration Statement (333-125485) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-32 (Jul. 7, 2005); Registration Statement (333-140609) filed by Residential Asset Mortgage Products, Inc. (Form S-3/A, Am. 1), at S-53 (Apr. 10, 2007); Registration Statement (333-140605) filed by Residential Funding Mortgage Securities II, Inc. (Form S-3/A, Am. 1), at S-54 (Apr. 3, 2007).

316. These representations were false because Defendants and Debtors did not, in fact, believe that the representations made in the Offering Documents were substantially representative of the mortgage pools, and selected loans for securitization based on profitability rather than investor preferences or rating agency criteria.

## XI. DEFENDANTS AND DEBTORS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS

317. The allegations below are made in support of Plaintiffs' common-law fraud, aiding and abetting claims, and not in support of its negligent misrepresentation claim, and Minnesota Securities Act claims, and Securities Act claims, which are based solely on negligence and/or strict liability.

318.   As set forth above, at all relevant times, Defendants and Debtors knew or were reckless in not knowing that the Offering Documents contained material misstatements and omissions.   Defendants and Debtors' knowledge or recklessness is evidenced by, among other things, the following:

- Defendants and Debtors knew or should have known, from the due diligence reports they received on the mortgage loans being pooled for securitization, their relationships with the third party originators, and their oversight of their affiliated originators GMAC Mortgage and Homecomings, that there were significant and extensive defects in the mortgage loans underlying the Certificates.   Defendants and Debtors were aware that a significant proportion of the loans they originated or purchased had defects, including breaches of their and the third party originators' underwriting guidelines, improper appraisals and lack of documentation, or were reckless in not discovering this information.   Ally-GMAC was aware that its underwriting software, including Assetwise and Desktop Underwriter, did not apply its stated underwriting standards and would not screen out non-conforming loans.   Defendants and Debtors nonetheless allowed large numbers of defective mortgages to be included in the mortgage pools used to collateralize the Certificates sold to Plaintiffs and other investors.   *See supra* Section IV.

- The Defendants and Debtors also knew or were reckless in not knowing that those mortgages were being issued to borrowers that were likely to default, as evidenced by the high percentage of loans underlying the Certificates that are currently in foreclosure, as well as the percentage of loans underlying the Certificates that are currently delinquent by more than 90 days.   *See infra* ¶427.

- Defendants and Debtors knew or were reckless in not knowing that the appraisal and owner-occupancy data presented in the Offering Documents was false, as evidenced by the degree to which the Offering Documents consistently overstated owner-occupancy rates and understated LTV ratios.   Defendants and Debtors knew or should have known that their underwriting procedures were inadequate to verify that the mortgaged properties had been independently appraised and that the statistical data presented in the Offering Documents was accurate.   *See supra* Sections V-VI.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 167 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 167 of 214

- Defendants and Debtors knew that the mortgages they were acquiring from the various originators as quickly as possible and packaging into the Certificates sold to investors such as Plaintiffs were not worthy of their high credit ratings. The investment grade ratings of the Certificates at the time they were sold to the Plaintiffs have declined substantially to their current non-investment grade and/or junk ratings. *See supra* Sections VII-VIII.

- Defendants and Debtors had control over the loan files, promissory notes and security instruments of the underlying mortgages, and were responsible for ensuring that the documents were properly indorsed and transferred so as to accord with state law and the terms of the applicable PSAs. Defendants and Debtors were aware that they routinely failed to transfer title to the Issuing Trusts, and attempted to conceal this fact through fraudulent filings when foreclosing on securitized mortgages. *See supra* Section IX.

## XII.   PLAINTIFFS JUSTIFIABLY RELIED ON DEFENDANTS AND DEBTORS' MISREPRESENTATIONS TO THEIR DETRIMENT

319. Plaintiffs and/or their agents purchased the Certificates to generate income and ensure total return through safe investments. The securities were purchased with the expectation that the investments could be—and indeed some would be and were—purchased and sold on the secondary market.

320. In making their investments, Plaintiffs and/or their agents relied upon Defendants and Debtors' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the underwriting processes related to the underlying mortgage loans. Plaintiffs and/or their agents received, reviewed, and relied upon the Offering Documents, which described in detail the mortgage loans underlying each offering. Offering Documents containing the representations outlined above (or nearly identical, materially similar counterparts thereto) were obtained, reviewed, and relied upon before any purchase was made.

321.    In purchasing the Certificates, Plaintiffs and/or their agents justifiably relied on Defendants and Debtors' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Documents. These representations materially altered the total mix of information upon which Plaintiffs and/or their agents made its purchasing decisions.

322.    But for the misrepresentations and omissions in the Offering Documents, Plaintiffs and/or their agents would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decisions to acquire the Certificates, as described above.

323.    As discussed *supra*, Plaintiffs relied on Defendants and Debtors' representations in the Offering Documents that the Certificates purchased by Plaintiffs were investment grade securities.  Because Plaintiffs did not have access to the loan files, appraisals or other supporting documentation for the loans underlying the Certificates, Plaintiffs had no reasonable means or ability to conduct their own due diligence regarding the quality of the mortgage pool.  As such, Plaintiffs and their agents were forced to and did rely on the representations made by Defendants and Debtors in the Offering Documents, and it was because of those representations that Plaintiffs purchased the Certificates at issue in this Complaint.

## XIII.  THE LIABILITY OF THE CONTROL PERSON DEFENDANTS

### A.    DEFENDANTS ALLY FINANCIAL AND ALLY BANK

324.    Defendant Ally Financial was in a position to and in fact controlled each of the Debtors, RALI, RASC, RAMP RFMSI, RFC, Residential Funding, ResCap, GMAC-

RFC, GMAC Mortgage and Homecomings. Defendant Ally Financial, through its wholly-subsidiary Ally Bank, operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for Ally Financial's executives and corporate parent.

325. Unlike arm's-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the sponsor (RFC); the depositor (RALI, RAMP, RASC, or RFMSI), and the Issuing Trust were not arm's-length transactions at all, as Ally Financial controlled every aspect of the securitization processes. Furthermore, the Ally-controlled entity Residential Funding was an underwriter for many of the Certificates purchased by Plaintiffs.

326. The mortgage loans underlying the Certificates were originated by the Ally Financial-controlled entity Homecomings or third-party originators and acquired by the sponsor, RFC. Ally Financial created RALI, RAMP, RASC, and RFMSI corporations structured as limited purpose subsidiaries, to acquire mortgage loans from RFC and to transfer the loans to the Issuing Trusts for sale to investors as RMBS. As the depositors, RALI, RAMP, RASC and RFMSI were shell corporations with no assets of their own, and had the same directors and officers (Paradis, Duncan and Flees among others) as other Ally-GMAC entities. Through these executives, Ally Financial exercised actual day-to-day control over RALI, RAMP, RASC, and RFMSI. Revenues flowing from the issuance and sale of the Certificates were passed through to Ally Financial.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 170 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 170 of 214

327.    RALI, RAMP, RASC and RFMSI in turn created the Issuing Trusts.  Like the Depositor Debtors, the Issuing Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by the Depositor Debtors, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public.  Through the Depositor Debtors, Ally Financial also exercised actual control over the Issuing Trusts.

328.    Once the Issuing Trusts issued the Certificates, the Certificates were purchased by one or more underwriters.  In several cases, Residential Funding, which was similarly controlled by Ally Financial, was one of the underwriters.

329.    Ally Financial also participated in creating the Offering Documents.  In sum, Ally Financial maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to Plaintiffs.

330.    In its SEC filings, Ally Financial discussed its practice of securitizing loans by acting through its subsidiaries.  For example, Ally Financial's 10-K Annual Report, filed on March 28, 2006 for the period ending December 31, 2005, states that:

- "We operate directly and through our subsidiaries and affiliates in which we or GM have equity investments. . . . We originate, purchase, service, sell and securitize residential and commercial mortgage loans and mortgage related products."

- "[W]e utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy."

- "We are a leading real estate finance company with two of our mortgage segments, GMAC Residential and GMAC-RFC, providing residential real estate products and services.  Net income from the

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 171 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 171 of 214

> operations of GMAC Residential and GMAC-RFC together totaled
> $1,021 million, which accounted for approximately 43% of our net
> income in 2005."

331.   Ally Financial also touted its purported underwriting standards in its SEC

filings, asserting that it followed established policies and procedures to ensure asset

quality.  Ally Financial's 10-K Annual Report, filed on March 28, 2006 for the period

ending December 31, 2005, states that:

> All mortgage loans that we originate and most of the
> mortgage loans we purchase are subject to our underwriting
> guidelines and loan origination standards.  When originating
> mortgage loans directly through our retail branches, or by
> internet or telephone, or indirectly through mortgage brokers,
> we follow established lending policies and procedures that
> require consideration of a variety of factors, including:
>
> • The borrower's capacity to repay the loan;
>
> • The borrower's credit history;
>
> • The relative size and characteristics of the proposed loan; and
>
> • The amount of equity in the borrower's property (as measured by the
>   borrower's loan-to-value ratio.
>
> Our underwriting standards have been designed to produce
> loans that meet the credit needs and profiles of our borrowers,
> thereby creating more consistent performance characteristics
> for investors in our loans.  When purchasing mortgage loans
> from correspondent lenders, we either re-underwrite the loan
> prior to purchase or delegate underwriting responsibility to
> the correspondent lender originating the mortgage loan.

332.   Similarly, Ally Financial's 10-K Annual Report, filed on February 28, 2012

for the period ending December 31, 2011, states that:

> Ally Bank, our [Ally Financial's] direct banking platform,
> provides our . . . mortgage loan operations with a stable and
> low-cost funding source and facilitates prudent asset growth.

333.   Thus, according to Ally Financial's own SEC filings, it controlled the underwriting standards for its subsidiaries' RMBS offerings.

334.   In addition, Ally Financial's Chief Executive Officer Michael Carpenter has signed a consent order ("the Consent Order") with the Federal Deposit Insurance Corporation ("FDIC") on behalf of Ally acknowledging the very control it denies in its motion.  In particular, Ally admits the following in the Consent Order:

- "Ally Financial Inc,. . . a registered bank holding company, indirectly owns and controls Ally Bank (f/k/a GMAC Bank), . . . and numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC, Minneapolis, Minnesota ("ResCap"), and its direct and indirect subsidiaries, including GMAC Mortgage, LLC . . . and its subsidiaries."  Consent Order at 1.

- "Ally Financial *engages in the business of servicing residential mortgage loans through various indirect subsidiaries, including GMAC Mortgage and its subsidiaries*."  *Id.* at 2 (emphasis added).

- "[I]t is the common goal of the FDIC and Ally Bank to ensure that the residential mortgages owned or serviced by Ally Bank are serviced or sub-serviced in a safe and sound manner and in compliance with all Legal Requirements."  *Id.* at 5.

335.   Pursuant to the Consent Order, Ally agreed, along with ResCap, GMAC Mortgage, and their institution-affiliated parties, to "cease and desist and take affirmative action" to, *inter alia*, (1) provide additional oversight from the board of directors over the mortgage servicing companies, including oversight of risk management, internal audit, and compliance programs,  *id.*  at 7; (2) take steps to "improve the information and reports that will be regularly reviewed by the board of directors or authorized committee of the board of directors of Ally Financial regarding residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations,"  *id.* at 8; (3) ensure that the

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01842-SRN-JJG    Document 1    Filed 07/27/12    Page 173 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 173 of 214

Mortgage Servicing Companies "have adequate levels and types of officers and staff to carry out residential mortgage loan servicing, Loss Mitigation, and foreclosure activities in compliance with Legal Requirements…," *id.* at 9; and (4) take steps to better assess and manage the risk associated with mortgage loans, *id.* at 27-30.

336.    Ally Financial culpably participated in the violations of its subsidiaries discussed above.  Ally Financial approved the manner in which it sold the loans it elected to securitize and controlled the disclosures made in connection with those securitizations. Among other misconduct, Ally Financial oversaw the actions of its subsidiaries and allowed them, including Debtors RALI, RAMP, RASC, RFMSI, and Residential Funding, to misrepresent the mortgage loans' characteristics in the Offering Documents.

**B.    THE INDIVIDUAL DEFENDANTS.**

**1.    Duncan**

337.    As Acting Chief Financial Officer of Debtors RALI, RAMP, RASC, and RFMSI, Duncan had the power to direct RALI, RAMP, RASC, and RFMSI's policies relating to securitization.  Duncan aided and abetted the fraud by permitting RALI, RAMP, RASC, and RFMSI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.  Duncan personally participated in the fraud by, *inter alia*, signing the RAMP Registration Statement dated July 7, 2005; the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; and the RAMP Registration Statement dated March 31, 2006.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 174 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 174 of 214

338.   In addition to serving as an officer of RALI, RAMP, RASC, and RFMSI, according to SEC filings, Duncan was also the Executive Vice President, Acting Chief Financial Officer of Debtors RFC, GMAC RFC and Homecomings.  As Homecomings' Acting Chief Financial Officer, Duncan either knew of Homecomings' abandonment of its underwriting standards, as discussed in Section IV.A, or was reckless for not knowing of these critical matters.  Furthermore, Duncan was familiar with and participated in Ally-GMAC's RMBS operations through his high-ranking positions with GMAC RFC, the parent corporation of the Depositor Debtors, and RFC, the Sponsor Debtor.

### 2.   Flees

339.   As Controller of RALI, RAMP, RASC, and RFMSI, Flees had the power to direct RALI, RAMP, RASC, and RFMSI's policies relating to securitization.  Flees aided and abetted the fraud by permitting RALI, RAMP, RASC, and RFMSI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.  Flees personally participated in the fraud by, *inter alia*, signing the RAMP Registration Statement dated July 7, 2005, the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; the RAMP Registration Statement dated March 31, 2006; the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007.

340.   In addition to serving as an officer of RALI, RAMP, RASC, and RFMSI, according to SEC filings, Flees was also the Principal Accounting Officer of Debtors

RFC, GMAC RFC and Homecomings.  As such, Flees either knew of Homecomings'
abandonment of its underwriting standards, as discussed in Section IV.A, or was reckless
for not knowing of these critical matters.  Furthermore, Flees was familiar with and
participated in Ally-GMAC's RMBS operations through his high-ranking position with
GMAC RFC, the parent corporation of the Depositor Debtors and Sponsor Debtor.

### 3.   Katzmark

341.   As Controller (Principal Accounting Officer) of RALI, RAMP, RASC, and
RFMSI, Flees had the power to direct RALI, RAMP, RASC, and RFMSI's policies
relating to securitization.  Katzmark aided and abetted the fraud by permitting RALI,
RAMP, RASC, and RFMSI to purchase low-quality, poorly-underwritten loans from
Ally-GMAC entities and/or third-party originators for securitization.   Katzmark
personally participated in the fraud by, *inter alia*, signing the RAMP Registration
Statement dated May 1, 2003; the RFMSI Registration Statement dated November 7,
2003; the RAMP Registration Statement dated December 2, 2003; the RAMP
Registration Statement dated August 5, 2004; and the RASC Registration Statement
dated April 19, 2005.

### 4.   Lundsten

342.   As Senior Vice President of Securitization Management at GMAC RFC
Lundsten had the power to direct GMAC RFC's policies relating to securitization.
Lundsten aided and abetted the fraud by permitting RALI, RAMP, RASC, and RFMSI to
purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-
party originators for securitization.  Lundsten personally participated in the fraud by,

*inter alia*, the RAMP Registration Statement dated May 1, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; the RASC Registration Statement dated April 19, 2005; the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; the RAMP Registration Statement dated March 31, 2006; the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007.

### 5.    Olson

343.    As an Executive Vice President, Chief Financial Officer and a Director of Debtors  RFMSI of RALI, and a Director of Debtors RAMP and RASC, Olson had the power to direct RALI, RAMP, RASC, and RFMSI's policies relating to securitization. Olson aided and abetted the fraud by permitting RALI, RAMP, RASC, and RFMSI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.

344.    Olson was also the Chief Financial Officer of ResCap, the indirect parent company of GMAC Mortgage, and a Director of GMAC RFC, RFC, and Homecomings. As such, Olson either knew of GMAC Mortgage and Homecomings' abandonment of their underwriting standards, as discussed in Section IV.A, or was reckless for not knowing of these critical matters. According to a September 18, 2006 article in the NATIONAL MORTGAGE NEWS, Olson was appointed the Senior Managing Director of

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01842-SRN-JJG   Document 1   Filed 07/27/12   Page 177 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 177 of 214

ResCap's warehouse lending business in May 2006, a position believed to involve significant contact with and analysis of third-party mortgage originators.

345.    Olson personally participated in the fraud by, *inter alia*, signing the RAMP Registration Statement dated May 1, 2003; the RFMSI Registration Statement dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; the RASC Registration Statement dated April 19, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; and the RAMP Registration Statement dated March 31, 2006.

### 6.    Paradis

346.    As President and Chief Executive Officer of GMAC RFC, Chief Executive Officer of ResCap and President, Chief Executive Officer, and a Director of RALI, RAMP, RASC and RFMSI, Paradis had the power to direct RALI, RAMP, RASC, and RFMSI's policies relating to securitization.   Paradis aided and abetted the fraud by permitting RALI, RAMP, RASC, and RFMSI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.

347.    In addition, by virtue of his position as President and Chief Executive Officer of GMAC RFC and Chief Executive Officer of ResCap, Paradis either knew of GMAC Mortgage and Homecomings' abandonment of their underwriting standards, as discussed in Section IV.A, or was reckless for not knowing of these critical matters. Furthermore, Paradis was familiar with and participated in GMAC's RMBS operations

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 178 of 204
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 178 of 214

through his top-ranking positions with ResCap and GMAC RFC, the indirect and direct parents of the Sponsor Debtor and Depositor Debtors.  As discussed in Section IV.A, a former GMAC employee has said that Paradis personally exhorted Ally-GMAC personnel to buy even defective loans from favored vendors so as to maintain good business relationships.

348.    Paradis also personally participated in the fraud by, *inter alia*, signing the RAMP Registration Statement dated May 1, 2003; the RFMSI Registration Statement dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP Registration Statement dated August 5, 2004; and the RASC Registration Statement dated April 19, 2005; the RAMP Registration Statement dated July 7, 2005; the RFMSI Registration Statement dated August 3, 2005; the RALI Registration Statement dated August 9, 2005; the RALI Registration Statement dated March 6, 2006; the RASC Registration Statement dated March 30, 2006; and the RAMP Registration Statement dated March 31, 2006.

### 7.    Walker

349.    As a Director of Debtors RAMP and RFMSI, Walker had the power to direct RAMP and RFMSI's policies relating to securitization.  Walker aided and abetted the fraud by permitting RAMP and RFMSI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.  Walker personally participated in the fraud by, *inter alia*, signing the RAMP Registration Statement dated May 1, 2003; the RFMSI Registration Statement dated November 7, 2003; the RAMP Registration Statement dated December 2, 2003; the RAMP

Registration Statement dated August 5, 2004; the RASC Registration Statement dated April 19, 2005; the RAMP Registration Statement dated July 7, 2005; the RFMSI Registration Statement dated August 3, 2005; and the RALI Registration Statement dated August 9, 2005.

350.    In addition to serving as an officer of RAMP, according to SEC filings, Walker was also a Director of ResCap, GMAC RFC, GMAC Mortgage, RFC, and Homecomings.  As such, Walker either knew of GMAC Mortgage and Homecomings' abandonment of their underwriting standards, as discussed in Section IV.A, or was reckless for not knowing of these critical matters.  Furthermore, Walker was familiar with and participated in Ally-GMAC's RMBS operations through his positions with ResCap and GMAC RFC, the indirect and direct parents of the Sponsor Debtor and Depositor Debtors.

### 8.    Wold

351.    As GMAC RFC's Senior Vice President of Securitization Management and head of investor relations and corporate finance of Debtor ResCap, Wold had the power to direct RALI, RAMP, RASC, and RFMSI's policies relating to securitization.  Indeed, a June 7, 2011 article in the ASSET SECURITIZATION REPORT characterized Wold as having led ResCap's private label mortgage securitization program.  Wold aided and abetted the fraud by permitting RALI, RAMP, RASC, and RFMSI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.

352.   Wold personally participated in the fraud by, *inter alia*, signing the RALI Registration Statement dated September 23, 2003 and the RAMP Registration Statement dated July 7, 2005.

### 9.   Jones

353.   As the President, Chief Executive Officer, and a Director of Defendant RALI, Jones had the power to direct RALI's polices relating to securitization.  Jones aided and abetted the fraud by permitting RALI to purchase low-quality, poorly underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.

354.   In addition, Jones was Chief Executive Officer and Chief Operating Officer of ResCap, the indirect parent company of GMAC Mortgage.  Due to his positions, Jones either knew of GMAC Mortgage's abandonment of its underwriting standards, as discussed in Section IV.A, or was reckless for not knowing of these critical matters.

355.   Jones personally participated in the fraud by, *inter alia*, signing the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007.

### 10.   Bricker

356.   Bricker was a Director and Chief Financial Officer of Defendant RALI.  As such Bricker had the power to direct RALI's policies relating to securitization.  Jones aided and abetted the fraud by permitting RALI to purchase low-quality, poorly underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.

174

357. As Chief Financial Officer of GMAC Mortgage and GMAC RFC, Bricker knew of the abandonment of their underwriting standards, as discussed in Section IV.A, or was reckless for not knowing of these critical matters.

358. Bricker personally participated in the fraud by, *inter alia*, signing the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007.

### 11. Young

359. As a Director of Defendant RALI, Young had the power to direct RALI's policies relating to securitization. Young aided and abetted fraud by permitting RALI to purchase low-quality, poorly-underwritten loans from Ally-GMAC entities and/or third-party originators for securitization.

360. Young was also the Chief Accounting Officer and Controller of ResCap, the indirect parent company of GMAC Mortgage. As such, Young either knew of GMAC Mortgage's abandonment of its underwriting standards as discussed in Section IV.A, or was reckless for not knowing of these critical matters.

361. Young personally participated in the fraud by, *inter alia*, signing the RFMSI Registration Statement dated April 3, 2007; the RALI Registration Statement dated April 3, 2007; and the RAMP Registration Statement dated April 10, 2007.

## XIV. PLAINTIFFS HAVE SUFFERED DAMAGES AS A RESULT OF THEIR PURCHASES OF THE CERTIFICATES

362. The false and misleading statements of material facts and omissions of material facts in the Offering Documents directly caused Plaintiffs damage, because the

Certificates were in fact far riskier than Defendants and Debtors had described them to

be.  As set forth below, the loans underlying the Certificates experienced default and

delinquency at very high rates due to Defendants and Debtors' abandonment of their

purported underwriting guidelines.  The resulting downgrades to the Certificates ratings

have made them unmarketable at anywhere near the prices Plaintiffs paid, thus

confirming that Plaintiffs paid far more for the Certificates than the value they actually

received.

363.   As a result of Defendants' and Debtors' misstatements and omissions

regarding matters such as the true condition of the underlying collateral and the falsity of

the Certificates' credit ratings, when the truth regarding the Certificates came to light,

many of the Certificates incurred substantial losses in market value.  The income and

principal payments Plaintiffs received have been lower than Plaintiffs expected.  Because

of the declining collateral base, it is increasingly likely that Plaintiffs will not obtain the

full payments expected under the "waterfall" provisions of the securitizations.  This is

reflected in the far diminished market value for these securities, which, again, is a strong

indicator that the true value of the Certificates was far less than what Plaintiffs paid.

364.   Additionally, at the time when Plaintiffs purchased the Certificates, the

Certificates' interest rates were artificially depressed by Defendants' and Debtors'

misrepresentations and omissions.   Persons selling financial instruments that are

perceived to be very safe may charge a safety premium and offer relatively low interest

rates.  By contrast, persons selling instruments that are known to be very speculative must

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 183 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 183 of 214

offer lower prices and/or higher interest rates to compensate investors for taking on increased risk.

365.    Here, because of Defendants' and Debtors' misrepresentations regarding the Certificates, the quality of the underlying assets, and the credit ratings assigned to the Certificates, Defendants and Debtors were able to sell the Certificates at inflated prices and offer inadequate interest.  The initial prices and interest rates of the Certificates were appropriate for safe, investment-grade instruments.  However, as Defendants and Debtors knew, the Certificates were not, in fact, safe, investment-grade instruments.  Had Defendants and Debtors' accurately described the Certificates and their underlying collateral, neither Plaintiffs nor any other reasonable investors would have purchased the Certificates at the prices and interest rates offered.    Plaintiffs paid for assets of investment-grade quality, but got speculative "junk" in return.

366.    Plaintiffs purchased Certificates issued by RASC 2005-KS12, Tranche M3, on December 16, 2005, in the offering, when they were rated Aa3 by Moody's, but the Certificates have since been downgraded three times and are currently rated C.

367.    Plaintiff purchased Certificates issued by RAMP 2006-RS1, Tranche AI2, on January 18, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa1.

368.    Plaintiff purchased Certificates issued by RAMP 2004-RS5, Tranche MII3, on January 20, 2006, when they were rated Baa3 by Moody's, but the Certificates have since been downgraded and are currently rated C.

12-12020-mg   Doc 6427-3   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 184 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 184 of 214

369.   Plaintiffs purchased Certificates issued by RAMP 2003-RS10, Tranche MII2, on January 20, 2006, when they were rated A2 by Moody's, but the Certificates have since been downgraded three times and are currently rated C.

370.   Plaintiffs purchased Certificates issued by RALI 2006-QA1, Tranche A31, on January 25, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.

371.   Plaintiffs purchased Certificates issued by RALI 2005-QA12, Tranche NB5, on January 31, 2005, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa3.

372.   Plaintiffs purchased Certificates issued by RASC 2006-EMX2, Tranche A2, on February 8, 2006, in the offering, when they were rated Aaa, but the Certificates have since been downgraded twice and are now rated B2.

373.   Plaintiffs purchased Certificates issued by RASC 2006-KS2, Tranche A1, on February 15, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.[15]

374.   Plaintiffs purchased Certificates issued by RFMSI 2006-S2, Tranche M1, on February 24, 2006, in the offering, when they were rated AA by Fitch.  Fitch has since withdrawn its rating.

---

[15] According to Moody's Policy for Withdrawal of Credit Ratings issued September 9, 2011, Moody's typically withdraws a credit rating when, *inter alia*: (i) the rated entity experiences a bankruptcy, liquidation, debt restructuring, or debt writedown; or (ii) there is insufficient or inaccurate information to support the rating.

375.    Plaintiffs purchased Certificates issued by RFMSI 2006-S2, Tranche M2, on February 24, 2006, in the offering, when they were rated A by Fitch.  Fitch has since withdrawn its rating.

376.    Plaintiffs purchased Certificates issued by RASC 2006-KS3, Tranche AI1, on March 17, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

377.    Plaintiffs purchased Certificates issued by RALI 2006-QO3, Tranche A1, on March 21, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.

378.    Plaintiffs purchased Certificates issued by RFMSI 2006-S3, Tranche A10, on April 5, 2006, in the offering, when they were rated AAA by Fitch, but the Certificates have since been downgraded there times and are currently rated D.

379.    Plaintiffs purchased Certificates issued by RAMP 2006-RZ2, Tranche A2, on April 24, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are now rated B3.

380.    Plaintiffs purchased Certificates issued by GMACM 2006-AR5, Tranche 3A1, on April 27, 2006, when they were rated AAA by S&P, but the Certificates have since been downgraded twice and are currently rated CCC.

381.    Plaintiffs purchased Certificates issued by RALI 2005-QA7, Tranche A1, on May 5, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa3.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 186 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 186 of 214

382.   Plaintiffs purchased Certificates issued by RAAC 2006-RP2, Tranche A, on May 8, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ba3.

383.   Plaintiffs purchased Certificates issued by RALIN 2006-QO4, Tranche N1, on May 12, 2006, in the offering, when they were rated A- by S&P.  S&P has since withdrawn its rating.

384.   Plaintiffs purchased Certificates issued by RASC 2006-EMX4, Tranche A1, on May 18, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

385.   Plaintiffs purchased Certificates issued by RALI 2006-QO5, Tranche 3A1, on May 19, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

386.   Plaintiffs purchased Certificates issued by RAMP 2003-RS4, Tranche AIIB, on May 23, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded five times and are currently rated Caa2.

387.   Plaintiffs purchased Certificates issued by RASC 2006-KS4, Tranche A-1, on May 25, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

388.   Plaintiffs purchased Certificates issued by RALI 2005-QA7, Tranche A1, on June 3, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Caa3.

389.    Plaintiffs purchased Certificates issued by RAMP 2006-RS4, Tranche A3, on June 19, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.

390.    Plaintiffs purchased Certificates issued by RALI 2005-QO3, Tranche A1, on June 21, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

391.    Plaintiffs purchased Certificates issued by RAAC 2006-RP3, Tranche A, on June 29, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Caa2.

392.    Plaintiffs purchased Certificates issued by RFSC 2002-RP1, Tranche A1, on July 14, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated Caa1.

393.    Plaintiffs purchased Certificates issued by RASC 2006-KS6, Tranche A1, on July 21, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

394.    Plaintiffs purchased Certificates issued by RAMP 2006-RZ3, Tranche M1, on July 28, 2006, in the offering, when they were rated Aa1 by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.

395.    Plaintiffs purchased Certificates issued by RASC 2006-KS7, Tranche A1, on August 15, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

396.   Plaintiffs purchased Certificates issued by RASC 2006-KS8, Tranche A1, on September 21, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

397.   Plaintiffs purchased Certificates issued by RAMP 2006-RZ4, Tranche A1A, on September 21, 2006, in the offering, when they were rated Aaa by Moody's. Moody's has since withdrawn its rating.

398.   Plaintiffs purchased Certificates issued by RASC 2006-EMX9, Tranche A1A, on October 24, 2006, in the offering, when they were rated Aaa by Moody's. Moody's has since withdrawn its rating.

399.   Plaintiffs purchased Certificates issued by RALI 2005-QO1 Tranche A1, on October 24, 2006, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.

400.   Plaintiffs purchased Certificates issued by RAMP 2006-RS6, Tranche A1, on October 25, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

401.   Plaintiffs purchased Certificates issued by RASC 2006-KS9, Tranche AI1, on October 25, 2006, in the offering, when they were rated Aaa by Moody's.  Moody's has since withdrawn its rating.

402.   Plaintiffs purchased Certificates issued by RALI 2006-Q18, Tranche 2A1, on November 29, 2006, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.

403.   Plaintiffs purchased Certificates issued by RAMP 2006-RZ5, Tranche A1A, on December 18, 2006, in the offering, when they were rated Aaa by Moody's. Moody's has since withdrawn its rating.

404.   Plaintiffs purchased Certificates issued by RAMP 2006-RZ2, Tranche A2, on January 30, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated B3.

405.   Plaintiffs purchased Certificates issued by RAMP 2003-RS7, Tranche AI6, on February 2, 2007, when they were rated Aa2 by Moody's, but the Certificates have since been downgraded three times and are currently rated Baa3.

406.   Plaintiffs purchased Certificates issued by RASC 2007-KS2, Tranche AI1, on February 21, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and Moody's subsequently withdrew its rating.

407.   Plaintiffs purchased Certificates issued by HELT 2007-HSA2, Tranche A1F, on April 24, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and Moody's subsequently withdrew its rating.

408.   Plaintiffs purchased Certificates issued by HELT 2007-HSA3, Tranche AI1, on May 23, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and Moody's subsequently withdrew its rating.

409.   Plaintiffs purchased Certificates issued by HELT 2007-HSA3, Tranche AI3, on May 23, 2007, in the offering, when they were rated Aaa by Moody's, but the

Certificates have since been downgraded three times and Moody's subsequently withdrew its rating.

410. Plaintiffs purchased Certificates issued by RALI 2007-QS6, Tranche A29, on June 11, 2007, when they were rated Aaa by Moody's, but the Certificates have since been downgraded and are currently rated Caa3.

411. Plaintiffs purchased Certificates issued by GMACM 2007-HE2, Tranche A3, on June 27, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded five times and are currently rated Caa3.

412. Plaintiffs purchased Certificates issued by GMACM 2004-AR1, Tranche 22A, on August 14, 2007, when they were rated AAA by S&P, but the Certificates have since been downgraded and are currently rated AA+.

413. Plaintiffs purchased Certificates issued by RFMSI 2005-SA4, Tranche 1A21, on August 14, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

414. Plaintiffs purchased Certificates issued by GMACM 2004-AR1, Tranche 24A, on August 17, 2007, when they were rated AAA by S&P, but the Certificates have since been downgraded and are currently rated AA+.

415. Plaintiffs purchased Certificates issued by, RALI 2007-QS9, Tranche A33, on August 23, 2007, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.

12-12020-mg Doc 6427-2 Filed 02/04/14 Entered 02/04/14 15:48:52 Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial Inc. fka GMA Pg 191 of 214
CASE 0:12-cv-01841-SRN-DJF Document 1 Filed 07/27/12 Page 191 of 214

416. Plaintiffs purchased Certificates issued by RALI 2007-QS11, Tranche A1, on September 14, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded four times and are currently rated D.

417. Plaintiffs purchased Certificates issued by RALI 2007-QS11, Tranche A2, on September 26, 2007, in the offering, when they were rated AAA by S&P, but the Certificates have since been downgraded three times and are currently rated D.

418. Plaintiffs purchased Certificates issued by HELT 2006-HI1, Tranche A1, on December 7, 2007, when they were rated Aaa by Moody's. Moody's has since withdrawn its rating.

419. Plaintiffs purchased Certificates issued by RALI 2005-QO2, Tranche X, on February 8, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.

420. Plaintiffs purchased Certificates issued by RALI 2006-QO6, Tranche A1, on March 5, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.

421. Plaintiffs purchased Certificates issued by GMACM 2005-AR6, Tranche 3A1, on May 21, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa1.

422. Plaintiffs purchased Certificates issued by RALI 2007-QH4, Tranche A2, on May 21, 2008, in the offering, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated C.

CASE 0:12-cv-01842-SRN-JJG    Document 1    Filed 07/27/12    Page 192 of 214

423.    Plaintiffs purchased Certificates issued by RALI 2006-QA2, Tranche 2A1, on May 21, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded 3 times and are currently rated Ca.

424.    Plaintiffs purchased Certificates issued by RAAC 2007-RP3, Tranche A, on July 22, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.

425.    Plaintiffs purchased Certificates issued by RALI 2007-QO2, Tranche A1, on July 25, 2008, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.

426.    Plaintiffs purchased Certificates issued by RALI 2007-QS10, Tranche A1, on September 9, 2008, when they were rated AAA by S&P, but the certificates have since been downgraded three times and are currently rated D.

427.    As a result of the multiple and material misrepresentations contained in the Offering Documents, Plaintiffs have suffered losses on its purchases of Certificates.  As of the filing of this Complaint, the mortgage loans in the pools held by the Issuing Trusts and underlying Plaintiffs' Certificates have suffered escalating default rates and mounting foreclosures, resulting in across-the-board ratings downgrades and other negative actions by the rating agencies, as shown in the table below.

| Certificates Purchased by Plaintiffs | Percentage of Loans Underlying the Certificates Delinquent by More than 90 Days | Percentage of Loans Underlying the Certificates in Foreclosure | Current Moody's Ratings |
|---|---|---|---|
| RASC 2005-KS12 | 23.64 | 15.81 | C |
| RAMP 2006-RS1 | 32.4 | 26.57 | Caa1 |
| RAMP 2004-RS5 | 17.93 | 7.62 | C |
| RAMP 2003-RS10 | 20.12 | 10.19 | C |
| RALI 2006-QA1 | 22.34 | 12.87 | Ca |
| RALI 2005-QA12 | 15.16 | 13.31 | Caa3 |
| RASC 2006-EMX2 | 48.00 | 37.46 | B2 |
| RASC 2006-KS2 | 22.69 | 14.22 | Aaa* |
| RFMSI 2006-S2 M1/M2 | 10.46 | 5.06 | [AA]*/[A]* |
| RASC 2006-KS3 | 28.27 | 21.20 | Aaa* |
| RALI 2006-QO3 | 36.28 | 19.64 | Caa2 |
| RFMSI 2006-S3 | 11.17 | 6.82 | [D] |
| RAMP 2006-RZ2 | 15.77 | 11.78 | B3 |
| GMACM 2006-AR5 | 8.81 | 3.97 | (CCC) |
| RALI 2005-QA7 | 14.45 | 12.44 | Caa3 |
| RAAC 2006-RP2 | 39.21 | 23.35 | Ba3 |
| RALIN 2006-QO4 | n/a | n/a | (A-*) |
| RASC 2006-EMX4 | 47.99 | 33.84 | Aaa* |
| RALI 2006-QO5 | 41.47 | 20.67 | Aaa* |
| RAMP 2003-RS4 | 18.75 | 10.45 | Caa2 |
| RASC 2006-KS4 | 26.59 | 16.11 | Aaa* |
| RALI 2005-QA7 | 14.45 | 12.44 | Caa3 |
| RAMP 2006-RS4 | 25.96 | 18.60 | Caa2 |
| RALI 2005-QO3 | 37.09 | 18.85 | Caa3 |
| RAAC 2006-RP3 | 41.91 | 26.90 | Caa2 |
| RFSC 2002-RP1 | 29.19 | 17.28 | Caa1 |
| RASC 2006-KS6 | 24.19 | 16.05 | Aaa* |
| RAMP 2006-RZ3 | 23.21 | 14.83 | Ca |
| RASC 2006-KS7 | 27.06 | 17.45 | Aaa* |
| RASC 2006-KS8 | 27.99 | 17.39 | Aaa* |
| RAMP 2006-RZ4 | 22.75 | 14.69 | Aaa* |
| RASC 2006-EMX9 | 61.60 | 49.43 | Aaa* |
| RALI 2005-QO1 | 32.56 | 21.42 | Caa2 |
| RAMP 2006-RS6 | 26.91 | 21.00 | Aaa* |
| RASC 2006-KS9 | 30.62 | 22.65 | Aaa* |
| RALI 2006-Q18 | 27.18 | 19.24 | Ca |
| RAMP 2006-RZ5 | 24.05 | 15.32 | Aaa* |

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 194 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 194 of 214

| Certificates Purchased by Plaintiffs | Percentage of Loans Underlying the Certificates Delinquent by More than 90 Days | Percentage of Loans Underlying the Certificates in Foreclosure | Current Moody's Ratings |
|---|---|---|---|
| RAMP 2006-RZ2 | 15.77 | 11.78 | B3 |
| RAMP 2003-RS7 | 9.54 | 6.40 | Baa3 |
| RASC 2007-KS2 | 30.42 | 22.09 | Baa2* |
| HELT 2007-HSA2 | 3.22 | 0.00 | B3* |
| HELT 2007-HSA3 AI1/AI3 | 3.79 | 0.00 | B3*/B3* |
| RALI 2007-QS6 | 21.27 | 13.34 | Caa3 |
| GMACM 2007-HE2 | 4.11 | 0.11 | Caa3 |
| GMACM 2004-AR1 22A | 4.88 | 3.27 | (AA+) |
| RFMSI 2005-SA4 | 10.50 | 9.61 | Caa3 |
| GMACM 2004-AR1 24A | 4.88 | 3.27 | (AA+) |
| RALI 2007-QS9 | 21.75 | 14.30 | Ca |
| RALI 2007-QS11 A1/A2 | 23.41 | 16.37 | (D/D) |
| HELT 2006-HI1 | 1.91 | 0.00 | Aaa* |
| RALI 2005-QO2 | 32.64 | 19.66 | Ca |
| RALI 2006-QO6 | 37.59 | 21.62 | Caa2 |
| GMACM 2005-AR6 | 7.57 | 3.94 | Caa1 |
| RALI 2007-QH4 | 44.95 | 30.33 | C |
| RALI 2006-QA2 | 18.61 | 6.40 | Ca |
| RAAC 2007-RP3 | 48.34 | 32.49 | Caa3 |
| RALI 2007-QO2 | 40.65 | 23.51 | Ca |
| RALI 2007-QS10 | 23.36 | 16.58 | (D) |

Note: If a rating is followed by an asterisk ("*"), the rating is the last available rating before Moody's withdrew its ratings of that Certificate altogether.  If a rating is encased by ellipses, it is a S&P rating.  If a rating is encased by brackets, it is a Fitch rating.

## XV.    TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS

428.    The statutory claims raised by Plaintiffs herein are currently the subject of class action lawsuits.  Plaintiffs  are putative class members of two class action lawsuits (the "Class Actions") for its purchases of Certificates from the following trusts:

RALI 2006-QO6; RALI 2006-QS18; RALI 2007-QH4

429.    On September 22, 2008, a class action was filed against several Ally-GMAC entities and certain present and former Ally-GMAC officers and directors on behalf of a class of investors who purchased or otherwise acquired specific certificates that Ally-GMAC issued, underwrote or sold.  *See* Complaint *N.J. Carpenters Health Fund v. Residential Accredit Loans Inc., et. al.*  Case No. 602727/08 (Sup. Ct. N.Y. Co. 2008) (the "RALI Class Action").  The RALI Class Action was later consolidated and transferred to the United States District Court for the Southern District of New York, Case No. 08-8781.  The RALI Class Action alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

430.    The following Certificates were included in the RALI Class Action: RALI 2006-QO6, RALI 2006-QS18, and RALI 2007-QH4.  On March 31, 2010, Judge Baer dismissed all offerings from which no named plaintiff had purchased securities. Claims as to RALI 2007-QH4, purchased by New Jersey Carpenters Vacation Fund survived.  On July 30, 2010, the Orange County Employees Retirement System and the Iowa Public Employees' Retirement System filed a Motion to Intervene with respect to the RALI 2006-QO6 and RALI 2006-QS18 Certificates, thereby tolling the statute of limitations as to these Certificates.  On December 21, 2010, Judge Baer granted the Motion to Intervene.  On April 28, 2011, Judge Baer denied Defendant's Motion to Dismiss the Second Consolidated Amended Complaint with respect to Section 11 claims against all defendants and Section 15 claims against the individual defendants. On May 5, 2011, Judge Baer granted plaintiffs' request for a stay pending a resolution by the Second Circuit on the District Court's denial of class certification. Consequently, the statute of limitations as to these claims with respect to RALI 2006-QO6, RALI 2006-QS18, and RALI 2007-QH4 certificates is tolled.

431.    Defendants Goldman Sachs, Deutsche Bank, Bricker, Duncan, Flees, Jones, Olson, Lundsten, Paradis and Young, and Debtors RALI, RFC, and ResCap in

this Complaint are also defendants in the RALI Class Action, for the same statutory causes of action asserted herein.

432.    Plaintiffs reasonably and justifiably relied on the class action tolling doctrines of *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) and *In re WorldCom Secs Litig.*, 496 F.3d 245, 256 (2d Cir. 2007) to toll the statute of limitations on its 1933 Act claims.  Under *American Pipe*, all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them.  *American Pipe*, 414 U.S. at 255.  As the Second Circuit stated in *WorldCom*, "because Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class."  *WorldCom*, 496 F.3d at 256; see also *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011) (rejecting defendants' argument that *American Pipe* tolling does not apply when the original Plaintiffs did not purchase the same certificates as the new Plaintiffs and therefore did not have standing to bring the new Plaintiffs' claims).

433.    Plaintiffs have chosen to file this separate action and to assert its Securities Act claims, which have been tolled by the pendency of this Class Action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Common-Law Fraud
### (Against the Corporate Defendants)

434.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

435.    This claim is brought against the Corporate Defendants.

436.    The Corporate Defendants promoted and sold the Certificates purchased by Plaintiffs pursuant to the defective Offering Documents. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

437.    Each of the Corporate Defendants knew their representations and omissions were false and/or misleading at the time they were made. Each of the Corporate Defendants made the misleading statements with an intent to defraud Plaintiffs.

438.    Each of the Corporate Defendants knew that their representations and omissions were false and/or misleading at the time they were made or at the very least, recklessly made such representations and omissions without knowledge of their truth or falsity.

439.    Each of the Corporate Defendants made the misleading statements and omissions with an intent to defraud Plaintiffs and to induce Plaintiffs into purchasing the Certificates. Furthermore, these statements related to these Defendants' own acts and omissions.

440.    The Corporate Defendants knew or recklessly disregarded that investors such as Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations. These Defendants knew or recklessly disregarded that investors such as Plaintiffs would rely upon their representations in connection their decision to purchase the Certificates. These

Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

441.    Plaintiffs reasonably, justifiably and foreseeably relied on the Corporate Defendants' false representations and misleading omissions.

442.    It was only by making such representations that the Corporate Defendants were able to induce Plaintiffs to buy the Certificates. Plaintiffs would not have purchased or otherwise acquired the Certificates but for these Defendants' fraudulent representations and omissions about the quality of the Certificates.

443.    Had Plaintiffs known the true facts regarding the loans underlying the Certificates, including the Corporate Defendants' and the Originators' abandonment of their underwriting practices, the Corporate Defendants' and Originators' improper appraisal methods, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, Plaintiffs would not have purchased the Certificates.

444.    As a direct and proximate result of Plaintiffs' reliance on the Corporate Defendants' false and misleading statements and omissions, Plaintiffs have suffered pecuniary damages in connection with their purchases of the Certificates.

445.    Because the Corporate Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the general public, including but not limited to all persons with interests in the RMBS, Plaintiffs are entitled to recover pecuniary damages.

12-12020-mg    Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 199 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA    Pg 199 of 214

446.   In the alternative, Plaintiffs hereby demand rescission and make any necessary tender of Certificates.

### SECOND CAUSE OF ACTION
### Aiding & Abetting Fraud
### (Against All Defendants)

447.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

448.   This claim is brought against all Defendants for aiding and abetting the fraudulent and reckless misrepresentations by all Defendants and Debtors.  Each of the Defendants aided and abetted the frauds committed by Debtors and other Defendants.

449.   As alleged in detail above, the Corporate Defendants and Debtors knowingly promoted and sold Certificates to Plaintiffs pursuant to materially misleading Offering Documents, thereby damaging Plaintiffs.  Each of the other Defendants knew of the fraud perpetrated on Plaintiffs by the Corporate Defendants and Debtors. Defendants directed, supervised and otherwise knew of the abandonment of underwriting practices and the utilization of improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

450.   Each of the Defendants provided the Corporate Defendants and Debtors with substantial assistance in perpetrating the fraud.  Defendants participated in the violation of mortgage loan underwriting and appraisal standards; made false public statements about mortgage loan underwriting and appraisal standards; provided false information about the mortgage loans underlying the Certificates to the rating agencies;

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 200 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 200 of 214

provided false information for use in the Offering Documents; and/or participated in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

451.   It was foreseeable to the Defendants at the time they actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

452.   As a direct and natural result of the fraud committed by the Corporate Defendants and Debtors, and the knowing and active participation by the other Defendants, Plaintiffs have suffered substantial damages.

**THIRD CAUSE OF ACTION**
**Violation of Minnesota Securities Act § 80A.76(b)**
**(Against the Corporate Defendants)**

453.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

454.   This claim is brought under the Minnesota Securities Act § 80A.76(b) against the Corporate Defendants.   The Corporate Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Minn. Stat §§ 80A.68 and 80A.76(b).

455.   As alleged in detail above, the Offering Documents contained untrue statements of material fact regarding the present creditworthiness of the Certificates and the quality of the underlying assets, omitted to state material facts necessary to make the untrue statements not misleading, and concealed and failed to disclose material facts.

The Corporate Defendants promoted and sold the Certificates purchased by Plaintiffs pursuant to the defective Offering Documents.

456.    Each of the Corporate Defendants either knew their representations and omissions were false and/or misleading at the time they were made, or made their representations with reckless disregard for their truth or falsity.

457.    Each of the Corporate Defendants made the representations and omissions in the Prospectuses and Prospectus Supplements with the intention to induce Plaintiffs and other investors to act in reliance thereon.

458.    At the time of the Corporate Defendants' false statements, misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs justifiably relied on the Corporate Defendants' false and misleading representations and omissions in purchasing the Certificates.  The true facts regarding the creditworthiness of the Certificates and the quality of the underlying assets, including the Originators' abandonment of their underwriting practices, the use of improper appraisal methods to value collateral, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, were peculiarly within the Corporate Defendants' knowledge and not ascertainable by Plaintiffs or other investors through ordinary channels.  Had Plaintiffs known about these matters, Plaintiffs would not have purchased the Certificates.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 202 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 202 of 214

459.    As a direct and proximate result of Plaintiffs' reliance on the Corporate Defendants' false and misleading statements and omissions, Plaintiffs have suffered pecuniary damages in connection with their purchases of the Certificates.

460.    By virtue of the foregoing, Defendants have violated Minn. Stat § 80A.68 and are liable to Plaintiffs pursuant to MINN. STAT. § 80A.76(b).

### FOURTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against All Defendants)

461.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.

462.    This claim is brought against all Defendants.

463.    Defendants were in the business of underwriting home mortgage loans, pooling the mortgage assets for securitization, issuing RMBS, and marketing RMBS to investors.  Defendants received pecuniary compensation from the sale of the Certificates.

464.    Because Defendants arranged the Securitizations, and originated or acquired, and underwrote all of the underlying mortgage loans, they had unique and special knowledge about the loans in the Offerings.  In particular, Defendants had unique and special knowledge and expertise regarding the quality of the underwriting of those loans as well as the servicing practices employed as to such loans.

465.    In the course of selling the Certificates, Defendants drafted and distributed the Offering Documents for the guidance of investors such as Plaintiffs.  The Offering

Documents purported to contain material information regarding the creditworthiness of the Certificates and the quality of the underlying assets, and Defendants anticipated that investors would rely on this information in deciding whether or not to purchase Certificates.

466.   As an investor in the Certificates, Plaintiffs are one of a limited group of persons whom the Defendants intended would rely on the information in the Offering Documents.

467.   Because Plaintiffs could not evaluate the loan files for the mortgage loans underlying the Certificates, and because Plaintiffs could not examine the underwriting quality or servicing practices for the mortgage loans in the securitizations on a loan-by-loan basis, Plaintiffs were heavily reliant on Defendants' unique and special knowledge regarding the underlying mortgage loans when determining whether to make each purchase of Certificates.   Plaintiffs were entirely reliant on Defendants to provide accurate information regarding the loans in engaging in that analysis.   Accordingly, Defendants were uniquely situated to evaluate the economics of each Certificate.

468.   The true facts regarding the creditworthiness of the Certificates and the quality of their underlying assets, including the Originators' abandonment of their underwriting practices, the use of improper appraisal methods to value collateral, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, were peculiarly within Defendants' knowledge and not ascertainable by Plaintiffs or other investors through ordinary channels.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 204 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 204 of 214

469.     Defendants owed Plaintiffs a duty to use reasonable care to ensure that their statements on these matters were not untrue or misleading.

470.     Defendants negligently breached and violated this duty to use reasonable care.  As alleged above, the Offering Documents contained untrue statements of material fact regarding the present creditworthiness of the Certificates and the quality of the underlying assets, omitted to state material facts necessary to make the untrue statements not misleading, and concealed and failed to disclose material facts.   At the time Defendants provided the Offering Documents to Plaintiffs, Defendants had no reasonable grounds to believe that the information contained therein regarding the creditworthiness of the Certificates and the quality of the underlying assets was true.

471.     At the time of Defendants' false statements, misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true. Defendants were aware that Plaintiffs relied on their unique and special expertise and experience and depended upon them for accurate and truthful information.   Plaintiffs justifiably relied on Defendants' false and misleading representations and omissions in purchasing the Certificates.  Had Plaintiffs known the truth about the creditworthiness of the Certificates and the quality of the underlying assets, Plaintiffs would not have purchased the Certificates.

472.     Based on their expertise, superior knowledge, and relationship with Plaintiffs, Defendants owed a duty to Plaintiffs to use reasonable care in providing complete, accurate, and timely information regarding the mortgage loans and the

12

Certificates.   Defendants breached their duty to provide such reasonable care and competence to Plaintiffs.

473.   Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time to be false, in order to induce Plaintiffs' investment in the Certificates.   Defendants provided the Offering Documents to Plaintiffs in connection with the Certificates, for the purpose of informing Plaintiffs of material facts necessary to make an informed judgment about whether to purchase the Certificates in the Offerings.   In providing these documents, Defendants knew that the information contained and incorporated therein would be used for a serious purpose, and that Plaintiffs, like other reasonably prudent investors, intended to rely on the information.

474.   As a direct and proximate result of Plaintiffs' reliance on Defendants to provide accurate information regarding the Certificates and their underlying assets, and Defendants' negligent breach of that duty of care, Plaintiffs have suffered pecuniary damages in connection with their purchases of the Certificates.

**FIFTH CAUSE OF ACTION**
**Violation of Section 11 of the Securities Act**
**(Against All Defendants)**

475.   Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

476.   This claim is brought pursuant to Section 11 of the Securities Act against all Defendants.   This claim is predicated upon Defendants' strict liability and/or negligence for making material untrue statements and omissions in the Offering Documents.   For purposes of this claim, Plaintiffs expressly exclude and disclaim any

199

allegation that could be construed as alleging fraud or intentional misconduct.  Plaintiffs limit this claim to those Certificates for which their claims have been tolled.

477.    The Registration Statements for the Certificate offerings were materially misleading, contained untrue statements of material fact, and omitted to state other facts necessary to make the statements not misleading.    Each Defendant issued and disseminated, caused to be issued or disseminated, and/or participated in the issuance and dissemination of the material statements and omissions that were contained in the Offering Documents.

478.    The Individual Defendants were executive officers and representatives of the respective companies responsible for the contents and dissemination of the Shelf Registration Statements.    Each of the Individual Defendants was a director of their respective companies at the time the Shelf Registration Statement became effective as to each Certificate.  Each Individual Defendant signed the relevant Registration Statements, or documents incorporated by reference, in their capacities as officers or directors of their respective companies, and caused and participated in the issuance of the Registration Statements.    By reasons of the conduct alleged herein, each of these Individual Defendants violated Section 11 of the Securities Act.

479.    The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

480.   Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

481.   Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.  The facts misstated or omitted were material to a reasonable investor in the securities sold pursuant to the Offering Documents.

482.   By reason of the conduct alleged herein, each of the Defendants violated Section 11 of the Securities Act, and is liable to Plaintiffs.

483.   Plaintiffs acquired Certificates pursuant to the false and misleading Offering Documents, including the Registration Statements.   At the time Plaintiffs obtained the Certificates, it did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

484.   This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents, and brought within three years of the effective date of the Offering Documents, by virtue of the timely filing of the Class Actions and by the tolling of Plaintiffs' claims afforded by such filings.

485.    Plaintiffs have sustained damages measured by the difference between the price Plaintiffs paid for the Certificates and (1) the value of the Certificates at the time this suit is brought, or (2) the price at which Plaintiffs sold the Certificates in the market prior to the time suit is brought.  Plaintiffs' Certificates lost substantial market value subsequent to and due to the materially untrue statements of facts and omissions of material facts in the Offering Documents alleged herein.  Additionally, because of Defendants' misrepresentations and omissions, Plaintiffs overpaid for the Certificates, and accepted rates of interest that did not adequately compensate Plaintiffs for the risks that they assumed.

486.    By virtue of the foregoing, Plaintiffs are entitled to damages, jointly and severally from each of the Defendants, as set forth in Section 11 of the Securities Act.

**SIXTH CAUSE OF ACTION**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against the Underwriter Defendants)**

487.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

488.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Underwriter Defendants from whom Plaintiffs acquired the Certificates.  For purposes of this claim, Plaintiffs expressly exclude and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This claim is based solely on claims of strict liability and/or negligence under the Securities Act.  Plaintiffs limit this claim to those Certificates for which their claims have been tolled.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document    Entered 07/27/12    Page 209 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 209 of 214

489.    The Underwriter Defendants offered, promoted, and/or sold the Certificates to Plaintiffs by means of the Offering Documents, including the Prospectuses and Prospectus Supplements, which contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.    The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

490.    Plaintiffs purchased Certificates directly from the Underwriter Defendants in the Offerings, pursuant to the Offering Documents, including the Prospectuses and Prospectus Supplements which contained untrue statements and omissions, as reflected in Section XI.    Defendants sold these Certificates for their own financial gain.

491.    The Underwriter Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, including the Prospectuses and Prospectus Supplements, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.    The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, including the Prospectuses and Prospectus Supplements as set forth above.

492.    Each of the Underwriter Defendants actively participated in the solicitation of Plaintiffs' purchases of the Certificates, and did so in order to benefit themselves. Such solicitation included assisting in preparing the Offering Documents, filing the Offering Documents, and assisting in marketing the Certificates.

493.    Plaintiffs purchased or otherwise acquired Certificates pursuant to the defective Offering Documents, including the Prospectuses and Prospectus Supplements. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents, including the Prospectuses and Prospectus Supplements.

494.    Plaintiffs acquired the Certificates in the primary market pursuant to the Offering Documents, including the Prospectuses and Prospectus Supplements.  Plaintiffs did not know, nor in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents, including the Prospectuses and Prospectus Supplements.

495.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents, and brought within three years of the effective date of the Offering Documents, by virtue of the timely filing of the Class Actions and by the tolling of Plaintiffs' claims afforded by such filings.

496.    By reason of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs sustained material damages in connection with its purchases of the Certificates.  Plaintiffs have the right to rescind and recover the consideration paid for its Certificates, and hereby elects to rescind and tender its securities to the Underwriter Defendants, except as to any Certificates that Plaintiffs have sold, as to which Plaintiffs seek damages to the extent permitted by law.

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 211 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 211 of 214

## SEVENTH CAUSE OF ACTION
### Violation of Section 15 of the Securities Act
### (Against Ally Financial, Ally Bank and the Individual Defendants)

497.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegations that the Defendants made any untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.  Plaintiffs limit this claim to those Certificates for which their claims have been tolled.

498.    This claim is asserted against Ally Financial, Ally Bank and the Individual Defendants under Section 15 of the Securities Act.

499.    Each of Ally Financial, Ally Bank and the Individual Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of the Depositor Debtors within the meaning of Section 15 of the Securities Act.  Ally Financial and the Individual Defendants conducted and participated, directly and indirectly in the conduct of the Depositor Debtors' business affairs, and had the power and influence and exercised the same to cause the Depositor Debtors to engage in the acts described herein.

500.    Ally Financial, Ally Bank and the Individual Defendants' control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiffs.

501.    Because of their positions of authority and control as senior officers and directors, the above-named Individual Defendants were able to, and in fact did, control the contents of the applicable Registration Statements, including the related Prospectus

12-12020-mg    Doc 6427-2    Filed 02/04/14    Entered 02/04/14 15:48:52    Exhibit B:
CASE 0:12-cv-01841-SRN-JJG    Document 1    Filed 07/27/12    Page 212 of 214
John Hancock Insurance Company (USA) v. Ally Financial    Inc. fka GMA    Pg 212 of 214

Supplements, that each is associated with as set forth above.  These materials contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

502.   Defendants Ally Financial, Ally Bank and the Individual Defendants culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the securitizations, selecting the entities to issue the Certificates, and selecting the underwriters.  In these roles, these Defendants knew and intended that the mortgage loans they purchased would be sold in connection with the securitization process, and that the Certificates would be issued by the relevant trusts.

503.   Debtor RFC was the sponsor for 34 Securitizations carried out under the 10 Registration Statements filed by Debtors RALI, RASC, RAMP, and RFMSI, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates purchased by Plaintiffs, by initiating these securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, and selecting the underwriters.  In its role as sponsor, RFC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing ownership interests of investors in the cashflows would be issued by the relevant trusts.

504.   This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Documents, and brought within three

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
CASE 0:12-cv-01842-SRN-JJG   Document 1   Filed 07/27/12   Page 213 of 214
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 213 of 214

years of the effective date of the Offering Documents, by virtue of the timely filing of the Class Actions and by the tolling of Plaintiffs' claims afforded by such filings.

505.    By virtue of the conduct alleged herein, Ally Financial, Ally Bank and the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs for damages suffered as a result.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

An award in favor of Plaintiffs against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

(i)    Plaintiffs' monetary losses, including loss of market value and loss of principal and interest payments;

(ii)    Rescission and recovery of the consideration paid for the Certificates, with interest thereon;

(iii)    Plaintiffs' costs and disbursements in this suit, including reasonable attorneys' fees and expert fees;

(iv)    Prejudgment interest at the maximum legal rate; and

(v)    Such other and further relief as the Court deems just and proper.

12-12020-mg   Doc 6427-2   Filed 02/04/14   Entered 02/04/14 15:48:52   Exhibit B:
John Hancock Insurance Company (USA) v. Ally Financial   Inc. fka GMA   Pg 214 of 214
CASE 0:12-cv-01841-SRN-JJG   Document 1   Filed 07/27/12   Page 214 of 214

# JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated:  July 27, 2012            **s/Elizabeth R. Odette**
                                        Richard A. Lockridge, MN #64117
                                        Karen H. Riebel, MN #219770
                                        Elizabeth R. Odette, MN #0340698
                                        LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                        100 Washington Avenue South, Suite 2200
                                        Minneapolis, MN 55401
                                        Tel:  (612) 339-6900
                                        Fax:  (612) 339-0981

                                        Jay W. Eisenhofer
                                        Geoffrey C. Jarvis
                                        Deborah A. Elman
                                        Robert D. Gerson
                                        GRANT & EISENHOFER P.A.
                                        485 Lexington Ave., 29th Floor
                                        New York, NY  10017
                                        Tel:  (646) 722-8500
                                        Fax:  (646) 722-8501

                                        *Counsel for Plaintiffs John Hancock Life*
                                        *Insurance Company (U.S.A.); John Hancock*
                                        *Life Insurance Company (U.S.A.) Separate*
                                        *Account 6A; and John Hancock Life*
                                        *Insurance Company (U.S.A.) Separate*
                                        *Account 131; John Hancock Funds II; John*
                                        *Hancock Variable Insurance Trust; John*
                                        *Hancock Sovereign Bond Fund; John*
                                        *Hancock Bond Trust, John Hancock Strategic*
                                        *Series; and John Hancock Income Securities*
                                        *Trust*