**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*

Debtors.

Case No. 12-12020 (MG)

Jointly Administered

---

**MEMORANDUM OPINION AND ORDER GRANTING DEBTORS' MOTION**
**APPROVING PAYMENT OF SUCCESS FEE TO DEBTORS' CRO**

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Attorneys for the Debtors and Debtors in Possession*
1290 Avenue of the Americas
New York, NY 10104
By:    Gary S. Lee, Esq.
       Lorenzo Marinuzzi, Esq.

WILLIAM K. HARRINGTON
*United States Trustee for Region 2*
201 Varick Street, Room 1006
New York, NY 10014
By:    Brian S. Masumoto, Esq.
       Michael T. Driscoll, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Debtors' Motion for Entry of an Order Approving*

*Payment of Success Fee to Debtors' Chief Restructuring Officer, Lewis Kruger* (the "Motion,"

ECF Doc. # 6172). In support of the Motion, the Debtors attach the Declaration of John

Dempsey (the "Dempsey Decl.," ECF Doc. # 5229) and the Declaration of William J. Nolan (the

"Nolan Decl.," ECF Doc. # 5230). The U.S. Trustee (the "UST") filed an objection to the

Motion (the "Objection," ECF Doc. # 6215) and the Debtors replied (the "Reply," ECF Doc.

# 6350). The Debtors previously filed the *Debtors' Motion Pursuant to Sections 105(a) and*

*363(b) of the Bankruptcy Code for an Order Approving Amendment to Engagement Letter with Debtors Chief Restructuring Officer, Lewis Kruger* (the "CRO Amendment Motion," ECF Doc. # 5227), supported by the Declaration of Pamela E. West (the "West Decl.," ECF Doc. # 5228), the Dempsey Decl., and the Nolan Decl.[1]  The Amendment to the Engagement Letter, which explicitly provides for a success fee of $2.0 million, subject to a reasonableness determination under Bankruptcy Code section 330, was approved by the Court at a hearing on October 9, 2013 without objection from any party in interest, including the UST.

For the reasons explained below, the Court grants the Motion and approves the payment of the $2.0 million success fee to Mr. Kruger.

## I.    BACKGROUND

The Debtors, with the support of the Unsecured Creditors' Committee (the "Creditors' Committee"), propose paying Lewis Kruger ("Kruger") a success fee in the amount of $2.0 million (the "Success Fee").  No creditor constituency has objected to the Success Fee.  The Debtors argue that they arrived at this number based upon their "reasonable business judgment," considering (1) the challenges presented in these chapter 11 cases, (2) the timing of Kruger's appointment, and (3) the uniqueness of Kruger's role in these cases, including his assumption of certain duties traditionally performed by the CEO, following Thomas Marano's departure from that position in May 2013.  (West Decl. ¶¶ 7–8.)  The Debtors assert that under Kruger's leadership, they engaged in extensive, successful settlement negotiations with the Creditors' Committee and other major stakeholders in the case through mediation led by Judge Peck. (Motion ¶ 4.)  The Debtors also point to Kruger's "key testimony" regarding settlements and

---

[1]    The Nolan and Dempsey Declarations filed in support of the Motion are the same declarations previously filed in support of the CRO Amendment Motion.

plan confirmation ("the Plan"),[2] which the Debtors claim "laid the foundation for confirmation of

the Plan." (*Id.*)  Additionally, the Debtors argue that Kruger played an integral role in allowing

the Debtors to achieve a global consensus on the now-confirmed Plan.  According to the

Debtors, "Mr. Kruger's reputation in the restructuring field and his objectivity concerning the

Debtors' pre-petition relationship with [the Debtors' parent Ally Financial Inc. ("AFI")] made

him uniquely qualified to lead the plan process," and "the resolution of crucial disputes,

including the AFI settlement, is due directly to Mr. Kruger's leadership." (*Id.* ¶ 5 (citing West

Decl. ¶ 4).)

The Debtors appointed Kruger as CRO on February 7, 2013, to assist the Debtors in their

attempts to achieve a consensual chapter 11 plan and negotiate with major creditor

constituencies.  Kruger's Engagement Letter, executed between Kruger and the Debtors on

February 11, 2013, set forth the terms and conditions of his employment, including:

> In addition to regular fees, the Company and Mr. Kruger agree that Mr. Kruger
> may, in the future, request a Success Fee upon the confirmation of a plan of
> reorganization or upon the occurrence of a significant milestone to be later
> defined and determined in these Chapter 11 cases.  The approval of the amount
> and the appropriateness of the Success Fee, if any, will be at the sole discretion of
> the Company's Board of Directors after consultation with the Official Committee
> of Unsecured Creditors of the Chapter 11 Cases.  The parties acknowledge that
> any Success Fee would require appropriate notice and ultimately Bankruptcy
> Court approval.

(Engagement Letter at 3.)  Also on February 11, 2013, the Debtors filed the CRO Retention

Application with the Court, which stated:

> In addition to the Hourly Rate and expense reimbursement, the Engagement
> Letter provides that Mr. Kruger will have the right to earn a fee for the successful
> completion of his engagement.  Mr. Kruger and the Board are in the process of
> negotiating the amount of the Success Fee and the targets required to be achieved

---

[2]        On December 11, 2013, the Court entered an *Order Confirming Second Amended Joint Chapter11 Plan
Proposed by Residential Capital, LLC, et al. and The Official Committee of Unsecured Creditors* (ECF Doc.
# 6065).  The confirmed Plan became effective on December 17, 2013.  (ECF Doc. # 6137.)

in order to earn such Success Fee.  Once the parameters of the Success Fee are
determined, the Debtors will separately seek Court approval for the Success Fee.

(CRO Retention Motion ¶ 29.)  The CRO Retention Motion further states:  "the Debtors propose

that approval of any Success Fee will be considered at the close of Mr. Kruger's engagement,

subject to a reasonableness standard."  (*Id.* at n.3.)

The Court approved Kruger's retention on March 5, 2013 (the "CRO Order," ECF Doc.

# 5318).  The CRO Order provides that "[t]he Debtors are authorized to pay Mr. Kruger in such

amounts and at such times as is provided in the Engagement Letter.  Notwithstanding the

previous provision, any Success Fee shall not be pre-approved under section 328(a) of the

Bankruptcy Code, and the Debtors shall separately seek Court approval of the Success Fee."

(CRO Order ¶¶ 4–5.)

The issue of the Success Fee was not taken up immediately upon Kruger's retention

approval.  Instead, Kruger focused on the issues surrounding the chapter 11 cases.  After the

Debtors filed a Plan with the Court, Kruger and the Debtors renewed discussions regarding the

Success Fee.  (Motion ¶ 23.)  The Board of Directors requested that Mercer (US) Inc. ("Mercer")

and FTI Consulting, Inc. ("FTI") each perform an analysis of success fees awarded to chief

restructuring officers in comparable bankruptcy cases.  (*Id.* ¶ 24; West Decl. ¶ 7.)  Mercer and

FTI examined the structure, prevalence, and appropriateness of success fees in those cases and

presented their findings to the Board.  (Motion ¶ 27; West Decl. ¶ 7.)

The Court granted the CRO Amendment Motion on October 9, 2013, determining that

the amendment providing for the Success Fee (subject to section 330 review) was within the

Debtors' reasonable business judgment.  (Oct. 9, 2013 Tr. 18:15–19 ("So the Court is very

comfortable, in these circumstances, concluding that the debtors' board has exercised appropriate

business judgment in recommending—in negotiating the proposed amendment to the Kruger

12-12020-mg    Doc 6437    Filed 02/06/14    Entered 02/06/14 09:21:12    Main Document
Pg 5 of 21

engagement letter and agreeing upon the amount.").)  Based upon those presentations and

considering Kruger's achievements in the cases, the Board determined that a $2.0 million

Success Fee was reasonable and appropriate.  (*Id.* (citing West Decl. ¶ 7).)  The Board's approval

of the Success Fee nevertheless remained subject to the Court's approval of the fee under the

section 330 reasonableness standard.

The Debtors argue and the Court finds that the Board was well-informed by its legal and

financial advisors when it considered and approved a Success Fee of $2.0 million to Kruger.  In

particular, the Board received detailed analyses and advice from Mercer and FTI.  The Debtors

and their professionals at Mercer and FTI considered the reasonableness and appropriateness of

success fees in the context of market practice and arrived at the $2.0 million figure as reasonable

in light of the marketplace comparison.  (*Id.* ¶¶ 45–51.)  Among other factors, those

professionals considered the Debtors' asset size, amount of liabilities, and the measure of value

creation, and savings, to the estates.

Mercer reviewed over 30 bankruptcy cases since 2005 where the debtor retained

restructuring professionals to act as CROs; in five of those cases, the retained professionals also

acted as CEO.  (Dempsey Decl. ¶¶ 12–13.)  In 21 of those cases (approximately 66%), the

professionals received both a time-based compensation rate (either an hourly or monthly rate)

and a success fee.  (*Id.* ¶ 13.)  The median value of the success fee in the cases analyzed was $2

million, and the 75th percentile was $3 million.  (*Id.*)  The proposed $2.0 million Success Fee

falls at the median of the sample.  (*Id.*)  Mercer's statistical analysis of success fees found that a

higher prepetition asset base roughly correlates to a higher success fee.  (*Id.* ¶ 15.)  The Mercer

professionals also considered that Kruger's perceived independence from AFI accelerated the

progress of the chapter 11 cases and that "even a three month acceleration of the resolution of

5

plan issues has saved substantial costs in professional fees alone—the total professional fees for

a recent quarter was just short of $100 million." (*Id.* ¶ 19.)  Finally, Mercer considered whether

the size of the engagement team and the duration of the engagement should impact the size of the

success fee and concluded that the success fee should reflect the value of the contribution rather

than the number of people assigned to the engagement; in any event, Mercer found that the

empirical correlation between team size and success fee was weaker than the link between asset

size and success fee.  (*Id.* ¶ 20.)

FTI examined ten large bankruptcy cases in the Southern District of New York in which

a CRO was retained.[3]  (Nolan Decl. ¶ 13.)  FTI considered that, by the time Kruger was retained,

the sale of the majority of the Debtors' assets was substantially completed and that Kruger's

primary duties involved negotiating settlements of the Debtors' significant liabilities.  (*Id.* ¶ 14.)

Consequently, FTI considered the correlation between the size of a success fee and the size of

the Debtors' liabilities at the time of filing.  (*Id.* ¶¶ 15–16.)  The weighted average success fee

paid to CROs in the sample of cases in the Southern District of New York is 0.02% of total

liabilities at filing.  (*Id.* ¶ 16.)  Using that metric and applying it to Residential Capital's

("ResCap") $15.276 billion of liabilities at the time of filing, FTI found that a success fee

ranging from $2.5 million to $2.8 million was implied.  (*Id.*)  FTI further evaluated Kruger's

enagement with the Debtors, using the ResCap estate's Key Employee Incentive Program

("KEIP") as a baseline for analyzing Kruger's success fee.  (*Id.* ¶¶ 18–20.)  The KEIP was

established to incentivize the Debtors' management by matching compensation to increased

creditor recoveries.  Though Kruger was not compensated under the KEIP, FTI found that his

role as an intermediary in negotiating between multiple parties-in-interest and having the estate's

---

[3]     FTI considered the following cases:  Lyondell Chemical Company; Chemtura; General Motors
Corporation; Saint Vincents Catholic Medical Centers of NY; Blockbuster Inc.; Borders Group, Inc.; Eastman
Kodak Co.; Velo Holdings Inc.; Metro-Goldwyn-Mayer Studios Inc.; Patriot Coal Corp.

and creditors' interests in mind warranted using the KEIP as a baseline to analyze a success fee. (*Id.* ¶ 18.) AFI ultimately contributed $2.1 billion to the global settlement. Subtracting from that contribution the $750 million original proposed AFI contribution (included in a prepetition plan support agreement that was opposed by most creditor constituencies and was *not* approved by the Court), the estate's recovery was enhanced by $1.35 billion dollars due to negotiations with AFI during the case. Considering Kruger's role helping to achieve the $1.35 billion enhanced recovery, and taking into account that Kruger cannot take all of the credit for that enhancement, FTI determined that a success fee of approximately $2.228 million was appropriate using the KEIP as a guideline. (*Id.* ¶ 20.)

## A.    The Motion

In the Motion, the Debtors enumerate the reasons Kruger's Success Fee is reasonable under section 330. Aside from the reasons stated above, the Debtors argue that the Success Fee is within market awards for CRO services (Motion ¶ 26), focusing on: (1) Kruger's accomplishments related to the Plan, including (a) bringing the parties together to enter into the Plan Support Agreement, (b) providing key testimony to address issues related to Plan confirmation, and (c) assisting the Debtors through the Plan confirmation process (*id.* ¶ 27); (2) Kruger's accomplishments outside of the Plan, such as the FGIC Settlement and his role in analyzing the Debtors' Foreclosure Review obligations under the Consent Order (*id.* ¶¶ 28–30); (3) Kruger's "unique role and independence," which allowed him—as a party with no allegiance to AFI—to reassure creditors that the AFI settlements ultimately included in the Plan (providing for AFI's $2.1 billion contribution) were not inside deals (*id.* ¶¶ 31–34); and (4) Kruger's special expertise and reputation, including his restructuring background as Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP (*id.* ¶¶ 35–38).

**B.     The UST's Objection**

The UST objects to the timing of the Motion, arguing that the hearing on Kruger's Success Fee should be postponed to a later date because the Success Fee is subject to the same reasonableness standard under section 330 as the final fee applications of other estate professionals and would be better addressed concurrently with those applications (not yet scheduled), and the parties-in-interest have not been given enough time to fully examine the reasonableness of the requested Success Fee.

Alternatively, the UST argues that the Debtors have not met their burden of establishing the reasonableness of the Success Fee under section 330 of the Bankruptcy Code because: (1) awarding the Success Fee would result in "an exceptionally high hourly rate" of over $2,300 per hour, and the Debtors did not address the reasonableness of the high hourly rate in the Motion; (2) Kruger's monthly fee statements do not support the Debtors' contention that he was serving in the capacity of CEO but rather suggest that he engaged in "work more commonly performed by a bankruptcy attorney and not a company executive or a crisis manager;" and (3) the cases cited by the Debtors to support the high Success Fee award are not analogous to Kruger's situation because the CRO in each of those cases involved awards to firms, not individuals.  (Objection at 10–12.)

The UST provided a number of charts in the Objection displaying (1) Kruger's approximate average weekly hours (*id.* at 7), (2) the number of hours, percentage of total hours, and value earned in hourly compensation broken down by project category (*id.*), and (3) hours broken down by project category and by month (*id.* at 8.)  The UST places a great deal of weight on the argument that granting the Motion would effectively increase Kruger's compensation on an hourly basis from $895 to $2,300.  But as explained below, a success fee is not intended to

compensate a professional at an hourly rate; rather, the Court's determination focuses on whether the proposed success fee is reasonable in light of the results accomplished by the professional. By that measure, the Court concludes that Kruger's success fee is reasonable.

### C.   The Debtors' Reply

In the Reply, the Debtors contend that the timing of the Motion is appropriate.  The Debtors argue that all parties, including the UST, had sufficient notice and time to review the reasonableness of the Success Fee.  (Reply ¶ 4.)  The Debtors filed the CRO Amendment Motion on September 27, 2013 and included three declarations supporting the Debtors' business judgment that $2.0 million was a reasonable amount to pay Kruger for his CRO services.  (*Id.*) Moreover, the parties have had an additional three weeks to review the matter because the original hearing on the motion was adjourned from January 8, 2014 to January 30, 2014.[4]  (*Id.*) Additionally, the Debtors argue that the timing of the Motion is appropriate because (1) the Creditors' Committee, "an economic stakeholder and representative of parties actually paying for the professional fees, including the Success Fee," endorses the Success Fee (*id.* ¶ 8); (2) other estate professionals have received all but a roughly 10% holdback (the majority of their compensation), whereas the majority of Kruger's compensation derives from the Success Fee, which has not been paid (*id.* ¶ 9); (3) all parties have had nearly four months to "review the Success Fee application, first filed in connection with the CRO Amendment Motion on September 27, 2013 (*id.* ¶ 10); and (4) the volume of documents related to reviewing Kruger's Success Fee is significantly less than the volume associated with reviewing the other estate professionals' fee applications (*id.* ¶ 11).

---

[4]     The adjournment was not a voluntary adjournment by the Debtors but rather an adjournment by the Court because of the Court's schedule.

Additionally, the Debtors argue that the reasonableness of the Success Fee should not depend on the impact the fee would have on Kruger's effective hourly rate. Moreover, the Debtors claim that they appropriately considered Kruger's assumption of certain CEO responsibilities as one factor supporting the Success Fee, along with the Debtors' asset size, the Debtors' liabilities, and the measure of value creation and savings to the estates by Kruger. The Debtors further assert that even though success fees in certain other cases were paid to firms rather than individuals, Mercer determined that the size of the award should reflect the overall impact of the contribution rather than the human resources expended in the engagement. (*Id.* ¶¶ 13–22.) The Debtors also argue that the UST has not provided any evidence to suggest that Kruger's services were unnecessary or not beneficial to the estate. (*Id.* ¶ 15.) Indeed, at the hearing on the Motion, the UST agreed that Kruger's services were necessary and beneficial.

## II.    DISCUSSION

As an initial matter, the Court rejects the UST's argument that the Motion should be adjourned until the Court considers all final fee applications. All parties in interest have had sufficient time to respond to the Motion; only the UST has objected and the Creditors' Committee joins with the Debtors in supporting the Motion. The Court's determination of the issues raised by the Motion is not dependent on the Court's rulings on final fee applications of other estate professionals, and the Court finds it appropriate to determine the reasonableness of the Success Fee now.

Pursuant to 11 U.S.C. §§ 330 and 363, courts may award reasonable success fees to parties providing benefit to a debtor's estate. Bankruptcy Code section 363(b) provides, in relevant part, that the trustee or debtor in possession "after notice and a hearing, may use, sell, or lease, other than in the course of ordinary business, property of the estate . . . ." 11 U.S.C.

§ 363(b)(1).  If a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy

Code represents a reasonable business judgment on the part of the debtor, that use may be

approved.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063, 1070

(2d Cir. 1983) (requiring an "articulated business justification").  The business judgment rule "is

a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*

*(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*,

488 A.2d 858, 872 (Del. 1985)).

Success fees must meet Bankruptcy Code section 330's test for reasonableness.[5]

Section 330(a) lists relevant factors a court should consider when determining if requested

compensation is reasonable:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at
the time at which the service was rendered toward the completion of, a case under
this title;

(D) whether the services were performed within a reasonable amount of time
commensurate with the complexity, importance, and nature of the problem, issue,
or task addressed;

(E) with respect to a professional person, whether the person is board certified or
otherwise has demonstrated skill and experience in the bankruptcy field; and

---

[5]    Success fees are, of course, distinguishable from "bonuses" or "fee enhancements," which are paid if,
through the efforts of a particular professional, some "rare and extraordinary" result is achieved that would warrant
an upward departure from the agreed upon or standard compensation. *See Blum v. Stenson*, 465 U.S. 886, 898–902
(1984) (discussing, in the context of a civil rights case, the standard for an upward adjustment from the prevailing
market rates for attorney fees).

(F) whether the compensation is reasonable based on the customary compensation
charged by comparably skilled practitioners in cases other than cases under this
title.

11 U.S.C. § 330(a)(3).  But reasonableness analysis under section 330(a) is not an application of

a strict formula.  For example, the reasonableness of a success fee does not hinge on the hours

worked or billing rates of a professional.  *See In re XO Commc'ns, Inc.* (*XO Commc'ns II*), 398

B.R. 106, 113 (Bankr. S.D.N.Y. 2008).  In the present case, the relevant factors to consider when

determining the reasonableness of Kruger's Success Fee are:  (1) whether Kruger's services were

necessary and beneficial to the estates at the time they were rendered and (2) whether the

Success Fee is reasonable based on a market comparison.

## A.    Necessary and Beneficial at the Time Rendered

In determining the reasonableness of fee awards under section 330, courts consider

whether the services provided are "services which are reasonably likely to benefit the debtor's

estate."  *In re Angelika Films 57th Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998) (citing *In re

Ames Dep't Stores, Inc.*, 76 F.3d 66, 71–72 (2d Cir. 1996).  Additionally, "[w]hen a court

conducts a section 330 review of fees that only are compensable if a specific result is achieved, it

must find that the work was beneficial when rendered and [therefore] must look to the nexus

between the work done and the results achieved."  *XO Commc'ns II*, 398 B.R. at 113–14.  Thus,

the "reasonableness standard" analysis required by section 330 allows the court to consider "the

nexus between the tasks performed and the results achieved," as well as the "impact of the

advisor's effort in that regard."  *Id.* at 114, 116.

The Debtors have provided substantial and uncontroverted evidence of the services

provided by Kruger, which the Court observed first hand during the case.  The UST has not

suggested that Kruger did not provide substantial services to the estates.  Rather, the UST takes

issue with whether the Debtors have shown a nexus between Kruger's efforts and the results

achieved in this case.  To this end, the UST argues that Judge Morris' opinion in *Northwest*

*Airlines* asserts that "where the efforts of that applicant were in tandem with other applicants, . . .

the success fee was not merited."  (Jan. 30, 2014 Tr. 27:14–16.)

The issue of a success fee in the Northwest Airlines chapter 11 case was addressed in

three opinions—first, by the bankruptcy court, *see In re Nw. Airlines Corp.* (*Northwest Airlines*

*I*), 382 B.R. 632 (Bankr. S.D.N.Y. 2008), then, on appeal, by the district court, *see In re Nw.*

*Airlines Corp.* (*Northwest Airlines II*), 399 B.R. 124 (S.D.N.Y. 2008), and then, on remand,

again by the bankruptcy court, *see In re Nw. Airlines Corp.* (*Northwest Airlines III*), 400 B.R.

393 (Bankr. S.D.N.Y. 2009).  As explained below, the Court does not believe that the *Northwest*

decisions require rejection of the Kruger Success Fee in this case.

The UST argues that because Kruger worked "in tandem" with other professionals to

achieve the results that the Debtors highlight, approval of the Success Fee is inappropriate.  The

Court disagrees.  In *Northwest Airlines III*, the court found that the "direct benefit of the estate

[from the applicant's efforts] appears to have been realized through the efforts of some other

entity or professional."  *Northwest Airlines III*, 400 B.R. at 400.  "[T]he tasks performed by the

advisor were remote from the main action or, at best, were carried out in tandem with other

estate professionals."  *Id.*  The applicant's efforts lacked a sufficient "nexus" in relation to the

achievements; the result did *not* turn on whether the applicant worked with others to achieve

results.  *Id.*

> [The applicant] has not shown that it played a vital and indispensable role at any
> stage of the reorganization, such as the confirmation of the Debtors' plan.  Under
> the circumstances of this case, the nexus between the restructuring in this case and
> [the applicant's] efforts is tenuous.

*Id.* at 401.

While the applicant in *Northwest* had "*participated* in the reorganization and *contributed at some level*," it did not show the strong nexus required of its efforts and the results achieved to justify the substantial success fee it sought. *Id.* (emphasis added).

In this case, Kruger played a "vital and indispensable role" in the Debtors' reorganization. This was an extremely complicated and contentious case. At the start of this case, justified or not, major creditor constituencies questioned the fairness and objectivity of Debtors' management and the degree to which they were beholden to the non-debtor AFI. The prepetition plan support agreement that included a $750 million contribution from AFI had virtually no support from creditor constituencies other than those that signed the agreement. The case was nearly in a free-fall before Kruger's appointment as CRO. The two events that finally moved the process along were Judge Peck's appointment as mediator and Kruger's appointment as CRO, ultimately leading to a largely consensual chapter 11 plan.

Though Kruger was not *solely* responsible for the success in this case, section 330 does not require sole responsibility. Kruger's contributions were substantial; he played a vital and indispensable role in the Debtors' reorganization. That he did so in tandem with other actors, including most especially the tireless efforts of Judge Peck, as mediator, does not mean that awarding a success fee for Kruger's contributions is unreasonable under section 330. The Court expressly finds that that Kruger's contributions and services were both necessary and beneficial to the estates at the times they were rendered, satisfying the first prong of section 330 analysis.

### B.    "Market-Driven" Approach

"Courts in the Second Circuit have adopted a 'market-driven' approach in which the cost of comparable services is a significant factor in determining reasonableness of fees." *XO Commc'ns, Inc.* (*XO Commc'ns I*), 323 B.R. 330, 343 (Bankr. S.D.N.Y. 2005) (citing *Ames*

*Dep't Stores*, 76 F.3d at 71 (noting that when Congress enacted section 330, it took "the position that 'compensation in bankruptcy matters be commensurate with the fees awarded in non-bankruptcy cases'"); *In re Bennett Funding Grp., Inc.*, 213 B.R. 234, 250 (Bankr. N.D.N.Y. 1997) (stating that courts should rely on the "'market' of comparable legal services to assist in determining the level of compensation to be awarded")). Courts in other circuits also consider market practices when determining reasonableness of fees under section 330. *See In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 229 (3d Cir. 2003) (section 330 "takes a 'market-driven' approach"); *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 258 (3d Cir. 1995) (same); *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 852 (3d Cir. 1994) (same); *In re Insilco Techs., Inc.*, 291 B.R. 628, 633–34 (Bankr. D. Del. 2003) (stating that "we have recognized that § 330, which deals with what constitutes 'reasonable' compensation for professionals, takes a 'market-driven' approach").

The Debtors have provided evidence that the $2.0 million Success Fee is well within market standards, considering the Debtors' asset size, amount of liabilities, and the measure of value creation, and savings, to the estates. (*See generally* Dempsey Decl.; Nolan Decl.) The UST challenges the evidence presented on the grounds that (1) comparisons between fees awarded to firms are not relevant here because the proposed Success Fee will go to an individual and (2) Kruger did not act substantially as CEO, making the Debtors' consideration of cases where the CROs assumed CEO duties flawed. The Court disagrees on both counts.

First, the UST asserts that Mercer's analysis of recent bankruptcy cases did not yield acceptable market comparisons because the success fees in those cases were paid to firms rather than to individuals. The Debtors established that Mercer considered a variety of factors to determine which market variables were most important to determining success fee awards and

concluded that the Success Fee "ought to reflect the value of the contribution rather than the amount of human resources assigned to the engagement because the empirical correlation between team size and success fee was weaker than the link between asset size and success fee." (Reply ¶ 16.)  Finding no other case in this district with comparable facts, the Debtors and their professionals considered a variety of recent "mega Chapter 11 cases" to determine the market comparison most appropriate for the Success Fee.  (*Id.* ¶ 17; *see also* Dempsey Decl. ¶ 13.)  The analyses conducted showed that the proposed $2.0 million Success Fee is comparable in amount to the market rate as determined by the large sample of cases considered by Mercer and FTI. (Reply ¶ 17 (citing Dempsey Decl. and Nolan Decl.).)

The UST further challenges the Debtors' assertion that Kruger acted as more than *just* the CRO after Thomas Marano resigned as CEO, thereby justifying a higher success fee based upon market analysis.  But the Debtors cite Kruger's contributions by wearing multiple hats as one of many factors informing their decision regarding the amount of the award.  That Kruger filled more than one role is only one of many factors the Debtors listed in support of the Motion.  How many hours Kruger spent on his expanded responsibilities does not determine the outcome on this Motion.  Even removing from consideration the five cases Mercer analyzed that involved CROs performing CEO duties, the median compensation was $1.75 million and the 75th percentile was $2.2 million.  (Dempsey Decl. ¶ 14.)  The $2.0 million Success Fee falls within that range.

Kruger was not a traditional CRO.  The biggest hurdles in this case, after a majority of the Debtors' assets were successfully sold at auction, were *billions of dollars* of litigation claims, including the RMBS trusts' claims, borrower claims, government regulators' claims, and securities claims.  A professional with Kruger's background and experience was needed to help

work towards a resolution of those claims.  Though the UST argues that Kruger acted

"essentially like a legal advisor to the debtors," Kruger was not retained under section 327 of the

Bankruptcy Code.  He was retained, and acted, as the CRO to the Debtors, and the

reasonableness of his Success Fee is properly considered under section 330.

Based on a careful review of the services Kruger performed, the results achieved, and the

uncontroverted evidence of market rates, the Court finds that Kruger's proposed $2.0 million

Success Fee is reasonable.

### C.    Hourly Rates

Finally, the UST argues that the reasonableness of success awards should be tied to the

number of hours worked rather than the significance of the contribution.  While the number of

hours worked is, perhaps, a relevant factor, it is by no means the most important factor.  Success

fees are intended to compensate a professional for the results achieved by the professional.  Here,

the results achieved with Kruger's considerable skill and efforts were exceptional.  As noted

above, Kruger was retained as the CRO at a time when these cases were approaching free-fall.

Kruger restored the Debtors' credibility, essential to the lengthy mediation and negotiation

process, ultimately leading to a series of proposed settlements and, finally, a largely consensual

chapter 11 plan.

Judge Gonzalez's opinion in *XO Communications* is instructive in this case.  In *XO*

*Communications*, Judge Gonzalez considered a fee request by Houlihan Lokey Howard & Zukin

Capital ("Houlihan"), restructuring financial advisor to the debtor, XO Communications, Inc.

("XO").  XO's prepetition financial advisor retained Houlihan pursuant to an engagement letter,

which provided for a monthly fee of $250,000, reimbursement of expenses, and a transaction fee,

payable upon the occurrence of certain restructuring transactions.[6]  *XO Commc'ns II*, 398 B.R. at

109.  When Houlihan ultimately sought approval of its compensation and reimbursement

requests, it included a request for a transaction fee.[7]  Certain creditors, joined by the debtor,

opposed Houlihan's motion.[8]  After an evidentiary hearing, Judge Gonzalez approved a

transaction fee.[9]  Judge Gonzalez explained that section 330(a) allows for "reasonable

compensation for actual necessary services," the analysis of which is "market driven . . . based

upon the facts that existed when the services were rendered."  *Id.* at 113.  After reviewing the

factors listed in section 330(a), however, Judge Gonzalez noted that, "[i]n considering a

transaction fee, courts recognize that certain of these [section 330] factors do not apply, such as

'time spent' or the 'rates charged.'"  *Id.* (quoting *In re Intelogic Trace, Inc.*, 188 B.R. 557, 559

(Bankr. W.D. Tex. 1995)).  Instead, the standard of review for a success (or in *XO*

*Communications*, a "transaction") fee is:  (1) whether the services were necessary and beneficial

to the estates at the time they were rendered, and (2) whether the success fee is reasonable based

---

[6]      The UST argues that since Houlihan's fee was monthly and not hourly, *XO Communications* is not directly applicable.  This is a distinction without a difference.  Section 330(a)(2)(A)–(B) lists "the time spent on such services" and "the rates charged for such services."  Though Kruger was paid by the hour and Houlihan by the month, the *XO Communications* rationale and the same reasonableness standard apply.

[7]      Pursuant to Houlihan's engagement letter with XO, a credit, representing the monthly fee payments received by Houlihan, would be applied to an award of a transaction fee.  *XO Commc'ns II*, 398 B.R. at 110–11.  Houlihan originally requested a transaction fee of $20 million, which the court reduced to $5 million.  *Id.* at 110–11, 119.

[8]      By the time of Houlihan's motion, major creditors of XO, High River Limited Partnership and Meadow Walk Limited Partnership (the "Icahn Entities"), which collectively held a large amount of XO's unsecured debt and later purchased approximately 85% of the secured lenders' claims against XO, had significant influence over XO and the confirmation process, by virtue of their ownership of XO's debt.  *XO Commc'ns II*, 398 B.R. at 109 n.3, 110 nn.5–6.

[9]      Though, as noted, the transaction fee approved was substantially less than the fee originally requested by Houlihan, based on the court's assessment of the reasonableness of the fee, considering "whether the requested fee [was] commensurate with compensation awarded for comparable services outside of bankruptcy."  *XO Commc'ns I*, 323 B.R. at 340.  The objecting parties presented evidence at the evidentiary hearing related to transaction fees awarded in cases they considered comparable to XO's case and which had not awarded such high transaction fees.  Ultimately, the court awarded a reduced transaction fee concluding "that, pursuant to section 330 of the Bankruptcy Code, $4 million represented a reasonable Transaction Fee for the services rendered by Houlihan."  *XO Commc'ns II*, 398 B.R. at 110.  On remand, Judge Gonzalez increased the award to $5 million.  *Id.* at 119.

on the market. *Id.* In fact, with regard to "time spent," Judge Gonzalez noted that "[u]nder a

section 330(a) examination, the time spent may *shed little light* on the actual value that a

financial advisor brought to a transaction, it is more the financial advisor's access to market

opportunities and the *results it achieved* that warrant its compensation." *Id.* at n.9 (emphasis

added).

    The UST is correct that some courts have used a lodestar method and calculated the

number of hours worked and rates charged as compared to similar professionals in assessing an

award as an incentive to produce a particular result. *See Houlihan Lokey Howard and Zukin

Capital v. Unsecured Liquidating Trust (In re Commercial Fin. Servs., Inc.)*, 427 F.3d 804, 815

(10th Cir. 2005) (approving the bankruptcy court's reasonableness evaluation with regard to a

financial advisor's compensation based upon the lodestar method, calculating number of hours

worked and rates charged in comparison to other financial advisors working in the same

proceeding); *In re Citation Corp.*, 493 F.3d 1313, 1320–21 (11th Cir. 2007) (approving use of

adjusted lodestar analysis as one method to determine the reasonableness of fees charged for

financial advisory and investment banking services). But Judge Gonzalez did not find the

lodestar method to be the most reliable method for evaluating a financial advisor's entitlement to

a transaction or success fee. *XO Commc'ns II*, 398 B.R. at 117. Instead, those fees, "intended to

act as an incentive for the professional to obtain a certain result," should not depend on the

amount of time spent if the marketplace does not concern itself with that metric. *Id.* at 118. This

Court agrees.

    The UST misplaces its reliance on Judge Morris' opinion in *Northwest Airlines* to argue

that an hourly fee analysis is an appropriate measure of reasonableness under section 330(a). In

*Northwest Airlines*, Judge Morris considered an interim retention order for a financial advisor to

the unsecured creditors committee that "did not pre-approve a completion or success fee" and did

not contain "defined goals for [the financial advisor applying for a "completion fee"], such as a

recapitalization, a percentage repayment for creditors or other 'success,' which, if met, would

entitle it to a bonus."[10]  *Northwest Airlines III*, 400 B.R. at 395–96.  The court considered the

hours expended by the financial advisor and how those hours translated to hourly rates because

> *although the time spent and rates charged by a financial advisor might not
> normally be of great relevance in assessing the reasonableness* of the amount of a
> transaction fee or success fee, the hourly rate is relevant in this case because,
> unlike the scheme ordinarily utilized by other financial advisors in bankruptcy
> cases, the terms of [the advisor's] retention are devoid of other specific factors
> that the Court can look to in order to assess reasonable compensation.

*Id.* at 399 (citing *XO Commc'ns II*, 398 B.R. at 111, 113 n.9) (emphasis added).  The advisor's

retention application in *Northwest Airlines* stated that its "entitlement, if any, to an additional

success or completion fee" would be deferred until a later date in the chapter 11 case.  *Northwest

Airlines I*, 382 B.R. at 636–37.  "[T]he terms 'success fee' and 'completion fee'" were not

defined by the retention order, retention application, or the engagement letter.  *Id.* at 637.

In this case, it was clear from the time Kruger's engagement was first approved that there

would be a success fee "upon the confirmation of a plan of reorganization or upon the occurrence

of a significant milestone to be later defined and determined in these Chapter 11 cases," though

the exact amount of the Success Fee was set at a later date.  (Engagement Letter at 3.)  The

Engagement Letter explicitly provides a reference to the Court to assess reasonable

compensation:  confirmation of a plan of reorganization.  As noted above, Kruger's efforts

substantially assisted the Debtors in confirming a chapter 11 plan in less time than otherwise was

---

[10]    Although referred to here as a "bonus," the court in *Northwest III* did not consider the financial advisor's
"request for a success or completion fee as a request for a 'fee enhancement.'"  *Northwest III*, 400 B.R. at 398.  In
the bankruptcy court's first opinion, *Northwest I*, the court considered "requests for a success or completion fee to
be requests for fee enhancements" and considered a lodestar approach.  382 B.R. at 643.  On appeal, the district
court remanded, stating that "to the extent that the lodestar analysis sets a higher bar for [the applicant's]
performance than section 330(a) reasonableness, it departs from the statutory language."  *Northwest Airlines II*, 399
B.R. at 129.

likely to occur.  Unlike the retention of the applicant considered in *Northwest Airlines*, Kruger's

Engagement Letter, CRO Retention Application, and amended Engagement Letter provide the

Court with specific factors by which to determine the reasonableness of the Success Fee.

Consequently, the effect of Kruger's Success Fee on his hourly rate is not of great relevance in

this case.  The Success Fee in this case was, as the court observed in *XO Communications*,

"intended to act as an incentive for the professional to obtain a certain result," and should

therefore not be calculated based on the amount of time Kruger spent to reach the goal of

achieving plan confirmation.  *XO Commc'ns II*, 398 B.R. at 118.

### III.    CONCLUSION

For the reasons discussed above, the Court concludes that the Debtors' Board was fully

informed and exercised appropriate business judgment is setting the amount of the Kruger

Success Fee.  Additionally, applying the reasonableness standard under section 330 of the

Bankruptcy Code, the Court concludes that the Success Fee is reasonable under the

circumstances.  Therefore, the Objection of the UST is overruled and the Debtors' Motion is

**GRANTED.**

**IT IS SO ORDERED.**

Dated:    February 6, 2014
          New York, New York


                                        ___*Martin Glenn*_____
                                              MARTIN GLENN
                                        United States Bankruptcy Judge