Pg 1 of 15

**Exhibit A**

DATE: June 4, 2007

BORROWER(S): **DENNIS G BURGIN**
**MARCENE L. BURGIN**

LOAN NUMBER: [redacted]

PROPERTY ADDRESS: **8759 QUAIL VALLEY DRIVE, REDDING, CALIFORNIA 96002**

NOTICE TO BORROWER: THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE.

# HOME OWNER'S LINE OF CREDIT AGREEMENT AND INITIAL DISCLOSURE STATEMENT

This Home Owner's Line of Credit Agreement and Initial Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you.

The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to **Transcontinental Lending Group, Inc.**, and its successors and assigns.

**1. LOANS: INTEREST ONLY PERIOD AND REPAYMENT PERIOD.**

Subject to the limitations explained in this Agreement, upon my request for advances, you agree to lend money to me from time to time during the term of this Agreement up to the Credit Limits indicated in paragraph 4 below. (You will not make any advances if my Account is sooner terminated or suspended under paragraphs 10.B, 10.D, 11.B or 15.A below.) I understand that you will not make any advances before the earlier of the 10th business day following the signing of this Agreement or until I receive the checkbook for my Account.

The "Interest Only Period" will be 120 monthly billing cycles (approximately 120 months), commencing on the date of this Agreement. After the Interest Only Period ends, I must pay the outstanding balance over a 240-month period commencing at the end of the Interest Only Period (the "Repayment Period"), unless my Account is sooner terminated under paragraph 11.B below, in which case my Account may be due and payable in full at the time of such termination.

**2. LOANS: REQUESTING ADVANCES.**

After the earlier of the 10th business day following the signing of this Agreement or my receipt of the checkbook for my Account, you will make advances under this Agreement by (i) honoring checks that you provide me that directly access my Account requesting advances; (ii) honoring my written request in a form you approve to disburse monies to other accounts or to third parties; (iii) paying closing costs and **FINANCE CHARGES** in accordance with paragraph 7 below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Deed of Trust; or (vi) any other method or procedure you establish. You may honor a request for an advance made by any person signing this Agreement as a Borrower.

**3. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.**

A. I promise to pay to your order, when and as due, but not later than the end of the Repayment Period, without set-off or counterclaim, all advances made under this Agreement, plus all unpaid **FINANCE CHARGES**, insurance premiums, collection costs and other charges I owe to you now or in the future. Unless you and I otherwise agree in writing, I promise to make my payments of the Minimum Payment Due (defined below) in United States Dollars by pre-authorized electronic funds transfers from an account at a bank or financial institution acceptable to you. Such transfers shall be in amounts sufficient to pay my Minimum Payment Due by the applicable Payment Due Date (defined below). If I discontinue or reduce the amount of such electronic funds transfers so that such transfers are no longer sufficient to pay my Minimum Payment Due by the applicable Payment Due Date, then the Margin (defined below) and the Maximum APR (defined below) may be increased, as described in paragraph 5.D below. Payments of amounts in excess of the Minimum Payment Due may be made by any method of payment acceptable to you. You may refuse to credit to my Account payments made with advances under this Agreement.

B. I will pay my Minimum Payment Due monthly by the Payment Due Date shown on my periodic statement. You will send me periodic statements monthly, commencing in the first calendar month following the date my Account is opened. The periodic statement will show all activity on my Account during the billing cycle and contain other important information, including my "New Balance," my **ANNUAL PERCENTAGE RATE** (defined below), the amount of my "Minimum Payment Due," the date my "Payment Must Be Received By" (the "Payment Due Date"), my "Total Credit Line" (defined below as my "Credit Limit") and any amount past due (any "Amount Past Due").

C. I may pay all or any part, in excess of my Minimum Payment Due, of my Account balance at any time subject to an Early Termination Fee if required by paragraph 7.D below. Because periodic **FINANCE CHARGES** will accrue on my Account balance until it is fully repaid, payment of the "New Balance" shown on my periodic statement will not fully repay my Account balance. If I want to include those **FINANCE CHARGES** with the payment of the "New Balance" shown on my most recent periodic statement, I will contact Lender at the address indicated in paragraph 17.L or such other address as

Lender may designate by written notice to me as provided in paragraph 17.L., for details concerning the amount I must include.

D. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 11.B below, I must pay you at least the Minimum Payment Due for each billing cycle by the Payment Due Date.

E. During the Interest Only Period, my "Minimum Payment Due" for my Account equals all overdrafts, unpaid **FINANCE CHARGES** and other charges imposed during the billing cycle together with any "Amount Past Due" shown on my most recent periodic statement for my Account. My Minimum Payment Due during the Interest Only Period will not reduce the principal balance that is outstanding on my Account.

F. During the Repayment Period, my "Minimum Payment Due" for my Account equals for each Payment Due Date, any "Amount Past Due" shown on my most recent periodic statement plus the amount, if any, by which the outstanding principal balance at the end of the applicable billing cycle exceeds my Credit Limit for my Account for such billing cycle, plus finance and other charges accrued or imposed on my Account during such billing cycle. During the Repayment Period, my Minimum Payment Due may not reduce the principal balance that is outstanding on my Account, depending upon how much of my Credit Limit is available for advances.

G. You will apply payments I make to amounts due under this Agreement and/or the Deed of Trust (defined below) in any order you choose.

H. If upon the crediting of a payment to my Account, my Account would have a credit balance, you may, to the extent permitted by law, in your discretion:

(a) refuse to accept that payment and refund it to me;

(b) credit that payment to my Account and refund to me the amount by which my Account has a credit balance; or

(c) credit that payment to my Account and leave my Account with a credit balance.

Except as required by law, no int[illegible]est will be payable to me on any credit balance.

**4. CREDIT LIMIT.**

During the Interest Only Period, my "Credit Limit" under this Agreement is

| $ 456,000.00 for Account. |
|---|

During the Repayment Period, my "Credit Limit" under this Agreement is for each billing cycle, an amount equal to the Credit Limit as of the expiration of the Interest Only Period multiplied by the number of billing cycles remaining in the term of this Agreement (including the billing cycle for which my Credit Limit is being calculated) and divided by 240.

I promise not to request an advanc[illegible] [illegible]t would cause the unpaid principal balance of my Account to exceed my Credit Limit. You can refuse to make advances that cause [illegible] obligations under this Agreement to exceed my Credit Limit. You will make advances on my Account to the extent my Credit Limit exceeds the sum of my principal balance, any Amount Past Due, all accrued and unpaid **FINANCE CHARGES** and other charges imposed during the billing cycle. In addition to each Minimum Payment Due, I must pay immediately, without notice or demand fr[illegible]m you, any part of the principal balance of my Account that exceeds my Credit Limit.

**5. ANNUAL PERCENTAGE RATE.**

A. The initial Daily Periodic Rate is **0.0212877%** and the corresponding **ANNUAL PERCENTAGE RATE** (the "Initial APR") is **7.770%**. The initial Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** will remain in effect until the end of the first billing cycle. After the first billing cycle, my Daily Periodic Rate (and corresponding **ANNUAL PERCENTAGE RATE**) may increase or decrease. My Daily Periodic Rate will equal the sum of a margin (the "Margin") (defined below) and the Index (defined below), divided by 365. If the Daily Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** increase, I will have to pay additional periodic **FINANCE CHARGES**, and, as a result, my Minimum Payment Due will increase.

B. After the first billing cycle, my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate may increase or decrease. My **ANNUAL PERCENTAGE RATE** will be calculated by adding the applicable Margin (which may be negative) to the Index.

[X] If this box is checked, the applicable index for my Account is the one month LIBOR rate as published in the "Money Rates" table of *The Wall Street Journal*, rounded to three decimal places (the "LIBOR rate") on the first business day of the month during the billing cycle to which such rate is to apply. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.C below. Each billing cycle will (i) subject to (iii) below, start on the first calendar day of the month, and (ii) end on the last day of each calendar month during the term of this Agreement; subject however, to (iii) if the last day of any calendar month is a Saturday or a Sunday or a federal holiday then the last day of the applicable billing cycle will be the last business day of the month. For example, if the last day of any calendar month is a Saturday or Sunday or a federal holiday then those days will be carried over to the following billing cycle, and such billing cycle will commence on the relevant Saturday or Sunday or federal holiday as applicable. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value occurs.



☐ If this box is checked, the applicable index for my Account is the highest "Prime Rate" as published in the "Money Rates" table of *The Wall Street Journal* (the "Prime Rate") at any time during the billing cycle. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.C below. Each billing cycle will (i) subject to (iii) below, start on the first calendar day of the month, and (ii) end on the last day of each calendar month during the term of this Agreement; subject however, to (iii) if the last day of any calendar month is a Saturday or a Sunday or a federal holiday then the last day of the applicable billing cycle will be the last business day of the month. For example, if the last day of any calendar month is a Saturday or Sunday or a federal holiday then those days will be carried over to the following billing cycle, and such billing cycle will commence on the relevant Saturday or Sunday or federal holiday as applicable. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value occurs.

Upon a change in the Index, any resulting change in my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate will take effect without prior notice to me, and will apply to any advances made during the applicable billing cycle and to the outstanding principal balance for my Account. The new **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new advances I obtain until my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the **ANNUAL PERCENTAGE RATE** divided by 365.

C. The Margin to be used under paragraph 5.B above to determine my **ANNUAL PERCENTAGE RATE** is 2.450 % for my Account.

D. The corresponding **ANNUAL PERCENTAGE RATE** will never exceed 21% or the maximum amount permitted by law, whichever is less (the "Maximum APR"). The corresponding **ANNUAL PERCENTAGE RATE** will never drop below 2.500% (the "Minimum APR") regardless of whether the Index plus my Margin is less than the Minimum APR at any point during the term of this Agreement. The corresponding **ANNUAL PERCENTAGE RATE** is a simple rate. The corresponding **ANNUAL PERCENTAGE RATE** includes only interest and not other costs.

In addition, the corresponding **ANNUAL PERCENTAGE RATE** is subject to the following limitations:

☒ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not exceed the Initial APR plus eight percentage points (8.000%) during the first 60 months. This limitation is referred to below as the "Periodic Rate Limitation." Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** is fixed at the Initial Rate for the first 12 months. For the next 48 months, the corresponding **ANNUAL PERCENTAGE RATE** may not exceed the Initial APR plus eight percentage points (8.000%). Together, these limitations are referred to below as the "Periodic Rate Limitations." Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than one percentage point during the first 24 months of the Account. For the next 36 months, the corresponding **ANNUAL PERCENTAGE RATE** may not exceed the Initial APR plus eight percentage points (8.000%). Together, these limitations are referred to below as the "Periodic Rate Limitations." Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than two percentage points during the first 24 months of the Account. For the next 36 months, the corresponding **ANNUAL PERCENTAGE RATE** may not exceed the Initial APR plus eight percentage points (8.000%). Together, these limitations are referred to below as the "Periodic Rate Limitations." Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than one percentage point during the first 60 months of the Account. This limitation is referred to below as the "Periodic Rate Limitation." Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than two percentage points during the first 60 months of the Account. This limitation is referred to below as the "Periodic Rate Limitation." Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

Any change in my daily periodic rate and corresponding **ANNUAL PERCENTAGE RATE** will take effect without prior notice to me. The new rate will apply to both new advances made during the applicable billing cycle and to the outstanding principal balance for my Account until my rate changes again.

If I have agreed to make payments by pre-authorized electronic funds transfers (for example, by direct debit against a deposit account) sufficient to pay at least my Minimum Payment Due and if payments by such method become insufficient, at any time, to pay at least my Minimum Payment Due (because, for example, I cancel or reduce the amount of such transfers) then the Margin and the Periodic Rate Limitation or Periodic Rate Limitations shall be increased by 0.625 percentage points (0.625%). This may result in an increase in my daily periodic rate, the corresponding **ANNUAL**

**PERCENTAGE RATE** and my Minimum Payment Due. Such increase shall be effective as of the first day of the billing cycle in which such insufficiency occurs and shall remain effective until the first day of the billing cycle following restoration of pre-authorized electronic funds transfers in amounts sufficient to pay my Minimum Payment Due. If I did not agree at the commencement of this Agreement to make payments by pre-authorized electronic funds transfers (for example, by direct debit against a deposit account) sufficient to pay at least my Minimum Payment Due, but during the term of this Agreement I agree to make payments by pre-authorized electronic fund transfers sufficient to pay at least my Minimum Payments Due then the Margin shall be decreased by 0.625 percentage points (0.625%) until the payment method becomes insufficient, at any time, to pay at least my Minimum Payment Due (as described above).

**6. PERIODIC FINANCE CHARGE.**

I agree to pay a periodic **FINANCE CHARGE** on my Account as explained below.

A. An advance represented by a check will be posted to my Account on the date that such a check is presented to you for payment. An advance represented by a request for an electronic funds transfer will be posted to my Account on the date that you receive such request. The periodic **FINANCE CHARGE** begins to accrue on my Account from the time an advance is posted to my Account and continues until it is paid in full. There is no "grace period" or time period within which any advances may be repaid without paying interest. For each billing cycle, you compute the periodic **FINANCE CHARGE** on my Account by applying the Daily Periodic Rate to the Average Daily Balance (defined below) in my Account (including current transactions). To determine the periodic **FINANCE CHARGE** for any billing cycle, the Average Daily Balance is multiplied by the Daily Periodic Rate, and then this product is multiplied by the number of days in the billing cycle.

B. To calculate the Average Daily Balance, you take the beginning principal balance of my Account each day, add any new advances and fees and subtract any principal payments or credits for such day. This gives you the "Daily Balance." Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

**7. OTHER FINANCE CHARGES, FEES OR CHARGES.**

A. In addition to any **FINANCE CHARGE** that will be added to my Account each billing cycle, I agree to pay the following **FINANCE CHARGES**:

**AT CLOSING:**

| | | | |
|---|---|---|---|
| Processing Fee | Mortgage Processing Inc. | $ | 513.80 |
| Administration Fee | BROKER | $ | 495.00 |
| Courier Fee | BROKER | $ | 14.40 |
| Underwriting Fee | Transcontinental Lending Group, Inc. | $ | 575.00 |
| Settlement or Closing Fee | Chicago Title Company | $ | 250.00 |
| Document Preparation E-Mail | Chicago Title Company | $ | 50.00 |
| Notary Fees | | $ | 60.00 |
| Overnigh Delivery Fee | Chicago Title Company | $ | 23.00 |

**POST CLOSING:**

B. I also agree to pay you the following **Other Charges and Fees:**

**AT CLOSING:**

| | | | |
|---|---|---|---|
| Credit Report | BROKER | $ | 16.76 |
| Title Insurance | Chicago Title Insurance Company | $ | 1,150.00 |
| Endorsement Fee | Chicago Title Company | $ | 25.00 |
| Recording Fees | | $ | 75.00 |
| Escrow Fees - AG Settlement Discount 1 Discount | | $ | -20.00 |

**POST CLOSING:**

(1) If I fail to make my Minimum Payment Due by **FIFTEEN** days after the applicable Payment Due Date, I agree to pay a late fee of **5.000%** of the scheduled payment.

(2) I agree to pay an over limit charge equal to **$25.00** each time I exceed my Credit Limit.

(3) I agree to pay an Annual Loan Administration Fee. The **$60.00** Annual Fee will be due in **$30.00** increments on **March 15th** and **September 15th** of every year following the first twelve months after the closing date. I agree that the Annual Fee will be included in the monthly statement. I further agree that the Annual Fee will be due with the monthly payment or debited with the monthly payment.

C. I agree to pay you or my broker closing costs incurred in connection with opening my Account at or before the time I sign this Agreement. I may choose to pay such costs and the applicable **FINANCE CHARGES** and other fees and charges

described above in cash or by check at or before the time I sign this Agreement, or I may request to finance some or all of such costs (excluding any down payment) by allowing you to make an advance under my Account to pay some or all of such costs.

D. To cover your costs of processing and administering my Account, and except as otherwise provided by applicable law or in this Agreement, **I AGREE TO PAY AN EARLY TERMINATION FEE IF I PAY IN FULL AND TERMINATE MY ACCOUNT WITH YOU AND ASK YOU TO SATISFY MY MORTGAGE LINE ("TERMINATION") BEFORE THE THIRTY-SIXTH (36th) MONTH AFTER THE DATE OF THIS AGREEMENT (THE "CLOSING DATE").** To the extent that my payment in full which terminates my Account exceeds 20% of the highest principal balance of my Account during the existence of my Account (the "Excess Amount"), the Early Termination Fee shall be equal to but shall not be greater than six months' advance interest on the Excess Amount. For purposes of determining the amount of advance interest payable as provided above, the Annual Percentage Rate in effect as of the date of your receipt of my Termination payment shall be applied.

The early termination fee provided for in this Section 7.C will not apply in connection with a Termination that results from the Property not being able to be occupied because it was damaged by a natural disaster for which a state of emergency is declared under the circumstances referred to in California Civil Code Section 2954.9(c), or following your exercise of your rights under Sections 11.A(3) of this Agreement.

☐ If this box is checked, the Early Termination Fee will not apply and an Early Termination Fee Waiver Addendum to the Home Owner's Line of Credit Agreement and Initial Disclosure Statement will be provided to me for my execution as of the date of this Agreement.

**8. PROPERTY SECURITY.**

To secure the payment of all advances I obtain and the performance of all promises I make in this Agreement, all co-owners and I are giving you a Deed of Trust (the "Deed of Trust") covering property located at

**8759 QUAIL VALLEY DRIVE**
**REDDING, CALIFORNIA 96002**

(the "Property"). The Deed of Trust is security for my current and future obligations under this Agreement. I will continue to be obligated to make payments to you under this Agreement even if the Property is damaged or destroyed and whether or not any insurance proceeds are available.

**9. PROPERTY INSURANCE.**

I agree to obtain and maintain property insurance against loss or damage to the Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Deed of Trust or otherwise. **I may obtain property insurance from any company of my choice that is acceptable to you.** If the amount of the premiums for property insurance increases at any time during the term of this Agreement, I agree to pay any such increase(s).

**10. YOUR RIGHTS TO TEMPORARILY SUSPEND MY ADVANCES OR REDUCE MY CREDIT LIMIT.**

A. You may take the actions listed in paragraph 10.B below during the period that any of the following events or conditions exist:

(1) the value of the Property declines significantly below its appraised value for the purposes of my Account;

(2) there is a material adverse change in my financial condition, and, as a result, you reasonably believe that I will not be able to make payments as agreed;

(3) I am in default of any material obligation of this Agreement;

(4) the Maximum APR set forth in paragraph 5.D above is reached;

(5) GOVERNMENT ACTION SUCH AS ENACTMENT OF A STATE USURY LAW PREVENTS YOU FROM CHARGING THE **ANNUAL PERCENTAGE RATE** PROVIDED FOR YOU IN THIS AGREEMENT;

(6) government action (such as imposition of a tax lien) impairs the priority of the lien of the Deed of Trust such that the value of the lien of the Deed of Trust is less than 120% of my Credit Limit; or

(7) you are notified by a regulatory agency that continued advances constitute an unsafe and unsound practice.

B. During the period in which a condition described in paragraph 10.A above exists, you may refuse to make any additional advances or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit, and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed and I have notified you in writing, explaining how the condition(s) have been cured or have changed, and provided no new condition(s) under paragraph 10.A above exists or 11.A below has occurred.

C. Before reinstating my right to obtain advances, or restoring my Credit Limit, you may conduct or obtain credit reports, appraisals, lien searches and other evaluations as you consider appropriate. I agree to reimburse you on demand for any costs you actually incur for obtaining such information.

D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making advances, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the advances for such request to be effective. If all such persons subsequently request reinstatement of the advances, you must honor such a request unless a condition listed in paragraph 10.A above exists or 11.A below has occurred.

E. If an event or condition described in paragraph 10.A above occurs which is also an event or condition described in paragraph 11.A below, your rights and remedies described under paragraph 11.B below apply and supersede your rights described in this paragraph 10.

## 11. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. You may take the actions listed in paragraph 11.B below if any of the following events or conditions occur:

(1) I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

(2) I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Deed of Trust;

(3) I sell or transfer title to the Property without first obtaining your written permission;

(4) I fail to maintain insurance on the Property as required under this Agreement or the Deed of Trust;

(5) I act or fail to act and as a result a lien senior to the lien of the Deed of Trust is filed against the Property;

(6) I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7) All or part of the Property is taken through eminent domain, condemnation or similar taking;

(8) A prior lienholder on the Property begins foreclosure under its security instrument;

(9) The Property is used for an illegal purpose which could subject the Property to seizure;

(10) I fail to pay taxes on the Property; or

(11) My action or inaction adversely affects the Property or your rights in the Property. Such action or inaction could include, for example:

(a) A judgment is filed against me

(b) I commit waste or otherwise destructively use or fail to maintain the Property;

(c) I die and I am not survived by another person obligated as a Borrower under this Agreement;

(d) I move out of the Property; or

(e) I break any promise made in this Agreement (including those set forth in paragraph 13 below) or in the Deed of Trust.

B. If an event described in paragraph 11.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

(1) you may terminate any of my rights under my Account;

(2) you may temporarily or permanently refuse to make any additional advances;

(3) you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

(4) you may foreclose the Deed of Trust;

(5) you may reduce my Credit Limit; and

(6) you may take any other action permitted by this Agreement, by law or in equity.

C. Without limiting the foregoing, the Deed of Trust contains the following provision, at Section 6(h):

"If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law."

## 12. SALE OF PROPERTY.

Unless you otherwise agree, I will not sell, transfer ownership of, mortgage, or otherwise dispose of my interest in the Property, in whole or in part, or permit any other lien or claim senior to the Deed of Trust against the Property. If I have indicated in paragraph 13.G below that the Property is to be my principal residence, I will move in and occupy the Property within 60 days after closing. If the Property is to be used for investment purposes as indicated in paragraph 13.G below, I may lease the Property.

**13. OBLIGATIONS.**
I agree that:

A. I will pay all of my existing and future debts to you under any existing or future agreement with you.

B. I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C. I will not permit a receiver, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Property.

D. I will not use or allow use of the Property for any illegal purpose.

E. From time to time, if requested, I will supply you with current financial information about me.

F. I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Deed of Trust.

G. I will establish and use the Property only for:

- [X] my principal residence (which I will occupy)
- [ ] a secondary residence for me
- [ ] investment purposes
- [ ] ______________________

within 60 days after the date of this Agreement and shall continue to use the Property for that purpose unless and until you otherwise agree in writing.

H. I will not use advances from my Account to pay amounts due under this Agreement.

I. I will not break any promise made in this Agreement or in the Deed of Trust.

**14. COSTS OF COLLECTION.**
Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection or foreclosure, such as your court costs, reasonable attorneys' or trustees' fees. Periodic **FINANCE CHARGES** will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

**15. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN ADVANCES.**

A. **Termination by Me.** I may terminate my right to obtain advances by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain advances may be terminated by a written notice pursuant to this paragraph 15.A signed by any one or more of such persons. I may also suspend my right to obtain advances pursuant to paragraph 10.D above.

B. **Termination by You.** My right to advances under my Account will terminate at the end of the Repayment Period, if not sooner, upon your exercise of your termination or suspension rights under paragraphs 10.B or 11.B above or upon my exercise of my suspension or termination rights under paragraphs 10.D or 15.A above.

C. **Effect of Termination.** Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the Minimum Payments Due on or before the applicable Payment Due Dates until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 11.B above. I must return unused checks to you upon termination. **I understand that I may be required to pay an Early Termination Fee pursuant to paragraph 7.D above.**

D. **Contracted for Rate of Interest.** I agree to pay a contracted for rate of interest equal to the **ANNUAL PERCENTAGE RATE** as provided in this Agreement plus the additional rate of interest resulting from all other fees, charges, goods, sums, or things of value paid or payable by me, whether pursuant to this Agreement, the Deed of Trust, or any other document pertaining to my Account, that may be deemed to be interest for the purposes of any law of the State of California that may limit the maximum amount of interest that may be charged on my Account.

**16. CHANGES TO AGREEMENT.**
You may change this Agreement if:

(1) the original applicable Index is no longer available, to change the applicable Index and applicable Margin, as long as the change is in compliance with all applicable State and Federal laws and the new index has a historical movement substantially similar to that of the original index and the new index and margin would have resulted in an **APR** substantially similar to the rate in effect at the time the original index became unavailable;

(2) I agree to such change in writing;

(3) such change is unequivocally beneficial to me; or

(4) such change is an insignificant change.

**17. CREDIT CARD ACCESS.**

[X] I hereby request that one or more Macquarie Mortgages Platinum Access card(s) (referred to as the "Credit Card" and collectively as the "Credit Cards") be issued in the name of each Borrower who signs below. Borrowers who are trustees of a trust or individuals signing on behalf of a Borrower under a power of attorney, guardianship, conservatorship or similar power are not eligible to receive Credit Cards. While the Account is not in default, closed or suspended, any Borrower may borrow money from the Account by use of the Borrower's Credit Card. If this is a joint Account, each Borrower is jointly and severally responsible for payment of the entire amount due resulting from the use of the Credit Card.

You will honor (up to my Credit Limit) advances I request by using the Credit Card at any merchant or service provider ("Merchant") that allows me to use the Credit Card to pay for goods and services. If you provide me with a personal identification number ("PIN"), I may also receive loan advances by using the card at participating automated teller machine ("ATM") networks. I agree not to write my PIN on my Credit Card or to disclose it to others. If I use my Credit Card at an ATM, I understand that the owner of the ATM may charge me a fee for the transaction. I understand the Credit Card advances may be subject to transactional limits that could restrict the full use of my available Credit Limit. Any advance represented by a Credit Card transaction will be posted to my account on the date that you receive the transaction for processing, and the periodic finance charge will begin to accrue as of that date.

It is my responsibility to use the Credit Card only for valid and lawful purposes. If I use the Credit Card for any other purpose or transaction, including, without limitation, unlawful gambling activities, I agree to promptly reimburse you for all amounts or expenses incurred as a result of the invalid or unlawful purpose. You may block and/or refuse to approve any request for authorization for an invalid or unlawful purpose. You will not be liable and I will be liable for the full amount of advances made in connection with an invalid or unlawful purpose. You are not responsible for the refusal of any merchant, bank or ATM to honor or accept the Credit Cards issued on my Account.

All Credit Card transactions are processed through the applicable Bankcard Networks that are branded on the Credit Card ("Bankcard Networks") according to the requirements and procedures of the applicable Bankcard Networks. Some transactions may require prior authorization by you or pursuant to the requirements and procedures of the Bankcard Networks before they are approved for processing. The Bankcard Networks may refuse to process any transaction if it appears to be illegal or fraudulent, or if the Merchant or the transaction does not otherwise meet the requirements of the Bankcard Networks. Some transactions with the Credit Card will require prior approval. These prior approvals are called "authorizations." If the your authorization system is not working fully or if the number of transactions exceeds the limit for a certain period of time, you may not give or you may be unable to give an authorization even though t[illegible]ransaction would not exceed my credit limit and my Account is in good standing. For security reasons, you cannot explain the det[illegible] of how the authorization system works. I agree that you will not be liable for failing to provide an authorization.

If I engage in a Credit [illegible]ard transaction in a currency other than U.S. Dollars, the Bankcard Network will convert the charge to a U.S. Dollar amount. The exc[illegible]ange rate used to convert the currency to U.S. Dollars will be a rate selected by the Bankcard Network from the range of rates availa[illegible]e in wholesale currency markets for the applicable central processing date, which rate may vary from the rate the Bankcard Network itself receives, or the government-mandated rate in effect for the applicable central processing date. The currency conversion rate o[illegible] the applicable central processing date may differ from the rate that would have been used on the date of the transaction or the date the transaction posted to my billing statement.

In addition to my other obligations to notify you regarding billing errors and lost or stolen checks, I will immediately notify you and confirm by letter if my Credit Card [illegible] ever lost or stolen or if another person has my PIN number, if there are any errors on my monthly billing statement, or I suspect a[illegible] unauthorized use of the Account and my Credit Card. I agree to assist you in determining the facts, circumstances, and other pertin[illegible] information relating to any loss, theft, or possible unauthorized use of my Credit Card. If my Account is in good standing, you will [illegible]d me a new Credit Card with a new account number to replace the Credit Card that was lost, stolen or wrongfully used. Although [illegible]ill be issued a new account number, I will not be considered to have opened a new account, and my existing balance will be tra[illegible]rred to the replacement account number.

**18. LIABILITY FOR UNAUTHORIZED TRANSACTIONS.**

I may be liable for the unauthorized use of my Credit Card. I will not be liable for unauthorized use that occurs after I notify you, orally or in writing, of the loss, theft, or possible unauthorized use. In any case, my maximum liability will not exceed $50.00. To notify you of a lost or stolen Credit Card, or of unauthorized use of my Credit Card, I can either call you at the telephone number on my monthly billing statement or at the number listed below anytime, 24 hours a day, 7 days a week, followed by a written notice to: **401 Fairway Drive, Suite 100, Deerfield Beach, FL 33441 Telephone 866-219-8100.**

**19. LIMITATION OF LIABILITY.**

Your liability to me, if any, for wrongful dishonor of any advance request I make using my Credit Card is limited to my actual damages. You will not be liable if any merchant, financial institution or Bankcard Network refuses to honor a Credit Card transaction.

**20. OTHER PROVISIONS.**

A. **Third Parties.** This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me; I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Deed of Trust at any time without my consent.

B. **Additional Credit Reports and Appraisals.** I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Property and the Deed of Trust as you may deem necessary from time to time. I will cooperate in having the Property reappraised.

C. **Tax Deductibility.** I understand that no assurance can be provided that all or any part of the amounts payable in connection with this Agreement or any sums due hereunder are tax deductible for any purpose. I know that I should consult a tax adviser regarding the deductibility of interest and charges. I acknowledge that neither you nor any person acting for you has, in connection with this Agreement, made any representation regarding tax deductibility.

D. **Applicable Law.** I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Property is located.

E. **Application of Payments.** You may apply payments and proceeds of the Property in such order as you elect or as otherwise required by applicable law.

F. **Failure to Perform.** If I violate or fail to perform any term or condition of this Agreement (or the Deed of Trust), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account, and **FINANCE CHARGES** will be figured at the rates described above. I agree to pay these costs and **FINANCE CHARGES** on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

G. **Complete Understanding of the Parties.** There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

H. **Waiver of Notice.** I waive presentment, demand, protest notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z or other applicable law.

I. **Meaning of Words.** All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrases "such as" or "for example" or other similar phrase is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

J. **Payment Marked "Payment in Full."** I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. **Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to 401 Fairway Drive, Suite 100, Deerfield Beach, FL 33441 or phone 866-219-8100**, or to such other address as you may designate by written notice to me as provided in paragraph 17.L.

K. **Enforcement.** You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

L. **Notices.** Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 17.L and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at

**Transcontinental Lending Group, Inc.**
**401 Fairway Drive, Suite 100, Deerfield Beach, FL 33441**

or to such other address as you may designate by written notice to me as provided in this paragraph 17.L.

M. **Riders/Addenda.** The covenants and agreements of any rider/addendum that I sign are incorporated into and supplement and amend the terms of this Agreement.

N. **Assignment.** We understand that you may sell or transfer our Credit Line Account and your rights and obligations under this Agreement and your rights under the Mortgage to another lender or other person without giving us prior notice (except where the law requires) or getting our approval. We also understand that the lender or other person to whom you sell or transfer our Credit Line Account will then be responsible for providing us with credit advances and performing all of your obligations under this Agreement and that you will no longer have any obligations to us under this Agreement.

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDER/ADDENDUM, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDER/ADDENDUM AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDER/ADDENDUM. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME OWNER'S LINE OF CREDIT" AND THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE."

BORROWER

Dennis G. Burgin (Seal) -Borrower
DENNIS G. BURGIN

Marcene L. Burgin (Seal) -Borrower
MARCENE L. BURGIN

Pay to the order of Macquarie Mortgages USA Inc
Without Recourse Transcontinental Lending Group Inc
This 4th day of June, 2007.

By: [signature]

Its: MONSERRATE TORRES
SHIPPER
INSOUTH FUNDING
AS ATTORNEY IN FACT FOR

Transcontinental Lending Group Inc.

**Limited and Special**
**Power of Attorney**

The undersigned, Transcontinental Lending Group, Inc. ("Seller") irrevocably appoints INSOUTH FUNDING, INC., a Tennessee corporation ("INSOUTH") as its attorney-in-fact (with full power of substitution) for, on behalf, and in the name of Seller to (a) endorse and deliver to any Person any check, instrument, or other documents received by INSOUTH with respect to Mortgage Loans sold by Seller to INSOUTH pursuant to the Master Loan Purchase and Sale Agreement between the Seller and INSOUTH, (b) prepare, complete, execute, deliver and record any assignment of any mortgage, deed of trust, or trust deed securing any Mortgage Loan, which is part of a loan or mortgage, (c) endorse and deliver or otherwise transfer any promissory note evidencing any Mortgage Loan and do every other thing necessary or desirable to effect transfer of all or any Mortgage Loan, (d) take all necessary and appropriate action with respect to any Mortgage Loan, and (e) sign Seller's name wherever appropriate to effect the performance of the Master Loan Purchase and Sale Agreement. This section shall be liberally, not restrictively, construed to give the greatest latitude to INSOUTH's power as the Seller's attorney-in-fact to deal with the Mortgage Loan Documents sold by Seller to INSOUTH. The powers and authorities conferred on INSOUTH in this section (a) are discretionary and not obligatory on the part of INSOUTH, (b) may be exercised by INSOUTH through any Person who, at the time of the execution of a particular document, is an officer of INSOUTH or an employee of INSOUTH authorized by INSOUTH to act pursuant to this Power of Attorney, and (c) are granted for a valuable consideration, coupled with an interest, and irrevocable until (and all Persons dealing with INSOUTH, and of its officers acting under this section, or any substitute are fully protected in treating the powers and authorities conferred by this section as existing and continuing in full force and effect until advised by INSOUTH) that the Master Purchase and Sale Agreement has been terminated or canceled and the Obligations are fully paid and performed.

Seller: Transcontinental Lending Group, Inc.

By: [signature]

Name (Please Print): Earl S. Wiley

Title (Please Print): President

Date: 3/31/2005

Scott A. Schuppie
My Commission DD250212
Expires September 18, 2007

[signature]

SIGNED Before Me 3/31/2005

# IN CASE OF ERRORS OR INQUIRIES ABOUT MY BILL

## MY BILLING RIGHTS

## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about my rights and your responsibilities under the Fair Credit Billing Act.

**I Will Notify You In Case of Errors or Questions About My Bill**

If I think my bill is wrong, or if I need more information about a transaction on my bill, I will write you on a separate sheet at the address listed on my bill. I will write to you as soon as possible. You must hear from me no later than 60 days after you sent me the first bill on which the error or problem appeared. I can telephone you, but doing so will not preserve my rights.

In my letter, I will give you the following information:

- My name and account number.
- The dollar amount of the suspected error.
- A description of the error and an explanation, if I can give one, why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized you to pay my bill automatically from my savings or checking account, I can stop the payment on any amount I think is wrong. To stop the payment my letter must reach you three business days before the automatic payment is scheduled to occur.

**My Rights and Your Responsibilities After You Receive My Written Notice**

You must acknowledge my letter within 30 days, unless you have corrected the error by then. Within 90 days, you must either correct the error or explain why you believe the bill was correct.

After you receive my letter, you cannot try to collect any amount I question, or report me as delinquent. You can continue to bill me for the amount I question, including **FINANCE CHARGES**, and you can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while you are investigating, but I am still obligated to pay the parts of my bill that are not in question.

If you find that you made a mistake on my bill, I do not have to pay any **FINANCE CHARGES** related to any questioned amount stemming from such mistake. If you didn't make a mistake, I may have to pay **FINANCE CHARGES**, and I will have to make up any missed payments on the questioned amount. In either case, you will send me a statement of the amount I owe and the date that it is due.

If I fail to pay the amount that you think I owe, you may report me as delinquent. However, if your explanation does not satisfy me and I write to you within ten days telling you that I still refuse to pay, you must tell anyone you report me to that I have a question about my bill. And, you must tell me the name of anyone you reported me to. You must tell anyone you report me to that the matter has been settled between us when it finally is.

If you don't follow these rules, you can't collect the first $50.00 of the questioned amount, even if my bill was correct

DATE: **June 4, 2007**

BORROWER(S): **DENNIS G. BURGIN**
**MARCENE L. BURGIN**

PROPERTY ADDRESS: **8759 QUAIL VALLEY DRIVE**
**REDDING, CALIFORNIA 96002**

LOAN NUMBER: [redacted]

# ADDENDUM TO THE HOME OWNER'S LINE OF CREDIT AGREEMENT AND INITIAL DISCLOSURE STATEMENT

This Addendum is made on **June 4, 2007** and is incorporated into and shall be deemed to amend and supplement the Home Owner's Line of Credit Agreement and Initial Disclosure Statement made by the undersigned (the "Borrower") in favor of **Transcontinental Lending Group, Inc.** (the "Creditor"), dated the same date as this Addendum (the "Agreement"). The terms of this Addendum are incorporated into and made a part of the Agreement. The Agreement is secured by a deed of trust, mortgage or other security instrument, signed the same date as the Agreement, on real property referenced in the Agreement.

The Borrower and the Creditor agree as follows, using the words having the same meaning as set forth in the Agreement:

**A. Section 5 of the Agreement.** Section 5 of the Agreement is removed and replaced with the following provisions which change the method of determining the Maximum APR that could apply under the Agreement:

**5. ANNUAL PERCENTAGE RATE.**

A. The initial Daily Periodic Rate is **0.0212877%** and the corresponding **ANNUAL PERCENTAGE RATE** (the "Initial APR") is **7.770%.** The initial Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** will remain in effect until the end of the first billing cycle. After the first billing cycle, my Daily Periodic Rate (and corresponding **ANNUAL PERCENTAGE RATE**) may increase or decrease. My Daily Periodic Rate will equal the sum of a margin (the "Margin") (defined below) and the Index (defined below), divided by 365. If the Daily Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** increase, I will have to pay additional periodic **FINANCE CHARGES**, and, as a result, my Minimum Payment Due will increase.

B. After the first billing cycle, my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate may increase or decrease. My **ANNUAL PERCENTAGE RATE** will be calculated by adding the applicable Margin (which may be negative) to the Index.

[X] If this box is checked, the applicable index for my Account is the one month LIBOR rate as published in the "Money Rates" table of *The Wall Street Journal*, rounded to three decimal places (the "LIBOR rate") on the first business day of the month during the billing cycle to which such rate is to apply. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.C below. Each billing cycle will (i) subject to (iii) below, start on the first calendar day of the month, and (ii) end on the last day of each calendar month during the term of this Agreement; subject however, to (iii) if the last day of any calendar month is a Saturday or a Sunday or a federal holiday then the last day of the applicable billing cycle will be the last business day of the month. For example, if the last day of any calendar month is a Saturday or Sunday or a federal holiday then those days will be carried over to the following billing cycle, and such billing cycle will commence on the relevant Saturday or Sunday or federal holiday as applicable. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value occurs.

[ ] If this box is checked, the applicable index for my Account is the highest "Prime Rate" as published in the "Money Rates" table of *The Wall Street Journal* (the "Prime Rate") at any time during the billing cycle. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.C below. Each billing cycle will (i) subject to (iii) below, start on the first calendar day of the month, and (ii) end on the last day of each calendar month during the term of this Agreement; subject however, to (iii) if the last day of any calendar month is a Saturday or a Sunday or a federal holiday then the last day of the applicable billing cycle will be the last business day of the month. For example, if the last day of any calendar month is a Saturday or Sunday or a federal holiday then those days will be carried over to the following billing cycle, and such billing cycle will commence on the relevant Saturday or Sunday or federal holiday as applicable. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value occurs.

Upon a change in the Index, any resulting change in my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate will take effect without prior notice to me, and will apply to any advances made during the applicable billing cycle and to the outstanding principal balance for my Account. The new **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new advances I obtain until my **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the **ANNUAL PERCENTAGE RATE** divided by 365.

C. The Margin to be used under paragraph 5.B above to determine my **ANNUAL PERCENTAGE RATE** is **2.450** % for my Account.

D. The maximum corresponding **ANNUAL PERCENTAGE RATE** that could apply is six percentage points (6.000%) above your Initial APR, or the maximum rate permitted by law, whichever is lower (the "Maximum APR"). The corresponding **ANNUAL**

**PERCENTAGE RATE** will never drop below 2.500% (the "Minimum APR") regardless of whether the Index plus my Margin is less than the Minimum APR at any point during the term of this Agreement. The corresponding **ANNUAL PERCENTAGE RATE** is a simple rate. The corresponding **ANNUAL PERCENTAGE RATE** includes only interest and not other costs.

In addition, the corresponding **ANNUAL PERCENTAGE RATE** is subject to the following limitations "Periodic Rate Limitations":

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** is fixed at the Initial Rate for the first 12 months. Beginning in the 13th month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than one percentage point during the first 24 months of the Account. Beginning in the 25th month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than two percentage points during the first 24 months of the Account. Beginning in the 25th month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than one percentage point during the first 60 months of the Account. Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

☐ If this box is checked, the corresponding **ANNUAL PERCENTAGE RATE** may not increase by more than two percentage points during the first 60 months of the Account. Beginning in the 61st month, the corresponding **ANNUAL PERCENTAGE RATE** will equal the Index plus Margin, subject only to the Minimum APR and Maximum APR limits.

Any change in my daily periodic rate and corresponding **ANNUAL PERCENTAGE RATE** will take effect without prior notice to me. The new rate will apply to both new advances made during the applicable billing cycle and to the outstanding principal balance for my Account until my rate changes again.

If I have agreed to make payments by pre-authorized electronic funds transfers (for example, by direct debit against a deposit account) sufficient to pay at least my Minimum Payment Due and if payments by such method become insufficient, at any time, to pay at least my Minimum Payment Due (because, for example, I cancel or reduce the amount of such transfers) then the Margin and the Periodic Rate Limitation or Periodic Rate Limitations shall be increased by 0.625 percentage points (0.625%). This may result in an increase in my daily periodic rate, the corresponding **ANNUAL PERCENTAGE RATE** and my Minimum Payment Due. Such increase shall be effective as of the first day of the billing cycle in which such insufficiency occurs and shall remain effective until the first day of the billing cycle following restoration of pre-authorized electronic funds transfers in amounts sufficient to pay my Minimum Payment Due. If I did not agree at the commencement of this Agreement to make payments by pre-authorized electronic funds transfers (for example, by direct debit against a deposit account) sufficient to pay at least my Minimum Payment Due, but during the term of this Agreement I agree to make payments by pre-authorized electronic fund transfers sufficient to pay at least my Minimum Payments Due then the Margin shall be decreased by 0.625 percentage points (0.625%) until the payment method becomes insufficient, at any time, to pay at least my Minimum Payment Due (as described above).

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THE AGREEMENT INCLUDING THIS ADDENDUM, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING THE TERMS AND CONDITIONS LISTED IN THIS ADDENDUM AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THE AGREEMENT AND THIS ADDENDUM. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME OWNER'S LINE OF CREDIT" AND THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE."

Dennis G. Burgin 6/4/07
DENNIS G. BURGIN Date

Marcene L. Burgin 6/4/07
MARCENE L. BURGIN Date