1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  RESIDENTIAL CAPITAL, LLC, et al.,      Case No. 12-12020-mg

7            Debtors.

8  - - - - - - - - - - - - - - - - - - - -x

9  JENNIFER L. WILSON,

10            Plaintiff,              Adv. No. 12-01936-mg

11       - against -

12  RESIDENTIAL CAPITAL, LLC, et al.,

13            Defendants.

14  - - - - - - - - - - - - - - - - - - - -x

15            United States Bankruptcy Court

16            One Bowling Green

17            New York, New York

18

19            February 6, 2014

20            10:07 AM

21

22  B E F O R E:

23  HON. MARTIN GLENN

24  U.S. BANKRUPTCY JUDGE

25

2

1

2  Doc# 6245 Motion for an Order Pursuant to Section 105 of the

3  Bankruptcy Code and Rule 9019 of the Federal Rules of

4  Bankruptcy Procedure Approving the Settlement Agreement Between

5  Debtor GMAC Mortgage, LLC and Lynn McLaughlin-Montero and Lynn

6  McLaughlin P.L.L.C..

7

8  Doc# 6278 Motion to Approve / Motion of the ResCap Liquidating

9  Trust for an Order Pursuant to Bankruptcy Code Section 105(a)

10  and Bankruptcy Rule 9019 Approving Settlement Agreement Between

11  Debtor GMAC Mortgage, LLC and Bay-Valley Mortgage Group

12  (related document(s)6277)

13

14  Doc# 6277 Motion to File Under Seal / Motion of the ResCap

15  Liquidating Trust, Pursuant to 11 U.S.C. 107(b) and Fed. R.

16  Bankr. P. 9018, to File Under Seal Redacted Portions of (I) The

17  Motion for an Order Pursuant to Bankruptcy Code Section 105(a)

18  and Bankruptcy Rule 9019 Approving Settlement Agreement Between

19  Debtor GMAC Mortgage, LLC and Bay-Valley Mortgage Group, and

20  (II) The Settlement Agreement

21

22

23

24

25

1

2    Doc# 6280 Motion to Approve / Motion of the ResCap Liquidating

3    Trust for an Order Pursuant to Bankruptcy Code Section 105(a)

4    and Bankruptcy Rule 9019 Approving Settlement Agreement Among

5    Debtor Residential Funding Company, LLC and CTX Mortgage

6    Company, Pulte Homes, Inc. and PulteGroup, Inc. (related

7    document(s)6279)

8

9    Doc# 6279 Motion to File Under Seal / Motion of the ResCap

10   Liquidating Trust, Pursuant to 11 U.S.C. 107(b) and Fed. R.

11   Bankr. P. 9018, to File Under Seal Redacted Portions of (I) The

12   Motion for an Order Pursuant to Bankruptcy Code Section 105(a)

13   and Bankruptcy Rule 9019 Approving Settlement Agreement Among

14   Debtor Residential Funding Company, LLC and CTX Mortgage

15   Company, Pulte Homes, Inc. and PulteGroup, Inc. and (II) The

16   Settlement Agreement

17

18   (Doc. nos. 5105, 5897, 6090) Hearing RE: Response to Debtors'

19   Objection to Proof of Claim No. 3835 Filed by Becky Spence.

20

21

22

23

24

25

1

2  Adversary proceeding: 12-01936-mg Wilson v. Residential

3  Capital, LLC et al

4  (CC: Doc no. 1) Status Conference

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2  A P P E A R A N C E S :
 3  MORRISON & FOERSTER LLP
 4      Attorneys for ResCap  Liquidating Trust and
 5        ResCap Borrower Claims Trust
 6      1290 Avenue of the Americas
 7      New York, NY 10104
 8
 9  BY:   NORMAN S. ROSENBAUM, ESQ.
10        DANIEL J. HARRIS, ESQ.
11
12
13  MORRISON & FOERSTER LLP
14      Attorneys for ResCap  Liquidating Trust and
15        ResCap Borrower Claims Trust
16      425 Market Street
17      San Francisco, CA 94105
18
19  BY:   ADAM A. LEWIS, ESQ.
20
21
22
23
24
25
```

1

2  POLSINELLI LLP

3       Attorneys for ??ResCap Borrowers Claims Trust

4       900 Third Avenue

5       21st Floor

6       New York, NY 10022

7

8  BY:   DAN FLANIGAN, ESQ. (TELEPHONICALLY)

9

10

11  KRIGEL & KRIGEL, P.C.

12       Attorneys for Becky Spence

13       4550 Belleview Avenue

14       Kansas City, MO 64111

15

16  BY:   ERLENE W. KRIGEL, ESQ. (TELEPHONICALLY)

17

18

19  ALSO APPEARING TELEPHONICALLY:

20       JENNIFER WILSON, PRO SE

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                                    7

```
 1                    P R O C E E D I N G S
 2              THE COURT:  All right.  Please be seated.  All right.
 3     We're here in Residential Capital, number 12-12020.
 4              Mr. Rosenbaum?
 5              MR. ROSENBAUM:  Good morning, Your Honor.  Norm
 6     Rosenbaum, Morrison & Foerster, for the ResCap  Liquidating
 7     Trust and the ResCap Borrower Claims Trust.  Your Honor, with
 8     me today are my colleagues Adam Lewis and Dan Harris.
 9              Your Honor, the first matter on the agenda is at page
10     3, II.
11              THE COURT:  Okay.
12              MR. ROSENBAUM:  These are three uncontested motions to
13     approve settlements.
14              Your Honor, the first matter is the motion for an
15     order, pursuant to Section 105 of the Bankruptcy Code and
16     Bankruptcy Rule 9019, to approve a settlement agreement between
17     GMAC Mortgage and Lynn McLaughlin-Montero and Lynn McLaughlin
18     P.L.L.C.  Your Honor, it's supported by the declaration of
19     Lauren Delehey, former chief litigation counsel for ResCap and
20     now the current chief litigation counsel for the liquidating
21     trust.
22              Your Honor, no objections were received.  This relates
23     to a pending adversary proceeding that GMAC commenced against a
24     former broker regarding disputed commissions.  And the
25     settlement provides for a release of approximately 12,000
```

RESIDENTIAL CAPITAL, LLC, et al.                                    8

1    dollars to GMAC.  And in turn, this will be submitted to the

2    liquidating trust.  Your Honor, no objections were received.

3    If Your Honor has any other questions, I'm happy to address

4    them.

5            THE COURT:  No.  Does anybody else wish to be heard

6    with respect to the McLaughlin 9019 settlement?

7            All right.  The McLaughlin -- the motion is at ECF

8    docket 6245.  It's supported by the Delehey declaration, which

9    is Exhibit 2 to the motion.  The Court has reviewed the motion

10   and the attached papers.  In applying the usual standard, as

11   always, I applied the Second Circuit's In re Iridium Operating

12   nonexclusive seven-factor test.  Since no opposition has been

13   filed, I won't go through each of the factors separately, other

14   than to say I've considered each, to the extent applicable in

15   the circumstances.  The motion to approve the settlement is

16   granted.

17           MR. ROSENBAUM:  Thank you, Your Honor.

18           The next item is number 2 on page 3 under II.  It's

19   the motion of the ResCap Liquidating Trust for an order,

20   pursuant to Bankruptcy Code Section 105 and Bankruptcy Rule

21   9019, approving a settlement agreement between GMAC and

22   Bay-Valley Mortgage Group.  Your Honor, we also filed a related

23   motion to seal partially redacted copies of the motion and the

24   settlement agreement.

25           Your Honor, this motion -- and there's a companion

1   motion, the next item under it -- these are related.  These

2   relate to the settlement of correspondent repurchase demands.

3   Your Honor, the Bay-Valley motion is supported by the

4   declaration of Deanna Horst, who is currently the claims

5   management professional for the liquidating trust, formerly for

6   ResCap.

7        Your Honor, no objections were received to the motion

8   itself.  In terms of the motion to seal, we did preview it with

9   the Office of the United States Trustee.  If Your Honor

10  recalls, there was an almost identical motion we filed to

11  approve the settlement agreement with GVC, and over time,

12  worked out language acceptable to the U.S. Trustee on the

13  sealing.  Your Honor, I'm happy to address the details of

14  the --

15        THE COURT:  All right.  Does anybody wish to be heard

16  either with respect to the 9019 motion or the 105 sealing

17  motion?

18        All right.  The sealing motion is at ECF 6277, and the

19  motion to approve the settlement is at ECF 6278.  As Mr.

20  Rosenbaum indicated, the proposed order on the sealing motion

21  is similar to the order that I did approve with respect to the

22  GVC Mortgage settlement.  That order is at ECF docket 6146.  No

23  objections have been filed.

24        Applying the usual standards for approval of settle --

25  first, with respect to the sealing motion, in light of the

1    order, again, similar to the order in GVC, which was

2    satisfactory to the U.S. Trustee, the sealing motion is

3    granted.

4            In applying the usual standards for approval of the

5    settlement, the seven-factor In re Iridium Operating test,

6    applying those factors relevant to the circumstances, the

7    motion is approved.

8            MR. ROSENBAUM:  Thank you, Your Honor.

9            The next matter on the agenda, Your Honor, is at page

10   4 under II, number 3.  This is an almost identical motion of

11   the ResCap Liquidating Trust for approval of a settlement

12   agreement, under Bankruptcy Code Section 105 and Bankruptcy

13   Rule 9019, approving a settlement agreement between debtor

14   Residential Funding Company, LLC and CTX Mortgage Company,

15   Pulte Homes, Inc. and PulteGroup, Inc.

16           Your Honor, this settlement resolves a pending

17   litigation in Minnesota on mortgage loan and purchase demands.

18   It's also supported by the declaration of Deanna Horst.  We

19   filed a similar companion motion to seal relevant portions of

20   the agreement and the motion.  No objections have been

21   received, Your Honor.

22           THE COURT:  Okay.  Does anybody wish to be heard with

23   respect to the settlement with Pulte?

24           I think I misspoke with the last motion.  I referred

25   to the sealing motion as 105; it's actually under the

RESIDENTIAL CAPITAL, LLC, et al.                    11

1  Bankruptcy Code Section 107, as is this.

2          And again, so the motion to approve the settlement is

3  at ECF 6280.  It's supported by the declaration of Deanna

4  Horst, which is Exhibit 2 to the motion.  The sealing motion is

5  at ECF 6279.  Once again, the order proposed here is similar to

6  the GVC, which, as I said before, is at ECF 6146.

7          The Court has reviewed the motion, the supporting

8  documents, also reviewed the sealing motion.  The sealing

9  motion is granted, and the motion to approve the settlement is

10  granted, applying the same standards for review of settlement

11  agreements.

12          MR. ROSENBAUM:  Thank you, Your Honor.  I will now

13  cede the podium to my colleague Adam Lewis.  This is page 4,

14  III.  It's the claims objection to the claim filed by Becky

15  Spence.

16          THE COURT:  Okay.

17          MR. LEWIS:  Good morning, Your Honor.  Adam Lewis of

18  Morrison & Foerster for the borrower's trust, on the Spence

19  claim objection.  I feel a little bit like the Maytag repair

20  person, given how crowded this courtroom usually is.

21          THE COURT:  I guess interest is dwindling.

22          MR. LEWIS:  This concerns an objection to the proof of

23  claim filed by Becky Spence.  The proof of claim was filed --

24  it's number 3 --

25          THE COURT:  So let me ask, is Ms. Spence's lawyer on

1    the phone?

2            MR. LEWIS:  Yeah, I think Ms. Krigel is.

3            MS. KRIGEL:  Yes, Your Honor.

4            THE COURT:  Okay.

5            MS. KRIGEL:  Good morning.  Erlene Krigel appears for

6    Becky Spence.

7            THE COURT:  Thank you very much, Ms. Krigel.

8            Go ahead.

9            MS. KRIGEL:  Your Honor, I'm having a difficult time

10   understanding debtors' counsel when he speaks.

11           THE COURT:  All right.  We'll try and get him to speak

12   more directly into the microphone.

13           MS. KRIGEL:  Thank you.

14           THE COURT:  Let me know if you have any trouble again,

15   okay?

16           MS. KRIGEL:  Thank you.

17           THE COURT:  Go ahead, Mr. Lewis.

18           MR. LEWIS:  Thank you, Your Honor.  The claim is

19   number 3835, was filed on November 9th of 2012.  The original

20   objection is docket 5105.  Ms. Spence filed her own response on

21   the 18th of October, but I don't have a docket number for that

22   one; it's a letter response.  The reply that we filed is docket

23   number 6090.  There's now a supplemental response; that's 6330,

24   and our supplemental reply which is 6395.

25           THE COURT:  Let me just -- Ms. Spence's pro se

1  response was at ECF 5897.

2          MR. LEWIS:  Thank you, Your Honor.  So what I'd like

3  to do, Your Honor, is do a little procedural history first on

4  this objection, and then get into the merits of it a little bit

5  more.

6          THE COURT:  Sure.

7          MR. LEWIS:  We filed the objection to the proof of

8  claim on September 18th.  Ms. Spence's response was a little

9  late, and so the hearing that was originally scheduled for

10  November was continued to December.  And at the December

11  hearing, on the eve of the December hearing, we were contacted

12  by Ms. Krigel -- first by Ms. Spence, saying she was getting

13  counsel, and then by Ms. Krigel, asking for a continuance,

14  saying she was going to -- as Ms. Spence and the Court will

15  recall, at the hearing in December, the Court set a new

16  schedule and allowed Ms. Krigel to file a supplemental

17  response.  That was originally due in mid-January.  She

18  contacted us, and we agreed to give her a short extension so

19  she could get some more information together.  And the point,

20  of course, of getting Ms. Krigel as counsel was to help Ms.

21  Spence to put her objection -- her position into cognizable --

22  legal and cognizable form and marshal her allegations and her

23  facts and so on.

24          Where we are now is we now have an objection response

25  that is mostly unsupported, unsworn statements.  There's a

1    little bit of sworn material.  It's sort of peripheral.  It has

2    to do with what homeowners were told about paying their rents

3    and --

4            THE COURT:  What tenants were told about paying their

5    rent.

6            MR. LEWIS:  Right -- tenants were told about paying

7    their own rents, and what some people overhead at one end of a

8    phone call, during the course of some discussions.  But most of

9    it is unsworn, including the key allegations by the debtor

10   herself.  And also, there are some notarized documents, but

11   that's not sworn testimony; that's authentication of a

12   signature.  That's a totally different thing.

13           THE COURT:  Mr. Lewis, the issue for me today is

14   whether this presents a contested matter as to which some

15   further proceedings are required.  And there are a few issues

16   as to which the Court has questions, based on the documents

17   that have been put before me.  But let me -- I'm going to allow

18   you to make your argument and then I'll allow Ms. Krigel to

19   make her argument, and then I'll, undoubtedly, have some

20   comments about it.

21           MR. LEWIS:  So now I'm going to go back to the merits,

22   because that's clearly where you would like to go.  And I think

23   the first point here is the point we made originally, which was

24   her original claim was based on the contention that we didn't

25   possess the notes when we foreclosed, and the foreclosures were

1   therefore void.

2           THE COURT:  They seemed to have dropped that issue.

3           MR. LEWIS:  Yeah, totally.  And in fact, they seem to

4   have gone to a completely different set of issues and claims.

5           THE COURT:  Well, I think one of the things that I've

6   been mulling is -- and you raise this issue that this is an

7   improper proposed amendment of a claim after the bar date.  And

8   I think the issue for the Court is whether the presentation is

9   such, and the facts and circumstances are such that the Court

10  would consider the additional allegations as part of the

11  original claim or as an amended claim.

12          MR. LEWIS:  I understand, Your Honor.

13          THE COURT:  So what I want to do for today -- I

14  understand your position that, essentially, they've changed the

15  claim and it's a late-filed claim and it shouldn't be

16  considered.  But for purposes of the argument today, what I

17  would ask you to do -- and I'm aware of all of those arguments,

18  Mr. Lewis, and I haven't made up my mind about it, okay.  But I

19  want you to deal with them on the merits.

20          MR. LEWIS:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. LEWIS:  Before I do that, I would just want to add

23  one point about the claim amendment thing.

24          THE COURT:  Yes.

25          MR. LEWIS:  The allegations that Ms. Spence later

1  raised are not allegations of facts that she wasn't aware of

2  when she filed her proof of claim.  Most of those concerned

3  things that she personally contends she was involved in.

4          THE COURT:  Look, I really am on top --

5          MR. LEWIS:  Okay.

6          THE COURT:  -- of the issues.

7          MR. LEWIS:  All right.

8          THE COURT:  Okay?

9          MR. LEWIS:  Okay.

10          THE COURT:  And what your time would be better

11  spent --

12          MR. LEWIS:  Very well, Your Honor.

13          THE COURT:  -- addressing -- and I'm not saying

14  whether I'm going to permit, essentially, an amendment of the

15  claim to raise new arguments that weren't raised before or not.

16  I'm not ruling on that now.  But I want you to address the

17  merits.

18          MR. LEWIS:  Okay.  Very well, Your Honor.  Well, the

19  merits are the following.  The first theory that Ms. Spence

20  uses now is that the foreclosures were void because we

21  cancelled the prior sales, and thereafter, we didn't properly

22  renotice them as required --

23          THE COURT:  Foreclosure sales --

24          MR. LEWIS:  Yeah.

25          THE COURT:  -- not fire sales.

1          MR. LEWIS:  Right; foreclosure sales.  We thereafter

2  didn't properly renotice them after they were cancelled.  The

3  fact is -- and it appears from the evidence that she submits,

4  if you look at her own -- she submits the grant deeds, or the

5  trustee's deeds, and they say "continued from".

6          THE COURT:  Four of the six --

7          MR. LEWIS:  Right.

8          THE COURT:  -- say "continued".

9          MR. LEWIS:  Right.

10         THE COURT:  But you haven't dispute -- as I understand

11 Missouri state law, you can only continue the sale for seven

12 days, and all six of the sales didn't take place within the

13 seven days; I think they were twenty-one days.  Okay.  So

14 even -- so for two -- you didn't address whether all six were

15 continued.  You point to the deeds that Ms. Krigel attached

16 that shows -- that recite that four of the six were continued,

17 but you didn't address whether the actual sales occurred within

18 the permitted time period under Missouri law.  And you can

19 address this, if you will, but as I understand Missouri law,

20 you can continue it once, for no more than seven days.  And

21 none of the six foreclosure sales occurred within seven days of

22 the original notice, am I correct in that?

23         MR. LEWIS:  Yes, Your Honor.  The answer to that

24 question is the Maynard case which says that, while that may be

25 true, it's not ground to void a sale.

RESIDENTIAL CAPITAL, LLC, et al.                    18

1        THE COURT:  Well, so let's focus on that for a minute,

2   because I've thought about that issue.  I understand your

3   argument of Maynard, and I'm going to ask Ms. Krigel whether

4   she has any contrary authority.  But it may be that you're

5   correct that the sales can't be voided, but that doesn't mean

6   that Ms. Spence wouldn't have a valid damage claim, that the

7   sales -- that whoever bought the property at the sale, the sale

8   is a valid sale.  It can't be set aside; it's not void.  But

9   that doesn't answer the question of whether Missouri would

10  recognize a damages claim for a sale that was not conducted in

11  accordance with Missouri law.  So you have the Maynard case

12  that basically says the sale's not void.

13        What about on the damage issue?

14        MR. LEWIS:  Well, Your Honor, if the sale is not void

15  because the procedure we used, if irregular, is acceptable,

16  because it meets the underlying --

17        THE COURT:  Well, don't tell me it's acceptable.  What

18  it is is -- first off, I take it you acknowledge that all six

19  sales -- that none of those six sales were conducted consistent

20  with Missouri law.

21        MR. LEWIS:  Consistent with the statute --

22        THE COURT:  Yes.

23        MR. LEWIS:  But I think consistent with Missouri law

24  under Maynard.

25        THE COURT:  Yeah --

1           MR. LEWIS:  I want to --

2           THE COURT:  I mean, you could continue the sale for

3    not more than seven days; otherwise, you'd have to renotice it.

4    Four of the six deeds recite that the sales were continued.

5    Two of them I don't know.  So I think there's -- there's no

6    evidence as to the other two as to whether they were continued

7    or cancelled.  You didn't put in any evidence on it.

8           But it doesn't answer my question about -- so the

9    Maynard supports your argument -- and we'll see whether Ms.

10   Krigel has anything to the contrary -- that the sales are not

11   void.  But it doesn't answer the question whether Ms. Spence

12   has a damage -- I don't know what her damages would be; it's a

13   different issue, but --

14          MR. LEWIS:  I think it does answer that question.

15          THE COURT:  Well, why does it answer --

16          MR. LEWIS:  If you look at the reasoning of Maynard,

17   the reasoning of Maynard is there's nothing wrong here in the

18   end because persons who are concerned could show up at the

19   original date and hear a new date.  They are in a position to

20   protect themselves.  Evidently, Ms. --

21          THE COURT:  Well, let me ask you this, Mr. Lewis.  If

22   you had to renotice the sales, how much notice was required?

23          MR. LEWIS:  To renotice the sales?

24          THE COURT:  Yes.

25          MR. LEWIS:  Well, I think that there's a minimum -- I

1    don't know the minimum amount of time, under Missouri law, for

2    an initial sale, so I'm not -- I don't really have the answer

3    there.

4              THE COURT:  Okay.

5              MR. LEWIS:  But once again, I mean -- and California's

6    not Missouri, but in California, for example --

7              THE COURT:  Well, let's talk about Missouri, not

8    California.  Go --

9              MS. KRIGEL:  Your Honor, if I might --

10             THE COURT:  No, Ms. Krigel, why don't you -- you'll

11   get your chance, okay?

12             MS. KRIGEL:  All right.

13             THE COURT:  Go ahead.

14             MR. LEWIS:  Your Honor, I think the point is the owner

15   has the ability to protect herself against a surprise sale by

16   showing up at a sale of the property that she contends she's

17   concerned with.  And that's the whole rationale behind Maynard.

18   And I think what it comes down to is a kind of assumption of

19   the risk issue here.  You could show up -- if you really cared

20   about the sale, you could show up.  Maybe the sale would go

21   through and that would be the end of it for you.  But on the

22   other hand, maybe it would be continued for some reason.  Maybe

23   you could persuade the secured creditor to continue it, for

24   some reason, and you would be there to know what the new date

25   is.  So you are in a position to protect yourself; you're

1   perfectly capable of doing that.  And the policy underlying the

2   Maynard decision, I think, applies equally to whether --

3            THE COURT:  Yeah, but --

4            MR. LEWIS:  -- there's a damage claim.

5            THE COURT:  But Maynard said that its holding "did not

6   preclude the possibility that under an appropriate evidentiary

7   setting the violation of that section could nullify and void a

8   foreclosure sale".  That's at page 391.  It's 952 S.W.2d at 391

9   is where I quoted from.  But it doesn't say what kind of

10  evidence is required.

11           So Maynard did not absolutely preclude a borrower from

12  seeking to void the sale.  I don't know what evidence they had

13  in mind, because they didn't say.  But what you're asking me to

14  determine, as a matter of law, that Maynard precludes Spence

15  from asserting a claim.  And while I might -- while, given the

16  passage of time, I think it would be unlikely -- I'm not saying

17  it couldn't happen -- that the sale would be voided.  I don't

18  know who owned -- I don't know how many times the property's

19  been sold since then, who owns it now, whether a good-faith

20  purchaser, et cetera.  But I don't see it precluding the

21  possibility of a damage remedy.

22           You're asking me to expunge the Spence claim.  And I

23  have no hesitancy about expunging claims, if the position of

24  the debtors is well taken.  But as to this aspect of it -- when

25  I say "this aspect", the portion of what's been raised now that

1    Homecomings failed properly to publish the foreclosure sales;

2    you acknowledge they didn't, right?  You've acknowledged

3    that --

4            MR. LEWIS:  After the initial --

5            THE COURT:  -- the sales were noticed, and we know at

6    least four of the six were continued; I don't know as to the

7    other two.  But a continuance is not permissible under the

8    statute for more than seven days, and these sales didn't occur

9    within seven days.

10           MR. LEWIS:  Well, Your Honor, I would urge that

11   there's no essential difference, given the policy that's

12   enunciated --

13           THE COURT:  It's interesting, you argued Maynard, but

14   I had to dig -- you didn't come out and say, Maynard says that

15   a sale that didn't comply is void.  You didn't point out in

16   your argument that, by the way, we continued it, but it didn't

17   happen within the seven days.  One had to dig to see these

18   sales didn't happen in the seven days.

19           MR. LEWIS:  Well, I guess, Your Honor, we didn't say

20   that because we didn't consider it to be a relevant fact, given

21   our reading of Maynard.

22           THE COURT:  I did.

23           MR. LEWIS:  I gather, Your Honor.

24           THE COURT:  I did.

25           MR. LEWIS:  But I would urge that, given the rationale

1    of Maynard, the essential facts here are the same.  There might

2    be some other set of facts, as Maynard speculates --

3              THE COURT:  Are there any other -- did you find any

4    other cases other than Maynard?

5              MR. LEWIS:  No, Your Honor, no cases pointing to an

6    alternative outcome on these kinds of facts.  And I don't see

7    any essential --

8              THE COURT:  Well,  you say " no cases pointing to an

9    alternative outcome", but the Court in Maynard specifically

10   left open -- didn't preclude the possibility that, under an

11   appropriate evidentiary setting, the violation of this

12   statutory section could nullify and void a foreclosure sale.  I

13   don't know what that means.

14             MR. LEWIS:  Yeah, under a different set of facts is --

15   what I take it to mean, they're saying different circumstances

16   might result in a different outcome.  But in this case --

17             THE COURT:  That's what says to me that I've got to

18   have an evidentiary hearing to determine all of the facts

19   before I can make a determination.

20             MR. LEWIS:  Well, Your Honor, I respectfully disagree.

21             THE COURT:  All right.  All right.

22             MR. LEWIS:  But there it is.  I mean, I think

23   Maynard --

24             THE COURT:  So that's -- I have to say that you've

25   gone to the main point that I'm troubled by, this issue about

RESIDENTIAL CAPITAL, LLC, et al.                    24

1   the sales.  You also argue that the claimant has failed to

2   basically establish damages on a breach of contract claim.

3          MR. LEWIS:  That's right, Your Honor.

4          THE COURT:  And I guess my reaction there, Mr. Lewis,

5   and you can address it, is that the issue of the quantum of

6   damages can't be resolved based on a claim objection.  And the

7   issue for me is whether the claimant has stated a claim for

8   breach of contract, in which case she's entitled to an

9   opportunity to prove her damages.

10         MR. LEWIS:  Well, I guess our argument there, Your

11  Honor, is she doesn't present any evidence or any argument that

12  she had any alternatives that she could have pursued.  The fact

13  is Ms. Spence was in default on a number of properties.  She

14  didn't have the money to pay the defaults.  And that's not

15  really in dispute; that's why there were foreclosures on the

16  way.

17         THE COURT:  Well, she says she was denied a

18  1.8-million-dollar loan that would have allowed her to

19  refinance some of the properties, and another 35-million-dollar

20  loan for beginning construction on a hotel.  So she suffered

21  economic losses due to the raising of certain of her properties

22  in anticipation of receiving loans for constructing the hotel.

23  I mean, in her supplemental resp -- you said she didn't

24  establish any damages, and in the supplemental response they

25  come back and -- it's not proof, but they've raised a number of

1    arguments about how she was damaged.  Whether they're valid or

2    not, that's different; I'm not making any comment about it

3    whatsoever.  But --

4            MR. LEWIS:  Your Honor, if you look at that one, for

5    example, that letter  --

6            THE COURT:  Yes.

7            MR. LEWIS:  -- which, again, is unsworn; I mean, it's

8    just a letter.

9            THE COURT:  Okay.

10           MR. LEWIS:  And you're supposed to present conflicting

11   evidence, especially having gotten counsel at these

12   proceedings; that's the whole point is there's conflict -- it's

13   almost -- the analogy I would draw, I suppose, is something

14   like a summary judgment.  If there's a genuine --

15           MS. KRIGEL:  I'm sorry, Your Honor.  I cannot

16   understand --

17           MR. LEWIS:  I'm sorry.

18           MS. KRIGEL:  -- debtors' counsel.

19           THE COURT:  Okay.

20           MR. LEWIS:  It's a little like a summary judgment,

21   it's whether there's a genuine dispute of fact that needs to be

22   tried.  There isn't a genuine dispute of fact here because, on

23   the Spence's side, there are very few evidentiary facts before

24   the Court.  There's a lot of statements, but very few

25   evidentiary facts, including on this issue.

RESIDENTIAL CAPITAL, LLC, et al.                       26

1         And if you look at that letter, the letter talks about

2    the -- the loan fell through because of derogatory information.

3    Ms. Spence was in default; of course there was derogatory

4    information.  She was in default at that point.  And that was

5    not our fault.  It's not because of anything bad we did.  She

6    was in default, so she didn't get her loan.  That's not our

7    fault.  It's her fault.

8         THE COURT:  Okay.

9         MR. LEWIS:  I'm not blaming her for it, but that's a

10   fact.  And so there's no evidence that the derogatory

11   information had anything to do with what we did that she said

12   we did wrong.  The derogatory information we know about, if

13   there was any at that point, would be she was in default and we

14   would report that to a credit agency.  That's how that works.

15   So again, I don't see any real issue of fact that the response

16   has created.

17        THE COURT:  Well, I guess maybe your position is

18   you're privileged in reporting -- the debtors were

19   privileged --

20        MR. LEWIS:  Yeah.

21        THE COURT:  -- in reporting the default to a credit

22   agency.

23        MR. LEWIS:  And there's no suggestion that what we

24   reported was inaccurate.

25        THE COURT:  All right.

RESIDENTIAL CAPITAL, LLC, et al.                  27

1            MR. LEWIS:  And once again, Ms. Spence, with Ms.

2   Krigel's help on this round, had the option to develop that

3   evidence --

4            THE COURT:  Well --

5            MR. LEWIS:  -- but didn't.

6            THE COURT:  All right.  Any other arguments?

7            MR. LEWIS:  Only if you have any other questions, Your

8   Honor.  I mean, I think that's --

9            THE COURT:  Let me look back at my notes, okay?

10           MR. LEWIS:  Sure.

11           THE COURT:  So on the issue of the notification of the

12   tenants to stop paying Ms. Spence the rent, is there any

13   Missouri case law as to whether the notice has to be in writing

14   or not?

15           MR. LEWIS:  Not that I'm aware of.

16           THE COURT:  Okay.  And what evidence do I have that

17   the tenants were notified orally -- were they -- because Ms.

18   Krigel raised the issue about, well, were they told who to pay

19   it to.  Were tenants -- did tenants simply stop paying rent, or

20   did they pay the rent to Homecomings?  What happened?  What are

21   the facts?

22           MR. LEWIS:  Well --

23           THE COURT:  And I know I don't have an evidentiary

24   record, but I'd like to --

25           MR. LEWIS:  And I'm not --

1          THE COURT:  -- know what --

2          MR. LEWIS:  -- sure that I --

3          THE COURT:  I want you to represent what you can --

4          MR. LEWIS:  Yeah.

5          THE COURT:  -- about what --

6          MR. LEWIS:  Understood.

7          THE COURT:  -- what the evidence would show.

8          MR. LEWIS:  And I'm not sure that I have the evidence

9   now about what actually happened to the money, whether they

10  just held it or they gave it to us.  But I'd urge the Court

11  that that's not relevant, because the key issue, under Missouri

12  law, is whether the lender exercises control, and we did that.

13         THE COURT:  Well, the issue is --

14         MR. LEWIS:  Whether we told them --

15         THE COURT:  -- do you exercise control by orally

16  telling your tenants to stop paying Spence.  I don't know.  I

17  mean, you don't have any cases; they don't have any cases.

18         MR. LEWIS:  Well, Your Honor, they're the ones who are

19  making the point, and I think it's incumbent on them to have

20  cases that say that what we did isn't appropriate.

21         THE COURT:  They did say that.  And neither side has

22  any cases.  You don't have any cases that say they're wrong,

23  and they don't have any cases that say that they're right.  I

24  don't know what the law is, okay?  I understand about the issue

25  of possession, all right?  I don't know how I'm going to come

RESIDENTIAL CAPITAL, LLC, et al.                    29

1    out on this point, but that's why I want to know -- I'm going

2    to ask Ms. Krigel does she have any cases.  I mean, you didn't

3    have any cases.  I didn't see any in her submission.

4         MR. LEWIS:  There's one further point on this issue,

5    Your Honor, and that's -- we also pointed out that, by Ms.

6    Spence's own account, the money that she would have gotten in

7    rent, she would have used to maintain the properties, not to

8    solve her other financial problems.  Well, if anybody was hurt

9    by that, it was Homecomings, which foreclosed on properties

10   that might not have been worth what they otherwise would have

11   been if they'd been maintained, if maintenance was an issue at

12   all.  So there's no damage, even if there's a wrong.  And under

13   Missouri law, as we indicated with case law, you have to have

14   damages to have a claim.  And there are no damages here.  It's

15   on the face of Ms. Spence's own position that she has no

16   damages.

17        THE COURT:  Okay.  Let me ask you one other question.

18        MR. LEWIS:  Yes, Your Honor.

19        THE COURT:  In paragraph 14 of the supplemental

20   response, Spence asserts that Homecomings, "both over the phone

21   and in writing", although she didn't attach the writing,

22   "represented that it would cancel the second foreclosure

23   sales".  And what's your position on that?

24        MR. LEWIS:  We have no evidence that that ever

25   happened.  In fact, the only evidence we have is that, at least

1    in four cases, and probably in six, because that's probably how

2    the other two trustee's deeds would have read, they were

3    continued.

4          THE COURT:  Well, that doesn't -- with all due

5    respect, Mr. Lewis, that doesn't address the issue of whether

6    representation was made to Spence by Homecomings that the

7    second sale would be cancelled or adjourned or what have you.

8    What they put in are four of six deeds, the four deeds saying

9    it was continued.  Interesting, but it wasn't -- the sales

10   didn't occur consistent with the statute within seven days of

11   the original sale date.  At least as to the four, it would

12   appear that there's evidence that the first sale wasn't

13   cancelled; it was continued.  It just seems to have gotten

14   continued for longer than the statute permitted.  But that

15   doesn't address the issue of -- I mean, has somebody gone to

16   the servicing notes to see whether there is anything in the

17   servicing notes that addresses cancellation, continuation of

18   the sales, et cetera.

19         MR. LEWIS:  To my knowledge, there's nothing in the

20   servicing notes that --

21         THE COURT:  When you say there's nothing -- have you

22   looked?

23         MR. LEWIS:  I have asked that it be looked for, and

24   I've been told that there's no indication one way or the other.

25         But ask yourself, Your Honor, first of all, if she's

1  asking for some accommodation for trying to find some money,

2  why would we cancel the sales instead of continue them?  I

3  mean, it makes no sense to do that.

4          THE COURT:  I don't know.

5          MR. LEWIS:  And secondly, Your Honor, once again, we

6  have no evidence --

7          THE COURT:  I'll accept that as to four of them --

8  because the only evidence before me are the deeds -- that four

9  of them were continued.  The problem is I don't know whether

10  there's anything in the servicing notes about, all right, we

11  continued the sales, we'll reschedule it for such and such

12  date.  Is this issue addressed in the servicing notes?

13          MR. LEWIS:  Not that I'm aware of, Your Honor.

14          THE COURT:  And you specifically inquired, and that's

15  what you've been told?

16          MR. LEWIS:  I have.

17          THE COURT:  Okay.  All right.  Let me hear from Ms.

18  Krigel.

19          MR. LEWIS:  Thank you, Your Honor.

20          THE COURT:  Go ahead, Ms. Krigel.

21          MS. KRIGEL:  Thank you, Your Honor.  Well, I would

22  like to first address the Maynard case, because I think that in

23  looking at the Maynard case, the facts in that case were that

24  the lender had continued a sale for seven days but then

25  continued it again for a second seven days.  And the Court in

1   that case held that it wasn't a problem because the fact that

2   they continued it for two seven-day extensions was not enough

3   to feel that it violated the spirit of the statute.

4           In our case, we're not talking about just one seven

5   days and then another seven days.  If they really continued it,

6   they continued it for much more than seven days, which, in

7   effect, was not a continuance but a cancellation, because the

8   statute didn't provide for that type of a continuance.

9           The Maynard case, at 392, does recognize that a

10  borrower may have a claim for damages.  And Maynard cites two

11  other cases.  One is Graham v. Oliver at 659 S.W. 601.  It's a

12  1983 Missouri Court of Appeals decision.  And in that decision,

13  the Court held that there are some procedural requirements so

14  fundamental to a foreclosure sale that failure to observe them

15  must be held to cause a sale and a resulting trustee's deed to

16  be void.  And the Graham court seems to cite the failure to

17  publish as one of those failures.  We believe that even if four

18  of the six deeds recited that it was a continuance, it couldn't

19  have been a continuance because, again, it was for much more

20  than the seven days.  The second case that Maynard cited is

21  Zdazinsky, it's Z-D-A-Z-I-N-S-K-Y v. Four Seasons Lakesides,

22  Inc., 901 S.W.2d 224, 225.  It's a 1995 Missouri Court of

23  Appeals decision.  It also stood for the same proposition.

24          So we believe there's ample case law in Missouri to

25  find that while exactly seven days, there may be some leeway

1    there, based on what Maynard had to say, it doesn't give free
2    reign to the lender to just select whatever continuance it
3    wants.  And so we feel that if they believed it was a
4    continuance, it wasn't; it couldn't have been, because it was
5    for much more than what the statute allowed.
6          I also want to point out, Your Honor, that as part of
7    Ms. Spence's pro se initial response, she provided in her
8    response copies of reinstatement quotes that she had received
9    from Homecomings, providing her with what amounts needed to be
10   paid in order to bring these loans current.  And each
11   reinstatement quote gave her a date through which reinstatement
12   would be valid.  And the dates on most of those quotes was June
13   10th, 2008. The sale dates on most of the properties was June
14   11th, 2008.  So in my --
15         THE COURT:  So she didn't --
16         MS. KRIGEL:  -- in my mind, Your Hon --
17         THE COURT:  Ms. Krigel, she didn't cure by June 10th,
18   correct?
19         MS. KRIGEL:  That is correct.
20         THE COURT:  So the sales --
21         MS. KRIGEL:  But in my mind, Your Honor, they would
22   have cancelled the sales because they gave her a new
23   opportunity to try and bring the loans current.
24         THE COURT:  She didn't do it, though.
25         MS. KRIGEL:  That is correct, she did not do it.

1          THE COURT:  So it's not like they jumped the gun and

2     sold the property before -- they gave her a chance to cure.

3          MS. KRIGEL:  Right, but they --

4          THE COURT:  They told her that --

5          MS. KRIGEL:  But she didn't have notice of the new

6     foreclosure dates because they did not provide that

7     notification.  And in the Zdazinsky case, it says that if the

8     lender gives the borrower a belief that the sale will be

9     delayed or cancelled, that the lender has to give the borrower

10    actual notice of the sale.

11         So the fact that they gave her some accommodation and

12    then they went ahead and foreclosed, I believe, based on

13    Missouri case law, they needed to have given her her proper

14    notice of the subsequent foreclosure sale.  And by just merely

15    saying we continued it isn't enough.  They didn't give her any

16    additional notice.  Their own documents support that.  Their

17    own documents say the only notice we gave was for the original

18    sale date.

19         THE COURT:  But, Ms. Krigel --

20         MS. KRIGEL:  So --

21         THE COURT:  -- let me ask you.  I asked Mr. Lewis this

22    question.  In paragraph 14 of your supplemental response --

23         MS. KRIGEL:  Yes, sir.

24         THE COURT:  -- you assert that Homecomings, both over

25    the phone and in writing, represented it would cancel the

RESIDENTIAL CAPITAL, LLC, et al.                    35

1  second foreclosure sales.  Where's the writing?  You didn't

2  attach it.  What is the writing?  Where is it?

3           MS. KRIGEL:  Well, at this moment, Your Honor, I'm not

4  sure if I recall where she told me that the delay -- I know

5  that it was orally given to her.  I can't say other than I

6  understood it to be in these communications, the reinstatement

7  quote communica --

8           THE COURT:  Yeah, but your pleading said it was in

9  writing.

10          MS. KRIGEL:  Right.

11          THE COURT:  It said orally and in writing, but you

12  didn't attach it, and so I want to know -- I want to see the

13  writing.

14          MS. KRIGEL:  Okay.  All right.  Well, Your Honor, I

15  apologize that I don't have that information in front of me at

16  the moment.

17          THE COURT:  Okay.

18          MS. KRIGEL:  I don't know that.

19          THE COURT:  Okay.

20          MS. KRIGEL:  I would also like to address one other

21  point that was made -- one moment -- that has to do with the

22  Court wanting to know our position on the assignment of rents

23  and the fact that it was an oral communication but we believe

24  to be not sufficient to qualify.  And we had cited a Northwest

25  Commons case, 136 B.R., 215, that's an Eastern District of

1    Missouri 1991 decision.  And in that case, Your Honor, I think

2    I cited in my brief that that case stood for the proposition

3    that the lender must give the tenants a written notice of its

4    demand for the rent, and the notice must provide the tenant

5    with enough information for the tenant to know who to pay and

6    where to send the payment.  And we believe that, again, while

7    the representative for the lender told the tenants not to pay

8    the rent, they didn't tell the tenants who to pay or where to

9    pay it.  And we believe that that created two problems, one of

10   which is with not knowing who to pay or where to pay it, they

11   didn't pay anyone.  And if they had either paid Ms. Spence or

12   paid the lender, it would have at least reduced what arrearage

13   she was accruing, as well as potentially helping her to try and

14   bring enough money to the table to reinstate the loan.

15           THE COURT:  Ms. Krigel, I read Northwest Commons

16   differently than you've just described.  It required the lender

17   to give notice "that it is activating its rights under an

18   assignment of rent clause".  But the lender in Northwest

19   Commons did notify the tenants by mail of its intent to

20   exercise its rights under an assignment of rents clause.  It

21   didn't seem to me that the Court announced a per se rule that

22   notice must be given in written form.  It was there.  And --

23           MS. KRIGEL:  Your Honor, I'm not complaining about the

24   fact --

25           THE COURT:  Well, but you're relying on Northwest

1    Commons --

2          MS. KRIGEL:  -- that the notice wasn't in writing.

3          THE COURT:  Hold it.  Stop.  You argued to me that

4    Northwest Commons holds that the notice has to be in writing,

5    and I don't read the case that way.  It was in writing there.

6    There were other problems about it.  But I didn't see the Court

7    saying it had to be in writing.  You think it does?

8          MS. KRIGEL:  No, Your Honor.  I think that our

9    complaint is that the notice was insufficient because it merely

10   told them not to pay; it didn't tell them who to pay and where

11   to pay it.  And we believe that, based on this decision, that

12   that was what caused the notice to be defective.

13         THE COURT:  Can you tell me -- are you able to

14   represent facts as to what the -- did all the tenants -- did

15   they pay the rent to the mortgagee?  Did they stop paying the

16   rent at all?  Can you represent to me what the facts would

17   show?

18         MS. KRIGEL:  I believe they stopped paying the rents

19   completely.  And I believe that Ms. Spence, in her pro se

20   response, did attach -- I think there were three parts in her

21   response that she sent me.  And in the second part there was a

22   letter from a tenant, a former tenant that indicated that they

23   did not know where to send the payment or to who.

24         THE COURT:  Okay.  Anything else you want to argue,

25   Ms. Krigel?

1          MS. KRIGEL:  I'm sorry?

2          THE COURT:  Anything else you wish to argue?

3          MS. KRIGEL:  Well, Your Honor, I didn't know if you

4   wanted me to address the issue of the debtors' complaint that

5   this was an improper amendment of the claim after the bar date,

6   because I am prepared to speak on that if the Court --

7          THE COURT:  I cut Mr. Lewis off on speaking -- I think

8   I have that clearly in mind.  I'm not ruling now; I'm taking

9   the whole thing under submission, but --

10          MS. KRIGEL:  All right.

11          THE COURT:  Because if I let you argue it, then I've

12   got to let Mr. Lewis argue it as well, and I'm not sure that

13   we're going to accomplish a whole lot by diving in there.  I

14   understand the arguments about --

15          MS. KRIGEL:  All right.

16          THE COURT:  -- whether to permit this as -- whether

17   it's a permissible amendment or not, et cetera.  I just haven't

18   decided what we're doing.  That's why I wanted -- and I'll give

19   you a chan -- I mean, I asked Mr. Lewis to address the claim on

20   the merits, and that's what I want you to do as well.  I think

21   you've done that.

22          MS. KRIGEL:  Okay.  And Your Honor, so the only item

23   that I think I would bring to your attention was that on June

24   11th of 2013, after Ms. Spence had filed her claim, Morrison &

25   Foerster did send her a letter that said -- that invited her to

1    provide more information for her wrongful foreclosure as the

2    basis of her claim.  So again, I believe that they understood

3    that that was the basis of her --

4          THE COURT:  Well, they did that because it was a -- I

5    had entered a procedures order with objections to borrower

6    claims.  And special counsel to the creditors' committee, who

7    happens to be sitting in the back of the courtroom -- that was

8    part of the procedures with objections to borrower claims;

9    because so many of them were pro se, there was a notice,

10   essentially, a letter that would go to the borrowers, basically

11   asking them for more information.

12         MS. KRIGEL:  Yes.

13         THE COURT:  And because I didn't want to be ruling on

14   borrower's claims without sufficient information in front of

15   me.  That was -- that's essentially why it was agreed that that

16   procedure would be adopted.

17         MS. KRIGEL:  And that is why, Your Honor, Ms. Spence

18   did attempt on or her own, pro se, to provide that information.

19   And it, again, was not for the purpose of amending or changing

20   her claim but just to flesh out and provide debtors' counsel

21   and the Court with additional information.

22         THE COURT:  What would be helpful if you would

23   address, Ms. Krigel, and I'd ask Mr. Lewis about this at the

24   end, I'm not sure what breach of contract you're saying there

25   was.  You also seem to be alleging tortious interference with

RESIDENTIAL CAPITAL, LLC, et al.                    40

1    contract.  It's unclear to me what contract you're talking

2    about, what the terms of it are.  The papers talk about receipt

3    of a payment from Elegant, and it all seemed quite iffy to me.

4    So what contract do you say was breached?  What contract do you

5    say was tortiously interfered with?

6         MS. KRIGEL:  The contracts that were tortiously

7    interfered with were her leases with her tenants because those

8    provided for the tenants to pay her the rent.  And they were,

9    in fact, paying her the rent until the representatives of

10   Homecomings approached the tenants and orally told them to stop

11   paying.

12        And it's our position that because the attempt at

13   making an assignment of rents claim was improper and because

14   later the foreclosures were improperly performed, that those

15   created not only a breach of contract for the deeds of trusts

16   and contract that she had with Homecomings but created a breach

17   of -- a tortious interference with her contract rights with her

18   tenants.

19        THE COURT:  All right.  So that's what you're talking

20   about; you're talking about the leases that she had with

21   tenants in the building?

22        MS. KRIGEL:  Yes, Your Honor.

23        THE COURT:  Okay.  Would you -- you agree that Ms.

24   Spence was in default, correct?

25        MS. KRIGEL:  Yes, Your Honor.

1       THE COURT:  And I take it you would agree that

2   Homecomings, if they had given written notice to the tenants

3   with the particulars that you say they had to do, that that

4   would have authorized them to direct the tenants to stop paying

5   Ms. Spence, correct?

6       MS. KRIGEL:  That is correct, Your Honor.

7       THE COURT:  Okay.  And so your argument relates to it

8   was done orally instead of in writing, it was -- they didn't

9   tell the tenants where to send the money, and for that reason

10  you think they didn't trigger possession that was necessary for

11  the assignment of rents, that's your position?

12      MS. KRIGEL:  That is correct, Your Honor.

13      THE COURT:  Okay.  Wouldn't you agree that Ms. Spence

14  had no right to continue to collect the rent if Homecomings, in

15  fact, did trigger the assignment of rents?

16      MS. KRIGEL:  If they had properly triggered it then

17  that is correct, she would not have had the right to collect

18  the rents.

19      THE COURT:  Okay.

20      MS. KRIGEL:  But she could have had the expectation

21  that the rents were being paid to the lender, and that the

22  lender would then apply those payments to her mortgage.

23      THE COURT:  Was she -- did the property sell for less

24  than the secured debt, or was she under water?

25      MS. KRIGEL:  I believe that they did sell for less.

1    And I don't -- and in Missouri when a lender forecloses, they

2    have, essentially, free reign to bid in almost any number.

3    Missouri law says that in order to set aside a foreclosure sale

4    the sale price has to shock the conscience of the community.

5    And courts have held that as low as twenty percent does not

6    shock the conscience.  So --

7            THE COURT:  Under Missouri law where there's

8    nonjudicial foreclosure, is the lender entitled to a deficiency

9    claim against the borrower?

10           MS. KRIGEL:  Yes.

11           THE COURT:  I don't know this may have been

12   nonrecourse loans, but in many states where there's nonjudicial

13   foreclosure, if a lender pursues it they can't seek a

14   deficiency.

15           MS. KRIGEL:  No.  No, Your Honor.  In Missouri there

16   is a right to pursue a deficiency.

17           THE COURT:  And did Homecomings pursue a deficiency

18   against Ms. Spence?

19           MS. KRIGEL:  I don't believe so, Your Honor, because,

20   in part, she had filed a Chapter 11 later in 2008, and I -- and

21   named them as a creditor in that proceeding.

22           THE COURT:  Okay.

23           MS. KRIGEL:  That was not the Chapter 11 that I'm

24   involved with.  That one was dismissed, and a second one was

25   filed, and I'm counsel on that second Chapter 11.

1        THE COURT:  So would you agree if the property had

2   sold for less than the secured debt that Ms. Spence was not

3   harmed by not receiving the rents, because the rents would have

4   gone to the mortgagee and not to Ms. Spence?

5        MS. KRIGEL:  I wouldn't agree with that, respectfully,

6   Your Honor, because I believe that she was cash flowing, and

7   that the rents were actually in excess of the mortgage amount.

8   And therefore, had they been collecting the rents it could have

9   been enough to help or move forward to reinstate those loans.

10        THE COURT:  How much were the -- do you know -- I

11   don't know, there were six properties, but do you know how much

12   the arrears were on each property at the time the foreclosures

13   took place?

14        MS. KRIGEL:  Yes, Your Honor, I think, again, attached

15   as part of her supplemental response, it appears that they were

16   somewhere between 6 and 9,000 per property.

17        THE COURT:  Okay.  All right.  Anything else you want

18   to add, Ms. Krigel?

19        MS. KRIGEL:  No, Your Honor.

20        THE COURT:  Mr. Lewis.

21        MR. LEWIS:  Thank you, Your Honor.  Just a few things.

22        First of all, to get to the issue you have just been

23   discussing, the rents, it's worth remembering that Ms. Spence,

24   in her supplemental reply, said she would have used the rents

25   to pay for maintenance.  Now we're hearing she would have used

1  it to try to shorten up her shortfall.  That's a totally

2  different story, and we have no evidence that it would have

3  been successful anyhow.  So once again, I don't think there's

4  been any harm even if the rents are an issue.

5        I don't think the rents are an issue because, first of

6  all, as the Court notes, Northwest doesn't say that a notice

7  has to be in writing.  It was --

8        THE COURT:  It doesn't say it doesn't either.

9        MR. LEWIS:  No, but it was; it doesn't address the

10  issue at all.

11        And then, secondly, the key issue for exercising

12  control over rents and profits clause is control.  And we were

13  exercising control of what to do with that money.

14        THE COURT:  Maybe you were, maybe you weren't; I have

15  to decide that.

16        MR. LEWIS:  Okay.  Well, I understand that.  I'm just

17  sort of tossing in my arguments for your consideration here.

18        THE COURT:  Here's what I -- I think I -- I'm going to

19  take the matter under submission.  But, Ms. Krigel, I'm going

20  to give you until next Wednesday to produce the writing that

21  you say exists in paragraph 14 of your supplemental response.

22        MS. KRIGEL:  All right.

23        THE COURT:  If no such writing exists, please state

24  that clearly, okay.

25        MS. KRIGEL:  All right.

RESIDENTIAL CAPITAL, LLC, et al.                    45

1           THE COURT:  And file a copy as part of a pleading on

2    ECF, and that way the debtor will get it as well.

3           Mr. Lewis, I want to see the servicing notice.

4           MR. LEWIS:  I was just going to suggest, Your Honor,

5    we'll take another scrub at that.

6           THE COURT:  And I know that it exists.  So I want the

7    servicing notes for these properties, and attach them to a

8    document on ECF so that Ms. Krigel has them as well.  I'm going

9    to take the matter under submission.  Is it possible to get

10   those by next Wednesday as well?

11          MR. LEWIS:  The servicing notes?

12          THE COURT:  Yes.

13          MR. LEWIS:  Oh, sure.

14          THE COURT:  Okay.  All right.  So both these -- one

15   from each side, I want to see the stuff by next Wednesday, and

16   I'll reserve decision.  It will be submitted after I receive

17   those documents.

18          MR. LEWIS:  Your Honor, may I just make a comment on

19   Graham?

20          THE COURT:  Go ahead.

21          MR. LEWIS:  In Graham --

22          THE COURT:  I didn't read Graham.

23          MR. LEWIS:  I understand.  So --

24          THE COURT:  I'll go back and read Graham.

25          MR. LEWIS:  I'll call your attention to this and then

RESIDENTIAL CAPITAL, LLC, et al.                                      46

 1    you'll see it for yourself.

 2              THE COURT:  Okay.

 3              MR. LEWIS:  In Graham, the court says that what

 4    happened has to have been so fundamental as to affect the

 5    meaning of the process, essentially.  And in Graham what

 6    happened was the publication -- the initial publication had the

 7    wrong property description in it; it didn't relate to the

 8    property that was at issue.

 9              We're nothing like that here.  Once again, we have a

10    situation where you have potential continuity of notice of the

11    sale dates if you show up at the sales.

12              THE COURT:  Potential.  Mr. Lewis, do you know who

13    owns the property at this time?

14              MR. LEWIS:  I don't, Your Honor.

15              THE COURT:  Did Homecomings buy it at the foreclosure

16    sales?

17              MR. LEWIS:  That I don't know either, but I'll find

18    out for the Court.

19              THE COURT:  Okay.  I'd like to know because this --

20    and Ms. Krigel, do you know what happened to the properties?

21              MS. KRIGEL:  Yes, Your Honor.  According to the

22    trustee's deeds, it looks like Deutsche purchased them and it

23    shows the purchaser as Deutsche in care of Countrywide.

24              THE COURT:  Yeah, but I don't know who owns them

25    today.  I mean --

RESIDENTIAL CAPITAL, LLC, et al.                    47

1           MS. KRIGEL:  Oh, I don't know who owns them today, no.

2           MR. LEWIS:  I don't know that we know, but we will do

3    what we can to find out.

4           THE COURT:  All right.  That might take a little

5    longer to figure out.

6           MR. LEWIS:  We'll try to do it by Wednesday, but we'll

7    see what they can come up with.

8           THE COURT:  I'll give you till next -- I'll give both

9    of you till a week from tomorrow, Friday, give you a couple of

10   extra days.  This may be a little more complicated to figure

11   out.

12          But where this goes, I mean, look, if -- I assume that

13   these mortgages were in a securitization trust with Deutsche

14   Bank as the trustee; that's what it sounds like to me.  I can't

15   imagine they want to inventory this property very long, and I

16   suspect it's been sold -- this is a total surmise on my part --

17   been sold -- property's been sold.  I don't know who owns it

18   now.

19          And, certainly, in terms of -- if I were to determine

20   that a claim has been stated and subsequent proceedings had to

21   be held, this might go to whether the only remedy is a damage

22   remedy or -- I don't -- to be quite honest, don't see myself

23   canceling a deed if this property's been transferred to a good-

24   faith purchaser for value downstream of Deutsche Bank.  But

25   that's all surmised.  I don't know what I'm going to do yet,

1   but --

2           MR. LEWIS:  Your Honor, if we can't figure out by next

3   Friday --

4           THE COURT:  At least give me a status letter.

5           MR. LEWIS:  I was going to ask, we could, of course,

6   on those properties ask for title reports, preliminary reports.

7           THE COURT:  Let's hold off on doing that.

8           MR. LEWIS:  Okay.

9           THE COURT:  Okay.  Because if -- and I don't know what

10   I'm going to do, but if I conclude this is a contested matter,

11   what we're going to do is we're going to have a telephone

12   status conference to come up with a schedule, and the remedy

13   doesn't have to be decided before that schedule.  But I

14   still -- I'm mulling this.

15           I've read all these papers, and I've read some of

16   these cases as well.  I've got a few more cases that I need to

17   read.  And obviously I have to decide whether this is a

18   permissible amendment of a claim or not.  That's I think a

19   threshold issue, because most of these arguments were not

20   raised in the first instance, but this was a pro se borrower's

21   claim that was filed.

22           So anything else?  Ms. Krigel, anything you want to

23   add?

24           MS. KRIGEL:  No, Your Honor.

25           THE COURT:  Okay.

1          MS. KRIGEL:  Thank you very much for giving us the

2    opportunity to speak --

3          THE COURT:  Okay.

4          MS. KRIGEL:  -- on this.

5          THE COURT:  Okay.  Mr. Lewis?

6          MR. LEWIS:  No, Your Honor.  Thank you very much.

7          THE COURT:  The only other thing I would say, Ms.

8    Krigel --

9          MS. KRIGEL:  Yes.

10          THE COURT:  -- if we wind up having -- if this is a

11    contested manner and I wind up having an evidentiary hearing,

12    you can't do it by telephone.

13          MS. KRIGEL:  We understand.

14          THE COURT:  Okay.  We'll work out the procedures, but

15    everybody needs to understand evidentiary hearings happen in my

16    courtroom with everybody here.

17          MS. KRIGEL:  Okay.

18          MR. LEWIS:  I take it the Court does not ride circuit

19    in Missouri.

20          THE COURT:  I don't ride circuit in Missouri, no.  I

21    know some good bankruptcy judges in Missouri; maybe they'd want

22    to get involved.

23          MR. LEWIS:  I know some great barbecue places, too.

24          MS. KRIGEL:  Absolutely, we'd welcome mediation, and

25    I'm sure they would assist.

RESIDENTIAL CAPITAL, LLC, et al.                    50

1          THE COURT:  Barry Schermer, in fact, served as a

2     mediator in one of my cases, and did a great job of getting it

3     settled.  So I don't know what part of Missouri you're in.

4          MS. KRIGEL:  I'm actually on the western side.

5          THE COURT:  Okay.

6          MS. KRIGEL:  Judge Federman.

7          THE COURT:  Who is an excellent judge; Judge Federman,

8     he's an excellent judge.

9          MS. KRIGEL:  He is.  Absolutely.

10         THE COURT:  You've got good judges in Missouri.

11         MS. KRIGEL:  We do, we have great judges.

12         THE COURT:  Okay.

13         MS. KRIGEL:  And we appreciate your allowing us to

14    speak on this case.

15         THE COURT:  Okay.

16         MS. KRIGEL:  And we'll provide you with the additional

17    information.

18         THE COURT:  Thank you very much, Ms. Krigel.

19         MS. KRIGEL:  All right.  Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Lewis.

21         MR. LEWIS:  Thank you, Your Honor.

22         THE COURT:  Mr. Rosenbaum, we have anything else?

23         MR. ROSENBAUM:  There's an adversary status

24    conference, Your Honor.

25         THE COURT:  Okay.  Let's move on to it.

RESIDENTIAL CAPITAL, LLC, et al.                    51

1        MR. ROSENBAUM:  And it's the last matter on the

2   agenda, page 6, Roman numeral IV; it relates to Wilson v.

3   Residential Capital, it's adversary number 12-1936.  I believe

4   Ms. Wilson is appearing pro se, had made a telephonic

5   appearance, Your Honor.

6        THE COURT:  Ms. Wilson, are you on the phone?

7        MS. WILSON:  Yes.  By special appearance, Jennifer

8   Wilson, is present.

9        THE COURT:  All right.  Thank you very much.  Mr.

10  Rosenbaum, where are we on this case?

11       And I'll give you a chance to speak after Mr.

12  Rosenbaum speaks.  Okay?

13       Go ahead, Mr. Rosenbaum.

14       MR. ROSENBAUM:  Your Honor, the complaint was filed in

15  November of 2012, November 9th, 2012, to be exact.  Your Honor,

16  we did -- the complaint relates to a foreclosure of properties

17  in North Carolina that was completed -- commenced in 2009 and

18  completed in 2010.  I think it best describes North Carolina

19  has a quasi nonjudicial foreclosure, but it does require a

20  court order.

21       THE COURT:  Make sure you're speaking into the

22  microphone, so she can hear you.

23       MR. ROSENBAUM:  Sure, am I --

24       THE COURT:  Go ahead.

25       MR. ROSENBAUM:  We filed a -- the debtors filed a

1    motion to dismiss in February of 2013.  Ms. Wilson responded.

2    And then shortly after that, I believe in April, we instituted

3    the supplemental procedures on behalf of the debtors.  We did

4    engage in settlement negotiations with Ms. Wilson for quite

5    some time.  Unfortunately, we were able to consummate the

6    settlement.

7          I would note that although Ms. Wilson did file this

8    adversary proceeding in which she seeks apparently equitable

9    relief as well as damages, she has not filed a proof of claim.

10   We did raise that issue in our briefing.  And to the best of my

11   knowledge Mrs. Wilson has taken -- excuse me, Ms. Wilson has

12   taken no action with respect to that.

13         In light of the institution of the supplemental

14   proceedings we did not -- that put a moratorium on future

15   filings, we didn't respond to the -- we didn't submit our

16   surreply to her response to the motion to dismiss.

17         That's where we are, Your Honor.  We'd like to proceed

18   with the motion to dismiss.

19         THE COURT:  All right.  Ms. Wilson, let me hear from

20   you.

21         MS. WILSON:  Yes.  My understanding is that today we

22   would be setting a date for them to respond to the reply to

23   that motion to dismiss.  But before we go further, I would like

24   to object to any pre-trial dates wherein an Article 3 judge of

25   the District Court would not be presiding over any dispositive

1   decisions, because this is a noncore proceeding, and this is an

2   ongoing objection.

3          THE COURT:  We're moving forward.  Your remedy, if you

4   think you're entitled to it, is to make a motion to withdraw

5   the reference.  As long as the case is before me, this case

6   moves forward.

7          Mr. Rosenbaum, when are you going to be prepared to

8   file your --

9          MR. ROSENBAUM:  Your Honor, given the time that's

10  gone, if we could schedule that for the first week in March.

11         THE COURT:  Okay.  What's the date of the Friday of

12  the first week in March?  Does somebody have a calendar?  Thank

13  you.  7th, March 7th, Friday March 7th at noon.  Okay.

14         MR. ROSENBAUM:  Thank you, Your Honor.

15         THE COURT:  And after I receive all the papers, I will

16  schedule -- we'll schedule an argument -- I'll have -- I'll

17  permit Ms. Wilson to appear by telephone for the argument; I'm

18  usually not a big fan of doing that, but she's pro se and --

19  you're in North Carolina, Ms. Wilson, is that -- am I correct?

20         MS. WILSON:  Yes, I am.

21         THE COURT:  Okay.  So you don't have -- are you a

22  lawyer?

23         MS. WILSON:  I am not.

24         THE COURT:  Okay.  I'll permit you to appear and argue

25  by telephone.

RESIDENTIAL CAPITAL, LLC, et al.                    54

1          After I get the papers, we'll be in touch with the

2    Morrison & Foerster firm.  And I don't know whether there will

3    be other omnibus dates when this could be put on but I'll make

4    sure that somebody talks to you to make sure that the date

5    works for you.  It doesn't have to be an omnibus day.

6          Anything else you want to add, Ms. Wilson?

7          MS. WILSON:  Not at this time, thank you.

8          THE COURT:  Okay.  Mr. Rosenbaum, anything you want to

9    add?

10         MR. ROSENBAUM:  No, Your Honor.  Thank you.  That

11   concludes our agenda.

12         THE COURT:  Okay.

13         MR. ROSENBAUM:  And we'll see you on February 20th.

14         THE COURT:  All right.  We're adjourned.  Thank you

15   very much.

16         MR. ROSENBAUM:  Thank you.

17         THE COURT:  Thank you, Ms. Wilson.

18    (Whereupon these proceedings were concluded at 11:10 AM)

19

20

21

22

23

24

25

```
 1
 2                        I N D E X
 3
 4                     R U L I N G S
 5                                      PAGE     LINE
 6  Debtors' Motion Pursuant Order Approving    8      15
 7  Motion to approve settlement between
 8  GMAC Mortgage and Lynn McLaughlin-Montero
 9  and Lynn McLaughlin P.L.L.C. granted
10  Motion to seal partially redacted copies    9      24
11  of the motion and settlement agreement
12  between GMAC Mortgage and Bay-Valley
13  Mortgage Group granted
14  Motion to approve settlement between        10      4
15  GMAC Mortgage and Bay-Valley Mortgage
16  Group granted
17  Motion to seal partially redacted copies    11      8
18  of the motion and settlement agreement
19  between Residential Funding Company, LLC
20  and CTX Mortgage Company, Pulte Homes, Inc.
21  and PulteGroup, Inc. granted
22  Motion to approve  settlement between       11      9
23  Residential Funding Company,LLC and CTX
24  Mortgage Company, Pulte Homes, Inc. and
25  PulteGroup, Inc. granted
```

1

2                          C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7              *Sharona Shapiro*

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D-492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  February 7, 2014

18

19

20

21

22

23

24

25