**MORRISON COHEN LLP**
909 Third Avenue
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan, Esq.
Robert K. Dakis, Esq.

*Attorneys for the Independent Directors*
*of the Residential Capital, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : |
| | : Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.,* | : |
| | : Case No. 12-12020 (MG) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

**SUMMARY SHEET PURSUANT TO UNITED STATES TRUSTEE GUIDELINES FOR
REVIEWING APPLICATIONS FOR COMPENSATION AND REIMBURSEMENT OF
EXPENSES FILED UNDER 11 U.S.C. § 330**

**FINAL FEE APPLICATION**

| | |
|---|---|
| Name of Applicant: | Morrison Cohen LLP |
| Time Period: | May 14, 2012 through December 16, 2013 |
| Role in the Case: | Attorneys for the Independent Directors of the Residential Capital, LLC |
| Fees Incurred for Counsel: | $4,212,750.50[1] |
| Expenses Incurred: | $105,565.95[2] |
| Blended Professional Hourly Rate for Fees Incurred during Compensation Period | $565.10 |

---

[1] This reflects a total voluntary reduction of $61,570.00 for more than three MoCo attorneys in any meeting, call or hearing, plus $6,637.00 for responding to an Interim Fee Application Objection and to revise invoices.

[2] This total reflects a voluntary reduction of $1,149.50 which was consented to in connection with the First Interim Fee Application, consisting of a $529.91 reduction in travel expenses and a $619.59 reduction in meal expenses.

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...............................................................2

II.    JURISDICTION AND VENUE ..........................................................3

III.   GENERAL BACKGROUND..............................................................3

IV.   RETENTION OF MORRISON COHEN ...........................................5

V.     MONTHLY FEE STATEMENTS AND INTERIM FEE APPLICATIONS.............6

VI.   SUMMARY OF PROFESSIONAL SERVICES RENDERED .............................10

    A.  General Case Administration (Hours: 248.10; Fees: $69,851.50).....................11

    B   Retention and Fee Applications (Hours: 242.3; Fees: $106,280.00).................12

    C.  Board of Directors Matters (Hours: 6,964.50; Fees: $4,036,619.00) .................12

    D.  Board of Directors Meetings and Inquiries.........................................................13

    E.  Examiner Issues .................................................................................................16

    F.   Committee Communications and Litigations .....................................................18

    G.  Global Settlement Mediation .............................................................................23

    H.  Plan and Disclosure Statement...........................................................................24

VII.   ALLOWANCE OF COMPENSATION.............................................25

VIII.  DISBURSEMENTS.............................................................................27

IX.    NOTICE .............................................................................................29

X.     CONCLUSION...................................................................................29

## PRIOR QUARTERLY FEE APPLICATIONS

| Date Filed | Period Covered | Requested Fees | Requested Expenses | Allowed Fees | Allowed Expenses |
|---|---|---|---|---|---|
| 10/19/2012<br><br>[ECF#1904]<br><br>First Interim Fee Application | 5/14/12-8/31/12 | $325,625.50 | $4,248.73 | $319,039.50[3] | $3,099.23[4] |
| 3/14/2013<br><br>[ECF #3556]<br><br>Second Interim Fee Application | 9/1/12 – 12/31/12 | $751,416.50 | $12,391.71 | $744,779.50[5] | $12,391.71 |
| 8/7/2013<br><br>[ECF#4527]<br><br>Third Interim Fee Application | 1/1/13 – 4/30/13 | $1,318,943 | $42,792.26 | $1,303,943[6] | $42,792.26 |
| 11/18/2013<br><br>[ECF#5841]<br><br>Fourth Interim Fee Application | 5/1/13 – 8/31/13 | $1,231,368.50 | $36,075.45 | $1,208,260[7] | $36,075.45 |

---

[3] This amount reflects voluntary reductions agreed to at the request of the US Trustee.

[4] This amount reflects voluntary reductions agreed to at the request of the US Trustee.

[5] This amount reflects voluntary reductions agreed to at the request of the US Trustee.

[6] This amount reflects voluntary reductions agreed to at the request of the US Trustee.

[7] This amount reflects voluntary reductions agreed to at the request of the US Trustee.

**FEES AND EXPENSES INCURRED SINCE THE FOURTH INTERIM FEE
APPLICATION**

| Month | Hours | Fees | Expenses |
|---|---|---|---|
| September, 2013 | 202.70 | $113,689.00 | $3,652.05 |
| October, 2013 | 471.00 | $266,341.50 | $348.07 |
| November, 2013 | 444.20 | $241,078.00 | $5,207.31 |
| December, 2013 | 60.00 | $35,201.50 | $2,264.98 |

**Schedule 1**

**COMPENSATION BY PROFESSIONAL**

| NAME | YEAR OF ADMISSION | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Joseph T. Moldovan | 1983 | $685.00 | 2,371.60 | $1,624,546.00 |
| Michael Connolly | 1986 | $570.00 | 892.00 | $508.440.00 |
| David Piedra | 1992 | $575.00 | 1,264.60 | $727,145.00 |
| Jack Levy | 1977 | $605.00 | 113.10 | $68,425.00 |
| David Lerner | 1981 | $585.00 | 37.60 | 21,996.00 |
| Isaac Grossman | 1985 | $695.00 | 34.10 | $23,699.50 |
| Eitan Tabak | 1994 | $485.00 | 0.80 | $388.00 |
| **SENIOR COUNSEL** | | | | |
| Robert K. Dakis | 2005 | $525.00 | 1361.10 | $714,577.50 |
| **ASSOCIATES** | | | | |
| Neil Siegel | 1979 | $450.00 | 53.30 | $23,985.00 |
| Neil Siegel | 1979 | $475.00 | 641.60 | $304,760.00 |
| Wendy Fiel | 2002 | $385.00 | 167.40 | $64,449.00 |
| Rebecca Saenger | 2004 | $380.00 | 29.10 | $11,058.00 |
| Andrea Kahn | 2007 | $385.00 | 6.00 | $2,310.00 |
| **PARAPROFESSIONALS/OTHERS** | | | | |
| Mariola Wiatrak | N/A | $215.00 | 221.50 | $47,622.50 |
| Mariola Wiatrak | N/A | $220.00 | 25.10 | $5,522.00 |
| Jason Reid | N/A | $360.00 | 15.20 | $1,872.00 |
| Jason Reid | N /A | $370.00 | 43.10 | $15,947.00 |
| Thomas Sullivan | N/A | $250.00 | 137.10 | $34,275.00 |
| Kristina Concepcion Horn | N/A | $335.00 | 12.10 | $4,053.50 |
| Lucy Mahecha | N/A | $250.00 | 2.90 | $725.00 |
| Lucy Mahecha | N/A | $275.00 | 24.70 | $6,792.50 |
| Edward Miller | N/A | $210.00 | 0.30 | $63.00 |
| Deirdre Rose | N/A | $165.00 | 0.60 | $99.00 |
| **TOTAL** | | | **7,454.90[8]** | **$4,212,750.50** |

---

[8] Various totals for time (and the corresponding fees) have been reduced when applicable to account for voluntary write-downs.

**Schedule 2**

**HOURS AND FEES FOR ALL INTERIM COMPENSATION PERIODS PLUS FINAL
PERIOD FROM September 1, 2013 – December 13, 2013, AS RENDERED BY
CATEGORY**

| Category | Hours | Fees |
|---|---|---|
| Case Administration | 248.10 | $69,851.50 |
| Fee/Employment Applications | 242.30[9] | $106,280.00 |
| Board of Directors Matters | 6,964.50 | $4,036,619.00 |
| **Total** | **7,454.90**[10] | **$4,212,750.50** |

---

[9] 5.1 hours incurred by Robert Dakis attending the uncontested First Interim Fee Application hearing were mistakenly categorized under "Fee Objections," and appear here to reflect their proper classification.

[10] This total has been reduced by 127.60 hours to reflect voluntary write-downs,

## Schedule 3

## NUMBER OF HOURS SPENT ON THE PROJECT

| NAME | CASE ADMINISTRATION | FEE/EMPLOYMENT APPLICATION | BOARD OF DIRECTORS MATTERS | TOTAL |
|---|---|---|---|---|
| **PARTNERS** | | | | 2,371.60 |
| Joseph T. Moldovan | | 4.1 | 2,367.50 | 2,371.60 |
| Michael Connolly | | | 892.00 | 892.00 |
| David Piedra | | 1.4 | 1,263.20 | 1,264.60 |
| Jack Levy | | | 113.10 | 113.10 |
| David Lerner | | | 37.60 | 37.60 |
| Isaac Grossman | | | 34.00 | 34.00 |
| Eitan Tabak | | | 0.80 | 0.80 |
| **SENIOR COUNSEL** | | | | |
| Robert K. Dakis | | 66.8[11] | 1,294.30 | 1,361.1 |
| **ASSOCIATES** | | | | |
| Neil Siegel | 50.80 | 116.3 | 527.80 | 696.80 |
| Wendy Fiel | | | 167.40 | 167.40 |
| Rebecca Saenger | | | 29.10 | 29.10 |
| Andrea Kahn | | | 6.00 | 6.00 |
| **PARAPROFESSIONALS/ OTHERS** | | | | |
| Mariola Wiatrak | 106.50 | 30.60 | 109.60 | 246.70 |
| Jason Reid | 1.1 | | 57.20 | 58.30 |
| Thomas Sullivan | 89.70 | 23.10 | 24.40 | 137.10 |
| Lucy Mahecha | | | 27.60 | 27.60 |
| Kristina Horn | | | 12.10 | 12.10 |
| Edward Miller | | | 0.30 | 0.30 |
| Deirdre Rose | | | 0.60 | 0.60 |
| **SUB-TOTAL** | **248.10** | **242.30** | **6,964.50** | |
| **GRAND TOTAL** | | | | **7,454.90** |

---

[11] 5.1 hours incurred by Robert Dakis attending the uncontested First Interim Fee Application hearing were mistakenly categorized under "Fee Objections," and appear here to reflect their proper classification.

**Schedule 4**

**SUMMARY OF EXPENSES**

| Description | Total |
|---|---|
| Telephone/Facsimile Charges | $10,028.60 |
| Photocopying (at $.07 per page) | $2,985.86 |
| Printing (at $.07 per page) | $961.18 |
| Court Filings (Court Call & Misc.) | $8,781.25 |
| Court Services (PACER) | $4,962.50 |
| Database Search | $16,072.24 |
| Meals | $2,895.65 |
| Travel | $747.30 |
| Postage /Courier | $3,051.38 |
| Professional Services | $55,079.99 |
| **TOTAL** | **$105,565.95** |

**MORRISON COHEN LLP**
909 Third Avenue
New York, New 10022
Joseph T. Moldovan
Robert K. Dakis
Telephone: (212) 735-8600

*Counsel for the Independent Directors of*
*Residential Capital LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | : | |
| | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

**FINAL APPLICATION OF MORRISON COHEN LLP FOR ALLOWANCE OF**
**COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND**
**EXPENSES INCURRED DURING THE PERIOD FROM MAY 14, 2012**
**THROUGH DECEMBER 16, 2013**

Morrison Cohen LLP ("MoCo"), Counsel to the Independent Directors of Residential

Capital, LLC (the "Independent Directors"), by this application (the "Application"), respectfully

moves this Court, pursuant to sections 330 and 331 of title 11 of the United States Code, §§ 101-

1532 (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and the Order Establishing Procedures for Interim Compensation and

Reimbursement of Expenses of Professionals entered July 17, 2012 (the "Compensation Order"), for

allowance of final compensation for professional services rendered in the amount of $4,212,750.00

and reimbursement of actual, reasonable and necessary out-of-pocket expenses incurred or paid in

the amount of $105,565.95 during the period beginning May 14, 2012 through and including

#4915806 v4 \020530 \0002

December 16, 2013 (the "Fee Period" or the "Final Compensation Period"), and, in support thereof, respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.    Before filing its chapter 11 Petition on May 14, 2012, Residential Capital, LLC ("ResCap"), the mortgage arm of Ally Financial ("Ally"), serviced approximately $374 billion of U.S. residential mortgage loans, was ranked as the fifth largest residential mortgage loan servicer in the U.S., and was the country's tenth-largest residential mortgage loan originator. As counsel to ResCap's Independent Directors, MoCo's primary areas of responsibility were to provide guidance in connection with corporate governance, investigation, and litigation matters. These responsibilities proved to be critical to the Independent Directors, who during the course of the case became the majority of the Board. As counsel to the Independent Directors, who held positions of particularly significant responsibility even before they held a majority of Board seats due to their independence from Ally, ResCap's ultimate corporate parent, MoCo was required to be involved in almost every matter arising in the course of these highly complicated and contentious chapter 11 cases. ResCap's ability to withstand and emerge from a barrage of formal and informal investigations, litigation, and business challenges was tested almost daily. Accordingly, the Independent Directors had much to consider and to do on a regular basis.

2.    In September 2008, at the beginning of a widespread and rapidly worsening financial panic that soon became known as the Great Recession, MoCo was retained as counsel to ResCap's Independent Directors who were being asked to review and approve nearly every one of what came to be an extensive number of transactions with Ally and its affiliates. Many of these transactions were significant to ResCap as it struggled to maintain its financial footing in highly uncertain times. As counsel to the Independent Directors, a team of MoCo attorneys with varied areas of core expertise provided guidance and support as the Independent Directors carried out their

growing responsibilities. ResCap had two Independent Directors when MoCo began serving as their counsel several years prior to the bankruptcy filing. The number of Independent Directors grew to four immediately prior to the bankruptcy, culminating with five Independent Directors well before the modified plan of reorganization which the Debtors proposed jointly with the Creditors Committee was confirmed on December 11, 2013.

3.      During the course of the case, MoCo added value of benefit to the estates by assisting the Independent Directors, and thus, the Debtors as well, in responding effectively to a number of investigations regarding varied aspects of the Debtors' business affairs (including the Examiner's wide-ranging investigation, among others, the selection process of Lou Kruger as ResCap's CRO, and other strategic activity.) MoCo also played a significant role in the negotiations which led to the crafting, filing, and ultimately, confirmation of a consensual plan.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to hear and determine the Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code. Pursuant to the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on January 29, 2013 (the "Amended Guidelines"), a certification regarding compliance with the Amended Guidelines is attached hereto as Exhibit A.

## GENERAL BACKGROUND

5.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors managed and operated their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and

1108. These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). No trustee has been appointed in these Chapter 11 cases.

6.      On May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine member official committee of unsecured creditors (the "Creditors' Committee").

7.      On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "Examiner") to investigate, inter alia, various transfers and transactions involving the Debtors and their affiliates as well as the events immediately preceding the commencement of the Chapter 11 Cases [Docket No. 674].

8.      On December 26, 2012, the Court ordered that the Honorable Judge James Peck, U.S.B.J. be appointed as mediator [Docket No. 2519], (the "Mediator"), to assist the parties in overcoming significant differences in their negotiations towards reaching a consensual plan of reorganization in these cases. The Mediator's meetings with the parties, with the Mediator's significant efforts and involvement, were largely responsible for the Debtors' ability to negotiate and enter into the Plan Support Agreement ("PSA") and Plan Term Sheet with key constituencies in June, 2013. This led to the preparation and filing of the Debtors' largely consensual Plan and Disclosure Statement of July, 2013 which were based upon the PSA.

9.      A Plan and Disclosure Statement based upon the PSA were filed in these cases on July 3, 2013 [Docket No's 4153, and 4157, respectively]. The Disclosure Statement was approved on August 23, 2013 [Docket No. 4809].

10.     After a great deal of litigation and negotiation with dissenting junior secured creditors (the "JSNs"), the Debtors and the Creditors Committee, as the joint proponents of the Plan that was filed on July 3, reached an agreement in principle with the JSNs' representatives to resolve

their material differences. The details of that agreement are contained in a Second Amended Joint Chapter 11 Plan which was filed on December 3, 2013 [Docket No. 5993-1]. Additionally, a Notice of Proposed Resolution of Litigation regarding Junior Secured Notes Claims and Opportunity to Change Votes with Respect to a Second Amended Joint Chapter 11 Plan was also filed on December 3, 2013 [Docket No. 5998]. As a result of this agreement (and the resulting Plan voting changes by a number of the JSNs), the Debtors and the Creditors Committee requested a confirmation date of December 11, 2013 for the Second Amended Joint Chapter 11 Plan. This request was granted, and the Second Amended Joint Chapter 11 Plan proposed by the Debtors and the Committee was confirmed by an order entered on December 11, 2013 [Docket No. 6065].

## RETENTION OF MOCO

11.    On September 5, 2012, the Debtors filed their Motion for the Entry of an Order Under Sections 105 and 363 of the Bankruptcy Code Authorizing the Reimbursement of Expenses Including Counsel Fees Incurred by the Independent Directors (the "Retention Motion").

12.    On September 27, 2012, this Court entered the Order Under Sections 105 and 363 of the Bankruptcy Code Authorizing the Reimbursement of Expenses Including Counsel Fees Incurred by the Independent Directors (the "Retention Order" *nunc pro tunc* to the Petition Date). A true and correct copy of the Retention Order is attached hereto as Exhibit B. Pursuant to the Retention Order, the Debtors were authorized to reimburse reasonable expenses, including reasonable charges for professional services rendered and disbursements incurred by MoCo as counsel to the Independent Directors.

13.    As set forth in the Retention Application, the Independent Directors retained MoCo in connection with corporate governance, investigation, and litigation matters. In addition, MoCo represented the Independent Directors in considering a number of corporate, finance, transactional, and financial services matters relating to the Debtors. MoCo ran and led the process

#4915806 v4 \020530 \0002

resulting in the retention of Louis Kruger as CRO of the Debtors. MoCo also advised and continued to advise the Independent Directors with respect to a number of transactions that were the subject of the investigation by the Examiner. MoCo further advised, and continued to advise, the Independent Directors on discrete issues arising in these Chapter 11 cases, including issues relating to Ally, including and not limited to the tax allocation agreements, the sales of the Debtors' assets, litigation concerning the RMBS Trust Settlement Agreements, valuation and the extent of the Junior Secured Noteholders' collateral, and discovery relating thereto.

14.    To that end, MoCo has served as counsel to the Independent Directors and rendered legal services for the benefit of the Independent Directors before and during the course of these cases.

## MONTHLY FEE STATEMENTS AND QUARTERLY APPLICATIONS

15.    The Compensation Order established a procedure for, *inter alia*, the payment of interim fees and reimbursement of expenses of professionals retained by the Independent Directors on a monthly basis. MoCo, on a monthly basis, prepared and served monthly fee statements in accordance with the Compensation Order throughout the entire Fee Period.

16.    On October 19, 2012, MoCo filed its First Interim Fee Application for Compensation of Services Rendered and Reimbursement of Expenses (the "First Interim Fee Application") as counsel for the Independent Directors for the period of May 14, 2012 through August 31, 2012. Pursuant to the First Interim Fee Application, MoCo sought fees in the amount of $325,625.50 and reimbursement in the amount $4,248.73. By this court's order dated December 28,

2012, MoCo was awarded fees in the amount of $319,039.50 and reimbursement in the amount $3,099.23[12]

17.    On March 14, 2013, MoCo filed its Second Interim Fee Application for Compensation of Services Rendered and Reimbursement of Expenses (the "Second Interim Fee Application") as counsel for the Independent Directors for the period of September 1, 2012 through December 31, 2012. Pursuant to the Second Interim Fee Application, MoCo sought fees in the amount of $751,416.50 and reimbursement in the amount $12,391.71. By this Court's order dated April 23, 2013 [Docket No. 3556], MoCo was awarded fees in the amount of $744,779.50 and reimbursement in the amount $12,391.71.

18.    On August 7, 2013, MoCo filed its Third Interim Fee Application for Compensation of Services Rendered and Reimbursement of Expenses (the "Third Interim Fee Application") as counsel for the Independent Directors for the period of January 1, 2013 through April 30, 2013. Pursuant to the Third Interim Fee Application, MoCo sought fees in the amount of $1,318,943 and reimbursement in the amount $42,792.26. By this court's order dated September 25, 2013 [Docket No. 5205], MoCo was awarded fees in the amount of $1,173,548.70 and reimbursement in the amount $42,792.26.

19.    On November 18, 2013, MoCo filed its Fourth Interim Fee Application for Compensation of Services Rendered and Reimbursement of Expenses (the "Fourth Interim Fee Application") as counsel for the Independent Directors for the period of May 1, 2013 through August 31, 2013. Pursuant to the Fourth Interim Fee Application, MoCo sought fees in the amount of $1,231,368.50 and reimbursement in the amount $36,075.45. By this court's order dated

---

[12] These sums represented voluntary reductions made at the request of the US Trustee.

December 26, 2013 [Docket No. 6193], MoCo was awarded fees in the amount of $1,208,260.00 and reimbursement in the amount $36,075.45.

20.     For the period from September 1, 2013 through and including September 30, 2013, MoCo submitted a monthly fee statement (the "Monthly Fee Statement"). Through the Monthly Fee Statement, MoCo requested interim fee compensation in the amount of $113,689.00 (representing 80% of the fees billed by MoCo from September 1, 2013 through September 30, 2013) and expenses incurred in the total amount of $3,652.05 (100% of the expenses billed by MoCo from September 1, 2013 through September 30, 2013).

21.     For the period from October 1, 2013 through and including October 31, 2013, MoCo submitted a monthly fee statement (the "Monthly Fee Statement"). Through the Monthly Fee Statement, MoCo requested interim fee compensation in the amount of $266,341.50 (representing 80% of the fees billed by MoCo from October 1, 2013 through October 31, 2013) and expenses incurred in the total amount of $348.07 (100% of the expenses billed by MoCo from October 1, 2013 through October 31, 2013).

22.     For the period from November 1, 2013 through and including November 30, 2013, MoCo submitted a monthly fee statement (the "Monthly Fee Statement"). Through the Monthly Fee Statement, MoCo requested interim fee compensation in the amount of $241,078.00 (representing 80% of the fees billed by MoCo from November 1, 2013 through November 30, 2013) and expenses incurred in the total amount of $5,207.31 (100% of the expenses billed by MoCo from July 1, 2013 through July 31, 2013).

23.     For the period from December 1, 2013 through and including December 13, 2013, MoCo submitted a monthly fee statement (the "Monthly Fee Statement"). Through the Monthly Fee Statement, MoCo requested interim fee compensation in the amount of $35,201.50 (representing 80% of the fees billed by MoCo from December 1, 2013 through December 13, 2013)

and expenses incurred in the total amount of $2,264.98 (100% of the expenses billed by MoCo from December 1, 2013 through December 13, 2013).

24.     Pursuant to the Compensation Order, if no timely objections are filed to MoCo's monthly fee statements, MoCo is paid 80% of its fees and 100% of its expenses.

25.     Over the course of the cases, the Court has rendered a number of rulings regarding the allowance of certain categories of professional fees and expenses. After consultation with the U.S. Trustee's Office, and in light of the Court's admonitions, MoCo agreed to voluntary reductions of fees and expenses of $52,481.00, collectively, in its prior Interim Fee Applications.[13] MoCo continues to agree to those reductions and is not seeking those amounts in this Final Application. In light of the Court's rulings and admonitions, MoCo systematically reviewed all of its time going back to the Petition Date (and the period from 9/1/13 – 12/16/13) and has made an additional voluntary reduction of 30 hours corresponding to $16,875.00 in fees.[14]

26.     This Application is MoCo's Final Fee Application and seeks payment of compensation and reimbursement of expenses for services rendered to the Independent Directors in amounts that have been invoiced to the Debtors for the period from May 14, 2012 through December 16, 2013.

27.     This Application requests that the Court (a) approve fees in the total amount of $4,212,750.50, and reasonable out-of-pocket expenses in the amount of $105,565.95 incurred by MoCo for services rendered in the Chapter 11 Cases during the Fee Period and (b) award and order

---

[13] MoCo voluntarily consented to a $6,586.00 fee reduction and a $1,149.50 expense reduction in connection with its First Interim Fee Application. MoCo consented to fee reductions of $6,637.00, $15,000.00, and $23,108.50 in connection with its Second, Third, and Fourth Interim Fee Applications, respectively.

[14] This further reduction accounts for the additional instances in which more than three MoCo attorneys billed for participating in any meeting, conference call or hearing at any time during these cases.

to be paid[15] to MoCo the balance of any such fees, costs and expenses that remain unpaid, including amounts subject to prior "hold backs" that have not yet been released, after deducting interim payments already received by MoCo pursuant to the Compensation Order.

28.     The fees and expenses requested are reasonable, and all amounts requested were for actual and necessary services rendered on behalf of the Independent Directors.

29.     MoCo has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases. No promises have been received by MoCo or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code. The Independent Directors were provided with a copy of the Application in advance of its filing and approve of the amounts requested herein.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

30.     Pursuant to the guidelines promulgated by the United States Trustee, MoCo classified all services performed for which compensation is sought into separate categories. MoCo attempted to place the services performed in the category that best relates to the services provided. However, because certain services may relate to one or more categories, services pertaining to one category may be included in another category. Schedule 1, attached hereto, lists each timekeeper, his or her respective billing rate, professional information, and the total number of hours expended on this case. Schedule 2, attached hereto, summarizes the professional and paraprofessional time expended by project category. Timekeeping entries and MoCo invoices provide detailed descriptions of all services rendered by each of these categories. Exhibit C, attached hereto, contains time entry

---

[15] Pursuant to its Retention Motion, MoCo held a retainer received pre-petition. MoCo credited approved fees against the retainer until the retainer was exhausted. Since the retainer has been exhausted, MoCo will be paid by the estate.

records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Independent Directors.

31.     The following summary is intended only to highlight key services rendered by MoCo in certain project billing categories where MoCo has expended a considerable number of hours on behalf of the Independent Directors, and is not meant to be a detailed description of all of the work performed.

### A.    <u>Case Management/Calendar Maintenance (Hours: 248.10, Fees: $69,851.50)</u>

32.     MoCo served as counsel to the Independent Directors in respect of numerous matters, including various estate transactions, the RMBS litigation, the Examiner's investigation and extensive Report, the mediation conducted by Judge Peck, negotiations leading up to the Plan Support Agreement ("PSA") and Plan Term Sheet, litigations, including the FGIC Settlement and JSN litigation among others, and the Plan and Disclosure Statement. Accordingly, and at the request of the Independent Directors, during the Fee Period a MoCo paralegal or an associate, when the paralegal was unavailable, spent time reviewing pleadings filed each day in the ResCap cases and various adversary proceedings. In order to create cost savings to the estate, MoCo arranged for a specially-trained paralegal (who billed at a rate lower than a first year associate) to conduct a review and assessment of newly filed pleadings (including, without limitation, whether the pleadings raise issues of concern to the Independent Directors, or were filed in connection with an examination or litigation in which one or more of the Independent Directors were or were expected to be witnesses), so that attorneys could be directed only to those pleadings most relevant to the interests of the Independent Directors. These activities were part of MoCo's representation of the Independent Directors, and were integral to their discharge of their duties.

B.    **Fee/Employment Applications (Hours: 242.3, Fees: $106,280.00)**

33.    Pursuant to the Bankruptcy Code, Local Rules, and the Compensation Order, MoCo prepared and served monthly fee statements (the "Fee Statements") for approval and allowance of compensation for actual, reasonable and necessary professional services rendered, and reimbursement of expenses for actual reasonable and necessary expenses incurred during those fee periods. Each Fee Statement contained extensive records of the work performed by MoCo. Given that these statements contain a record of the activities performed by MoCo, there was the potential for a monthly fee statement to contain sensitive and privileged material that, if made public, could have compromised MoCo's advice and counsel. While MoCo did not bill for the time spent preparing the fee statements, MoCo did charge the estate for redacting confidential information from the fee statements.

34.    MoCo attorneys also prepared the First, Second, Third and Fourth Interim Fee Applications during the Fee Period. Preparing each Interim Fee Application involved consolidating MoCo's fees and expenses for four monthly fee statements and preparing a detailed narrative in the pleading describing these efforts. Extensive time was also spent organizing the time entries and preparing the charts and the summary descriptions of the work done throughout the period covered by each Interim Fee Application.

C.    **Board of Directors Issues (Hours 6,964.50, Fees: $4,036,619.00)**

35.    Time billed to this category generally relates to issues that MoCo attorneys, as counsel to the Independent Directors, handled at the direction of the Independent Directors. Generally, time billed in this category falls into four main categories: Corporate Governance - Board of Directors Meetings and Inquiries, Examiner Issues, Mediation and Plan / Disclosure issues, and Litigations.

36.     <u>Board of Directors Meetings and Inquiries</u>. As counsel to the Independent Directors of ResCap, MoCo was primarily responsible for advising the Independent Directors in connection with corporate governance, investigation, and litigation matters. In addition, MoCo represented the Independent Directors, and had been doing so since September, 2008, in considering a number of corporate, finance, transactional, and financial services matters relating to the Debtors. Indeed, over the course of the cases and as a matter of corporate governance, the Independent Directors became a majority of the Board. Therefore, as their counsel, MoCo was required to be involved in almost every matter that faced these chapter 11 debtors. MoCo was responsible for, among other things; i) monitoring the case and advising the Independent Directors regarding all material developments; ii) advising and representing the Independent Directors in connection with the Examiner's investigation; and iii) drafting materials both in response to Examiner requests, and sections of the Disclosure Statement for the Joint Plan proposed by the Debtors and the Creditors Committee in response to portions of the Examiner's Report regarding the Independent Directors or their decisions regarding various actions taken by ResCap.

37.     As counsel for the Independent Directors, MoCo attorneys were tasked with participating in seventy seven (77) meetings of the full Board of Directors, twenty two (22) subcommittee meetings of the Independent Directors and the subcommittees upon which they sit, and one hundred twenty (120) conferences with the Independent Directors as a group. Additionally, the Independent Directors often made inquiries as to the status of the cases and the procedural and substantive issues raised therein, and MoCo attorneys regularly contacted individual Directors in person, by telephone or by e-mail with specific questions or information. Given the size and complexity of these cases, this task required a significant expenditure of resources. As part of fulfilling their duties, MoCo attorneys considered and assisted the Independent Directors regarding general corporate and restructuring developments such as the board decision to retain and the

#4915806 v4 \020530 \0002

selection of Mr. Kruger as Chief Restructuring Officer, the FRB Review Motion, insurance issues, preparing for and attending Plan Mediation sessions, KERP/KEIP issues, and selecting a new board member. MoCo attorneys also reviewed hearing transcripts in order to remain abreast of the procedural and substantive issues pending in these proceedings in addition to attending or monitoring over fifty seven (57) hearings in order to provide real time updates to the Independent Directors of any key developments in these cases. Some of these hearings concerned, for example, the Examiner, the Ally Servicing Agreement, KERP/KEIP issues, RMBS issues, the Committee's STN Motion, the two day FGIC Settlement approval trial in mid-August, 2013, Status Conferences, and multiple JSN litigation hearings culminating with the JSN adversary trial. Phase II of that trial was conducted concurrently with the contested Confirmation hearing.

38.    As part of diligently performing their duties, MoCo attorneys analyzed and reported to the Independent Directors regarding nearly every pleading filed in these cases, (and every major issue, whether or not it was reflected in a Motion), including and not limited to:

- the "First Day" Motions,

- the Sale Motion,

- the examiner Motion,

- the KERP/KEIP Motions,

- the RMBS 9019 Motion,

- preparing for and attending global Mediation sessions,

- Examiner information requests (and those made by the Examiner's professionals),

- the Examiner's Report,

- the PSA and Term Sheet,

- the Joint Plan and Disclosure Statement – (In addition to their review duties, MoCo attorneys were, of necessity, actively involved in drafting portions of

these documents which reflected on or affected the rights and obligations of the Independent Directors, especially with respect to the Independent Directors' significant financial contributions to the Plan. These services are discussed further in the Mediation and Plan discussion, supra.),

- insurance issues,

- post-confirmation governance issues,

- CRO retention and compensation negotiations and the CRO retention Motion,

- CRO bonus negotiations, and the CRO bonus Motion,

- the Wilmington STN Motion,

- the Committee STN Motion,

- RMBS trial preparations including preparation of Directors' expected testimony,

- the JSN disqualification and "neutralization" Motion,

- the two day FGIC settlement trial,

- the JSN adversary litigations and related motions,

- the two phase JSN adversary trial and related conferences,

- the plan confirmation trial (conducted jointly with Phase II of the JSN adversary trial) and related conferences, including a conference on plan confirmation discovery protocols in light of the significant amount of information which had already been the subject of discovery through the consolidated JSN adversary litigations,

- Auction of Debtors' Assets - MoCo attorneys attended and advised the Independent Directors in connection with the Debtors' three-part sale of their mortgage loan servicing platform assets to Ocwen Loan Servicing, LLC; the sale of their loan originations and capital markets platform to Walter Investment Management Corp.; and the sale of a whole loan portfolio to Berkshire Hathaway. The three sale transactions, in the aggregate, generated more than $4 billion in proceeds for the benefit of ResCap's creditors and preserved more than 3,800 U.S. jobs.

- As the multi-day auction and bidding process required the full board to be present at all times to evaluate and approve the terms of any proposed bids, MoCo attorneys were present to advise in this connection.

39.    <u>Examiner Issues</u>. On June 20, 2012, the Court directed that an examiner be appointed, and on July 3, 2012, the Court appointed the Examiner. The scope of the Examiner's investigation included the entire course of conduct and all material intra-company dealings involving Ally, ResCap, and Ally's major investors over the course of nearly a decade. This investigation was a very significant undertaking, and of necessity, the Examiner required an extensive amount of information in various forms. He interviewed 83 witnesses, sometimes more than once, (including several Independent Directors and a former Independent Director), required multiple written submissions from a dozen parties including the Independent Directors, and deposed witnesses involved in pending litigation. The Examiner's Counsel requested documents (and supplemental documents) from the Independent Directors, and the Examiner requested interviews with each of the four serving Independent Directors and a former Independent Director who was also represented by MoCo. He subsequently requested supplemental interviews with two of the four serving Independent Directors, and of one MoCo attorney regarding a discrete but significant issue. MoCo attorneys spent considerable time preparing the document productions and supplemental document productions, and in preparing the five Independent Directors plus the MoCo attorney for their original and supplemental interviews with the Examiner. These preparations included:

- Review of voluminous documents (including prior fairness opinions, emails, board presentations, handwritten notes, board minutes, transactional documents, etc.) relevant to each examination or supplemental examination;

- Meetings with each Independent Director and the MoCo attorney prior to his or her interview(s) with the Examiner and his professionals;

- Appearing with and representing the Independent Directors and the MoCo attorney at their lengthy interviews (and, when applicable, their supplemental interviews) by the Examiner's Counsel;

- Corresponding and communicating with counsel for the Examiner and the Debtors with respect to the interviews, and each original and supplemental production;

- Responding to additional party submissions to the Examiner, particularly insofar as parties alleged possible wrongdoing by the Independent Directors in approving certain transactions.

40.     MoCo worked to produce additional documents from the Independent Directors directly to the Examiner in response to the Examiner's document requests, and to respond to substantive inquiries made by the Examiner's counsel and other professionals. These responses often required discussions with MoCo attorneys that worked on the pre-petition transactions to which the Examiner's questions related. These attorneys may not have been tasked with day to day matters in the bankruptcy cases, but given their experience over several years of pre-petition history with the underlying transactions, it was more efficient to involve these attorneys than to attempt to reconstruct the issues. In many cases, these inquiries required review of contemporaneous documentation and consultation with Debtors' employees and/or counsel. Additionally, MoCo spent time liaising with the Debtors' main bankruptcy counsel to understand the procedural and substantive issues involved in the Examiner's investigation (among multiple other issues), and in responding to the Examiner's inquiries.

41.     The Examiner's extensive Report (over 2235 pages) was filed under seal in May, 2013 and was released on June 26, 2013. The Examiner's sealed report, together with extensive mediated plan negotiations which included the Independent Directors, was a factor in allowing the Debtors and the Creditors Committee to negotiate and draft a Plan Support Agreement (the "PSA") and a Plan Term Sheet which provided the rough outline of a plan. A largely consensual Joint Plan proposed by the Debtors and the Creditors Committee which the Independent Directors helped create was filed on July 3, 2013, barely one week after the Examiner's Report was released. This avoided a "nuclear war" of litigation among multiple parties, although it could not prevent continued litigation with the JSNs who were not parties to the PSA or the Plan Term Sheet, and vehemently opposed the plan in that form. In light of both the Board's involvement in the

Examiner's investigation, and the Report's expected impact on (i) the pending Plan negotiations (ii) pending litigations including the JSN litigation, and (iii) threatened litigation against the Board, MoCo attorneys, at the Board's direction, performed an in-depth analysis of the Examiner's findings and conclusions. This analysis was then reported to the Board through a series of meetings and memoranda that were prepared jointly by MoCo and MoFo. Additionally, MoCo's analysis formed the basis for additions to the discussion of the Examiner's findings in the Disclosure Statement. This analysis was critical to the Board's consideration of settlements and compromises made through the Plan process as well as in considering litigation positions against, inter alia, the JSNs.

42.    Committee Communications, and Litigations. Before the cases were filed, ResCap and its ultimate parent, Ally, negotiated regarding various claims each had, or could possibly assert against the other arising from multiple pre-petition transactions and agreements. These negotiations resulted in a proposed settlement which would pay ResCap approximately $750 million dollars and facilitate a prompt sale of ResCap's mortgage origination and servicing platform to a third party, together with a separate sale of its legacy loan portfolio in which Ally would serve as the stalking horse bidder for the loan portfolio. ResCap's potential claims against Ally and this proposed settlement attracted a great deal of Committee attention. In addition to the discovery attendant to the Examiner's investigation, MoCo also worked with counsel for the Debtors in addressing inquiries and document requests made by the Creditors' Committee to the Independent Directors. In connection with responding to these inquiries, MoCo attorneys spent time reviewing documents regarding certain pre-petition transactions. MoCo also reviewed documents relating to the proposed settlement between the Debtors and Ally, and MoCo attorneys attended meetings with the Creditors' Committee, including several meetings concerning alleged claims against Ally, and other claims. MoCo attorneys evaluated, assessed and discussed the presentation with the Independent Directors

and also attended a lengthy meeting with counsel for Ally concerning a response to the Committee Presentation.

43.    MoCo attorneys were also required to prepare responsive memoranda to the Committee's motion seeking standing to pursue estate causes of action under the STN line of cases, and to the Committee's preclusion motion concerning prospective testimony in the RMBS 9019 litigation. This representation included review of extensive documentation, drafting responses, discussions and coordination with the Independent Directors, and discussions with Debtors' lead counsel as needed.

44.    <u>Litigations</u>. On the Petition date, ResCap had billions of dollars in litigated representation and warranty claims by investors in multiple tranches of residential mortgage-backed securities in numerous trusts ("RMBS litigation"), and claims by residential mortgage borrowers. ResCap's most contentious litigations, however, were conducted with the JSNs, who throughout virtually the entire case, literally conceded nothing and litigated everything.

45.    <u>RMBS Litigation</u>. MoCo represented the Independent Directors in connection with discovery issues relating to Debtors' Motion pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements [Docket # 320]. Counsel for Wilmington Trust (indenture trustee for the Senior Unsecured Notes), served subpoenas for the production of documents, and attendance at depositions, against two Independent Directors. Wilmington Trust's document production requests to the Independent Directors, and the issues to be addressed in their examinations reflected the massive scope of the underlying RMBS litigation. MoCo's attorneys addressed multiple issues in responding to these requests (including resolving discovery disputes), while allowing the Independent Directors to focus as much of their energies as possible on their primary duties in helping to reorganize ResCap. MoCo attorneys (i) made inquiry of these Independent Directors regarding responsive documents they may have had in their possession, (ii)

responded to document requests and supplemental document requests, (iii) addressed discovery disputes regarding confidentiality and related issues, (iv) assisted Debtors' lead counsel in preparing both Independent Directors for their depositions, (although one was cancelled at the very last minute) [and months later, assisted Debtors' lead counsel in preparing these Independent Directors for their potential trial testimony as the evidentiary hearing approached on this hotly contested matter in the event that Plan Support Agreement ("PSA") negotiations did not bear fruit], and (v) produced documents and an extensive privilege log. This representation included reviewing thousands of documents to determine if they were responsive to the requests made by Wilmington. It also required coordination with Debtors' counsel to determine whether any documents produced were duplicative of documents produced by the Debtors in response to similar subpoenas, and whether documents were appropriately the subject of privilege.

It is important to note that while MoCo was assisting the Debtors through MoCo's representation of the Independent Directors in the Plan mediation in the late Spring of 2013, the parties were simultaneously preparing for trial on the proposed settlement between the Debtors and the RMBS litigants, which trial was scheduled to occur if the PSA negotiations did not bear fruit. This representation included reviewing documents and coordination with Debtors' counsel on multiple trial preparation issues. MoCo attorneys also reviewed the voluminous submissions of the objections to the RMBS 9019 motion, particularly insofar as the submission contended that the Independent Directors had purportedly acted improperly in approving the RMBS settlement. In addition, MoCo attorneys assisted Debtor's primary bankruptcy counsel in drafting responsive pleadings.

46.    FGIC Settlement Litigation. Among the various issues addressed through the Plan process was the contentious disagreement between the FGIC and the Debtors. The proposed FGIC Settlement, however, was challenged by the JSNs, among others. This made it necessary, at

the Board's direction, for MoCo attorneys to review the multiple rounds of pleadings and evidence submissions, assist the Debtors' general counsel in other trial preparations, monitor the two-day FGIC settlement trial held on August 16 and August 19, 2013, and report to the Board at all times.

47.    On September 13, 2013, the Court issued a Memorandum Opinion and Order approving the FGIC settlement [Docket No. 5042].

48.    JSN litigation. The most contentious issues in these cases arose from the longstanding dispute between the Committee and the Debtors, on the one hand, and JSNs on the other. The JSNs contested everything and conceded nothing until shortly before December 3, 2013, after the end of testimony in a bitterly contested two phase adversary trial combined with plan confirmation. MoCo attorneys spent considerable time and resources in three areas of the JSN Litigation.

49.    First, MoCo attorneys participated in numerous mediation sessions between the Debtors, the Committee and the JSNs. Participation in these sessions required MoCo attorneys to analyze and discuss certain key transactions that MoCo previously advised on through the course of its representation of the Board. This often meant consulting with those attorneys who worked directly on the subject transactions. Through this analysis, MoCo attorneys were able to materially advance arguments made by the Debtors and the Committee at the mediation. MoCo attorneys also attended the all-day mediation sessions.

50.    Second, MoCo attorneys assisted the Debtors in their successful challenge of the JSNs' motion to disqualify Debtors' counsel and have the Board remain "neutral" during the JSN litigation, which motion was filed on July 18, 2013 [Docket No. 4289], and heard on July 30.

51.    Third, MoCo attorneys spent considerable time reviewing documents and pleadings in connection with the JSN litigations, and attending the two phase trial and related conferences. On February 28, 2013, the Committee had filed an adversary complaint against the

JSNs seeking, inter alia, a declaratory judgment regarding the scope of the JSNs' liens. The Debtors filed a similar complaint on May 3, 2013. On June 28, the JSNs answered the Debtors' amended complaint and asserted voluminous counter-claims [Adv. Docket No. 14], and on July 11, the JSNs answered the Debtors' first amended complaint and asserted counter-claims [Adv. Docket No. 18]. MoCo, at the direction of the Board, reviewed the various pleadings and had numerous discussions with Board regarding these litigations.

52.    Additionally, on July 22, 2013, the Debtors filed a motion to dismiss certain of the JSNs' counter-claims [Adv. Docket No. 22]. The JSNs filed a competing motion to dismiss on the same day [Adv. Docket No. 21]. Motions to dismiss were also filed regarding the Committee's claims on April 30, 2013 [Cmtee Adv. Docket No. 21], and July 16, 2013 [Cmtee Adv. Docket No. 52]. On August 28, 2013, the Court held a hearing on the motions to dismiss, which were denied in a September 19 Memorandum Opinion. MoCo attorneys spent considerable time reviewing and analyzing these pleadings, and attending the adversary status conferences, miscellaneous hearings, and the adversary trial so as to keep the Board informed regarding the issues involved on a real-time basis.

53.    Phase I of the trial on the consolidated JSN adversary proceedings began in Mid-October, 2013. Closing arguments for Phase I were held on November 6. Phase II of the JSN trial was conducted concurrently with the contested Confirmation hearing, and began on November 15 after a Pre-Trial Conference the day before, and continued through November 25. Closing arguments for Phase II and plan confirmation were scheduled for December 11. However, in light of the negotiation breakthrough days after the end of the evidence submission on November 25, 2013 in Phase II of the combined JSN trial and confirmation hearing, a Second Amended Joint Plan was filed on December 3 which contained an agreement with the JSNs, leading to confirmation of what had then become a fully consensual Plan on December 11, 2013.

#4915806 v4 \020530 \0002

54.    <u>Global Settlement Mediation sessions</u>. On December 26, 2012, the Court

appointed the Honorable James Peck, United States Bankruptcy Judge for the Southern District of

New York as mediator to assist the parties with respect to the negotiation of a consensual plan of

reorganization. MoCo attorneys spent significant time preparing for and participating in mediation

sessions, including those held in early May, 2013. The Plan mediation was successful, as it

materially aided the parties in the critical and delicate task of negotiating and crafting the largely

consensual Joint Plan of reorganization which was filed on July 3, but which was bitterly contested

by the JSNs.

55.    MoCo's mediation preparations included:

- Meetings and communications with Debtors' lead bankruptcy counsel;

- Review and analysis of voluminous documents including and not limited to
  pleadings and binders with collected materials;

- Internal conferences regarding various mediation issues and approaches;

- Review and analysis of fiduciary duty issues, Wilmington Trust, and UCC
  submissions to the Examiner, and other issues; and

- Planning presentations for mediation sessions.

56.    As a result of the hard work performed by counsel and the tremendous efforts

of Judge Peck as mediator, numerous key constituencies, including the Debtors, Ally, the Board, the

Committee, the RMBS litigation claimants and RMBS Trusts, and the holders of the Debtors'

unsecured bonds reached agreement on the form of a Plan Support Agreement ("PSA") and Plan

Term Sheet. Given that this agreement substantially affected the rights of the Board members, who

agreed to contribute their insurance policies in order to increase the funds available to creditors

through the Ally Settlement, and for the Directors to obtain releases through the Plan, MoCo

attorneys were required to be involved in all aspects of memorializing these agreements. This often

required numerous MoCo attorneys, each with a necessary skill set, to be deeply involved in

reviewing and revising drafts of the various agreements comprising the Plan Support Agreement. As a result of these efforts, on May 23, 2013 the Debtors filed a motion seeking authority to enter into and perform under the PSA [Docket No. 3841.] After a hearing on June 26, 2013, the Court approved the PSA [Docket No. 4098], which paved the way for the Debtors to prepare and file the Plan and Disclosure Statement.

57.     <u>Plan and Disclosure Statement</u>. Following completion of the mediation and subsequent memorialization of the Plan Support Agreement, MoCo attorneys then spent considerable time reviewing and revising key portions of the Joint Plan and the Disclosure Statement. In particular, MoCo attorneys were directly responsible for discussing the various allegations regarding the Board's exercise of its fiduciary duties. MoCo attorneys also spent many hours negotiating and drafting the release provisions that were ultimately included in the Plan and Disclosure Statement. As a result of the efforts of numerous parties, including MoCo, the Joint Plan, and the Disclosure Statement were filed on July 3 and 4, 2013 [Docket No's 4153, and 4157, respectively]. The Court approved the Disclosure Statement after a hearing on August 21, 2013 [Docket No. 4809]. As noted above in the discussion of the two phase JSN adversary trial, phase II of which was conducted jointly with the contested plan confirmation hearing beginning on November 19, 2013 and continuing through November 25, the JSNs remained bitterly opposed to the otherwise largely consensual plan until negotiations led to a settlement and the filing of a Second Amended Joint Plan on December 3, 2013, days before the previously scheduled December 11 closing arguments. The Court approved confirmation of the Second Amended Joint Plan during the December 11 hearing and issued a Plan Confirmation Order that day [Docket No. 6065.]

## ALLOWANCE OF COMPENSATION

58.     The factors to be considered in awarding attorneys fees as enumerated in *In re First Colonial Corp. of America*, 544 F.2d 1291, 1298-99 (5th Cir. 1977), have been adopted by

most courts, including the Bankruptcy Court for the Southern District of New York. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 22 n.5 (Bankr. S.D.N.Y. 1991). Indeed, a majority of the *First Colonial* factors are now codified in section 330(a)(3). See, e.g., 3 L. King, et al., *Collier on Bankruptcy* at ¶ 330.04[3][c] (15th ed. rev 2008).

59.    Section 330(a)(1)(A) of the Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person, "reasonable compensation for actual, necessary services rendered." Section 330(a)(3)(A), in turn, provides that:

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A).

60.    The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. at 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on

requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists."). MoCo respectfully submits that the consideration of these factors should result in this Court's allowance of the full compensation sought.

### A.    The Time and Labor Required

61.    The professional services rendered by MoCo required the continuous expenditure of time and effort, under time pressures which at times necessitated providing services late into the evening and, on a number of occasions, over weekends and holidays. The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch. Mindful of the cost of these cases, however, MoCo staffed the case leanly so as to efficiently handle each issue for which it was tasked. Moreover, MoCo's pre-petition representation of the Independent Directors lessened the time necessary for MoCo attorneys to familiarize themselves with the issues. During the Fee Period, Period, approximately 7,454.90 recorded hours for which compensation is sought hereby were expended by MoCo' s partners, associates, and legal assistants in providing the requested professional services. MoCo's hourly billing rates, as set out in Schedule 1, are computed at the rates MoCo regularly charges its hourly clients. MoCo's hourly rates are based on, and largely lower than, compensation charged by comparably skilled practitioners in cases other than cases under title 11.

### B.    The Necessity of The Services and Benefit to the Estate

62.    These Chapter 11 Cases were among the most active pending bankruptcy cases. Indeed, many of the complex issues regarding the Debtors' operations and relationships with affiliates were hotly contested, with significant legal and factual issues being raised by the parties. As detailed above, the services MoCo provided to the Independent Directors were necessary to assist the Debtors in preserving and enhancing the value of the Debtors' estates and in confirming a plan,

and conferred substantial benefit to the Debtors' unsecured creditors. MoCo's services have furthered the Independent Directors' obligations and maximized estate value.

### C.    The Novelty and Difficulty of Issues Presented in the Cases

63.    Many novel and complex issues have arisen in the course of the Chapter 11 Cases. In these cases, as in many others in which the firm is involved, MoCo's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and proved beneficial.

### D.    The Experience, Reputation and Ability of the Attorneys

64.    MoCo has extensive experience in the areas of insolvency, workouts and corporate reorganizations. MoCo's services on behalf of the Independent Directors have been rendered in a highly efficient manner by attorneys who have achieved a high degree of expertise in these areas. The skill and competency of the MoCo attorneys who have represented the Independent Directors have ensured that these cases have been administered in the most efficient and expeditious manner.

### DISBURSEMENTS

65.    MoCo has incurred a total of $105,565.95 in expenses in connection with representing the Independent Directors during the Fee Period. MoCo records all expenses incurred in connection with the performance of professional services. A summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit D.

66.    In connection with the reimbursement of expenses, MoCo's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients. The expenses charged to MoCo's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses,

local transportation expenses, expenses for working meals, computerized research and transcription costs.

67.     MoCo charged the Independent Directors for expenses at rates consistent with those charged to MoCo's other bankruptcy clients, which rates are equal to or less than the rates charged by MoCo to its non-bankruptcy clients. MoCo seeks reimbursement from the Debtors at the following rates for the following expenses: (a) $0.7 per page for photocopying; (b) no charge for incoming facsimiles; and (c) toll charges only for outgoing facsimiles. In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and with the U.S. Trustee Guidelines, MoCo seeks reimbursement only for the actual cost of such expenses to MoCo.

68.     In providing or obtaining from third parties services which are reimbursable by clients, MoCo does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

69.     MoCo regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates. However, MoCo is not requesting reimbursement of such expenses.

70.     Attorneys at MoCo have not incurred expenses for luxury accommodations or deluxe meals. Throughout the Fee Period, MoCo has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## NOTICE

71.     Notice of this Application, as set forth in the Compensation Order, has been given to (a) counsel for the Debtors, Morrison & Foerster LLP (Attn: Larren M. Nashelsky, Gary S. Lee and Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: William K. Harrington,

Linda A. Riffkin, and Brian S. Masumoto); (c) counsel for the Official Committee of Unsecured

Creditors (the "Creditors' Committee"), c/o Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of

the Americas, New York, NY 10036 (Attn: Kenneth H. Eckstein and Douglas H. Mannal); (d)

counsel for Ally Financial Inc., Kirkland & Ellis, 601 Lexington Avenue, New York, NY 10022

(Attn: Richard M. Cieri and Ray C. Schrock); and (e) counsel for Barclays Bank PLC, Skadden,

Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attn: Kenneth S.

Ziman and Jonathan H. Hofer).

## CONCLUSION

WHEREFORE, MoCo respectfully requests the Court to enter an order, conforming

to the amounts set forth in Fee Schedule A (1) attached hereto as Exhibit E (a) allowing MoCo (i)

final compensation for professional services rendered as counsel for the Independent Directors

during the Fee Period in the amount of $4,212,750.00 and (ii) reimbursement of expenses incurred in

connection with rendering such services in the aggregate amount of $105,565.95, for a total award of

$4,318,315.95; (b) authorizing and directing the Debtors to pay to MoCo any and all such amounts

less any amounts already received for services rendered and expenses incurred during the Fee

Period; and (c) granting such further relief as is just and necessary.

Dated:  New York, New York
        March 3, 2014

                                MORRISON COHEN LLP


By:  _*/s/ Joseph T. Moldovan*_____
               Joseph T. Moldovan
               Robert K. Dakis
               909 Third Avenue
               New York, New York 10022
               Telephone:  (212) 735-8600
               Fax:  (212) 735-8708
               jmoldovan@morrisoncohen.com
               www.morrisoncohen.com