MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Erica J. Richards
Meryl L. Rothchild

*Counsel for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------ ) | |
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ------------------------------------------------------ ) | |

**FIFTH INTERIM AND FINAL FEE APPLICATION OF MORRISON & FOERSTER
LLP AS BANKRUPTCY COUNSEL FOR THE DEBTORS FOR ALLOWANCE OF
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR
REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED
<u>FROM MAY 14, 2012 THROUGH DECEMBER 17, 2013</u>**

## SUMMARY SHEET PURSUANT TO UNITED STATES
## TRUSTEE GUIDELINES FOR REVIEWING
## APPLICATIONS FOR COMPENSATION AND
## REIMBURSEMENT OF EXPENSES FILED UNDER 11 U.S.C. § 330

### FIFTH INTERIM AND FINAL APPLICATION

| | | |
|---|---|---|
| Name of Applicant: | Morrison & Foerster LLP | |
| Authorized to Provide Professional Services to: | Residential Capital, LLC, *et al.* (collectively, the "**Debtors**") | |
| Date of Retention: | Order entered on July 16, 2012 retaining Applicant *nunc pro tunc* to May 14, 2012 | |
| Fifth Application Period: | September 1, 2013 through December 17, 2013 | |
| | Total Fees Incurred: | $18,999,937.40 |
| | Total Fees Requested:[1] | $18,626,667.90 |
| | Total Expenses Requested: | $1,118,669.96 |
| | Total Fees & Expenses Requested: | $19,745,337.86 |
| Final Period: | May 14, 2012 through December 17, 2013 | |
| | Total Fees Incurred: | $99,843,636.30 |
| | Total Fees Requested:[2] | $98,457,127.80 |
| | Total Expenses Incurred: | $3,471,548.15 |
| | Total Expenses Requested:[3] | $3,043,012.82 |
| | Total Fees & Expenses Requested: | $101,500,140.62 |

---

[1]   The total fees requested for the Fifth Application Period reflect a reduction of the total fees incurred for the Fifth Application Period in the amounts of (i) $12,837.50 due to a 50% reduction for non-working travel, (ii) $341,487.00 due to time billed for the review of monthly fee statements to ensure that time detail and expenses complies with applicable compensation Guidelines, as well as to ensure that no privileged or confidential information is disclosed therein and (iii) $18,945.00 due to associate timekeepers that billed less than five hours.

[2]   The total fees requested for the Final Application Period reflect a reduction of the total fees incurred for the Final Application Period in the amounts of (i) $356,977.50 due to a 50% reduction for non-working travel, (ii) $750,914.50 due to time billed for the review of monthly fee statements and (iii) $278,616.50 due to associates that billed less than five hours.

[3]   The total expenses requested for the Final Application Period reflect an aggregate reduction of $428,535.33 in the total expenses incurred during the Chapter 11 Cases to reflect, among other things, write downs for costs for research, travel, business meals, and other disbursements.

ny-1128092

| | |
|---|---|
| Total Compensation and Expenses Previously Requested: | $81,742,800.27 |
| **Total Compensation and Expenses Previously Awarded:** | **$81,011,086.25** |

### Summary of Monthly Statements for Fifth Application Period:

| Date | Compensation Period | Requested Fees (80%) | Requested Expenses | Fees Paid | Expenses Paid | 20% Holdback |
|---|---|---|---|---|---|---|
| 11/27/2013 | 9/1/2013 – 9/30/2013 | $4,166,581.60 | $78,789.77 | $4,166,581.60 | $78,789.77 | $1,041,645.40 |
| 12/6/2013 | 10/1/2013 – 10/31/2013 | $5,379,166.40 | $133,652.62 | $5,505,958.98 | $126,792.58 | $1,344,791.60 |
| 2/20/2014 | 11/1/2013 – 11/30/2013 | $4,877,068.75 | $881,940.43 | $0.00 | $0.00 | $975,413.75 |
| 2/25/2014 | 12/1/2013 – 12/17/2013 | $1,375,614.00 | $24,287.14 | $0.00 | $0.00 | $343,903.50 |
| **TOTAL** | | **$15,798,430.75** | **$1,118,669.96** | **$9,672,540.58** | **$205,582.35** | **$3,705,754.25** |

### Summary of Previous Interim Applications:

| Fee Application & Period Covered | Fees Requested (as indicated in Fee Order) | Fees Allowed | Expenses Requested | Expenses Allowed | Date Entered & Docket No. of Fee Order | Total Requested (as indicated in Fee Order) | Total Allowed | Total Fees Paid to Applicant | Total Expenses Paid to Applicant |
|---|---|---|---|---|---|---|---|---|---|
| **First** 5/14/2012 – 8/31/2012 | $14,667,747.50 | $14,273,523.50 | $598,549.72 | $587,369.72 | 12/28/2012 [Dkt. No. 2530] | $15,266,297.22 | $14,860,893.22 | $14,273.523.50 | $587,369.72 |
| **Second** 9/1/2012 – 12/31/2012 | $20,712,177.25 | $20,622,177.25 | $418,544.90 | $418,544.90 | 4/29/2013 [Dkt. No. 3556] | $21,130,722.15 | $21,040,722.15 | $20,622,177.25 | $418,544.90 |
| **Third** 1/1/2013 – 4/30/2013 | $22,790,342.60 | $22,750,816.10 | $350,910.44 | $299,176.32 | 9/25/2013 [Dkt. No. 5205] | $23,141,253.04 | $23,049,992.42 | $22,750,816.10 | $299,176.32 |
| **Fourth** 5/1/2013 – 8/31/2013 | $21,653,139.30 | $21,525,639.30 | $551,388.56 | $533,839.16 | 12/26/2013 [Dkt. No. 6193] | $22,204,527.86 | $22,059,478.46 | $19,431,158.45 | $533,839.16 |
| **TOTAL** | **$79,823,406.65** | **$79,172,156.15** | **$1,919,393.62** | **$1,838,930.10** | -- | **$81,742,800.27** | **$81,011,086.25** | **$62,818,425.823** | **$1,838,930.10** |

**Remaining 10% Holdback Amount for Third Interim Fee Period:**    **$2,279,711.81**

**Remaining 10% Holdback Amount for Fourth Interim Fee Period:**    **$2,158,266.03**

**Total Holdback Amount Sought for Final Application Period:**    **$5,143,732.09[4]**

---

[4]    Applicant's Total Holdback Amount on account of fees incurred during the Final Application Period equals $8,143,732.04. However, as a further accommodation to the Debtors and their estates, Applicant has agreed to leave behind with the Liquidating Trust (defined below) $3.0 million of these fees.

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Erica J. Richards
Meryl L. Rothchild

*Counsel for the Post-Effective Date Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------ ) | |
| In re:                                              ) | Case No. 12-12020 (MG) |
|                                                     ) | |
| RESIDENTIAL CAPITAL, LLC, et al.,   ) | Chapter 11 |
|                                                     ) | |
| Debtors.                           ) | Jointly Administered |
| ------------------------------------------------------ ) | |

**FIFTH INTERIM AND FINAL FEE APPLICATION OF MORRISON & FOERSTER
LLP AS BANKRUPTCY COUNSEL FOR THE DEBTORS FOR ALLOWANCE OF
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR
REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES
INCURRED FROM MAY 14, 2012 THROUGH DECEMBER 17, 2013**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

　　　　For its Fifth Interim and Final Fee Application, Morrison & Foerster LLP ("**Morrison &**

**Foerster**" or "**Applicant**"), bankruptcy counsel to Residential Capital, LLC, *et al.*, as debtors

and debtors in possession (collectively, the "**Debtors**"), hereby submits this Fifth Interim and

Final Fee Application (the "**Final Application**") pursuant to section 330 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules for the

United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") for (a) allowance of compensation for professional services rendered by Morrison & Foerster for the period from September 1, 2013 through December 17, 2013 (the "**Fifth Application Period**"); (b) reimbursement of its actual and necessary expenses incurred during the Fifth Application Period; and (c) final allowance of compensation for professional services rendered by Morrison & Foerster and reimbursement of actual and necessary expenses incurred for the period from May 14, 2012 through December 17, 2013 (the "**Final Application Period**").  In support of this Final Application, Morrison & Foerster respectfully states as follows:

## **JURISDICTION, VENUE AND STATUTORY PREDICATES**

1.      This Court has jurisdiction over the Final Application pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and the Final Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 330, 331, and 1103 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-1.  This Application has been prepared in accordance with General Order M-447, *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, effective as of January 29, 2013 (the "**Local Guidelines**"), and the *U.S. Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330* effective January 30, 1996 (the "**UST Guidelines**" and, together with the Local Guidelines, the "**Guidelines**").  Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit A.

ny-1128092

## BACKGROUND

**A.      The Chapter 11 Cases**

3.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  Following the Petition Date, the Debtors managed and operated their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.   These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases (the "**Chapter 11 Cases**").

4.      On May 16, 2012, the U.S. Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed a nine member official committee of unsecured creditors [Docket No. 102] (the "**Creditors' Committee**").

5.      On June 20, 2012, the Court directed that an examiner be appointed, and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "**Examiner**").  On July 27, 2012, the Court entered an *Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner* [Docket No. 925], including the issuance of a report (the "**Examiner's Report**").  On May 13, 2013, the Examiner filed the Examiner's Report under seal [Docket Nos. 3677, 3697]. On June 26, 2013, the Examiner's Report was unsealed and made available to the public [Docket No. 4099].

6.      On October 23, 2012 and October 24, 2012, the Debtors successfully conducted an auction for the sale of the servicing and origination platform (the "**Platform Sale**") to Ocwen Loan Servicing, LLC ("**Ocwen**") for $3 billion.  On October 25, 2012, the Debtors conducted an auction for the sale of their whole loan portfolio assets (the "**Whole Loan Sale**") to Berkshire Hathaway Inc. ("**Berkshire**") for $1.5 billion.

ny-1128092

7.     At a hearing held on November 19, 2012, the Court approved the Sale Motion[1] on the record. On November 21, 2012, the Court entered orders approving the Platform Sale (which incorporated the sale and assignment of certain of the servicing and original platform assets to Walter Investment Management Corporation ("**Walter**")) and the Whole Loan Sale (collectively, the "**Asset Sales**") [Docket Nos. 2246 and 2247]. The transactions comprising the Debtors' Platform Sale closed in two parts: a sale to Walter that closed on January 31, 2013, and a sale to Ocwen that closed on February 15, 2013. The Debtors' Whole Loan Sale to Berkshire closed on February 5, 2013.

8.     On December 26, 2012, the Court entered an order approving the appointment of the Honorable Judge James M. Peck as mediator (the "**Mediator**") to assist the plan negotiations process for an initial term through and including February 28, 2013 [Docket No. 2519]. Mediation commenced shortly after the Mediator was appointed. On March 5, 2013, the Court *sua sponte* extended the appointment of the Mediator through and including May 31, 2013 [Docket No. 3101], and on June 4, 2013, the Court further extended such appointment until October 31, 2013 [Docket No. 3877]. On April 22 and 23, 2013, parties in interest attended an initial mediation "summit" with the Mediator, the Debtors' CRO (defined below) and advisors and/or business level leaders of each of the Debtors' major claimant constituencies to provide a structure in which these parties could resolve complex legal issues and develop a consensual Chapter 11 plan.

---

[1]     *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123 and Fed R. Bankr. P. 2002, 6004, 6006 and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Hearing and Sale Deadline; (III) Approving Form and Manner of Notice Thereof and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 61] (the "**Sale Motion**").

9.      Following the Court's orders extending and further extending the Debtors' exclusive period to file a Chapter 11 plan [Docket Nos. 1413, 2489], on February 22, 2013, the Court entered a bridge order to continue the extension of the Debtors' exclusive period [Docket No. 3007].    The Court subsequently entered orders during the Application Period further extending the Debtors' exclusive period to file a plan [Docket Nos. 3102, 3440, 3634, 3919, 3958], extending this period through and including August 21, 2013.   Pursuant to the Court's latest order, the Plan Proponents (defined below) had the exclusive right to solicit votes on the Plan (defined below) through and including October 21, 2013.

10.     On March 5, 2013, the Court entered an *Order Granting Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 3103], pursuant to which Lewis Kruger was appointed as the Debtors' Chief Restructuring Officer ("**CRO**").

11.     On June 26, 2013, the Court entered an order authorizing the Debtors to enter into and perform under a plan support agreement (the "**PSA**") by and among the Debtors, Ally, the Creditors' Committee, and certain consenting claimants [Docket No. 4098].

12.     On July 3, 2013, the Debtors and the Creditors' Committee (together, the "**Plan Proponents**") filed the Joint *Chapter 11 Plan Proposed by Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors* [Docket No. 4153] (as amended, the "**Plan**") and the *Disclosure Statement for the Joint Chapter 11 Plan of Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors* [Docket No. 4157] (as amended, the "**Disclosure Statement**").   On August 20, 2013, the Debtors filed with the Court the *Revised Joint Chapter 11 Plan Proposed by Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors* [Docket No. 4770].    On August 23, 2013, the Debtors filed with the Court the

5

*Corrected Solicitation Version of the Disclosure Statement and Joint Chapter 11 Plan* [Docket No. 4819].  On August 23, 2013, the Court entered an order approving, *inter alia*, the Disclosure Statement, as amended, and authorizing the Plan Proponents to solicit acceptances of the Plan [Docket No. 4809].  On November 13, 2013, the Debtors filed with the Court the *First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors* [Docket No. 5722].  On November 18, 2013, the Debtors filed with the Court the *Revised First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors* [Docket No. 5854].  On December 3, 2013, the Debtors filed with the Court the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors and (II) Blacklines of Second Amended Joint Chapter 11 Plan* [Docket No. 5993].  On December 6, 2013, the Debtors filed with the Court the *Revised Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC,* et al. *and the Official Committee of Unsecured Creditors and (II) Blackline of Changed Pages in Revised Second Amended Joint Chapter 11 Plan* [Docket No. 6030].

13.    On October 11, 2013, the Plan Proponents filed Exhibit 2 through Exhibit 21 comprising the plan supplement to the Plan (as amended, the "**Plan Supplement**").  On October 29, 2013, the Plan Proponents filed the schedule of certain contracts and unexpired leases (as amended, the "**Assumption Schedule**") as Exhibit 1 comprising the Plan Supplement.  Pursuant to the Plan, the Plan Proponents have since amended and/or supplemented certain Exhibits of the Plan Supplement.

14.    Commencing on October 15, 2013, the Court presided over a trial during which the Debtors and the Creditors' Committee litigated certain "Phase I" issues raised in their

6

respective adversary proceeding complaints (the "**JSN Adversary Proceedings**") against holders of junior secured notes (the "**JSNs**"). The Phase I trial was substantially complete by October 25, 2013, subject to post-trial briefing due on November 1, 2013 and closing arguments presented on November 6, 2013. On November 15, 2013, the Court entered the *Memorandum Opinion, and Findings of Fact and Conclusions of Law, After Phase I Trial* [Docket No. 5772].

15.    A hearing to consider confirmation of the Plan and Phase II of the JSN Adversary Proceedings began on November 19, 2013 and continued through November 26, 2013, with closing arguments heard on December 11, 2013 (the "**Confirmation Hearing**"). On December 11, 2013, the Court entered the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* [Docket No. 6065] (the "**Confirmation Order**") approving the terms of the Plan, as amended, filed in these Chapter 11 Cases. On December 17, 2013, the Effective Date (as such term is defined in the Plan) of the Plan occurred, and, among other things, the Liquidating Trust and Borrower Claims Trust (as such terms are defined in the Plan) were established [Docket No. 6137].

16.    All quarterly fees have been paid to the U.S. Trustee and all required monthly operating reports have been filed.

17.    As of the date of this Final Application, the Liquidating Trust, after making significant creditor distributions shortly after the Effective Date, has approximately $400,951,318.00 in cash on hand or on deposit, all of which is unencumbered. The Debtors estimate that as of December 16, 2013, the date of the most recent closing of the Debtors' monthly financial statements, the estates have accrued approximately $184,953,557.00 in unpaid

administrative expenses on account of operating expenses, employee liabilities (including compensation), professional fees, and other miscellaneous liabilities.

B.    **Applicant's Retention**

18.    On July 16, 2012, the Court entered the *Order Authorizing the Retention and Employment of Morrison & Foerster LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 786], approving Applicant's retention in these Chapter 11 Cases.

19.    Morrison & Foerster brought its significant experience in complex bankruptcy restructurings to bear in the Debtors' Chapter 11 Cases, which is one of the largest bankruptcy filings ever.  From the time of its retention, Morrison & Foerster diligently provided around-the-clock legal advice on a number of fronts.  Morrison & Foerster devoted time to assisting the Debtors in completing the transition to operating its businesses under Chapter 11.  Morrison & Foerster also assisted the Debtors and their other professionals with the marketing strategy of the Debtors' assets to maximize the value of, and obtain the most competitive bids for, their assets, which eventually led to two successful auctions and the consummation of the Asset Sales. Throughout the Chapter 11 Cases, Morrison & Foerster worked to ensure that the Debtors remained in compliance with the obligations set forth in certain prepetition settlements that were the result of investigations carried out by certain governmental agencies.  Additionally, since the Petition Date, Morrison & Foerster managed and responded to the perpetual inundation of contested matters and requests for information regarding the impact of these Chapter 11 Cases. Further, Morrison & Foerster has coordinated and managed a complex claims reconciliation process to assist the Debtors in assessing and determining the treatment of over 7,400 claims filed in these Chapter 11 Cases, and has worked with the Debtors, the Creditors' Committee and

8

SilvermanAcampora (defined below), and other parties in interest to resolve unique borrower

issues as well as other complex issues arising from asserted class action and individual claims.

20.    Moreover, Morrison & Foerster's professionals assisted the Debtors in all aspects

of the Creditors' Committee's investigation under Bankruptcy Rule 2004 as well as the

Examiner's thorough investigation in these Chapter 11 Cases.  These investigations involved the

review and analysis of the Debtors' documents relating to a number of significant transactions

with Ally Financial Inc. ("**AFI**") and the initial AFI settlement, the completion of monumental

document productions amounting to millions of pages relating to the same, as well as the

preparation of submissions to the Examiner and preparation of witnesses for Examiner

interviews to provide information requested so that the Examiner could complete the

investigation.

21.    The Debtors, with advice from Morrison & Foerster, engaged in a consistent and

almost daily dialogue with the Debtors' key creditor constituencies to discuss a broad spectrum

of complex issues in an effort to forge a path to a consensual Chapter 11 plan.  Morrison &

Foerster's professionals devoted many months participating in difficult mediation discussions

with respect to the Debtors' initial proposed plan settlement among the Debtors, AFI, and other

creditor constituencies, and maintained exclusivity to resolve plan issues and make progress

towards their goal of confirming a largely consensual Chapter 11 plan.  Morrison & Foerster

assisted the Debtors in reaching a subsequent plan settlement proposal, which was endorsed by

the Creditors' Committee and certain consenting claimants, and which eventually received the

support of all of the Debtors' key stakeholders.[2]

---

[2]    The final AFI settlement provided for, among other things:  (i) a $2.1 billion contribution from AFI, comprised
of (a) $1,950,000,000 in cash on the Effective Date of the Plan and (b) $150,000,000, anticipated to come from
a settlement between AFI and its insurers, but in any event to be paid by AFI no later than September 30, 2014,
in exchange for, among other things, Debtor Releases and Third Party Releases (as such terms are defined in

9

22.    Morrison & Foerster also devoted substantial time and effort to its successful litigation of the JSN Adversary Proceedings, which required extensive coordination with the Debtors' other professionals and the Creditors' Committee in order to collect, review, and analyze information, prepare fact and expert witnesses and numerous pleadings, and participate in a full trial.  Further, and simultaneously, Morrison & Foerster's tireless efforts culminated in assisting the Debtors in proposing and negotiating a Chapter 11 Plan.  The Plan incorporated numerous complex settlement agreements with certain key creditor constituencies and the formation of a number of trusts, which was confirmed on December 11, 2013.  The Plan went effective on December 17, 2013.

### MORRISON & FOERSTER INTERIM AND FINAL COMPENSATION

23.    On July 17, 2012, the Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 797] (the "**Interim Compensation Order**").  Pursuant to the terms of the Interim Compensation Order, Applicant, among others, is authorized to submit monthly invoices to the Debtors, counsel for the Creditors' Committee, counsel for AFI, counsel for Barclays Bank PLC, and the U.S. Trustee (collectively, the "**Notice Parties**") on or before the thirtieth day of each month following the end of the month for which compensation was sought.  Absent objections from the Notice Parties, or if such objections were resolved, following the twentieth day after receipt of the monthly fee statement by the parties listed above, Morrison & Foerster and the Debtors' other retained professionals were entitled to be compensated by the Debtors for 80% of the fees and 100% of the expenses requested in their respective monthly fee statements.

---

the Plan) in favor of AFI, (ii) the allocation of proceeds available for distribution to creditors based on a mediated compromise and settlement of disputed intercreditor and interdebtor issues and (iii) the creation of various trusts to provide distributions to creditors and to administer the estates following confirmation.

ny-1128092

24.     On October 11, 2012, Applicant filed its first interim fee application covering the period from May 14, 2012 through August 31, 2012 (the "**First Interim Fee Application**").  The First Interim Fee Application was granted pursuant to, and to the extent set forth in, the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 2530], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.

25.     On March 14, 2013, Applicant filed its second interim fee application covering the period from September 1, 2012 through December 31, 2012 (the "**Second Interim Fee Application**").  The Second Interim Fee Application was granted pursuant to, and to the extent set forth in, the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 3556], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.

26.     On August 7, 2013, Applicant filed its third interim fee application covering the period from January 1, 2013 through April 30, 2013 (the "**Third Interim Fee Application**"). The Third Interim Fee Application was granted, pursuant to, and to the extent set forth in, the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 5205], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.  The Court also approved the payment of the remaining 10% holdbacks for each the First Interim Fee Application and Second Interim Fee Application.

27.     On November 18, 2013, Applicant filed its fourth interim fee application covering the period from May 1, 2013 through August 31, 2013 (the "**Fourth Interim Fee Application**"). The Fourth Interim Fee Application was granted, pursuant to, and to the extent set forth in, the

*Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 5839], which provided, among other things, that the fees allowed thereunder remained subject to a 10% holdback.

28.    Morrison & Foerster has rendered services on behalf of the Debtors for the Fifth Application Period totaling 28,830.5 hours and $18,999,937.40 in fees.  In connection with the services provided during the Fifth Application Period, Morrison & Foerster requests allowance of interim compensation in the amount of $18,626,667.90[3] and reimbursement of expenses in the amount of $1,118,669.96.

29.    November 27, 2013, Applicant served its monthly invoice covering the period from September 1, 2013 through September 30, 2013 (the "**September Invoice**") on the Notice Parties.  On December 6, 2013, Applicant served its monthly invoice covering the period from October 1, 2013 through October 31, 2013 (the "**October Invoice**") on the Notice Parties.  On February 20, 2014, Applicant served its monthly invoice covering the period from November 1, 2013 through November 30, 2013 (the "**November Invoice**") on the Notice Parties.  On February 21, 2014, Applicant served its monthly invoice covering the period from December 1, 2013 through December 17, 2013 (the "**December Invoice**" and together with the September Invoice, the October Invoice, and the November Invoice, the "**Monthly Invoices**") on the Notice Parties.  As of the date hereof, Applicant had not received any objection to the Monthly Invoices.[4]

---

[3]    The total fees requested for the Fifth Application Period reflect a reduction of the total fees incurred for the Fifth Application Period in the amount of (i) $12,837.50 due to Applicant only billing the Debtors for one-half of the fees incurred for non-working travel, (ii) $341,487.00 due to time billed for the review of monthly fee statements to ensure that time detail and expenses complies with applicable compensation Guidelines, as well as to ensure that no privileged or confidential information is disclosed therein and (iii) $18,945.00 due to time spent by Applicant's associates who billed less than five hours in total during the Fifth Application Period.

[4]    The objection periods for the November Invoice and December Invoice expire on March 12, 2014 and March 13, 2014, respectively.

ny-1128092

30.     For the convenience of this Court and all parties in interest, attached hereto as Exhibit B is a schedule of the total amount of fees incurred under each of Applicant's internal task codes during the Final Application Period.

31.     As of the date of this Final Application, pursuant to the terms of the Interim Compensation Order, Applicant has received $4,245,371.37 for fees and $78,789.77 for expenses on account of its September Invoice, and $5,505,958.98 for fees and $126,792.58 for expenses on account of its October Invoice.  Applicant has not yet received any payments for fees and expenses on account of either the November Invoice or December Invoice as of the date hereof.[5]  The Monthly Invoices reflect voluntary aggregate deductions of $373,269.50 in fees during the Fifth Application Period, comprising a 50% reduction for non-working travel ($12,837.50) and a 100% reduction for Applicant's review of the Monthly Invoices for privilege and compliance with compensation guidelines ($341,487.00).  In addition, this Final Application reflects the deduction of fees for time billed by associates who billed less than five hours total during the Fifth Application Period ($18,945.00).

32.     Applicant maintains computerized records of the time expended in the rendering of the professional services required by the Debtors.  These records are maintained in the ordinary course of Applicant's practice.  For the convenience of this Court and all parties in interest, attached hereto as Exhibit C is a billing summary for the Final Application Period, setting forth the name of each attorney and paraprofessional who rendered services during the Final Application Period, each attorney's year of bar admission and area of practice

---

[5]     On account of the November Invoice and December Invoice, respectively, Applicant expects to receive prior to the hearing on this Final Application payment of 80% of fees and 100% of expenses for the applicable compensation periods, which will bring the total fees paid for the Fifth Application Period to $14,916,490.32 and total expenses paid for the Fifth Application Period to $1,111,809.92, bringing the aggregate amount of payments received by Applicant for the Fifth Application Period to $16,028,300.24.

ny-1128092

concentration, the aggregate time expended by each attorney and each paraprofessional, the hourly billing rate for each attorney and each paraprofessional at Applicant's current billing rates, and the individual amounts requested for each professional.  The compensation requested by Applicant is based on the customary compensation charged by comparably skilled practitioners in other similar cases under the Bankruptcy Code.

33.    Applicant also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursements are sought is attached hereto as <u>Exhibit D</u>.[6] The Monthly Invoices reflect aggregate deductions of $151,862.03 in expenses incurred during the Fifth Application Period.  Additionally, as an accommodation to the Debtors made in accordance with prepetition practices, Applicant does not charge the Debtors for expenses incurred by Applicant for Lexis or Westlaw research, overtime meals, in-house document preparation fees, or secretarial overtime.  These expenses are in addition to the deductions described above.

34.    Copies of Applicant's computerized records of fees and expenses in the format specified by the Guidelines have been served on the Notice Parties with each of the Monthly Invoices and are attached hereto collectively as <u>Exhibit E</u>.

35.    There is no agreement or understanding between Applicant and any other person, other than partners of the firm, for the sharing of compensation to be received for services rendered in the Chapter 11 Cases.

---

[6]    To the extent that the descriptions of expenses for travel and transportation to and/or from the Court, either after 8:00 a.m. or before 8:00 p.m., do not state the purpose for the use of a cab or car, Applicant submits that such expenses were incurred by the Applicant's professionals for the purpose of transporting voluminous hearing materials to and/or from Court.

36.    Except as otherwise set forth herein, parties listed in paragraph (a) of the Interim Compensation Order will be furnished with a copy of this Final Application.  All other parties that have filed a notice of appearance with the Clerk of this Court and requested notice of pleadings in these Chapter 11 Cases shall be furnished with a notice of hearing on the final applications, with a right to receive copies of the final applications upon request.

37.    On December 7, 2012, March 25, 2013, August 28, 2013 and December 9, 2013, the U.S. Trustee filed responses to Morrison & Foerster's requests for interim compensation for the first interim period, the second interim period, the third interim period, and the fourth interim period, respectively.

38.    Morrison & Foerster has been allowed, on an interim basis, fees and expenses in the following amounts on account of its previous interim fee applications:

| Fee Application & Period Covered | Fees Requested (as indicated in Fee Order) | Fees Allowed | Expenses Requested | Expenses Allowed | Date Entered & Docket No. of Fee Order | Total Requested (as indicated in Fee Order) | Total Allowed |
|---|---|---|---|---|---|---|---|
| **First** 5/14/2012 – 8/31/2012 | $14,667,747.50 | $14,273,523.50 | $598,549.72 | $587,369.72 | 12/28/2012 [Dkt. No. 2530] | $15,266,297.22 | $14,860,893.22 |
| **Second** 9/1/2012 – 12/31/2012 | $20,712,177.25 | $20,622,177.25 | $418,544.90 | $418,544.90 | 4/29/2013 [Dkt. No. 3556] | $21,130,722.15 | $21,040,722.15 |
| **Third** 1/1/2013 – 4/30/2013 | $22,790,342.60 | $22,750,816.10 | $350,910.44 | $299,176.32 | 9/25/2013 [Dkt. No. 5205] | $23,141,253.04 | $23,049,992.42 |
| **Fourth** 5/1/2013 – 8/31/2013 | $21,653,139.30 | $21,525,639.30 | $551,388.56 | $533,839.16 | 12/26/2013 [Dkt. No. 6193] | $22,204,527.86 | $22,059,478.46 |
| **TOTAL** | **$79,823,406.65** | **$79,172,156.15** | **$1,919,393.62** | **$1,838,930.10** | -- | **$81,742,800.27** | **$81,011,086.25** |

## COMPENSATION REQUESTED BY MORRISON & FOERSTER

39.    By this Final Application, Morrison & Foerster requests approval of its fees and expenses relating to professional services provided to the Debtors during the entirety of the Debtors' Chapter 11 Cases, including approval of fees for services rendered and expenses incurred during the Fifth Application Period, for which approval has not yet been received.

40.     Specifically, Morrison & Foerster requests final allowance of (i) its fees for the Fifth Application Period in the aggregate amount of $18,626,667.90 and reimbursement of expenses incurred in connection with the rendition of such services in the aggregate amount of $1,118,669.96, for a total award of $19,745,337.86 (the "Fifth Period Compensation Amount"), and (ii) $101,500,140.62 for the Final Application Period, of which $$98,457,127.80 is for professional services rendered and $3,043,012.82 for reimbursement of actual and necessary expenses incurred by Morrison & Foerster during these Chapter 11 Cases, and which includes the Fifth Period Compensation Amount.

41.     The Fifth Period Compensation Amount includes all of the fees for services rendered and expenses incurred and billed to the Debtors, including 20% of the total amount of fees invoiced for which Morrison & Foerster is not entitled to payment under the Interim Compensation Order, as well as those fees paid in accordance with the Interim Compensation Order.

42.     As a further accommodation to the Debtors and their estates, Morrison & Foerster has agreed to leave behind with the Liquidating Trust $3.0 million of fees incurred by Applicant's professionals during the Final Application Period.  While Applicant's total holdback amount on account of fees incurred during the Final Application Period equals $8,143,732.04, Applicant will only seek payment of $5,143,732.04 so as to provide for this accommodation.

43.     The fees sought by this Final Application reflect (i) an aggregate of 28,830.5 hours of attorney and paraprofessional time spent and recorded in performing services for the Debtors and their estates during the Fifth Application Period, and (ii) an aggregate of 159,247.1 hours of attorney and paraprofessional time for services rendered during the Final Application Period.  The blended average hourly rate for both professionals and paraprofessionals is $659.02

16

during the Fifth Application Period and $626.97 for the Final Application Period.  The blended hourly rate for attorneys only is $714.84 for the Fifth Application Period and $663.47 for the Final Application Period.  Morrison & Foerster is only seeking compensation for services rendered to the Debtors in connection with these Chapter 11 Cases.

44.    Pursuant to Article II, Section B of the Plan, "[a]ll final requests for Professional Claims must be Filed no later than seventy-five (75) days after the Effective Date."  Plan at Art. II.B. This Final Application is being filed in accordance with the confirmed Plan.

45.    As required by the Local Guidelines, a certification regarding Applicant's compliance with the Local Guidelines is attached hereto as Exhibit A.

46.    For the convenience of this Court and all parties in interest, attached hereto as Exhibit B is a schedule of the total amount of fees incurred under each internal Morrison & Foerster task code during the Fifth Application Period and the Final Application Period.

47.    Morrison & Foerster maintains computerized records of the time expended in the rendering of the professional services required by the Debtor and their estates.  These records are maintained in the ordinary course of Morrison & Foerster's practice.  For the convenience of this Court and all parties in interest, attached hereto as Exhibit C is a billing summary for the Fifth Application Period and the Final Application Period, setting forth the name of each attorney and paraprofessional who rendered services during the Fifth Application Period and the Final Application Period, each attorney's year of bar admission and area of practice concentration, the aggregate time expended by each attorney and each paraprofessional, the hourly billing rate for each attorney and each paraprofessional at Morrison & Foerster's billing rates and the individual amounts requested for each professional.  The compensation requested by Morrison & Foerster is

17

based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

48.    Morrison & Foerster also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought for the Fifth Application Period and the Final Application Period is attached hereto as Exhibit D.  As stated above, the Monthly Invoices reflect aggregate deductions of $151,862.03 in expenses incurred during the Fifth Application Period.  Applicant has complied with the Debtors' billing policies and has not charged for certain expenses.[7]  Additionally, as an accommodation to the Debtors made in accordance with prepetition practices, Applicant does not charge the Debtors for expenses incurred by Applicant for Lexis or Westlaw research, overtime meals, in-house document preparation fees, or secretarial overtime.  These expenses are in addition to the deductions described above.  With respect to certain larger expenses incurred by the Debtors during the Fifth Application Period, annexed hereto as Exhibit D-1 is supporting documentation for these disbursements.  Specifically, Exhibit D-1 is comprised of invoices and corresponding time detail submitted by certain vendors and experts engaged for their professional services necessary to these Chapter 11 Cases (e.g., discovery-related expenses, expert analyses in support of the FGIC 9019 Settlement (defined below), etc.).

49.    Copies of Morrison & Foerster's computerized records of fees and expenses in the format specified by the Guidelines have been filed with this Court and served on the Notice Parties with each of the Monthly Fee Statements in the Fifth Application Period, and, for the convenience of this Court, are attached hereto as Exhibit E.

---

[7]    For example, Applicant has not billed the Debtors for certain photocopying, printing, mailing, and local travel charges.

ny-1128092

50.     There is no agreement or understanding between Morrison & Foerster and any other person, other than members of the firm, for the sharing of compensation to be received for services rendered in these Chapter 11 Cases.

## SUMMARY OF PROFESSIONAL SERVICES
## RENDERED DURING THE CHAPTER 11 CASES

51.     As set forth in more detail in the First through Fifth Interim Fee Applications, Morrison & Foerster professionals provided substantial and continuing services to the Debtors during these Chapter 11 Cases.  These Chapter 11 Cases frequently presented unique challenges. Despite these complex issues and the extraordinary efforts required to coordinate the numerous interests at stake in these cases, the Debtors, with the assistance of Morrison & Foerster and the Debtors' other retained professionals, were able to work with the major stakeholders and certain federal and state agencies to confirm a consensual Plan.  The successful completion of these complex cases required enormous efforts by Morrison & Foerster on behalf of the Debtors.

52.     In addition, the success of the Debtors' Chapter 11 Cases required constant and close coordination among a multitude of interested parties.  To keep the cases on track, Morrison & Foerster attorneys engaged in communications on a regular basis with the Debtors, other professionals, and both individual and groups of creditors.

53.     Specifically, during the pendency of these Chapter 11 Cases, Morrison & Foerster professionals devoted significant efforts to, among other things:

> (A)     advising the Debtors with respect to their powers and duties as debtors in possession in the continued management and operation of their businesses and properties;

> (B)     attending meetings and negotiating with creditors, governmental regulatory agencies, and parties in interest;

> (C)     advising the Debtors in connection with the Asset Sales as well as the sales of *de minimis* assets in these Chapter 11 Cases;

19

(D)     taking all necessary action to protect and preserve the Debtors' estates, involving prosecuting actions on the Debtors' behalf, including, but not limited to, the JSN Adversary Proceedings, defending any action commenced against the Debtors, and representing the Debtors' interests in negotiations concerning all litigation in which the Debtors are involved, including, but not limited to, objections to claims filed against the Debtors or their estates;

(E)     preparing all motions, applications, answers, orders, reports, and papers necessary to the administration of the Chapter 11 Cases;

(F)     taking any necessary action on behalf of the Debtors to obtain approval of solicitation procedures, the Disclosure Statement and confirmation of a consensual Chapter 11 Plan, including engaging in plan mediation under the direction of the Mediator;

(G)     providing U.S. tax advice to the Debtors regarding restructuring matters;

(H)     appearing before this Court, any appellate courts, and the U.S. Trustee to protect the interests of the Debtors' estates before such Courts and the U.S. Trustee;

(I)     performing other necessary legal services for the Debtors in connection with the Chapter 11 Cases, including (i) analyzing the Debtors' leases and executory contracts and the assumption or assignment thereof, (ii) analyzing the validity of liens against the Debtors, and (iii) advising on corporate, litigation, and other legal matters;

(J)     facilitating and cooperating with the Creditors' Committee's and the Examiner's investigations, including responding to voluminous discovery requests and preparing written submissions in response to Examiner inquiries; and

(K)     taking all steps necessary and appropriate to bring the Chapter 11 Cases to conclusion.

54.     Moreover, during the Fifth Application Period, for which interim approval has not previously been sought, Morrison & Foerster provided ongoing professional services to the Debtors in connection with the completion of the tasks necessary to reach the Effective Date of the Plan.  These services were, from time to time, performed under time constraints.  Morrison & Foerster attorneys and paraprofessionals focused their efforts in this time period on finalizing all of the documents to be executed in connection with the Effective Date; coordinating with the

ny-1128092

Debtors and the Debtors' professionals and the Creditors' Committee regarding Effective Date matters; developing procedures necessary to satisfy the conditions precedent to the Effective Date; and coordinating the several processes and personnel essential to reaching the Effective Date.

55.    To provide a more detailed, orderly and meaningful summary of the services rendered by Morrison & Foerster on behalf of the Debtors during the Final Application Period, Morrison & Foerster established, in accordance with the Guidelines and its internal billing procedures, separate task codes in connection with these Chapter 11 Cases. The following is a summary of the most significant professional services rendered by Morrison & Foerster during the Final Application Period, including, where applicable, a description of the services performed during the Fifth Application Period, organized in accordance with Morrison & Foerster's internal system of task codes.

### (a)    Asset Analysis and Recovery – 001

**Fees for Fifth Period:  $499,302.50; Hours for Fifth Period:  793.1**

**Fees for Final Period:  $596,903.50; Hours for Final Period:  928.2**

56.    This category includes time spent by Applicant's professionals reviewing and analyzing materials regarding the Debtors' assets and liabilities, including:  analysis of assets and liabilities related to intercompany balances and secured bondholder obligations; analysis and discussion of strategies for obtaining capital returns with respect to the Debtors' captive non-Debtor insurer CapRe of Vermont; analysis of the repurchase recovery protocol, and the Debtors' loan repurchase recovery efforts with respect to charged off loans and pending settlements in connection with certain repurchase recovery claims; research and analysis of issues related to unclaimed borrower funds; and analysis of strategies for liquidating certain non-

21

Debtor affiliates incorporated under the laws of the United Kingdom, as well as discussions with the Creditors' Committee and its advisors regarding the same. In addition, Applicant devoted time to analyzing repurchase recovery thresholds and settlement parameters with FTI; researching and analyzing issues related to potential avoidance action recoveries; and researching and analyzing, among other matters, loan level data and statute of limitations and jurisdictional issues in connection with potential estate claims against certain third party correspondent lenders and originators to recover amounts due and owing under certain indemnification agreements and representation and warranty contract provisions, and researching, drafting, and preparing complaints to preserve such claims.

   (b)  **Asset Dispositions/Sales – 002.**

   **Fees for Fifth Period:  $459,184.50; Hours for Fifth Period:  682.6**

   **Fees for Final Period:  $7,609,589.00; Hours for Final Period:  10,980.1**

   54.  This category includes time devoted by Applicant to all matters related to the disposition of the Debtors' assets through the Asset Sales by and between the Debtors and Ocwen, Walter, and Berkshire, respectively, which generated an aggregate of approximately $4.5 billion in sale proceeds for the Debtors' estates, as well as matters concerning various *de minimis* asset sales. This category includes time billed to: preparing for and participating in numerous meetings and calls with the various parties in interest regarding sale issues, including the Debtors, stalking horse bidders, other potential third party bidders, the Creditors' Committee, AFI and Ally Bank, and governmental entities; assisting the Debtors and the Debtors' other professionals with the marketing strategy of such assets and securing stalking horse bidders; researching, drafting, and revising the asset purchase agreements, and the schedules and disclosure memoranda and proposed orders related thereto; preparing the sale procedures motion; reviewing, analyzing, and responding to objections to the motion for

approval of bidding and sale procedures and researching issues in connection therewith; reviewing and analyzing competing bids; negotiating non-disclosure agreements with potential bidders; preparing forms of subservicing agreements and transition services agreements in connection with the Asset Sales; and researching issues in connection with the appointment of a privacy ombudsman, drafting an ombudsman declaration and privacy notices, and correspondence with the U.S. Trustee regarding same.

55.    In addition, Applicant devoted time to conducting the auctions for the Platform Assets and Whole Loan Assets, which spanned three days; reviewing, analyzing, and responding to numerous pre- and post-auction objections to the Asset Sales and researching issues in connection therewith; engaging in extensive negotiations with various parties objecting to the Asset Sales regarding the potential resolution of such objections; preparing for contested hearings to approve the Asset Sales; preparing forms of subservicing agreements and transition services agreements in connection with the Asset Sales; and preparing for and participating in numerous meetings and calls with Ocwen, Walter, Berkshire, and the Creditors' Committee regarding operational and closing requirements and mechanics for each of the Asset Sales.  In addition, Applicant spent time researching, negotiating, and drafting certain amendments to the asset purchase agreement for the Platform Sale with Ocwen and asset purchase agreement for the Whole Loan Sale with Berkshire; drafting, revising, and executing numerous Platform Sale and Whole Loan Sale closing documents, as well as the various schedules, disclosure memoranda and non-disclosure agreements, power of attorney agreements, purchase price adjustments, and amendments related thereto; drafting and preparing certain notices of assumption and assignment for servicing agreements to be assumed and assigned to Ocwen and Berkshire, respectively, in connection with the Asset

23

Sales; and preparing and conducting analyses in connection with a potential sale of FHA/VA loans.

56.    Further, Applicant spent significant time in connection with managing other issues related to the Asset Sales, including: drafting and preparing replies, including an omnibus reply, to certain cure and sale objections, and drafting and negotiating stipulations, including stipulations with certain SBO servicers, relating to the resolution of the same; reviewing and engaging in negotiations and discovery, where applicable, to reconcile certain outstanding asserted cure claims; reviewing and analyzing numerous post-closing issues, including, but not limited to, obtaining the extension of Ginnie Mae PIIT[8] authorization, and documentation of the same, including preparing comments to a Ginnie Mae PIIT extension letter agreement in connection with PIIT servicing transfers; reconciling servicing and subservicing agreements, and determining true-up payments with Ocwen, Berkshire, and Walter; drafting, analyzing, revising, and discussing with parties in interest certain primary servicing, master servicing, subservicing, and servicing transfer agreements, as well as statements of work issues post-closing of the Asset Sales; managing the sale proceeds allocation and transfer of funds relating to various components of the Asset Sales, as well as analyzing the rights of the RMBS Trustees regarding the post-closing payment of fees.

57.    Additionally, this category includes time billed to Applicant's time spent on reviewing, analyzing, negotiating, and reconciling remaining asserted cure claims and cure amount and sale objections, including:  preparing for and participating in numerous meetings and calls with the various parties in interest regarding pending sale-related and/or open cure claim issues involving, among others, Impac Funding Corporation ("**Impac**"), Syncora

---

[8]    PIIT is a term used by Ginnie Mae to designate an ability to effectuate an immediate pool transfer upon issuance.

Guarantee Inc. (**Syncora**), Financial Guaranty Insurance Company ("**FGIC**"), Ambac, and DB Structured Products, Inc. ("**DB**"), including meetings and calls between the Debtors, Ocwen, various third parties, the Creditors' Committee, AFI and Ally Bank regarding the same; analyzing, drafting, and preparing stipulations and side letters to resolve the cure claim and servicing transfer issues between the Debtors and aforementioned third parties; researching and reviewing transactions, deal level information and related documents to analyze servicing assets, servicing, master servicing, and/or SBO servicing issues, loan status, and assignment issues so as to diligence asserted claims and/or assignment of loan agreements involving such counterparties; researching, negotiating, and drafting certain settlements, stipulations, and motions relating to the same; and negotiating and drafting a scheduling order and amendments thereto to allow Applicant to draft a stipulation letter agreement between the Debtors, Ocwen, and FGIC in connection with resolving FGIC's outstanding cure claim and to document the transfer of certain FGIC agreements to Ocwen.

58.    Further, Applicant devoted time to: analyzing Ocwen's obligation to pay the purchase price for charged off loans; engaging in discussions with the Debtors, Ocwen, Walter, and other parties in interest regarding loan modification issues and loan file issues and potential courses of action, including drafting responses to Ocwen's dispute letter, to resolve the same; reviewing pooling and servicing agreements in connection with parties' remaining post-closing obligations and continue to review servicing-related agreements and related schedules in connection with Asset Sales reconciliation efforts and true-up calculations; analyzing purchase price schedules and adjustments, various non-disclosure agreements with certain third parties; reviewing and analyzing amendments and modifications to the AFI Shared Services Agreement and Transition Services Agreements between the Debtors and

25

Ocwen and Walter, respectively; reviewing and analyzing SLS (HELOC services) reporting issues; and participation in numerous meetings and calls with Debtors' other professional advisors, the Creditors' Committee and its professional advisors in connection with the aforementioned activities.

59.    Lastly, Applicant devoted time to: researching and discussing a potential non-government loan sale and sale of FHA and VA loans; analyzing, drafting, and preparing a section 363 motion, declaration in support, and proposed order to approve the sale of these mortgage loans, and mortgage loan purchase agreement and interim servicing agreement to document the same; and discussing same with the Debtors, Centerview, and other parties in interest regarding the same.

**(c)    Business Operations and Advice – 003.**

**Fees for Fifth Period:  $448,652.00; Hours for Fifth Period:  504.4**

**Fees for Final Period:  $3,388,571.50; Hours for Final Period:  4,161.4**

60.    This category includes matters related to advising the Debtors with respect to their business operations, in connection with both day-to-day matters and long-term strategic planning, relating to the Debtors' business and management generally.  Such tasks included: correspondence with the Debtors and default/foreclosure counsel regarding the impact of the bankruptcy filing on pending foreclosures and loss mitigation activities; analyzing cash management and servicing issues; providing advice regarding the implementation of interim first day orders; assisting the Debtors with resolving various operational issues, including those related to stopped payments, servicing agreement terminations, misdirected transfers, and reporting obligations incurred as a result of the bankruptcy filing; assisting the Debtors in the preparation of monthly operating reports and other required periodic reporting and related audits, such as drafting and preparing the Debtors' 2012 year-end consolidated financial

26

statements and related financial statement notes; and analyzing the mechanics for transitioning employees and the separation of intellectual property and services following the closing of the Asset Sales.

61.    In addition, Applicant devoted time to preparing for and participating in board meetings and periodic estate presentations, and providing advice to the Debtors' directors regarding, among other things: strategy regarding the trajectory of the Chapter 11 Cases; negotiated settlements with key stakeholders; the JSN Adversary Proceedings and pending litigation; governance issues; estate budget and wind-down activities and cost analyses, and estate management issues to ensure the efficient use of estate resources; directors' fiduciary duties; estate operations; board composition; director indemnification post-closing of the Asset Sales; providing analyses of cash management budgets, and servicing issues; and advising the Debtors as to the run rates, fee limits, and quarterly reporting for ordinary course professionals retained by the Debtors.

62.    In providing advice to the Debtors with respect to the Debtors' business and management, Applicant's professionals invested significant time in the following: advising the Debtors on Plan and Disclosure Statement negotiations, including advising the Debtors on term sheet discussions and the progress of mediation relating to Plan negotiations, and providing updates and analyses as to the negotiations with various creditor constituencies.  Applicant also devoted time to: correspondence and meetings with the Debtors regarding the necessity and impact of selecting a CRO to assist the Debtors and the estates in plan negotiations and wind-down activities, the process by which such CRO was selected, and discussions concerning the scope of the CRO's duties and CRO compensation matters in the Chapter 11 Cases; reviewing, analyzing, and discussing with the Debtors, the Creditors' Committee and its professionals the

scope of the CRO's duties and inclusion of a market-rate success fee in connection with the CRO's compensation for work performed in the Chapter 11 Cases, and advising the Debtors on analyses provided by FTI and Mercer in connection with the same.

63.    Additionally, Applicant spent time: advising the Debtors as to the necessity of working with a chief liquidation officer to continue to wind-down the estates, and the process for selecting and retaining the same; assisting the Debtors with resolving various operational issues, including those related to DOJ (defined below) consent order obligations; analyzing and advising on the considerations of implementing the Plan and the effect on the estate and remaining Debtor UK companies; and managing numerous press inquiries regarding the status and developments of the Chapter 11 Cases.

**(d)    Case Administration – 004.**

**Fees for Fifth Period:  $123,980.00; Hours for Fifth Period:  261.6**

**Fees for Final Period:  $1,099,147.50; Hours for Final Period:  2,054.3**

64.    This category includes matters related to the administration of the Debtors' Chapter 11 Cases, including:  preparing and revising the consolidated list of top 50 creditors and master service list; reviewing and monitoring the main Chapter 11 Cases consolidated docket and related adversary proceeding dockets; managing task lists, and tracking deadlines; assisting the Debtors with preparing expense reports and tracking and payment of invoices for retained professionals, ordinary course professionals, expert witnesses, RMBS trustees and their counsel, and contract attorneys; preparing weekly update memoranda to distribute to the board to inform on case status and strategy; managing the costs of document production, including the approval of contract attorney time sheets and payment of vendor production invoices; coordination and delivery of hearing materials to Court; and preparation for and participation in various working group meetings to discuss case strategy and status, upcoming

ny-1128092

hearing matters, and allocation and coordination of tasks. Applicant's professionals developed a practice of participating in a weekly meeting/call in which the attorneys bearing material responsibility for every workstream in the Chapter 11 Cases engage in discussions addressing a wide range of topics, such as Plan negotiations and settlement discussions with various creditor constituencies, mediation efforts, the claims reconciliation process, and estate planning efforts, among others. Such discussions directly assisted Applicant's professionals in understanding the impact of issues arising in one workstream on various other workstreams, and were necessary for the coordination of overall case strategy and planning to progress the Debtors' Chapter 11 Cases.

65.     Furthermore, Applicant devoted time to reviewing and analyzing certain motions filed by the JSNs and other filings relating thereto, including the JSNs' motion to disqualify Applicant from participation in these Chapter 11 Cases, or alternatively, requiring neutrality of Applicant in the context of inter-Debtor disputes. Applicant conducted numerous internal meetings and engaged in correspondence internally and with the Creditors' Committee and other parties to determine the appropriate response thereto, and prepared, filed papers, and argued in opposition to that motion.

**(e)     Claims Administration and Objections – 005.**

**Fees for Fifth Period:  $3,311,664.00; Hours for Fifth Period:  5,275.6**

**Fees for Final Period:  $11,784,843.50; Hours for Final Period:  17,964**

66.     This category includes time spent by Applicant's professionals in connection with the identification, review, categorization, and analysis of claims asserted against the Debtors, and reconciling the same to work towards identifying and classifying an accurate universe of claims asserted against the Debtors. Applicant devoted time to: preparing the motion establishing bar dates for filing proofs of claim, corresponding with various parties in

29

interest regarding the bar date notice and cure claims deadlines, and negotiating and drafting various bar date stipulations with parties in interest; researching issues in connection with, among other matters, potential intercompany claims, administrative claims and HELOC obligations; researching and analyzing equitable subordination issues; correspondence with certain governmental associations and the Debtors regarding potential put-back claims; and researching, drafting and revising motions seeking approval of omnibus claims objection procedures and extension of the general bar date.

67.     Time in this category includes substantial time devoted to the performance of numerous claims reconciliation tasks, including: drafting and preparing omnibus claims objections to certain borrower and non-borrower claims on a variety of bases, including, but not limited to, (i) late filed, (ii) amended and superseded, (iii) duplicate, (iv) insufficient documentation, (v) no liability (books and records), (vi) duplicate debt with trustee, and (vii) barred by the doctrine of res judicata, as well as related declarations, exhibits and proposed orders, and filing a total of fifty-seven (57) omnibus claims objections and numerous individual borrower and non-borrower claims objections within the Final Application Period, and conducting diligence in preparation for subsequent omnibus claims objections; researching, drafting, and revising replies to certain responses filed in connection with the omnibus claims objections and individual claim objections, and preparing stipulations to document claims settlement terms with certain third parties as required; researching and analyzing issues and general claims reconciliation strategy with the Debtors' claims management and reconciliation team ("**CM&R**") and preparing for and participating in periodic meetings and conferences to discuss the status of the same; discuss claims reconciliation issues and progress with CM&R, the Creditors' Committee and its advisors,

ny-1128092

including SilvermanAcampora LLP, special borrowers' counsel to the Creditors' Committee

("**SilvermanAcampora**"), and other Debtors' professionals and special and ordinary course

counsel in connection with certain class action claims and the administration and treatment of

borrower claims, including the drafting, preparation, and tracking of borrower request letters

for additional claim information and any responses provided thereto, to manage the Debtors'

claims register; and preparing for and participating in meetings with Debtors' personnel

regarding claim reconciliation process and strategy.

68.     In addition, Applicant expended significant efforts in pursuing the Debtors'

strategy in the treatment of certain classes of claims in the Chapter 11 Cases, including:

researching and analyzing issues surrounding individual objections to large borrower claims,

including jurisdictional and res judicata issues, and preparing to litigate the same; objecting to

certain securities claims, and engaging in litigation and settlement negotiations in connection

with the same; and researching and analyzing issues related to large general unsecured claims,

securities claims, servicing claims, rep and warrant claims, indemnification claims, and tax

claims, among others, and filing certain objections and stipulations of settlement in connection

with certain claims.

69.     Further, Applicant devoted a great amount of time to analyzing the underlying

bases and value of certain monoline claims, including those claims asserted by FGIC, and

working with the Debtors' other advisors, as well as the Creditors' Committee and certain

trustees, towards a settlement agreement to resolve the treatment of such claims (the "**FGIC**

**9019 Settlement**").   In connection with the FGIC 9019 Settlement, Applicant spent time:

researching, drafting, revising, and discussing the motion in support of the FGIC 9019

Settlement; analyzing, researching, and preparing responses to the objections filed in

connection with the same; analyzing the Debtors' expert reports and drafting, revising, and finalizing expert and witness testimonies in support of the FGIC 9019 Settlement; analyzing objectors' expert reports and drafting, revising, and finalizing rebuttals to same. Once determining that the FGIC 9019 Settlement would need to be heard before the Court at an evidentiary hearing, Applicant devoted time to researching and analyzing issues relating to motions in limine, and preparing motions in limine to prevent certain of the objectors' expert testimony from being introduced at that hearing, as well as responding to motions in limine filed to by certain objectors in connection with certain of the Debtors' expert testimony; and discussing strategy relating to the aforementioned activities, with the goal of receiving Court approval of the FGIC 9019 Settlement, with Applicant's professionals and the Debtors' other advisors, trustees, the Creditors' Committee and its advisors.

70.    Lastly, Applicant spent time continuing to research and analyze equitable subordination issues and preparing briefs in connection with the subordination of certain classes of claims; reviewing and analyzing issues concerning the classification of securities claims, the estimation of such claims and asserted damages, related indemnification agreements in connection therewith, and related strategy; researching and analyzing intercompany claims, debt forgiveness and balance issues, and the impact of the same on the Debtors' estates. Applicant also devoted time to: researching, analyzing, drafting, and filing an objection to the JSN claims' ability to vote at each Debtor, and discussing with the Creditors' Committee's professionals and other parties in interest the impact of same on JSN votes on the Plan; researching, analyzing, and drafting a process for the estimation of contingent, disputed, and unliquidated claims, and drafting and finalizing the related motion, exhibits, declaration, and proposed order to establish a claims reserve for the reconciliation of said claims;

discussing the same with the Debtors' other professionals and the Creditors' Committee' professionals, as well as responding to formal and informal responses thereto; analyzing various class action claims and class certification issues, negotiating, and resolving over a dozen large putative class action claims against the Debtors' estates, and researching, analyzing, drafting, and preparing the class data, settlement agreements, confidentiality agreements, and related filings to document the same; and analyzing and drafting proposed procedures for the adjudication of objections to certain borrower claims relating to loan modification matters, and discussions with the Debtors and SilvermanAcampora regarding the aforementioned activities.

    **(f)      Executory Contracts – 006.**

    **Fees for Fifth Period:  $123,322.00; Hours for Fifth Period:  199.6**

    **Fees for Final Period:  $1,911,288.00; Hours for Final Period:  3,201.7**

71.    This category includes time spent by Applicant's professionals related to the review, analysis, and activities relating to the assumption/rejection of executory contracts and unexpired leases prior to and after the closing of the Asset Sales, including:  preparation of consent letters related to assignment of agreements under the asset purchase agreements; research and analysis relating to the severing of origination and servicing obligations under the Debtors' pooling and servicing agreements; identification and analysis of provisions relating to requirements for assumption and assignment of pooling and servicing agreements and intellectual property licenses as part of the Asset Sales; corresponding and negotiating with counterparties in connection with the consensual extension of certain lease agreements; researching and analyzing issues relating to the treatment of certain servicing agreements and agreements relating to HELOCs, strategy regarding zero-balance HELOCs.

72.     Applicant also devoted time to: drafting motions to assume and assign servicing agreements with respect to Ambac, DB, Impac, Hewlett Packard, Syncora, CalHFA, and Wells Fargo, as well as drafting reply briefs and conducting negotiations concerning consensual resolution of the same; negotiating and preparing stipulations in connection with the assumption and assignment of certain agreements and the resolution of related cure issues with, among others, the aforementioned parties; preparing notices of assumption and assignment of certain executory contracts and unexpired leases; preparation of rejection notices of certain executory contracts and unexpired leases; identifying and analyzing certain borrower rewards programs, borrower loss mitigation programs, and VA programs and determining whether to assume and assign contracts relating to the same; and engaging in numerous meetings with the Debtors' management regarding the aforementioned activities.

(g)     **Fee/Employment Applications – 007.**

**Fees for Fifth Period:  $93,008.50; Hours for Fifth Period:  166.5**

**Fees for Final Period:  $999,562.00; Hours for Final Period:  1,752.4**

73.     This category includes all matters related to the review, analysis and preparation of fee and retention applications and associated exhibits, affidavits, and supporting documentation, filed by Applicant and by various retained professionals in the Chapter 11 Cases, and providing advice and assistance to the Debtors and the Debtors' other professionals retained in connection with their retention in these cases, including, but not limited to, retention applications and certain supplemental applications, declarations, and proposed orders filed by Pepper Hamilton, Bradley Arant Boult Cummings, Hudson Cook, Orrick, Herrington & Sutcliffe LLP, Deloitte & Touche, Ernst & Young, Locke Lord LLP, Perkins Coie, PriceWaterhouseCoopers, LLP, FTI Consulting, Inc., Centerview Partners, Zeichner Ellman & Krause, Dorsey and Whitney LLP, and various ordinary course professionals utilized by the

34

Debtors, as well as reviewing and analyzing retention applications filed by professionals retained by the Creditors' Committee and the Examiner, including, among others, Moelis & Company and Wilmer Cutler Pickering Hale and Dorr LLP.

74.     This category also includes time spent advising various retained professionals and the Debtors of the process for applying for, and obtaining, payment in accordance with the Interim Compensation Order, and preparation of forms of interim fee applications for retained professionals and for ordinary course professionals.   Applicant also spent time preparing Applicant's First Interim Fee Application, Second Interim Fee Application, Third Interim Fee Application, and Fourth Interim Fee Application, as well as preparing documentation in support of the fees incurred and expenses submitted for reimbursement; reviewing and analyzing monthly fee statements and interim fee applications for retained professionals in the Chapter 11 Cases, and preparing and revising the omnibus order approving all professionals' first interim fee applications, the omnibus order approving all professionals' second interim fee applications, the omnibus order approving all professionals' third interim fee applications, and the omnibus order approving all professionals' fourth interim fee applications.

75.     In addition, the Applicant devoted time to negotiating engagement letters and drafting retention applications for KPMG, ARC Excess, New Oak Capital Advisors, and Tilghman and Co. in connection with such professionals' services needed in these Chapter 11 Cases.  Finally, Applicant devoted time to: preparing and filing the CRO's monthly fee reports for submission to the Court; researching, drafting, and preparing the motion to further amend the CRO engagement letter to include a definitive success fee; analyzing and discussing with the Creditors' Committee and its professionals, along with the Debtors' other professionals, the Creditors' Committee's motion and related declaration in support of the motion to retain

Jeffrey A. Brodsky of Quest Turnaround Advisors as the Liquidating Trust Manager of the Liquidating Trust; and discussions with the U.S. Trustee with respect to all of the aforementioned activities.

      **(h)**      **Fee/Employment Objections – 008.**

      **Fees for Fifth Period:  $9,707.50; Hours for Fifth Period:  20.6**

      **Fees for Final Period:  $156,120.50; Hours for Final Period:  249.3**

76.      This category includes time spent by Applicant's professionals in connection with assisting and advising various retained professionals regarding the logistics and process for resolving objections to fee applications, including the omnibus formal objections and various informal objections and inquiries by the U.S. Trustee, in advance of the hearing on the aforementioned interim fee applications, preparation of a chart summarizing these resolutions for each interim fee application period, and corresponding with the U.S. Trustee and Chambers regarding the status of same.  Pursuant to the Court's directive, activities billed under this task code do not include time spent by Applicant's professionals in responding to or resolving the U.S. Trustee's objections to any of Morrison & Foerster's filed interim fee applications.

      **(i)**      **Financing – 009.**

      **Fees for Fifth Period:  $26,227.00; Hours for Fifth Period:  36.6**

      **Fees for Final Period:  $1,007,233.50; Hours for Final Period:  1,532.4**

77.      This category includes matters related to the Debtors' financing arrangements, including:  preparation, review, analysis, negotiation, and revision of the debtor-in-possession financing facilities provided by each of AFI and Barclays and the Debtors' first day motions seeking authority to use the cash collateral of AFI and Citibank; correspondence with the Creditors' Committee and U.S. Trustee regarding each of the foregoing; review, analysis and preparation of responses to objections to the foregoing; research of issues in connection with

36

same and correspondence with objecting parties in order to resolve objections; drafting of the Debtors' cash collateral motion and discussing the same with the Debtors' financial advisors; reviewing and analyzing objections thereto and preparing a reply and proposed order to the same; analyzing related discovery issues, including preparing certain witnesses for depositions, in connection with the Debtors' use of cash collateral, and correspondence and discussions with parties in interest regarding the strategy of same.

78.     This category also includes time devoted to: drafting of and negotiations regarding an amendment to the Citibank DIP facility and AFI DIP facility, and correspondence with parties in interest regarding same; analysis of and research regarding adequate protection and surcharge issues; analysis of and correspondence with Barclays, Citibank, the Creditors' Committee, the Debtors' financial advisors, and other parties in interest in connection with the extension of the DIP facilities, the use of cash collateral post-closing of the Asset Sales, DIP repayment procedures, and determining a revised expense allocation methodology.  Applicant also devoted time to drafting and preparing the Debtors' motion for the continued use of cash collateral and related documentation in connection with same, correspondence with the Debtors' financial advisors in connection with the analysis of same, and engaging in discovery activity related to same; drafting and negotiating a cash collateral extension and scheduling stipulation in connection with the same; and preparing a stipulation and order amending the AFI DIP facility.

79.     In addition, Applicant engaged in: the analysis of and correspondence with the Debtors' financial advisors and other parties in interest to discuss the use of cash collateral and adequate protection lien issues; responding to inquiries regarding the lien investigation conducted by the Creditors' Committee; analysis of issues relating to the paydown of AFI as

37

part of the paydown of JSN debt, drafting of the Debtors' reply in support of the motion for the

paydown of such debt, and discussions and correspondence with the Creditors' Committee,

AFI, and other parties in interest and their respective counsel regarding issues relating to the

same; discussions and preparation of drafts of and revisions to a debt repayment stipulation,

and correspondence with the Debtors' advisors, the Creditors' Committee, JSNs, and AFI

regarding the same; and discussions with the U.S. Trustee regarding the Debtors' cash

management system.

80.     Applicant also devoted time to:  researching, discussing, and preparing certain

lien UCC-3 continuation filing statements, and researching security interest filings, lien

perfection and release issues, and collateral valuation issues.

### (j)     Plan, Disclosure Statement and Confirmation Matters – 010.

**Fees for Fifth Period:  $6,995,481.50; Hours for Fifth Period:  9,972.8**

**Fees for Final Period:  $12,536,522.50; Hours for Final Period:  17,794.7**

81.     This category includes all time spent by Applicant's professionals in connection

with the Plan, including the preparation, review, analysis, negotiation, documentation, and

revision of the initial iterations of a Chapter 11 plan and its structure and related disclosure

statement, including correspondence with parties to the initial versions of plan support

agreements, AFI, the Creditors' Committee, and various governmental entities, and

preliminary research regarding various plan-related issues, including substantive consolidation,

third party releases, and claims subordination.  This category also includes time spent: drafting

and revising the periodic motions to extend exclusivity and the replies to objections regarding

same, as well as the Debtors' reply in support of the final motion to extend exclusivity, the

supplemental declaration of Lewis Kruger (CRO) in support thereof, and related bridge order

to permit the Plan Proponents to file a joint Disclosure Statement and Plan within the exclusive

38

period; reviewing, analyzing and revising materials regarding various waterfall recovery scenarios; reviewing and analyzing third party discovery requests in connection with plan negotiations and research issues related to same; drafting and revising the motion seeking appointment of Mediator and researching issues in connection with same.

82.    In addition, time in this category includes Applicant's significant efforts devoted to: analyzing, negotiating, and drafting the proposed drafts of the CRO and mediation-driven plan term sheet with the Creditors' Committee and the Debtors' major creditor constituencies, the supplemental term sheet, the RMBS trust settlement and monoline settlement agreements, proposed draft plan term sheets proposed by certain creditor constituencies, and the PSA that formed the foundation of the Plan Proponents' Disclosure Statement, Plan, and related exhibits.  These documents required that Applicant consult with the Debtors' other professionals and advisors, as well as the Creditors' Committee, and devote an enormous amount of time to meetings, calls, and conferences with key parties in interest to identify and address open issues and Plan-related tasks, including, but not limited to: the establishment of certain trusts; the treatment of classes of claims; and coordination and finalization of the consensual terms of these key documents and agreements.  Additionally, Applicant also spent time:  preparing, revising, and filing the related joint defense and common interest agreement among the PSA parties, and the motion to approve the PSA and related term sheets; analyzing the objections, statements, and reservations of rights filed in connection with the motion to approve the PSA; preparing a reply to such objections and discussions of strategy in connection therewith.

83.    In connection with the Disclosure Statement, Applicant devoted significant time and effort to:  researching and analyzing appropriate precedent and provisions to include

therein, including, but not limited to, descriptions of liquidating trusts, tax issues, and other relevant sections; coordinating research and drafting responsibilities amongst various team members and specialists; preparing and updating issues lists relating to tracking issues raised in connection with drafting and multiple revisions to the Disclosure Statement; continuous around-the-clock discussions and negotiations with the Creditors' Committee and various key stakeholders to address the structure of the Disclosure Statement, the content of the Disclosure Statement, and certain other topics of interest raised by these parties in connection therewith; researching and analyzing, among other things, solicitation issues, ballot and voting matters, tax disclosures, liquidating trust description; working with Debtors' financial advisors and management in connection with the preparation of recovery and liquidation analyses and updates of same to include as exhibits to the Disclosure Statement; coordination with Applicant's team and the Debtors' other professionals to provide summaries of certain descriptions of various litigation settlement history, negotiations, and outcomes, pending and resolved litigation, and updated information to include in the Disclosure Statement; and analyzing, drafting, and revising the risk factors to include therein.

84.    In addition, Applicant spent significant time: drafting, revising, negotiating, and finalizing the motion to approve the Disclosure Statement, as well as ballots to be distributed to voting claimants and notices relating to the same; numerous internal discussions, as well as discussions with the Creditors' Committee and the U.S. Trustee, regarding the same; attending to filing the Disclosure Statement and motion in support of approval of the same, as well as the Plan and related exhibits; addressing and negotiating certain requested revisions to the Disclosure Statement post-filing, and negotiating key provisions and revising the Disclosure Statement and Plan, where appropriate, to reflect resolutions of the same; drafting, revising,

and preparing for filing the reply in support of the sufficiency of the Disclosure Statement, including a chart detailing the objections to the same and eventual resolutions and/or settlement of objections; revising ballots and notices to address the Court's and the U.S. Trustee's concerns.    Further, Applicant spent time discussing internally and with the Creditors' Committee and its professionals the need to establish procedures to manage the discovery that would likely be sought by parties in interest in connection with Plan confirmation and the preparation and contents of the document repository for such purposes, and drafting letters to the Court regarding the same.

85.    In connection with the Plan, Applicant devoted time to:  participating in numerous discussions, calls, and meetings to determine the appropriate Plan structure, mechanics, conformity with the plan term sheets and PSA, and Plan construct and treatment of various classes of claims; revising several iterations of the Plan, including but not limited to drafting an initial "no settlement" version of the Plan.  Applicant also engaged in:  discussions with the CRO and the Debtors' financial advisors in analyzing and negotiating various plan waterfall structures, recovery scenarios, and wind-down budgets in connection with proposed Plan structure and mechanics; exploring, negotiating, and finalizing certain settlement agreements (*e.g.*, NJ Carpenters Class Action) to be incorporated into the Plan structure and recovery assumptions; discussing numerous Plan-related issues, including the allocation of the AFI settlement contribution, Plan process, claims estimation and reserves, the impact of Plan mechanics on certain classes of claims, and judgment reduction provision set forth in the Plan, and related issues; the scope of third party releases and potential carve outs of the same for certain parties, impairment issues for plan voting purposes, trust-related issues.

ny-1128092

86.    Furthermore, Applicant conducted extensive research regarding various Plan matters including, but not limited to, the debtor's releases, D&O releases, consensual and non-consensual third party releases, and claims subordination.    In addition, Applicant devoted substantial time to: drafting, revising, and preparing for filing the solicitation version of the Disclosure Statement and Plan and related exhibits; researching, drafting, negotiating, revising, and preparing Plan solicitation and voting procedures, forms of ballots and working through balloting issues, voting certifications, the voting stipulation entered into with the JSNs, and a proposed order relating to solicitation and voting procedures; analyzing voting projections and FTI's claims voting analyses, and preparing for and participating in numerous internal discussions and correspondence, as well as discussions with Kurtzman Carson Consultants, LLC, as the Debtors' noticing, claims and voting agent, the Creditors' Committee and its professionals, and other parties in interest regarding the same.    Additionally, Applicant spent time reviewing, analyzing and discussing with the Debtors and the Creditors' Committee the borrower claim true-up data to ensure appropriate reserves for the Borrower Claims Trust and other distributions to creditor constituencies.

87.    Moreover, Applicant's professionals devoted an extraordinary amount of time negotiating with AFI, the Creditors' Committee, and other parties in interest and reviewing, analyzing, and drafting revisions to the Plan to resolve both formal and informal objections to the Plan and Disclosure Statement.    Applicant also spent significant time in preparing for the Confirmation Hearing, including: discussions internally and with the Creditors' Committee regarding the confirmation process, evidentiary burdens and standard of proof necessary to meet confirmation standards on various settlements and other aspects of confirmation; analyzing updated "best interest of creditors" test and liquidation and recovery analyses;

42

creating, revising and finalizing witness and exhibit lists and Federal Rule 30(b)(6) designations, objections, and related issues; interviewing and preparing fact and expert witnesses for depositions and defending depositions; researching, drafting, revising, and filing fact and expert witness direct testimony and expert rebuttal reports in support of Plan confirmation and issues relating to Phase II of the JSN Adversary Proceedings; preparing for and participating in periodic "meet and confer" sessions with the Creditors' Committee and JSNs to discuss and resolve ongoing Plan discovery and Confirmation Hearing and Phase II evidentiary and scheduling disputes, including the drafting, revising, and submission of proposed joint pretrial orders relating to the same. Applicant also devoted substantial time to: researching, drafting, and revising Confirmation Hearing opening remarks and closing arguments; researching, analyzing, and preparing exhibits relating to the aforementioned direct testimony in support of Plan confirmation; preparing fact and expert witnesses for cross examination; researching, analyzing, drafting, and preparing a motion in limine to exclude Judge Lyons' expert testimony, and an objection in response to the JSNs' motion in limine to exclude Gina Gutzeit's expert testimony; researching and drafting a letter brief in support of including the expert testimony of Mark Renzi in support of the Plan Proponents' intercompany balances analysis and liquidation and recovery analyses; and numerous internal meetings and telephone conferences, as well as meetings and communications with the Debtors' other professionals, the Creditors' Committee and its professionals, AFI, and other parties in interest to discuss the same and strategy for the Confirmation Hearing.

88.    Lastly, Applicant's professionals devoted a substantial amount of time to researching, analyzing, drafting, and finalizing the Plan Proponent's memorandum in support of Plan confirmation and reply, in response to formal and informal Plan objections, in support

43

Pg 47 of 79

of Plan confirmation, the proposed order confirming the Plan, and extensively discussing the aforementioned documents, their content, and strategy relating to the same internally, with the Debtors' other professionals, and with the Creditors' Committee and its professionals. Applicant also spent time negotiating with objectors to the Plan, including the JSNs and their counsel, to resolve outstanding objections so as to eventually submit to the Court a consensual Chapter 11 Plan.

**(k)** **Plan Supplement Documents – 011.**

**Fees for Fifth Period:  $162,696.00; Hours for Fifth Period:  239.6**

**Fees for Final Period:  $181,972.00; Hours for Final Period:  269.2**

89.     This category includes time spent by Applicant's professionals in connection with:  researching, analyzing, revising, and filing certain Plan Supplement documents, including the Assumption Schedule, the schedule of non-borrower and borrower causes of action and potential causes of action to be retained by the Liquidating Trust post-Effective Date, and discussions regarding the same with the Debtors and Creditors' Committee's professionals; drafting and revising the respective agreements and related documents establishing the Liquidating Trust and the Borrower Claims Trust, and the cooperation agreement between the Liquidating Trust and Borrower Claims Trust; and drafting and revising documents establishing the RMBS Claims Trust as well as the Private Securities Claims Trust (as such terms are defined in the Plan), in addition to the other exhibits comprising the Plan Supplement.  Applicant spent time researching trust law, the formation of a trust and appointment of a trustee thereof, tax considerations and other issues relating to trusts and liquidating trusts.

**(l)**      Relief from Stay Proceedings – 012.

**Fees for Fifth Period:  $124,068.50; Hours for Fifth Period:  235.0**

**Fees for Final Period:  $2,521,535.50; Hours for Final Period:  4,367.8**

90.      This category includes time spent by Applicant's professionals in connection with the review and analysis of dozens of motions for stay relief filed in the Chapter 11 Cases, including, but not limited to, junior and senior lienholders', borrowers', and third parties' requests for relief from stay.    Applicant also continuously engaged in discussions and correspondence with the Debtors and outside counsel in connection with such motions, and the preparation of responses to such motions, including objections to requested relief and stipulations granting such relief, in whole or in part.    This category also includes time spent negotiating with certain movants regarding stipulated stay relief, discussions with counsel for the Creditors' Committee regarding the same, and appeals of decisions regarding motions for stay relief.

91.      Specifically, Applicant devoted significant time to: analyzing issues and filing pleadings to extend the automatic stay as to non-Debtor affiliates, including the FHFA, with respect to certain discovery requests made on the Debtors; litigating with the FHFA in the District Court for the Southern District of New York and preparing appellate filings in connection with the same; preparing for oral argument before the Circuit Court for the Second Circuit regarding the same; drafting and revising a letter brief to Judge Cote in connection with the FHFA appeal matter and remand from the Second Circuit, and analyzing Judge Cote's decision regarding the same; discussing the FHFA stay matter with the Creditors' Committee, AFI, and their professionals to determine strategy relating to the same; and litigating subsequent discovery requests from third parties, as well as the FHFA's motion to seek relief from the automatic stay to secure certain of the Debtors' loan files.  This category also includes

45

time spent:  discussing with the Debtors and Carpenter Lipps & Leland LLP ("**CLL**") strategy with respect to the Debtors' response to the motion by U.S. Bank for limited relief seeking discovery from the Debtors to use in a pending state court action; negotiating with certain movants regarding FDIC and Assured extend stay matters, related stipulated stay relief, and discussions with counsel for the Creditors' Committee regarding the same; preparing for appeals of decisions regarding motions for stay relief in the FHFA dispute, as well as responding to MassMutual, FDIC, and Cambridge Place subpoenas and document requests in the FHFA lift stay matter, and discussions with the Debtors, Ocwen, the Creditors' Committee, and counsel to the aforementioned third parties regarding the same.

> **(m)    Hearings – 013.**
>
> **Fees for Fifth Period:  $989,402.50; Hours for Fifth Period:  1,541.2**
>
> **Fees for Final Period:  $3,273,218.50; Hours for Final Period:  5,384**

92.    This category includes all matters related to preparation for and attendance at hearings in the Chapter 11 Cases, including:  preparation of agendas, scripts, binders, outlines, and other hearing materials; meetings with potential witnesses to prepare for hearings and correspondence with various of the Debtors' retained professionals in advance of hearings; coordination with Chambers, the Creditors' Committee, and other parties in regarding scheduling issues; for the Fifth Application Period, in addition to hearings and Court conferences held during the first interim fee period, second interim fee period, third interim fee period, and fourth interim fee period, attendance at twenty-five (25) hearings and Court conferences, including those in connection with Phase I and Phase II of the JSN Adversary Proceedings and the Confirmation Hearing, held on September 3, 2013, September 11, 2013, September 24, 2013, October 2, 2013, October 9, 2013, October 15, 2013, October 16, 2013, October 17, 2013, October 21, 2013, October 22, 2013, October 23, 2013, October 28, 2013,

46

November 4, 2013, November 6, 2013, November 14, 2013, November 15, 2013, November 19, 2013, November 20, 2013, November 21, 2013, November 22, 2013, November 25, 2013, November 26, 2013, December 3, 2013, December 11, 2013 and December 17, 2013.

93.     In accordance with the Court's billing guidelines, where multiple attorneys attended omnibus hearings, no more than three of Applicant's professionals billed for the entire length of the hearing.  In further recognition of this Court's directive, Applicant's professionals who spent time arguing or appearing, or specifically supporting work on particular matters heard at the omnibus hearings, billed for their time in connection with only those matters.

**(n)     Tax Matters – 014.**

**Fees for Fifth Period:  $180,156.00; Hours for Fifth Period:  258.2**

**Fees for Final Period:  $786,440.50; Hours for Final Period:  1,155.6**

94.     This category includes time spent by Applicant's professionals in connection with analyzing various tax issues related to the Chapter 11 Cases, the Debtors' operations, and estate wind-down activities, including:  reviewing and analyzing the Debtors' obligations under their tax sharing agreement with AFI; analyzing and drafting the Debtors' first day motion for authority to pay taxes and regulatory fees; and analyzing tax considerations arising with respect to the Asset Sales and post-Asset Sales.  Applicant also devoted time to reviewing and analyzing other tax issues, including analysis of the Debtors' ownership and schedules of certain REMIC residual interests, as well as related interest calculations, and the tax implications of the assignment of such interests under the standard pooling and servicing agreements.

95.     In addition, Applicant devoted time to:  researching and analyzing tax issues and disclosures in connection with the Disclosure Statement and the Plan, including the tax implications of various Plan structures and tax considerations in connection with potential

47

settlements between the Debtors and key stakeholders; researching and analyzing the federal law and the law of certain taxing authorities on liquidating trusts, assignments to the liquidating trusts as well as the assets to be held by such trusts, and tax considerations relating to the same; analyzing the tax consequences in connection with the liquidation of United Kingdom subsidiaries; researching and analyzing NERDS (non-economic residual interests) assessments and the opportunities to assign the same; discussing and analyzing potential post-confirmation tax issues; analysis of certain *de minimis* sales tax issues; and conferences and correspondence with counsel for the Creditors' Committee regarding the foregoing.

96.    Applicant also spent time reviewing and analyzing the findings of Ernst & Young ("**E&Y**") on various tax issues, and participating in frequent meetings with E&Y and FTI to discuss the same.  Applicant spent time analyzing the tax considerations relating to issues raised in the JSN Adversary Proceedings, and reviewing and analyzing relevant case law and arguments relating to the same, including those regarding the tax allocation agreement claims and issues relating thereto.  Lastly, Applicant devoted time to:  analyzing the Internal Revenue Service claim and other issues arising from claims filed by taxing authorities, including supplemental tax assessment issues; analyzing tax considerations relating to, among other filings, the Liquidating Trust Agreement (as such term is defined in the Plan) and other Plan Supplement documents, as well as the motion to abandon certain of the Debtors' assets; and reviewing and analyzing tax considerations and tax planning during the wind-down phase of the Chapter 11 Cases and transition of interests into the various trusts created pursuant to the Plan in preparation of the Debtors' emergence from bankruptcy.

(o)    **Plan Support Agreement Matters – 016.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $510,397.00; Hours for Final Period:  721.6**

97.    This category includes time spent by Applicant's professionals in connection with:  the Debtors' preparation, analysis, and revision of the terms and conditions of initial plan support agreements with each of AFI, the JSNs, and various groups of RMBS litigation plaintiffs; extensive correspondence and meetings with various parties in interest, including counsel for the trustees, the insurers, and the Creditors' Committee regarding the foregoing; and preparation of motions seeking to assume the plan support agreements, and research regarding various legal issues arising in connection therewith.    In addition, Applicant's professionals spent time on the amendment, potential extension, and eventual termination of the aforementioned plan support agreements, including analysis of the disclosure of non-public material information in connection with plan support and global settlement negotiations, and correspondence and meetings with various parties in interest including counsel for the trustees, the insurers, and the Creditors' Committee regarding the foregoing.

(p)    **PLS Litigation – 017.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $8,188,913.00; Hours for Final Period:  12,531.9**

98.    This category includes time spent by Applicant's professionals in connection with: the Debtors' preparation, analysis, negotiation and revision of settlement agreements with the RMBS litigation plaintiffs represented by Gibbs & Bruns LLP/Ropes & Gray LLP and Talcott Franklin; extensive discussions with counsel for AFI, the Creditors' Committee, insurers, and the trustees for the respective RMBS trusts regarding the settlements and the proposed amended RMBS settlement trust allocation methodology; and research and analysis

49

of precedent with respect to various settlement issues; preparation of responses to objections regarding the settlements, including briefing the analysis of the factors in support of the reasonableness of entry into such settlements; the negotiation and preparation of multiple scheduling orders in connection with the foregoing; review and analysis of expert reports and disclosures regarding the settlements; and preparations for trial regarding the Debtors' Rule 9019 motion seeking approval of the settlements.

99.    In addition, time in this category includes time spent by Applicant's professionals in connection with their assisting and advising the Debtors in preparing for trial regarding Debtors' Rule 9019 motion seeking approval of the RMBS settlements, including: review and analysis of expert reports and disclosures regarding the settlements and preparations for the RMBS 9019 trial, including preparation of information and accounting memoranda for additional experts and submissions in connection with Debtors' reply in support of RMBS settlement agreements; drafting and preparing witness statements, direct testimony, and direct and cross examination outlines for RMBS 9019 fact and expert trial witnesses, including certain of the Debtors' directors, the Debtors' advisors, and certain experts, and analyzing the application of the rules of evidence in connection with the same in anticipation of the issues to be raised at trial. Applicant also assisted the Debtors in preparing, revising, and updating the list of exhibits to be used in connection with the RMBS 9019 reply briefs, statements in support of entry into the RMBS settlement agreements and allocation strategy set forth therein, use at trial.

100.    Further, Applicant engaged in: extensive analysis relating to and discussions with Debtors' professionals and counsel for AFI, the Creditors' Committee, insurers, and the trustees for the respective RMBS trusts to prepare extensive pre-trial briefing and other

litigation-related activities in support of the proposed amended RMBS 9019 settlement and in preparation for the Rule 9019 trial on the RMBS settlement; research, analysis, and preparation of issues in response to motions to preclude certain evidence at issue in the RMBS 9019 trial, and drafting certain Daubert motions to preclude certain expert testimony as inadmissible, including research for and preparation of motions in limine to exclude certain allegedly irrelevant evidence. Ultimately, the trial on the RMBS settlement was avoided when the settlement was embodied in the PSA.

### (q)    Litigation (Other) – 018.

**Fees for Fifth Period:  $3,562,438.00; Hours for Fifth Period:  5,268.5**

**Fees for Final Period:  $8,558,794.40; Hours for Final Period:  13,109**

101.    This category includes time spent by Applicant's professionals in connection with the Debtors' participation in various adversary proceedings brought by third parties, including borrowers, who filed adversary complaints against the Debtors, such as American Residential Equities, LLC, Shelley von Brincken, Conrad P. Burnett, Bruce DeMustchine, Princess Dixon, Michael A. Farr, Green Planet Servicing, LLC, Gwendolyn B. Hawthorne, Charles C. Heyward, Marion L. Jenkins and Sharon Jenkins, Brian Finnell Kimer and Malinda Kimber, Linton C. Layne and Nancy K. Layne, Derrick Lytle, Kevin J. Matthews, Wendy Allison Nora, Paul N. Papas, Alfredia Pruitt, Sealink Funding Limited, Julio Solano, Kenneth J. Taggart, *et al.*, the United States, *ex rel.* (Sidney Lewis), Universal Restoration Services, Inc., George Van Wagner, Todd A. Williams, and Jennifer L. Wilson, through the application of the Debtors' supplemental case management procedures for adversary proceedings; participation in pre-trial initial and subsequent status conferences, litigation (including researching and drafting motions to dismiss) where appropriate, and settlement discussions in

connection with resolving these adversary proceedings; and preparing case status reports to submit to the Court to track the status and progress of such cases.

102.    Time spent in this category was also devoted to: research, analysis, and drafting of complaints filed against AIG Asset Management, *et al.* in connection with the request to subordinate the securities claims held by these parties, and Allstate Insurance Company, *et al.* seeking to enjoin or extend the automatic stay to the continuation of any lawsuits against the Debtors' directors and officers based on the Debtors' issuance or sale of mortgage-backed securities and litigation of the same; research and analysis of issues in connection with the Debtors' pending litigation in other jurisdictions; and correspondence and periodic conferences with the Debtors' in-house legal department, outside counsel, and the Creditors' Committee regarding the aforementioned adversary proceedings.

103.    In addition, Applicant expended significant time in connection with extensive litigation activity and trial preparations involving the JSN Adversary Proceedings, and in particular, the Debtors' adversary proceeding complaint against the JSNs, including: researching and analyzing certain lien and security interest issues; drafting and amending the Debtors' complaint, and engaging in numerous strategy sessions with Applicant's professionals and the Debtors' other advisors in connection with the same; drafting, revising, and preparing a motion to dismiss the JSNs' counterclaims, and conducting extensive research regarding the issues raised therein; drafting and revising an opposition to the JSN' motion to dismiss the Debtors' complaint; drafting and revising a discovery plan and scheduling orders, and discussions with other parties in interest regarding the same. Applicant's professionals devoted time to: analyzing, preparing, drafting, and revising the Debtors' witness statements, direct testimony, redirect testimony, expert reports, and rebuttal expert reports in support of the

52

Debtors' complaint against the JSNs and position on issues raised therein; preparing for and attending expert interviews and witness deposition preparation sessions and depositions, and analyzing all witness testimony provided for use in the JSN Adversary Proceedings; meeting and strategizing with witnesses to discuss the same, as well as participating in numerous internal strategy sessions to discuss the same.

104.    Specifically, in preparation for the trial for Phase I of the JSN Adversary Proceedings, Applicant spent time preparing numerous fact and expert witnesses for depositions ahead of trial, analyzing key documents and research in connection with Debtors' as well as the Creditors' Committee's positions in connection with the respective complaints against the JSNs; reviewing and analyzing witness documents and exhibit lists to create deposition outlines in preparation to take and defend depositions of Phase I and Phase II trial witnesses; negotiations with the JSNs regarding Federal Rule 30(b)(6) deposition topic issues; analyzing, drafting and preparing corresponding direct examination and cross examination outlines, scripts and materials for each; preparing and revising Phase I and Phase II trial task lists and designations; numerous discussions with the Debtors' witnesses and continuous review of produced documents received from and produced to the JSNs, as well as prior testimony provided to the Examiner and congressional testimony, to prepare witnesses for trial; researching, analyzing, drafting, and preparing the post-trial brief on Phase I issues, and discussions with the Creditors' Committee and other of the Debtors' professionals regarding the same; analyze Phase I trial and results of the same in preparation for and to discuss the Debtors' strategy relating to Phase II and the Confirmation Hearing; and numerous meetings, including strategy and joint defense meetings and calls with the Creditors' Committee and its

professionals, internal discussions and conference calls in connection with the coordination of tasks and strategy relating to the aforementioned activities.

(r)    **Government/Regulatory – 019.**

**Fees for Fifth Period:  $261,630.00; Hours for Fifth Period:  468.8**

**Fees for Final Period:  $2,921,749.50; Hours for Final Period:  4,294.3**

105.    This category includes time spent by Applicant's professionals with respect to matters related to the Debtors' interactions with various state and federal governmental or regulatory bodies, including, but not limited to:  correspondence with Ginnie Mae, Freddie Mac, and Fannie Mae, and the analysis of issues related to the Debtors' relationships with and obligations to each of the foregoing; discussions with the Creditors' Committee and its professionals, the Federal Reserve Board ("**FRB**"), the Department of Justice ("**DOJ**") and various state attorneys general and other regulators regarding the Debtors' continued compliance with the FRB and DOJ consent orders and related obligations; extensive negotiations related to the employment of third party professionals and payment of costs in connection with the foreclosure review being conducted in connection with the FRB consent order; review and analysis of issues and strategies in connection with the pending investigations being conducted by governmental agencies; and review, analysis, and research in connection with compliance with Hart-Scott-Rodino Act.

106.    In addition, Applicant devoted substantial time to: preparing the Debtors' motion in connection with the foreclosure review of the FRB's claim, and supplemental motion brief relating to the foreclosure review and the Debtors' obligations in connection with the same; discussions with the FRB, the DOJ, and the Creditors' Committee's regulatory counsel in connection with the same and the FRB's reply brief in connection with the foreclosure review motion; extensive negotiations to discuss proposed settlement with the FRB in

54

connection with the foreclosure review and analyze and revise related proposed term sheets to document the same; analyzing related research in connection with FRB settlement options and structures and costs associated with such options; discussions with the aforementioned parties relating to the same, and drafting a stipulation of settlement with the FRB, as well as declarations and proposed orders in support of the same; discussions, review and analysis of establishment of an escrow agreement for a qualified settlement fund in connection with settlement payments made to the FRB, and drafting and revising the same as well as a proposed order permitting the Debtors to escrow FRB settlement funds.

107.    Further, Applicant engaged in: reviewing and analyzing issues and strategies in connection with the pending SEC and FIRREA investigations being conducted by the U.S. government, and certain subpoenas and responses to document requests issued by governmental agencies relating to the same; reviewing and analyzing documents and preparing witnesses for governmental agency interviews and depositions relating to the same; continuing negotiations related to the employment of third party professionals and payment of costs in connection with the foreclosure review being conducted in connection with the FRB consent order, and preparing interim orders for the employment on an interim basis of these professionals associated with the foreclosure review.   Lastly, Applicant devoted time to: researching, reviewing and analyzing the Plan's release and exculpation provisions, and engaging in extensive negotiations regarding the scope of such provisions generally and to arrive at mutually acceptable carve-out language as to governmental agencies, which resulted in the resolution and settlement of the States' and DOJ/AG's formal and informal objections to the Plan; and discussions with the DOJ and other parties regarding the Plan's treatment of the DOJ and related settlement obligations.

ny-1128092

(s)    **Customer and Vendor Matters – 020.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0.0**

**Fees for Final Period:  $90,932.00; Hours for Final Period:  151.9**

108.    This category includes time spent by Applicant's professionals in connection with matters related to the Debtors' customers and vendors, including:  responding to borrower and vendor inquiries regarding the Debtors' Chapter 11 Cases; correspondence with vendors regarding the impact of the Asset Sales and payment concerns; preparing notices to be provided to the foregoing; addressing issues related to the Debtors' call center; and responding to inquiries from critical vendors regarding the mechanics for payment of prepetition claims. This category also includes Applicant's time spent on analyzing the rights of certain borrowers in connection with lien releases related to certain HELOCs, and discussions with SilvermanAcampora and the Creditors' Committee regarding the disposition of zero-balance HELOCs.

(t)    **Insurance Matters – 021.**

**Fees for Fifth Period:  $20,133.50; Hours for Fifth Period:  25.8**

**Fees for Final Period:  $491,910.00; Hours for Final Period:  617.8**

109.    This category includes time spent by Applicant's professionals in connection with matters related to insurance issues, and insurance benefits and coverage, including: correspondence and analysis regarding insurance coverage for pending litigation involving the Debtors, and review and analysis of issues in connection with monoline claims and issues, FGIC payment demands, and the potential insolvency/rehabilitation of the Debtors' captive insurer, CapRe of Vermont; correspondence with Perkins Coie, the Debtors' insurance coverage special counsel, and the Creditors' Committee's professionals to analyze the potential scope and availability of insurance coverage for pending litigation, including, but not limited

56

to, settlements relating to certain class action claims, and participation in negotiations regarding insurance issues relating to the same; the scope of D&O and E&O insurance claims and policies, as well as related shared insurance issues between the Debtors and AFI; analyzing and presenting to the Creditors' Committee and other parties in interest information relating to insurance available to the Debtors and the use of insurance proceeds; and reviewing and analyzing with AFI and the Creditors' Committee's professionals the potential use of available insurance proceeds.  Lastly, Applicant spent time assisting the Debtors in reviewing and analyzing their insurance policy and coverage information, and analyzing, negotiating, and drafting documents relating to the settlement with certain insurers in connection with certain claims.

> **(u)** **Communication with Creditors – 022.**
>
> **Fees for Fifth Period:  $10,249.50; Hours for Fifth Period:  16.2**
>
> **Fees for Final Period:  $367,985.50; Hours for Final Period:  489.8**

110.    This category includes time spent by Applicant's professionals communicating with Creditors' Committee members, general unsecured creditors and other parties in interest regarding: the status of the Debtors' bankruptcy proceedings, including:  providing updates to the Creditors' Committee and claimants regarding business operations, information regarding relief requested pursuant to the Debtors' first day motions, the claims reconciliation process, treatment of proofs of claim, and claims objections, borrower-related issues, creditor inquiries regarding foreclosures and loan modifications, Plan negotiations, settlement discussions with the FRB and DOJ in connection with the foreclosure review, and various case issues; providing notices and updates to claimants relating to the filed iterations of the Plan and Disclosure Statement; preparing materials and presentations for the Creditors' Committee's professionals;

and negotiating and preparing confidentiality agreements with creditors and the Creditors' Committee.

### (v)    Meetings of Creditors – 023.

**Fees for Fifth Period:  $24,749.00; Hours for Fifth Period:  28.6**

**Fees for Final Period:  $356,451.00; Hours for Final Period:  446**

111.    This category includes time spent by Applicant's professionals preparing for and participating in various meetings of creditors, including:  the Creditors' Committee organizational meeting on May 16, 2012, and coordination with U.S. Trustee regarding the same; preparing for and participating in the section 341 creditors' meetings held on June 25, 2012, and July 27, 2012, and coordination with the U.S. Trustee regarding the same; preparing for and participating in meetings with the Creditors' Committee and/or its professionals to discuss the status of the Chapter 11 Cases, developments with respect to the Asset Sales, and other matters of significance to general unsecured creditors, held on May 29, 2012, June 4, 2012, June 6, 2012, June 8, 2012, June 15, 2012, and July 17, 2012.  Applicant's professionals devoted time to preparing materials for and participating in subsequent meetings with the Debtors' creditor constituencies, including the Creditors' Committee, senior unsecured noteholders, the JSNs, and RMBS plaintiffs, and their respective counsel to discuss the status of the case, updates on the claims reconciliation process, new developments relating to Plan negotiations and proposed revisions to the same, waterfall analyses, secured creditor positions, estate management and governance issues, insurance issues, schedules of assets to be liquidated, estate wind-down activities and related issues, and other matters of significance to general unsecured creditors and other creditor constituencies, where such meetings were held on September 6, 2012, September 12, 2012, October 3, 2012, October 11, 2012, November 14,

58

2012, and December 13, 2012, March 20, 2013, August 1, 2013, September 12, 2013, October

2, 2013, and October 17, 2013.

(w)     **Employee Matters – 024.**

**Fees for Fifth Period:  $64,285.00; Hours for Fifth Period:  80.6**

**Fees for Final Period:  $2,292,705.50; Hours for Final Period:  3,060.5**

112.    This category includes time spent by Applicant addressing issues related to

employee matters, including: review and analysis of key employee lists; research, analysis,

preparation and revisions regarding the Debtors' proposed key employee incentive program

("**KEIP**") and key employee retention program ("**KERP**"); preparation of motions seeking

approval of the KEIP/KERP and declarations in support thereof; review, analysis, and research

regarding objections to the KEIP/KERP, and preparation of responses to the same, as well as

preparation of revisions to the KEIP/KERP and preparation of a motion seeking approval of

the revised KEIP and declarations in support thereof; review, analysis, and research regarding

objections to the revised KEIP, and preparation of responses to the same; and review and

analysis of potential estate severance and indemnification obligations; analysis of TARP

restrictions on executive compensation and director compensation alternatives, including in

consideration of post-closing of the Asset Sales; and review and analysis of employment

agreements with the Debtors' key executives.

113.    This category also includes time spent by Applicant addressing issues related to

employee matters, including: researching, analyzing, and preparing certain executive non-

compete agreements and separation agreements for certain officers; drafting, revising, and

preparing Debtors' employee severance motion and proposed order for filing, as well as a

motion to seal exhibits to same from the public record; analyzing and discussing director and

officer indemnification issues, and key employee lists and related incentive and other employee

59

programs, including related severance payment issues, workers' compensation, transitional employee benefits matters and Liquidating Trust employee benefits; researching and analyzing CRO success fees as a component of restructuring officer compensation metrics and discussing the same with the Debtors' management and the Creditors' Committee; analyzing and discussing internally, with the PBGC, and the Creditors' Committee pension and employee benefits matters, as well as other PBGC-related matters; analyzing and discussing potential PBGC-related Disclosure Statement revisions, Plan release language and fiduciary liability issues with Debtors' professionals, AFI, and the PBGC representatives; preparing and revising an employee reimbursement protocol motion and annual incentive plan motion and correspondence with U.S. Trustee and Creditors' Committee regarding same; and reviewing and analyzing potential estate severance and indemnification obligations.

**(x)      Discovery or Rule 2004 Requests – 025.**

**Fees for Fifth Period:  $979,127.40; Hours for Fifth Period:  1,872.3**

**Fees for Final Period:  $15,385,297.40; Hours for Final Period:  31,663.6**

114.    This category includes the very significant time spent by Applicant analyzing and responding to numerous and extensive document and information requests involving several litigated and otherwise contested issues, including: analyzing and responding to numerous document and information requests from the Creditors' Committee and subpoena requests issued pursuant to Bankruptcy Rule 2004 on various topics, including, but not limited to, each of the Debtors' first day motions, the lien investigation by the Creditors' Committee, the PLS and Ally settlements, and the Debtors' prepetition transactions with AFI and Ally Bank; preparing for, attending, and defending depositions of various of the Debtors' management and personnel; compiling responsive materials, reviewing them for relevance and

privilege, preparing privilege logs, transmitting materials to requesting parties; and negotiating non-disclosure agreements with parties seeking discovery or access to confidential materials.

115.    Applicant also devoted significant time reviewing, analyzing, and preparing documents and responses relating to discovery requested from the Examiner pursuant to Bankruptcy Rule 2004 on various topics in connection with the Examiner's investigation for the Examiner's Report, as well as in connection with the use of certain "professional eyes only" and privileged information in the Examiner's Report. In addition, the Applicant spent significant time completing the production of 926,328 documents, consisting of 5.3 million pages in connection with the Examiner's investigation, engaging in reviewing, analyzing, preparing and compiling responsive materials, reviewing responsive materials for relevance, confidentiality, and privilege, as well as preparing privilege logs, transmitting materials, and negotiating nondisclosure agreements with parties seeking discovery or access to confidential materials. In connection with the production of such documents to the Examiner, Applicant analyzed and discussed with counsel to the Examiner and other parties in interest issues surrounding the claw back of certain inadvertently produced documents.

116.    In addition, Applicant devoted time to managing and analyzing additional discovery requests, including analyzing and responding to document and information requests in connection with: the Debtors' motion for continued use of cash collateral and related issues; the Debtors' entry into the RMBS settlement agreement; the Debtors' entry into the FGIC 9019 Settlement; the Debtors' proceedings against monoline claims and securities claims; and discovery projects involving the JSN Adversary Proceedings and related lien challenges and intercompany balance and debt forgiveness issues.

117.    In connection with preparation for the FGIC 9019 Settlement hearing, Applicant similarly discussed document production issues and coordination of same with counsel to the RMBS trustees, and other parties in interest, respectively, concerning the scheduling orders related to the same.

118.    For each of the aforementioned matters, the Applicant engaged in reviewing, analyzing, preparing and compiling responsive documents and other materials, reviewing responsive materials for relevance, confidentiality, and privilege, as well as preparing privilege logs, transmitting materials, and negotiating non-disclosure agreements with parties seeking discovery or access to confidential materials.    Furthermore, Applicant devoted significant amounts of time in drafting and responding to certain interrogatories, as well as strategizing and preparing the Debtors' witnesses for deposition and defending these witnesses in deposition, and preparing to take depositions of fact and expert witnesses in connection with the aforementioned matters.    Applicant's professionals engaged in discussions and correspondence to review, analyze, and update strategy relating to the same.

119.    In connection with the production of such documents to the JSNs during Phase I and Phase II discovery, within the Final Application Period, Applicant produced (i) 366,692 emails from all JSN-identified custodians, consisting of 2,492,166 pages, and (ii) 9,883 non-custodial large financial documents (where a single document could represent an entire spreadsheet or database) relating to Phase I issues, consisting of 50,702 pages, all of which included time-consuming document restoration and preparations for the periodic creation, updating, and production of privilege logs to parties in accordance with the order regarding the JSN discovery protocol, which required that such production be substantially complete on an expedited basis.    In addition, Applicant analyzed and discussed with counsel to the JSNs and

62

the Debtors' other professionals, including CLL and Curtis, Mallet-Prevost, Colt & Mosle LLP, document review, data collection issues, document restoration and retention issues, discovery scope, confidentiality and production issues relating to the same.

120.    Applicant also spent time managing and analyzing certain discovery requests arising from certain adversary proceedings and motions for relief from stay, including analyzing and responding to document and information requests from governmental agencies. In addition, Applicant devoted time to:  researching, discussing, and preparing a motion, set of procedures, proposed order, and related documents in connection with establishing a discovery protocol relating to Plan confirmation; coordinating and engaging in discussions with the Debtors, the Creditors' Committee, vendors, and other parties in interest regarding the Plan confirmation discovery protocol, amended order, and the Plan discovery repository and access thereto; reviewing and analyzing Debtor and non-Debtor documents imported into the repository for privilege and confidentiality issues, periodic document productions and supplemental productions and claw backing responding to discovery requests; and reviewing and analyzing produced documents for witness deposition preparation on issues in connection with Plan confirmation.

**(y)      Schedules and Statements – 026.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $192,042.0; Hours for Final Period:  283.6**

121.    This category includes time spent by Applicant's professionals advising the Debtors and working with the Debtors' employees and other professionals to prepare, and subsequently amend, the Debtors' schedules and statements of financial affairs to ensure that, when filed, they would represent the most accurate and complete data available.

63

**(z)      First Day Motions and Hearings – 027.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $1,311,334.00; Hours for Final Period:  1,880**

122.    This category includes time spent by Applicant:  preparing and representing the Debtors at the various hearings before the Court regarding the motions filed on the Petition Date (including, among others, the Debtors' motion for authority to continue performing under their subservicing agreement with Ally Bank); reviewing, analyzing and responding to objections to the first day motions; negotiating with potential objecting parties to the filed first-day motions, and corresponding with the U.S. Trustee regarding the same; and negotiating with various parties in interest including the U.S. Trustee, the Creditors' Committee, AFI, governmental agencies, parties to plan support agreements with the Debtors, and potential objecting parties to revise the proposed final orders granting the requested first day relief.

**(aa)     Other Motions and Applications – 028.**

**Fees for Fifth Period:  $142,038.50; Hours for Fifth Period:  271.5**

**Fees for Final Period:  $1,809,947.50; Hours for Final Period:  2,814.7**

123.    This category includes matters related to the review, analysis, research, and preparation of motions, applications and objections filed in these Chapter 11 Cases to the extent not addressed specifically under other task codes (*i.e.*, fee and employment applications (007, 008), motions for stay relief (012) and other general litigation (018)) with respect to the Debtors' cases, including, among others: the Debtors' motion to permit the trading of claims against the Debtors; the case management procedures; the motion to employ ordinary course professionals; the supplemental servicing motion; the motion to appoint a borrowers' committee; the motion to reimburse Morrison Cohen pursuant to section 363 of the Bankruptcy Code; the Creditors' Committee motion for standing to prosecute certain claims and causes of

action; reviewing and responding to borrower motions to convert or dismiss the Chapter 11 Cases; the Debtors' motion for authority to perform remediation activities with respect to certain real estate owned properties; certain motions for approval of settlements pursuant to Bankruptcy Rule 9019; and researching, analyzing, and responding to the motion filed by Rowena Drennan and others seeking class certification pursuant to Bankruptcy Rule 7023.

124.    In addition, Applicant devoted time under this task code to researching, analyzing, and drafting: the motion for supplemental case management procedures for adversary proceedings; the stipulation and order for the settlement of Green Planet claims; the Debtors' joinder brief to AFI's motion to enforce the automatic stay in connection with the Rothstein litigation and to enforce the automatic stay in the Knutson matter; the Debtors' Rule 9019 motion to approve claim settlement agreements with the People's Choice debtors; the Debtors' motion to abandon DOA property to Durbin Crossing; several of the Debtors' Rule 9019 motions, and related declarations, to approve a settlement agreement with Chicago Title Insurance Company, a settlement with GVC, and a settlement with Regions Bank; the motion seeking approval to make settlement payments to the NJ Carpenters plaintiffs and advance notice costs, and related motions to file same under seal; the motion in connection with the establishment of an escrow account for the Kessler class action settlement; and the opposition to borrower Philip Scott's declaratory judgment motion regarding, among other things, the estate's ownership of the borrower's note.

125.    Further, Applicant spent time on a variety of other tasks, including: reviewing and analyzing the Creditors' Committee motion for standing to prosecute certain claims and causes of action, and Wilmington Trust's motion for standing to prosecute certain claims and causes of action, as well as the Debtors' responses to the Creditors' Committee's and other

ny-1128092

parties' motions and statements in connection with the request for standing to prosecute claims against the JSNs in the JSN Adversary Proceedings, and review and analysis of related filings thereto; researching and drafting a response objection to the Lewis sanctions motion against Morrison & Foerster; researching and drafting the Debtors' responses to the Court's order to show cause why the *pro hac vice* admission of Wendy Allison Nora should not be revoked and with respect to related Wendy Allison Nora pleadings, including Ms. Nora's motion to consolidate the Debtors' objections to her proofs of claim, and motions to vacate the Court's verbal orders and disqualify the Court from the Chapter 11 Cases.

**(bb)    Non-Working Travel – 029.**

**Fees for Fifth Period:  $25,675.00; Hours for Fifth Period:  39.0**

**Fees for Final Period:  $699,107.50; Hours for Final Period:  1,104.8**

126.    This category includes time spent by Applicant's professionals in non-working travel while representing the Debtors at meetings, hearings, depositions, and other occasions, excluding time spent by attorneys traveling within New York City.[9]  Applicant billed one-half of the total time that such professionals spent on non-working travel.

**(cc)    Monthly Fee Statements – 030.**

**Fees for Fifth Period:  $341,487.00; Hours for Fifth Period:  539.9**

**Fees for Final Period:  $750,914.50; Hours for Final Period:  1,203.8**

127.    This category includes all time spent by Applicant's professionals reviewing Applicant's monthly invoices to ensure that the time detail and expenses complies with applicable compensation Guidelines, as well as to ensure that no privileged or confidential information is disclosed therein.  This category also includes time spent coordinating with

---

[9]    Applicant has taken additional reductions totaling $14,477.00 on account of time incurred during the Final Application Period in connection with non-working travel within New York City that was initially included in certain monthly invoices.

certain of the Debtors' other retained professionals to ensure that the Debtors were not being billed for duplicative services. In accordance with the Court's billing guidelines, Applicant has deducted 100% of the time within this task code.

**(dd)    Ally Reimbursable Legal Support – 031.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $278.00; Hours for Final Period:  .4**

128.    This category includes time spent by Applicant's professionals that are or may be reimbursable by AFI or Ally Bank under the shared services agreement.

**(ee)    Ally Settlement – 032.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $32,671.00; Hours for Final Period:  38.2**

129.    This category contains time spent by Applicant's professionals in connection with the Debtors' proposed settlement with AFI, including the analysis of claims against AFI and/or Ally Bank, and discussions with the Debtors and counsel for AFI regarding the foregoing. In addition, Applicant's professionals spent time in discussions with parties in interest in connection with the eventual termination of the aforementioned proposed settlement with AFI.

**(ff)    Examiner – 033.**

**Fees for Fifth Period:  $10,182.00; Hours for Fifth Period:  15.8**

**Fees for Final Period:  $6,079,010.50; Hours for Final Period:  10,599.9**

130.    This category contains time spent by Applicant's professionals related to the appointment of the Examiner and the Debtors' cooperation with the Examiner's investigation, including: reviewing and analyzing the proposed examiner order and work plan, researching the scope of the Examiner's duties, and advising the Debtors regarding compliance with same;

facilitating the Debtors' cooperation with the Examiner's investigation, including identification of relevant materials, and assisting with and responding to requests for information pursuant to the uniform protective order for Examiner discovery; assisting the Debtors' employees and directors with the preparation for and participation in Examiner interviews; extensive preparation, review, and analysis of written submissions in response to Examiner inquiries; review, research, and analysis of the Examiner's requests for: additional briefing and submissions on Minnesota law issues, and preparation of submissions to same; consideration of the Examiner's proposed use of highly confidential and "professional eyes only" documents in the Examiner's Report, and discussions with the Examiner and certain parties in interest the implications of the same.  Debtors also devoted significant time to drafting, revising, and submitting an emergency motion to seal the Examiner's Report, as well as responding to certain parties' motions to unseal the same.

131.    In addition, Applicant devoted significant time to reviewing and analyzing the Examiner's Report itself, along with all parties' submissions to the Examiner, and drafting the Debtors' response and reply submissions in connection with the filed Examiner's Report. Applicant also prepared detailed summaries and internal memoranda to document the numerous Examiner interviews and briefing issues covered to date, completeness of document production to the Examiner, as well as a summary of the Examiner's conclusions.  Further, Applicant spent time drafting, reviewing, and editing a response to the Examiner's motion for an order granting, among other things, the Examiner's discharge from its duties.

(gg)   **Insurer Termination – 034.**

**Fees for Fifth Period:  $0.00; Hours for Fifth Period:  0**

**Fees for Final Period:  $5,008.00; Hours for Final Period:  7.5**

132.    This category includes time spent by Applicant's professionals related to the termination of certain servicing agreements insured by monolines, including the review and analysis of proposals by Ambac relating to same.

(hh)   **Minimal Hours Associates – 035.**

**Fees for Fifth Period:  $18,945.00; Hours for Fifth Period:  34.4**

**Fees for Final Period:  $278,616.50; Hours for Final Period:  399.3**

133.    This category includes time spent by Applicant's associates who billed less than five hours in total during the Fifth Application Period.  Applicant has deducted 100% of the time within this task code.

(ii)   **Mediation Issues– 037.**

**Fees for Fifth Period:  $11,090.00; Hours for Fifth Period:  16.1**

**Fees for Final Period:  $1,711,552.50; Hours for Final Period:  2,033.4**

134.    This category includes time spent by Applicant's professionals in connection with the Plan mediation, including: review and analysis of the scope of the mediation, preparation for and participation in mediation sessions with the Mediator, and discussions with the Creditors' Committee and Mediator regarding the foregoing; engaging in mediation and strategy discussions with the Mediator and CRO to analyze various Plan waterfall scenarios and the positions of creditor constituencies in connection with participation in mediation to discuss and negotiate Plan distributions and mechanics; discuss disclosures and proposed confidentiality agreements for parties participating in mediation; extensive preparation for and participation in the April 2013 mediation "summit" whereby the Debtors, AFI, the Creditors'

Committee, and certain major creditor constituencies engaged in discussions and negotiations concerning numerous recovery scenarios based on an AFI settlement contribution to the Debtors' estates, in an effort to form the foundation for a consensual Chapter 11 Plan.

135.    In addition, Applicant devoted time to discussions with the Debtors and the Mediator in connection with supplemental mediation matters, including, but not limited to:  NJ Carpenters settlement as well as possible mediation of disputes with the FHFA and JSNs; drafting, revising, and finalizing the order in aid of mediation and confidentiality agreement with the JSNs to address the sharing of information in connection with the same; negotiating a settlement of issues surrounding the JSN Adversary Proceedings and related Plan objections; reviewing and discussing JSN requests for continued mediation, the structure of the same, and confidentiality issues relating to mediation materials; drafting and revising the non-disclosure agreement for the termination of mediation; and engaging in numerous discussions with parties in interest regarding the aforementioned activities.

136.    The foregoing descriptions of services rendered by Applicant in specific areas are not intended to be exhaustive of the scope of Applicant's activities in the Chapter 11 Cases. The time records attached hereto as <u>Exhibit E</u> present more completely the work performed by Applicant in each billing category during the Application Period.

## REASONABLE AND NECESSARY SERVICES
## RENDERED BY MORRISON & FOERSTER

137.    Morrison & Foerster respectfully submits that the professional services rendered by Morrison & Foerster on behalf of the Debtors during the Fifth Application Period and the Final Application Period were reasonable, necessary and appropriate to the administration of these Chapter 11 Cases and related matters.

70

138.    Morrison & Foerster advised and assisted the Debtors in every phase of these Chapter 11 Cases.  To this end, as set forth in detail in Exhibit C of this Final Application, numerous Morrison & Foerster attorneys and paraprofessionals from various Morrison & Foerster practice groups expended 28,830.5 hours during the Fifth Application Period and approximately 159,247.1 hours during the Final Application Period rendering professional services on behalf of the Debtors.

139.    During the Fifth Application Period, Morrison & Foerster's hourly billing rates for attorneys ranged from $1,240 to $370.  Allowance of compensation in the amount requested would result in a blended hourly billing rate for attorneys of approximately $714.84 (based on 25,074.5 recorded professional hours by attorneys at Morrison & Foerster at the regular billing rates in effect at the time of the performance of services).

140.    During the Final Application Period, Morrison & Foerster's hourly billing rates for attorneys, including contract attorneys, ranged from $1,240 to $195.  Allowance of compensation in the amount requested would result in a blended hourly billing rate for attorneys of approximately $663.47 (based on 143,834.6 recorded professional hours by attorneys at Morrison & Foerster at the regular billing rates in effect at the time of the performance of services).

141.    The fees charged by Morrison & Foerster in these Chapter 11 Cases are billed in accordance with its existing billing rates and procedures in effect during the respective fee application periods.  The rates Morrison & Foerster charges for the services rendered by its professionals and paraprofessionals in these Chapter 11 Cases are the same rates Morrison & Foerster charges for professional and paraprofessional services rendered in comparable non-bankruptcy related matters.  Such fees are reasonable based on the customary compensation

charged by comparably skilled practitioners in non-bankruptcy cases in a competitive national

legal market.

## ACTUAL AND NECESSARY EXPENSES INCURRED BY MORRISON & FOERSTER

142.    As set forth in Exhibit D attached hereto, Morrison & Foerster has incurred a

total of $1,118,669.96 in expenses on behalf of the Debtors in providing professional services

during the Fifth Application Period and $3,043,012.82 [10] in expenses during the Final

Application Period.  Morrison & Foerster states as follows regarding these expenses:

(A)    It is Morrison & Foerster's policy to charge its clients in all areas of practice for identifiable, non-overhead expenses incurred in connection with the client's case that would not have been incurred except for representation of that particular client.

(B)    It is also Morrison & Foerster's policy to charge its clients only the amount actually incurred by Morrison & Foerster in connection with such items.  Examples of such expenses are postage, overnight mail, courier delivery, transportation, computer assisted legal research, photocopying, outgoing facsimile transmissions, long-distance telephone calls, airfare, meals, and lodging. However, to comply with the Debtors' billing policy, Morrison & Foerster did not charge for certain of these expenses.

(C)    Morrison & Foerster professionals also may charge their overtime meals and overtime transportation to the Debtors consistent with prepetition practices.

(D)    Morrison & Foerster generally charges $0.10 per page for standard duplication, which conforms to the charge per page rate prescribed by the Guidelines.  In addition, Morrison & Foerster charged a one-time charge of $7.80 each instance it required a specific outside vendor to perform certain voluminous outside duplication services.  During the Final Application Period, Morrison & Foerster charged $1 per page for local faxes and $2 per page for domestic and international fax transmissions.

143.    The basis for these rates is Morrison & Foerster's calculation of the actual cost

of these services.  Each of these categories of expenses does not exceed and, in some instances,

---

[10]    The amount of total expenses incurred for the Final Application Period reflects a reduction of $428,535.33 due to a decrease in the amounts of expenses allowed in certain of Applicant's interim fee applications.

is below the maximum rate set by the Guidelines.  These charges are intended to cover Morrison & Foerster's direct operating costs, which costs are not incorporated into the Morrison & Foerster hourly billing rates.  Only clients who actually use services of the types set forth in Exhibit D of this Final Application are separately charged for such services.  The effect of including such expenses as part of the hourly billing rates would impose that cost upon clients who do not require extensive photocopying and other facilities and services.

144.    Many of the actions taken by Morrison & Foerster on behalf of the Debtors in these Chapter 11 Cases required Morrison & Foerster professionals, on some occasions, to devote time during the evenings and on weekends to perform legal services on behalf of the Debtors.  These services were essential to advance these cases, meet deadlines and maintain the orderly administration of the Debtors' estates.  Consistent with firm policy, as further disclosed in Morrison & Foerster's retention application, attorneys and other Morrison & Foerster employees who worked late in the evenings or on weekends were reimbursed for their reasonable meal and transportation costs.  Morrison & Foerster's regular practice is not to include components for those charges in overhead when establishing billing rates, but rather to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of the rendering of legal services.  The reimbursement amounts do not exceed those amounts set forth in the Guidelines.

145.    In addition, on many occasions, overnight delivery of documents and other materials was required to meet expedited deadlines in these Chapter 11 Cases.  The disbursements for such services are not included in Morrison & Foerster's overhead for the purpose of setting billing rates, and Morrison & Foerster made every effort to minimize its disbursements in these Chapter 11 Cases.

ny-1128092

146.    Morrison & Foerster believes that the actual expenses incurred in providing professional services during the Fifth Application Period and the Final Application Period were necessary, reasonable and justified under the circumstances to serve the needs of the Debtors in these Chapter 11 Cases.

## MORRISON & FOERSTER'S REQUESTED FEES AND
## REIMBURSEMENT OF EXPENSES SHOULD BE ALLOWED BY THIS COURT

147.    Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered . . . and reimbursement for actual, necessary expenses."   11 U.S.C. § 330(a)(1). Section 330 sets forth the criteria for the award of compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded . . . the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (a)    the time spent on such services;
>
> (b)    the rates charged for such services;
>
> (c)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (d)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (e)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (f)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

148.    In the instant case, Morrison & Foerster respectfully submits that the services for which it seeks compensation in this Final Application, which includes the Fifth Application

74

Period, were necessary for and beneficial to the Debtors and were rendered in order to protect and preserve the value of the Debtors' estates during the pendency of these Chapter 11 Cases. Morrison & Foerster respectfully submits that the services rendered to the Debtors were performed economically, effectively and efficiently and the results obtained have benefited not only the Debtors, but also the unsecured creditor body as a whole. Morrison & Foerster further submits that the compensation requested herein is reasonable in light of the nature, extent and value of such services to the Debtors and all parties in interest.

149.    In sum, the services rendered by Morrison & Foerster were necessary and beneficial to the Debtors and were consistently performed in a timely manner commensurate with the complexity, importance, novelty and nature of the issues involved. Accordingly, approval of the compensation sought herein is warranted.

## NOTICE

150.    Morrison & Foerster will provide a copy of this Final Application to: (a) the Liquidating Trust; (b) counsel to the Creditors' Committee; (c) the U.S. Trustee; and (d) counsel to AFI and Ally Bank.

## NO PRIOR REQUEST

151.    No prior application for the relief requested herein has been made to this Court or any other court.

WHEREFORE, Morrison & Foerster respectfully requests the Court enter an order:

(i) awarding on a final basis compensation for professional services rendered during the Fifth Application Period in the amount of $18,626,667.90 and reimbursement for actual and necessary expenses incurred by Morrison & Foerster during the Fifth Application Period in the amount of $1,118,669.96;

75

(ii) awarding on a final basis aggregate fees in the amount of $98,457,127.80, and aggregate expenses in the amount of $3,043,012.82 for the Final Application Period, which includes the fees and expenses for the Fifth Application Period;

(iii) authorizing and directing payment by the Debtors of any remaining holdback amounts due and owing to Morrison & Foerster in connection with the First through the Fourth Interim Applications (the "Remaining Holdback");

(iv) approving and directing the Debtors' payment of all allowed fees for services rendered and expenses incurred by Morrison & Foerster in connection with these Chapter 11 Cases that remain unpaid as of the date of entry of the Order;

(v) providing that the allowance of such compensation for professional services rendered and reimbursement of actual and necessary expenses incurred be without prejudice to Morrison & Foerster's right to seek additional compensation for services performed and expenses incurred during these Chapter 11 Cases which were not processed at the time of this Final Application; and

(vi) granting Morrison & Foerster such other and further relief as is just and proper.

Respectfully submitted,

Dated:  March 3, 2014         /s/ Lorenzo Marinuzzi
        New York, New York    Gary S. Lee
                              Lorenzo Marinuzzi
                              Erica J. Richards
                              Meryl L. Rothchild
                              **MORRISON & FOERSTER LLP**
                              1290 Avenue of the Americas
                              New York, New York 10104
                              Telephone: (212) 468-8000
                              Facsimile: (212) 468-7900

                              *Counsel for the Post-Effective Date
                              Debtors*