Hearing Date: TBD
Objection Deadline: at least 10 days
prior to hearing date
Re: Docket Nos. 6065

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------ | ) | |

**SUMMARY SHEET FOR FIFTH INTERIM AND FINAL APPLICATION OF FTI CONSULTING, INC., AS FINANCIAL ADVISOR FOR THE DEBTORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE FIFTH INTERIM PERIOD OF SEPTEMBER 1, 2013 THROUGH DECEMBER 17, 2013 AND FOR FINAL APPROVAL OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD <u>OF MAY 14, 2012 THROUGH DECEMBER 17, 2013</u>**

This is a(n):      ___  monthly        X  interim    X  final application.

Name of Applicant:                           FTI Consulting, Inc. ("**FTI**" or "**Applicant**")[1]

Authorized to Provide Professional          Residential Capital, LLC, *et al*. (collectively,
Services to:                                the "**Debtors**")

Date of Retention:                          Original retention Order entered on July 25,
                                            2012 retaining Applicant nunc pro tunc to May
                                            14, 2012 [Docket No. 902]; retention amended
                                            pursuant to Second Addendum and Order
                                            entered on March 5, 2013, nunc pro tunc to
                                            December 5, 2012 [Docket No.3104] to expand
                                            scope of services relating to "Walter Project
                                            Services"; retention further amended pursuant to
                                            Third Addendum and Order entered on March
                                            25, 2013 [Docket No.3308] to extend Rollover
                                            Period through December 31, 2013; retention
                                            further amended pursuant to Fourth Addendum
                                            and Order entered on June 13, 2013, nunc pro
                                            tunc to March 1, 2013 [Docket No.3971] to
                                            expand scope of services relating to "Litigation
                                            Support Services"; and retention supplemented
                                            pursuant to First Supplemental Declaration of
                                            William J. Nolan Pursuant to Fourth Addendum
                                            to Engagement Agreement filed on July 30,2013
                                            [Docket No. 4417] to expand scope of Litigation
                                            Support Services to include certain contested
                                            matters and litigation involving the Ad Hoc
                                            Group of Junior Secured Noteholders (the
                                            "Litigation Support Services – JSN
                                            Proceedings", and together with Litigation
                                            Support Services, "**Litigation Support**" )

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to said terms in the Application.

Fifth Interim Fee and Expense Request:

| | |
|---|---|
| Period for which Interim Compensation and Expense Reimbursement is sought: | September 1, 2013 through December 17, 2013 (the " **Interim Application Period**") |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $3,633,019.50 (inclusive of $1,903,323.00 for the Litigation Support)[2] |
| Blended Average Hourly Rate: | $582.35 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $46,041.87 |

Final Fee and Expense Request

| | |
|---|---|
| Period for which Final Compensation and Expense Reimbursement is sought: | May 14, 2012 through December 17, 2013 (the "**Final Application Period**") |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $32,491,560.75 (inclusive of $2,500,000.00 Completion Fee, $2,393,285.00 for the Litigation Support, and $843,049.50 for Walter Project Services)[5] |
| Blended Average Hourly Rate: | $541.44 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $920,158.65[6] |

---

[2] The total fees requested for the Interim Application Period reflect a reduction of the total fees incurred for the Interim Application Period in the amounts of (i) $67,032.50 due to a reduction for non-working travel, (ii) $106,451.00 due to time billed for the review of monthly fee statements to ensure that time detail and expenses complies with applicable compensation guidelines and resolving fee application objections (iii) $2,837.00 due to associate timekeepers that billed less than five hours on the matter.

Prior Requests for Fees and Expenses

| | |
|---|---|
| Amount of Compensation Sought as Actual Reasonable and Necessary[3]: | $28,858,541.25 (inclusive of $843,049.50 for Walter Project Services for the period of December 5, 2012 through February 28, 2013 and $489,962.00 for the Litigation Support for the period of March 1, 2013 through August 31, 2013) |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $994,351.92 (inclusive of $48,681.04 for expense reimbursement relating to Walter Project Services for period of December 5, 2012 through February 28, 2013) |
| Amount of Compensation Awarded by the Court[4]: | $28,858,541.25 (inclusive of $843,049.50 for Walter Project Services for the period of December 5, 2012 through February 28, 2013 and $489,962.00 for the Litigation Support for the period of March 1, 2013 through August 31, 2013) |
| Amount of Expenses Awarded by the Court: | $874,116.77 (inclusive of $48,681.04 for expense reimbursement relating to Walter Project Services for period of December 5, 2012 through February 28, 2013) |

_____

(continued...)

[5] The total fees requested for the Final Application Period reflect a reduction of the total fees incurred for the Final Application Period in the amount of $1,125,332.75.

[6] The total expenses requested for the Final Application Period reflect an aggregate reduction of $148,282,30 in the total expenses incurred during the Chapter 11 Cases to reflect, among other things, write downs for costs for travel, business meals, and other disbursements.

[3] Does not include amounts related to the Rollover Provision of $1,941,182.00 requested as part of FTI's Fourth Interim Application.

[4] Does not include amounts related to the Rollover Provision of $1,775,814.75 that was approved from FTI's Fourth Interim Application.

## Summary of Monthly Fee Statements for Interim Application Period:

| Date Filed | Compensation Period | Requested Fees | Requested Expenses | Fees / Expenses Paid | 20% Holdback[7] | Rollover Amount[8] |
|---|---|---|---|---|---|---|
| 12/2/2013 | 9/1/13-9/30/13 | $1,000,000.00 | $47,047.23 | $847,047.23 | $200,000.00 | $1,386,561.75 |
| 12/2/2013[9] | 9/1/13-9/30/13 | $429,527.00 | N/A | $343,621.60 | $85,905.40 | N/A |
| 3/3/2014 | 10/1/13-10/31/13 | $1,000,000.00 | $13,443.36 | $0.00 | $200,000.00 | $862,563.75 |
| 3/3/2014[9] | 10/1/13-10/31/13 | $1,000,359.50 | N/A | $0.00 | $200,071.90 | N/A |
| 3/3/2014 | 11/1/13-11/30/13 | $1,000,000.00 | $13,250.30 | $0.00 | $200,000.00 | $318,852.75 |
| 3/3/2014 | 11/1/13-11/30/13 | $473,436.50 | N/A | $0.00 | $94,687.30 | N/A |
| 3/3/2014 | 12/1/13-12/17/13 | $520,458.25 | $348.13 | $0.00 | $104,091.65 | $0.00 |
| Voluntary Reduction | N/A | ($14,947.00) | (28,047.2) | N/A | ($2,989.40) | N/A |
| **TOTAL** | **9/1/13 - 12/17/13** | **$5,408,834.25** | **$46,041.87** | **$1,190,668.83** | **$1,081,766.85** | **$0.00** |

---

[7] Amounts held back for monthly fee statement periods of 9/1/13 through 9/30/13, and amounts subject to holdback for periods 10/1/13 through 12/17/13.

[8] The Rollover Amount is a cumulative concept as described in Paragraph 20 of the Application. The total row reflects the cumulative amount at the end of the Application Period. The Rollover Amount reflects a $260,033.25 reduction per FTI's agreement with the US Trustee to resolve objections to FTI's First, Second, Third and Fourth Interim Fee Applications.

[9] Represents billing for the Litigation Support (described in more detail in the Application).

**Summary of Fee Applications and Previous Orders for Final Application Period:**

| Interim Fee Application /Document # | Time Period Covered | Date of Order/ Document # | Interim Fees Requested on Application[10] | Interim Expenses Requested | Fees Allowed[11] | Interim Expenses Allowed | Amount Paid[12] | Allowed Fees Unpaid |
|---|---|---|---|---|---|---|---|---|
| First Interim [1905] | 5/14/12 - 8/31/12 | 12/28/2012 [2530] | $7,500,000.00 | $385,757.98 | $7,440,775.00 | $378,231.38 | $7,819,006.38 | $0.00 |
| Second Interim [3208] | 9/1/2012 - 12/31/2012 | 4/23/2013 [3556] | $7,238,803.00 | $250,791.68 | $7,298,028.00 | $250,791.68 | $7,548,819.68 | $0.00 |
| Third Interim [4542] | 1/1/2013 - 04/31/2013 | 9/25/2013 [5205] | $5,501,118.50 | $227,254.30 | $5,501,118.50 | $199,687.47 | $5,211,118.77 | $489,687.20 |
| Fourth Interim [5853] | 5/1/2013 - 8/31/2013 | 11/18/2013 [5853] | $4,342,805.00 | $130,547.97 | $4,342,805.00 | $45,406.25 | $3,953,929.75 | $434,281.50 |
| Fifth Interim [N/A] | 9/1/2013 - 12/17/2013 | N/A | $5,408,834.25 | $46,041.87 | N/A | N/A | $1,190,668.83 | N/A |
| Completion Fee | 5/14/2012 - 12/17/2013 | N/A | $2,500,000.00 | N/A | N/A | N/A | $2,500,000.00 | N/A |
| Total | 5/14/2012 - 12/17/2013 | | $32,491,560.75 | $1,040,393.80 | | | $28,223,543.41 | |

[10] Does not include the Rollover Amount of (i) $295,362.00 requested as part of FTI's Second Interim Application, (ii) $1,614,064.75 requested as part of FTI's Third Interim Application and (iii) $1,941,182.00 requested as part of FTI's Fourth Interim Application.

[11] Fees allowed include $59,225 in the Second Interim Application deferred from the First Interim Application (payments related to this amount are included with the second interim payments).

12 Does not include the Rollover Amount of $1,775,814.75 that was approved from FTI's Fourth Interim Application.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| --------------------------------------------------------------- | ) | |

**FIFTH INTERIM AND FINAL APPLICATION OF FTI CONSULTING, INC., AS
FINANCIAL ADVISOR FOR THE DEBTORS FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES INCURRED FOR THE INTERIM PERIOD OF
SEPTEMBER 1, 2013 THROUGH DECEMBER 17, 2013 AND FOR FINAL APPROVAL
OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR
THE PERIOD OF MAY 14, 2012 THROUGH DECEMBER 17, 2013**

**INDEX OF EXHIBITS**

EXHIBIT A – Certificate under Guidelines for Fees and Disbursements

EXHIBIT B – FTI Retention Documents

EXHIBIT C – Summary of Rollover Fees for Interim Application Period

EXHIBIT D – Summary of Fees and Hours by Task Code for Interim Application Period

EXHIBIT E – Summary of Fees and Hours by Professional for Interim Application Period

EXHIBIT F – Summary of Expenses by Category for Interim Application Period

EXHIBIT G – Detail of Time Entries for Interim Application Period

EXHIBIT H – Expense Detail by Professional for Interim Application Period

EXHIBIT I – Summary of Hours by Task Code for Final Application Period

EXHIBIT J – Summary of Fees by Task Code for Final Application Period

EXHIBIT K – Summary of Hours by Professional for Final Application Period

EXHIBIT L – Summary of Fees by Professional for Final Application Period

EXHIBIT M – Summary of Expenses by Category for Final Application Period

EXHIBIT N – Monthly Fee Statement of FTI Consulting, Inc. for Compensation for Services and Reimbursement of Expenses Incurred as Financial Advisor to the Debtors for the Period of September 1, 2013 through September 30, 2013

EXHIBIT O – Monthly Fee Statement of FTI Consulting, Inc. for Compensation for Services and Reimbursement of Expenses Incurred as Financial Advisor to the Debtors for the Period of October 1, 2013 through October 31, 2013

EXHIBIT P – Monthly Fee Statement of FTI Consulting, Inc. for Compensation for Services and Reimbursement of Expenses Incurred as Financial Advisor to the Debtors for the Period of November 1, 2013 through November 30, 2013

EXHIBIT Q – Monthly Fee Statement of FTI Consulting, Inc. for Compensation for Services and Reimbursement of Expenses Incurred as Financial Advisor to the Debtors for the Period of December 1, 2013 through December 17, 2013

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ---------------------------------------------------------------- | ) | |

**FIFTH INTERIM AND FINAL APPLICATION OF FTI CONSULTING, INC., AS FINANCIAL ADVISOR FOR THE DEBTORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE FIFTH INTERIM PERIOD OF SEPTEMBER 1, 2013 THROUGH DECEMBER 17, 2013 AND FOR FINAL APPROVAL OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD OF MAY 14, 2012 THROUGH DECEMBER 17, 2013**

FTI Consulting, Inc. ("**FTI**" or "**Applicant**"), financial advisor to Residential Capital, LLC., *et al.*, as debtors and debtors in possession (collectively, the "**Debtors**"), for its fifth interim application for compensation and reimbursement of expenses (the "**Interim Application**") for the period September 1, 2013 through December 17, 2013 (the "**Interim Application Period**") and for final approval of compensation and reimbursement of expenses (the "**Final Application**", and collectively with the Interim Application, the "**Application")** for the period of May 14, 2012 through December 17, 2013 (the "**Final Application Period**", and collectively with the Interim Application Period, the "**Application Period**"), respectfully represents as follows:

## INTRODUCTION

1.      By this application, FTI seeks allowance of compensation for professional services rendered as financial advisor to the Debtors and for Interim Application Period in the amount of $ 3,633,019.50 and actual and necessary out-of-pocket expenses of $46,041.87 and for

the Final Application Period in the amount of $32,491,560.75 and actual and necessary out-of-pocket expenses of $920,158.65. In support of this application, Applicant represents as follows:

2.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 330, 331, and 1103 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"). This Application has been prepared in accordance with General Order M-447, *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, entered January 29, 2013 (the "**Local Guidelines**"), and the *United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330* effective January 30, 1996 (the "**UST Guidelines**" and, together with the Local Guidelines, the "**Guidelines**").  Pursuant to the Local Guidelines, a certification by William J. Nolan regarding compliance with the Local Guidelines is attached hereto as <u>Exhibit A</u>.

## **BACKGROUND**

### A.    **The Chapter 11 Cases**

4.     On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  Through the Effective Date of the Plan (as those terms are defined and discussed below), and for all periods relevant to

this Application, the Debtors continued in the management and operation of their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). During the Application Period no trustee was been appointed in these Chapter 11 cases (the "**Chapter 11 Cases**").

5.      On May 16, 2012, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed a nine member Creditors Committee (the "**Creditors' Committee**").

6.      On June 20, 2012, the Court directed that an examiner be appointed, and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "**Examiner**") [Docket Nos. 454, 674]. On July 27, 2012, the Court entered an *Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner* [Docket No. 925], including the issuance of a report (the "**Examiner's Report**"). On May 13, 2013, the Examiner filed the Examiner's Report under seal [Docket Nos. 3677, 3697]. On June 26, 2013, the Examiner's Report was unsealed and made available to the public [Docket No. 4099].

7.      On October 23, 2012 and October 24, 2012, the Debtors successfully conducted an auction for the sale of the servicing and origination platform (the "**Platform Sale**") to Ocwen Loan Servicing, LLC ("**Ocwen**") for $3 billion. On October 25, 2012, the Debtors conducted an auction for the sale of their whole loan portfolio assets (the "**Whole Loan Sale**") to Berkshire Hathaway Inc. ("**Berkshire**") for $1.5 billion.

8.      At a hearing held on November 19, 2012, the Court approved the Sale Motion[13] on the record. On November 21, 2012, the Court entered orders approving the Platform Sale

---

[13]    *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123 and Fed R. Bankr. P. 2002, 6004, 6006 and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Hearing and Sale Deadline; (III) Approving Form and* (continued...)

(which incorporated the sale and assignment of certain of the servicing and original platform assets to Walter Investment Management Corporation ("**Walter**")) and the Whole Loan Sale (collectively, the "**Asset Sales**") [Docket Nos. 2246 and 2247]. The transactions comprising the Debtors' Platform Sale closed in two parts: a sale to Walter that closed on January 31, 2013, and a sale to Ocwen that closed on February 15, 2013. The Debtors' Whole Loan Sale to Berkshire closed on February 5, 2013.

9.       On December 26, 2012, the Court entered an order approving the appointment of the Honorable Judge James M. Peck as mediator (the "**Mediator**") to assist the plan negotiations process for an initial term through and including February 28, 2013 [Docket No. 2519]. Mediation commenced shortly after the Mediator was appointed. On March 5, 2013, the Court *sua sponte* extended the appointment of the Mediator through and including May 31, 2013 [Docket No. 3101], and on June 4, 2013, the Court further extended such appointment until October 31, 2013 [Docket No. 3877]. On April 22 and 23, 2013, parties in interest attended an initial mediation "summit" with the Mediator, the Debtors' Chief Restructuring Officer ("**CRO**") and advisors and/or business level leaders of each of the Debtors' major claimant constituencies to provide a structure in which these parties could resolve complex legal issues and develop a consensual plan of reorganization.

10.       Following the Court's orders extending and further extending the Debtors' exclusive period to file a chapter 11 plan [Docket Nos. 1413, 2489], on February 22, 2013, the

---

(continued...)

*Manner of Notice Thereof and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "**Sale Motion**") [Docket No. 61].

Court entered a bridge order to continue the extension of the Debtors' exclusive period [Docket No. 3007].    The Court subsequently entered orders during the Application Period further extending the Debtors' exclusive period to file a plan [Docket Nos. 3102, 3440, 3634, 3919, 3958], extending this period through and including August 21, 2013.    Pursuant to the Court's latest order, the Debtors and the Creditors' Committee (together, the "**Plan Proponents")** had the exclusive right to solicit votes on the Plan through and including October 21, 2013.

11.    On March 5, 2013, the Court entered an *Order Granting Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 3103], pursuant to which Lewis Kruger was appointed as the Debtors' CRO.

12.    On June 26, 2013, the Court entered an order authorizing the Debtors to enter into and perform under a plan support agreement (the "**PSA**") by and among the Debtors, Ally Financial Inc. ("**AFI**"), the Creditors' Committee, and certain consenting claimants [Docket No. 4098].

13.    On July 3, 2013, the Plan Proponents filed the *Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Creditors Committee* [Docket No. 4153] and the *Disclosure Statement for the Joint Chapter 11 Plan of Residential Capital, LLC, et al. and the Creditors Committee* [Docket No. 4157] (as amended, the "**Disclosure Statement**").    On August 23, 2013, the Court entered an order approving, *inter alia*, the Disclosure Statement, as amended, and authorizing the Plan Proponents to solicit acceptances [Docket No. 4809].

14.    On October 11, 2013, the Plan Proponents filed Exhibit 2 through Exhibit 21 comprising the plan supplement (the "**Plan Supplement**").    On October 29, 2013, the Plan Proponents filed the schedule of certain contracts and unexpired leases, the "Assumption

Schedule," as Exhibit 1 comprising the Plan Supplement. Pursuant to the Plan, the Plan Proponents have since amended and/or supplemented certain Exhibits of the Plan Supplement.

15.    Commencing on October 15, 2013, the Court presided over a trial during which the Plan Proponents litigated certain "Phase I" issues raised in their respective adversary proceeding complaints (the "**JSN Adversary Proceedings**") against holders of junior secured notes (the "**JSNs**"). The Phase I trial concluded on October 25, 2013, subject to post-trial briefing due on November 1, 2013 and closing arguments presented on November 6, 2013. On November 15, 2013, the Court entered the *Memorandum Opinion, and Findings of Fact and Conclusions of Law, After Phase I Trial* [Docket No. 5772]. Commencing on November 19, 2013, the Court presided over the "Phase II" of the JSN Adversary Proceedings. Subsequently, the Plan Proponents and certain holders of the JSNs have reached an agreement in principle with respect to resolution of pending litigation regarding the treatment of the JSNs claims. The agreement provided for an additional recovery of $125 million to the JSNs. On December 3, 2013, the Plan Proponents filed the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Creditors Committee [Docket No. 5993] (the "**Plan**").

16.    On December 11, 2013, the United States Bankruptcy Court entered the Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Creditors Committee [Docket No. 6065] (the "**Confirmation Order**") confirming the Plan. On December 17, 2013, pursuant to the satisfaction of the conditions set forth in Article X.B of the Plan, the Effective Date of the Plan occurred, and the Plan was substantially consummated.

17.    All quarterly fees have been paid to the U.S. Trustee and all required monthly operating reports have been filed.

14

B.    **Applicant's Retention and Interim Compensation**

18.    On July 25, 2012, the Court entered the Order Authorizing the Employment and Retention of FTI Consulting, Inc. as Financial Advisor *Nunc Pro Tunc* to May 14, 2012 [Docket No. 902] as thereafter amended and supplemented as set forth below (as amended and supplemented, the "**Retention Order**"), approving Applicant's retention.

19.    On July 17, 2012, the Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "**Interim Compensation Order**") [Docket No. 797].  Pursuant to the terms of the Interim Compensation Order, Applicant, among others, is authorized to file and submit monthly fee  statements  to the Debtors and their counsel, counsel for the Creditors' Committee, counsel for AFI, counsel for Barclays Bank PLC, and the U.S. Trustee (collectively, the "**Notice Parties**").

20.    Pursuant to FTI's Retention Order, for the Application Period, FTI is entitled to seek payment for compensation on an hourly basis, subject to certain monthly caps (the "**Monthly Caps**"). Throughout the case, these caps provided an incentive for FTI to be efficient and to avoid any billing redundancy.  In addition, FTI is entitled to (a) bill in subsequent months for any fees which, on a cumulative basis, are in excess of the previous Monthly Caps, also calculated on a cumulative basis, provided that the total monthly fee amount billed for any given month does not exceed the applicable Monthly Cap for such month (the "**Rollover Provision**"), and (b) a Completion Fee (as defined in and provided for under the First Addendum).  On March 25, 2013 the Court entered the *Order Under Bankruptcy Code Sections 327(a), 328(a) and 363 Approving Third Addendum to Engagement Agreement with FTI Consulting, Inc., as Financial Advisors to the Debtors* [Docket No. 3308], extending the period during which the Rollover Provision is applicable (the "**Rollover Period**") to December  31, 2013.  FTI is also entitled to

seek and obtain reimbursement of actual and necessary expenses incurred by FTI.   For the

convenience of this Court and all parties in interest, attached hereto as Exhibit C is a schedule of

FTI's monthly fees after the application of the Monthly Caps and Rollover Provision.

21.      Pursuant to that certain *Application Under Sections 327(a), 328(a) and 363 of the*

*Bankruptcy For The Entry of An Order Modifying the Retention and Employment of FTI*

*Consulting, Inc. as Financial Advisor To the Debtors Pursuant Second Addendum Nunc Pro*

*Tunc To December 5, 2012, and For Related Relief*, filed on February 18, 2013 [Docket No.

2943], incorporated herein by this reference thereto (the "**Second Addendum Application**"),  on

March 5, 2013, the Court entered the *Order Approving the Second Addendum to Engagement*

*Agreement with FTI Consulting, Inc., Nunc Pro Tunc to December 5, 2012, and Granting*

*Related Relief* [Docket 3104] (the "**Walter Supplemental Retention Order**"), approving an

amendment to Applicant's retention to, *inter alia,*  expand the scope of services to be provided by

FTI to include the services referred to in the Walter Supplemental Retention Order as the "Walter

Project Services"  (the "**Walter Project Services**").  Pursuant to FTI's Walter Supplemental

Retention Order,  for the Application Period, FTI is entitled to compensation for the fees and

expenses incurred for the Walter Project Services in addition to the compensation otherwise

provided for  pursuant to the to the Retention Order.  For the Walter Project Services, FTI is

entitled to be compensated on an hourly basis, plus reimbursement of actual and necessary

expenses incurred.  The Walter Project Services were completed during the third interim fee

application period of January 1, 2013 through April 30, 2013. Accordingly, no compensation or

reimbursement of expenses in connection with the Walter Project Services is sought pursuant to the Interim Application[14].

22.     Pursuant to that certain *Application Under Bankruptcy Code Sections 327(a) and 328(a) for Entry of An Order Approving Fourth Addendum to Engagement Agreement With FTI Consulting, Inc., as Financial Advisor to the Debtors, Authorizing Provision of Litigation Support Services Nunc Pro Tunc to March 1, 2013* filed on May 24, 2013 [Docket No. 3829], incorporated herein by this reference thereto (the "**Fourth Addendum Application**"),  on June 13, 2013, the Court entered the *Order Approving Fourth Addendum to Engagement Agreement with FTI Consulting, Inc., as Financial Advisors to the Debtors, Authorizing Provision of Litigation Support Services Nunc Pro Tunc to March 1, 2013* [Docket 3971] (the "**Fourth Addendum Order**"). The Fourth Addendum Order approved an amendment to Applicant's retention to, *inter alia,* expand the scope of services to be provided by FTI to include certain services referred to in the Fourth Addendum Application as "Litigation Support Services"  (the "**Litigation Support Services**") in connection with the Subordination Complaint (as defined in the Fourth Addendum Application), and for which services FTI is entitled (to the extent awarded by the Court) to compensation on an hourly basis, plus reimbursement of actual and necessary expenses incurred, that is not subject to the Monthly Caps.

23.     In addition, the Fourth Addendum Order approved certain procedures pursuant to which the scope of the authorized Litigation Support Services may be expanded without the necessity of obtaining a further order of the Court, and for which additional services FTI would also be entitled (to the extent awarded by the Court) to compensation on an hourly basis, plus

---

[14] The Debtors have been reimbursed by Walter for all fees and expenses incurred in connection with the Walter Project Services paid to FTI.

reimbursement of actual and necessary expenses incurred, that would not be subject to the

Monthly Caps.  In accordance with those approved procedures, notice in the form of the First

Supplemental Declaration of William J. Nolan Pursuant to Fourth Addendum to Engagement

Agreement with FTI Consulting, Inc., as Financial Advisor to the Debtors was filed on July 30,

2013 [docket 4417] (the "**Supplemental Nolan Declaration"**), which, with the passage of time

without objection, resulted in FTI being authorized to also provide Litigation Support Services

with respect to the JSN Adversary Proceedings and the Ad Hoc Group Confirmation Objections

(as defined in the Supplemental Nolan Declaration).

24.     On December 2, 2013, the Applicant served its sixteenth monthly fee statement

covering the period from September 1, 2013 through September 30, 2013 (the "**Sixteenth

Monthly Fee Statement**") on the Notice Parties.  On March 3, 2014, the Applicant served its

seventeenth monthly fee statement covering the period from October 1, 2013 through October 31,

2013 (the "**Seventeenth Monthly Fee Statement**"), eighteenth monthly fee statement covering

the period from November 1, 2013 through November 30, 2013 (the "**Eighteenth Monthly Fee

Statement**"), and nineteenth monthly fee statement covering the period from December 1, 2013

through December 17, 2013 (the "**Nineteenth Monthly Fee Statement**" and collectively with

Sixteenth Monthly Fee Statement, Seventeenth Monthly Fee Statement, Eighteenth Monthly Fee

Statement, the "**Monthly Fee Statements**") on the Notice Parties. The Applicant has not

received any objections to its Monthly Fee Statements; however, the objection deadline has not

yet passed for the Seventeenth, Eighteenth and Nineteenth Monthly Fee Statements.

25.     Applicant maintains computerized records of the time expended in the rendering

of the professional services required by the Debtors. The compensation requested by Applicant is

based on the customary compensation charged by comparably skilled practitioners in other similar cases not under title 11 of the Bankruptcy Code.

26.    For the convenience of this Court and all parties in interest, attached hereto as Exhibit D is a schedule of the total hours and fees incurred under each of Applicant's internal task codes during the Interim Application Period.  Also, attached hereto as Exhibit I and Exhibit J are total hours and fees incurred under each of Applicant's internal task codes during the Final Application Period, respectively.

27.    For the convenience of this Court and all parties in interest, attached hereto as Exhibit E are schedules of the total hours and fees incurred by each professional during the Interim Application Period.  Also, attached hereto as Exhibit K and Exhibit L are total hours and fees incurred by each professional during the Final Application Period, respectively.

28.    Applicant also maintains computerized records of all expenses incurred in connection with the performance of professional services. For the convenience of this Court and all parties in interest, attached hereto as Exhibit F and Exhibit M are summaries of expenses by category incurred during the Interim Application Period and the Final Application Period, respectively.

29.    As consistent with other matters and the guidance provided by the Court, the Applicant has elected to institute certain restrictions with respect to expense reimbursement such as capping lodging at $500.00 per night, limiting meal reimbursement to $20.00 per person, and limiting car service to $100.00 per person. No expense reimbursement is sought for use of car service or overtime meals after 8pm unless such timekeeper worked and recorded at least 10 hours for this matter on such day.

30.     Copies of Applicant's computerized records of fees and expenses in the format specified by the UST Guidelines have been served on the Notice Parties with each of the Monthly Fee Statements and are attached hereto as <u>Exhibit G</u> for fees and <u>Exhibit H</u> for expenses.

31.     There is no agreement or understanding between Applicant and any other person for the sharing of compensation to be received for services rendered in these Chapter 11 Cases.

32.     The total payments requested by Applicant in connection with the Interim Application as of the date hereof are equal to: (i) 80% of requested fees from the Monthly Fee Statements subject to the Monthly Fee Caps and Rollover Provision[15], and (ii) 100% of requested expenses from the Monthly Fee Statements.  Specifically, to date, the Applicant has received payments of $1,190,668.83 for Monthly Fee Statements related to the Interim Application Period.

33.     The Monthly Fee Statements submitted by Applicant are subject to a 20% holdback pursuant to the Interim Compensation Order (as is customary in this District) on the allowance of fees.  The aggregate amount of Applicant's holdback during the Interim Application Period is $1,081,766.85.  Applicant respectfully requests, in connection with the relief requested herein, that the Court allow this holdback amount on a final basis pursuant to sections 330 of the Bankruptcy Code and authorize the Debtors to satisfy such amounts.

34.      In addition, in accordance with its Retention Order, and subject to Section 328 of the Bankruptcy Code, FTI is entitled to a Completion Fee.  In accordance with Article II. B of the confirmed Plan such Completion Fee was paid upon the occurrence of the Effective Date of the Plan.

---

[15] Subject to the exceptions for the Litigation Support Services as noted in this Application.

## SUMMARY OF FTI'S SIGNIFICANT CONTRIBUTIONS

35.    Since the Petition Date, FTI has expended a considerable number of hours on behalf of the Debtors.  The sheer magnitude of matters in these Chapter 11 cases has required substantial effort on the part of the Debtors, FTI and other advisors to address the many complex issues that were presented by these cases.  FTI and other advisors worked cooperatively and productively with the Debtors during these Chapter 11 cases in order to bring about the best results for the Debtors, their creditors and other parties of interest in these Chapter 11 cases.  FTI was intimately involved in many key focus areas for the Debtors as set forth below.

A.    **Establishment of the Liquidating Trust** – The Liquidating Trust ( as defined in the Plan)  is charged with the monetization of the Debtors' assets that were not sold as part of the Debtors' §363 asset sales and the resolution of claims not resolved as of the Effective Date; and is governed by the Liquidating Trust Agreement (the "**LTA**").  FTI provided support in numerous areas to establish the Liquidating Trust, such that it could perform the functions necessary to wind down the affairs of the Debtors.  FTI's assistance included, but was not limited to, the following:

   i.    **Liquidation Basis of Accounting** – The Debtors requested assistance with the implementation of the liquidation basis of accounting for the Liquidating Trust.  FTI researched issues raised by the Debtors' accounting staff and participated in working sessions to develop a plan to implement the liquidation basis of accounting.

   ii.    **Distribution of Liquidation Trust Units** (the "**Units**") – FTI assisted the Debtors in identifying the claimants entitled to receive the Units at the Effective Date.  FTI reviewed the reasonableness of the issuance ratios

calculated by the investment bankers retained by the Creditors' Committee
and prepared spreadsheets to track the issuance of the Units, including the
allocation of the Units in accordance with special instructions from creditors.
The Units and Initial Distribution of $1.765 billion was completed within two
weeks of the Plan Effective Date.

iii.    **Information Technology Requirements -** FTI assisted the Debtors in
evaluating their information technology needs, including software, hardware
and data. FTI identified, evaluated, and presented potential solutions including
third-party service providers as well as Transition Services Agreements ("the
TSAs") with AFI. FTI assisted the Debtors in developing a data and
applications matrix to ensure that the Liquidation Trust had access to the
information it needs to fulfill its mission.

iv.    **Wind-down budget -** FTI assisted the Debtors in developing a detailed
bottoms-up three-year post 363 sale budget of expenses, by functional area,
and proceeds from the disposition of assets. The model included assumptions
for human capital, operating expenses, TSA's expenses, professional fees and
other costs, along with forecast of proceeds from asset disposition by asset
type.

v.    **Claims resolution -** Throughout the pendency of the Debtors' Chapter 11
proceedings, FTI assisted the Debtors to minimize the number of non-
borrower claims needing to be addressed by the Liquidating Trust.  As of the
Effective Date, there remained approximately $400 million in asserted claims.

FTI provided the Liquidating Estate with a listing of claims, by claims class

that need to be resolved and which reserve the unresolved claims are

associated with.  Additionally, FTI validated the list of unresolved borrower

claims to provide the Borrower Claims Trust (as defined in the Plan).  FTI

began transitioning some of the claims analysis and tracking work to the

Estate personnel.

B.  **Consensual Plan** – The Plan required the settlement with multiple parties, including

the Private Securities Claimants, the RMBS Trustees, the Senior Unsecured Creditors

(the "**SUNs**"), AFI, certain borrower class action claimants, certain monoline

insurance providers, and the Creditors' Committee.   Had the stakeholders not

reached a consensual plan, it is likely that significant litigation would have been

required to resolve the claims asserted by these parties resulting in the dissipation of

Estate assets and lower recoveries for the Debtors' creditors.  FTI provided

significant support to the settlement and mediation process that resulted in the Plan,

including:

i.  **Waterfall Recovery Model** – FTI developed a waterfall recovery model that

allowed the stakeholders to evaluate the impact of the assumptions

incorporated in the Plan on their recovery.  The recovery model was prepared

on a Debtor-by-Debtor basis and analyzed recoveries across dozens of legal

entities, allowing for varying assumptions related to, intercompany claims,

cross-guarantees, lien pledges, AFI contribution, estimation and allocation of

administrative expenses by Debtor, and value of the JSN claim.  The model

was updated multiple times throughout the case to reflect actual results,
updated forecasts, and changes to assumptions and terms of the Plan.

ii.    **Mediation –** FTI participated in the mediation efforts to produce a consensual
Plan, spanning multiple sessions.  In addition to participating in the
mediations sessions, FTI also prepared various scenarios from the waterfall
recovery model, and ad hoc analyses in response to requests from the
Mediator and other stakeholders to facilitate the negotiations that led to a
consensual Plan.

iii.    **Liquidation Analysis –** FTI prepared the liquidation analysis for the best
interest of creditors test ("**Best Interest Test**") as required under the
Bankruptcy Code.  This analysis was done on a Debtor-by-Debtor basis for
approximately 30 Debtors (those Debtors that have assets).  The liquidation
analysis required the estimation of asset recoveries and wind-down expenses
in a liquidation scenario, and the estimation of certain claims assuming the
settlements in the PSA would not be realized under a liquidation scenario.

iv.    **Claims –** FTI assisted in the estimation of claims by priority and Debtor to
support the negotiations to arrive at a consensual Plan. In doing so FTI
analyzed the asserted claims in order to ensure that the claims were asserted at
the appropriate Debtors.  There were many claimants who filed claims against
multiple entities and it was essential that this analysis was performed to ensure
the Plan satisfies the Best Interest Test.

v.   **Plan and Disclosure Statement –** FTI assisted the Debtors' counsel in the drafting of the Plan and Disclosure Statement.  This included preparing exhibits that detail the assumptions and results of the recovery analysis and the liquidation analysis, providing estimates of claim amounts by Plan class and recovery percentages, and providing data for various ad hoc financial analysis and requests.  FTI also reviewed the numbers included in the Plan and Disclosure Statement to ensure there was supporting documentation for the numbers.

vi.   **Testimony –** FTI prepared testimony that the Plan satisfies the Best Interest Test and that the partial consolidation of the Debtors' estates under the Plan does not harm any of the creditors.

C.   **<u>Settlement of the Junior Secured Noteholders Litigation</u>** – The JSNs objected to their treatment under the Plan, claiming they were entitled to both post-petition interest and default interest.  The JSN litigation ultimately settled prior to the Effective Date for $125 million.  The settlement of the JSN litigation brought certainty to a matter that could have resulted in significant diminution in the value available to distribute to the general unsecured creditors ("GUCs").  It also allowed for a quicker and more substantial distribution to the GUCs without the need to escrow the asserted value of the JSN litigation.   FTI's assistance to the Debtors included:

i.   **Discovery Requests** - FTI worked closely with the Debtors' counsel as well as other involved counterparties to facilitate an efficient formal discovery

process. As a part of the discovery process, FTI managed the search, review and production of thousands of emails from certain FTI professionals in connection with the Debtors' Chapter 11 proceedings to the JSNs. This data set included an initial universe of over 195,000 documents (including emails and email attachments), which required significant involvement and assistance from FTI's technology personnel.

ii. **Supporting Analyses** - FTI, at the request of Debtors' counsel and in preparation for mediation sessions with the JSNs, prepared specific waterfall analysis scenarios, to show the potential impact on creditor recoveries based on different assumptions contingent upon various litigation and mediation outcomes. Such scenarios were prepared specifically for the purposes of demonstrating the impact of different outcomes of the JSN Adversary Proceeding. These scenarios included, but were not limited to, potential recoveries assuming the allowance of post-petition interest and the disallowance of Original Issue Discount ("**OID**") on the JSNs. FTI participated in the mediation sessions to further explain the alternative scenarios and to assist the Debtors in settlement negotiations with the JSNs. Finally, FTI was required to perform certain additional tasks related to the JSN Adversary Proceeding, including but not limited to an analysis of JSN collateral values as of the petition date, and evaluation of the JSN equity pledges from certain debtor entities.

iii. **Expert Reports and Testimony** - Upon the request of the Debtors' counsel, certain FTI senior professionals prepared and issued several expert reports

supporting the analysis and opinion regarding (1) collateral available to the JSNs, (2) GAAP treatment of intercompany balances, (3) the liquidation analysis, and (4) certain hypothetical waterfall scenarios with allowed pre-petition intercompany balances. Specifically, FTI professionals provided the following:

### Mark Renzi, Senior Managing Director

- Mark Renzi provided expert testimony regarding the calculation of the valuation of the JSN collateral, including equity pledges, as set forth in the Disclosure Statement.  As part of this, he submitted an expert report on September 20, 2013, gave testimony in a deposition on October 3, 2013, submitted written direct testimony to the Court on October 8, 2013 and testified at trial on October 16, 2013.  Mark Renzi also provided expert testimony regarding the reasonableness of assumptions used in the Plan's liquidation analysis as well as advantages of limited partial consolidation of the Debtors' estates under the Plan.  As part of this, he submitted written direct testimony to the Court on October 18, 2013 and gave deposition testimony on November 6, 2013, and testified at trial on November 21, 2013 and November 22, 2013.  Finally, Mark Renzi provided expert rebuttal testimony in response to Michael Fazio's expert report regarding the allowance of intercompany balances and its hypothetical impact on the JSN recoveries. As part of this, he submitted an expert rebuttal report on November 1, 2013, gave testimony in a deposition on November 6,

2013, submitted written direct testimony to the Court on November 12,

2013, and testified at trial on November 21, 2013 and November 22,

2013.

**Gina Gutzeit, Senior Managing Director**

- Gina Gutzeit provided expert rebuttal testimony in response to Robert

  Bingham's expert report regarding the accounting for and the validity

  of the Debtors' intercompany balances. As part of this, she submitted

  an expert rebuttal report on November 1, 2013, submitted written

  direct testimony to the Court on November 12, 2013, gave testimony in

  a deposition on November 15, 2013, and testified at trial on November

  22, 2013.

D. **Monetization of the Debtors' Assets** – The Debtors' most valuable asset at the time

of its Chapter 11 filing was its mortgage servicing rights (the "**MSRs**"). At the time

of its Chapter 11 filing, the Debtors filed a Motion Seeking Approval of Sale of

Substantially All of its Assets under §363 of the Bankruptcy Code. The assets were

sold under a Bankruptcy Court supervised auction. The auction attracted numerous

bidders and resulted in several rounds of topping bids. As a result of the auction, the

Debtors realized $4.5 billion in value and preserved almost 4,000 jobs. FTI provided

assistance in the analysis of the competing bids as well as in the closing of the

transaction.

i. **Analysis in Support of the 363 Sales -** FTI developed integrated models that

were utilized in valuing and comparing competing bids. These models

analyzed the proceeds, assets acquired, and costs to provide the transition

services.  In addition, these models allocated bid value to legal entity and collateral silo.  The models were not only important in analyzing the bids prior to the auction, but were also utilized during the auction to evaluate the topping bids and to assess the "highest and best" bid.

ii.   **Post-Auction Closing Support -** After the auction, FTI assisted the Debtors with the completing the tasks necessary to close the sales.  FTI prepared detailed sale closing workplans to ensure all the tasks necessary to close the transactions were completed in a timely fashion.  FTI prepared detailed funds flow schedules and checklists to ensure the proper funds were received by and paid by the Debtors.  FTI also assisted the Debtors in analyzing the general ledger to identify which assets and liabilities were being transferred pursuant to the sales to ensure the Debtors accounted for the transactions properly.  FTI assisted the Debtors with various analysis as a result of changes to which MSRs were included in the transactions.  Finally, FTI assisted the Debtors in managing and responding to the data requests from the acquirers and in the analysis of the cure costs related to contracts to be assumed and assigned.

iii.   **Walter Transaction Assistance -** The Order approving the sale of certain of the Debtors' assets to Walter required the closing of the transaction by January 31, 2013 (the "**Walter Sale**"), which was a little over two months after the entry of the Order approving the Sale.  Subsequent to the approval of the Walter Sale, it became apparent to the Debtors and to Walter that if the sale was to close without undue delay, it would require the assistance of professionals with the requisite experience to provide certain project

management services.  Although outside the scope of FTI's retention, in view of both FTI's general expertise as project managers of the nature necessary for this transaction, and its base of knowledge as the Debtor's financial advisors, it was uniquely qualified to step in and provide the required services so that the Sale could close without undue delay.  FTI's retention was modified to authorize FTI to provide such services, with the compensation therefore to be in addition to any compensation under the monthly caps otherwise authorized pursuant to the Retention Order. Although the additional services provided by FTI were on behalf and at the direction of the Debtors,  Walter agreed to (and did) reimburse the Debtors for all fees and expenses incurred by the Debtors with respect to the Walter Project Services provided by FTI.    FTI's assistance was integral to this transaction closing by the deadline, which it did.

iv.  **Purchase Price True-ups -** FTI developed models to allocate the purchase price adjustments by legal entity and funding facility.  The Debtors received approximately $69 million in true-up payments from Ocwen.

E.  **<u>DIP Financing, Cash Collateral and Liquidity Management</u>** – In order to provide the Debtors with adequate liquidity until it could sell its assets, the Debtors obtained Debtor-in-Possession financing ("**DIP**").  Pursuant to the Debtors' Cash Management Order, Cash Collateral Order and the terms of the DIP agreement, the Debtors were required to change their treasury and cash management system.  These changes included modifications to the Debtors' account structure, monitoring of cash receipts, cash disbursements and excess cash flow.  The services FTI provided ensured that accurate and timely information was provided to the Debtors' post-petition financing

sources. Access to this financing was necessary to allow the Debtors' adequate time to market and sell the assets and preserve value to the Estate and ultimately to enhance recoveries to the creditors of the Estate.

i.   **DIP Financing -** The DIP Order required the Debtors to update the DIP budget every 4 weeks.  FTI developed processes and tools to work with the Debtors accounting and finance personnel to update the budget in compliance with the Cash Management Order.  FTI evaluated the assumptions employed in the DIP budget with current and historical trends to assess their reasonableness.  FTI prepared variance analysis on the DIP budget and participated in numerous meetings with the stakeholders to discuss the revised DIP budgets and material variances from the prior DIP budget.

ii.  **Cash Management –** FTI assisted the Debtors in setting up the account structure, models, and financial processes to ensure that cash flows went to the proper debt facility.  This ensured compliance with the various debt facilities and the Cash Management Order.  In addition, FTI assisted the Debtors in managing a proactive communication strategy with its cash management banks, both pre and post filing, to prevent disruption in the Debtors' servicing operations and to ultimately preserve the value of the servicing operations.

iii. **Long-Term Cash Forecasting –** As an extension to the DIP budget, FTI assisted the Debtors in the preparation of long-term projection of cash flows and asset balances to assess liquidity needs beyond the DIP budget.  This

allowed the Debtors to assess liquidity requirements and the impact of various actions on forecasted liquidity.

    iv.    **Ad-Hoc Cash/Flow Liquidity Tasks –** In addition to the tracking and reporting for the DIP budget and long-term cash forecasts, FTI provided numerous ad-hoc analyses, including:

        i.    The analyses of delinquency trigger buyout impact on liquidity for GNMA, which resulted in GNMA granting the Debtors a release from the buyouts, thereby increasing liquidity.

        ii.    Preparing numerous analyses supporting the Debtors in obtaining an amendment to the Barclays DIP facility.

        iii.    Analysis of the allocation of historical and projected administrative expenses.

F.    **<u>Provision of Bankruptcy Guidance to the Debtors</u>** – The Debtors operated a large and complex organization at the time of its Chapter 11 Filing, with 51 legal entities filing petitions.   The filings and reporting required under Chapter 11 is unique and FTI's assistance enabled the Debtors to meet the often tight deadlines to ensure the Chapter 11 proceedings stayed on course.  The significant areas where FTI assisted the Debtors, included:

    i.    **First Day Orders -** The first day motions and orders were necessary to ensure that the Debtors' operating continued without interruption that could have diminished the value of the Debtors' assets. FTI, along with the Debtors'

32

counsel, provided guidance on the information and analysis needed to ensure

that the first day motions were granted without delay.  The first day motions

and orders provided the Debtors' with access to financing, the ability to use

their existing cash management system, the ability to provide compensation

and benefits to its workforce, the ability to pay critical vendors and ordinary

course professionals, the ability to operate its servicing business, and

establishing the procedures for selling the majority of the Debtors' assets.

ii.    **SOFA / SOAL -** FTI was instrumental in the preparation of the Debtors'

Statement of Financial Affairs ("**SOFA**") and Schedule of Assets and

Liabilities ("**SOAL**").  A separate SOFA and SOAL was required for each of

the 51 Debtors and were completed within 45 days of the Debtors' Petition

Date.  The completion of the SOFA and SOAL was necessary to establish the

claims bar date and in setting the timing of the §363 sale of the Debtors'

assets.  FTI managed the process for gathering the information to populate the

SOFA and SOAL, assisted in the drafting of the global notes, and reviewed

the SOFA and SOAL schedules in preparation for filing with the Bankruptcy

Court.  FTI had to construct the Debtors' disbursement schedules for SOFA

3B and 3C from the electronic BAI information.  This undertaking was a

daunting task given the number of disbursements and the need to segregate

disbursements between on-balance sheet cash accounts and off-balance sheet

cash accounts.

iii.    **Monthly Operating Reports -** FTI, along with Debtors' counsel, assisted the

Debtors with the format and content for its Monthly Operating Reports

("**MOR**").  The filing of these reports provided timely information to the

Debtors' stakeholders regarding the results of operation and that status of the

key milestones in the Debtors' Chapter 11 proceedings.  FTI coordinated the

gathering of information from various departments within the Debtors and

AFI, reviewed the information contained in the various schedules to ensure it

was properly characterized, and provided input for the Global Notes to

enhance the information disclosed in the MOR schedules.

iv.    **Technical Accounting Support -** FTI provided the Debtors with assistance

with bankruptcy accounting, including the interpretation of Accounting

Standards Codification 852 (previously referred to as Statement of Position

90-7) and the implementation of cut-off procedures to ensure prepetition

liabilities were not paid, unless approved by the Bankruptcy Court Orders.

This assistance included providing guidance on the classification of the

balance sheet to segregate prepetition/post-petition liabilities, the recording of

gains/losses from the sale of assets pursuant to §363 of the Bankruptcy Code,

treatment of OID and the recording of contract rejection damages.

Additionally, FTI reviewed the adequacy of the cut-off procedures and the

process for releasing payments for prepetition liabilities authorized by the

Bankruptcy Court.  FTI also analyzed post-petition intercompany transfers to

ensure they complied with the authority granted in the Cash Management

Order.  Finally, FTI participated in meetings with the Debtors' external

auditors to discuss the auditing of the Debtors' liabilities subject to

compromise ("**LSC**") account.

    v.    **KEIP / KERP -** The establishment of the KEIP/KERP was important to
incentivizing the Debtors' employees to work at maximizing the value of the
Estate in an expeditious manner.  It also helped ensure the Debtors' workforce
remained in place until the majority of the assets were sold.  FTI analyzed the
metrics and payouts in the proposed KEIP/KERP for reasonableness, and
prepared declarations in support of the KEIP/KERP motion.

    vi.    **Executory Contracts -** FTI assisted the Debtors with the analysis of
executory contracts to identify those that should be assumed and assigned
pursuant to the Debtors' motion under §363 of the Bankruptcy Code to sell
substantially all of its assets.  FTI assisted the Debtors in the resolution of
objections by the contract counterparties to the cure amounts proposed by the
Debtors.  The resolution of these objections was necessary to allow for the
assignment of these contracts necessary to the assets being sold.

G.  **Resolution of Claims** – Approximately 8,000 claims asserting almost $110 billion
were filed against the Debtor entities.  As a result of the services rendered by FTI, the
total amount of allowed claims is expected to be approximately $16 billion.  The
resolution of claims was an important factor in getting the Plan approved given the
compromises that key stakeholders made to arrive at a consensual Plan.  Without the
resolution of a substantial number of claims, it would have been more difficult for the
key stakeholders to arrive at a consensual Plan.  FTI assisted with the following
aspects of resolving claims:

i.  **Claims Database -** FTI worked with the Debtors to create a database and procedures for tracking claims and recording the status of the disposition of the claims.  FTI identified the appropriate fields to include in the database and then worked with the Debtors to develop the process for gathering the information required.  FTI met with various functional areas within the Debtors' organization to review and refine these processes.  FTI identified the likely reporting capabilities needed from the claims tracking database.  FTI assisted the Debtors with developing processes for updating the claims database to reflect activity recorded in the official claims register to ensure synchronicity with the claims tracking database.  FTI continually evaluated the claims database to identify additional enhancements to satisfy the information requests related to the status of claims resolution.

ii.  **Analyzing and Categorizing Claims -** FTI spent considerable time analyzing and categorizing the proofs of claims, this included assessing the type, asserted amount, unliquidated status, claim priority and Debtor.  FTI prepared multiple reports on a recurring and ad-hoc basis for the Debtors, their counsel and Creditors' Committee Advisors on the status of the proofs of claim.

iii.  **Omnibus Objections -** FTI assisted in preparing the exhibits to the omnibus objections.  This included developing templates that allowed for efficiently populating and editing these exhibits with the requisite claims information.  These templates were also used by the Debtors' Claims Agent Kurtzman Carson Consultants LLC ("**KCC**") to update the official claims register.  The Debtors have filed approximately 57 omnibus objections plus dozens of

individual objections during the pendency of their Chapter 11 case. These objections cover approximately 3,000 claims.

iv.    **Borrower Claims Trust True-up -** The Plan Proponents were required to file as part of the Plan Supplement the amount required in addition to the $57 million called for by the Plan to ensure that the Borrower Claims (as defined in the Plan) receive a recovery percentage by Debtor Group that is at least equivalent to that received by the non-borrower general unsecured claims (the "**Borrower Claims Trust True-up**"). FTI prepared an analysis to estimate the allowed amount for the currently unresolved Borrower Claims. This work involved identifying the unresolved Borrower Claims, assessing the historical resolution of Borrower Claims and the required distribution on account of the Borrower Claims already allowed. The result of the analysis indicated that no Borrower Claims Trust True-up was required. This analysis was presented to the Creditors' Committee and representatives for the Borrower Claims. No objections were filed to the Borrower Trust True-up.

v.    **Disputed Claims Reserve -** FTI was instrumental in the development of the Disputed Claims Reserve (the "**DCR**") that was required to be filed with the Bankruptcy Court prior to the Plan going effective. The DCR was established for GUCs in Classes R-4, GS-4a, RS-4 and 6 (Liquidating Trust Beneficiaries, as defined in the Plan). The Bankruptcy Court Order establishing the DCR was necessary before any distributions under the Plan could be made. FTI identified the unresolved claims in the requisite Plan classes as the basis for sizing the DCR. The claims were categorized into five categories (liquidated

claims, partially unliquidated claims, wholly unliquidated claims, disputed

claims and contingent claims). FTI with the assistance of Debtors' counsel

and Creditors' Committee counsel developed the methodology to establish the

DCR based on the five categories. Only four parties filed objections to the

DCR motion, of which three were resolved consensually and one was

overruled by the Bankruptcy Court.

vi. **Other Claims Reserves** - The Plan and the LTA required the establishment of

an Administrative, Priority, Secured and Convenience Distribution reserve, as

well as a reserve for disputed ETS claims. FTI ensured that the claims were

properly classified into these categories and reviewed these claims to

determine the appropriate reserve amount to establish. Communication with

Stakeholders and Advisors – Given the complex nature of the Debtors'

business there were multiple stakeholders requesting information about the

Debtors and the Chapter 11 proceedings. These stakeholders included, the

Creditors' Creditors, AFI, the SUNs, the JSNs, and the Examiner appointed

by the Bankruptcy Court. FTI coordinated the responses to information

requests from the various stakeholders and their advisors and prepared reports

to these stakeholders. Given the often accelerated timing and deadlines during

the pendency of the Debtors' Chapter 11 proceedings, it was critical that the

stakeholders receive the accurate information in a timely fashion. FTI's

intimate knowledge of the Debtors' operations and their Chapter 11 process

was critical in responding in a timely manner to the stakeholders' requests.

FTI assisted the Debtors in the preparation of monthly presentations to the

Creditors' Committee on the major milestones in the Debtors' Chapter 11

proceedings.  In order for the Examiner to complete his report to the

Bankruptcy Court, he required a significant amount of historical information

related to the transaction between the Debtors and AFI.  The finalization of

this report was a gating item in the development of a consensual Plan.

## SUMMARY BY TASK CODE DURING INTERIM APPLICATION PERIOD

36.     To provide an orderly and meaningful summary of the services rendered by

Applicant on behalf of the Debtors during the Interim Application Period, Applicant established,

in accordance with the Guidelines and its internal billing procedures, separate task codes in

connection with the Chapter 11 Cases.  The following is a summary of the most significant

professional services rendered by Applicant during the Interim Application Period organized in

accordance with Applicant's internal system of task codes:

### Cash Management/Treasury (Task Code 1)

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Eisenband, Michael | 895 | 1.0 | $895.0 |
| Gutzeit, Gina | 895 | 2.1 | 1,879.5 |
| Khairoullina, Kamila | 505 | 1.0 | 505.0 |
| McDonagh, Timothy | 755 | 2.8 | 2,114.0 |
| Meerovich, Tatyana | 725 | 2.2 | 1,595.0 |
| Witherell, Brett | 570 | 10.2 | 5,814.0 |
| **Total** | | **19.3** | **$12,802.50** |

37.     In accordance with the relief granted under the Cash Management Order, the Cash

Collateral Orders, and the terms and conditions contained within the DIP, the Debtors were

required to modify their treasury and cash management operations. In order to comply with the

requirements, modifications were made to the bank account structure, monitoring and control of cash receipts, cash disbursements and excess cash balances in the cash management system.

38.    In order to track and report the cash flows for each financing facility, FTI worked with the Debtors to develop and maintain an Excel model that utilized various reporting tools to reconcile the Debtors' daily cash flows by facility.  This Excel model also tracked the classification of cash flows by line item to assist in reporting variances between actual and forecasted cash flows, and tracked cash flows to be allocated to the accounts of specific financing facilities.  FTI also assisted the Debtors through daily calls and regular meetings in reconciling and researching cash inflows and outflows that were not part of the standard daily reporting packages, particularly related to the large monthly payment received each month from Ocwen for the entire month's servicing activity.  In doing so, FTI worked closely with the Debtors' finance staff and the Debtors' counsel to clearly identify the purpose of the cash flows and to identify the facility to which these cash flows were pledged.

39.    FTI worked with the Debtors' management to prepare and review historical cash flows.  FTI participated in meetings with management to review and discuss these reports, the Debtors' liquidity position, and cash performance in connection with the pay downs of secured debt facilities and confirmation of the Chapter 11 proceedings.

**Cash Forecasting and Facility Reporting (Task Code 2)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Gutzeit, Gina | 895 | 2.5 | $2,237.5 |
| McDonald, Brian | 615 | 1.2 | 738.0 |
| Meerovich, Tatyana | 725 | 18.1 | 13,122.5 |
| Nolan, William J. | 895 | 0.3 | 268.5 |
| Szymik, Filip | 540 | 0.8 | 432.0 |
| Tracy, Alexander | 325 | 1.9 | 617.5 |
| Witherell, Brett | 570 | 17.4 | 9,918.0 |
| **Total** | | **42.2** | **$ 27,334.0** |

40.     FTI, in conjunction with the Debtors, prepared a lifetime cash flow and asset

balance forecast ("**Lifetime Cash Forecast**") to estimate liquidity needs and collateral

performance over the remaining life of the Estate. FTI worked with the Debtors to prepare the

Lifetime Cash Forecast concurrently with the six-month cash flow projections.

41.     Following the completion of the Asset Sales on February 15, 2013, the DIP

requirement was amended such that the Debtors were required to provide updated six-month cash

flow projections along with month-end collateral balance by financing facility every month (the

"**Cash Flow Projections**"). FTI worked with the Debtors to prepare updated Cash Flow

Projections on September 16, 2013, October 14, 2013, and November 14, 2013.

42.     Subsequent to closing of the Asset Sales, FTI worked closely with the Debtors'

treasury team to transition responsibility for the regular maintenance and update of cash forecasts

to the Debtors. FTI designed the model for the Cash Flow Projections that was utilized by the

Debtors during the Interim Application Period, and was closely involved with the preparation of

the monthly updates.  FTI worked closely with the Debtors' treasury team to provide guidance,

and to prepare and review reports and analyses.

43.     In order to ensure the accuracy of the Cash Flow Projections, FTI performed a

thorough review of the projections each month.  As part of this review, FTI and the Debtors

worked closely together to validate and confirm the cash flows, asset balance rollforwards, and

underlying assumptions.  This was an iterative process with reviews leading to additional follow-

up items and updated Cash Flow Projections.

44.     In accordance with the relief granted under the cash collateral orders, and the DIP,

the Debtors were required to provide a 2-week and 4-week cash flow variance report broken

down by financing facility (the "**Variance Report**"). Following the Asset Sales, the Debtors

were required to provide the Variance Report by financing facility on a monthly basis.

45.     Subsequent to closing of the Asset Sales, FTI worked closely with the Debtors'

treasury team to transition responsibility for the regular maintenance and update of the Variance

Report to the Debtors. FTI designed the model for the Variance Report that was utilized by the

Debtors during the Interim Application Period, and was closely involved with the preparation of

the monthly updates.  In order to ensure the accuracy of the Variance Report, FTI performed a

thorough review of the analysis each month.  This was an iterative process with reviews leading

to additional follow-up items and updated Cash Flow Projections.

46.     In addition to the tasks described above, FTI prepared numerous ad-hoc analyses

based on the financial projections and scenarios related to those projections.  This included

analyses of the historical and projected allocation of administrative expenses, and the calculation

and allocation of administrative expenses by individual Debtor.

**Technical Accounting, Accounting Cutoff, and Reporting (Task Code 5)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Grover, Mark | 720 | 20.4 | $14,688.0 |
| Gutzeit, Gina | 895 | 7.1 | 6,354.5 |
| Meerovich, Tatyana | 725 | 0.2 | 145.0 |
| Milazzo, Anthony | 616 | 15.2 | 9,378.0 |
| Talarico, Michael J | 740 | 18.9 | 13,986.0 |
| **Total** | | **61.8** | **$ 44,551.5** |

47.     FTI assisted the Debtors in evaluating the need for accounting entries related to

rejected executory contracts and additional accounting accruals in LSCs due to the analysis of the

proofs of claim filed against the Debtors.  FTI participated in meetings with the Debtors'

accounting personnel to discuss the work plan for determining the need for additional accounting

journal entries.

48.    FTI assisted the Debtors in developing processes for preparing journal entries to

record additional LSCs based on the results of the Debtors' claim reconciliation process.

49.    FTI provided accounting research and US GAAP guidance materials in response

to inquiries from the Debtors' controller and other accounting staff.  The topics that FTI provided

guidance on include the appropriateness and timing for adoption of the liquidation basis of

accounting and the treatment of employee benefit liabilities upon the Plan going effective.  This

assistance included review of accounting literature and the application of the authoritative

guidance to the Debtors' facts and circumstances.  FTI participated in working sessions with the

Debtors' accounting personnel to plan the implementation of liquidation accounting within the

context of the LTA.


**Assistance with Various Motions (Task Code 6)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Gutzeit, Gina | 895 | 1.9 | $1,700.5 |
| McDonagh, Timothy | 755 | 0.9 | 679.5 |
| McDonald, Brian | 615 | 47.4 | 29,151.0 |
| Nolan, William J. | 895 | 18.5 | 16,557.5 |
| Tracy, Alexander | 325 | 50.5 | 16,412.5 |
| **Total** | | **119.2** | **$ 64,501.0** |

50.    FTI has included time spent on assisting the Debtors and the Debtors' counsel in

the review and analysis of financial information related to various motions.  During the Interim

Application Period, FTI primarily assisted the Debtors and Debtors' counsel in the preparation of

analyses and a declaration of William J. Nolan in support of the retention of the Debtors' CRO,

(the "**Nolan Declaration**").

51.     In assisting with the preparation of analyses in support of Mr. Kruger's retention and compensation arrangements, FTI performed several analyses used by the Debtors, Debtors' counsel, and Debtors' Board of Directors (the "**Board**") to understand typical market arrangements for CROs in large restructuring engagements.  While it was determined that the Debtors' situation was unique with respect to the CRO, FTI performed a market comparables analysis, as well as an analysis of the Debtor's KEIP to understand how Mr. Kruger could have been compensated under a comparable arrangement.  These analyses were extensively reviewed and modified to fit the needs of the Debtors and Debtors' Counsel, and were eventually entered into evidence as part of the Nolan Declaration and was referred to by the Court in its determination of the motion.

**Tax (Task Code 9)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Joffe, Steven | 895 | 0.3 | $268.5 |
| Nolan, William J. | 895 | 1.0 | 895.0 |
| **Total** | | **1.3** | **$ 1,163.5** |

52.     Although the Debtors' have retained Ernst &Young LLP and KPMG LLP as tax advisors, FTI has provided advice and analysis regarding the impact of restructuring activities on the Debtors' tax assets. FTI's assistance consisted of researching, at the request of the Creditors' Committee Advisors numerous tax guidelines in regards to the original issue discount calculation for tax purposes and the tax treatment of phantom income. FTI's tax advice during the Interim Application Period has been limited to these areas, and FTI has not served as a general tax advisor on other tax issues the Debtors' may have.

**Monthly Operating Report (Task Code 11)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Gutzeit, Gina | 895 | 2.2 | $1,969.0 |
| Mathur, Yash | 325 | 1.4 | 455.0 |
| Talarico, Michael J | 740 | 9.7 | 7,178.0 |
| Tracy, Alexander | 325 | 2.8 | 910.0 |
| Witherell, Brett | 570 | 5.5 | 3,135.0 |
| **Total** | | **21.6** | **$ 13,647.0** |

53.     In accordance with the requirement of the Court for the Debtors to file MORs, FTI assisted the Debtors in the planning, preparation, and review of the MOR for August, September, and October of 2013, as well as the financial reports for the six-month period ending June 30, 2013 for non-debtor subsidiaries as required under Rule 2015.3.

54.     In conjunction with the Debtors, and Debtors' counsel, FTI identified areas where global notes would provide additional disclosures, and enhance the readability of the MORs. Additionally, FTI, on a monthly basis, assisted the Debtors in the preparation of the schedule of receipts and disbursements utilizing the cash flows.  Furthermore, FTI, each month, prepared Schedule 6 to the monthly operating report, which included identifying and summarizing intercompany disbursements to AFI, and adequate protection payments under secured facilities. Finally, given the complexity of the Debtors' operations and the dependency on AFI for shared services, FTI participated in several discussions with the Debtors and the Debtors' counsel to develop the responses and explanatory notes for the Debtors' questionnaire.

55.     FTI also assisted the Debtors in the review of the schedules and notes for the MORs to ensure compliance with Guidelines.  This review included reconciling the schedules to supporting documentation and financial statements, identifying changes in the financial statements that required additional disclosure, and ensuring that the notes to the MORs were updated accordingly.  FTI participated in review meetings with the Debtors' management and

counsel. FTI also followed-up on questions raised during the management review sessions to

ensure issues were addressed and modifications were made and provided feedback to the Debtors

to ensure compliance with UST Guidelines, as necessary.

**UCC/Ad-hoc Committee Management (Task Code 12)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Eisenband, Michael | 895 | 1.9 | $1,700.5 |
| Gutzeit, Gina | 895 | 16.7 | 14,946.5 |
| Mathur, Yash | 325 | 11.6 | 3,770.0 |
| McDonald, Brian | 615 | 11.5 | 7,072.5 |
| Meerovich, Tatyana | 725 | 48.7 | 35,307.5 |
| Nolan, William J. | 895 | 25.4 | 22,733.0 |
| Renzi, Mark A | 790 | 1.0 | 790.0 |
| Szymik, Filip | 540 | 13.6 | 7,344.0 |
| Talarico, Michael J | 740 | 95.3 | 70,522.0 |
| Tracy, Alexander | 325 | 6.4 | 2,080.0 |
| Witherell, Brett | 570 | 53.3 | 30,381.0 |
| **Total** | | **285.4** | **$ 196,647.0** |

56.     FTI professionals assisted the Debtors with coordinating and responding to

ongoing day-to-day inquiries from the attorneys and other professionals retained by the

Creditors' Committee, including Alix Partners, Inc. ("**Alix**"), Kramer Levin Naftalis & Frankel

LLP ("**Kramer**"), and Moelis & Company LLC ("**Moelis**", together with Alix and Kramer, the

"**Creditors' Committee Advisors**").  FTI analyzed and tracked data requests, coordinated the

due diligence process, and reviewed financial information and reports in response to various

requests. Additionally, FTI assisted the Debtors in the preparation of regularly updated reporting

packages that were shared with the Creditors' Committee Advisors on a monthly basis.  As a

result of these actions and responsibilities, FTI provided Alix with multiple analyses including,

but not limited to: (i) detailed information on cash and expense forecasts; (ii) waterfall recoveries

analyses; (iii) collateral values and allocation; (iv) business performance and key statistics; (v)

liquidity; (vi) wind-down and asset recovery forecasts; (vii) the use of cash collateral; and (viii) claims.  FTI responded to Alix's requests while minimizing the impact on the Debtors' management team, treasury department and business segment leaders, ensuring their continued focus on operations, Plan negotiation and implementation, and the estate wind-down plan.

57.     In addition, FTI developed numerous presentations for the Creditors' Committee Advisors and the Creditors' Committee, including presentation on the waterfall recoveries analyses, wind-down expense plans and forecasts, asset recovery plans and forecasts, claims reconciliation and disputed claims, and voting analyses.

58.     Additionally, FTI has interacted with numerous other third party advisors, including, but not limited to, advisors to AFI, the Residential Mortgage Backed Securities Trustees (the "**RMBS Trustees**"), the JSNs, the SUNs, and others.  Discussions with these advisors include, but are not limited to: (i) settlement negotiations and analyses; (ii) waterfall recoveries analyses; (iii) intercompany activity and accounting; (iv) collateral; (v) claims estimation and allocation; (vi) Plan negotiations and (vii) voting analyses.

59.     Finally, FTI has assisted the Debtors in the management of multiple diligence processes being performed simultaneously by various parties-in-interest.  Such tasks have included the maintenance of detailed request trackers and constant monitoring of diligence requests and responses in order to minimize the disruption to the Debtors' ongoing business operations

**UST Compliance (Task Code 13)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Gutzeit, Gina | 895 | 0.3 | $268.5 |
| Talarico, Michael J | 740 | 0.3 | 222.0 |
| **Total** | | **0.6** | **$ 490.5** |

60.     During the period, FTI professionals assisted the Debtors and Debtors' counsel in the review of compliance reporting relative to Court Orders; responding to US Trustee information requests; and in the calculation and reconciliation of US Trustee fees.

**Estate Support and Wind-Down Planning (Task Code 15)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Brown JR, Walton | 740 | 0.8 | $592.0 |
| Grover, Mark | 720 | 1.3 | 936.0 |
| Gutzeit, Gina | 895 | 28.6 | 25,597.0 |
| McDonagh, Timothy | 755 | 64 | 48,320.0 |
| McDonald, Brian | 615 | 6.8 | 4,182.0 |
| Meerovich, Tatyana | 725 | 6.8 | 4,930.0 |
| Nolan, William J. | 895 | 13.6 | 12,172.0 |
| Renzi, Mark A | 790 | 0.8 | 632.0 |
| Szymik, Filip | 540 | 2.1 | 1,134.0 |
| Talarico, Michael J | 740 | 13.7 | 10,138.0 |
| Tracy, Alexander | 325 | 83.4 | 27,105.0 |
| Witherell, Brett | 570 | 32.9 | 18,753.0 |
| **Total** | | **254.8** | **$ 154,491.0** |

61.     FTI assisted the Debtors in the establishment, management and implementation of a wind-down Estate compliant with the terms of the Plan and the LTA.  This involved in depth review of the Plan and the LTA as well as meetings and working sessions with the Debtors and the Debtors' management team to ensure that requirements for Plan confirmation were satisfied in advance of the expected Effective Date of the Plan. This included activities related to advising the Debtors on requirements for treasury, accounting, reporting, claims resolution/distribution and other issues related to the Estate operations post the effective date.

62.     FTI frequently met with functional area leaders and the Debtors' counsel and provided feedback on the Plan execution workplan, distribution of available funds and claims process.

63.     In addition, FTI advised the Debtors on the 2014 compensation plans for the Liquidating Trust.  In doing so FTI (i) reviewed and commented on potential proposed changes

to the structure of the compensation plans, (ii) performed analysis on compensation levels and the timing of reduction in staffing levels, (iii) prepared various scenario analysis related to different metric structures, (iv) prepared presentations for the Creditors' Committee and Board related to the 2014 plans, and (v) participated in the meeting of the Board to review the analyses supporting the proposed compensation plans.  FTI worked with the Debtors' compensation consultants to understand the assumptions of the compensation metrics and the reasonability of the proposed compensation plans.  FTI participated in meetings with the Debtors, their counsel and the financial advisors to the Creditors' Committee to discuss the status and issues related to the compensation plans for the Liquidating Trust.

64.    On a regular basis, FTI reviewed changes to the Debtors' forecasted cash flows, and provided guidance and comments as applicable.  Such review included detailed analysis of the underlying cash flows, verification of the implied balance sheet impact, and meetings with the Debtors' management team to discuss, these issues.  FTI assisted the Debtors in the preparation of a preliminary budget for the Borrower Claims Trust (as defined in the Plan) operating expenses.  FTI participated in meetings with the Creditors' Committee Advisors to discuss the assumptions and the estimated cash expenditures for the borrower claims trust.

65.    FTI also continued to meet with the asset disposition team to review assumptions relative to the asset disposition strategy, and assisted the Debtors' in formalizing the assumptions into an asset wind-down forecast. The wind-down expense and asset disposition budget were subject to frequent refinement as the structure of the post 363 sale estate was developed.

**Claims Management, Reconciliation and Resolution (Task Code 16)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Bernstein, Matthew | 470 | 0.7 | $329.0 |
| Brown JR, Walton | 740 | 58.5 | 43,290.0 |
| Gutzeit, Gina | 895 | 11.7 | 10,471.5 |
| Mathur, Yash | 325 | 534.3 | 173,647.5 |
| Meerovich, Tatyana | 725 | 1.1 | 797.5 |
| Nolan, William J. | 895 | 3.1 | 2,774.5 |
| Renzi, Mark A | 790 | 0.8 | 632.0 |
| Smith, Douglas | 540 | 3.2 | 1,728.0 |
| Talarico, Michael J | 740 | 197.5 | 146,150.0 |
| Tracy, Alexander | 325 | 22.6 | 7,345.0 |
| Witherell, Brett | 570 | 142.1 | 80,997.0 |
| **Total** | | **975.6** | **$ 468,162.0** |

66.    FTI analyzed the claims register, and where necessary, the individual proofs of claim to (i) prepare summaries of the magnitude of various claims types; (ii) assess the magnitude of claims asserted at a claims classification other than general unsecured; (iii) assess the magnitude of the same claim being filed against multiple Debtors; and (iv) to understand the claim amounts asserted against each Debtor entity.

67.    FTI assisted the Debtors and their counsel with the preparation of omnibus claims objections.  This assistance consisted of refining templates for the various omnibus objection types, identifying claims to include in the omnibus objections and preparing files for use by KCC in noticing the parties subject to the omnibus objections.

68.    FTI participated in working sessions with the Debtors' Claims Management and Reconciliation ("**CM&R**") team to develop parameters for analyzing the claims register to identify claims to include in the omnibus objections.  FTI assisted the Debtors and their counsel in the preparation of 25 omnibus objections, plus 7 individual objections.  These objections related to both borrower and non-borrower claims.  The omnibus objections included (i) amended and superseded claims, (ii) insufficient documentation, (iii) no liability – paid, (iv) no

liability – books and records, (v) no liability – non-debtor, (vi) no liability – assigned contracts, (vii) late filed claims, (viii) duplicate claims, (ix) redesignate, reclassify, reduce and allow claims, (x) reclassify claims, and (xi) redesignate and allow claims..  FTI also provided the CM&R team with guidance on the assessment of claim priority asserted by the claimant, as well as the appropriateness of the Debtor entity asserted by the claimant in their proof of claim.

69.     FTI assisted the Debtors with the preparation of the notice of satisfaction for claims included in the SOAL that were satisfied via a post-petition payment in according with Bankruptcy Court orders or the assumption of the executory contract between the creditor and the Debtors.  FTI worked with the Debtors' accounting personnel to review the accounts payable balances for creditors scheduled in the SOAL where no proof of claim were filed to identify those creditors whose balances were paid in full.  FTI worked with Debtors' counsel to prepare the notice, including the exhibit with the satisfied claims.

70.     FTI also provided ad-hoc guidance to the CM&R team on issues that arose from the reconciliation of individual proofs of claims.  FTI reviewed proofs of claim filed by landlords for non-residential real property lease rejection claims to analyze the application of damage limits set forth in the Bankruptcy Code.

71.     FTI continued to assist the Debtors in the development and modification of the database used to track the progress of claims reconciliation.  FTI participated in weekly conference calls to provide guidance on the updating of the database to reflect changes in the claims register and the fields to incorporate in the database to reflect key data needed for and gathered from analyses.  FTI continued to develop reporting and tracking mechanisms for efficient communication on the progress of the claims reconciliation efforts and to incorporate

information requested by the Creditors' Committee Advisors.  FTI also ensured that the

information in the Debtors' claims database was consistent with the KCC claims register.

72.    FTI worked with Debtors' counsel and the CM&R team to develop strategies for

resolving claims, focusing on the larger dollar claims and those with secured and priority status.

73.    FTI along with Debtors' counsel participated in numerous meetings with the

Creditors' Committee Advisors to provide them with information on the status of the claims

reconciliation process as well as updates on the estimates of allowed claims by major claims

class.

74.    FTI assisted in refining the estimates of allowed claims by the proposed claim

classes and Debtor Groups in the Plan and Disclosure Statement.  FTI participated in numerous

meetings with the Debtors, their counsel and counsel to the Creditors' Committee.  These

estimates encompassed, secured claims, priority claims, administrative claims and general

unsecured claims.  FTI analyzed the claims register to assess the reasonability of the current

estimate of the unresolved claims, as well as summarize the claims that will be allowed at the

Effective Date and which ones will be entitled to cash versus liquidating trust units.

75.    FTI participated in discussions with the Debtor personnel and Debtors' counsel

regarding the approach for dealing with certain classes of claims and analyzed proofs of claim in

these categories to identify those to include on omnibus objection exhibits.

76.    FTI assisted in further refining the segregation of the claims register between

borrower and non-borrower claims.  FTI assisted in the compilation of the final list of borrower

claims to provide to the Borrower Claims Trust.

**Plan of Reorganization Development and Supporting Analysis (Task Code 17) and Recovery Waterfall Analysis (Task Code 18)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Brown JR, Walton | 740 | 17.1 | $12,654.0 |
| Eisenband, Michael | 895 | 1.0 | 895.0 |
| Gutzeit, Gina | 895 | 30.9 | 27,655.5 |
| Mathur, Yash | 325 | 115.6 | 37,570.0 |
| McDonald, Brian | 615 | 17.3 | 10,639.5 |
| Meerovich, Tatyana | 725 | 4.5 | 3,262.5 |
| Nolan, William J. | 895 | 11.7 | 10,471.5 |
| Renzi, Mark A | 790 | 12.1 | 9,559.0 |
| Szymik, Filip | 540 | 3.3 | 1,782.0 |
| Talarico, Michael J | 740 | 272.4 | 201,576.0 |
| Tracy, Alexander | 325 | 59.9 | 19,467.5 |
| Witherell, Brett | 570 | 164.2 | 93,594.0 |
| Yozzo, John | 705 | 1.0 | 705.0 |
| **Subtotal Task Code 17** | | **711.0** | **$ 429,831.5** |
| Szymik, Filip | 540 | 4.2 | $2,268.0 |
| **Subtotal Task Code 18** | | **4.2** | **$ 2,268.00** |
| **Total Task Code 17 and 18** | | **715.2** | **$ 432,099.50** |

77.    FTI assisted the Debtors with the analysis of the voting status for the Plan.  FTI reviewed the solicitation procedures and had discussions with the Debtors' claims agent to ensure the proper application of the voting procedures.  FTI prepared and updated a model used to analyze the Plan voting on a Debtor-by-Debtor basis.  This analysis segregated the claims between Consenting Claimants (as defined in the PSA) and non-Consenting Claimants.  FTI had discussions with Debtors' counsel, counsel for the Creditors' Committee, and counsel for AFI, and revised the model throughout the period covered by the Interim Application Period for new developments.  FTI's services allowed counsel for the various stakeholders to assess the likelihood of Plan acceptance by the impaired Plan classes.

78.    FTI assisted the Debtors in estimating the number of Liquidating Trust Unit holders at the Effective Date.  FTI analyzed the claims register and identified those claims that had already been allowed or believed would be allowed by the time the Plan was effective.  FTI

had discussions with Debtors' counsel and counsel for the Creditors' Committee to discuss the methodology and results of this analysis. FTI's services were important in assisting counsel for the Creditors' Committee in assessing the securities law requirements for the Liquidating Trust Units.

79.    FTI assisted the Debtors in the establishment of a Disputed Claims Reserve (the "**DCR**"). FTI analyzed the list of unresolved claims where the claimant would be entitled to Liquidating Trust Units on account of any allowed claim. FTI prepared presentations for the Creditors' Committee and their advisors summarizing the claims in the DCR and their asserted amounts. FTI prepared reconciliations of the claims register to the claims included in the DCR to ensure all claims were accounted for properly. FTI worked with the Debtors, their counsel and counsel for the Creditors' Committee to develop and apply the methodology to create the DCR claim amounts, including estimates for wholly and partially unliquidated claims and contingent claims (i.e. future contract rejection damages). Additionally, FTI assisted Debtors' counsel and the counsel for the Creditors' Committee in the drafting of the DCR Motion, including the preparation of the exhibits of the claims included in the DCR. FTI also analyzed the objections to the DCR motion to assist counsel in responding to the objections. The Order establishing the DCR was necessary before any distributions of Liquidating Trust Units and cash on account of those units could be made.

80.    FTI assisted the Debtors in preparing the list of allowed claims entitled to Liquidating Trust Units. FTI created a spreadsheet of the allowed claims and calculated the number of units to be allocated to each of the allowed claims and the claims in the DCR. FTI reconciled the claims register to the unit calculations prepared by the investment bankers to the Creditors Committee. FTI had numerous meetings with the Debtors, their counsel, and counsel

to the Creditors' Committee to review the methodology and results of the Liquidation Trust Unit allocation. FTI's services were necessary to ensure that the issuance of the Liquidating Trust Units and the initial distribution on account of these units occurred within two weeks of the Effective Date.

81.     FTI assisted the Debtors in preparing a list of allowed claims at the Debtors' Effective Date that are entitled to payment in cash as well as estimates of the Administrative, Priority, Secured and Convenience Distribution Reserve and the ETS Claims Reserve. FTI utilized the knowledge it gained from assisting the Debtors in the claims resolution process to prepare schedules used by the Debtors to manage the payout of claims and the funding of reserves. FTI participated in numerous meetings with the Debtors, their counsel, and counsel to the Creditors' Committee.

82.     FTI assisted the Debtors with identifying and tracking the tasks required for the Plan to become effective. FTI reviewed the Debtors' Chapter 11 Plan and the Liquidating Trust Agreement and prepared tracking spreadsheets and detailed task plans for the key deliverables and milestones. FTI contributed to the development of schedules prepared by the Debtors on the cash available for distribution to General Unsecured Creditors at the Effective Date. FTI participated in numerous working sessions with the Debtors, their counsel, and the counsel for the Creditors' Committee to ensure Effective Date readiness. FTI reviewed and revised schedules of executory contracts to be assumed and rejected at the Effective Date. Additionally, FTI prepared cash flow budgets for the Liquidating Trust and the Borrower Trust. FTI also reviewed certain objections to the Plan and Disclosure Statement to assist the Debtors and their counsel in responding to these objections. The Plan was complex and required the completion of numerous documents and analyses in a short time frame in order to go effective. FTI's services

allowed for the efficient tracking of these tasks to ensure they were completed in a timely fashion.

83.     FTI assisted the Debtors in preparing analyses to compare the current estimate of the cash flows to the estimates included in the Disclosure Statement.  FTI summarized the key drivers contributing to the cash flow variance to discuss with other constituencies in the case.  FTI also assessed the impact of the changes in estimated cash flows on the waterfall recovery analysis.

84.     FTI assisted the Debtors in preparing a revised estimate of the allowed General Unsecured Claims requested by the Creditors Committee.  FTI analyzed the unresolved claims and refreshed the methodology for estimating these claims and added this estimate to the allowed amount of those claims that have been resolved.  FTI met with the Debtors, their counsel and the counsel to the Creditors' Committee to discuss the methodology and revised estimate.

85.     FTI assisted the Debtors in analyzing potential avoidance actions.  FTI summarized the Debtors disbursements in the preference period from its SOFA 3B to assess the dollar magnitude of potential avoidance actions.

86.     FTI assisted the Debtors in the analysis of whether a Borrower Trust True-up was required.  Under the terms of the Plan, the Plan Proponents were to analyze whether the Borrower Trust Claims would receive a recovery percentage by Debtor Group that was estimated to be at least as equal to the recovery percentage for the General Unsecured Claimants receiving Liquidating Trust Units.  In consultation with the Debtors', FTI developed the assumptions and methodologies to assess the adequacy of the funding to the Borrower Claims Trust.  FTI applied the assumptions and methodologies to the Borrower claims and prepared presentations on the results of this analysis.  FTI had numerous meetings with the Debtors, their counsel, and counsel

to the Creditors' Committee to discuss the methodology and results of the analysis.  The results

of this analysis were presented to the representatives of the Borrower Claimants and the Creditors

Committee.

**Case/Project Management/Meetings with Debtors and Their Professionals (Task Code 20)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Eisenband, Michael | 895 | 4.1 | $3,669.5 |
| Gutzeit, Gina | 895 | 15.1 | 13,514.5 |
| Mathur, Yash | 325 | 7.3 | 2,372.5 |
| McDonagh, Timothy | 755 | 3.8 | 2,869.0 |
| McDonald, Brian | 615 | 23.0 | 14,145.0 |
| Meerovich, Tatyana | 725 | 22.8 | 16,530.0 |
| Nolan, William J. | 895 | 33.2 | 29,714.0 |
| Renzi, Mark A | 790 | 3.3 | 2,607.0 |
| Szymik, Filip | 540 | 6.1 | 3,294.0 |
| Talarico, Michael J | 740 | 11.1 | 8,214.0 |
| Tracy, Alexander | 325 | 12.3 | 3,997.5 |
| Witherell, Brett | 570 | 10.2 | 5,814.0 |
| **Total** | | **152.3** | **$ 106,741.0** |

87.    As in any complex bankruptcy case where FTI is involved, there are a significant

number of tasks that require coordination amongst FTI's own professionals, the Debtors,

Debtors' counsels, and Debtors' investment bank to properly support the overall advisory effort

and to minimize the duplication of effort.  These tasks include, but are not limited to the

following: assisting the Debtors in the development and revision of work plans and subsequent

meetings to assign tasks to complete the work plan in order to efficiently and effectively manage

staff and projects; and meetings, work sessions and phone calls between FTI's professionals,

Debtors, and Debtors' advisors to discuss case strategy, modification and refinement to various

work plans ensuring that various issues are being addressed in a timely, efficient, consistent and

cost effective manner.

88.     In addition, FTI's senior professionals met on a regular basis with the Debtors'

management and the Debtors' other professionals and advisors to discuss strategic issues,

identify important and emerging matters and prioritize demands throughout the case and to

ensure coordination between the Debtors' professionals and personnel.  The Debtors held

weekly, and often more frequent, update calls with their professionals to review upcoming

workstreams and meetings, and to discuss resources, information requirements, and timing of

deliverables.

**Prepare for and Attend Court Hearings (Task Code 21)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Gutzeit, Gina | 895 | 2.8 | $2,506.0 |
| McDonald, Brian | 615 | 4.8 | 2,952.0 |
| Nolan, William J. | 895 | 4.8 | 4,296.0 |
| **Total** | | **12.4** | **$ 9,754.0** |

89.     During the application period, FTI worked closely with the Debtors' counsel to

prepare for Court hearings.  FTI also played an active role in preparing the Debtors for court

hearings and providing the Debtors and the Debtors' counsel with additional support, analysis

and information to proactively address any questions, concerns or issues that the Court and other

key constituents may have had during the proceedings.

90.     FTI's professionals attended several of the Debtors' Court hearings as needed to

support the Debtors.  In order to facilitate a smooth bankruptcy process, FTI's professionals

prepared numerous source data binders to support the analyses and information provided for each

of the hearings and to ensure that FTI and the Debtors were well prepared to address any

questions or objections that could have arisen at any of these hearings.  Among the several

hearings that FTI professionals attended and provided direct support to counsel was the hearing

regarding retention of Lewis Kruger, the Debtors' CRO.

**363 Sale Support (Task Code 23)**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Khairoullina, Kamila | 505 | 2.1 | $1,060.5 |
| Meerovich, Tatyana | 725 | 0.6 | 435.0 |
| **Total** | | **2.7** | **$ 1,495.5** |

91.     During the fee period, FTI worked with the Debtors, the Debtors' counsel and the

Debtors' investment banker on true-ups related to the asset purchase agreements. The initial 363

sales were based on asset balances from the December 31, 2012 balance sheets. Per the terms of

the asset purchase agreements, once the closing date balances became available (i.e. January 31,

2013 for the Walter sale), an adjustment to the purchase prices would be made. FTI continued to

follow up on the status of the Walter true-up through communication with various relevant

parties. In addition, FTI worked with the Debtors to confirm the legal entity allocation for the

Ocwen true-up.

### Fee Application Process (Task Code 24)

**Task Code 24**

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Gutzeit, Gina | 895 | 17.7 | $15,841.5 |
| Hayes, Dana | 550 | 0.6 | 330.0 |
| Hellmund-Mora, Marili | 250 | 152.3 | 38,075.0 |
| Mathur, Yash | 325 | 34.8 | 11,310.0 |
| McDonagh, Timothy | 755 | 42.9 | 32,389.5 |
| McDonald, Brian | 615 | 118.9 | 73,123.5 |
| Meerovich, Tatyana | 725 | 8.6 | 6,235.0 |
| Moore, Teresa | 220 | 86.5 | 19,030.0 |
| Nolan, William J. | 895 | 59.4 | 53,163.0 |
| Renzi, Mark A | 790 | 5.3 | 4,187.0 |
| Szymik, Filip | 540 | 1.5 | 810.0 |
| Talarico, Michael J | 740 | 1.8 | 1,332.0 |
| Tracy, Alexander | 325 | 51.4 | 16,705.0 |
| Witherell, Brett | 570 | 53.9 | 30,723.0 |
| **Total** | | **635.6** | **$ 303,254.5** |
| Voluntary reduction for fee application preperation time | | | $ (106,451.00) |
| **Adjusted Total** | | | **$ 196,803.5** |

92.     Time expended in this category during the Interim Application Period relates to tasks involved with the preparation, review, finalizing and filing monthly fee and expense statements, and the preparation, review and finalizing of FTI's Third interim fee application period January 1, 2013 through April 30, 2013 ("**Third Interim App**") and forth interim fee application period May 1, 2013 through August 31, 2013("**Fourth Interim Application**").  Time in this category includes, tasks associated with the consolidation of detailed time and expenses, preparation of exhibits for the monthly fee statements and fee applications and subsequent review by senior FTI professionals for adherence to the Office of the US Trustee, US Bankruptcy Court Guidelines, and rulings made by Judge Glenn on the other fee applications.

93.     FTI does not normally bill its client in this level of detail, and preparing the fee statements and applications can require significant time.  However, in order to fulfill its obligation to prepare and file requisite fee statements, and applications, including supporting

details and exhibits, in a cost effective manner, FTI endeavors to use members of its professional

staff with lower hourly rates.  As a result, the average hourly billing rate for this task code is

approximately $477.11 as compared to the average hourly billing rate for the Interim Application

of approximately $582.35.  In addition, FTI has voluntarily reduced the overall amount in this

category for which it is seeking compensation by $106,451.00 to eliminate a substantial portion

of the time that was expended by personnel of FTI in, among other things, reviewing the

contemporaneously prepared time records and bringing them into compliance with the UST

Guidelines and practices in this district for recording of time and service entries.

94.     Furthermore, FTI is not requesting compensation in connection with FTI's

response to the US Trustee's objection to the Fourth Interim Application.

95.     The amount that FTI seeks approval from the Bankruptcy Court for fee

application preparation is 3.3% of the total compensation for which FTI is seeking approval in

connection with the Final Application.


### Travel (Task Code 25)

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Brown JR, Walton | 740 | 6.0 | $4,440.0 |
| Brown, Michael | 280 | 1.5 | 420.0 |
| Nolan, William J. | 895 | 25.5 | 22,822.5 |
| Szymik, Filip | 540 | 3.0 | 1,620.0 |
| Talarico, Michael J | 740 | 35.0 | 25,900.0 |
| Witherell, Brett | 570 | 24.0 | 13,680.0 |
| **Total** | | **95** | **$ 68,882.5** |
| Voluntary reduction for non-working travel time | | | (67,032.50) |
| **Adjusted Total** | | | **$ 1,850.0** |

96.     Fees for non-working travel time have been charged at one-half (50%) of the

actual time incurred, not to exceed a maximum limit generally applied by FTI based upon home

locations for travel to and from the Debtors' locations in Fort Washington, Pennsylvania and Bloomington, Minnesota.  This has resulted in a write-down of $1,850.00.

97.     FTI also had senior personnel, with significant history on this engagement (some dating back to 2008), travel from other offices to New York to attend Court hearings, depositions, and to participate in meetings with the Mediator, the Debtors, counsel and other creditors and their advisors.  Given the significant history with the Debtors', the reasons for travel, and the industry experience of these professionals, FTI respectfully submits that the travel time to New York for these professionals were necessary.  However, given the Court's ruling with respect to the Fourth Interim Application, FTI has written off 100% of non working travel time related to travel to and from New York for these individuals. This has resulted in an additional write-down of $67,032.50.

**Litigation Support – JSN Proceedings (Task Code 28)**

Task Code 28

| Professional | Rate | Hours | Fees |
|---|---|---|---|
| Alvarez, Javier | 570 | 2.8 | $1,596.0 |
| Brower, Daly | 280 | 76.0 | 21,280.0 |
| Brown, Michael | 286 | 136.3 | 38,877.0 |
| Dragelin, Timothy J. | 895 | 43.8 | 39,201.0 |
| Giampietro, Claude | 305 | 5.8 | 1,769.0 |
| Gutzeit, Gina | 895 | 182.4 | 163,248.0 |
| Hayes, Dana | 570 | 0.6 | 342.0 |
| Heller, Alana | 535 | 56.5 | 30,227.5 |
| Imburgia, Basil | 720 | 1.6 | 1,152.0 |
| Kay, Peter | 700 | 0.8 | 560.0 |
| Kerr, Andrew | 305 | 56.3 | 17,171.5 |
| Khairoullina, Kamila | 505 | 5.0 | 2,525.0 |
| Lynch, Phillip | 420 | 15.2 | 6,384.0 |
| McDonagh, Timothy | 755 | 1.2 | 906.0 |
| McDonald, Brian | 615 | 201.8 | 124,107.0 |
| Meerovich, Tatyana | 725 | 323.6 | 234,610.0 |
| Milazzo, Anthony | 624 | 182.8 | 114,064.0 |
| Moser, Edward | 325 | 1.0 | 325.0 |
| Murphy, Jennifer | 280 | 39.0 | 10,920.0 |
| Nolan, William J. | 895 | 192.1 | 171,929.5 |
| Park, Ji Yon | 705 | 6.4 | 4,512.0 |
| Renzi, Mark A | 790 | 467.5 | 369,325.0 |
| Rodriguez, Yolanda | 150 | 10.0 | 1,500.0 |
| Smith, Douglas | 543 | 17.4 | 9,441.0 |
| Stahlke IV, William | 315 | 10.0 | 3,150.0 |
| Szymik, Filip | 540 | 521.3 | 281,502.0 |
| Talarico, Michael J | 740 | 13.6 | 10,064.0 |
| Thompson, Brian | 250 | 4.5 | 1,125.0 |
| Tracy, Alexander | 325 | 344.9 | 112,092.5 |
| Witherell, Brett | 570 | 222.1 | 126,597.0 |
| Yozzo, John | 705 | 4.0 | 2,820.0 |
| **Total** | | **3146.3** | **$ 1,903,323.0** |

*Includes fees included in task code 29 in the fee statement for the period of September 1, 2013
through September 30, 2013.*

98.      In the context of the JSN Adversary Proceeding, FTI was asked to perform

numerous tasks with respect to legal and financial discovery on behalf of the Debtors.  In

addition to the Ad-Hoc Committee's investment banker, Houlihan Lokey, Inc. ("Houlihan"), the

Ad-Hoc Committee retained Zolfo Cooper, LLC ("Zolfo") to assist in discovery, analysis,

litigation, and the preparation of expert reports.  During the Interim Application Period, FTI

worked closely with the Debtors' counsel Morrison & Foerster ("MoFo") as well as Zolfo to facilitate an efficient formal discovery process. FTI researched, reviewed and produced documents covering a multitude of topics, including, but not limited to (i) the allocation of administrative expenses, (ii) the Debtors' processes and systems for the tracking of collateral, (iii) the historical movement of collateral between the Debtors' various financing facilities, (iv) the financials driving the Debtors' estimation of JSN secured recovery, (v) the function of the Debtors' General Ledger ("GL") system, and (vi) intercompany balances between Debtor entities.

99.    As part of the litigation process, FTI was also required to prepare an analysis of historical lien releases under several of the Debtors' financing facilities. As the JSNs contended that liens were not released on certain collateral pools, FTI was tasked with the preparation of analyses that could either confirm or refute that contention. As this included thousands of releases over many years of activity, this required a tremendous amount of data to be processed and analyzed. FTI eventually concluded that such releases were in fact valid, which was a critical component of the Debtors' response to JSN assertions.

100.    In addition, FTI, at the request of Counsel and in preparation for mediation sessions with the JSNs, prepared specific waterfall analysis scenarios, to show the potential impact on creditor recoveries based on different assumptions contingent upon various litigation and mediation outcomes. Such scenarios were prepared specifically for the purposes of demonstrating the impact of different outcomes of the JSN Adversary Proceedings. These scenarios included, but were not limited to, potential recoveries assuming the allowance of post-petition interest and the disallowance of OID on the JSNs. FTI participated in the mediation sessions to further explain the alternative scenarios and to assist the Debtors in settlement negotiations with the JSNs.

101.    During the JSN Adversary Proceedings, the Debtors' Counsel requested that certain senior FTI professionals provide expert testimony in connection with issues critical to the outcome of the JSN Adversary Proceeding such as the validity of the Debtors' intercompany balances and the value of the JSN collateral.

102.    Mark Renzi provided expert testimony regarding the calculation of the valuation of the JSN collateral, including equity pledges, as set forth in the Disclosure Statement.  As part of this, he submitted an expert report on September 20, 2013, gave testimony in a deposition on October 3, 2013, submitted written direct testimony to the Court on October 8, 2013 and testified at trial on October 16, 2013.  Mark Renzi also provided expert testimony regarding the reasonableness of assumptions used in the Plan's liquidation analysis as well as advantages of limited partial consolidation of the Debtors' estates under the Plan.  As part of this, he submitted written direct testimony to the Court on October 18, 2013 and gave deposition testimony on November 6, 2013, and testified at trial on November 21, 2013 and November 22, 2013.  Finally, Mark Renzi provided expert rebuttal testimony in response to Michael Fazio's expert report regarding the allowance of intercompany balances and its hypothetical impact on the JSN recoveries. As part of this, he submitted an expert rebuttal report on November 1, 2013, gave testimony in a deposition on November 6, 2013, submitted written direct testimony to the Court on November 12, 2013, and testified at trial on November 21, 2013 and November 22, 2013.

103.    Gina Gutzeit provided expert rebuttal testimony in response to Robert Bingham's expert report regarding the accounting for and the validity of the Debtors' intercompany balances.  As part of this, she submitted an expert rebuttal report on November 1, 2013, submitted written direct testimony to the Court on November 12, 2013, gave testimony in a deposition on November 15, 2013, and testified at trial on November 22, 2013.

104.    FTI professionals assisted Mark Renzi and Gina Gutzeit in the preparation of their expert reports, including review and analyses of supporting information, verification of source information, incorporating revisions to the expert reports and direct testimony, and preparation for depositions and testimony in Court.  FTI professionals also assisted in performing similar tasks in connection with testimony provided by various representatives of the Debtors.

105.    In addition to the expert testimony prepared by FTI as described above, FTI assisted the Debtors, Debtors' counsel, Creditors' Committee Advisors, and Creditors' Committee counsel in the preparation of analyses and documents used in the preparation of rebuttals and depositions for the JSN expert witnesses.  FTI prepared initial responses and questions lists for each JSN expert report submitted in the JSN Adversary Proceeding.  Such lists included detailed follow-up questions regarding methodology, assumptions, factual basis, and comparable examples for each JSN report.

106.    FTI also participated in the depositions of JSN expert witnesses.  In doing so, FTI was required to prepare detailed questions with backup documentation.  Additionally, FTI participated in meetings with the Debtors' counsel and Creditors' Committee counsel to discuss deposition strategy.  Such meetings required further preparation of analyses, and in some cases, the re-creation of the JSN experts' analyses to ensure results were reasonable from the Debtors' perspective.

107.    FTI was required to perform certain additional tasks related to the JSN Adversary Proceeding, including but not limited to analysis of JSN collateral values as of the petition date, and evaluation of the JSN equity pledges from certain debtor entities.

## **CONCLUSION**

108.    The foregoing general description of services rendered in specific areas is not intended to be exhaustive of the scope of Applicant's activities on behalf of the Debtors in these cases. The time records submitted with this Interim Application and Final Application and the four previous interim fee applications included herein by reference (Docket Nos. [1905], [3208], [4542], and [5853]) present more completely the work performed by Applicant in each billing category in the prior interim periods covered in the Final Application Period.

109.    The time and labor expended by the Applicant has been commensurate with the size, complexity and aggressive timeframe in which these cases proceeded.  In rendering these services, Applicant made every effort to maximize the benefit to the Debtors, to work efficiently with other professionals employed in these cases and to leverage staff appropriately in order to minimize duplication of effort.

110.    During the Final Application Period, Applicant provided a focused range of professional services as requested by the Debtors. Applicant respectfully submits that these services: (i) were necessary and beneficial to the Debtors successful and prompt administration of these cases; and (ii) have been provided in a cost efficient manner.

111.    The services that have been provided by the Applicant during these proceedings have been wholly consistent with the Debtors' intentions.  These cases have necessitated the use of experienced advisors with specialized expertise in bankruptcy issues, technical accounting, discovery technology and financial analysis to timely and thoroughly address the needs of the Debtors.  The persons who have worked on these cases have demonstrated the skill in their respective areas of expertise required to provide the services necessary to assist the Debtors.

112.    Applicant believes that the services rendered during the Application Period on behalf of the Debtors were reasonable and necessary within the meaning of Bankruptcy Code section 330.  Further, the expenses requested were actual and necessary to the performance of Applicant's services.

113.    During the Final Application Period, FTI professionals expended an aggregate of 57,471.0 hours in rendering services on behalf of the Debtors for total fees of $32,491,560.75 (including the Completion Fee of $2,500,000). FTI submits that its fee is reasonable for the work performed in these cases and the results obtained.  FTI incurred out-of-pocket expenses of $920,158.65 in connection with the rendering of the professional services described above during this Final Fee Period. The actual expenses incurred in providing professional services were necessary, reasonable, and justified under the circumstances to serve the needs of the Committee in these Chapter 11 cases.

114.    Applicant therefore requests an order (i) approving interim compensation in the amount of $3,633,019.50 inclusive of the Litigation Support provided during the Interim Application Period in the amount of $1,903,323.00 and reimbursement of expenses incurred during the Interim Application Period in the amount of $46,041.87[16] ; (ii) approving final compensation in the amount of $32,491,560.75, inclusive of the amounts sought herein for the Interim Application Period,  Completion Fee in the amount of $2,500,000.00, Litigation Support Services in the amount of $2,393,285.00, Walter Project Services[17] in the amount of $843,049.50

---

[16]    The rates charged for such expenses are (i) equivalent to what Applicant normally bills to its non-bankruptcy clients and (ii) calculated to compensate Applicant for only the actual costs of the expenses.

[17] As set forth above, the fees paid, and expenses reimbursed, to Applicant on account of the Walter Project services have all been reimbursed to the Debtors by Walter.

and final reimbursement of expenses in the amount of $920,158.65[18], (iii) directing payment of

all compensation held back in connection with the Monthly Fee Statements and prior interim

awards of compensation, and (iv) granting such other and further relief as may be just and proper.


Dated: March 3, 2014                    FTI CONSULTING, INC.


By:  _____

William J. Nolan
FTI CONSULTING, INC.
3 Times Square
New York, New York 10036
Telephone: (212) 247-1010
Facsimile: (212) 841-9350
william.nolan@fticonsulting.com

---

[18]    The rates charged for such expenses are (i) equivalent to what Applicant normally bills to its non-bankruptcy clients and (ii) calculated to compensate Applicant for only the actual costs of the expenses.

**EXHIBIT A**
**Certificate under Guidelines for Fees and Disbursements**

## EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS FOR
PROFESSIONALS IN RESPECT OF FIFTH INTERIM APPLICATION OF FTI
CONSULTING, INC. AS FINANCIAL ADVISOR FOR THE DEBTORS FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE
<u>PERIOD SEPTEMBER 1, 2013 THROUGH DECEMBER 31, 2013</u> AND FOR FINAL
APPROVAL OF COMPENSATION AND REIMBURSEMENT OF EXPENSES
INCURRED FOR THE PERIOD OF <u>MAY 14, 2012 THROUGH DECEMBER 17, 2013</u>**

I, William J. Nolan, hereby certify that:

1.  I am a Senior Managing Director with the applicant firm, FTI Consulting, Inc.

("**FTI**" or "**Applicant**"), which serves as financial advisor to Residential Capital, LLC., *et al.*, as

debtors and debtors in possession (collectively, the "**Debtors**").

2.  This certification is made in respect of FTI's compliance with the *Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases*, Administrative Order M-447, adopted by the Court on January 29, 2013 (the

"**Local Guidelines**"), the *United States Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, adopted on

January 30, 1996* (the "**UST Guidelines**") and the *Order to Establish Procedures for Interim

Monthly Compensation and Reimbursement of Expenses of Professionals* (the "**Interim

Compensation Order**") [Docket No. 172], and collectively with the Local Guidelines and UST

Guidelines, the "**Guidelines**"), in connection with FTI 's application, dated March 3, 2014 (the

"**Application**"), for interim compensation and reimbursement of expenses for the period

commencing September 1, 2013 through and including December 17, 2013, in accordance with

the Guidelines and for final approval of compensation and reimbursement of expenses for the

period commencing May 14, 2012 through and including December 17, 2013.

3.      In respect of Section B.1 of the Local Guidelines, I certify that:

(a)     I have read the Application;

(b)     to the best of my knowledge, information, and belief formed after reasonable inquiry, the fees and expenses sought fall within the Guidelines;

(c)     the fees and disbursements sought are billed at rates and in accordance with practices customarily employed by FTI and generally accepted by FTI's clients; and

(d)     in providing the reimbursable services reflected in the Application, FTI did not make a profit on those services, whether performed by FTI in-house or through a third party.

4.      In respect of Section B.2 of the Local Guidelines and as required by the Interim

Compensation Order, I certify that the Applicant has complied with the provisions requiring it to

provide the United States Trustee for the Southern District of New York and the Debtors and

their attorneys with a statement of the Applicant's fees and expenses accrued during the previous

month although, due to administrative limitations, such statements were not always provided

within the timetables set forth in the Local Guidelines and the Interim Compensation Order.

5.      In respect of Section B.3 of the Amended Local Guidelines, I certify that

although Applicant has not provided the Debtors, United States Trustee or the chair of the

Committee with a copy of the Application 14 days in advance of the deadline for filing fee

applications, such parties will have at least 50 days from the filing of Applicant's Application

within which to review and object to such Applications in accordance with the timetable

provided in the December 11, 2013 [docket No 6065] order confirming the chapter 11 Plan in this case.

6.      The Debtors, their attorneys, and the United States Trustee for the Southern District of New York are each being provided with a copy of the Application.

7.      I certify that: (a) any airfare for which reimbursement is sought under this Application was for a coach class or economy fare, or if not the reimbursement requested was reduced to an equivalent coach or economy fare; (b) no fees are sought with respect to time spent responding to the U.S. Trustee's fee objections; and (c) all requests for reimbursement for meals comply with applicable dollar and time requirements.

Dated: March 3, 2014                    FTI CONSULTING, INC.

By: _____

William J. Nolan
FTI CONSULTING, INC.
3 Times Square
New York, New York 10036
Telephone: (212) 247-1010
Facsimile: (212) 841-9350
william.nolan@fticonsulting.com