## Exhibit A

**Supplemental Declaration**

6

ny-1133982

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF DEANNA HORST IN SUPPORT OF SUPPLEMENTAL BRIEF OF THE RESCAP BORROWER CLAIMS TRUST WITH RESPECT TO CLAIM NO. 3502 OF JACQUELINE WARNER**

I, Deanna Horst, hereby declare as follows:

1. I am the Chief Claims Officer for The ResCap Liquidating Trust (the "Liquidating Trust"),[1] and I previously served as Chief Claims Officer for Residential Capital, LLC and its affiliates ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I have been employed by affiliates of ResCap since August of 2001. In June 2012, I became Senior Director of Claims Management for ResCap and in October of 2013, I became the Chief Claims Officer. I began my association with ResCap in 2001 as the Director, Responsible Lending Manager, charged with managing the Debtors' responsible lending on-site due diligence program. In 2002, I became the Director of Quality Asset Management, managing Client Repurchase, Quality Assurance and Compliance—a position I held until 2006, at which time I became the Vice President of the Credit Risk Group, managing Correspondent and Broker approval and monitoring. In 2011, I became the Vice

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among of things, provides the ResCap Borrower Claims Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the ResCap Borrower Claims Trust in performing its obligations.

ny-1134166

President, Business Risk and Controls, and supported GMAC Mortgage, LLC and Ally Bank in this role. In my current position, I am responsible for Claims Management and Reconciliation and Client Recovery. I am authorized to submit this supplemental declaration (the "Supplemental Declaration") in further support of the *Supplemental Brief of The ResCap Borrower Claims Trust With Respect to Claim No. 3502 of Jacqueline Warner* (the "Response").[2]

        2. Except as otherwise indicated, all facts set forth in this Supplemental Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information I have received through my discussions with other members of the Debtors' management or other former employees of the Debtors, the Debtors' and the Trust's professionals and consultants, and/or Kurtzman Carson Consultants LLC, the Debtors' noticing and claims agent. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

        3. In my capacity as Chief Claims Officer, I am intimately familiar with the claims reconciliation process in these Chapter 11 Cases. Except as otherwise indicated, all statements in this Supplemental Declaration are based upon my familiarity with the Debtors' books and records, my review and reconciliation of claims, and/or my review of relevant documents.

---

[2] Defined terms used but not defined herein shall have the meanings ascribed to such terms as set forth in the Response.

2

ny-1134166

    A.    **Warner's Relationship with the Debtors**

    4.    On November 9, 2007, Warner executed a home equity line of credit (the "Loan") with CMG Mortgage, Inc.,[3] secured by her primary residence located at 10 Emerald Lake Place, Redwood City, California 94062.  A copy of the Loan is annexed hereto as Exhibit 1.  The Loan was an open-ended transaction, which provided for an initial advance of $100,000 and a total credit limit of up to $1,000,000 over the Loan's thirty-year term, as well as providing for certain finance charges.  After reviewing the Debtors' books and records including its servicing notes for the Loan, which were kept and maintained in the ordinary course of GMACM's business, I confirmed that Ms. Warner resided in the Redwood City property before she obtained the Loan, as well as that GMACM only serviced the Loan from November 9, 2007 until the servicing was transferred to Ocwen Loan Servicing, LLC on February 16, 2013.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 14, 2014

                                              */s/*  Deanna Horst
                                              Deanna Horst
                                              Chief Claims Officer for The ResCap
                                              Liquidating Trust

---

[3] As set forth in the Loan, CMG Mortgage, Inc. contemplated transferring its rights as and delegating its duties as Lender to GMAC Bank (n/k/a Ally Bank), a non-debtor entity. *See* Loan at 2.

# Exhibit 1

**The Loan**



| Loan No: | | Data ID: | |
|---|---|---|---|
| Borrower: | JACQUELINE A. WARNER | Borrower: | |
| Borrower: | | Borrower: | |

## CMG HOME OWNERSHIP ACCELERATOR LINE OF CREDIT
## AGREEMENT AND DISCLOSURE STATEMENT

| November 9, 2007 | REDWOOD CITY | CALIFORNIA |
|---|---|---|
| [Date] | [Title City] | [Title State] |

**10 EMERALD LAKE PLACE, REDWOOD CITY, CALIFORNIA 94062**
[Property Address]

| Initial Advance[1] | $ | 100,000.00 | Credit Limit | $ | 1,000,000.00 |
|---|---|---|---|---|---|
| Margin | | 0.750% | Reduced Limit Period | | Beginning November 1, 2017 |
| Initial Periodic Rate | | 5.466% | Limit Reduction Amount | $ | 4,166.67 |
| Initial ANNUAL PERCENTAGE RATE | | 5.466% | Maturity Date | | November 1, 2037 |
| ANNUAL PERCENTAGE RATE Cap | | 10.466% | Annual Fee | $ | 30.00 |
| [ ] 3-Year/1% Program (Applies if Box is Checked) | | | Early Termination Fee | $ | 0.00 |
| [X] 5-Year/1% Program (Applies if Box is Checked) | | | | | |

**Account Opening Fees/Charges Payable—Fees marked "FC" are Finance Charges**

| FC | Discount Fee TO CMG | $ | 4,750.00 |
|---|---|---|---|
| ` | Appraisal TO LEQUITY POC $500.00 | $ | |
| FC | LENDER FEE - NEW ACCT FEE TO CMG | $ | 875.00 |
| FC | MTG BRK COM/FEE TO LEQUITY | $ | 3,000.00 |
| FC | PROCESSING FEE - BROKER | $ | 425.00 |
| FC | ADMIN FEE - BROKER TO LEQUITY | $ | 300.00 |
| FC | ONE/INTEGRATED RATE FEE TO FIRST AMERICAN TITLE | $ | 1,750.00 |
| ` | RECORDING FEE (900) TO FIRST AMERICAN TITLE | $ | 49.00 |
| ` | ENDORSEMENT FEE TO FIRST AMERICAN TITLE | $ | 25.00 |

This is the agreement and disclosure statement which will cover your CMG Home Ownership Accelerator Line of Credit Account sponsored by CMG Mortgage, Inc., and made available to you by CMG Mortgage, Inc., or by another lender. The agreement contains a variable rate provision. Please read it carefully before you sign below.

1. **DEFINITIONS**
   Unless defined elsewhere in this Agreement, the following capitalized terms have the meanings set forth here:
   (A) **Accelerator Account** means your CMG Home Ownership Accelerator Account with Lender.
   (B) **Accelerator Account Balance** means the total of the unpaid principal outstanding under this Agreement, plus earned but unpaid Finance Charges and other fees and charges.
   (C) **Agreement** means this document.
   (D) **Available Credit** means the difference at any given time between your Credit Limit and your Accelerator Account Balance.
   (E) **Banking Day** means a day on which GMAC Bank and Lender are open for conducting substantially all of their respective business operations. Saturdays and Sundays are not Banking Days even if GMAC Bank and Lender are open for conducting substantially all of their respective business operations.
   (F) **Billing Statement** means a statement furnished by Lender each monthly billing period that shows, among other things, Loans, Finance Charges, other charges, payments made, other credits, the previous Accelerator Account Balance, the current

---

[1] This amount must be at least the greater of $100,000 or 10% of your Credit Limit, but not more than 98% of your Credit Limit.

{00031834.2a}        Page 1 of 11
cmghaqus

 

Accelerator Account Balance and the required Minimum Monthly Payment for the Accelerator Account during the following billing period.

(G) **Chart** means the chart that appears on the first page of this Agreement.

(H) **Checking Account** means a negotiable order of withdrawal account (NOW Account) (1) established in your name at GMAC Bank and (2) associated with your Accelerator Account. The fees and charges associated with your NOW Account are shown in your Checking Account Documents.

(I) **Checking Account Documents** means the Deposit Agreement and any other documents separately provided to you in connection with your Checking Account, including the disclosures so provided to you and relating to the terms and fees applicable to that Checking Account.

(J) **Credit Limit** means the maximum principal amount that can be outstanding at any one time under this Agreement. Your Initial Credit Limit is indicated above. Your Credit Limit will be reduced as provided in Section 4 of this Agreement.

(K) **Deposit Agreement** means the agreement separately provided to you in connection with your Checking Account, a copy of which has been provided to you with your copy of this Agreement.

(L) **Index** means the One-Month London Interbank Offered Rate ("LIBOR") as quoted by in the Money Rates table of the *Wall Street Journal* (the "Journal"). The latest value of the Index quoted in the Journal published on the last Banking Day of a given calendar month will be used to determine the Annual Percentage Rate for the billing period that starts during the following month. For example, if your billing period begins on July 10, 2007, we will use the rate quoted in the June 29, 2007 Journal.

(M) **Initial Advance** means the amount that will be advanced as soon as your Accelerator Account has been opened.

(N) **Lender** means CMG MORTGAGE, INC.. Lender's address is **3160 CROW CANYON ROAD, SUITE 400, SAN RAMON, CALIFORNIA 94583**. If CMG Mortgage, Inc. is not the initial Lender, Lender contemplates transferring its rights and delegating its duties to CMG Mortgage, Inc.. In any event, CMG Mortgage, Inc. contemplates transferring or further transferring Lender's rights and delegating Lender's duties to GMAC Bank, all such transfers and delegations to be without cost to you. If and when a Lender's rights and duties under this Agreement are transferred to another person or entity, the transferee and delegate will become the Lender.

(O) **Lender's Privacy Policy** means Lender's privacy policy as separately disclosed to you.

(P) **Loan** means the money advanced to you from your Accelerator Account.

(Q) **Property** has the meaning given to that term in Section 11.

(R) **Reduced Limit Period** means the period that begins on the date shown in the Chart and during which your Credit Limit will be reduced on a monthly basis, as provided in Section 4.

(S) **Security Instrument** has the meaning given to that term in Section 11.

(T) **You** or **Your** means each Borrower or all Borrowers identified at the top of this Agreement, as the context requires or expressly states.

2. **OPENING YOUR ACCELERATOR ACCOUNT**

Your Accelerator Account will be opened when you have signed and delivered in acceptable form all documents considered necessary by Lender and any applicable rescission period has expired. If more than one person signs this Agreement:

(A) "You" and "your" will apply to each of you and all billing statements may be mailed or delivered to the address given on the application for this Accelerator Account for the first customer listed at the top of this Agreement unless you later direct otherwise.

(B) Each of you will have the right to use the Accelerator Account to obtain Loans from it, so long as the Credit Limit is not exceeded.

(C) Each of you will be jointly and separately obligated to keep all of the promises made in this Agreement and to pay all amounts owing on your Accelerator Account, whether borrowed by you or the others who sign below and whether a given Loan was within or beyond the Available Credit at the time.

(D) You agree not to give Lender conflicting instructions regarding your Accelerator Account and Lender may consider any instruction given by any of you to be binding on all of you.

3. **ACCESSING YOUR ACCELERATOR ACCOUNT**

The Checking Account associated with your Accelerator Account will serve as the primary vehicle for accessing your Accelerator Account. As soon as the Checking Account has been established for you (your Checking Account should be established for you within one to two weeks after your Accelerator Account is opened), you may make deposits to and withdraw or transfer funds from your Checking Account in the manner set forth in your Checking Account Documents.

If, at the close of business on a Banking Day the balance of your Checking Account has fallen below $0 as a result of transactions, including debits associated with fees or charges incurred in connection with your Checking Account, Lender will transfer funds to your Checking Account to bring the balance in your Checking Account back to $0. (Note, however, that no fees will be imposed against your Checking Account for overdrawing that account during a Banking Day if, at the close of that Banking Day a transfer from your Accelerator Account is made to cover the overdraft.) You may also access your Accelerator Account by such other method as is acceptable to Lender.

Notwithstanding the foregoing, Lender may, or at its option may not, transfer funds to your Checking Account or honor any other Loan request (a) if you are in default under this Agreement, (b) if this Agreement has been terminated or your Accelerator Account has been suspended, or (c) as otherwise provided in this Agreement, such as in its Section 4. In this regard, you agree not to attempt to obtain a Loan from your Accelerator Account if you know that your borrowing privileges have been suspended or terminated under Section 17 or 18.

### 4. CREDIT LIMIT

Your Initial Credit Limit is shown in the Chart and, subject to the other terms of this Agreement, this Credit Limit will remain at that level until commencement of the Reduced Limit Period on the date shown in the Chart. On the date shown in the Chart for the beginning of the Reduced Limit Period, and again on the last day of each subsequent billing period, your Credit Limit will be reduced by the Limit Reduction Amount. (For example, if the Credit Limit stated above were $480,000, the Reduced Limit Period begins on the December 9, 2014 billing date and the Limit Reduction Amount is to be $2,000, your Credit Limit would be reduced to $478,000 on December 9, 2014, to $476,000 on January 9, 2015, to $474,000 on February 9, 2015, and so forth.)

Lender may, but is not obligated to, honor any Loan request if it exceeds your Available Credit. If Lender elects to honor a Loan request that allows you to exceed your Credit Limit and the Loan request is not related to an advance made to protect the Property or Lender's security interest in the Property pursuant to the Security Instrument, the portion of the Loan that is so made will not be secured by the Property. All payments that are allocated to reduce the principal amount outstanding under this Agreement will first be applied to reduce or repay such unsecured Loans.

### 5. FINANCE CHARGES

In addition to the amount of any Loans made to you and the amount of any Finance Charges or other charges stated in the Chart, you agree to pay Lender interest on the principal balance component of your Accelerator Account Balance. This Finance Charge will be added to your Accelerator Account Balance on the final day of each billing period. The principal balance of your Accelerator Account will be determined by taking the Accelerator Account Balance at the beginning of that day and (a) subtracting any unpaid Finance Charges and other fees and charges (such as Late Charges and Annual Fees) that are outstanding; (b) subtracting the portion of any payments or credits received by Lender that day that apply to the repayment of the principal balance; and (c) adding any Loans made that day. Notwithstanding the previous sentence, any Finance Charges or other fees or charges described in the Chart and payable before or on the day that your Accelerator Account is opened will be included in the principal balance of your Accelerator Account unless you pay those amounts on or before the day your Accelerator Account is opened.

The Finance Charge on a Loan begins to accrue immediately from the time Lender makes the Loan to you (including any Loan made to cover your Minimum Monthly Payment, as discussed in Section 7 of this Agreement). There is no "free ride period" during which Finance Charges will not accrue.

The finance charge is determined for each day by applying a daily periodic rate ("Daily Periodic Rate") to the principal balance component of the Accelerator Account Balance for that day. The Daily Periodic Rate is $1/365^{th}$ of the Annual Percentage Rate applicable to that day ($1/366^{th}$ during leap years). The total Finance Charge for each billing period is determined by adding together the Finance Charges for the actual number of days in the billing period.

The Annual Percentage Rate and the corresponding daily periodic rate in effect for your initial billing period are stated in the Chart. Except as stated in Section 6, the Annual Percentage Rate for future billing periods will be determined by Lender by adding the Margin stated in the Chart to the Index value for the billing period. The corresponding increase or decrease in the Daily Periodic Rate will be determined as described above. An increase or decrease in the Annual Percentage Rate will result in a corresponding increase or decrease in your Minimum Monthly Payment.

The Annual Percentage Rate discussed in this agreement includes only interest and not other costs.

### 6. RATE CAPS

Regardless of the Index value:

(A)  If the box in the Chart indicates that the 3-Year/1% Program applies to your Account, regardless of the Index value, the Annual Percentage Rate will not exceed the Initial Annual Percentage Rate stated in the Chart by more than 1% at any time before the end of your 36th full billing period.[2] Thereafter, the Annual Percentage Rate could go as high as–but no higher than–the Annual Percentage Rate Cap stated in the Chart.

(B)  If the box in the Chart indicates that the 5-Year/1% Program applies to your Account, regardless of the Index value, the Annual Percentage Rate will not exceed the Initial Annual Percentage Rate stated in the Chart by more than 1% at any time before the end of your 60th full billing period.[3] Thereafter, the Annual Percentage Rate could go as high as–but no higher than the Annual Percentage Rate Cap stated in the Chart.

---

[2] For example, if the initial Annual Percentage Rate were to be 8.57%, it could not go higher than 9.57% during the first three years, regardless of the level of the Index.

[3] For example, if the initial Annual Percentage Rate were to be 8.57%, it could not go higher than 9.57% during the first five years, regardless of the level of the Index.

{00031834;2a}                                                         Page 3 of 11

(C) If the boxes in the Chart do not indicate that either the 3-Year/1% Program or 5-Year/1% program apply to your Account, the Annual Percentage Rate will never exceed the Annual Percentage Rate Cap stated in the Chart.

## 7. PAYMENTS

You promise to pay Lender any amounts owed under this Agreement, as follows:

(A) Until the Maturity Date

Until the Maturity Date shown in the Chart, no later than the payment date specified in your Billing Statement, you must pay a Minimum Monthly Payment equal to at least the lesser of (1) the amount of any Finance Charges and other fees and charges that are reflected on the Billing Statement, plus any overdue payments from previous billing periods, plus any amount necessary to bring your Accelerator Account Balance down to the Credit Limit applicable to your Accelerator Account on the Billing Statement Date; or (2) the Accelerator Account Balance.

You may make your Minimum Monthly Payment by check or by transfer from any other deposit account (including your Checking Account) you might maintain, or by making deposits to your Checking Account, to be transferred pursuant to Section 7(B). However, unless you do not have sufficient Available Credit to cover the payment, you authorize Lender, on the Minimum Monthly Payment Due Date, to advance the unpaid portion, if any, of your Minimum Monthly Payment as a Loan from your Accelerator Account. (The unpaid portion of your Minimum Monthly Payment will be the positive difference between the amount of your Minimum Monthly Payment and the sum of all amounts Lender receives from you after closing date shown on your Billing Statement, whether by check or transfer – including any automated transfers from your Checking Account as provided in Section 7(B). Of course, you may always pay more than your Minimum Monthly Payment and/or make more frequent payments.

(B) Transfers of Funds from Checking Account

Whenever at the close of business on a Banking Day the balance in your Checking Account exceeds $0, Lender will transfer the amount of such excess to your Accelerator Account. Transfers from your Checking Account made between the date of your Billing Statement and the date your Minimum Monthly Payment is due will be credited toward that Minimum Monthly Payment. Any excess amounts will be treated as a prepayment.

(C) Prepayment

You may prepay all or any portion of your Accelerator Account Balance at any time without penalty; however, if your prepayment does not fully repay the entire Accelerator Account Balance, you must continue to make the required Minimum Monthly Payments. See Section 20(C) for information regarding an early termination fee that may be payable if your prepayment is accompanied by early cancellation of your Accelerator Account.

(D) Final Payment

On the Maturity Date stated in the Chart, you must pay the entire Accelerator Account Balance.

(E) General Payment Terms.

You must make all payments in U.S. dollars at the address shown on your Billing Statement. Your payment will be due on the date shown in your Billing Statement.

Payments and transfers received by Lender for application to your Accelerator Account will be allocated first to Finance Charges, then to any outstanding fees and other charges applicable to your Accelerator Account and finally to reduce or fully repay the principal balance of your Accelerator Account. Notwithstanding the foregoing, if an escrow fund is established pursuant to Section 3 of the Security Instrument, any amount due the escrow fund will be taken from any payment before it is allocated in accordance with the previous sentence.

## 8. CHECKS MARKED "PAYMENT IN FULL"

*Any check you send to Lender in payment of your Accelerator Account and marked "Payment in Full" or with similar wording shall be sent, together with a letter or other statement indicating the basis of your claim that the payment will pay your Accelerator Account in full, to GMAC Mortgage Corporation, 6716 Grade Lane, Building #9 Suite 910-C, Louisville, KY 40213 unless, by notice, Lender instructs you to send this payment and correspondence to another location. Any such payment must include the amount of the early termination charge if one is applicable under Section 20(C).* The previous two sentences will not apply if the amount of the check is equal to the total amount then owing on your Accelerator Account according to Lender's records and you have cancelled your Accelerator Account or the Maturity Date has passed.

## 9. FEES AND CHARGES ASSOCIATED WITH ACCELERATOR ACCOUNT

In addition to any fees and charges directly associated with your Checking Account (see Checking Account Documents), you agree to pay the following additional fees and charges to the extent not prohibited by applicable law.

(A) Annual Fee

If an annual fee is specified in the Chart, that amount will be charged to your Accelerator Account Balance each year on the anniversary date of the Accelerator Account. There will be no annual fee for the first year.

(B) Late Charge

Unless the Property is located in Mississippi or North Carolina, a late charge will be imposed for any monthly payment not paid on or before the 15th calendar day following the payment due date. The amount of the charge will be the lesser of $20.00 ($10 if

the Property is located in Alabama; $15 if the Property is located in Iowa) or 5% of the payment of principal and interest; provided, however, that Lender may not charge this late charge to the extent prohibited by applicable law.

If the Property is located in Mississippi, a late charge equal to the greater of $5 or 4% of the delinquent amount will be imposed for any monthly payment not paid on or before the 15th calendar day following the payment due date.

(C)    Other Finance Charges

The Other Finance Charges indicated in the Chart.

(D)    Other Loan Fees and Charges

The Other Loan Fees and Charges indicated in the Chart, as well as, for Property located in a state other than Michigan, a recording fee that may be payable when the Security Instrument is released after your Accelerator Account is fully repaid and closed.

(E)    Application, Appraisal and other Fees Applicable to Credit Limit Increases

An application fee, appraisal fee and title insurance charges if you apply for an increase in the Credit Limit for your Accelerator Account. Lender will advise you of the cost of these fees and charges when you discuss your limit increase with Lender.

(F)    Payment of Lender's Costs and Expenses

If you are in default, all costs and expenses, including without limitation reasonable attorneys' fees (not to exceed 20% of the amount adjudged for principal and interest as contemplated by 10 Del.C § 3912 if the Property is located in Delaware), Lender incurs in enforcing this agreement in any collection, foreclosure, appellate or bankruptcy proceeding, to the extent not prohibited by applicable law. If the Property is located in Missouri, attorneys' fees will not exceed 15% of the balance of your Accelerator Account.

(G)    Checking Account Fees

In addition to the foregoing fees and charges directly associated with your Accelerator Account, you agree to pay the additional fees and charges stated in the CMG Deposit Agreement to the extent not prohibited by applicable law.

## 10. NOTICES

Unless applicable law requires or you and Lender have agreed to a different method for giving a notice, any notice that must be given to you under this Agreement will be given by delivering it or mailing it by first class mail to the Property Address above or at a different address if you give Lender a notice of your different address. Any notice that must be given to Lender under this Agreement will be given by delivering it or mailing it by first class mail to Lender at the address stated in Section 1(N) above or at a different address if you are given a notice of that different address.

## 11. SECURITY

Your Accelerator Account obligations will be secured by a lien taken against the real property ("Property") located at the Property Address shown in the Chart and more particularly described in the separate mortgage, deed of trust, deed to secure debt or similar instrument ("Security Instrument") dated the same date as this Agreement. If there is a conflict between the definition of the Property in the Security Instrument and the location of the Property as stated in the Property Address, the definition in the Security Instrument will control.

The Security Instrument requires you to take certain actions to protect the Property. You could lose the Property and your home on it if you do not meet the conditions of this Agreement or the Security Instrument. One of the conditions of the Security Instrument concerns the transfer of the Property.

You also agree to obtain and maintain such insurance on the Property as Lender may require, provided Lender is not permitted to and will not require you to cover the Property with hazard insurance for more than the replacement value of the improvements thereon; you agree to maintain such insurance in the amounts and for the periods Lender requires. Unless prohibited by applicable law, the Accelerator Account will be secured as well by proceeds of such insurance. You may obtain such insurance from the carrier of your choice, subject to Lender's right to disapprove your choice, which right will not be exercised unreasonably.

If you fail to keep the insurance required under this Section, Lender may obtain such insurance coverage at Lender's option and your expense, and Lender may charge you a fee to do so unless otherwise prohibited from doing so by applicable law. Lender is under no obligation to purchase any particular type or amount of coverage; as such, you, your equity in the Property, or the contents of the Property may not be protected to the extent you desire. Any amount paid by Lender under this Section 11 will be added as a Loan under this Agreement and be subject to Finance Charges.

You should be aware that if Lender procures insurance on the Property because you have failed to do so, (a) the insurance may be more expensive than comparable insurance that you might have been able to obtain had you complied with the requirements of this Section 11, and (b) Lender may receive a commission, fee or experience refund in connection with the insurance it procures.

## 12. CREDIT AND PROPERTY INFORMATION

You agree to furnish personal financial information and information about the Property and your occupation of the Property reasonably requested by Lender from time to time. Such information must be furnished to Lender within a reasonable time but in no event later than 30 days after Lender's request. In addition, you authorize Lender, at Lender's expense, to make credit inquiries, and you authorize any person to whom Lender makes such inquiries to furnish Lender with the requested information. You also authorize Lender to release information regarding the status and history of the Accelerator Account to third persons, including without limitation credit bureaus, merchants, and financial institutions, to the extent permitted by applicable law and consistent with Lender's Privacy Policy.

13. **ASSIGNMENT**

Lender may assign or transfer this Agreement and the Security Instrument without notice to you. You may not assign or transfer your rights or obligations under this Agreement without Lender's written authorization; however, this Agreement is binding upon your heirs, successors, and legal representatives.

14. **TAX DEDUCTIBILITY**

You should consult a tax advisor regarding the deductibility of interest and charges under your Accelerator Account.

15. **DEFAULT**

You will be in default under this Agreement if:

(A) You engage in fraud or material misrepresentation in connection with any aspect of your Accelerator Account, including without limitation your application for the Accelerator Account and your occupancy of the Property;

(B) You do not meet the repayment terms under this Agreement; or

(C) Your action or inaction adversely affects the collateral for the Accelerator Account (including without limitation the Property) or Lender's rights in the collateral under the Security Instrument, including without limitation: (i) your failure to maintain insurance as required under the Security Instrument; (ii) your transfer of the Property as provided in the Security Instrument; (iii) your failure to maintain the Property or your use of the Property in a destructive manner; (iv) your commission of waste of the Property, (v) your failure to pay taxes due on the Property or your failure to act such that a lien superior to Lender's lien is filed against the Property; (vi) the death of all of you; (vii) the Property is taken by condemnation or eminent domain; or (viii) a superior lienholder forecloses on the Property such that Lender's interest in the Property is adversely affected.

16. **REMEDIES FOR DEFAULT**

If you are in default, Lender may terminate your Accelerator Account, require you to pay the entire outstanding Accelerator Account Balance and any collection fees unless otherwise prohibited from doing so by applicable law. Lender at Lender's option also may take one or more lesser actions. Such lesser actions may include without limitation reducing your Credit Limit. Lender may take action under this Section only after complying with any notice or cure provisions required under applicable law. In the event Lender elects not to terminate your Accelerator Account or take lesser action when you are in default, Lender does not forfeit or waive its right to do so at a later time or to do so if you are in default again.

17. **SUSPENSION OF BORROWING PRIVILEGES OR REDUCTION IN CREDIT LIMIT**

In addition to suspending your Accelerator Account for the reasons stated in Section 18 of this agreement, Lender can suspend your right to borrow under the Accelerator Account or reduce your Credit Limit at any time without notice to you during any period in which one or more of the following conditions apply:

(A) The value of the Property has declined significantly below the value of the Property at the time your Accelerator Account was opened.

(B) Lender reasonably believes that you will be unable to fulfill your repayment obligations under this Agreement due to a material change in your financial circumstances.

(C) You are in default of any material obligation under this Agreement or the Security Instrument; for purposes of this Agreement a material obligation will include without limitation your obligation to supply Lender with the credit and Property information required under Section 12 of this Agreement.

(D) Lender is prevented by government action from charging interest at the rate provided in this Agreement.

(E) The priority of Lender's security interest in the Property is adversely affected by any governmental action and the value of Lender's security interest in the Property is less than 120 % of the amount of your Credit Limit.

(F) Lender has been notified by a governmental agency with regulatory authority over Lender that making further advances on your Accelerator Account would constitute an unsafe and unsound banking practice.

(G) The Annual Percentage Rate reaches the Annual Percentage Rate Cap reflected in the Chart.

If Lender suspends your borrowing privileges or reduces your Credit Limit, Lender will notify you in writing of that action and state the reason for such suspension or reduction. Interest will continue to accrue on your Accelerator Account and payments will continue to become due as if the suspension of your Accelerator Account or reduction in your Credit Limit had not occurred.

If the condition upon which Lender based its decision to suspend your borrowing privileges or reduce your Credit Limit ceases to exist before the Maturity Date, Lender will again allow borrowings or increase your Credit Limit to the previously established level (as it may have been reduced in accordance with Section 4 of this Agreement) unless you have previously canceled your Accelerator Account or Lender has terminated the Accelerator Account in accordance with the provisions of this Agreement. If Lender's notice to you so specifies, and you wish to restore your borrowing privileges or initial Credit Limit, you will be required to notify Lender when the condition stated by Lender as the reason for suspending your borrowing privileges or reducing your Credit Limit has been eliminated and you will have to furnish Lender with whatever information it reasonably requires to confirm that the condition no longer applies.

18. **TERMINATION AND ACCELERATION**

Lender may terminate or suspend your Accelerator Account under any of the following conditions:

(A) You fail to make payments as required under this Agreement.
(B) Lender reasonably believes that you have committed fraud or made a material misrepresentation in connection with the Accelerator Account.
(C) Title to or an interest in the Property is sold or transferred without Lender's permission.
(D) You fail to maintain insurance on the Property in accordance with this Agreement and the Security Instrument.
(E) You act or fail to act in a fashion that adversely affects the Property or our security interest in it.
(F) All of you die.

### 19. EFFECTS OF TERMINATION OR SUSPENSION

If Lender *terminates* your Accelerator Account for any of these reasons, no further borrowings will be allowed in connection with the Accelerator Account, and Lender, at its option, can do any of the following:
(A) Make the Accelerator Account balance immediately due and payable.
(B) Permit you to continue to make Minimum Monthly Payments until the Maturity Date.
(C) Offer you different repayment provisions than are contained in this agreement.

If Lender merely *suspends* your Accelerator Account, Lender will not be obligated to extend any credit to you under this Agreement unless and until Lender notifies you to the contrary.

### 20. CANCELLING THE ACCOUNT

You may cancel your Accelerator Account at any time by notifying Lender in writing as provided in Section 10 above. Cancellation of your Accelerator Account by any of you will cancel the Accelerator Account for all of you. However, Lender may release any of you from your obligations under this Agreement without releasing the remainder of you from your obligations.

If your Accelerator Account is canceled or terminated for any reason:
(A) You will not be entitled to a refund of or a credit for any initial or annual fees or other charges payable in connection with your Accelerator Account, unless otherwise required by applicable law.
(B) You must return to Lender any devices you may have to access your Accelerator Account and any further use of such devices may be considered fraudulent.
(C) If an early termination fee is reflected in the Chart, you agree to pay the stated amount if you fully repay your Accelerator Account Balance and close your Accelerator Account within one year (6 months if the Property is located in Kansas). However: if the Property is located in Arkansas, notwithstanding this stated amount, the early termination fee will not exceed the equivalent of 3% of the outstanding balance of your Accelerator Account immediately before your early full repayment Kentucky, notwithstanding this stated amount, the early termination fee will not exceed the equivalent of 5% of the outstanding balance of your Accelerator Account immediately before your early full repayment; if the Property is located in Michigan or Ohio, this fee will not exceed 1% of the amount of your prepayment; if the Property is located in Missouri, this fee will not exceed 2% of the amount of your prepayment; and if the Property is in Illinois, this fee will not apply if the termination occurs at a time when the Annual Percentage Rate for your account exceeds 8%.
(D) You will remain obligated to repay the Accelerator Account Balance in full, including any money loaned to you after the Accelerator Account has been canceled or terminated.

### 21. CHANGING THE TERMS OF THIS AGREEMENT

Lender may not change the terms of this Agreement except under the following circumstances:
(A) Lender may change the Index and Margin if the original Index or any replacement index is no longer available. Any new Index must have a historical movement similar to the original Index and together with a new Margin must result in an Annual Percentage Rate substantially similar to the Annual Percentage Rate in effect at the time the original Index or replacement index became unavailable.
(B) Lender may make changes that you agree to in writing.
(C) Lender may make changes that unequivocally benefit you throughout the remaining term of your Accelerator Account.
(D) Lender may make changes to insignificant terms of this Agreement.

Unless otherwise prohibited from doing so by applicable law, Lender may refuse to make additional Loans or reduce the Credit Limit whenever the Annual Percentage Rate Cap reflected in the Chart is reached.

### 22. LOAN CHARGES

If this Agreement is subject to a law that sets maximum Loan charges, and that law is finally interpreted so that the Finance Charge or other charges collected or to be collected in connection with the Accelerator Account exceed the permitted limits, then:
(A) Any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and
(B) Any sums already collected from you that exceeded permitted limits will be refunded to you. Lender may choose to make this refund by reducing the principal owed under the Accelerator Account or by making a direct payment to you. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge. Your acceptance of any such refund made by direct payment to you will constitute a waiver of any right of action you might have arising out of such overcharge.

### 23. SEVERABILITY

In the event that any provision or clause of this Agreement or the Security Instrument conflicts with applicable federal, state or local law, such provision or clause will be considered changed to the extent permissible and necessary to comply with such law. Otherwise, such conflict will not affect other provisions of this Agreement or the Security Instrument that can be given effect without the conflicting provision.

### 24. NOTICE OF CHANGE OF NAME, ADDRESS OR EMPLOYMENT OR OF UNAUTHORIZED ACCOUNT USE

You will immediately notify Lender in writing at the address shown on your monthly statement if your name or home address changes, if there is any change in the ownership of the Property or in your employment, if there are any errors on your monthly statement or if an unauthorized person has used or may use your Accelerator Account as the result of the loss or theft of any check, card or other means of access to your Checking Account or your Accelerator Account, and in the latter events, you will reasonably assist Lender in determining the facts and circumstances relating to any unauthorized use of your Checking Account or your Accelerator Account.

### 25. GOVERNING LAW

This agreement will be governed by federal law and, except as stated in the remainder of this Section 25, the law of the State of California. However, issues concerning the Property will be governed by the law of the state in which the Property is located.

If the Property is located in Maryland, this agreement will be governed by the law of the State of Maryland, including (without limiting the generality of this provision) title 12, Subtitle 9 of the Maryland Commercial Law Article, as applicable). If the Property is located in the State of Delaware, this agreement will be governed by the law of the State of Delaware. If the Property is located in the District of Columbia, this agreement will be governed by the law of the District of Columbia.

### 26. YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Lender In Case Of Questions Or Errors About Your Bill.*

If you think your bill is wrong or if you need more information about a transaction on your bill, write Lender on a separate sheet at the address listed on your bill. Write to Lender as soon as possible. Lender must hear from you no later than 60 days after Lender sent the first bill on which the error or problem appeared. You can telephone Lender, but doing so will not preserve your rights.

In your letter, give Lender the following information:
- Your name and Accelerator Account number.
- The dollar amount of the suspected error.
- Describe the error and explain, as clearly as you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

With regard to the Minimum Monthly Payments that will automatically be taken from your Checking Account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach Lender 3 business days before the automatic payment is scheduled to occur.

*Your Rights And Lender's Responsibilities After Lender Receives Your Written Notice.*

Lender must acknowledge your letter within 30 days, unless Lender has corrected the error by then. Within 90 days, Lender must either correct the error or explain why Lender believes the bill was correct.

After Lender receives your letter, Lender cannot try to collect any amount you question, or report you as delinquent. Lender can continue to bill you for the amount you question, including Finance Charges, and Lender can apply an unpaid amount against your Credit Limit. You do not have to pay any questioned amount while Lender is investigating, but you are still obligated to pay the parts of your bill that are not in question.

If Lender finds that Lender made a mistake on your bill, you will not have to pay any Finance Charges related to any questioned amount. If Lender didn't make a mistake, you may have to pay Finance Charges, and you will have to make up any missed payment on the questioned amount. In either case, Lender will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that Lender thinks you owe, Lender may report you as delinquent. However, if Lender's explanation does not satisfy you and you write to Lender within ten days telling Lender that you still refuse to pay, Lender must tell anyone Lender reports you to that you have a question about your bill. And, Lender must tell you the name of anyone Lender reported you to. Lender must tell anyone Lender reports you to that the matter has been settled between us when it finally is.

If Lender doesn't follow these rules, Lender can't collect the first $50 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases*

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:
- You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

- The purchase price must have been more than $50.

These limitations do not apply if Lender owns or operates the merchant, or if Lender mailed you the advertisement for the property or services.

### 27.    ARBITRATION; WAIVER OF A RIGHT TO A JURY

EXCEPT AS DETAILED IN THIS SECTION 27, <u>AND UNLESS YOU TELL US IN WRITING WITHIN 15 CALENDAR DAYS THAT YOU DON'T WANT TO BE SUBJECT TO THIS SECTION</u>, ALL CLAIMS (AS DEFINED BELOW) WILL BE RESOLVED BY BINDING · TRATION. YOU AND HOLDER VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT TO LITIGATE THE CLAIM IN COURT, PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. *YOU HEREBY WAIVE A TRIAL BY JURY OF ALL CLAIMS THAT ARE SUBJECT TO ARBITRATION.*

(A)    AGREEMENT TO ARBITRATION CLAIMS.

Any claim, dispute, or controversy (collectively "Claim") between you and Lender (except those listed below in Section 27(B), including without limitation those arising out of your Accelerator Account, your application, advertisements by Lender, servicing and collection of the Accelerator Account, any outstanding Accelerator Account Balance, insurance products or services, as well as any other disclosure or document related to your Accelerator Account and this Agreement will be resolved exclusively by **BINDING ARBITRATION** by an arbitrator of the American Arbitration Association ("AAA") in accordance with: (1) the Federal Arbitration Act; (2) the Expedited Procedures of the Commercial Rules of the AAA ("Rules"); and (3) this Section 27. The term "Claim" will be given the broadest possible meaning. The terms of this Section 27 will control any inconsistency between the Rules and this Section 27. You may obtain a copy of the Rules by writing the AAA at: American Arbitration Association, 335 Madison Avenue, 10th Floor, New York, NY 10017-4605. An action to compel arbitration may be brought at any time even after (1) a Claim has been commenced or raised in a court of law or equity, or (2) the Accelerator Account has been paid in full. At your written request Lender will pay all fees up to $1,000; you and Lender will share the excess cost equally, unless otherwise ordered by the AAA due to prohibitive costs to you. Unless inconsistent with applicable law, each party will pay its own fees and expenses for attorneys, experts, and witnesses.

(B)    CLAIMS EXCLUDED FROM JURISDICTION.

The following actions will not be subject to arbitration: (1) any judicial or nonjudicial action to obtain possession of or title to the Property, such as through foreclosure of Lender's security interest in the Property; or (2) any action for prejudgment injunctive relief or appointment of receivers. In addition, Lender agrees that Lender will not require you to arbitrate an individual Claim brought against Lender in small claims court or an equivalent state court, if any; however, if the Claim is transferred or appealed to a different court, Lender reserves the right to require arbitration under this Section 27.

(C)    JUDGMENT AND ADDITIONAL TERMS.

An arbitration award will be final and may be entered as a judgment in any court having jurisdiction; provided, however, if the amount in controversy exceeds $10,000, either party may appeal the arbitrator's award to a three-arbitrator panel of the AAA, which shall reconsider, *de novo*, any aspect of the initial award. The costs of such appeal will be borne by the appealing party regardless of the outcome of the appeal. You agree that any arbitration proceeding will consider only your Claims and/or Lender's Claims related to your own Accelerator Account. Claims by or on behalf of other borrowers, co-borrowers, co-signers, sureties, or applicants in connection with other Accelerator Accounts will not be arbitrated in any proceeding that is considering your Claim.

This Section will survive any termination of your Accelerator Account or the Security Instrument, including, without limitation repayments of amounts owed on your Accelerator Account and an event of default set forth in Section 15 of this Agreement. If any portion of this Section 27 is deemed invalid or unenforceable, the remaining portions of this Section 27 of this Agreement, and your Accelerator Account, will not be invalidated and will remain in effect.

### 28.    NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN CALIFORNIA

One of the conditions of the Security Instrument concerns the transfer of the Property, as follows:

"17. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

"If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

"If Lender exercises this option Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

Also, see Section 41.

29. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN CALIFORNIA**
As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

30. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN COLORADO**
If the initial advance from your Accelerator Account will be used to repay a loan used to acquire the Property, Colorado law requires that you be advised that the Security Instrument creates a lien against the Property and that the limits set forth in Colo. Rev. Stat. Ann. § 5-5-112 of the UCCC on the amounts of attorney fees that a lender may charge you are not applicable.

31. **AGREEMENT REGARDING ATTORNEYS' FEES FOR BORROWERS WHOSE PROPERTY IS LOCATED IN FLORIDA.**
With reference to Section 9(F), you agree that attorneys fees of up to ten percent (10%) of the principal sum will be reasonable in such instances, and that such fees as may exceed this amount will also be reasonable if so deemed by the applicable court.

32. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN ILLINOIS.**
Unless you provide Lender with evidence of the insurance coverage required by this Agreement and your Security Instrument, Lender may purchase insurance at your expense to protect Lender's interests in your Property. This insurance may, but need not, protect your interests. The coverage that Lender purchases may not pay any claim that you make or any claim that is made against you in connection with the Property. You may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that you have obtained insurance as required by this Agreement and the Security Instrument. If Lender purchases insurance for the Property, you will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

33. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN LOUISIANA**
This Agreement and the Account opened pursuant to it are governed by the Louisiana Residential Mortgage Lending Act.

34. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN MARYLAND**
Under Maryland law, a tax will be imposed on the Deed of Trust. You may pay the tax computed on your Accelerator Account credit limit. Then, your local tax liability will be satisfied regardless of the amount you actually borrow. Or you may pay the tax computed on each Loan you actually receive (even if the total amount borrowed and reborrowed exceeds the amount of your Credit Limit). Then, within 7 days after receiving each Loan, you must file with the Clerk of the Court with which the Deed of Trust has been recorded a verified statement of the amount of the Loan and pay the tax computed on such amount. FAILURE TO PAY THE TAX COULD SUBJECT YOU TO A FINE OF NOT MORE THAN $500.00 OR TO A JAIL SENTENCE OF NOT MORE THAN SIX MONTHS.

35. **STATUTORY NOTICES FOR BORROWERS WHOSE PROPERTY IS LOCATED IN MINNESOTA**
NOTICE OF RIGHT TO DISCONTINUE ESCROW: If your mortgage loan involves an escrow account for taxes and homeowner's insurance, you may have the right in five years to discontinue the account and pay your own taxes and homeowner's insurance. If you are eligible to discontinue the escrow account, you will be notified in five years.
NOTICE: This loan is made under Minn.Stat. § 47.204.

36. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN MISSOURI.**
**Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you and Lender from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

37. **ADDITIONAL PROVISION FOR BORROWERS WHOSE PROPERTY IS LOCATED IN NEVADA.**
It shall be an event of default hereunder If Borrower, or any other "borrower" (as such term is defined in NRS 106.310) who may send a notice pursuant to NRS 106.380(1), with respect to this Agreement or the Deed of Trust, (a) delivers, sends by mail or otherwise gives, or purports to deliver, send by mail or otherwise give, to Lender (i) any notice of an election to terminate the operation of the Deed of Trust as security for any secured obligation, including, without limitation, any obligation to repay any "future advance" (as defined in NRS 106.320) of "principal" (as defined in NRS 106.345) or (ii) any other notice pursuant to NRS 106.380(1), (b) records a statement pursuant to NRS 106.380(3), or (c) causes the Deed of Trust to be subject to NRS 106.380(2), 106.380(3) or 106.400.

38. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN OHIO.**
This loan is made pursuant to Ohio Rev. Code Chapter 1343 and federal law.

39. **STATUTORY NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN OREGON**
WARNING: Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

40. **NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN TENNESSEE**
Tennessee law gives you the right to reduce your Credit Limit, thereby reducing the maximum amount of total principal indebtedness secured by the Property.

41. **NOTICE FOR BORROWERS WHOSE PROPERTY IS LOCATED IN UTAH**
As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

---

**NOTICE TO THE BORROWER: Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a fee for terminating the agreement within one year of the date the Account is opened.**

---

By signing below, you agree to all the above terms and conditions, and you acknowledge that you have received a copy of this Agreement and the following Notice regarding your billing rights. You also confirm that you received a disclosure of the Important Terms of the CMG Home Ownership Accelerator Line of Credit, a copy of a booklet entitled, "When Your Home Is On the Line" and the CMG Deposit Agreement.

_Signed_ JACQUELINE A. WARNER

Signed _____

Signed _____

Signed _____

Pay to the order of: **GMAC BANK**
Without Recourse
CMG MORTGAGE, INC.

By: _____
Name and Title: __Mia Ferreira/Asst. Secretary__