*Execution Version*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re:                                      :     Chapter 11

RESIDENTIAL CAPITAL, LLC, *et al*.          :     Case No. 12-12020 (MG)

           Debtors.            :     (Jointly Administered)

---------------------------------------------------------x

**STIPULATED FACTS IN CONNECTION WITH
THE MOTION OF CITIBANK, N.A. FOR AN ORDER (I)
DETERMINING THAT IT IS ENTITLED TO POST-PETITION INTEREST
ON ITS OVERSECURED MSR FACILITY CLAIMS AT THE CONTRACTUAL
DEFAULT RATE, AND (II) DIRECTING DEBTORS TO PAY SUCH INTEREST
AS WELL AS CITIBANK'S DUE AND UNPAID COUNSEL FEES AND EXPENSES**

The ResCap Liquidating Trust (the "**Liquidating Trust**") as the successor in interest of the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), and Citibank, N. A. ("**Citibank**," and together with the Liquidating Trust, the "**Parties**") submit this stipulation in connection with the *Motion of Citibank, N.A. for an Order (I) Determining That It Is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (II) Directing Debtors to Pay Such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses* [Docket No. 6174] (the "**Motion**"), the Liquidating Trust's objection to the Motion [Docket No. 6276] (the "**Objection**"), and Citibank's reply to the Objection [Docket No. 6352] (the "**Reply**"). In connection with the Court's consideration of the Motion, the Objection, and the Reply, the Parties admit, stipulate, and agree that:

I.    **The Credit Agreement**

1.    On May 14, 2012, (the "**Petition Date**") the Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  On May 16, 2012, the United States Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**").

2.    Prior to the Petition Date, Citibank entered into the Amended and Restated Loan and Security Agreement (the "**Original Credit Agreement**," as amended the "**Credit Agreement**") dated June 30, 2010 creating a secured revolving credit facility (the "**Citibank MSR Facility**") with Debtor GMAC Mortgage, LLC ("**GMACM**"), as borrower, and Residential Capital, LLC ("**ResCap**," and with GMACM, the "**Obligors**"), as guarantor, that provided for borrowings of up to $700 million.  A copy of the Original Credit Agreement is attached to the Motion as Exhibit A.

3.    Specifically, the Citibank MSR Facility was secured by certain mortgage servicing rights (the "**MSRs**") with respect to mortgage loans in Federal Home Loan Mortgage Corporation ("**Freddie Mac**") and Fannie Mae (and collectively with Freddie Mac, the "**GSEs**") securitization pools (respectively, the "**Freddie Mac MSRs**" and the "**Fannie Mae MSRs**", and collectively, the "**Collateral**") and the proceeds thereof (the "**Cash Collateral**").

4.    From its inception, the Citibank MSR Facility was subject to acknowledgement agreements (i) among Freddie Mac, Citibank and GMACM, a copy of which is attached hereto as **Exhibit A** (the "**Freddie Mac Acknowledgement Agreement**") and (ii) between Fannie Mae and Citibank (which was acknowledged by GMACM), a copy of which is attached hereto as **Exhibit B** (the "**Fannie Mae Acknowledgement Agreement**" and together

with the Freddie Mac Acknowledgment Agreement, the "**GSE Acknowledgment Agreements**").

5.      In Section 4 of the Freddie Mac Acknowledgement Agreement, GMACM and Citibank acknowledged to Freddie Mac that Citibank's security interest in the Freddie Mac MSRs:

> [I]s subject and subordinate in each and every respect (a) to all rights, powers and prerogatives of Freddie Mac under and in connection with the Purchase Documents, as that term is defined in the Freddie Mac Sellers' & Servicers' Guide, which rights include, without limitation, the right of Freddie Mac to disqualify [GMACM] as an approved Freddie Mac seller/servicer, with or without cause, and the right to terminate the Servicing Contract with [GMACM], and to transfer and sell all or any portion of the Servicing Contract, as provided in the Purchase Documents; and (b) to payment of all of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs, as defined below . . . .

6.      Section 2 of the Fannie Mae Acknowledgment Agreement, provided that Citibank's security interest in the Fannie Mae MSRs:

> [I]s subject to and subordinate in all respects to all rights, powers and prerogatives of Fannie Mae under and in connection with:  (i) this Acknowledgement Agreement, (ii) the Mortgage Selling and Servicing Contract, all applicable Pool Purchase Contracts between Fannie Mae and [GMACM] and all agreements between Fannie Mae and [GMACM] that impose servicing requirements or servicing transfer restrictions, and (iii) the Selling Guide, Servicing Guide and other applicable Guides, as each of such Guides is amended from time to time ((ii) and (iii) collectively, the "Fannie Mae Contract"), which rights, powers, and prerogatives include, without limitation, the right of Fannie Mae to terminate the Fannie Mae Contract with or without cause and the right to sell, or have transferred, the Servicing Rights as therein provided.

7.      The Credit Agreement initially provided that all amounts outstanding under the Citibank MSR Facility would be repaid no later than August 31, 2010 (the "**Maturity Date**").  *See* Credit Agreement § 2.08.

8.      The Credit Agreement originally provided that the interest rate under the Citibank MSR Facility would be the LIBOR rate plus six percent (the "**Non-Default Rate**"), or, in the case of past due payments, the Non-Default Rate plus four percent (the "**Default Rate**").

## II.    The Credit Agreement Amendments

9.      Citibank and the Obligors entered into the following amendments to the Credit Agreement (including Amendment Number Ten, the "**Credit Agreement Amendments**"):

- Pursuant to Amendment Number One effective as of August 19, 2010, the Maturity Date was extended to September 15, 2010, and the Obligors agreed to pay Citibank a fee of $291,666.67.

- Pursuant to Amendment Number Two effective as of September 15, 2010, the Maturity Date was extended to September 30, 2010, and the Obligors agreed to pay Citibank a fee of $250,000.00.

- Pursuant to Amendment Number Three effective as of September 30, 2010, the Maturity Date was extended to November 30, 2010, and the Obligors agreed to pay Citibank a fee of $1,002,740.00.

- Pursuant to Amendment Number Four effective as of November 30, 2010, the Maturity Date was extended to January 18, 2011, and the Obligors agreed to pay Citibank a fee of $736,111.11.

- Pursuant to Amendment Number Five effective as of January 18, 2011, the Maturity Date was extended to March 15, 2011, and the Obligors agreed to pay Citibank a fee of $777,777.78.

- Pursuant to Amendment Number Six effective as of March 15, 2011, the Maturity Date was extended to April 1, 2011, and the Obligors agreed to pay Citibank a fee of $177,083.33.

- Pursuant to Amendment Number Seven effective as of April 1, 2011, the Maturity Date was extended to April 11, 2011, and the Obligors agreed to pay Citibank a fee of $104,166.67.

- Pursuant to Amendment Number Eight effective as of April 11, 2011, the Maturity Date was extended to March 30, 2012, and the Obligors agreed to pay Citibank a fee of $3,687,500.00.

- Pursuant to Amendment Number Nine effective as of February 1, 2012, certain financial reporting required by the Credit Agreement and other provisions of the Credit Agreement were modified.

10.     In addition, pursuant to Amendment Number Ten effective as March 30, 2012 ("**Amendment 10**"), the Maturity Date was extended to May 30, 2012, A copy of the Credit Agreement Amendments are attached hereto as **Exhibit C-1** to **Exhibit C-10**.

11.     In Amendment 10, the Non-Default Rate was increased from LIBOR plus six percent to LIBOR plus eight and one-half percent, and Citibank received an extension fee in the amount of $3,160,000.  In addition, pursuant to Amendment 10, the Commitment Amount (as that term is defined in the Credit Agreement) was reduced from $300 million to $158,000,000, and Citibank received a payment of $124,000,000, which was the amount by which the then-outstanding amount under the Citibank MSR Facility exceeded the reduced Commitment Amount.

12.     At the time the Parties entered into Amendment 10, the Parties understood that the Obligors were preparing to file bankruptcy petitions.  The Parties agreed that the Debtors would seek to use the Cash Collateral following the commencement of the bankruptcy cases.  In Section 1(d) of Amendment 10, the parties agreed that Citibank would consent to the use of cash collateral, provided that any applicable cash collateral order provided for the following:

(1)     current interest accrued under [the Credit Agreement] shall be paid on the dates contemplated [by the Credit Agreement] at a rate equal to the non-Default rate (or the Default rate, if adequate protection is provided to any other secured creditor at the Default rate), (2) all fees and expenses payable to the [Citibank] under this [Credit] Agreement shall be paid on a monthly basis within five Business Days of submission to the Borrower, (3) copies of budgets, variance reports and reports on the Collateral, . . . (4) providing that any order approving the sale of the Collateral shall provide for the repayment of Loans with the proceeds of Collateral received by the Borrower from

such sale, and (5) such other terms as are reasonably requested by [Citibank].

13.     Section 8.01(q) of the Credit Agreement provides that the commencement of a bankruptcy case constituted an Event of Default.  Section 8.02(b) of the Credit Agreement provides for the automatic acceleration of the Obligations under the Credit Agreement upon the occurrence of an Event of Default under Section 8.01(q).

14.     As set forth in Schedule I of the Credit Agreement, the term Obligations means "the Outstanding Aggregate Loan Amount, all accrued interest thereon and all other amounts payable by the Borrower to the Lender."

15.     As of the Petition Date, the Debtors were current in their payments of interest and fees to Citibank under the Credit Agreement, and, other than the commencement of the Debtors' chapter 11 cases, no events of default had occurred under the Credit Agreement. However, the commencement of the chapter 11 cases on the Petition Date was an Event of Default under the Credit Agreement.  Citibank was not repaid on the Maturity Date of May 30, 2012.

### III.     **The Citibank Cash Collateral Order**

16.     On the Petition Date, the Debtors filed a motion seeking approval of the use of the Cash Collateral on the same terms provided for in Amendment 10 [Docket No. 15] (the "**Citibank Cash Collateral Motion**").  A copy of the Citibank Cash Collateral Motion is attached hereto as **Exhibit D**.

17.     The Citibank Cash Collateral Motion conformed with the adequate protection provisions of Amendment 10.  Citibank, therefore, consented to the relief sought in the Citibank Cash Collateral Motion.

18.     On June 20, 2012, the Court entered its *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Modifying the Automatic Stay* [Docket No. 471] (the "**Final Citibank Cash Collateral Order**") approving the Citibank Cash Collateral Motion [Docket No. 471]. A copy of the Citibank Cash Collateral Order is attached hereto as **Exhibit E**.

19.     The Final Citibank Cash Collateral Order contained several stipulations regarding the Credit Agreement and the Obligations (collectively, the "**Stipulations**"), including paragraph G(iv) of the Final Citibank Cash Collateral Order, which provided that:

> [I]n light of the Prepetition MSR Obligations and the value of the MSR Prepetition Collateral with respect thereto, Citibank is oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR Obligations in accordance with the Prepetition MSR Credit Documents.[1]

20.     The Debtors' Stipulations in the Final Citibank Cash Collateral Order, including the stipulation contained in paragraph G(iv), were made subject to a 120-day challenge period set forth in Section 16 of the Final Citibank Cash Collateral Order (the "**Challenge Period**") in favor of the Creditors Committee and certain third parties. No Challenge was made within the Challenge Period.

21.     Pursuant to ¶ 6(a) of the Final Citibank Cash Collateral Order, the Debtors were required to make Adequate Protection Payments, including:

> (i) payments of interest on the Prepetition MSR Obligations at the non-default rate set forth in the Prepetition MSR Agreement, (ii) any fees of Citibank pursuant to the Prepetition MSR Agreement payable at the times specified in the Prepetition MSR Agreement, and (iii) ongoing payment of the reasonable fees, costs and expenses of Citibank, including, without limitation, the

---

[1]   The relevant terms are defined in Paragraphs F and G of the Final Citibank Cash Collateral Order.   The terms "Prepetition MSR Credit Documents" and "Prepetition MSR Agreement" are defined thereunder to include the Credit Agreement Amendments, including Amendment 10.

payment of the reasonable fees and expenses of legal and other professionals retained by Citibank in accordance with Paragraph 11 hereof.

In addition, the Final Cash Collateral Order provided for adequate protection to the extent of diminution of the value of the collateral securing the Citibank MSR Facility, in the form of:

- Superpriority adequate protection claims under sections 503(b) and 507(b) of the Bankruptcy Code.

- Additional and replacement liens on the assets that would have constituted Collateral under the Citibank MSR Facility.

Citibank was not granted additional collateral in any assets unrelated to the MSRs, including any DIP Collateral (as defined below), even on a subordinated basis.

22.     Paragraph G(vii) of the Final Citibank Cash Collateral Order, recognized that Citibank's liens on its collateral were subordinate to the interests of the GSEs.

23.     Under ¶ H of the Final Citibank Cash Collateral Order the Debtors were required to "seek authority in any order approving the sale of the Prepetition MSR Collateral to provide that the net proceeds of such sale shall be applied by the Debtors to repay the Obligations under the Prepetition MSR Credit Documents" (the "**Collateral Sale Requirement**").

24.     Pursuant to the Citibank Cash Collateral Order, the Debtors continued to make all payments of non-default interest due under the Credit Agreement through the repayment of the Citibank MSR Facility on January 31, 2013, and continued to pay Citibank's professional fees and expenses in full through March 2013.

25.     The Citibank Cash Collateral Order provided that the Debtors may use the Cash Collateral for a period no later than 18 months following the closing of the DIP Facility (defined below).

IV.    **The Bankruptcy Cases**

26.    On the Petition Date, the Debtors filed a motion (the "**DIP Motion**") seeking approval of a secured debtor in possession finance facility provided by Barclays Bank plc (the "**DIP Facility**") [Docket No. 13].    The DIP Facility provided for the following borrowings:

| Facility | Principal | Interest Rate |
|---|---|---|
| Revolver | $200,000,000 | LIBOR + 4.00% |
| Term A-1 Loan | $1,050,000,000 | LIBOR + 4.00% (1.25% LIBOR floor) |
| Term A-2 Loan | $200,000,000 | LIBOR + 6.00% (1.25% LIBOR floor) |

27.    On June 25, 2012, the Court entered an order approving the DIP Facility on a final basis [Docket No. 490] (the "**DIP Order**").

28.    The collateral securing the DIP Facility (the "**DIP Collateral**") consisted primarily of servicing advances pledged to the GSAP Facility (as defined in the DIP Motion) and mortgage loans pledged to the BMMZ Repo Facility (as defined in the DIP Motion).    Both the GSAP Facility and the BMMZ Repo Facility were refinanced with the proceeds of the DIP Facility.

29.    The DIP Collateral did not include any of the Collateral under the Citibank MSR Facility nor did entry of the DIP Order alter the priority or validity of Citibank's interest in the Collateral.    The DIP Facility was not subject to the subordination rights of the GSEs as set forth in the GSE Acknowledgement Agreements.

30.    On the Petition Date, the Debtors filed a motion seeking the establishment of bid procedures for the sale of various assets, including the mortgage originations and servicing platform (the "**Original Bid Procedures Motion**") [Docket No. 61].    In support of the Original Bid Procedures Motion, the Debtors filed the Declaration of Samuel M. Greene (the "**Greene Declaration**") [Docket No. 63].    Both the Original Bid Procedures Motion and the Greene

Declaration noted that the GSEs would need to support the proposed sales. *See* Original Bid Procedures Motion at ¶ 43; Greene Declaration at ¶ 28.

31.     By Order dated November 21, 2012, the Court approved the sale of the Debtors' mortgage originations and servicing platform to Ocwen Loan Servicing LLC ("**Ocwen**") and its designee, Walter Investment Management Corp. ("**Walter**"), pursuant to section 363 of the Bankruptcy Code (the "**Ocwen Sale Order**") [Docket No. 2246].  Paragraph 39 of the Ocwen Sale Order stated that "provided that the Agency Interests are satisfied through the Sale, the Debtors are authorized and directed to apply the net proceeds of the Sale attributable to the Prepetition MSR Collateral to repay the Obligations under the Prepetition MSR Credit Documents."

32.     As a condition to be satisfied after the entry of the Ocwen Sale Order, the consent of each of Fannie Mae and Freddie Mac was required for the consummation of the sales contemplated by the Ocwen Sale Order.

33.     Both of the GSEs interposed objections to the sales, and asserted first-priority claims aggregating approximately $500 million, a portion of which related to the mortgage servicing rights that constituted Citibank's collateral, and a portion of which did not constitute Citibank's collateral.  The GSEs reserved the right to set-off their claims against any claims held by the Debtors against the GSEs, which included more than $200 million in servicing advances.

34.     The objections of the GSEs were settled in January 2013, and the closing of the sales was permitted to proceed, as follows: (i) Fannie Mae received a payment of $265

million in respect of its claims under its various contracts with the Debtors[2] and (ii) Freddie Mac received a payment of $39.4 million.

35.    On January 31, 2013, the Debtors completed that portion of the sale of their mortgage servicing portfolio that was designated for Walter (the "**Walter Sale**"), which included the Fannie Mae MSRs.

36.    At the time of the Walter Sale, Citibank advised the Debtors of its position that among the "Obligations" due to Citibank were the $152 million principal balance of its claim and unpaid interest under the Credit Agreement, including accrued but unpaid contractual default rate interest in the amount of $4,424,888.89 (as of January 31, 2012). The Debtors disputed Citibank's entitlement to default interest and informed Citibank that they would not agree to the payment thereof. Counsel to the Debtors and Citibank agreed, among other things, that (i) Citibank would be paid the $152 million outstanding principal amount at the closing, together with post-petition interest at the contractual non-default rate, and (ii) the default interest issue would be left for later resolution or determination.

37.    On August 23, 2013, the Court entered the *Order (I) Approving Disclosure Statement, (II)* Establishing *Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 4809] approving the *Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* [Docket No. 4819-1] (the "**Disclosure Statement**").

---

[2] In addition, Fannie Mae received $32.6 million in respect of its Early Advance Funding facility with the Debtors.

38.    As disclosed in the Disclosure Statement, general unsecured claims against the Debtors are projected to receive recoveries as follows: (i) 9.0% for unsecured claims against the RFC Debtors (as defined in the Disclosure Statement); (ii) 30.1% for unsecured claims against the GMACM Debtors (as defined in the Disclosure Statement), and (iii) 36.3% for unsecured claims against the ResCap Debtors (as defined in the Disclosure Statement). *See* Ex. 7 to the Disclosure Statement.

39.    On December 11, 2013, the Court entered the *Order Confirming Second Amended Joint* Chapter *11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6065] confirming the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6065-1] (as may be amended, modified or supplemented from time to time, the "**Plan**").

40.    On December 17, 2013, the Effective Date under the Plan occurred, and the Plan was substantially consummated.

41.    Under the Plan, unsecured creditors are not receiving a full recovery on their claims.

42.    Any amounts paid by the Liquidating Trust on account of Citibank's claim for payment of interest at the Default Rate would reduce recoveries to unsecured creditors.

43.    The Disclosure Statement estimated the distributable value to the holders of beneficial interests in the Liquidating Trust to be $2.462 billion. *See* Disclosure Statement at 45.

V.      **The Motion**

44.      By the Motion, Citibank asserts that it was entitled to payment of interest at the Default Rate under the Credit Agreement for the period beginning on the Petition Date and ending on January 31, 2013 in the amount of $4,424,888.89.  Citibank further asserts that the amount of its Default Interest Claims, as of March 11, 2014, is $5,054,632.95 (inclusive of interest accrued at the Default Rate since the closing of the Walter Sale in the amount of $629,774.06), which represents approximately 0.2 % of the distributable value referred to in the preceding paragraph.

45.      Section 8.02(c) of the Credit Agreement provides that "[a]ll out-of-pocket costs incurred by [Citibank] in the collection of all Obligations, and the enforcement of its rights hereunder, including reasonable attorneys' fees and legal expenses, shall be paid out of the Collateral."  Additionally, Paragraph G(iv) the Final Cash Collateral Order contains a Stipulation of the Debtors pursuant to which Citibank, as an oversecured creditor, is entitled to fees "in accordance with the Prepetition MSR Credit Documents."

46.      From the Petition Date and until April 2013, the Debtors paid the monthly invoices of Citibank's counsel, Shearman & Sterling, LLP ("**Shearman & Sterling**") in full. The Debtors ceased paying Shearman & Sterling's invoices beginning with its May 16, 2013, invoice for work performed in April 2013.

47.      Copies of Shearman & Sterling's invoices from the Petition Date through and including September 2013 are attached as Exhibit A to the Citibank Reply.  Shearman & Sterling's invoice for the period covering October 2013 through and including January 2014 is attached hereto as **Exhibit F**.  As of January 31, 2014, for the period starting in April 2013 and

through January 31, 2014, Citibank asserts it is owed $351,935.20 in fees and $5,233.34 in expenses.

Dated: March 17, 2014

| **KRAMER LEVIN NAFTALIS & FRANKEL LLP** | **SHEARMAN & STERLING LLP** |
|---|---|
| By: /s/ Gregory A. Horowitz | By: /s/ Fredric Sosnick |
| Kenneth H. Eckstein | Fredric Sosnick |
| Gregory A. Horowitz | William J.F. Roll, III |
| Douglas H. Mannal | Edmund M. Emrich |
| 1177 Avenue of the Americas | 599 Lexington Avenue |
| New York, New York 10036 | New York, New York 10022 |
| Tel: (212) 715-9100 | Telephone: (212) 484-4000 |
| Fax: (212) 715-8000 | Facsimile: (212) 484-7179 |
| *Counsel for the ResCap Liquidating Trust* | *Counsel for Citibank, N.A.* |

# Exhibit A

<u>FEDERAL HOME LOAN MORTGAGE CORPORATION</u>

<u>ACKNOWLEDGEMENT AGREEMENT</u>

This Acknowledgement Agreement, entered into effective as of the 12th day of March, 2009 (the "Agreement"), by and among the Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States ("Freddie Mac"), GMAC Mortgage, LLC organized and existing under the laws of the State of Delaware, whose chief executive office is located at 1100 Virginia Drive, Fort Washington, PA, 19034 (the "Servicer"), and Citibank, N.A., a national banking association, whose chief executive office is located at 390 Greenwich Street, 4th Floor, New York, NY, 10013 (the "Secured Party");

<u>W I T N E S S E T H</u>

WHEREAS, the Servicer and the Secured Party have entered into, or, contemporaneous with the execution of this Agreement, intend to enter into, a security agreement (the "Security Agreement") whereby the Servicer granted, or will grant, to the Secured Party a security interest in, among other things, (a) part or all of the conditional, non-delegable right of the Servicer to service certain single-family mortgages for Freddie Mac, which mortgages are described with particularity in Addendum A to this Agreement (the "Mortgages"), in exchange for the right to retain certain payments otherwise due to Freddie Mac, pursuant to the terms of the unitary, indivisible master servicing contract (the "Servicing Contract"), as described in the Freddie Mac Sellers' and Servicers' Guide, as it may be amended from time to time (the "Guide"), and (b) any proceeds resulting from the sale of such right to service mortgages for Freddie Mac (the Servicing Contract and such proceeds hereinafter referred to as the "Servicing Collateral;" the security interest in the Servicing Collateral held by the Secured Party hereinafter referred to as the "Servicing Security Interest"); and

WHEREAS, the Servicer's grant of the Servicing Security Interest is prohibited under the terms of the Guide, unless Freddie Mac shall consent to the grant of such security interest by entering into this Agreement; and

WHEREAS, the Servicer and the Secured Party have requested that Freddie Mac consent to the grant of the Servicing Security Interest, and Freddie Mac is agreeable to so doing, on the terms and conditions set forth in this Agreement, in consideration of the acknowledgments, promises, undertakings, warranties and representations on the part of the Servicer and the Secured Party set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Extent of Servicing Security Interest</u>.    Based upon the representations and warranties of the Servicer and the Secured Party set forth in this Agreement, and subject to the terms and conditions stated herein, Freddie Mac consents to the grant by the Servicer of the Servicing Security Interest in the Servicing Collateral, but does not consent to the grant of any other security interest in collateral not included in the Servicing Collateral.

1

Confidential

2.      Purpose of Servicing Security Interest; Loan Participations and Assignment of a Loan: No Additional Interests in Servicing Security Interest.  The Servicer represents and warrants that it has granted or will grant the Servicing Security Interest, and the Secured Party represents and warrants that it has taken or will take the Servicing Security Interest, as collateral to secure an extension of credit for a purpose permitted by Freddie Mac. The Secured Party also represents and warrants that, if it sells one or more participations in a loan, or assigns a loan, made to the Servicer in connection with the Security Agreement, each participant or the assignee shall be bound by a written agreement with the Secured Party (a) to benefit under the Security Agreement and this Agreement exclusively by and through the Secured Party, (b) to authorize the Secured Party or its agent to act exclusively for each participant or the assignee with respect to this Agreement and Freddie Mac, and (c) to agree that all terms of this Agreement shall be binding upon the participant or the assignee as if it had executed the same. The Servicer and the Secured Party each further represents and warrants that, besides the grant of the Servicing Security Interest by the Servicer, and/or a sale of a loan participation or assignment of a loan (as provided for in the immediately preceding sentence) by the Secured Party, it has not, and it will not, sell, grant or convey to any other person any interest whatsoever in this Agreement, the Servicing Security Interest, the Servicing Collateral, and/or the Servicing Contract.

3.      Filing of Financing Statement. If, under the Security Agreement, the Servicer grants to the Secured Party the Servicing Security Interest, but does not grant to the Secured Party a security interest in other rights which are similar to the Servicing Collateral and which are owned by the Federal National Mortgage Association ("Fannie Mae") , the Government National Mortgage Association ("Ginnie Mae"), or another investor, the Secured Party agrees that it will write, or cause to be written, the following language in, or attached to, each financing statement which it shall file, or cause to be filed, in connection with the Security Agreement:

"The security interest referred to in this financing statement is subject and subordinate in each and every respect (a) to all rights, powers and prerogatives of Freddie Mac under and in connection with Purchase Documents, as that term is defined in the Freddie Mac Sellers' & Servicers' Guide, which rights include, without limitation, the right of Freddie Mac to disqualify the debtor named herein as an approved Freddie Mac seller/servicer, with or without cause, and the right to terminate the unitary, indivisible master servicing contract and to transfer and sell all or any portion of said servicing contract, as provided in the Purchase Documents; and (b) to all claims of Freddie Mac arising out of any and all defaults and outstanding obligations of the debtor to Freddie Mac."

If, in contrast to the facts set forth in the immediate preceding paragraph, the Servicer, in addition to granting to the Secured Party the Servicing Security Interest, also grants to the Secured Party a security interest in other rights which are similar to the Servicing Collateral and which are owned by Fannie Mae, Ginnie Mae, or another investor, the Secured Party agrees that it will write, or cause to be written, the following language in, or attached to, each financing statement which it shall file, or cause to be filed, in connection with the Security Agreement:

"The security interest referred to in this financing statement is subject and subordinate in each and every respect (a) to all rights, powers and prerogatives of one or more of the following:  the Federal Home Loan Mortgage Corporation

Confidential

("Freddie Mac"), the Federal National Mortgage Association ("Fannie Mae"), the Government National Mortgage Corporation ("Ginnie Mae"), or such other investors that own mortgage loans, or which guaranty payments on securities based on and backed by pools of mortgage loans, identified on the exhibit(s) or schedule(s) attached to this financing statement (the "Investors"); and (b) to all claims of an Investor arising out of any and all defaults and outstanding obligations of the debtor to the Investor. Such rights, powers and prerogatives of the Investors may include, without limitation, one or more of the following: the right of an Investor to disqualify the debtor from participating in a mortgage selling or servicing program or a securities guaranty program with the Investor; the right to terminate contract rights of the debtor relating to such a mortgage selling or servicing program or securities guaranty program; and the right to transfer and sell all or any portion of such contract rights following the termination of those rights."

4.    <u>Subordination of Servicing Security Interest</u>. The Secured Party and the Servicer hereby acknowledge that the Servicing Security Interest is subject and subordinate in each and every respect (a) to all rights, powers and prerogatives of Freddie Mac under and in connection with the Purchase Documents, as that term is defined in the Freddie Mac Sellers'& Servicers' Guide, which rights include, without limitation, the right of Freddie Mac to disqualify the Servicer as an approved Freddie Mac seller/servicer, with or without cause, and the right to terminate the Servicing Contract with the Servicer and to transfer and sell all or any portion of the Servicing Contract, as provided in the Purchase Documents; and (b) to payment of all of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs, as defined below in Sections 8(a)(1) and 8(a)(2)of this Agreement.

5.    <u>Non-Applicability of Security Agreement and of UCC</u>. Each of the parties agrees, and expressly acknowledges its understanding, that Freddie Mac shall not be bound in any way whatsoever by any terms or provisions of the Security Agreement, and that in the event of an actual or apparent conflict between the provisions of the Security Agreement and the provisions of this Agreement with respect to the rights or obligations of the Servicer or the Secured Party, the provisions of this Agreement shall govern. Each of the parties also agrees, and expressly acknowledges its understanding, that Freddie Mac's rights and obligations under this Agreement will in no way be derived from or subject to Article 9 of the UCC, as it may have been adopted in any state or federal district or territory; provided, however, that the foregoing provision shall not affect the applicability of Article 9 to the creation and validity of the Servicing Security Interest and the enforceability of the Servicing Security Interest against the Servicer or third parties other than Freddie Mac.

6.    <u>Continuation of Security Interest in Proceeds</u>. Each of the parties agrees, and expressly acknowledges its understanding, that if Freddie Mac shall exercise its right to terminate the Servicing Contract, the Secured Party's Servicing Security Interest shall continue with respect to any Surplus Proceeds, as that term is defined in Section 8(a)(11) below, subject to all of the terms and conditions of Sections 8(a) through 8(g) below.

7.    <u>Covenant to Cooperate and Not to Interfere:  Waiver or Standing to Sue</u>. The Servicer and the Secured Party (to the extent that the Secured Party may directly or indirectly be

Confidential

in possession or control of any of the Servicing Collateral or any documentation, agreements, data, information or proceeds related in any way to the Servicing Collateral or the Servicing Contract) each covenants that it will cooperate with Freddie Mac in all respects in connection with any termination of, or transfer or sale of, the Servicing Contract by Freddie Mac. The Secured Party hereby waives any and all right or standing which it may have, directly or indirectly, as a secured creditor of the Servicer, or in any other capacity, to protest a disqualification of the Servicer as an approved Freddie Mac seller/servicer or a termination by Freddie Mac of the Servicing Contract, and agrees not to interfere in any way, directly or indirectly, with any termination by Freddie Mac of the Servicing Contract or with Freddie Mac's exercise of any of its rights relating thereto, including Freddie Mac's right to effectuate an Interim Servicing Transfer or a Permanent Servicing Transfer, as defined below in Sections 8(a)(3) and 8(a)(4). The Secured Party also hereby waives any right or standing which it might otherwise have to bring suit, and hereby covenants that it will not bring suit, to restrain or enjoin any termination of, or transfer or sale of, the Servicing Contract by Freddie Mac, or any exercise by Freddie Mac of any of its rights relating thereto, including Freddie Mac's right to effectuate an Interim Servicing Transfer or a Permanent Servicing Transfer; provided, however, that the Secured Party does not hereby waive its right to bring suit against Freddie Mac for damages arising out a breach of this Agreement by Freddie Mac.

8.    Permanent Servicing Transfer by Freddie Mac: Payment of Surplus Proceeds.

(a)    Definitions. For the purposes of this Agreement, the following terms shall have the meanings ascribed to them in the paragraphs below.

1.    "Freddie Mac's Claims" means the amounts of any and all defaults and outstanding obligations of the Servicer due and owing to Freddie Mac, including Freddie Mac's attorneys' fees and costs, whether arising under the Purchase Documents or any agreement or instrument constituting part of, or entered into or given in connection with, a purchase contract (including, but not limited to, a guaranty, a letter of credit agreement, an indemnity agreement, or a spread account agreement); or associated with the purchase or sale of securities from or to Freddie Mac (including, but not limited to, any transactions entered into between the Servicer and the Security Sales and Trading Group ("SS&TG") of Freddie Mac, or any organizational units of Freddie Mac which may, at any time hereafter, perform any or all of the functions which are presently performed by SS&TG); or associated with repurchase agreement transactions with Freddie Mac; or arising under any other agreement between the Servicer and Freddie Mac.

2.    "Freddie Mac's Servicing Transfer Costs" means all costs and expenses incurred by Freddie Mac relating to or arising from a Termination With Cause or a Termination Without Cause; all payments made or costs incurred by Freddie Mac with respect to an Interim Servicing Transfer; and all costs and expenses incurred by Freddie Mac in connection with an actual or proposed Permanent Servicing Transfer;" and including Freddie Mac's attorneys' fees and costs.

Confidential

3.        *"Interim Servicing Transfer"* means the appointment of a servicer by Freddie Mac to service the Mortgages, usually for a period not to exceed 180 days, following a Termination With Cause or a Termination Without Cause and prior to the effective date of a Permanent Servicing Transfer, effectuated in accordance with the Servicing Transfer Procedures.

4.        *"Permanent Servicing Transfer"* means a transfer of the Servicing Contract to a new servicer, following a Termination With Cause or a Termination Without Cause and, if applicable, following an Interim Servicing Transfer, all effectuated in accordance with the Servicing Transfer Procedures.

5.        *"Secured Party's Claims"* means all defaults and outstanding obligations of the Servicer to the Secured Party under the Security Agreement, and any related loan agreements or other agreements between the Servicer and the Secured Party.

6.        *"Secured Party's Servicing Transfer Costs"* means all costs and expenses incurred by the Secured Party in connection with an actual or proposed Permanent Servicing Transfer.

7.        *"Servicing Transfer With Assumption of Warranties"* means a Permanent Servicing Transfer in which the new servicer assumes all of the warranties and obligations of the Servicer under the Purchase Documents relating to the sale of the Mortgages to, or the servicing of the Mortgages for, Freddie Mac, regardless of whether such warranties and obligations were made and assumed by the Servicer upon the sale of the Mortgages to Freddie Mac or assumed by the Servicer thereafter.

8.        *"Servicing Transfer Without Assumption of Warranties"* means a Permanent Servicing Transfer in which the new servicer does not assume all of the warranties and obligations of the Servicer under the Purchase Documents relating to the sale of the Mortgages to, or the servicing of the Mortgages for, Freddie Mac, regardless of whether such warranties and obligations were made and assumed by the Servicer upon the sale of the Mortgages to Freddie Mac or assumed by the Servicer thereafter.

9.        *"Servicing Transfer Proceeds"* means the consideration paid by a new servicer to Freddie Mac in a Permanent Servicing Transfer transaction.

10.        *"Servicing Transfer Procedures"* means the provisions of the Purchase Documents which prescribe the terms and conditions under which the Servicing Contract may be terminated and transferred and sold, as supplemented by Freddie Mac corporate policies relating to servicing transfer procedures, as the same may be revised from time to time, which shall at all times apply with equal force and effect to all Interim Servicing Transfers and to all Permanent Servicing Transfers effectuated by Freddie Mac, whether occurring pursuant to this Agreement or not.

Confidential

11.     *"Surplus Proceeds"* means any monies available for payment to the Secured Party and to the Servicer, equal to the balance of monies remaining from the Servicing Transfer Proceeds or the Termination Fee after deduction therefrom of the amounts of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs.

12.     *"Termination Fee"* means the fee payable by Freddie Mac resulting from a Termination Without Cause, as determined under the Purchase Documents.

13.     *"Termination With Cause"* means a termination of the Servicing Contract between Freddie Mac and the Servicer for cause under the Purchase Documents.

14.     *"Termination Without Cause"* means a termination of the Servicing Contract between Freddie Mac and the Servicer without cause under the Purchase Documents, pursuant to which a Termination Fee is payable by Freddie Mac.

(b)     <u>Notice to Secured Party of Termination With Cause or Termination Without Cause: Interim Servicing Transfer</u>. Freddie Mac shall have at all times the unqualified right to effect a Termination With Cause or a Termination Without Cause and to transfer and sell the Servicing Contract in accordance with the Servicing Transfer Procedures. If Freddie Mac shall effect a Termination With Cause or a Termination Without Cause with respect to the Servicing Contract, Freddie Mac will give the Secured Party notice of the same, in accordance with the provisions of Section 8(b)(1) below.

1.     <u>*Notice to Secured Party*</u>. Freddie Mac will give notice of a Termination With Cause or a Termination Without Cause to the Secured Party within ten (10) days after the date of the notice of termination. The notice shall be in the form of a copy of the notice of Termination With Cause or Termination Without Cause sent to the Servicer. Notwithstanding the terms of the first sentence of this Section 8(b)(1), the Secured Party agrees, and expressly acknowledges its understanding that (A) Freddie Mac will not be liable to the Secured Party for failure to provide such notice on a timely basis and (B) the Secured Party may contract with the Servicer to require the Servicer to provide such notice on a timely basis.

Following receipt of notice of the termination, the Secured Party may then contact Freddie Mac to determine (A) whether the termination was a Termination With Cause or a Termination Without Cause; and (B) whether the termination has been followed by an immediate Interim Servicing Transfer. Freddie Mac agrees that, within fifteen (15) days after giving the notice provided for in the first paragraph of this Section 8(b)(l), and within each thirty (30)-day period thereafter until a Permanent Servicing Transfer has been effectuated, it will provide the Secured Party with estimates of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs.  Freddie Mac will also provide the Secured Party with the final

Confidential

amounts of Freddie Mac's Claims and Freddie Mac's Servicing Costs, as provided in Sections 8(c) and 8(f) below.

2.      _Interim Servicing Transfer Immediately Effectuated_.  If, following the termination, Freddie Mac shall have immediately effectuated an Interim Servicing Transfer, the Secured Party may exercise its option to seek to arrange a Permanent Servicing Transfer, as set forth in Section 8(c) below.

3.      _Impracticality of Interim Servicing Transfer_. Freddie Mac and the Secured Party agree, and expressly acknowledge their understanding, that incurring the cost of an Interim Servicing Transfer may be impractical, particularly if it shall appear likely that the cost of an Interim Servicing Transfer may exceed the amount of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs. If, following a termination, Freddie Mac shall determine that effectuating an Interim Servicing is impractical, Freddie Mac shall immediately notify the Secured Party of that determination. The Secured Party expressly acknowledges its understanding that, in such case, the Secured Party likely would not elect to seek to arrange a Permanent Servicing Transfer under Section 8(c) below, and Freddie Mac would instead assume sole responsibility for effectuating a Permanent Servicing Transfer in accordance with the provisions of Section 8(d) below. If, however, after reviewing the first estimates of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs provided under Section 8(b)(1), the Secured Party nevertheless in good faith disagrees with Freddie Mac's determination regarding the economic impracticality of an Interim Servicing Transfer, the Secured Party shall have the right to arrange an Interim Servicing Transfer with a Freddie Mac-approved servicer. Such an Interim Servicing Transfer shall only be on terms no less favorable to Freddie Mac than those negotiable by Freddie Mac.

If the Secured Party shall decide to exercise its right to arrange an Interim Servicing Transfer, it shall give Freddie Mac notice of its intent to do so within a reasonable period of time after receiving Freddie Mac's notice provided for in the immediately preceding paragraph. If the Secured Party gives Freddie Mac such notice, the Secured Party shall have a reasonable period of time to arrange for the Interim Servicing Transfer. If the Secured Party shall arrange for an Interim Servicing Transfer on the terms set forth in the immediately preceding paragraph, Freddie Mac and the Secured Party shall then proceed to arrange for a Permanent Servicing Transfer in accordance with the provisions of Sections 8(c) and 8(d) below (excluding the notice provision set forth in the first clause of the first sentence of Section 8(c)).

If it shall eventually occur that the amount of the Servicing Transfer Proceeds are less than the amount of the sum of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs, the Secured Party hereby expressly agrees to indemnify Freddie Mac for the amount of the difference; provided, however, that the amount of indemnification shall under no circumstances be greater than the cost of the Interim Servicing Transfer arranged by the Secured Party under this Section

Confidential

8(b)(3). Freddie Mac may request of the Secured Party reasonable assurances of the Secured Party's ability to pay a prospective claim for indemnification (as reasonably estimated by the parties) before Freddie Mac shall permit the Secured Party to arrange for an Interim Servicing Transfer.· In determining whether or not to request such reasonable assurances, and in determining the nature thereof, Freddie Mac may consider the totality of circumstances relating to the Secured Party's financial, management, and regulatory status at the time the Secured Party requests to arrange an Interim Servicing Transfer.

If the Secured Party (A) shall not give the notice specified in the first paragraph of this Section 8(b)(3) on a timely basis, or (B) shall give such notice, but shall not arrange for an Interim Servicing Transfer on the terms and conditions specified in this section, or (C) shall not provide reasonable assurances requested by Freddie Mac, then the Secured Party's rights under this Section (b)(3) shall expire. In such case, Freddie Mac shall assume sole responsibility for arranging a Permanent Servicing Transfer pursuant to the provisions of Section 8(d) below.

(c)    _Secured Party's Request to Arrange Servicing Transfer With Assumption of Warranties_. The Secured Party may, within ten (10) days after the date of Freddie Mac's notice provided for under Section 8(b)(l), request to enforce its Servicing Security Interest by giving Freddie Mac notice stating that the Secured Party so elects and that the Secured Party understands and acknowledges that its right to enforce its security interest is and shall be expressly conditioned upon Freddie Mac's approval of any proposed new servicer (including the Secured Party, if the Secured Party is an approved Freddie Mac seller/servicer) and upon such a servicer's being actually able to satisfy or discharge all of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs and consummate a Servicing Transfer With Assumption of Warranties.

1.    _Effectuation of Servicing Transfer With Assumption of Warranties_. If Freddie Mac shall receive a notice from the Secured Party which complies with the terms of the immediately preceding sentence, Freddie Mac will reasonably cooperate with the Secured Party in seeking to effect a Servicing Transfer with Assumption of Warranties, in accordance with the provisions of the Servicing Transfer Procedures, to an approved Freddie Mac seller/servicer (including the Secured Party, if the Secured Party is an approved Freddie Mac seller/servicer) which, in the determination of Freddie Mac, is competent to service the Mortgages, and any other mortgages then being serviced by the Servicer, in accordance with the terms of the Purchase Documents; provided, however, that such a transfer must be effectuated within 180 days from the date of the notice received by Freddie Mac in accordance with the requirements of the first sentence of this Section 8(c) and shall be expressly conditioned upon the satisfaction or discharge by any proposed new servicer of all of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs; and, further provided, that the Secured Party shall have complied with all the provisions of this Agreement. If a Servicing Transfer with Assumption of Warranties arranged by the Secured Party and approved by Freddie Mac shall be effectuated, the Secured Party and Freddie Mac

Confidential

shall proceed in accordance with the provisions of Sections 8(e) through 8(g) below.

In addition to the estimates provided for under Section 8(b)(1), Freddie Mac agrees to make its best effort to provide the Secured Party with the final amounts of amounts of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs within 150 days from the date of the notice received by Freddie Mac in accordance with the requirements of the first sentence of this Section 8(c). If, however, Freddie Mac is not able to furnish such final amounts within said 150-day period, then it shall make its best effort to do so within 180 days, and the period for effectuating a transfer shall be extended to 210 days. Additional extensions of thirty (30) days for providing the final amounts and for effectuating a transfer may be agreed upon by amendment to this Agreement pursuant to the provisions of Section 16 below.

2.      *Secured Party's Inability to Arrange Servicing Transfer with Assumption of Warranties*. If, within 180 days (or such greater period of time as may be applicable pursuant to the provisions of Section 8(c)(1)) from the date of the notice received by Freddie Mac in accordance with the requirements of the first sentence of this Section 8(c), the Secured Party shall not have arranged for a Servicing Transfer with Assumption of Warranties acceptable to Freddie Mac, in accordance with the provisions of the Servicing Transfer Procedures, Freddie Mac will assume sole responsibility for effectuating a Permanent Servicing Transfer, in accordance with the provisions of the Servicing Transfer Procedures and the provisions of Section 8(d) below.

3.      *No Request by Secured Party*. Freddie Mac shall also effectuate a Permanent Servicing Transfer if the Secured Party shall not give to Freddie Mac a written notice which complies with the provisions of the first sentence of this Section 8(c). In such case, Freddie Mac will effectuate the Permanent Servicing Transfer within 180 days from the expiration of the ten (10)-day period set forth in the first sentence of this Section 8(c).

(d)     Permanent Servicing Transfer Arranged By Freddie Mac. If the Secured Party shall be unable to arrange a Servicing Transfer with Assumption of Warranties acceptable to Freddie Mac, pursuant to the provisions of Section 8(c), Freddie Mac will assume sole responsibility for arranging a Permanent Servicing Transfer. Freddie Mac will seek to arrange a Permanent Servicing Transfer. in order of preference, in accordance with the provisions of Sections 8(d)(1), 8(d)(2), and 8(d)(3) below.

1.      *Consummation of Servicing Transfer with Assumption of Warranties*.  If Freddie Mac is able to arrange for a Servicing Transfer with Assumption of Warranties, it will do so and conclude the transfer within 180 days of the end of the 180-day period in which the Secured Party sought to arrange for such a transfer, pursuant to the terms of Section 8(c). In such case, Freddie Mac will give the Secured Party notice of the transfer within ten (10) days of the effective date. Within 30 days of the date of such notice, the Secured Party may

Confidential

submit a statement of the Secured Party's Claims and the Secured Party's Servicing Transfer Costs, in conformity with the provisions of Section 8(e) below, and the parties will proceed in accordance with the provisions of Sections 8(e) through 8(g) below.

2.       *Secured Party's Election to Service*. If, at any time during the 180-day period provided for in Section 8(d)(1), Freddie Mac shall determine that it will be unable to arrange for a Servicing Transfer With Assumption of Warranties, Freddie Mac shall so notify the Secured Party. If the Secured Party shall be an approved Freddie Mac Seller/Servicer, the Secured Party may give Freddie Mac notice requesting that the Secured Party be approved as the new servicer of the Mortgages and all other mortgages which had been serviced by the Servicer for Freddie Mac. Such request may provide for the use by the Secured Party of a servicing agent, as that term is defined in the Purchase Documents. If Freddie Mac shall receive such a notice from the Secured Party, Freddie Mac will review the request in accordance with the provisions of the Servicing Transfer Procedures. Freddie Mac's determination of whether or not to approve the request shall be conditioned upon (A) the Secured Party's having complied with all the provisions of this Agreement; (B) the Secured Party's actual satisfaction or discharge of all of Freddie Mac's Claims and all of Freddie Mac's Transfer Costs; (C) the Secured Party's agreement to effect a Servicing Transfer With Assumption of Warranties; (D) Freddie Mac's determination that the Secured Party (and any proposed servicing agent, if applicable) is competent to service the Mortgages, and all other mortgages which have been serviced by the Servicer, in accordance with the terms of the Purchase Documents; and (E) the Secured Party's ability to consummate the Servicing Transfer With Assumption of Warranties with a reasonable period of time, as determined by Freddie Mac, in its sole and absolute discretion. If Freddie Mac shall approve the Secured Party's request to be the new servicer of the Mortgages, and the Servicing Transfer With Assumption of Warranties shall be effectuated on the terms described in this Section 8(d)(2), the provisions of Sections 8(e) through 8(g) shall not be applicable to the transfer.

3.       *Servicing Transfer Without Assumption of Warranties*. If the Secured Party shall not request to be approved as the new Servicer, or if it shall so request and Freddie Mac shall disapprove the request, in accordance with the Servicing Transfer Procedures, Freddie Mac shall then effectuate a Servicing Transfer Without Assumption of Warranties. In such case, the Secured Party's Servicing Security Interest in Surplus Proceeds shall be extinguished, and the Secured Party shall have no further rights under this Agreement. The Secured Party and the Servicer agree, and expressly acknowledge their understanding, that because of the indeterminate potential for monetary losses to Freddie Mac resulting from the inability to effect a Servicing Transfer With Assumption of Warranties, there cannot be any Surplus Proceeds in the event of a Servicing Transfer Without Assumption of Warranties resulting from the transfer, and, therefore, they hereby waive any claim to any Surplus Proceeds in the event of a Servicing Transfer Without Assumption of Warranties.

Confidential

(e)    Secured Party's Claims and Servicing Transfer Costs.  Within 30 days after the date of a notice of the effectuation of a Permanent Servicing Transfer by Freddie Mac, or within 30 days of the effectuation of a Permanent Servicing Transfer which the Secured Party participating in arranging under the provisions of Section 8(c), the Secured Party may submit to Freddie Mac a statement of the Secured Party's Claims and the Secured Party's Servicing Transfer Costs. Absent manifest error, the statement submitted by the Secured Party shall be deemed to be conclusive of the correctness of the amount payable to the Secured Party out of Surplus Proceeds, if any, under the provisions of Section 8(g) below.

(f)    Determination of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs. After the effective date of a Permanent Servicing Transfer effectuated under the provisions of Section 8(d)(1), Freddie Mac shall determine the amounts of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs. Freddie Mac shall complete such determination within 120 days following the effective date of the Permanent Servicing Transfer.

(g)    Accounting and Distribution of Any Surplus Proceeds.  Immediately following completion of the determination of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs, Freddie Mac shall pay to itself the sum of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs out of the amount of the Servicing Transfer Proceeds or the Termination Fee. Immediately thereafter, Freddie Mac shall render an accounting to the Secured Party and to the Servicer by sending them a notice which shall inform them of the amount of the Servicing Transfer Proceeds or the Termination Fee; the sum which Freddie Mac has paid to itself to cover Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs; the amount of the Surplus Proceeds, if any; and the amounts, if any, of the Surplus Proceeds payable to the Secured Party and the Servicer, respectively.

Freddie Mac shall make disbursement of any Surplus Proceeds to the Secured Party and the Servicer contemporaneously with the sending of the notice provided for in the immediately preceding paragraph. Distribution of any Surplus Proceeds shall be payable as follows: first, to the Secured Party on account of the Secured Party's Claims; second, to the Secured Party for the amount of the Secured Party's Transfer Costs; and third, to the Servicer. Freddie Mac shall pay interest on the amount of any Surplus Proceeds paid to the Secured Party or to the Servicer. Interest shall be payable at the rate of Freddie Mac's costs of funds, as determined by Freddie Mac, for the period commencing on the effective date of the Permanent Servicing Transfer and ending on the day before the date of the notice provided for in the immediately preceding paragraph.

9.    Secured Party's Foreclosure of Servicing Security Interest.

(a)    Request. If the Secured Party shall, at any time, declare a default of the Servicer under the Security Agreement, and if Freddie Mac shall not previously have given the Secured Party notice of a Termination With Cause or a Termination Without Cause, the Secured Party may request that it be permitted to foreclose its security interest by seeking to arrange a Permanent Servicing Transfer which is effectuated as a Servicing

Confidential

Transfer With Assumption of Warranties. The Secured Party may make such request by giving Freddie Mac notice in accordance with the provisions of Section 8(c) of this Agreement.  If the Secured Party shall give Freddie Mac notice in conformity with the requirements of Section 8(c), the Secured Party and Freddie Mac shall then proceed in accordance with the balance of the provisions of Section 8(c) and the applicable provisions of Sections 8(d) through (g).

(b)     Secured Party's Power of Attorney. The Servicer hereby irrevocably appoints the Secured Party, and any designee of the Secured Party, as its attorney-in-fact to request, seek to arrange, and cooperate in effecting any Permanent Servicing Transfer, including a sale of the Servicing Contract. Said power of attorney shall be deemed to be in addition to, and shall not limit the scope of, any power of attorney granted by the Servicer in the Secured Agreement. In connection with any such Permanent Servicing Transfer and any such sale of the Servicing Contract which Freddie Mac may approve, Freddie Mac will accept the power of attorney as authorizing the Secured Party to act for and on behalf of the Servicer in performing any and all acts necessary to effect such transactions, and will not consider or regard the Secured Party, when acting as such attorney-in-fact, as being the transferor of the Servicing Contract.

(c)     Continuing Right to Effectuate Termination With Cause or Termination Without Cause. Notwithstanding the provisions of Section 9(a), Freddie Mac shall, during the 180-day period under Section 9(a) during which the Secured Party may seek to arrange a Permanent Servicing Transfer, retain its right to effectuate a Termination With Cause or a Termination Without Cause, in accordance with the provisions of the Servicing Transfer Procedures. If Freddie Mac shall exercise this right during the 180-day period, Freddie Mac shall give the Secured Party notice of the termination in conformity with the requirements of Section 8(b)(1), and Freddie Mac and the Secured Party will thereafter proceed in accordance with all of the applicable provisions of Sections 8(a) through 8(g) with respect to any Interim Servicing Transfer, the Permanent Servicing Transfer, and the payment of any Surplus Proceeds. Freddie Mac agrees that it will not effectuate a Termination With Cause solely because of the fact that the Secured Party declares a default of the Servicer under the Security Agreement; provided, however, that if the fact or occurrence constituting the basis for the Secured Party's declaration of a default shall also constitute a default or a breach of an obligation or warranty of the Servicer under the Purchase Documents, Freddie Mac shall not be precluded from effectuating a Termination with Cause based upon such fact or occurrence.

10.     Partial Servicing Security Interest. If the Servicing Security Interest of the Secured Party only relates to part of the mortgages serviced by the Servicer under the Servicing Contract (a "Partial Servicing Security Interest"), the provisions of Sections 8 and 9 hereof shall apply only to the limited extent stated in the remainder of this Section 10, and the rest of the rights and obligations of the parties shall be determined under the Servicing Transfer Procedures. In the event that Freddie Mac shall effect a Termination With Cause or a Termination Without Cause of the Servicer, and the Servicer shall have granted only a Partial Servicing Security Interest to the Secured Party, Freddie Mac shall give notice to the Secured Party in accordance with the provisions of Section 8(b)(1), and the parties shall then proceed in accordance with the

Confidential

Servicing Transfer Procedures. In the event that the Secured Party shall declare a default of the Servicer under the Security Agreement, and the Servicer shall have granted only a Partial Servicing Security Interest to the Secured Party, the Secured Party shall give notice of the default to Freddie Mac, and the parties shall then proceed in accordance with the Servicing Transfer Procedures.

11.    Reliance Upon Written Notices. The Secured Party and the Servicer agree that Freddie Mac shall be entitled to rely on any written notice, direction, request or consent received by Freddie Mac pursuant to the provisions of this Agreement which Freddie Mac reasonably believes to be genuine.

12.    Indemnification of Freddie Mac. The Secured Party hereby agrees to indemnify and hold Freddie Mac harmless from and against any and all actual losses, liabilities, damages, charges or expenses (including Freddie Mac's reasonable attorneys' fees) incurred by Freddie Mac as a result of (a) the material breach of any provision of this Agreement by the Secured Party or (b) the willful conduct of any other person (including the Servicer) acting at the specific direction of the Secured Party.

13.    Indemnification of Secured Party. Freddie Mac hereby agrees to indemnify and hold the Secured Party harmless from and against any and all actual losses, liabilities, damages, charges or expenses (including the Secured Party's reasonable attorneys' fees) incurred by the Secured Party as a result of (a) the material breach of any provision of this Agreement by Freddie Mac or (b) the willful conduct of any other person acting at the specific direction of Freddie Mac.

14.    Notices.

(a)    Addresses.    Any notice required or permitted to be given under the terms of this Agreement may be given by delivering or mailing the same to the following addresses:

If to Freddie Mac:

Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive
McLean, VA 22102
Attention: Vice President--Institutional Credit Risk

If to the Servicer:

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA  19034

Attention:  Heather Anderson                      Hu Benton
Title:  Manager – Operations                      Associate General Counsel
Telephone No.:  952-857-6030                      301-215-6320

Confidential

E-mail:  Heather.Anderson@gmacrescap.com          Hu.Benton@gmacrfc.com
Telecopier No.:  866-502-4526                              301-215-6999

If to the Secured Party:

Citibank, N.A

  390 Greenwich Street, 4th Floor

New York, New York 10013

Attention:  Bobbie Theivakumaran
Title:  Managing Director
E-mail: bobbie.theivakumaran@citi.com
Telephone No.:  212-723-6753
Telecopier No.:  212-723-8604

or to such other addresses and persons as the parties hereto may in writing hereafter indicate by like notice.

(b)    Effectiveness.    A notice shall be in writing, unless communicated by telephone to the attention of the person identified above and confirmed within one business day thereafter by a writing sent to such person by telex, telecopier or other direct written electronic means, charges prepaid. A notice may be (i) personally delivered (including delivery by a private mail or courier service) at the appropriate address stated hereinabove; or (ii) sent by telex, telecopier or other direct written electronic means, charges prepaid; or (ii) sent by United states registered, certified, or express mail, postage prepaid. Any notice personally delivered shall be deemed to have been validly and effectively given on the day of such delivery. Any notice communicated orally and confirmed in writing the following business day shall be deemed to have been validly and effectively given on the date of such oral communication. Any written notice transmitted by telex, telecopier or other direct written electronic means shall be deemed to have been validly and effectively given on the day (if a business day, and, if not, on the next business day) on which it is transmitted. Any notice sent by United States mail shall be deemed to have been validly and effectively given on the fifth day (if a business day, and, if not, on the next business day) after it shall have been deposited in the United States Mail.

15.    Entire Agreement.    This Agreement constitutes the entire Agreement among the parties concerning the subject matter hereof, and supersedes any and all prior representations, statements, discussions and negotiations concerning this Agreement and the subject matter hereof which may have been made or which may have occurred prior to or contemporaneous with the execution of this Agreement.

16.    Amendments.    This Agreement may not be amended, and none of its terms may be waived, except by a writing which specifically refers to this Agreement, which expressly

Confidential

states that it constitutes an amendment or waiver to this Agreement, and which is signed by the party or parties against whom enforcement of the amendment or waiver is sought.

17.    <u>Severability</u>.       If any term or provision of this Agreement shall be held to be unenforceable by a court of competent jurisdiction, the validity of all of the remaining provisions of this Agreement shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not contain the particular term or provision held to be invalid.

18.    <u>Rights Cumulative</u>.      All rights granted to Freddie Mac hereunder shall be cumulative and shall be in addition to any other rights which Freddie Mac may have under the Purchase Documents or under applicable law. Nothing in this Agreement is intended to or shall be construed to amend or modify any of the terms or provisions of the Purchase Documents or any other agreements between the Servicer and Freddie Mac.

19.    <u>No Waiver</u>.       Neither delay on the part of Freddie Mac in the exercise any of its rights hereunder, nor any partial exercise of any such right, shall constitute a waiver of such right or of any other rights of Freddie Mac under this Agreement.

20.    <u>Successors and Assigns</u>.       This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

21.    <u>Governing Law</u>.       This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the United States. Insofar as there may be no applicable precedent, and insofar as to do so will not frustrate the purposes of this Agreement or the transactions governed hereby, the local laws of the State of New York shall be deemed reflective of the laws of the United States.

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized corporate officers as of the date and year first written above.

FEDERAL HOME LOAN MORTGAGE CORPORATION

By (Signature)

Pamela C. Williams
Typed Name

Director
Typed Title

CITIBANK, N.A.

By (Signature)
SUSAN MILLS
Typed Name
VICE PRESIDENT
Typed Title

GMAC MORTGAGE, LLC, 277105, 106026, 206953, 114736, 815105

By (Signature)

Typed Name        Melissa White
                  Assistant Treasurer
Typed Title

Confidential

FEDERAL HOME LOAN MORTGAGE CORPORATION

<u>ADDENDUM A</u>

<u>TO</u>

<u>ACKNOWLEDGEMENT AGREEMENT</u>

The Mortgages, as defined in the Acknowledgement Agreement, are the following (check applicable box):

| X | All single-family mortgages which are now, or which hereafter are, in the ordinary course of business, serviced by the Servicer for Freddie Mac under the terms of the Servicing Contract. |

|   | The single-family mortgages listed below or on pages attached hereto, which are now serviced by the Servicer for Freddie Mac under the terms of the Servicing Contract.  (List each such mortgage.  State, at a minimum, the Freddie Mac loan number and name(s) of the borrower(s) for each mortgage.) |

Confidential

# FEDERAL HOME LOAN MORTGAGE CORPORATION

## ADDENDUM B TO
## ACKNOWLEDGEMENT AGREEMENT

This Addendum B to Acknowledgement Agreement ("Addendum") is entered by and among the Federal Home Loan Mortgage Corporation ("Freddie Mac"), GMAC Mortgage, LLC (the "Servicer"), and Citibank, N.A. (the "Secured Party"), and amends the Acknowledgement Agreement and Addendum A attached thereto (together, the "Agreement") simultaneously entered into by the parties. Capitalized terms used in this Addendum shall have the same meaning as provided in the Agreement. Except to the extent otherwise provided in the Agreement, capitalized terms shall have the same meaning as provided in the Guide.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Unless otherwise determined by Freddie Mac and notwithstanding any provision in the Agreement, Freddie Mac shall be entitled to retain the Servicing Spread and any income, compensation and fees (collectively, the "Servicing Revenue") derived from the servicing of the Mortgages from the date of the termination of the Servicing Contract to the date of a Permanent Servicing Transfer. The amount of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs shall not be set-off or reduced by the Servicing Revenue.

2.     If, in accordance with Section 8(c)(1) or Section 8(d)(2) of the Agreement, the Secured Party notifies Freddie Mac of the Secured Party's request to be approved by Freddie Mac as the new servicer of the Mortgages, and if Freddie Mac, in its sole and absolute discretion, agrees to approve the Secured Party as the new servicer, then (a) the parties agree that there shall be no Servicing Transfer Proceeds available or required to be distributed by Freddie Mac to the Secured Party or the Servicer, and (b) the Servicer waives any and all rights it may have, at law, in equity or otherwise, to the Surplus Proceeds, Servicing Transfer Proceeds, compensation or other payment, if any, and agrees not to assert any claim of right, title or interest in such funds in any subsequent legal or administrative proceeding including, without limitation, any civil proceedings in state or federal courts, proceedings under the United States Bankruptcy Code, or proceedings under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, provided, however, that the Servicer and the Secured Party may, but are not required to, provide by separate agreement solely between themselves for payment or compensation from the Secured Party to the Servicer.

3.     If, in accordance with Section 8(c)(1) or Section 8(d)(2) of the Agreement, the Secured Party notifies Freddie Mac of Secured Party's request to be approved by Freddie Mac as the new servicer of the Mortgages, and if Freddie Mac, in its sole and absolute discretion, disapproves of the Secured Party becoming the new servicer, then Freddie Mac shall have the right, pursuant to a Permanent Servicing Transfer, to select a servicer through a commercially

Confidential

reasonable bidding process and auction sale. Freddie Mac shall have the right to permit the interim servicer, if any, to participate in the bidding process. Freddie Mac reserves the right to accept or reject any bid for the purchase of the right to service the Mortgages on the basis of any criteria it deems appropriate in its sole discretion including, but not limited to, the price offered, the financial strength of, and quality of current servicing performed by, the bidder, the ability of the bidder to perform within the time guidelines for closing and transfer of servicing, the bidder's assumption of the Servicer's origination and servicing representations and warranties and the satisfaction prior to any transfer of all of Freddie Mac's Claims and Freddie Mac's Servicing Transfer Costs.

4.      In the event that the Secured Party becomes the servicer of the Mortgages, then in addition to all other requirements of this Addendum, the Secured Party agrees to indemnify and hold harmless Freddie Mac and its directors, officers, employees and agents from and against any and all claims, damages, judgments, liabilities, losses and settlements, including reasonable attorneys' fees, costs and expenses, arising directly or indirectly from any action or claim by the Servicer, its directors, officers, employees or agents, or any successor in interest, or any trustee or receiver, or any assignee thereof or any other party, which is related to or derived in any manner, from (a) the Secured Party becoming the new servicer of the Mortgages or (b) any agreement, or failure to have any agreement, between the Servicer and the Secured Party relating to Servicing Transfer Proceeds, compensation or payment to the Servicer.

5.      The Secured Party and the Servicer agree to execute any and all documents, as identified by Freddie Mac, necessary to effectuate (a) an Interim Servicing Transfer, (b) a Permanent Servicing Transfer, (c) a transfer of the custodial accounts, and (d) a transfer of all documents related to the Mortgages. In addition, the Secured Party and the Servicer agree to execute, within 24 hours of a request by Freddie Mac, a limited power of attorney for (i) assignment of the Mortgages in such form as may be recorded in every jurisdiction in which the Mortgages are located, (ii) wire instructions to transfer the custodial accounts, and (iii) a transfer of ownership of all documents and data relating to the Mortgages including any documents and data in the custody of a third party.

6.      The Servicer hereby represents and warrants to the Secured Party and to Freddie Mac as follows, each such representation and warranty to survive execution and delivery of this Agreement:

As of the date this Addendum is executed by the Servicer,

(a)      The Servicer had no present intention of filing any petition under, initiating any proceeding under, or otherwise seeking the protection of, the United States Bankruptcy Code or any state law concerning bankruptcy, reorganization, insolvency, moratorium, receivership or creditor's rights or debtor's obligations generally, or making an assignment for the benefit of creditors, or entering into a composition or similar agreement.

Confidential

(b)     The Servicer was not insolvent within the meaning of 11 U.S.C. § 101 (32).

(c)     The Servicer did not grant the Servicing Security Interest with actual intent to hinder, delay or defraud any entity to which Servicer was or became indebted on or after the date of granting the Servicing Security Interest.

(d)     Granting the Servicing Security Interest will not benefit any insider of the Servicer within the meaning of 11 U.S.C. § 101 (31).

(e)     The Servicer received reasonably equivalent value in exchange for granting the Servicing Security Interest to the Secured Party.

(f)     The Servicer was not engaged in business or a transaction, or about to engage in, a business or a transaction for which any property remaining with the Servicer was an unreasonably small capital.

(g)     The Servicer did not intend to incur, or believed that it would incur, debts that would be beyond the Servicer's ability to pay as such debts matured.

The Servicer acknowledges that the Servicer's representations in this Section 6 are a material inducement to Freddie Mac and the Secured Party without which neither Freddie Mac nor the Secured Party would have entered into this Addendum and upon which Freddie Mac and the Secured Party are entitled to rely.

7.     The Secured Party and the Servicer may not assign their respective rights or obligations under the Agreement without Freddie Mac's prior written consent, which consent may be granted or withheld in Freddie Mac's sole and absolute discretion.

8.     The term of the Agreement shall automatically renew for successive annual terms from the effective date of the Agreement; provided, however, the Secured Party and Freddie Mac each reserve the right, at their discretion, to terminate the Agreement upon notice to the other parties at least sixty (60) calendar days prior to the expiration of an annual renewal of the term.

9.     Except as otherwise provided in this Addendum, all terms and conditions of the Agreement shall remain in full force and effect. This Addendum is deemed to be part of the Agreement.

10.     The effective date of the Agreement and this Addendum is March 12, 2009.

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed
and delivered by their respective duly authorized corporate officers as of the date and year first
written above.

FEDERAL HOME LOAN MORTGAGE
CORPORATION

By (Signature) _Camela C Williams_

Typed Name _Pamela C. Williams_
_Director_

Typed Title _March 11, 2009_

Date

GMAC MORTGAGE, LLC

By (Signature)

Typed Name Elissa White
                   ssistant Treasurer

Typed Title _3 - 6 - 09_

Date

CITIBANK, N.A.

By (Signature)
SUSAN MILLS
Typed Name
VICE PRESIDENT
Typed Title
March 6th, 2009
Date

DB1/62026603.2                                    4

Confidential

Additional Page to LD Form 103C
GMAC Mortgage, LLC

This Additional Page to LD Form 103C ("Additional Page") relates to the Acknowledgement Agreement dated as of March 12, 2009 (the "Acknowledgement Agreement") among the Federal Home Loan Mortgage Corporation ("Freddie Mac"), GMAC Mortgage, LLC (the "Servicer") and Citibank, N.A. (the "Secured Party").  Capitalized terms that are used but not defined in this letter have the meanings specified in the Acknowledgement Agreement.

Notwithstanding any express or implied statement to the contrary in the Acknowledgement Agreement (including section 2 thereof and all related cover pages and addenda), the Servicer hereby discloses to the Secured Party that the Servicer has sold and transferred, and continues to sell and transfer, Servicer's right to reimbursement for advances made by Servicer under and in accordance with the provisions of the Servicing Agreement (the "Seller Receivables").  Such sale and transfer of the Seller Receivables is made pursuant to a Receivables Sale Agreement dated as of June 30, 2004 between the Borrower and GMAC Mortgage Products, Inc. (the "Transferee") in connection with the financing of the Seller Receivables.

The complete legal name, address and contact information of the Transferee is as follows:

GMAC Mortgage Products, Inc.
1100 Virginia Drive
Fort Washington, Pennsylvania 19034

Contact Persons:

Heather Anderson                          Hu Benton
Manager – Operations                      Associate General Counsel
Telephone No.:  952-857-6030              Telephone No.:  301-215-6320
E-mail:  Heather.Anderson@gmacrescap.com  E-mail:  Hu.Benton@gmacrfc.com
Telecopier No.:  866-502-4526             Telecopier No.:  301-215-6999

This Additional Page is hereby incorporated by reference into the Acknowledgement Agreement.

Confidential

# Exhibit B

# ACKNOWLEDGEMENT AGREEMENT
## (Single Secured Party)

THIS ACKNOWLEDGMENT AGREEMENT, made and entered into as of this 7th day of September, 2007 by Citibank, N.A., a national banking association, with its principal offices at 390 Greenwich Street, 4th Floor, New York, NY  10013 (the "Secured Party"), GMAC Mortgage, LLC, a Delaware limited liability company, with its principal offices at 100 Witmer Road, Horsham, PA  19044 (the "Lender") and Fannie Mae, a corporation organized and existing under the laws of the United States of America, with an office at 1835 Market Street, Suite 2300, Philadelphia, PA  19103.

## WITNESSETH

A. The Secured Party and the Lender have entered into a certain Loan and Security Agreement, dated as of September 7, 2007 (the "Security Agreement"), whereby the Lender granted to the Secured Party a security interest in certain servicing rights relating to mortgage loans or mortgage loan pools identified on Exhibit A attached to and made a part of this Acknowledgment Agreement (the "Servicing Rights") with respect to mortgages owned or held in whole or in part by Fannie Mae, with such security interest ("Security Interest") in the Servicing Rights now being held by the Secured Party. Capitalized terms used herein without definition shall have the respective meanings attributed to them in the Security Agreement or (as applicable) in the Fannie Mae Contract referenced below.

B. The Secured Party and the Lender have requested that Fannie Mae consent, and Fannie Mae is willing to consent, subject to the terms, provisions, and conditions of this Acknowledgment Agreement, to the Lender's grant or assignment of the Security Interest to the Secured Party.

C. Fannie Mae has requested the Secured Party and the Lender, and the Secured Party and the Lender have agreed, to acknowledge and reaffirm the rights of Fannie Mae pursuant to the Fannie Mae Contract, and to be bound by the terms, provisions, and conditions of this Acknowledgment Agreement.

NOW THEREFORE, in accordance with the Fannie Mae Contract, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Secured Party and the Lender hereby acknowledge, and all parties hereto agree to, the following:

1. Fannie Mae hereby consents, subject to the terms, provisions and conditions of this Acknowledgment Agreement, to the Lender's grant or assignment of the Security Interest to the Secured Party.

2. The Security Interest is subject to and subordinate in all respects to all rights, powers, and prerogatives of Fannie Mae under and in connection with: (i) this Acknowledgment Agreement, (ii) the Mortgage Selling and Servicing Contract, all applicable Pool Purchase Contracts between Fannie Mae and the Lender and all agreements between Fannie Mae and the Lender that impose servicing requirements or servicing transfer

-1-

1-PH/2742713.3

Confidential

restrictions, and (iii) the Selling Guide, Servicing Guide, and other applicable Guides, as each of such Guides is amended from time to time ((ii) and (iii) collectively, the "Fannie Mae Contract"), which rights, powers, and prerogatives include, without limitation, the right of Fannie Mae to terminate the Fannie Mae Contract with or without cause and the right to sell, or have transferred, the Servicing Rights as therein provided.  The Secured Party also acknowledges that it has no claim or entitlement as a secured creditor against Fannie Mae, and Fannie Mae has no duty or obligation to the Secured Party, except as otherwise expressly provided in this Acknowledgement Agreement.  It is understood that no automatic default or violation of the Fannie Mae Contract by the Lender shall be deemed to have occurred solely by reason of any actual or alleged breach of the Security Agreement.   In the event of any conflict or inconsistency between the terms and provisions of this Acknowledgement Agreement and those of the Security Agreement, the terms and provisions of this Acknowledgment Agreement shall prevail.

3.   In recognition of the foregoing, the Secured Party agrees to insert the following language in any financing statement filed in connection with the Security Agreement:

The Security Interest created by this financing statement is subject and subordinate to all rights, powers, and prerogatives of Fannie Mae under and in connection with (i) the terms and conditions of that certain Acknowledgment Agreement, with respect to the Security Interest, by and between Fannie Mae, GMAC Mortgage, LLC (the "Debtor") and Citibank, N.A., (ii) the Mortgage Selling and Servicing Contract, all applicable Pool Purchase Contracts between Fannie Mae and the Debtor and all agreements between Fannie Mae and the Debtor that impose servicing requirements or servicing transfer restrictions, and (iii) the Selling Guide, Servicing Guide, and other Guides, as each of such Guides is amended from time to time ((ii) and (iii) collectively, the "Fannie Mae Contract"), which rights, powers, and prerogatives include, without limitation, the right of Fannie Mae to terminate the Fannie Mae Contract with or without cause and the right to sell, or have transferred, the Servicing Rights as therein provided.

4.   If Fannie Mae, on its own initiative, decides to effect the termination, sale, or transfer of the Servicing Rights, pursuant to applicable provisions of the Fannie Mae Contract, Fannie Mae may, at its sole discretion, transfer the Servicing Rights to a servicer or subservicer of its choice and market and sell the Servicing Rights in a manner it deems appropriate, with the Servicing Rights being, at all times after any such termination, sale, or transfer effected by Fannie Mae, free and clear of the Security Interest.  In the event that Fannie Mae elects to terminate the Servicing Rights and does not select the Secured Party or its designee as the new servicer, Fannie Mae acknowledges that it intends to market, sell and transfer the Servicing Rights within a reasonable time, and in such a manner, that is consistent with the marketing, sale and transfer of other Fannie Mae servicing portfolios at the time of the termination of the Servicing Rights.

Fannie Mae is agreeable to giving, and intends to give, the Secured Party written notice of any such termination of the Servicing Rights, within ten (10) business days after the termination; however, Fannie Mae shall have no liability to the Secured Party or any other party for failure to give (or for any delay in giving) this notice or any other notice described in this Section 4.  Fannie Mae (without incurring any liability to the Lender) may select the Secured Party or its designee to act as the new servicer (or subservicer) or to act as Fannie Mae's agent in such a sale of the Servicing Rights.  If Fannie Mae does not select the Secured Party or its designee to act as the new servicer (or subservicer),

-2-

Confidential

Fannie Mae will provide written notification to the Secured Party of the initial transfer of the servicing responsibilities to a new servicer (or subservicer). This notification will identify the new servicer (or subservicer) and will be provided to the Secured Party within ten (10) business days of the transfer.

In the event of any such termination, sale, or transfer of the Servicing Rights pursuant to this Section 4, Fannie Mae will conduct any such sale of the Servicing Rights in such a manner that is consistent with the rights of Fannie Mae set forth in this Section 4 and the Acknowledgment Agreement as a whole and the amount of the entire proceeds obtained for the Servicing Rights ("Gross Sale Proceeds") will represent the maximum value reasonably obtainable by making the Servicing Rights (either separately or combined with the right to service other loans being serviced by the Lender for Fannie Mae) available for bid by a representative selection of approved Fannie Mae lenders in good standing that Fannie Mae determines are qualified to service the portfolio. In addition, Fannie Mae will conduct any such sale of the Servicing Rights under standard bid terms for Servicing Rights at the time of the sale. Fannie Mae will also provide to the Secured Party written notification of the identity of the purchaser and the amount of Gross Sale Proceeds paid for the Servicing Rights. This notification will be provided to the Secured Party at least 5 business days prior to the transfer date of the Servicing Rights to the purchaser.

In addition, in the event of any such termination, sale or transfer of the Servicing Rights pursuant to this Section 4, Fannie Mae shall determine, in its sole and absolute discretion, the amount of net sale proceeds ("Net Sale Proceeds") available for payment to the Secured Party, which payment, if applicable, shall be made after deducting the following amounts from the sum of the Gross Sale Proceeds plus any servicing fees Fannie Mae or the Secured Party has retained in excess of the fees paid to a subservicer prior to the sale of the Servicing Rights:

(a) all costs or expenses related to the sale and transfer of Servicing Rights that Fannie Mae sustains; and

(b) any amounts that are due Fannie Mae by reason of: (i) any breach of servicing obligations or breach of mortgage selling warranty to Fannie Mae under the Fannie Mae Contract (including without limitation any unmet mortgage repurchase obligation), (ii) any unperformed obligation with respect to mortgages in an MBS pool that the Lender is servicing for Fannie Mae under the regular servicing option or other mortgages subject to recourse agreements, (iii) any loss or damage to Fannie Mae by reason of any inability to transfer to a purchaser of the Servicing Rights the Lender's selling and servicing representations, warranties and obligations, as well as any existing MBS recourse (regular servicing option) obligations, or other recourse obligations, and (iv) any other unmet obligations to Fannie Mae under the Fannie Mae Contract.

If the Servicing Rights relate to less than the entire portfolio of loans being serviced by the Lender for Fannie Mae, deductions from Gross Sale Proceeds for costs and expenses referred to in Section 4 and for amounts due under Section 4 shall refer to sums related to the Lender's entire Fannie Mae servicing portfolio and not just to the loans for which the Lender has granted the Secured Party the Security Interest in the Servicing Rights.

1-PH/2742713.3

Confidential

If, subject to the provisions and remedies contained in the Security Agreement, the Secured Party wishes to claim all or a part of the Net Sale Proceeds, or all or part of the Contract termination fee (if applicable and payable by Fannie Mae under the Fannie Mae Contract in case of termination without cause), the Secured Party must submit to Fannie Mae a request to obtain such funds or fee, specifying the amount due the Secured Party pursuant to the Security Agreement.

Upon receipt of such a request (Request for Net Sale Proceeds or Termination Fee), together with a valid power of attorney ("Power of Attorney") authorizing the Secured Party to make such Request, Fannie Mae will: (i) pay the Secured Party, or permit it to retain, the amount it is due, pursuant to the Security Agreement and this Acknowledgment Agreement, from the Net Sale Proceeds of such a sale of the Servicing Rights (as such proceeds are determined by Fannie Mae in accordance with the criteria provided above in this Section 4), or (ii) pay the Secured Party the amount it is due from any applicable Contract termination fee that Fannie Mae shall be obligated to pay under the Fannie Mae Contract in the event it terminates such Contract with the Lender without cause. Such a payment to, or retention by, the Secured Party of all or part of the Net Sale Proceeds or Contract termination fee (together with Fannie Mae's remittance to the Lender of any sum payable to the Lender from the third application of the Gross Sale Proceeds or Contract termination fee as provided below) shall fully discharge and acquit Fannie Mae of any and every obligation or liability to the Lender or Secured Party, under the Fannie Mae Contract, with respect to the proceeds or the Contract termination fee (whichever shall have been paid to, or retained by, the Secured Party). It is specifically understood and agreed that the Net Sale Proceeds or the Contract termination fee, as applicable, paid to the Secured Party as provided in this paragraph may be insufficient to satisfy the indebtedness owed to the Secured Party which is secured by the Security Interest and Fannie Mae shall have no obligation of any kind with respect to such deficiency.

With respect to the complete disposition of the Gross Sale Proceeds that are realized from any such sale of the Servicing Rights by Fannie Mae or any Contract termination fee payable in the case of termination without cause, and thereafter distributed and allocated pursuant to this Section 4 upon such a Request by the Secured Party, such Gross Sale Proceeds or Contract termination fee shall be applied by or at the specific discretion of Fannie Mae as follows: First, to satisfy all costs and expenses, and all obligations and amounts due Fannie Mae, as set forth in this Section 4 under (a) and (b) above; second, to satisfy (i) all costs and expenses that the Secured Party shall have sustained associated with the foreclosure, transfer, or sale of the Servicing Rights, and (ii) obligations owed by the Lender to the Secured Party; and third, to Fannie Mae. The sum, if any, distributed to Fannie Mae as the third application provided for above (the "Sum") shall be retained permanently by Fannie Mae; provided, however, that if the termination, sale, or transfer of the Servicing Rights did not occur as a result of any default upon, or breach of, the Fannie Mae Contract by the Lender, Fannie Mae shall distribute and remit the Sum to the Lender.

Further, Fannie Mae confirms that it will, consistent with its rights under this Section 4, and the Acknowledgment Agreement as a whole, (a) make any payment of Net Sale Proceeds determined to be owing to the Secured Party within (5) business days after Fannie Mae's determination that Net Sale Proceeds are due and payable, (b) provide to the Secured Party a written summary of the basis for any continued retention by Fannie Mae of any portion of the Gross Sale Proceeds for unmet contingent liabilities of the

-4-

Confidential

Lender under the Fannie Mae Contract, (c) respond in a reasonable manner to reasonable periodic requests by Secured Party for information regarding further determination and payment of Gross Sale Proceeds retained, (d) hold retained Gross Sale Proceeds in a Fannie Mae bank account and, (e) pay interest on Gross Sale Proceeds retained by Fannie Mae and determined later to be owing to the Secured Party at the rate of Fannie Mae's cost of funds as determined by Fannie Mae in its sole discretion.

5.   Subject to the provisions of Section 2 of this Acknowledgment Agreement regarding the seniority of Fannie Mae's rights, powers and prerogatives in and to the Servicing Rights, if the Secured Party shall elect to enforce the Security Interest or remedies in connection therewith, the Secured Party may submit to Fannie Mae, in accordance with the then-existing provisions and requirements relating to servicer-initiated transfers of servicing that are contained in Part I (Lender Relationships) of the Fannie Mae Servicing Guide, a request ("Transfer/Sale Request") to effect the transfer, or the sale and transfer, of the Servicing Rights to the Secured Party (if the Secured Party is then a Fannie Mae approved lender), or to such other Fannie Mae approved lender as the Secured Party designates. Subject to the provisions of the Fannie Mae Contract, Fannie Mae will not unreasonably withhold or delay its consent to the transfer of the Servicing Rights to the Secured Party (if the Secured Party is a Fannie Mae approved lender in good standing) or other Fannie Mae approved lender in good standing, in either case as proposed by the Secured Party, and in the event that any such proposed transferee is unacceptable to Fannie Mae, Fannie Mae agrees that it will in good faith work with the Secured Party to assist the Secured Party in its locating a satisfactory transferee of such Servicing Rights and to effect the transfer of such Servicing Rights to any such Fannie Mae approved transferee. Any such Transfer/Sale Request will be accompanied by a valid instrument properly executed by the Lender that constitutes or contains a valid power of attorney ("Power of Attorney") authorizing the Secured Party to make such Transfer/Sale Request on the Lender's behalf and to effect the requested transfer, or sale and transfer, and in connection with any such transfer, or sale and transfer, all of the requirements of the Fannie Mae Contract must be met and fully complied with as determined by Fannie Mae in its sole discretion.

In connection with any such requested sale, or sale and transfer, that Fannie Mae approves, Fannie Mae (i) will accept and recognize the related Power of Attorney, executed by the Lender and furnished to Fannie Mae by the Secured Party, as authorizing the Secured Party to act on behalf of the Lender in completing all forms and making all certifications required by Fannie Mae of the transferor of the Servicing Rights (with Fannie Mae, however, not otherwise being bound by such Power of Attorney or the terms and provisions thereof), and (ii) will not treat or regard the Secured Party, when acting pursuant to the Power of Attorney in connection with the transfer, as itself the transferor. In no event shall Fannie Mae pay to the Lender or Secured Party any separate Contract termination fee in connection with any such transfer, or sale and transfer, or any other action taken or agreed to pursuant to a Transfer/Sale Request.

6.   It is agreed that, in the event of any sale or transfer of Servicing Rights pursuant to a Transfer/Sale Request made by the Secured Party, the transferor (or its attorney-in-fact) and transferee will be required to sign a transfer agreement prescribed by Fannie Mae and to submit the agreement, together with related documentation that Fannie Mae prescribes, to Fannie Mae not later than thirty calendar days before the proposed date for completion of the transfer. Except to the extent that Fannie Mae grants a written waiver

1-PH/2742713.3

Confidential

of any of the following provisions, the documents will provide (among other things) for: (a) the transferee's agreement to service the portfolio under the applicable provisions of the Fannie Mae Contract, and the transferee's assumption of all obligations (including, without limitation, all obligations to which the transferor may be subject under the MBS regular servicing option or other recourse agreements); and (b) joint and several responsibility on the part of the transferor and transferee for all obligations and liabilities to Fannie Mae (including, without limitation, liability for breach of the Fannie Mae Contract that has arisen or occurred, and is unsatisfied, as of the date of transfer).

7.    Any Request for Net Sale Proceeds or Termination Fee or any Transfer/Sale Request from the Secured Party shall be contained in a letter (Exhibit B Letter), signed by the Secured Party and in form and content as set forth in Exhibit B hereto.  Fannie Mae, without further inquiry or other action (and without actual examination of the Power of Attorney, which may be contained in the Security Agreement or granted by a separate document), shall be entitled to rely upon the statements in such Letter, and upon the Power of Attorney, as being conclusive of the Secured Party's right, pursuant to the Security Agreement and any related agreement(s), between the Secured Party and the Lender, to request and (upon Fannie Mae's express written approval) receive a transfer of the Servicing Rights, to designate (upon Fannie Mae's express written approval) another Fannie Mae approved servicer to receive a transfer of such Servicing Rights, or to receive all or part of the Net Sale Proceeds (or, if applicable, the Contract termination fee).  Fannie Mae shall incur no liability to the Lender, its successors or assigns, for agreeing to, approving, or effecting any such sale or transfer of the Servicing Rights or the payment of the Net Sale Proceeds (or, if applicable, the Contract termination fee) to the Secured Party or its designee, or for any other act, or any omission, pursuant to the provisions of this Acknowledgment Agreement or exhibit(s) hereto.

8.    Within five (5) business days after the effective date of: (i) any transfer of the Servicing Rights to the Secured Party or (ii) any termination or extinguishment of the Security Interest, the Secured Party shall file for recording, in the appropriate official recording office, a proper release of the Security Interest (if the Security Interest was recorded), and shall give notice to Fannie Mae of such filing on or before the date thereof; provided, however, that the Secured Party may defer filing a release of its Security Interest for a longer period of time, subject to Fannie Mae's approval, if it believes its rights thereto are being challenged or may be subject to challenge.

9.    Subject to the provisions of Section 4 of this Acknowledgment Agreement, nothing contained in this Acknowledgment Agreement shall obligate Fannie Mae to give notice to the Secured Party of any exercise by Fannie Mae of any of its rights, powers, or prerogatives referred to in Section 2 of this Acknowledgment Agreement, or to delay, postpone, or refrain from such exercise (whether or not the Secured Party shall have elected to enforce the Security Interest or remedies in connection therewith, or shall have submitted to Fannie Mae a Transfer/Sale Request).

10.    Any notice, Request, or other communication to Fannie Mae pursuant to this Acknowledgment Agreement shall be in writing and shall be: (a) mailed by certified first-class mail (return receipt requested), postage prepaid, to Fannie Mae at the address of the Lender's lead Fannie Mae regional office (and to the attention of the officer of Fannie Mae) shown below or (b) sent to Fannie Mae (to the attention of such officer) by FAX and confirmed by mailing in the manner specified above at substantially the same time as such FAX transmission. The Secured Party requests that any communication

1-PH/2742713.3

Confidential

from Fannie Mae to the Secured Party be given in the same manner, and under the same procedures, as provided above, with the Secured Party's address for such purpose, and related information, being as shown below.

FANNIE MAE:

> Fannie Mae
> 1835 Market Street, Suite 2300
> Philadelphia, PA 19103
> Attention: Vice President, Single-Family Operations
> Fax No.: (215) 575-1900

SECURED PARTY:

> Citibank, N.A.
> 390 Greenwich Street, 4th Floor
> New York, New York 10013

11. Fannie Mae shall be fully protected in acting or relying upon, and shall have no duty or obligation to verify the truth, accuracy, authenticity, validity, or legal sufficiency of any written notice, direction, request, waiver, consent, receipt, or other paper or document which Fannie Mae in good faith believes to be genuine and to have been signed or presented by the Secured Party pursuant to its rights under the Security Agreement and this Acknowledgment Agreement.

12. The Secured Party shall indemnify, defend and hold harmless Fannie Mae against any and all losses, claims, lawsuits, actions, damages, judgments, costs, and expenses arising or resulting from: (i) any present or future act or omission of Fannie Mae taken or not taken on behalf of the Secured Party in compliance with this Acknowledgment Agreement or (ii) any past, present, or future act or omission of the Secured Party, pursuant or with respect to this Acknowledgment Agreement or the Security Agreement. Furthermore, the Secured Party shall indemnify, defend, and hold harmless Fannie Mae against any and all losses, claims, lawsuits, actions, damages, judgments, costs and expenses arising from or connected with any future act, error or omission by Secured Party under the Security Agreement, including but not limited to any foreclosure, transfer, or sale of the Servicing Rights by the Secured Party. Notwithstanding the foregoing, the Secured Party is not responsible for, and is not indemnifying and holding Fannie Mae harmless against any liability, obligation, duty or responsibility of any kind whatsoever: (i) of the Lender to Fannie Mae under or pursuant to the Fannie Mae Contract except to the extent the Secured Party elects to become the transferee servicer of record pursuant to Section 6 hereof or (ii) arising from the negligence or willful misconduct of Fannie Mae.

13. The Lender shall indemnify, defend, and hold harmless Fannie Mae against any and all losses, claims, lawsuits, actions, damages, judgments, costs, and expenses arising or resulting from: (i) any present or future act or omission of Fannie Mae with respect to the Lender in compliance with this Acknowledgment Agreement or (ii) any past, present, or future act or omission of the Lender, pursuant or with respect to this Acknowledgment Agreement or the Security Agreement.

14. The Lender hereby warrants, represents, and confirms to Fannie Mae the following:

-7-

Confidential

A.      The Security Interest is the only outstanding and existing interest that the Lender has granted to the Secured Party, or any other party other than the interest granted in connection with the Fannie Mae Stripped Mortgage Backed Securities Trust Number 362 ("Trust Number 362"), which interest is not subject to the Security Interest, in the servicing rights to the mortgages that are subject to the Security Interest; and, the Security Agreement is the sole outstanding and existing agreement or instrument other than those executed and delivered in connection with Trust Number 362 containing any grant by the Lender of any interest in the Servicing Rights that are subject to the Security Interest.

B.      The execution and delivery of this Acknowledgment Agreement will not violate any provision of law or regulation applicable to the Lender, any order of any court or other agency of government or any agreement or other instrument to which the Lender is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any such agreement or other instrument.

C.      If the Lender is a federally insured institution or an affiliate or subsidiary of a federally insured institution, the grant of a Security Interest in the Servicing Rights to the Secured Party pursuant to the Security Agreement, and the Lender's execution (and the delivery) of this Acknowledgment Agreement, has each been: (i) specifically approved by the Board of Directors of the Lender, and such approval is reflected in the minutes of the meetings of such Board of Directors or (ii) approved by an officer of the Lender who was duly authorized by the Board of Directors to enter into such types of transactions and such authorization is reflected in the minutes of the Board of Directors' meetings. This Acknowledgment Agreement, together with the applicable Security Agreement between the Lender and Secured Party and any amendments thereto made in accordance with Section 16 of this Acknowledgment Agreement, and any UCC financing statements, constitute the written agreement governing the Lender's grant of a Security Interest in its Servicing Rights to the Secured Party pursuant to the Security Agreement and the matters agreed to in this Acknowledgment Agreement, and the Lender shall continuously maintain all components of such written agreement as an official record of the Lender (or any successor thereto).

15. The Secured Party hereby warrants, represents, and confirms to Fannie Mae the following:

A.      The Security Interest is the only outstanding and existing interest that the Lender has granted to the Secured Party in the servicing rights to the mortgages that are subject to the Security Interest; and, to the best of the Secured Party's knowledge, information, and belief (based solely on a review of UCC searches conducted by the Secured Party, which the Secured Party represents that it has conducted in the appropriate public offices where the Lender's principal place of business is located), the Security Agreement is the sole outstanding and existing agreement or instrument containing any grant by the Lender of any interest in the Security Rights that are subject to the Security Interest.

B.      The execution and delivery of this Acknowledgment Agreement will not violate any provision of law or regulation applicable to the Secured Party, any order

Confidential

of any court or other agency of government or any agreement or other instrument to which the Secured Party is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any such agreement or other instrument, provided, that the representations contained in this Section 15.B are made for the sole purpose of preventing the Secured Party from raising any such violation, breach, conflict, or default as a defense to the enforceability of this Acknowledgment Agreement.

C.    If the Secured Party is a federally insured institution or an affiliate or subsidiary of a federally insured institution, the Secured Party's execution (and the delivery) of the Security Agreement and the Acknowledgment Agreement, has each been: (i) specifically approved by the Board of Directors of the Secured Party, and such approval is reflected in the minutes of the meetings of such Board of Directors or (ii) approved by an officer of the Secured Party, who was duly authorized by the Board of Directors to enter into such types of transactions and such authorization is reflected in the minutes of the Board of Directors' meetings. This Acknowledgment Agreement, together with the applicable Security Agreement between the Lender and Secured Party and any amendments thereto made in accordance with Section 16 of this Acknowledgment Agreement, and any UCC financing statements, constitute the written agreement governing the Lender's grant of a Security Interest in its Servicing Rights to the Secured Party pursuant to the Security Agreement and the matters agreed to in this Acknowledgment Agreement, and the Secured Party shall continuously maintain all components of such written agreement as an official record of the Secured Party (or any successor thereto).

16.    The Security Agreement may be amended without the consent of Fannie Mae in accordance with the terms and conditions of the Security Agreement, provided that the Secured Party and the Lender each hereby agree that each of the representations and warranties contained in Sections 14.B, 14.C, 15.B, and 15.C of this Acknowledgment Agreement shall be applicable to any such amendment.

17.    If the Secured Party sells one or more participations in the loans made pursuant to the Security Agreement (or enters into any other arrangement whereby one or more entities have rights through, or with, the Secured Party with respect to the Security Interest), such participants shall benefit under the Security Agreement and the Acknowledgment Agreement solely through the Secured Party. Fannie Mae shall have no direct liability to any such participant in the loans made pursuant to the Security Agreement. The Secured Party hereby represents, warrants, and confirms to Fannie Mae that: (i) the Secured Party has the authority to enter into this Acknowledgment Agreement on behalf of any such participants, (ii) this Acknowledgment Agreement, the Security Agreement, and any amendments thereto, shall be binding on any such participants as if they were original signatories thereto and hereto, and (iii) the Secured Party shall have the authority and duty to act exclusively for such participants with respect to Fannie Mae.

18.    This Acknowledgment Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be an original and all of which together shall constitute one and the same instrument.

Confidential

IN WITNESS WHEREOF, the Secured Party, the Lender, and Fannie Mae have executed and delivered this Acknowledgment Agreement as of the date first above written.

SECURED PARTY:

By:  _____

Name:  ___Wayne Beckmann_____

Title:  ____Managing Director_____

LENDER:

By:  _____

Name:  _____

Title:  _____

FANNIE MAE:

By:  _____

Name:  _____

Title:  _____

-10-

Confidential

IN WITNESS WHEREOF, the Secured Party, the Lender, and Fannie Mae have executed and delivered this Acknowledgment Agreement as of the date first above written.

SECURED PARTY:

By: _____

Name: _____

Title: _____

LENDER:

By: _____

Name: _____

Title: _____

FANNIE MAE:

By: _____

Name: _____

Title: _____

Confidential

IN WITNESS WHEREOF, the Secured Party, the Lender, and Fannie Mae have executed and delivered this Acknowledgment Agreement as of the date first above written.

SECURED PARTY:

By: _____

Name: _____

Title: _____

LENDER:

By: _____

Name: _____

Title: _____

FANNIE MAE:

By: _____

Name: _____Cheryl Croxton_____

Title: _____VP_____

-10-

Confidential

Exhibit "A" to Acknowledgment Agreement
Dated as of September 7, 2007, among
Citibank, N.A. (Secured Party),
GMAC Mortgage, LLC (Lender), and Fannie Mae


All mortgages which are now, or which hereafter will be, in the ordinary course of business,
serviced by the Lender for Fannie Mae under the terms of the Mortgage Selling and
Servicing Contract

-11-

Confidential

Exhibit B to Acknowledgment Agreement
Dated as of September 7, 2007, among
Citibank, N.A. (Secured Party),
GMAC Mortgage, LLC (Lender), and Fannie Mae

Form Letter to Fannie Mae Relating to Security Interest
(Request for Net Sale Proceeds or
Contract Termination Fee; Transfer/Sale Request)

Fannie Mae

_____

(Address of Lender's Lead Fannie Mae Regional Office)

_____

_____

Attention: Vice President, Single-Family Operations

Ladies and Gentlemen:

Under and by authority of a power of attorney ("Power of Attorney") granted to
_____, the secured party ("Secured Party") referred to in a
certain Loan and Security Agreement ("Security Agreement") dated as of September 7, 2007
between the Secured Party and _____, the debtor ("Debtor")
referred to in the Security Agreement, the Secured Party hereby notifies Fannie Mae that, by
reason of an event of default under the Security Agreement [if other valid reason exists for
enforcing the Security Interest or exercising remedies under the Security Agreement, specify
such reason and, if appropriate, delete reference to a default], the Secured Party has the right
under such Agreement (and has elected) to enforce the Security Interest created therein
and/or to exercise its remedies thereunder.

[ALTERNATIVE No. 1 – In this regard, the Secured Party has elected to cause the
transfer of all or a portion of the Debtor's Fannie Mae servicing portfolio to
_____, subject to Fannie Mae's right to approve such
transfer and all related rights of Fannie Mae provided or referred to in the Acknowledgment
Agreement referred to below. Enclosed are completed Request for Transfer forms. We ask
that Fannie Mae process and approve this request in accordance with the terms of that certain
Acknowledgment Agreement dated as of September 7, 2007 by and among the Secured
Party, the Debtor, and Fannie Mae.]

[ALTERNATIVE No. 2 – In this regard, the Secured Party requests that any Net
Sale Proceeds from the sale by Fannie Mae of the Debtor's Servicing Rights (or, if
applicable, any Contract termination fee payable by Fannie Mae pursuant to the Fannie Mae
Contract referred to in the Acknowledgment Agreement) be remitted to the Secured Party,
pursuant to the terms of that certain Acknowledgment Agreement dated September 7, 2007
by and among the Secured Party, the Debtor, and Fannie Mae. Notwithstanding anything to
the contrary herein, the amount to be remitted to the Secured Party pursuant to the foregoing
sentence shall not exceed $_____, which is the amount due the Secured Party
pursuant to the Security Agreement.]

-12-

1-PH/2742713.3

Confidential

The Secured Party hereby certifies that it simultaneously has sent a copy of this letter to the Debtor, and that Fannie Mae, pursuant to the terms of the Acknowledgment Agreement, has authority (i) to rely upon this letter and upon the Power of Attorney (an executed counterpart of which is enclosed), and (ii) to assume the existence, authenticity, validity, and legal sufficiency of the Power of Attorney (whether or not actually examined by Fannie Mae) and that the Power of Attorney has not been, and will not be, revoked.

[This letter must be signed by each Secured Party if more than one.]

1-PH/2742713.3

Confidential

# Exhibit C-1

EXECUTION VERSION

T932

AMENDMENT NUMBER ONE
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER ONE (this "Amendment") is made as of this 19th day of August, 2010 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), between the Borrower, the Guarantor and the Lender.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of August 19, 2010 (the "Effective Date") the Agreement is hereby amended as follows:

(a)      Schedule I to the Agreement is hereby amended by deleting the definition of "Loan Repayment Date" and replacing it with the following:

"Attributed Rate" shall mean (a) with respect to Eligible Servicing Rights (other than "payment option ARMs" and "HELOCs"), (i) from and after June 30, 2010, through and including August 31, 2010, 72.5% and (ii) from and after August 31, 2010, through and including September 15, 2010, 65%, and (b) with respect to "payment option ARMs" and "HELOCs", zero (0).  For the avoidance of doubt, if more than one of the foregoing applicable percentages could apply to the Eligible Servicing Rights, the lowest percentage shall be applied.

"Loan Repayment Date" means, the earlier to occur of (i) September 15, 2010, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

SECTION 2.   Fees and Expenses. The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in

- 1 -

Confidential

connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.    <u>Limited Effect</u>.    Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

SECTION 4.    Representations.    To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.  Extension Fee.    In consideration of the renewal and extension of the Agreement from August 31, 2010 until September 15, 2010, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender on September 1, 2010, an extension fee equal to $291,666.67 (the "Extension Fee").  The Borrower hereby agrees that the Extension Fee shall be both fully earned and nonrefundable for any reason whatsoever as of the Effective Date and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.  Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.  Counterparts. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 2 -

Confidential

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

    Name:  Jerry Lombardo
    Title:    Global Funding & Liquidity Executive and Treasurer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

    Name:  Jerry Lombardo
    Title:    Treasury Executive

CITIBANK, N.A., as Lender

By:_____

    Name:
    Title:

Amendment Number One to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____
      Name:
      Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____
      Name:
      Title:

CITIBANK, N.A., as Lender

By:_____
      Name: Susan Mills
      Title: Vice President for CBNA

Amendment Number One to Amended and Restated Loan and Security Agreement

Confidential

# Exhibit C-2

EXECUTION COPY

T932

AMENDMENT NUMBER TWO
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER TWO (this "Amendment") is made as of this 15th day of September, 2010 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date and, in connection therewith, to reduce the Commitment Amount, each as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of September 15, 2010 (the "Effective Date") the Agreement is hereby amended as follows:

(a)     Schedule I to the Agreement is hereby amended by deleting the definitions of "Commitment Amount" and "Loan Repayment Date" and replacing such definitions with the following:

"Commitment Amount" means, (i) from the Closing Date and at all times prior to September 15, 2010, $700,000,000, and (ii) at all times on and after September 15, 2010, $600,000,000.  The Commitment Amount may be further reduced in accordance with Section 2.10.

"Loan Repayment Date" means, the earlier to occur of (i) September 30, 2010, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

(c)     Section 7.01(i) of the Agreement is hereby amended by deleting such section in its entirety and replacing such section with the following:

- 1 -

Confidential

(i)    <u>Financial Statements</u>.  The Borrower shall deliver to the Lender:

(1)    As soon as available and in any event within thirty (30) days after the end of each calendar month the consolidated balance sheets of the Borrower and the Guarantor, as at the end of such calendar month and the related consolidated statements of income for the Borrower and the Guarantor for such month, setting forth in each case in comparative form the figures for the previous month;

(2)    As soon as available and in any event within forty-five (45) days after the end of each of the first three quarterly fiscal periods of each fiscal year of the Borrower and the Guarantor, the unaudited consolidated balance sheet of the Borrower and the Guarantor as at the end of such period, the related unaudited, consolidated statement of income for the Borrower and the Guarantor for such period and the portion of the fiscal year through the end of such period, and the related unaudited, consolidated statements of retained earnings and of cash flows for the Borrower and the Guarantor for the portion of the fiscal year through the end of such period, in each case setting forth in comparative form the figures for the previous year;

(3)    As soon as available and in any event within ninety (90) days after the end of each fiscal year of the Borrower and the Guarantor, the consolidated balance sheets of the Borrower and the Guarantor as at the end of such fiscal year and the related consolidated statements of income and retained earnings and of cash flows for the Borrower and the Guarantor for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Borrower and the Guarantor at the end of, and for, such fiscal year in accordance with GAAP;

(4)    On or before March 31st of each year beginning March 31, 2011, the Borrower, at its expense, shall either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Lender to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate), and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Borrower's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement, or (b) furnish to Lender the Borrower's assessment of Borrower's compliance with the servicing

- 2 -

Confidential

criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants;

(5)     Together with each set of the financial statements delivered under clauses (1) through (3) above, a certificate of a Responsible Officer of Borrower or Guarantor, as applicable (in substantially similar form as the certificate set forth in Schedule 7.01 hereto), certifying (x) Borrower's compliance with the Consolidated Tangible Net Worth requirement and the Guarantor's compliance with the Consolidated Liquidity requirement and setting forth the calculations demonstrating compliance the Consolidated Tangible Net Worth requirement and the Consolidated Liquidity requirement as of the close of business on the Business Day immediately preceding the date such certificate is delivered to Lender, (y) that no Default or Event of Default exists under any Facility Documents, the Goldman Repurchase Facility or the GMAC Facilities as of the date of such certificate and (z) that neither the Goldman Repurchase Facility nor the GMAC Facilities have been amended, modified or supplemented other than in accordance with the terms of the Citi Repurchase Facility; and

(6)     From time to time such other information regarding the Servicing Rights, financial condition, operations, or business of Borrower or the Guarantor, as Lender may reasonably request.

SECTION 2.    Fees and Expenses.  The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.    Limited Effect.   Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

SECTION 4.    Representations.    To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.  Extension Fee.  In consideration of the extension of the Loan Repaument Date under the Agreement from September 15, 2010 until September 30, 2010, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender on September 17, 2010, an extension fee equal to $250,000 (the "Extension Fee").  The Borrower hereby agrees that the Extension Fee shall be both fully earned and nonrefundable for any reason whatsoever as of the

- 3 -

Confidential

Effective Date and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.  <u>Governing Law</u>. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.  <u>Counterparts</u>. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 4 -

Confidential

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

    Name: Jerry Lombardo
    Title:  Global Funding & Liquidity Executive and Treasurer


RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

    Name: Jerry Lombardo
    Title:  Treasury Executive


CITIBANK, N.A., as Lender

By:_____

    Name:
    Title:

Amendment Number Two to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____
    Name:
    Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____
    Name:
    Title:

CITIBANK, N.A., as Lender

By:_____
    Name:
    Title:
                        Peter D. Steinmetz
                        Vice President
                        Citibank N.A.

Amendment Number Two to Amended and Restated Loan and Security Agreement

Confidential

# Exhibit C-3

**EXECUTION COPY**

AMENDMENT NUMBER THREE
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

T932

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER THREE (this "Amendment") is made as of this 30th day of September, 2010 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date and, in connection therewith, to reduce the Attributed Rate, each as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of September 30, 2010 (the "Effective Date") the Agreement is hereby amended as follows:

(a)  Schedule I to the Agreement is hereby amended by deleting the definitions of "Attributed Rate" and "Loan Repayment Date" and replacing such definitions with the following:

"Attributed Rate" shall mean (a) with respect to Eligible Servicing Rights (other than "payment option ARMs" and "HELOCs"), (i) from and after June 30, 2010, through and including August 31, 2010, 72.5%, (ii) from and after August 31, 2010, through and including September 30, 2010, 65%, (iii) from and after September 30, 2010 through and including November 15, 2010, 62.5% and (iv) from and after November 15, 2010 through and including November 30, 2010, 60% (b) with respect to "payment option ARMs" and "HELOCs", zero (0). For the avoidance of doubt, if more than one of the foregoing applicable percentages could apply to the Eligible Servicing Rights, the lowest percentage shall be applied.

"Loan Repayment Date" means, the earlier to occur of (i) November 30, 2010, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a

- 1 -

Confidential

Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

SECTION 2.   Fees and Expenses. The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.   Limited Effect.   Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

SECTION 4.   Representations.   To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.   Extension Fee.   In consideration of the extension of the Loan Repayment Date under the Agreement from September 30, 2010 until October 29, 2010, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender on October 8, 2010, an extension fee equal to $509,589 (the "October Extension Fee").  In consideration of the extension of the Loan Repayment Date under the Agreement from October 29, 2010 until November 30, 2010, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender on November 8, 2010, an extension fee equal to $493,151 (the "November Extension Fee" and together with the October Extension Fee, the "Extension Fee").  The Borrower hereby agrees that the Extension Fee shall be both fully earned and nonrefundable for any reason whatsoever as of the Effective Date and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.   Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.   Counterparts. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as

- 2 -

Confidential

PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 3 -

Confidential

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

Name: Jerry Lombardo
Title: Global Funding &Liquidity Executive and Treasurer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

Name: Jerry Lombardo
Title: Treasury Executive

CITIBANK, N.A., as Lender

By:_____

Name:
Title:

Amendment Number Three to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

Name:

Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

Name:

Title:

CITIBANK, N.A., as Lender

By:_____

Name:  Susan Mills

Title:  Vice President

Amendment Number Three to Amended and Restated Loan and Security Agreement

Confidential

Exhibit C-4

EXECUTION COPY

T932

AMENDMENT NUMBER FOUR

to the

Amended and Restated Loan and Security Agreement

Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor

and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER FOUR (this "Amendment") is made as of this 30th day of November, 2010 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date and, in connection therewith, to modify the Attributed Rate and reduce the Commitment Amount, each as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of November 30, 2010 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Section 7.01(i) of the Agreement is hereby amended by deleting such section in its entirety and replacing such section with the following:

(i)  Financial Statements.  The Borrower shall deliver to the Lender:

(1)  As soon as available and in any event within thirty (30) days after the end of each calendar month the consolidated balance sheets of the Borrower and the Guarantor, as at the end of such calendar month and the related consolidated statements of income for the Borrower and the Guarantor for such month, setting forth in each case in comparative form the figures for the previous month;

(2)  As soon as available and in any event within forty-five (45) days after the end of each of the first three quarterly fiscal periods of each fiscal year of the Borrower and the Guarantor, the unaudited consolidated balance sheet of the Borrower and the Guarantor as at the end of such period, the related unaudited, consolidated statement of income for the Borrower and the Guarantor for such

- 1 -

Confidential

period and the portion of the fiscal year through the end of such period, and the related unaudited, consolidated statements of retained earnings and of cash flows for the Guarantor for the portion of the fiscal year through the end of such period, in each case setting forth in comparative form the figures for the previous year;

(3)    As soon as available and in any event within ninety (90) days after the end of each fiscal year of the Borrower and the Guarantor, the consolidated balance sheets of the Borrower and the Guarantor as at the end of such fiscal year and the related consolidated statements of income and retained earnings and of cash flows for the Borrower and the Guarantor for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of the Borrower and the Guarantor at the end of, and for, such fiscal year in accordance with GAAP;

(4)    On or before March 31st of each year beginning March 31, 2011, the Borrower, at its expense, shall either (a) cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Lender to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate), and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Borrower's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement, or (b) furnish to Lender the Borrower's assessment of Borrower's compliance with the servicing criteria set forth in Section 1122(d) of Securities and Exchange Commission Regulation AB (17 C.F.R. Section 229.1122(d)), which assessment shall be attested to by a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants;

(5)    Together with each set of the financial statements delivered under clauses (1) through (3) above, a certificate of a Responsible Officer of Borrower or Guarantor, as applicable (in substantially similar form as the certificate set forth in Schedule 7.01 hereto), certifying (x) Borrower's compliance with the Consolidated Tangible Net Worth requirement and the Guarantor's compliance with the Consolidated Liquidity requirement and setting forth the calculations demonstrating compliance with the Consolidated Tangible Net Worth requirement and the Consolidated Liquidity requirement as of the close of business on the Business Day immediately preceding the date such certificate is delivered to Lender, (y) that no Default or Event of Default exists under any Facility

- 2 -

Confidential

Documents, the Goldman Repurchase Facility or the GMAC Facilities as of the date of such certificate and (z) that neither the Goldman Repurchase Facility nor the GMAC Facilities have been amended, modified or supplemented other than in accordance with the terms of the Citi Repurchase Facility; and

(6)    From time to time such other information regarding the Servicing Rights, financial condition, operations, or business of Borrower or the Guarantor, as Lender may reasonably request.

(b) Schedule I to the Agreement is hereby amended by deleting the definitions of "Attributed Rate", "Commitment Amount" and "Loan Repayment Date" and replacing such definitions with the following:

"Attributed Rate" shall mean (a) with respect to Eligible Servicing Rights (other than "payment option ARMs" and "HELOCs"), (i) from and after June 30, 2010, through and including August 31, 2010, 72.5%, (ii) from and after August 31, 2010, through and including September 30, 2010, 65%, (iii) from and after September 30, 2010 through and including November 15, 2010, 62.5% and (iv) from and after November 15, 2010 through and including January 18, 2011, 60%, and (b) with respect to "payment option ARMs" and "HELOCs", zero (0).  For the avoidance of doubt, if more than one of the foregoing applicable percentages could apply to the Eligible Servicing Rights, the lowest percentage shall be applied.

"Commitment Amount" means, (i) from the Closing Date and at all times prior to September 15, 2010, $700,000,000, (ii) from September 15, 2010 and at all times prior to December 15, 2010, $600,000,000, (iii) from December 15, 2010 and at all times prior to January 15, 2011, $550,000,000 and (iv) at all times on and after January 15, 2011, $500,000,000.  The Commitment Amount may be further reduced in accordance with Section 2.10.

"Loan Repayment Date" means, the earlier to occur of (i) January 18, 2011, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

SECTION 2.    Fees and Expenses.  The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.    Limited Effect.    Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

- 3 -

Confidential

SECTION 4.   Representations.   To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.   Extension Fee.   In consideration of the extension of the Loan Repayment Date under the Agreement from November 30, 2010 until January 18, 2011, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender on January 18, 2011, an extension fee equal to $736,111.11 (the "Extension Fee").   The Borrower hereby agrees that the Extension Fee shall be both fully earned and nonrefundable for any reason whatsoever as of the Effective Date and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.   Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.   Counterparts. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.   Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.   The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.   The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

10416143\V-3

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____

Name: Jerry Lombardo
Title: Global Funding & Liquidity Executive & Treasurer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____

Name: Jerry Lombardo
Title: Treasury Executive

CITIBANK, N.A., as Lender

By: _____

Name:
Title:

Amendment Number Four to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

Name:

Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

Name:

Title:

CITIBANK, N.A., as Lender

By:_____

Name:   Susan  Mills

Title:   Vice  President

Amendment Number Four to Amended and Restated Loan and Security Agreement

Confidential

# Exhibit C-5

EXECUTION COPY

T932

# AMENDMENT NUMBER FIVE
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER FIVE (this "Amendment") is made as of this 18th day of January, 2011 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  <u>Amendments</u>.  Effective as of January 18, 2011 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Schedule I to the Agreement is hereby amended by deleting the definition of "Loan Repayment Date" and replacing such definition with the following:

> "Loan Repayment Date" means, the earlier to occur of (i) March 15, 2011, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

SECTION 2.  <u>Fees and Expenses</u>.  The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.  <u>Limited Effect</u>.  Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being

Confidential

sufficient to refer to the Agreement as amended hereby.

SECTION 4.   Representations.   To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.   Extension Fee.   In consideration of the extension of the Loan Repayment Date under the Agreement from January 18, 2011 until March 15, 2011, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender on the date hereof, an extension fee equal to $777,777.78 (the "Extension Fee").  The Borrower hereby agrees that the Extension Fee shall be both fully earned and nonrefundable for any reason whatsoever as of the Effective Date and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.   Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.   Counterparts. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 2 -

10416143\V-3

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____

    Name:  Joseph Ruhlin
    Title:   Senior Treasury Services Officer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____

    Name:  Joseph Ruhlin
    Title:   Assistant Treasurer

CITIBANK, N.A., as Lender

By: _____

    Name:
    Title:

Amendment Number Five to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this
Amendment to be executed and delivered by their duly authorized officers as of the day and year
first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

   Name:

   Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

   Name:

   Title:

CITIBANK, N.A., as Lender

By:_____

   Name:   Susan Mills

   Title:   Vice President

Amendment Number Five to Amended and Restated Loan and Security Agreement

Confidential

# Exhibit C-6

EXECUTION COPY

T932

AMENDMENT NUMBER SIX
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER SIX (this "Amendment") is made as of this 15th day of March, 2011 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date, as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of March 15, 2011 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Schedule I to the Agreement is hereby amended by deleting the definition of "Loan Repayment Date" and replacing such definition with the following:

"Loan Repayment Date" means, the earlier to occur of (i) April 1, 2011, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

SECTION 2.  Fees and Expenses. The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.  Limited Effect.  Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being

- 1 -

Confidential

sufficient to refer to the Agreement as amended hereby.

SECTION 4.    Representations.    To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.  Extension Fee.  In consideration of the extension of the Loan Repayment Date under the Agreement from March 15, 2011 until April 1, 2011, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender, an extension fee in an amount equal to $177,083.33 (the "April Extension Fee") such payment to be made in Dollars, in immediately available funds without deduction, set off or counterclaim on March 30, 2011.  Upon the occurrence of an Event of Default or if the Loan Repayment Date occurs prior to March 30, 2011, Borrower shall pay the April Extension Fee to Lender on the date of such occurrence.  The Borrower hereby agrees that the April Extension Fee shall be fully earned as of the Effective Date and shall be nonrefundable for any reason whatsoever when paid and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.  Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.  Counterparts. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 2 -

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

Name: Jerry Lombardo
Title:  Global Funding & Liquidity Executive & Treasurer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

Name: Jerry Lombardo
Title: Treasury Executive

CITIBANK, N.A., as Lender

By:_____

Name:
Title:

Amendment Number Six to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this
Amendment to be executed and delivered by their duly authorized officers as of the day and year
first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

    Name:

    Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

    Name:

    Title:

CITIBANK, N.A., as Lender

By:_____

    Name:

    Title:    **Susan Mills**
             Vice President
             Citibank, N.A.

Amendment Number Six to Amended and Restated Loan and Security Agreement

Confidential

# Exhibit C-7

EXECUTION COPY

T932

AMENDMENT NUMBER SEVEN
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER SEVEN (this "Amendment") is made as of this 1st day of April, 2011 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date and to modify the Events of Default, as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. Amendments. Effective as of April 1, 2011 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Section 8.01(k) of the Agreement is hereby amended by deleting clause (k) of Section 8.01 and replacing such clause with the following:

> (k)     The Borrower shall fail to maintain either (i)(1) at all times while Fannie Mae is utilizing the monthly Peak Score rating system, a monthly Peak Score which equates to "Excellent" or better or (2) at all times after Fannie Mae has developed and implemented a replacement rating system for the monthly Peak Score rating system, a score or rating in respect of such replacement rating system that is reasonably equivalent to a monthly Peak Score of "Excellent" or better, as agreed upon by the Borrower and the Lender, (ii) at all times while Freddie Mac is using the "Tier" system to rate residential mortgage loan servicers, an Investor Reporting and Remitting rating from Freddie Mac which equates to "Tier 2" or better or (iii) a rating as a prime residential mortgage servicer, from two of the following three rating agencies, (A) "average" by S&P, (B) "RPS3-" by Fitch and (C) "SQ3-" by Moody's.

(b) Schedule I to the Agreement is hereby amended by deleting the definition of "Loan

- 1 -

Confidential

Repayment Date" and replacing such definition with the following:

"Loan Repayment Date" means, the earlier to occur of (i) April 11, 2011, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

(c) Exhibit 2.03 to the Agreement is hereby amended by deleting such Exhibit in its entirety and replacing Exhibit 2.03 with Exhibit A attached hereto.

SECTION 2.    Fees and Expenses. The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.    Limited Effect.    Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

SECTION 4.    Representations.    To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.    Extension Fee.    In consideration of the extension of the Loan Repayment Date under the Agreement from April 1, 2011 until April 11, 2011, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender, an extension fee in an amount equal to $104,166.67 (the "Second April Extension Fee"), such payment to be made in Dollars, in immediately available funds without deduction, set off or counterclaim on April 7, 2011.  Upon the occurrence of an Event of Default or if the Loan Repayment Date occurs prior to April 7, 2011, Borrower shall pay the Second April Extension Fee to Lender on the date of such occurrence.  The Borrower hereby agrees that the Second April Extension Fee shall be fully earned as of the Effective Date and shall be nonrefundable for any reason whatsoever when paid and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

SECTION 6.    Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

- 2 -

Confidential

SECTION 7.  <u>Counterparts</u>. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 3 -

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____

Name: Joe Ruhlin
Title: Senior Treasury Services Officer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____

Name: Joe Ruhlin
Title: Assistant Treasurer

CITIBANK, N.A., as Lender

By: _____

Name:
Title:

Amendment Number Seven to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

    Name:

    Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

    Name:

    Title:

CITIBANK, N.A., as Lender

By:_____

    Name:  **Susan Mills**

    Title:   Vice President
               Citibank, N.A.

Amendment Number Seven to Amended and Restated Loan and Security Agreement

Confidential

**EXHIBIT A**

EXHIBIT 2.03
to Loan and security Agreement

FORM OF BORROWER FUNDING REQUEST

[DATE]

Citibank, N.A.
390 Greenwich Street, 4th Floor
New York, New York  10013

Attention: [      ]

Ladies and Gentlemen:

This [Initial] Borrower Funding Request is delivered to you pursuant to Section 2.03(a) of the Amended and Restated Loan and Security Agreement, dated as of June 16, 2010 (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), between GMAC Mortgage, LLC, as the Borrower (the "Borrower") and Citibank, N.A., as lender (the "Lender"). Unless otherwise defined herein or as the context otherwise requires, terms used herein have the meaning assigned thereto under Schedule I of the Loan Agreement.

The undersigned hereby requests that a Loan be made in the aggregate principal amount of $____ on _____, 20__ to be secured by the [Fannie Mae]/[Freddie Mac] Servicing Rights.

As of the date hereof, the Borrower has [IF APPLICABLE: (i) a [Peak Score] / [NEW SCORE] from Fannie Mae which equates to ["Excellent" or better] / [NEW SCORE] or better, (ii) an Investor Reporting and Remitting rating from Freddie Mac which equates to "Tier 2" or better and (iii) a rating as a prime residential mortgage servicer, from two of the following three rating agencies, (A) ["average"] by S&P, (B) ["RPS3-"] by Fitch and (C) ["SQ3-"] by Moody's.

An updated Electronic File, revised to reflect the acquisition of any additional Servicing Rights purchased by the Borrower since the most recently delivered Electronic File, has been delivered pursuant to Section 2.03 of the Loan Agreement.  Such Electronic File reflects all Eligible Servicing Rights that constitute Collateral under the terms and conditions of the Agreement and a hyperlink to such Electronic File is attached hereto as Schedule One.

[TO BE USED FOR ALL FUNDINGS THAT INVOLVE NEW COLLATERAL]   [The Borrower hereby acknowledges and agrees that (other than with respect to the Agreement) (i) the Servicing Rights currently pledged as Collateral under the Agreement and (ii) any of the Servicing Rights identified on Schedule One attached hereto, are not currently assigned, pledged, conveyed or encumbered under any credit, warehouse or financing facility.  The Borrower further acknowledges and agrees that (other than under the Agreement) it shall not assign,

Amendment Number Seven to Amended and Restated Loan and Security Agreement

pledge, convey or encumber such Servicing Rights under any credit, warehouse or financing facility in the future, except with prior notice to, and consent from, the Lender.]

The undersigned hereby acknowledges that the delivery of this [Initial] Borrower Funding Request and the acceptance by the undersigned of the proceeds of the Loan requested hereby constitute a representation and warranty by the undersigned that all conditions precedent to such Loan specified in Article V of the Loan Agreement have been satisfied and will continue to be satisfied after giving effect to such Loan.

The undersigned further represents and warrants that either (a) the Freddie Mac Guides, the Fannie Mae Guides, and the Servicing Contracts have not been materially modified since the last date the undersigned delivered a Borrower Funding Request or (b) attached hereto is a true and complete description of any changes to the applicable Servicing Contracts since the last date the undersigned delivered a Borrower Funding Request.

Please wire transfer the proceeds of the Loan to the following account pursuant to the following instructions:

Wachovia Bank ABA: 031-201-467
a/c GMAC Mortgage, LLC, 2100012764397

The undersigned has caused this [Initial] Borrower Funding Request to be executed and delivered, and the certification and warranties contained herein to be made, by its duly authorized officer this _____ day of _____, 20__.

GMAC MORTGAGE, LLC, as the Borrower

By: _____
    Name:
    Title:

Acknowledged and agreed:

CITIBANK, N.A.

By: _____
    Name:
    Title:

- 6 -

Confidential

# Exhibit C-8

EXECUTION COPY

T932

AMENDMENT NUMBER EIGHT
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER EIGHT (this "Amendment") is made as of this 11th day of April, 2011 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower, the Guarantor and the Lender wish to modify the Agreement to extend the Loan Repayment Date, to modify the Extension Fee and to modify the requirements of Borrower in connection with any increased capital costs, as more particularly set forth herein;

WHEREAS, the Borrower acknowledges and agrees that the modifications regarding the requirements of Borrower in connection with any increased capital costs are intended to address the expected imposition of increased capital costs on or about September 2011;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of April 11, 2011 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Section 2.06 of the Agreement is hereby amended by deleting Section 2.06 in its entirety and replacing such section with the following:

"Increased Capital Costs.  If any change in, or the introduction, adoption, effectiveness, interpretation or reinterpretation or phase-in, in each case after the date hereof, of any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any court, central bank, regulator or other Governmental Authority affects or would affect the amount of capital required or reasonably expected to be maintained by the Lender or any Person controlling the Lender and the Lender reasonably determines (in its sole discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans or other advances of funds made by the Lender

- 1 -

Confidential

pursuant to this Agreement or any of the Facility Documents relating to fundings or commitments under this Agreement is reduced to a level below that which the Lender or such controlling Person would have achieved but for the occurrence of any such circumstance, then, in any such case after notice from time to time by the Lender to the Borrower, (i) the Borrower shall pay to the Lender compensation sufficient to compensate the Lender or such controlling Person for such reduction in rate of return or (ii) Borrower shall restructure or revise the Facility Documents (including but not limited to, adding an additional obligor or guarantor) in order to reduce the amount of capital required or reasonably expected to be maintained by Lender but for the occurrence of any such circumstance; provided, however, that the Borrower shall not have any obligation to pay any such amount under this Section 2.06 with respect to any day or days preceding the fourth Business Day following the date on which the Lender has notified the Borrower that it intends to make a claim under this Section 2.06. Upon receipt of such notice from the Lender, the Borrower may prepay the Obligations in full prior to the end of such fourth Business Day, and if such prepayment is made within such time frame, the Borrower shall (i) have no liability for increased costs under this Section 2.06 and (ii) have no obligation to pay any portion of the Total Extension Fee not already paid (except for any accrued Monthly Extension Fee for the period beginning on the first day of the current Interest Period through the date the Obligations are prepaid in full) after the end of such fourth Business Day. A statement of the Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail), in the absence of manifest error, shall be conclusive and binding on the Borrower and the Lender; provided, further, that the initial payment of such compensation shall include a payment for accrued amounts due under this Section 2.06 prior to such initial payment but not before four Business Days after such notice. In determining such additional amount, the Lender may use any method of averaging and attribution that it (in its reasonable discretion) shall deem applicable so long as it applies such method to other similar transactions.

(b) Section 3.03(d) of the Agreement is hereby amended by deleting such clause in its entirety and replacing it with the following:

In consideration of the renewal and extension of the Agreement from April 11, 2011 until the Loan Repayment Date, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Borrower, the Borrower hereby agrees to pay to the Lender, an extension fee in an amount equal to $3,687,500 (the "Total Extension Fee") in connection with the extension of the Agreement, which fee shall be paid in equal installments of $307,291.67 on first Business Day following the end of each Interest Period (the "Monthly Extension Fee"), such payment to be made in Dollars, in immediately available funds without deduction, set off or counterclaim. Upon the occurrence of an Event of Default or if the Loan Repayment Date occurs prior to March 29, 2012, Borrower shall pay the remaining portion of the Total Extension Fee to Lender on the date of such occurrence.  Subject to Section 2.06, the Borrower hereby agrees that the Total Extension Fee shall be fully earned as of the Effective

- 2 -

Confidential

Date and each payment of a Monthly Extension Fee shall be nonrefundable for any reason whatsoever when paid and shall be in addition to any other fees, costs and expenses payable pursuant to the Agreement or the other documents and agreements entered into in connection with the transactions described herein.

(c) Section 7.01(z) of the Agreement is hereby amended by deleting such clause in its entirety and replacing it with the following:

"Additional Commitment.  Borrower shall, maintain at all times throughout the term of this Agreement, the GMAC Facilities, the Goldman Repurchase Facility and the Citi Repurchase Facility, in each case with the maximum amount available for borrowing at least equal to the amount available on January 19, 2011 (taking into consideration any mandatory reduction of the GMAC Facilities in accordance with their terms and any mandatory reduction in the Goldman Facility in accordance with its terms) and, with respect to the Goldman Facility, with a term at least equal to the term of this Agreement; provided however that the Goldman Repurchase Facility and the Citi Repurchase Facility may be paid to $0.00 in accordance with the terms and provisions of the Goldman Repurchase Facility and the Citi Repurchase Facility, as applicable.  No later than the Extension Compliance Date (as such term is defined below), the Borrower shall obtain an extension of the maturity date of the GMAC Facilities. For purposes of this Section 7.01(z) to this Agreement, the term "Extension Compliance Date" shall mean, as of any date of determination, the date that is seven (7) calendar days prior to the then current maturity date of the GMAC Facilities (or, if such date is not a Business Day, the immediately preceding Business Day)."

(d) Schedule I to the Agreement is hereby amended by deleting the definition of "GMAC Facilities" and replacing such definition with the following:

"GMAC Facilities" means (i) that certain $1,600,000,000 line of credit facility provided by Ally Financial to the Sellers and (ii) that certain senior debt loan agreement provided by Ally Financial to Sellers, each as in effect on the date hereof and as amended in accordance with this Agreement.

(e) Schedule I to the Agreement is hereby amended by deleting the definition of "Loan Repayment Date" and replacing such definition with the following:

"Loan Repayment Date" means, the earlier to occur of (i) March 30, 2012, or (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

SECTION 2.   Fees and Expenses. The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.   Limited Effect.   Except as amended hereby, the Agreement shall

- 3 -

Confidential

continue in full force and effect in accordance with its terms.  Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

SECTION 4.   Representations.   To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.   Reserved

SECTION 6.   Governing Law. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.   Counterparts. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 4 -

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____

Name:  Jerry Lombardo
Title:   Global Funding & Liquidity Executive & Treasurer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____

Name:  Jerry Lombardo
Title:   Treasury Executive

CITIBANK, N.A., as Lender

By:_____

Name:
Title:

Amendment Number Eight to Amended and Restated Loan and Security Agreement

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____
    Name:
    Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____
    Name:
    Title:

CITIBANK, N.A., as Lender

By:_____
    Name:
    Title:    Susan Mills
            Vice President
            Citibank, N.A.

Amendment Number Eight to Amended and Restated Loan and Security Agreement

Confidential

# Exhibit C-9

AMENDMENT NUMBER NINE
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER NINE (this "Amendment") is made as of this 1st day of February, 2012 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, the Borrower and the Guarantor has requested, and the Lender has agreed, subject to the terms hereof, to amend the Agreement to make certain changes as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Amendments.  Effective as of February 1, 2012 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Section 7.01(q) of the Agreement is hereby amended by deleting such clause in its entirety and replacing it with the following:

(q)    Maintenance of Financial Covenants and Reporting Requirements. Borrower and Guarantor each agree that, in the event that Borrower or Guarantor is now, or in the future becomes, subject to any financial test or reporting requirement (or similar condition including without limitation any test that is used as part of a financial covenant) under any lending or similar agreement that is more restrictive of Borrower or Guarantor or otherwise more favorable to the lender or counterparty thereunder than the financial test set forth in Section Section 8.01(l), such financial test or reporting requirement (or other condition) shall be automatically incorporated in this Agreement as if fully set forth herein and the failure of any such test (or other condition) shall be an Event of Default hereunder, without the need of any further action on the part of any party hereto.  Borrower shall promptly notify Lender of any such amendment to any lending or similar agreement.

- 1 -

(b) Schedule I of the Agreement is hereby amended by deleting the definition of "Commitment Amount" and replacing it with the following:

> "<u>Commitment Amount</u>" means $300,000,000. The Commitment Amount may be reduced in accordance with Section 2.10.

(c) Schedule I of the Agreement is hereby amended by deleting the definition of "Uncommitted Amount" in its entirety and replacing it with the following:

> "<u>Uncommitted Amount</u>" shall mean $250,000,000.

SECTION 2.    <u>Fees and Expenses</u>. The Borrower agrees to pay to the Lender all fees and out of pocket expenses incurred by the Lender in connection with this Amendment, including all reasonable fees and out of pocket costs and expenses of the Lender's legal counsel incurred in connection with this Amendment, in accordance with Section 10.01 of the Agreement.

SECTION 3.    <u>Limited Effect</u>.   Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms.   Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

SECTION 4.    <u>Representations</u>.   To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents.

SECTION 5.    <u>Governing Law</u>. This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 7.    <u>Counterparts</u>. For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.   Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.   The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.   The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

- 2 -

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By:_____
    Name:
    Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By:_____
    Name:
    Title:

CITIBANK, N.A., as Lender

By:_____
    Name:
    Title:

          Peter D. Steinmetz
          Vice President
          Citibank NA.

Amendment Number Nine to Amended and Restated Loan and Security Agreement

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____

Name: Randall Newman

Title: Chief Treasury Management Officer

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____

Name: Randall Newman

Title: Assistant Treasurer

CITIBANK, N.A., as Lender

By: _____

Name:

Title:

Amendment Number Nine to Amended and Restated Loan and Security Agreement

# Exhibit C-10

Execution Copy

AMENDMENT NUMBER TEN
to the
Amended and Restated Loan and Security Agreement
Dated as of June 30, 2010

between

GMAC MORTGAGE, LLC, as Borrower,

RESIDENTIAL CAPITAL, LLC, as Guarantor
and

CITIBANK, N.A., as Lender

This AMENDMENT NUMBER TEN (this "Amendment") is made as of this 30th day of March, 2012 by and between GMAC MORTGAGE, LLC (the "Borrower"), RESIDENTIAL CAPITAL, LLC (the "Guarantor") and CITIBANK, N.A. (the "Lender") to the Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among the Borrower, the Guarantor and the Lender. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

WHEREAS, pursuant to the terms of the Agreement, the Loan Repayment Date was scheduled to occur on March 30, 2012;

WHEREAS, the Borrower and Guarantor have indicated a desire to amend the Agreement, to, among other things, extend the Loan Repayment Date;

WHEREAS, the Borrower and Guarantor believe that extending the Loan Repayment Date at this time provides significant value to each of them;

WHEREAS, the Borrower and the Guarantor have requested, and the Lender has agreed, subject to the terms hereof, to amend the Agreement to make certain changes as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. Amendments. Effective as of March 30, 2012 (the "Effective Date") the Agreement is hereby amended as follows:

(a) Section 2.01 of the Agreement is hereby amended by adding a new sentence at the end of such section to read as follows: "Notwithstanding the foregoing, the Lender shall not make new Loans on a committed or uncommitted basis following March 30, 2012."

(b) Section 7.01(i) of the Agreement is hereby amended by inserting "; and" at the end of clause (6) and adding new clauses (7) and (8) following clause (6) in such Section 7.01(i) to read

- 1 -

Confidential

as follows:

    (7)    On a weekly basis, a report (which may be telephonic) of all material developments in any litigation in which Fannie Mae, Freddie Mac, or FHFA is seeking relief against Borrower, Guarantor or any Subsidiary of Guarantor other than repurchase or indemnity claims with respect to specific Mortgage Loans, including but not limited to, escrow amounts, settlements, additional repurchase claims, new defendant parties or any other material information requested by Lender in connection with such litigation.; and

    (8)    As soon as available, but in any event within two Business Days of delivery, copies of budgets, variance reports and reports on the Collateral, delivered to any prospective arranger of debtor-in-possession financing for the Borrower.

    (c)    Section 7.01(q) of the Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

    (q)    <u>Maintenance of Financial Covenants and Reporting Requirements</u>. Borrower and Guarantor each agree that, in the event that Borrower or Guarantor is now, or in the future becomes, subject to any financial test or reporting requirement (or similar condition including without limitation any test that is used as part of a financial covenant) under any lending or similar agreement that is more restrictive of Borrower or Guarantor or otherwise more favorable to the lender or counterparty thereunder than the financial test set forth in Section 8.01(l), the Borrower and the Guarantor shall give the Lender written notice of such financial test or reporting requirement (or other condition) no less than two Business Days prior to the effectiveness thereof, and if, in the sole judgment of the Lender such financial test or other requirement is more restrictive of Borrower or Guarantor or otherwise more favorable to the lender or counterparty than the provisions of Section 8.01(l), upon Lender's providing notice of such determination such financial test or reporting requirement (or other condition) shall be automatically incorporated in this Agreement as if fully set forth herein and the failure of any such test (or other condition) shall be an Event of Default hereunder, without the need of any further action on the part of any party hereto.

    (d) Section 7.01 of the Agreement is hereby amended by adding the following new covenants as clauses (dd) and (ee) of such Section:

    (dd) <u>Indebtedness Payments</u>.  The Borrower shall give not less than ten (10) Business Days' prior written notice to Lender of any Indebtedness Payment.

    (ee) <u>Adequate Protection</u>. Within 2 Business Days following the entry of relief in a Bankruptcy Case, Borrower shall obtain an order of the Bankruptcy Court approving, as "adequate protection", as such term is used in Section 361 of the Bankruptcy Code, and without prejudice to the Lender seeking additional adequate protection, the following: (1) current interest accrued under this Agreement shall be paid on the dates contemplated by Section 2.05 of this Agreement at a rate equal to the non-Default rate (or the Default rate, if adequate

- 2 -

protection is provided to any other secured creditor at the Default rate), (2) all fees and expenses payable to Lender under this Agreement shall be paid on a monthly basis within five Business Days of submission to the Borrower, (3) copies of budgets, variance reports and reports on the Collateral, each with the same frequency as and consistent with those provided under any debtor-in-possession financing facility, (4) providing that any order approving the sale of the Collateral shall provide for the repayment of Loans with the proceeds of the Collateral received by the Borrower from such sale, and (5) such other terms as are reasonably requested by the Lender.

(e) Section 7.02 of the Agreement is hereby amended by deleting "." at the end of clause (i) and replacing it with "; and" and adding the following new negative covenants as clauses (j), and (k) of such Section 7.02:

(j) enter into any commitment for debtor-in-possession financing with any Person that contemplates the "priming" (in accordance with Section 364(d)(1) of the Bankruptcy Code) of the security interest created under Section 4.01 in favor of the Lender; and

(k) agree with any Person that adequate protection to be provided to the Lender in the event of the commencement of a Bankruptcy Case shall be anything other than the adequate protection specified in Section 7.01(ff), or permit the Guarantor to enter into any such agreement.

(f) Section 8.01(b) of the Agreement is hereby amended by deleting "Subsections 7.01(j), 7.02 (other than 7.02(g)), or 7.03" in clause (i) of such section and replacing it with "Subsections 7.01(j), (dd), (ee) and (ff), 7.02 (other than 7.02(g)), or 7.03".

(g) Section 8.01(e) of the Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

(e) Any "event of default" or other breach or failure to perform shall have occurred and shall be continuing beyond the expiration of any applicable grace period under the terms of any of the GMAC Facilities or any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds entered into by the Borrower, the Guarantor or any Material Affiliate on the one hand and any third party (including an Affiliate of the Borrower, the Guarantor or any Material Affiliate but excluding the Lender or any Affiliate of Lender), which relates to the Indebtedness of such Borrower, Guarantor or Material Affiliate in an amount individually or in the aggregate greater than $25,000,000;

(h) Schedule I to the Agreement is hereby amended by adding new definitions of "Ally Line of Credit" and "Ally Revolver" after the definition of "Ally Financial" to read as follows:

"Ally Line of Credit" shall mean that certain $1,100,000,000 secured line of credit facility provided by Ally Financial to the Borrower.

- 3 -

Confidential

"Ally Revolver" shall mean that certain senior debt loan provided by Ally Financial to Borrower.

(i) Schedule I to the Agreement is hereby amended by deleting the definition of "Applicable Margin", and replacing it with the following:

"Applicable Margin" shall mean 8.50% (850) basis points.

(j) Schedule I to the Agreement is hereby amended by deleting the definition of "Attributed Rate", and replacing it with the following:

"Attributed Rate" shall mean (a) with respect to Eligible Servicing Rights (other than "payment option ARMs" and "HELOCs"), 34%, and (b) with respect to "payment option ARMs" and "HELOCs", zero (0). Notwithstanding the foregoing, upon the earlier to occur of Lender's receipt of an Indebtedness Payment Notice or the making by any Person of an Indebtedness Payment, "Attributed Rate" shall mean (a) with respect to Eligible Servicing Rights (other than "payment option ARMs" and "HELOCs") 24%, and (b) with respect to "payment option ARMs" and "HELOCs", zero (0).

(k)     Schedule I to the Agreement is hereby amended by adding new definitions of "Bankruptcy Case", "Bankruptcy Code", "Bankruptcy Court" and "BMMZ Master Repurchase Facility" after the definition of "Available Loan Amount" to read as follows:

"Bankruptcy Case" means proceedings commenced by or against the Borrower under the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"Bankruptcy Court" means the any court having jurisdiction in a Bankruptcy Case to enter orders pursuant to the Bankruptcy Code.

"BMMZ Master Repurchase Facility" means the mortgage loan repurchase facility provided for in the Master Repurchase Agreement, dated as of December 21, 2011, among BMMZ Holdings LLC, as Buyer, GMAC Mortgage, LLC as Seller and Servicer, Residential Funding Company, LLC, as Seller, and Residential Capital, LLC, as Guarantor, as such facility may be amended and/or restated and otherwise in effect from time to time.

(l) Schedule I to the Agreement is hereby amended by deleting the definition of "Commitment Amount" and replacing it with the following:

"Commitment Amount" shall mean the lesser of (i) $158,000,000 and (ii) the lowest Outstanding Aggregate Loan Amount at any time outstanding under this Agreement. The Commitment Amount may be reduced in accordance with Section 2.10.

(m)Schedule I to the Agreement is hereby amended by deleting the definition of "GMAC Facilities" and replacing it with the following:

- 4 -

Confidential

"GMAC Facilities" means (i) the Ally Line of Credit, (ii) the Ally Revolver, (iii) the BMMZ Master Repurchase Facility and (iv) the GSAP Facility, each as such agreement may be amended and in effect from time to time.

(n) Schedule I to the Agreement is hereby amended by adding a new definition of "GSAP Facility" after the definition of "Government Authority" to read as follows:

"GSAP Facility" means, the servicing advance receivables financing facility entered into in connection with the Fourth Amended and Restated Indenture, dated as of March 15, 2011 among GMAC Mortgage Servicer Advance Funding Company LTD., as issuer, The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, Borrower, as an administrator and as a servicer and Guarantor as an administrator and as a servicer, as such facility may be amended and/or restated and otherwise in effect from time to time.

(o) Schedule I to the Agreement is hereby amended by adding new definitions of "Indebtedness Payment", "Indebtedness Payment Date" and "Indebtedness Payment Notice" after the definition of "Indebtedness" to read as follows:

"Indebtedness Payment" means any payment by the Borrower, the Guarantor or any subsidiary of the Guarantor, of any Indebtedness (other than Indebtedness created pursuant to this Agreement), but excluding (i) periodic payments of interest and fees on Indebtedness at the applicable non-default rate, and (ii) principal payments (but not prepayments) made in the ordinary course of business on the GMAC Facilities or the Borrower's early advance funding facility with Fannie Mae.

"Indebtedness Payment Date" means the date of any Indebtedness Payment.

"Indebtedness Payment Notice" means a written notice required in accordance with Section 7.01(ee) of this Agreement.

(p) Schedule I to the Agreement is hereby amended by deleting the definition of "Loan Repayment Date" and replacing it with the following:

"Loan Repayment Date" means, the earliest to occur of (i) May 30, 2012, (ii) a Change of Control of Borrower or Guarantor, or if such day is not a Business Day, the immediately preceding Business Day, (iii) such earlier date as may be notified by Lender in accordance with Section 8.02(a), or (iv) the date that is two (2) days prior to the maturity of any of the GMAC Facilities.

SECTION 2. Limited Effect. Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms. Reference to this Amendment need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being

- 5 -

Confidential

sufficient to refer to the Agreement as amended hereby.

SECTION 3.    Representations.    To induce the Lender to execute and deliver this Amendment, the Borrower hereby represents to the Lender that as of the date hereof, (i) the Borrower is in full compliance with all of the terms and conditions of the Facility Documents, and each of the GMAC Facilities and (ii) no Default or Event of Default has occurred and is continuing under the Facility Documents or any of the GMAC Facilities.

SECTION 4.    Conditions Precedent.    It shall be a condition precedent to the effectiveness of this Amendment that the Lender shall have received (i) a payment of an amount equal to the amount by which the Outstanding Aggregate Loan Amount immediately prior to the effectiveness of this Amendment exceeds the Commitment Amount as such term is amended in accordance with Section 1(l) hereof, (ii) the payment of all invoiced fees of Shearman & Sterling LLP and SNR Denton US LLP, and (iii) in consideration of the extension of the Loan Repayment Date pursuant to Section 1(o) hereof, (the payment of an extension fee in an amount equal to 2% of the Commitment Amount.

SECTION 5.    Governing Law.    This Amendment shall be construed in accordance with the laws of the State of New York and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws without regard to conflict of laws doctrine applied in such state (other than Section 5-1401 of the New York General Obligations Law).

SECTION 6.    Counterparts.    For the purpose of facilitating the execution of this Amendment, and for other purposes, this Amendment may be executed simultaneously in any number of counterparts.    Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.    The Lender and the Borrower each intend that faxed signatures and electronically imaged signatures such as PDF files shall constitute original signatures and are binding on all parties.    The original documents shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

Confidential

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____

Name: Joe Ruhli

Title: Treasury Executive

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____

Name: Joe Ruhlin

Title: Treasury Executive

CITIBANK, N.A., as Lender

By: _____

Name:

Title:

Amendment Number Ten to Amended and Restated Loan and Security Agreement

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

GMAC MORTGAGE, LLC, as Borrower

By: _____
    Name:
    Title:

RESIDENTIAL CAPITAL, LLC, as Guarantor

By: _____
    Name:
    Title:

CITIBANK, N.A., as Lender

By: _____
    Name:
    Title:    Susan Mills
             Vice President
             Citibank, N.A.

Amendment Number Ten to Amended and Restated Loan and Security Agreement

# Exhibit D

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------
                                                    )
In re:                                              )    Case No. 12-
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                                Debtors.            )    Joint Administration Pending
                                                    )
---------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT**
**TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 507(b) AND**
**BANKRUPTCY RULE 4001(B): (I) AUTHORIZING THE USE OF CASH**
**COLLATERAL AND RELATED RELIEF, (II) GRANTING ADEQUATE**
**PROTECTION AND (III) SCHEDULING A FINAL HEARING**

**(CITIBANK, N.A. CASH COLLATERAL)**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[1] hereby move this Court (the "Motion")[2] pursuant to sections 105, 361, 362, 363, and

507(b) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rule

4001(b) of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on
       Exhibit 1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors
       may file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such
       entities.

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the
       relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.



4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the Southern District of New York (the "Local Rules"), for entry of an interim order

(substantially in the form annexed hereto as <u>Exhibit A</u>, the "Interim Order") and a final order

(the "Final Order", and together with the Interim Order, the "Cash Collateral Orders")[3]

(i) authorizing the use of Citibank's cash collateral (the "MSR Cash Collateral")[4] and related

relief, (ii) granting adequate protection to Citibank, N.A. ("Citibank"), and (iii) scheduling a final

hearing regarding the same.[5]   In support of the Motion, the Debtors rely upon and incorporate by

reference the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC,

in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court concurrently

herewith (the "Whitlinger Affidavit").   In further support of the Motion, the Debtors, by and

through their undersigned counsel, respectfully represent:

## JURISDICTION

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and

this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 507(b),

Bankruptcy Rule 4001(b) and Local Rule 4001-2.

---

[3]       A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing (as defined below).

[4]       As used herein, "<u>MSR Cash Collateral</u>" means the cash collateral (as defined in section 363(a) of the Bankruptcy Code) of Citibank, N.A under the Citibank MSR Facility (as defined herein).

[5]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Whitlinger Affidavit or in the proposed Interim Order.

## PRELIMINARY STATEMENT

2.      The Debtors operate in a highly regulated business in which they service

over 2.4 million mortgage loans with an aggregate unpaid principal balance of approximately

$374.2 billion, which are held by private investors or included in securitization trusts.  The

holders of these loans, and the purchasers of the mortgage-backed securities ("MBS") issued by

the securitization trusts, are comprised of a broad range of investors, such as pension funds,

banks, insurance companies, governmental bodies and other public and private entities.  These

investors depend on the performance of the Debtors, as servicer, to ensure the recovery of their

investments.  The Debtors intend to sell their mortgage loan origination and loan servicing

businesses in these Chapter 11 cases, and the Debtors expect that such sale will yield a

significant return for the benefit of the Debtors' estates and creditors.  The Debtors' largest cash

need, by far, is to fund the servicing advances required under the servicing agreements.

Accordingly, the Debtors request use of the MSR Cash Collateral so that they can maintain the

servicing business and preserve the value of their assets pending one or more sales of their

businesses.

3.      The MSR Cash Collateral will be used, among other things, to fund only

the cash needs related to the operations (including funding advances and loan repurchases the

Debtors are obligated to make in accordance with their servicing agreements with Fannie Mae

and Freddie Mac, which servicing rights secure the Citibank MSR Facility, as well as an

allocated portion of the costs to administer the Bankruptcy Cases based on the value of the

Prepetition MSR Collateral relative to the value of the Debtors' other assets) and assets of the

Citibank MSR Facility collateral pool.

4.      In exchange for the use of the MSR Cash Collateral, Citibank will receive

(i) the MSR Adequate Protection Liens, (ii) superpriority administrative expense claims, (iii) the

ny-1039734

Adequate Protection Payments, and (iv) the Debtors will seek authority under any order

approving the sale of MSR Collateral to repay the loans under the Citibank MSR Facility with

the proceeds of such collateral received by the Debtors from such sale, subject to the interests

(collectively, the "Agency Interests") of Freddie Mac and Fannie Mae as set forth in (a) the

Prepetition MSR Agreement, (b) the Federal Home Loan Mortgage Corporation

Acknowledgement Agreement among Freddie Mac, GMAC Mortgage and Citibank, N.A. dated

March 12, 2009, and (c) the  Acknowledgement Agreement (Single Secured Party) among

Citibank, N.A., GMAC Mortgage and Fannie Mae dated September 7, 2007.

     5.      It is critical that the Debtors have access to the MSR Cash Collateral

within the first week of the cases so they can continue operating their mortgage loan servicing

business in the ordinary course, which will instill public confidence in the Debtors' capabilities

to continue functioning as a servicer, notwithstanding the commencement of these Chapter 11

cases.  If the Debtors are unable to demonstrate sufficient liquidity, borrowers and the market

could experience confusion and uncertainty.  Borrowers may refuse to make payments to the

Debtors, thus impairing the Debtors' ability to continue meeting their ongoing payment

obligations (e.g., making payment advances required under certain circumstances for the benefit

of investors and paying certain securitization fees) and the Debtors' future capacity to collect on

these loans.  Similarly, it is essential that the Debtors remain vigilant to ensure that borrowers

continue making payments on their loans (e.g., by sending out bills and ensuring the collection

and proper distribution of funds received).  If the Debtors' ability to do so is impaired, there is a

real risk that delinquencies and defaults may materially increase to the ultimate detriment of the

Debtors' estates.

ny-1039734

6.      Further, if the Debtors do not continue to honor their ordinary course servicing commitments for mortgage loans which are owned, insured or guaranteed by the federal government sponsored entities Fannie Mae and Freddie Mac, or by the corporation Ginnie Mae (the "Agency Loans"),[6] they face the possible termination of their Agency Loan servicing rights, which, if successful, would result in the loss of future servicing fees, with a concomitant tremendous (and potentially catastrophic) loss to their estates.  The Debtors also may incur penalties under recent settlements with the federal government and various state agencies, pursuant to which the Debtors agreed to, among other things, certain heightened servicing requirements with respect to the Agency Loans.

7.      Accordingly, the Debtors believe that the terms governing the proposed use of the MSR Cash Collateral are reasonable, and the use of the MSR Cash Collateral is necessary to support the Debtors' operations and restructuring activities throughout the Chapter 11 cases for the ultimate benefit of all creditors and other parties in interest pending the closing of the sales of the Debtors' assets.

### BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 CONCISE STATEMENT[7]

8.      It is critical that the Debtors have access to the MSR Cash Collateral during these Chapter 11 cases.  This is the first time a debtor has tried to sell an operating servicing and origination platform in bankruptcy.  The use of the MSR Cash Collateral will

---

[6]      As used herein, Ginnie Mae is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans Affairs ("VA").

[7]      The descriptions of the terms of the proposed Interim Order provided in this Motion are intended only as summaries. In the event of any inconsistency between the descriptions set forth herein and the terms of the Interim Order, the terms of the Interim Order shall govern. **Local Rule 4001-2 requires the Debtors to highlight certain provisions in the motion in any proposed cash collateral order. Sections that must be highlighted for the Court are in bold and are marked with an asterisk.**

provide the Debtors with the liquidity to achieve this result, which will create substantial value

for the Debtors' estates.

9.    In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2,

below is a summary of the terms of the proposed use of the MSR Cash Collateral:

| | |
|---|---|
| **Use of the MSR Cash Collateral** | The Debtors shall use the MSR Cash Collateral to pay expenses of operating their business. The MSR Cash Collateral securing the revolving facility with Citibank (the "Citibank MSR Facility")[8] shall be used to fund only the cash needs related to the operations (including funding advances and loan repurchases the Debtors are obligated to make in accordance with their servicing agreements with Fannie Mae and Freddie Mac,[9] which servicing rights (the "Servicing Rights") secure the Citibank MSR Facility, as well as an allocated portion of the costs to administer the Bankruptcy Cases based on the value of the Prepetition MSR Collateral (as defined below) relative to the value of the Debtors' other assets) and assets of the Citibank MSR Facility collateral pool. |
| | The Debtors shall segregate the MSR Cash Collateral and deposit it into a new concentration account at JP Morgan Chase Bank, N.A. ("JPM") that is subject to a deposit account control agreement between JPM, Citibank and GMAC Mortgage (the "MSR Concentration Account").  **Interim Order ¶ 3.** |
| **Termination Date** | In the absence of further order of the Bankruptcy Court, the Debtors shall no longer be authorized pursuant to the Cash Collateral Orders to use the MSR Cash Collateral without the consent of Citibank after the earliest to occur of: (i) the date that is 18 months from the closing date of the DIP Facility, (ii) 45 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day period, (iii) the effective date of a Chapter 11 plan for any Debtor with assets exceeding $10 million, and (iv) the date on which maturity of the DIP Facility is accelerated pursuant to the DIP Credit Agreement (as defined in the DIP Motion) as a result of an event of default.  **Interim Order ¶ 3.** |

---

[8]    "Citibank MSR Facility" means that certain Amended and Restated Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or otherwise modified, including pursuant to Amendment Number Ten, dated March 30, 2012, pursuant to which Citibank agreed, among other things, to the extension of the Loan Repayment Date (as defined in the Amended and Restated Loan and Security Agreement) to May 30, 2012, the "Prepetition MSR Agreement" and, together with all other loan and security documents related to, referenced in or executed in connection with the Prepetition MSR Agreements, the "Prepetition MSR Credit Documents"), among GMAC Mortgage, LLC ("GMAC Mortgage"), as Borrower, Residential Capital LLC, as Guarantor, and Citibank, as Lender.

[9]    As used herein, "Fannie Mae" means the Federal National Mortgage Association, "Freddie Mac" means the Federal Home Loan Mortgage Corporation and "Ginnie Mae" means the Government National Mortgage Association.  Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress and are referred to herein as the "GSEs."  Fannie Mae and Freddie Mac securitize or buy mortgage loans originated by mortgage lenders, enabling the lenders to replenish their funds so that they can make loans to other homeowners.

| | |
|---|---|
| **Adequate Protection** | Citibank, in its capacity as lender under the Citibank MSR Facility, shall receive the following: |

(a) additional and replacement continuing, valid, binding, enforceable, non-avoidable, and automatically perfected security interests and liens (the "MSR Adequate Protection Liens") on any and all presently owned and hereafter acquired assets of the Debtors and their estates that do or would (absent the commencement of the Cases) constitute Prepetition MSR Collateral under the Prepetition MSR Credit Documents, including but not limited to all cash in the MSR Concentration Account (such assets, together with the Prepetition MSR Collateral, the "MSR Collateral"), which shall be senior to the liens (the "DIP Liens") granted to the DIP Lenders under the DIP Facility (each as defined below) and shall not be made subject to or *pari passu* with any lien or security interest granted in these Chapter 11 cases;

(b) to the extent the MSR Adequate Protection Liens are insufficient to provide adequate protection, superpriority administrative expense claims which (i) shall be junior to the superpriority administrative expense claims granted to the Debtors' proposed providers of debtor in possession financing and the Carve Out,[10] and (ii) may be *pari passu* with the superpriority administrative expense claims granted to any parties that provide the Debtors' with use of cash collateral  (collectively, the "Permitted Superpriority Claims");

(c) adequate protection payments (the "Adequate Protection Payments") consisting of: (i) payments of interest on the Prepetition MSR Obligations at the non-default rate set forth in the Prepetition MSR Agreement, (ii) any fees of Citibank, including professionals' fees, pursuant to the Prepetition MSR Agreement payable at the times specified in the Prepetition MSR Agreement; and (iii) ongoing payment of the reasonable fees, costs and expenses of Citibank, including, without limitation, the payment of the reasonable fees and expenses of legal and other professionals retained by Citibank; and

(d) the Debtors shall seek authority under any order approving the sale of MSR Collateral to repay the loans under the Citibank MSR Facility with the proceeds of such collateral received by the Debtors from such sale, subject to the Agency Interests (as defined below). **Interim Order ¶¶ 4-6.**

| | |
|---|---|
| **Reporting** | Reporting shall include (i) the monthly servicing tapes required under the MSR Prepetition Agreement, (ii) on a bi-weekly basis, variance reports on actual vs. projected cash flows of the operations with respect to the MSR Collateral (with updated budgets[11] provided every |

---

[10]  The Carveout includes: (i) all fees and expenses in an aggregate amount of up to $25,000,000 incurred by professionals of the Debtors and the official committee of unsecured creditors appointed in the Chapter 11 cases following delivery of notice of an event of default under the DIP Facility, (ii) allowed unpaid professional fees and disbursements incurred prior to the delivery of the notice, (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court, and (iv) fees and expenses up to $500,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.  The Carveout generally does not include professional fees and disbursements incurred in connection with challenges against the DIP Lenders (but may be used by professionals for any official committee to investigate certain matters in an amount not to exceed $100,000).

[11]  The Debtors believe that the budget will be adequate, considering all available assets, to pay all administrative expenses due and accruing during the period covered by the financing or the budget.  The Debtors' variance reports are for informational purposes only, and the Debtors' failure to meet any variance obligation shall not be considered a default or breach of the Debtors' obligations described herein.

four (4) weeks), (iii) monthly collateral reports and such other monthly, quarterly, or annual financial reports, each consistent with those provided under any postpetition financing facilities, (iv) notice of any changes in tier rating of GMAC Mortgage by Freddie Mac or Fannie Mae, and (v) a copy of each monthly report filed by the Debtors in these Chapter 11 cases as required by the Court, the U.S. Trustee or applicable law.  **Interim Order ¶ 10.**

**Events of Default**

The occurrence of any of the following events, unless waived by Citibank, shall constitute an event of default:

(i) an event of default is declared under the DIP Facility;

(ii) failure to satisfy the reporting requirements under the Interim or Final Order, as applicable, that continues unremedied for a period of five (5) business days after the date it was due;

(iii) any failure to perform or observe any term, covenant or agreement under the Interim or Final Order, as applicable, that is not otherwise specified as an Event of Default and that remains unremedied for fifteen (15) business days;

(iv) any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 cases) shall occur under any material document or agreement that relates to the Prepetition MSR Agreement or the MSR Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of Citibank;

(v) any liens, claims and other interests created by the Cash Collateral Orders shall cease to be valid, perfected and enforceable and of the same priority purported to be created thereby or any of the Debtors or their subsidiaries shall challenge in any action the validity, perfection, enforceability or priority thereof;

(vi) dismissal of any of the Chapter 11 cases with assets exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting such dismissal) or conversion of any of the Chapter 11 cases with assets exceeding $10 million to a case under chapter 7 of the Bankruptcy Code (or any of the Debtors or their affiliates seeking or supporting such conversion);

(vii) appointment of a trustee (or comparable person) or a responsible officer or examiner with expanded powers in any of the Chapter 11 cases with assets exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting such appointment);

(viii) entry of an order granting relief from the automatic stay as to MSR Collateral with a value in excess of $10 million (or any of the Debtors or their affiliates seeking or supporting such relief) (i) to allow any creditor to execute upon or enforce a lien on or security interest in any MSR Collateral, or (ii) with respect to any lien of or the granting of any lien on any MSR Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

(ix) a court shall enter an order amending, supplementing, staying, vacating, reversing or otherwise modifying the Interim or Final Order, as applicable except as otherwise agreed to in writing by Citibank, or the Cash Collateral Orders shall cease to be in full force and effect; *provided* that no event of default shall occur to the extent that any such amendment, supplement or other modification is made in compliance with the Cash Collateral Orders and is not adverse to Citibank, in the reasonable judgment of Citibank;

8

(x) entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior to or *pari passu* with the claims of Citibank or any lien or security interest that is senior to or *pari passu* with the liens and security interests securing the Citibank MSR Facility, except for the Permitted Superpriority Claims;

(xi) entry of an order authorizing recovery from the MSR Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than as may be provided in the Cash Collateral Orders, or certain de minimis amounts;

(xii) upon written notice from Citibank, any material misrepresentation of a material fact made after the Petition Date by any of the Debtors or their agents to Citibank or its agents about the financial condition of the Debtors, or any of them, the nature, extent, location or quality of any MSR Collateral, or the disposition or use of any MSR Collateral, including the MSR Cash Collateral;

(xiii) the sale after the Petition Date of any portion of the MSR Collateral except pursuant to an order that provides for the repayment of the Prepetition MSR Obligations from the proceeds of such sale, subject to the Agency Interests; and

(xiv) upon written notice from Citibank, the material failure to make Adequate Protection Payments or other payments to Citibank when due, subject to a cure period of five (5) days. **Interim Order ¶ 12.**

| **Debtors' Stipulations** | The Debtors stipulate that: |
|---|---|

(a)  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition MSR Agreement was not less than $152 million (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition MSR Credit Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorney's fees, related expenses and disbursements), reimbursement obligations, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof to the extent and as provided for in the Prepetition MSR Credit Documents, including all "Obligations" as described in the Prepetition MSR Agreement, the "Prepetition MSR Obligations").  Subject to any Challenges within the Challenge Period, in light of the Prepetition MSR Obligations and the value of the MSR Prepetition Collateral with respect thereto, Citibank is oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR Obligations in accordance with the Prepetition MSR Credit Documents.

(b) As more fully set forth in the Prepetition MSR Credit Documents, prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, all of the Debtors' existing and after acquired Servicing Rights, to the full extent of the Debtors' interest therein and regardless of where located, whether or not yet accrued, earned, due or payable, as well as all other present and future rights and interests of GMAC Mortgage in such Servicing Rights, all contracts with Fannie Mae and Freddie Mac relating to the Servicing Rights, and all monies due or to become due with respect to and all proceeds of the Servicing Rights and related collateral (collectively, the "Prepetition MSR Collateral") to Citibank (the "Prepetition MSR Liens").

(c) Subject to any Challenges within the Challenge Period, each of the Debtors acknowledges and agrees that: (a) as of the Petition Date, the Prepetition MSR Liens on the

9

Prepetition MSR Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) the Prepetition MSR Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (c) other than the Agency Interests (as defined below), to the extent set forth in the Agency Acknowledgement Agreements (as defined below), no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition MSR Liens or Prepetition MSR Obligations exist; (d) no portion of the Prepetition MSR Liens or Prepetition MSR Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under the Bankruptcy Code, against Citibank or its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to its loans to the Debtors under the Prepetition MSR Credit Documents.

(d) As of the Petition Date, the Prepetition MSR Liens were senior in priority over any and all other liens on the Prepetition MSR Collateral, subject only to the interests (collectively, the "Agency Interests") of Freddie Mac and Fannie Mae as set forth in (a) the Prepetition MSR Agreement, (b) the Federal Home Loan Mortgage Corporation Acknowledgement Agreement among Freddie Mac, GMAC Mortgage and Citibank, N.A. dated March 12, 2009 (the "Freddie Mac Acknowledgement Agreement"), and (c) the Acknowledgement Agreement (Single Secured Party) among Citibank, N.A., GMAC Mortgage and Fannie Mae dated September 7, 2007 (the "Fannie Mae Acknowledgement Agreement" and, together with the Freddie Mac Acknowledgement Agreement, the "Agency Acknowledgement Agreements").

(e) Each Debtor represents that all of the Debtors' cash proceeds of the Servicing Rights and related collateral, including but not limited to all cash on deposit in that certain "Collection Account," as defined in the Prepetition MSR Agreement and the MSR Collateral Account (as defined herein), constitutes the MSR Cash Collateral. **Interim Order ¶ G.**

| | |
|---|---|
| **Determination of the Validity, Enforceability, and Amount of the Claims and Liens of Citibank** | The Interim Order contains acknowledgements as to the validity, enforceability and amount of Citibank's claims and that the liens securing the Citibank MSR Facility (the "Stipulated Claims and Liens") are properly perfected, valid, enforceable and non-avoidable, *provided*, however, that any party shall have seventy-five (75) days from entry of the Interim Order (the "Challenge Period") to commence a challenge (each, a "Challenge") to the amount and validity of the Stipulated Claims and Liens. **Interim Order ¶ G.** |
| **Section 506(c) Waiver** | Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 cases at any time shall be charged against Citibank or any of its claims or the MSR Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of Citibank, and no such consent shall be implied from any other action, inaction, or acquiescence by Citibank. **Interim Order ¶ 18.** |
| **Reservation of Rights** | Citibank's consent to the use of the MSR Cash Collateral shall be without prejudice to Citibank seeking additional adequate protection in the event that of a diminution of the value of the MSR Collateral, or if circumstances otherwise warrant. **Interim Order ¶ 21.** |

10

| **Waiver of Automatic Stay** | Upon the occurrence and during the continuation of an event of default under the DIP Facility, (i) Citibank shall have customary remedies, including, upon seven (7) days' written notice, relief from the automatic stay without further order of or application to the Bankruptcy Court to permit Citibank exercise its to rights and remedies as set forth in the Prepetition MSR Documents or under applicable law (including the right to setoff monies of the Debtors in accounts maintained with Citibank and delivery of a shifting control notice with respect to the MSR Collateral Account (as defined in the Prepetition MSR Documents)). **Interim Order ¶ 13.** |
|---|---|

## BACKGROUND

10.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has been appointed in these Chapter 11 cases.

11.     A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

12.     The Debtors' primary and most valuable business operations consist of servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank (f/k/a GMAC Bank), and other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal balance of approximately $374 billion.  To preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the Debtors developed and are prepared to implement a strategy that provides maximum value to the Debtors' estates.

13.     The Debtors negotiated and entered into two separate asset purchase agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder

11

("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the "Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the "Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

14.    In furtherance of their restructuring strategy, and contemporaneous with the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to, among other things, establish auction and sale procedures for the Asset Sales,[12] and for approval to consummate the Asset Sales under a plan.  If, however, the Debtors do not obtain confirmation of a plan, the Sale Motion allows the Debtors to pursue an alternative course of action and immediately move forward with the Asset Sales under Bankruptcy Code section 363(b) and outside of a plan.

## I.    Overview of the Debtors' Businesses

15.    The Debtors are a leading residential real estate finance company indirectly owned by AFI, which is not a Debtor in these Chapter 11 proceedings.  As of the Petition Date, the Debtors and their non-debtor affiliates, including Ally Bank, are collectively the tenth largest originator and fifth largest servicer of residential mortgage loans in the United States.  The Debtors, together with their non-debtor subsidiaries, manage the mortgage-related businesses in two business lines: (i) the ongoing Origination and Servicing business and (ii) the Legacy Portfolio and Other operations, which are being wound down.

---

[12] *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m) and 365 and 1123 and Fed R. Bankr. P. 2002, 6004, and 6006 and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion").

A.      **Origination and Servicing**

16.      The principal activities of the Debtors' Origination and Servicing are:
(a) brokering, originating, purchasing, selling and securitizing residential mortgage loans
throughout the United States for the Debtors and their non-debtor affiliate, Ally Bank; and
(b) servicing residential mortgage loans throughout the United States for the Debtors, Ally Bank
and other investors in residential mortgage loan and mortgage-backed securities ("MBS").

17.      GMAC Mortgage, under the GMAC Mortgage brand, brokers and
originates mortgage loans through a consumer lending business that consists of internet and
telephone-based call center operations and, to a lesser extent, a retail network of loan officers
who have direct contact with consumers, including through referrals from builders, realtors, and
other third parties.  GMAC Mortgage brokers its loan production in 47 states to Ally Bank.[13]
Ally Bank underwrites and originates loans based on loan application packages submitted by
GMAC Mortgage in accordance with applicable regulatory and industry standards.  In recent
years, substantially all of the Debtors' loan production has consisted of conforming loans (that is,
loans that meet the required guidelines of Fannie Mae, Freddie Mac or Ginnie Mae, as
applicable) and a limited number of prime nonconforming jumbo mortgage loans.

18.      In the years ended December 31, 2010 and 2011 and the three months
ended March 31, 2012, the Debtors brokered $7.4 billion, $7.3 billion and $3.6 billion,
respectively, of mortgage loans to Ally Bank.  During the same periods, Debtors purchased $66.3
billion, $56.7 billion and $9.9 billion, respectively, of mortgage loans from Ally Bank.

---

[13] GMAC Mortgage does not originate loans in Hawaii.  Ally Bank does not have the licenses to originate mortgage
      loans in Nevada and Ohio, in which states, GMAC Mortgage originates and funds mortgage loans directly.

19.     A fundamental part of the Debtors' business strategy consists of securitizing or selling substantially all of the mortgage loans they purchase or originate.  As described in greater detail in the Whitlinger Affidavit, the Debtors participate in the securitization programs of Fannie Mae, Freddie Mac and Ginnie Mae.  The Debtors also pool together non-conforming mortgage loans in their own names ("private label") and convey the pool of loans to newly formed private label securitization trusts.[14]  In each case, the securitization trust issues securities to a broad range of investors, including pension funds, money market funds, mutual funds, banks, insurance companies, governmental bodies and other public and private entities.

20.     Since 2008, mortgage loan servicing has been the Debtors' primary source of ongoing revenue.  The Debtors hold "mortgage servicing rights" (referred to as "**MSRs**") that consist of primary, master, or sub-servicing rights.  As a primary servicer, the Debtors, among other things, collect and remit mortgage loan payments, respond to borrower inquiries, account for and apply principal and interest, hold custodial and escrow funds for payment of property taxes and insurance premiums, provide ancillary products, counsel or otherwise work with delinquent borrowers, supervise foreclosures and property dispositions, make advances of required principal, interest, and certain "property protection" costs with respect to delinquent and defaulted mortgage loans and the real estate that the trust or owner acquires as the result of a foreclosure of the loan (the "**Advances**"), and generally administer the loans consistent with their contractual undertakings and business practices.  When the Debtors act as master servicer, they collect mortgage loan payments from primary servicers or sub-servicers and distribute those

---

[14]     Since the decline in the mortgage industry beginning in 2007, the Debtors have sold mortgage loans into only two private label securitizations.

funds to investors and to other transaction parties in mortgage-backed and mortgage-related

asset-backed securities and whole-loan packages.[15]  Finally, as a sub-servicer, the Debtors

perform functions similar to the primary servicing functions described above pursuant to

contractual arrangements with other servicers.  The Debtors receive a fee based on the unpaid

principal balance ("**UPB**") of the mortgage pool, or in some cases, for each loan serviced.  In

addition, the Debtors may receive other remuneration for loan servicing, including interest

earned on custodial accounts where mortgage payments are held pending remittance to investors,

as well as borrower-contracted fees, such as late charge fees, assignment transfer fees, and other

incidental fees and charges.

21.    As of March 31, 2012, the Debtors acted as the primary servicer for

approximately 1.5 million loans having an aggregate UPB of approximately $197 billion.  In

addition, as of March 31, 2012, the Debtors acted as subservicer for over 847,000 loans having

an aggregate UPB of approximately $169 billion, including mortgage loans for which Ally Bank

retains the MSRs and whole loans owned by Ally Bank.  The Debtors are the master servicer for

approximately 439,000 loans having an aggregate UPB of approximately $58.7 billion as of

March 31, 2012, including loans having an aggregate UPB of $7.8 billion for which the Debtors

are the master servicer but not the primary servicer.

## B.    Legacy Portfolio and Other

22.    The Debtors' legacy portfolios principally consist of the remaining

mortgage loan assets from their historical non-conforming domestic residential mortgage loan

origination and securitization activities, the Debtors' remaining international operations, and the

---

[15]    In addition, for Agency Securitizations, they provide certain key services, including advancing required principal and interest and other expenses with respect to mortgage loans (to the extent the primary servicer does not make such advances), claims administration, oversight of primary servicers and sub-servicers, loss mitigation, investor reporting, and other contractual functions.

Debtors' captive mortgage reinsurance operation.  The legacy portfolios are being wound down

through opportunistic asset sales, workouts, or other strategic disposition transactions.

## II.    Overview of the Certain of the Debtors' Prepetition Debt

23.    The Debtors are borrowers under credit facilities and also maintain

collateralized nonrecourse borrowing facilities for securitization trusts.[16]  The Debtors also are

the issuer of $2.1 billion of secured and $972.2 million of unsecured publicly traded U.S. dollar,

Euro and U.K. Sterling-denominated notes.

24.    The Debtors are party to a revolving facility with Citibank, referred to

herein as the Citibank MSR Facility.  The Debtors own MSRs with a carrying value as of March

31, 2012 of approximately $1.3 billion.  GMAC Mortgage is a borrower, and ResCap is the

guarantor, under the Citibank MSR Facility, consisting until March 30, 2012, of a $300 million

committed line with an additional $250 million of uncommitted capacity secured by MSRs for

mortgage loans in Fannie Mae and Freddie Mac securitization pools.  The Citibank MSR

Facility, originally scheduled to terminate on March 30, 2012, was extended to the earlier of

(i) two days prior to the maturity of the AFI Senior Secured Credit Facility[17] and the AFI LOC[18]

---

[16]    As required by New York State for licensing purposes, Debtors also have a $1 million line of credit with Citibank.

[17]    On December 30, 2009, Debtors Residential Funding Company, LLC ("RFC") and GMAC Mortgage, as borrowers, and Debtors ResCap, Passive Asset Transactions, LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as guarantors, entered into a loan agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior Secured Credit Facility"), amending and restating in its entirety the original loan agreement entered into on June 4, 2008.  The AFI Senior Secured Credit Facility terminates on May 14, 2012, and the outstanding principal amount as of the Petition Date is approximately $747 million.  The AFI Senior Secured Credit Facility is described in greater detail in the Whitlinger Affidavit.

[18]    On December 30, 2009, Debtors RFC and GMAC Mortgage, as borrowers, Debtors ResCap, PATI and RAHI and certain other Debtors, as guarantors, and AFI, as agent and lender, also entered into a $1.1 billion amended and restated secured loan agreement (as amended from time to time, the "AFI LOC") in order to consolidate under one agreement the terms and provisions of two secured credit agreements with AFI.  AFI LOC terminates on May 14, 2012.  The outstanding principal amount under the AFI LOC as of Petition Date was approximately $380 million.  The AFI LOC provides funds to the Debtors, generally limited to unused capacity, when the Debtors' unrestricted liquidity is less than $300 million.  The AFI

(Footnote continues on next page.)

16

or (ii) May 30, 2012. As part of the extension, the Citibank MSR Facility is no longer revolving

and the Debtors repaid $124 million of the outstanding principal.  The outstanding principal

amount of all loans under the Citibank MSR Facility as of the Petition Date is $152 million.

## III.    Cash Needs Post-Filing

25.    The Debtors seek to continue their operations, including the origination,

servicing, and sale of mortgage loans, in the ordinary course pending the closing of the Asset

Sales.  The Debtors are optimistic that the sale of the servicing platform will yield a significant

return for the benefit of their estates and creditors.  As described in greater detail in the Sale

Motion, Purchaser requires, as a condition to closing, that the Debtors maintain their servicing

operations until the sale is consummated.  Thus, the use of the MSR Cash Collateral is necessary

to preserve the value of their servicing platform for the ultimate benefit of their stakeholders

pending the closing of the sale of these assets to Purchaser.  At the same time, the Debtors will

continue to earn loan servicing fees and other fees in the ordinary course of business.

26.    Further, the Debtors seek to use the MSR Cash Collateral to maintain their

mortgage loan servicing business in the ordinary course to instill confidence in their capabilities

to continue functioning as a servicer, notwithstanding the commencement of these Chapter 11

cases.  If the Debtors are unable to demonstrate sufficient liquidity, borrowers and the market

could experience confusion and uncertainty.  Borrowers may refuse to make payments to the

Debtors, thus impairing the Debtors' ability to continue meeting their ongoing payment

obligations (e.g., making payment advances required under certain circumstances for the benefit

of investors and paying certain securitization fees) and the Debtors' future capacity to collect on

_____

(Footnote continued from previous page.)

LOC is described in greater detail in the Whitlinger Affidavit.

ny-1039734

these loans.  Similarly, it is essential that the Debtors remain vigilant to ensure that borrowers

continue making payments on their loans (e.g., by sending out bills and ensuring the collection

and proper distribution of funds received).  If the Debtors' ability to do so is impaired, there is a

real risk that delinquencies and defaults may materially increase to the ultimate detriment of the

Debtors' estates.

27.    Further, if the Debtors do not continue to honor their ordinary course

servicing commitments for mortgage loans which are owned, insured or guaranteed by the

federal government sponsored entities Fannie Mae and Freddie Mac, or by the corporation

Ginnie Mae (the "Agency Loans"), they face the possible termination of their Agency Loan

servicing rights, which, if successful, would result in the loss of future servicing fees, with a

concomitant tremendous (and potentially catastrophic) loss to their estates.  The Debtors also

may incur penalties under recent settlements with the federal government and various state

agencies, pursuant to which the Debtors agreed to, among other things, certain heightened

servicing requirements with respect to the Agency Loans.

28.    In addition, Citibank and the Debtors have negotiated at arm's length and

in good faith regarding the Debtors' use of the MSR Cash Collateral, and Citibank has consented

to the use of the MSR Cash Collateral as described herein.

29.    Accordingly, the relief herein requested is in the best interests of the

Debtors' estates and amply warranted under the circumstances.

## RELIEF REQUESTED

30.    This Motion is one of three related motions that collectively seek authority

for the Debtors to obtain financing and utilize the cash collateral of certain secured lenders, each

of whose claims is secured by its own separate set of cash-generating collateral.

Contemporaneously herewith, the Debtors have also filed (i) a separate motion[19] to (a) obtain

postpetition financing from AFI in the form of postpetition draw(s) under the AFI LOC, and

(b) utilize the cash collateral of AFI and the Junior Noteholders with respect to the assets

securing the AFI LOC, the AFI Senior Secured Credit Facility, and the Junior Secured Notes,[20]

and (ii) a separate motion (the "DIP Motion")[21] to obtain postpetition financing (the "DIP

Facility") on a senior secured, superpriority basis from Barclays Bank PLC ("Barclays"), as

Administrative Agent on behalf of a syndicate of lenders (collectively, the "DIP Lenders").

While the motions and orders are separate, each relating to separately identifiable collateral, they

are being presented in tandem and must be granted together as an integrated whole for the

Debtors to be able to continue operating their businesses seamlessly and without interruption

pending one or more sales of their business lines and assets.

      31.     The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases. The

Debtors propose that an affiliated debtor be deemed to be a Future Debtor upon the Court's entry

---

[19]     <u>See</u> *Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (Debtor in Possession Financing and Ally Financial Inc. and Junior Secured Noteholders Cash Collateral)*

[20]     As of the Petition Date, the outstanding principal amount of the 9.625% junior secured notes due 2015 (the "Junior Secured Notes", and the holders thereof, the "Junior Noteholders") was approximately $2.1 billion. The Junior Secured Notes are described in greater detail in the Whitlinger Affidavit.

[21]     <u>See</u> *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (a) Enter Into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (b) Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Scheduling a Final Hearing, and (III) Granting Related Relief.*

19

of an order authorizing the joint administration of such Future Debtor's Chapter 11 case with the

Chapter 11 cases of the Debtors.

## APPLICABLE AUTHORITY

**I.     The Use of the MSR Cash Collateral is Necessary**

32.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not

use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section." 11 U.S.C. § 363(c)(2).

33.     It is essential that the Debtors obtain authority to use the MSR Cash

Collateral to fund the day-to-day operating expenses of their businesses.  Indeed, absent

sufficient funds to support the Debtors' servicing business, the value of that asset will quickly

erode and the Debtors' ability to service loans will be greatly jeopardized to the detriment of the

Debtors' estates, as well as borrowers of and investors in the mortgage loans.

34.     Citibank has consented to the Debtors' continued use of the MSR Cash

Collateral pursuant to the terms of the Interim Order and Final Order.  Thus, the Court has

authority to enter such orders pursuant to section 363(c)(2) of the Bankruptcy Code.

35.     Accordingly, authorization to use the MSR Cash Collateral is in the best

interests of the Debtors' estates and creditors.

**II.    The Interests of Citibank are Adequately Protected**

36.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, Citibank is

entitled to adequate protection of its interest in the MSR Cash Collateral for, and equal in amount

to, the aggregate diminution in the value of its security interests in the MSR Cash Collateral as a

result of the Debtors' use, sale or lease of the MSR Cash Collateral.  See 11 U.S.C. § 363(e) ("on

request of an entity that has an interest in property used, sold, or leased, or proposed to be used,

sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition

such use, sale, or lease as is necessary to provide adequate protection of such interest.").

37.    What constitutes adequate protection is determined on a case-by-case

basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate

protection is a fact-specific inquiry . . . left to the vagaries of each case") (quotation omitted); In

re Realty Sw. Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).  Although the Bankruptcy

Code does not define the term "adequate protection," it provides a non-exhaustive list of types of

adequate protection, including "other relief" resulting in the "indubitable equivalent" of the

secured creditor's interest in such property.  See 11 U.S.C. § 361.  Specifically, section 361 of

the Bankruptcy Code provides the following non-exclusive examples of what may constitute

adequate protection:

> (1)    requiring the trustee to make a cash payment or periodic
> cash payments to such entity, to the extent that the . . . use . . . under
> section 363 . . . results in a decrease in the value of such entity's interest in
> such property;
>
> (2)    providing to such entity an additional or replacement lien to
> the extent that such . . . use . . . results in a decrease in the value of such
> entity's interest in such property; or
>
> (3)    granting such other relief . . . as will result in the realization
> by such entity of the indubitable equivalent of such entity's interest in
> such property.

11 U.S.C. § 361.  Essentially, the Bankruptcy Code intends "adequate protection" to shield a

secured creditor from diminution in the value of its interest in the particular collateral during the

period of use by the debtor.  See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor

from diminution in value of its interest during the Chapter 11 case); Save Power Ltd. v. Pursuit

Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.), 193 B.R. 713, 716 (Bankr. D. Del.

1996) (holding creditor adequately protected if no diminution in value of collateral).

38.    Here, the Debtors believe that Citibank is adequately protected in several ways in connection with the Debtors' proposed use of the MSR Cash Collateral.  <u>First</u>, Citibank will be granted replacement liens and additional liens related to the use of its MSR Cash Collateral.  <u>Second</u>, Citibank will be adequately protected by the superpriority administrative expense claims granted by the Debtors.  <u>Third</u>, Citibank will receive Adequate Protection Payments consisting of current interest paid at the non-default rate, as well as payments of all fees and expenses, each to the extent permitted by the applicable loan documents.  <u>Fourth</u>, the Debtors have agreed to seek authority to use the proceeds from any sale of Prepetition MSR Collateral to repay the loans under the Citibank MSR Facility, subject to the Agency Interests.  <u>Fifth</u>, the MSR Cash Collateral will be used only to fund the Debtors' operations related to Citibank's collateral pool, including the payment of servicing Advances and related fees or the repurchases of loans related to the Prepetition MSR Collateral (plus an allocated portion of administrative expenses).

39.    Moreover, the Debtors believe that the sale of the servicing platform will yield a significant return for their estates.  In fact, the Debtors have already received an offer from Purchaser to buy their mortgage loan origination and loan servicing businesses (including the Prepetition MSR Collateral).  As a condition to closing, Purchaser requires that the Debtors maintain their servicing operations until the sale is consummated.  If the underlying mortgage loans could not be serviced, however, there could be a precipitous decline in the value of the Prepetition MSR Collateral.  The Court's authorization of the use of the MSR Cash Collateral, therefore, will protect Citibank's security interests by preserving the value of its collateral.  <u>See</u> <u>In re Salem Plaza Assocs.</u>, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured

creditor was adequately protected when cash collateral was used to pay necessary operating

expenses); In re Pursuit Athletic Footwear, 193 B.R. at 717-18 (holding that a showing that the

debtors could operate profitably postpetition demonstrated adequate protection); In re Mullen,

172 B.R. 473, 478 (Bankr. D. Mass. 1994) ("If the rents were not used to pay for management,

taxes and maintenance of the properties, the value of [the secured lender's] mortgage interest

would rapidly decline."); In re 495 Cent. Park Ave. Corp., 136 B.R. at 631 (holding that a

prepetition secured creditor was adequately protected because "the value of the debtor's property

[would] increase as a result of the renovations funded by the proposed financing."); In re

Constable Plaza Assocs., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use

of rents to maintain and operate property "will serve to preserve or enhance the value of the

building which, in turn, will protect the collateral covered by [the secured lender's] mortgage.");

Hartigan v. Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co.), 16 B.R. 750,

756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's

collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected.").

40.     Additionally, the Debtors believe that Citibank is adequately protected

through the existence of a substantial equity cushion in its collateral.  The Debtors have

borrowed approximately $152 million under the Citibank MSR Facility, and the Purchaser has

allocated approximately $362.6 million of its purchase price to the Prepetition MSR Collateral.

Thus, the Citibank MSR Facility likely is over-secured by approximately $210.6 million.  It is

highly unlikely that Citibank will harmed by any diminution of the value of the Prepetition MSR

Collateral by the Debtors' use thereof.  As several courts have held, the presence of an equity

cushion in encumbered collateral is itself a form of adequate protection. See In re Realty Sw.

Assocs., 140 B.R. at 366-67 (holding that creditor was adequately protected pursuant to

Bankruptcy Code section 363(e) because of substantial equity cushion); In re Am. Consol.

Transp. Cos., No. 09-B-26062, 2010 Bankr. LEXIS 3144, *11 (Bankr. N.D. Il. Sept. 10, 2010)

(finding adequate protection where there was a substantial equity cushion in the debtors'

property, including the debtors' real estate, buses, inventory, and cash); In re Dynaco Corp., 162

B.R. 389, 398 (Bankr. D.N.H. 1993).  See also Capital Commc'ns Fed. Credit Union v. Boodrow

(In re Boodrow), 126 F.3d 43, 53 (2d Cir. 1997) ("[I]n determining whether a creditor's interest

in a debtor's property is adequately protected, most courts engage in an analysis of the property's

'equity cushion.'") (citation and internal quotation marks omitted)); In re New Era Co., 125 B.R.

725, 728 (S.D.N.Y. 1991) ("[I]t is clear that one way to assure [adequate] protection is to have an

`equity cushion.'").

41.     The Debtors submit that the terms and conditions of adequate protection

set forth in the Interim Order and Final Order are, taken as a whole, fair and reasonable under the

circumstances, reflect the Debtors' reasonable exercise of business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  For

the foregoing reasons, the Debtors' requested use of the MSR Cash Collateral and the protections

provided to Citibank are reasonable, appropriate, and sufficient to satisfy the legal standard of

"adequate protection."

## III.    Support for Modification of the Automatic Stay

42.     As set forth more fully in the proposed Interim Order, the Debtors propose

to grant Citibank limited relief from the automatic stay established pursuant to section 362 of the

Bankruptcy Code to permit Citibank, in its sole discretion, to take certain actions permitted or

required under the applicable loan documents and to enforce certain remedies against the

Prepetition MSR Collateral without having to obtain any further order of this Court.  The Interim

Order further provides that, prior to the exercise of any enforcement or liquidation remedies,

Citibank shall be required to give seven (7) days' written notice to each of (i) counsel for the

Debtors, (ii) counsel for the Creditors' Committee, (iii) Freddie Mac, and its counsel, (iv) Fannie

Mae, and its counsel, and (v) the United States Trustee.

43.     The Debtors submit that stay modification provisions such as these are

ordinary and usual features of adequate protection and, in the Debtors' business judgment, are

reasonable under the present circumstances.  Courts in this jurisdiction have granted similar

relief on an interim basis in other Chapter 11 cases.  See e.g., In re Last Mile, Inc., Case No. 11-

14769 (SHL) (Bankr. S.D.N.Y. Apr. 19, 2012) (Docket No. 134); In re Innkeepers USA Trust,

Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. July 20, 2010) (Docket No. 54); In re BearingPoint,

Inc., Case No. 09-10691 (REG) (Bankr. S.D.N.Y. Feb. 19, 2009) (Docket No. 37); In re DBSD

North America, Inc., Case No. 09-13061 (REG) (Bankr. S.D.N.Y. May 22, 2009) (Docket No.

41); In re Extended Stay, Case No. 09-13764 (JMP) (Bankr. S.D.N.Y. June 29, 2009) (Docket

No. 110).

**IV.     Interim Approval Should be Granted**

44.     Bankruptcy Rule 4001(b)(2) provides that:

The court may commence a final hearing on a motion for authorization to
use cash collateral no earlier than 14 days after service of the motion. If
the motion so requests, the court may conduct a preliminary hearing
before such 14 day period expires, but the court may authorize the use of
only that amount of cash collateral only as is necessary to avoid immediate
and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).  Similarly, to the extent the Debtors are seeking authority to sell,

use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003

provides that the Court may only grant immediate relief to the extent it is necessary to avoid

immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

25

45. Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990). Approval of the use of cash collateral on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. See e.g., In re Eastman Kodak Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (Docket No. 54); In re Hostess Brands, Inc., Case No. 12-22052 (RDD) (Bankr S.D.N.Y. Jan. 12, 2012) (Docket No. 63); In re General Maritime Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Nov. 18, 2011) (Docket No. 32); In re MF Global Holdings Ltd., Case No. 11-15059 (MG) (Bankr. S.D.N.Y. Nov. 2, 2011) (Docket No. 24); In re Borders Group, Inc. Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 17, 2011) (Docket No. 69); In re The Great Atlantic & Pacific Tea Co., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43).

46. The Debtors seek expedited approval of the relief requested in this Motion in light of the immediate and irreparable harm that the Debtors' estates will incur unless they obtain the liquidity necessary to sustain their businesses. Absent sufficient liquidity to support the Debtors' servicing business, the Debtors' assets will quickly erode to the detriment of the Debtors' estates, the borrowers of the mortgage loans, and investors. For the reasons set forth above, the Debtors submit that the use of the MSR Cash Collateral is necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

47. Courts in this jurisdiction have granted similar relief in other Chapter 11 cases. See, e.g., In re Eastman Kodak Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20,

2012) (Docket No. 54) (order approving use of cash collateral on an interim basis); <u>In re Hostess Brands Inc.</u>, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2012) (Docket No. 63) (same), <u>In re General Maritime Corp.</u>, Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Nov. 18, 2011) (Docket No. 32) (same); <u>In re MF Global Holdings Ltd.</u>, Case No. 11-15059 (MG) (Bankr. S.D.N.Y. Nov. 2, 2011) (Docket No. 24) (same); <u>In re The Great Atlantic & Pacific Tea Co.</u>, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43) (same); <u>In re Boston Generating, LLC</u>, Case No. 10-14419 (SCC) (Bankr. S.D.N.Y. Aug. 20, 2010) (Docket No. 56) (same); <u>In re Chemtura Corp.</u>, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Mar. 20, 2009) (Docket No. 58) (same); <u>In re Lyondell Chem. Co.</u>, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (Docket No. 79) (same).

## V.    Request for Immediate Relief and Waiver of Stay

48.    Bankruptcy Rule 6003 generally precludes the Court from authorizing certain relief until twenty-one days after the petition is filed, except to the extent necessary to prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief requested in this Motion be entered on an interim basis.

49.    To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

50.    Therefore, the Debtors request that this Court (i) conduct an expedited hearing on this Motion, (ii) grant the relief sought in this Motion on an interim basis and enter

27

the Interim Order, (iii) schedule the Final Hearing on this Motion, and (iv) establish notice and

objection procedures in respect thereof in accordance with Bankruptcy Rule 4001(c).

## NOTICE

51.    Notice of this Motion will be given to the following parties, or in lieu

thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of

New York; (b) the office of the United States Attorney General; (c) the office of the New York

Attorney General; (d) the office of the United States Attorney for the Southern District of New

York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of

the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

for the Debtors' outstanding notes issuances; (i) the Administrative Agent and its counsel; (j) the

Collateral Agent; (k) Barclays Bank PLC ("Barclays"), as the Administrative Agent under the

Barclays DIP Facility; (l) The Bank of New York Mellon, as indenture trustee under the Pre-

Petition GSAP Facility; (m) Ally Financial, Inc. and its counsel, Kirkland & Ellis LLP; (n) Ally

Bank and its counsel, Kirkland & Ellis LLP; (o) Citibank, N.A. as secured lender under the MSR

Facility; (p) U.S. Bank National Association, as trustee for the Prepetition Junior Secured Notes

(q) Wells Fargo Bank, N.A., as collateral agent for the Prepetition Junior Secured Notes, as

collateral agent for the Prepetition Ally Revolver, and as collateral control agent under the

Intercreditor Agreement, dated as June 6, 2008; (r) BMMZ, as buyer under the Pre-Petition Ally

Repo Facility; (s) Fannie Mae; (t) Freddie Mac; (u) Ginnie Mae; (v) servicers and sub-servicers

under the Designated Servicing Agreements and the Specified Servicing Agreements (each term

as defined in the DIP Credit Agreement); (w) the MBS Trustees (as defined in the DIP Credit

Agreement); (x) Nationstar Mortgage LLC and its counsel; and (y) the parties included on the

Debtors' list of fifty (50) largest unsecured creditors (collectively, the "Initial Notice Parties").

52.     Within two (2) days after entry of the Interim Order, the Debtors propose

to serve a copy of the Motion and the Interim Order upon the Initial Notice Parties.  The Debtors

request that the Court schedule the Final Hearing on the Motion for a date that is as soon as

practicable, but in no event later than forty-five (45) days following the entry of the Interim

Order, and establish the date prior to the Final Hearing for parties to file objections to the

Motion.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an

interim order substantially in the form attached hereto as <u>Exhibit A</u>, granting certain of the relief

sought herein immediately; (ii) enter a final order granting the relief sought herein on a final

basis; and (iii) grant such other and further relief to the Debtors as the Court may deem just and

proper.

Dated:  May 14, 2012
        New York, New York

/s/    Larren M. Nashelsky
Larren M. Nashelsky
Gary S. Lee
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

12-12020-mg    Doc 66-8    Filed 05/04/12    Entered 05/04/12 14:27:28    Main Document
Pg 50 of 58

# **EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- x
In re                                          :
                                               :    Chapter 11
                                               :
RESIDENTIAL CAPITAL, LLC, et al.,              :    Case No. 12-_____
                                               :
                    Debtors.                   :    (Jointly Administered)
                                               :
-------------------------------------------------------- x
```

### INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING

Upon the motion, dated May 14, 2012 (the "**Motion**")[1] of Residential Capital, LLC and its direct and indirect subsidiaries, each as a debtor and debtor in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, with any successor case, the "**Cases**") pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules of the Southern District of New York, seeking entry of an interim order (this "**Interim Order**"):

(i)    authorizing the Debtors' use of "cash collateral" (as defined in section 363(a) of the Bankruptcy Code) of Citibank (as defined herein) (the "**MSR Cash Collateral**");

(ii)   providing adequate protection to Citibank and for any diminution in value of its interest in the Prepetition MSR Collateral (as defined herein), including the MSR Cash Collateral;

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed in the Motion.

(iii)    vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and

provisions of this Interim Order; and

(iv)    scheduling a final hearing (the "**Final Hearing**") to consider the relief

requested in the Motion and the entry of a Final Order (as defined herein), and approving

the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day

Pleadings, sworn to on May 14, 2012, the exhibits attached thereto, and the evidence submitted

or adduced and the arguments of counsel made at the interim hearing held on May __, 2012 (the

"**Interim Hearing**"); and after due deliberation and consideration, and for good and sufficient

cause appearing therefor;

## THE COURT HEREBY FINDS THAT[2]:

A.    _Petition Date_:  On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed

a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the Southern District of New York (the "**Court**") commencing these Cases.

B.    _Debtors in Possession_.  The Debtors are continuing in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.    _Jurisdiction and Venue_.  This Court has jurisdiction, pursuant to 28 U.S.C.

§§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.

NYDOCS03/948309.6
ny-1040177

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue

for the Cases appears proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

        D.    *Statutory Committee*. As of the date hereof, the United States Trustee (the "**U.S.**

**Trustee**") has not yet appointed an official committee of unsecured creditors in these Cases

pursuant to section 1102 of the Bankruptcy Code (a "**Statutory Committee**").

        E.    *Notice.* Notice of the Interim Hearing and the relief requested in the Motion was

given on the Petition Date by electronic mail, facsimile and/or overnight delivery to (i) the 50

largest unsecured creditors of the Debtors on a consolidated basis; (ii) the Administrative Agent

under the DIP Facility; (iii) the Collateral Agent under the DIP Facility; (iv) the DIP Lenders (as

defined in the Motion); (v) the Prepetition Finance Parties;[3] (vi) Ally Financial Inc.; (vii) Ally

Bank; (viii) Citibank, N.A., as secured lender under the Prepetition MSR Facility (as defined

below); (ix) U.S. Bank National Association, as trustee for the Junior Secured Notes;[4] (x) Wells

Fargo Bank, N.A., as collateral agent for the Junior Secured Notes, as collateral agent for the

Ally Senior Secured Credit Facility,[5] and as collateral control agent under the Intercreditor

Agreement;[6] (xi) BMMZ Holdings LLC, as buyer under the BMMZ Repo Facility; (xii) Fannie

Mae (a/k/a The Federal National Mortgage Association); (xiii) Freddie Mac (a/k/a The Federal

---

[3]    "**Prepetition Finance Parties**" means The Bank of New York Mellon, as indenture trustee under the Prepetition GSAP Facility (as defined in the DIP Credit Agreement) and Barclays, as administrative agent under the Prepetition GSAP Facility.

[4]    "**Junior Secured Notes**" means the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000, as amended or supplemented prior to the date hereof. "**Prepetition Junior Secured Indenture**" means the Indenture, dated as of June 6, 2008, among ResCap, as issuer, the Subsidiaries of ResCap party thereto as guarantors, and U.S. Bank National Association, as trustee, as amended or supplemented prior to the date hereof.

[5]    The "**AFI Senior Secured Credit Facility**" means the credit facility under (a) the Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among RFC, GMACM, ResCap, certain other affiliates of ResCap, Wells Fargo Bank, N.A., and GMAC Inc., as amended or supplemented prior to the date hereof, and related documents, as amended or supplemented prior to the date hereof.

[6]    The "**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of June 6, 2008, relating to the Junior Secured Notes and the AFI Senior Secured Credit Facility.

Home Loan Mortgage Corporation); (xiv) Ginnie Mae (a/k/a the Government National Mortgage

Association); (xv) the GSAP Transferor (as defined below); (xvi) the servicers and sub-servicers

under the Designated Servicing Agreements and the Specified Servicing Agreements (each term

as defined in the DIP Credit Agreement); (xvii) the MBS Trustees (as defined in the DIP Credit

Agreement); (xviii) Nationstar Mortgage LLC and its counsel; and (xix) the U.S. Trustee

(collectively, the "**Initial Notice Parties**").  Such notice constitutes good and sufficient notice of

the Motion and the Interim Hearing under the circumstances in accordance with Bankruptcy

Rules 4001(b), 4001(c), the Local Bankruptcy Rules and section 102(1) of the Bankruptcy Code,

as required by sections 363(c), 363(e), 364(c) and 364(d) of the Bankruptcy Code in light of the

emergency nature of the relief requested in the Motion.

F.      _The Prepetition MSR Facility_.  Pursuant to that certain Amended and Restated

Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or

otherwise modified, including pursuant to Amendment Number Ten, dated March 30, 2012,

pursuant to which Citibank agreed, among other things, to the extension of the Loan Repayment

Date (as defined in the Amended and Restated Loan and Security Agreement) to May 30, 2012,

the "**Prepetition MSR Agreement**" and, together with all other loan and security documents

related to, referenced in or executed in connection with the Prepetition MSR Agreements, the

"**Prepetition MSR Credit Documents**"), among GMAC Mortgage, LLC ("**GMAC

Mortgage**"), as Borrower, Residential Capital LLC, as Guarantor, and Citibank, N.A., as Lender

("**Citibank**"), Citibank provided a credit facility to GMAC Mortgage (the "**Prepetition MSR

Facility**").  The Prepetition MSR Facility provided the Debtors with financing to provide

funding for the origination or acquisition of certain mortgage loan servicing rights (as defined in

the Prepetition MSR Agreement, the "**Servicing Rights**").  GMAC Mortgage's obligations under

4

the Prepetition MSR Facility are guaranteed by Residential Capital, LLC, a Debtor in these

Cases.

       G.     *Debtors' Stipulations Regarding the Prepetition MSR Facility*.  Without prejudice

to the rights of parties in interest as set forth in Paragraph 16 herein, the Debtors admit, stipulate

and agree to, and with, the following with respect to the Prepetition MSR Facility (collectively,

the "**Debtors' Stipulations**"):

       (i)     *Prepetition MSR Obligations*.  As of the Petition Date, the outstanding

principal amount of all loans under the Prepetition MSR Agreement was not less than

$152 million (collectively, together with any amounts paid, incurred or accrued prior to the

Petition Date in accordance with the Prepetition MSR Credit Documents, principal, accrued and

unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorney's

fees, related expenses and disbursements), reimbursement obligations, indemnification

obligations and other charges of whatever nature, whether or not contingent, whenever arising,

due or owing in respect thereof to the extent and as provided for in the Prepetition MSR Credit

Documents, including all "Obligations" as described in the Prepetition MSR Agreement, the

"**Prepetition MSR Obligations**").  Subject to Paragraph 16, in light of the Prepetition MSR

Obligations and the value of the MSR Prepetition Collateral with respect thereto, Citibank is

oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR

Obligations in accordance with the Prepetition MSR Credit Documents.

       (ii)     *Prepetition MSR Liens and Prepetition MSR Collateral*.  As more fully set

forth in the Prepetition MSR Credit Documents, prior to the Petition Date, the Debtors granted

security interests in and liens on, among other things, all of the Debtors' existing and after

acquired Servicing Rights, to the full extent of the Debtors' interest therein and regardless of

5

where located, whether or not yet accrued, earned, due or payable, as well as all other present

and future rights and interests of GMAC Mortgage in such Servicing Rights, all contracts with

Fannie Mae and Freddie Mac relating to the Servicing Rights, and all monies due or to become

due with respect to and all proceeds of the Servicing Rights and related collateral (collectively,

the "**Prepetition MSR Collateral**") to Citibank (the "**Prepetition MSR Liens**").

(iii)    *Validity and Perfection of Prepetition MSR Liens and Prepetition MSR

Obligations*.  Subject to the provisions of Paragraph 16 of this Interim Order, each of the Debtors

acknowledges and agrees that: (a) as of the Petition Date, the Prepetition MSR Liens on the

Prepetition MSR Collateral were valid, binding, enforceable, non-avoidable and properly

perfected; (b) the Prepetition MSR Obligations constitute legal, valid, binding, and non-

avoidable obligations of the Debtors; (c) other than the Agency Interests (as defined herein), to

the extent set forth in the Agency Acknowledgement Agreements (as defined herein), no offsets,

challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the

Prepetition MSR Liens or Prepetition MSR Obligations exist; (d) no portion of the Prepetition

MSR Liens or Prepetition MSR Obligations is subject to any challenge or defense including,

without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination

(whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy

law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of

actions, and/or choses in action, including without limitation, avoidance claims under the

Bankruptcy Code, against Citibank or its affiliates, agents, attorneys, advisors, professionals,

officers, directors and employees arising out of, based upon or related to its loans to the Debtors

under the Prepetition MSR Credit Documents.

(iv)    *Priority of Prepetition MSR Liens*.  As of the Petition Date, the Prepetition

MSR Liens were senior in priority over any and all other liens on the Prepetition MSR

Collateral, subject only to the interests (collectively, the "**Agency Interests**") of Freddie Mac

and Fannie Mae as set forth in (a) the Prepetition MSR Agreement, (b) the Federal Home Loan

Mortgage Corporation Acknowledgement Agreement among Freddie Mac, GMAC Mortgage

and Citibank, N.A. dated March 12, 2009 (the "**Freddie Mac Acknowledgement Agreement**"),

and (c) the Acknowledgement Agreement (Single Secured Party) among Citibank, N.A., GMAC

Mortgage and Fannie Mae dated September 7, 2007 (the "**Fannie Mae Acknowledgement**

**Agreement**" and, together with the Freddie Mac Acknowledgement Agreement, the "**Agency**

**Acknowledgement Agreements**").

(v)    *Cash Collateral*.  Each Debtor represents that all of the Debtors' cash

proceeds of the Servicing Rights and related collateral, including but not limited to all cash on

deposit in that certain "Collection Account," as defined in the Prepetition MSR Agreement and

the MSR Collateral Account (as defined herein), constitutes the MSR Cash Collateral of

Citibank.

H.    *Adequate Protection*.  Citibank is entitled to receive adequate protection to the

extent of any diminution in value of its interests in the Prepetition MSR Collateral, including the

MSR Cash Collateral, resulting from the use of MSR Cash Collateral without the continued

maintenance of the Borrowing Base (as defined in the Prepetition MSR Agreement) in

accordance with the terms of the Prepetition MSR Agreement. as a result of the imposition of the

automatic stay pursuant to sections 362 of the Bankruptcy Code.  Pursuant to sections 361, 363,

and 507(b) of the Bankruptcy Code, as adequate protection, (a) Citibank will receive (i) the MSR

Adequate Protection Liens (as defined below); (ii) the Adequate Protection Superpriority Claim

7

(as defined below); and (iii) the Adequate Protection Payments (as defined below) and (b) the

Debtors agree that they will seek authority in any order approving the sale of the Prepetition

MSR Collateral to provide that the net proceeds of such sale shall be applied by the Debtors to

repay the Obligations under the Prepetition MSR Credit Documents, provided the Agency

Interests (as defined herein) are satisfied through such sale (together with the MSR Adequate

Protection Liens, the Adequate Protection Superpriority Claim and the Adequate Protection

Payments, the "**Adequate Protection**").  Notwithstanding the foregoing, if the Prepetition MSR

Obligations are determined by this Court to be undersecured, interest payments and payment of

fees permitted hereunder may be recharacterized and recredited to the principal balance of such

Prepetition MSR Obligations pursuant to further order entered by this Court.

I.    _Necessity of Relief Requested_.  The ability of the Debtors to finance their

operations requires, in addition to the Debtors' proposed DIP Facility and use of the Ally Cash

Collateral and Junior Secured Notes Cash Collateral, the use of MSR Cash Collateral, absent

which immediate and irreparable harm will result to the Debtors, their estates and creditors.  In

the absence of the use of MSR Cash Collateral, the continued operation of the Debtors'

businesses would not be possible and serious and irreparable harm to the Debtors, their estates

and their creditors would occur.  The relief requested in the Motion therefore is necessary for the

continued operation of the Debtors' businesses and the preservation of their property.  Citibank

and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of

MSR Cash Collateral as set forth herein to fund the continued operation of the Debtors'

businesses during the Specified Period (as defined below).  Entry of this Interim Order is in the

best interests of the Debtors and their estates.

J.      *Final Hearing*.  At the Final Hearing, the Debtors will seek final approval of the

relief requested in the Motion pursuant to a proposed final order (the "**Final Order**"), which

shall be in form and substance acceptable to Citibank, notice of which Final Hearing and Final

Order will be provided in accordance with this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Motion Granted.  The Motion is granted on an interim basis as set forth herein,

and the use of MSR Cash Collateral on an interim basis is authorized, subject to the terms of this

Interim Order.

2.      Objections Overruled.  All objections to the Motion to the extent not withdrawn

or resolved are overruled.

3.      Authorization to Use MSR Cash Collateral.  Subject to the terms and conditions

of the Cash Collateral Orders, the Debtors are authorized to use the MSR Cash Collateral for the

period (the "**Specified Period**") from the Petition Date through the date that is the earliest to

occur of (a) the expiration of the Remedies Notice Period, (b) forty-five (45) days after entry of

the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day

period, (c) the date on which maturity of the DIP Facility is accelerated pursuant to the DIP Loan

Agreement as a result of an event of default thereunder, (d) the effective date of a Chapter 11

plan for any Debtor with assets exceeding $10 million, or (e) subject to entry of the Final Order,

the date that is eighteen (18) months from the closing date of the DIP Facility.  The MSR Cash

Collateral may be used during the Specified Period solely (x) to fund the cash needs related to

the operations and assets of the assets that comprise the Prepetition MSR Collateral, including

9

funding advances or repurchase obligations owed by the Debtors with respect to such Prepetition

MSR Collateral, and (y) to fund (an allocated portion of the Debtors' costs of administering these

Cases based on the value of the Prepetition MSR Collateral relative to the value of the Debtors'

other assets in accordance with the budget previously approved by Citibank, a copy of which is

attached hereto as **Exhibit A** (as may be amended as provided herein, the "**Budget**").

   4. <u>MSR Adequate Protection Liens</u>.

   (a) *MSR Adequate Protection Liens*.  As adequate protection of the interests

of Citibank, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are

authorized to grant, and upon entry of this Interim Order shall be deemed to have granted

additional and replacement continuing valid, binding, enforceable, non-avoidable, and

automatically perfected post-petition security interests in and liens on (the "**MSR Adequate**

**Protection Liens**") any and all presently owned and hereafter acquired assets of the Debtors and

their estates that do or would (absent the commencement of the Cases) constitute Prepetition

MSR Collateral under the Prepetition MSR Credit Documents, including but not limited to all

cash in the MSR Concentration Account (as defined herein) (such assets, together with the

Prepetition MSR Collateral, the "**MSR Collateral**").

   (b) *Priority of MSR Adequate Protection Liens*.

   (i) The MSR Adequate Protection Liens shall be senior to all other

security interests in, liens on, or claims against any of the MSR Collateral, subject only to

the Agency Interests.

   (ii) The MSR Adequate Protection Liens shall be enforceable against

the Debtors, their estates and any successors thereto, including without limitation, any

trustee or other estate representative appointed in the Cases, or any case under chapter 7

of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "**Successor Cases**"). Except as provided herein, the MSR Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and the MSR Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The MSR Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code, and no lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Prepetition MSR Liens or the MSR Adequate Protection Liens.

5.    Adequate Protection Superpriority Claim.

(a)    *Adequate Protection Superpriority Claim.* As further adequate protection of the interests of Citibank in the MSR Prepetition Collateral against any Diminution in Value of such interests in the Prepetition MSR Collateral, Citibank hereby is granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "**Adequate Protection Superpriority Claim**").

(b)    *Priority of the Adequate Protection Superpriority Claim.* The Adequate Protection Superpriority Claim shall have priority over all administrative expenses and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds

11

specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a),

507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy

Code, except the Adequate Protection Superpriority Claim (i) shall be junior to the superpriority

administrative expense claims granted to the Debtors' proposed providers of debtor in possession

financing and the Carve Out (as defined herein), and (ii) may be *pari passu* with the

superpriority administrative expense claims granted to any parties that provide the Debtors with

use of cash collateral (collectively, the "**Permitted Superpriority Claims**").

      6.     <u>Adequate Protection Payments and Protections</u>.

      (a)    *Adequate Protection Payments*.  As further adequate protection, each

Debtor is authorized and directed to provide adequate protection payments to Citibank (the

"**Adequate Protection Payments**"), in the form of: (i) payments of interest on the Prepetition

MSR Obligations at the non-default rate set forth in the Prepetition MSR Agreement, (ii) any

fees of Citibank pursuant to the Prepetition MSR Agreement payable at the times specified in the

Prepetition MSR Agreement; and (iii) ongoing payment of the reasonable fees, costs and

expenses of Citibank, including, without limitation, the payment of the reasonable fees and

expenses of legal and other professionals retained by Citibank in accordance with Paragraph 11

hereof.

      (b)    The Debtors shall seek authority from the Court pursuant to any order

approving the sale, transfer, lease, encumbrance or other disposition of any portion of the MSR

Collateral prior to payment in full of the Prepetition MSR Obligations to repay the loans under

the Prepetition MSR Facility with the proceeds of such disposition, provided the Agency

Interests are satisfied through such sale.

NYDOCS03/948309.6
ny-1040177

7.     <u>MSR Concentration Account</u>.  As a condition to the authorization to use MSR

Cash Collateral, the Debtors shall segregate the MSR Cash Collateral from the Debtors' other

cash by depositing the MSR Cash Collateral into a newly formed separate concentration account

(the "**MSR Concentration Account**") at JP Morgan Chase Bank, N.A. ("**JPM**"), and subject to

a deposit account control agreement entered into among JPM, the GMAC Mortgage, and

Citibank.

8.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy

Code section 362(a) is modified as necessary to effectuate all of the terms and provisions of this

Interim Order, including, without limitation, to: (a) permit the Debtors to grant the MSR

Adequate Protection Liens and Adequate Protection Superpriority Claim; (b) permit the Debtors

to perform such acts as Citibank may request in its reasonable discretion to assure the perfection

and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and

obligations to Citibank under this Interim Order; (d) permit the Debtors to open the MSR

Concentration Account, as necessary and execute a deposit account control agreement with

respect thereto without further order of this Court; and (e) authorize the Debtors to pay, and

Citibank to retain and apply payments made in accordance with the terms of this Interim Order;

<u>provided</u>, <u>however</u>, that any stay of relief with respect to the exercise of remedies shall be in

accordance with Paragraph 13 below or as otherwise ordered by this Court.

9.     <u>Perfection of MSR Adequate Protection Liens</u>.  This Interim Order shall be

sufficient and conclusive evidence of the validity, perfection, and priority of the MSR Adequate

Protection Liens and the liens on the MSR Cash Collateral Account without the necessity of

filing or recording any financing statement, mortgage, notice, or other instrument or document

which may otherwise be required under the law or regulation of any jurisdiction or the taking of

any other action (including, for the avoidance of doubt, entering into any deposit account control

agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the MSR

Adequate Protection Liens and the liens on the MSR Cash Collateral Account, or to entitle

Citibank to the priorities granted herein.  Notwithstanding the foregoing, Citibank is authorized

to file, as it deems necessary or advisable, such financing statements, notices of liens and other

instruments or documents to perfect in accordance with applicable non-bankruptcy law or to

otherwise evidence the applicable MSR Adequate Protection Liens, liens on the MSR Cash

Collateral Account, and all such financing statements, notices and other documents shall be

deemed to have been filed or recorded as of the Petition Date; provided, however, that no such

filing or recordation shall be necessary or required in order to create, evidence or perfect the

MSR Adequate Protection Liens including the liens on the MSR Cash Collateral Account.  The

Debtors are authorized and directed to execute and deliver promptly upon demand to Citibank all

such financing statements, notices, instruments and other documents as Citibank may reasonably

request.  Citibank, in its sole discretion, may file a copy of this Interim Order as a financing

statement or notice with any filing or recording office or with any registry of deeds or similar

office, in addition to or in lieu of such financing statements, notices of lien, instrument, or similar

document.

      10.    <u>Additional Covenants of the Debtors</u>.  The Debtors shall:

      (a)    Remit all MSR Cash Collateral, as and when received, for deposit to the

MSR Concentration Account to be used in accordance with this Interim Order, the Budget and

the Cash Management Order (as defined herein);

      (b)    Provide to Citibank (i) monthly servicing tapes required under the MSR

Prepetition Agreement; (ii) on a bi-weekly basis, variance reports on actual versus projected cash

flows of the operations with respect to the MSR Collateral; (iii) every four weeks, updated

Budgets; (iv) monthly collateral reports and such other monthly, quarterly or annual financial

reports as the Debtor is required to provide pursuant to the DIP Facility; and (v) notice of any

changes in tier rating of GMAC Mortgage by Freddie Mac or Fannie Mae.

(c)    Serve Citibank and its counsel, and counsel to any Statutory Committee,

with a copy of each monthly report filed by the Debtors in these Cases as required by the Court,

the U.S. Trustee or applicable law.

11.    <u>Payment of Professional Fees</u>.  Professionals for Citibank shall not be required to

comply with the U.S. Trustee fee guidelines for the payment of fees and expenses, but each

professional shall provide detailed fee and expense statements (redacted if necessary for

privilege) to the U.S. Trustee, counsel for any Statutory Committee, counsel for the DIP Lender,

and counsel for the Debtors.  To the extent that the Debtors, U.S. Trustee, Statutory Committee,

or the DIP Lender has an objection to the fees and expenses of any such professional, they shall

so advise the professional.  If any such objection is raised and not resolved and/or withdrawn

within five (5) business days after receipt of the fee or expense statement (or such later date as

the objecting party and the professional shall agree), the parties shall submit any dispute to this

Court for adjudication.

12.    <u>Events of Default</u>.  The occurrence of any of the following events, unless waived

in writing by Citibank, shall constitute an event of default (collectively, the "**Events of**

**Default**"):

(a)    the occurrence and continuance of an event of default under the DIP

Facility (as defined in the Motion);

15

(b)    the failure to obtain a Final Order within forty-five (45) days after the

Petition Date;

(c)    the failure of the Debtors to provide any report or certificate due under

Paragraph 10 that continues unremedied for a period of five (5) business days after the date that

such report or certificate was due;

(d)    any event of default, early amortization event, termination event or other

similar event (other than as a result of the commencement of the Cases) shall occur under any

material document or agreement that relates to the Prepetition MSR Agreement or the MSR

Collateral and such event could reasonably be expected to be materially adverse to the rights and

interests of Citibank;

(e)    any liens, claims and other interests created by this Interim Order shall

cease to be valid, perfected and enforceable and of the same priority purported to be created

hereby or any of the Debtors or their subsidiaries shall challenge in any action the validity,

perfection, enforceability or priority thereof;

(f)    dismissal of the Case of any Debtor with assets exceeding $10 million (or

any of the Debtors or their affiliates seeking or supporting such any such dismissal) or

conversion of the Case of any Debtor with assets exceeding $10 million to a case under chapter 7

of the Bankruptcy Code (or any of the Debtors or their affiliates seeking or supporting any such

conversion);

(g)    appointment of a trustee (or such other comparable responsible person) or

a responsible officer or examiner with expanded powers in the Case of any Debtor with assets

exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting any such

appointment);

16

(h)      entry of an order granting relief from the automatic stay as to the MSR

Collateral with a value in excess of $10 million (or any of the Debtors or their affiliates seeking

or supporting any such relief) (i) to allow any creditor to execute upon or enforce a lien on or

security interest in any MSR Collateral, or (ii) with respect to any lien of or the granting of any

lien on any MSR Collateral to any state or local environmental or regulatory agency or authority,

which in either case would have a material adverse effect on the business, operations, property,

assets, or condition, financial or otherwise, of the Debtors;

(i)      entry an order amending, supplementing, staying, vacating, reversing or

otherwise modifying this Interim Order except as otherwise agreed to in writing by Citibank, or

this Interim Order shall cease to be in full force and effect;

(j)      entry of an order granting any superpriority claim (or claim of equivalent

status) that is senior to or *pari passu* with the claims of Citibank or any lien or security interest

that is senior to or *pari passu* with the liens and security interests securing the Prepetition MSR

Facility, except for the Permitted Superpriority Claims, which superpriority claims may be senior

or *pari passu* with the Adequate Protection Superpriority Claim as provided in paragraph 5(b);

(k)      entry of an order authorizing recovery from the MSR Collateral for any

cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or

otherwise, other than as may be provided in this Interim Order.

(l)      upon written notice from Citibank, any material misrepresentation of a

material fact made after the Petition Date by any of the Debtors or their agents to Citibank or its

agents about the financial condition of the Debtors, or any of them, the nature, extent, location or

quality of any MSR Collateral, or the disposition or use of any MSR Collateral, including MSR

Cash Collateral;

17

(m)     the sale after the Petition Date of any portion of the MSR Collateral except

pursuant to an order that provides for the repayment of the Prepetition MSR Obligations from the

proceeds of such sale, provided the Agency Interests are satisfied through such sale;

(n)     upon written notice from Citibank, the material failure to make Adequate

Protection Payments or other payments to Citibank when due, subject to a cure period of five (5)

days; and

(o)     the failure by the Debtors to perform or observe in any respect any terms,

provisions, conditions, covenants, agreements or obligations under this Interim Order that is not

otherwise specified as an Event of Default and that remains unremedied for fifteen (15) business

days; provided, however, that a variance from the Budget shall not be deemed an Event of

Default hereunder;

13.    Rights and Remedies Upon Event of Default.  Upon the occurrence of an Event of

Default and at any time thereafter during the continuance thereof, with seven (7) days' prior

written notice (an "**Enforcement Notice**") of any such occurrence, in each case given to (i) the

Debtors and their counsel, (ii) counsel to the Adminstrative Agent and Collateral Agent under

the DIP Facility, (iii) counsel to any Statutory Committee, (iv) the U.S. Trustee, (v) counsel to

Ally, (vi) counsel to the Junior Secured Notes, (vii) Freddie Mac, and its counsel, and (viii)

Fannie Mae, and its counsel, Citibank shall be entitled to exercise Citibank's rights and remedies

as set forth in the Prepetition MSR Documents or under applicable law (including the right to

setoff monies of the Debtors in accounts maintained with Citibank and delivery of a shifting

control notice with respect to the MSR Collateral Account).  Any Enforcement Notice shall also

be filed with the Court.  This Interim Order shall not prejudice the rights of any party in interest

to oppose the exercise of Citibank's remedies; provided that the only issue that may be raised by

any party in opposition thereto shall be whether an Event of Default has in fact occurred and is

continuing, and the Debtors hereby waive their right to seek any relief, whether under section

105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or

delay the exercise or benefit of, the rights and remedies of Citibank under the Prepetition MSR

Documents or this Interim Order.  Upon the expiration of the seven (7) day period (the

"**Remedies Notice Period**"), in the absence of a determination by the Court that an Event of

Default has not occurred or is not continuing, Citibank shall be entitled to pursue all remedies

under the Prepetition MSR Documents or applicable law without further order of the Court, and

the automatic stay is hereby deemed modified to permit the pursuit of such remedies.

      14.   Carve Out.  As used in this Interim Order, the "**Carve Out**" means the Carve Out

as defined in any order of the Court approving the DIP Facilities provided by Barclays Bank

PLC and Ally Financial Inc..  Notwithstanding anything to the contrary herein, the Carve Out

shall be junior in priority to the Prepetition MSR Liens and the MSR Adequate Protection Liens.

No payment of any Carve Out amount shall reduce any Prepetition MSR Obligations.

      15.   Limitations on the Use of MSR Cash Collateral.  The MSR Cash Collateral may

not be used in connection with or to finance in any way any action, suit, arbitration, proceeding,

application, motion or other litigation of any type (a) adverse to the interests of Citibank, or its

rights and remedies under the Prepetition MSR Credit Documents or this Interim Order,

including, without limitation, for the payment of any services rendered by the professionals

retained by the Debtors or any Statutory Committee in connection with the assertion of or joinder

in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other

contested matter, the purpose of which is to seek, or the result of which would be to obtain, any

order, judgment, determination, declaration or similar relief adverse to the interests of Citibank,

or their rights and remedies under the Prepetition MSR Credit Documents or this Interim Order,

(b) invalidating, setting aside, recharacterizing, avoiding or subordinating, in whole or in part,

the Prepetition MSR Obligations, (c) objecting to or challenging in any way the claims, liens, or

interests (including interests in the MSR Collateral) held by or for the benefit of Citibank;

(d) asserting, commencing or prosecuting any claims or causes of action whatsoever, including,

without limitation, any actions under chapter 5 of the Bankruptcy Code, against Citibank; (e)

prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity,

extent, amount, perfection, priority, characterization or enforceability of any of the Prepetition

MSR Obligations or Prepetition MSR Liens or any other rights or interests of Citibank; or

(f) preventing, hindering or otherwise delaying the exercise by Citibank of any rights and

remedies granted under this Interim Order; provided that such restrictions shall not prohibit any

investigation by any Statutory Committee of any of the foregoing.

16.    Reservation of Certain Statutory Committee and Third Party Rights and Bar of
Challenges and Claims.  Nothing in this Interim Order shall prejudice the rights of a Statutory

Committee to seek to avoid, object to or otherwise challenge the findings or Debtors'

Stipulations regarding (a) the validity, extent, priority, or perfection of the mortgages, security

interests, and liens of Citibank; or (b) the validity, allowability, priority, fully secured status or

amount of the Prepetition MSR Obligations.  Subject to the entry of a Final Order, any Statutory

Committee, if appointed, must commence, as appropriate, a contested matter or adversary

proceeding raising such claim, objection, defense, or other challenge, including, without

limitation, any claim against Citibank in the nature of a setoff, counterclaim or defense to the

applicable Prepetition MSR Obligations (each, a "**Challenge**") within seventy-five (75) calendar

days after entry of the Interim Order subject to further extension by written agreement between

the parties (in each case, a "**Challenge Period**" and the date of expiration of each Challenge

Period being a "**Challenge Period Termination Date**").  Upon the expiration of the Challenge

Period Termination Date, without the filing of a challenge (or if any such challenge is filed and

overruled):  (x) any and all such Challenges by any party (including, without limitation, the

Statutory Committee, any chapter 11 trustee, examiner or other estate representative appointed or

elected in these Cases, and any chapter 7 trustee, examiner or other estate representative

appointed or elected in any Successor Case) shall be deemed to be forever waived, released and

barred, and (y) all of the Debtors' Stipulations, waivers, releases, affirmations and other

stipulations as to the priority, extent, and validity as to Citibank's claims, liens, and interests

shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy

estates and all creditors, holders of interests, and other parties in interest in these Cases and any

successor cases.

17.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim

Order does not create any rights for the benefit of any third party, creditor, equity holder or any

direct, indirect, or incidental beneficiary.

18.     <u>Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of

administration which have been or may be incurred in the Cases at any time shall be charged

against Citibank or its claims or the MSR Collateral pursuant to sections 105 or 506(c) of the

Bankruptcy Code, or otherwise, without the prior express written consent of Citibank, and no

such consent shall be implied, directly or indirectly, from any other action, inaction, or

acquiescence by Citibank.

19.     <u>No Marshaling/Applications of Proceeds</u>.  Upon entry of the Final Order,

Citibank shall not be subject to the equitable doctrine of "marshaling" or any other similar

doctrine with respect to any of the Prepetition MSR Collateral, as the case may be, and proceeds

shall be received and applied in accordance with this Interim Order notwithstanding any other

agreement or provision to the contrary.

20.     Section 552(b).  Upon entry of the Final Order, Citibank shall be entitled to all of

the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case"

exception under section 552(b) of the Bankruptcy Code shall not apply to Citibank with respect

to proceeds, product, offspring or profits of any of the Prepetition MSR Collateral.

21.     Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of

this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly: (a) Citibank's right to seek any other or supplemental relief in respect of any Debtor,

including the right to seek additional adequate protection (without prejudice to the Debtors' or

any other person's right to object to or otherwise oppose such additional adequate protection);

(b) any of the rights of Citibank under the Bankruptcy Code or under non-bankruptcy law,

including, without limitation, the right to (i) request modification of the automatic stay of section

362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases,

conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or

examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the

Bankruptcy Code, a chapter 11 plan or plans.  Other than as expressly set forth in this Interim

Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of Citibank

are preserved, including Citibank's rights under section 507(b) of the Bankruptcy Code.

22.     No Waiver by Failure to Seek Relief.  The failure of Citibank to seek relief or

otherwise exercise its rights and remedies under this Interim Order, the Prepetition MSR Credit

Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of Citibank.

23.    <u>Proofs of Claim</u>.  Upon entry of the Final Order, Citibank will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein, and the Debtors' Stipulations in Paragraph G herein shall be deemed to constitute a timely filed proof of claim for Citibank.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, Citibank is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim allowed herein.

24.    <u>Good Faith</u>.  Citibank has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.

25.    <u>Reservation of Rights</u>.  Nothing in this Order shall discharge, release, or otherwise preclude any setoff or recoupment right of the United States of America, its agencies, departments, or agents.  Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

23

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates (excluding

ResCap and its subsidiaries).

26.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court

(notwithstanding any applicable law or rule to the contrary), the terms and provisions of this

Interim Order shall become valid and binding upon and inure to the benefit of the Debtors,

Citibank, all other creditors of any of the Debtors, any Statutory Committee or any other Court

appointed committee appointed in any of the Cases, and all other parties in interest and their

respective successors and assigns, including any trustee or other fiduciary hereafter appointed in

any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.  In the

event of any inconsistency between the provisions of this Interim Order and the Prepetition MSR

Credit Documents or any other order (including any "first-day" order), the provisions of this

Interim Order shall govern and control.  Any payments to be made under any order (including

any "first-day" order) shall be made in accordance with this Interim Order.

27.    <u>No Modification of Interim Order</u>.  Subject to Paragraph 15, the Debtors

irrevocably waive any right to seek any amendment, modification or extension of this Interim

Order without the prior written consent of Citibank, and no such consent shall be implied by any

other action, inaction or acquiescence of Citibank.  In the event any or all of the provisions of

this Interim Order are hereafter modified, amended or vacated by a subsequent order of this

Court or any other court, such modification, amendment or vacatur shall not affect the validity,

perfection, priority, allowability, enforceability or non-avoidability of any advances previously

made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or

claims granted to Citibank hereunder arising prior to the effective date of any such modification,

amendment or vacatur of this Interim Order shall be governed in all respects by the original

provisions of this Interim Order, including entitlement to all rights, remedies, privileges and

benefits granted herein.

28.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant

hereto shall survive entry of any order that may be entered: (a) confirming any plan of

reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of

the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; (d) discharging

any Debtor; or (e) pursuant to which this Court abstains from hearing any of the Cases or

Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens,

security interests and other protections granted to Citibank pursuant to this Interim Order,

notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases,

or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as

provided by this Interim Order until all Prepetition MSR Obligations have been indefeasibly paid

in full in cash, notwithstanding the expiration of the Specified Period or any earlier termination

of the Debtors' authorization to use MSR Cash Collateral.

29.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order is

scheduled for _____, 2012 at _____.m. (Eastern Time) before the Honorable

_____, United States Bankruptcy Judge, at the United States Bankruptcy Court for the

Southern District of New York.  The Debtors shall promptly mail copies of this Order (which

shall constitute adequate notice of the Final Hearing, including without limitation, notice that the

Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the

Bankruptcy Code) to the parties having been given notice of the Interim Hearing, and to any

other party that has filed a request for notices with this Court and to any Statutory Committee

after the same has been appointed, or to counsel to any Committee, after the same shall have

been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall

serve and file written objections; which objections shall be served upon (a) Morrison & Foerster

LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Larren M. Nashelsky

(LNashelsky@mofo.com) and Todd M. Goren (TGoren@mofo.com), attorneys for the Debtors;

(b) Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036

(Attention: Kenneth S. Ziman (Ken.Ziman@skadden.com) and Jonathan Hofer

(Jonathan.Hofer@skadden.com)), attorneys for Barclays Bank PLC, as Administrative Agent; (c)

counsel to Citibank, attn: Fredric Sosnick and Susan A. Fennessey, Shearman & Sterling LLP,

599 Lexington Avenue, New York, NY 10022; and (d) the Office of the United States Trustee

for the Southern District of New York, and shall be filed with the Clerk of the United States

Bankruptcy Court, Southern District of New York, 33 Whitehall Street, 21st Floor New York,

New York 10004 (Attention: Tracy Hope Davis; Brian S. Masumoto; and Linda Riffkin) in each

case to allow actual receipt by the foregoing no later than _____, 2012 at _____,

prevailing Eastern time (with any replies filed by _____, 2012 at _____ ).

30.    Effect of this Interim Order.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be

enforceable immediately upon execution hereof.

31.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce

this Interim Order according to its terms.

Dated: _____, 2012
        New York, New York


_____
The Honorable _____
United States Bankruptcy Judge

26

**Exhibit A**

**Budget**

**Weekly Cash Flow Projections - Citi MSR**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CITI MSR CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1 FNMA / FHLMC Net Repurchases | $ (0.8) | $ (0.8) | $ (0.9) | $ (0.9) | $ (0.6) | $ (0.9) | $ (0.9) | $ (0.9) | $ (1.1) | $ (1.1) | $ (1.1) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.0) | $ (1.0) | $ (0.9) | $ (1.2) | $ (1.2) | $ (1.4) | $ (19.4) |
| 2 Servicing / Ancillary Fees | 4.0 | 2.6 | 5.4 | 3.9 | 4.8 | 2.7 | 4.0 | 5.6 | 3.8 | 3.9 | 2.6 | 6.7 | 3.8 | 3.9 | 2.3 | 2.9 | 5.5 | 3.7 | 3.8 | 4.2 | 80.0 |
| 3 Interest | - | - | (1.1) | - | - | - | - | (1.1) | - | - | - | (1.1) | - | - | - | - | (1.1) | - | - | - | (0.6) |
| 4 Operating Expenses / Professional Fees | (1.4) | (2.8) | (1.0) | (2.8) | (2.4) | (1.3) | (1.3) | (2.4) | (1.2) | (5.0) | (1.2) | (2.6) | (1.2) | (5.2) | (1.2) | (2.5) | (1.1) | (5.7) | (1.4) | (2.7) | (47.9) |
| 5 **Net Cash Flow** | **1.8** | **(1.0)** | **2.3** | **0.3** | **1.8** | **(0.9)** | **1.8** | **1.2** | **1.5** | **(2.2)** | **0.3** | **2.0** | **1.6** | **(2.3)** | **0.2** | **0.2** | **2.3** | **(3.1)** | **1.3** | **0.0** | **8.2** |
| | | | | | | | | | | | | | | | | | | | | | |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 6 Beginning Cash Balance | - | 1.8 | 0.8 | 3.1 | 3.4 | 5.2 | 4.3 | 6.1 | 7.3 | 8.8 | 6.5 | 6.8 | 8.8 | 10.4 | 8.2 | 8.4 | 7.7 | 10.0 | 6.9 | 8.2 | - |
| 7 Net Cash Flow | 1.8 | (1.0) | 2.3 | 0.3 | 1.8 | (0.9) | 1.8 | 1.2 | 1.5 | (2.2) | 0.3 | 2.0 | 1.6 | (2.3) | 0.2 | 0.6 | 2.3 | (3.1) | 1.3 | 0.0 | 8.2 |
| 8 **Ending Cash Balance** | **1.8** | **0.8** | **3.1** | **3.4** | **5.2** | **4.3** | **6.1** | **7.3** | **8.8** | **6.5** | **6.8** | **8.8** | **10.4** | **8.2** | **8.4** | **7.7** | **10.0** | **6.9** | **8.2** | **8.2** | **8.2** |

# Exhibit E

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------- x
In re                                        :
                                             :   Chapter 11
                                             :
RESIDENTIAL CAPITAL, LLC, et al.,            :   Case No. 12-12020 (MG)
                                             :
          Debtors.                           :   (Jointly Administered)
                                             :
----------------------------------------------------------------- x
```

### FINAL ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, AND (III) MODIFYING THE AUTOMATIC STAY

Upon the motion, dated May 14, 2012 (the "**Motion**")[1] of Residential Capital, LLC and

its direct and indirect subsidiaries, each as a debtor and debtor in possession (collectively, the

"**Debtors**") in the above-captioned chapter 11 cases (collectively, with any successor case, the

"**Cases**") pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the United States Code,

11 U.S.C. § 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the

Local Bankruptcy Rules of the Southern District of New York, seeking entry of an order (this

"**Final Order**"):

      (i)     authorizing the Debtors' use of "cash collateral" (as defined in section

363(a) of the Bankruptcy Code) of Citibank (as defined herein) (the "**MSR Cash**

**Collateral**");

      (ii)    providing adequate protection to Citibank and for any diminution in value

of its interest in the Prepetition MSR Collateral (as defined herein), including the MSR

Cash Collateral; and

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed in the Motion.



¤1212020120620000000000022¤

(iii)      vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and

provisions of this Final Order.

The Court having considered the Motion, the Affidavit of James Whitlinger, Chief

Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day

Pleadings, sworn to on May 14, 2012, the exhibits attached thereto, and the evidence submitted

or adduced and the arguments of counsel made at the interim hearing held on May 14, 2012 (the

"**Interim Hearing**") and the final hearing held on June 18, 2012 (the "**Final Hearing**"); and

after due deliberation and consideration, and for good and sufficient cause appearing therefor;

## THE COURT HEREBY FINDS THAT[2]:

A.      *Petition Date*:  On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed

a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the Southern District of New York (the "**Court**") commencing these Cases.

B.      *Debtors in Possession*.  The Debtors are continuing in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C.

§§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue

for the Cases appears proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.

2

D.      _Statutory Committee._  On May 16, 2012, the United States Trustee (the "**U.S.**

**Trustee**") appointed an official committee of unsecured creditors in these Cases pursuant to

section 1102 of the Bankruptcy Code (the "**Statutory Committee**").

E.      _Notice._  Notice was given by electronic mail, facsimile and/or overnight delivery

of (1) the Interim Hearing, the Final Hearing, and the relief requested in the Motion, to (i) the 50

largest unsecured creditors of the Debtors on a consolidated basis; (ii) the Administrative Agent

under the DIP Facility; (iii) the Collateral Agent under the DIP Facility; (iv) the DIP Lenders (as

defined in the Motion); (v) the Prepetition Finance Parties;[3] (vi) Ally Financial Inc.; (vii) Ally

Bank; (viii) Citibank, N.A., as secured lender under the Prepetition MSR Facility (as defined

below); (ix) U.S. Bank National Association, as trustee for the Junior Secured Notes;[4]  (x) Wells

Fargo Bank, N.A., as collateral agent for the Junior Secured Notes, as collateral agent for the

Ally Senior Secured Credit Facility,[5]  and as collateral control agent under the Intercreditor

Agreement;[6] (xi) BMMZ Holdings LLC, as buyer under the BMMZ Repo Facility; (xii) Fannie

Mae (a/k/a The Federal National Mortgage Association); (xiii) Freddie Mac (a/k/a The Federal

Home Loan Mortgage Corporation); (xiv) Ginnie Mae (a/k/a the Government National Mortgage

Association; (xv) the GSAP Transferor (as defined below); (xvi) the servicers and sub-servicers

---

[3]      "**Prepetition Finance Parties**" means The Bank of New York Mellon, as indenture trustee under the Prepetition GSAP Facility (as defined in the DIP Credit Agreement) and Barclays, as administrative agent under the Prepetition GSAP Facility.

[4]      "**Junior Secured Notes**" means the 9.625% Junior Secured Guaranteed Notes due 2015 issued by ResCap pursuant to the Prepetition Junior Secured Indenture, in an initial aggregate face amount of $4,010,280,000, as amended or supplemented prior to the date hereof.  "**Prepetition Junior Secured Indenture**" means the Indenture, dated as of June 6, 2008, among ResCap, as issuer, the Subsidiaries of ResCap party thereto as guarantors, and U.S. Bank National Association, as trustee, as amended or supplemented prior to the date hereof.

[5]      The "**AFI Senior Secured Credit Facility**" means the credit facility under (a) the Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among RFC, GMACM, ResCap, certain other affiliates of ResCap, Wells Fargo Bank, N.A., and GMAC Inc., as amended or supplemented prior to the date hereof, and related documents, as amended or supplemented prior to the date hereof.

[6]      The "**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of June 6, 2008, relating to the Junior Secured Notes and the AFI Senior Secured Credit Facility.

under the Designated Servicing Agreements and the Specified Servicing Agreements (each term

as defined in the DIP Credit Agreement); (xvii) the MBS Trustees (as defined in the DIP Credit

Agreement); (xviii) Nationstar Mortgage LLC and its counsel; and (xix) the U.S. Trustee

(collectively, the "**Initial Notice Parties**"), and (2) the Final Hearing only, to (i) the Statutory

Committee and (ii) those parties who have requested notice pursuant to Bankruptcy Rule 2002

(collectively, together with the Initial Notice Parties, the "**Notice Parties**").  Such notice

constitutes good and sufficient notice of the Motion, the Interim Hearing and the Final Hearing

under the circumstances in accordance with Bankruptcy Rule 4001(b), the Local Bankruptcy

Rules and section 102(1) of the Bankruptcy Code, as required by sections 363(c) and 363(e) of

the Bankruptcy Code.

       F.     *The Prepetition MSR Facility*.  Pursuant to that certain Amended and Restated

Loan and Security Agreement, dated as of June 30, 2010 (as amended, supplemented or

otherwise modified, including pursuant to Amendment Number Ten, dated March 30, 2012,

pursuant to which Citibank agreed, among other things, to the extension of the Loan Repayment

Date (as defined in the Amended and Restated Loan and Security Agreement) to May 30, 2012,

the "**Prepetition MSR Agreement**" and, together with all other loan and security documents

related to, referenced in or executed in connection with the Prepetition MSR Agreements, the

"**Prepetition MSR Credit Documents**"), among GMAC Mortgage, LLC ("**GMAC**

**Mortgage**"), as Borrower, Residential Capital LLC, as Guarantor, and Citibank, N.A., as Lender

("**Citibank**"), Citibank provided a credit facility to GMAC Mortgage (the "**Prepetition MSR**

**Facility**").  The Prepetition MSR Facility provided the Debtors with financing to provide

funding for the origination or acquisition of certain mortgage loan servicing rights (as defined in

the Prepetition MSR Agreement, the "**Servicing Rights**").  GMAC Mortgage's obligations under

4

the Prepetition MSR Facility are guaranteed by Residential Capital, LLC, a Debtor in these

Cases.

      G.     *Debtors' Stipulations Regarding the Prepetition MSR Facility*.  Without prejudice

to the rights of parties in interest as set forth in Paragraph 16 herein, the Debtors admit, stipulate

and agree to, and with, the following with respect to the Prepetition MSR Facility (collectively,

the "**Debtors' Stipulations**"):

      (iv)     *Prepetition MSR Obligations*.  As of the Petition Date, the outstanding

principal amount of all loans under the Prepetition MSR Agreement was not less than

$152 million (collectively, together with any amounts paid, incurred or accrued prior to the

Petition Date in accordance with the Prepetition MSR Credit Documents, principal, accrued and

unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorney's

fees, related expenses and disbursements), reimbursement obligations, indemnification

obligations and other charges of whatever nature, whether or not contingent, whenever arising,

due or owing in respect thereof to the extent and as provided for in the Prepetition MSR Credit

Documents, including all "Obligations" as described in the Prepetition MSR Agreement, the

"**Prepetition MSR Obligations**").  Subject to Paragraph 16, in light of the Prepetition MSR

Obligations and the value of the MSR Prepetition Collateral with respect thereto, Citibank is

oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition MSR

Obligations in accordance with the Prepetition MSR Credit Documents.

      (v)     *Prepetition MSR Liens and Prepetition MSR Collateral*.  As more fully set

forth in the Prepetition MSR Credit Documents, prior to the Petition Date, the Debtors granted

security interests in and liens on, among other things, all of the Debtors' existing and after

acquired Servicing Rights, to the full extent of the Debtors' interest therein and regardless of

where located, whether or not yet accrued, earned, due or payable, as well as all other present

and future rights and interests of GMAC Mortgage in such Servicing Rights, all contracts with

Fannie Mae and Freddie Mac relating to the Servicing Rights, and all monies due or to become

due with respect to and all proceeds of the Servicing Rights, including the MSR Cash Collateral,

and related collateral (collectively, the "**Prepetition MSR Collateral**") to Citibank (the

"**Prepetition MSR Liens**").

(vi)    *Validity and Perfection of Prepetition MSR Liens and Prepetition MSR*

*Obligations*.  Subject to the provisions of Paragraph 16 of this Final Order, each of the Debtors

acknowledges and agrees that: (a) as of the Petition Date, the Prepetition MSR Liens on the

Prepetition MSR Collateral were valid, binding, enforceable, non-avoidable and properly

perfected; (b) the Prepetition MSR Obligations constitute legal, valid, binding, and non-

avoidable obligations of the Debtors; (c) other than the Agency Interests (as defined herein), to

the extent set forth in the Agency Acknowledgement Agreements (as defined herein), no offsets,

challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the

Prepetition MSR Liens or Prepetition MSR Obligations exist; (d) no portion of the Prepetition

MSR Liens or Prepetition MSR Obligations is subject to any challenge or defense including,

without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination

(whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy

law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of

action, and/or choses in action, including without limitation, avoidance claims under the

Bankruptcy Code, against Citibank or its affiliates, agents, attorneys, advisors, professionals,

officers, directors and employees arising out of, based upon or related to its loans to the Debtors

under the Prepetition MSR Credit Documents.

(vii)    *Priority of Prepetition MSR Liens*.  As of the Petition Date, the Prepetition

MSR Liens were senior in priority over any and all other liens on the Prepetition MSR

Collateral, subject only to the interests (collectively, the "**Agency Interests**") of Freddie Mac

and Fannie Mae as set forth in (a) the Prepetition MSR Agreement, (b) the Federal Home Loan

Mortgage Corporation Acknowledgement Agreement among Freddie Mac, GMAC Mortgage

and Citibank, N.A. dated March 12, 2009 (the "**Freddie Mac Acknowledgement Agreement**"),

and (c) the Acknowledgement Agreement (Single Secured Party) among Citibank, N.A., GMAC

Mortgage and Fannie Mae dated September 7, 2007 (the "**Fannie Mae Acknowledgement

Agreement**" and, together with the Freddie Mac Acknowledgement Agreement, the "**Agency

Acknowledgement Agreements**").

(viii)    *Cash Collateral*.  Each Debtor represents that all of the Debtors' cash

proceeds of the Servicing Rights and related collateral, including but not limited to all cash on

deposit in that certain "Collection Account," as defined in the Prepetition MSR Agreement and

the MSR Concentration Account (as defined herein), constitutes the MSR Cash Collateral of

Citibank.

(ix)    *Section 552(b)*.  The Debtors have agreed not to assert any "equities of the

case" claims under section 552(b) of the Bankruptcy Code against Citibank with respect to

proceeds, products, offspring or profits of any of the Prepetition MSR Collateral.

H.    _Adequate Protection_.  Citibank is entitled to receive adequate protection to the

extent of any diminution in value of its interests in the Prepetition MSR Collateral, including the

MSR Cash Collateral, resulting from the use of MSR Cash Collateral without the continued

maintenance of the Borrowing Base (as defined in the Prepetition MSR Agreement) in

accordance with the terms of the Prepetition MSR Agreement or as a result of the imposition of

7

the automatic stay pursuant to section 362 of the Bankruptcy Code.  Pursuant to sections 361,

363, and 507(b) of the Bankruptcy Code, as adequate protection, (a) Citibank will receive (i) the

MSR Adequate Protection Liens (as defined below); (ii) the Adequate Protection Superpriority

Claim (as defined below); and (iii) the Adequate Protection Payments (as defined below) and

(b) the Debtors agree that they will seek authority in any order approving the sale of the

Prepetition MSR Collateral to provide that the net proceeds of such sale shall be applied by the

Debtors to repay the Obligations under the Prepetition MSR Credit Documents, provided the

Agency Interests are satisfied through such sale (together with the MSR Adequate Protection

Liens, the Adequate Protection Superpriority Claim and the Adequate Protection Payments, the

"**Adequate Protection**").  Notwithstanding the foregoing, if the Prepetition MSR Obligations

are determined by this Court to be undersecured, interest payments and payment of fees

permitted hereunder may be recharacterized and recredited to the principal balance of such

Prepetition MSR Obligations pursuant to further order entered by this Court.

I.    _Necessity of Relief Requested_.  The ability of the Debtors to finance their

operations requires, in addition to the Debtors' proposed DIP Facility and use of the Ally Cash

Collateral and Junior Secured Notes Cash Collateral, the use of MSR Cash Collateral, absent

which immediate and irreparable harm will result to the Debtors, their estates and creditors, and

the possibility for a successful chapter 11 case.  In the absence of the use of MSR Cash

Collateral, the continued operation of the Debtors' businesses would not be possible and serious

and irreparable harm to the Debtors, their estates and their creditors would occur.  The relief

requested in the Motion, therefore. is necessary for the continued operation of the Debtors'

businesses and the preservation of their property.  Citibank and the Debtors have negotiated at

arms' length and in good faith regarding the Debtors' use of MSR Cash Collateral as set forth

herein to fund the continued operation of the Debtors' businesses during the Specified Period (as

defined below).  Entry of this Final Order is in the best interests of the Debtors and their estates.

Based upon the foregoing findings and conclusions, the Motion and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Motion Granted.  The Motion is granted as set forth herein, and the use of MSR

Cash Collateral is authorized, subject to the terms of the interim order of the Court entered on

May 15, 2012 granting the Motion on an interim basis [Docket No. 79] (the "**Interim Order**")

and this Final Order.

2.      Objections Overruled.  All objections to the Motion to the extent not withdrawn

or resolved are overruled.

3.      Authorization to Use MSR Cash Collateral.  Subject to the terms and conditions

of this Final Order, the Debtors are authorized to use the MSR Cash Collateral for the period (the

"**Specified Period**") from the date of entry of this Final Order through the date that is the earliest

to occur of (a) the expiration of the Remedies Notice Period, (b) the date on which maturity of

the DIP Facility is accelerated pursuant to the DIP Loan Agreement as a result of an event of

default thereunder, (c) the effective date of a Chapter 11 plan for any Debtor with assets

exceeding $10 million, or (d) the initial scheduled date of maturity of the DIP Facility, up to a

maximum of eighteen (18) months from the closing date of the DIP Facility.  The MSR Cash

Collateral may be used during the Specified Period solely (x) to fund the cash needs related to

the operations and assets of the assets that comprise the Prepetition MSR Collateral, including

funding advances or repurchase obligations owed by the Debtors with respect to such Prepetition

MSR Collateral, and (y) to fund an allocated portion of the Debtors' costs of administering these

Cases based on the value of the Prepetition MSR Collateral relative to the value of the Debtors'

other assets (any such MSR Cash Collateral used to pay such allocated administrative costs, the

"**Allocated MSR Cash Collateral**") in accordance with the budget previously approved by

Citibank, a copy of which is attached hereto as **Exhibit A** (as may be amended as provided

herein, the "**Budget**").

        4.    <u>MSR Adequate Protection Liens</u>.

        (a)    *MSR Adequate Protection Liens*.  As adequate protection of the interests

of Citibank, pursuant to sections 361 and 363(e) of the Bankruptcy Code, in an amount equal to

the aggregate diminution in value of the MSR Prepetition Collateral to the extent of Citibank's

interests therein, the Debtors were, pursuant to the Interim Order, and hereby are authorized and

deemed to have granted additional and replacement continuing valid, binding, enforceable, non-

avoidable, and automatically perfected post-petition security interests in and liens (the "**MSR**

**Adequate Protection Liens**") on any and all presently owned and hereafter acquired assets of

the Debtors and their estates that do or would (absent the commencement of the Cases) constitute

Prepetition MSR Collateral under the Prepetition MSR Credit Documents, including but not

limited to all cash in the MSR Concentration Account (as defined herein) (such assets, together

with the Prepetition MSR Collateral, the "**MSR Collateral**").

        (b)    *Priority of MSR Adequate Protection Liens*.

        (i)    The MSR Adequate Protection Liens shall be senior to all other

security interests in, liens on, or claims against any of the MSR Collateral, subject only to

the Agency Interests.

        (ii)    The MSR Adequate Protection Liens shall be enforceable against

the Debtors, their estates and any successors thereto, including without limitation, any

10

trustee or other estate representative appointed in the Cases, or any case under chapter 7

of the Bankruptcy Code upon the conversion of any of the Cases, or in any other

proceedings superseding or related to any of the foregoing (collectively, "**Successor**

**Cases**").  Except as provided herein, the MSR Adequate Protection Liens shall not be

made subject to or *pari passu* with any lien or security interest heretofore or hereinafter

granted in the Cases or any Successor Cases, and the MSR Adequate Protection Liens

shall be valid and enforceable against any trustee or other estate representative appointed

in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or

Successor Cases.  The MSR Adequate Protection Liens shall not be subject to sections

510, 549, or 550 of the Bankruptcy Code, and no lien or interest avoided and preserved

for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be

made *pari passu* with or senior to the Prepetition MSR Liens or the MSR Adequate

Protection Liens.

5.     Adequate Protection Superpriority Claim.

(a)     *Adequate Protection Superpriority Claim.*  As further adequate protection

of the interests of Citibank in the MSR Prepetition Collateral against any diminution in value of

such interests in the Prepetition MSR Collateral, Citibank was, pursuant to the Interim Order,

and hereby is granted as and to the extent provided by sections 503(b) and 507(b) of the

Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases

and any Successor Cases including, without limitation, the proceeds of chapter 5 avoidance

actions other than the proceeds of an avoidance action, if any, received from Citibank (the

"**Adequate Protection Superpriority Claim**"); provided, however, that Citibank agrees to use

commercially reasonable efforts to seek payment from the MSR Cash Collateral to satisfy the

11

Adequate Protection Superpriority Claim prior to seeking payment from the unencumbered

assets of the Debtors' estates.

(b) *Priority of the Adequate Protection Superpriority Claim*. The Adequate

Protection Superpriority Claim shall have priority over all administrative expenses and

unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any

kind or nature whatsoever, including, without limitation, administrative expenses of the kinds

specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a),

507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy

Code, except the Adequate Protection Superpriority Claim (i) shall be junior to the superpriority

administrative expense claims granted to the Debtors' proposed providers of debtor in possession

financing and the Carve Out (as defined herein), and (ii) may be *pari passu* with the

superpriority administrative expense claims granted to any parties that provide the Debtors with

use of cash collateral (collectively, the "**Permitted Superpriority Claims**").

6.      Adequate Protection Payments and Protections.

(a) *Adequate Protection Payments*. As further adequate protection, each

Debtor was, pursuant to the Interim Order, and hereby is authorized and directed to provide

adequate protection payments to Citibank (the "**Adequate Protection Payments**"), in the form

of: (i) payments of interest on the Prepetition MSR Obligations at the non-default rate set forth in

the Prepetition MSR Agreement, (ii) any fees of Citibank pursuant to the Prepetition MSR

Agreement payable at the times specified in the Prepetition MSR Agreement; and (iii) ongoing

payment of the reasonable fees, costs and expenses of Citibank, including, without limitation, the

payment of the reasonable fees and expenses of legal and other professionals retained by

Citibank in accordance with Paragraph 11 hereof.

(b)      The Debtors shall seek authority from the Court in any order approving

the sale, transfer, lease, encumbrance or other disposition of any portion of the MSR Collateral

issued prior to payment in full of the Prepetition MSR Obligations, that such approval be

conditioned upon the repayment of the loans under the Prepetition MSR Facility with the

proceeds thereof, provided the Agency Interests are satisfied through such sale.

7.      MSR Concentration Account.  As a condition to the authorization to use MSR

Cash Collateral, the Debtors shall segregate the MSR Cash Collateral from the Debtors' other

cash by depositing the MSR Cash Collateral into a newly formed separate concentration account

(the "**MSR Concentration Account**") at JP Morgan Chase Bank, N.A. ("**JPM**"), and subject to

a deposit account control agreement entered into among JPM, GMAC Mortgage, and Citibank.

8.      Modification of Automatic Stay.  The automatic stay imposed under Bankruptcy

Code section 362(a) is modified as necessary to effectuate all of the terms and provisions of this

Final Order, including, without limitation, to: (a) permit the Debtors to grant the MSR Adequate

Protection Liens and Adequate Protection Superpriority Claim; (b) permit the Debtors to perform

such acts as Citibank may request in its reasonable discretion to assure the perfection and priority

of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to

Citibank under this Final Order; (d) permit the Debtors to open the MSR Concentration Account,

as necessary and execute a deposit account control agreement with respect thereto without

further order of this Court; and (e) authorize the Debtors to pay, and Citibank to retain and apply

payments made in accordance with the terms of this Final Order; provided, however, that any

stay of relief with respect to the exercise of remedies shall be in accordance with Paragraph 13

below or as otherwise ordered by this Court.

13

9.      <u>Perfection of MSR Adequate Protection Liens</u>.  The Interim Order and this Final

Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the

MSR Adequate Protection Liens and the liens on the MSR Cash Collateral Account without the

necessity of filing or recording any financing statement, mortgage, notice, or other instrument or

document which may otherwise be required under the law or regulation of any jurisdiction or the

taking of any other action (including, for the avoidance of doubt, entering into any deposit

account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy

law) the MSR Adequate Protection Liens and the liens on the MSR Cash Collateral Account, or

to entitle Citibank to the priorities granted herein.  Notwithstanding the foregoing, Citibank is

authorized to file, as it deems necessary or advisable, such financing statements, notices of liens

and other instruments or documents to perfect in accordance with applicable non-bankruptcy law

or to otherwise evidence the applicable MSR Adequate Protection Liens, liens on the MSR Cash

Collateral Account, and all such financing statements, notices and other documents shall be

deemed to have been filed or recorded as of the Petition Date; <u>provided</u>, <u>however</u>, that no such

filing or recordation shall be necessary or required in order to create, evidence or perfect the

MSR Adequate Protection Liens including the liens on the MSR Cash Collateral Account.  The

Debtors are authorized and directed to execute and deliver promptly upon demand to Citibank all

such financing statements, notices, instruments and other documents as Citibank may reasonably

request.  Citibank, in its sole discretion, may file a copy of the Interim Order and this Final Order

as a financing statement or notice with any filing or recording office or with any registry of

deeds or similar office, in addition to or in lieu of such financing statements, notices of lien,

instrument, or similar document.

10.      <u>Additional Covenants of the Debtors</u>.  The Debtors shall:

14

(a)    Remit all MSR Cash Collateral, as and when received, for deposit to the

MSR Concentration Account to be used in accordance with the Interim Order, this Final Order,

the Budget and the Cash Management Order (as defined herein);

(b)    Provide to Citibank and the Statutory Committee (i) monthly servicing

tapes required under the MSR Prepetition Agreement; (ii) on a bi-weekly basis, variance reports

on actual versus projected cash flows of the operations with respect to the MSR Collateral;

(iii) every four weeks, updated Budgets; (iv) monthly collateral reports and such other monthly,

quarterly or annual financial reports as the Debtor is required to provide pursuant to the DIP

Facility; and (v) notice of any changes in tier rating of GMAC Mortgage by Freddie Mac or

Fannie Mae.

(c)    Serve Citibank and its counsel, and counsel to any Statutory Committee,

with a copy of each monthly report filed by the Debtors in these Cases as required by the Court,

the U.S. Trustee or applicable law.

11.    <u>Payment of Professional Fees</u>.  Professionals for Citibank shall not be required to

comply with the U.S. Trustee fee guidelines for the payment of fees and expenses, but each

professional shall provide detailed fee and expense statements (redacted if necessary for

privilege) to the U.S. Trustee, counsel for the Statutory Committee, counsel for the

Administrative Agent under the DIP Facility, and counsel for the Debtors (the "**Fee Notice**

**Parties**").  On the eleventh (11th) business day after receipt of any invoice for such fees and

expenses by the Fee Notice Parties, the Debtors shall pay all fees and expenses not subject to

objection.  To the extent any of the Fee Notice Parties has an objection to the fees and expenses

of any such professional, they shall so advise the professional.  If any such objection is raised

and not resolved and/or withdrawn, the parties shall submit any dispute to this Court for

adjudication.

12.    <u>Events of Default</u>.  The occurrence of any of the following events, unless waived

in writing by Citibank, shall constitute an event of default (collectively, the "**Events of**

**Default**"):

(a)    the occurrence and continuance of an event of default under the DIP

Facility (as defined in the Motion);

(b)    the failure of the Debtors to provide any report or certificate due under

Paragraph 10 that continues unremedied for a period of five (5) business days after the date that

such report or certificate was due;

(c)    any event of default, early amortization event, or termination event (other

than as a result of the commencement of the Cases) shall occur under any material document or

agreement that relates to the Prepetition MSR Agreement or the MSR Collateral and such event

could reasonably be expected to be materially adverse to the rights and interests of Citibank;

(d)    any liens, claims and other interests created by the Interim Order or this

Final Order shall cease to be valid, perfected and enforceable and of the same priority purported

to be created hereby or any of the Debtors or their subsidiaries shall challenge in any action the

validity, perfection, enforceability or priority thereof;

(e)    dismissal of the Case of any Debtor with assets exceeding $10 million (or

any of the Debtors or their affiliates seeking or supporting such any such dismissal) or

conversion of the Case of any Debtor with assets exceeding $10 million to a case under chapter 7

of the Bankruptcy Code (or any of the Debtors or their affiliates seeking or supporting any such

conversion);

16

(f)       appointment of a trustee (or such other comparable responsible person) or

a responsible officer or examiner with expanded powers in the Case of any Debtor with assets

exceeding $10 million (or any of the Debtors or their affiliates seeking or supporting any such

appointment);

(g)       entry of an order granting relief from the automatic stay as to the MSR

Collateral with a value in excess of $10 million (or any of the Debtors or their affiliates seeking

or supporting any such relief) (i) to allow any creditor to execute upon or enforce a lien on or

security interest in any MSR Collateral, or (ii) with respect to any lien of or the granting of any

lien on any MSR Collateral to any state or local environmental or regulatory agency or authority,

which in either case would have a material adverse effect on the business, operations, property,

assets, or condition, financial or otherwise, of the Debtors;

(h)       entry an order amending, supplementing, staying, vacating, reversing or

otherwise modifying this Final Order except as otherwise agreed to in writing by Citibank, or

this Final Order shall cease to be in full force and effect;

(i)       entry of an order granting any superpriority claim (or claim of equivalent

status) that is senior to or *pari passu* with the claims of Citibank or any lien or security interest

that is senior to or *pari passu* with the liens and security interests securing the Prepetition MSR

Facility, except for the Permitted Superpriority Claims, which superpriority claims may be senior

or *pari passu* with the Adequate Protection Superpriority Claim as provided in paragraph 5(b);

(j)       entry of an order authorizing recovery from the MSR Collateral for any

cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or

otherwise, other than as may be provided in this Final Order.

17

(k)     upon written notice from Citibank, any material misrepresentation of a material fact made after the Petition Date by any of the Debtors or their agents to Citibank or its agents about the financial condition of the Debtors, or any of them, the nature, extent, location or quality of any MSR Collateral, or the disposition or use of any MSR Collateral, including MSR Cash Collateral;

(l)     the sale after the Petition Date of any portion of the MSR Collateral except pursuant to an order that provides for the repayment of the Prepetition MSR Obligations from the proceeds of such sale, provided the Agency Interests are satisfied through such sale;

(m)     upon written notice from Citibank, the material failure to make Adequate Protection Payments or other payments to Citibank when due, subject to a cure period of five (5) days; and

(n)     the failure by the Debtors to perform or observe in any respect any terms, provisions, conditions, covenants, agreements or obligations under this Final Order that is not otherwise specified as an Event of Default and that remains unremedied for fifteen (15) business days; provided, however, that a variance from the Budget shall not be deemed an Event of Default hereunder;

13.     Rights and Remedies Upon Event of Default.  Upon the occurrence of an Event of Default and at any time thereafter during the continuance thereof, with seven (7) days' prior written notice (an "**Enforcement Notice**") of any such occurrence, in each case given to (i) the Debtors and their counsel, (ii) counsel to the Administrative Agent and Collateral Agent under the DIP Facility, (iii) counsel to the Statutory Committee, (iv) the U.S. Trustee, (v) counsel to Ally, (vi) counsel to the Junior Secured Notes, (vii) Freddie Mac, and its counsel, and (viii) Fannie Mae, and its counsel, Citibank shall be entitled to exercise Citibank's rights and

18

remedies as set forth in the Prepetition MSR Documents or under applicable law (including the

right to setoff monies of the Debtors in accounts maintained with Citibank and delivery of a

shifting control notice with respect to the MSR Collateral Account).  Any Enforcement Notice

shall also be filed with the Court.  This Final Order shall not prejudice the rights of any party in

interest to oppose the exercise of Citibank's remedies; *provided* that the only issue that may be

raised by any party in opposition thereto shall be whether an Event of Default has in fact

occurred and is continuing, and the Debtors hereby waive their right to seek any relief, whether

under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or

restrict, or delay the exercise or benefit of, the rights and remedies of Citibank under the

Prepetition MSR Documents, the Interim Order or this Final Order.  Upon the expiration of the

seven (7) day period (the "**Remedies Notice Period**"), in the absence of a determination by the

Court that an Event of Default has not occurred or is not continuing, Citibank shall be entitled to

pursue all remedies under the Prepetition MSR Documents or applicable law without further

order of the Court, and the automatic stay is hereby deemed modified to permit the pursuit of

such remedies.

14.     Carve Out.  As used in this Final Order, the "**Carve Out**" means the Carve Out as

defined in any order of the Court approving the DIP Facilities provided by Barclays Bank PLC

and Ally Financial Inc..  Notwithstanding anything to the contrary herein, the Carve Out shall be

junior in priority to the Prepetition MSR Liens and the MSR Adequate Protection Liens.  No

payment of any Carve Out amount shall reduce any Prepetition MSR Obligations.

15.     Limitations on the Use of MSR Cash Collateral.  Other than the Allocated MSR

Cash Collateral, the MSR Cash Collateral may not be used in connection with or to finance in

any way any action, suit, arbitration, proceeding, application, motion or other litigation of any

type (a) adverse to the interests of Citibank, or its rights and remedies under the Prepetition MSR

Credit Documents or this Final Order, including, without limitation, for the payment of any

services rendered by the professionals retained by the Debtors or the Statutory Committee in

connection with the assertion of or joinder in any claim, counterclaim, action, proceeding,

application, motion, objection, defense or other contested matter, the purpose of which is to seek,

or the result of which would be to obtain, any order, judgment, determination, declaration or

similar relief adverse to the interests of Citibank, or their rights and remedies under the

Prepetition MSR Credit Documents or this Final Order, (b) invalidating, setting aside,

recharacterizing, avoiding or subordinating, in whole or in part, the Prepetition MSR

Obligations, (c) objecting to or challenging in any way the claims, liens, or interests (including

interests in the MSR Collateral) held by or for the benefit of Citibank; (d) asserting, commencing

or prosecuting any claims or causes of action whatsoever, including, without limitation, any

actions under chapter 5 of the Bankruptcy Code, against Citibank; (e) prosecuting an objection

to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection,

priority, characterization or enforceability of any of the Prepetition MSR Obligations or

Prepetition MSR Liens or any other rights or interests of Citibank; or (f) preventing, hindering or

otherwise delaying the exercise by Citibank of any rights and remedies granted under this Final

Order; provided that such restrictions shall not prohibit any investigation by any Statutory

Committee of any of the foregoing.

16.     <u>Reservation of Certain Statutory Committee and Third Party Rights and Bar of</u>

<u>Challenges and Claims</u>.  Nothing in this Final Order shall prejudice the rights of a Statutory

Committee to seek to avoid, object to or otherwise challenge the findings or Debtors'

Stipulations regarding (a) the validity, extent, priority, or perfection of the mortgages, security

interests, and liens of Citibank; or (b) the validity, allowability, priority, fully secured status or

amount of the Prepetition MSR Obligations.  The Statutory Committee (or any other official

committee  appointed by the Court in these cases) must commence, as appropriate, a contested

matter or adversary proceeding raising such claim, objection, defense, or other challenge,

including, without limitation, any claim against Citibank in the nature of a setoff, counterclaim

or defense to the applicable Prepetition MSR Obligations, or file a pleading for standing to

commence such contested matter or adversary proceeding (each, a "**Challenge**") within one

hundred and twenty (120) calendar days after entry of the Final Order subject to further

extension by written agreement between the parties (in each case, a "**Challenge Period**" and the

date of expiration of each Challenge Period being a "**Challenge Period Termination Date**").

Upon the expiration of the Challenge Period Termination Date, without the filing of a challenge

(or if any such challenge is filed and overruled):  (x) any and all such Challenges by any party

(including, without limitation, the Statutory Committee, any chapter 11 trustee, examiner or

other estate representative appointed or elected in these Cases, and any chapter 7 trustee,

examiner or other estate representative appointed or elected in any Successor Case) shall be

deemed to be forever waived, released and barred, and (y) all of the Debtors' Stipulations,

waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to

Citibank's claims, liens, and interests shall be of full force and effect and forever binding upon

the Debtors, the Debtors' bankruptcy estates and all creditors, holders of interests, and other

parties in interest in these Cases and any successor cases.

17.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order

does not create any rights for the benefit of any third party, creditor, equity holder or any direct,

indirect, or incidental beneficiary.

18.     <u>Section 506(c) Claims</u>.  No costs or expenses of administration which have been

or may be incurred in the Cases at any time shall be charged against Citibank or its claims or the

MSR Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise,

without the prior express written consent of Citibank, and no such consent shall be implied,

directly or indirectly, from any other action, inaction, or acquiescence by Citibank.

19.     <u>No Marshaling/Applications of Proceeds</u>.  Citibank shall not be subject to the

equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the

Prepetition MSR Collateral, as the case may be, and proceeds shall be received and applied in

accordance with this Final Order notwithstanding any other agreement or provision to the

contrary.

20.     <u>Section 552(b)</u>.  The Debtors agree that they shall not assert the "equities of the

case" exception under section 552(b) of the Bankruptcy Code against Citibank with respect to

proceeds, products, offspring or profits of any of the Prepetition MSR Collateral.

21.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of

this Final Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly: (a) Citibank's right to seek any other or supplemental relief in respect of any Debtor,

including the right to seek additional adequate protection (without prejudice to the Debtors' or

any other person's right to object to or otherwise oppose such additional adequate protection);

(b) any of the rights of Citibank under the Bankruptcy Code or under non-bankruptcy law,

including, without limitation, the right to (i) request modification of the automatic stay of section

362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases,

conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or

examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the

22

Bankruptcy Code, a chapter 11 plan or plans. Other than as expressly set forth in this Final

Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of Citibank

are preserved, including Citibank's rights under section 507(b) of the Bankruptcy Code.

22.    <u>No Waiver by Failure to Seek Relief</u>. The failure of Citibank to seek relief or

otherwise exercise its rights and remedies under the Interim Order, this Final Order, the

Prepetition MSR Credit Documents, or applicable law, as the case may be, shall not constitute a

waiver of any of the rights hereunder, thereunder, or otherwise of Citibank.

23.    <u>Proofs of Claim</u>. Citibank will not be required to file proofs of claim in any of the

Cases or Successor Cases for any claim allowed herein, and the Debtors' Stipulations in

Paragraph G herein shall be deemed to constitute a timely filed proof of claim for Citibank.

Notwithstanding any order entered by the Court in relation to the establishment of a bar date in

any of the Cases or Successor Cases to the contrary, Citibank is hereby authorized and entitled,

in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a

proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any

claim allowed herein.

24.    <u>Good Faith</u>. Citibank has acted in good faith in connection with the Interim Order

and this Final Order and its reliance on the Interim Order and this Final Order is in good faith.

25.    <u>Reservation of Rights</u>. Nothing in this Order shall discharge, release, or

otherwise preclude any setoff or recoupment right of the United States of America, its agencies,

departments, or agents. Notwithstanding anything herein to the contrary, this Order shall not

modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

23

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

26.    <u>Binding Effect of Final Order</u>.  Immediately upon entry by this Court

(notwithstanding any applicable law or rule to the contrary), the terms and provisions of this

Final Order shall become valid and binding upon and inure to the benefit of the Debtors,

Citibank, all other creditors of any of the Debtors, the Statutory Committee or any other official

committee appointed by the Court in any of the Cases, and all other parties in interest and their

respective successors and assigns, including any trustee or other fiduciary hereafter appointed in

any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.  In the

event of any inconsistency between the provisions of this Final Order and the Prepetition MSR

Credit Documents or any other order (including any "first-day" order), the provisions of this

Final Order shall govern and control.  Any payments to be made under any order (including any

"first-day" order) shall be made in accordance with this Final Order.

27.    <u>No Modification of Final Order</u>.  The Debtors irrevocably waive any right to seek

any amendment, modification or extension of this Final Order without the prior written consent

of Citibank, and no such consent shall be implied by any other action, inaction or acquiescence

of Citibank.  In the event any or all of the provisions of this Final Order are hereafter modified,

amended or vacated by a subsequent order of this Court or any other court, such modification,

amendment or vacatur shall not affect the validity, perfection, priority, allowability,

enforceability or non-avoidability of any advances previously made or made hereunder, or lien,

24

claim or priority authorized or created hereby.  Any liens or claims granted to Citibank hereunder

arising prior to the effective date of any such modification, amendment or vacatur of this Final

Order shall be governed in all respects by the original provisions of this Final Order, including

entitlement to all rights, remedies, privileges and benefits granted herein.

28.    <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant

hereto shall survive entry of any order that may be entered: (a) confirming any plan of

reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of

the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; (d) discharging

any Debtor; or (e) pursuant to which this Court abstains from hearing any of the Cases or

Successor Cases.  The terms and provisions of this Final Order, including the claims, liens,

security interests and other protections granted to Citibank pursuant to this Final Order,

notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases,

or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as

provided by this Final Order until all Prepetition MSR Obligations have been indefeasibly paid

in full in cash, notwithstanding the expiration of the Specified Period or any earlier termination

of the Debtors' authorization to use MSR Cash Collateral.

29.    <u>Acknowledgement Agreements</u>.  Nothing in this Final Order affects the rights,

duties or obligations of (a) Freddie Mac or Citibank under the Freddie Mac Acknowledgement

Agreement or (b) Fannie Mae or Citibank under the Fannie Mae Acknowledgement Agreement.

30.    <u>Effect of this Final Order</u>.  This Final Order shall constitute findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon execution hereof.

31.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce

this Final Order according to its terms.

Dated:  June 20, 2012
         New York, New York


_____<b>/s/Martin Glenn</b>_____
MARTIN GLENN
United States Bankruptcy Judge

12-12020-mg    Doc 4755    Filed 08/20/13    Entered 08/20/13 18:06:43    Main Document
Pg 27 of 28

**Exhibit A**

**Budget**

**Weekly Cash Flow Projections - Citi MSR**

| ($ millions) | W/B 14-May-12 Week 1 | W/B 21-May-12 Week 2 | W/B 28-May-12 Week 3 | W/B 4-Jun-12 Week 4 | W/B 11-Jun-12 Week 5 | W/B 18-Jun-12 Week 6 | W/B 25-Jun-12 Week 7 | W/B 2-Jul-12 Week 8 | W/B 9-Jul-12 Week 9 | W/B 16-Jul-12 Week 10 | W/B 23-Jul-12 Week 11 | W/B 30-Jul-12 Week 12 | W/B 6-Aug-12 Week 13 | W/B 13-Aug-12 Week 14 | W/B 20-Aug-12 Week 15 | W/B 27-Aug-12 Week 16 | W/B 3-Sep-12 Week 17 | W/B 10-Sep-12 Week 18 | W/B 17-Sep-12 Week 19 | W/B 24-Sep-12 Week 20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CITI MSR CASH FLOWS** | | | | | | | | | | | | | | | | | | | | | |
| 1   FNMA / FHLMC Net Repurchases | (0.8) | (0.8) | (0.9) | (0.9) | (0.6) | (0.9) | (0.9) | (0.9) | (1.1) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (1.0) | (0.9) | (1.2) | (1.2) | (1.4) | (1.0) | (19.4) |
| 2   Servicing / Ancillary Fees | 4.0 | 2.6 | 5.4 | 3.9 | 4.8 | 2.7 | 4.0 | 5.6 | 3.8 | 3.9 | 2.6 | 6.7 | 3.8 | 3.9 | 2.3 | 2.9 | 5.5 | 3.7 | 4.2 | 3.7 | 80.0 |
| 3   Interest | - | - | (1.1) | - | - | - | - | (1.1) | - | - | - | (1.1) | - | - | - | - | (1.1) | - | - | - | (4.6) |
| 4   Operating Expenses / Professional Fees | (1.4) | (2.8) | (1.0) | (2.8) | (2.4) | (2.8) | (1.3) | (2.4) | (1.2) | (5.0) | (1.2) | (2.6) | (1.2) | (5.2) | (1.2) | (2.5) | (1.1) | (5.7) | (1.4) | (2.7) | (47.9) |
| 5   **Net Cash Flow** | **1.8** | **(1.0)** | **2.3** | **0.3** | **1.8** | **(0.9)** | **1.8** | **1.2** | **1.5** | **(2.2)** | **0.3** | **2.0** | **1.6** | **(2.3)** | **0.2** | **(0.6)** | **2.3** | **(3.1)** | **1.3** | **0.0** | **8.2** |
| **CASH BALANCE ROLL-FORWARD** | | | | | | | | | | | | | | | | | | | | | |
| 6   Beginning Cash Balance | - | 1.8 | 0.8 | 3.1 | 3.4 | 5.2 | 4.3 | 6.1 | 7.3 | 8.8 | 6.5 | 6.8 | 8.8 | 10.4 | 8.2 | 8.4 | 7.7 | 10.0 | 6.9 | 8.2 | - |
| 7   Net Cash Flow | 1.8 | (1.0) | 2.3 | 0.3 | 1.8 | (0.9) | 1.8 | 1.2 | 1.5 | (2.2) | 0.3 | 2.0 | 1.6 | (2.3) | 0.2 | (0.6) | 2.3 | (3.1) | 1.3 | 0.0 | 8.2 |
| 8   **Ending Cash Balance** | **1.8** | **0.8** | **3.1** | **3.4** | **5.2** | **4.3** | **6.1** | **7.3** | **8.8** | **6.5** | **6.8** | **8.8** | **10.4** | **8.2** | **8.4** | **7.7** | **10.0** | **6.9** | **8.2** | **8.2** | **8.2** |

# Exhibit F

# SHEARMAN & STERLING LLP

599 LEXINGTON AVENUE | NEW YORK | NY | 10022-6069

WWW.SHEARMAN.COM | T +1.212.848.4000 | F +1.212.848.7179

February 14, 2014

When remitting,
please reference:

John Dorans
Managing Director - IRM NA
Citigroup Global Markets Inc.
388 Greenwich Street
New York, NY 10013

00048-00657

Invoice Number: 5302325

FOR LEGAL SERVICES RENDERED in connection with ResCap chapter 11.

**FEES**........................................................................................................................... $196,488.20

## COST SUMMARY

| | | |
|---|---|---|
| CPY | Inhouse Photocopies | 418.88 |
| INF | Other Information Services | 16.00 |
| OSD | Other Outside Services | 1,602.32 |

**COSTS** related thereto........................................................................................... $2,037.20

**TOTAL** ....................................................................................................................... $198,525.40

*PAYMENT INSTRUCTIONS*
*Please return one remittance copy with your payment to the attention of the Financial Services Department.*
*For wire transfer payment, please send funds to:*

Citibank N.A.
153 East 53rd Street
New York, NY 10022
ABA #021000089

Shearman & Sterling LLP
General 1 Account
Account #09280096
SWIFT Code CITIUS33

*Please reference the client matter and invoice numbers on the electronic fund transfer.*
*Time and costs, if any, recorded after date of statement will appear on a subsequent statement*
*Tax Identification Number 13-5514352*

CITICORP GLOBAL FINANCE NORTH AMERICA                    Account Number: 00048-00657
Page Number: 2                                           Invoice Number: 5302325

## TIME DETAIL

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|------------|-------------|-------|
| 09/30/2013 | Mounier, Jerome | Review ResCap dockets (E.Emrich) | 0.70 |
| 10/01/2013 | Roll III, William J. | Review of Emrich draft of motion on default interest issue. | 0.50 |
| 10/01/2013 | Emrich, Edmund M. | Worked on drafts of pleadings regarding default interest dispute; circulated drafts to Sosnick & Roll; e-mails regarding same; e-mails with roll regarding call with Curtis Mallet regarding ResCap's bank accounts. | 1.50 |
| 10/02/2013 | Sosnick, Fredric | Review draft motion and brief on default interest; meet with Emrich regarding same; emails regarding frozen accounts. | 1.10 |
| 10/02/2013 | Emrich, Edmund M. | Telephone call with Roll regarding his discussion with Curtis Mallet regarding ResCap bank accounts; e-mails with Sosnick & Roll regarding same; e-mails with Sosnick regarding draft of letter regarding unpaid invoices; worked on pleadings regarding default interest dispute. | 1.70 |
| 10/03/2013 | Emrich, Edmund M. | Met with Sosnick to discuss comments to pleadings regarding default interest litigation; worked on revising & supplementing same; reviewed relevant materials. | 2.30 |
| 10/04/2013 | Mounier, Jerome | Review ResCap dockets (E.Emrich) | 0.50 |
| 10/07/2013 | Emrich, Edmund M. | Worked on pleadings regarding default interest litigation. | 1.00 |
| 10/08/2013 | Roll III, William J. | Review of revised draft motion papers on default interest issue. | 1.00 |
| 10/09/2013 | Sosnick, Fredric | Worked on revisions to memorandum of law; review research regarding same. | 2.20 |
| 10/09/2013 | Emrich, Edmund M. | Reviewed Case Management & Scheduling Order regarding JSN adversary proceedings; worked on matters relating to default interest litigation. | 0.80 |
| 10/10/2013 | Sosnick, Fredric | Review research for brief; meet with Emrich regarding same. | 2.30 |
| 10/10/2013 | Emrich, Edmund M. | Worked on default interest litigation; met with Sosnick regarding same. | 1.00 |
| 10/10/2013 | Mounier, Jerome | Review ResCap dockets (Pre-UMB trial filings) (E.Emrich) | 0.60 |
| 10/11/2013 | Sosnick, Fredric | Meet with Roll and Emrich regarding default interest motion. | 0.80 |
| 10/11/2013 | Roll III, William J. | Attention to contested matter versus adversary providing issue; review of draft motion papers on default interest issue; meeting with Sosnick and Emrich; review of cases on default interest issue. | 2.80 |
| 10/11/2013 | Emrich, Edmund M. | Met with Sosnick & Roll to discuss drafts of motion papers regarding default interest dispute; reviewed additional cases; worked on revising & supplementing motion papers. | 2.30 |

CITICORP GLOBAL FINANCE NORTH AMERICA

Page Number: 3

Account Number:  00048-00657

Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|------------|-------------|-------|
| 10/14/2013 | Roll III, William J. | Review of cases on default interest issue. | 1.50 |
| 10/14/2013 | Emrich, Edmund M. | Reviewed cases & materials & worked on revising motion papers regarding default interest dispute. | 1.00 |
| 10/15/2013 | Roll III, William J. | Continued review of cases on default interest issue; review and revision of revised draft motion papers on same. | 2.00 |
| 10/15/2013 | Emrich, Edmund M. | Finalized & circulated draft of revised motion papers regarding default interest dispute; reviewed & incorporated comments of Roll & Sosnick; reviewed applicable rules regarding procedures; discussion with Mounier regarding same. | 2.00 |
| 10/16/2013 | Sosnick, Fredric | Worked on revisions to default interest motion. | 0.80 |
| 10/16/2013 | Roll III, William J. | Review of revised draft papers on default interest issues. | 0.80 |
| 10/16/2013 | Emrich, Edmund M. | Reviewed revisions & comments from Sosnick regarding draft of Motion regarding default interest litigation; reviewed cases & materials & worked on revising & supplementing draft of motion; discussions & e-mails with team regarding same; finalized & circulated revised draft; reviewed procedural rules & requirements. | 1.80 |
| 10/16/2013 | Mounier, Jerome | Review/analyze, communications regarding UMB Trial transcripts & service list (eScribe, E.Emrich, R.Facundo) | 1.90 |
| 10/17/2013 | Sosnick, Fredric | Worked on revisions to default interest brief; telephone calls with Emrich regarding same; review research regarding same. | 3.30 |
| 10/17/2013 | Emrich, Edmund M. | Worked on matters regarding Motion, including review of additional case law; telephone calls with Sosnick regarding same. | 0.90 |
| 10/17/2013 | Mounier, Jerome | Review/analyze, communications regarding UMB Trial (transcripts & filings) (eScribe, E.Emrich) | 0.90 |
| 10/20/2013 | Sosnick, Fredric | Worked on revisions to default interest pleading; emails regarding same. | 3.30 |
| 10/20/2013 | Roll III, William J. | Review of Sosnick comments on draft motion on default interest issue; review of revised draft. | 0.50 |
| 10/21/2013 | Sosnick, Fredric | Review further revisions to brief; meet with Emrich regarding same. | 0.60 |
| 10/21/2013 | Roll III, William J. | Review of revised draft of motion papers and Sosnick comments; telephone call with Emrich (2) regarding same. | 1.20 |
| 10/21/2013 | Emrich, Edmund M. | Reviewed revisions & comments from Sosnick re draft of Motion; worked on revising & supplementing same; reviewed case law; e-mails & discussions with Sosnick, Roll & Bokosha regarding same. | 2.30 |
| 10/21/2013 | Bokosha, Terence | Bluebooking Citibank's petition. | 4.00 |
| 10/22/2013 | Sosnick, Fredric | Meet with Emrich regarding brief; telephone call with Roll and Emrich regarding settlement possibilities; meet with Emrich regarding call from Debtor's counsel; telephone call with Roll and Emrich regarding same. | 1.00 |

February 14, 2014

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 4

Account Number: 00048-00657
Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| 10/22/2013 | Roll III, William J. | Telephone calls with Emrich (3) and Sosnick and Emrich regarding draft papers, inquiry from Curtis Mallet; review of revised draft papers on default interest. | 2.50 |
| 10/22/2013 | Emrich, Edmund M. | Worked on drafts of Motion, Notice of Motion & Order regarding default interest dispute; discussions & e-mails with team regarding same; met with Sosnick regarding same; discussions with Roll & Sosnick regarding Debtors' request for consolidation of foreign currency accounts; called Washburn regarding same; reviewed relevant portion of Plan Supplement, including Liquidation Trust Agreement; discussion with Sosnick regarding same; telephone calls with S. Martin regarding same. | 2.90 |
| 10/22/2013 | Facundo, Richard | Call with E. Emrich regarding Citibank MSR Facility; Email to E. Emrich regarding same. | 0.20 |
| 10/23/2013 | Emrich, Edmund M. | Reviewed corrections to draft of Motion; telephone call with Sosnick to discuss revisions. | 0.30 |
| 10/24/2013 | Emrich, Edmund M. | E-mails with Citibank & team regarding Debtors' request relating to consolidation of foreign currency accounts; telephone call with Washburn regarding same. | 0.30 |
| 10/25/2013 | Sosnick, Fredric | Telephone call with Citi and S&S teams regarding consolidation of accounts per Rescap request. | 0.30 |
| 10/25/2013 | Roll III, William J. | Telephone calls with Emrich (4) regarding account consolidation issue, call from Curtis Mallat; attention to default interest issue, draft papers. | 1.20 |
| 10/25/2013 | Emrich, Edmund M. | E-mails & conference call with Citibank, With. Roll & F. Sosnick regarding Debtors' request to consolidate bank accounts; telephone calls with J. Walsh, W. Washburn & E. Cornejo regarding same. | 1.00 |
| 10/29/2013 | Emrich, Edmund M. | E-mail to Citibank with drafts of motion papers; discussions with Mounier regarding procedural issues. | 0.30 |
| 10/29/2013 | Mounier, Jerome | Review/, research & communications regarding omnibus Hearing and preparation filing of CTBK motion(E.Emrich/MA's Office) | 1.40 |
| 10/30/2013 | Sosnick, Fredric | Telephone call with Poss regarding default interest motion; meet with Emrich regarding same. | 0.40 |
| 10/30/2013 | Emrich, Edmund M. | Telephone call with Washburn regarding draft of motion; discussion with Sosnick regarding same; e-mails with Washburn, Poss & Sosnick regarding motion & process issues; telephone call with Washburn regarding same; discussions with Mounier regarding procedural matters relating to same. | 0.70 |
| 11/04/2013 | Emrich, Edmund M. | Briefly reviewed post-trial briefs 7 proposed findings of fact regarding JSN adversary proceeding. | 0.50 |
| 11/04/2013 | Mounier, Jerome | Review & communications regarding ResCap & UMB trial dockets (E.Emrich) | 0.80 |
| 11/05/2013 | Emrich, Edmund M. | Briefly reviewed JSN corrected pleadings; reviewed Debtors' status report regarding Plan confirmation | 0.50 |

CITICORP GLOBAL FINANCE NORTH AMERICA

Account Number: 00048-00657

Page Number: 5

Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| 11/08/2013 | Emrich, Edmund M. | Reviewed comments from L. Poss regarding draft of Motion; e-mails regarding same; began making revisions. | 0.50 |
| 11/09/2013 | Sosnick, Fredric | Review comments from Poss to default interest motion; emails regarding same. | 0.40 |
| 11/11/2013 | Sosnick, Fredric | Meet with Emrich regarding Citi comments; telephone call with Poss, Washburn and Emrich regarding same; follow up meeting with Emrich regarding same. | 1.10 |
| 11/11/2013 | Emrich, Edmund M. | Met with Sosnick to discuss Citibank comments to draft of Motion; conference call with Poss, Washburn & Sosnick regarding same; follow-up with Sosnick regarding same; revised draft of Motion; e-mails with team regarding same; discussion & e-mails with Mounier regarding status; reviewed Stipulated Scheduling Order regarding Phase II of JSN trial. | 2.50 |
| 11/12/2013 | Sosnick, Fredric | Review revised motion; emails regarding same. | 0.40 |
| 11/12/2013 | Roll III, William J. | Review of further revised draft of motion on default interest; email with Emrich regarding same. | 1.00 |
| 11/12/2013 | Emrich, Edmund M. | Finalized & circulated revised draft of Motion; e-mails regarding same with team & Citibank; further revisions to draft; reviewed & commented upon revised drafts of Notice of Motion & cover letter to chambers; e-mails & discussion with Mounier regarding status; follow-up e-mails with Citibank; briefly reviewed Stipulation & Order regarding JSN trial. | 1.50 |
| 11/13/2013 | Emrich, Edmund M. | Briefly reviewed Pretrial Order regarding Phase II of JSN trial; briefly reviewed Agenda for omnibus hearing; e-mails & discussion with Mounier regarding potential hearing dates & status; e-mail to Sosnick & Roll re same. | 0.50 |
| 11/13/2013 | Mounier, Jerome | Review & communications regarding ResCap & UMB trial dockets; update & communications regarding motion-related filings (E.Emrich) | 1.50 |
| 11/15/2013 | Emrich, Edmund M. | Reviewed Memorandum Opinion regarding JSN trial; e-mail to team regarding same; reviewed Agenda regarding confirmation hearing; briefly reviewed Amended Phase II Pre-Trial Order regarding JSN litigation. | 0.80 |
| 11/18/2013 | Sosnick, Fredric | Emails regarding JSN decision and Citi update regarding same; meet with Emrich regarding same; review JSN decision. | 2.40 |
| 11/18/2013 | Emrich, Edmund M. | Reviewed bankruptcy court's decision regarding JSN litigation; e-mails with Sosnick & Citibank regarding same. | 1.60 |
| 11/19/2013 | Sosnick, Fredric | Prepared for LBSF meeting on the ongoing transactions; participated in ongoing transactions meeting. | 2.40 |
| 11/19/2013 | Emrich, Edmund M. | Reviewed Amended Pretrial Order regarding JSN litigation. | 0.20 |
| 11/19/2013 | Mounier, Jerome | Review & communications regarding ResCap & UMB | 0.70 |

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 6

Account Number: 00048-00657
Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|---|---|---|---|
| | | trial dockets (E.Emrich) | |
| 11/20/2013 | Sosnick, Fredric | Call with Citi team regarding JSN decision; follow up call with S&S team.. | 0.40 |
| 11/20/2013 | Roll III, William J. | Conference call with Washburn and Poss (with Sosnick and Emrich) regarding strategy following bondholder decision; telephone call with Sosnick and Emrich regarding same. | 0.80 |
| 11/20/2013 | Emrich, Edmund M. | Conference call with Poss, Washburn, Roll & Sosnick regarding default interest litigation & JSN ruling; follow-up discussion with Sosnick & Roll regarding same; discussion with Mounier regarding status; briefly reviewed revised version of Plan, proposed Confirmation Order & Amended Agenda regarding Confirmation Hearing. | 1.60 |
| 11/22/2013 | Mounier, Jerome | Review ResCap & UMB trial dockets (E.Emrich) | 0.40 |
| 12/04/2013 | Emrich, Edmund M. | Reviewed Second Amended Plan of Reorganization & Notice regarding JSN Settlement; e-mails with Sosnick, Washburn & Poss re same; worked on analyzing potential impact of JSN settlement on plan distributions; revised draft of motion regarding default interest; e-mail from E. Cornejo regarding ResCap bank accounts. | 1.80 |
| 12/05/2013 | Emrich, Edmund M. | Revised draft of motion re default interest. | 0.50 |
| 12/06/2013 | Emrich, Edmund M. | Reviewed Plan Proponents' Proposed Findings of Fact in Support of Plan Confirmation; e-mail to team regarding same; reviewed Disputed Claims Reserve Motion; revised draft of Default Interest Motion. | 1.50 |
| 12/10/2013 | Sosnick, Fredric | Meet with Emrich regarding modifications to motion based upon secured note settlement; emails regarding same. | 0.50 |
| 12/10/2013 | Emrich, Edmund M. | E-mail from L. Poss regarding draft of default interest motion; worked on same & circulated revised draft; e-mail from T. Houston regarding potential relevance of Wi.R. Grace proceedings regarding default interest issue; reviewed W.R.Grace decision & other recent case law; e-mail to Citibank regarding same. | 1.50 |
| 12/11/2013 | Sosnick, Fredric | Meetings with Emrich regarding ipso facto issues; review cases regarding same; emails with Citi regarding brief; review Citi comments. | 1.30 |
| 12/11/2013 | Emrich, Edmund M. | Reviewed Judge Glenn's Confirmation Order & Findings of Fact; e-mails with L. Poss, F. Sosnick & T. Houston regarding default interest motion;met with Sosnick regarding reviewed ipso facto issue; reviewed comments to draft of motion from L. Poss; revised draft of motion. | 2.70 |
| 12/12/2013 | Sosnick, Fredric | Revised default interest motion for filing; emails regarding same. | 2.30 |
| 12/12/2013 | Emrich, Edmund M. | Finalized revised draft of default interest motion, incorporating Citibank comments; e-mails with Sosnick, Roll & Mounier regarding same. | 0.80 |

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 7

Account Number: 00048-00657
Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| 12/12/2013 | Mounier, Jerome | Review & communications regarding ResCap & UMB trial dockets; preparation & communication regarding motion ancillaries (E.Emrich) | 2.00 |
| 12/13/2013 | Emrich, Edmund M. | Revised draft of default interest motion; circulated revised draft to team; e-mails regarding same. | 1.10 |
| 12/13/2013 | Mounier, Jerome | Review & communications regarding motion ancillaries (E.Emrich/MAs office) | 0.50 |
| 12/16/2013 | Sosnick, Fredric | Further revisions to brief regarding Citi comments; meetings with Emrich regarding same. | 0.70 |
| 12/16/2013 | Roll III, William J. | Review and comment regarding further revised draft of motion on default interest issue; telephone call with Emrich, emails regarding same. | 2.00 |
| 12/16/2013 | Emrich, Edmund M. | E-mails with Sosnick & Roll regarding draft of default interest motion; finalized draft & circulated to Houston, Washburn & Poss. | 0.50 |
| 12/19/2013 | Emrich, Edmund M. | Discussions & e-mails with Citibank & team regarding default interest motion & potential hearing dates. | 0.20 |
| 12/20/2013 | Roll III, William J. | Telephone calls with Emrich regarding filing and hearing date; telephone call with Gallagher and Walsh regarding same. | 0.80 |
| 12/20/2013 | Emrich, Edmund M. | E-mails with Sosnick & Roll regarding discussion with Curtis Mallet regarding logistics of default interest motion; discussion with Mounier regarding status. | 0.20 |
| 12/20/2013 | Mounier, Jerome | Communications & preparation CTBK motion & ancillaries filing (e.Emrich) | 0.70 |
| 12/23/2013 | Roll III, William J. | Review of filed version of motion on default interest issue. | 0.20 |
| 12/23/2013 | Emrich, Edmund M. | Reviewed & finalized motion papers & proposed order for filing & service; discussions with J. Mounier regarding same; e-mail to Citibank regarding same. | 1.10 |
| 12/23/2013 | Mounier, Jerome | Review/analyze, revisions, communications, filing & service CTBK motion (E.Emrich/SDNY/MA's office) | 4.00 |
| 12/23/2013 | Flores, Alfredo | Conferred with legal assistant, formated documents to PDF and electronically file motion of Citibank. | 0.60 |
| 12/24/2013 | Mounier, Jerome | Communications & filing service affidavit & delivery courtesy copy to court (MA's office/SDNY) | 0.80 |
| 12/26/2013 | Roll III, William J. | Review of final version of motion papers on default interest issue. | 0.80 |
| 01/06/2014 | Mounier, Jerome | Review/analyze, communications regarding filing & service of CTBK's motion (Bankr. S.D.N.Y., PACER) | 0.70 |
| 01/15/2014 | Roll III, William J. | Review of Liquidating Trust opposition to motion on default interest. | 1.00 |
| 01/15/2014 | Emrich, Edmund M. | Reviewed & analyzed Liquidating Trust's Objection to Citibank Motion; e-mails to Citibank & team regarding same; discussions with team regarding same; reviewed cases & documents & began working on same. | 3.50 |

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 8

Account Number: 00048-00657
Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| 01/15/2014 | Mounier, Jerome | Review/analyze, retrieval & communications regarding ResCap Post-Petition Interest Objection (E.Emrich) | 1.00 |
| 01/16/2014 | Sosnick, Fredric | Review Trustee objection; review cases from objection and cases for reply; meetings with Emrich regarding same; emails with Citi regarding same. | 4.50 |
| 01/16/2014 | Roll III, William J. | Review of emails on opposition to motion; review of opposition brief. | 0.50 |
| 01/16/2014 | Emrich, Edmund M. | Worked on matters relating to Liquidating Trust's Objection to Citibank Motion, including review of cases & documents & begin drafting outline of responses; meetings with Sosnick regarding same; e-mails & discussions with team & Citibank. | 2.50 |
| 01/16/2014 | Mounier, Jerome | Review/analyze, retrieval & communications regarding ResCap Post-Petition Interest Objection; preparation Jan. 30 hearing binders; retrieval related cases; review local rules (E.Emrich) | 5.50 |
| 01/17/2014 | Sosnick, Fredric | Worked on reply brief; meetings with Emrich regarding same. | 4.80 |
| 01/17/2014 | Emrich, Edmund M. | Worked on matters relating to Liquidating Trust's Objection to Citibank Motion, including review of cases & relevant documents & drafting outline of responses; meeting with Sosnick regarding same. | 2.90 |
| 01/17/2014 | Mounier, Jerome | Review/analyze, retrieval & communications regarding CTBK filings; preparation Jan. 30 hearing binders; retrieval related cases (E.Emrich) | 4.00 |
| 01/19/2014 | Emrich, Edmund M. | Worked on drafting Reply to Liquidating Trust's Objection to Citibank Motion; reviewed relevant cases & documents. | 4.00 |
| 01/20/2014 | Sosnick, Fredric | Worked on revisions to reply; emails regarding same; meetings with Emrich regarding same. | 5.40 |
| 01/20/2014 | Emrich, Edmund M. | E-mails regarding Reply; worked on revisions to Reply; meetings with Sosnick regarding same; further e-mails regarding same. | 4.80 |
| 01/21/2014 | Sosnick, Fredric | Revisions to draft of reply. | 0.50 |
| 01/21/2014 | Roll III, William J. | Review and revision of revised draft of reply brief on default interest issue; telephone calls with Emrich (several); emails with Sosnick and Emrich regarding same. | 2.50 |
| 01/21/2014 | Emrich, Edmund M. | Worked on revisions to reply & incorporated comments from Sosnick & Roll; circulated draft to Citibank; e-mails & discussions with Poss regarding same; worked on revisions to Reply to address comments from Poss & Roll; worked on table of authorities; further revised daft; circulated draft to Sosnick & Roll. | 4.50 |
| 01/22/2014 | Sosnick, Fredric | Revised objection; telephone calls with Emrich regarding same; emails with Citi and Emrich regarding same. | 4.20 |

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 9

Account Number: 00048-00657
Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| 01/22/2014 | Emrich, Edmund M. | E-mails & telephone call with Sosnick regarding comments to draft of Reply; reviewed relevant cases & documents; worked on revisions to Reply; circulated revised draft; e-mails with Sosnick regarding same; e-mails with Poss regarding same; circulated draft to Citibank. | 4.10 |
| 01/22/2014 | Mounier, Jerome | Review/analyze, retrieval & communications regarding CTBK filings; preparation Jan. 30 hearing binders; retrieval related cases (E.Emrich) | 4.00 |
| 01/23/2014 | Sosnick, Fredric | Final review of case law; final revisions to brief regarding same; meetings with Emrich regarding same. | 5.30 |
| 01/23/2014 | Emrich, Edmund M. | Worked on matters relating to Reply; e-mails & meetings with Sosnick regarding same; reviewed case law; finalized draft of same & circulated to Citibank. | 3.80 |
| 01/23/2014 | Mounier, Jerome | Review/analyze, retrieval & communications regarding CTBK filings; preparation Jan. 30 hearing binders; retrieval related cases (E.Emrich) | 3.00 |
| 01/24/2014 | Sosnick, Fredric | Final Citibank revisions to reply; meetings with Emrich regarding same; review final pleading for filing; meetings with Mounier regarding service issues in light of PACER disruption; emails regarding same. | 2.10 |
| 01/24/2014 | Roll III, William J. | Attention to further revised draft of reply, comments from Poss and others; emails regarding same. | 1.00 |
| 01/24/2014 | Emrich, Edmund M. | Worked on multiple drafts of Reply, incorporating comments from Citibank & Sosnick; discussions with Sosnick & Mounier. e-mails with Citibank regarding same; finalized same for service & filing. | 4.00 |
| 01/24/2014 | Mounier, Jerome | Review/analyze, retrieval & communications regarding CTBK filings; preparation Jan. 30 hearing binders; retrieval related cases; filing CTBK Reply (E.Emrich/MAs's Office/PACER/Bankr. S.D.N.Y.) | 6.00 |
| 01/27/2014 | Emrich, Edmund M. | Preparation for hearing on default interest motion. | 1.00 |
| 01/27/2014 | Mounier, Jerome | Review/analyze, research & communications 11/20/12 hearing transcript; preparation. & filing Reply affidavit of service (e.Emrich) | 2.40 |
| 01/27/2014 | Shanks, Frederick | Research  - searched Westlaw, Bloomberg for Rescap bankruptcy case docket entry for J. Mounier. | 0.40 |
| 01/28/2014 | Sosnick, Fredric | Telephone call with Roll and Horowitz regarding adjournment; telephone call with Citi and Roll regarding same; telephone call with Horowitz and Chambers regarding same; telephone call with Horowitz regarding next steps; emails regarding adjournment. | 0.70 |
| 01/28/2014 | Roll III, William J. | Telephone call with Horowitz; telephone call with Horowitz and Sosnick; telephone call with Citibank and Sosnick regarding hearing issues; emails regarding same. | 1.20 |
| 01/28/2014 | Emrich, Edmund M. | Worked on preparation for hearing on default interest motion;reviewed draft of Agenda for omnibus hearing; e-mails with Mounier regarding same; discussion with | 1.20 |

February 14, 2014

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 10

Account Number: 00048-00657
Invoice Number: 5302325

| DATE | TIMEKEEPER | DESCRIPTION | HOURS |
|------|-----------|-------------|-------|
| | | Sosnick regarding Liquidating Trust's request for adjournment of hearing; worked on drafting of Notice regarding same; discussion with Mounier regarding same. | |
| 01/28/2014 | Mounier, Jerome | Review/analyze, communications, preparation, filing & service Adjournment Notice (E.Emrich) | 1.50 |
| 01/28/2014 | Woods, Matthew | Electronically filed Notice of Adjournment for J. Mournier regarding Residential Capital. | 0.50 |
| 01/29/2014 | Mounier, Jerome | Review/analyze, communications, service Adjournment Notice (E.Emrich) | 0.80 |

**TOTAL HOURS**                                                          215.80

**FEES**..................................................................................................................   $196,488.20

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 11

Account Number: 00048-00657
Invoice Number: 5302325

## COST DETAIL

| DATE | CODE | DESCRIPTION | AMOUNT |
|------|------|-------------|--------|
| 10/30/13 | CPY | Inhouse Photocopies 2375 COPIES AT C1-4 REPRODUCTION CANON COPIER 7105 - N9 | 166.25 |
| 12/11/13 | CPY | Inhouse Photocopies 72 COPIES AT 9TH FLOOR CONV. CANON COPIER 5055 | 5.04 |
| 12/23/13 | CPY | Inhouse Photocopies 810 COPIES AT C1-4 REPRODUCTION CANON COPIER 7105 - N8 | 56.70 |
| 12/23/13 | CPY | Inhouse Photocopies 1 COPIES AT 9TH FLOOR CONV. CANON COPIER 5055 | 0.07 |
| 01/16/14 | CPY | Inhouse Photocopies 414 COPIES AT C1 - REPRODUCTION OFFICE | 28.98 |
| 01/16/14 | CPY | Inhouse Photocopies 3 COPIES AT 9TH FLOOR CONV. CANON COPIER 5055 | 0.21 |
| 01/22/14 | CPY | Inhouse Photocopies 267 COPIES AT C1 - REPRODUCTION OFFICE | 18.69 |
| 01/24/14 | CPY | Inhouse Photocopies 2040 COPIES AT C1-4 REPRODUCTION CANON COPIER 7105 - P0 | 142.80 |
| 01/24/14 | CPY | Inhouse Photocopies 1 COPIES AT 9TH FLOOR CONV. CANON COPIER 5055 | 0.07 |
| 01/28/14 | CPY | Inhouse Photocopies 1 COPIES AT 9TH FLOOR CONV. CANON COPIER 5055 | 0.07 |
| 01/23/14 | INF | Other Information Services - - VENDOR: PACER SERVICE CENTER Bank ID: CITBKNY4 Check Number: 782436 | 16.00 |
| 10/11/13 | OSD | Other Outside Services - - VENDOR: BLOOMBERG FINANCE LP Bank ID: CITBKNY4 Check Number: 780603 | 280.90 |
| 10/18/13 | OSD | Other Outside Services - - VENDOR: ESCRIBERS, LLC Bank ID: CITBKNY4 Check Number: 780295 | 352.80 |
| 10/31/13 | OSD | Other Outside Services - - VENDOR: PACER SERVICE CENTER Bank ID: CITBKNY4 Check Number: 780586 | 11.00 |
| 10/31/13 | OSD | Other Outside Services - - VENDOR: PACER SERVICE CENTER Bank ID: CITBKNY4 Check Number: 780586 | 30.00 |
| 11/14/13 | OSD | Other Outside Services - - VENDOR: BLOOMBERG FINANCE LP Bank ID: CITBKNY4 Check Number: 780990 | 369.09 |
| 12/10/13 | OSD | Other Outside Services - - VENDOR: BLOOMBERG FINANCE LP Bank ID: CITBKNY4 Check Number: 781588 | 297.23 |
| 01/29/14 | OSD | Other Outside Services - - VENDOR: BLOOMBERG FINANCE LP Bank ID: CITBKNY4 Check Number: 782585 | 261.30 |

## COST SUMMARY

| CPY | Inhouse Photocopies | 418.88 |
|-----|---------------------|--------|

February 14, 2014

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 12

Account Number: 00048-00657
Invoice Number: 5302325

| INF | Other Information Services | 16.00 |
| OSD | Other Outside Services | 1,602.32 |

**COSTS related thereto** ..................................................................................................... $2,037.20

**TOTAL** ..................................................................................................... $198,525.40

February 14, 2014

CITICORP GLOBAL FINANCE NORTH AMERICA
Page Number: 13

Account Number: 00048-00657
Invoice Number: 5302325

## SUMMARY OF TIME CHARGES

| TIMEKEEPER | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Roll III, William J. | 25.80 | 1,104.00 | 28,483.20 |
| Sosnick, Fredric | 55.50 | 1,204.00 | 66,822.00 |
| Emrich, Edmund M. | 82.50 | 984.00 | 81,180.00 |
| Bokosha, Terence | 4.00 | 444.00 | 1,776.00 |
| Facundo, Richard | 0.20 | 659.00 | 131.80 |
| Flores, Alfredo | 0.60 | 204.00 | 122.40 |
| Mounier, Jerome | 46.30 | 384.00 | 17,779.20 |
| Shanks, Frederick | 0.40 | 229.00 | 91.60 |
| Woods, Matthew | 0.50 | 204.00 | 102.00 |
| **TOTALS** | 215.80 | | $196,488.20 |