1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          March 18, 2014

          2:02 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2  Telephone Conference, on the Record, Regarding Debtors'

3  Objection to the Claim of Becky Spence.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Aliza Chodoff

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :  (All Appearances are Telephonic)

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   ADAM A. LEWIS, ESQ.

9        DANIEL J. HARRIS, ESQ.

10

11

12  KRIGEL & KRIGEL, P.C.

13        Attorneys for Becky Spence

14        4550 Belleview Avenue

15        Kansas City, MO 64111

16

17  BY:   ERLENE W. KRIGEL, ESQ.

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           THE COURT:  All right.  This is Judge Glenn.  We're on

3    the record in Residential Capital, number 12-12020.  This is

4    specifically with respect to debtors' objection to proof of

5    claim number 3835 filed by Becky Spence.

6           Who's on the phone for ResCap?

7           MR. LEWIS:  Good afternoon, Your Honor.  Adam Lewis of

8    Morrison & Foerster.

9           THE COURT:  All right.  And for Ms. Spence?

10          MS. KRIGEL:  Good afternoon.  Erlene Krigel, Your

11   Honor.

12          MR. LEWIS:  Your Honor, Mr. Harris -- Dan Harris of

13   Morrison & Foerster is also on the line for ResCap --

14          THE COURT:  Okay.

15          MR. LEWIS:  -- the borrower's trust.

16          THE COURT:  Thank you.

17          MR. HARRIS:  Good afternoon.

18          THE COURT:  Good afternoon, Mr. Harris.

19          I'm just making a note here.  Just a second.

20          All right.  We set up this telephone conference

21   because after the last hearing, each of the parties produced

22   additional documents in response to the Court's direction.  And

23   the Court has reviewed those documents.  And I'm really, at

24   this stage, trying to decide how to proceed with respect to

25   what seems to me to be a contested matter with respect to the

1   Spence claim and the borrower's trust objection to the claim.

2          Let me make clear that I'm not making any rulings

3   today, and I'm going to talk about what some of the documents

4   appear to show.  But I want to make clear that, though this is

5   a factual finding, because what -- and the parties did

6   produce -- did provide documents in response to the Court's

7   direction, for example, the borrower's trust provided the

8   servicing notes, which I specifically asked for, and the Court

9   has reviewed those, if there's an evidentiary hearing, it may

10  well be contested as to the admissibility of what's in the

11  servicing notes.  Excuse me.

12          And with respect to what Ms. Krigel filed on behalf of

13  Ms. Spence, there is a huge amount of hearsay which, in its

14  current form, is highly unlikely to be admitted at a hearing.

15  So I'm going to make some observations.  And really, what

16  they're designed do, then, is to ask some questions about -- to

17  find out how the parties want to proceed, given what the Court

18  sees as the issues.

19          So I just wanted that as a backdrop.  And this is

20  being recorded, so this is on the record.  You can all order a

21  transcript from it.  So let me -- when you were last here, it

22  seemed to me that the issues that the Court was focused on, at

23  least, were in two areas:  the alleged wrongful foreclosure of

24  Ms. Spence's properties and -- so the seven properties -- and

25  as to five of the properties, the Court, I think, observed at

1  the last hearing that the documents reflected that the

2  foreclosure sales were adjourned.  The issue that the Court

3  raised was that the Missouri statute only seemed to provide for

4  an adjournment of seven days, and these sales were adjourned

5  for longer.

6        Just to back up a little, Ms. Spence asserts -- or her

7  counsel asserted at the last hearing that Ms. Spence believes

8  the debtors agreed to adjourn the foreclosure sales to give her

9  an opportunity to avoid foreclosure, that she had received

10  reinstatement quotes.

11        Okay.  The second area -- in addition to the issues

12  about wrongful foreclosure, the other area -- and I'll talk

13  about it separately -- is over -- and I think the claim pleads

14  it as an interference with contract claim -- was over the

15  collection of the rents, and the issue was whether the

16  assignment of rents clauses were properly triggered by the

17  debtors.

18        Okay.  But let's deal with the wrongful foreclosure

19  issues first.  And Mr. Lewis, let me say first -- and it may be

20  because it was because of the issues that you thought were

21  before the Court the last go around or not, but I feel like

22  I've been doing the work that you should have been doing all

23  along because the review of the servicing notes reflects very

24  different issues and arguments than you were making.  And it's

25  not the Court's job to do the work of counsel -- either side's

1   counsel.

2           With that said, a review of the servicing notes appear

3   to say that Ms. Spence consented to the adjournment of the

4   sales for more than seven days to give her a chance to avoid

5   foreclosure and reinstate the loans.  It appears to the Court,

6   on a careful review of the servicing notes, that none of the

7   sales took place until the reinstatement quotes had lapsed.

8   One has to look very carefully as to the notes, as to each of

9   the properties and the reinstatement quotes and when they were

10  set to expire.  And as to two of the properties, it appears to

11  the Court that there is error -- there are typographical errors

12  in two of the deeds.  But it looks to the -- and again, I'm not

13  resolving any factual issues, but it looks to the Court that

14  all of the sales took place after the reinstatement quotes had

15  lapsed without Ms. Spence paying the money that was due in

16  reinstating the loans.

17          So Ms. Spence -- the issue I had focused on at the

18  last hearing was, under Missouri law, it appears -- it appeared

19  that the trustee -- and I think this is true -- the trustee can

20  only adjourn the sale for not to exceed seven days.  But the

21  servicing notes -- if I can find in my notes here -- the

22  servicing notes appear to reflect that the sales were adjourned

23  for more than seven days on consent of Ms. Spence.  And the

24  Missouri statute -- let me find it in my notes here -- Section

25  443.355 of the Missouri revised statute "does not prevent the

1    holder of a security instrument and the owner of the land

2    encumbered thereby from agreeing to more than one continuance

3    or to continuances for more than one week."

4                And as I say, the servicing notes, at least, reflect

5    that Ms. Spence consented to a longer continuance to try and

6    give her a chance to reinstate the loans.  So if that -- if the

7    debtors are able -- I don't know what Ms. Spence is going to

8    say about whether she consented, but servicing notes, at least,

9    reflect that.  Then it's going to be an issue of whether the

10    debtors are able to introduce the servicing notes as the

11    necessary evidence on that.  But I was concerned at the last

12    hearing that it -- and I found Mr. Lewis' arguments quite

13    unpersuasive when he argued that full compliance with the

14    Missouri statutes weren't required, a position I'm not willing

15    to take.  I thought that was a pretty weak argument.  But you

16    don't have to go there because it looks like Missouri law

17    specifically allows a longer continuance with consent, and the

18    servicing notes seem to reflect that consent was received.

19                So as to -- again, I'm not making any findings now,

20    and I'd have to listen to the evidence if we get to that.  But

21    Ms. Krigel, I think you've got a real uphill battle in showing

22    wrongful foreclosure.  It looks like none of the foreclosure

23    sales occurred until after the reinstatement quotes lapsed.

24    And I think it was uncontested that Ms. Spence never, in fact,

25    paid the money that was required to reinstate the loans.

1              MS. KRIGEL:  Your Honor, I actually believe there
2    were.  There was one foreclosure that occurred the day before
3    the reinstatement quote expired.  The sale date was on, I
4    believe, the 10th, and the date was given until the 11th on one
5    property.  And then there were two properties that were later
6    foreclosed, but there were also reinstatement quotes that went
7    beyond that second foreclosure date.  I'm looking at my notes
8    here.
9              For example, my Exhibit I, that had Gaslight (ph.) and
10   Glenwood were good through July 22nd, but --
11             THE COURT:  Yeah, and the final sale date was July
12   23rd on Gaslight.
13             MS. KRIGEL:  Oh, okay.  And --
14             THE COURT:  And on Glenwood, the reinstatement
15   deadline was July 22nd, and the final sale date was July 23rd.
16   And on Homewood, the final sale date was June 11th.  It
17   looked -- I mean, I got a chart.  We went through --
18             MS. KRIGEL:  Okay.
19             THE COURT:  We spent a lot of time on this.
20             MS. KRIGEL:  Okay.
21             THE COURT:  And it looks like the -- and look, I'm not
22   making any findings, Ms. --
23             MS. KRIGEL:  Sure.
24             THE COURT:  -- Krigel.  And --
25             MS. KRIGEL:  No, I understand.

1    THE COURT:  But before you and your -- before your

2  client decides to go spend a lot of money by going ahead and

3  litigating, you better figure out really what you got a good

4  claim on.  I'll just tell you that there were two of the deeds

5  that had -- it looks like the dates weren't corrected, okay?

6  And it's those two.  It's Gaslight and Glenwood.

7    MS. KRIGEL:  Um-hum.

8    THE COURT:  It looked like there was a scrivener's

9  error in the trustee's deed under sale.  It refers to a sale on

10  June 25th, but in fact, the date of the instrument is July

11  23rd.  So it just -- and the servicing notes say the same

12  thing.  The servicing notes are consistent with that.  So I --

13  you can look -- I don't expect you to respond to that now.  But

14  if you look carefully, it looks like with Gaslight, the

15  original sale date, June 25th, was postponed by agreement.  And

16  Glenwood, the original June 25th sale date was postponed by

17  agreement.  The final reinstatement dates on both of those

18  properties were July 22nd, and the sales were actually on July

19  23rd.

20    So I mean, you ought to -- we spent a lot of time

21  going over this, because -- I mean, I'm troubled -- I was -- I

22  think your arguments were fair arguments that you made.  And

23  this is not an evidentiary hearing, but I think you've got an

24  uphill battle on it.

25    MS. KRIGEL:  Okay.

1        THE COURT:  And with respect to the other properties,

2    3864 South Cottage, 3870 South Cottage, 3871 South Cottage,

3    2770 West LaSalle and 3877 South Homewood, the reinstatement

4    dates were June 10th, June 17th -- four of them were June 10th,

5    one was June 17th.  And on each of those, it looks like the

6    final sale was the day after the reinstatement quote lapsed.

7    So on 3864 South Cottage, for example, it looked like the final

8    reinstatement date was June 10th; the sale was June 11th.  3877

9    South Cottage, the final reinstatement deadline was June 10th;

10    the sale was June 11th.  3871 South Cottage, the final

11    reinstatement date was June 17th; the sale was June 18th.  2770

12    West LaSalle, the final reinstatement date was June 10th; the

13    sale was June 11th.  3877 South Homewood, the final

14    reinstatement date was June 10th; the final sale was June 11th.

15        I've already referred to Gaslight and Glenwood.  Both

16    of those sales were July 23rd.  It looks like the final

17    reinstatement date was July 22nd, the day after.  So in each

18    of -- for each of the properties, it appears that the sales

19    actually took place after the reinstatement quotes had lapsed

20    without Ms. Spence being able to pay the money to avoid

21    foreclosure.  So -- and that -- I think underpinning my, at

22    least, tentative analysis with respect to all of these

23    properties is what I raised -- I mean, I -- at the time of the

24    hearing -- the last hearing, the issue seemed to be whether the

25    adjourned sale dates were permissible, because it was more than

1  the seven days after the original date.

2          And there, I'm looking at these servicing notes, for

3  example.  So if you -- and I don't expect you to do it now, Ms.

4  Krigel, but -- I guess these are all -- on June 25th, 2008,

5  there's a -- one of the entries is "per client request PP sale

6  for" -- which I think is postponement sale -- "for thirty days

7  by agreement".  Thirty days by agreement is in quotes.  New

8  sale date, July 23rd.  So that's entered -- is an entry on June

9  25th.  And there are similar entries for the other properties

10 about postponed by agreement.  And Missouri law permits that,

11 at least that's certainly my reading of Missouri law is that

12 the noticing statute, which is Missouri revised statute 443.310

13 and 443.320 and 443.355, permit a longer than seven-day

14 adjournment on consent.  So there's the issue of consent.

15         What Ms. Spence would testify, I don't know.  And

16 whether the debtors can -- the borrower's trust can

17 successfully introduce the notes in evidence, we'll see.  And

18 whether they have a witness or not, I don't know.  I just --

19 just looking at the paper trail, I think you're going to have

20 an uphill battle on this, Ms. Krigel.

21         MS. KRIGEL:  All right.

22         THE COURT:  Okay.  So with respect -- let me shift,

23 then I'll give you both the chance to respond.  The other area

24 was over the assignment of rents.  And there, at least on

25 review of Missouri law is not at all clear what's necessary to

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1  trigger the assignment of rents.  I think, initially, Ms.
2  Krigel, you argued it had to be in writing.  And then, you
3  seemed to drop the argument it had to be in writing.  You
4  submitted some statements of tenants; certainly in their
5  current form, you're not getting any of those into evidence.
6  Whether you can get deposition testimony -- I guess all these
7  people are out of state.  I guess they could testify by
8  deposition.  The borrower's trust could certainly cross-examine
9  at deposition.  What you can get it, I don't know at this
10 point.

11          I do have -- one of the things that I focused on --
12 and Mr. Lewis or Mr. Harris, maybe you can answer this or maybe
13 Ms. Krigel can -- in Ms. Spence's bankruptcy case, have any of
14 the debtors filed a claim for a deficiency?  I mean, the
15 properties were sold for less than the amounts of the mortgage.
16 It was like -- I tried to think about it.  I couldn't remember
17 whether anybody addressed this issue.  Have the debtors filed a
18 deficiency against Ms. Spence with respect to any of the
19 foreclosed properties?

20          MR. LEWIS:  Your Honor, it's Adam Lewis.  I don't know
21 the answer to that question.  Maybe Ms. Krigel does since she's
22 representing Ms. Spence in that case and may have been watching
23 the claims docket.

24          MS. KRIGEL:  I don't remember, Your Honor.  I'd have
25 to look back at the claims register.

RESIDENTIAL CAPITAL, LLC, ET AL.                         14

1          THE COURT:  Yeah, I didn't think so, but that doesn't

2    count for anything, frankly.

3          MR. LEWIS:  And Your Honor, it's Adam Lewis.  I kind

4    of doubt it, but we can certainly check on that.

5          THE COURT:  Here's the reason I raise that issue.

6    Okay.  So let's just assume for a second that the debtors

7    didn't properly trigger the assignment of rents.  And it

8    remains a mystery to me what has to be done under Missouri law

9    to do that and whether it requires just simply tell the tenants

10   don't pay the landlord the rent.  Is that sufficient?  Is it

11   don't pay the landlord; pay me?  Is that required?  The part

12   about pay me.

13         So Ms. Spence -- Ms. Krigel, you put in your -- I

14   think your argument was that Ms. Spence would have -- if she

15   had collected the rent, she would have used the money to make

16   up a shortfall on some other property.  And I have some real

17   question about that.  I mean, I don't think there's any doubt

18   that the debtors could have triggered the assignment of rents

19   clause.  Whether they did or not remains to be decided.  So

20   let's assume that what they did was insufficient, and Ms.

21   Spence didn't get paid the rent.  The properties got

22   foreclosed.  Was the amount of the rent that was withheld,

23   would that have been enough?  I can't imagine there was enough

24   to reinstate the loans.

25         I mean -- and if there's no deficiency claim, I don't

1  see what injury or harm there's been to Ms. Spence.  Certainly,

2  if the debtors were seeking a deficiency judgment, and they had

3  diverted the rents from Ms. Spence to themselves, for example,

4  I think they'd have to give her a credit, at least, for

5  whatever they collected.  And if it just simply wasn't

6  collected, I mean, somebody may have a claim against the

7  tenants or former tenants for the unpaid rent.  But it's hard

8  for me -- if the foreclosure -- if there was no deficiency, and

9  the amount of the loans exceeded the values of the -- I guess

10 we have the sale prices.  It looks like she comes up short on

11 all of them.  I'm not sure how she's hurt by it.

12          So that's sort of the state of the Court's thinking at

13 this point.  And I want to give you both a chance to address

14 it.  I'll tell you right now, Ms. Krigel, if what you want is

15 to go -- look, any trial's going to be a trial in my courtroom.

16 You may be entitled under the Federal Rules of Civil Procedure

17 to introduce testimony of witnesses who can't be subpoenaed

18 because -- in this court by deposition, so you're going to head

19 down the road of taking a bunch of expensive depositions.

20 Where it's going to get you, I don't know, but that's not for

21 me to say at this point.  I'm not telling you you can't do

22 that.  But --

23          MS. KRIGEL:  Well, Your Honor, I think what I would

24 hope for is that if there -- if we had a submissible case based

25 on what evidence would show, I would hope that debtors'

1   counsel, in recognizing that Ms. Spence, like a lot of other

2   homeowners/borrowers, don't have the resources to pursue an

3   evidentiary hearing and that they would sit down to the table

4   and hopefully reach a settlement based on the potential merits

5   of the case as opposed to being a good advocate in litigation

6   and hoping to just be successful because they can outspend.

7          THE COURT:  I would hope so, too, because -- look,

8   I won't even necessarily attribute a good heart and good

9   motives to the borrower's trust.  It costs them money as well,

10  okay?  Where are these properties?  Remind me.  Mid-Missouri?

11         MS. KRIGEL:  Mid-Missouri.

12         THE COURT:  If they've got to go off to Missouri to

13  take or defend a lot of depositions in Missouri, the meter is

14  running on all of them, and it's coming out of the borrower's

15  trust.  So look, the borrower's tr -- look, I will -- this

16  isn't to give you any false hope.  In at least one other matter

17  where I had overruled an objection and said, if necessary, I'll

18  sit down at an evidentiary hearing and actually had the parties

19  in the courtroom in front of me, well, before they left the

20  court that day, they had settled it.  So I think -- the

21  borrower's trust has not demonstrated that it wants to act

22  vindictively to anybody.  I think they'll make rational

23  decisions.

24         I think -- my clerks, even more than I, have spent

25  more time than one might have wanted to reviewing these

1   documents.  I'm glad we did.  I mean, the servicing notes,

2   it -- look, with respect to foreclosure, I think if you dig

3   down it tends to support the borrower's trust's position.  And

4   as I say, Missouri law does permit the sales to be adjourned

5   for more than seven days on consent.  And those notes, the

6   borrower -- the servicing notes expressly reflect by agreement.

7   So you'll talk to your client and you'll see.

8          I think that -- here's what I would like to do.  You

9   each need to go talk to your clients, and then you need to talk

10  to each other.  And if you're going to -- if the decision is go

11  ahead and litigate this, then what we're going to do is you're

12  going to try and negotiate -- it's a contested matter, but I

13  apply the Federal Rules of Civil Procedure, the discovery

14  rules, and I apply the rules of evidence.  So whatever

15  anybody's going to offer is going to comply with the rules of

16  evidence.

17         In the first instance, I want you -- if the decision

18  is to go ahead and litigate, you need to try and work out a

19  case management order and scheduling order that includes

20  deadlines for completion of fact discovery.  I don't see this

21  as involving any expert discovery.  This seems to be

22  essentially factual questions, not expert questions.  But if

23  you think you're entitled to an expert, I'm not precluding it.

24  But I want to give you a couple of weeks to talk to your

25  clients and then, if necessary, hopefully negotiate a

1    settlement or negotiate the terms of a case management order.

2    And then, we'll have another telephone hearing.  And if I need

3    to -- and I will schedule -- we'll set -- an order will get

4    entered setting the schedule.  And just so you know, Ms.

5    Krigel, things don't linger on my docket.

6         MS. KRIGEL:  Okay.

7         THE COURT:  So on a matter like this, if you got to

8    take a bunch of depositions and stuff, I'm going to give you 90

9    or 120 days to complete fact discovery.  And you'll get a very

10   prompt trial date.

11        MS. KRIGEL:  Well, I appreciate that, Your Honor.

12        If I might just briefly address the assignment of

13   rents --

14        THE COURT:  Yeah, please, go ahead.

15        MS. KRIGEL:  -- issue that you -- because you had

16   raised a couple of questions.

17        THE COURT:  I did.

18        MS. KRIGEL:  I think that while we would like to say

19   that it would be the burden of the lender to make a written

20   assignment -- I'm sorry, to make a written demand that would

21   perfect their assignment of rents, we acknowledge that they

22   sent an agent out to the properties and they made an oral --

23        THE COURT:  Um-hum.

24        MS. KRIGEL:  -- demand.  But they didn't -- the demand

25   was not you must pay your rent to the lender.  It was that Ms.

1   Spence was in default, and do not pay her the rent.  And so our

2   argument is, first, that in the first instance they didn't

3   perfect their assignment because their notice -- their oral

4   notice was insufficient.  It didn't tell the tenants where to

5   pay it or an address or who to pay it, and so as a result of

6   that, the tenants didn't pay.  They didn't pay Ms. Spence, but

7   they didn't pay anyone else.

8          So why is that significant?  Well, it's significant

9   because she was -- she would have cash flow.  That amount that

10  she would -- and that would be her testimony.  The amount of

11  rent she was collecting was enough to cover the mortgage

12  payment.  And while it may not have completely brought her

13  current with her arrearage that she had, I mean, she could have

14  potentially picked and chosen between the seven properties and

15  had enough rents to maybe bring some of them current, maybe to

16  the sacrifice of others.  But she didn't have that.

17         And moreover, they didn't collect the rents.  And

18  therefore, they didn't reduce down her balance and diminish her

19  arrearage.

20         THE COURT:  That's why I -- let me just interrupt you

21  to this extent.  That's why I focus on the fact -- with

22  foreclos -- with her own bankruptcy -- that's why I asked the

23  question about a deficiency -- if she hadn't filed a

24  bankruptcy -- I'm not wishing that on anybody; trust me -- I'm

25  not sure how she's harmed as long as they're not seeking a

1    deficiency judgment against her.

2            But go ahead.  I interrupted you, Ms. Krigel.

3            MS. KRIGEL:  No, that's all right.

4            Well -- so the other -- the comment to that is that

5    this was in 2008 before the market tanked.  She had equity in

6    those properties.  So it's quite possible and probable that

7    there was no deficiency because they bid in what was owed,

8    because they believed, as we did, that the properties not only

9    were worth what was owed, but were worth more.  And that is

10   part of our claim for damages is that about 460,000 dollars for

11   the seven properties was her projected equity based on her

12   approximate loan balance and the approximate value of the

13   properties.  They --

14           THE COURT:  Let me ask you this, Ms. Krigel.  What --

15           MS. KRIGEL:  Yes.

16           THE COURT:  I mean, I know what the sales price is --

17   what the purchase prices of the properties were at the

18   foreclosure sale.  It was my understanding that the mortgage

19   balance exceeded the purchase price in every case.  Is that

20   right or wrong?

21           MS. KRIGEL:  I don't know, Your Honor.

22           THE COURT:  So for --

23           MS. KRIGEL:  So I don't know.

24           THE COURT:  So for 3864 South Cottage, the purchase

25   price was 114,240.  For 3870 South Cottage, it was 114,665.

1  For 3871 South Cottage, it was 118,915.  For 2770 West LaSalle,

2  it was 107,865.  For 3877 South Homewood, it was 110,075.  For

3  1061 East Gaslight, it was 215,910 dollars.  For 1413 West

4  Glenwood, it was 73,950.  So I don't have -- in the chart I

5  have in front of me, I don't have what the mortgage balances

6  were in each case.  It was my impression, and just that, that

7  the balances exceeded those purchase prices.  So you're going

8  to have to show, it seems to me, that the value of the property

9  was something different than what it sold for at auction.

10  That's a pretty heavy burden.

11          I understand foreclosure values are -- foreclosure

12  prices are frequently depressed, but that's the nature of the

13  beast.  So --

14          MS. KRIGEL:  Well --

15          THE COURT:  -- showing that she had equity, I think is

16  going to be a tough sale for you.  I'm -- again, I'm not making

17  any rulings at this point.

18          MS. KRIGEL:  Oh.

19          THE COURT:  But I spent a lot of time studying this.

20          Go ahead, Ms. Krigel.

21          MS. KRIGEL:  Thank you, Your Honor.  Well, I would say

22  that I'm somewhat familiar with the valuation of these

23  properties only because in her personal Chapter 11, we actually

24  had a valuation hearing last Thursday.  And the lenders -- even

25  though the values have definitely gone down, the lenders are

1   asserting that the values are really higher than even those

2   numbers that you were quoting.  And all of Ms. Spence's

3   properties are generally in the same neighborhoods and all

4   approximately within the same -- the type of house -- and some

5   are four bedrooms, some of three bedrooms, but generally all

6   within the same.  So I do think we would have testimony as to

7   what the value of the properties were back then, because I

8   would bet that the lenders have appraisals in their files,

9   because if they were going to foreclose, they would have most

10  probably gotten a BPO or an appraisal of the property.

11           THE COURT:  No.  Each of the properties -- well, I'm

12  not going to say that.  I think -- the only property I have a

13  question about is the 3864 South Cottage.  As to all the other

14  properties, the properties were resold.  And I don't know the

15  prices at which they were resold.

16           MS. KRIGEL:  Okay.

17           THE COURT:  So for example, 3870 South Cottage was

18  sold in November 11th.  I guess that's 2008.

19           MS. KRIGEL:  Um-hum.

20           THE COURT:  And all the other properties were resold

21  in 2009.  So I have -- we've seen the dates.  I don't know what

22  the prices that they were resold.

23           MS. KRIGEL:  Okay.  And I can also say, Your Honor,

24  that Missouri is a terrible state for borrowers in -- with

25  respect to foreclosures, because being a nonjudicial

1    foreclosure state, our law on challenging the validity of a

2    foreclosure is that the court has to find that the sale price

3    shocks the conscious of the community.  And the courts have

4    found that, frankly, you can bid just about anything, and it

5    doesn't shock the --

6              THE COURT:  Right.

7              MS. KRIGEL:  -- court.

8              THE COURT:  Well, that's why I'm interested --

9              MS. KRIGEL:  So --

10             THE COURT:  -- in what they resold the properties at.

11             MS. KRIGEL:  Yeah.

12             THE COURT:  -- I had that -- we tried to look at that

13   specifically.  I wanted to see whether the price that they

14   bought it in at a foreclosure, did they then double their money

15   or something when they resold it?  I have no idea what they

16   resold them for.  I just have -- I've got dates, but not

17   amounts.

18             MS. KRIGEL:  Okay.  Well, and that is something, I

19   guess, if we get to that point, we could provide or maybe

20   provide to counsel for the debtor that might then indicate that

21   we had --

22             THE COURT:  Ms. Krigel, if you got a couple hundred

23   thousand dollars to litigate the case with, this might be an

24   interesting trial.

25             MS. KRIGEL:  Yeah.  No, we don't, Your Honor.

1        THE COURT:  And I don't -- look, I want to make clear

2   I don't say that to try and dissuade Ms. Spence from or you

3   from arguing your positions.  It's the real world.

4        MS. KRIGEL:  Yeah.

5        THE COURT:  And I'm not telling you anything you don't

6   know.  Look, what I -- that's why I wanted to have this --

7   there will be a transcript of this conference.  You can -- you

8   all need to talk to your clients.  You need to talk to each

9   other.  You ought to see whether you can resolve this.  If

10  you're going to go ahead and litigate it, it's going to get

11  expensive for both sides.  And it does come out of the

12  borrower's trust pocket.  It affects all of -- which money is

13  going to borrowers, so it isn't that this money is going to any

14  deep pockets or anything like that.

15        MR. LEWIS:  Your Honor, if I may have just a moment.

16        THE COURT:  Yeah.  Go ahead, Mr. Lewis.

17        MR. LEWIS:  I don't want to reargue the merits.  That

18  will be for another day if we get there.

19        A couple of quick things.  The first is a question.

20  It sounds like the Court has decided that our arguments about

21  the claim being either late or barred, the Court has rejected

22  those.

23        THE COURT:  I'm not ruling on anything today --

24        MR. LEWIS:  Okay.

25        THE COURT:  -- Mr. Lewis.

1        MR. LEWIS:  Okay.  I just wanted clarification.  I'm

2   not asking for anything more than that.  I just want to know

3   where we stand and what's --

4        THE COURT:  I'm --

5        MR. LEWIS:  -- still at issue and what isn't.

6        THE COURT:  I'm not ruling on anything.

7        MR. LEWIS:  Okay.  Great.  Thank you.

8        Secondly, as a general matter, we are always willing

9   to talk settlement.  We're not in the practice, which I think

10  the Court acknowledged, of litigating people to death in order

11  to win.  It's not an efficient use of our money, which, after

12  all, goes to other creditors who have also suffered losses.

13  And so we're more than willing to talk to counsel and Ms.

14  Spence about a settlement, but it will be a settlement that

15  reflects what we believe the risks and merits are, along with

16  the costs.

17       THE COURT:  You'll have to talk to Ms. Krigel.  I'm

18  not getting in the middle of --

19       MR. LEWIS:  Yeah.

20       THE COURT:  -- your settlement.

21       MR. LEWIS:  No, no.  And I'm not asking the Court to

22  get involved in settlement discussions.  I'm just stating what

23  our approach is so that the Court understands it and so Ms.

24  Krigel understands it, that we're always willing to talk

25  settlement.

1        MS. KRIGEL:  Thank you.

2        THE COURT:  What's the status of Ms. Spence's Chapter

3    11, Ms. Krigel?

4        MS. KRIGEL:  Well, unfortunately, last Thursday was

5    valuation and confirmation hearing.  And Judge Federman denied

6    confirmation as he believed that her plan was not feasible

7    given her income.

8        THE COURT:  Okay.

9        MS. KRIGEL:  So we're at the point now where we're

10   considering whether to convert to Chapter 7 or have it

11   dismissed.

12       MR. LEWIS:  And Your Honor, this is Mr. Lewis; while

13   we've been talking an awful lot on -- and we did not file a

14   proof of claim in her Chapter 11 case.

15       THE COURT:  Okay.  Look, here's what I'd like you to

16   do.  The two of you clearly need to talk.  One of you needs to

17   get a date from my courtroom deputy, Deanna Anderson, for

18   another telephone conference, I'd say, in three weeks or so,

19   okay?  And work it out with Deanna and get a date that works

20   for both of you.  I'm letting you all appear by telephone.

21       Mr. Lewis, you're in San Francisco.  Is that --

22       MR. LEWIS:  Yes.

23       THE COURT:  Yeah?  Okay.

24       And Ms. Krigel, where are you?  You're in Missouri?

25       MS. KRIGEL:  In Kansas City, Your Honor.

1          THE COURT:  In Kansas City?  Okay.  I guess that's

2    where Judge Federman sits.

3          MS. KRIGEL:  Yes.

4          THE COURT:  He's a wonderful judge, I got to tell you.

5    And I just --

6          MS. KRIGEL:  Thank you.  We think so too.

7          THE COURT:  So look, get a date for a tel -- I

8    generally do these telephone conferences in the afternoon.

9    Sometimes, it's later than 2 o'clock, depending on what my

10   calendar is.  But get a date.  Talk.  Get a date from Deanna.

11   See what you can do.

12         I don't want a lot of paper flying back and forth in

13   this.  So what -- this all started with the debtors' objection

14   to the claim.  It was a pretty boilerplate objection.  We've

15   been through rounds of submissions.  I had you both put in

16   additional materials.  I think if it's going to get litigated,

17   I'm going to enter a case management order.  It's going to have

18   a call for discovery.  You will know what you need to submit

19   and when and that sort of thing.  And if you're actually going

20   to have expert valuation testimony, there'll be dates for

21   expert reports and close of expert discovery and that sort of

22   thing.  And then, there'll be a trial shortly -- within a

23   couple of weeks after the last papers are in.

24         So that's where we are, okay?

25         MS. KRIGEL:  Very good.

RESIDENTIAL CAPITAL, LLC, ET AL.                                 28

1              MR. LEWIS:  Thank you, Your Honor.  This has been very

2     helpful.  I really appreciate the insights.

3              THE COURT:  Okay.

4              MS. KRIGEL:  Thank you very much.

5              THE COURT:  All right.  Thanks very much, everybody.

6     We're adjourned.

7              MS. KRIGEL:  Okay.

8          (Whereupon these proceedings were concluded at 2:44 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                               C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ALIZA CHODOFF

12   AAERT Certified Electronic Transcriber CET**D-634

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  March 19, 2014

19

20

21

22

23

24

25