# EXHIBIT

# 1

RESIDENTIAL CAPITAL, LLC, ET AL.

1   PROCEEDINGS

2   THE CLERK: All rise.

3   THE COURT: Please be seated. All right, we're here

4   in Residential Capital, number 12-12020. Mr. Rosenbaum?

5   MR. ROSENBAUM: Good morning, Your Honor. Norm

6   Rosenbaum, Morrison & Foerster, for the debtors.

7   Your Honor, on this morning's calendar, we have, in

8   addition to the UMB matters, three contested matters, and then

9   status conferences in three borrower adversary proceedings, and

10  one motion to dismiss. And just to set the stage for the

11  morning, we will, with Your Honor -- if it's okay with Your

12  Honor, we will deal with the contested matters, the borrower

13  adversary proceedings, and then we can clear the deck here, and

14  we can proceed with the UMB matters.

15  THE COURT: Okay.

16  MR. ROSENBAUM: Your Honor, the first matter on the

17  calendar this morning is at page 9 on the agenda, (V). This is

18  the motion of claimants Helen, Jessica Angel and Ramon Quiroz

19  to lift the automatic stay, docket number 3978. I'm not sure

20  if the Quirozes have made an appearance, but if they're in the

21  court, I will cede the podium to them?

22  THE COURT: Anyone here representing Quiroz?

23  Anybody on the telephone representing Quiroz?

24  Just give me a second, Mr. Rosenbaum.

25  I do have some questions about this one, Mr.

RESIDENTIAL CAPITAL, LLC, ET AL.

1   Rosenbaum.  There's an appeal pending in the Second Circuit
2   that's been stayed by virtue of this bankruptcy, correct?
3           MR. ROSENBAUM:  Correct, Your Honor.
4           THE COURT:  Why shouldn't the appeal go forward to
5   conclusion?  In the district court, as I understand it the
6   magist -- the district court adopted the magistrate judge's
7   report and recommendation in its entirety, and dismissed the
8   complaint on the grounds that the claims -- among other
9   reasons, that the claims were barred by the Rooker-Feldman
10  doctrine and res judicata.
11          The report and recommendation also recommended the
12  district court to decline to exercise supplemental jurisdiction
13  over negligence claims.  On September 6, 2011, the Quiroz
14  family appealed the decision to the Second Circuit.  The appeal
15  has been -- as I understand it, it's fully briefed at this
16  point, isn't it?
17          MR. ROSENBAUM:  I believe the Quirozes still have the
18  opportunity to submit a reply brief, Your Honor.
19          THE COURT:  Why shouldn't the appeal go forward to
20  decision?
21          MR. ROSENBAUM:  Your Honor, we are sensitive to that
22  issue.  And I know that there has been instances, several of
23  them, where we have consented to relief from the stay to
24  resolve those kinds of matters.
25          THE COURT:  One of those is in the First Circuit,

RESIDENTIAL CAPITAL, LLC, ET AL.

1   you've consented to the appeal. I mean, there's nothing left

2   for you to do. I mean, shouldn't the Second Circuit -- if the

3   Second Circuit affirms the district court, that's all to the

4   good.

5           MR. ROSENBAUM: Your Honor, just two brief points

6   there.

7           THE COURT: Go ahead.

8           MR. ROSENBAUM: The problem is that the Quirozes have

9   filed a proof of claim. The proof of claim is not based on the

10  lawsuit. That might have been the intention. So we're faced

11  with the problem that we still have to object to the proof of

12  claim.

13          THE COURT: So what difference does -- does it make a

14  difference to the debtors which way the Second Circuit decides

15  the pending appeal?

16          MR. ROSENBAUM: Yes, it does, Your Honor. Because if

17  the Second Circuit reverses, then it goes back -- I assume it's

18  remanded back to the trial court. Then we're looking at a

19  trial.

20          THE COURT: Okay. If the Second Circuit reverses,

21  because it finds errors of law by the district court in

22  dismissing the complaint, isn't that going to be, if not

23  binding, certainly persuasive on any determination by this

24  Court with respect to any objection to the proof of claim you

25  file?

RESIDENTIAL CAPITAL, LLC, ET AL.

1      MR. ROSENBAUM: Your Honor, I think that would be up
2  to the claimant. We don't exactly know what the basis of the
3  claim is. As I said, it might have been the intention of the
4  claimant, and I believe it probably was, that their underlying
5  actions in the district court -- their underlying causes of
6  action in the district court should be the basis for the
7  complaint -- for the proof of claim.
8      But there's extreme incongruity between both. The
9  district court action alleges fifty million dollars in punitive
10 damages, and there's three nondebtor defendants. The proof of
11 claim is for half a million dollars.
12     THE COURT: So why should the -- there are three
13 nondebtor defendants. Why shouldn't the appeal proceed to
14 decision, because it affect -- have the nondebtor defendants
15 filed indemnification claims in this case.
16     MR. ROSENBAUM: I'm not aware if they have, Your
17 Honor.
18     THE COURT: Okay. So when I --
19     MR. ROSENBAUM: U.S. Bank might have --
20     THE COURT: -- look at the -- when I look at the
21 Sonnax factors, one, whether relief would result in a partial
22 or complete resolution of the issues: it might. I mean, I
23 don't know until the Second -- there's little or nothing that
24 the debtors need to do to enable this -- other than agreeing or
25 having the court rule to lift the stay -- to have the Second

RESIDENTIAL CAPITAL, LLC, ET AL.

1   Circuit decide the issues.  Their resolution may result in a

2   partial or complete resolution of the issues.  If they affirm,

3   it may well dispose of issues.

4              Second factor:  The lack of any connection with or

5   interference with the bankruptcy case.  How is it going to

6   interfere with the bankruptcy case to allow the Second Circuit

7   to reach a decision on an appeal, that if not fully briefed,

8   there's one brief left from the appellants?

9              MR. ROSENBAUM:  One brief point, Your Honor.  We --

10  it's hard to estimate when the Second Circuit will rule.  It

11  could be nine months; it could be shorter; it could be longer.

12  We're faced still with the half-a-million-dollar claim; we'd

13  either need to seek to estimate or reserve for it.

14             THE COURT:  I'll go ahead and dec -- if you want to go

15  ahead and object to the claim, I'll go ahead and deal with

16  that.  But there are nondebtor defendants.  You don't know

17  whether they filed claims for indemnification in the case.

18  When I look through the twelve Sonnax factors, frankly, I don't

19  see any -- some are not applicable at all; some point strongly

20  in favor of lifting the stay to permit the Second Circuit to

21  reach a decision. And which of them do you think points to

22  continuing the stay?

23             MR. ROSENBAUM:  Your Honor, I think it's the ability

24  to efficiently deal with the claim is really our primary --

25             THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.

```
 1            MR. ROSENBAUM:  -- focus here.
 2            THE COURT:  I've heard enough.  The -- prepare an
 3   order.  I'm lifting the stay to permit the Second Circuit to
 4   proceed to decide the pending appeal.  I don't know that -- I
 5   don't know that it needs to do anything -- that the order needs
 6   to say anything further than that.  The Second Circuit, because
 7   of this case, has held the appeal in abeyance.
 8            MR. ROSENBAUM:  Understood.
 9            THE COURT:  And if anything, it will just -- look, if
10   you want to go ahead and object to the claim, I'll go ahead and
11   hear it.  Although I'll see what the status of the -- I'll
12   compare what the issues in the Second Circuit are with the
13   arguments you raise here, and I'll either decide it then or
14   I'll hold it.  But I see no reason to -- there's no burden on
15   you -- on the debtors to allow this appeal to go forward.  So
16   I'm going to grant the motion to lift the stay, for the limited
17   purpose of allowing the Second Circuit appeal to proceed.
18            If the Second Circuit reverse, I'm -- somebody will
19   have to come back to me as to whether the matter proceeds in
20   the district court.  But at least for the limited purpose of
21   permitting the Second Circuit to decide the pending appeal, I'm
22   lifting the stay.
23            MR. ROSENBAUM:  Thank you, Your Honor.
24            THE COURT:  So prepare an order and submit it to
25   chambers.
```

# EXHIBIT

# 2

3/19/2014 Stutman Treister & Glatt: Case Alert: In re Residential Capital, LLC, et al.: Bankruptcy Court Defines Gating Principles For Determining The Amount Of A…

12-12020-mg Doc 6683-1 Filed 03/21/14 Entered 03/24/14 15:09:49 Exhibit Exhibits 1 & Pg 9 of 14

**STUTMAN TREISTER & GLATT**

Home | Firm Overview | Attorneys | Practice Areas | Industry Expertise | News & Events | Recruiting | Contact Us

**< Return to Home Page**

### Case Alert: In re Residential Capital, LLC, et al.: Bankruptcy Court Defines Gating Principles For Determining The Amount Of A Secured Claim

In a recent opinion from the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the *Residential Capital, LLC* ("ResCap") bankruptcy proceedings,[1] Judge Martin Glenn specified a number of significant principles governing the calculation of an allowed secured claim that necessarily will impact secured creditors, distressed debt buyers, and future litigation over the allowed amount of a secured creditor's claim. Judge Glenn held that: (i) a "fair value" debt-for-debt exchange that creates original issue discount ("OID")[2] for accounting and tax purposes does not create unmatured interest that is disallowed as a claim for bankruptcy purposes; (ii) a creditor with a secured claim against multiple, unconsolidated chapter 11 debtors can aggregate the value of the collateral of all such debtors to determine whether the secured creditor is oversecured; (iii) pursuant to Bankruptcy Code section 552(b), intangibles and goodwill created through a chapter 11 debtor's postpetition resources or efforts are not subject to a prepetition lien on the debtor's assets; and (iv) for purposes of an adequate protection claim based upon alleged diminution of collateral value from the petition date to the effective date of a plan of reorganization, where a debtor continues to operate as a going concern on the petition date, the secured creditor's collateral must be valued on the petition date based upon going concern (and not liquidation) value, and such valuation must reflect the actual facts and circumstances of the debtor on the petition date.

Judge Glenn's ruling came after a multi-day trial that included fact and expert testimony, and after consideration of a number of novel or unsettled legal issues. Although final word on the confirmation of the pending chapter 11 plan (the "Plan") in *ResCap* and the issues decided by Judge Glenn (i.e., whether the junior secured noteholders (the "JSNs") in the case are entitled to postpetition interest and fees under section 506(b)) has not been written,[3] the ruling requires careful study.

### Background Information

Prior to their bankruptcies, Residential Capital, LLC ("ResCap") and its affiliated debtors (collectively, the "Debtors") were a leading originator of residential mortgage loans and the fifth largest servicer of residential mortgage loans in the United States. ResCap and the Official Committee of Unsecured Creditors (the "Committee") proposed a reorganization plan (the "Plan") that, among other things, treats the JSNs as undersecured creditors, "but would pay them the face amount of all principal and prepetition interest ($2.222 billion, less $1.1 billion repaid postpetition)."[1] The JSNs voted against and objected to the Plan, contending that they are oversecured based upon the aggregate going concern value of their collateral among all the Debtors and, thus, entitled to postpetition interest and fees, and that they are also entitled to an adequate protection claim of $515 million based on an alleged postpetition diminution in value of their prepetition collateral.

The Debtors and the Committee argued that (i) the JSNs were undersecured based upon the value of their collateral—even if aggregated among all Debtors—and thus not entitled to postpetition interest, and (ii) the JSNs were not entitled to an adequate

3/19/2014 Stutman Treister & Glatt: Case Alert: In re Residential Capital, LLC, et al.: Bankruptcy Court Defines Gating Principles For Determining The Amount Of A...

12-12020-mg  Doc 6683-1  Filed 03/24/14  Entered 03/24/14 15:09:49  Exhibit Exhibits 1 &...  Pg 10 of 14

protection claim because the value of the JSNs' collateral had increased from its petition date liquidation value to the value at the anticipated plan effective date based upon the actual sale (and appraised) value of the collateral.

The Debtors and the Committee commenced separate adversary proceedings against the JSNs. These actions were consolidated (the "Adversary Proceeding"), and the JSNs asserted a number of counterclaims. After ruling on cross-motions to dismiss, the Bankruptcy Court bifurcated the trial on the remaining issues in the Adversary Proceeding. Phase I of the trial, which resulted in Judge Glenn's opinion, governed issues specific to only the plaintiffs and defendants in the Adversary Proceeding, whereas Phase II commenced on November 19, 2013 as part of a contested Plan confirmation hearing, and will involve issues common to other claimants. Judge Glenn deferred making a final determination on the "extent" of the JSNs' security until conclusion of Phase II.

**The Bankruptcy Court's Rulings**

1. **The JSNs' Claim Based On Unamortized OID From A "Fair Value" Exchange Is Not Disallowed Under Bankruptcy Code Section 502(b)(2).**

ResCap issued junior secured notes (the "Junior Secured Notes") to the JSNs "in connection with a 2008 debt-for-debt exchange" (the "Exchange").[2] Through the Exchange, ResCap exchanged then-outstanding unsecured notes with a face value of approximately $6 billion for approximately $4 billion in face amount of Junior Secured Notes and $500 million in cash. As opposed to a "face value" exchange, where the principal amount of the debt is not reduced, the Exchange in this case was a "fair value" exchange, as "old securities were exchanged for new securities with a reduced principal amount that in theory approximated the market value of the old securities."[3] It is undisputed that the Exchange created OID for tax and accounting purposes, with approximately $377 million or $386 million unmatured as of the Debtors' petition date, depending on how it was compounded. The JSNs included in their claim OID that had not yet matured as of the Petition Date. The Plaintiffs alleged that any claim for unmatured OID must be disallowed under Bankruptcy Code section 502(b)(2), which requires disallowance of any claim for "unmatured interest."

Judge Glenn began his analysis with a review of the Second Circuit's decision in *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*.[4] In *Chateaugay*, the Second Circuit held "that a face value exchange of debt obligations in a consensual workout does not, for purposes of section 502(b)(2), generate new OID" that is disallowable.[5] The Second Circuit reached this conclusion, even though it held that unmatured OID is generally "'unmatured interest' within the meaning of section 502(b)(2)," based on "the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition."[6] If OID realized through consensual "face value" consensual exchanges could not form the basis of an allowed claim in bankruptcy, the Second Circuit feared that creditors would be disincentivized from cooperating out-of-court with struggling debtors.[7] Notably, the Second Circuit specifically left open the issue of whether OID generated "in the context of a fair market value exchange," rather than through a face value exchange, should be disallowed under section 502(b)(2).[8]

Filling the void left by the Second Circuit, Judge Glenn applied the ruling in *Chateaugay* to the fair value Exchange at issue in *ResCap*. Specifically, Judge Glenn "conclude[d] that despite the differences between face value and fair value debt-exchanges, the same rule on disallowance of OID should apply in both circumstances. Since *Chateaugay* is the law of the Circuit, . . . the unamortized OID generated by the fair value exchange here should not be disallowed from the JSNs' claim."[9]

2. **The JSNs Can Establish Whether They Are Oversecured By Aggregating The Value Of Collateral Granted By Multiple Debtors.**

ResCap's obligations under the Junior Secured Notes were guaranteed by certain affiliates, and secured by assets of ResCap and the guarantor affiliates (the "JSN Collateral").[10] In arguing that the JSNs were not entitled to postpetition interest and fees under Bankruptcy Code section 506(b), "the Debtors contend[ed] that under applicable law, the JSNs must be oversecured at a single Debtor entity—without reference to JSN Collateral held by other Debtor entities . . . ."[11] The JSNs disagreed, arguing "that a determination of their oversecured status must be made based on the aggregate value of their collateral, across Debtor entities."[12]

Judge Glenn agreed with the JSNs, holding that where a claim is secured by collateral owned by multiple debtors in bankruptcy, the value of such collateral must be combined in determining whether a claim is oversecured. Not persuaded by "the general principle that, absent substantive consolidation, a court will not pool the assets of multiple debtors to satisfy their liabilities,"[13] Judge Glenn followed decisions from bankruptcy courts in Massachusetts and Utah that similarly rejected the argument that "a secured creditor had to be oversecured at a single debtor in order to be entitled to postpetition interest."[14] Notably, this holding is limited to collateral granted by multiple debtors in bankruptcy. Judge Glenn specifically distinguished the facts in *ResCap* from those in a Third Circuit opinion,[15] which had held that a creditor with a security interest in assets of both a debtor in bankruptcy and a non-debtor entity could only look to the value of collateral owned by the chapter 11 debtor for purposes of section 506(b).[16]

3. **The JSNs' Liens Do Not Extend To Any Postpetition Goodwill Realized From The Sale Of The JSN Collateral.**

In determining whether the JSNs were oversecured, Judge Glenn addressed numerous factual and legal disputes involving the nature and value of the JSN Collateral. One of the more interesting disputes concerned whether a portion of the purchase price for the Debtors' mortgage loan origination and servicing assets, which included goodwill and general intangibles related to such assets, should be specifically allocated as proceeds of the prepetition JSN Collateral.[17] Judge Glenn ruled that the JSNs did not provide an adequate basis to value goodwill existing on the petition date, resulting in no value being attributed to the JSN Collateral which included prepetition goodwill. Having found that the JSNs failed to prove the value of any prepetition goodwill, Judge Glenn considered whether any postpetition goodwill was part of the JSNs' collateral.

Bankruptcy Code section 552(b) provides that "if a prepetition security agreement extends to proceeds of collateral, then postpetition proceeds would also be subject to that security agreement, unless the court orders otherwise after a hearing based on the equities of the case."[18] Judge Glenn held that section 552(b) only applies to collateral acquired postpetition that is "directly attributable to prepetition collateral, *without the addition of estate resources*."[19]
The JSNs' security agreement granted them a lien on proceeds of the JSN Collateral. But, Judge Glenn found that even if the JSN Collateral was used to generate goodwill postpetition, estate resources were also used to generate such goodwill. Specifically, any goodwill included in the sale of the Debtors' assets was at least partially attributable to the Debtors' negotiations and agreements with certain key constituents that had interests in the sold assets. The JSNs failed to satisfy their burden of proving that any part of the sale proceeds representing postpetition goodwill was a proceed of their prepetition collateral. Accordingly, no proceeds from the sale of the Debtors' assets were attributed to the JSNs' lien on goodwill and general intangibles.[20]

4. **The JSNs Are Not Entitled To An Adequate Protection Claim**

For Diminution Of Collateral.

At the commencement of the case, the JSNs consented to the use of their cash collateral in exchange for adequate protection in the form of priming liens on many of the Debtors' assets. Under the cash collateral order, the JSNs had the right to assert a priority claim under Bankruptcy Code section 507(b) to the extent such liens provided insufficient adequate protection.[21] The JSNs asserted an adequate protection claim in the amount of $515 million. Judge Glenn rejected this claim.

In reaching his conclusion, Judge Glenn first held that a party seeking to assert an adequate protection claim has the burden of proving that the value of its collateral has diminished during the bankruptcy case.[22]

Second, the Bankruptcy Court analyzed whether, for "adequate protection purposes," collateral should be valued as of the petition date based on "the foreclosure value of the collateral in the hands of the secured creditor," as the Debtors argued, or on "the fair market value of the collateral in the hands of the Debtors," as the JSNs argued. [23] The court did not create a bright-line rule on this issue, but, based largely on the Supreme Court's decision in *Associates Commercial Corp. v. Rash*,[24] concluded that the value of the JSN Collateral must be "based on the proposed disposition of the collateral" [25] during the bankruptcy. Under the circumstances of *ResCap*, this meant the collateral had to be valued as of the petition date as a going concern, because, from the commencement of the bankruptcy cases, the Debtors intended to sell their assets as a going concern. However, Judge Glenn also concluded that the facts and circumstances under which ResCap operated as of the commencement of the chapter 11 cases, and the actions taken during the chapter 11 cases to create collateral value, had to be considered in the analysis of determining collateral value as of the petition date.[26]

Ultimately, the Bankruptcy Court concluded the JSNs had failed to satisfy their burden of proving any diminution in the value of their collateral. This conclusion was based largely on the court's conclusion that the JSNs' valuation testimony, which was based upon a hypothetical going concern valuation of the Debtors untethered from the facts and concerns confronting the Debtors at the commencement of the chapter 11 cases, was "seriously flawed," as it "ignore[d] the reality of the period leading up to th[e] bankruptcy: ResCap was an insolvent company, over-burdened with debt, owning assets that had to be 'fixed' before they could be sold, and facing a real possibility of being shut down."[27] Valuation of the JSN Collateral needed to take account of the Debtors' facts and circumstances on the petition date, and the JSNs' valuation experts failed to do so.

### Author's Comments

Judge Glenn's opinion in *ResCap* has important implications with respect to determining the amount and validity of claims and security interests in bankruptcy proceedings, at least in the Southern District of New York.

The Second Circuit in *Chateaugay* specifically left open the question of whether OID resulting from a fair value exchange, as opposed to a face value exchange, can form the basis of an allowed claim given section 502(b)(2)'s disallowance of claims for "unmatured interest." Judge Glenn has filled the gap left by the Second Circuit on this issue, finding that for purposes of section 502(b)(2) there is no meaningful difference between OID that results from face value and fair value exchanges. This ruling may eliminate, or at least alleviate, concern from lenders or claims traders as to how unmatured OID will be treated in a bankruptcy proceeding where the OID is the product of a fair value exchange.

In addition, Judge Glenn's holding regarding the aggregation of collateral among multi-debtor estates for purposes of section 506(b) broadens secured lenders' ability to augment the amount of their claims with interest and fees accruing postpetition.

3/19/2014  Stutman Treister & Glatt Case Alert: In re Residential Capital, LLC, et al.: Bankruptcy Court Devises Guiding Principles For Determining The Amount Of A…

12-12020-mg    Doc 6683-1    Filed 03/21/14    Entered 03/24/14 15:09:49    Exhibit
                                  Exhibits 1 &    Pg 13 of 14

Moreover, because this ruling does not allow for aggregation of collateral where collateral is owned by an entity not in bankruptcy, Judge Glenn's holding may provide another factor for bankruptcy counsel to consider in assessing which entities in a corporate family should file, and which should remain outside of bankruptcy.

Moreover, Judge Glenn's ruling on the application of Bankruptcy Code section 552(b) should provide a clear warning to secured creditors attempting to assert a security interest in collateral generated postpetition. A secured creditor's right to a lien on postpetition collateral has limits under section 552(b), particularly where the collateral was generated through postpetition efforts or resources of a trustee or debtor in possession.

Finally, Judge Glenn's analysis with respect to the JSNs' alleged adequate protection claim provides a roadmap for how future claimants seeking to benefit from section 507(b) must prove up their claim. Based on the decision in *ResCap*, the burden of proof lies squarely with the claimant, and must be satisfied through the presentation of valuation testimony that takes account of the debtor's circumstances and the "proposed disposition" of any collateral as of the petition date, not on hypothetical scenarios unsupported by the realities of the case.

**This article was prepared by Michael S. Neumeister, with assistance of other attorneys of Stutman, Treister & Glatt. Mike is resident in our Los Angeles office, and can be contacted at mneumeister@stutman.com or (310) 228-5680.**

---

[1]  *Id.* at **1-2.
[2]  *Id.* at *64.
[3]  *Id.* at *66.
[4]  961 F.2d 378.
[5]  *Id.* at 382.
[6]  *Id.* at 380, 382.
[7]  *Id.* at 382.
[8]  *Id.*
[9]  *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 4844, at **94-95.
[10]  *See id.* at *10.
[11]  *Id.* at *128.
[12]  *Id.*
[13]  *Id.* at *129 (citing *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988)).
[14]  *Id.* at *135 (citing *In re SW Hotel Venture, LLC*, 460 B.R. 4, 26 (Bankr. D. Mass. 2011); *In re Revolution Dairy, LLC*, Case No. 13-20770 (Bankr. D. Utah Apr. 29, 2013) Hr'g Tr. [Docket No. 206], at pp. 12:19 – 13:3).
[15]  *DeNofa v. Nat'l Loan Investors L.P. (In re DeNofa)*, 124 F. App'x 729 (3d Cir. 2005).
[16]  In reaching his conclusion, Judge Glenn rejected arguments from both the Debtors and the JSNs that the Bankruptcy Court's analysis should be guided by whether certain provisions in the Bankruptcy Code are drafted in the singular or the plural. *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 4844, at **94-95. Judge Glenn found that "the statute seems silent on the issue at hand." *Id.* at *130 n.37.
[17]  *See id.* at *62.
[18]  *Id.* (citing 11 U.S.C. § 552(b)).
[19]  *Id.* (quoting 5 Collier on Bankruptcy ¶ 552.02[2][a] (16th ed. 2013)).
[20]  *Id.* at *173.
[21]  *Id.* at *103.
[22]  *Id.* at *110.
[23]  *Id.* at **109-10.
[24]  520 U.S. 953 (1997).

3/19/2014 Stutman Treister & Glatt Case Alert: In re Residential Capital, LLC, et al.: Bankruptcy Court Defines Guiding Principles For Determining The Amount Of A...

12-12020 Doc 6683-1 Filed 03/21/14 Entered 03/24/14 15:09:49 Exhibit
Exhibits 1 & Pg 14 of 14

[25]   *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 4844, at *120.

[26]   *Id.* at **122-27.

[27]   *Id.* at *125.

Disclaimer | Site Map | © 2014 Stutman Treister & Glatt | Site by Firmseek


