**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**DECLARATION OF JOSEPH A. SHIFER IN SUPPORT OF THE MOTION OF
THE RESCAP LIQUIDATINGTRUST FOR AN ORDER ENFORCING
PLAN INJUNCTION AGAINST KARLA BROWN**

I, Joseph A. Shifer, hereby declare as follows:

1.      I am an associate at the law firm of Kramer Levin Naftalis & Frankel LLP,

counsel to the ResCap Liquidating Trust in the above-captioned matters.

2.      I submit this declaration to provide the Court with what, to the best of my

knowledge and belief, are true and correct copies of the following documents in support of the

*Motion of the ResCap Liquidating Trust for an Order Enforcing Plan Injunction Against Karla*

*Brown*:

| | |
|---|---|
| Exhibit 1. | Claim No. 5314 filed by Karla Brown against GMAC Mortgage, LLC, including the complaint filed in *Brown v. Accredited Home Lenders, Inc., et al*., Civil Action No. 09-1812E. |
| Exhibit 2. | *Notice of Bankruptcy and Effect of Automatic Stay* filed June 11, 2012. |
| Exhibit 3. | *Philip Brown's Motion for Summary Judgment* filed November 9, 2012. |
| Exhibit 4. | *Notice of Entry of Confirmation Order and Plan Release and Injunction Provisions* filed by Philip Brown on January 31, 2014. |
| Exhibit 5. | *Response to Defendant Philip Brown's Bankruptcy Notice* filed by Karla Brown on February 10, 2014. |

Exhibit 6.    *Plaintiff's Stipulation Clarifying Complaint* filed by Karla Brown on February 10, 2014.

Pursuant to 28 U.S.C. §  1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on March 24, 2014

       /s/ Joseph A. Shifer

Joseph A. Shifer

## **Exhibit 1**

Claim #5314 Date Filed: 11/16/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor and Case Number: **GMAC Mortgage, LLC, Case No. 12-12032** | |

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Karla Brown**

Name and address where notices should be sent:

Max Weinstein, Esq.
Legal Services Center of Harvard Law School
122 Boylston St.
Jamaica Plain, MA 02130

Telephone number: 617-390-2694                        email:

Name and address where payment should be sent (if different from above):



Telephone number:                                        email:

❑ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
(If known)

Filed on:_____

❑ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**$ 700, 000

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Karla Brown v. GMAC Mortgage, LLC et al. (Mass. Super Ct.) (complaint attached hereto)
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** Karla Brown vs Accredited Home Lenders Inc etc. (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)

Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❑ Real Estate ❑ Motor Vehicle ❑ Other

Describe:

**Value of Property: $**_____ **Annual Interest Rate**_____% ❑ Fixed ❑ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**

**if any: $**_____             **Basis for perfection:** _____

**Amount of Secured Claim: $**_____             **Amount Unsecured: $**_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____                (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.

❑ I am the creditor.    ■ I am the creditor's authorized agent.    ❑ I am the trustee, or the debtor, or    ❑ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)        their authorized agent.                indorser, or other codebtor.
                                                                (See Bankruptcy Rule 3004.)        (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Max Weinstein
Title: Attorney
Company: Legal Services Center of Harvard Law School
Address and telephone number (if different from notice address above):

(Signature)                                        11/15/12
(Date)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

❑ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

■ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

❑ Contributions to an employee benefit plan – 11 U.S.C §507 (a)(5).

❑ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

❑ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

❑ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

RECEIVED

NOV 1 6 2012

KURTZMAN CARSON CONSULTANTS

Telephone number:                        Email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.

1212032121116000000000022



# LEGAL SERVICES CENTER
## CENTRO DE SERVICIOS LEGALES

**The WilmerHale Legal Services Center of Harvard Law School**

122 Boylston Street • Jamaica Plain, MA 02130
Telephone: 617-522-3003 • Facsimile: 617-522-0715 • TTY: 617-522-3575
*www.law.harvard.edu/academics/clinical/lsc/*

November 15, 2012

ResCap Claims Processing Center c/o KCC
2335 Alaska Ave
El Segundo, CA 90245

VIA FEDERAL EXPRESS OVERNIGHT DELIVERY

Re: In re GMAC Mortgage, LLC, Case No. 12-12032 (Bankr. S.D.N.Y)

Dear sir or madam:

Please find enclosed proofs of claim submitted on behalf of (1) Karla Brown; and (2) Jerry Rateau and Claudette St. Juste.

Very truly yours,

Max Weinstein

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, ss

TRIAL COURT
SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.

09-1812 $\mathcal{E}$

---

Karla Brown,
    Plaintiff,

v.

    Accredited Home Lenders, Inc.,
Deutsche Bank National Trust Company,
Philip Brown, Barrando Butler, GMAC
Mortgage Corporation, HSBC Mortgage
Services Inc., and Saxon Mortgage
Services, Inc.,
    Defendants.

**COMPLAINT AND JURY TRIAL
DEMAND**

**RECEIVED**

MAY 01 2009

SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## I. INTRODUCTION

Plaintiff Karla Brown, a single mother of two and the owner of the two-family

home located at 52-54 Mather Street in Dorchester, was the victim of a predatory lending

scheme perpetuated by Defendants. Taking advantage of Karla Brown's desire to own a

home, Defendants GMAC Mortgage Corporation, acting as a mortgage broker, and Philip

Brown, an employee of GMAC, represented that they would obtain an affordable

mortgage so that Plaintiff could purchase the Mather Street property. Without informing

Plaintiff, Defendants unilaterally misrepresented Karla Brown's income to justify higher

interest rates and higher monthly payments. Defendants GMAC and Philip Brown, aided

by Defendant Barrando Butler, coerced Karla Brown into accepting two loans from

Defendant Accredited Home Lenders, Inc. that demanded monthly payments exceeding

the sum of Karla Brown's monthly income and required unreasonable balloon payments.

1

Defendants have inflicted great emotional distress upon Plaintiff. Karla Brown has taken out credit card loans and borrowed from family and friends in order to pay what she can of her mortgage payments. Yet, her monthly mortgage payments are still much more than she can afford and she faces the possibility of losing her home.

Plaintiff seeks rescission of both Notes and Mortgages, invalidation of the debt, actual, statutory, consequential and punitive damages, costs, fees and other necessary relief.

## II. PARTIES

1. Plaintiff Karla Brown is a homeowner and resident of Massachusetts living at 52-54 Mather Street in Dorchester and a Plaintiff in this Court.

2. Defendant Accredited Home Lenders, Inc. ("Accredited") is, upon information and belief, a California Corporation with a principal place of business at 15253 Avenue of Science, San Diego, California 92128.

3. Accredited was the originator of the first and second purchase-money mortgage loans in the original amounts of $374,400 and $93,600, granted by Plaintiff on or about June 6, 2006.

4. Defendant Deutsche Bank National Trust Company ("Deutsche") is, upon information and belief, a Delaware Corporation with a principal place of business at 1761 East St. Andrew Place, Santa Ana, California 02705-4935.

5. Upon information and belief, Defendant Deutsche is the trustee for the current holder of the first mortgage in the original amount of $374,400 granted by the Plaintiff on or about June 6, 2006.

2

6.  Defendant Saxon Mortgage Services, Inc. ("Saxon") is, upon information and belief, a Texas Corporation with a principal place of business at 4708 Mercantile Drive North, Fort Worth, Texas 76137.

7.  Upon information and belief, Defendant Saxon is the current servicer of the first mortgage in the original amount of $374,400 granted to the Plaintiff on or about June 6, 2006.

8.  Defendant HSBC Mortgage Services Inc. ("HSBC") is, upon information and belief, a Delaware Corporation with a principal place of business at 2700 Sanders Road, Prospect Heights, IL 60070.

9.  Upon information and belief, Defendant HSBC is the current servicer of the second mortgage in the original amount of $93,600 granted to the Plaintiff on or about June 6, 2006.

10.  Defendant GMAC Mortgage Corporation ("GMAC" or "Broker") is, upon information and belief, a Pennsylvania Corporation with a principal place of business at PO Box 963, 100 Witmer Road, Horsham, Pennsylvania 19044.

11.  Upon information and belief, Defendant GMAC is the mortgage broker of two notes dated on or about June 6, 2006 given by Karla Brown to Accredited.

12.  Defendant Philip Brown is, upon information and belief, an employee and/or agent of GMAC with a principal place of business at 1250 Hancock Street, #110N, Quincy, Massachusetts 02169.

13.  Defendant Barrando Butler is, upon information and belief, an attorney with a principal place of business at 49 Walnut Avenue, Braintree, Massachusetts 02184.

**III. JURISDICTION**

3

14. Defendants Accredited, Deutsche, Saxon, HSBC, GMAC Mortgage Corporation and Philip Brown regularly solicit and transact business in the Commonwealth through the provision of consumer credit and financial services and/or maintain a place of business in the Commonwealth.  Accordingly, this Court has personal jurisdiction over Defendants pursuant to M.G.L. c. 223A, § 3.

15. Venue is proper in this Court pursuant to M.G.L. c. 223 §§ 1, 8.

### IV. STATEMENT OF FACTS

16. Plaintiff Karla Brown is an African-American single mother of two and a social worker.  She resides with her children, Omolola and Safiya, in Dorchester, Massachusetts.

17. In April 2006, Alysha Lawton, an agent for Coldwell Banker, approached Plaintiff about buying a home.  After taking her to several other properties, Lawton took Plaintiff to see the property at 52-54 Mather Street in Dorchester, a two-family duplex.  Lawton subsequently arranged for Plaintiff to use the services of Defendant Philip Brown, an employee/agent of Defendant GMAC Mortgage Corporation.

18. On or about April 2006, Defendants Philip Brown and GMAC represented to Plaintiff that they would obtain a mortgage for her so that she could afford to purchase the 52-54 Mather Street property.

19. In multiple conversations before the closing, Defendants Philip Brown and GMAC presented Plaintiff with wildly varying interest rates and monthly payment options, each representing more favorable terms than those ultimately extended to Plaintiff.

4

20. Defendant Philip Brown further assured Plaintiff on multiple occasions that if her mortgage payments became too high, she would be able to refinance the loans in six months and receive lower interest rates and lower payments.

21. Plaintiff provided Defendants GMAC and Philip Brown with proof of employment, pay stubs, and bank account information correctly disclosing her job title, employer and gross income of approximately $3,500 per month, or approximately $42,000 per year.

22. Although Plaintiff accurately disclosed her occupation as social worker, her employer, and her income, Defendants GMAC and Philip Brown – unilaterally and without Plaintiff's knowledge – stated in the Uniform Residential Loan Application that Plaintiff's gross income at closing was $7,500 per month, or approximately $90,000 per year.

23. Alysha Lawton also arranged for Plaintiff to be represented by Defendant Barrando Butler, a real estate attorney. Although Plaintiff spoke to Defendant Butler a few times over the phone, she did not meet him in person until the closing.

24. In April 2006, Plaintiff signed a Purchase and Sale Agreement with the Seller, Timothy C. Williams. The Purchase and Sale Agreement includes a "Mortgage Contingency Clause," which stated: "…the BUYER shall apply for a conventional bank or other institutional mortgage loan not to exceed $468,000 at prevailing rates, terms and conditions. If despite the BUYER's diligent efforts an unconditional written commitment for such loan cannot be obtained on or before May 8, 2006, the BUYER may terminate this agreement by written notice to the

SELLER, prior to the expiration of such time, whereupon any payment made under this agreement shall be forthwith refunded and all other obligations of the parties, hereto shall cease and this agreement shall be void without recourse to the parties hereto."

25. After Plaintiff signed the Purchase and Sale Agreement and after Defendants Philip Brown and GMAC submitted the falsified Uniform Residential Loan Application without Plaintiff's knowledge, Defendants Philip Brown and GMAC presented Plaintiff with a loan package. Plaintiff noticed and said to Defendants Philip Brown and GMAC that her stated income on the loan documents was higher than she expected.

26. Defendants Philip Brown and GMAC falsely informed Plaintiff that the stated income on the loan documents included the rental income she expected from the duplex. Further, Defendants Philip Brown and GMAC assured Plaintiff that the income amount was a complicated calculation that was standard for a "Stated Income Loan."

27. Fearing that her monthly payment under the loan package brokered by Defendants GMAC and Philip Brown would be too high, Plaintiff approached another mortgage broker, who warned her that her income did not justify a mortgage loan of $468,000 and advised her to cancel the transaction pursuant to the Mortgage Contingency Clause of the Purchase and Sale Agreement.

28. Subsequently, Plaintiff contacted Lawton and Defendants Philip Brown and GMAC to cancel the transaction pursuant to the Mortgage Contingency Clause of the Purchase and Sale Agreement. Defendants Philip Brown and GMAC coerced

Plaintiff to go through with the transaction by falsely informing Plaintiff that she

did qualify for a mortgage of $468,000 and as such would lose her deposit paid

upon signing the Purchase and Sale Agreement, which amounted to Plaintiff's life

savings.

29. In telephone conversations prior to closing, Defendant Butler assured Plaintiff

that her loan documents were in order and that she was receiving a good deal.

Defendant Butler also falsely advised Plaintiff that she qualified for a loan and

therefore could not obtain the letter of denial from the mortgage broker necessary

to cancel the transaction without forfeiting her down payment.

30. On June 6, 2006, Plaintiff entered into two loans with Accredited for the principal

amounts of $374,400 and $93,600, which are currently serviced by Defendants

Saxon and HSBC. Defendant Butler encouraged her to sign, neither explaining

the loan provisions nor allowing her enough time to carefully review the

documents. At closing, Plaintiff paid Defendant Butler $900 for his legal

services, partly from the cash payment from the proceeds of the mortgage and the

rest by borrowing funds from relatives.

31. The first loan for $374,400 (the "$374,400 loan") is a 30-year adjustable rate

mortgage with a disclosed Annual Percentage Rate ("APR") of 9.378%. The loan

requires a $236,565.21 balloon payment, equaling 63.2% of the amount financed,

at the maturity of the loan. Even with the balloon payment, the Plaintiff's initial

monthly payments on the $374,400 loan were $2,498.98 not including charges for

taxes and insurance in escrow.

7

32. The second loan for $93,600 (the "$93,600 loan") was a 15-year fixed rate mortgage at 12.99% with monthly payments of $1,034.68. The loan requires an $82,842.93 balloon payment, equaling 88.8% of the amount financed, at the maturity of the loan.

33. Plaintiff was never told – and never agreed – that the $374,400 loan would feature a $236,565.21 balloon payment or that the $93,600 loan would feature an $82,842.93 balloon payment.

34. By borrowing large sums of money from her family and friends, Plaintiff has been current on her mortgage payments until recently but they are more than she can afford.

35. Defendant Saxon has denied Plaintiff's repeated requests for modification of the $374,400 loan.

### Pattern and practices in Defendants' mortgage underwriting

36. Defendants together have developed a common plan and scheme for marketing and underwriting predatory "stated income" loans to families in low-income neighborhoods like Dorchester, Massachusetts.

37. These "stated income" loans led to unaffordable mortgages based on fraudulently inflated incomes, driving real estate prices higher and commissions for lenders and mortgage brokers ever higher.

38. The pattern and practices which Defendants adopted include, but are not limited to, the proliferation of mortgage loans where obviously excessive income is invented by the broker, no income verification is provided by the broker or required by the lender, loan(s) unaffordable with the applicant's actual income are

8

approved, and the falsified application and unaffordable mortgage disclosures are

concealed from the homebuyer in a hurried closing conference where the

applicant is actually told nothing but "sign here" and "initial here."

39. These "stated income" loans flooded neighborhoods like Dorchester with artificial

demand, inflating real estate prices.

40. Although Dorchester residents could not afford these escalating property values,

Defendants knowingly continued to market and originate "stated income" loans.

41. Defendants' continued practice of marketing and originating these loans

generated substantial commissions. In this way, Defendants made short-term

profits on mortgages that they knew homebuyers could not afford and would

never be able to pay in full.

42. While Defendants purportedly offered these "stated income" loans as a means for

residents of neighborhoods like Dorchester to remain in their communities, these

loans did not render escalating property values affordable for Dorchester

residents.

43. Rather, Defendants' practices diverted more and more of residents' incomes into

monthly mortgage payments and inflated property values even further, creating an

unsustainable bubble.

44. Real estate prices in Dorchester have now plummeted. Because of the

unaffordable, fraudulently inflated principal balances on their mortgages,

numerous Dorchester homeowners in the neighborhood face the loss their homes

in a wave of defaults and foreclosures.

## V. CAUSES OF ACTION

### Count I: Intentional or Negligent Misrepresentation

45. Plaintiff reasserts and realleges each and every allegation set forth in the above

 paragraphs as if fully set forth herein.

46. Defendants GMAC and Philip Brown knowingly or negligently misrepresented

 material facts of the loan transaction, including but not limited to representing that

 Plaintiff would be able to refinance to reduce her monthly mortgage payments.

47. Plaintiff reasonably relied on Defendants GMAC and Philip Brown's

 representations in signing the loans.

48. Defendants GMAC and Philip Brown knew or should have known that but for

 their false representations, Plaintiff would not have signed the loans.

49. When Plaintiff learned the actual terms of the Accredited loans and sought to

 cancel the transaction pursuant to the legally operative Purchase and Sale

 Agreement, Defendants GMAC and Philip Brown coerced Plaintiff into accepting

 the mortgages and proceeding with the closing by threatening to deprive Plaintiff

 of the $2,500 deposit which she paid at the time of signing the Purchase and Sale

 Agreement.

50. Defendant's threat constituted an intentional misrepresentation as no one had any

 legal right to retain Plaintiff's deposit if the closing was duly canceled pursuant to

 the Purchase and Sale Agreement.

51. Defendant Accredited knowingly, recklessly or negligently granted loans to

 Plaintiff on the basis of a patently absurd and facially fraudulent income statement

 on the loan application.

10

52. Plaintiff reasonably relied on Accredited's false representation that the loans were correctly calculated, underwritten and lawful.

53. Plaintiff suffered injury as the proximate result of Defendants' intentional or negligent misrepresentations.

54. Based on Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorney's fees.

### Count II:  Unconscionability

55. Plaintiff reasserts and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

56. Prior to and during the closing, there existed a vast disparity in bargaining power between Plaintiff, a social worker and single mother purchasing her first home, and the experienced business entities that are the Defendants.

57. Defendants exploited this disparity in bargaining power to induce Plaintiff to enter into unconscionable loans that violate numerous consumer protection statutes and regulations.

58. Defendants further ensured that Plaintiff would have no meaningful choice in accepting the loan terms by threatening to deprive Plaintiff of the $2,500 she paid at the time of signing the Purchase and Sale Agreement should she not proceed with the closing.

59. Defendants' sole control over the terms of the agreement, their false promises and repeated misrepresentations, and their other deceptive acts and omissions led to unfair surprise.

11

60. The sum total of the provisions of the entire transaction (the $374,400 loan and the $93,600 loan taken together) is so oppressive and drives so hard a bargain as to be unconscionable where, upon information and belief, both loans carried balloon payments of respectively $236,565.21 and $82,842.93.

61. Plaintiff's monthly mortgage payments exceeded her monthly income at the time of origination, which is a facially unconscionable debt to income ratio.

62. Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorneys' fees.

### Count III: Good Faith and Fair Dealing

63. Plaintiff reasserts and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

64. Defendants or their predecessors-in-interest breached their duty of good faith and fair dealing in (i) seeking to collect monies in amounts to which they were not entitled, (ii) coercing Plaintiff to accept a mortgage which she cannot afford, (iii) refusing to modify the loan, and (iv) failing otherwise to act with good faith and in fair dealing.

65. Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorneys' fees.

### Count IV: Tortious Interference with Contract

66. Plaintiff reasserts and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

12

67. Defendants GMAC and Philip Brown tortiously interfered with the contract between Plaintiff and the Seller by intentionally misleading Plaintiff into believing that she would lose her $2,500 deposit.

68. Defendants GMAC and Philip Brown intentionally misrepresented the terms of the legally operative Purchase and Sale Agreement, which stated: "...the BUYER shall apply for a conventional bank or other institutional mortgage loan not to exceed $468,000 at prevailing rates, terms and conditions. If despite the BUYER's diligent efforts an unconditional written commitment for such loan cannot be obtained on or before May 8, 2006, the BUYER may terminate this agreement by written notice to the SELLER, prior to the expiration of such time, whereupon any payment made under this agreement shall be forthwith refunded and all other obligations of the parties, hereto shall cease and this agreement shall be void without recourse to the parties hereto."

69. Despite Plaintiff's diligent efforts, she was not able to obtain a "conventional bank or other institutional mortgage loan not to exceed $468,000 at prevailing rates, terms and conditions" as the loans from Defendants GMAC and Philip Brown were altogether too expensive.

70. Under the terms of the Purchase and Sale Agreement, Plaintiff was entitled to "terminate this agreement ... whereupon any payment made under this agreement shall be forthwith refunded...." However, Defendants GMAC and Philip Brown tortiously interfered with the contractual relationship between Plaintiff and the Seller by fraudulently informing Plaintiff that she would lose her deposit, which comprised her life savings.

13

71. But for Defendants GMAC and Philip Brown's intentional interference, Plaintiff

would have properly terminated the closing pursuant to the Purchase and Sale

Agreement upon discovery that she could not afford the loans and would have

regained her $2,500 deposit.

72. Defendants GMAC and Philip Brown's tortious inference with the proper

termination of the contract between Plaintiff and the seller directly harmed

Plaintiff because she was coerced into entering into two unaffordable and

unconscionable loans.

73. Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the

security interest, void the loan indebtedness and recover actual, consequential,

statutory and punitive damages, costs and attorneys' fees.

### Count V: Violations of M.G.L.A. 183 § 63

74. Plaintiff reasserts and realleges each and every allegation set forth in the above

paragraphs as if fully set forth herein.

75. M.G.L.A.183 § 63 states: "a…mortgage broker… shall not charge a loan fee,

finder's fee, points, so-called, or similar fees in a mortgage transaction …except

to the extent that such fees or points have been previously disclosed to the

mortgagor in writing…."

76. Defendants GMAC and Philip Brown improperly charged Plaintiff an undisclosed

loan fee for the "low documentation" loan that Plaintiff received.

77. Plaintiff provided Defendants GMAC and Philip Brown with proof of

employment, pay stubs, and bank account information correctly disclosing her job

14

title, employer, and gross income of $3,500 per month, or approximately $42,000

per year.

78. However, Defendants GMAC and Philip Brown misled Plaintiff into accepting a

"stated income" or "low documentation" loan, which incurs a premium for the

"privilege" of asserting one's income on the loan application.

79. Defendants GMAC and Philip Brown received an undisclosed loan fee because

their loan origination fee, consisting of 1.624% of the value of Plaintiff's loans,

was inflated as a result of the premium attached to Plaintiff's low documentation

loan. Defendants GMAC and Philip Brown failed to disclose the difference

between Plaintiff's unnecessary low documentation loan and a more affordable

traditional loan that she would have qualified for but for Defendants'

misrepresentations.

80. In violation of M.G.L.A.183 § 63, Defendants GMAC and Philip Brown never

disclosed to Plaintiff the additional loan origination fee that they received due to

coercing Plaintiff into accepting a "low documentation" loan.

81. Moreover, Defendants GMAC and Philip Brown intentionally and unilaterally

falsified Plaintiff's income on the loan application they prepared and submitted.

Despite the fact that Plaintiff correctly disclosed to Defendants GMAC and Philip

Brown her job title, employer and annual income of approximately $42,000 per

year, Defendants falsified Plaintiff's income in the loan application as being

approximately $90,000 per year.

82. Defendants GMAC and Philip Brown received an undisclosed loan fee due to

their intentional and unilateral falsification of Plaintiff's income because their

15

loan origination fee consisted of 1.624% of Plaintiff's loans. Defendants GMAC and Philip Brown inflated Plaintiff's income so as to obtain a hefty commission for brokering a more expensive loan that they knew Plaintiff would not be able to afford.

83. In violation of M.G.L.A.183 § 63, Defendants GMAC and Philip Brown never disclosed to Plaintiff the additional loan origination fee that they received due to their inflation of Plaintiff's income.

84. Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorneys' fees.

## Count VI: Legal Malpractice

85. Plaintiff reasserts and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

86. Defendant Butler was in an attorney-client relationship with Plaintiff and thus owed her a duty to adhere to a standard of care, namely to exercise the reasonable care and skill expected of the average qualified practitioner in the performance of the legal tasks undertaken.

87. Defendant Butler violated the standard of care owed to Plaintiff by falsely advising her that she would lose her $2,500 down payment if she did not go through with the closing. Defendant Butler further misled her into believing that she qualified for a loan and therefore needed a denial letter from the mortgage broker in order to cancel the transaction.

88. When Plaintiff told Defendant Butler that she was worried she could not afford the monthly payment, Defendant Butler falsely advised her that she was receiving a good deal and that she would be able to refinance at a later time. Even when Plaintiff expressed her concern that her income may have been inflated on the loan application, Defendant Butler failed to review the loan documents for error and instead falsely advised her that she should proceed with the closing.

89. Moreover, Defendant Butler failed to properly advise Plaintiff as to the loan documents she was signing at the closing. Defendant Butler never informed Plaintiff about the particular loan provisions, such as the balloon payment. Instead, Defendant Butler sought to rush Plaintiff into signing the documents without a careful review so that he could collect his payment upon closing the deal.

90. Defendant Butler's subpar performance and violation of his duties as an attorney proximately caused Plaintiff's damages. Due to his encouragement and relying on his legal expertise, Plaintiff closed the two loans, which were more than she could afford.

91. Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorneys' fees.

## Count VII: Intentional Inflictment of Emotional Distress

92. Plaintiff reasserts and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

17

93. Defendants intentionally, knowingly or recklessly inflicted severe emotional distress upon Plaintiff.

94. Defendants' conduct was extreme and outrageous under the circumstances and constituted willful conduct toward Plaintiff in total disregard of her rights and well-being.

95. Defendants' infliction of emotional distress caused Plaintiff to suffer actual and consequential damages.

96. Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorneys' fees.

**Count VIII: Violations of Massachusetts Consumer Protection Act**

97. Plaintiff reasserts and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

98. The Attorney General's Regulations promulgated under the Massachusetts Consumer Protection Act provide that an act is unfair or deceptive within the meaning of the law if:

    a. It is oppressive or otherwise unconscionable in any respect; or

    b. Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or

    c. It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by

the Commonwealth or any political subdivision thereof intended to

provide the consumers of this Commonwealth protection; or

d.  It violates the Federal Trade Commission Act, the Federal Consumer

Credit Protection Act or other Federal consumer protection statute within

the purview of M.G.L. c. 93A, § 2.

940 C.M.R. § 3.16.

99. As set forth above, Defendants' conduct in this transaction, individually and in

concert, is unfair and deceptive in many respects, including but not limited to:

a.  Defendants misrepresented Plaintiff's income in order to make possible an

unaffordable loan, where Plaintiff had provided actual income verification

to Defendant.

b.  Defendants underwrote unaffordable mortgages on the basis of a patently

absurd and facially fraudulent income statement on the loan application

Defendants prepared and submitted on behalf of Plaintiff.

c.  Defendants financed and closed loans to Plaintiff that are so wholly

oppressive and unconscionable as to constitute an act that is unfair and

deceptive.  Both the $374,400 loan and the $93,600 loan include

egregiously oppressive balloon payments.  Further, the two loans require

unreasonably high monthly mortgage payments that exceed Plaintiff's net

monthly income at the time of closing.

d.  Defendants intentionally misrepresented to Plaintiff that they would

broker an affordable mortgage loan.  Throughout the process of brokering

a mortgage loan, Defendants presented Plaintiff with wildly varying

19

interest rates and monthly payment options, each representing more favorable terms than the loan ultimately extended to Plaintiff.

e.  Defendants coerced Plaintiff into accepting the mortgages and proceeding with the closing by threatening to deprive Plaintiff of the $2,500 deposit which she paid at the time of singing the Purchase and Sale Agreement. Defendants' threat constituted an intentional misrepresentation as no one had any legal right to retain Plaintiff's deposit if the closing was duly canceled pursuant to the Purchase and Sale Agreement.

f.  Defendants induced Plaintiff to accept the unreasonable loan terms by assuring her that she would be able to obtain more favorable refinancing for lower interest rates and lower monthly payments just six months after the closing.

100.  Based upon Defendants' unlawful conduct, Plaintiff is entitled to rescind the security interest, void the loan indebtedness and recover actual, consequential, statutory and punitive damages, costs and attorneys' fees.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Wherefore, Plaintiff Karla Brown requests that the Court, after Trial by Jury, enter and adjudge as follows:

(i)  determine that Defendants are liable to Plaintiff upon Plaintiff's claims, and award actual, consequential, statutory and punitive damages as determined by the jury or as the Court may deem appropriate;

(ii)  rescind Defendants' security interest and indebtedness, allowing such further equitable relief as may be just and fair;

20

(iii)    award expert fees, costs and attorney's fees; and

(iv)    grant such other and further relief as merited in the interests of justice.

Respectfully submitted,
Karla Brown
By Her Attorney,


Max Weinstein, Esq.
BBO: 600982
Legal Services Center
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003

Date:  May 1, 2009

21

## Exhibit 2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                              SUPERIOR COURT
                                                         CIVIL ACTION
                                                         NO. 2009-01812-E

KARLA BROWN,                            )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )
                                        )
ACCREDITED HOME LENDERS, INC. *et al.*, )
                                        )
        Defendants.                     )

## NOTICE OF BANKRUPTCY
## AND EFFECT OF AUTOMATIC STAY

Defendant, GMAC Mortgage, LLC (the "Debtor"), by its undersigned counsel, in

accordance and consistent with section 362(a) of the United States Bankruptcy Code, 11 U.S.C.

§§ 101 *et seq.* (the "Bankruptcy Code"), submit this Notice of Bankruptcy and Effect of

Automatic Stay, and state as follows:

1.      On May 14, 2012 (the "Petition Date"), the Debtor and certain of their affiliates

filed voluntary petitions (the "Petitions") under Chapter 11 of Title 11 of the Bankruptcy Code in

the United States Bankruptcy Court for the Southern District of New York, One Bowling Green,

New York, NY 10004-1408 (the "Bankruptcy Code"). The Debtor's cases are jointly

administered with their affiliates under the Chapter 11 Case for the Debtor Residential Capital,

LLC, and are indexed as case number 12-12020.

2.      The "automatic stay" is codified in section 362 of the Bankruptcy Code. Section

362(a), *inter alia*, operates as an automatic stay of: (i) the commencement or continuation of a

"judicial, administrative, or other action or proceeding" against the Debtor (11 U.S.C.

§ 362(a)(1)); (ii) acts to "obtain possession of property" of the Debtor's estates (11 U.S.C.

1

§ 362(a)(3)); and (iii) acts to "collect, assess, or recover a claim" against the Debtor arising prior to the Petition Date (11 U.S.C. § 362(a)(6)).

3.   The above-captioned action constitutes a "judicial, administrative, or other action or proceeding" against the Debtor, an act to obtain possession of the Debtor's property, and/or an act to collect or recover on a claim against the Debtor.

4.   Accordingly, the above-captioned lawsuit should be stayed pursuant to 11 U.S.C. § 362(a).

5.   Any action taken by the Plaintiff against the Debtor without obtaining relief from the automatic stay from the Bankruptcy Court may be void *ab initio* and may result in finding of contempt against the Plaintiff by the Bankruptcy Court. The Debtor reserves and retains all of its statutory rights to seek relief in Bankruptcy Court from any action, judgment, order, or ruling entered in violation of the Automatic Stay.

GMAC MORTGAGE, LLC,
By its attorneys,

Richard E. Briansky, BBO #632709
rbriansky@princelobel.com
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
Tel: 617-456-8000

Dated: June 11, 2012

2

CERTIFICATE OF SERVICE

    I, Richard E. Briansky, certify that on June 11, 2012, I served the foregoing document on all counsel and parties of record by sending upon all counsel of record, via first class mail postage prepaid to:

Max Weinstein, Esq.
WilmerHale Legal Services Center
122 Boylston Street
Jamaica Plain, MA 02130

Jonathan M. Horne, Esq.
Nicholas Rosenberg, Esq.
Jager Smith, P.C.
One Financial Center
Boston, MA 02111

Robert K. Malone, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, NJ 07932-1047

Barrando Butler (pro se)
P. O. Box 10
Stoughton, MA 02072

                                       _____
                                      Richard E. Briansky

3

**<u>Exhibit 3</u>**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                                SUPERIOR COURT
                                                                            CIVIL ACTION
                                                                            NO. 2009-01812-E

|                                          |     |
| ---------------------------------------- | --- |
| KARLA BROWN,                             | )   |
|                                          | )   |
|     Plaintiff,       | )   |
|                                          | )   |
| v.                                       | )   |
|                                          | )   |
| ACCREDITED HOME LENDERS, INC. *et al.*,  | )   |
|                                          | )   |
|     Defendants.      | )   |

## PHILIP BROWN'S MOTION FOR SUMMARY JUDGMENT

### (Memorandum of Law Incorporated)

Philip Brown ("Brown"), pursuant to Mass. R. Civ. P. 56, moves for summary judgment

on all claims asserted against him in the complaint (the "Complaint") by Plaintiff Karla Brown

("Plaintiff").

## INTRODUCTION

By this action, Plaintiff Karla Brown ("Plaintiff"), the current owner of residential

property located at 52-54 Mather Street in Dorchester, Massachusetts (the "Property"), seeks

monetary damages from her mortgage broker, Philip Brown ("Brown").[1]  Plaintiff maintains that

---

[1] On June 11, 2012, GMAC filed a Notice of Bankruptcy and Effect of Automatic Stay with the Court.  As set forth in the Notice, GMAC Mortgage LLC and certain of its affiliates filed voluntary petitions under chapter 11 of title 11 of the United States Bankruptcy Code in the United States Bankruptcy court for the Southern District of New York on May 14, 2012.  By Supplemental Order dated June 15, 2012, the Bankruptcy Court granted "Limited Stay Relief" to permit "foreclosure and eviction proceedings" and "title disputes."  Specifically, the Order allows for "a borrower, mortgagor or lienholder" to "assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced" but prevents claims with respect to "monetary relief of any kind."  A copy of the Order is attached as **Exhibit A**.  Accordingly, Plaintiff's claims against GMAC are barred by the automatic stay.

Brown made representations that she could refinance her loan in six (6) months, that Plaintiff relied upon the statement when she signed the loan documents, and that the statement was false.

Plaintiff's claims are barred as a matter of law. First, Plaintiff can neither demonstrate that she reasonably relied upon a representation of Brown, nor can she identify any statement. Neither can Plaintiff prevail on the remaining claims in her Complaint. Specifically,

- her claim for tortious interference with contract (Count 4) fails because no party was actually induced to breach the Purchase and Sale Agreement;

- Brown did not violate G.L. c. 183, § 63 (Count 5) because GMAC charged only those fees that were disclosed to Plaintiff, and were actually less than what was specifically authorized by her; and

- Plaintiff's claims for unconscionability (Count 2) and breach of the implied covenant of good faith and fair dealing (Count 3) fail because Brown is not a party to the loan contract.

For the foregoing reasons, Brown is entitled to judgment as a matter of law.

## UNDISPUTED MATERIAL FACTS

### *Loan Origination*

Plaintiff is an African-American single mother of two (2) that holds a bachelor's degree from Suffolk University. See Rule 9A Statement of Facts ("SOF") at ¶ 1. After "seriously looking" at homes for months, Plaintiff submitted an offer (the "Offer") for a two family property located at 52-54 Mather Street, Dorchester, Massachusetts (the "Property") in the amount of $479,000 with a $500 deposit to bind the Offer. Id. at ¶ 2.

After Plaintiff's Offer was accepted, Plaintiff retained Attorney Barrando Butler ("Attorney Butler") to represent her in purchase of the Property. Id. at ¶ 3. To finance the Property, Plaintiff worked with a local mortgage broker, Philip Brown ("Brown"). Id. During their first telephone conversation, Brown informed Plaintiff what information would be required to process her loan application, including her income, pay stubs, W-2 forms and a bank

2

statement, all of which Plaintiff subsequently gave to Brown. Id. at ¶ 4. Brown then filled out

the loan application with the information Plaintiff provided to him. Id. Once the application was

complete, Brown sent Plaintiff a copy, which she then signed and promptly returned to Brown.

Id. According to Plaintiff's testimony, she understood that by signing the application she was

verifying the information contained therein. Id.

By mid-April, Brown had provided Plaintiff's loan application to Accredited Home

Lenders, Inc. ("Accredited"), a third-party lender for whom GMAC brokered loans. Id. at ¶ 5.

Pursuant to the Applicant Brokering Notice that Plaintiff executed, Plaintiff expressly authorized

GMAC to receive a mortgage brokerage fee in the amount of 1.625% of the total loan amount, or

$7,605. Id.

At or around this time, Attorney Butler drafted and negotiated a purchase and sale

agreement ("P&S") for Plaintiff's purchase of the Property. Id. at ¶ 6. The P&S set a purchase

price of $468,000 and contained a Mortgage Contingency Clause that allowed Plaintiff to

terminate the P&S if she was unable to secure an unconditional commitment letter for a

conventional bank or other institutional mortgage loan. Id. On or about April 28, 2008, Plaintiff

executed the P&S and paid an additional $2,000 to the seller as a deposit. Id. According to

Plaintiff, her $2,500 deposit could not be recovered unless she received a disqualification letter

from Brown. Id.

Per Plaintiff's Complaint, after Plaintiff signed the P&S, and after Brown submitted

Plaintiff's loan application to Accredited, Brown presented her with a "loan package." Id. at ¶ 7.

The loan package contained an "80/20" loan for 100 percent financing in the amount of $468,000

and required a total monthly payment of "3,000-plus dollars." Id. The 80/20 loan consisted of

two (2) loans originated by Accredited. The first was a 30-year adjustable rate note ("First

3

Promissory Note") in the original principal amount of $374,400. Id. The First Promissory Note carried a 9.378% adjustable rate, contained a so-called "balloon" payment in the amount of $236,565.21, and required monthly payments in the amount of $2,498.98. Id. The second loan ("Second Promissory Note") was a fixed 15-year note in the amount of $93,600, with a 12.99% interest rate, a monthly payment of $1,034.68, and a so-called "balloon" payment of $82,842.93. Id.

Upon reviewing the loan package, Plaintiff raised some concerns with Brown. Id. at ¶ 8. First, Plaintiff questioned the $7,500 income figure on the loan documents asserting, "[t]hat number seems kind of high." Id. Brown explained that the income figure included the rental income Plaintiff expected from the Property and that it was the result of a "complicated calculation" standard for a "stated income loan." Id. Plaintiff also expressed dissatisfaction at the 12.99% interest rate that the second loan carried, as well as the amount of the total monthly payment. Id. at 9. According to Plaintiff, Brown attempted to pacify her concerns by telling her that she could refinance the loan in six (6) months. Id. at 10.

After reviewing the loan package, Plaintiff feared that her monthly payment would be too high and approached her friend, "Keke," who was employed as a mortgage broker to get his opinion. Id. at 11. Once Keke had reviewed the loan package and P&S, he advised Plaintiff that it was not a good transaction for her, that Plaintiff should cancel the transaction pursuant to the Mortgage Contingency Clause in the P&S, and that Plaintiff should request "a disqualification letter [from Brown] and get [her] deposit back." Id. After consulting with Keke, Plaintiff concluded that she could not afford the loan package that she was offered. Id.

Plaintiff then called Brown to request a disqualification letter so that she could get back the $2,500 deposit that she paid for the purchase of the Property. Id. at 12. Brown declined to

4

provide Plaintiff with a disqualification letter based on the fact that Accredited had actually approved Plaintiff's application. Id. at 13.

Unsure of what to do and "unhappy" with the situation, Plaintiff called Lawton, who solicited the help of Attorney Butler to speak with Plaintiff about the loan package. Id. at 14. According to Plaintiff's testimony, she "wasn't comfortable with the answer from…Brown, so [she] went to [Attorney] Butler to further ask more probing questions," and "to find out if this information was actually correct and to look over any information [Attorney Butler] had, to make sure…Brown was actually looking to [her] best interest…" Id. Plaintiff informed Attorney Butler that she was "ready to walk away" from the transaction. Id. at 15. Attorney Butler responded that he would call Brown and get back to Plaintiff at that time. Id.

After speaking with Brown, Attorney Butler called Plaintiff and assured her that everything was "okay," that her loan documents were "in order," that it all looked "fine," that Plaintiff qualified for the loan and that "she was receiving a good deal." Id. at 16. Attorney Butler also informed Plaintiff that she would lose her deposit if she canceled the loan. Id. Attorney Butler's assurances assuaged Plaintiff's concerns and caused her to become comfortable in moving forward with the transaction. Id. at 17. In particular, Plaintiff testified:

> Q:    And armed with the information provided to you from [Keke] and that conversation you had with your attorney, Mr. Butler, you felt comfortable going forward with the package that was presented to you by Mr. Brown?
>
> …
>
> A:    *I was basically going on the advice of my attorney* that he felt that this was fine, based on what Mr. Brown told him. And since he was an attorney and this is what he did, I assumed that they knew what they were doing.
>
> Q:    When he said this was fine, do you know what he was referring to?

A:    He said that Philip Brown said this package is a good package for me. It's a package that I can afford and it works for me and that – you know. And I do remember him saying that Mr. Brown said that I could be refinanced in six months and so I should be ok. It will be all right. In six months of good payment, you'll be all set. You can refinance out of this and get yourself into a better package.

Q:    So you felt comfortable, based on the representations of Mr. Butler, that you could afford this mortgage?

…

A:    Yeah.

Id. at 18 (emphasis supplied). According to Plaintiff, she decided to go ahead with the loan transaction based on her conversation with Attorney Butler. Id. at ¶ 19.

Plaintiff's loans closed on June 6, 2006. Id. at ¶ 20. Plaintiff executed the First and Second Promissory Note, each made payable to Accredited. Id. The First Promissory Note specified that Plaintiff would make monthly payments in the amount of $2,498.48 for a period of two (2) years, after which her interest rate could adjust. Id. The Second Promissory Note specified a monthly payment of $1,034.68 for a period of fifteen (15) years. Id. Both the First and Second Note were secured by a mortgage on the Property. Id. GMAC received a fee of $6,080.75 for its brokerage services, or approximately 1.3% of the total loan amount. Id.

Plaintiff defaulted under the First and Second Promissory Note for failing to make all of her requirement payments. Id. at ¶ 21. As a result, Plaintiff claims she has incurred emotional distress in the form of a "fear of losing her home." Id.

### Plaintiff's Allegations and Procedural History

On May 1, 2009, Plaintiff filed her Complaint alleging that Brown falsified her income on the loan application; coerced Plaintiff to go through with the transaction by falsely informing her that she qualified for a mortgage and that she would lose her deposit paid upon signing the

6

Purchase and Sale Agreement; and falsely assured Plaintiff that she would be able to refinance in

six (6) months and receive lower interest rates and monthly payments. SOF at ¶ 22. Plaintiff

asserts claims against Brown for (i) intentional or negligent misrepresentation (Count 1);

unconscionability (Count 2); breach of the implied covenant of good faith and fair dealing

(Count 3), tortious interference with contract (Count 4); violation of G.L. c. 183, § 63 (Count 5),

intentional infliction of emotional distress (Count 7); and violation of G.L. c. 93A (Count 8).

## ARGUMENT

**I.    PLAINTIFF'S CLAIM FOR MISREPRESENTATION (COUNT 1),
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT 7) AND
G.L. C. 93A (COUNT 8) ARE BARRED AS A MATTER OF LAW**

"To succeed on claim of intentional misrepresentation, a plaintiff must show that the

defendant made a false representation of a material fact with knowledge of its falsity for the

purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the

representation as true and acted upon it to his damage." Logan Equip. Corp. v. Simon Aerials,

Inc., 736 F. Supp. 1188, 1199 (D. Mass. 1990) (internal citations and quotations omitted)

(applying Massachusetts law).[2]  Brown's alleged statement that Plaintiff could refinance her loan

in six (6) months is not actionable as misrepresentation because it is an opinion, estimate or

judgment, or, alternatively, a statement that involves conditions to exist in the future and is

promissory in nature. Moreover, even assuming that Brown's alleged misrepresentation is

actionable, which it is not, Plaintiff cannot prevail because she concedes that she did not rely on

any representation made by Brown.

---

[2] A defendant is liable for negligent misrepresentation if (1) in the course of business, (2) the defendant supplied false information for the guidance of others (3) in his business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that the defendant (6) failed to exercise reasonable care or competence in obtaining or communicating that information. Golber v. BayBank Valley Trust Co., 46 Mass. App. Ct. 256, 257 (1999). The Complaint raises an "intentional or negligent misrepresentation" claim (Count V). See Complaint, at ¶¶ 45-54. Brown's argument applies equally to both claims.

7

## A.    Brown's Statement Of Expectation, Or Alternatively Of A Future Condition, Is Not Actionable As Misrepresentation As A Matter of Law

As a prerequisite to recovery Plaintiff must establish that the alleged misrepresentations made by Brown were misrepresentations of <u>fact</u>.  A fact is defined as something "susceptible of knowledge."  <u>Stolzoff v. Waste Sys. Int'l, Inc.</u>, 58 Mass. App. Ct. 747, 760 (2003) (quoting <u>Zimmerman v. Kent</u>, 31 Mass. App. Ct. 72, 79 (1991)).  Under Massachusetts law, false statements of (1) opinion, estimate or judgment, which were not susceptible of actual knowledge at the time of their utterance, (2) conditions to exist in the future, or (3) matters promissory in nature are not actionable as either intentional or negligent misrepresentation.  <u>Yerid v. Mason</u>, 341 Mass. 527, 529-30 (1960); <u>see also</u> <u>Logan Equip. Corp.</u>, 736 F. Supp. at 1199.  Because Plaintiff's misrepresentation claim is predicated on statements of opinion, estimate or judgment, or, alternatively, conditions to exist in the future which are promissory in nature, it must fail as a matter of law.

The only basis for Plaintiff's misrepresentation claim is Brown's alleged assurance that Plaintiff would be able to refinance six (6) months after the closing to lower her interest rate and reduce her monthly mortgage payments.  SOF ¶ 10.  This statement is not actionable as misrepresentation a matter of law because it is not susceptible of actual knowledge, but is rather one of expectation, estimate, opinion, or judgment, which does not support a claim for misrepresentation.  <u>See</u> <u>Logan Equipment Corp.</u>, 736 F.Supp. at 1200 (statements of opinion or judgment are generally not actionable as misrepresentation); <u>Hogan v. Riemer</u>, 35 Mass. App. Ct. 360, 365 (1993) ("Statements of expectation, such as 'We'll work with you," do not support an action for common law fraud.").

Even if the Court finds that Brown's statement was not one of expectation, estimate, opinion or judgment, the statement is still not actionable because it involves conditions to exist in

8

the future and is promissory in nature. See Logan Equip. Corp., 736 F.Supp. at 1199; Yerid v.

Mason, 341 Mass. 527, 529-30 (1960). No action for misrepresentation lies where the alleged

misrepresentation is promissory rather than factual. See Murray v. Xerox Corp., 811 F.2d 118,

123 (2d Cir.1987) ("Promises of future conduct are not actionable as negligent

misrepresentation."); Silver v. Countrywide Home Loans, Inc., 760 F. Supp. 2d 1330, 1342-43

(S.D. Fla. 2011) aff'd, No. 11-12282, 2012 WL 2052949 (11th Cir. June 8, 2012) (per curium)

(the plaintiff's claims that she was induced into accepting loan based upon fraudulent

misrepresentations that "the loan was a good deal for her," and "that the value of [her] home

would continue to rise and she would not have a problem refinancing" held to be statements of

opinion and projections about future events, not statements of existing material fact).

    While there are exceptions to the rule that statements promissory in nature or those

regarding future events are not actionable as misrepresentation, neither of those exceptions apply

here. First, there is an exception where the defendant misrepresents his action present intent to

perform a future act. Logan Equip. Corp., 736 F. Supp. at 1200. In this case, there is nothing in

the record to suggest that Brown did not intend to work with Plaintiff to try and refinance her

loan six (6) months after the closing.

    Second, a defendant may be liable for statements regarding future events when "the

parties to the transaction are not on equal footing but where one has or is in a position where he

should have superior knowledge concerning the matters to which the misrepresentation relate"

and the future event is fully within the defendant's control. Cellucci v. Sun Oil Co., 2 Mass.

App. Ct. 722, 730 (1974); see also Logan Equip. Corp., 736 F. Supp. at 1200.

9

Even if Brown was in a position of superior knowledge concerning Plaintiff's ability to refinance, unlike cases involving contract execution or financing arrangements,[3] the ability of Plaintiff to refinance her loan and lower her monthly mortgage payments was not completely in Brown's control. Cf. Griffith v. Bank of Am., N.A., No. CV 11-5867 PA FFMX, 2011 WL 6849048, *3 (C.D. Cal. Dec. 13, 2011) (Anderson, J.) (loan refinance application is just that, "an application that could not be summarily or personally approved by [defendant bank's] employees or loan underwriters"); McLean v. Countrywide Home Loans, Inc., No. 09-CV-11239, 2009 WL 5171842, *4 (E.D. Mich. 2009) (Steeh, J.); (alleged representations that plaintiffs would later be able to sell home for substantial profit or refinance are not actionable representations of past or existing fact, but predictions for the future); Maffei v. Roman Catholic Archbishop of Boston, 449 Mass. 235, 252 (2007) (the alleged oral promise of a church existing in perpetuity and in plaintiff's honor cannot fairly be characterized as a verifiable statement when made).

Brown's alleged statement that Plaintiff could refinance six (6) months after the closing of Plaintiff's loan, therefore, is not actionable as misrepresentation because it is promissory in nature, regards conditions to exist in the future, and is not subject to an exception. Thus, summary judgment should be granted in favor of Brown on Count 1, as well as Counts 7 (intentional infliction of emotional distress) and 8 (violation of G.L. c. 93A), which are based upon Brown's alleged misrepresentation.

---

[3] Cellucci, 2 Mass. App. Ct. at 729-30 (whether defendant would execute a contract lies within defendant's entire and exclusive control and thus, statements that the deal was "all set" and defendant would accept plaintiff's offer were actionable as fraud); Gopen, 10 Mass. App. Ct. at 345 (parent corporation's false statements concerning the internal finances of a wholly owned subsidiary over which the parent had virtually exclusive control were actionable as fraud).

**B.    Even If The Alleged Misrepresentations Were Actionable, Which They Are Not, Plaintiff Cannot Prevail On Her Claims Because She Did Not Rely On Brown's Alleged Misrepresentations**

An essential element of a claim for misrepresentation, and a claim under G.L. c. 93A based upon that alleged misrepresentation, is the plaintiff's detrimental reliance on the allegedly false statement. See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 471 (2009); Masingill v. EMC Corp., 449 Mass. 532, 540 (2007); Rodi v. S. New England Sch. Of Law, 532 F.3d 11, 19 (1st Cir. 2008) ("In order for [plaintiff] to recover under Chapter 93A based on his claim of fraudulent misrepresentation he must prove reasonable reliance"). Similarly, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant's "extreme and outrageous" conduct actually caused the emotional distress. See Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997). In this case, because Plaintiff concedes that she relied on the advice of her own attorney to proceed with the transaction and *not* on any misrepresentations allegedly made by Brown, she cannot prevail as a matter of law on these claims.

While Plaintiff was not required to independently investigate the truth of any particular representation, her subsequent investigation precludes reliance – and therefore liability – on the allegedly false statement. See *Restatement (Second) of Torts*, § 547(1) ("the maker of a fraudulent misrepresentation is not liable to another whose decision to engage in the transaction that the representation was intended to induce is not caused by his belief in the truth of the representation but is the result of an independent investigation made by him"); French v. Isham, 801 F. Supp. 913, 921 (D.R.I. 1992) ("Perhaps most relevant to the case at bar is § 547 of the Restatement, instructing that no liability arises where one decides to enter into a transaction based on an independent investigation"); Rockley Manor v. Strimbeck, 382 S.E.2d 507, 509

11

(W.Va. 1989) ("Where, however, the purchaser *does* undertake further inquiry into the facts, he

is charged with and presumed to rely on everything his investigation uncovers") (emphasis in

original); Czarnecki v. Roller, 726 F. Supp. 832, 838 (S.D. Fla. 1989) ("In actions such as this,

where the decision to engage in a transaction is the result of an independent inspection and

evaluation, rather than an alleged misrepresentation, no claim for fraudulent misrepresentation

will lie"). Independent investigations include those performed by one's agent, such as attorney,

on behalf of the recipient. See Davis v. Montenery, 173 Ohio App. 3d 740, 753 (2007) (finding

that plaintiff could not have relied on realtor's representation regarding existence of easement

where she had engaged own attorney to conduct title search).[4]

In this case, even if the Court was to assume that Brown had misrepresented Plaintiff's

ability to refinance her loan six (6) months after the closing, the undisputed facts demonstrate

that Plaintiff relied on the subsequent assurances provided by her own attorney rather than

anything Brown may have said in deciding to go forward with the transaction. Plaintiff testified

that after speaking with Brown and reviewing the proposed terms of the loan, she spoke with one

of her mortgage broker friends, "Keke," and concluded that she could not afford to make the

necessary mortgage payments. When Attorney Butler contacted Plaintiff, she informed him that

she was "ready to walk away," and instructed him to cancel the mortgage. It was only after her

own attorney assured her that she had been approved by Accredited, that she was "getting a good

---

[4] See also French, 801 F. Supp. at 921-923 (finding that purchaser of Newport estate could not have relied on
seller's representations regarding the structural integrity of the property where plaintiff's engineering expert
investigated property prior to sale); Sherban v. Richardson, 445 So. 2d 1147, 1148 (Fla. Dist. Ct. App. 1984)
(finding that purchaser of stock could not have relied on company's ownership representations because purchaser's
attorney conducted independent investigation of company documents prior to sale); Schmidt v. Landfield, 20 Ill.2d
89, 93-95 (1960) (affirming judgment against plaintiff on claim for misrepresentation where they had own attorney
provide independent explanation); Adams v. Bernard, 59 Mass. App. Ct. 1104 (2003) (finding buyer did not rely on
broker's representation concerning the condition of house where buyer hired professional inspector to evaluate
property for potential structural defects); Nei v. Burley, 388 Mass. 307, 311 (1983) (buyer's knowledge of
surveyor's report tended to demonstrate she did not rely on representation of defendant broker).

#1567863 101903/70

deal," and that she could not back out of the transaction without forfeiting her deposit that she

decided to go through with the purchase.

Plaintiff confirms as much in asking this Court to enter partial summary judgment against

Attorney Butler on her claim for malpractice (Count 6). In requesting this relief from the Court,

Plaintiff states, among other things, that:

- "*Based on Butler's advice*, Karla Brown believed she had two options: 'to walk away and leave the $2,500 deposit money that it took her years to save up, or go forward with the transaction. Fearing the loss of her deposit money, which amounted to her life savings, *she went forward with the deal*." *Plaintiff's Motion for Summary Judgment Against Attorney Butler*, at pp. 6-7 (emphasis supplied);

- "[Attorney Butler's] negligent advice compelled Karla Brown to enter into an unfair and deceptive mortgage agreement that *she would not have accepted had it not been for the defendant's legal advice*. She felt trapped by the prospect of losing her down payment and *believed based on the advice of her attorney that her only option was to go forward with the purchase*." Id., at p. 17 (emphasis supplied); and

- "Butler's misrepresentations very clearly caused her to act differently than she would have absent them, compelling her to proceed with the Agreement and accept a wholly unaffordable sub-prime loan package that *she would have avoided had she been counseled appropriately* . . .." Id., at p. 19 (emphasis supplied).

These unambiguous admissions conclusively establish that, despite any statement made

by Brown, Plaintiff *would have* withdrawn her application if not for the assurances made by her

own attorney. In other words, before her conversation with Attorney Butler, Plaintiff had

decided not to proceed with the loan, a decision that changed only once she obtained advice from

her counsel. Since Plaintiff cannot prove that she relied on Brown's statements as a matter of

law, summary judgment should enter in favor of Brown on Counts 1, 7, and 8 of the Complaint.

13

**II.     PLAINTIFF CANNOT PREVAIL ON HER CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT (COUNT 4) SINCE NO PARTY WAS INDUCED TO BREACH THE CONTRACT.**

To prevail on a claim of tortious interference with a contract, a plaintiff must establish that:  (a) she had a contract with a third party; (b) *the defendant knowingly induced the third party to break that contract*; (c) the defendant's interference, in addition to being intentional, was improper in motive or means; and (d) the plaintiff was harmed by the defendant's actions.  Psy-Ed Corp. v. Klein, 459 Mass. 697, 715-16 (2011) (emphasis supplied).  Thus, if the third party never breached the underlying contract, a plaintiff cannot prevail on her claim.  Id. at 717 ("But for Klein to prevail on his claim, the judge would have to find that Valenzano induced Psy-Ed's breach of a contract . . . with Klein.")

In Count 4, Plaintiff asserts that Brown tortuously interfered with the P&S she entered into with the seller.  Importantly, Plaintiff does not allege, nor has she produced any evidence, that the seller actually breached any term of the P&S.  To the contrary, the theory set forth in the Complaint is that Brown should be liable for causing her to actually *proceed* with the transaction.  Complaint, at ¶ 72.  While Plaintiff's allegations may under the right set of circumstances support a claim under alternative theories of recovery (such as misrepresentation), there has been no case located that actually supports a claim for intentional interference where the third party did not actually breach the underlying contract at issue.  In fact, Massachusetts courts consistently affirm that a plaintiff cannot recover for tortious interference where the third party's conduct was not altered in any fashion.  See Psy-Ed , 459 Mass. at 717; Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003) (affirming entry of judgment for defendants where there was no evidence that third party breached the contract); CG Intern. Co., Inc. v. Rochem Intern., Inc., USA, 659 F.3d 53, 61 n.7 (1st Cir. 2011) (breach of contract is essential element of tortious

14

interference claim); <u>Comerford v. Meier</u>, 302 Mass. 398, 405 (1939) (affirming judgment in favor of defendant on claim for tortious interference with contract where no evidence that plaintiff's contract was altered in any fashion).

Since it is undisputed that there was no breach of the P&S, Plaintiff cannot prevail on her claim for tortious interference with contract.

**III.    BROWN DID NOT VIOLATE G.L. C. 183, § 63 (COUNT 5) BECAUSE HE COLLECTED ONLY THOSE FEES THAT WERE PREVIOUSLY DISCLOSED TO AND SPECIFICALLY AUTHORIZED BY PLAINTIFF.**

In Count 5, Plaintiff alleges that Brown violated G.L. c. 183, § 63 by charging her an "inflated" loan fee for her stated income loan. However, contrary to Plaintiff's unfounded allegations, this statute does not govern the precise amount of a fee that a mortgage broker may charge the applicant. Rather, this statute merely prohibits a mortgage broker from charging an *undisclosed* fee for its services. G.L. c. 183, § 63 ("A . . . mortgage broker . . . shall not charge a loan fee, finder's fee, points, so-called, or similar fees in a mortgage transaction . . . except to the extent that such fees or points have been previously disclosed to the mortgagor in writing").

Plaintiff has not presented any evidence demonstrating that Brown violated this statute. To the contrary, by signing GMAC's Applicant Brokering Notice on May 24, 2006 – nearly two (2) weeks before the loan closed – Plaintiff expressly authorized GMAC to receive a mortgage brokerage fee in the amount of 1.625% of the total loan amount. Brown was therefore permitted to charge a fee of $7,605.00 for its services. However, at the closing, GMAC received only $6,080.75, or approximately 1.3% of the total loan amount. These facts prove that not only did GMAC collect fees that were previously disclosed and *specifically authorized* by Plaintiff, but

15

collected less fees than it was actually entitled to under the statute.[5]  Count 5 therefore fails as a

matter of law.

**IV.     COUNTS 2 AND 3 DO NOT APPLY TO BROWN BECAUSE HE IS NOT A PARTY TO THE UNDERLYING CONTRACT.**

Rather than identify what particular defendants are alleged to have committed unlawful

conduct in connection with Counts 2 and 3, Plaintiff alleges that all the "defendants" are liable

for unconscionability (Count 2) and breach of the implied covenant of good faith and fair dealing

(Count 3).  Given the nature of Brown's undisputed involvement in this transaction, however,

these counts cannot apply to him as a matter of law.

A claim for unconscionability is a defense to a procedurally and substantively unfair

contract.  See Skirchak v. Dynamics Research Corp., Inc., 432 F. Supp. 2d 175, 178 (D. Mass.

2006) ("generally applicable contract defenses, such as fraud, duress, or unconscionability . . .");

35 Thomas B. Merritt, Consumer Law § 5.51 (3d ed. 2012) ("The impact of the

unconscionability provision . . . is basically negative and defensive"); 14 Howard J. Alperin,

Summary of Basic Law § 5.50 (4th ed. 2011) ("unconscionability is recognized as a defense in

non-UCC cases").  It is a remedy designed to preclude enforcement of a contractual term or

provision that is deemed to be "too hard a bargain for a court of conscience to assist."  Waters v.

Min Ltd., 412 Mass. 64, 66 (1992) (citing Covich v. Chambers, 8 Mass. App. Ct. 740, 750 n.13

(1979); see also Restatement (Second) of Contracts § 208 ("If a contract or term thereof is

unconscionable at the time the contract is made a court may refuse to enforce the contract . . .");

35 Thomas B. Merritt, Consumer Law § 5.51 (3d ed. 2012) (unconscionability "gives the court

---

[5]  There is no evidence that Plaintiff was charged a higher *brokerage* fee for obtaining a stated income loan.  To the extent Plaintiff believes that she was charged other fees (or possibly a higher interest rate) because of the stated income nature of her Application, such an allegation implicates only the lender, Accredited, who would have received this unidentified fee.  There is no evidence that GMAC charged or collected anything other than the $6,080.75 brokerage fee.

16

power to pare away any unconscionable features of a contract, and even to strike down an entire

contract").

Similarly, the implied covenant of good faith and fair dealing is a covenant implied in the

terms of a parties' contract. Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass.

376, 385 (2004). "It cannot be invoked to create rights and duties not otherwise provided for in

the existing contractual relationship, as the purpose of the covenant is to guarantee that the

parties remain faithful to the intended and agreed expectations of the parties in their

performance." Id.

Here, Plaintiff alleges that the "defendants" have breached the implied covenant of good

faith and fair dealing by seeking to enforce an unconscionable loan. Although Plaintiff attempts

to lump Brown into these allegations, it is undisputed that Brown is not a party to the contract

that contains the allegedly "unconscionable" loan terms or that gives rise to the implied covenant

of good faith and fair dealing. Rather, these are claims that can be asserted only against the

original lender, Accredited, or possibly its assignee, Deutsche Bank. Accordingly, Brown is

entitled to summary judgment on Counts 2 and 3.

## CONCLUSION

For the foregoing reasons, Brown is entitled to judgment as a matter of law on each of the

counts asserted against him in the Complaint.

17

#1567863 101903/70

PHILIP BROWN
By his attorney,

Richard E. Briansky, #632709
rbriansky@princelobel.com
**PRINCE LOBEL TYE LLP**
100 Cambridge Street, Suite 2200
Boston, MA 02114
Tel:  617-456-8000

Dated:  November 9, 2012

## CERTIFICATE OF SERVICE

  I, Richard E. Briansky, certify that on November 9, 2012, I served the foregoing document on by sending a copy to Plaintiff's attorney, Max Weinstein, via email and first class mail, and upon co-defendants via first class mail, postage prepaid to:

Max Weinstein, Esq.
WilmerHale Legal Services Center
122 Boylston Street
Jamaica Plain, MA 02130

Jonathan M. Horne, Esq.
Jager Smith, P.C.
One Financial Center
Boston, MA 02111

Robert K. Malone, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, NJ 07932-1047

Barrando Butler (pro se)
P. O. Box 10
Stoughton, MA 02072

Richard E. Briansky

18

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**FINAL SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a),**
**362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019 (I) AUTHORIZING**
**THE DEBTORS TO CONTINUE IMPLEMENTING LOSS MITIGATION PROGRAMS;**
**(II) APPROVING PROCEDURES FOR COMPROMISE AND SETTLEMENT OF**
**CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING**
**LIMITED STAY RELIEF TO PERMIT FORECLOSURE AND EVICTION**
**PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE DISPUTES TO**
**PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE DEBTORS TO PAY**
**SECURITIZATION TRUSTEE FEES AND EXPENSES**

Upon the motion (the "<u>Motion</u>")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of a

supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and

Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation

programs; (ii) approving procedures for the compromise and settlement of certain claims,

litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting

limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct

claims and counter-claims in foreclosure and eviction proceedings (including in states in which

non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower

bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.

ny-1046923



1212020120713000000000011

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim Supplemental Order on June 15, 2012

[Docket No. 391]; and the Court having entered a final order on June 15, 2012 granting the GA

Servicing Motion on a final basis [Docket No. 401]; and the Court having entered a final order

on June 15, 2012 granting the Non-GA Servicing Motion on a final basis [Docket No. 402]; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given and it appearing that no other or further notice need be provided; and the

National Association of Consumer Bankruptcy Attorneys, on its own behalf and in a

representative capacity, two individuals who are debtors under Chapter 13, and Edward Boltz,

counsel for those individuals, having filed jointly the Limited Omnibus Objection To The

Servicing Orders And Debtors' May 31, 2012 Motion For A Supplemental Order [Docket No.

221] (the "NACBA Objection"); and the Committee having filed the Omnibus Response And

Reservation Of Rights Of The Official Committee Of Unsecured Creditors To Certain Of The

Debtors' First Day Motions [Docket No. 240]; and the Debtors having filed the Omnibus Reply

To Objections To Entry Of Final Orders For Specific "First Day" Motions And Related Relief

[Docket. No. 254]; and upon the record of the hearing; and it appearing that the relief requested

by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and after due deliberation thereon; and any objections to the Motion, including the

NACBA Objection, having been withdrawn, resolved, or overruled on the merits; and sufficient

cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED on a final basis, as set forth herein, and any

objections to the Motion are hereby overruled;

Loss Mitigation Programs

2.    The Debtors are authorized, but not directed in their sole and absolute

discretion and subject to available funding, to continue developing and implementing loss

mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to

the Petition Date, including, but not limited to, making incentive payments to borrowers in

connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction

proceedings, or in the form of borrower rebates for loan payoffs including honoring all

obligations related thereto that accrued in whole or in part prior to the Petition Date (collectively,

the "Loss Mitigation Programs"); provided, however, that the aggregate cash payments made by

the Debtors to individual borrowers under the Loss Mitigation Programs that are not reimbursed

to the Debtors shall not exceed $550,000 per month (the "Monthly Cap"), absent consent of the

Committee or further order of the Court; provided, further, however, that to the extent the

Debtors do not exceed the Monthly Cap in any month they shall be entitled to utilize the

difference between the actual amount and the Monthly Cap in any succeeding month. The

Debtors shall provide monthly reports to the Committee and the Office of the United States

Trustee for the Southern District of New York (the "U.S. Trustee"), which reports shall be in a

3

form agreed to by the Debtors and the Committee and such additional information as shall be reasonably requested by the Committee, in each case, concerning the Loss Mitigation Programs.

3.    Cash payments made by the Debtors to individual borrowers under the Loss Mitigation Programs for which the Debtors are not reimbursed shall not exceed $4.2 million in the aggregate, absent consent of the Committee or further order of the Court. For the avoidance of doubt, the limitation on the amount of cash payments provided for in this paragraph 3 is in addition to the limitation on the amount of cash payments provided for in paragraph 12 hereof.

Settlement Procedures

4.    The Debtors are authorized, but not directed to compromise and settle certain claims brought by the Debtors against any non-insider third parties in connection with foreclosure, eviction, or borrower bankruptcy proceedings (each a "Settling Party") or by a Settling Party against any of the Debtors (each, a "Claim") in accordance with the following two-tiered procedures (the "Settlement Procedures"):

> Tier I: The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts not to exceed $40,000 in full settlement of such Claim (each, a "Tier I Settlement").

> Tier II: The Debtors may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts exceeding $40,000 but less than $100,000 in full settlement of such Claims (each, a "Tier II Settlement"); provided, that in each case:

> (a) The Debtors must provide advance written notice (by formal or informal means, including by e-mail correspondence) of the terms of any Tier II Settlement to (x) the U.S. Trustee, 33

4

Whitehall Street, 21st Floor, New York, New York 10004, Attn: Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal; and (z) counsel to the administrative agent for the Debtors' providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer (collectively the "Notice Parties")

(b) Those Notice Parties wishing to object to any proposed Tier II Settlement must serve a written objection (by formal or informal means, including by e-mail correspondence) on the Debtors, so that it is received by no later than 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days from the date the Notice Parties received written notice of such Tier II Settlement (the "Settlement Objection Deadline"). Objections should be addressed to the proposed attorneys for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Larren M. Nashelsky (LNashelsky@mofo.com) and Norman S. Rosenbaum (NRosenbaum@mofo.com).

(c) If the Debtors receive a timely objection from a Notice Party, the parties will confer and attempt to resolve any differences. Failing that, the Debtors may petition the Court for approval of the Tier II Settlement in accordance with any case management orders entered in the Chapter 11 cases. An objection by a Notice Party with respect to a given Tier II Settlement shall not delay the finality or effectiveness of any other settlement to which an objection has not timely been delivered.

(d) If the Debtors do not receive a written objection to a Tier II Settlement from a Notice Party by the Settlement Objection Deadline, then such Tier II Settlement shall be deemed approved and the Debtors and Settling Parties may carry out the terms of such Tier II Settlement without further notice or Court approval.

5.       The Debtors shall be required to seek approval from the Court in order to enter into and consummate any proposed settlement of a Claim with a settlement amount in excess of $100,000.

6.       The Debtors are authorized in their sole discretion, but not directed, to settle claims where some or all of the consideration is being provided by a third party and/or

5

where the Debtors are releasing claims against creditors or third parties provided the Debtors

otherwise comply with the Settlement Procedures.

7.    The Settlement Procedures are without prejudice to the right of the

Debtors to seek an order of this Court approving additional or different procedures with respect

to specific claims or categories of claims.  For claims relating to matters specified in paragraphs

14(a) and 15(a) of this Order that were resolved pursuant to a settlement prior to the Petition

Date, but where such settlement has not been consummated, the Debtors are authorized, but not

directed to, consummate said settlements in accordance with the Settlement Procedures set forth

in this Order.

8.    Notwithstanding anything to the contrary contained herein, this Order

shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any

prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses,

or resolve any controversy authorized by any other order of the Court.

9.    Nothing in this Order or the Motion shall constitute a determination or

admission of liability or of the validity or priority of any claim against the Debtors, and the

Debtors reserve their rights to dispute the validity or priority of any claim asserted.

10.    The authority granted in this Order shall not replace or obviate the need to

comply with the Debtors' internal procedures, legal or otherwise, for authorizing the settlements

contemplated in the Motion.  All settlements made pursuant to the Settlement Procedures shall,

to the extent applicable, be made in accordance with the Debtors' settlement procedures in effect

as of the Petition Date (the "Internal Settlement Protocol") and as may be amended from time;

provided, however, that the Debtors shall provide the Committee and the U.S. Trustee with

notice of any material changes to the Internal Settlement Protocol.

6

ny-1046923

11.    The Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning settlements of any Claims pursuant to the Settlement Procedures.

12.    Cash payments made by the Debtors under the Settlement Procedures shall not exceed $4 million in the aggregate, absent consent of the Committee or further order of the Court.

13.    Any period prescribed or allowed by the Settlement Procedures shall be computed in accordance with Bankruptcy Rule 9006.

Limited Relief from Automatic Stay

*Borrower Foreclosure And Eviction Proceedings*

14.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to (a) pending and future foreclosure actions initiated by the Debtors or in those states providing for non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with respect to properties for which a foreclosure has been completed or is pending, is hereby modified pursuant to the following terms and conditions:

(a)    except as set forth herein, a borrower, mortgagor, or lienholder (each, an "Interested Party") shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction proceeding, where a final judgment (defined as any judgment where the right to appeal or seek reconsideration has expired or has been exhausted) permitting the foreclosure or

7

eviction has not been awarded or, with respect to completed foreclosure sales in Non-Judicial States, where any applicable challenge period has not yet expired, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Interested Party direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the Debtors, except where a monetary claim must be plead in order for an Interested Party to assert a claim to defend against or otherwise enjoin or preclude a foreclosure (each a "Mandatory Monetary Claim"); (ii) for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the form of a class action or collective action;

(c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Interested Party on behalf of any other Interested Party or class of Interested Parties;

(d)    under no circumstances shall an Interested Party be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order, including, without limitation, a Mandatory Monetary Claim;

(e)    the Debtors shall retain the right, upon appropriate motion and notice to any affected Interested Party, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the

Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(f)    nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

15.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "Bankruptcy Borrower"), is hereby modified pursuant to the following terms and conditions:

(a)    except as set forth herein, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "Bankruptcy Trustee") shall be entitled to:  (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce (including to reduce to $0) or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) prosecute appeals with respect to items (i) through (iv) above; (vi) seek an accounting from the Debtors with respect to the Bankruptcy

Borrower's loan; and (vii) enter into, execute and consummate a written agreement of settlement with the Debtors where the Debtors elect to enter into such settlement in their sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (vi) above;

(b)    except as set forth herein, a Bankruptcy Borrower shall be entitled to (i) engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's direct claims, counter-claims, motions or adversary proceedings:  (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for violation of any local, state or federal statute or other law in connection with the origination of the Bankruptcy Borrower's loan; (iii) for relief that if granted, would have no effect on the amount, ~~validity or priority of~~ the Debtors' claim or lien again~~st a Bankruptcy Borrower~~ or the property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or (iv) asserted in the form of a class action or collective action; provided however, a Bankruptcy Trustee or Bankruptcy Borrower, solely in connection with their objections to Debtors' proof of claim permitted by paragraph 15(a)(i) or proceedings permitted by 15(a)(iii), may assert claims of the type covered by subsection (i) or (ii) of this paragraph 15(c);

ny-1046923

(d)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankruptcy Borrower on behalf of any other class of borrowers;

(e)     with the sole exception of objections to Debtors' proofs of claim permitted by paragraph 15(a)(i) above and proceedings described in 15(a)(iii) above and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order;

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(g)     nothing set forth herein shall preclude or limit any Bankruptcy Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Foreclosures By The Debtors On Senior Loans*

16.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to pending and future foreclosure actions initiated by the Debtors in cases where they act as

11

servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property (collectively, the "Junior Foreclosure Actions") is hereby modified pursuant to the following terms and conditions:

(a)    except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute Junior Foreclosure Actions, whether in a Judicial State or a Non-Judicial State;

(b)    the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to a Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying a Senior Loan in connection with any sale or other disposition of such property;

(c)    the Debtors shall be entitled to seek all appropriate relief with respect to a Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court; and

(d)    the Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning Junior Foreclosure Actions.

D.    *Actions Involving Amount, Validity Or Priority Of Liens*

17.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to

12

properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is hereby modified pursuant to the following terms and conditions:

(a)    except as otherwise set forth herein, a Third Party Claimant shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor in connection with any Title Dispute, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Third Party Claimant direct claims and counter-claims: (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or (iii) asserted in the form of a class action or collective action;

(c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Third Party Claimant on behalf of any other Third Party Claimant or class of Third Party Claimants;

(d)    under no circumstances shall a Third Party Claimant be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of the Order;

(e)    the Debtors shall be entitled to take such actions as are necessary to clear title with respect to property that is subject to a Title Dispute or to otherwise ensure

13

clear and marketable title with respect to such property in connection with any sale, foreclosure or other disposition of such property;

       (f)     the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

       (g)     nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

Payment of Securitization Trustee Fees and Expenses

      18.     The Debtors shall continue to perform all of their respective servicing duties and servicing related duties, including, but not limited to, their duties as master servicer, under all the governing agreements (including, without limitation, pooling and servicing agreements, servicing agreements, or any other agreements concerning or relating to the Debtors' obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or losses) (collectively, the "Agreements") relating to Debtor-sponsored securitization transactions and non-Debtor sponsored securitization transactions to which any of The Bank of New York Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of their respective capacities as trustee (collectively, the "Trustees") and one or more of the Debtors is a party, including but not limited to, making all principal, interest or other servicing advances (including property protection advances) and reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost

14

or expense (including fees and disbursements of counsel or agents) incurred by any of the

Trustees in the performance of their duties or their administration of the trusts or other agencies

under the Agreements to the extent required by the Agreements.  For the avoidance of doubt, the

Debtors shall pay the reasonable, actual out-of-pocket costs and expenses of the Trustees in

connection with reviewing and analyzing the request by the Debtors to approve the MBS

Settlement Agreement, and in connection with reviewing and analyzing amendments to the

Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the

MBS Settlement Agreement or the Platform Sale.  Notwithstanding the foregoing, nothing in this

paragraph 18 shall require any Debtor (i) to repurchase any mortgage loans on the basis of

alleged breaches of representations, warranties or other requirements of the Agreements, or make

any make-whole payments with respect to any mortgage loans pursuant to the Agreements; or

(ii) to enforce, as against any other Debtor entity or any non-Debtor affiliate, any provision of the

Agreements under which such other Debtor entity or non-Debtor affiliate are required to

repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or

other requirements of the Agreements, or make any make-whole payments with respect to any

mortgage loans pursuant to the Agreements; and nothing in this paragraph 18 shall be deemed to

impose liability on any Debtor with respect to such alleged breaches or make-whole payment

requirements.

19.    The Trustees shall submit invoices to (a) counsel to the Debtors,

(b) counsel to the Committee, and (c) the U.S. Trustee, and all such invoices shall include (i) an

itemization of all professional fees by task with a detailed description of the work performed in

connection with such task, (ii) a description of related expenses, and (iii) a description of any

indemnity claims.  Thereafter, within thirty (30) days of presentment of such invoices, if no

ny-1046923

written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made by the Debtors, the Committee, or the U.S. Trustee, the Debtors are authorized and directed to pay all reasonable fees, costs and expenses and all indemnity claims referred to in paragraph 18 (including without limitation, attorney, financial advisor, consultant and expert fees and costs) incurred postpetition by any of the Trustees relating to the performance of each of the Trustees' duties or the administration of the trusts or other agencies under the Agreements (the "Trustee Expenses") that are not subject to an objection by the Debtors, the Committee, or the U.S. Trustee without further order from the Court. Any objection to the payment of the Trustee Expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and a detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Committee, or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the disputed amounts. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

20.    To the extent either the Committee, or the RMBS Trustees determine that the Trustee Expenses were improperly or mistakenly allocated to an RMBS trust or to the Debtors' estates, the Committee and the RMBS Trustees reserve the right to seek to correct the allocation of the Trustee Expenses as between the RMBS trusts or the Debtors' estates in accordance with the applicable Agreement, and such adjustment shall be the Committee's and RMBS Trustees' sole remedy arising from a misallocation. All Trustee Expenses for which (a) no objection under paragraph 19 has been interposed, or (b) where such an objection has been

16

interposed and the amount of Trustee Expenses determined by the Court to be reasonable, shall

be entitled to administrative expense priority in the Debtors' Chapter 11 cases notwithstanding

the entry of an order authorizing the assumption and assignment or rejection of any Agreement.

However, the Debtors will not be responsible for any fees, costs and expenses incurred with

respect to any Agreement after the entry of an order in the Debtors' Chapter 11 cases authorizing

the rejection of such Agreement.

21.      If any or all of the provisions of this Order are hereafter reversed,

modified, limited, vacated or stayed, such reversal, stay, modification or vacatur shall not affect

the validity, priority or enforceability of any Trustee Expenses incurred prior to the actual receipt

of written notice by the Trustees of the effective date of such reversal, stay, modification or

vacatur (the "Notice Date"). Notwithstanding any such reversal, stay, modification or vacatur,

the payment of any Trustee Expenses incurred prior to the Notice Date and reimbursed prior to

or after the Notice Date by the Debtors shall be governed in all respects by the original

provisions of this Order, and the Trustees shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Order with respect to payment of Trustee Expenses.

22.      Notwithstanding the Debtors' obligations set forth in paragraphs 18 and

19, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

23.      Any disputes regarding the extent, application and/or effect of the

automatic stay under this Order shall be heard and determined in the Debtors' jointly

administered bankruptcy cases pending in the United States Bankruptcy Court for the Southern

ny-1046923

District of New York, Case No. 12-12020 in accordance with the Case Management Order entered in the Debtors' cases [Docket No. 141] and such other and further orders as may be entered by the Court.

24.     The Debtors are authorized and empowered to take all actions and execute such documents as may be necessary or appropriate to carry out the relief granted herein.

25.     Nothing herein shall be deemed to limit the rights of the Debtors to operate their business in the ordinary course, and no subsequent order shall be required to confirm such rights.

26.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

27.     Notwithstanding anything to the contrary in this Order, any action to be taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings.  All amounts authorized to be paid pursuant to this Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To the extent that there is any inconsistency between the terms of this Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

28.     Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

18

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

29.    Nothing in this Order shall discharge, release, or otherwise preclude any

setoff or recoupment right of the United States of America, its agencies, departments, or agents.

30.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

31.    Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

32.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.


~~Dated:~~        ~~July 13, 2012~~
New York, New York


_/s/Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge

ny-1046923

**<u>Exhibit 4</u>**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 09-1812-E

---

KARLA BROWN,

                    Plaintiff,

v.

ACCREDITED HOME LENDERS, INC.,
DEUTSCHE BANK NATIONAL TRUST
COMPANY, PHILIP BROWN, BARRANDO
BUTLER, GMAC MORTGAGE
CORPORATION, HSBC MORTGAGE
SERVICES, INC. and SAXON MORTGAGE
SERVICES, INC.

                    Defendants.

---

## NOTICE OF ENTRY OF CONFIRMATION ORDER
## AND PLAN RELEASE AND INJUNCTION PROVISIONS

Philip Brown, by and through his undersigned counsel, respectfully submits this Notice of Entry of Confirmation Order and Plan Release and Injunction Provisions, and states as follows:

1.      On May 14, 2012 (the "Petition Date"), Residential Capital, LLC and certain of its direct and indirect subsidiaries (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408 (the "Bankruptcy Court"). The Debtors' Chapter 11 cases are being jointly administered, indexed at case number 12-12020 (MG).

2.      On December 11, 2013, the Bankruptcy Court entered an order, among other things, confirming the Debtors' Chapter 11 plan [Bankruptcy Docket No. 6065] (the

#1852677 104909/75

"Confirmation Order"). The Plan is annexed to the Confirmation Order as Appendix 1 (the

"Plan"). The Plan and Confirmation Order are annexed hereto as Exhibit A. On December 17,

2013, the Effective Date of the Plan occurred [Bankruptcy Docket No. 6137].

     3.     Article IX.D of the Plan and Paragraph 40.B of the Confirmation Order provide

for a broad "third party release" of various parties, including former employees of the Debtors.

This section, titled "Third Party Release," provides, in relevant part, as follows:

> On and as of the Effective Date of the Plan, except as provided by Article IX.E
> [of the Plan], the holders of Claims and Equity Interests shall be deemed to
> provide a full and complete discharge and release to the Ally Released Parties and
> their respective property from any and all Causes of Action whatsoever, whether
> known or unknown, asserted or unasserted, derivative or direct, foreseen or
> unforeseen, existing or hereinafter arising in law, equity, or otherwise, whether
> for tort, fraud, contract, violations of federal or state securities laws, veil piercing
> or alter-ego theories of liability, contribution, indemnification, joint liability, or
> otherwise, arising from or related in any way to the Debtors, including those in
> any way related to RMBS issued and/or sold by the Debtors or their affiliates
> and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of
> Assessment.

     4.     The defined term "Ally Released Parties" in the Plan includes the Debtors'

"Representatives," Plan, Art. I.21, and the definition of "Representatives," in turn, includes each

of the Debtors' former and current employees. Id. at 245.

     5.     To implement the "Third Party Release," section G of Paragraph 40 of the

Confirmation Order and Article IX.I of Plan contain an "Injunction" provision that, among other

things, enjoins all parties from commencing or continuing any action or other proceeding that is

released under the Plan. The Third Party Release provision provides, in relevant part, as follows:

> Except as otherwise provided in the Plan or this Order and in accordance with
> Article IX.E of the Plan, ***all Entities, including Investors, who have held, hold or
> may hold Claims, Equity Interests, Causes of Action or liabilities that constitute
> Released Claims, are permanently enjoined and precluded, from and after the
> Effective Date of the Plan, from: (a) commencing or continuing in any manner
> or action or other proceeding of any kind against any Released Party whether***

2

*directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims. . . .*

6.    A "Released Party" under the Plan and Confirmation Order includes the "Ally Released Parties" that are covered by the Third Party Release provision above. Plan, Art. I.243.

7.    In addition, Article XII of the Plan, titled "Retention of Jurisdiction," provides that the Bankruptcy Court retains *exclusive* jurisdiction to hear any dispute "regarding the existence, nature, and scope of the releases, injunction, and exculpation provided under the Plan." Plan, Art. XII(c).

8.    Accordingly, Defendant respectfully submits that the Confirmation Order and Plan enjoins the above-captioned matter.

PHILIP BROWN
By his attorney,

Richard E. Briansky, BBO# 632709
rbriansky@princelobel.com
**PRINCE LOBEL TYE LLP**
100 Cambridge Street, Suite 2200
Boston, MA 02114
Tel: 617-456-8000

Dated:  January 31, 2014

3

<u>CERTIFICATE OF SERVICE</u>

I, Richard E. Briansky, certify that on January 31, 2014, I served the foregoing document on by sending a copy to all counsel of record via email and first class mail, postage prepaid to:

Max Weinstein, Esq.
WilmerHale Legal Services Center
122 Boylston Street
Jamaica Plain, MA 02130

Paul R. Collier, III, Esq.
678 Massachusetts Avenue, 3rd Floor
Cambridge, MA 02139

Barrando Butler, Esq.
258 Blue Hill Parkway
Milton, MA 02186

_____
Richard E. Briansky

#1852677 104909/75

# EXHIBIT A

[Omitted]

# **Exhibit 5**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT
SUPERIOR COURT DEPARTMENT

|  |  |  |
|---|---|---|
| KARLA BROWN, | ) | Civil Action No. 09-1812 |
|  | ) |  |
| Plaintiff, | ) | **PLAINTIFF'S RESPONSE** |
|  | ) | **TO DEFENDANT PHILIP BROWN'S** |
| v. | ) | **BANKRUPTCY "NOTICE"** |
|  | ) |  |
| DEUTSCHE BANK NATIONAL TRUST | ) |  |
| COMPANY et al. | ) |  |
| Defendants. | ) |  |
|  | ) |  |

In this action, Defendant Philip Brown is being sued **solely in his individual capacity**, and **solely for his individual actions**, and primarily his own **intentional** torts. No claims are made against him for the conduct of GMAC. See Stipulation Clarifying Complaint, filed herewith.

The GMAC Bankruptcy Plan ("GMAC Plan") asserted by Philip Brown as requiring his release from Karla Brown's claims provides protection **solely to representatives of GMAC**, and **solely for claims against GMAC representatives in their representative capacity:**

> [GMAC] Representatives, means a person's or entity's former and current officers, former and current directors, former and current principals, employees, agents,…
> ***each solely in its capacity as such;***

See ¶¶21 and 245 of GMAC Plan, attached to Philip Brown's "Notice." In an effort to avoid the obvious and transparent inapplicability of the GMAC Plan to claims brought against Philip Brown **solely in his individual capacity** and **solely for his own intentionally tortuous conduct**, Philip Brown quotes the GMAC Plan only in part, and entirely omits the instruction that the release is limited to claims against a "Representative … ***solely in its capacity as such"***; Philip Brown then buries his editorial omission in a three hundred and sixty page filing. Indeed, not once in the entire "Notice" does Philip Brown disclose that the GMAC Plan releases claims against a former GMAC "Representative … ***solely in its capacity as such."*** Most obviously, the Philip

Brown's "Notice" must be disregarded because, on its own terms, the GMAC Plan does not apply to any of the claims asserted in this action.

Moreover, Massachusetts law provides that an individual is personally liable for his own violations of M.G.L. c. 93A and the common law, regardless of whether that individual has a claim against his employer to indemnify him for the damages he caused. In *Skowronski v. Sachs*, the Appeals Court affirmed a judgment against Sachs, who "was acting as an agent or employee of [a jewelry] store" for negligent misrepresentation and violation of c. 93A. *Skowronski v. Sachs*, 62 Mass.App.Ct. 630, 634 (2004). Sachs "misrepresented the quality of [a] diamond at the time of the sale." *Id.* Moreover, "[t]he plaintiff was awarded treble damages and attorney's fees under G.L. c. 93A, based on the same facts, which the judge concluded were unfair and deceptive practices." *Id.* at 630. The Court rejected the contention that he was immune from liability as the mere employee or agent of the store and concluded that:

> The mere fact that the defendant was acting as an agent for his employer, the store, when he made the representations about the grade and color of the diamond ultimately purchased by the plaintiff does not insulate him from liability for the damages caused by his fraudulent misrepresentations. It is well established that an agent is liable in tort when he or she makes a negligent or fraudulent misrepresentation actionable within ordinary tort principles.

*Id.* at 634. The Court further affirmed the trial court's award of treble damages and attorneys' fees under c. 93A based on the same facts. *See also Travis v. McDonald*, 397 Mass. 230 (1986) (holding a claim under G.L. c. 93A, § 9 directly against "an employee of Crown Chevrolet, Inc." to be triable in Superior Court).

This result is supported by the Bankruptcy Code itself, which prohibits the discharge of any and all claims:

> **(2)** for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> **(A)** false pretenses, *a false representation*, or *actual fraud*...

2

11 USCS § 523(a)(2)(A). As was established at the Summary Judgment hearing, most of the

claims asserted by Karla Brown are based upon the Philip Brown's express misrepresentations,

and so non-dischargeable:

> Section 523(a) of the Bankruptcy Code provides that a discharge in bankruptcy
> shall not discharge an individual debtor from certain kinds of obligations, including
> those for money obtained by "actual fraud."

*Grogan v. Garner*, 498 U.S. 279, 280-281 (U.S. 1991); *accord:*

> while fraud [rendering a debt non-dischargeable] may not be implied in law, it may
> be inferred as a matter of fact. The finder of fact may "infer[] or imply[] bad faith
> and intent to defraud based on the totality of the circumstances when convinced by
> a preponderance of the evidence.

*Palmacci v. Umpierrez*, 121 F.3d 781, 789 (1st Cir. 1997).

Finally, it is important to note that bankruptcy courts are not Article III courts, but are

rather in the nature of limited jurisdiction magistrate-judges. Where, as here, an effort is made to

extend the Bankruptcy Court's reach far beyond the jurisdiction over the core Debtor/Creditor

claims into areas of common law liability traditionally under the jurisdiction of state courts, the

U.S. Supreme Court has recently ruled that the extension exceeds Constitutional limitations on the

jurisdiction of non-Article III courts:

> It is clear that the Bankruptcy Court in this case exercised the "judicial Power of
> the United States" in purporting to resolve and enter final judgment on a state
> common law claim.... No ...exception excuses the failure to comply with Article
> III in doing so.... [Plaintiff] argues that this case is different because the defendant
> is a creditor in the bankruptcy. But the debtors' claims in the cases on which she
> relies were themselves federal claims under bankruptcy law, which would be
> completely resolved in the bankruptcy process of allowing or disallowing claims.
> Here [Plaintiff's] claim is a state law action independent of the federal bankruptcy
> law.

*Stern v. Marshall*, 131 S. Ct. 2594, 2611 (U.S. 2011). The Supreme Court further

explained:

3

[Previously] we rejected the argument that… permitted a bankruptcy court to adjudicate a state law suit brought by a debtor against a company that had not filed a claim against the estate …

The claim is instead one under state common law between two private parties. What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking …

The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Id. at* 2611-15.

## CONCLUSION

Nothing in the GMAC Plan applies to claims against Philip Brown **solely in his individual capacity**, and **solely for his individual actions**, and primarily for his own **intentional** torts. Moreover, the Broker's intentional fraud and related intentional tortious conduct may not be discharged according to the Bankruptcy Code. And any effort to have a non-Article III court adjudicate a state common law claim never filed as part of any bankruptcy court action would violate the constitutional limitations upon the jurisdiction of that court.

4

Respectfully submitted,

Karla Brown
By her attorneys,

BY MW

Paul R. Collier, III, Esq.
BBO # 092040
678 Massachusetts Ave.,
3rd Floor
Cambridge, MA 02139
617-441-3303

Max Weinstein
BBO# 600982
Legal Services Center
of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
Facsimile: (617) 522-0715
mmweinstein@law.harvard.edu

Dated: February 10, 2014

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the foregoing document was served upon all parties by first class mail, postage prepaid, on February 10, 2014, at the following addresses:

Richard Briansky, Esq.
Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114

Christopher A. Cornetta
HOUSER & ALLISON, APC
45 School Street, 2nd Floor
Boston, MA 02108

Max Weinstein, Esq.

5

**Exhibit 6**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT
SUPERIOR COURT DEPARTMENT

Civil Action No.  09-1812

|  |  |
|---|---|
| KARLA BROWN, | ) |
| Plaintiff, | ) |
| v. | ) |
| DEUTSCHE BANK NATIONAL TRUST COMPANY et al. | ) |
| Defendants. | ) |

**PLAINTIFF'S STIPULATION
CLARIFYING COMPLAINT**

Pursuant to the Court's direction at oral argument on January 22, 2014, Plaintiff Karla Brown hereby stipulates as follows:

1.      Karla Brown asserts claims arising under Counts I – IV, VII and VIII of her Complaint against Philip Brown **solely in his individual capacity**, and **solely for his individual actions**, and **not** for actions of Defendant GMAC Mortgage Corp. and **not** in Philip Brown's capacity as an employee of GMAC Mortgage Corp. Karla Brown further stipulates that she now pursues no claim against Philip Brown under Counts V and VI of her Complaint.

2.      Karla Brown has moved the Court to reconsider its decision entering summary judgment against her on her claims against Deutsche Bank National Trust Co. arising out of Counts II (Unconscionability) and VIII (Violations of M.G.L. c. 93A) of her Complaint on the basis of the SJC's decision in Drakopoulos v. US Bank, 465 Mass. 775 (2013). All other claims against Deutsche Bank have been dismissed by the Court.

3.      All claims against Saxon Mortgage Services have been dismissed by the Court.

3.      Karla Brown asserts claims arising under Counts I – IV, and VI-VII  of her Complaint against Barrando Butler. Karla Brown further stipulates that she now pursues no claim against Butler under Count V of her Complaint.

4.      Karla Brown asserts claims arising under Counts I – IV, VII and VIII of her Complaint against Defendant GMAC Mortgage Corp., which claims are presently stayed by the automatic stay arising out of GMAC's bankruptcy filing. Karla Brown further stipulates that she now pursues no claim against GMAC under Counts V and VI of her Complaint.

5.      Pursuant to a settlement agreement, all claims against Defendant Accredited Home Lenders, Inc. have been dismissed pursuant to a Notice of Dismissal.

6.      Pursuant to a settlement agreement, all claims against Defendant HSBC Mortgage Services Inc. have been dismissed pursuant to an unopposed Joint Motion to Dismiss.

Respectfully submitted,

Karla Brown
By her attorneys,

BY MW

Paul R. Collier, III, Esq.
BBO # 092040
678 Massachusetts Ave.,
3rd Floor
Cambridge, MA 02139
617-441-3303


Max Weinstein
BBO# 600982
Legal Services Center
of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
Facsimile: (617) 522-0715
mmweinstein@law.harvard.edu

Dated: February 10, 2014

2

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing document was served upon all parties by first class mail, postage prepaid, on February 10, 2014, at the following addresses:

Richard Briansky, Esq.
Prince, Lobel, Glovsky & Tye, LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114

Christopher A. Cornetta
HOUSER & ALLISON, APC
45 School Street, 2nd Floor
Boston, MA 02108

_____
Max Weinstein, Esq.