**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ECEIVE
MAR 1 4 2014
U.S.D.C. S.D. N.Y.

RESIDENTIAL FUNDING COMPANY, LLC,

        Plaintiff,

v.

GREENPOINT MORTGAGE FUNDING,
INC., AN AFFILIATE OF CAPITAL ONE
BANK,

        Defendant.

CASE NO.  13-CV-8937 (PKC)

PLAINTIFF'S FIRST AMENDED
COMPLAINT

Plaintiff Residential Funding Company, LLC, ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its First Amended Complaint against defendant GreenPoint Mortgage Funding, Inc., an affiliate of Capital One Bank ("GreenPoint" or "Defendant"), as follows:

## NATURE OF ACTION

1.     This case arises in substantial part from the billions of dollars in liability Plaintiff RFC incurred during its chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of New York (Case No. 12-12020 (MG)). That liability, in turn, arose from defective residential mortgage loans sold to RFC by mortgage loan sellers, including Defendant Terrace Mortgage Company, who are legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

2.     Plaintiff RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.

3.     RFC's business model was built on acquiring loans from "correspondent lenders," such as Defendant GreenPoint, and distributing those loans by either pooling them together with

other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

4.      Over the course of the parties' relationship, GreenPoint sold over 1,200 mortgage loans, with an original principal balance in excess of $470 million, to RFC pursuant to the Mortgage Loan Purchase and Warranties Agreement attached as Exhibit A (the "Agreement").

5.      Critical to RFC's business success was the quality of the loans it purchased.  To that end, RFC required its correspondent lenders, including GreenPoint, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

6.      Over the course of RFC's business relationship with Defendant GreenPoint, RFC identified loans that contained material defects violating one or more of GreenPoint's contractual representations and warranties, and GreenPoint in many instances acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent GreenPoint repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  However, many defective loans sold to RFC by GreenPoint remain unresolved.  Moreover, as described below, even those loans GreenPoint repurchased have continued to contribute to RFC's losses and liabilities, and the parties' Agreement expressly provides that RFC is entitled to indemnification from losses, judgments, legal fees, and other costs and expenses stemming from those loans.

7.      Ultimately, due in significant part to the failure of correspondent lenders, including GreenPoint, to honor their contractual representations and warranties, RFC was sued

2

by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

8.  By the time RFC and certain of its affiliates (collectively, the "Debtors") filed for bankruptcy in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

9.  Additional RMBS claims emerged following the bankruptcy filing. Hundreds of proofs of claim were filed by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings). Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by GreenPoint.

10.  Following a lengthy and intensive mediation presided over by sitting bankruptcy judge Hon. James M. Peck, RFC was able to resolve its RMBS liabilities for over $9 billion of allowed claims in its bankruptcy case, plus additional sums for securities fraud claims. This agreed resolution of RFC's RMBS liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors. On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement—including the $9 billion RMBS settlement—finding it to be reasonable and in the best interests of each of the Debtors, and confirmed the chapter 11 plan.

3

11.     Defendant GreenPoint is contractually obligated to indemnify RFC for all liabilities and expenditures incurred by RFC as a result of breaches of Defendant's representations and warranties.

12.     Accordingly, RFC brings this action for breach of contract, and for indemnification of all liabilities and expenses RFC has incurred due to Defendant's breaches of its representations and warranties.

## PARTIES

13.     Plaintiff RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  When this case was filed, RFC was a wholly owned subsidiary of GMAC Residential Holding Company, LLC, a Delaware limited liability company. GMAC Residential Holding Company, LLC was a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company, which in turn was a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et. al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"), on December 17, 2013, GMAC Residential Holding Company, LLC's interest in RFC was cancelled and the ResCap Liquidating Trust (the "Trust") succeeded to all of RFC's rights under RFC's Agreement with Greenpoint, and now controls RFC.[1]

---

[1]     The Trust is organized pursuant to the Delaware Statutory Trust Act.

4

14.     Defendant GreenPoint Mortgage Funding, Inc., an affiliate of Capital One Bank, is a New York corporation with its principal place of business at 1680 Capital One Drive, McLean, VA 22102.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the bankruptcy proceeding and § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

16.     Venue is most appropriate in the United States Bankruptcy Court for the Southern District of New York, because these claims arise out of the bankruptcy of Plaintiff RFC and certain of its affiliates already pending in that court at Case No. 12-12020 (MG). The Amended Standing Order of Reference issued by Chief Judge Loretta Preska on January 31, 2012 (M10-468, in Case No. 12-Misc.-00032) provides in relevant part that "any or all proceedings … arising in or related to a case under title.11 are referred to the bankruptcy judges for this district." In the event the case is not referred to the bankruptcy court, however, venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events and omissions giving rise to this Complaint occurred in New York, Defendant is a New York corporation, and because the parties have contractually agreed that New York is an appropriate venue.

## FACTUAL BACKGROUND

### The Agreement Between RFC and GreenPoint

17.     Over the course of the parties' relationship, Defendant GreenPoint sold over 1,200 mortgage loans to RFC pursuant to the Agreement.

18. A preliminary list of the loans sold by GreenPoint to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit B. The original principal balance of these loans exceeds $470 million.

19. As a correspondent lender, GreenPoint had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan. GreenPoint had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan. It was GreenPoint, or others from whom GreenPoint purchased mortgages, that actually closed the loans with the borrowers.

20. As GreenPoint was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust. The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

21. As GreenPoint was also well aware, RFC from time to time sold pools of loans to whole loan investors.

22. GreenPoint knew of RFC's intention to securitize and/or sell the loans. Specifically, Defendant GreenPoint acknowledged, in Section 14 of the Agreement, that RFC, at its option, could sell some or all of the Mortgage Loans to "one or more trusts or other entities to be formed as part of one or more Securitization Transfers," which, in turn, was defined as "[t]he sale or transfer of some or all of the Mortgage Loans to a trust or other entity as part of a publicly-offered or privately-placed, rated or unrated mortgage pass-through or other mortgage-backed securities transaction." Accordingly, Defendant GreenPoint represented and warranted that none of the information it provided, either under the Agreement or for use in connection

6

with any Securitization Transfer or other sale of the loans, "contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading." (Exhibit A, Subsection 9.2(k).) Defendant further agreed to cooperate fully with RFC, including by restating its representations and warranties regarding itself and the Mortgage Loans, for the purposes of allowing the loans to be securitized. (Exhibit A, Section 14.)

23.    Pursuant to the Agreement, Defendant GreenPoint made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

> a. "The information set forth in the related Mortgage Loan Schedule is complete, true and correct and there are no omissions of material facts." (Exhibit A at Section 9.1(a).)
>
> b. "The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury …." (Exhibit A at Section 9.1(e).)
>
> c. "Any and all requirements of any federal, state or local law, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending, equal credit opportunity and disclosure laws applicable to the Mortgage Loan, including, without limitation, any provisions relating to a Prepayment Penalty have been complied with…and [Defendant] shall maintain in its possession…evidence of compliance with all such requirements." (Exhibit A at Section 9.1(g).)
>
> d. "No fraud, error, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan. [Defendant] has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein." (Exhibit A at Section 9.1(k).)
>
> e. "No Mortgage Loan has an LTV greater than 100%. Any Mortgage Loan that had at the time of origination an LTV in excess of 80% is insured as to payment defaults by a PMI Policy." (Exhibit A at Section 9.1(o).)

      f. "The Mortgage Loan was originated in accordance with the Underwriting Guidelines" incorporated into each Assignment made under the Agreement. (Exhibit A at Section 9.1(v).)

      g. "The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by a Qualified Appraiser." (Exhibit A at Section 9.1(nn).)

      h. "No Mortgage Loan was a "high cost" loan or predatory loan, or otherwise in violation of any comparable state or local laws. (Exhibit A at Sections 9.1(uu) & (yy).)

24.    The Defendant further represented and warranted that "[t]he Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered under this Agreement for each Mortgage Loan have been delivered" to RFC, and represented that it was in possession of a "complete true and accurate Mortgage File" that complied with a long list of requirements. (Exhibit A at Section 9.1(aa).) Among other things, Defendant warranted that the file included copies of the loan application, closing statement, verification of employment and income (where required), verification of acceptable evidence of the source and amount of the down payment for the Loan, a credit report on the borrower, a residential appraisal report, photographs of the mortgaged property and comparable properties, copies of all required disclosure statements, title insurance, and hazard or flood insurance. (Exhibit A at Section 9.1(aa) & Exhibit A-2.)

25.    In addition, the Defendant represented and warranted that its "origination and servicing of the Mortgage Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (Exhibit A at 9.2(g).)

26.    These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from GreenPoint. GreenPoint's contractual warranty of the quality of the loans was critical because RFC in turn sold these loans to RMBS trusts and whole loan

8

purchasers, making its own representations and warranties to the trusts and investors. If any of

GreenPoint's representations and warranties turned out to be false, RFC could have exposure to

these third parties, and thus RFC required contractual protection from GreenPoint under which

RFC would have recourse for its losses on account of defective loans.

27.      Pursuant to the Contract, Defendant's failure to comply with its representations

and warranties gave RFC the right to seek cure, repurchase, substitution, or payment. (Exhibit A

at § 3.03.)

28.      The Defendant also expressly agreed to broad indemnification provisions, which

provide as follows:

> In addition to such [other remedies], [Defendant] shall indemnify the
> Purchaser ... and hold [it] harmless against any losses, damages, penalties,
> fines, forfeitures, legal fees and expenses and related costs, judgments, and
> other costs and expenses resulting from any claim, demand, defense or
> assertion based on or grounded upon, or resulting from, a breach of
> [Defendant's] representations and warranties contained in this
> Agreement....

(Exhibit A at Section 9.3.)

29.      The Defendant further agreed to indemnify RFC for all such losses, costs

and expenses incurred in connection with enforcement of the indemnification obligation,

or due to the Defendant's failure to perform its duties "in strict compliance with the terms

of this Agreement." (Exhibit A at Section 13.1.)

30.      Moreover, the Defendant agreed to indemnify RFC "from and against any

losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs,

judgments, and any other costs, fees and expenses that [RFC] may sustain in any way

related to any information provided by or on behalf of [Defendant] regarding the

[Defendant], the Mortgage Loans or the Underwriting Guidelines set forth in any offering

document prepared in connection with" any securitization or whole loan sale, and "for

9

any untrue statement of any material fact contained in other information contained in any disclosure document, or the omission to state therein a material fact ... necessary to make the statements ... not misleading." (Exhibit A at Section 14.)

31.    In other words, Defendant knew RFC would rely on information provided by Defendant in securitizing the loans it acquired from Defendant, and expressly agreed to indemnify RFC from any losses stemming from material misrepresentations or omissions in that information.

32.    Additionally, prior to the commencement of this lawsuit, GreenPoint previously conceded that certain of its loans sold to RFC were materially defective. In that regard, GreenPoint has already paid substantial sums to RFC to cover those defects. In this action, RFC is not seeking to recover those sums.

33.    RFC at all times performed all of its obligations to GreenPoint, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

## Defendant Materially Breached Numerous Loan-Level Representations and Warranties.

34.    As noted above, the loans RFC acquired from GreenPoint and other correspondent lenders were sold, either into RMBS trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

35.    The loans GreenPoint sold RFC were eventually deposited in over 25 RMBS Trusts. When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS. In making those representations and warranties, RFC relied on information provided to it by GreenPoint and other correspondent lenders. That information in many cases violated GreenPoint's representations and warranties to RFC.

36.    GreenPoint materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

37.    Over time, many of the loans sold to RFC by GreenPoint defaulted or became seriously delinquent. The losses sustained on the securitized GreenPoint loans exceeded $100 million.

38.    These delinquency and default-related losses exceed what would normally be expected.

39.    Internal reviews conducted by RFC determined that dozens of the loans sold to RFC by GreenPoint violated the contractual representations or warranties made by GreenPoint, resulting in Events of Default under the Agreement.

40.    The types of defects varied, but included owner occupancy fraud, appraisal fraud or inaccuracies, undisclosed debt, employment misrepresentations, and income misrepresentations.    Additional material defects are likely contained throughout the loan population sold to RFC by GreenPoint. Indeed, a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans.

41.    By way of example, the following loans sold to RFC by GreenPoint were identified as having significant and material defects violating the Client Guide representations and warranties:

> a.   Loan ID # 10489261 (included in securitization 2006-RS3) – The mortgage
>       insurer on this loan rescinded mortgage insurance on this $577,000 loan based

11

on findings of value misrepresentation. Specifically, investigation by the mortgage insurer found that the actual value of the property, based on proper comparables and a field review, was 20% lower than the original appraiser had found. Moreover, the property was a condominium, but had originally been appraised based on comparables that were single family residences, located in more desirable neighborhoods and on the high end of the available comparables in the same subdivision. The appraisal also showed a supposed increase in the property's value of over $200,000 in just two years, representing a more than 30% increase in value, with no explanation of this purportedly sudden and dramatic increase. These issues demonstrated material breaches of the appraisal standards. Taken together, RFC's internal audit personnel agreed these facts presented an unacceptable risk under RFC's standards.

b. Loan ID # 10801857 (included in securitization 2006-QA7) – The borrower on this $272,000 loan made material misrepresentations about his employment, and then defaulted on the loan. The borrower's misrepresentations were deemed to be material breaches rendering the loan unacceptable under RFC's standards.

c. Loan ID # 10802825 (included in securitization 2006-QA7) – The borrower on this $94,000 loan made material misrepresentations about both his employment and his income, and then defaulted on the loan. The borrower's misrepresentations were deemed to be material breaches rendering the loan unacceptable under RFC's standards.

d. Loan ID # 10802945 (included in securitization 2006-QA7) – The borrower on this $271,000 loan purchased the property and obtained the mortgage loan based on the representation that the property would be his primary residence. The borrower then defaulted on the loan. Subsequent investigation by RFC's internal quality audit personnel confirmed—included by direct contact with the borrower—that, in fact, the borrower was still living in his original property. It is commonly accepted in the industry that owner-occupied properties have lower default rates than properties that are not owner-occupied. The borrower's misrepresentations were deemed to be material breaches rendering the loan unacceptable under RFC's standards.

e. Loan ID # 10802901 (included in securitization 2006-QA7) – The borrower on this $250,000 loan was required to accurately disclose all existing debts and pertinent credit history. However, the borrower failed to disclose additional material debts, including additional mortgages, that affected the calculation of his debt-to-income ratio, a key factor in the assessment of the borrower's ability to repay the mortgage. In fact, the borrower defaulted on the loan. Upon review by RFC's internal audit personnel, it was determined that the undisclosed debts caused the borrower's debt-to-income ratio to exceed 70%, and constituted a material misrepresentation rendering the loan unacceptable by RFC's standards.

      f.   Loan ID # 11036803 – The borrower on this stated income loan overstated his income by more than 50%. Moreover, in the time period between applying for the loan and the loan closing, the borrower left his employment. This rendered the representations relating to income, employment, and the borrower's ability to pay materially inaccurate. The loan ultimately was deemed unfit to be included in one of RFC's securitizations, yet repurchase was denied.

      g.   Loan ID # 11036785 (included in securitization 2007-SP3) The appraisal on this $120,000 loan was based on materially inflated values, which overstated the value of the property by more than $20,000. The loan was ultimately kicked out of a RFC securitization due to material defects in the loan, yet repurchase was denied.

    42.    The above examples are not intended to be an exhaustive list of the loans sold by GreenPoint to RFC that contained material breaches of representations and warranties. Rather, these loans represent a sampling of the material defects found in the loans GreenPoint sold to RFC. Many more of the loans sold to RFC by GreenPoint contained material defects that violated the representations and warranties GreenPoint made in the Agreement. While GreenPoint has, over the parties' course of dealing, repurchased some individual loans (thereby acknowledging it sold defective loans to RFC), it has in no way fully compensated RFC for the breaches of representations and warranties or the losses stemming from the universe of defective loans GreenPoint sold to RFC over time.

    43.    GreenPoint has been the target of numerous other lawsuits, similarly questioning the quality of its underwriting practices and complaining of defects in the mortgage loans it sold to others under similar arrangements. See, e.g., Morgan Stanley Mortgage Loan Trust 2007-2AX (MSM 2007-2AX) v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Standley Mortgage Capital, Inc. and GreenPoint Mortgage Funding, Inc., New York Supreme Court, Index No. 650339/2013; DB Structured Products, Inc. v. GreenPoint Mortgage Funding, Inc., New York Supreme Court, Index No. 650705/2010; U.S. Bank, N.A. v. GreenPoint Mortgage Funding, Inc., New York Supreme Court, Index No. 600352/2009.

44.    As detailed below, the defects in the loans sold to RFC by GreenPoint constituted material breaches of GreenPoint's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.

## RFC's Liabilities and Losses Stemming from Defendant's Breaches.

45.    As a direct result of Defendant GreenPoint's failure to abide by its contractual representations and warranties, RFC has suffered extensive legal and financial exposure, and incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from GreenPoint pursuant to the Agreement.

46.    First, RFC has incurred billions of dollars in liability stemming from defective loans, including those sold to RFC by GreenPoint.

47.    In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by GreenPoint and others in extensive federal and state court litigation, in which plaintiffs claimed that the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

48.    Beginning in 2008 and continuing until RFC filed for bankruptcy protection on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by GreenPoint and others.

49.    For example, the RFC-sponsored RMBS offerings containing loans sold to RFC by GreenPoint included a number of RMBS that became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations, alleging that as many as 98% of the loans contained in the RMBS offerings were defective in one or more ways.

50.    RFC had always received a limited number of repurchase demands, primarily from whole loan investors.

14

51.     However, beginning in 2008, RFC began to receive increasing numbers of repurchase demands from bond insurers, whole loan purchasers, and RMBS trustees, including for loans RFC had acquired from GreenPoint. These repurchase demands relating to GreenPoint loans included demands made by Deutsche Bank, FGIC, Credit Suisse, IndyMac, and others. RFC repurchased over $1.2 million worth of GreenPoint loans as a result of these repurchase demands.

52.     One of the earliest and largest lawsuits filed against RFC was a class action suit filed by the New Jersey Carpenters pension funds.

53.     The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans. These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS." As shown in Exhibit B, more than 800 GreenPoint loans were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

54.     The New Jersey Carpenters complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession when New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the Complaint. (NJ Carpenters First Am. Compl. ¶¶ 9, 110 in *New Jersey Carpenters et al. v. Residential Capital, LLC et al.* Case No. 08-cv-08781 (HB) (S.D.N.Y.)) Of course, that data was provided to RFC—and represented and warranted to be accurate—by GreenPoint and other correspondent lenders.

15

55.    Similarly, the Federal Housing Finance Authority, as conservator for Freddie Mac, filed suit against RFC in 2011, seeking to recover hundreds of millions of dollars in losses stemming from loan defects in various RMBS offerings, one of which – 2006-RS1 – contained more than 130 GreenPoint loans.

56.    Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including five lawsuits brought by private investors in RFC-sponsored RMBS securities that included GreenPoint loans:

      a.  Cambridge Place Investment Management filed suit against RFC in part based on defective loans included in RMBS offering 2006-QS17, which contained more than a dozen GreenPoint mortgage loans;

      b.  Union Central and the FDIC each filed separate lawsuits against RFC based in part on defective loans included in RMBS offering 2006-QS18, which contained more than 40 GreenPoint mortgage loans;

      c.  Allstate Insurance filed a very large lawsuit against RFC based in part on defective loans included in RMBS offering 2006-RS3, which contained more than 25 GreenPoint mortgage loans;

      d.  Massachusetts Mutual filed a lawsuit against RFC based in part on defective loans included in RMBS offerings 2006-RS6 and 2007-RZ1, which together included nearly 20 GreenPoint mortgage loans.

57.    All of these lawsuits, along with the others filed against RFC in the months leading up to its bankruptcy filing, alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate

documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

58.     Collectively, these lawsuits involved more than one hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

59.     As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan. As described in more detail above, these included numerous loans sold to RFC by GreenPoint.

60.     In May 2012, the Debtors—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

61.     In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by GreenPoint. By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

> a. The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust and Wells Fargo, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors. The institutional investors collectively asserted that loan-level defects (including in the loans shown in Exhibit C that were sold to RFC by GreenPoint and securitized) were responsible for more than $19.5 billion in repurchase obligations.

17

b. AIG, an investor in 35 Debtor-sponsored securitizations (a number of which, including 2007-SA1, 2006-RS1, 2006-RS2, 2006-SA3, 2007-RS2 and others, included GreenPoint loans), filed five proofs of claim (Nos. 4778, 5321, 5344, 5346, and 5347) totaling in excess of $2.6 billion, based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

c. John Hancock and its affiliates, who were investors in 12 Debtor-sponsored securitizations (several of which, such as 2006-RS1, 2006-RS6 and 2006-QS18, included GreenPoint loans), filed 59 proofs of claim asserting similar allegations.

62.     Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

63.     These proofs of claim, lawsuits, and demands all alleged, among other things, that the loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from GreenPoint, and on which RFC had relied.

64.     The Debtors initially proposed to settle portions of their RMBS liabilities for an aggregate $8.7 billion allowed claim in its bankruptcy case. Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS liabilities and of other disputed issues. A lengthy mediation process ensued, resulting in a global settlement that provided for the resolution of *all* of the Debtors' RMBS liabilities, as follows: (a) the various RMBS trusts were granted a $7.3 billion allowed claim; (b) MBIA, FGIC and other monoline insurers were granted approximately $2 billion in allowed claims; and (c) securities law claimants, including class members in the NJ Carpenters Class

Action and investors in private-label RMBS, were granted hundreds of millions of dollars in compensation.

65.      The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement—including the $9.3 billion in RMBS and monoline settlements and others—finding them to be reasonable and in the best interests of each of the Debtors, and confirmed the plan. (See Case No. 12-12020-mg, Doc. 6066 (Findings of Fact) (Glenn, J.), at ¶¶ 98 to 176.) RFC filed this suit on December 14, 2013, after RFC's RMBS-related liabilities became fixed through confirmation of the Plan. The Plan became effective on December 17, 2013.[2]

66.      Pursuant to its express contractual obligations, GreenPoint is obligated to compensate RFC for the portion of the $9.3 billion RMBS settlements associated with breaches of representations and warranties, as well as for the portion of RFC's other liabilities and expenditures (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.

## COUNT ONE
## (BREACH OF CONTRACT)

67.      RFC realleges each and every allegation set forth in Paragraphs 1 through 66, above, as if fully rewritten herein.

68.      RFC and Defendant GreenPoint entered into a valid and enforceable Agreement pursuant to which RFC acquired over 1,200 mortgage loans from GreenPoint.

---

[2]      RFC continues to litigate other proofs of claim, including those brought by whole loan purchasers.

69.     Pursuant to the parties' Agreement, GreenPoint made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

70.     RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

71.     Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

72.     Defendant's material breaches constitute Events of Default under the Agreement.

73.     RFC has suffered loss, harm, and financial exposure directly attributable to GreenPoint's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by GreenPoint, and fees and costs incurred in prosecuting this action.

74.     Accordingly, RFC is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

**COUNT TWO**
**(INDEMNIFICATION)**

75.     RFC realleges each and every allegation set forth in Paragraphs 1 through 74, above, as if fully rewritten herein.

76.     RFC has incurred substantial liabilities, losses and damages arising from and relating to material defects in the mortgage loans Defendant GreenPoint sold to RFC, including over $9 billion in allowed claims approved by the United States Bankruptcy Court for the

20

Southern District of New York, as well as tens of millions in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by GreenPoint.

77.     Defendant expressly agreed to indemnify RFC for the liabilities, losses and damages, including attorneys' fees and costs, which RFC has incurred.

78.     Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)     On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)     On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify RFC against liabilities, losses, expenses and/or other damages paid or to be paid in settlements or otherwise stemming from Defendant's conduct, an order for damages sufficient to reimburse RFC's liabilities, losses, costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(C)     All such further relief, as the Court deems necessary or proper.

Dated:  March 14, 2014

By: _____

    Jeffrey A. Lipps (admitted pro hac vice)
    Jennifer A.L. Battle
    CARPENTER LIPPS & LELAND LLP
    1570 Broadway, Suite 3710
    New York, New York 10036
    Telephone:  (212) 837-1110
    Facsimile:  (212) 837-1108
    lipps@carpenterlipps.com
    battle@carpenterlipps.com

    and

    Peter E. Calamari
    Isaac Nesser
    Alex Rossmiller
    John Sullivan
    Nicholas Smith
    QUINN EMANUEL URQUHART & SULLIVAN,
    LLP
    51 Madison Avenue, 22nd Floor
    New York, New York  10010
    Telephone:  (212) 849-7000
    Facsimile:  (212) 849-7100
    PeterCalamari@quinnemanuel.com
    IsaacNesser@quinnemanuel.com
    AlexRossmiller@quinnemanuel.com
    JohnSullivan@quinnemanuel.com
    NicholasSmith@quinnemanuel.com

    ATTORNEYS FOR PLAINTIFF
    RESIDENTIAL FUNDING COMPANY, LLC