RECEIVED

MAR 26 2014

U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC., et al., | Chapter 11 |
| Debtors. | Jointly Administered |

## DECLARATION OF TIMOTHY J. LAHRMAN

I, Timothy J. Lahrman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I make this declaration on the basis of my personal knowledge of the facts stated herein;

2.    I am a citizen of the State of Indiana and a non-lawyer pro se litigant educated and trained as a paralegal with over twenty years of exposure and experience in legal research and associated study.  By virtue of personal experiences in my past, the law of guardianship and conservatorship is body of law in which I find particular interest.  Prior to my endeavoring into a life of legal studies I founded a sub-s corporation for which I once had to rely on Title 11 and chapter 11.  As an honest and unfortunate debtor I was successful in creating and implementing a reorganization plan which successfully afforded the corporation a fresh start, and the corporation survives successfully to date.  In sum, I have the utmost respect for the rule of law and for the processes and remedies of a chapter 11 bankruptcy.

3.    I am the 'significant other' to Cynthia S. Damron and I am personally familiar with every aspect of her dealings with the "purported mortgage" referred to by Robert Ellis in Doc. 6621 at p.1 ¶ #4 cont. p. 2.  Not unlike Mr. Ellis, I too question the veracity of this "purported mortgage" and I further question what became of this particular asset in the

1

bankruptcy, assuming it was ever a scheduled asset to begin with, and if it was known to be

invalid and not scheduled as a separate asset in the bankruptcy estate, what is GMAC Mortgage

LLC doing in an Indiana State Court trying to enforce it?  It is my understanding that 'servicing

rights', an asset separate and distinct from an enforceable 'security instrument', relative to the

"purported mortgage" were sold and transferred in the bankruptcy and that Green Tree Servicing,

LLC, vis a vis Ocwen Loan Servicing, LLC, now claims ownership of the servicing rights.  I also

know and understand that the Consumer Financial Protection Bureau ("CFPB") has recently

announced its intentions to file and pursue an "Enforcement Action" against Green Tree

(**Exhibit A**; online at: http://www.marketwatch.com/story/walter-investment-management-

facing-enforcement-action-2014-02-27-114493351 - [last visited 03/25/2014]); and

on  December 19, 2013, Ocwen Loan Servicing LLC and the CFPB entered into a 'Consent

Judgement' (**Exhibit B**; online at: http://www.consumerfinance.gov/newsroom/cfpb-state-

authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/

[last visited 03/25/2014].[1]

4.      As between Cynthia and I, at all times relevant hereto, I have always been tasked

with the responsibility of managing, maintaining and caring for our properties, and for a few

years at least we enjoyed a beneficial net positive income every month.  We re-invested in the

properties with significant upgrades; on both homes we upgraded with new furnaces, central air,

and significant landscaping; on one home we added a large front porch, a brick paver drive, a

stone entrance walkway, and selective aesthetic fencing; on the other home, we upgraded all the

interior doors and the bathroom (new tile, new tub, new toilet, sink, lighting etc.), we dug a

---

**1.** *CFPB, et al v. Ocwen Loan Servicing LLC* complaint document online at:  http://
files. consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf [last visited 03/25/
2014]; "Consent Judgment" online at:  http://files.consumerfinance.gov/f/201312_
cfpb_consent-order_ocwen.pdf [last visited 03/25/2014]

walk-out patio entrance to the basement and installed a door.  The interior of the basement was insulated, studded and dry-walled, sliding pocket doors were installed (3 single doors – 2 solid, 1 15 pane glass; 1 door comprised of 2 15 pane glass; 5 doors total); an up-flush toilet is set in place and a shower is planned for --- and then the market crashed.  Cynthia and I reside in Elkhart IN – the RV capital of the world and as goes Detroit, so goes Elkhart.  Our local economy was decimated, unemployed hit our community like the plague and it did not just slide upward it spiked quickly and nearly topped 30%. This area is among the 'Hardest Hit' and almost overnight, the marketability of our properties, the property values themselves and our equity were all destroyed – and yet our notes (Cynthia's) were paid current.  Our properties were NEVER over leveraged nor underwater – and yet, as I understand it, we have fallen prey to the scheme of deceptive mortgage servicing practices which led to, *inter alia*, *CFPB v. Ocwen* and the pending *CFPB v. Green Tree* enforcement actions referred to above, the same which in this instance begins with GMAC Mortgage Corporation, and the same which according to the Federal Housing Finance Agency Office of Inspector General's report dated February 12, 2014, (**Exhibit C**; online at: http://www.fhfaoig.gov/Content/Files/EVL-2014-003.pdf [last visited 03/25/2104]) is tantamount to "Considerable Servicer Non-Compliance". (emphasis added)

5.     As I understand it and know it to be, before there was a "ResCap" bankruptcy in this Court, Ally Financial, Inc. entered into a "Consent Order" with the Board of Governors of the Federal Reserve System, the Office of the Comptroller of Currency, the U.S. Treasury and the Federal Deposit Insurance Corp. [online at: http://www.federalreserve.gov/newsevents/ press/ enforcement/enf20110413a3.pdf [last visited 03/25/2014]  wherein and under **Ally *agreed* "*to serve as source of strength*"** [*id* p. 7 ¶ 1] to attain the mutually agreed upon goals of the "Consent Order" and which included, *inter alia,* to ensure that Ally Bank and its subsidiary

3

"Mortgage Servicing Companies" operate in a safe and sound manner and that they cease and

desist in those practices and conducts as set forth in the Consent Order at p. 3 ¶¶ (a)(b)(c) and at

p. 4 ¶¶ (d)(e) which Federal regulators and authorities found to constitute unsafe and unsound

banking  The Consent Order reiterated, and Ally consented to agree, that Ally et al will comply

with all relevant federal and state laws and regulations governing their business practices,

including, Ally, et al.'s consumer mortgage servicing business.

6.    As I understand it and know it to be, also before there was a "ResCap" bankruptcy

in this Court, Ally Financial, Inc. entered into a "Consent Judgment" with the United States

Department of Justice and the Attorney Generals of forty-nine (49) individual states. [online at:

https://d9klfgibkcquc.cloudfront.net/Consent_Judgment_Ally-4-11-12.pdf [last visited 03/25/

2014]; *see also* Cause No.: 1:12-cv-00361 (RMC) (D. DC. 2012) ECF/Pacer Doc. 13] wherein

and under **Ally** *agreed* to conform its business practices and those of its subsidiaries, Ally Bank

and its Mortgage Servicing Companies included, to all applicable state and federal laws relevant

to its business practices and to the terms and conditions of the "Consent Judgment" which

included, without limitation, defined servicing standards, foreclosure practices, consumer relief

and borrower protections and, participation in an "Independent Review" undertaken at the

direction and supervision of the Office of the Comptroller of Currency and for which our

one property, which is the residence for Cynthia and I, qualified to be reviewed and was in fact

reviewed, the result of which found undefined and left unexplained 'servicing irregularities'

committed by GMAC Mortgage LLC. (**Exhibit D**)

7.    As I understand and know it to be, approximately thirty (30) days after entering

into the "Consent Judgment" ResCap, *et al.* filed for chapter 11 bankruptcy protection in this

Court.  During the course of these proceedings an adversary proceeding was commenced by

4

ResCap which sought to extend to Ally the ResCap bankruptcy protections under § 362 and § 105 and on July 17, 2012, U.S. District Court Judge D. Cote denied ResCap's attempts to shelter Ally who <u>did not</u> file for bankruptcy. (**Exhibit E**)  Underlying this adversary proceeding and prompting its attempt to shelter Ally is the fact that **Ally** was facing another federal enforcement action and lawsuit brought by the Federal Housing Finance Agency ("FHFA") as conservator of Fannie Mae and Freddie Mac who had been placed under federal conservatorship on September 6, 2008.  As described by US Treasury Secretary Henry Paulson, "*I attribute the need for today's action primarily to the inherent conflict and flawed business model embedded in the GSE structure, ...* " (**Exhibit F**; online at:  http://www.treasury.gov/press-center/press-releases/Pages/ hp1129.aspx [last visited 03/25/2014] at ¶ 9) (emphasis added)

8.      As I understand and know it to be, before being chartered as Ally Bank/Ally Financial, Inc., the hierarchy of the GMAC-mortgage entities joined with Fannie Mae, Freddie Mac and other mortgage and banking industry leaders as founding shareholders in the creation of MERSCorp, Inc. and its subsidiaries however structured.  At all times relevant hereto Ally *et al.* has played a role in participating to create, execute and further "*the inherent conflict and flawed business model embedded in the GSE structure, ...* ", and on April 23, 2013 and after three (3) years of state court proceedings against my significant other GMAC Mortgage LLC suddenly discloses that subject of Cause No. 20D01-1004-MF-187 (a copy of the 'Complaint on Note and to Foreclose Mortgage' in MF-187 was submitted to the Court by way of letter-motion dated March 7, 2014 "via E-Mail and FedEx" to the Honorable Martin Glenn personally) is a "*loan that remains owned by Federal National Mortgage Association ("Fannie Mae") ...* " (see Doc. 6621 at p. 15 ¶ 24), and as I understand and know it to be the FHFA has argued and taken the position "that HERA endowed it with sole authority to litigate claims belonging to Fannie Mae.

The district court agreed and granted the motion. *In re Fannie Mae,* MDL No. 1668, No. 08-1093, slip. op. at 6 (D.D.C. June 25, 2010)." (see *Kellmer, et al v. Raines,* 674 F. 3d 848 (Cir. App. D.C. 2012); *see also Federal Housing Finance Agency v. UBS Americas, Inc,.* 712 F.3d 136 (2nd Cir, 2013) ["Congress specifically authorized FHFA, <u>**as conservator**</u> or receiver, to "collect all obligations and money due the [GSEs]." *Id.* § 4617(b)(2)(B)(ii)."] (emphasis added)).

9.    As I understand and know it to be, I am in fact not a named "mortgagor" to or on the "purported mortgage" (Doc. 6621 – Declaration of Robert Ellis p. 1 ¶ 4 cont. p. 2). Likewise I am not a borrower nor debtor named on the "Promissory Note" attached as an exhibit to the 'Complaint on Note and to Foreclose Mortgage' in MF-187 (see 'letter-motion' dated March 7, 2014). These consideration however, standing alone, do not speak for what are and/or what are not my legal and or equitable rights and interests in the real property at issue of MF-187 and *"the Action"*, nor does the strength of a "purported mortgage" and a 'robo-signed' "Corrective Assignment of Mortgage" [see 'letter-motion' Complaint on Note and to Foreclose Mortgage exhibit C ][2] rise above my twenty-plus years of rights to and interest in my homestead and residence that I am going to sit by idle and be rendered homeless without a fight, and be rendered homeless on the strength of documents which, pursuant to the express terms of the 'Consent Order(s)" and "Consent Judgment" to which Ally *et al.* are parties, are **not** supposed to be presented and relied upon in any court, this Court included --- and yet again Ally chose otherwise. (see 'letter motion' dated March 7, 2014), and violates both the 'Consent Order' and 'Consent Judgment', and their own chapter 11 "Plan".

---

**2.** see Congressional Record online at: http://banking.senate.gov/public/index.cfm?Fuse Action=Files.View&FileStore_id=1c7f57c0-a25e-4c04-80cc-9ad8e65e0bea [last visited 03/25/2014] at p. 13 fn. 48  Deposition Jeffery Stephan December 10, 2009 - *GMAC Mortgage LLC v. Neu* - Case No. 50 2008 CA 040805XXXX MB, (noting that relevant hereto GMAC's exhibit C attached to the 'Complaint on Note and to Foreclose Mortgage' (letter-motion dated March 7, 2014) was signed by Jeffery Stephan just nineteen days before admitting in the FL deposition that all his documents are "robo-signed")

10.    As I understand and know it to be, pursuant to Ind. Code § 32-29-8-4, I am an "Interested Person and Omitted Party" in MF-187, GMAC Mortgage, LLC was obligated by both Indiana law and state trial rules to include me as a party in MF-187, and they chose otherwise. They were also required to join Fannie Mae's FHFA conservator, and they chose otherwise, and Ind. Tr. R. 17.1 required GMAC Mortgage LLC to join the State of Indiana, and they chose otherwise.

11.    As I understand the questions and issues presented to this Court in these proceedings, this is neither the venue nor the jurisdiction to argue and determine the veracity of the documents, the defenses and issues of MF-187, the questions and issues with compliance, non-compliance and/or the applicability of the "Consent Order(s) and/or the "Consent Judgment", the question before this Court is a narrow one, it is just not the question Ally presents. As I understand it, the question is --- [A]re the equitable powers of this Court available to Ally, *et al.* as a license to return to and engage in 'business as usual'? And I believe myself to know and understand that the answer is, "he who seeks equity, must himself do equity", and so no, with all due respect to this Court, Ally is simply not entitled to the relief they seek. I have not harmed nor caused injury or harm to Ally, Ally has done it to themselves. Maybe their shareholders should sue Ally like the shareholders of Walter investment and Fannie Mae are doing. I note from my research that Judge Robert E. Grossman (U.S. Dist. Bankr. E.D. NY), *In re Agard*, 444 BR 231 (2011), found that;

> MERS and its partners made the decision to create and operate under a business model that was designed in large part to avoid the requirements of the traditional mortgage recording process. This Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law.

7

and in *JP Morgan Chase Bank, Natl. Assn. v. Butler*, 2013 NY Slip Op 51050 (King's County

NY: Supreme Court 2013) Judge Schack found, "… it is FANNIE MAE'S roadmap of how to

inveigle and deceive a court" (*see* Fannie Mae Servicing Guide; online at: https://www.Fannie

mae.com/content/guide/svc031412.pdf [last visited 03/25/2014] that Chase, Ally, *et al.*, and

many of their industry counterparts all adhere to, and adhered to when conducting their mortgage

business, never mind state and federal law.  Which brings us to today –


   I swear and affirm under the penalties of perjury that the foregoing facts and
representations are true and within the best of my personal knowledge.


Dated: March 25, 2014


   Timothy J. Lahrman, *pro se*


### CERTIFICATE OF SERVICE

   I hereby certify that I am not an ECF/Pacer subscriber with access to electronic filing yet on
March 25, 2014, via U.S. Postal Service over-night prepaid Priority Mail Express (article # EK
077052772 US) I filed the foregoing pleading or paper with the Clerk of the Court who, by entering the
document into the CM/ECF system will cause to be sent a copy of this filing on all parties of record who
are registered in and subscriber to the CM/ECF system and identified to receive Notice in these
proceedings.


   Timothy J. Lahrman

# EXHIBIT A



At 64%, Ontario has the highest
percentage of post-secondary
ec



Feb. 27, 2014, 5:43 p.m. EST

# Walter Investment Management Facing Enforcement Action

**By Andrew R. Johnson And Alan Zibel , The Wall Street Journal**

Federal regulators plan to file a legal action against a unit of mortgage-servicing firm Walter Investment Management (NYSE:WAC) Corp. over alleged violations of consumer financial laws, the company said in a regulatory filing Thursday.

**Walter** said the Federal Trade Commission and Consumer Financial Protection Bureau advised Walter's Green Tree Servicing LLC on Feb. 20 that the agencies have sought authority to file an action and "negotiate a resolution" with the company over "alleged violations of various federal consumer financial laws."

"The company anticipates meeting with the staff in the near future to get a better understanding of the staff's concerns and to see if the matter can be resolved," Walter said in its annual report filed with the Securities and Exchange Commission.

Denmar Dixon, chief investment officer of Walter, said during a conference call Thursday that it expects the agencies' approval process to take about 30 days, after which "we should receive more specific information regarding the inquiry."

"We are very proud of the servicing standards we maintain," Mr. Dixon said.

The disclosure Thursday is the latest indication of the growing reach of federal and state probes into the mortgage-servicing industry.

Walter had previously disclosed that the CFPB notified Green Tree in October that the agency was considering taking action against the company. The FTC first issued a civil investigative demand to Green Tree in 2010, according to filings.

The CFPB has highlighted that the mortgage-servicing industry is one of its top concerns. The agency's deputy director, Steve Antonakes , issued a stern warning to an industry conference earlier this month, saying he was "deeply disappointed" with how the industry treats consumers and demanded improvements. "Business as usual has ended in mortgage servicing," Mr. Antonakes said.

The regulator said earlier this year that its examinations of servicers have revealed numerous problems in the industry, such as the failure to honor existing agreements to modify loans after the right to collect payments on a loan is transferred from one servicer to another.

New rules written by the CFPB that went into effect in January establish new responsibilities for servicers, including requirements for evaluating borrowers' loan-assistance applications. The regulator has the authority to examine whether mortgage servicers are complying with these rules and could penalize those who aren't.

The CFPB and state officials reached a $2.1 billion settlement in December with mortgage servicer Ocwen Financial (NYSE:OCN) Corp. over allegations it charged unauthorized fees, failed to credit borrowers' mortgage payments in a timely fashion, and improperly imposed expensive insurance policies, among other problems. Ocwen didn't admit to or deny the allegations. And in 2012, five large banks reached a $25 billion foreclosure-abuse settlement that imposed new standards for industry practices.

The New York Department of Financial Services earlier this month halted a deal in which Ocwen had agreed to acquire the rights to service $39 billion of mortgages from Wells Fargo (NYSE:WFC) & Co., citing concerns about Ocwen's ability to handle more loans.

The company, along with Walter and competing servicer Nationstar Mortgage Holdings (NYSE:NSM) Inc., has grown rapidly in recent years by acquiring servicing portfolios from banks that have scaled back in the business.

Write to Andrew R. Johnson at andrewr.johnson@wsj.com and Alan Zibel at alan.zibel@wsj.com

Copyright © 2014 MarketWatch, Inc. All rights reserved.
By using this site, you agree to the Terms of Service, Privacy Policy, and Cookie Policy.

Intraday Data provided by SIX Financial Information and subject to terms of use. Historical and current end-of-day data provided by SIX Financial Information. Intraday data delayed per exchange requirements. S&P/Dow Jones Indices (SM) from Dow Jones & Company, Inc. All quotes are in local exchange time. Real time last sale data provided by NASDAQ. More information on NASDAQ traded symbols and their current financial status. Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. S&P/Dow Jones Indices (SM) from Dow Jones & Company, Inc. SEHK intraday data is provided by SIX Financial Information and is at least 60-minutes delayed. All quotes are in local exchange time.

# EXHIBIT B

An official website of the United States Government 🇺🇸                                      Español

  cfpb Consumer Financial Protection Bureau

Contact us **(855) 411-2372**

[ Search ]

| HOME | INSIDE THE CFPB | GET ASSISTANCE | PARTICIPATE | LAW & REGULATION | SUBMIT A COMPLAINT |

HOME > NEWSROOM
> CFPB, STATE AUTHORITIES ORDER OCWEN TO PROVIDE $2 BILLION IN RELIEF TO HOMEOWNERS FOR SERVICING WRONGS

DEC 19 2013



# CFPB, State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners for Servicing Wrongs

*Largest Nonbank Servicer Will Also Refund $125 Million to Foreclosure Victims and Adhere to Significant New Homeowner Protections*

**WASHINGTON, D.C.** — Today, the Consumer Financial Protection Bureau (CFPB), authorities in 49 states, and the District of Columbia filed a proposed court order requiring the country's largest nonbank mortgage loan servicer, Ocwen Financial Corporation, and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in principal reduction to underwater borrowers. The consent order addresses Ocwen's systemic misconduct at every stage of the mortgage servicing process. Ocwen must also refund $125 million to the nearly 185,000 borrowers who have already been foreclosed upon and it must adhere to significant new homeowner protections.

"Deceptions and shortcuts in mortgage servicing will not be tolerated," said CFPB Director Richard Cordray. "Ocwen took advantage of borrowers at every stage of the process. Today's action sends a clear message that we will be vigilant about making sure that consumers are treated with the respect, dignity, and fairness they deserve."

**The proposed Ocwen Consent Order is available at:**
http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ocwen.pdf

Ocwen, a publicly traded Florida corporation headquartered in Atlanta, Ga., is the largest nonbank mortgage servicer and the fourth-largest servicer overall in the United States. As a mortgage servicer, it is responsible for collecting payments from the mortgage borrower and forwarding those payments to the owner of the loan. It handles customer service, collections, loan modifications, and foreclosures.

Ocwen specializes in servicing subprime or delinquent loans and places a major emphasis on resolving delinquency through loss mitigation or foreclosure. In recent years, it has acquired competitors – including Homeward Residential Holdings LLC (formerly American Home Mortgage Servicing Inc.) and Litton Loan Servicing LP. It has also acquired the mortgage servicing rights from the portfolios of some of the country's largest banks.

The CFPB is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act which protects consumers from unfair, deceptive, or abusive acts or practices by mortgage servicers – whether they are a bank or nonbank. State financial regulators, state attorneys general, and the CFPB uncovered substantial evidence that Ocwen violated state laws and the Dodd-Frank Act.

In early 2012, examinations by the Multistate Mortgage Committee, which is comprised of state financial regulators, identified potential violations at Ocwen. In addition, the Federal Trade Commission referred its investigation of Ocwen to the CFPB after the

**Receive press releases by email**

Email address

[ SIGN UP ]

**More Information On**

Press Release    Enforcement

Mortgages

  cfpb Consumer Financial Protection Bureau

Need our logo? You can find it here.

**Photos and bios**

  



Director Rich      Deputy Director
Cordray            Steven
                   Antonakes

**Press contacts**

Jen Howard
Assistant Director of Communications
(202) 435-7170
Jennifer.Howard@cfpb.gov

Walter Suskind
Press Assistant
(202) 435-9469
Walter.Suskind@cfpb.gov

Mallory McLean
Regional Spokesperson

CFPB, State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners for ...     Page 2 of 4
1714-2020-mg    Doc 6715    Filed 03/28/14    Entered 03/28/14 12:16:26    Main Document
Pg 13 of 49

Bureau opened in July 2011. The Bureau then teamed with state attorneys general and state regulators to investigate and resolve the issues identified. Today's settlement is a multi-jurisdictional collaborative effort.

# Borrowers Pushed into Foreclosure by Servicing Errors

The CFPB and its partner states believe that Ocwen was engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process. According to the complaint filed in the federal district court in the District of Columbia, Ocwen's violations of consumer financial protections put thousands of people across the country at risk of losing their homes. Specifically, the complaint says that Ocwen:

- **Took advantage of homeowners with servicing shortcuts and unauthorized fees:** Customers relied on Ocwen to, among other things, treat them fairly, give them accurate information, and appropriately charge for services. According to the complaint, Ocwen violated the law in a number of ways, including:
  - Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;
  - Charging borrowers unauthorized fees for default-related services;
  - Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; and
  - Providing false or misleading information in response to consumer complaints.

- **Deceived consumers about foreclosure alternatives and improperly denied loan modifications:** Struggling homeowners generally turn to mortgage servicers, the link to the owners of the loans, as their only means of developing a plan for payment. Ocwen failed to effectively assist, and in fact impeded, struggling homeowners trying to save their homes. This included:
  - Failing to provide accurate information about loan modifications and other loss mitigation services;
  - Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;
  - Providing false or misleading reasons for denying loan modifications;
  - Failing to honor previously agreed upon trial modifications with prior servicers; and
  - Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer.

- **Engaged in illegal foreclosure practices:** One of the most important jobs of a mortgage servicer is managing the foreclosure process. But Ocwen mishandled foreclosures and provided consumers with false information. Specifically, Ocwen is accused of:
  - Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and
  - Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.

## Remedies: Consumer Protections

Today's proposed court order will bar Ocwen from committing such violations in the future. It requires Ocwen to provide $125 million in refunds to foreclosed-upon

(202) 435-7955
Mallory.Mclean@cfpb.gov

Michelle Person
Spokesperson
(202) 435-7857
Michelle.Person@cfpb.gov

Sam Gilford
Spokesperson
(202) 435-7673
Samuel.Gilford@cfpb.gov

**Stay connected**

   

Twitter   Facebook   Flickr   Youtube

**Archive**

▼ 2014
  MARCH 2014 (11)
  FEBRUARY 2014 (11)
  JANUARY 2014 (12)
► 2013
► 2012
► 2011
► 2010

http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide...     3/25/2014

consumers and $2 billion in loan modification relief to its customers through principal
reduction. The refunds and relief also apply to consumers whose loans were previously
serviced by Homeward Residential Holdings and Litton Loan Servicing. According to
the proposed order, Ocwen must:

- **Provide $2 billion in relief to underwater borrowers:** Over a three-year
  period, Ocwen must complete sustainable loan modifications that result in
  principal reductions totaling $2 billion. For loan modification options, eligible
  borrowers may be contacted directly by Ocwen. Or borrowers may contact Ocwen
  to obtain more information about specific loan modification programs and to find
  out whether they may be impacted by this settlement. Ocwen can be reached at
  1-800-337-6695 or ConsumerRelief@Ocwen.com. If Ocwen fails to meet this
  commitment, it must pay a cash penalty in the amount of any shortfall to the
  CFPB and the states.

- **Provide $125 million in refunds to foreclosure victims:** Ocwen must
  refund $125 million to consumers whose loans were being serviced by Ocwen,
  Homeward Residential Holdings, or Litton Loan Servicing, and who lost their
  homes to foreclosure between Jan. 1, 2009 and Dec. 31, 2012. All eligible
  consumers who submit valid claims will receive an equal share of the $125
  million. Borrowers who receive payments will not have to release any claims and
  will be free to seek additional relief in the courts. Ocwen will also pay $2.3 million
  to administer the refund process. Eligible consumers can expect to hear from the
  settlement administrator about potential payments.

- **Stop robo-signing official documents:** Ocwen must ensure that facts
  asserted in its documents about borrowers' loans used in foreclosure and
  bankruptcy proceedings are accurate and supported by reliable evidence.
  Affidavits and sworn statements must be based on personal knowledge.

- **Adhere to significant new homeowner protections:** Ocwen must change
  the way it services mortgages to ensure that borrowers are protected from the
  illegal behavior that puts them in danger of losing their homes. To ensure this, the
  CFPB and the states are proposing that Ocwen follow the servicing standards set
  up by the 2012 National Mortgage Settlement with the five largest banks. Because
  of Ocwen's track record of problems handling the large volume of mortgage
  servicing rights it has quickly acquired in recent years, Ocwen is also being
  ordered to adhere to additional consumer protections, including how it manages
  transferred lans. Among other things, Ocwen must:
  - **Properly process pending requests:** For loans that are transferred to
    Ocwen, the company must determine the status of in-process loss mitigation
    requests pending within 60 days of transfer. Until then, Ocwen cannot start,
    refer to, or proceed with foreclosure.
  - **Honor previous loan modification agreements:** If the borrower has a
    loan modification agreement, Ocwen must honor it under the terms of the
    company that transferred the loan.
  - **Ensure continuity of contact for consumers:** Ocwen will have to
    ensure that consumers get regular and dependable assistance when they call
    for help. This includes requiring more than just a single point of contact
    assigned to each borrower, but also that other Ocwen employees with access
    to the borrower's information be available if the borrower wants to speak to
    someone immediately.
  - **Restrict servicing fees:** All servicing fees must be reasonable, bona fide,
    and disclosed in detail to borrowers. For example, Ocwen cannot collect any
    late fees if a loan modification application is under review or if the borrower
    is making timely trial modification payments.
  - **Notify consumers of loss mitigation options and restrict dual
    tracking:** Ocwen generally cannot refer a borrower's account to foreclosure

while the borrower's application for a loan modification is still pending. If the loan-modification request is denied, the borrower can appeal that decision and Ocwen cannot proceed to foreclosure until that appeal has been resolved.

In January 2013, the CFPB released new rules on mortgage servicing that will apply to every mortgage servicer. The standards that Ocwen must adhere to according to this court order are in addition to the protections offered to consumers under the new rules that take effect on Jan. 10, 2014. More information about the CFPB's new mortgage rules can be found at: consumerfinance.gov/mortgage.

A factsheet about the proposed order filed today can be found at:
http://files.consumerfinance.gov/f/201312_cfpb_factsheet_ocwen.pdf

Common consumer questions and answers about the order can be found at:
http://files.consumerfinance.gov/f/201312_cfpb_common-questions_ocwen.pdf

A copy of the Ocwen complaint that the CFPB and state attorneys general filed today can be found at:
http://files.consumerfinance.gov/f/201312_cfpb_complaint_ocwen.pdf

The complaint is not a finding or ruling that the defendants have actually violated the law. The proposed federal court order will have the full force of law only when signed by the presiding judge.

###

*The Consumer Financial Protection Bureau is a 21st century agency that helps consumer finance markets work by making rules more effective, by consistently and fairly enforcing those rules, and by empowering consumers to take more control over their economic lives. For more information, visit consumerfinance.gov.*

Updated on March 4, 2014:

The Ocwen consent judgment entered by the court can be found at:
http://files.consumerfinance.gov/f/201403_cfpb_entered-judgment-with-exhibits_ocwen.pdf

---



Privacy policy and legal notices    USA.gov

Accessibility                       Office of Inspector General    

Plain writing                       Ombudsman                      Visite nuestro sitio web en español

No FEAR Act

FOIA

Contact us    Newsroom    Jobs    Open government

# EXHIBIT C



Federal Housing Finance Agency
Office of Inspector General

# FHFA's Oversight of the Servicing Alignment Initiative

Evaluation Report • EVL–2014–003 • February 12, 2014



**Synopsis**

February 12,
2014

# FHFA's Oversight of the Servicing Alignment Initiative

## Why OIG Did This Report

During the financial crisis which started in 2007, delinquencies on mortgage loans owned or guaranteed by Fannie Mae and Freddie Mac (the Enterprises) increased rapidly. Many mortgage servicers – private companies contracted by the Enterprises to service their mortgages – did not respond effectively to the surge in delinquencies. For example, servicers often failed to assist financially distressed borrowers to secure Enterprise-sponsored loan modifications that would create more affordable mortgage payments. Consequently, many such borrowers ultimately lost their homes through foreclosure. Moreover, the Enterprises themselves likely incurred additional losses due to their servicers' failure to execute consistently their contractual responsibilities with respect to delinquent borrowers.

As the Enterprises' conservator, the Federal Housing Finance Agency (FHFA or Agency) established the Servicing Alignment Initiative (SAI) in April 2011 to improve the servicers' performance and thereby limit the Enterprises' financial losses.

SAI consists of a series of FHFA directives that set forth contractual requirements that the Enterprises must incorporate into their servicing guidelines. Servicers must comply with these guidelines when managing the accounts of financially distressed borrowers. For example, servicers are required to respond to borrowers' requests for assistance within specified timeframes, and conduct loan modifications and foreclosures pursuant to procedures and deadlines prescribed by FHFA.

We commenced this evaluation to assess FHFA's oversight of SAI since the establishment of the program in 2011. Specifically, we assessed FHFA's monitoring of the Enterprises' servicers' compliance with SAI guidelines.

## What OIG Found

*FHFA's Monitoring of Enterprise Servicers' Compliance with SAI is Limited*

FHFA's Division of Housing Mission and Goals (DHMG), which established SAI, has primary responsibility within the Agency for overseeing SAI and servicer compliance with its requirements. Therefore, DHMG staff reviewed the Enterprises' servicing guidelines prior to their publication in 2011 to ensure that they incorporated FHFA's SAI-related directives. DHMG also periodically communicates with other FHFA divisions and units with respect to the implementation of the SAI program.

However, DHMG's SAI oversight has significant limitations. Specifically, since establishing the program in 2011, DHMG has neither reviewed nor evaluated the servicers' overall compliance with SAI's numerous requirements. Moreover, DHMG does not require the Enterprises to submit for its routine review and assessment their critical reports on servicer compliance with SAI's requirements. Consequently, DHMG has not determined whether the servicers are complying with SAI or if the initiative is achieving its intended purpose.



## Synopsis

February 12, 2014

We analyzed the reports by which the Enterprises monitor their servicers' compliance with SAI. The reports identified servicer compliance deficiencies in key SAI areas such as responding to borrower requests for assistance and executing loan modifications. DHMG has not received these reports on a regular basis. Consequently, DHMG has missed opportunities to learn about servicer compliance deficiencies that could undermine SAI's effectiveness. It has also compromised FHFA's ability to oversee the Enterprises' efforts to correct their servicers' SAI compliance deficiencies.

## What OIG Recommends

We recommend that DHMG's Deputy Director:

1. Establish an ongoing process to evaluate servicers' SAI compliance and the effectiveness of the Enterprises' remediation efforts;

2. Direct the Enterprises to provide routinely their internal reports and reviews for DHMG's assessment; and

3. Regularly review SAI-related guidelines for enhancements or revisions, as necessary, based on servicers' actual versus expected performance.

# TABLE OF CONTENTS ...................................................................

ABBREVIATIONS ........................................................................................5

PREFACE .....................................................................................................6

CONTEXT .....................................................................................................8

    Servicers Are Required to Manage Enterprise Mortgages in Compliance with the
Enterprises' Servicing Guidelines ..............................................................................8

    Many of the Enterprises' Servicers Failed to Properly Manage Delinquent Borrower
Accounts During the Financial Crisis...........................................................................9

    FHFA Established SAI to Address Enterprise Servicer Deficiencies in the
Management of Delinquent Mortgages .........................................................................10

        FHFA's Initial SAI Directive ..........................................................................11

        FHFA's Subsequent SAI Directives.................................................................12

        FHFA's Servicer Performance Goals ...............................................................12

        FHFA's Examination of the Enterprises' Implementation of SAI .................................13

FINDINGS ....................................................................................................14

    1.    DHMG's SAI and Servicer Oversight Program is Limited ...............................14

    2.    Enterprise Reports Indicate Considerable Servicer Non-Compliance with SAI's
Requirements ......................................................................................15

CONCLUSION................................................................................................17

RECOMMENDATIONS ....................................................................................17

OBJECTIVE, SCOPE, AND METHODOLOGY .......................................................18

APPENDIX A .................................................................................................19

    FHFA's Comments on OIG's Findings and Recommendations ...............................19

APPENDIX B .................................................................................................23

    OIG's Response to FHFA's Comments ........................................................23

ADDITIONAL INFORMATION AND COPIES .......................................................25

## ABBREVIATIONS ...............................................................

| | |
|---|---|
| BRP | Borrower Response Package |
| DER | FHFA Division of Enterprise Regulation |
| DHMG | FHFA Division of Housing Mission and Goals |
| Enterprises | Fannie Mae and Freddie Mac |
| Fannie Mae | Federal National Mortgage Association |
| FHFA or Agency | Federal Housing Finance Agency |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| GPRMA | Government Performance and Results Modernization Act of 2010 |
| OIG | Federal Housing Finance Agency Office of Inspector General |
| QRPC | Quality Right Party Contact |
| SAI | Servicing Alignment Initiative |

## PREFACE .................................................................

The Enterprises support the secondary market by purchasing mortgages that meet their underwriting standards from originators such as banks or thrifts. Traditionally, the Enterprises hold these mortgages in their retained portfolios or package them into mortgage-backed securities that they sell to investors.

The Enterprises' servicers perform a variety of contractual functions on behalf of the Enterprises, including the management of accounts of borrowers who become delinquent on their mortgage obligations. In this regard, servicers are expected to assist such borrowers in obtaining foreclosure alternatives,[1] such as loan modifications[2] or short sales.[3] If a borrower cannot repay the mortgage and a foreclosure alternative cannot be completed, then the servicer is required to liquidate the mortgage through foreclosure.

Beginning in 2007, the U.S. financial crisis caused mortgage delinquencies to increase significantly in a relatively short period of time. However, many servicers did not respond in a timely way to financially distressed borrowers who requested assistance. In some cases, they failed to process loan modifications and foreclosures effectively. They also engaged in abusive practices that harmed borrowers; and the servicers' poor performance likely caused the Enterprises to incur financial losses.

In 2011, FHFA established SAI to improve mortgage servicing and limit Enterprise financial losses. It consisted of a series of contractual provisions that the Enterprises were required to incorporate into their servicing guidelines. For their part, servicers must comply with these guidelines in managing the accounts of financially distressed borrowers. For example, servicers are required to respond to borrowers' requests for assistance within specified timeframes, and conduct loan modifications and foreclosures pursuant to procedures and deadlines prescribed by FHFA. SAI also established a system of financial rewards and penalties to encourage servicer compliance with its terms.

Given SAI's importance to the matter of servicer performance, we initiated this evaluation to assess FHFA's oversight of it. Specifically, we assessed FHFA's monitoring of the Enterprises' servicers' compliance with SAI's requirements.

---

[1] Foreclosure alternatives include a payment plan, forbearance plan, loan modification, short sale, or deed-in-lieu of foreclosure.

[2] In a loan modification, the terms of a mortgage are modified to create a more affordable monthly payment for the borrower. Upon completion of the modification, the mortgage is brought to a current status.

[3] In a short sale, the borrower is permitted to avoid a completed foreclosure by selling the property for less than the payoff balance of the mortgage.

This evaluation was led by Christine Eldarrat, Senior Policy Advisor, with assistance from Brian Harris, Investigative Counsel; Desiree I-Ping Yang, Financial Analyst; and Irene Porter, Supervisory Auditor.  We appreciate the cooperation of everyone who contributed to this evaluation.  It has been distributed to Congress, the Office of Management and Budget, and others and will be posted on OIG's website, www.fhfaoig.gov.

Richard Parker
Deputy Inspector General for Evaluations

# CONTEXT ........................................................................

## Servicers Are Required to Manage Enterprise Mortgages in Compliance with the Enterprises' Servicing Guidelines

The Enterprises contract with servicers to manage the mortgages they own or guarantee. Upon origination a mortgage is transferred to a servicer. The servicer is often an affiliate of the lender that originated the mortgage.[4]  Figure 1 contains a list of the largest mortgage servicers.

Each Enterprise's servicing guidelines contains a list of duties that its servicers must carry out in order to fulfill their contractual obligations to the Enterprise. Figure 2, below, depicts the servicers' contractual relationship with the Enterprises.[6]

When a mortgage is performing, i.e., the borrower is making timely payments, then the servicing guidelines specify that the job of the servicer is to collect principal and interest payments from the borrower and remit them to the Enterprise. As compensation, the servicer retains a small percentage of the payment received from the borrower as a servicing fee.

The Enterprises' servicing guidelines also contain extensive instructions on the management of non-performing mortgages, i.e., those that are delinquent. These instructions cover activities such as contacting the borrower, managing bankruptcy cases, implementing foreclosure alternatives, and pursuing foreclosures.

**FIGURE 1.  TOP TEN ENTERPRISE MORTGAGE SERVICERS**

| Top Ten Enterprise Servicers as of October 2013 (alphabetical order)[5] |
| --- |
| 1.  Bank of America |
| 2.  CitiMortgage |
| 3.  Green Tree |
| 4.  JP Morgan Chase |
| 5.  Nationstar |
| 6.  Ocwen |
| 7.  PHH Mortgage |
| 8.  PNC Bank |
| 9.  US Bank |
| 10. Wells Fargo |

---

[4] However, not all servicers are affiliated with a lender. Some servicers purchase the mortgage servicing rights from lenders or other servicers and then service the underlying loans on behalf of the Enterprises.

[5] Source: Internal Enterprise reports based on the number of mortgages serviced.

[6] Fannie Mae's servicing guidelines (Fannie Mae Servicing Guide) can be found at https://www.fanniemae.com/singlefamily/servicing; Freddie Mac's servicing guidelines (Freddie Mac Single-Family Seller/Servicer Guide) can be found at http://www.freddiemac.com/singlefamily/service/.

**FIGURE 2. MORTGAGE SERVICING**

Performing (Current) Loan

- Homeowner submits mortgage payment to Servicer

- Servicer retains a portion of the mortgage payment as compensation
- Servicer forwards the principal and interest payment to the Enterprise

Borrower          Servicer          Enterprise




- Servicer communicates with delinquent borrowers as specified in the Enterprise's servicing guidelines
- This includes offering foreclosure alternatives and, if necessary, beginning the foreclosure process

- Enterprise issues servicing guidelines, including a section that instructs Servicer on how to service delinquent loans

Non-Performing (Delinquent) Loan

## Many of the Enterprises' Servicers Failed to Properly Manage Delinquent Borrower Accounts During the Financial Crisis

During the financial crisis, which started in 2007, there was a surge in the number of borrowers who became delinquent on mortgages owned or guaranteed by the Enterprises. In particular, the Enterprises' serious delinquency rates increased from a low of 0.92% (277,000 mortgages) in January 2008, to a peak of 4.93% (1,501,000 mortgages) in March 2010.[7]

In many cases, servicers failed to properly manage the surge in delinquencies. Specifically, servicers:

- Often did not timely respond to financially distressed borrowers' requests for assistance;

---

[7] Source: FHFA's Foreclosure Prevention Reports. The serious delinquency rate measures the percent of mortgages in the Enterprises' portfolios that are three or more payments late, including those mortgages that are in foreclosure and subject to disposition pursuant to bankruptcy proceedings.

- Failed to properly administer loan modifications such as Treasury's Home Affordable Modification Program (HAMP);[8]

- Engaged in "dual-tracking," which is the simultaneous pursuit of both a foreclosure alternative, such as a loan modification, and foreclosure for the same borrower;

- Lost critical borrower documents such as applications for foreclosure alternatives; and

- Did not meet the various legal requirements within the foreclosure process, which gave rise to abusive practices such as "robo-signing."[9]

This poor servicer performance had an adverse financial impact on the Enterprises. According to FHFA and the Enterprises, foreclosing upon a mortgage generally results in a greater credit loss than does sustaining a mortgage through a foreclosure alternative.[10] Thus, the servicers' failure to properly manage delinquent mortgages likely resulted in foreclosures in cases in which foreclosure alternatives would have served better the interest of the Enterprises and, by extension, the taxpayer. Conversely, in situations in which borrowers are unable to meet their obligations despite consideration of foreclosure alternatives, it is generally in the Enterprises' best financial interests for servicers to pursue foreclosure actions on a timely basis. Thus, the servicers' failure to pursue foreclosures pursuant to established timelines likely increased the Enterprises' related losses.[11]

### FHFA Established SAI to Address Enterprise Servicer Deficiencies in the Management of Delinquent Mortgages

In April 2011, FHFA established SAI to improve the servicers' management of delinquent mortgages and limit the Enterprises' associated losses. SAI contains uniform servicing requirements, compliance with which may be encouraged by monetary incentives and

---

[8] HAMP is Treasury's modification program under the Making Home Affordable Initiative that was announced by President Obama in February 2009. Both Enterprises offer HAMP and non-HAMP modifications. In all delinquency cases, the Enterprises must evaluate the borrower for a HAMP modification first.

[9] "Robo-signing" refers to a variety of practices, including: signing documents without verifying the information in them; forging an authorized signature on a document, e.g., the signature of a bank executive; misrepresenting the title of an authorized signer; and failing to comply with notary procedures as required by the relevant jurisdiction.

[10] When foreclosure occurs, the Enterprise seizes control of the property securing the mortgage and resells it to recover some of its credit and other related losses. While in the Enterprise's inventory, the foreclosed property may further increase the Enterprise's credit losses by, for example, further declining in value, and incurring maintenance, tax, and other expenses.

[11] When foreclosure becomes unavoidable, it is generally in the Enterprise's financial interest for it to be conducted as quickly as permitted by state laws and regulations. For example, a property that is not maintained properly during a lengthy foreclosure process may suffer a decline in value and bring a lower resale price.

penalties.[12]  DHMG[13] is primarily responsible for the oversight of SAI and the Enterprises' efforts to ensure that their servicers comply with its provisions.

### FHFA's Initial SAI Directive

In 2011 FHFA directed the Enterprises to update their servicing guidelines by adding new standards and timelines by which servicers were to manage delinquent mortgages.  The changes affected the following key areas, known as SAI work streams:

- **Borrower Contact and Delinquency Management** – Changes in this area aligned servicer requirements for: (1) contacting borrowers – including rules regarding collection calls, written communications, and quality right party contacts (QRPC);[14] (2) responding to borrower response packages (BRP);[15] (3) referring mortgages to foreclosure; and (4) reviewing and responding to borrower inquiries and complaints. In addition, they established incentives and penalties related to the receipt of completed BRPs.

- **Property Inspections** – Changes in this area aligned servicer requirements for ordering property inspections.  Servicers are required to identify and pay particular attention to vacant, tenant-occupied, and abandoned properties.

- **Foreclosure Timelines** – Changes in this area aligned state-level timelines for the processing of foreclosures from the date of referral to the attorney/trustee through the date of the foreclosure sale.  They also established compensatory fees for servicer non-compliance.

- **Standard Loan Modifications** – Changes in this area aligned requirements for a standard loan modification (a non-HAMP modification), including eligibility and documentation criteria, along with approval terms and conditions.  The changes established incentives for servicers to complete standard modifications.

---

[12] Additional remedies are available to the Enterprises when a servicer fails to meet its contractual obligations, including requiring the servicer to indemnify the Enterprise for losses or imposing a suspension.  Whether and when the Enterprises impose penalties or pursue remedies is outside the scope of this evaluation.

[13] DHMG is responsible for policy development and analysis, oversight of housing and regulatory policy, oversight of the mission and goals of the Enterprises, and the housing finance and community and economic development mission of the Federal Home Loan Banks.

[14] A QRPC occurs when a servicer identifies and discusses with a borrower, co-borrower, or trusted party, such as a housing counselor, the most appropriate options for resolving the delinquency.  During a QRPC the servicer:  establishes rapport with the borrower; determines the reason for delinquency, the occupancy status of, or intent to vacate, the mortgaged property; educates the borrower on alternatives to foreclosure; and obtains the borrower's commitment on the next steps.

[15] When a borrower seeks to avoid foreclosure and requests assistance, the servicer will require the borrower to submit a BRP.  Generally, a BRP includes a completed and signed *Uniform Borrower Assistance Form* (Fannie Mae/Freddie Mac Form 710) and documentation of the hardship, employment, and income.

The Enterprises revised their servicing guidelines to reflect these changes.

### FHFA's Subsequent SAI Directives

Beginning in January 2012, FHFA released four additional SAI directives over a period of 14 months. Each directive was focused on a specific SAI work stream, and the Enterprises modified their servicing guidelines accordingly.

- **Unemployment Forbearance** – This program allows a borrower to pay less than the payment required by the mortgage note for a defined period of time not to exceed six months. Upon completion of the plan, the borrower is required to bring the account current.

- **Short Sales** – This program allows a borrower to sell the property for less than the payoff balance of the mortgage to avoid a completed foreclosure.[16]

- **Deed-in-Lieu** – This program allows a borrower to convey the property to the mortgage holder to satisfy the mortgage and avoid foreclosure.

- **Streamlined Modification** – This program modifies the terms of the mortgage to create a more affordable payment for the borrower.

### FHFA's Servicer Performance Goals

FHFA's directives also established specific servicer performance goals to ensure improvements within the various SAI work streams.[17] For example, FHFA's initial directive contained at least 35 mandatory servicer activities and established a variety of performance goals by which the Enterprises could measure servicers' progress in achieving them. Figure 3 provides examples of some of those activities and goals.

---

[16] The payoff balance is the sum of the following: unpaid principal, accrued but unpaid interest, balance of tax and insurance escrows, and default-related expenses, e.g., attorney fees and costs, title costs, and property inspection fees.

[17] FHFA's establishment of such performance goals appears consistent with the Government Performance and Results Modernization Act of 2010 (GPRMA). GPRMA establishes the importance of setting performance goals that are objective, quantifiable, and measurable for significant federal agency activities. Furthermore, it establishes the importance of setting performance indicators to measure progress toward those goals and to assess actual results against expected performance. Finally, GPRMA identifies program evaluation as a means for assessing, through objective measurement and systematic analysis, the manner and extent to which federal programs achieve their intended objectives.

## FINDINGS...................................................................................................................

### 1. DHMG's SAI and Servicer Oversight Program is Limited

According to DHMG's Deputy Director, the division is primarily responsible for overseeing
SAI and servicer's compliance with the program's requirements and performance goals.
Therefore, in 2011 DHMG reviewed the SAI-related changes to their servicing guidelines
made by the Enterprises. DHMG has also communicated with other FHFA divisions
regarding SAI's implementation.

However, DHMG's SAI and servicer compliance oversight program has significant
limitations. In particular, DHMG has neither reviewed nor evaluated the servicers' overall
compliance with numerous SAI-related guidelines and performance goals even though they
have been in place since 2011.[20]  As a result, DHMG is not in a position to determine whether
SAI is achieving the intended objectives: improving the servicers' management of delinquent
accounts and limiting the Enterprises' losses. Neither is DHMG in a position to assess the
overall effectiveness of the Enterprises' initiatives to ensure that servicers correct identified
SAI compliance deficiencies.

Moreover, DHMG does not require the Enterprises to submit critical internal reports and
reviews on servicers' SAI compliance that would be of benefit to the division's oversight
program.[21]  Although DHMG periodically reviews some Enterprise reports on servicer
performance, these reports are of limited utility. For example, some provide aggregated
Enterprise financial information, but do not provide a sufficient understanding of servicers'
SAI compliance and progress in achieving their numerous performance goals.

---

[20] In August 2012, the Enterprises briefed DHMG on SAI's first year of operations. Based upon this
presentation, DHMG concluded that SAI was a success because "all major delinquency categories were
reduced with the implementation of SAI." However, DHMG's conclusion was not well-founded.

We reviewed the PowerPoint presentation provided to DHMG by the Enterprises in August 2012. It does not
contain evidence establishing a causal relationship between SAI and the decrease in defaults. We also
reviewed the Enterprise reports set forth in note 23, *infra*. They do not provide a basis from which to conclude
that SAI caused the decline in defaults, nor do they indicate that there has been consistent servicer compliance
with SAI.

[21] We believe that FHFA's failure to review and assess the information in these reports is inconsistent with its
responsibility under GPRMA to evaluate whether, and how well, SAI is meeting its intended objectives. *See*
footnote 17, *supra*.

## 2. Enterprise Reports Indicate Considerable Servicer Non-Compliance with SAI's Requirements

We reviewed reports that the Enterprises use to monitor[22] servicer compliance with SAI-related guidelines,[23] most of which are not provided routinely to DHMG. We identified the following potentially significant SAI compliance deficiencies:[24],[25]

- In October 2013, an Enterprise reported on the servicer quality reviews conducted that month for 18 of its servicers. Based upon these reviews, the Enterprise made 63 SAI non-compliance findings in multiple areas, including: untimely referrals to foreclosure and completed foreclosures; failure to solicit borrowers to consider foreclosure alternatives, and failure to respond timely to requests for foreclosure alternatives; and failure to complete loan modifications timely and document modifications sufficiently.

- In August 2012, an Enterprise's servicer performance scorecard[26] rated 34 of the top 35 servicers on components measured by the SAI servicer quality review. Twenty-five servicers received a rating of "satisfactory," while nine servicers received a rating of "needs significant improvement." In October 2013, 19 of the top 30 servicers were rated. Ten servicers received a rating of "satisfactory," four servicers received a rating of "needs improvement," and five servicers received a rating of "needs significant improvement" on their overall servicer quality review rating.

---

[22] The Enterprises conduct SAI-related servicer quality reviews of individual servicers. They include sampling loan-level data and documents from servicers. The results of a review allow the Enterprises to make a finding when there is evidence that the servicer failed to comply with one of the SAI guidelines. However, as detailed in our Findings, the Agency does not actively monitor the Enterprises' oversight of their servicers' compliance with SAI.

[23] We obtained the following reports from the Enterprises for our review:

Fannie Mae: Borrower Response Package Report; Compensatory Fee Reports; Lender Assessment of Risk and Controls Report; NSO Monthly Fact Book; NSO Performance Scorecard; Property Inspection Exception Report; SAI Call Center Metrics Report; Servicer Quality and Risk Review Report; SQR Remediation Reports; SQR Servicing Alignment Initiative Findings; and the STAR Program Performance Scorecard Report.

Freddie Mac: Borrower Response Package Monthly Progress Report; Operational Review; Program Compliance Review; Prudent Servicing Review; Servicer Performance Grid – Larger and Specialty Servicers Report; Servicing Account Plan Report; Servicing Quality Assurance Monthly Management Report; Single Family Servicing and REO – Monthly Performance Report and Financial Drivers Analysis; SPP Executive Summary Report; and the SPP Servicer Success Program Scorecard.

[24] We note, as discussed earlier, that the DER exams indicated the Enterprises were producing reports that allowed them to monitor servicers' performance and SAI compliance.

[25] Our observations of continued deficiencies in mortgage servicing are consistent with the Consumer Financial Protection Board's observations as identified in its September 2013 *Supervisory Highlights* report.

[26] The servicer performance scorecard is a high-level report that graphically represents servicers' progress toward achieving Enterprise targets or goals over time. A scorecard allows for performance monitoring and identification of less than acceptable performance.

DHMG's Deputy Director, who was appointed in March 2013, acknowledged in discussions with us that the division's past SAI oversight efforts have been limited. She emphasized that servicers' compliance with SAI and other Agency directives is of critical importance, and that she receives the Enterprises' monthly servicer scorecards. Further, she is seeking to strengthen DHMG's communications with other Agency divisions, such as DER, to ensure the successful implementation of FHFA's directives, including SAI.

Our review indicates that the monthly servicer scorecards are high-level summaries that, by themselves, do not present a complete picture of servicer performance. For example, a given servicer's scorecard would not reveal its poor implementation of foreclosure alternatives, such as short sales and loan modifications, or other such conduct; but such information is contained in the reports that the Enterprises compile to monitor their servicers' compliance with SAI's various requirements. DHMG, however, does not routinely receive these reports. Thus, vital information about the servicers' failure to comply with SAI's various requirements may have escaped the Agency's attention.

In any event, DHMG has not determined whether the servicers are complying with SAI or if the initiative is achieving its intended purposes: to improve servicer performance and limit the Enterprises' financial losses. Finally, there is no indication that DHMG sought or obtained information regarding any efforts by the Enterprises to address these issues.

We believe that, in order to ensure the success of its program, the Agency must actively monitor the Enterprises' oversight and enforcement of the provisions of SAI at the servicer level.

## CONCLUSION ........................................................................

FHFA's establishment of SAI in 2011 was a proactive effort to address widespread deficiencies in servicer management of delinquent mortgages. However, DHMG did not develop and implement a process to determine whether servicers were complying with the numerous requirements contained in the SAI-related servicing guidelines and meeting related performance goals. Moreover, DHMG does not require the Enterprises to provide certain internal reports and reviews that would likely benefit the division's SAI oversight program.

We believe it is critical that FHFA address this deficiency in its oversight process. Doing so would enable the Agency to identify and understand SAI compliance deficiencies and trends, ensure that corrective action is undertaken, assess the effectiveness of SAI, and make adjustments to the program as needed.

## RECOMMENDATIONS ........................................................................

We recommend that DHMG's Deputy Director:

1. Establish an ongoing process to evaluate servicers' SAI compliance and the effectiveness of the Enterprises' remediation efforts;

2. Direct the Enterprises to provide routinely their internal reports and reviews for DHMG's assessment; and

3. Regularly review SAI-related guidelines for enhancements or revisions, as necessary, based on servicers' actual versus expected performance.

# OBJECTIVE, SCOPE, AND METHODOLOGY ...................................

### Objective

The objective of this report was to assess FHFA's oversight of SAI.

To achieve this objective we reviewed all publicly available FHFA documents. In addition, we requested SAI-related documents from FHFA and the Enterprises. We interviewed or met with multiple individuals from FHFA, Fannie Mae, and Freddie Mac. Finally, we specifically requested all records maintained pursuant to the SAI charter.

### Scope

This survey covers FHFA's implementation and oversight of SAI during the period of January 1, 2011, through October 31, 2013.

### General Methodology

We evaluated FHFA's oversight of SAI using the principles detailed in the Government Performance and Results Modernization Act of 2010 (GPRMA) and the SAI charter.

In conducting this evaluation, we also considered:

- FHFA's Strategic Plans, Performance Goals, and Performance Measures
- FHFA's Conservatorship Strategic Plans and Scorecards
- Fannie Mae's SAI-Related Servicer Performance Reports
- Freddie Mac's SAI-Related Servicer Performance Reports

This evaluation was conducted under the authority of the Inspector General Act of 1978, as amended, and in accordance with the *Quality Standards for Inspection and Evaluation*, which were promulgated by the Council of the Inspectors General on Integrity and Efficiency. These standards require OIG to plan and perform an evaluation that obtains evidence sufficient to provide a reasonable basis to support the findings and recommendations made in it. We believe that the finding and recommendations discussed in this report meet these standards.

# APPENDIX A .................................................................

## FHFA's Comments on OIG's Findings and Recommendations

 **Federal Housing Finance Agency**

### MEMORANDUM

**DATE:** February 11, 2014

**TO:** Richard Parker, Deputy Inspector General for Evaluations
FHFA Office of Inspector General

**FROM:** Sandra Thompson, Deputy Director
Division of Housing Mission and Goals

**SUBJECT:** Evaluation of FHFA's Oversight of the Servicing Alignment Initiative

This memorandum transmits the Federal Housing Finance Agency's (FHFA) management response to the findings and recommendations contained in the above referenced evaluation report (Report). We appreciate the opportunity to clarify FHFA activities related to the Servicing Alignment Initiative (SAI).

### The Roles of FHFA, the Division of Housing and Regulatory Policy, the Division of Enterprise Regulation and the Enterprises in SAI Oversight

#### FHFA and the Enterprises
FHFA serves as the primary regulator for the Enterprises. The legislative authority to oversee the Enterprises does not extend to oversight of the servicers. Consequently, FHFA is not in a position to perform any supervisory activities or directly monitor the servicers. While the Enterprises have negotiated agreements with servicers that allow FHFA's Division of Enterprise Regulation to access some servicer information, this access exists only as an outgrowth of FHFA's regulatory authority over the Enterprises to assure their safe and sound operation.

FHFA, as conservator, has the authority to make decisions affecting the Enterprises. However, the Agency has delegated responsibility for most business decisions back to the Enterprises. Under FHFA's delegation of authority, responsibility for overseeing servicer compliance with Enterprise policies rests with the Enterprises.

#### The Division of Housing Mission and Goals and the Division of Enterprise Regulation
One of the primary roles of FHFA's Division of Housing Mission and Goals (DHMG), and specifically DHMG's Office of Housing and Regulatory Policy (OHRP), is to maintain an awareness of, review changes to and identify areas for improvement of Enterprise selling and servicing policies. When a need is identified, OHRP works with the Enterprises to develop policy, which is implemented by the Enterprises through changes to their selling and servicing guides.

February 11, 2014    Page 2

DHMG's role in policy development is distinctly and intentionally separated from FHFA's supervisory oversight activities. DHMG informs the Division of Enterprise Regulation (DER) of policy changes throughout the policy making process. Based on that information, DER can assess the risks and status of implementation in order to determine the appropriate supervisory approach to the matter at an appropriate future date. This typically results in ongoing monitoring activities to assess the Enterprises' implementation plans and execution, which may then result in onsite examination work. DER followed this process in its oversight of the rollout of SAI.

DER is responsible for supervision of the Enterprises to ensure they operate in a safe and sound manner. As OIG states in its Report, DER reviewed and found that Enterprise controls over SAI requirements were adequate. The servicer deficiencies noted in the OIG Report are all deficiencies that were identified by the Enterprises as part of their existing compliance function.

**DHMG has and continues to fulfill its role in directing the Enterprises' policy and programmatic changes and improvements**

In addition to monthly servicer scorecards reviewed by DHMG's Deputy Director, OHRP subject matter experts receive and review specific monthly and quarterly reports from the Enterprises. This information, along with feedback from meetings with the Enterprises, stakeholders and other federal regulators, is used as a basis to determine if additional policy work is necessary. A few examples that demonstrate the effectiveness of this process include changes to Short Sale and Deed-in-Lieu policies and creation of the Streamlined Modification Program. These loss mitigation enhancements were made after the original implementation of SAI.

- **Short Sale and Deed-in-Lieu Policies** – After completion of an overhaul of the home retention option, standard modification, it became apparent that the servicer struggled to offer borrowers a suitable liquidation alternative. Across the two Enterprises there were four short sales and two deed-in-lieu offerings, each with their own distinct sets of rules and terms. FHFA applied the general SAI principles of streamlining and simplifying to these programs to make it easier and faster for borrowers to resolve their delinquencies. These changes were made because OHRP has an established process to identify where policy changes are needed.

- **Streamlined Modification Initiative** – Announced on March 27, 2013, this new modification program requires no borrower hardship or financial documentation. FHFA worked with the Enterprises to introduce the new program after conducting continuous assessment of Standard Modification uptake and determining that a uniform approach and a streamlined borrower application with simpler rules was not sufficient to assist all delinquent borrowers. In fact, the borrower challenges associated with compiling the required documentation was the persistent problem that needed to be addressed. Removing the administrative barriers associated with document collection and servicer evaluation enabled significantly more borrowers to access the available options to keep their homes.

OHRP and the Enterprises continued SAI policy discussions throughout 2013, which culminated in changes to Enterprise servicing guides to adapt relevant parts of SAI guidance to new Consumer Finance Protection Bureau (CFPB) regulations.

## OIG Report Footnotes

We appreciate that, in Footnote 17, OIG refers to the GPRA Modernization Act of 2010 (GPRAMA). The actual performance goals (2.1.2 and 2.1.3) and means to assess them related to foreclosure prevention and loan modification activities (SAI) are contained on pages 17 and 18 of FHFA's Annual Performance Plan for 2014. DHMG reports on these goals on a quarterly basis as required by GPRAMA.

In Footnote 20 the Report infers that DHMG determined SAI was a success based solely on delinquency data provided by the Enterprises when, in fact, DHMG was noting that the data was one indicator perceived to show SAI was successful. DHMG's actual response to the question of whether it considered SAI a success, in full stated: "Yes. In August 2013, both Enterprises provided FHFA with one year statistics. The data demonstrated that for both Enterprises all major delinquency categories were reduced with the implementation of SAI. FHFA continues to meet with the Enterprises on a weekly basis to review and improve upon the SAI policies. Another perceived success measure is that both the upcoming CFPB Regulation X servicing rules and the AG settlement rules are aligned with existing SAI policy."

## Report Recommendations and FHFA Responses

OIG recommends that DHMG's Deputy Director:

1. Establish an ongoing process to evaluate servicers' SAI compliance and the effectiveness of the Enterprises' remediation efforts.

   **FHFA Response**: FHFA partially agrees with this recommendation. DHMG, through its OHRP servicing team, will continue current practices which include periodic review of reports and dialogue with the Enterprises, stakeholders, other regulatory agencies and DER to determine if and when additional changes to servicing policies are necessary. DER will continue to monitor the Enterprises' controls over servicer compliance with their guides either as part of its overall examination plan or through targeted monitoring. FHFA will provide to OIG copies of SAI steering committee meeting notes by February 15, 2015.

2. Direct the Enterprises to provide routinely their internal reports and reviews for DHMG's assessment.
   **FHFA Response**: FHFA partially agrees with this recommendation. As stated above, DHMG management and subject matter experts review certain reports relevant to servicing activity, many of which are contained in a larger set of reports the Enterprises submit to DER. DHMG will continue its practice of reviewing reports in combination

February 11, 2014    Page 4

with other activities related to servicing policy.  FHFA will provide to OIG an updated
list of the reports DHMG reviews by February 15, 2015.

3.  Regularly review SAI related guidelines for enhancements or revisions, as necessary,
based on servicers' actual versus expected performance.

**FHFA Response**: FHFA partially agrees with this recommendation. The fact that a
servicer does not comply with a guideline does not mean the guideline is problematic.
DHMG will continue to engage in policy review as necessary and consider implications
of servicer performance when reviews are completed by the Enterprises.  FHFA will
provide to OIG copies of SAI steering committee meeting notes by February 15, 2015.

# APPENDIX B.....................................................................................

## OIG's Response to FHFA's Comments

Although FHFA states that it "partially agrees" with our three recommendations, we believe the response indicates that the Agency does not plan to alter substantively its limited oversight of SAI. FHFA claims that it lacks authority to assess servicer compliance with SAI – a program that it established in order to improve servicer performance and thereby limit the Enterprises' financial losses. We find FHFA's arguments for maintaining its current approach to be unpersuasive as described below.

### OIG's Response to FHFA Comments on its Lack of Regulatory Authority Over Servicers

FHFA's position is that it does not directly regulate the Enterprises' servicers, and that it has delegated to the Enterprises the responsibility to ensure that their servicers comply with SAI.

We understand that FHFA does not directly regulate servicers, but that fact is irrelevant to the oversight deficiencies we identify in this report. FHFA established SAI and prescribed the standards that servicers must meet in fulfilling their contracts with the Enterprises. FHFA's delegation of day-to-day SAI implementation responsibilities to the Enterprises does not absolve FHFA of its responsibility to determine whether SAI is having the desired impact on servicer performance.

### OIG's Response to FHFA's Comments on DHMG's and DER's Roles in SAI Oversight

FHFA has narrowly defined the roles of DHMG and DER with respect to SAI. According to FHFA, DHMG's role was to develop SAI, the implementation of which was left to the Enterprises, while DER's role is limited to reviewing the Enterprises' controls over SAI. Thus, no unit within FHFA is monitoring the servicers' compliance with SAI and determining whether it is having the desired impact on servicer performance.

### OIG's Response to FHFA's Planned Actions on the Draft Report's Recommendations

*Recommendation 1*: FHFA's response indicates that it plans to continue its current oversight approach with regard to SAI.

*OIG Response:* As described in the report, we believe FHFA's ongoing activities are insufficient. For example, the Agency has not compared servicer performance against the SAI work stream goals, even though SAI has been in effect for nearly three years. Moreover, FHFA has offered no plan for assessing the effectiveness and success of SAI.

*Recommendation 2*:  The Agency states that it receives certain Enterprise reports relevant to servicing activity and will continue to review them; it appears unwilling to review the additional reports we have identified.

*OIG Response*:  As we stated, the reports to which FHFA confines its oversight are insufficient to the task.  The additional reports we identified are important; for example, they highlight significant servicer compliance deficiencies, such as failing to respond timely to requests for foreclosure alternatives.  We believe FHFA should obtain these reports so that it may effectively evaluate servicers' SAI compliance and, by extension, the impact of SAI.

*Recommendation 3*:  FHFA stated that the fact a servicer does not comply with a guideline does not mean the guideline itself is problematic.

*OIG Response*:  We agree that a servicer's failure to comply with a guideline does not necessarily mean that the guideline is problematic.  However, we believe that by reviewing the guidelines and servicer compliance FHFA may be better able to determine whether any enhancements to the guidelines are necessary.

# ADDITIONAL INFORMATION AND COPIES.................................

For additional copies of this report:

- Call:  202–730–0880
- Fax:  202–318–0239
- Visit:  www.fhfaoig.gov

To report potential fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

- Call:  1–800–793–7724
- Fax:  202–318–0358
- Visit:  www.fhfaoig.gov/ReportFraud
- Write:

  FHFA Office of Inspector General
  Attn: Office of Investigation – Hotline
  400 Seventh Street, S.W.
  Washington, DC  20024

# EXHIBIT D

Paying Agent – Rust Consulting, Inc.
P.O. Box 3037
Faribault, MN 55021-2637

**An important message directed by the Board of Governors of the Federal Reserve System**

FIRST-CLASS MAIL
U.S. POSTAGE
**PAID**
Rust Consulting, Inc.

**PERSONAL & CONFIDENTIAL**
**DO NOT DISCARD**
**PLEASE OPEN IMMEDIATELY**

**E**

*1001923978-UPPN*

B105014

********** SNGLP
CYNTHIA S DAMRON
3004 GARDEN BLVD
ELKHART, IN 46517-2646

# Attention

**You are eligible for compensation pursuant to orders issued by Federal Banking Regulators.**

**Atención:**

**Usted es elegible para obtener una compensación según órdenes emitidas por los reguladores federales de la banca.**

**PLEASE DO NOT DISCARD - OPEN NOW FOR MORE INFORMATION**

**PLEASE WATCH YOUR MAIL**

You are eligible to receive a payment as the result of an agreement between GMAC Mortgage, LLC and the Federal Reserve Board—announced in July. This payment is related to an enforcement action regarding deficiencies in the mortgage servicing and foreclosure processes of GMAC Mortgage, LLC. Payment will be made by the paying agent—Rust Consulting, Inc.

**You should expect a check or additional information about your payment to be mailed by Rust Consulting by the end of January 2014. Please watch your mail.** If your mailing address is different than the one pre-printed on this card or you move, please contact Rust Consulting at 1-888-952-9105 to update your mailing address.

Only Rust Consulting will contact you regarding your check or to request additional information if required to process your payment. Always use caution when providing personal information.

If you have questions, you may call toll free at 1-888-952-9105 or visit

www.independentforeclosurereview.com

www.federalreserve.gov

Si tiene preguntas, puede llamar al número de teléfono 1-888-952-9105 para hablar con un representante.

Assistance is also available from the toll-free number in more than 200 languages, including Chinese, Korean, Vietnamese, Tagalog, Hmong, and Russian.

| 提供中文帮助。 | Trợ giúp hiện có bằng tiếng Việt. | Peb muaj cov neeg hais lus Hmoob pab nej. |
| 한국어 도움을 제공합니다. | Available ang tulong sa wikang Tagalog. | Помощь на русском языке. |

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
RESIDENTIAL CAPITAL, LLC, et al.,       :
                                        :
                    Debtors-Plaintiffs, :      12 Civ. 5116 (DLC)
                                        :
        -v-                             :           ORDER
                                        :
FEDERAL HOUSING FINANCE AGENCY,         :      Also filed in
                                        :      11 Civ. 5201 (DLC)
                    Defendant.          :
                                        :
----------------------------------------X

DENISE COTE, District Judge:

     Plaintiffs Residential Capital, LLC and related debtor

entities (collectively, "ResCap") have moved pursuant to 11

U.S.C. § 105 to enjoin the defendant from pursuing litigation

against ResCap's non-debtor corporate affiliates, including Ally

Financial, Ally Securities and GMACM Group (the "Ally

Defendants").  In the alternative, ResCap seeks a judicial order

bringing the Ally Defendants within the coverage of the

Bankruptcy Code's Automatic Stay.  See 11 U.S.C. § 360(a).  For

the reasons stated on the record during a conference with the

parties on July 17, 2012, it is hereby

Case 1:12-cv-05116-DLC   Document 28   Filed 07/17/12   Page 2 of 2

ORDERED that the motion is denied.  The Clerk of Court is
directed to close this case.


        SO ORDERED:

Dated:    New York, New York
          July 17, 2012

                                    _____
                                         DENISE COTE
                              United States District Judge

2

# EXHIBIT F

U.S. DEPARTMENT OF THE TREASURY

# Press Center

**Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers**

9/7/2008
hp-1129

**Washington, DC--** Good morning. I'm joined here by Jim Lockhart, Director of the new independent regulator, the Federal Housing Finance Agency, FHFA.

In July, Congress granted the Treasury, the Federal Reserve and FHFA new authorities with respect to the GSEs, Fannie Mae and Freddie Mac. Since that time, we have closely monitored financial market and business conditions and have analyzed in great detail the current financial condition of the GSEs -- including the ability of the GSEs to weather a variety of market conditions going forward. As a result of this work, we have determined that it is necessary to take action.

Since this difficult period for the GSEs began, I have clearly stated three critical objectives: providing stability to financial markets, supporting the availability of mortgage finance, and protecting taxpayers -- both by minimizing the near term costs to the taxpayer and by setting policymakers on a course to resolve the systemic risk created by the inherent conflict in the GSE structure.

Based on what we have learned about these institutions over the last four weeks -- including what we learned about their capital requirements -- and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form.

The four steps we are announcing today are the result of detailed and thorough collaboration between FHFA, the U.S. Treasury, and the Federal Reserve.

We examined all options available, and determined that this comprehensive and complementary set of actions best meets our three objectives of market stability, mortgage availability and taxpayer protection.

Throughout this process we have been in close communication with the GSEs themselves. I have also consulted with Members of Congress from both parties and I appreciate their support as FHFA, the Federal Reserve and the Treasury have moved to address this difficult issue.

Before I turn to Jim to discuss the action he is taking today, let me make clear that these two institutions are unique. They operate solely in the mortgage market and are therefore more exposed than other financial institutions to the housing correction. Their statutory capital requirements are thin and poorly defined as compared to other institutions. Nothing about our actions today in any way reflects a changed view of the housing correction or of the strength of other U.S. financial institutions.

I support the Director's decision as necessary and appropriate and had advised him that conservatorship was the only form in which I would commit taxpayer money to the GSEs.

I appreciate the productive cooperation we have received from the boards and the management of both GSEs. I attribute the need for today's action primarily to the inherent conflict and flawed business model embedded in the GSE structure, and to the ongoing housing correction. GSE managements and their Boards are responsible for neither. New CEOs supported by new non-executive Chairmen have taken over management of the enterprises, and we hope and expect that the vast majority of key professionals will remain in their jobs. I am particularly pleased that the departing CEOs, Dan Mudd and Dick Syron, have agreed to stay on for a period to help with the transition.

I have long said that the housing correction poses the biggest risk to our economy. It is a drag on our economic growth, and at the heart of the turmoil and stress for our financial markets and financial institutions. Our economy and our markets will not recover until the bulk of this housing correction is behind us. Fannie Mae and Freddie Mac are critical to turning the corner on housing. Therefore, the primary mission of these enterprises now will be to proactively work to increase the availability of mortgage finance, including by examining the guaranty fee structure with an eye toward mortgage affordability.

To promote stability in the secondary mortgage market and lower the cost of funding, the GSEs will modestly increase their MBS portfolios through the end of 2009. Then, to address systemic risk, in 2010 their portfolios will begin to be gradually reduced at the rate of 10 percent per year, largely through natural run off, eventually stabilizing at a lower, less risky size.

Treasury has taken three additional steps to complement FHFA's decision to place both enterprises in conservatorship. First, Treasury and FHFA have established Preferred Stock Purchase Agreements, contractual agreements between the Treasury and the conserved entities. Under these agreements, Treasury will ensure that each company maintains a positive net worth. These agreements support market stability by providing additional security and clarity to GSE debt holders -- senior and subordinated -- and support mortgage availability by providing additional confidence to investors in GSE mortgage backed securities. This commitment will eliminate any mandatory triggering of receivership and will ensure that the conserved entities have the ability to fulfill their financial obligations. It is more efficient than a one-time equity injection, because it will be used only as needed and on terms that Treasury has set. With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government senior preferred shares.

These Preferred Stock Purchase Agreements were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt and guaranteed MBS. Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.

Market discipline is best served when shareholders bear both the risk and the reward of their investment. While conservatorship does not eliminate the common stock, it does place common shareholders last in terms of claims on the assets of the enterprise.

Similarly, conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses. The federal banking agencies are assessing the exposures of banks and thrifts to Fannie Mae and Freddie Mac. The agencies believe that, while many institutions hold common or preferred shares of these two GSEs, only a limited number of smaller institutions have holdings that are significant compared to their capital.

The agencies encourage depository institutions to contact their primary federal regulator if they believe that losses on their holdings of Fannie Mae or Freddie Mac common or preferred shares, whether realized or unrealized, are likely to reduce their regulatory capital below "well capitalized." The banking agencies are prepared to work with the affected institutions to develop capital restoration plans consistent with the capital regulations.

Preferred stock investors should recognize that the GSEs are unlike any other financial institutions and consequently GSE preferred stocks are not a good proxy for financial institution preferred stock more broadly. By stabilizing the GSEs so they can better perform their mission, today's action should accelerate stabilization in the housing market, ultimately benefiting financial institutions. The broader market for preferred stock issuance should continue to remain available for well-capitalized institutions.

The second step Treasury is taking today is the establishment of a new secured lending credit facility which will be available to Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. Given the combination of actions we are taking, including the Preferred Share Purchase Agreements, we expect the GSEs to be in a stronger position to fund their regular business activities in the capital markets. This facility is intended to serve as an ultimate liquidity backstop, in essence, implementing the temporary liquidity backstop authority granted by Congress in July, and will be available until those authorities expire in December 2009.

Finally, to further support the availability of mortgage financing for millions of Americans, Treasury is initiating a temporary program to purchase GSE MBS. During this ongoing housing correction, the GSE portfolios have been constrained, both by their own capital situation and by regulatory efforts to address systemic risk. As the GSEs have grappled with their difficulties, we've seen mortgage rate spreads to Treasuries widen, making mortgages less affordable for homebuyers. While the GSEs are expected to moderately increase the size of their portfolios over the next 15 months through prudent mortgage purchases, complementary government efforts can aid mortgage affordability. Treasury will begin this new program later this month, investing in new GSE MBS. Additional purchases will be made as deemed appropriate. Given that Treasury can hold these securities to maturity, the spreads between Treasury issuances and GSE MBS indicate that there is no reason to expect taxpayer losses from this program, and, in fact, it could produce gains. This program will also expire with the Treasury's temporary authorities in December 2009.

Together, this four part program is the best means of protecting our markets and the taxpayers from the systemic risk posed by the current financial condition of the GSEs. Because the GSEs are in conservatorship, they will no longer be managed with a strategy to maximize common shareholder returns, a strategy which historically encouraged risk-taking. The Preferred Stock Purchase Agreements minimize current cash outlays, and give taxpayers a large stake in the future value of these entities. In the end, the ultimate cost to the taxpayer will depend on the business results of the GSEs going forward. To that end, the steps we have taken to support the GSE debt and to support the mortgage market will together improve the housing market, the US economy and the GSEs' business outlook.

Through the four actions we have taken today, FHFA and Treasury have acted on the responsibilities we have to protect the stability of the financial markets, including the mortgage market, and to protect the taxpayer to the maximum extent possible.

And let me make clear what today's actions mean for Americans and their families. Fannie Mae and Freddie Mac are so large and so interwoven in our financial system that a failure of either of them would cause great turmoil in our financial markets here at home and around the globe. This turmoil would directly and negatively impact household wealth: from family budgets, to home values, to savings for college and retirement. A failure would affect the ability of Americans to get home loans, auto loans and other consumer credit and business finance. And a failure would be harmful to economic growth and job creation. That is why we have taken these actions today.

While we expect these four steps to provide greater stability and certainty to market participants and provide long-term clarity to investors in GSE debt and MBS securities, our collective work is not complete. At the end of next year, the Treasury temporary authorities will expire, the GSE portfolios will begin to gradually run off, and the GSEs will begin to pay the government a fee to compensate taxpayers for the on-going support provided by the Preferred Stock Purchase Agreements. Together, these factors should give momentum and urgency to the reform cause. Policymakers must view this next period as a "time out" where we have stabilized the GSEs while we decide their future role and structure.

Because the GSEs are Congressionally-chartered, only Congress can address the inherent conflict of attempting to serve both shareholders and a public mission. The new Congress and the next Administration must decide what role government in general, and these entities in particular, should play in the housing market. There is a consensus today that these enterprises pose a systemic risk and they cannot continue in their current form. Government support needs to be either explicit or non-existent, and structured to resolve the conflict between public and private purposes. And policymakers must address the issue of systemic risk. I recognize that there are strong differences of opinion over the role of government in supporting housing, but under any course policymakers choose, there are ways to structure these entities in order to address market stability in the transition and limit systemic risk and conflict of purposes for the long-term. We will make a grave error if we don't use this time out to permanently address the structural issues presented by the GSEs.

In the weeks to come, I will describe my views on long term reform. I look forward to engaging in that timely and necessary debate.

-30-

**REPORTS**

- FHFA Director Lockhart Remarks on Housing GSE Actions
- Fact Sheet: FHFA Conservatorship
- Fact Sheet: Treasury Preferred Stock Purchase Agreement
- Fact Sheet: Treasury MBS Purchase Program
- Fact Sheet: Treasury GSE Credit Facility
- Freddie Mac Warrant to Purchase Common Stock
- Freddie Mac Certificate
- Freddie Mac Senior Preferred Stock Purchase Agreement
- Fannie Mae Warrant to Purchase Common Stock
- Fannie Mae Certificate
- Fannie Mae Senior Preferred Stock Purchase Agreement