1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              March 26, 2014

19              10:01 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2   (CC: Doc# 6174) Adj. Hrg. RE: Motion of Citibank, N.A. for an

3   Order (I) Determining that it is Entitled to Post-Petition

4   Interest on its Oversecured MSR Facility Claims at the

5   Contractual Default Rate, and (II) Directing Debtors to Pay

6   such Interest as well as Citibank's Due and Unpaid Counsel Fees

7   and Expenses.

8

9   (CC: Doc# 6527, 6621, 6635) Ally Financial Inc.'s Motion for an

10  Order Enforcing the Chapter 11 Plan Injunction.

11

12  (CC: Doc# 5162) Adj. Hrg. Re: Motion for Omnibus Objection to

13  Claim(s) / Debtors' Fiftieth Omnibus Objection to Claims (No

14  Liability Borrower Claims - Books and Records).

15  Going forward solely as it relates to the claim filed by

16  Jacqueline Warner (Claim No. 3502).

17

18  (CC: Doc# 6305, 6455) Motion for Omnibus Objection to Claim(s)/

19  The ResCap Borrower Claims Trusts Fifty-Eighth Omnibus

20  Objection to (A) Amended and Superseded Borrower Claims; (B)

21  Late Filed Borrower Claims; and (C) Non-Debtor Borrower Claims.

22  This matter, solely as it relates to the claims filed by Walter

23  Olszewski (Claim Nos. 7163 and 7172), has been withdrawn. The

24  hearing on this matter as it relates to all other claimants

25  will be going forward.

1

2  (CC: Doc# 6448) Motion for Omnibus Objection to Claim(s) /

3  ResCap Borrower Claims Trusts Fifty-Ninth Omnibus Objection to

4  Claims (Insufficient Documentation Borrower Claims).

5  The hearing on this matter, as it relates to the claims filed

6  by Annie Trammell and Alfredia Holiday, has been adjourned to

7  April 24, 2014. The hearing on this matter as it relates to all

8  other claimants will be going forward.

9

10  (CC: Doc# 6457) Motion for Omnibus Objection to Claim(s)/

11  ResCap Borrower Claim Trusts Sixtieth Omnibus Objection to

12  Claims (Res Judicata Borrower Claims).

13

14

15

16

17

18

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8   BY:   JORDAN A. WISHNEW, ESQ.

9

10

11  KIRKLAND & ELLIS LLP

12         Attorneys for Ally Financial and Ally Bank

13         601 Lexington Avenue

14         New York, NY 10022

15

16  BY:   RAY C. SCHROCK, ESQ.

17         JUSTIN BERNBROCK, ESQ.

18

19

20

21

22

23

24

25

5

1

2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

3           Attorneys for ResCap Liquidating Trust

4           1177 Avenue of the Americas

5           New York, NY 10036

6

7   BY:   JOSEPH A. SHIFER, ESQ.

8           GREGORY A. HOROWITZ, ESQ.

9           DOUGLAS H. MANNAL, ESQ.

10

11

12   SHEARMAN & STERLING LLP

13           Attorneys for Citibank N.A.

14           599 Lexington Avenue

15           New York, NY 10022

16

17   BY:     WILLIAM J.F. ROLL, III, ESQ.

18           FREDRIC SOSNICK, ESQ.

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                                    6

1              P R O C E E D I N G S

2              THE COURT:  All right.  Please be seated.  We're here

3     on Residential Capital, number 12-12020.

4              MR. WISHNEW:  Good morning, Your Honor.  Jordan

5     Wishnew, Morrison & Foerster.

6              Your Honor, the first contested matter on today's

7     agenda appears on page 7, the motion of Citibank for its

8     entitlement of post-petition default interest.  In that regard,

9     I'll turn the podium over to my colleagues from Kramer Levin on

10    behalf of the ResCap liquidating trust.

11             THE COURT:  Thank you.

12             MR. ROLL:  Your Honor, if I may.  William Roll of

13    Shearman & Sterling, appearing along with my partner Fred

14    Sosnick for Citibank, N.A.

15             THE COURT:  All right.  Let me get the other

16    appearances.

17             MR. HOROWITZ:  Thank you, Your Honor.  Gregory

18    Horowitz of Kramer Levin, on behalf of the ResCap liquidating

19    trust.

20             THE COURT:  All right.  Go ahead.

21             MR. ROLL:  Again, William Roll, Your Honor.  And I'm

22    assuming that because it's our motion the Court would prefer --

23             THE COURT:  Yes.

24             MR. ROLL:  -- to hear us first.

25             THE COURT:  Absolutely.

1          MR. ROLL:  Thank you, Your Honor.  As indicated, this

2   is Citibank's motion for an order directing the payment of

3   interest from the petition date through today, at the default

4   rate specified in the bank's pre-petition MSR facility, and

5   secondly for --

6          THE COURT:  When you say --

7          MR. ROLL:  -- reimbursement of legal fees incurred --

8          THE COURT:  I thought you were repaid.  You say

9   payment through today.  You were -- Citibank was -- when was

10   the loan -- the principal and contract interest were repaid

11   when?

12          MR. ROLL:  They were repaid shortly after the closing

13   of the Walter sale on January 31, 2013.

14          THE COURT:  Okay.

15          MR. ROLL:  But there is -- there would still be

16   something owed to use from that date through today, in the

17   sense of there being a differential, as we see it, between the

18   nondefault rate and the default rate from the petition date

19   through that date.

20          THE COURT:  Okay.

21          MR. ROLL:  So I'm not saying it's a large amount from

22   that date through today, but it does exist.  And our claim for

23   reimbursement is for those fees incurred in pursuing the claim

24   for that interest.  And we're seeking that under both the MSR

25   credit agreement provision providing for attorneys' fees and

1  the cash collateral order itself.

2         The parties to this controversy have decided that --

3  have determined that the facts material to each side's position

4  are undisputed, so the parties have put together a stipulation

5  of facts and filed that some days ago now, Your Honor, so I

6  hope the Court has that.

7         THE COURT:  Yes.

8         MR. ROLL:  And let me start by pointing out three of

9  the most fundamental of those undisputed facts.

10         First, Citibank was an oversecured creditor here;

11  there's no dispute about that.  We've stipulated to that.

12  There was also a specific finding to that effect in the cash

13  collateral order.

14         Secondly, we did have a contract, the MSR credit

15  facility, that did specify a default rate to be applicable upon

16  the occurrence of a default.  And thirdly -- and there's no

17  dispute about that.  And thirdly -- and there's no dispute

18  about what the rate was.

19         And thirdly, there is no dispute that a default

20  actually occurred here.

21         THE COURT:  Well, when did the default occur?

22         MR. ROLL:  The default occurred on the filing of the

23  petition.

24         THE COURT:  The loan was current up to the filing of

25  the petition?

1          MR. ROLL:  The loan was current until the filing of

2    the petition.  The filing constituted an event of default.  The

3    maturity would have been -- or was, in fact, at that point,

4    sixteen days after the petition date.  So had the petition not

5    intervened, we would have been paid sixteen days later.

6          THE COURT:  I know this is not in the stipulation, but

7    was the loan agreement amended in contemplation of the filing

8    of bankruptcy?

9          MR. ROLL:  The loan agreement was amended a number of

10   times.  I think it's --

11         THE COURT:  But the last time it was in March and it

12   was --

13         MR. ROLL:  It was.

14         THE COURT:  -- pretty much on the eve of --

15         MR. ROLL:  It was.

16         THE COURT:  -- the bankruptcy.

17         MR. ROLL:  It was.  And to be candid, Your Honor, the

18   stipulation does indicate that the parties have agreed that

19   that last amendment was done with bankruptcy in mind.

20         THE COURT:  Okay.

21         MR. ROLL:  So there were things done at that point

22   with bankruptcy being contemplated.  The one thing that was not

23   done, despite the ability for the parties to do that, was to

24   change the default rate, to eliminate the default rate

25   altogether, or to change the rate specified upon default, to

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1    change the filing of bankruptcy as an event of default.  There

2    are a lot of things the parties could have done but did not do.

3            THE COURT:  But you -- I take it you agree that post-

4    petition interest is governed by the Bankruptcy Code 506 --

5            MR. ROLL:  Um-hum.

6            THE COURT:  -- and not by the contract.  It may be

7    presumptive that the contract rate would apply, but you're not

8    arguing that the Court is bound by the contract rate in

9    awarding post-petition interest to an oversecured creditor?

10           MR. ROLL:  Not bound by it exclusively.  What we are

11   arguing, though, Your Honor, is that there is, under all the

12   cases -- and flowing especially from Travelers, the Supreme

13   Court decision in 2007, which I can elaborate on in a second --

14   that there is a rebuttable presumption that it's the contract

15   rate that applies.  It can be rebutted by showing that there's

16   something under nonbankruptcy law that would render that

17   contract or the underlying substantive --

18           THE COURT:  No, more than that, I mean, because the

19   way I read the cases is that the Court has limited discretion,

20   based on equitable bankruptcy considerations --

21           MR. ROLL:  Yes.

22           THE COURT:  -- to award post-petition interest at

23   something other than the contract rate.  Do you agree?

24           MR. ROLL:  I agree that the Court has discretion to do

25   that.

1          THE COURT:  Okay.

2          MR. ROLL:  Yes, and I --

3          THE COURT:  And Travelers doesn't really alter that,

4     and cases since Travelers have continued to apply the principle

5     that the bankruptcy court has discretion to award post-petition

6     interest at something other than the contract rate, correct?

7          MR. ROLL:  Well, here's what I believe the cases say,

8     Your Honor.  It's not far from what Your Honor has said, but I

9     want to make sure we're clear about where we do differ with the

10    articulation the Court just gave.  In the first instance -- and

11    this is what the Supreme Court said in Travelers -- in the

12    first instance you look to the underlying substantive law, in

13    this case the law of contract, and the contract itself, for the

14    specification of the creditor's entitlement.  That's where you

15    look first.  That's then subject to any qualifying language in

16    the Bankruptcy Code or other considerations.  And it's the

17    other considerations into which you -- you lump the equitable

18    considerations.

19         THE COURT:  We all agree about that, okay?

20         MR. ROLL:  Okay.  But I think it is important that, in

21    the first instance, you look to the contract.  And the cases,

22    including the cases by other judges in this courthouse, Judge

23    Bernstein recently in two cases, the 92nd Street Associates

24    case and the 785 Partners case --

25         THE COURT:  So but in 785 Partners, yes, the creditor

1   was oversecured --

2          MR. ROLL:  Um-hum.

3          THE COURT:  -- but unsecured creditors were being paid

4   in full and it was a solvent debtor and the issue was,

5   essentially -- I mean, I think Judge Bernstein doesn't quite

6   describe it this way, but I think it's pretty close -- I mean,

7   it's the issue of whether the secured lender should get

8   interest at the default rate or whether equity should benefit

9   from it.  It wasn't a case in which unsecured creditors were

10  going to be paid less than full.

11         MR. ROLL:  That's correct, Your Honor.

12         THE COURT:  So my question to you is, are there any

13  cases -- let's start with this district -- where the Court has

14  awarded post-petition interest at a contract default rate where

15  unsecured creditors are being paid less than the full amount?

16         MR. ROLL:  I can't cite to a case in this district,

17  Your Honor, but what I can --

18         THE COURT:  Are there any recent decisions from courts

19  in other -- other bankruptcy courts awarding full default

20  interest in case -- on post-petition amount where unsecured

21  creditors are impaired?

22         MR. ROLL:  I don't know of any, Your Honor, but what I

23  do know is that in every one of those cases the courts have

24  all, including Judge Bernstein, in both the cases we mentioned,

25  and Judge Gerber before that, in the Urban Communicators case,

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1    admitted of the possibility of there being payment of default

2    interest.

3            THE COURT:  Oh, I don't doubt that there's a

4    possibility of it.

5            MR. ROLL:  And it came down to the look at the

6    equitable factors that we were both mentioning a short time

7    ago.  And --

8            THE COURT:  Well, one of those equitable factors would

9    be what's the situation of the unsecured creditors --

10           MR. ROLL:  Right --

11           THE COURT:  -- in the case.

12           MR. ROLL:  -- it's the solvency question.  We don't

13   disagree.  That's one of the factors.  I happen to think -- we

14   happen to think, and we argue in our papers, and I'll argue

15   today that when you look at that issue here, it doesn't compel

16   a conclusion that the default rate shouldn't apply because the

17   amount we're seeking is miniscule.

18           THE COURT:  Oh, it's not miniscule, come on.

19           MR. ROLL:  It's miniscule in comparison --

20           THE COURT:  Not to me.

21           MR. ROLL:  Well, or to me either.  To each of us as

22   people; think about what's in our pockets at any given time.

23   But in comparison to the pot that's distributable, it's about

24   .2 percent; it's two-tenths of a percent.  It was also -- and

25   I --

1        THE COURT:  So I'm going to take out my violin and

2   really feel for Citibank on this one.

3        MR. ROLL:  Right.  Well, here's -- you don't have to

4   feel for Citibank, but you do have -- one does have to note

5   also that this was -- the risk of this happening, the risk of

6   this day occurring was fully disclosed in the disclosure

7   statement.  The controversy --

8        THE COURT:  Sure.

9        MR. ROLL:  -- was there.

10       THE COURT:  And when you entered into the amended loan

11   agreement it was in contemplation of bankruptcy, so everybody

12   had their eye on the ball about what this was really about.

13       MR. ROLL:  That's right.  And I don't think there's

14   any reason the bank has to feel embarrassed, for lack of a

15   better word about --

16       THE COURT:  Citibank shouldn't feel embarrassed.

17       MR. ROLL:  -- about seeking something it's entitled to

18   under the agreement, especially if the law is pretty clear that

19   presumptively that's what'll apply.  And --

20       THE COURT:  That may be a bigger issue for me on the

21   attorneys' fees issue, because you're certainly litigating over

22   a valid issue.  So I separate out the issue of what attorneys'

23   fees Citibank is entitled to recover versus what -- and I

24   haven't decided -- I want to be clear.  I may -- my questions

25   shouldn't suggest to you that I've decided this issue, because

1   I haven't.

2          MR. ROLL:  Okay.

3          THE COURT:  Okay.

4          MR. ROLL:  I appreciate that, Your Honor.  I do think,

5   before we actually look at the equitable factors here -- and

6   we've already touched on the solvency issue and the payment to

7   unsecureds, that issue.  There are others at play here, as Your

8   Honor probably knows from reading the papers.  Before we get to

9   that, I do think it's worth pausing and noting that every one

10  of these cases we've talked about, and one we haven't talked

11  about -- the one written by the great Judge Posner in the

12  Lapiana decision in the Seventh Circuit, which I think has some

13  language that is useful.  Every one of these cases has said the

14  equitable inquiry here ought to be a limited one.  The

15  equitable power exercised by the court ought to be exercised

16  with a very light touch.

17         As Judge Posner said in Lapiana, he said that Section

18  506(b) is "not an invitation to a free-for-all equity-balancing

19  act".  He went on to say "We deprecate flaccid invocations of

20  'equity' in bankruptcy proceedings. Creditors have rights,

21  among them the right of oversecured creditors to post-petition

22  interest, and bankruptcy judges are not empowered to dissolve

23  rights in the name of equity."  And --

24         THE COURT:  That's not an issue of dissolving the

25  rights of post-petition interest.  You got post-petition

1    interest; the question is whether you're entitled at the

2    default rate or some other rate.

3          MR. ROLL:  Understood.  So let me talk about the

4    factors.  The courts usually refer to four, only one of which

5    applies here.  Misconduct by the creditor; there's no issue of

6    misconduct.

7          THE COURT:  No.

8          MR. ROLL:  Direct harm to the unsecureds; that's the

9    solvency issue.  Prevention of a fresh start by the debtor; not

10   an issue here.  And whether the right to be applied constitutes

11   a penalty.  Now, I --

12         THE COURT:  This is not a penalty.

13         MR. ROLL:  It's not a penalty --

14         THE COURT:  Don't -- let's --

15         MR. ROLL:  -- and I haven't argued that.

16         THE COURT:  -- not go to the penalty.

17         MR. ROLL:  So it's really just harm to the

18   unsecureds  --

19         THE COURT:  That's right.

20         MR. ROLL:  -- and some other stuff that they've thrown

21   in which, if the Court permits, I'd like to address --

22         THE COURT:  Okay.

23         MR. ROLL:  -- as long as I'm up here.  On the harm to

24   the unsecureds, it really does come down to what, I will again

25   say, is a miniscule amount.  I heard what the Court said

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1    earlier about that.  It is all --

2            THE COURT:  That miniscule amount is how much?

3            MR. ROLL:  Five million dollars.

4            THE COURT:  Five million dollars.

5            MR. ROLL:  5 and change, 5.04 million out of 2.462

6    billion, with a B, in the pot to be distributed to the

7    unsecureds.  It was fully disclosed.  And more than that, this

8    is the very type of risk that creditors are always understood

9    to take.  Unsecured creditors understand that there is a

10   risk -- or they're deemed to understand that there is a risk

11   that secured creditors will be paid up to the extent of any

12   equity cushion that they have.  We had an equity cushion here.

13   We were oversecured.  And the understanding ought to be, at

14   least constructively, and I think the cases recognize this,

15   that this, the kind of thing we're asking for today, could

16   happen to them.

17           THE COURT:  Let me ask this.  There was a cash

18   collateral stipulation --

19           MR. ROLL:  Yes.

20           THE COURT:  -- that entitled Citibank to adequate

21   protection payments of the nondefault contract rate of

22   interest.

23           MR. ROLL:  Right.

24           THE COURT:  Was there a gap between the filing and

25   Citibank actually being paid current interest?  In other words,

1   because the filing of the case stopped the payment of interest.

2          MR. ROLL:  Right.

3          THE COURT:  But the cash collateral stipulation

4   authorized the payment.  So was there any gap?

5          MR. ROLL:  I think it -- I don't -- I think it was

6   minor, if there was one.

7          THE COURT:  Okay.

8          MR. ROLL:  I think for practical purposes there was

9   not.

10          THE COURT:  So in -- I didn't find -- the issue I'm

11   going to raise I didn't find in any of the cases, but -- and

12   probably, I guess it wouldn't make much difference here.  The

13   maturity date of this was March 30th; is that -- or May 30th,

14   excuse me -- May 30th, 2012.

15          MR. ROLL:  Correct.

16          THE COURT:  It looks like two weeks after the --

17          MR. ROLL:  Correct.

18          THE COURT:  -- the bankruptcy petitions were filed.

19   Do you think it would make a difference in the case if the

20   maturity date was further out, if you were repaid the full

21   amount before the loan had matured versus when the loan had

22   matured?

23          MR. ROLL:  Analytically, I don't think so, Your Honor.

24   I mean, we might -- if I'm understanding the Court's question

25   correctly, if we had been paid, you know, from -- shortly after

1  the petition date during a longer period --

2          THE COURT:  I guess the reason --

3          MR. ROLL:  -- up to maturity --

4          THE COURT:  The difference -- potential difference I

5  see -- and here I don't think it makes -- because this clearly

6  was the loan amendment in contemplation of the bankruptcy

7  filing.  There was only about two weeks that we're talking

8  about.  When a lender negotiates a loan for a specific term,

9  it's not contemplating that that loan's going to be extended

10  longer.  And that may go into how a lender sets its interest

11  rates; for example, the risk that it's taking, extended

12  maturity.  Here what we're talking -- it was only seven months

13  before you got repaid.

14          MR. ROLL:  Um-hum.

15          THE COURT:  In any event, this may not be a factor

16  here, but I'm just --

17          MR. ROLL:  It's hard to know, Your Honor.  I --

18          THE COURT:  Okay.  I just --

19          MR. ROLL:  -- think we'd be speculating as to what was

20  on people's minds at that point.

21          THE COURT:  Well, I -- I'm sure what was on Citibank's

22  mind was, okay, they're going to file and we're going to seek

23  post-petition interest at the default rate.  And the debtor may

24  have thought that's in the contract, but the law is that the

25  bankruptcy judge -- that the contract is not going to control.

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1    It may be the first thing to look at.

2          MR. ROLL:  Well, there would have -- if that's what

3    the debtor were thinking or concerned about at the time, it

4    could easily have said, in the negotiation of amendment number

5    10, let's strike the default rate.  They could have --

6          THE COURT:  They didn't have to.  I mean, you all knew

7    what the law was when it was entered into.

8          MR. ROLL:  Why not?  If they're at the point of

9    amending, why not?  At a later point, they could have asked

10   that a provision to that effect be included in the cash

11   collateral stipulation.  They could have argued over it at the

12   time.

13         THE COURT:  You wouldn't have agreed.

14         MR. ROLL:  Right, there are -- what happened instead

15   was there is a final cash collateral order entered by this

16   court, which basically says that the proceeds from the sale of

17   our collateral -- the eventual sale of our collateral would be

18   used to pay off the capital obligations.

19         THE COURT:  Sure, you reserved the issue of whether

20   you were entitled to interest at the default rate.

21         MR. ROLL:  Exactly.  So nobody was surprised here.

22         THE COURT:  No, and I'm not suggesting anybody was

23   surprised.

24         MR. ROLL:  And if what they've argued or what the

25   Court is suggesting is that we ought to have understood, by

1    reason of what happened at that time, that this motion would be

2    subject entirely to the Court's discretion, I don't think we

3    would have seen the law --

4          THE COURT:  Well, I wouldn't say entirely.  You knew

5    what the law was and they knew what the law was.  This was no

6    secret.

7          MR. ROLL:  We did.  And what we knew the law to be was

8    as I described it earlier which is, in the first instance, the

9    contract rate applies, unless there's some equitable --

10         THE COURT:  Well, that's why I asked whether there are

11   any insolvent debtor cases where the court has explained why it

12   was awarding post-petition interest at the default rate.

13         MR. ROLL:  None that I can identify for Your --

14         THE COURT:  Okay.

15         MR. ROLL:  -- for Your Honor.  But I can tell you, as

16   I've said before, that in the solvent debtor cases --

17         THE COURT:  Solvent --

18         MR. ROLL:  -- that the Courts have said that --

19         THE COURT:  If this was a solvent -- I have solvent --

20   a few --

21         MR. ROLL:  Right.

22         THE COURT:  Very few; I mean, we don't get very many

23   solvent debtors here, but yes, I've had solvent debtor cases,

24   and yes, I've said pay it at the contract rate; if it's a

25   default, it's a default.

RESIDENTIAL CAPITAL, LLC, ET AL.                      22

1          MR. ROLL:  Right.

2          THE COURT:  As between creditors and equity --

3          MR. ROLL:  Yeah.

4          THE COURT:  -- it's basically what Judge Bernstein

5    did.  Okay?  And I've done that.  But what I haven't had is

6    this issue arise in an insolvent debtor case.

7          MR. ROLL:  I have no doubt that's correct, Your Honor,

8    and that that's -- I mean, that's something the Court has to

9    consider, obviously.

10         But I would say a couple of things. One is that in

11   every one of those -- in every one of those instances, it was

12   just one factor among many that the court looked at.

13         Secondly, I'm reminded by my colleague, Mr. Sosnick,

14   that the Terry case, the Seventh Circuit decision, involved a

15   payment to insolvent equity, the payment of default interest

16   with insolvent equity.  And the dispute there was between first

17   and second lien creditors.  So it's one instance, perhaps.

18   It's an older case.  But I know it's an issue.

19         Here, though, I really do have to come back to how

20   small this is, how readily known this was, how easy to

21   understand it was for everybody on the scene that we were going

22   to be doing this, and that even if it were only an equitable

23   inquiry, even if it were only that, we'd be in good stead

24   standing here asking for the payment of interest.

25         The unsecured creditors in this case, they're not

1   getting 100 cents on the dollar, but --

2           THE COURT:  Far from it.

3           MR. ROLL:  -- but they're not getting zero either.

4   They're doing a lot better than a lot of other cases, and it's

5   pertinent to the comparison of who's doing what here, of who's

6   being hurt.  And an argument -- I think a good argument can be

7   made that, in effect, abrogating the contractual provision,

8   when it was fully in view of everybody at the time all this

9   happened, is just as --

10          THE COURT:  I'm not abrogating --

11          MR. ROLL:  -- as big a harm to the --

12          THE COURT:  -- a contract provision.  You've

13  acknowledged the contract provision doesn't control.  So I'm

14  not abrogating a cont -- even if I decide for the trust, I'm

15  not abrogating a contract provision.

16          MR. ROLL:  Well, in a manner of speaking, with all due

17  respect, I think that's what the Court would be doing if it

18  denied that.  It would be substituting a judgment that the set

19  of equitable considerations present here trump the presumptive

20  viability of the contract rate -- of the existence of the

21  contract which is otherwise enforceable.  There's no claim that

22  the agreement is unenforceable.

23          I actually think it would run afoul of the literal

24  terms of Travelers, which didn't even talk about equity; it

25  talked about contract provisions in the Bankruptcy Code or

1   other aspects of the underlying substantive law.  There's none

2   of that here.  Their position -- the trust's position is

3   entirely based on equity.  And as I hear the Court's concerns,

4   they're all within the rubric of equity.  And although we might

5   quibble over whether what would be happening with the denial of

6   our motion, whether it's an abrogation of the contract or not,

7   it's an impediment to our proceeding as if the contract

8   provision applies.  I don't want to get hung up on the words we

9   use, but in effect, it would be the substitution of a judgment

10  that the equitable factors here trump the presumptive -- the

11  presumptive and presumptively legal and presumptively

12  applicable contract rate.

13          THE COURT:  How much in attorneys' fees are you

14  seek -- because you're -- the bank's attorneys' fees were paid

15  through when?

16          MR. ROLL:  The bank's attorneys' fees were paid

17  through -- I think it was early in 2013, shortly after the

18  sale, shortly after we were paid.  The specifics are actually

19  in our reply papers.  It was up to a point in mid-2013, I

20  believe.  The ones that have not been -- the bills that have

21  not been paid I think were something less than all that were

22  rendered in the post-petition period.  And the total amount

23  we're seeking in attorneys' fees is in the mid-hundreds of

24  thousands.  I'll get the exact number for the Court in a

25  second.

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1          I don't know if the Court's interested in hearing

2     about the other factors the trust raises and our position on

3     them --

4          THE COURT:  Go ahead.

5          MR. ROLL:  -- but I do feel duty bound to go into

6     them --

7          THE COURT:  Sure.

8          MR. ROLL:  -- because there is more to their position

9     than just the solvency issue, and I think that's a recognition

10    on their part that they had to find something else.  They make

11    a large bit about, you know, we were not harmed by the -- we're

12    not going to be harmed by it because we got the "benefit" of

13    our bargain by reason of being paid the principal and interest

14    at the nondefault rate after the closing of that sale.  It's

15    actually not right.  The benefit of the bargain would have been

16    to be repaid in full at maturity, sixteen days after the --

17         THE COURT:  That's why I asked my question about

18    maturity.  If the maturity of the loan had been a year later,

19    but you were repaid prior to maturity -- so we negotiate a

20    loan, here in contemplation of bankruptcy, but with a maturity

21    less than a month after the bankruptcy petition was filed.  I'm

22    not articulating it particularly well, but I'm just -- and

23    that's what I was wondering, whether in terms of the equitable

24    factors that go into it, you negotiated to get your money back

25    on a particular date; while you were paid nondefault contract

 1  interest thereafter, you didn't get your money back on the
 2  particular date.  Lenders generally price loans based on risk,
 3  maturity, et cetera.  So that was a change.  That was
 4  something -- and that's why -- I mean, here it was, like, two
 5  weeks, so you obviously timed the maturity of this loan to
 6  pretty closely coincide with when the expected filing date was.
 7          MR. ROLL:  I understand -- now I understand the --
 8          THE COURT:  So I'm just wond -- when I started
 9  thinking about well, what are the equitable factors and should
10  the presumptive default rate apply here, Mr. Horowitz is going
11  to tell me why he doesn't think an equitable factor, on
12  Citibank's side, is that the loan matured and, in effect, it
13  was an involuntary extension of the maturity date for close to
14  seven months.  Okay.  So that's what I -- I'm struggling to
15  articulate exactly, but I think that's closer to what I was
16  mulling about.
17          MR. ROLL:  Well, I think -- I don't know if this is
18  pertinent to that, but it does appear that if you look at all
19  of the amendments, every one of the -- because there were a
20  host of extensions; there were ten extensions, basically, and
21  each of them was in the neighborhood of --
22          UNIDENTIFIED SPEAKER:  Except one.
23          MR. ROLL:  -- all but one.  Yeah, all but one.  One
24  was just on another point.  They were all for relatively
25  limited periods of time. So there was nothing --

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1          THE COURT:  You put them on a short fuse, basically.

2          MR. ROLL:  Yes, so it's easy to say now that the last

3      one was in contemplation of bankruptcy.  You could --

4          THE COURT:  I'm not saying there's anything wrong with

5      it.  That's what it appears, okay?

6          MR. ROLL:  No, but the -- whether we were -- the

7      extent to which we were contemplating it all along; I mean, we

8      knew it was a possibility.

9          THE COURT:  Sure.

10         MR. ROLL:  And obviously there were reasons for the

11     loan to have to be extended in the first place, that bore on

12     that question and the health of the debtor.  But the fact of

13     the matter is, I don't think we had any particular or

14     particularized or particularly better knowledge, at the time of

15     the last amendment, that we were only looking at that shorter

16     fuse.

17         I think the expectation was we would get repaid --

18         THE COURT:  And you did.

19         MR. ROLL:  And we did, but seven or eight months

20     later.  And for a bank like Citibank not to be able to redeploy

21     capital for seven or eight months, that's what they're in

22     business to do; that's a big deal.  So it's --

23         THE COURT:  So you're articulating what, among the

24     factors that are the equitable -- that I would say would

25     balance on the scale of equitable considerations in support of

1   permitting Citibank to recover default interest -- contract

2   default interest for the period, because you had, in effect, an

3   involuntary extension of the maturity date of the loan.

4            MR. ROLL:  Yes.

5            THE COURT:  That wasn't what was bargained for

6   initially.

7            MR. ROLL:  Yes, and I now apologize for not having

8   followed --

9            THE COURT:  No --

10            MR. ROLL:  -- the Court's question earlier.

11            THE COURT:  -- I mean, I wasn't articulating it very

12   well.

13            MR. ROLL:  But that's --

14            THE COURT:  But --

15            MR. ROLL:  But that's really -- I mean, that is the

16   point.  I mean, they're saying we weren't harmed; I'm saying we

17   were harmed, because as I've indicated, there was an

18   expectation, a rolling expectation, if you will, that we would

19   be paid relatively soon.  They kept asking for more time and we

20   kept giving them more time.  But I think, our view, the

21   institutional of the bank was the maturity date is a real date,

22   and we expect to be paid on that date.

23            THE COURT:  Okay.

24            MR. ROLL:  To not be paid on that date put us in

25   jeopardy.  And that actually segues to another one of their

1  concerns, which was that even though there was a delay, we were

2  never really at risk during the course of the bankruptcy.  I

3  mean, that really does overlook what we thought of as a very

4  important factor in that period, the fact that we were

5  subordinated to the GSE's positions.  And the sales by the

6  debtor of assets, including our collateral, were all subject to

7  an effective veto by the GSEs.  And they, in fact, asserted

8  rather large first priority claims that would come ahead of us.

9  So that was a period of considerable uncertainty for us, and we

10 set forth all that language from the agreements with the

11 acknowledgement agreements with the GSEs in the stipulated

12 facts so the Court could see exactly what we were facing.

13        So until the very moment when the debtors arrived at

14 the settlements with the GSEs, with Fannie Mae and Freddie Mac,

15 over what they would be getting as a result of the sales, it

16 was entirely unclear to us, entirely uncertain, in our

17 contemplation, that we were going to get anything with respect

18 to our collateral, our secured position.

19        So we were very much at risk during that period.  I

20 mean, that, I think, is an equitable factor that ought to be

21 weighed here too.  We took a huge risk during that period.  We

22 could have ended up with --

23        THE COURT:  Don't overstate it; you took a risk.

24        MR. ROLL:  We took a risk.  We took a risk based on a

25 very large claim ahead of us and a set of powers, if you will,

1    ahead of us, that could have put us very much in a much worse

2    position.  Things worked out.  The debtors did a nice job

3    reaching agreement, getting the sales approved and all of that.

4    And we were paid.

5              THE COURT:  Why didn't it seem so easy while it was

6    going on?

7              MR. ROLL:  Because it never does, Your Honor.

8              But that's -- I think that's a point that's easy to

9    overlook.  We were sitting here watching, but uncertain at that

10   time.  And it was a time in which we were thinking, for what

11   that's worth, that at the end of all this, if it works out, we

12   should also be entitled to the default --

13             THE COURT:  Okay.  I have your -- I do understand your

14   arguments.

15             MR. ROLL:  Okay.  And the same goes for the notion

16   that we somehow -- the adequate protection payments were

17   enough.  Same issue.  The adequate protection liens we got

18   would not have amounted to much, had we not been able to

19   actually -- had they not been able to come to some agreement

20   with the GSEs and allow us to recover something from the

21   collateral as it was sold.

22             So I think Your Honor does get the gist.

23             THE COURT:  Okay.

24             MR. ROLL:  I'll cede the podium at this point.

25             THE COURT:  All right.  I'll give you a chance for

1  rebuttal if you need it.

2          MR. ROLL:  I appreciate that.

3          THE COURT:  Mr. Horowitz?

4          MR. HOROWITZ:  Thank you, Your Honor.  Greg Horowitz

5  from Kramer Levin, on behalf of the ResCap liquidating trust.

6          Your Honor, I have a two-page demonstrative exhibit

7  that I'm going to make reference during the argument, if I

8  could.

9          THE COURT:  Please go ahead.  You always have a

10 demonstrative for me.

11         MR. HOROWITZ:  No PowerPoint.

12         THE COURT:  Well -- thank you.

13         MR. HOROWITZ:  I'm not real big on charts unless they

14 have a point.  I'll make reference to that in a few minutes,

15 Your Honor.

16         Your Honor, I'm going to just spend a little bit of

17 time on the law, and I'm going to highlight a significant

18 number of facts that I believe the Court may not be fully aware

19 of because they weren't highlighted in our response.  They came

20 to the fore in connection with the stipulations, and I think

21 that they're extremely important.  And I think as I go through

22 this, Your Honor will see that, putting aside very strong law,

23 under the facts of this case, Citi's request for default

24 interest is particularly inequitable.

25         What you're going to see, Your Honor, is that in

1  negotiating that final tenth amendment, six weeks before the

2  petition date, Citibank, with considerable leverage at the

3  time, engaged in self-help and obtained terms that handsomely

4  and far more than adequately, indeed, I'd say excessively,

5  compensated it for its involvement in this bankruptcy.

6          So let me just start with the law.  There is -- as it

7  became clear, there's not too much dispute as to the most basic

8  principles.  Post-petition interest, as a secured claim, is

9  only allowable under 506(b).

10          Under the Supreme Court's decision in Ron Pair, which

11 absolutely was not affected by Travelers, the entitlement to

12 interest as part of a secured claim is not a function of

13 contract.  The phrase under the agreement does not modify

14 interest in 506(b).

15          And as the Second Circuit made clear in Key Bank, the

16 interest rate to be applied is a matter for the bankruptcy

17 court's discretion.  There's --

18          THE COURT:  Limited discretion.  I think the cases --

19          MR. HOROWITZ:  Limited discretion.

20          THE COURT:  -- have talked about limited discretion.

21          MR. HOROWITZ:  And I would also agree, Your Honor --

22          THE COURT:  They've also talked about presumptive use

23 of the contract rate.

24          MR. HOROWITZ:  Exactly.  I would also agree, Your

25 Honor, that the courts have routinely stated there is a

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1    rebuttable presumption that the court should adopt the contract

2    rate.  And in fact, there are even a couple of cases within

3    this circuit that have said there's a rebuttable presumption in

4    favor of the default rate under the contract.

5            It's also clear though, Your Honor, under the uniform

6    case law, that that rebuttable presumption is readily and

7    automatically rebutted by the fact of insolvency.

8            THE COURT:  Well, that's the part --

9            MR. HOROWITZ:  Or --

10           THE COURT:  -- where I'm balking, because I haven't

11   read a case yet that says the rebuttable presumption is

12   automatically rebutted in an insolvent debtor case.  Have you

13   got a case that says that?

14           MR. HOROWITZ:  No, I don't have a case that says that;

15   I have case -- I have holdings, though, that are uniform,

16   that -- and I should be more clear.  It's not the fact of

17   insolvency, I think.  I think, properly understood, it is that

18   the presumption is rebutted where default interest would come

19   out of the pockets of general unsecured creditors.

20           THE COURT:  You say that's a black letter rule that

21   the default interest rate will not be applied where it will

22   come out of the pockets of the unsecured creditors?

23           MR. HOROWITZ:  I'm saying --

24           THE COURT:  I haven't seen that said either.

25           MR. HOROWITZ:  I'm saying that's a principle, in my

1  view, that becomes clear through a review of the case law, and

2  it's also fairly close to explicitly articulated by Judge Sweet

3  in Urban Communications.  I'll quote from that in a moment.

4  Well, we cited four cases from courts within this circuit,

5  three bankruptcy court cases.  One, Your Honor -- I'll just

6  pause momentarily.  The Northwest Airlines case --

7          THE COURT:  Yes, Judge Gropper's case, right.

8          MR. HOROWITZ:  Yes, Judge Gropper's case.  That was

9  denying a 61,000-dollar default interest claim in the Northwest

10  Airlines case, so I don't think there was any principle of de

11  minimis impact on unsecured creditors.

12          THE COURT:  Well, I -- you know, four million dollars

13  is not de minimis -- or five million dollars is not de minimis

14  to me.  So that isn't going to be --

15          MR. HOROWITZ:  Okay.  So I'll pass over that.

16          THE COURT:  -- the basis for my decision, okay?

17          MR. HOROWITZ:  I have not -- thank you, Your Honor, I

18  will pass over that.

19          In Urban Communications, Your Honor, Judge Gerber --

20  Judge Sweet reversed Judge Gerber, to the extent that he denied

21  default interest coming out of the pockets of equity, and

22  affirmed, to the extent that he denied default interest coming

23  out of the pockets of equity --

24          THE COURT:  As I say --

25          MR. HOROWITZ:  -- excuse me.

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1          THE COURT:  -- I didn't write an opinion, but I have

2     granted default interest in a solvent debtor case where it's

3     coming out of the pockets of equity.  So the issue here is what

4     principles -- I think I know what the principles are, but where

5     I'm having a problem, Mr. Horowitz, I don't doubt that the

6     solvency of the debtor recovery by unsecureds is a factor for

7     me to take into consideration in my limited exercise of

8     discretion.  What I haven't found is a case that says it's

9     absolutely controlling, that if it's coming out of the hide of

10    the unsecured creditors, you don't give -- and there's no

11    misconduct or anything, you don't give the lender the default

12    rate.  I don't -- that may be the result in some cases, but I

13    haven't seen where a judge has said that's determinative,

14    that's controlling.

15          MR. HOROWITZ:  Your Honor, I agree that there is no

16    case that says that that explicitly.  What I'm saying is the

17    one case where an insolvent debtor was ordered to pay default

18    interest, the Terry case -- the one reported decision, the

19    Terry case, from the Seventh Circuit, as Mr. Roll acknowledged,

20    there the default interest was coming at the expense of a third

21    lien mortgagee who had expressly contracted and accepted the

22    risk of subordination to the default interest.

23          So what I'm saying is that I think the principle --

24    the more accurate principle to recognize is it's inequitable to

25    award default interest at the expense of creditors who have not

RESIDENTIAL CAPITAL, LLC, ET AL.                                    36

1   voluntarily -- or I should say stakeholders who have not

2   voluntarily assumed the risk.

3          And getting back to Urban Communications, Judge Gerber

4   had relied on the Supreme Court's -- on Justice Black's

5   language from Vanston, which is still good law, and this was

6   Judge Sweet and Judge Gerber quoting this after Travelers, I'll

7   say.  "That it is manifest that the touchstone of each decision

8   on allowance of interest in bankruptcy has been a balance of

9   equities between a creditor and creditor or between creditor

10  and debtor."

11         What Judge Sweet said is that's right, the balance of

12  equities as between a creditor and an unsecured creditor, in

13  the default interest situation, weighs in favor of the

14  unsecured creditors, therefore affirmed Judge Gerber to that

15  extent.  The balance of equities between a creditor, a secured

16  lender --

17         THE COURT:  What was the maturity date of the loans in

18  Urban Communicators?

19         MR. HOROWITZ:  I have to admit I don't have that

20  information.

21         THE COURT:  All right.  I may be hitting down the

22  wrong avenue, but I sort of --

23         MR. HOROWITZ:  I will have much to say about that.

24         THE COURT:  -- put out for everybody to think about,

25  does it make a difference whether it's, in effect, a forced --

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1    whether bankruptcy is a forced extension of maturity?

2          MR. HOROWITZ:  And I understand that.  And let me turn

3    to that, because I think that's very important and I think this

4    maturity date issue is a bit of a red herring, as you'll see.

5    I agree; maybe there's an extraordinary case where a court

6    would find that it's equitable and appropriate to award default

7    interest at the expense of unsecured creditors.  I think Your

8    Honor identified one factor you might find very important is if

9    this amounted to an involuntary forced extension of credit

10   under circumstances where the risk was significantly greater

11   than the secured creditor had, in the first instance, bargained

12   for.  That's not -- by the way, I emphasize Citi --

13         THE COURT:  You put an addendum on what I asked that I

14   didn't put.

15         MR. HOROWITZ:  Well, I think that would be an

16   equitable consideration.  But first of all, I stress neither we

17   nor Citi has found such a case.  I think you made that clear,

18   Your Honor.  But this wouldn't be the case, if there were such

19   a case, and I want to identify a couple of reasons why Citi's

20   claim for default interest is particularly inequitable here.

21         First of all, neither of these two identified defaults

22   is, in any sense, a meaningful or equitable basis for default

23   interest.  The bankruptcy event of default is not -- first of

24   all, it's an ipso facto clause.  And in other circuits even,

25   Judge Fitzgerald's decision in W.R. Grace actually denied

1    default interest to secured lenders in a solvent case, finding

2    that the bankruptcy acceleration is an unenforceable ipso facto

3    clause.  I understand that's not the law in this circuit, that

4    the courts in this circuit have rejected that.  But the fact

5    remains, ipso facto clauses are generally disfavored, and it's

6    not a strong equitable grounds for default.

7            More fundamentally, and Your Honor certainly touched

8    on this, it's not equitable here because Citi entered into the

9    tenth amendment six weeks before the bankruptcy petition,

10   knowing -- it's in the stipulations, stipulated fact, paragraph

11   12 -- expressly contemplating that the debtor was in the

12   process of filing a bankruptcy petition.  In fact, the

13   amendment negotiated the terms of a cash collateral order.  It

14   specified the adequate protection package Citi was to receive.

15           In anticipation of bankruptcy, Citi extracted a

16   250-basis-point increase in the base interest rate, from LIBOR

17   plus six to LIBOR plus eight and a half.  And it extracted a

18   3.16-million-dollar extension fee, which I'll have more to say

19   about in a minute.  And six weeks before bankruptcy, it

20   obtained a paydown of 124 million dollars, leaving only 154

21   million outstanding.

22           I would submit that, under these circumstances, Citi's

23   extension of credit, in knowing anticipation of a bankruptcy,

24   and express negotiation of the terms of those bankruptcy,

25   amounts to a tacit waiver of the bankruptcy event of default,

1    and at the very least, renders it inequitable for Citi to rely

2    on the bankruptcy event of default as a basis for default

3    interest.  And I think Citi knows that, which is why, in its

4    papers and Mr. Roll's argument, it stressed the maturity date.

5         So let's turn to that maturity date.  The facts make

6    it clear, Your Honor, that that maturity date was a complete

7    fiction and a knowing and complete fiction.

8         THE COURT:  Well, sure, once they filed for bankruptcy

9    it's a complete fiction because everybody knows you don't

10   pay -- the loans --

11        MR. HOROWITZ:  Exactly.  Not only did they know --

12        THE COURT:  It's not a fiction; it's in the contract

13   and --

14        MR. HOROWITZ:  Okay.  But --

15        THE COURT:  But you know you're not going to be paid

16   at maturity.

17        MR. HOROWITZ:  So you enter into an extension saying

18   here's a maturity date that you know not only will the debtor

19   not be able to pay, but the debtor won't pay.  Moreover, the

20   extension itself includes provisions that would have been

21   completely meaningless if that maturity date were taken

22   seriously.  It included, for example, current interest being

23   paid on the dates contemplated by the credit agreement --

24   dates, plural, contemplated.  So it contemplated ongoing

25   interest payments after the supposed date of maturity.  It

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

 1  included that fees and expenses shall be paid on a monthly

 2  basis, obviously well past the date of maturity.

 3          THE COURT:  Are you shocked about that?

 4          MR. HOROWITZ:  No, I'm not.  I think it's obvious and

 5  I think it makes clear the point that Citi knew it was

 6  extending credit well beyond that maturity date.

 7          It also specified how they would be paid off.  It

 8  specified that they were going to be paid off from the proceeds

 9  of the sale of their collateral, knowing there was this

10  stalking-horse agreement in place, knowing that there was going

11  to be a sale process, and therefore knowing, within a fair

12  degree of certainty, what the time frame for this extension of

13  credit was going to be, as you say, in the event it ended up

14  being from the bankruptcy filing through the payoff date at the

15  end of January, seven months.  Did I get that right?  Yes,

16  seven months, and nine months from -- more or less, from the

17  date of the extension.

18          More important -- I shouldn't say more importantly,

19  but more dramatically, Your Honor, I'd ask you to turn to the

20  chart that I handed up.  The extension fee, that I referred to,

21  that Citi extracted for this tenth amendment was an amount

22  massively higher than could be justified by a two-month

23  extension of credit.  What you'll see here, Your Honor, in this

24  exhibit is -- and this is all using --

25          THE COURT:  Well, you're including it in the extension

1  to be the paydown part of the principal.

2          MR. HOROWITZ:  No, I'm not.  I'll walk through it,

3  but --

4          THE COURT:  Go ahead.

5          MR. HOROWITZ:  The 3.16 million extension fee under

6  amendment 10 is in fact the fee that was paid, not the

7  principal paydown amount.

8          THE COURT:  Okay.

9          MR. HOROWITZ:  And I think Mr. Roll will confirm that

10  if you ask him.

11          THE COURT:  All right.

12          MR. HOROWITZ:  All of this information, Your Honor, is

13  taken from the amendments that are attached to the stipulation.

14          THE COURT:  All right.

15          MR. HOROWITZ:  But what we did is we show on here the

16  effective date of each amendment, the commitment amount that

17  was then outstanding -- it reduced over time -- the new

18  maturity date -- we calculated the number of days with an

19  extension.  And you'll see that what happens is in each case

20  Citi gets an extension fee -- it's typical -- and that

21  extension fee is proportional to the length of the extension.

22  It basically amounts to a pre-paid interest, a slug of

23  interest.

24          So, for example, you'll see that in the amendment 1

25  there's a fifteen-day maturity extension and a 291,000 dollar

1   extension fee when you get to amendment 3, four times the

2   maturity extension, slightly lower commitment amount, and you

3   see a significantly higher extension fee.  We calculate this

4   out, what is the extension fee in each case as a per -- on an

5   annualized basis, as a percentage of the commitment amount, and

6   it's a round number in every case.  Citi was extracting a one-

7   percent annualized extension fee in each of the first five

8   extensions; then I think there was a period of time, if Your

9   Honor may recall, that ResCap seemed a little bit healthier;

10  went down to .75.

11        Per the short leash, the penultimate -- love using

12  that word -- extension was not a short leash; it was nearly a

13  year.  And the amendment number 8 extended from April 2011

14  through March 30th, 2012, and that was a significant extension

15  fee in terms of dollars, but on an annualized percentage basis

16  was .75 percent.

17        The extension fee that was extracted on the verge of

18  bankruptcy -- it actually says it in the agreement -- it was

19  calculated as two percent of the commitment amount, so it ends

20  up being 3.16 million.

21        THE COURT:  Okay.

22        MR. HOROWITZ:  If they charged two percent for a one-

23  year extension, that would have been double what they had

24  charged at any point in the future.  If they were charging two

25  percent for a sixty-day extension fee, then they were charging

1    an effective interest rate for that sixty-day extension of
2    credit, of twelve percent.  Or put another way, they were
3    charging an effective interest rate for that sixty days, of
4    LIBOR plus eight and a half plus twelve, or LIBOR plus twenty
5    and a half.  And I'm not suggesting that that's what Citi did.
6    What Citi did is they did double their typical extension fee,
7    but they did it knowing that, for all intents and purposes,
8    they were agreeing to extend credit for maybe as much as a
9    year, depending on how long the sale process went on.

10          In the event, Your Honor, they only ended up extending
11   credit, they got paid down nine months later, so -- I should
12   say ten months; I'm sorry.  It was ten months.  So what you see
13   on the next page is that that 3.16 million amounted to a 2.4
14   percent interest rate on the 158 million that they loaned for
15   that ten-month period.

16          So, Your Honor, I would submit that these facts make
17   it clear that that maturity date (a) was a fiction -- they knew
18   they weren't going to be paid -- and (b) that on economic
19   terms, they bargained for and they got compensation for
20   extending credit through the end of the sale process, which is
21   what happened.  So I don't think that that nominal May 30th
22   maturity-date default is an equitable basis for extracting
23   default interest.

24          Moreover, Your Honor, and we already covered this, but
25   the same facts show that Citi was handsomely compensated for

1  any supposed increased risk that it was being -- that it was

2  assuming by extending the significantly reduced amount of

3  credit into the bankruptcy.  It received a large paydown.  It

4  received a two and a half percent, 250 basis-point explicit

5  increase in the interest rate.  It received, in the form of

6  that extension fee, an additional at least 200 basis points;

7  turns out to be 240 basis-point increase in the interest rate.

8  So its effective interest rate -- and this is shown on the

9  second page -- went from LIBOR plus 6 percent before that final

10  amendment, to LIBOR plus 10.9 percent.  That's an increase of

11  almost four -- sorry -- almost five percent, which is

12  significant, more than that four-percent default interest

13  kicked -- that they say they bargained for as compensation for

14  being an involuntary creditor into the bankruptcy.

15         That LIBOR plus 10.9 percent is significantly more

16  than the debtor was paying on any of its DIP financing, and I

17  raise that, Your Honor, because what's also important to

18  understand is that this bankruptcy did not in any realistic

19  sense increase Citi's risk.  The collateral was untouched; it

20  was not primed.  In fact, not only did Citi have its collateral

21  untouched on a significantly lower commitment-amount borrowing

22  base; it also received a superpriority claim for the

23  possibility of any diminishing in value.  Citi makes a great

24  deal out of the fact that they were putatively exposed to GSC's

25  asserted first-priority claims.  The fact is, Your Honor, that

1   wasn't a change by virtue of the bankruptcy at all.  Those

2   superpriority claims existed for the life of the credit

3   agreement and were the subject of express Citibank

4   acknowledgments of the GSC superpriority claims, which Citibank

5   executed in 2007 and 2009; and those are Exhibits 1 and 2 to

6   the stipulation.  Not only did those -- that potential risk

7   exist throughout but, by virtue of getting a 124 million dollar

8   paydown, Citibank significantly reduced its exposure to that

9   priority claim.

10          So the bankruptcy did virtually nothing to affect

11  Citi's status as, as Mr. Roll points out, an oversecured

12  creditor, as recited in the collateral -- sorry -- in the cash

13  collateral order.  Throughout the bankruptcy, Citi received

14  interest vastly greater than similarly situated DIP lenders.

15  And in sum, Your Honor, Citi received a large paydown less than

16  two months before the bankruptcy, significant cash extension

17  fee and a great increase, received current interest during the

18  bankruptcy, was paid off less than nine months into the case,

19  was reimbursed in full for its attorney's fees through the date

20  that it was paid off, and indeed for some time past that.  The

21  actual -- actually, Citi was paid through April of --

22          THE COURT:  Do you agree that given the existing case

23  law, that Citi has acted in good faith in litigating this

24  issue?

25          MR. HOROWITZ:  Your Honor, that's a closer question in

1  my mind, obviously.  But I would say that under the

2  circumstances I've just recited, Citi's request for default

3  interest here is inequitable and, therefore --

4          THE COURT:  Well, I may determine at the end of the

5  day that it's inequitable, but the issue of whether they're

6  entitled to their legal fees seems to me different.  That's why

7  I framed my question differently.

8          MR. HOROWITZ:  And I think -- you know what, I tried

9  to be candid up here.  I candidly agree that that is a closer

10  question.  I would just submit that --

11          THE COURT:  How much are we talking about on the legal

12  fees?

13          You were going to look at that, Mr. Roll.

14          MR. HOROWITZ:  Three hundred and -- it's in the

15  stipulation.

16          MR. ROLL:  It is.  It is, Your Honor.  $351,935.20 --

17          THE COURT:  All right.

18          MR. ROLL:  -- through January of 2014.

19          MR. HOROWITZ:  And that's almost entirely, Your

20  Honor -- I think everyone'll agree -- fees that were incurred

21  in connection with pursuing this motion.  And so I think --

22          MR. ROLL:  That's not entirely true, but --

23          MR. HOROWITZ:  Well, I was taking a look at the

24  narrative, and --

25          THE COURT:  Well, let's not --

1     MR. HOROWITZ:  Okay.  Okay, well, Your Honor, my view

2  would simply be that since it was under these circumstances --

3  which I think are really rather extreme, frankly -- it was

4  inequitable to pursue the default interest and, therefore, the

5  fees incurred in that regard should not be allowed.  But I

6  agree that that's a closer question, Your Honor.

7     THE COURT:  Okay.  Thank you.

8     MR. HOROWITZ:  Thank you, Your Honor.

9     THE COURT:  Mr. Roll, you want to briefly respond?

10     MR. ROLL:  Yes, briefly, Your Honor.  And if I may,

11  I'd like to start with that last point.  If Mr. Horowitz and

12  his colleagues thought it was inequitable for us to pursue this

13  such that we shouldn't even get our attorney's fees, he should

14  have said that, they should have said that, on day one.

15     THE COURT:  Don't spend any more time on this issue,

16  okay?

17     MR. ROLL:  Okay.  With respect to some of the other

18  arguments he made, it's -- there's a lot that could be said

19  about this exhibit.  Here's all I will say about that:  It's

20  not quite right, as Mr. Horowitz said, that it's taken only

21  from the stipulated facts.  He was -- one thing we don't have

22  in the stipulation of facts that would have been pertinent and

23  would be pertinent to the calculation of all these rates is

24  what was actually outstanding at any given time.  He was --

25  he's doing all these calculations on the basis of commitment

1  amounts.  He's drawing inferences -- or making an inference

2  that the thing was fully drawn each time, and it was not, so --

3  there were a lot of instances where the amount drawn was

4  actually a lot less than the commitment amount.  So --

5      THE COURT:  Commitment fees are based on the

6  availability, not on what's actually drawn.

7      MR. ROLL:  I'm sorry?

8    (Counsel confer)

9      MR. ROLL:  But there were nuances here that we're just

10  not taking into account in that particular stipulation -- in

11  this particular exhibit.  That's really the point I'm trying to

12  make.

13      The other thing too is, every one of these points --

14  at every one of the points where one of these amendments was

15  negotiated -- and this is the second -- it was a point I made

16  earlier.  I don't want to beat a dead horse, but they could

17  have said no.  Mr. Horowitz kept saying Citibank did this,

18  Citibank took this, Citibank insisted on this.  The fact of the

19  matter is it takes two to tango, in any contract.  They agreed.

20  They may have felt that that was -- that they were -- that they

21  didn't want to do it, but they did it nonetheless.

22      THE COURT:  And if we were talking about pre-petition

23  interest, that argument might -- would be persuasive.  But

24  we're not talking about pre-petition --

25      MR. ROLL:  We're not.

1        THE COURT:  -- interest.

2        MR. ROLL:  We're not.  And it's also interesting that

3  they're sort of tying us to all these agreements and the

4  literal terms, and yet unwilling to recognize the literal terms

5  post-petition with respect to the default rate and the

6  applicability of the default rate.

7        The other thing worth noting too, and this is standing

8  back a little bit, the numbers -- I mean, he's trying to say

9  that the numbers on here were large, that the fees the bank got

10  were large.  None of this changes the analysis of the amount

11  with respect to what we're seeking in post-petition default-

12  rate terms.  It's still only five million dollars.  It's on the

13  same order of mag --

14        THE COURT:  Well, you were careful to make sure you

15  got the extension fee before they filed for bankruptcy.  The

16  money was -- it is high; it was in your pocket.

17        MR. ROLL:  And it was in return for consideration

18  conveyed to the debtors at the time.

19        THE COURT:  Sure.

20        MR. ROLL:  And again, they never sought to change the

21  provision in the underlying agreement, so --

22        THE COURT:  They didn't have to.  That's the point.

23  They didn't have to, because the issue is -- for post-petition

24  interest, is different.  We acknowledged that.

25        Okay, I think I have your points, unless there's

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1   something directly responsive to Mr. Horowitz you want to add.

2   We're just kind of treading the same ground.

3           MR. ROLL:  No, Your Honor.

4           THE COURT:  I'm going to take it under submission.

5   Okay?

6           MR. ROLL:  Thank you, Your Honor.

7           THE COURT:  Thank you.

8           All right, what's next on the calendar?

9           Anybody who was here on this matter is excused.

10          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11          UNIDENTIFIED SPEAKER:  Thank you.

12          UNIDENTIFIED SPEAKER:  Thank you.

13          MR. SCHROCK:  Good morning, Your Honor.  Ray Schrock

14  of Kirkland & Ellis, on behalf of Ally Financial.  I'm here

15  today with my colleague Justin Bernbrock.  And I'd also like to

16  introduce the Court to Mr. Robert Ellis with the Dykman (ph.)

17  firm; he is our declarant and, in case the Court has any

18  questions about the underlying action, he certainly is much

19  more facile with certain of the salient facts.

20          THE COURT:  Is there somebody -- who's arguing on the

21  other side?  Is there anybody here for the other counterparty?

22          MR. SCHROCK:  Your Honor, it's a pro se matter.  He

23  may be --

24          THE COURT:  All right, is anybody on the phone in

25  connection with the Ally motion to enforce the third-party

 1    nondebtor release?

 2            All right, no appearance.  Go ahead.

 3            MR. SCHROCK:  Okay.  Your Honor, I'll be brief.  We

 4    rest largely on our papers.  We think this is a straightforward

 5    application of enforcement of the Court's order.  We've set

 6    forth the salient facts in our -- and allegations, in our

 7    motion and the reply.  I did want to note for Your Honor that

 8    we did contact the other defendants in the action, and they

 9    have all consented to -- they don't have an issue with Ally

10    being dismissed from the action.

11            THE COURT:  What's happened?  Tell me this:  So there

12    was a hear -- did the hearing in the state court go forward?

13            MR. SCHROCK:  It did, Your Honor.  The hearing in

14    state court took place -- here, just a -- March 14th.

15            THE COURT:  Right.

16            MR. SCHROCK:  The judge stayed the action as to Ally

17    until a determination was made by this Court, and they also --

18    the court also denied Lahrman's motion for sanctions against

19    Ally; so that's no longer on the table.

20            THE COURT:  So let me -- the relief you're seeking

21    from me -- because you're seeking an injunction, and typically

22    an injunction has to be under Rule 7001 in an adversary

23    proceeding.

24            MR. SCHROCK:  Yes.

25            THE COURT:  The confirmation order -- or violation of

1   the confirmation order would ordinarily be enforced by

2   contempt.

3           MR. SCHROCK:  Um-hum.

4           THE COURT:  Could you address whether you can --

5   whether I could issue an injunction in response to your motion?

6           MR. SCHROCK:  Well, Your Honor, I think the Court

7   always has authority sua sponte to enforce the Court's order.

8   We --

9           THE COURT:  The question is how I enforce it.

10          MR. SCHROCK:  How you enforce it.  Your Honor, we

11  actually -- in other cases, I would say in the Southern

12  District, we have brought motions to enforce the plan, the plan

13  injunction, and I've also filed motions for contempt for

14  violating a release.  We could have brought -- I admit we could

15  have brought an adversary proceeding and gone down that route

16  for injunctive relief.  And I believe, Your Honor, we

17  actually -- addressing that issue, we informally contacted

18  chambers to -- just to query what would be -- if there's any

19  particular preference.

20          We were trying to keep it, frankly, a little lean and

21  mean, given we had a pro se plaintiff.

22          THE COURT:  Well, it's mean enough.

23          MR. SCHROCK:  Well, Your Honor, we didn't seek costs

24  or anything of that nature.  We really have tried to work this

25  out in good faith.  We don't have any interest in this

1   underlying action.  We're trying -- we're being sued for

2   something that we don't have any association with; this just

3   deals with the debtors' business.

4           THE COURT:  So just review for me -- and I know you

5   filed some supplemental papers, I think in response to an

6   inquiry from my chambers.

7           MR. SCHROCK:  Um-hum.

8           THE COURT:  I want you to put on -- go through and put

9   on the record the support that Lahrman or his significant other

10  was served with the bar-date notice, with the notice of the

11  confirmation hearing, and that because you've done this by

12  motion -- I think it has to be served in the manner of a

13  summons.  This is where a contempt issue comes in.

14          MR. SCHROCK:  Um-hum.

15          THE COURT:  I think I'm correct that -- so I want you

16  to put on the record the evidence -- referring to the evidence

17  that I have before me that Lahrman -- well, with respect to the

18  mortgage on this property, who the mortgagor is or was, because

19  I guess Lahrman is contending that he got a -- I don't know

20  whether it was a quitclaim of a half interest or of a life

21  estate, a transfer of an interest in the property from his

22  significant other, who I gather is the mortgagor.

23          MR. SCHROCK:  Yes.

24          THE COURT:  But I'd like to make sure that if

25  necessary, there's -- I mean, I've read everything that's --

RESIDENTIAL CAPITAL, LLC, ET AL.                    54

1          MR. SCHROCK:  Yes.

2          THE COURT:  -- before me, but I want you to put on the

3     record -- walk through the trail of paper that you believe

4     supports the Court granting relief, whether it's in the form of

5     an injunction or it's in the form of an order, in the nature of

6     contempt, that basically requires Lahrman to discontinue his

7     action against Ally within a certain number of days and, in the

8     event he fails to do so, would impose appropriate contempt

9     sanctions for failing to do so.

10         MR. SCHROCK:  Certainly, Your Honor.  I'd be happy to.

11    And for the record, most of these facts are set forth in Ally's

12    reply, which is filed with the Court at docket number 6661.  As

13    we note in our reply, Ally has filed appropriate notice

14    necessary to enforce the Court's order and the confirmation

15    order and the plan in these cases, with regard to Mr. Lahrman.

16    The foundation for Mr. Lahrman's claims is a 2005 mortgage

17    between GMAC Mortgage, LLC and Ms. Cynthia Damron regarding a

18    residence at 3004 Garden Boulevard, Elkhart, Indiana 46517,

19    referred to as "the Property".  It's also referred to in

20    Mr. Ellis' declaration, which is filed with the Court at docket

21    number 6621.

22         Now, according to his complaint, Lahrman and Damron

23    are significant others, are life partners.  But it is Damron,

24    not Lahrman, who is the sole borrower and mortgagor under the

25    2005 mortgage.  And accordingly, throughout these Chapter 11

1    cases, the debtors caused Damron to be served at the property

2    with, among others, notice of the commencement of the cases,

3    the bar-date order, the Court's hearing on the disclosure

4    statement, and the effective date.  That could be found in

5    footnote 4 of our reply that's at the affidavit of service for

6    the notice of the cases, at ECF 336; service regarding notice

7    of deadlines or filing proofs of claim is at 1412; the

8    affidavit of service regarding the disclosure statement is at

9    ECF 4285; the affidavit for entry of the confirmation order is

10   at docket number 6187.

11        Now, accordingly, the debtors caused notice of the

12   confirmation hearing to be published.  We also caused notice of

13   the confirmation hearing to be published in the national

14   edition of The Wall Street Journal and USA Today.  And I would

15   direct the Court to -- in the record, to ECF number 5025 for

16   the evidence of publication.

17        Under the circumstances here, Your Honor, and because

18   Lahrman was not known to Ally or the debtors until he filed an

19   action on January 3rd, 2014, specific notice to Damron and

20   publication notice of the confirmation hearing provided

21   sufficient basis, under applicable law, to enter the order.

22        And since Ally was initially served with the summons

23   in this Indiana State Court, as set forth in the declaration of

24   Robert Ellis at 6621, there were a couple of letters that we

25   sent to Mr. Lahrman, the first indicating there's been an

1    injunction -- or there's been a plan confirmed, Ally has been

2    released, its January 29th letter, and then a follow-up letter

3    on February 20th.

4          Interestingly, in these particular cases, again, Ally

5    does not have any interest in the underlying property.  We do

6    not have a stake in the outcome.  I will state for the record

7    that, as counsel, we have contacted the other defendants in

8    this action, who have all indicated that they do not have an

9    issue with Ally being dismissed from this action and that, in

10    fact, Mr. Lahrman can continue his action and seek whatever

11    relief he deems appropriate against those parties.

12          But here we're simply, given the fact of Ally being

13    taken to another court for actions where this entire business

14    and this entire -- all of the allegations -- if you look at

15    Mr. Lahrman's complaint, which is attached as Exhibit A to

16    docket number 6621, the entire substance of his allegations

17    relate to -- and although Ally's named in the caption, the

18    allegations go to the debtors' business in servicing the loan

19    at issue.  It's just the defined term "Ally" that is used.

20          And so therefore, Your Honor, in light of the fact

21    that we've contacted counsel -- you know, we are expending fees

22    and coming here before you today -- we'd ask for the Court to

23    enjoin or otherwise issue an order to show cause why, if Ally's

24    not dismissed from the action within a certain period of time,

25    that -- and frankly, I know Mr. Lahrman wants this action to go

1  forward, and the state court has stayed it pending this Court's

2  decision as to whether or not to dismiss Ally with prejudice.

3  But if any further action --

4         THE COURT:  Well, I --

5         MR. SCHROCK:  -- is --

6         THE COURT:  I'll tell you that I don't believe that I

7  have the power to enter an order dismissing Ally with prejudice

8  in an action pending in state court.

9         MR. SCHROCK:  Yes.

10        THE COURT:  I believe that I do have the power to

11 enter an order requiring Lahrman to dismiss Ally as a defendant

12 in the state court action --

13        MR. SCHROCK:  Or otherwise holding him in contempt.

14        THE COURT:  -- and in failure to -- in his failure to

15 do so, bearing the consequences of disobeying an order of the

16 Court.  It'll be for the court in Indiana to decide what, if

17 anything, it's going to do if I enter an order and Lahrman

18 ignores it, in terms of that action.

19        MR. SCHROCK:  Yeah, I agree, Your Honor.

20        THE COURT:  Okay.

21        MR. SCHROCK:  That's correct.

22        THE COURT:  So let me -- I raised the issue before,

23 and I will -- I think it's not entirely clear to me -- Rule

24 7001, subsection (7) -- an adversary proceeding is governed by

25 the Rules of this part.  The following are adversary

1   proceedings.  (7) is a proceeding to obtain an injunction or

2   other equitable relief, except when a Chapter 9, 11, 12 or 13

3   plan provides further relief.  And here the plan does provide

4   further relief.

5            MR. SCHROCK:  Um-hum.

6            THE COURT:  All right.  There is a provision that

7   enjoins anyone from seeking to -- disobeying the third-party

8   nondebtor release, in circumstances where it applies.

9            MR. SCHROCK:  Yes, sir.  Your Honor, I've done it both

10  ways.  We're happy to --

11           THE COURT:  Okay.  Just --

12           MR. SCHROCK:  -- proceed how you want to do --

13           THE COURT:  Let me ask this:  I want -- because Rule

14  9020 is the Rule that applies to contempt proceedings, and it

15  requires -- it says 9014 -- Rule 9014 governs a motion for an

16  order of contempt.  And 9014(b), Service:  The motion shall be

17  served in the manner provided for service of a summons and

18  complaint by Rule 7004.  So, just, how was Lahrman served with

19  the motion?

20           MR. SCHROCK:  Your Honor, he was served by special --

21  frankly, by a special process server --

22           THE COURT:  Okay.

23           MR. SCHROCK:  -- and as well as by mail.

24           THE COURT:  All right.  So the process server -- is

25  there an affidavit of service with respect to service of the

1  motion?

2          MR. SCHROCK:  Your Honor, give me just a moment --

3          THE COURT:  Okay.

4          MR. SCHROCK:  -- please.

5          Yes, Your Honor.  It's -- actually, it's at Exhibit A

6  to our reply.

7          THE COURT:  Okay.  And just why don't you just recite

8  to me what it shows.

9          MR. SCHROCK:  It is an affidavit of process server and

10  it shows that on March 1st of 2014 at 9:50 a.m. that the notice

11  of Ally Financial Inc.'s motion for an order enforcing the plan

12  injunction was served on Timothy Lahrman at his home.

13          THE COURT:  It was personal service?

14          MR. SCHROCK:  Yes, it was, Your Honor --

15          THE COURT:  Okay.

16          MR. SCHROCK:  -- personal service.

17          THE COURT:  All right.

18          MR. SCHROCK:  And that is Exhibit A to docket number

19  6661.

20          THE COURT:  All right.

21          MR. SCHROCK:  So, Your Honor, I think, under those

22  circumstances, we think we've met the requirements to enforce

23  the Court's order.

24          THE COURT:  Okay.  Well, the Court grants the motion

25  and will enter an order enjoining Mr. Lahrman from prosecuting

1   his state court action against Ally Financial.  The basis of

2   the Court's ruling is the provisions in the confirmed plan of

3   reorganization, which was not appealed, that both releases Ally

4   from claims that would clearly include the claims that

5   Mr. Lahrman has asserted in his state court action, and also

6   provides a provision for an injunction barring prosecution of

7   those released claims.

8          "All courts retain the jurisdiction to interpret and

9   enforce their own orders," In re Charter Communications, number

10  09-11435, 2010 WL 502764, at star 4 (Bankr. S.D.N.Y., Feb. 8,

11  2010), and it's Judge Peck's decision in Charter Communications

12  enforcing third-party release in the Charter case.  And while a

13  bankruptcy court's jurisdiction does not begin to diminish in

14  importance following a plan confirmation, the action in this

15  case is "sufficiently close in time to confirmation of the

16  plan, sufficiently critical to the integrity of the plan

17  structure, that it is proper for this Court to take firm

18  control and decide" the motion.  Charter Communications,

19  2010 WL 502764, at star 4.

20         As Judge Peck noted in Charter Communications, where a

21  motion seeks to "prevent the prosecution of causes of action

22  expressly prohibited by the confirmation order", it would be

23  "difficult to identify judicial acts that are any more critical

24  to the orderly functioning of the bankruptcy process or more

25  closely tethered to core bankruptcy jurisdiction."  Again, it's

 1   the Charter decision at star 4, in citing In re Petrie Retail

 2   Inc., 304 F.3d 223, at 230 (2d Cir. 2002), finding a bankruptcy

 3   court retained core jurisdiction post-confirmation "to

 4   interpret and enforce its own orders, particularly when

 5   disputes arise over a bankruptcy plan of reorganization".

 6        Mr. Schrock has indicated that at a hearing on March

 7   14th, the state court judge in Indiana stayed the action as to

 8   Ally pending a decision by this Court.  While it would

 9   certainly be, I think, proper for both the state court and this

10   Court to interpret and enforce the provisions in the plan,

11   here, as Judge Peck concluded in Charter, the "bankruptcy court

12   is more closely connected to the current dispute and is the

13   proper forum to rule with respect to" enforcement of third-

14   party releases pursuant to the plan.  That's Charter, star 3.

15        I won't quote further from Charter, but Judge Peck

16   carefully examined the factors that go into deciding whether

17   it's appropriate for the bankruptcy court to decide the matter

18   before it of this nature, and I believe it clearly is, in this

19   circumstance.

20        The 2.1 billion dollar Ally contribution to the

21   successful plan in this case was a significant factor to

22   achieving global resolution and plan confirmation of the

23   debtors' bankruptcy, and a key component of Ally's willingness

24   to provide the contribution was the plan injunction and third-

25   party release.  And at the confirmation hearing, I believe I

1    carefully reviewed on the record the factors that go into

2    considering -- and there were no objections -- by the time of

3    confirmation, there were no objections to the third-party

4    nondebtor release included in the plan.  Earlier in the case,

5    the U.S. Trustee, for one, had objected; the JSNs had objected.

6    Those objections were withdrawn.  And certainly I think the

7    U.S. Trustee, as always, carefully monitors the inclusion of

8    any third-party nondebtor releases in Chapter 11 plans, and it

9    carefully carried out that role here.  So there's no issue that

10   the JSNs withdrew their objection because they got some other

11   consideration for doing so.  The U.S. Trustee, I think fairly

12   rigorously, enforces the law with respect to third-party

13   nondebtor releases.

14       And this Court went through all of the factors under

15   Metromedia, Johns-Manville, in finding that the Court had the

16   jurisdiction to enter the third-party nondebtor release in

17   favor of Ally in that the Metromedia factors, which created a

18   very high burden before a court will grant such relief, were

19   satisfied in this case.  And I went through that analysis and

20   carefully considered all those factors in going ahead and

21   granting -- and approving the plan that included the third-

22   party nondebtor release.

23       Here, having reviewed the state court pleading and the

24   facts as set out in Ally's supporting papers, it strongly

25   appears here that Mr. Lahrman has tried to do an end run around

1     the fact that the mortgagor was his life partner, Ms. Damron,

2     who, if anyone had a claim, it would have been Ms. Damron.  And

3     if he felt he had a claim, he should have filed a claim in this

4     bankruptcy case.  Neither he nor Ms. Damron filed a proof of

5     claim in this bankruptcy case, and clearly it's far too late

6     for that to occur.  By failing to file claims, any claim would

7     be discharged as a result of the plan.  The plan here included

8     very express terms with a third-party release and plan

9     injunction.

10          Mr. Lahrman didn't file his action against Ally until

11     after the plan was confirmed.  Well, I believe he filed it in

12     January -- am I correct -- January 2014?

13          MR. SCHROCK:  Yes, that's correct, Your Honor.

14          THE COURT:  And this plan became effective -- I think

15     it was December 19th or --

16          MR. SCHROCK:  Yes, Your Honor.

17          THE COURT:  -- thereabouts.  So it's the brazen

18     disregard of the confirmed plan, confirmation order in this

19     case, that had become effective before Lahrman filed his action

20     in -- so the Court will enter an order enjoining Mr. Lahrman

21     from prosecuting his claims against Ally Financial in the state

22     court action in Indiana.

23          You need to revise the proposed order.

24          MR. SCHROCK:  Yes.

25          THE COURT:  The order should provide that the Court

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1    gives Mr. Lahrman fourteen days from today -- fourteen calendar

2    days from today to file a dismissal of the action, with

3    prejudice against Ally Financial in the state court action in

4    Indiana.  If Lahrman fails to do so, the Court will hold

5    Mr. Lahrman in contempt.  I will reserve decision on what

6    contempt sanctions will be applied in the event that Lahrman

7    fails to comply with my order.

8          Mr. Schrock, provide us with an amended order to the

9    effect that I've just described; it'll get entered.  And then I

10   want the order served on Mr. Lahrman in the same manner

11   required by 9014(b).  Since he hasn't made an appearance here,

12   I want to be sure that the order should be served in the manner

13   provided for service of a summons and complaint.  I'm not sure

14   that that's required, but I want that done here.

15         If Lahrman fails to comply with the order, you can

16   bring on another motion to enforce this order, with contempt.

17   The contempt sanctions, while not determining the amount, it

18   should include any additional attorney's fees from today on, in

19   bringing on an additional motion.  Civil contempt is intended

20   to compel compliance with a lawful order of a court and can

21   include a compensatory award including attorney's fees.  So you

22   didn't see attorney's fees for the motion today; I'm not going

23   to permit you to do that.  But if you have to go through

24   further action in this court, you can make an appropriate

25   motion to include it.

1          Have I left anything out?

2          MR. SCHROCK:  I think that covers it, Judge.

3          THE COURT:  Thank you very much, Mr. Schrock.

4          MR. SCHROCK:  Thank you very much.

5          Your Honor, if I could just address one other --

6          THE COURT:  Yeah, go ahead.

7          MR. SCHROCK:  -- one other matter.  We've been

8   trying -- just to keep the Court updated, we're trying very

9   hard not to bring these type of motions, and we've worked out a

10  very good number of them where parties have just voluntarily

11  dismissed the action; of course all the consenting claimants

12  have.  We do have a couple of matters where I think we're going

13  to have to bring actions.  We're bringing one -- another motion

14  before the Court, and we were notified of one the other day.

15         Your Honor, we'll take great pain, of course, not to

16  bring these motions unless absolutely necessary.  Sometimes

17  we're put under very strict response deadlines.  And so I would

18  just ask Your Honor, if we do have to indulge the Court -- and

19  we're going to try very much not to -- there may be an occasion

20  where we have to ask for expedited consideration of a couple of

21  issues.  We're trying not to do that, but there's one

22  particular action in Alabama where we have a ten-day response

23  for, to --

24         THE COURT:  I assume you'll order a transcript from

25  today as well.

1        MR. SCHROCK:  Yes, we will.  Yes, we will, Judge.

2        THE COURT:  I will -- as with everything that has

3   occurred in the ResCap case, where appropriate I've shortened

4   time and heard things on a short schedule.

5        MR. SCHROCK:  Okay.

6        THE COURT:  Okay.

7        MR. SCHROCK:  Thanks very much, Judge.

8        THE COURT:  Thanks very much --

9        MR. SCHROCK:  Okay.

10        THE COURT:  -- Mr. Schrock.

11        MR. SCHROCK:  Thank you.

12        THE COURT:  Mr. Wishnew, what's next?

13        MR. WISHNEW:  Thank you, Your Honor.  Just for the

14   record, Jordan Wishnew, Morrison & Foerster, for the ResCap

15   Borrower Claims Trust.

16        That brings us, Your Honor, to section 5, the claims

17   objections on today's agenda, on page 8.  The first contested

18   matter before Your Honor is item 3 on page 10, the fiftieth

19   omnibus objection.  Your Honor, this is something that the

20   debtors put -- I'm sorry -- the borrowers' trust put back on

21   the calendar because, prior to the hearing on the fiftieth

22   omnibus objection, we had reached a settlement with counsel to

23   Ms. Jacqueline Warner; we had documented the settlement, hadn't

24   heard anything.  Long story short, we find out that her counsel

25   was released by Ms. Warner, and Ms. Warner believed that she

1    had a secured claim against us, as opposed to an unsecured

2    claim.  We tried to dispel her of that, not to -- we didn't

3    have any success in that regards, and we felt that the matter

4    needed to come back on the calendar, to bring to the Court's

5    attention.

6           The basis for the debtor -- for --

7           THE COURT:  Let me ask; is Ms. Warner on the phone?

8           MS. WARNER:  Yes.  Jacqueline Warner's here, on

9    CourtCall.

10          THE COURT:  Thank you.

11          Go ahead, Mr. Wishnew.

12          MR. WISHNEW:  Your Honor, the basis for the objection

13   was what we deemed an origination-issues objection, and that

14   was because there was an allegation that Ms. Warner had -- she

15   believed, had validly rescinded her loan.  And the fact of the

16   matter is, while she did send notices to cancel her loan, that

17   loan was never cancelled.  She never sought to repay the amount

18   to the debtors that was owed under her loan.  She simply, in

19   our opinion, tried to unilaterally cancel her loan and say it

20   was discharged.  She argues that her obligation to GMAC

21   Mortgage began as servicer.  We did not originate this loan.

22   This loan was originated with CMG Mortgage, and the note was

23   assigned to GMAC Bank, which is Ally Bank, a nondebtor entity.

24   GMAC Mortgage only serviced this loan, and has always serviced

25   this loan.

1       So she then says, well, the loan was -- my obligation

2   was discharged in my Chapter 7.  And just to back up and give

3   you a little bit of chronology, Your Honor; Ms. Warner filed a

4   Chapter 13 in the Northern District of California in November

5   2009.  She voluntarily converted that to a Chapter 7 in

6   December 2009.  In September 2010, she did receive a discharge;

7   however, her discharge specifically notes that a creditor may

8   have the right to enforce a valid lien, subsume mortgage or

9   security interest against the discharge of the debtors'

10  property after the bankruptcy if the lien was not void or

11  eliminated in the bankruptcy case.

12      Your Honor if you were to look to the docket of

13  Ms. Warner's bankruptcy case, specific --

14      THE COURT:  Which I did this morning.

15      MR. WISHNEW:  Okay.  Thank you, Your Honor.  Docket at

16  entry 143 is the Chapter 7 trustee's report, and in that

17  trustee's report he confirms -- or the U.S. Trustee confirms

18  that the real property that's at issue here, in California, was

19  deemed abandoned, per Section 54 --

20      THE COURT:  Where is it?  This is in the trustee's

21  final report?

22      MR. WISHNEW:  That's correct, Your --

23      THE COURT:  I have that in front of me.  What page?

24      MR. WISHNEW:  Sure, Your Honor.  Hold on one minute.

25      THE COURT:  So the trustee's final report --

1          MR. WISHNEW:  It's Form 1, Your Honor, Exhibit 8.

2    It's --

3          THE COURT:  Well -- okay, I don't have the exhibits --

4          MR. WISHNEW:  I can --

5          THE COURT:  -- all the exhibits to it.

6          MR. WISHNEW:  If Your Honor -- I can hand it to you.

7          THE COURT:  Okay, come on up.  Oh, I --

8          All right, what I've been handed is a document,

9    Chapter 7 Trustee's Final Account and Distribution Report

10   Certification that the estate has been fully administered and

11   the application to be discharged; it's filed in case number

12   09-33436, and it is ECF docket number 143, filed on November

13   4th, 2010.  And Mr. Wishnew has pointed me to Form 1, which is

14   Exhibit 8, and page 1 of that document; it's page 15 of the

15   filed document with the ECF number; page 15 of the filing.

16         What I had before me actually, Mr. Wishnew, was not

17   this document, but I had the trustee's final report from the

18   case, which is ECF docket number 113 from the same case.  But

19   what is it that you say this shows?

20         MR. WISHNEW:  Well, I think the first line of that

21   page, Your Honor, shows that the real property was deemed

22   abandoned back to Ms. Warner.  So, essentially the secured

23   claim --

24         THE COURT:  How does -- why does it show that it was

25   abandoned?

1          MR. WISHNEW:  If you look at the far right-hand --

2          THE COURT:  Yes.

3          MR. WISHNEW:  -- column, I believe it says "DA".

4          THE COURT:  It doesn't.  It says -- which number is

5     this now you're looking at?

6          MR. WISHNEW:  It should be --

7          THE COURT:  I could give the document back to you.

8          MR. WISHNEW:  Yeah.

9          THE COURT:  It has "FA", fully administered.

10          MR. WISHNEW:  Your Honor, in that report, line 1,

11     there's two relevant columns:  there's column 6, which does say

12     it's fully administered, as noted by "FA" --

13          THE COURT:  Yes.

14          MR. WISHNEW:  -- but in column 4 it does say "DA" --

15          THE COURT:  Okay.

16          MR. WISHNEW:  -- deemed abandoned --

17          THE COURT:  All right.

18          MR. WISHNEW:  -- under 54 -- 554(c).  So in other

19     words, the Chapter 7 trustee's never administered -- or never

20     actually liquidated the property.  It was deemed abandoned back

21     to Ms. Warner.  The secured claim remained in place.  There's

22     no order of a court, in the Chapter 7 proceeding, in any way

23     invalidating the lien.  And subsequently -- and so there is no

24     discharge of the lien.  The lien has always remained in place.

25          THE COURT:  Let's back up for a second --

1          MR. WISHNEW:  Sure.

2          THE COURT:  -- because -- Ally filed a proof of claim

3    in the bankruptcy --

4          MR. WISHNEW:  Um-hum.

5          THE COURT:  -- in her bankruptcy, and there was never

6    an objection to the claim, nor did Ms. Warner ever file an

7    adversary proceeding under Rule 7001, subsection -- hang on --

8    subsection (2) -- let me find the Rule.

9          Yeah.  7001, subsection (2), a proceeding to determine

10   the validity, priority or extent of a lien.  The law basically

11   is, in any event, that a lien rides through bankruptcy unless

12   it's been invalidated.  And in support of that, we can look at

13   my decision in In re Wilson, 492 B.R. 691 (Bankr. S.D.N.Y.,

14   2013).  The effect of the discharge is to discharge the

15   personal liability but does not affect the lien.  And the

16   secured creditor, post-discharge, post-dismissal, of the

17   bankruptcy case, is permitted to enforce its lien.  I covered

18   that in the Wilson case.

19         There's an additional issue here that I want to raise.

20   Well, first off, tell me -- let me find what I'm looking for.

21      (Pause)

22         THE COURT:  As I understand it, Ms. Warner sold the

23   property in November 2012.

24         MR. WISHNEW:  That's correct, Your Honor.

25         THE COURT:  And she asserts that she was forced to pay

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1  GMAC $1,049,761.96 following the property sale.  Who owned the

2  mortgage at that point?

3          MR. WISHNEW:  At that point, Your Honor, the

4  mortgage -- let's see.  It was Ally Bank, Your Honor.

5          THE COURT:  All right.  So when -- what, GMAC was

6  still servicing the mortgage --

7          MR. WISHNEW:  That --

8          THE COURT:  -- at that time?

9          MR. WISHNEW:  Absolutely correct, Your Honor.

10         THE COURT:  And so the proceeds that were received

11  were paid back to Ally Bank?  Is that right?

12         MR. WISHNEW:  Correct, Your Honor.

13         THE COURT:  All right.  Do you agree that the personal

14  liability was discharged as a result of the discharge in

15  Ms. Warner's bankruptcy, but the lien rode through and could

16  still be enforced by the mortgagee or the loan servicer?

17         MR. WISHNEW:  Yes, Your Honor.

18         THE COURT:  Okay, and that's what happened here --

19         MR. WISHNEW:  Correct, Your Honor.

20         THE COURT:  -- not through foreclosure, but basically,

21  she couldn't sell the house unless she satisfied the existing

22  lien?

23         MR. WISHNEW:  I believe it actually was through

24  foreclosure, Your Honor.

25         THE COURT:  Okay.

1        MR. WISHNEW:  Foreclosure was started in September of

2   2012 and then it was sold in November of two thousand --

3        THE COURT:  In a foreclosure sale?

4        MR. WISHNEW:  I believe so, Your Honor; yes.

5        THE COURT:  Ms. Warner, was the house sold in

6   foreclosure, or did you find a buyer for it?

7        MS. WARNER:  The house was not sold in foreclosure,

8   but it was sold under the threat of foreclosure.

9        THE COURT:  Okay.  You found a buyer?

10       MS. WARNER:  The house -- I had an agent that did find

11   a buyer --

12       THE COURT:  Okay.

13       MS. WARNER:  -- that was qualified and could buy a

14   home --

15       THE COURT:  Okay.  What --

16       MS. WARNER:  -- to avoid the scheduled sale at the

17   auct -- at the courthouse steps on January 9th --

18       THE COURT:  Okay.  How --

19       MS. WARNER:  -- 2013, which --

20       THE COURT:  How much did the house sell for?

21       MS. WARNER:  One million -- I think it's 725 --

22       THE COURT:  Okay.  In --

23       MS. WARNER:  -- 725,000.

24       THE COURT:  Were you paid the surplus from the sale?

25       MS. WARNER:  Yes.

1   THE COURT:  So the other issue, Mr. Wishnew, that

2   neither you nor Ms. Warner have addressed, she filed her --

3   filed a Chapter 13 on November 4th, 2009.  She served a notice

4   of right to cancel, on November 16, 2009, after the filing of

5   the Chapter 13.  She alleges, in the notice of right to cancel

6   that she filed during the Chapter 13 case, that -- and I'm

7   reading from page 2 of three -- "Being as the entire purported

8   loan/mortgage process and deed of trust/security instrument

9   referenced herein and throughout was obtained by wrongful acts

10  of fraud, fraudulent inducement, concealment, and fraudulent

11  misrepresentation, the borrower has other recourse right and

12  cause of action under numerous state and federal statutes."  It

13  goes on from there.

14        Schedules that Ms. Warner filed -- all right, so,

15  filed it as a Chapter 13 on November 4th, 2009.  It was

16  converted to a Chapter 7 on December 23, 2009.  In looking at

17  the schedules that she filed, she did not list among her assets

18  any claims against Ally or anyone else, for fraud in connection

19  with the mortgage loans that she obtained.  Any such claims

20  would have been property of the estate.

21        So the loan was in 2007, I believe?

22        MR. WISHNEW:  That's correct, Your Honor.

23        THE COURT:  So what she is -- what she was complaining

24  about was fraud in connection with the loan transaction on

25  November 16th, 2007.

1          MR. WISHNEW:  Correct, Your Honor.

2          THE COURT:  She files for bankruptcy in 2009.  If she

3  had any claims for fraud, those claims would have been property

4  of the estate in her Chapter 13 and upon conversion to Chapter

5  7, in particular because the fraud allegedly occurred before

6  she filed the bankruptcy petition at all.

7          MR. WISHNEW:  Agree, Your Honor.

8          THE COURT:  And so I don't know how she has standing

9  to assert any claims in this bankruptcy, because the claims --

10  she didn't schedule it, but there are consequences in

11  failing -- if you think you have a claim, in failing to

12  schedule it.  So she did, in the bankruptcy, file a copy of

13  this notice of right to cancel.

14          Cover for me, if you will, Mr. Wishnew -- as I

15  understand it, there's a split in authority -- who has the

16  burden of bringing an action -- if a lender won't acknowledge a

17  rescission, who has the burden of bringing an action to force a

18  rescission.

19          MR. WISHNEW:  It should be the borrower that brings

20  the action for rescission; but again, it's against the lender

21  as opposed to --

22          THE COURT:  Right.

23          MR. WISHNEW:  -- the servicer.  And here, GMAC

24  Mortgage was only acting in its capacity as a servicer.  And so

25  any sort of action for rescission under the Truth in Lending

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1    Act is properly against a nondebtor entity, which really goes

2    to the heart of our objection here is that any sort of

3    rescission-related claim or anything deriving from that claim

4    isn't assertible against GMAC Mortgage or its debtor

5    affiliates.

6            THE COURT:  All right, anything else you want to add?

7            MR. WISHNEW:  That's it, Your Honor.

8            THE COURT:  Okay.  Ms. Warner, go ahead.

9            MS. WARNER:  Okay.  Thank you.  First off, in regards

10   to the bankruptcy, I just want to disclose that I really should

11   not have been in bankruptcy.  I went pro se originally; made a

12   mistake.  I then hired a bankruptcy attorney.  And in response

13   to your comment of there was no claim against Ally for fraud in

14   my bankruptcy, I relied upon -- on my attorney at that time, to

15   tell me that I -- this is something I had not heard until just

16   now.  So I didn't know that that was -- I think you said Rule

17   7001 --

18           THE COURT:  Well, 7001 --

19           MS. WARNER:  -- subsection (2).

20           THE COURT:  Wait.  Let me just say, 7001-2 (sic) deals

21   with trying to invalidate a lien.

22           MS. WARNER:  Okay.  That doesn't deal with whether --

23   if you had a claim for fraud against Ally or the other parties

24   that were involved in granting you the loan.  So I just want to

25   be -- I'm not giving you legal advice but, just to be clear --

1          MS. WARNER:  Yeah.

2          THE COURT:  -- I wasn't suggesting that you had to

3    bring an adversary proceeding under 7001, subsection 2, to

4    assert a fraud claim against anybody.

5          MS. WARNER:  Okay.

6          THE COURT:  The 7001 --

7          MS. WARNER:  Thank you for the clarification.

8          THE COURT:  Okay.  That deals with invalidating the

9    lien.

10         Go ahead.

11         MS. WARNER:  Okay.  So my first point is that I didn't

12   make a claim against Ally for fraud, because I was not advised

13   by my attorney, at the time, to do so, because I realized that

14   I had gotten myself into bankruptcy -- I was solvent.  And I --

15   they would not let me out.  So I was stuck in bankruptcy.

16         I got an attorney; he knew my case, he knew my claim

17   about the fraud, he knew all my rental properties were in

18   foreclosure.  He knew the whole story.  He said that he would

19   help me, and then he proceeded to not.  So I was really, I

20   don't know, undermined, disarmed, to not do that.  Number one.

21         In terms of the -- well, there's a lot I can say here.

22   In terms of your question, the burden of action to force the

23   rescission, which is off topic from the bankruptcy.  Sorry.

24         THE COURT:  It's not off topic.  I mean that's -- you

25   need to address it.

RESIDENTIAL CAPITAL, LLC, ET AL.                          78

1          MS. WARNER:  You know, everything that I've read, and,

2     again, I'm pro se, and I just tried to learn as much as I can

3     the old-fashioned way, by reading things over and over.

4     Nothing in the rescission laws say that the borrower has the

5     burden of action to force the rescission.  Everything I read is

6     contrary to that and says step one is notice.  Step two, then

7     the lender can do and respond within twenty days and make the

8     deed of trust unsecured and go through it that way.  I've never

9     seen that, so this is the question I had, and I'd like to see

10    more information where it points specifically to that, because

11    I could not find who has the burden of proof to force the

12    rescission.  That's, you know, one of my observations in this

13    conversation here.

14          THE COURT:  Well, let me ask you this.

15          MS. WARNER:  The other thing -- the other thing that

16    comes up is the nondebtor entity.  My first notice of

17    rescission was done on June 29, 2009, which is prior to my

18    bankruptcy, and which is what I'm really relying upon in this

19    situation, because I notified Ally Bank, CMG Mortgage, LLC --

20    C-M-G Mortgage, and including the title company, First American

21    Title, and I let everybody know.

22          The next event after I get no response --

23          THE COURT:  Let me just stop you for a second.  What's

24    the date, because the earliest one I saw was November 16, 2009?

25    You say there was a June, 2009?

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1        MS. WARNER:  Oh.  It was in June 29, 2009.  So it's
2   previous to the November.
3        THE COURT:  Okay.  That I haven't seen.
4        MS. WARNER:  Okay.  It's in one of my attachments.  I
5   don't know which offhand.  I'll get that in a minute, but my
6   point is bankruptcy aside, it was a major mistake for me.  I
7   understand that the trustee abandoned my claim.  My perception
8   on that is that she abandoned it because she knew that I had
9   done the rescission previous --
10       THE COURT:  She didn't --
11       MS. WARNER:  -- and didn't want to step on that --
12       THE COURT:  She didn't --
13       MS. WARNER:  -- so she just --
14       THE COURT:  She didn't --
15       MS. WARNER:  -- let it go.
16       THE COURT:  She didn't abandon your claim.  I mean,
17   you never scheduled your claim.  You scheduled the property,
18   and the trustee abandoned the property.  The trustee couldn't
19   abandon the claim, because you didn't schedule the claim.
20       MS. WARNER:  And I didn't schedule it because I didn't
21   know I was supposed to, and I had an attorney that didn't tell
22   me that.
23       THE COURT:  Let me ask you this.  And I think this is,
24   sort of, at the heart of Mr. Wishnew's objection, is if you had
25   a rescission claim to assert it was against Ally Bank, not

1  against the loan servicer.  The loan servicer didn't put you

2  into the loan.  You were trying to rescind the loan on the

3  basis of fraud.  GMAC was servicing the loan.  Why do you think

4  you have a claim against the debtor, any of the debtors in this

5  case, based on rescission?  Whether you had a good rescission

6  claim against Ally Bank or not, what do you think gives you a

7  claim for money against GMAC?

8          MS. WARNER:  Because GMAC filed a claim in my

9  bankruptcy --

10         THE COURT:  Nor Ally --

11         MS. WARNER:  -- to the --

12         THE COURT:  I looked.  And the schedule lists the

13 creditor.  Let me find it.  I've got it in my pile of things.

14 Bear with me a second.

15     (Pause)

16         THE COURT:  The claims register lists claim number 5

17 as Ally Bank, formerly known as GMAC Bank, and it lists a

18 secured claim in the amount of $990,742.62.  GMAC Bank, which

19 is now known as Ally Bank, is not a debtor in this bankruptcy

20 case.  Never been in this case.  So that's who filed the claim.

21 GMAC Mortgage, who serviced the loan, never filed a claim in

22 your bankruptcy case.  Ally Bank, which held the note, that's

23 who filed the claim.

24         So what is it that you think gives you -- and I

25 understand that you believed you were entitled to rescission of

1  the loan.  What is it that you think gives you a claim against

2  GMAC Mortgage -- which was the loan servicer, not the lender --

3  and it is a debtor in this case or was a debtor in this case?

4       MS. WARNER:  Because I had notified the attorney that

5  filed claim number 5 that you just mentioned, and I notified

6  her also of my notice of right to cancel, which you saw the

7  letter, and that was done approximately a month after the one

8  that you referred to.  It was done in December of 2009.  And I

9  went, based on the B10, that she worked for GMAC, who also

10 represented and worked for, was affiliated with Ally Bank.  So

11 I went with the fact that notice to agent is also notice to all

12 of the other parties.  Especially being an attorney she

13 obviously would know all the parties.

14      THE COURT:  No.  Well, whether notice was appropriate

15 or not really isn't the issue I'm focused on.  It's whether you

16 have a -- because the issue here is you filed claims in this

17 bankruptcy case.  And the issue is do you have -- and they've

18 moved to expunge the claim.  So the issue is do you have a

19 claim against the debtors, not because you served a notice on

20 them because you say they were an agent for Ally Bank.

21      MS. WARNER:  They took the money.

22      THE COURT:  Well, they took the money and paid it back

23 to Ally Bank, which was -- they were the servicer.  So the

24 servicer collects the money and forwards it on to the lender to

25 repay the loan.

1          MS. WARNER:  Can I respond to that?

2          THE COURT:  Yes.  Go ahead.

3          MS. WARNER:  In reading over the servicing agreement

4    that GMAC agreed to with -- let's see.  Let me find my -- okay.

5    Right here.  The servicing agreement filed with the sec.gov

6    dated October 26, 2007, GMAC Mortgage, LLC, as servicer, GMACM

7    Home Equity Loan Trust 2007-HE3, as issuer, and Bank of New

8    York Trust Company, N.A., as indenture trustee.  It says under

9    Article III, "Administration and Servicing of Mortgage Loans",

10   Section 3.01, "The Servicer", (a).

11         For the sake of time I'm going to just skip to the

12   middle of the paragraph --

13         THE COURT:  Yes.  Go ahead.

14         MS. WARNER:  -- if that's okay with you.  Your

15   Honor's --

16         THE COURT:  Sure.  Go ahead.

17         MS. WARNER:  Is that okay?

18         THE COURT:  Yes.  Go ahead.

19         MS. WARNER:  Okay.  "Without limiting the generality

20   of the foregoing, the servicer shall continue, and he is (sic)

21   authorized and empowered by the issuer and the indenture

22   trustee, as pledges of the Mortgage Loans, to execute

23   satisfaction or cancellation, or of partial or full release or

24   discharge and all other comparable instruments with respect to

25   the mortgage loans and the mortgaged properties."

1        So they had the power to do this.  They had the power

2   to administer any discharge if they wanted to or satisfaction

3   if they wanted to.  But also it says, and I can't find it right

4   now, but they were entitled -- the agreement between these

5   parties says that GMAC is entitled to Foreclosure Profits,

6   meaning capital F and capital P, which to me seems a little

7   contradictory, because everything I hear about foreclosure,

8   there's a loss of money, not a gain of money.  There's

9   certainly no profits on the table.  So I really have to

10  question who got to keep the money, based on the servicing

11  agreement, Article III.

12        THE COURT:  Okay.  Anything else you want to add?

13        MS. WARNER:  At this particular point not for this.

14  There's other things I can say --

15        THE COURT:  Go ahead.

16        MS. WARNER:  -- of course, whenever the time's right.

17        THE COURT:  No.  The time is right.  Go ahead.

18        MS. WARNER:  Okay.  Well, I want to back up to June

19  29, 2009.  Apparently you did not get a copy of the exhibit.

20        THE COURT:  I may.  It may be in -- look, there's a

21  lot of paper here that I tried to dig through and find so --

22  but go ahead.

23        MS. WARNER:  Okay.  My claim in -- my claim, based on

24  that rescission, all four parties were notified.  Nobody

25  responded.  It was a default on their part.  And now it seems

RESIDENTIAL CAPITAL, LLC, ET AL.                                    84

1    like everybody wants to go back in time to four plus years and

2    say oh, you know, we disagree.  Where was everybody then?  I

3    really would like to have had that conversation back then.  It

4    would have changed my life dramatically.  For the better or the

5    worse, it still would have been better, because at least I

6    could have resolved the issue.

7          Now, I state -- and my claim, you say that they're a

8    nondebtor entity.  Well, okay.  Let's not go there.  Sorry.

9          My claim is based on that letter that it was an

10   unsecured deed of trust.  When I had a independent party, and I

11   didn't get any response, and I thought that that was -- that

12   they were in default, and it was automatically unsecured.

13   That's what I read in the laws, specifically the ones that

14   we've been talking about, the 226s.

15         If they choose not to take any action, and Ally was

16   notified.  This is crucial.  It's not like they were left out

17   of the loop.  I then get a B10 filed on me, claim number 5, by

18   Pite Duncan, the law firm, and it's an attorney that represents

19   Ally Bank -- GMAC Bank, Ally Bank, and GMAC.  To me --

20         THE COURT:  No, let's not -- just stop.

21         MS. WARNER:   -- it's all the same parties.

22         THE COURT:  Wait.  Just stop for a second, okay?  And

23   this may be confusing, but Ally Bank used to be known as GMAC

24   Bank, okay?

25         MS. WARNER:  Correct.

1        THE COURT:  GMAC Mortgage is a different company.

2    It's the loan servicer.  GMAC Mortgage is before me in the

3    bankruptcy case, okay?  Ally Bank, or formerly known as GMAC

4    Bank, has never been in this bankruptcy case.  So the fact that

5    it used to be called GMAC Bank doesn't mean it's the same as

6    any of the entities here.  It's not.

7        MS. WARNER:  Okay.

8        THE COURT:  I just want to make that clear.  But go

9    ahead.

10       MS. WARNER:  GMAC has possession of the funds.  I have

11   no way of knowing where they really went, and I'd like them to

12   have more proof of where it did go, because based on reading

13   the servicing agreement it contradicts what I just heard, that

14   they cast it on to Ally.  I'd like to see evidence of that.

15       From what I can read, or understand from reading the

16   servicing agreement, GMAC Mortgage, LLC is an affiliate of GMAC

17   Bank, now Ally Bank.

18       THE COURT:  It's not.

19       MS. WARNER:  And they have permission to keep the

20   profits, which I don't know what those profits are, but it

21   could be anywheres from zero to the whole entire dollar amount

22   collected.  I'd like to know what that number is.

23       THE COURT:  Well, you indicated that you got paid back

24   the surplus.  The amount of the mortgage was subtracted from

25   the sale proceeds, and you got the balance.  Right?

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

1        MS. WARNER:  Well, you know, that's somewhat true.

2   I'd like to add, and I didn't bring this up before, because I

3   just felt it was -- there's just too much information going on

4   here.  I was overcharged by GMAC in the escrow by somewhere

5   around twenty some thousand dollars.

6        THE COURT:  Look, that's not in your claim.

7        MS. WARNER:  I know.

8        THE COURT:  And I can't -- I'm not dealing with it.

9        MS. WARNER:  Okay.

10       THE COURT:  I'm dealing with your proof of claim,

11  okay?

12       MS. WARNER:  Okay.

13       THE COURT:  Mr. Wishnew, do you have anything that

14  shows that the proceeds from -- that the mortgage amount that

15  came out of the proceeds of sale was repaid to Ally Bank?

16       MR. WISHNEW:  Not with me in court today, Your Honor,

17  but I'm sure I can go back to servicing records and try and

18  track that down.

19       THE COURT:  Okay.  Could you send a copy to Ms.

20  Warner?

21       MR. WISHNEW:  Sure.

22       THE COURT:  And me.

23       MR. WISHNEW:  Sure.

24       THE COURT:  Okay.  All right.  Anything else, Ms.

25  Warner?

1       MS. WARNER:  One second here.  Well, I guess I want to

2   ask why didn't Ally respond to my letter and just say hey, get

3   out of here or whatever.  But there was just no response.  Why

4   didn't anybody talk to me?

5       THE COURT:  That I can't tell you, and Ally Bank has

6   never been a party in my case.

7       MS. WARNER:  But what is one supposed to assume or

8   proceed on when there's no response?  It's a default, is it

9   not?

10      THE COURT:  So your bankruptcy case was in the

11  Northern District of California, which is in the Ninth Circuit.

12  And in a case called Yamamoto v. Bank of New York, 329 F.3d

13  1167, 1170 (9th Cir. 2003) the Ninth Circuit rejected the

14  argument that a letter of rescission had the automatic and

15  immediate effect of voiding a loan transaction.

16      I know that's the position you assert, but in

17  California, where you asserted it, where the property was and

18  where you asserted the claim, the rule in the Ninth Circuit is

19  that it's not -- the letter of rescission does not have the

20  automatic effect of voiding a loan transaction.

21      MS. WARNER:  So is this a circumvention around TILA?

22      THE COURT:  No.  The Ninth Circuit interpreted what's

23  required.

24      All right.  Anything else you want to argue now?

25      MS. WARNER:  I had a thought and I just lost it.

1        THE COURT:  All right.  I'm going to take the matter

2   under submission, Mr. Wishnew, and I'll --

3        MS. WARNER:  I'm sorry?

4        THE COURT:  I'm going to take -- I'm not deciding it

5   from the bench, Ms. Warner.  I'm going to enter a written

6   decision order, okay, resolving the issues.

7        MS. WARNER:  Okay.  Yeah, I understand.

8        THE COURT:  Thank you very much.

9        MS. WARNER:  Can I provide you with the one documents

10  (sic) that you didn't have?

11       THE COURT:  I'm not sure that it's going to add

12  anything.  It just makes it clear that before you filed -- I'll

13  accept your representation that before you filed your Chapter 7

14  case you sent a notice of rescission to the lenders.  That's

15  what you're telling me.  You sent it in June of 2009.  You

16  filed your bankruptcy in November of 2009.  Do I have that

17  right?

18       MS. WARNER:  That's correct.

19       THE COURT:  Okay.  Okay.  All right.  I'm going to

20  take the matter under submission.  Thank you very much.  Thank

21  you very much, Ms. Warner.

22       MS. WARNER:  Your Honor, thank you for having me.

23  Okay?

24       THE COURT:  Okay.

25       MS. WARNER:  I do mean it.

1        THE COURT:  All right.  Okay.

2        MS. WARNER:  Thank you.

3        THE COURT:  All right.  All right.

4        MR. WISHNEW:  Thank you.  Thank you.

5        THE COURT:  Let's move on.

6        MS. WISHNEW:  Yes.

7        THE COURT:  Try to finish the agenda.

8        MR. WISHNEW:  Next matter before Your Honor is matter
9   6 on page 13 of today's agenda, the Borrower Trust's fifty-
10  eighth omnibus objection to amended and superseded borrower
11  claims, late-filed borrower claims, and nondebtor borrower
12  claims.

13       Your Honor, through this omnibus objection the
14  Borrower Trust seeks to expunge a total of fifteen claims on
15  the aforementioned three bases.  In support of the objection
16  the Borrower Trust submitted two declarations, one by Ms.
17  Horst, chief claims officer of the ResCap Liquidating Trust,
18  and the other by Mr. Morrow of the Kurtzman Carson firm.  Ms.
19  Horst is here today to answer any questions Your Honor may
20  have.

21       There were two responses with regards to this omnibus
22  objection, Your Honor.  One was filed by Mr. Olszewski at
23  docket number 6615.  After reviewing the response on March 19th
24  the Trust withdrew its objection to Mr. Olszewski's claims,
25  claim number 7163 and 7172, and recognized that there was an

1   error that invalidated its basis to object to the claims as

2   being late-filed and reserved its right to object to the claims

3   on a different substantive basis in the future.  That notice of

4   withdrawal was at docket entry 6670.

5           I'll also add for the record that on March 12th the

6   Borrower Trust did send Mr. Olszewski a letter seeking

7   information from him related to all of his claims.  He has

8   filed a number of amended claims that have gradually increased

9   the assert amount against the debtors' estates and the Borrower

10  Trust, and so we have asked for him to substantiate those

11  claims.  In that same information request letter we also

12  advised him that we are withdrawing the late-filed objection in

13  order -- so we can understand the rationale for our liability

14  to him.

15          So in that regard we are not proceeding with the

16  objection as to Mr. Olszewski's claims.  His claims will not be

17  reflected on any order the Court enters.

18          And so that would bring me to the second objection,

19  which is that of Mr. Leroy Hines.  This is --

20          MR. OLSZEWSKI:  May I interject, please?

21          THE COURT:  Are you Mr. Hines?

22          MR. OLSZEWSKI:  No, I'm Mr. Olszewski, sir.

23          THE COURT:  Oh, okay.  Go ahead.  Yes.  Let me hear

24  what you have to say.

25          MR. OLSZEWSKI:  Well, first of all, we're in estoppel.

1   We're in now -- there is no disagreement.  They have agreed

2   that I did have a secured file.  They've agreed that they would

3   not go into litigation.  They agreed that in estoppel because I

4   sent an affidavit, and I do believe that the fax I did send to

5   you of different amendments inclusive, I did send amendments,

6   and I did do those in the form of affidavits.  And so I don't

7   know why there is any kind of conflict at all.

8         THE COURT:  Well, what Mr. Wishnew was telling me is

9   they've withdrawn the -- I think it's in the fifty-eighth

10  omnibus objection.

11        MR. WISHNEW:  Yes, Your Honor.

12        MR. OLSZEWSKI:  I understand.

13        THE COURT:  Just stop.  Stop, Mr. Olszewski

14        MR. OLSZEWSKI:  But where I'm coming from is --

15        THE COURT:  Mr. Olszewski, just stop.  Okay.

16        MR. OLSZEWSKI:  I'm sorry.

17        THE COURT:  That -- having withdrawn that objection,

18  it's still without prejudice.  They still have time, and

19  they're going to evaluate your claim and see whether there's

20  any other basis for an objection.  This doesn't preclude them

21  from doing that.

22        MR. OLSZEWSKI:  I understand, sir.

23        THE COURT:  Okay.

24        MR. OLSZEWSKI:  But what I'm saying is that I have

25  shown them already that it is a secured claim.  I've given that

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1   in the form of an affidavit.  And my belief was that an un-

2   rebutted affidavit becomes true.

3          THE COURT:  Well, Mr. --

4          MR. OLSZEWSKI:  And an un-rebutted affidavit is acting

5   as a judgment in commerce.

6          THE COURT:  It's not.  Mr. Olszewski --

7          MR. OLSZEWSKI:  And so I don't understand what they're

8   asking for that I haven't given them.

9          THE COURT:  Mr. Olszewski, we'll see whether they come

10  back with an objection to your claim or whether the matter is

11  resolved.  You ought to continue to discuss it with them, and

12  hopefully it'll get resolved and won't come back on the court's

13  docket.  So this --

14         MR. OLSZEWSKI:  Okay.

15         THE COURT:  Okay?  All right?

16         MR. OLSZEWSKI:  And all I'm asking, Your Honor, sir,

17  is to just look at the facts --

18         THE COURT:  Mr. Olszewski.

19         MR. OLSZEWSKI:  -- and --

20         THE COURT:  If they don't come back --

21         MR. OLSZEWSKI:  -- and make conclusions of law based

22  on the facts.

23         THE COURT:  Mr. Olszewski, if they don't --

24         MR. OLSZEWSKI:  Yes, sir?

25         THE COURT:  -- come back with an objection to your

1   claim it's never going to come back to me.  If they don't

2   object to it the claim is going to be allowed.  They've got a

3   certain amount of time to object.  They're reviewing the

4   additional materials that you've provided them.  And we'll see

5   whether --

6           MR. OLSZEWSKI:  But they haven't asked me for -- they

7   haven't asked me formally for anything new --

8           THE COURT:  Okay.

9           MR. OLSZEWSKI:  -- from anyone that I talked to.

10           THE COURT:  All right.  Well, what's the status --

11           MR. OLSZEWSKI:  In other words, they haven't responded

12   to any of the affidavits that I've sent to them in affidavit

13   form.

14           THE COURT:  What's the status, Mr. Wishnew?

15           MR. WISHNEW:  The status at this point, Your Honor, is

16   that a letter was sent to Mr. Olszewski on March 12th asking

17   for information about his most recent claim in the amount of

18   twenty million dollars and understanding why, first, we have

19   liability to him in the amount of two million dollars, and then

20   why that should be, I guess, multiplied by ten, as he asserts.

21   When we receive that information we will evaluate that, and if

22   we disagree with his legal bases for that liability we will

23   bring an objection before the Court.

24           THE COURT:  Okay.  The matter is -- the objection to

25   Mr. Olszewski's claim has been withdrawn for today, and we'll

RESIDENTIAL CAPITAL, LLC, ET AL.                    94

1    see whether it comes back again.

2         Thank you, Mr. Olszewski.

3         Go ahead, Mr. Wishnew.

4         MR. WISHNEW:  Thank you, Your Honor.  That brings us

5    to the response filed by Mr. Hines, claim number 7312.  I'm not

6    sure if Mr. Hines is appearing telephonically.

7         THE COURT:  Mr. Hines, are you on the phone?

8         Go ahead.

9         MR. WISHNEW:  Thank you, Your Honor.  This was a claim

10   filed against Residential Capital, LLC for $38,789.36 for the

11   secured claim and 2,600 dollars as a priority claim based on a

12   "mortgage note".  The claim was filed on November 20, 2013,

13   approximately one year after the bar date.

14        THE COURT:  All right.  I have this matter.  I'll take

15   it under submission and enter an order.  This is an issue about

16   a late-filed claim.

17        MR. WISHNEW:  That's correct, Your Honor.

18        THE COURT:  Okay.  It'll be resolved in an order,

19   since Mr. Hines is not on the phone.

20        MR. WISHNEW:  Fair enough, Your Honor.  That brings us

21   to the next matter, which is the fifty-ninth omnibus objection

22   to insufficient documentation borrower claims.  There were two

23   late-filed replies to this matter.  Those were identified on

24   yesterday afternoon's agenda and are being carried to the April

25   24th hearing.  The Borrower Trust is hoping to try and resolve

1  the matters consensually.  If not, then we'll bring them before

2  Your Honor at the --

3          THE COURT:  That's Trammell and Holiday?

4          MR. WISHNEW:  Correct, Your Honor.  Yes.

5          THE COURT:  All right.

6          MR. WISHNEW:  Putting aside those two claims, this

7  omnibus objection sought to expunge eighteen claims that the

8  Borrower Trust asserts failed to provide sufficient

9  documentation in support of the borrowers' respective claims.

10         In each instance the debtors and the Borrower Trust

11  sought additional information from these claimants, and a

12  number of borrowers failed to return any response, and if any

13  responses were received, such responses were deficient.

14         With regards to -- I know, in speaking with Your

15  Honor's chambers, there were certain questions as to particular

16  claimants, and I'm happy to address those, if you'd like, for

17  the record.

18         THE COURT:  Go ahead.

19         MR. WISHNEW:  Thank you, Your Honor.  Let me just say

20  that in response to inquiries from chambers we did withdraw the

21  objection as to Ruth Hutchins, claim 5602.  That withdrawal was

22  docketed at docket number 6670.

23         So there are three claims that I will briefly address:

24  claim 731 filed by Louise Budelis, claim 913 by Ronald Gillis,

25  and claim 5763 by Ms. Hanover.  For each of these claims, it is

RESIDENTIAL CAPITAL, LLC, ET AL.                    96

1    the Borrower Trust's position that the debtors took great

2    efforts to obtain additional information from these borrowers

3    and diligently reviewed their records and claims analyses and

4    did not find any tangible connection between these individuals

5    and the debtor entities.

6           Claim 731 by Ms. Budelis, filed against GMACM/ResCap

7    as a priority claim in the amount of nineteen dollars on

8    account of alleged "Ground rent for 4217 Grace Court,

9    Baltimore, Maryland".  The proof of claim attached to the deed,

10   dated July 7, 2011, signed by the special administrator of the

11   estate of William R. Noeth, bequeathing to Ms. Budelis a fee

12   simple interest in a number of property lots.

13          The borrower provides no explanation for the basis of

14   the claim.  The debtors sent a request letter to Ms. Budelis on

15   June 21, 2013 requesting additional information in support of

16   her claim, including a request that the borrower provide the

17   loan number that relates to her claim.  We did not receive any

18   response to that request letter.

19          THE COURT:  Did you search your records to see whether

20   there was any --

21          MR. WISHNEW:  That's exactly --

22          THE COURT:  -- loan --

23          MR. WISHNEW:  That was the next step I was going to,

24   Your Honor.

25          THE COURT:  Okay.  Go ahead.

1        MR. WISHNEW:  Based on a thorough search of our books

2    and servicing records we have no record relating to this

3    borrower or address.

4        THE COURT:  All right.  Objection to the claim is

5    sustained.

6        MR. WISHNEW:  Thank you, Your Honor.  Claim number 913

7    filed by Mr. Gillis, which amended claim 444.  This was filed

8    against Residential Capital as a general unsecured claim in the

9    amount of $290,859.68 on account of alleged slander to property

10   title.

11       The proof of claim only attaches a foreclosure action

12   that Wells Fargo was handling as a servicer.  RFC was a master

13   servicer, and Deutsche Bank was investor and plaintiff in the

14   foreclosure action.  The borrower alleges slander to property

15   title that occurred in 2009, when Deutsche Bank omitted (sic)

16   the caption on a foreclosure action pending in Charlotte

17   County.  The borrower appears to take an issue with Deutsche

18   Bank's addition of the language "for GMAC-RFC master

19   servicing".

20       We sent a borrower request letter to Mr. Gillis on

21   June 21, 2013.  He did not respond to our request letter.

22   Again, we went through our books and records, looked into the

23   claims, and there was no information, and we were not aware of

24   any pending litigation against us, any debtor entity.

25       THE COURT:  Well, was GMAC servicing the loan?

1        MR. WISHNEW:  As a master servicer, Your Honor.  Wells

2   Fargo was the subservicer.

3        THE COURT:  The subservicer.

4        MR. WISHNEW:  Correct, Your Honor.  So the debtors had

5   no involvement in the day-to-day servicing of Mr. Gillis's

6   loan, and we're neither the investor nor owner but merely the

7   master servicer for the securitization.  Therefore it's unclear

8   how Mr. Gillis is damaged by the fact that the master servicer

9   language was added to the caption of his foreclosure action,

10  and to date he's offered no explanation or basis for his

11  damages.

12        THE COURT:  All right.  Objection sustained.

13        MR. WISHNEW:  Thank you, Your Honor.  Lastly, claim

14  5763 filed by Ms. Hanover.  The claim was filed against

15  Residential Capital, though it looks to be against GMAC

16  Mortgage, as a general unsecured claim in the amount of 25,000

17  dollars.  The only color we have are the two paragraphs she

18  puts into her claim where she says GMAC, and she doesn't

19  identify this GMAC Bank, GMAC Mortgage, GMAC brought an action

20  against Ms. Hanover in the Court of Common Pleas for Montgomery

21  County and claimed an ownership in her loan.  She's expecting,

22  and I emphasize the word expecting, a foreclosure action will

23  commence shortly.

24        Her proof of claim asserts potential, and again, I

25  emphasize potential, counterclaims against the debtors.  Aside

RESIDENTIAL CAPITAL, LLC, ET AL.                    99

1    from this statement there is no other information or supporting

2    documentation included with the proof of claim.

3              THE COURT:  Did you check your records to see

4    whether --

5              MR. WISHNEW:  Exactly, Your Honor.

6              THE COURT:  -- any of the debtors were either the --

7              MR. WISHNEW:  We sent her a --

8              THE COURT:  -- the lender or the loan servicer?

9              MR. WISHNEW:  We sent a request letter on November

10   13th.  There was no response.  We reviewed our books and

11   servicing records, and we were unable to connect Ms. Hanover to

12   any properties in Montgomery County, Ohio.

13             THE COURT:  Objection is sustained.

14             MR. WISHNEW:  Thank you, Your Honor.  So that brings

15   us to the conclusion of the fifty-ninth.  We will submit orders

16   consistent with these rulings.

17             THE COURT:  All right.  So any of those that I didn't

18   ask be raised at this, which is no response, I'm sustaining the

19   objection.

20             MR. WISHNEW:  Thank you very much, Your Honor.

21             That brings us to the last matter on today's agenda,

22   which is matter 8 on page 14, the sixtieth omnibus objection,

23   which deals with res judicata borrower claims.  There was one

24   response received, Your Honor, from Ms. Randle, and basically,

25   Your Honor, by this omnibus objection the Borrower Trust seeks

1    to expunge eight borrower proofs of claim relating to matters

2    that were previously litigated and decided by a final judgment

3    in the debtors' favor, and each of which meet the elements of

4    res judicata and should be barred by that doctrine.

5         The only response we've received is from Ms. Randle.

6    She had two claims at issue.  One was claim 4133 against GMAC

7    Mortgage and claim 4199 against Residential Funding Company,

8    each in the amount of 234,200 dollars.

9         THE COURT:  Ms. Randle, are you on the phone?

10        Go ahead.

11        MR. WISHNEW:  Okay.  For the sake of completeness,

12   Your Honor, I want to make sure that the Court's aware, minutes

13   before the start of this hearing Mr. Rosenbaum did receive an

14   e-mail request from Ms. Randle seeking leave to file a

15   surreply, because she had received our reply and wanted to make

16   additional arguments.  Again, Ms. Randle is not on the phone

17   today.

18        I will say the following.  Ms. Randle asserts that

19   this action -- that our basis of res judicata is invalid

20   because of actions that occurred subsequent to the judgments.

21   But the fact of the matter is, Your Honor, there's a claim

22   against GMAC Mortgage for wrongful foreclosure.  There's a

23   claim against RFC for wrongful title.  There was an exhaustive

24   foreclosure action with GMAC Mortgage in Massachusetts.  We

25   obtained a final judgment in both our affirmative action and

 1   her affirmative action.  We obtained a ruling, attached to our

 2   reply, that says we had the right to pursue the foreclosure.

 3        THE COURT:  Yes.  I would question whether it's

 4   appropriate to refer to it as an exhaustive foreclosure action,

 5   because Massachusetts is a nonjudicial foreclosure state.  I

 6   read the Court's opinion yesterday from the Massachusetts Land

 7   Court, and I guess GMAC had filed an action against Randle

 8   seeking a declaratory judgment that she wasn't entitled to

 9   relief under the Servicemen's Act.  And then she filed an

10   action against GMAC, and, I think, others.

11        And in the Court's opinion and its judgment it refers

12   to two forms of relief that Ms. Randle sought.  First she asked

13   for a determination that GMAC had no security interest in the

14   property.  And she sought to prevent foreclosure on that basis.

15   Secondly, she sought a determination that GMAC didn't have

16   standing to assert the Service -- seeking relief under the

17   Servicemen's Act.

18        In granting summary judgment, most of the opinion was

19   focused on the Servicemen's Act claim.  My paraphrase of it, it

20   didn't really matter whether GMAC had standing to bring it.

21   Standing on that isn't quite the same as standing on

22   foreclosure.  In any event, Ms. Randle acknowledged she wasn't

23   entitled to relief on the Servicemen's Act issue.

24        Less time is spent in this -- less words in this

25   opinion dealing with the issue of whether GMAC has a security

1    interest entitling it to foreclosure.  The judgment

2    specifically identifies the two issues, namely Servicemen's Act

3    and does it have an interest in the property, in the mortgage,

4    and grants judgment on all claims.  So it grants judgment on

5    the -- it's not the most crystal clear opinion I've ever read,

6    but it does do that.

7          So there's some history here that I do want you to

8    briefly address.

9          The debtors' fiftieth omnibus objection had sought to

10   expunge Ms. Randle's claim, essentially, on a books and records

11   basis.  That was withdrawn, and what I have before me now is

12   ResCap Borrower Claims Trust's sixtieth omnibus objection to

13   claims res judicata borrower claims.  That objection is at ECF

14   6457.  Ms. Randle filed a response to that, which is at ECF

15   6665.  6665.  The debtor filed a reply, which is at 6678.

16         Ms. Randle, in her response to the objection, which is

17   fairly short, does not repeat the same objections that she had

18   included in her response to the fiftieth omnibus objection.

19   But she basically argues that res judicata doesn't apply,

20   because she's challenging things that happened after the

21   judgment from the land court.  What was very confusing to me is

22   that she said twice in there, both with respect to the GMAC

23   claim and the RFC claim, that she was seeking damages that

24   resulted from the fact that foreclosure didn't take place for

25   more than a year after the judgment of the land court.  She

1  cited a section of Massachusetts general law.  I don't remember

2  the section number that we looked at.

3       I was concerned that there was some provision in

4  Massachusetts law that effectively created a staleness argument

5  that if you get a judgment and then you don't do anything about

6  it for more than a year you can't enforce it, but I didn't find

7  anything like that.  Is there anything like that?

8       MR. WISHNEW:  Not that I'm specifically aware of, but

9  I think Ms. Randle's -- I think Your Honor's picked up on some

10 confusion, and let me clarify that.

11      So we got the judgment in October, 2010.

12      THE COURT:  She then sought reconsideration.

13      MR. WISHNEW:  That's correct, Your Honor.

14      THE COURT:  And the reconsideration was denied when?

15      MR. WISHNEW:  The reconsideration was denied, I

16 believe, in September.  Either August or September of 2011.

17 And, yes, so --

18      THE COURT:  So it was less than a year.  The

19 foreclosure was completed less than a year after the Court

20 denied reconsideration.

21      MR. WISHNEW:  That's exactly -- the time gap is

22 because of the reconsideration.  So she filed the motion for

23 reconsideration after the 2010 judgment.  It was denied by the

24 Massachusetts Land Court on August 25, 2011.  She then had

25 thirty days to appeal that.  Again, the appeal would have been

1  timely if filed by September 26, 2011.

2          THE COURT:  Well, she did appeal.  Didn't she appeal?

3  What did she -- she claims res judicata doesn't apply because

4  she has an appeal pending.  What did she appeal?

5          MR. WISHNEW:  She, I think, appealed the

6  reconsideration decision.  But the fact of the matter is --

7          THE COURT:  You're saying it was untimely.

8          MR. WISHNEW:  I'm saying it was untimely.  It was

9  filed after the expiration of the statutory thirty days.

10          THE COURT:  Well, in any event, Massachusetts law, as

11  the Court has -- wait a second.

12          Massachusetts State Courts, similar to those in a

13  majority of the states, follow the federal rule that for

14  purpose of preclusion, "a trial court judgment is final and has

15  preclusive effect regardless of the fact that it is on appeal".

16  See O'Brien v. Hanover Insurance Co., 692 N.E.2d 39, 44 (Mass.

17  1998).  So even if there is an appeal pending there's still

18  preclusion from a trial court judgment that's being appealed.

19          MR. WISHNEW:  Agree, Your Honor.  Absolutely.

20          THE COURT:  Okay.  But she argues that there's no res

21  judicata because the claim is seeking to recover damages based

22  on acts that occurred after the land court judgment.  What's

23  your response to that?

24          MR. WISHNEW:  My response is that essentially she's

25  basically saying -- I think she's wrong.  And I think what it

1    is is that we got the foreclosure judgment.  We went --

2           THE COURT:  You didn't get a foreclosure judgment.

3           MR. WISHNEW:  I'm sorry.  We got the judgment

4    affirming our rights to pursue the foreclosure.

5    Reconsideration was denied.  Appeal period expired.  We

6    pursued, as was recognized, our right to the nonjudicial

7    foreclosure.  And then we subsequently conveyed title to RFC.

8    So the fact of the matter is it all derives -- any action

9    derives from the course of the facts that was adjudicated by

10   the Massachusetts Land Court.  And so to try and say well, this

11   happened after the fact, well, yes.  Chronologically it

12   happened after the fact.  But it all goes back to Ms. Randle

13   contesting the ability of GMAC Mortgage to foreclose.  And so

14   to say that it happened after the fact is disingenuous.

15          THE COURT:  Let me ask you this.  Should the Court

16   consider arguments that she made in her response to the

17   fiftieth omnibus objection?  She did not incorporate by

18   reference the prior response.  She made some arguments in the

19   response to the fiftieth omnibus objection that she has not

20   repeated here.  Should the Court consider those now?

21          MR. WISHNEW:  I don't believe so, Your Honor.  I mean,

22   the Borrower Trust has not reincorporated the fiftieth omnibus

23   objection.  It made a decision, or the debtors at that time

24   made a decision to withdraw the objection, because it felt it

25   had a better ground to pursue it on res judicata, which the

1    Borrower Trust has now pursued.  So we're moving forward on the

2    record in relation to the sixtieth omni and don't think that

3    Ms. Randle, if she hasn't sought the benefit of her earlier

4    response, should be able to incorporate it now.

5            THE COURT:  All right.  I will take it under

6    submission.

7            MR. WISHNEW:  Thank you, Your Honor.  So that

8    concludes today's calendar, and, as always, appreciate your

9    Court's time and patience.

10           THE COURT:  Okay.  Thank you.

11        (Whereupon these proceedings were concluded at 12:28 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

107

```
 1
 2                              I N D E X
 3
 4                              RULINGS
 5                                             Page      Line
 6  Ally Financial Inc.'s motion for an order    59        24
 7  enforcing the Chapter 11 plan injunction,
 8  granted, and Mr. Lahrman is enjoined from
 9  prosecuting his claims against Ally Financial
10  in the state court action in Indiana.
11  Objection to claim number 731, filed by      97         4
12  Louise Budelis, is sustained
13  Objection to claim number 913, filed by      98        12
14  Ronald Gillis, is sustained
15  Objection to claim number 5763, filed by     99        13
16  Kathleen Hanover, is sustained
17  Objections to the rest of the claims in      99        17
18  the fifty-ninth omnibus objection are
19  sustained, except for Annie Trammell
20  and Alfredia Holiday
21
22
23
24
25
```

1

2                    C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D-492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  March 27, 2014

18

19

20

21

22

23

24

25