UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            March 26, 2014

            3:00 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2   Telephone Conference, on the Record, Regarding Burgin Claim

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Ellen S. Kolman

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4          Attorneys for Debtors
 5          1290 Avenue of the Americas
 6          New York, NY 10104
 7
 8   BY:   JORDAN A. WISHNEW, ESQ. (TELEPHONICALLY)
 9
10
11   ALSO APPEARING:
12          MARCENE L. BURGIN, Pro Se (TELEPHONICALLY)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        P R O C E E D I N G S

2              THE COURT:  All right.  This is Judge Glenn.  We're on

3    the record in Residential Capital, number 12-12020.  This is a

4    telephone hearing at the request of the Court in connection

5    with the objection to the claim of Daniel G. (sic) and Marcene

6    Burgin.  It's claim number 4494 and the Court issued a

7    memorandum opinion and supplemental order regarding that claim

8    on March 17th, 2014.

9              Who's on the phone?

10             MR. WISHNEW:  Good afternoon, Your Honor.  Jordan

11   Wishnew at Morrison & Foerster for the ResCap Borrower Claims

12   Trust.

13             THE COURT:  Okay.  And for the Burgins?

14             MS. BURGIN:  Yes.  Marcene Burgin.

15             THE COURT:  Thank you, Ms. Burgin.

16             Ms. Burgin, did you have a chance to review the

17   memorandum opinion and supplemental order that I entered?

18             MS. BURGIN:  Yes, I did.

19             THE COURT:  Okay.  So I need to have a better

20   understanding of what your claim is, and also, as I indicated

21   in the short opinion, Mr. Wishnew, I don't really have a full

22   understanding of what's been described as the checking account

23   feature of the HELOC loan.

24             Ms. Burgin, let me ask you first.  After GMAC froze

25   the HELOC line of credit, did you continue to make regular

1    monthly payments of the minimum amount?

2             MS. BURGIN:  Yes, Your Honor, we did.  That was set up

3    as an automatic withdrawal from our account from day one.  So

4    they just, you know, would take it out at the same day every

5    month.  So there was never a time when there was any lapse in

6    that.

7             THE COURT:  Okay.  When you say an automatic

8    withdrawal from your account, what -- from -- is this a totally

9    separate checking account of yours or something?

10            MS. BURGIN:  Yes.

11            THE COURT:  Okay.  So this is not an account that was

12   with the lenders on the HELOC?

13            MS. BURGIN:  No.  No, we did have another checking

14   account.

15            THE COURT:  Okay.

16            MS. BURGIN:  And then, that was required by them,

17   actually, that they could take our payments out of at the same

18   time each month.  That was separate from the checking account

19   that was connected.

20            We would then take our income and deposit it into the

21   HELOC loan.

22            THE COURT:  So when you say you would deposit your

23   income, was this -- did you deposit amounts in excess of the

24   minimum required monthly payments?

25            MS. BURGIN:  You know, I'm sorry, Your Honor, that --

1  it's kind of a fuzzy connection.  Could you repeat that

2  question?

3          THE COURT:  Yes, I can.

4          MS. BURGIN:  I'm sorry.

5          THE COURT:  I can.  Okay.

6          So this was what I was a little confused about.  Were

7  you making monthly deposits in excess of the minimum required

8  monthly payments?

9          MS. BURGIN:  Yes, we were.

10         THE COURT:  Okay.  And at some point, did GMAC prevent

11 you from doing that?  That's what I couldn't understand as to

12 whether -- because you say that you weren't permitted to make

13 the deposits by.  I'm just trying to get a better understanding

14 of what it is you're saying.

15         MS. BURGIN:  Yes.  Yes, I understand it.  It was -- it

16 was kind of a different type of a loan.

17         So the way it worked is you would deposit money into

18 that -- so that's where it's a little different.  You know, the

19 line of credit is a part of it but the checking account feature

20 is sort of separate from that in that we would deposit our

21 income into the -- I guess it's the HELOC account, and then we

22 would actually pay our bills out of that account.  We had a

23 separate checkbook for that account.

24         And so when they froze our account, it took the money

25 that we had in there and also it stopped that ability that we

1  had to use that account to, you know, pay bills and do other

2  investing.  So that part was separate.

3         The line of credit, in my mind, was fine.  They did

4  have every right to close that; that was in the loan docs.  And

5  that's different because the line of credit would be money that

6  we were using that they advanced us and then we were writing

7  checks against that.  But that's not what this part was.  This

8  was only money that we had deposited from our own income, and

9  we were not asking to write more than we were depositing but

10 they froze what we had deposited and then closed that checking

11 account.

12        THE COURT:  So let me just -- to be sure I understand

13 before I have Mr. Wishnew speak to it, you -- do I understand

14 that you wanted to write checks against monthly deposits that

15 were in excess of the minimum required payments each month?

16        MS. BURGIN:  Yes.

17        THE COURT:  Okay.  So this is not a --

18        MS. BURGIN:  That we had already -- money that we were

19 depositing.  So actually, I guess I'm not sure what you mean by

20 deposits.

21        We would deposit -- at that time, we were depositing

22 approximately 5,000 dollars a month into that account.  It

23 would vary a little bit each month with our income but we were

24 depositing that.  So then we would use that account.  That

25 would go against our principal, therefore, lowering the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1  interest on the loan, which was the reason that we went for

2  that particular loan product, and then we would pay our bills

3  from that.  We would write checks from that loan account but it

4  was all money that we were depositing monthly.

5           THE COURT:  So how much was the monthly -- the minimum

6  required monthly payment?

7           MS. BURGIN:  That was an interest-only on the loan so

8  it varied some.  It usually right around 1,000 dollars a month.

9           THE COURT:  Okay.  Mr. Wishnew, can you -- do you want

10 to address these issues?

11          MR. WISHNEW:  I guess, obviously, we were concerned

12 that we could not -- once we froze the account, we wanted to

13 ensure that there wasn't a further -- I guess a further

14 increase in the balance on the account.  And so that would have

15 been why we would have stopped use of the checking accounts.

16 But again, having learned some of these facts now, I'd have to

17 verify that with the company.

18          THE COURT:  Yes.  I mean because here's the -- here's

19 where --

20          MR. WISHNEW:  I guess, Your Honor, maybe --

21          THE COURT:  Let me just -- just stop a second, Mr.

22 Wishnew.

23          What I wasn't clear about, and Ms. Burgin has

24 addressed that, is that the Burgins were depositing -- were

25 paying into the account, depositing into the account amounts in

1   excess each month of the minimum required payment.  And

2   correctly or incorrectly, they believed that they had the

3   ability to write checks against the amount of those excess

4   deposits.  And I guess they're saying that to the extent

5   they're writing checks against the excess deposits, that's not

6   an advance under the loan.  Is that what you're telling me, Ms.

7   Burgin?

8            MS. BURGIN:  Yes, Your Honor.  That's accurate.

9            THE COURT:  Okay.

10           MS. BURGIN:  Um-hum.

11           THE COURT:  And so, Mr. Wishnew, that's what I -- and

12   I tried to -- I surmised that and I think sort of got it

13   correctly in the opinion that that seemed to be what the

14   Burgins are complaining about, that's what they allege is the

15   breach of contract that you couldn't do that.  But I have to

16   tell you, Ms. Burgin, that -- so initially, you didn't attach

17   the whole HELOC agreement and I did order the debtor to produce

18   it and they did and I assume you agree that they correctly

19   attached a copy of the HELOC?  Do you --

20           MS. BURGIN:  Well, I don't believe I -- do I have a --

21   I don't know that I have a copy that they attached.

22           MR. WISHNEW:  We would have served it

23   contemporaneously with service on the Court; I can honestly

24   resend it today.

25           THE COURT:  Well, hold on.  We'll come to -- because

1   this is not -- I'm not definitively deciding anything today.

2   All right.

3          MR. WISHNEW:  Of course.

4          THE COURT:  But, Ms. Burgin, what I read -- do you

5   have a copy of the entire HELOC agreement?  You had originally

6   attached two pages.

7          MS. BURGIN:  Yes.

8          THE COURT:  And then you attached two other pages but

9   not the whole thing.

10          MS. BURGIN:  Yes, I do --

11          THE COURT:  Okay.

12          MS. BURGIN:  -- Your Honor.

13          THE COURT:  So what it looked like, when I read the

14   agreement, because the agreement had a provision about the

15   minimum monthly required payments and we've talked about that,

16   but allowed you to pay more than that.  And so when you

17   deposited amounts in excess of the minimum monthly payments, it

18   was your intention, as I'm hearing it today, to reduce the

19   outstanding principal balance of the loan and, thereby, reduce

20   the continued amount of accruing interest.  Am I correct in

21   that?

22          MS. BURGIN:  Yes, Your Honor, that's correct.

23          THE COURT:  Okay.  So, you know, when I read the

24   agreement then, once you make a deposit and use it to reduce

25   the balance of the loan, one argument is it's their money now.

1  You've deposited it.  You used it to reduce the balance of the

2  loan and anything you want to draw from the account is a new

3  advance which they've frozen.  I mean that's the issue.

4          What I don't have, I don't know whether I have all of

5  the information or disclosure documents that were provided to

6  the Burgins when this account was set up.  So what I ultimately

7  got was the HELOC agreement, which includes some disclosures,

8  but got the HELOC agreement.  I don't know -- the Burgins are

9  saying that the debtors breached the contract because there is

10  this separate checking account feature that permitted them to

11  use it as a checking account.

12          And, Mr. Wishnew, can you address these issues for me?

13          MR. WISHNEW:  At this point in time, I don't know if

14  I'm in the best position and I would prefer to take another

15  closer look at the agreement and discuss it with the debtors to

16  address these points.

17          THE COURT:  Okay.  Ms. Burgin, is there anything else

18  you want to add now?

19          MS. BURGIN:  Only, Your Honor, that in a conventional

20  line of credit situation, it is true that you would normally, I

21  suppose, what money you'd put down would go strictly to the

22  amount of the loan and -- but in this particular loan product,

23  that became a very fluid amount.  You would put your income in

24  there and then you would write checks against it.  So it was --

25  the interest was calculated on a daily basis and it would

RESIDENTIAL CAPITAL, LLC, ET AL.                    12

1  change as you deposited money and then as you, you know, wrote

2  checks against the account so your interest was figured

3  separately every day.  So very unconventional way of doing it,

4  I know.  But the nice thing about that was that it was -- it

5  was lowering your interest but yet it wasn't money that was --

6  like, you put it in there and then that froze it to be against

7  the loan.  You would then be able to use it for other things on

8  an ongoing basis.

9           THE COURT:  See, that's what I don't see in the HELOC

10  agreement, okay.  Because when I read the HELOC agreement, I

11  see how you can pay in each month amounts in excess of the

12  minimum required.  So from reading the agreement, the issue,

13  then, is well, what's the status of that additional money?  Can

14  you continue to write checks against it or -- and I said this

15  in footnote 6 of the opinion, I say, "From a review of the

16  HELOC agreement, it appears that each check written by the

17  Burgins was an advance against the line of credit increasing

18  the loan balance.  When the HELOC was frozen, preventing any

19  new loan advances, the Burgins could not write checks against

20  the account."  The footnote goes on and I'll stop the quote

21  there.

22           And that's where -- do you have any other

23  documentation that was provided to you with an explanation of

24  this checking account feature?

25           MS. BURGIN:  I will go back and, if that's

1  permissible, here, and review all of the documents and see how

2  it describes that.  I -- because I did read your footnote there

3  and the part that was incorrect, to some degree, is that let's

4  say we deposited 5,000 dollars in there and then the next day

5  we wrote a check for, you know, a 100 dollars' worth of

6  groceries.  That didn't increase the loan amount by that

7  hundred dollars that we wrote the check for.  That would just

8  be, basically, subtracted from the 5,000 that we had just put

9  in.

10             THE COURT:  That's what I don't -- that's what -- from

11  reading the agreement itself, the argument you just made didn't

12  appear consistent with the language but I'm not ruling on

13  anything now, Ms. Burgin.  I just --

14             MS. BURGIN:  Um-hum.

15             THE COURT:  Look, here's what I want to happen, okay.

16  I definitely want to give you and your husband, Ms. Burgin, a

17  fair chance to support your claim.  And from the debtors'

18  standpoint, or the trust standpoint now, I want to give you the

19  fair opportunity to object to the claim.

20             What I've never gotten from the debtors is a fuller

21  explanation and declarations and any documentation that

22  explains this checking account feature.  And I don't know, Mr.

23  Wishnew, for example, whether there's material, marketing

24  material, that was sent to people like the Burgins when they

25  set up this account that explains how they can use it.

1        So once the -- let me ask you this -- a couple more

2    questions, Ms. Burgin.  Once the debtors froze the account, you

3    must have found out pretty quickly they weren't going to honor

4    any checks you wrote on it.  Is that a fair statement?

5            MS. BURGIN:  Yes.

6            THE COURT:  Okay.

7            MS. BURGIN:  Yes.

8            THE COURT:  So did you stop depositing your income

9    into the account?

10           MS. BURGIN:  We had to.  They closed it.  Yes.

11           THE COURT:  Well, they didn't -- I mean, they didn't

12   close it, did they?  They froze the account; they didn't close

13   it.  Did they close it at some point?

14           MS. BURGIN:  Yes.  I believe it was closed.

15           THE COURT:  Well, you still have a loan --

16           MS. BURGIN:  Because they also stopped honoring checks

17   that we had written against it.  They would send them back

18   saying that the account had been closed.

19           THE COURT:  All right.  What is it that you're

20   claiming is your damages?

21           MS. BURGIN:  Monetary or are you looking for --

22           THE COURT:  Yeah.  I want to know -- because you filed

23   a claim for money and I want to know what it is -- that's

24   unclear to me what it is you're seeking.

25           MS. BURGIN:  Well, here's -- you know, and I

1   understand that it's hard to pin down, you know, what the

2   actual monetary implications would be.  So the way I looked at

3   it, I just -- I took the amount -- the loan originated in May

4   of 2007 and they closed the account in November of 2008.  So

5   there were eighteen months that went by there.  So I just

6   looked at it as if we had been putting in -- I took the amount

7   that we had run through that account monthly, so it was

8   approximately -- it varied somewhat each month -- but

9   approximately 5,000 dollars a month.  So if we had been putting

10  that through the account for the 64 months that have transpired

11  since then, we would have run, approximately, 320,000 dollars

12  through the account.

13          And the hard part that I had in figuring out is, okay,

14  so what does that mean, you know.  How would that have -- how

15  much would that have changed the loan balance?  And I'm not --

16  I'm not sure there.  So --

17          THE COURT:  This is writing checks against -- you

18  maybe have put 300,000 dollars in but you're writing checks --

19          MS. BURGIN:  Right.

20          THE COURT:  -- against that every month.

21          MS. BURGIN:  Yes.  So there isn't, like, a, you know,

22  the amount is kind of an incalculable number because it would

23  have affected the interest rate and the principal but I don't

24  know how much.

25          So by closing that account, it also forced us to go

1  out and, you know, seek independent banking, it caused a loss

2  of the continuity in how we were doing our business at that

3  time and then it froze those funds that caused a business

4  opportunity loss that we were working with at the same time

5  because then we couldn't go out -- then we had that 450,000-

6  dollar debt against us but couldn't go out and get additional

7  financing.  So it kind of changed our whole --

8            THE COURT:  Well, you agreed, though, the way I read

9  your papers, you agreed that they could freeze the line of

10 credit?

11           MS. BURGIN:  Yes.

12           THE COURT:  Okay.

13           MS. BURGIN:  Yes.  I do believe that that's in the

14 contract and that, you know, I could completely understand.

15           THE COURT:  Okay.  And I take it you're not disputing

16 that the value of your property declined?  How much, I don't

17 know, but everybody's property declined in value.

18           MS. BURGIN:  Yes.  Yes.  Um-hum.

19           THE COURT:  Okay.  So --

20           MS. BURGIN:  And that part, yes, you know, I

21 understand that completely too.  I do dispute the fact that

22 they said we were late on payments because that never happened.

23           THE COURT:  I want to raise that question, okay.

24 We're going to get to that in a minute.

25           MS. BURGIN:  Okay.  So I'm sorry, so to answer your

1  question, you know, what I would -- I was trying to think what

2  could I propose that would be a fair, you know, way of -- we

3  would like to just get past this, get a settlement, and have

4  something where ResCap can, you know, make money on that loan

5  and yet we can afford to keep our home.

6          THE COURT:  Let me put it this --

7          MS. BURGIN:  So --

8          THE COURT:  -- let me stop you because --

9          MS. BURGIN:  Um-hum.

10          THE COURT:  -- I encourage parties to settle but

11  because I may have to decide issues of fact, I don't inject

12  myself into settlements.  I encourage you to talk to Mr.

13  Wishnew and see whether you can reach a settlement, but I will

14  get -- I won't be involved in that, okay.  That's why I just

15  want to stop you there.  I fully encourage you to do that, all

16  right, but not with me, okay, because --

17          MS. BURGIN:  Okay.  So that would be one of the

18  attorneys that's present now?

19          THE COURT:  Yes.  Mr. Wishnew can talk to you.

20          MR. WISHNEW:  Yes.  That's me, Ms. Burgin, and I

21  welcome the opportunity to speak further about that.

22          THE COURT:  Okay.

23          MS. BURGIN:  Great.  Okay.

24          THE COURT:  So let me just -- as I've tried to think

25  this through, Ms. Burgin, I'm trying -- okay.  Let's assume it

1   was a breach of contract, and then I try to think well, what's

2   the damages the Burgins have suffered?  They really haven't

3   disputed that it was proper for GMAC to freeze the line and

4   once it got frozen, they stopped depositing the excess funds

5   in.  And because the loan balance would remain high, it was

6   still an interest-only period, you're saying you incurred

7   additional interest costs by not being able to deposit more

8   each month, reduce the principal balance, have it increase when

9   you wrote checks but net to reduce your interest expense.

10   That's essentially what I read your papers to say.  Is that a

11   fair statement?

12             MS. BURGIN:  Yes.

13             THE COURT:  Okay.

14             MS. BURGIN:  That's a fair statement, Your Honor.  Um-

15   hum.

16             THE COURT:  And I can see where it would be difficult

17   but the burden -- if this goes to an evidentiary hearing, the

18   burden's going to be on you to prove your damages, to liquidate

19   the amount of the claim.  And it may not be precise but it has

20   to be a reasonable estimation of the claim.

21             The fact that you -- I mean nothing stopped -- if

22   there was 300,000 that you deposited elsewhere when you

23   couldn't deposit it into the HELOC, you could earn interest on

24   it, you could invest it in alternative investments, you -- so

25   that isn't a fair measure; to the extent you're earning a

1    return elsewhere, some of it may have been used to pay your

2    interest here.

3           Has this loan converted to -- because I think what you

4    said it was five years interest-only and then it converted to a

5    traditional loan?

6           MS. BURGIN:  Yes.  It was ten years interest-only.

7           THE COURT:  Ten.  Okay.

8           MS. BURGIN:  Um-hum.

9           THE COURT:  Well, here's what I want to happen, I

10   want -- and you don't -- as I understand it, you don't have an

11   attorney, Ms. Burgin.  Correct?

12          MS. BURGIN:  That's correct.

13          THE COURT:  Okay.  And you've been doing all right

14   without an attorney but I just -- what that means is that Mr.

15   Wishnew, or one of his colleagues, can talk directly with you.

16   If you had an attorney, he wouldn't be permitted.  The rules of

17   ethics wouldn't permit him to talk with you directly.  But

18   because you're pro se, you don't have an attorney, you're free

19   to talk to him, he's free to talk to you.  Okay.

20          MS. BURGIN:  Okay.  Great.

21          THE COURT:  And I encourage you to do that.  If -- I

22   want to give you a couple of weeks to see whether you could

23   come up with a fair resolution that satisfies both sides.

24   Okay.  And if you can't, Mr. Wishnew and Ms. Burgin, we're

25   going to move this toward an evidentiary hearing.  I'm going to

 1   determine it's a contested matter.  But I need -- I want to

 2   see -- if there are documents that address this so-called

 3   "checking account feature," I want to see them because I

 4   don't -- you haven't provided them, Mr. Wishnew; I'm not

 5   faulting you for not having provided them and Ms. Burgin hasn't

 6   provided them.

 7            She's described, in her objection, what her

 8   understanding of this checking account feature was, and that

 9   is, perhaps, not entirely consistent with the language of the

10   HELOC agreement itself but I'm not making a determination about

11   that.  So --

12            MR. WISHNEW:  Understood.

13            THE COURT:  But really what you're talking about is

14   you believe that you and your husband are having to pay more

15   interest than you otherwise would have if you could have

16   continued to use the so-called "checking account feature"?

17   That's, basically -- without quantifying the amount, that's

18   what you're talking about.

19            MS. BURGIN:  Yes.  That's correct.  And we haven't

20   been able to lower that -- that principal as it would have.

21            THE COURT:  Well, you could because you could -- you

22   could always -- I mean, the way I -- and I don't think the

23   debtors disagree with this, if you wanted to reduce that

24   principal balance, you can make payments in excess of the

25   minimum required and reduce the balance.  You can't take it

1    back out again if you do that but -- so if you wanted to

2    deposit 5,000 dollars a month in excess of the minimum required

3    payment, I read the agreement as saying they have to take it

4    and it'll be used to reduce the principal balance of the loan.

5            You lose the flexibility of what you're going to do

6    with that money but -- I mean --

7            MS. BURGIN:  Well --

8            THE COURT:  -- have you considered doing that?  I

9    mean, you can pay down the loan.  You don't have to pay it all

10   off but you can start to pay it down.

11           MS. BURGIN:  Right.  I understand that, Your Honor,

12   but what was in the original loan, let's say that our income

13   was 5,000 dollars in a month and we deposited that into that

14   account and then that lowered the interest daily while that was

15   in there but we were also writing checks against it, then that

16   was -- that was lowering our interest liability, thus lowering

17   our principal.

18           Now, with that closed, if we put that into another

19   account and we are paying our bills from it, that is not

20   affecting our principal or our interest on our loan --

21           THE COURT:  Sure, you'd have --

22           MS. BURGIN:  -- whereas before it did.

23           THE COURT:  -- you'd have to take some of your money

24   and use it to pay down the loan, the balance of the loan.  But

25   I -- look, I have to tell you, when I read the HELOC agreement

1  itself, I didn't see provisions that support your

2  interpretation of the checking account.  None of it talks about

3  checking account feature.  I know they issued you checks.

4  There's no question about that.

5          So -- look, what I'd like you to do is -- I'll hang up

6  now and you two ought to continue to talk for a little bit

7  without me and you ought to figure out -- maybe work out a time

8  when you can speak further and if it involves a voluntary

9  exchange of information, that's fine.

10          Mr. Wishnew, I want you to get a date that's

11  convenient for both yourself and Ms. Burgin for another

12  telephone hearing, I'd say, in three weeks.  You have to get

13  that from Deanna.  But get a date and time that works for Ms.

14  Burgin.

15          MR. WISHNEW:  Yes, Your Honor.

16          THE COURT:  And we'll have another hearing.

17          This is on the record so there will be a transcript of

18  our hearing today and in the meantime, Mr. Wishnew, you got to

19  be -- you need to talk to your client.  You need to get a

20  better understanding, because if you're going to object to this

21  claim, you have -- if you're going to defeat one of the

22  essential elements of Ms. Burgin's claim, you're going to have

23  to refute her explanation of what she understood and it seems

24  reasonable of this checking account feature.  So I'm going to

25  want to see whatever documentation there is that explains it

1  and we'll see where we go from there.

2          Because ultimately, Ms. Burgin, if this goes to a

3  hearing, it's going to be a live hearing, not by telephone;

4  it's going to be a hearing in court and you're going to have to

5  come back here and you have to be prepared to testify or have

6  your husband testify.  I'm not going to get into that now, but

7  I don't do evidentiary hearings by telephone.

8          MS. BURGIN:  I see.

9          THE COURT:  Okay.  But we're not there yet.  I'm

10 hopeful that you and the trust are going to be able to work

11 this issue out.  Okay?

12         MS. BURGIN:  Yes.  Thank you very much, Your Honor.

13         THE COURT:  All right.  So I'm going to hang up now

14 and you two ought to stay on the -- Mr. Wishnew, maybe you can

15 give Ms. -- if somehow we get disconnected our you get

16 disconnected, why don't you give Ms. Burgin your telephone

17 number.

18         MR. WISHNEW:  Sure.  Ms. Burgin, if somehow you get

19 disconnected, 212-336-4291.

20         THE COURT:  And that's your direct dial?  Is that

21 correct?

22         MR. WISHNEW:  That is as where I'm sitting right now.

23 Yes, Your Honor.

24         THE COURT:  Okay.  And were you able to get that down,

25 Ms. Burgin?

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1           MS. BURGIN:  I believe so.  That was 212-336-4291?

2           MR. WISHNEW:  Yes.  I think once Judge Glenn hangs up,

3    we should still be on the conference line but if for some

4    reason we disconnect then it means you can reach me at that

5    number.

6           THE COURT:  Okay.

7           MS. BURGIN:  Okay.  Great.

8           THE COURT:  Very good.

9           MS. BURGIN:  Thanks very much.

10          THE COURT:  Thank you very much.  We're off the record

11   and I'm going to have the phone hung up.

12       (Whereupon these proceedings were concluded at 3:31 PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Ellen S. Kolman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   ELLEN S. KOLMAN

11   AAERT Certified Electronic Transcriber CET**D-568

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  March 27, 2014

18

19

20

21

22

23

24

25