**<u>Exhibit 6</u>**

**Original Complaint**

4:12cv375

CAUSE NO. 199-01915-2012

| | | |
|---|---|---|
| **GREGORY C. MORSE** | § | 199th **JUDICIAL DISTRICT** |
| | § | |
| **V.** | § | |
| | § | |
| **HOMECOMINGS FINANCIAL, L.L.C** | § | |
| **GMAC MORTGAGE CORPORATION, LLC,** | § | |
| **GMAC BANK (NOW ALLY BANK),** | § | |
| **MORTGAGE ELECTRONIC REGISTRATION** | § | |
| **SYSTEMS, INC., MERSCORP, INC., FEDERAL** | § | |
| **NATIONAL MORTGAGE ASSN. and** | § | |
| **COMMONWEALTH LAND TITLE** | § | |
| **INSURANCE COMPANY** | § | **COLLIN COUNTY, TEXAS** |

## ORIGINAL PETITION

Plaintiff Gregory C. Morse files this Original Petition against Homecomings Financial,

LLC, GMAC Mortgage Corporation, LLC, GMAC Bank (now Ally Bank), Mortgage Electronic

Registration Systems, Inc., MERSCORP, Inc., Federal National Mortgage Association and

Commonwealth Land Title Insurance Company, and would show the Court as follows:

### I.
### JURISDICTION AND VENUE

Plaintiff has asserted claims under Texas law. This Court has jurisdiction over these

claims and the damages are within the jurisdictional limits of this Court.

Venue is proper in Collin County, Texas under CPRC 15.002(a)(1) in that all or a

substantial part of the events giving rise to the claim occurred in Collin County.

### II.
### PARTIES

Plaintiff Gregory C. Morse ("Morse") is an individual residing at 223 High Point Drive,

Murphy, Texas 75094.

FILED

Defendant Homecomings Financial, L.L.C. ("Homecomings") is a limited

liability company which has represented that its primary business location is 8400 Normandale

1

Lake Blvd, Suite 250, Minneapolis, MN 55437. It may be served through Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

Defendant GMAC Mortgage Corporation, LLC ("GMAC") is a mortgage company which has represented that it is the servicer of the refinancing note, and that its primary business location is 3451 Hammond Ave., Waterloo, IA 50701. On information and belief, it was a subsidiary of GMAC Financial Services, Inc. (now Ally Bank). It may be served through CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201, according to the Texas Secretary of State's office.

Defendant GMAC Bank (now Ally Bank), may be served through Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th St., Suite 620, Austin Texas 78701-3218, according to the Texas Secretary of State's office.

Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a privately owned mortgage company which, on information and belief, is owned and controlled by MERSCORP, Inc. On information and belief, MERS was established in 1997 to allow banks and other lenders to circumvent the several centuries' old custom that protected real property rights by requiring every sale of property be publically recorded, and requiring that any creditor claiming a right to foreclose to demonstrate the clear right to do so. MERS has represented that it has various business locations, including P.O. Box 3186, Memphis, TN 38173-0186 and 1595 Spring Hill Road, Vienna, VA. It may be served through CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201, according to the Texas Secretary of State's office. For the purposes of this pleading, reference to MERS includes reference to MERSCORP.

Defendant MERSCORP, Inc. ("MERSCORP") is, on information and belief, that corporate entity that serves as the holding company for MERS. Its principal place of business is 1595 Spring Hill Road, Suite 310, Vienna, VA. It may be served through the Secretary of

2

State's office of the State of Virginia by mailing to 1818 Library Street, Suite 300, Reston, VA

20190. For the purposes of this pleading, reference to MERS includes reference to MERSCORP.

Defendant Federal National Mortgage Association ("Fannie Mae") is a Federal

government sponsored enterprise chartered in 1968 by the U.S. Congress as a private shareholder

corporation.  Its principal place of business is 3900 Wisconsin Avenue, N.W., Washington, D.C.

20016-2892.  The Federal Housing Finance Agency (FHFA) was appointed conservator of

Fannie Mae on or about September 7, 2008.  While in conservatorship, Fannie Mae continues to

operate and conduct business.

Defendant Commonwealth Land Title Insurance Company ("Commonwealth"), is a

corporation which has represented that its primary business location is 6601 Frances Street,

Omaha, NE 68106. On information from Commonwealth's legal counsel, Commonwealth, as a

subsidiary of LandAmerica Financial Group, Inc., was sold to Fidelity National Financial, Inc.

("Fidelity"). According to Fidelity's/Commonwealth's legal counsel's March 24, 2011 letter,

Fidelity has "agreed to undertake all obligations of" Commonwealth. Nevertheless,

Commonwealth apparently remains an independent legal entity and may be served as

LandAmerica Commonwealth Title of Dallas, Inc, by serving the CT Corporation, according to

the Texas Secretary of State's office.

### III.
### CONDITIONS PRECEDENT

All conditions precedent have been performed or have occurred, which conditions are

necessary to maintain this action

### IV.
### NATURE OF THE CASE

This is a suit for damages and declaratory judgment arising from and within the context

of the Wall Street home loan mortgage securitization debacle into which Plaintiff was swept

through what appeared to be a routine home refinancing. That context is more fully described
hereafter.

## V.
## FACTUAL BACKGROUND

### Overview of the Industry Context of this Transaction

"In the fall of 2008, America suffered a devastating economic collapse. Once valuable
securities lost most or all of their value, debt markets froze, stock markets plunged, and storied
financial firms went under. Millions of Americans lost their jobs; millions of families lost their
homes; and good businesses shut down. These events cast the United States into an economic
recession so deep that the country has yet to fully recover." Report of the United States Senate
Permanent Subcommittee on Investigations Committee on Homeland Security and
Governmental Affairs ("Permanent Subcommittee"), U.S. Senator Carl Levin, Chairman and
U.S. Senator Tom Coburn, Ranking Minority Member, entitled "Wall Street and the Financial
Crisis: Anatomy of a Financial Collapse" ("the Wall Street Report") issued April 13, 2011, p. 1.

"In 2008, OTS [The U.S. Office of Thrift Supervision] closed the doors of five thrifts
with combined assets of $354 billion. Another seven thrifts holding collective assets of $350
billion were sold or declared bankruptcy. Virtually all of these thrifts conducted high risk
lending, accumulated portfolios with high risk assets, and sold high risk, poor quality mortgages
to other financial institutions and investors." Wall Street Report, p. 231.

"Mortgage lenders other than banks also failed. Many of these mortgage lenders had
operated as private firms, rather than as depository institutions, and were not overseen by any
federal or state bank regulator. Some were overseen by the SEC; others were not overseen by

4

any federal financial regulator.  Some became large companies handling billions of dollars in residential loans annually, yet operated under minimal and ineffective regulatory oversight. When residential loans began to default in late 2006, and the subprime securitization market dried up in 2007, these firms were unable to sell their loans, developed liquidity problems, and went out of business.  Together, these failed mortgage lenders, like the failed thrifts, contributed to systemic risk that damaged the U.S. Banking system, U.S. financial markets, and the U.S. economy as a whole."  Wall Street Report, p. 231.

As the Wall Street Report describes in the time leading up to the fall of 2008, "Lenders began to make money, not from holding onto the loans they originated and collecting mortgage payments over the years, but from the relatively short term fees associated with originating and selling the loans."  Wall Street Report, p. 17.

"By 2003 many lenders began using higher risk lending strategies involving the origination and sale of complex mortgages that differed substantially from the traditional 30-year fixed rate home loan."  Wall Street Report, p. 18.

"To make home loan sales more efficient and profitable, banks began making increasing use of the mechanism now called "securitization."  In a securitization, a financial institution bundles a large number of home loans into a loan pool, and calculates the amount of mortgage payments that will be paid into that pool by the borrowers. The securitizer then forms a shell corporation or trust, often offshore, to hold the loan pool and use the mortgage revenue stream to support the creation of bonds that make payments to investors over time.  Those bonds, which are registered with the SEC, are called residential mortgage backed securities (RMBS) and are typically sold in a public offering to investors."  Wall Street Report, p. 18.

"For years securitization worked well.  Borrowers paid their 30-year, fixed rate mortgages with few defaults, and mortgage backed securities built up a reputation as a safe

5

investment. Lenders earned fees for bundling the home loans into pools and either selling the pools or securitizing them into mortgage backed securities." Wall Street Report, p. 18.

"Due to the 2002 Treasury rule that reduced capital reserves for securitized mortgages, RMBS holdings also became increasingly attractive to banks, which could determine how much capital they needed to hold based on the credit ratings their RMBS securities received from the credit ratings agencies." Wall Street Report, p. 18.

"The resulting increased demand for mortgage backed securities, joined with Wall Street's growing appetite for securitization fees, prompted lenders to issue mortgages not only to well qualified borrowers, but also higher risk borrowers." Wall Street Report, p. 18.

"Some lenders began to specialize in issuing loans to subprime borrowers and became known as subprime lenders. Subprime loans provided new fuel for the securitization engines on Wall Street." Wall Street Report, pp. 18-19.

"Some lenders engaged in a host of risky lending practices that allowed them to quickly generate a large volume of high risk loans to both subprime and prime borrowers. Those practices, for example, required little or no verification of borrower income, required borrowers to provide little or no down payments, and used loans in which the borrower was not required to pay down the loan amount, and instead incurred added debt over time, known as "negative amortization" loans." Wall Street Report, p. 19.

"These practices were used to qualify borrowers for larger loans than they could have otherwise obtained. When borrowers took out larger loans, the mortgage broker typically profited from higher fees and commissions; the lender profited from higher fees and a better price for the loan on the secondary market; and Wall Street firms profited from a larger revenue stream to support bigger pools of mortgage backed securities." Wall Street Report, p. 20.

"After 2000, the number of high risk loans increased rapidly, from about $125 billion in

6

dollar value or 12% of all U.S. loan originations in 2000, to about $1 trillion in dollar value or

34% of all loan originations in 2006. Altogether from 2000 to 2007, U.S. lenders originated

about 14.5 million high risk loans." Wall Street Report, p. 20.

"When lenders kept on their books the loans they issued, the creditworthiness of those

loans determined whether the lender would turn a profit. Once lenders began to sell or securitize

most of their loans, volume and speed, as opposed to creditworthiness, became the keys to a

profitable securitization business." Wall Street Report, p. 24.

"Lenders that produced a high volume of loans could sell pools of the loans to Wall

Street or to government sponsored entities like Fannie Mae and Freddie Mac. Likewise, they

could securitize the loans and work with Wall Street investment banks to sell the securities to

investors." Wall Street Report, p. 24.

"Investment banks that securitized the loans garnered fees for their services and also

typically passed on the risk of nonpayment to the investors who bought the mortgage backed

securities. The investment banks were typically interested in loan repayment rates only to the

extent needed to ensure defaulting loans did not cause losses to the mortgage backed securities

they sold." Wall Street Report, p. 25.

"To ensure an ongoing supply of loans for sale, lenders created compensation incentives

that encouraged their personnel to quickly produce a high volume of loans." Wall Street Report,

p. 25.

"Loan officers, for example, received more money per loan for originating higher risk

loans and for exceeding established loan targets. Loan processing personnel were compensated

according to the speed and number of the loans they processed. Loan officers and their sales

associates received still more compensation, often called yield spread premiums, if they charged

borrowers higher interest rates or points than required in the lender's rate sheets specifying loan

prices, on included prepayment penalties in the loan agreements." Wall Street Report, p. 25.

In effect, from the early part of the new century, a swirling mess of greed, under-

regulation, and over-complication in the structure of publically marketed financial instruments

dominated the mortgage industry in the United States, principally arising from activities

associated with the several trillion dollar sub-prime mortgage trading and residential mortgage

backed securities ("RMBS") described in more detail in the bipartisan Wall Street Report.

Many tens of thousands of American citizens were thus swept up into complex financial

gamesmanship, attended by the guile, scheme, artifice, misleading non-disclosure and/or

misrepresentation, and avarice which was, for the industry, described by the FBI, as follows:

> "Criminal activity has become more complex and loan frauds are expanding to
> multitransactional frauds involving groups of people from top management to
> industry professionals who assist in the loan application process."

FY 2004 "Financial Institution Fraud and Failure Report," prepared by the Federal Bureau of

Investigation. See also, Wall Street Report, p. 271.

### Context of Defendants' Involvement in the Wall Street Debacle

According to the Wall Street Report, GMAC Financial Services (now Ally Financial),

was one of "[t]he largest recipients of TARP funds...." P. 44.

The TARP funds – Troubled Asset Relief Program funds – were provided for the express

purpose "to stop financial institutions from collapsing and further damaging the U.S. economy."

P. 44.

On information and belief GMAC was a part of the reason for the application by GMAC

Financial Services to seek TARP funds, resulting from the actions reported by the Permanent

Subcommittee, beginning on p. 17 of the Wall Street Report. In fact, that Report analyzed "High

Risk Mortgage Lending" (p. 17), "Securitization" (p. 18), "High Risk Mortgages" (pp. 18-21),

and related aspects of the residential mortgage backed securities practice in the mid to late first

decade of the new century.

More specifically, the Wall Street Report set out that "Once lenders began to sell or securitize most of their loans, volume and speed, as opposed to creditworthiness, became the keys to a profitable securitization business." Wall Street Report, p. 24.

"Lenders that produced a high volume of loans could sell pools of the loans to Wall Street or to government sponsored entities like Fannie Mae and Freddie Mac." Wall Street Report, p. 24.

"Investment banks that securitized the loans garnered fees for their services and also typically passed on the risk of nonpayment to the investors who bought the mortgage backed securities." Wall Street Report, pp. 24-25.

"To ensure an ongoing supply of loans for sale, lenders created compensation incentives that encouraged their personnel to quickly produce a high volume of loans. They also encouraged their staffs to issue or purchase higher risk loans, because those loans produced higher sales prices on Wall Street. Loan officers, for example, received more money per loan for originating higher risk loans and for exceeding established loan targets. Loan processing personnel were compensated according to the speed and number of the loans they processed. Loan officers and their sales associates received still more compensation, often called yield spread premiums, if they charged borrowers higher interest rates or points than required in the lender's rates sheets specifying loan prices, or included prepayment penalties in the loan agreements." Wall Street Report, p. 25.

### Drawing Plaintiff into the Wall Street Debacle

Robert Stanley, Texas Mortgage Broker License #65268, the original loan broker agent acting for ABB and/or Abd, made a "cold call" to Plaintiff early in 2008 to induce him to refinance his home at 223 High Point Drive, Murphy, Texas 75094 ("the property") claiming that

Stanley could save Plaintiff money on his existing loan and could handle all the process so that it would be easy and cost free to Plaintiff.

Without warning or material disclosures to Plaintiff of the real nature of the fraudulently framed transaction, Plaintiff relied upon those representations to proceed through Stanley into the refinancing ("the refinancing"), on or about March 3, 2008, a refinancing sponsored or supported by one or more Defendants.

In connection with that refinancing Plaintiff received a copy of a HUD 1 apparently keyed to the refinancing.

The HUD 1 was and is a form required, in part, as a result of the requirements of the Real Estate Settlement Procedures Act (RESPA), 12 USC, 2605 (e)(1)(B) and its related Reg. X Sec 3500.21 (f)2.

The HUD 1 reflects in substantial part the roles one or more of the Defendants purportedly played in securing the refinancing.

More specifically, the refinancing apparently involved a 30 year fixed rate commitment by Plaintiff, with note and mortgage obligations flowing to the lender identified on the HUD 1, Homecomings Financial.

The refinancing was purportedly accomplished through the use of a $414,500 note, the proceeds of which were to pay off the prior liens in the amounts of $367,642.40 and $40,242.77, respectively, reflected on the HUD 1.

Plaintiff has performed under that note. From the time of the refinancing until the filing of this petition, no Defendant has declared a default in the refinancing obligation by Plaintiff to any lender. This suit is not filed in response to any effort to foreclose on his property.

However, the certainty of Plaintiff's contract with one or more of Defendants is clouded by events subsequent to the closing, at least, and perhaps certain events prior as they pertain to

10

the role of MERS.

As an illustration of the problems generated by the practices outlined by the Wall Street Report, Robert Stanley was, on information and belief, later convicted of Federal felony charges in Houston concerning matters which were routed through one or more of the Defendants' company(ies).

In this specific transaction, to Plaintiff's personal knowledge Stanley made representations to secure Plaintiff's business and then later represented to Plaintiff that he(Stanley)/ABB were only making $465 on this transaction, a sum that appears at variance with the HUD 1 by many hundreds to thousands of dollars.

As a further illustration of the sickness of residential mortgage securitization market described in the Wall Street Report, on information and belief, Pinnacle, the title company which Stanley/ABB cooperated with extensively, is now apparently defunct as reflected in the Texas Secretary of State records, evidently going out of business within about 4-5 years of its founding.

Further, Pinnacle failed to provide Plaintiff with a copy of the title policy which, according to the HUD 1, he was charged for at closing.

Neither Pinnacle nor LandAmerica Financial Group, Inc. provided Plaintiff with a copy of the report of title examination made by LandAmerica and, according to the HUD 1, Plaintiff was charged $150 for at closing.

LandAmerica Financial Group, Inc, the parent of LandAmerica Title Company (of which Commonwealth was a subsidiary) which the HUD 1 indicates was paid for title examination, on information and belief took bankruptcy on or about November 26, 2008.

Commonwealth (and/or its successor) has failed to provide Plaintiff with a copy of the actual title policy with its "unnamed mortgagee", a policy which, according to the HUD 1, he was charged for at closing.

Neither Pinnacle nor Don Ledbetter (State Bar of Texas No. 12100800), apparently Plaintiff's counsel in this refinancing, provided Plaintiff with a waiver or any other document to limit Ledbetter's service for Plaintiff in this matter, nor has either sought to account to Plaintiff for the quality, specific services, or charges for services for which Plaintiff was billed at closing on March 3, 2008 under the HUD 1.

As the practices described in the Wall Street Report and evidenced in this transaction became too sizeable to contain, in early September 2008 Homecomings Financial, then publicizing itself as a division of GMAC, announced that its operations at its Dallas, Texas, 14850 Quorum Drive, Ste.500 address would be shut down, including retail and wholesale operations.

### Plaintiff's Efforts to Determine the True Nature of the Refinancing

These and related matters cause Plaintiff concern about whether other closing charges were either not paid, were paid to the wrong party, were misallocated, were fabricated, or were otherwise misrepresented, reflecting an overcharge in the process: which party actually funded the loan, whether it was securitized before closing, what was paid to whom to prepare the loan for closing, what was told Plaintiff that was false and misleading and what wasn't, whether there were or are still unannounced yield spread premiums embedded in the transaction(s), whether the property appraisal was misleading or professionally inapposite, whether the credit scores were artificially hiked to permit a financing or refinancing by a borrower, the Plaintiff, who otherwise would not have qualified, and related matters.

It is not apparent, for example, how much ABB was paid, for what services, how those services were evidenced, and what documents verify ABB's compensation, given the admission of ABB's agent, Stanley, about the limited amount of payment that was to be received by ABB.

As a result of that HUD 1 and later questions raised by Plaintiff, certain communications

were directed to Defendants by Plaintiff, including a letter dated March 04, 2011 essentially

addressed to Defendants (excluding Fannie Mae) or their representatives to request information

that would shed light on Plaintiff's concerns respecting the closing and the resultant status of

Plaintiff's title in the property.

Plaintiff was concerned about having to account for the process of the closing, the

substance of the change in title, the accounting for funds being disbursed at closing, the impact

on the title of his property, and any other matter that he might be required to disclose in

accordance with duties imposed either under Federal or Texas law in the event of any further sale

or marketing of the property.

Accordingly, Plaintiff specifically sought:

a) an accounting by one or more addressees for funds purportedly disbursed in a loan

closing on or about March 3, 2008 (hereafter March 3, 2008), and

b) information about the status of Plaintiff's clear title in the property from one or more

addressees.

Defendants either did not respond, or responded with limited information not helpful to

answer the concerns Plaintiff raised.

### Plaintiff's Concerns About the Regularity of the Refinancing

#### a) respecting the ownership of the note

The note and mortgage may have been transferred or assigned to GMAC so that as of

May 1, 2008 the payments were to be made to GMAC at PO Box 79135, Phoenix, AZ.

On later information, and specifically based on GMAC's letter dated April 12, 2011

("The current owner of your loan is Fannie Mae…"), there may later have been some

involvement of the refinancing note with the "Fannie Mae", although it is unknown whether

Fannie Mae claims an interest in the relevant note, mortgage, or property.

13

b) **respecting the payment of existing liens**

According to the HUD 1 governing the March 3, 2008 closing, the first and second liens

on the property, $367,642.40 and $40,242.77, respectively, were to have been released at or

about the time of closing. According to the documentation Plaintiff has reviewed, however, those

liens were not released at that time.

Those two liens were purportedly later released by MERS as purported nominee for one

or more of the Defendants, respectively, on these dates and by these persons represented to be

MERS agents:

> a) first lien: purportedly released on March 13, 2008 by Jimmy Gossett, Assistant
>
> Vice President of MERS; and
>
> b) second lien: purportedly released on March 24, 2008 by Ashley Johnson, Assistant
>
> Secretary of MERS.

On information and belief, both Mr. Gossett and Ms. Johnson were persons whose

signatures were reproduced by MERS as "robo-signers" of many thousands of documents, and

neither read nor understood the documents that were "robo-signed" in their names, including the

documents signed in this case.

Those documents, purportedly "robo-signed", may be ineffective in the absence of

knowledge of the contents and an intention to sign as a legally binding document within the

course and scope of such agency relationship they may have had with MERS.

c) **respecting the difference between the amount refinanced and the amount of the
existing liens**

The $414,500 refinancing note proceeds were to pay off prior liens in the amounts of

$367,642.40 and $40,242.77, respectively, reflected on the HUD 1.

The total of those two liens was $407,885.17, leaving $6,614.83 to pay off all the closing

costs which the HUD 1 listed to be at least $16,371.89.

The HUD 1 "Cash From Borrower" was accordingly listed as $9,757.06, apparently
derived by simple subtraction: $16,371.89 – 6,614.83.

The HUD 1 reflects the following entries as a part of the $16,371.89 referenced above,
each being set out here beside the respective numbered line on which it appears:

| | | |
|---|---|---|
| 804. | Broker Origination Fee 0.2413% to ABB Mortgage $1,000.19 | |
| 805. | Appraisal Fee to ABB Mortgage | $ 350.00 |
| 806. | Lender Loan Charge to Homecomings F. | $ 550.00 |
| 807. | Broker Processing Fee to ABB Mortgage | $ 495.00 |
| 808. | Broker Admin Fee to ABB Mortgage | $ 595.00 |
| 809. | Broker Application Fee to ABB Mortgage | $ 487.42 |
| 901. | Interest from 3/7 – 4/1 to ___ (unknown) | $ 1,703.43 |
| 1107. | Attorneys fees to Don Ledbetter | $   80.00 |
| 1108. | Title Insurance (with tax deletion) to Pinnacle Title | $ 2,268.70 |
| 1111. | Escrow fee to Pinnacle Title | $  350.00 |
| 1112. | State of Texas Policy Guaranty Fee to Texas Title Ins. G. | $    1.00 |
| 1113. | Messenger Fee to Pinnacle Title | $   71.00 |
| 1201. | Recording Fees to Pinnacle Title | $  176.00 |
| 1204. | Tax certificates to Dan Trace | $   65.52 |
| 1304. | 2007 County Taxes to Collin County | $  993.18 |
| 1305. | 2007 County Community Taxes to Collin County | $  352.62 |
| 1306. | 2007 City of Murphy Taxes to Collin County | $ 1,898.39 |
| 1307. | 2007 Plano ISD Taxes to Collin County | $ 4,934.44 |
| **Total HUD 1 "Paid From Borrower's Funds at Settlement"** | | **$16,371.89** |

These charges were presumably to be made and "Paid From Borrower's Funds at Settlement" and from Homecomings Financial's funds, as "Lender", on March 7, 2008 according to the HUD 1.

Thus, there should have been a paper trail, if not destroyed, with records showing how, when, and to whom those closing funds were disbursed.

Defendants, although requested, did not supply copies of those documents to Plaintiff in response to the referenced March 4, 2011 letter.

### d) respecting the non-payment of the appraisal

Unresolved issues regarding what happened to those funds are significant and arise in part because one of the presumed payees at closing, DuPriest Appraisal, informed Plaintiff that no such payment for appraisal was ever made. (Cf. Line 805 on the HUD 1, "Appraisal Fee to ABB Mortgage $350.00.").

The non-payment of the appraisal fee raised a question as to whether all other such listed payments were made from funds received from Homecomings Financial, for example, in its purported status as "lender" under the closing documents, thus somehow allowing it to designate MERS as its "nominee", then allowing GMAC to accrue to the status of assignee/transferee of either Homecomings Financial or MERS, and then allowing subsequent lien holders, including possibly Homecomings Wholesale, to accrue to the status of assignee/transferee of either Homecomings Financial or GMAC or MERS.

In addition, there were other closing related charges reflected as "POC" – presumably paid outside of closing -- on the HUD 1, which charges require explanation, including at least what was listed as:

| | | |
|---|---|---|
| 810. | Broker Fee from HF (POC (L)) to ABB Mortgage | $ 2,557.47 |
| 811. | Flood Cert Fee by Lender (POC) to 1st Am. Flood Data | $    6.00 |

16

| 812.   Tax Service Fee (POC) to Home Connects LS | $    70.00 |
| 1114.  Examination Fee (POC) to LandAmerica Title | $  150.00 |

**Listed as POC or POC (L), the L presumably standing for Lender:     $ 2,783.47**

It is thus unclear who provided those POC funds, if anyone, whether those funds should

be added to the $16,371.89 to reflect the total amount due from the borrower at closing, or

whether they, less the $2,557.47 broker fee from Homecomings Financial to ABB, should be

added to the $16,371.89 to reflect the total amount due from the borrower at closing.

It is also unclear, if either of the latter two points reflects reality at closing, whether the

extra money above the $9,757.06 was somehow reflected on the HUD 1.

It is also unclear how all that could have resulted in a loan closing consistent with the

HUD 1, especially if Morse contributed less than $9,757.06 to make up the $9,757.06 required

by the HUD 1 or less than an arguably due higher amount which would include all or part of the

$2,783.47.

**f) respecting the clarity or marketability of the title if the underlying note amount is
uncertain**

Plaintiff requested in the March 4, 2011 letter, among other things, any evidence

respecting any contribution Plaintiff made directly or indirectly for the payment of those or other

funds which were not rolled into the $414,500 refinancing note, as well as an explanation of the

Defendants' role in relation one to the other.   In fact, Defendants' failure to explain may at least

indirectly affect the title and/or the marketability of the property.

Plaintiff, however, has been left with a property he is required to pay for in amounts

which may not be based on honest or realistic closing assessments as reflected in the HUD 1.

Plaintiff may not have a clear title regardless of how much money he pays.

**g) respecting the clarity or marketability of the title if the underlying title insurance
if not clearly established**

17

When LandAmerica Financial took bankruptcy, as parent of Commonwealth, on information and belief, it caused the sale of Commonwealth to Fidelity National Financial, Inc. In doing so it may have cast a shadow on the certainty of the title by, among other things, creating a gap between what its legal counsel's March 24, 2011 letter referenced respecting the title policy which was promised to Plaintiff as "a refinance transaction wherein a lender's policy of title insurance was apparently issued by Commonwealth Title Insurance Company ("CLTIC") to an **unnamed insured** mortgagee." (emphasis added).

In contrast to such "unnamed insured mortgagee", GMAC enclosed in its letter of April 12, 2011, a purported "Mortgagee Policy of Title Insurance" issued by Commonwealth Land Title Insurance Company (Policy Number 535-Z014715 on March 14, 2008) (emphasis added) which names "Homecomings Financial Network, Inc., and each successor in ownership of the indebtedness secured by the insured mortgage..." as the named "Insured," making unclear whether and what title insurance policy was issued – the one identified by Commonwealth's legal counsel or the one, with a slightly different name, produced by GMAC.

Further, the purported March 14, 2008 policy of title insurance was (i) some 11 days after closing on March 3, 2008 and (ii) some 15 days after a February 29, 2008 dated letter from Homecomings Financial to Plaintiff in which it announced that "your mortgage has been purchased by GMAC Bank from HOMECOMINGS FINANCIAL, L.L.C. (FKA HOMECOMINGS FINANCIAL NETWORK, INC.)...," all at a time before Plaintiff had signed the mortgage.

Upon further inquiry regarding the nature and terms of the title insurance coverage, Commonwealth's counsel responded on March 24, 2011, raising further uncertainty about the title and the particulars of the refinancing:

18

"We also have not been able to access the agent's file or determine who may have access to it. My statements as to the lender's policy related solely to the information contained in the HUD 1 Settlement Statement that a lender's policy was issued. An owner would not receive a copy of the lender's policy, even though charged for the same. Also, based on the Hud-1 (sic), I would assume that the insured lender is Homecomings Financial, LLC, but without access to the agent's file or even a Commitment, I cannot be certain."

Accordingly, Defendants, one or more, evidently participated in effectively making indefinite the title and making Plaintiff a renter of his own property, with no clear end in sight for his dilemma, by failing to provide verifiable proof that items listed in Schedule „C" to Commonwealth's „Commitment of Title Insurance" were „dispose[d] of to [Commonwealth's] satisfaction, before the Policy is issued."

**h) respecting the clarity or marketability of the title based on the structural role and actions of MERS in this and prior transactions related to the property**

On information and belief under the present circumstances and state of knowledge, Plaintiff reasonably may expect difficulty in establishing clear title to his property as a result of the transfers and/or assignments that resulted from this transaction, along with possible improprieties associated with the loan closing.

MERS played a role in the 2005 refinancing of the property.

Homecomings Financial and/or others played a role in the 2005 refinancing of the property.

On information and belief, the role of both MERS and Homecomings Financial casts a shadow on the title during that 2005 refinancing, unbeknownst to Plaintiff.

Whatever that might have been, MERS created the following ambiguity related to the refinancing here, as follows:

a) The MERS Identification Number („MIN" ) is generated when a mortgage is entered into the MERS database, on information and belief.

b) The MIN is an 18 digit number produced by MERS apparently in accordance with internal MERS standards, on information and belief.

c) The MIN for the subject loan is 1000626-0476868450-0, as reflected on the Deed of Trust referencing the property.

d) On information and belief, the first seven digits of the MIN correspond to the MERS Organization ID number for the entity generating the MIN; the next ten digits correspond to a number generated by that entity, often considered to be a loan number; while the last digit is a check digit.

e) Respecting the refinancing, the loan number portion of the MIN -- 686845-0 -- apparently corresponds with the Homecomings Financial loan number which, by means unknown to Plaintiff, might have later become the GMAC loan number.

f) However, the MERS Organizational ID indicated on the corresponding deed of trust, 1000626, on information and belief, belonged to Homecomings Wholesale.

g) The MERS Organizational ID indicated, 1000626, on information and belief, was formerly the MERS Organizational ID number of Homecomings Wholesale which, on information and belief, was last listed on a MERS Lender Membership List no later than on or about January 27, 2009.

h) While generation of the MIN may not necessarily constitute direct evidence of ownership of the underlying refinancing note or mortgage, or providing the funds for the refinancing, it is at least an indicator of the parties that may have been involved in the handling of, processing of, or responsibility for the loan, including whether there is a Homecomings Financial claim which may cloud the title of the property.

i) Homecomings Wholesale was, on information and belief, neither licensed by the Texas Department of Savings and Mortgage loans, nor a company registered with the

Texas Secretary of State at times relevant to this refinancing.

j) MERS Servicer Identification System available for search reflects that "3 records

matched your search": one for Homecomings Wholesale, two for Greenpoint Mortgage,

with the three being serviced either by GMAC or EMC Mortgage.

**i) respecting the clarity or marketability of the title in the absence of a legal
description of any property at the time Plaintiff signed the mortgage**

The mortgage in question did not contain any legal description when signed by Plaintiff

on March 3, 2008.

In the absence of a legal description, Plaintiff did not sign an enforceable or recordable

mortgage under Texas law, including Texas Business and Commerce Code, §26.01, et seq and

Texas property Code, §13.01, et seq. Thus, no Defendant has secured an interest in the property

through the refinancing note or mortgage. An after-the-fact amendment without Plaintiff's

consent is unauthorized, is of no legal moment.

**j) respecting the clarity or marketability of the title based on any previous
attempted transfer of the note to GMAC Bank, or others**

In the absence of a legal description and in the absence of Plaintiff's signature on

February 29, 2008, despite Homecoming Financial's assertion that "your mortgage has been

purchased by GMAC Bank from Homecomings Financial", there would be nothing for GMAC

Bank to record under Texas law except, if it did so, an unsigned purported mortgage without a

legal description. This would be insufficient under Texas law, including Texas Business and

Commerce Code, §26.01, et seq and Texas property Code, §13.01, et seq. Thus, neither GMAC

Bank nor any subsequent assignee could have secured an interest in the note, mortgage, or

property. An after-the-fact amendment without Plaintiff's consent is unauthorized, and is of no

legal moment.

**k) respecting the clarity or marketability of the title based on any subsequent**

21

**attempted transfer of the note to Fannie Mae or others**

In response to a RESPA Qualified Written Request, GMAC as purported loan servicer responded that the loan was owned by Fannie Mae as of March 4, 2010, and then recently in its letter dated April 12, 2011.

To Plaintiff's knowledge, there is no evidence provided to him other than that claim that such a transfer or assignment ("transfer") of the mortgage on his property occurred, contrary to the terms of RESPA which require disclosures of relationship between the transferring or referring parties, costs, yield spread premiums, and related matters.

On information and belief, such a transfer could not occur legally absent some unproduced purchase and sale agreement, a transfer receipt, a delivery receipt, a receipt of funds for the purchase of the note, or other similar documents evidencing a disbursement of funds for the acquisition of the note by Fannie Mae or other purchaser, nor in the absence of complying with all applicable Federal and Texas statutes and regulations.

Further, such transfer could not be accomplished absent a valid mortgage in the first instance, one which included a legal description which this mortgage did not.

**l)  respecting the clarity or marketability of the title based on any subsequent attempted transfer of the note by MERS**

Furthermore, any transfer could not be accomplished absent a valid authority to transfer, and MERS legal counsel has conceded on the record in one Federal Court that MERS evidently does not have the authority to transfer the mortgage to any other party, thus eclipsing MERS as a possible transferring agent to Fannie Mae or any other entity since, according to MERS legal counsel, MERS doesn't "hold the note" and doesn't transfer it. See Transcript, pp. 2, 10-12, *Delaney, et al v. One West Bank, et al*, Federal District Court for the District of Oregon, CV-10-977-KI, September 28, 2010.

However, to the extent that MERS attempted a transfer, any such transfer would need to be internally consistent, showing, at the very least, that the entities that had authority made legally enforceable transfers.  In this instance that would require some clearing up of legal interests in the note, mortgage, and/or property of the following entities which in some manner show up in the paperwork and/or chain of title available, on information and belief:

 a) EMC Holdings, LLC (MIN 1003559),

 b) Greenpoint Mortgage Funding, Inc. (MIN 1000138),

 c) Homecomings Financial, LLC (MIN 1000474),

 d) Homecomings Wholesale Funding (MIN 1000626),

 e) GMAC Mortgage, LLC (MIN 1000375),

 f) GMAC Bank Asset Management Co. (MIN 1005727),

 g) Fannie Mae (MIN 1000130), and

 h) Fannie Mae (reverse mortgage) (MIN 1005586).

Any inconsistency in any documentation bearing the wrong MIN number creates a cloud on the title of the property.

### Relationship of Defendants, One to Another at All Material Times

The Defendants' responses to request for information have been inadequate to the central task of figuring out both what happened in the closing and whether there is or was a clear title to the property subject to the mortgage and a 30 year note obligation arising out of the March 3, 2008 refinancing.

It is correspondingly unclear what entity is the legally appropriate recipient of any payment under that note and subsequent assignments/transfers: Homecomings Financial, Homecomings Wholesale, GMAC, GMAC Bank, MERS, Fannie Mae, or some other entity.

Based upon the Wall Street Report and Plaintiff's experience with one or more

Defendants it appears that at all material times Defendants, one or more, cooperated with, agreed to, conspired with, acted in conscious parallelism, or later ratified the acts of one or more other Defendants so that the act of one Defendant become the act of all, whether under the principles of agency, concerted activity, conspiracy, or otherwise.

On information and belief, such Defendants were a party to or an entity which encouraged or ratified the formation of MERS, mechanically stating in an April 12, 2011 letter, "Please be advised that Loans can be registered with Mortgage Electronic Registration System (MERS) after they have originated with a mortgage company. Please be advised, MERS is an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." GMAC letter dated April 12, 2011.

MERS has accordingly been a party to practices that leave many of the titles and matters relating to titles unclear and in need of judicial declaration of the extent to which they are clear or clouded, including the instruments that were the product of the closing here.

Yet, in *Delaney, et al v. One West Bank, et al*, CV-10-977-KI, the Federal District Court for the District of Oregon on September 28, 2010, was told by counsel for MERS that MERS did not "hold title" or "transfer title", thus casting doubt on any title transfer where MERS was the transferring agent, i.e. where MERS has been "trading residential and commercial mortgage loans." See Transcript, pp. 2, 10-12 of the hearing before the District Court on September 28, 2010, contrasted with GMAC's April 12, 2011 letter.

Those four parties – the three banks and MERS – have in some manner yet unknown set in motion the pursuit of refinancings like the one here through various agents who cooperated: mortgage companies like ABB and sub-agents like Stanley who recruited persons like Plaintiff to

24

part with clear title, signatures, and funds so that the lenders and MERS could amass portfolios

which supported some form of marketable securities, all consistent with the descriptions of the

Permanent Subcommittee in its Wall Street Report, pp. 17, et seq.

Included in that process inevitably were parties like Pinnacle and Commonwealth, which

facilitated the fraud and/or breach of contract evident here, and the clouding of property's title.

Each Defendant received from this and related transactions, a) such information to know

about (and ratify) the actions of each and b) such financial reward to intend harm to Plaintiff and

persons like Plaintiff.

## VI.

## CAUSES OF ACTION

### A. Declaratory Judgment

The facts, some pleaded alternatively, as set forth in Section V above, are incorporated

herein for all purposes. Other portions of this pleading are referenced to the extent that they may

be a necessary predicate for relief in this subparagraph.

Plaintiff is entitled to a declaratory judgment that

a)  he either has or doesn't have clear title,

b)  that there was or was not a lender at the closing,

c)  whether that lender was or was not  Homecomings Financial, Homecomings

Wholesale, GMAC, or some other entity,

d)  which entity, if any, had the right to transfer interests to Fannie Mae, if it did receive

any interest in the mortgage in question,

e)  whether RESPA was complied with on any entity after Homecomings Financial

initially took the position of the lender before closing,

f)  what amount of money, if any, is owed to what entity by Plaintiff,

g) whether there is a lien on the property as result of the refinancing, and specifically

whether that is so as a result of the closing occurring before any legal description was

attached to the mortgage,

h) what entities, if any, have any interest in Plaintiff's mortgage;

i) what entities, if any, have an interest in Plaintiff's property; and

j) if there is an obligation to do under the facts and matters presented here, what judicial

remedy allows Plaintiff to proceed so that he will not be paying out funds which, at some

point in the future, will leave him without clear title, including appropriate ancillary relief

under 28 U.S.C. Sec. 2201, et seq.

## B. Fraud

The facts, some pleaded alternatively, as set forth in Section V above, are incorporated

herein for all purposes. Other portions of this pleading are referenced to the extent that they may

be a necessary predicate for relief in this subparagraph.

Defendants made false, material representations to Plaintiff to secure his business and to

induce him into the refinancing. At the time the representations were made, Defendants knew

the representations to be false. Representations were made recklessly, as a positive assertion,

and without knowledge of their truth. Defendants made representations with the intent that

Plaintiff would act on them. Plaintiff relied on Defendants' false material representations which

caused Plaintiff's injury. Defendants are liable either under the common law or Texas Business

and Commerce Code, Sec. 27.01, et seq.

Defendants' further sought to entrap Plaintiff in a scheme that made their fraudulent

scheme unassailable by requiring Plaintiff to sign a "TEXAS MORTGAGE FRAUD NOTICE"

which, after inducing Plaintiff to go along with the incomplete documentation that Defendants

promulgated – containing as it did arguably false or misleading information, the mortgage fraud

26

notice, would predictably intimidate Plaintiff and prevent him from speaking out about the fraud

being perpetrated for fear of being implicated in a threatened with a criminal charge carrying a

penalty of "2 years to 99 year and a fine not to exceed $10,000."

Defendants' intent is discernible from a number of factors, not the least being violations

of 18 U.S.C. §§1341 and 1343, RESPA, 12 U.S.C. §2605 (e)(1)(B) e (and its related Reg. X

§3500.21 (f)2) and the Truth in Lending Act (TILA), 15 U.S.C. §1601, et seq. The policy

underlying the latter two statutes is protective of consumers, and restricts lenders and associated

others from infringing upon rights of consumers to know and understand certain options relating

to refinancing options as were to have been presented to Plaintiff prior to the March 3, 2008

closing.

That Defendants violated those protections without apparent hesitation as an apparent

deliberate part of an artifice, scheme, or device to harm others, an effort that reflects their

intention to harm Plaintiff and those similarly situated. In that respect, Plaintiff notes that the

State of Texas has enacted Texas Finance Code, §§156.001, et seq and 157.001, et seq to protect

Texas citizens against unlicensed mortgage lenders and brokers reflecting Texas public policy

which Defendants were charged to know and comply with.

## C. Breach of Contract

The facts, some pleaded alternatively, as set forth in Section V above, are incorporated

herein for all purposes. Other portions of this pleading are referenced to the extent that they may

be a necessary predicate for relief in this subparagraph.

Alternatively, there is a valid, enforceable contract. Plaintiff is the proper party to file

suit for breach of the contract. Plaintiff performed, tendered performance of, or was excused

from performing his contractual obligations. Defendants breached the contract. The

Defendants' breach caused Morse's injury. Plaintiff contends that all conditions precedent to

Defendants' performance have been performed, excused, waived, or otherwise satisfied.

### D. Violation of the Texas Mortgage Broker License Act

The facts, some pleaded alternatively, as set forth in Section V above, are incorporated herein for all purposes. Other portions of this pleading are referenced to the extent that they may be a necessary predicate for relief in this subparagraph.

On information and belief, given the joint action of one or more parties to induce Plaintiff to enter into the refinancing, one or more of the Defendants so acting apparently were not registered as required by the Texas Mortgage Broker License Act, Texas Finance Code §§156.001, et seq., and specifically pursuant to §156.003 thereof. According to an overriding Federal statutory scheme each state was to enact a law to protect consumers such as Plaintiff from unregistered mortgage brokers. There was to be a central registry in that state, or failing that, registration on a national registry. Any such Defendant whose failure to so register or otherwise, violated the statute to Plaintiff's damage becomes liable to Plaintiff under §156.406 in a range from the amount of the fee or profit any such Defendant received up to and not to exceed three times such amount.

### E. Violation of the Texas Mortgage Banker Registration and Residential Mortgage Loan Originator License Act

The facts, some pleaded alternatively, as set forth in Section V above, are incorporated herein for all purposes. Other portions of this pleading are referenced to the extent that they may be a necessary predicate for relief in this subparagraph.

On information and belief, given the joint action of one or more parties to induce Plaintiff to enter into the refinancing, one or more of the Defendants so acting appear to be unregistered as required by the Texas Mortgage Banker Registration and Residential Mortgage Loan Originator License Act, Texas Finance Code §157.001, et seq., and specifically §157.003

thereof. Further, any such Defendant so acting has not been discharged as allowed by §157.030

since any such Defendant has not completed the loan originator's duty to see that the

"disbursement of mortgage proceeds to or on behalf of the residential mortgage loan applicant",

## F. Accounting

The facts, some pleaded alternatively, as set forth in Section V above, are incorporated

herein for all purposes. Other portions of this pleading are referenced to the extent that they may

be a necessary predicate for relief in this subparagraph.

As set forth above, and in the attached HUD 1, Plaintiff is entitled to an accounting for

the funds that each and/or all Defendants were associated with. The numbers don't make sense.

They appear to be dishonest. Defendants should be made to account.

## VII.

## DAMAGES, ATTORNEYS FEES, AND PRAYER

Plaintiff has suffered damages as a result of the Defendants' conduct and actions. This is

Plaintiff's home, and effectively he has been discharged from it, thus imposing on Plaintiff loss

of value of his home, extra expenditure of money to try to determine the extent of his

predicament, mental and emotional distress and anguish, and other injuries. Plaintiff's actual

damages relating to the lack of clear title of the property have not become clear enough to plead

with precision since Morse suffered actual as well as special damages as a result of Defendants'

conduct herein.

Plaintiff also seeks the imposition of exemplary damages.

Plaintiff seeks reasonable attorneys fees under law, including Texas Civil Practice and

Remedies Code, §37.09. Plaintiff further seeks attorneys fees (and as may be permitted, certain

costs allowed by statute) a) for fraud involving fraud in a real-estate transaction pursuant to

Texas Business and Commerce Code, §27.01 (b) and (e), b) for violation of Mortgage Broker

License Act pursuant to Texas Finance Code, §156.402(a), c) for violation of Texas Mortgage

Banker Registration and Residential Mortgage Loan Originator License Act pursuant to Texas

Finance Code, §157.027, and d) for breach of contract pursuant to Texas Civil Practice and

Remedies Code, §38.001 (8).

     Plaintiff seeks pre and post-judgment interest.

     Plaintiff seeks recovery of his costs.

     Plaintiff requests a jury trial.

     Plaintiff requests such other relief as the Court may find appropriate to the facts,

including injunctive relief, if necessary.

     Respectfully submitted,


Gregory C. Morse
223 High Point Drive Murphy, Tx 75094