## Exhibit 7

**Amended Original Complaint**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

AUG 20 2012

DAVID J. ~~~~~~~~ CLERK
BY
DEPUTY _____

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| GREGORY C. MORSE | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:12-cv-375 |
| | § | |
| COMMONWEALTH LAND TITLE | § | |
| INSURANCE COMPANY, HOMECOMINGS | § | |
| FINANCIAL, L.L.C., HOMECOMINGS | § | JURY REQUESTED |
| WHOLESALE FUNDING, GMAC | § | |
| MORTGAGE, L.L.C., MORTGAGE | § | |
| ELECTRONIC REGISTRATION SYSTEMS, | § | |
| INC., ("MERS"), MERSCORP, INC., | § | |
| ALLY BANK f/k/a GMAC BANK, and | § | |
| FEDERAL NATIONAL MORTGAGE | § | |
| ASSOCIATION | § | |

## Amended ORIGINAL COMPLAINT

This ORIGINAL COMPLAINT is hereby being filed in accordance with that certain

ORDER AND ADVISORY first issued by the Court on 6-22-2012 and subsequently extended

by that certain ORDER AND ADVISORY issued by the Court on 7-20-2012.

7

Plaintiff Gregory C. Morse files this Original Complaint and would show the Court as

follows:

### I. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. §1331

because this is a civil action arising under the laws of the United States, including 18 U.S.C.

§1964, Title V of P.L. 110-289, 42 USC §1983 and 28 U.S.C. §1391(b)(2).

2.      Plaintiff has also asserted numerous claims under Texas law.  This Court has

supplemental jurisdiction over these claims pursuant to 28 U.S.C. §1367(a) as the State and

Federal claims arise out of essentially common facts and circumstances relating to the harm

Defendants directed at Plaintiff.

3.       The damages occurred within the Sherman Division of the Eastern District of Texas.

The acts and omissions proximately causing Plaintiff's injuries and damages were committed in

the Sherman Division of the Eastern District of Texas. This Court has personal jurisdiction over

the Defendants since their wrongful actions occurred primarily within the Sherman Division of

the Eastern District of Texas.

## II. PARTIES

4.       Plaintiff Gregory C. Morse ("Morse") is an individual residing at 223 High Point Drive,

Murphy, Texas 75094.

5.       Defendant Commonwealth Land Title Insurance Company ("Commonwealth"), is a

corporation which has represented that its primary business location is 6601 Frances Street,

Omaha, NE 68106. On information from Commonwealth's legal counsel, Commonwealth, as a

subsidiary of LandAmerica Financial Group, Inc., was sold to Fidelity National Financial, Inc,

("Fidelity"). According to Fidelity's/Commonwealth's legal counsel's March 24, 2011 letter,

Fidelity has "agreed to undertake all obligations of" Commonwealth. Nevertheless,

Commonwealth apparently remains an independent legal entity and may be served as

LandAmerica Commonwealth Title of Dallas, Inc, by serving the CT Corporation, according to

the Texas Secretary of State's office.

6.       Defendant Homecomings Financial, L.L.C. ("Homecomings Financial") is a limited

liability company which has represented that its primary business location is 8400 Normandale

Lake Blvd, Suite 250, Minneapolis, MN 55437. It may be served through Corporation Service

Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

7.     Defendant Homecomings Wholesale Funding ("Funding") is represented to be a business

entity, on information and belief, that funded, or so represented, the 2008 mortgage on the

Plaintiff's homestead at 223 High Point Drive, Murphy, Texas.  Although the Deed of Trust

states that Homecomings Financial, L.L.C. is the lender, the MIN Number, being the loan

ownership and tracking mechanism number, used by all MERS Members and all the Defendants

identifies Homecomings Wholesale Funding, not Homecomings Financial, L.L.C., as the lender

in the Deed of Trust recorded in Collin County Texas.  On information and  belief, Defendants

Mortgage Electronic Registration Systems, Inc. (MERS), MERSCORP, Inc., Commonwealth

Land Title Insurance Company, Ally Bank, GMAC Mortgage, L.L.C., Homecomings Financial,

L.L.C. and Federal National Mortgage Association possess critical information as to the location,

address, whereabouts and status of Homecomings Wholesale Funding.

8.     Defendant GMAC Mortgage, L.L.C. is a mortgage company which has represented that it

is the servicer of the refinancing note, and that its primary business location is 3451 Hammond

Ave., Waterloo, IA 50701.  On information and belief, it was a subsidiary of GMAC Financial

Services, Inc., (now Ally Bank).  It may be served through CT Corporation System, 350 N.  St.

Paul Street, Dallas, Texas 75201, according to the Texas Secretary of State's office.

9.     Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a privately

owned, unregistered electronic mortgage tracking and registration company which, on

information and belief, is owned and controlled by MERSCORP, Inc.  MERS has represented it

has various business locations, including P.O.  Box 2026, Flint MI and 1595 Spring Hill Road,

Vienna, VA.  It may be served through CT Corporation System, 350 N.  St.  Paul Street, Dallas,

Texas 75201, according to the Texas Secretary of State's office.  For the purposes of this

pleading, reference to MERS includes reference to MERSCORP, Inc., Mortgage Electronic

Registration Systems, Inc. and the "MERS System" as defined by MERSCORP, Inc. and

Mortgage Electronic Registration Systems, Inc. ("MERS").

10.     MERSCORP, Inc. ("MERSCORP") is, on information and belief, the corporate entity

that serves as the parent company of MERS.  Its principal place of business is 1595 Spring Hill

Road, Suite 310, Vienna, VA.  It may be served through the Secretary of State's office of the

State of Virginia by mailing to 1818 Library Street, Suite 300, Reston, VA 20190.  For the

purposes of this pleading, reference to MERS includes reference to MERSCORP, Inc., Mortgage

Electronic Registration Systems, Inc. ("MERS") and the "MERS System" as defined by

MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. ("MERS").

11.     Defendant Ally Bank f/k/a GMAC Bank represents it was a holder of the promissory

note.  On information and belief, it was a subsidiary of GMAC Financial Services, Inc. (now

Ally Bank).  It may be served through Corporate Service Company dba CSC – Lawyers

Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218,

according to the Texas Secretary of State's office.

12.     Federal National Mortgage Association ("Fannie Mae") is a Federal Government

Sponsored Enterprise chartered in 1968 by the U.S. Congress as a private shareholder

corporation.  Its principal place of business is 3900 Wisconsin Avenue, N.W., Washington, D.C.

20016-2892.  The Federal Housing Finance Agency (FHFA) was appointed conservator of

Fannie Mae on or about September 7, 2008.  While in conservatorship, Fannie Mae continues to

operate and conduct business.

### III.  CONDITIONS PRECEDENT

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 4**

13.    All conditions precedent have been performed or have occurred, which conditions are
necessary to maintain this action

## IV. NATURE OF THE CASE

14.    This is a suit for damages and declaratory judgment arising from and within the context
of fraud, misinformation, deceptive trade practices, shredding of legal public documents, non-
recording of mortgage transfers and assignments, unregistered and unqualified mortgage
bankers, lenders and brokers involved in a massive generational control fraud disguised as a
routine refinancing to separate the Plaintiff from his homestead. That context is more fully
described hereafter.

15.    Additionally, damages and declaratory judgment arise out of the fraud, deceptive trade
practices and violations of Federal and State mortgage regulatory laws violated by the defendants
in utilizing a RICO Enterprise to relieve the Plaintiff of ownership of his homestead located at
223 High Point Drive in Murphy, TX.

## V. FACTUAL BACKGROUND

### Overview of the Industry Context of this Transaction

16.    "In the fall of 2008, America suffered a devastating economic collapse. Once valuable
securities lost most or all of their value, debt markets froze, stock markets plunged, and storied
financial firms went under. Millions of Americans lost their jobs; millions of families lost their
homes; and good businesses shut down. These events cast the United States into an economic
recession so deep that the country has yet to fully recover." This excerpted quote is found in the
report of the United States Senate Permanent Subcommittee on Investigations Committee on
Homeland Security and Governmental Affairs ("Permanent Subcommittee"), U.S. Senator Carl
Levin, Chairman and U.S. Senator Tom Coburn, Ranking Minority Member, is entitled "Wall

Street and the Financial Crisis: Anatomy of a Financial Collapse" ("the Wall Street Report")

issued April 13, 2011, p. 1.

17.    As the Wall Street Report describes, in the time leading up to the fall of 2008, "Lenders

began to make money, not from holding onto the loans they originated and collecting mortgage

payments over the years, but from the relatively short term fees associated with originating and

selling the loans." Report of the United States Senate Permanent Subcommittee on

Investigations Committee on Homeland Security and Governmental Affairs ("Permanent

Subcommittee"), U.S. Senator Carl Levin, Chairman and U.S. Senator Tom Coburn, Ranking

Minority Member, entitled "Wall Street and the Financial Crisis: Anatomy of a Financial

Collapse" ("the Wall Street Report") issued April 13, 2011, p. 17.

18.    "By 2003 many lenders began using higher risk lending strategies involving the

origination and sale of complex mortgages that differed substantially from the traditional 30-year

fixed rate home loan." Wall Street Report, p. 18.

19.    "To make home loan sales more efficient and profitable, banks began making increasing

use of the mechanism now called "securitization." In a securitization, a financial institution

bundles a large number of home loans into a loan pool, and calculates the amount of mortgage

payments that will be paid into that pool by the borrowers. The securitizer then forms a shell

corporation or trust, often offshore, to hold the loan pool and use the mortgage revenue stream to

support the creation of bonds that make payments to investors over time. Those bonds, which

are registered with the SEC, are called residential mortgage backed securities (RMBS) and are

typically sold in a public offering to investors." Wall Street Report, p. 18.

20.    "For years securitization worked well. Borrowers paid their 30-year, fixed rate

mortgages with few defaults, and mortgage backed securities built up a reputation as a safe

investment. Lenders earned fees for bundling the home loans into pools and either selling the
pools or securitizing them into mortgage backed securities." Wall Street Report, p. 18.

21.     "Due to the 2002 Treasury rule that reduced capital reserves for securitized mortgages,
RMBS holdings also became increasingly attractive to banks, which could determine how much
capital they needed to hold based on the credit ratings their RMBS securities received from the
credit ratings agencies." Wall Street Report, p.18.

22.     "The resulting increased demand for mortgage backed securities, joined with Wall
Street's growing appetite for securitization fees, prompted lenders to issue mortgages not only to
well qualified borrowers, but also higher risk borrowers." Wall Street Report, p. 18.

23.     "When lenders kept on their books the loans they issued, the creditworthiness of those
loans determined whether the lender would turn a profit.  Once lenders began to sell or securitize
most of their loans, volume and speed, as opposed to creditworthiness, became the keys to a
profitable securitization business." Wall Street Report, p. 24.

24.     "Lenders that produced a high volume of loans could sell pools of the loans to Wall
Street or to government sponsored enterprises like Fannie Mae and Freddie Mac.  Likewise, they
could securitize the loans and work with Wall Street investment banks to sell the securities to
investors." Wall Street Report, p. 24.

25.     Many tens of thousands of American citizens were thus swept up into complex financial
gamesmanship, attended by the guile, scheme, artifice, misleading non-disclosure and/or
misrepresentation, and avarice which was, for the industry, described by the FBI, as follows:

> "Criminal activity has become more complex and loan frauds are expanding to
> multitransactional frauds involving groups of people from top management to industry
> professionals who assist in the loan application process."

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 7**

FY 2004 "Financial Institution Fraud and Failure Report," prepared by the Federal Bureau of
Investigation.  See also, Wall Street Report, p. 271.

### Context of Defendants' Involvement in the Wall Street Debacle

26.    More specifically, the Wall Street Report set out that "Once lenders began to sell or
securitize most of their loans, volume and speed, as opposed to creditworthiness, became the
keys to a profitable securitization business."  Wall Street Report, p. 24.

27.    "Lenders that produced a high volume of loans could sell pools of the loans to Wall
Street or to government sponsored entities like Fannie Mae and Freddie Mac." Wall Street
Report, p. 24.

28.    "To ensure an ongoing supply of loans for sale, lenders created compensation incentives
that encouraged their personnel to quickly produce a high volume of loans.  They also
encouraged their staffs to issue or purchase higher risk loans, because those loans produced
higher sales prices on Wall Street.  Loan officers, for example, received more money per loan for
originating higher risk loans and for exceeding established loan targets.  Loan processing
personnel were compensated according to the speed and number of the loans they processed.
Loan officers and their sales associates received still more compensation, often called yield
spread  premiums, if they charged borrowers higher interest rates or points than required in the
lender's rates sheets specifying loan prices, or included prepayment penalties in the loan
agreements." Wall Street Report, p. 25.

### Drawing Plaintiff Into the Wall Street Debacle

29.    Robert Stanley, Texas Mortgage Broker License #65268, the original loan broker agent
acting for and on behalf of ABB Mortgage and/or Walid Abd, made a "cold call" to Plaintiff
early in 2008 to induce him to refinance his home at 223 High Point Drive, Murphy, Texas

75094 ('the property'), claiming that Stanley could save Plaintiff money on his existing loan and
could handle all the process so that it would be easy and cost free to Plaintiff.

30.    Without warning or material disclosures to Plaintiff of the real nature of the fraudulently
framed transaction, Plaintiff relied upon those representations to proceed through Stanley into
the refinancing ("the refinancing"), on or about March 3, 2008, a refinancing sponsored or
supported by one or more Defendants.

31.    In connection with that refinancing, Plaintiff received a copy of a HUD 1 apparently
keyed to the refinancing. A copy of that HUD 1 is attached hereto and incorporated herein to the
extent allowed by the Federal Rules of Civil Procedure, as Exhibit "A."

32.    The HUD 1 was and is a form required, in part, as a result of the requirements of the Real
Estate Settlement Procedures Act (RESPA), 12 USC, 2605 (e)(1)(B) and its related Reg. X Sec
3500.21 (f)2.

33.    The HUD 1 reflects, in substantial part, the roles one or more of the Defendants
purportedly played in securing the refinancing.

34.    More specifically, the refinancing apparently involved a 30 year fixed rate commitment
by Plaintiff, with note and mortgage obligations flowing to the lender identified on the HUD 1 as
Homecomings Financial.

35.    The refinancing was purportedly accomplished through the use of a $414,500 note, the
proceeds of which were to pay off the prior liens in the amounts of $367,642.40 and $40,242.77,
respectively as reflected on the HUD 1.

36.    Plaintiff has performed under that note. From the time of the refinancing until the filing
of this petition, no Defendant has declared a default in the refinancing obligation by Plaintiff to

any lender. This suit is not filed in response to any effort, by any Defendant, to foreclose on his

property.

37.    However, the certainty of Plaintiff's contract with one or more of Defendants is clouded

by events as they pertain to the involvement of MERS.

38.    As an illustration of the problems generated by the practices outlined by the Wall Street

Report, Robert Stanley was, on information and belief, later convicted of Federal felony charges

in Houston, Texas concerning matters which were routed through one or more of the

Defendants' company(ies).

39.    In this specific transaction, to Plaintiff's personal knowledge, Stanley made

representations to secure Plaintiff's business and then later represented to Plaintiff that he

(Stanley)/ABB were only making $465 on this transaction, a sum that appears at variance with

the HUD 1 by many thousands of dollars.

40.    As a further illustration of the sickness of the residential mortgage securitization market

described in the Wall Street Report, on information and belief, Pinnacle Title Company

(Pinnacle), the title company which Stanley/ABB cooperated with extensively, is now apparently

defunct as reflected in the Texas Secretary of State records, evidently going out of business

within approximately 4-5 years of its founding.

41.    Further, Pinnacle failed to provide Plaintiff with a copy of the title policy which,

according to the HUD 1, was charged for at closing.

42.    Neither Pinnacle nor LandAmerica Financial Group, Inc. provided Plaintiff with a copy

of the report of title examination made by LandAmerica and, according to the HUD 1, Plaintiff

was charged $150 for at closing.

43.    LandAmerica Financial Group, Inc, the parent of LandAmerica Title Company (of which

Commonwealth was a subsidiary) which the HUD 1 indicates was paid for title examination, on

information and belief took bankruptcy on or about November 26, 2008.

44.    Commonwealth (and/or its successor) has failed to provide Plaintiff with a copy of the

actual title policy with its "unnamed mortgagee", a policy which, according to the HUD 1, he

was charged for at closing.

45.    Neither Pinnacle nor Don Ledbetter (State Bar of Texas No. 12100800), apparently

Plaintiff's counsel in this refinancing, whom Plaintiff does not and has never known, provided

Plaintiff with a waiver or any other document to limit Ledbetter's service for Plaintiff in this

matter, nor has either sought to account to Plaintiff for the quality, specific services or charges

for services for which Plaintiff was billed at closing on March 3, 2008 in accordance with the

HUD 1.

46.    As the practices described in the Wall Street Report and evidenced in this transaction

became too sizeable to contain, in early September 2008 Homecomings Financial, then

publicizing itself as a division of GMAC, announced that its operations at its Dallas, Texas,

14850 Quorum Drive, Ste. 500 address would be shut down, including both retail and wholesale

operations.

**Plaintiff's Efforts to Determine the True Nature of the Refinancing**

47.    These and related matters caused Plaintiff concern about whether other closing charges

were either not paid, were paid to the wrong party, were misallocated, were fabricated, or were

otherwise misrepresented, reflecting an overcharge in the process, which party actually funded

the loan, whether it was securitized before closing, what was paid to whom to prepare the loan

for closing, what was told Plaintiff that was false and misleading and what wasn't, whether there

were or are still unannounced yield spread premiums embedded in the transaction(s), whether the

property appraisal was misleading or professionally inapposite, whether the credit scores were

artificially hiked to permit a financing or refinancing by a borrower, the Plaintiff, who otherwise

would not have qualified and numerous other related matters.

48.    As a result of that HUD 1 and later questions raised by Plaintiff, certain communications

were directed to Defendants by Plaintiff, including a letter dated March 04, 2011 essentially

addressed to Defendants (excluding Fannie Mae) or their representatives to request information

that would shed light on Plaintiff's concerns respecting the closing and the resultant status of

Plaintiff's title in the property.

49.    Plaintiff was concerned about having to account for the process of the closing, the

substance of the change in title, the accounting for funds being disbursed at closing, the impact

on the title of his property, and any other matter that he might be required to disclose in

accordance with duties imposed either under Federal or Texas law in the event of any further sale

or marketing of the property.

50.    Accordingly, Plaintiff specifically sought:

a)    an accounting by one or more addressees for funds purportedly disbursed in a

loan closing on or about March 3, 2008 (hereafter March 3, 2008), and

b)    information about the status of Plaintiff's clear title in the property from one or

more addressees.

51.    Defendants either did not respond, or responded with limited information not helpful to

answer the concerns raised by Plaintiff.

### Plaintiff's Concerns About the Regularity of the Refinancing

a)    <u>respecting the ownership of the note</u>

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 12**

52.    The note and mortgage may have been transferred or assigned to GMAC Bank so that as

of May 1, 2008 the payments supposedly were to be made to GMAC Bank through its mortgage

servicer GMAC Mortgage at P. O. Box 79135, Phoenix, AZ.  The true identity of the owner of

the note or the holder of the note in due course is not apparent at this time nor at the time of

closing.

53.    On later information, and specifically based on GMAC's letter dated April 12, 2011

("The current owner of your loan is Fannie Mae…"), there may later have been some

involvement of the refinancing note with "Fannie Mae" as Fannie Mae claims an interest in a

subsequent promissory note endorsed in blank on the Plaintiff's property.

>    **b)**    **respecting the payment of existing liens**

54.    According to the HUD 1 governing the March 3, 2008 closing, the first and second liens

on the property, $367,642.40 and $40,242.77, respectively, were to have been released at or

about the time of closing.  According to the documentation Plaintiff has reviewed, however,

those liens were not released at that time.

55.    Those two liens were purportedly later released by MERS, as purported nominee, for one

or more of the Defendants, respectively, on these dates and by these persons represented to be

MERS agents:

>    a)    first lien: purportedly released on March 13, 2008 by Jimmy Gossett, Assistant
>
>    Vice President of MERS; and
>
>    b)    second lien: purportedly released on March 24, 2008 by Ashley Johnson,
>
>    Assistant Secretary of MERS.

56.    On information and belief, both Mr. Gossett and Ms. Jones are MERS "certifying

officers" and employees of one or more MERS member organizations.  A MERS "certifying

officer" is a fraudulent credential created by MERSCORP, Inc. and/or Mortgage Electronic

Registration Systems, Inc.

57.    Those documents, "robo-signed," may be ineffective in the absence of knowledge of the

contents and an intention to sign as a legally binding document within the course and scope of

such agency relationship they may have had with MERS.

> **c)    respecting the difference between the amount refinanced and the amount of
> the existing liens**

58.    The $414,500 refinancing note proceeds were to pay off prior liens in the amounts of

$367,642.40 and $40,242.77, respectively, as reflected on the HUD 1.

59.    The total of those two liens was $407,885.17, leaving $6,614.83 to pay off all the closing

costs which the HUD 1 listed to be at least $16,371.89.

60.    The HUD 1 "Cash From Borrower" was accordingly listed as $9,757.06, apparently

derived by simple subtraction: $16,371.89 – 6,614.83.

61.    The HUD 1 reflects the following entries as a part of the $16,371.89 referenced above,

each being set out here beside the respective numbered line on which it appears:

- 804.   Broker Origination Fee 0.2413%     to ABB Mortgage     $1,000.19
- 805.   Appraisal Fee                      to ABB Mortgage     $   350.00
- 806.   Lender Loan Charge                 to Homecomings F.   $   550.00
- 807.   Broker Processing Fee              to ABB Mortgage     $   495.00
- 808.   Broker Admin Fee                   to ABB Mortgage     $   595.00
- 809.   Broker Application Fee             to ABB Mortgage     $   487.42
- 901.   Interest from 3/7 – 4/1            to ___ (unknown)    $ 1,703.43
- 1107.  Attorneys fees                     to Don Ledbetter    $    80.00

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 14**

- 1108.  Title Insurance (with tax deletion)     to Pinnacle Title        $ 2,268.70

- 1111.  Escrow fee                             to Pinnacle Title        $   350.00

- 1112.  State of Texas Policy Guaranty Fee     to Texas Title Ins. G.  $     1.00

- 1113.  Messenger Fee                          to Pinnacle Title        $    71.00

- 1201.  Recording Fees                         to Pinnacle Title        $   176.00

- 1204.  Tax certificates                       to Dan Trace             $    65.52

- 1304.  2007 County Taxes                      to Collin County         $   993.18

- 1305.  2007 County Community Taxes            to Collin County         $   352.62

- 1306.  2007 City of Murphy Taxes              to Collin County         $ 1,898.39

- 1307.  2007 Plano ISD Taxes                   to Collin County         $ 4,934.44

**Total HUD 1 "Paid From Borrower's Funds at Settlement"        $16,371.89**

62.    These charges were presumably to be made and "Paid From Borrower's Funds at

Settlement" and from Homecomings Financial's funds, as "Lender", on March 7, 2008 according

to the HUD 1.

63.    Thus, there should have been a paper trail, if not destroyed, with records showing how,

when, and to whom those closing funds were disbursed.

64.    Defendants, although requested, refused to supply copies of those documents to Plaintiff

in response to the referenced March 4, 2011 letter.

   **d)      respecting the non-payment of the appraisal**

65.    Unresolved issues regarding what happened to those funds are significant and arise in

part because one of the presumed payees at closing, DuPriest Appraisal, informed Plaintiff that

no such payment for appraisal was ever made. (Cf. Line 805 on the HUD 1, "Appraisal Fee to

ABB Mortgage $350.00.").

66.    The non-payment of the appraisal fee raises questions as to whether all other such listed payments were made from funds received from Homecomings Financial, for example, in its purported status as "lender" under the closing documents, thus somehow allowing it to designate Mortgage Electronic Registration Systems, Inc. as its "nominee," then allowing GMAC Bank to accrue to the status of assignee/transferee of either Homecomings Financial, Homecomings Wholesale Funding or Mortgage Electronic Registration Systems, Inc., and then allowing subsequent lien holders, including possibly Homecomings Wholesale, to accrue to the status of assignee/transferee of either Homecomings Financial or GMAC Bank or Mortgage Electronic Registration Systems, Inc.

        **e)**    **respecting the non-payment or payment of "POC" matters**

67.    In addition, there were other closing related charges reflected as "POC" and presumably paid outside of closing, on the HUD 1, which charges require explanation, including at least what was listed as:

- 810.   Broker Fee from HF (POC (L))          to ABB Mortgage     $ 2,557.47
- 811.   Flood Cert Fee by Lender (POC)       to 1st Am. Flood Data $    6.00
- 812.   Tax Service Fee (POC)                to Home Connects LS $   70.00
- 1114. Examination Fee (POC)                to LandAmerica Title $   150.00

    **Listed as POC or POC (L), the L presumably standing for Lender:        $ 2,783.47**

68.    It is thus unclear who provided those POC funds, if anyone, whether those funds should be added to the $16,371.89 to reflect the total amount due from the borrower at closing, or whether they, less the $2,557.47 broker fee from Homecomings Financial to ABB, should be added to the $16,371.89 to reflect the total amount due from the borrower at closing.

69.    It is also unclear if either of the latter two points reflect reality at closing, whether the extra money above the $9,757.06 was somehow reflected on the HUD 1.

70.    It is also unclear how all that could have resulted in a loan closing consistent with the HUD 1, especially if Morse contributed less than $9,757.06 to make up the $9,757.06 required by the HUD 1 or less than an arguably due higher amount which would include all or part of the $2,783.47.

      **f)**    **respecting the clarity or marketability of the title if the underlying note amount is uncertain**

71.    Plaintiff requested in the March 4, 2011 letter, among other things, any evidence respecting any contribution Plaintiff made directly or indirectly for the payment of those or other funds which were not rolled into the $414,500 refinancing note, as well as an explanation of the Defendants' role in relation one to the other.

72.    In fact, Defendants' failure to explain may at least indirectly affect the title and/or the marketability of the property.

73.    Plaintiff, however, has been left with a property he is required to pay for in amounts which may not be based on honest or realistic closing assessments as reflected in the HUD 1. Plaintiff may not have a clear title regardless of how much money he pays.

      **g)**    **respecting the clarity or marketability of the title if the underlying title insurance is not clearly established**

74.    When LandAmerica Financial took bankruptcy, as parent of Commonwealth, on information and belief, it caused the sale of Commonwealth to Fidelity National Financial, Inc. In doing so it may have cast a shadow on the certainty of the title by, among other things,

creating a gap between what its legal counsel's March 24, 2011 letter referenced respecting the

title policy which was promised to Plaintiff as "a refinance transaction wherein a lender's policy

of title insurance was apparently issued by Commonwealth Title Insurance Company ("CLTIC")

to an **unnamed insured** mortgagee." (emphasis added).

75.     In contrast to such "unnamed insured mortgagee", GMAC Mortgage enclosed in its letter

of April 12, 2011, a purported "Mortgagee Policy of Title Insurance" issued by Commonwealth

Land Title Insurance Company (Policy Number 535-Z014715 on March 14, 2008) (emphasis

added) which names "Homecomings Financial Network, Inc., and each successor in ownership

of the indebtedness secured by the insured mortgage..." as the named "Insured," making unclear

whether and what title insurance policy was issued – the one identified by Commonwealth's

legal counsel or the one, with a slightly different name, produced by GMAC Mortgage.

76.     Further, the purported March 14, 2008 policy of title insurance was (i) some 11 days after

closing on March 3, 2008 and (ii) some 15 days after a February 29, 2008 dated letter from

Homecomings Financial to Plaintiff in which it announced that "your mortgage has been

purchased by GMAC Bank from HOMECOMINGS FINANCIAL, L.L.C. (FKA

HOMECOMINGS FINANCIAL NETWORK, INC.)...,"   all at a time before Plaintiff had

signed  and become legally connected to the mortgage.

77.     Upon further inquiry regarding the nature and terms of the title insurance coverage,

Commonwealth's counsel responded on March 24, 2011, raising further uncertainty about the

title and the particulars of the refinancing:

>    "We also have not been able to access the agent's file or determine who may have access
>
>    to it.  My statements as to the lender's policy related solely to the information contained
>
>    in the HUD 1 Settlement Statement that a lender's policy was issued.  An owner would

not receive a copy of the lender's policy, even though charged for the same. Also, based

on the Hud-1 (sic), I would assume that the insured lender is Homecomings Financial,

L.L.C., but without access to the agent's file or even a Commitment, I cannot be certain."

78.    Accordingly, Defendants, one or more, evidently participated in effectively making

indefinite the title and making Plaintiff a renter of his own property, with no clear end in sight

for his dilemma, by failing to provide verifiable proof that items listed on Schedule "C" to

Commonwealth's "Commitment of Title Insurance were "dispose[d] of to [Commonwealth's]

satisfaction, before the Policy is issued."

> **h)    respecting the clarity or marketability of the title based on the structural role
> and actions of MERS in this and prior transactions related to the property**

79.    On information and belief under the present circumstances and knowledge, Plaintiff

reasonably may expect difficulty in establishing clear title to his property as a result of the

transfers and/or assignments that resulted from this transaction, along with possible improprieties

associated with the loan closing.

80.    Mortgage Electronic Registration Systems, Inc. and MERSCORP, Inc. played a role in

the 2005 refinancing of the property.

81.    Homecomings Financial and others played a role in the 2005 refinancing of the property.

    a)    Homecomings Wholesale was, on information and belief, neither licensed by the

    Texas Department of Savings and Mortgage loans, nor a company registered with the

    Texas Secretary of State at times relevant to this refinancing (See Exhibits 399, 400).

    b)    On information and belief, Exhibit 319 is a true and correct copy of Mortgage

    Electronic Registration Systems, Inc and MERSCORP, Inc. activity reflected on MERS

    Servicer Identification System available for search. A search of that site reflects that "3

records matched your search:" The first and second liens from 2005 initiated by

Greenpoint Mortgage and serviced by Homecomings Financial, L.L.C. and J. P. Morgan

Chase Bank, N.A. f/k/a EMC and the 2008 loan initiated by Homecomings Wholesale

Funding is serviced by GMAC Mortgage, L.L.C.

    i)    **respecting the clarity or marketability of the title in the absence of a legal**

           **description of any property at the time Plaintiff signed the mortgage**

82.    The mortgage in question did not contain any legal description when signed by Plaintiff

on March 3, 2008.

83.    In the absence of a legal description, Plaintiff did not sign an enforceable or recordable

mortgage under Texas law, including Texas Business and Commerce Code, §26.01, et seq and

Texas property Code, §13.01, et seq (See Exhibit 261). Thus, no Defendant has secured an

interest in the property through the refinancing note or mortgage. An after-the-fact amendment

without Plaintiff's consent is unauthorized and is of no legal consequence.

    j)    **respecting the clarity or marketability of the title based on any previous**

           **attempted transfer of the note to GMAC Bank, or others**

84.    In the absence of a legal description and in the absence of Plaintiff's signature on

February 29, 2008, despite Homecoming Financial's assertion that "your mortgage has been

purchased by GMAC Bank from Homecomings Financial", there would be nothing for GMAC

Bank to record under Texas law. The Plaintiff did not sign the Deed of Trust and Promissory

Note until March 3, 2008. This would be insufficient under Texas law, including Texas Business

and Commerce Code, §26.01, et seq and Texas property Code, §13.01, et seq. Thus, neither

GMAC Bank nor any subsequent assignee could have secured an interest in the note, mortgage,

or property. An after-the-fact amendment without Plaintiff's consent is unauthorized and is of no legal consequence.

85.     In the mid to late 1990's, two Delaware Corporations, MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. were created by a conglomeration of members of the professional organization known as the Mortgage Bankers of America, several large title and title insurance companies, several major banks, two government sponsored enterprises (GSE), Freddie Mac and Fannie Mae, American Land Title Association (ALTA) and other unnamed parties active in the residential mortgage industry in the United States.

86.     The official dates of formation are listed by the Delaware Secretary of State on the business portal established by the Office of the Secretary. This business portal lists the registration and formation date of Mortgage Electronic Registration Systems, Inc. (MERS) as October 16, 1995 (See Exhibit 2). Likewise, the registration and formation date for MERSCORP, Inc. is listed as June 30, 1998 (See Exhibit 3). Yet, in Disclosure Statements to this Court, Mortgage Electronic Registration Systems, Inc. contends that MERSCORP, Inc. is its parent company (See Exhibit 270). MERSCORP, Inc., in its Disclosure Statement to this Court, states that it is a privately held corporation. Yet, some of the shareholders of MERSCORP, Inc. are public corporations and GSEs (See Exhibit 50).

87.     Documentation specifically generated by the "MERS Law Department" of MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. ("MERS") obfuscates and muddies the relationship between these two corporations (See Exhibit 150). In this document, MERSCORP, Inc. is defined as the owner and operator of the "MERS System" and Mortgage Electronic Registration Systems, Inc. Whereas, in this same document, Mortgage Electronic Registration Systems, Inc. is defined as the mortgagee of record and nominee for the beneficial owner of the

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 21**

mortgage loan. One cannot be the owner of a particular set of rights and the future owner of those rights by transference. A beneficial nominee receives rights in due course when granted those rights by the legal transference of those rights through power of attorney, granting by the appropriate court or inheritance of those rights because of the demise or dissolution of the original holder of those rights.

88.     In their official publication, both MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. assert that the mortgagee is the lien holder on the property or title to said property. In the same document, MERS states they only track transfers of the promissory note or servicing rights among the member organizations (See Exhibit 36). In effect, MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. purport to have the legal authority to dispense with 400 years of British and subsequent American residential property laws by electronically separating the Deed of Trust from the Promissory Note which secures it. This argument and contention by MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. is a fallacy. In Carpenter v. Longan, 83 U.S. 271, 274 (1872), Justice Swayne, in delivering the opinion of the Court, maintains on Page 83 U.S. 274 "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."

89.     This 140 plus year old ruling by the United States Supreme Court was recently upheld in the United States District Court, Northern District of Texas in Jane McCarthy vs. Bank of America, NA, BAC Home Loans Servicing, L.P. and Federal Home Loan Mortgage Corporation 4:11-cv-356-A. U.S. District Judge John McBryde quoted the aforementioned section from Carpenter v. Longan, 83 U.S. 271, 274 (1872). Judge McBryde also cited Bellistri v. Ocwen

Loan Servicing, L.L.C. in which the Missouri Court of Appeals ruled that "The mortgage loan
becomes ineffectual when the note holder did not also hold the Deed of Trust."

90.    Knowingly utilizing at best, dubious and flawed legal advice, MERSCORP, Inc.,
Mortgage Electronic Registration Systems, Inc. and Fannie Mae induced the 5,000 plus MERS
Member organizations to generate, by their estimates, over 31 million fraudulent Deeds of Trust
and Mortgage contracts throughout the United States since 1997 (See Exhibits 2, 36, 151, 152,
338 and 339). These Deeds of Trusts and Mortgages are fraudulent because the MERS Members
utilizing the MERS System of databases enter the data without any credible oversight by an
employee or officer of MERSCORP, Inc. or Mortgage Electronic Registration Systems, Inc.

91.    Mr. R. K. Arnold, in his capacity as CEO and President of both MERSCORP, Inc. and
Mortgage Electronic Registration Systems, Inc. testified before both the U.S. Senate and House
of Representatives subcommittees that the MERS organization, overseeing the repository of the
databases, had only 50 to 65 employees. In further testimony before these subcommittees, he
testified under oath that there were over 20,302 "certifying officers" of MERS. These
"certifying officers" could engage contracts for legal services and could certify and release liens
in MERS name. Until 2006, these "certifying officers" could institute and prosecute foreclosures
in MERS name in almost all 50 states. The State Supreme Court of Florida revoked MERS
standing to institute foreclosures in the State about 2005. Yet, these "certifying officers," usually
carrying the title of Vice-President or Executive Assistant of MERS, were not supervised by any
officers or employees of MERSCORP, Inc. or Mortgage Electronic Registration Systems, Inc.
These "certifying officers" were employees of the "MERS" Member organizations whose only
qualifications were the payment of an annual $125 fee. To this day, there are no training
manuals for these "certifying officers" (See Exhibit 55).

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 23**

92.     Thus, with the system instituted by MERSCORP, Inc., Mortgage Electronic Registration

Systems, Inc. and their shareholders, MERS Member organizations were strongly encouraged to

induce their business-to-business customers to become members of MERS (See Exhibit 184).

Once banks, mortgage companies, document preparers, title companies and mortgage servicers

became members of the MERS System, they were given a seven digit organizational number

called the OrgID.  This OrgID, plus a unique 10 digit contract number, plus a one digit check

number became the "Social Security" number of the mortgage loan.  This 18 digit number, just

like a social security number, was officially assigned up to 10 (ten) days before the birth of the

Deed of Trust and Promissory Note.  By MERS rules and procedures, this number reflects the

actual funding and basis generating lender of legal record and is the ONLY number used,

recognized and accepted as the sole identification marking and number for any given loan in the

MERS system.  Once the residential loan died through foreclosure or payoff by the borrower,

this number was never again to be used (See Exhibit 184).

93.     So, MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. became the

perfect foils for this fraudulent enterprise system to gain total control of the residential real estate

market.  This enterprise was and is fraudulent as there is no credible auditing of the data entered

into the MERS System databases by employees of the MERS Member organizations.  There is

no credible supervision of the 20,000 plus "certifying officers" of the MERS System.  These two

facts are in direct contravention of the Cease and Desist Order issued in April 2011 by the Office

of the Comptroller of the Currency and 13 other Federal regulatory agencies (See Exhibit 325).

The Comptroller of the Currency and co-signers of the Cease and Desist Order found that

MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. actively engaged in

shoddy business practices that introduced and exposed Federally regulated business entities to

unnecessary, dangerous and unwise business practices and risks.

94.    This fraudulent enterprise consisting of MERSCORP, Inc., Mortgage Electronic

Registration Systems, Inc. (MERS), their shareholders and MERS members unduly influenced

new MERS Members to create MOM Deeds of Trust and Mortgages.  MOM is an acronym for

MERS as Original Mortgagee (See Exhibits 76, 147, 148, 150-152, 161, 163, 168, 169, 178, 183-

185 and 313).  The MOM Exhibits have been obtained from both the MERS and Fannie Mae

websites.  MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. and Fannie Mae

emphatically state that only the origination and final dispensation of the MOM loan has to be

registered with the County Clerk Recorder's Office.  Any intervening assignments and/or

transfers between MERS Members do not have to be recorded.

95.    This is in direct violation of Texas State Property Code §12.001(a) and Texas

Government Code §192.007.  Texas Property Code §12.001(a) stipulates that a Deed of Trust

does not have to be registered in the County Clerk Recorder's Office.  However, once a Deed of

Trust is registered, Texas Government Code §192.007 mandates that all subsequent transfers and

assignments of the instruments must be registered in the Recorder's Office.

96.    These two sections of Texas State Statutes were enacted to legally preserve and protect

the Chain of Title and to ensure that the property Deed is never clouded without substantial

repercussions occurring.  Thus, the interests of both the borrower and the lender are preserved.

97.    By encouraging their MERS Members not to record assignments and transfers,

MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc., their shareholders and other

MERS Member organizations actively encourage other MERS Members to violate numerous

statutes of the State of Texas.

98.    By not verifying the data entered by MERS Member organizations into the MERS

System databases, MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.

encourage fraud, negligence, misrepresentation and deceptive trade practices.  Lender Processing

Services a known robo-signer organization that has fraudulently processed hundreds of

thousands of mortgage documents and is still a Member in good standing in the MERS System

(See Exhibits 404 and 149).  Homecomings Wholesale Funding which has not, to the Plaintiff's

knowledge, ever registered as a domestic or foreign corporation in any State was a Member of

MERS with the MERS Member OrgID of 1000626 (See Exhibits 316, 327, 381).

99.    An unnamed party from Homecomings Financial, L.L.C., GMAC Bank, GMAC

Mortgage, L.L.C. or Homecomings Wholesale Funding created a MIN number for the Deed of

Trust signed by the Plaintiff on March 8, 2008.  This Deed of Trust states that the lender of the

loan is Homecomings Financial, L.L.C. (See Exhibit 383).  In reviewing Exhibit 397, the Deed

of Trust is over twenty pages long and typed in fine print.  There are only four nondescript

sentences describing Mortgage Electronic Registration Systems, Inc. (MERS) as the nominee

and beneficiary.

100.    This is fraudulent under numerous Texas State statutes.  Mortgage Electronic

Registration Systems, Inc. (MERS), a Delaware domestic corporation, has never legally

registered as a domestic corporation or as a registered foreign corporation in the State of Texas

(See Exhibits 10-13).  Mortgage Electronic Registration Systems, Inc. (MERS), a Delaware

domestic corporation, has never registered with the Texas Comptroller's Office.  These are

violations of the Texas Business Organization Code §§9.001(a)(1), (b),  9.051(b) and 9.502 (See

Exhibit 243).

101.    By demanding of all of its Member organizations operating in the State of Texas to

designate Mortgage Electronic Registration Systems, Inc. as a beneficiary and nominee in the

Deed of Trust for each and every MOM loan, MERSCORP, Inc. and Mortgage Electronic

Registration Systems, Inc. are acting as a mortgage banker, mortgage lender and/or a mortgage

broker.  These actions violate Texas Finance Code §§156.201(a),(c) and 156.204, §§157.003,

157.014 and 157.015 and §§180.002(12), (15)(A)(B)(b) and 180.051 (See Exhibits 247-249).

102.    MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. have not

registered with the federal and duly constituted Nationwide Mortgage Licensing System &

Registry.  Thus, both defendants are in violation of Texas Finance Code §§156.201(a),(c) and

156.204,  §§157.003, 157.014 and 157.015,  §§180.002(12), (15)(A)(B)(b) and 180.051 and

§342.0515 (See Exhibits 247-250).  These actions further violate Title V of Public Law 110-289.

This public law is referred to as the SAFE Mortgage Licensing Act of 2008.


**The MERS Scheme**

103.    In the home purchasing process, a potential homeowner enters into a contract with a

qualified lender to arrange for financing for a particular piece of property as specified in Texas

Finance Code §343.001(2)(A)and §343.001(2)(B)(ii) (See Exhibit 251).  The results of this

engagement are two legal documents.  These legal documents are a Promissory Note which is

secured by a Deed of Trust as described in Texas Business and Commerce Code Chapter 9 (See

Exhibit 241).  An irrevocable bond is created between these two instruments at the time of

signing.  This bond is called the Chain of Title.

104.    The Deed of Trust is the legal evidence of a trust between the potential homeowner and

the lender.  The homeowner, as a trustee to this trust, pledges to service the Promissory Note and

maintain the property in a condition such that the lender, in the event of default, can recoup its investment as described in Texas Business and Commerce Code §9.207 (See Exhibit 241). Consequently, the lender, also as a trustee to this trust, promises to protect the original Title Deed of the property as described in Texas Business and Commerce Code §9.207 (See Exhibit 241) and the Promissory Note as described in Texas Business and Commerce Code §9.102(a)(12) (See Exhibit 241).

105.    The lender, in its role as a trustee to the trust, protects the Deed of Trust by recording same in the County Clerk Recorder's Office in accordance with Texas Property Code §11.001 (See Exhibit 259), and Texas Property Code §13.002 (See Exhibit 261). The initial filing of the Deed of Trust is optional pursuant to Texas Property Code §12.001(a) and (b) (See Exhibit 260). Once a Deed of Trust is filed in the State of Texas, the mortgagee, holder of the note in due course and owner of the note are required to file all subsequent transactions which include assignments and transfers of rights pursuant to Texas Local Government Code §192.001 and §192.007 (See Exhibit 257).

106.    At the end of the servicing of the Promissory Note, the lender files a release of lien affidavit with the County Clerk Recorder's Office. Thus, the homeowner now owns their home completely free and clear. The lender may choose to sell the Deed of Trust and the Promissory Note that secures the Deed of Trust prior to the homeowner completing their financial obligation. In these instances, both the Deed of Trust and the Promissory Note are sold together, as a single instrument, to a third party. In the event that the Promissory Note is separated from its collateral Deed of Trust, thereby destroying the Chain of Title, as is the circumstance in this Instant Case, the Promissory Note is a nullity and therefore becomes VOID (See Paragraph 89 above).

107.    Under Texas law, this third party becomes the holder of the note in due course. The

holder of the note in due course receives all of the rights and responsibilities from the original

lender. These rights and responsibilities are only transferred in the State of Texas when an

assignment of loan is filed in the County Clerk Recorder's Office in a timely manner as described

by law in Texas Business and Commerce Code §9.203 (See Exhibit 241) and Texas Property

Code §12.017 (See Exhibit 260).

108.    Since the revocation of the Glass-Stiegel Act in 1996-97, banks, mortgage companies,

title companies and government sponsored enterprises have conspired and circumvented this

long standing and accepted system of creating a complete and legal paper trail documenting the

creation of mortgage trusts and any subsequent assignments and transfers thereof. The two

major circumventers are State of Delaware domestic corporations:  MERSCORP, Inc. and

Mortgage Electronic Registration Systems, Inc. (MERS).

109.    The fraudulent enterprise referred to as the MERS System, formed by these 2 (two)

Delaware corporations, their shareholders and certain other parties, created a membership

scheme of mortgagers, mortgage servicers, mortgage securities aggregators, document preparers,

banks, title companies and government sponsored enterprises (GSE) in a closed system where

loans are initially recorded, after closing, in the County Clerk Recorder's Office. All future

assignments, securitizations of the entire Promissory Note and securitizations of parts of the

Promissory Note, in various mortgage backed securities, occur and are recorded only in an

electronic set of databases owned by Mortgage Electronic Registration Systems, Inc. and

MERSCORP, Inc.

110.    After recording the Promissory Note in the MERS databases, the shredding of the

original legal document occurs (See Exhibits 75, 76, 42, 365 ).  All data recorded in these

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 29**

databases is entered by the staff of each individual MERS Member (See Exhibits 47, 55, 72-148, 166, 167, 170-177 and 181-185).

111.    Up to four employees of each member organization are given fraudulent credentials identifying them as either a Vice President of Executive Secretary of MERS and having the right to create, reassign and release liens in the name of MERS, who is not a lien holder, and engage legal services to foreclose in the name of MERS.  The pre-designed and determined final destination for the Promissory Note or parts of the Promissory Note is a Mortgage Backed Security which may be sold on the open commodities market or a Mortgage Backed Security sold by a government sponsored enterprise (GSE) (See Exhibits 184, 325, 338-341, 151, 152, 213, 214, 218 and 220).

112.    In subsequent paragraphs, the Plaintiff will show how the Defendants created this Racketeering Influenced and Corrupt Organizations (RICO) enterprise, (the MERS Scheme), actively engaged in a pattern of racketeering activities, actively and collectively engaged in the RICO enterprise and racketeering activities and that one or more of these activities resulted in injury to the Plaintiff and his property at 223 High Point Drive, Murphy, Texas.  (Case reference Standard Chlorine of Delaware, Inc v.  Sinbaidi, D.  Del. 1992, 821 F.  Supp.  232).

113.    In its voluminous documentation, MERSORP, Inc. states it is ONLY a national registry with the expressed purposes of (1) tracking mortgage loan interests and servicing rights of its 5,500 members (See Exhibit 287) and (2) eliminate paperwork through the use of electronic commerce (See Exhibit 49).  In this same documentation, Mortgage Electronic Registration Systems, Inc. acts as the nominee and beneficiary for the lender and mortgage servicer (See Exhibits 36-39, 42, 43, 45, 49, 70, 72, 74, 75, 76, 104, 107, 165, 185, 186 and 332).

114.    Individuals of average intelligence would believe that these two separate Delaware

domestic corporations were created for conducting their own individual businesses.  Yet, we see

from the corporate structure of these two organizations that they, in fact, act as one.  In reviewing

the list of officers for both corporations, 60% of the board of Mortgage Electronic Registration

Systems, Inc. hold the same positions in MERSCORP, Inc. (See Exhibit 51).  This duality of

offices includes the top three positions on both boards.

115.    It follows in the corporate world, that the shareholders control the Board of Directors of

the private corporation and that the private corporation controls its wholly owned private

subsidiary.  When, several of the shareholders hold controlling and officer positions on the Board

of Directors of each corporation, the stockholders are intimately involved in the daily operations

of both corporations.  All officers of MERSCORP, Inc. are either "C" officers or executive level

Vice Presidents in their respective organizations.  This gives the direct nexus of insuring that

their stockholders and member organizations of the MERS System fall in lockstep with the

directives they establish in the name of MERSCORP, Inc. and Mortgage Electronic Registration

Systems, Inc. (See Exhibits 50 and 51).

116.    The members of the Board of Directors in MERSCORP, Inc. and Mortgage Electronic

Registration Systems, Inc. represent some of the largest banks, title companies, government

sponsored enterprises and the Mortgage Bankers Association.  These officers have actively

directed  the MERS Scheme and the devastation resulting therefrom.  All corporate Officers of

Mortgage Electronic Registration Systems, Inc. hold the same corporate positions in

MERSCORP, Inc. (See Exhibits 51 and 52).

117.    It is reasonable to assume that every time the MERSCORP, Inc. Board meets, there is a

simultaneous quorum of the Mortgage Electronic Registration Systems, Inc. Board such that

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 31**

directives and corporate policies, as specified by MERSCORP, Inc., are simultaneously accepted

by Mortgage Electronic Systems, Inc. (See Exhibit 52). The reasonable conclusion is that any

schemes to control the residential mortgage market are explicitly and simultaneously coordinated

and implemented by MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.

acting as a single corporate control authority.

118.    This scheme consists of the majority of all mortgage lenders, mortgage bankers,

mortgage brokers, mortgage servicers, title companies and other business entities that affect

mortgage transactions throughout the United States residential mortgage market (See Exhibit

327). These organizations become affiliated with MERSCORP, Inc. and Mortgage Electronic

Registration Systems, Inc. by paying transaction, monthly and annual subscription fees (See

Exhibits 151, 152, 213, 272, 273, 285, 286 and 327).

119.    In addition to the subscription fees, MERSCORP, Inc. and Mortgage Electronic

Registration Systems, Inc. instituted various fee systems that MERS Members are required to

pay for the privilege of entering, without scrutiny or oversight, their data into the various MERS

databases (See Exhibits 280, 281, 282 and 283). MERSCORP, Inc. and Mortgage Electronic

Registration Systems, Inc., require MERS Member organizations self-regulate (See Exhibits 149

and 161). According to the testimonies of MERSCORP, Inc. and MERS CEO and President R.

K. Arnold and MERS Vice President William C. Hultman, neither MERSCORP, Inc. nor

Mortgage Electronic Registration Systems, Inc. (MERS) provide any oversight to the mortgage

data entered into the MERS System databases by its MERS Members (See Exhibits 151, 152,

340 and 341).

120.    MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. encourage

members to actively participate in fraud and misrepresentation by allowing for the creation of

computerized parent/child relationships between members (See Exhibit 81). In the world of electronic commerce and computer programming, a parent/child relationship mandated that a new programming object take on some of the properties of the parent. The parent has the natural ability to manipulate any and all of the data of the child. Thus, loan information entered by a parent organization can be enhanced and extended by another MERS Member organization that has a parent/child relationship to the originator of the data.

121.    MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. encourage members to actively participate in fraud and misrepresentation by mandating a maximum of four employees from each member organization as "Corporate Officers of MERS." By paying an annual fee for up to four employees, each member organization obtains the ability to engage in contracts, authorize assignments of Promissory Notes, release liens and foreclose in the names of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (See Exhibits 151, 152, 184, 325 and 338-341)

122.    There is neither oversight nor supervision by any officer or employee of either MERSCORP, Inc. or Mortgage Electronic Registration Systems, Inc. CEO and President of MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. testified before a US House of Representatives Congressional subcommittee "...As of November 15, 2010, MERS has 20,302 certifying officers who work with the more than 31 million active loans registered on the MERS® System" (See Exhibits 151 and 152).

123.    In several testimonies and depositions, it has been admitted that "certifying officers" have exacted harmful damage to homeowners through fraudulent foreclosure proceedings and seizing of incorrect properties due to errors in data in the databases acted upon by these certifying officers (See Exhibits 151, 152, 325, 338 and 339) . The actions of these "certifying officers"

have caused violations of Texas Business and Commerce Code §3.201(a), §3.308, §3.309 and

§3.402(a) (See Exhibit 240).  Because of the numerous errors nationwide in this fraudulent

foreclosure process, MERS changed its policy so that it is never the named as the moving party

on a foreclosure (See Exhibit 40).

124.    In deposition, MERSCORP, Inc. Vice-President William C. Hultman testified that 94%

of the 61 million loans registered in the MERS System were "MOM" loans (See Exhibit 340).

MOM is an official MERS System acronym which means MERS as Original Mortgagee.  A

residential mortgage can only become a MOM Loan when it is generated by a member

organization, at its inception and before its closing information is entered in the MERS database,

it was given a MERS MIN Number, (MERS Identification Number), and the Deed of Trust or

Mortgage document the borrower signs contains language approved by MERS, Fannie Mae,

Freddie Mac, Ginnie Mae, Federal Housing Administration and the Veterans Administration

(See Exhibits 36-39, 43, 49, 57, 61-63, 72, 74-77, 87 and 88).

125.    The language on the MOM Loan document specifies a post office box in Flint Michigan

for Mortgage Electronic Registration Systems, Inc. (MERS) (See Exhibits 162, 386, 387, 390,

391, 392, 393 and 397).  In this case, the "MOM" Loan information which specifies a Flint,

Michigan post office box as the MERS address occurs in the Deed of Trust executed on March 3,

2008.  As the mortgage documents were delivered by Federal Express and were required to be

returned by Federal Express for delivery by the next day, the nexus for using mail and interstate

commercial carriers as transports for fraudulent documents was established in violation of 18

USC §1341.

126.    Mortgage Electronic Registration Systems, Inc. (MERS) established themselves as the

beneficiary and nominee on the instruments concerning the domicile at 223 High Point Drive.

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 34**

All legal documents at some point had to be delivered to them or to MERSCORP, Inc.. The
MERS System in its documentation states that it shreds all originals in 30 days (See Exhibits 42,
75, 76, and 365). In its Integration Handbook Vol. 1, MERS states that the mail it shreds after 30
days consists of recorded mortgage documents (See Exhibits 75, 390-393 and 397).

127.    By shredding these documents, MERSCORP, Inc. and Mortgage Electronic Registration
Systems, Inc. (MERS) are in violation of Texas Property Code Title 9 Chapter 112 ,
§111.004(25) and Texas Finance Code §342.454, (See Exhibits 263 and 264). By shredding the
originals and utilizing electronic copies, MERSCORP, Inc. and Mortgage Electronic Registration
Systems, Inc. (MERS) have established the standard for the rapid securitization, trading and
selling of either whole, or portions of, residential mortgages (See Exhibits 41 and 46) .
MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. (MERS) state that by
being the nominee and beneficiary absolves MERS Member organizations of the legal
requirement to record transfers and assignments of Deeds of Trust and Promissory Notes. This is
in violation of Texas Property Code §11.001, §11.004 and §12.001(a) and Texas Local
Government Code §192.001, §192.007, §193.003 (See Exhibits 257 - 260).

128.    Therefore, under the MERS System Scheme the Chain of Title is irrevocably broken and
the title to the property is clouded. With a broken Chain of Title, ownership of the property
becomes a legal nullity. At any time, a holder of a note can appear and claim interests in the real
property in which the Title Deed of the Property was to be held in trust by the original lender.
While Carpenter v. Longan, 83 U.S. 271 dealt with the separation of the Deed of Trust from the
Promissory Note, the legal remedy was simple as both the wet-ink originals of the Deed of Trust
and the Promissory Note existed. In this case, it is probable and likely that neither wet-ink
originals of the Deed of Trust or the Promissory Note exist. Nor can factual and court

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 35**

admissible evidence of the subsequent transactions affecting the continued destruction of the

Deed of Trust, Promissory Note and Chain of Title be produced as they likely either do not exist

or have been hidden.  Therefore, the foundation exists for the violation of numerous loan,

mortgage and trust statutes in effect and governing in the State of Texas.

129.    The Plaintiff contends that MERSCORP, Inc. and Mortgage Electronic Registration

Systems, Inc. (MERS) were two of the creators and active participants in the Racketeer

Influenced and Corrupt Organizations (RICO) enterprise as defined under Title 18 of the United

States Code.  After the Plaintiff has identified the other members and their roles in this RICO

fraud enterprise, evidence of the actual code sections violated will be enumerated along with the

specificity of the damages suffered by the Plaintiff and the property at 223 High Point Drive,

Murphy, Texas.

**GMAC Mortgage, L.L.C. and Homecomings Financial, L.L.C. ~ All in the Family**

130.    In March of 2008, the Plaintiff entered into a thirty year fixed rate mortgage with

Homecomings Financial, LLC as the lender.  The Deed of Trust was properly recorded in the

Recorder's Office in Collin County Texas, (See Exhibit 397).  The plaintiff has the reasonable

expectation to believe that his mortgage was financed by Homecomings Financial, LLC.

Unbeknownst to the plaintiff at the time, Homecomings Financial, LLC was a member in good

standing of MERS with a MERS OrgID of 100474 (See Exhibits 316 and 380).

131.    On the Deed of Trust filed in the Collin County Clerk Recorder's Office, a MERS

Identification Number, (MIN), of 10062604768684500.  This MIN number is created when the

loan information is entered in a MERS database (See Exhibit 184).  Verification that the MIN

number was properly executed occurs in various daily and monthly MERS reports, (See Exhibits

134, 135, 144, and 147).  Exhibit 184 states there are three parts of a MIN number.  These three

parts never change through the life of the loan in the MERS System. The first part is the seven

digit OrgID of the MERS Member organization funding the loan. The second part is the 10 digit

loan number assigned by the funder of the loan. The third part of the MIN number is a

mathematical check digit which verifies the accuracy of the first seventeen digits entered.

132.    In this case, the OrgID on the Deed of Trust registered in the Collin County Recorder's

Office is 100626 not 100474 (See Exhibit 397). Therefore, another entity funded the mortgage

on the property at 223 High Point Drive, Murphy, Texas. This OrgID belongs to Homecomings

Wholesale Funding (See Exhibits 381 and 383). Homecomings Wholesale Funding is not and

has never been registered as either a domestic or foreign corporation in the State of Texas (See

Exhibits 399 and 400).

133.    Homecomings Wholesale Funding violated Texas Finance Code §156.201(a) (c),

§156.204, §157.003, §157.014, §157.015, §180.002(12), (15)(A)(B)(b), §180.051 and §342.0515

(See Exhibits 247, 248, 249 and 250) and Title V of Public Law 110-289 because they have not

registered with the National Mortgage Licensing System & Registry (NMLS) (See Exhibit 369).

Homecomings Wholesale Funding violated Texas Finance Code §156.201(a)(c), §156.204,

§157.003, §157.014, §157.015, §180.002(12),(15)(a)(b)(b) and §180.051 (See Exhibits 247-249)

by not registering with the Texas Department of Savings and Mortgage Lending (See Exhibit

371).

134.    On the other hand, Homecomings Financial, L.L.C. was properly registered with the

Texas Secretary of State (See Exhibit 402) and NLMS (See Exhibit 370). Homecomings

Financial, L.L.C. violated Texas Finance Code §156.201(a)(c), §156.204, §157.003, §157.014,

§157.015, §180.002(12),(15)(a)(b)(b) and §180.051 (See Exhibits 247-249) by not registering

with the Texas Department of Savings and Mortgage Lending (See Exhibit 371).

135.    The Plaintiff has discovered Homecomings Wholesale Funding is directly related to and a part of the business model for Homecomings Financial, L.L.C. (See Exhibit 372) and that Homecomings Wholesale Funding has executed mortgage instruments in other states (See Exhibit 382).  Thus, Homecomings Financial, L.L.C. has, by proxy, violated Texas Finance Code §156.201(a)(c), §156.204, §157.003, §157.014, §157.015, §180.002(12),(15)(a)(b)(b) and §180.051 (See Exhibits 247-249) by not registering with the Texas Department of Savings and Mortgage Lending (See Exhibit 371).

136.    It is conceivable that Mortgage Electronic Registration Systems, Inc. (MERS), MERSCORP, Inc., Homecomings Wholesale Funding, Homecomings Financial, L.L.C., GMAC Bank and GMAC Mortgage, L.L.C. will claim that the national registry listed in Texas Property Code §51.0001(1) and §51.0001(4)(A) (See Exhibit 252) is MERS.  This opinion it erroneously and fraudulently stated by Texas lawyer G. Tommy Bastian in Westlaw (See Exhibits 333 and 334).

137.    In the Texas House and Senate analyses and in the conference committee meetings on Texas H.B. 1493, neither MERS, Mortgage Electronic Registration Systems, Inc. (MERS) nor MERSCORP, Inc. are listed as giving testimony or mentioned.  Texas H.B. 1493 was created to rectify a massive problem in Texas where mortgage servicers were illegally foreclosing on residential mortgages instead of the lender or holder of the note in due course (See Exhibits 254, 255 and 256).  The reference to a national registry was in preparation for what later became the SAFE Mortgage Act, Title V of P.L. 110-289 which was developed in national discussions by the mortgage regulators from all fifty states for 8 years before being presented to Congress.

138.    G. Tommy Bastian never reveals that he is in the employ of the MERS System.  He, in this case, has served as Trustee for the first and second liens executed in 2005 and the thirty year

fixed mortgage in 2008. Therefore, the Plaintiff, under the assumption that his mortgage in 2008 was a fair deal, was inextricably caught up in the RICO fraud perpetrated by Homecomings Financial, L.L.C., Homecomings Wholesale Funding, GMAC Bank, GMAC Mortgage, L.L.C., MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc. (MERS) at the time of signing of the Deed of Trust (See Exhibits 392, 393 and 397).

139.    The Plaintiff received a letter dated February 29, 2008 stating that GMAC Bank had purchased his mortgage, which did not exist until March 3, 2008, from Homecomings Financial (See Exhibit 321). This was an illegal transaction as a mortgage cannot be sold until it and the secured Promissory Note are consummated with the signing by the borrower. Because no documents listing GMAC Bank were submitted to him at the time of closing, he ignored the letter.

140.    Yet, a review of the mortgage documents and releases of liens involving the property at 223 High Point Drive, Murphy, Texas and the Plaintiff show the fingerprints of MERS "certifying officers," Mortgage Registration Systems, Inc. (MERS), MERSCORP, Inc., GMAC Bank, GMAC Mortgage L.L.C., Homecomings Financial, L.L.C. and Homecomings Wholesale Funding (See Exhibits 386-398).

141.    In addition, because the initial mortgages first and second liens from 2002 were entered in the MERS System as a non-MOM loan (See Exhibit 63 for non-MOM loan sample), the Plaintiff has been tracked and profiled by MERS Member organizations and has been offered loan packages that had been price-fixed by the profiling nature of the various MERS databases (See Exhibits 47, 55, 73, 76, 166, 170, 172, 174, 176, 181, 182, 183, 185). All knew that the Plaintiff was in a pickle as the loan would reset causing severe financial hardship on the Plaintiff.

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 39**

Because they knew the perfect payment history and profile of the Plaintiff, Homecomings

Financial, L.L.C. offered a fraudulent no/low documentation loan to the Plaintiff.

142.    The Plaintiff not having much experience in the home buying process asked questions of

Pinnacle Title Company, now a part of Commonwealth Title. Each time he was instructed to ask

these questions of the mortgage broker. When questioned of the letter alerting that the mortgage

had been purchased by GMAC Bank, the Plaintiff was told don't worry, all is done in accordance

with proper and normal procedures. Homecomings Financial, L.L.C. in violation of internal

directives sold its mortgage to GMAC Bank without obtaining permission from the borrower

(See Exhibit 362).

143.    At the time of closing, the actual lender of the loan was not known and the loan

securitization process has already begun. Pinnacle Title conspired with Homecomings Financial,

L.L.C., GMAC Bank, Homecomings Wholesale Funding, Mortgage Electronic Registration

Systems, Inc. (MERS) and MERSCORP, Inc. to violate Texas Finance Code §343.001(2)(A),

§343.001(2)(B)(ii), Texas Business and Commerce Code §3.104(a), §3.104(a)(1),

§3.164(a)(3)(A)(B), Texas Local Government Code §192.007, §192.001, §193.003 Texas

Property Code §11.0001, §11.004 and §12.001 (See Exhibits 240, 251, 257, 258, 259 and 260).

**Fannie Mae:  The Last Stop**

144.    The Plaintiff made six requests for loan documents and title policy (See Exhibits 295-

300). As these were not answered, the Plaintiff sent two Qualified Written Requests (QWR), to

GMAC in accordance with Title 12 §2605 (e)(l)(B) (e) and Reg. X §3500.21(f)2 of the United

States Code as well as a request under Truth In Lending Act [TILA] 15 U.S.C. §1601, et seq.

GMAC Mortgage, L.L.C. acknowledged the properly formed QWR and twice declined to

provide the information requested (See Exhibits 302 and 303). Subsequently, the Plaintiff

commissioned a forensic audit of his loan documents (See Exhibit 406). Through this audit, the
Plaintiff discovered his mortgage may be "owned" by Fannie Mae. The Plaintiff discovered that
he could only find very limited information on his mortgage that is stored in the MERS System
databases (See Exhibits 60, 182 and 328-331).

145.    Exhibit 317 shows that Fannie Mae is listed as the investor in the loan. The Plaintiff
looks to Fannie Mae for independent corroboration (See Exhibit 189). The Fannie Mae lookup
gives a tacit answer that they may own the loan. The Plaintiff subsequently asked his lead
researcher to see if he could verify the information. The lead researcher called Fannie Mae who
verified that they in fact have owned the loan since April 1, 2009 (See Exhibit 199). Yet, Fannie
Mae refused to provide any Pool Numbers and/or CUSIP numbers that Fannie Mae uses to track
mortgages so the Plaintiff could find more information on his loan (See Exhibits 193, 194, 195,
196, 200, 202, 206, 207, 209, 210 and 211).

146.    Fannie Mae is intimately involved with the founding, operation, policy making and
purchasing of loans from the MERS System, Member organizations of MERS, Mortgage
Electronic Registration Systems, Inc. (MERS) and MERSCORP, Inc. (See Exhibits 50, 51, 82,
193, 194, 213, 214, 218, 219, 221, 222 and 223). By purchasing the loan from GMAC Bank,
Fannie Mae conspired with Pinnacle Title, Commonwealth Title, Homecomings Financial,
L.L.C., Homecomings Wholesale Funding, MERSCORP, Inc., Mortgage Electronic Registration
Systems, Inc. (MERS) and other unnamed parties to destroy the Chain of Title in violation of
Texas Local Government Code §192.007, §192.001, §193.003, Texas Property Code §11.001,
§11.004, §12.001, §12.017(c)(d), §12.017(d), §12.017(e), §12.017(f), Texas Business and
Commerce Code §3.104(a)(3)(A), §9.203(a)(b)(g). Fannie Mae has a MERS OrgID of 1000130
(See Exhibit 375).

147.    In addition, by producing or subsequently accepting documents they knew to be

fraudulent, the Defendants clouded the title to the property while violating Texas Finance Code

§156.002(5), §156.002(8), §156.201, §156.2015(a), §156.2015(b), §156.2105(d), §156.204(a),

§156.208(a-1), §180.251(a), §342.051, §342.051(a), §342.051(f), 51.004(A), 51.004(C) and

Texas Government Code §2306.004(2).

148.    Fannie Mae, Mortgage Electronic Registration Systems, Inc. (MERS) and MERSCORP,

Inc. destroyed the Chain of Title by trading Promissory Notes endorsed in blank (See Exhibit

214) in violation of Texas Property Code §12.017, §51.004(A), §51.0025 and Texas Business

and Commerce Code §3.201(a), §3.308, §3.309 and §3.402(a).

149.    Fannie Mae, Mortgage Electronic Registration Systems, Inc. (MERS) and MERSCORP,

Inc. destroyed or have caused to be destroyed legal documents that would have preserved the

Chain of Title (See Exhibits 42, 75, 76 and 220).

150.    Fannie Mae, MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. (MERS),

Homecomings Financial, L.L.C., Homecomings Wholesale Funding, Commonwealth Land Title

and other unnamed parties engaged in RICO fraud that resulted in the Promissory Note on the

residence at 223 High Point Drive, Murphy, Texas, which was signed by the Plaintiff, becoming

null and void in accordance with Texas Business and Commerce Code §9.203(a) as the original

Deed of Trust signed on March 3, 2008 was fraudulent in violation of Texas Civil Practice and

Remedies Code §12.002(a)(1) and its successive assignments were fraudulent in violation of

Texas Business and Commerce Code §3.201 and §3.203.  Because of these actions by the

Defendants, the Plaintiff was a victim of Deceptive Trade Practices as defined in Texas Business

and Commerce Code §17.45 (See Exhibit 359).

151.    Homecomings Financial, L.L.C., Homecomings Wholesale Funding, Attorney Don W.

Ledbetter (Trustee), Mortgage Electronic Registration Systems, Inc. (MERS) committed fraud as

defined in Texas Business and Commerce Code §27.01(a)(1), §27.01(a)(2), §27.01(b) and

§27.01(c) (See Exhibit 242).  MERSCORP, Inc., GMAC Bank, GMAC Mortgage, L.L.C. and

Commonwealth Land Title committed fraud as defined in Texas Business and Commerce Code

§27.01(d).

152.    Mortgage Electronic Systems, Inc. (MERS),  MERSCORP, Inc., Homecomings

Financial, L.L.C., GMAC Bank, Homecomings Wholesale Funding and Fannie Mae jointly and

severally violated Texas Local Government Code §192.001 and  §192.007 (See Exhibit 257).

153.    Each of the Defendants actively participated in a massive generational control fraud.  The

purpose of this control fraud was and is to transform borrowers on residential mortgages into

involuntary indentured servants by making them permanent renters through the destruction of the

Chain of Title, clouding of the title on residential property, destruction of legal public documents

and illegal conversion of monies paid to satisfy a secured Promissory Note,  into payments on an

unsecured instrument.  Because of the shredding of the original documents, the Defendants are in

violation of Texas Finance Code §342.454 (See Exhibit 250) which stipulates the return of the

cancelled instruments including the note and security agreement that secured the loan.

154.    The forcing of involuntary indentured servitude is in direct violation of Amendments XIII

and XIV of the United States Constitution and 42 USC §1994.  In this case, the Plaintiff has been

illegally separated from his property at 223 High Point Drive, Murphy, Texas and has become an

involuntary indentured servant, serving under peonage because of a broken Chain of Title,

destruction of legal documents, willful non-filing of mortgage assignments, mail fraud, wire

fraud, RICO enterprise activity and conversion of monies paid on a secured promissory note into payments on unsecured instrument.

155.    These actions have caused the Plaintiff to suffer physical, mental and financial damages to his person and the financial destruction of his homestead at 223 High Point Drive, Murphy, Texas.  The financial damages are calculated as the total value of the mortgage contract (signed by the Plaintiff on March 3, 2008), improvements, maintenance fees, property taxes, utility taxes and equity in the property.

156.    Texas Business and Commerce Code §27.01(e) stipulates that the Defendants are liable to the Plaintiff for reasonable attorney's fees, expert witness fees, costs for copies of depositions, and court costs (See Exhibit 242).  Texas Business and Commerce Code 17.49(h) stipulates that persons are jointly and severally liable for actual damages, court costs and attorney's fees. Subject to Chapter 41 of the Civil Practices and Remedies Code, exemplary damages may be awarded in the case of fraud or malice (See Exhibit 359).  In accordance with Federal Statute 18 USC §1964(c), Plaintiff may seek civil redress and damages pursuant to harm resulting from RICO enterprises and activities.

157.    The Defendants actively participated through both direct action and inaction in the MERS Scheme as Principals as defined in 18 USC §2 to defraud, implement deceptive trade practices, destroy public records and convert secured financial instruments  into unsecured financial instruments.  The Defendants are foreign corporations neither created in or registered with the State of Texas.  The Defendants have a place of employment where the fraud took place outside of the State of Texas in violation of 18 USC §1962(c).

158.    Defendants used the wire service, the United States Postal Service and commercial interstate carriers to transmit and transport fraudulent mortgage documents between each other,

the Plaintiff and the Collin County Recorder's Office in violation of 18 USC §1343. The

Defendants committed bank fraud by converting a secured financial instrument into an unsecured

financial instrument in violation of 18 USC §1344. The Defendants engaged in computer fraud

in violation of 18 USC §1956(A)(i), (B)(i) (B)(ii) and (3)(B). The Defendants have conspired to

defraud the Plaintiff of his homestead in violation of 18 USC §1349. The Defendants have

engaged in racketeering as described in 18 USC §1961(1). The Defendants are entities that are

capable of holding a legal or beneficial interest in property as defined by 18 USC §1961(3).

159.    The Defendants are members of the MERS System which, through the utilization of

several computer databases and the use of unsupervised fake MERS corporate officers who act

as robo-signers, cause the MERS System to act as a RICO enterprise. The Defendants have

committed several RICO fraud acts against the Plaintiff and his homestead property located at

223 High Point Drive, Murphy Texas in 2005, 2008, 2009 and very likely prior to 2005 in

violation of 18 USC §1961(5).

160.    The Defendants both jointly and severally have violated 18 USC §1962 through the use

of bank, mail, wire and computer fraud along with numerous violations of various Texas State

Statutes including the willful destruction of legal documents, the non-filing of mortgage

assignments and transfers, engaging in Deceptive Trade Practices and violations of consumer

credit, home loan, mortgage and trust laws.

## VI.  CAUSES OF ACTION

### A.    Declaratory Judgment

161.    The facts, some plead alternatively, as set forth in Paragraphs 16 -160 above, are

incorporated herein for all purposes. Other portions of this pleading are referenced to the extent

they may be a necessary predicate for relief in this subparagraph.

162.    Plaintiff is entitled to a declaratory judgment due to the fact that:

a)    he does not currently have clear title

b)    there was not a lender at the closing

c)    the lender was or was not  Homecomings Financial

d)    no entity had the right to transfer interests to Fannie Mae

e)    there is not a lien on the property as a result of the refinancing and specifically whether that is so as a result of the fraudulent and deceptive Deed of Trust signed at closing without the legally required property description

f)    what entities, if any, have any interest in Plaintiff's mortgage

g)    what entities, if any, have an interest in Plaintiff's property, and

h)    Plaintiff is entitled to treble civil damages under 18 USC §1964(c) the Court shall estop the Defendants from denying the essential allegations in any subsequent civil proceeding(s) pursuant to 18 USC §1964(d).

**B.    Fraud**

163.    The facts, some plead alternatively, as set forth in Paragraphs 16 -160 above, are incorporated herein for all purposes.  Other portions of this pleading are referenced to the extent they may be a necessary predicate for relief in this subparagraph.

164.    Defendants made false, material representations to Plaintiff to secure his business and to induce him into the refinancing.  At the time the representations were made, Defendants knew the representations to be false.  Representations were made recklessly, as a positive assertion, and without knowledge of their truth.  Defendants made representations with the intent that Plaintiff would act on them.  Plaintiff relied on Defendants' false material representations which

caused Plaintiff's injury. Defendants are liable either under the common law or Texas Business and Commerce Code, Section 27.01, et seq.

165.    Defendants further sought to entrap Plaintiff in a scheme that made their fraudulent scheme unassailable by requiring Plaintiff to sign a "TEXAS MORTGAGE FRAUD NOTICE" which, after inducing Plaintiff to go along with the incomplete documentation promulgated by the Defendants, containing as it did, arguably false or misleading information, the mortgage fraud notice, would predictably intimidate Plaintiff and prevent him from speaking out about the fraud being perpetrated for fear of being implicated in or threatened with a criminal charge carrying a penalty of "2 years to 99 years and a fine not to exceed $10,000."

166.    Defendants' intent is discernible from a number of factors, not the least being violations of 18 U.S.C. §§1341 and 1343, 18 USC §1961, 18 USC §1963 and Texas Business and Commerce Code §17.45 and §27.01.

167.    That Defendants violated those protections, without apparent hesitation and as an apparent and deliberate part of an artifice, scheme or device to harm others, was an effort reflecting their intention to harm Plaintiff and those similarly situated. In that respect, Plaintiff notes that the State of Texas has enacted Texas Finance Code, §§156.001, et seq and 157.001, et seq to protect Texas citizens against unlicensed mortgage lenders and brokers reflecting Texas' public policy which Defendants were charged to know and comply with.

### C.    Breach of Contract

168.    The facts, some plead alternatively, as set forth in Paragraphs 16 -160 above, are incorporated herein for all purposes. Other portions of this pleading are referenced to the extent they may be a necessary predicate for relief in this subparagraph.

169.    Alternatively, there is a valid, enforceable contract. Plaintiff is the proper party to file

suit for breach of contract. Plaintiff performed, tendered performance of or was excused from

performing his contractual obligations. Defendants breached the contract. The Defendants'

breach caused Morse's injury. Plaintiff contends that all conditions precedent to Defendants'

performance have been performed, excused, waived or otherwise satisfied.


**D.    Violation of the Texas Mortgage Broker License Act**

170.    The facts, some plead alternatively, as set forth in Paragraphs 16 -160 above, are

incorporated herein for all purposes. Other portions of this pleading are referenced to the extent

they may be a necessary predicate for relief in this subparagraph.

171.    On information and belief, given the joint action of one or more parties to induce Plaintiff

to enter into the refinancing, one or more of the Defendants so acting apparently were not

registered as required by the Texas Mortgage Broker License Act, Texas Finance Code

§§156.001, et seq., and specifically pursuant to §156.003 thereof. According to Title V of P.L.

110-289, each state was to enact a law to protect consumers, such as Plaintiff, from unregistered

mortgage brokers. There was to be a central registry in that state and registration on a national

registry. Any such Defendant whose failure to so register or otherwise violated the statute to

Plaintiff's damage becomes liable to Plaintiff under §156.406 in a range from the amount of the

fee or profit any such Defendant received up to and  not to exceed three times such amount.

**E.    Violation of the Texas Mortgage Banker Registration and Residential Mortgage**

**Loan Originator License Act**

172.    The facts, some plead alternatively, as set forth in Paragraphs 16 -160 above, are incorporated herein for all purposes.  Other portions of this pleading are referenced to the extent they may be a necessary predicate for relief in this subparagraph.

173.    On information and belief, given the joint action of one or more parties to induce Plaintiff to enter into the refinancing, one or more of the Defendants so acting appear to be unregistered as required by the Texas Mortgage Banker Registration and Residential Mortgage Loan Originator License Act, Texas Finance Code §157.001, et seq. and specifically §157.003 thereof. Further, any such Defendant so acting has not been discharged as allowed by §157.030 since any such Defendant has not completed the loan originator's duty to see that the "disbursement of mortgage proceeds to or on behalf of the residential mortgage loan applicant" has occurred.

**F.    Accounting**

174.    The facts, some plead alternatively, as set forth in Paragraphs 16 -160 above, are incorporated herein for all purposes.  Other portions of this pleading are referenced to the extent they may be a necessary predicate for relief in this subparagraph.

175.    As set forth above, and specifically in paragraphs 29 - 70 and in the included HUD 1, Plaintiff is entitled to an accounting for the funds that each and/or all Defendants were associated with.  The numbers don't make sense.  They appear to be dishonest.  Defendants should be made to account.

**G.    Other Causes of Action**

176.    Although not specifically alleged due to insufficient information, Plaintiff serves notice that one or more Defendants may have violated both State and Federal banking, finance, fraud, and racketeering statutes in continuing violation which may survive the claim of limitations, a

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 49**

matter that will not become clear until discovery is allowed since certain Defendants essentially
refused Plaintiff's earlier requests for information.

## VII. DAMAGES, ATTORNEYS FEES, AND PRAYER

177.    Plaintiff has suffered damages as a result of the Defendants' conduct and actions. This is
Plaintiff's homestead and effectively he has been discharged from it, thus imposing on Plaintiff
loss of value of his homestead, extra expenditure of money to attempt to determine the extent of
his predicament, mental and emotional distress and anguish and other injuries. Plaintiff's actual
damages relating to the lack of clear title of the property have not become completely clear
enough to plead with exact precision since Morse suffered actual as well as special damages as a
result of Defendants' conduct herein. It is estimated that the damages suffered thus far are in
excess of $1,573,000.

178.    Plaintiff also seeks the imposition of exemplary damages.

179.    Plaintiff seeks reasonable attorneys fees under Federal and Texas case law which allows
Federal awards in declaratory judgment cases in the discretion of the Court, including Texas
Civil Practice and Remedies Code, §37.09. Plaintiff further seeks attorneys fees (and as may be
permitted, certain costs allowed by statute) a) for fraud involving fraud in a real-estate
transaction pursuant to Texas Business and Commerce Code, §27.01 (b) and (e), b) for violation
of the Mortgage Broker License Act pursuant to Texas Finance Code, §156.402(a), c) for
violation of the Texas Mortgage Banker Registration and Residential Mortgage Loan Originator
License Act pursuant to Texas Finance Code, §157.027, d) for breach of contract pursuant to the
Texas Civil Practice and Remedies Code, §38.001 (8), e) economic and exemplary damages
pursuant to Texas Civil Practice and Remedies Code §41.001, f) civil damages pursuant to 18
USC §1964 and g) declaratory relief pursuant to 42 USC §1983.

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 50**

180.    Plaintiff requests a jury trial.

181.    Plaintiff requests such other relief as the Court may find appropriate to the facts,

including injunctive relief, if necessary.


Respectfully submitted,

_____
Gregory C. Morse
223 High Point Drive
Murphy, Texas  75094
972-808-7028


## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of August, 2012, I served a  true and correct copy  of the

foregoing instrument  via the United States Mail, first-class postage prepaid and addressed to the

regular mailing address, to the following:

Hope T.  Cannon
Bradley Arant Boult Cummings, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

Thad Barreneche
600 E. John W. Carpenter Freeway
Suite 125
Irving, Texas  75062

_____
Gregory C.  Morse


**PLAINTIFF'S ORIGINAL COMPLAINT – Page 51**