## Exhibit 8

**Defendants' Motion to Dismiss and Supporting Memorandum of Legal Authority**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **GREGORY C. MORSE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **HOMECOMINGS FINANCIAL, L.L.C.** | ) | |
| **GMAC MORTGAGE CORPORATION,** | ) | **CIVIL ACTION NO.: 4:12-CV-375** |
| **LLC, GMAC BANK (NOW ALLY** | ) | |
| **BANK), MORTGAGE ELECTRONIC** | ) | |
| **REGISTRATION SYSTEMS, INC.,** | ) | |
| **MERSCORP, INC., FEDERAL** | ) | |
| **NATIONAL MORTGAGE ASSN. AND** | ) | |
| **COMMONWEALTH LAND TITLE** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF
LEGAL AUTHORITY**

---

**COME NOW** defendants Homecomings Financial, LLC ("Homecomings"), GMAC

Mortgage, LLC  ("GMAC"), Ally Bank ("Ally"), Mortgage Electronic Registration Systems,

Inc. ("MERS"), MERSCORP, Inc., and Federal National Mortgage Association ("Fannie Mae"),

collectively the "Defendants"), and move to dismiss all of Plaintiff's claims pursuant to Rule

12(b)(6).[1]  In support thereof, Defendants state as follows:

---

[1] Homecomings and GMACM filed a Notice of Bankruptcy Filing and Supplemental Servicing
Order on September 10, 2012.  As detailed in the Notice, on May 14, 2012, Residential Capital,
LLC and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), including
Homecomings and GMACM, filed voluntary petitions for relief under Chapter 11 of the
Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York,
One Bowling Green, New York, NY 10004-1408.  The Debtors' Chapter 11 cases are being
jointly administered and are indexed at case number 12-12020 (MG).  As a result of the

1/2379905.3

# I.    INTRODUCTION

This lawsuit arises out of a mortgage loan that Plaintiff obtained in 2008.  It is Plaintiff's second lawsuit[2] against these Defendants (and other named defendants) wherein he requests declaratory relief to quit title to the property while also asserting claims for fraud, breach of contract, and violations of the Texas Business and Commerce Code – Texas Deceptive Trade Practices Act, the Texas Finance Code – Mortgage Broker License Act and Mortgage Banker Registration and Residential Mortgage Loan Originator License Act, and the Federal Racketeer Influenced and Corrupt Organization Act.[3]  (See Amended Petition, at ¶¶ 163-75).  Plaintiff's claims arise out of his speculation that one or more of the settlement costs which were paid at the

---

Bankruptcy Filing, the protections of the automatic stay codified in Section 362(a) of the Bankruptcy Code arose with regard to the Debtors.

As stated in the Notice, Plaintiff's declaratory judgment claim, to the extent it is an attack on the validity of the lien, is a "Permitted Claim" against Homecomings and GMAC that may proceed before this Court.  Plaintiff's other claims, including claims for fraud, breach of contract, violations of the Rackering Influence and Corrupt Organizations Act, violations of the Texas Mortgage Broker License Act, violations of the Texas Mortgage Banker Registration and Residential Mortgage Loan Originator License Act and his request for an accounting are not Permitted Claims against Homecomings and GMACM, they remain subject to the automatic stay, and the continued prosecution of these claims is prohibited.  Additionally, any claims for monetary relief against Homecomings and GMACM -- including claims for damages or requests for attorneys' fees and costs -- are not Permitted Claims and are stayed.

Thus, as to GMACM and Homecomings, these Defendants are moving to dismiss only as to the declaratory judgment claim.

[2] Plaintiff's previous lawsuit was filed in the Eastern District of Texas as Cause No. 4:11-CV-230.  On March 23, 2012, The Honorable Don D. Bush entered a Final Judgment in Cause No. 4:11-CV-230 dismissing Plaintiff's federal question claims with prejudice and declining to exercise supplemental jurisdiction over the Plaintiff's state law claims.  On May 18, 2012, Plaintiff filed this lawsuit in the District Court for the 199th Judicial District of Collin County, Texas (Cause No. DC-199-01915-2012).  Defendants removed the matter to this Court on June 20, 2012.  Although the Plaintiff is asserting different causes of action against the Defendants in this action, the premise and alleged factual basis for his claims remains the same, which is that payments contained in his HUD-1 Statement may not have been made to the payees, as designated.

loan closing were somehow calculated incorrectly or misapplied, which allegedly results in a cloud on Plaintiff's title. All of Plaintiff's claims should be dismissed as a matter of law because (1) the claims that he has asserted have been rejected by the courts of this State and therefore have no legal basis and (2) Plaintiff's claims do not meet the pleading standard set forth in the Federal Rules of Civil Procedure or as required by <u>Iqbal</u> or <u>Twombly</u>.

## II.    FACTUAL BACKGROUND

1.      On March 3, 2008, Plaintiff took out a mortgage loan in the amount of $414,500.00 (the "Loan"), which was secured by a Deed of Trust on property located at 223 High Point Drive, Plano, Texas 75094 (the "Property"). (<u>See</u> Note, attached hereto as Ex. A; Deed of Trust, attached hereto as Ex. B).[4]

2.      The original lender was Homecomings. (<u>See</u> Note, ¶ 1). The Note is indorsed in blank. (<u>See</u> <u>id.</u>, p. 3).

3.      The Deed of Trust provides that MERS is the "nominee for Lender and Lender's successors and assigns" and "MERS is the beneficiary under this Security Instrument . . . and the successors and assigns of MERS." (<u>See</u> Deed of Trust, ¶ E).

4.      The Deed of Trust also provides that MERS "hold[s] only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with the law or custom, MERS (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property." (<u>See</u> <u>id.</u> at ¶ R).

---

[4] Because the Note and Deed of Trust and other documents attached hereto are referenced in Plaintiff's Complaint and/or are integral to Plaintiff's claims, the Court can consider them in ruling on this motion. <u>See, e.g.</u>, <u>Lechner v. Citimortgage, Inc.</u>, No. 4:09-CV-302-Y, 2009 WL 2356142, at *4 n.1 (N.D. Tex. Jul. 29, 2009) (citing <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498-99 (5th Cir. 2000)); <u>Bailey v. CIGNA Ins. Co.</u>, 87 Fed. Appx. 347, 348 (5th Cir. 2004); <u>Kelley v. KIMC Investments, Inc.</u>, No. 3:10-CV-2384-L, 2012 WL 639283, at * 1 (N.D. Tex. Feb. 28, 2012).

5.      GMAC is the mortgage servicer on the loan.  (<u>See</u> Amended Petition, ¶ 8).

6.      At the loan closing, Plaintiff received and executed a variety of documents and disclosures, including a Settlement Statement.   (<u>See</u> HUD-1 Settlement Statement, attached hereto as Exhibit C).  The proceeds of the Note were used to pay off two then-existing liens that Plaintiff had on the Property.  (<u>See</u> Amended Petition, ¶¶ 31, 35; <u>see also</u> Releases of Liens, attached hereto as Exhibit D).

7.      At the loan closing, the funds were also used to pay for a "lender's" title insurance policy for the benefit of Homecomings.   (<u>See</u> Lender's Policy, attached hereto as Exhibit E).

8.      Plaintiff made his last mortgage payment in March 2011, which was on or around the date he filed his previous lawsuit in Cause No. 4:11-CV-230.

9.      Although Plaintiff is in clear default on his note and mortgage, the Property remains in the possession of Plaintiff and has not been sold at a foreclosure sale.   (<u>See</u> <u>id.</u>, at ¶ 36).

### III.    <u>LEGAL STANDARD</u>

It is well-established that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" so that the defendant has "fair notice of what the...claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 554-55 (2007); <u>Ashcroft v. Iqbal</u>,  129 S.  Ct. 1937, 1949-51 (2009).  A complaint should be dismissed if it lacks a cognizable legal theory or sufficient facts alleged under a cognizable legal theory. <u>Peter v. Fisher</u>, 2009 WL 1065358, at *1 (N.D. Tex Jun. 8, 2009) (citing cases); <u>Overton v. JPMC Chase Bank</u>, 2010 WL 1141417, at *1 (S.D. Tex. Mar. 20, 2010).  In practice, "a complaint…must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." <u>Twombly</u>, 550 U.S. at 562.  "A formulaic recitation of a cause of action's elements will not do." <u>Id.</u> at 555; <u>see also</u>

4

Iqbal, 129 S. Ct. at 1949-50; Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993).

## IV.    ARGUMENTS

### A.    Plaintiff Fails to State a Plausible Claim For Quiet Title

Plaintiff fails to state a plausible claim for a suit to quit title through is his request for declaratory relief.  Plaintiff seeks a declaration of the following: (1) "he does not currently have clear title"; (2) "there was not a lender at the closing"; (3) "the lender was not Homecomings Financial"; (4) "no entity had a right to transfer an interest to Fannie Mae"; (5) "there is not a lien on the property . . . . "; (6) "what entities, if any, have any interest in Plaintiff's mortgage"; and (7) "what entitites, if any, have an interest in Plaintiff's property.  (See Amended Petition, at ¶ 162).  (See id. at p. 8).  "The elements of the claim for relief to quiet title are (1) an interest in a specific property, (2) title to the property is affected by a claim by the defendant, and (3) the claim, although facially valid, is invalid or unenforceable." Henderson v. Wells Fargo Home Mortgage, No. H-11-4294, 2012 WL 718605, at *5 (S.D. Tex. Mar. 5, 2012); Bell v. Bank of America Home Loan Servicing, No. 4:11-cv-02085, 2012 WL 568755, at *7 (S.D. Tex. Feb. 21, 2012) (citing U.S. Nat'l Bank Ass'n v. Johnson, No. 01-10-00837-CV, 2011 WL 6938507, at *3 (Tex. App. – Houston [1st Dist.] Dec. 30, 2011)).

"To quiet title in his favor, the plaintiff 'must allege right, title, or ownership in himself or herself with sufficient certainty to enable the court to see he or she has a right of ownership that will warrant judicial interference.'" Bell, 2012 WL 586755, at *7 (citing Wells v. BAC Home Loans Servicing, L.P., No. W-10-CA-00350, 2011 WL 2163987, at *4 (W.D. Tex. Apr. 26, 2011) (quoting Wright v. Matthews, 26 S.W.3d 575, 578 (Tex. App. – Beaumont 2000, pet. denied)); Anderson v. Nat'l City Mortgage, No. 3:11-CV-1687-N, 2012 WL 612562, at *6 (N.D. Tex. Jan. 17, 2012).  "A plaintiff in a suit to quiet title must prove and recover on the strength of

5

his own title, not the weakness of his adversary's title." <u>Bell</u>, 2012 WL 586755, at *7 (citing cases); <u>Swim v. Bank of America, N.A.</u>, No. 3:11-CV-1240-M, 2012 WL 170758, at *8 (N.D. Tex. Jan. 20, 2012). Plaintiff fails to sufficiently allege that he has a superior right of ownership in the Property. In fact, Plaintiff does not dispute that he took out a mortgage loan, secured by a Deed of Trust, on the subject Property. Plaintiff has not alleged any facts (and cannot) that the loan or Deed of Trust securing the loan are invalid. Accordingly, Plaintiff's request for declaratory judgment challenging the validity of the lien and his underlying suit to quiet title fails and should be dismissed as a matter of law as to all the Defendants filing this Motion.

### 1.    Plaintiff's Underlying Attack On MERS Lacks Merit

Plaintiff's underlying attack[5] on MERS is also without merit. (<u>See</u> Amended Petition, ¶¶ 85-160). Plaintiff's underlying argument is directly contrary to applicable law. State and federal courts in Texas have consistently held that MERS has the authority to transfer the rights and interests in a deed of trust. <u>See</u>, <u>e.g.</u>, <u>Athey v. MERS</u>, 314 S.W.3d 161, 166 (Tex. App. – Eastland 2010); <u>Wiggington v. Bank of New York Mellon</u>, 2011, WL 2669071, at *3 (N.D. Tex. July 7, 2011); <u>Defranceschi v. Wells Fargo Bank, N.A.</u>, 2011 WL 3875338 at *4 (N.D. Tex. Aug. 31, 2011); <u>Richardson v. CitiMortgage, Inc.</u>, 2010 WL 4818556, at *5 (E.D. Tex. Nov. 22, 2010); <u>Santarose v. Aurora Bank FSB</u>, 2010 W L 2232819, at *5 (W.D. Tex. June 2, 2010). Where "MERS is a beneficiary and nominee for both the originating lender and its successors and assigns by the express language in the Deed of Trust, the situation falls within an exception to the general rule that a party holding only the deed of trust cannot enforce the mortgage." <u>Eskridge v. Federal Home Loan Mortgage Corp.</u>, 2011 WL 2163989, at *5 (W.D. Tex. Feb. 24, 2011).

---

[5] It should be noted that Plaintiff refers to "exhibits" at least 57 times in his Amended Petition , but fails to attach to his Amended Petition any such exhibits.

In this case, the Deed of Trust provides that MERS is the "nominee for Lender and Lender's successors and assigns."  (See Deed of Trust, ¶ E).  MERS and the successors and assigns of MERS are defined as the Beneficiary.  (See id.).  The Deed of Trust also provides that MERS "hold[s] only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with the law or custom, MERS (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property."  (See id. at ¶ R).  Accordingly, Plaintiff's claims surrounding the legitimacy of MERS should be dismissed as a matter of law.

## 2.    Plaintiff's Split the Note Theory Has Been Repeatedly Rejected by Texas Courts

Similarly, Plaintiff's argument that the Deed of Trust is unsecured because it was "split and separated" from the Note is without legal basis.  (See Amended Complaint, at ¶ 128).  Plaintiff's "split the note" argument has been repeatedly rejected by the courts of this State.  See e.g., Wiggington, 2011 WL 2669071 at *2; McAllister v. BAC Home Loans Servicing, LP, 2011 WL 2200672, at *6 (E.D. Tex. Apr. 28, 2011), adopted by 2011 WL 2183844 (E.D. Tex. 2011); Broyles v. Chase Home Finance, 2011 WL 1428904, *3 (N.D. Tex. Apr. 13, 2011); Eskridge, 2011 WL 2163989, at *5 (plaintiff's allegations that because the note and deed of trust were split she had superior title to the property were "without merit because MERS was given the authority to transfer the documents in the Deed of Trust.").  Indeed, and as a matter of law, "a transfer of an obligation secured by a note also transfers the note because the deed of trust and note are read together to evaluate their provisions."  DeFranchesci, 2011 WL 3875338 at *4.  Accordingly, Plaintiff's "split the note" argument should be dismissed as a matter of law.

Not only has the "split the note" argument been soundly rejected, but Plaintiff, as a third party to the MERS assignment he is attacking, has no standing to attack the assignment.  It is

well settled, that, as a matter of law, borrowers do not have standing to attack the validity of assignments of mortgage, documents to which they are not a party. Eskridge, 2011 WL 2163989 at *5. Plaintiff's lack of standing in this regard, is another basis for dismissing Plaintiff's claim.

**B.**     **Plaintiff Has Not Pled His Fraud Allegations With Sufficient Particularity**

Plaintiff's fraud claim has no substance and was insufficiently pled.    (See Amended Petition, at ¶¶ 163-167Rule 9(b) of the Federal Rules of Civil Procedure provides that when a party alleges fraud, there is a heightened pleading standard that the "party must state with particularity the circumstances constituting fraud or mistake."   Fed. R. Civ. P. 9(b); City of Clinton v. Pilgrim's Pride Corp., 2010 WL 5162041, at *3 (5th Cir. Dec. 21, 2010).   To be sufficient, a fraud claim must lay out the "who, what, when, where, and how" of the events constituting fraud.   Benchmark Elec., Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003).    Under Texas law the elements of a fraud allegation are: (1) that a material misrepresentation was made, (2) that the representation was false, (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) the speaker made the representation with the intent that the other party should act upon it, (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury.   Cole v. Sandel Medical Industries, LLC, 2011 WL 116402, at *3 (5th Cir. Jan. 12, 2011) (citing Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 774 (Tex. 2009)).

The 4-paragraphs of Plaintiff's fraud count contain nothing more than a bare-bones recitation of the elements of a fraud claim with no substance or specifics of ***what*** false representations were made, ***who*** made such representations, ***to whom*** they were made, ***when such*** statements were made, ***how*** there was knowledge or reckless disregard of any falsity, ***how***

*Plaintiff relied* on such a representation or *what* damages were suffered.  (See id.).  Plaintiff cannot survive dismissal with such generic, non-specific allegations.  See Iqbal, 129 S. Ct. at 1949 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not accepted as true); Murungi v. Texas Guaranteed, 2010 WL 3736227, at *2 (5th Cir. Sept. 16, 2010) (affirming 12(b)(6) dismissal of fraud claim that had "no factual heft" and fell short of laying out the "who, what, when, where, and how" of the events constituting fraud); City of Clinton, 2010 WL 5162041, at *3-4 (affirming dismissal of fraud claim that pled only vague and attenuated statements); Dupree v. EMC Mortg. Corp., 2011 WL 147683, at *3 (E.D. Tex. Jan. 7, 2011) (dismissing fraud claim because the complaint did not identify any misrepresentations made by the defendant to the plaintiff).  It is apparent that Plaintiff's fraud claim falls far short of the federal pleading requirement under Rule 9(b) and should be dismissed.

Moreover, Plaintiff should not be allowed to amend his Amended Complaint.  Plaintiff has already amended his complaint once.  Additionally, this is Plaintiff's second lawsuit over essentially the same alleged facts.  Plaintiff's suit is one of delay and, given that Plaintiff has not paid on his mortgage loan for over a year; allowing Plaintiff to amend his complaint a second time would only delay the rightful resolution of this matter and would be prejudicial to the Defendants.

### 1.    **Plaintiff Fails To State A Plausible DTPA Claim**

As part of his fraud claim, Plaintiff includes an allegation that Defendant's violated the DTPA.  (See Amended Petition, at ¶ 165).  To prevail on a DTPA claim Plaintiff must show: (1) the plaintiff is a consumer; (2) the defendant can be sued under the DTPA; (3) the defendant violated a specific provision of the DTPA; and (4) the defendant's violation is a producing cause of the plaintiff's damages.  See Tex. Bus. & Com.Code Ann. §§ 17.41–17.63; Amstadt v. U.S.

1/2379905.3

Brass Corp., 919 S.W.2d 644, 649 (Tex. 1996). To qualify as a consumer, a plaintiff must (1)
seek or acquire goods or services and (2) the goods or services purchased or leased must form
the basis of the complaint.  Modelist v. Deutsche Bank Nat. Trust Co., 2006 WL 2792196, *7
(S.D. Tex. Aug. 25, 2006) (citing Sherman Simon Enters., Inc. v. Lorac Serv. Corp., 724 S.W.2d
13, 14 (Tex. 1987)).  In evaluating whether Plaintiff is a consumer, the Court must look to the
object of the transaction. TEX. BUS. & COM.CODE ANN. § 17.45; La Sara Grain Co. v. First Nat'l
Bank of Mercedes, 673 S.W.2d 558, 567 (Tex. 1984).  A person whose objective is merely to
borrow money is not a consumer because the lending of money does not involve either the
purchase or lease of a good or service.  Riverside Nat'l Bank v. Lewis, 603, S.W.2d 169, 173
(Tex. 1980).

Here, Plaintiff's claim arises out of mortgage loans and do not involve the purchase or
lease of either goods or services.  Plaintiff did not and does not even allege that he sought to
purchase or lease any goods or services from Defendants.  Therefore, the law is clear that
Plaintiff is not a "consumer" for purposes of the DTPA, and thus cannot pursue a claim for an
alleged DTPA violation.  See Henry v. CitiMortgage, Inc., 2011 WL 2261166, at *6 (E.D. Tex.
May 10, 2011) (dismissing the plaintiff's DTPA claims because they "ar[o]se out of a loan and
do not involve the purchase or lease of either goods or services"); see also Brimer v. Chase Bank,
USA, N.A., 2011 WL 4715173, *9-10 (N.D. Tex. Sep. 22, 2011); Marquez v. Fed. Nat'l Mortg.
Assoc., 2011 WL 3714623, at *5 (N.D. Tex. Aug. 23, 2011); Ayers v. Aurora Loan Servs., LLC,
787 F. Supp.2d 451, 455 (E.D. Tex. 2011); Mitchell v. Chase Home Finance, LLC, 2008 WL
623395, at *5 (N.D. Tex. Mar. 4, 2008).  Accordingly, Plaintiff's DTPA claims should be
dismissed against MERS, MERSCORP, Inc., Ally Bank, and Fannie Mae.

2.      **Defendants Are Not Liable Under Texas Business and Commerce Code
Section 27.01**

Also, as part of his fraud claim, Plaintiff includes an allegation that Defendants violated

Texas Business and Commerce Code Section 27.01.    Contrary to Plaintiff's allegation,

Defendants are not liable for fraud under the Texas Business and Commerce Code Section 27.01.

See Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 343 (5th Cir. 2008) (citing Burleson State

Bank v. Plunkett, 27 S.W.3d, 605, 611 (Tex. App. 2000) § 27.01 of Texas Bus. & Comm. Code

applies only to fraud in a real estate or stock transaction and "[a] loan transaction, even if secured

by land, is not considered to come under [§ 27.01]"); Greenway Bank & Trust of Houston v.

Smith, 679 S.W.2d 592, 596 (Tex. App. 1984) (§ 27.01 "makes no mention of any application . .

. to a party who 'merely' loans money for the purchase of real estate.").    This type of transaction

is not subject to Texas Business and Commerce Code Section 27.01.    Therefore, Plaintiff's

claims under Texas Business and Commerce Code Section 27.01 should be dismissed as a matter

of law.

3.      **Plaintiff Fails To State A Plausible RICO Claim**

Plaintiff also alleges that Defendants are members of a RICO enterprise and actively

engaged in a pattern of racketeering in violation of 18 U.S.C. § 1964.    (See Amended Petition, ¶¶

112, 165).    Like Plaintiff's fraud claim, Plaintiff's RICO claim contains nothing more than a

bare-bones recitation of the elements.    "A plaintiff bringing a claim under the RICO statute must

show at least the three following elements: (1) a person who engages in (2) a pattern of

racketeering activity, and (3) connected to the acquisition, establishment, conduct, or control of

an enterprise." Anderson v. CitiMortgage, Inc., 2011 WL 1113494, *3 (E.D. Tex. Mar. 24, 2011)

(citing 18 U.S.C. § 1962; St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir.2009).    A pattern of

racketeering activity consists of two or more predicate criminal acts that are (1) related and (2)

11

amount to or pose a threat of continued criminal activity.  Id. An enterprise under RICO is a

group of persons or entities associating together for the common purpose of engaging in a course

of conduct, and an enterprise may be a legal entity or any union or group of individuals

associated in fact.  Id.  (citing Whelan v. Winchester Prod. Co., 319 F.3d 225, 229 (5th Cir.2003)

(citing 18 U.S.C. § 1961(4)). The enterprise is not a pattern of racketeering activity, but must

exist separate and apart from the pattern of racketeering activity in which it engages. Whelan,

319 F.3d at 229 (citing 18 U.S.C. § 1961(4)).

In this case, Plaintiff has failed to allege any facts showing a pattern of racketeering

activity consisting of two criminal acts.   Additionally, Plaintiff has failed to allege facts to

establish the alleged activity of Defendants was connected to the acquisition, establishment,

conduct, or control of an enterprise.  See Anderson v. Citimortgage, Inc., 2011 WL 1113494, at

*3-4 (E.D. Tex. Mar. 24, 2011).  Accordingly, Plaintiff's RICO claim should be dismissed as a

matter of law and Plaintiff's should not be afforded another opportunity to amend his claims and

to delay this action.

## C.    Plaintiff's Breach of Contract Claim Should Be Dismissed As A Matter of Law

Plaintiff goes on to assert a claim for breach of contract.  Plaintiff states "there is a valid,

enforceable contract," "Plaintiff performed, tendered performance of or was excused from

performing his contractual obligations," "Defendant's breached the contract," and "the

Defendant's breach caused Morse's injury."  (See Amended Petition, ¶¶ 168-169).   Again,

Plaintiff does nothing more than recite the basic elements of a breach of contract claim.   To

prevail on a breach of contract claim, a party must show (1) the existence of a valid contract; (2)

the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4)

the plaintiff was damaged as a result of the breach. Wright v. Christian & Smith, 950 S.W.2d

411, 412 (Tex. App. – Houston [1st Dist.] 1997) (citing Hussong v. Schwan's Sales Enters, Inc.,
896 S.W.2d 320, 326 (Tex. App. – Houston [1st Dist.] 1995, no writ).    Additionally, Plaintiff
does not plead how the Defendants breached the Note or Deed of Trust nor does he link the
alleged breach to specific damages.    Thus, Plaintiff's allegations do not support a breach of
contract claim as a matter of law.

Moreover, even if Plaintiff had alleged sufficient facts to constitute a breach of contract
claim (which he has not), Plaintiff's claim is barred as a matter of law because Plaintiff has
materially breached the contract under which he seeks to recover by failing to make payments.
In this case, the only contracts that could be at issue are the Note and Deed of Trust.    The Note
states that, "If I do not pay the full amount of each monthly payment on the date it is due [the
FIRST day of each month], I will be in default."    (See Note, ¶ 6(B)).    Plaintiff, however, has not
performed under the contract because he has failed to make payments since March 2011 when he
filed his first lawsuit.    See Moe v. Option One Mortgage Corp., 2009 WL 136892, *3 (Tex.
App.-Houston [14th Dist.] Jan. 20, 2009) (affirming summary judgment as to the borrowers'
breach of contract claim when the borrowers failed to make mortgage payments and thus
breached the contract themselves).    Therefore, Plaintiff's breach of contract claim fails to meet
the pleading standards, and should be dismissed as a matter of law.

**D.**    **Plaintiff Fails To State A Plausible Claim Under Texas Mortgage Broker or Banker
Provisions Of Texas Finance Code Sections § 156.001 Or 157.001 Et. Seq.**

Plaintiff also asserts that some or all of the Defendants violated the licensing
requirements contained in the Texas Mortgage Broker and Banker Licensing Acts.    (See
Amended Petition, at ¶¶ 170-173.    To that end, Plaintiff is seeking damages pursuant to Texas
Finance Code Sections 156.406 and 157.027 respectively.    In each instance, Plaintiff fails to
establish how he has been damaged by the alleged violations.    More specifically, Plaintiff does

not properly plead that he is an "aggrieved person" under Texas Finance Code Section 156.406(b).  See Dohalick v. Moody National Bank, 2012 WL 2792453, at *3 (Tex. App. – Houston July 10, 2012) (holding mortgagee was not an aggrieved person entitled to recover damages under unlicensed).  Similarly, Plaintiff fails to show any "injury" as required by Texas Finance Code Section 157.027.[6]  Accordingly, Plaintiff's claims under the Texas Mortgage Broker and Banker Licensing Acts should be dismissed.

### E.    Plaintiff Has No Grounds For A Request For "Accounting"

Last, Plaintiff alleges that "he is entitled to an accounting for the funds that each and/or all Defendants were associated with."  (See Amended Petition, ¶¶ 174-175).  Plaintiff does not explain why he is entitled to an accounting, let alone allege any facts to support his request.  As has been previously established, Plaintiff does not have any viable causes of action.  Consequently, Plaintiff's claim for an accounting should be dismissed.

## V.    CONCLUSION

Plaintiff's Petition fails to state any viable causes of action.  There is no need for this case to occupy the Court's time or for any discovery to be conducted as there is simply no merit to any of the allegations.  The entirety of Plaintiff's Amended Petition appears to be based on his belief that the Defendants have not responded to or did not adequately respond to certain inquires

---

[6] For example, Plaintiff admits that the suit was not brought in response to a foreclosure action. (See Amended Petition, at ¶ 36).  Instead, Plaintiff brought this action because the "certainty of Plaintiff's contract with one or more of Defendants is clouded by events as they pertain to the involvement of MERS . . . ."  (Id. at ¶ 37).  Plaintiff is "concern[ed] about whether other closing charges were either not paid, were paid to the wrong party, were misallocated, were fabricated or were otherwise misrepresented."  (Id. at ¶ 47).  "Plaintiff was concerned about having to account for the process of the closing . . . ."  (Id. at ¶ 49).  Plaintiff alleges that the assignments releasing prior liens on his property "may be ineffective."  (Id. at  ¶ 57), "The nonpayment of the appraisal fee raises questions as to whether all other such listed payments were made from funds received from Homecomings . . . ."  (Id. at ¶ 66).  Similarly, "Defendant's failure to explain may at least indirectly affect the title and/or the marketability of the property."  (Id. at ¶ 72).  "Plaintiff may not have clear title regardless of how much money he pays."  (Id. at ¶ 73).  "Plaintiff reasonably may expect difficulty in establishing clear title . . . ."  (Id. at ¶ 79).  "It is probable and likely that neither wet-ink originals of the Deed of Trust or the Promissory Note exists."  (Id. at ¶ 128).

14

he made to them more than three (3) years after the loan closing about events that occurred at the

closing.  Those allegations, even if true, do not support causes of action for which relief can be

granted. Plaintiff's Petition, therefore, should be dismissed as against these Defendants.

WHEREFORE, for the reasons set forth above, Defendants respectfully request that

Plaintiff's Amended Petition be dismissed in its entirety with prejudice as to these Defendants.

DATED this 10th day of September, 2012.

Respectfully submitted,

/s/ Preston H. Neel
Hope T. Cannon (Bar No. 24077276)
Preston H. Neel (Bar No. 24072254)
Graham W. Gerhardt (Bar No. 24075698)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama  35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
hcannon@babc.com
pneel@babc.com
ggerhardt@babc.com

ATTORNEYS FOR DEFENDANTS HOMECOMINGS
FINANCIAL, LLC, GMAC MORTGAGE, LLC,
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC., MERSCORP, INC. AND FEDERAL NATIONAL
MORTGAGE ASSOCIATION

1/2379905.3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 10, 2012, I filed a copy of the foregoing via the Court's electronic filing system and served the same by certified mail return receipt requested and first-class U.S. Mail, postage prepaid, to the following:

Gregory C. Morse
223 High Point Drive
Murphy, Texas 75094
*PRO SE* PLAINTIFF

Thad Barreneche
600 E. John W. Carpenter Freeway, Suite 125
Irving, Texas 75062
(972) 281-0452
(972) 812-9408 (fax)
Thad.barreneche@fnf.com

ATTORNEY FOR COMMONWEALTH LAND TITLE INSURANCE COMPANY


/s/ Preston H. Neel
OF COUNSEL

1/2379905.3

# Exhibit A
# Note

# NOTE

MARCH 3RD, 2008                          HOUSTON                          TEXAS
    [Date]                                   [City]                                   [State]


223 HIGH POINT DRIVE, PLANO, TX 75094
                          [Property Address]


## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    414,500.00    (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is    HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS
FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of    6.0000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   FIRST   day of each month beginning on   MAY 1ST, 2008          . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on   APRIL 1ST, 2038         , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at   14850 QUORUM DRIVE, SUITE 500, DALLAS, TX 75254
                                       or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    2,485.14  .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Amended for Texas

-6N(TX) (0011)        Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3              Initials:        MFTX6054 - (08/2006) / 047-686845-0

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15         calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00         % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
GREGORY C. MORSE                        -Borrower                                                        -Borrower

_____ (Seal)          _____ (Seal)
                                                       -Borrower                                                        -Borrower

_____ (Seal)          _____ (Seal)
                                                       -Borrower                                                        -Borrower

_____ (Seal)          _____ (Seal)
                                                       -Borrower                                                        -Borrower

[Sign Original Only]

-6N(TX) (0011)                    Page 3 of 3    MFTX6054 - (08/2005) / 047-686846-0              Form 3200 1/01

Without Recourse
Pay to the Order of

Melissa Windler
Assistant Secretary
Homecomings Financial, LLC

# Exhibit B
# Deed of Trust

The undersigned does hereby certify
that this instrument is a true and
correct copy of the original.
PINNACLE TITLE COMPANY

By _____

Return To:    Homecomings Financial
One Meridian Crossing, Ste. 100
Minneapolis  MN  55423
Loan Number: 047-686845-0

Prepared By:    Homecomings Financial
14850 Quorum Drive, Suite 500
Dallas, TX  75254

-------------------[Space Above This Line For Recording Data]-------------------

# DEED OF TRUST

MIN 100062604768684500

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON,
YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING
INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST
IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC
RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE
NUMBER.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   MARCH 3RD, 2008
together with all Riders to this document.

(B) "Borrower" is
GREGORY C. MORSE, AN UNMARRIED MAN

Borrower is the grantor under this Security Instrument.

(C) "Lender" is
HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

TEXAS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                     Form 3044  1/01
MFTX7770 (06/2007) / 047-686845-0
Wolters Kluwer Financial Services

VMP ®-6A(TX) (0704)

Page 1 of 18                    Initials: _____

Lender is a  LIMITED LIABILITY COMPANY
organized and existing under the laws of  DELAWARE
Lender's address is  14850 QUORUM DRIVE, SUITE 500
DALLAS, TX 75254
Lender includes any holder of the Note who is entitled to receive payments under the Note.

(D) "Trustee" is  Atty. Don W. Ledbetter
. Trustee's address is
17130 Dallas Parkway, #115, Dallas    , TX  75248

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is a beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated MARCH 3RD, 2008
The Note states that Borrower owes Lender  FOUR HUNDRED FOURTEEN THOUSAND FIVE
HUNDRED AND NO/100                                                          Dollars
(U.S. $  414,500.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    APRIL 1ST, 2038

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

Initials: ___

VMP ®-6A(TX) (0704)                    Page 2 of 19                    Form 3044  1/01
MFTX7770 (06/2007) / 047-686845-0

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                    of  COLLIN                                    :

    [Type of Recording Jurisdiction]                  [Name of Recording Jurisdiction]

Legal description attached hereto and made a part hereof

Parcel ID Number:  R445700B00401                              which currently has the address of

223 HIGH POINT DRIVE                                                                        [Street]

PLANO                                                             [City], Texas 75094        [Zip Code]

("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this

Initials:

VMP®-6A(TX) (0704)                              Page 3 of 15                              Form 3044  1/01
MFTX7770 (06/2007) / 047-686845-0

Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

Initials:

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials:

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any

VMP®-6A(TX) (0704)    Page 6 of 16    Form 3044  1/01
MFTX7770 (06/2007) /  047-686845-0

Initials: _____

interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

VMP®-6A(TX) (8704)
MFTX7770 (06/2007) / 047-686845-0

Page 7 of 18

Form 3044  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: _____

VMP®-6A(TX) (0704)
MFTX7770 (06/2007) / 047-686845-0

Page 9 of 10

Form 3044  1/01

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually

Initials: _____

received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan

Initials: _____

VMP®-6A(TX) (0704)                                Page 11 of 16                                Form 3044  1/01
MPTX7770 (06/2007) / 047-686845-0

servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee; Trustee Liability. All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

VMP®-6A(TX) (0704)
MFTX7770 (06/2007) / 047-686845-0

Page 13 of 16

Initials: _____

Form 3044  1/01

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**25. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

**26. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

**27. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property.** Check box as applicable:

☐ Purchase Money.

The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ Owelty of Partition.

The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☒ Renewal and Extension of Liens Against Homestead Property.

The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

☐ Acknowledgment of Cash Advanced Against Non-Homestead Property.

The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan.** The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the

Initials: _____

VMP ®-6A(TX) (0704)
MPTX7770 (06/2007) / 047-686845-0

Page 14 of 18

Form 3044  1/01

Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                                                    -Borrower
                                          GREGORY C. MORSE


_____          _____ (Seal)
                                                                                    -Borrower


_____ (Seal)              _____ (Seal)
                     -Borrower                                                      -Borrower


_____ (Seal)              _____ (Seal)
                     -Borrower                                                      -Borrower


_____ (Seal)              _____ (Seal)
                     -Borrower                                                      -Borrower


VMP®-6A(TX) (0704)                Page 16 of 16                Form 3044  1/01
MFTX7770 (06/2007)  /  047-686845-0

STATE OF TEXAS
County of Collin

Before me    Sandra S. Maxfield    on this day personally appeared
GREGORY C. MORSE, AN UNMARRIED MAN

known to me (or proved to me on the oath of
or through    TEXAS DRIVERS LICENSE    ) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he/she/they executed the same for the purposes and
consideration therein expressed.

Given under my hand and seal of office this    3rd    day of    March    2008 .

(Seal)



SANDRA S. MAXFIELD
Notary Public
STATE OF TEXAS
My Comm. Exp. Nov. 29, 2011

Sandra S Maxfield
Notary Public

My Commission Expires:    11/29/2011

VMP ®-6A(TX) (0704)
MFTX7770 (06/2007) / 047-686845-0

Page 18 of 18

Initials: _____

Form 3044    1/01

## EXHIBIT "A"

**LOT 4, BLOCK B , ROLLING RIDGE ESTATES - PHASE 1, AN ADDITION TO THE CITY OF MURPHY, COLLIN COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME N, PAGE 304, MAP RECORDS, COLLIN COUNTY, TEXAS.TOGETHER WITH A CERTIFICATE OF CORRECTION, FILED SEPTEMBER 4, 2002, RECORDED IN VOLUME 5246, PAGE 545, DEED RECORDS, COLLIN COUNTY, TEXAS.**

## RENEWAL AND EXTENSION RIDER

The note hereby secured is given in renewal and extension of the sum(s) left owing and unpaid by Grantor(s) herein upon the following indebtedness(es):

> That one certain promissory note in the original principal amount of $324,000.00, dated December 18, 2002, executed by GREGORY C. MORSE , payable to the order of "MERS" AS NOMINEE FOR GREENPOINT MORTGAGE FUNDING, INC., more fully described in a Deed of Trust of even date therewith, executed by GREGORY C. MORSE to G. TOMMY BASTIAN, TRUSTEE(S) and recorded in Volume 6005, Page 3912, of the Deed of Trust Records of COLLIN County, Texas, and said note being secured by said Deed of Trust Lien and being additionally secured by a Vendor's Lien retained in Deed of even date therewith recorded in Volume 5323, Page 5242 of the Deed Records of COLLIN County, Texas;

> That one certain promissory note in the original principal amount of $40,500.00, dated December 18, 2002, executed by GREGORY C. MORSE , payable to the order of "MERS" AS NOMINEE FOR GREENPOINT MORTGAGE FUNDING, INC., more fully described in a Deed of Trust of even date therewith, executed by GREGORY C. MORSE to G. TOMMY BASTIAN, TRUSTEE(S) and recorded in Volume 6005, Page 3937, of the Deed of Trust Records of COLLIN County, Texas, and said note being secured by said Deed of Trust Lien and being additionally secured by a Vendor's Lien retained in Deed of even date therewith recorded in Volume 5323, Page 5242 of the Deed Records of COLLIN County, Texas;

said lien(s) being against the herein described property and which said lien(s) have this day been transferred and assigned to HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.), and it is expressly agreed by Grantor(s) herein that said note(s) and lien(s) are hereby renewed, extended and carried forward in full force and effect to secure payment of the note hereby secured; and if not the original owner and holder or if not previously subrogated, the holder of the Note hereby secured is hereby subrogated to all the rights, powers and equities of the original owner(s) and holder(s) of the above described indebtedness.

_____
GREGORY C. MORSE

_RENEWAL AND EXTENSION RIDER_ – Page 1 of 1

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this  3RD                    day of
MARCH,                                    2006 , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the
"Security Instrument") of the same date, given by the undersigned (the "Borrower") to
secure Borrower's Note to
HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:
223 HIGH POINT DRIVE
PLANO, TX 75094
                                   [Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS, AND RESTRICTIONS


(the "Declaration"). The Property is a part of a planned unit development known as
ROLLING RIDGE ESTATES #01


                          [Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.
    PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
    A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.


MULTISTATE PUD RIDER · Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01    MFC06058 (08/2005) / 047-888845-0
Wolters Kluwer Financial Services         Page 1 of 3          Initials: 
VMP®-7R (0411).01

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:

VMP®-7R (0411).01                     Page 2 of 3                     Form 3150 1/01
MFPC09096 (08/2009) / 047-888845-0

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in
this PUD Rider.

_____ (Seal)          _____ (Seal)
                       -Borrower                              -Borrower
GREGORY C. MORSE


_____ (Seal)          _____ (Seal)
                       -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                       -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                       -Borrower                              -Borrower


VMP®-7R (0411).01                    Page 3 of 3              Form 3150 1/01
MPC03088 (08/2008) / 047-688845-0

# Exhibit C
# HUD-1 Settlement Statement

A. **Settlement Statement**

U.S. Department of Housing
and Urban Development

The undersigned does hereby certify
that this instrument is a true and
correct copy of the original.

OMB No. 2502-0265

PINNACLE TITLE COMPANY

By: Mortgage Loan Case Number

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
| 4. ☐ VA | 5. ☐ Conv Ins. | 6. ☐ Seller Finance | 0712270 | 047-686845-0 | |

C. Note:  This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Gregory C. Morse<br>223 High Point Dr.<br>Plano, TX 75094 | . | Homecomings Financial, LLC<br>14850 Quorum Drive #500<br>Dallas, TX 77027 |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| Rolling Ridge Estates #01, Block 4, Lot 4, Collin County<br>223 High Point Dr.<br>Murphy, TX 75094 | Pinnacle Title Company, LP<br>19 Briar Hollow #115<br>Houston, TX 77027  Tax ID: 201052870 |

| | Place of Settlement | I. Settlement Date |
|---|---|---|
| | Pinnacle Title Company, LP<br>19 Briar Hollow Lane, Suite 115<br>Houston, TX 77027 | 3/3/2008<br>Fund: 3/7/2008 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to borrower | $16,371.89 | 403. | |
| 104. 1st Lien Payoff - EMC Mortgage | $367,642.40 | 404. | |
| 105. 2nd Lien Payoff - Homecomings | $40,242.77 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City property taxes | | 406. City property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Annual assessments | | 408. Annual assessments | |
| 109. School property taxes | | 409. School property taxes | |
| 110. MUD Taxes | | 410. MUD Taxes | |
| 111. HOA Dues | | 411. HOA Dues | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | $424,257.06 | **420. Gross Amount Due to Seller** | $0.00 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess Deposit | |
| 202. Principal amount of new loan(s) | $414,500.00 | 502. Settlement Charges to Seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing Loan(s) Taken Subject to | |
| 204. Loan Amount 2nd Lien | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City property taxes | | 510. City property taxes | |
| 211. County property taxes | | 511. County property taxes | |
| 212. Annual assessments | | 512. Annual assessments | |
| 213. School property taxes | | 513. School property taxes | |
| 214. MUD Taxes | | 514. MUD Taxes | |
| 215. HOA Dues | | 515. HOA Dues | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $414,500.00 | **520. Total Reduction Amount Due Seller** | $0.00 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $424,257.06 | 601. Gross Amount due to seller (line 420) | $0.00 |
| 302. Less amounts paid by/for borrower (line 220) | $414,500.00 | 602. Less reductions in amt. due seller (line 520) | $0.00 |
| **303. Cash From Borrower** | $9,757.06 | **603. Cash  Seller** | $0.00 |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;
• Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. There are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.
The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.
This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. The information requested does not lend itself to confidentiality.

**L. Settlement Charges**

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | $0.00 | @ % = $0.00 | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. | to | | | | |
| 702. | to | | | | |
| 703. Commission Paid at Settlement | | | | $0.00 | $0.00 |
| 704. The following persons, firms or | to | | | | |
| 705. corporation s received a portion | to | | | | |
| 706. of the real estate commission amount | to | | | | |
| 707. shown above: | to | | | | |
| **800. Items Payable In Connection with Loan** | | | | | |
| 801. Loan Origination Fee    % | to | | | | |
| 802. Loan Discount    % | to | | | | |
| 803. Appraisal Fee | to | | | | |
| 804. Broker Origination Fee 0.2413% | to  ABD Mortgage | | | $1,000.19 | |
| 805. Appraisal Fee | to  ABD Mortgage | | | $350.00 | |
| 806. Lender Loan Charge | to  Homecomings Financial, LLC | | | $550.00 | |
| 807. Broker Processing Fee | to  ADB Mortgage | | | $495.00 | |
| 808. Broker Admin Fee | to  ABD Mortgage | | | $595.00 | |
| 809. Broker Application Fee | to  ABD Mortgage | | | $487.42 | |
| 810. Broker Fee from HF | to  ABD Mortgage | | POC (L) $2,557.47 | | |
| 811. Flood Cert Fee by Lender | to  First American Flood Data Services, Inc. | | POC $6.00 | | |
| 812. Tax Service Fee | to  Home Connects Lending Services, LLC | | POC $70.00 | | |
| **900. Items Required by Lender To Be Paid In Advance** | | | | | |
| 901. Interest from   3/7/2008   to   4/1/2008 @ $68.1369/day | | | | $1,703.43 | |
| 902. Mortgage Insurance Premium for months | to | | | | |
| 903. Hazard Insurance Premium for years | to | | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard insurance | | months @ | per month | | |
| 1002. Mortgage insurance | | months @ | per month | | |
| 1003. City property taxes | | months @ | per month | | |
| 1004. County property taxes | | months @ | per month | | |
| 1005. Annual assessments | | months @ | per month | | |
| 1006. School property taxes | | months @ | per month | | |
| 1007. MUD Taxes | | months @ | per month | | |
| 1008. HOA Dues | | months @ | per month | | |
| 1011. Aggregate Adjustment | | | | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or closing fee | to | | | | |
| 1102. Abstract or title search | to | | | | |
| 1103. Title examination | to | | | | |
| 1104. Title insurance binder | to | | | | |
| 1105. Document preparation | to | | | | |
| 1106. Notary fees | to | | | | |
| 1107. Attorney's fees | to  Don Ledbetter | | | $80.00 | |
| (includes above items numbers: | | | ) | | |
| 1108. Title insurance | to  Pinnacle Title Company, LP | | | $2,268.70 | |
| (includes above items numbers: Tax Deletion T17 T19 T36 R8(454.40) | | | ) | | |
| 1109. Lender's coverage | $414,500.00/$2,268.70 . | | | | |
| 1110. Owner's coverage | $0.00/$0.00 | | | | |
| 1111. Escrow fee | to  Pinnacle Title Company, LP | | | $350.00 | |
| 1112. State of Texas Policy Guaranty Fee | to  Texas Title Insurance Guaranty Association | | | $1.00 | $0.00 |
| 1113. Messenger Fee | to  Pinnacle Title Company, LP | | | $71.00 | |
| 1114. Examination Fee POC $150 | to  LandAmerica Charter Title | | | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording Fees   Deed ; Mortgage $130.00 ; Rel $56.00 | to Pinnacle Title Company, LP | | | $176.00 | |
| 1202. City/county tax/stamps   Deed ; Mortgage | to | | | | |
| 1203. State tax/stamps   Deed ; Mortgage | to | | | | |
| 1204. Tax certificates | to  Data Trace | | | $65.52 | |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. Survey | to | | | | |
| 1302. Pest Inspection | to | | | | |
| 1303. Home Warranty | to | | | | |
| 1304. 2007 County Taxes | to  Collin County | | | $993.18 | |
| 1305. 2007 County Community Taxes | to  Collin County | | | $352.62 | |
| 1306. 2007 City of Murphy Taxes | to  Collin County | | | $1,898.39 | |
| 1307. 2007 Plano ISD Taxes | to  Collin County | | | $4,934.44 | |
| **1400. Total Settlement Charges** (enter on lines 103, Section J and 502, Section K) | | | | $16,371.89 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

Gregory C. Morse

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate
account of this transaction. I have caused the funds to be disbursed in
accordance with this statement.

_____    3/3/08
Settlement Agent                          Date
Warning: It is a crime to knowingly make false statements to the United
States on this or any other similar form. Penalties upon conviction can
include a fine and imprisonment. For details see: Title 18 U.S. Code Section
1001 and Section 1010.

Previous Editions are Obsolete                Page 3                    form HUD-1 (3/86)
                                                                       Handbook 4305.2

# Exhibit D
# Releases of Liens

20080313000302310   03/13/2008 02:43:53 PM RE 1/1

Return To:
DOCX
Ron Meharg
1111 Alderman Drive, Ste 350
Attn: Release Dept.
Alpharetta GA 30005

Prepared By:
DOCX on behalf of EMC Mortgage Corporation
1111 Alderman Drive, Ste 350
Attn: Release Dept.
Alpharetta GA 30005

Loan Number: EMC-589-0014113591
MERS ID: 100013800878435797
MERS Telephone:

## Deed of Release

For Value Received, the present undersigned Beneficiary under a deed of trust executed by GREGORY C MORSE, AN UNMARRIED MAN as Grantor/Trustor, to G. TOMMY BASTIAN as Trustee, dated 09/02/2005 , certifies that the Deed of Trust has been fully paid, satisfied or otherwise discharged. The Deed of Trust was recorded in the Deed of Trust Records of Collin County, Texas on 09/19/2005 , and is indexed as Volume 06005 , Page 03912 , File No. 2005-0132002 . The undersigned releases and reconveys, without covenant or warranty, the Deed of Trust and all of its right, title and interest which was acquired by the Trustee under the Deed of Trust, in the property located at: 223 HIGH POINT DRIVE, MURPHY, TX 75094

IN WITNESS WHEREOF, Mortgage Electronic Registration Systems, Inc. ("MERS") by the officers duly authorized, has duly executed the foregoing instrument.

Dated this: 03/13/2008

Lender: Mortgage Electronic Registration Systems, Inc. ("MERS")

*Jimmy Gossett*

Jimmy Gossett, Asst. Vice President

State of Georgia , County of Fulton County
This instrument was acknowledged before me on 03/13/2008 by Jimmy Gossett as Asst. Vice President .

Witness my hand,

*Veronica Turner*

Veronica Turner
Notary Public for said state and county

Expires: 08/31/2010

Veronica Turner
NOTARY PUBLIC
Fulton County
State of Georgia
My Commission Expires
August 31, 2010



Filed and Recorded
Official Public Records
Stacey Kemp
Collin County, TEXAS
03/13/2008 02:43:53 PM
$16.00 DLAIRD
20080313000302310

2008052400035230  05/24/2008 09:42:21 AM RE 1/2

Recording Requested By:
HOMECOMINGS FINANCIAL, LLC

When Recorded Return To:

LIEN RELEASE
HOMECOMINGS FINANCIAL, LLC
PO BOX 205
WATERLOO, IA  50704-0205

### RELEASE OF LIEN

HOMECOMINGS FINANCIAL, LLC #:7303878599 "MORSE" Lender ID:93045/10167509  Collin, Texas PIF: 03/10/2008
MERS #: 100013800878435870  VRU #: 1-888-679-6377

KNOW ALL MEN BY THESE PRESENTS that , for value received, Mortgage Electronic Registration Systems, Inc.,
("MERS") owner of the beneficial interest under a certain Deed of Trust, whose parties, dates and recording
information are below, does hereby acknowledge that it has received full payment and satisfaction of the same, and
in consideration thereof, does hereby reconvey, without warranty, to the person or persons legally entitled thereto,
the estate, title and interest now held by it under said Deed of Trust in Collin County, State of  Texas.

Original Borrower: GREGORY C MORSE
Original Beneficiary: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
Dated:  09/02/2005 Recorded:  09/19/2005  in Book/Reel/Liber: NA Page: NA as Instrument No.: 2005-0132003

Legal Description: As Referenced on Original Recorded Document

Property Address : 223 HIGH POINT DRIVE, MURPHY, TX  75094

IN WITNESS WHEREOF, Mortgage Electronic Registration Systems, Inc., ("MERS"), whose address is 1595
SPRING HILL ROAD, VIENNA, VA  22182, by the officer duly authorized, has duly executed the foregoing
instrument.

Mortgage Electronic Registration Systems, Inc., ("MERS")
On March 21st, 2008

By: _Ashley Johnson_____
ASHLEY JOHNSON, Assistant Secretary

*BLK*BLKGMAC*'03/21/2008 06 54 37 PM* GMAC32GMAC00000000000000X229452'' TXCOLDT_7303878599 TXCOLLI_TRUST_REL *BLK*BLKGMAC*

RELEASE OF LIEN Page 2 of 2

STATE OF Iowa
COUNTY OF Black Hawk

On March 21st, 2008, before me, H DAHLGREN, a Notary Public in and for Black Hawk in the State of Iowa, personally appeared ASHLEY JOHNSON, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

*HDahlgren*

H DAHLGREN
Notary Expires: 08/23/2010  #748557

H. DAHLGREN
NOTARIAL SEAL - STATE OF IOWA
COMMISSION NUMBER 748557
MY COMMISSION EXPIRES AUG. 23, 2010

"BLK"BLKGMAC"/03/21/2008 06 54 37 PM" GMAC,32GMAC00000000000000092148425" TXCOLLR,7203278599 TXCOLLI_TRUST_REL "BLK"BLKGMAC"

**Filed and Recorded**
**Official Public Records**
**Stacey Kemp**
**Collin County, TEXAS**
**03/24/2008 09:42:21 AM**
**$20.00 DLAIRD**
**20080324000339230**

# Exhibit E
# Lender's Policy



## PINNACLE
### TITLE

### MORTGAGEE   POLICY OF TITLE INSURANCE

July 16, 2008

Homecomings Financial
One Meridian Crossing, #100
Minneapolis, Mn 55423
Attn: Final Docs

RE:  223 High Point Dr.  Plano, Texas 75094

GF:# 0712270

Enclosed are the original:

Mortgagee Title Policy/Binder and original recorded document(s) for the address listed
above.

If I can be of further assistance please contact me at the above number. It's been a
pleasure working with you and we are looking forward to working with you in the future.

Sincerely,

B Garcia

Beatrice Garcia
Title Policy Department

5020 Montrose 3rd Floor  Houston, TX  77006  Ph: 713.621.7766  Fax: 713.621.0224

# MORTGAGEE POLICY OF TITLE INSURANCE

## Issued by Commonwealth Land Title Insurance Company


**LandAmerica Commonwealth**

*Commonwealth Land Title Insurance Company is a member of the LandAmerica family of title insurance underwriters.*

**POLICY NUMBER**

**535-Z014715**

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, Commonwealth Land Title Insurance Company, a Nebraska corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Lack of a right of access to and from the land;
4. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
5. The priority of any lien or encumbrance over the lien of the insured mortgage;
6. Lack of priority of the lien of the insured mortgage over any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or material having its inception on or before Date of Policy;
7. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens;
8. Lack of good and indefeasible title.

The Company also will pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Policy to become valid when countersigned by an authorized officer or agent of the Company.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Attest:

Secretary

**(SEAL)**

By: *Theodore L Chandler Jr*

President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:

1.  (a) any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking that has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3.  Defects, liens, encumbrances, adverse claims or other matters:
    (a) created, suffered, assumed or agreed to by the insured claimant;
    (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    (c) resulting in no loss or damage to the insured claimant;
    (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or
    (e) resulting in loss or damage that would not have been sustained if the insured claimant had paid value for the insured mortgage.
4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.
5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6.  Any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or material having its inception subsequent to Date of Policy.
7.  The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A because of unmarketability of the title.
8.  Any claim which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or other state or federal creditors' rights laws that is based on either
    (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer or a voidable distribution or voidable dividend;
    (ii) the subordination or recharacterization of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination or
    (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure of the Company or its issuing agent to timely file for record the instrument of transfer to the insured after delivery or the failure of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

1. **DEFINITION OF TERMS.**

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes:

(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice that may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto that by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "access": legal right of access to the land and not the physical condition of access. The coverage provided as to access does not assure the adequacy of access for the use intended.

2. **CONTINUATION OF INSURANCE.**

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of: (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality that acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance. The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

3. **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, or (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest that is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

Subject to the provisions of the policy, upon acquisition of all or any part of the estate or interest in the land pursuant to the provisions of Section 2 of these Conditions and Stipulations, when, after the date of the policy, the insured notifies the Company as required herein of a lien, encumbrance, adverse claim or other defect in title to the estate or interest in the land insured by this policy that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect is valid and not barred by law or statute. The Company shall notify the insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall specifically advise the insured of the reasons for its determination. If the Company concludes that the lien, encumbrance, adverse claim or defect is valid, the Company shall take one of the following actions: (i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect from the title to the estate as insured; (ii) indemnify the insured as provided in this policy; (iii) upon payment of appropriate premium and charges therefor, issue to the insured claimant or to a subsequent owner, mortgagee or holder of the estate or interest in the land insured by this policy, a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect, said policy to be in an amount equal to the current value of the property or, if a mortgagee policy, the amount of the loan; (iv) indemnify another title insurance company in connection with its issuance of a policy(ies) of title insurance without exception for the lien, encumbrance, adverse claim or defect; (v) secure a release or other document discharging the lien, encumbrance, adverse claim or defect; or (vi) undertake a combination of (i) through (v) herein.

4. **DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

5. **PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 91 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

6. **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i) to pay or tender payment of the amount of insurance under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii) the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**(Continued)**

7. **DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

   (i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

   (ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

   (iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy at the date the Insured Claimant is required to furnish to Company a proof of loss or damage in accordance with Section 5 of these Conditions and Stipulations.

(b) In the event the Insured has acquired the estate or interest in the manner described in *Section 2(a) of these Conditions and Stipulations* or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

8. **LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or otherwise establishes the lien of the insured mortgage, all as insured, or takes action in *accordance* with *Section 3* or *Section 6*, *in a reasonably diligent manner by any method*, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, *the Company shall have no liability for loss or damage until there* has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land, which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

9. **REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the Insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of Insurance pro tanto. The amount of Insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

10. **LIABILITY NONCUMULATIVE.**

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

11. **PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

12. **SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies that the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the

---

Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments that provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

13. **ARBITRATION.**

Unless prohibited by applicable law or unless this arbitration section is deleted by specific provision in Schedule B of this policy, either the Company or the Insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this Policy, and service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less SHALL BE arbitrated at the request of either the Company or the Insured, unless the Insured is an individual person (as distinguished from a corporation, trust, partnership, association or other legal entity). All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this Policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the Insured, the Rules in effect at the Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The Law of the situs of the land shall apply to any arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

14. **LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

15. **SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

16. **NOTICES WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27567, Richmond, Virginia 23261-7567.

**COMPLAINT NOTICE.**

Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the Company that issued the policy. If the problem is not resolved, you also may write the Texas Department of Insurance, P.O. Box 149091, Austin, TX 78714-9091, Fax No. (512) 475-1771. This notice of complaint procedure is for information only and does not become a part or condition of this policy.

FOR INFORMATION, OR
**TO MAKE A COMPLAINT, CALL:**
**1-800-925-0965**

**PARA INFORMACION, O**
**PARA HACER UNA QUEJA, HABLE**
**1-800-925-0965**

## MORTGAGEE POLICY OF TITLE INSURANCE

### SCHEDULE A

G.F. No. 0712270

Policy No. 535-Z014715

Amount of Insurance: $414,500.00

Premium: $2,268.70

Date of Policy: March 14, 2008, 04:17 pm

1.  Name of Insured:  Homecomings Financial Network Inc. , and each successor in ownership of the indebtedness secured by
the insured mortgage, except a successor who is an obligor under the provisions of Section 12(c) of the
Conditions and Stipulations.

2.  The estate or interest in the land that is insured as encumbered by the insured mortgage is:  Fee Simple

3.  Title to the estate or interest in the land is insured as vested in:  Gregory C. Morse

4.  The insured mortgage and assignments thereof, if any, are described as follows:

Deed of Trust executed by Gregory C. Morse, an unmarried man to DON W. LEDBETTER, Trustee, dated March 3,
2008, and recorded on March 14, 2008 under Clerk's File No. 20080314000310130 of the Real Property Records of Collin
County, Texas, securing the payment of one note to Homecomings Financial Network Inc. in the principal sum of Four
Hundred Fourteen Thousand Five Hundred and 00/100 ($414,500.00) due and payable and bearing interest as therein
provided; and all the terms, conditions and stipulations contained therein, including, but not limited to, any additional
indebtedness, if any, secured by said instrument.

5.  The land referred to in this policy is described as follows:

LOT 4, BLOCK B , ROLLING RIDGE ESTATES - PHASE 1, AN ADDITION TO THE CITY OF MURPHY, COLLIN
COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME N, PAGE 304, MAP
RECORDS, COLLIN COUNTY, TEXAS.TOGETHER WITH A CERTIFICATE OF CORRECTION, FILED
SEPTEMBER 4, 2002, RECORDED IN VOLUME 5246, PAGE 545, DEED RECORDS, COLLIN COUNTY, TEXAS.

## MORTGAGEE POLICY OF TITLE INSURANCE

### SCHEDULE B

G.F. No.  0712270

Policy No.  535-Z014715

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of the leases and easements, if any, shown in Schedule A, and the following matters:

1.   The following restrictive covenants of record itemized below, but the Company insures that any such restrictive covenants have not been violated so as to affect, and that future violation thereof will not affect, the validity or priority of the mortgage hereby insured (insert specific recording data or delete this exception):

**Item 1, Schedule B is hereby deleted in its entirety.**

2.   ~~Any discrepancies, conflicts, or~~ shortages in area ~~or boundary lines, or any encroachments or protrusions, or any overlapping of improvements~~.

3.   Standby fees, taxes and assessments by any taxing authority for the year **2007**, and subsequent years; ~~and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership~~, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, *Texas Tax Code*, or because of improvements not assessed for a previous tax year.  **Company insures that standby fees, taxes and assessments by any taxing authority for the year 2007 are not yet due and payable.**

4.   Liens and leases that affect the title to the estate or interest, but that are subordinate to the lien of the insured mortgage.

5.   *(Insert here all other specific exceptions as to the superior liens, easements, outstanding mineral and royalty interests, etc.)*

   b.   **Easement(s) and/or building lines, as shown on plat recorded in Volume N, Page 304, Map Records, COLLIN County, Texas, to-wit:**

Countersigned
**Commonwealth Land Title Insurance Company**

By *Chelsea Smith*
Authorized Signatory

G.F. No. 0712270

## Commonwealth Land Title Insurance Company

Mortgagee Policy Number: **535-Z014715**

| Premium Amount | Rate Rules | Property Type | County Code | Liability | Date | | |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| $2,268.70 | 3000 | 1 | 85 | $414,500.00 | 03/14/2008 | | |
| | 4006 | | | | | | |
| | 0710 | | | | | | |
| | 0700 | | | | | | |
| | 0810 | | | | | | |
| | 0885 | | | | | | |
| | 0884 | | | | | | |

## PLANNED UNIT DEVELOPMENT ENDORSEMENT

| GF Number | Policy Number | Date of Endorsement | Amount of Insurance |
|---|---|---|---|
| 0712270 | 535-Z014715 | 03/14/2008 | N/A |

Attached to and made a part of
Mortgagee Title Policy Number as shown above.

Issued by

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

The Company insures the Insured against loss or damage sustained by reason of:

1. Present violations of any restrictive covenants referred to in Schedule B which restrict the use of the land, except violations relating to environmental protection unless a notice of a violation thereof has been recorded or filed in the public records and is not excepted in Schedule B. The restrictive covenants do not contain any provisions which will cause a forfeiture or reversion of title.

2. The priority of any lien for charges and assessments at Date of Policy in favor of any association of homeowners which are provided for in any document referred to in Schedule B over the lien of any insured mortgage identified in Schedule A.

3. The enforced removal of any existing structure on the land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4. The failure of title by reason of a right of first refusal to purchase the land which was exercised or could have been exercised at Date of Policy.

This endorsement, when signed below by an Authorized Countersignature, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

By: *Chelsea Smith*

Authorized Signatory

**ENDORSEMENT T-17  Planned Unit Development**
Effective 4-4-2002

## RESTRICTIONS, ENCROACHMENTS, MINERALS ENDORSEMENT

| GF Number | Policy Number | Date of Endorsement | Amount of Insurance |
|-----------|---------------|---------------------|---------------------|
| 0712270 | 535-Z014715 | 03/14/2008 | N/A |

Attached to and made a part of
Mortgagee Title Policy Number as shown above.

Issued by
### COMMONWEALTH LAND TITLE INSURANCE COMPANY

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1. The existence at Date of Policy of any of the following:
   (a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
   (b) Unless expressly excepted in Schedule B:
       (1) Present violations on the land of any enforceable covenants, conditions or restrictions, and any existing improvements on the land which violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.
       (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, (i) establishes an easement on the land; (ii) provides a lien for liquidated damages; (iii) provides for a private charge or assessment; (iv) *provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.*
       (3) Any encroachment of existing improvements located on the land onto adjoining land, or any encroachment onto the land of existing improvements located on adjoining land.
       (4) *Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.*
       (5) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.
2. Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the Insured, provided the violation results in:
   (a) Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or
   (b) loss of title to the estate or interest in the land if the Insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.
3. Damage to existing improvements, including lawns, shrubbery or trees:
   (a) which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;
   (b) resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.
4. Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.
5. Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement, when signed below by an Authorized Countersignature, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Signed under seal for the Company, but this endorsement is to be valid only when it bears an authorized countersignature.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

By: _Chelsea Smith_

Authorized Signatory

Form T-19: Restrictions, Encroachments, Minerals Endorsement

| Endorsement Serial Number | Premium Amount | Rate Rule(s) | Property Type |
|---|---|---|---|
| 535Z014715 | $25.00 | R-11g | Residential 1-4 |

G.F. No.:  0712270

## ENVIRONMENTAL PROTECTION LIEN ENDORSEMENT

Attached to Mortgagee Policy Number 535-Z014715 of **COMMONWEALTH LAND TITLE INSURANCE COMPANY.**

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

    (a)   any environmental protection lien which, at the Date of Policy, is recorded in those records *established under state statutes at the Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge,* or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

    (b)   any environmental protection lien provided for by any state statute in effect at the Date of Policy, except environmental protection liens provided for by the following state statutes:

        TEX. HEALTH & SAFETY CODE '361.194;

        TEX. HEALTH & SAFETY CODE "342.007, 342.008;

        TEX. LOCAL GOV'T CODE "214.001, 214.0015(b), (d), and (e); and

        TEX. NATURAL RESOURCES CODE '134.150, if applicable.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsement, nor does it increase the face amount thereof.

*This endorsement, when countersigned below by an Authorized Countersignature, is made a part of said policy and is subject to the Schedules, Exclusions from Coverage, and Conditions and Stipulations therein, except as modified by the provisions hereof.*

           **COMMONWEALTH LAND TITLE INSURANCE COMPANY**

        By _Chelsea Smith_

           **Authorized Signatory**

**ENDORSEMENT FORM:  T-36 Environmental Protection Lien**

# TEXAS MORTGAGEE POLICY OF TITLE INSURANCE

Issued by

## Commonwealth Land Title Insurance Company

Commonwealth Land Title Insurance Company is a member of the LandAmerica family of title insurance underwriters.



LandAmerica Financial Group, Inc.
5600 Cox Road
Glen Allen, Virginia 23060-9266
www.landam.com

Form B 1179-1Z

---

## THANK YOU.

Title insurance provides for the protection of your real estate investment. We suggest you keep this policy in a safe place where it can be readily available for future reference.

If you have questions about title insurance or the coverage provided by this policy, contact the office that issued this policy, or you may call or write:

Commonwealth Land Title Insurance Company
Consumer Affairs
P.O. Box 27567
Richmond, Virginia 23261-7567
*telephone, toll free:* 800 446-7086
*web:* www.landam.com

We thank you for choosing to do business with Commonwealth Land Title Insurance Company, and look forward to meeting your future title insurance needs.

Commonwealth Land Title Insurance Company is a member of the LandAmerica family of title insurance underwriters.

