Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**ALLY FINANCIAL INC.'S OBJECTION TO EX PARTE MOTION OF THE MOVANT
YOSEF LE ROI MUSTAFANOS FOR AN ORDER SHORTENING THE NOTICE
PERIOD FOR CERTAIN EMERGENCY RELIEF FROM THE AUTOMATIC STAY**

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Ally Financial Inc. ("**Ally**") submits this Objection to the *Ex Parte Motion of the Movant Yosef Le Roi Mustafanos for an Order Shortening the Notice Period for Certain Emergency Releif From the Automatic Stay* [ECF No. 6535] (the "**Motion**"). In support hereof, Ally submits the *Declaration of Rachel A. Robinson*, which is attached hereto as **Exhibit A** (the "**Robinson Declaration**"), and respectfully states as follows:

## INTRODUCTION

Reverend Yosef L. Mustafanos, a *pro se* plaintiff, seeks relief from the automatic stay so that he may pursue foreclosure-related claims against Ally.[1]  Mustafanos' pursuit of those claims is in direct contravention of this Court's order confirming the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [ECF No. 6065-1] (the "***Plan***")—which permanently released, and enjoined the pursuit of, claims against Ally "arising from or related in any way to the Debtors."  (Plan Art. IX.D.)[2]

The Plan's Third Party Release is broad, applying to "*any and all Causes of Action whatsoever*, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, *arising from or related in any way to the Debtors*."  (Plan Art. IX.D.)  Mustafanos' claims against Ally are based on business activities of the Debtors, not Ally, and thus arise from and relate to the Debtors.

The Plan's injunction "permanently enjoined and precluded" the continuation of claims subject to the Third Party Release, such as Mustafanos' claim against Ally.  (Plan Art. IX.I.)  This Court therefore should deny the Motion, enforce the Plan's injunction, and permanently enjoin Mustafanos from continuing his lawsuit against Ally.

## BACKGROUND

On May 10, 2012, Everbank, Inc. filed a complaint for judicial foreclosure against Reverend Mustafanos and others in Oregon state court.  (Robinson Decl. ¶ 1.)  On August 28,

---

[1] The Liquidating Trust has filed a statement regarding the specific relief sought in the Motion.  *See Statement of the Liquidating Trust in Connection with Motion of Movant Yosef Le Roi Mustafanos for an Order Shortening Notice Period for Certain Emergency Relief From the Automatic Stay* [ECF No. 6747].

[2] Capitalized terms used but not defined herein have the meanings given to them in the Plan.

2012, a default order was entered as to all named defendants except for Mustafanos. (*Id.*) On March 4, 2013, Mustafanos filed a counterclaim alleging that Mustafanos' deceased father was coerced into refinancing the loan for the subject property on terms that the decedent could not afford. (*Id.* ¶ 4.) On August 22, 2013, Mustafanos filed an amended counterclaim that, for the first time, named Ally as a counterclaim defendant.[3] (*Id.* ¶ 6.)

Mustafanos, however, did not file a proof of claim in these chapter 11 cases. He was served with notice of the confirmation hearing and notified of his opportunity to object to the Plan and its Third Party Release, but he did not file an objection.[4]

On December 11, 2013, this Court entered the Confirmation Order [ECF No. 6065], confirming the Plan. An "essential component" of the Plan is a broad Third Party Release of "any and all Causes of Action" against Ally "arising from or related in any way to the Debtors." (Plan Art. IX.D.) The Plan further includes an Injunction that "permanently enjoined and precluded" an entity from "commencing or continuing … against any Released Party … on account of or in connection with or with respect to any Released Claims." (Plan Art. IX.I.)

Separately, on December 5, 2013, Ally moved to dismiss Mustafanos' third-party claims against it on grounds that the amended counterclaim included no specific allegations against Ally. The Oregon state court granted Ally's motion to dismiss on January 28, 2014, but granted Mustafanos leave to amend his counterclaim. (Robinson Decl. ¶ 7.)

Despite this Court's Order, on February 6, 2014, Mustafanos mailed Ally an "amended" third-party complaint. The amended complaint alleges that Ally was "doing business as" GMAC

---

[3] Ally was not actually named in the caption of the amended counterclaim that was filed with the Action on August 22, 2013. However, Ally was named as a defendant in the caption of the version of the amended counterclaim that Mustafanos served on Ally in October 2013. No new amended counterclaim was filed in the Action between August 22, 2013 and the time that Ally was served in October 2013.

[4] *See Supplemental Affidavit of Service of Clarissa D. Cu Regarding Notice of (I) Approval of Disclosure Statement, (II) Deadline for Voting on Plan, (III) Hearing to Consider Confirmation of Plan, and (IV) Deadline for Filing Objections to Confirmation of Plan*, Ex. C, p. 3 [ECF No. 6316].

Mortgage and that Ally and GMAC Mortgage were "operating as a single entity." This amended counterclaim was filed in the Action on February 14, 2014. (*Id.* ¶ 9.) On February 10, 2014, Ally's counsel in the lawsuit informed Mustafanos that this Court entered a Confirmation Order confirming the Second Amended Joint Chapter 11 Plan, explained that Mustafanos' claims against Ally fall squarely within the Third Party Release, and notified Mustafanos that by virtue of the Plan's Injunction, he is enjoined from pursuing his claims against Ally. (*Id.* ¶ 8.) Mustafanos was encouraged to contact Ally's counsel to discuss the matter further. Ally's counsel sent a second letter, dated February 14, 2014, to Mustafanos reiterating that Mustafanos' claims are barred by the Third Party Release. (*Id.* ¶ 10.)

On February 24, 2014, Ally's counsel in the ResCap bankruptcy proceeding sent Mustafanos a third letter reiterating its explanation that Mustafanos' claims against Ally were subject to the Third Party Release and the injunction in ResCap's Plan of Reorganization. (*Id.* ¶ 11.) Ally reiterated its willingness to discuss the matter with Mustafanos and offered to arrange a telephone conference with this Court to discuss the matter. Mustafanos has not dismissed his lawsuit against Ally, and he has not reached out to Ally's counsel to discuss the matter. (*Id.* ¶ 12.) He instead filed a motion in this Court to lift the automatic stay so he can proceed with his claims.

## JURISDICTION

This Court is intimately familiar with the Plan, the issues that were litigated leading to Plan confirmation, the objections previously raised to the Third Party Release, and the purpose of the Third Party Release—which this Court deemed "an essential component and critical to the success of the Plan." (Plan Art. IX.D.) This Court is uniquely equipped to interpret and enforce the Plan terms, relevant Bankruptcy Code provisions, and ultimately its own injunction. Indeed, this Court specifically and broadly retained exclusive jurisdiction to "hear and determine any

4

matter, case, controversy, suit, dispute, or Causes of Action [] regarding the existence, nature, and scope of the releases, injunctions, and exculpation provided under the Plan," to "hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan," to "issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan," and to "[e]nforce all orders previously entered by the Bankruptcy Court." (Plan Art. XII (c), (k), (s), and (u).)

Pursuant to that exclusive jurisdiction, Ally now seeks this Court's enforcement of the Plan, and its Third Party Release and injunction, against Mustafanos. *See, e.g.*, *In re Charter Communications*, 2010 WL 502764, at *3-4 (Bankr. S.D.N.Y. Feb. 8, 2010).

## ARGUMENT

Mustafanos' claims against Ally fall squarely within the Third Party Release and injunction in the Plan confirmed by this Court. This Court should enforce the Plan and enjoin Mustafanos from continuing his lawsuit against Ally.

Mustafanos' claims against Ally are based on the origination of a residential mortgage loan, the assignment of the recorded mortgage, the securitization of the underlying indebtedness, the servicing of the loan, and the attempts to foreclose upon the loan and the secured real property. Those claims are precisely within the scope of the Plan's Third Party Release. The Plan expressly provides as follows:

> On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification,

> joint liability, or otherwise, arising from or related in any way to
> the Debtors, including those in any way related to RMBS issued
> and/or sold by the Debtors or their affiliates and/or the Chapter 11
> Cases or the Plan, and any obligations under the DOJ/AG
> Settlement, the Consent Order, and the Order of Assessment.

(Plan Art. IX.D.)

Mustafanos is a holder of a "Claim," as that term is defined in the Plan and the

Bankruptcy Code.  The Plan defines "Claim" as "a 'claim' as such term is defined in section

101(5) of the Bankruptcy Code."  (Plan Art. I.A.53.)  Section 101(5), in turn, defines "claim" as

any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured."  11 U.S.C. § 101(5).  As courts have observed, "[t]he definition of 'claim' in the

Bankruptcy Code is very broad."  *In re Egleston*, 448 F.3d 803, 812 (5th Cir. 2006); *accord*

*Johnson v. Home State Bank*, 501 U.S. 78 (1991).  A claim need not have been asserted in

litigation, be ripe for litigation, or even be known to the claimant to fall within the scope of

Section 101(5).  Under the Bankruptcy Code, "'[i]t is well-established that a claim is ...

allowable ... in a bankruptcy proceeding even if it is a cause of action that has not yet accrued.'"

*In re R.H. Macy & Co.*, 67 F. Appx. 30, 31-32 (2d Cir. 2003) (quoting *In re Cool Fuel, Inc.*, 210

F.3d 999, 1006 (9th Cir. 2000) (collecting cases)).

Mustafanos' claim also "aris[es] from [and is] related in any way to the Debtors."

Mustafanos' foreclosure-related claim against is based upon the mortgage business of the

Debtors, including the securitization of residential mortgage loans.   Mustafanos challenges the

origination, securitization, servicing, and foreclosure of a residential mortgage loan originated

and serviced by the Debtors—not any action by Ally or its non-debtor subsidiaries.  His claim

therefore arises from and is related to the Debtors.

Because Mustafanos is a "holder[] of [a] Claim[] … arising from or related in any way to the Debtors," he is bound by the Third Party Release.  *See* Plan Art. IX.D.  The express terms of the Plan's injunction therefore "permanently enjoin[] and preclude[]" Mustafanos from continuing its lawsuit against Ally.  *See* Plan Art. IX.I (enjoining all entities who hold "Claims … from: (a) commencing or continuing in any manner or action of other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; … [and] (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims");  *see also In re Charter Communications*, 2010 WL 502764, at *5 (Bankr. S.D.N.Y. Feb. 8, 2010) (enforcing confirmed plan of reorganization to enjoin plaintiffs' lawsuit against non-debtor beneficiaries of third party release).

*[Remainder of page intentionally left blank]*

## <u>CONCLUSION</u>

For the foregoing reasons, Ally respectfully requests that the Court order that the Plan enjoins the Mustafanos from pursuing his claims against Ally, deny his motion to lift the stay, and further award any other relief that the Court deems just and appropriate.

April 3, 2014                                           */s/ Ray C. Schrock*_____
New York, New York                                  Richard M. Cieri
                                                             Ray C. Schrock
                                                             Justin R. Bernbrock
                                                             KIRKLAND & ELLIS LLP
                                                             601 Lexington Avenue
                                                             New York, New York 10022
                                                             Telephone: (212) 446-4800
                                                             Facsimile: (212) 446-4900

                                                             - and -

                                                             Jeffrey S. Powell
                                                             Daniel T. Donovan
                                                             Judson D. Brown
                                                             KIRKLAND & ELLIS LLP
                                                             655 15th Street, N.W., Ste. 1200
                                                             Washington, D.C. 20005
                                                             Telephone: (202) 879-5000
                                                             Facsimile: (202) 879-5200

                                                             *Counsel to Ally Financial Inc.*

## EXHIBIT A

**Robinson Declaration**

Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                                    )
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                              Debtors.              )    Jointly Administered
                                                    )
---------------------------------------------------------------

## DECLARATION OF RACHEL A. ROBINSON

I, Rachel A. Robinson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I make this declaration on the basis of my personal knowledge of the facts stated herein, except to the extent that I make reference to documents.  When referencing documents, my knowledge is based upon my review of documents provided to me during the course of my representation of Ally Financial Inc.

2.      I am an attorney based in Oregon.

3.      On May 10, 2012, Everbank, Inc. filed a complaint for judicial foreclosure against Reverend Mustafanos and others in Oregon state court.  On August 28, 2012, a default order was entered as to all named defendants except for Mustafanos.

4.      In March 2013, Reverend Yosef Mustafanos filed a counterclaim in Oregon state court against a number of defendants related to a foreclosure matter (the "***Original Counterclaim***"), which is attached as **Exhibit 1**.  *See generally* Original Countercl.

5.      As reflected in the Original Counterclaim, Mustafanos's claims concern the origination, securitization, servicing and foreclosure of a 2007 refinanced mortgage.  *See generally* Original Countercl.

6.      On August 22, 2013, Mustafanos filed an amended counterclaim that, for the first time, named Ally as a counterclaim defendant.[1]

7.      On December 5, 2013, Ally moved to dismiss Mustafanos' third-party claims against it on grounds that the amended counterclaim included no specific allegations against Ally.  The Oregon state court granted Ally's motion to dismiss on January 28, 2014, but granted Mustafanos leave to amend his counterclaim.

8.      On February 10, 2014, Rachel Robinson, who is Ally's local counsel in the lawsuit, informed Mustafanos via letter that this Court entered a Confirmation Order confirming the Plan, and provided Mustafanos with copies of the Plan and Confirmation Order.  Robinson's letter is attached as **Exhibit 2**.

9.      On February 14, 2014, Mustafanos filed an amended counterclaim in his lawsuit (the "***Amended Counterclaim***"), alleging that Ally does business as GMAC Mortgage, LLC, and Everbank, Inc.  The Amended Counterclaim is attached as **Exhibit 3**.  *See* Am. Countercl. ¶ 6.

---

[1] Ally was not actually named in the caption of the amended counterclaim that was filed with the Action on August 22, 2013.  However, Ally was named as a defendant in the caption of the version of the amended counterclaim that Mustafanos served on Ally in October 2013.  No new amended counterclaim was filed in the Action between August 22, 2013 and the time that Ally was served in October 2013.

10.     On February 14, 2014, Robinson sent Mustafanos another letter.    Again, Robinson highlighted the Plan's Third Party Release and Injunction provisions.    Robinson's second letter is attached as **Exhibit 4**.

11.     On February 24, 2014, Ally's counsel in these chapter 11 cases sent Mustafanos a third letter, which is attached as **Exhibit 5**, explaining that Mustafanos's claims against Ally are barred by the Third Party Release.

12.     To date, Mustafanos has not dismissed his lawsuit, and he has not contacted Ally's counsel regarding his lawsuit.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 3, 2014.

Rachel A. Robinson

**<u>Exhibit 1</u>**

**Original Counterclaim**

FILED

13 MAR -4 PM 2:56

CIRCUIT COURT
FOR MULTNOMAH COUNTY

ENTERED

MAR 0 5 2013

IN REGISTER SCL

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| EVERBANK,<br><br>            Plaintiff,<br><br>    vs.<br><br>YOSEF LEROI MUSTAFANOS; TONNY D. MARSHALL;<br><br>JAMES J. MARSHALL; DON E. MARSHALL; CHERRY<br><br>BUSH LANE HOMEOWNERS' ASSOCIATION, INC; NW<br><br>PROFESSIONAL JUDGEMENT RECOVERY; AND<br><br>OCCUPANTS OF THE PREMISES,<br><br>        Defendant | Case No.: No. 1205-05897<br><br>COUNTERCLAIM:<br>FRAUD AND DECEIT IN RESPECT TO<br>SECURITIES OR SECURITIES BUSINESS<br>PREDITORY LENDING PRACTICES, DEFRAUDING A<br>SENIOR CITIZEN Pursuant to: ORS 86A.154<br>(1),(2)and(3); ORS 59.135(1),(2)and(3);<br>ORS 59.137(1),(2)and(3); ORS 646.638(1)<br><br>CLAIM EXCEEDS $10,000 PRAYER AMOUNT<br>$109,610.00 FEE AUTHORITY: ORS 595, SEC. 15<br>(1)(c) |

1.

    Defendant, Yosef Le Roi Mustafanos, IN PRO SE, files this Counterclaim to the

Complaint for Deed of Trust Foreclosure on the property located at 10827 S.E. Bush

Street, Portland, OR 97266, to which Claimant holds Lawful and peaceable possession by

way of Affiant's Deed.

# I. VENUE AND JURISDICTION

2.

The Defendant stipulate to the proper Venue and Jurisdiction, but refuse to agree to a Proceeding In Rem because of other mitigating factors that need to be addressed. Defendant has substantive rights that need to be protected. Also, The Court has venue and jurisdiction over this proceeding pursuant to ORS 165.095(1), ORS 165.075 and pursuant to ORS 165.080(1).

# II.PROPERTY

3.

The property that is subject to above-entitled action is legally described as follows:

Lot 8, together with an undivided interest in and to Tract "A", Janlar,

In the City of Portland, Count of Multnomah and State of Oregon.

Commonly known as 10827 S.E. Bush Street, Portland, OR 97266 (the "property").

4.

The visual description of the property is as follows:

A plus or minus 1100 square foot mobile home setup on what appears to be less than $1/16^{th}$ of an acre lot (nearly a zero lot), with a small driveway and carport. The carport cover is built as one piece, shared with the neighboring carport. The carport is not accessible, due to the air condition condenser mounted under the carport. The mobile home has no back yard and it has approximately 5 feet of walkway on one side. The mobile home is set back approximately 40 feet from the street. This property is located in an area of town that has a reputation of crime labeling it a "less than desirable" place to live.

### III. PARTIES

5.

SIERRA PACIFIC MORTGAGE extended funds used to purchase the home on 10827 SE Bush Street on July 16, 2003, in the amount of $102,500.00 at an annual fixed interest rate of 5.25% for the term of 30 Years, with monthly mortgage payments of $566.01.

6.

GMAC MORTGAGE CORPORATION, is the mortgage broker who prepared all documents and shopped and secured the Lender (Mortgage Investors Corporation) for the decedent James J. Marshall. Mortgage Investors Corporation, funded a refinance for James J. Marshall on March 3, 2007 in the amount of $107,950.00. The loan is a 4.25% adjustable interest rate with the first adjustment due to occur in 36 months. The first adjustment will be a 3.250% to 5.250% increase, which would happen July 7, 2007. The monthly mortgage payment was $531.05 before July 7, 2007 and increased to $857.49.

7.

MORTGAGE INVESTORS CORPORATION, a Florida lending institution governed under the laws of the State of Ohio, was the originator of the refinance loan note and deed of trust instruments.

8.

EVERBANK, a Florida lending institution, an authorized assignee for Mortgage Investors Corporation in the state of Oregon, pursuant to ORS 14.040(4).

9.

YOSEF LE ROI MUSTAFANOS, a 54 year old American Black Man, Husband and father. The Claimant was raised (38 years) in Sacramento, California, was an undefeated heavy weight amateur boxer, given the honors of All League Champion Athlete, and honorable mentioned All State Champion Athlete in the sport of football. In 1982, the defendant was cut from the Dallas Cowboys NFL spring training camp. Claimant, was Ordained a Minister of the Gospel in 1980 and is the founder of Deeper Truth Ministries. The

10.

Claimant is legal guardian and provides care for his 63 year old sister, who was violently victimized and disabled by her husband. The Claimant's brother, mother in-law, sister in-law and wife's cousin, lives in the Portland, Oregon area. Claimant possess the subject property by virtue of Affiant's Deed dated October 27, 2010 and recorded as Recorder's Fee No. 2010-136000 of the official records of Multnomah County, Oregon.

11.

CHERRY BUSH LANE HOMEOWNERS' ASSOCIATION, INC, A domestic non-profit corporation formed in 2005 and is currently in an inactive status by the Oregon Department of Corporations. This Homeowners Association never received support nor membership enrollment from the decedent James J. Marshall.

12.

OCCUPANTS OF THE PREMISES Claimant occupies the foresaid property during holidays and summer. Claimant's family also occupy the foresaid property.

.

## IV. STATEMENT OF FACTS

Claimant allege the following facts expressed by way of numbered paragraphs:

13.

On or about January 2003, decedent James J. Marshall, who was sharing an apartment with his son, Don E. Marshall, asked Don E. Marshall to help him buy a home.

14.

James J. Marshall suffered from: Type 2 Diabetes, High blood pressure, obesity, cataracts, dementia, paranoid schitzophrenia, obsessive compulsion disorder, disorientation, fainting spells, kidney and liver dialysis dependency.

15.

James J. Marshall could not engage in a legal process without becoming disoriented, forgetting the last thought and occasionally the last activity. He would become

1  sombolent and become agitated until he takes a nap.  His vision was very marginal and

2  he often complained about headaches.

                                    16.

4  Don E. Marshall performed all of the tasks involving paperwork and often argued with

5  each others, because of James J. Marshall's paranoia. The Mortgage Broker would often

6  ask Don E. Marshall, "How do you deal with such insanity". James J. Marshall caused

7  much tension around Don E. Marshall's apartment complex because the decedent was

8  verbalizing his paranoia regarding Latin males and Latin females. He always thought

9  that Latin people were planning to rob him, steal his car or break into the apartment.

10  James J. Marshall often referred to himself as Waldo James Jackson, the birth name

11  given him by his unmarried maternal mother and he answered to that name before she

12  died. His Aunt, Haiti Marshall adopted Waldo James Jackson, at age seven, and renamed

13  him James Jackson Marshall. 33 years in the U.S. Army, made him a very mean man and

14  because of his quick temper and bouts of delusional thinking and behavior, he never

15  advanced beyond the rank of E-4. It was his obsession for neatness and organization

16  that allowed him to remain in the military as a warehouse worker (supply sergeant).

                                    17.

18  After Don E. Marshall had secured a loan with a fixed interest rate of 5.25%, Don E.

19  Marshall explained the decedent that the loan was the best that could be found. James

20  J. Marshall was receiving letters and phone calls from GMAC Mortgage Corporation

21  claiming that he could refinance his home for 4.25% annual interest rate. Don E.

22  Marshall would visit the decedent, at his home 10827 SE Bush Street, once a week and

23  Would phone the decedent every day and run errands for him.

                                    18.

25  GMAC MORTGAGE CORPORATION somehow arranged for James J. Marshall to show up in their

26  office and 8 months later and coerced the decedent into signing a refinance loan

27  application and documents just to save $35.00 for 36 months, then receive punishment

28

1  by a $300.00 per month mortgage increase. James J. Marshall was on a fixed income and

2  that $300.00 increase made it difficult to manage his living expenses.

3                                    19.

4  James J. Marshall managed to hide the refinance from Don E. Marshall until the

5  decedent suffered a heart attack in February 2007. The decedent, James J. Marshall,

6  while re-cooperating in the hospital asked Don E. Marshall to act as an agent and

7  attorney for the purpose of paying his bills and handling his personal affairs.

8                                    20.

9  On March 1, 2007, Don E. Marshall signed a Power of Attorney and began managing the

10 decedent's finances. James J. Marshall lost the 50% use of the right side of his body

11 and lost control of his bowels and bladder and needed more attending at home.

12                                    21.

13 On July 7, 2007, Don E. Marshall noticed that the decedent's monthly mortgage

14 increased by $300.00. After many phone calls and discussions with the decedent,

15 Don E. Marshall was told what the decedent, or what GMAC did with the mortgage. James

16 J. Marshall died on or about March 20, 2010.

17                                    22.

18 Claimant, Yosef L. Mustafanos called his niece in San Antonio, Texas to invite her to

19 my wedding on August 7, 2010. Claimant was very surprised to hear the death of his

20 father, that he haven't seen, at that time, 20 years.

21                                    23.

22 Claimant, Yosef Le Roi Mustafanos, on or about the first week in November 2010,

23 contacted Everbank and spoke to a loan officer by the name of Michelle Holmes. The

24 Defendant expressed an interest in buying the aforesaid property for a reduced price.

25 Michelle Holmes said, "Your credit must be approved first". "I'll send you a credit

26 application". Michelle Holmes thought that the Claimant was being a good and

27 responsible man for saving his father's home and that she was willing to help him. The

28 claimant told Michelle Holmes that 1.) He has zero credit. 2.) He is self employed,

with an inconsistent monthly income that range from $0 to $2300.00. 3.) Everbank was willing to grant a loan to the Claimant at a 60% debt to income ratio.

24.

Michelle Holmes received the credit application and called the defendant and told him that his credit application was approved, even without tax returns.

Michelle Holmes asked the Claimant to move into the foresaid property immediately and told him to call her when he was moved in so that she can mail the Claimant the loan note and deed of trust to sign in front of a notary.

25.

Michelle Holmes called the Claimant and told him that someone notified her that they drove by the home found that it was cleaned and secured, and she had already mailed out the loan note and deed of trust on December 30 2010 by way of Federal Express with prepaid Federal Express return envelope. Michelle Holmes told the defendant to sign the loan documents in front of a notary and mail them back A.S.A.P. The Claimant never returned the documents.

26.

The defendant now has proof of how his deceased father James J. Marshall, an incompetent man, became entangled into signing a $107,950.00 loan note and deed of trust for a mobile home having an intrinsic value of $49,000.00 to $83,000.00 located in a bad neighborhood and how that perpetrated an attack against the decedent and his estate.

27.

DEED OF TRUST:

Defendant asserts that the Deed of Trust is not a true depiction or facsimile of the document to which the decedent James J. Marshall visually saw and agreed to, by affixing his signature and initials upon such.

28.

The Deed of Trust referred to as Exhibit 1 has black rectangular boxes, which

originally revealed "writing" that which aided and affected the reasoning and decision

of James J. Marshall.

29.

Plaintiff will argue that the Deed of Trust never had writing, but transparent

windows, therefore the document is original and never had writing on it and will also

argue that the fine print on the bottom, (Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

WITH MERS), certifies that the form is an official Government document.

30.

An investigation from the Court will produce the same results as the defendant that

Fannie Mae and Freddie Mac has absolutely nothing to do with the regulating and

creation of lender documents and forms.

Words are as important to a contract as they are to a recipe. To remove key words from

a recipe not only could affect the outcome of the dish, but to hand over a recipe

gaping holes, effects the confidence and trust of the cook and anyone who takes

possession of that recipe. If our Grandmother explains the gaping holes in her recipe

to us, our confidence is restored, but the Lenders in this case are not our

Grandmother. This shell game of altered perception is mere chicanery and a parlor

trick of which the Court must find deplorable.

31.

Even if the Plaintiff produced a complete unused instrument and attempt to explain

its function, the explanation cannot be admissible.

32.

The originating Lender, Mortgage Investors Corporation, claiming to be governed under

the laws of the State of Ohio, should they violate an Ohio State Statute making such

transactions null and void, has escaped detection and prosecution by operating in the

State of Florida, can they truly grant and assign that illegal transaction to

1    Everbank, a Florida Corporation? Absolutely not! How then can Everbank claim to have

2    authority to bring a claim in the State of Oregon?

3                                    33.

4     GMAC Mortgage Corporation, Mortgage Investors Corporation and Everbank are operating

5    as a single entity regarding the Toxicity of this predatory loan. They all have used

6    drastic measures to burden a borrower with this property, without regards to laws or

7    rights of the borrower.

8                                    34.

9                             DEED OF TRUST

10    Defendant asserts that the Deed of Trust is not a true depiction or facsimile of the

11    document to which the decedent James J. Marshall visually saw and agreed to, by

12    affixing his signature and initials upon such.

13    The Deed of Trust referred to as Exhibit 1 has black rectangular boxes, which

14    originally revealed "writing" that which aided and affected the reasoning and decision

15    of James J. Marshall.

16                                    35.

17    Plaintiff will argue that the Deed of Trust never had writing, but transparent

18    windows, therefore the document is original and never had writing on it and will also

19    argue that the fine print on the bottom, (MULTISTATE ADJUSTABLE RATE NOTE-Single

20    Family-Veterans Affairs), certifies that the form is an official Government document.

21                                    36.

22    An investigation from the Court will produce the same results as the defendant that

23    the Veterans Administration has absolutely nothing to do with the regulating and

24    creation of lender documents and forms.

25

26

27

28

37.

## CURRENT HOLDER OF DEED OF TRUST AND DEED OF TRUST

Plaintiff claims to possess the original Note and Deed of Trust. Plaintiff must be prepared to produce those original instruments.

38.

James J. Marshall, Sr., a 74 year old man, not of sound mind, on March 3, 2004 entered a GMAC MORTGAGE CORPORATION office in Portland, Oregon and signed a Deed of Trust instrument in the presence of a notary public by the name of Karen S. McCoy. Two days later, James J. Marshall's signature appears on an Adjustable Rate Note loan without a notary public seal, stamp or signature affixed to that document.

## V. ARGUMENT

FRAUD AND DECEIT WITH RESPECT TO SECURITIES OR SECURITIES BUSINESS

39.

When GMAC Mortgage Corporation allegedly solicited the decedent about the 4.25% adjustable rate loan as though it was a better loan than a fixed rate 5.25%, 8 months after purchase of the property was deceitful. The broker knew that the decedent was mentally incompetent and was living by way of a fixed income.

40.

After the decedent experienced the first adjustment after 36 months, which was a $300.00 increase, subjected the decedent to undue stress and diminished the decedent's quality of life. He knew that he was going to eventually lose his first home to foreclosure. All that the GMAC Mortgage Corporation broker should have done is tell the decedent to go home and bring a friend or family member back who can help advise him on the legalities of the loan, but that did not happen. ORS 59.135(1),(2)and(3);ORS 59.137(1),(2)and(3);ORS

1    646.638(8)(b); ORS 86A.154

2    41.

3    ## RIGHT OF POSSESSION

4    Claimant Yosef L. Mustafanos assert that Everbank as never held a Deed or

5    Title of ownership of said property known as: 10827 SE Bush Street Portland,

6    OR. 97266. That Everbank has not produced any document that proves superior

7    possession to that of the Claimant, other than Security Instruments, which

8    shall always be protected by the land and improvements. Everbank, at most

9    possess 49% interest or less. Their desire is to liquidate the forementioned

10   property to the highest bidder and at a loss, to recover the $30,000.00

11   guarantee from the Veterans Administration. Everbank has already received

12   approximately $58,000.00 from the decedent James J. Marshall. If Everbank

13   should sell the forementioned property for the sum of $35,000.00, Everbank

14   will have made a sum total of $123,000.00 in less than 10 years for a home

15   that was sold to decedent James J. Marshall for $102,500.00. Everbank will

16   never live in the said property, nor make plans to beautify and build

17   42.

18   additions to expand usability. Everbank's possession, by way of way of

19   security interest, is substandard to the possession of the Claimant.

20   ORS 164.105 (3)

21   43.

22   Conceding that a deed given as a mere security for an existing debt is not

23   effective to transfer the legal title or right of possession of the mortgaged

24   property from the Grantor to the Grantee, nevertheless the voluntary

25   surrender of actual possession to the grantee as further security is lawful,

26   and may be effective to create a legal right of possession sufficient to bar

27   a right of recovery in an action of Ejectment by the Mortgagor against the

28   Mortgagee.

1  C.C.A.Or 1910. Sheradin v. Southern Pac. Co. 179 F. 81, 102 C.C.A. 375

2  44.

3  The law will never construe a possession tortuous unless of necessity, but

4  will consider every possession lawful, the commencement or continuation of

5  which is not proven to be wrongful. …

6  When, therefore, a naked possession is in proof, it will be deemed lawful and

7  coextensive with the right set up.

8  Or. 1860. McEwen v. City of Portland, 1 Or. 300.

9  45.

10  The Plaintiff's Complaint meets the guidelines entitled "Quiet Title Action"

11  which invokes a lawful, "At Law" Jurisdiction through which All Lawful Rights

12  and Interests of the Claimant are protected.

13  46.

14  "Possession is Nine Tenths of the Law", is a very ancient "Maxim of Law", aka:

15  "Common-Law Maxim". This "Maxim of Law" is designed to prevent any "Breach of

16  the Peace". Here-under, if a person has acquired actual/physical possession

17  of real-property under peaceable circumstances, meaning that there was no

18  actual violence involved, this means that the person has a lawful entitlement

19  or "Title" to the property. This is referred to as, "Possessory Title" or

20  "Adverse Possession".

21  47.

22  There is a grey area, such as, when a person leaves his home for a few days

23  or weeks to help Family, or friends, but where it is obvious that he has not

24  abandoned his property, and he intends to return, then case-law in very

25  ancient times, recognizes that it is a "breach of the peace" to recognize a

26  new right of ownership for a person who takes another's property when he is

27  temporarily away. When one person has never had actual physical possession of

28

1  a specific piece of property, then there is no "right of possession" that may

2  be attached there-to.

3                                    **48.**

4  **164.105 Right of possession.** Right of possession of property is as

5  follows:

6     (1) A person who has obtained possession of property by theft or other

7  illegal means shall be deemed to have a right of possession superior to that

8  of another person who takes, obtains or withholds the property from that

9  person by means of theft.

10    (2) A joint or common owner of property shall not be deemed to have a

11 right of possession of the property superior to that of any other joint or

12 common owner of the property.

13    (3) In the absence of a specific agreement to the contrary, a person in

14 lawful possession of property shall be deemed to have a right of possession

15 superior to that of a person having only a security interest in the property,

16 even if legal title to the property lies with the holder of the security

17 interest pursuant to a conditional sale contract or other security agreement.

18 [1971 c.743 §130; 1987 c.158 §28]

19                                    **49.**

20 In more detail; the Filing by this Constitutional State and the Plaintiff of

21 the "Quiet Title" portion of our main complaint invokes the Fundamental

22 Constitutional Principles of American and Oregon "Property Law", all of which

23 is Firmly Rooted in the Common-Law ideas of Preventing "Breaches of the

24 Peace".

25                                    **50.**

26 1.) The Plaintiff named in this case may claim that he have "Adequate Remedy"

27 for any such truly

28

"Lawful" Interests which they might possess in this property, through a

"Counter-Complaint" which invokes an "Ejectment Action", as statutorily

authorized through ORS 105.005 - 105.080 .

51.

2.) We suppose it is also remotely possible that the Plaintiff in this case

might somehow also Counter-Complaint under the more summary process called

"Forcible Entry and Wrongful Detainer", as statutorily authorized through ORS

105.105 - 105.168 .

52.

Both of these modes of procedure are firmly rooted in Oregon's Constitutional

Concepts of "Property Law". These are the Lawful Modes of Authorizing

Sheriff's Deputies to Use Force against any individual or persons who un-

lawfully take possession of any real property in Oregon. But in this case,

the Claimant can never be considered a trespasser because the claimant took

possession by lawful means and has done nothing unlawful which may be

interpreted as breaching the peace.

53.

All of these concepts are firmly rooted in very ancient "At Law" aka:

"Common-Law" which provide Long-Term Stability to the Laws of Real Property

and Land for the People of Oregon.

54.

A few citations from "Oregon Digest", from its chapter on "Ejectment":

"Suit to recover possession of real property admits possession of defendant,

which possessory title must prevail until complainant shows a better title.

In action to recover realty, a mere possessory right to occupancy of the realty may be

pleaded defensively. Or. 1943. Sertic v. Roberts, 136 P.2d 248, 171 Or 121.

# VI. CONCLUSION

### 55.

That all parties, agents, brokers and assignees be held jointly cupable

civilly who were involved in the refinance loan dated March 3, 2004. ORS

59.135(1),(2)and(3); ORS 59.137(1),(2)and(3)

### 56.

That the Court grant the claimant punitive damages against all parties who

were involved in the refinance loan dated March 3, 2004. ORS 646.638(1);

646.608(j)

### 57.

That the Court present this case for sanctions against all licensed

individuals and businesses. ORS 86A.154; ORS 86A.990(1)


### 58.

The Court Order the Plaintiff Everbank to produce original loan documents and

If the plaintiff fails to produce such documents, the Court dismiss the

Plaintiff's case with prejudice.

### 59.

Claimant claims lawful possession of 10827 SE Bush Street Portland, OR 97266.

That the Court finds that the Claimant has a superior possession than

Everbank and order Everbank to settlement conference of face dismissal until

Plaintiff obtain possession greater than that of the Claimant.

1

2
Dated this 2 day of MARCH, 2013

3

4

5
REV. YOSEF MUSTAFANOS

6
5400 RAILROAD STREET
SILVER SPRINGS, NEVADA
89429

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



December 17, 2012

Reverend Yosef Leroi Mustafanos
5400 Railroad Street
Silver Springs, NV 89429

Reference:    Everhome Mortgage Loan Number 9000613108
Borrower Estate of James J. Marshall
Property 10827 SE Bush Street, Portland, OR 97266

Dear Reverend Mustafanos:

We appreciate the opportunity to respond to your inquiry addressed to Mr. Robert Clements, Chief
Executive Officer of EverBank. Due to the nature of your concerns, the correspondence was
forwarded to me for handling.

Please accept our condolences for the loss of your father, Mr. James J. Marshall. We have updated
our records to list the account in the Estate of James J. Marshall, and have listed you as the
Successor of the Estate.

As you know, we referred the loan to foreclosure, as required by the loan's investor, on July 27,
2010. The loan was due for the March 1, 2010 payment and all subsequent installments at that
time.

You requested payment assistance in December 2010. Based on the information you provided us,
we approved you for a permanent loan modification, with an effective date of March 2011.
Unfortunately, you did not return the modification agreement, and as a result, we closed your file on
February 17, 2011. We mailed notice of our action to you that same day.

In your correspondence, you state that we have not provided you with a copy of your father's
mortgage insurance policy. Contrary to optional insurance products, mortgage insurance is an
insurance policy that protects the lender, in the event that the homeowner defaults on the loan. We
have no record of a prior request from you; however, we confirm that your father did not carry an
optional insurance policy with our company.

Although we sympathize with your situation, we are unable to comply with your request to reduce the
loan amount due to the property's condition.

As of the date of this letter, the loan remains due for the March 1, 2010 payment and all subsequent
installments. Should you have questions regarding the foreclosure process, you may contact our
foreclosure counsel, Shapiro & Sutherland at (503) 241-0772.

P.O. Box 2167 • Jacksonville, FL 32232-0004

EHM-8100/11EHS0005.2

# Everhome
## ——— MORTGAGE ———

December 17, 2012

Reverend Yosef Leroi Mustafanos
5400 Railroad Street
Silver Springs, NV 89429

Reference:    Everhome Mortgage Loan Number 9000613108
Borrower Estate of James J. Marshall
Property 10827 SE Bush Street, Portland, OR 97266

Page 2

If you would like to request payment assistance, please contact your Relationship Manager, Ms.
Stephanie Lockwood, at (866) 839-7151, extension 8968, Monday through Friday, 8:30AM to
8:00PM, ET.  Additionally, you may complete an application for assistance via our website at
www.everhomemortgage.com.

We enclosed copies of all documents we referenced in this reply.  Should you have questions
regarding this response, please contact me at (888) 632-9320, Monday through Friday, 8AM to 5PM,
ET.

Sincerely,

Felicia Leonard
Coordinator
Enterprise Priority and Special Services

Enclosures

cc:  Stephanie Lockwood

P.O. Box 2167 • Jacksonville, FL 32232-0004

EHM-8100/11EHS0005.2


**Department of
Veterans Affairs**

000000017753484

UNITED STATES OF AMERICA

*LOAN GUARANTY CERTIFICATE*

ISSUED TO:

MORTGAGE INVESTORS CORP
6090 CENTRAL AVENUE
ST PETERSBURG FL 33707

O600958124

| LOAN NUMBER | DATE OF LOAN | AMOUNT OF LOAN | PERCENT GUARANTEED |
|---|---|---|---|
| 48-48-6-0318287 | 03/03/2004 | $107,950 | 33.35% |

## CERTIFICATION TO FINANCIAL INSTITUTION

This is to certify that, in this case, the Department of Veterans Affairs (VA) has complied with the applicable provisions of the Right to Financial Privacy Act of 1978, title xi of Public Law 95-630. Pursuant to section 113(h)(2) of the Act, no further certification shall be required for subsequent access by the Department of Veterans Affairs, Loan Guaranty Service or Division to financial records on this loan during the term of the loan guaranty.

This is to certify that pursuant to chapter 37, title 38, U.S.C., as amended, and the regulations effective thereunder on the date of this certificate, the indebtedness outstanding from time to time under the loan identified herein is guaranteed in the following amount(s):

| FULL NAME(S) OF VETERAN(S) | AMOUNT OF LOAN | AMOUNT OF GUARANTY |
|---|---|---|
| JAMES J. MARSHALL | $107,950 | $36,000 |

BY *Grace A. Cooper*                     for SECRETARY OF VETERANS AFFAIRS
(SIGNATURE OF AUTHORIZED AGENT)

DATE OF THIS          03/26/2004          ISSUING          Denver CO          339(HLO)
CERTIFICATE                               OFFICE

Upon full satisfaction of this loan by payment or otherwise, this certificate must be appropriately endorsed and signed, and returned to VA pursuant to 38 CFR 36.4218 or 36.4333. Check the appropriate box to show the reason for the termination for VA's guaranty liability.

☐ PAID-IN-FULL          ☐ CLAIM PAID          ☐ CANCELED

MAR 1993
VA FORM    **26-1899 (cg)**          EXISTING STOCK OF VA FORM 26-1899,
                                      JUN 1992, WILL BE USED

# GENERAL POWER OF ATTORNEY

I, James Jackson Marshall, residing at 10827 SE Bush St., Portland, Oregon 97266, hereby appoint Don Elroy Marshall of 10827 SE Bush St., Portland, Oregon 97266, as my Attorney-in-Fact ("Agent").

My Agent shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent to manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future. My Agent's powers shall include, but not be limited to, the power to:

1. Open, maintain or close bank accounts (including, but not limited to, checking accounts, savings accounts, and certificates of deposit), brokerage accounts, retirement plan accounts, and other similar accounts with financial institutions.

   a. Conduct any business with any banking or financial institution with respect to any of my accounts, including, but not limited to, making deposits and withdrawals, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to me by any person, firm, corporation or political entity.

   b. Perform any act necessary to deposit, negotiate, sell or transfer any note, security, or draft of the United States of America, including U.S. Treasury Securities.

   c. Have access to any safe deposit box that I might own, including its contents.

2. Sell, exchange, buy, invest, or reinvest any assets or property owned by me. Such assets or property may include income producing or non-income producing assets and property.

3. Purchase and/or maintain insurance and annuity contracts, including life insurance upon my life or the life of any other appropriate person.

4. Take any and all legal steps necessary to collect any amount or debt owed to me, or to settle any claim, whether made against me or asserted on my behalf against any other person or entity.

5. Enter into binding contracts on my behalf.

6. Exercise all stock rights on my behalf as my proxy, including all rights with respect to stocks, bonds, debentures, commodities, options or other investments.

7. Maintain and/or operate any business that I may own.

8. Employ professional and business assistance as may be appropriate, including attorneys, accountants, and real estate agents.

9. Sell, convey, lease, mortgage, manage, insure, improve, repair, or perform any other act with respect to any of my property (now owned or later acquired) including, but not limited to, real estate and real estate rights (including the right to remove tenants and to recover possession). This includes the right to sell or encumber my homestead legally described as:

One family manufactured home located at address on document.

10. Prepare, sign, and file documents with any governmental body or agency, including, but not limited to, authorization to:

a. Prepare, sign and file income and other tax returns with federal, state, local, and other governmental bodies.

b. Obtain information or documents from any government or its agencies, and negotiate, compromise, or settle any matter with such government or agency (including tax matters).

c. Prepare applications, provide information, and perform any other act reasonably requested by any government or its agencies in connection with governmental benefits (including medical, military and social security benefits).

11. Make gifts from my assets to members of my family and to such other persons or charitable organizations with whom I have an established pattern of giving, to file state and federal gift tax returns, and to file a tax election to split gifts with my spouse. However, my Agent may not make gifts of my property to the Agent, the Agent's estate or creditors, or the creditors of the Agent's estate. The Agent may not disclaim assets to which I would be entitled, if the result is that the disclaimed assets pass directly or indirectly to the Agent or the Agent's estate. The Agent may not use my assets to discharge any of the Agent's legal obligations of support of another, except me and those I am legally obligated to support.

12. Transfer any of my assets to the trustee of any revocable trust created by me, if such trust is in existence at the time of such transfer.

13. Disclaim any interest which might otherwise be transferred or distributed to me from any other person, estate, trust, or other entity, as may be appropriate.

This Power of Attorney shall be construed broadly as a General Power of Attorney. The listing of specific powers is not intended to limit or restrict the general powers granted in this Power of

Feb-28-2013 12:52 PM US Bank 5032755498

3/5

Attorney in any manner.

Any power or authority granted to my Agent under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing: (i) my income to be taxable to my Agent, (ii) my assets to be subject to a general power of appointment by my Agent, or (iii) my Agent to have any incidents of ownership with respect to any life insurance policies that I may own on the life of my Agent.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith. However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney. A successor Agent shall not be liable for acts of a prior Agent.

I authorize my Agent to indemnify and hold harmless any third party who accepts and acts under this document.

My Agent shall be entitled to reasonable compensation for any services provided as my Agent. My Agent shall be entitled to reimbursement of all reasonable expenses incurred in connection with this Power of Attorney.

My Agent shall provide an accounting for all funds handled and all acts performed as my Agent, but only if I so request or if such a request is made by any authorized personal representative or fiduciary acting on my behalf.

This Power of Attorney shall become effective immediately, and shall not be affected by my disability or lack of mental competence, except as may be provided otherwise by an applicable state statute. This is a Durable Power of Attorney. This Power of Attorney shall continue effective until my death. This Power of Attorney may be revoked by me at any time by providing written notice to my Agent.

Dated _March 1, 2007_, at Portland, Oregon.

James Jackson Marshall

Feb-28-2013 12:52 PM US Bank 5032755498

4/5

STATE OF OREGON, COUNTY OF MULTNOMAH, ss:

This instrument was acknowledged before me on this _1_ day of _March_ _2007_ by James Jackson Marshall.



_____
Notary Public

_11/9/09_
My commission expires _____

This document was prepared by:

Name:        Connie Bianco
Address:     2046 NE 136th Ave
             Portland, Oregon  97230
             (503)256-4749

-4-

85
14

FATCO NO. 187400-SS

Recorded in MULTNOMAH COUNTY, OREGON
C. Swick, Deputy Clerk    ATBSB
C18    17
Total :        99.00
2003-165006    07/16/2003 03:55:31pm

Until a change is requested all tax statements
shall be sent to the following address:
*10827 SE BUSH STREET,*
*PORTLAND, OR 97266*

When Recorded Mail To:
*MIP INSURING DEPARTMENT*
*SIERRA PACIFIC MORTGAGE COMPANY, INC.*
*11000 OLSON DRIVE, SUITE 202,*
*RANCHO CORDOVA, CA 95670*
*(916) 638-7700*

[Space Above This Line For Recording Data]

Loan No:    *0000143613*
Parcel ID No:  *R192333*

## DEED OF TRUST

MIN: *1000703-0000143613-5*

## NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    *JULY 14, 2003*
together with all Riders to this document.
(B) "Borrower" is    *JAMES J. MARSHALL*

Borrower is the trustor under this Security Instrument.
(C) "Lender" is    *SIERRA PACIFIC MORTGAGE COMPANY, INC.*

Lender is a    *CORPORATION*    organized and existing under the laws of    *CALIFORNIA*
Lender's address is    *11000 OLSON DRIVE, SUITE 202, RANCHO CORDOVA, CA 95670*

(D) "Trustee" is    *FIRST AMERICAN TITLE INSURANCE COMPANY OF OREGON*

Form 3038 1/01
(page 1 of 14 pages)

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.VA.DT.1.WPF (0101\DOCS\DEEDS\VA\OR_MERS.VA)

17

7-16-03

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P. O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated        JULY 14, 2003
The Note states that Borrower owes Lender
   ONE HUNDRED TWO THOUSAND FIVE HUNDRED and NO/100 -----                    Dollars
(U.S. $    102,500.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than        AUGUST 1, 2033

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |
| [ xx ] V. A. Rider | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Loan No:  0000143613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                Form 3038 1/01
DRAW.MERS.OR.CVL.DT.2.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)                                (page 2 of 14 pages)

7-16-03

Title Data, Inc. PA POR10350 MU 2003165006.002

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of  MULTNOMAH                                :
    LOT 8, TOGETHER WITH AN UNDIVIDED INTEREST IN AND TO TRACT "A", JANLAR, IN
    THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON.

which currently has the address of    10827 SE BUSH STREET                              [Street],
PORTLAND            [City], Oregon     97266     [Zip Code]  ("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is

                                                                    Loan No:  0000143613
OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS         Form 3038 1/01
DRAW.MERS.OR.CVL.DT.3.WPF (0101DOCS)DEEDS/CVL)OR_MERS.CVL)                          (page 3 of 14 pages)

7-16-03

not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

LOAN NO: 0000143613
Form 3038 1/01
(page 4 of 14 pages)

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL_DT_1.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)

7-16-03

Title Data, Inc. FA POR10350 MU 2003165006.004

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts

Loan No: 0000143623

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.5.WPF (0101)DOCS\DEEDS\CVL\OR_MERS.CVL)

Form 3038 1/01
(page 5 of 14 pages)

7-16-03

disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Loan No: 0000143613

OREGON—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS      Form 3038 1/01
DRAW.MERS.OR.CVL.DT.6.WPF (0101/DOCS/DEEDS/CVL/OR_MERS.CVL)      (page 6 of 14 pages)

7-16-03

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Loan No: 0000143613

Form 3038 1/01
(page 7 of 14 pages)

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.7.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)

7-16-03

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any * with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

Loan No: 0000143613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS    Form 3038 1/01
DRAW.MERS.OR.CVL.DT.8.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)    (page 8 of 14 pages)

7-16-03

Title Data, Inc. FA POR10350 MU 2003165006.008

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys'fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

Loan No:  0000143613

Form 3038 1/01
(page 9 of 14 pages)

OREGON—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.9.WPF (0191DOC)/DEEDS/CVL/OR_MERS.CVL)

7-16-03

Title Data, Inc. PA POR10350 MU 2003165006.009

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits; then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which

Loan No: 0000143613

OREGON—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
Form 3038 1/01
DRAW.MERS.OR.CVL.DT 10.WPF (0101DOCS/DEEDS/CV/MOR_MERS.CVL)
(page 10 of 13 pages)

7-16-03

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of MULTNOMAH

LOT 8, TOGETHER WITH AN UNDIVIDED INTEREST IN AND TO TRACT "A", JANLAR, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON.

which currently has the address of    10827 SE BUSH STREET                    [Street],
PORTLAND                        [City], Oregon    97266    [Zip Code]  ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is

Loan No:  0000143613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS            Form 3038 1/01
DRAW.MERS.OR.CVL.DT.3.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)                    (page 3 of 14 pages)

7-16-03

not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

Loan No: 0000143613

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
DRAW.MERS.OR.CVL.DT.1.WPF (0101)DOCS\DEEDS\CVL\OR_MERS.CVL)

Form 3038 1/01
(page 4 of 14 pages)

7-16-03

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts

Loan No: 0000193613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DHAW.MERS.OR.CVL.DT.5.WPF (0101DUES\DEEDS\CVL\OR_MERS.CVL)

Form 3038 1/01
(page 5 of 14 pages)

7-16-03

disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Loan No: 0000243613

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.6.WPF (0101DOCS/DEEDS/CVL/OR_MERS.CVL)

Form 3038 1/01
(page 6 of 14 pages)

7-16-03

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including, protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Loan No:  0000143613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.7.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)

Form 3038 1/01
(page 7 of 13 pages)

7-16-03

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has* if any* with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

Loan No: 0000143613

OREGON—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS    Item XXX 1/01
DRAW.MERS.OR.CVL.DT.8.WPF (0101/DOCS\DEEDS\CVL\OR_MERS.CVL)    (page 8 of 14 pages)

7-16-03

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

Loan No:  0000143613

OREGON—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS      Form 3038 1/01
DRAW.MERS.OR.CVL.DT.9.WFF  (0101)DOCS\DEEDS\CVL\OR_MERS.CVL)      (page 9 of 14 pages)

7-16-03

Title Data, Inc. FA POR10350 MU 2003165006.009

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which

Loan No: 0000143623

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.18.WPF (0101/DOC'S/DEEDS/CVL/OR_MERS.CVL)

Form 3038 1/01
(page 10 of 14 pages)

7-16-03

then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Loan No: 0000143613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL. DT.11.WPF (0101DOCS\DEEDS\CVL\OR_MERS.CVL)

Form 3038 1/01
(page 11 of 14 pages)

7-16-03

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs.

24. **Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

Loan No: 0000243613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                Form 3038 1/01
DRAW.MERS.OR.VA.DT.12.WFF (0101DOCS/DEEDS/WAOR_MERS.VA)                (page 12 of 14 pages)

7-16-03

Title Data, Inc. PA POR10350 MU 2003165006.012

26. **Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

27. **Required Evidence of Property Insurance.**

**WARNING**

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.



THIS SPACE INTENTIONALLY LEFT BLANK

Loan No: 0000143613

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS
DRAW.MERS.OR.CVL.DT.13.WPF (0101DOCS/DEEDS/CVL/OR_MERS.CVL)

Form 3038 1/01
(page 13 of 14 pages)

7-16-03

Title Data, Inc. FA POR10350 MU 2003165006.013

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)                    _____ (Seal)
JAMES J. MARSHALL          -Borrower                                           -Borrower

_____ (Seal)                    _____ (Seal)
                           -Borrower                                           -Borrower

_____ (Seal)                    _____ (Seal)
                           -Borrower                                           -Borrower

Loan No: 0000143613

STATE OF OREGON,                                   County ss: Clackamas

On this 5 day of July 2013 , personally appeared
James J. Marshall

and acknowledged the foregoing instrument to be his voluntary act and deed.

My Commission Expires:  2-3-06                     Before me:
(Official Seal)
                                                   Notary Public for Oregon

OFFICIAL SEAL
SHERRY A. HURLIMAN
NOTARY PUBLIC-OREGON
COMMISSION NO. 353735
MY COMMISSION EXPIRES FEB. 3, 2006

This Instrument Was Prepared By:

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS        Form 3138 1/01
DRAW.MERS.OR.CVL.DT.14.WPF (0101/DOCS/DEEDS/CVLOR_MERS.CVL)                        (page 14 of 14 pages)

7-16-03

Title Data, Inc. PA POR10350 MU 2003165006.014

## V.A. GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

THIS V.A. GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this 14th day of JULY 2003, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to SIERRA PACIFIC MORTGAGE COMPANY, INC.
(herein "Lender"), and covering the Property described in the Security Instrument and located at

10827 SE BUSH STREET
PORTLAND, OR 97266
(Property Address)

V.A. GUARANTEED LOAN COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instrument to said Title or Regulations.

Loan No: 0000143613

MULTISTATE VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER (3/99)    Page 1 of 3
DRAW.0101.MX.VA.ASSUM.RIDER.1.WPF (F:\DPSHARE\0101DOCS\RIDERS\VAYA_ASSUM.RID)

7-16-03

**LATE CHARGE:** At Lender's option, Borrower will pay a "late charge" not exceeding _four_ per centum ( 4 %) of the overdue payment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

**GUARANTY:** Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

**TRANSFER OF THE PROPERTY:** this loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the property shall also be subject to additional covenants and agreements as set forth below:

(a)     ASSUMPTION FUNDING FEE: A fee equal to one-half of 1 percent (.50%) of the unpaid balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and, at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b)     ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the lesser of the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c)     ASSUMPTION INDEMNITY LIABILITY: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.

LOAN NO: 0000143013

MULTISTATE VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER (3/99)     Page 2 of 3
DRAW.0101.MX.VA_ASSUM.RIDER.2.WPF (F:\WPSHARE\0101\DOC\RIDERS\VAVA_ASSUM_RID)

7-16-03

Title Data, Inc. FA POR10350 MU 2003165006.016

IN WITNESS WHEREOF, Borrower(s) has executed this V.A. Guaranteed Loan and Assumption Policy Rider.

_____    _____
JAMES J. MARSHALL          -Borrower                                    -Borrower

_____    _____
                            -Borrower                                    -Borrower

_____    _____
                            -Borrower                                    -Borrower

                                                          [Sign Original Only]

                                        Loan No: 0000143613

MULTISTATE VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER (3/99)                Page 3 of 3
DRAW.0101.MX.VA.ASSUM.RIDER.3.WPF (F:\DFSHARE\0101DOCS\RIDERS\VA\VA_ASSUM_RID)

7-16-03

Title Data, Inc. FA POR10350 MU 2003165006.017

**<u>Exhibit 2</u>**

**February 10, 2014 Letter**



February 10, 2014

28539.0101

Yosef L. Mustafanos
5400 Railroad Street
Silver Springs, NV  89429

**Re:**    *Everbank, Inc. v. Yosef Leroi Mustafanos, et al.*
       **Multnomah County Circuit Court Case No. 1205-05897**

Dear Rev. Mustafanos:

Please be advised that on December 11, 2103, the U.S. Bankruptcy Court for the Southern District of
New York in *In re Residential Capital, LLC*, case number 12-12020 MG ("Bankruptcy Case"), confirmed a
Chapter 11 plan that directly bears upon the instant action.  For the reasons discussed below, you are
permanently enjoined from asserting the claims in Oregon state court or any other venue.  Ally
Financial, Inc. ("AFI") therefore requests that you dismiss this action no later than February 14, 2014, or
AFI will seek to enforce the injunction in the Bankruptcy Case.

The claims that you assert in this lawsuit against AFI apparently relate to the origination or servicing of
a mortgage loan by GMAC Mortgage, LLC ("GMAC").  GMAC, along with other direct and indirect
subsidiaries of Residential Capital, LLC, are the Debtors in the Bankruptcy Case.

On December 11, 2013, an Order Confirming Second Amended Joint Chapter 11 Plan Proposed by
Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors (Docket No. 6065)
was entered in the Bankruptcy Case.  The confirmed Plan includes a third party release of AFI set forth
in Section IX(D) which provides:

> **D.    Third Party Release**
>
> On and as of the Effective Date of the Plan, except as provided by Article
> IX.E, the holders of Claims and Equity Interests shall be deemed to
> provide a full and complete discharge and release to the Ally Released
> Parties and their respective property from any and all Causes of Action
> whatsoever, whether known or unknown, asserted or unasserted,
> derivative or direct, foreseen or unforeseen, existing or hereinafter
> arising, in law, equity, or otherwise, whether for tort, fraud, contract,
> violations of federal or state securities laws, veil piercing or alter-ego

Williams, Kastner & Gibbs PLLC
888 SW Fifth Avenue, Suite 600
Portland, Oregon 97204
main 503.228.7967  fax 503.222.7261
www.williamskastner.com
SEATTLE . TACOMA . PORTLAND

*Practicing law with greater resolve*™
4613083.1

Yosef L. Mustafanos
February 10, 2014
Page 2

theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of Assessment.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute the Bankruptcy Court's finding that this Third Party Release is: (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) resulted in distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

Your claims against AFI relate to a mortgage loan originated or serviced by a Debtor and are therefore "arising from or related in any way to Debtors" and you are permanently enjoined from asserting them as set forth in Section IX(I) of the confirmed Plan which provides:

D.    **Injunction**

Except as otherwise provided in the Confirmation Order or herein and in accordance with Article IX.E hereof, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the effective date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any

Yosef L. Mustafanos
February 10, 2014
Page 3

Released Party on account of or in connection with or with respect to any
Released Claims; (c) creating, perfecting or enforcing any lien (other than
any charging lien of a trustee under its respective indenture), claim or
encumbrance of any kind against any Released Party on account of or in
connection with or with respect to any Released Claims; (d) asserting any
right to setoff, subrogation or recoupment of any kind against any
obligation due from any Released Party on account of or in connection
with or with respect to any Released Claims unless such holder has filed a
motion requesting the right to perform such setoff on or before the
Confirmation Date, and notwithstanding any indication in a Proof of
Claim or Equity Interest or otherwise that such holder asserts, has or
intends to preserve any right of setoff pursuant to section 553 of the
Bankruptcy Code or otherwise; (e) commencing or continuing in any
manner or action or other proceeding of any kind against any Released
Party on account of or in connection with or with respect to any Released
Claims; and (f) seeking relief or collecting judgments on an Investor-
related securities claim in a manner that fails to conform with the terms of
the judgment reduction provision set forth in the Plan and the
Confirmation Order; provided, that nothing contained herein shall be
construed to prevent any entity from objecting to claims or defending
against claims objections or collection actions whether by asserting a right
of setoff or otherwise to the extent permitted by law. Such injunction shall
extend to the successors of the Liquidating Trust, if any, and to their
respective properties and interests in property. Any person injured by
any willful violation of this injunction shall be entitled to recover actual
damages, including costs and attorneys' fees and, in appropriate
circumstances, may recover punitive damages from the willful violator.

The Bankruptcy Case order confirming the Plan provides for the court's exclusive jurisdiction to
enforce the Plan, including the Third Party Release. *See* Section I(A), (XX).

Again, please dismiss this action no later than February 14, 2014 or AFI will bring a motion in the
Bankruptcy Court to enjoin you from proceeding with this lawsuit against AFI in the Oregon state
court.

AFI notified the Oregon state court of the Bankruptcy Case confirmation order today. *See* Third-Party
Defendant Ally Financial, Inc.'s Notice of Entry of Residential Capital, LLC Confirmation Order and
Release of Ally Financial, Inc.

Yosef L. Mustafanos
February 10, 2014
Page 4


Very truly yours,

Rachel A. Robinson
Licensed in Oregon and Washington
(503) 944-6925
rrobinson@williamskastner.com

RAR:wms
Enclosure

cc:     Holger Uhl (w/ encl.)

4613083.1

## **Exhibit 3**

**Amended Counterclaim**

28539.0101

RECEIVED

FEB 1 1 2014

WILLIAMS, KASTNER & GIBBS PLLC
w: RPAR, NCB

SCANNED

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| YOSEF LEROI MUSTAFANOS;<br><br>      Counter-claimant,<br><br>vs.<br><br>EVERBANK,INC, GMAC MORTGAGE, INC,<br><br>GENERAL MOTORS ACCEPTANCE<br><br>CORPORATION, ALLY FINANCIAL, INC.,<br><br>ET AL.<br><br>      Counter-Defendants,<br><br>Does: 1-100 | Case No.: No. 1205-05897<br><br>AMENDED COUNTERCLAIM:<br><br>FRAUD AND DECEIT IN RESPECT TO SECURITIES OR SECURITIES BUSINESS PREDITORY LENDING PRACTICES, DEFRAUDING A SENIOR CITIZEN Pursuant to: ORS 86A.154 (1), (2)and(3); ORS 59.135(1),(2)and(3); ORS 59.137(1),(2)and(3); ORS 164.105<br><br>CLAIM EXCEEDS $10,000 PRAYER AMOUNT $110,492.25 PLUS PUNITIVE DAMAGE ORS 646.638(1)AND(8)(b) FEE AUTHORITY: ORS 595, SEC. 15 (1)(c) |

1.

    Defendant, Yosef Le Roi Mustafanos, IN PRO SE, files this Counterclaim to the Complaint for Deed of Trust Foreclosure on the property located at 10827 S.E. Bush Street, Portland, OR 97266, to which Claimant holds Lawful and peaceable possession by way of Affiant's Deed.


I. VENUE AND JURISDICTION

2.

The Defendant stipulate to the proper Venue and Jurisdiction, but refuse to agree to a Proceeding In Rem because of other mitigating factors that need to be addressed. Defendant has substantive rights that need to be protected. Also, The Court has venue and jurisdiction over this proceeding pursuant to ORS 165.095(1), ORS 165.075 and pursuant to ORS 165.080(1).

## II.PROPERTY

3.

The property that is subject to above-entitled action is legally described as follows:

Lot 8, together with an undivided interest in and to Tract "A", Janlar,

In the City of Portland, Count of Multnomah and State of Oregon.

Commonly known as 10827 S.E. Bush Street, Portland, OR 97266 (the "property").

4.

The visual description of the property is as follows:

A plus or minus 1100 square foot mobile home setup on what appears to be less than 1/16[th] of an acre lot (nearly a zero lot), with a small driveway and carport. The carport cover is built as one piece, shared with the neighboring carport. The carport is not accessible, due to the air condition condenser mounted under the carport. The mobile home has no back yard and it has approximately 5 feet of walkway on one side.

The mobile home is set back approximately 40 feet from the street. This property is located in an area of town that has a reputation of crime labeling it a "less than desirable" place to live.

### III. PARTIES

#### 5.

SIERRA PACIFIC MORTGAGE extended funds used to purchase the home on 10827 SE Bush Street on July 16, 2003, in the amount of $102,500.00 at an annual fixed interest rate of 5.25% for the term of 30 Years, with monthly mortgage payments of $566.01.

#### 6.

Ally Financial, Inc., doing Business as GMAC MORTGAGE CORPORATION, (Here after will be referred to as: GMAC MORTGAGE CORPORATION) is the mortgage broker who prepared all documents and shopped and secured the Lender (Mortgage Investors Corporation) for the decedent James J. Marshall. Mortgage Investors Corporation, funded a refinance for James J. Marshall on March 3, 2007 in the amount of $107,950.00. The loan is a 4.25% adjustable interest rate with the first adjustment due to occur in 36 months. The first adjustment will be a 3.250% to 5.250% increase, which would happen July 7, 2007. The monthly mortgage payment was $531.05 before July 7, 2007 and increased to $857.49.

#### 7.

MORTGAGE INVESTORS CORPORATION, a Florida lending institution governed under the laws of the State of Ohio, was the originator of the refinance loan note and deed of trust instruments.

#### 8.

EVERBANK, a Florida lending institution, an authorized assignee for Mortgage Investors Corporation in the state of Oregon, pursuant to ORS 14.040(4).

9.

YOSEF LE ROI MUSTAFANOS, a 54 year old American Black Man, Husband and father. The Claimant was raised (38 years) in Sacramento, California, was an undefeated heavy weight amateur boxer, given the honors of All League Champion Athlete, and honorable mentioned All State Champion Athlete in the sport of football. In 1982, the defendant was cut from the Dallas Cowboys NFL spring training camp. Claimant, was Ordained a Minister of the Gospel in 1980 and is the founder of Deeper Truth Ministries. The

10.

Claimant is legal guardian and provides care for his 63 year old sister, who was violently victimized and disabled by her husband. The Claimant's brother, mother in-law, sister in-law and wife's cousin, lives in the Portland, Oregon area. Claimant possess the subject property by virtue of Affiant's Deed dated October 27, 2010 and recorded as Recorder's Fee No. 2010-136000 of the official records of Multnomah County, Oregon.

11.

CHERRY BUSH LANE HOMEOWNERS' ASSOCIATION, INC, A domestic non-profit corporation formed in 2005 and is currently in an inactive status by the Oregon Department of Corporations. This Homeowners Association never received support nor membership enrollment from the decedent James J. Marshall.

12.

OCCUPANTS OF THE PREMISES Claimant occupies the foresaid property during holidays and summer. Claimant's family also occupy the foresaid property.

.

### IV. STATEMENT OF FACTS

Claimant allege the following facts expressed by way of numbered paragraphs:

#### 13.

On or about January 2003, decedent James J. Marshall, who was sharing an apartment with his son, Don E. Marshall, asked Don E. Marshall to help him buy a home.

#### 14.

James J. Marshall suffered from: Type 2 Diabetes, High blood pressure, obesity, cataracts, dementia, paranoid schitzophrenia, obsessive compulsion disorder, disorientation, fainting spells, kidney and liver dialysis dependency.

#### 15.

James J. Marshall could not engage in a legal process without becoming disoriented, forgetting the last thought and occasionally the last activity. He would become sombolent and become agitated until he takes a nap.  His vision was very marginal and he often complained about headaches.

#### 16.

Don E. Marshall performed all of the tasks involving paperwork and often argued with each others, because of James J. Marshall's paranoia. The Mortgage Broker would often ask Don E. Marshall, "How do you deal with such insanity". James J. Marshall caused much tension around Don E. Marshall's apartment complex because the decedent was

verbalizing his paranoia regarding Latin males and Latin females. He always thought that Latin people were planning to rob him, steal his car or break into the apartment.

James J. Marshall often referred to himself as Waldo James Jackson, the birth name given him by his unmarried maternal mother and he answered to that name before she died. His Aunt, Haiti Marshall adopted Waldo James Jackson, at age seven, and renamed him James Jackson Marshall. 33 years in the U.S. Army, made him a very mean man and because of his quick temper and bouts of delusional thinking and behavior, he never advanced beyond the rank of E-4. It was his obsession for neatness and organization that allowed him to remain in the military as a warehouse worker (supply sergeant).

## 17.

After Don E. Marshall had secured a loan with a fixed interest rate of 5.25%, Don E. Marshall explained the decedent that the loan was the best that could be found. James

J. Marshall was receiving letters and phone calls from Ally Financial, Inc., doing business as GMAC Mortgage Corporation claiming that he could refinance his home for 4.25% annual interest rate. Don E. Marshall would visit the decedent, at his home 10827 SE Bush Street, once a week and Would phone the decedent every day and run errands for him.

## 18.

GMAC MORTGAGE CORPORATION somehow arranged for James J. Marshall to show up in their office and 8 months later and coerced the decedent into signing a refinance loan application and documents just to save $35.00 for 36 months, then receive punishment by a $300.00 per month

mortgage increase. James J. Marshall was on a fixed income and that $300.00 increase made it difficult to manage his living expenses.

### 19.

James J. Marshall managed to hide the refinance from Don E. Marshall until the decedent suffered a heart attack in February 2007. The decedent, James J. Marshall, while re-cooperating in the hospital asked Don E. Marshall to act as an agent and attorney for the purpose of paying his bills and handling his personal affairs.

### 20.

On March 1, 2007, Don E. Marshall signed a Power of Attorney and began managing the decedent's finances. James J. Marshall lost the 50% use of the right side of his body and lost control of his bowels and bladder and needed more attending at home.

### 21.

On July 7, 2007, Don E. Marshall noticed that the decedent's monthly mortgage increased by $300.00. After many phone calls and discussions with the decedent,
Don E. Marshall was told what the decedent, or what GMAC did with the mortgage. James J. Marshall died on or about March 20, 2010.

### 22.

Claimant, Yosef L. Mustafanos called his niece in San Antonio, Texas to invite her to my wedding on August 7, 2010. Claimant was very surprised to hear the death of his father, that he haven't seen, at that time, 20 years.

### 23.

Claimant, Yosef Le Roi Mustafanos, on or about the first week in November 2010, contacted Everbank and spoke to a loan officer by the name of Michelle Holmes. The Defendant expressed an interest in buying

the aforesaid property for a reduced price. Michelle Holmes said, "Your credit must be approved first". "I'll send you a credit application". Michelle Holmes thought that the Claimant was being a good and responsible man for saving his father's home and that she was willing to help him. The claimant told Michelle Holmes that 1.) He has zero credit. 2.) He is self employed, with an inconsistent monthly income that range from $0 to $2300.00. 3.) Everbank was willing to grant a loan to the Claimant at a 60% debt to income ratio.

24.

Michelle Holmes received the credit application and called the defendant and told him that his credit application was approved, even without tax returns.

Michelle Holmes asked the Claimant to move into the foresaid property immediately and told him to call her when he was moved in so that she can mail the Claimant the loan note and deed of trust to sign in front of a notary.

25.

Michelle Holmes called the Claimant and told him that someone notified her that they drove by the home found that it was cleaned and secured, and she had already mailed out the loan note and deed of trust on December 30 2010 by way of Federal Express with prepaid Federal Express return envelope. Michelle Holmes told the defendant to sign the loan documents in front of a notary and mail them back A.S.A.P. The Claimant never returned the documents.

26.

The Claimant now has proof of how his deceased father James J. Marshall, an incompetent man, became entangled into signing a $107,950.00 loan note and deed of trust for a mobile home having an

intrinsic value of $49,000.00 to $83,000.00 located in a bad

neighborhood and how that perpetrated an attack against the decedent

and his estate.

27.

<u>DEED OF TRUST:</u>

Defendant asserts that the Deed of Trust is not a true depiction or

facsimile of the document to which the decedent James J. Marshall

visually saw and agreed to, by affixing his signature and initials

upon such.

28.

The Deed of Trust referred to as Exhibit 1 has black rectangular

boxes, which originally revealed "writing" that which aided and

affected the reasoning and decision of James J. Marshall.

29.

Everbank will argue that the Deed of Trust never had writing, but

transparent windows, therefore the document is original and never had

writing on it and will also argue that the fine print on the bottom,

(Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS), certifies that

the form is an official Government document.

30.

An investigation from the Court will produce the same results as the

defendant that Fannie Mae and Freddie Mac has absolutely nothing to do

with the regulating and creation of lender documents and forms.

Words are as important to a contract as they are to a recipe. To

remove key words from a recipe not only could affect the outcome of

the dish, but to hand over a recipe gaping holes, effects the

confidence and trust of the cook and anyone who takes possession of

that recipe. If our Grandmother explains the gaping holes in her recipe to us, our confidence is restored, but the Lenders in this case are not our Grandmother. This shell game of altered perception is mere chicanery and a parlor trick of which the Court must find deplorable.

31.

Even if Everbank produced a complete unused instrument and attempt to explain its function, the explanation cannot be admissible.

32.

The originating Lender, Mortgage Investors Corporation, claiming to be governed under the laws of the State of Ohio, should they violate an Ohio State Statute making such  transactions null and void, has escaped detection and prosecution by operating in the State of Florida, can they truly grant and assign that illegal transaction to Everbank, a Florida Corporation? Absolutely not! How then can Everbank claim to have authority to bring a claim in the State of Oregon?

33.

Ally Financial, Inc., GMAC Mortgage Corporation, Mortgage Investors Corporation and Everbank are operating as a single entity regarding the Toxicity of this predatory loan. They all have used drastic measures to burden a borrower with this property, without regards to laws or rights of the borrower.

34.

<u>DEED OF TRUST</u>

Defendant asserts that the Deed of Trust is not a true depiction or facsimile of the document to which the decedent James J. Marshall

visually saw and agreed to, by affixing his signature and initials upon such.

The Deed of Trust referred to as Exhibit 1 has black rectangular boxes, which originally revealed "writing" that which aided and affected the reasoning and decision of James J. Marshall.

### 35.

Everbank will argue that the Deed of Trust never had writing, but transparent windows, therefore the document is original and never had writing on it and will also argue that the fine print on the bottom, (MULTISTATE ADJUSTABLE RATE NOTE-Single Family-Veterans Affairs), certifies that the form is an official Government document._

### 36.

An investigation from the Court will produce the same results as the defendant that the Veterans Administration has absolutely nothing to do with the creation of lender documents and forms.

### 37.

### CURRENT HOLDER OF DEED OF TRUST AND DEED OF TRUST

Everbank claims to possess the original Note and Deed of Trust. Everbank must be prepared to produce those original instruments.

### 38.

James J. Marshall, Sr., a 74 year old man, not of sound mind, on March 3, 2004 entered a GMAC MORTGAGE CORPORATION office in Portland, Oregon and signed a Deed of Trust instrument in the presence of a notary public by the name of Karen S. McCoy. Two days later, James J. Marshall's signature appears on an Adjustable Rate Note loan without a notary public seal, stamp or signature affixed to that document.

### YOSEF LE ROI MUSTAFANOS RELATIONSHIP WITH DECEDENT

### 39.

Yosef Le Roi Mustafanos was an estranged son of decedent James Jackson Marshall and has not seen the decedent James J. Marshall for more than 22 years. Yosef Le Roi Mustafanos spoke to decedent James J. Marshall twice in 22 years, the first time in 2001 and the second time in 2005. Each phone communication lasted less than 10 ten (10) minutes and the conversation was strained. July 2010, Yosef Le Roi Mustafanos called his niece in San Antonio, Texas and learned about the death of the decedent. The siblings of Yosef Le Roi Mustafanos are estranged to him and his siblings and shelter the decedent from all communications and contact with Yosef Le Roi Mustafanos until and even after the death of James J. Marshall. All knowledge, evidence and facts have been acquired by Yosef Le Roi Mustafanos within the last nine (9) months.

### SIBLINGS OF YOSEF LE ROI MUSTAFANOS

### 40.

Siblings Tonny D. Marshall, Don E. Marshall and James J. Marshall, Jr., are not parties to this matter and has publically expressed no interest or involvement matter. Futhermore, they took no part in the execution of the Affiant's Deed, but express no opposition to Yosef Le Roi Mustafanos right, interest or involvement in this matter.

### V. ARGUMENT

#### FRAUD AND DECEIT WITH RESPECT TO SECURITIES OR SECURITIES BUSINESS

### 41.

When GMAC Mortgage Corporation allegedly solicited the decedent about the 4.25% adjustable rate loan as though it was a better loan than a fixed rate 5.25%, 8 months after purchase of the property committed a deceitful act. The broker knew that the decedent was mentally incompetent and was living by way of a fixed income. All

individuals remotely connected to the funding of the Everhome and

assignees are jointly culpable and liable financially to the

decedent and/or his estate in accordance to ORS 59.115(3)

42.

§ 59.115[1]

**Liability in connection with sale or successful solicitation of sale of securities**

- • recovery by purchaser
- • limitations on proceeding
- • attorney fees

**(1) A person is liable as provided in subsection (2) of this section to a purchaser of a security if the person:**

**(a) Sells or successfully solicits the sale of a security, other than a federal covered security, in violation of the Oregon Securities Law or of any condition, limitation or restriction imposed upon a registration or license under the Oregon Securities Law; or**

**(b) Sells or successfully solicits the sale of a security in violation of ORS 59.135 (Fraud and deceit with respect to securities or securities business) (1) or (3) or by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.**

**(2) The purchaser may recover:**

**(a) Upon tender of the security, the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 (Legal rate of interest) for judgments for the payment of money or the rate provided in the security if the security is an interest-bearing obligation, less any amount received on the security; or**

**(b) If the purchaser no longer owns the security, damages in the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and less interest on such value at the rate of interest specified in ORS 82.010 (Legal rate of interest) for judgments for the payment of money from the date of disposition.**

**(3) Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, limited liability company manager, including a member who is a manager, officer or director of such seller, every person occupying a similar status or performing similar functions, and every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of**

the existence of facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with that person.

## 43.

After the decedent experienced the first adjustment after 36 months, which was a $300.00 increase, subjected the decedent to undue stress and diminished the decedent's quality of life. He knew that he was going to eventually lose his first home to foreclosure. All that the GMAC Mortgage Corporation broker should have done is tell the decedent to go home and bring a friend or family member back who can help advise him on the legalities of the loan, but that did not happen. ORS 59.135(1),(2)and(3);ORS 59.137(1),(2)and(3);ORS 646.638(8)(b); ORS 86A.154

Claimant shall seek Punitive Damages and the Jury or Tier of Fact can order Everbank and all of those who are jointly involved in the selling of fraudulent securities to pay, in accordance to ORS646.638(1) and (8)(b).

## 44.

§ 646.638[1]

Civil action by private party

- • damages
- • attorney fees
- • effect of prior injunction
- • time for commencing action
- • counterclaim
- • class actions

(1) Except as provided in subsections (8) and (9) of this section, any person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608 (Additional unlawful business, trade practices), may bring an individual action in an appropriate court to recover actual damages or statutory damages of $200, whichever is greater. The court or the jury, as the case may be, may award punitive damages and the court may provide the equitable relief the court considers necessary or proper.

(2) Upon commencement of any action brought under subsection (1) of this section the party bringing the action shall mail a copy of the complaint or other initial pleading to the Attorney General and, upon entry of any judgment in the action, shall mail a copy of the judgment to the Attorney General. Failure to mail a copy of the complaint shall not be a jurisdictional defect, but a court may not enter judgment for the plaintiff until proof of mailing is filed with the court. Proof of mailing may be by affidavit or by return receipt of mailing.

(3) The court may award reasonable attorney fees and costs at trial and on appeal to a prevailing plaintiff in an action under this section. The court may award reasonable attorney fees and costs at trial and on appeal to a prevailing defendant only if the court finds there was no objectively reasonable basis for bringing the action or asserting the ground for appeal.

(4) The court may not award attorney fees to a prevailing defendant under the provisions of subsection (3) of this section if the action under this section is maintained as a class action pursuant to ORCP 32.

(5) Any permanent injunction or final judgment or order of the court made under ORS 646.632 (Enjoining unlawful trade practices) or 646.636 (Remedial power of court) is prima facie evidence in an action brought under this section that the respondent used or employed a method, act or practice declared unlawful by ORS 646.608 (Additional unlawful business, trade practices), but an assurance of voluntary compliance, whether or not approved by the court, shall not be evidence of the violation.

(6) Actions brought under this section shall be commenced within one year from the discovery of the unlawful method, act or practice. However, whenever any complaint is filed by a prosecuting attorney to prevent, restrain or punish violations of ORS 646.608 (Additional unlawful business, trade practices), running of the statute of limitations with respect to every private right of action under this section and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof.

(7) Notwithstanding subsection (6) of this section, in any action brought by a seller or lessor against a purchaser or lessee of real estate, goods or services, the purchaser or lessee may assert any counterclaim the purchaser or lessee has arising out of a violation of ORS 646.605 (Definitions for ORS 646.605 to 646.652) to 646.652 (District attorneys reports to Attorney General).

(8) A class action may be maintained under this section. In any class action under this section:

(a) Statutory damages under subsection (1) of this section may be recovered on behalf of class members only if the plaintiffs in the action establish that the members have sustained an ascertainable loss of money or property as a result of a reckless or knowing use or employment by the defendant of a method, act or practice declared unlawful by ORS 646.608 (Additional unlawful business, trade practices);

(b) The trier of fact may award punitive damages; and

(c) The court may award appropriate equitable relief.

RIGHT OF POSSESSION

45.

Claimant Alleges that: Everbank's Complaint meets the guidelines entitled "Quiet Title Action" which invokes a lawful, "At Law" Jurisdiction through which All Lawful Rights and Interests of the Claimant are protected.

46.

"Possession is Nine Tenths of the Law", is a very ancient "Maxim of Law", aka: "Common-Law Maxim". This "Maxim of Law" is designed to prevent any "Breach of the Peace". Here-under, if a person has acquired actual/physical possession of real-property under peaceable circumstances, meaning that there was no actual violence involved, this means that the person has a lawful entitlement or "Title" to the property. This is referred to as, "Possessory Title" or "Adverse Possession".

47.

164.105[1]

**Right of possession**

**Right of possession of property is as follows:**

(1) A person who has obtained possession of property by theft or other illegal means shall be deemed to have a right of possession superior to that of another person who takes, obtains or withholds the property from that person by means of theft.

(2) A joint or common owner of property shall not be deemed to have a right of possession of the property superior to that of any other joint or common owner of the property.

(3) In the absence of a specific agreement to the contrary, a person in lawful possession of property shall be deemed to have a right of possession superior to that of a person having only a security interest in the property, even if legal title to the property lies with the holder of the security interest pursuant to a conditional sale contract or other security agreement. [1971 c.743 §130; 1987 c.158 §28]

48.

Claimant alleges that: Conceding that a deed given as mere security for an existing debt is not effective to transfer the legal title or right of possession of the mortgaged property from the Grantor to the Grantee, nevertheless the voluntary surrender of actual possession to the grantee as further security is lawful, and may be effective to create a legal right of possession sufficient to bar a right of recovery in an action of Ejectment by the Mortgagor against the Mortgagee.

C.C.A.Or 1910. Sheradin v. Southern Pac. Co. 179 F. 81, 102 C.C.A. 375

49.

The law will never construe a possession tortious unless of necessity, but will consider every possession lawful, the commencement or continuation of which is not proven to be wrongful. ...

When, therefore, a naked possession is in proof, it will be deemed lawful and coextensive with the right set up.

Or. 1860. McEwen v. City of Portland, 1 Or. 300.

50.

There is a grey area, such as, when a person leaves his home for a few days or weeks to help Family, or friends, but where it is obvious that he has not abandoned his property, and he intends to return, then case-law in very ancient times, recognizes that it is a "breach of the peace" to recognize a new right of ownership for a person who takes another's property when he is temporarily away. When one person has never had actual physical possession of a specific piece of property, then there is no "right of possession" that may be attached there-to.

51.

In more detail; the Filing by this Constitutional State and Everbank
alleging to possess "Quiet Title" portion of our counterclaim invokes
the Fundamental Constitutional Principles of American and Oregon
"Property Law", all of which is Firmly Rooted in the Common-Law ideas
of Preventing "Breaches of the Peace".

52.

1.) Everbank named in this case may claim that they have "Adequate
Remedy" for any such truly "Lawful" Interests which they might possess
in this property, through a "Counter-Complaint" which invokes an
"Ejectment Action", as statutorily authorized through ORS 105.005 –
105.080 .

53.

2.) We suppose it is also remotely possible that Everbank in this case
might somehow also Counter-Complaint under the more summary process
called "Forcible Entry and Wrongful Detainer", as statutorily
authorized through ORS 105.105 – 105.168 .

54.

Both of these modes of procedure are firmly rooted in Oregon's
Constitutional Concepts of "Property Law". These are the Lawful Modes
of Authorizing Sheriff's Deputies to Use Force against any individual
or persons who un-lawfully take possession of any real property in
Oregon. But in this case, the Claimant can never be considered a
trespasser because the claimant took possession by lawful means and
has done nothing unlawful which may be interpreted as breaching the
peace.

55.

All of these concepts are firmly rooted in very ancient "At Law" aka: "Common-Law" which provide Long-Term Stability to the Laws of Real Property and Land for the People of Oregon.

56.

A few citations from "Oregon Digest", from its chapter on "Ejectment":

"Suit to recover possession of real property admits possession of defendant, which possessory title must prevail until complainant shows a better title.

In action to recover realty, a mere possessory right to occupancy of the realty may be pleaded defensively. Or. 1943. Sertic v. Roberts, 136 P.2d 248, 171 Or 121.

VI. CONCLUSION

FRAUD AND DECEIT WITH RESPECT TO SECURITIES OR SECURITIES BUSINESS

57.

Claimant alleges that: All parties remotely connected with the refinance of the forementioned property or home are liable for selling Fraudulent Securities. That all Brokers, Managers, individuals employed by financial institutions, as well as Trustees and Assignees are culpable and liable compensate the decedent's estate to the maximum limits of the law.

RIGHT OF POSSESSION

58.

Claimant Yosef L. Mustafanos assert that Everbank as never held a Deed or Title of ownership of said property known as: 10827 SE Bush Street Portland, OR. 97266. That Everbank has not produced any document that

proves superior possession to that of the Claimant, other than Security Instruments, which shall always be protected by the land and improvements. Everbank, at most possess 49% interest or less. Their desire is to liquidate the forementioned property to the highest bidder and at a loss, to recover the $30,000.00 guarantee from the Veterans Administration. Everbank has already received approximately $58,000.00 from the decedent James J. Marshall. If Everbank should sell the forementioned property for the sum of $35,000.00, Everbank will have made a sum total of $123,000.00 in less than 10 years for a home that was sold to decedent James J. Marshall for $102,500.00. Everbank will never live in the said property, nor make plans to beautify, remodel or build room additions to demonstrate love and pride in the property.

Everbank's possession, by way of security interest, is substandard to the possession of the Claimant. ORS 164.105 (3)

### VII. PRAYER FOR RELIEF

#### 59.

Claimant asserts that the Estate of the Decedent James J. Marshall, an incompetent man was defrauded by individuals jointly connected with Everbank by way of Preditory Practices, resulting in the Decedent James J. Marshall, making 84 monthly payments totaling $56,700 for a toxic loan effectively injuring the Estate of now deceased James J. Marshall.

#### 60.

That the Court Order Acknowledgement of Yosef Le Roi Mustafanos as Affiant over the Estate of James J. Marshall and accept the Affiant's Deed as an Affidavit declaring Yosef Le Roi Mustafanos as Trustee over the Estate of Decedent James J. Marshall.

61.

That the Court Order Everbank to repay the Estate of James J. Marshall $56,700.00 plus 10% interest per year amortized over 84 months to the present, or an amortized annual interest rate that the Court deem acceptable.

62.

That the Court Order Everbank and all parties who were involved in the refinance loan dated March 3, 2004 to each pay Punitive Damages in accordance to ORS 646.638(1)and(8)(b).

63.

That the Court Order the dismissal of Everbank's Civil Complaint against Tonny D. Marshall, Don E. Marshall, and James J. Marshall, Jr.

64.

That the Court Order all parties, agents, brokers and assignees be held jointly cupable civilly who were involved in the refinance loan dated March 3, 2004. ORS 59.135(1),(2)and(3); ORS 59.137(1),(2)and(3)

65.

That the Court Order sanctions against all licensed individuals and businesses involved in the fraudulent acts. ORS 86A.154; ORS 86A.990(1)

66.

The Court Order Everbank to produce original loan documents and If Everbank fails to produce such documents, the Court dismiss Everbank's case with prejudice.

67.

That the Court Order Claimant, Yosef Le Roi Mustafanos, to have lawful possession of 10827 SE Bush Street Portland, OR 97266 permenantly or until Everbank and joint parties repay the Estate of James J. Marshall

in full.

68.

That the Court Order Everbank to pay claimant's filing fees, mailing costs and Court Costs.

69.

That the Court Order the dismissal of CHERRY BUSH LANE HOMEOWNERS' ASSOCIATION, INC, A domestic non-profit corporation formed in 2005 and is currently in an inactive status by the Oregon Department of Corporations. This Homeowners Association never received support nor membership enrollment from the decedent James J. Marshall. The CHERRY BUSH LANE HOMEOWNERS' ASSOCIATION, INC, has no claim.

VIII. CLAIM FOR RELIEF-POSSESSION OF PROPERTY

70.

Everbank participated in using predatory practices to defraud an incompetent man James J. Marshall and his Estate for an accumulated amount of: $56,700.00, plus 10% amortized annual interest of: $53,792.25 plus Punitive Damages, mailing cost, Court Costs and Attorneys fees. Claimant requests a jury trial, and shall maintain possession of 10827 SE Bush Street Portland, Oregon 97266 Until Claimant acknowledge that the Estate of James J. Marshall is paid in full.

Dated this 6th day of FEBRUARY, 2014

REV. YOSEF MUSTAFANOS
5400 RAILROAD STREET
SILVER SPRINGS, NEVADA
89429

## CERTIFICATE OF SERVICE

I certify that I served the foregoing: ___AMENDED

COUNTERCLAIM_____

_____ on the following parties by

the method indicated below on: __February 6,_____ 2014.


Holger Uhl                                      ____Via First Class Mail

Shapiro & Sutherland L.L.C.                     ____ Via Facsimile

7632 SW Durham Rd Ste 350                       ____ Via Email

Tigard, OR 97224

Fax: 360-260-2285


George S. Pitcher & Rachel A. Robinson          ____Via First Class Mail

Williams, Kastner & Gibbs PLLC                  ____ Via Facsimile

888 SW Fifth Avenue, Suite 600                  ____ Via Email

Portland, OR 97204-2025

Fax: 503-222-7261


By_____

Rev. Yosef LeRoi Mustafanos

5400 Railroad Street

Silver Springs, NV 89429

Fax: 775-577-9926 Ph: 775-848-5940

| News, Quotes, Companies, Videos    SEARCH |

Home   World   U.S.   Business   Tech   Markets   Market Data   Your Money   Opinion   Life & Culture   N.Y.   Real Estate   Management

| TOP STORIES IN REAL ESTATE | 1 of 12 | | 2 of 12 | | 3 of 12 | | 4 of 12 |
The New First Family of Real Estate    Chelsea's Perennial Inspiration    'Painted Lady' for $2.295 Million    Foreclosures Show No Sign of Decline

WSJ BLOGS

# Developments

Real estate news and analysis from The Wall Street Journal

| Search Developments | SEARCH |

October 7, 2010, 3:29 PM

# Robo-Signer Debate: Was It Fraud?

**Article**          Comments (39)

DEVELOPMENTS HOME PAGE »

Email      Print

By Robbie Whelan

This week we saw the first major legal challenge to the mortgage servicers and lenders at the center of the kerfuffle over "robo-signers"—the mortgage servicer employees who allegedly signed thousands of documents authorizing foreclosures across the country, without actually having reviewed the loan documents, as the law requires.

Some say these middle-manager types (who have been identified at GMAC Mortgage LLC, J.P. Morgan Chase & Co., Bank of America Corp. and OneWest Bank, in depositions by consumer lawyers), if they did what they say they did, committed fraud in hundreds and even thousands of foreclosure cases by claiming knowledge of a financial matter of which they had no personal knowledge.



Bloomberg
Ohio Attorney General Richard Cordray

This chaffed Ohio Attorney General Richard Cordray so badly that he filed suit Wednesday against GMAC and its parent company Ally Financial Inc., seeking $25,000 in civil penalties for each instance of fraud, plus untold thousands of dollars more in consumer restitution.

That means, for each time a robo-signer's signature appears on an Ohio home loan (and all we know at this point is that there are "hundreds" such loans) and the signature was not based on personal knowledge or properly notarized, the state's AG could make them pay big bucks in penalties.

At the same time, Mr. Cordray sent stern letters to Wells Fargo & Co., Chase, Bank of America Corp., and CitiMortgage, Inc. asking them all to halt foreclosures in Ohio and meet with him to discuss how to solve the problem. His office sent a similar letter to GMAC before suing, suggesting that similar legal action against these other banks is not far off.

State AGs have been raising a ruckus over the foreclosure document fraud issue since it emerged in the public consciousness late last month. Top law officers in



IBM Watson  IBM

What will you do with Watson?

"Together we'll do things generations before couldn't dream of."

Watson is Open for Business
Watson on YouTube
Watson on IBMblr

Tweets from IBM Watson

IBM Watson  @IBMWatson    23 Jan

IBM Watson  @IBMWatson    22 Jan

See what Watson is up to

## Don't Miss                                        [?]


  


Target: Data Breach Affected 70 Million People    School Shooting in Moscow as Olympics Approach    Stocks Swoon, and This Time It's Not Emerging Markets

California, Connecticut, Illinois, Iowa, Maryland, Massachusetts, North Carolina and Texas have all sent similar letters to lenders and servicers, demanding either answers or a halt to foreclosures until the matter is resolved.

But the interesting thing about Mr. Cordray's case in Ohio is that it specifically names Jeffrey Stephan, GMAC's alleged robo-signer, as a defendant.

In an interview Wednesday, Mr. Cordray explained why Mr. Stephan was a target of the suit:

"Fraud is fraud. If you're ordered to violate the law and you violate the law, you're not innocent," he said. "That's the Nuremberg defense. In the trials after World War II, the defendants, the Nazis claimed, I did this, but someone ordered me to do it. You can't just say you're not responsible because someone told you to do it."

Does Mr. Stephan deserve to be compared to a Nazi? Was he actually maliciously signing fraudulent documents, or just doing what he was told to do? Well, we can't know for certain, because GMAC immediately circled the wagons around Mr. Stephan as soon as this news broke.

GMAC has repeatedly declined to make him available for comment, and calls to Mr. Stephan's house, cell phone and wife, as well as messages sent through the social-media network MySpace.com have gone unreturned. A Washington Post reporter even drove to his house in Sellersville, Pa. to chat with him, only to be turned away by Mr. Stephan.

A GMAC spokeswoman, in response to questions about the suit, wrote in an email that "there was nothing fraudulent or deceitful about GMAC Mortgage's practices," and vowed that the company "will vigorously defend this lawsuit and expects to be fully vindicated by the Ohio courts."

foreclosure crisis

« Previous
Real Estate News: Market Edge Ends for Manhattan Renters

Next »
Real Estate News: Foreclosure Bill Is Blocked

DEVELOPMENTS HOME PAGE

Email    Print

## About Developments

The Developments blog features exclusive news, analysis and commentary on residential and commercial real estate from The Wall Street Journal's real estate bureau. Send tips, comments and questions to developmentsblog@wsj.com.

Follow    Developments on Twitter

Like    Developments on Facebook

## Popular Now

What's This?

1  How Facebook, and Zuckerberg, Have Changed Over 10 Years


2  Apple Moves Toward Health and Fitness


3  Ford Follows Ka With Figo Concept


4  Regulators Ask Exxon: Why No Write-Downs?


5  Vote: Would You Pay More for Amazon Prime?


Show 5 More

## Don't Miss

[?]


Super Bowl: GoDaddy Ad


Five Vacations That Cost More Than You Earn All Year


Why the Super-Rich Want Bespoke Rolls-Royce Cars

'Naked Cowgirl' to Entertain Super Bowl Fans

Real Estate Investing
Looking For Real Estate Investing? Find It Nearby With Local.com!
Local.com

Buying Florida Homes ?
Florida Home Buyers SAVE with Buyer ONLY Real Estate Brokerages
www.GetYourOwnBuyerAgent.com

Charlestown Real Estate
See Charlestown RI Real Estate. See Real Estate Photos, MLS, & More
www.westerlyrealestate.com

Content from our Sponsors    [?]





Lifestyle Journal
Homeowners Get a Bailout This Year

Sunovis Financial
Small Business Owners Get Quick Loans

AARP
Wrong Ways to Pay Off Debt

<u>**Exhibit 4**</u>

**February 14, 2014 Letter**



WILLIAMS KASTNER™

February 14, 2014

28539.0101

Rev. Yosef L. Mustafanos
5400 Railroad Street
Silver Springs, NV  89429

**Re:**    *Everbank, Inc. v. Yosef Leroi Mustafanos, et al.*
**Multnomah County Circuit Court Case No. 1205-05897**

Dear Rev. Mustafanos:

My office has received service of the first amended counterclaim that you filed against Ally Financial Inc. ("Ally") in this matter.  In the counterclaim, you allege that Ally is "doing business as" GMAC Mortgage, LLC ("GMAC") and that Ally and GMAC "are operating as a single entity."

In my letter of February 10, 2014 I explained that your claims against Ally are barred by a Third Party Release pursuant to a Chapter 11 Plan confirmed by the United States Bankruptcy Court for the Southern District of New York in the matter of In re Residential Capital, LLC, Case No. 12020 (MG). The confirmation order and injunction that you received releases Ally of any claim "arising from or related in any way to" GMAC or the other Debtor entities.

Your allegation that Ally is liable for GMAC's alleged acts or omissions because Ally is "doing business" as GMAC and that the two entities are "operating as a single entity" clearly arise from and relate to GMAC and are therefore released.

Please be advised that if you fail to dismiss this matter by February 21, 2014 Ally's restructuring counsel will take appropriate action in the Bankruptcy Court to enforce the confirmation order and injunction that has been entered by that court.  Ally also will seek to hold you in contempt of court for willfully violating the Court's order and in connection therewith Ally will seek fees and costs in connection with bringing that proceeding.

Williams, Kastner & Gibbs PLLC
888 SW Fifth Avenue, Suite 600
Portland, Oregon 97204
main 503.228.7967  fax 503.222.7261
www.williamskastner.com
SEATTLE . TACOMA . PORTLAND

*Practicing law with greater resolve*™
4636770.1

Yosef L. Mustafanos
February 14, 2014
Page 2

Very truly yours,

Rachel A. Robinson
Licensed in Oregon and Washington
(503) 944-6925
rrobinson@williamskastner.com

RAR:wms

cc:    Holger Uhl

**Exhibit 5**

**February 24, 2014 Letter**

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Judson D. Brown
To Call Writer Directly:
(202) 879-5082
judson.brown@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

February 24, 2014

<u>Via Federal Express</u>

Rev. Yosef L. Mustafanos
5400 Railroad Street
Silver Springs, NV 89429

Re:  *Everbank, Inc. v. Yosef Leroi Mustafanos, et al.*
**Case No. 1205-08597, Multnomah County Circuit Court**

Dear Rev. Mustafanos:

I am counsel to Ally Financial Inc. and its non-debtor subsidiaries (collectively, "Ally") in the Residential Capital, LLC, et al. ("ResCap") Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of New York.

As you know, in December 2013, the Bankruptcy Court overseeing the ResCap bankruptcy confirmed ResCap's Chapter 11 Plan of Reorganization—and I understand you have received a copy of that Plan and the Court's Confirmation Order. ResCap's Plan includes a Third Party Release that releases all claims against Ally "arising from or related in any way to the Debtors," including ResCap, GMAC Mortgage, LLC and Residential Funding Company, LLC. (*See* Plan Art. IX.D.) ResCap's Plan also includes an Injunction which "permanently enjoined and precluded" the continuation of any claims against Ally that were released pursuant to the Third Party Release, and the Injunction further states that "[a]ny person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees." (*See* Plan Art. IX.I.)

I understand that you have brought the above-captioned lawsuit asserting claims against Ally and other defendants in Oregon state court concerning a foreclosure-related matter. The claims against Ally arise from and relate to the business of ResCap and its subsidiaries, including GMAC Mortgage, LLC and Residential Funding Company, LLC—and therefore those claims are subject to the Third Party Release and the Injunction in ResCap's Plan of Reorganization. As a result, we request that you voluntarily dismiss, with prejudice, the claims asserted against Ally in the above-referenced action.

Beijing    Chicago    Hong Kong    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

## KIRKLAND & ELLIS LLP

Reverend Yosef L. Mustafanos
February 24, 2014
Page 2


We are happy to discuss these issues if that would be helpful.  And we would be willing to arrange a telephone conference with the Bankruptcy Court, yourself or your counsel, and Ally's counsel to discuss these issues; let me know if you want us to do that.  However, if we do not hear from you and you have not dismissed the claims against Ally with prejudice by **Monday, March 3**, Ally will be forced to seek relief—including seeking to enforce the terms of the Injunction—in the Bankruptcy Court.

Sincerely,

Judson D. Brown