

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RESIDENTIAL FUNDING COMPANY,
LLC,

        Plaintiff,

      - against -

UBS REAL ESTATE SECURITIES, INC.,

        Defendant.

Case No. _____

**NOTICE OF BANKRUPTCY-
RELATED REMOVAL
PURSUANT TO 28 U.S.C. § 1452**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1452(a) and Federal Rule of

Bankruptcy Procedure 9027(a), Plaintiff Residential Funding Company, LLC ("RFC"), through

its successor the ResCap Liquidating Trust (the "Trust"),[1] hereby removes the civil action

entitled *Residential Funding Company, LLC v. UBS Real Estate Securities, Inc.*, No.

654323/2013 (the "Removed Case"), from New York Supreme Court, New York County, where

it is now pending, to the United States District Court for the Southern District of New York, for

anticipated further referral to the United States Bankruptcy Court for the Southern District of

New York ("Bankruptcy Court") pursuant to this District's Amended Standing Order of

Reference (M10-468), 12-mc-0032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.), and assignment to

Judge Martin Glenn as arising in or related to *In re Residential Capital, LLC*, No. 12-12020

(Bankr. S.D.N.Y. filed May 14, 2012). In support of removal, RFC states the following:

---

[1] Pursuant to the Order Confirming Second Amended Joint Chapter 11 Plan Proposed by
Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors, *In re
Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), on December
17, 2013, certain of RFC's assets, including the causes of action involved herein, were
transferred to the Trust. Federal Rule of Civil Procedure 25(c) permits continued litigation in
RFC's name.

## RFC IS ENTITLED TO REMOVAL

1.       On May 14, 2012, RFC filed a voluntary chapter 11 petition commencing a
bankruptcy case, *In re Residential Funding Co., LLC*, No. 12-12019, that remains pending in the
Bankruptcy Court for this District.

2.       That case and fifty other chapter 11 cases simultaneously commenced by
affiliated entities are being jointly administered by Judge Martin Glenn through a lead case, *In re
Residential Capital, LLC*, No. 12-12020. *See* Order Under Bankruptcy Rule 1015 Authorizing
Joint Administration of the Debtors' Chapter 11 Cases, *id.*, ECF No. 59.

3.       On December 11, 2013, the Bankruptcy Court confirmed the Second Amended
Joint Chapter 11 Plan proposed by the fifty-one affiliated entities. *See* Order Confirming Second
Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official
Committee of Unsecured Creditors, *id.*, ECF No. 6065 ("Confirmation Order"); Second
Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official
Committee of Unsecured Creditors, *id.*, ECF No. 6065-1 ("Plan").

4.       The Plan provides: "Notwithstanding the entry of the Confirmation Order and the
occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall
retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases
and the Plan . . . ." Plan at 116; *see* Confirmation Order at 79.

5.       The Plan also specifically preserved the causes of action asserted in the Removed
Case against Defendant UBS Real Estate Securities, Inc. ("Defendant"), its successors and
assigns. *See* Plan at 80-81; Confirmation Order at 65-68; Revised Plan Ex. 13 at 33, *id.*, ECF
No. 6036-1.

6.     On December 17, 2013, the conditions of the Plan were satisfied, the Effective
Date of the Plan occurred, and the Plan was substantially consummated. *See* Notice of Entry, *id.*,
ECF No. 6137.

7.     Also on December 17, 2013, RFC commenced the Removed Case by
electronically filing a Summons and Complaint with the New York County Clerk.

8.     28 U.S.C. § 1452(a) provides: "A party may remove any claim or cause of action
in a civil action other than a proceeding before the United States Tax Court or a civil action by a
governmental unit to enforce such governmental unit's police or regulatory power, to the district
court for the district where such civil action is pending, if such district court has jurisdiction of
such claim or cause of action under section 1334 of this title."

9.     The Removed Case is a civil action that is not before the United States Tax Court
and was not brought by a governmental unit.

10.     This Court is the proper destination for removal because the Removed Case is
pending in New York Supreme Court, New York County, which is within the Southern District
of New York.

11.     This Court has original jurisdiction under 28 U.S.C. § 1334 of all cases and
proceedings under Title 11 and all civil proceedings arising in or related to cases under Title 11.

12.     The Removed Case is a civil proceeding that is directly related to RFC's
bankruptcy case in multiple respects:

(a)     The Removed Case is an unliquidated asset of RFC's bankruptcy estate,
and any recovery in the Removed Case will be distributed to RFC's creditors pursuant to the
confirmed liquidation Plan. *See* Plan at 80-81; Confirmation Order at 65-68.

3

(b)      The Complaint in the Removed Case alleges that Defendant's actions

helped to cause RFC's bankruptcy. Specifically, the Complaint alleges that RFC purchased over

$460 million worth of mortgage loans from Defendant; that RFC frequently distributed through

whole loan sales or securitizations these loans along with loans purchased from other originators;

that RFC was then subjected to an onslaught of repurchase demands, lawsuits, and other claims

based on defects in the loans distributed through whole loan sales or securitizations, including

hundreds of the loans RFC purchased from Defendant; and that RFC filed its bankruptcy petition

in part because of these claims.

(c)      The Complaint seeks indemnification of and damages for liabilities and

losses that RFC incurred in its bankruptcy case in the form of settlements that granted allowed

claims totaling billions of dollars. Those settlements were a cornerstone of the Plan, and the

reasonableness of those settlements was extensively litigated in, and ultimately approved by, the

Bankruptcy Court.

(d)      Defendant has filed a proof of claim in the bankruptcy case seeking

indemnification and contribution from RFC for losses allegedly stemming from mortgage loans

Defendant purchased from RFC. *See* Response of UBS Real Estate Securities Inc. to Debtors' Fifty-

Second Omnibus Objection to Claims (Insufficient Documentation) at 1-2, 4, *In re Residential*

*Capital, LLC*, No. 12-12020 (Bankr. S.D.N.Y. Feb. 13, 2014), ECF No. 6470. The claims asserted

in the Removed Case are, in substance and effect, a counterclaim to Defendant's claims in the

bankruptcy case.

## THE REMOVED CASE IS A CORE PROCEEDING

13.      The Removed Case is a core proceeding because it: concerns issues and claims

similar and in some respects identical to those Defendant is asserting in its proof of claim in

4

RFC's bankruptcy case; is in substance and effect a counterclaim by the bankruptcy estate;

relates to the administration of the estate and the Trust's obligation to liquidate RFC's assets; and

may affect the allowance or disallowance of claims against the estate. *See* 28 U.S.C.

§ 157(b)(2); *Cent. Vt. Public Serv. Corp. v. Herbert*, 341 F.3d 186, 191-92 (2d Cir. 2003); *In re*

*Winimo Realty Corp.*, 270 B.R. 108, 120 & n.7 (S.D.N.Y. 2001); *Pan Am. World Airways, Inc. v.*

*Evergreen Int'l Airlines*, 132 B.R. 4, 7-8 (S.D.N.Y. 1991); *cf. Stern v. Marshall*, 131 S. Ct. 2594,

2616-17 (2011).

14.     Pursuant to Local Bankruptcy Rule 9027-1, RFC hereby states that it consents to

the entry of final orders or judgment by a bankruptcy judge if it is determined that a bankruptcy

judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article

III of the U.S. Constitution.

## ADDITIONAL REQUIREMENTS

15.     This Notice is timely because on February 25, 2014, the Bankruptcy Court issued

an order pursuant to Bankruptcy Rule 9006(b) extending until June 1, 2014, the time for RFC to

file notices of removal pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027 in civil actions

to which RFC is a party. Order Further Extending the Time to File Notices of Removal of Civil

Actions, *In re Residential Capital, LLC*, No. 12-12020 (Bankr. S.D.N.Y. Feb. 25, 2014), ECF

No. 6516. Additionally, no responsive papers have been filed in the Removed Case, and where,

as here, a plaintiff seeks to remove, an answer is an "initial pleading" for purposes of Rule 9027.

*See In re 47-49 Charles St.*, No. 98 Civ. 4669, 1999 WL 138929, at *2 (S.D.N.Y. Mar. 15,

1999); *In re Boyer*, 108 B.R. 19, 25 (Bankr. N.D.N.Y. 1988).

16.     Pursuant to Rule 9027(a)(1), a copy of all process and pleadings in the Removed

Case is attached hereto as Exhibit A.

17.     Pursuant to Rule 9027(b), Plaintiff will promptly serve a copy of this filed Notice on Defendant.

18.     Pursuant to Rule 9027(c), Plaintiff will promptly file a copy of this filed Notice with the New York County Clerk.

WHEREFORE, notice is hereby given that this action is removed from New York Supreme Court to the United States District Court for the Southern District of New York, for anticipated further referral to this District's Bankruptcy Court as related to *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y.), pursuant to this District's Amended Standing Order of Reference (M10-468), 12-mc-0032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

DATED:     March 27, 2014          QUINN EMANUEL URQUHART &
           New York, NY            SULLIVAN, LLP

                                   By:
                                   Peter E. Calamari
                                   Isaac Nesser
                                   Alex Rossmiller
                                   John Sullivan
                                   51 Madison Avenue, 22nd Floor
                                   New York, NY 10010
                                   Telephone: (212) 849-7000
                                   Facsimile: (212) 849-7100
                                   petercalamari@quinnemanuel.com
                                   isaacnesser@quinnemanuel.com
                                   alexrossmiller@quinnemanuel.com
                                   johnsullivan@quinnemanuel.com

6

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 12/17/2013

NYSCEF DOC. NO. 1

INDEX NO. 654323/2013

RECEIVED NYSCEF: 12/17/2013

12-12020-mg    Doc 6771-2    Filed 03/27/14    Entered 04/11/14 10:59:56    ntcrem    Pg
8 of 171

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------ X

RESIDENTIAL FUNDING COMPANY, LLC,

       Plaintiff,

    v.

UBS REAL ESTATE SECURITIES, INC.,

       Defendant.

------------------------------------------------------------------- X

Index No.:
Date Purchased:

**Plaintiff designates**
New York County as
the Place of trial

**SUMMONS**

Basis of Venue
CPLR §§501 and 503

**TO THE ABOVE NAMED DEFENDANT(S):**

     **YOU ARE HEREBY SUMMONED,** to answer the Complaint in this action and to serve a copy of the Answer, or if the Complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York; and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: December 17, 2013

                            Yours, etc.
                            **CARPENTER LIPPS & LELAND LLP**

                            /s/ Jennifer A.L. Battle
                            Jennifer A.L. Battle (Bar No. 3895315)

                            /s/ Katie P. Weitzman
                            Katie P. Weitzman (Bar No. 5087556)

                            CARPENTER LIPPS & LELAND LLP
                            280 Plaza, Suite 1300
                            280 North High Street
                            Columbus, Ohio 43215
                            Telephone:  (614) 365-4100
                            Facsimile:  (614) 365-9145
                            Battle@CarpenterLipps.com
                            Weitzman@carpenterlipps.com

*Attorneys for Plaintiff Residential Funding Company, LLC*

Of Counsel:

Jeffrey A. Lipps
Michael N. Beekhuizen
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145
Lipps@CarpenterLipps.com
Beekhuizen@CarpenterLipps.com

**Defendant's Address:**
**UBS REAL ESTATE SECURITIES, INC.**
1285 Avenue of the Americas
New York, NY 10019

**STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| RESIDENTIAL FUNDING COMPANY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UBS REAL ESTATE SECURITIES, INC., | ) |
| | ) |
| Defendant. | ) |

CASE NO. _____

## COMPLAINT

Plaintiff Residential Funding Company, LLC ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its Complaint against defendant UBS Real Estate Securities, Inc. ("Defendant"), as follows:

## NATURE OF ACTION

1.      Defendant sold mortgage loans to RFC pursuant to the Master Seller's Purchase and Warranties Agreement attached as Exhibit A (the "Contract").

2.      Pursuant to the Contract, Defendant made a number of representations and warranties to RFC regarding, among other things, the quality of the mortgage loans it sold RFC; the manner in which the mortgage loans were originated and underwritten; and the compliance of the mortgage loans with applicable state and federal law.

3.      Defendant breached these representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Contract; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

4.      Had RFC been aware of the defects in Defendant's loans, it would never have acquired them.

5.    As a direct result of these contractual breaches, RFC has suffered damages and losses for which it is entitled to damages pursuant to the Agreement.

6.    Pursuant to the Contract, RFC is entitled to seek repurchase of the defective loans from Defendant or, where repurchase is not possible, contractual damages sufficient to make RFC whole and/or compensate it for its acquisition of the defective loans.

7.    As a further result of Defendant's breaches of representations and warranties, RFC has been forced to incur (and continues to incur) substantial losses in the form of damages paid to third parties, settlement payments, repurchases, lost value and lost profits stemming from non-performing or defective loans, increased servicing expenses (including foreclosure costs associated with non-performing and/or non-compliant loans), attorneys' fees, court costs, and other losses.

8.    Indeed, as discussed in further detail below, in May 2012, RFC was forced to file for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code, in part because of the dozens of lawsuits and allegations relating to defective loans, including those sold to it by Defendant.

9.    Defendant agreed and is obligated to indemnify RFC, and to reimburse RFC for and against any and all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses resulting from Defendant's breaches and defaults.

10.    RFC therefore brings this action for breach of contract, and for indemnification for losses RFC has suffered due to Defendant's conduct.

## PARTIES

11.    Plaintiff Residential Funding Company, LLC, is a Delaware limited liability

company with its principal place of business in Minneapolis, Minnesota.

12.    Defendant UBS Real Estate Securities, Inc., is a Delaware corporation with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this proceeding pursuant to CPLR §§ 301 and 302 because Defendant transacted business in New York and committed acts in New York causing injury to RFC.

14.    Venue is proper in this Court pursuant to CPLR §§ 501 and 503, in that a substantial part of the events and omissions giving rise to this Complaint occurred in the State of New York and New York County, and because the parties have contractually agreed that New York law will apply.

## FACTUAL BACKGROUND

### The Agreement Between RFC and the Defendant

15.    RFC was an aggregator of residential mortgage loans and an issuer of mortgage-backed securities.

16.    As such, RFC acquired mortgage loans from "correspondent lenders," including Defendant.  As a correspondent lender, Defendant had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  Defendant had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was the Defendant that actually closed the loans with the borrowers.

17.    Defendant contracted with RFC to sell already-closed loans to RFC pursuant to the requirements set forth in the Contract.

3

18.    As Defendant was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

19.    RFC also sold pools of loans to whole loan investors.

20.    Defendant knew of RFC's intention to securitize and/or sell the loans. Specifically, the Defendant acknowledged, in Article IV of the Contract, that the loans it sold RFC were subject to being sold to others through whole loan transfers or as public or private pass-through transfers, such as would occur in a mortgage-backed securitization.  Accordingly, Defendant agreed to provide RFC "for inclusion in any prospectus or other offering material such publicly available information regarding the Company and its underwriting guidelines and procedures, and to indemnify [RFC] and its affiliates for material misstatements or omissions contained in such information …." See Exhibit A at 4.01(b)(4).

21.    Over the course of the parties' relationship, RFC acquired at least $460 million worth of residential mortgage loans from Defendant pursuant to the Contract.

22.    Pursuant to the Contract, Defendant made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

    a.    "The information set forth in the related Mortgage Loan Schedule, as of the dates set forth therein, is complete, true and correct in all material respects." (Exhibit A at § 3.02(a).)

    b.    "At origination of the Mortgage Loan, any and all requirements of any federal, state or local law, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan had been complied with in all material respects."  (Exhibit A at § 3.02(d).)

    c.    "No fraud, misrepresentation or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Company, the Originator or the

4

Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan." (Exhibit A at § 3.02(f).)

d.  "Each Mortgage Loan was originated pursuant to the Underwriting Standards" incorporated into the Contract, "and the Mortgage Loan complies with all the terms, conditions and requirements of such Underwriting Standards." (Exhibit A at § 3.02(l).) UBS's Underwriting Standards, in turn, contained a detailed set of requirements governing appraisals, income documentation, debt-to-income ratios, loan-to-value ratios, and other pertinent requirements.

e.  "The Mortgage File contains an appraisal of the Mortgaged Property which was signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan...." (Exhibit A at § 3.02(p).)

f.  "No Mortgage Loan had a Loan-to-Value Ratio at the time of origination of more than 100%." (Exhibit A at § 3.02(ii).)

g.  No Mortgage Loan was a "high cost" or "predatory" loan under applicable federal, state or local laws. (Exhibit A at § 3.02(jj) & (oo).)

h.  All points, fees and charges were disclosed in writing to the borrower "in accordance with applicable state and federal law and regulation." (Exhibit A at § 3.02(pp) & (qq).)

i.  "The representations and warranties of the Company contained in the related [Assignment, Assumption and Recognition Agreement] are true and correct in all material respects." (Exhibit A at § 3.02(uu).)

23.    RFC relied on these representations and warranties in acquiring the loans, and their presence was a material consideration in RFC's decision to acquire the mortgage loans from Defendant.

24.    Pursuant to the Contract, Defendant's failure to comply with its representations and warranties gave RFC the right to seek cure, repurchase, substitution, or payment. (Exhibit A at § 3.03.)

25.    The Defendant also expressly agreed to broad indemnification provisions, which provide as follows:

5

> In addition to such [other remedies], [Defendant] shall indemnify the
> Purchaser and hold it harmless against any losses, damages, penalties,
> fines, forfeitures, fees (including reasonable legal fees), judgments, costs
> and expenses resulting from any claim, demand, defense or assertion
> based on or grounded upon, or resulting from, a breach of [Defendant's]
> representations and warranties…

(Exhibit A at § 3.03.)

## The Performance of Defendant's Loans and the Consequences for RFC

26. RFC generally was not in the business of holding loans on its books. The loans it acquired from Defendant and other correspondent lenders were sold, either into residential mortgage-backed securitization ("RMBS") trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

27. The loans Defendant sold RFC were eventually included in approximately 50 RMBS Trusts. When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in its RMBS. In making those representations and warranties, RFC relied on information provided to it by Defendant and other correspondent lenders. That information in many cases violated the Defendant's representations and warranties to RFC.

28. Over time, many of the loans sold to RFC by Defendant defaulted or became seriously delinquent.

29. Internal reviews conducted by RFC after the loans were acquired from Defendant determined that various of the loans sold to RFC by Defendant violated the representations or warranties made by Defendant, resulting in an Event of Default under the Contract. In fact, more than half of the Defendant's loans reviewed by RFC were deemed to contain some type of defect.

30. The types of defects varied, but included income misrepresentation, employment

misrepresentation, owner occupancy fraud, appraisal fraud or inaccuracies, undisclosed debt, and

missing or inaccurate documents, among others.

31.    Indeed, as part of its own analysis of the claims later asserted against it, RFC

retained its own expert, who concluded that approximately 43.5% of the loans he reviewed were

materially defective in one or more ways, and that the likely exposure to RFC and its affiliates

from defective correspondent loans exceeded $7 billion.

32.    Beginning in 2008 and continuing until RFC filed for bankruptcy protection on

May 14, 2012, RFC faced a growing number of claims and lawsuits stemming from the defective

loans sold to it by Defendant and others.

33.    RFC had always received a certain number of repurchase demands, primarily

from whole loan investors.

34.    However, in early 2008, MBIA Insurance Corp., a bond insurer that issued

insurance policies guaranteeing the performance of certain mortgage-backed securities issued by

RFC, began for the first time questioning the quality of large numbers of loans in the

securitizations it had insured.

35.    MBIA hired a team to begin reviewing loan files, and in May 2008, based on the

*less-stringent* representations and warranties RFC had made to MBIA, demanded that RFC

repurchase over 2,000 allegedly defective loans.

36.    Although RFC aggressively defended the claims made by MBIA wherever

possible, RFC was forced to concede that, even on the basis of representations and warranties

that were less stringent than those Defendant made to RFC, RFC was obligated to repurchase at

least 24% of the loans MBIA claimed were defective.  MBIA continued its review and continued

to find thousands of defective loans, ultimately resulting in protracted and costly litigation, as

described below.

37.     Similar repurchase demands were made by other bond insurers, including FGIC,
FSA/Assured, Ambac and Syncora.

38.     In 2012, Deutsche Bank, a Trustee of numerous RMBS issued by RFC, for the
first time made a repurchase demand to RFC.  Deutsche likewise alleged that the loans were
defective in numerous ways.

39.     Beginning in October 2008, RFC was sued in literally dozens of lawsuits
stemming from allegedly defective mortgage loans, including those sold to it by Defendant.

40.     The first of these lawsuits was filed by bond insurer MBIA in October 2008.  The
MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage
loans. For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the
loans in the pools it insured were defective.

41.     The MBIA lawsuit was followed shortly by a class action suit filed by the New
Jersey Carpenters pension funds.

42.     The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed
securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-
lien Alt-A loans, including those sold to RFC by Defendant.

43.     The New Jersey Carpenters complaint alleged that 38% of the mortgage loans
underlying the securitizations were in delinquency, default, foreclosure or repossession by the
time New Jersey Carpenters filed their class action complaint, and that much of RFC's mortgage
loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower
income inflation, and the other facets of defective underwriting" described throughout the
Complaint. (NJ Carpenters First Am. Compl. at ¶¶ 9, 110.)  Of course, that data was provided to

RFC—and represented and warranted to be accurate—by Defendant and other correspondent lenders.

44.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

45.     All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

46.     Collectively, these lawsuits involved more than a hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

47.     Across the dozens of securitizations involved in these lawsuits, Defendant was responsible for hundreds of the loans.

48.     In May 2012, RFC filed for Chapter 11 bankruptcy protection in the Southern District of New York.

49.     In connection with the bankruptcy proceeding, literally hundreds of proofs of claim were filed by private securities investors, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Defendant.

50.     In addition, over time, RFC was forced to defend against, respond to, and in many instances accept repurchase demands made by purchasers of portfolios of whole loans from RFC. These whole loan purchasers included Countrywide, Wells Fargo, Indy Mac, Goldman Sachs

9

and others, many of whom also filed proofs of claim in the bankruptcy case seeking hundreds of thousands of dollars in recovery.

51.     These claims, lawsuits, and demands alleged, among other things, that the loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties.    Those representations and warranties were, in most cases, identical to or less stringent than those received by RFC from Defendant, and were based on RFC's reliance on Defendant's (and other correspondent lenders') representations and warranties to RFC.

52.     After hard-fought negotiations and litigation, RFC and its affiliates ultimately settled many of these claims and lawsuits in the bankruptcy proceeding for allowed claims totaling billions of dollars.  RFC continues to litigate other claims.

53.     Even given the fact that these creditors will only recover a small percentage of their claims under the Plan of Reorganization, RFC and its affiliates will still ultimately pay out hundreds of millions of dollars stemming from the defective loans.

54.     In addition to the bankruptcy settlements, before the bankruptcy, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.

55.     RFC continues to lose value on hundreds of loans still in its own portfolio.

56.     Finally, prior to and during the bankruptcy case, RFC paid millions of dollars in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans.

57.     These losses and exposures stem in part from Defendant's breaches of the

representations and warranties, and RFC is entitled to recover from Defendant for those breaches. RFC is also entitled to indemnification from Defendant pursuant to the Defendant's express indemnification obligations.

## COUNT ONE
### (BREACH OF CONTRACT)

58.    RFC realleges each and every allegation set forth in Paragraphs 1 through 57, above, as if fully rewritten herein.

59.    Defendant made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans, which Defendant sold to RFC.

60.    Defendant breached its representations and warranties to RFC inasmuch as the mortgage loans did not comply with the representations and warranties.

61.    Accordingly, RFC is entitled to damages equivalent to rescission or repurchase of the loans, and/or damages sufficient to make RFC whole for its purchase of defective loans, in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees and costs.

## COUNT TWO
### (INDEMNIFICATION)

62.    RFC realleges each and every allegation set forth in Paragraphs 1 through 61, above, as if fully rewritten herein.

63.    RFC has incurred substantial losses and damages arising from and relating to the mortgage loans, which Defendant sold to RFC.

64.    Defendant expressly agreed to indemnify RFC for the losses and damages, including attorneys' fees and costs, which RFC has incurred.

65.    Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an

amount to be proven at trial, and an award of attorneys' fees and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)     On Count One (Breach of Contract), contractual repurchase and/or "make whole"

damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys'

fees and costs; and

(B)     On Count Two (Indemnification), damages sufficient to reimburse RFC's losses,

costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be

proven at trial, and an award of attorneys' fees and costs; and

(C)     All such further relief, as the Court deems necessary or proper.

Dated: December 17, 2013

/s/ Jennifer A.L. Battle
Jennifer A.L. Battle (N.Y. Bar No. 3895315)

/s/ Katie P. Weitzman
Katie P. Weitzman (N.Y. Bar No. 5087556)

CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145
Battle@CarpenterLipps.com
Weitzman@carpenterlipps.com
*Attorneys for Plaintiff Residential Funding
Company, LLC*

Of Counsel:

Jeffrey A. Lipps
Michael N. Beekhuizen
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145
Lipps@CarpenterLipps.com
Beekhuizen@CarpenterLipps.com

12-12020-mg    Doc 6771-2    Filed 03/27/14    Entered 04/11/14 10:59:56    ntcrem    Pg
22 of 171

# Exhibit A

**RFC Draft 5/12/05**

RESIDENTIAL FUNDING CORPORATION,
Purchaser,


And


UBS REAL ESTATE SECURITIES INC.,
Company


MASTER SELLER'S PURCHASE AND WARRANTIES AGREEMENT
Dated as of May 12, 2005

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................. 2

    Section 1.01    Defined Terms. ..................................................................... 2

ARTICLE II RECORD TITLE AND POSSESSION OF MORTGAGE FILES; BOOKS AND
RECORDS; CUSTODIAL AGREEMENT; DELIVERY OF MORTGAGE LOAN
DOCUMENTS.......................................................................................... 13

    Section 2.01    Agreement to Purchase. ..................................................... 13

    Section 2.02    Purchase Price. .................................................................. 13

    Section 2.03    Conveyance; Record Title and Possession of Mortgage Files. .......... 14

    Section 2.04    Books and Records ............................................................ 14

    Section 2.05    Examination of Mortgage Files. ......................................... 14

    Section 2.06    Delivery of Mortgage Loan Documents. ............................ 15

    Section 2.07    Closing. .............................................................................. 15

    Section 2.08    Closing Documents. ........................................................... 16

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY;
REPURCHASE; REVIEW OF MORTGAGE LOANS ................................. 18

    Section 3.01    Representations and Warranties of the Company. ............... 18

    Section 3.02    Representations and Warranties as to Individual Mortgage
Loans. ................................................................................ 20

    Section 3.03    Repurchase; Substitution. .................................................. 28

    Section 3.04    Repurchase of Mortgage Loans With Early Payment Default........... 30

    Section 3.05    Purchase Price Protection. ................................................. 30

ARTICLE IV RECONSTITUTION OF MORTGAGE LOANS .......................... 32

    Section 4.01    Reconstitution of Mortgage Loans..................................... 32

ARTICLE V MISCELLANEOUS PROVISIONS ............................................. 34

    Section 5.01    Amendment.......................................................................... 34

    Section 5.02    Governing Law. .................................................................. 34

    Section 5.03    Notices. .............................................................................. 34

    Section 5.04    Severability of Provisions. ................................................. 35

    Section 5.05    Exhibits. ............................................................................. 35

    Section 5.06    General Interpretive Principles. ......................................... 36

    Section 5.07    Reproduction of Documents. ............................................. 36

i

Section 5.08    Confidentiality of Information. ............................................. 37

Section 5.09    Recordation of Assignments of Mortgage. ........................................ 37

Section 5.10    Non-Solicitation. ....................................................... 37

Section 5.11    Assignment by Purchaser and Company. ........................................... 37

Section 5.12    No Partnership. ......................................................... 38

Section 5.13    Entire Agreement. ...................................................... 38

Section 5.14    Mandatory Delivery; Grant of Security Interest. .............................. 38

Section 5.15    Counterparts. ......................................................... 38

Section 5.16    Intention of the Parties. ................................................. 39

Section 5.17    Waivers. ............................................................. 39

Section 5.18    Further Agreements. ..................................................... 39

Section 5.19    Costs.................................................................. 39

EXHIBITS

A          Contents of Mortgage File
B          Company's Underwriting Standards
C          Form of Assignment, Assumption and Recognition Agreement
D          Form of Security Release Certificate

[TPW: NYLEGAL:299098.2] 19356-00081  03/08/2005 03:33 PM

This is a Master Seller's Purchase and Warranties Agreement, dated as of May 12, 2005 and is executed between RESIDENTIAL FUNDING CORPORATION, as purchaser (the "Purchaser"), and UBS REAL ESTATE SECURITIES INC., as seller (the "Company").

## W I T N E S S E T H:

WHEREAS, the Company will acquire from certain third party originators, from time to time, certain Mortgage Loans;

WHEREAS, the Purchaser may agree to purchase from the Company and the Company may agree to sell to the Purchaser certain Mortgage Loans, from time to time, pursuant to this Agreement and the applicable Confirmation of Terms (as defined below);

WHEREAS, the Servicer owns the Servicing Rights with respect to the Mortgage Loans and shall continue to service each Mortgage Loan following the related Closing Date;

WHEREAS, each of the Mortgage Loans is secured by a mortgage, deed of trust or other security instrument creating a first lien on a residential dwelling located in the jurisdiction indicated on the related Mortgage Loan Schedule, which is attached to the related AAR. The Mortgage Loans as described herein shall be delivered in groups of whole loans (each, a "Mortgage Loan Package") on various dates as provided herein (each, a "Closing Date"); and

WHEREAS, the Purchaser and the Company wish to prescribe the representations, warranties and covenants of the Company with respect to itself and the Mortgage Loans;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Purchaser and the Company agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01 <u>Defined Terms.</u>

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meaning specified in this Article:

<u>AAR:</u>  An Assignment, Assumption and Recognition Agreement in the form of Exhibit C hereto.

<u>Adjustable Rate Mortgage Loan:</u>  A Mortgage Loan purchased pursuant to this Agreement which provides for the adjustment of the Mortgage Interest Rate payable in respect thereto.

<u>Adjustment Date:</u>  With respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on the Mortgage Loan is adjusted in accordance with the terms of the Mortgage Note.

<u>Agreement:</u>  This Master Seller's Purchase and Warranties Agreement including all exhibits hereto, amendments hereof and supplements hereto.

<u>Appraised Value:</u> With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan completed and prepared by a Qualified Appraiser in accordance with the standards described in Section 3.02(p) and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan.

<u>Assignment</u> or <u>Assignment of Mortgage</u>:  An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage.

<u>Balloon Mortgage Loan:</u>  A Mortgage Loan that provided on the date of origination for an amortization schedule extending beyond its maturity date.

<u>Balloon Payment:</u>  With respect to any Balloon Mortgage Loan, the Monthly Payment payable on the maturity of such Mortgage Loan.

<u>BIF:</u>  The Bank Insurance Fund, or any successor thereto.

<u>Business Day:</u>  Any day other than (i) a Saturday or a Sunday, or (ii) a legal holiday in the State of New York, or (iii) a day on which banks in the State of New York are authorized or obligated by law or executive order to be closed.

Closing Date:  The date or dates set forth in the related Confirmation of Terms on which the Purchaser from time to time shall purchase and the Company from time to time shall sell to the Purchaser, the Mortgage Loans listed on the related Mortgage Loan Schedule with respect to the related Mortgage Loan Package.

Code:  The Internal Revenue Code of 1986, as the same may be amended from time to time (or any successor statute thereto).

Company:  UBS Real Estate Securities Inc., a Delaware corporation, its successors and permitted assigns.

Company's Officer's Certificate: A certificate signed by the Chairman of the Board, President, any Vice President or Treasurer of the Company stating the date by which the Company expects to receive any missing documents sent for recording from the applicable recording office.

Condemnation Proceeds:  All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Confirmation of Terms: A written trade confirmation or similar letter agreement applicable to a particular sale of Mortgage Loans under this Agreement providing supplemental terms applicable to such sale.

Convertible Mortgage Loan:  Any Adjustable Rate Mortgage Loan purchased pursuant to this Agreement as to which the related Mortgage Note permits the Mortgagor to convert the Mortgage Interest Rate on such Mortgage Loan to a fixed Mortgage Interest Rate.

Credit Score:  The credit score for each Mortgage Loan shall be a Fair Issac Credit Score ("Empirica" on TransUnion, "Beacon" on Equifax and "FICO" on Expirian, f.k.a TRW) and there shall be at least two credit bureau scores obtained at origination or such other time by the Company.  If two credit bureau scores are obtained, the Credit Score will be the lower score.  If more than one Credit Score comes from the same repository, the lowest from that repository will be used.  If three credit bureau scores are obtained, the Credit Score will be the middle of the three.  When there is more than one applicant, the lowest of the applicants' Credit Scores will be used.  There is only one (1) score for any loan regardless of the number of borrowers and/or applicants.  The minimum Credit Score for each Mortgage Loan will be in accordance with the related Underwriting Standards.

Cut-off Date: With respect to each Mortgage Loan Package, the first day of the month in which the related Closing Date occurs or such other date agreed to by the Company and the Purchaser in writing.

Due Date:  The day of the month on which the Monthly Payment is due on a Mortgage Loan (including the Balloon Payment with respect to a Balloon Mortgage Loan), exclusive of any days of grace.

Existing Servicing Contract:  With respect to the Mortgage Loans included on a particular Mortgage Loan Schedule, the contract(s) or other agreement(s) governing the Servicer's servicing of such Mortgage Loans for any and all periods prior to the related Closing Date, whether executed and delivered in favor of Company or any of Company's predecessors in interest with respect to such Mortgage Loans, together, in each case, with all amendments, supplements and other modifications to such contract(s) and agreement(s).

Fannie Mae:  The entity formerly known as the Federal National Mortgage Association, or any successor thereto.

Fannie Mae Guides:  The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto, including, but not limited to, future updates thereof.

FDIC:  The Federal Deposit Insurance Corporation, or any successor thereto.

FIRREA:  The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended.

Fixed Rate Mortgage Loan:  A Mortgage Loan purchased pursuant to this Agreement which bears a fixed Mortgage Interest Rate during the life of the loan.

Freddie Mac:  The entity formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

Freddie Mac Guides:  The Freddie Mac Sellers' Guide and the Freddie Mac Servicers' Guide and all amendments or additions thereto, including, but not limited to, any future updates thereof.

Future Servicing Contract:  With respect to the Mortgage Loans included on a particular Mortgage Loan Schedule, the contract(s) or other agreement(s) governing the Servicer's servicing of the Mortgage Loans for periods on and after the related Closing Date which may include (as agreed upon between the Purchaser and the Servicer) (a) the Existing Servicing Contract (together with such amendments, supplements or modifications agreed upon between the Servicer and the Purchaser), (b) a new servicing contract or agreement negotiated between Servicer and Purchaser, or (c) an existing servicing contract or agreement between Servicer and Purchaser to which Company is not and has not been a party or a beneficiary for the servicing of mortgage loans generally which Servicer and Purchaser have agreed will govern the Servicer's servicing of such Mortgage Loans for Purchaser.

GAAP:  Generally accepted accounting principles, consistently applied.

GMAC:  GMAC Mortgage Corporation, a Delaware corporation.

Gross Margin:  With respect to any Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note and the related Mortgage Loan Schedule that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note to determine the new Mortgage Interest Rate for such Mortgage Loan.

HUD:  The United States Department of Housing and Urban Development or any successor thereto.

Index:  With respect to any Adjustable Rate Mortgage Loan, the index identified on the related Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating the Mortgage Interest Rate thereon.

Initial Rate Cap:  With respect to each Adjustable Rate Mortgage Loan and the initial Adjustment Date therefor, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Adjustable Rate Mortgage Loan may increase or decrease from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Liquidation Proceeds:  Amounts received in connection with the partial or complete liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise.

Loan-to-Value Ratio or LTV:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount of the Mortgage Loan to (i) the Appraised Value of the related Mortgaged Property at origination with respect to a Refinanced Mortgage Loan, and (ii) the lesser of the Appraised Value of the related Mortgaged Property at origination or the purchase price of the related Mortgaged Property with respect to all other Mortgage Loans.

Maximum Mortgage Interest Rate:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Adjustment Date.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The system of recording transfers of mortgages electronically maintained by MERS.

MIN:  The Mortgage Identification Number for any MERS Mortgage Loan.

Minimum Mortgage Interest Rate:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Adjustment Date.

MOM Loan:  Any Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

Monthly Payment:  The scheduled monthly payment (including any Balloon Payment) on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note which creates a first lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust or other instrument securing the Mortgage Note may secure and create a first lien upon a leasehold estate of the Mortgagor.

Mortgage File:  With respect to each Mortgage Loan, the documents pertaining thereto specified in Exhibit A and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate:  The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

Mortgage Loan:  An individual Mortgage Loan which is the subject of this Agreement, each Mortgage Loan originally sold and subject to this Agreement being identified on the related Mortgage Loan Schedule, which Mortgage Loan includes without limitation the Mortgage File, the Servicing File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds, any escrow accounts related to the Mortgage Loan, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan (other than the related Servicing Rights), excluding replaced or repurchased mortgage loans replaced or repurchased in accordance with the terms of this Agreement.

Mortgage Loan Documents:  The documents contained in a Mortgage File.

Mortgage Loan Schedule:  The schedule of Mortgage Loans annexed to the related AAR, such schedule setting forth the following information with respect to each Mortgage Loan in the related Mortgage Loan Package:

1.      the Company's Mortgage Loan identifying number;

2.      the Mortgagor's name;

3.      the street address of the Mortgaged Property including the city, state and zip code;

4.      a code indicating whether, as of origination, the Mortgaged Property was owner-occupied, a second home or an investor property;

5.      the type of residential property constituting the Mortgaged Property;

6.    the original months to maturity or the remaining months to maturity from the related Cut-off Date, in any case based on the original amortization schedule and, if different, the maturity expressed in the same manner but based on the actual amortization schedule;

7.    the Appraised Value (including the Purchase Price of the Mortgaged Property, if applicable) and Loan-to-Value Ratio at origination;

8.    the Mortgage Interest Rate at origination and as of the related Cut-off Date;

9.    the Mortgage Loan origination date;

10.    the actual interest paid through date;

11.    the scheduled interest paid through date;

12.    the stated maturity date of the Mortgage Loan;

13.    the amount of the Monthly Payment at origination and as of the related Cut-off Date;

14.    the original principal amount of the Mortgage Loan;

15.    the Stated Principal Balance of the Mortgage Loan as of the related Cut-off Date;

16.    a code indicating the purpose of the Mortgage Loan (i.e., purchase, rate and term refinance, equity take-out refinance);

17.    a code indicating the documentation style (i.e. full, alternative or reduced);

18.    the number of times during the twelve (12) month period preceding the related Closing Date that any Monthly Payment has been received thirty (30) or more days after its Due Date;

19.    the date on which the first Monthly Payment is due subsequent to the origination date;

20.    a code indicating whether or not the Mortgage Loan is insured as to payment defaults by a Primary Mortgage Insurance Policy; and, in the case of any Mortgage Loan which is insured as to payment defaults by a Primary Mortgage Insurance Policy, the name of the provider of such Primary Mortgage Insurance Policy;

21.    a code indicating whether or not the Mortgage Loan is the subject of a Prepayment Penalty as well as the terms of the Prepayment Penalty;

22.    the Primary Mortgage Insurance Policy Certificate Number, if applicable;

23.    the Primary Mortgage Insurance Policy Coverage Percentage, if applicable;

24.    a code indicating the Credit Score of the Mortgagor at the time of origination of the Mortgage Loan;

25.    a code indicating the credit grade and specific loan/underwriting program of each Mortgage Loan as assigned by the Company or Originator, as applicable, pursuant to the related Underwriting Standards;

26.    with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date and the Adjustment Date frequency;

27.    with respect to each Adjustable Rate Mortgage Loan, the Gross Margin;

28.    with respect to each Adjustable Rate Mortgage Loan, the Maximum Mortgage Interest Rate under the terms of the Mortgage Note;

29.    with respect to each Adjustable Rate Mortgage Loan, the Minimum Mortgage Interest Rate under the terms of the Mortgage Note;

30.    with respect to each Adjustable Rate Mortgage Loan, the Initial Rate Cap and Periodic Rate Cap;

31.    with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date immediately following origination and the related Cut-off Date;

32.    with respect to each Adjustable Rate Mortgage Loan, the Index;

33.    with respect to each Adjustable Rate Mortgage Loan, a code indicating whether the Mortgage Loan is a Convertible Mortgage Loan;

34.    the loan type (i.e. fixed, adjustable; 2/28, 3/27, 5/25, etc.);

35.    a code indicating whether the Mortgage Loan is a MERS Mortgage Loan and, if so, the corresponding MIN;

36.    a code indicating the form of appraisal in the related Mortgage File (i.e. form 1004, 2055, etc.);

37.    a code indicating whether the Mortgage Loan is a Balloon Mortgage Loan and, if so, the term of the Balloon Mortgage Loan;

38.    a code identifying the Underwriting Standards pursuant to which the Mortgage Loan was originated;

39.    a code identifying the related Servicer; and

40.    a code indicating the number of units included in the Mortgaged Property.

With respect to the Mortgage Loans in the aggregate in each Mortgage Loan Package, the Mortgage Loan Schedule shall set forth the following information, as of the related Cut-off Date unless otherwise specified:

      1.     the number of Mortgage Loans;

      2.     the current aggregate outstanding principal balance of the Mortgage Loans;

      3.     the weighted average Mortgage Interest Rate of the Mortgage Loans;

      4.     the weighted average original months to maturity of the Mortgage Loans and the weighted average remaining months to maturity of the Mortgage Loans.

<u>Mortgage Note</u>:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

<u>Mortgaged Property</u>:  The underlying real property securing repayment of a Mortgage Note, consisting of a fee simple parcel of real estate or a leasehold estate, the term of which is at least ten (10) years longer than the term of the related Mortgage Note.

<u>Mortgagor</u>:  The obligor on a Mortgage Note.

<u>Officers' Certificate</u>:  A certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a Senior Vice President or a Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Company, and delivered to the Purchaser as required by this Agreement.

<u>Originator</u>:  With respect to a Mortgage Loan, the entity that originated such Mortgage Loan and from whom the Company acquired such Mortgage Loan.

<u>OTS</u>:  Office of Thrift Supervision.

<u>Pass-Through Transfer</u>:  As defined in Section 4.01(a)(ii).

<u>Periodic Rate Cap</u>:  With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date, which may be a different amount with respect to the first Adjustment Date.

<u>Person</u>:  Any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Prepayment Penalty:   With respect to each Mortgage Loan, the penalty if the Mortgagor prepays such Mortgage Loan as provided in the related Mortgage Note or Mortgage.

Primary Mortgage Insurance Policy:  Each policy of primary mortgage insurance represented to be in effect pursuant to Section 3.02(v), or any replacement policy therefor.

Prime Rate:  The prime rate announced to be in effect from time to time as published as the average rate in The Wall Street Journal (Northeast Edition).

Principal Prepayment:  Any full or partial payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Penalty or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Price: As defined in Section 2.02.

Purchaser: RFC its successors and assigns.

Qualified Appraiser:   With respect to each Mortgage Loan, an appraiser, duly appointed by the originator, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated.

Qualified Insurer:  An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided by the insurance policy issued by it, approved as an insurer by Fannie Mae and Freddie Mac.

Refinanced Mortgage Loan:  A Mortgage Loan which was made to a Mortgagor who owned the Mortgaged Property prior to the origination of such Mortgage Loan and the proceeds of which were used in whole or part to satisfy an existing mortgage.

REMIC:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

REO Disposition:   The final sale by the Company (or, as applicable, by the Purchaser or Servicer) of any REO Property.

REO Disposition Proceeds:   Amounts received by the Company (or, as applicable, by the Purchaser or Servicer) in connection with an REO Disposition.

REO Property:  A Mortgaged Property acquired by or on behalf of the Purchaser in full or partial satisfaction of the related Mortgage.

Repurchase Price:  With respect to any Mortgage Loan, a price equal to (a)(i) with respect to a repurchase on or prior to the one-year anniversary of the related Closing Date, the greater of (A) the product of the percentage of par stated in the related Confirmation of Terms and the Stated Principal Balance of the Mortgage Loan and (B) the Stated Principal Balance of the Mortgage Loan and (ii) with respect to a repurchase following the one-year anniversary of the related Closing Date, the Stated Principal Balance of the Mortgage Loan, plus, (b) interest on such outstanding principal balance at the related Mortgage Interest Rate from the last date through which interest was last paid and distributed to the Purchaser to the last day of the month in which such repurchase occurs, plus, (c) reasonable and customary third party expenses incurred in connection with the transfer of the Mortgage Loan being repurchased, plus (d) any costs and damages incurred in connection with any violation of such Mortgage Loan of any predatory or abusive lending law.

RFC:  Residential Funding Corporation, a Delaware corporation.

SAIF:  The Savings Association Insurance Fund, or any successor thereto.

Servicer:  With respect to a Mortgage Loan, the Servicer identified on the related Mortgage Loan Schedule and its successors and permitted assigns.

Servicing File:  With respect to each Mortgage Loan, the documents held by the Servicer as the Company's designated servicer prior to the related Closing Date.

Servicing Rights:  With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loan; (b) all rights to receive servicing fees, additional servicing compensation (including without limitation any late fees, assumption fees, penalties or similar payments with respect to the Mortgage Loan, and income on escrow accounts or other receipts on or with respect to the Mortgage Loan), reimbursements or indemnification for servicing the Mortgage Loan, and any payments received in respect of the foregoing and proceeds thereof; (c) the right to collect, hold and disburse escrow payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto and to receive interest income on such amounts to the extent permitted by applicable law; (d) all accounts and other rights to payment related to any of the property described in this paragraph; (e) possession and use of any and all Servicing Files pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans; (f) all rights and benefits relating to the direct solicitation of the related Mortgagors for refinance or modification of the Mortgage Loans and attendant right, title and interest in and to the list of such Mortgagors and data relating to their respective Mortgage Loans; (g) all rights, powers and privileges incident to any of the foregoing; and (h) all agreements or documents creating, defining or evidencing any of the foregoing rights to the extent they relate to such rights.

Stated Principal Balance:  As to each Mortgage Loan, (i) the principal balance of such Mortgage Loan at the related Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, minus (ii) all amounts previously distributed to the Purchaser with respect to the Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Standard & Poor's:  Standard & Poor's Rating Services, a division of The McGraw-Hill Companies Inc., and its successors in interest.

Transferee:  With respect to any Whole Loan Transfer or any Pass-Through Transfer, the person or entity to whom Purchaser has transferred or assigned all or any part of its rights with respect to the Mortgage Loans covered by such Whole Loan Transfer or Pass-Through Transfer.

Underwriting Standards:  As to each Mortgage Loan the written underwriting guidelines pursuant to which such Mortgage Loan was originated, which shall be identified on the related Mortgage Loan Schedule and which shall be either (i) the Company's underwriting standards attached hereto as Exhibit B, or (ii) underwriting standards of another Originator which have been reviewed and accepted by Purchaser prior to Purchaser's purchase of such Mortgage Loan from Company.

Whole Loan Transfer:  As defined in Section 4.01(a)(i).

ARTICLE II

RECORD TITLE AND POSSESSION OF MORTGAGE FILES;
BOOKS AND RECORDS; CUSTODIAL AGREEMENT;
DELIVERY OF MORTGAGE LOAN DOCUMENTS

Section 2.01  Agreement to Purchase.

The Company agrees to sell and the Purchaser agrees to purchase on each Closing Date, pursuant to this Agreement and the related Confirmation of Terms, the Mortgage Loans being sold by the Company and listed on the related Mortgage Loan Schedule, having an aggregate Stated Principal Balance in an amount as set forth in the related Confirmation of Terms, or in such other amount as agreed by the Purchaser and the Company in writing on such Closing Date.  The Company shall deliver in an electronic format the related Mortgage Loan Schedule for the Mortgage Loans to be purchased on such Closing Date to the Purchaser at least four (4) Business Days prior to such Closing Date.

Section 2.02  Purchase Price.

The Purchase Price for the Mortgage Loans in a Mortgage Loan Package shall be equal to the sum of (a) the percentage of par as stated in the related Confirmation of Terms (subject to adjustment as provided therein), multiplied by the aggregate Stated Principal Balance of Mortgage Loans listed on the related Mortgage Loan Schedule, plus (b) an amount equal to accrued interest on the aggregate Stated Principal Balance of the Mortgage Loans at the weighted average Mortgage Interest Rate of such Mortgage Loans from the related Cut-off Date to but not including the related Closing Date (assuming 30/360) (the "Purchase Price"). If so provided in the related Confirmation of Terms, portions of the Mortgage Loans shall be priced separately.

The Purchase Price as set forth in the preceding paragraph for the Mortgage Loans in a Mortgage Loan Package shall be paid on the related Closing Date by wire transfer of immediately available funds.

With respect to each Mortgage Loan, the Purchaser shall be entitled to (1) the principal portion of all Monthly Payments due after the related Cut-off Date, (2) all other recoveries of principal collected after the related Cut-off Date (provided, however, that the principal portion of all Monthly Payments due on or before the related Cut-off Date and collected by the Company or any servicer after the related Cut-off Date shall belong to the Company), and (3) all payments of interest on the Mortgage Loans (minus that portion of any such payment which is allocable to the period prior to the related Cut-off Date).  The Stated Principal Balance of each Mortgage Loan as of the related Cut-off Date is determined after application of payments of principal due on or before the related Cut-off Date whether or not collected, together with any unscheduled Principal Prepayments collected prior to the related Cut-off Date; provided, however, that Monthly Payments for a Due Date beyond the related Cut-off Date shall not be applied to the principal balance as of the related Cut-off Date.  Such Monthly Payments shall be the property of the Purchaser.

Section 2.03 <u>Conveyance; Record Title and Possession of Mortgage Files.</u>

On each Closing Date, the Company shall execute an AAR in the form of Exhibit C hereto.

In accordance with Section 2.06, the Company shall deliver, or cause to be delivered, at its own expense, the Mortgage Files for the related Mortgage Loans to Purchaser or its designee. From the related Closing Date, the ownership of each related Mortgage Loan, including the Mortgage Note, the Mortgage, the contents of the related Mortgage File and all rights, benefits, proceeds and obligations arising therefrom or in connection therewith, has been vested in the Purchaser (subject to the applicable limitations of the related AAR). All rights arising out of the Mortgage Loans including, but not limited to, all funds received on or in connection with the Mortgage Loans and all records or documents with respect to the Mortgage Loans prepared by or which come into the possession of the Company shall be received and held by the Company in trust for the benefit of the Purchaser as the owner of the Mortgage Loans. In addition, in connection with the assignment of any MERS Mortgage Loan, the Company agrees that it will cause, at its own expense, the MERS® System to indicate that such Mortgage Loans have been assigned by the Company to the Purchaser in accordance with this Agreement by including in such computer files the information required by the MERS® System to identify the Purchaser as the owner of such Mortgage Loans.

Section 2.04 <u>Books and Records</u>

The sale of each Mortgage Loan will be reflected on the Company's records, balance sheet and other financial statements as a sale of assets by the Company.

In addition to the foregoing, the Company shall provide to any supervisory agents or examiners that regulate the Purchaser, including but not limited to, the OTS, the FDIC and other similar entities, access, during normal business hours, upon reasonable advance notice to the Company and without charge to the Purchaser or such supervisory agents or examiners, to any documentation regarding the Mortgage Loans that may be required by any applicable regulator.

Section 2.05 <u>Examination of Mortgage Files.</u>

In addition to the rights granted to the Purchaser under the related Confirmation of Terms to underwrite the Mortgage Loans and review the Mortgage Files and Servicing Files prior to the related Closing Date, prior to the related Closing Date, the Company shall (i)(a) deliver, or cause to be delivered, to the Purchaser or its designee in escrow, for examination with respect to each Mortgage Loan to be purchased on the related Closing Date, the related Mortgage File, or (b) make the related Mortgage File available to the Purchaser for examination at the offices of the Company's designated custodian or such other location as shall otherwise be agreed upon by the Purchaser and the Company (such examination may be made by the Purchaser or its designee at any reasonable time before or after the related Closing Date) and (ii) deliver or make available to the Purchaser the Underwriting Standards with respect to the related Mortgage Loans. If the Purchaser makes such examination prior to the related Closing Date and identifies any Mortgage Loans that do not conform to the terms of the related Confirmation of

Terms or the related Underwriting Standards, such Mortgage Loans may, at the Purchaser's option, be rejected for purchase by the Purchaser. If not purchased by the Purchaser, such Mortgage Loans shall be deleted from the related Mortgage Loan Schedule. The Purchaser may, at its option and without notice to the Company, purchase all or part of any Mortgage Loan Package without conducting any partial or complete examination. The fact that the Purchaser has conducted or has determined not to conduct any partial or complete examination of the Mortgage Files or Servicing Files shall not affect the Purchaser's (or any of its successors') rights to demand repurchase or other relief or remedy provided for in this Agreement.

Section 2.06  Delivery of Mortgage Loan Documents.

The Company shall deliver, or shall cause to be delivered, to the Purchaser or its designee the Mortgage Loan Documents no later than five (5) Business Days prior to the related Closing Date and shall be deemed to have released such Mortgage Loan Documents to the Purchaser immediately upon receipt of the related Purchase Price. If the Company cannot deliver the original recorded Mortgage Loan Documents on the related Closing Date, the Company shall, promptly upon receipt thereof and in any case not later than 120 days from the related Closing Date, deliver, or cause to be delivered, such original recorded documents to the Purchaser or its designee (unless the Company is delayed in making such delivery by reason of the fact that such documents shall not have been returned by the appropriate recording office). If delivery is not completed within 120 days of the related Closing Date solely because such documents shall not have been returned by the appropriate recording office, the Company shall deliver such document to Purchaser, or its designee, within such time period as specified in a Company's Officer's Certificate. In the event that documents have not been received by the date specified in the Company's Officer's Certificate, a subsequent Company's Officer's Certificate shall be delivered by such date specified in the prior Company's Officer's Certificate, stating a revised date for receipt of documentation. The procedure shall be repeated until the documents have been received and delivered. The Company shall use reasonable commercial efforts to effect delivery of all delayed recorded documents within 180 days of the related Closing Date. If delivery of all Mortgage Loan Documents with respect to any Mortgage Loan is not completed within 270 days of the related Closing Date then, at Purchaser's option, the Company shall repurchase such Mortgage Loan in such manner set forth in Section 3.03.

Any review by the Purchaser or its designee of the Mortgage Files shall in no way alter or reduce the Company's obligations hereunder.

If the Purchaser or its designee discovers any defect with respect to any document constituting part of a Mortgage File, the Purchaser shall, or shall cause its designee to, give written specification of such defect to the Company and the Company shall cure or repurchase such Mortgage Loan in accordance with Section 3.03.

Section 2.07  Closing.

The closing for the purchase and sale of the Mortgage Loans shall take place on the related Closing Date. The closing shall be either: by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

The closing for the Mortgage Loans to be purchased on the related Closing Date shall be subject to each of the following conditions:

(a)    the Company shall deliver to the Purchaser a magnetic diskette, or transmit by modem or e-mail, a listing on a loan-level basis of the information contained in the related Mortgage Loan Schedule;

(b)    all of the representations and warranties of the Company under this Agreement shall be materially true and correct as of the related Closing Date or, with respect to representations and warranties made as of a date other than the related Closing Date, as of such date, and no event shall have occurred which, with notice or the passage of time, would constitute a material default under this Agreement;

(c)    the Purchaser shall have received, or the Purchaser's attorneys shall have received in escrow, all closing documents set forth in Section 2.08, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the terms hereof;

(d)    the Company shall have delivered and released to the Purchaser (or its designee) on or prior to the related Closing Date all documents required pursuant to the terms of this Agreement; and

(e)    all other terms and conditions of this Agreement and the related Confirmation of Terms shall have been materially complied with.

Subject to the foregoing conditions, the Purchaser shall pay to the Company on the related Closing Date the Purchase Price pursuant to Section 2.02 of this Agreement, by wire transfer of immediately available funds to the account designated by the Company.

Section 2.08  Closing Documents.

(a)    On or before the initial Closing Date, the Company shall submit to the Purchaser fully executed originals or copies of this Agreement, in four counterparts ; and

(b)    On or before each Closing Date, the Company shall submit to the Purchaser fully executed originals or copies of the following documents:

1.    the related Confirmation of Terms;

2.    the related Mortgage Loan Schedule;

3.    if any of the Mortgage Loans is, on or immediately prior to the related Closing Date, subject to any security interest, pledge or hypothecation for the benefit of any Person, a Security Release Certification, in the form of Exhibit D hereto, executed by such Person;

4.    a certificate or other evidence of merger or change of name, signed or stamped by the applicable regulatory authority, if any of the Mortgage Loans

were acquired by the Company by merger or acquired or originated by the Company while conducting business under a name other than its present name, if applicable;

5.      an AAR in the form of <u>Exhibit C</u> hereto;

6.      Servicer has executed and delivered a Future Servicing Contract in favor of Purchaser relating to such Mortgage Loans in form and substance satisfactory to Purchaser (in its sole and absolute discretion) including, but not limited to, provisions requiring that (a) Servicer service such Mortgage Loans pursuant to a servicing standard specified by Purchaser, (b) Servicer provide such representations and warranties as to the historic servicing of such Mortgage Loans and such representations, warranties, and covenants as to the prospective servicing of such Mortgage Loans as Purchaser shall require, (c) Servicer will indemnify Purchaser for both historic and future failures to service such Mortgage Loans to the standards and representations, warranties and covenants described in (a) and (b) above, and (d) limitations on the Servicer's solicitation of the refinance of any such Mortgage Loan.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF
### THE COMPANY; REPURCHASE; REVIEW OF MORTGAGE LOANS

Section 3.01 <u>Representations and Warranties of the Company.</u>

The Company represents, warrants and covenants to the Purchaser that as of each Closing Date or as of such date specifically provided herein:

(a)    The Company is a corporation duly organized and validly existing under the laws of Delaware. The Company has all licenses necessary to carry out its business as now being conducted, and is licensed and qualified to transact business in and is in good standing under the laws of each state in which any Mortgaged Property is located or is otherwise exempt under applicable law from such licensing or qualification or is otherwise not required under applicable law to effect such licensing or qualification and no demand for such licensing or qualification has been made upon the Company by any such state, and in any event the Company is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of each Mortgage Loan. No licenses or approvals obtained by the Company have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(b)    The Company has the full power and authority and legal right to hold, transfer and convey each Mortgage Loan, to sell each Mortgage Loan and to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and the related Confirmation of Terms and to conduct its business as presently conducted; the Company has duly authorized the execution, delivery and performance of this Agreement and any agreements contemplated hereby, has duly executed and delivered this Agreement and the related Confirmation of Terms, and any agreements contemplated hereby, and this Agreement and the related Confirmation of Terms and each Assignment of Mortgage to the Purchaser and any agreements contemplated hereby, constitute the legal, valid and binding obligations of the Company, enforceable against it in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws, and by equitable principles affecting the enforceability of the rights of creditors; and all requisite corporate action has been taken by the Company to make this Agreement, the related Confirmation of Terms and all agreements contemplated hereby valid and binding upon the Company in accordance with their terms;

(c)    Neither the execution and delivery of this Agreement, the related Confirmation of Terms, the sale of the Mortgage Loans to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement and the related Confirmation of Terms will conflict with any of the terms, conditions or provisions of the Company's charter or by-laws or materially conflict with or result in a material breach of any of the terms, conditions or provisions of any legal restriction or any agreement or instrument to which the Company is now a party or by which it or its property is bound, or constitute a default or result in an acceleration under any of the

foregoing, or result in the material violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject;

(d)    There is no litigation, suit, proceeding or investigation pending or threatened, or any order or decree outstanding, which is reasonably likely to have a material adverse effect on the sale of the Mortgage Loans, the execution, delivery, performance or enforceability of this Agreement or the related Confirmation of Terms, or which is reasonably likely to have a material adverse effect on the Company's ability to perform its obligations hereunder;

(e)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with this Agreement and the related Confirmation of Terms, except for consents, approvals, authorizations and orders which have been obtained;

(f)    The consummation of the transactions contemplated by this Agreement and the related Confirmation of Terms are in the ordinary course of business of the Company, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Company pursuant to this Agreement and the related Confirmation of Terms are not subject to bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(g)    The Company will treat the transfer of the Mortgage Loans to the Purchaser as a sale for reporting and accounting purposes and, to the extent appropriate, for federal income tax purposes.  With respect to any Mortgage Loan Package, upon receipt of the related Purchaser Price, the Company has indicated on its books and records that the Mortgage Loans in such Mortgage Loan Package have been sold by the Company to the Purchaser.  The Company has at all times up to an including the Closing Date maintained accurate books and records with respect to the Mortgage Loans to be sold on such Closing Date;

(h)    The Company is an approved seller of residential mortgage loans for Fannie Mae or Freddie Mac and a HUD approved mortgagee. The Company is duly qualified, licensed, registered and otherwise authorized under all applicable federal, state and local laws and regulations and is in good standing to sell mortgage loans to Fannie Mae or Freddie Mac and no event has occurred which would make the Company unable to comply with eligibility requirements of or which would require notification to Fannie Mae, Freddie Mac or HUD;

(i)    The Company does not believe, nor does it have any cause or reason to believe, that it cannot perform each and every covenant contained in this Agreement and the related Confirmation of Terms applicable to it.  The Company is solvent and the sale of the Mortgage Loans will not cause the Company to become insolvent.  The sale of the Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of the Company's creditors;

(j)    The consideration received by the Company upon the sale of the Mortgage Loans constitutes fair consideration and reasonably equivalent value for such Mortgage Loans;

(k)    The Company's financial statements as to its last two complete fiscal years fairly present the pertinent results of operations and changes in financial position for each

of such periods and the financial position at the end of each such period of the Company and its subsidiaries and have been prepared in accordance with GAAP consistently applied throughout the periods involved, except as set forth in the notes thereto. There has been no change in the business, operations, financial condition, properties or assets of the Company since the date of the Company's financial statements that would have a material adverse effect on its ability to perform its obligations under this Agreement or the related Confirmation of Terms;

(l)    The Company has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans; and

(m)    The Company is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the transfer of the MERS Mortgage Loans on the MERS System to the Purchaser.

Section 3.02  Representations and Warranties as to Individual Mortgage Loans.

The Company hereby represents and warrants to the Purchaser, as to each Mortgage Loan, as of the related Closing Date (unless otherwise indicated) as follows:

(a)    The information set forth in the related Mortgage Loan Schedule, as of the dates set forth therein, is complete, true and correct in all material respects;

(b)    The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto; and the Mortgagor was not a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated;

(c)    All buildings upon the Mortgaged Property are insured by an insurer acceptable under the Fannie Mae Guides, against loss by fire, hazards of extended coverage and such other hazards as are provided for in the Fannie Mae Guides or by the Freddie Mac Guides, in an amount representing coverage not less than the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loans, and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan, and (b) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. All such standard hazard policies are in full force and effect and on the date of origination contained a standard mortgagee clause naming the Company and its successors in interest and assigns as loss payee and such clause is still in effect and all premiums due thereon have been paid. If required by the Flood Disaster Protection Act of 1973, as amended, the Mortgage Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration which policy conforms to Fannie Mae and Freddie Mac requirements, in an amount not less than the amount required by the Flood Disaster Protection Act of 1973, as amended. Such policy was issued by an insurer acceptable under Fannie Mae

or Freddie Mac guidelines. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(d)     At origination of the Mortgage Loan, any and all requirements of any federal, state or local law, including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory and abusive lending, or disclosure laws applicable to the Mortgage Loan had been complied with in all material respects;

(e)     The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property including all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems affixed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing securing the Mortgage Note's original principal balance. The Mortgage and the Mortgage Note do not contain any evidence of any security interest or other interest or right thereto. Such lien is free and clear of all adverse claims, liens and encumbrances having priority over the first lien of the Mortgage subject only to (1) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (2) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and either (A) which are referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan, or (B) which do not adversely affect the Appraised Value of the Mortgaged Property as set forth in such appraisal, and (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property;

(f)     The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general application affecting the rights of creditors and by general equitable principles and the Company has taken all action necessary to transfer such rights of enforceability to the Purchaser. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage. The Mortgage Note and the Mortgage have been duly and properly executed by such parties or pursuant to a valid power-of-attorney. No Mortgagor has been released from the Mortgage. Without limiting the representations and warranties in paragraph (i) below, neither the Mortgage Note nor the Mortgage have been modified, waived, forborne, released or otherwise impaired except as shown on a writing included in the related Mortgage File and no such modification, waiver, forbearance, release or impairment impairs or reduces any title insurance, mortgage insurance or other insurance coverage with respect to such Mortgage Loan, Mortgage Note, Mortgage or Mortgaged Property and all consents from any such insurer necessary to maintain such insurance coverage unimpaired have been obtained. No fraud, misrepresentation or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Company, the Originator or the Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan. The proceeds of the Mortgage Loan have

been fully disbursed and there is no requirement for future advances thereunder. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid or are in the process of being paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(g)    The Company is the sole owner and holder of the Mortgage Loan and the indebtedness evidenced by the Mortgage Note, and upon recordation the Purchaser or its designee will be the sole owner of the Mortgage and the indebtedness evidenced by the Mortgage Note. Immediately prior to the transfer and assignment to the Purchaser on the related Closing Date, the Mortgage Loan, including the Mortgage Note and the Mortgage, were not subject to an assignment or pledge, and the Company had title to and was the sole owner thereof and had full right to transfer and sell the Mortgage Loan to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has the full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign the Mortgage Loan pursuant to this Agreement and following the sale of the Mortgage Loan, the Purchaser will own such Mortgage Loan free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest. The Company intends to relinquish all rights to possess, control and monitor the Mortgage Loan. Either the Mortgagor is a natural person or the Mortgagor is a revocable inter-vivos trust acceptable to Fannie Mae;

(h)    Each Mortgage Loan is covered by an ALTA lender's title insurance policy or other form of title policy or insurance acceptable to Fannie Mae, in either case, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (e)(1), (2) and (3) above) the Company, its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan and, with respect to each Adjustable Rate Mortgage Loan, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such policy affirmatively insures ingress and egress to and from the Mortgaged Property. The Company, its successors and assigns, are the sole insureds of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to the Purchaser or the assignment to the Purchaser of the Company's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement and the related Confirmation of Terms;

(i)    There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note (other a delinquency by a mortgagor in making a Monthly Payment which delinquency did not last more than thirty (30) days and did not occur more than once in the preceding twelve (12) month period), no event exists which, with notice and expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note; and neither the Company nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration or granted any forbearance with respect to any of the foregoing;

(j)     There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(k)     All improvements subject to the Mortgage which were considered in determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of the Mortgaged Property (and wholly within the project with respect to a condominium unit) and no improvements on adjoining properties encroach upon the Mortgaged Property except for de minimis encroachments permitted by the Fannie Mae Guides or the Freddie Mac Guides and except those encroachments which are insured against by the title insurance policy referred to in clause (h) above; and all improvements on the property comply with all applicable zoning and subdivision laws and ordinances;

(l)     Each Mortgage Loan was originated pursuant to the Underwriting Standards and such Mortgage Loan was originated by or for the Company. The Company has delivered the related Underwriting Standards to the Purchaser and the Mortgage Loan complies with all the terms, conditions and requirements of such Underwriting Standards. The Mortgage Notes and Mortgages (exclusive of any riders) are on forms acceptable to Fannie Mae or Freddie Mac. The Mortgage Loan bears interest at the Mortgage Interest Rate set forth in the related Mortgage Loan Schedule, and Monthly Payments under the Mortgage Note are due and payable on the first day of each month. The Mortgage contains the usual and enforceable provisions for the acceleration of the payment of the unpaid principal amount of the Mortgage Loan if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(m)     The Mortgaged Property is not subject to any material damage by waste, fire, earthquake, windstorm, flood or other casualty. At origination of the Mortgage Loan there was, and there currently is, no proceeding pending for the total or partial condemnation of the Mortgaged Property. There have not been any condemnation proceedings with respect to the Mortgaged Property.

(n)     The related Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby. Either (i) each person or entity with an interest or a potential interest in the Mortgaged Property has signed the Mortgage and any related security agreement (if permitted by applicable law), or (ii) there is no homestead, dower, courtesy or other similar rights or exemptions available to the Mortgagor or any other person or entity with an interest or a potential interest in the Mortgaged Property which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage;

(o)     If the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale or attempted sale after default by the Mortgagor;

(p)    The Mortgage File contains an appraisal of the related Mortgaged Property which was signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and the appraiser and the appraisal satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated. The appraisal is in a form acceptable to Fannie Mae or Freddie Mac;

(q)    All parties which have had any interest in the Mortgage, other than the Purchaser, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (A) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (B) (1) organized under the laws of such state, or (2) qualified to do business in such state, or (3) federal savings and loan associations or national banks or a Federal Home Loan Bank or savings bank having principal offices in such state, (4) not doing business in such state or (5) not required to be licensed in such state;

(r)    The related Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to in (e) above;

(s)    The Mortgage Loan does not contain "graduated payment" features and does not have a shared appreciation or other contingent interest feature; no Mortgage Loan contains any buydown provisions;

(t)    As of the date of origination of the Mortgage Loan, the related Mortgagor was not in bankruptcy;

(u)    Principal payments on the Mortgage Loan commenced no more than sixty (60) days after the funds were disbursed in connection with the Mortgage Loan. The Mortgage Loans have an original term to maturity of not more than 30 years, with interest payable in arrears on the first day of each month. Each Mortgage Note requires a monthly payment which is sufficient to fully amortize the original principal balance over the original term thereof (other than with respect to a Balloon Mortgage Loan) and to pay interest at the related Mortgage Interest Rate. The Due Date for each Monthly Payment is the first day of each month. With respect to each Balloon Mortgage Loan, the Mortgage Note requires a monthly payment which is sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate and requires a final Monthly Payment substantially greater than the preceding monthly payment which is sufficient to repay the remained unpaid principal balance of the Balloon Mortgage Loan as the Due Date of such monthly payment. No Mortgage Loan contains terms or provisions which would result in negative amortization. No Mortgage Loan provides for the capitalization or forbearance of interest. No Mortgage Loan is a Convertible Mortgage Loan;

(v)    If a Mortgage Loan has an LTV greater than 80%, the Mortgage Loan will have mortgage insurance in accordance with the terms of the Fannie Mae Guides and will be

insured as to payment defaults by a Primary Mortgage Insurance Policy issued by a Qualified Insurer.  All provisions of such Primary Mortgage Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid.  Any Mortgage Loan subject to a Primary Mortgage Insurance Policy obligates the Mortgagor thereunder to maintain the Primary Mortgage Insurance Policy and to pay all premiums and charges in connection therewith.  The mortgage interest rate for the Mortgage Loan as set forth on the related Mortgage Loan Schedule is net of any such insurance premium. No Mortgage Loan is subject to a lender-paid mortgage insurance policy;

(w)    As to any Mortgage Loan which is not a MERS Mortgage Loan, the Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(x)    The Mortgaged Property consists of a single parcel of real property with a detached or attached one-to-four family residence erected thereon, or a townhouse, or a two-to four-family dwelling, or an individual condominium unit in a condominium project, or an individual unit in a planned unit development or a de minimis planned unit development, or a single parcel of real property with a cooperative housing corporation erected thereon; provided, however, that no residence or dwelling is a manufactured or mobile home.  As of the date of origination, no portion of the Mortgaged Property was used for commercial purposes;

(y)    No Mortgage Loan is subject to a Prepayment Penalty unless such Prepayment Penalty (i) is permitted by and complies with all applicable federal, state and local law, (ii) is enforceable only during the first five years following origination of the Mortgage Loan and (iii) does not become due on default.

(z)    As of the date of origination of each Mortgage Loan (and, to the best of the Company's knowledge, as of the related Closing Date), the related Mortgaged Property was lawfully occupied under applicable law. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of each Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(aa)    If the Mortgaged Property is a condominium unit or a planned unit development (other than a de minimis planned unit development), or stock in a cooperative housing corporation, such condominium, cooperative or planned unit development project meets the eligibility requirements of Fannie Mae and Freddie Mac;

(bb)    There is no violation of any environmental law, rule or regulation with respect to the Mortgaged Property; and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(cc)    The Mortgagor has not notified the Company requesting relief under the Soldiers' and Sailors' Civil Relief Act of 1940 or the Servicemembers Civil Relief Act, and the Company has no knowledge of any relief requested by or allowed to the Mortgagor under the

Soldiers' and Sailors' Civil Relief Act of 1940 or the Servicemembers Civil Relief Act or any similar state laws;

(dd)    No Mortgage Loan was made in connection with (i) the construction or rehabilitation of the Mortgaged Property or (ii) facilitating the trade-in or exchange of a Mortgaged Property;

(ee)    If the Mortgage Loan is secured by a leasehold interest (i) the use of leasehold estates for residential properties is an accepted practice in the area where the related Mortgaged Property is located, (ii) residential property in such area consisting of leasehold estates is readily marketable, (iii) no party is in breach of any provision of the lease, (iv) the lease is recorded and the leasehold is in full force and effect and is not subject to any prior lien or encumbrance by which the leasehold could be terminated or subject to any charge or penalty, and (v) the remaining term of the lease does not terminate less than ten (10) years after the maturity date of such Mortgage Loan;

(ff)    The Mortgage Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act, a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or similar banking institution which is supervised and examined by a federal or state authority;

(gg)    Each Mortgage Loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Code and Treasury Regulations Section 1.860G-2(a)(1);

(hh)    Except as set forth in Section 2.06, the Mortgage Note, the Mortgage, the Assignment of Mortgage and the other Mortgage Loan Documents set forth in Exhibit A and required to be delivered on the related Closing Date have been delivered to the Purchaser or its designee all in compliance with the specific requirements of this Agreement;

(ii)    No Mortgage Loan had a Loan-to-Value Ratio at the time of origination of more than 100%;

(jj)    No Mortgage Loan is (a) subject to, covered by or in violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), (b) classified as a "high cost," "covered," "high risk home", "high-rate, high-fee," "threshold," or "predatory" loan under HOEPA or any other applicable state, federal or local law, including any predatory or abusive lending laws (or a similarly classified loan using different terminology under a law imposing heightened scrutiny or additional legal liability for a residential mortgage loan having high interest rates, points and/or fees), (c) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the Standard & Poor's LEVELS® Glossary Revised, Appendix E) or (d) in violation of any state law or ordinance comparable to HOEPA;

(kk)    No Mortgage Loan finances any credit life, credit disability, credit unemployment, or any other prepaid accident, life or health insurance product directly or indirectly unless the applicable Mortgagor used the proceeds of the Mortgage Loan to finance such policies voluntarily and without any direct or indirect requirement in the Mortgage Loan

Documents or on the part of the Company, the Originator or any other party involved in the origination of the Mortgage Loan;

(ll)    Any principal advances made to the Mortgagor prior to the related Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien priority by a title insurance policy complying with clause (h) above insuring the mortgagee's consolidated interest;

(mm) Interest on each Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months;

(nn)    The Company has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws");

(oo)    No Mortgage Loan originated on or after March 8, 2003 is a "High Cost Home Loan" as defined in the Georgia Fair Lending Act, as amended (the "Georgia Act").  No Mortgage Loan secured by owner occupied real property or an owner occupied manufactured home located in the State of Georgia was originated (or modified) on or after October 1, 2002 through and including March 7, 2003;

(pp)    All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Mortgage Loan have been disclosed in writing to the Mortgagor in accordance with applicable state and federal law and regulation;

(qq)    All points and fees related to each Mortgage Loan were disclosed in writing to the Mortgagor in accordance with applicable state and federal law and regulation;

(rr)    If the Mortgage Loan has been held or serviced by Company for 90 or more days, Company or Servicer has reported at least quarterly to a nationally recognized consumer credit reporting agency the favorable and unfavorable payment history information of the related Mortgagor on payments due under such Mortgage Loan for the period Company owned or serviced the Mortgage Loan;

(ss)    Company has not solicited or provided information to another party for the purpose of soliciting the refinance of any Mortgage Loan.  The term "solicit" as used in this paragraph means a direct request or offer to refinance a Mortgage Loan and does not include general solicitations, advertisements or promotions directed to the public at large;

(tt)    No taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents relating to the Mortgage Loan are delinquent; and

(uu)    The representations and warranties of the Company contained in the related AAR are true and correct in all material respects.

Section 3.03  Repurchase; Substitution.

It is understood and agreed that the representations and warranties set forth in Sections 3.01 and 3.02 (as well as the remedies for the breach thereof) shall survive the sale of the Mortgage Loans and delivery of the Mortgage File to the Purchaser, or its designee, as well as any foreclosure with respect to such Mortgage Loans and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment or the examination, or lack of examination, of any Mortgage Loan Document; Upon discovery by the Company or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of any Mortgage Loan or the interest of the Purchaser in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the others.  The Company shall have a period of ninety (90) days from the earlier of its discovery or its receipt of notice of any such breach within which to correct or cure such breach.  The Company hereby covenants and agrees that if any such breach is not corrected or cured within such ninety (90) day period, the Company shall, at the Purchaser's option, either repurchase such Mortgage Loan at the Repurchase Price or substitute a mortgage loan for the Defective Mortgage Loan as provided below.  In the event that any such breach shall involve any representation or warranty set forth in Section 3.01, and such breach is not cured within ninety (90) days of the earlier of either discovery by or notice to the Company of such breach, all Mortgage Loans shall, at the option of the Purchaser, be repurchased by the Company at the Repurchase Price.  Any such repurchase shall be accomplished by wire transfer of the amount of the Repurchase Price to an account designated by the Purchaser.

Purchaser shall reconvey each Mortgage Loan repurchased by the Company pursuant to the foregoing provisions on a non-recourse basis and, if such Mortgage Loan has been foreclosed upon prior to such repurchase, by quit-claim deed.  Purchaser represents that each Mortgage Loan repurchased from Purchaser by Company will be free and clear of any lien or encumbrance created by Purchaser and Purchaser shall not have overtly and affirmatively consented to any subordination of Purchaser's lien against any such repurchased Mortgage Loan.

If pursuant to the foregoing provisions the Company repurchases a Mortgage Loan that is a MERS Mortgage Loan, the Purchaser shall (at Company's sole cost and expense) either (i) cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Company and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS® System the Company as the beneficial holder of such Mortgage Loan.

If the Company is required to repurchase any Mortgage Loan pursuant to this Section 3.03 as a result of a breach of any of the representations and warranties set forth in Section 3.02, the Company may, with the Purchaser's prior consent, within two (2) years from the related Closing Date, remove such defective Mortgage Loan from the terms of this Agreement and substitute another mortgage loan for such defective Mortgage Loan, in lieu of repurchasing such defective Mortgage Loan.  Any substitute Mortgage Loan shall (a) have a principal balance at the time of substitution not in excess of the principal balance of the defective Mortgage Loan (the amount of any difference, plus one month's interest thereon at the Mortgage Interest Rate borne by the defective Mortgage Loan, being paid by the Company and deemed to

be a Principal Prepayment to an account designated by the Purchaser), (b) have a Mortgage
Interest Rate not less than, and not more than one percentage point greater than, the Mortgage
Interest Rate of the removed Mortgage Loan, (c) have a remaining term to stated maturity not
later than, and not more than one year less than, the remaining term to stated maturity of the
removed Mortgage Loan, (d) be, in the reasonable determination of the Purchaser, of the same
type, quality and character (including location of the Mortgaged Property) as the removed
Mortgage Loan as if the breach had not occurred, (e) have a Loan-to-Value Ratio at origination
no greater than that of the removed Mortgage Loan, (f) have the same lien priority as that of the
removed Mortgage Loan and (g) be, in the reasonable determination of the Purchaser, in material
compliance with the representations and warranties contained in this Agreement and described in
Section 3.02 as of the date of substitution.

      The Company shall amend the related Mortgage Loan Schedule to reflect the
withdrawal of the removed Mortgage Loan from this Agreement and the substitution of such
substitute Mortgage Loan therefor.  Upon such amendment, the Purchaser shall review the
Mortgage File delivered to it relating to the substitute Mortgage Loan.  The Monthly Payment on
a substitute Mortgage Loan due on the Due Date in the month of substitution shall be the
property of the Company and the Monthly Payment on the Defective Mortgage Loan for which
the substitution is made due on such date shall be the property of the Purchaser.

      In addition to such cure, repurchase, payment and substitution obligations, the
Company shall indemnify the Purchaser and hold it harmless against any losses, damages,
penalties, fines, forfeitures, fees (including reasonable legal fees), judgments, costs and expenses
resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting
from, a breach of the Company's representations and warranties contained in Sections 3.01 or
3.02.  Company will assume the defense of any such claim and pay all costs and expenses in
connection therewith (including attorney's fees) and promptly pay, discharge and satisfy any
judgment or decree which may be entered against it or the Purchaser in respect of such claim or
the amount of any settlement entered into with respect thereto.  If the applicable claim or action
names Purchaser, any of Purchaser's affiliates, MERS or a Transferee or is conducted or certified
as a class action, Company will (a) promptly notify Purchaser of such claim or action and
provide a copy of the complaint to Purchaser, (b) retain counsel reasonably satisfactory to
Purchaser, (c) comply with Purchaser's instructions for the conduct of the litigation/defense and
for settlements, (d) not settle any such claim without Purchaser's written consent (except as
otherwise expressly authorized in this paragraph), (e) provide monthly litigation reports to
Purchaser, and (f) provide Purchaser with notice of any articles or publicity known to Company
with respect to such claims or actions.  If the applicable claim or action does not name Purchaser,
any of Purchaser's affiliates, MERS or a Transferee and is not conducted or certified as a class
action, Company will fully control the defense of any such claim or action and may settle such
claim or action subject to Purchaser's approval, which approval will not be unreasonably
withheld.    Notwithstanding  Purchaser's  right  to  consent  to  settlements  described  above,
Company may settle a claim or action without Purchaser's consent if (1) Company pays the full
amount of and performs any other obligations the subject of such settlement, (2) the settlement
includes no monetary exposure or monetary obligations or any other obligations of any kind on
the part of Purchaser, and (3) the settlement provides that neither Company nor any of Purchaser,
Purchaser's affiliates, MERS or any Transferee has to admit guilt or fault of any kind (Purchaser
may choose to continue to defend a claim or action proposed to be settled by Company under the

terms described in this sentence, but any such further defense by Purchaser will be at Purchaser's sole cost and expense). If Company fails to assume the defense of an action within twenty (20) days (or any shorter period required by applicable law or rule of court) after receiving notice, then Company will be bound by any determination made in the action or by any compromise or settlement Purchaser may effect and for Purchaser's related costs and expenses including reasonable attorney's fees. Purchaser may also choose to retain its own counsel in connection with an action or claim being properly defended by Company under the terms of this paragraph, but the costs and expenses of such additional counsel will be borne by Purchaser and not by Company.

It is understood and agreed that the obligation of the Company set forth in this Section 3.03 to cure, repurchase or substitute for a defective Mortgage Loan, and to indemnify Purchaser pursuant to this Section 3.03, constitutes the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties. If the Company fails to repurchase or substitute for a defective Mortgage Loan in accordance with this Section 3.03, or fails to cure a defective Mortgage Loan to Purchaser's reasonable satisfaction in accordance with this Section 3.03, or to indemnify Purchaser pursuant to this Section 3.03, the Purchaser shall be entitled to pursue all available remedies.

Any cause of action against the Company relating to or arising out of the breach of any representations and warranties made in Sections 3.01 and 3.02 shall accrue as to any Mortgage Loan upon (i) the earlier of discovery of such breach by the Company or notice thereof by the Purchaser to the Company, (ii) failure by the Company to cure such breach, repurchase such Mortgage Loan or indemnify Purchaser as specified above, and (iii) demand upon the Company by the Purchaser for compliance with this Agreement.

Section 3.04  Repurchase of Mortgage Loans With Early Payment Default.

In the event that as a result of a payment default or delinquency on a Mortgage Loan within sixty days of the related Closing Date (i) the Company is entitled to have such Mortgage Loan repurchased by the Originator or the entity that sold such Mortgage Loan to the Company or (ii) the Company is required to repurchase such Mortgage Loan from the Purchaser pursuant to the related Confirmation of Terms (or other agreement between the Company and the Purchaser), then, upon such default or delinquency, the Company, at the Purchaser's option, shall (a) promptly repurchase such Mortgage Loan from the Purchaser in accordance with the procedures set forth in Section 3.03 hereof, however, any such repurchase shall be made at the Repurchase Price, (b) indemnify the Purchaser in accordance with Section 3.03 hereof, or (c) substitute a mortgage loan acceptable to the Purchaser in accordance with Section 3.03 hereof.

Section 3.05  Purchase Price Protection.

With respect to any Mortgage Loan that prepays in full on or prior to the earlier of (x) the last day of the third full month following date upon which the Company purchased such Mortgage Loan or (y) the 60th day following the Closing Date (or such other date set forth in the related Confirmation of Terms), the Company shall reimburse the Purchaser an amount equal to (i) the product of (a) the excess of the Purchase Price percentage paid by the Purchaser to the Company for such Mortgage Loan over 100%, times (b) the outstanding principal balance of the

Mortgage Loan as of the date of such prepayment in full minus (ii) any prepayment charges with respect to such Mortgage Loan. Such payment shall be made within thirty (30) days of such payoff.

## ARTICLE IV

## RECONSTITUTION OF MORTGAGE LOANS

Section 4.01 <u>Reconstitution of Mortgage Loans.</u>

(a)     The Company acknowledges and the Purchaser agrees that with respect to some or all of the Mortgage Loans, the Purchaser may effect either:

(i)     one or more sales of the Mortgage Loans as whole loan transfers (each, a "<u>Whole Loan Transfer</u>"); and/or

(ii)     one or more sales of the Mortgage Loans as public or private pass-through transfers (each, a "<u>Pass-Through Transfer</u>").

(b)     With respect to each Whole Loan Transfer or Pass-Through Transfer, as the case may be, the Company agrees that:

(i)     Purchaser may effect a Whole Loan Transfer or Pass-Through Transfer without any notice to or approval of the Company and no assignment, assumption, recognition or similar agreement shall be required to provide or maintain, as the case may be, the rights of the Purchaser and the Transferee described in this Section 4.01; provided, however, that in order for the Company to recognize a Transferee as a Purchaser directly entitled to enforce this Agreement against Company with respect to a Mortgage Loan, the Transferee must appear as the owner of such Mortgage Loan on RFC's books and records and Company must have received such reasonable confirmation as Company shall require that the subject Transferee so appears on RFC's books and records, which confirmation RFC will supply when Company advises RFC of a request by such Transferee to directly enforce this Agreement against Company;

(ii)     With respect to Mortgage Loans not the subject of a Whole Loan Transfer or Pass-Through Transfer, Purchaser will retain all of its right, title and interest in and to such Mortgage Loans, including, without limitation, all of its rights and remedies under this Agreement with respect to such Mortgage Loans;

(iii)     With respect to Mortgage Loans that are the subject of a Whole Loan Transfer or Pass-Through Transfer, Transferee will acquire all of Purchaser's right, title and interest in and to such Mortgage Loans, including, without limitation, all of Purchaser's rights and remedies under this Agreement with respect to such Mortgage Loans; provided, however, that both Transferee (for its own account) and RFC (as master servicer acting for Transferee's account) will be entitled to enforce this Agreement as Purchaser with respect to such Mortgage Loans (subject to the RFC recordkeeping limitations expressed in clause (b)(i) above); provided, further that Purchaser will in all events be entitled (for its own account) to enforce this Agreement with respect to any claims of Purchaser arising during or relating to any period prior to the effective date of Purchaser's transfer or assignment of such Mortgage Loans to Transferee; and

(iv)    Company will deliver to the Purchaser and to any Person designated by the Purchaser for inclusion in any prospectus or other offering material such publicly available information regarding the Company and its underwriting guidelines and procedures, and to indemnify the Purchaser and its affiliates for material misstatements or omissions contained in such information, provided that the Company receives a similar indemnity from the Purchaser covering all information in the related offering material other than the information provided by the Company.    Company will provide such further cooperation in connection with a Pass-Through Transfer or Whole Loan Transfer as Purchaser may reasonably request, including, without limitation, reasonable access and cooperation to accommodate reasonable due diligence activity, except that the actual out-of-pocket costs (which costs shall in all events exclude allocated overhead costs of Company's employees) incurred by Company as a result of such additional cooperation shall be borne by Purchaser.

## ARTICLE V

## MISCELLANEOUS PROVISIONS

Section 5.01  Amendment.

This Agreement may only be amended by written agreement signed by the Company and the Purchaser.

Section 5.02  Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law provisions (other than Section 5-1401 of the New York General Obligations Law), except to the extent preempted by Federal law. The obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 5.03  Notices.

Any demands, notices or other communications permitted or required hereunder shall be in writing and shall be deemed conclusively to be given only if personally delivered at or mailed by registered mail, postage prepaid, and return receipt requested or certified mail, return receipt requested, or transmitted by facsimile, as follows:

(i)      if to the Company:

UBS Real Estate Securities Inc.
1285 Avenue of the Americas
New York, New York 10019
Attention: Eileen Lindblom
Phone:          (212) 713-6273
Facsimile:      (212) 713-2080

With a copy to:

UBS Real Estate Securities Inc.
1285 Avenue of the Americas
New York, New York 10019
Attention: General Counsel

(ii)     If to Purchaser:

Residential Funding Corporation
1 Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attention: Debra Severson
Phone: (952) 979-4577

Fax:    (952) 921-9065

With a copy to:
Residential Funding Corporation
Legal Department
Suite 1000
8400 Normandale Lake Blvd.
Minneapolis, MN 55437
Attention:      Steve Schaefer
Phone:  (952) 857-6273
Fax:    (952) 857-8500

Residential Funding Corporation
Master Servicing Division
2255 North Ontario Street, Suite 400
Burbank, California 91504
Attention: Sr. Compliance Officer
Phone: (818) 260-1403
Fax: (818) 260-1810

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 5.04  <u>Severability of Provisions.</u>

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

Section 5.05  <u>Exhibits.</u>

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 5.06  <u>General Interpretive Principles.</u>

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)      the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(ii)     accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(iii)    references herein to "Articles," "Sections," Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(iv)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(v)      the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vi)     the term "include" or "including" shall mean without limitation by reason of enumeration; and

(vii)    headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Section 5.07  <u>Reproduction of Documents.</u>

This Agreement and all documents relating thereto, including, without limitation, (i) consents, waivers and modifications which may hereafter be executed, (ii) documents received by any party at the closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 5.08  Confidentiality of Information.

Each party recognizes that, in connection with this Agreement, it may become privy to non-public information regarding the financial condition, operations and prospects of the other party.  Each party agrees to keep all non-public information regarding the other party as well as the terms and conditions of this Agreement, any Confirmation of Terms and any related assignment, assumption and reconstitution or similar agreement  strictly confidential, and to use all such information solely in order to effectuate the purpose of the Agreement, provided that each party may provide confidential information (i) as required by law or legal process, (ii) to such party's employees, agents and affiliates who have a need to know such information in order to effectuate the transactions contemplated by this Agreement or, with respect to Purchaser, as required by its parent corporation for reasons of corporate governance, or (iii) as required by a regulatory authority with supervisory power over the Purchaser or the Company; provided further that (a) the disclosing party will advise each recipient that such information is confidential non-public information, and (b) the party disclosing the confidential information shall inform the other party of such disclosure unless the disclosing party is legally prohibited from informing the other party of such disclosure.

Section 5.09  Recordation of Assignments of Mortgage.

To the extent permitted by applicable law, as to any Mortgage Loan which is not a MERS Mortgage Loan, each of the Assignments of Mortgage is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected at the Company's expense in the event recordation is either necessary under applicable law or requested by the Purchaser at its sole option.

Section 5.10  Non-Solicitation.

Company will not solicit or provide information to another party for the purpose of soliciting the refinance of any Mortgage Loan.  The term "solicit" as used in this paragraph means a direct request or offer to refinance a Mortgage Loan and does not include general solicitations, advertisements or promotions directed to the public at large.

Section 5.11  Assignment by Purchaser and Company.

This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assignees. Company shall not assign this Agreement, any AAR any Confirmation of Terms or any of its rights hereunder or thereunder, nor delegate any material duty hereunder or thereunder without the prior written consent of Purchaser, which such consent may be withheld in Purchaser's sole and absolute discretion. The Purchaser may assign this Agreement, any AAR and any Confirmation of Terms to any Person to whom any Mortgage Loan is transferred whether pursuant to a sale or financing and to any person to whom the Servicing Rights or master servicing of any Mortgage Loan is sold or transferred.

Section 5.12  No Partnership.

Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of the Company shall be rendered as an independent contractor and not as agent for Purchaser.

Section 5.13  Entire Agreement.

Each of the parties to this Agreement acknowledges that no representations, agreements or promises were made to any of the other parties to this Agreement or any of its employees other than those representations, agreements or promises specifically contained herein, in the related Confirmation of Terms and the related AAR. This Agreement and the related Confirmation of Terms set forth the entire understanding between the parties hereto and shall be binding upon all successors and assigns of all of the parties.  In the event of any inconsistency between the related Confirmation of Terms and this Agreement, this Agreement shall control.

Section 5.14  Mandatory Delivery; Grant of Security Interest.

The sale and delivery of each Mortgage Loan on or before the related Closing Date is mandatory from and after the date of the execution of the related Confirmation of Terms, it being specifically understood and agreed that each Mortgage Loan is unique and identifiable on the date of the related Confirmation of Terms and that an award of money damages would be insufficient to compensate the Purchaser for the losses and damages incurred by the Purchaser (including damages to prospective purchasers of the Mortgage Loans) in the event of the Company's failure to deliver each of the related Mortgage Loans or one or more Mortgage Loans otherwise acceptable to the Purchaser on or before the related Closing Date. The Company, upon the payment of the related Purchase Price by the Purchaser, hereby grants to the Purchaser a lien on and a continuing security interest in each Mortgage Loan and each document and instrument evidencing each such Mortgage Loan to secure the performance by the Company of its obligations hereunder, and the Company agrees, upon the payment of the related Purchase Price by the Purchaser, that it holds such Mortgage Loans in custody for the Purchaser subject to the Purchaser's (i) right to reject any Mortgage Loan under the terms of this Agreement and the related Confirmation of Terms, and (ii) obligation to pay the related Purchase Price for the Mortgage Loans. All rights and remedies of the Purchaser under this Agreement are distinct from, non-exclusive and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively without limiting the exercise of any other right or remedy or the further exercise of any chosen right or remedy.  This Agreement shall constitute a security agreement for all purposes of the Uniform Commercial Code of any applicable jurisdiction and Purchaser is hereby authorized to file such Uniform Commercial Code financing statements or other filings as it shall require to perfect and protect the security interest granted hereby.

Section 5.15  Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one

and the same instrument. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on the parties. The original document shall be promptly delivered, if requested.

Section 5.16 <u>Intention of the Parties.</u>

It is the intention of the parties that the Purchaser is purchasing, and the Company is selling, the Mortgage Loans and not a debt instrument of the Company or another security. Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Company, and a purchase by the Purchaser, of the Mortgage Loans. The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Files to determine the characteristics of the Mortgage Loans which shall affect the Federal income tax consequences of owning the Mortgage Loans and the Company shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

Section 5.17 <u>Waivers.</u>

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced. Each such waiver shall only be effective under the particular circumstances and for the particular purpose given and shall not be effective with respect to any other circumstance or purpose or a further occurrence of the event, condition or occurrence the subject of such waiver.

Section 5.18 <u>Further Agreements.</u>

The Company and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 5.19 <u>Costs.</u>

Company shall pay any fees and disbursements of its attorneys and the costs and expenses incurred in connection with the recording of the Assignments of Mortgage (and any other intervening Assignments of Mortgage), all documentary, stamp and similar taxes and expenses incurred in connection with the execution and delivery of this Agreement and any taxes, governmental assessments, insurance premiums, water, sewer and municipal charges and similar expenses, which became due in respect of the Mortgaged Property on or prior to the related Closing Date. Company shall also pay all amounts payable by Company as owner of the Mortgage Loans under the Existing Servicing Contract with respect to any Mortgage Loans sold by Company to Purchaser under this Agreement which are due, payable or relate to any period on or prior to the related Closing Date (including, without limitation, all fees, costs and expenses owing to the Servicer thereunder and payable by the owner of the Mortgage Loans but excluding any amounts for which the Servicer reimburses itself from collections against the Mortgage Loans which are not otherwise recoverable against the owner of the Mortgage Loans). Additionally, all costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans including, without limitation, any termination fees owed to Company's document custodian, Servicer or subservicer, any costs relating to transfer of the Mortgage File

and other Mortgage Loan records to Purchaser, the costs of delivering complete master file tape information and other electronically stored information to the Purchaser, the costs of notifying the Mortgagors, hazard, flood and mortgage insurance companies and other third parties as required, Purchaser's costs for setting up "lifetime" tax service contracts (to the extent the Mortgage Loan is not already covered by a fully assignable "lifetime" tax service contract), the costs of transferring "lifetime" flood certification contracts to the Purchaser, and the legal fees and expenses of its attorneys shall be paid by the Company.  In the event that the "lifetime" flood certification contracts are not transferable to, or acceptable to, Purchaser, Company will also reimburse Purchaser for any costs related to setting up such flood contracts.  Purchaser shall pay any of its expenses, including any fees and disbursements of its attorneys.

IN WITNESS WHEREOF, the Company and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

RESIDENTIAL FUNDING CORPORATION, Purchaser

By: *Debra A. Casale*

Name: *Debra A. Casale*

Title: *Managing Director*

UBS REAL ESTATE SECURITIES INC., Company

By: _____

Name: Christopher G. Schmidt
Associate Director

Title: _____

By: _____

Name: _____

Eileen A. Lindblom
Title: Executive Director

## Exhibit A

Contents of Mortgage File

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser, and which shall be delivered to the Purchaser or its designee pursuant to Sections 2.05 and 2.06 of the Agreement.

1.      The original Mortgage Note endorsed "Pay to the order of _____ without recourse," and signed via original signature in the name of the Company by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Company.  If the Mortgage Loan was acquired by the Company in a merger, the endorsement must be by "[Company], successor by merger to the [name of predecessor]".  If the Mortgage Loan was acquired or originated by the Company while doing business under another name, the endorsement must be by "[Company] formerly known as [previous name]".  If the original note is unavailable, Company will provide an affidavit of lost note (in form acceptable to the Purchaser) stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note and indemnifying the Purchaser against any and all claims arising as a result of any person or entity claiming they are the holder of the note or that the note has been paid off and returned.

2.      Except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage with evidence of recording thereon, or a copy thereof certified by the public recording office in which such Mortgage has been recorded or, if the original Mortgage has not been returned from the applicable public recording office, a true certified copy, certified by the [title insurer], of the original Mortgage together with a certificate of the Company certifying that the original Mortgage has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded.

3.      The original or certified true copy or if in electronic form identified on the related Mortgage Loan Schedule, the certificate number, certified by the Company, of the related Primary Mortgage Insurance Policy, if required.

4.      In the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original Assignment, from the Company in accordance with Purchaser's instructions, which assignment shall, but for any blanks requested by the Purchaser, be in form and substance acceptable for recording.  If the Mortgage Loan was acquired or originated by the Company while doing business under another name, the Assignment must be by "[Company] formerly known as [previous name]".  If the Mortgage Loan was acquired by the Company in a merger, the Assignment must be by "[Company], successor by merger to the [name of predecessor]".

B-1

5.    The original policy of title insurance, including riders and endorsements thereto, or if the policy has not yet been issued, a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company.

6.    Originals of all recorded intervening Assignments, or copies thereof, certified by the public recording office in which such Assignments have been recorded showing a complete chain of title from the originator to the Company, with evidence of recording thereon, or a copy thereof certified by the public recording office in which such Assignment has been recorded or, if the original Assignment has not been returned from the applicable public recording office, a true certified copy, certified by the [title insurer] of the original Assignment together with a certificate of the [title insurer] certifying that the original Assignment has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located.

7.    Originals, or copies thereof certified by the public recording office in which such documents have been recorded, of each assumption, extension, modification, written assurance or substitution agreements, if applicable, or if the original of such document has not been returned from the applicable public recording office, a true certified copy, certified by the [title insurer], of such original document together with certificate of Company certifying the original of such document has been delivered for recording in the appropriate recording office of the jurisdiction in which the Mortgaged Property is located.

8.    If the Mortgage Note or Mortgage or any other material document or instrument relating to the Mortgage Loan has been signed by a person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such person to sign bearing evidence that such instrument has been recorded, if so required in the appropriate jurisdiction where the Mortgaged Property is located (or, in lieu thereof, a duplicate or conformed copy of such instrument, together with a certificate of receipt from the recording office, certifying that such copy represents a true and complete copy of the original and that such original has been or is currently submitted to be recorded in the appropriate governmental recording office of the jurisdiction where the Mortgaged Property is located), or if the original power of attorney or other such instrument has not been returned from the applicable public recording office, a true certified copy, certified by the Company, of the original power of attorney or other such instrument together with a certificate certifying that the original power of attorney or other such instrument has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located.

9.    The original of any guarantee executed in connection with the Mortgage Note.

10.    Any original security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

Notwithstanding anything to the contrary herein, the Company may provide one certificate for all of the Mortgage Loans indicating that the documents were delivered for recording.

C-2

## **Exhibit B**

Company's Underwriting Standards

[TPW: NYLEGAL:299098.2] 19356-00081  03/08/2005 03:33 PM



STRICTLY PRIVATE AND CONFIDENTIAL

# UBS Investment Bank
# Whole Loan Conduit Web Site
# Guidelines and
# Product Specifications

## Version 3.1



# Contents

100 Introduction _____ 1

200 General Program Descriptions_____ 2

   201 General Description_____ 2

   202 Geographic Restrictions _____ 2

   203 Product Terms _____ 2

   204 Occupancy Types_____ 2

   205 Loan purpose _____ 2

   206 Eligible Borrowers _____ 3

   207 Multiple Loans/Properties _____ 3

   208 Ineligible Borrowers_____ 3

   209 Documentation Types _____ 3

   210 Eligible Properties _____ 4

   211 Ineligible Properties_____ 4

   212 Automated Underwriting System Underwriting Requirements_____ 5

   212.1 AUS Requirements for Conforming Balance Loans _____ 5

   212.2 AUS Requirements for Non- Conforming Balance Loans_____ 5

   213 Temporary Buy-Downs _____ 6

   214 Non-Occupant Co-Borrower _____ 6

   215 Earnest Money and Gifts _____ 6

   216 Relocation Mortgages_____ 7

   217 Trailing Spouse Income _____ 7

   218 Secondary Financing _____ 7

   219 Prepayment Penalities _____ 8

   220 Seller Contribution _____ 8

   221 Cooperative Requirements _____ 8

   222 Appraisal Documentation _____ 10

   223 Analyzing a Borrower's Credit History_____ 10

   224 Credit Report _____ 10

   224.1 Credit Scores_____ 10

   224.2 Credit Score Reporting _____ 10



# Contents (continued)

305.7 Predatory Lending _____ 21

306 Other Requirements _____ 21

307 Aged Loans _____ 21

400 Documentation Options _____ 22

401 General _____ 22

402 Age of Credit Documentation _____ 22

403 Full/Alternative Documentation _____ 22

403.1 ExpressDoc _____ 23

403.2 Stated Income/Verified Assets (Reduced) _____ 23

403.3 No Ratio/Verified Assets (No Ratio) _____ 24

403.4 Stated Income/Stated Assets (SISA) _____ 24

403.5 No Doc _____ 25

500 Qualifying a Borrower _____ 27

501 General _____ 27

502 Credit Analysis _____ 27

502.1 Credit Report _____ 27

502.2 Housing and Credit Payment Histories _____ 27

503 Liabilities _____ 29

503.1 Housing Expense _____ 29

503.2 Installment Debt _____ 29

503.3 Revolving Debt _____ 29

503.4 Other Real Estate _____ 30

503.5 Bridge Loans _____ 30

503.6 Other Debts _____ 30

504 Employment and Income _____ 30

504.1 General _____ 30

504.2 Salaried Income _____ 31

504.3 Self-Employed Income _____ 32

504.4 Fixed Income _____ 33

504.5 Other Income _____ 34

504.7 Unacceptable Income _____ 35

505 Assets and Sources of Funds _____ 35

 UBS

LBL GUIDELINES 3.1_FINAL-1-20040422.DOC

# Contents (continued)

505.1 Borrower Contributions _____ 35

505.3 Gift Funds _____ 36

505.4 Gift of Equity _____ 36

505.5 Unacceptable Sources of Funds _____ 36

600 Underwriting the Property _____ 37

601 General _____ 37

602 Property Types _____ 37

602.1 Eligible Property Types _____ 37

602.2 Definitions and Requirements _____ 37

602.3 Property Eligibility Issues _____ 39

602.4 Ineligible Property Types _____ 41

602.5 Other Ineligible Property Issues _____ 42

700 Insurance Requirements _____ 43

701 General Policy for Hazard and Flood Insurance _____ 43

702 Evidence of Insurance _____ 43

702.1 Purchase Money Transactions _____ 43

702.2 Refinance Transactions _____ 43

703 California and Washington State Properties _____ 43

704 Flood Insurance _____ 43

704.1 Purchase Money Transactions _____ 43

704.2 Refinance Transactions _____ 44

705 Non-Participating Areas _____ 44

706 Escrow Requirements _____ 44

800 Appraisal Standards _____ 45

801 General _____ 45

802 Appraiser Qualifications _____ 45

803 Appraisal Forms, Documents and Requirements _____ 45

803.1 Specific Requirements _____ 46

804 Required Exhibits _____ 48

805 Unacceptable Practices _____ 48

806 Appraisal Procedures _____ 49

900 Product Specifications and Matrices _____ 58

901 Jumbo Fixed and Adjustable Rate Product Matrix _____ 58



# Contents (continued)

Full/Alternative Documentation and Expressdoc documentation _____ 58

902 Jumbo Fixed and Adjustable Rate Mortgage Product Matrices _____ 60

Stated Income/Verified Assets _____ 60

903 Alt-A Product Matrix _____ 62

Full/Alternative Documentation and ExpressDoc Documentation _____ 62

904 Alt-A Product Matrix _____ 63

Stated Income/Verified Assets _____ 63

905 Alt-A Product Matrix _____ 64

Stated Income/Stated Assets _____ 64

906 Alt-A Product Matrix _____ 65

No Ratio/ Verified Assets _____ 65

907 Alt-A Product Matrix _____ 66

No Documentation _____ 66

1000 UBS Underwriting Parameters _____ 67

1001 UBS Investment Bank Alt-A Fixed-Rate Underwriting Matrix _____ 67

1002 UBS Investment Bank Alt-A Adjustable Rate Underwriting Matrix ___ 69

1003 UBS Jumbo Fixed Underwriting Matrix _____ 71

1004 UBS Jumbo Adjustable Rate Underwriting Matrix _____ 73

1005   UBS Example Project Questionnaire _____ 74

2000 Contact Information _____ 76



# 100 Introduction



UBS Real Estate Securities, Inc. (hereinafter referred to as "UBS" or "UBSRESI") is a subsidiary of UBS Investment Bank, a client-driven global securities and investment banking firm.   UBS has an unwavering commitment to building long-term partnerships with clients, and working with them to find the right solution to meet their needs.

In an effort to support our client's initiatives to deliver high quality mortgage loans, UBS created the Whole Loan Conduit and Product Specification Guidelines.   These guidelines, complimented by the specification matrices, provide the fundamentals of assessing credit risk as it relates to the quality of a borrower and the acceptability of the mortgaged property.   All loans submitted to UBS for consideration should, therefore, meet the guidelines and the applicable product matrix.   In the event a loan is submitted, but does not meet the guidelines, UBS may consider the loan for purchase, provided the loan has well-documented compensating factors and its expected performance is not impacted unfavorably.

All clients when delivering loans to UBS should exercise sound underwriting decision-making and utilize best practices when originating mortgage loans.   If there is an area of the UBS guidelines that is not addressed, a client may refer to guidelines published by the Federal National Mortgage Association (Fannie Mae).

All loans submitted for consideration are subject to review for compliance with UBS guidelines, the applicable product matrix, as well as with local, state and federal mortgage lending requirements. From time to time, UBS can amend the guidelines to reflect changes required for new and existing mortgage products and to maintain and enhance the suitability of UBS' loan products to its clients, and ultimately to its investors.

Overall, the size, strength and distribution capabilities of UBS, provides clients with product flexibility and the benefits of favorable execution.


**STATEMENT ON PREDATORY LENDING**

UBS believes that all lenders should adhere to high ethical standards and practices.   UBS endeavors to do business with reputable lenders that provide consumers with a variety of products for their individual financing needs.   UBS does not condone nor will it knowingly facilitate predatory or abusive lending practices.   UBS also believes that it is important to participate in industry efforts relating to the prevention of predatory lending by unscrupulous lenders.



# 200 General Program Descriptions

### 201 General Description

These guidelines are designed for ease and convenience. Section 200 of the guidelines is a general description of loans that UBS will consider for purchase for all products and program types. Sections that have additional details or have specific requirements for each product type can be easily accessed through links (move mouse over underlined text and left click).

The guidelines address the credit quality requirements for UBS' Alternative A (Alt-A) and Jumbo fixed and adjustable-rate loan programs. All products provide for flexibility related to documentation type, property type, loan-to-value (LTV) ratios, and credit score requirements. Be sure to refer to the appropriate matrix when underwriting the loan file.

### 202 Geographic Restrictions

UBS will consider loans for purchase that are originated in all states and the District of Columbia with the exception of the following states and regions:

♦ Alaska

♦ Hawaii (All product matrices reduce LTV by 10%)

♦ Guam

♦ Puerto Rico

♦ Virgin Islands

♦ Cash Out Refinance transactions in the state of Texas

### 203 Product Terms

UBS offers several product types to meet a borrower's financing needs. Products are distinguished as follows:

♦ Jumbo Loans

♦ Alt-A Loans

♦ Interest Only ARM

### 204 Occupancy Types

Under specific program parameters, UBS will consider purchasing loans that finance a borrower's principal residence, second home/vacation home and investment property:

♦ Primary Residence

♦ Second Homes/Vacation Homes

♦ Non-Owner Occupied Properties

### 205 Loan purpose

UBS will consider the following loan purpose types for purchase.



- Purchase Money
- Refinance (Rate-Term and Cash Out)
- Land Contracts
- Construction to Permanent

For more details on these loan purpose types refer to Section 305.

## 206 Eligible Borrowers

UBS will consider loans for purchase with the following types of borrowers:

- Individual or Natural Person
- Permanent Resident Aliens and Non-Permanent Resident Aliens
- Foreign Nationals
- Inter-vivos Trust
- Illinois Land Trusts

## 207 Multiple Loans/Properties

The total number of properties financed by UBS is restricted to ten (10) properties per individual, including the subject property.

- The aggregate outstanding balance of all properties cannot exceed $1MM to UBS
- All properties and respective liabilities must be listed in the Schedule of REO on the Universal Residential Loan Application (URLA)
- If properties are financed at the same time, the loan files must be delivered together for underwriting
- UBS will consider the impact of geographic concentration risk when analyzing the overall quality of the file(s). UBS therefore, reserves the right to not purchase loans where multiple properties are concentrated in one market area.

## 208 Ineligible Borrowers

- Corporations with or without recourse
- General Partnerships
- Limited Liability Corporations
- Not for Profit Corporations

## 209 Documentation Types

- Full Documentation
- ExpressDoc
- Stated Income/Verified Assets (Reduced Doc)
- No Ratio/Verified Assets (No Ratio)
- Stated Income/Stated Assets (SISA)

 UBS

3

- No Doc

## 210 Eligible Properties

- Single Family Attached
- Single Family Detached
- Prefab and Modular
- 1 – 4 Unit
- Agency Warrantable Condos
- Agency Warrantable PUDs
- Coops
- Condotels

For specific property eligibility by product refer to the Alt-A Underwriting Matrix or Jumbo Underwriting Matrix.

## 211 Ineligible Properties

- Log Cabins
- Properties with more than 4 units
- Manufactured Homes
- Mobile Homes
- Tax Shelter Syndicates
- Time-Share Units
- Unimproved Land
- Leasehold Properties
- Properties zoned commercial
- Properties zoned industrial
- Properties zoned agricultural
- Rehabilitation Loans
- Model Home Leasebacks
- Non-Warrantable Condos
- Non-Warrantable Cooperatives
- Working Farms, Orchards and Ranches
- Earth/Dome Homes
- Mixed-Use Properties
- Houseboats
- Properties with more than 10 acres

�֍ **UBS**

4

**212 Automated Underwriting System Underwriting Requirements**

Loans underwritten via Automated Underwriting Systems (AUS) may be considered for purchase by UBS. Requirements for the use of an AUS system in the decision-making process will depend upon several factors, namely the loan amount. If the loan amount is conforming (meets Fannie Mae's published loan limits as of the date of the origination date), then refer to Section 212.1. Otherwise, refer to Section 212.2 for those loans that exceed the loan limits as defined by Fannie Mae. **It is important to note, regardless of the AUS decision, a loan must meet the minimum requirements for credit score, DTI, and appraisal documentation as defined in the UBS Product Matrices in Section 900.** Further, some AUS decisions may not be eligible for all products. Refer to the appropriate section for additional information.

## 212.1 AUS REQUIREMENTS FOR CONFORMING BALANCE LOANS

UBS will consider conforming balance loans for purchase that have been underwritten by Fannie Mae's Desktop Underwriter (DU). The decision and documentation requirements determined by DU will be accepted provided that the data entered into the DU system is accurate and complete. A complete DU decision report, DU application, and DU generated credit report must accompany each credit file prior to submission.

Expanded Approval decisions are only allowed under the Alt A product. Loans that receive an "Approve", "EA-I", "EA-II", or "EA-III" decision and an "Eligible" response will be underwritten by verifying the accuracy of the data input. The underwriter must also verify that all DU required conditions were obtained and are maintained in the file. All risk factors identified by DU must also be addressed in the loan file. Loans with these decision types are only allowed from:

♦ Approved Fannie Mae Sellers

♦ Approved Fannie Mae Servicers

Loans that receive an "Approve/Ineligible" response may be underwritten to the UBS Underwriting Guidelines and respective product matrix.

For all program types, appraisal waiver options are not permitted.

For those loans that require mortgage insurance, please refer to Section 228 for coverage amounts.

Decisions and documentation standards of loans underwritten to all other automated underwriting systems (AUS) may be used as a compensating factor.

## 212.2 AUS REQUIREMENTS FOR NON- CONFORMING BALANCE LOANS

UBS will consider non conforming balance loans for purchase that have been underwritten by Fannie Mae's Desktop Underwriter (DU) or Freddie Mac's Loan Prospector (LP). The decision and documentation requirements determined by DU/LP may be accepted provided that the data entered into the DU/LP system is accurate and complete. All loans submitted to UBS for consideration should include a complete DU/LP decision report, DU/LP application, and DU/LP generated credit report. In addition, the DU/LP response should be reflected on any data tape submitted to UBS.

Appraisal waiver options are not permitted.

For those loans that require mortgage insurance, please refer to Section 228 for coverage amounts.

Loan Prospector

 **UBS**

5

Loans that receive an "Accept" or "Accept Plus" will be underwritten by verifying the accuracy of the data input. The underwriter must also verify that all LP required conditions were obtained and are maintained in the file. All risk factors identified by LP must also be addressed in the loan file. Loans that receive a "Caution" may not be considered for purchase by UBS.

<u>Desktop Underwriter</u>

Loans that receive an "Approve" or "Ineligible Loan Balance" exception response will be underwritten by verifying the accuracy of the data input. The underwriter must also verify that all DU required conditions were obtained and are maintained in the file. All risk factors identified by DU must also be addressed in the loan file.

Other automated underwriting systems may be considered as a compensating factor when making the decision to purchase a loan.

## 213 Temporary Buy-Downs

Temporary buy-downs are not allowed on all product types. For specific details refer to the product type below:

- ◆ <u>Jumbo Loans</u>
- ◆ <u>ALT A Loans</u>

## 214 Non-Occupant Co-Borrower

In general, non-occupant co-borrowers will be considered for purchase dependent on compensating factors and adherence to guidelines. Refer to the specific loan type for details:

- ◆ <u>Jumbo Loans</u>
- ◆ <u>ALT-A Loans</u>

## 215 Earnest Money and Gifts

Earnest Money is money paid by the purchaser of real estate when the buyer and seller reach an oral agreement for the sale of the property to show that the buyer's offer is being made in "good faith". Earnest money requirements are dependent on product and loan type, which may require minimum down payments. Refer to the Underwriting Matrices for more specific information.

- ◆ Dependent on the product type, any family member may contribute gift funds in addition to the borrower's minimum down payment required by the product matrix.

- ◆ If the LTV is 80% or less, 100% of the down payment can come from a gift. This is only acceptable for those loans that are fully or alternatively documented.

- ◆ If the LTV is 80% or greater, 5% of the down payment can come from a gift. This is only acceptable for those loans that are fully or alternatively documented.

- ◆ Verification of a gift is required regardless of documentation program used to underwrite the loan. The documentation requirements are as follows:

  - ◆ A gift from a relative, domestic partner, fiancé, or fiancée must be evidenced by a letter that is signed by the donor. The letter must:
    - – specify the dollar amount of the gift and the date the funds were transferred
    - – include the donor's statement that no repayment is expected; and



6

   − indicate the donor's name, address, telephone number, and relationship to the borrower.

   ♦ The lender must verify sufficient funds to cover the gift are either in the donor's account or have been transferred to the borrower's account. When the funds are not transferred to the borrower's account prior to settlement, the donor may give the closing agent a certified check, cashier's check, or other official check for the amount of the gift. Acceptable documentation to show the transfer of funds includes a copy of the donor's check or withdrawal slip and the borrower's deposit slip, a copy of the donor's check to the closing agent, a settlement statement showing receipt of the donor's check, etc.

## 216 Relocation Mortgages

♦ Allowed for purchase money transactions only.

♦ New employment contract executed by all parties must include a start date within 30 days of loan closing. Loans with this documentation will be treated as full documentation loans.

♦ The employment contract, executed by all parties, must provide for the debt treatment of the borrower's prior residence. If the contract does not include a provision related to the employer purchasing the borrower's current residence, the total liability will be included in the debt-to-income (DTI) ratio calculation.

## 217 Trailing Spouse Income

Trailing spouse income is defined as a spouse, relative, domestic partner, fiancé, or fiancée of the primary wage earner:

♦ If the employee/borrower is a newly hired employee and trailing co-borrower income is needed to qualify, the maximum LTV is 90%

♦ Unmarried borrowers must have a history of joint financial relationship with each other (i.e.: joint bank accounts, joint obligations, etc.)

♦ A letter of intent to seek employment is required

♦ The trailing spouse must be employed as a salaried employee or as an hourly wage or commissioned employee in the same profession for the past two years. If the seller is able to document a reasonable employment market for positions that are similar, the seller may consider either 75% of the trailing spouse's documented income if this income does not exceed 30% of the total qualifying income or 50% of the income if it exceeds 30% of the total qualifying income. The income from the previous employment must be verified in accordance with standard guidelines.

## 218 Secondary Financing

Loans with secondary financing will be considered for purchase. A second lien may be an open-end credit (HELOC), closed-end second (fully amortizing) or a balloon. A privately held second lien is not permitted. Dependent upon the second lien type, special rules will apply. The following are parameters:

♦ CLTV ratio, regardless of second lien type, cannot exceed 100%

♦ No negative amortization

♦ For balloon seconds, the balloon term is not less than 5 years

 UBS

- ◆ A HELOC is acceptable provided the loan does not negatively amortize and the maximum amount of the line of credit is used to calculate a CLTV ratio
- ◆ For all loans, a copy of the second lien Note must be in the loan file to verify the P & I payment and the terms of the loan.

For specific information regarding secondary financing refer to the appropriate Underwriting Matrix:

- ◆ Jumbo Loans
- ◆ ALT-A Loans

### 219 Prepayment Penalties

UBS will purchase loans with prepayment penalties that are compliant and enforceable under the state law in which the property is located. For more specific information refer to the Underwriting Matrix.

### 220 Seller Contribution

Seller contributions that are applied towards recurring (such as real estate taxes, hazard insurance premiums, and escrow accruals) and non-recurring closing costs (such a prepaid fees) are permitted and can be made by a seller, builder, or a real estate agent. Refer to the matrix below for maximum allowable contributions:

- ◆ The contribution percentage is based on the lesser of the property's sales price or appraised value of the subject property
- ◆ The total of the first lien, second lien and contribution cannot exceed 100%. Contributions are not allowed on an 80%/20% programs
- ◆ Contributions cannot be in the form of personal property, decorator items or other miscellaneous items.

*UBS Maximum Allowable Contributions*

| Occupancy | CLTV < 75.00% | CLTV > 75.01% -<90.01% | CLTV > 90.01% <97.00% | CLTV > 97.01% |
|---|---|---|---|---|
| Single Family Owner Occupied - Primary | 9% | 6% | 3% | Not Eligible |
| Second/Vacation | 9% | 6% | 3% | Not Eligible |
| Investment | 2% | 2% | 2% | Not Eligible |

### 221 Cooperative Requirements

UBS will consider loans secured by a cooperative (co-op) property for purchase if certain requirements are met. A Co-op is a corporation or trust that holds the title to the property and sells shares of stock representing one unit to the borrower. The property must be located in the metropolitan areas of New York, Washington DC, New Jersey, Pennsylvania, Maryland, Virginia, California, Massachusetts, Connecticut or Washington.

The requirements for co-ops are as follows:

- ◆ Verified monthly dues are included in the total housing and debt ratios
- ◆ The expiration of the proprietary lease is materially beyond the expiration date of the mortgage term



- The underlying mortgage on the co-op project must have a fixed rate and have remaining term of at least 3 years

- The pro rata portion of the underlying mortgage applicable to the individual co-op unit must be less than 35% of the lesser of the subject's sale price or appraised value.

- A completed questionnaire must be included in the file prior to submission.



**222 Appraisal Documentation**

## Appraisal Requirements:

- Full URAR appraisal (Fannie Mae Form 1004) is required regardless of the AUS decision
- Loan amounts > $650,000 and < $1,000,000 require a full appraisal AND a Drive-by (Fannie Mae Form 2055) with exterior inspection
- Loan amounts > $1,000,000 require 2 full appraisals
- Property values > $2,000,000 require 2 full appraisals regardless of LTV/CLTV and loan amount

**223 Analyzing a Borrower's Credit History**

A borrower's history of managing credit is an indication of future performance and will be considered strongly by UBS in the decision to purchase a loan:

- Mortgage/Housing History – 12 months history is required.  Maximum number of late payments are addressed in the following links:
- <u>Jumbo Loans</u>
- <u>Alt-A Loans</u>
- All liens and judgments affecting title must be paid prior to closing
- A minimum of 3 trade lines with each reflecting a 12-month history is required.  A VOR or VOM can be considered a trade line
- Repetitive charge-offs, judgments and liens may be considered as derogatory credit.

**224 Credit Report**

UBS will accept a Residential Mortgage Credit Report (RMCR) or a tri-merged report to determine the appropriate credit score for the borrower(s).  Acceptable scoring models are:

- Experian's Fair Isaac (FICO) score
- Equifax's Beacon score
- Trans Union's Empirica score.

The credit report cannot have a generated date more than 120 days from the Note date for existing properties.  For new construction, the credit report cannot have a generated date more than 180 days from the Note date.

### 224.1 CREDIT SCORES

- <u>Jumbo Loans</u>
- <u>Alt-A Loans</u>

### 224.2 CREDIT SCORE REPORTING

The middle of 3 scores or the lower score of 2 scores should be selected as the borrower's representative score.  For two or more borrowers, the lowest of the representative scores will be used to underwrite the loan.



### 224.3 NO CREDIT SCORE

UBS will consider borrowers with no credit score provided alternative credit demonstrating a good credit history is obtained.    For more details on acceptable forms of alternate credit refer to Section 225.

### 225 Alternative Credit

Alternative Credit History–If a Borrower does not have at least one credit score resulting from requests to all 3 repositories (no scores), and/or does not meet the minimum credit profile (stated above), the borrower may utilize alternative credit histories for full doc transactions only.

In these cases, a minimum of 3 alternative trade lines must be verified directly with the credit or, or with 12 months consecutive canceled checks, showing a maximum of 0 x 60 payment history over the past 12 months for each alternative trade line.  A VOR or VOM can be used as on of the three trade lines.

Alternative trade lines include: telephone bills, gas and/or electric utility bills, cable television bills, auto insurance bills (if paid monthly), etc.

Alternative credit can be used only after an attempt at pulling a full credit bureau report has failed. Evidence of the attempt must accompany the credit file.

- Foreign Nationals
- Jumbo Loans
- Alt-A Loans

### 226 Bankruptcy

- Jumbo Loans
- Alt-A Loans
- Previous bankruptcies/foreclosures should be fully discharged/ completed for three (3) full years prior to the loan application date
- Borrowers must have re-established credit for a minimum of 12 months after the discharge date with no derogatory reporting
- The minimum three-year look back requirement must be met regardless of any AUS decision.

### 227 Reserves

UBS requires two (2) months minimum PITI liquid reserves on primary and second homes.  Investment properties require six (6) months minimum PITI liquid reserves.

For Jumbo primary and second homes with a credit score greater than 720, LTV less than 80%, and a loan amount less than or equal to $650,000, no reserves are required.

Reserves cannot come from proceeds of any loan.

### 228 Mortgage Insurance

UBS will consider loans with LTVs greater than 80% that have Mortgage Insurance (MI) in place. Acceptable MI companies include: PMI, MGIC, Radian, GEMICO, RMIC, TRIAD Guaranty and United Guaranty.

In addition:



♦ Mortgage Insurance coverage is required on all loans with LTVs greater than 80% regardless of
any AUS Decision

♦ Reduced MI is not permitted

♦ Escrow waivers are not permitted when mortgage insurance is required.

♦ The following matrix is provided to show coverage requirements in relation to LTV:

|  | LTV 80.01-85% | LTV 85.01-90% | LTV 90.01-95% |
|---|---|---|---|
| 15yr | 6% | 12% | 25% |
| 30yr | 12% | 25% | 30% |

Radian is the UBS preferred MI provider.  The following loan parameters are ineligible for purchase:

♦ Fico scores must be obtained from two repositories.   The lower of the two scores will be used to
qualify.

♦ Properties in Alaska, Hawaii, Florida, (Dade County, Broward County, and Miami MSA are not
eligible)

♦ ALT A loans with a Fico of < 660

♦ Full Doc loans with Fico < 620

♦ Reduced Doc with Fico < 660

♦ Second Mortgages, loans to foreign nationals, loans secured by non- warrantable condos, condo-
hotels, rural properties, and single wide mobile homes

♦ Investor properties under any ALT Doc program (not full doc)

♦ No covered loan may be more than 1x30 on any scheduled monthly payment in the last 12
months

♦ Full Doc / Alt Doc loans as defined by Fannie/Freddie but per UBS guidelines are acceptable for
insurance and contract underwriting with a minimum fico of 620 and Fannie Mae Desktop
Underwriter Approve/Eligible (Conforming balances only) or Fannie Mae Desktop Underwriter
Approve/Eligible/ Freddie Mac Loan Prospector Accept/Eligible (non-conforming balances).

**229 Adjustable rate mortgages**

### 229.1 FIXED RATE PERIODS

♦ <u>Alt A:</u>  6 months, 2 years, 3 years, 5 years, 7 years

♦ <u>Jumbo:</u>  6 months, 3 years, 5 years, 7 years, 10 years

For Interest-Only loans, refer to the credit matrix for which the loan is delivered.  If the minimum score
listed for the loan is 620, the IO minimum score will be **640**.  For all other products, refer to the
minimum credit score noted in the matrix for IO minimum score requirements.

Specifically, for the 6 Month IO program, the qualifying rate must be the initial rate plus **2%.**

Assets are still required to be verified.

### 229.2 ARM CAPS

| Product Types | 1st Rate Cap | Periodic Cap | Life Cap |
|---|---|---|---|
| % 6 Month Fixed | 6% | 6% | 12% |



| % 2 Year Fixed | 3% | 1% | 6% |
| % 3 Year Fixed | 3% | 1% | 6% |
| % 5 Year Fixed | 5% | 1% | 5% |
| % 7 Year Fixed | 5% | 1% | 5% |
| % 10 Year Fixed | 5% | 1% | 5% |

**\*PERIODIC CAP FOR 1YR LIBOR INDEX IS 2%.**

\*Initial Rate Cap for 3yr Fixed 1yr LIBOR index is 2%.

\*1/1/12 caps available for 6 month fixed with price reduction.


### 229.3 ACCEPTABLE INDICES


♦ 6 month LIBOR

♦ 1Year LIBOR (Jumbo product only)


### 229.4 MAX RESET MARGIN

♦ Alt A: 5.0

♦ Jumbo – A: 3.5

### 229.5 MATURITIES

♦ 30 years only

### 229.6 AMORTIZATION TYPES

♦ 30 Year Amortization

♦ <u>Interest Only</u>


### 230 Community Property and Homestead States

♦ Arizona

♦ California

♦ Colorado

♦ Idaho

♦ Illinois

♦ Louisiana

♦ Nevada

♦ New Mexico

♦ Texas

♦ Washington

♦ Wisconsin

 UBS

# 300 Underwriting Guidelines

## 301 General Underwriting Policy

UBS requires the seller's underwriting standards to meet UBS investment quality standards. Residential mortgage loans will meet UBS investment quality standards if the credit, character and capacity of the borrower to repay the debt has been clearly demonstrated, and the collateral value has been well supported as documented by the appraisal(s).

The underwriting and product guidelines set forth in this Underwriting and Product Guide specifies the parameters under which UBS will purchase residential mortgage loans; however, all loans are subject to a pre-purchase review in order to validate the seller's underwriting methods and data integrity.

UBS may amend the underwriting guidelines and/or product specifications in response to changes in the market. It is the seller's responsibility to keep the guidelines current through the use of announcements, bulletins and amendments as they are released.  To ensure sellers are notified within a timely manner, UBS will provide announcements in advance to allow sellers to manage existing inventory and delivery to UBS.

All loans submitted for purchase by UBS must be compliant with all federal, state, and/or local residential lending guidelines and restrictions with proper disclosure to all borrowers. Evidence of all jurisdictional and regulatory compliance must be included in each loan file.

## 302 Eligible Borrowers

State and federal regulations and UBS guidelines determine a borrower's eligibility for particular mortgage loan programs.  UBS requires that all borrowers be at least the legal age in the state, which the property is located and are a natural person. There is no maximum age limit for borrowers.

### 302.1 ILLINOIS LAND TRUST

UBS will purchase loans held in an Illinois Land Trust.  This type of trust is a simple trust that vests in a trustee, the title and the power to administer the property at the direction of the beneficiary.  The beneficiary retains the power to use, convey, or manage the land in addition to other rights.

### 302.2 INTER VIVOS REVOCABLE TRUSTS

An Inter Vivos Revocable Trust is a trust that an individual creates during his or her lifetime and becomes effective during its creator's lifetime, and can be changed or canceled by its creator at any time, for any reason, during the individual's lifetime. UBS will require the note, mortgage and all compliance related disclosures to be executed by the trustee and the borrower(s).  With respect to title insurance, vesting can be in the name of the trust only.

### 302.3 RESIDENCY STATUS

UBS will consider for purchase US citizen and Permanent Resident Alien borrowers that meet or exceed guideline requirements. Non-Permanent Resident Aliens and Foreign Nationals are also eligible for purchase under certain criteria.  Refer to the Credit Underwriting Matrices (UBS Product Matrices) for specific information.

US Citizen



A United States citizen is a native or naturalized person entitled to all rights and privileges granted by the United States. Unless otherwise noted, loan program requirements are based on the assumption that the borrower is a U. S. citizen.

Permanent Resident Alien

A Permanent Resident Alien is an individual who permanently resides in the U.S. The INS has programs to allow another group of individuals, such as refugees and others seeking political asylum, to seek permanent employment while their permanent resident alien status is being obtained.

Non-permanent Resident Alien

A Non Permanent Resident Alien is an individual who seeks temporary entry into the United States for a specific purpose. The non-permanent resident alien must have a permanent residence abroad and must qualify for the admission classification being sought.

Foreign National

A Foreign National is an individual who is not a permanent resident alien or a non-permanent resident alien who is not allowed full or partial diplomatic immunity. A Foreign National visits but is not employed in the U.S. The seller is responsible for determining if a foreign national borrower can enter the United States legally. A Certificate of Foreign Status (IRS form W-8) is required for Foreign National borrowers without a social security number or a tax ID number.

UBS will consider loans to Foreign National borrowers secured by one unit second home properties only. These loans must be underwritten to full documentation standard as defined in Section 403. A Foreign National with a social security number must have a credit report in the file. If the borrower does not have a social security number then either an international credit report or one major bank reference from the borrower's country of origin must be obtained.

Foreign National borrowers must establish an escrow account at closing. No escrow waivers will be permitted.

## 302.4 CO-BORROWERS/GUARANTORS

In general, co-borrowers/guarantors to mortgage loans are not always required to be part of the entire loan process. In these instances, they may not have the same responsibilities and requirements as the primary borrowers. UBS guidelines are aligned with Fannie Mae guidelines and is as follows:

♦ Co-borrowers/guarantors do not have to take title to the property. If their income is to be used for qualification purposes, they must sign the Note at closing with applicable disclosures but would not be required to sign the Mortgage. In this case, the co-borrower's credit history, credit score, assets and liabilities must be fully considered in rendering a credit decision

♦ If the LTV is greater than 90%, and the co-borrower's income is used to qualify, then the co-borrower must occupy the property

♦ Co-borrowers/guarantors may not be an interested party (seller, builder, real estate agent, etc.) to the property sales transaction.

In addition to the above requirements for co-borrowers/guarantors, there are some restrictions for the following different types of co-borrowers/guarantors:

♦ **Alt-A Non-Occupant Co-borrower:** UBS allows non-occupant co-borrowers/guarantors on all loan programs with a CLTV of 90% or less and full/alt documentation standards. The non-



occupant co-borrower must be an immediate family member, a grandparent, or an individual who has a documented significant relationship with the occupying borrower. A credit report must be obtained on all non-occupant borrowers and those borrowers must meet the minimum credit standards set by UBS in Section 224.1.

Down payment requirements for the Owner-Occupant–For LTV ratios that are 80.01%-95.0%, when there is a non-occupant co-borrower in the transaction, the owner occupant must contribute at least 5% of the purchase price from their own funds. If the LTV is less than or equal to 80%, the entire down payment may be in the form of a gift.

- ♦ **Non-purchasing Spouse**: To perfect a lien in a community/homestead property state under governing state law, a married applicant that purchases a property without involving their spouse, UBS requires the spouse to sign the security instrument or other applicable documentation (e.g. Quit Claim Deed) to confirm they are relinquishing all rights to the property. As required by state jurisdiction, UBS will accept various state specific documentation provided UBS is guaranteed a lien position that is superior to that of the non -purchasing spouse.

### 302.5 NON-ARMS LENGTH TRANSACTIONS

A non-arms length transaction occurs when a personal or business relationship exists between the borrower(s) and the seller. Certain types of these transactions may be eligible for purchase by UBS.

Examples of acceptable non-arms length transactions may include:

- ♦ Family sales or transfers (either for or without consideration)
- ♦ Corporate sales or transfers (from business to personal ownership).

Non-arms length transactions with family members are generally acceptable if:

- ♦ The family member or relative is the borrowers' spouse, domestic partner, child, parent, or any other individual related to the borrowers by blood, adoption, or legal guardianship
- ♦ An executed purchase & sales agreement between the purchaser and the family member is in the loan file
- ♦ The source and ownership of funds for the down payment, closing costs, and reserves are well documented in the loan file when required
- ♦ The appraised value of the property is well supported, particularly for gifts or gifts of equity of more than 20% of the LTV.
- ♦ Gifts meet the normal gift guidelines as follows:
  - – if a down payment is required, the borrower must have 5% of their own funds unless the gift is 20% or more of the sales price or appraised value, whichever is less
  - – a signed gift letter and verification of the receipt of the gift funds are provided
  - – gifts of equity are acceptable from immediate family members only. A complete, fully executed gift letter must be provided and the standard gift requirements must be obtained. In addition, the HUD -1 Settlement Statement and the contract of sale must reflect the exact gift of equity.

All UBS loan programs are eligible for acceptable non-arms length transactions; however, these transactions may require additional documentation depending upon the seller's underwriter's assessment of risk.

Examples of unacceptable non-arms length transactions include, but are not limited to:

- ♦ Employer to employee sales or transfers



17

- ◆ Borrowers or co-borrowers/guarantors employed in the real estate or construction trades who are involved in the construction, financing, or sale of the subject property

- ◆ Transactions involving principals or employees of UBS approved sellers, real estate brokers or other vendors or service providers (such as an appraiser, settlement agent, title company, etc.) who is involved (directly or indirectly) in the sale and/or lending process of the subject property.

In order to be eligible for purchase by UBS, loans to be made to principals or employees of vendors or service providers (such as an appraiser, settlement agent, title company, etc.) cannot directly or indirectly provide these services on their own property.

If borrowers are purchasing a property from a builder who is purchasing the borrowers' existing residence, it is considered a non-arms length transaction that is not permitted by UBS.

## 303 Occupancy Types

The occupancy type for the subject property will determine the loan products available. There are generally three occupancy types as follows:

- ◆ Primary Residences/Owner Occupied Properties (O/O) is a one-to-four family dwelling, including condominiums and Planned Urban Developments (PUD) that are occupied by the borrower as their principal residence.

- ◆ Second Home/Vacation Home (SH) occupancy is a single family dwelling that the borrower occupies in addition to his or her primary residence.  A second home is generally located in a resort area or where the applicant regularly conducts business affairs.  The property must be suitable for year-round occupancy.  Any rental income received will not be considered in the underwriting analysis. (3- 4 unit properties are not acceptable second/vacation homes).

- ◆ Investment/Non-owner Occupied Properties (N/O/O) is any property owned, but not occupied, by the borrower and does not qualify as a primary or second/vacation home.  Income derived from rental units can be used for qualifying purposes.

## 304 Eligible Properties

### 304.1 PROPERTY TYPES

Refer to Section 602.1 and 602.4 for the eligible and ineligible property types.

### 304.2 GEOGRAPHIC RESTRICTIONS

UBS will purchase first lien mortgage loans secured by 1-4 family properties in all states and the District of Columbia with the following state or region exceptions:  Alaska, Hawaii (Reduce LTV/CLTV maximum by 10%), Guam, Puerto Rico, Virgin Islands and cash-out refinance transactions in Texas.

Certain loan programs, however, may have specific state restrictions. Refer to the Product Matrices for these restrictions, if any.

## 305 Loan Purpose Types

UBS will consider several different transaction types for purchase.  These transaction types include the three primary types of purchase money, rate and term refinance, and cash out refinance in addition to land contracts, construction to permanent, inherited properties and subordinate liens.

### 305.1 PURCHASE TRANSACTIONS

A purchase loan is a loan for the purpose of acquiring the subject property. The transaction is evidenced by a purchase contract/agreement, which is signed by the seller and the borrower.

 UBS

Lease/Purchase Option-With a Lease Option, the value used to calculate the LTV would be the lesser of the option price at the time of the contract or the appraised value when the original agreement is less than 12 months.

If the original agreement is over 12 months old at the time of application, UBS will require the seller to utilize the current appraised value to calculate the LTV. Copies of the cancelled rent checks are required to verify the length of the contract, as well as the payment history. The borrower's rental payment history for the length of the contract will be treated as a prior housing payment history for pricing purposes.

If the agreement specifies that rent credits are to be applied toward the down payment, UBS will consider this provided the appraiser documents the fair market rent with a market rent survey. The portion of rent that exceeds the rent market survey will be used to calculate the additional down payment. If a down payment was made, a copy of the cancelled check is required.

### 305.2 REFINANCE TRANSACTIONS

A refinance is a mortgage transaction on a property for which the borrower already has ownership. The proceeds of the loan closing are used for the repayment of an existing debt that has the same borrower and same security property, unless the property is owned free and clear of any liens. There are two types of refinance transactions:

♦ Rate/Term Refinance ("No Cash-Out" and "Limited Cash-Out") enables the borrower to reduce his or her mortgage interest rate or term (or both). In addition, the borrower may receive a limited amount of cash that can be used for any purpose. The mortgage amount is limited to the outstanding unpaid principal balance of the existing mortgage, closing costs (including all prepaid items), points, the amount required to satisfy any subordinate mortgages that were used in whole to acquire the subject property. In order for the loan purpose to qualify as a 'limited cash-out transaction,' the aggregate cash-out amount does not exceed the lesser of 2% of the loan amount or $2,000. Loan types that don't meet the aforementioned parameters will be considered cash-out refinance transactions.

♦ Equity Refinance ("Cash-Out") enables the borrower to take out the equity he or she has in the property. A loan is considered a cash-out if the cash back to the borrower is an amount more than the lesser of 2% of the balance of the new refinance mortgage or $2,000. The mortgage amount may include the unpaid principal balance of the existing first mortgage, closing costs, points, and the amount required to satisfy any outstanding subordinate mortgages not used to purchase the property.   An explanation letter regarding the purpose of the cash received is required. The cash out limits are defined on the UBS Product Matrices.

<u>Seasoning Requirements</u>

UBS does not require a borrower to have owned the subject property for any specified amount of time prior to a refinance.  UBS will rely on the current appraisal provided it adequately supports the value of the subject property and all improvements to the property from the date of acquisition are documented

If the property was acquired less then 12 months ago, the appraiser is required to document the original purchase price of the property.  All disparities must be addressed by the appraiser.  UBS reserves the right to reject any loan that does not contain reasonable documentation related to improvements.

UBS will not purchase rehabilitated properties.



### 305.3 LAND CONTRACT TRANSACTIONS

Land contract transactions are acceptable to UBS within certain parameters. If the contract has been in place for less than 12 months at the time of application, the transaction will be considered a purchase. The LTV ratio will be based on the lesser of the purchase price on the contract or the current appraised value. If the contract has been in place for 12 months or more at the time of application, the transaction will be considered a refinance and subject to rescission. The LTV ratio will be based on the current appraised value. The following document(s) are required for these transactions:

♦ A copy of the executed and notarized land contract

♦ If a refinance, a 12-month payment history must be obtained.  Documentation to support all improvements to the property must be obtained if the borrower is receiving cash out

♦ If a purchase transaction, the HUD-1 Settlement Statement must disclose the transaction as a purchase.  Cash back to the borrower is not permitted.

### 305.4 CONSTRUCTION-TO-PERMANENT TRANSACTIONS

A construction-to-permanent loan will be considered as either a purchase or a refinance transaction.

As a purchase-money transaction, the borrower is not permitted to receive cash back. The LTV for this transaction will be based on the **lowest** of the following:

♦ Appraised value after all improvements

♦ Builder contract price plus the cost of the land

♦ Builder contract price plus the market value of the land if owned for > 12 months

♦ Construction/acquisition costs (with documentation) plus the cost of the land.

As a refinance transaction, the borrower may obtain a rate and term transaction where the LTV is based on the appraised value of the property at the time that the permanent loan is closed. The construction loan is paid off at this time. Cash-out refinances will be permitted provided that the acquisition costs are fully documented.

### 305.5 INHERITED PROPERTIES

UBS will consider properties that are inherited for purchase.  The LTV will be based on the current appraised value. Cash-out refinances are permitted on owner occupied properties only. The property must be fully transferred from the Estate ownership prior to financing.

### 305.6 SUBORDINATE FINANCING

A second or third mortgage may be subordinated to the UBS lien only when the maximum combined loan-to- value ratio (CLTV) does not exceed UBS guidelines (see UBS Product Matrices for specifics). The subordinated lien must be a valid lien at a current market interest rate. The subordinated lien must be recorded and clearly subordinate to the new first mortgage or deed of trust.  All documentation to support the lien position and the terms (Note) of the subordinate lien must be included in the loan file.

Unacceptable subordinate lien terms include a lien:

♦ with a term less than 5 years

♦ subject to a temporary interest rate buy down

♦ that does not provide for regular monthly payments or allows for negative amortization.



<u>Seller Carry Back Subordinate Lien</u>

Seller Carry Back Subordinate Liens will be considered for purchase if the following requirements are met:

♦ Only allowed on Alt A products

♦ A copy of the seller carry back Note and security instrument are submitted with the loan package

♦ The Contract of Sale and final HUD-1 Settlement Statement reflect the seller carry back, including both the amount and to whom the carry back is payable

♦ The payments are at least interest-only and the rate must be at a reasonable or market rate

♦ There are no call provisions

♦ The carry back term is not less then five (5) years.

### 305.7 PREDATORY LENDING

Mortgages that are subject to local, state and federal, anti-predatory lending legislation are ineligible for purchase by UBS.

Proof of compliance with these acts must be provided with all loan files in these anti-predatory categories.

### 306 Other Requirements

♦ Interest credits are allowed provided the loan is funded by the 5th calendar day of the month

♦ Limited Power of Attorney is allowed only on full/alternative documentation loans

### 307 Aged Loans

UBS purchases newly originated mortgage loans through the Jumbo A and Alt A programs. Therefore, UBS will consider the purchase of mortgage loans when the first payment date is not older than 60 days from the UBS lock date.  For example:

|  |  |
|---|---|
| Note date: | January 27, 2004 |
| First Pay date: | March 1, 2004 |
| UBS Lock date: | No later than May 1, 2004 |

 UBS

# 400 Documentation Options

UBS offers loan documentation options to meet a borrower's financing needs.  Flexibility for verification of income and/or assets allows a client to deliver a diversified product mix.  The different loan documentation processing options for use with the applicable UBS Mortgage Products are defined in this Section.

## 401 General

Each loan must be delivered with a documentation type as defined in the following sections.  In the event, a loan is submitted, but does not meet the minimum documentation requirements of the category, it may be considered with a lower documentation level and may be priced accordingly.

## 402 Age of Credit Documentation

Any documentation verifying credit, employment, income, mortgage/rent payments and/or assets that is used for qualifying the borrower(s) must be dated within ninety (90) days of the Note date. Updates to expired documentation must be obtained prior to submittal to UBS.

## 403 Full/ Alternative Documentation

Full Documentation: Mortgage loans that have been processed using full/alternative documentation as defined by Fannie Mae and Freddie Mac are eligible for purchase by UBS. Full Documentation refers to the use of the standard forms approved by both Fannie Mae and Freddie Mac for verification purposes of income/employment, assets and certain payment histories. These forms include the Verification of Employment (VOE) for salaried borrowers, Verification of Deposit (VOD), and Verification of Mortgage/Rental History (VOM/VOR). The forms must be fully completed and signed by an authorized party in order for the form to be acceptable for this documentation type. At the underwriter's discretion, additional documentation may be requested to substantiate the borrower's income/employment, assets and/or payment history.

Mortgage History (either of the following)

♦ Verification of Mortgage (VOM) or Verification of Rent (VOR) documenting housing pay history for the previous 12 months

♦ Verification of mortgage or rental payment history with a credit report.


Asset Verification

♦ Verification of Deposit (VOD) documenting the most recent two months balances.


Employment and Income Verification

♦ Written Verification of Income and Employment documenting the most recent two years (salaried borrowers only)

♦ Verbal Verification of Employment (VVOE) performed by a third-party (e.g., client's employee) within 5 days of the Note date

♦ Most recent two years tax returns (self-employed borrowers).


Alternative Documentation



Alternative Documentation allows the seller to obtain documents directly from the borrower regarding employment, income, assets and mortgage/rental history in lieu of the standard documentation (VOE, VOD and/or VOM/VOR). Examples of this type of documentation level are as follows:

♦ Mortgage History

♦ Verification of mortgage or rental payment history with a credit report

♦ Twelve months cancelled checks (front and back) evidencing housing obligation.

♦ Asset Verification

♦ Two months most recent bank statements.

♦ Employment and Income Verification.

♦ Two years W-2s

♦ Two years most recent 1040s (including all schedules) ·

♦ Verbal Verification of Employment performed by a third-party (client's employee) within 5 days of the Note date.

### 403.1 EXPRESSDOC

Under this documentation level the loan must contain a minimum of 12 months of employment/income verification and one-month asset verification. Examples of this type of documentation are listed below:

♦ Mortgage History

♦ Verification of mortgage payment history with a credit report

♦ VOM/VOR or twelve (12) months' canceled mortgage or rent checks.

♦ Asset Verification

♦ VOD documenting most recent one (1) month balance

♦ One (1) month of the most recent bank statement for all accounts needed for funds to close.

♦ Employment and Income Verification.

♦ VOE documenting one (1) year of income

♦ One (1) year's worth of W-2 forms or 1040 tax returns

♦ Most recent year-to-date pay stub evidencing at least a 30-day period

♦ Verbal Verification of Employment performed by a third-party (client's employee) within 5 days of the Note date.

### 403.2 STATED INCOME/VERIFIED ASSETS (REDUCED)

Income as stated and acknowledged by the borrower on the Uniform Residential Loan Application (1003) and the Underwriting Transmittal (1008) is used to qualify the borrower. Verification of income is not required, if the following conditions are met:

♦ Self-employed and salaried borrowers are eligible. Self-employed borrowers must be self-employed with the same business entity for a minimum of 2 years. Salaried borrowers must be in the same line of work for a minimum of 2 years.



23

- Stated income must be reasonable for the job/occupation and length of employment of the borrower

- Gift funds are permitted provided the borrower contributes at least 10% of his/her own funds for the down payment and cash reserves.

Examples of acceptable stated income/verified asset documentation are listed below:

- Mortgage History

- VOM or VOR

- Twelve (12) months' canceled mortgage or rent checks

- Verification of mortgage payment history with a credit report.

- Asset Verification

- Two months most recent bank statements.

- Employment Verification.

- Verbal Verification of Employment performed within 5 days of the Note date.

- For self-employed borrowers, a verbal verification of employment must be obtained from the borrower's CPA or evidence of a business license for the past 2 years must be provided.

### 403.3 NO RATIO/VERIFIED ASSETS (NO RATIO)

This option does not require the calculation of the borrower's debt -to-income ratios. The borrower's income should not be disclosed anywhere within the loan application or the credit file. The borrower's employment must be stated and verified with a verbal verification completed by the processor (or via third party for self-employed borrowers). Assets and liabilities are verified according to full or alternative documentation option guidelines.

Examples of this type of documentation are listed below:

- Mortgage History

- VOM or VOR

- Twelve (12) months' canceled mortgage or rent checks

- Verification of mortgage payment history with a credit report.

- Employment Verification.

- Verbal Verification of Employment performed within 5 days of the Note date.

### 403.4 STATED INCOME/STATED ASSETS (SISA)

This option does not require verification of income or assets. The borrower's qualifying ratios are calculated on the basis of the income as stated on the loan application. The income stated must be reasonable for the position. The borrower's assets needed for the down payment, closing costs, and reserves are also calculated on the basis of the assets as stated on the loan application. Employment for wage earners and self- employed borrowers must be stated and verified, usually with a verbal verification completed by the processor (or via third party for self-employed).

Examples of this type of documentation are listed below:

- Employment Verification

- Verbal Verification of Employment performed within 5 days of the Note date.



♦ For self-employed borrowers, a verbal verification of employment must be obtained from the borrower's CPA or evidence of a business license for the past 2 years must be provided.

### 403.5 NO DOC

With this documentation option, the borrower's income, employment and assets are not disclosed anywhere within the loan application or the credit file. This option does not require the calculation of the borrower's debt-to-income ratios. The application must be complete with respect to liabilities, schedule of REO, and all other required documentation and must be executed by all borrowers.  This program is not permitted for first time homebuyers, borrowers on a fixed income or loans with powers of attorney.  Payment shock may be addressed on a case-by-case basis and the borrower's capacity and willingness to repay.  One form of legible ID including a photograph is required for each borrower.



# UBS Documentation Matrix

  UBS Investment Bank

| Documentation & Lookback Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Section | 403 | 403.1 | 403.2 | 403.3 | 403.4 | 403.5 |
| Minimum Income Verified (Written) | 2 Years | 1 Year | | | | |
| Income Documentation | Fannie Mae/Freddie Mac forms or W2s/1040s and paystub | W2/1040s and paystub | Stated on Application | | Stated on Application | |
| Minimum Employment Verified (Written) | 2 Years | 1 Year | Current Employment | Current Employment | Current Employment | |
| Verification of Employment (Verbal) | ✔ | ✔ | ✔ | ✔ | ✔ | |
| Verification of Mortgage/Rent | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Minimum Mortgage/Rental History Verified | 1 Year | 1 Year | 1 Year | 1 Year | 1 Year | 1 Year |
| Asset Documentation | Fannie Mae/Freddie Mac forms or 2 months bank statements | 2 months bank statements | 2 months bank statements | 2 months bank statements | Stated on Application | |

✿ UBS

# 500 Qualifying a Borrower

## 501 General

This section discusses UBS' specifications on underwriting a loan. The quality of a loan and the capacity of the borrower to accept a new debt can be determined by reviewing the employment, income, assets and liabilities of the borrower. The seller must be diligent in performing this review to ensure that all documentation is complete and accurate.

## 502 Credit Analysis

When analyzing the quality of a borrower, several attributes are considered to determine overall risk. These attributes may be reviewed independently; however, collectively these same attributes provide an indication for future performance. The first attribute of analysis is the borrower's willingness to repay the debt. The second attribute measures the borrower's ability to repay the debt. The following sections provide guidance in making sound, qualitative underwriting decisions.

### 502.1 CREDIT REPORT

The credit report provides an overall understanding of the borrower's liabilities. The borrower's ability to manage credit debt and the capacity to repay can be determined by reviewing the credit report. The report should include:

♦ A generated date that is not greater than 120 days from the date of the Note

♦ All pages (missing pages/sections will not be considered)

♦ Evidence that all qualifying borrowers' tax identification numbers were used to run a report

♦ A public record search for each qualifying borrower.

### 502.2 HOUSING AND CREDIT PAYMENT HISTORIES

<u>Mortgage History</u>

For borrowers that currently own their residence, twelve (12) consecutive months of mortgage payment history is required. Acceptable mortgage verification includes:

♦ A 12 month rating stated on an RMCR or merged in-file credit report

♦ A standard Verification of Mortgage (VOM) form completed by the holder of the mortgage

♦ Copies (front & back) of 12 consecutive months canceled mortgage payment checks.

<u>Rental History</u>

For borrowers that currently rent their residence, twelve (12) consecutive months of rental payment history is required. Acceptable rental verification would be any one of the following:

♦ A standard Verification of Rent (VOR) (Fannie Mae form or equivalent) completed by the non-related landlord or the landlord's agent

♦ A rental letter written by the non-related landlord or the landlord's agent which must include the rental payment status, payment amount, length of rental, and the name, address and telephone number of the landlord

♦ Copies (front & back) of 12 consecutive months canceled rent payment checks. Canceled checks are the only acceptable form of rental verification where the landlord is the borrower's relative

 UBS

- ◆ 12 months rent receipts provided by the non-related landlord or the landlord's agent. If using rent receipts, the name, address and telephone number of the landlord or the landlord's agent must also be provided

- ◆ Borrowers that currently live with family members, including first time homebuyers, and do not have a recent 12 month payment history will be considered as long as they have the appropriate additional and/or alternative credit history to verify their ability to meet their payment obligations.

### Consumer Credit

Consumer credit is based on any revolving and/or installment debt payment histories. All revolving and consumer installment trade line payment histories, as rated on the borrower's credit report, will be accepted as already factored into the borrower's credit score for rating purposes.

### Judgments and Liens, Collections, Charge-offs on Title

All judgments, liens and collections affecting title must be paid off and discharged prior to closing.

### Non-title Judgments and Liens, Collections, Charge-offs

All federal and/or state tax liens must be paid in full prior to or at closing, even if they are not listed on title. Other judgments or liens not appearing on title and collection accounts or charge-offs may not be required to be paid off.

For the requirements and limits regarding these accounts, please refer to the appropriate Product Matrix. The age of the delinquent account may determine whether it must be paid off. Calculation of the age of the adverse credit is considered as of the date the adverse action took place. As an example: A credit card went into collection in May of 1999, but the creditor continues to repay it as an active account. The date used for aging would be May 1999.

### Bankruptcy

A loan for a borrower who has experienced a Chapter 7 or Chapter 13 bankruptcy will be considered for purchase by UBS. Chapter 7 bankruptcies must be discharged. Proof of the bankruptcy discharge is required. The age of Chapter 7 bankruptcy will be calculated from the date of the discharge.  Chapter 7 or Chapter 13 Bankruptcies must be discharged greater then 3 years.

Discharged Chapter 13 bankruptcies must meet the identical requirements as specified for discharged Chapter 7 bankruptcies (see Product Matrices). The age of a Chapter 13 bankruptcy will be calculated from the date of Filing. Whether a Chapter 13 bankruptcy must be discharged depends upon the product parameters. Please refer to the appropriate Product Matrix.

Additional requirements and criteria regarding bankruptcies are also stated on the Product Matrices.

### Foreclosures/Deed in Lieu

A loan for a borrower who has been named a defendant in a foreclosure proceeding (foreclosure notification, Notice of filing or completion) or who gave a deed in lieu of foreclosure on a previously owned property will be considered for purchase by UBS.



The age of the foreclosure will be calculated using the date the foreclosure was completed.   The foreclosure must be discharged greater then 3 years.  Additional requirements and criteria regarding foreclosures are stated on the appropriate Product Matrices.

**503 Liabilities**

The Debt-to-Income ratio is based on the total of the monthly liabilities divided by the calculated monthly income. The maximum allowable Debt-to-Income ratios are stated on the individual product grids. Liabilities include all housing expenses, revolving charges, installment debts, real estate loans, rent, stock pledges, alimony, child support, and other consistent and recurring expenses.

### 503.1 HOUSING EXPENSE

The housing expense consists of the amount the borrower will be paying to live in his or her primary residence after loan closing. In most cases this would include the principal and interest payment, property taxes (expressed monthly and including all special tax assessments), hazard insurance, flood insurance, mortgage insurance premium, and any homeowner's monthly association dues or maintenance fees on the subject property. In addition, principal and interest payments on a junior lien will also be included. In some instances, however, the housing payment may not be the PITI of the subject property (such as the purchase of a second home).

### 503.2 INSTALLMENT DEBT

Consumer installment debt accounts are loans that have fixed payment amounts and terms. Installment debts appearing on the credit report or those verified directly with the creditor are to be included in the calculation of the total debt-to-income ratio.

If the payment shown on the credit report is disputed, evidence of a lower payment may be obtained via direct verification with the creditor, or with acceptable documentation provided by the borrower.

If the scheduled payment is not shown, the high credit is divided by the listed term to determine the payment. Alternatively, a credit supplement may be obtained to verify the payment.

Installment debts, where the term of debt will be ten months or less at closing, will not be considered in the debt-to-income ratio. It is also acceptable to "pay down" the debt enough to cause the term to be ten months or less.

Auto lease payments are included in the debt-to-income ratio regardless of the remaining months indicated on the credit report.

### 503.3 REVOLVING DEBT

Revolving debt accounts have variable payments and no fixed term. The payment listed on the credit report is used to calculate the total debt-to-income ratio.

If no payment is listed, 3% of the balance listed must be used to calculate the debt ratio unless statements can be provided to show a lower payment. Alternatively, a credit supplement may be obtained to verify the payment.

Revolving debt may be paid off to qualify, but should not be paid down. The 10-months-or-less rule does not apply in most cases.



### 503.4 OTHER REAL ESTATE

Real estate debt for investment properties that is not offset by calculations of net rental income will be counted as monthly debt.

If a property is owned free and clear, the current real estate taxes, hazard insurance premiums and HOA fees must be included in the applicant's monthly expenses. The applicant must supply a copy of the homeowners insurance policy declaration page to evidence the property is free and clear.

If a property is vacant and there is no verifiable income or history, the full principal, interest, taxes, hazard insurance, mortgage insurance and homeowner's association dues will be counted as part of the total monthly debt.

### 503.5 BRIDGE LOANS

Bridge loans are used by borrowers if their current residence will not be sold before the subject's loan closing and funds from the sale are needed. The bridge loan debt will not be counted in the borrower's total debt-to-income ratio if it is to be used towards the down payment and/or settlement charges for the purchase of the subject property and ALL of the following criteria are met:

- ♦ The borrower's prior residence was the borrower's owner occupied primary residence
- ♦ A valid, unexpired multiple listing agreement with a licensed Realtor on the prior residence with a remaining term of at least 3 months must be submitted
- ♦ The borrower's prior residence must currently be under agreement to be sold. A copy of the sales contract must be submitted with the borrower's loan application
- ♦ In the case of employer-assisted transactions where the employer pledges to pay or reimburse the applicant for payments on the bridge loan, the above three items should be met. If these are not met, the underwriter must analyze the terms of the employer's agreement to determine whether the bridge loan payment may be excluded from the applicant's total monthly debt.

### 503.6 OTHER DEBTS

There are several other debts that may not appear on a standard credit report, but should be included in the total debts for qualification. These debts may include the following:

- ♦ Secured Loans through payroll deductions
- ♦ Business Debt, which has been personally guaranteed by the borrower
- ♦ Co-Signed Obligations
- ♦ Alimony and Child Support
- ♦ Student Loans, unless deferred for at least 12 months
- ♦ Wage Garnishments
- ♦ Documentation to verify these debts should be obtained. If the payments are to be excluded, documentation to support the exclusion must be in the file.

### 504 Employment and Income

### 504.1 GENERAL

For loans where the income and/or employment are being verified, the Seller must carefully evaluate each borrower's employment and income stability and continuity. The last year of the borrower's employment/income history should be documented for all Full and Alt Doc Processing Options, in

 UBS

addition to certain Reduced Doc Processing Options, as applicable. Income may come from many different sources, although salary and wage income is the easiest to determine and verify. Income from most other sources can be considered as qualifying income as long as it is properly documented.   UBS guidelines regarding employment and income are aligned with Fannie Mae guidelines and is as follows:

### 504.2 SALARIED INCOME

Stable monthly income may be income from primary and secondary employment, including base earnings plus recognizable secondary income, such as bonuses, commissions, overtime, or additional part-time employment. Required documentation should be used to determine the amount and breakdown of the acceptable income amounts.

Acceptable forms of documentation for employed borrowers (wage earners) are discussed in Section 400 of this Guide.

The amount of the borrower's consistent monthly income is determined by using the gross monthly income from the borrower's primary income source and any stable secondary income and overtime, if applicable.  Secondary income is generally considered stable if it can be documented as being received in a timely manner over the previous 12 months and it is likely to continue.

Some additional issues for employed borrowers that should be considered are:

♦ Frequent job changes to advance a borrower's career within the same field are acceptable, but changes without advancement or between fields may indicate employment/income instability. The borrower should explain any gaps between jobs of more than 30 days

♦ Borrowers who have just entered the work force should show the potential for greater future earnings, the possibility of further career education and further career training.

Bonus, overtime and commission

This income may be included as monthly income, provided the income has been consistent for the past year and the employer verifies the likelihood of continuance. Bonus, overtime and commission income that has not been consistent for the past year may require a letter from the employer stating the income will continue to be paid.

Bonus income

Bonus income must be averaged. Year-to-date bonus income may be included, if such bonus income is consistent with bonus income received during the prior year. Bonus income may be used for down payment and income qualifications provided it is documented as required.

Overtime income

Overtime income must be averaged. The borrower's employer must indicate the average hours of overtime per pay period. If the overtime pay rate is not provided, use 1½ times the hourly rate.

Commissions

Commissions are subject to fluctuation from year to year; therefore, federal tax return for the prior year with all schedules is required for proper verification. Commissioned employees usually have expenses associated with the generation of income. The net commission income (gross minus expenses) for each year will be calculated. To receive credit for commission income, funds are required to be paid, as



31

opposed to just being earned. Commission income may be used for both down payment and income qualification if the income has been consistent for the past year. If there is less than a one-year history, there must be significant compensating factors for the income to be used. Commissions paid for less than six months will not be eligible for inclusion in qualifying income.

Family Employers

If a borrower is employed by a relative or a closely held family business, complete signed federal tax returns with all attachments and schedules are required for the previous two years in addition to the verification of employment.

Car Allowance

A car allowance may be included as income to qualify the borrower if it is typical for the occupation. The car allowance must be verified by the employer and must be shown on the borrower's federal income tax returns. Only the amount of the auto allowance that exceeds actual expenses may be considered as income. Depreciation on the car may be added back to income.

Second Jobs

Income from a second job may be used to qualify the borrower even if the job is part-time or seasonal provided the employer verifies a two-year history and the likelihood of continuance. The second job need not be related to the borrower's primary occupation.

Military Pay

For borrowers in the military, flight or hazard pay, rations, clothing allowance, quarters allowance and hardship pay may all be added to base income to qualify the borrower provided the military verifies continuance.

Subsidized Income

An employer may subsidize an employee's mortgage payment by paying the differential between the employee's present interest rate and the proposed interest rate. The exact amount and duration of the subsidy should be verified by a signed contract between the employer and the borrower. If the subsidy continues for three years or more from the date of closing, it may be added to the borrower's gross monthly income (not used to offset the mortgage payment).

## 504.3 SELF-EMPLOYED INCOME

A borrower who owns 25% or more of the company from which he receives his primary source of income will be considered self-employed. The business may be a sole proprietorship, a partnership (limited or general) or a corporation.

Generally, self-employed borrowers should be in business for at least two consecutive years. For loans with full or alternative income documentation, the income of the self-employed borrower will be averaged over the two years immediately preceding the date of the application. Newly formed businesses



must have been in operation for more than one year and the financial statements for such businesses must cover at least one year of operation. In addition, the borrower's previous employment history and income should be documented to show prior employment in the same or a related field.

Acceptable forms of documentation for self-employed borrowers are discussed in Section 300 of this Guide.   UBS has followed standards to that of Fannie Mae and described below.

When calculating a borrower's self-employment income, some form of analysis worksheet should generally be used. This will clearly show the calculation method used for determining the income. Often when analyzing a Borrower's federal tax returns, non-cash items such as depletion, depreciation and amortization may be added back to the adjusted gross income.

For "S" Corporations, the borrower's available net income plus the viability of the business must be determined. Income is calculated as the total of the adjusted gross income from the individual federal tax return, plus any items that may be added back. Items that may be added back include depreciation of real property, depletion, amortization, alimony paid, married couple deduction, a one-time capital loss, and dividends excluded from income. Since stable sources of income are being determined, deductions such as state/local tax refunds, disallowed losses and nonrecurring capital gains are required.

Financial statements and business tax returns are used as supporting documentation for income continuation at the same level as shown on the individual federal tax returns. Projected income may not be used to qualify a borrower.

### 504.4 FIXED INCOME

There are additional types of income that may be used as the sole source of qualifying income or in conjunction with employment income. Some of these types of income include the following:

♦  Retirement Income-Retirement income must be verified by one of the following:

♦  Letters from the organization providing the income or copies of the retirement award letter with one month's bank statement evidencing the deposit

♦  W-2 forms for the past year

♦  Signed copies of federal tax returns for the past year. If income is from a lump sum distribution, the credit package must include an income stream projection provided by the borrower's financial advisor.

♦  Social Security Income–Social Security income must be verified by one of the following:

♦  A copy of the most current award letter

♦  One month's bank statement evidencing automatic deposit

♦  W-2 form for the past year

♦  A signed copy of federal tax returns for the past year. If other than age-related social security income is used, there must be at least three years of benefits remaining to be considered as qualifying income.

♦  VA Income Benefits-VA Income benefits must be verified by a letter or distribution form from the VA. These benefits must have a remaining duration of three years to be eligible. Not all VA benefits are eligible to be used as income (i.e., education benefits).

♦  Non-Taxable Income-Non-Taxable Incomes are types of qualifying income that may be grossed up 125% (increased by 25%). These types of income may include certain military pay, social security and/or disability income, or workmen's compensation. Documentation of the base income amounts

 UBS

must be obtained and included in the credit file. The grossed up amount may be used for qualifying purposes, but not for residual income calculation purposes.

### 504.5 OTHER INCOME

If a borrower indicates income from other sources (such as alimony, child support or unemployment), the Seller may consider them as stable income based on the likelihood of the consistent continuance for at least three years.

Some forms of these other sources are as follows:

♦ Foster Care Income—Borrowers may have a history of receiving regular income from a state or county-sponsored organization for the temporary care of one or more foster children. This income may be considered as stable monthly income and used for qualifying, if the borrower has a two-year history of providing foster care services under a recognized program and is likely in the foreseeable future to continue to provide such services at a level that supports the amount of income needed to qualify.

♦ Rental Income—Verification of net real estate income requires copies of all current, fully executed leases for all rental units or the last year's tax returns including Schedule E indicating all units. For qualifying purposes, 75% of the verified rental income, net of mortgage payments (if any), monthly taxes and insurance(s), made by the borrower with respect to the rental property, may be added to the borrower's net income or long term debt payments. If the cash flow is positive, it may be added to the borrower's income. If the cash flow is negative, it must be added to the borrower's long- term debt payment.

♦ Installment Sales and Land Contracts—Income from an installment sale or land contract may be included in the borrower's income for qualifying purposes if evidence of timely receipt of payments in the past 12 months is provided and payments will continue for more than three years from the date of closing. Complete documentation on any installment sale or land contract must be provided.

♦ Alimony, Child Support and Maintenance—A copy of the divorce decree and/or separation agreement must be submitted to verify the amount and its continuance for three years from the date of closing for any child support, alimony or maintenance income. Evidence that such amount has been received for a minimum of 3 months is required. Evidence is also required showing the payments for the last 3 months (or since the beginning of receipt) have been received in a timely manner in order to use the income to qualify the borrower.

♦ Note Receivable Income—Income received from the repayment of a note must be verified by a copy of the note, which identifies the payment and terms. Income must have been received for the past 12 months and be verified by 12 months of bank statements, deposit slips or signed copies of federal tax returns with Schedule B attached. Payments must continue for at least three years after the first payment date of the proposed mortgage loan.

♦ Interest and Dividends—Interest and dividend income must be verified by copies of the account statements received from financial institutions, stockbrokers, etc., evidencing that the interest and dividends are still on deposit with such institutions. In addition, signed copies of federal tax returns for the past two years must be included in the credit package. Two years of interest and dividend income will be averaged to determine the amount to be included in qualifying income. If any funds that earn interest or dividend income are to be used for the down payment or closing costs, the interest and dividends related to such funds must be deducted before the income is calculated.

♦ Trust Income—Trust income must be verified by a copy of the Trust Agreement or the trustee's statement confirming the amount, frequency and duration of payments. Trust income must have a remaining duration of at least three years to be eligible.

 UBS

- ◆ Unemployment and State or Agency Benefits–Unemployment and state or agency benefits must be verified by letters from the paying agency with the amount, frequency and duration of payment specified. If the borrower receives unemployment as regular income (i.e., seasonal profession), signed copies of the last two years' federal income tax returns are required.

- ◆ Income from a Foreign Source–Income that originates from a source outside of the United States will be considered for qualification at the seller's underwriter's discretion. This type of income will only be approved for qualifying purposes when the source of the income is clearly verified and continuance of the income is certain. Any income not verified in US dollars must include an acceptable statement of conversion.

The above noted examples of other income are aligned with Fannie Mae guidelines.

### 504.7 UNACCEPTABLE INCOME

Deferred income that is not currently available, education benefits, illegal income sources, options, rent from the borrower's primary residence after closing or rent from a second home. Further, any income that cannot be verified (for processing options that require full or alternative verification of income) will not be allowed as income for qualifying purposes. Retained earnings in a corporation may also not be included in qualifying.

### 505 Assets and Sources of Funds

### 505.1 BORROWER CONTRIBUTIONS

For loans where the assets are verified and a down payment is required, the borrowers must contribute a minimum percentage of the down payment from their own liquid assets. For loans with LTV ratios greater than 80.0% and less than or equal to 95%, the minimum percentage sourced directly from the borrower(s) is 5%. For loans with LTV ratios of 80% or less, the entire down payment may consist of a gift.

Borrower assets may come from several different sources, although the most common sources are bank depository accounts. These accounts include checking, savings, money market and certificates of deposit. If assets are being verified, the funds must be seasoned for a minimum of 30 days as well as the source of the asset must be verified.

Acceptable forms of documentation for assets and other sources of funds are discussed in Section 400 of this Guide.   These examples are aligned to Fannie Mae guidelines.

Other forms of borrower assets and sources of funds include the following:

- ◆ Proceeds from Sale of Real Estate or Other Personal Property–Net cash proceeds from the sale of the applicant's current home is an acceptable source of down payment, settlement charges and/or cash reserves. A copy of the final HUD-1 Settlement Statement and/or bill of sale is required to verify the sale and amount of net cash proceeds.

- ◆ Earnest Money Deposit–The applicant's earnest money deposit to escrow must be verified by a copy of the canceled check when the total deposit amount exceeds 2% of the sales price. Verification of the source of funds exceeding 2% of the sales price must also be verified. If the canceled check is not available, a letter from the escrow agent verifying the amount of the earnest money deposit and when it was tendered is acceptable.

- ◆ Land Equity–Land equity is an acceptable source of funds. If the land is owned less than one year, then the lesser of the acquisition price or the current appraised value will be used to determine the



property value. If the land has been owned for more than one year, then the current appraised value may be used as long as the value is supported by comparable sales.

♦ Marketable Securities–Marketable securities including stocks and bonds may be an acceptable source of a borrower's funds. Bonds should be valued at their purchase price, unless the redemption value can be determined and verified. A current statement or a copy of the stock certificate accompanied by a dated newspaper stock list may verify the value of stocks. The actual receipt of either of these sources of funds must be verified.

♦ IRA/Keogh, 401K's and other retirement accounts–Funds from retirement accounts may be used as a borrower's source of funds. When funds from these sources are used for the down payment or closing costs, any applicable penalties or income tax must be taken into consideration. A 401K account can be used to the extent that the borrower is "vested". These types of accounts should be properly verified according the documentation type for the loan program.

### 505.3 GIFT FUNDS

A minimum of five percent (5%) of the purchase price must be verified as coming from the applicant's own funds when the LTV is greater than 80.00%. The remaining down payment may be a cash gift from an immediate family member or other appropriate relation.

For loans with LTV ratios of 80% or less, the entire down payment may be a gift. In all cases, the donor must execute a gift letter stating the donor's name and address, the donor's relationship to the applicant, the amount of the gift and that no repayment is expected or implied. Verification of the receipt of funds is required. Gift funds may be used towards the remaining down payment, closing costs, and/or reserves.

### 505.4 GIFT OF EQUITY

A gift of equity in the subject property from a family member is an acceptable source of funds up to a maximum LTV of 80% on owner-occupied primary residences originated to UBS Alt A guidelines. If a gift of equity occurs, the donor must execute a gift letter stating the donor's name, the donor's relationship to the applicant, the amount of the gift of equity, and that no repayment is expected or implied. In addition, the HUD-1 Settlement Statement at closing must identify the gift of equity. If the transaction is completed as a purchase, the contract of sale must also indicate the gift of equity.

### 505.5 UNACCEPTABLE SOURCES OF FUNDS

Unacceptable sources of funds include, but are not limited to, the following:

♦ Cash on Hand

♦ Sweat Equity

♦ Unsecured Loans (i.e., credit cards, unsecured installment loans, unsecured lines of credit)

♦ Funds from Illegal Sources.



# 600 Underwriting the Property

## 601 General

UBS will purchase loans secured by residential real property provided that the property represents reasonable collateral for the loan. The property type and its current condition are important factors in the qualification of a loan application. The property appraisal is a key indicator of the property condition and value as collateral for the loan.

## 602 Property Types

UBS will purchase loans made on several different types of properties. Not all of the property types are eligible for every program offered. Please refer to the individual product matrices to determine the property type eligibility for the product requested.

### 602.1 ELIGIBLE PROPERTY TYPES

♦ Single Family Residences

♦ Planned Unit Developments

♦ Modular Homes, Pre-fabricated Homes

♦ Condominiums

♦ Condotels

♦ Two to Four-Unit Multi-Family Properties

♦ Cooperatives

### 602.2 DEFINITIONS AND REQUIREMENTS

Single Family Residence

A single-family residence is a property that consists of one (1) single unit structure. This includes attached and detached properties. In addition to the standard site-built and stick-built homes, other types of single-family homes are acceptable as follows:

♦ PUD (Planned Unit Development)-A PUD is a property where each unit owner has title to a residential lot and building and generally a non-exclusive easement on the common areas of the project. The owner often pays monthly homeowners association (HOA) fees as part of the project.  Requirements for PUD properties include the following:

♦ The unit owner owns the parcel of land improved by the dwelling. The homeowner's association manages the development

♦ There are mandatory HOA fees associated with this property type

♦ UBS requires that the seller warrant that the PUD and meets standard agency (Fannie Mae or Freddie Mac) guidelines. Non-warrantable PUD's may be considered for purchase by UBS with additional restrictions and/or pricing adjustments.

♦ Modular Homes-A modular home consists of prefabricated components that are transported to the property site for final assembly. Although a modular home may be transported on a steel undercarriage, the undercarriage is not a permanent structural component and is removed when the home is placed on a foundation.  Requirements for Modular Homes include the following physical characteristics, as applicable:

 **UBS**

- The property must have the general appearance and functional utility of a site-built home

- The home must be permanently attached per manufacturer specifications and/or state building codes

- The home must have full perimeter walls that include brick, block, poured concrete or treated wood

- The home must have a pitched roof with overhang. The roof covering must be standard composition shingle (asphalt or fiberglass) or superior

- The unit must have permanent steps and stoops

- The property must have on-site parking.


### Condominiums

Condos are properties in which common ownership of land and facilities is included with the individual ownership of the interior space of the subject property. A condo building that has greater than four stories is considered a high-rise. A condo building that has four or less stories is considered a low-rise.

Requirements for Condominiums include the following:

- The seller warrants that the Condominium meets standard agency (Fannie Mae/Freddie Mac) guidelines.

- UBS will not purchase more than 10% of the units in anyone project

- UBS will purchase a maximum of two units in a single condo project to the same borrower. One unit must be the borrower's primary residence

- A standard Fannie Mae condo questionnaire must be completed with all required documentation

- Condo projects with less than 5 units will require an arbitration agreement

- The condo project can not be involved in any current litigation

- Condo projects containing mixed-use units may be acceptable if the style is common and customary to the area and there are no negative effects on marketability

- A complete project questionnaire must accompany all files.


### Condotel

Condotels are condominium projects, individually owned, that operate like a hotel.  Typically, a condotel will have a registration desk in the lobby, allow short-term occupancy, and other hotel-like amenities such as cleaning services, food, and telephone.  Condotels will be acceptable for financing within the following parameters:

- Project must be located in a vacation/resort area

- Subject will be treated as a non-owner occupied, subject to non-owner occupied pricing

- Unit must have at least 600 square feet

- Rental income from the property cannot be used to qualify the borrower

- The project must be established a minimum of 2 (two) years as a condotel

- Cash out is not permitted

- The project must be 75% sold

- No more than 10% of the units can be owned by one single entity




- ◆ Project must meet all non-warrantable guidelines plus:
- ◆ Project cannot require mandatory rental pools
- ◆ Conversion from apartment or other use is ineligible
- ◆ Owner-occupancy percentage requirement will not be required
- ◆ Purchaser will limit exposure to 20% of the number of units in the project
- ◆ Studio units are acceptable however Purchaser will limit its exposure to 5% of the number of units in the project.

<u>Multi-Family Properties (2-4 Units)</u>

Acceptable multi-family properties are single or multiple structures that consist of two, three or four separate dwellings/units. The ownership of the structure is evidenced by a single deed and the structure(s) must be situated on one lot.

<u>Cooperatives</u>

A Co-op is a residential property in which a corporation or trust holds the title and sells shares of stock representing the value of a single unit to the purchaser. A purchaser receives a proprietary lease that allows the purchaser to occupy the property in addition to all other rights, privileges and/or restrictions.

Requirements for Co-operatives include the following:

- ◆ The verified monthly dues are included in the total housing and debt ratios.
- ◆ The expiration of the proprietary lease is beyond the expiration date of the mortgage term.  The underlying mortgage on the co-op project must have a fixed rate and have remaining term of at least 3 years
- ◆ The pro rata portion of the underlying mortgage applicable to the individual co-op unit must be less than 35% of the lesser of the subject's sale price or appraised value
- ◆ All units, common elements and facilities within the project must be fully completed
- ◆ No more than 10% of the units within the project can be owned by one entity, with the exception of the sponsor
- ◆ Evidence that a Master insurance policy is in effect
- ◆ The property is located in the metropolitan areas of New York, Washington DC, New Jersey, Pennsylvania, Maryland, Virginia, California, Massachusetts, Connecticut and Washington
- ◆ A complete project questionnaire must accompany all files.

## 602.3 PROPERTY ELIGIBILITY ISSUES

<u>Standard Property Requirements</u>

- ◆ All properties must be designed for year round residential use
- ◆ The property must be greater than 500 square feet of living area. Exceptions may be granted for certain condos or co-ops



39

- ♦ A permanent heat source is required (unless typical for climate and at least 2 comparables demonstrate the same feature/marketability)

- ♦ The utilities serving the subject must meet community standards

- ♦ The improvements must conform to all applicable zoning requirements

- ♦ The property must be taxed as real estate by the jurisdiction where it is located

- ♦ The property and improvements must represent the highest and best use of the property.

The property is complete with no deferred maintenance affecting market value, structural integrity or health and safety of the occupants of the dwelling. Deferred maintenance not to exceed 2% or $2,000, whichever is less.

### Multiple Parcels

Loans secured by multiple contiguous legal parcels are acceptable for purchase by UBS if certain criteria are met. The parcels should have a consistent use, the total subject property must conform to the area in which it is located and the encumbrance of the multiple parcels may not compromise the properties highest and best use. The multiple parcels cannot be valued as one. Each legal parcel must have a separate appraisal.

### Incomplete Properties

All properties must be 100% complete and must be appraised "As Is" if a property is not complete at the time of the appraisal, or the property is undergoing renovation, at the time of the appraisal, the original appraiser must issue a Completion Certificate (Form 442) upon a final inspection indicating the construction/repairs are 100% complete prior to closing.

### Leasehold Properties

If the property is subject to a lease, the terms must be typical and customary for the market. For each home mortgage on a leasehold estate, the Seller must warrant the following:

- ♦ The leasehold Mortgage constitutes an interest in real estate

- ♦ The mortgaged premises are insured by a title policy

- ♦ The lease and any sublease (including all amendments) are recorded in the appropriate public land records

- ♦ The lease is in full force and effect and will not impair the first lien status of the mortgage

- ♦ The term of the lease must be at least 15 years, with no more than minimal (PI based)

- ♦ Adjustments to the rent or lease payments during the lease term. The lease must extend or be automatically renewable for a period of ten (10) years beyond the mortgage

- ♦ The ground lease does not provide for termination of the lease in the event of the lessee's default without the mortgagee being entitled to receive written notice of and a reasonable opportunity

- ♦ To cure the default

- ♦ The lease does not contain provisions for termination in the event of damage to or destruction of the mortgaged premises so long as the leasehold mortgage exists

- ♦ All ground lease rents, other payments, or assessments that have become due have been paid.



<u>Rural Properties/Excess Acreage</u>

Special requirements for rural property include:

♦ The area should be stable and/or appreciating in market value and at least 25% developed

♦ The property should be readily salable in 6 months or less

♦ The property must be owner-occupied or a second home

♦ There must be adequate sewage/septic connectivity, water and utilities

♦ All comparables are to be within 5 miles of the subject property

♦ Properties consisting of 10 acres or less are acceptable for purchase by UBS


<u>Zoning</u>

Residential is the appropriate zoning classification for most properties to be purchased. Additional acceptable zoning classifications are as follows:

♦ Non-conforming - Legal non-conforming zoning is allowed, provided that a 100% rebuild letter has been obtained from the municipality or verification from the appraiser has been obtained which states that the property can be rebuilt to its current status on its existing footprint in the event of total or partial destruction.

♦ Agricultural - Agriculturally zoned properties are acceptable if they are typical for the area, there are supporting comparable sales and the property is not used for agricultural purposes.

### 602.4 INELIGIBLE PROPERTY TYPES

♦ <u>Manufactured Housing</u>

♦ Mobile Homes

♦ Commercial Properties

♦ Mixed Use Properties

♦ Properties zoned for commercial use

♦ Properties zoned for industrial use

♦ Properties zoned agricultural

♦ <u>Rehabilitation Loans</u>

♦ Working Farms, Ranches or Orchards

♦ Properties with more than 4 units

♦ Properties not suitable for year round use

♦ Vacant Land

♦ Earth/Dome Homes

♦ Timeshares

♦ Tax-Sheltered Syndicates

♦ Houseboats



- ◆ Log Cabins
- ◆ Leasehold Properties
- ◆ Non Warrantable Condos
- ◆ Non Warrantable Cooperatives

<u>Other Ineligible Types</u>

Properties that do not have full utilities installed to meet local health and safety standards, including:

- ◆ Continuing supply of potable water
- ◆ Public sewer or certified septic system
- ◆ Public electricity
- ◆ Natural or LP gas.

<u>Manufactured Homes</u>

Manufactured homes are not eligible. A manufactured home is assembled off-site and then transported to its permanent location. The homes are built on a steel undercarriage with a wheel assembly necessary to transport the structure to the site. The undercarriage remains intact and is the primary difference between a manufactured home and a modular home. Other identifiable characteristics are the floor plan configuration. Manufactured homes typically consist of single, double or multiple rectangular sections pieced together.

<u>Rehabilitation Loans</u>

Rehabilitation loans are not eligible for purchase. These are government or non-government sponsored loans where the borrower has acquired a distressed property, made improvements and is trying to refinance within twelve (12) months to realize an appreciated value. <u>The sales contract and title chain will be reviewed in these instances to determine prior ownership. UBS will not purchase any loan where the seller of the subject property is not a natural person.</u>

## 602.5 OTHER INELIGIBLE PROPERTY ISSUES

UBS will not purchase properties that have been listed for sale within the previous six (6) months that are now being considered for a refinance transaction.



# 700 Insurance Requirements

**701 General Policy for Hazard and Flood Insurance**

For all loans delivered to UBS, hazard insurance coverage is required. Acceptable evidence of hazard insurance must be received before loan funds are disbursed. Most home buyers purchase a homeowner's insurance policy that includes personal liability insurance in case someone is injured on their property; personal property coverage for loss and damage to personal property due to theft or other events; and dwelling coverage to protect the house against fire, theft, weather damage, and other hazards. The Homeowners Insurance Coverage must be at least :

The **lesser** of the Loan Amount or Total Estimated Cost New as determined by the appraisal;

OR

Have guaranteed replacement cost coverage. Additionally, the policy/binder must indicate whether the property is owner or non-owner occupied.

Further, there is no minimum deductible requirement for hazard insurance.

**702 Evidence of Insurance**

UBS will require proof that adequate insurance is on the property and that the policy is in effect.

### 702.1 PURCHASE MONEY TRANSACTIONS

A homeowner's/ fire insurance policy prepaid for one year or a binder with receipt of prepayment for one year is acceptable.

### 702.2 REFINANCE TRANSACTIONS

A homeowners/ fire insurance policy with a remaining term of no less than **90 days** or a binder with a receipt of prepayment for one year is acceptable.

### 703 CALIFORNIA AND WASHINGTON STATE PROPERTIES

For California and Washington properties, the policy must be issued in the amount of the loan, or contain a 100% replacement cost endorsement. If a 100% replacement cost endorsement is not provided, the face amount of the policy must be equal to the "value of the dwelling plus improvements" indicated on the appraisal.

### 704 FLOOD INSURANCE

Federal law requires flood insurance for those properties located in a federally designated flood hazard area. As such, flood hazard insurance cannot be waived under any circumstance. Proof of insurance (either the flood insurance policy or binder) for the minimum amount required by law must be obtained prior to the loan closing. All documents associated with flood hazard insurance must be maintained in the mortgage loan file indefinitely. Flood certifications from a recognized flood certification firm.

### 704.1 PURCHASE MONEY TRANSACTIONS

 UBS

43

Flood insurance for single family, 2-4 family, PUDs and individual townhomes should be equal to the LESSER of the unpaid principal balance of the mortgage or the overall value of the property less the value of the land in which the property is located.  A flood insurance policy prepaid for one year or a binder with receipt of prepayment for one year is acceptable.

### 704.2 REFINANCE TRANSACTIONS

Flood insurance for single family, 2-4 family, PUDs and individual townhomes should be equal to the LESSER of the unpaid principal balance of the mortgage or the overall value of the property less the value of the land in which the property is located.  A flood insurance policy with a remaining term of no less than 90 days or a binder with a receipt of prepayment for one year is acceptable.

### 705 NON-PARTICIPATING AREAS

If a property is located in an area designated as not participating and complying with the National Flood Insurance Program, UBS will not purchase the loan.

### 706 ESCROW REQUIREMENTS

UBS requires all loans to require escrows.  Escrow impounds are created to adequately collect and remit payments for taxes and insurance.  As such, sufficient proof of assets must be included in the file for submission to UBS.



# 800 Appraisal Standards

### 801 GENERAL

UBS Investment Bank will purchase mortgage loans that contain the appropriate appraisal report (s) for the program and property type. Each appraisal report should comply with all applicable appraisal requirements and fully verify the existence, condition and current market value of the subject property. Furthermore, the Seller should include any and all information regarding the secured property that may affect either the marketability of the property or the appraiser's estimate of its market value.

### 802 APPRAISER QUALIFICATIONS

The seller assumes full responsibility for the quality of the appraisal for all mortgage loan programs.  As such, the seller is responsible for the selection and performance of the appraiser, and is responsible for monitoring the quality of the select appraiser's practices.

All appraisers must be licensed or certified by the state in which the property is located. The seller must not assume that an appraiser is qualified simply based on the fact the appraiser is licensed or certified. It is the seller's responsibility to confirm with the appraiser that he/she is experienced with the type of assignment requested, and is competent to complete the assignment, especially for complex properties.

The seller is to be aware of and in compliance with state laws regarding licensing and certification for all applicable states.

The approved appraiser must meet the independent appraiser requirements for staff appraisers or, as appropriate, fee appraisers by Fannie Mae/FHLMC, the OCC, FRS, FDIC and OTS with their respective real estate appraisal regulations adopted in accordance with Title XI of FIRREA of 1989, regardless of whether the Seller is subject to those regulations

The approved appraiser must also adhere to the Uniform Standards of Professional Practice (USPAP) as defined by the Appraisal Foundation.

In addition to selecting the appraiser, the seller must order and receive the appraisal report for each mortgage transaction. Any other party that has an interest in the property such as the borrower, current owner or real estate broker may not order the appraisals.

### 803 APPRAISAL FORMS, DOCUMENTS AND REQUIREMENTS

All appraisal reports must be typewritten on the current Fannie Mae form applicable to the property being appraised. The appraiser(s) must indicate their license or certification number and sign each appraisal report, the Fannie Mae Form 1004B Statement of Limiting Conditions.

The appropriate appraisal forms to be used are listed in the table below:



| Report Type | Fannie Mae Form |
|---|---|
| SFR, PUD, Modular Appraisal (1 Unit) | 1004 |
| Multi-Family Appraisal  (2-4 Units) | 1025 |
| Condominium Appraisal | 1073 |
| Cooperative Appraisal | 1075 |
| Operating Income Statement | 216 |
| Comparable Rent Schedule | 1007 |
| Completion Certificate | 442 |
| Field Review | 2000 |
| Desk Review | 2006 |
| DU Quantitative Appraisal | 2055 |
| Statement of Limiting Conditions | 1004B |

Form 1004 may also be used for two-family properties, if each of the units is occupied by one of the co-borrowers as his or her principal residence or if the value of the legal second unit is relatively insignificant in relation to the total value of the property (as might be the case for a basement unit or a unit over a garage). In addition, appraisals for units in condominium projects that consist solely of detached dwellings may be documented on Form 1004, if there are no common area improvements (other than greenbelts, private streets, and parking areas) and the appraiser includes an adequate description of the project and information about the owners' association fees and the quality of the project maintenance.

All information in the reports must be complete without any omissions or alterations. All appropriate attachments and addenda must be included (see Appraisal Exhibits below). The report should present a complete and accurate evaluation of the property so that the appraised value is supported.

DU Quantitative Appraisals (Form 2055) must be performed with an interior inspection and meet specific loan program criteria.

DU Qualitative Appraisals (Form 2065) is not accepted by UBS Investment Bank.

Electronic transmission of appraisal reports is acceptable; however, the report must identify the appraiser and include a reproduced signature of the same appraiser. It must also be certified to be complete and unaltered, and the photos must be clear. Electronic transmission includes facsimile machines, internet connections, and wireless transmissions.

### 803.1 SPECIFIC REQUIREMENTS

Sale and Listing History

All transactions with title transfers within the twelve (12) month period preceding the date of the appraisal (purchase or refinance) must have the transfers disclosed, documented and analyzed. The appraiser must specify the date of each transfer, the transfer value and the circumstances involving each transfer. All listings of the subject within the twelve (12) months preceding the date of the appraisal must also be disclosed and analyzed, including date of listing and listing price for each listing. If the appraiser has failed to disclose any prior sales or listing activity within the twelve (12) months preceding the date of the appraisal and it is discovered through a secondary review process, the loan may be subject to repurchase.

♦ For properties that have sold within an eighteen (12) month period preceding the appraisal that have been renovated and appraised for more than 25% of the original purchase price, the seller must provide adequate documentation for the renovation, including but not limited to the following:



- (1) Detailed description of ALL improvements made since the prior sale
- (2) Interior and exterior photographs of the improvements verifying completion of work
- (3) Total costs involved in renovation
- (4) Receipts or signed statement from licensed contractors who completed the work.

- (5) In addition to these requirements, the seller must obtain an enhanced field review (field review with additional comparables) from a UBS approved nationwide appraisal review company.

For refinance transactions, if the property has been listed for sale in the six months preceding the date of the appraisal the loan will not be accepted.

Certificate of Completion

If the appraisal was made 'subject to completion', a Certificate of Completion must be completed verifying all conditions of the appraisal have been met, prior to closing and purchase by UBS. This certification should be completed by the appraiser and must be accompanied by photographs of the completed improvements. The appraiser must certify that the improvements were completed in accordance with the requirements and conditions stated in the original appraisal report. The original appraiser should complete the certification of completion.  A substitute appraiser may be used if necessary; however, an adequate explanation should be provided for the use of a substitute appraiser.

For proposed construction, the appraisal may be based on plans and specifications if the lender obtains a certificate of completion before closing and purchase by UBS.

Re-certification of Value and Age of Documents

If the report is older than 4 months, or 120 days, a re-certification of value from the original appraiser must be in the file at closing. If the appraiser indicates the property has declined in value then a new appraisal must be completed and the appraisal must address the economic conditions of the subject market area.

The appraisal report may never be older than 6 months, or 180 days, at closing.

Jumbo A and Alt A Appraisal Requirements- All Loans

For loan amounts exceeding $650,000, but less than $1,000,000, a Drive-by Appraisal with **exterior** inspection is required.

For loan amounts exceeding $1,000,000, two full appraisals are required from independent appraisers. (UBS will accept the lower of the two appraised values).

Property values greater than $2,000,000 require two full appraisals regardless of LTV and loan amount.

New Construction

New Construction properties located in a development require a minimum of 1 comparable sale within the development and 1 outside the development.

Disclosure



The Seller must disclose to the appraiser any and all information that could affect the marketability of the property or the appraiser's estimate of its market value.

### 804 REQUIRED EXHIBITS

Street Map

A street map must be provided that shows the location of the subject property and of all comparables that the appraiser used.

Sketch

A sketch of the exterior of the building improvements that indicates the dimensions must be provided. For condominium or cooperative projects, the sketch of the unit must indicate interior dimensions rather than exterior dimensions. The appraiser must also include the calculations used to estimate the gross living area.

Plat Map

A plat map shows lot dimensions, where the subject is positioned on the street and how the subject's lot compares to adjoining properties. This map should be provided if available.

Photographs

The front, back, and a street scene of the subject property must be photographed and provided in an addendum. The photos must be originals and must be clear (electronic imaging is acceptable).

Operating Income Statement

If the property is a two-four family dwelling or investment property an Operating Income Statement (Form 216) must be included regardless of documentation type.

Comparable Rent Schedule

If the property is a single-family investment property, a Single-Family Comparable Rent Schedule (Form 1007) should be provided regardless of documentation type.

Other

Addendums explaining the appraiser's comparable sale selection, adjustment process, final reconciliation and any unusual items must be provided as well as any other attachment necessary to adequately support the conclusions arrived at in the appraisal.

### 805 Unacceptable Practices

The appraiser should fully understand the principal of substitution and make every attempt to apply it to the appraisal process. The comparables selected should be equal substitutes to the subject property and appeal to the same market of buyers as the subject appeals to, within the same market area. Adjustments should only be necessary for MINOR differences in property characteristics and external factors. Only the comparables that are the most similar with respect to location, quality, design/appeal

 UBS

and overall utility should be used. The use of comparables dissimilar to the subject in these respects or comparable from different market areas when similar comparables from within the subject market area are available is unacceptable.

Also unacceptable are the following:

♦ Failure to disclose any listings of the subject property in the 12 months preceding the appraisal date

♦ Failure to disclose and analyze all sales of the subject property in the three years preceding the appraisal date

♦ Failure to disclose any deferred maintenance affecting the subject property

♦ Failure to disclose and analyze any functional obsolescence affecting the subject property

♦ Failure to report an estimated 'cost-to-cure' for any curable physical or functional inadequacies

♦ Failure to disclose and analyze any external obsolescence affecting the subject property.

♦ Failure to disclose and adjust for any positive factors affecting the comparable sales

♦ Failure to disclose any adverse influences or adverse economic conditions within the subject neighborhood

♦ Failure to inspect the exterior of the comparable sales.

♦ Use of adjustments that do not reflect the market's reaction to the differences of the subject and the comparables

♦ Use of data that was not verified by a secondary data source.

Since the lender is responsible for the quality of the appraisals it uses to support the value of a property, the lender should take appropriate action to assure that the appraiser it uses does not engage in unacceptable practices.

### 806 APPRAISAL PROCEDURES

<u>Legal Description</u>

The appraiser must provide a complete property address and legal description. The appraiser should also provide an assessor's parcel number if available. If a house number is not available the appraiser should provide a narrative description of the location of the property in an addendum.

<u>Property Rights Appraised</u>

The appraiser must identify the property rights as Fee Simple or Leasehold. The appraiser must also indicate if the property is a single-family residence, condominium, cooperative, PUD or multi-family (2 – 4 units) and use the appropriate appraisal report form (see table above).

<u>Concessions</u>

The appraiser must state whether the transaction is a purchase or refinance transaction. For a purchase, the appraiser must report any personal property involved in the transaction and must report any concessions to be paid by the seller.   The contract of sale should be provided to the appraiser to identify such terms of the transaction.

<u>Neighborhood</u>

The appraiser must define the neighborhood and use specific boundaries in the definition. A complete analysis of pricing trends, supply and demand, and any other economic factors that may have a direct



affect on property values within the subject market area, including available methods of financing should be provided. Any adverse influences that have an affect on property values must be disclosed.

Location

The characteristics of the subject property, zoning, and present land use must be consistent with residential use. The property may be located in urban, suburban or rural areas however must be readily accessible by roads that meet local standards and have adequate utilities. All positive and negative external factors affecting value must be adequately explained and analyzed in the appraisal. The appraiser must also consider the present or anticipated use of any adjoining property that may adversely affect the value or marketability of the subject property.

Degree of Development and Growth Rate

The degree of land development of a neighborhood excluding government land must be identified as the percentage of 'built-up' area as indicated in the appraisal report form. If the growth rate is not steady, the appraiser must comment as to why and explain the affect on the subject property's marketability.

Property Values

The appraiser must indicate whether property values in the subject neighborhood are stable, increasing or declining. If property values are declining the appraiser should provide at least one pending sale comparable and one listing comparable and make appropriate time adjustments to the other comparables if dated and if applicable.

Demand, Supply, and Marketing Time

The appraiser must provide an adequate explanation for neighborhoods where typical marketing periods exceed six months, and report the affect this extended marketing period has on the value of the subject property.

Predominant Occupancy

The appraiser must report whether the predominant occupancy of the neighborhood is 'owner' or 'tenant' and indicate whether the vacancy rate is between 0-5%, or over 5%.

Price Range and Predominant Price

The appraiser must indicate the price range and predominant price of properties in the subject's immediate neighborhood. This price range should reflect the predominant low and high prices for properties that are comparable to the property being appraised. The predominant price may be reported as a range if it is considered more appropriate.

The appraiser must explain a significant variance between the appraised value and the predominant price for the neighborhood and identify whether or not the subject is over-improved or under-improved for the neighborhood. If the subject is over-improved, it must be reflected in the level of adjustments made to the comparables in the sales comparison analysis adjustment grid.

Age Range and Predominant Age



50

The appraiser must indicate the age range and predominant age of similar residential property types in the subject neighborhood. The age range should reflect the oldest and newest ages for similar properties. The predominant age can be stated as a range if it is considered more appropriate to do so.

Present Land Use

The relative percentage of developed land in the neighborhood is to be reported and must equal 100%. Undeveloped land should be reported as vacant. Government land, parks, lakes, etc should be reported separately and not included as vacant land. Commentary should be provided if the predominant developed land use is not residential.

Changes in Land Use

The appraiser must indicate if the area is currently undergoing any land use changes and if there is potential for any future land use change. Present or future land use change requires careful analysis and its affect on the subject's marketability must be addressed.

Multi- Family Properties

At least three active listings of similar two-four family properties must be provided in the report followed by a narrative analysis describing the similarities and differences between the listings and the subject property. If there are less than three competitive properties for sale in the neighborhood, the appraiser must provide an explanation and address any under-supply or non-conforming issues. The appraiser must also identify current pricing trends and report the typical marketing period for similar properties.

Site Analysis

The size, shape, and topography of the site should be conforming to the market area, as well as the utilities and street improvements. Comments must be made regarding any positive or negative factors affecting the marketability of the site.

Zoning

The appraiser must report the specific zoning classification for the subject property and include a general statement to describe what the zoning permits. The appraiser must also indicate whether the improvements represent a legal use, legal but non-conforming use, or illegal use. If no zoning exists, the appraiser must specifically state this (rather than leave the field blank).

Properties zoned for non-residential use, which includes, but is not limited to those zoned commercial, industrial, light industrial, or agricultural are not eligible for purchase.

Highest and Best Use

The highest and best use of a site is the most reasonable and probable use that supports the highest value as of the effective date of the appraisal. The improvements must be legally permissible, financially feasible, physically possible, and provide more profit than any other use of the site.

Utilities

The utilities of the property must conform to the area and meet community standards.

Site Improvements



The appraiser must report all off-site improvements that affect the marketability of the property - streets, curbs, gutters, sidewalks, streetlights, alleys, etc. The appraiser must also indicate if these improvements are publicly or privately maintained. If the property does not front a publicly maintained street there must be a legally enforceable agreement for maintenance of the street and commentary must be provided regarding this agreement.

If sidewalks, curbs, gutters, streetlights, and alleys are typical for the area they should be present on the subject site. If not the appraiser must address the effect on the marketability and value of the subject property.

The Lot

The appraiser must report the topography of the site as well as its overall usable area. If the site is steeply sloping the appraiser must address any adverse conditions that may result from this type of topography. Drainage must be away from the improvements and special attention must be made regarding any erosion or soil slippage. If the appraiser notes any problems a soils engineer must be contracted and must certify the site to be in compliance.

Flood Hazard Area

The appraiser must indicate whether or not the property is located in a Special Flood Hazard Area. If part or all of the improvements are located in the hazard area, flood insurance is required.  Escrow for hazard insurance cannot be waived under these circumstances.

Improvement Analysis

The appraiser must provide a specific and comprehensive description of the improvements. Additional features and modernization should be completely detailed. All items of deferred maintenance must be disclosed.

Conformity to Neighborhood

The improvements should generally conform to the neighborhood in terms of age, size/utility, architectural style and quality. If it is not compatible the appraiser must address the issue and explain the affect on the subject's marketability and value.

Actual and Effective Ages

The appraiser must report the actual chronological age, and provide an estimate of the property's effective age.

Layout and Floor Plans

Functional obsolescence created by atypical or inadequate floor plans must be addressed. Some examples of inadequate floor plans include but are not limited to the following: floors with bedrooms and no baths, rooms with tandem access only, additional floor levels with no interior access, kitchens located in the basement or away from the dining area. Other inadequacies may be the result of garage conversions, room additions or conversions from two-four family properties to single family properties or vice versa. Comparable sales with the same inadequacy should be provided in the analysis. If not available, adjustments should be made in the sales comparison approach to reflect the inadequacy.

Gross Living Area



Only finished, heated, above grade living area is to be included in the Gross Living Area. If any portion of a level is below grade, the entire level should be excluded from the Gross Living Area. Fully finished daylight basements and walkout basements do not qualify regardless of the quality of their finish. These areas are to be given value separately in the 'Basement and Finished Rooms Below Grade' section of the Sales Comparison Approach.

For units in condominium or cooperative projects, interior unit dimensions should be used to calculate the gross living area. For all other property types the exterior building dimensions should be used.

Gross Building Area

Gross building area includes all finished above and below grade living areas, including stairways, hallways, utility rooms, etc. and is based on exterior measurements.  It is most commonly used in comparing two- to four-family properties; however the comparison must be consistent between subject property and comparables. The GLA of the comparables is not to be compared to the GBA of the subject and vice versa.

Infestation, Dampness, or Settlement

If the appraiser indicates there is evidence of wood-boring insects, dampness, or settlement, the lender must provide satisfactory evidence that the condition was corrected or submit a professionally prepared report that concludes the condition does not pose any threat of structural damage to the improvements.

Property Condition and Appraiser Comments

All items of deferred maintenance must be disclosed and any detrimental condition must be reported regardless if the appraiser determines this condition to be typical for the neighborhood.  This includes any adverse environmental conditions that are on or near the subject site.

If the property has been recently rehabbed or significant value is being given to recent upgrades or modernization, the improvements must be completely detailed in an addendum along with interior photos and a cost estimate of the work completed.

If the property is unique in any way, the appraiser should provide commentary in an addendum that adequately explains the uniqueness of the property and include any relevant data supporting.

Cost Approach

The cost approach does not apply to condominium or cooperative units. It is typically only reliable as support to the Sales Comparison Approach or Income Approach for newer or renovated properties in areas with an adequate supply of comparable vacant land sales. Please note that appraisals relying solely on the Cost Approach as an indicator of market value will not be accepted.

The three types of depreciation - physical, functional, and external are typically itemized in the Cost Approach, however it should be noted these factors are also addressed and analyzed in the Sales Comparison Approach.

Physical Depreciation: a loss in value that is caused by deterioration in the physical condition of the improvements. The deterioration is either curable or incurable. Curable physical deterioration refers to items that are easily curable that cost less than the contribution to value – such as minor deferred maintenance. Incurable physical deterioration refers to items that cost more to correct than the value added by making the correction.



Functional Depreciation:  a loss in value that is caused by defects in the design of the structure such as inadequate floor plans, atypical architectural design, disproportionate room sizes, etc. It also can be caused by outdated improvements or a change in market preference to more modern improvements.

External Depreciation: a loss in value that is caused by negative influences that are external to the property, such commercial areas, busy traffic streets, waste areas, etc. External depreciation can also be a loss in value due to economic factors or environmental changes.

Estimated Land Value – If the estimated land value is not typical for the subject neighborhood, the appraiser must provide an explanation why and address the affect on the marketability of the subject property.

## Comparable Rental Data

At least three rental comparables must be provided in the report. These rental comparables must be within the subject's immediate neighborhood and at least one of the comparables units must be similar in size and utility to one of the subject's units. These comparables can be the same as the sale or listing comparables provided in the appraisal, however the appraiser must provide commentary that reconciles the differences and similarities between the subject and the comparables. It is not acceptable for the appraiser to provide only owner occupied units as rental comparables and base the rental survey on 'estimated' market rents.

## Sales Comparison Approach

The estimated value by the sales comparison approach or market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:[1]

♦ buyer and seller are typically motivated

♦ both parties are well informed or well advised, and acting in what they consider their own best interests

♦ a reasonable time is allowed for exposure in the open market

♦ payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto

♦ the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

The appraiser's analysis must also take the principle of substitution into account when using the sales comparison approach to value, i.e. the typical buyer would pay no more for one property that they would for an equally desirable property. In addition to the analysis of comparable sales, the appraiser should also analyze listings and pending sales in order to show current market trends.

## Comparable Sale Selection

---

[1] The Appraisal Standards Board of the Appraisal Foundation, *USPAP 2003 (Glossary)*, https://www.appraisalfoundation.org/html/uspap2003/glossary.htm.

 UBS

At least three closed sales must be utilized as comparable sales; these sales should preferably be within 6 months old, however if older sales are used an explanation should be provided. Comparable sales over 12 months old are generally not acceptable unless an explanation is provided.

The most similar and proximate sales should be analyzed. If the subject property is in a subdivision, a PUD, or a condominium project, the most reliable value indicators are typically within the subject property's development. If no sales or listings are provided from within subject's subdivision, PUD, or condominium project, an explanation should be provided.

Properties in new subdivisions, PUDS, or condominium projects must be compared to at least one comparable sale within the subject development and at least one similar sale from a competing development. If there are no closed sales within the subject development as of the date of inspection for the subject property, then the appraiser should analyze a listing or a pending sale within the project.

For rural properties, the appraiser should provide an explanation for using distanced comparable sales and analyze the most similar and proximate sales available. If sales are from different towns, an explanation should be provided for the differences between the two locations. The appraiser should examine proximity to towns and employment centers and the impact on value that this may have on the subject property or comparable sales.

Data Verification

Comparable sales should be verified as closed through at least one, but preferably two sources. Appraisers should use the local Multiple Listing Service (MLS) board as a data source whenever possible.

Adjustments to Comparable Sales

Comparable sales are adjusted against the subject property.  For example, if a comparable sale is inferior to the subject property in condition, an upward (positive) condition adjustment should be made to the comparable sale and vice-versa. Adjustments should be reflective of what the "market will bear;" Further, the contributory value the market will place on a particular feature or up grade may differ than that of the cost of the improvement. Sales and Financing Concessions are the one exception to this rule in that they are adjusted against the market.

Adjustments for Date of Sale/Time should be supported by paired sales whenever possible and/or by published sources such as publications by the local Boards of Realtors local newspaper. These adjustments should be based on the time from the contract date for comparables to the date of inspection.

When net adjustments are greater than 15%, gross adjustments are greater than 25% and individual (line) adjustments are greater than 10%, an explanation should be provided for not using more similar comparable sales.

Entering Data into the Sales Comparison Approach Adjustment Grid

♦ Proximity-Proximity/distance from the subject to comparables should be specific.  For example, two blocks southeast (SE) or .75 miles north (N), and the units of measure (blocks, miles, etc.) should be consistent for all comparable sales. Comparable sales within the immediate neighborhood are the most reliable value indicators due to similar location influences on value between the subject and comparable sales.



- Sales price—Comparable sales should both bracket the subject property's estimated value and be within a reasonable range of the estimated value, ex. a $100,000 comparable sale for a property appraised at $75,000 would raise questions about the reliability of the comparable sale.

- Sales or Financing Concessions—All sales and financing concession information for comparable sales should be disclosed in the appraisal, (i.e. loan amounts, loan types, interest rates, terms, and seller-paid concessions). This information should come from a party to the transaction such as a broker, buyer or seller or from a data source that is deemed reliable such as MLS. If this sales/financing concession information cannot be obtained, an explanation should be provided.

- Sales and financing concessions can include, but are not limited to, interest rate buy downs, seller paid loan discount points or loan origination fees, seller paid closing costs (typically paid by the buyer), payment of condominium, PUD, or cooperative fees and/or assessment charges, monthly mortgage payments, assignment of rent payments, and the inclusion of personal property items in the sales transaction.

- Negative sales or financing concession adjustments must reflect the difference between what the comparables actually sold for with the sales concessions and what they would have sold for without the concessions so that the dollar amount of the adjustments will approximate the reaction of the market to the concessions as opposed to a dollar-for-dollar adjustment.

- Positive adjustments for sales or financing concessions are unacceptable and not allowed as cash equivalency is the basis for this adjustment.

- Date of Sale/Time Adjustment—At least three closed sales should be provided and the contract and closing dates should be provided for each of these sales. The specific date is preferable, however if only the month and year are available this is acceptable. If either the contract date or the closing date is provided, the report should specify which one is provided. If only the contract date is provided, it should be stated whether or not the sale closed.

- Gross Living Area and Room Count Adjustments (for above grade areas)—Only above-grade finished areas should be included in the GLA for a single-family residence, a unit in a PUD project, or a condominium unit. Basement and other partially below grade areas should be adjusted separately in the basement section of the grid. Gross living areas and room counts should be similar between the subject and comparables. For example, a four bedroom comparable is generally not comparable to a two-bedroom subject property. The use of comparables with large square footage and room count differences from the subject should be explained.

- Over-improvements—The contributory value of features that are atypical for the area such as swimming pools, oversized home, oversized garages, etc., should be used as an adjustment as opposed to the cost of the improvement. Adjustments for these items should be explained.

- Indicated Value by the Sales Comparison Approach and Commentary—The commentary should explain how the indicated value by the sales comparison approach was reconciled and identify the comparable sale(s) that were given primary consideration in this determination. Appraisers should consider price per gross building area, sale price per unit, and/or sale price per room if the typical buyer/investor of 2-4 unit properties in the local market use these measures in their decision making process.

- Sales/Listing History of the Subject Property and Comparable Sales—The appraisal should have a three-year sale and listing history for the subject property and sale history for comparable sales for all appraisals dated after January 1, 2003 pursuant to USPAP guidelines. For appraisals dated prior to this date, a 12-month sale/listing history for the subject and comparable sales is required. Recent sales and listings within the past year of the date of inspection should be addressed in commentary.



- ◆ Income Approach–The income approach is appropriate in SFR, condominium or 2-4 unit neighborhoods where there is a substantial rental market and market rents can be verified. The income approach is inappropriate in neighborhoods where there are a high number of owner-occupied homes. Rental comparables are used to project the estimated rents for the subject property, which is multiplied by a gross rent multiplier (sale price divided by gross monthly rent) taken from similar and recent comparable rental property sales. An appraisal is not acceptable where the income approach is relied upon solely to determine market value.

- ◆ A Single-Family Comparable Rent Schedule (Form 1007) should be provided for a single-family residence that will be used as an investment property in addition to the appropriate appraisal report form.

- ◆ Final Reconciliation–The final reconciliation process should include an explanation of which three approach(es) to value (sales comparison approach, income approach, or cost approach) were given primary consideration in determining the final value estimate. The final reconciliation should then explain why this approach to value was the most reliable method of valuation.  The appraiser should provide an explanation of the typical buyer's motivation for purchasing 2-4 unit properties, i.e.. is the property being purchased as a non-owner occupied rental/investment property or is it an owner occupied rental property where the rental unit(s) are helping to offset the mortgage payments.



# 900 Product Specifications and Matrices

**901 Jumbo Fixed and Adjustable Rate Product Matrix**

**FULL/ALTERNATIVE DOCUMENTATION AND EXPRESSDOC DOCUMENTATION**

**Primary Residence/Owner Occupied (0/0) Purchase & Rate/Term Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1-2 | 620 | 50 |
| 750,000 | 90 | 90 | 1-2 | 620 | 50 |
| 1,000,000 | 80 | 90 | 1-2 | 620 | 50 |
| 1,500,000 | 75 | 80 | 1-2 | 660 | 45 |
| 2,000,000 * | 65 | 70 | 1-2 | 680 | 40 |

♦ Only eligible sellers may deliver loan amounts up to $2,000,000

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Primary Residence/Owner Occupied (0/0) Cash Out Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Debt to Income Ratio | Maximum Cash Out |
|---|---|---|---|---|---|---|
| 500,000 | 90 | 90 | 1-2 | 620 | 50 | 150,000 |
| 650,000 | 80 | 90 | 1-2 | 620 | 50 | 200,000 |
| 1,000,000 | 75 | 75 | 1-2 | 620 | 50 | 250,000 |
| 2,000,000* | 65 | 65 | 1-2 | 680 | 45 | 300,000 |

♦ Only eligible sellers may deliver loan amounts up to $2,000,000

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Second Home (SH) & Non Owner Occupied (N/O/O) Purchase & Rate/Term Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 90 | 90 | 1 | 620 | 45 |
| 650,000 | 80 | 90 | 1 | 620 | 45 |
| 750,000 | 75 | 90 | 1 | 620 | 45 |
| 1,000,000 | 70 | 80 | 1 | 620 | 45 |
| 2,000,000* | 60 | 60 | 1 | 680 | 40 |

♦ Only eligible sellers may deliver loan amounts up to $2,000,000

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

 UBS

♦ IO ARMs have additional restrictions.  Refer to the underwriting and guidelines matrices for more details.

## Second Home (SH) & Non Owner Occupied (N/O/O) Cash Out Refinance

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Debt to Income Ratio | Maximum Cash Out |
|---|---|---|---|---|---|---|
| 500,000 | 80 | 80 | 1 | 620 | 45 | 100,000 |
| 650,000 | 75 | 80 | 1 | 620 | 45 | 150,000 |
| 750,000 | 70 | 80 | 1 | 620 | 45 | 200,000 |
| 1,000,000 | 60 | 70 | 1 | 660 | 45 | 250,000 |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions.  Refer to the underwriting matrices and guidelines for more details.



**902 Jumbo Fixed and Adjustable Rate Mortgage Product Matrices**

**Stated Income/Verified Assets**

**Stated Income/Verified Assets—Primary Residence (O/O) Purchase & Rate/Term Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 80 | 90 | 1-2 | 620 | 40 |
| 650,000 | 75 | 75 | 1-2 | 620 | 40 |
| 1,000,000 | 70 | 70 | 1-2 | 620 | 40 |
| 1,500,000 | 65 | 65 | 1-2 | 660 | 40 |
| 2,000,000* | 50 | 50 | 1-2 | 680 | 40 |

- ♦ Only eligible sellers may deliver loan amounts up to $2,000,000
- ♦ All properties in HI, reduce LTV/CLTV maximums by 10%
- ♦ IO ARMs have additional restrictions. Refer to the underwriting matrices for more details.

**Stated Income/Verified Assets—Primary Residence (O/O) Cash Out Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Debt to Income Ratio | Maximum Cash Out |
|---|---|---|---|---|---|---|
| 500,000 | 75 | 80 | 1-2 | 620 | 40 | 150,000 |
| 650,000 | 70 | 70 | 1-2 | 620 | 40 | 200,000 |
| 1,000,000 | 65 | 65 | 1-2 | 620 | 40 | 250,000 |
| 1,500,000 | 60 | 60 | 1-2 | 660 | 40 | 300,000 |
| 2,000,000* | 50 | 50 | 1-2 | 680 | 40 | 300,000 |

- ♦ Only eligible sellers may deliver loan amounts up to $2,000,000
- ♦ All properties in HI, reduce LTV/CLTV maximums by 10%
- ♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Stated Income/Verified Assets**

**Second Home (SH) & Non Owner Occupied (N/O/O) Purchase & Rate/Term Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 400,000 | 75 | 80 | 1 | 620 | 40 |
| 650,000 | 70 | 80 | 1 | 620 | 40 |
| 750,000 | 65 | 80 | 1 | 620 | 40 |
| 1,000,000 | 60 | 70 | 1 | 660 | 40 |

- ♦ All properties in HI, reduce LTV/CLTV maximums by 10%
- ♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.



**Stated Income/Verified Assets**

**Second Home (SH) & Non Owner Occupied (N/O/O) Cash Out Refinance**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Debt to Income Ratio | Maximum Cash Out |
|---|---|---|---|---|---|---|
| 400,000 | 70 | 70 | 1 | 620 | 40 | 100,000 |
| 650,000 | 65 | 65 | 1 | 620 | 40 | 150,000 |
| 750,000 | 60 | 60 | 1 | 620 | 40 | 200,000 |
| 1,000,000 | 50 | 50 | 1 | 660 | 40 | 300,000 |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.



**903 Alt-A Product Matrix**

**Full/Alternative Documentation and ExpressDoc Documentation**

**Primary Residence/Owner Occupied (O/O)—Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 100 | 1–4 | 620 | 50 |
| 750,000 | 90 | 100 | 1–4 | 620 | 50 |
| 1,000,000 | 80 | 95 | 1–4 | 660 | 50 |
| 1,500,000 | 75 | 90 | 1–4 | 680 | 50 |

- ◆ All properties in HI, reduce LTV/CLTV maximums by 10%

- ◆ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Second/Vacation Home (SH)—Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1 | 620 | 50 |
| 750,000 | 90 | 90 | 1 | 620 | 50 |
| 1,000,000 | 80 | 80 | 1 | 660 | 50 |
| 1,500,000 | 75 | 75 | 1 | 680 | 50 |

- ◆ All properties in HI, reduce LTV/CLTV maximums by 10%

- ◆ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Investment Property (N/O/O)—Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 85 | 90 | 1–4 | 620 | 50 |
| 750,000 | 85 | 90 | 1–4 | 620 | 50 |
| 1,000,000 | 80 | 90 | 1–2 | 660 | 50 |
| 1,500,000 | 75 | 90 | 1–2 | 680 | 45 |

- ◆ All properties in HI, reduce LTV/CLTV maximums by 10%

- ◆ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

[1] No Limit for Cash-Out

 UBS

**904 Alt-A Product Matrix**

**Stated Income/Verified Assets**

**Primary Residence/Owner Occupied—Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 100 | 1-4 | 620 | 50 |
| 750,000 | 90 | 100 | 1-4 | 620 | 50 |
| 1,000,000 | 80 | 90 | 1-2 | 660 | 50 |
| 1,500,000 | 75 | 80 | 1-2 | 680 | 45 |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Second/Vacation Home (SH)—Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1 | 620 | 50 |
| 750,000 | 90 | 90 | 1 | 620 | 50 |
| 1,000,000 | 80 | 80 | 1 | 660 | 50 |
| 1,500,000 | 75 | 75 | 1 | 680 | 45 |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Investment Property (N/O/O)— Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 85 | 90 | 1–4 | 620 | 50 |
| 750,000 | 80 | 80 | 1–2 | 620 | 50 |
| 1,000,000 | 80 | 80 | 1–2 | 660 | 50 |
| 1,500,000 | 75 | 75 | 1–2 | 680 | 45 |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

1

[1]No Cash out Limit

 UBS

### 905 Alt-A Product Matrix

### Stated Income/Stated Assets

#### Primary Residence/Owner Occupied—Purchase and Refinance Transactions[1]

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1-4 | 620 | 50 |
| 750,000 | 90 | 90 | 1-4 | 620 | 50 |
| 1,000,000 | 80 | 90 | 1-2 | 660 | 50 |
| 1,500,000 | 75 | 80 | 1-2 | 680 | 45 |

- ♦ All properties in HI, reduce LTV/CLTV maximums by 10%

- ♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

#### Second/Vacation Home (SH)—Purchase and Refinance Transactions[1]

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1 | 620 | 50 |
| 750,000 | 90 | 90 | 1 | 620 | 50 |
| 1,000,000 | 80 | 80 | 1 | 660 | 50 |
| 1,500,000 | 75 | 75 | 1 | 680 | 45 |

- ♦ All properties in HI, reduce LTV/CLTV maximums by 10%

- ♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

#### Investment Property (N/O/O)— Purchase and Refinance Transactions[1]

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 85 | 90 | 1–4 | 620 | 50 |
| 750,000 | 80 | 80 | 1–2 | 620 | 50 |
| 1,000,000 | 80 | 80 | 1–2 | 660 | 50 |
| 1,500,000 | 75 | 75 | 1–2 | 680 | 45 |

- ♦ All properties in HI, reduce LTV/CLTV maximums by 10%

- ♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

1

[1]No Cash out Limit



**906 Alt-A Product Matrix**

**No Ratio/ Verified Assets**

### Primary Residence/Owner Occupied—Purchase and Refinance Transactions[1]

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1-4 | 620 | N/A |
| 750,000 | 90 | 90 | 1-4 | 620 | N/A |
| 1,000,000 | 80 | 90 | 1-2 | 660 | N/A |
| 1,500,000 | 75 | 80 | 1-2 | 680 | N/A |

- All properties in HI, reduce LTV/CLTV maximums by 10%

- IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

### Second/Vacation Home (SH)— Purchase and Refinance Transactions[1]

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1 | 620 | N/A |
| 750,000 | 90 | 90 | 1 | 620 | N/A |
| 1,000,000 | 80 | 80 | 1 | 660 | N/A |
| 1,500,000 | 75 | 75 | 1 | 680 | N/A |

- All properties in HI, reduce LTV/CLTV maximums by 10%

- IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

### Investment Property (N/O/O)— Purchase and Refinance Transactions[1]

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 85 | 90 | 1–4 | 620 | N/A |
| 750,000 | 80 | 80 | 1–2 | 620 | N/A |
| 1,000,000 | 80 | 80 | 1–2 | 660 | N/A |
| 1,500,000 | 75 | 75 | 1–2 | 680 | N/A |

- All properties in HI, reduce LTV/CLTV maximums by 10%

- IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

[1]No Cash out Limit



**907 Alt-A Product Matrix**

**No Documentation**

**Primary Residence/Owner Occupied—Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1–4 | 620 | N/A |
| 750,000 | 90 | 90 | 1–4 | 620 | N/A |
| 1,000,000 | 80 | 80 | 1–2 | 660 | N/A |
| 1,500,000 | 75 | 75 | 1–2 | 680 | N/A |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Second/Vacation Home (SH)— Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 95 | 95 | 1 | 620 | N/A |
| 750,000 | 90 | 90 | 1 | 620 | N/A |
| 1,000,000 | 80 | 80 | 1 | 660 | N/A |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

**Investment Property (N/O/O)— Purchase and Refinance Transactions[1]**

| Maximum Loan Amount ($) | Max LTV (%) | Max CLTV (%) | Units | Credit Score | Maximum Debt to Income Ratio |
|---|---|---|---|---|---|
| 500,000 | 85 | 90 | 1–4 | 620 | N/A |
| 750,000 | 80 | 80 | 1–2 | 620 | N/A |
| 1,000,000 | 80 | 80 | 1 | 680 | N/A |

♦ All properties in HI, reduce LTV/CLTV maximums by 10%

♦ IO ARMs have additional restrictions. Refer to the underwriting matrices and guidelines for more details.

[1]No Cash out Limit



# 1000 UBS Underwriting Parameters



**1001 UBS Investment Bank Alt-A Fixed-Rate Underwriting Matrix**

| | |
|---|---|
| **Geographic Restrictions** | Alaska, Hawaii (10% reduction on LTV), Guam, Puerto Rico, Virgin Islands, Texas Cash Out Refinance Transactions |
| **Terms** | 15 and 30 year fully amortizing products 20 year is available by exception only |
| **Number of Units** | Primary 1 - 4 Units<br><br>Second Home 1 - 2 Units<br><br>Non Owner Occupied 1 - 4 Units |
| **Eligible Borrowers** | Individuals, Inter-vivos Trust, Illinois Land Trusts, Permanent Resident Aliens, Non Permanent Resident Aliens, Foreign Nationals |
| **Ineligible Borrowers** | Corporations, General Partnerships, Non Profit Organizations |
| **Documentation Types** | Full/Alternative, ExpressDoc, Stated Income/Verified Assets (Reduced), No Ratio/Verified Assets (No Ratio), Stated Income/Stated Assets (SISA), No Doc |
| **Eligible Properties** | Single Family Detached, Single Family Attached, 2- 4 Units, Agency Warrantable Condos, Agency Warrantable PUDs, Modular, Prefab, Co-ops (NY, NJ, CT, DC, PA, MD, VA, CA, MA), Condotels |
| **Ineligible Properties** | Log Cabins, Manufactured Homes, Tax Shelter Syndicates, Time-Share Units, Unimproved Land, Leasehold Properties, Properties Zoned Commercial, Model Home Leasebacks, Working farms, orchards and ranches, Dome Homes, Mixed-Use Properties, Properties with more than 10 acres, Non-Warrantable Condos, properties zoned industrial, properties > 4 units, mobile homes, properties zoned agricultural, rehab loans and houseboats. |
| **Cash Reserves** | Primary and Second Home: 2 months PITI<br><br>Investment: 6 months PITI<br><br>Reserves cannot come from proceeds.. |
| **Buydowns** | Compressed and Annual<br><br>Full/Alt Doc only<br><br>Not available on cash out refinance transactions |
| **Secondary Financing** | Permitted as per the <u>Alt-A Product Matrix</u><br><br>80-10-10%, 80-15-5%, 80%-20% is permitted<br><br>Seller held secondary financing is permitted<br><br>Secondary financing must have a maturity date equal or prior to the first lien<br><br>Secondary financing cannot be a balloon that matures in 5 years or less |
| **Appraisal** | Full URAR appraisal (1004) is required<br><br>Loan amounts > $650,000 and < $1,000,000 require a full appraisal (1004) and a |



|  | Drive-by with exterior inspection<br><br>Loan Amounts > $1,000,000 require 2 full appraisals<br><br>Property values > $2,000,000 require 2 full appraisals regardless of LTV and loan amount |
|---|---|
| **Credit/Mortgage History** | 12 months mortgage/rental history<br><br>1x30 days max in last 12 months<br><br>All collections/charge-offs affecting title must be paid prior to closing |
| **Bankruptcy Provisions** | Bankruptcies and foreclosures must be discharged/completed for three (3) full years prior to loan application.  Borrowers must have re-established good credit with a 12-month history. |
| **Credit Scores** | Minimum score of 620<br><br>See Alt-A Product Matrix for specifics |
| **Alternate Credit** | Three (3) alternative trade lines must be verified with a credit report or 12 months consecutive cancelled checks.  The trade lines must show 0x60 pay history the last 12 months. |
| **Prepayment Penalty Restrictions** | Set by state law |





### 1002 UBS Investment Bank Alt-A Adjustable Rate Underwriting Matrix

| | |
|---|---|
| **Geographic Restrictions** | Alaska, Hawaii (10% reduction on LTV), Guam, Puerto Rico, Virgin Islands, Texas Cash Out Refinance Transactions |
| **Terms** | 2/6, 3/6, 5/6, 7/6, 6 month annual LIBOR ARM products (30 year fully amortizing terms) <br><br> For Interest-Only loans, refer to the credit matrix for which the loan is delivered. If the minimum score listed for the loan is 620, the IO minimum score will be **640**. For all other products, refer to the minimum credit score noted in the matrix for IO minimum score requirements. <br><br> Specifically, for the 6 Month IO program, the qualifying rate must be the initial rate plus **2%.** <br><br> Assets are still required to be verified. |
| **Number of Units** | Primary 1 - 4 Units <br><br> Second Home 1 - 2 Units <br><br> Non Owner Occupied 1 - 4 Units |
| **Eligible Borrowers** | Individuals, Inter-vivos Trust, Illinois Land Trusts, Permanent Resident Aliens, Non Permanent Resident Aliens, Foreign Nationals |
| **Ineligible Borrowers** | Corporations, General Partnerships, Non Profit Organizations |
| **Documentation Types** | Full/Alternative, ExpressDoc, Stated Income/Verified Assets (Reduced), No Ratio/Verified Assets (No Ratio), Stated Income/Stated Assets (SISA), No Doc |
| **Eligible Properties** | Single Family Detached, Single Family Attached, 2- 4 Units, Agency Warrantable Condos, Agency Warrantable PUDs, , Modular, Prefab, Coops (NY, NJ, CT, DC, PA, MD, VA, CA, MA), Condotels |
| **Ineligible Properties** | Log Cabins, Manufactured Homes, Tax Shelter Syndicates, Time-Share Units, Unimproved Land, Leasehold Properties, Properties Zoned Commercial, Model Home Leasebacks, Working farms, orchards and ranches, Dome Homes, Mixed-Use Properties, Properties with more than 10 acres, Non-Warrantable Condos, properties zoned industrial, properties > 4 units, mobile homes, properties zoned agricultural, rehab loans and houseboats. |
| **Cash Reserves** | Primary and Second Home: 2 months PITI <br><br> Investment: 6 months PITI <br><br> Reserves cannot come from proceeds. |
| **Buydowns** | Not Allowed |
| **Secondary Financing** | Permitted as per the Alt-A Product Matrix <br><br> 80-10-10%, 80-15-5%, and 80%-20% is permitted |



|  | Seller held secondary financing is permitted |
|  | Secondary financing must have a maturity date equal or prior to the first lien |
|  | Secondary financing cannot be a balloon that matures in 5 years or less |
| **Appraisal** | Full URAR appraisal (1004) is required |
|  | Loan amounts > $650,000 and < $1,000,000 require a full appraisal (1004) and a Drive-by with exterior inspection |
|  | Loan Amounts > $1,000,000 require 2 full appraisals |
|  | Property values > $2,000,000 require 2 full appraisals regardless of LTV and loan amount |
| **Credit/Mortgage History** | 12 months mortgage/rental history |
|  | 1x30 days max in last 12 months |
|  | All collections/charge-offs affecting title must be paid prior to closing |
| **Bankruptcy Provisions** | Bankruptcies and foreclosures must be discharged/completed for three (3) full years prior to loan application.  Borrowers must have re-established good credit with a 12-month history. |
| **Credit Scores** | Minimum score of 620 |
|  | See Alt-A Product Matrix for specifics |
| **Alternate Credit** | Three (3) alternative trade lines must be verified with a credit report or 12 months consecutive cancelled checks.  The trade lines must show  0x60 pay history the last 12 months. |
| **Prepayment Penalty Restrictions** | Prepayment penalty period cannot be longer than the fixed rate term of the loan (except for 6 month fixed period product) and as allowed by state law. |



�֍ **UBS** Investment Bank

**1003 UBS Jumbo Fixed Underwriting Matrix**

| | |
|---|---|
| **Geographic Restrictions** | Alaska, Hawaii, (10% reduction on LTV), Guam, Puerto Rico, Virgin Islands, Texas Cash Out Refinance Transactions |
| **Terms** | 15, and 30 Fully Amortizing Products<br><br>20 is available by Exception only |
| **Number of Units** | Primary 1 - 2 Units<br><br>Second Home 1 Unit<br><br>Non Owner Occupied 1 - 2 Units |
| **Eligible Borrowers** | Individuals, Inter-vivos Trust, Illinois Land Trusts, Permanent Resident Aliens, Non Permanent Resident Aliens |
| **Ineligible Borrowers** | Corporations, General Partnerships, Foreign Nationals, Non Profit Organizations |
| **Documentation Types** | Full/Alternative, Stated Income/Verified Assets (Reduced) |
| **Eligible Properties** | Single Family Detached, Single Family Attached, 1 - 2 Units (on certain occupancy types), Agency Warrantable Condos, Agency Warrantable PUDs, Modular, Prefab, Coops (NY, NJ, CT, DC, PA, MD, VA, CA, MA) |
| **Ineligible Properties** | Log Cabins, Manufactured Homes, Tax Shelter Syndicates, Time-Share Units, Unimproved Land, Leasehold Properties, Properties Zoned Commercial, Model Home Leasebacks, Working farms, orchards and ranches, Dome Homes, Mixed-Use Properties, Properties with more than 10 acres, Non-Warrantable Condos, properties zoned industrial, properties > 4 units, mobile homes, properties zoned agricultural, rehab loans and houseboats. |
| **Cash Reserves** | Primary and Second Home: 2 months PITI<br><br>Investment: 6 months PITI<br><br>Credit scores > 720, with LTV < 80% and loan amount <= $650,000: no reserves required.<br><br>Reserves cannot come from proceeds. |
| **Buydowns** | Compressed and Annual<br><br>Full/Alt Doc only<br><br>Not available on cash out transactions |
| **Secondary Financing** | Permitted as per the Jumbo Product Matrix<br><br>80-10-10%, 80-15-5% 80%-20% is permitted<br><br>Seller held secondary financing is not permitted<br><br>Secondary financing must have a maturity date equal or prior to the first lien<br><br>Secondary financing cannot be a balloon that matures in 5 years or less |
| **Appraisal** | Full URAR appraisal (1004) is required<br><br>Loan amounts > $650,000 and < $1,000,000 require a full appraisal (1004) and a |



|  | Drive-by with exterior inspection<br>Loan Amounts > $1,000,000 require 2 full appraisals<br>Property values > $2,000,000 require 2 full appraisals regardless of LTV and loan amount |
|---|---|
| **Credit/Mortgage History** | 12 months mortgage/rental history<br>Full/Alt Doc: 1x30 days max in last 12 months<br>Reduced Doc: 0x30 days max in last 12 months<br>All collections/charge-offs affecting title must be paid prior to closing |
| **Bankruptcy Provisions** | Bankruptcies and foreclosures must be discharged/completed for three (3) full years prior to loan application.  Borrowers must have re-established good credit with a 12-month history. |
| **Credit Scores** | Jumbo minimum score of 620<br>See Jumbo Product Matrix for specifics |
| **Alternate Credit** | Not Allowed |
| **Prepayment Penalty Restrictions** | Set by state law |



**1004 UBS Jumbo Adjustable Rate Underwriting Matrix**              ❈ **UBS** Investment Bank

| | |
|---|---|
| **Geographic Restrictions** | Alaska, Hawaii (10% reduction on LTV), Guam, Puerto Rico, Virgin Islands, Texas Cash Out Refinance Transactions |
| **Terms** | 3/6, 5/6, 7/6, 6 month annual LIBOR ARM products (30 year fully amortizing terms) |
| | For Interest-Only loans, refer to the credit matrix for which the loan is delivered.  If the minimum score listed for the loan is 620, the IO minimum score will be **640**.  For all other products, refer to the minimum credit score noted in the matrix for IO minimum score requirements. |
| | Specifically, for the 6 Month IO program, the qualifying rate must be the initial rate plus **2%.** |
| | Assets are still required to be verified. |
| **Number of Units** | Primary 1 - 2 Units |
| | Second Home 1 Unit |
| | Non Owner Occupied 1 - 2 Units |
| **Eligible Borrowers** | Individuals, Inter-vivos Trust, Illinois Land Trusts, Permanent Resident Aliens, Non Permanent Resident Aliens |
| **Ineligible Borrowers** | Corporations, General Partnerships, Foreign Nationals, Non Profit Organizations |
| **Documentation Types** | Full/Alternative, Stated Income/Verified Assets (Reduced) |
| **Eligible Properties** | Single Family Detached, Single Family Attached, 1 - 2 Units (on certain occupancy types), Agency Warrantable Condos, Agency Warrantable PUDs, Modular, Prefab, Coops (NY, NJ, CT, DC, PA, MD, VA, CA, MA) |
| **Ineligible Properties** | 3 + unit properties, Condotels, Log Cabins, Manufactured Homes, Tax Shelter Syndicates, Non Warrantable Condos, Time-Share Units, Unimproved Land, Leasehold Properties, Properties Zoned Commercial, Model Home Leasebacks, Working farms, orchards and ranches, Dome Homes, Mixed-Use Properties, Properties with more than 10 acres, properties zoned industrial, properties > 4 units, mobile homes, properties zoned agricultural, rehab loans and houseboats. |
| **Cash Reserves** | Primary and Second Home:  2 months PITI |
| | Investment: 6 months PITI |
| | Credit scores > 720, with LTV < 80% and loan amount <= $650,000:  no reserves required. |
| | Reserves cannot come from proceeds. |
| **Buydowns** | Not Allowed |
| **Secondary Financing** | Permitted as per the Jumbo Product Matrix |
| | 80-10-10%, 80-15-5% and 80%-20% is permitted |
| | Seller held secondary financing is not permitted |
| | Secondary financing must have a maturity date equal or prior to the first lien |
| | Secondary financing cannot be a balloon that matures in 5 years or less |



| Appraisal | Full URAR appraisal (1004) is required |
|---|---|
|  | Loan amounts > $650,000 and < $1,000,000 require a full appraisal (1004) and a Drive-by with exterior inspection |
|  | Loan Amounts > $1,000,000 require 2 full appraisals |
|  | Property values > $2,000,000 require 2 full appraisals regardless of LTV and loan amount |
| **Credit/Mortgage History** | 12 months mortgage/rental history |
|  | Full/Alt Doc: 1x30 days max in last 12 months |
|  | Reduced Doc: 0x30 days max in last 12 months |
|  | All collections/charge-offs affecting title must be paid prior to closing |
| **Bankruptcy Provisions** | Bankruptcies and foreclosures must be discharged/completed for three (3) full years prior to loan application.  Borrowers must have re-established good credit with a 12-month history. |
| **Credit Scores** | Jumbo minimum score of 620 |
|  | See Jumbo Product Matrix for specifics |
| **Alternate Credit** | Not Allowed |
| **Prepayment Penalty Restrictions** | Prepayment penalty period cannot be longer than the fixed rate term of the loan (except 6 month fixed period product) and is only eligible pursuant to state law. |



## 1005 UBS Project Questionnaire
## (Condo, PUD and Cooperative)

Project name:
Address:
City State:

1. Describe the unit sales:
_____Total no. units in project
_____Total no. units conveyed to purchasers, show breakdown
_____Total no. of units that are primary residents
_____Total no. of units that are second homes
_____Total no. of units rented/investor
Does any one entity (same individual, investor group, partnership, or corporation) own more than one unit?
( ) Yes   ( ) No   If yes, identify entity and indicate numbers of units and percentage owned?

    Entity _____   #Units _____   Percentage_____

    Entity_____   #Units_____   Percentage_____

2. Are all the units' common areas and amenities, including those that are part of a master associated, 100% complete? ( ) Yes ( ) No
3. Is the project subject to additional phasing? ( ) Yes   ( ) No
4. Is the project a conversion of an existing building? ( ) Yes ( ) No
5. Has control of the owners association been turned over to the unit purchasers? ( ) Yes ( ) NO
Date turned over to owners: _____
6. How is title to the units being held? _____ Fee Simple _____Leasehold (If leasehold, please provide a copy of lease)
7. Are there any leased recreational facilities or any common area leases? ( ) Yes ( ) No ( If yes, please provide a copy of the lease)
8. Is any space within the project designated for commercial / non-residential use? ( ) Yes ( ) No
If yes, how many commercial units are there? _____ What type of commercial space? _____
9. Do the project documents allow short-term rentals ( less than 30 days) ? ( ) Yes   ( ) No
If yes, does the project provide for a front desk to service short-term rental? ( ) Yes ( ) No
10. Is there a rental service for leasing units? ( ) Yes ( ) No   If yes, participation is ( ) Mandatory
( ) Voluntary     # of owners participating _____
11. Does the owners association provide daily cleaning service for rental units? ( ) Yes   ( ) No
12. The amount of reserves for future repairs and/or replacement of major components currently held in a segregated reserve fund is $ _____
13.  The number of owner's currently delinquent more than 30 days in their unit assessments __
Total amount of delinquent charges_____
14.  Is the HOA involved in any lawsuits or pending litigation? ( ) Yes ( ) No  If yes, provide information on litigation.

I the undersigned, certify to the best of my knowledge and belief, the information and statements contained on this form and the attachments are true and correct.

Signature of Association Representative or Preparer.

_____

Telephone Number                 Date

_____

 **UBS**

# 2000 Contact Information

**UBS Investment Bank**

1285 Avenue of the Americas
New York, NY 10019

Tel:    212-713-2779 or 800-221-8422

www.ubs.com

UBS Investment Bank is a subsidiary of UBS AG
UBS Securities LLC is a business group of UBS AG



# EXHIBIT C

RFC DRAFT 5/12/05

## ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

This ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT (this "Agreement"), dated as of May __, 2005, is by and among UBS Real Estate Securities Inc., a Delaware corporation ("Assignor"), Residential Funding Corporation ("Assignee"), and _____ (the "Servicer").

## RECITALS

WHEREAS, pursuant to a Master Seller's Purchase and Warranties Agreement dated as of May 12, 2005 between Assignor and Assignee, as amended, restated, supplemented or otherwise modified from time to time (the "Purchase Agreement"), Assignor has agreed to sell all of its right, title and interest in and to the Subject Mortgage Loans to Assignee.

WHEREAS, in connection with the sale of the Subject Mortgage Loans by Assignee to Assignor, Assignee and Assignor wish to specify the rights assigned by Assignor and the obligations, duties and liabilities assumed by Assignee with respect to the Subject Mortgage Loans and the Servicing Agreement as well as providing for the Servicer's recognition of Assignee as "owner" of the Subject Mortgage Loans for all purposes of the Servicing Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

Section 1.    Defined Terms.  All capitalized terms used in this Agreement that are not defined herein are used with the meanings given to such terms in the Purchase Agreement.  In addition, the following terms shall have the meanings specified below when used in this Agreement:

"Assignment Effective Date" shall mean May __, 2005.

"Assigned Interests" means (a) all right, title and interest of Assignor in and to the Subject Mortgage Loans, and (b) all right, title and interest of Assignor as owner of the Subject Mortgage Loans under the Servicing Agreement (including, without limitation, all representations, warranties, covenants and remedies (including indemnification) made by the Servicer relating to the servicing of the Subject Mortgage Loans), but in all events excluding the Retained Interests.

"Assumed Obligations" means all duties, liabilities and obligations of Assignor as owner of the Subject Mortgage Loans (including without limitation, those as "owner" of the Subject Mortgage Loans for all purposes of the Servicing Agreement) for any period after the Assignment Effective Date, but in all events excluding the Retained Obligations.

"Mortgage Loan" has the meaning specified in the Purchase Agreement.

"Retained Interests" means (a) the principal portion of all Monthly Payments with respect to each Subject Mortgage Loan due for any period prior to the related Cut-off Date, (b) all payments of interest with respect to each Subject Mortgage Loan allocable to any period prior to the related Cut-off Date, (c) any unscheduled Principal Prepayment to the extent such Principal Prepayment was a prepayment of principal due for any period prior to the related Cut-off Date, and (d) any rights under the Servicing Agreement that do not relate to the servicing of the Subject Mortgage Loans (including, without limitation, the representations and warranties made by the Servicer and the document delivery requirements of the Servicer and the remedies (including indemnification) available for breaches thereof).

"Retained Obligations" means (a) any obligation or duty to be performed with respect to a Subject Mortgage Loan to the extent that such duty or obligation was required to be performed by the owner of the Subject Mortgage Loan at any time on or prior to the Assignment Effective Date, (b) any liability for the failure to properly perform the duties and obligations described in clause (a) of this definition on or prior to the Assignment Effective Date, (c) any liability for the failure of any representation or warranty made by the owner of a Subject Mortgage Loan with respect to such Subject Mortgage Loan to the extent that such representation or warranty relates to any period on or prior to the Assignment Effective Date, (d) any obligation, duty or liability under the Servicing Agreement relating to any matter not constituting the servicing of such Subject Mortgage Loan, (e) any obligation, duty or liability with respect to the ownership of a Subject Mortgage Loan that arises from a document, instrument or agreement (i) executed by Assignor, or (ii) in Assignor's possession and such document instrument or agreement, in each such case, was not delivered to Assignee, and (f) any obligation, duty or liability of any kind relating to a Mortgage Loan not constituting a Subject Mortgage Loan.

"Servicing Agreement" shall mean the servicing agreement attached to this Agreement as Exhibit B hereto together with all amendments, restatements, supplements and modifications thereof attached thereto as part of such Exhibit B which were effective on or prior to the date of this Agreement.

"Subject Mortgage Loan" means a Mortgage Loan listed on Exhibit A to this Agreement.

Section 2.    Assignment. ASSIGNOR does hereby ASSIGN, TRANSFER, SELL, DELIVER AND CONVEY UNTO ASSIGNEE, ITS SUCCESSORS AND ASSIGNS, TO HAVE AND TO HOLD FOREVER, without recourse, but subject to the terms of this Agreement and the Purchase Agreement, and Assignee hereby accepts the assignment of the Assigned Interests on such terms on and as of the Assignment Effective Date.

Section 3.    Assumption. Assignee does hereby assume the Assumed Obligations on and as of the Assignment Effective Date.

Section 4.    Recognition. Servicer agrees to recognize Assignee as the "owner" of the Subject Mortgage Loans for all purposes of the Servicing Agreement (other than any

purposes relating to the Retained Interests) and that Assignee is entitled to all rights and benefits accruing to the owner of the Subject Mortgage Loans thereunder (other than the Retained Interests) and Servicer will faithfully perform all of its duties and obligations owing to Assignee in such capacity under the Servicing Agreement.

Section 5.    Representations, Warranties and Covenants of Assignor. The Assignor represents and warrants to and covenants with the Assignee and the Servicer as of the date hereof:

(a)    The Assignor is the lawful owner of the Assigned Interests with full right and power to transfer each and all of them to Assignee as described in this Agreement and each and all of the foregoing are transferred to Assignee subject to no lien, claim or other encumbrance and, on and as of the Assignment Effective Date, Assignee will be the lawful owner of such Assigned Interests subject to no liens, claims or encumbrances;

(b)    The Assignor has full corporate power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Agreement is in the ordinary course of the Assignor's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of the Assignor's charter or by-laws or any legal restriction, or any material agreement or instrument to which the Assignor is now a party or by which it or its properties are bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Assignor or its property are subject. The execution, delivery and performance by the Assignor of this Agreement and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on part of the Assignor. This Agreement has been duly executed and delivered by the Assignor and constitutes the valid and legally binding obligation of the Assignor enforceable against the Assignor in accordance with its terms except as enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law; and

(c)    There is no default, breach or violation under or any event which, with notice and expiration of any grace or cure period, would constitute a default, breach or violation under the Servicing Agreement (i) on the part of Assignor, or (ii) to the best of Assignor's knowledge, on the part of Servicer.

Section 6.    Representations, Warranties and Covenants of the Assignee.    The Assignee represents and warrants to and covenants with, the Assignor and the Servicer that:

The Assignee has full power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions set forth herein. The execution, delivery and performance of the Assignee of this Agreement, and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary corporate action of the Assignee. This Agreement has been duly executed and delivered by the Assignee and constitutes the valid and legally binding obligation of the Assignee enforceable against the Assignee in accordance with its respective terms except as

3

enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law.

Section 7.    Representations, Warranties and Covenants of the Servicer.    The Servicer represents and warrants to and covenants with the Assignor and the Assignee that:

(a)    Attached hereto as <u>Exhibit B</u> is a true and accurate copy of the Servicing Agreement, which agreement is in full force and effect as of the date hereof and the provisions of which have not been waived, amended or modified in any respect, nor has any notice of termination been given thereunder;

(b)    The Servicer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has all requisite power and authority to service the Subject Mortgage Loans and otherwise to perform its duties and obligations with respect to the Subject Mortgage Loans under the Servicing Agreement;

(c)    The Servicer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Agreement is in the ordinary course of the Servicer's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of the Servicer's charter or by-laws or any legal restriction, or any material agreement or instrument to which the Servicer is now a party or by which it or its property are bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject. The execution, delivery and performance by the Servicer of this Agreement and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on part of the Servicer. This Agreement has been duly executed and delivered by the Servicer constitutes the valid and legally binding obligation of the Servicer, enforceable against the Servicer in accordance with its terms except as enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law;

(d)    No consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Servicer in connection with the execution, delivery or performance by the Servicer of this Agreement, or the consummation by it of the transactions contemplated hereby;

(e)    Without limiting the representations, warranties and related remedies contained in the Servicing Agreement (which the Assignee shall be fully entitled to rely on and enforce), the Subject Mortgage Loans have each been serviced in all material respects in compliance with (i) the terms of the Servicing Agreement (or, to the extent such servicing predates the effectiveness of the Servicing Agreement, the servicing standards identified in the Servicing Agreement as applicable to loans serviced under the Servicing Agreement), (ii) the related mortgage, promissory note and other documents contained in the related mortgage

4

file, and (iii) all applicable federal, state and local law, and in the case of each of items (i), (ii) and (iii) of this clause (e) such representations and warranties are made from the time of the origination of the Subject Mortgage Loans through and including the Assignment Effective Date;

(f)    There is no default, breach or violation under or any event which, with notice and expiration of any grace or cure period, would constitute a default, breach or violation under the Servicing Agreement (i) on the part of Servicer, or (ii) to the best of Servicer's knowledge, on the part of Assignor;

(g)    If any Mortgage for a Subject Mortgage Loan has been recorded in the name of Mortgage Electronic Registration System, Inc. ("MERS") or its designee, the Servicer shall take all actions as are necessary to cause the Assignee to be shown as the owner of the related Subject Mortgage Loan on the record of MERS for the purpose of the system of recording transfers of beneficial ownership of mortgage maintained by MERS;

(h)    The Servicer agrees that the servicing of the Subject Mortgage Loans for all periods on and after the Assignment Effective Date will be subject to and conducted in compliance with the GMAC-RFC Servicer Guide, as amended, restated, supplemented or otherwise modified from time to time (the "GMAC-RFC Servicer Guide"); provided, however, that, such agreement shall not extinguish Assignee's rights or the Servicer's duties, obligations or liabilities under the Servicing Agreement with respect to the Subject Mortgage Loans for any period prior to the Assignment Effective Date or with respect to the representations and warranties made in clause (e) above or the remedies therefor; and

(i)    The breach of any representation, warranty or covenant made by Servicer in favor of Assignee under this Agreement shall be treated as a breach of the Servicing Agreement and all remedies available to the owner of the Subject Mortgage Loans thereunder for a breach of the Servicing Agreement shall be available to Assignee in respect of any such breach of this Agreement in addition to any other rights or remedies the Assignee may otherwise have against the Servicer by contract, at law or in equity.

Section 8.    Further Assurances.    Assignor agrees to execute and deliver such further documents, and to do such further things, as Assignee may reasonably request in order to more fully effect this Agreement and the transactions contemplated hereby and by the Purchase Agreement.  Assignee agrees to execute and deliver such further documents, and to do such further things, as Assignor may reasonably request in order to more fully effect this Agreement and the transactions contemplated hereby and by the Purchase Agreement.

Section 9.    Costs.    Each party will pay all costs and expenses incurred by it in connection with the negotiation and execution and delivery of this Agreement, including, without, limitation the fees, costs and expenses of its counsel.

Section 10.    Governing law.    This instrument shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its conflict of laws provisions (other than Section 5-1401 of the New York General Obligations Law), and the

obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 11.    <u>Counterparts</u>.    This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall constitute but one and the same instrument.

Section 12.    <u>Amendments</u>. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

Section 13.    <u>Effectiveness</u>.    This Agreement shall become effective on the Amendment Effective Date after it has been duly executed and delivered by the parties hereto.  This Agreement shall bind and inure to the benefit of the successors and assigns of the parties hereto.

*[Signature Page Follows]*

M1:1211162.01

6

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed as of the day and year first above written.

**UBS REAL ESTATE SECURITIES INC.,**
Assignor

By: _____
Its:


**RESIDENTIAL FUNDING CORPORATION,**
Assignee

By: _____
Its:


_____, Servicer

By: _____
Its:


*[Signature Page to Assignment, Assumption and Recognition Agreement]*

## Exhibit A

Mortgage Loans

<u>Exhibit B</u>

Servicing Agreement

## **Exhibit D**

Security Release Certification

1.    <u>Release of Security Interest</u>

                      , hereby relinquishes any and all right, title and interest it may have in and to the Mortgage Loans described in Exhibit A attached hereto upon purchase thereof by Residential Funding Corporation from the Company named below pursuant to that certain Master Seller's Purchase and Warranties Agreement, dated as of May __, 2005, as of the date and time of receipt by _____ of $_____ for such Mortgage Loans (the "Date and Time of Sale"), and certifies that all notes, mortgages, assignments and other documents in its possession relating to such Mortgage Loans have been delivered and released to the Company named below or its designees as of the Date and Time of Sale.

Name and Address of Financial Institution

_____
          (Name)

_____
         (Address)

By:_____

D-1

## II.    Certification of Release

The Company named below hereby certifies to Residential Funding Corporation that, as of the Date and Time of Sale of the above mentioned Mortgage Loans to Residential Funding Corporation, the security interests in the Mortgage Loans released by the above named Person comprise all security interests relating to or affecting any and all such Mortgage Loans. The Company warrants that, as of such time, there are and will be no other security interests affecting any or all of such Mortgage Loans.

UBS REAL ESTATE SECURITIES INC., Company

By:_____

Name:_____

Title:_____

D-2

AMENDMENT NUMBER ONE
to the
Master Seller's Purchase and Warranties Agreement
Dated as of May __, 2005
by and among
RESIDENTIAL FUNDING CORPORATION
and
UBS REAL ESTATE SECURITIES INC.

THIS AMENDMENT NUMBER ONE (this "Amendment Number One"), entered into as of the 20th day of June, 2005, by and between UBS Real Estate Securities Inc. ("UBSRES") and Residential Funding Corporation ("RFC"), provides as follows:

RECITALS

WHEREAS, UBSRES and RFC previously entered into a Master Seller's Purchase and Warranties Agreement, dated as of May __, 2005 (the "Purchase Agreement"), pursuant to which RFC agreed to purchase certain mortgage loans from UBSRES pursuant to the terms and conditions set forth therein.

WHEREAS, UBSRES and RFC desire to amend the Purchase Agreement to provide for the purchase of certain mortgage loans on a servicing released basis.

WHEREAS, UBSRES and RFC have agreed to amend the Purchase Agreement as set forth herein.

NOW THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1.  The Amendments

    (A) The third "WHEREAS" clause in the preamble is hereby deleted in its entirety and replaced with the following two "WHEREAS" clauses:

    WHEREAS, the Servicer owns the Servicing Rights with respect to the Servicing Retained Mortgage Loans (as defined herein) and shall continue to service each Servicing Retained Mortgage Loans following the related Closing Date;

    WHEREAS, UBSRES desires to sell and RFC desires to purchase certain Servicing Released Mortgage Loans (as defined herein) on a servicing released basis from time to time for which the related Servicing Rights will be sold to RFC together with the related Mortgage Loan.

    (B) The definition of "Existing Servicing Contract" in Section 1.01 is hereby amended by including the words "Servicing Retained" immediately before the words "Mortgage Loans" on the first line of such definition.

(C) The definition of "Future Servicing Contract" in Section 1.01 is hereby amended by including the words "Servicing Retained" immediately before the words "Mortgage Loans" on the first line of such definition.

(D) The definition of "Mortgage Loan" in Section 1.01 is hereby amended by including the words "Servicing Retained Mortgage Loan or Servicing Released" immediately before the words "Mortgage Loan" on the first line of such definition.

(E) The definition of "Mortgage Loan" in Section 1.01 is hereby further amended by replacing the parenthetical in the third to last line with the following:

(other than, with respect to the Servicing Retained Mortgage Loans only, the related Servicing Rights).

(F) The following new definitions are added to Section 1.01 in the appropriate alphabetical order:

Servicing Released Mortgage Loans: The Mortgage Loans sold by the Company to the Purchaser on a servicing released basis.

Servicing Retained Mortgage Loans: The Mortgage Loans sold by the Company to the Purchaser on a servicing retained basis.

(G) The definition of "Stated Principal Balance" in Section 1.01 is hereby amended by including the words "Servicing Retained" immediately before the words "Mortgage Loan" in the first line of such definition.

(H) The definition of "Stated Principal Balance in Section 1.01 is hereby further amended by including the following new sentence at the end of such definition:

As to each Servicing Released Mortgage Loan, (i) the principal balance of the Mortgage Loans as of the Cut-off Date after giving effect to payments of principal received on or before such date, minus (ii) all amounts previously distributed to the Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal.

(I) The first sentence of Section 2.01 is hereby amended by including the following parenthetical immediately after the words "the Mortgage Loans":

(including the Servicing Rights thereon, with respect to the Servicing Released Mortgage Loans).

(J) Section 2.02 is hereby amended by including the paragraph number "(a)" immediately prior to the first paragraph of such definition.

(K) Section 2.02 is hereby further amended by including the words "Servicing Retained" immediately before the words "Mortgage Loans" in the first line of

each of the first and second paragraphs of such Section and immediately before the words "Mortgage Loan" in the first line of the third paragraph of such Section.

(L) Section 2.02 is hereby further amended by including the following new provisions at the end of such Section:

(b) The Purchase Price for each Servicing Released Mortgage Loan in a Mortgage Loan Package shall be equal to the sum of (a) the percentage of par as stated in the related Confirmation of Terms (subject to adjustment as provided therein), multiplied by its Stated Principal Balance as of the related Cut-off Date, plus (b) an amount equal to accrued interest on the aggregate Stated Principal Balance of the Mortgage Loans at the weighted average Mortgage Interest Rate of such Mortgage Loans from the related Cut-off Date to but not including the related Closing Date (assuming 30/360) (the "Purchase Price"). If so provided in the related Confirmation of Terms, portions of the Mortgage Loans shall be priced separately.

The Purchase Price as set forth in the preceding paragraph for the Servicing Released Mortgage Loans in a Mortgage Loan Package shall be paid on the related Closing Date by wire transfer of immediately available funds.

The Purchaser shall own and be entitled to receive with respect to each Servicing Released Mortgage Loan purchased all payments collected after the related Cut-off Date.

(M)    Section 5.11 is hereby amended by including the following clause immediately after the words "person to whom" and immediately prior to the words "the Servicing Rights" in the last sentence of such Section:

, with respect to the Servicing Retained Mortgage Loans,.

Section 2. Defined Terms. Any terms capitalized but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

Section 3. Limited Effect. Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms. Reference to this Amendment Number One need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby. The amendments made in this Amendment Number One shall be effective with respect to any Mortgage Loans purchased by the Buyer on or after the date hereof.

Section 4. Governing Law. This Amendment Number One shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law provisions (other than Section 5-1401 of the New York General Obligations Law), except to the

extent preempted by Federal law. The obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws

Section 6. <u>Counterparts</u>. This Amendment Number One may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on the parties. The original document shall be promptly delivered, if requested.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the UBSRES and RFC have caused this Amendment Number One to be executed and delivered by their duly authorized officers as of the day and year first above written.

UBS REAL ESTATE SECURITIES INC.

By:_____

Name:
Title:

By:_____

Name:
Title:

RESIDENTIAL FUNDING
CORPORATION

By:_____

Name:
Title:

IN WITNESS WHEREOF, the Company and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

RESIDENTIAL FUNDING CORPORATION,
Purchaser

By: *Debra A. Casale*

Name: *Debra A. Casale*

Title: *Managing Director*


UBS REAL ESTATE SECURITIES INC.,
Company

By: *[signature]*

Name: Eileen A. Lindblom
Executive Director

Title:


By: *[signature]*

Name: Christopher G. Schmidt
Associate Director

Title:

Draft 5/09/05

# UBS REAL ESTATE SECURITIES INC.

As of April 27, 2005

TO:          GMAC RFC ("Purchaser")
             1 Meridian Crossings, Suite 100
             Minneapolis, MN 55423
             Attention: Deb Severson
             Phone: (952) 979-4577
             Telecopier No.: (952) 921-9065
             E-Mail: debra.severson@gmacrfc.com

FROM:        UBS Real Estate Securities Inc. ("Seller")

RE:          Confirmation of Terms

---

This letter will serve as confirmation of the agreement by the Seller to sell and the agreement by the Purchaser to purchase, on a mandatory delivery basis, without recourse, certain fixed rate, first lien, Alt-A residential mortgage loans (the "Mortgage Loans"), having an original term to maturity of up to approximately 30 years and an aggregate unpaid principal balance of approximately $40.0 million (based upon the unpaid principal balance of the Mortgage Loans as of the Cut-off Date) with the characteristics and under the terms set forth below. Purchaser will purchase all of Seller's right, title and interest in the Mortgage Loans. The Mortgage Loans are those more particularly described below and on Exhibit A, which is made a part hereof and which generally describes the characteristics of the pool of Mortgage Loans to be purchased (including the relative proportions of certain mortgage loan characteristics present within the overall pool of mortgage loans to which the Mortgage Loans to be purchased should substantially conform as of the Cut-off Date unless otherwise indicated herein). The Mortgage Loans were originated by National City Mortgage Co. (or its affiliates or predecessors) and are serviced by National City Mortgage Co. (the "Servicer"). The Servicer owns the servicing rights for the related Mortgage Loans and is currently servicing such Mortgage Loans. The terms and provisions of this transaction, including the purchase price for the Mortgage Loans, are described below.

1.   Unpaid Principal Balance          $40,000,000 (+/- 5%)

2.   Cut-off Date                      May 1, 2005 or such other date as mutually agreed to by the Seller and Purchaser.

3.   Closing Date                      May 20, 2005 or such other date as may be agreed upon between the parties hereto.

4.   Gross Weighted Average Coupon     5.9073%.

5.   Net Weighted Average Coupon       5.6515%

6.   Weighted Average Servicing Fee    0.2557%

7.   Purchase Price Percentage         99.433386%. Increases or decreases in gross weighted average coupon ("WAC") on the aggregate pool of Mortgage Loans purchased on the Closing Date will result in an adjusted purchase price. Any purchase price adjustment will be based upon an interpolated dollar price using the final Net WAC on the pool of Mortgage Loans to be purchased using the following Fannie Mae MBS prices, as applicable, less 1.1875

                                       FNMA 5.5% (April)     100.046875%
                                       FNMA 6.0% (April)     102.093750%

8.   Funding Amount                    The scheduled principal balance of the Mortgage Loans (assuming application of the scheduled May 1, 2005 principal payment) multiplied by the Purchase Price Percentage, plus accrued interest at the net

---

57270                                          1
(2.25.05 scheduled settlement)

Draft 5/09/05

mortgage interest rate for each of the Mortgage Loans from and including the Cut-off Date through and including the day prior to the Closing Date (assuming a year of twelve thirty-day months).

9.  Pool Characteristics

The Mortgage Loans will substantially conform to the pool characteristics as set forth in Exhibit A attached hereto.

10. Agreement

This transaction is subject to the execution of an assignment, assumption and recognition agreement assigning the Seller's rights under the related purchase and servicing agreements between the Seller and the Servicer pursuant to which purchase and servicing agreements the Seller purchased., or shall purchase, from the Servicer and the Servicer is obligated or shall be obligated to service the Mortgage Loans.

11. Closing

The closing may occur via facsimile transmission.

12. Further Assurances

The Purchaser and Seller further agree that upon reasonable request they shall do such other and further acts and deeds, and shall execute, acknowledge and deliver and record such other documents and instruments as may be reasonably necessary from time to time to evidence, confirm or carry out the intent and purposes of this letter.

13. Expenses

Each party will bear its own costs, fees and expenses (including the costs, fees and expenses of its attorneys). Seller will bear the cost of the delivery of the Collateral files to the Custodian (including any costs owed to Seller's custodian related to the release and shipment of the Collateral files to Purchaser); the costs of preparing and recording the Assignments (including intervening assignments necessary to perfect title to Purchaser) from Seller to Purchaser and endorsing notes to Purchaser, as required; the costs of delivering complete master-file tape information and other electronically stored information to Purchaser; and the costs of shipping all Mortgage Loan records to the Purchaser. The Purchaser will be responsible for the costs of its due diligence.

14. Choice of Law/Jurisdiction

This letter shall be governed by the laws of the State of New York applicable to contracts executed and performed in that state without regard to principles of conflicts of laws. With respect to any suit, action or proceeding relating to this letter (each, a "Proceeding"), the Seller and Purchaser each irrevocably (i) waives any and all right to trial by jury, (ii) submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the borough of Manhattan in the City of New York, and (iii) waives (A) any objections which it may have at any time to the laying of venue of any such Proceedings brought in any such court and (B) any claim that such Proceedings have been brought in an inconvenient forum and further.

15. Entire Agreement

This letter sets forth the entire understanding of the parties relating to the subject matter hereof to date and supersedes and cancels any prior communications, understandings and agreements between the parties. This letter may not be amended or modified except by the parties in writing. This letter may be simultaneously executed in several counterparts, each of which shall be deemed to be an original, and all such counterparts shall together constitute but one and the same agreement.

57270
(2.25.05 scheduled settlement)

2

**Draft 5/09/05**

| | | |
|---|---|---|
| 16. | Assignment | This letter shall inure to the benefit of and be binding upon the Seller and Purchaser and their respective successors. No party's rights or obligations under this letter may be assigned and/or assumed by any other person. |
| 17. | Due Diligence: | Prior to the Closing Date, the Purchaser may perform a due diligence review of up to 25% of the Mortgage Loan credit files. The Purchaser will conduct such credit review based upon the Seller's published underwriting guidelines. Prior to the Closing Date, the Purchaser may reject any of the Mortgage Loans not substantially underwritten in accordance with the Seller's published underwriting guidelines based on such review. Purchaser will be responsible for the costs of its due diligence. |
| 18. | Confidential Information: | Purchaser shall hold and use all Confidential Information, as hereinafter defined, in compliance with Subtitle A of Title V of the Gramm-Leach-Bliley Act (codified at 15 U.S.C. § 6801 et seq.), as it may be amended from time to time (the "GLB Act"), the regulations promulgated thereunder, the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA") and all other applicable law. "Confidential Information" shall mean any data or information that is proprietary to the disclosing party and not generally known to the public, whether in tangible or intangible form, including, but not limited to, the following information: inventions, trade secrets, know-how, software, databases, customer lists, and other customer or consumer specific data deemed to be "nonpublic personal information" under the GLB Act or the FCRA. Purchaser shall take all reasonable measures to ensure that the Confidential Information is not disclosed, published, released, transferred, duplicated or otherwise made available to others in contravention of the provisions of this Agreement or of the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law. If the GLB Act, the regulations promulgated thereunder, the FCRA or other applicable law now or hereafter in effect impose a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Agreement. Purchaser shall indemnify and hold harmless Seller for all damages incurred by Seller arising from Purchaser's failure to comply with the GLB Act and the FCRA. |

**[SIGNATURES COMMENCE ON FOLLOWING PAGE]**

Please acknowledge your acceptance and agreement to the foregoing by signing and returning this confirmation letter via facsimile and overnight courier to Eileen Lindblom (Phone Number: (212) 713-6273; Facsimile Number (212) 713-2080) at UBS Real Estate Securities Inc., 1285 Avenue of the Americas, 11th Floor, New York, New York 10019. Thank you.

Very Truly Yours,

**UBS REAL ESTATE SECURITIES INC.**

BY:_____

NAME:

TITLE:


BY:_____

NAME:

TITLE:


**CONFIRMED AND AGREED TO:**

**RFC GMAC**


BY:_____

NAME:

TITLE: