## **Exhibit 3**

**Delehey Declaration**

ny-1135273

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------- ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ----------------------------------------------- ) | | |

### DECLARATION OF LAUREN GRAHAM DELEHEY IN SUPPORT OF OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO CLAIM NUMBER 4167 FILED BY GERALD GANDRUP

Lauren Graham Delehey, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1.      I serve as Chief Litigation Counsel in the legal department of The ResCap Liquidating Trust (the "Liquidating Trust"), and previously served as Chief Litigation Counsel at Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").  I joined ResCap as in-house litigation counsel on August 1, 2011.

2.      In my role as Chief Litigation Counsel at ResCap, I was responsible for the management of litigation for the Debtors and am now responsible for the management of litigation for the Liquidating Trust.  I am generally familiar with the Debtors' litigation matters, including the Gandrup Litigation (defined below) brought by Mr. Gandrup against GMAC Mortgage, LLC ("GMACM") and Executive Trustee Services, LLC ("ETS").  I am authorized to

submit this declaration (the "Declaration") in support of the *Objection of The ResCap Borrower
Claims Trust to Claim Number 4167 Filed By Gerald Gandrup* (the "Objection").[1]

3.    Except as otherwise indicated, all statements in this Declaration are based
upon my personal knowledge; information supplied or verified by personnel in departments
within the Debtors' various business units; my review of the Debtors' litigation case files, books
and records, as well as other relevant documents; my discussions with other members of the
Debtors' legal department; information supplied by the Debtors' professionals and consultants,
and/or Kurtzman Carson Consultants LLC ("KCC"), the Debtors' notice and claims agent; or my
opinion based upon my experience, expertise, and knowledge of the Debtors' litigation matters,
financial condition and history.  In making these statements based on my review of the Debtors'
litigation case files, books and records, relevant documents, and other information prepared or
collected by the Debtors' employees, consultants or counsel, I have relied upon these employees,
consultants, and counsel accurately recording, preparing, collecting, or verifying any such
documentation and other information.

4.    If I were called to testify as a witness in this matter, I would testify
competently to the facts set forth herein.

5.    I am familiar with the claims reconciliation process in these Chapter 11
cases.  Except as otherwise indicated, all statements in this Declaration are based upon my
familiarity with the Debtors' books and records (the "Books and Records"), the Debtors'
schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11
Cases, my review and reconciliation of claims, and/or my review of relevant documents.  Since
the Plan went effective and the Borrower Trust was created, I, along with other members of the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

ny-1135273

Liquidating Trust's management or other employees of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same.[2]

6.    Considerable resources and time have been expended to ensure a high level of diligence in reviewing and reconciling the proofs of claim filed in these Chapter 11 Cases.  Such claims were reviewed and analyzed by the appropriate personnel and professional advisors.  More specifically, the Liquidating Trust, in support of the Borrower Trust, has reviewed proof of claim number 4167, filed by Mr. Gandrup (the "Gandrup Claim"), and the Response submitted in support thereof, and have diligently examined the Books and Records in order to assess the allegations made in the Gandrup Claim and the Response.  In addition, on June 21, 2013, the Debtors sent a request letter to Mr. Gandrup requesting additional information and documentation in support of the Gandrup Claim (the "Request Letter").  A copy of the Request Letter is attached hereto as Exhibit A.  Mr. Gandrup never responded to the Request Letter.

7.    Based on the below facts, and as set forth in further detail in the Objection, the Borrower Trust, in consultation with its professionals, determined that the Gandrup Claim should be disallowed and expunged from the Claims Register.

### A.    The Gandrup Loan

8.    On or about April 4, 2007, Mr. Gandrup obtained a loan from Atlantic Savings of America ("Atlantic Savings") in the amount of $880,000.00 (the "Gandrup Loan"). The Gandrup Loan was secured by a deed of trust (the "Deed of Trust"), dated April 4, 2007 and

---

[2] The ResCap Liquidating Trust (the "Liquidating Trust") and the Borrower Trust are parties to an Access and Cooperation Agreement, dated December 17, 2013 that, among of things, provides access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.

3

recorded on April 12, 2007, on real property located at 200 Gregory Court, Scotts Valley, California 95066 (the "Gandrup Property"). See Deed of Trust, a copy of which is attached hereto as Exhibit B. On April 27, 2007, GMACM began servicing the Gandrup Loan. A Substitution of Trustee was recorded on August 23, 2010 (the "Substitution of Trustee"), which substituted ETS as Successor Trustee for the original Trustee. See Substitution of Trustee, a copy of which is attached hereto as Exhibit C. On February 16, 2013, servicing of the Gandrup Loan transferred to Ocwen Loan Servicing, LLC ("Ocwen").

9.      According to the Debtors' payment records (the "Payment Records"), Mr. Gandrup has failed to make monthly payments on the Gandrup Loan since April 2010. See Payment Records, a copy of which is attached hereto as Exhibit D.[3]  On August 23, 2010, as a result of the missed payments, a notice of default (the "Notice of Default") was recorded in Santa Cruz County. See Notice of Default, a copy of which is attached hereto as Exhibit E. The Notice of Default invited Mr. Gandrup to contact the beneficiary under the Deed of Trust, Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Atlantic Savings, through its agent, ETS, to make arrangements to stop the foreclosure. See Notice of Default. Mr. Gandrup failed to take any steps to cure his default, and, on November 23, 2010, a Notice of Trustee's Sale (the "Notice of Trustee's Sale") was recorded in Santa Cruz County. See Notice of Trustee's Sale, a copy of which is attached hereto as Exhibit F.  On April 4, 2011, the Gandrup Property was sold at a trustee's sale to HSBC as the Trustee for DBALT 2007-OA4, and on May 19, 2011, a Trustee's Deed Upon Sale (the "Trustee's Deed Upon Sale") was recorded in Santa Cruz County. See Trustee's Deed Upon Sale, a copy of which is attached

---

[3] Due to the voluminous nature of Mr. Gandrup's complete payment record, attached as Exhibit D is a summary of the payment record. A complete copy of Mr. Gandrup's payment record is available upon request.

hereto as <u>Exhibit G</u>.  As of the April 4, 2011 sale, Mr. Gandrup's interest in the Gandrup

Property was extinguished.[4]

**B.    The Gandrup Litigation**

10.    On February 14, 2011, Mr. Gandrup initiated litigation (the "<u>Gandrup</u>

<u>Litigation</u>") in the United States District Court for the Northern District of California (the

"<u>District Court</u>") against, among other defendants, GMACM and ETS (together, the "<u>Debtor</u>

<u>Defendants</u>"), and alleged four causes of action including (i) violations of TILA, (ii) violations of

the Home Ownership Equity Protection Act ("<u>HOEPA</u>") and the Federal Trade Commission

("<u>FTC</u>") Act, (iii) prohibited loan terms and (iv) quiet title.

11.    On September 23, 2011, Mr. Gandrup filed an amended complaint (the

"<u>Amended Complaint</u>") against the Debtor Defendants and other defendants alleging the

following ten causes of action: (i) violations of the Truth in Lending Act ("<u>TILA</u>"); (ii)

violations of the Real Estate Settlement Procedures Act ("<u>RESPA</u>"); (iii) fraud; (iv) unjust

enrichment; (v) civil violations of the Racketeer Influenced and Corrupt Organizations ("<u>RICO</u>")

Act; (vi) breach of security instrument; (vii) wrongful foreclosure; (viii) quiet title; (ix)

rescission-mistake-void agreement; and (x) invasion of Constitutional right to privacy.

12.    On October 10, 2011, the Debtor Defendants filed a motion to dismiss the

Amended Complaint, and on September 10, 2012, the District Court entered an order (the

"<u>Dismissal Order</u>") dismissing Mr. Gandrup's claims for unjust enrichment, breach of security

---

[4] After the April 4, 2011 sale to HSBC as the Trustee for DBALT 2007-OA4, GMACM continued in its role as servicer.  In its capacity as servicer, GMACM continued to service the Gandrup Loan and the Gandrup Property was managed through GMACM's real estate owned ("<u>REO</u>") department.  On April 13, 2012, HSBC as the Trustee for DBALT 2007-OA4 sold the property in REO to a private third party for $701,000.  At the time the property was sold to a private third party, a claim was filed by GMACM to Atlantic Savings as the original investor of the loan in an effort to recoup some of the principal balance that was outstanding from the REO sale.  Due to this claim, the Gandrup Loan remained active on GMACM's system until February 16, 2013, at which time the Gandrup Loan was transferred to Ocwen.  The transfer to Ocwen occurred due to outstanding litigation fees that still showed as owing to GMACM by Atlantic Savings.  Such fees were resolved in May 2013.

ny-1135273

interest, wrongful foreclosure and quiet title without leave to amend, and dismissing the remaining claims with leave to amend.  See Dismissal Order, a copy of which is attached hereto as Exhibit H.

13.    On October 1, 2012, Mr. Gandrup filed a second amended complaint (the "Second Amended Complaint") against the Debtor Defendants, among other defendants, alleging the following six causes of action: (i) violations of TILA; (ii) violations of RESPA; (iii) fraud; (iv) civil RICO violations; (v) rescission-mistake-void agreement; and (vi) invasion of Constitutional right to privacy.  See Second Amended Complaint, a copy of which is attached hereto as Exhibit I.  In response to the Second Amended Complaint, the Debtor Defendants, on October 8, 2012, filed a motion to dismiss the Second Amended Complaint, arguing that, although the Second Amended Complaint had been "amended," the Second Amended Complaint still contained overly broad allegations and the same flawed arguments and theories that were present in the prior complaint.

14.    On October 22, 2012, Mr. Gandrup filed a notice of voluntarily dismissal (the "Notice of Voluntary Dismissal") indicating that he was voluntarily dismissing the Gandrup litigation, without prejudice, as to all defendants, including the Debtor Defendants.  See Notice of Voluntary Dismissal, a copy of which is attached hereto as Exhibit J.  On October 23, 2012, the District Court entered an order (the "Voluntary Dismissal Order") dismissing the Gandrup Litigation without prejudice.  See Voluntary Dismissal Order, a copy of which is attached hereto as Exhibit K.

C.       **The Gandrup Claim**

15.      On November 9, 2012, Mr. Gandrup filed the Gandrup Claim as a general unsecured claim against ResCap in the amount of $1,000,000.00 in relation to the Gandrup Litigation.

16.      On September 20, 2013, the Debtors filed the *Debtors' Fiftieth Omnibus Objection to Claims (No Liability Borrower Claims – Books and Records)* (the "Fiftieth Omnibus Objection"), which objected to the Gandrup Claim, among other claims, on the basis that the Books and Records showed no liability in relation to the Gandrup Claim because Mr. Gandrup voluntarily dismissed the Gandrup Litigation.

17.      On October 25, 2013, Mr. Gandrup filed a response to the Fiftieth Omnibus Objection (the "Response").

18.      On or around January 23, 2014, the Borrower Trust and Mr. Gandrup entered into a stipulation to withdraw, without prejudice, the Fiftieth Omnibus Objection as to the Gandrup Claim.

19.      If the Gandrup Claim is not disallowed and expunged in its entirety, then Mr. Gandrup may potentially receive a wholly improper recovery to the detriment of other Borrower Trust beneficiaries.

20.       Accordingly, based upon this review and in consultation with the Borrower Trust, and for the reasons set forth in the Objection, I have determined that the Gandrup Claim should be accorded the proposed treatment described in the Objection.

7

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.


Dated:  April 11, 2014

                                      /s/ Lauren Graham Delehey

                                      Lauren Graham Delehey
                                      Chief Litigation Counsel for
                                      The ResCap Liquidating Trust

8

## Exhibit A

**Request Letter**

Residential Capital, LLC
c/o KCC
2335 Alaska Ave
El Segundo, CA 90245

PRF # 59050***                          PackID: 116
Case No.: 12-12020                      NameID: 11079790
Svc: 3

Gerald Gandrup
PO Box 67359
Scotts Valley, CA 95067



MORRISON | FOERSTER

June 21, 2013

**Claim Number:** 4167

Dear Claimant: Gerald Gandrup

You are receiving this letter because you or someone on your behalf filed a Proof of Claim form in the jointly-administered chapter 11 bankruptcy cases of Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC and other affiliated debtors and debtors in possession (collectively, the "Debtors") pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020 (MG) (the "ResCap bankruptcy case"), and we need additional information from you regarding the claim(s) ("claim") you are asserting against the Debtors.

**<u>The Information we Need From You Regarding Your Proof of Claim</u>:**
We reviewed a copy of the Proof of Claim form and documents that you filed in the ResCap bankruptcy case.  A copy of your Proof of Claim form is enclosed for your reference.  According to our records, you have filed a lawsuit against one or more of the Debtors.  Please reply using the attached form and let us know whether the basis for and amount of the claim contained in the Proof of Claim form are the same or different in any way from the claim you have asserted in your lawsuit against the Debtors.  Please ensure that you provide specific detail and support as to the basis for and amount of claim referenced in your Proof of Claim.  If your lawsuit has been dismissed or withdrawn, please provide a specific explanation as to why you believe that you are still owed money or entitled to other relief from one or more of the Debtors.

**<u>You Must Respond to this Letter by no Later Than July 22, 2013</u>:**
In accordance with the Order of the Bankruptcy Court (Docket No. 3294, filed March 21, 2013), you **must** respond to this letter by no later than July 22, 2013 with the requested information and an explanation stating the legal and factual reasons why you believe you are owed money or are entitled to other relief from one or more of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases). You **must** also provide copies of any and all documentation that you believe supports the basis for and amount of your claim.  A form is included with this letter to assist you in responding to our request for additional information.

**<u>Consequences of Failing to Respond</u>:**
If you do not provide the requested information regarding the basis for and amount of your claim and the supporting documentation by July 22, 2013, the Debtors may file a formal objection to your Proof of Claim on one or more bases, including that you failed to provide sufficient information and documentation to support your claim.  If the Debtors file such an objection and it is successful, your claim may be disallowed and permanently expunged.  If your claim is disallowed and expunged, you will not receive any payment for your claim and any other requests you may have made for non-monetary relief in your Proof of Claim will be denied.  Therefore, it is very important that you respond by the date stated above with the requested information and documentation supporting the basis for and amount of your claim.

Residential Capital, LLC     P.O. Box 385220  Bloomington, Minnesota  55438

Claim Number: 4167
Gerald Gandrup
Type: POC

**For Those With a Mortgage Loan Originated or Serviced by One of the Debtors**:
If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the loan number and property address that the loan relates to in the information and any documentation that you send us, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

**Questions**:
If you have any questions about this letter, or need help in providing the requested information and document(s), you should contact an attorney.  You may also contact the Special Counsel to the Official Committee of Unsecured Creditors[1] with general questions (contact information provided below):

**SPECIAL COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 866-259-5217
Website: http://silvermanacampora.com
E-mail address: rescapborrower@silvermanacampora.com

**You must send the requested information and document(s) supporting your claim on or before the date provided in this letter to either;**

      (i)     **Claims.Management@gmacrescap.com; or**
      (ii)    **Residential Capital, LLC**
               **P.O. Box 385220**
               **Bloomington, Minnesota 55438**

**Please mark each document you send with the Claim Number referenced above.**

Sincerely,

Claims Management
Residential Capital, LLC

---

[1] Please be advised that SilvermanAcampora LLP does not represent you individually and, therefore, cannot provide you with legal advice.

Claim Number: 4167
Gerald Gandrup
Type: POC



MORRISON | FOERSTER

## Claim Information

| Claim Number | 4167 |
|---|---|
| **Basis of Claim**<br><br>Explanation that states the legal and factual reasons why you believe you are owed money or are entitled to other relief from one of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases) and, you **must** provide copies of any and all documentation that you believe supports the basis for your claim. | |

**If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the following loan information, so that we can effectively search our records for information on your property and loan, and evaluate your claim.**

| Loan Number: | | |
|---|---|---|
| **Address of property related to the above loan number:** | | |
| **City:** | **State:** | **ZIP Code:** |

**Additional resources may be found at  -  http://www.kccllc.net/rescap**

Residential Capital, LLC    P.O. Box 385220  Bloomington, MN  55438

Claim Number: 4167
Gerald Gandrup
Type: POC

## Exhibit B

**Deed of Trust**

RECORDED AT THE REQUEST OF
OLD REPUBLIC TITLE COMPANY

2007-0020087

Recording Requested By:
ATLANTIC SAVINGS OF AMERICA

| Recorded Official Records County of Santa Cruz GARY E. HAZELTON Recorder | REC FEE | 78.00 |
| --- | --- | --- |

And After Recording Return To:
ATLANTIC SAVINGS OF AMERICA
5776 STONERIDGE MALL RD #288
PLEASANTON, CALIFORNIA 94588
Loan Number: 0799000202

08:00AM 12-Apr-2007    LTS    Page 1 of 24

0711000170-HL
APN: 024-341-03

——————— [Space Above This Line For Recording Data] ———————

# DEED OF TRUST

**MIN:** 1004778-0799000202-4

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated APRIL 4, 2007 , together with all Riders to this document.
**(B)** **"Borrower"** is GERALD GANDRUP, AN UNMARRIED MAN

Borrower is the trustor under this Security Instrument.
**(C)** **"Lender"** is ATLANTIC SAVINGS OF AMERICA

Lender is a CALIFORNIA CORPORATION organized
and existing under the laws of CALIFORNIA
Lender's address is 5776 STONERIDGE MALL RD #288, PLEASANTON, CALIFORNIA 94588

**(D)** **"Trustee"** is OLD REPUBLIC TITLE CO.
511 WATER STREET, SANTA CRUZ, CALIFORNIA 95060

**(E)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)** **"Note"** means the promissory note signed by Borrower and dated APRIL 4, 2007
The Note states that Borrower owes Lender EIGHT HUNDRED EIGHTY THOUSAND AND 00/100 Dollars (U.S. $ 880,000.00 ) plus interest.

---

Ca3005.mzd

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
**MAY 1, 2037**

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Planned Unit Development Rider | |
| ☒ Balloon Rider | ☐ Biweekly Payment Rider | |
| ☐ 1-4 Family Rider | ☐ Second Home Rider | |
| ☐ Condominium Rider | ☒ Other(s) [specify] | |
| | PREPAYMENT RIDER | |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in
lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note,
plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter. As used in this Security Instrument,
"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan"
even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that
party has assumed Borrower's obligations under the Note and/or this Security Instrument.


## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and
assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of
the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

Cx3005.mzd

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants
and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | SANTA CRUZ | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 024-341-03

which currently has the address of  200 GREGORY COURT

[Street]

SCOTTS VALLEY                    , California        95066        ("Property Address"):

[City]                                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security
Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors
and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose
and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling
this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right
to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any
encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall
pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late
charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due
under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other
instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid,
Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in
one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,
treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured
by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other
location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return
any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender
may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights
hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

Ca3005.mzd

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01 (02/01/07)                                    Page 4 of 14                    *DocMagic* *eForms* 800-649-1362
                                                                                                   www.docmagic.com

Ca3005.mzd

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

---

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01 (02/01/07)                            Page 5 of 14

*DocMagic* **eForms** 800-649-1362
www.docmagic.com

Cx3005.mzd

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

---

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01 (02/01/07)                    Page 6 of 14                    DocMagic *eFoRMs* 800-649-1362
www.docmagic.com

Ca3005.mzd

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Ca3005.mzd

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether

---

Ca3005.mzd

or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires

Ca3005.mzd

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

Ca3005.mzd

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action

---

required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Ca3005.mzd

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.


_____ (Seal)                    _____ (Seal)
GERALD GANDRUP                      -Borrower                                               -Borrower


_____ (Seal)                    _____ (Seal)
                                    -Borrower                                               -Borrower


_____ (Seal)                    _____ (Seal)
                                    -Borrower                                               -Borrower


Witness:                                                    Witness:


_____                          _____

Cs3005.mzd

[Space Below This Line For Acknowledgment]

State of California         )
                            ) ss.
County of _Santa Cruz_      )

On _4-5-07_ before me, _HS Lusk, notary public_

personally appeared _GERALD GANDRUP_

_____

_____ ,

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

```
H.S. LUSK
Comm. 1679885
NOTARY PUBLIC-CALIFORNIA
SANTA CRUZ COUNTY
MY COMMISSION EXPIRES AUG 4, 2010
```

_____
NOTARY SIGNATURE

_H S Lusk_
_____
(Typed Name of Notary)

NOTARY SEAL

**ORDER NO. :** 0711000170-HL

# EXHIBIT A

The land referred to is situated in the County of Santa Cruz, City of Scotts Valley, State of California, and is described as follows:

PARCEL I:

Parcel 3 as shown and so designated on the map of Tract 1511, Forest Hill Reserve Subdivision, filed for record August 4, 2005 in Volume 107 of Maps, at Page 22, Official Records, Santa Cruz County.

PARCEL II:

An undivided 1/5 interest in and to Parcel A as said parcel is shown and so designated on the map of Tract 1511, Forest Hill Reserve Subdivision, filed for record August 4, 2005 in Volume 107 of Maps, at Page 22, Official Records, Santa Cruz County.

# PREPAYMENT RIDER

Loan Number: 0799000202

Date: APRIL 4, 2007

Borrower(s): GERALD GANDRUP


      THIS PREPAYMENT RIDER (the "Rider") is made this 4th    day of APRIL    ,
2007           , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
ATLANTIC SAVINGS OF AMERICA, A CALIFORNIA CORPORATION

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

      200 GREGORY COURT, SCOTTS VALLEY, CALIFORNIA 95066
[Property Address]


      ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.    PREPAYMENT CHARGE
The Note provides for the payment of a prepayment charge as follows:

### 5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE
      I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment." When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
      The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note. However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.
      If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment. However, any reduction due to my partial Prepayment may be offset
by an interest rate increase.

---

CALIFORNIA PREPAYMENT RIDER
(CIVIL CODE PROVISION)
12/13/05                Page 1 of 2                  DocMagic *eForms* 800-649-1362
www.docmagic.com

Capr.ppf

If within THIRTY-SIX ( 36 ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds TWENTY percent ( 20.000 %) of the original principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX ( 6 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds TWENTY percent ( 20.000 %) of the original principal amount of the loan.

If the Note contains provisions for a variable interest rate, the purpose of the loan is to finance the purchase or construction of real property containing four or fewer residential units or on which four or fewer residential units are to be constructed, and the Note Holder is not a "supervised financial organization," as defined in California Civil Code Section 1916.5, then I may prepay the loan in whole or in part without a Prepayment charge within 90 days of notification of any increase in the rate of interest.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)          _____ (Seal)
GERALD GANDRUP          -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                              -Borrower


CALIFORNIA PREPAYMENT RIDER                                              DocMagic eForms 800-649-1362
(CIVIL CODE PROVISION)                                                          www.docmagic.com
12/13/05                                    Page 2 of 2

Capr.ppf

―――――――――――― [Space Above This Line For Recording Data] ――――――――――――

Loan Number: 0799000202

# BALLOON RIDER

THIS BALLOON RIDER is made this 4th day of APRIL, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Note (the "Note") to ATLANTIC SAVINGS OF AMERICA, A
CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

200 GREGORY COURT, SCOTTS VALLEY, CALIFORNIA 95066
[Property Address]

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the
"Note Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The
Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled
to receive payments under the Note is called the "Note Holder."

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security
Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary
contained in the Security Instrument or the Note):

**NOTWITHSTANDING THE 40 YEAR AMORTIZATION PERIOD, THIS LOAN IS
PAYABLE IN FULL ON THE MATURITY DATE. YOU MUST REPAY THE ENTIRE PRINCIPAL
BALANCE OF THE NOTE AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO
OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE
REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU
WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN
WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT
MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY
ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME
LENDER. ACCORDINGLY, IF THIS LOAN HAS NOT BEEN SATISFIED, YOU WILL HAVE A
BALLOON PAYMENT ON THE MATURITY DATE.**

―――――――――――――――――――――――――――――――――――――――――――――――――――

BALLOON RIDER - MULTISTATE
01/01/97

Page 1 of 2

DocMagic *eForms* 800-649-1362
www.docmagic.com

Br.wes

     BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Balloon Rider.


_____ (Seal)          _____ (Seal)
GERALD  GANDRUP            -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                  -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                  -Borrower                                          -Borrower


**BALLOON RIDER - MULTISTATE**
**01/01/97**                        Page 2 of 2                        DocMagic *eForms* 800-649-1362
                                                                    www.docmagic.com

Br.wes

MIN: 1004778-0799000202-4          Loan Number: 0799000202

# ADJUSTABLE RATE RIDER
### (1/MTA or 3/MTA with 40/30 Payment Options)

THIS ADJUSTABLE RATE RIDER is made this **4th** day of **APRIL, 2007**          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to ("Lender") of the same date and covering the property
described in the Security Instrument and located at:

200 GREGORY COURT, SCOTTS VALLEY, CALIFORNIA 95066
[Property Address]

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN
ADJUSTABLE INTEREST RATE.    THIS NOTE LIMITS THE AMOUNT MY
ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE I MUST PAY.**

**THIS NOTE ALSO PROVIDES FOR CHANGES IN MY MINIMUM MONTHLY
PAYMENT. MAKING ONLY THE MINIMUM MONTHLY PAYMENTS DUE UNDER
THIS NOTE COULD RESULT IN THE PRINCIPAL AMOUNT THAT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT
MORE THAN 115.000 % OF THE ORIGINAL AMOUNT (OR $1,012,000.00 ).
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE
OR ANY RIDER TO THIS NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

## A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2.    INTEREST
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Until
the first Interest Rate Change Date, I will pay interest at a yearly rate of        1.000 % (the "Initial
Interest Rate").  The interest rate I will pay may change in accordance with Section 4 of this Note.  The
interest rate calculated in accordance with Section 4 is known as the "Adjustable Interest Rate."
The interest rate required by this Section 2 and Section 4 of this Note is the rate that I will pay both
before and after any default described in Section 6(B) of this Note.

Usbmta.ff5

### 3. PAYMENTS AND PAYMENT CHANGES

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month. In this Note, "payments" refers to Principal and interest payments only, although other charges, such as taxes, insurance, late charges, or other charges may also be payable with my monthly payment.

I will make my monthly payments on the 1st day of each month beginning on JUNE 1, 2007, and on that day every month thereafter. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 5776 STONERIDGE MALL RD #288, PLEASANTON, CALIFORNIA 94588

or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Minimum Payments

The minimum amount that I may pay and avoid a default, as described under Section 7(B) of this Note, is referred to as the "Minimum Payment." Each of my monthly payments until the first Payment Change Date, as defined in Section 3(D) of this Note, will be in the amount of U.S. $2,225.13 (the "Initial Minimum Payment"). This amount is calculated to fully amortize the Principal balance in full by the Amortization Date based upon the amount of interest that will accrue each month at a rate equal to the Initial Interest Rate. The Amortization Date is the date that is 120 months after the Maturity Date. Because the Initial Interest Rate may be lower than the Adjustable Interest Rate that I will owe starting on the first Interest Rate Change Date, if I pay only the Initial Minimum Payment, accrued but unpaid interest may be added to the Principal amount. This practice is known as "Negative Amortization." Negative Amortization may also occur because the Adjustable Interest Rate may change more frequently than my Minimum Payment is recalculated in accordance with this Section 3.

#### (C) Payment Options

The Note Holder may provide me with up to three (3) additional payment options (the "Payment Options") in addition to my Minimum Payment. I will be able to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

> (i) **Interest Only Payment:** The amount that would pay the interest portion of the monthly payment at the Full Interest Rate. This Payment Option will not increase or decrease the Principal balance and it is only available if the interest portion exceeds the Minimum Payment.

> (ii) **Fully Amortizing Payment:** The amount necessary to pay the unpaid Principal balance that I owe in full at the Maturity Date at the Full Interest Rate in substantially equal monthly payments.

> (iii) **15 Year Amortizing Payment:** The amount necessary to pay the unpaid Principal balance that I owe in full within a fifteen (15) year term from the first payment due date at the Full Interest Rate in substantially equal monthly payments.

#### (D) Payment Change Dates

A date on which my Minimum Payment changes is referred to as a "Payment Change Date." Effective every year commencing JUNE 1, 2008, and on the same date each twelfth month

---

ADJUSTABLE RATE RIDER
(1/MTA OR 3/MTA WITH 40/30 PAYMENT OPTIONS)
08/18/06                                          Page 2 of 5

DocMagic *eForms* 800-649-1362
www.docmagic.com

Usbrmta.ff5

thereafter until the fifth anniversary of my first monthly payment or until the Recast Date referred to in
Section 3(G) is reached, the Note Holder will determine the amount of the monthly payment that would be
sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in
full on the Amortization Date at the interest rate in effect on the Payment Change Date in substantially equal
monthly payments. The result of this calculation will be my new Minimum Payment, subject to the Payment
Adjustment Limitations described in Section 3(E) below, and I will make payments in this new amount until
the next Payment Change Date unless my payments are changed earlier under Section 3(G) of this Note.

**(E) Payment Adjustment Limitations**

Unless Section 3(G) or 3(H) below apply, the amount of my new monthly payment, beginning with
a Payment Change Date, will be limited to 7 ½ % more or less than the amount that I have been paying.
This payment cap applies only to the Principal and interest payment and does not apply to any escrow
payments Lender may require under the Security Instrument.

**(F) Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the Minimum
Payment is subject to the payment limitations described in Section 3(E), my Minimum Payment could be
lower or greater than the amount of the amount of the interest portion of the monthly payment that would
be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Amortization
Date in substantially equal monthly payments. For each month that I pay the Minimum Payment and the
Minimum Payment is less than the interest portion, the Note Holder will subtract the Minimum Payment
from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will
accrue on the amount of this difference at the then current interest rate. For each month that I pay the
Minimum Payment and the Minimum Payment is greater than the interest portion, the Note Holder will apply
the excess towards a principal reduction of the Note.

**(G) Maximum Principal Balance; Increased Minimum Payment**

My unpaid Principal can never exceed the Maximum Principal Balance, which is equal to
115.000          % of the Principal amount I originally borrowed. If on any payment due date, the
Principal balance that I owe would exceed the Maximum Principal Balance if I pay the Minimum Payment,
then the Note Holder will calculate a new Minimum Payment, which will be equal to the amount necessary
to pay the unpaid Principal balance that I owe in full at the Amortization Date at the interest rate in effect
the month prior to the payment due date in substantially equal monthly payments. Because the Amortization
Date is after the Maturity Date, I will owe a balloon payment on the Maturity Date if I continue to pay only
the Minimum Payment due. Please refer to the Balloon Payment Disclosure for additional information
regarding this loan feature. A date that the Note Holder recalculates my Minimum Payment in accordance
with this Section 3(G) is known as a Recast Date. The new Minimum Payment will remain my Minimum
Payment until the next Interest Rate Change Date referred to in Section 4(A) and will adjust monthly
thereafter.

**(H) Required Full Monthly Payment**

If the Recast Date does not occur before the fifth anniversary of the due date of the first monthly
payment, the Minimum Payment will be adjusted on the fifth anniversary of the due date of the first monthly
payment without regard to the Payment Adjustment Limitation in Section 3(E). My new Minimum Payment
will be equal to the amount necessary to pay the unpaid Principal balance that I owe in full at the
Amortization Date at the interest rate in effect the month prior to the payment due date in substantially equal
monthly payments. Because the Amortization Date is after the Maturity Date, I will owe a balloon payment
on the Maturity Date if I continue to pay only the Minimum Payment due. Please refer to the Balloon
Payment Disclosure for additional information regarding this loan feature. The new Minimum Payment will

---

Usbrmia.ff5

remain my Minimum Payment until the next Interest Rate Change Date referred to in Section 4(A) and will adjust monthly thereafter.

**(I) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**(J) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the Minimum Payment amount as described in this Note, regardless of any notice requirement, I agree that the Note Holder may, upon discovery of such failure, then make the adjustment as if it had been made on time. I also agree not to hold the Note Holder responsible for any damages to me which may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

## 4. ADJUSTABLE INTEREST RATE

**(A) Interest Rate Change Dates**

The interest rate that I will pay will change on the 1st day of JUNE, 2007 and this Adjustable Interest Rate will change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

**(B) The Index**

Beginning with the first Interest Rate Change Date, my Adjustable Interest Rate will be based on an Index. The "Index" is the Twelve Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of date 15 days before each Interest Rate Change Date is called the "Current Index." If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new Interest Rate by adding THREE AND 750/1000 percentage point(s) ( 3.750 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

The Note Holder will then determine the amount of the Minimum Payment in accordance with Section 3 of this Note.

**(D) Limits on Interest Rate Changes**

The interest rate that I am required to pay at the first Interest Rate Change Date will not be greater than 9.950 % or less than 3.750 %. My interest rate will never be greater than 9.950 %. My interest rate will never be less than 3.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date.

---

Usbmts.fl5

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                 _____ (Seal)
GERALD  GANDRUP                -Borrower                                                             -Borrower


_____ (Seal)                 _____ (Seal)
                                                 -Borrower                                                             -Borrower


_____ (Seal)                 _____ (Seal)
                                                 -Borrower                                                             -Borrower

ADJUSTABLE RATE RIDER
(1/MTA OR 3/MTA WITH 40/30 PAYMENT OPTIONS)
08/18/06                                                             Page 5 of 5

DocMagic *EForms* 800-649-1362
www.docmagic.com

Usbrmta.f5

# Exhibit C

**Substitution of Trustee**

RECORDING REQUESTED BY:

THIS IS TO CERTIFY THAT THIS IS A FULL,
TRUE AND CORRECT COPY OF THE ORIGINAL
RECORDED IN THE OFFICE OF THE COUNTY

RECORDING FEE: __$21.00__

LSI TITLE COMPANY, INC.

RECORDED ON: __August 23, 2010__

AS DOCUMENT NO: __10-33190__

ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
(818) 260-1600

BY: __s/ JEREMY RUACHO__
FIDELITY NATIONAL TITLE INSURANCE CO. (LSI DIVISION)

TS NO : GM-220283-C
LOAN NO : 0359499847

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBSTITUTION OF TRUSTEE

WHEREAS, GERALD GANDRUP, AN UNMARRIED MAN was the original Trustor, OLD REPUBLIC TITLE CO was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ATLANTIC SAVINGS OF AMERICA, A CALIFORNIA CORPORATION was the original Beneficiary under that certain Deed of Trust dated 4/4/2007 and recorded on 4/12/2007 as Instrument No. 2007-0020087, in Book , Page   of Official Records of Santa Cruz County, California; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

NOW, THEREFORE, the undersigned desires to substitute Executive Trustee Services, LLC dba ETS Services, LLC, as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Dated : 8/19/2010

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

DONNA FITTON,  ASSISTANT SECRETARY

State of California} ss.
County of Los Angeles }

On 8/19/2010 before me, Dee C. Ortega Notary Public, personally appeared Donna Fitton who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
Dee C. Ortega

DEE C. ORTEGA
Commission # 1892426
Notary Public - California
Los Angeles County
My Comm. Expires Jun 12, 2014

## Exhibit D

**Payment Records**

| Account Number | Trans Added Date | Interest Paid Current | Prin Bal after trans | Transaction Description | Trans Type | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0359499847 | 04/30/2010 | 04/01/2010 | $966,978.60 | PAYMENT | AP | $4,103.85 | ($820.61) | $3,392.02 | $1,532.44 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 04/05/2010 | 03/01/2010 | $966,157.99 | PAYMENT | AP | $4,103.85 | ($824.15) | $3,395.56 | $1,532.44 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 04/05/2010 | 03/01/2010 | $966,157.99 | PAYMENT | SRA | $128.57 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $128.57 |
| 0359499847 | 02/26/2010 | 01/01/2010 | $964,504.57 | PAYMENT | PR3 | ($4,103.85) | $829.27 | ($3,400.68) | ($1,532.44) | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 02/26/2010 | 02/01/2010 | $965,333.84 | PAYMENT | PR3 | ($4,360.99) | $824.15 | ($3,395.56) | ($1,532.44) | $0.00 | $0.00 | $0.00 | ($257.14) |
| 0359499847 | 02/26/2010 | 02/01/2010 | $965,333.84 | PAYMENT | RP | $4,360.99 | ($829.27) | $3,400.68 | $1,532.44 | $0.00 | $0.00 | $0.00 | $257.14 |
| 0359499847 | 02/24/2010 | 01/01/2010 | $964,504.57 | PAYMENT | AP | $1,001.18 | ($876.77) | $3,448.18 | $2,533.62 | $0.00 | ($4,103.85) | $0.00 | $0.00 |
| 0359499847 | 02/24/2010 | 02/01/2010 | $965,333.84 | PAYMENT | AP | $4,103.85 | ($829.27) | $3,400.68 | $1,532.44 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 02/24/2010 | 03/01/2010 | $966,157.99 | PAYMENT | AP | $4,360.99 | ($824.15) | $3,395.56 | $1,532.44 | $0.00 | $0.00 | $0.00 | $257.14 |
| 0359499847 | 02/19/2010 | 12/01/2009 | $963,627.80 | PAYMENT | SR | $4,103.85 | $0.00 | $0.00 | $0.00 | $0.00 | $4,103.85 | $0.00 | $0.00 |
| 0359499847 | 12/28/2009 | 12/01/2009 | $963,627.80 | PAYMENT | AP | $5,105.03 | ($943.99) | $3,515.40 | $2,533.62 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 12/28/2009 | 12/01/2009 | $963,627.80 | PAYMENT | SRA | $128.57 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $128.57 |
| 0359499847 | 11/04/2009 | 11/01/2009 | $962,683.81 | PAYMENT | AP | $3,132.70 | ($1,041.16) | $3,612.57 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 10/13/2009 | 10/01/2009 | $961,642.65 | PAYMENT | AP | $3,132.70 | ($1,151.29) | $3,722.70 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 09/10/2009 | 09/01/2009 | $960,491.36 | PAYMENT | AP | $3,132.70 | ($1,266.29) | $3,837.70 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 08/10/2009 | 08/01/2009 | $959,225.07 | PAYMENT | AP | $3,132.70 | ($1,387.65) | $3,959.06 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 07/01/2009 | 07/01/2009 | $957,837.42 | PAYMENT | AP | $3,132.70 | ($1,485.12) | $4,056.53 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 06/01/2009 | 06/01/2009 | $956,352.30 | PAYMENT | AP | $3,132.70 | ($1,557.28) | $4,128.69 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 04/29/2009 | 05/01/2009 | $954,795.02 | PAYMENT | AP | $2,953.30 | ($1,788.51) | $4,180.52 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 04/06/2009 | 04/01/2009 | $953,006.51 | PAYMENT | AP | $2,953.30 | ($1,874.61) | $4,266.62 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 02/27/2009 | 03/01/2009 | $951,131.90 | PAYMENT | AP | $2,953.30 | ($2,015.84) | $4,407.85 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 01/28/2009 | 02/01/2009 | $949,116.06 | PAYMENT | AP | $2,953.30 | ($2,187.18) | $4,579.19 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |

| Account Number | Trans Added Date | Interest Paid Current | Prin Bal after trans | Transaction Description | Trans Type | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0359499847 | 12/26/2008 | 01/01/2009 | $946,928.88 | PAYMENT | AP | $2,953.30 | ($2,335.68) | $4,727.69 | $561.29 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 11/26/2008 | 12/01/2008 | $944,593.20 | PAYMENT | AP | $2,392.01 | ($2,498.25) | $4,890.26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 10/27/2008 | 11/01/2008 | $942,094.95 | PAYMENT | AP | $2,392.01 | ($2,630.21) | $5,022.22 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 09/25/2008 | 10/01/2008 | $939,464.74 | PAYMENT | AP | $2,392.01 | ($2,764.52) | $5,156.53 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 08/25/2008 | 09/01/2008 | $936,700.22 | PAYMENT | AP | $2,392.01 | ($2,921.97) | $5,313.98 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 07/30/2008 | 08/01/2008 | $933,778.25 | PAYMENT | AP | $2,392.01 | ($3,068.16) | $5,460.17 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 06/23/2008 | 07/01/2008 | $930,710.09 | PAYMENT | RP | $2,392.01 | ($3,233.14) | $5,625.15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 05/21/2008 | 06/01/2008 | $927,476.95 | PAYMENT | AP | $2,392.01 | ($3,417.25) | $5,809.26 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 04/18/2008 | 05/01/2008 | $924,059.70 | PAYMENT | AP | $2,225.13 | ($3,776.65) | $6,001.78 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 03/24/2008 | 04/01/2008 | $920,283.05 | PAYMENT | AP | $2,225.13 | ($3,941.85) | $6,166.98 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 02/18/2008 | 03/01/2008 | $916,341.20 | PAYMENT | AP | $2,225.13 | ($4,063.50) | $6,288.63 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 01/28/2008 | 02/01/2008 | $912,277.70 | PAYMENT | AP | $2,225.13 | ($4,140.91) | $6,366.04 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 12/20/2007 | 01/01/2008 | $908,136.79 | PAYMENT | AP | $2,225.13 | ($4,206.34) | $6,431.47 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 11/16/2007 | 12/01/2007 | $903,930.45 | PAYMENT | AP | $2,225.13 | ($4,232.45) | $6,457.58 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 10/16/2007 | 11/01/2007 | $899,698.00 | PAYMENT | AP | $2,225.13 | ($4,254.15) | $6,479.28 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 09/20/2007 | 10/01/2007 | $895,443.85 | PAYMENT | AP | $2,225.13 | ($4,260.46) | $6,485.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 08/13/2007 | 09/01/2007 | $891,183.39 | PAYMENT | AP | $2,225.13 | ($4,245.82) | $6,470.95 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 07/27/2007 | 08/01/2007 | $886,937.57 | PAYMENT | AP | $2,225.13 | ($4,227.48) | $6,452.61 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 06/28/2007 | 06/01/2007 | $878,508.20 | PAYMENT | PR0 | ($2,225.13) | $4,201.89 | ($6,427.02) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 06/28/2007 | 06/01/2007 | $878,508.20 | PAYMENT | PT | $2,225.13 | $0.00 | $0.00 | $0.00 | $0.00 | $2,225.13 | $0.00 | $0.00 |
| 0359499847 | 06/28/2007 | 06/01/2007 | $878,508.20 | PAYMENT | RT | ($2,225.13) | $0.00 | $0.00 | $0.00 | $0.00 | ($2,225.13) | $0.00 | $0.00 |
| 0359499847 | 06/28/2007 | 06/01/2007 | $878,508.20 | PAYMENT | SR | $2,225.13 | $0.00 | $0.00 | $0.00 | $0.00 | $2,225.13 | $0.00 | $0.00 |
| 0359499847 | 06/28/2007 | 07/01/2007 | $882,710.09 | PAYMENT | PA | $0.00 | ($4,201.89) | $6,427.02 | $0.00 | $0.00 | ($2,225.13) | $0.00 | $0.00 |
| 0359499847 | 06/19/2007 | 07/01/2007 | $882,710.09 | PAYMENT | AP | $2,225.13 | ($4,201.89) | $6,427.02 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0359499847 | 05/16/2007 | 06/01/2007 | $878,508.20 | PAYMENT | AP | $2,225.13 | $1,491.80 | $733.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**Exhibit E**

**Notice of Default**



2010-0033190 08/23/2010 01:15:35 PM

OFFICIAL RECORDS OF Santa Cruz County
Sean Saldavia Recorder
RECORDING FEE: $21.00
COUNTY TAX: $0.00
CITY TAX: $0.00

NDEF
2 PGS
RCD135

**RECORDING REQUESTED BY:**

LSI TITLE COMPANY, INC.

**WHEN RECORDED MAIL TO:**
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No. : GM-220283-C    Loan No.: 0359499847

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$19,491.62** as of  **8/19/2010,**  and will increase until your account becomes current.  While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
C/O ETS Services, LLC
**2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
(818) 260-1600 phone**

**Page 2 of 2**

12-12020-mg   Doc 6778-3   Filed 04/11/14   Entered 04/11/14 18:35:03   Exhibit 3 -
Case 5:Doc 000853-3   Filed 04/11/14   Document 15-3   Filed 05/05/11   Page 3 of 5
Delehey Declaration     Pg 49 of 128

TS NO.: GM-220283-C          LOAN NO.: 0359499847

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.**

## Remember,  YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN:  That **Executive Trustee Services, LLC dba ETS Services, LLC** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated  **4/4/2007** , executed by **GERALD GANDRUP, AN UNMARRIED MAN,** as Trustor, to secure certain obligations in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ATLANTIC SAVINGS OF AMERICA,  A CALIFORNIA CORPORATION,** as beneficiary, recorded **4/12/2007**, as Instrument No. **2007-0020087**, in Book , Page ,  of Official Records in the Office of the Recorder of **Santa Cruz** County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **ONE NOTE FOR THE ORIGINAL** sum of  **$880,000.00** ; that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 5/1/2010 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

**The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with California Civil Code Section 2923.5 by making contact with the borrower or tried with due diligence to contact the borrower as required by California Civil Code Section 2923.5.**

**Dated: 8/19/2010**

                              **ETS Services, LLC as Agent for Beneficiary**


BY: _____

**Neda Cayco**
**TRUSTEE SALE OFFICER**

## **Exhibit F**

**Notice of Trustee's Sale**

2010-0049026  11/23/2010  11:14:32 AM
OFFICIAL RECORDS OF Santa Cruz County
Sean Saldavia Recorder
RECORDING FEE: $21.00
COUNTY TAX: $0.00
CITY TAX: $0.00

NTSA
2 PGS
RCD135

RECORDING REQUESTED BY
ETS Services, LLC

AND WHEN RECORDED MAIL TO:
ETS Services, LLC
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

T.S. No. GM-220283-C        Investor No. **115362784**
Loan No. **0359499847**

SPACE ABOVE THIS LINE FOR RECORDER'S Use

*100499972*   **NOTICE OF TRUSTEE'S SALE**

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 4/4/2007.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

TRUSTOR:**GERALD GANDRUP, AN UNMARRIED MAN**
Recorded 4/12/2007 as Instrument No. **2007-0020087** in Book , page  of
Official Records in the office of the Recorder of **Santa Cruz** County, California,
Date of Sale:**12/17/2010 at 1:30 PM**
Place of Sale:    **At the Ocean Street entrance to the Administration Build-ing, 701 Ocean Street, Santa Cruz, California**
Property Address is purported to be:    **200 GREGORY COURT**
                                        **SCOTTS VALLEY, California 95066**

APN #:  **024-341-03**

The total amount secured by said instrument as of the time of initial publication of this notice is **$1,017,933.00**, which includes the total amount of the unpaid balance (including accrued and unpaid interest) and reasonable estimated costs, expenses, and advances at the time of initial publication of this notice.

Pursuant to California Civil Code §2923.54 the undersigned, on behalf of the beneficiary, loan servicer or authorized agent, declares as follows:

[ 1 ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed;
[ 2 ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55.

T.S. No. **GM-220283-C**
Loan No. **0359499847**
Investor No. **115362784**

Date: **11/22/2010**

**ETS Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**
**Sale Line: 714-730-2727**

Christine Gomez-Schwab, **TRUSTEE SALE OFFICER**

## Exhibit G

**Trustee's Deed Upon Sale**

12-12020-mg Doc 6770-3 Filed 04/11/14 Entered 04/11/14 18:35:02 Exhibit 3 -
Case 5:12-cv-00859-EJD Document56-9 Filed 10/06/14 Page2 of 4
Delehey Declaration    Pg 54 of 128

Page 1 of 3

RECORDING REQUESTED BY:
**Executive Trustee Services, LLC dba ETS Services, LLC**

AND WHEN RECORDED MAIL TO:
**GMAC MORTGAGE, LLC**
**FKA GMAC MORTGAGE CORPORATION**
**1100 VIRGINIA DRIVE**
**FORT WASHINGTON, PA 19034**

Forward Tax Statements to
the address given above



```
2011-0020677  05/19/2011  11:00:07 AM
OFFICIAL RECORDS OF Santa Cruz County
           Sean Saldavia Recorder
RECORDING FEE: $21.00
    COUNTY TAX: $0.00
      CITY TAX: $0.00
                                          TDEE
                                          3 PGS
                                          RCD135
```

_____

SPACE ABOVE LINE FOR RECORDER'S USE

TS # GM-220283-C
LOAN # 0359499847      **INVESTOR #: 115362784**
TITLE ORDER # 100499972-CA-MSO

## TRUSTEE'S DEED UPON SALE

APN 024-341-03      TRANSFER TAX: $00.00
"THIS TRANSACTION IS EXEMPT FROM THE REQUIREMENTS OF THE REVENUE AND TAXATION CODE, SECTION 480.3"
The Grantee Herein **Was** The Foreclosing Beneficiary.
The Amount Of The Unpaid Debt was **$1,034,827.84**
The Amount Paid By The Grantee was **$697,500.00**
Said Property Is In The City Of **SCOTTS VALLEY**, County of **Santa Cruz**

**Executive Trustee Services, LLC dba ETS Services, LLC**, as Trustee, (whereas so designated in the Deed of Trust
hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

## HSBC Bank USA, NA as trustee of DBALT 2007-OA4

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and
now held by it as Trustee under the Deed of Trust in and to the property situated in the county of **Santa Cruz**, State of
California, described as follows:

**See exhibit "A" attached hereto and made a part hereof**

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **GERALD
GANDRUP, AN UNMARRIED MAN** as Trustor, dated **04/04/2007** of the Official Records in the office of the Recorder of
**Santa Cruz**, California under the authority and powers vested in the Trustee designated in the Deed of Trust or as the
duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Default and Election to
Sell under the Deed of Trust recorded on **04/12/2007**, instrument number **2007-0020087** (or Book , Page ) of Official
records. Trustee having complied with all applicable statutory requirements of the State of California and performed all
duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its
recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each
person entitled to notice in compliance with California Civil Code 2924b.

[Page 1 of 2]

12-12020-mg5-Doc-6778-3 - Filed 04/11/14 - Entered 04/11/14 18:35:02 - Exhibit 3 -
Case 5:12-cv-00859-EJD Document56-3 Filed 04/06/12 Page3 of 4
Delehey Declaration    Pg 55 of 128

Page 2 of 3

## EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SCOTTS VALLEY, COUNTY OF
SANTA CRUZ, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL I:

Parcel 3 as shown and so designated on the map of Tract 1511, Forest Hill Reserve Subdivision, filed for
record August 4, 2005 in Volume 107 of Maps, at Page 22, Official Records, Santa Cruz County.

PARCEL II:

An undivided 1/5 interest in and to Parcel A as said parcel is shown and so designated on the map of
Tract 1511, Forest Hill Reserve Subdivision, filed for record August 4, 2005 in Volume 107 of Maps, at
Page 22, Official Records, Santa Cruz County.

APN: 024-341-03(PARCEL I), 024-341-06(PARCEL II)

## TRUSTEE'S DEED UPON SALE

Trustee's Deed
T.S.# **GM-220283-C**
Loan # **0359499847**
Title Order # **100499972-CA-MSO**

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies of Notice of
Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of
Trustee's Sale have been complied with.  Trustee, in compliance with said Notice of Trustee's sale and in exercise of its
powers under said Deed of Trust sold said real property at public auction on **04/04/2011**.  Grantee, being the highest
bidder at said sale became the purchaser of said property for the amount bid, being  **$697,500.00**, in lawful money of the
United States, in pro per, receipt there of is hereby acknowledged in full/partial satisfaction of the debt secured by said
Deed of Trust.

In witness thereof, **Executive Trustee Services, LLC dba ETS Services, LLC**, as Trustee, has this day, caused its
name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws

Date: 5/12/11

"This instrument is being recorded as an
ACCOMMODATION ONLY, with no
Representation as to its effect upon title"

**Executive Trustee Services, LLC dba ETS Services, LLC**

By: _____
Maria Reyes, Authorized Officer

**State of California**        } **S.S.**
**County of Los Angeles**  }

On ___5 12 11___ before me, **Sally Beltran** Notary Public, personally appeared **Maria Reyes** who proved to me
on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
**Sally Beltran**

> SALLY BELTRAN
> Commission # 1777085
> Notary Public - California
> Los Angeles County
> My Comm. Expires Oct 30, 2011

(Seal)

[Page 2 of 2]

## Exhibit H

**Dismissal Order**

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| GERALD GANDRUP, | CASE NO. 5:11-cv-00659 EJD |
|---|---|
| Plaintiff(s), | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| GMAC MORTGAGE, LLC, et. al., | |
| Defendant(s). | [Docket Item No(s). 22] |
| _____/ | |

## I.   INTRODUCTION

In 2007, Plaintiff Gerald Grandrup ("Plaintiff") executed a Deed of Trust in the amount of $880,000.00 to purchase real property located in Scotts Valley, California.  Plaintiff defaulted on the underlying loan and foreclosure proceedings were initiated.  The property was eventually sold at a trustee's sale on April 4, 2011.  Plaintiff commenced the instant action before the trustee's sale was completed alleging irregularities in the foreclosure process, and filed an amended complaint ("FAC") on September 23, 2011.  See Docket Item No. 20.

Presently before the court is a motion to dismiss the FAC filed by Defendants GMAC Mortgage, LLC and ETS Services, LLC ("Defendants").  See Docket Item No. 22.  Plaintiff filed written opposition to the motion.  See Docket Item No. 24.  The court has carefully reviewed the relevant documents.[1]  For the reasons stated below, Defendants' motion to dismiss is granted.

---

[1] The court was able to reach the decisions contained in this Order without reference to Defendants' Request for Judicial Notice.

1

Case No. 5:11-cv-00659 EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Twombly, 550 U.S. at 556-57.

Claims which sound in fraud are subject to a heightened pleading standard. Fed. R. Civ. Proc. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007) ("Rule 9(b) imposes heightened pleading requirements where 'the object of the conspiracy is fraudulent.'"). The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). To that end, the allegations must contain "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz, 476 F.3d at 764. In other words, these claims must generally contain more specific facts than is necessary to support other causes of action.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). The court must generally accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1988). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice.

**United States District Court**
For the Northern District of California

Case No. 5:11-cv-00659 EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1  See Lee v. City of Los Angeles, 250 F.3d 668, 688-69 (9th Cir. 2001). "[Material which is properly

2  submitted as part of the complaint may be considered." Twombly, 550 U.S. at 555. But "courts are

3  not bound to accept as true a legal conclusion couched as a factual allegation." Id.

### III.    DISCUSSION

5  The FAC contains ten claims: (1) violation of the Truth in Lending Act ("TILA"), 15 U.S.C.

6  § 1601 et. seq., (2) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §

7  2601 et. seq., (3) fraud, (4) unjust enrichment, (5) violation of the Racketeer Influenced and Corrupt

8  Organizations Act ("RICO"), 18 U.S.C. § 1961 et. seq., (6) breach of security instrument, (7)

9  wrongful foreclosure, (8) quiet title, (9) rescission, and (10) invasion of privacy. Each is subject to

10  dismissal.

### A.    Claim 1: TILA

12  Plaintiff alleges that all Defendants violated TILA by failing to disclose certain charges and

13  other information on the loan documents. See FAC, at ¶¶ 104, 108. Plaintiff also alleges that

14  Defendants improperly calculated the annual percentage rate. See id., at ¶¶ 104, 105. He seeks both

15  damages and rescission for the alleged TILA violations. See id., at ¶ 120.

16  The factual allegations contained in the FAC raise the issue of timeliness. This is because

17  under TILA, a claim for damages must be brought within one year from the date of the signing of

18  the loan documents. 15 U.S.C. § 1640(e); Meyer v. Ameriquest Mortg. Co., 342 F.3d 899, 902 (9th

19  Cir. 2003). A claim for rescission must be brought within three years of the same date. 15 U.S.C. §

20  1635(f).

21  Here, Plaintiff alleges his mortgage loan was finalized in 2007, and the Deed of Trust

22  attached to the FAC confirms that Plaintiff signed that document on April 5, 2007. See FAC, at ¶

23  18; Ex. A. As such, a timely claim for damages under TILA should have been filed no later than

24  April, 2008, and a timely claim for rescission should have been filed no later than April, 2010.

25  Since Plaintiff did not file this action until February 14, 2011, the request for rescission under TILA

26  is absolutely barred because that claim cannot be equitably tolled. See Beach v. Ocwen Fed. Bank,

27  523 U.S. 410, 412 (1998) ("[TILA] provides, however, that the borrower's right of rescission 'shall

28  expire three years after the date of consummation of the transaction or upon the sale of the property,

**United States District Court**
For the Northern District of California

3

United States District Court

For the Northern District of California

1   whichever occurs first,' even if the required disclosures have never been made.").

2       A request for damages under TILA, however, is only presumptively time-barred absent

3   allegations that support an equitable exception. 15 U.S.C. § 1640(e); <u>King v. California</u>, 784 F.2d

4   910, 915 (9th Cir. 1986); <u>see also</u> <u>Beach</u>, 523 U.S. at 417-18 (discussing the "stark" difference in the

5   limiting language of § 1640(e) and § 1635(f)). "Equitable tolling is generally applied in situations

6   where the claimant has actively pursued his judicial remedies by filing a defective pleading during

7   the statutory period, or where the complainant has been induced or tricked by his adversary's

8   misconduct into allowing the filing deadline to pass." <u>O'Donnell v. Vencor, Inc.</u>, 465 F. 3d 1063,

9   1068 (9th Cir. 2006) (internal quotations omitted).

10      Plaintiff does not disagree that the claim under TILA is untimely, but attempts to invoke the

11  doctrine of equitable tolling in both the FAC and his opposition to the motion to dismiss.

12  Specifically, Plaintiff alleges that he "first learned of the actions of Defendants, including their

13  failure to disclose and the fraud committed upon *her* [sic] on or about November 2010." <u>See</u> FAC,

14  at ¶ 110 (emphasis added). This allegation and those related to it, however, are insufficient to

15  support an exception to the limitations period provided by TILA. Indeed, the inadequacy of

16  allegations nearly identical to those stated in this pleading have already been pointed out by one of

17  this court's contemporaries:

18          Plaintiff argues, in his opposition, that he "is a lay person . . . [who]
            reasonably relied upon the representations of the Defendants in
19          agreeing to execute the mortgage loan documents," and that "a
            reasonable person would not have been able to discover the alleged
20          violations as the actions by Defendants . . . were matters of
            Defendants' internal business and accounting to which an average
21          person has no access." . . . Even if those assertions are credited,
            Plaintiff has still failed to allege any facts either: (1) explaining why
22          he had no reasonable opportunity to discover the facts underlying the
            alleged violations within the statutory period, when he was apparently
23          able to discover the violations thereafter; or (2) showing diligence on
            his part in attempting to discover the facts underlying the alleged
24          violations. Plaintiff's TILA and HOEPA damages claims are therefore
            dismissed, without prejudice.

25

26  <u>Ohlendorf v. Am. Brokers Conduit</u>, No. CIV. S-11-293 LKK/EFB, 2012 U.S. Dist. LEXIS 28862, at

27

28

4

Case No. 5:11-cv-00659 EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1    *21-22, 2012 WL 718682 (E.D. Cal. Mar. 5, 2012).[2]

2        The court rejects Plaintiff's tolling allegations for the same reasons explained by the court in

3    Ohlendorf.  The TILA claim is therefore dismissed.  Leave to amend is permitted only to the extent

4    Plaintiff seeks damages under that statute.

5        **B.    Claim 2:  RESPA**

6        Plaintiff alleges Defendants violated § 2607 of RESPA when they "accepted charges for the

7    rendering of real estate services which were in fact charges for other than services actually

8    performed."  See FAC, at ¶ 123.

9        Like the TILA claim, the claim under RESPA is time-barred as plead.  See Patague v. Wells

10   Fargo Bank, N.A., No. 10-03460, 2010 U.S. Dist. LEXIS 124980, at *9-10, 2010 WL 4695480

11   (N.D. Cal. Nov. 5, 2010) ("The statute of limitations for a RESPA claim is three years for violations

12   of 12 U.S.C. § 2605 and one year for violations of § 2607 or 2608 'from the date of the occurrence

13   of the violation[.]'").  Again, the loan transaction at issue here took place in April, 2007.  From that

14   date, a timely claim under § 2607 should have been filed in or before April, 2008.  Since this case

15   was not commenced until nearly a year later, this claim is untimely.  The allegations seeking

16   ─────────────────────

17       [2] A survey of orders involving plaintiffs represented by the attorney currently representing
     Plaintiff in this case, Holly S. Burgess, reveals a pattern in the context of equitable tolling

18   allegations.  It appears Ms. Burgess has included identical allegations of equitable tolling in nearly
     every complaint filed on behalf of those plaintiffs - about 20 cases so far - regardless of whether the

19   allegations coincide with the actual facts.  In fact, most cases include an alleged discovery date of
     November, 2010, for whatever reason.  See, e.g., Shapiro v. Bank of America, N.A., No.

20   2:11-CV-00576-JAM-CKDI, 2012 U.S. Dist. LEXIS 26414, at *6-8 (E.D. Cal. Feb. 29, 2012)
     ("Plaintiff pled that he first learned of Defendants' actions in November 2010 because the alleged

21   non-disclosures and fraudulent actions of Defendants were not apparent from the face of the loan
     documents."); Klepac v. CTX Mortg. Co., LLC, No. 2:11-cv-00752-GEB-GGH, 2012 U.S. Dist.

22   LEXIS 25640, at *10, WL CITE (E.D. Cal. Feb. 28, 2012) ("Plaintiffs first learned of the actions of
     Defendants, including their failure to disclose and the fraud committed upon them in November of

23   2010."); King v. Capitol Commerce Mortg. Co., No. 2:11-cv-01225-MCE-DAD, 2012 U.S. Dist.
     LEXIS 5368, at *8, WL Cite (E.D. Cal. Jan. 11, 2012).

24
         The court makes note of this pattern for two reasons.  First, it reinforces the inadequacy of

25   the tolling allegations for this case because numerous courts have rejected them previously.  Second,
     it provides reason to remind counsel that she has an affirmative duty pursuant to Federal Rule of

26   Civil Procedure 11(b)(3) to ensure that "the factual contentions have evidentiary support or, if
     specifically so identified, will likely have evidentiary support after a reasonable opportunity for

27   further investigation or discovery."  The court therefore advises Ms. Burgess that, should Plaintiff
     choose to file an amended complaint, the use of boilerplate allegations copied from previously filed

28   pleadings in other cases, without any verification as to the applicability of those allegations to the
     instant action, may lead to the imposition of sanctions.

Case No. 5:11-cv-00659 EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1   equitable tolling of the RESPA filing deadline are rejected for the same reasons discussed under the

2   TILA claim.  The claim for violation of RESPA is dismissed with leave to amend.

3       **C.**    **Claim 3: Fraud**

4       Within the claim for common law fraud, Plaintiff alleges that Defendants "disguised" his

5   loan transaction to "create the appearance of a 'straw lender,'" when in fact "the real party in interest

6   was not disclosed to plaintiff."  See FAC, at ¶ 129.  According to Plaintiff, this fraudulent scheme

7   "was in actuality a plan to trick plaintiff into signing what would become a negotiable security used

8   to sell unregulated securities under fraudulent and changed terms from the original notes."  See id.,

9   at ¶ 136.

10       In California, the elements of fraud are: (1) misrepresentation; (2) knowledge of falsity; (3)

11   intent to defraud or to induce reliance (4) justifiable reliance; and (5) resulting damage.  Engalla v.

12   Permanente Med. Group, Inc., 15 Cal. 4th 951, 974 (1997).  Although the court looks to state law to

13   determine if the elements of fraud have been properly pleaded, a plaintiff must still meet the federal

14   standard to plead fraud with particularity.  Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir.

15   2009).

16       Looking first at the elements, the fraud claim is obviously incomplete.  While Plaintiff

17   identifies the alleged misrepresentation made in some form, he provides little more.  Plaintiff did not

18   state the details of the misrepresentation, identify which Defendant allegedly made it, indicate why

19   that Defendant knew the statements were false, or allege why Plaintiff's reliance on the

20   misrepresentation was justifiable.  This falls short of the standard required by Rule 9(b).

21       Also, Plaintiff's theory of liability based on securitization of the debt has been rejected by

22   numerous courts.  See, e.g., Lane v. Vitek Real Estate Indus. Grp., 713 F. Supp. 2d 1092, 1099

23   (E.D. Cal. 2010) ("[T]he argument that parties lose their interest in a loan when it is assigned to a

24   trust pool has also been rejected by many district courts."); Hague v. Wells Fargo Bank, N.A., No.

25   3:11-cv-02366-THE, 2011 U.S. Dist. LEXIS 140122, at *16, 2011 WL 6055759 (N.D. Cal. Dec. 6,

26   2011) ("To the extent that Plaintiffs' claims rely on the securitization of the loan . . . into a

27   mortgage-backed security, there is no merit to the contention that securitization renders the lender's

28   loan in the property invalid."); Wadhwa v. Aurora Loan Servs., LLC, No. S-11-1784 KJM KJN,

6

United States District Court
For the Northern District of California

1   2011 U.S. Dist. LEXIS 73949, at *9-10, 2011 WL 2681483 (E.D. Cal. July 8, 2011), Kimball v.

2   BAC Home Loans Servicing, LP, No. 10-CV-05670 LHK, 2011 U.S. Dist. LEXIS 17751, at *4,

3   2011 WL 577418 (N.D. Cal. Feb. 9, 2011); Marty v. Wells Fargo Bank, No. CIV S-10-0555 GEB

4   DAD PS, 2011 U.S. Dist. LEXIS 29686, at *20-21, 2011 WL 1103405 (E.D. Cal. Mar. 22, 2011)

5   ("[P]laintiff also claims that the 'securitization' of the note was an improper conversion and

6   alteration of the note and deed of trust, undertaken without his consent and rendering the mortgage

7   and Deed of Trust unenforceable against him. This claim is frivolous, has no support in the law and

8   should be dismissed with prejudice.").

9       This claim is dismissed with leave to amend.

10      **D.    Claim 4: Unjust Enrichment**

11      Plaintiff's fourth claim is for unjust enrichment under state law.  In this state, "[c]ourts

12  consistently have held that unjust enrichment is not a proper cause of action under California law."

13  In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,

14  754 F. Supp. 2d 1145, 1194 (C.D. Cal. 2010).  "Unjust enrichment is a general principle, underlying

15  various legal doctrines and remedies, rather than a remedy itself."  Melchior v. New Line Prods.,

16  Inc., 106 Cal. App. 4th 779, 793 (2003).  "Simply put, 'there is no cause of action in California for

17  unjust enrichment.'"  In re Toyota Motor Corp., 754 F. Supp. 2d at 1194 (citing Melchior, 106 Cal.

18  App. 4th at 793).

19      Since Plaintiff's claim for unjust enrichment cannot state a claim for relief in California, it

20  will be dismissed without leave to amend.

21      **E.    Claim 5:  Civil RICO**

22      Plaintiff has included a claim for violation of RICO, alleging that Defendants conspired to

23  defraud plaintiff "through the use of intentional nondisclosure, material misrepresentation, and

24  creation of the fraudulent loan documents."  See FAC, at ¶ 149.

25      While RICO is generally a statute which defines a crime, civil remedies may be pursued for

26  RICO violations if a plaintiff has been "injured in his business or property by reason of a violation

27  of section 1962 . . . ."  18 U.S.C. § 1964(c).  "To state a civil claim for a RICO violation . . . , a

28  plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

Case5:11-cv-00659-EJD Document44 Filed04/10/12 Page64 of 12

1   activity." Rezner v. Bayerische Hypo-Und Vereinsbank AG, 630 F.3d 866, 873 (9th Cir. 2010)

2   (internal citation omitted).

3       This claim is not sufficiently plead. "Neither fraud, in and of itself, nor the creation of

4   fraudulent loan documents are predicate offenses under RICO." Ohlendorf, 2012 U.S. Dist. LEXIS

5   28862, at *33 (citing Tilley v. Ampro Mortg., No. 2:11-cv-1134, 2011 U.S. Dist. LEXIS 136096, at

6   *32, 2011 WL 5921415 (E.D. Cal. Nov. 28, 2011)). Moreover, Plaintiff has not included enough

7   specific factual information to meet the heightened pleading standard imposed by Rule 9(b). See

8   Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989) (applying the higher

9   pleading standard contained in Rule 9(b) to a claim under RICO. This claim is therefore dismissed

10  with leave to amend.

11      **F.      Claim 6: Breach of Security Instrument**

12      Plaintiff alleges that Defendants breached certain provisions of the Deed of Trust because the

13  entity that initiated the foreclosure and recorded the Notice of Default was never properly

14  substituted as trustee. See FAC, at ¶ 176. Plaintiff alleges the Notice of Default is void ab initio

15  because it was signed before the assignment. See id., at ¶ 177.

16      Plaintiff's "breach" theory is without merit. The allegation that only the lender, and not

17  Mortgage Electronic Registration Systems, Inc. ("MERS"), can execute a Substitution of Trustee is

18  inconsistent with the terms of the Deed of Trust. That document states that MERS is "a nominee for

19  Lender and Lender's successors and assigns." See id., at Ex. B. The Deed of Trust also states that

20  "MERS is the beneficiary" and contains the following language:

21          Borrower understands and agrees that MERS holds only legal title to
            the interests granted by Borrower in this Security Instrument, but, if
22          necessary to comply with law or custom, MERS (as nominee for
            Lender and Lender's successors and assigns) has the right: to exercise
23          any or all of those interests, including but not limited to, the right to
            foreclose and sell the Property . . . .
24  See id.

25      Therefore, according to express language of the Deed of Trust, MERS was vested with the

26  right to foreclose and could assign such right to subsequent trustees. Courts that have previously

27  examined Deeds of Trust containing this exact language have routinely found that "MERS had the

28  right to assign its beneficial interest to a third party." Basia v. Indymac Fed. Bank, No.

United States District Court
For the Northern District of California

8

Case5:11-cv-00659-EJD Document44 Filed04/10/12 Page9 of 12

1  CIV-09-1464 WBS JMF, 2009 U.S. Dist. LEXIS 103444, at *8-11 (E.D. Cal. Nov. 6, 2009); see

2  also, e.g., Roybal v. Countrywide Home Loans, Inc., No. 2:10-CV-750-ECR-PAL, 2010 U.S. Dist.

3  LEXIS 131287, at *11, 2010 WL 5136013 (D. Nev. Dec. 9, 2010)  ("there is a near consensus

4  among district courts in this circuit that while MERS does not have standing to foreclose as a

5  beneficiary, because it is not one, it does have standing as an agent of the beneficiary where it is the

6  nominee of the lender, who is the true beneficiary"); Morgera v. Countrywide Home Loans, Inc.,

7  No. 2:09-cv-01476-MCE-GGH, 2010 U.S. Dist. LEXIS 2037, at *21, 2010 WL 160348 (E.D. Cal.

8  Jan. 11, 2010) ("Courts have consistently found that MERS does in fact have standing to foreclose

9  as the nominee of the lender.") (citations omitted); Gomes v. Countrywide Home Loans, Inc., 192

10  Cal. App. 4th 1149, 1158 (2011) ("'MERS is the owner and holder of the note as nominee for the

11  lender, and thus MERS can enforce the note on the lender's behalf.'") (quoting Morgera, 2010 U.S.

12  Dist. LEXIS 2037, at *22).

13       MERS assigned its right to foreclose to ETS Services LLC on August 23, 2010.  See FAC, at

14  Ex. C.  ETS Services LLC the recorded a Notice of Default and was substituted as trustee that same

15  day.  See id., at Ex. D.  The procedure was proper because "[u]nder California law, a 'trustee,

16  mortgagee or beneficiary or any of their authorized agents' may conduct the foreclosure process by

17  filing a Notice of Default."  Wood v. Aegis Wholesale Corp., No. 09-CV-536, 2009 U.S. Dist.

18  LEXIS 57151, at *10, 2009 WL 1948844 (E.D. Cal. July 6, 2009) (quoting Cal. Civ. Code §

19  2924(a)). Additionally, the Notice of Default is not void simply because the Substitution of Trustee

20  was signed on a previous date.  "[A]ny of the beneficiary's authorized agents" may file the Notice of

21  Default, and "it is immaterial to the validity of the foreclosure process" that the Notice of Default

22  predates the Substitution of Trustee.  Wood, 2009 U.S. Dist. LEXIS 57151, at *4.

23       It is also worth noting that district courts in California have consistently rejected the theory

24  that the foreclosure process is invalid if the trustee does not possess the original promissory note.

25  See, e.g., Gamboa v. Tr. Corps, 09-0007 SC, 2009 U.S. Dist. LEXIS 19613, at *9-10, 2009 WL

26  656285 (N.D. Cal. Mar. 12, 2009); Putkkuri v. Recontrust Co., 08CV1919WQH (AJB), 2009 U.S.

27  Dist. LEXIS 32, at *5-6, 2009 WL 32567 (S.D. Cal. Jan. 5, 2009); Neal v. Juarez, 06CV0055

28  J(JMA), 2007 U.S. Dist. LEXIS 98068, at *25, 2007 WL 2140640 (S.D. Cal. July 23, 2007).

**United States District Court**
For the Northern District of California

9

<strong>United States District Court</strong><br/>For the Northern District of California

1  Plaintiff's allegations which suggest the foreclosure process is void for a lack of the original note are

2  misplaced.

3         The court finds that allowing for amendment of this claim would be futile because it does not

4  present a valid theory of liability no matter what amendment Plaintiff may attempt to make.  It will

5  be dismissed without leave to amend.

6         **G.     Claims 7 and 8: Wrongful Foreclosure and Quiet Title**

7         Essential to the seventh claim for wrongful foreclosure and the eighth claim for quiet title is

8  Plaintiff's allegation that the foreclosing entity does not have an interest in the property.  However,

9  as already explained, this allegation is directly contradicted by documents attached to the FAC.

10  Accordingly, Plaintiff has failed to state claims for wrongful foreclosure and quiet title, much like he

11  failed to state a claim for breach of security instrument.

12         Furthermore, Plaintiff did not allege an ability to tender the full amount owed on the loan,

13  which is necessary to maintain claims for wrongful foreclosure and quiet title.  See Roque v.

14  Suntrust Mortg., Inc., No. C-09-00040 RMW, 2010 U.S. Dist. LEXIS 11546, at *11, 2010 WL

15  546896 (N.D. Cal. Feb. 10, 2010) (citing Abdallah v. United Savings Bank, 43 Cal. App. 4th 1101,

16  1109 (1996)); see also Briosos v. Wells Fargo Bank, 737 F. Supp. 2d 1018, 1032 (N.D. Cal. 2010)

17  (quoting Shimpones v. Stickney, 219 Cal. 637, 649  (1934)).  Plaintiff's argument to the contrary is

18  unpersuasive.

19         Because the claims for wrongful foreclosure and quiet title rely on the same theory

20  underlying the claim for breach of security instrument, these claims are also dismissed without leave

21  to amend as allowing for amendment under these circumstances would be futile.

22         **H.     Claim 9: Rescission**

23         Plaintiff contends the Deed of Trust and the loan documents upon which it is based are void

24  due to a mistake.  Specifically, Plaintiff alleges that "he executed his loan documents based on the

25  mistaken belief that he would remain in a borrower/lender relationship" with his original lender.

26  See FAC, at ¶ 227.  He also alleges that his lender "knew there would be no borrower/lender

27  relationship."  See id., at ¶ 228.

28         California Civil Code Section 1689(b)(1) states that "[a] party to a contract may rescind the

10

Case No. 5:11-cv-00659 EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

contract . . . [i]f the consent of the party rescinding, or of any party jointly contracting with him, was

given by mistake."  A mistake of fact exists when a mistake consists of "an unconscious ignorance

or forgetfulness of a fact past or present, material to the contract; or, the belief in the present

existence of a thing material to the contract, which does not exist, or in the past existence of such a

thing, which has not existed."  Cal. Civ. Code § 1577.  "To relieve one from obligations resulting

from the signing of an instrument, on the ground of mistake, the error must be real and vital and not

merely fanciful, unreasonable, or the result of negligently failing to read the document."  Fraters

Glass & Paint Co. v. Southwestern Const. Co., 107 Cal. App. 1, 6 (1930)

This rescission claim fails as plead because it does not meeting the Rule 9(b) pleading

standard.  Plaintiff has not explained why he was unaware of the plain terms of the Deed of Trust,

which clearly state that the Plaintiff's debt could be sold without notice to him.  See FAC, at Ex. B

("The Note or a partial interest in the Note (together with the Security Instrument) can be sold on or

more times without prior notice to the Borrower.").  Having read that statement - which is

unambiguous - it is impossible for Plaintiff to have relied on an ongoing "borrower/lender"

relationship as a basis for entering into the loan transaction.  If he was not aware that portion of the

Deed of Trust, then his mistaken belief that the loan would not be sold is a result of his own

negligence in not carefully reviewing the document.

Since the allegations in the FAC are not specific and do not explain why Plaintiff was

mistaken despite the cited language in the Deed of Trust, this claim is dismissed with leave to

amend.

**H.      Claim 10: Invasion of Privacy**

Plaintiff's final claim is for invasion of privacy in violation of  Article I, § 1, of the

California Constitution.  Plaintiff alleges that Defendants authorized disclosure of private

information without permission by outsourcing credit checks of their borrowers to determine

whether their borrowers were experiencing financial difficulties.  See id., at ¶ 245.

A plaintiff alleging an invasion of privacy in violation of California's constitutional right to

privacy must establish each of the following: (1) a legally protected privacy interest; (2) a

reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a

11

1   serious invasion of privacy.  <u>Foley v. Bates</u>, 2007 U.S. Dist. LEXIS 38063, at *23, 2007 WL

2   1430096 (N.D. Cal. May 14, 2007) (citing <u>Hill v. Nat'l Collegiate Athletic Assn.</u>, 7 Cal. 4th 1, 40

3   (1994)).

4          Despite a review of the entire FAC, the court is unable to find any allegations indicating

5   which Defendant and what times allegedly disclosed Plaintiff's private information.  All that

6   Plaintiff has provided here is the most general of allegations "on information and belief."  Without

7   more, Plaintiff has failed to state a claim.  Thus, this claim is dismissed with leave to amend.

8                                              **IV.    ORDER**

9          Based on the foregoing, Defendants' Motion to Dismiss (Docket Item No. 22) is GRANTED.

10  Claims 4, 6, 7, and 8 are DISMISSED WITHOUT LEAVE TO AMEND.  The remaining claims are

11  DISMISSED WITH LEAVE TO AMEND.

12         Any amended complaint must be filed on or before **October 1, 2012.**  Plaintiff is advised that

13  he may not add new claims or parties without first obtaining Defendants' consent or leave of court

14  pursuant to Federal Rule of Civil Procedure 15.  Plaintiff is further advised that failure to file a

15  timely amended complaint or failure to amend the complaint in a manner consistent with this Order

16  may result in dismissal of this action.

17         The court schedules this case for a Case Management Conference on **October 26, 2012.**  The

18  parties shall file a Joint Case Management Statement on or before **October 19, 2012.**

19  **IT IS SO ORDERED.**

20

21  Dated:  September 10, 2012

22                                              EDWARD J. DAVILA
                                                United States District Judge

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

12

Case No. 5:11-cv-00659 EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

## **Exhibit I**

**Second Amended Complaint**

**52**

Holly S. Burgess (SBN 104757)
LAW OFFICES OF HOLLY S. BURGESS
660 Auburn Folsom Road, Suite 203
Auburn, CA  95661
Telephone:  (530) 889-8900
Facsimile:   (530) 820-1526
*hollyburgess@lohsb.com*

Attorney for Plaintiff,
GERALD GANDRUP

THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GERALD GANDRUP,<br><br>                    Plaintiff,<br><br>       vs.<br><br>GMAC MORTGAGE, LLC fka GMAC WHOLESALE MORTGAGE CORPORATION; a Delaware limited liability company; EXECUTIVE TRUSTEE SERVICES, LLC dba ETS SERVICES, LLC, a Delaware limited liability company; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation; ATLANTIC SAVINGS OF AMERICA, a California corporation (suspended); HSBC BANK USA, N.A., as Trustee of Deutsche Bank Alt-A Securities Inc.'s (DBALT) Mortgage Pass-Through Certificates, Series 2007-OA4; ALL PERSONS KNOWN OR UNKNOWN CLAIMING AN INTEREST IN 200 Gregory Court, Scotts Valley, California 95066; and DOES 1-20, inclusive,<br><br>                    Defendants. | **CASE NO. 5:11-CV-00659-EJD**<br><br>**VERIFIED SECOND AMENDED COMPLAINT FOR:**<br><br>1.  VIOLATIONS OF TRUTH IN LENDING ACT<br>2.  VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT<br>3.  FRAUD<br>4.  CIVIL RICO VIOLATIONS<br>5.  RESCISSION-MISTAKE-VOID AGREEMENT<br>6.  INVASION OF CONSTITUTIONAL RIGHT TO PRIVACY<br><br>**PLAINTIFF DEMANDS A JURY TRIAL** |

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case5:11-cv-00659-EJD   Document45   Filed10/11/12   Page2 of 52

**PARTIES**

1.     Plaintiff, Gerald Gandrup, at all relevant times, has been an adult and resident of Santa Cruz County, California.

2.     Defendant GMAC Mortgage, LLC fka GMAC Wholesale Mortgage Corporation ("GMAC"), is a Delaware corporation, with its principal place of business in Fort Washington, Pennsylvania. The company is one of the largest residential mortgage servicing companies in the United States. GMAC is part of the Residential Capital (ResCap) mortgage arm of Ally Financial, the financing arm of General Motors.  GMAC is the purported servicer of the loan that is the subject of this litigation.

3.     Defendant Executive Trustee Services, LLC dba ETS Services, LLC ("ETS") is a Delaware corporation, with its principal place of business in Burbank, California.  ETS is a GMAC company and initiated the foreclosure proceedings against the property that is the subject of this litigation.

4.     Defendant Mortgage Electronic Registration Systems, Inc. ("MERS"), is a Delaware corporation, with its principal place of business in Reston, Virginia. MERS is a "process" that simplifies the way mortgages are originated, serviced and tracked. MERS was created by the real estate finance industry, and purports to eliminate the need to prepare and record assignments when trading residential (and commercial) mortgage loans.

5.     Defendant Atlantic Savings of America (dba Atlantic Bancorp of California) was incorporated in California in 2006, and at one time licensed, in California, as a mortgage broker ("ATLANTIC").  According to the California Department of Real Estate website, the license of Atlantic Bancorp of California was voluntarily surrendered in 2009 during an administrative action or investigation of the company. Thus, the status of ATLANTIC is suspended, according to the Secretary of State website. The president of ATLANTIC, Edwin Devera Mendaros, was also

- 2-

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1    president of Atlantic Bancorp Holdings, Inc. (1994) and Atlantic Bancorp of America (2002). But,

2    like Atlantic Bancorp of California, neither of those companies is qualified to do business in

3    California, their licenses having also been suspended. Mr. Mendaros, himself, was licensed at one

4    time, by the California Department of Real Estate, as a real estate mortgage broker. In 2008 and 2009,

5    Mr. Mendaros was the subject of licensed disciplinary actions for one or more violations of real estate

6    law, the regulations of the Real Estate Commissioner, or the conviction of a crime. His license to

7    practice as a mortgage broker, in California, was revoked effective March 24, 2009.  ATLANTIC is

8    described as "lender" on the deed of trust that is the subject of this litigation.

9        6.      With the Assignment of the Deed of Trust recorded on February 8, 2011, Plaintiff's

10   mortgage loan was purportedly assigned to Defendant HSBC BANK USA, N.A. ("HSBC"), as

11   Trustee of Deutsche Bank Alt-A Securities Inc.'s (DBALT) Mortgage Pass-Through Certificates,

12   Series 2007-OA4.  The trustee of a mortgage-backed security is distinct from the trustee of a deed of

13   trust.  Thus, HSBC is not exempt from liability under Plaintiff's claims.[1] On page 28, the DBALT

14   Trust Pooling and Servicing Agreement states that the Trust's **closing date was June 29, 2007**.

15   The DBALT Pooling and Service Agreement is attached hereto and incorporated herein by reference

16   as **Exhibit N**.

17       7.      Defendants All Persons Known or Unknown Claiming An Interest in 200 Gregory

18   Court, Scotts Valley, California 95066.

19       8.      Defendants DOES 1 through 10 are believed to be the current beneficiaries of the deed

20   of trust, if the lien has not been extinguished by operation of law. Plaintiff does not know the true

21   names, capacities, or basis for liability of defendants sued as DOES 1 through 10, the beneficiaries.

22   Each fictitiously named defendant is in some manner liable to plaintiff, and claims some right, title,

23   or interest in the subject property, or both.

24

_____

[1] *Vogan v. Wells Fargo Bank, N.A.,* 2011 WL 5826016, p.2-4 (E.D. Cal. 2011)

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

9.      Plaintiff does not know the true names, capacities, or basis for liability of defendants sued as DOES 11 through 20. Each such fictitiously named defendant is in some manner liable to plaintiff, and claims some right, title, or interest in the subject property, or both.

10.     At all times relevant to this complaint, each of the defendants was the agent or employee of each of the remaining defendants, and was acting within the course and scope of such agency or employment.

## JURISDICTION

11.     This court has original jurisdiction, under 28 U.S.C.A. §1331, based on the laws of the United States, as alleged herein.

12.     This court has supplemental jurisdiction, under 28 U.S.C. §1367(a), over the related state court claims.

13.     This court has jurisdiction, under 28 U.S.C. §1332, over the citizens of the various states, as alleged above; and, the amount in controversy exceeds $75,000 exclusive of interest and costs.

## FACTS COMMON TO ALL CAUSES OF ACTION

14.     From 2007 to 2010 the subject property was the primary residence of Plaintiff and his disabled wife.  In addition, both Plaintiff and his wife are senior citizens.

15.     Defendants failed to provide a proper Notice of Right to Cancel to Plaintiff in violation of 12 C.F.R. §226.23, Reg. Z §226.4(a)(2)-1 and Reg. Z §226.4(b)(2); charged unearned, split, duplicate and/or excessive fees in violation of 12 U.S.C. §2607; engaged in fraudulent and deceptive business practices.

16.     Prior to Plaintiff's alleged default on the subject mortgage loan, Plaintiff spoke with multiple GMAC representatives to obtain a loan modification.  Plaintiff also contacted other mortgage vendors in an attempt to refinance his loan.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

17.     In or about 2010 Plaintiff began to suspect wrongdoing pertaining to his loan after contacting Linda Tucker, a mortgage consultant with Countryside Financial Services.  Plaintiff had contacted Ms. Tucker in an attempt to refinance his mortgage loan.  Ms. Tucker denied Plaintiff's application pointing out some of the faults in Plaintiff's loan provided by Defendants.  Thereafter, Plaintiff sought information from news accounts, loan agents and attorneys.  Finally, a tax accountant explained (to Plaintiff's dismay) that contrary to Plaintiff's express request when obtaining the loan from Defendants, the interest was not fixed for the first two years.  Further, the interest added to the principal was not tax deductible until sold or refinanced by a lender other than GMAC.  Also, Plaintiff was not expecting to incur a $600,000.00 balloon payment.

18.     At all times relevant, Defendants knew that terms of the Payment Option ARM loan they were providing was so complicated in its terms that no reasonable person could possibly know the inner workings of negative amortization, recasting periods, impact on payments and the loan balance. Defendants caused the uncertainty and ambiguity as alleged herein by purposefully stating in the TILD that Plaintiff was paying a finance charge less than what the Plaintiff was actually paying.  Congress recognized that documents like home mortgage are filled with complicated finance terms, and passed consumer protection laws, such as Truth in Lending Act, to require lenders to fully disclose those terms to consumers.

19.     Thus, Plaintiff contends a reasonable person would not have been able to discover defendants' actions within the respective limitations statutes.

20.     Any applicable statutes of limitations have been tolled by the Defendants' continuing, knowing, and active concealment of the facts alleged herein. Despite exercising reasonable diligence, Plaintiff could not have discovered, did not discover, and was prevented from discovering, the wrongdoing complained of herein.

21.     In the alternative, Defendants should be estopped from relying on any statutes of

1   limitations. Defendants have been under a continuing duty to disclose the true character, nature, and

2   quality of their financial services and debt collection practices. Defendants owed Plaintiff an

3   affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.

4       22.      The property that is the subject of this litigation is located at 200 Gregory Court,

5   Scotts Valley, California 95066, APN #024-341-03 ("Property" or "Subject Property").   Attached

6   hereto as **Exhibit A** is a true and correct legal description of the property.   On April 3, 2011, Plaintiff

7   was the record owner of the Property, which was no longer his primary residence.   On April 4, 2011.

8   the Property was "sold" to HSBC at the Trustee's Sale.

9       23.      Plaintiff borrowed money in 2007, signed a promissory note for $880,000.00, and

10  secured the loan with a deed of trust on the property (DOT).   Attached hereto as **Exhibit B** is a true

11  and correct copy of the DOT.  Shortly, thereafter, Plaintiff's Property was valued at $626,000.00.

12      24.      Plaintiff maintains that the DOT is a contract of adhesion.  Plaintiff does not admit the

13  truth of every fact recited in the DOT.   The DOT is a four-party contract, identifying plaintiff the

14  trustor/borrower, ATLANTIC the lender, MERS the nominee/beneficiary, and Old Republic Title the

15  trustee.  At the time of the DOT, ATLANTIC was *not* a member of MERS.

16      25.      The DOT states that the borrower agrees that MERS holds only legal title to the

17  interests granted by the borrower.  Further, only the Lender, not MERS, is entitled to payments of the

18  mortgage loan.

19      26.      The DOT also states that the " Lender" has the exclusive right to appoint a successor

20  trustee under the DOT.

21      27.      Plaintiff contends that the alleged "default amount" on his mortgage loan is knowingly

22  false because the alleged creditor, the DBALT Trust, has not experienced a default and the loan is

23  being reported as "no loss" to the investors.

24      28.      Plaintiff's construction business has been affected by the American financial crisis;

1    and beginning in or about May 2010 Plaintiff was unable to make his mortgage payments. However,

2    on information and belief, other obligors existed under Plaintiff's note and the creditor has received

3    full payment under the contract terms of the note.  Therefore, Plaintiff's loan was not in default in

4    August 2010 when ETS recorded the Notice of Default.

5         29.    Defendants' scheme of financial transactions not only prevented Plaintiff from being

6    able to refinance the loan, but from even being able to reasonably ascertain with whom he was

7    supposed to be dealing. Inevitably and predictably, Plaintiff lost his Property through non-judicial

8    foreclosure.  As a consequence of the wrongful conduct and predatory lending practices of the

9    Defendants, individually and acting in concert, Plaintiff was deprived of his ability to modify or

10   refinance the Property with a loan that he could repay, in the process ruining his credit by way of a

11   non-judicial foreclosure which will take him years to repair.

12        30.    The means and mechanism by which this result was accomplished by the various

13   Defendants proceeded by way of a complicated scheme involving fraud, misrepresentation, civil

14   conspiracy, and breaches of the general negligence duties of due care and due diligence, the

15   fiduciary duty of trust and confidence existing between financial institutions and their customers, the

16   duties of good faith and fair dealing that underlie all contractual relationships in the State of

17   California, as well as violation of a number of statutory and regulatory duties imposed by the

18   California Civil and Business & Professions Codes.

19        31.    When the inevitable and predictable result of that overreaching, unscrupulous conduct

20   then came to pass, Defendants refused to deal with Plaintiff fairly and in good faith, and, in the

21   process, trampled upon a litany of duties imposed by statute and regulation.

22        32.    Attached hereto, marked **Exhibits C** and **D**, respectively, are true and correct copies of

23   the Substitution of Trustee and the Notice of Default.  The Substitution of Trustee is executed by

24   MERS.  Donna Fitton, who is employed with ETS, executed the document; and Dee C. Ortega, who

Case5:11-cv-00659-EJD  Document45  Filed10/11/12  Page84 of 52

1    is also employed with ETS, notarized it for subsequent handling by LSI Title. The signature of Dee C.

2    Ortega, on the Substitution of Trustee, may be forged.  Attached hereto, collectively marked

3    **Exhibit H**, are true and correct copies of various facsimiles or versions of signatures purporting to be

4    that of Dee C. Ortega.

5         33.    Thereafter, ETS filed a trustee's sale notice, in November 2010, identifying "investor

6    no. 115362784." Attached hereto, marked **Exhibit E**, is a true and correct copy of the trustee's sale

7    notice.

8         34.    Then, in or about January 2011, outside counsel for GMAC, Pite Duncan, LLP,

9    attorneys at law, drafted an assignment of the deed of trust, at the request of GMAC (but not at the

10   request of the certificateholders of the trust), for signature by MERS, "solely as nominee for

11   ATLANTIC, its successors and assigns." Attached hereto, marked **Exhibit F**, is a true and correct

12   copy of the assignment of the deed of trust.

13        35.    At the time of the assignment, the DOT had already been transferred into the DBALT

14   trust, or supposed to have been transferred into the DBALT trust, in 2007. With the Assignment of

15   the Deed of Trust recorded on February 8, 2011, Plaintiff's mortgage loan was purportedly assigned

16   to Defendant HSBC BANK USA, N.A. ("HSBC"), as Trustee of Deutsche Bank Alt-A Securities

17   Inc.'s (DBALT) Mortgage Pass-Through Certificates, Series 2007-OA4.  The trustee of a mortgage-

18   backed security is distinct from the trustee of a deed of trust.  Thus, HSBC is not exempt from

19   liability under Plaintiff's claims.[2] On page 28, the DBALT Trust Pooling and Servicing Agreement

20   states that the Trust's **closing date was June 29, 2007**.   The DBALT Pooling and Service Agreement

21   is attached hereto and incorporated herein by reference as **Exhibit N**.  Despite this fact, Defendant

22   GMAC held itself out as the owner of Plaintiff's loan.  At the time it began foreclosure activities,

23   GMAC did not have standing to foreclose as the closing date of the Trust was June 29, 2007.

24

------

[2] *Vogan v. Wells Fargo Bank, N.A.,* 2011 WL 5826016, p.2-4 (E.D. Cal. 2011)

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case5:11-cv-00659-EJD   Document45   Filed 19/11/12   Page94 of 52

36.     Neither HSBC nor DBALT trust has ever been a member of MERS.  According to the trustee's deed upon sale, filed in May 2011 by ETS, the property reverted to the DBALT trust at foreclosure sale in April 2011. Attached hereto, marked **Exhibit G**, is a true and correct copy of the Trustee's Deed Upon Sale.

**MERS AND ITS CERTIFYING OFFICERS**

37.     For many of the claims raised in this complaint, the status of MERS as well as the efficacy of its policies, practices, and procedures, at all relevant times, are of particular significance. Assuming for the sake of argument that MERS is legal, in California, MERS, as nominee, did not act with the utmost good faith and loyalty in the performance of its duties in the instant case.

38.     First, MERS operates an electronic registry designed to track servicing rights and the ownership of mortgages. MERS does not: (1) take applications for, underwrite or negotiate mortgage loans; (2) make or originate mortgage loans to consumers; (3) extend credit to consumers; (4) service mortgage loans; or (5) invest in mortgage loans. MERS's designating itself as "the beneficiary," in the DOT, including for the purpose of executing trustee substitutions, is a violation of state recording and foreclosure statutes.

39.     Secondly, MERS may only act as an agent, such as nominee/beneficiary, for entities that are members of MERS.  Attached hereto, marked **Exhibit I,** is a true and correct copy of MERS's "Terms and Conditions."

40.     When a loan is *transferred among MERS members*, MERS simplifies the process by avoiding the requirement to re-record liens and pay county recorder filing fees.  At the same time, when a loan is transferred out of the MERS system, MERS loses its status to act in the capacity as a nominee or in the capacity as beneficiary under the DOT or in any other capacity, and becomes a stranger to the transaction.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1    41.    At the time of the DOT, ATLANTIC was *not* a member of MERS; thus, all of

2    MERS's acts from that date are void, including the actions taken by MERS in executing the trustee

3    substitution and the assignment of the DOT.  MERS has been and continues to knowingly and

4    intentionally improperly record mortgages and conduct business in California and elsewhere on a

5    systematic basis for the benefit of the defendants and other lenders.

6    42.    Here are excerpts from an article, in the *New York Times*, "Mers? It May Have

7    Swallowed Your Loan," dated March 5, 2011, written by Michael Powell and Gretchen Morgenson,

8    that discusses such concerns as  the "loose" process of MERS:

9    "Judges, lawmakers, lawyers and housing experts are raising piercing questions
about MERS..., whose private mortgage registry has all but replaced the
nation's public land ownership records.
---

10    ---
"Alan Grayson, who was a U.S. representative for Florida' Eight congressional

11    district from 2009 - 2011, has seen MERS's record-keeping up close, …. "In
many foreclosures, the MERS paperwork was squirrelly," Mr. Grayson said.

12    ***With no real legal authority, he says, Fannie and the banks eliminated the
old system and replaced it with a privatized one that was unreliable.***  A

13    spokeswoman for MERS, Karmela Lejarde, wrote, "At times, some MERS
members have failed to follow those procedures and/or established state

14    foreclosure rules," "or to properly explain MERS and document MERS
relationships in legal pleadings."

15    ---
"Federal bankruptcy courts and state courts have found that MERS and its

16    member banks often confused and misrepresented who owned mortgage notes.
In thousands of cases, they apparently lost or mistakenly destroyed loan

17    documents. The problems, at MERS and elsewhere, became so severe last fall
that many banks temporarily suspended foreclosures. ...

18    "[N]ot even the mortgage giant Fannie Mae, an investor in MERS, depends on

19    it these days. We would never rely on it to find ownership," says Janis Smith, a
Fannie Mae spokeswoman, noting it has its own records. Apparently with good

20    reason. Alan M. White, a law professor at the Valparaiso University School of
Law in Indiana, last year matched MERS's ownership records against those in

21    the public domain. The results were not encouraging. "Fewer than 30 percent of
the mortgages had an accurate record in MERS," Mr. White says. "I kind of
assumed that MERS at least kept an accurate list of current ownership. They

22    don't."

23    43.    MERS could not act as the nominee of ATLANTIC, at the time of the DOT, because,

as stated above, ATLANTIC was not a member of MERS at that time. Because ATLANTIC was not

24    a member of MERS at the time of the DOT, MERS cannot be a successor or assign of ATLANTIC .

- 10-

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

44.     Neither could MERS have acted as the nominee of the DBALT trust in 2011 because neither HSBC nor the DBALT Trust has ever been a member of MERS.

45.     Moreover, once the subject loan had been purportedly transferred into the DBALT trust in 2007, MERS lost its status to act as nominee, beneficiary, or in any other capacity.

46.     Further, at the time of the trustee substitution, the true lender, if the loan had been placed into the DBALT trust in 2007, were the investors of the trust.  As such, all investors, who are also the beneficiaries, were required to execute the trustee substitution.

47.     Thus, MERS had no authority and was never authorized by the lender or its agent to substitute ETS for Old Republic as the trustee of the DOT; and was never an agent of the lender. MERS was also never authorized by the beneficial owners or their agent to initiate foreclosure proceedings, including the filing of the Notice of Default.

48.     If the DBALT Trust wanted to substitute a trustee, then it could easily have done so through its purported trustee, HSBC Bank, USA, N.A.   Moreover, as stated above, MERS lost its ability and capacity to act in a nominee capacity or as beneficiary at the time the loan was transferred into the trust in 2007.  Under California law the substitution of a trustee requires the signature of the beneficiary or beneficiaries, in the true sense of the word.  This stands to reason, otherwise, any trustee company could substitute itself (with or without authority from the lender) by simply claiming membership in MERS and then hiding behind the name MERS in the execution of the substitution.

49.     As stated above, at the time of the DOT, ATLANTIC  (lender on the DOT) was not a MERS member. In 2007 MERS's status as "nominee" or as "beneficiary" was extinguished once the loan was transferred out of the MERS system into the DBALT trust. Under both bases, any actions purportedly taken by MERS are ultra vires and void, including the purported Assignment of the DOT in 2011.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

50.     As such, any actions taken by MERS at all relevant times in this complaint in connection with Plaintiff's mortgage loan are ultra vires and void.

51.     Further, Plaintiff alleges that such conduct, if proven, constitutes a violation of Cal.Penal Code § 532f(a)(4).  The Code prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office that is known to be false, with the intent to defraud.

**<u>Cease and Desist Orders; Government Findings</u>**

52.     MERS is the subject of a cease and desist order, issued in April 2011, in *In the Matter of Merscorp, Inc. and the Mortgage Electronic Registration Systems, Inc.* Attached hereto, marked **Exhibit J**, is a true and correct copy of the consent order. The order was issued by five agencies: (i) the Department of the Treasury Comptroller of the Currency, (ii) the Board of Governors of the Federal Reserve System, (iii) the FDIC, (iv) the Office of Thrift Supervision, and (v) the Federal Housing Finance Agency (collectively, "the agencies").

53.     The agencies' investigation "identified certain deficiencies and unsafe or unsound practices by MERS and MERSCORP that present financial, operational, compliance, legal and reputational risks to MERSCORP and MERS, and to the participating Members."[3]  The "unsafe or unsound practices" pertain to MERS's "tracking and registering residential mortgage ownership and servicing, acting as mortgagee of record in the capacity of nominee for lenders, and initiating foreclosure actions."[4]  The wrongful acts identified in the MERS consent order include initiating foreclosures that resulted in unacceptable legal risks due to lack of compliance with the applicable laws.[5]

54.     The consent order, in pertinent part, also requires MERS submit a plan to strengthen its governance processes applicable to MERS certifying officers with respect to its members. The

---

[3] *Id.* at p.2
[4] *Id.*
[5] *Id.*

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1    plan must include policies and processes to designate or certify individuals as authorized MERS

2    certifying officers, and policies, process and resources to track the identity and activities of MERS

3    certifying officers to ensure their compliance with the Rules and related requirements of MERS; and

4    policies, process, and resources to ensure that the members can quickly and accurately determine if

5    specific individuals are designated to act as authorized MER certifying officers.

6         55.     Defendant GMAC is, likewise, the subject of a consent order issued by the Board of

7    Governors of the Federal Reserve System, and the FDIC. Attached hereto, marked **Exhibit K**, is a

8    true and correct copy of the order. The federal agencies made specific findings that GMAC initiated

9    non-judicial foreclosures without always confirming that documentation of ownership was in order at

10    the appropriate time, including confirming that the promissory note and mortgage document were

11    properly endorsed or assigned, and, if necessary, in the possession of the appropriate party. The

12    federal agencies also made specific findings that GMAC filed or caused to be filed in local land

13    records offices, numerous mortgage-related documents that were not properly notarized, including

14    those not signed or affirmed in the presence of a notary; and further failed to have adequate internal

15    controls, policies, and procedures, compliance risk management, internal audit, training and oversight

16    of the foreclosure process, including sufficient oversight of outside counsel and other third-party

17    providers handling foreclosure-related services with respect to their servicing portfolio.

18         56.     Defendant HSBC is also under a cease and desist order issued by the Board of

19    Governors of the Federal Reserve System. Attached hereto, marked **Exhibit L**, is a true and correct

20    copy of the order. The federal agency made specific findings that HSBC initiated non-judicial

21    foreclosures without always confirming that documentation of ownership was in order at the

22    appropriate time, including confirming that the promissory note and mortgage document were

23    properly endorsed or assigned, and, if necessary, in the possession of the appropriate party.

24

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

57.     The federal agency also made specific findings that HSBC filed or caused to be filed in local land records offices, numerous mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; and further failed to have adequate internal controls, policies, and procedures, compliance, risk management, internal audit, training and oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to their servicing portfolio.

58.     Defendants are big corporations under cease and desist orders for unsafe and unsound mortgage practices and ordered to make restitution where warranted.  Defendants should be prevented from asserting a technical defense of "he should have found out sooner" of their improper actions.  Based on the foregoing, equitable tolling is appropriate in this case.

### Violations of Cal.Penal Code § 532f(a)(4):  Creating and Recording Fraudulent, Void Documents

59.     The Code prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office that is known to be false, with the intent to defraud.  It is a highly publicized fact that banks and MERS use "robo-signers" on documents filed with the county recorders' offices.

60.     Donna Fitton is a robo-signer for ETS, GMAC and LSI Title Company.   Don Dempsey of GMAC and notary Dee C. Ortega are also robo-signers.

61.     Attached hereto are the following collectively marked exhibits: **Exhibit M** are true and correct copies of documents purportedly executed by Donna Fitton; and **Exhibit H** are true and correct copies of various facsimiles or versions of signatures purporting to be that of documents purportedly executed by Dee C. Ortega.

### Chain of Title Problems

62.     There are additional title problems in addition to the ultra vires, void documents that MERS recorded, as discussed above.  The Notice of Default contains the "declaration" of ETS

1    purporting to be "pursuant to Cal. Civ. Code section 2923.5", reciting that it received a written

2    declaration of default from the original beneficial interest holder under the DOT. This is false: Prior

3    to the signing of the NOD, no valid substitution of trustee was recorded naming ETS as the

4    authorized trustee.  Thus, ETS (an unknown entity and a stranger to the transaction) cannot *possibly*

5    comply with section 2923.5 because, as of the date of signing the NOD, Old Republic was the

6    authorized trustee, not ETS.

7        63.    The California Civil Code allows that a trustee may be substituted from the original

8    trustee, but only in strict compliance with the requirements of §2934(a)(2)A through D. In this case

9    none of these steps was taken. ETS conducted the sale under a trustee substitution purportedly

10    executed and notarized under California law.  But, nothing was recorded in the county recorder's

11    office to show compliance with the Code requirements. Thus, any action taken by ETS, including

12    most importantly, conducting the foreclosure sale, is ultra vires and void. Thus the trustee substitution

13    and any documents issued by ETS after the trustee substitution, including the trustee's deed upon sale

14    are void.

15        64.    With the Assignment of the Deed of Trust recorded on February 8, 2011, Plaintiff's

16    mortgage loan was purportedly assigned to Defendant HSBC, as Trustee of the DBALT Trust.

17    However, the Pooling and Servicing Agreement for the DBALT Trust states that the Trust's **closing**

18    **date was June 29, 2007**.   Under IRS Rule 860D (a)(4) the trustee or custodian  must have had the

19    mortgages recorded in the investors' name as the beneficiaries of the Trust within 90 days of the

20    closing date, June 29, 2007.  Therefore, the assignment of Plaintiff's mortgage into the Trust should

21    have been recorded in Santa Cruz County by **September 30, 2007**.   However, no such recording

22    exists in the Santa Cruz County records.  Therefore, HSBC is asserting ownership interests over the

23    Property but has no standing or authority to foreclose.

24

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case 5:11-cv-00659-EJD    Document 45    Filed 10/01/12    Page 16 of 52

**Securitization Issues**

65.    Plaintiff's mortgage loan was pooled into a hidden mortgage-backed security trust (MBST).   Through the mechanism of securitization, the "interests" in the loan may be re-sold on a continuing basis, a borrower's loan may be evidenced only on a balance sheet which cannot be discovered.  This creates the nefarious and dangerous credence that the note may be exercised by another party at a time in the future without borrowers ever knowing who, if anyone, truly owns the "beneficial interest" in their note.

66.    On information and belief, Plaintiff alleges that the promissory note was never conveyed pursuant to the trust mandates and the mortgages were never conveyed or recorded pursuant to the proper chain of custody and assignment within the trust agreement(s). the mortgage loan was not conveyed into the trust under the requirements of the prospectus for the trust or the REMIC requirements of the IRS.

67.    Consequentially, the end result is that the required trust asset, or any part thereof (mortgage note or security interest), was not legally transferred to the trust to allow the trust to ever be considered a "holder" of a mortgage loan.  Neither the trust nor ETS, as a servicer, would ever be entitled to bring a foreclosure or declaratory action.  The trust will never have standing or be a real party in interest before this Court.

68.    While the note and DOT may be extinguished or lost, the true owner(s) of the obligation, if any, are the certificate holders, not the defendants who foreclosed on the DOT.

**Due Diligence and Equitable Tolling of Statutes of Limitations**

69.    The court should exercise its discretion and equitable power and toll the statute of limitations.[6]  Here, the general equitable principle of disregarding the statute of limitations should be applied to avoid a harsh and technical forfeiture.[7]

---

[6] King v. State of California, 784 F.2d 910(9th Cir. 1986).
[7] Bollinger v. National Fire Ins. Co. of Hartford, Connecticut (1944) 25 C.2d 399, 154 P.2d 399

- 16-

70.     Additionally, the equitable tolling principles are to be read into every federal statute of limitations unless Congress expressly provides to the contrary in clear and unambiguous language.

71.     Additionally, equitable tolling of claims under Truth in Lending Act (TILA) can operate to suspend a limitations period until borrower discovers or had reasonable opportunity to discover fraud or non-disclosures that form the basis of TILA actions.[8]

72.     In an action based upon the rescission of a contract in writing the time begins to run from the date upon which the facts that entitle the aggrieved party to rescind occurred.  Where the ground for rescission is fraud or mistake, the time does not begin to run until the discovery by the aggrieved party of the facts constituting the fraud or mistake.  The federal doctrine of fraudulent concealment operates to toll the statute of limitations "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part.'"  (See, *Holmberg v. Armbrecht* , 327 U.S. 392, 397; *Maggio v. Gerard Freezer & Ice Co.* , 824 F.2d 123, 127 (1st Cir. 1987).

73.      Plaintiff has pled fraud in the purported assignment of the deed of trust, recordation of spurious documents and fraud in concealment in the predatory loan given to plaintiff.

74.     The test for equitable tolling turns on whether a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period.[9]  From the face of the documents, and with a lay person's due diligence, it was <u>not</u> possible for plaintiff to learn of Defendants' wrongdoing and to bring the TILA and RESPA claims within the statute of limitations.

75.     Based on the foregoing, equitable tolling is appropriate in this case.

//

---

[8] *Rosenfeld v. JPMorgan Chase Bank, N.A. (N.D. Cal. 2010) 732 F.Supp. 2d 952;* Truth in Lending Act, § 130(e), 15 U.S.C.A. § 1640(e).
[9] *Santa Maria v. Pac.Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000).

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1

**FIRST CAUSE OF ACTION**
**Violations of Truth In Lending Act**
**(As to All defendants and DOES)**

2

3

**15 U.S.C. § 1641(g):**

4

76.      15 U.S.C. § 1641(g), titled "Liability of Assignees," requires that when an entity

5

purchases or is assigned the beneficial interest in a loan on a property, it must notify the borrower in

6

writing within 30 days of when the loan is transferred. This statute authorizes a civil action for

7

violations of § 1641 for (1) actual damages, or (2) statutory damages that may included (a) damages

8

equal to twice the amount of any finance charge or (b) for a credit transaction secured by real

9

property an amount not less than $400 and not greater than $4000.

10

77.      Recently, the Eastern District Court made the following determinations:

11

> "Under the common law of trusts, a 'trustee is subject to personal liability
> to third persons on obligations incurred in the administration of the trust to

12

> the same extent that he would be liable if he held the property free of
> trust.' Restatement (2d) of Trusts § 261. This common law rule shows a

13

> stark contrast between the duties of the trustee of a deed of trust, as limited
> by California law, and those of a common law trustee.  A traditional

14

> trustee holds title to trust property and is responsible for omissions related
> to the administration of that property. Exempting all trustees from TILA

15

> would permit trusts acting as lenders to completely evade TILA's
> provisions." [10]

16

17

78.      As an assignee, HSBC is liable under 15 U.S.C. § 1641(g), which creates liability for

18

the assignees of the loan's original creditor if the assignee fails to notify the borrower of the

19

acquisition.

20

79.      Federal law requires that the trustee or custodian of a mortgage-backed security trust,

21

must have the mortgages recorded in the investors' names as the beneficiaries of the trust within 90

22

days of the "closing date."[11]

23

24

---

[10] *Vogan v. Wells Fargo Bank, N.A.,* 2011 WL 5826016, p.2-4  (E.D. Cal. 2011)
[11] *IRS Rule 860D (a)(4)*

- 18-

Case5:11-cv-00659-EJD Document45 Filed10/01/12 Page19 of 52

80.    As stated above, with the Assignment of the Deed of Trust recorded on February 8,
2011, Plaintiff's mortgage loan was purportedly assigned to Defendant HSBC, as Trustee of the
DBALT Trust. However, the Pooling and Servicing Agreement for the DBALT Trust states that the
Trust's **closing date was June 29, 2007**.   Under IRS Rule 860D (a)(4) the trustee or custodian
must have had the mortgages recorded in the investors' name as the beneficiaries of the Trust within
90 days of the closing date, **June 29, 2007**.  Therefore, the assignment of Plaintiff's mortgage into
the Trust should have been recorded in Santa Cruz County by **September 30, 2007**.   However, no
such recording exists in the Santa Cruz County records.  Therefore, Defendants violated 15 U.S.C. §
1641(g).

81.    15 U.S.C. § 1640(a) authorizes claims for actual damages, statutory damages, and
attorneys fees for violations of 15 U.S.C. § 1641(g).

82.    Defendants' violation of § 1641(g) caused Plaintiff's Property to be foreclosed
because he were unable to contact the actual creditor to negotiate a modification of his loan.
Plaintiff had to hire an attorney to seek remedies.

**15 USC §1601 et seq., Regulation Z §226.18(d):**

83.    Defendants failed to disclose the material terms of Plaintiff's transaction in a clear
and conspicuous manner and provide rescission rights in a lawful manner.

84.    ATLANTIC was required to provide Plaintiff certain disclosures pursuant to the
TILA. Under TILA and Reg. Z, ATLANTIC was required to clearly and conspicuously disclose the
"amount financed" and the "finance charge," among other things, in connection with the loan.

85.    Defendants failed to include and disclose certain charges in the finance charge shown
on the TILA statement, which charges were imposed on plaintiff incident to the extension of credit
to plaintiff and were required to be disclosed pursuant to 15 USC §1605 and Regulation Z §226.4,
thus resulting in an improper disclosure of financial charges in violation of 15 USC §1601 et seq.,

1 | Regulation Z §226.18(d).  Such undisclosed charges included some identified on the settlement
2 | statement listing the amount financed which is different from the sum listed in the original Note.
3 |      86.     By calculating the annual percentage rate ("APR") based upon improperly calculated
4 | and disclosed amounts, defendants are in violation of 15 USC §1601 et seq., Regulation Z §226.18
5 | (c), 18(d), and 22.D
6 |      87.     Defendants' failure to provide the required disclosures provides plaintiff with the right
7 | to rescind the transaction, and plaintiff, through this public complaint which is intended to be
8 | construed for purposes of this claim as a formal notice of rescission, hereby elect to rescind the
9 | transaction.
10 |      88.     Under 15 U.S.C.A. § 1635(i) and Under 12 C.F.R. § 226.15,   Plaintiff has a right to
11 | rescind the security interest in his property, within three years from the date of consummation of the
12 | transaction, which was in 2007.  He filed this complaint in February 2011, little more than 10 months
13 | beyond the three year statute, which delay was reasonable given the inducement and reliance that
14 | defendants falsely induced Plaintiff into entering a predatory loan and false DOT, upon which
15 | Plaintiff relied to his detriment.
16 |      89.     Specifically, the following is the information required to be disclosed that was not
17 | disclosed:
18 |    -   ATLANTIC  was not the lender under the DOT, but merely a loan broker;
19 |    -   That Plaintiff was given a loan that included amounts that were to be paid for fees and
20 |        profit in the mortgage backed security Trust;
21 |    -   The true originators of the loan immediately and simultaneously securitized (allegedly)
22 |        the note through the means of conversion of an Article III negotiable Instrument (U.C.C.)
23 |        into Article IX (U.C.C.), non-negotiable paper, resulting in the fact the the DOT was
24 |        immediately changed without his knowledge and his lender would no longer be his

1        lender; in violation of 15 U.S.C. 1635.

2    -    His credit and signature and credit score were used to pre-sell the securities and then used

3        to fund the predatory loan given to him, to his detriment, because at that point he lost the

4        benefit of isr side of the bargain where he undertook certain benefits and protections and

5        agreements  (giving the right of non-judicial foreclosure) to an entity he never agreed to,

6        who was not acting as a true beneficiary under the DOT to his detriment; whose true

7        identity was not disclosed and who was not available to him in the modification process

8        nor available for alternatives to foreclosure.

9        90.    Under the statute, once Plaintiff is entitled to rescind the loan transaction and the

10    security interest in the Subject Property becomes void, Plaintiff was no longer liable for any

11    amounts, including any finance charge.  This is exactly the statutory protection provided for in

12    15 U.S.C.§ 1635 when material terms and conditions of the loan were undisclosed to Plaintiff

13    though he requested the information from his loan servicer, the last being by a written request dated

14    **December 2, 2010**.

15        91.    Plaintiff could not have learned of these violations at the time the loan was obtained

16    by looking at his loan documents and escrow closing statements as the true facts of the lender and

17    the charges not disclosed to him and the securitization of his Note and DOT and the fees attached

18    thereto, which was undisclosed to him, are not apparent from the face of the loan documents, nor

19    DOT itself.

20        92.    Only upon inquiry and getting professional help did Plaintiff learn that he may have

21    rights under the TILA statute and that the original transaction, the loan and the promissory note and

22    deed of trust that secured the note were not what they were represented to be at the time of the loan

23    transaction.  He also learned than his Note and DOT were allegedly transferred to the Deutsche

24    Bank Alt-A Securities Inc.'s (DBALT) Mortgage Pass-Through Certificates, Series 2007-OA4.

93.      No doubt defendants GMAC and ETS will claim they are not liable under TILA because they were not involved in the original loan transaction.  This is false.  Defendants have not disputed that the Trust is the alleged beneficiary of the note and deed of trust.  GMAC as a servicer would be collecting payments on behalf of that Trust.  If the loan was immediately securitized as alleged on information and belief, the the servicer would be the only entity with any contact with the borrower and thus should be subject to the requirements of TILA.

94.      Based on information and belief, Plaintiff claims his Note and DOT were conveyed, and in part responsible for the predatory loan and non-disclosures about the loan and the assignment as required by 15 U.S.C. 1601 et seq, TILA was created to protect consumers like Plaintiff and because GMAC and  the other defendants created a mortgage-backed security out of Plaintiff's Note and DOT, they should not be allowed to escape liability or responsibility for violations of TILA.

95.      Defendants did not comply with TILA effective May 20, 2009, pursuant to an amendment to the Federal Truth in Lending Act (TILA), transferors of mortgage loans must disclose to the mortgagor the identity of any transferees. The notice must include the identity, address and telephone number of the new creditor; the date of the transfer; how to reach an agent or party having authority to act on behalf of the new creditor; the location of the place where transfer of ownership of the debt is recorded; and any other relevant information regarding the new creditor.

96.      Section 404 of TILA, NOTIFICATION OF SALE OF TRANSFER OF MORTGAGE LOANS, provides: IN GENERAL -Section 131 of the Truth in Lending Act (15  .S.C. 1641) is amended by adding at the end the following g. NOTICE OF NEW CREDITOR- 1) IN GENERAL- In addition to other disclosures required by this title, not later than assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including: i. the identity, address, telephone number of the new creditor; ii. the date of transfer; iii. how to reach an agent or party having authority to act on behalf of the new creditor;

iv. the location of the place where transfer of ownership of the debt is recorded; and v. any other

relevant information regarding the new creditor. 2) DEFINITION -As used in this subsection, the

term 'mortgage loan' means any consumer credit transaction that is secured by the principal

dwelling of a consumer." 3) PRIVATE RIGHT OF ACTION -Section 130(a) of the Truth in

Lending Act (15 U.S.C. 1640(a)) is amended by inserting "subsection (f) or (g) of section 131, after

"section 125."

97.     The amendment above was signed into law as part of the Helping Families Save

Their Homes Act of 2009, with immediate effect from the President's signature. The purpose of the

amendment is to ensure that homeowners know who owns their mortgages and to prevent lenders

from standing behind nominees. The requirement for "any other relevant information" is particularly

strong, underscoring the strong Congressional intent for complete disclosure. ***Using MERS to***

***foreclose may violate 15 U.S.C. § 1641.***

98.     In December 2010, Plaintiff sent a detailed letter to GMAC and ETS requesting

specific disclosures about his loan and true creditor and rescinded the loan under 12 U.S.C. 2605.

This written request and rescission was ignored by defendants.  See **Exhibit O** attached.

99.     Defendants violated TILA in failing to make the proper disclosures to plaintiff.

Remedies for TILA violations include rescission, damages and equitable relief.  15U.S.C. §§ 1635-

1640.

### SECOND CAUSE OF ACTION
**Violations of Real Estate Settlement Procedures Act**
**(As to All Defendants and DOES)**

100.     Plaintiff reaffirms and re-alleges the above paragraphs as if set forth fully herein

below.

101.     As mortgage lenders, defendants are subject to the provisions of the Real Estate

Settlement Procedures Act ("RESPA"), 12 USC §2601 et. seq.

Case 5:11-cv-00659-EJD    Document45    Filed 01/11/12    Page 24 of 52

102.    RESPA prohibits kickbacks and referral fees: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

103.    RESPA prohibits unearned fees: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

104.    RESPA requires that the lender provide to the borrower a settlement statement which shall "conspicuously and clearly itemize all charges imposed upon the borrower ... in connection with the settlement." 12 U.S.C. § 2603(a).

105.    RESPA requires that the lender and mortgage broker provide to the borrower "a good faith estimate of the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement." 12 U.S.C. § 2604(c); 24 C.F.R. § 3500.7.

106.    The term "settlement services" includes "any service provided in connection with a real estate settlement including, but not limited to, ... the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans)." 12 U.S.C. § 2602(3); 24 C.F.R. § 3500.2.

107.    ATLANTIC violated RESPA in that it collected fees that were not disclosed to Plaintiff. In particular Yield Spread Premiums that were collected from GMAC. Such violation is an Unfair Business Practice, fraudulent, a secret profit and a Breach of the Fiduciary duty owed Plaintiff.

108.    ATLANTIC and GMAC devised a scheme in which they attempted to create a secondary market transaction when in fact the acts of ATLANTIC were truly a "table funded"

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

transaction by a mortgage broker. In doing so, ATLANTIC and GMAC violated RESPA and

fraudulently attempted to circumvent the consumer protections of RESPA and create a transaction in

which they are fraudulently attempting to secure a "holder in due course" status.

109.    ATLANTIC, a licensed real estate broker, by receiving such compensation by

circumvention received a secret profit in violation of the California Real Estate Law.

110.    ATLANTIC, a mortgage broker, and James J. Chapman, the broker, licensed by the

Department of Real Estate as a Real Estate Broker, who represented Plaintiff failed to disclose all

material facts related to the loan transaction regarding how the loan product worked, the negative

aspects of the transaction and withheld information regarding the compensation they received. Such

acts are considered constructive fraud by a fiduciary

111.    Defendants have violated RESPA with respect to Plaintiff by giving or paying fees,

kickbacks or other things of value to Defendant ATLANTIC pursuant to an agreement or

understanding that business incident to or a part of a real estate settlement service involving

federally related mortgage loans would be referred by Defendant ATLANTIC to Defendant GMAC,

in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(b).

112.    Defendants have violated RESPA with respect to Plaintiff by giving or accepting a

portion, split, or percentage of charges made or received for the rendering of a real estate settlement

service in connection with a transaction involving a federally related mortgage loan other than for

services actually performed, in violation of 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c).

113.    Defendants have violated RESPA with respect to Plaintiff by attempting to create a

transaction in which RESPA does not apply by use of fraud and circumvention by characterizing the

loan transaction as a secondary market transaction when it truly is a table funded transaction by a

mortgage broker thereby extracting secret profits from the consumer by failing to disclose the Yield

Spread Premium to the Plaintiff.

114.     In violation of 12 USC §2607 and in connection with the mortgage loan to Plaintiff, Defendants accepted charges for the rendering of real estate services which were in fact charges for services other than actually performed.

115.     As a result of the Defendants' violations of RESPA, defendants are liable to plaintiff in an amount equal to three (3) times the amount of charges paid by Plaintiff for "settlement services" pursuant to 12 USC §2607 (d) (2).  Defendants failure to disclose the material terms of plaintiff's transaction in a clear and conspicuous manner, provide rescission rights in a lawful manner, charging excessive and/or unearned fees under RESPA, failing to properly disclose rebates and overall providing a loan product so complex that no reasonable person could understand the terms thereby creating an unfair business practice and breach of fiduciary duty.

### THIRD CAUSE OF ACTION
**Fraud**
**(As to All Defendants and DOES)**

116.     Plaintiff reaffirms and  re-alleges the above paragraphs as if set forth fully herein below.

117.     Under California law, the indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages, and in such situations, **only the allegations of fraudulent conduct must satisfy the federal rule requiring particularized pleading of circumstances constituting fraud.** [12]

**Defendants ATLANTIC and GMAC:**

118.     As alleged herein, Defendant had a duty to disclose to Plaintiff and at all times relevant, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendant had exclusive knowledge of material facts. Defendants concealed and omitted information which was not known to Plaintiff and which, at all times re1evant, Defendant

---

[12] *In re Charles Schwab Corp. Securities Litigation*, N.D.Cal.2009, 257 F.R.D. 534.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case 5:11-cv-00659-EJD    Document 45    Filed 07/01/11    Page 27 of 52

1   failed to disclose and/or actively concealed by making such statements and partial, misleading

2   representations to Plaintiff.

3        119.    As alleged herein, pursuant to TILA, 15 U.S.C. §1601, et seq., Regulation Z

4   (11C.F.R. §226) and the Federal Reserve Board's Official Staff Commentary, Defendants had a duty

5   to provide for accurate disclosure of the amount financed, finance charge and Annual Percentage

6   Rate.

7        120.    As alleged herein, pursuant to RESPA, 12 U.S.C. § 2601 et seq., Defendant

8   ATLANTIC  had a duty to disclose the Yield Spread Premium changed to Plaintiff.  Defendant

9   ATLANTIC failed to disclose and/or actively concealed by making such statements and partial,

10  misleading representations to Plaintiff.

11       121.    These facts were material to the loan transaction, and constituted material factors,

12  terms, or conditions of a transaction to which a mortgage lender or broker was a party, pertinent to

13  an applicant for a mortgage loan or mortgagor.

14       122.    Defendant ATLANTIC had a duty not to conceal and suppress these material facts

15  from Plaintiff under the particular circumstances of this case as provided by the California Real

16  Estate Law.  Suppression or concealment of a material fact which a party is under an obligation to

17  communicate constitutes fraud.

18       123.    From the inception of subject loan scheme, until the present, all Defendants have

19  engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not

20  reasonably discoverable by Plaintiff regarding true facts concerning the finance charge, which

21  Defendant ATLANTIC was duty bound to clearly and conspicuously disclose.

22       124.    Defendants purposefully and intentionally devised this loan scheme to defraud and/or

23  mislead consumers into believing that these loans would provide a lower finance charge than what

24  the plaintiff was actually charged for the loan, resulting in more profits to Defendants.

125. Defendant ATLANTIC represented to Plaintiff that no other compensation other than was listed on the HUD-1 Settlement Statement would be charged. On information and belief, Defendant ATLANTIC was paid a secret profit by GMAC using a scheme claiming the transaction was a secondary market transaction under RESPA.

126. At all times relevant, Defendants knew that terms of the Payment Option ARM loan they were providing was so complicated in its terms that no reasonable person could possibly know the inner workings of negative amortization, recasting periods, impact on payments and the loan balance. Defendants caused the uncertainty and ambiguity as alleged herein; by purposefully stating in the TILD that Plaintiff was paying a finance charge less than what the Plaintiff was actually paying.

127. While Defendant ATLANTIC may be able to show documentation that purports to "disclose" these complicated terms, they misled Petitioner into believing the traditional terms and interest of an adjustable rate loan, which have traditionally been at a lower interest rate than fixed rate loans rewarding consumers who bore some of the market risk, was being equally provided on favorable terms.

128. In fact, the Payment Option ARM loan product within one month of closing has an interest rate substantially higher than a fixed rate loan at the time the Plaintiff's loan was originated.

129. While Plaintiff and the public were led to believe they were securing long-term loans, in fact, the industry had no intention of providing long term financing but were providing loans they knew borrowers would have to pay off before they reset.

130. At all times relevant, Defendants knew that they were creating a scheme in which to purposely evade disclosing to Plaintiff secret profits being paid by GMAC to ATLANTIC by attempting to treat a table funded loan transaction by a mortgage broker as a secondary market transaction when in fact GMAC underwrote, reviewed and approved the loan well before

Case 5:11-cv-00659-EJD   Document45   Filed 10/01/12   Page 29 of 52

1  ATLANTIC funded the loan and shortly thereafter in 2007 transferred the loan, presumably into the

2  DBALT Trust, or to some other entity.

3      131.    Defendant ATLANTIC intentionally suppressed and concealed from Plaintiff the fact

4  that the money for this payment did not come came from ATLANTIC, and therefore, charged

5  Plaintiff a higher interest rate and margin for which Plaintiff was otherwise qualified.

6      132.    At all times relevant, Defendants knew that terms of the Payment Option ARM loan

7  they were providing was so complicated in its terms that no reasonable person could possibly know

8  the inner workings of negative amortization, recasting periods, impact on payments and the loan

9  balance. Defendants caused the uncertainty and ambiguity as alleged herein; by purposefully stating

10  in the TILD that Plaintiff was paying a finance charge less than what the Plaintiff was actually

11  paying.

12      133.    Defendants expressly agreed that Plaintiff's finance charge would be less than what it

13  really was.  Surreptitiously, Defendants charging more in finance charges than what they disclosed

14  on the TILDS.  Thus, Plaintiff has incurred additional finance charges which were not disclosed in

15  the TILDS.

16      134.    Further, Plaintiff is informed and believes that the subject loan, note, and mortgage

17  were structured so as to create the appearance of a higher value of real property than the actual fair

18  market value.  Plaintiff's mortgage loan was financed in the amount of $880,000.00.  However,

19  shortly, thereafter, Plaintiff discovered his Property was valued at $626,000.00.

20      135.    The specificity of Defendants acts were as follows:

21          a.  **When**:              In 2009

22          b.  **Where**:              Santa Cruz County, California

23          c.  **To whom**:          to Plaintiff

24          d.  **How/ By what means**:      conversations and loan documents

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

e. **Who/Authority**:    representative/agents of ATLANTIC while acting within the actual or ostensible scope of authority;

136.    As a direct and proximate result of Defendant's failures to disclose and omission of material facts, as alleged herein, Plaintiff has suffered damages.

137.    By executing the loan agreement, Plaintiff unwittingly agreed to pay charges that were actually improper and illegal charges, at a higher interest rate and points (finance charges) than were actually available to him.

138.    As a result of Defendant's suppression and concealment, Plaintiff is entitled to compensatory damages, measured by the difference between the amounts required to be paid to Defendants and the amounts that would have been paid had Plaintiff's actual approval rates and terms been offered to her, rather than the inflated rates and terms; litigation expenses and costs; and such other relief as the Court deems just and proper.

**Defendant GMAC**:

139.    Defendant GMAC is not the owner/beneficiary of the promissory note and security instrument secured by the Property.  However, GMAC unilaterally held itself out as having the sole authority to modify Plaintiff's loan. At all time relevant, Defendant GMAC has purposely held itself out as having the sole authority to modify Plaintiff's loan when in fact Plaintiff's loan had been sold to persons or entities unknown to Plaintiff.  Plaintiff contends this is a common practice of GMAC to frustrate consumers and keep them from properly exercising their rights.

140.    Defendants suppressed and concealed these facts for the purpose of obtaining an advantage or benefit over Plaintiff.

a. **When**:              In 2009-2010

b. **Where**:              Santa Cruz County, California

c. **To whom**:           to  Plaintiff

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

d. **How/ By what means**:       telephone conversations and correspondence

e. **Who/Authority**:    representative/agents of GMAC while acting within the actual

or ostensible scope of authority.

141.    Plaintiff is informed, believes and thereon alleges Defendant GMAC maintains

extensive audio recordings and/ or telephone call records.  On information and belief GMAC has

actual knowledge and information regarding the above conversations that occurred between Plaintiff

and GMAC representatives regarding Plaintiff's loan.

142.    The omitted information, as alleged herein, was material to Plaintiff in that had the

information been disclosed, Plaintiff would not have entered into the loan.

**All Defendants**:

143.    15 U.S.C. § 1641(g), titled "Liability of Assignees," requires that when an entity

purchases or is assigned the beneficial interest in a loan on a property, it must notify the borrower in

writing within 30 days of when the loan is transferred.

144.    On February 8, 2011, MERS, as nominee for ATLANTIC, recorded a fabricated

assignment of deed of trust assigning interest in Plaintiff's loan to U.S. Bank.  As discussed above,

Plaintiff alleges that the recorded assignment was executed well after the closing date June 29, 2007

of the DBALT Trust to which it was allegedly sold, giving rise to a plausible inference that at least

some part of the recorded assignment was fabricated. Plaintiff alleges that such conduct, if proven,

constitutes a violation of Cal.Penal Code § 532f(a)(4).  The Code prohibits any person from filing a

document related to a mortgage loan transaction with the county recorder's office that is known to

be false, with the intent to defraud.  Therefore, HSBC is asserting ownership interests over the

Property but has no standing or the capacity to foreclose.  .

145.    Defendants' recorded documents, telephone conversations, and correspondences to

Plaintiff have fraudulently misled Plaintiff.  Defendants are purposely suppressing and concealing

the true owner/beneficiary to frustrate Plaintiff's remedies.  In fact, Defendants have given Plaintiff

no choice but to file this action which will ultimately lead to the true owner/beneficiary.

    a.  **When**:         In 2009-2011

    b.  **Where**:        Santa Cruz County, California

    c.  **To whom**:       to Plaintiff

    d.  **How/ By what means**:     recorded documents, telephone conversations and
         correspondence

    e.  **Who/Authority**:   representative/agents of Defendants while acting within the

         actual or ostensible scope of authority.

146.    Collectively, Defendants have created an unlawful scheme in which they attempt to

evade, hide, frustrate, circumvent, minimize and shield themselves from any and all consumer

protection statutes.

147.    Plaintiff could not have discovered these intentionally concealed facts by the exercise

of ordinary care.

148.    Plaintiff was damaged by Defendants conduct.  As a result of Defendants fraud,

suppression and concealment, Plaintiff is entitled to compensatory damages, litigation expenses and

costs, and such other relief as the Court deems just and proper.

149.    Defendants disguised the transaction to create the appearance that "straw lender" was a

properly chartered and registered financial institution, authorized to do business and to enter into the

subject transaction.  In fact, the real party in interest was not disclosed to plaintiff, and neither were

the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated

in this unlawful scheme.

150.    Defendant MERS falsely named itself the beneficiary under the Notice of Default.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case 5:11-cv-00659-EJD Document45 Filed 10/01/12 Page 33 of 52

151.    Defendants GMAC, ETS and HSBC knowingly and willfully used the void Assignment of Deed of Trust to claim an interest in Plaintiff's Note, foreclose on and sell Plaintiff's Property.

152.    Defendants knew that Plaintiff's Note had been securitized and that the documents they signed and recorded did not state true recitals of the facts pertaining to who owned the interests in Plaintiff's Note and who had authority to foreclose and sell Plaintiff's Property.

153.    Each defendant is an agent or employee of each other.  Each defendant was the agent of the other defendants, and all of the defendants acted within the scope of their agency or employment acted as an agent of another.  At all times each defendant committed the acts, defendant directed others to commit the acts, or permitted others to commit the acts alleged in this complaint.

154.    As such, this fraudulent scheme (which was in actuality a plan to trick plaintiff into signing what would become a negotiable security used to sell unregulated securities under fraudulent and changed terms from the original notes) was in fact a sham to use plaintiff's interest in the real property to collect interest in excess of the legal rate.

155.    Under applicable law and Plaintiff's reliance on the fraud, Plaintiff is entitled to demand that a permanent injunction be entered against the Defendants:

    A.    Preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious;

    B.    Requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the record;

    C.    Allowing the filing of said order in the office of the clerk of the property records where the subject property, "loan transaction" and any other documents relating to this transaction are located; and

D.      Dissolving any lis pendens or notice of pendency relating to the defendants'
purported claim.

### FOURTH CAUSE OF ACTION
**Civil RICO Violations**
**(As to All Defendants and DOES)**

156.    Plaintiff reaffirms and re-alleges the above paragraphs as if set forth fully herein below.

157.    Defendants and each of them participated in the conspiracy, the subject of this action, which has existed from date of application to the present, with the injuries and damages resulting therefrom being continuous. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud plaintiff constitutes an "enterprise," with the aim and objective of the enterprise being to perpetuate a fraud upon him through the use of intentional nondisclosure, material misrepresentation, and creation of the fraudulent loan documents.

158.    Each of the defendants is an "enterprise defendant."  The enterprise is the engagement of obtaining Plaintiff's property under the DOT, when they do not have the rights given by Plaintiff to the lender under the deed of trust, the wrongful foreclosure activities connected with the parties who are participating in the trust to which Plaintiff note and deed of trust was allegedly conveyed, the Deutsche Bank Alt-A Securities Inc.'s (DBALT) Mortgage Pass-Through Certificates, Series 2007-OA4 all while being undisclosed to plaintiff to his detriment for profit.

### Defendants ATLANTIC and GMAC:

159.    As alleged herein, Defendant had a duty to disclose to Plaintiff and at all times relevant, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendant had exclusive knowledge of material facts. Defendants concealed and omitted information which was not known to Plaintiff and which, at all times re1evant, Defendant

- 34 -

1    failed to disclose and/or actively concealed by making such statements and partial, misleading

2    representations to Plaintiff.

3        160.    As alleged herein, pursuant to TILA, 15 U.S.C. §1601, et seq., Regulation Z

4    (11C.F.R. §226) and the Federal Reserve Board's Official Staff Commentary, Defendants had a duty

5    to provide for accurate disclosure of the amount financed, finance charge and Annual Percentage

6    Rate.

7        161.    As alleged herein, pursuant to RESPA, 12 U.S.C. § 2601 et seq., Defendant

8    ATLANTIC  had a duty to disclose the Yield Spread Premium changed to Plaintiff.  Defendant

9    ATLANTIC failed to disclose and/or actively concealed by making such statements and partial,

10    misleading representations to Plaintiff.

11        162.    These facts were material to the loan transaction, and constituted material factors,

12    terms, or conditions of a transaction to which a mortgage lender or broker was a party, pertinent to

13    an applicant for a mortgage loan or mortgagor.

14        163.    Defendant ATLANTIC had a duty not to conceal and suppress these material facts

15    from Plaintiff under the particular circumstances of this case as provided by the California Real

16    Estate Law.  Suppression or concealment of a material fact which a party is under an obligation to

17    communicate constitutes fraud.

18        164.    From the inception of subject loan scheme, until the present, all Defendants have

19    engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not

20    reasonably discoverable by Plaintiff regarding true facts concerning the finance charge, which

21    Defendant ATLANTIC was duty bound to clearly and conspicuously disclose.

22        165.    Defendants purposefully and intentionally devised this loan scheme to defraud and/or

23    mislead consumers into believing that these loans would provide a lower finance charge than what

24    the plaintiff was actually charged for the loan, resulting in more profits to Defendants.

Case5:11-cv-00659-EJD   Document45   Filed 10/01/12   Page36 of 52

166.    Defendant ATLANTIC  represented to Plaintiff that no other compensation other than was listed on the HUD-1 Settlement Statement would be charged.  On information and belief, Defendant ATLANTIC was paid a secret profit by GMAC using a scheme claiming the transaction was a secondary market transaction under RESPA.

167.    At all times relevant, Defendants knew that terms of the Payment Option ARM loan they were providing was so complicated in its terms that no reasonable person could possibly know the inner workings of negative amortization, recasting periods, impact on payments and the loan balance.  Defendants caused the uncertainty and ambiguity as alleged herein; by purposefully stating in the TILD that Plaintiff was paying a finance charge less than what the Plaintiff was actually paying.

168.    While Defendant ATLANTIC may be able to show documentation that purports to "disclose" these complicated terms, they misled Petitioner into believing the traditional terms and interest of an adjustable rate loan, which have traditionally been at a lower interest rate than fixed rate loans rewarding consumers who bore some of the market risk, was being equally provided on favorable terms.

169.    In fact, the Payment Option ARM loan product within one month of closing has an interest rate substantially higher than a fixed rate loan at the time the Plaintiff's loan was originated.

170.    While Plaintiff and the public were led to believe they were securing long-term loans, in fact, the industry had no intention of providing long term financing but were providing loans they knew borrowers would have to pay off before they reset.

171.    At all times relevant, Defendants knew that they were creating a scheme in which to purposely evade disclosing to Plaintiff secret profits being paid by GMAC to ATLANTIC by attempting to treat a table funded loan transaction by a mortgage broker as a secondary market transaction when in fact GMAC underwrote, reviewed and approved the loan well before

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1  ATLANTIC funded the loan and shortly thereafter in 2007 transferred the loan, presumably into the

2  DBALT Trust, or to some other entity.

3      172.  Defendant ATLANTIC intentionally suppressed and concealed from Plaintiff the fact

4  that the money for this payment did not come came from ATLANTIC, and therefore, charged

5  Plaintiff a higher interest rate and margin for which Plaintiff was otherwise qualified.

6      173.  At all times relevant, Defendants knew that terms of the Payment Option ARM loan

7  they were providing was so complicated in its terms that no reasonable person could possibly know

8  the inner workings of negative amortization, recasting periods, impact on payments and the loan

9  balance. Defendants caused the uncertainty and ambiguity as alleged herein; by purposefully stating

10  in the TILD that Plaintiff was paying a finance charge less than what the Plaintiff was actually

11  paying.

12      174.  Defendants expressly agreed that Plaintiff's finance charge would be less than what it

13  really was.  Surreptitiously, Defendants charging more in finance charges than what they disclosed

14  on the TILDS.  Thus, Plaintiff has incurred additional finance charges which were not disclosed in

15  the TILDS.

16      175.  Further, Plaintiff is informed and believes that the subject loan, note, and mortgage

17  were structured so as to create the appearance of a higher value of real property than the actual fair

18  market value.  Plaintiff's mortgage loan was financed in the amount of $880,000.00.  However,

19  shortly, thereafter, Plaintiff discovered his Property was valued at $626,000.00.

20      176.  The specificity of Defendants acts were as follows:

21        a.  **When**:  In 2009

22        b.  **Where**:  Santa Cruz County, California

23        c.  **To whom**:  to Plaintiff

24        d.  **How/ By what means**:  conversations and loan documents

e. **Who/Authority**:   representative/agents of ATLANTIC while acting within the
actual or ostensible scope of authority;

177.    By executing the loan agreement, Plaintiff unwittingly agreed to pay charges that
were actually improper and illegal charges, at a higher interest rate and points (finance charges) than
were actually available to him.

**Defendant GMAC**:

178.    Defendant GMAC is not the owner/beneficiary of the promissory note and security
instrument secured by the Property.  However, GMAC unilaterally held itself out as having the sole
authority to modify Plaintiff's loan. At all time relevant, Defendant GMAC has purposely held itself
out as having the sole authority to modify Plaintiff's loan when in fact Plaintiff's loan had been sold
to persons or entities unknown to Plaintiff.  Plaintiff contends this is a common practice of GMAC
to frustrate consumers and keep them from properly exercising their rights.

179.     Defendants suppressed and concealed these facts for the purpose of obtaining an
advantage or benefit over Plaintiff.

a. **When**:                In 2009-2010

b. **Where**:                Santa Cruz County, California

c. **To whom**:          to  Plaintiff

d. **How/ By what means**:        telephone conversations and correspondence

e. **Who/Authority**:   representative/agents of GMAC while acting within the actual
or ostensible scope of authority.

180.    Plaintiff is informed, believes and thereon alleges Defendant GMAC maintains
extensive audio recordings and/ or telephone call records.  On information and belief GMAC has
actual knowledge and information regarding the above conversations that occurred between Plaintiff
and GMAC representatives regarding Plaintiff's loan.

181.    The omitted information, as alleged herein, was material to Plaintiff in that had the information been disclosed, Plaintiff would not have entered into the loan.

**All Defendants**:

182.    15 U.S.C. § 1641(g), titled "Liability of Assignees," requires that when an entity purchases or is assigned the beneficial interest in a loan on a property, it must notify the borrower in writing within 30 days of when the loan is transferred.

183.    On February 8, 2011, MERS, as nominee for ATLANTIC, recorded a fabricated assignment of deed of trust assigning interest in Plaintiff's loan to U.S. Bank.  As discussed above, Plaintiff alleges that the recorded assignment was executed well after the closing date June 29, 2007 of the DBALT Trust to which it was allegedly sold, giving rise to a plausible inference that at least some part of the recorded assignment was fabricated. Plaintiff alleges that such conduct, if proven, constitutes a violation of Cal.Penal Code § 532f(a)(4).  The Code prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office that is known to be false, with the intent to defraud.  Therefore, HSBC is asserting ownership interests over the Property but has no standing or the capacity to foreclose.  .

184.    Defendants' recorded documents, telephone conversations, and correspondences to Plaintiff have fraudulently misled Plaintiff.  Defendants are purposely suppressing and concealing the true owner/beneficiary to frustrate Plaintiff's remedies.  In fact, Defendants have given Plaintiff no choice but to file this action which will ultimately lead to the true owner/beneficiary.

a.   **When**:                In 2009-2011

b.   **Where**:                 Santa Cruz County, California

c.   **To whom**:            to Plaintiff

d.   **How/ By what means**:        recorded documents, telephone conversations and correspondence

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

e.  **Who/Authority**:   representative/agents of Defendants while acting within the actual or ostensible scope of authority.

185.    Collectively, Defendants have created an unlawful scheme in which they attempt to evade, hide, frustrate, circumvent, minimize and shield themselves from any and all consumer protection statutes.

186.    Plaintiff could not have discovered these intentionally concealed facts by the exercise of ordinary care.

187.    Defendants disguised the transaction to create the appearance that "straw lender" was a properly chartered and registered financial institution, authorized to do business and to enter into the subject transaction.  In fact, the real party in interest was not disclosed to plaintiff, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme.

188.    Defendant MERS falsely named itself the beneficiary under the Notice of Default.

189.    Defendants GMAC, ETS and HSBC knowingly and willfully used the  void Assignment of Deed of Trust to claim an interest in Plaintiff's Note, foreclose on and sell Plaintiff's Property.

190.    Defendants knew that Plaintiff's Note had been securitized and that the documents they signed and recorded did not state true recitals of the facts pertaining to who owned the interests in Plaintiff's Note and who had authority to foreclose and sell Plaintiff's Property.

191.    Each defendant is an agent or employee of each other.  Each defendant was the agent of the other defendants, and all of the defendants acted within the scope of their agency or employment acted as an agent of another.  At all times each defendant committed the acts, defendant directed others to commit the acts, or permitted others to commit the acts alleged in this complaint.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case5:11-cv-00659-EJD   Document45   Filed07/01/11   Page41 of 52

192.     As such, this fraudulent scheme (which was in actuality a plan to trick plaintiff into signing what would become a negotiable security used to sell unregulated securities under fraudulent and changed terms from the original notes) was in fact a sham to use plaintiff's interest in the real property to collect interest in excess of the legal rate.

193.     The primary cause of this action is a widespread civil and criminal enterprise engaged in a pattern of racketeering activity across state lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during at least the past five years, as described in paragraphs 159 – 192 above.

194.     The predicate acts alleged here cluster around violations of federal law involving mortgage lending, bank regulations and consumer credits laws as alleged in this complaint along with violations of various California state laws concerning conveyance of notes and deeds of trust as alleged in this complaint. (See 15 U.S.C.§§1601 et seq., 1639 et.seq., 1681; 12 U.S.C. 2601 and California Civil Code §2923.5, California Commercial Code § 3602 and California Corporations Code §313, respectively.)

195.     Other RICO predicate acts were part of the overall conspiracy and pattern of racketeering *activity* alleged herein, *e.g.* mail fraud by transaction the false transactions over state lines, recording false documents and and fraud.  (See 18 U.S.C. §§1341 and 1344, respectively.), which provides in pertinent part: "…Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations…"

196.     Plaintiff alleges that the list of exhibits attached to this amended complaint, shows the false and fraudulent documents recorded with the Santa Cruz County Recorder's Office constitutes probable cause for granting all relief requested in this complaint. Plaintiff alleges that defendants did, each, act wrongfully to take and deprive him of him property, knowing that they, without his

1    knowledge converted his note and DOT to a mortgage-backed security, to charge him for insurance

2    and other forms of credit enhancements, which have paid plaintiff's note, thereby falsely claiming a

3    "default" on the obligation.

4        197.    Plaintiff's aallegations identify the time, place, and manner of each fraud plus the role

5    of each defendant in each scheme, as alleged in paragraphs 159 -192 above, and have alleged all

6    defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO

7    enterprise of individuals who were associated in fact and who did engage in, and whose activities

8    did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and

9    1962(b).

10        198.    During the pertinent time in question, all defendants did cooperate jointly and

11    severally in the commission of two or more of the RICO predicate acts that are itemized in the RICO

12    laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C.

13    1962(b), as alleged in paragraphs 159-192 above.

14        199.    Plaintiff further alleges that all defendants did commit two or more of the offenses

15    itemized above in a manner which they calculated and premeditated intentionally to threaten

16    continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the

17    RICO law at 18 U.S.C. 1962(b) *supra*, as alleged in paragraphs 159-192 above.

18        200.    Whenever references are made in this complaint to any act of any defendants, that

19    allegation shall mean that each defendant acted individually and jointly with the other defendants.

20        201.    Any allegation about acts of any corporate or other business defendant means that the

21    corporation or other business did the acts alleged to its officers, directors, employees, agents and/or

22    representatives while they were acting within the actual or ostensible scope of their authority.

23        202.    At all times each defendant committed the acts, defendant directed others to commit

24    the acts, or permitted others to commit the acts alleged in this complaint. Defendants' co-

1     conspirators are in a common scheme and plan.

2        203.     Additionally, some or all of the defendants acted as the agent of the other defendants,

3 and all of the defendants acted within the scope of their agency or is acting as an agent of another.

4        204.     Under the principles of respondent superior, the principal is liable for agents'

5 misconduct, including knowledge of, participation in, and benefit from a RICO enterprise.

6 Whenever references are made in this complaint to any act of any defendant, that allegation shall

7 mean that each defendant acted individually and jointly with the other defendants

8        205.     .At all relevant times, each defendant knew or realized that the other defendants were

9 engaging in or plan to engage in the violations of law alleged in the complaint. Knowing or realizing

10 that at the time defendants were engaging in and are planning to engage in unlawful conduct, each

11 defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to

12 and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and

13 abetted the other defendants in the unlawful conduct.

14        206.     At all relevant times, defendants have engaged in a conspiracy, common enterprise,

15 and common course of conduct, the purpose of which is to engage in the violations of law alleged in

16 the complaint.  This conspiracy, common enterprise, and common course of conduct continue to the

17 present.

18        207.     Defendants directly and through their agents violated plaintiff's privacy rights by

19 disclosing his private information without his knowledge, authorization or consent to potential

20 buyers of a mortgage-backed security investment.  This unauthorized disclosure of private

21 information is intrusive into the most private reaches of plaintiff's life, and does not include

22 information that is of a legitimate public concern. Plaintiff was harmed by the release of his social

23 security number by an increased  risk of theft form records that are under some third party control, to

24 which Plaintiff never agreed.   As a direct result of the actions of the defendants, plaintiff has

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1  suffered and continues to suffer damages.  As a proximate result of Defendant's actions, Plaintiff has

2  been harmed and continues to suffer further financial loss from the denial of credit or utility

3  services, higher insurance and credit rates and the inability to deal with the true holder of his note

4  and deed of trust to modify his mortgage.  Pplaintiff's damages as a result of the foregoing also

5  include direct losses associated with reduced credit scores, including, among others, unavailability

6  of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings,

7  increased costs of those service, as well as fees and costs, including, without limitations, attorneys'

8  fees and costs.

9        208.    At all relevant times, defendants have engaged in a conspiracy, common enterprise,

10  and common course of conduct, the purpose of which is to engage in the violations of law alleged in

11  the complaint.  This conspiracy, common enterprise, and common course of conduct continue to the

12  present.

13        209.    Plaintiff, being a lay person and not being an investment banker, securities dealer,

14  mortgage lender, or mortgage broker, reasonably relied upon the representations of the defendants in

15  agreeing to execute the mortgage loan documents. Plaintiff first learned of the actions of defendants,

16  including their failure to disclose and the fraud committed upon him in November 2010.  Any

17  applicable statute of limitations should run from this date.

**FIFTH CAUSE OF ACTION**
**Rescission – Mistake – Void Agreement**
**(Against All Defendants, except ETS)**

20        210.    Plaintiff re-alleges and incorporates by reference all paragraphs of this complaint as

21  though fully set forth herein below.

22        211.    The Restatement (Second) of Contract, § 17 states that "the formation of a contract

23  requires a bargain in which there is a manifestation of mutual assent. . ." The bargain between the

24  parties is `often referred to as the "meeting of the minds." A lack of meeting of the minds, a mistake

as to fact, can justify a rescission of the contract. "A mutual mistake, whether of fact or law, which

- 44 -

affects an essential element of the contract and is harmful to one of the parties, is subject to

rescission by the party harmed.  Where a mistake of one party at the time a contract was made as to

a basic assumption on which he made the contract has a material effect on the agreed exchange of

performances that is adverse to him, the contract is voidable by him if he does not bear the risk of

the mistake under the rule.   Restatement (Second) of Contracts, § 17(1). 232, comment 2.233 and

§153.

212.    Plaintiff alleges that had he known that the Lender was merely a "straw" lender and

not the party putting up the money for the mortgage and that he would be giving up the right of non-

judicial foreclosure to a disinterested third party mortgage backed security trust, he would not have

entered the transaction in the first place.

213.    Because as alleged above, once the note and deed of trust were conveyed to the

Deutsche Bank Alt-A Securities Inc.'s (DBALT) Mortgage Pass-Through Certificates,

Series 2007-OA4 Trust, the servicer was in charge of modification considerations, not the

lender or beneficiary.  Plaintiff's agreement was with the lender, not a later appointed

servicer.  Defendant's as servicers have no privity with the Servicer by which the servicer

can non-judicially foreclose on the Plaintiff.  Plaintiff did not agree in the Deed of Trust to

give the servicer the right to sell his property.

214.    Because of this mistake, the plaintiff's benefit from his loan agreement is far less than

he thought he would receive. Instead of a lender who had full authority to deal with his contractual

relationship and the economic value to the lender, the plaintiff received a relationship with a party

who lacked the full authority of the lender and lacked the economic incentive to modify the loan

rather than foreclose.

215.    The mistake was not a future contingency, but a reality present at the contract

formation: the defendants knew the securitization of the conduit loan would occur with certainty and

they knew no borrower/lender relationship was contemplated or planned as a result of the loan.

216.    It would be unconscionable for the defendants, having withheld material information

regarding the loans from plaintiff, to still receive the benefits of the loan.

- 45 -
**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

217.    The defendants knew that the plaintiff did not understand that the securitization of the loan would destroy the lender/borrower relationship.  He was giving the right to non-judicial foreclosure to an unnamed undisclosed third party, who was known to Defendants at the time of the signing of the DOT.

218.    Further, Plaintiff alleges that terms of the Payment Option ARM loan they were providing was so complicated in its terms that no reasonable person could possibly know the inner workings of negative amortization, recasting periods, impact on payments and the loan balance. The balloon Rider and ARM Rider are confusing and contradictory.  (See,Exhibit B, Bates pages nos: GAND000021 and GAND000023)  For example, Defendants caused the uncertainty and ambiguity as alleged herein; by  purposefully stating in the Truth in Lending Disclosure (TILD) that Plaintiff was paying a finance that was less than the Plaintiff was _actually_ paying.

219.    Defendants deceptively expressed and /or through their conduct and actions told Plaintiff his finance charge would be less than what it really was. Though the interest rate was stated, the net amount of the loan due and owing changed between the amortization date and the maturity date.  (See Exhibit B, bates page no.GAND000024, 3.b)  This means the finance charge was disclosed as less than it actually was. Defendants have breached the agreement by charging more than was disclosed on the TILD.  Defendants breached this agreement by charging more in finance charge.

220.    At all times relevant during the liability period, there existed a gross inequality of bargaining position between the parties to the loan contracts.  At all times relevant, Defendants unreasonably and unconscionably exploited their superior bargaining position and foisted upon Plaintiff extremely harsh, one-sided provisions in the contract, which Plaintiff was not made aware of an did not comprehend   Based on these extremely harsh, one-sided provisions and based on the material mistake in the formation of the contract, plaintiff is therefore, entitled to an order  rescinding the loan and/or declaring the loan void, invalid, and unenforceable.

221.    In addition, plaintiff request restitution and damages in an amount in excess of $75,000, the specific amount to be determined at trial.

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

**SIXTH CAUSE OF ACTION**
**Invasion of Constitutional Right to Privacy**
**(Against All Defendants except ETS )**

222.     Plaintiff re-alleges and incorporates by reference all paragraphs of this complaint as though fully set forth herein below.

223.     The guarantee of privacy granted to each Californian is a special and unique right embedded in the very first clause of the California Constitution. Article I, § 1 of the California Constitution, which provides:  "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Emphasis added). One class of legally recognized privacy interests, "informational privacy," includes "interests in precluding the dissemination or misuse of sensitive and confidential information."

224.     The California Constitution (Art. I, § 1) is self-executing and confers a right of action beyond the scope of the mere common law tort.

225.     The unauthorized disclosure of "private information" (confidential, nonpublic personal information, including such information as social security numbers, dates of birth, property values, bank and credit card account numbers, and other personal information) is a fundamental violation of  the inalienable right to privacy afforded all Californians. Plaintiff has a constitutionally protected privacy interest and right in his or private information.

226.     Plaintiff provided private information to the defendants as a requirement for obtaining a mortgage only. Plaintiff had a reasonable expectation that the defendants would preserve the privacy of plaintiff's private information and not use it to sell an interest in an mortgage-backed security investment to undisclosed third party.  Plaintiff expected his credit and information would be kept confidential in the confines of obtaining a mortgage for himself.

- 47 -
**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

Case5:11-cv-00659-EJD   Document45   Filed10/01/12   Page48 of 52

227.    Plaintiff entered into a financial transaction in which he believed the material terms to be vastly different than they actually were.  Plaintiff had been the recipient of representations by Atlantic Savings, and their agents about the terms of his loan.

228.    Atlantic Savings purposefully, willfully and with full knowledge procured Plaintiff's signature for the express purpose of garnering certain profits and to mislead  him into a financial transaction that was destined to fail.  Atlantic Savings knew that they were not the lender or creditor as defined by Federal and California laws and purposefully misrepresented their status as lender on the trust deed and note.

229.    Atlantic Savings and their successors and assigns received the fruits of this inaccurate financial transaction when it was allegedly placed into the Deutsche Bank Alt-A Securities Inc.'s (DBALT) Mortgage Pass-Through Certificates, Series 2007-OA4 ETS and GMAC foreclosed on Plaintiff's rightfully owned Property.

230.    Defendants herein breached this agreement by recording documents onto the Santa Cruz County Public Record without any right or authority under the deed of trust, note or statute.

231.    Plaintiff alleges, Defendants cannot establishing a defense to the disclosure of the existence of a countervailing interests that justify the invasion of Plaintiff's privacy.

232.    As a proximate result of Defendant's actions, Plaintiff has been harmed and continues to suffer further financial loss from the denial of credit or utility services, higher insurance and credit rates.

233.    Defendants directly and through their agents violated plaintiff's privacy rights by disclosing his private information without his knowledge, authorization or consent to potential buyers of a mortgage-backed security investment.  This unauthorized disclosure of private information is intrusive into the most private reaches of plaintiff's life, and does not include information that is of a legitimate public concern. Plaintiff was harmed by the release of his social

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1 | security number by an increased  risk of theft form records that are under some third party control, to

2 | which Plaintiff never agreed.

3 |      234.     Fundamental to privacy is the ability to control circulation of personal information.

4 | The proliferation of business records over which individuals have no control limits their ability to

5 | control their personal lives. Personal privacy is threatened by the information-gathering capabilities

6 | and activities of private business-and never more then when a financial institution that requires

7 | personal information to permit a consumer to buy a house and obtain it with the assertion and

8 | promise it will be safeguarded fails to safeguard that information.

9 |      235.     On information and belief, defendants began running credit checks on their borrowers

10 | to determine who was experiencing financial difficulties. These credit checks were outsourced,

11 | meaning that private data and other information was sent off-site. The goal was to develop

12 | information that could be used to further defendants' fraud involving the sale of collateralized

13 | securities and also to improperly provide information to those who already had purchased such

14 | collateralized securities in order to give defendants a tactical advantage.

15 |      236.     Defendants unlawfully disclosed the private and confidential information of plaintiff.

16 | On information and belief, third parties unlawfully used the private information acquired from

17 | defendants, thereby further damaging plaintiff.  By reason of the conduct alleged herein, defendants

18 | violated plaintiff's constitutional right of privacy and plaintiff has suffered special damages in an

19 | amount according to proof at trial. Had plaintiff known of the intended disclosure, at least he would

20 | have had the opportunity to decline.

21 |      237.     Further, as a proximate and foreseeable result of defendants' intentional disclosure of

22 | plaintiff's private information, plaintiff has suffered general damages- including pain and suffering

23 | and emotional distress- in an amount according to proof at trial.

24 |

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

238.    Defendants' conduct is willful, outrageous and pervasive, involving hundreds of thousands of California citizens. Not only did defendants abuse private information, willfully fail to maintain the security of the private information, and then disclose it to third parties without permission, but they took no material steps to retrieve the private information, concealed the extent of the violations.

239.    Without limiting the damages as described elsewhere in this complaint, plaintiff's damages as a result of the foregoing also include direct losses associated with identity theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those service, as well as fees and costs, including, without limitations, attorneys' fees and costs.

240.    Defendants acted with actual malice by disclosing plaintiff's private information, failing to cure the same, concealing the magnitude of the problem.

241.    Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and such further relief as is set forth below.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendants and each of them as follows:

1.    For an order compelling said defendants, and each of them, to transfer or release legal title and any alleged encumbrances thereon, and possession of the subject property to the plaintiff herein;

2.    For a declaration and determination that plaintiff is the rightful holder of title to the Subject property and that defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property;

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

3.      For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

4.      For a declaration that the foreclosure which was instituted be deemed and declared illegal and void, and that the foreclosure sale be deemed void;

5.      For attorney's fees according to the governing contract or by statute or otherwise reasonable attorneys' fees;

6.      For actual, compensatory and punitive damages;

7.       For costs of suit herein incurred;

8.      For applicable statutory fees for statutory violations;

9.      For pre-and post-judgment interest

10.     For such other further relief as the Court may deem just and proper.

Dated:  October 1, 2012              LAW OFFICES OF HOLLY S. BURGESS


By:   _/s/  **Holly S. Burgess**_____/
        HOLLY S. BURGESS
        Attorney for Plaintiff,
         GERALD GANDRUP

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  October 1, 2012                LAW OFFICES OF HOLLY S. BURGESS


By:   _/s/  **Holly S. Burgess**_____/
        HOLLY S. BURGESS
        Attorney for Plaintiff,
        GERALD GANDRUP

**SECOND AMENDED COMPLAINT – CASE NO. 5:11-CV-00659-EJD**

1                              **VERIFICATION**

2

3        I, Gerald Gandrup, declare as follows:

4        I am the Plaintiff in this action and have read the foregoing Second Amended Complaint.

5        Except for matters stated on information and belief, the facts stated therein are true of my

6   own knowledge, and as to those matters stated on information and belief, I believe them to be true.

7        I declare under penalty of perjury under the laws of the United States that the foregoing is

8   true and correct and that this verification was executed on October 1, 2012, at San Mateo County,

9   California.

10

11                                              Gerald Gandrup

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **Exhibit J**

**Notice of Voluntary Dismissal**

**2**

Holly S. Burgess (SBN 104757)
LAW OFFICES OF HOLLY S. BURGESS
660 Auburn Folsom Road, Suite 203
Auburn, CA  95661
Telephone:  (530) 889-8900
Facsimile:   (530) 820-1526
*hollyburgess@lohsb.com*

Attorney for Plaintiff
GERALD GANDRUP

THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GERALD GANDRUP,<br><br>                    Plaintiff,<br><br>           vs.<br><br>GMAC MORTGAGE, LLC fka GMAC<br>WHOLESALE MORTGAGE CORPORATION; a<br>Delaware limited liability company; EXECUTIVE<br>TRUSTEE SERVICES, LLC dba ETS<br>SERVICES, LLC, a Delaware limited liability<br>company; MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS, INC., a Delaware<br>corporation; ATLANTIC SAVINGS OF<br>AMERICA, a California corporation (suspended);<br>HSBC BANK USA, N.A., as Trustee of Deutsche<br>Bank Alt-A Securities Inc.'s (DBALT) Mortgage<br>Pass-Through Certificates, Series 2007-OA4; ALL<br>PERSONS KNOWN OR UNKNOWN<br>CLAIMING AN INTEREST IN 200 Gregory<br>Court, Scotts Valley, California 95066; and<br>DOES 1-20, inclusive,<br><br>                    Defendants. | ) **CASE NO:  5:11-CV-00659-EJD**<br>)<br>)<br>)<br>) **NOTICE OF VOLUNTARILY**<br>) **DISMISSAL WITHOUT PREJUDICE**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

- 1-

*Gandrup v GMAC Mortgage, LLC, et al., Case No.5:11-CV-00659-EJD*

**NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE**

**NOTICE IS HEREBY GIVEN that pursuant to Fed. R. Civ. Pro. 41(a)** Plaintiff

GERALD GANDRUP voluntarily dismisses the above-captioned action without prejudice as to all

Defendants.


DATED:  October 22, 2012          **LAW OFFICES OF HOLLY S. BURGESS**


                                 By: **/s/  *Holly S. Burgess***                .
                                 HOLLY S. BURGESS
                                 Attorney for Plaintiff

*Gandrup v GMAC Mortgage, LLC, et al., Case No.5:11-CV-00659-EJD*

**NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE**

**<u>Exhibit K</u>**

**Voluntary Dismissal Order**

**2**

Holly S. Burgess (SBN 104757)
LAW OFFICES OF HOLLY S. BURGESS
660 Auburn Folsom Road, Suite 203
Auburn, CA  95661
Telephone:  (530) 889-8900
Facsimile:   (530) 820-1526
*hollyburgess@lohsb.com*

Attorney for Plaintiff
GERALD GANDRUP

IT IS SO ORDERED

Judge Edward J. Davila

10/23/2012

THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GERALD GANDRUP,<br><br>     Plaintiff,<br><br>  vs.<br><br>GMAC MORTGAGE, LLC fka GMAC<br>WHOLESALE MORTGAGE CORPORATION; a<br>Delaware limited liability company; EXECUTIVE<br>TRUSTEE SERVICES, LLC dba ETS<br>SERVICES, LLC, a Delaware limited liability<br>company; MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS, INC., a Delaware<br>corporation; ATLANTIC SAVINGS OF<br>AMERICA, a California corporation (suspended);<br>HSBC BANK USA, N.A., as Trustee of Deutsche<br>Bank Alt-A Securities Inc.'s (DBALT) Mortgage<br>Pass-Through Certificates, Series 2007-OA4; ALL<br>PERSONS KNOWN OR UNKNOWN<br>CLAIMING AN INTEREST IN 200 Gregory<br>Court, Scotts Valley, California 95066; and<br>DOES 1-20, inclusive,<br><br>     Defendants. | **CASE NO:  5:11-CV-00659-EJD**<br><br>**NOTICE OF VOLUNTARILY<br>DISMISSAL WITHOUT PREJUDICE** |

- 1-

*Gandrup v GMAC Mortgage, LLC, et al., Case No.5:11-CV-00659-EJD*

**NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE**

Case5:11-cv-00659-EJD   Document60   Filed10/23/12   Page2 of 2

1

2      **NOTICE IS HEREBY GIVEN that pursuant to Fed. R. Civ. Pro. 41(a)** Plaintiff

3 GERALD GANDRUP voluntarily dismisses the above-captioned action without prejudice as to all

4 Defendants.   The Clerk shall close this file.

5

6 DATED:  October 22, 2012        **LAW OFFICES OF HOLLY S. BURGESS**

7

              By**:**___/s/___***Holly S. Burgess***_____.

8                HOLLY S. BURGESS
               Attorney for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*Gandrup v GMAC Mortgage, LLC, et al., Case No.5:11-CV-00659-EJD*

**NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE**