1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              April 17, 2014

19              3:03 PM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    Telephone Conference, on the Record, Regarding Burgin Claim

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Sara Davis

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        250 West 55th Street

6        New York, NY 10019

7

8  BY:    JORDAN A. WISHNEW, ESQ. (TELEPHONICALLY)

9        JONATHAN PETTS, ESQ. (TELEPHONICALLY)

10

11

12  ALSO APPEARING:

13        MARCENE L. BURGIN, Pro Se (TELEPHONICALLY)

14        DENNIS G. BURGIN, Pro Se (TELEPHONICALLY)

15

16

17

18

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

4

1               P R O C E E D I N G S

2          THE COURT:  All right.  We're on the record in

3  Residential Capital; it's number 12-12020.  This is in

4  connection with the claim number 4494 of Dennis G. and Marcene

5  L. Burgin.  The Court previously issued an opinion that

6  overruled the objection of the debtors, really now, the Trust.

7  It was overruled without prejudice.  The opinion was entered on

8  March 17th, 2014.

9          May I ask who's on the phone?

10          MS. BURGIN:  Marcene --

11          THE COURT:  Go ahead.  Ms. Burgin, are you -- Mrs.

12  Burgin, you're on the phone?

13          MS. BURGIN:  Yes, I am.

14          THE COURT:  Okay.  And is your husband on the -- also

15  on the phone?

16          MS. BURGIN:  He is here, yes.

17          THE COURT:  Okay, all right.  And for the debtors?

18          MR. WISHNEW:  Good afternoon, Your Honor.  Jordan

19  Wishnew, Morrison & Foerster for the ResCap Borrower Claims

20  Trust.

21          THE COURT:  Okay.

22          MR. WISHNEW:  With me is my colleague Jonathan Petts.

23          THE COURT:  All right.  Mr. Wishnew, would you address

24  first what the status of the matter is and any suggestions

25  that -- I guess I got a message this morning the matter's not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

5

1    been resolved, so further scheduling has been --

2          MR. WISHNEW:  That's right, Your Honor.  So after we

3    spoke the last -- two weeks ago, we continued our conversation

4    with Ms. Burgin.  What we asked of her was basically an

5    itemization of her damages, and trying to understand the basis

6    for her damages and understand her rationale for the fact that

7    our freezing of the home equity line of credit caused her harm.

8    And she kindly provided us with materials that discussed the

9    checking account feature of the HELOC notes.  And while there

10   certainly is a checking account feature available, it is all

11   one and the same account.

12          That is, that the checking account feature allows her

13   to take advances against the home equity line and then pay it

14   back.  However, if the line is frozen because of a default or

15   some other condition, then the ability to take advances stops.

16   Based on our examination of the materials and our view of the

17   agreement, it's the borrower claims trust's position at this

18   point in time that there's no secondary rights to essentially

19   utilize the account after a default and after the line's been

20   frozen.

21          Having said all that, we did ask Ms. Burgin to make an

22   offer, a settlement offer.  She did make that offer.  We

23   countered that offer.  There was a second response from Ms.

24   Burgin and we made another response.  We are still not -- we

25   haven't come to a consensual resolution yet.  And at this point

**RESIDENTIAL CAPITAL, LLC, ET AL.**

6

1    in time, I'm not sure if discussions will be -- will produce a

2    further agreement.  It's the borrower claims trust's position

3    that at this point in time the line of credit was properly

4    frozen, that there was not a right given to her after the

5    freezing of the line to continue to use the checking account

6    feature that that -- that the ability to use that feature was

7    a -- as long as the line was available, the checking account

8    feature was available.  If the line was not available, then the

9    checking account feature was not available.

10          So in our opinion, at least it's our position at this

11   point in time that with the valid freezing of the line, there

12   was no ability to use the checking account feature.  And so

13   there's really no damages to Ms. Burgin.  So we've -- our

14   settlement offers have reflected an attempt to try and resolve

15   this, but there's only so far we can go in trying to come to a

16   consensual resolution.

17          THE COURT:  Okay.  Ms. Burgin?  Or Mr. Burgin?

18   Whoever wants to respond?  And let me just say before you

19   respond, because if this matter goes to an evidentiary hearing,

20   I have to be the trier of fact.  I don't get involved in the

21   precise settlement position, so I don't want to know what the

22   back and forth has been.  I certainly always encourage the

23   parties to try and reach a consensual settlement, but I don't

24   want to get into the details of what each side offered or

25   counteroffered, et cetera.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

7

1          But go ahead, Ms. Burgin.

2          MS. BURGIN:  Okay, Your Honor.  I think I understand

3  what you're saying there, and this is really important and

4  we -- we're taking it very seriously.  And this isn't about

5  just getting some extra money to take a vacation or buy

6  something extra or anything like that.  This is about figuring

7  out if GMAC had the right to stop us from using that checking

8  account feature that allowed us to pay that loan off sooner.

9  And so when they asked for -- or I believe, actually, that it

10 was you that referenced the attorneys' understanding the loan

11 product a little better, and I was able to find most of the

12 documentation that was used originally to sell that loan.  And

13 it actually referenced the GMAC loan which was called the

14 Freedom Home Ownership Accelerator -- that was the name of the

15 loan -- and how it allowed borrowers to combine a home equity

16 line of credit with a checking account, which to me shows that

17 the two are separate entities.  How can you combine something

18 that's one from the beginning?

19          And that feature -- then they provided -- or I gave

20 them copies of a graph that the company actually had online

21 where we could go in and plug in our income and what we would

22 put into that checking account and then what we would take out.

23 And it would figure out how that would accelerate the payment

24 of the loan.  And it showed that the loan would be paid off in

25 12.7 years at that rate.  So to me, that -- I mean, that means

**RESIDENTIAL CAPITAL, LLC, ET AL.**

8

 1   that our loan would have been paid off in five more years, had

 2   we been able to use that particular part of that loan by

 3   putting our income in there.  And at that time, we were paid --

 4   and still are, actually -- on commission.  And so we do about

 5   eighty percent of our income in one quarter of the year.  So we

 6   would park a substantial amount of money into that account and

 7   then it would sit there and lower the principal, thus the

 8   interest, on a daily basis.  And we would draw out of that for

 9   our living expenses all year.

10          So I went over and over Section 10 which is the only

11   place I can find in the original loan documents that references

12   what GMAC could or couldn't do, and I can find nowhere that

13   gives them the permission to restrict us from putting our own

14   money into that checking account and then access that money,

15   therefore, lowering that.  So I still feel that the way I read

16   it, there is some liability there.  So I haven't felt that

17   we've been treated very fairly as we've looked at this.

18          The first time we -- well, it was actually the second

19   time; we spoke right after the court call last time, and so

20   then they called me and wanted me to make an offer and gave me

21   an hour-and-a-half to do it.  And then when I said I couldn't

22   put it together that fast, he did back it up some.  But then I

23   made the offer and then waited a week and a half before ever

24   hearing from them.  And then went through the same -- a similar

25   thing again.  So I just feel that they're not taking this as

**RESIDENTIAL CAPITAL, LLC, ET AL.**

9

1  seriously as we feel this matter is, and we're trying to just

2  make it so that we get the proper compensation for what they

3  did so that we can continue to stay in our home, basically.

4           THE COURT:  May I ask you, what is the balance of the

5  loan today?

6           MS. BURGIN:  It's right about 450,000 dollars.

7           THE COURT:  Okay.

8           All right, so I think where we go from here, since the

9  parties have been unable to resolve the matter -- I mean, I'll

10 ask this question, but I'm not sure that this is the

11 appropriate case.  But, I mean, sometimes having a mediator, a

12 neutral to work on trying to resolve the issues, resolve the

13 case sometimes helps.  And I don't know; have you discussed

14 that, Mr. Wishnew, with the Burgins?

15          MS. BURGIN:  I'm sorry, Your Honor.  If that was

16 addressed at me, the line got very fuzzy there and I --

17          THE COURT:  Okay, I'm sorry.  So let me repeat it and

18 you can --

19          MS. BURGIN:  Oh, that's much better.  Thank you.

20          THE COURT:  Yeah, that's because I turned -- you know,

21 I did what I'm not supposed to do; I turned my face away from

22 where the microphone is, so you caught me.  And usually the

23 reporter's very good about making sure that I'm always talking

24 to the microphone.

25          And the question I raised was about having a mediator,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

10

1    see if that would assist in trying to reach a resolution.  The

2    reason I say that is -- and there is some cost in having a

3    mediator; I want to make that clear -- if you proceed with the

4    litigation, and that's what it essentially is, if the

5    debtors -- if the Trust objects to your claim, I've already

6    determined that it's a contested matter and an evidentiary

7    hearing is going to be required, and that's going to require

8    you to travel here for it, because I don't take testimony over

9    the telephone.  And so, it adds to the expense of doing it, and

10   expense for the Trust as well, in going ahead.  Sometimes a

11   mediator can listen -- a neutral can listen to both sides and

12   suggest -- either encourage the parties to exchange offers and

13   then at the end of the day, if necessary, provide the

14   mediator's view about what an appropriate disposition would be.

15           Ms. Burgin, did you and Mr. Wishnew or anyone from the

16   Trust discuss the possibility of having this mediated?

17           MS. BURGIN:  No, we did not.

18           THE COURT:  Okay.  Mr. Wishnew, do you want to address

19   that issue?

20           MR. WISHNEW:  We did not specifically address the

21   possibility of mediation, Your Honor.  But certainly, if

22   there's a more efficient way to bring this to a resolution

23   without litigation, I would think that the Borrower Claims

24   Trust would be open to that.

25           THE COURT:  So I don't want to know where the parties

**RESIDENTIAL CAPITAL, LLC, ET AL.**

11

1    are on settlement.  I don't know whether either of you think

2    you're within striking distance of being able to reach a

3    settlement.  Ms. Burgin, I can just tell you from my years of

4    experience as a practicing lawyer before I became a judge,

5    people frequently start off pretty far apart, tend to narrow

6    the differences and what a lot of people say, and I've always

7    thought, is the best settlement is one that neither side is

8    particularly happy with at the end of the day, but makes sense.

9            So, I mean, this isn't going to -- let me make clear

10   that if the matter isn't resolved soon, I'm going to enter an

11   order that's going to set it down for an evidentiary hearing.

12   And that's going to require exchange of exhibits.  And I don't

13   know, Mr. Wishnew, are you going to want to take any

14   depositions?

15           MR. WISHNEW:  I don't believe so, Your Honor.  I think

16   this is really an interpretation of underlying agreements --

17           THE COURT:  Well, you --

18           MR. WISHNEW:  -- I --

19           THE COURT:  You say that, but I don't know what

20   documents Ms. Burgin found or how GMAC advertised this Freedom

21   Home Owners Accelerator.  But that's going to be relevant

22   evidence.  So I didn't get the agreement, the full agreement

23   initially, but I requested it and finally got that.  And I

24   raised some issues about it in the opinion that I wrote.  But

25   that isn't necessarily going to be the determinative evidence;

**RESIDENTIAL CAPITAL, LLC, ET AL.**

12

1  it's all well and good for the agreement to say what it says,

2  but if GMAC was advertising this differently, it may create

3  more problems for you than you think you have.  But I haven't

4  seen it, I haven't seen the evidence, and if I have to,

5  obviously, I'll evaluate all the evidence.

6           I guess, here's what I would like to do.  I'd like to

7  give -- well, I'd like to give both sides a week to see

8  whether, on your own, you can reach a resolution.  Failing

9  that, discuss having a mediator.  Frankly, I don't know whether

10  a mediator would help at this point or not.  I don't know where

11  the parties are on settlement, and whether they're just too far

12  apart, too hardened in their positions, but I want you to

13  discuss that.

14      So within two weeks, Mr. Wishnew, you ought to advise the

15  Court in writing, and it'd be a fairly simple writing, that

16  either the parties have agreed to mediate and when that's going

17  to happen, or that the parties are unable to resolve the matter

18  and have not agreed to proceed with mediation.  And I don't

19  want to know what each side's position is just the bottom line

20  whether the parties have agreed to mediate or not.

21      I want to make clear, Ms. Burgin, that if the parties

22  decide that they want to go forward with litigation, that's

23  fine with me.  So I'm not -- you shouldn't feel that you're

24  somehow going to get the short shrift if you don't settle it or

25  if you don't agree to mediate.  You also understand that while

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1    I'm --

2              MR. WISHNEW:  Jordan Wishnew.

3              THE COURT:  -- while I'm --

4              COURTCALL RECORDING:  Left.

5              THE COURT:  Were you cut off, Mr. Wishnew, and now

6    back on?

7              MR. PETTS:  Your Honor, this is Jonathan Petts from

8    Morrison & Foerster.  I think my colleague just got

9    disconnected, but I'm here to --

10             THE COURT:  Okay.

11             MR. PETTS:  -- to take down your thoughts.

12             THE COURT:  All right.  So I try to be accommodating

13   to pro se, people without attorneys --

14             COURTCALL RECORDING:  Joined.

15             THE COURT:  -- but when it comes --

16             Okay.  I understand, Mr. Wishnew, you were cut off,

17   but your colleague just said he was -- he'll fill you in on

18   what -- nothing dramatic transpired with you gone.

19             MR. WISHNEW:  Sorry, Your Honor.

20             THE COURT:  That's okay.

21             Ms. Burgin, what I would say is; if we go to an

22   evidentiary hearing, I try to be reasonably accommodating to

23   pro ses, but I apply the rules.  I apply the rule of evidence.

24   I apply the rules of law.  You'll have to be here.  If you have

25   an attorney, that's great.  If you don't, that's fine.  Nothing

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1    forces you to do it, but you're going to have to comply with

2    the Rules of Evidence and that sort of things.  So it's not

3    going to be an easy task, but that's fine if that's what you

4    decide to do.

5           But I'm going to give it another two weeks.  Then if

6    there is no agreement either to settle it or mediate in a

7    very -- relatively short time -- by short time I'm talking

8    about a month after you agree, you got to mediate and see

9    whether you can get it resolved -- and if not, then I'm going

10   to enter a scheduling order.  And the scheduling order is going

11   to -- let me work backwards.  We'll probably do a telephone

12   conference because I want to find a date that's mutually

13   convenient for both sides.  I'm going to set an evidentiary

14   hearing.  And I work backwards from that for when I require

15   both sides to exchange and mark as exhibits whatever documents

16   they intend to use at the hearing.  So if you have -- if you

17   located additional documents you want to use, if some of it's

18   electronic, you'll put it on a flash drive, and you can prepare

19   to offer that.  You ought to talk to Mr. Wishnew about whether

20   they're going to be any objections to any of that evidence.

21          But we're going to work backwards from the hearing

22   date.  I'm going to give you a date when you have to provide

23   whatever written evidence you intend to offer.  And I'm going

24   to ask -- and Mr. Wishnew's got to do the same thing --

25   whatever written evidence the trust intends to offer.  And I'm

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1    probably going to require at least a brief description of the

2    anticipated direct testimony that each side would offer.

3    Ordinarily, if there were lawyers involved, I require

4    written -- that the testimony be in writing under oath.  I

5    might not do that in the case with pro se litigants, but I want

6    each side -- I don't want any surprises.  I want each side to

7    have an understanding of this is what we expect to offer and

8    know what the other side's going to offer.  But for now, we'll

9    just let this move just a little bit longer.

10         And I would say, Ms. Burgin, that if I schedule it for

11   an evidentiary hearing -- so we're sort of the middle of

12   April -- I would think that an evidentiary hearing is going to

13   happen in June.  And we'll work backwards from then about what

14   the dates when various things have to be filed in the Court.  I

15   would set down in a written order, so that you would understand

16   exactly what has to be provided to the opposing side, what has

17   to be filed to the Court, when that has to happen.  But I will

18   give this another couple of weeks.  If you agree on

19   mediation --

20         MS. BURGIN:  Yes, Your Honor, I -- I would like to

21   settle it now.  I mean it's -- one question that I do have is

22   now they keep telling me that they don't have the power to --

23   to negotiate any farther.  So where does that leave us?

24         THE COURT:  Well --

25         MR. WISHNEW:  If -- Your Honor, if I can address that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1          THE COURT:  Go ahead, Mr. Wishnew.

2          MR. WISHNEW:  Thank you, Your Honor.  Obviously, Ms.

3     Burgin, at this point, we've had this status conference with

4     Judge Glenn.  We are going to report back to our client, the

5     Borrower Claims Trust, convey to them exactly what Judge Glenn

6     has just described, and reengage with them and see what we can

7     do to try and bring us to resolutions.  So either myself or Mr.

8     Petts will follow up with you in the coming days once we've got

9     a chance to speak with the Borrower Claims Trust

10    representatives and see how we're going to move forward.

11         THE COURT:  Yeah, the only think I would add, and it

12    may be that the scope of the authority of the Trust counsel is

13    limited and they can't go beyond it, but I can just tell you in

14    the many years that I practiced, it was not uncommon for me to

15    negotiate with the other side and wind up with a deal I've made

16    clear I didn't have authority for but get to a position where I

17    would say that okay, we've reached a proposed resolution that

18    I'm prepared to recommend to my client, and that we'll do so

19    and get back to you within a few days or something like that.

20         I'm sure Mr. Wishnew will report back to his client

21    and will certainly report back to his client that we're looking

22    at an evidentiary hearing in June with filings beforehand and

23    that the Court is particularly interested in whatever documents

24    or electronic information that GMAC held out with respect to

25    the program under which the Burgins arranged their HELOC and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1  this combination of the checking account feature.

2          As I said, what I would say, Ms. Burgin -- and I said

3  this in the opinion -- that I think I understand where the

4  Trust is coming from.  When I read the agreement, and you don't

5  really dispute that they had the ability to freeze the line,

6  the line of credit, and when you deposited -- I'll refer to it

7  as, excess funds, excess amounts above which the minimum

8  required payments -- when you deposited it, it becomes their

9  money.  You specifically do it to reduce the outstanding

10  balance.  But if the line is frozen, I think I understand the

11  Trust's position, that the borrower no longer had the ability

12  to make additional draws because you say it was your money;

13  they say no, they paid it down to reduce the outstanding

14  balance, it was our money, and the agreement expressly provided

15  we could freeze it.

16          So I understand their position, but I understand yours

17  as well.  And I am very interested in knowing what was the

18  advertising material or any other material that GMAC had

19  available, so I'm going to want that as well.  Let me just

20  think whether there's anything -- any last thoughts I have.

21          Oh, Mr. Wishnew, and I think I forgot to raise this

22  issue last time -- it's identified in my opinion -- and that is

23  whether the Burgins had defaulted in making any payments.  In

24  the papers that the debtor and now the Trust has submitted,

25  that allegation was made.  I think that the affidavit that was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1  submitted, the Horst declaration, alleged that the Burgins were

2  in default in making payments.  And Ms. Burgin, during one of

3  the telephone hearings, expressly disputed that, and that

4  seemed to have fallen away somewhat.  What is the Trust's

5  position whether the Burgins were in default in making any

6  payments?

7        MR. WISHNEW:  Your Honor, I don't specifically recall.

8  I know that we've looked into it just off the top of my head.

9  I don't have the materials in front of me.  I don't have reason

10  to believe that our position is different from what was earlier

11  stated, but I don't have the specific facts in front of me to

12  also --

13        THE COURT:  Okay.  When we have --

14        MR. WISHNEW:  -- further support that.

15        THE COURT:  When we have the next call, I want to

16  know, very specifically, whether the debtors contend that the

17  Burgins were in default of required payments under the HELOC,

18  and if so, what payments and when because I must say the debtor

19  also was unable to provide copies of the letter that they

20  purportedly sent to Ms. Burgin freezing the line.  I had

21  entered an order requiring it to be produced, and what I got

22  was a supplemental declaration that said we can't find it, but

23  here's the form.

24        Well, the form didn't say anything about a default in

25  payments.  So I want to know, and Ms. Burgin and Mr. Burgin are

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**19**

1  entitled to know, does the debtor contend that they were in

2  default of making any required payments; if so, when, what

3  amounts, et cetera.  That was certainly in the filings that the

4  debtor made.  I flagged the issue in the written opinion, and

5  it hasn't been satisfactorily answered.  I want to know on what

6  basis the Trust will proceed in arguing that the line was

7  frozen; is it solely because of a decline in value of the

8  property or is it also because of a default in payments.  Okay.

9         MR. WISHNEW:  Understood, Your Honor.

10        THE COURT:  Okay.

11        Ms. Burgin, anything that either you or your husband

12  want to add at this point?

13        MS. BURGIN:  I don't think so, Your Honor, other than

14  I -- I know that they can't support that we were late with

15  anything because they had complete control over that.  It was

16  an automatic withdrawal, and there was never a time when there

17  wasn't money in the account.  So I guess that would -- that

18  would be it.  And I -- we are, you know, anxious to put this

19  behind us and move on.

20        THE COURT:  Sure.

21        MS. BURGIN:  So we're anxious to work with them.

22        THE COURT:  Well, I'm anxious for you all to put this

23  behind you and move on.  But sometimes things don't get

24  resolved consensually, and the Court has to decide them, and

25  I'm certainly prepared to go forward and do that, okay.  So,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1  we'll --

2         MS. BURGIN:  Thank you, Your Honor.

3         THE COURT:  I'll expect to hear back within the next

4  two weeks how we're proceeding.  If we're proceeding further

5  toward a hearing, Mr. Wishnew, I'll ask you to set up another

6  telephone conference at a time that's convenient for both you

7  and the Burgins.  That will probably be the last time we do it

8  by telephone.  After that, I'm going to enter a scheduling

9  order, and we'll just proceed in accordance with that.  And

10  then a hearing will be set at a time that, hopefully, will be

11  convenient to everybody.  Okay?

12         MR. WISHNEW:  Understood.

13         THE COURT:  All right.

14         MR. WISHNEW:  Thank you, Your Honor.

15         THE COURT:  Thanks, very much.  All right, we're

16  adjourned.

17      (Whereupon these proceedings were concluded at 3:32 PM)

18

19

20

21

22

23

24

25

21

1

2              C E R T I F I C A T I O N

3

4    I, Sara Davis, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8    _____

9    SARA DAVIS

10   AAERT Certified Electronic Transcriber CET**D-567

11

12   eScribers

13   700 West 192nd Street, Suite #607

14   New York, NY 10040

15

16   Date:  April 18, 2014

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

April 17, 2014

## A

**ability (5)**
5:15;6:6,12;17:5,
11
**able (3)**
7:11;8:2;11:2
**above (1)**
17:7
**accelerate (1)**
7:23
**Accelerator (2)**
7:14;11:21
**access (1)**
8:14
**accommodating (2)**
13:12,22
**accordance (1)**
20:9
**account (16)**
5:9,10,11,12,19;
6:5,7,9,12;7:8,16,22;
8:6,14;17:1;19:17
**actually (5)**
7:9,13,20;8:4,18
**add (2)**
16:11;19:12
**additional (2)**
14:17;17:12
**address (4)**
4:23;10:18,20;
15:25
**addressed (1)**
9:16
**adds (1)**
10:9
**adjourned (1)**
20:16
**advances (2)**
5:13,15
**advertised (1)**
11:20
**advertising (2)**
12:2;17:18
**advise (1)**
12:14
**affidavit (1)**
17:25
**afternoon (1)**
4:18
**again (1)**
8:25
**against (1)**
5:13
**ago (1)**
5:3
**agree (3)**
12:25;14:8;15:18
**agreed (3)**
12:16,18,20
**agreement (8)**
5:17;6:2;11:22,22;

## 12:1;14:6;17:4,14

**agreements (1)**
11:16
**ahead (4)**
4:11;7:1;10:10;
16:1
**allegation (1)**
17:25
**alleged (1)**
18:1
**allowed (2)**
7:8,15
**allows (1)**
5:12
**always (3)**
6:22;9:23;11:6
**amount (1)**
8:6
**amounts (2)**
17:7;19:3
**answered (1)**
19:5
**anticipated (1)**
15:2
**anxious (3)**
19:18,21,22
**apart (2)**
11:5;12:12
**apply (3)**
13:23,23,24
**appropriate (2)**
9:11;10:14
**April (1)**
15:12
**arguing (1)**
19:6
**arranged (1)**
16:25
**assist (1)**
10:1
**attempt (1)**
6:14
**attorney (1)**
13:25
**attorneys (1)**
13:13
**attorneys' (1)**
7:10
**authority (2)**
16:12,16
**automatic (1)**
19:16
**available (6)**
5:10;6:7,8,8,9;
17:19
**away (2)**
9:21;18:4

## B

**back (9)**
5:14;6:22;8:22;
13:6;16:4,19,20,21;

## 20:3

**backwards (4)**
14:11,14,21;15:13
**balance (3)**
9:4;17:10,14
**Based (1)**
5:16
**basically (2)**
5:4;9:3
**basis (3)**
5:5;8:8;19:6
**became (1)**
11:4
**becomes (1)**
17:8
**beforehand (1)**
16:22
**beginning (1)**
7:18
**behind (2)**
19:19,23
**best (1)**
11:7
**better (2)**
7:11;9:19
**beyond (1)**
16:13
**bit (1)**
15:9
**Borrower (7)**
4:19;5:17;6:2;
10:23;16:5,9;17:11
**borrowers (1)**
7:15
**both (5)**
10:11;12:7;14:13,
15;20:6
**bottom (1)**
12:19
**brief (1)**
15:1
**bring (2)**
10:22;16:7
**Burgin (35)**
4:5,10,11,12,13,16;
5:4,21,24;6:13,17,17;
7:1,2;9:6,15,19;
10:15,17;11:3,20;
12:21;13:21;15:10,
20;16:3;17:2;18:2,
20,25,25;19:11,13,
21;20:2
**Burgins (7)**
9:14;16:25;17:23;
18:1,5,17;20:7
**buy (1)**
7:5

## C

**call (2)**
8:19;18:15
**called (2)**

## 7:13;8:20

**can (15)**
6:15;7:17;8:11,12;
9:3,18;10:11,11;
11:3;12:8;14:9,18;
15:25;16:6,13
**Capital (1)**
4:3
**case (3)**
9:11,13;15:5
**caught (1)**
9:22
**caused (1)**
5:7
**certainly (6)**
5:10;6:22;10:21;
16:21;19:3,25
**cetera (2)**
6:25;19:3
**chance (1)**
16:9
**checking (12)**
5:9,10,12;6:5,7,9,
12;7:7,16,22;8:14;
17:1
**claim (2)**
4:4;10:5
**Claims (6)**
4:19;5:17;6:2;
10:23;16:5,9
**clear (4)**
10:3;11:9;12:21;
16:16
**client (4)**
16:4,18,20,21
**colleague (3)**
4:22;13:8,17
**combination (1)**
17:1
**combine (2)**
7:15,17
**coming (2)**
16:8;17:4
**commission (1)**
8:4
**company (1)**
7:20
**compensation (1)**
9:2
**complete (1)**
19:15
**comply (1)**
14:1
**concluded (1)**
20:17
**condition (1)**
5:15
**conference (3)**
14:12;16:3;20:6
**connection (1)**
4:4
**consensual (3)**
5:25;6:16,23

**consensually (1)**
19:24
**contend (2)**
18:16;19:1
**contested (1)**
10:6
**continue (2)**
6:5;9:3
**continued (1)**
5:3
**control (1)**
19:15
**convenient (1)**
14:13;20:6,11
**conversation (1)**
5:3
**convey (1)**
16:5
**copies (2)**
7:20;18:19
**cost (1)**
10:2
**counsel (1)**
16:12
**countered (1)**
5:23
**counteroffered (1)**
6:25
**couple (1)**
15:18
**COURT (39)**
4:2,5,11,14,17,21,
23;6:17;8:19;9:4,7,
17,20;10:18,25;
11:17,19;12:15;13:3,
5,10,12,15,20;15:14,
17,24;16:1,11,23;
18:13,15;19:10,20,
22,24;20:3,13,15
**COURTCALL (2)**
13:4,14
**create (1)**
12:2
**credit (4)**
5:7;6:3;7:16;17:6
**cut (2)**
13:5,16

## D

**daily (1)**
8:8
**damages (3)**
5:5,6;6:13
**date (3)**
14:12,22,22
**dates (1)**
15:14
**day (2)**
10:13;11:8
**days (2)**
16:8,19
**deal (1)**

16:15
**debtor (4)**
17:24;18:18;19:1,4
**debtors (4)**
4:6,17;10:5;18:16
**decide (3)**
12:22;14:4;19:24
**declaration (2)**
18:1,22
**decline (1)**
19:7
**default (8)**
5:14,19;18:2,5,17,
24;19:2,8
**defaulted (1)**
17:23
**Dennis (1)**
4:4
**deposited (2)**
17:6,8
**depositions (1)**
11:14
**described (1)**
16:6
**description (1)**
15:1
**details (1)**
6:24
**determinative (1)**
11:25
**determined (1)**
10:6
**differences (1)**
11:6
**different (1)**
18:10
**differently (1)**
12:2
**direct (1)**
15:2
**disconnected (1)**
13:9
**discuss (3)**
10:16;12:9,13
**discussed (2)**
5:8;9:13
**discussions (1)**
6:1
**disposition (1)**
10:14
**dispute (1)**
17:5
**disputed (1)**
18:3
**distance (1)**
11:2
**documentation (1)**
7:12
**documents (5)**
8:11;11:20;14:15,
17;16:23
**dollars (1)**
9:6

**down (4)**
11:11;13:11;15:15;
17:13
**dramatic (1)**
13:18
**draw (1)**
8:8
**draws (1)**
17:12
**drive (1)**
14:18
**during (1)**
18:2

**E**

**earlier (1)**
18:10
**easy (1)**
14:3
**efficient (1)**
10:22
**eighty (1)**
8:5
**either (6)**
10:12;11:1;12:16;
14:6;16:7;19:11
**electronic (2)**
14:18;16:24
**encourage (2)**
6:22;10:12
**end (2)**
10:13;11:8
**enter (3)**
11:10;14:10;20:8
**entered (2)**
4:7;18:21
**entities (1)**
7:17
**entitled (1)**
19:1
**equity (3)**
5:7,13;7:15
**essentially (2)**
5:18;10:4
**et (2)**
6:25;19:3
**evaluate (1)**
12:5
**everybody (1)**
20:11
**evidence (9)**
11:22,25;12:4,5;
13:23;14:2,20,23,25
**evidentiary (8)**
6:19;10:6;11:11;
13:22;14:13;15:11,
12;16:22
**exactly (2)**
15:16;16:5
**examination (1)**
5:16
**excess (2)**

17:7,7
**exchange (3)**
10:12;11:12;14:15
**exhibits (2)**
11:12;14:15
**expect (2)**
15:7;20:3
**expense (2)**
10:9,10
**expenses (1)**
8:9
**experience (1)**
11:4
**expressly (2)**
17:14;18:3
**extra (2)**
7:5,6

**F**

**face (1)**
9:21
**fact (2)**
5:6;6:20
**facts (1)**
18:11
**Failing (1)**
12:8
**fairly (2)**
8:17;12:15
**fallen (1)**
18:4
**far (3)**
6:15;11:5;12:11
**farther (1)**
15:23
**fast (1)**
8:22
**feature (11)**
5:9,10,12;6:6,6,8,9,
12;7:8,19;17:1
**feel (4)**
8:15,25;9:1;12:23
**felt (1)**
8:16
**few (1)**
16:19
**figure (1)**
7:23
**figuring (1)**
7:6
**filed (2)**
15:14,17
**filings (2)**
16:22;19:3
**fill (1)**
13:17
**finally (1)**
11:23
**find (5)**
7:11;8:11,12;
14:12;18:22
**fine (3)**

12:23;13:25;14:3
**first (2)**
4:24;8:18
**five (1)**
8:1
**flagged (1)**
19:4
**flash (1)**
14:18
**Foerster (2)**
4:19;13:8
**follow (1)**
16:8
**forces (1)**
14:1
**forgot (1)**
17:21
**form (2)**
18:23,24
**forth (1)**
6:22
**forward (3)**
12:22;16:10;19:25
**found (1)**
11:20
**Frankly (1)**
12:9
**Freedom (2)**
7:14;11:20
**freeze (2)**
17:5,15
**freezing (4)**
5:7;6:5,11;18:20
**frequently (1)**
11:5
**front (2)**
18:9,11
**frozen (5)**
5:14,20;6:4;17:10;
19:7
**full (1)**
11:22
**funds (1)**
17:7
**further (4)**
5:1;6:2;18:14;20:4
**fuzzy (1)**
9:16

**G**

**gave (2)**
7:19;8:20
**given (1)**
6:4
**gives (1)**
8:13
**Glenn (2)**
16:4,5
**GMAC (7)**
7:7,13;8:12;11:20;
12:2;16:24;17:18
**goes (1)**

6:19
**Good (3)**
4:18;9:23;12:1
**graph (1)**
7:20
**great (1)**
13:25
**guess (3)**
4:25;12:6;19:17

**H**

**half (1)**
8:23
**happen (3)**
12:17;15:13,17
**happy (1)**
11:8
**hardened (1)**
12:12
**harm (1)**
5:7
**head (1)**
18:8
**hear (1)**
20:3
**hearing (13)**
6:19;8:24;10:7;
11:11;13:22;14:14,
16,21;15:11,12;
16:22;20:5,10
**hearings (1)**
18:3
**held (1)**
16:24
**HELOC (3)**
5:9;16:25;18:17
**help (1)**
12:10
**helps (1)**
9:13
**here's (2)**
12:6;18:23
**home (6)**
5:7,13;7:14,15;9:3;
11:21
**Honor (16)**
4:18;5:2;7:2;9:15;
10:21;11:15;13:7,19;
15:20,25;16:2;18:7;
19:9,13;20:2,14
**hopefully (1)**
20:10
**Horst (1)**
18:1
**hour-and-a-half (1)**
8:21
**husband (2)**
4:14;19:11

**I**

**identified (1)**

17:22
**important (1)**
  7:3
**income (3)**
  7:21;8:3,5
**information (1)**
  16:24
**initially (1)**
  11:23
**intend (2)**
  14:16,23
**intends (1)**
  14:25
**interest (1)**
  8:8
**interested (2)**
  16:23;17:17
**interpretation (1)**
  11:16
**into (5)**
  6:24;7:22;8:6,14;
  18:8
**involved (2)**
  6:20;15:3
**issue (3)**
  10:19;17:22;19:4
**issued (1)**
  4:5
**issues (2)**
  9:12;11:24
**itemization (1)**
  5:5

**J**

**Joined (1)**
  13:14
**Jonathan (2)**
  4:22;13:7
**Jordan (2)**
  4:18;13:2
**judge (3)**
  11:4;16:4,5
**June (2)**
  15:13;16:22

**K**

**keep (1)**
  15:22
**kindly (1)**
  5:8
**knowing (1)**
  17:17

**L**

**last (5)**
  5:3;8:19;17:20,22;
  20:7
**late (1)**
  19:14
**law (1)**

13:24
**lawyer (1)**
  11:4
**lawyers (1)**
  15:3
**least (2)**
  6:10;15:1
**leave (1)**
  15:23
**Left (1)**
  13:4
**letter (1)**
  18:19
**liability (1)**
  8:16
**limited (1)**
  16:13
**line (16)**
  5:7,13,14;6:3,5,7,8,
  11:7;16:9;16:12:19;
  17:5,6,10;18:20;19:6
**line's (1)**
  5:19
**listen (2)**
  10:11,11
**litigants (1)**
  15:5
**litigation (3)**
  10:4,23;12:22
**little (2)**
  7:11;15:9
**living (1)**
  8:9
**loan (11)**
  7:8,10,12,13,15,24,
  24;8:1,2,11;9:5
**located (1)**
  14:17
**long (1)**
  6:7
**longer (2)**
  15:9;17:11
**looked (2)**
  8:17;18:8
**looking (1)**
  16:21
**lot (1)**
  11:6
**lower (1)**
  8:7
**lowering (1)**
  8:15

**M**

**makes (1)**
  11:8
**making (5)**
  9:23;17:23;18:2,5;
  19:2
**many (1)**
  16:14
**Marcene (2)**

4:4,10
**March (1)**
  4:8
**mark (1)**
  14:15
**material (2)**
  17:18,18
**materials (3)**
  5:8,16;18:9
**matter (7)**
  4:24;6:19;9:1,9;
  10:6;11:10;12:17
**matter's (1)**
  4:25
**May (4)**
  4:9;9:4;12:2;16:12
**mean (5)**
  7:25;9:9,11;11:9;
  15:21
**means (1)**
  7:25
**mediate (5)**
  12:16,20,25;14:6,8
**mediated (1)**
  10:16
**mediation (3)**
  10:21;12:18;15:19
**mediator (6)**
  9:11,25;10:3,11;
  12:9,10
**mediator's (1)**
  10:14
**message (1)**
  4:25
**microphone (2)**
  9:22,24
**middle (1)**
  15:11
**might (1)**
  15:5
**minimum (1)**
  17:7
**money (8)**
  7:5;8:6,14,14;17:9,
  12,14;19:17
**month (1)**
  14:8
**more (3)**
  8:1;10:22;12:3
**morning (1)**
  4:25
**Morrison (2)**
  4:19;13:8
**most (1)**
  7:11
**move (4)**
  15:9;16:10;19:19,
  23
**Mrs (1)**
  4:11
**much (2)**
  9:19;20:15
**must (1)**

18:18
**mutually (1)**
  14:12
**myself (1)**
  16:7

**N**

**name (1)**
  7:14
**narrow (1)**
  11:5
**necessarily (1)**
  11:25
**necessary (1)**
  10:13
**negotiate (2)**
  15:23;16:15
**neither (1)**
  11:7
**neutral (2)**
  9:12;10:11
**next (2)**
  18:15;20:3
**notes (1)**
  5:9
**nowhere (1)**
  8:12
**number (2)**
  4:3,4

**O**

**oath (1)**
  15:4
**objection (1)**
  4:6
**objections (1)**
  14:20
**objects (1)**
  10:5
**obviously (2)**
  12:5;16:2
**off (7)**
  7:8,24;8:1;11:5;
  13:5,16;18:8
**offer (12)**
  5:22,22,22,23;8:20,
  23;14:19,23,25;15:2,
  7,8
**offered (1)**
  6:24
**offers (2)**
  6:14;10:12
**once (1)**
  16:8
**one (6)**
  5:11;7:18;8:5;
  11:7;15:21;18:2
**online (1)**
  7:20
**only (3)**
  6:15;8:10;16:11

**open (1)**
  10:24
**opinion (7)**
  4:5;7;6:10;11:24;
  17:3,22;19:4
**opposing (1)**
  15:16
**order (6)**
  11:11;14:10,10;
  15:15;18:21;20:9
**Ordinarily (1)**
  15:3
**original (1)**
  8:11
**originally (1)**
  7:12
**ought (2)**
  12:14;14:19
**out (5)**
  7:7,22,23;8:8;
  16:24
**outstanding (2)**
  17:9,13
**over (4)**
  8:10,10;10:8;19:15
**overruled (2)**
  4:6,7
**own (2)**
  8:13;12:8
**Owners (1)**
  11:21
**Ownership (1)**
  7:14

**P**

**paid (4)**
  7:24;8:1,3;17:13
**papers (1)**
  17:24
**park (1)**
  8:6
**part (1)**
  8:2
**particular (1)**
  8:2
**particularly (2)**
  11:8;16:23
**parties (9)**
  6:23;9:9;10:12,25;
  12:11,16,17,20,21
**pay (2)**
  5:13;7:8
**payment (1)**
  7:23
**payments (9)**
  17:8,23;18:2,6,17,
  18,25;19:2,8
**people (3)**
  11:5,6;13:13
**percent (1)**
  8:5
**permission (1)**

8:13
**Petts (5)**
4:22;13:7,7,11;
16:8
**phone (3)**
4:9,12,15
**place (1)**
8:11
**plug (1)**
7:21
**PM (1)**
20:17
**point (7)**
5:18,25;6:3,11;
12:10;16:3;19:12
**position (10)**
5:17;6:2,10,21;
12:19;16:16;17:11,
16;18:5,10
**positions (1)**
12:12
**possibility (2)**
10:16,21
**power (1)**
15:22
**practiced (1)**
16:14
**practicing (1)**
11:4
**precise (1)**
6:21
**prejudice (1)**
4:7
**prepare (1)**
14:18
**prepared (2)**
16:18;19:25
**pretty (1)**
11:5
**previously (1)**
4:5
**principal (1)**
8:7
**pro (3)**
13:13,23;15:5
**probably (3)**
14:11;15:1;20:7
**problems (1)**
12:3
**proceed (4)**
10:3;12:18;19:6;
20:9
**proceeding (2)**
20:4,4
**proceedings (1)**
20:17
**produce (1)**
6:1
**produced (1)**
18:21
**product (1)**
7:11
**program (1)**

16:25
**proper (1)**
9:2
**properly (1)**
6:3
**property (1)**
19:8
**proposed (1)**
16:17
**provide (3)**
10:13;14:22;18:19
**provided (4)**
5:8;7:19;15:16;
17:14
**purportedly (1)**
18:20
**put (5)**
7:22;8:22;14:18;
19:18,22
**putting (2)**
8:3,13

**Q**

**quarter (1)**
8:5

**R**

**raise (1)**
17:21
**raised (2)**
9:25;11:24
**rate (1)**
7:25
**rationale (1)**
5:6
**reach (4)**
6:23;10:1;11:2;
12:8
**reached (1)**
16:17
**read (2)**
8:15;17:4
**really (5)**
4:6;6:13;7:3;
11:16;17:5
**reason (2)**
10:2;18:9
**reasonably (1)**
13:22
**recall (1)**
18:7
**recommend (1)**
16:18
**record (1)**
4:2
**RECORDING (2)**
13:4,14
**reduce (2)**
17:9,13
**reengage (1)**
16:6

**refer (1)**
17:6
**referenced (2)**
7:10,13
**references (1)**
8:11
**reflected (1)**
6:14
**relatively (1)**
14:7
**relevant (1)**
11:21
**repeat (1)**
9:17
**report (3)**
16:4,20,21
**reporter's (1)**
9:23
**representatives (1)**
16:10
**requested (1)**
11:23
**require (5)**
10:7;11:12;14:14;
15:1,3
**required (4)**
10:7;17:8;18:17;
19:2
**requiring (1)**
18:21
**ResCap (1)**
4:19
**Residential (1)**
4:3
**resolution (6)**
5:25;6:16;10:1,22;
12:8;16:17
**resolutions (1)**
16:7
**resolve (5)**
6:14;9:9,12,12;
12:17
**resolved (4)**
5:1;11:10;14:9;
19:24
**respect (1)**
16:24
**respond (2)**
6:18,19
**response (2)**
5:23,24
**restrict (1)**
8:13
**right (12)**
4:2,17,23;5:2;6:4;
7:7;8:19;9:6,8;13:12;
20:13,15
**rights (1)**
5:18
**rule (1)**
13:23
**rules (3)**
13:23,24;14:2

**S**

**same (3)**
5:11;8:24;14:24
**satisfactorily (1)**
19:5
**saying (1)**
7:3
**schedule (1)**
15:10
**scheduling (4)**
5:1;14:10,10;20:8
**scope (1)**
16:12
**se (2)**
13:13;15:5
**second (2)**
5:23;8:18
**secondary (1)**
5:18
**Section (1)**
8:10
**seemed (1)**
18:4
**sell (1)**
7:12
**sense (1)**
11:8
**sent (1)**
18:20
**separate (1)**
7:17
**seriously (2)**
7:4;9:1
**ses (1)**
13:23
**set (5)**
11:11;14:13;15:15;
20:5,10
**settle (3)**
12:24;14:6;15:21
**settlement (8)**
5:22;6:14,21,23;
11:1,3,7;12:11
**short (3)**
12:24;14:7,7
**showed (1)**
7:24
**shows (1)**
7:16
**shrift (1)**
12:24
**side (7)**
6:24;11:7;15:2,6,6,
16;16:15
**sides (4)**
10:11;12:7;14:13,
15
**side's (2)**
12:19;15:8
**similar (1)**
8:24

**simple (1)**
12:15
**sit (1)**
8:7
**solely (1)**
19:7
**somehow (1)**
12:24
**sometimes (4)**
9:11,13;10:10;
19:23
**somewhat (1)**
18:4
**soon (1)**
11:10
**sooner (1)**
7:8
**sorry (3)**
9:15,17;13:19
**sort (2)**
14:2;15:11
**speak (1)**
16:9
**specific (1)**
18:11
**specifically (4)**
10:20;17:9;18:7,16
**spoke (2)**
5:3;8:19
**start (1)**
11:5
**stated (1)**
18:11
**status (2)**
4:24;16:3
**stay (1)**
9:3
**still (3)**
5:24;8:4,15
**stop (1)**
7:7
**stops (1)**
5:15
**striking (1)**
11:2
**submitted (2)**
17:24;18:1
**substantial (1)**
8:6
**suggest (1)**
10:12
**suggestions (1)**
4:24
**supplemental (1)**
18:22
**support (2)**
18:14;19:14
**supposed (1)**
9:21
**sure (5)**
6:1;9:10,23;16:20;
19:20
**surprises (1)**

12-12020-mg    Doc 6802    Filed 04/21/14    Entered 04/21/14 09:50:51    Main Document
Pg 26 of 26
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

April 17, 2014

15:6

**T**

**talk (1)**
14:19
**talking (2)**
9:23;14:7
**task (1)**
14:3
**telephone (5)**
10:9;14:11;18:3;
20:6,8
**telling (1)**
15:22
**tend (1)**
11:5
**testimony (3)**
10:8;15:2,4
**Thanks (1)**
20:15
**therefore (1)**
8:15
**thought (1)**
11:7
**thoughts (2)**
13:11;17:20
**thus (1)**
8:7
**today (1)**
9:5
**together (1)**
8:22
**top (1)**
18:8
**toward (1)**
20:5
**transpired (1)**
13:18
**travel (1)**
10:8
**treated (1)**
8:17
**trier (1)**
6:20
**Trust (13)**
4:6,20;10:5,10,16,
24;14:25;16:5,9,12;
17:4,24;19:6
**trust's (4)**
5:17;6:2;17:11;
18:4
**try (5)**
6:14,23;13:12,22;
16:7
**trying (5)**
5:5;6:15;9:1,12;
10:1
**turned (2)**
9:20,21
**two (5)**
5:3;7:17;12:14;
14:5;20:4

**U**

**unable (3)**
9:9;12:17;18:19
**uncommon (1)**
16:14
**under (3)**
15:4;16:25;18:17
**underlying (1)**
11:16
**Understood (2)**
19:9;20:12
**up (4)**
8:22;16:8,15;20:5
**use (6)**
6:5,6,12;8:2;14:16,
17
**used (1)**
7:12
**using (1)**
7:7
**usually (1)**
9:22
**utilize (1)**
5:19

**V**

**vacation (1)**
7:5
**valid (1)**
6:11
**value (1)**
19:7
**various (1)**
15:14
**view (2)**
5:16;10:14

**W**

**waited (1)**
8:23
**wants (1)**
6:18
**way (2)**
8:15;10:22
**week (2)**
8:23;12:7
**weeks (5)**
5:3;12:14;14:5;
15:18;20:4
**Whereupon (1)**
20:17
**who's (1)**
4:9
**wind (1)**
16:15
**WISHNEW (30)**
4:18,19,22,23;5:2;
9:14;10:15,18,20;
11:13,15,18;12:14;

13:2,5,16,19;14:19;
15:25;16:1,2,20;
17:21;18:7,14;19:9;
20:5,12,14
**Wishnew's (1)**
14:24
**withdrawal (1)**
19:16
**within (4)**
11:2;12:14;16:19;
20:3
**without (3)**
4:7;10:23;13:13
**work (6)**
9:12;14:11,14,21;
15:13;19:21
**writing (3)**
12:15,15;15:4
**written (5)**
14:23,25;15:4,15;
19:4
**wrote (1)**
11:24

**Y**

**year (2)**
8:5,9
**years (4)**
7:25;8:1;11:3;
16:14

**1**

**10 (1)**
8:10
**12.7 (1)**
7:25
**12-12020 (1)**
4:3
**17th (1)**
4:8

**2**

**2014 (1)**
4:8

**3**

**3:32 (1)**
20:17

**4**

**4494 (1)**
4:4
**450,000 (1)**
9:6